UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                        :

In re                                :        **Chapter 11**

                                :

**CHASSIX HOLDINGS, INC.,** *et al.*,   :        **Case No. 15-_____ (___)**

                                :

                                :        **(Joint Administration Pending)**

                **Debtors.**[1]    :

                                :
------------------------------------------------------x

## DECLARATION OF J. MARK ALLAN
## PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2

    I, J. Mark Allan, make this declaration under 28 U.S.C. § 1746:

    1.    I am the President of Chassix Holdings, Inc. ("**Chassix Holdings**"), and

the President and Chief Executive Officer of UC Holdings, Inc. ("**UC Holdings**") and Chassix,

Inc. ("**Chassix**"). I also serve as the President and, in certain instances, the Chief Executive

Officer, for each of Chassix's domestic subsidiaries. I have served in these capacities since May

12, 2014. Prior to assuming these positions, I served as the President of International Operations

for Chassix. On March 12, 2015 (the "**Commencement Date**"), Chassix Holdings, UC

Holdings, Chassix, and each of their domestic subsidiaries (collectively, the "**Debtors**," and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

together with their non-Debtor subsidiaries, the "**Enterprise**") each commenced a case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").[2]

2.    I am knowledgeable and familiar with the business and financial affairs of the Debtors.  Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge, and information concerning the operations of the Debtors and the casting and machining industries.  Unless otherwise indicated, the financial information contained herein, and in the schedules attached hereto, is unaudited and provided on a consolidated basis for the Enterprise, which includes certain of its non-Debtor subsidiaries.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.

3.    This Declaration is submitted pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") for the purpose of apprising the Court and other parties in interest of the circumstances that compelled the commencement of these chapter 11 cases and in support of (i) the Debtors' chapter 11 petitions and (ii) the motions and applications that the Debtors have filed with the Court, including, but not limited to, the "first-day motions" (the "**First-Day Pleadings**").  I am authorized to submit this Declaration on behalf of the Debtors.

---

[2] Based on information and belief, venue for the Debtors' chapter 11 cases is proper before this Court, pursuant to 28 U.S.C. §§ 1408 and 1409, as Debtor Automotive Properties of New York, LLC is a New York State limited liability company formed in September 2001, and, therefore, has been domiciled in this district for at least one hundred and eighty days prior to the Commencement Date.

WEIL:\95271116\1\35076.0003

**Preliminary Statement**

4.      The Debtors appear before the Court with a prenegotiated chapter 11 plan of reorganization that will enable them to right-size their capital structure, reduce their operational overhead, and successfully restructure their operations.  The Debtors have reached an agreement on the terms of a financial and operational restructuring with their major stakeholders, including an ad hoc committee comprised of holders of approximately 72% of the Debtors' senior secured notes and approximately 80% of the Debtors' unsecured notes (the "**Informal Committee of Noteholders**"), Platinum Equity Advisors LLC, the Debtors' prepetition private equity sponsor, and certain affiliated entities and investment funds (collectively, "**Platinum Equity**"), and all of the Debtors' largest customers, including Ford Motor Company ("**Ford**"), General Motors LLC ("**GM**"), FCA US LLC f/k/a Chrysler Group LLC ("**FCA**"), Nissan North America, Inc. ("**Nissan**"), and BMW Manufacturing Co., LLC ("**BMW**" and together with Ford, GM, FCA, and Nissan, collectively, the "**OEM Customers**"), which will result in a significant and substantial infusion of new capital in the Debtors in the form of new debtor-in-possession and exit financing.  The Debtors further anticipate exiting chapter 11 with a 68% reduction in their funded indebtedness and substantial improvements to their prospects for long-term stability and profitability.[3]  Specifically, pursuant to the prearranged chapter 11 plan of reorganization that has been filed contemporaneously herewith (as may be amended, modified or supplemented, the "**Plan**"), the Debtors are proposing a restructuring that will achieve:

(a)      Approximately $250 million in debtor-in-possession financing comprised of a new $150 million revolving asset based lending facility to be provided by PNC Bank, National Association and a new $100 million term loan (which will convert to an exit term

---

[3] Estimated reduction in funded debt calculated based on the Debtors' expected draw on their Revolving Exit Facility (as defined in the Plan) on the effective date of the Plan.

loan at emergence) to be provided by the Debtors' prepetition secured noteholders, to facilitate operations in chapter 11;

(b)     An infusion of $50 million by certain secured noteholders in the form of an additional exit term loan at emergence, as well as a commitment from the ABL DIP Lenders to work in good faith on acceptable terms for converting the $150 million revolving asset based lending facility to an exit asset based lending facility, that will provide ongoing liquidity for the Debtors post-emergence;

(c)     Conversion of approximately $375 million of the Debtors' senior secured notes and $158 million of the Debtors' unsecured notes to equity;

(d)     Agreements with the OEM Customers on long-term accommodations that will provide the Debtors with approximately $45 million in annual price increases new business and programs, as well as certain other valuable accommodations and protections, including waivers of setoff and plan distributions on account of the OEM Customers' substantial claims against the Debtors;

(e)     Prompt emergence from chapter 11; and

(f)     Pro rata distributions to holders of allowed General Unsecured Claims subject to certain conditions set forth in the Plan.

5.      The Plan provides for a comprehensive restructuring of the Debtors' prepetition obligations, preserves the going-concern value of the Debtors' businesses, maximizes creditor recoveries, provides for an equitable distribution to the Debtors' stakeholders and protects the jobs of employees.

6.      The agreements that the Debtors have reached with the OEM Customers are central to the Plan.  Pursuant to the Accommodation Agreements (defined below), which the Debtors have filed contemporaneously herewith for Court approval, the Debtors will receive long-term accommodations and pricing relief from the OEM Customers for the benefit of their estates, creditors and other stakeholders.  In addition to the substantial pricing and new business awards mentioned above, these valuable accommodations include the following:

4

(a)     A right of last refusal on certain future programs;

(b)     A continuation of certain interim accommodation implemented prior to the Commencement Date with respect to the Debtors' facility in Bristol, Indiana (the "**Bristol Facility**") designed to fund the Debtors' operating losses at the Bristol Facility;

(c)     A waiver by the OEM Customers of certain significant fees and expenses including expenses relating to premium and expedited freight, quality spill charges, outage costs, and third-party advisor fees and expenses;

(d)     significant liquidity enhancement from the acceleration of payment terms on outstanding purchase orders from the OEM Customers' standard payment terms;

(e)     Restrictions on the OEM Customers' ability to resource programs to the Debtors' competitors; and

(f)     Agreements by the OEM Customers to waive and/or limit their ability to setoff or recoup charges against amounts owed to the Debtors.

7.     In exchange for these accommodations, the Debtors have committed to continue to produce and deliver component parts to the OEM Customers during the term of the Accommodation Agreements, as well as to provide certain assistance in connection with any resourcing activities that may be permitted under the agreement.  The Debtors have further agreed to provide the OEM Customers with certain limited access rights to utilize the Debtors' facilities and equipment in the event there is a substantial likelihood the OEM Customers' production will be interrupted.  These accommodations provide the Debtors with significant value and are an essential component of the Debtors' Plan as well as for their long-term prospects for successes and sustainability.

WEIL:\95271116\1\35076.0003

8.      In addition, the Plan provides for a significant deleveraging of the

Debtors' balance sheet post-emergence as summarized in the chart below.

| Pre-Petition Capital Structure | | Post-Emergence Capital Structure | |
|---|---|---|---|
| **Prepetition Revolving ABL Facility** | $135 million[4] | **Revolving Exit Facility** | $55 million[5] |
| **Secured Notes Due 2018** | $375 million | **Converted Exit Term Loan** | $100 million |
| **Unsecured Notes Due 2018** | $158 million | **Additional Exit Term Loan** | $50 million |
| **Capital Lease Obligations** | $12 million | **Capital Lease Obligations** | $12 million |
| **Total:** | **Approx. $680 million** | **Total:** | **Approx. $217 million** |

9.      The Plan also implements a global release and settlement of numerous

Debtor-creditor and inter-creditor issues with the Debtors' existing equity sponsor, Platinum

Equity, and the members of the Informal Committee of Noteholders (the "**Global Settlement**").

Under the Plan, and in accordance with the Global Settlement, the holders of Allowed Secured

Note Claims will receive their Pro Rata share of approximately 97.5% of the New Common

Stock (subject to dilution).  In addition, as described in further detail below, under the terms of

the Global Settlement, and in consideration of each of their substantial contributions to the

Debtors' chapter 11 cases, (a) the Unsecured Noteholders (as defined below) will receive their

pro rata share of approximately 2.5% (subject to dilution) of the Reorganized Debtors' new

common stock and warrants to purchase an additional 5% of the New Common Stock (the "**New

Warrants**") and (b) Platinum Equity will receive a release, as set forth in the Plan.  The Plan

further provides for distributions to holders of Allowed General Unsecured Claims.  The terms of

the Global Settlement, including the release and indemnification provisions incorporated in the

---

[4] Approximate amount drawn on $150 Prepetition Revolving ABL Facility as of Commencement Date.

[5] Estimated amount to be drawn on $150 Revolving Exit Facility on the effective date of the Plan.

WEIL:\95271116\1\35076.0003

Plan, are integral parts of the Plan and have been agreed to, and are supported by, the Debtors and the members of the Informal Committee of Noteholders.

10.    As set forth below, the Debtors faced an unprecedented sequence of events and circumstances during 2014 that ultimately led to the commencement of these chapter 11 cases. A combination of operational and financial difficulties due to, among other things, underpriced contracts and programs, compounded by a marked spike in the demand for automobile production in North America at a time when there was limited capacity in the machining and casting sectors, overwhelmed the Debtors' manufacturing facilities and capabilities. This perfect storm of events resulted in an onslaught of quality issues and missed release dates that significantly increased the Debtors' costs of manufacturing. These issues were most pronounced at the Bristol Facility, where the Debtors experienced precipitous losses that grew exponentially to over $16 million per month primarily due to significant premium and expedited freight charges and third-party consultant fees and expenses. By the fourth quarter of 2014, these operational issues—which had snowballed at a rate that neither the Debtors, their customers nor any of their other constituents had anticipated – had severely impacted the Debtors' cash flows and erased any operating profit they had hoped to achieve due to the increase in production demand.

11.    Thus, in November of 2014—facing a severe liquidity crisis—the Debtors and their professionals commenced good faith negotiations with the Informal Committee of Noteholders, the OEM Customers, and the Debtors' existing equity sponsor, Platinum Equity, to devise a comprehensive restructuring of the Debtors' businesses and provide the Debtors with much needed liquidity in the interim. As a result, on March 11, 2015, the Debtors reached an agreement with their key constituencies on the terms of the Plan described above, which

WEIL:\95271116\1\35076.0003

contemplates an operational restructuring and a recapitalization of the Debtors' balance sheet. To evidence their support of the Debtors' restructuring, certain of the parties executed the Restructuring Support Agreement (as herein defined), a copy of which is annexed hereto as **Exhibit "A."** In addition to securing support of the Plan in the form of the Restructuring Support Agreement, as described in further detail below, the Debtors have also secured $250 million in debtor-in-possession financing to provide them with sufficient liquidity to operate during the chapter 11 cases.

12.    By commencing these chapter 11 cases, the Debtors are seeking to effectuate their proposed restructuring and maximize their long-term growth prospects and operating performance.   The Debtors believe that the contemplated prearranged reorganization will enable them to emerge from these chapter 11 cases as a robust, well-capitalized global supplier of chassis sub-frame components and powertrain products strongly aligned with their customers' needs.

13.    This Declaration is intended to provide a summary overview of the Debtors' businesses and the need for a restructuring pursuant to chapter 11 of the Bankruptcy Code.  Section I describes the nature of the Debtors' businesses.  Section II describes the Debtors' current capital structure.  Section III describes the circumstances that compelled the commencement of the chapter 11 cases and the Debtors' plan for reorganization, including a summary and description of the Plan and the Restructuring Support Agreement.  Section IV provides a summary of the First Day Pleadings and factual bases for the relief requested therein. Section V identifies the attached schedules of information required by Local Rule 1007-2.

## I.

## The Debtors' Businesses

14.     Chassix is a leading global manufacturer and supplier of aluminum and iron chassis sub-frame components and powertrain products with both casting and machining capabilities.  The Debtors are based in Southfield, Michigan and serve a diverse customer base that includes both original equipment manufacturers ("**OEMs**") and Tier One suppliers.  For the twelve months ended December 31, 2014, the Debtors generated approximately $1.37 billion in revenue on a consolidated basis.  As of December 31, 2014, the Debtors had approximately $833 million in assets and $784 million in liabilities on a consolidated basis.

15.     The Debtors are currently one of the only suppliers of casted and machined parts such as steering knuckles and control arm components with global manufacturing capabilities in each of North America, South America, Asia and Europe.  As of the Commencement Date, the Debtors employed approximately 3,500 employees, as well as several hundred temporary workers, in fifteen manufacturing facilities located throughout the United States, including facilities in New York, Georgia, Indiana, Massachusetts, Michigan, and Tennessee.

16.     Chassix launched in 2013, and was a result of the integration of two separate businesses.  The Debtors' two business lines—machining and casting—were vertically integrated through the combination of the two businesses in December of 2012.   The following chart summarizes certain relevant aspects of the Debtors' corporate structure as of the Commencement Date.  A more detailed summary of the Debtors' current organizational structure is attached hereto as **Exhibit "B."**

WEIL:\95271116\1\35076.0003

## Capital Structure as of the Commencement Date



WEIL:\95271116\1\35076.0003

**A.  The Debtors' Operations**

17.    Chassix is one of the only suppliers of casted and machined parts with manufacturing capabilities in each of North America, South America, Europe, and China.  The Debtors are the sole source provider on nearly all of the OEM platforms for which they supply component parts.  All of the Debtors' operating facilities have full development, design, engineering, and testing capabilities.

18.    The Debtors and their subsidiaries operate twenty-three manufacturing facilities across six countries, providing safety critical automotive components, having content on approximately 64% of the largest platforms in North America.  Their product mix maintains an even balance among trucks, minivans and SUVs, as well as small and medium size cars and cross-over vehicles.  The Debtors supply component parts to the largest automotive manufacturers in the world, including General Motors, Ford, Fiat/Chrysler, Renault/Nissan, BMW, Volkswagen, and Daimler, as well as other global automotive OEMs and Tier One suppliers.  The Debtors' contracted programs relate to nearly all of the high volume vehicles produced in North America, including, without limitation:

(a)    **Chrysler**:  Jeep Grand Cherokee, Chrysler 300, Dodge Challenger, Dodge Charger, Dodge Durango and Dodge Ram;

(b)    **GM**:  Chevy Cruze, Chevy Malibu, Chevy Impala, Chevy Silverado, GMC Sierra, Chevy Tahoe, GMC Yukon, Cadillac Escalade, GMC Acadia, Buick Enclave, Chevy Corvette, Cadillac SRX, Cadillac XTS and Chevy Traverse;

(c)    **Ford**:  F-150, Fusion, Explorer, Mustang, Taurus, Edge and Transit;

(d)    **Nissan**:  Altima, Maxima, Rogue and Pathfinder; and

(e)    **BMW**:  X5 and X6.

11

*Chassis Products*

19.    The Debtors have fully integrated design, development, testing, casting,

machining and assembly capabilities across a wide range of aluminum, ductile iron, and steel

chassis components.

*Representative Chassis Products*



20.    The Debtors primary chassis products include steering knuckles, sub-

frames and control arms.  Steering knuckles, which comprise the Debtors' largest product

category, are highly engineered components that, together with the steering arm, allow the wheel

to pivot.  Approximately 50% of the steering knuckles sold by the Debtors are aluminum, with

the remainder manufactured from ductile iron.  Other chassis components produced by the

Debtors include wheel hubs, spindles, brake calipers and brackets.  Safety critical chassis

components are designed into OEM platforms and homologated, or crash-tested, in accordance

12

with federal safety standards.  Chassis products were responsible for approximately 97% of the

Debtors' revenue for the fiscal year ended December 31, 2014.  The following table describes

the Debtors' chassis products:

| Product | | Description |
|---|---|---|
| Front Steering Knuckle |  | Main structural component for a front end vehicle suspension. Brakes, shocks and the wheel are all mounted to the steering knuckle. A front steering knuckle also has a steering arm for the control and alignment of the vehicle |
| Rear Steering Knuckle |  | Main structural component for a rear end vehicle suspension. Brakes, shocks and the wheels are all mounted to the steering knuckle. |
| Sub-Frame and Beams |  | Serviceable section of the frame or unibody of a vehicle chassis that can support suspension components or engine/driveline components. Typically used in front/rear construction of an independent suspension configuration. |
| Control Arms |  | Linkage between the steering knuckle and main frame component. Allows for independent vehicle suspension. |
| Brake Calipers and Brackets |  | Calipers are the main section of a hydraulic brake system that contains the pistons and the brake pads. Brackets are a key part of a brake caliper that retain the caliper during the braking cycle. The brake bracket is bolted to the steering knuckle. |
| Corner Modules |  | A chassis sub-assembly consisting of a steering knuckle, wheel bearing, wheel hub, dust shield and ABS sensor. In some cases the brake caliper and rotor are part of the sub-assembly. Corner modules allow for better control of the alignment of the wheel hub and brake caliper/rotor assembly for longer brake life. |
| Front Spindles |  | A spindle is used in a two-wheel drive vehicle configuration and is either a subassembly to the steering knuckle or can be machined as part of the steering knuckle. The wheel bearing and hub are pressed onto the spindle and the assembly is completed with a locking nut. |
| Wheel Hubs |  | The wheel of a vehicle is mounted to a hub via wheel studs that are installed in the hub with lug nuts. The hub is attached to a steering knuckle with a wheel bearing. |

13

21.     The Debtors' chassis products benefit from a number of competitive advantages that the Debtors have relative to their competitors, including: (a) fully integrated capabilities, including design and engineering, testing, and casting and machining capabilities; (b)  a defensible market position due to complexity of products and full engineering integration with customers; (c) strong aluminum capabilities to leverage the migration of products from iron to aluminum for lighter, more fuel efficient vehicles; and (d) highly engineered and proprietary design and manufacturing processes.

*Powertrain Products*

22.     The Debtors' powertrain products include engine and cylinder blocks, cylinder heads, front covers, intake manifolds, bedplates and brackets.  The Debtors specialize in complex, thin-wall aluminum intakes, fully machined and assembled cylinder heads and engine blocks.  The Debtors benefit from a unique capability to maintain cylindricity and other tight tolerances with engine blocks applications.  The Debtors' powertrain capabilities also include design, testing and casting for both aluminum and iron components.  The key powertrain manufacturing processes include broaching, rack rolling, hard and precision turning, micro finishing, grinding and assembly.  Powertrain products were responsible for 3% of the Debtors' revenue for the fiscal year ended December 31, 2014.

WEIL:\95271116\1\35076.0003

23.     The following charts detail revenue for the Enterprise by product, material, vehicle type and geography for the twelve months ended December 31, 2014.



24.     For the fiscal year ended December 31, 2014, approximately 58% of the Debtors' sales were of aluminum components and approximately 42% were of iron components. As set forth above, the Debtors' significant capabilities with respect to both aluminum and iron components give them a distinct advantage over their competitors and their strength in aluminum components positions them well as automakers are increasingly utilizing aluminum parts instead of steel to reduce vehicle weight and improve fuel efficiency.  Based on their book of business and the impact of increased fuel-efficiency standards, the Debtors anticipate a significant shift in revenue towards aluminum products over iron products in the coming years.

25.     For the twelve months ended December 31, 2014, the Debtors generated approximately $1.37 billion of net sales and $21.6 million of pro forma adjusted EBITDA.

**B.  The Debtors' Business Model**

26.     As is common-place throughout the automotive industry, the Debtors' businesses function under a tiered supply chain structure.  Under this structure, upstream from the car manufacturers (*i.e.*, the OEMs) are Tier One suppliers, like the Debtors, that produce the specialized component parts, service parts and assembled goods ("**Component Parts**") needed for new vehicles.  The Debtors' business relationships with their customers begin when the

Debtors are awarded a new program, which generally occurs two or three years prior to the

production launch. This system allows for high revenue visibility and a large program backlog

(subject to ultimate production volumes on a particular platform). The Debtors estimate that, as

of December 31, 2014, they had contractually booked revenue of more than $5 billion over the

five years ending December 31, 2019.

27.    Generally, each Component Part manufactured by the Debtors is

engineered and designed in partnership with the applicable customer. Key Component Parts

must be designed, tested, and validated for quality and safety—a process that can take months or

years to complete. In almost all cases, the Debtors are the sole manufacturer of the Component

Parts which they supply for their customers. Accordingly, the chassis and powertrain products

that the Debtors manufacture and produce are critical to their customers and cannot be easily

replaced or resourced from alternative suppliers even with many months of lead time.

28.    The Debtors deliver Component Parts to the OEMs on a "just-in-time"

basis, matching the OEM's exact build schedule for a particular day and shift, thereby reducing

inventory levels.    To minimize inventory costs and allow for rapid shifts in manufacturing

output based on consumer purchasing trends, the Debtors and their customers maintain a low

inventory of finished parts and raw materials and may schedule deliveries of components directly

to the assembly line. This system requires highly choreographed design, purchasing, shipping,

inbound logistics and manufacturing operations, working in a highly synchronized manner.

Because of the minimal inventory retained by the Debtors and by their customers and the short

lead time on meeting orders, any breakdown in the supply chains could significantly impair—or

even completely halt—the Debtors' production process. Any disruption in the Debtors'

production could immediately impact their customers' ability to manufacture automobiles and

could result in a shutdown in production of many of the largest vehicle platforms in North

America.  An OEM's ability to assemble cars, therefore, is directly dependent on the Debtors'

ability to deliver Component Parts on schedule.[6]

### C.  International Operations

29.    In addition to their domestic operations, the Debtors maintain

manufacturing facilities in five different international geographies and employ over 1,200

employees abroad.   Internationally, the Debtors operate machining facilities in South America,

Europe, and Asia as well as casting facilities in the People's Republic of China.  The Debtors'

international affiliates (all of which are non-Debtors) have historically been self-sustaining and

cash generating, with funds flowing up to the United States parent in the form of management

fees.  From time to time, however, funds flow out of the United States cash management system

to the foreign subsidiaries in the form of an intercompany loan and/or capital contributions to

address either statutory requirements or specified liquidity needs.

### D.  Platinum Equity and the DMI / SMW Integration

30.    Platinum Equity's ownership of the Debtors began in December 2011 with

the purchase of Diversified Machine, Inc. and its subsidiaries (collectively, "**DMI**") from the

Carlyle Group.  At that time, DMI had an established history as a global manufacturer of

precision chassis and suspension products, including steering knuckles and control arms, as well

as engine products, including engine blocks and cylinder heads.  The sale and purchase was

accomplished on December 1, 2011, when UC Holdings, then the sole shareholder of DMI, was

acquired via merger by Dharma Holding Corporation ("**DHC**"), a wholly-owned subsidiary of

---

[6] Additional information regarding the critical nature of the Debtors' supply chain is set forth in the *Declaration of David J. Woodward Pursuant to Local Bankruptcy Rule 1007-2 in Support of Vendor Related First Day Motions* filed contemporaneously herewith.

certain private equity funds sponsored by Platinum Equity, LLC through its subsidiary Dharma Intermediate Holding Corporation ("**DIHC**").

31.    Platinum Equity subsequently purchased Concord International, Inc., the parent of SMW Automotive LLC, and Automotive Properties of New York, LLC (together, "**Concord**" or "**SMW**"), in the first quarter of 2012.  Specifically, on January 13, 2012, Triomphe Intermediate Holding Corporation ("**TIHC**"), an indirect wholly-owned subsidiary of certain private equity funds sponsored by Platinum Equity through DHC and the parent company of UC Holdings, acquired the equity of Concord.  DIHC was subsequently merged into TIHC through DHC and the parent company of UC Holdings.

32.    What is now known as Chassix was later formed in the fourth quarter of 2012, through the combination of the two separate businesses.  Specifically, on December 21, 2012, TIHC contributed its 100% equity interests in DMI and Concord to DMI SMW Holding Corporation.  Beginning in December, 2012, DMI SMW Holding Corporation began to integrate the operations of DMI and SMW.  On May 6, 2013, DMI SMW Holding Corporation changed its name to Chassix.  By combining the machining and casting businesses of DMI and SMW the Debtors positioned themselves as one the few Tier One suppliers able to offer aluminum and iron casting as well as machining and assembly.

33.    Since first purchasing DMI in December 2011 and 2012, Platinum Equity has contributed and invested approximately $450 million in the Debtors' businesses and operations.

18

*Corporate Advisory Services Agreements*

34.    Since acquiring the Debtors' businesses in 2011, Platinum Equity, by and through certain of its direct and indirect affiliates and subsidiaries, has supplied the Debtors, pursuant to certain advisory services agreements (the "**Advisory Agreements**"), with advisory services, including, without limitation, management and financial planning advice; general business advice; assistance and advice regarding negotiating and obtaining financing; accounting advice; and advice and assistance with respect to commercial and marketing activities.  The Advisory Agreements generally provide that DHC or TIHC, on behalf of certain Debtors, pay an annual fee, which is capped at $5 million per year (plus related expenses), to certain Platinum Equity entities for the management of, and financial advisory services and oversight provided to, the Debtors.

## II.

## Capital Structure

35.    As of the Commencement Date, the Debtors had outstanding funded debt obligations in the aggregate amount of approximately $680 million, which amount consists of (i) approximately $135 million in secured borrowings under the Debtors' Prepetition Revolving ABL Facility (as herein defined), (ii) approximately $375 million in principal amount of Secured Notes (as herein defined), (iii) approximately $158 million in principal amount of Unsecured Notes (as herein defined), and (iv) approximately $12 million in capital lease obligations.

36.    Because the Debtors are privately held, they are not subject to the information disclosure requirements of the Securities Exchange Act of 1934, as amended. Accordingly, the Debtors do not file annual, quarterly, or current reports or any other financial information with the Securities and Exchange Commission.

WEIL:\95271116\1\35076.0003

**A. The Prepetition Revolving ABL Facility**

37.     On July 23, 2013, Chassix, together with its domestic subsidiaries, as co-borrowers and guarantors, and UC Holdings, as parent guarantor, entered into that certain amended and restated loan and guaranty agreement (as thereafter amended or modified from time to time, the "**Prepetition Revolving ABL Facility**") with BMO Harris Bank N.A., (the "**Prepetition Agent**"), providing the Debtors with a $125 million asset-based revolving credit facility.  On June 6, 2014, pursuant to that certain Commitment Increase Joinder, the revolving loan commitments under the Prepetition Revolving ABL Facility were increased by $25 million to $150 million.  Funds from the Prepetition Revolving ABL Facility are used for working capital purposes.

38.     Up to $25 million of the Prepetition Revolving ABL Facility was available for issuances of letters of credit and any such issuance of letters of credit reduced the amount available under the Prepetition Revolving ABL Facility on a dollar-for-dollar basis.  Availability under the Prepetition Revolving ABL Facility was capped by a borrowing base, calculated based on certain percentages of the value of the borrowers' inventory and receivables and subject to certain reserves and sub-limits.  Borrowings under the Prepetition Revolving ABL Facility bore interest, at the option of Chassix, at either (i) a base rate or (ii) a LIBOR rate plus, in each case, an applicable margin ranging from 0.75%–1.25% for base rate loans and 1.75%–2.25% for LIBOR rate loans, in each case based on the amount of average excess availability as reported on the most recently delivered borrowing certificate.[7]  A commitment fee was payable quarterly in

---

[7] As described in further detail below, on February 6, 2015, the Debtors entered into an amendment with the lenders under the Prepetition Revolving ABL Facility pursuant to which, among other things, the parties agreed to: (i) shorten the maturity date until March 6, 2015 (which was thereafter extended by amendment to the Commencement Date), (ii) pay interest at the base rate plus 3.75% per annum on a monthly basis, (iii) pay an unused commitment fee of 0.375% per annum paid monthly and (iv) eliminate the fixed charge coverage ratio and  implement daily cash dominion sweeps.

WEIL:\95271116\1\35076.0003

arrears at rates per annum, depending on average usage under the Prepetition Revolving ABL

Facility, of 0.375% or 0.50% of the average daily unused amount of the commitments in respect

of the Prepetition Revolving ABL Facility.  Prior to the amendment described below, the

Prepetition Revolving ABL Facility was scheduled to mature on December 21, 2017.  The

Prepetition Revolving ABL Facility included a financial maintenance covenant whereby UC

Holdings and its subsidiaries on a consolidated basis must maintain a minimum fixed charge

coverage ratio of 1.0:1.0, tested on the last day of each fiscal quarter only if there exists an Event

of Default (as defined in the Prepetition Revolving ABL Facility) or if undrawn availability

under the Prepetition Revolving ABL Facility is less than the greater of 10% of the maximum

borrowing amount under the Prepetition Revolving ABL Facility and $7.5 million for five

consecutive business days.

    39.    As set forth above, the Prepetition Revolving ABL Facility is guaranteed

by UC Holdings and each of its current and future direct and indirect wholly-owned subsidiaries

other than certain (i) certain immaterial subsidiaries, (ii) certain foreign subsidiaries, and (iii) any

subsidiary of any borrower prohibited by requirements of law or an existing contractual

restriction from being joined as a guarantor of the Prepetition Revolving ABL Facility.  The

Prepetition Revolving ABL Facility is secured by a first-priority lien on substantially all

accounts, deposit and securities accounts, and inventory (collectively, the "**ABL Priority**

**Collateral**").  Subject to certain exclusions, the Prepetition Revolving ABL Facility is also

secured by a second-priority lien on substantially all real estate assets, intellectual property,

equipment, capital stock held by the Debtors and all other collateral other than the ABL Priority

Collateral (collectively, the "**Notes Priority Collateral**").

21

40.     On February 6, 2015, as part of their prepetition restructuring efforts, the Debtors negotiated an amendment to the Prepetition Revolving ABL Facility (the "**ABL Amendment**") that provided the Debtors with approximately $23 million in additional liquidity by, among other things, eliminating certain borrowing base reserves and the springing fixed charge coverage ratio covenant.  The ABL Amendment also shortened the maturity date on the Prepetition Revolving ABL Facility to March 6, 2015 (which was thereafter extended by amendment to the Commencement Date).  Closing on the ABL Amendment allowed the Debtors to extend their cash runway, which provided them with the time necessary to negotiate a prearranged restructuring with their key constituencies.  Contemporaneously therewith, the Debtors also moved the monthly deliveries of borrowing base certificates under the Prepetition Revolving ABL Facility to weekly deliveries, which provided the Debtors with an additional $6 to $7 million liquidity benefit by the end of February 2015.

41.     As of the Commencement Date, the Debtors had drawn approximately $135 million under the Prepetition Revolving ABL Facility.

**B.  The Secured Notes**

42.     On July 23, 2013, Chassix, together with the guarantor parties thereto, entered into an Indenture (the "**Secured Indenture**") with U.S. Bank National Association, as trustee and collateral agent (the "**Secured Indenture Trustee**"), pursuant to which Chassix issued $350 million in aggregate principal amount of 9 1/4% Senior Secured Notes due 2018 ("**Secured Notes**") in a private offering exempt from registration under the Securities Act of 1933, as amended (the "**Securities Act**").  An additional $25 million of Secured Notes were thereafter issued pursuant to a supplemental indenture dated June 17, 2014.  The proceeds of the Secured Notes were used to repay outstanding borrowings under the Debtors' existing

WEIL:\95271116\1\35076.0003

indebtedness, to pay related fees and expenses, and for general corporate purposes.   The Secured

Notes mature on August 1, 2018.

43.     Chassix pays interest on the Secured Notes semi-annually, in arrears, at

the rate of 9 1/4% per year, payable in cash, on February 1 and August 1 of each year.   The

Notes are guaranteed on a senior secured basis by UC Holdings and all of Chassix's existing

domestic subsidiaries and all future domestic subsidiaries that guarantee its indebtedness or

indebtedness of any subsidiary guarantor, including any indebtedness under the Prepetition

Revolving ABL Facility.   The Secured Notes are secured by a first-priority lien on all Notes

Priority Collateral and a second-priority lien on all ABL Priority Collateral.

44.     As discussed in further detail below, the Debtors' $17.3 million interest

payment due on February 2, 2015, was a significant driver in the timing and commencement of

the Debtors' chapter 11 cases.

**C.  The Intercreditor Agreement**

45.     The relative priorities of the liens held by the holders of the Secured Notes

and the lenders for the Prepetition Revolving ABL Facility and restrictions on the ability to

exercise remedies against collateral are subject to that certain Intercreditor Agreement (the

"**Intercreditor Agreement**") by and between BMO Harris Bank N.A., as ABL Collateral Agent

and U.S. Bank National Association, as Notes Collateral Agent, dated as of July 23, 2013.  In

accordance with the Intercreditor Agreement, the holders of the Secured Notes and the lenders

for the Prepetition Revolving ABL Facility agree that (i) the Prepetition Revolving ABL Facility

liens on the ABL Priority Collateral are senior in all respects and prior to any lien on such

collateral by the holders of the Secured Notes; and (ii) the liens that the holders of the Secured

Notes have on the Notes Priority Collateral will be senior and prior to any liens the Prepetition

Revolving ABL Facility lenders may have on such collateral.

### D.  The Unsecured Notes

46.     On December 13, 2013, Chassix Holdings entered into an Indenture (the

"**Unsecured Note Indenture**") with U.S. Bank National Association, as trustee (the "**Unsecured**

**Indenture Trustee**"),[8] pursuant to which Chassix Holdings issued $150 million in aggregate

principal amount of 10%/10.75% Senior PIK Toggle Notes due 2018 ("**Unsecured Notes**") in a

private offering exempt from the registration requirements under the Securities Act.  The

Unsecured Notes are unsecured and are not guaranteed.  Most of the purchasers of the Unsecured

Notes were the same funds and financial institutions that previously purchased the Debtors'

Secured Notes. The proceeds of the Unsecured Notes were used to pay a special dividend to

Platinum Equity and costs and expenses related to the offering.   The Unsecured Notes mature on

December 15, 2018.  Chassix Holdings pays interest on the Unsecured Notes semi-annually, in

arrears, at the rate of 10% per year with respect to cash interest and 10.75% per year with respect

to payment in kind (PIK) interest, payable on June 15 and December 15 of each year.

47.     At the initial stages of the Debtors' restructuring discussions, a cash

interest payment for the Senior Unsecured Notes came due on December 15, 2014.  Although the

Unsecured Note Indenture permits the Debtors, in certain situations, to pay interest in kind *in*

*lieu* of payment in cash, they were required under the Unsecured Note Indenture to elect to

exercise that option in June of 2014 prior to the commencement of the interest period, which the

Debtors had not elected to do.   In an effort to conserve cash while they continued restructuring

negotiations, and after consulting with their advisors as well as representatives of the Informal

---

[8] By agreement dated as of March 6, 2015, Delaware Trust Company succeeded U.S. Bank National Association as
Unsecured Indenture Trustee.

WEIL:\95271116\1\35076.0003

Committee of Noteholders, the Board of Directors for Chassix Holdings determined that it was in the Debtors' best interests not to make the cash payment at that time. Accordingly, on December 30, 2014, Chassix Holdings commenced a solicitation of consents and waivers (the "**Consent Solicitation**") soliciting the holders of Unsecured Notes to agree to waive any default resulting from the failure to make the December 15, 2014 interest payment, permit that the payment be made in the form of additional principal of Unsecured Notes, and approve certain proposed amendments to the Unsecured Notes Indenture to enable the same. The Consent Solicitation was supported by an overwhelming majority of the holders of the Unsecured Notes, achieving nearly 99% acceptance.

48.    As a result, on January 5, 2015, pursuant to the Unsecured Notes Indenture, Chassix Holdings entered into a first supplemental indenture (the "**Supplemental Indenture**") to the Unsecured Notes Indenture, pursuant to which holders of Unsecured Notes who provided their consent and waiver (the "**Consenting Holders**") in accordance with the Consent Solicitation received amended Unsecured Notes (the "**Consenting Holder Notes**"), which were increased by an aggregate principal amount equal to 10.75% of the Unsecured Notes held by Consenting Holders *in lieu* of cash interest for the December 15, 2014 interest payment date (the "**PIK Payment**").[9]

49.    As of the Commencement Date, the principal amount of the Unsecured Notes was approximately $158,000,000.

---

[9] The additional Unsecured Notes issued pursuant to the PIK Payment provided that holders of 50.1% or more of the Consenting Holder Notes would be able to give a notice to Chassix Holdings no earlier than the first business day following January 31, 2015, requiring that Chassix Holdings redeem all Consenting Holder Notes in an amount equal to the aggregate principal amount of additional Unsecured Notes. The Supplemental Indenture amended the Unsecured Notes Indenture and the Unsecured Notes (including any related default provisions) as necessary to permit the PIK Payment and the redemption feature described herein.

### E.  Capital Lease Obligations

50.  As of December 31, 2014, the Debtors had capital lease obligations totaling approximately $12 million, which were used to finance various specialized equipment and machinery.  The collateral for the capital lease obligations is the equipment and other property that is being leased and the maturity dates range from 2015 through 2018.

### F.  Foreign Debt

51.  As of December 31, 2014, the foreign debt of the Enterprise was approximately $31 million, which includes, among other things, $6 million in foreign capital lease obligations, several working capital and equipment loans, and an accounts receivable pledging arrangement.  Collateral for the Enterprise's foreign debt includes certain foreign equipment, certain real estate assets, and pledged accounts receivable.  Maturity dates for the foreign debt range from 2015 through 2018 at interest rates ranging from 2.5% to 8.7%.

### III.

### The Need for Chapter 11 Relief and the Events
### Compelling the Commencement of These Chapter 11 Cases

52.  As noted above, a combination of operational and financial difficulties in 2014 due to, among other things, underpriced contracts and programs, compounded by a marked spike in the demand for automobile production in North America at time when there was limited capacity in the machining and casting sectors, began to overwhelm the Debtors' manufacturing facilities and capabilities – in particular, the Bristol Facility, which experienced an unanticipated and precipitous decline in performance.  As set forth in further detail below, by the fourth quarter of fiscal year 2014, the Debtors were failing to meet projections and faced an imminent liquidity crisis.

26

### A.  Initial Integration and Cost Saving Initiatives

53.    As a part of their integration efforts, and after carefully examining the Debtors' financial projections and operations, the Debtors determined that it was necessary to implement certain measures that were designed to (a) optimize the Debtors' manufacturing footprint, (b) realize purchasing savings by leveraging greater combined purchasing power, and (c) increase vertical integration, or insourcing, by producing certain castings internally that the Debtors had previously purchased from third parties.  Thereafter, the Debtors merged certain of their machining and casting facilities, closed unprofitable plants located in Port Huron, Michigan and Edon, Ohio, and opened a new machining facility in Columbus, Georgia.  The Debtors also closed their facility in Milwaukee, Wisconsin, which was determined to be non-core to the Debtors' overall integration strategy.

### B.  Infrastructure Constraints and Legacy Contracts

54.    Although the Debtors were making strides to realize cost savings and synergies through their integration efforts, they faced additional constraints with respect to their equipment and infrastructure.  The Debtors' infrastructure required significant upgrade and repair.  Generally, the equipment utilized by the Debtors in their manufacturing has a lifetime of ten to fifteen years.  Most of DMI and SMW's machinery and equipment was at or near the end of its respective useful lifetime (*e.g.*, 79% of the molding equipment was over ten years old) and required extensive, unexpected maintenance and improvement.

55.    Additionally, some of the manufacturing facilities that had been acquired required considerable technological and structural upgrades.  In the three years prior to the Commencement Date, the Debtors invested approximately $300 million to upgrade their infrastructure and purchase new machines in an attempt to meet production demands.

27

56.    In addition, the Debtors also inherited a number of contracts and programs that were negotiated during a time when DMI and SMW were competitors engaging in bidding wars.   As a result, certain of the Debtors' legacy contracts were negotiated in a competitive landscape that created destructive pricing conditions and, in some cases, failed to account for maintenance and other capital expenditure costs or current production costs.

### C.  Increases in Demand for Automobile Production in North America Lead to a Precipitous Decline at the Bristol Facility

57.    As the Debtors continued to pursue their integration efforts, the automotive industry as a whole began to experience significant growth.  The industry's growth was followed by a corresponding spike in demand, which quickly brought to light the level to which certain of the Debtors' programs had been underpriced.  As the Debtors struggled to meet the increase in demand, their situation was aggravated by a number of new program launches in 2014 – including the CD4 chassis program – which began to overload the Debtors' equipment and facilities.   These complications were most prevalent at the Debtors' Bristol Facility.

58.    In 2014, the Bristol Facility was responsible for the most new business of all of the Debtors' manufacturing facilities, with twelve new launches—compared to seven new launches in 2013.   To meet production demands, the Debtors relied heavily on existing machinery and equipment at the Bristol Facility while making significant investments in additional equipment.  Notwithstanding this investment, by the fourth quarter of 2014, the Debtors were running almost all of the Bristol Facility's machinery and equipment at a relentless pace – operating shifts seven days a week rather than the standard five or six days to keep up with demand and production levels.

59.    This non-stop level of activity prevented the Debtors from conducting routine maintenance and service checks on their equipment at the Bristol Facility.  Not

WEIL:\95271116\1\35076.0003

surprisingly, as the Debtors were forced to continue to operate their equipment at an unending

pace to keep up with customer demand, they began to see a significant increase in the

occurrences of machine and equipment breakdown, which reduced the overall equipment

effectiveness ("**OEE**") for the Debtors' inventory.  These equipment failures and delays forced

the Debtors to expend significant capital and resources on premium and expedited truck

deliveries and, in some instances, expedited air shipment (including helicopters), in order to meet

their scheduled deliveries for their customers.  During the month of September 2014, the Debtors

spent over 30% more in premium freight when compared to the same period in 2013.

60.    In response to the decline in OEE and the missed delivery deadlines,

certain of the Debtors customers insisted that the Debtors bring in outside advisors and

consultants to oversee the production lines at Bristol and other facilities in an effort to mitigate

the operational impediments.  By September 2014, the Debtors were expending over $2 million

dollars per month in third-party advisor fees and expenses.

61.    Even with the assistance of these outside advisors, however, the Debtors

were unable to stave off the precipitous decline at the Bristol Facility.  By the fourth quarter of

2014, the facility was incurring operating losses ranging from $350,000 to $500,000 per day.

**D.  Prepetition Trade Contraction**

62.    As news of the Debtors' production and liquidity troubles began to

permeate throughout the automotive industry, a number of the Debtors' suppliers and vendors

began contacting management and demanding changes in payment and credit terms.  Certain of

the Debtors' vendors negotiated reductions in trade terms while others demanded that the

Debtors pay cash in advance for further delivers or post a letter of credit.  Although the Debtors

diligently worked with their advisors to resolve open vendor issues and avoid production

stoppages, the actions taken by these vendors diminished the Debtors' cash position by approximately $40 million in the months prior to the Commencement Date.

### E. Prepetition Restructuring Efforts

63.     In light of the aforementioned issues, including the unprecedented difficulties facing the Bristol Facility, in the months preceding the chapter 11 cases, management, with the assistance of their advisors, took all available actions to preserve and extend the Debtors' liquidity and address their operational and financial concerns.  In October 2014, the Debtors retained Oliver Wyman, Inc., a leading global automotive consulting firm, to assist with the operational challenges facing the Bristol Facility.  In addition, the Debtors retained (a) FTI Consulting, Inc. ("**FTI**"), to provide an interim chief financial officer and additional personnel to assist with liquidity and cash forecasting and to provide other restructuring services, and (b) Lazard Frères & Co. LLC ("**Lazard**"), as their investment banker to assist the Debtors in addressing their overall financial situation and to take steps to address their immediate interim liquidity needs.  At this time, the Debtors also retained Weil Gotshal, & Manges LLP ("**Weil**"), as counsel, to assist them in developing and implementing a comprehensive restructuring plan.

(a)     **Bristol Initiatives and Interim Accommodations**

64.     Following an in-depth analysis of their businesses, the Debtors, with the assistance of their professionals, implemented certain operational initiatives specifically designed to address the situation at Bristol.  These operational initiatives included (i) reducing spending costs related to production and external contractors, (ii) improving planning and scheduling, (iii) provisionally increasing the use of temporary workforce to meet customer needs, and

WEIL:\95271116\1\35076.0003

(iv) transferring production to the Debtors' other facilities to alleviate some of the increased production stress.

65.     Although these operational initiatives showed progress, it would be several months before they would have any meaningful impact on the Debtors' financial position and, absent an immediate infusion of capital, the Debtors were facing an imminent liquidity crisis.  To that end, in November 2014, the Debtors commenced negotiations with representatives of the OEM Customers, including Ford, GM, Chrysler, and (later) Nissan regarding interim financial accommodations with respect to the Bristol Facility.

66.     Following nearly a month of good faith and arms' length negotiations, on or about December 31, 2014, the Debtors, together with certain of the OEM Customers, agreed upon certain limited interim accommodations with respect to the Bristol Facility in the form of that certain proposed term sheet for interim accommodations (as thereafter amended from time to time, the "**Interim Accommodations Term Sheet**"), that would help shore up a portion of the Debtors' liquidity gap and enable them to continue to operate while they negotiated a long-term solution.   In addition to limiting the OEM Customers' ability to resource programs away from the Debtors, restricting the OEM Customers' ability to set-off amounts against the Debtors' accounts receivable, and providing other industry standard accommodations, the Interim Accommodations Term Sheet provided that each of the OEM Customers party to the Interim Accommodations Term Sheet, and certain other customers that (directly or indirectly) had production at the Bristol Facility, was responsible for (i) funding its allocated amount of projected operating losses at the Bristol Facility in accordance with an agreed upon monthly budget, and (ii) funding capital expenditure advances for such customer's projects at the Bristol Facility again in accordance with an agreed upon budget.  The OEM Customers party thereto

31

also waived certain rights for reimbursement from the Debtors for expenses relating to premium

freight and shipping, outage costs, quality spill costs, and third-party advisors fees and expenses.

Furthermore, the Interim Accommodations Term Sheet facilitated the resolution of certain

outstanding commercial issues that resulted in valuable short-term liquidity for the Debtors.

67.    The accommodations provided under the Interim Accommodations Term

Sheet resulted in approximately $22.2 million in additional liquidity for the Debtors from the

effective date of the agreement through the Commencement Date.

(b)    **Additional Incremental Financing Actions**

68.    While the interim accommodations contributed by the OEM Customers

under the Interim Accommodations Term Sheet provided the Debtors with some much needed

liquidity, the Debtors understood that the liquidity provided by accommodations was insufficient

to allow them the time necessary to negotiate a prearranged restructuring of their capital structure

with their key creditor constituencies.  To further bridge the Debtors' short-term liquidity gap, in

November 2014, the Debtors, together with their professionals at Lazard and Weil, began

exploring other potential avenues to augment their liquidity position and provide the Debtors

with sufficient runway to negotiate a more permanent restructuring solution.  To that end, Lazard

undertook an effort to survey potential sources of incremental financing.  After it became

apparent that new or additional third-party incremental financing would not be available to the

Debtors prepetition, the Debtors commenced negotiations with the Prepetition Agent on an

amendment that would provide the Debtors with some limited incremental liquidity under their

existing Prepetition Revolving ABL Facility.

69.    As set forth above, the ABL Amendment, which closed on February 6,

2015, increased the Debtors' ability to borrow on the Prepetition Revolving ABL Facility and

provided the Debtors with an additional $23 million in liquidity. At that same time, the Debtors also moved the monthly deliveries of borrowing base certificates under the Prepetition Revolving ABL Facility to weekly deliveries, which provided the Debtors with an additional $6 to $7 million liquidity benefit by the end of February 2015.

(c)      **Capital Structure Negotiations, the Restructuring Support Agreement and the Debtors' Chapter 11 Plan**

70.      Having secured sufficient interim financial assistance to allow the parties the time necessary to negotiate a long-term solution to the Debtors' financial situation, the Debtors and their advisors commenced negotiations in January 2015 with representatives of Platinum Equity, the Informal Committee of Noteholders, and the OEM Customers regarding a comprehensive operational and financial restructuring for the Debtors. Although the Debtors, through their prepetition financing activities, had secured some additional runway for plan negotiations, the Debtors had a $17.3 million interest payment on their Secured Notes coming due on February 2, 2015 (with a 30-day grace period prior to triggering an event of default under the Secured Indenture). With that deadline looming, the parties immediately commenced negotiations on two parallel fronts.

71.      First, the Debtors, together with representatives from FTI, as well as the advisors for the Informal Committee of Noteholders, began negotiating with representatives of the OEM Customers on long-term accommodations that were designed both to replace the accommodations provided under the Interim Accommodations Term Sheet as well as to provide long-term pricing relief on the Debtors' existing contracts and commitments for new business. Several rounds of in-person meetings and conferences were held between and among the parties over the course of approximately two months. These hard fought negotiations ultimately resulted in the parties entering into (a) that certain accommodation agreement (together with any

33

exhibits or schedules thereto, the "**Multi-Customer Accommodation Agreement**"), dated

March 12, 2015, between and among the Debtors, Ford, GM, FCA, Nissan, PNC Bank, National

Association, as agent for the lenders under the Debtors' debtor-in-possession asset-based

revolving credit facility (the "**DIP ABL Agent**"), and Cantor Fitzgerald Securities, as agent for

the lenders under the Debtors' debtor-in-possession term loan facility (the "**DIP Term Agent**"

and, together with the DIP ABL Agent, the "**DIP Agents**"), and (b) that certain accommodation

agreement (together with any exhibits or schedules thereto, the "**BMW Accommodation**

**Agreement**" and together with the Multi-Customer Accommodation Agreement, the

"**Accommodation Agreements**"), between and among the Debtors, BMW, the DIP ABL Agent,

and the DIP Term Agent.  As described above, the Accommodation Agreements provide for

approximately $45 million in annual prices increases and new business and programs.

Contemporaneously herewith, the Debtors have filed a motion seeking authority to enter into the

Accommodation Agreements.

   72. On the second front, representatives of the Debtors, Platinum Equity and

the Informal Committee of Noteholders commenced negotiations on the Debtors' go-forward

capital structure and balance sheet restructuring.  These negotiations included in-person

meetings, conference calls, and multiple term sheet iterations over a period of two months, which

ultimately culminated in an agreement on the Plan filed contemporaneously herewith.

   73. To demonstrate and affirm their support for the Plan, the Debtors,

Platinum Equity, and the members of the Informal Committee of Noteholders executed a

Restructuring Support Agreement (the "**Restructuring Support Agreement**") on March 11,

2015.  Among other things, the Restructuring Support Agreement provides the following:[10]

---

[10] The following is a summary of the Restructuring Support Agreement.  The Restructuring Support Agreement is
incorporated by reference as if fully set forth herein.  In the event of any inconsistency between this summary and

WEIL:\95271116\1\35076.0003

(a)     <u>Agreement to Vote</u>.  So long as the Restructuring Support Agreement has not been terminated in accordance with the terms thereof, and subject to certain limitations set forth therein, the Consenting Noteholders and Platinum Equity each agree (i) subject to the receipt of a disclosure statement and other solicitation materials in respect of the applicable Plan, to vote their claims against the Debtors to accept the  Plan, (ii) not (x) object to, delay, impede or take any other action to interfere with acceptance or implementation of the Plan, (y) solicit, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout or plan of reorganization for the Debtors other than the Plan or (z) otherwise take any action that would or would reasonably be expected to, in any material respect interfere with, delay, impede or postpone the consummation of the Plan and the Restructuring or otherwise breach or be inconsistent with the Restructuring Support Agreement, and (iii) use commercially reasonable efforts to support and take all reasonably necessary steps to effectuate the Debtors' restructuring and consummation of the Plan.

(b)     <u>Transfer Restrictions</u>.  Each Consenting Noteholder and Platinum Equity agree that, for the term of the agreement, such party will not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of, directly or indirectly, in whole or in part, any of its claims against or interests in the Debtors, subject to certain limitations and exceptions set forth therein.

(c)     <u>Releases</u>. Subject to certain conditions and exceptions set forth in the Restructuring Support Agreement, each Consenting Noteholder, as of the Support Effective Date (as defined in the Restructuring Support Agreement) agrees to waive and release any and all Claims and all Causes of Action (as defined in the Plan) against Platinum Equity and its Released Parties (as defined in the Restructuring Support Agreement) from any and all Claims and Causes of Action (as defined in the Plan) related to the Debtors or their restructuring.

(d)     <u>Debtors' Agreements</u>. Each of the Debtors party to the Restructuring Support Agreement agrees to (i) act in good faith and use reasonable best efforts to support and complete

---

the Restructuring Support Agreement, the Restructuring Support Agreement controls.  Capitalized terms used in this section but not otherwise defined in this section shall have the meanings ascribed to them in the Restructuring Support Agreement.

successfully the Solicitation in accordance with the terms of the Restructuring Support Agreement and (ii) do all things reasonably necessary and appropriate in furtherance of confirming the Plan and consummating the Restructuring.

(e)     Events of Default and Plan Milestones.  In addition to certain other events of default set forth therein (including, among other things, a material breach of the agreement by the Debtors, the appointment of an examiner with expanded powers or a trustee in the Debtors' chapter 11 cases, or the termination of the Debtors' exclusive periods to file and solicit a chapter 11 plan), the Restructuring Support Agreement imposes a number of deadlines and milestones with respect to the Debtors' Plan confirmation process which, if not met, will result in the automatic termination of the Restructuring Support Agreement, including the following:

(i)     Five (5) days after the Commencement Date, if the Debtors have not filed the Plan and its related disclosure statement with the Bankruptcy Court;

(ii)     Forty-five (45) days after the Commencement Date, if the Bankruptcy Court has not have entered an order approving the Debtors' disclosure statement for the Plan;

(iii)     June 30, 2015, if the Bankruptcy Court fails to enter an order confirming the Plan in form and substance reasonably satisfactory to the Restructuring Support Parties; and

(iv)     July 17, 2015, if the effective date for the Plan has not occurred.

74.     The Debtors believe that the restructuring contemplated by the Plan is in the best interests of their estates and their creditors.  The restructuring not only provides for the Debtors' prompt emergence from chapter 11, but also will facilitate the successful ongoing operations of the Debtors' businesses.

WEIL:\95271116\1\35076.0003

## IV.

### First-Day Pleadings

75.    The Debtors have filed their First Day Pleadings contemporaneously herewith to ensure that the Debtors' businesses continue to function during these chapter 11 cases.[11]  For the reasons set forth below, I submit that (i) the relief requested in the First Day Pleadings is necessary to enable the Debtors to operate with minimal disruption during the pendency of their chapter 11 cases and (ii) approval of the First Day Pleadings is warranted.

**Motion of Debtors Pursuant to Fed. R. Bankr. P. 1015(b) for Entry of Order Directing Joint Administration of Chapter 11 Cases**

76.    By this motion, the Debtors request entry of an order directing joint administration of their chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b).  Specifically, the Debtors request that the Court maintain one file and one docket for all of the chapter 11 cases under the lead case, Chassix Holdings.  Further, the Debtors request that an entry be made on the docket of each of the chapter 11 cases of the Debtors other than Chassix Holdings to indicate the joint administration of the chapter 11 cases.

77.    Given the integrated nature of the Debtors' businesses, joint administration of the chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest.  Many of the motions, hearings, and orders that will be filed in the chapter 11 cases will almost certainly affect each of the Debtors.  I believe that an order directing joint administration of the chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow the United States

---

[11] Capitalized terms used in this Part of this Declaration and not defined herein shall have the meanings ascribed to them in the relevant First Day Pleading.

Trustee for the Southern District of New York (the "**U.S. Trustee**") and all parties in interest to

monitor the chapter 11 cases with greater ease and efficiency.

> **Motion of Debtors Pursuant to 11. U.S.C. §§ 521 and 105(a), Fed. R. Bankr. P. 1007(c), 2015.3 and 9006(b), and Local Rule 1007-1 for Entry of Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs and (II) Granting Additional Time to File 2015.3 Reports**

78.     Pursuant to this motion, the Debtors request entry of an order granting

additional time to file their schedules and statements of financial affairs (collectively, the

"**Schedules and Statements**") for an additional fifteen (15) days.  The Debtors estimate that

they have approximately 1,500 trade creditors and other parties in interest on a consolidated

basis.  The breadth of the Debtors' business operations requires the Debtors to maintain

voluminous books and records and complex accounting systems.  Given the size, complexity,

and geographic diversity of their business operations, and the number of creditors, I submit that

the large amount of information that must be assembled to prepare the Schedules and Statements

and the hundreds of employee and advisor hours required to complete the Schedules and

Statements would be unnecessarily burdensome to the Debtors during the period of time

following the Commencement Date.  Additionally, for many of the reasons previously stated, the

Debtors are also requesting an extension of the time to file their initial reports of financial

information in respect of entities in which their chapter 11 estates hold a controlling or

substantial interest until thirty (30) days after the meeting of creditors to be held pursuant to

section 341 of the Bankruptcy Code or to file a motion with the Court seeking a modification of

such reporting requirement for cause.

WEIL:\95271116\1\35076.0003

**Application of Debtors Pursuant to 28 U.S.C. §§ 156(c),11 U.S.C. § 105(a), and Local Rule 5075-1 for an Order Appointing Prime Clerk LLC as Claims and Noticing Agent for the Debtors**

79.     By this Application, pursuant to section 156(c) of title 28 of the United States Code, section 105(a) of the Bankruptcy Code, and Local Rule 5075-1, the Debtors request authority to appoint Prime Clerk LLC ("**Prime Clerk**") as claims and noticing agent in the Debtors' chapter 11 cases, in accordance with the terms and conditions of that certain engagement agreement dated as of December 29, 2014, effective *nunc pro tunc* to the Commencement Date.

80.     The Debtors request entry of an order appointing Prime Clerk as the Claims and Noticing Agent for the Debtors and their chapter 11 cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases.  Although the Debtors have not yet filed their schedules of assets and liabilities, they anticipate that there will be in excess of 2,000 entities to be noticed.  In view of the number of anticipated claimants and the complexity of the Debtors' businesses, I believe that the appointment of Prime Clerk as claims and noticing agent is in the best interests of both the Debtors' estates and their creditors.

**Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 342(a) and 521(a)(1),  Fed. R. Bankr. P. 1007(a) and 2002(a), (d), (f) and (*l*), and Local Rule 1007-1 for Entry of Order (I) Waiving Requirement to File List of Creditors and (II) Granting Debtors Authority to Establish Procedures for Notifying Creditors of Commencement of Debtors' Chapter 11 Cases**

81.     By this motion, the Debtors seek entry of an order waiving the requirements to file a list of creditors on the Commencement Date.  In lieu of filing the list of creditors, the Debtors propose to provide a notice and claims agent with a consolidated list of creditors.  The Debtors propose that the notice and claims agent undertake all mailings directed

by the Court, the U.S. Trustee, or as required by the Bankruptcy Code, including, without limitation, the notice of commencement of these chapter 11 cases. In addition, the Debtors propose to publish the notice of commencement in the national editions of each of the *Wall Street Journal* and *The New York Times*, as well as on the website to be established by the Debtors' notice and claims agent. Given the large number of creditors, I submit that the notice and claims agent's assistance with mailing and preparation of creditor lists and notices will ease administrative burdens that would otherwise fall upon the Court and the U.S. Trustee, while at the same time ensuring that actual notice is provided to all of the Debtors' creditors in an efficient and cost-effective manner.

### Motion of Debtors Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 for Entry of Order Implementing Certain Notice and Case Management Procedures

82.    By this motion (the "**Case Management Motion**"), the Debtors seek to establish certain notice, case management and administrative procedures in these chapter 11 cases. The Debtors believe that the proposed procedures will streamline the administration of their chapter 11 cases and, consequently, preserve value that ultimately will inure to the benefit of the Debtors and their estates. Accordingly, the Debtors believe, and I agree, that it is in the best interest of the Debtors, their estates and creditors, and other all parties in interest in these chapter 11 cases that the Court grant the relief requested in the Case Management Motion.

### Motion of Debtors For Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) To Use Cash Collateral Pursuant to 11 U.S.C. § 363, (C) Grant Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (D) Schedule a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) AND (c)

83.    By this Motion, the Debtors request entry of interim and final orders (collectively, the "**DIP Orders**") granting the Debtors authority to obtain postpetition debtor-in-

40

possession financing (the "**DIP Financing**"), use cash collateral in accordance with the priorities set forth in the Interim DIP Order and the Intercreditor Arrangements[12] annexed thereto, and provide adequate protection to the prepetition secured parties on the terms set forth in the Interim DIP Order and the other DIP documents.

84.    As of January 2015, the Debtors' worsening financial performance and liquidity pressures made it evident that a more permanent restructuring solution was needed and the best way to protect the interests of all stakeholders and preserve the value of their enterprise as a going-concern would be the commencement of a case under the Bankruptcy Code. The Debtors, together with Lazard, determined that immediate funds were needed to address their existing financial obligations and to cover the costs of going through an in-court restructuring. To that end, Lazard and the Debtors successfully negotiated an amendment to the Prepetition ABL Credit Agreement that, among other things, gave the Debtors over $20 million in new money. Lazard then turned its focus on obtaining the best available DIP Financing.

85.    After a competitive arms'-length negotiation process, which involved approaching both BMO and the Informal Committee of Noteholders, and analyzing numerous proposals submitted from non-secured noteholders, the Debtors, in an exercise of sound business judgment, decided to move forward with the DIP Facilities before the Court. For a number of reasons, I believe the DIP Financing selected by the Debtors is in the best interests of the Debtors, their estates, and creditors.

86.    The two-part $250,000,000 DIP Financing is comprised of both an asset based revolving credit facility and a new money term loan facility (together, the "**DIP Facilities**"). The first DIP Facility is a senior secured non-amortizing asset based revolving

---

[12] Capitalized terms not otherwise herein defined shall have the meaning ascribed to such terms in the Motion.

credit facility in the principal amount of $150,000,000, (the "**DIP ABL Facility**"), from PNC

Bank.  The DIP ABL Facility will be the Debtors' primary mechanism to fund its day-to-day

operations and is to be secured by, among other things, the Debtors' account receivables, cash

and inventory.  Entering into the DIP ABL Facility and refinancing the existing $150,000,000

asset backed loan facility (the "**Prepetition ABL Facility**") on the first day of these Chapter 11

Cases was a prerequisite for the Debtors' major stakeholders to support the Prearranged Plan so

that the Debtors have a functional and competitively priced working capital facility.

        87.      The second DIP Facility is backstopped by the Informal Committee of

Noteholders and is a senior secured non-amortizing new money term loan credit facility in the

aggregate principal amount of $100,000,000 (the "**DIP Term Loan Facility**").  The DIP Term

Loan Facility is to be secured by all of the Debtors' property that is not considered secured by

the DIP ABL Facility.  The Informal Committee of Noteholders has committed to providing the

Debtors with the option of converting the DIP Term Loan Facility to an exit term loan facility

upon the Debtors' emergence and has also committed to infusing an additional $50,000,000 exit

term loan.  In furtherance of its commitment to the Debtors' operations, the Informal Committee

of Noteholders is providing a substantial amount of new money and consenting to prime their

existing security interests and liens on the Debtors' assets.  I believe that absent the financing

provided by the Informal Committee of Noteholders, the Debtors would lack the liquidity to

maintain key business relationships with vendors, suppliers, and customers, provide working

capital to operate during the Chapter 11 Cases, and effectively implement the Prearranged Plan.

        88.      Significantly, the DIP Facilities allow the Debtors to draw $205 million

upon entry of the Interim Order and, upon entry of the Final Order, make an additional draw of

$45 million.  Further, the DIP ABL Agent committed to use best efforts and negotiate the terms

of exit facility financing and the DIP Term Loan Lenders committed to convert all of the loans under the DIP Term Loan Facility on a dollar-for-dollar basis plus an additional aggregate principal amount of $50 million into the Exit Term Loan Facility, upon the Debtors' request. The DIP Lenders' commitments provide the Debtors with the ability to meet their administrative obligations during these chapter 11 cases and emerge on a timely basis and as a stronger enterprise.

89.     The Debtors are also seeking authority to use their Cash Collateral to, among other things, fund the cash needs related to their operations (including the amounts necessary to administer these Chapter 11 Cases), satisfy their obligations under the DIP Facilities, and provide adequate protection to the Prepetition Secured Parties.  The Debtors' access to sufficient working capital and liquidity made through the use of Cash Collateral, incurrence of new indebtedness, and other financial accommodations, are vital to the preservation and maintenance of their going concern value.  Further, given the realities of the Debtors' circumstances, including a capital structure that includes little to no available unencumbered assets, I submit that the terms of the prudently selected DIP Facilities reflect the most reasonable and viable option for the Debtors.  The Debtors' decision to enter into the DIP Financing was fair and reasonable, reflected an exercise of prudent business judgment consistent with their fiduciary duties, and was appropriate under the circumstances

### Motion of Debtors Pursuant to 11 U.S.C. §§ 363(b)(1) and 105(a) and Fed. R. Bankr. P. 9019 for Entry of Order Authorizing Debtors to Enter Into Accommodation Agreements with Customers

90.     By this motion, the Debtors request authority, on an interim (and later final) basis, pursuant to sections 363(b)(1) and 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, to enter into the Accommodation Agreements.  As set forth above, the Accommodation Agreements, which were the product of nearly a month of good-faith and arms'

length negotiations, are a cornerstone of the Debtors' Plan and represent significant value for the Debtors, their estates and all parties in interest. Pursuant to the Accommodation Agreements, the Debtors will receive both interim and long-term accommodations from the OEM Customers and significant price adjustments on existing and future programs. In addition, the OEM Customers have agreed to support the Debtors' Plan, subject to delivery of an approved disclosure statement and other solicitation materials. A more detailed summary of the terms and conditions of the Accommodation Agreements is set forth in the motion.

87.     In exchange for these accommodations, the Debtors have committed to continue to produce and deliver to the OEM Customers component parts during the terms of the Accommodation Agreements, as well as to provide certain assistance in connection with any resourcing activities that are permitted under the agreements. In addition, the Debtors have agreed that each of the OEM Customers will have allowed general unsecured claims, set forth below, as a part of the overall settlement and compromise. The Debtors have further agreed, pursuant to an access agreement, to provide the OEM Customers with certain limited rights to access and utilize the Debtors' facilities and equipment in the event there is a continuing default under the Accommodation Agreements which has resulted in a substantial likelihood that an OEM Customer's production will be interrupted.

88.     The concessions embodied in the Accommodation Agreements represent real and significant value for the Debtors, their estate and all parties in interest. These accommodations are more than a mere piece of the Debtors' Plan – they are central to the Debtors' ability to continue to operate both in the near-term, during the chapter 11 cases, and on a more permanent basis post-emergence. The Debtors' proposed debtor-in-possession lenders have relied on certain of the terms and conditions set forth in the Accommodation Agreements,

44

including, without limitation, the accounts receivable set-off waivers and limitations, in agreeing

to extend financing under the DIP Facilities.  Absent approval of the Accommodation

Agreements on an interim basis, as set forth in the motion, the Debtors will be unable to borrow

under the terms of their proposed DIP Facilities.  In addition, failing to secure approval of the

Accommodation Agreements would also trigger a default under the Restructuring Support

Agreement, which would derail the Debtors' chapter 11 cases from the start.

89.    The broad support the Debtors have garnered for the Plan reflects the

consensus among the Debtors' key constituents that the agreements embodied in the

Accommodation Agreements represent real and significant value for the Debtors, for the benefit

of the estates, and all of their creditors.  Accordingly, the Debtors should be authorized to enter

into the Accommodation Agreements.

### Motion of Debtors Pursuant to 11 U.S.C. § 107(b) and Fed. R. Bankr. P. 9018 For an Order Authorizing Them to File Exhibits to Accommodation Agreements Under Seal

91.    In conjunction with the Accommodation Agreements, the Debtors have

moved to file the schedules and exhibits to the Agreements under seal and to redact versions of

the Accommodation Agreements in order to protect certain highly confidential and proprietary

information relating to customer-specific pricing and accommodations contained therein.  The

individual component supply agreements, term sheets, and similar agreements that we are

moving to seal contain pricing, quality metrics, payment terms, future business awards and rights

of last refusal.  If disclosed, the contents of these agreements would divulge confidential and

commercially sensitive information relating to the Debtors' ongoing business relationship with

each of the OEM Customers that would be harmful to both the Debtors and OEM Customers.

Thus, I believe this information must be sealed and redacted in order to protect the Debtors and

the OEM Customers.

WEIL:\95271116\1\35076.0003

**Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363(b), 363(c), and 364(a) and Fed. R. Bankr. P. 6003 and 6004 for Entry of Order (I) Authorizing Debtors to (A) Continue Using Existing Cash Management System, (B) Honor Certain Postpetition Obligations Related to the Use Thereof, (C) Provide Postpetition Intercompany Claims Administrative Expense Priority, and (D) Maintain Existing Bank Accounts and Business Forms, and (II) Waiving the Requirements of 11 U.S.C. § 345(b)**

92.     By this motion (the "**Cash Management Motion**"), pursuant to sections 105(a), 345(b), 363(b), 363(c), and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, the Debtors request entry of an order:  (a) authorizing them to (i) continue to operate their existing cash management system (the "**Cash Management System**"), as described therein, including the continued maintenance of existing bank accounts (the "**Bank Accounts**")[13] at the existing banks (the "**Banks**") and continue transferring funds among the Debtors and their non-Debtor affiliates in the ordinary course of business, consistent with their prepetition practices, (ii) honor certain prepetition obligations related to the Cash Management System, and (iii) maintain existing business forms; and (b) waiving the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to any of the Debtors' Bank Accounts.

93.     Prior to the Commencement Date, in the ordinary course of their businesses, the Debtors used the Cash Management System to fund their operations, as well as the operations of certain of their non-Debtor affiliates.  The Debtors use of the Cash Management System enables them to collect, concentrate, and disburse the funds generated by the Debtors' global multi-brand media and direct marketing operations.  The Cash Management

---

[13] As a part of the Debtors' senior secured debtor-in-possession financing facility, the Debtors agreed to implement certain modifications to their Cash Management System.  As more fully described in the Debtors' motion seeking approval of the DIP Facility (the "**DIP Financing Motion**"), the increased oversight of the Debtors' operations and finances from their postpetition secured lenders will provide the Court with additional assurance that the Debtors' management of their finances will be prudent and maximize the value of the Debtors' estate for the benefit of all creditors/stakeholders.

WEIL:\95271116\1\35076.0003

System allows the Debtors to efficiently collect and transfer the cash generated by the manufacture and sale of aluminum and iron automotive components, including steering knuckles, control arms, sub-frames and assemblies, that are designed into OEM platforms. Further, the Cash Management System enables the Debtors to facilitate their cash forecasting and reporting, monitor the global collection and disbursement of funds, and maintain control over the administration of the Debtors' Bank Accounts.

94.    The Cash Management System is overseen primarily by the personnel in the Debtors' finance department (the "**Finance Department**") and is comprised of approximately forty-four (44) Bank Accounts(as well as a number of lockbox accounts) maintained at various Banks in the United States and abroad.  Although much of the Cash Management System is automated, the Debtors' Finance Department personnel monitor the system and manage the proper collection and disbursement of funds.  Many of the Debtors' Bank Accounts are located in banks designated as authorized depositories by the U.S. Trustee, pursuant to the U.S. Trustee's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "**U.S. Trustee Guidelines**").  The various features and accounts that make up the Cash Management System are described in greater detail below.

95.    <u>Cash Collection</u>.  The Debtors collect and deposit the funds generated from their operations in a variety of collection accounts ("**Collection Accounts**") and lockboxes ("**Lockboxes**").  The majority of the Debtors' receipts are received at Lockboxes and Collection Accounts maintained at the Debtors' primary bank, BMO Harris Bank N.A ("**BMO**").  Payments from certain customers, however, primarily relating to the Debtors' casting productions under their SMW business lines, are received at accounts maintained at PNC Bank, N.A. ("**PNC Bank**") although the Debtors have been working to transfer those collections over to BMO.

47

96.    *BMO Collection Accounts.*  The Debtors maintain approximately seven Collection Accounts at BMO, each of which has a corresponding Lockbox Account.  The Lockbox Accounts receive check payments from the OEMs and the Debtors' other trade customers, which are directly deposited into the associated Collection Accounts.  All electronic payment receipts from the OEMs and other customers are received directly into the Collection Accounts.  Each of the Collection Accounts is a zero-balance account, meaning it does not carry a cash balance at the end of each business day.   The funds maintained within these accounts are automatically transferred at the end of each business day into the Debtors' primary collections concentration account at BMO (the "**BMO Collections Concentration Account**").

97.    In addition to concentrating all receipts from the Collection Accounts, prior to the Commencement Date, the BMO Collections Concentration Account was also utilized to pay down outstanding balances on the Debtors' ABL Facility.  The BMO Collections Concentration Account also receives a daily automated transfer from the various Collection Accounts included within the PNC Bank structure, which includes all receipts collected into the accounts from the prior day.  The BMO Collections Concentration Account is swept on a daily basis to repay the outstanding Revolver balance.

98.    *PNC Bank Collection Accounts.*  The Debtors also maintain a Lockbox and Collection Accounts at PNC Bank to receive payments from certain SMW-related customers and other parties.  The Lockbox receives all checks made to the Debtors' SMW business, which are then directly deposited into a Collection Account at PNC Bank.   Electronic payments from customers and other trade parties are deposited into various Collection Accounts at PNC Bank. The funds maintained within the Collection Accounts are automatically transferred at the end of each business day into the BMO Collections Concentration Account.

WEIL:\95271116\1\35076.0003

99. *The BMO Disbursements Concentration Account*. The Debtors' primary disbursements concentration account with BMO (the "**BMO Disbursements Concentration Account**") is utilized as the funding account for the Debtors' various disbursement and payroll accounts, in addition to acting as the receipt account for Revolver funding. On a daily basis, the BMO Disbursements Concentration Account, which is a non-zero balance account, was funded by the ABL Facility, subject to monthly (or weekly) borrowing base availability and the outstanding Revolver balance. The BMO Disbursements Concentration Account is also utilized as the funding account for the Debtors' PNC Operating Account (as defined below). The BMO Disbursements Concentration Account is a non-zero balance account, therefore, to the extent the Debtors disburse fewer funds than anticipated, the account may have an ending cash balance.

100. *The PNC Operating Account*. The Debtors maintain an operating account at PNC Bank in the name of Concord International, Inc. (the "**PNC Operating Account**"), which is utilized for the purpose of receiving funding from the BMO Disbursements Concentration Account. The PNC Operating Account is a non-zero balance account and, therefore, is not swept; rather, the account is typically funded based on known disbursements scheduled to be made from the PNC Disbursement / Transfer Account and/or the Lease Disbursements Account. The PNC Operating Account may maintain a cash balance at the end of each business day.

101. *International Cash Concentration*. Outside the United States, cash concentration occurs at the local foreign entity level. The Debtors do not centrally manage cash for their foreign non-Debtor affiliates. Additionally, excess cash from foreign operations is not automatically swept by the Debtors from their international locations into the United States. Rather, cash is repatriated by the Debtors from their international operations pursuant to certain

49

Management Services Agreements. In addition, certain of the Debtors' foreign affiliates are parties to intercompany loans, which are subject to specific loan agreements. These intercompany loans are typically settled via cash payment unless, in rare circumstances, the intercompany loan is forgiven or converted to equity.

102.    The Debtors also manufacture and ship component parts and other goods for their foreign non-Debtor affiliates. Goods shipped from a Debtor entity to a foreign non-Debtor affiliate are typically settled via cash payments, as the Debtors' foreign affiliates send cash to the appropriate Bank Account in the same manner as the Debtors' other customers. If, for any reason, the foreign affiliate does not tender a cash payment, the liability continues to be reflected as an intercompany balance within the Debtors' books and records.

103.    Disbursements. The Debtors transfer the cash required to satisfy their daily financial obligations from their concentration and operating accounts. Disbursements are calibrated by the personnel in their Finance Department such that only the needed amount of cash is transferred out of the BMO Disbursements Concentration Account or the PNC Operating Account to pay the Debtors' obligations. The majority of the Debtors' disbursements, including payroll, corporate payables, and employee health and welfare benefits, are paid locally at the divisional level from one of the Debtors' Disbursement Accounts maintained at BMO.

104.    *Disbursement / Payroll Accounts*. The Debtors maintain various Disbursement / Payroll Accounts at BMO to make electronic payments to trade vendors, employees and all other parties. The accounts are funded, based on known daily wire or automated clearing house (ACH) disbursements, by the BMO Disbursements Concentration Account. The Debtors' third-party payroll processor draws funds required for payroll

50

obligations from each of these Disbursement / Payroll Accounts, which are setup on a divisional basis.

105.   *Check Disbursement Account*.  The Debtors' maintain a Check Disbursement Account at BMO for the purpose of making check payments to trade vendors and all other parties.  The Check Disbursement Account is funded, based on known daily check clearings, by the BMO Disbursements Concentration Account.

106.   *Capital Expenditures Equity Account*.  The Debtors have historically maintained a capital expenditures equity account with BMO that was created under a previous credit agreement to segregate funding contributions by the Debtors' equity sponsor related to capital expenditures.  While considered part of the Debtors' Cash Management System, this account is idle, and does not actively receive or disburse funds to any of the Debtors' other bank accounts.

107.   *PNC Disbursement Accounts*.  Certain of the Debtors' other disbursements are funded out of various Disbursement Accounts maintained at PNC Bank.  These disbursements include payments on account of legacy lease obligations, certain limited engineering software license fees, a limited amount of raw materials for certain of the Debtors' foreign affiliates, and transfers related to the Debtors' operations within Paris and Thailand.

108.   Intercompany Transfers.  In the ordinary course of business, the Debtors maintain business relationships with their Debtor and non-Debtor affiliates, including foreign affiliates, which result in intercompany receivables and payables (the "**Intercompany Claims**") arising from the following types of transactions (the "**Intercompany Transactions**"):

(a)   *Intercompany Sales*.  In the ordinary course of business, the Debtors sell and purchase goods from various Debtor and non-Debtor foreign affiliates.  The Debtors' records of Intercompany

51

Transactions reflect the net position of both sales and purchases made between their affiliates.

(b)   *Expense Allocations.*  In the ordinary course of business, the Debtors incur centrally-billed expenses, including insurance premiums, workers' compensation obligations, payroll and benefit costs, and IT costs.  The Debtors and certain non-Debtor foreign affiliates often pay these expenses and then allocate them to the appropriate affiliates.

(c)   *Intercompany Loans.*  The Debtors also maintain a complex and well documented system of intercompany loans and capital contributions to facilitate the flow of cash (i) between each of the Debtors, and (ii) between the Debtors and its foreign subsidiaries.

109.    Historically, the non-Debtor foreign affiliates have been self-sustaining and cash generating, with funds generally flowing up to the U.S. parent in the form of management fees as discussed above.  From time to time, funds have flowed out of the U.S. Cash Management System to the foreign subsidiaries in the form of intercompany loans and/or capital contributions to address statutory requirements or liquidity needs.  As set forth in further detail in the Debtors' motion seeking approval of their postpetition debtor-in-possession financing facility, the Debtors anticipate that it may be necessary at some point to send capital to certain of their non-Debtor foreign affiliates as a result of trade contraction and other issues relating to the commencement of these chapter 11 cases.

110.    Domestically, as funds are disbursed throughout the Cash Management System, at any given time there may be Intercompany Claims owing by one Debtor to another Debtor (the "**Inter-Debtor Transactions**").  As I understand it, these Inter-Debtor Transactions are settled by book entry rather than by an actual transfer of cash.  The Debtors track all Inter-Debtor Transactions electronically in their accounting system and can ascertain, trace and account for them as needed.  If the Inter-Debtor Transactions were to be discontinued, the Cash

52

Management System and related administrative controls would be disrupted to the Debtors'
detriment.

111.    <u>Service Charges</u>.  The Debtors incur periodic service charges and other
fees to the Banks in connection with the maintenance of the Cash Management System (the
"**Service Charges**"), which average approximately $25,000 per month for the Banks.  Payment
of the prepetition Service Charges is in the best interests of the Debtors and all parties in interest
in these chapter 11 cases, as it will prevent any disruption to the Cash Management System.

112.    <u>Existing Business Forms</u>.  In the ordinary course of business, the Debtors
use a multitude of check types.  Additionally, the Debtors use a variety of correspondence and
business forms, including, but not limited to, purchase orders, checks, and other business forms
(collectively, the "**Business Forms**").  To minimize the expense to the Debtors' estates
associated with developing and/or purchasing entirely new forms, the delay in conducting
business prior to obtaining such forms, and the confusion of suppliers and other vendors, the
Debtors seek authority to continue to use their Business Forms as such forms existed
immediately prior to the Commencement Date, without reference therein to the Debtors' status
as debtors in possession.  The Debtors will use their reasonable best efforts to mark "debtor in
possession" on their Business Forms as soon as reasonably practicable following the
Commencement Date.

113.    Strict enforcement of the U.S. Trustee Guidelines in these chapter 11 cases
would severely disrupt the ordinary financial operations of the Debtors by reducing efficiencies
and creating unnecessary expenses.  Absent the relief requested in the Cash Management
Motion, the Debtors would be unable to effectively and efficiently maintain their financial
operations, which would cause significant harm to the Debtors and their estates and creditors.

WEIL:\95271116\1\35076.0003

By avoiding the disruption and delay to the Debtors' payroll, disbursement, and collection activities that would result from closing the Bank Accounts and opening new accounts, and preserving business continuity, all parties in interest, including employees, vendors, customers, and creditors, will be best served by the relief requested in the Cash Management Motion. Granting the relief requested will provide the Debtors, their business operations, and all parties in interest, with considerable benefits.

> **Motion of Debtors Pursuant to 11 U.S.C. §§ 363(b) and 105(a) for Entry of Order (I) Authorizing, but Not Directing, Debtors to (A) Pay Prepetition Employee Obligations and Temporary Worker Obligations, and (B) Maintain All Employee Benefit Programs; and (II) Authorizing and Directing Applicable Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Presented for Payment and to Honor All Fund Transfer Requests**

114.    By this motion (the "**Employee Motion**"), the Debtors request the entry of interim and final orders authorizing, but not directing, them to (i) pay, in their sole discretion, all prepetition amounts required under or related to Compensation Obligations, Union Dues, Employee Incentive Program Obligations, Reimbursable Expenses, Withholding Obligations, Severance Obligations, Employee Benefit Programs, and Independent Contractor Obligations (each as defined in the Employee Motion and, together with any costs or related administrative expenses, the "**Prepetition Employee Obligations**");[14] and (ii) continue their prepetition practices, programs, and policies for their Employees as those practices, programs, and policies may be modified, amended, or supplemented from time to time in the ordinary course of the Debtors' businesses, and honor any related administrative costs and obligations arising thereunder.  Further, the Debtors request that the Court authorize and direct the banks and other

---

[14] The Debtors believe that the list of wages, benefits, and other obligations is a comprehensive list of obligations arising from the Debtors' employee compensation and benefits programs.  To the extent that any plan or program obligation was inadvertently omitted, the term "Employee Obligations" includes such obligation.

financial institutions at which the Debtors maintain disbursement accounts, at the Debtors'

direction, to receive, process, honor, and pay, to the extent of funds on deposit, any and all

checks drawn or electronic fund transfers requested or to be requested by the Debtors relating to

the Prepetition Employee Obligations. The Debtors also seek authority to issue new postpetition

checks, or effect new electronic fund transfers, on account of such obligations to replace any

prepetition checks or electronic fund transfer requests that may be lost, dishonored, or rejected as

a result of the commencement of these chapter 11 cases. As of the Commencement Date, the

Debtors employ approximately 3,500 Employees,[15] including approximately (i) 3,000 hourly

Employees, regularly scheduled to work a minimum of forty hours per week, and (ii) 500

salaried Employees, most of who are also employed to work a minimum of forty hours per

week.[16] Most of the Debtors' Employees are retained at the plant level and perform work in the

Debtors' various manufacturing facilities located throughout the United States. The Employees

that work at the Debtors' Southfield headquarters are employed by Chassix.

115. As of the Commencement Date, approximately 270 Employees that work

in the Debtors' facilities located in Batavia, New York and Columbus, Georgia are members of

labor unions and are subject to collective bargaining agreements (collectively, the "**CBAs**") with

the Debtors. The facilities located in Batavia and Columbus are the Debtors' only unionized

facilities and the union Employees at such facilities are the only Employees subject to CBAs.

---

[15] For purposes of the Employee Motion, "**Employees**" includes all persons entitled to, as of the Commencement Date, compensation, benefits, reimbursement, or any other similar payment as a consequence of being employed by the Debtors but does not include any temporary workers or independent contractors.

[16] Additionally, the Debtors' foreign affiliates and subsidiaries (all of which are non-Debtors) retain approximately 1,200 individuals abroad. Because all of the Debtors are organized under the laws of various states in the United States, and because none of their foreign affiliates are parties to these chapter 11 cases, unless otherwise noted herein, the Debtors have limited the description of their workforce and benefits programs to their domestic operations.

The Debtors do not maintain defined benefit pension plans for their Employees and, accordingly, do not owe any amounts on account of pension obligations.

116.    The Employees perform a variety of critical functions for the Debtors including, without limitation, tasks pertaining to management, product manufacturing, facility and machine maintenance, quality assurance, purchasing and sales administration, finance and accounting, human resources, customer service, security, and other areas crucial to the Debtors' casting and machining businesses.  Due to the highly technical and specialized nature of the automotive industry, the skill and "know how" of the Employees are fundamental to the success of the Debtors' businesses and operations.

117.    In addition to their Employees, the Debtors also employ (i) two independent contractors to perform resource planning implementation services, information technology services, and related financial projects (the "**Independent Contractors**"), and (ii) approximately seven hundred-forty temporary workers to work at the Debtors' various manufacturing facilities through various staffing agencies.[17]

118.    The Debtors believe that, as of the Commencement Date, the aggregate amount of their Prepetition Employee Obligations is approximately $6.1 million, approximately $4.5 million of which relates to prepetition Compensation Obligations.[18]  By the Employee Motion, the Debtors are not seeking authority to pay to any individual any amount in compensation or benefits that collectively would exceed the $12,475 priority cap imposed by section 507(a)(4) of the Bankruptcy Code (the "**Prepetition Compensation Cap**") during the

---

[17] By the Employee Motion, the Debtors are not seeking authority to pay prepetition amounts owed to staffing agencies on account of temporary workers.

[18] This amount does not include non-cash pay obligations (such as paid vacation time), any Reimbursable Expenses that may be outstanding, or Withholding Obligations.

Interim Period.  The various components of the Prepetition Employee Obligations are described in further detail in the Employee Motion.

119.    The Debtors believe that a substantial portion of the Prepetition Employee Obligations constitute priority claims under sections 507(a)(4) and (5) of the Bankruptcy Code. As priority claims, such Prepetition Employee Obligations must be paid in full before any general unsecured obligation of the Debtors may be satisfied.  Accordingly, the relief requested herein likely may affect only the timing of the payment of a substantial portion of the Prepetition Employee Obligations and should not prejudice the rights of the general unsecured creditors.

120.    Payment of the Prepetition Employee Obligations, including, without limitation, the Employee Incentive Programs, is also warranted as they are justified by the facts and circumstances of these chapter 11 cases.  The Employees are vital to the continued operation of the Debtors' businesses and necessary for the Debtors to successfully emerge from these chapter 11 cases.  Any delay in paying Prepetition Employee Obligations will adversely impact the Debtors' relationship with their Employees as it could irreparably harm the Employees' morale, dedication, confidence, and cooperation.  Because many of the Employees interact with the Debtors' customers—on whose continued support and loyalty the Debtors rely—the Employees' support for the Debtors' reorganization efforts is key to the Debtors' ongoing operations.  The Debtors cannot risk the damage to their businesses that would follow any decline in Employee morale that likely would occur if the Debtors fail to pay the Employees their wages, salaries, and other benefits.  Moreover, absent an order granting the relief requested, many Employees will suffer undue hardship and, in many instances, serious financial difficulties. Thus, without the relief requested, the Debtors' restructuring efforts may be undermined by the possibility that otherwise loyal Employees will seek other employment alternatives.

WEIL:\95271116\1\35076.0003

121.    The Debtors also believe that it is necessary to pay the administrative costs owed to third-party vendors who provide compensation- and other benefit-related services and products.  Absent the relief requested, the Debtors will be unable to maintain their compensation programs and Benefit Programs in an efficient and cost-effective manner.

122.    The Debtors do not currently seek to alter their compensation, vacation, or other benefit programs or policies.  Rather, pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, the Debtors seek authority to honor and pay the Prepetition Employee Obligations as and when they come due, and to continue at this time their practices, programs, and policies for their Workforce, as those practices, programs and policies were in effect as of the Commencement Date.

123.    Further, the Debtors are not seeking authority pay any individual Employee or Independent Contractor in an amount greater than the Prepetition Compensation Cap on account of outstanding prepetition Compensation Obligations prior to entry of the Final Order.  The Debtors are also not seeking to make any payments on account of any Employee Incentive Program prior to entry of the Final Order and will not make any payment to any "Insider," as that term is defined in section 101(31) of the Bankruptcy Code, on account of the Severance Program, or any severance obligation owed pursuant to an employment agreement, without first requesting separate authority from the Court.

124.    The Debtors estimate that, as of the Commencement Date, the aggregate amount of outstanding, due and payable Prepetition Employee Obligations is approximately $6.1 million, which does not include obligations that are not cash pay obligations, such as paid vacation time.

WEIL:\95271116\1\35076.0003

**Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 503(b)(9) for Entry of Order (I) Authorizing, but Not Directing, Debtors to Pay Prepetition Obligations of Critical Vendors, and (II) Authorizing and Directing Financial Institutions to Honor and Process Related Checks and Transfers**

125.    By this motion, pursuant to  sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code, the Debtors seek (i) authority, but not direction, to pay some or all of the prepetition claims of certain vendors, suppliers, service providers, and other similar entities that are essential to maintaining the going concern value of the Debtors' enterprise (the "**Critical Vendors**" whose prepetition claims shall be defined as the "**Critical Vendor Claims**"), subject to the conditions described in the Motion, and (ii) approval of the procedures set forth in the Motion for addressing those vendors who repudiate and refuse to honor their contractual obligations to the Debtors.  The Debtors also seek entry of an order authorizing and directing the banks and other financial institutions at which the Debtors maintain disbursement accounts, at the Debtors' direction, to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks drawn or electronic fund transfers requested or to be requested by the Debtors relating to the Critical Vendor Claims.  Further, the Debtors seek authority to issue new postpetition checks, or effect new electronic fund transfers, on account of the Critical Vendor Claims to replace any prepetition checks or electronic fund transfer requests that may be lost, dishonored, or rejected as a result of the commencement of the Debtors' chapter 11 case.

126.    As a major Tier One supplier of aluminum and iron chassis sub-frame components and powertrain products to the largest automotive manufacturers in the word, the Debtors rely heavily on certain Critical Vendors to provide them with the specialized and unique parts, materials, and services necessary to manufacture the steering knuckles, control arms and various other casted and machined parts that the Debtors produce for their Customers.  Because most of the component parts manufactured by the Debtors are safety-critical and must adhere to

rigorous federal safety standards, many of the parts and sub-components sourced by the Debtors

from third-party vendors and suppliers are highly specialized and must undergo a lengthy and

detailed validation and testing process.  As a result, a significant amount of the component parts

supplied by the Debtors' Critical Vendors require substantial lead time to develop and cannot be

replaced in timely or efficient manner.  Additionally, as the Debtors, like their Customers, utilize

a "just-in-time" inventory supply system, the Debtors are highly dependent on the inventory

supplied by their Critical Vendors to meet their Customers' needs for production for a particular

day.  Thus, to avoid catastrophic disruptions in their supply chain, which could result in

production stoppages both for the Debtors and their Customers, it is of the utmost importance

that the Debtors' supply chain remain intact.

 127.    Pursuant to this motion, the Debtors are requesting critical vendor relief

similar to that received by other distressed automotive suppliers and other companies heavily

reliant on supply chain continuity to preserve the viability of a going-concern enterprise.  Many

of the Debtors' sub-suppliers are sole source suppliers (*i.e.*, the only supply source for certain

complex parts and specifically designed systems necessary to the Debtors' production process)

that cannot be timely and/or efficiently replaced given the highly-engineered nature of the

component parts they provide.  A number of the Debtors' suppliers are also "directed-buy

suppliers," meaning that the Debtors are directed by their Customers to utilize the component

parts of such sub-suppliers.  The Debtors do business with many of these vendors pursuant to

short term, or "as needed," purchase orders without a long-term agreement.  As is typical in

distressed situations, vendors have been increasingly unwilling to extend trade credit to the

Debtors.

128.    Anticipating this situation, the Debtors took painstaking efforts to ensure their supply chain stability prior to commencing these chapter 11 cases—including implanting a narrowly-tailored critical vendor program.  The development process involved a monumental effort to design, structure, and execute a mechanism under which a core, centralized team—comprised of members of the Debtors' purchasing and supply team with the assistance of professionals at FTI and Weil and subject to the personal supervision of the Debtors' Interim Chief Financial Officers—will authorize payment only to those suppliers critical to the Debtors' operations and subject to the vendors' own obligations to provide Customary Trade Terms (as herein defined).  This process was developed through meetings and dialogue between the Debtors' senior management and professionals at FTI and Weil.

129.    The Critical Vendors are all important to the Debtors' machining and casting businesses and, accordingly, a delay in their services could cause irreparable harm to the Debtors' revenue, goodwill, and market share.  In general, the Critical Vendors fall into the following four categories:  (i) component part providers; (ii) tooling and equipment providers (iii) raw materials providers; and (iv) essential services providers.[19]

130.    The Debtors believe this deliberative process, combined with their comprehensive Payment Protocol, justifies the relief requested therein.  Pursuant to this motion, the Debtors are not seeking to pay all prepetition claims of the Critical Vendors.  Instead, the Debtors seek to pay such undisputed amounts in the ordinary course of the Debtors' businesses and on terms consistent with the Debtors' prepetition practices that the Debtors determine, in their business judgment, are in the best interests of the Debtors' businesses.  Finally, to ensure that the Debtors' liquidity is preserved as they transition their supply chain into chapter 11,

---

[19] These categories generally describe the major categories of goods and services provided by Critical Vendors and are not intended to be exclusive.

WEIL:\95271116\1\35076.0003

payments to Critical Vendors will be contingent on the Critical Vendors agreeing to continue to sell their goods or services on terms at least as favorable as those in effect before the Commencement Date.

### Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), 503(b)(9) For Entry of Order (I) Authorizing Debtors to Pay Prepetition Obligations Owed to Foreign Creditors, and (II) Authorizing and Directing Financial Institutions to Honor and Process Related Checks and Transfers

131.    By this motion (the "**Foreign Creditors Motion**"), pursuant to sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code, the Debtors seek (i) authority, but not direction, to pay, in their sole discretion in the ordinary course of business, the prepetition claims (the "**Foreign Claims**") owing to certain foreign vendors, suppliers, service providers, independent contractors, landlords and other entities (collectively, the "**Foreign Vendors**") and (ii) authorizing and directing the Debtors' banks to receive, process, honor, and pay, to the extent of funds on deposit, checks or electronic transfers used by the Debtors to pay the Foreign Claims without further order of the Court.  The Debtors are not seeking to pay all prepetition claims of Foreign Vendors.  Instead, the Debtors seek to pay such undisputed amounts in the ordinary course of the Debtors' businesses and on terms consistent with the Debtors' prepetition practices.[20]

132.    Due to the limitations of the enforceability of the automatic stay, the risk of foreign creditors' exercising remedial rights, and the critical nature of goods and services provided by foreign creditors, I believe that the relief requested in the Foreign Creditors Motion

---

[20] The Debtors generally are not responsible for the payment of any taxes to foreign governmental and quasi-government authorities (collectively, the "**Foreign Governmental Authorities**," and together with the Foreign Vendors, the "**Foreign Creditors**"), which are paid at the local foreign entity level.  This is consistent with certain management service agreements between the Debtors and the Debtors' foreign subsidiaries, which require that the foreign entity is responsible for paying any foreign tax obligations.  To the extent the Debtors are responsible for paying any Foreign Governmental Authorities, the Debtors also request authority to pay those amounts pursuant to the Foreign Creditors Motion, and such amounts shall constitute Foreign Claims.

WEIL:\95271116\1\35076.0003

is warranted.  Moreover, payment of the Foreign Vendor Claims as proposed will assure the orderly operation of the Debtors' businesses and avoid costly disruptions and the significant loss of value and irreparable harm arising therefrom

133.    In light of the potential for serious and potentially irreparable consequences if the Foreign Vendors do not continue to make uninterrupted and timely deliveries—and the lack of any enforcement mechanism against them—I submit that payment of the Foreign Vendors' claims is essential to avoid costly disruptions to the Debtors' operations.

**Motion of Debtors Pursuant to 11 U.S.C. §§ 363(b), 105(a) and 503(b) for Entry of Order Authorizing Debtors to Pay (I) Certain Prepetition Charges for Shippers, Warehousemen, Other Lien Claimants and Customs Duties and (II) Granting Administrative Status for Goods Delivered to Debtors Postpetition**

134.    By this motion, the Debtors request authority  to (i) pay certain prepetition amounts owed to parties that may be able to assert liens against the Debtors and their property (the "**Lien Claimants**") that the Debtors determine, in the exercise of their business judgment, to be necessary or appropriate to obtain the release of inventory, supplies, merchandise, goods, tools, equipment, components, materials, or other items (collectively, the "**Goods**") held by any Lien Claimants, and (ii) pay prepetition custom duties and such other related prepetition import expenses and charges (the "**Customs Duties**") as the Debtors determine, in the exercise of their business judgment, to be necessary or appropriate to obtain Goods in transit and to satisfy any related liens.  The Debtors further request authority to condition payment of prepetition amounts owed to any Lien Claimant on written verification that such Lien Claimant will abide by certain conditions, including that the Lien Claimant will continue performing on favorable terms and that the Lien Claimant will not cancel on less than ninety days' notice.  By this motion, the Debtors also request that the Court (i) grant administrative priority status to all undisputed obligations of the Debtors owing to third-party vendors and suppliers arising from the

postpetition delivery of Goods ordered prior to the Commencement Date and (ii) authorize the Debtors to pay such obligations in the ordinary course of business.  Finally, the Debtors request that the Court authorize and direct all banks and other financial institutions on which checks are drawn or electronic funds are transferred for the payment of any charges to Lien Claimants and Customs Duties to receive, process, honor, and pay all checks and electronic transfers, whether they were issued before or after the Commencement Date.

135.    In operating their businesses, the Debtors use and make payments to a number of Lien Claimants, including, without limitation, shippers and warehousemen, tool makers, equipment manufacturers, service technicians and other service providers.  The services provided by the Lien Claimants are critical to the Debtors' day-to-day operations.  As discussed, the Debtors use a "just-in-time" supply method and thus do not amass large amounts of materials in their manufacturing facilities.  The Debtors' Customers similarly do not keep excess inventory on hand and, instead, rely on the Debtors to make frequent and timely deliveries, consistent with the Debtors' contractual obligations.  To meet their delivery deadlines and maintain uninterrupted operations, the Debtors rely heavily on third-parties, including shippers who transport Goods for the Debtors and warehousemen who store Goods while they are in transit.  Because of the commencement of these chapter 11 cases, certain shippers and warehousemen who hold Goods for delivery to or from the Debtors may refuse to release the Goods pending receipt of payment.

136.    The Debtors do business with a number of other third-parties that hold, and may be able to impose liens on, certain of the Debtors' property.  Such Lien Claimants include independent tool and die shops and equipment manufacturers who make tools and equipment necessary for the continued operations of the Debtors' businesses.  Typically, the

64

Debtors pay for tools and equipment in intervals so, at any given time, tool makers and equipment manufacturers may possess tools and equipment necessary for the Debtors' operations that have not yet been fully paid for.  Tool makers and equipment manufacturers may be able to assert liens on certain tools and equipment for any unpaid amounts.  Accordingly, it is imperative that the Debtors be authorized to pay the claims of the Lien Claimants, including claims of shippers, warehousemen, tool makers, and equipment manufacturers, whether such claims arose prior to or after the Commencement Date, if the Debtors determine payment is necessary to ensure the uninterrupted shipment, delivery, and manufacture of Goods.

137.    In the ordinary course of their businesses, the Debtors are also involved with the importation and exportation of Goods necessary to the Debtors' businesses.  To facilitate the important and exportation of such Goods, including payment of the related Customs Duties, the Debtors often utilize the services of customs brokers.  The customs brokers charge the Debtors Customs Duties, which are ultimately paid by the brokers to the relevant governmental authority, such as the U.S. Customs and Border Protection Agency, as well as fees for their services.  The Goods that are imported and exported by customs brokers include components, parts, and equipment vital to the Debtors' business operations that the Debtors could not readily obtain from other suppliers.  Moreover, because the Debtors use a "just-in-time" inventory process, the Debtors have a limited supply of such Goods on hand at any given time.  If Customs Duties are not timely paid, U.S. and non-U.S. customs authorities may demand liquidated damages, assess interest, or impose other sanctions, including by asserting liens against imported or exported Goods.  The customs broker themselves may also, in some instances, be able to assert liens against any imported or exported Goods.  Any liens or sanctions would be costly to the Debtors and their estates and inhibit the Debtors' receipt of Goods.

WEIL:\95271116\1\35076.0003

Accordingly, it is imperative that the Debtors be authorized to pay the Customs Duties and related fees and expenses.

138.    As of the Commencement Date, the Debtors have certain prepetition purchase orders (the "**Prepetition Orders**") outstanding with various third-party vendors and suppliers related to Goods that have been ordered by the Debtors but not yet delivered to the Debtors' facilities.  I believe that these vendors may be concerned that, because the Debtors' obligations under the Prepetition Orders arose prior to the Commencement Date, any claims related to the Prepetition Orders will be treated as general unsecured claims and, accordingly, such vendors may demand that the Debtors reissue the Prepetition Orders postpetition or refuse to deliver Goods.  To assuage these potential concerns, and in light of the significant administrative burden that re-issuing the Prepetition Orders would impose upon the Debtors, the Debtors request an order explicitly affording claims arising under Prepetition Orders administrative expense status and authorizing the Debtors to pay such claims in the ordinary course.  I have been informed that any such claims are afforded administrative expense priority under section 503(b)(1)(A) of the Bankruptcy Code.  Accordingly, the relief requested will not provide vendors with any greater priority than they would otherwise have in these chapter 11 cases.

### Motion of Debtors Pursuant to 11 U.S.C. §§ 363 and 105(a) for Entry of an Order (I) Authorizing Debtors to Continue Tooling and Warranty Programs in the Ordinary Course of Business and Pay Prepetition Obligations Related Thereto, and (II) Authorizing but Not Directing the Disbursement Banks to Honor and Process Related Checks and Transfers

139.    By this motion, pursuant to sections 363 and 105(a) of the Bankruptcy Code, the Debtors request entry of an order (i) authorizing the Debtors, in their business judgment, to (a) perform and honor their prepetition obligations related to their tooling equipment, product warranties, and related programs (collectively, the "**Tooling and Warranty**

**Programs**" and the obligations thereunder and related thereto, collectively, the "**Tooling and Warranty Obligations**") as they deem appropriate, and (b) continue, renew, replace, implement new, and/or terminate the Tooling and Warranty Programs as they deem appropriate, in the ordinary course of business, without further application to the Court, and (ii) authorizing and directing that banks and other financial institutions honor and process related checks and transfers.  In order to maintain the Debtors' reputation for reliability and to maintain the loyalty, goodwill and support of their Customers, the Debtors must maintain their Tooling and Warranty Programs in the ordinary course of business and honor their obligations thereunder.

140.    Under the Tooling Programs, the Debtors purchase tooling equipment on behalf of many of their Customers.  The Debtors need to acquire such specialized tooling equipment in order to produce the specific component parts ordered by their Customers.  In such instances, the Customers will ultimately own the tooling equipment and use the Debtors to sub-contract the tool production work, perform quality control assessments, or retain the tooling at the Debtors' facilities to be used in the production of the component parts for the Customers.  If the tooling is to be owned by the Customers, the Debtors seek reimbursement for funds that they have previously paid to third-party tool makers.  In these cases, the Debtors may not have an equitable interest in the tooling.  Therefore, the Debtors are requesting the authority to continue their tooling programs, regardless of whether any payments involve prepetition or postpetition transfers.

141.    Under the Warranty Programs, the Debtors, customary with industry standards, are subject to the standard terms and conditions of their Customers ("**Customer Terms**"), when supplying products to those Customers.  Customer Terms typically include references to warranty clauses that encompass the workmanship of the Debtors' products.  To the

extent that the Customers identify workmanship issues with the Debtors' products, either upon initial receipt of such products, during the production process, through the post-production period, or subsequent to the final sale of the Customers' vehicles to end-consumers, the Debtors may be held liable to remedy any identified workmanship defects.  Typically, remedies are in the form of replacement parts, or monetary damages levied by the Customers.

142.    Because the Debtors' Customers are the lifeblood of their businesses, their loyalty and continued support and patronage are critical to the success of these chapter 11 cases. The continuation of the Tooling and Warranty Programs on an uninterrupted basis is critical to maintain this support and loyalty.  I submit that it is in the best interests of the Debtors' estates to continue these programs, as the obvious disruption and damage that will ensue if Tooling and Warranty Programs are not honored and continued far exceed the costs associated with honoring the Tooling and Warranty Obligations and continuing these practices.

**Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a)(8), and 541 for Entry of an Order (I) Authorizing, but Not Directing, Debtors to Pay Prepetition Taxes and Assessments, and (II) Authorizing and Directing Financial Institutions to Honor and Process Related Checks and Transfers**

143.    In this motion, the Debtors request authority to pay certain use, franchise, real and personal property, and other taxes, as well as certain other annual fees, including fees related to the maintenance of the Debtors' intellectual property, both abroad and domestically, that accrued or arose in the ordinary course of the Debtors' businesses prior to the Commencement Date (the "**Prepetition Taxes and Assessments**").  The Debtors also request that the Court authorize and direct the banks and other financial institutions at which the Debtors maintain disbursement accounts to receive, process, honor, and pay any and all checks drawn or electronic fund transfers requested relating to payment of the Prepetition Taxes and Assessments.

WEIL:\95271116\1\35076.0003

144.    The Debtors must continue to pay the Prepetition Taxes and Assessments to continue operating in certain jurisdictions and to avoid costly distractions during the chapter 11 cases.  Specifically, it is my understanding that the Debtors' failure to pay the Prepetition Taxes and Assessments could adversely affect the Debtors' business operations because the governmental authorities could assert liens on the Debtors' property, assert penalties and/or significant interest on past-due taxes, or possibly bring personal liability actions against directors, officers, and other employees in connection with non-payment of the Prepetition Taxes and Assessments, thus distracting the Debtors' management and employees from their important reorganization efforts.

**Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 362, 363(b), and 503(b), for Entry of Order (I) Authorizing, But Not Directing, Debtors to (A) Pay All Insurance Obligations and (B) Continue All Insurance Programs; (II) Modifying the Automatic Stay with Respect to the Workers' Compensation Claims; and (III) Authorizing and Directing Applicable Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Presented for Payment and to Honor All Fund Transfer Requests**

145.    In this motion, the Debtors request entry of an order (a) authorizing the Debtors to (i) continue, in their discretion, their prepetition insurance coverage, and (b) pay, in their discretion, all insurance premiums and related obligations; and (ii) authorizing and direct the Debtors' banks and other financial institutions to receive, honor, process, and pay any and all checks or electronic fund requests relating to the Debtors' insurance obligations.  In addition, to the extent any of the Debtors' employees hold valid claims under their workers' compensation programs, the Debtors also seek entry of an order modifying the automatic stay imposed by section 362 of the Bankruptcy Code (the "**Automatic Stay**") to permit these employees to proceed with their claims under the Workers' Compensation Programs.

146.    In the ordinary course of their businesses, the Debtors have maintained and continue to maintain a number of insurance policies that benefit the Debtors' estates.

Continuation of such policies is essential to the preservation of the Debtors' businesses, property, and assets. In many cases, the coverage under such policies is required by various regulations, laws, and contracts that govern the Debtors' business conduct. If the Debtors' Insurance Programs lapse without renewal, the Debtors could be exposed to substantial liability to the detriment of all parties in interest. Additionally, in order to comply with the U.S. Trustee Guidelines, the Debtors must maintain their Insurance Programs. I understand that as part of the effort to obtain comprehensive insurance coverage for the Debtors' operations in the most cost-effective manner, the Debtors maintain brokerage agreements with a number of brokers who assist in procuring and negotiating favorable policies and premiums for the Debtors.

147.    As of the Commencement Date, the Debtors believe that they owe approximately $109,000 with respect to prepetition Insurance Obligations.

### Motion of Debtors Pursuant to 11 U.S.C. §§ 503(b)(9) and 105(a) for Entry of Order (I) Approving Procedures For The Assertion, Resolution, and Satisfaction of Claims Asserted Pursuant to 11 U.S.C. § 503(b)(9) and (II) Prohibiting Vendors From Pursuing Such Claims Outside the Procedures

148.    In this motion, the Debtors seek entry of an order (i) approving procedures for the assertion of unpaid claims pursuant to section 503(b)(9) of the Bankruptcy Code ("**503(b)(9) Claims**") and the resolution, allowance, and satisfaction thereof and (ii) prohibiting vendors from pursuing 503(b)(9) Claims outside the proposed procedures.

149.    Prior to the Commencement Date, in the ordinary course of business, the Debtors purchased on credit a variety of raw materials, component parts, supplies, equipment, and other goods for use in their casting and machining operations. As of the Commencement Date, the Debtors were in possession of certain Goods that had been delivered to them by various vendors or other parties within the twenty days prior to the Commencement Date, but for which the Debtors had not yet made payment. I have been informed that claims related to these Goods

are entitled to administrative expense status under section 503(b)(9) of the Bankruptcy Code.  As

of the Commencement Date, the Debtors were in possession of certain goods that had been

delivered to them by various vendors or other parties, but for which the Debtors had not yet

made payment.  The Debtors believe that there will be some uncertainty among vendors over the

procedures and methods they must undertake to properly assert 503(b)(9) Claims.  This

uncertainty could result in numerous inquiries and demands on the Debtors' employees and

professionals or the initiation of piecemeal litigation, both of which would divert the attention of

the Debtors and their professionals from the more pressing task of administering the chapter 11

cases.  The Debtors submit that approval of the procedures outlined in this Motion will avoid the

distraction, delay, and expense that may ensue as a result of uncertainty regarding 503(b)(9)

Claims.

**Motion of Debtors Pursuant to 11 U.S.C. §§ 366 and 105(a) for Entry of Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utilities, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service**

WEIL:\95271116\1\35076.0003

150.    To ensure the uninterrupted supply of water, electricity, natural gas, waste management, telephone, and other utility services (collectively, the "**Utility Services**"), which are critical to the operations of the Debtors' sub-component manufacturing and supply businesses, in this Motion the Debtors request entry of an order (a) approving the Debtors' proposed form of adequate assurance of payment for postpetition Utility Services, (b) establishing procedures for resolving objections by Utility Companies relating to the adequacy of the proposed adequate assurance, and (c) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors because of the commencement of these chapter 11 cases or a debt that is owed by the Debtors for Utility Services rendered prior to the Commencement Date.

151.    To operate their businesses and manage their properties, including their manufacturing facilities, the Debtors obtain Utility Services from a number of utility companies or their brokers. Uninterrupted Utility Services are essential to the Debtors' ongoing operations, and, therefore, the success of the Debtors' reorganization.  Indeed, any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations and service their customers.  This disruption would adversely impact customer relationships and result in a decline in the Debtors' revenues and profits.  Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, the value of the Debtors' estates and creditor recoveries.  It is, therefore, critical that Utility Services continue uninterrupted during these chapter 11 cases.

152.    I believe and am advised that the proposed procedures are necessary to the success of the Debtors' chapter 11 cases because if such procedures are not approved, the Debtors could be forced to address numerous requests by utility companies for adequate

assurance in a disorganized manner during the critical first weeks of the chapter 11 cases.

Moreover, a utility company could blindside the Debtors by unilaterally deciding—on or after

the thirtieth day following the Commencement Date—that it is not adequately protected and

threatening to discontinue service or making an exorbitant demand for payment to continue

service.  Discontinuation of Utility Service could disrupt operations and jeopardize the Debtors'

reorganization efforts and, ultimately, the value of the Debtors' estates and creditor recoveries.

### Motion of Debtors for Entry of Order Pursuant to 11 U.S.C. §§ 105(a), 327, and 330 Authorizing Debtors to Employ Certain Professionals Used in the Ordinary Course of Business *Nunc Pro Tunc* to the Commencement Date

153.    By this motion, the Debtors seek authority to (i) establish certain

procedures to retain and compensate those professionals that the Debtors employ in the ordinary

course of business (collectively, the "**Ordinary Course Professionals**"), effective as of the

Commencement Date, without (a) the submission of separate employment applications and

(b) the issuance of separate retention orders for each individual Ordinary Course Professional,

and (ii) compensate and reimburse such professionals without individual fee applications.

154.    The Debtors seek the continued employment of the Ordinary Course

Professionals to render professional services to the Debtors' estates in the same manner and for

the same purposes as the Ordinary Course Professionals were retained prior to the

Commencement Date.  In the past, these professionals have provided professional services to the

Debtors relating to such matters as general corporate counseling, litigation, intellectual property,

tax, employee related issues, as well as other services relating to issues that have a direct and

significant impact on the Debtors' day-to-day operations.  It is thus essential that the

employment of these Ordinary Course Professionals, many of whom are already familiar with

the Debtors' business and financial affairs, be continued to avoid disruption of the Debtors'

normal business operations.

WEIL:\95271116\1\35076.0003

**Motion of the Debtors for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 331 Establishing Procedures for Interim Compensation and Reimbursement of Professionals**

155.    The Debtors request the entry of an order establishing an orderly, regular process for the monthly allowance and payment of compensation and reimbursement of expenses for professionals whose services are authorized by the Court pursuant to sections 327 or 1103 of the Bankruptcy Code and who will be required to file applications for allowance of compensations and reimbursement of expenses.  It is my belief that establishing orderly procedures to pay the Debtors' professionals and attorneys whose retentions are approved by this Court and who will be required to file applications for the allowance of compensation and reimbursement of expenses will streamline the administration of these chapter 11 cases and otherwise promote efficiency for the Court, the Office of the U.S. Trustee for the Southern District of New York, and all parties in interest.

## V.

## Information Required by Local Rule 1007-2

156.    In accordance with Local Rule 1007-2, the schedules attached hereto provide certain information related to the Debtors.

157.    Pursuant to Local Rule 1007-2(a)(3), **Schedule 1** hereto lists the names and addresses of the members of, and attorneys for, any committee organized prior to the Commencement Date and a brief description of the circumstances surrounding the formation of the committee and the date of its formation.

158.    Pursuant to Local Rule 1007-2(a)(4), **Schedule 2** hereto lists the following information with respect to each of the holders of the Debtors' forty (40) largest unsecured claims on a consolidated basis, excluding claims of insiders:  the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post

74

office address), and telephone number; the name(s) of persons(s) familiar with the Debtors'

accounts, the approximate amount of the claim, and an indication of whether the claim is

contingent, unliquidated, disputed, or partially secured.

159.    Pursuant to Local Rule 1007-2(a)(5), **Schedule 3** hereto provides the

following information with respect to each of the holders of the five (5) largest secured claims

against the Debtors on a consolidated basis: the creditor's name, address (including the number,

street, apartment or suite number, and zip code, if not included in the post office address), and

telephone number; the approximate amount of the claim; a brief description of the collateral

securing the claim; an estimate of the value of the collateral, and whether the claim or lien is

disputed.

160.    Pursuant to Local Rule 1007-2(a)(6), **Schedule 4** hereto provides a

summary of the (unaudited) consolidated assets and liabilities for the Debtors and their non-

Debtor affiliates.

161.    Pursuant to Local Rule 1007-2(a)(7), **Schedule 5** hereto provides the

following information: the number and classes of shares of stock, debentures, and other

securities of the Debtors that are publicly held and the number of record holders thereof; and the

number and classes of shares of stock, debentures, and other securities of the Debtors that are

held by the Debtors' directors and officers, and the amounts so held.

162.    Pursuant to Local Rule 1007-2(a)(8), **Schedule 6** hereto provides a list of

all of the Debtors' property in the possession or custody of any custodian, public officer,

mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the

name, address, and telephone number of each such entity and the location of the court in which

any proceeding relating thereto is pending.

WEIL:\95271116\1\35076.0003

163.    Pursuant to Local Rule 1007-2(a)(9), **Schedule 7** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

164.    Pursuant to Local Rule 1007-2(a)(10), **Schedule 8** hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

165.    Pursuant to Local Rule 1007-2(a)(11), **Schedule 9** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

166.    Pursuant to Local Rule 1007-2(a)(12), **Schedule 10** hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

167.    Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Schedule 11** hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors, members of any partnerships, and financial and business consultants retained by the Debtors for the thirty (30) day period following the filing of the Debtors' chapter 11 petitions as the Debtors intend to continue to operate their businesses.

168.    Pursuant to Local Rule 1007-2(b)(3), **Schedule 12** hereto provides, for the thirty (30) day period following the filing of the chapter 11 petitions, a list of estimated cash

WEIL:\95271116\1\35076.0003

receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue

that remain unpaid, other than professional fees.

WEIL:\95271116\1\35076.0003

**V.**

**Conclusion**

169.    The above illustrates the factors that have precipitated the commencement of the chapter 11 cases and the critical need for the Debtors to restructure their financial affairs and operations.  The provisions of chapter 11 will assist in enabling the Debtors to achieve their objective of reestablishing themselves as a viable economic enterprise able to compete in its marketplace to the benefit of its economic stakeholders, employees, and the public it serves.

WEIL:\95271116\1\35076.0003

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

/s/ J. Mark Allan
J. Mark Allan
President, Chassix Holdings, Inc.

**Exhibit A**

**Restructuring Support Agreement**

EXECUTION COPY

# RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "Agreement")[1], dated as of March 11, 2015, is entered into by and among (i) Chassix Holdings, Inc. ("Chassix Holdings"), UC Holdings, Inc. ("UC Holdings"), Chassix, Inc. (the "Company") and the direct and indirect subsidiaries of the Company set forth on Schedule 1 annexed hereto (such entities, together with Chassix Holdings, UC Holdings and the Company, the "Chassix Parties") (ii) the undersigned beneficial holders, or investment advisors or managers for the account of beneficial holders (the "Opco Noteholders" and, together with their respective successors and permitted assigns and any subsequent Opco Noteholder that becomes party hereto in accordance with the terms hereof, the "Consenting Opco Noteholders") of the 9 1/4 % Senior Secured Notes due 2018 (the "Opco Notes") issued by the Company, (iii) the undersigned beneficial holders, or investment advisors or managers for the account of beneficial holders (the "Holdco Noteholders" and, together with their respective successors and permitted assigns and any subsequent Holdco Noteholder that becomes party hereto in accordance with the terms hereof, the "Consenting Holdco Noteholders" and together with the Consenting Opco Noteholders, the "Consenting Noteholders") of the 10% / 10 3/4% Senior PIK Toggle Notes due 2018 (the "Holdco Notes") issued by Chassix Holdings, and (iv) Platinum Equity Advisors, LLC, on behalf of certain affiliated entities and investment funds (collectively, the "Consenting Sponsors"). The Chassix Parties, the Consenting Noteholders, and the Consenting Sponsors, collectively, the "Restructuring Support Parties" and together with any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred to herein as the "Parties" and each individually as a "Party."

**WHEREAS**, the Parties have agreed to undertake a financial restructuring and recapitalization of the Chassix Parties (the "Restructuring"), which is anticipated to be effected through the solicitation of votes for a plan of reorganization for each Chassix Party on terms materially consistent with the Acceptable Plan (as defined below) and reasonably acceptable to the Restructuring Support Parties (the solicitation for such plan, the "Solicitation") and the commencement by each of the Chassix Parties of a voluntary case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

**WHEREAS**, as of the date hereof, the Consenting Opco Noteholders hold, in the aggregate, approximately 73% of the aggregate outstanding principal amount of the Opco Notes issued by the Company under that certain Indenture, dated July 23, 2013, by and among the Company, as issuer, UC Holdings and certain of its subsidiaries as guarantors thereto, and U.S. Bank National Association, as trustee (as amended, modified or otherwise supplemented from time to time prior to the date hereof, the "Opco Notes Indenture").

**WHEREAS**, as of the date hereof, the Consenting Holdco Noteholders hold, in the aggregate, approximately 82% of the aggregate outstanding principal amount of the Holdco Notes issued by Chassix Holdings under that certain Indenture, dated December 13, 2013, by and

---

[1] Any capitalized term that is not otherwise defined herein shall have the meaning ascribed to such term in the Acceptable Plan, in the form attached hereto as Exhibit A.

among Chassix Holdings, as issuer, and U.S. Bank National Association, as trustee (as amended, modified or otherwise supplemented from time to time prior to the date hereof, the "Holdco Notes Indenture").

**WHEREAS**, the Parties desire to express to each other their mutual support and commitment with respect to the Restructuring, the Acceptable Plan and the matters discussed hereunder.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

## 1. <u>Certain Definitions</u>.

As used in this Agreement, the following terms have the following meanings:

(a)    "<u>Acceptable Plan</u>" means a plan of reorganization of the Chassix Parties on terms materially consistent with the plan attached hereto as <u>Exhibit A</u>, or otherwise in a form and substance reasonably satisfactory to the Chassix Parties, the Required Consenting Noteholders and, consistent with the Consenting Sponsor Consent Right, the Consenting Sponsors, further, notwithstanding anything to the contrary herein, the Chassix Parties may amend, modify or supplement the Acceptable Plan, from time to time, (x) without the consent of any of the other Restructuring Support Parties, to cure any ambiguity, defect (including any technical defect), inconsistency or amendment with respect to the treatment of creditors, <u>provided</u> that any such amendments, modifications or supplements do not adversely affect the rights, interests, or treatment of any of the other Restructuring Support Parties under the Acceptable Plan or (y) to the extent any such amendments, modifications or supplements are provided to the other Restructuring Support Parties upon at least three (3) business days prior written notice, and if no objection is received from any Restructuring Support Party within two (2) business days following receipt, the other Restructuring Support Parties shall be deemed to have consented to such amendments, modifications or supplements.

(b)    "<u>Acceptable Disclosure Statement</u>" means a disclosure statement of the Chassix Parties for the Acceptable Plan in a form and substance reasonably satisfactory to the Chassix Parties, the Required Consenting Noteholders and, consistent with the Consenting Sponsor Consent Right, the Consenting Sponsors.

(c)    "<u>Claim</u>" means "claim," as defined in section 101(5) of the Bankruptcy Code, against any Chassix Party.

(d)    "<u>Consenting Sponsor Consent Right</u>" means the Consenting Sponsors' right to consent to or approve documents, actions, or agreements, as applicable, solely to the extent such documents, actions, or agreements alter in any material way any of the rights or benefits proposed to be granted to, or received by, the Consenting Sponsors or any Released Party related thereto, or any obligation the Consenting Sponsors (or any Released Party related thereto) may have, pursuant to the Acceptable Plan, in the form attached hereto.

2

(e)        "<u>Definitive Documents</u>" means the documents and agreements (including any related instruments, schedules or exhibits) that are contemplated by the Acceptable Plan that are otherwise necessary or desirable to implement, or otherwise relate to, the Restructuring and the Acceptable Plan, including, but not limited to, (i) this Agreement, (ii) the Acceptable Plan, (iii) the Acceptable Disclosure Statement, (iv) the materials related to the Solicitation, (v) the order entered by the Bankruptcy Court approving the Acceptable Disclosure Statement and materials related to the Solicitation as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "<u>Disclosure Statement Order</u>"), (vi) definitive documentation for the DIP Facilities and Exit Facilities and all agreements and documentation related or ancillary thereto, (vii) the order entered by the Bankruptcy Court confirming the Acceptable Plan, including all exhibits, appendices and related documents (the "<u>Confirmation Order</u>") and pleadings in support of entry of the Confirmation Order, (viii) any documents included in the Plan Supplement, (ix) any motion and proposed interim and final orders (the "<u>DIP Orders</u>") relating to debtor-in-possession financing and/or use of cash collateral, (x) the Accommodation Agreements, Access Agreement (as defined in the Accommodation Agreement) and the attached component supply agreements (each a "<u>Component Supply Agreement</u>" and collectively, the "<u>Component Supply Agreements</u>") among the Debtors and certain of the OEM Customers entered into in connection with the Accommodation Agreements, (xi) organizational and governance documents (including, without limitation, the organizational and governance documents for the reorganized Chassix Parties), shareholder and member related agreements, or other related transactional or corporate documents (including, without limitation, any agreements and documents described in the Acceptable Plan), and (xii) the motions or pleadings seeking approval or confirmation of any of the foregoing transactional or corporate documents, including the motion to approve the Acceptable Disclosure Statement, confirm the Acceptable Plan, ratify the Solicitation, and scheduling a joint hearing, except as otherwise set forth herein, each of the foregoing in form and substance reasonably satisfactory to the Required Consenting Noteholders and, consistent with the Consenting Sponsor Consent Right, the Consenting Sponsors.

(f)        "<u>Indentures</u>" means the Opco Notes Indenture and the Holdco Notes Indenture.

(g)        "<u>Notes</u>" means the Opco Notes and the Holdco Notes.

(h)        "<u>Required Consenting Noteholders</u>" means the Required Opco Noteholders and the Required Holdco Noteholders.

(i)        "<u>Required Opco Noteholders</u>" means, as of the date of determination, Consenting Opco Noteholders holding at least a majority of the outstanding principal amount of the Opco Notes held by such holders, in the aggregate, as of such date.

(j)        "<u>Required Holdco Noteholders</u>" means, as of the date of determination, Consenting Holdco Noteholders holding at least a majority of the outstanding principal amount of the Holdco Notes held by such holders, in the aggregate, as of such date.

(k)        "<u>Support Effective Date</u>" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by: (i) the Chassix Parties; (ii)

the Consenting Sponsors, and (iii) the Consenting Noteholders holding at least (A) 66.7% in aggregate outstanding principal amount of the Opco Notes, and (B) 66.7% in aggregate outstanding principal amount of the Holdco Notes.

## 2.    **Bankruptcy Process; Plan of Reorganization.**

(a)    <u>Commencement of the Chapter 11 Cases</u>.  Each Chassix Party hereby agrees that, as soon as reasonably practicable, but in no event later than March 11, 2015 (the date on which such filing occurs, the "<u>Commencement Date</u>"), such Chassix Party shall file with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Case of such Chassix Party.

(b)    <u>Filing of the Acceptable Plan</u>.  On the Commencement Date, the Chassix Parties shall file the Acceptable Plan and the related Acceptable Disclosure Statement with the Bankruptcy Court.

(c)    <u>Confirmation of the Acceptable Plan</u>.  Each of the Chassix Parties shall use its commercially reasonable efforts to obtain confirmation of the Acceptable Plan as soon as reasonably practicable following the Commencement Date in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules of the Bankruptcy Court (the federal and local rules being, the "<u>Bankruptcy Rules</u>") and on terms consistent with this Agreement, and each of the Parties shall use its commercially reasonable efforts to cooperate fully in connection therewith.

(d)    <u>Amendments and Modifications of the Acceptable Plan</u>.  Notwithstanding anything to the contrary herein, the Acceptable Plan may be amended from time to time following the date hereof by written approval of (A) the Required Consenting Noteholders and (B) consistent with the Consenting Sponsor Consent Right, the Consenting Sponsors.  Each of the Restructuring Support Parties agrees to negotiate in good faith all amendments and modifications to the Acceptable Plan as reasonably necessary and appropriate to obtain confirmation of the Acceptable Plan pursuant to a final order of the Bankruptcy Court; <u>provided</u> that the Restructuring Support Parties shall have no obligation to agree to any modification that (i) is inconsistent with the Acceptable Plan in the form attached hereto, (ii) creates any material new obligation on any Restructuring Support Party, or (iii) changes or otherwise adversely affects the rights, interests or treatment of such Restructuring Support Party.

## 3.    **Agreements of the Consenting Noteholders.**

(a)    <u>Agreement to Vote</u>.  So long as this Agreement has not been terminated in accordance with the terms hereof, each Consenting Noteholder agrees that it shall:

(i)    subject to the receipt by such Consenting Noteholder of an Acceptable Disclosure Statement and other solicitation materials in respect of the applicable Acceptable Plan, and approval by the Bankruptcy Court of such Acceptable Disclosure Statement and other solicitation materials as consistent with section 1125 of the Bankruptcy Code, (x) vote its Claims to accept the Acceptable Plan, by delivering its duly executed and completed ballots accepting the Acceptable Plan on a timely basis following the commencement of the Solicitation; <u>provided</u> that such vote shall be

WEIL:\95270837\1\35076.0003

immediately revoked and deemed void *ab initio* upon termination of this Agreement pursuant to the terms hereof; or (y) not change or withdraw (or cause to be changed or withdrawn) any such vote;

(ii)    not (x) object to, delay, impede or take any other action to interfere with acceptance or implementation of the Acceptable Plan and the Restructuring, (y) solicit, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout or plan of reorganization for the Chassix Parties other than the Acceptable Plan or (z) otherwise take any action that would in any material respect interfere with, delay, impede or postpone the consummation of the Acceptable Plan and the Restructuring; and

(iii)    use commercially reasonable efforts through the informal committee of Opco Noteholders and Holdco Noteholders (the "Informal Committee of Noteholders") or otherwise to support and take all reasonably necessary steps to effectuate the Restructuring and consummation of the Acceptable Plan; provided that nothing in this Agreement, including this Section 3, or the transactions contemplated by this Agreement, shall require, other than as set forth in Section 3(a)(i) and (ii), any Consenting Noteholder to make, seek or receive any filings, notifications, consents, determinations, authorizations, permits, approvals, licenses or the like with or provide any documentation or information to any regulatory or self-regulatory bodies having jurisdiction over the Company or the Consenting Noteholders.

(b)    Transfers.

(i)    Each Consenting Noteholder agrees that, for the duration of the period commencing on the date hereof and ending on the date on which this Agreement is terminated in accordance with Section 6, such Consenting Noteholder shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of (each, a "Transfer"), directly or indirectly, in whole or in part, any of the Claims (including grant any proxies, deposit any Notes or any other claims against or interests in the Chassix Parties into a voting trust or entry into a voting agreement with respect to any such Notes or such other claims against or interests), unless the transferee thereof either (i) is a Consenting Noteholder or (ii) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Noteholder and to be bound by all of the terms of this Agreement applicable to Consenting Noteholders (including with respect to any and all Claims it already may hold prior to such Transfer) by executing a joinder agreement substantially in the form attached hereto as Exhibit B (each, a "Joinder Agreement"), and delivering an executed copy thereof within two (2) business days following such execution, to (i) Weil, Gotshal & Manges LLP ("Weil"), counsel to the Company, 767 Fifth Avenue, New York, New York 10153 (Attn: Marcia L. Goldstein and Ray C. Schrock) (ii) Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), counsel to the Consenting Sponsors, 28 Liberty Street, New York, New York 10005 (Attn: Dennis F. Dunne and Samuel A. Khalil) and (iii) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), counsel to the Informal Committee of Noteholders, 1285 6th Avenue, New York, New York 10019 (Attn: Andrew N. Rosenberg and Alice B. Eaton) in which event (A) the transferee (including the Consenting Noteholder transferee, if applicable)

shall be deemed to be a Consenting Noteholder hereunder to the extent of such transferred rights and obligations and (B) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations; provided, that this Section 3(b)(i) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker-dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities. Each Consenting Noteholder agrees that any Transfer of any Claims that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Noteholder or the Consenting Sponsors shall have the right to enforce the voiding of such Transfer.

(ii)    Notwithstanding Section 3(b)(i): (A) a Consenting Noteholder may Transfer its Notes to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker become a Party; provided that (1) such Qualified Marketmaker must Transfer such right, title or interest within five (5) business days following its receipt thereof, (2) any subsequent Transfer by such Qualified Marketmaker of the right, title or interest in such Notes is to a transferee that is or becomes (by executing a Joinder Agreement and delivering an executed copy thereof to the persons set forth in clause (i) of this Section 3(b)) a Consenting Noteholder at the time of such transfer, (3) such Consenting Noteholder shall be solely responsible for the Qualified Marketmaker's failure to comply with the requirements of this Section 3, and (4) any Transfer that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio* and the Company and each other Consenting Noteholder or the Consenting Sponsors shall have the right to enforce the voiding of such Transfer; and (B) to the extent that a Consenting Noteholder is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interest in the Notes that the Qualified Marketmaker acquires from a holder of the Notes who is not a Consenting Noteholder without the requirement that the transferee be or become a Consenting Noteholder. For these purposes, a "Qualified Marketmaker" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers Claims (including debt securities or other debt) or enter with customers into long and short positions in Claims (including debt securities or other debt), in its capacity as a dealer or market maker in such Claims, and (y) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

(c)    Additional Claims. This Agreement shall in no way be construed to preclude any Consenting Noteholder from acquiring additional Claims. Each Consenting Noteholder agrees such additional Claims shall be subject to this Agreement (including the obligations of the Consenting Noteholders under this Section 3) and such acquiring Consenting Noteholder shall promptly notify Weil of such acquisition of Claims.

(d)    Releases. Each Consenting Noteholder shall, as of the Support Effective Date, fully and finally waive, release, acquit and forever discharge Platinum Equity and its Released Parties (including, without limitation, in all of their respective capacities or positions relating to the Debtors) from any and all claims and Causes of Action of any kind or nature

whatsoever (whether class, derivative or individual in nature) whether known or unknown, fixed or contingent, past, present or future, in law or in equity in any way related to the Debtors or the Restructuring (collectively, the "Release"); provided that no Released Party (including Platinum Equity) shall be released from any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Holdco Notes, the use of their proceeds, and any events related thereto.  Such Release shall continue and remain in full force and effect from and after the Support Effective Date, provided that such Release shall terminate and be deemed, for all purposes, to be immediately null and void *ab initio* without any further action if (i) any Consenting Sponsor breaches any of the undertakings, representations, warranties or covenants of this Agreement in any material respect, (ii) any Consenting Sponsor seeks additional consideration except that which is expressly provided for under the Acceptable Plan, (iii) the Chapter 11 Case for the Company or any of the Chassix Parties shall have been converted to a case under chapter 7 of the Bankruptcy Code, or such cases shall have been dismissed by Final Order of the Bankruptcy Court, or (iv) the Bankruptcy Court confirms (by Final Order) a plan of reorganization for the Debtors that (A) provides the Consenting Noteholders with treatment that is materially inconsistent with the Acceptable Plan or that is, in material respects, less favorable to the Consenting Noteholders compared to the treatment provided to the Consenting Noteholders in the Acceptable Plan (a material increase in the proposed principal amount of the DIP Facilities or Exit Facilities being deemed to be "less favorable treatment"), and (B) has not been accepted by Opco Noteholders and Holdco Noteholders, in each case holding at least two-thirds in amount and more than one-half in number of the Opco Notes and Holdco Notes voting on such plan of reorganization.  For the avoidance of doubt, for so long as the Release remains in effect, each Consenting Noteholder agrees and confirms that it shall not (i) exercise any "opt out" right related to the releases in the Acceptable Plan or otherwise object to or challenge the releases in the Acceptable Plan in any way, or (ii) seek to receive, or support any party in seeking to receive, any proceeds arising from, or related to, any claims or Causes of Action or any other litigation or similar action (including, without limitation, any settlement or other resolution related thereto) that is the subject of the Release.

(e)     The foregoing clauses (a) – (d) of this Section 3 will not limit any of the Consenting Noteholders' rights to (i) appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement, or (ii) enforce any rights under this Agreement.

(f)     The Consenting Noteholders agree to cooperate with any tax-related requests of the Consenting Sponsors, including in connection with revising the structure of the Plan, if such revisions would not adversely impact the reorganized Chassix Parties, the Consenting Noteholders or their recoveries.

## 4.     **Agreements of the Consenting Sponsors.**

(a)     So long as this Agreement has not been terminated in accordance with the terms hereof, each of the Consenting Sponsors, agrees that it shall not (i) object to, delay, impede or take any other action to interfere with acceptance or implementation of the Acceptable Plan and the Restructuring, (ii) solicit, encourage, propose, file, support, participate in the formulation

of or vote for, any restructuring, sale of assets, merger, workout or plan of reorganization for the Chassix Parties other than the Acceptable Plan or (iii) otherwise take any action that would in any material respect interfere with, delay, impede or postpone the consummation of the Acceptable Plan and the Restructuring.

(b)    Each of the Consenting Sponsors, agrees to use commercially reasonable efforts to support and take all reasonably necessary steps to effectuate the Restructuring and consummation of the Acceptable Plan, and each of the Consenting Sponsors agrees, to the extent applicable, to use commercially reasonable efforts to cause the Chassix Parties to timely provide, all requisite consents and approvals to the extent required for the Chassix Parties to file for relief under chapter 11 of the Bankruptcy Code.

(c)    Each of the Consenting Sponsors, agrees that it shall, subject to the receipt by such Consenting Sponsor of an Acceptable Disclosure Statement and other solicitation materials in respect of the Acceptable Plan, and approval by the Bankruptcy Court of such Acceptable Disclosure Statement and other solicitation materials as consistent with section 1125 of the Bankruptcy Code, (i) vote to accept the Acceptable Plan by delivering its duly executed and completed ballot accepting the Acceptable Plan on a timely basis following the commencement of the Solicitation, and (ii) not change or withdraw (or cause to be changed or withdrawn) any such vote; provided that such vote shall be immediately revoked and deemed void *ab initio* upon termination of this Agreement pursuant to the terms hereof.

(d)    Each of the Consenting Sponsors agree to (A) waive or cause to be waived any stock loss in respect of the stock of UC Holdings and Chassix Holdings pursuant to Treasury regulation § 1.1502-36, and any comparable provision of state or local income tax, to the extent directed by the reorganized Chassix Parties, (B) not take, or cause to be taken, any other action that would reduce, limit or otherwise adversely affect the U.S. federal income tax attributes of the reorganized Chassix Parties, except as consistent with past practice, general cash management, or short term prudent investment, and (C) cooperate with the reorganized Chassix Parties in connection with any group tax return filings, audits and proceedings with respect to taxable years ending on or prior to, or including, the Effective Date (including jointly managing such filings and proceedings, and not compromising any audit or proceeding without the reorganized Chassix Parties' consent, such consent not to be unreasonably withheld); provided that reasonable expenses incurred by the Consenting Sponsors at the request of the reorganized Chassix Parties in connection with this clause (C) shall be borne by the reorganized Chassix Parties.

(e)    Transfers. Each Consenting Sponsor agrees that, as long as this Agreement has not terminated in accordance with its terms, it shall not sell, transfer, assign or otherwise dispose of any of its Claims unless the transferee thereof either (i) is a Consenting Sponsor or (ii) prior to such transfer, agrees in writing for the benefit of the Parties to become a Party to this Agreement. Each Consenting Sponsor further agrees not to transfer, abandon or otherwise dispose of, its interests in Dharma Holding Corporation prior to the effective date of the Acceptable Plan. For the avoidance of doubt, this Agreement shall in no way be construed to preclude any Consenting Sponsor from acquiring additional Claims.

WEIL:\95270837\1\35076.0003

(f)    The foregoing sub-clauses (a) – (e) of this Section 4 will not limit any of the Consenting Sponsors' rights to (i) appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement, or (ii) enforce any rights under this Agreement.

## 5.    Agreements of the Chassix Parties.

(a)    Solicitation and Confirmation.  Each Chassix Party agrees to (i) act in good faith and use reasonable best efforts to support and complete successfully the Solicitation in accordance with the terms of this Agreement, (ii) do all things reasonably necessary and appropriate in furtherance of confirming the Acceptable Plan and consummating the Restructuring in accordance with, and within the time frames contemplated by, this Agreement (including within the deadlines set forth in Section 6), (iii) execute and deliver any required agreements to effectuate and consummate the Restructuring, (iv) obtain any and all required regulatory and/or third-party approvals for the Restructuring, and (v) take no actions materially inconsistent with this Agreement, the Acceptable Plan or the confirmation and consummation of the Acceptable Plan, in each case to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of directors, managers, members or partners, as applicable, of each Chassix Party; provided that no Chassix Party shall be obligated to agree to any modification of any document that is inconsistent with the Acceptable Plan.

(b)    Certain Additional Chapter 11 Related Matters.  Each Chassix Party, as the case may be, shall provide draft copies of all material motions or applications and other documents (including the Acceptable Plan and Acceptable Disclosure Statement, any proposed amended version of such plan or disclosure statement and all "first day" pleadings, or any other plan) any Chassix Party intends to file with the Bankruptcy Court to counsel for the Restructuring Support Parties, if reasonably practicable, at least three (3) days prior to the date when the applicable Chassix Party intends to file any such pleading or other document (and, if not reasonably practicable, as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the form and substance of any such pleading or document.

(c)    Restructuring Expenses.  The Chassix Parties shall pay, and shall seek under the DIP Orders the authority to pay, when due and payable, the respective reasonable and documented fees and expenses incurred in connection with the Restructuring, including, the reasonable and documented fees, charges and disbursements of such parties limited to (i) one primary counsel for the Informal Committee of Noteholders (Paul Weiss), (ii) one primary financial advisor to the Informal Committee of Noteholders (AlixPartners LLP), (iii) one primary counsel for the Consenting Sponsors (Milbank, Tweed, Hadley & McCloy LLP), (iv) one primary financial advisor to the Consenting Sponsors (Houlihan Lokey Capital, Inc.), and (v) any other professionals that may be reasonably retained by the Informal Committee of Noteholders that may be required in connection with the Restructuring, provided, that, the expenses of Consenting Sponsors' professionals subject to this provision shall not exceed $1,250,000.  All such reasonable and documented fees, expenses and reimbursements incurred and invoiced up to the Commencement Date shall be paid in full prior to the Commencement Date (without deducting any retainers).  For the avoidance of doubt, such fees, expenses and reimbursements

9

shall be treated as Restructuring Expenses, and the Parties shall not be required to file retention applications, fee applications or any other applications in the Chapter 11 Cases.

## 6.    Termination of Agreement.

(a)    Consenting Noteholder Termination Events.  Unless cured or a waiver or deferral is agreed to in writing by the Required Consenting Noteholders, this Agreement shall automatically terminate three (3) business days following the delivery of written notice from the Required Consenting Noteholders to the other Restructuring Support Parties any time after and during the continuance of any Consenting Noteholder Termination Event.  A "Consenting Noteholder Termination Event" shall mean any of the following:

(i)    The breach in any material respect by any Chassix Party or the Consenting Sponsors of any of the undertakings, representations, warranties or covenants of the Chassix Parties or the Consenting Sponsors set forth herein which breach remains uncured for a period of five (5) business days after the receipt of written notice of such breach from the Required Consenting Noteholders in accordance with Section 22.

(ii)    On March 11, 2015 at 11:59 p.m. (New York time), unless the Chassix Parties have commenced the Chapter 11 Cases.

(iii)    On the date that is five (5) days after the Commencement Date, if the Chassix Parties have not filed the Acceptable Plan and Acceptable Disclosure Statement with the Bankruptcy Court.

(iv)    On the date that is forty-five (45) days after the Commencement Date, if the Bankruptcy Court shall not have entered an order approving the Acceptable Disclosure Statement for the Acceptable Plan.

(v)    The Chassix Parties (a) withdraw the Acceptable Plan or (b) file any motion or pleading with the Bankruptcy Court that is not consistent with this Agreement or the Acceptable Plan and such motion or pleading has not been withdrawn prior to the earlier of (i) two (2) business days after the Chassix Parties receive written notice from the Required Consenting Noteholders (in accordance with Section 22) that such motion or pleading is inconsistent with this Agreement or the Acceptable Plan and (ii) entry of an order of the Bankruptcy Court approving such motion or pleading.

(vi)    June 30, 2015, if the Bankruptcy Court fails to enter an order confirming the Acceptable Plan in form and substance reasonably satisfactory to the Required Consenting Noteholders.

(vii)    July 17, 2015, if the Effective Date for the Acceptable Plan has not occurred (the "Outside Date").

(viii)    An examiner with expanded powers or a trustee shall have been appointed in the Chapter 11 Cases.

(ix)    The Chassix Parties lose the exclusive right to file and solicit acceptances of a chapter 11 plan.

(x)    The Bankruptcy Court grants relief that is inconsistent with this Agreement or the Acceptable Plan in any materially adverse respect to the Required Consenting Noteholders.

(xi)    The Chassix Parties file, propound or otherwise support any plan of reorganization other than the Acceptable Plan, or publicly announce their intention not to pursue the Restructuring, and such plan of reorganization or public announcement has not been withdrawn or otherwise corrected within two (2) business days after the Chassix Parties receive written notice from the Required Consenting Noteholders (in accordance with Section 22) that such plan of reorganization or public announcement is inconsistent with this Agreement or the Acceptable Plan.

(xii)    The Accommodation Agreements, the Access Agreement or any Component Supply Agreement is terminated, or the Bankruptcy Court does not enter an order or orders approving the terms of the Accommodation Agreements, the Access Agreement or any Component Supply Agreement.

(xiii)    An event of default occurs under the DIP Facilities that results in the acceleration of the Chassix Parties' obligations thereunder.

(xiv)    The Revolving DIP Credit Facility is refinanced, extended, renewed, defeased, amended, increased, modified, supplemented, restructured, refunded, replaced or repaid, in whole or in part, on terms that are not reasonably acceptable to the Required Consenting Noteholders.

(xv)    The commencement by the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Creditors' Committee") of litigation, for which the Creditors' Committee has been granted standing by the Bankruptcy Court to commence, against the Consenting Noteholders or with respect to this Agreement.

(xvi)    The occurrence of an Other Termination Event (as defined in Section 6(d)).

(b)    Consenting Sponsors Termination Events.  Unless cured or a waiver or deferral is agreed to in writing by the Consenting Sponsors, this Agreement shall automatically terminate three (3) business days following the delivery to the other Restructuring Support Parties of a written notice, delivered in accordance with Section 22 of this Agreement, by any of the Consenting Sponsors upon the occurrence and at any time during the continuance of a Consenting Sponsor Termination Event.  A "Consenting Sponsor Termination Event" shall mean any of the following:

(i)    The breach in any material respect by one or more of the Parties of any of the undertakings, representations, warranties or covenants of the Parties set forth herein in any material respect which breach remains uncured for a period of five (5) days after the receipt of written notice of such breach pursuant to Section 22.

(ii)      A Definitive Document modifies, removes or impairs any of the rights or benefits proposed to be granted to, or received by, any Consenting Sponsors as specified under the Acceptable Plan in the form attached hereto or under this Agreement and the Consenting Sponsors have not consented to such modification.

(iii)      The occurrence of an Other Termination Event (as defined in Section 6(d)).

(c)      Company Termination Events.  This Agreement may be terminated by delivery to the other Restructuring Support Parties of a written notice, delivered in accordance with Section 22 of this Agreement, by any of the Chassix Parties upon the occurrence and at any time during the continuance of a Company Termination Event.  A "Company Termination Event" shall mean any of the following:

(i)      The breach in any material respect by one or more of the Parties of any of the undertakings, representations, warranties or covenants of the Parties set forth herein in any material respect which breach remains uncured for a period of five (5) days after the receipt of written notice of such breach pursuant to Section 22.

(ii)      The board of directors (or managers) of the Company or another Chassix Party determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law.

(iii)      The occurrence of an Other Termination Event (as defined in Section 6(d)).

(d)      Other Termination Events.  An "Other Termination Event" shall mean the following:

(i)      The issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring or the consummation of the Acceptable Plan, which ruling, judgment or order has not been stayed, reversed or vacated within fourteen (14) days after such issuance.

(ii)      The date that the Chapter 11 Case for the Company or any of the Chassix Parties shall have been converted to a case under chapter 7 of the Bankruptcy Code, or such cases shall have been dismissed by order of the Bankruptcy Court .

(iii)      The date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Acceptable Plan for any of the Chassix Parties or refusing to approve the Acceptable Disclosure Statement, provided, that none of the Parties shall have the right to terminate this Agreement pursuant to this clause (c)(iii) if the Bankruptcy Court declines to approve the Acceptable Disclosure Statement or denies confirmation of the Acceptable Plan subject only to modifications to the Acceptable Plan or Acceptable Disclosure Statement that would not have an adverse effect on the recovery or treatment that a Party would receive as

12

compared to the recovery they would have otherwise received pursuant to the Acceptable Plan in the form attached hereto.

(iv)    March 11, 2015 at 11:59 p.m. (New York time), if the Support Effective Date shall not have occurred.

Notwithstanding the foregoing, any of the dates or deadlines set forth in Section 6(a) may be extended by agreement among the Chassix Parties and the Required Consenting Noteholders and the dates or deadlines set forth in Section 6(d) may be extended by agreement among the Restructuring Support Parties.

(e)    Mutual Termination.    This Agreement may be terminated by mutual agreement of the Restructuring Support Parties upon the receipt of written notice delivered in accordance with Section 22.

(f)    Automatic Termination.    This Agreement shall terminate automatically without any further required action or notice on the date that the Acceptable Plan becomes effective.

(g)    Effect of Termination.    Subject to the provisions contained in Section 6 and Section 15, upon the termination of this Agreement in accordance with this Section 6, this Agreement shall become void and of no further force or effect in respect to the Party whose rights and obligations have been terminated hereunder and such Party shall, except as otherwise provided in this Agreement, be immediately released from its respective liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement, shall have no further rights, benefits or privileges hereunder, and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring, the Acceptable Plan or otherwise, that it would have been entitled to take had it not entered into this Agreement and no such rights or remedies shall be deemed waived pursuant to a claim of laches or estoppel; provided that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.    Any and all consents and ballots tendered by the Consenting Noteholders and/or Consenting Sponsors (if any) whose obligations to the Chassix Parties have been terminated, as applicable, prior to such termination shall be deemed, for all purposes, automatically to be null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Acceptable Plan and this Agreement or otherwise and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Chassix Parties allowing such change or resubmission).    Further, notwithstanding anything to the contrary herein, a Party shall not have a right to terminate this Agreement if a default or failure (including, without limitation, by action, inaction or misrepresentation) by such Party of its obligations, undertakings, representations, warranties or covenants hereunder is the cause, directly or indirectly, of the event giving rise to the right to terminate.

(h)    Automatic Stay.    The Chassix Parties acknowledge that after the commencement of the Chapter 11 Cases, the giving of notice of default or termination by any other Restructuring Support Party pursuant to this Agreement shall not be a violation of the

13

automatic stay under section 362 of the Bankruptcy Code; <u>provided</u> that nothing herein shall prejudice any Restructuring Support Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

**7.    Definitive Documents; Good Faith Cooperation; Further Assurances.** Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise reasonable best efforts with respect to, the pursuit, approval, implementation and consummation of the Restructuring and the Acceptable Plan, as well as the negotiation, drafting, execution and delivery of the Definitive Documents.  Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

**8.    Representations and Warranties.**

(a)    Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Noteholder becomes a party hereto):

(i)    Such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder.  The execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part.

(ii)    The execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents), or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party.

(iii)    The execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary or required by the SEC.

(iv)    This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

14

(b)    Each Consenting Noteholder severally (and not jointly) represents and warrants to the Chassix Parties that, as of the date hereof (or as of the date such Consenting Noteholder becomes a party hereto), such Consenting Noteholder (i) is the beneficial owner of the aggregate principal amount of Notes set forth below its name on the signature page hereto (or below its name on the signature page of the applicable Joinder Agreement for any Consenting Noteholder that becomes a party hereto after the date hereof), and/or (ii) has, with respect to the beneficial owners of such Notes, (A) sole investment or voting discretion with respect to such Notes, (B) full power and authority to vote on and consent to matters concerning such Notes or to exchange, assign and Transfer such Notes, and (C) full power and authority to bind or act on the behalf of, the beneficial owners of such Notes.

9.    **Disclosure; Publicity**.  The Company shall submit drafts to counsel for the Restructuring Support Parties of any press releases, public documents and any and all filings that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) business days prior to making any such disclosure. Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Chassix Parties and any Consenting Noteholder, no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Consenting Noteholder), other than advisors to the Restructuring Support Parties, the principal amount or percentage of any Notes held by any Consenting Noteholder or use the name of any Consenting Noteholder or its controlled affiliates, officers, directors, managers, stockholders, members, employees, partners, representatives and agents in any press release, in each case, without such Consenting Noteholder's prior written consent; provided that (a) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Noteholder a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the Company), (b) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Notes (including any series of Notes) held by all the Consenting Noteholders collectively and (c) any Party may disclose information requested by a regulatory authority with jurisdiction over its operations to such authority without limitation or notice to any Party or other person.  Any public filing of this Agreement, with the Bankruptcy Court or otherwise, which includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the holdings of each Consenting Noteholder (provided, that the holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court under seal).

10.    **Creditors' Committee**.  Notwithstanding anything herein to the contrary, if any Consenting Noteholder is appointed to and serves on a Creditors' Committee, the terms of this Agreement shall not be construed so as to limit such Consenting Noteholder's exercise of its fiduciary duties to any person arising from its service on such Creditors' Committee, and any such exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement; provided that nothing in this Agreement shall be construed as requiring any Consenting Noteholder to serve on any Creditors' Committee in any such chapter 11 case. All Parties agree they shall not oppose the participation of any of the Consenting Noteholders or the trustees under the Indentures, on any Creditors' Committee formed in the Chapter 11 Cases.

WEIL:\95270837\1\35076.0003

**11.    Amendments and Waivers**.  Except as otherwise expressly set forth herein, this Agreement may not be waived, modified, amended or supplemented except with the prior written consent of all of the Restructuring Support Parties (which consent may be delivered by electronic mail from counsel to the Restructuring Support Parties).  Notwithstanding the foregoing the Chassix Parties may enter into letter agreements with one or more Consenting Noteholders regarding the binding effect of this Agreement on such Consenting Noteholders' business units or affiliates, without the prior written consent of the Restructuring Support Parties so long as such side letter(s) do not alter the Acceptable Plan.

**12.    Effectiveness**.  This Agreement shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto; provided that signature pages executed by Consenting Noteholders shall be delivered to (a) the other Consenting Noteholders in a redacted form that removes such Consenting Noteholders' holdings of the applicable Notes and (b) the Company, Milbank, Weil, and the Company's other advisors in an unredacted form (to be held by Weil and such other advisors on a professionals' eyes only basis).

**13.    Governing Law; Jurisdiction; Waiver of Jury Trial**.

(a)    This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York, without giving effect to the conflict of laws principles thereof.  Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any Party or its successors or assigns shall be brought and determined in any federal or state court in the Borough of Manhattan, the City of New York (the "New York Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement and the Restructuring.  Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the New York Courts, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any New York Court.  Each of the Parties further agrees that notice as provided in Section 22 shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.  Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in the New York Courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (ii) that (A) the proceeding in any New York Court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 13(a) shall be brought in the Bankruptcy Court.

(b)    Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated hereby (whether based on

contract, tort or any other theory).  Each Party (i) certifies that no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other Parties have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this section.

14.    **Specific Performance/Remedies**.  It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and the Chassix Parties shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy.  Each Party hereby waives any requirement for the security or posting of any bond in connection with such remedies.

15.    **Survival**.  Notwithstanding the termination of this Agreement pursuant to Sections 6, 6(g), 9, 13 and 14 shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; provided that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

16.    **Headings**.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17.    **Successors and Assigns; Severability**.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; provided that nothing contained in this Section 17 shall be deemed to permit Transfers of the Notes or any Claims other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

18.    **Several, Not Joint, Obligations**.  The agreements, representations and obligations of the Parties under this Agreement are, in all respects, several and not joint.

19.    **Relationship Among Parties**.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.  No Party shall have any responsibility for any trading by any other entity by virtue of this Agreement.  No prior history, pattern or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.  The Parties have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any equity securities

of the Company and do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.

20.    **Prior Negotiations; Entire Agreement**.  This Agreement, including the exhibits and schedules hereto (including the Acceptable Plan), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements executed between the Company and each Consenting Noteholders prior to the execution of this Agreement shall continue in full force and effect.

21.    **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement delivered by facsimile or PDF shall be deemed to be an original for the purposes of this paragraph.

22.    **Notices**.  All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers:

(a)    If to a Chassix Party, to:

Chassix, Inc.
300 Galleria Officentre, Suite 501
Southfield, MI 48034
Attn: Bibi N. Di Serio Vice President and General Counsel
Email: Bibi.DiSerio@chassix.com

With a copy to (that shall not constitute notice):

Weil, Gotshal & Manges LLP (as counsel to the Company)
767 Fifth Avenue
New York, NY 10153
Fax:  (212) 310-8007
Attn: Marcia L. Goldstein and Ray C. Schrock
Email: marcia.goldstein@weil.com and ray.schrock@weil.com

(b)    If to a Consenting Sponsor, the address set forth on its signature page, with a copy (that shall not constitute notice) to:

Milbank Tweed Hadley & McCloy LLP
28 Liberty St.
New York, NY 10005
Fax: (212) 530-5219
Attn:  Dennis F. Dunne and Samuel Khalil
Email:  ddunne@milbank.com and skhalil@milbank.com

(c)    If to a Consenting Noteholder, the address set forth on its signature pages, with a copy (that shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Fax: (212) 492-0158
Attn: Andrew N. Rosenberg and Alice Eaton
Email: arosenberg@paulweiss.com and aeaton@paulweiss.com

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by facsimile or electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

**23.**    **Settlement Discussions**.  This Agreement and the Acceptable Plan are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

**24.**    **No Solicitation; Adequate Information**.  This Agreement is not and shall not be deemed to be a solicitation for consents to the Acceptable Plan.  The votes of the holders of Claims will not be solicited until such holders who are entitled to vote on the Acceptable Plan have received the Acceptable Plan, the Acceptable Disclosure Statement and related ballots, and other required solicitation materials, and the Acceptable Disclosure Statement and other solicitation materials have been approved by the Bankruptcy Court as consistent with section 1125 of the Bankruptcy Code.  In addition, this Agreement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities.

**25.**    **Interpretation; Rules of Construction; Representation by Counsel**. When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference shall be to a Section, Exhibit or Schedule, respectively, of or attached to this Agreement unless otherwise indicated. Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or." The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

**26.**    **Acknowledgements**.  THIS AGREEMENT, THE ACCEPTABLE PLAN, AND THE TRANSACTIONS CONTEMPLATED HEREIN AND THEREIN, ARE THE PRODUCT OF NEGOTIATIONS BETWEEN THE PARTIES AND THEIR RESPECTIVE REPRESENTATIVES. EACH PARTY HEREBY ACKNOWLEDGES THAT THIS AGREEMENT IS NOT AND SHALL NOT BE DEEMED TO BE A SOLICITATION OF

VOTES FOR THE ACCEPTANCE OR REJECTION OF ANY CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR OTHERWISE.    THE COMPANY WILL NOT SOLICIT ACCEPTANCES OF THE ACCEPTABLE PLAN FROM ANY PERSON OR ENTITY UNTIL THE PERSON OR ENTITY HAS BEEN PROVIDED WITH A COPY OF THE ACCEPTABLE DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. NOTHING IN THIS AGREEMENT SHALL REQUIRE ANY PARTY TO TAKE ANY ACTION PROHIBITED BY THE BANKRUPTCY CODE, THE SECURITIES ACT OF 1933 (AS AMENDED), THE SECURITIES EXCHANGE ACT OF 1934 (AS AMENDED), ANY RULE OR REGULATIONS PROMULGATED THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY AN ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL GOVERNMENTAL AUTHORITY.

[Signature Page Follows]

WEIL:\95270837\1\35076.0003

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

### CHASSIX PARTIES

CHASSIX HOLDINGS, INC.

By:_____

    Name:   J. Mark Allan
    Title:    President

UC HOLDINGS, INC.

By:_____

    Name:   J. Mark Allan
    Title:    President and Chief Executive Officer

CHASSIX, INC.

By:_____

    Name:   J. Mark Allan
    Title:    President and Chief Executive Officer

EACH OF THE SUBSIDIARIES LISTED ON SCHEDULE 1 HERETO

By:_____

    Name:   J. Mark Allan
    Title:    President

**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**





**CONSENTING NOTEHOLDERS**





[SIGNATURE PAGE TO JOINDER AGREEMENT FOR CONSENTING NOTEHOLDERS]



**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



15-10578-mew   Doc 3   Filed 03/12/15   Entered 03/12/15 10:56:33   Main Document
Pg 129 of 154

**CONSENTING NOTEHOLDERS**



CONSENTING SPONSORS
Platinum Equity Advisors, LLC

By: 

Name: Eva M. Kalawski

Title: Executive VP, General Counsel & Secretary

**Schedule 1**

**Restructuring Subsidiaries**

| Subsidiary | Tax Identification Number |
|---|---|
| Automotive Properties of New York, LLC | 30-0024323 |
| Diversified Machine, Inc. | 02-0758762 |
| Diversified Machine Bristol, LLC | 38-2265409 |
| Chassix Georgia Machining, LLC | 27-1111940 |
| DMI Columbus, LLC | 27-1111833 |
| Diversified Machine Montague, LLC | 38-1854771 |
| Diversified Machine, Milwaukee LLC | 26-1500875 |
| DMI Edon LLC | 27-0951847 |
| Mexico Products I, LLC | 27-0393039 |
| DMI China Holding LLC | 45-3214331 |
| Concord International, Inc. | 38-2973536 |
| SMW Automotive, LLC | 38-3269452 |
| Automotive, LLC | 38-3492897 |
| Chassis Co. of Michigan, LLC | 38-3752692 |
| AluTech, LLC | 32-0100012 |

**Exhibit B**

**Organizational Chart**

WEIL:\95271116\1\35076.0003



### Schedule 1

**Committees**

Pursuant to Local Rule 1007-2(a)(3), the Debtors believe that the ad hoc committee of holders of Secured Notes and Unsecured Notes (the "**Informal Committee of Noteholders**") is the only committee that was formed prior to the Commencement Date.   To the best of the Debtors' knowledge and belief, as of the Commencement Date, the Informal Committee of Noteholders is comprised of the following financial institutions:

- Angel Island Capital
- Avenue Capital Group
- Fidelity Management and Research Company
- Lord, Abbett & Co. LLC
- Midocean Credit Partners
- Nomura Corporate Research & Asset Management
- Oaktree Capital Management, L.P.

The attorneys for the Informal Committee of Noteholders are:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Facsimile:   (212) 492-0158
Attention:   Andrew N. Rosenberg, Esq.
              Alice B. Eaton, Esq.

To the best of the Debtors' knowledge and belief, the members of the Informal Committee of Noteholders currently hold or manage in the aggregate approximately ninety percent (82%) of the outstanding face amount of Unsecured Notes and approximately sixty percent (73%) of the outstanding face amount of Secured Notes.

## Schedule 2

### Consolidated List of 40 Largest Unsecured Claims (Excluding Insiders)[1]

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding, as of March 2, 2015, the forty (40) largest noncontingent, unsecured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| No. | Creditor | Contact, Mailing Address, Telephone Number/Fax Number, Email | Nature of Claim | C U D P[2] | Amount of Claim |
|---|---|---|---|---|---|
| 1 | DELAWARE TRUST COMPANY, AS SUCCESSOR TRUSTEE | Delaware Trust Company 2711 Centerville Road Wilmington, DE 19808 Attn: Sandra E. Horwitz Telephone:  877.374.6010, ext. 62412 Facsimile:  302.636.8666 | Unsecured Notes | | $157,971,125 |
| 2 | BECK ALUMINUM CORPORATION | Beck Aluminum Corporation 6150 Parkland Blvd. Paragon II, Suite 260 Mayfield Heights, OH 44124 Attn:  Bryan Beck Telephone:  440.684.4848 Facsimile:  216.861.0545 bryan@beckalum.com | Trade Claim | | $12,353,000 |
| 3 | KOYO BEARINGS NORTH AMERICA | Koyo Bearings North America 4895 Dressler Road NW #B Canton, OH 44718 Attn:  Keith Genzel Telephone:  734.454.7560 Facsimile:  440.825.9347 keith.genzel@jtekt.com | Trade Claim | | $4,419,945 |
| 4 | AUTOMOTIVE CASTING TECHNOLOGY, INC D/B/A CASTING TECHNOLOGIES CO. | Automotive Casting Technology, Inc. 14638 Apple Drive Fruitport, MI 49415 Attn:  Mike Weber Telephone:  586.909.1230 Facsimile:  616.842.5872 mweber@c-t-c.com | Trade Claim | | $4,016,341 |

---

[1] The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.   All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

[2] C: Contingent; U: Unliquidated; D: Disputed; P: Partially Secured

| No. | Creditor | Contact, Mailing Address, Telephone Number/Fax Number, Email | Nature of Claim | C U D P[2] | Amount of Claim |
|---|---|---|---|---|---|
| 5 | C.H. ROBINSON COMPANY, INC. | C.H. Robinson Company, Inc.<br>14701 Charlson Road<br>Suite 2400<br>Eden Prarie, MN 55347<br>Attn:  Brian Tonn<br>Telephone:  952.683.3766<br>Facsimile:  952.683.3768<br>brian.tonn@chrobinson.com | Trade Claim | | $3,016,269 |
| 6 | NTN BEARING CORPORATION | NTN Bearing Corporation<br>39255 W 12 Mile Road<br>Farmington Hills, MI 48331-2975<br>Attn:  Chris Meissnest<br>Telephone:  248.324.4574<br>Facsimile:  847.294.1000<br>cmeissnest@ntnusa.com | Trade Claim | | $2,277,170 |
| 7 | FAGOR EDERLAN, S. COOP | Fagor Ederlan, S.Coop.<br>Torrebaso Pasealekua 7<br>Eskoriatza, Spain 20540<br>Attn:  Gumaro Rivera<br>Telephone:  0034.943.719000<br>Facsimile:  34.943.719.001<br>g.rivera@fagorederlan.com | Trade Claim | | $2,176,811 |
| 8 | ZF CHASSIS COMPONENTS, LLC | ZF Chassis Components, LLC<br>1570 East P Street Extension<br>Newton, NC 28658-3059<br>Attn:  Doug Kramer<br>Telephone:  734.354.1485<br>Facsimile:  734.416.1948<br>doug.kramer@zf.com | Trade Claim | | $2,137,417 |
| 9 | SKF USA INC. | SKF USA Inc.<br>46815 Port Street<br>Plymouth, MI 48170<br>Attn:  Michael Draughn<br>Telephone:  734.414.6991<br>Facsimile:  734.414.6850<br>michael.draughn@skf.com | Trade Claim | | $2,077,969 |
| 10 | GREDE LLC - ST. CLOUD | Grede LLC-St. Cloud<br>St. Cloud Foundry<br>5200 Foundry Circle<br>St. Cloud, MN 56303<br>Attn:  Matt McDonald<br>Telephone:  248.440.9522<br>Facsimile:  248.440.9577<br>msmcdonald@grede.com | Trade Claim | | $2,074,069 |
| 11 | P.F. MARKEY, INC. | P.F. Markey, Inc.<br>2880 Universal Drive<br>Saginaw, MI 48603<br>Attn:  Jim Terry<br>Telephone:  989.793.0900<br>Facsimile:  989.793.9511<br>jimterry@pfmarkey.com | Trade Claim | | $1,920,734 |

WEIL:\95271126\1\35076.0003

| No. | Creditor | Contact, Mailing Address, Telephone Number/Fax Number, Email | Nature of Claim | C U D P[2] | Amount of Claim |
|---|---|---|---|---|---|
| 12 | ILJIN USA CORPORATION | Iljin USA Corporation<br>28055 Haggerty Road<br>Novi, MI 48377<br>Attn:  John Anwiler<br>Telephone:  248.848.9303<br>Facsimile:  248.848.0566<br>janwiler@iljin.com | Trade Claim | | $1,764,411 |
| 13 | ALCOA PRIMARY METALS | Alcoa Primary Metals<br>1100 Riverview Tower<br>900 S. Gay Street<br>Knoxville, TN 37902<br>Attn:  Peter Smith<br>Telephone:  865.594.4823<br>Facsimile:  865.594.4981<br>peter.smith@alcoa.com | Trade Claim | | $1,663,161 |
| 14 | GREDE LLC - REEDSBURG | Grede LLC-Reedsburg<br>700 Ash Street<br>Reedsburg, WI 53959<br>Attn:  Carrie Heiking<br>Telephone:  608.524.9407<br>Facsimile:  608.524.9501<br>cheiking@grede.com | Trade Claim | | $1,644,325 |
| 15 | CTC CASTING TECHNOLOGIES CO. | CTC Casting Technologies Co.<br>75 Remittance Drive<br>Suite 3232<br>Chicago, IL 60675-1212<br>Attn:  Mike Weber<br>Telephone:  586.909.1230<br>Facsimile:  248.477.4891<br>mweber@c-t-c.com | Trade Claim | | $1,466,462 |
| 16 | CADILLAC CASTING, INC. | Cadillac Casting, Inc.<br>1500 4th Avenue<br>Cadillac, MI 49601<br>Attn:  Matt Roberts<br>Telephone:  734.347.7780<br>Facsimile:  231.779.9640<br>mroberts@cadillaccasting.com | Trade Claim | | $1,374,213 |
| 17 | ANDERSON EXPRESS | Anderson Express<br>580 W. Sherman Boulevard<br>Muskegon Heights, MI 49444<br>Attn:  Dan Arends<br>Telephone:  231.733.6014<br>Facsimile:  231.733.2166<br>darends@andersonexpressinc.com | Trade Claim | | $1,353,506 |
| 18 | ZHONGDING USA INC. | Zhongding USA Inc.<br>400 Detroit Avenue<br>Monroe, MI 48162<br>Attn:  Steven Michael<br>Telephone:  765.662.3607<br>Facsimile:  734.241.8354<br>steve.michael@zd-usa.com | Trade Claim | | $1,310,886 |

WEIL:\95271126\1\35076.0003

| No. | Creditor | Contact, Mailing Address, Telephone Number/Fax Number, Email | Nature of Claim | C U D P² | Amount of Claim |
|---|---|---|---|---|---|
| 19 | SW INDUSTRIES, INC. | SW Industries, Inc.<br>40615 Koppernick Road<br>Canton, MI 48187<br>Attn:  Mark Reichenbacher<br>Telephone:  248.622.9725<br>Facsimile:  49.0.7402.74.118<br>m.reichenbacher@sw-machines.de | Trade Claim | | $1,293,862 |
| 20 | ZF LEMFORDER CORPORATION | ZF Lemforder Corporation<br>Brewer Components<br>P.O. Box 933059<br>Atlanta, GA 31193-3059<br>Attn:  Daniel Diaz<br>Telephone:  734.207.7769<br>Facsimile:  734.416.1948<br>daniel.diaz@zf.com | Trade Claim | | $1,263,470 |
| 21 | TUOPU NORTH AMERICA LIMITED | Tuopu North America Limited<br>2100 Bloor Street W<br>Unite 6283<br>Toronto, ON MS6 5A5<br>Attn:  Gao Wei<br>Telephone:  8.680.1301<br>Facsimile:  8.680.1326<br>seekfull@hotmail.com | Trade Claim | | $1,258,949 |
| 22 | SUSTAINED QUALITY | Sustained Quality<br>431 E. Colfax Avenue<br>Suite 100<br>South Bend, IN 46617<br>Attn:  Lesley Maydon<br>Telephone:  574.231.6392<br>Facsimile:  267.295.8211<br>lmaydon@sustained-quality.com | Trade Claim | | $1,190,008 |
| 23 | GENERAL ALUMINUM MANUFACTURING COMPANY | General Aluminum Manufacturing Company<br>6065 Parkland Boulevard<br>Cleveland, OH 44124<br>Attn:  Gary McLaughlin<br>Telephone:  440.947.2017<br>Facsimile:  440.947.2009<br>gmclaughlin@generalaluminum.com | Trade Claim | | $1,079,197 |
| 24 | MAKINO, INC. | Makino, Inc.<br>7680 Innovation Way<br>Mason, OH 45040<br>Attn:  Bill Schwanki<br>Telephone:  248.320.7513<br>Facsimile:  513.573.7265<br>william.schwanki@makino.com | Trade Claim | | $1,009,881 |
| 25 | BREMBO S.P.A. | Brembo S.p.A.<br>Via Brembo N.25<br>Curno Bergamo, Italy 24035<br>Attn:  LeBlanc Thomas<br>Telephone:  734.468.2107<br>Facsimile:  39.035.605.300<br>tLeBlanc@us.brembo.com | Trade Claim | | $996,799 |

WEIL:\95271126\1\35076.0003

| No. | Creditor | Contact, Mailing Address, Telephone Number/Fax Number, Email | Nature of Claim | C U D P[2] | Amount of Claim |
|---|---|---|---|---|---|
| 26 | MANPOWERGROUP US INC. | ManpowerGroup US Inc. 21271 Network Place Chicago, IL 60673-1212 Attn:  Mike Dixon Telephone:  217.416.5331 Facsimile:  N/A mike.dixon@manpower.com | Trade Claim | | $987,450 |
| 27 | BOSELLO HIGH TECHNOLOGY SRL | Bosello High Technology srl Via San Bernardo 25/27 Cassano Magnago Italy 21012 Attn:  Moreno Savio Telephone:  39.0331.776109 Facsimile:  N/A moreno.savio@bosello.it | Trade Claim | | $956,108 |
| 28 | DONGAH AMERICA, INC. | Dongah America, Inc. 1807 East Maple Road Troy, MI 48084 Attn:  Hanik Bae Telephone:  248.918.5810, ext. 5823 Facsimile:  248.680.0166 hibae@dtrvms.com | Trade Claim | | $950,195 |
| 29 | CENTRAL CORPORATION CTR | Central Corporation CTR 3000 Town Center Southfield, MI 48075 Attn:  Jill Blair Telephone:  248.358.1129, ext. 151 Facsimile:  248.339.2897 jblair@centralsales.net | Trade Claim | | $916,888 |
| 30 | EMPLOYMENT PLUS, INC. | Employment Plus, Inc. 1801 S. Liberty Drive Suite 300 Bloomington, IN 47403 Attn:  Amy Grinole Telephone:  574.206.1522 Facsimile:  574.206.1565 agrinole@employmentplus.com | Trade Claim | | $796,685 |
| 31 | DYNAMIC MACHINE OF DETROIT | Dynamic Machine of Detroit 1653 East Maple Road Troy, MI 48083 Attn: Julie Rice Telephone:  248.404.6190 Facsimile:  248.404.6196 jrice@dynamicdetroit.com | Trade Claim | | $752,917 |
| 32 | JINYOUNG INDUSTRIAL CO., LTD. | Jinyoung Industrial Co., Ltd. 472-7 Moknae-Dong Ansan-City Kyunggi-Do, Korea Attention:  Ricky Telephone:  82.31.492.3882 Facsimile:  82.31.492.3890 richy@i-jy.com | Trade Claim | | $736,414 |

WEIL:\95271126\1\35076.0003

| No. | Creditor | Contact, Mailing Address, Telephone Number/Fax Number, Email | Nature of Claim | C U D P[2] | Amount of Claim |
|---|---|---|---|---|---|
| 33 | PUSAN CAST IRON CO., LTD. | Pusan Cast Iron Co., Ltd. 60-4, Haknam-Ri, Onsan-Eup Uljoo-Kun, Ulsan, Korea Attn:  Ted Kim Telephone:  82.1195.476464 Facsimile:  82.52.231.3860 tkim@pci21c.com | Trade Claim | | $702,753 |
| 34 | MOTION INDUSTRIES, INC. | Motion Industries, Inc. 4709 Wyland Drive Elkhart, IN 46516 Attn:  Paul Blair Telephone:  216.398.2200 Facsimile:  216.398.2220 paul.blair@motion-ind.com | Trade Claim | | $687,431 |
| 35 | AMERICAN COLLOID COMPANY | American Colloid Company NW 5020 Minneapolis, MN 55485-5020 Attention:  Darren Howard Telephone:  423.265.5707 Facsimile:  423.265.4702 darren.howard@amcol.com | Trade Claim | | $687,103 |
| 36 | COBRA TRADING, LLC | Cobra Trading, LLC 2237 E. Enterprise Parkway Twinsburg, OH 44087 Attention:  Kevin Dykstra Telephone:  330.653.3526 Facsimile:  330.653.3527 rhoefler@cobratradingllc.com | Trade Claim | | $672,516 |
| 37 | AEROTEK, INC. | Aerotek, Inc. 555 Briarwood Circle Ann Arbor, MI 48108 Attention:  Julia Graves Telephone:  800.708.0312 Facsimile:  734.452.2095 jgraves@aerotek.com | Trade Claim | | $653,233 |
| 38 | BREMBO NORTH AMERICA, INC. | Brembo North America, Inc. 47765 Halyard Drive Plymouth, MI 48170 Attn:  Trent DeGrazia Telephone:  734.468.2124 Facsimile:  734.468.2161 tdegrazia@us.brembo.com | Trade Claim | | $637,559 |
| 39 | BENNETT TOOLING SOLUTIONS | Bennett Tooling Solutions 3320 Bay Road Saginaw, MI 48603 Attn:  Kris Berg Telephone:  989.797.5670 Facsimile:  989.797.5680 btsberg@gmail.com | Trade Claim | | $624,873 |

WEIL:\95271126\1\35076.0003

| No. | Creditor | Contact, Mailing Address, Telephone Number/Fax Number, Email | Nature of Claim | C U D P[2] | Amount of Claim |
|---|---|---|---|---|---|
| 40 | B&H PATTERN INC. | B&H Pattern Inc.<br>3240 W. Highview Drive<br>Appleton, WI 54130<br>Attention: Amy Bloch<br>Telephone: 920.731.3861<br>Facsimile: 920.731.5241<br>abloch@bh-pattern.com | Trade Claim | | $600,480 |

7

**Schedule 3**

**Consolidated List of Holders of 5 Largest Secured Claims**

      Pursuant to Local Rule 1007-2(a)(5), the following chart lists the creditors holding, as of March 10, 2015, the five largest secured, non-contingent claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| No. | Creditor | Contact, Mailing Address, Telephone Number/Fax Number, Email | Amount of Claim | Type of Collateral |
|---|---|---|---|---|
| 1 | U.S. Bank National Association, as Trustee | U.S. Bank National Association<br>1349 W. Peachtree Street, N.W.<br>Suite 1050<br>EX-GA-ATPT<br>Atlanta, GA 30309<br>Attn: Muriel Shaw<br>Telephone:  (404) 898-8822<br>Facsimile:  (404) 898-8844 | $396,192,637.24 | First lien on all fixed assets including real estate assets, intellectual property, equipment, capital stock, and other collateral.  Second lien on accounts, deposit and security accounts (other than various notes accounts), and inventory. |
| 2 | BMO Harris Bank N.A., as Agent | BMO Harris Bank N.A.<br>111 West Monroe<br>20th Floor East<br>Chicago, IL 60603<br>Attn: Jason M. Hoefler<br>Telephone:   (312) 461-7856<br>Facsimile:   (312) 765-1641<br>Jason.Hoefler@bmo.com | $131,300,000 | First lien on accounts, deposit and security accounts (other than various notes accounts), and inventory.   Second lien on all fixed assets including real estate assets, intellectual property, equipment, capital stock, and other collateral. |
| 3 | Pacific Western Bank | Pacific Western Bank<br>30 S. Wacker Drive<br>35th Floor<br>Chicago, IL 60606<br>Attn: Scott D. Radtke<br>Telephone:   (312) 706-2157<br>Facsimile:   (312) 577-7917<br>sradtke@capitalsource.com | $10,998,081.21 | Equipment for Multiple Company Facilities / Locations |
| 4 | NXT Capital, LLC | NXT Capital, LLC<br>191 N. Wacker Drive<br>12th Floor<br>Chicago, IL 60606<br>Attn: David Heidt<br>Telephone:   (312) 450-8176<br>Facsimile:   (312) 450-8103<br>David.heidt@nxtcapital.com | $404,815.19 | Equipment for Multiple Company Facilities / Locations |
| 5 | NHMG Financial Services, Inc. | NHMG Financial Services, Inc.<br>10 Riverview Drive<br>Danbury, CT 06810 | $1,907.56 | Equipment for Howell Facility |

<u>**Schedule 4**</u>

**Consolidated Balance Sheet (unaudited)**
**as of December 31, 2014**

*(dollars in thousands)*

# UC Holdings, Inc. and Subsidiaries
## Consolidated Balance Sheets

|  | As of | | | |
|---|---|---|---|---|
|  | December 31, 2014 | | June 30, 2014 | |
|  | *(Unaudited)* | | | |
|  | *(In Thousands)* | | | |
| **Assets** | | | | |
| Current assets | | | | |
|     Cash and cash equivalents | $ | 75,265 | $ | 28,240 |
|     Accounts receivable (*net of allowances of $6,896 and $3,064 for December 31 and June 30, respectively*) | | 176,239 | | 227,331 |
|     Inventories, net | | 88,579 | | 76,996 |
|     Reimbursable tooling | | 11,755 | | 27,649 |
|     Prepaid expenses and other current assets | | 16,794 | | 16,578 |
|     Deferred tax assets | | 8,408 | | 8,539 |
|         Total current assets | | 377,041 | | 385,333 |
| Property, plant and equipment (*net of accumulated depreciation of $124,764 and $106,099 for December 31 and June 30, respectively*) | | 353,315 | | 343,955 |
| Goodwill | | 27,861 | | 29,230 |
| Other intangible assets, net | | 59,124 | | 64,640 |
| Deferred tax assets | | 1,534 | | 1,747 |
| Due from related party | | 174 | | 410 |
| Other assets | | 13,545 | | 15,251 |
|     Total assets | $ | 832,597 | $ | 840,566 |
| **Liabilities and Equity** | | | | |
| Current liabilities | | | | |
|     Current portion of long-term debt | $ | 27,278 | $ | 18,930 |
|     Accounts payable | | 165,937 | | 168,463 |
|     Accrued liabilities | | 46,638 | | 46,638 |
|     Income and other taxes payable | | 1,226 | | 1,934 |
|     Due to related party | | 1,691 | | 2,000 |
|         Total current liabilities | | 242,772 | | 237,965 |
| Long-term debt | | 519,287 | | 421,813 |
| Deferred tax liabilities | | 16,059 | | 16,859 |
| Other accrued liabilities | | 6,234 | | 6,315 |
|     Total liabilities | | 783,893 | | 682,952 |
| Equity | | | | |
|     Stated capital (*par value $0.01; 1, 000 common shares authorized, 100 common shares issued and outstanding*) | | - | | - |
| Paid-in capital | | 422,818 | | 447,298 |
| Accumulated deficit | | (394,782) | | (294,328) |
| Accumulated other comprehensive income | | 19,559 | | 3,566 |
|     Total UC Holdings, Inc. stockholder's equity | | 47,595 | | 156,536 |
| Noncontrolling interest | | 1,109 | | 1,078 |
|     Total equity | | 48,703 | | 157,614 |
|     Total liabilities and equity | $ | 832,597 | $ | 840,566 |

WEIL:\95271130\1\35076.0003

## Schedule 5

### The Debtors' Securities

Pursuant to Local Rule 1007-2(a)(7), the Debtors submit that they have not issued securities that are registered with the Securities and Exchange Commission.   The securities listed in the chart below were issued by the Debtors pursuant to an exemption from registration under the Securities Act of 1933, as amended.

| Type of Security | Issuer | Principal Amount | Approximate Number of Record Holders[1] | As of |
|---|---|---|---|---|
| 9 1/4% Senior Secured Notes due 2018 | Chassix, Inc. | $375,000,000 | Undetermined | February 25, 2015 |
| 10% / 10 3/4% Senior PIK Toggle Notes due 2018 | Chassix Holdings, Inc. | $157,971,125 | Undetermined | February 25, 2015 |

As of the Commencement Date, one hundred percent (100%) of the equity interests of Chassix Holdings, Inc. were held by Triomphe Intermediate Holding Corporation, which itself is a wholly-owned subsidiary of Dharma Holding Corporation ("**DHC**").   DHC is a wholly-owned subsidiary of certain private equity funds sponsored by Platinum Equity, LLC.

---

[1] The Debtors are unable to approximate the number of record holders of their notes as only information regarding the registered holder, typically the depository company, is available.

## Schedule 6

**Debtors' Property Not in the Debtors' Possession**

Local Rule 1007-2(a)(8) requires the Debtors to list property that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

In the ordinary course of business, on any given day, property of the Debtors (including security deposits or other collateral with counterparties to certain commercial relationships) is likely to be in the possession of various third parties, including, shippers, common carriers, materialmen, logistics vendors, tooling vendors, distributors, expeditors, warehousemen, other related service providers, or agents, where the Debtors' ownership interest is not affected. Because of the constant movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting the property would be impractical.

## Schedule 7

Pursuant to Local Rule 1007-2(a)(9), the following lists the property or premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

### Owned Property

| Debtor | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| AluTech, LLC | 2800 Yasdick | Stevensville | MI | 49127 | USA |
| Automotive Properties of New York, LLC | 4320 Federal Drive | Batavia | NY | 14020 | USA |
| Automotive Properties of New York, LLC | 2223 Dove Street | Port Huron | MI | 48060 | USA |
| Automotive Properties of New York, LLC | 2347 Dove Street | Port Huron | MI | 48060 | USA |
| Automotive Properties of New York, LLC | 3150 Dove Street | Port Huron | MI | 48060 | USA |
| Automotive Properties of New York, LLC | 100 Northcreek Drive | Shelbyville | TN | 37162 | USA |
| Automotive Properties of New York, LLC | 1320 Paw Paw Avenue | Benton Harbor | MI | 49022 | USA |
| Automotive Properties of New York, LLC | V/L Dove Street | Port Huron | MI | 48060 | USA |
| Chassix Georgia Machining, LLC | 1600 Northside Industrial Boulevard | Columbus | GA | 31904 | USA |
| Chassix Georgia Machining, LLC | 1442 Belfast Avenue | Columbus | GA | 31904 | USA |

### Leased Property[1]

| Debtor | Street Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| AluTech, LLC and Concord International, Inc.* | 1320 Paw Paw Avenue | Benton Harbor | MI | 49022 | USA |
| Automotive, LLC* | 4320 Federal Drive | Batavia | NY | 14020 | USA |
| Chassix, Inc. | 24155 Wahl Street | Warren | MI | 48089 | USA |
| Concord International, Inc. | 30-32 rue de Paradis | Paris | | 75010 | France |
| Diversified Machine, Inc. | 2280 West Grand River | Howell | MI | 48843 | USA |

---

[1]  The classification of the contractual agreements listed herein as real property leases or property held by other arrangements is not binding upon the Debtors.

*  Subject to an intercompany lease agreement with Automotive Properties of New York, LLC, as lessor.

| | | | | | |
|---|---|---|---|---|---|
| Diversified Machine Bristol, LLC | 51650 County Road #133 | Bristol | IN | 46507 | USA |
| Diversified Machine Montague, LLC | 5353 Wilcox | Montague | MI | 49437 | USA |
| DMI Edon LLC | 507 W. Indiana Street | Edon | OH | 43518 | USA |
| SMW Automotive, LLC | 23300 Blackstone | Warren | MI | 48089 | USA |
| SMW Automotive, LLC | 12700 Stephens Road | Warren | MI | 48089 | USA |
| SMW Automotive, LLC | 2005 Petit Street | Port Huron | MI | 48060 | USA |
| SMW Automotive, LLC* | 3150 Dove Street | Port Huron | MI | 48060 | USA |
| SMW Automotive, LLC* | 2347 Dove Street | Port Huron | MI | 48060 | USA |
| SMW Automotive, LLC* | 100 Summit Drive | Shelbyville | TN | 37162 | USA |
| SMW Automotive, LLC and Concord International, Inc.* | 2223 Dove Street | Port Huron | MI | 48060 | USA |
| SMW Automotive, LLC | 3 Allied Drive | Dedham | MA | 02026 | USA |
| SMW Automotive, LLC | 300 Galleria Office Center Suite 501 | Southfield | MI | 48034 | USA |

2

## Schedule 8

### Location of Debtors' Assets, Books, and Records

Pursuant to Local Rule 1007-2(a)(10), the following lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

### Location of Debtors' Substantial Assets

The Debtors have assets of more than $760 million (unaudited and subject to change), with substantial assets in Batavia, New York; Columbus, Georgia; Bristol, Indiana; Dedham, Massachusetts; Benton Harbor, Howell, Montague, Port Huron, Southfield, Stevensville, and Warren, Michigan; Edon, Ohio; and Shelbyville, Tennessee.

### Books and Records

The Debtors' books and records are located in Southfield, Michigan.

### Debtors' Assets Outside the United States

The Debtors, in addition to their non-Debtor affiliates, have significant assets worldwide of more than $830 million (unaudited and subject to change), including significant assets held outside the United States through direct and indirect subsidiaries of the Debtors.

**Schedule 9**

**Litigation**

Pursuant to Local Rule 1007-2(a)(11), to the best of the Debtors' knowledge and belief, the following is a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent.

| Action or Proceeding | Nature of Proceeding | Status of the Proceeding |
|---|---|---|
| Allison Transmission, Inc. v. DMI Milwaukee LLC, Diversified Machine, Milwaukee LLC, Diversified Machine, Inc., Diversified Machine, Inc., and Chassix, Inc., pending in the Superior Court, Marion County, in the State of Indiana (Cause No. 49D06-1401-PL-001337) | Breach of contract, promissory estoppel, replevin, and various alter ego theories of recovery including successor liability, agency, and course of performance liability | Pending |
| Albreit et al. v. DMI Vaux et al. (RG Nos. 13/00310 et seq.); Bougerol et al. v. DMI Vaux et al. (RG Nos. 13/00327 et seq.); Uzan v. DMI Vaux et al. (RG No. 13/00567), pending in the Commercial Court of Montlucon, France | Unfair termination pursuant to French labor law | Pending |
| C.M.R. Manufacturing Company d/b/a Roofcore International v. DMI Columbus, LLC, Diversified Machine, Inc. d/b/a Diversified Columbus, LLC and Chassix Georgia Machining, LLC f/k/a DMI Columbus Real Estate Holdings, LLC | Breach of contract relating to installment of a roofing system | Pending |

## Schedule 10

### Senior Management

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name & Position | Responsibilities & Experience |
|---|---|
| **J. Mark Allan**<br><br>*Chief Executive Officer* | Mr. Allan has served as the President and CEO of Chassix, Inc. ("**Chassix**") and President of Chassix Holdings, Inc. ("**Chassix Holdings**"), since May 2014.  Prior to assuming those roles, he served as President, International Operations for Chassix, where he was responsible for overseeing stable, predictable growth and profitability of the Company's international markets including Europe, China, and South America.  Prior to that, Mr. Allan served as interim president of SMW Automotive, LLC.  He has held numerous interim CEO and transition related positions with other Platinum Equity portfolio companies including Acument Global Technologies (Europe).  Prior to joining Platinum Equity, Mr. Allan held senior positions at GTS-Ebone, Honda Motor Europe Ltd., Hunting Plc and Elf Atochem. |
| **Eric Rouchy**<br><br>*Vice President of Engineering & Launch* | Mr. Rouchy is the Vice President of Engineering and Launch.  In this capacity, he is responsible for overseeing program management, manufacturing engineering, product engineering and product testing for Chassix, Inc.  Prior to the merger of SMW and DMI, Mr. Rouchy joined SMW in 2002 and held increasingly responsible product engineering leadership positions.  This includes project engineer, engineering group leader, engineering manager, and senior director of engineering.  Mr. Rouchy holds a baccalaureate with honors in mathematics and physics, and received a master's degree in automotive structure and material from ESTACA (France) as well as a Business Engineering degree from Oulu Polytechnic in 2002. |

| Name & Position | Responsibilities & Experience |
|---|---|
| **Thomas Bane**<br><br>*Vice President of North American Operations* | Mr. Bane is the Vice President of North American Operations. In this capacity, he is responsible for the financial and operational performance of sixteen (16) casting and machining plants. This includes quality, production, sustainability (safety), automation technology (global), and continuous improvement. Mr. Bane began his career in 1984 as production/quality supervisor, progressing to plant manager and operations manager at Machining Enterprises, Royal Oak Industries, and United Machining. In 2000, Tom joined SMW Automotive as plant manager, which progressed to director of manufacturing, leading the company through a period of significant growth to thirteen plants globally. During the merger of SMW and DMI, Mr. Bane took the role of Vice President of Operations for North America, which he maintains today. |
| **Safi Hamid**<br><br>*Vice President of Sales and Supply Chain* | Mr. Hamid is the Vice President of Sales and Supply Chain. In this capacity, he is responsible for guiding and directing revenue development and analysis, and worldwide key account management. Prior to the merger of SMW and DMI, Mr. Hadid joined SMW in 1995 and held increasingly responsible sales, supply chain, and quality management positions. During his tenure, Mr. Hamid has positioned the company for significant growth in North America, Europe, and Asia. Mr. Hamid has multiple degrees in the sciences and arts, and received a degree in international business from ICN in France in 1995. |
| **David Woodward**<br><br>*Chief Financial Officer* | David Woodward is the Interim Chief Financial Officer, and is a Senior Managing Director at FTI Consulting. Mr. Woodward has over 34 years of financial, operating, and mergers and acquisitions experience in a variety of industrial sectors, including more than 25 years in the transportation (automotive and heavy truck) industry. Mr. Woodward holds a B.A. in accounting, with a minor in economics from Westminster College. He is a member of the Association for Corporate growth, Turnaround Management Association, American Bankruptcy Institute, and Association of Insolvency and Restructuring Advisors. Mr. Woodward is a Certified Insolvency and Restructuring Advisor. |

WEIL:\95271139\1\35076.0003

## Schedule 11

### Payroll

Pursuant to Local Rule 1007-2(b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors for the 30-day period following the filing of the chapter 11 petitions.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors, and Stockholders)** | $15,900,000 |
| **Payments to Officers, Stockholders, and Directors** | $221,000[1] |
| **Payments to Financial and Business Consultants** | $3,500,000[2] |

---

[1] The Debtors do not anticipate making any payments to Stockholders or Directors in the 30-day period following the filing of the chapter 11 petitions.

[2] This does not include any payments to the Debtors' attorneys or auditors.   Pursuant to the retention applications filed for these professionals, the Debtors will not make any payments in the 30-day period following the filing of the chapter 11 petitions.

**Schedule 12**

**Cash Receipts and Disbursements,
Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the filing of the chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash Receipts** | $122,700,000 |
| **Cash Disbursements** | $122,900,000 |
| **Net Cash Loss** | ($200,000) |
| **Unpaid Obligations** | $47,000,000 |
| **Uncollected Receivables** | $159,800,000 |