Marcia L. Goldstein
Ray C. Schrock, P.C.
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------x
                                         :
In re                                    :        Chapter 11
                                         :
CHASSIX HOLDINGS, INC., et al.,          :        Case No. 15-_____ (___)
                                         :
                                         :        (Joint Administration Pending)
                       Debtors.¹         :
                                         :
-------------------------------------------------------x
```

**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) FOR ENTRY OF ORDER (I) AUTHORIZING (A) PAYMENT OF PREPETITION WAGES, SALARIES, AND OTHER COMPENSATION AND BENEFITS, AND (B) MAINTENANCE OF EMPLOYEE BENEFITS PROGRAMS AND PAYMENT OF RELATED ADMINISTRATIVE OBLIGATIONS AND (II) AUTHORIZING AND DIRECTING APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS TO RECEIVE, PROCESS, HONOR, AND PAY CHECKS PRESENTED FOR PAYMENT AND TO HONOR ALL FUND TRANSFER REQUESTS**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Chassix Holdings, Inc. ("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**"), and certain of their affiliates and subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, including Chassix Holdings and Chassix, the "**Debtors**," and together with their non-Debtor subsidiaries, the "**Company**"), respectfully represent:

## Background

1.      On the date hereof (the "**Commencement Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

2.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

3.      The Debtors commenced their chapter 11 cases on a prearranged basis with the support of their (a) secured and unsecured noteholders, which have committed to make significant and immediate capital infusions into the Debtors' businesses, and (b) major automotive manufacturing customers, which have committed to long-term pricing commitments and other valuable accommodations.  Consistent with their obligations under the restructuring support agreement, the Debtors have filed a plan of reorganization and proposed disclosure statement with the Court and are seeking to emerge from chapter 11 on an expedited timeframe.

2

4.        Information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the Declaration of J. Mark Allan Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Allan Declaration**"), sworn to on the date hereof, which has been filed with the Court contemporaneously herewith.

## Jurisdiction

5.        This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409 and Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).

## Relief Requested

6.        By this Motion, pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, the Debtors seek entry of an order authorizing, but not directing, them to (i) pay, in their sole discretion, all prepetition amounts required under or related to Compensation Obligations, Union Dues, Employee Incentive Program Obligations, Reimbursable Expenses, Withholding Obligations, Severance Obligations, Employee Benefit Programs, and Independent Contractor Obligations (each as herein defined and, together with any costs or related administrative expenses, the "**Prepetition Employee Obligations**")[2] and (ii) continue their prepetition practices, programs, and policies for their Employees (as herein defined), as those practices, programs, and policies were in effect as of the Commencement Date and as those practices, programs, and policies may be modified, amended, or supplemented from time-to-time

---

[2] The Debtors believe that the list of wages, benefits, and other obligations is a comprehensive list of obligations arising from the Debtors' employee compensation and benefits programs.  To the extent that any plan or program obligation was inadvertently omitted, the term "Prepetition Employee Obligations" includes such obligation.

3

in the ordinary course of the Debtors' businesses, and honor any related administrative costs and obligations arising thereunder.

7.      Further, the Debtors request that the Court authorize and direct the banks and other financial institutions at which the Debtors maintain disbursement accounts, at the Debtors' direction, to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks drawn or electronic fund transfers requested or to be requested by the Debtors relating to the Prepetition Employee Obligations.  The Debtors also seek authority to issue new postpetition checks, or effect new electronic fund transfers, on account of such obligations to replace any prepetition checks or electronic fund transfer requests that may be lost, dishonored, or rejected as a result of the commencement of these chapter 11 cases.

8.      The Debtors have annexed hereto as **Exhibit "A"** a proposed form of order (the "**Interim Order**") that provides for the relief requested herein during the interim period (the "**Interim Period**") from the Commencement Date to the entry of a final order (the "**Final Order**").

## The Debtors' Employees

9.      As of the Commencement Date, the Debtors employ approximately 3,500 Employees,[3] including approximately (i) 3,000 hourly Employees, regularly scheduled to work a minimum of forty hours per week and (ii) 500 salaried Employees, most of who are also employed to work a minimum of forty hours per week.[4]  Most of the Debtors' Employees are retained at the plant level and perform work in the Debtors' various manufacturing facilities

---

[3] For purposes of this Motion, "**Employees**" includes all persons entitled to, as of the Commencement Date, compensation, benefits, reimbursement, or any other similar payment as a consequence of being employed by the Debtors but does not include any temporary workers or independent contractors.

[4] Additionally, the Debtors' foreign affiliates and subsidiaries (all of which are non-Debtors) retain approximately 1,200 individuals abroad.  Because all of the Debtors are organized under the laws of various states in the United States, and because none of their foreign affiliates are parties to these chapter 11 cases, unless otherwise noted herein, the Debtors have limited the description of their workforce and benefits programs to their domestic operations.

WEIL:\95271050\1\35076.0003

located throughout the United States.  The Employees that work at the Debtors' Southfield headquarters are employed by Chassix.

10.      As of the Commencement Date, approximately 270 Employees that work in the Debtors' facilities located in Batavia, New York and Columbus, Georgia are members of labor unions and are subject to collective bargaining agreements (collectively, the "**CBAs**") with the Debtors.  The facilities located in Batavia and Columbus are the Debtors' only unionized facilities and the union Employees at such facilities are the only Employees subject to CBAs.  The Debtors do not maintain defined benefit pension plans for their Employees and, accordingly, do not owe any amounts on account of pension obligations.

11.      The Employees perform a variety of critical functions for the Debtors including, without limitation, tasks pertaining to management, product manufacturing, facility and machine maintenance, quality assurance, purchasing and sales administration, finance and accounting, human resources, customer service, security, and other areas crucial to the Debtors' casting and machining businesses.  Due to the highly technical and specialized nature of the automotive industry, the skill and "know how" of the Employees are fundamental to the success of the Debtors' businesses and operations.

12.      In addition to their Employees, the Debtors also employ (i) two independent contractors to perform resource planning implementation services, information technology services, and related financial projects (the "**Independent Contractors**"), and (ii) approximately seven hundred-forty temporary workers to work at the Debtors' various manufacturing facilities through a number staffing agencies.[5]

---

[5] The Debtors are not seeking authority herein to pay prepetition amounts owed to staffing agencies on account of temporary workers.

WEIL:\95271050\1\35076.0003

## Prepetition Employee Obligations

13.      As described more fully herein, the Debtors believe that, as of the

Commencement Date, the aggregate amount of their Prepetition Employee Obligations is

approximately $6.1 million.[6]  By this Motion, the Debtors are not seeking authority to pay to any

individual any amount in compensation or benefits that collectively would exceed the $12,475

priority cap imposed by section 507(a)(4) of the Bankruptcy Code (the "**Prepetition**

**Compensation Cap**") during the Interim Period.  The various components of the Prepetition

Employee Obligations are described in further detail below.

### A.  Compensation Obligations

14.      The Debtors pay Employees salaries, wages, and other compensation

(including overtime pay) in exchange for the services they provide (the "**Compensation**

**Obligations**").  Most of the Debtors' salaried Employees receive biweekly payments (*i.e.*, 26

pay periods per year) for wages and salaries one week in arrears.[7]  The Debtors' hourly

Employees generally receive weekly payments (*i.e.*, 52 pay periods per year) for wages and

salaries also one week in arrears.  The vast majority of Employees receive their compensation

through electronic funds transferred directly to their accounts, with the balance of Employees

receiving checks or, in rare instances, prepaid cards.  Additionally, as of the Commencement

Date, some of the Employees may be entitled to additional prepetition compensation either

because (i) discrepancies exist between the amounts paid and the amounts that should have been

paid or (ii) the checks issued to Employees prior to the Commencement Date were not presented

---

[6] This amount does not include non-cash pay obligations (such as paid vacation time), any Reimbursable Expenses that may be outstanding, or Withholding Obligations.

[7] The salaried Employees that work out of the Debtors' Columbus, Georgia facility are not paid in arrears.

for payment or did not clear the banking system.  The Debtors estimate that the aggregate

amount of accrued, but unpaid Compensation Obligations total $4.5 million.[8]

### B.  Union Dues

15.    As noted above, approximately two hundred-seventy hourly Employees

at the Debtors' Batavia and Columbus facilities are represented by unions and owe union dues

(the "**Union Dues**") to one of the following two unions:  (i) the International Union, United

Automobile, Aerospace and Agricultural Implement Workers of America Local No. 481 or

(ii) the United Steel Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and

Service Workers International Union, Local Union No. 2948.  Pursuant to the applicable CBAs,

the Debtors pay the Union Dues on behalf of their union Employees and such payments are then

deducted from the compensation that would be received by such Employees.

16.    As of the Commencement Date, the Debtors estimate that they owe

approximately $10,000 on account of prepetition Union Dues.

### C.  Employee Incentive Programs

17.    In addition to paying their wages and salaries, prior to the

Commencement Date, the Debtors utilized a number of bonus programs to encourage and

incentivize their Employees to maximize their performance for the benefit of the Debtors'

businesses (collectively, the "**Employee Incentive Programs**" and the obligations arising

---

[8] Additionally, the Debtors remit compensation to the two Independent Contractors in accordance with their
respective agreements by making payments directly to the individual workers.  As of the Commencement Date, the
Debtors estimate that they owe their Independent Contractors approximately $20,000 in the aggregate on account of
prepetition wages (the "**Independent Contractor Obligations**").

WEIL:\95271050\1\35076.0003

thereunder, the "**Incentive Program Obligations**").[9]  The Employee Incentive Programs are

critical components of Employee compensation and bring substantial value to the Debtors'

estates because they align Employee incentives with those of the Debtors.  Each of the Employee

Incentive Programs is described in further detail below.  By this Motion, the Debtors are not

seeking to make any incentive or bonus payments to Employees during the Interim Period.

      i.   *Annual Incentive Plan*

      18.      The Debtors have historically offered an Annual Incentive Plan (the

"**AIP**") to certain Employees, which was established, and is maintained, both at the corporate

level (for those Employees located at the Debtors' headquarters) and at the plant and regional

levels.  The AIP sets forth the goals and administrative guidelines that reflect the Debtors'

expectations for company performance and resulting incentive compensation.  Because the

performance goals are measured on, among other things, the Debtors' financial performance for

the current fiscal year, whether an Employee is entitled to receive an AIP bonus is determined by

the Debtors' actual performance at the plant, regional, and/or corporate levels, as applicable.  In

fiscal year 2013, approximately 100 Employees received AIP bonuses and such payments

accounted for between 5% and 75% of such Employees' total compensation, totaling

approximately $2.6 million.  Due to the Debtors' financial condition during 2014, the amount to

be paid to eligible Employees on account of the AIP will be meaningfully less than what was

paid in 2013.  The AIP bonuses for fiscal year 2014 are scheduled to be paid following the

second pay period in March 2015.  As of the Commencement Date, the Debtors estimate that

---

[9] As part of their prepetition restructuring initiatives, the Debtors engaged in a review of their existing bonus programs and assessed ways to improve and tailor them to address current needs.  The Debtors determined that it was necessary, and in their best interests, to implement additional incentive programs (the "**Restructuring Bonus Programs**") for Employees who they deemed necessary to maintain operations during the critical period within which the Debtors are seeking to restructure and reorganize their businesses and operations.  By this Motion, the Debtors are not seeking authority to make payments under the Restructuring Bonus Programs.

WEIL:\95271050\1\35076.0003

approximately 100 Employees have earned AIP bonuses for fiscal year 2014, totaling approximately $1.2 million in the aggregate. The Debtors are not seeking to make any payments on account of the AIP during the Interim Period.

ii. *Pay for Performance Incentive Plan*

19.    The Debtors have also historically offered a Pay for Performance Incentive Program ("**P4P Program**"), which is a quarterly incentive program designed to motivate certain Employees who assist the Debtors in achieving their financial and operational goals. All full-time hourly and salaried Employees who are not eligible for the AIP bonus program are eligible for the P4P Program.[10] Payments on account of the P4P Program are based on quarterly budget projections by plant and constitute an average of approximately 2.5% of an Employee's total compensation. In January 2015, the Debtors made approximately $600,000 in bonus payments to slightly over 1,000 Employees under the P4P Program. The next quarterly installments are scheduled to be made in April 2015 and the Debtors estimate that payments will total approximately $1.1 million.[11] As of the Commencement Date, the Debtors believe that no payments are accrued and outstanding in connection with the P4P Program.

iii. *Facility-Specific Bonus Programs*

20.    In extraordinary circumstances the Debtors' manufacturing facilities may also implement facility-specific bonus programs. For example, in November 2014, the facility located in Bristol, Indiana, introduced a bonus program for key management at the facility (which includes supervisors, project managers, engineers, and first line supervisors, but does not include any "Insiders" as that term is defined by section 101(31) of the Bankruptcy

---

[10] No "Insiders" (as such term is defined in section 101(31) of the Bankruptcy Code) are eligible to receive a bonus under the P4P Program.

[11] This estimate is subject to change based on actual performance.

9

Code), which would be paid in two installments.[12]  The Bristol program was implemented

because, as described in the Allan Declaration, that facility has been facing an unprecedented

increase in manufacturing demands and undergoing significant restructuring initiatives, which

have augmented the work-load for certain Employees.  In an effort to improve Employee

performance at that facility, the Debtors determined, in their business judgment, that it was

necessary to institute an incentive program targeted at key management at Bristol.  Thus, in

November 2014, approximately twenty-four Employees from the Bristol facility received

bonuses on account of the Bristol program, totaling approximately $160,000 in the aggregate.

The second and final installment of the Bristol is scheduled to be made in July 2015 in the

aggregate amount of approximately $140,000.  By this Motion, the Debtors are not seeking

authority to make any payments on account of the Bristol bonus program during the Interim

Period.

      *iv.*    *Spot Awards Program*

      21.    In addition to the foregoing, the Debtors have, on occasion, provided spot

bonuses for Employees who make exceptional contributions to the Debtors' businesses.  Based

on past practices, the Debtors may make one-time cash payments to eligible Employees in

amounts ranging from $25.00 to $300.00.  The spot awards are made on an *ad hoc* basis and the

Debtors base the amount of each award on the recipient's contribution and on his/her impact on

the Debtors' businesses.  The Debtors do not intend to make any spot awards during the Interim

Period.

### D.  Reimbursable Expenses

      22.    In the ordinary course of their businesses, the Debtors reimburse certain

of their Employees for reasonable and customary expenses incurred in the scope of their

---

[12] Currently, the Bristol facility is the only manufacturing plant that maintains a facility-specific bonus program.

employment (collectively, the "**Reimbursable Expenses**").  The Reimbursable Expenses include those expenses related to (i) business travel, (ii) business entertainment, (iii) communications (*e.g.*, cellular telephone usage and internet access for business purposes), and (iv) other expenses allowed pursuant to the Debtors' travel and entertainment policy.

      23.    Many of the Employees who incur such expenses pay for them by charging the American Express cards (the "**Employee Credit Cards**") provided to them by the Debtors.  The invoices for the Employee Credit Cards are sent directly to the Employees, who then seek reimbursement from the Debtors for all business-related expenses.  Employees may also seek reimbursement from the Debtors for business-related expenses that were not charged to an Employee Credit Card.  In both cases, the business-related expenses incurred by Employees are reimbursed by submitting an expense reimbursement form, either manually or through the Company's third-party expense reimbursement portal, for approval by supervisory personnel.  In addition to the Employee Credit Cards, because of the nature of the Debtors' businesses (i) certain plant level supervisors are provided with purchasing cards to pay for necessary day-to-day operating expenses (such as parts, certain goods, and related production materials), the invoices for which are paid for directly by the Debtors, and (ii) certain management level employees at the corporate level are provided with personal expense cards to use in accordance with the Debtors' travel and entertainment policy, the invoices for which are also paid for directly by the Debtors.

      24.    Because Reimbursable Expenses are reimbursed to Employees on a regular basis, it is difficult to determine how much is owed by the Debtors at any given time. The Debtors estimate that they incur liabilities of approximately $300,000 per month on account of Reimbursable Expenses.  By this Motion, the Debtors are seeking authorization to satisfy all

11

prepetition Reimbursement Obligations, including those incurred through the use of the

Employee Credit Cards, as and when they arise.

**E. Withholding Obligations**

25.        As employers, the Debtors are required by law to withhold from

Employees' salaries, wages, and other compensation amounts related to federal, state, and local

income taxes, as well as Social Security and Medicare taxes (collectively, the "**Withholding Taxes**")

and to remit them to the appropriate taxing authorities (collectively, the "**Taxing Authorities**").  The

Debtors are also required to make payments from their own funds on account of Social Security and

Medicare taxes and to pay, based on a percentage of gross payroll (and subject to state-imposed

limits), additional amounts to the Taxing Authorities for, among other things, state and federal

unemployment insurance (collectively, the "**Employer Payroll Taxes**" and, together with the

Withholding Taxes, the "**Payroll Tax Obligations**").  The Debtors' average liabilities each

month for Withholding Taxes and Employer Payroll Taxes total approximately $2.7 million and

$1.0 million, respectively.

26.        In the ordinary course of processing payroll for the Employees, the

Debtors may also be required by law, in certain circumstances, to withhold from certain Employees'

wages amounts for various garnishments, such as tax levies, child support, and other court-ordered

garnishments (collectively, the "**Garnishments**" and, together with the Payroll Tax Obligations, the

"**Withholding Obligations**").  Each pay cycle, the Debtors withhold such amounts from applicable

Employees' paychecks and remit them to the appropriate authorities or entities.  On average, the

Debtors withhold approximately $72,000 in Garnishments per month from Employees' wages and

salaries.

WEIL:\95271050\1\35076.0003

**F.  Payroll Maintenance Fees**

27.        To efficiently manage the processing and payment of the various

obligations described above, the Debtors heavily rely on the services provided by ADP, LLC

("**ADP**" and, obligations related thereto, the "**Payroll Maintenance Fees**") through a master

services agreement with the Debtors.  ADP provides payroll processing, tax computation,

payment preparation, payroll transfer administration, and various administrative services.  Each

payroll period, the Debtors fund certain disbursement accounts with the amounts necessary to

satisfy the Debtors' payroll obligations.  ADP then processes direct deposit transfers, issues

prepaid cards, or administers payroll checks to Employees.  The services that ADP provides are

critical to the smooth functioning of the Debtors' payroll system.  ADP is responsible for

ensuring that (i) Employees are paid on time, (ii) deductions are appropriately determined,

(iii) payroll reporting is accurate, and (iv) appropriate amounts are remitted to the applicable

taxing authorities and other payees.  The Debtors pay ADP approximately $94,000 per month for

the aforementioned services.  As of the Commencement Date, the Debtors believe that they owe

ADP approximately $110,000 on account of Payroll Maintenance Fees.

**G.  Severance Obligations**

28.        In their normal course of business, the Debtors have historically offered

severance to their rank and file Employees (the "**Severance Program**").  Pursuant to the

Severance Program, the Debtors have historically offered severance payments equal to one

week's salary for each full year that an Employee has been working with the Debtors, with a

minimum of two weeks and a maximum of twelve weeks.  The Severance Program is intended to

compensate Employees for the economic disruption following termination of employment.  As

of the Commencement Date, the Debtors estimate that approximately four Employees (not

including any "Insiders," as that term is defined by section 101(31) of the Bankruptcy Code)

13

remain entitled to receive continued severance benefits pursuant to the Severance Program, with outstanding payments totaling $160,000 in the aggregate.  In addition, some Employees may also be entitled to receive severance payments as part of their employment agreements (these obligations, together with the obligations owed on account of the Severance Program, the "**Severance Obligations**").  By this Motion, the Debtors are not seeking authority to pay Severance Obligations owed to "Insiders," as that term is defined by section 101(31) of the Bankruptcy Code.

### H.  Employee Benefits

29.     In addition to the aforementioned payment-related obligations, the Debtors maintain various employment benefit plans and policies.  The benefit plans fall within the following categories:  (i) paid time off benefits that only include holidays and vacation days; (ii) medical, dental, and vision benefits; (iii) 401(k) plan benefits and two flexible spending plans; and (iv) certain employee insurance benefits (collectively, the "**Employee Benefit Programs**").  Any Employee who is regularly scheduled to work thirty or more hours per week is eligible for the Employee Benefit Programs (the "**Program Participants**").  Coverage for the Employee Benefit Programs begins on the first of the month following thirty days after an Employee's first day of employment.

### i.    The PTO Plan

30.     Program Participants receive their full wages from the Debtors when they take time off from work for certain holidays and vacation.  Program Participants accrue vacation entitlement based on how long the Program Participants have been employed by the Debtors.  The minimum yearly vacation accrual is at a rate of five days of vacation per year of employment; the maximum yearly vacation accrual is at a rate of twenty days of accrued vacation.  Certain Employees may be eligible for more than twenty days of yearly accrued

14

vacation pursuant to the terms of outlined in their employment agreements, or legacy vacation policies that existed prior to the Company's formation (which allowed for more than twenty days of vacation per year).  Additionally, Program Participants may carry over up to five days to the following calendar year, provided that the Program Participants must use any carry over days by March of the new calendar year.  Generally, Program Participants do not receive paid personal or sick days.  Program Participants are required to use any accrued and unused vacation time whenever they are out from work, subject to certain exceptions such as an absence on account of jury duty.

31.    In accordance with the Debtors' prepetition practices, in the event of termination, a Program Participant will receive a cash payment in satisfaction of his/her earned holiday and vacation pay.  The Debtors believe that, as of the Commencement Date, no outstanding amounts are owed to terminated Program Participants on account of accrued but unpaid holiday and vacation pay.

*ii.    Medical, Dental, and Vision Plans*

32.    Program Participants are also eligible to receive medical, dental, and vision insurance (collectively, the "**Health Care Plan**," and the obligations thereunder, the "**Health Care Plan Obligations**").  The Health Care Plan is self-funded, with payments made by the Debtors including contributions from their Employees by way of payroll deductions.  The Debtors estimate that they remit payments to Blue Cross Blue Shield totaling approximately $2 million per month on account of the Health Care Plan Obligations (which includes payments made on account of Employee claims, the costs of administrating the policies, and the cost of maintaining the Stop Loss Insurance as well as payments owed on account of the vision plan as explained below), $1.5 million of which is paid net of Employee contributions.

WEIL:\95271050\1\35076.0003

33.     <u>Medical Plan</u>.  The Debtors offer Program Participants and their

families medical benefits administered by Blue Cross Blue Shield of Michigan ("**Blue Cross**

**Blue Shield**").  Program Participants can either opt out of the medical plan ("**Medical Plan**") or

choose between three different plans (a health maintenance organization provider, a preferred

provider organization, and a consumer driven health plan with a preferred provider organization).

In all cases, Program Participants' claims are administered and paid by Blue Cross Blue Shield

and the Debtors subsequently reimburse Blue Cross Blue Shield for the same.  The Debtors also

maintain a stop-loss insurance policy ("**Stop Loss Insurance**") with Blue Cross Blue Shield that

covers any medical claim that exceeds $250,000 per year.  As of the Commencement Date, the

Debtors are current with respect to amounts owed to Blue Cross Blue Shield on account of the

Medical Plan and the Stop Loss Insurance.

34.     <u>Dental and Vision Plans.</u>  The Debtors participate in a dental plan

through Delta Dental ("**Delta**"), a preferred provider organization, and a vision plan that is self-

funded and administered by Vision Service Plan ("**VSP**").  The vision plan is funded through

contributions made by the Debtors and the Program Participants by way of payroll deductions.

Any amounts owed to VSP for administering the vision plan are included in the payments made

to Blue Cross Blue Shield for administering the Medical Plan.  The Debtors make monthly

premium payments to Delta on account of the dental plan.  The Debtors estimate that, as of the

Commencement Date, they are current on premium payments owed to Delta.

35.     <u>Benefits Advisor</u>.  The Debtors utilize Mercer LLC ("**Mercer**") as their

benefits advisor for the Health Care Plan.  Mercer provides certain necessary health and welfare

consulting services, including, among other things, annual health plan strategy and

management, communications, open enrollment, actuarial services, and government reporting.

16

In exchange for these services, Mercer receives a negotiated percentage of the payments made by the Debtors to the Insurance Carriers for the Health Care Plans.  Accordingly, as of the Commencement Date, the Debtors do not owe any prepetition amounts to Mercer on account of the foregoing benefits advisor services.

   iii.    *Flexible Spending Accounts & Health Savings Account*

36.    In addition to offering the medical benefits described above, the Debtors also provide Program Participants the option to enroll in up to three of four following flexible spending accounts (each a "**FSA**") or  health savings accounts (the "**HSA**"), each administered by ADP: (i) the healthcare related FSA, which provides a participating Employee with pre-tax reimbursement for qualified health care expenses not covered by insurance, (ii) the dependent care related FSA, which provides pre-tax reimbursement for a participating Employees' eligible dependents' day care needs, (iii) the limited purpose FSA, which provides pre-tax reimbursement for a participating Employees' qualified health care expenses not covered by insurance (for those Employees with HSA only), and (iv) the HSA, which provides a participating Employee with pre-tax reimbursement for qualified health care expenses not covered by insurance.  Under the terms of the FSAs and the HSA, during the annual enrollment period, Program Participants may choose to designate an amount of their pre-tax wages or salary towards the FSAs or the HSA, which can then be used for eligible health care expenses incurred. Participating Employees submit receipts for such eligible expenses to and are paid by the administrators for the FSAs and HSA, who are then reimbursed by the Debtors on a regular basis.  Currently, approximately 200 Employees are enrolled in the FSAs or HSA.  The cost for administering the FSAs and the HSA is built into the Payroll Maintenance Fees paid to ADP.

17

    *iv.*   *The 401(k) Plan*

      37.    The Debtors maintain a qualified defined contribution savings plan for the benefit of all eligible Program Participants meeting the requirements of section 401(a) and 401(k) of the Internal Revenue Code (the "**401(k) Plan**," and the obligations thereunder, the "**401(k) Plan Obligations**"). There are approximately seven hundred Employees enrolled in the 401(k) Plan. The estimated weekly amount withheld from such Employees' paychecks for 401(k) Plan contributions is $53,000 in the aggregate. The Debtors match 20% of the first 6% of an Employee's contribution. Pursuant to that certain *Fidelity Investments Retirement Plan Service Agreement*, between Chassix and Fidelity Management Trust Company ("**Fidelity**"), Fidelity performs certain recordkeeping services on account of the 401(k) Plan. Payments owed to Fidelity for administering the 401(k) Plan are drawn directly from 401(k) Plan funds. Further, The Brice Group, which is part of Morgan Stanley's Graystone Consulting unit, acts as the Debtors' financial advisor with respect to the 401(k) plan. The Brice Group reviews the plan and makes recommendations on the Debtors' behalf to ensure the Debtors are in compliance with applicable regulations and their investment policy statement (including plan design and asset allocation). The Debtors make payments totaling approximately $14,000 per quarter for the services provided by The Brice Group. The Debtors do not owe any amounts to Fidelity on account of the 401(k) Plan and are current with respect to payments owed to The Brice Group.

    *v.*   *Employee Insurance Programs*

      38.    The Debtors also provide certain insurance coverage to Program Participants and offer other additional insurance options (collectively, the "**Employee Insurance Programs**," and the obligations related thereto, the "**Employee Insurance Obligations**").

      39.    <u>Basic Life and AD&D Insurance</u>. The Debtors purchase core Life ("**Basic Life Insurance**") and Accidental Death and Dismemberment Insurance ("**AD&D**

18

**Insurance**") for Program Participants in the event of serious illness, injury, or death through Minnesota Life.  Under the Debtors' Basic Life Insurance, the Employee's designee receives an amount equal to the Program Participant's annual base salary upon the Program Participant's death.  The AD&D Insurance is equal to the Basic Life Insurance amount and, in addition, if a serious accident takes a Program Participant's sight, limb, or life, such Program Participant (or his/her designee) would receive added compensation, as provided for in their AD&D Insurance. As of the Commencement Date, the Debtors believe that they are current on the payment of premiums for the Basic Life Insurance and AD&D Insurance.

40.        Supplemental Life Insurance.  Program Participants are eligible to purchase supplemental life insurance (the "**Supplemental Life Insurance**").  The Supplemental Life Insurance must be elected within the first thirty days of employment and premiums are paid exclusively by the Employees.  Premiums for this coverage are paid through regular payroll deductions from the participating Employees' paychecks and, accordingly, no amounts are outstanding.

41.        Disability Benefits.  The Debtors also offer Program Participants short-term and long-term disability insurance.  The long-term disability program is offered through The Life Insurance Company of North America ("**CIGNA**") and the short-term disability is self-funded and administered by CIGNA.  The aggregate monthly premium for the long-term disability program is approximately $42,000.  Under the long-term disability program, participating Employees are eligible to receive 60% of their monthly salary up to a maximum of $10,000 per month.  The aggregate quarterly payments made by the Debtors on account of the short-term disability program total approximately $2,500.  The short-term disability program also offers all participating Employees 60% of their weekly salary up to a maximum of $1,000

19

per week.  In January 2015, the Debtors made a payment of approximately $2,500 on account of

the short-term disability program covering the period commencing on October 1, 2014 through

December 31, 2014.  As of the Commencement Date, the Debtors are current with respect to

premium payments owed to CIGNA for the long-term disability program and are not aware of

any amounts owed on account of the short-term disability program.

### The Court Should Authorize the Debtors<br>to Pay Outstanding Prepetition Employee Obligations

42.     Under section 507(a)(4)(A) of the Bankruptcy Code, claims of employees

against a debtor for "wages, salaries, or commissions, including vacation, severance, and sick

leave pay," that are "earned within 180 days before" the date on which the debtor's chapter 11

case is commenced are afforded priority unsecured status up to $12,475 per individual.

Similarly, section 507(a)(5) of the Bankruptcy Code provides that employees' claims for

contributions to certain employee benefit plans are also afforded priority unsecured status to the

extent of $12,475 per employee covered by such plans, less any amount paid pursuant to section

507(a)(4) of the bankruptcy Code.

43.     Additionally, a court may authorize a debtor to pay certain prepetition

obligations pursuant to section 363(b) of the Bankruptcy Code.  *See In re Ionosphere Clubs, Inc.*,

98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).  Section 363(b) of the Bankruptcy Code provides, in

pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in

the ordinary course of business, property of the estate . . . ."  To approve the use of a debtor's

assets outside the ordinary course of business pursuant to section 363(b), a Court must find that a

"good business reason" exists for the use of such assets.  *See, e.g., Official Comm. of Unsecured*

*Creditors v. Enron Corp. (In re Enron Corp.)*, 335 B.R. 22, 27-28 (S.D.N.Y. 2005) (quoting *In*

*re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)).  The business judgment rule is satisfied

where "'the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts in this District consistently have declined to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and have upheld a board's decisions as long as such decisions are attributable to any "'rational business purpose.'" *Integrated*, 147 B.R. at 656 (quoting *CRTF Corp. v. Federated Dep't Stores*, 683 F. Supp. 422, 436 (S.D.N.Y. 1988)).

44.     The Court also has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the Debtors to pay the Prepetition Employee Obligations because such payments are necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the Bankruptcy Code. Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to act as a fiduciary to "protect and preserve the estate, including an operating business' going-concern value," on behalf of the debtor's creditors and other parties in interest. *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232-33 (Bankr. S.D.N.Y. 1998) ("upon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of

21

a bankruptcy trustee").  Section 105(a) of the Bankruptcy Code empowers the Court to "issue

any order, process, or judgment that is necessary or appropriate to carry out the provisions of"

the Bankruptcy Code.  11 U.S.C. § 105(a); *see Schwartz v. Aquatic Dev. Group, Inc. (In re*

*Aquatic Dev. Group, Inc.)*, 352 F.3d 671, 680 (2d Cir. 2003) ("it is axiomatic that bankruptcy

courts are 'courts of equity, empowered to invoke equitable principles to achieve fairness and

justice in the reorganization process'") (quoting *In re Momentum Mfg. Corp.*, 25 F.3d 1132,

1136 (2d Cir. 1994)).

45.    In a long line of well-established cases, courts consistently have permitted

postpetition payment of prepetition obligations where necessary to preserve or enhance the value

of a debtor's estate for the benefit of all creditors.  *See, e.g., In re Fin. News Network, Inc.*, 134

B.R. 732, 735-36 (Bankr. S.D.N.Y. 1991) ("[A] bankruptcy court may allow pre-plan payments

of prepetition obligations where such payments are critical to the debtor's reorganization")*;*

*Ionosphere*, 98 B.R. at 175 (citing *Miltenberger v. Logansport, C&S W.R. Co..*, 106 U.S. 286,

312 (1882) (payment of pre-receivership claim before reorganization permitted to prevent

stoppage of "indispensable business relations")); *Mich. Bureau of Workers' Disability Comp. v.*

*Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285-86 (S.D.N.Y. 1987) (approving

lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

46.    This "doctrine of necessity" functions in a chapter 11 reorganization as a

mechanism by which the Court can exercise its equitable power to allow payment of critical

prepetition claims not explicitly authorized by the Bankruptcy Code.  *See In re Lehigh & New*

*England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (quoting *In re Penn Cent. Transp. Co.*, 467

F.2d 100, 102 n.1 (3d Cir. 1972) ("[T]he 'necessity of payment' doctrine…[permits] immediate

payment of claims of creditors where those creditors will not supply services or material

essential to the conduct of the business until their pre-reorganization claims shall have been paid."); *In re Boston & Me. Corp.,* 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing "existence of a judicial power to authorize trustees in reorganization to pay claims [for] goods and services indispensably necessary" to debtors' continued operation); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396 ("A general practice has developed…where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Structurelite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) ("[A] *per se* rule proscribing the payment of pre-petition indebtedness may well be too inflexible to permit the effectuation of the rehabilitative purposes of the Code").  The rationale for the doctrine of necessity is consistent with the paramount goal of chapter 11— "facilitating the continued operation and rehabilitation of the debtor." *Ionosphere*, 98 B.R. at 176.

47.    The Debtors believe that a substantial portion of the Prepetition Employee Obligations constitute priority claims under sections 507(a)(4) and (5) of the Bankruptcy Code.  As priority claims, such Prepetition Employee Obligations must be paid in full before any general unsecured obligation of the Debtors may be satisfied.  Accordingly, the relief requested herein likely may affect only the timing of the payment of a substantial portion of the Prepetition Employee Obligations and should not prejudice the rights of the general unsecured creditors.

48.    Payment of the Prepetition Employee Obligations is also warranted as they are justified by the facts and circumstances of these chapter 11 cases.  The Employees are vital to the continued operation of the Debtors' businesses and necessary for the Debtors to successfully emerge from these chapter 11 cases.  Any delay in paying Prepetition Employee

23

Obligations will adversely impact the Debtors' relationship with their Employees as it could irreparably harm the Employees' morale, dedication, confidence, and cooperation. Because many of the Employees interact with the Debtors' customers—on whose continued support and loyalty the Debtors rely—the Employees' support for the Debtors' reorganization efforts is key to the Debtors' ongoing operations. The Debtors cannot risk the damage to their businesses that would follow any decline in Employee morale that likely would occur if the Debtors fail to pay the Employees their wages, salaries, and other benefits. Moreover, absent an order granting the relief requested, many Employees will suffer undue hardship and, in many instances, serious financial difficulties. Thus, without the relief requested, the Debtors' restructuring efforts may be undermined by the possibility that otherwise loyal Employees will seek other employment alternatives.

49.    The Debtors also believe that it is necessary to pay the administrative costs owed to third-party vendors who provide compensation- and other benefit-related services and products. Absent the relief requested, the Debtors will be unable to maintain their compensation programs and Benefit Programs in an efficient and cost-effective manner.

50.    The Debtors do not currently seek to alter their compensation, vacation, or other benefit programs or policies. Rather, pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, the Debtors seek authority to honor and pay the Prepetition Employee Obligations as and when they come due, and to continue at this time their practices, programs, and policies for their Workforce, as those practices, programs and policies were in effect as of the Commencement Date.

51.    Further, the Debtors are not seeking authority pay any individual Employee or Independent Contractor in an amount greater than the Prepetition Compensation

24

Cap on account of outstanding prepetition Compensation Obligations prior to entry of the Final

Order.  The Debtors are also not seeking to make any payments on account of any Employee

Incentive Program prior to entry of the Final Order and will not make any payment to any

"Insider," as that term is defined in section 101(31) of the Bankruptcy Code, on account of the

Severance Program, or any severance obligation owed pursuant to an employment agreement,

without first requesting separate authority from the Court.

### The Court Should Authorize and Direct Banks and Other Financial Institutions to Honor and Pay Checks Issued and Make Other Transfers to Pay the Prepetition Employee Obligations

52.        The Debtors request that the Court authorize and direct the Debtors'

banks and other financial institutions at which the Debtors maintain disbursement accounts at the

Debtors' direction, to receive, process, honor, and pay, to the extent of funds on deposit, any and

all checks drawn or electronic fund transfers requested or to be requested by the Debtors relating

to the Prepetition Employee Obligations.  The Debtors also seek authority to issue new

postpetition checks, or effect new electronic funds transfers, on account of such obligations to

replace any prepetition checks or electronic fund transfer requests that may be lost, dishonored,

or rejected as a result of the commencement of these chapter 11 cases.

### Reservation of Rights

53.        Nothing contained herein is intended to be or shall be construed as

(i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors'

or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or

assumption of any agreement, contract, program, policy, or lease under section 365 of the

Bankruptcy Code.  Likewise, if this Court grants the relief sought herein, any payment made

pursuant to the Court's order is not intended to be and should not be construed as an admission to

the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

WEIL:\95271050\1\35076.0003

## The Debtors Have Satisfied Bankruptcy Rule 6003(b)

54.    Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty-one (21) days after the Commencement Date.  Fed. R. Bankr. P. 6003(b).  As described herein, the continued and uninterrupted service of the Employees is critical to the Debtors' business operations.  The Debtors submit that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors, as described herein, and that Bankruptcy Rule 6003(b) has been satisfied.

## Waiver of Bankruptcy Rules 6004(a) and (h)

55.    To implement the foregoing immediately, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Notice

56.    Notice of this Motion has been provided to (i) the Office of the United States Trustee for the Southern District of New York; (ii) the holders of the five largest secured claims against the Debtors (on a consolidated basis); (iii) the holders of the forty (40) largest unsecured claims against the Debtors (on a consolidated basis); (iv) the attorneys for BMO Harris Bank, N.A., as administrative agent under that certain Amended and Restated Loan, Security and Guaranty Agreement, dated as of July 23, 2013; (v) the attorneys for U.S. Bank National Association, as trustee under that certain Indenture for 9 1/4% Senior Secured Notes due 2018, dated as of July 23, 2013; (vi) the attorneys for Delaware Trust Company, as successor trustee under that certain Indenture for 10% / 10 3/4% Senior PIK Toggle Notes due 2018, dated as of December 13, 2013; (vii) the attorneys for the Informal Committee of

26

Noteholders; (viii) the attorneys for the Revolving DIP Lenders; (ix) the attorneys for the DIP

Term Lenders; (x) the OEM Customers; (xi) the attorneys for Platinum Equity Advisors, LLC;

(xii) the Securities and Exchange Commission; (xiii) the Internal Revenue Service; and (xiv) the

United States Attorney's Office for the Southern District of New York.  The Debtors submit

that, in view of the facts and circumstances, such notice is sufficient and no other or further

notice need be provided.

      57.     No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

      WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: March 12, 2015
     New York, New York

          /s/ Ray C. Schrock, P.C.         
          Marcia L. Goldstein
          Ray C. Schrock, P.C.

          **WEIL, GOTSHAL & MANGES LLP**
          767 Fifth Avenue
          New York, New York 10153
          Telephone:  (212) 310-8000
          Facsimile:  (212) 310-8007

          *Proposed Attorneys for Debtors*
          *and Debtors in Possession*

WEIL:\95271050\1\35076.0003

**Exhibit A**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                        :
In re                                   :        **Chapter 11**
                                        :
CHASSIX HOLDINGS, INC., *et al.*,       :        **Case No. 15-_____ (___)**
                                        :
                                        :        **Jointly Administered**
                        Debtors.[1]     :
                                        :
-------------------------------------------------------x

### INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) (I) AUTHORIZING (A) PAYMENT OF PREPETITION WAGES, SALARIES, AND OTHER COMPENSATION AND BENEFITS, AND (B) MAINTENANCE OF EMPLOYEE BENEFITS PROGRAMS AND PAYMENT OF RELATED ADMINISTRATIVE OBLIGATIONS AND (II) AUTHORIZING AND DIRECTING APPLICABLE BANKS AND OTHER FINANCIAL INSTITUTIONS TO RECEIVE, PROCESS, HONOR, AND PAY CHECKS PRESENTED FOR PAYMENT AND TO HONOR ALL FUND TRANSFER REQUESTS

Upon the motion, dated ___, 2015 (the "**Motion**"),[2] of Chassix Holdings, Inc.

("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**"), and certain of their affiliates and subsidiaries,

as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively,

including Chassix Holdings and Chassix, the "**Debtors**"), pursuant to sections 363(b) and 105(a)

of title 11 of the United States Code (the "**Bankruptcy Code**"), for entry of an order

(i) authorizing, but not directing, the Debtors to pay, in their sole discretion, all payments

required under or related to Prepetition Employee Obligations, including, without limitation,

Compensation Obligations, Union Dues, Employee Incentive Program Obligations,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee, LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

Reimbursable Expenses, Withholding Obligations, Severance Obligations, Independent

Contractor Obligations, and Employee Benefit Programs; (ii) authorizing, but not directing, the

Debtors to continue their practices, programs, and policies for their Employees, as those

practices, programs, and policies were in effect as of the Commencement Date and as such

practices, programs, and policies may be modified, amended, or supplemented from time to time

in the ordinary course of the Debtors' businesses; and (iii) authorizing and directing applicable

banks and other financial institutions to receive, process, and pay any and all checks drawn on

the Debtors' payroll and general disbursement accounts, and automatic payroll transfers to the

extent that such checks or transfers relate to any of the foregoing, all as more fully described in

the Motion; and the Court having jurisdiction to consider the Motion and the relief requested

therein in accordance with 28 U.S.C. §§ 157 and 1334 and Amended Standing Order of

Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the

relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided to (i) the Office of the United States Trustee for the Southern

District of New York; (ii) the holders of the five largest secured claims against the Debtors (on a

consolidated basis); (iii) the holders of the forty (40) largest unsecured claims against the

Debtors (on a consolidated basis); (iv) the attorneys for BMO Harris Bank, N.A., as

administrative agent under that certain Amended and Restated Loan, Security and Guaranty

Agreement, dated as of July 23, 2013; (v) the attorneys for U.S. Bank National Association, as

trustee under that certain Indenture for 9 1/4% Senior Secured Notes due 2018, dated as of July

23, 2013; (vi) the attorneys for Delaware Trust Company, as successor trustee under that certain

Indenture for 10% / 10 3/4% Senior PIK Toggle Notes due 2018, dated as of December 13,

2013; (vii) the attorneys for the Informal Committee of Noteholders; (viii) the attorneys for the

Revolving DIP Lenders; (ix) the attorneys for the DIP Term Lenders; (x) the OEM Customers;

(xi) the attorneys for Platinum Equity Advisors, LLC; (xii) the Securities and Exchange

Commission; (xiii) the Internal Revenue Service; and (xiv) the United States Attorney's Office

for the Southern District of New York (the "**Notice Parties**"); and it appearing that no other or

further notice need be provided; and a hearing having been held to consider the relief requested

in the Motion (the "**Hearing**"); and upon the Declaration of J. Mark Allan Pursuant to Rule

1007-2 of the Local Bankruptcy Rules of the Southern District of New York, filed

contemporaneously with the Motion, and the record of the Hearing and all of the proceedings

had before the Court; and the Court having found and determined that the relief sought in the

Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as

contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates,

creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion

establish just cause for the relief granted herein; and after due deliberation and sufficient cause

appearing therefor, it is

ORDERED that the Motion is granted on an interim basis, as provided herein; and

it is further

ORDERED that pursuant to sections 363(b) and 105(a) of the Bankruptcy Code,

the Debtors are authorized, but not directed, to pay or otherwise honor all Compensation

Obligations, Union Dues, Reimbursable Expenses, Withholding Obligations, Payroll

Maintenance Fees, Severance Obligations, and Employee Benefit Programs and pay all

Independent Contractor Obligations (which in each of the foregoing cases includes, without

limitation, any costs and administrative expenses arising thereunder), that are due and payable

3

and relate to the period prior to the Commencement Date or come due during the Interim Period,

without further order of this Court, in accordance with the Debtors' ordinary course of conduct

and consistent with the Debtors' prepetition practices; <u>provided</u> that during the Interim Period,

(i) the aggregate amount of payments made pursuant to outstanding prepetition Compensation

Obligations and Independent Contractor Obligations shall not exceed $4.5 million (which

amount includes any amounts that may have already been paid pursuant to any related bridge

order entered by the Court); (ii) the Debtors shall not pay any individual Employee or

Independent Contractor an amount greater than the Prepetition Compensation Cap on account of

outstanding Compensation Obligations or Independent Contractor Obligations; (iii) the Debtors

shall not make payments that exceed the Prepetition Compensation Cap to any individual

pursuant to the Severance Program; and (iv) the Debtors shall not make any payments on

account of any of the Employee Incentive Programs; and it is further

   ORDERED that, notwithstanding anything herein to the contrary, during the

pendency of these chapter 11 cases, the Debtors shall, by separate motion, obtain authority from

the Court before making any payments under the Severance Program to "Insiders," as that term

is defined in section 101(31) of the Bankruptcy Code; and it is further

   ORDERED that, the Debtors are authorized to pay and otherwise honor all

Reimbursement Obligations in the ordinary course, as and when due; <u>provided</u> that the Debtors

shall not accelerate payment of any Reimbursement Obligations prior to the respective payment

date; and it is further

   ORDERED that the Debtors are authorized, but not required, to continue to honor

the practices, programs, and policies for their Employees (including, without limitation, the

Employee Benefit Programs), as those practices, programs, and policies were in effect as of the

4

Commencement Date and as such practices, programs, and policies may be modified, amended

or supplemented from time to time in the ordinary course of the Debtors' businesses; and it is

further

ORDERED that the banks and other financial institutions at which the Debtors

maintain accounts shall be, and hereby are, authorized, when requested by the Debtors in the

Debtors' sole discretion, to receive, process, honor, and pay any and all checks drawn on the

Debtors' payroll or disbursement accounts and any other transfers that are related to Prepetition

Employee Obligations or Independent Contractor Obligations, whether those checks were

presented before or after the Commencement Date, provided that sufficient funds are available in

the accounts to make the payments; and it is further

ORDERED that the banks and other financial institutions at which the Debtors

maintain accounts are authorized and directed to rely upon the representations of the Debtors as

to which checks and transfers to honor with respect to the payment of Prepetition Employee

Obligations or Independent Contractor Obligations; and it is further

ORDERED that the Debtors shall serve this Interim Order within three (3)

business days of its entry on the Notice Parties; and it is further

ORDERED that nothing in the Motion or this Interim Order shall be deemed to

authorize the Debtors to accelerate any payments not otherwise due prior to the date of the

hearing to consider entry of an order granting the relief requested in the Motion on a final basis

(the "**Final Hearing**"); and it is further

ORDERED that nothing contained in this Interim Order or in the Motion is

intended to be or shall be construed as (i) an admission as to the validity of any claim against the

Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any

5

claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease

under section 365 of the Bankruptcy Code.  Likewise any payment made pursuant to this Interim

Order is not intended to be and shall not be construed as an admission to the validity of any

claim or a waiver of the Debtors' rights to dispute such claim subsequently; and it is further

ORDERED that notwithstanding entry of this Interim Order, nothing herein shall

create, nor is intended to create, any rights in favor of, or enhance the status of any claim held

by, any party; and it is further

ORDERED that Bankruptcy Rule 6003(b) has been satisfied; and it is further

ORDERED that the requirements set forth in Bankruptcy Rule 6004(a) are hereby

waived; and it is further

ORDERED that pursuant to Bankruptcy Rule 6004(h), the terms and provisions

of this Interim Order shall be immediately effective and enforceable upon its entry; and it is

further

ORDERED that the Final Hearing on the Motion shall be held on _____, **2015**

**at __:__ _.m. (Eastern Time)**, and any objections to entry of such order shall be in writing, filed

with the Court in accordance with General Order M-399, and served upon (i) the attorneys for

the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153

(Attn: Ray C. Schrock, P.C.)  and (ii) the Notice Parties, in each case so as to be received no later

than at **__:__ _.m. (Eastern Time) on** _____, **2015**; and it is further

ORDERED that notwithstanding anything to the contrary contained herein,

(i) any payment to be made, or authorization contained, hereunder shall be subject to the

requirements imposed on the Debtors under the Debtors' postpetition financing agreements (the

"**DIP Documents**") and any orders approving the DIP Documents and governing the Debtors'

6

use of cash collateral (including with respect to any budgets governing or relating thereto) and

(ii) to the extent there is any inconsistency between the terms of such orders approving the DIP

Documents or the Debtors' use of cash collateral and any action taken or proposed to be taken

hereunder, the terms of such orders approving the DIP Documents and use of cash collateral

shall control; and it is further

ORDERED that this Interim Order is effective only from the date of entry through

this Court's disposition of the Motion on a final basis at or after the Final Hearing; provided that

the Court's ultimate disposition of the Motion on the final basis shall not impair or otherwise

affect any action taken pursuant to this Interim Order; and it is further

ORDERED that the Debtors are authorized to take all steps necessary to carry out

this Interim Order; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation, interpretation and/or enforcement of this

Interim Order.

Dated: _____, 2015
          New York, New York


_____
United States Bankruptcy Judge

WEIL:\95271050\1\35076.0003