Marcia L. Goldstein
Ray C. Schrock, P.C.
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x
:
**In re**                                              :        **Chapter 11**
:
**CHASSIX HOLDINGS, INC.,** *et al.*,                   :        **Case No. 15-_____ (___)**
:
:        **(Joint Administration Pending)**
                    **Debtors.**[1]                     :
:
------------------------------------------------------x

**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 345(b),**
**363(b), 363(c), AND 364(a) AND FED. R. BANKR. P. 6003 AND 6004 FOR**
**ENTRY OF AN ORDER (I) AUTHORIZING DEBTORS TO (A) CONTINUE**
**USING EXISTING CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN**
**PREPETITION OBLIGATIONS RELATED TO THE USE THEREOF, (C) PROVIDE**
**POSTPETITION INTERCOMPANY CLAIMS ADMINISTRATIVE EXPENSE**
**PRIORITY, AND (D) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS**
**FORMS, AND (II) WAIVING THE REQUIREMENTS OF 11 U.S.C. § 345(b)**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Chassix Holdings, Inc. ("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**"), and certain of their affiliates and subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, including Chassix Holdings and Chassix, the "**Debtors**," and together with their non-Debtor subsidiaries, the "**Company**"), respectfully represent:

### Background

1. On the date hereof (the "**Commencement Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors ("**Creditors Committee**") has been appointed in these chapter 11 cases.

2. Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

3. The Debtors commenced their chapter 11 cases on a prearranged basis with the support of their (a) secured and unsecured noteholders, which have committed to make significant and immediate capital infusions into the Debtors' businesses, and (b) major automotive manufacturing customers, which have committed to long-term pricing commitments and other valuable accommodations. Consistent with their obligations under the restructuring support agreement, the Debtors have filed a plan of reorganization and proposed disclosure statement with the Court and are seeking to emerge from chapter 11 on an expedited timeframe.

WEIL:\95271047\1\35076.0003

4.      Information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the Declaration of J. Mark Allan Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York, sworn to on the date hereof (the "**Allan Declaration**"), which has been filed with the Court contemporaneously herewith.

## Jurisdiction

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

6.      By this Motion, pursuant to sections 105(a), 345(b), 363(b), 363(c), and 364(a) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, the Debtors request entry of an order:  (i) authorizing them to (a) continue to operate their existing cash management system (the "**Cash Management System**"), as described herein, including the continued maintenance of existing bank accounts (the "**Bank Accounts**[2]") at the existing banks (the "**Banks**") consistent with their prepetition practices, (b) honor certain prepetition obligations related to the Cash Management System, (c) provide postpetition intercompany claims administrative expense priority, and (d) maintain existing business forms; and (ii) waiving the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to any of the Debtors' Bank Accounts.  A proposed form of order granting the relief requested in the Motion

---

[2] As a part of the Debtors' senior secured debtor-in-possession financing facility (the "**DIP Facility**"), the Debtors agreed to implement certain modifications to their Cash Management System.  As more fully described in the Debtors' motion seeking approval of the DIP Facility (the "**DIP Financing Motion**"), the increased oversight of the Debtors' operations and finances from their postpetition secured lenders will provide the Court with additional assurance that the Debtors' management of their finances will be prudent and maximize the value of the Debtors' estates for the benefit of all creditors/stakeholders.

on an interim basis is attached hereto as **Exhibit "A"** (the "**Proposed Order**").  A list of Banks

and Bank Accounts is affixed as an exhibit to the Proposed Order.

<u>**The Debtors' Bank Accounts and Cash Management System**</u>

7.    In the ordinary course of their businesses, the Debtors have historically

used the Cash Management System to fund their operations, as well as the operations of certain

of their non-Debtor affiliates.  By use of the Cash Management System, the Debtors collect,

concentrate, and disburse funds generated by the manufacture and sale of aluminum and iron

automotive components, including steering knuckles, control arms, sub-frames and assemblies,

that are designed into original equipment manufacturer ("**OEM**") platforms.  The Cash

Management System allows the Debtors to efficiently collect and transfer the cash generated by

their businesses and pay their financial obligations.  Further, the Cash Management System

enables the Debtors to facilitate their cash forecasting and reporting, monitor the global

collection and disbursement of funds, and maintain control over the administration of the

Debtors' Bank Accounts.  In broad terms, the Debtors' Cash Management System is similar to

the cash management systems used by other major corporate enterprises.  A general overview of

the movement of cash through the Debtors' Cash Management System is illustrated by the flow

of funds charts attached hereto as **Exhibit "B."**

8.    The Cash Management System is overseen primarily by the personnel in

the Debtors' finance department (the "**Finance Department**") and is comprised of

approximately forty-four (44) Bank Accounts (as well as a number of lockbox accounts as

discussed below) maintained at various Banks in the United States and abroad.  Although much

of the Cash Management System is automated, the Debtors' Finance Department personnel

monitor the system and manage the proper collection and disbursement of funds.  Many of the

Debtors' Bank Accounts are located in banks designated as authorized depositories

4

("**Authorized Depositories**") by the Office of the United States Trustee for the Southern District of New York (the "**U.S. Trustee**"), pursuant to the U.S. Trustee's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "**UST Guidelines**").[3]

9.       Given the substantial economic scale and geographic reach of the Debtors' business operations, any disruption to the Cash Management System could impede a successful reorganization of the Debtors' businesses.

## Cash Collection

10.       As set forth in the Allan Declaration, the Debtors generate and receive funds primarily through the manufacture and sale of component parts to OEMs and other customers and from customer reimbursements for equipment, tooling and other capital expenditures.  The Debtors generally receive these funds via wire transfer or checks into zero balance lockbox accounts (the "**Lockboxes**") or collection accounts (the "**Collection Accounts**").  The majority of the Debtors' receipts are received at Lockboxes and Collection Accounts maintained at the Debtors' primary bank, BMO Harris Bank N.A ("**BMO**").  Payments from certain customers, however, primarily relating to the Debtors' casting productions under their SMW Automotive business lines ("**SMW**"), are received at accounts maintained at PNC Bank, N.A. ("**PNC Bank**") although the Debtors have been working to transfer those collections over to BMO.[4]  The Debtors' cash collection systems and accounts are discussed in further detail below.

---

[3] As set forth on Exhibit "1" to the Proposed Order, the Debtors' Bank Accounts are held as follows: (i) approximately thirty accounts are held at BMO Harris Bank N.A.; (ii) approximately twelve accounts are held at PNC Bank, N.A.; (iii) approximately one account is held at Bangkok Bank Public Company Limited; and (iv) approximately one account is held at Société Générale S.A.

[4] As set forth in the Allan Declaration, the formal consolidation of the Debtors' Diversified Machine, Inc. and SMW operations occurred in December 2012.  Accordingly, certain internal systems and operations have yet to achieve full integration, including, as set forth above, with respect to the Cash Management System.

5

11.    <u>BMO Collection Accounts</u>.  The Debtors maintain approximately seven Collection Accounts at BMO, each of which has a corresponding Lockbox Account.  The Lockbox Accounts receive check payments from the OEMs and the Debtors' other trade customers, which are directly deposited into the associated Collection Accounts.  All electronic payment receipts from the OEMs and other customers are received directly into the Collection Accounts.  Each of the Collection Accounts is a zero-balance account, meaning it does not carry a cash balance at the end of each business day.   The funds maintained within these accounts are automatically transferred at the end of each business day into the Debtors' primary collections concentration account (the "**BMO Collections Concentration Account**").

12.    In addition to concentrating all receipts from the Collection Accounts, prior to the Commencement Date, the BMO Collections Concentration Account was also utilized to pay down outstanding balances on the Debtors' asset based revolving loan facility maintained at BMO pursuant to that certain Amended and Restated Loan, Security and Guaranty Agreement dated as of July 23, 2013 (the "**ABL Facility**" or the "**Revolver**").  Furthermore, as discussed below, the BMO Collections Concentration Account receives a daily automated transfer from the various Collection Accounts included within the PNC Bank structure, which includes all receipts collected into the accounts from the prior day.  The BMO Collections Concentration Account is swept on a daily basis to repay the outstanding Revolver balance and, therefore, it does not maintain a cash balance at the end of each business day.

13.    <u>PNC Bank Collection Accounts</u>.  The Debtors also maintain a Lockbox and Collection Accounts at PNC Bank to receive payments from certain SMW-related customers and other parties.  The Lockbox receives all checks made to the following Debtor entities: Concord International, Inc., SMW Automotive, LLC, AluTech, LLC, Automotive, LLC, Chassis

WEIL:\95271047\1\35076.0003

Co. of Michigan, LLC and Automotive Properties of New York, LLC.  All receipts from this Lockbox Account are directly deposited into a Collection Account at PNC Bank held by SMW Automotive, LLC.   Electronic payments from customers and other trade parties are deposited into various Collection Accounts at PNC Bank.  Each of the Collection Accounts at PNC Bank is a zero balance account.  The funds maintained within these accounts are automatically transferred at the end of each business day into the BMO Collections Concentration Account.

### Cash Concentration

14.    As described above, the Debtors collect cash in Lockboxes and Collection Accounts.  To manage their business, and coordinate the payment of their outstanding obligations, the Debtors regularly draw these cash assets together into concentration and operating accounts at BMO and PNC Bank.

15.    The BMO Disbursements Concentration Account.  The Debtors' primary disbursements concentration account with BMO (the "**BMO Disbursements Concentration Account**") is utilized as the funding account for the Debtors' various disbursement and payroll accounts, in addition to acting as the receipt account for Revolver funding.  Prior to the Commencement Date, on a daily basis, the BMO Disbursements Concentration Account was funded by the ABL Facility, subject to monthly (or weekly) borrowing base availability and the outstanding Revolver balance.  As discussed in further detail below, the BMO Disbursements Concentration Account is also utilized as the funding account for the Debtors' PNC Operating Account (as defined below).  The BMO Disbursements Concentration Account is a non-zero balance account, therefore, to the extent the Debtors disburse fewer funds than anticipated, the account may have an ending cash balance.

WEIL:\95271047\1\35076.0003

16.    <u>The PNC Operating Account</u>.  The Debtors maintain an operating account at PNC Bank in the name of Concord International, Inc. (the "**PNC Operating Account**"), which is utilized for the purpose of receiving funding from the BMO Disbursements Concentration Account.  The PNC Operating Account is a non-zero balance account and, therefore, is not swept; rather, the account is typically funded based on known disbursements scheduled to be made from the PNC Disbursement / Transfer Account and/or the Lease Disbursements Account (each as defined below).  The PNC Operating Account may maintain a cash balance at the end of each business day.

17.    <u>International Cash Concentration</u>.  Outside the United States, cash concentration occurs at the local foreign entity level.  The Debtors do not centrally manage cash for their foreign non-Debtor affiliates.  Additionally, excess cash from foreign operations is not automatically swept by the Debtors from their international locations into the United States.  Rather, cash is repatriated by the Debtors from their international operations pursuant to certain management services agreements (the "**Management Services Agreements**") between Chassix and its various non-Debtor foreign affiliates.  In exchange for certain fees, Chassix provides its non-Debtor foreign affiliates with certain services pursuant to the Management Services Agreements, including, without limitation, services relating to finance, legal, information technology, manufacturing and engineering, supply chain logistics and sales.  In addition, certain of the Debtors' foreign affiliates are parties to intercompany loans, which are subject to specific loan agreements.  These intercompany loans are typically settled via cash payment unless, in rare circumstances, the intercompany loan is forgiven or converted to equity.

18.    The Debtors also manufacture and ship component parts and other goods for their foreign non-Debtor affiliates.  Goods shipped from a Debtor entity to a foreign non-

8

debtor affiliate are typically settled via cash payments, and the Debtors' foreign affiliates send

cash to the appropriate Bank Account in the same manner as the Debtors' other customers.  If,

for any reason, the foreign affiliate does not tender a cash payment, the liability continues to be

reflected as an intercompany balance within the Debtors' books and records.  The intercompany

balance may be reflected as either a net receivable or payable amount due from or to the related

Debtor, based upon that Debtor's outstanding intercompany balance with the foreign affiliate.

19.    Additional information regarding the funding and operation of the

Debtors' international affiliates is described in further detail below.

## Cash Disbursements

20.    The Debtors transfer cash necessary to satisfy their daily financial

obligations from the respective concentration and operating accounts described above.

Disbursements are calibrated by the personnel in their Finance Department such that only the

needed amount of cash is transferred out of the BMO Disbursements Concentration Account or

the PNC Operating Account to pay the Debtors' obligations.  The majority of the Debtors'

disbursements, including payroll, corporate payables, and employee health and welfare benefits,

are paid locally at the divisional level from one of the Debtors' disbursement accounts (the

"**Disbursement Accounts**") maintained at BMO.  The Debtors' various Disbursement Accounts

are discussed below.

21.    <u>Disbursement / Payroll Accounts</u>.  The Debtors maintain various

Disbursement Accounts at BMO which are utilized to make electronic payments to trade

vendors, employees and all other parties (the "**Disbursement / Payroll Accounts**").  The

accounts are funded, based on known daily wire or automated clearing house (ACH)

disbursements, by the BMO Disbursements Concentration Account, and are zero balance

accounts.  The Debtors' third party payroll processor, Automatic Data Processing ("**ADP**"),

draws funds required for payroll obligations from each of these Disbursement / Payroll

Accounts, which are setup on a divisional basis.  These funds are then remitted to the Debtors'

employees via direct deposit, standard check issuance or "pay cards."

22.    <u>Check Disbursement Account</u>.  The Debtors' maintain a Disbursement

Account at BMO for the purpose of making check payments to trade vendors and all other

parties (the "**Check Disbursement Account**").  The Check Disbursement Account is funded,

based on known daily check clearings by the BMO Disbursements Concentration Account and is

a zero balance account.

23.    <u>Capital Expenditures Equity Account</u>.  The Debtors have historically

maintained a capital expenditures equity account with BMO that was created under a previous

credit agreement to segregate funding contributions by the Debtors' equity sponsor related to

capital expenditures.  While considered part of the Debtors' Cash Management System, this

account is idle, and does not actively receive or disburse funds to any of the Debtors' other bank

accounts.  Furthermore, the account does not maintain a cash balance.

24.    <u>PNC Disbursement Accounts</u>.  Certain of the Debtors' other

disbursements are funded out of various Disbursement Accounts maintained at PNC Bank.  As

discussed below, these disbursements include payments on account of legacy lease obligations,

certain limited engineering software license fees, a limited amount of raw materials for certain of

the Debtors' foreign affiliates, and transfers related to the Debtors' operations within Paris and

Thailand.

> (a)    *The PNC Disbursement / Transfer Account.*  The Debtors maintain
> a Disbursement Account at PNC Bank (the "**PNC Disbursement /
> Transfer Account**") for purposes of making check and electronic
> payments to trade vendors and other parties.  The account is

funded, based on known daily check clearings and disbursements, by the PNC Operating Account. Although the PNC Disbursement / Transfer Account is not a zero balance account, it does not maintain and ending cash balance at the end of each business day, as it is only funded to the level of known daily check clearings and disbursements. Furthermore, the PNC Disbursement / Transfer Account is utilized for making transfers to certain foreign bank accounts (the "**Local Disbursement Accounts**") located in France and Thailand, which are described in further detail below. Lastly, the PNC Disbursement / Transfer Account is utilized for making payments to a raw material supplier on behalf of a non-Debtor affiliate located in France.[5]

(b)    *The PNC Lease Disbursements Account.* The Debtors' lease Disbursements Account maintained at PNC Bank (the "**PNC Lease Disbursements Account**") is utilized for the purpose of making specific lease payments to various lessors. The account is funded, based on known daily check clearings and disbursements, by the PNC Operating Account. Although the PNC Lease Disbursements Account is not a zero balance account, it does not maintain an ending cash balance at the end of each business day, as it is only funded to the level of known daily check clearings and disbursements.

(c)    *The Local Disbursement Accounts.* The Debtors maintain a total of two foreign bank accounts, which, as previously noted, are used to support the two international office locations of Concord International, Inc. Transfers to the Local Disbursement Account maintained with Société Générale S.A. (to support the France location) occur on a monthly basis and are primarily used to pay office expenses, including employee payroll, rent and utilities. Transfers to the Local Disbursement Account maintained with Bangkok Bank Public Company Limited (to support the Thailand location) occur less frequently, on an ad-hoc basis, and are primarily used to pay office overhead expenses.

(d)    *Other PNC Disbursement Accounts.* The Debtors maintain a total of four other Disbursement Accounts at PNC Bank that were previously used for the purpose of making check and electronic payments to trade vendors and other parties. Additionally, the Debtors maintain a Multicurrency Operating Account that was previously used for the purpose of receiving and disbursing foreign

---

[5] Payments to this supplier are made on a monthly basis and relate to the procurement of raw materials, as the supplier's purchase order is contracted with Concord International, Inc. Payments to the supplier are reimbursed by the non-Debtor affiliate in the form of cash payments made into a specific Collection Account.

currency-dominated receipts and payments.  While considered part of the Debtors' Cash Management System, these accounts are idle, and do not actively receive or disburse funds to any of the Debtors' other bank accounts.  Furthermore, the accounts do not maintain a cash balance.  The idle Disbursement Accounts and Multicurrency Operating Account maintained at PNC Bank are expected to be closed by March 31, 2015.

25.     As set forth above, in certain instances, balances may exist in some of the Collection and Disbursement Accounts.  Except to the limited extent set forth herein, in foreign countries, the Debtors employ local operating accounts, which are used to collect receipts and pay local expenses.

**Intercompany Claims and Inter-Debtor Transactions**

26.     In the ordinary course of business, the Debtors maintain business relationships with their Debtor and non-Debtor affiliates, including foreign affiliates, which result in intercompany receivables and payables (the "**Intercompany Claims**") arising from the following types of transactions (the "**Intercompany Transactions**"):

(a)     *Intercompany Sales*.  As set forth above, in the ordinary course of business, the Debtors sell and purchase goods from various Debtor and non-Debtor foreign affiliates.  The Debtors' records of Intercompany Transactions reflect the net position of both sales and purchases made between their affiliates.

(b)     *Expense Allocations*.  In the ordinary course of business, the Debtors incur certain limited centrally-billed expenses, including insurance premiums, workers' compensation obligations, payroll and benefit costs, and IT costs.  The Debtors and certain non-Debtor foreign affiliates often pay these expenses and then allocate them to the appropriate affiliates.

(c)     *Intercompany Loans*.  The Debtors also maintain a complex and well documented system of intercompany loans and capital contributions to facilitate the flow of cash (a) between each of the Debtors, and (b) between the Debtors and their foreign subsidiaries.

12

27.     Historically, the non-Debtor foreign affiliates have been self-sustaining and cash generating, with funds generally flowing up to the U.S. parent in the form of management fees as discussed above.  From time to time, funds have flowed out of the U.S. Cash Management System to the foreign subsidiaries in the form of intercompany loans and/or capital contributions to address statutory requirements or liquidity needs.  As set forth in further detail in the Debtors' DIP Financing Motion, the Debtors anticipate that it may be necessary at some point to send capital to certain of their non-debtor foreign affiliates as a result of trade contraction and other issues relating to the commencement of these chapter 11 cases. Accordingly, in connection with the DIP Financing Motion, the Debtors are requesting authority to transfer up to $10 million to their non-debtor affiliates during the pendency of these chapter 11 cases.  Any transfers of funds to the Debtors' foreign subsidiaries will be subject to the terms of the Debtors' proposed DIP Facility.

28.     Domestically, as funds are disbursed throughout the Cash Management System, at any given time there may be Intercompany Claims owing by one Debtor to another Debtor (the "**Inter-Debtor Transactions**").  These Inter-Debtor Transactions are settled by book entry rather than by an actual transfer of cash.  The Debtors track all Inter-Debtor Transactions electronically in their accounting system and can ascertain, trace and account for them as needed. If the Inter-Debtor Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' detriment.

29.     The Debtors maintain records of all transfers and, therefore, can ascertain, trace, and account for all Intercompany Transactions, and will continue to do so during these chapter 11 cases.

WEIL:\95271047\1\35076.0003

**The Debtors' Existing Business Forms and Checks**

30.     In the ordinary course of business, the Debtors use a multitude of check types.  Additionally, the Debtors use a variety of correspondence and business forms, including, but not limited to, purchase orders, checks, and other business forms (collectively, the "**Business Forms**").  To minimize the expense to the Debtors' estates associated with developing and/or purchasing entirely new forms, the delay in conducting business prior to obtaining such forms and the confusion of suppliers and other vendors, the Debtors seek authority to continue to use their Business Forms as such forms existed immediately prior to the Commencement Date, without reference therein to the Debtors' status as debtors in possession.  The Debtors will use their reasonable best efforts to mark "debtor in possession" on their newly purchased Business Forms as soon as reasonably practicable following the Commencement Date.

31.     The Debtors have prepared communications materials to distribute to the various parties with whom they conduct business, which will, among other things, inform such parties of the commencement of these chapter 11 cases.  The Debtors believe that these direct communications will provide adequate notice of the Debtors' status as debtors in possession.

**Continuing the Cash Management
System is in the Best Interests of the Debtors,
Their Creditors, and All Other Parties in Interest**

32.     The Cash Management System constitutes an ordinary course and essential business practice of the Debtors.  The Cash Management System provides significant benefits to the Debtors including, among other things, the ability to: (i) control corporate funds; (ii) ensure the maximum availability of funds when and where necessary; and (iii) reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.  The use of a centralized Cash Management

14

System has historically reduced expenses by enabling the Debtors to optimally use and allocate funds within the system.

33.    The operation of the Debtors' businesses requires that the Cash Management System continue during the pendency of these chapter 11 cases. As a practical matter, because of the Debtors' corporate and financial structure, it would be extremely difficult and expensive to establish and maintain a separate cash management system for each Debtor and non-Debtor entity. Requiring the Debtors to adopt new, segmented cash management systems at this early and critical stage of these cases, or to extract the Debtors from the Cash Management System, would be expensive, create unnecessary administrative burdens, and be extraordinarily disruptive to the operation of their global network. Any such disruption would have a severe and adverse impact upon the Debtors' reorganization efforts. Consequently, maintaining the existing Cash Management System, is not only essential, but in the best interest of all creditors and other parties in interest.

34.    The Debtors also seek to maintain their books and records relating to the Cash Management System to the same extent these books and records were maintained before the Commencement Date. As a result, the Debtors will continue to document and record the transactions occurring within the Cash Management System.

35.    In furtherance of the foregoing, the Debtors request that all Banks at which their Bank Accounts are maintained be authorized and directed to continue to administer those accounts as they were maintained and administered prepetition, without interruption and in the usual and ordinary course. The Banks should also be authorized and directed to pay all checks, drafts, wires, and ACH transfers ("**ACH Transfers**") issued on the Bank Accounts for payment of any claims arising on or after the Commencement Date so long as sufficient funds

15

are in those accounts.  To effectuate the foregoing, the Debtors request that the Banks be
authorized and directed to honor all representations from the Debtors as to which checks should
be honored or dishonored.  To the extent that the Debtors have directed that any prepetition
checks be dishonored, they reserve the right to issue replacement checks to pay the amounts
related to any dishonored checks, consistent with orders of this Court.

36.     Section 363(c)(1) of the Bankruptcy Code authorizes the debtor in
possession to "use property of the estate in the ordinary course of business without notice or a
hearing."  The purpose of section 363(c)(1) is to provide a debtor in possession with the
flexibility to engage in the ordinary transactions required to operate its business without
unneeded oversight by its creditors or the court.  *Med. Malpractice Ins. Ass'n v. Hirsch (In re
Lavigne)*, 114 F.3d 379, 384 (2d Cir. 1997); *Chaney v. Official Comm. of Unsecured Creditors of
Crystal Apparel, Inc. (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y. 1997).  Included
within the purview of section 363(c) is a debtor's ability to continue the "routine transactions"
necessitated by a debtor's cash management system.  *Amdura Nat'l Distrib. Co. v. Amdura Corp.
(In re Amdura Corp.)*, 75 F.3d 1447, 1453 (10th Cir. 1996).  Accordingly, the Debtors seek
authority under section 363(c)(1) to continue the collection, concentration, and disbursement of
cash pursuant to their Cash Management System.

37.     Continuation of the intercompany transactions in the Cash Management
System is in the best interests of the Debtors, their estates, and all parties in interest.  The
Debtors' equity interests in (and intercompany receivables from) their subsidiaries and affiliates
are valuable assets of the estates.  If the Debtors' subsidiaries are not funded and cannot meet
their obligations and manage their cash as a result of these chapter 11 cases, there is a likelihood
that they will decrease substantially in value, causing great harm to the Debtors, their estates, and

16

their creditors.  In addition, the integrated Cash Management System enables the Debtors to

achieve efficiencies and effectively manage their cash.

38.    The Court may exercise its equitable powers to grant the relief requested

herein.  Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process,

or judgment that is necessary to carry out the provisions of this title."  Continuing the Debtors'

Cash Management system without interruption is vital to the Debtors' business operations and

the success of these reorganization cases.  Therefore, it is within the Court's equitable power

under section 105(a) to approve the continued use of the Cash Management System.  Based on

the foregoing, the Debtors believe that maintenance of the existing Cash Management System is

in the best interests of their estates and all parties in interest.  Therefore, the Debtors seek

authority to maintain and use their Cash Management System during their chapter 11 cases.

## Granting Administrative Expense Priority to Postpetition
## Intercompany Claims is Necessary to Protect the Debtors' Claims

39.    The Debtors' funds are commingled in the Cash Management System, and

each individual Debtors' rights with respect to funds input into the Cash Management System is

documented in the ordinary course by intercompany book entries reflecting intercompany claims,

dividends, and investments among the participants in the Cash Management System.  The

Debtors track all fund transfers electronically in their accounting system and have the ability to

ascertain, trace, and account for all Intercompany Transactions.  If the Intercompany

Transactions that permit use of the Cash Management System were to be discontinued, that

system and related administrative controls would be disrupted to the Debtors' detriment.

Furthermore, preserving the "business as usual" atmosphere and avoiding the unnecessary

distractions that inevitably would be associated with any substantial disruption in the Cash

Management System will facilitate the Debtors' reorganization efforts.

WEIL:\95271047\1\35076.0003

40.     To ensure each individual Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all intercompany claims against a Debtor by another Debtor or a non-Debtor affiliate arising after the Commencement Date, as a result of Intercompany Transactions through the Cash Management System, be accorded administrative priority expense status.  If Intercompany Claims are accorded administrative priority expense status, each entity utilizing funds flowing through the Cash Management System should continue to bear ultimate repayment responsibility for such ordinary course transactions.

**Honoring Certain Prepetition Obligations Related
to the Cash Management System Should be Approved**

41.     The Debtors incur periodic service charges and other fees to the Banks in connection with the maintenance of the Cash Management System (the "**Service Charges**"), which average approximately $25,000.00 per month for the Banks.  Such Service Charges are automatically deducted from the Debtors' Bank Accounts as they are assessed by the Banks. Payment of the prepetition Service Charges is in the best interests of the Debtors and all parties in interest in these chapter 11 cases, as it will prevent any disruption to the Cash Management System.  Further, because the Banks likely have setoff rights for the Service Charges, payment of prepetition Service Charges should not alter the rights of unsecured creditors in these chapter 11 cases.  Accordingly, by this Motion, the Debtors also seek authority, pursuant to sections 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 to pay, at the Debtors' sole discretion, the prepetition Service Charges, if any.

**Section 345(b) of the Bankruptcy Code**

42.     Section 345 of the Bankruptcy Code governs a debtor's cash deposits during a chapter 11 case and authorizes deposits of money as "will yield the maximum

18

reasonable net return on such money, taking into account the safety of such deposit or investment." For deposits that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) requires the estate to obtain from the entity with which the money is deposited a bond in favor of the United States and secured by the undertaking of an adequate corporate surety, unless the Court for cause orders otherwise. In the alternative, the estate may require the entity to deposit governmental securities pursuant to 31 U.S.C. § 9303. Section 9303 provides that when a person is required by law to give a surety bond, that person, in lieu of a surety bond, may instead provide an eligible obligation, designated by the Secretary of the Treasury, as an acceptable substitute for a surety bond.

43.     Many of the Debtors' Bank Accounts are maintained at banks that have been approved by the U.S. Trustee as Authorized Depositories in accordance with the UST Guidelines. Accordingly, the Debtors believe that any funds that are deposited in these accounts are secure and, thus, the Debtors are in compliance with section 345. However, out of an abundance of caution, to the extent necessary, the Debtors submit that "cause" exists pursuant to section 345(b) of the Bankruptcy Code to waive the requirements therein because, among other considerations, (i) the Debtor's primary bank, BMO, is highly rated and is a federally chartered bank subject to supervision by federal banking regulators, (ii) the cost associated with satisfying the requirements of section 345(b) is burdensome, and (iii) the process of satisfying those requirements would lead to needless inefficiencies in the management of the Debtor's business.

### Maintenance of the Debtors' Existing
### Bank Accounts and Business Forms is Warranted

44.     The Debtors respectfully request that the Court waive the requirements of the UST Guidelines, which mandate, among other things, the closure of the Debtors' prepetition

19

bank accounts, the opening of new bank accounts, and the immediate printing of new Business

Forms, including new checks, with a "debtor in possession" designation on them.  The Debtors

seek an order granting the Banks, including but not limited to those listed on **Exhibit "1"** to the

Proposed Order, authority to continue to treat, service, and administer the Bank Accounts as

accounts of the respective Debtor as a debtor in possession without interruption and in the usual

and ordinary course, and to receive, process, and honor and pay all checks, drafts, wires, or ACH

Transfer drawn on the Bank Accounts after the Commencement Date by the holders or makers

thereof, as the case may be; provided that checks issued or dated prior to the Commencement

Date will not be honored absent a prior order of the Court.  In addition, to the extent necessary,

the Debtors request the authority to open new bank accounts at their existing Banks or other

Authorized Depositories (as designated by the U.S. Trustee).

45.     The Debtors believe that their transition to chapter 11 will be more

orderly, with a minimum of harm to operations, if all Bank Accounts are continued following the

Commencement Date with the same account numbers.  By preserving business continuity and

avoiding the disruption and delay to the Debtors' disbursement obligations, including payroll,

payments to critical vendors, and clearinghouse settlements that would necessarily result from

closing the Bank Accounts and opening new accounts, all parties in interest, including

employees, vendors, and customers, will be best-served by the relief requested.  The benefit to

the Debtors, their business operations, and all parties in interest will be considerable, while the

confusion that would result absent the relief requested would ill-serve the Debtors' rehabilitative

efforts.

46.     To minimize expenses, the Debtors further request they be authorized to

continue to use their Business Forms, substantially in the forms existing immediately before the

20

Commencement Date, without reference to their status as debtors in possession.  The Debtors

request authority to utilize their existing check stock and electronically generated forms, rather

than obtain new check stock and implement new electronic check forms reflecting their status as

debtors in possession.  To the extent the Debtors use all their existing check stock, any new

check stock ordered will reflect their status as debtors in possession.  Moreover, the Debtors will

work with their systems personnel and outside systems consultants to determine what computer

system changes are required to reflect their status as debtors in possession on electronically

generated checks and implement changes to their electronically generated forms as soon as

reasonably practicable.

47.     By virtue of the nature and scope of the Debtors business operations and

the large number of suppliers of goods and services with whom the Debtors transact on a regular

basis, it is important that the Debtors be permitted to continue to use their existing checks and

other Business Forms without alteration or change, except as requested herein.  Indeed, because

parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as

debtors in possession as a result of the publicized nature of these chapter 11 cases and the

communications and notice of commencement the Debtors' are distributing to such parties,

changing business forms is unnecessary and unduly burdensome.

48.     If the Debtors are not permitted to maintain and use their Bank Accounts

and continue to use their existing Business Forms, the resulting prejudice will include

(i) disruption of the ordinary financial affairs and business operations of the Debtors, (ii) delay in

the administration of the Debtors' estates, and (iii) cost to the estates to set up new systems and

open new accounts, print new business forms, and immediately print new checks.  Accordingly,

WEIL:\95271047\1\35076.0003

the Debtors respectfully request that they be permitted to maintain and use their Bank Accounts and continue to use their existing Business Forms as requested herein.

## Interim Order

49.     The Debtors seek the relief requested in this Motion in the form of the attached interim Proposed Order.  Within three business days of the entry of the Proposed Order, the Debtors will serve a copy of the Proposed Order and this Motion on the Notice Parties defined in the Proposed Order and the domestic Banks.

50.     Banks outside the United States (the "**Foreign Banks**") are excluded from the Notice Parties in the Proposed Order.  Rather than mailing notice directly to the Foreign Banks, the Debtors propose to inform them of the Motion and Proposed Order through their pre-existing channels of communication.  Based on differences in language and insolvency law as it is practiced in some foreign jurisdictions, the Foreign Banks may misunderstand the intent of the Motion and take measures that will adversely effect the Debtors' Cash Management System. The Debtors will contact the Foreign Banks and apprise them of the Motion and Proposed Order, thereby ensuring that they understand the relief requested.

## The Debtors Have Satisfied Bankruptcy Rule 6003

51.     Bankruptcy Rule 6003 provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty-one days after the Commencement Date.  Fed. R. Bankr. P. 6003.  As described herein and in the Allan Declaration, the Debtors' business operations rely heavily on the Debtors' Cash Management System, Bank Accounts and Business Forms.  Any disruption in the continuation of these practices would severely disrupt the Debtors' operations and cause a severe decline in the value

of the Debtors' estates.  Accordingly, the Debtors submit that the relief requested is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

### Waiver of Bankruptcy Rules 6004(a) and (h)

52.     To implement the foregoing immediately, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and, to the extent applicable, the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Notice

53.     Notice of this Motion has been provided to (i) the Office of the United States Trustee for the Southern District of New York; (ii) the holders of the five largest secured claims against the Debtors (on a consolidated basis); (iii) the holders of the forty (40) largest unsecured claims against the Debtors (on a consolidated basis); (iv) the attorneys for BMO Harris Bank, N.A., as administrative agent under that certain Amended and Restated Loan, Security and Guaranty Agreement, dated as of July 23, 2013; (v) the attorneys for U.S. Bank National Association, as trustee under that certain Indenture for 9 1/4% Senior Secured Notes due 2018, dated as of July 23, 2013; (vi) the attorneys for Delaware Trust Company, as successor trustee under that certain Indenture for 10% / 10 3/4% Senior PIK Toggle Notes due 2018, dated as of December 13, 2013; (vii) the attorneys for the Informal Committee of Noteholders; (viii) the attorneys for the Revolving DIP Lenders; (ix) the attorneys for the DIP Term Lenders; (x) the OEM Customers; (xi) the attorneys for Platinum Equity Advisors, LLC; (xii) the Securities and Exchange Commission; (xiii) the Internal Revenue Service; and (xiv) the United States Attorney's Office for the Southern District of New York.  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

23

54.    No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: March 12, 2015
        New York, New York

/s/ Ray C. Schrock, P.C.
Marcia L. Goldstein
Ray C. Schrock, P.C.

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for Debtors
and Debtors in Possession*

**Exhibit A**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
                                                    :
In re                                               :        Chapter 11
                                                    :
CHASSIX HOLDINGS, INC., *et al.*,                   :        Case No. 15-_____ (___)
                                                    :
                                                    :        Jointly Administered
            Debtors.[1]                             :
                                                    :
--------------------------------------------------------x

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 345(b), 363(b), 363(c),
AND 364(a) AND FED. R. BANKR. P. 6003 AND 6004 (I) AUTHORIZING DEBTORS TO
(A) CONTINUE USING EXISTING CASH MANAGEMENT SYSTEM, (B) HONOR
CERTAIN PREPETITION OBLIGATIONS RELATED TO THE USE THEREOF,
(C) PROVIDE POSTPETITION INTERCOMPANY CLAIMS ADMINISTRATIVE
EXPENSE PRIORITY, AND (D) MAINTAIN EXISTING BANK ACCOUNTS AND
BUSINESS FORMS; AND (II) WAIVING THE REQUIREMENTS OF 11 U.S.C. § 345(b)**

Upon the motion, dated March __, 2015 (the "**Motion**"),[2] of Chassix Holdings,

Inc. ("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**"), and certain of their affiliates and

subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, including Chassix Holdings and Chassix, the "**Debtors**"), pursuant to sections

105(a), 345(b), 363(b), 363(c), and 364(a) of title 11 of the United States Code (the

"**Bankruptcy Code**") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure

(the "**Bankruptcy Rules**"), for entry of an order (i) authorizing the Debtors to (a) continue using

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee, LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012).  The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

their existing Cash Management System, (b) honor certain prepetition obligations related to the

use thereof, (c) provide postpetition intercompany claims administrative expense priority, and (d)

maintain their existing Bank Accounts and Business Forms; and (ii) waiving the requirements of

section 345(b) of the Bankruptcy Code to the extent they apply to any of the Debtors' Bank

Accounts, all as more fully described in the Motion; and the Court having jurisdiction to consider

the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and

Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided to (i) the Office of the

United States Trustee for the Southern District of New York (the "**U.S. Trustee**"); (ii) the

holders of the five largest secured claims against the Debtors (on a consolidated basis); (iii) the

holders of the forty (40) largest unsecured claims against the Debtors (on a consolidated basis);

(iv) the attorneys for BMO Harris Bank, N.A., as administrative agent under that certain

Amended and Restated Loan, Security and Guaranty Agreement, dated as of July 23, 2013; (v)

the attorneys for U.S. Bank National Association, as trustee under that certain Indenture for 9

1/4% Senior Secured Notes due 2018, dated as of July 23, 2013; (vi) the attorneys for Delaware

Trust Company, as successor trustee under that certain Indenture for 10% / 10 3/4% Senior PIK

Toggle Notes due 2018, dated as of December 13, 2013; (vii) the attorneys for the Informal

Committee of Noteholders; (viii) the attorneys for the Revolving DIP Lenders; (ix) the attorneys

for the DIP Term Lenders; (x) the OEM Customers; (xi) the attorneys for Platinum Equity

Advisors, LLC; (xii) the Securities and Exchange Commission; (xiii) the Internal Revenue

Service; and (xiv) the United States Attorney's Office for the Southern District of New York (the

"**Notice Parties**"), and it appearing that no other or further notice need be provided; and a hearing having been held to consider the relief requested in the Motion (the "**Hearing**"); and upon the Declaration of J. Mark Allan Pursuant to Rule 1007-2 of the Local Bankruptcy Rules of the Southern District of New York, filed contemporaneously with the Motion**,** and the record of the Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy Rule 6003, and is in the best interest of the Debtors, their estates, creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted on an interim basis, as provided herein; and it is further

ORDERED that the Debtors are authorized and empowered, pursuant to sections 363(c) and 105(a) of the Bankruptcy Code, to continue to manage their cash pursuant to the Cash Management System maintained by the Debtors before the Commencement Date; to collect, concentrate, and disburse cash in accordance with the Cash Management System, including intercompany funding to Debtor and non-Debtor affiliates, and to make ordinary course changes to their Cash Management System without further order of the Court; and it is further

ORDERED that, pursuant to section 105(a) of the Bankruptcy Code, each of the Banks is authorized and directed to continue to honor transfers, as directed by the Debtors, of funds among the Debtors' Bank Accounts and to the Debtors and non-Debtor affiliates; and it is further

WEIL:\95271047\1\35076.0003

ORDERED that the Debtors shall maintain accurate records of all transfers within the Cash Management System so that all postpetition transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, their books and records, to the same extent maintained by the Debtors before the Commencement Date; and it is further

ORDERED that the Debtors are authorized to: (i) designate, maintain and continue to use any or all of their existing Bank Accounts listed on **Exhibit "1"** annexed hereto (which Exhibit "1" shall be promptly amended to identify any Bank Accounts inadvertently omitted therefrom, with any such amendments being served on the U.S. Trustee and any statutory committee of creditors), in the names and with the account numbers existing immediately before the Commencement Date, (ii) deposit funds in and withdraw funds from such accounts by all usual means, including, without limitation, checks, wire transfers, ACH Transfers and other debits, (iii) pay any bank fees or charges associated with the Bank Accounts, including any Service Charges, whether arising before or after the Commencement Date, and (iv) treat their prepetition Bank Accounts for all purposes as debtors in possession accounts; and it is further

ORDERED that the Debtors are authorized to open new bank accounts so long as any such new account is (A) with a bank that is (i) insured with the Federal Deposit Insurance Corporation or the Federal Savings and Loan Insurance Corporation and (ii) designated as an authorized depository by the U.S. Trustee pursuant to the U.S. Trustee's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees, and (B) the Debtors provide notice to the U.S. Trustee of the opening of such account; <u>provided</u> that all accounts opened by any of the Debtors on or after the Commencement Date at any bank shall, for purposes of this

4

Interim Order, be deemed a Bank Account as if it had been listed on **Exhibit "1"** hereof; and it is further

ORDERED that all Banks with which the Debtors maintained Bank Accounts as of the Commencement Date are authorized to debit the Debtors' accounts in the ordinary course of business without the need for further order of this Court for: (i) all checks drawn on the Debtors' accounts which are cashed at such bank's counters or exchanged for cashier's checks by the payees thereof prior to the Commencement Date; (ii) all checks or other items deposited in one of Debtors' accounts with such bank prior to the Commencement Date which have been dishonored or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to the Commencement Date; and (iii) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Bank as Service Charges for the maintenance of the Cash Management System; and it is further

ORDERED that the Banks are authorized to charge, and the Debtors are authorized and directed to pay or honor, both prepetition and postpetition service and other fees, costs, charges and expenses to which the Banks may be entitled in the ordinary course under the terms of and in accordance with their contractual arrangements with Debtors (including, without limitation, any fees, costs, charges and expenses arising from any "stop payment"). The Debtors shall promptly reimburse the Banks for any claims, whether arising (i) under their contractual arrangement and account documentation with the Debtors or otherwise or (ii) prior to or after the Commencement Date, in connection with any returned items to the Bank Accounts in the normal course of business and such claims by the Banks shall be joint and several allowed superpriority claims against each Debtors (without the need to file any proof of claim) pursuant to section

5

364(c)(1) of the Bankruptcy Code.  Further, the Banks are authorized to "charge back" to the

Debtors' Bank Accounts any amounts incurred by the Bank resulting from returned checks or

other returned items, and the Debtors are authorized and directed to promptly pay any fees and

expenses owed to the Banks, in each case regardless of whether such items were deposited

prepetition or postpetition or relate to prepetition or postpetition items; and it is further

ORDERED that any payment from a Bank Account made by any of the Banks

arising from a request of the Debtors or a third-party payee made prior to or on the

Commencement Date (including any ACH Transfer such Bank is or becomes obligated to settle),

or any instruments issued by any of the Banks on behalf of any Debtor pursuant to a "midnight

deadline" or otherwise (solely for purposes of the automatic stay), shall be deemed to be paid

prepetition, whether or not actually debited from such Bank Account prepetition; and it is further

ORDERED that the Banks shall not be liable to any party on account of (a)

following the Debtors' representations, instructions, or presentations as to any order of the Court

(without any duty of further inquiry), (b) the honoring of any prepetition checks, drafts, wires or

ACH Payments in a good faith belief or upon a representation by the Debtors that the Court has

authorized such prepetition check, draft, wire or ACH Payments or (c) an innocent mistake made

despite implementation of reasonable handling procedures; and it is further

ORDERED that nothing contained herein shall prevent the Debtors from closing

any Bank Account(s) as they may deem necessary and appropriate, to the extent consistent with

the terms of any postpetition financing agreement and any order(s) of this Court relating thereto,

any relevant bank is authorized to honor the Debtors' requests to close such Bank Accounts, and

the Debtors shall give notice of the closure of any account to the U.S. Trustee; and it is further

WEIL:\95271047\1\35076.0003

ORDERED that for Banks at which the Debtors hold accounts that are not party to a uniform depository agreement with the U.S. Trustee, the Debtors shall use their good-faith efforts to cause the Banks to execute a uniform depository agreement in a form prescribed by the U.S. Trustee within thirty (30) days of the date of this Interim Order.  The U.S. Trustee's rights to seek further relief from this Court on notice in the event that the aforementioned Banks are unwilling to execute a uniform depository agreement in a form prescribed by the U.S. Trustee are fully reserved; and it is further

ORDERED that all Intercompany Claims arising after the Commencement Date shall be accorded administrative expense priority in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code; and it is further

ORDERED that the Debtors are authorized, but not directed, to transfer funds to their foreign subsidiaries as set forth in the Motion; provided that such transfers total not more than $10 million in the aggregate prior to the date of the hearing to consider entry of an order granting the relief requested in the Motion on a final basis (the "**Final Hearing**"); and it is further

ORDERED that, to the extent applicable, the requirements of section 345(b) of the Bankruptcy Code are hereby waived; and it is further

ORDERED that the Debtors are authorized to use their existing Business Forms and not print "debtor in possession" on any of their Business Forms; provided that the Debtors shall print "debtor in possession" on any new checks ordered during the chapter 11 cases, and, as soon as reasonably practicable, the Debtors shall change their system for electronic generation of checks and Business Forms to reflect their status as debtors in possession; and it is further

ORDERED that the Debtors are hereby authorized to execute any additional documents and reasonably cooperate with the financial institutions as may be required to carry out the intent and purpose of this Interim Order; and it is further

ORDERED that the Debtors shall serve this Interim Order within three (3) business days of its entry on the Notice Parties and the domestic Banks; and it is further

ORDERED that nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the Final Hearing; and it is further

ORDERED that nothing contained in this Interim Order or in the Motion is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise any payment made pursuant to this Interim Order is not intended to be and shall not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently; and it is further

ORDERED that notwithstanding entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of or enhance the status of any claim held by, any party; and it is further

ORDERED that the requirements of Bankruptcy Rule 6003(b) have been satisfied; and it is further

ORDERED that the requirements set forth in Bankruptcy Rule 6004(a) are hereby waived; and it is further

ORDERED that pursuant to Bankruptcy Rule 6004(h), the terms and provisions

8

of this Interim Order shall be immediately effective and enforceable upon its entry; and it is

further

ORDERED that the Final Hearing on the Motion shall be held on _____, 2015

at __:__ _.m. (Eastern Time), and any objections to entry of such order shall be in writing, filed

with the Court in accordance with General Order M-399, and served upon (i) the proposed

attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New

York 10153 (Attn: Ray C. Schrock, P.C.); and (ii) the Notice Parties, in each case so as to be

received no later than 4:00 p.m. (Eastern Time) on _____, 2015; and it is further

ORDERED that notwithstanding anything to the contrary contained herein, (a)

any payment to be made, or authorization contained, hereunder shall be subject to the

requirements imposed on the Debtors under the Debtors' postpetition financing agreements

(the "DIP Documents") and any orders approving the DIP Documents and governing the

Debtors' use of cash collateral (including with respect to any budgets governing or relating

thereto) and (b) to the extent there is any inconsistency between the terms of such orders

approving the DIP Documents or the Debtors' use of cash collateral and any action taken or

proposed to be taken hereunder, the terms of such orders approving the DIP Documents and use

of cash collateral shall control; and it is further

ORDERED that the Debtors are authorized to take all steps necessary to carry out

this Order; and it is further

WEIL:\95271047\1\35076.0003

ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation, interpretation and/or enforcement of this

Order.

Dated: _____, 2015
      New York, New York

_____
United States Bankruptcy Judge

10

**Exhibit 1**

**The Banks and Bank Accounts**

SUBJECT TO FRE 408 & CONFIDENTIAL
ATTORNEY - CLIENT WORK PRODUCT

Chassix Holdings, Inc. *et al.*
Exhibit 1 - Schedule of Debtors' Bank Accounts

| | | | | | | |
|---|---|---|---|---|---|---|
| **Debtors' Bank Account Information (Debtors' Lockboxes Excluded)** | | | | | | |
| **No.** | **Debtor Name** | **Bank Name** | **Acct No. (Last 4 Digits)** | **Currency** | **Type of Account** | **Account No. (Full)** |
| (1) | AluTech, LLC | BMO Harris Bank N.A. | x672-2 | US Dollar | Disbursement / Payroll Account | 160-672-2 |
| (2) | AluTech, LLC | BMO Harris Bank N.A. | x671-4 | US Dollar | Disbursement / Payroll Account | 160-671-4 |
| (3) | AluTech, LLC | PNC Bank, N.A. | x7807 | US Dollar | Disbursement Account (Idle) | 80-2655-7807 |
| (4) | Automotive, LLC | BMO Harris Bank N.A. | x964-3 | US Dollar | Disbursement / Payroll Account | 160-964-3 |
| (5) | Automotive, LLC | PNC Bank, N.A. | x8857 | US Dollar | Collection Account | 80-2623-8857 |
| (6) | Automotive, LLC | PNC Bank, N.A. | x7348 | US Dollar | Disbursement Account (Idle) | 80-2655-7348 |
| (7) | Automotive Properties of New York, LLC | PNC Bank, N.A. | x7479 | US Dollar | Disbursement Account (Idle) | 80-2655-7479 |
| (8) | Chassix Co. of Michigan, LLC | BMO Harris Bank N.A. | x065-8 | US Dollar | Disbursement / Payroll Account | 203-065-8 |
| (9) | Chassix Co. of Michigan, LLC | PNC Bank, N.A. | x8822 | US Dollar | Collection Account | 80-2623-8822 |
| (10) | Chassix Co. of Michigan, LLC | PNC Bank, N.A. | x7321 | US Dollar | Disbursement Account (Idle) | 80-2655-7321 |
| (11) | Chassix, Inc. | BMO Harris Bank N.A. | x919-1 | US Dollar | Check Disbursement Account | 398-919-1 |
| (12) | Chassix, Inc. | BMO Harris Bank N.A. | x918-3 | US Dollar | Disbursement / Payroll Account | 398-918-3 |
| (13) | Chassix Georgia Machining, LLC | BMO Harris Bank N.A. | x287-9 | US Dollar | Disbursement / Payroll Account | 202-287-9 |
| (14) | Chassix Georgia Machining, LLC | BMO Harris Bank N.A. | x285-3 | US Dollar | Collection Account | 202-285-3 |
| (15) | Concord International, Inc. | PNC Bank, N.A. | x8873 | US Dollar | Collection Account | 80-2623-8873 |
| (16) | Concord International, Inc. | PNC Bank, N.A. | x9024 | US Dollar | Operating Account | 80-2623-9024 |
| (17) | Concord International, Inc. | PNC Bank, N.A. | x7364 | US Dollar | Disbursement / Transfer Account | 80-2655-7364 |
| (18) | Concord International, Inc. | Bangkok Bank Public Company Limited | x3576 | Thai Baht | Local Disbursement Account | 203-3-053576 |
| (19) | Concord International, Inc. | Société Générale S.A. | x49 81 | EU Euro | Local Disbursement Account | 30003 02070 00020021949 81 |
| (20) | Diversified Machine, Inc. | BMO Harris Bank N.A. | x679-7 | US Dollar | Collections Concentration Account | 236-679-7 |
| (21) | Diversified Machine, Inc. | BMO Harris Bank N.A. | x680-5 | US Dollar | Disbursements Concentration Account | 236-680-5 |
| (22) | Diversified Machine, Inc. | BMO Harris Bank N.A. | x671-4 | US Dollar | Collection Account | 236-671-4 |
| (23) | Diversified Machine, Inc. | BMO Harris Bank N.A. | x662-3 | US Dollar | Disbursement / Payroll Account | 236-662-3 |
| (24) | Diversified Machine, Inc. | BMO Harris Bank N.A. | x757-1 | US Dollar | Capital Expenditures Equity Account (Idle) | 236-757-1 |
| (25) | Diversified Machine, Milwaukee LLC | BMO Harris Bank N.A. | x676-3 | US Dollar | Collection Account | 236-676-3 |
| (26) | Diversified Machine, Milwaukee LLC | BMO Harris Bank N.A. | x666-4 | US Dollar | Disbursement / Payroll Account | 236-666-4 |
| (27) | Diversified Machine Bristol, LLC | BMO Harris Bank N.A. | x673-0 | US Dollar | Collection Account | 236-673-0 |
| (28) | Diversified Machine Bristol, LLC | BMO Harris Bank N.A. | x665-6 | US Dollar | Disbursement / Payroll Account | 236-665-6 |
| (29) | Diversified Machine Montague, LLC | BMO Harris Bank N.A. | x672-2 | US Dollar | Collection Account | 236-672-2 |
| (30) | Diversified Machine Montague, LLC | BMO Harris Bank N.A. | x664-9 | US Dollar | Disbursement / Payroll Account | 236-664-9 |
| (31) | DMI China Holding LLC | BMO Harris Bank N.A. | x635-9 | US Dollar | Disbursement / Payroll Account | 236-635-9 |
| (32) | DMI Columbus, LLC | BMO Harris Bank N.A. | x678-9 | US Dollar | Collection Account | 236-678-9 |
| (33) | DMI Columbus, LLC | BMO Harris Bank N.A. | x670-6 | US Dollar | Disbursement / Payroll Account | 236-670-6 |
| (34) | DMI Edon LLC | BMO Harris Bank N.A. | x677-1 | US Dollar | Collection Account | 236-677-1 |
| (35) | DMI Edon LLC | BMO Harris Bank N.A. | x667-2 | US Dollar | Disbursement / Payroll Account | 236-667-2 |
| (36) | SMW Automotive, LLC | BMO Harris Bank N.A. | x407-6 | US Dollar | Disbursement / Payroll Account | 399-407-6 |
| (37) | SMW Automotive, LLC | BMO Harris Bank N.A. | x375-5 | US Dollar | Disbursement / Payroll Account | 399-375-5 |
| (38) | SMW Automotive, LLC | BMO Harris Bank N.A. | x332-6 | US Dollar | Disbursement / Payroll Account | 399-332-6 |
| (39) | SMW Automotive, LLC | BMO Harris Bank N.A. | x406-8 | US Dollar | Disbursement / Payroll Account | 399-406-8 |
| (40) | SMW Automotive, LLC | BMO Harris Bank N.A. | x376-3 | US Dollar | Disbursement / Payroll Account | 399-376-3 |
| (41) | SMW Automotive, LLC | BMO Harris Bank N.A. | x377-1 | US Dollar | Disbursement / Payroll Account | 399-377-1 |
| (42) | SMW Automotive, LLC | PNC Bank, N.A. | x6247 | US Dollar | Multicurrency Operating Account (Idle) | 781-0026247 |
| (43) | SMW Automotive, LLC | PNC Bank, N.A. | x8865 | US Dollar | Collection Account | 80-2623-8865 |
| (44) | SMW Automotive, LLC | PNC Bank, N.A. | x7356 | US Dollar | Lease Disbursement Account | 80-2655-7356 |

**Exhibit B**

**Illustration of the Cash Management System**

WEIL:\95271047\1\35076.0003

Chassix Holdings, Inc.
**BMO Harris Bank Cash Management Diagram**



**RECEIPTS**

**Debtors' Lockboxes**

Diversified Machine, Inc.
BMO Harris Bank N.A.
Chicago Lockbox
Lockbox #71305

Diversified Machine
Montague, LLC
BMO Harris Bank N.A.
Chicago Lockbox
Lockbox #71540

Diversified Machine Bristol, LLC
BMO Harris Bank N.A.
Chicago Lockbox
Lockbox #95214

Diversified Machine, Milwaukee LLC
BMO Harris Bank N.A.
Chicago Lockbox
Lockbox #71877

DMI Edon LLC
BMO Harris Bank N.A.
Chicago Lockbox
Lockbox #71436

DMI Columbus, LLC
BMO Harris Bank N.A.
Chicago Lockbox
Lockbox #71265

Chassix Georgia Machining, LLC
BMO Harris Bank N.A.
Chicago Lockbox
Lockbox #71604

**Debtors' Collection Accounts**

Diversified Machine, Inc.
BMO Harris Bank N.A.
Collection Account
x671-4

Diversified Machine
Montague, LLC
BMO Harris Bank N.A.
Collection Account
x672-2

Diversified Machine Bristol, LLC
BMO Harris Bank N.A.
Collection Account
x673-0

Diversified Machine, Milwaukee LLC
BMO Harris Bank N.A.
Collection Account
x676-3

DMI Edon LLC
BMO Harris Bank N.A.
Collection Account
x677-1

DMI Columbus, LLC
BMO Harris Bank N.A.
Collection Account
x678-9

Chassix Georgia Machining, LLC
BMO Harris Bank N.A.
Collection Account
x285-3

**Debtors' "Idle" Accounts**

Diversified Machine, Inc.
BMO Harris Bank N.A.
Capital Expenditures Equity Account
x757-1

Revolving Credit Line
(ABL Facility)
BMO Harris Bank N.A.

Diversified Machine, Inc.
BMO Harris Bank N.A.
Collections Concentration Account
x679-7

Diversified Machine, Inc.
BMO Harris Bank N.A.
Disbursements Concentration Account
x680-5

Chassix, Inc.
BMO Harris Bank N.A.
Check Disbursement Account
x919-1

**Debtors' Disbursement / Payroll Accounts**

Diversified Machine, Inc.
BMO Harris Bank N.A.
Disbursement / Payroll Account
x662-3

Diversified Machine
Montague, LLC
BMO Harris Bank N.A.
Disbursement / Payroll Account
x664-9

Diversified Machine Bristol, LLC
BMO Harris Bank N.A.
Disbursement / Payroll Account
x665-6

Diversified Machine, Milwaukee LLC
BMO Harris Bank N.A.
Disbursement / Payroll Account
x666-4

DMI Edon LLC
BMO Harris Bank N.A.
Disbursement / Payroll Account
x667-2

DMI Columbus, LLC
BMO Harris Bank N.A.
Disbursement / Payroll Account
x670-6

Chassix Georgia Machining, LLC
BMO Harris Bank N.A.
Disbursement / Payroll Account
x287-9

Chassix, Inc.
BMO Harris Bank N.A.
Disbursement / Payroll Account
x918-3

AluTech, LLC
BMO Harris Bank N.A.
Disbursement / Payroll Account
x671-4

AluTech, LLC
BMO Harris Bank N.A.
Disbursement / Payroll Account
x672-2

DMI China Holding LLC
BMO Harris Bank N.A.
Disbursement / Payroll Account
x635-9

Chassis Co. of Michigan, LLC
BMO Harris Bank N.A.
Disbursement / Payroll Account
x065-8

Automotive, LLC
BMO Harris Bank N.A.
Disbursement / Payroll Account
x964-3

SMW Automotive, LLC
BMO Harris Bank N.A.
Disbursement / Payroll Account
x332-6

SMW Automotive, LLC
BMO Harris Bank N.A.
Disbursement / Payroll Account
x375-5

SMW Automotive, LLC
BMO Harris Bank N.A.
Disbursement / Payroll Account
x376-3

SMW Automotive, LLC
BMO Harris Bank N.A.
Disbursement / Payroll Account
x377-1

SMW Automotive, LLC
BMO Harris Bank N.A.
Disbursement / Payroll Account
x406-8

SMW Automotive, LLC
BMO Harris Bank N.A.
Disbursement / Payroll Account
x407-6

**VENDOR / PAYROLL / ALL OTHER DISBURSEMENTS**

Chassix Holdings, Inc.
**PNC Bank & Foreign Accounts Cash Management Diagram**

