Marcia L. Goldstein
Ray C. Schrock, P.C.
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x
:
In re                                              :          **Chapter 11**
:
**CHASSIX HOLDINGS, INC.,** *et al.*,              :          **Case No. 15-_____ (___)**
:
:          **(Joint Administration Pending)**
**Debtors.**[1]                                    :
:
------------------------------------------------------x

**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b) AND 503(b)(9)**
**FOR ENTRY OF ORDER (I) AUTHORIZING, BUT NOT DIRECTING, DEBTORS**
**TO PAY PREPETITION OBLIGATIONS OF CRITICAL VENDORS, AND**
**(II) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS**
**TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Chassix Holdings, Inc. ("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**"), and

certain of their affiliates and subsidiaries, as debtors and debtors in possession in the above-

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

captioned chapter 11 cases (collectively, including Chassix Holdings and Chassix, the "**Debtors**," and together with their non-Debtor subsidiaries, the "**Company**"), respectfully represent:

**Background**

1.      On the date hereof (the "**Commencement Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

2.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

3.      The Debtors commenced their chapter 11 cases on a prearranged basis with the support of their (a) secured and unsecured noteholders, which have committed to make significant and immediate capital infusions into the Debtors' businesses, and (b) major automotive manufacturing customers, which have committed to long-term pricing commitments and other valuable accommodations.  Consistent with their obligations under the restructuring support agreement, the Debtors have filed a plan of reorganization and proposed disclosure statement with the Court and are seeking to emerge from chapter 11 on an expedited timeframe.

4.      Information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the Declaration of J. Mark Allan Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the

WEIL:\95271065\1\35076.0003

Southern District of New York, sworn to on the date hereof, which has been filed with the Court contemporaneously herewith.

### Jurisdiction

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Preliminary Statement

6.      As a major Tier One supplier of aluminum and iron chassis sub-frame components and powertrain products to the largest automotive manufacturers in the world, the Debtors rely heavily on certain Critical Vendors (as defined below) to provide them with the specialized and unique parts, materials, and services necessary to manufacture the steering knuckles, control arms, and various other casted and machined parts that the Debtors produce for original equipment manufacturers ("**OEMs**") and other customers (collectively, the "**Customers**").  Because most of the component parts manufactured by the Debtors are safety-critical and must adhere to rigorous federal safety standards, many of the parts and sub-components sourced by the Debtors from third party vendors and suppliers are highly specialized and must undergo a lengthy and detailed validation and testing process.  As a result, a significant amount of the component parts supplied by the Debtors' Critical Vendors require substantial lead time to develop and cannot be replaced in a timely or efficient manner.  Additionally, as the Debtors, like their Customers, utilize a "just-in-time" inventory supply system, the Debtors are highly dependent on the inventory supplied by their Critical Vendors to meet their Customers' needs for production for a particular day.  Thus, to avoid catastrophic disruptions in their supply chain, which could result in production stoppages both for the

WEIL:\95271065\1\35076.0003

Debtors and their Customers, it is of the utmost importance that the Debtors' supply chain remain intact.

7.        Pursuant to this Motion, the Debtors are requesting critical vendor relief similar to that received by other distressed automotive suppliers and other companies heavily reliant on supply chain continuity to preserve their viability as a going-concern enterprise.  A significant number of the Debtors' sub-suppliers are sole source suppliers (*i.e.*, the only supply source for certain complex parts and specifically designed systems necessary to the Debtors' production process) that cannot be timely and/or efficiently replaced given the highly-engineered nature of the component parts they provide.  A number of the Debtors' suppliers are also "directed-buy suppliers," meaning that the Debtors are directed by their Customers to utilize the component parts of such sub-suppliers.  The Debtors do business with many of these vendors pursuant to short term, or "spot," purchase orders without a long-term agreement.  As is typical in distressed situations, vendors have been increasingly unwilling to extend trade credit to the Debtors.

8.        Anticipating this situation, the Debtors took painstaking efforts to ensure their supply chain stability prior to commencing these chapter 11 cases—including implementing a narrowly-tailored critical vendor program.  The development process involved a monumental effort to design, structure, and execute a mechanism under which a core, centralized team— comprised of members of the Debtors' purchasing and supply team with the assistance of FTI Consulting, Inc. ("**FTI**") and Weil, Gotshal & Manges LLP ("**Weil**") and subject to the personal supervision of the Debtors' Interim Chief Financial Officer—will authorize payment only to those suppliers critical to the Debtors' operations and subject to the vendors' own obligations to provide Customary Trade Terms (as herein defined).  This process was developed through

4

meetings and dialogue between the Debtors' senior management and professionals at FTI and Weil.

9.     The Debtors focused on four primary items to develop and implement their proposed critical vendor program.

(a)     <u>First</u>, the Debtors and their professionals rigorously scrutinized more than 1,500 open accounts and approximately $135 million in trade payables.  Areas of focus included: (i) the goods or services at issue, the Debtors' ability to find alternative sources of supply, and the potential disruption or lost revenues while a supplier was resourced; (ii) whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation; (iii) whether a supplier is a "directed-buy supplier" where the Debtors are required by their Customers to utilize the component parts of such sub-supplier; (iv) whether a vendor may face its own liquidity crisis due to such vendor's operational or cash flow issues if the Debtors were to withhold payment on account of such vendor's prepetition claims; and (v) the Debtors' ability to compel contractual performance.

(b)     <u>Second</u>, the Debtors designated a centralized, high-level team, with the guidance and supervision of their professionals (collectively, the "**Vendor Contingency Team**"), to review, assess, and potentially authorize payment to a Critical Vendor.

(c)     <u>Third</u>, the Debtors and their professionals began to implement a detailed protocol (the "**Payment Protocol**") to route all requests for Critical Vendor treatment through this core group and to educate lower-level procurement, payables, and operations personnel on the process.

(d)     <u>Fourth</u>, the Debtors incorporated a mechanism to provide information on actual Critical Vendor payments on a confidential basis to interested parties such as the United States Trustee for the Southern District of New York (the "**U.S. Trustee**"), counsel for the informal committee of holders of the Debtors' secured and unsecured notes (the "**Informal Committee of Noteholders**"), their proposed postpetition secured lenders, and the professionals retained by any official committee of unsecured creditors appointed in these chapter 11 cases.

5

10.     The Debtors believe this deliberative process, combined with their comprehensive Payment Protocol, justifies the relief requested herein.  Pursuant to this Motion, the Debtors are not seeking to pay all prepetition claims of the Critical Vendors.  Instead, the Debtors seek to pay such undisputed amounts in the ordinary course of the Debtors' businesses and on terms consistent with the Debtors' prepetition practices.

11.     Finally, to ensure that the Debtors' liquidity is preserved as they transition their supply chain into chapter 11, payments to Critical Vendors will be contingent on the Critical Vendors agreeing to continue to sell their goods or services on terms at least as favorable as those in effect before the Commencement Date.

## Relief Requested

12.     By this Motion, pursuant to sections 105(a), 363(b), and 503(b)(9) of the Bankruptcy Code, the Debtors seek entry of an order authorizing, but not directing, the Debtors to pay certain prepetition claims of certain vendors, suppliers, service providers, and other similar entities that are essential to maintaining the going concern value of the Debtors' enterprise (the "**Critical Vendors**" whose prepetition claims shall be defined as the "**Critical Vendor Claims**"), subject to the procedures and conditions described herein.  As described below, the Debtors have put into place detailed procedures that will ensure only Critical Vendors will be paid, each justified in accordance with established law in this district.

13.     The Debtors also request that the Court authorize and direct the banks and other financial institutions at which the Debtors maintain disbursement accounts, at the Debtors' direction, to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks drawn or electronic fund transfers requested or to be requested by the Debtors relating to the Critical Vendor Claims.  Further, the Debtors also seek authority to issue new postpetition

6

checks, or effect new electronic fund transfers, on account of the Critical Vendor Claims to replace any prepetition checks or electronic fund transfer requests that may be lost, dishonored, or rejected as a result of the commencement of these chapter 11 cases.

14.    Concurrently herewith, the Debtors have filed separate motions seeking authority to pay, among other things, the prepetition claims of (i) certain shippers, warehouseman and other lien holders (the "**Shippers, Warehousemen and Other Lienholders Motion**"), and (ii) certain foreign vendors, suppliers and essential service providers (the "**Foreign Vendors Motion**" and together with this Motion and the Shippers, Warehousemen and Other Lienholders Motion, the "**Vendor Motions**").[2]  In support of the Vendor Motions, the Debtors submit the Declaration of David J. Woodward (the "**Woodward Declaration**"), the Interim Chief Financial Officer for the Debtors, which has been filed contemporaneously herewith.  A proposed form of order (once entered by the Court, the "**Interim Order**") granting the relief requested herein on an interim basis is annexed hereto as **Exhibit "A."**

<u>The Debtors' Business Model and Supply Chain</u>

15.    As is common place throughout the automotive industry, the Debtors' business functions under a tiered supply chain structure.  Under this structure, upstream from the car manufacturers (*i.e.*, the OEMs) are Tier One suppliers, like the Debtors, that produce the specialized component parts, service parts and assembled goods needed for new vehicles.  As is the case with the Debtors and their Customers, many of the Debtors' sub-suppliers ship parts and materials on a "just-in-time" basis to meet the Debtors' needs for a particular day.  This process is utilized to minimize inventory costs and allow for rapid shifts in manufacturing output based on consumer purchasing trends.  As a result, however, the Debtors and their Customers maintain

---

[2] Although the Debtors have endeavored to provide accurate figures and calculations herein, there may, in some instances, be overlap between the amounts sought to be expended herein and these other Vendor Motions.

WEIL:\95271065\1\35076.0003

a low inventory of finished parts and raw materials and may schedule deliveries of components directly to the assembly line. This system requires highly choreographed design, purchasing, shipping, inbound logistics and manufacturing operations, working in a highly synchronized manner. Because of the minimal inventory retained by the Debtors and by their Customers and the short lead time on meeting orders, any breakdown in the supply chains could significantly impair—or even completely halt—the Debtors' production process. Any disruption in the Debtors' production could immediately impact their Customers' ability to manufacture automobiles and could result in a shutdown of multiple OEM production lines worldwide. Thus, the success of the Debtors' businesses necessarily depends, among other things, on the timely shipment and storage of parts, goods, and/or services from the lower-tiered suppliers with which the Debtors do business.

16.    In almost all cases, the Debtors are the sole manufacturers of certain essential component parts and vehicle systems for their Customers. Additionally, the Debtors' products are designed, tested and specifically qualified for particular applications. Typically, a Customer will contract with the Debtors to supply a specific product or system for a particular vehicle model or platform being built by the Customer. Due, in part, to the customization of their products, the component parts manufactured by the Debtors reflect the culmination of a lengthy and intensive development, testing and manufacturing process. If outside suppliers are needed then, after conducting a rigorous selection process, the Debtors will generally contract with one vendor for a particular component and rely on that vendor as their sole source supplier. Significantly, the parts sold to the Debtors often are not standard parts, but rather custom designed months or years in advance of production and built to fit the Debtors' and their Customers' specified needs.

8

17.     In addition, sole sourcing is driven by a rigorous certification process that the Debtors and their suppliers must undertake for a significant portion of the parts integrated into the products shipped to the Customers and, ultimately, incorporated into a completed vehicle.  The parts produced by the Debtors and the constituent components of these parts must meet demanding specifications mandated both by the Debtors and the Customers, as well as federally mandated safety standards, before they can be used in the Debtors' manufacturing process.  Validation and qualification of parts requires extensive testing and evaluation, all of which takes, at least, several months to complete.

18.     As set forth in the Woodward Declaration, the Debtors' inability to maintain relationships with their most critical suppliers during the pendency of these chapter 11 cases would irreparably harm the Debtors' businesses, causing catastrophic damage to their going-concern value.

19.     In the months immediately preceding the Commencement Date, a number of the Debtors' suppliers have contacted management and demanded changes in payment and credit terms.   Some of these suppliers have already stopped shipments to the Debtors unless the Debtors comply with their restricted terms.  These actions have diminished the Debtors' cash position by approximately $40 million in the four months prior to the Commencement Date. Further restrictions on working capital could prove devastating to the Debtors' operations. Flexibility to pay prepetition claims to certain Critical Vendors is therefore crucial to preserving the Debtors' supply chain and enabling the Debtors to maximize enterprise value.

**The Debtors' Critical Vendors**

20.     With the assistance of FTI and Weil, prior to the Commencement Date, the Debtors spent significant time reviewing and analyzing their books and records, consulting

WEIL:\95271065\1\35076.0003

operations management and purchasing personnel, reviewing contracts and supply agreements,
and analyzing applicable laws, regulations, and historical practices to identify certain critical
business relationships and Critical Vendors—the loss of which could materially harm the
Debtors' businesses or impair going-concern viability.  As a result of that analysis and review,
the Debtors have identified the following three categories of Critical Vendors, as more fully
described below:  (i) component part providers; (ii) raw materials and other production
providers; and (iii) essential services providers.[3]

21.    **Component Part Providers**.  To meet production requirements and
demand, the Debtors utilize a number of lower-tiered component part providers, a large portion
of which are sole source suppliers.  Certain of the sole source component suppliers are also
"directed-buy suppliers" where the Debtors are directed by their Customers to utilize the
components of a specific sub-supplier.  As discussed above, many of these component parts
suppliers have already demanded that the Debtors satisfy prepetition obligations as a condition to
continuing to deliver parts postpetition.  Indeed, certain of the component part suppliers have
refused to ship product to the Debtors absent payment on their outstanding invoices.  Because of
the "just-in-time" nature of their businesses, a delay or stop in shipment can halt an entire
production line and, as discussed above, finding replacement parts that meet specifications in a
time and cost-effective manner is virtually impossible.

22.    **Raw Materials and Other Production Providers**.  In the ordinary course
of their business, the Debtors also rely on the timely delivery of a number of production supplies
and materials including, without limitation, raw materials (principally aluminum, iron, and
alloys) and oil coolants utilized to process aluminum, that are necessary to fulfill Customer

---

[3] These categories generally describe the major categories of goods and services provided by Critical Vendors and
are not intended to be exclusive.

demands.  Many of these production suppliers provide specialty materials utilized in the

production process that cannot be easily replaced and are sole source providers.  Should any of

the raw material vendors refuse to deliver without prepetition payment, the Debtors would be

forced to purchase necessary raw materials on the spot market.   The Debtors submit that the

price differential between raw materials procured from suppliers with whom the Debtors have a

long standing relationship and receive favorable pricing and raw materials procured on the spot

market could, in some instances, create an increase in operating costs that would detrimentally

affect the Debtors' operations.  Additionally, if the Debtors were forced to procure raw materials

on the spot market, they would be subject to product availability risks, in addition to raw material

validation processes required for certain specialized alloys.

      23.  **Essential Service Providers**.  The Debtors rely on certain service

providers to assist with some of their most critical business functions, such as equipment

maintenance, information technology work, and work pertaining to simulation software.

Demand for these particular services is high and the availability of qualified personnel is often

limited.  In some instances, if the Debtors were required to suddenly change service providers, it

would require a significant amount of time, capital, and other resources to locate qualified

replacements (to the extent such replacements exist).

      24.  As discussed in further detail below, it is in the best interests of the

Debtors and their estates to pay certain Critical Vendor Claims (including Critical Vendors with

claims under section 503(b)(9) of the Bankruptcy Code).  These payments would be contingent

on the Critical Vendors agreeing to continue to sell their goods or services on terms at least as

favorable as those in effect within two (2) years before the Commencement Date.  If, however,

the Debtors are unable to reach such an agreement with a particular Critical Vendor to continue

11

business on Customary Trade Terms, the Debtors seek authority to pay, in their sole discretion, all or a portion of such Critical Vendor's prepetition obligations.

### The Critical Vendor Cap

25.    Following an extensive evaluation by the members of the Vendor Contingency Team, the Debtors estimate that the aggregate amount owed to Critical Vendors for goods delivered or services provided during the period before the Commencement Date should not exceed $40 million (the "**Critical Vendor Cap**").[4]  Of this amount, the Debtors are requesting authority to pay approximately $16 million of Critical Vendor Claims prior to the hearing to authorize the relief requested herein on a final basis.

26.    In determining the amount of the Critical Vendor Cap, the Debtors considered, among other things, the following:  (i) which suppliers are sole-source or limited-source suppliers, without whom the Debtors could not continue to operate; (ii) which suppliers would be prohibitively expensive to replace; and (iii) which suppliers are at risk of ceasing the provision of truly essential services or supplies.  The Debtors also considered the financial condition of each supplier, to the extent such information was known, and whether the vendor might face its own liquidity crisis, due to such vendor's operational or cash flow issues, if the Debtors do not promptly pay its prepetition claim.  The Debtors also reviewed the extent to which the Critical Vendors are party to executory contracts with the Debtors and accordingly, would be precluded from unilaterally ceasing to comply with the terms of their contracts.  The Debtors then estimated the amount they believe they may be required to pay for prepetition obligations to ensure the continued supply of critical goods and services (*i.e.*, the Critical Vendor Cap).  Thus, the Critical Vendor Cap was determined after taking into account all appropriate

---

[4] The Critical Vendor Cap does not include any amounts owed for prepetition claims that the Debtors are seeking authority to pay pursuant to other Vendor Motions.

WEIL:\95271065\1\35076.0003

circumstances and represents an amount necessary to avoid irreparable harm to the Debtors'

businesses and all other parties in interest.

## Proposed Conditions to Receiving Payment

*The Debtors' Payment Protocol*

27.    To minimize the amount of payments required, the Debtors request

authority to identify particular Critical Vendors and pay Critical Vendor Claims utilizing the

Payment Protocol annexed as **Exhibit "B"** hereto.  The Debtors Payment Protocol can be

generally summarized as follows:

(a)    Requests for Critical Vendor treatment (*i.e.*, any payment on account of prepetition claims) will be routed through a centralized control center staffed by specifically identified members of the Vendor Contingency Team, including professionals from FTI and Weil.

(b)    All aspects of any proposed payment to a Critical Vendor will be scrutinized for, among other things: (i) the amount of payment at issue; (ii) the terms offered by the particular vendor; and (iii) the business need for the goods or services at issue.

(c)    Material business terms (including proposed payments) require written approval by specifically-designated members of the Debtors' management team, following review and oversight by the Debtors' professionals.

(d)    All proposed payments over $100,000 require the personal approval of the Debtors' Interim Chief Financial Officer.

(e)    All proposed payments must be documented pursuant to an executed Vendor Agreement as set forth above, with any specific exception from this requirement to be made only with the express authorization of the Debtors' Interim Chief Financial Offer.

(f)    Payment may only be physically executed by specifically-designated members of the Debtors' finance department when the Payment Protocol has been completed and upon presentation of completed documentation.

WEIL:\95271065\1\35076.0003

28.    And although the Debtors have effectively "pre-screened" certain vendors who have satisfied the criteria for Critical Vendor treatment, the Debtors are keenly aware they must be prepared to address new or additional exigencies should they emerge—particularly given the size and scope of their operations.  Thus, the Debtors' Payment Protocol includes specific processes by which specific vendors may be designated as "Critical Vendors" on a case-by-case basis.  But, again, this process will be routed through the Debtors' Vendor Contingency Team with executive level of approvals required—in addition to the approvals required for any vendor ("pre-screened" or otherwise) to receive payment on account of a prepetition claim.

29.    The Debtors have educated senior personnel (*i.e.*, those individuals tasked with screening such vendors) on their Payment Protocol prior to the Commencement Date, and are also educating "rank and file" personnel on critical vendor issues across their enterprise.  All vendor disbursements, however, are centralized through the Debtors' Southfield headquarters and disbursements are not made at the plant level, which further ensures that the controls and protocols with respect to Critical Vendor Payments will be observed.  At the end of the day, the "faucet" of Critical Vendor dollars will be controlled by a core group of executives operating under significant professional oversight with ultimate control of Critical Vendor Payments ending with David Woodward, the Debtors' Interim Chief Financial Officer.

*Vendor Agreements*

30.    The Debtors propose to pay a Critical Vendor Claim in accordance with the Payment Protocol and to the extent that the related Critical Vendor (including Critical Vendors with claims under section 503(b)(9) of the Bankruptcy Code) agrees to continue to supply goods or services to the Debtors—as well as any and all entities affiliated with the Debtors with whom the Critical Vendors conducts business—on "Customary Trade Terms" for

14

two (2) years from the date of the agreement.  As used herein, "Customary Trade Terms" means industry trade terms and existing contractual obligations between the parties including rebates and discounts, and shall in no event be worse than the most favorable terms and credit limits in effect within the two years before the Commencement Date, or such other trade terms as agreed by the Debtors and the Critical Vendor.  However, as noted above, if the Debtors are unable to negotiate continued supply upon Customary Trade Terms, the Debtors seek authority, based on their business judgment, to pay Critical Vendors all or a portion of their Critical Vendor Claim in return for the continued supply of critical goods and supplies (even if not on the Customary Trade Terms).

31.    To ensure that Critical Vendors continue business with the Debtors on Customary Trade Terms, the Debtors propose that they be authorized to require the following procedures as a condition to paying any Critical Vendor:  (i) a letter, substantially in the form of the letter annexed hereto as **Exhibit "1"** to the Interim Order (each a "**Vendor Agreement**"), must be delivered to, and executed by, the Critical Vendor along with a copy of the order granting the relief requested herein; and (ii) if the payment of the Critical Vendor Claim is by check, the check must contain a legend (or be accompanied by an enclosure) substantially as follows:[5]

> By accepting this check, the payee agrees to the terms of the order of the United States Bankruptcy Court for the Southern District of New York (the "**Court**"), dated _____, 2015, in the chapter 11 cases of Chassix Holdings, Inc., *et al.* (Case Nos. 15 -____(_) through 15 -____(_)), entitled "Interim Order Pursuant to 11 U.S.C. §§ and 105(a), 363(b) and 503(b)(9) (i) Authorizing, but not Directing, Debtors to Pay Prepetition Obligations of Critical Vendors, and (ii) Authorizing and Directing Financial Institutions to Honor and Process Related Checks and Transfers."

---

[5] Any checks issued after entry of a final order granting the relief requested in this Motion shall refer to such final order instead of the Interim Order.

WEIL:\95271065\1\35076.0003

32.    Some of the Critical Vendors also may possess mechanics' liens, possessory liens, or similar state law trade liens (the "**Trade Liens**") on the Debtors' assets based upon the claims held by those Critical Vendors.  As a further condition of receiving payment on a Critical Vendor Claim, the Debtors propose that a Critical Vendor must agree to take whatever action is necessary to remove the Trade Lien at Critical Vendor's sole expense.

33.    The Debtors further propose that if a Critical Vendor fails to comply with the terms and provisions of the Vendor Agreement or such other terms as were individually agreed to between the Debtors and such Critical Vendor, then the Debtors may, in their discretion, and without further order of the Court, declare that:  (i) the payment of the Critical Vendor Claim, as the case may be, is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Debtors may recover from the Critical Vendor in cash or in goods (including by setoff against postpetition obligations); or (ii) the Critical Vendor shall immediately return the Debtors' payment of its Critical Vendor Claim without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever, and the Critical Vendor Claim shall be reinstated in an amount that will restore the Debtors and the Critical Vendor to their original positions as if the Vendor Agreement had never been entered into and the payment of the Critical Vendor Claim had not been made.

34.    The Debtors propose to maintain a matrix summarizing (i) the name of each Critical Vendor paid; (ii) the amount paid to each Critical Vendor on account of its Critical Vendor Claim; and (iii) the type of goods or services provided by that Critical Vendor.  This matrix will be provided (i) upon request, to the U.S.  Trustee and (ii) on a weekly basis (or such other agreed  upon time period), to counsel for the Noteholder Group, the attorneys for the Debtors' postpetition debtor in possession lenders, and the professionals retained by any official

committee of unsecured creditors appointed in these chapter 11 cases; provided that the

professionals for any such committee shall keep the matrix confidential and shall not disclose

any of the information in the matrix to anyone, including, but not limited to, any member of any

statutory committee of creditors, without prior written consent of the Debtors.

### The Court May Authorize Payment of Critical Vendor Claims
### Pursuant to Sections 105(a), 363(b) and 503(b)(9) of the Bankruptcy Code

35.    The Debtors submit that the Court has authority pursuant to sections

105(a), 363(b) and 503(b)(9) of the Bankruptcy Code to authorize the Debtors to pay all or part

of the Critical Vendor Claims.

36.    A court may authorize a debtor to pay certain prepetition obligations

pursuant to section 363(b) of the Bankruptcy Code.  Section 363(b) provides that "the trustee,

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate."  11 U.S.C. § 363(b)(1).  To approve the use of a debtor's assets outside

the ordinary course of business pursuant to section 363(b), "the debtor must articulate some

business justification, other than the mere appeasement of major creditors. *See In re Ionosphere*

*Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989).

37.    This business judgment rule is satisfied where "'the directors of a

corporation acted on an informed basis, in good faith and in the honest belief that the action

taken was in the best interests of the company.'" *Official Comm. of Subordinated Bondholders*

*v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting

*Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir.

1993).  "Where the debtor articulates a reasonable basis for its business decisions (as distinct

from a decision made arbitrarily or capriciously), courts will generally not entertain objections to

the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re*

*Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts in this District consistently have declined to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and have upheld a board's decisions as long as such decisions are attributable to any "'rational business purpose.'" *Integrated*, 147 B.R. at 656 (quoting *CRTF Corp. v. Federated Dep't Stores*, 683 F. Supp. 422, 436 (S.D.N.Y. 1988)).

38.     Furthermore, due to the nature of their businesses, including, without limitation, their use of a "just-in-time" inventory supply method, certain of the Critical Vendors that the Debtors are seeking authority to pay delivered raw materials, equipment, supplies and other goods in the ordinary course to the Debtors within the twenty days before the Commencement Date and are entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code. Payment of such Critical Vendor Claims at the onset of these chapter 11 cases, therefore, merely accelerates the timing of payment and not the ultimate treatment of such claims. Additionally, all creditors will benefit from the seamless transition of the Debtors' operations into bankruptcy.

39.     The Bankruptcy Code does not prohibit a debtor from paying such administrative claims prior to confirmation. As administrative claims incurred in the ordinary course of business, the Debtors believe they may pay such claims in accordance with their business judgment pursuant to section 363(c)(1) of the Bankruptcy Code. *See, e.g.*, *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC) (Bankr. D. Del. Oct. 31, 2006) Hr'g Tr. 49:21-23 ("I think arguably the [D]ebtor could pay its 503(b)(9) claimants without court approval."). The timing of such payments also lies squarely within the Court's discretion. *See In re Global Home Prods., LLC*, No. 06-10340 (KG), 2006 WL 3791955, at *3 (Bankr. D. Del. Dec. 21, 2006) (agreeing

WEIL:\95271065\1\35076.0003

with parties that "the timing of the payment of that administrative expense claim is left to the discretion of the Court").

40.    In addition, the Court has the authority, pursuant to its equitable powers under section 105(a) of the Bankruptcy Code, to authorize the Debtors to pay any amounts that may be owed to Critical Vendors because such payments are necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the Bankruptcy Code.  Section 1107(a) of the Bankruptcy Code "contains an implied duty of the debtor-in-possession" to act as a fiduciary to "protect and preserve the estate, including an operating business' going-concern value," on behalf of the debtor's creditors and other parties in interest.  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)); *see also Unofficial Comm. of Equity Holders v. McManigle (In re Penick Pharm., Inc.)*, 227 B.R. 229, 232-33 (Bankr. S.D.N.Y. 1998) ("upon filing its petition, the Debtor became debtor in possession and, through its management . . . was burdened with the duties and responsibilities of a bankruptcy trustee").

41.    In a long line of well-established cases, courts consistently have permitted postpetition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors.  *See, e.g.*, *In re Fin. News Network, Inc.*, 134 B.R. 732, 735-36 (Bankr. S.D.N.Y. 1991) ("[A] bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's reorganization")*; Ionosphere*, 98 B.R. at 175 (citing *Miltenberger v. Logansport, C&S W.R. Co..*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim before reorganization permitted to prevent stoppage of "indispensable business relations")); *Mich. Bureau of Workers' Disability Comp. v.*

19

*Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285-86 (S.D.N.Y. 1987) (approving

lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

42.    This "doctrine of necessity" functions in a chapter 11 reorganization as a

mechanism by which the Court can exercise its equitable power to allow payment of critical

prepetition claims not explicitly authorized by the Bankruptcy Code. *See In re Lehigh & New*

*England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (quoting *In re Penn Cent. Transp. Co.*, 467

F.2d 100, 102 n.1 (3d Cir. 1972) ("[T]he 'necessity of payment' doctrine…[permits] immediate

payment of claims of creditors where those creditors will not supply services or material

essential to the conduct of the business until their pre-reorganization claims shall have been

paid."); *In re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing "existence

of a judicial power to authorize trustees in reorganization to pay claims [for] goods and services

indispensably necessary" to debtors' continued operation); *In re Quality Interiors, Inc.*, 127 B.R.

391, 396 ("A general practice has developed…where bankruptcy courts permit the payment of

certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to

reorganize without such payment."); *In re Structurelite Plastics Corp.*, 86 B.R. 922, 931 (Bankr.

S.D. Ohio 1988) ("[A] *per se* rule proscribing the payment of pre-petition indebtedness may well

be too inflexible to permit the effectuation of the rehabilitative purposes of the Code"). The

rationale for the doctrine of necessity is consistent with the paramount goal of chapter 11—

"facilitating the continued operation and rehabilitation of the debtor." *Ionosphere*,

98 B.R. at 176.

43.    Similar relief has been granted in other automotive supplier cases in this

and other districts. *In re Lear Corp.*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. July 31, 2009

(ECF 245); *In re Visteon Corp.*, Case No. 09-11786 (CSS) (Bankr. D. Del. June 19, 2009) (ECF

No. 374); *In re Dana Corp.*, Case No. 06-10354 (BRL) (Bankr. S.D.N.Y. May 29, 2006) (ECF

No. 722); *In re Delphi Corp.*, Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Oct. 13, 2006) (ECF

No. 197); *In re Tower Automotive, Inc.*, Case No. 05-10578 (ALG) (Bankr. S.D.N.Y. Mar. 14,

2005) (ECF No. 239).

**Payment of Critical Vendor Claims
Is Necessary to the Debtors' Reorganization**

44.     As noted herein and in the Woodward Declaration, in almost all cases, the

Debtors are the sole manufacturer of certain essential component parts for their Customers.

These parts are designed, tested, and manufactured to meet the needs and specifications of a

particular Customer.  Once completed, the parts are delivered using the "just-in-time" supply

method, which means that the Customers utilize the Debtors' parts almost immediately upon

receiving them and any disruption on the delivery process can cause significant harm to the

Debtors' operations.  The culmination of these factors creates a system highly sensitive to

interruptions in production or delivery.  Within this system, an uncooperative vendor's actions

(or inactions) can compromise the Debtors' ability to fulfill their commitments to Customers.

Accordingly, maintaining favorable trade terms and credit is important to the continued,

uninterrupted operation of the Debtors' businesses and is in the best interests of all creditors.

45.     Based on their experience, the Debtors believe that some of the vendors

that they deem to be critical to their operations could demand that the Debtors satisfy prepetition

obligations as a condition to doing business.  Notwithstanding the automatic stay, failure to pay

certain of those vendors may cause an interruption of a production line that could result in large

economic losses for the Debtors, the Customers, and all other parties in the supply chain.

Moreover, because many of the Debtors component part suppliers are sole source or "directed-

21

buy" suppliers, replacing these suppliers is not feasible, not allowed, or would require significant time and resources that could be expended elsewhere.

46.    Thus, the Debtors submit that the failure to pay the Critical Vendors may result in (i) the Debtors' inability to acquire necessary materials and parts for their operations, (ii) temporary shutdowns of one or more of the Debtors' manufacturing facilities, and (iii) a severe negative impact on the Customers' manufacturing processes.  Depending on the circumstances, this may lead to a domino-like effect on sub-suppliers that rely on payments received by the Debtors for their ongoing business operations.  In addition, if the Debtors are forced to shut down an assembly line, the Customers may have no choice but to look for new suppliers, which, if possible, would cause irreparable financial harm to all stakeholders, including the Debtors' employees and other creditors.  Accordingly, the relief requested herein is necessary and appropriate and is in the best interests of their estates and all their creditors.

## Reservation of Rights

47.    Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## The Debtors Have Satisfied Bankruptcy Rule 6003

48.    Bankruptcy Rule 6003 provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a Bankruptcy Court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty-one days after the

Commencement Date. Fed. R. Bankr. P. 6003. As described herein and in the Woodward

Declaration, the Critical Vendors are an integral part of the Debtors' businesses. Failure to pay

the Critical Vendors could subject the Debtors to a potential cessation of operations, to the

detriment of all parties in interest. Accordingly, the Debtors submit that the relief requested

herein is necessary to avoid immediate and irreparable harm, and, therefore, Bankruptcy Rule

6003 is satisfied.

### Waiver of Bankruptcy Rules 6004(a) and (h)

49.     To implement the foregoing immediately, the Debtors seek a waiver of

the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order

authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Notice

50.     Notice of this Motion has been provided to (i) the U.S. Trustee; (ii) the

holders of the five largest secured claims against the Debtors (on a consolidated basis); (iii) the

holders of the forty (40) largest unsecured claims against the Debtors (on a consolidated basis);

(iv) the attorneys for BMO Harris Bank, N.A., as administrative agent under that certain

Amended and Restated Loan, Security and Guaranty Agreement, dated as of July 23, 2013; (v)

the attorneys for U.S. Bank National Association, as trustee under that certain Indenture for 9

1/4% Senior Secured Notes due 2018, dated as of July 23, 2013; (vi) the attorneys for Delaware

Trust Company, as successor trustee under that certain Indenture for 10% / 10 3/4% Senior PIK

Toggle Notes due 2018, dated as of December 13, 2013; (vii) the attorneys for the Informal

Committee of Noteholders; (viii) attorneys for the Revolving DIP Lenders; (ix) attorneys for the

DIP Term Lenders; (x) the OEM Customers; (xi) the attorneys for Platinum Equity Advisors,

LLC; (xii) the Securities and Exchange Commission; (xiii) the Internal Revenue Service; and

(xiv) the United States Attorney's Office for the Southern District of New York. The Debtors

submit that, in view of the facts and circumstances, such notice is sufficient and no other or

further notice need be provided.

51.    No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: March 12, 2015
       New York, New York

/s/ Ray C. Schrock, P.C.
Marcia L. Goldstein
Ray C. Schrock, P.C.

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

WEIL:\95271065\1\35076.0003

**Exhibit A**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
:
In re                                             :        **Chapter 11**
:
**CHASSIX HOLDINGS, INC.,** *et al.,*             :        **Case No. 15-_____ (___)**
:
:        **Jointly Administered**
**Debtors.**[1]                                   :
:
------------------------------------------------------------x

### INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105(a), 363(b) AND 503(b)(9) (I) AUTHORIZING, BUT NOT DIRECTING, DEBTORS TO PAY PREPETITION OBLIGATIONS OF CRITICAL VENDORS, AND (II) AUTHORIZING AND DIRECTING FINANCIAL INSTITUTIONS TO HONOR AND PROCESS RELATED CHECKS AND TRANSFERS

Upon the motion, dated March __, 2015 (the "**Motion**"),[2] of Chassix Holdings,

Inc. ("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**"), and certain of their affiliates and

subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases

(collectively, including Chassix Holdings and Chassix, the "**Debtors**,"), pursuant to sections

105(a), 363(b) and 503(b)(9) of title 11 of the United States Code (the "**Bankruptcy Code**"), for

entry of an order (i) authorizing, but not directing, the Debtors to pay prepetition obligations of

Critical Vendors, and (ii) authorizing and directing financial institutions to pay, honor, and

process related checks and transfers, all as more fully described in the Motion; and upon the

Declaration of David J. Woodward, Interim Chief Financial Officer of the Debtors, submitted in

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012).  The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

support of the Motion; and the Court having jurisdiction to consider the Motion and the relief

requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and Amended Standing Order

of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and

the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue

being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper

notice of the Motion having been provided to (i) the United States Trustee for the Southern

District of New York (the "**U.S. Trustee**"); (ii) the holders of the five largest secured claims

against the Debtors (on a consolidated basis); (iii) the holders of the forty (40) largest unsecured

claims against the Debtors (on a consolidated basis); (iv) the attorneys for BMO Harris Bank,

N.A., as administrative agent under that certain Amended and Restated Loan, Security and

Guaranty Agreement, dated as of July 23, 2013; (v) the attorneys for U.S. Bank National

Association, as trustee under that certain Indenture for 9 1/4% Senior Secured Notes due 2018,

dated as of July 23, 2013; (vi) the attorneys for Delaware Trust Company, as successor trustee

under that certain Indenture for 10% / 10 3/4% Senior PIK Toggle Notes due 2018, dated as of

December 13, 2013; (vii) the attorneys for the Informal Committee of Noteholders;

(viii) attorneys for the Revolving DIP Lenders; (ix) attorneys for the DIP Term Lenders; (x) the

OEM Customers; (xi) the attorneys for Platinum Equity Advisors, LLC; (xii) the Securities and

Exchange Commission; (xiii) the Internal Revenue Service; and (xiv) the United States

Attorney's Office for the Southern District of New York (the "**Notice Parties**"), and it appearing

that no other or further notice need be provided; and a hearing having been held to consider the

relief requested in the Motion (the "**Hearing**"); and upon the Declaration of J. Mark Allan

Pursuant to Local Bankruptcy Rule 1007-2 of the Local Bankruptcy Rules for the Southern

District of New York and the record of the Hearing and all of the proceedings had before the

Court; and the Court having found and determined that the relief sought in the Motion is

necessary to avoid immediate and irreparable harm to the Debtors and their estates as

contemplated by Bankruptcy Rule 6003, and is in the best interests of the Debtors, their estates,

creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion

establish just cause for the relief granted herein; and after due deliberation and sufficient cause

appearing therefor, it is

ORDERED that the Motion is granted on an interim basis, as provided herein; and

it is further

ORDERED that, pursuant to sections 105(a), 363(b) and 503(b)(9) of the

Bankruptcy Code, the Debtors are authorized, but not directed, in the reasonable exercise of their

business judgment, to pay some or all of the Critical Vendor Claims (which include claims under

section 503(b)(9) of the Bankruptcy Code), upon such terms and in the manner provided in this

Interim Order and the Motion; provided that prior to a final hearing to consider the relief

requested in the Motion (the "**Final Hearing**") the amount paid with respect to Critical Vendor

Claims shall not exceed the aggregate amount of $16,000,000; and it is further

ORDERED that the Debtors shall undertake all appropriate efforts to cause

Critical Vendors (including Critical Vendors with claims under section 503(b)(9) of the

Bankruptcy Code) to enter into an agreement (the "**Vendor Agreement**") with the Debtors,

substantially in the form of the agreement annexed hereto as **Exhibit "1"**; and it is further

ORDERED that the Debtors are authorized, but not required, to enter into Vendor

Agreements when the Debtors determine, in the exercise of their reasonable business judgment,

that it is appropriate to do so; provided that the Debtors' inability to enter into a Vendor

Agreement shall not preclude them from paying a Critical Vendor Claim when in the exercise of

their reasonable business judgment, such payment is necessary to the Debtors' reorganization; and it is further

ORDERED that the Debtors shall not pay or honor any Critical Vendor Claim (including any Claims arising under section 503(b)(9) of the Bankruptcy Code) in an aggregate amount greater than $250,000.00 owed to a Critical Vendor that has refused to enter into a Trade Agreement with the Debtors, or has otherwise refused or failed to commit to provide the Debtors' with Customary Trade Terms, without the prior consent (which consent may be secured via telephone or electronic mail) of the Informal Committee of Noteholders, which consent may not be unreasonably delayed, conditioned or withheld; and it is further

ORDERED that the Debtors may, in their discretion, declare that a Vendor Agreement with a Critical Vendor has terminated on the date the Debtors deliver notice to the Critical Vendor, as the case may be, that such vendor has not complied with the terms and provisions of such Vendor Agreement; provided that the Vendor Agreement may be reinstated if:

    i.    Such determination is subsequently reversed by the Court for good cause shown that the determination was materially incorrect after notice and a hearing following a motion from the Critical Vendor; or

    ii.    The underlying default under the Vendor Agreement was fully cured by the Critical Vendor not later than five (5) business days after the date when the initial default occurred; or

    iii.    The Debtors, in their discretion, reach an agreement with the Critical Vendor;

and it is further

ORDERED that if a Critical Vendor has received payment of its Critical Vendor Claim and later refuses to continue supplying goods or services for the applicable period in compliance with the Vendor Agreement, this Order, or such terms as were individually agreed to between the Debtors and such Critical Vendor, the Debtors may, in their discretion, declare that (i) the payment of the Critical Vendor Claim is a voidable postpetition transfer pursuant to

4

section 549(a) of the Bankruptcy Code that the Debtors may recover in cash or in goods from

such Critical Vendor (including by setoff against postpetition obligations); or (ii) the Critical

Vendor shall immediately return the payment of its Critical Vendor Claim without giving effect

to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever, and

the Critical Vendor Claim shall be reinstated in such an amount so as to restore the Debtors and

the Critical Vendor to their original positions as if the Vendor Agreement had never been entered

into and no payment of the Critical Vendor Claim had been made; and it is further

ORDERED that the Debtors shall maintain a matrix summarizing (i) the name of

each Critical Vendor paid; (ii) the amount paid to each vendor for its Critical Vendor Claim; and

(iii) the type of goods or services provided by each Critical Vendor.  This matrix shall be

provided (a) upon request, to the U.S. Trustee, and (b) on a weekly basis (or such other agreed

upon time period), to counsel for the Noteholder Group, counsel for the Debtors' postpetition

debtor in possession lenders, and any professionals retained by any statutory committee of

unsecured creditors appointed in these chapter 11 cases; provided that the professionals for any

statutory committee of creditors shall keep the matrix confidential and shall not disclose any of

the information in the matrix to anyone, including, but not limited to, any member of any

statutory committee of creditors, without prior written consent of the Debtors; and it is further

ORDERED that the banks and other financial institutions at which the Debtors

maintain their disbursement accounts are authorized and directed at the Debtors' direction, to

receive, process, honor, and pay, to the extent of funds on deposit, any and all checks drawn or

electronic fund transfers requested or to be requested by the Debtors on account of the Critical

Vendor Claims; and it is further

WEIL:\95271065\1\35076.0003

ORDERED that the Debtors are authorized, but not directed, to issue new postpetition checks, or effect new electronic fund transfers, on account of the Critical Vendor Claims to replace any prepetition checks or electronic fund transfer requests that may be lost or dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases; and it is further

ORDERED that the Debtors shall serve this Interim Order within three (3) business days of its entry on the Notice Parties; and it is further

ORDERED that nothing in the Motion or this Interim Order shall be deemed to authorize the Debtors to accelerate any payments not otherwise due prior to the Final Hearing; and it is further

ORDERED that nothing contained in this Interim Order or in the Motion is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise any payment made pursuant to this Interim Order is not intended to be and shall not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently; and it is further

ORDERED that notwithstanding entry of this Interim Order, nothing herein shall create, nor is intended to create, any rights in favor of, or enhance the status of any claim held by, any party; and it is further

ORDERED that Bankruptcy Rule 6003(b) has been satisfied; and it is further

ORDERED that the requirements set forth in Bankruptcy Rule 6004(a) are hereby waived; and it is further

6

ORDERED that pursuant to Bankruptcy Rule 6004(h), the terms and provisions of this Interim Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that the Final Hearing on the Motion shall be held on _____, **2015 at __:__ _.m. (Eastern Time)**, and any objections to entry of such order shall be in writing, filed with the Court in accordance with General Order M-399, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C.); and (ii) the Notice Parties, in each case so as to be received no later than **4:00 p.m. (Eastern Time) on** _____, **2015**; and it is further

ORDERED that notwithstanding anything to the contrary contained herein, (i) any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under the Debtors' postpetition financing agreements (the "**DIP Documents**") and any orders approving the DIP Documents and governing the Debtors' use of cash collateral (including with respect to any budgets governing or relating thereto) and (ii) to the extent there is any inconsistency between the terms of such orders approving the DIP Documents or the Debtors' use of cash collateral and any action taken or proposed to be taken hereunder, the terms of such orders approving the DIP Documents and use of cash collateral shall control; and it is further

ORDERED that this Interim Order is effective only from the date of entry through this Court's disposition of the Motion on a final basis; provided that the Court's ultimate disposition of the Motion on a final basis shall not impair or otherwise affect any action taken pursuant to this Interim Order; and it is further

ORDERED that the Debtors are authorized to take all steps necessary to carry out this Interim Order; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

Dated: _____, 2015
      New York, New York

_____
United States Bankruptcy Judge

8

**Exhibit 1**

**Form of Vendor Agreement**

WEIL:\95271065\1\35076.0003

**[Name of Applicable Debtor]**

_____, 2015

TO:    [Critical Vendor]
       [Name]
       [Address]

Dear Valued Supplier:

As you are aware, Chassix Holdings, Inc. and certain of its affiliates and subsidiaries (collectively, the "**Company**") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Case**" and the "**Bankruptcy Court**," respectively) on _____, 2015 (the "**Commencement Date**"). On the Commencement Date, the Company requested the Bankruptcy Court's authority to pay certain suppliers and service providers (collectively, "**Vendors**") in recognition of the importance of the Company's relationship with those Vendors and the Company's desire that the Bankruptcy Cases have as little effect on certain Vendors as possible. On _____, 2015 the Bankruptcy Court entered an interim order (the "**Order**") authorizing the Company, under certain conditions, to pay prepetition claims of certain Vendors that agree to the terms below as well as agree to be bound by the terms of the Order. A copy of the Order is annexed hereto (collectively with this letter, the "**Letter Agreement**").

To receive payment on prepetition claims, each selected Vendor must agree to continue to supply goods or services to the Company based on "Customary Trade Terms." As used herein and in the Order, "Customary Trade Terms" are the normal and customary trade terms, practices, and programs (including, but not limited to, credit limits, cash discounts, timing of payments, allowances, rebates, coupon reconciliation, and other applicable terms and programs) that were most favorable to the Company and in effect between the Vendor and the Company at any time within the two (2) years prior to the Commencement Date or such other trade terms as agreed by the Company and the Vendor.

For purposes of administration of this program, and as authorized by the Bankruptcy Court, the Company and you agree as follows:

1.    The Company will provisionally pay you $_____ (the "**Payment**") on account of your prepetition claim (net of any setoffs, credits, or discounts) (the "**Vendor Claim**") of which $_____ will be applied toward that portion of your Vendor Claim that is entitled to administration expense priority pursuant to section 503(b)(9) of the Bankruptcy Code, satisfying _____% of such claim.

2.    Nothing herein waives the Company's or your rights under section 365 of the Bankruptcy Code.

3.    You will provide Customary Trade Terms as follows (if more space is required, attach continuation pages), which credit terms shall be no less favorable than

those in effect between you and the Company at any time during the two year period immediately before the Commencement Date.

_____
_____
_____
_____

4. You agree that you shall not require a lump-sum payment upon the confirmation or consummation of a plan of reorganization in these cases on account of any administrative expense priority claim that you may assert, but instead agree that such claims will be paid in the ordinary course of business after confirmation of a plan under applicable Customary Trade Terms, if the plan provides for the ongoing operations of the Company.

5. You will hereafter extend to the Company all Customary Trade Terms and agree to abide by [_____'s] the Purchase Order Terms and Conditions between you and the Company as in effect prior to the Commencement Date (the "**Current PO(s)**").

Payment of your Vendor Claim in the manner set forth in the Order may only occur upon execution of this Letter Agreement by a duly authorized representative of your company and the return of this letter to the Company. Your execution and return of this letter agreement constitutes an agreement between you and the Company:

(i) to the Customary Trade Terms and, subject to the reservations contained in the Order, to the amount of the Payment set forth above;

(ii) that, for a period lasting until the later of two (2) years from the Commencement Date, or the date upon which the term of your Current PO(s) expire, you will continue to supply the Company with goods or services pursuant to Customary Trade Terms and that the Company will pay for those goods or services in accordance with Customary Trade Terms;

(iii) that you will continue to supply goods or provide services, as applicable, to any non-debtor affiliate of the Company with which you do business, on the terms set forth in the applicable contracts or purchase orders;

(iv) that you have reviewed the terms and provisions of the Order and consent to be bound by the same;

(v) that you will not separately seek payment for reclamation, claims pursuant to section 503(b)(9) of the Bankruptcy Code, or other similar claims outside of the terms of the Order unless your participation in the vendor payment program authorized by the Order (the "**Vendor Payment Program**") is terminated;

(vi) that, in consideration for the Payment, you agree not to file or otherwise assert against the Company, its estate, or any other person or entity, or any of their respective assets or property (real or personal) any lien (regardless of the statute

2

or other legal authority upon which the lien is asserted) related to any remaining prepetition amounts allegedly owed to you by the Company arising from agreements entered into before the Commencement Date.  Furthermore, if you have taken steps to file or assert a lien before entering into this letter agreement, you agree to take all necessary steps to remove the lien as soon as possible at your sole cost and expense;

(vii)   that if you fail to comply with the terms and provisions of this Letter Agreement, the Company may, in its discretion, and without further order of the Bankruptcy Court, declare: (i) that the Payment is a voidable postpetition transfer pursuant to section 549(a) of the Bankruptcy Code that the Company may recover from you in cash or in goods (including by setoff against outstanding postpetition obligations); or (ii) that you shall immediately return the Payment to the Company without giving effect to alleged setoff rights, recoupment rights, adjustments, or offsets of any type whatsoever, and your Vendor Claim shall be reinstated in an amount that will restore the Company and you to their original positions as if this agreement had never been entered into and the payment of the Vendor Claim had not been made; and

(viii)   that you will keep the existence and the terms of this Letter Agreement confidential and will not disclose it to any person or entity without the prior written consent of Company, other than as required by law to any court or governmental authority.

The Company and you also hereby agree that any dispute concerning this Letter Agreement, the Order, or your participation in the Vendor Payment Program shall be determined by the Bankruptcy Court and that all litigation arising out of or relating to this Letter Agreement, the Order, and/or your participation in the Trade Payment Program or its subject matter must be commenced by the Bankruptcy Court.

If you have any questions about this Letter Agreement or our financial restructuring, do not hesitate to call.

Sincerely,
[Name of Applicable Debtor]

By: _____
    Its: _____

Agreed and Accepted by:
[Vendor]

By: _____
    Its: _____
Dated: _____, 2015

3

**Exhibit B**

**Payment Protocol**

## VENDOR PAYMENT PROTOCOL

### I.    *Payment Protocol Objective*
- Understand the approval process (the "**Payment Protocol**") for paying prepetition claims of those vendors the Debtors deem to be "critical" (the "**Critical Vendors**") pursuant to the Critical Vendor Motion and bankruptcy court order approving the same.

### II.    *The Vendor Contingency Team*
- All discussions and negotiations regarding a vendor's status as a Critical Vendor or payments to Critical Vendors will be directed to a centralized, high-level team, led by the guidance and supervision of members from the Debtors' sales & purchasing department and finance department, professionals from FTI Consulting, Inc. and Weil, Gotshal & Manges LLP, and the Debtors' general counsel (the "**Vendor Contingency Team**").

- All requests to receive Critical Vendor status ("**Requests**") should be emailed to the Vendor Contingency Team.

### III.    *Criteria for Determining Critical Vendor Status*
- Pursuant to the Critical Vendor Motion, there are several criteria for determining whether a vendor can be paid for its prepetition claim(s) as a Critical Vendor.

- Criteria for receiving Critical Vendor status includes the following:
  - The vendor does not provide goods or services pursuant to an executory contract;
  - The goods or services supplied by the vendor are only available from that vendor;
  - The cost to switch vendors is high relative to the claim;
  - The time it would take to switch vendors could cause irreparable harm to the Debtors' operations;
  - A relatively significant increase to costs or decrease to revenue could arise if the vendor is not paid for its prepetition claims; and
  - The vendor would be subject to its own financial challenges were it not to be paid on its prepetition claims prior to confirmation of a plan of reorganization.

- In addition, each Critical Vendor must commit to continuing to supply goods or services under normal credit terms (*i.e.*, not pre-payment or cash on delivery) pursuant to a Vendor Agreement.

### IV.    *Payment Protocol – General Information*
- Pursuant to this Payment Protocol, proposed prepetition payments to Critical Vendors that exceed $100,000.00 (U.S. Dollars) must be approved by David Woodward, Interim Chief Financial Officer (the "**Interim CFO**"), following review by the Vendor Contingency Team.

- Additionally, any exceptions to the procedures detailed in this Payment Protocol require specific authorization from the Interim CFO, following review by the Vendor Contingency Team, before any payment can be made.

## V.    *Critical Vendor Payment Process*

| | | | |
|---|---|---|---|
| A.  Receive | Receive Request | Evaluate Request | Negotiate Vendor Agreement | Pay Approved Amount and update Vendor Matrix |
| B.  Evaluate | | | |
| C.  Negotiate | | | |
| D.  Pay | | | |

## A.  Receive Request

*All Requests will be forwarded to the Vendor Contingency Team.*

**(1)**  The payment approval process begins when a vendor (the "**Requesting Vendor**") contacts the Debtors to request payment of its prepetition claim(s) pursuant to the Critical Vendor Motion.
  - All Requests must be forwarded to the Vendor Contingency Team.

**(2)**  Upon receiving a Request, a member of the Vendor Contingency Team will communicate in writing (with email being sufficient) to the Requesting Vendor that it must continue shipping on then-current payment terms in order to be considered for Critical Vendor status.

## B.  Evaluate Request

*Members of the Vendor Contingency Team will meet daily to evaluate all Requests.*

**(3)**  The Vendor Contingency Team will require each Requesting Vendor to submit a completed Financial Considerations Form (each a "**FCF**"), a copy of which is annexed hereto as **Schedule "1"** and will be provided to all Requesting Vendors.  Pursuant to the FCF, each Requesting Vendor will provide the following information:
  - Financial information, including most recent borrowing base certificate, to illustrate the harm to its business resulting from inability to recover on its payables until a plan of reorganization is confirmed by the bankruptcy court, and;
  - The amount of the Requesting Vendor's 503(b)(9) claim, if any, along with supporting documentation.

Upon receipt of a Requesting Vendor's FCF, the Vendor Contingency Team will:
  - Confirm the outstanding payables balance;
  - Confirm the amount of 503(b)(9) claim, if any, that would be payable upon confirmation of a plan of reorganization; and
  - Compute the cash flow impact to the Debtors of the vendor returning to the most favorable payment terms provided to the Debtors in the past year.

2

( 4 )   In evaluating a Request, the Vendor Contingency Team will determine whether the Requesting Vendor is subject to a supply/services agreement and/or long-term purchase order.

- If so, except for the financial distress exception above, the Vendor Contingency Team will inform the Requesting Vendor that it must continue to perform under its contract and will be prepared to take legal action if the Requesting Vendor does not comply.

- If not, the Vendor Contingency Team will consider, among other things, the following:
  - o Information contained in the FCF (subject to confirming the information as set forth above); and
  - o Whether the Requesting Vendor is a sole source provider whose replacement would put production at risk and/or be cost prohibitive.

## C. Negotiate Vendor Agreement
*Members of the Vendor Contingency Team will negotiate all Vendor Agreements.*

( 5 )   If a Requesting Vendor is deemed eligible for Critical Vendor status, the Vendor Contingency Team will designate a member of the team to negotiate the terms of the Vendor Agreement, a form of which is attached to the Critical Vendor Motion.

- The Vendor Contingency Team will scrutinize all aspects of any proposed payment to a Critical Vendor for, among other things, (i) the amount of payments at issues; (ii) the terms offered by the Requesting Vendor; and (iii) the business need for the goods and services at issue.

- All material business terms (including proposed payments) require prior written approval from specifically-designated members of the Debtors' management team.

- Before entering into any Vendor Agreement providing that a Critical Vendor will receive payments in excess of $100,000.00 (U.S. Dollars) during the pendency of the chapter 11 cases, such agreement and all terms therein must be expressly approved by the Interim CFO.

- Additionally, any exceptions to the procedures detailed in this Payment Protocol require express approval from the Interim CFO.

( 6 )   Upon attaining all requisite approvals, the Vendor Contingency Team will memorialize the terms of their agreements with Critical Vendors.

3

**D.  Pay Critical Vendor Claim and Maintain Database**

( 7 )  Once a Vendor Agreement is finalized, the Vendor Contingency Team will send payment instructions to a designated member of the Debtors' finance department to ensure payments are processed timely and in accordance with the Vendor Agreement.

( 8 )  The Vendor Contingency Team will maintain a database listing all Requesting Vendors and all Critical Vendors with whom the Debtors have entered into Vendor Agreements.
- The database will include, among other things, the (i) name of the Requesting Vendor, (ii) amount and timing of any Critical Vendor payment, (iii) amount of the Critical Vendor's 503(b)(9) claim satisfied by the Critical Vendor payment, and the (iv) a summary of the material payment terms.

4

## <u>Summary of Payment Protocol</u>

*For ease of reference, the below is a summary reflecting the aforementioned Payment Protocol.*

**Critical Vendor Payment Life Cycle**          **Critical Vendor Payment Process**



WEIL:\95271065\1\35076.0003

### Schedule 1
### Financial Considerations Form

Vendor Name:  _____

Vendor Contact Name:  _____

Vendor Contact Phone and E-mail:  _____

Total claim amount outstanding:  _____

503(b)(9) claim amount included above:  _____

2014 annual sales:  _____

2014 annual sales to Chassix entities:  _____

Most recent month-end cash balance:  _____

Most recent month-end credit line availability:  _____

Additional information to be provided in support of the responses above includes the following:
- 2014 audited (preferred) or unaudited financials;
- Most recent borrowing base certificate; and
- 503(b)(9) supporting information including, without limitation, invoices and bills of lading.

6