Marcia L. Goldstein
Ray C. Schrock, P.C.
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------x
                                         :
In re                                    :        Chapter 11
                                         :
CHASSIX HOLDINGS, INC., et al.,          :        Case No. 15-_____ (___)
                                         :
                                         :        (Joint Administration Pending)
                      Debtors.¹          :
                                         :
-------------------------------------------------------x
```

**MOTION OF DEBTORS FOR INTERIM AND FINAL ORDERS**
**AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING**
**PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1)**
**AND 364(e), (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363,**
**(C) GRANT CERTAIN PROTECTIONS TO PREPETITION SECURED PARTIES**
**PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (D) SCHEDULE A FINAL**
<u>**HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)**</u>

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Chassix Holdings, Inc. ("**Chassix Holdings**"), UC Holdings, Inc. ("**UC Holdings**"), Chassix, Inc. ("**Chassix**"), and certain of their affiliates and subsidiaries, as debtors and debtors-in-possession (collectively, including Chassix Holdings, UC Holdings and Chassix, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), respectfully represent:

### Jurisdiction

1.       This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C.  §§ 1408 and 1409.

2.       The statutory basis for the relief requested herein are sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**").

### Preliminary Statement[2]

3.       The Debtors have commenced these Chapter 11 Cases with a prearranged chapter 11 plan of reorganization (the "**Prearranged Plan**") that is supported by their major stakeholders, including an adhoc committee comprised of their secured and unsecured noteholders (approximately 72% of the principal amount of senior secured notes and approximately 80% of the principal amount unsecured notes (the "**Informal Committee of Noteholders**")), their prepetition private equity sponsor, and all of the Debtors' largest

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Interim Order or the applicable DIP Documents.

2

customers.  The Prearranged Plan is the result of a series of interdependent agreements, each critical to the others and necessary for the Debtors' reorganization.  Significantly, the Prearranged Plan will provide the Debtors with an infusion of new capital in the form of postpetition debtor-in-possession financing ("**DIP Financing**") and exit financing, reduce operational overhead expenses, and recapitalize indebtedness *via* the conversion of issued secured and unsecured notes to equity.  The aforementioned benefits of the Prearranged Plan are based on the interdependent agreements that each require the implementation of the other.

4.       The DIP Financing before the Court is a cornerstone of the Prearranged Plan and the numerous arrangements entered into therewith and, is thus vital to the Debtors' emergence from these Chapter 11 Cases as a stronger reorganized enterprise.  Specifically, the two-part $250 million DIP Financing, comprised of an asset-based revolving credit facility and a new money term loan facility (together, the "**DIP Facilities**"), is the financing necessary to facilitate the Debtors' reorganization efforts.

5.       The first DIP Facility is a senior secured non-amortizing asset-based revolving credit facility in the principal amount of $150 million, including sub-facilities for swingline loans in an amount equal to $10 million and letters of credit in an amount equal to $15 million (the "**DIP ABL Facility**"), from PNC Bank, National Association ("**PNC**"), as Agent (in such capacity, the "**DIP ABL Agent**"), for itself or, if it elects to syndicate the loan, for a syndicate of banks, financial institutions and other institutional lenders (collectively, the "**DIP ABL Lenders**").  The DIP ABL Facility, like its predecessor facility of a similar structure, will be the Debtors' primary mechanism to fund its day-to-day operations and is to be secured by, among other things, the Debtors' accounts receivable, cash and inventory.  Entering into the DIP ABL Facility and refinancing the existing $150 million asset backed loan facility (the

WEIL:\95271616\1\35076.0003

"**Prepetition ABL Facility**") on the first day of these Chapter 11 Cases was a prerequisite for the Debtors' major stakeholders to support the Prearranged Plan so that the Debtors have a functional and competitively priced working capital facility. Further, a condition precedent to securing the DIP ABL Facility is the requirement that the Debtors repay the Prepetition ABL Facility in full upon entry of the Interim Order.

6.    The second DIP Facility is backstopped by certain holders of 9 1/4% Senior Secured Notes due 2018 (the "**Senior Secured Notes**" and, holders thereof, the "**Secured Noteholders**") that are members of the Informal Committee of Noteholders. The Debtors have procured a senior secured non-amortizing new money term loan credit facility in the aggregate principal amount of $100,000,000 (the "**DIP Term Loan Facility**"). The final compositions of the lenders for the DIP Term Loan Facility will be determined after all of the holders of the Senior Secured Notes are offered the opportunity to participate.[3] The DIP Term Loan Facility is to be secured by all of the Debtors' property that is not securing the DIP ABL Facility. The Informal Committee of Noteholders has committed to providing the Debtors with the option of converting the DIP Term Loan Facility to an exit term loan facility upon the Debtors' emergence and has also committed to infusing an additional $50,000,000 exit term loan (the "**Exit Term Loan Facility**"). In furtherance of its commitment to the Debtors' operations, the Informal Committee of Noteholders is providing a substantial amount of new money and consenting to prime their existing security interests and liens on the Debtors' assets. Absent the financing provided by the Informal Committee of Noteholders, the Debtors would lack the liquidity to

---

[3] Participation in the DIP Term Loan Facility will be available to all holders of the Prepetition Secured Notes (the "**Secured Noteholders**") on a *pro rata* basis and syndication will take place after the date of the filing of this Motion and before the date of the final hearing to approve this Motion. Those Secured Noteholders that elect to participate in the DIP Term Loan Facility shall be the "**DIP Term Loan Lenders**".

4

maintain key business relationships with vendors, suppliers and customers, provide working capital to operate during the Chapter 11 Cases, and effectively implement the Prearranged Plan.

7.    The DIP Facilities were procured at the conclusion of a robust marketing and negotiation process spearheaded by the Debtors' investment banker, Lazard Frères & Co. LLC ("**Lazard**").[4]   Lazard was cognizant of the difficulties in obtaining DIP Financing given that all or substantially all of the Debtors' assets are encumbered by valid and perfected liens. *See* Cowan Decl. at ¶ 17.   And while the Prepetition ABL Facility is oversecured, as clearly evidenced by the current amount by which the value of the Debtors' Prepetition ABL Priority Collateral exceeds the outstanding borrowing under such facility.   The Debtors lack the necessary collateral value to provide a sufficient equity cushion to adequately protect the interests of holders of Prepetition Secured Notes.   Absent a priming fight, the Debtors would require (i) the consent of the Prepetition Secured Party holding such interest to have its liens primed, or (ii) to locate a third-party lender willing to provide DIP Financing on an unsecured basis or secured by liens junior in priority to the approximately $510 million of prepetition secured debt.   In this context, Lazard contacted over many financial institutions, including BMO Harris Bank N.A. in its capacity as Agent for the Prepetition ABL Facility (the "**Prepetition ABL Agent**"), and the Informal Committee of Noteholders.   *See* Cowan Decl. at ¶ 16.

8.    As discussed more fully in the Cowan Declaration, regarding a Proposed ABL Facility, out of the six initial proposals received, the Debtors' final decision was between two proposals, one of which was submitted by PNC.   When compared side-by-side, the terms of

---

[4] Additional facts and circumstances supporting this Motion and detailing the Debtors' DIP Financing marketing process are set forth in the *Declaration of Tyler Cowan in Support of Debtors' Motion for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363, (ii) Grant Certain Protections to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364 and (iii) Schedule a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c)*, attached hereto as **Exhibit "A"** (the "**Cowan Declaration**").

PNC's proposal were equivalent to or more favorable than those of the other final round potential lender that submitted a proposal. *See* Cowan Decl. at ¶¶ 22 and 23. As to obtaining a new money term loan, the Debtors received two proposals from parties who were not holders of Prepetition Secured Notes. However, both proposals were premised on receiving the Debtors consent of the Prepetition Secured Notes to be primed. The Debtors also received a formal proposal from the Informal Committee of Noteholders. The Debtors ultimately selected the Informal Committee of Noteholders to finance the second DIP Facility because, among other reasons, they proposed satisfactory terms and, insomuch as the DIP Term Loan Lenders will be essentially consenting to prime themselves, the Debtors will avoid the time and considerable expense attendant in a priming fight and the Debtors' Prearranged Plan, including all of the valuable accommodations received from their largest customers, would not be available in the context of a priming fight with the Debtors' largest secured creditors. In an exercise of sound business judgment, the Debtors decided to move forward with the DIP Facilities before the Court. For a number of reasons, including those highlighted below, the Debtors selected the DIP Financing that is in the best interests of the Debtors, their estates and creditors.

9.    First, in contrast to the Prepetition ABL Facility, the DIP ABL Facility provides the Debtors with substantial flexibility to operate their businesses, eliminates permanent cash dominion, a higher advance rate on certain collateral, imposes lower interest rates and fees, and is void of many of the harsh covenants existing under the Prepetition ABL Credit Agreement. The following side-by-side comparison of the Prepetition ABL Facility and the DIP ABL Facility illustrates the Debtors' benefits in refinancing the Prepetition ABL Facility and gaining immediate access to the DIP ABL Facility:

6

| Material Terms | Prepetition ABL Facility | DIP ABL Facility |
|---|---|---|
| Amount | $150 million | $150 million |
| Interest Rate Other Fees | • Base Rate + 3.75%<br>• LIBOR + 4.75%<br>• Letter of Credit Fee:  4.75%<br>• L/C Fronting Fee: 0.375%<br>• Unused Line Fee: 0.375%<br>• Default Rate 2% per annum | • Base Rate + 1.25%<br>• LIBOR + 2.25%<br>• Letter of Credit Fee: 2.25%<br>• L/C Fronting Fee: 0.125%<br>• Unused Line Fee: 0.375%<br>• Default Rate 2% per annum |
| Borrowing Base | **85%** (net amt. of Eligible Accts.) + the lesser of (i) **70%** of the value of Eligible Inventory and (ii) **85%** of the NOLV of Eligible Inventory, (-) minus Available Reserves | **92.5%** (net amt. of Eligible OEM Accounts) + **85%** (net amt. of all other accts.) + the lesser of (i) **70%** of the value of Eligible Inventory and (ii) **85%** of the NOLV of Eligible Inventory, (-) minus Available Reserves |
| Cash Dominion | • Permanently in effect | • Only triggered if either -<br>(i) an Event of Default occurs,<br><br>(ii) average Excess Availability for 5 business days is less than 10% of Commitment, or<br><br>(iii) Excess Availability is less than 5% of Commitment on any day |

It is axiomatic that the DIP ABL Facility is superior in all material ways to the Prepetition ABL Facility.  Further, BMO was provided with the opportunity to fund the DIP ABL Facility and, among other things, their proposal contemplated materially higher interest rates and fees, as well as included requirements for the Debtors to remain in permanent cash dominion and agree to onerous covenants.

10.    Second, PNC's terms were also superior to the other final round potential third-party lender that submitted a proposal to provide DIP ABL Financing.  In pertinent part, the DIP ABL Facility has a lower underwriting fee, lower interest rate, lower cash dominion threshold, less restrictive covenants, and did not require that the Debtors grant it a second lien on the DIP ABL Priority Collateral.  Additionally, PNC has also agreed to work with the Debtors in good faith (subject to Creditors' Committee approval and due diligence) to either (i) provide a fully underwritten exit financing commitment for an asset-based revolving credit facility, or

WEIL:\95271616\1\35076.0003

(ii) amend the DIP ABL Credit Agreement to provide for a conversion of the DIP ABL Facility to an asset-based revolving credit facility at emergence.

11.    <u>Third</u>, the DIP Term Loan Facility pending approval before the Court is the Debtors' best and only available option.  The interest rate applicable to the DIP Term Loans will be 10% and subject to certain fees.  Although the interest rate and fees are higher than those applied to the DIP ABL Facility, the proposed terms of the DIP Term Loan Facility are not outside of the range of other similar DIP Financing facilities.  Most importantly, the DIP Term Loan Facility avoids a priming fight and comes with a valuable DIP-to-exit financing commitment of $150 million.

12.    <u>Fourth</u>, entering into the DIP Facilities is a condition precedent to the Debtors entering into certain long-term accommodation agreements with some of their largest customers and entering into access agreements that provide such customers with limited rights to utilize the Debtors' facilities and equipment under certain circumstances.  Both agreements are valuable to the Debtors' estates insomuch as they will provide millions of dollars in additional liquidity, a waiver of significant fees and expenses, new business, and foster customer loyalty and confidence.

13.    The Debtors are also seeking authority to use their Cash Collateral to, among other things, fund the cash needs related to their operations (including the amounts necessary to administer these Chapter 11 Cases), satisfy their obligations under the DIP Facilities, and provide adequate protection to the Prepetition Secured Parties.  It is beyond peradventure that the Debtors' access to sufficient working capital and liquidity made through the use of Cash Collateral, incurrence of new indebtedness, and other financial accommodations, are vital to the preservation and maintenance of their going concern value.  Further, given the

8

realities of the Debtors' circumstances, including a capital structure that includes little to no available unencumbered assets, the terms of the prudently selected DIP Facilities reflect the most reasonable and viable option for the Debtors.

14.      For the reasons set forth herein, the Debtors believe that authority to obtain DIP Financing as provided under the DIP Facilities and use of the Cash Collateral is in the best interests of the Debtors, their estates and their creditors and should be granted.

<u>**Concise Summary of the Terms of the DIP ABL Facility**</u>[5]

15.      In accordance with Bankruptcy Rules 4001(b) and (d) and Local Rule 4001-2(a), the below charts summarize the significant terms of the Interim Order and the DIP Documents. The Debtors believe that the following provisions of the DIP Documents and the Interim Order are justified and necessary in the context and circumstances of these cases:

| MATERIAL TERMS OF THE DIP ABL FACILITY | |
| --- | --- |
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | All Debtors other than Chassix Holdings and UC Holdings. ***See* DIP ABL Credit Agreement, Preamble; Interim Order Recital (1).** |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | Each Debtor on behalf of the other Debtors. ***See* DIP ABL Credit Agreement, Preamble; Interim Order Recital (2).** |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | A syndicate of banks, financial institutions and other institutional lenders party to the DIP ABL Credit Agreement from time to time. **See DIP ABL Credit Agreement Preamble; Interim Order Recital (1).** |
| **Administrative Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | PNC Bank, National Association. ***See* DIP ABL Credit Agreement Preamble; Interim Order ¶ Recital (1).** |

---

[5] This concise statement is qualified in its entirety by reference to the applicable provisions of the DIP ABL Facility Documents or the Interim DIP Order. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP ABL Facility Documents, the provisions of the DIP ABL Facility Documents shall control. Any terms used but not defined in the chart shall have the meanings ascribed to such terms in the applicable DIP ABL Facility Document or the proposed Interim Order, as applicable. **In accordance with Local Rule 4001-2, sections that must be highlighted for the Court are in bold and marked with an asterisk.**

9

| MATERIAL TERMS OF THE DIP ABL FACILITY | |
|---|---|
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii) | $150 million asset-based revolving credit facility, with sub-facilities for swingline loans ($10 million) and letters of credit ($15 million). *See* **DIP ABL Credit Agreement §2; Interim Order ¶ Recital (1).** |
| **Borrowing Limits**<br>Bankruptcy Rule 4001(c)(1)(B) | Initial draw: $125 million<br>Final draw: $25 million<br>*See* **Interim Order ¶ (11)(b)**. |
| **13-Week Projection and Full Term Budget**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(2) | Use of the Cash Collateral and the proceeds from the DIP ABL Facility are subject to a 13-week projected statement of sources and uses of cash approved by the DIP ABL Agent.<br><br>Full Term Budget: A projected monthly budget delivered to and subject to the approval of the DIP ABL Agent. *See* **DIP ABL Credit Agreement §8.1.9; Interim Order ¶(10).** |
| **Use of DIP ABL Facility Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(6)-(a)(7) | (1) refinance the Prepetition ABL Facility;<br>(2) make adequate protection payments;<br>(3) satisfy general operating capital needs.<br><br>*See* **DIP ABL Credit Agreement §2.1.2; Interim Order ¶ Recital (4).** |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | The Borrowers' may elect, subject to certain conditions, either the (a) Alternative Base Rate or (b) Adjusted LIBOR Rate, in each case plus the Applicable Margin:<br><br>Alternate Base Rate + 1.25%<br>LIBOR + 2.25%<br><br>Default Interest Rate:  Applicable rate plus 2.00% per annum plus the interest rate otherwise applicable thereto. *See* **DIP ABL Credit Agreement §3.1.** |
| **Expenses and Fees[6]\***<br>Local Rule 4001-2(a)(3) | **Agent/Collateral Fee:**  $5,000/month<br>**Unused Line Fee:**  0.375% per annum.<br>**Collateral Protection Expenses:** Borrowers pay all out-of-pocket expenses incurred in protecting any of the Collateral or the sale thereof.<br>**Letter of Credit Fee:** Fronting fee of 0.125% per annum<br>**Bank Charges:**  Borrowers shall pay to the DIP ABL Agent any bank charges arising out of or in connection with (i) the proceeds of Loans and |

---

[6] Other fees are set forth in the confidential fee letters between the Debtors and each of the DIP ABL Agent (the "**DIP ABL Fee Letter**"), the DIP Term Loan Agent (the "**DIP Term Loan Agent Fee Letter**"), and the Informal Committee of Noteholders (the "**DIP Term Loan Fee Letter**" and, together with the DIP ABL Fee Letter and the DIP Term Loan Agent Letter, the "**Fees Letters**"), dated March 12, 2015.  The Debtors have provided or will provide copies of the confidential Fee Letters to the Court, the U.S. Trustee, and to any official committee of unsecured creditors appointed in the Debtors' Chapter 11 Cases.  The Debtors request that the Fee Letters and their contents be kept confidential pursuant to Bankruptcy Rule 9018, and be limited to the parties listed above (including being limited to only the professionals for any appointed committee), in order to protect the sensitive commercial information of the DIP Agents and the DIP Lenders contained therein.

WEIL:\95271616\1\35076.0003

| MATERIAL TERMS OF THE DIP ABL FACILITY | |
|---|---|
| | (ii) the depositing of payment on account of the obligations under the DIP ABL Credit Agreement. *See* **DIP ABL Credit Agreement § 3.** |
| **Scheduled Termination Date** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(10) | The earlier of (i) December 31, 2015, and (ii) the effective date of an Acceptable Reorganization Plan. *See* **DIP ABL Credit Agreement §1.1.** |
| **Prepayments** Local Rule 4001-2(a)(13) | **Mandatory Prepayments:** (a) 30 days after the entry of the Interim Order if the Final Order has not been entered; and (b) whenever the Revolving Outstandings exceed the Maximum Borrowing Amount, Borrowers shall prepay the Loans and/or Cash Collateralize LC Obligations in an aggregate amount equal to such excess. *See* **DIP ABL Credit Agreement §4.3.** <br><br> **Optional Prepayments:** <br> (i) LIBOR Loans – at least two Business Days' <br> (ii) Base Rate Loans, no later than 1:00 p.m. on the date of prepayment that is in multiples of $100,000. *See* **DIP ABL Credit Agreement §(4.3.4.)** |
| **Collateral and Priority** Bankruptcy Rule 4001(c)(1)(B)(ii); Local Rule 4001-2(a)(4) | The DIP ABL Obligations shall be secured by a first-priority, fully perfected lien on the DIP ABL Priority Collateral described in section 6.1 of the DIP ABL Credit Agreement. *See* **DIP ABL Credit Agreement §6.4; Interim Order ¶ (4)(a)(ii).** |
| **Conditions to Closing** Bankruptcy Rule 4001(c)(1)(B);Local Rule 4001-2(a)(2) | • Prepetition ABL Facility paid in full <br> • Execution of the Accommodation Agreement and Access Agreement <br> • Receipt of 13-Week Projection, Borrowing Base Certificates <br> • At least $80,000,000 is funded from the DIP Term Loan Facility upon entry of the Interim Order <br> • Payment of fees and expenses <br> • Entering into a restructuring support agreement with at least 60% principal claim amount of Secured Notes and 66.67% principal claim amount of Unsecured Notes <br> • Acceptable cash management <br> • Continued retention of Debtors' restructuring advisors <br> • Entry of the Interim Order prior to closing or not later than 5 business days following the Commencement Date <br> • No trustee or examiner is appointed in the Chapter 11 Cases <br> • DIP Liens are created and perfected upon entry of the Interim DIP Order. <br> • Minimum Excess Availability of $55 million. <br> ***See* DIP ABL Credit Agreement §10.1.** |
| **Covenants** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(8) | Usual and customary for financings of this type: <br><br> **Affirmative Covenants**. (1) site visits and property inspections, (2) audit of books and records, (3) conduct appraisals, (4) written notifications of material events, (5) maintaining adequate financial records consistent with GAAP, (6) delivery of financial statements, (7) delivery of Borrowing Base Certificates, (8) provision of information regarding collateral, |

11

| MATERIAL TERMS OF THE DIP ABL FACILITY | |
|---|---|
| | (9) maintenance of properties and insurance, (10) payment of any postpetition obligations, and (11) delivery of copies of any Collateral Access Agreements. *See* **DIP ABL Credit Agreement §9.1.**<br><br>**Negative Covenants**. restrictions on mergers/consolidations/structural changes, investments, certain indebtedness, liens, affiliate transactions, prepayments of certain indebtedness, sale and leaseback transactions, and amendment of certain material documents. *See* **DIP ABL Credit Agreement §9.2.**<br><br>**Financial Covenants**. Cumulative Net Cash Flow not less than negative $37 million through May 15, 2015, or negative $32 million thereafter, Minimum Excess Availability set at the cash dominion triggers (10% of commitments for 5 days or 5% of Commitments for 1 day). *See* **DIP ABL Credit Agreement §9.3.** |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(10) | **Events of Default**. Usual and customary for financings of this type, including:<br>• non-payment of principal, interest and fees<br>• defaults under affirmative and negative covenants<br>• breaches of representations and warranties<br>• breach of covenants<br>• Loan Documents or provision thereof ceases to be valid<br>• dismissal or conversion of the Chapter 11 Cases<br>• a money judgment issued against any Borrower in an aggregate amount of $10 million or more<br>• entry of an order vacating the automatic stay to foreclose on property which have a value in excess of $10 million<br>• entry of an order reversing or staying the DIP Orders or more than 10 days<br>• non-permitted prepetition debt payments<br>• seeking authority to sell substantially all of any the Debtors' assets<br>• failure to comply with certain ERISA regulations<br>• invalidation of liens securing the DIP collateral<br>• confirmation of a non-Acceptable Reorganization Plan<br>• modification or extension of the Interim Order without certain consent<br>• order appointing a chapter 11 trustee or examiner<br>• order changing venue<br>• order converting or dismissing the Chapter 11 Cases<br>*See* **DIP ABL Credit Agreement §11.1.** |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi); Local Rule 4001-2(10) | • File an Acceptable Reorganization Plan and accompanying disclosure statement within 5 days from the Commencement Date.<br>• An Acceptable Reorganization Plan and accompanying disclosure statement is approved within 45 days of the Commencement Date.<br>• An Acceptable Reorganization Plan is confirmed by June 30, 2015<br>• An Acceptable Reorganization Plan goes effective by July 17, 2015.<br>*See* **DIP ABL Credit Agreement §11.1.8(a) – (d).** |

| MATERIAL TERMS OF THE DIP ABL FACILITY | |
|---|---|
| **Carve-Out**<br>Local Rule 4001-2(a)(5) | "**Carve Out**" shall mean an amount equal to the sum of: (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses of up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) allowed and unpaid claims for unpaid fees, costs, and expenses (the "**Professional Fees**") incurred by persons or firms retained by the Debtors or the Creditors' Committee, if any, whose retention is approved by the Bankruptcy Court pursuant to section 327 and 1103 of the Bankruptcy Code (collectively, the "**Professional Persons**"), subject to the terms of the Interim Order, the Final Order and any other interim or other compensation order entered by the Bankruptcy Court that are incurred (A) at any time before or on the first business day following delivery by any DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (the "**Pre-Trigger Date Fees**"), subject to (x) a monthly cap of $50,000 (the "**Committee Monthly Cap**") with respect to Professional Fees incurred by Professional Persons retained by a Creditors' Committee, if any and (y) any limits by the Interim Order or the Final Order on Professional Fees permitted to be incurred in connection with any permitted investigations of claims and defenses against any Prepetition Secured Parties pursuant to the Interim Order or the Final Order; and (B) after the first business day (the "**Trigger Date**") after the occurrence and during the continuance of an Event of Default (as defined in the DIP ABL Credit Agreement or the DIP Term Loan Agreement) and delivery of notice (the "**Carve-Out Trigger Notice**") thereof (which may be by email) to the Debtors, the Debtors' counsel, the U.S. Trustee, and lead counsel for a Creditors' Committee, if any, in an aggregate amount not to exceed $2,000,000 (the amount set forth in this clause (iv)(B) being the "**Post-Carve Out Trigger Notice Cap**" and together with the Committee Monthly Cap, the **"Carve-Out Cap"**); provided that, nothing in the Interim Order shall be construed to impair the ability of any party to the DIP Documents to object to the fees, expenses, reimbursement or compensation described in clauses (iii) or (iv) above, on any grounds.<br><br>The DIP ABL Agent may impose a reserve against the Borrowing Base (as defined in the DIP ABL Credit Agreement) in an amount equal to the estimated total amount of all items that comprise the Carve Out for the tenor of the case, including Professional Fees in an amount determined by the DIP ABL Agent in its sole discretion. *See* **Interim Order ¶ 8(b).** |
| **Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(ii)<br>Local Rule 4001-2(a)(ii) | Subject to the Interim Order and 13-Week Projection, used for working capital and general corporate purposes, including, without limitation, in connection with the Debtors' transfer of funds to their non-Debtor foreign subsidiaries. *See* **Interim Order ¶ (6).** |
| **Duration of Use of Cash Collateral**<br>Bankruptcy Rule | The Debtors' right to use the Cash Collateral shall terminate automatically on the earlier of (i) the Scheduled Termination Date, (ii) maturity, and (ii) the occurrence of an Event of Default under the DIP ABL Credit |

WEIL:\95271616\1\35076.0003

| MATERIAL TERMS OF THE DIP ABL FACILITY | |
|---|---|
| 4001(b)(1)(B)(iii) | Agreement. Debtors must receive at least five (5) days' notice before the use of cash collateral ceases   *See* **Interim Order ¶ (6).** |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(iv) and (c)(1)(B)(ii) | Adequate Protection liens equal in amount to any aggregate diminution in the value: <br><br> Until the Prepetition ABL Facility is refinanced – the Prepetition ABL Agent (on behalf of the Prepetition ABL Lenders) shall receive adequate protection liens on all DIP Collateral, junior and subject to (1) all DIP Liens and (2) any adequate protection liens granted to Secured Noteholders for DIP Term Loan Collateral. *See* **Interim Order ¶ (11)(e).** <br><br> The Prepetition Secured Noteholders shall have: <br> (i) 2nd priority lien on the DIP Term Loan Priority Collateral <br> (ii) 4th third-priority lien on the DIP ABL Priority Collateral <br> *See* **Interim Order ¶ (14)(a).** <br><br> All adequate protection liens are junior in all respects to the Carve-Out and any Other Priority Liens. |
| **Liens on Avoidance Actions** Bankruptcy Rule 4001(c)(1)(B)(xi); Local Bankruptcy Rule 4001-2(a)(i)(C) | **The DIP Agents and the DIP Lenders will not receive a lien on causes of action under Chapter 5 of the Bankruptcy Code; however, upon entry of the Final Order the proceeds of Avoidance Actions shall constitute Unencumbered Assets and the DIP Term Loan Agent and DIP ABL Agent, each on behalf of the lenders.  Lenders shall have liens on the Avoidance Proceeds ranking *pari passu*.** <br><br> *See* **Interim Order ¶ (10)(a).** |
| **Determination Regarding Prepetition Claim** Bankruptcy Rule 4001(c)(1)(B)(iii) | The Interim Order contains stipulated findings of fact, including those related to the validity and enforceability of the Prepetition Secured Indebtedness, the liens securing the Prepetition Secured Parties. *See* **Interim Order ¶ (4).** <br><br> There is a 60 day challenge period for a committee appointed under section 1102 of the Bankruptcy Code and other parties-in-interest to investigate and challenge the validity of the Prepetition Secured Interests. *See* **Interim Order ¶ (25).** |
| **Effect of Debtors' Stipulations on Third Parties** Bankruptcy Rule 4001(c)(1)(B)(iii),(viii) | The stipulations and admissions contained in the Interim Order shall be binding upon each Debtor, party to the DIP Documents and party-in-interest.  *See* **Interim Order ¶ (26)**. |
| **Waiver or Modification\* of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | Five (5) days' prior notice to the Debtors, the automatic stay is vacated to permit the exercise of remedies by the DIP ABL Agent and DIP ABL Lenders to the extent set forth in the DIP Orders. *See* **Interim Order ¶ (22)(a).** |

14

| MATERIAL TERMS OF THE DIP ABL FACILITY | |
|---|---|
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | All security interests and liens granted under the DIP ABL Credit Agreement and Interim Order shall be effective and perfected upon entry of the Interim Order.  *See* **Interim Order ¶ (23)**. |
| **Section 506(c) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) | Subject to entry of the Final Order, except to the extent of the Carve Out and absent prior written consent of the DIP ABL Agent providing for otherwise.  *See* **Interim Order ¶ (19)**. |
| **Section 552(b) Waiver** Bankruptcy Rule 4001(c)(1)(B) | The "equities of the case" exception in section 552(b) of the Bankruptcy Code shall not apply to the secured claims of the Prepetition Secured Parties.  *See* **Interim Order ¶ (19)**. |
| **Release, Waivers or Limitation on any Claim or Cause of Action** Bankruptcy Rule 4001(c)(1)(B)(viii) | Subject to the Interim DIP Order, the Debtors grant the DIP ABL Agent and the DIP ABL Lenders a broad release of claims arising prior to the Commencement Date in respect of the postpetition obligations under the DIP Documents, the DIP Liens, the DIP Collateral, and the DIP Facilities. Prepetition ABL Lender and Prepetition ABL Lenders get a release of claims after the expiration of the Challenge period.  *See* **Interim Order ¶ (4)(k)**.  The Debtors exculpate the DIP ABL Agent and the DIP ABL Lenders of any claims in connection with the DIP Obligations, DIP Liens, DIP Collateral or the debtor-creditor relationship between the applicable DIP Agents or the DIP Lenders on one hand and the Debtors on the other hand.  *See* **Interim Order ¶ (25)**. |

| MATERIAL TERMS OF THE DIP TERM LOAN FACILITY | |
|---|---|
| **Borrowers** Bankruptcy Rule 4001(c)(1)(B) | All Debtors other than Chassix Holdings and UC Holdings.  *See* **DIP Term Loan Agreement, Preamble; Interim Order Recital (1)**. |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Each Debtor on behalf of the other Debtors.  *See* **DIP Term Loan, Preamble; Interim Order Recital (2)**. |
| **DIP Lenders** Bankruptcy Rule 4001(c)(1)(B) | A syndicate of Secured Noteholders.  *See* **DIP Term Loan Agreement Preamble; Interim Order Recital (1)**. |
| **Administrative Agent** Bankruptcy Rule 4001(c)(1)(B) | Cantor Fitzgerald Securities.  *See* **DIP Term Loan Agreement, Preamble; Interim Order Recital (1)**. |
| **Commitment** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii) | $100 million new money term loan credit facility.  *See* **DIP Term Loan Agreement, Recitals; Interim Order Recital (1)**. |
| **Borrowing Limits** Bankruptcy Rule 4001(c)(1)(B) | Initial draw: $80 million Delayed Draw: $20 million *See* **Interim Order ¶ 14(b)**. |

15

| MATERIAL TERMS OF THE DIP TERM LOAN FACILITY | |
|---|---|
| **13-Week Projection**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(2) | 13-Week Projection: 13-week statement of receipts and disbursements of the Debtors on a consolidated basis, together with a variance analysis from the previously delivered 13-week Projection, including a statement of the actual amounts of each line item for the preceding two (2) weeks.  **See DIP Term Loan Agreement § 1.1; Interim Order ¶ 10.** |
| **Use of DIP Term Loan Proceeds**<br>Bankruptcy Rule 4001(c)(1)(B); Local Bankruptcy Rule 4001-2(a)(6)-(a)(7) | (a) refinance the Prepetition ABL Facility<br>(b) make adequate protection payments<br>(c) provide general operating capital needs<br>(d) pay fees and expenses<br><br>***See DIP Term Loan Agreement §2.1.2; Interim Order ¶ Recital (5).*** |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | Alternate Base Rate + 8.00%<br>LIBOR + 9.00% (1.00% Floor)<br><br>Default Interest Rate:  Applicable rate plus 2.00% per annum plus the interest rate otherwise applicable thereto.  **See DIP Term Loan Agreement § 3.1.2.** |
| **Expenses and Fees[7]\***<br>Local Rule 4001-2(a)(3) | <u>**Collateral Protection Expenses: Borrowers pay all out-of-pocket expenses incurred in protecting any of the Collateral or the sale thereof.  See DIP Term Loan Agreement §3.7.**</u> |
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(10) | The earlier of:  (i) nine months following the Interim Order Entry Date, (ii) the acceleration of the Term Loans and the termination of the Term Loan Commitments, (iii) 30 days after the entry of the Interim Order if the Final Order has not been entered, or (iv) the substantial consummation of a confirmed Acceptable Reorganization Plan.  **See DIP Term Loan Agreement § 1.1.** |
| **Prepayments**<br>Local Rule 4001-2(a)(13) | **Mandatory Prepayments:** all terms loans repaid in full on the Maturity Date, 100% of any proceeds received due to sale of secured collateral, 100% of the proceeds of any issuance of new indebtedness, and 100% of payment of insurance losses, tax refunds, indemnification payments, etc.  **See DIP Term Loan Agreement §4.3.1.**<br><br>**Optional Prepayments:** 3 business days' prior written notice, in minimum amounts to be agreed upon.  **See DIP Term Loan Agreement §4.3.2.** |
| **Collateral and Priority**<br>Bankruptcy Rule 4001(c)(1)(B)(ii);<br>Local Rule 4001-2(a)(4) | The DIP Term Loan Obligations shall be secured by:<br>1st priority on the DIP Term Loan Priority Collateral<br>2nd priority on the DIP ABL Priority Collateral.<br>***See DIP Term Loan Agreement §6.4 ; Interim Order ¶ 15(b).*** |

---

[7] Other fees are set forth in the confidential fee letter between the Debtors and the DIP ABL Agent, dated March 12, 2015 (the "**DIP Term Loan Fee Letter**").  The Debtors have provided or will provide copies of the confidential DIP Term Loan Fee Letter to the Court, the U.S. Trustee, and to any official committee of unsecured creditors appointed in the Debtors' Chapter 11 Cases. The Debtors request that the DIP Term Loan Fee Letter and its contents be kept confidential pursuant to Bankruptcy Rule 9018, and be limited to the parties listed above (including being limited to only the professionals for any appointed committee), in order to protect the sensitive commercial information of the DIP Term Loan Agent and the DIP Term Loan Lenders contained therein.

| MATERIAL TERMS OF THE DIP TERM LOAN FACILITY | |
|---|---|
| **Conditions to Closing**<br>Bankruptcy Rule 4001(c)(1)(B);Local Rule 4001-2(a)(2) | • Prepetition ABL Facility paid in full<br>• Execution of the Accommodation Agreement and Access Agreement<br>• Receipt of 13-Week Projection, Borrowing Base Certificates<br>• Audited and unaudited financial statements<br>• At least $125 million is funded from the DIP ABL Facility upon entry of the Interim Order<br>• Payment of fees and expenses<br>• Entering into a restructuring support agreement with at least 60% principal claim amount of Secured Notes and 66.67% principal claim amount of Unsecured Notes<br>• Acceptable cash management<br>• Continued retention of Debtors' restructuring advisors<br>• Entry of the Interim Order prior to closing or not later than 5 business days following the Commencement Date<br>• No trustee or examiner is appointed in the Chapter 11 Cases<br>• DIP Liens are created and perfected upon entry of the Interim DIP Order.<br>***See* DIP Term Loan Agreement § 10.** |
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(a)(8) | Usual and customary for financings of this type, including:<br><br>**Affirmative Covenants**. (1) site visits and property inspections, (2) audit of books and records, (3) conduct appraisals, (4) written notifications of material events, (5) maintaining adequate financial records consistent with GAAP, (6) delivery of financial statements, (7) delivery of Borrowing Base Certificates, (8) provision of information regarding collateral, (9) maintenance of properties and insurance, (10) payment of any postpetition obligations, and (11) delivery of copies of any Collateral Access Agreements. ***See* DIP Term Loan Agreement § 9.1.**<br><br>**Negative Covenants**. restrictions on mergers/consolidations/structural changes, investments, certain indebtedness, liens, affiliate transactions, prepayments of certain indebtedness, sale and leaseback transactions, and amendment of certain material documents. ***See* DIP Term Loan Agreement § 9.2.**<br><br>**Financial Covenants**. Compliance with the 13-Week Projection, tested weekly on a cumulative basis from the Commencement Date. ***See* DIP Term Loan Agreement § 9.3.** |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(10) | **Events of Default**. Usual and customary for financings of this type, including:<br>• non-payment of principal, interest and fees<br>• defaults under affirmative and negative covenants<br>• breaches of representations and warranties<br>• breach of covenants<br>• Loan Documents or provision thereof ceases to be valid<br>• dismissal or conversion of the Chapter 11 Cases |

17

| MATERIAL TERMS OF THE DIP TERM LOAN FACILITY | |
|---|---|
| | • a money judgment issued against any Borrower in an aggregate amount of $10 million or more<br>• entry of an order vacating the automatic stay to foreclose on property which have a value in excess of $10 million<br>• entry of an order reversing or staying the DIP Orders or more than 10 days<br>• non-permitted prepetition debt payments<br>• seeking authority to sell substantially all of any the Debtors' assets<br>• failure to comply with certain ERISA regulations<br>• invalidation of liens securing the DIP collateral<br>• confirmation of a non-Acceptable Reorganization Plan<br>• modification or extension of the Interim Order without certain consent<br>• order appointing a chapter 11 trustee or examiner<br>• order changing venue<br>• order converting or dismissing the Chapter 11 Cases<br>• order charging DIP Collateral under section 506(c)<br>*See* **DIP Term Loan Agreement § 11.1.** |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi); Local Rule 4001-2(10) | • File an Acceptable Reorganization Plan and accompanying disclosure statement within 5 days from the Commencement Date.<br>• An Acceptable Reorganization Plan and accompanying disclosure statement is approved within 45 days of the Commencement Date.<br>• An Acceptable Reorganization Plan is confirmed by June 30, 2015.<br>• An Acceptable Reorganization Plan goes effective by July 17, 2015.<br>*See* **DIP Term Loan Agreement §11.1.21.** |
| **Carve-Out**<br>Local Rule 4001-2(a)(5) | "**Carve Out**" shall mean an amount equal to the sum of: (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses of up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) allowed and unpaid claims for unpaid fees, costs, and expenses (the "**Professional Fees**") incurred by persons or firms retained by the Debtors or the Creditors' Committee, if any, whose retention is approved by the Bankruptcy Court pursuant to section 327 and 1103 of the Bankruptcy Code (collectively, the "**Professional Persons**"), subject to the terms of the Interim Order, the Final Order and any other interim or other compensation order entered by the Bankruptcy Court that are incurred (A) at any time before or on the first business day following delivery by any DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve-Out Trigger Notice (the "**Pre-Trigger Date Fees**"), subject to (x) a monthly cap of $50,000 (the "**Committee Monthly Cap**") with respect to Professional Fees incurred by Professional Persons retained by a Creditors' Committee, if any and (y) any limits by the Interim Order or the Final Order on Professional Fees permitted to be incurred in connection with any permitted investigations of |

WEIL:\95271616\1\35076.0003

| MATERIAL TERMS OF THE DIP TERM LOAN FACILITY | |
|---|---|
| | claims and defenses against any Prepetition Secured Parties pursuant to the Interim Order or the Final Order; and (B) after the first business day (the "**Trigger Date**") after the occurrence and during the continuance of an Event of Default (as defined in the DIP ABL Credit Agreement or the DIP Term Loan Agreement) and delivery of notice (the "**Carve-Out Trigger Notice**") thereof (which may be by email) to the Debtors, the Debtors' counsel, the U.S. Trustee, and lead counsel for a Creditors' Committee, if any, in an aggregate amount not to exceed $2,000,000 (the amount set forth in this clause (iv)(B) being the "**Post-Carve Out Trigger Notice Cap**" and together with the Committee Monthly Cap, the **"Carve-Out Cap"**); provided that, nothing in the Interim Order shall be construed to impair the ability of any party to the DIP Documents to object to the fees, expenses, reimbursement or compensation described in clauses (iii) or (iv) above, on any grounds.<br><br>The DIP ABL Agent may impose a reserve against the Borrowing Base (as defined in the DIP ABL Credit Agreement) in an amount equal to the estimated total amount of all items that comprise the Carve Out for the tenor of the case, including Professional Fees in an amount determined by the DIP ABL Agent in its sole discretion.  *See* **Interim Order ¶ 8(b).** |
| **Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(ii)<br>Local Rule 4001-2(a)(ii) | Subject to the Interim Order and 13-Week Projection, used for working capital and general corporate purposes, including, without limitation, in connection with the Debtors' transfer of funds to their non-Debtor foreign subsidiaries.<br><br>The DIP ABL Agent may impose a reserve against the Borrowing Base (as defined in the DIP ABL Credit Agreement) in an amount equal to the estimated total amount of all items that comprise the Carve Out for the tenor of the case, including Professional Fees in an amount determined by the DIP ABL Agent in its sole discretion.<br>*See* **DIP Term Loan Agreement 5; Interim Order ¶ (6).** |
| **Duration of Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The Debtors' right to use the Cash Collateral shall terminate automatically on the earlier of (i) the Scheduled Termination Date, (ii) maturity, and (iii) the occurrence of an Event of Default under the DIP Documents. Debtors must receive at least five (5) days' notice before the use of cash collateral ceases   *See* **Interim Order ¶ (6).** |

WEIL:\95271616\1\35076.0003

| MATERIAL TERMS OF THE DIP TERM LOAN FACILITY | |
|---|---|
| **Liens, Cash Payments or\* Adequate Protection Provided for Use of Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(iv) and (c)(1)(B)(ii) | Adequate Protection liens equal in amount to any aggregate diminution in the value: Until the Prepetition ABL Facility is refinanced – the Prepetition ABL Agent (on behalf of the Prepetition ABL Lenders) shall receive adequate protection liens on all DIP Collateral, junior and subject to (1) all DIP Liens and (2) any adequate protection liens granted to Secured Noteholders for DIP Term Loan Collateral.  *See Interim Order ¶(11).* **In consideration of being primed, the Prepetition Secured Noteholders shall have:** **(i) 2nd priority lien on the DIP Term Loan Priority Collateral** **(ii) 3rd third-priority lien on the DIP ABL Priority Collateral** *See Interim Order ¶15.* All adequate protection liens are junior in all respects to the DIP Liens, the Carve-Out and any Other Priority Liens. |
| **Liens on Avoidance\* Actions** Bankruptcy Rule 4001(c)(1)(B)(xi); Local Bankruptcy Rule 4001-2(a)(i)(C) | **The DIP Term Loan Agent and the DIP Term Loan Lenders will not receive a lien on causes of action under Chapter 5 of the Bankruptcy Code; however, upon entry of the Final Order they will receive a lien on the proceeds of such actions.** *See DIP Term Loan Agreement § 6.4; Interim Order ¶ (15).* |
| **Determination Regarding Prepetition Claim** Bankruptcy Rule 4001(c)(1)(B)(iii) | The Interim Order contains stipulated findings of fact, including those related to the validity and enforceability of the Prepetition Secured Indebtedness, the liens securing the Prepetition Secured Parties.  *See Interim Order ¶(4).*  There is a 60 day challenge period for a committee appointed under section 1102 of the Bankruptcy Code and other parties-in-interest to investigate and challenge the validity of the Prepetition Secured Interests. **Interim Order ¶(25).** |
| **Effect of Debtors' Stipulations on Third Parties** Bankruptcy Rule 4001(c)(1)(B)(iii),(viii) | The stipulations and admissions contained in the Interim Order shall be binding upon each Debtor, party to the DIP Documents and party-in-interest.  *See Interim Order ¶ (26).* |
| **Waiver or Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | **Five (5) days' prior notice to the Debtors, the automatic stay is vacated to permit the exercise of remedies by the DIP Term Loan Agent and DIP Term Loan Lenders to the extent set forth in the DIP Orders.** *See Interim Order ¶(20).* |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | All security interests and liens granted under the DIP Term Loan Credit Agreement and Interim Order shall be effective and perfected upon entry of the Interim Order.  *See Interim Order ¶ (21).* |

20

| MATERIAL TERMS OF THE DIP TERM LOAN FACILITY | |
|---|---|
| **Section 506(c) Waiver\*** <br> Bankruptcy Rule <br> 4001(c)(1)(B)(x) | **Subject to entry of the Final Order, except to the extent of the Carve Out and absent prior written consent of the DIP Term Loan Agent providing for otherwise.** *See* **Interim Order ¶ (17).** |
| **Section 552(b) Waiver\*** <br> Bankruptcy Rule <br> 4001(c)(1)(B) | **The "equities of the case" exception in section 552(b) of the Bankruptcy Code shall not apply to the secured claims held by the Prepetition Secured Parties, DIP Agents and DIP Lenders.** *See* **Interim Order ¶ (17).** |
| **Release, Waivers or Limitation on any Claim or Cause of Action** <br> Bankruptcy Rule <br> 4001(c)(1)(B)(viii) | Subject to the Interim DIP Order, the Debtors grant the DIP Term Loan Agent and the DIP Term Loan Lenders a broad release of claims arising prior to the Commencement Date in respect of the postpetition obligations under the DIP Documents, the DIP Liens, the DIP Collateral, and the DIP Facilities. Prepetition ABL Lender and Prepetition ABL Lenders get a release of claims after the expiration of the Challenge period. *See* **Interim Order ¶ 4(k).** <br><br> The Debtors exculpate the DIP Term Loan Agent and the DIP Term Loan Lenders of any claims in connection with the DIP Obligations, DIP Liens, DIP Collateral or the debtor-creditor relationship between the applicable DIP Agents or the DIP Lenders on one hand and the Debtors on the other hand. *See* **Interim Order ¶ 25.** |

## Background

16.     On the date hereof (the "**Commencement Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors ("**Creditors' Committee**") has been appointed in these chapter 11 cases.

17.     Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

18.     The Debtors commenced their chapter 11 cases on a prearranged basis with the support of their (a) secured and unsecured noteholders, which have committed to make significant and immediate capital infusions into the Debtors' businesses, and (b) major

WEIL:\95271616\1\35076.0003

automotive manufacturing customers, which have committed to long term pricing commitments and other valuable accommodations. Consistent with their obligations under the restructuring support agreement, the Debtors have filed a plan of reorganization and proposed disclosure statement with the Court and are seeking to emerge from chapter 11 on an expedited timeframe.

19.     Information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of J. Mark Allan Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York*, sworn to on the date hereof (the "**Allan Declaration**"), which has been filed with the Court contemporaneously herewith.

## Relief Requested

20.     By this Motion, the Debtors request entry of an interim order, substantially in the form attached hereto as **Exhibit "B"** (the "**Interim Order**"), and final order (the "**Final Order**," and, together with the Interim Order, the "**DIP Orders**") granting, among other things, the following relief:

(i)     authority for the Debtors other than Chassix Holdings and UC Holdings (collectively, the "**Borrowers**") to be borrowers of the DIP ABL Facility and the DIP Term Loan Facility;

(ii)    authority for each Debtor to serve as guarantor under the DIP Facilities;

(iii)   authority for the Borrowers to execute and enter into the DIP ABL Credit Agreement and the DIP Term Loan Agreement (together, the "**DIP Documents**"),[8] and to perform all such other and further acts as may be necessary or appropriate in connection with the DIP Documents;

---

[8] Copies of the DIP ABL Credit Agreement and the DIP Term Loan Agreement are annexed hereto as **Exhibit "C"** and **Exhibit "D"**, respectively.

22

(iv)    authority for the Borrowers to make an initial draw under the DIP ABL Facility in the aggregate amount of up to $125,000,000 and an initial draw under the DIP Term Loan Facility in the aggregate amount of up to $80,000,000;

(v)    authority for the Debtors to use Cash Collateral and all other Prepetition Collateral (as defined below) in accordance with the relative priorities set forth in the Interim DIP Order and intercreditor arrangements (as attached to the Interim Order as **Exhibit "1"**, the "**Intercreditor Arrangements**");

(vi)    authority for the Debtors to provide adequate protection on the terms set forth in the Interim Order and in the DIP Documents to the Prepetition Secured Parties;

(vii)    approval of the Intercreditor Arrangements;

(viii)    modification of the automatic stay set forth in section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Documents and the Interim Order;

(ix)    a waiver of any applicable stay with respect to the effectiveness and enforceability of the Interim Order (including under Bankruptcy Rule 6004);

(x)    grant allowed superpriority claims to the DIP Agents and the DIP Lenders on the terms set forth in the Interim Order;

(xi)    subject to entry of the Final Order, authority to grant liens to the DIP Lenders on the proceeds of any of the Debtors' claims or causes of action under section 5 of the Bankruptcy Code (collectively, the "**Avoidance Action Proceeds**");

(xii)    subject to and effective upon entry of the Final Order, authorizing waiver by the Debtors of any right to seek to surcharge against the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any other law or principle of equity; and

(xiii)    scheduling of a final hearing (the "**Final Hearing**"), pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, to be held no later than 30 days after entry of the Interim Order, to consider entry of the Final Order.

### The Debtors' Prepetition Indebtedness

21.    As of the Commencement Date, the Debtors' domestic outstanding funded debt obligations are in the aggregate amount of approximately $680 million, which amount

23

consists of (i) approximately $135 million in secured borrowings under the Prepetition ABL Credit Agreement, (ii) approximately $375 million in principal amount of Prepetition Secured Notes issued under the Prepetition Secured Indenture, (iii) approximately $158 million in principal amount of 10%/10.75% Senior PIK Toggle Notes due 2018 issued by Chassix Holdings, and (iv) approximately $12 million in capital lease obligations. *See* Allan Decl. ¶ [35]. The Debtors have granted security interests and liens on all or substantially all of their assets to secure their obligations under the Prepetition ABL Credit Agreement and the Prepetition Secured Indenture, amounting to approximately $510 million of their total $680 million prepetition indebtedness (the "**Prepetition Secured Indebtedness**").

A.    **Prepetition ABL Facility**

22.    On July 23, 2013, Chassix, together with its domestic subsidiaries, as co-borrowers and guarantors, and UC Holdings, as parent guarantor (collectively, the "**Prepetition Loan Parties**"), entered into the Prepetition ABL Credit Agreement, providing the Debtors with a $125 million asset-based revolving credit facility.  On June 6, 2014, pursuant to that certain Commitment Increase Joinder, the revolving loan commitments under the Prepetition ABL Facility were increased by $25 million to $150 million.  The Debtors used the proceeds of the Prepetition ABL Facility for working capital purposes.  The borrowing availability under the Prepetition ABL Facility is capped by a borrowing base calculated by taking the sum of certain percentages of value of the Prepetition Loan Parties' inventory and accounts receivables, subject to certain reserves and sub-limits.

23.    The Prepetition Loan Parties secured their obligations under the Prepetition ABL Credit Agreement by granting the Prepetition ABL Agent, for the benefit of the Prepetition ABL Lenders, a first-priority lien, subject to certain exclusions described in Prepetition ABL Credit Agreement, on substantially all existing and future accounts receivable,

24

inventory, cash, deposit accounts, investments in cash and cash equivalents and other permitted investments, letter of credit rights relating to inventory and the accounts receivable of the Prepetition Loan Parties and all proceeds of the foregoing (collectively, the "**Prepetition ABL Priority Collateral**").  The Prepetition ABL Credit Agreement is also secured by, subject to certain exclusions described therein, a second-priority lien on substantially all real estate assets, intellectual property, equipment, capital stock (limited in the case of any foreign subsidiaries, to 65% of the voting stock of such foreign subsidiaries), and certain other collateral of the Prepetition Loan Parties other than the Prepetition ABL Priority Collateral, and all proceeds of the foregoing (collectively, the "**Notes Priority Collateral**" and together with the Prepetition ABL Priority Collateral, the "**Prepetition Collateral**," and such liens and security interests, collectively the "**ABL Security Interests**").

24.    On February 6, 2015, the Debtors successfully negotiated an amendment to the Prepetition ABL Facility (the "**ABL Amendment**") that provided the Debtors with approximately $23 million in additional liquidity by, among other things, eliminating certain borrowing base reserves and the springing fixed charge coverage ratio covenant.  The ABL Amendment also shortened the maturity date on the Prepetition Revolving ABL Facility to March 6, 2015 (which was thereafter extended by amendment to the Commencement Date).

**B.    Prepetition Secured Notes**

25.    On July 23, 2013, pursuant to the Prepetition Secured Indenture, the Prepetition Loan Parties issued $350 million in aggregate principal amount of Secured Notes in a private offering exempt from registration under the Securities Act of 1933.  Almost a year later, on June 17, 2014, an additional $25 million of Secured Notes were issued pursuant to a supplemental indenture.  The proceeds of the Secured Notes were used to repay outstanding

borrowings under the Debtors' existing indebtedness, to pay related fees and expenses, and for general corporate purposes.

26.    The Secured Notes mature on August 1, 2018, and the Debtors are obligated to make semi-annual interest payments at the rate of 9 1/4% per year, in arrears, due on February 1st and August 1st of each year and payable in cash.  The most recent of such payments was due on February 2, 2015 (with a 30-day grace period prior to triggering an event of default under the Prepetition Secured Indenture),[9] in the aggregate amount of $17.3 million.

27.    As security for the Prepetition Loan Parties' obligations under the Prepetition Secured Indenture, the Prepetition Secured Notes were granted a first-priority lien on all the Notes Priority Collateral and a second-priority lien on all the ABL Priority Collateral (collectively, the "**Noteholder Security Interests**").

C.    **Intercreditor Agreement**

28.    The relative priorities of the liens encumbering the Prepetition Loan Parties' assets are set forth in that certain Intercreditor Agreement (the "**Prepetition Intercreditor Agreement**") between BMO, in its capacity as ABL Collateral Agent, and U.S. Bank, National Association in its capacity as Notes Collateral Agent, dated July 23, 2013.  A copy of the Intercreditor Agreement is attached hereto as **Exhibit "E"**.

<u>**The Debtors' Need for DIP Financing**</u>

29.    As more fully set forth in the Allan Declaration, the Debtors' chapter 11 filing is the result of a combination of operational and financial difficulties that began in 2014. *See* Allan Decl. ¶¶ 10, 52.  By October 2014, the Debtors were facing an imminent liquidity

---

[9] On March 4, 2015, the Prepetition Loan Parties entered into a forbearance agreement with the Informal Committee of Noteholders (as hereinafter defined) providing the Debtors with an additional thirty days to make its interest payment due under the Secured Notes and memorializing the Informal Committee of Noteholders' agreement to forbear from exercising remedies against the Debtors with respect to the interest payment.

crisis due to their sizable operating losses, underpriced contracts and programs, and the significant reduction of their trade credit with vendors.  Beginning in November 2014, the Debtors and their advisors took various steps to preserve and extend the Debtors' liquidity runway and to address their operational and financial challenges.  *See* Cowan Decl. ¶ 16.

30.    The Debtors' restructuring efforts were focused on (a) optimizing their manufacturing footprint, (b) realizing purchase savings by leveraging greater combined purchasing power, (c) increasing vertical integration or insourcing by producing certain castings internally that the Debtors had previously purchased from third parties, and (d) addressing their overall financial situation and immediate liquidity needs.  Although significant headway was made from November 2014 through early February 2015, including obtaining over $23 million of incremental liquidity by entering into the ABL Amendment, the Debtors lacked the funds to also satisfy, among other things, their obligation under the Prepetition Secured Indenture to make an interest payment in the amount of $17.3 million.  *Id*. at ¶ 14.  As of February 2015, the Debtors' worsening financial performance and liquidity pressures made it evident that a more permanent restructuring solution was needed and the best way to protect the interests of all stakeholders and preserve the value of their enterprise as a going-concern would be the commencement of a case under the Bankruptcy Code.

31.    Insomuch as the Debtors lack sufficient unencumbered assets to meet their ongoing obligations, the Debtors continued viability and successful reorganization are hinged on obtaining an immediate infusion of liquidity to fund operations during the pendency of these Chapter 11 Cases.

WEIL:\95271616\1\35076.0003

## The Debtors' Marketing Efforts to Secure the DIP Facilities

32.    As described more fully in the Cowan Declaration, prior to the Commencement Date, the Debtors surveyed various sources of DIP Financing to fund the Debtors' operations and the chapter 11 process.    Lazard commenced a competitive DIP Financing process reflective of the practical realities of the Debtors' situation.    In particular, Lazard sought to obtain the best DIP Financing available notwithstanding all or substantially all of the Debtors' assets being encumbered by valid and perfected liens.    *See* Cowan Decl. at ¶ 17. The existence of the ABL Security Interests and the Noteholder Security Interests placed the Debtors in the untenable position of either (i) engaging in a priming fight with the Prepetition Secured Party whose liens are primed, (ii) obtaining the consent of the party holding the secured interests to have their liens primed, or (iii) locating a third-party postpetition lender willing to provide DIP Financing on an unsecured basis or secured by liens junior in priority to the approximately $510 million of secured prepetition debt.    As a result, Lazard's DIP Financing marketing process involved contacting unrelated third-parties, as well as approaching the Prepetition ABL Lenders and the Informal Committee of Noteholders, to discuss the Debtors' financial condition and immediate liquidity issues and to explore potential restructuring scenarios.    In January 2015, the Prepetition ABL Agent and the Informal Committee of Noteholders made it patently clear that they would not consent to a priming of their security interests in the Prepetition Collateral.    *See* Cowan Decl. ¶ 18.

33.    The Prepetition ABL Agent submitted a proposal to continue underwriting the Prepetition ABL Facility under new terms, the majority of which were burdensome and not conducive to implementing the successful reorganization the Debtors needed.    In furtherance of exploring all available options, Lazard contacted eight additional unrelated third-party potential

28

lenders in respect of obtaining a senior secured non-amortizing asset-based revolving credit facility (the "**Proposed ABL Facility**") of a sufficient amount to refinance the Prepetition ABL Facility.[10]  *See* Cowan Decl. ¶ 20.  At the end of a competitive, arms'-length negotiation and marketing process, the Debtors ultimately chose between two proposals for a Proposed ABL Facility, one of which was submitted by PNC.  When compared side-by-side, the terms of the Proposed ABL Facility from PNC were equivalent to or better than those of the other final potential lender that submitted a proposal to provide a Potential ABL Facility (the "**Final Round ABL Lender**").  In an exercise of sound business judgment, the Debtors selected PNC to provide the DIP ABL Facility under the terms described herein and set forth in the DIP ABL Credit Agreement.

34.    Although Lazard initially focused on soliciting the Secured Noteholders to provide a new money term loan credit facility (the "**Proposed Term Loan Facility**"), Lazard also entertained proposals for a Proposed Term Loan Facility from other potential lenders and arrangers.  *See* Cowan Declaration ¶¶ 19 and 25.   The two proposals that Lazard received from non-Secured Noteholders to either provide or act as the arranger for a Proposed Term Loan Facility were premised on the Debtors receiving the consent of the Secured Noteholders to prime their Notes Priority Collateral.  *Id*. at ¶ 25.  From the outset of the marketing process the Informal Committee of Noteholders had made it clear that they would not consent to be primed by any DIP Financing.  *Id*. at ¶ 18.  Fortunately, on or about February 6, 2015, the Informal Committee of Noteholders formally expressed its interest in providing the Proposed Term Loan Facility and informed Lazard that it would not need an arranger.  *Id*. at ¶ 26.  After extensive negotiations and several rounds of revisions, the Debtors accepted the Informal Committee of

---

[10] The Secured Notes Indenture in effect limited the Debtors from entering into any credit agreement that would exceed $150 million.

Noteholders' final proposal submitted on March 11, 2015.  *Id.* at ¶ 27.  In addition to providing terms that are not outside the range of other similar DIP Financing facilities, each DIP Term Loan Lender has agreed, upon the Borrowers' request, to convert all of the loans under the DIP Term Loan Facility on a dollar-for-dollar basis into an Exit Term Loan Facility.  *Id.* at ¶¶ 29 and 30.  The DIP Term Loan Facility pending approval before the Court is the Debtors' best and only available option.

### Implementation of the DIP Facilities

35.     As set forth above and in the Cowan Declaration, the Debtors and the DIP Lenders have engaged in extensive, good faith, arms'-length negotiations with respect to the terms and conditions of the proposed DIP Facilities and the use of Cash Collateral (as such term is defined in section 363 of the Bankruptcy Code).  These negotiations successfully culminated in the agreed upon terms set forth in the respective DIP Documents.  Significantly, the DIP Facilities allow the Debtors to draw $205 million upon entry of the Interim Order and, upon entry of the Final Order, make an additional draw of $45 million.  Further, the DIP ABL Agent committed to use best efforts and negotiate the terms of exit facility financing in good faith (subject to Creditors' Committee approval and due diligence) and the DIP Term Loan Lenders committed to convert all of the loans under the DIP Term Loan Facility on a dollar-for-dollar basis plus an additional aggregate principal amount of $50 million into the Exit Term Loan Facility, upon the Debtors' request.  The DIP Lenders' commitments provide the Debtors with the ability to meet their administrative obligations during this Chapter 11 Case and emerge on a timely basis and as a stronger enterprise.

36.     In furtherance of successfully restructuring and to ensure that the proceeds under the DIP Facilities are used in the manner most likely to maximize its value, the Debtors

30

and the DIP Lenders have agreed upon an initial 13-Week Projection, substantially in the form attached hereto as **Exhibit "F"**. The Debtors believe that the 13-Week Projection is achievable and will allow the Debtors to operate without the accrual of unpaid administrative expenses. Additionally, the relative priorities as among the DIP ABL Facility, the DIP Term Loan Facility and the Prepetition Secured Indenture with respect to the DIP ABL Priority Collateral and the DIP Term Loan Priority Collateral, and any other property of the DIP Loan Parties on which a lien is granted pursuant to the Interim Order, are set forth in the Intercreditor Arrangements.

### Basis for Relief

**A.**    **The Debtors Should be Authorized to Obtain Postpetition Financing through the DIP Documents**

37.    The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances. The Debtors, with the assistance of their advisors, carefully reviewed the DIP Financing options presented to them at the completion of a competitive process. To assist in the decision making process, Lazard made formal presentations to the Debtors' Board of Directors. *See* Cowan ¶¶ 22, 27 and 28. The Debtors carefully contemplated the advantages and disadvantages of the proposed DIP Financing submitted for their consideration and selected the proposals that were in the best interests of the Debtors, their estates and creditors. The DIP Facilities are tailored to the Debtors' circumstances and provide a bridge to the Debtors' emergence. Absent the relief requested herein, the Debtors' ability to continue to operate their businesses and reorganize under Chapter 11 of the Bankruptcy Code will be in jeopardy.

31

WEIL:\95271616\1\35076.0003

38.    For the foregoing reasons and those discussed further below, the Debtors satisfy the necessary conditions under section 364(c) and (d) for authority to enter into the DIP Facilities.

### i.    Entry into the DIP Facilities is an Exercise of the Debtors' Sound Business Judgment

39.    Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit. *See, e.g.*, *In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, inter alia, an exercise of "sound and reasonable business judgment.").

40.    In determining whether the Debtors have exercised sound business judgment in selecting the DIP Facilities and entering into the DIP Documents, the Court should consider the economic terms of the DIP Facilities in light of current market conditions. *See* Hr'g Tr. at 734 35:24, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009) (recognizing "the terms that are now available for DIP Financing in the current economic

32

environment aren't as desirable" as in the past).   Moreover, the Court may appropriately take

into consideration non-economic benefits to the Debtors offered by a proposed postpetition

facility.   For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern

District of New York held that:

> Although all parties, including the Debtors and the Committee, are
> naturally motivated to obtain financing on the best possible terms,
> a business decision to obtain credit from a particular lender is
> almost never based purely on economic terms. Relevant features of
> the financing must be evaluated, including non-economic elements
> such as the timing and certainty of closing, the impact on creditor
> constituencies and the likelihood of a successful reorganization.
> This is particularly true in a bankruptcy setting where cooperation
> and established allegiances with creditor groups can be a vital part
> of building support for a restructuring that ultimately may lead to a
> confirmable reorganization plan. That which helps foster
> consensus may be preferable to a notionally better transaction that
> carries the risk of promoting unwanted conflict.

Case No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009). In light of the

interrelated agreements comprising the Prearranged Plan, the condition precedent of the Debtors'

entering into the DIP Facilities in order to enjoy the benefits of other valuable agreements, and

the need for immediate liquidity, the non-economic benefits of the DIP Facilities is of particular

import to the Debtors' situation.

41.      In pertinent part, the Debtors' determination to secure DIP Financing was

a business decision guided by the Debtors' current financial and operational needs.  The Debtors

and their advisors determined that the Debtors will require additional liquidity to support their

operational and restructuring activities.   To support these anticipated costs, the DIP Lenders have

fully committed to fund the DIP Facilities as an integral part of implementing the Prearranged

Plan.  Bankruptcy courts generally will not second-guess a debtor's business decisions when

those decisions involve "a business judgment made in good faith, upon a reasonable basis, and

33

within the scope of [its] authority under the [Bankruptcy] Code." *Id.* at 513-14 (footnote

omitted). To determine whether the business judgment test is met, "the court 'is required to

examine whether a reasonable business person would make a similar decision under similar

circumstances.'" *In re Dura Auto. Sys. Inc.*, Case No. 06-11202 (KJC), 2007 Bankr. LEXIS

2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (citation omitted).

42.    As discussed in the Cowan Declaration, an extensive marketing effort was

undertaken and the available DIP Financing options were carefully evaluated by the Debtors'

management and experienced professionals. The Debtors selected the proposed DIP Facilities

only after conducting a robust marketing and extensive negotiation process designed to provide

them with the best options available. The DIP Facilities, as proposed by PNC and the Informal

Committee of Noteholders, respectively, are in the best interests of the Debtors because entering

the facilities would not result in a potentially costly priming fight with the Debtors' Prepetition

Secured Parties and the Debtors can continue operating as a going concern. Additionally, PNC's

proposal was superior in all material respects to any Proposed ABL Facility submitted by others

and the Informal Committee of Noteholders ultimately offered terms for the Proposed Term

Loan Facility that are within the ambit of other similar DIP Financing facilities. The Debtors'

decision was fair and reasonable, reflected an exercise of prudent business judgment consistent

with their fiduciary duties, and was appropriate under the circumstances.

**ii.    The DIP Financing Represents the Best Available Financing**

43.    Both PNC and the other final round potential third-party lender had

similar conditions precedent, including a requirement that the Debtors enter into:

> (i) an acceptable agreement on long-term accommodations (*e.g.*, price increases), as well as certain other valuable protections, including waivers of accounts payable setoff (the "**Accommodation Agreement**") with each of Ford Motor Company, General Motors LLC, FCA US LLC f/k/a Chrysler Group LLC, Nissan

34

> North America, Inc., and BMW Manufacturing Co., LLC (collectively, the
> "**OEM Customers**"); and
>
> (ii) acceptable agreements with the OEM Customer that provides it with certain
> limited access rights to utilize the Debtors' facilities and equipment in the event
> there is a substantial likelihood the OEM Customers' production will be
> interrupted (the "**Access Agreements**").

*See* Cowan Declaration ¶ 23.  None of the Potential ABL Lenders were willing to provide the

Proposed ABL Facility without requiring entry into the Accommodation Agreement or Access

Agreements.  *Id.*  Also, the financing proposed by PNC and the Final Round ABL Lender were

for the same amount ($150 million) and contemplated the same borrowing base formulation and

reserves.  *Id.*  The principal economic terms of the PNC proposal, however, were superior in all

material respects, including a lower underwriting fee, lower interest rate, lower cash dominion

threshold, less restrictive covenants, and PNC did not require a second lien on the DIP ABL

Priority Collateral.  *Id.*  Furthermore, in addition to providing the DIP ABL Facility, PNC has

also agreed to work with the Debtors in good faith (subject to conditions) to either (i) provide a

fully underwritten exit financing commitment for an asset-based revolving credit facility at

emergence, or (ii) amend the DIP ABL Credit Agreement to provide for a conversion of the DIP

ABL Facility to an asset-based revolving credit facility at emergence.  *Id.*

> 44.    When the Informal Committee of Noteholders formally expressed interest

in providing a Proposed DIP Term Loan Facility, it confirmed for the Debtors that they would

not receive consent from the Secured Noteholders for a third-party lender to prime their liens on

the Noteholder Priority Collateral.  *See* Cowan Declaration ¶ 25.  Nevertheless, after extensive

good faith arms' length negotiations, the Informal Committee of Noteholders ultimately

submitted terms for consideration that are commercially reasonable and in the best interests of

the Debtors, their estates and creditors.

WEIL:\95271616\1\35076.0003

45.    Accordingly, the Debtors submit that entry into the DIP Financing is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets and is an exercise of the Debtors' sound and reasonable business judgment.

### iii.    The Debtors Should be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis

46.    The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title; [or]
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien;
>
> (3) secured by a junior lien on property of the estate that is subject to a lien[.]

11 U.S.C. § 364(c).

47.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be able and willing to extend the

36

necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

48.    As detailed in the Cowan Declaration, the Debtors attempted to secure financing on terms other than a secured superpriority basis.  From the beginning of Lazard's engagement through the Commencement Date, Lazard contacted over twenty financial institutions in an effort to procure interim financing and, later, DIP Financing.  However, the Debtors were precluded from securing financing on terms other than secured superpriority basis because it would be impossible to prime the Secured Noteholders absent their consent, the Debtors have an over-leveraged balance sheet, and the Debtors lack significant unencumbered assets.  *See* Cowan Declaration ¶ 16.  The Court should, therefore, authorize the Debtors to provide the DIP Agents and the DIP Lenders a superpriority administrative expense status for any obligations arising under their respective DIP Documents as provided for in section 364(c)(1) of the Bankruptcy Code.

**iv.    The Debtors Should be Authorized to Obtain Postpetition Financing Secured by First Priority Priming Liens**

49.    In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lien holders, if the debtor cannot otherwise obtain such credit and the

37

interests of existing lien holders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).

Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:

> (A) the trustee is unable to obtain such credit otherwise; and

> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

50.    Here, the only parties who may have their interests in the Debtors' assets subject to a priming lien are the Secured Noteholders because under the terms of the DIP Documents the DIP Lenders are refinancing the Prepetition ABL Lenders in full.  When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the Debtors' assets. Courts consider a number of factors, including, without limitation:

- Whether the party subject to a priming lien has consented to such treatment;

- whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids or timely proposals are before the court);

- whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

- whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

38

- whether the proposed financing agreement was negotiated in good faith and at arms' length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See*, *e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649 at *10; *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (15th ed. rev. 2008).  The DIP Documents satisfy each of these factors.

51.    First, the Informal Committee of Noteholders holds in excess of two-thirds of principal amount of Secured Notes.  Accordingly, the Secured Noteholders have consented to the priming feature of the DIP Facility.  *See* Prepetition Secured Indenture § 9.2 (requiring the consent of holders of at least $66^{2/3}\%$ in aggregate principal amount of the Secured Notes then outstanding in order to modify the Intercreditor Agreement in a manner adverse to the Secured Noteholders).  The Debtors therefore submit that such treatment is appropriate with respect to such parties.

52.    Second, the Debtors and their advisors explored a variety of possible financing sources, and ultimately determined that the DIP Lenders offered the best option for obtaining the postpetition financing that the Debtors require. The Debtors conducted arms'-length negotiations with the DIP Lenders regarding the terms of the DIP Facilities and those agreements reflect the most favorable terms on which the DIP Lenders were willing to offer financing.  The Debtors have not been able to obtain financing on equal or better terms from the DIP Lenders, or any other source, without granting first priority priming liens.

39

53.    Third, the Debtors need the proceeds of the DIP Facilities to preserve the value of their estates for the benefit of all creditors and other parties-in-interest.  Without access to the DIP Facilities and use of the Cash Collateral, the Debtors will be unable to operate their business or prosecute their Chapter 11 Cases.  Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these Chapter 11 Cases is in the best interest of all stakeholders.

54.    Fourth, upon entry of the Interim Order, the DIP Financing will provide access to $205 million in incremental liquidity, which the Debtors and their advisors have independently determined is sufficient and necessary to allow the Debtors to maintain their operations and meet the various obligations they owed to key constituents notwithstanding the commencement of these Chapter 11 Cases.  Accordingly, the terms of the DIP Facilities are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these Chapter 11 Cases.

55.    Fifth, as described in greater detail above and in the Cowan Declaration, the Debtors and the DIP Lenders negotiated the DIP Documents in good faith and at arms'-length, and the Debtors' entry into the DIP Documents is an exercise of their sound business judgment.  The other Proposed ABL Lenders submitted less favorable proposals that consisted of more restrictive covenants, higher interest rates and higher fees.  Additionally, the Informal Committee of Noteholders refused to consent to a third-party priming the Noteholder Security Interests, thus, absent a costly priming fight, the Informal Committee of Noteholders is the only option for financing a Proposed Term Loan Facility.  The DIP Lenders are truly the Debtors most logical and only choice.

40

v.    **The Interests of the Prepetition Secured Parties Are Adequately Protected**

56.    Parties with an interest in cash collateral or collateral that may be used to secure DIP Financing are entitled to adequate protection.  11 U.S.C. § 363(e).  In addition, a debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. *See* 11 U.S.C. § 364(d)(1)(B).  Adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. Thus, what constitutes adequate protection is decided on a case-by-case basis. *See, e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).  The critical purpose of adequate protection is to guard against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor in possession. *See 495 Cent. Park*, 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the chapter 11 reorganization."); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

WEIL:\95271616\1\35076.0003

57.    The Debtors have proposed to provide for adequate protection for the

Prepetition Secured Parties in the following manner:

- **Superpriority and Administrative Claims**.  Subject to the Carve Out and the claims of the DIP Lenders, the obligations due to the Prepetition Secured Parties in respect of the Adequate Protection Obligations shall constitute superpriority claims against the Debtors as provided in sections 503(b) and 507(b) of the Bankruptcy Code with priority in payment over any and all administrative expenses and all other claims asserted against the Debtors;

- **Adequate Protection Liens**.  Subject to the Carve Out, DIP Liens and Other Priority Liens, the Debtors propose to grant the (i) Prepetition ABL Lenders a third-priority lien on, and security interests in, the DIP ABL Priority Collateral and the DIP Term Loan Collateral, to the extent they have valid claims and solely until the Prepetition ABL Facility is fully refinanced, and (ii) Prepetition Indenture Trustee a fourth-priority lien on, and security interests in, the DIP ABL Priority Collateral and a second-priority lien on, and security interests in, the DIP Term Loan Collateral; and

- **Additional Adequate Protection**.  The Debtors propose to pay customary fees and expenses of the DIP Agents and the DIP Lenders, and comply with the 13-Week Projection (included permitted variances), in form and substance reasonably satisfactory to the DIP Agents.

58.    The interests of the Prepetition ABL Agent and the Prepetition ABL

Lenders are minimally impacted by the DIP Facilities because the Prepetition ABL Debt will be

fully refinanced with proceeds of the initial draw under the DIP Facilities.  Additionally, it is

clear that the Prepetition ABL Lenders are oversecured at this time.  The Prepetition ABL

Facility is a borrowing base loan and, as of the Commencement Date, there was significant

excess availability.  Moreover, in light of the above adequate protection provided to, among

others, the Prepetition ABL Agent and the Prepetition ABL Lenders, the Debtors have

appropriately provided for diminution in the value of the Prepetition ABL Lenders' interests in

the Prepetition Collateral.  Likewise, the Debtors will also provide the Secured Noteholders,

42

whose liens on the Prepetition Collateral are being consensually primed, with adequate protection to account for any potential diminution in value of the Noteholder Security Interests.

59.    The Adequate Protection Liens granted to the Prepetition Secured Parties are both fair and reasonable, and are sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**B.    The Debtors Should be Authorized to Use the Cash Collateral**

60.    For the reasons set forth herein, the Debtors require use of Cash Collateral to provide working capital and continue as a going concern.  It is imperative to the Debtors' reorganization efforts that they have access to cash collections pending closing of the DIP Facilities.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral. Specifically, that provision provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
> (A) each entity that has an interest in such cash collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

61.    The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the Cash Collateral.  Importantly, the Prepetition Secured Parties and the DIP Lenders have consented to the use of the Cash Collateral, subject to the 13-Week Projection and the Carve Out.  Also, as described above, the funded Prepetition ABL Facility Debt is being repaid in full immediately upon entry of the Interim Order and the DIP Facilities are initially funded by the DIP Lenders.  Further, the Debtors are providing the Prepetition

43

Secured Parties with replacement liens on the Prepetition Collateral and Superpriority Claims for

and equal in amount to any aggregate diminution in the value of each Prepetition Secured

Parties' respective security interests and liens in the Prepetition Collateral.   Accordingly, the

Court should grant the Debtors the authority to use their Cash Collateral under section 363(c)(2)

of the Bankruptcy Code.

**C.     The Debtors Should be Authorized to Pay the Fees Required by the Lenders and
Honor Obligations Under the Commitment Letter**

62.     As described above, the Debtors have agreed, subject to Court approval, to

pay certain fees to the DIP Lenders in exchange for their funding the DIP Facilities. The

confidential Fee Letters reflect the Debtors agreement to pay fees that are in line with those

imposed in transactions of this type.   The Debtors considered the fees described above and as set

forth in the Fee Letters when determining in their sound business judgment that the DIP

Facilities were the best available. The Debtors submit that the terms of the DIP Facilities,

including the fees imposed thereunder, constitute the best terms on which the Debtors could

obtain the postpetition financing necessary to continue their operations and prosecute their

Chapter 11 Cases, and paying these fees in order to obtain the DIP Financing is in the best

interests of the Debtors' estates, creditors, and other parties in interest.

**D.     The Debtors' Decision to Refinance the Prepetition ABL Debt Should be Approved**

63.     A condition precedent to securing the DIP Financing under the DIP

Facilities was the Debtors' agreement to fully refinance the DIP ABL Facility Debt.  Pursuant to

the proposed Interim Order, the Debtors are seeking authority to use proceeds of the DIP

Facilities drawn on the first day of these Chapter 11 Cases in order to refinance in full the

indebtedness outstanding under the Prepetition ABL Credit Agreement, including the cash

collateralization of all outstanding letters of credit or letters of credit guaranties thereunder and

44

any interest accrued through the date of discharge, and provide working capital to the Debtors (the "**Refinancing**").

64.    The Refinancing, as a material condition to approval of the DIP Facilities, was carefully considered by the Debtors and their advisors.  First, it is of preeminent importance that the DIP ABL Facility will provide the Debtors with better advance rate, lower interest rates, and less restrictive covenants.  In pertinent part, the alternative base rate due under the DIP ABL Facility is more than three-times less than the rate under the Prepetition ABL Facility.  Also, the Prepetition ABL Credit Agreement includes harsh provisions such as granting the Prepetition ABL Lenders broad authority to sell, assign or transfer the Prepetition ABL Credit Agreement (including the Prepetition ABL Lenders' rights, title, interests, remedies and powers thereunder) and any loans thereunder to any OEM Customer or operating competitor.  Second, the DIP ABL Facility provides the Debtors with a lower cost of capital when compared to the Prepetition ABL Facility.  Third, to protect both the estates and their creditors, the DIP Orders contain a provision that require the Prepetition ABL Agent or any Prepetition ABL Lenders (each in their capacities as such) to disgorge, refund or in any manner repay to the Debtors or their estates any amounts paid to the Prepetition ABL Agent and the Prepetition ABL Lenders if it is determined that the Contingent Prepetition ABL Debt was not valid or that the liens held by such parties on the Prepetition ABL Priority Collateral were not perfected or otherwise valid.  By including a mechanism to disgorge amounts erroneously paid, unsecured creditors of the Debtors are protected through the challenge mechanism set forth in the DIP Order, while at the same time receiving the substantial benefits of the DIP Financing.

65.    The terms of the proposed refinancing are being disclosed pursuant to Local Rule 4001-2(a)(7).  Refinancings are commonly approved in the Bankruptcy Court for the

Southern District of New York. *See, e.g.*, *In re Daffy's, Inc.*, Case No. 12-13312 (MG) (Bankr.

S.D.N.Y. Aug. 2, 2012) [Docket No. 21]; *In re Patriot Coal Corp.*, Case No. 12-12900 (SCC)

(Bankr. S.D.N.Y. July 11, 2012) [Docket No. 39]; *In re Velo Holdings, Inc.*, Case No. 12-11384

(MG) (Bankr. S.D.N.Y. Apr. 3, 2012) [Docket No. 31]; *In re Eastman Kodak Co.*, Case No. 12-

10202 (Bankr. S.D.N.Y. Jan. 20, 2012) [Docket No. 54]; *In re The Great Atl. & Pac. Tea Co.*,

Case No. 10-24549 (Bankr. S.D.N.Y. Jan. 13, 2010) [Docket No. 43]; *In re Blockbuster Inc.*,

Case No. 10-14997 (BRL) (Bankr. S.D.N.Y. Sept. 27, 2010) [Docket No. 95]; *In re Uno Rest.*

*Holdings Corp.*, Case No. 10-10209 (MG) (Bankr. S.D.N.Y. Jan. 20, 2010) [Docket No. 40].

66.    Moreover, approval of refinancing prepetition debt by an outside party at

the first day hearing has been approved in this district and others. *See, e.g., In re The Great*

*Atlantic & Pacific Tea Company, Inc.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 13,

2010) [Docket No. 43]; and *In re Lyondell Chem. Co.*, Case No. 09-10023 (REG) (Bankr.

S.D.N.Y. Jan. 8, 2009) [Docket No. 79].

**E.    The Scope of the Carve Out is Appropriate**

67.    The proposed DIP Facilities subject the DIP Lenders' security interests

and administrative expense claims to the Carve Out.  The Carve Out is similar to other terms

created for professional fees that have been found to be reasonable and necessary to ensure that a

debtor's estate and any statutory committee can retain assistance from counsel. *See Ames*, 115

B.R. at 40.  The Carve Out is capped with respect to the fees and expenses of Professional

Persons retained by the Creditors' Committee at $50,000 per month.  Additionally, the DIP ABL

Agent may impose a reserve against the Borrowing Base (as defined in the DIP ABL Credit

Agreement) in an amount equal to the estimated total amount of all items that comprise the

46

Carve Out, including Professional Fees in an amount determined by the DIP ABL Agent in its

sole discretion.  The Debtors submit that such bifurcation and reserve is fair and reasonable.

68.     Without the Carve Out, the Debtors' estates or other parties-in-interest

may be deprived of possible rights and powers because the services for which Professional

Persons may be paid in these Chapter 11 Cases is restricted. *Id.* at 38 (observing that courts insist

on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection,

the collective rights and expectations of all parties-in-interest are sorely prejudiced").

Additionally, the Carve Out protects against administrative insolvency during the course of the

case by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of

the Debtors and the Creditors' Committee, if appointed, notwithstanding the grant of

superpriority and administrative liens and claims under the DIP Facilities.

**F.      The Lenders Should be Deemed Good Faith Lenders under Section 364(e)**

69.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right

to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under
> this section [364 of the Bankruptcy Code] to obtain credit or incur
> debt, or of a grant under this section of a priority or a lien, does not
> affect the validity of any debt so incurred, or any priority or lien so
> granted, to an entity that extended such credit in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and the incurring of such debt, or the
> granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

70.     As explained in detail herein and in the Allan Declaration and the Cowan

Declaration, the DIP Documents are the result of the Debtors' reasonable and informed

47

determination that the DIP Lenders offered the most favorable terms on which to obtain needed

postpetition financing, and of extended arms' length, good faith negotiations between the

Debtors and the DIP Lenders. The terms and conditions of the DIP Documents are fair and

reasonable, and the proceeds of the DIP Facilities be used only for purposes that are permissible

under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP

Documents other than as described herein.  Accordingly, the Court should find that the DIP

Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code,

and are entitled to all of the protections afforded by that section.

### G.     Modification of the Automatic Stay is Warranted

71.     The relief requested herein contemplates a modification of the automatic

stay (to the extent applicable) to permit the Debtors to: (i) grant the security interests, liens, and

superpriority claims described above with respect to the DIP Lenders and to perform such acts as

may be requested to assure the perfection and priority of such security interests and liens,

(ii) permit the DIP Lenders to exercise, upon the occurrence and during the continuance of an

Event of Default (as defined in the operative DIP Documents), after the expiration of the

applicable grace period, if any, or the occurrence of a Scheduled Termination Date or Maturity

Date, as applicable, (a) certain immediate remedies, as further detailed in the Interim Order, with

respect to the loans issued under the DIP Facilities, and (b) certain other remedies under the DIP

Documentation at any time five (5) business days' after giving notice; and (iii) implement the

terms of the proposed DIP Orders.

72.     Stay modifications of this kind are ordinary and standard features of

postpetition debtor financing facilities and, in the Debtors' business judgment, are appropriate

under the present circumstances.  *See, e.g., In re The Great Atlantic & Pacific Tea Company,*

48

*Inc.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 13, 2010) [Docket No. 43]; *In re The Reader's Digest Assoc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) [Docket No. 26]; *In re Lear Corp.*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. July 7, 2009) [Docket No. 59]; *In re Gen. Growth Props. Inc.*, Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. Apr. 16, 2009) [Docket No. 44]; *In re Tronox Inc.*, Case No. 09-10156 (MEW) (Bankr. S.D.N.Y. Jan. 13, 2009) [Docket No. 46]; *In re Chemtura Corp.*, Case No. 09-11233 (REG) (Bankr. S.D.N.Y. March 20, 2009) [Docket No. 58]; *In re Wellman, Inc.*, Case No. 08-10595 (SMB)  (Bankr. S.D.N.Y. Feb. 27, 2008) [Docket No. 60].

## H.    The Debtors Require Immediate Access to the Cash Collateral and DIP Financing

73.    The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).  In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

74.    The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to borrow up to $205,000,000 under the DIP Financing, is not granted promptly after the Commencement Date. The Debtors have insufficient cash to fund operations without immediate access to the DIP Financing. Further, the Debtors anticipate that the commencement of these Chapter 11 Cases will significantly and immediately increase the demands on their free cash as a result of, among other things, the costs of administering these Chapter 11 Cases and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of

49

these Chapter 11 Cases. Accordingly, the Debtors have an immediate need for access to liquidity

to, among other things, continue the operation of their businesses, maintain their relationships

with customers, meet payroll, pay capital expenditures, procure goods and services from vendors

and suppliers and otherwise satisfy their working capital and operational needs, all of which is

required to preserve and maintain the Debtors' enterprise value for the benefit of all parties in

interest.

75.     The importance of a debtor's ability to secure postpetition financing to

prevent immediate and irreparable harm to its estate has been repeatedly recognized in this

district in similar circumstances. *See, e.g., In re Eastman Kodak Co.*, Case No. 12-10202 (MEW)

(Bankr. S.D.N.Y. Jan. 20, 2012) (order approving postpetition financing on an interim basis)

[Docket No. 54]; *In re The Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (RDD) (Bankr.

S.D.N.Y. Dec. 13, 2010) (same) [Docket No. 43]; *In re The Reader's Digest Assoc.*, Case No.

09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) (same) [Docket No. 26]; *In re Tronox Inc.*,

Case No. 09-10156 (MEW) (Bankr. S.D.N.Y. Jan. 13, 2009) (same) [Docket No. 46]; *In re

Lyondell Chem. Co.*, No. 09-10023 (REG)  (Bankr. S.D.N.Y. Jan. 8, 2009) (same) [Docket No.

79]; *In re Frontier Airlines Holdings, Inc.*, Case No. 08-11298 (RDD) (Bankr. S.D.N.Y. Aug. 5,

2008) (same) [Docket No. 433].  Accordingly, for the reasons set forth above, prompt entry of

the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates

and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

## I.      Request for Final Hearing

76.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors

request that the Court set a date that is no later than 30 days after entry of the Interim Order as a

final hearing for consideration of entry of the Final Order.

50

77.    The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the Notice Parties listed below. The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

### Reservation of Rights

78.    Nothing contained herein is intended to be or shall be construed as (a) an admission as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any appropriate party-in-interest's rights to dispute any claim, or (c) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Interim Order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

### Waiver of Bankruptcy Rule 6004(h)

79.    To implement the foregoing successfully, the Debtors also requests that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  As described above, the relief requested in the Motion is necessary for the Debtors to operate without interruption and to preserve value for its estate.  The DIP Facilities are essential to prevent irreparable damage to the Debtors' operations, value, and ability to reorganize.  Accordingly, the Debtors respectfully requests that the Court waive the fourteen day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies, as the exigent nature of the relief sought herein justifies immediate relief.

51

**Notice**

80.     Notice of this Motion has been provided to (i) the Office of the United

States Trustee for Region 2; (ii) the holders of the five largest secured claims against the Debtors

(on a consolidated basis); (iii) the holders of the forty (40) largest unsecured claims against the

Debtors (on a consolidated basis); (iv) the attorneys for BMO; (v) the attorneys for U.S. Bank

National Association, as trustee under the Prepetition Secured Indenture; (vi) the attorneys for

Delaware Trust Company, as successor trustee under that certain Indenture for 10% / 10 3/4%

Senior PIK Toggle Notes due 2018, dated as of December 13, 2013; (vii) the attorneys for the

Informal Committee of Noteholders; (viii) the attorneys for the DIP ABL Lenders; (ix) the

attorneys for the DIP Term Loan Lenders; (x) the OEM Customers; (xi) the attorneys for

Platinum Equity Advisors, LLC; (xii) the Securities and Exchange Commission; (xiii) the

Internal Revenue Service; and (xiv) the United States Attorney's Office for the Southern District

of New York.

81.     No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: March 12, 2015
       New York, New York

                                        /s/ Ray C. Schrock, P.C.
                                        Marcia L. Goldstein
                                        Ray C. Schrock, P.C.
                                        **WEIL, GOTSHAL & MANGES LLP**
                                        767 Fifth Avenue
                                        New York, New York  10153
                                        Telephone:  (212) 310-8000
                                        Facsimile:  (212) 310-8007

                                        *Proposed Attorneys for Debtors*
                                        *and Debtors in Possession*

WEIL:\95271616\1\35076.0003

**Exhibit A**

**Cowan Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

In re

CHASSIX HOLDINGS, INC., *et al.*,

Debtors.[1]

:
:
:
:
:
:
:
:
:
:

Chapter 11

Case No. 15-_____ (___)

(Joint Administration Pending)

---------------------------------------------------------x

**DECLARATION OF TYLER COWAN IN SUPPORT**
**OF MOTION OF DEBTORS FOR INTERIM AND FINAL**
**ORDERS AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION**
**FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2),**
**364(c)(3), 364(d)(1) AND 364(e), (B) USE CASH COLLATERAL PURSUANT TO 11**
**U.S.C. § 363, (C) GRANT CERTAIN PROTECTIONS TO PREPETITION SECURED**
**PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (D) SCHEDULE A**
**FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)**

Pursuant to 28 U.S.C. § 1746, I, Tyler Cowan, hereby declare as follows:

1.      I am a Director in the Restructuring Group of Lazard Frères & Co. LLC

("**Lazard**"), the U.S. operating subsidiary of a preeminent international financial advisory and

asset management firm founded in 1848.  Lazard operates in forty-three cities across twenty-

seven countries, including my office location at 190 South LaSalle St., Floor 31, Chicago,

Illinois, 60603.

2.      Since joining Lazard in 2003, I have advised companies and creditors on in-court

and out-of-court restructurings, recapitalizations, and reorganizations, as well as companies on

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax
identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC
Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC
(5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague,
LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC
(3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452);
Automotive, LLC (2897); Chassix Co. of Michigan, LLC (2692); AluTech, LLC (0012).  The direct and indirect
international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

capital raises, mergers, acquisitions, and divestitures.  Prior to joining Lazard in 2003, I attended

Northwestern University where I graduated with a Bachelor of Science degree in engineering.

3.      Before Chassix Holdings, Inc. ("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**")

and certain of their direct and indirect subsidiaries, each as debtor and debtor-in-possession

(collectively, including Chassix Holdings and Chassix, the "**Debtors**"), commenced the above

captioned chapter 11 cases (the "**Chapter 11 Cases**") on March 12, 2015 (the "**Commencement**

**Date**"), Lazard was engaged by the Debtors to serve as their investment banker and to provide

general restructuring advice.

4.      I submit this declaration ("**Declaration**") in support of the *Motion of Debtors for*

*Interim and Final Orders Authorizing Debtors to (A) Obtain Postpetition Financing Pursuant to*

*11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) Use Cash*

*Collateral Pursuant to 11 U.S.C. § 363, (C) Grant Certain Protections to Prepetition Secured*

*Parties Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (D) Schedule a Final Hearing*

*Pursuant to Fed. R. Bankr. P. 4001(b) and (c)*, filed contemporaneously herewith (the

"**Motion**").[2]  In particular, I submit this Declaration as evidence supporting my opinions that the

proposed DIP Facilities are (a) the product of an arm's length negotiation process, (b) the best

available debtor-in-possession financing options for the Debtors, and (c) in the best interests of

the Debtors and their estates and creditors.

5.      Except as otherwise indicated herein, all facts set forth in this Declaration are

based upon my personal knowledge of the Debtors' operations and finances, my review of

relevant documents, information provided to me by Lazard employees working under my

supervision, or information provided to me by members of the Debtors' management or their

---

[2] Capitalized terms used herein but not defined shall have the meanings set forth in the Motion.

other advisors.  If called upon to testify, I could and would testify to the facts set forth herein on that basis.

### The Debtors' Prepetition Indebtedness

6.      The Debtors' capital structure is detailed in the Motion and the *Declaration of J. Mark Allan Pursuant to Local Bankruptcy Rule 1007-2* (the "**Allan Declaration**").  The Allan Declaration is incorporated herein by reference.  I understand that all or substantially all of the Debtors' assets are encumbered by liens securing approximately $510 million (the "**Prepetition Secured Indebtedness**") of the Debtors' total $680 million of prepetition indebtedness.[3]

7.      The Prepetition Loan Parties' obligations under the Prepetition ABL Agreement are secured by a first-priority lien on, among other things, accounts receivable, inventory and cash.  The Prepetition ABL Credit Agreement is also secured by, subject to certain limitations, a second-priority lien on all other property that doesn't constitute Prepetition ABL Priority Collateral, including the Debtors' real estate, equipment, intellectual property and capital stock. I understand that availability under the Debtors' $150 million Prepetition ABL Facility is capped by a borrowing base calculated by taking the sum of certain percentages of value of the Prepetition Loan Parties' inventory and accounts receivables, subject to certain reserves and sub-limits.   As of the Commencement Date, the Prepetition ABL Lenders are oversecured.   The Debtors' have significant excess collateral under the Prepetition ABL Facility relative to the amount of borrowings outstanding.  Specifically, the Prepetition ABL Facility is oversecured by approximately $100 million, as a result of the Prepetition Loan Parties having approximately $165 million of gross accounts receivable and inventory of approximately $70 million, as

---

[3] Furthermore, foreign non-debtor entities have approximately $28 million of debt and capital leases.

3

compared to approximately $135 million of borrowings outstanding under the Prepetition ABL Facility.

8.        The Prepetition Secured Notes, on the other hand, are secured by a first-priority lien on all the Notes Priority Collateral and a second-priority lien on all the ABL Priority Collateral (collectively, the "**Notes Security Interests**" and together with the ABL Security Interests, the "**Prepetition Security Interests**").  The relative priorities of the liens securing the Prepetition Security Interests and encumbering the Debtors' assets are set forth in that certain Intercreditor Agreement (the "**Prepetition Intercreditor Agreement**") between BMO Harris Bank N.A. ("**BMO**"), in its capacity as ABL Collateral Agent, and U.S. Bank, National Association in its capacity as Notes Collateral Agent, dated July 23, 2013.

### The Debtors' DIP Facilities

9.        As detailed in the Motion, the Debtors procured two DIP Facilities with total aggregate commitments of $250 million.  First, PNC Bank, National Association ("**PNC**") has committed to providing the Debtors with a senior secured non-amortizing asset-based revolving credit facility in the principal amount of $150 million, including sub-facilities for swingline loans in an amount equal to $10 million and letters of credit in an amount equal to $15 million (the "**DIP ABL Facility**").

10.      Second, a syndicate of holders of approximately 72% of the principal amount of Secured Notes (the "**DIP Term Loan Lenders**" and, together with PNC, the "**DIP Lenders**") have committed to backstop a senior secured non-amortizing new money term loan credit facility in the aggregate principal amount of $100 million (the "**DIP Term Loan Facility**").  Cantor Fitzgerald Securities, in its capacity as Syndication Agent for the DIP Term Loan Lenders, will solicit all of the Secured Noteholders to provide them with an opportunity to participate in the DIP Term Loan Facility on a pro rata basis.  The ultimate composition of the DIP Term Loan

4

Lenders will be based on those Secured Noteholders that elect to serve as lenders under the DIP

Term Loan Facility.   As set forth more fully in the Motion, as consideration for allowing

themselves to be primed by the DIP Lenders, the Secured Noteholders shall be entitled to

adequate protection of their interest in the Prepetition Collateral equal in amount to any

aggregate diminution in the value of their Prepetition Security Interests.

11.    Subject to approval by the Bankruptcy Court, the DIP Facilities will be used by

the Debtors to provide working capital, satisfy operational needs, fund the administrative costs of

these Chapter 11 Cases, and refinance the indebtedness outstanding under the Prepetition ABL

Credit Agreement, including the cash collateralization of all outstanding letters of credit or letters

of credit guaranties thereunder, plus unliquidated amounts including interest thereon and fees,

expenses, charges and other obligations incurred in connection therewith.

<u>**The Debtors' Require Access to the DIP Facilities**</u>

12.    As more fully set forth in the Motion and the Allan Declaration, the Debtors'

chapter 11 filing is the result of a combination of operational and financial difficulties that began

in 2014.   By October 2014, the Debtors were facing an imminent liquidity crisis due to their

sizable operating losses and the contraction of their trade credit with vendors.   The Debtors

retained Lazard, among other advisors, to assist them in exploring all available in-court and out-

of-court restructuring options, including securing the best financing to address their pressing

liquidity needs.   In the ensuing several months, the Debtors' management, with the assistance of

their advisors, took all available actions necessary to preserve and extend the Debtors' liquidity

runway and address their operational and financial challenges.   Specifically, the Debtors

effectuated an amendment of their Prepetition ABL Credit Agreement that became effective on

February 6, 2015.  The Prepetition ABL Amendment provided the Debtors with over $23 million

of incremental liquidity and enabled them to continue to negotiate with their stakeholders

5

regarding a potential prearranged restructuring.  However, the Prepetition ABL Amendment did

not provide enough funds to also satisfy the Debtors' obligation to make an interest payment in

the amount of $17.3 million on February 2, 2015 (with a 30-day grace period prior to triggering

an event of default under the Prepetition Secured Indenture).

13.    The Debtors require access to the DIP Facilities, as well as the use of the Cash

Collateral, in order to, among other things, continue operating their businesses, preserve their

going concern value, maintain business relationships with vendors, suppliers and customers,

satisfy payroll obligations, discharge in full the indebtedness outstanding under the Prepetition

ABL Credit Agreement, make capital expenditures, instill confidence in their creditors,

employees and customers, pay for certain costs and expenses related to the Chapter 11 Cases,

and satisfy other working capital and operational needs.  Without access to the DIP Facilities, the

Debtors will suffer from irreparable harm to the Estates in the form of significant disruption to

their business operations to the material detriment of all parties-in-interest.  Further, without

access to the DIP Facilities, the Debtors will be in breach of their Restructuring Support

Agreement and put at risk their entire prearranged restructuring, including the hundreds of

millions of dollars in customer accommodations the Debtors are receiving in connection with

their plan.  Furthermore, the Debtors' inability to access the DIP Facilities could create the

perception of an "off the tracks" restructuring that could result in substantial instability among

the Debtors' vendors, suppliers, customers and employees, thereby further exacerbating issues

arising from the Debtors' inability to fund their operations.  Without access to the DIP Facilities,

the Debtors will not be able to operate their businesses and I believe will suffer a shut down in

operations and irreparable harm to the business in several respects.

WEIL:\95259364\10\58399.0011

## The DIP Financing Marketing Process

14.    Given the Debtors' tenuous liquidity situation, Lazard launched a process in November 2014 in an effort to procure interim financing for the Debtors that could both (i) provide the liquidity runway necessary to negotiate a prearranged restructuring, and (ii) fund a prearranged chapter 11 bankruptcy.   Lazard initiated its search by contacting over twenty financial institutions, six of which provided term sheet proposals to the Debtors by December 9, 2014.  After over six weeks of discussions with various potential lenders, it became apparent that it was not feasible for the Debtors to raise cost-effective interim financing from third parties not already in the Debtors' capital structure prior to the commencement of a chapter 11 case. Consequently, by early January 2015, the Debtors, with the guidance of their advisors, turned their attention to (i) negotiating with BMO, as the Prepetition ABL Agent, to effectuate the Prepetition ABL Amendment, and (ii) commencing a competitive arm's length process to secure debtor-in-possession financing ("**DIP Financing**").  When the Prepetition ABL Amendment was effectuated on February 6, 2015, the remaining task was to obtain DIP Financing.

15.    From the outset of the DIP Financing marketing process, Lazard was cognizant that, absent the consent of the Secured Noteholders or Bankruptcy Court approval, the Secured Notes Indenture limited the Debtors' ability to enter into a credit agreement with commitments that would exceed the greater of $150 million or the Borrowing Base (as defined in the Secured Notes Indenture) then in effect.  Further, all or substantially all of the Debtors' assets are encumbered by valid and perfected liens.  Absent a priming fight, it is axiomatic that the existence of the Prepetition Security Interests would either require (i) the consent of the parties holding such interests to have their liens primed, or (ii) for the Debtors to locate a third-party postpetition lender willing to provide DIP Financing on an unsecured basis or secured by liens junior in priority to the approximately $510 million of secured prepetition debt.  Accordingly,

7

without the Secured Noteholders consent to be primed, a potential DIP lender would need to value the Debtors' total enterprise in excess of the Prepetition Secured Indebtedness.  Lazard, however, estimates that the Debtors' consolidated total enterprise value range (excluding excess balance sheet cash, if any) is approximately $450 to $550 million,[4] with a midpoint of $500 million, which is below the balance of the Debtor's Prepetition Secured Indebtedness.[5] Moreover, this valuation takes into account and gives the benefit of the DIP Facilities and the valuable customer accommodations that are tied to the Debtors' prearranged plan. For purposes of evaluating the Debtors' enterprise value in the context of a priming fight, where these accommodations would not be present, the Debtors' enterprise valuation would be significantly lower.   Additionally, it is not customary in my experience for lenders to extend credit to a debtor-in-possession on a junior or unsecured basis.   Indeed, I have had conversations with several potential DIP lenders to inquire whether such parties would be willing to extend credit to the Debtors on a junior, unsecured, or superpriority unsecured basis.   Each of these parties confirmed that they would not be willing to extend credit to a bankrupt company on such a basis, especially one without material unencumbered assets like the Debtors.

16.      Furthermore, Lazard's valuation of the Debtors demonstrates that it would be virtually impossible to prime the Secured Noteholders absent their consent.   Specifically, the Debtors lack the necessary collateral value to provide sufficient equity cushion to cover the diminution in value of the Secured Noteholders' Security Interests.   In January 2015, both BMO and an ad hoc group of Secured Noteholders (the "**Noteholder Group**") made it clear to the

---

[4] Lazard calculated the Debtors' consolidated total enterprise value range based on an assumed valuation date of July 31, 2015.

[5] When the Debtors' consolidated total enterprise value range is adjusted for its capital leases, as well as the debt and capital leases of non-debtors (*i.e.* foreign entities), the mid-point is even further below the Debtors' Prepetition Secured Indebtedness.

8

Debtors that they would not consent to be primed by any DIP Financing.  In light of the foregoing, I believe that the Debtors are not reasonably able to obtain DIP Financing on something other than a consensually priming basis.

17.    Against this backdrop, Lazard commenced a DIP Financing Process reflective of the practical realities of the Debtors' situation.  Specifically, Lazard principally focused on obtaining a senior secured non-amortizing asset-based revolving credit facility (the "**Proposed ABL Facility**") of a sufficient amount to refinance the existing Prepetition ABL Facility and not require the consent of Secured Noteholders.  Lazard also focused on soliciting the Secured Noteholders for interest in providing a senior secured non-amortizing new money term loan credit facility (the "**Proposed Term Loan Facility**").[6]

### The DIP ABL Marketing Process

18.    With respect to the Proposed ABL Facility, Lazard contacted nine parties (including the Prepetition ABL Agent) that were not Secured Noteholders (the "**Potential ABL Lenders**"), eight of whom requested further information in order to conduct due diligence and assess their interest.  On January 28, 2015, at the conclusion of a preliminary due diligence review period, Lazard received initial financing proposals from three Potential ABL Lenders. Three subsequent proposals (together with the initial three proposals, the "**Initial Proposals**") were received over the course of the ensuing two weeks, including one from PNC and one from the Prepetition ABL Agent.  One of the Potential ABL Lenders submitted an Initial Proposal that contemplated both a Proposed ABL Facility and a Proposed Term Loan Facility.  Another Initial Proposal contemplated a Proposed Term Loan Facility and a cash flow revolver (instead of a Proposed ABL Facility).  The four other Initial Proposals solely contemplated a Proposed ABL

---

[6] For a period of time until early February 2015, however, Lazard did discuss the Proposed Term Loan Facility with parties other than the Noteholder Group.

WEIL:\95259364\10\58399.0011

Facility.  After reviewing the Initial Proposals, the Debtors eliminated two of the six Potential ABL Lenders from the process (one due to the high proposed interest rate and another because the Initial Proposal did not include a Proposed ABL Facility).

19.    On February 10, 2015, Lazard and the Debtors' attorneys, Weil, Gotshal & Manges LLP, distributed a formal term sheet for a Proposed ABL Facility to four of the Potential ABL Lenders that submitted an Initial Proposal and set a response deadline of February 12, 2015.  Responses were received from all four of the Potential ABL Lenders solicited in the second round.  A careful review of the submitted second round proposals revealed that one of the Potential ABL Lenders was unlikely to be able to fund the Proposed ABL Facility in the first week of March 2015 (the then anticipated timing of a potential chapter 11 filing), while another Potential ABL Lender, in addition to proposing certain less competitive terms, had substantial diligence requirements that were likely difficult to complete by the first week of March 2015. Based on these factors, the Debtors eliminated two of the remaining four Potential ABL Lenders from the process.  Lazard solicited final round proposals for the Proposed ABL Facility from PNC and the final remaining Potential ABL Lender (the "**Final Round ABL Lender**").  The proposals were received on February 20, 2015 and February 21, 2015, respectively.

20.    Upon receipt of the final round proposals, the Debtors held a board meeting on February 23, 2015, at which time both proposals were considered.  Lazard made a formal presentation to the Debtors' Board of Directors that (i) analyzed the details of the competing proposals, (ii) answered questions posed by members of the Board of Directors, and (iii) made various observations and recommendations concerning the strengths and weakness of each proposal.  When compared side-by-side, the terms of the Proposed ABL Facility from PNC were equivalent to or better than those of the Final Round ABL Lender.

10

21.      First, both the Final Round ABL Lender and PNC had similar conditions precedent, including a requirement that the Debtors enter into (i) acceptable agreements with the OEM Customers on long-term accommodations (*e.g.*, price increases), as well as certain other valuable protections, including waivers of accounts payable setoff (the "**Accommodation Agreement**") and (ii) an acceptable agreement with each OEM Customer that provides it with certain limited access rights to utilize the Debtors' facilities and equipment in the event there is a substantial likelihood the OEM Customers' production will be interrupted (the "**Access Agreements**").  It should be noted that none of the Potential ABL Lenders were willing to provide the Proposed ABL Facility without requiring entry into the Accommodation Agreement or Access Agreements.  Second, the financing proposed by PNC and the Final Round ABL Lender were for the same amount ($150 million) and contemplated the same borrowing base formulation and reserves.  Third, the principal economic terms of the PNC proposal were superior in all material respects, including a lower underwriting fee (by 50 basis points) and a lower interest rate (by 75 basis points).  Fourth, unlike the Final Round ABL Lender, the PNC proposal did not require a second lien on the Notes Priority Collateral, which substantially simplifies documentation.  Finally, the PNC proposal had a lower cash dominion threshold, as well as certain less restrictive covenants.  In addition to providing the DIP ABL Facility, PNC has also agreed to work with the Debtors in good faith (subject to credit committee approval and due diligence) in the weeks ahead to either (i) provide a fully underwritten exit financing commitment for an asset-based revolving credit facility, or (ii) amend the DIP ABL Credit Agreement to provide for a conversion of the DIP ABL Facility to an asset-based revolving credit facility at emergence.

11

22.    In my opinion, PNC submitted the best available terms for a Proposed ABL Facility and it is evident that the Debtors selected the Potential ABL Lender that was in their best interests. I believe that the Debtors' decision was fair and reasonable, and appropriate under the circumstances.

## The Debtors' Term Loan Marketing Process

23.    At the beginning of the DIP Financing marketing process in January 2015, the Debtors had not received a commitment from the Noteholder Group to provide financing and there was no indication as to whether, if financing was provided, the Noteholder Group would require the assistance of an agent or arranger. In light of this, Lazard initially entertained proposals for a Proposed Term Loan Facility from potential third-party lenders and arrangers. As noted above, two of the parties that submitted Initial Proposals included an offer to either provide or act as the arranger for a Proposed Term Loan Facility. In both instances, however, the Proposed Term Loan Facilities were premised on the Debtors receiving the consent of the Secured Noteholders to prime their Notes Priority Collateral.

24.    On or about February 6, 2015, during the time period that Initial Proposals were being received and considered by the Debtors, the Noteholder Group formally expressed its interest in providing the Proposed Term Loan Facility and informed Lazard that it would not need an arranger. The formal involvement of the Noteholder Group confirmed for the Debtors that they would not receive consent from the Secured Noteholders for a third-party lender to prime their liens on the Noteholder Priority Collateral. The Debtors received the Noteholder Groups' initial term sheet for the Proposed Term Loan Facility on February 12, 2015. The term sheet was extensively reviewed by the Debtors, with the assistance of Lazard and its other advisors, and comments were provided to the Noteholder Group on February 17, 2015. The Noteholder Group submitted a revised term sheet on February 23, 2015. Notably, the

12

Noteholder Group term sheet for a Proposed Term Loan Facility did not include economic terms
(*e.g.*, interest rate, fees) until February 23, 2015.

25.     At the Debtors' February 23, 2015 board meeting, the Board reviewed and
extensively discussed with its advisors the Noteholder Group's Proposed Term Loan Facility.  In
the days thereafter, the Debtors and the Noteholder Group continued to engage in extensive good
faith negotiations and, on March 3, March 9, March 10 and March 11, 2015, the Noteholder
Group submitted further revised terms for the Debtors' consideration.

26.     Following receipt of the Noteholder Group's final proposal on March 11, 2015,
the Debtors held a board meeting later that day, at which time Lazard made a formal presentation
to the Debtors' Board of Directors that (i) described the terms of the DIP Term Loan Facility,
(ii) articulated why the proposal is the Debtors' best and only available option and (iii) answered
questions posed by members of the Board of Directors.

27.     The DIP Term Loan Facility pending approval before the Court is the Debtors'
best and only available option.  The interest rate applicable to the DIP Term Loans will be
approximately 10.0% (LIBOR plus 900bps, with a 100bps LIBOR floor) and, as set forth in the
Fee Letter, subject to certain upfront fees, including a Backstop Fee of 2.0% and an Upfront Fee
of 3.0%.[7]  While the interest rate and upfront fees associated with the DIP Term Loan Facility
are higher than those provided for under the DIP ABL Facility, the proposed terms are not
outside of the range of other comparable DIP Financing facilities.

28.     Additionally, subject to approval of the Court and payment of a Conversion Fee in
accordance with the Fee Letter, each DIP Term Loan Lender has agreed, upon the Borrowers'

---

[7] The Debtors have also agreed to pay certain fees to the DIP Term Loan Agent, including an Agent Fee ($50,000),
Funding Fee ($50,000), and Syndication Fee ($35,000).

request, to convert all of the loans under the DIP Term Loan Facility on a dollar-for-dollar basis

into an Exit Term Loan Facility at emergence.  Moreover, subject to approval of the Court and

payment of additional fees in accordance with the Fee Letter, the DIP Term Loan Lenders have

agreed to increase the Exit Term Loan Facility at emergence by providing an additional firm

commitment in the principal amount of $50 million.[8]  The firm commitment by the DIP Term

Loan Lenders to provide a total of $150 million of Exit Term Loan Financing is very valuable to

the Debtors' reorganization efforts and was a critical component of securing the support of the

Debtors' stakeholders, including its customers, for the prearranged restructuring.  Importantly,

the Debtors have the ability to raise alternative exit financing if they so choose and use the

proceeds from such exit financing to repay the DIP Term Loan Facility in full and replace the

committed Exit Term Loan Financing at emergence without penalty.  This flexibility provides

the Debtors with the security of knowing a viable option is available while giving them the

opportunity to explore other exit financing alternatives should the market present more attractive

options at a later date.

### The DIP Facilities Are Fair and Reasonable

29.    In my opinion, the DIP Financing proposed by PNC and the Noteholder Group is

in the best interests of the Debtors because, in pertinent part, it would not result in a potentially

costly and uncertain priming fight with the Debtors' Prepetition Secured Parties.  As set forth

more fully in the Motion, the Secured Noteholders are consenting to the priming lien granted to

the DIP Term Loan Lenders and, in consideration thereof, will receive a second-priority lien on

the DIP Term Loan Priority Collateral and, during the period in which there remains outstanding

---

[8] With respect to the $50 million additional exit financing commitment, a Backstop Fee of 2.0% is payable when the Court enters a final order with respect to the Motion.  An additional Upfront Fee of 3.0% is payable upon closing of the Exit Term Loan Facility.

obligations under the Prepetition ABL Facility, a fourth-priority lien (junior to the DIP Liens and

the contingent adequate protection lien granted to the Prepetition ABL Lenders) on the DIP ABL

Priority Collateral.    I believe that the DIP Facilities and the liens granted under the DIP

Documents are fair and reasonable.    Furthermore, PNC's commitment to negotiate in good faith

(subject to credit committee approval and due diligence) the terms of an ABL Exit Facility,

together with the DIP Term Loan Lenders commitment to provide the Exit Term Loan Facility,

significantly improve the Debtors' ability to successfully emerge from chapter 11 on a timely

basis.

30.    Based on my experience and involvement in the marketing and negotiation of the

DIP Financing options available to the Debtors, including engaging in good faith and arm's

length negotiations with all potential lenders, I believe that the DIP Facilities should be

approved.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true and correct to the best of my knowledge, information, and belief.

Dated:  March 12, 2015
        Chicago, Illinois

                                            /s/ Tyler Cowan
                                            Tyler Cowan
                                            Director
                                            Lazard Frères & Co., LLC

15

**Exhibit B**

**Proposed Interim Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                          :
In re                                     :         Chapter 11
                                          :
CHASSIX HOLDINGS, INC., *et al.*,         :         Case No. 15-_____ (___)
                                          :
                                          :         (Joint Administration Pending)
                   Debtors.[1]            :
                                          :
---------------------------------------------------------x

## INTERIM ORDER AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e), (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (C) GRANT CERTAIN PROTECTIONS TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (D) SCHEDULE A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)

Upon the motion (the "**Motion**"), dated March 12, 2015, of Chassix Holdings,

Inc. ("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**") and certain of their direct and indirect

subsidiaries, each as debtor and debtor-in-possession (collectively, including Chassix Holdings

and Chassix, the "**Debtors**"), in the above captioned chapter 11 cases (the "**Chapter 11 Cases**")

pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and

364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the

"**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy

Procedure (as amended, the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Bankruptcy

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

Rules (the "**Local Rules**") for the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), seeking:

(1)        authority for the Debtors other than Chassix Holdings and UC Holdings, Inc. (collectively, the "**Borrowers**") to obtain postpetition financing consisting of (i) a senior secured non-amortizing asset based revolving credit facility in the principal amount of $150,000,000, including sub-facilities for swingline loans in an amount equal to $10,000,000 and letters of credit in an amount equal to $15,000,000 (the "**DIP ABL Facility**"), from PNC Bank, National Association, as Agent (in such capacity, the "**DIP ABL Agent**"), for itself or, if it elects to syndicate the loan, for a syndicate of banks, financial institutions and other institutional lenders (collectively, the "**DIP ABL Lenders**") and (ii) a senior secured non-amortizing new money term loan credit facility in the aggregate principal amount of $100,000,000 (the "**DIP Term Loan Facility**," and together with the DIP ABL Facility, the "**DIP Facilities**") from Cantor Fitzgerald Securities, as Agent (in such capacity, the "**DIP Term Loan Agent**" and together with the DIP ABL Agent, the "**DIP Agents**") for a syndicate of Prepetition Secured Noteholders (as defined below and such group, the "**DIP Term Loan Lenders**" and together with the DIP ABL Lenders, the "**DIP Lenders**");

(2)        authority for Debtor Chassix Holdings together with Debtor UC Holdings, Inc. ("**UC Holdings**") and each direct or indirect subsidiary of UC Holdings that is a guarantor (collectively, the "**DIP Loan Parties**") under (i) that certain Secured Notes Indenture (as amended or modified from time to time, the "**Prepetition Secured Indenture**") between Chassix and U.S. Bank National

2

Association ("**U.S. Bank**"), as trustee (in such capacity, the "**Prepetition Indenture Trustee**"), dated July 23, 2013, and (ii) that certain Amended and Restated Loan, Security and Guaranty Agreement (as amended or modified from time to time, the "**Prepetition ABL Credit Agreement**") among UC Holdings, the Borrowers, BMO Harris Bank N.A. ("**BMO**"), as agent (in such capacity, the "**Prepetition ABL Agent**") and the lenders from time to time party thereto (the "**Prepetition ABL Lenders**"), dated July 23, 2013, to guarantee on a secured basis the Borrowers' obligations in respect of the DIP Facilities;[2]

(3)      authority for the Borrowers to execute and enter into the DIP Documents (as defined below) and to perform all such other and further acts as may be necessary or appropriate in connection with the DIP Documents;

(4)      authority for the Borrowers to immediately use proceeds of the DIP ABL Facility and proceeds of the DIP Term Loan Facility upon entry of this interim order (the "**Interim Order**"), in order to refinance in full the indebtedness outstanding under the Prepetition ABL Credit Agreement, including the cash collateralization of all outstanding letters of credit or letters of credit guaranties thereunder and any interest accrued through the date of discharge, and, upon such discharge, receive the simultaneous release and termination of the Prepetition

---

[2] Chassix Holdings is not initially a guarantor of the DIP ABL Facility.  Within 30 days after the closing of the DIP ABL Facility, Debtors shall cause Chassix Holdings to deliver to the DIP ABL Agent such customer identification information as the DIP ABL Agent shall require in order to comply with CIP regulations, and upon the DIP ABL Agent's satisfactory review of the same, at the DIP ABL Agent's option, shall cause Chassix Holdings to become a guarantor by execution of a joinder to the DIP ABL Credit Agreement.  To the extent that Chassix Holdings, at the option of the DIP ABL Agent, does not become a guarantor under the DIP ABL Credit Agreement, the provisions of the DIP Orders adversely impacting Chassix Holdings or requiring or directing Chassix Holdings to take certain actions or incur certain obligations shall be of no force and effect, and Chassix Holdings will not be considered a DIP Loan Party with respect to the DIP ABL Facility.

3

ABL Lenders' liens, claims and encumbrances in accordance with this Interim Order, and provide working capital to the Debtors;

(5)    authority for the Debtors to (i) use the Cash Collateral (as defined below) pursuant to sections 361, 362 and 363 of the Bankruptcy Code, and all other Prepetition Collateral (as defined below), in each case in accordance with the relative priorities set forth more fully below, but subject in all respects to the Carve Out (as defined below), and (ii) provide adequate protection on the terms set forth in this Interim Order to (a) those purchasers and holders of 9 1/4% Senior Secured Notes due 2018 (the "**Prepetition Secured Notes**") issued by Chassix under the Prepetition Secured Indenture, whose liens and security interests are being primed by the DIP Facilities, and (b) the Prepetition ABL Agent and the Prepetition ABL Lenders in respect of contingent obligations that comprise a portion of the unpaid amounts of the Prepetition ABL Debt (as defined below);

(6)    approval of the intercreditor arrangements (the "**Intercreditor Arrangements**") set forth in **Exhibit "1"** annexed to this Interim Order as among the DIP ABL Facility, the DIP Term Loan Facility and the Prepetition Secured Indenture with respect to the DIP ABL Priority Collateral (as defined below) and the DIP Term Loan Priority Collateral (as defined below), and other property of the Debtors, if any, on which a lien is granted pursuant to the DIP Documents and this Interim Order (collectively, the "**DIP Collateral**");

(7)    the granting of *pari passu* superpriority claims under section 364(c)(1) of the Bankruptcy Code to the DIP Lenders payable from, and having recourse to, all

4

prepetition and postpetition property of the Debtors' chapter 11 estates and all proceeds thereof (including, subject only to and effective upon entry of the Final Order (as defined below), any Avoidance Proceeds (as defined below)), subject to the Carve Out (as defined below) and the terms of this Interim Order;

(8)      subject only to and effective upon entry of the Final Order, the limitation of the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(9)      modification of the automatic stay set forth in section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Documents and this Interim Order;

(10)      a waiver of any applicable stay with respect to the effectiveness and enforceability of this Interim Order (including under Bankruptcy Rule 6004); and

(11)      that the Bankruptcy Court schedule a final hearing (the "**Final Hearing**"), pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, to be held within 30 days of entry of this Interim Order to consider entry of an order granting the relief requested in the Motion on a final basis (the "**Final Order**").

The interim hearing on the Motion having been held on March 12, 2015 (the "**Interim Hearing**"); and based upon all of the pleadings filed with the Bankruptcy Court, the evidence presented at the Interim Hearing and the entire record herein; and there being no objections to the relief sought in the Motion that have not previously been withdrawn, waived, settled, or resolved; and the Bankruptcy Court having noted the appearance of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtors and the Debtors' estates and creditors; and the Debtors having provided notice of the

5

Motion as set forth in the Motion and it appearing that no further or other notice of the Motion

need be given; and after due deliberation and consideration, and sufficient cause appearing

therefor:

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED**, that:

(1)      *Jurisdiction*.  The Bankruptcy Court has core jurisdiction over the Chapter

11 Cases, the parties affected by the Motion, and the Debtors' property pursuant to 28 U.S.C. §§

157(b) and 1334.  Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408

and 1409.

(2)      *Notice*.  Notice of the Motion, the relief requested therein and the Interim

Hearing was served by the Debtors on (i) the Office of the United States Trustee for Region 2

(the "**U.S. Trustee**"); (ii) the holders of the five largest secured claims against the Debtors (on a

consolidated basis); (iii) the holders of the forty (40) largest unsecured claims against the

Debtors (on a consolidated basis); (iv) the attorneys for BMO; (v) the attorneys for U.S. Bank

National Association, as trustee under the Prepetition Secured Indenture; (vi) the attorneys for

Delaware Trust Company, as successor trustee under the Unsecured Notes Indenture (defined

below); (vii) the attorneys for the Informal Committee of  Noteholders; (viii) the attorneys for

the DIP ABL Lenders; (ix) the attorneys for the DIP Term Loan Lenders; (x) the OEM

Customers; (xi) the attorneys for Platinum Equity Advisors, LLC; (xii) the Securities and

Exchange Commission; (xiii) the Internal Revenue Service; and (xiv) the United States

Attorney's Office for the Southern District of New York (collectively, the "**Notice Parties**").

Under the circumstances, the notice given by the Debtors of the interim relief requested in the

Motion and of the Interim Hearing constitutes due and sufficient notice thereof and complies

6

with Bankruptcy Rules 4001(b) and (c) and 9014, and Local Rule 4001-2, and no further notice

of the relief sought at the Interim Hearing is necessary or required.

   (3) *Creditors' Committee Formation*.  No statutory committee of unsecured

creditors has yet been appointed in any of these Chapter 11 Cases (the "**Creditors Committee**").

   (4) *Debtors' Stipulations*.  Without prejudice to the rights of any other party

(but subject to the limitations contained in paragraph 25 below), the Debtors admit, stipulate, and

agree that:

   (a) as of the commencement of the Debtors' Chapter 11 Cases on

March 12, 2015 (the "**Commencement Date**"), the Debtors were indebted and liable to the

Prepetition ABL Lenders  and to the holders of the Prepetition Secured Notes (the "**Prepetition**

**Secured Noteholders**") as follows:

   (i) to the Prepetition ABL Agent and the Prepetition ABL

Lenders, without objection, defense, counterclaim or offset of any kind, in the aggregate

principal amount of approximately $135,000,000, in respect of loans and advances made and the

cash collateralization of all outstanding letters of credit or letters of credit guaranties thereunder,

plus, unliquidated amounts including interest thereon and fees, expenses, charges and other

obligations incurred in connection therewith as provided under the Prepetition ABL Credit

Agreement (the "**Prepetition ABL Debt**");

   (ii) the Borrowers' obligations under the Prepetition ABL

Credit Agreement are guaranteed by UC Holdings and certain of its direct and indirect

subsidiaries (collectively, the "**Prepetition Loan Parties**"), and the Prepetition ABL Credit

Agreement is, subject to certain exclusions described in the Prepetition ABL Credit Agreement,

secured by a first-priority lien on substantially all existing and future accounts receivable,

7

inventory, cash, deposit accounts, investments in cash and cash equivalents, and other permitted

investments, letter of credit rights relating to inventory and the accounts receivable of the

Prepetition Loan Parties and all proceeds of the foregoing (collectively, the "**Prepetition ABL**

**Priority Collateral**").   Subject to certain exclusions described in the Prepetition ABL Credit

Agreement, the Prepetition ABL Credit Agreement is also secured by a second-priority lien on

substantially all real estate assets, intellectual property, equipment, capital stock (limited in the

case of  any foreign subsidiaries, to 65% of the voting stock of the Debtors' first tier foreign

subsidiaries) and certain other collateral of the Prepetition Loan Parties other than the Prepetition

ABL Priority Collateral (collectively, the "**Notes Priority Collateral**" and together with the

Prepetition ABL Priority Collateral, the "**Prepetition Collateral**," and such liens and security

interests, collectively the "**Prepetition ABL Security Interests**").   The Prepetition ABL

Security Interests (i) are valid, binding, perfected, enforceable liens and security interests in the

Prepetition Collateral, (ii) are not subject to avoidance, recharacterization or subordination

pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(iii)     to the Prepetition Secured Noteholders, without objection,

defense, counterclaim or offset of any kind, in the aggregate principal amount of $375,000,000,

plus accrued and unpaid interest thereon, fees, expenses (including, without limitation, any

attorneys', accountants', appraisers', and financial advisors' fees that are chargeable or

reimbursable under the Prepetition Secured Indenture and related documents or pursuant to

existing engagement letters as of the Commencement Date with certain Prepetition Secured

Noteholders in connection with transactions contemplated hereby), charges and other obligations

incurred prior to the Commencement Date in respect of the Prepetition Secured Notes (the

8

"**Prepetition Secured Notes Debt**" and together with the Prepetition ABL Debt, the "**Prepetition Indebtedness**");

(iv)    the Prepetition Secured Notes Debt is guaranteed by the Prepetition Loan Parties and the Prepetition Secured Notes are secured by a first-priority lien on all Notes Priority Collateral and a second-priority lien on all Prepetition ABL Priority Collateral (collectively, the "**Notes Security Interests**" and together with the Prepetition ABL Security Interests, the "**Prepetition Security Interests**").  The Notes Security Interests (i) are valid, binding, perfected, enforceable liens and security interests in the Prepetition Collateral, (ii) are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iii) are subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve Out (as defined below) to which the DIP Liens are subject, and (C) valid, perfected and unavoidable liens permitted under the Prepetition Financing Documents (as defined below) to the extent such permitted liens are senior to or pari passu with the liens of the Prepetition Indenture Trustee and the Prepetition Secured Noteholders on the Prepetition Collateral;

(b)    the Prepetition Indebtedness constitutes the legal, valid, binding, non-avoidable and enforceable obligations of the Debtors, other than Chassix Holdings, and the Prepetition Security Interests are valid, binding, properly perfected, non-avoidable, and enforceable liens on and security interests in the Prepetition Collateral, subject to the terms set forth in that certain Intercreditor Agreement (the "**Prepetition Intercreditor Agreement**") between BMO, in its capacity as ABL Collateral Agent, and U.S. Bank, in its capacity as Notes Collateral Agent, dated July 23, 2013;

9

(c)       The Debtors' obligations under the Indenture (as amended or modified from time to time, the "**Unsecured Notes Indenture**") with Delaware Trust Company, as successor trustee, pursuant to which Chassix Holdings issued $150 million in aggregate principal amount of 10%/10.75% of Senior PIK Toggle Notes due 2018 (collectively with all other expenses, charges and other obligations incurred in connection therewith as provided under the Unsecured Notes Indenture, the "**Unsecured Notes Indebtedness**") constitutes the legal, valid, binding, and enforceable obligations of the Debtors and the other DIP Loan Parties.

(d)       the Prepetition Indebtedness and the Prepetition Security Interests are not and shall not be subject to any attachment, contest, attack, rejection, recoupment, reduction, defense, counterclaim, setoff, offset, recharacterization, avoidance or other claim (as "claim" is defined by section 101(5) of the Bankruptcy Code), impairment, disallowance, counterclaim, subordination (whether equitable, contractual, or otherwise, except for any lien subordination contemplated herein), cause of action or any other challenge of any nature under the Bankruptcy Code (including, without limitation, under chapter 5 of the Bankruptcy Code), under applicable nonbankruptcy law or otherwise (including, without limitation, any applicable state Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act);

(e)       in accordance with the terms and conditions set forth in this Interim Order and the DIP Documents, a portion of the Debtors' initial draw under the DIP Facilities will be immediately used to discharge in full the non-contingent indebtedness outstanding under the Prepetition ABL Credit Agreement, including the cash collateralization of all outstanding letters of credit or letter of credit guarantees thereunder and any interest accrued through the date of discharge; and, subject to the terms and conditions herein (including, without limitation, the priming liens granted hereunder, the Carve Out, and expiration of the Challenge

10

Period (as defined below)), adequate protection replacement liens at any time granted to the

Prepetition ABL Agent and the Prepetition ABL Lenders by the Bankruptcy Court shall, unless

otherwise ordered by the Bankruptcy Court), (i) continue to secure the unpaid portion of any

Prepetition ABL Debt (including, without limitation, any Prepetition ABL Debt subsequently

reinstated after the repayment thereof because such payment (or any portion thereof) is required

to be returned or repaid to the Debtors or the DIP Lenders and the liens securing the Prepetition

ABL Debt shall have not been avoided), and (ii) be (A) junior and subordinate in all respects to

the DIP Lenders' liens on and security interests in the DIP Collateral (as defined below and

including, without limitation, the DIP Liens granted under this Interim Order and the DIP

Documents), (B) senior in priority to the Adequate Protection Liens (as defined below) on the

DIP ABL Priority Collateral granted to the Prepetition Indenture Trustee under this Interim

Order and (C) junior in priority to the Adequate Protection Liens (as defined below) on the DIP

Term Loan Priority Collateral  granted under this Interim Order to the Prepetition Indenture

Trustee (collectively, such liens and security interests of the Prepetition Secured Parties are

hereinafter referred to as the "**Contingent Adequate Protection Liens**")), and any such

reinstated Prepetition ABL Debt described in clause (i) of this subparagraph is hereinafter

referred to as the "**Contingent Prepetition ABL Debt**");

        (f)      In the event that the Prepetition ABL Agent or any Prepetition

ABL Lenders (each in their capacities as such) are ordered by the Bankruptcy Court to disgorge,

refund or in any manner repay to the Debtors or their estates any amounts (the **"Disgorged**

**Amounts**") leading to Contingent Prepetition ABL Debt, the Disgorged Amounts, unless

otherwise ordered by the Bankruptcy Court, shall be placed in a segregated interest bearing

account in which the Prepetition ABL Agent (on behalf of the Prepetition ABL Lenders) shall

11

have the first lien upon, pending a further final, non-appealable order of a court of competent jurisdiction regarding the distribution of such Disgorged Amounts (either returning the Disgorged Amounts to the Prepetition ABL Agent and the Prepetition ABL Lenders, distributing such amounts to the Debtors or otherwise); provided that, to the extent the Disgorged Amounts are returned to the Prepetition ABL Agent or any Prepetition ABL Lender, they shall receive such amounts plus any interest accrued at the non-default rate set forth in the Prepetition ABL Credit Agreement;

(g)    none of the Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition Indenture Trustee, the Prepetition Secured Noteholders (collectively, the "**Prepetition Secured Parties**"), the DIP Agents or the DIP Lenders are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition ABL Credit Agreement, the Prepetition Secured Indenture, the Prepetition Intercreditor Agreement (collectively with all security, pledge and guaranty agreements and all other documentation executed in connection with any of the foregoing, each as amended, supplemented, or otherwise modified, the "**Prepetition Financing Documents**"), or the DIP Documents;

(h)    the Debtors do not have any claims, challenges, counterclaims, causes of action, defenses, recoupment, disgorgement, or setoff rights related to the Prepetition Indebtedness or the Prepetition Financing Documents, whether arising under the Bankruptcy Code or applicable nonbankruptcy law, on or prior to the date hereof, against the Prepetition Secured Parties, and the Debtors waive, for themselves and their non-Debtor subsidiaries and affiliates, any right to challenge or contest in any way the perfection, validity, and enforceability

12

of the Prepetition Security Interests or the validity or enforceability of the Prepetition
Indebtedness and the Prepetition Financing Documents;

(i)     the liens granted to the DIP Agents on behalf of the DIP Lenders
shall be valid, enforceable and non-avoidable liens against the Debtors and the DIP Loan Parties;
and

(j)     subject to the reservation of rights set forth in paragraph 25 below,
including the expiration of the Challenge Period, the Debtors and the DIP Loan Parties hereby
absolutely and unconditionally forever waive, discharge and release each of the Prepetition ABL
Agent, the Prepetition Indenture Trustee and the Prepetition Secured Parties and each of their
respective present and former predecessors, successors, assigns, affiliates, members, partners,
managers, current and former equity holders, agents, attorneys, financial advisors, consultants,
officers, directors, employees and other representatives thereof (all of the foregoing, solely in
their respective capacities as such, collectively, the "**Prepetition Secured Party Releasees**") of
any and all "claims" (as defined in the Bankruptcy Code), counterclaims, actions, causes of
action (including, without limitation, causes of action in the nature of "lender liability"),
defenses, demands, debts, accounts, contracts, liabilities, setoff, recoupment or other offset rights
against any and all of the Prepetition Secured Party Releasees, whether arising at law or in
equity, relating to and/or otherwise in connection with the applicable Prepetition Indebtedness,
the Prepetition Security Interests, Prepetition Collateral or the debtor-creditor relationship among
any of the applicable Prepetition ABL Agent, Prepetition Indenture Trustee or the Prepetition
Secured Parties, on the one hand, and the Debtors, on the other hand, from the beginning of time
until immediately preceding the entry of this Interim Order, including, without limitation, (i) any
recharacterization, subordination, avoidance or other claim arising under or pursuant to section

13

105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law or municipal law and (ii) any right or basis to challenge or object to the amount, validity or enforceability of the applicable Prepetition Indebtedness or any payments made on account of the applicable Prepetition Indebtedness, or the validity, enforceability, priority or non-avoidability of the applicable Prepetition Security Interests securing the applicable Prepetition Indebtedness.

(k)     Effective upon entry of this Interim Order, the Debtors hereby absolutely and unconditionally forever waive, discharge and release each of the DIP Agents and the DIP Lenders and each of their respective present and former predecessors, successors, assigns, affiliates, members, partners, managers, current and former equity holders, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives thereof (all of the foregoing, solely in their respective capacities as such, collectively, the "**DIP Party Releasees**") of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, actions, causes of action (including, without limitation, causes of action in the nature of "lender liability"), defenses, demands, debts, accounts, contracts, liabilities, setoff, recoupment or other offset rights against any and all of the DIP Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the applicable DIP Obligations, DIP Liens, DIP Collateral or the debtor-creditor relationship among any of the applicable DIP ABL Agent, DIP Term Loan Agent, DIP ABL Lenders or the DIP Term Loan Lenders, on the one hand, and any of the Debtors, on the other hand, from the beginning of time until immediately preceding the entry of this Interim Order, including, without limitation, (i) any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law or

14

municipal law and (ii) any right or basis to challenge or object to the amount, validity or enforceability of the applicable DIP Obligations or any payments made on account of the applicable DIP Obligations, or the validity, enforceability, priority or non-avoidability of the applicable DIP Liens securing the applicable DIP Obligations; <u>provided</u> that, nothing herein shall relieve the DIP Party Releasees from fulfilling their obligations or commitments with the DIP Facilities or operate as a release related thereto.

        (l)      In no event shall the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable.

        (5)      *Cash Collateral*.  For purposes of this Interim Order, the term "**Cash Collateral**," including, without limitation, all cash proceeds of Prepetition Collateral, shall have the meaning ascribed in section 363(a) of the Bankruptcy Code.

        (6)      *Use of Cash Collateral*.  The Debtors are hereby authorized, subject to the terms and conditions of the DIP Documents, this Interim Order,  and in accordance with the Budget and the 13-Week Projection (each defined below), to use the Cash Collateral, during the period from the Commencement Date through termination of the DIP Obligations pursuant to the DIP Documents, solely for working capital and general corporate purposes, including, without limitation, in connection with the Debtors' transfer of funds to their non-Debtor foreign subsidiaries if authorized under the Budget and the 13-Week Projection; <u>provided</u> that, and, upon the request of the Debtors, the Prepetition Secured Parties are directed to promptly turn over to the Debtors any and all Cash Collateral they may have received or may hold.  The Debtors' right to use the Cash Collateral shall terminate automatically, provided that, notwithstanding anything to the contrary herein or in the DIP ABL Credit Agreement, the DIP ABL Agent shall be

15

required to comply with the notice requirement in subsection (c) of this paragraph (6), on the earlier of:

(a)       the Scheduled Termination Date, as defined in the DIP ABL Credit Agreement (as defined below);

(b)       the Maturity Date, as defined in the DIP Term Loan Agreement (as defined below); and

(c)       the occurrence of an Event of Default under any DIP Documents; pursuant to which, either the DIP ABL Agent in respect of an Event of Default under the DIP ABL Credit Agreement or the DIP Term Loan Agent in respect of an Event of Default under the DIP Term Loan Agreement (as defined below), provides the Debtors, with a copy to the Debtors' counsel, five (5) days' prior written notice (which shall run concurrently with any notice provided under the applicable DIP Documents);

(7)       *Findings Regarding the DIP Facilities and Use of Cash Collateral*.

(a)       *Good Cause*.  Good cause has been shown for entry of this Interim Order.

(b)       The Debtors have an immediate need to obtain the financing provided under the DIP Facilities and use the Cash Collateral, in order to, among other things, permit the orderly continuation of their businesses, preserve the going concern value of the Debtors, maintain business relationships with vendors, suppliers and customers, to satisfy payroll obligations, to discharge in full the Prepetition ABL Debt, to make capital expenditures, to pay for certain costs and expenses related to the Debtors' Chapter 11 Cases, and to satisfy other working capital and operational needs of the Debtors.  The access of the Debtors to sufficient working capital and liquidity made available through the use of Cash Collateral, incurrence of

16

new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern value of the Debtors' estates and to a successful reorganization of the Debtors.

(c)    The Debtors are unable to obtain financing, under existing circumstances, on more favorable terms from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.   The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors (i) granting the DIP Lenders, subject to the Carve Out as provided for herein, the DIP Liens (as defined below) and the Superpriority Claims (as defined below), in each case on the terms and conditions set forth in this Interim Order and the DIP Documents, and (ii) discharging the Prepetition ABL Debt in full upon entry of this Interim Order, such discharge being a requirement by the DIP ABL Agent for the DIP ABL Facility (and absent discharging the Prepetition ABL Debt in full upon entry of the Interim Order, would be unable to obtain the consent of the Prepetition ABL Lenders to the provisions of this Interim Order).

(d)    The terms of the DIP Facilities and the use of the Cash Collateral pursuant to this Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are appropriate under the circumstances, and constitute reasonably equivalent value and fair consideration.

(e)    The DIP Facilities have been negotiated in good faith and at arm's length among the Debtors, the DIP ABL Agent, the DIP Term Loan Agent, and the DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection

17

with the DIP Facilities and the DIP Documents, including, without limitation, (i) all loans made

to, and all letters of credit issued for the account of the Debtors pursuant to that certain

Superpriority Secured Debtor-In-Possession ABL Loan, Security and Guaranty Agreement,

dated as of March 12, 2015 (as amended, supplemented, refinanced or otherwise modified from

time to time not in violation of this Interim Order) among the Debtors, the lenders from time to

time party thereto, the DIP ABL Agent and the other parties from time to time party thereto,

substantially in the form attached as **Exhibit "C"** to the Motion (the "**DIP ABL Credit**

**Agreement**"), (ii) all loans made to the Debtors pursuant to the Superpriority Secured Debtor-In-

Possession Term Loan, Security and Guaranty Agreement, dated as of March 12, 2015 (as

amended, supplemented, refinanced or otherwise modified from time to time not in violation of

this Interim Order) among the Debtors, the lenders from time to time party thereto, the DIP Term

Agent and the other parties from time to time party thereto, substantially in the form attached as

**Exhibit "D"** to the Motion (the "**DIP Term Loan Agreement**" and, together with the DIP ABL

Credit Agreement, including, in each case, any exhibits attached thereto and including, without

limitation, all security agreements, all related or ancillary documents and agreements, and any

mortgages contemplated thereby, the "**DIP Documents**"),   and (iii) any obligations and

indebtedness of the Debtors arising under or in connection with the DIP Documents and this

Interim Order now and hereafter owing to the DIP Agents or any DIP Lender (all of the

foregoing in clauses (i), (ii) and (iii) collectively, the "**DIP Obligations**"), shall be deemed to

have been extended by the DIP ABL Agent and the DIP ABL Lender in respect of the DIP ABL

Facility, and the DIP Term Loan Agent and the DIP Term Loan Lenders in respect of the DIP

Term Loan Facility, each in "good faith" as such term is used in section 364(e) of the

Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be

WEIL:\95256444\10\58399.0011

entitled to the full protection of section 364(e) of the Bankruptcy Code, in the event that this

Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.

(f)    Based upon the record before the Bankruptcy Court, the terms of

the use of Cash Collateral and the adequate protection granted in this Interim Order have been

negotiated at arms' length and in good faith, as that term is used in section 364(e) of the

Bankruptcy Code, and are in the best interests of the Debtors, their estates and creditors and are

consistent with the Debtors' fiduciary duties.

(g)    *Discharge of the Prepetition ABL Debt.*    Immediately following

the entry of this Interim Order and as part of the initial borrowing under the DIP Facilities, the

Debtors shall be required to use a portion of the proceeds from the DIP ABL Facility and the DIP

Term Loan Facility, in accordance with the DIP Documents and this Interim Order, to discharge

in full the Prepetition ABL Debt then outstanding.  The Prepetition ABL Security Interests shall

be automatically released and terminated upon such discharge.  The Prepetition ABL Agent shall

deliver or cause to be delivered, at the Debtors' cost and expense, any termination statements,

releases and/or assignments in favor of the DIP ABL Agent, the DIP ABL Lenders or other

documents, in each case as reasonably requested by the Debtors or the DIP ABL Agent in order

to effectuate and/or evidence the release and termination of the Prepetition ABL Security

Interests.

(h)    The Debtors have requested immediate entry of this Interim Order

pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001-2.  Absent

granting the interim relief set forth in this Interim Order, the Debtors' estates will be immediately

and irreparably harmed.  Consummation of the DIP Facilities and the use of the Cash Collateral

19

in accordance with this Interim Order and the DIP Documents are, therefore, in the best interest of the Debtors' estates.

(8)    *Superpriority Claims.*

(a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority senior administrative expense claims against the Debtors (the "**Superpriority Claims**"), which Superpriority Claims in respect of the DIP ABL Facility and the DIP Term Loan Facility shall rank *pari passu* with each other, with priority (except in respect of the Carve Out) over any and all administrative expenses, adequate protection claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which Superpriority Claims shall be payable from and have recourse to all unencumbered property of the Debtors and their estates and all proceeds thereof.    Any payments, distributions or other proceeds received on account of such Superpriority Claims shall be promptly delivered to the applicable DIP Agent (on a *pari passu* basis) to be applied or further distributed by the applicable DIP Agent on account of the applicable DIP Obligations in such order as is specified in this Interim Order and the applicable DIP Documents.    The Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

20

(b)        For purposes hereof, the "**Carve Out**" shall mean an amount equal to the sum of: (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses of up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) allowed and unpaid claims for unpaid fees, costs, and expenses (the "**Professional Fees**") incurred by persons or firms retained by the Debtors or the Creditors' Committee, if any, whose retention is approved by the Bankruptcy Court pursuant to section 327 and 1103 of the Bankruptcy Code (collectively, the "**Professional Persons**"), subject to the terms of this Interim Order, the Final Order and any other interim or other compensation order entered by the Bankruptcy Court that are incurred (A) at any time before or on the first business day following delivery by any DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (the "**Pre-Trigger Date Fees**"), subject to (x) a monthly cap of $50,000 (the "**Committee Monthly Cap**")   with respect to Professional Fees incurred by Professional Persons retained by a Creditors' Committee, if any, and (y) any limits by this Interim Order or the Final Order or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigations of claims and defenses against any Prepetition Secured Parties pursuant to this Interim Order or the Final Order; and (B) after the first business day (the "**Trigger Date**") after the occurrence and during the continuance of an Event of Default (as defined in the DIP ABL Credit Agreement or the DIP Term Loan Agreement) and delivery of notice (the "**Carve Out Trigger Notice**") thereof (which may be by email) to the Debtors, the Debtors' counsel, the United States Trustee, and lead counsel for a Creditors' Committee, if any,

21

in an aggregate amount not to exceed $2,000,000 (the amount set forth in this clause (iii)(B) being the "**Post-Carve Out Trigger Notice Cap**" and together with the Committee Monthly Cap, the "**Carve Out Cap**"); provided that, nothing herein shall be construed to impair the ability of any party to the DIP  Documents to object to the fees, expenses, reimbursement or compensation described in clauses (iii) and (iv) above, on any grounds.

(c)       The DIP ABL Agent may impose a reserve against the Borrowing Base (as defined in the DIP ABL Credit Agreement) in an amount equal to the estimated total amount of all items that comprise the Carve Out for the tenor of the case, including Professional Fees in an amount determined by the DIP ABL Agent in its sole discretion (the "**Carve Out Reserve**").  Initially, and without limiting the DIP ABL Agent's discretion to increase the Carve Out Reserve in its sole discretion, the Carve Out Reserve shall consist of the sum of (i) the Professional Fees and U.S. Trustee fees, each as set forth in the 13-Week Projection for the months of March and April 2015, (ii) $100,000 for fees and expenses of a Chapter 7 trustee; (iii) $250,000 reserve for legal fees and expenses incurred by the Prepetition ABL Agent (on behalf of the Prepetition ABL Lenders) in connection with its defense of any unsuccessful investigation, prosecution or cause of action commenced by the Creditors' Committee or a party-in-interest prior to the expiration of the Challenge Period, solely as it relates to the Prepetition ABL Agent and Prepetition ABL Lenders' Prepetition Security Interests (the "**Prepetition ABL Facility Reserve**"), and (iv) the Post-Carve Out Trigger Notice Cap, and on the 25th day of each month, commencing March 25, 2015, the Carve Out Reserve will be adjusted (x) to relieve any amounts which were previously subject to the Carve Out Reserve but which were subsequently paid, (y) to increase (or decrease) the Carve Out Reserve for the prior month's Professional Fees and U.S. Trustee fees based on actual billings and (z) to increase the Carve Out Reserve by the

22

amount of the Professional Fees and the U.S. Trustee fees set forth in the 13-Week Projection for the subsequent month.

(d)      For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Documents, except as otherwise set forth in paragraph 25 below, all liens and claims securing the DIP Facilities, the Superpriority Claims, and any adequate protection liens granted to any parties entitled thereto shall be subject to the Carve Out, it being understood and agreed that the Carve Out shall be allocated 100% against the DIP ABL Priority Collateral.

(e)      *Budget/13-Week Projection*.  Attached as **Exhibit "2"** hereto and incorporated by reference herein is the weekly statement of receipts and disbursements of the Debtors and their domestic subsidiaries on a consolidated basis for the 21 weeks commencing with the first week following the Commencement Date (the "**Budget**"), including (i) individual line items for "Cash Receipts", "Vendors", "Lease, rent and utilities", "Payroll and benefits", "Taxes", "Capital and tooling", "Funding to rest of world entities", "DIP fees and interest", "Professional fees", "U.S. Trustee fees", "Other", "Net Cash Inflow / (Outflow)" and (ii) the anticipated uses of the DIP Term Loan Facility and the DIP ABL Facility for such period, in form and substance reasonably satisfactory to the DIP ABL Lenders and the Majority Lenders; provided that, to the extent that payment in full in cash of all DIP Term Loan Obligations has not occurred within such 21-week period, the Debtors shall deliver to the DIP Agents an updated budget covering the period through the Maturity Date (as defined in the DIP Term Loan Credit Agreement), which shall be in the same form as the Budget and shall be reasonably satisfactory to the DIP ABL Lenders and the Majority Lenders (as defined in the DIP Term Loan Credit Agreement), and such updated budget shall become the "Budget" for all purposes under the DIP

23

Documents.  The Debtors shall also deliver to the DIP Agents no later than 5:00 p.m. on Friday

of each calendar week, commencing with the first such date following the Commencement Date,

(a) a projected statement of receipts and disbursements of the Debtors and their  consolidated

domestic subsidiaries on a weekly basis for the following 13 calendar weeks which shall be in

the same form as the Budget and shall be reasonably satisfactory to the DIP Agents (the "**13-
Week Projection**"); and (b) a variance report on a weekly basis setting forth (1) actual cash

receipts and disbursements for the week ending on the previous Friday, (2) all variances, on an

individual line item basis and an aggregate basis, as compared to the Budget and the previously

delivered 13-Week Projection on a weekly and cumulative basis, and (3) a certified explanation,

in reasonable detail, for any material variance (the "**Variance Report**").

## THE DIP ABL FACILITY

(9)        *Authorization of the DIP ABL Facility Documents and the DIP ABL
Facility.*

(a)        The Debtors are hereby authorized and directed to execute, deliver,

enter into, and perform all obligations under the DIP ABL Credit Agreement, and the DIP Loan

Parties are authorized to guarantee all of the Borrowers outstanding obligations under the DIP

ABL Credit Agreement (the "**DIP ABL Obligations**").

(b)        The Borrowers are hereby authorized to make an initial draw under

the DIP ABL Facility pursuant to the DIP ABL Credit Agreement, and the DIP Loan Parties are

hereby authorized to guaranty such borrowings of money and letters of credit, in an initial

aggregate principal amount of up to $125,000,000 of the DIP ABL Facility (subject to any

limitations on borrowings thereunder), in accordance with this Interim Order and the DIP ABL

Facility Documents (as defined below), which amount shall be used for all purposes permitted

24

under the DIP ABL Facility Documents, including, without limitation, a portion of which shall be used together with proceeds from the DIP Term Loan Facility to discharge in full the Prepetition ABL Debt, providing working capital for the Debtors, for other general corporate purposes and to pay interest, fees, and expenses in accordance with this Interim Order and the DIP ABL Facility Documents.

(c)    In furtherance of the foregoing and without further approval of the Bankruptcy Court, each Debtor is authorized and directed to perform, and is authorized and directed to cause the DIP Loan Parties to perform, all acts and to execute, deliver and perform all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages, and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP ABL Facility, including, without limitation:

(i)    the execution, delivery and performance of the DIP ABL Credit Agreement and any exhibits attached thereto, including, without limitation, all security agreements and all related or ancillary documents and agreements and any mortgages contemplated thereby (collectively, the "**DIP ABL Facility Documents**");

(ii)    the execution, delivery and performance of the guarantees by the DIP Loan Parties of the obligations of the Borrowers under the DIP ABL Facility Documents;

(iii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP ABL Facility Documents, in each case in such form as the Debtors and the DIP ABL Agent may agree, and no further approval of the Bankruptcy Court shall be required for amendments, waivers, consents or

25

other modifications to and under the DIP ABL Facility Documents (and any reasonable fees paid in connection therewith) that do not (A) shorten the maturity or the scheduled termination date thereunder, or (B) increase the commitments, the rate of interest (other than invoking the default rate upon an Event of Default), or the letter of credit fees payable thereunder,

(iv)    the non-refundable payment to the DIP ABL Agent and the DIP ABL Lenders, as the case may be, of the reasonable fees and expenses set forth in the DIP ABL Facility Documents, including, without limitation, any upfront or backstop commitment, administrative, syndication or collateral agency fee, and the fees and expenses of the professionals retained as provided for in the DIP ABL Facility Documents, without the need to file retention motions or fee applications, or to provide notice to any party; and

(v)    the performance of all other acts required under or in connection with the DIP ABL Facility Documents.

(d)    Upon execution and delivery of the DIP ABL Facility Documents, the DIP ABL Facility Documents shall constitute valid, binding and unavoidable obligations of the Debtors and the DIP Loan Parties, enforceable against each Debtor and the other DIP Loan Parties in accordance with the terms of this Interim Order and the DIP ABL Facility Documents. No obligation, payment, transfer or grant of security under the DIP ABL Facility Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under chapter 5 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim or counterclaim.

26

(10)   *DIP ABL Facility Liens.*   As security for the DIP ABL Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP ABL Agent of any property, the following security interests and liens are hereby granted to the DIP ABL Agent, for its own benefit and the benefit of the DIP ABL Lenders, subject only to the Carve Out (all such liens and security interests granted to the DIP ABL Agent, for its benefit and for the benefit of the DIP ABL Lenders, pursuant to this Interim Order and the DIP Documents, the "**DIP ABL Facility Liens**"):

(a)   <u>First Lien on DIP ABL Priority Collateral</u>.   Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP ABL Agent, for the benefit of the DIP ABL Lenders, shall have a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in the prepetition and postpetition assets of the Debtors defined as DIP ABL Priority Collateral in the DIP ABL Credit Agreement (the "**DIP ABL Priority Collateral**"), which shall include, without limitation, the Debtors' existing and future accounts receivable, inventory, cash, deposit accounts, investments in cash and cash equivalents and other permitted investments (other than capital stock of subsidiaries), letter of credit rights relating to inventory, accounts receivable and all proceeds of the foregoing, subject only to validly perfected, enforceable and unavoidable liens, arising on or before the Commencement Date, that are expressly allowed to have priority by operation of statute or rule of law ("**Other Priority Liens**") (for clarity, the prepetition liens securing the Prepetition Indebtedness shall not constitute Other Priority Liens), <u>provided</u> that the DIP ABL Priority Collateral shall not include the identifiable cash proceeds of the DIP Term Loan Collateral (as defined below) that are held

27

in a segregated deposit account used only for the purposes of holding such proceeds.  All of the

Debtors' claims, causes of action or other avoidance claims under sections 502(d), 544, 545, 547,

548, 549, 550 or 553 of the Bankruptcy Code, or any other avoidance actions under the

Bankruptcy Code (collectively, "**Avoidance Actions**") or any successful Avoidance Actions,

whether by judgment, settlement or otherwise shall not be considered  DIP ABL Priority

Collateral, but, subject only to and effective upon entry of the Final Order, any proceeds thereof

or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions,

whether by judgment, settlement or otherwise ("**Avoidance Proceeds**") shall constitute DIP

ABL Priority Collateral, provided that, the lien on Avoidance Proceeds securing the DIP ABL

Obligations and the lien on Avoidance Proceeds securing the DIP Term Loan Obligations shall

rank *pari passu* with each other.

(11)    *Adequate Protection of Prepetition ABL Lenders*.  Until the indefeasible

discharge of the Prepetition ABL Debt (which shall be deemed to have occurred upon the

expiration of the Challenge Period (as defined below) if no adversary proceeding or contested

matter is timely and properly asserted, in accordance with paragraph 25 hereof, with respect to

the Prepetition ABL Debt or against the Prepetition ABL Agent or the Prepetition ABL Lenders

(in their capacities as such)), the Prepetition ABL Lenders are entitled, pursuant to sections 361,

363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interest in the

Prepetition Collateral, including the Cash Collateral, for and equal in amount to any aggregate

diminution in the value of the Prepetition ABL Lenders' interests in the Prepetition Collateral,

including, without limitation, any such diminution resulting from the sale, lease or use by the

Debtors (or other decline in value) of Cash Collateral and any other Prepetition Collateral, the

priming of the Prepetition ABL Agent's security interests and liens in the Prepetition Collateral

28

by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Interim Order,

the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the

Prepetition ABL Debt and the Contingent Prepetition ABL Debt.  As adequate protection, the

Prepetition ABL Agent and the Prepetition ABL Lenders are hereby granted the following

(collectively, the "**Prepetition ABL Adequate Protection Obligations**"):

        (a)    <u>Prepetition ABL Adequate Protection Liens</u>.  The Prepetition ABL

Agent (for itself and for the benefit of the Prepetition ABL Lenders) is hereby granted in the

amount of diminution in value of the Prepetition ABL Lenders' interest in its Cash Collateral

that results from the Debtors' use thereof and the amount of any Contingent Prepetition ABL

Debt, a replacement security interest in and lien upon all of the DIP Collateral, subject and

subordinate only to (i) the security interests and liens granted to (x) the DIP Agents for the

benefit of the DIP Lenders, and (y) the Prepetition Secured Noteholders in respect of the DIP

Term Loan Priority Collateral pursuant to this Interim Order and the DIP Documents and any

liens on the DIP Collateral, (ii) the Carve Out, (iii) the Prepetition Secured Noteholders

Adequate Protection Liens (as defined below), and (iv) Other Priority Liens (such liens securing

the Prepetition ABL Adequate Protection Obligations, the "**Prepetition ABL Adequate**

**Protection Liens**").  The Prepetition ABL Adequate Protection Liens shall secure (i) solely in

the event that the Prepetition ABL Debt is not discharged as provided in this Interim Order, an

amount equal to any diminution in value of the Prepetition ABL Lenders' interest in its Cash

Collateral that results from the Debtor's use thereof, and (ii) the amount of any Contingent

Prepetition ABL Debt.

        (b)    In the event that the conditions precedent to the granting of the

Prepetition ABL Adequate Protection Liens are satisfied, the Prepetition ABL Agent and the

29

Prepetition ABL Lenders are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the Prepetition ABL Adequate Protection Liens.  Whether or not the Prepetition ABL Agent and the Prepetition ABL Lenders shall, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Interim Order.

(c)    Prepetition ABL Sections 503(b) and 507(b) Claim.    The Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, is hereby granted, subject to the Carve Out, a superpriority claim as provided for in sections 503(b) and 507(b) of the Bankruptcy Code for any remaining Prepetition ABL Debt and all Contingent Prepetition ABL Debt, immediately junior to the Superpriority Claims held by the DIP Agents and the DIP Lenders and senior to the superpriority claim held by the Prepetition Indenture Trustee and the Prepetition Secured Noteholders in respect of the DIP ABL Priority Collateral; provided that, unless otherwise expressly agreed to in writing by each DIP Agent, the Prepetition ABL Agent and the Prepetition ABL Lenders shall not receive or retain any payments, property or other amounts in respect of the superpriority claims under section 507(b) of the Bankruptcy Code granted hereunder or under the Prepetition ABL Credit Agreement unless and until the DIP Obligations have indefeasibly been paid in cash in full in accordance with the DIP Documents (the "**ABL Adequate Protection Claim**"); and provided further, that the Prepetition ABL

30

WEIL:\95256444\10\58399.0011

Lenders hereby irrevocably waive the section 503(b) claim granted to them by this Interim Order upon the expiration of the Challenge Period with no challenge having been brought or, if such a challenge is brought, upon the entry of a final judgment resolving such challenge in favor of the Prepetition ABL Lenders; and provided further, that unless the initial draw on the DIP ABL Facility and the DIP Term Loan Facility is used to discharge the outstanding Prepetition ABL Debt, as authorized and directed herein, no further borrowings under the DIP ABL Facility or the DIP Term Loan Facility shall be permitted (other than for other expenditures that the Debtors choose to pay simultaneously therewith or for other expenditures consented to by the Prepetition ABL Agent).

### THE DIP TERM LOAN FACILITY

(12)    *Authorization of the DIP Term Loan Documents and the DIP Term Loan Facility.*

(a)    The Debtors are hereby authorized and directed to execute, deliver, enter into, and perform all obligations under the DIP Term Loan Agreement and related documents, including, without limitation, any exhibits attached thereto, all security agreements, all guarantees, all related or ancillary documents and agreements, and any mortgages contemplated thereby, as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, the "**DIP Term Loan Documents**"), and the DIP Loan Parties are authorized to guarantee all of the Borrowers' outstanding obligations under the DIP Term Loan Documents (the "**DIP Term Loan Obligations**").

(b)    The Borrowers are hereby authorized to borrow a portion of the DIP Term Loan Facility in an amount not to exceed an aggregate principal amount of up to

31

$80,000,000 (subject to any limitations on borrowings thereunder), in accordance with this Interim Order and the DIP Term Loan Documents, which amount shall be used solely for purposes permitted under the DIP Term Loan Documents, including, without limitation, discharging the Prepetition ABL Debt, providing working capital for the Debtors, and paying interest, fees, and expenses in accordance with this Interim Order and the DIP Term Loan Documents.

(c)    In furtherance of the foregoing and without further approval of the Bankruptcy Court, each Debtor is authorized and directed to perform, and is authorized and directed to cause the DIP Loan Parties to perform, all acts and to execute, deliver and perform all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages, and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Term Loan Facility, including, without limitation:

(i)    the execution, delivery and performance of the DIP Term Loan Documents;

(ii)    the execution, delivery and performance of the guarantees by the DIP Loan Parties of the Borrowers' obligations under the DIP Term Loan Documents;

(iii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Term Loan Documents, in each case in such form as the Debtors and the DIP Term Loan Agent may agree, and no further approval of the Bankruptcy Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Term Loan Documents (and any reasonable fees paid in connection therewith) that do not (A) shorten the maturity of the extensions of credit

32

or scheduled termination date thereunder, (B) increase the commitments or the rate of interest payable thereunder;

(iv)    the non-refundable payment to the DIP Term Loan Agent and the DIP Term Loan Lenders, as the case may be, of the fees and any amounts due (or that may become due) in respect of the indemnification obligations in connection with the DIP Term Loan Documents and reasonable fees and expenses as may be due from time to time under the DIP Term Loan Documents, including, without limitation, any upfront or backstop commitment, administrative or collateral agency fee, and the fees and expenses of the professionals retained as provided for in the DIP Term Loan Documents, without the need to file retention motions or fee applications, or to provide notice to any party; and

(v)    the performance of all other acts required under or in connection with the DIP Term Loan Documents.

(d)    Upon execution and delivery of the DIP Term Loan Documents, the DIP Term Loan Documents shall constitute valid, binding and unavoidable obligations of the Debtors and the other DIP Loan Parties, enforceable against each Debtor and each DIP Loan Party in accordance with the terms of this Interim Order and the DIP Term Loan Documents.  No obligation, payment, transfer or grant of security under the DIP Term Loan Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under chapter 5 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim or counterclaim.

(13)    *DIP Term Loan Liens.*  As security for the DIP Term Loan Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Term Loan Agent of any property, the following security interests and liens are hereby granted to the DIP Term Loan Agent, for its own benefit and the benefit of the DIP Term Loan Lenders (all property identified in clauses (a), (b), (c) and (d) below being collectively referred to as the "**DIP Term Loan Collateral**"), subject only to the payment of the Carve Out as provided for herein (all such liens and security interests granted to the DIP Term Loan Agent, for its benefit and for the benefit of the DIP Term Loan Lenders, pursuant to this Interim Order and the DIP Documents, the "**DIP Term Loan Liens**" and, together with the DIP ABL Liens, the "**DIP Liens**"):

(a)    First Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Term Loan Agent, for the benefit of the DIP Term Loan Lenders, shall have a valid, binding, continuing, enforceable, fully-perfected first-priority lien on, and security interest in, all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on or as of the Commencement Date or otherwise thereafter acquired, including as a result of the discharge of the Prepetition ABL Debt, that is not subject to valid, perfected, non-avoidable and enforceable liens (collectively, the "**Unencumbered Property**"), including, without limitation, any and all cash and cash collateral of the Debtors (whether maintained with the DIP Term Loan Agent or otherwise) and any investment of such cash and cash collateral, general intangibles, intercompany loans, contracts, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit

34

accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other

intellectual property, all issued and outstanding capital stock of each subsidiaries, other rights to

payment whether arising before or after the Commencement Date (including, without limitation,

postpetition intercompany claims against the Debtors, the DIP Loan Parties and any non-Debtor

affiliates), and the proceeds, product, offspring or profits of all of the foregoing, as set forth in

the DIP Term Loan Documents, provided that, for the avoidance of doubt, the Unencumbered

Property shall not include the DIP ABL Priority Collateral.

(b)    First Lien on DIP Term Loan Priority Collateral.    Pursuant to

section 364(c)(2) of the Bankruptcy Code, the DIP Term Loan Agent, for the benefit of the DIP

Term Loan Lenders, shall have a valid, binding, continuing, enforceable, fully-perfected first

priority lien on, and security interest in all assets of the Debtors and the DIP Loan Parties that do

not constitute the DIP ABL Priority Collateral (the "**DIP Term Loan Priority Collateral**"),

subject to the Intercreditor Arrangements and any Other Priority Liens.    The DIP Term Loan

Priority Collateral is also encumbered by a second-priority lien (junior to the DIP Term Loan

Liens) held in favor of the Prepetition Indenture Trustee for the benefit of the Prepetition

Secured Noteholders.

(c)    Priming Liens on Prepetition Collateral.    Pursuant to section

364(d)(1) of the Bankruptcy Code, the DIP Term Loan Agent, for the benefit of the DIP Term

Loan Lenders, shall have a valid, binding, continuing, enforceable, fully-perfected first-priority

senior priming lien on, and security interest upon all pre- and post-petition property of the

Debtors and the DIP Loan Parties that constitutes DIP Term Loan Priority Collateral.    Such

security interests and liens shall be senior in all respects to the interests in such property of the

Prepetition Secured Parties arising from current and future liens of the Prepetition Secured

35

Parties (including, without limitation, adequate protection liens granted hereunder), but shall not be senior to any valid, perfected and unavoidable interest of other parties arising out of liens, if any on such property existing immediately prior to the Commencement Date.

(d)      Junior Liens on the DIP ABL Priority Collateral. Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Term Loan Agent, for the benefit of the DIP Term Loan Lenders, shall have a valid, binding, continuing, enforceable, fully-perfected second-priority lien (junior to the DIP ABL Facility Liens) on, and security interest in, the DIP ABL Priority Collateral, subject only to the Intercreditor Arrangements and any Other Priority Liens. The DIP ABL Priority Collateral is also encumbered by a third-priority lien (junior to the DIP ABL Facility Liens and the DIP Term Loan Liens) held in favor of the Prepetition Indenture Trustee for the benefit of the Prepetition Secured Noteholders, subject to the Intercreditor Arrangements and any Other Priority Liens.

(e)      Notwithstanding the foregoing clauses (a), (b), (c) and (d) the DIP Term Loan Collateral under this Interim Order shall exclude Avoidance Actions, but, subject only to and effective upon entry of the Final Order, shall include Avoidance Proceeds, provided, however, that the lien on Avoidance Proceeds securing the DIP Term Loan Obligations and the lien on Avoidance Proceeds securing the DIP ABL Obligations shall rank *pari passu* with each other.

(14)    *Adequate Protection of Prepetition Secured Noteholders*. The Prepetition Secured Noteholders are entitled, pursuant to sections 361, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interest in the Prepetition Collateral, including any Cash Collateral, for and equal in amount to any aggregate diminution in the value of the Prepetition Secured Noteholders' interests in the Prepetition Collateral, including, without

36

limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral, the Notes Priority Collateral, the ABL Priority Collateral, and any other Prepetition Collateral, the priming of the Prepetition Secured Noteholders' security interests and liens in the Prepetition Collateral by the DIP Agents and the DIP Lenders pursuant to the DIP Documents and this Interim Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.   As adequate protection, the Prepetition Indenture Trustee and the Prepetition Secured Noteholders are hereby granted the following (collectively, the "**Prepetition Secured Noteholders Adequate Protection Obligations**" and, together with the Prepetition ABL Adequate Protection Obligations, the "**Adequate Protection Obligations**"):

(a)    <u>Prepetition Secured Noteholder Adequate Protection Liens</u>. The Prepetition Indenture  Trustee, on behalf of itself and for the benefit of the Prepetition Secured Noteholders, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of such diminution, the following liens: (i) a second-priority lien on the DIP Term Loan Priority Collateral, junior to the lien and security interests granted to the DIP Term Loan Agent for the benefit of the DIP Term Loan Lenders and (ii) a fourth-priority lien on the DIP ABL Priority Collateral, junior to the lien and security interests granted to (x) the DIP ABL Agent for the benefit of the DIP ABL Lenders, (y) the DIP Term Loan Agent for the benefit of the DIP Term Loan Lenders and (z) the Prepetition ABL Adequate Protection Liens (such liens securing the Prepetition Secured Noteholders' Adequate Protection Obligations, collectively, the "**Prepetition Secured Noteholders Adequate Protection Liens**" and, together with the Prepetition Adequate Protection Liens and Contingent Adequate Protection Liens, the "**Adequate Protection Liens**").

37

The Prepetition Secured Noteholders Adequate Protection Liens shall also be junior in all respects to the Carve Out, any Other Priority Liens, and, solely in respect of the DIP ABL Priority Collateral, junior in all respects to the Contingent Adequate Protection Liens.

(b)    The Prepetition Indenture Trustee and the Prepetition Secured Noteholders are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the Prepetition Secured Noteholders Adequate Protection Liens.    Whether or not the Prepetition Indenture Trustee and the Prepetition Secured Noteholders shall, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Interim Order.

(c)    The Debtors are authorized and directed under sections 361, 363 and 364 of the Bankruptcy Code to make adequate protection payments which shall include (a) ongoing payments, when due or as soon as practicable thereafter, of all reasonable and documented costs, fees and expenses incurred either prior to or after the Commencement Date of Paul, Weiss, Rifkind, Wharton & Garrison LLP, AlixPartners and, as reasonably agreed to by the Debtors and in accordance with the Budget,  other legal (foreign and domestic), environmental and industry advisors, each in its capacity as advisor, to the Informal Committee of Noteholders, and in each case, incurred in connection with the Debtors, the Chapter 11 Cases or the transactions contemplated hereby; and (b) continued maintenance and insurance of the

38

Prepetition Collateral and the DIP Collateral as required under the Prepetition Financing Documents and the DIP Documents (collectively, the "**Adequate Protection Payments**").

(15)  *Prepetition Secured Noteholders' Section 507(b) Claim.*  The Prepetition Indenture Trustee, on behalf of itself and the Prepetition Secured Noteholders, is hereby granted, subject to the Carve Out, a superpriority claim as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the Superpriority Claims held by the DIP Agents and the DIP Lenders; provided that, unless otherwise expressly agreed to in writing by the DIP Agents, the Prepetition Indenture Trustee and the Prepetition Secured Noteholders shall not receive or retain any payments, property or other amounts in respect of the superpriority claims granted hereunder or under the Prepetition Financing Documents unless and until the DIP Obligations have indefeasibly been paid in cash in full in accordance with the DIP Documents (the "**Prepetition Secured Noteholders Adequate Protection Claim**" and, together with the Prepetition ABL Adequate Protection Claim, the "**Adequate Protection Claims**").

(16)  *Sufficiency of Adequate Protection.*  Under the circumstances and given that the Adequate Protection Liens, the Adequate Protection Claims and the Adequate Protection Payments (collectively, the "**Adequate Protection Obligations**") are consistent with the Bankruptcy Code; the Bankruptcy Court finds that such adequate protection is reasonable and sufficient to protect the interests of the Prepetition Secured Parties.  Except as expressly provided herein, nothing contained in this Interim Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to any Prepetition Secured Party, the DIP Agents or any DIP Lenders including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract or repurchase agreement with a Debtor to assert rights of setoff or

39

other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion).

(17)        *Limitation on Charging Expenses Against Collateral.*  Subject to and effective only upon entry of the Final Order, except to the extent of the Carve Out, no expenses of administration of these Chapter 11 Cases or any future proceeding that may result therefrom, including a case under Chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the DIP Agents and the DIP Lenders or the Prepetition Indenture Trustee and the Prepetition Secured Noteholders, as the case may be with respect to their respective interests, and no consent shall be implied from any action, inaction or acquiescence by the DIP Agents, the DIP Lenders, the Prepetition Indenture Trustee or the Prepetition Secured Noteholders.  In no event shall the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties be subject to (i) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral.

(18)        *Payment of Fees and Expenses.*  Except as set forth in this paragraph 18, no payments (including professional fees and expenses) with respect to the DIP Obligations or the Adequate Protection Obligations shall be subject to Bankruptcy Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines, and no recipient of any such payments shall be required to file any interim or final fee applications with the Bankruptcy Court or otherwise seek Bankruptcy Court's approval of any such payments.

40

(19)    *Credit Bid.*  The DIP Agents, the DIP Lenders and the Prepetition Secured

Parties, respectively, shall have the respective right to credit bid (in the case of the DIP Term

Loan Obligations, with the consent of the Majority Lenders (as defined in the DIP Term Loan

Agreement)) a portion of or all of their respective claims in connection with a sale of the

Debtors' assets under section 363 of the Bankruptcy Code or under a plan of reorganization,

unless the Bankruptcy Court, for cause, orders otherwise.  For the avoidance of doubt, no party

other than the DIP ABL Agent may credit bid for any DIP ABL Priority Collateral unless the

DIP ABL Obligations have been paid in full in cash.

(20)    *Protection of DIP Lenders' Rights.*

(a)    The automatic stay provisions of section 362 of the Bankruptcy

Code shall be vacated and modified (and any stay of such vacation or modification under

Bankruptcy Rule 4001(a)(3) is waived) without further order of the Bankruptcy Court to the

extent necessary to permit the DIP Agents and the DIP Lenders to exercise all rights and

remedies provided for in the DIP Documents and Interim Order without further order of or

application or motion to the Bankruptcy Court, provided that, such rights and remedies that are

exercisable only upon the occurrence of an Event of Default (as defined in the DIP Documents

and as set forth in paragraph 23 of this Interim Order), but subject in all respects to the Carve Out

Cap, shall require the applicable DIP Agent to give five (5) days' prior written notice (which five

days' notice period (the "**Default Notice Period**") shall run concurrently with any notice

provided under the DIP Documents) to the U.S. Trustee, the Debtors, the Prepetition Indenture

Trustee, the Prepetition ABL Agent, the other DIP Agent, and the Creditors' Committee, if any,

of such DIP Agent's intent to exercise such rights and remedies; provided that, the Debtors shall

not have the right to contest the enforcement of the remedies set forth in this Interim Order and

41

the DIP Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth herein or in the applicable DIP Documents; and <u>provided</u> further that during the Default Notice Period, the Debtors shall have no authority to borrow under the respective DIP Facility unless the applicable DIP Agent otherwise consents with respect to its DIP Facility, and each DIP Agent may terminate its respective DIP Facility and declare the respective DIP Obligations to be immediately due and payable, and the Debtors' authority to use Cash Collateral shall be as set forth in the 13-Week Projection and limited solely to payment of expenses critical to preservation of the Debtors' estates and the payment of the fees, costs and expenses to administer these Chapter 11 Cases, as agreed by each respective DIP Agent in its sole discretion.  The Debtors and the Prepetition Secured Parties shall waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Agents and the DIP Lenders set forth in this Interim Order and in the DIP Documents. For the avoidance of doubt, notwithstanding anything to the contrary in this Interim Order, immediately after the occurrence of a Triggering Event (as defined in the DIP ABL Credit Agreement), the DIP ABL Agent may place the Debtors on dominion of funds as provided in the DIP ABL Credit Agreement without the requirement of five days' prior written notice.

(b)    The DIP Agents' or any DIP Lender's delay or failure to exercise rights and remedies under the applicable DIP Documents or this Interim Order shall not constitute a waiver of such DIP Agent's or such DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents.

42

(c)       Except as otherwise expressly set forth in this Interim Order, the

Debtors irrevocably waive any right, without the prior written consent of the DIP Agents, (a) to

grant or impose, under section 364 of the Bankruptcy Code or otherwise, liens or security

interests in any DIP Collateral, whether senior, equal or subordinate to the DIP Agents' liens and

security interests; (b) to use, or seek to use, Cash Collateral or; (c) to modify or affect any of the

rights of the DIP Agents or the DIP Lenders under this Interim Order or the DIP Documents by

any plan of reorganization confirmed in these Chapter  11 Cases or subsequent order entered in

these Chapter 11 Cases.

(21)    *Perfection of DIP Liens.*

(a)       The DIP Agents and the DIP Lenders are hereby authorized, but

not required, to file or record (and to execute in the name of the Debtors, as its true and lawful

attorney, with full power of substitution, to the maximum extent permitted by law) financing

statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments

in any jurisdiction, or take possession of or control over deposit accounts and securities accounts

or any other asset, in each case, in order to validate and perfect the liens and security interests

granted to them in the DIP Documents and this Interim Order.  Whether or not the DIP Agents

on behalf of the respective DIP Lenders, each in their discretion, choose to file such financing

statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments,

or take possession of or control over deposit accounts and securities accounts or any other assets,

such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-

avoidable and not subject to challenge dispute or subordination, at the time and on the date of

entry of this Interim Order.  Upon the reasonable request of the DIP Agents, without any further

consent of any party, the DIP Agents, the Debtors, each DIP Lender and the Prepetition Secured

43

Parties are authorized and directed to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agents to further perfect the DIP Liens.

(b)    A certified copy of this Interim Order may, in the discretion of the DIP Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording. For the avoidance of doubt, the automatic stay provisions of section 362(a) of the Bankruptcy Code shall be modified (and any stay of such modification under Bankruptcy Rule 4001(a)(3) is waived) to the extent necessary to permit the DIP Agents to take all actions, as applicable, referenced in this subparagraph (b) and in the immediately preceding subparagraph (a).

(c)    Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other Collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the granting of post-petition liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Lenders in accordance with the terms of the DIP Documents or this Interim Order.

(22)    *Preservation of Rights Granted Under this Interim Order*.

(a)    Except as expressly provided herein or in the DIP Documents, no claim or lien having a priority senior to or *pari passu* with those granted by this Interim Order

44

and the DIP Documents to the DIP Agents, the DIP Lenders and the Prepetition Secured Noteholders shall be granted or allowed while any portion of the DIP Obligations or the Adequate Protection Obligations (with respect to the Prepetition ABL Adequate Protection Obligations, only if the Challenge Period has not expired) remain outstanding, and the DIP Liens and the Adequate Protection Liens (with respect to the Prepetition ABL Adequate Protection Liens, only if the Challenge Period has not expired) shall not (i) be subject to or junior to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Commencement Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors, or (ii) subordinate to or made *pari passu* with any other lien or security interest, whether under sections 363 or 364 of the Bankruptcy Code or otherwise.

(b)    In addition to the Events of Default set forth in the DIP Documents, unless all DIP Obligations and all Adequate Protection Obligations shall have been indefeasibly paid in full in cash, the Debtors shall not seek, and it shall constitute an Event of Default under the DIP Documents and terminate the right of the Debtors to use Cash Collateral hereunder if any of the Debtors seek, or if there is entered, unless the DIP Agents have otherwise consented:  (i) any modification or extension of this Interim Order without the prior written consent of the DIP Agents, the Prepetition Indenture Trustee, and the Prepetition Secured Noteholders, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agents, the Prepetition Indenture Trustee, and the Prepetition Secured Noteholders, (ii) an order converting or dismissing these Chapter 11 Cases; (iii) an order appointing a Chapter

45

11 trustee in these Chapter 11 Cases or any other representative or other similar appointment, (iv) an order appointing an examiner with enlarged powers in these Chapter 11 Cases, (v) an order providing for a change of venue with respect to these Chapter 11 Cases and such order shall not have been reversed or vacated within ten (10) days; (vi) an order approving a plan of reorganization or the sale of all or substantially all of the DIP Collateral (except to the extent permitted under the DIP Documents) or the Prepetition Collateral (except to the extent permitted under the Prepetition Financing Documents) shall have been entered which does not provide for the repayment in full in cash of all DIP Obligations (other than any contingent obligations not yet due and payable) and all Adequate Protection Obligations (with respect to the Prepetition ABL Adequate Protection Obligations, so long as the Challenge Period has not expired) upon the consummation thereof.  If an order dismissing these Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (x) the Superpriority Claims, priming liens, security interests and replacement security interests granted to the DIP Agents, the DIP Lenders and the Prepetition Secured Parties, including, without limitation, the DIP Liens, the Adequate Protection Liens, the Prepetition Secured Noteholders Adequate Protection Claims and Adequate Protection Payments, the 507(b) claims, and the other administrative expense claims granted pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order (and that such Superpriority Claims, priming liens, security interests and replacement security interests granted to the DIP Agents, the DIP Lenders and the Prepetition Secured Parties, including, without limitation, the DIP Liens, the Adequate Protection Liens, the Prepetition Secured Noteholders Adequate Protection Claims and Adequate Protection Payments, the 507(b) claims, and the other administrative expense claims,

46

liens and security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest, including the priorities set forth herein and in the DIP Documents) until all DIP Obligations and all Adequate Protection Obligations (with respect to the Prepetition ABL Adequate Protection Obligations, so long as the Challenge Period has not expired) shall have been paid and satisfied in full and (y) the Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above; provided that the Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition Obligations or under the Prepetition Financing Documents unless and until the DIP Obligations have indefeasibly been paid in cash in full in accordance with the DIP Documents.

(c)        If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity, priority or enforceability of any DIP Obligations or the Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agents, the Prepetition ABL Agent or the Prepetition Indenture Trustee, as applicable, of the effective date of such reversal, modification, vacation or stay or (ii) the validity, priority or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Documents with respect to any DIP Obligations or the Adequate Protection Obligations.  Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral, the DIP Obligations or the Adequate Protection Obligations incurred by the Debtors to the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agents, the Prepetition ABL Agent or the Prepetition Indenture Trustee of the effective date of such reversal, modification, vacation or stay shall be governed in

47

all respects by the original provisions of this Interim Order, and the DIP Agents, the DIP

Lenders, and the Prepetition Secured Parties shall be entitled to all the rights, remedies,

privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and

pursuant to the DIP Documents.

(d)    Except as expressly provided in this Interim Order or in the DIP

Documents, the DIP Obligations and the Adequate Protection Obligations, including the DIP

Liens, the Superpriority Claims, the 507(b) claims, the Adequate Protection Liens, the Adequate

Protection Claims, the Adequate Protection Payments and all other rights and remedies of the

DIP Agents, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of

this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or

discharged by (i) the entry of an order converting any of these Chapter 11 Cases to a case under

Chapter 7, dismissing these Chapter 11 Cases, approving the sale of any DIP Collateral pursuant

to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents,

or except to the extent that a release of such liens is authorized under the Intercreditor

Arrangements) or by any other act or omission or (ii) the entry of an order confirming a plan of

reorganization in these Chapter 11 Cases (except an acceptable plan to the DIP Agents and DIP

Lenders under the DIP Documents) and, pursuant to section 1141(d)(4) of the Bankruptcy Code,

the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate

Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents

shall continue in the Chapter 11 Cases, in any successor cases, or in any superseding Chapter 7

cases under the Bankruptcy Code, and the DIP Obligations and the Adequate Protection

Obligations, including the DIP Liens, the Superpriority Claims, the 507(b) claims, the Adequate

Protection Liens, the Adequate Protection Claims, the Adequate Protection Payments, the other

48

administrative expense claims granted pursuant to this Interim Order and all other rights and remedies of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties granted under the DIP Documents and this Interim Order shall continue in full force and effect and shall be binding on any Chapter 7 trustee, Chapter 11 trustee, any litigation trust representative, other or similar party hereinafter appointed or elected for the estates of the Debtors until all DIP Obligations and all Adequate Protection Obligations are indefeasibly paid in full in cash as set forth herein and the DIP Documents.

(23)    *Exculpation*.  Nothing in this Interim Order, the DIP Documents, or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Agent or any DIP Lender any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  In addition, (a) the DIP Agents and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors; provided that, (i) the foregoing shall not apply to any act or omission by the DIP Agents or the DIP Lenders that constitutes gross negligence or willful misconduct by the DIP Agents or the DIP Lenders as finally determined by a court of competent jurisdiction.

(24)    *Effect of Stipulations on Third Parties*.

(a)    The stipulations and admissions contained in this Interim Order, including, without limitation, in paragraph 4 of this Interim Order, shall be binding upon each

49

Debtor and their subsidiaries and any of their respective successors and assigns (including, without limitation, any Chapter 7 or Chapter 11 trustee appointed or elected for a Debtor), and each person or entity party to the DIP Documents in accordance with their respective terms and the terms of this Interim Order, in all circumstances.

(b)    The stipulations and admissions contained in this Interim Order, including without limitation, in paragraph 4 of this Interim Order, shall be binding on a permanent basis upon all other parties in interest, including without limitation, the Debtors, as debtors-in-possession, and the Debtors' estates, any Chapter 7 trustee, and any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases (including the Creditors' Committee, if any) and any other person or entity acting on behalf of the Debtors' estates, unless (a) such committee or any other party-in-interest, in each case, with requisite standing granted by the Bankruptcy Court, has timely and properly filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in paragraph 25) by no later than the date that is the later of (i) in the case of any such adversary proceeding or contested matter filed by a party-in-interest with requisite standing other than the Creditors' Committee, 60 days' after the date of entry of the Final Order, (ii) in the case of any such adversary proceeding or contested matter filed by the Creditors' Committee, 60 days after the appointment of the Creditors' Committee, (iii) any such later date agreed to in writing by the Prepetition ABL Agent or the Prepetition Indenture Trustee, as applicable, and (iv) such longer period as the Bankruptcy Court orders for cause shown prior to the expiration of such period (the "**Challenge Period**"), (1) challenging the validity, enforceability, priority, extent, or amount of the obligations under the Prepetition Financing Documents (the "**Prepetition Obligations**") or the liens, subject to valuation under section 506 of the Bankruptcy Code, on the Prepetition Collateral securing the

50

Prepetition Obligations or (2) otherwise asserting or prosecuting any avoidance actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "**Claims and Defenses**") against the Prepetition Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors in connection with any matter related to the Prepetition Obligations or the Prepetition Collateral, and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding or contested matter; provided that, (i) as to the Debtors, all such Claims and Defenses are hereby irrevocably waived and relinquished as of the Commencement Date and (ii) any challenge or claim shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be forever deemed waived, released and barred.  If no such adversary proceeding or contested matter is timely and properly filed in respect of the Prepetition Obligations, (x) the Prepetition ABL Obligations to the extent not heretofore repaid and the other Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, subordination, defense or avoidance, for all purposes in the Chapter 11 Cases and any subsequent Chapter 7 case, (y) the liens on the Prepetition Collateral securing the Prepetition Obligations, as the case may be, shall be deemed to have been, as of the Commencement Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph 4(b), not subject to defense, counterclaim, recharacterization, subordination or avoidance and (z) the Prepetition Obligations, the Prepetition Secured Parties, and the liens on the Prepetition Collateral granted to secure the Prepetition Obligations, as the case may be, shall not be subject to any other or further challenge by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any

51

other party-in-interest, and such committee or party-in-interest shall be enjoined from seeking to

exercise the rights of the Debtors' estates, including without limitation, any successor thereto

(including, without limitation, any estate representative or a Chapter 7 or 11 trustee appointed or

elected for any of the Debtors) with respect thereto.    If any such adversary proceeding or

contested matter is timely and properly filed, the stipulations and admissions contained in

paragraph 4 of this Interim Order shall nonetheless remain binding and preclusive (as provided in

the second sentence of this subparagraph) on any statutory or non-statutory committees

appointed or formed in the Chapter 11 Cases and any other party-in-interest, except as to any

such findings and admissions that were expressly and successfully challenged in such adversary

proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction.    In

the event that there is a timely successful challenge, pursuant and subject to the limitations

contained in this paragraph 24, to the validity, enforceability, extent, perfection or priority of the

Prepetition ABL Debt, the Bankruptcy Court shall have the power to unwind or otherwise

modify, after notice and hearing, the discharge of the Prepetition ABL Debt or a portion thereof

(which might include payment of the Disgorged Amounts or re-allocation of interest, fees,

principal or other incremental consideration paid in respect of the Prepetition ABL Debt or the

avoidance of liens and/or guarantees with respect to the Debtors), as the Bankruptcy Court shall

determine.    Nothing in this Interim Order vests or confers on any Person (as defined in the

Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in

the Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the

Debtors or their estates, including, without limitation, Claims and Defenses with respect to the

Prepetition Loan Documents or the Prepetition Obligations or any liens granted by any Debtor to

secure any of the foregoing.

WEIL:\95256444\10\58399.0011

(25)    *Limitation on Use of DIP Facilities and DIP Collateral.*
(a) Notwithstanding anything herein or in any other order by the Bankruptcy Court to the

contrary, no borrowings, letters of credit, Cash Collateral, Collateral, Carve Out or the Carve Out

Cap may be used to (i) object, contest or raise any defense to, the validity, perfection, priority,

extent or enforceability of any amount due under the DIP Documents or the Prepetition

Financing Documents, or the liens or claims granted under this Interim Order, the DIP

Documents or the Prepetition Financing Documents, (ii) assert any Claims and Defenses or

causes of action against the DIP Agents, the DIP Lenders, the Prepetition ABL Agent, the

Prepetition ABL Lenders, the Prepetition Secured Noteholders, or the Prepetition Indenture

Trustee, or their respective agents, affiliates, representatives, attorneys or advisors, (iii) prevent,

hinder or otherwise delay the DIP Agents' assertion, enforcement or realization on the Cash

Collateral or the Collateral in accordance with the DIP Documents, the Prepetition Financing

Documents or this Interim Order, (iv) seek, except in response to the final relief requested in the

Motion, to modify any of the rights granted to the DIP Agents, the DIP Lenders, the Prepetition

ABL Agent, the Prepetition ABL Lenders, the Prepetition Indenture Trustee, or the Prepetition

Secured Noteholders hereunder or under the DIP Documents, the Prepetition Financing

Documents or the Prepetition Secured Indenture, in each of the foregoing cases without such

parties' prior written consent or (v) pay any amount on account of any claims arising prior to the

Commencement Date unless such payments are (1) approved by an order of this Court (including

hereunder) and (2) in accordance with the DIP Documents and the 13-Week Projection; provided

that, in accordance with the Carve Out, advisors to the Creditors' Committee may investigate the

liens granted pursuant to the Prepetition Financing Documents during the Challenge Period at an

aggregate expense for such investigation, but not litigation, prosecution, objection or challenge thereto, not to exceed $50,000.

(26)    *Intercreditor Arrangements*.    The Bankruptcy Court approves the Intercreditor Arrangements annexed hereto as **Exhibit "1"** and authorizes the Debtors to execute and perform under any related documents and to perform all such other and further acts as may be necessary or appropriate to comply with and fulfill the obligations under the Intercreditor Arrangements.  Notwithstanding anything to the contrary herein or in any other order of the Bankruptcy Court, in determining the relative priorities and rights of any Prepetition Secured Party as against any other Prepetition Secured Party (including, without limitation, the relative priorities and rights of the Prepetition Secured Parties with respect to the Adequate Protection Liens granted hereunder), such priorities and rights shall continue to be governed by the Prepetition Financing Documents.  The Intercreditor Arrangements shall survive the conversion or dismissal of any of the Chapter 11 Cases or any relief from the automatic stay granted in the Chapter 11 Cases.

(27)    *Proofs of Claim*.  None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties will be required to file proofs of claim in any of Chapter 11 Cases or any successor case, and the Debtor's stipulations in this Interim Order shall be deemed to constitute a timely filed proof of claim.  Any order entered by the Bankruptcy Court in connection with the establishment of a bar date for any claim (including without limitation administrative claims) in the Chapter 11 Cases or any successor case shall not apply to the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.

(28)    *Rights of Access and Information*.  Without limiting the rights of access and information afforded the DIP Agents and DIP Lenders under the DIP Documents or the

54

Prepetition Secured Parties under the Prepetition Financing Documents, the Debtors shall be, and hereby are, required to afford representatives, agents and/or employees of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties reasonable access to the Debtors' premises and their books and records in accordance with the DIP Documents and the Prepetition Financing Documents, as the case may be, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.  In addition, the Debtors authorize their independent certified public accountants, financial advisors, restructuring advisers, investment bankers and consultants to cooperate, consult with, and provide to the DIP Agents, and the Prepetition Indenture Trustee (and so long as an Event of Default has occurred and is continuing, each Prepetition Secured Party and DIP Lender) all such information as may be reasonably requested with respect to the business, results of operations and financial condition of the Debtors.

(29)    *Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order or the Final Order, if and when entered, and the DIP Documents, the provisions of this Interim Order or the Final Order, as applicable, shall govern.  Additionally, to the extent that there may be an inconsistency between the terms of this Interim Order or the Final Order, if and when entered, and the Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures, if and when entered, the terms of this Interim Order or Final Order, as applicable, shall govern.

(30)    *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Interim Order, including all findings herein and the Intercreditor Arrangements, shall be binding upon all parties-in-interest in the Chapter 11 Cases on a permanent basis, including without limitation, the DIP Agents, the DIP Lenders, the Prepetition

55

Secured Parties, any statutory or non-statutory committees appointed or formed in the Chapter 11

Cases, and the Debtors and their respective successors and assigns (including any Chapter 7 or

chapter 11 trustee hereinafter appointed or elected for any of the Debtors, an examiner appointed

pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal

representative of any of the Debtors, or similar responsible person or similar designee or

litigation trust hereinafter appointed or elected for the estates of the Debtors) and shall inure to

the benefit of the DIP ABL Agent, the DIP Term Loan Agent, the DIP Lenders, the Prepetition

Secured Parties and the Debtors and their respective successors and assigns, including after

conversion or dismissal of any of the Chapter 11 Cases; *provided* *that*, except to the extent

expressly set forth in this Interim Order, the DIP Agents, the DIP Lenders, and the Prepetition

Secured Parties shall have no obligation to permit the use of Cash Collateral or extend any

financing to any Chapter 7 trustee, chapter 11 trustee or similar responsible person or similar

designee or litigation trust hereunder appointed for the estates of the Debtors.

(31)    *Limitation of Liability*.  In determining to make any loan under the DIP

Documents, permitting the use of Cash Collateral or in exercising any rights or remedies as and

when permitted pursuant to this Interim Order or the DIP Documents, the DIP Agents, the DIP

Lenders and the Prepetition Secured Parties shall not be deemed to be in control of the operations

of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to

the operation or management of the Debtors (as such terms, or any similar terms, are used in the

United States Comprehensive Environmental Response, Compensation and Liability Act, 29

U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Furthermore, nothing

in this Interim Order or in the DIP Documents shall in any way be construed or interpreted to

impose or allow the imposition upon the DIP Agents, the DIP Lenders, or the Prepetition

Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their affiliates (as defined in section 101(2) of the Bankruptcy Code).

(32)    *Effectiveness.*    This Interim Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof as of the Commencement Date, and there shall be no stay of execution of effectiveness of this Interim Order.    Any stay of the effectiveness of this Interim Order under Bankruptcy Rule 6004 or otherwise is waived.

(33)    *Final Hearing*.    The Final Hearing on the Motion shall be held on **_____, 2015 at __:__ _.m. (Eastern Time)**, before the Bankruptcy Court.

(34)    *Final Hearing Notice*.    The Debtors shall promptly mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with the Bankruptcy Court and to the Creditors' Committee after the same has been appointed, or Creditors' Committee counsel, if the same shall have been appointed.    Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file written objections with the Bankruptcy Court in accordance with General Order M-399, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue,

57

New York, New York 10153 (Attn: Marcia L. Goldstein, Esq. and Ray C. Schrock, Esq.); and

(ii) the Notice Parties, in each case so as to be received no later than **4:00 p.m. (Eastern Time)**

**on _____, 2015**.

Dated: _____, 2015
        New York, New York

_____
United States Bankruptcy Judge

58

## EXHIBIT 1 – INTERCREDITOR ARRANGEMENTS

*Capitalized terms used in this Exhibit I and not defined in this Exhibit shall have the meanings assigned to such terms in this Interim Order.*

## 1.    DEFINITIONS.

"Access Agreement" – means that certain Access Agreement by and among Chassix, Inc., as Supplier, UC Holdings, Inc., PNC Bank, National Association and Cantor Fitzgerald Securities, as the DIP Agents, and General Motors LLC, Ford Motor Company, Nissan North America, Inc., and FCA US LLC f/k/a Chrysler Group LLC, as Customers.

"DIP ABL Secured Parties" – means the "Secured Parties" (as defined in the DIP ABL Credit Agreement).

"Discharge of DIP ABL Obligations" - means (A) termination of all commitments of the DIP ABL Secured Parties under the DIP ABL Facility Documents and (B) with respect to (i) any DIP ABL Obligations (other than contingent indemnification and contingent expense reimbursement obligations, in each case, for which no claims have been asserted), payment in full in cash of all DIP ABL Obligations, and, with respect to letters of credit or letter of credit guaranties outstanding under the DIP ABL Facility Documents, either (x) cancellation and return to the DIP ABL Agent of all letters of credit or letter of credit guaranties outstanding under the DIP ABL Facility Documents or (y) delivery of cash collateral in respect thereof in a manner consistent with the DIP ABL Credit Agreement; and (ii) any DIP ABL Obligations that are contingent in nature (other than DIP ABL Obligations consisting of LC Obligations or Secured Bank Product Obligations (each as defined in the DIP ABL Credit Agreement) of a DIP Loan Party, which are

1

addressed in subparagraph B(i) above), the depositing of cash with the DIP ABL Agent in an

amount equal to 100% of any such DIP ABL Obligations that have been liquidated or, if such

DIP ABL Obligations are unliquidated in amount and represent a claim which has been asserted

against the DIP ABL Agent or a DIP ABL Secured Party and for which an indemnity has been

provided by the DIP Loan Parties in any of the DIP ABL Facility Documents, in an amount that

is equal to such claim or the DIP ABL Agent's good faith estimate of such claim; provided that

the Discharge of DIP ABL Obligations shall not be deemed to have occurred if such payments

are made with the proceeds of other DIP ABL Obligations that constitute an exchange or

replacement for or a Refinancing of such DIP ABL Obligations.

"Discharge of DIP Term Loan Obligations" - means (A) termination of all commitments under

the DIP Term Loan Documents, and (B) payment in full in cash of all DIP Term Loan

Obligations and satisfaction and discharge of the DIP Term Loan Credit Agreement (other than

obligations that expressly survive such satisfaction and discharge or legal or covenant

defeasance).

"Discharge of Prepetition Secured Notes Obligations" - means payment in full in cash of all

Prepetition Secured Notes Obligations, satisfaction and discharge of the Prepetition Secured

Indenture or legal or covenant defeasance of the Prepetition Secured Indenture (other than

obligations that expressly survive such satisfaction and discharge or legal or covenant

defeasance).

"Discharge of Fixed Asset Obligations" – means, collectively, the Discharge of DIP Term Loan

Obligations and Discharge of Prepetition Secured Notes Obligations.

2

"<u>Enforcement Notice</u>" – means a written notice delivered, at a time when an event of default has occurred and is continuing under the DIP ABL Facility Documents, the DIP Term Loan Documents or the Prepetition Secured Indenture, by the DIP ABL Agent, the DIP Term Loan Agent or the Prepetition Indenture Trustee, as applicable, to the other parties, specifying the relevant event of default.

"<u>Fixed Asset Obligations</u>" – means, collectively, the DIP Term Loan Obligations and the Prepetition Secured Notes Obligations.

"<u>Fixed Asset Secured Parties</u>" – means, collectively, the Prepetition Indenture Trustee, the Prepetition Secured Noteholders, the DIP Term Loan Agent and the DIP Term Loan Lenders.

"<u>Premises</u>" – means any real property owned or leased by the DIP Loan Parties at which any DIP Collateral is located.

"<u>Prepetition Secured Notes Documents</u>" – means Prepetition Secured Indenture and the other Senior Secured Notes Documents (as defined in the Prepetition Secured Indenture).

"<u>Prepetition Secured Notes Obligations</u>" – means all obligations outstanding under the Prepetition Secured Notes.

"<u>Proceeds</u>" means (a) all "proceeds," as defined in Article 9 of the UCC, with respect to the DIP Collateral, and (b) whatever is recoverable or recovered when any DIP Collateral is sold, exchanged, collected or disposed of, whether voluntarily or involuntarily.

"<u>Refinance</u>" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend,

3

increase, modify, supplement, restructure, refund, replace or repay, or to issue other indebtedness

or enter alternative financing arrangements, in exchange or replacement for such indebtedness, in

whole or in part, including by adding or replacing lenders, creditors, agents, borrowers and/or

guarantors, including any increase in the principal amount of the loans and commitments

provided thereunder, and including in each case, but not limited to, after the original instrument

giving rise to such indebtedness has been terminated.  "Refinanced" and "Refinancing" have

correlative meanings.

"Secured Party Representative" means, collectively, the DIP ABL Agent, the DIP Term Loan

Agent and the Prepetition Indenture Trustee.

"UCC" means the Uniform Commercial Code of any applicable jurisdiction.

4

2.      **Exercise of Remedies on DIP ABL Priority
        Collateral by Fixed Asset Secured Parties**

(a) Until the Discharge of  DIP ABL Obligations, the Fixed Asset Secured Parties:

(i)       will not exercise or seek to exercise any rights, powers, or remedies with

respect to any DIP ABL Priority Collateral;

(ii)      will not, directly or indirectly, contest, protest or object to or hinder any

judicial or non-judicial foreclosure proceeding or action (including any partial or

complete strict foreclosure) brought by the DIP ABL Agent or any other DIP

ABL Lender relating to the DIP ABL Priority Collateral or any other exercise by

the DIP ABL Agent or any other DIP ABL Lender of any other rights, powers and

remedies relating to the DIP ABL Priority Collateral, including any sale, lease,

exchange, transfer or other disposition of the DIP ABL Priority Collateral,

whether under the DIP ABL Facility Documents, applicable law, or otherwise;

(iii)     will not object to the forbearance by the DIP ABL Agent or the DIP ABL

Lenders from bringing or pursuing any enforcement action with respect to the DIP

ABL Priority Collateral;

(iv)      except as may be permitted by Section 2(c), irrevocably, absolutely and

unconditionally waive any and all rights the Fixed Asset Secured Parties may

have as a junior lien creditor or otherwise to object (and seek or be awarded any

relief of any nature whatsoever based on any such objection) to the manner in

which the DIP ABL Agent or the DIP ABL Lenders (i) enforce or collect (or

attempt to collect) the DIP ABL Obligations or (ii) realize or seek to realize upon

5

or otherwise enforce the DIP ABL Facility Liens, regardless of whether any action or failure to act by or on behalf of the DIP ABL Agent or the DIP ABL Lenders is adverse to the interest of the Fixed Asset Secured Parties.  Without limiting the generality of the foregoing, the Fixed Asset Secured Parties shall be deemed to have irrevocably, absolutely and unconditionally waived any right to object (and seek to be awarded any relief of any nature whatsoever based on any such objection), at any time prior or subsequent to any disposition of any of the DIP ABL Priority Collateral, on the ground(s) that any such disposition of the DIP ABL Priority Collateral (x) would not be or was not "commercially reasonable" within the meaning of the UCC and/or (y) would not or did not comply with any other requirement under the UCC or under any other applicable law governing the manner in which a secured creditor is to realize on its collateral;

(v)        subjection to Section 2(c), acknowledge and agree that no covenant, agreement or restriction in the documents evidencing the liens and claims of the Fixed Asset Secured Parties shall be deemed to restrict in any way the rights and remedies of the DIP ABL Agent or the DIP ABL Lenders with respect to the DIP ABL Priority Collateral; and

(vi)        subject to Section 2(c), agree that none of them shall object (or support any other Person objecting) to any motion by the DIP ABL Agent or the other DIP ABL Lenders seeking relief from the automatic stay in respect of the DIP ABL Priority Collateral;

provided that, in the case of (i), (ii) and (iii) above, the liens granted to secure the Fixed Asset

6

Obligations shall attach to any Proceeds resulting from actions taken by the DIP ABL Agent or

any DIP ABL Security Party with respect to the DIP ABL Priority Collateral in accordance with

the Intercreditor Arrangements (including the priorities described in Section 2) after application

of such Proceeds to the extent necessary to meet the requirements of a Discharge of DIP ABL

Obligations.

(b)    Until the Discharge of DIP ABL Obligations, the DIP ABL Agent and the other DIP

ABL Lenders shall have the right to enforce rights, exercise remedies (including set-off

and the right to credit bid their debt) and, in connection therewith (including voluntary

dispositions of DIP ABL Priority Collateral by the Debtors after an Event of Default

under the DIP ABL Facility Documents) make determinations regarding the release,

disposition or restrictions with respect to the DIP ABL Priority Collateral (including,

without limitation, exercising remedies under account control agreements and lockbox

agreements) without any consultation with, notice to or the consent of the Fixed Asset

Secured Parties; provided that the liens securing the obligations owed to the Fixed Asset

Secured Parties shall remain on the Proceeds (other than those properly applied to the

DIP ABL Obligations) of such DIP ABL Priority Collateral released or disposed of (for

clarity, to the extent that the DIP ABL Agent or DIP ABL Lenders acquire DIP ABL

Priority Collateral via credit bid, then there shall be no Proceeds and the liens of the

Fixed Assets Secured Parties on the DIP ABL Priority Collateral that is subject to such

credit bid shall be discharged).  In exercising rights, powers and remedies with respect to

the DIP ABL Priority Collateral, the DIP ABL Agent and the DIP ABL Lenders may

enforce the provisions of the DIP ABL Facility Documents and exercise rights, powers

and/or remedies thereunder and/or under applicable law or otherwise, all in such order

7

and in such manner as they may determine in the exercise of their sole discretion.  Such

exercise and enforcement shall include, without limitation, the rights of an agent

appointed by them to sell or otherwise dispose of the DIP ABL Priority Collateral upon

foreclosure, to incur expenses in connection with such sale or disposition and to exercise

all the rights and remedies of a secured creditor under the UCC.

(c) Notwithstanding anything to the contrary contained herein, any Fixed Asset Secured

Party may:

(i) take any action (not inconsistent with the terms of the Intercreditor

Arrangements and not adverse to the priority status of the DIP Liens on the DIP

ABL Priority Collateral, or the rights of the DIP ABL Agent or any of the DIP

ABL Secured Parties to exercise rights, powers, and/or remedies in respect

thereof) in order to create, perfect, preserve or protect (but not enforce) its DIP

Liens and Adequate Protection Liens on any of the DIP ABL Priority Collateral;

(ii) file any necessary or appropriate responsive or defensive pleadings in

opposition to any motion, claim, adversary proceeding or other pleading made by

any person objecting to or otherwise seeking the disallowance of the claims or

DIP Liens of the Fixed Asset Secured Parties, including any claims secured by the

DIP ABL Priority Collateral, if any, in each case in accordance with the terms of

the Intercreditor Arrangements;

(iii) unless such Fixed Asset Secured Party would not be permitted under the

Intercreditor Arrangements to take such action in its capacity as a secured

creditor, file (A) any pleadings, objections, motions or agreements which assert

rights or interests available to unsecured creditors of the Debtors, in each case, in

8

accordance with the terms of the Prepetition Financing Documents and the DIP

Documents, as applicable, and applicable law; provided that in the event that any

Fixed Asset Secured Party becomes a judgment Lien creditor in respect of the

DIP ABL Priority Collateral as a result of its enforcement of its rights as an

unsecured creditor with respect to the Fixed Asset Obligations, such judgment

Lien shall be subject to the terms of the Intercreditor Arrangements for all

purposes (including in relation to the DIP ABL Obligations) as the other liens

securing the Fixed Asset Obligations are subject to the Intercreditor Arrangements

and (B) any pleadings, objections, motions or agreements which assert rights or

interests available to secured creditors solely with respect to the Fixed Asset

Collateral; and

(iv) vote on any plan of reorganization, file any proof of claim, impose a default

rate or late fees, collect and apply monies deposited from time to time in their

accounts to the extent constituting Fixed Asset Collateral against the Fixed Asset

Obligations, make other filings and make any arguments and motions (including

in support of or opposition to, as applicable, the confirmation or approval of any

plan of reorganization) that are, in each case, in accordance with the terms of the

Intercreditor Arrangements.

(d) Nothing in the Intercreditor Arrangements shall prohibit the receipt by any Fixed Asset

Secured Parties of the required payments of interest, principal, adequate protection

payments and other amounts owed in respect of the Fixed Asset Obligations, so long as

such receipt is not the direct or indirect result of the exercise by the Fixed Asset Secured

Parties of rights or remedies as a secured creditor (including set-off) with respect to the

9

DIP ABL Priority Collateral or enforcement in contravention of the Intercreditor

Arrangements of any lien held by any of them.  Nothing in the Intercreditor

Arrangements impairs or otherwise adversely affects any rights or remedies any Fixed

Asset Secured Party may have against the Debtors and the DIP Loan Parties under the

DIP Term Loan Documents or the Prepetition Financing Documents.

3.      **Exercise of Remedies on DIP Term Loan Priority
        Collateral by DIP ABL Agent**

(a) Until the Discharge of Fixed Asset Obligations, the DIP ABL Agent and the DIP ABL

Secured Parties:

(i)      will not exercise or seek to exercise any rights, powers, or remedies with

respect to any DIP Term Loan Priority Collateral;

(ii)     will not, directly or indirectly, contest, protest or object to or hinder any

judicial or non-judicial foreclosure proceeding or action (including any partial or

complete strict foreclosure) brought by any Fixed Asset Secured Party relating to

the DIP Term Loan Priority Collateral or any other exercise by any Fixed Asset

Secured Party of any other rights, powers and remedies relating to the DIP Term

Loan Priority Collateral, including any sale, lease, exchange, transfer or other

disposition of the DIP Term Loan Priority Collateral, whether under the DIP

Term Loan Facility Documents, applicable law, or otherwise;

(iii)    will  not object to the forbearance by the DIP Term Loan Agent or any

Fixed Asset Secured Party from bringing or pursuing any enforcement action with

respect to the DIP Term Loan Priority Collateral;

(iv)     except as may be permitted by Section 3(c), irrevocably, absolutely and

10

unconditionally waive any and all rights the DIP ABL Agent or any DIP ABL

Lender may have as a junior lien creditor or otherwise to object (and seek or be

awarded any relief of any nature whatsoever based on any such objection) to the

manner in which the DIP Term Loan Agent or the Fixed Asset Secured Parties (i)

enforce or collect (or attempt to collect) the Fixed Asset Obligations or (ii) realize

or seek to realize upon or otherwise enforce the liens on the DIP Term Loan

Priority Collateral, regardless of whether any action or failure to act by or on

behalf of the DIP Term Loan Agent or the Fixed Asset Secured Parties is adverse

to the interest of the DIP ABL Agent or the DIP ABL Lenders.  Without limiting

the generality of the foregoing, the DIP ABL Agent and the DIP ABL Lenders

shall be deemed to have irrevocably, absolutely and unconditionally waived any

right to object (and seek to be awarded any relief of any nature whatsoever based

on any such objection), at any time prior or subsequent to any disposition of any

of the DIP Term Loan Priority Collateral, on the ground(s) that any such

disposition of the DIP Term Loan Priority Collateral (x) would not be or was not

"commercially reasonable" within the meaning of the UCC and/or (y) would not

or did not comply with any other requirement under the UCC or under any other

applicable law governing the manner in which a secured creditor is to realize on

its collateral;

(v)        subject to Section 3(c), acknowledge and agree that no covenant,

agreement or restriction in the documents evidencing the liens and claims of the

DIP ABL Lenders shall be deemed to restrict in any way the rights and remedies

of the DIP Term Loan Agent or the Fixed Asset Secured Parties with respect to

11

the DIP Term Loan Priority Collateral; and

(vi)    subject to Section 3(c), agree that none of them shall object (or support

any other Person objecting) to any motion by the DIP Term Loan Agent or the

other Fixed Asset Secured Parties seeking relief from the automatic stay in respect

of the DIP Term Loan Priority Collateral;

provided that, in the case of (i), (ii) and (iii) above, the liens granted to secure the DIP ABL

Obligations shall attach to any Proceeds resulting from actions taken by the DIP Term Loan

Agent or any Fixed Asset Secured Party with respect to the DIP Term Loan Priority Collateral in

accordance with the Intercreditor Arrangements (including the priorities described in Section 3)

after application of such Proceeds to the extent necessary to meet the requirements of a

Discharge of Fixed Asset Obligations.

(b)    Until the Discharge of Fixed Asset Obligations, the DIP Term Loan Agent and the other

Fixed Asset Secured Parties shall have the right to enforce rights, exercise remedies

(including set-off and the right to credit bid their debt) and, in connection therewith (including

voluntary dispositions of DIP Term Loan Priority Collateral by the Debtors after an Event of

Default under the DIP Term Loan Facility Documents) make determinations regarding the

release, disposition or restrictions with respect to the DIP Term Loan Priority Collateral

(including, without limitation, exercising remedies under account control agreements and

lockbox agreements) without any consultation with, notice to or the consent of the DIP ABL

Agent or the DIP ABL Lenders; provided that the liens securing the obligations owed to the

DIP ABL Lenders shall remain on the Proceeds (other than those properly applied to the

Fixed Asset Obligations) of such DIP Term Loan Priority Collateral released or disposed of.

In exercising rights, powers and remedies with respect to the DIP Term Loan Priority

12

Collateral, the DIP Term Loan Agent and the Fixed Asset Secured Parties may enforce the provisions of the DIP Term Loan Facility Documents and exercise rights, powers and/or remedies thereunder and/or under applicable law or otherwise, all in such order and in such manner as they may determine in the exercise of their sole discretion.  Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of the DIP Term Loan Priority Collateral upon foreclosure, to incur expenses in connection with such sale or disposition and to exercise all the rights and remedies of a secured creditor under the UCC.

(c)    Notwithstanding anything to the contrary contained herein, the DIP ABL Agent and any DIP ABL Secured Party may:

(i) take any action (not inconsistent with the terms of the Intercreditor Arrangements and not adverse to the priority status of the DIP Liens on the DIP Term Loan Priority Collateral, or the rights of the DIP Term Loan Agent or any of the Fixed Asset Secured Parties to exercise rights, powers, and/or remedies in respect thereof) in order to create, perfect, preserve or protect (but not enforce) its DIP Liens and Adequate Protection Liens on any of the DIP Term Loan Priority Collateral;

(ii) file any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims or DIP Liens of the DIP ABL Secured Parties, including any claims secured by the DIP Term Loan Priority Collateral, if any, in each case in accordance with the terms of the Intercreditor Arrangements;

(iii)    unless such DIP ABL Agent or DIP ABL Secured Party would not be permitted under the Intercreditor Arrangements to take such action in its capacity as a secured creditor, file

13

(A) any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Debtors in accordance with the terms of the DIP Documents and applicable law; provided that in the event that any DIP ABL Secured Party becomes a judgment Lien creditor in respect of the DIP Term Loan Priority Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the DIP ABL Obligations, such judgment Lien shall be subject to the terms of the Intercreditor Arrangements for all purposes (including in relation to the Fixed Asset Obligations) as the other liens securing the DIP ABL Obligations are subject to the Intercreditor Arrangements and (B) any pleadings, objections, motions or agreements which assert rights or interests available to secured creditors solely with respect to the DIP ABL Collateral; and

(iv) vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments and motions (including in support of or opposition to, as applicable, the confirmation or approval of any plan of reorganization) that are, in each case, in accordance with the terms of the Intercreditor Arrangements.

(d) Nothing in the Intercreditor Arrangements shall prohibit the receipt by the DIP ABL Agent or any DIP ABL Lender of the required payments of interest, principal, adequate protection payments and other amounts owed in respect of the DIP ABL Obligations, so long as such receipt is not the direct or indirect result of the exercise by the DIP ABL Agent or any DIP ABL Lender of rights or remedies as a secured creditor (including set-off) with respect to the DIP Term Loan Priority Collateral or enforcement in contravention of the Intercreditor Arrangements of any Lien held by any of them.  Nothing in the Intercreditor Arrangements impairs or otherwise adversely affects any rights or remedies the DIP ABL Agent or any DIP ABL Lender may have against the Debtors and the DIP Loan Parties under the DIP ABL

14

Documents.

4.      **Bailee for Perfection**

Each Secured Party Representative agrees to hold that part of the DIP Collateral that is in its

possession or control to the extent that possession or control thereof is taken to perfect a lien

thereon as gratuitous bailee and agent for the benefit and on behalf of the other Secured Party

Representatives (to the extent that such Secured Party Representative has been granted a lien on

such DIP Collateral pursuant to DIP ABL Facility Documents, the Prepetition Secured Notes

Documents and DIP Term Loan Documents, respectively) (such bailment and agency being

intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2), 9-

104(a) and 9-313(c) of the UCC) and any assignee solely for the purpose of perfecting the

applicable security interest granted under the DIP ABL Facility Documents, the Prepetition

Secured Notes Documents and DIP Term Loan Documents, respectively.  The Fixed Asset

Secured Parties hereby appoint the DIP ABL Agent as their agent for the purposes of perfecting

their security interest in all Deposit Accounts and Securities Accounts (in each case, other than

the DIP Term Loan Collateral Account and the Prepetition Secured Notes Collateral Account

(each as defined in the DIP ABL Credit Agreement as in effect on the date hereof)) of the DIP

Loan Parties.  The DIP ABL Agent and the DIP ABL Secured Parties hereby appoint the

Prepetition Indenture Trustee and the DIP Term Loan Agent, as applicable, as their agent for the

purposes of perfecting their security interest in all intercompany notes of the DIP Loan Parties.

Upon the Discharge of DIP ABL Obligations or the Discharge of DIP Term Loan Obligations, as

applicable, the applicable Secured Party Representative shall deliver the remaining DIP

Collateral in its possession together with any necessary endorsements, <u>first</u>, (i) in the case of DIP

15

Term Loan Priority Collateral, to the Prepetition Indenture Trustee and (ii) in the case of DIP

ABL Priority Collateral, to the DIP Term Loan Agent, to the extent the applicable Obligations

remain outstanding, and <u>second</u>, (i) in the case of DIP Term Loan Priority Collateral, to the

applicable DIP Loan Party or as otherwise required by law and (ii) in the case of DIP ABL

Priority Collateral, to the Prepetition Indenture Trustee, to the extent the applicable Obligations

remain outstanding and <u>third</u>, in the case of DIP ABL Priority Collateral, to the applicable DIP

Loan Party or as otherwise required by law, in each case, so as to allow such Person to obtain

possession or control of such DIP Collateral.

## 5.    **IP License**

For the purposes of enabling the DIP ABL Agent to exercise rights and remedies under the

Interim Order, the Fixed Asset Secured Parties and each DIP Loan Party hereby grants (to the

full extent of their respective rights and interests) the DIP ABL Agent and its agents,

representatives and designees an irrevocable, non-exclusive, royalty-free, rent-free license and

lease (which will be binding on any successor or assignee of any DIP Term Loan Priority

Collateral) to use all of the DIP Term Loan Priority Collateral (including, without limitation, all

intellectual property) to collect all accounts included in DIP ABL Priority Collateral, to copy,

use, or preserve any and all information relating to any of the DIP ABL Priority Collateral, and

to complete the manufacture, packaging, advertising for sale and sale of (i) work-in-process, (ii)

raw materials and (iii) complete inventory.

## 6.    **Access Rights**

Upon the occurrence of any Event of Default (as defined in the DIP ABL Credit Agreement), the

DIP ABL Agent and its agents, representatives and designees shall have an irrevocable, non-

16

exclusive right to have access to, and a rent-free right to use, the applicable parcel of Premises

that constitutes DIP Term Loan Priority Collateral and to use any DIP Term Loan Priority

Collateral located thereon (the "**Right of Access**"), for a period of up to 60 days, commencing

upon the date the DIP ABL Agent provides written notice of the intent to exercise the Right of

Access to the DIP Term Loan Agent, for the purpose of (i) arranging for and effecting the sale or

disposition of DIP ABL Priority Collateral located on such parcel, including the manufacture,

production, completion, packaging and other preparation of such DIP ABL Priority Collateral for

sale or disposition, (ii) selling (by public auction, private sale or a "store closing", going out of

business sale or similar sale, whether in bulk, in lots or to customers in the ordinary course of

business or otherwise and which sale may include augmented inventory of the same type sold in

any DIP Loan Party's business), (iii) storing or otherwise dealing with the DIP ABL Priority

Collateral, in each case without notice to, the involvement of or interference by the Fixed Asset

Secured Parties or liability to the Fixed Asset Secured Parties; provided that, (on a plant by plant

basis) in the event that any of the Debtors' customers exercise their respective rights of access

pursuant to the Access Agreement at any plant, then the Right of Access of the DIP ABL Agent

and its agents, representatives and designees with respect to such plant shall terminate 60 days

following the first day on which a customer exercises its access right at such plant.  During any

such Event of Default (as defined in the DIP ABL Credit Agreement), the DIP ABL Agent and

its representatives (and persons employed on their behalf), may continue to operate, service,

maintain, process, manufacture, package and sell the DIP ABL Priority Collateral, as well as to

engage in bulk sales of DIP ABL Priority Collateral.  The DIP ABL Agent shall take proper and

reasonable care under the circumstances of any DIP Term Loan Priority Collateral that is used by

the DIP ABL Agent and repair and replace any damage (ordinary wear-and-tear excepted)

17

caused by the DIP ABL Agent or its agents, representatives or designees and the DIP ABL

Agent shall comply with all applicable laws in all material respects in connection with its use or

occupancy of the DIP Term Loan Priority Collateral. The DIP ABL Agent and the DIP ABL

Secured Parties shall reimburse the Fixed Asset Secured Parties for any injury or damage to

Persons or property (ordinary wear-and-tear excepted) directly caused by the acts or omissions of

Persons under its control; provided, however, that the DIP ABL Agent and the DIP ABL Secured

Parties will not be liable for any diminution in the value of the Premises caused by the absence of

the DIP ABL Priority Collateral therefrom. In no event shall the DIP ABL Secured Parties or the

DIP ABL Agent have any liability to the Fixed Asset Secured Parties hereunder as a result of any

condition (including any environmental condition, claim or liability) on or with respect to the

DIP Term Loan Priority Collateral existing prior to the date of the exercise by the DIP ABL

Agent) of its rights under the Interim Order. The DIP ABL Agent and the Fixed Asset Secured

Parties shall cooperate and use reasonable efforts to ensure that their activities described above

do not interfere materially with the activities of the other as described above, including the right

of Fixed Asset Secured Parties to show the DIP Term Loan Priority Collateral to prospective

purchasers and to ready the DIP Term Loan Priority Collateral for sale. The Fixed Asset

Secured Parties shall not foreclose or otherwise sell or dispose of any of the DIP Term Loan

Priority Collateral unless the buyer agrees in writing to acquire the DIP Term Loan Priority

Collateral subject to the terms of these Intercreditor Arrangements and agrees to comply with the

terms of this section 5. The DIP ABL Agent and the DIP ABL Secured Parties shall have the

right to bring an action to enforce their rights under this Section 5 including, without limitation,

an action seeking possession of the applicable DIP Collateral and/or specific performance.

Notwithstanding the foregoing, in no event shall the Fixed Asset Secured Parties have any

18

liability or obligation to the DIP ABL Agent, the DIP ABL Lenders or any of their respective

agents, representatives and designees to pay for any costs and expenses (whether actual or

accrued) incurred in connection with the DIP ABL Agent's, any DIP ABL Lender's or any of

their respective agents', representatives' and designees' exercise of Right of Access.

7.    **Application of Proceeds/Turnover**

(a) <u>Revolving Nature of DIP ABL Obligations</u>.  The Fixed Asset Secured Parties

acknowledge and agree that the DIP ABL Credit Agreement includes a revolving

commitment and that the amount of the DIP ABL Obligations that may be outstanding at

any time or from time to time may be increased or reduced and subsequently reborrowed

in accordance with the terms of the DIP Documents and the Interim Order or Final Order,

as applicable.

(b) <u>Application of Proceeds of Collateral</u>.

i.   So long as the Discharge of DIP ABL Obligations has not occurred, all

DIP ABL Priority Collateral or Proceeds thereof received in connection

with the sale or other disposition of, or collection on, such DIP ABL

Priority Collateral as a result of the exercise of remedies by any Secured

Party Representative or any DIP ABL Secured Parties or Fixed Asset

Secured Parties, shall be delivered to the DIP ABL Agent and shall be

applied or further distributed by the DIP ABL Agent to or on account of

the DIP ABL Obligations in such order, if any, as specified in the relevant

DIP ABL Facility Documents or as a court of competent jurisdiction may

otherwise direct.  Upon the Discharge of DIP ABL Obligations, the DIP

19

ABL Agent shall deliver to the DIP Term Loan Agent any DIP ABL Priority Collateral and Proceeds of DIP ABL Priority Collateral received or delivered to it pursuant to the preceding sentence, in the same form as received, with any necessary endorsements, to be applied by the DIP Term Loan Agent to the Fixed Asset Obligations in such order as specified in the DIP Term Loan Agreement or as a court of competent jurisdiction may otherwise direct.

ii. So long as the Discharge of Fixed Asset Obligations has not occurred, all DIP Term Loan Priority Collateral or Proceeds thereof received in connection with the sale or other disposition of, or collection on, such DIP Term Loan Priority Collateral as a result of the exercise of remedies by any Secured Party Representative or any Fixed Asset Secured Parties or DIP ABL Secured Parties, shall be delivered to the DIP Term Loan Agent and shall be applied by the DIP Term Loan Agent to the DIP Term Loan Obligations in such order as specified in the relevant DIP Term Loan Documents or as a court of competent jurisdiction may otherwise direct. Upon the Discharge of DIP Term Loan Obligations, the DIP Term Loan Agent shall deliver to the Prepetition Indenture Trustee any DIP Term Loan Priority Collateral and Proceeds of DIP Term Loan Priority Collateral received or delivered to it pursuant to the preceding sentence, in the same form as received, with any necessary endorsements to be applied by the Prepetition Indenture Trustee to the Prepetition Secured Notes Obligations in such order as specified in the Prepetition Secured Notes

20

Documents or as a court of competent jurisdiction may otherwise direct.

(c) <u>Payments Over</u>.  So long as neither the Discharge of DIP ABL Obligations nor the

Discharge of Fixed Asset Obligations has occurred, any DIP Collateral received by any

Secured Party Representative or any Fixed Asset Secured Parties or DIP ABL Secured

Parties in connection with the exercise of any right, power, or remedy (including set-off)

relating to the DIP Collateral in contravention of the Interim Order shall be segregated

and held in trust and forthwith paid over to the appropriate Secured Party Representative

for the benefit of the Fixed Asset Secured Parties or the DIP ABL Secured Parties, as

applicable, in the same form as received, with any necessary endorsements or as a court

of competent jurisdiction may otherwise direct.  Each Secured Party Representative is

hereby authorized by the other Secured Party Representative to make any such

endorsements as agent for the other Secured Party Representative or any Fixed Asset

Secured Parties or DIP ABL Secured Parties, as applicable.  This authorization is coupled

with an interest and is irrevocable until the Discharge of DIP ABL Obligations and

Discharge of Fixed Asset Obligations.

(d) <u>Application of Payments</u>.  Subject to the other terms of the Interim Order and Final

Order, as applicable, all payments received by (a) the DIP ABL Agent or the DIP ABL

Secured Parties may be applied, reversed and reapplied, in whole or in part, to the DIP

ABL Obligations to the extent provided for in the DIP ABL Facility Documents and (b)

the Fixed Asset Secured Parties may be applied, reversed and reapplied, in whole or in

part, to the Fixed Asset Obligations to the extent provided for in the DIP Term Loan

Documents.

21

(e)    The DIP ABL Agent, for itself and on behalf of the DIP ABL Lenders, and the Fixed

Asset Secured Parties further agree that, prior to an issuance of any Enforcement Notice,

any Proceeds of DIP Collateral, whether or not deposited in an account subject to an

account control agreement, which are used by any Debtor to acquire other property which

is DIP Collateral shall not (solely as between the DIP ABL Agent, the DIP ABL Lenders

and the Fixed Asset Secured Parties) be treated as Proceeds of DIP Collateral for

purposes of determining the relative priorities in the DIP Collateral which was so

acquired.  In addition, unless and until the Discharge of DIP ABL Obligations occurs, the

Fixed Asset Secured Parties each hereby (i) consents to the application, prior to the

receipt by the DIP ABL Agent of an Enforcement Notice issued by the DIP Term Loan

Agent or the Prepetition Indenture Trustee, of cash or other Proceeds of DIP Collateral,

deposited in accounts subject to an account control agreement that constitute DIP ABL

Priority Collateral to the repayment of DIP ABL Obligations under DIP ABL Facility

Documents, (ii) agrees that such cash or other Proceeds shall be treated as DIP ABL

Priority Collateral and (iii) unless the DIP ABL Agent has actual knowledge to the

contrary or unless such funds are identifiable Proceeds of DIP Term Loan Priority

Collateral, any claim that payments made to the DIP ABL Agent through accounts that

are subject to such account control agreements are Proceeds of or otherwise constitute

DIP Term Loan Priority Collateral is waived by the Fixed Asset Secured Parties;

provided that after the receipt by the DIP ABL Agent of an Enforcement Notice issued by

the DIP Term Loan Agent or the Prepetition Indenture Trustee, all identifiable Proceeds

of DIP Term Loan Priority Collateral shall be treated as DIP Term Loan Priority

Collateral.

22

In the event that directly or indirectly some or all of the DIP ABL Priority Collateral and some or all of the DIP Term Loan Priority Collateral are disposed of in a single transaction or series of related transactions in which the aggregate sales price is no allocated between DIP ABL Priority Collateral and DIP Term Loan Priority Collateral being sold (including in connection with or as a result of the sale of the capital stock of a Debtor which shall be treated as a sale of assets), then the portion of the aggregate sales price determined to be Proceeds of DIP ABL Priority Collateral on the one hand, and DIP Term Loan Priority Collateral on the other hand, shall be allocated based upon, in the case of (i) any DIP ABL Priority Collateral consisting of inventory, no less than the book value as assessed on the date of such disposition, (ii) any DIP ABL Priority Collateral consisting of accounts receivable, no less than the book value as assessed on the date of such disposition, and (iii) all other DIP ABL Priority Collateral and DIP Term Loan Priority Collateral, fair market value of such DIP ABL Priority Collateral and DIP Term Loan Priority Collateral, as determined in good faith by Debtors in their reasonable judgment.

## 8.    Release of DIP ABL Priority Collateral

If, in connection with (A) any exercise of remedies, or (B) any sale, transfer or other disposition of all or any portion of the DIP ABL Priority Collateral, so long as such sale, transfer or other disposition is then not prohibited by the DIP ABL Facility Documents (or is otherwise consented to by the requisite DIP ABL Lenders), or by the DIP Term Loan Documents (or is otherwise consented to by the requisite DIP Term Loan Lenders) irrespective of whether an Event of Default (as defined in the DIP ABL Credit Agreement) has occurred and is continuing, the DIP

23

ABL Agent, on behalf of any of the DIP ABL Secured Parties, releases any of its liens on any part of the DIP ABL Priority Collateral (or if such liens are automatically released pursuant to the DIP ABL Facility Documents upon such sale, transfer or other disposition), then the liens, if any, of the Fixed Asset Secured Parties on the DIP ABL Priority Collateral sold or disposed of in connection therewith, shall be automatically, unconditionally and simultaneously released; provided that the Proceeds of such DIP ABL Priority Collateral are applied to reduce DIP ABL Obligations and the Fixed Asset Secured Parties shall retain a lien on such Proceeds in accordance with the terms of the Interim Order and the DIP Documents (for clarity, to the extent that the DIP ABL Agent or DIP ABL Lenders acquire DIP ABL Priority Collateral via credit bid, then there shall be no Proceeds and the liens of the Fixed Assets Secured Parties on the DIP ABL Priority Collateral that is subject to such credit bid shall be discharged).  The Fixed Asset Secured Parties promptly shall, at the sole cost and expense of the Debtors and the DIP Loan Parties, execute and deliver to the DIP ABL Agent or such DIP Loan Party such termination statements, releases and other documents as the DIP ABL Agent or such Debtor or the DIP Loan Party may reasonably request in writing to effectively confirm such release.

9.    **Insurance**

(a)  Unless and until the Discharge of DIP ABL Obligations has occurred and subject to the terms of, and the rights of the DIP Loan Parties under, the DIP ABL Facility Documents, the DIP ABL Agent, on behalf of the DIP ABL Secured Parties, shall have the sole and exclusive right to adjust settlement for any insurance policy covering the DIP ABL Priority Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation)

24

affecting such DIP ABL Priority Collateral.  Until the Discharge of DIP ABL Obligations has occurred, (i) all Proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of the DIP ABL Priority Collateral and to the extent required by the DIP ABL Facility Documents shall be paid to the DIP ABL Agent for the benefit of the DIP ABL Secured Parties pursuant to the terms of the DIP ABL Facility Documents (including, without limitation, for purposes of cash collateralization of letters of credit) and thereafter, if the Discharge of DIP ABL Obligations has occurred, and subject to the rights of the DIP Loan Parties under the DIP Term Loan Agreement, to the Fixed Asset Secured Parties to the extent required under the DIP Term Loan Agreement and then, to the extent the Discharge of Fixed Asset Obligations has occurred, to the owner of the subject property or such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct, and (ii) if the Fixed Asset Secured Parties shall, at any time, receive any Proceeds of any such insurance policy or any such award or payment with respect to DIP ABL Priority Collateral, it shall segregate and hold in trust and forthwith pay such Proceeds over to the DIP ABL Agent.

(b)  Unless and until the Discharge of Fixed Asset Obligations has occurred, subject to the terms of, and the rights of the DIP Loan Parties under, the DIP Term Loan Documents, the Fixed Asset Secured Parties shall have the sole and exclusive right to adjust settlement for any insurance policy covering the DIP Term Loan Priority Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting such DIP Term Loan Priority Collateral.  Until the Discharge of Fixed Asset Obligations has occurred, (i) all

25

Proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of the DIP Term Loan Priority Collateral and to the extent required by the DIP Term Loan Documents shall be paid to the Fixed Asset Secured Parties pursuant to the terms of the DIP Term Loan Documents and thereafter to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct, and (ii) if the DIP ABL Agent or any DIP ABL Secured Parties shall, at any time, receive any Proceeds of any such insurance policy or any such award or payment with respect to DIP Term Loan Priority Collateral, it shall segregate and hold in trust and forthwith pay such Proceeds over to the Fixed Asset Secured Parties.

(c)    To effectuate the foregoing, and to the extent that the pertinent insurance company agrees to issue such endorsements, the DIP ABL Agent and the DIP Term Loan Agent shall each receive separate lender's loss payable endorsements naming themselves as loss payee and additional insured, as their interests may appear, with respect to any policies which insure the DIP Collateral.  To the extent any Proceeds are received for business interruption or for any liability or indemnification and those Proceeds are not in whole or in part compensation for a casualty loss with respect to the DIP Term Loan Priority Collateral, such Proceeds shall be applied first, to repay the DIP ABL Obligations (to the extent required pursuant to the DIP ABL Facility Documents), second, to the extent no DIP ABL Obligations are outstanding, to repay the Fixed Asset Obligations (to the extent required by the DIP Term Loan Documents), and third, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct.

26

10.    **Amendments**

The DIP ABL Facility Documents and DIP Term Loan Documents may be amended, supplemented or otherwise modified in accordance with their terms, all without affecting the lien subordination or other provisions of the Interim Order or the lien and claim priorities set forth in the Interim Order.  The DIP ABL Obligations may be Refinanced without notice to, or the consent of, the Fixed Asset Secured Parties and without affecting the lien subordination or other provisions of the Interim Order, and the Fixed Asset Obligations may be Refinanced without notice to, or consent of, the DIP ABL Agent or the DIP ABL Secured Parties and without affecting the lien subordination and other provisions of the Interim Order so long as such Refinancing is on terms and conditions that would not violate the DIP Term Loan Documents or the DIP ABL Facility Documents (as applicable), each as in effect on the date hereof (or, if less restrictive to the DIP Loan Parties, as in effect on the date of such amendment or Refinancing) or the Interim Order; provided that, in each case, (x) the DIP Loan Parties shall deliver a notice to the DIP ABL Agent or the DIP Term Loan Agent, as applicable, stating that the DIP Loan Parties has entered into new DIP ABL Facility Documents or DIP Term Loan Documents, as the case may be, and identifying the agent under such Credit Documents (the "New Agent") and (iii) the New Agent shall acknowledge in writing that it is bound by the terms of the Interim Order; provided further, however, that, if such Refinancing debt is secured by a lien on any DIP Collateral the holders of such Refinancing debt shall be deemed bound by the terms hereof regardless of whether or not such joinder is provided.  For the avoidance of doubt, the sale or other transfer of indebtedness is not restricted by the Interim Order but the provisions of the Interim Order shall be binding on all holders of DIP ABL Obligations and Fixed Asset Obligations.  Notwithstanding the foregoing, (i) the DIP ABL Secured Parties will not be entitled

27

to agree (and will not agree) to any amendment to or modification of the DIP ABL Facility

Documents, whether in a Refinancing or otherwise, that is inconsistent with the terms of the

Interim Order and (ii) the Fixed Asset Secured Parties will not be entitled to agree (and will not

agree) to any amendment to or modification of the DIP Term Loan Documents, whether in a

Refinancing or otherwise, that is inconsistent with the terms of the Interim Order.

## 11.    <u>Asset Dispositions of DIP ABL Priority Collateral</u>

The Fixed Asset Secured Parties shall not oppose (or support, directly or indirectly, any other

Person seeking to oppose) any motion by a DIP Loan Party that is supported by the DIP ABL

Secured Parties (i) for any disposition of any DIP ABL Priority Collateral free and clear of liens

or other claims, under Sections 363 or 1129 of the Bankruptcy Code or otherwise, or (ii) to

approve any procedures for the disposition of any DIP ABL Priority Collateral of any of the DIP

Loan Parties, and the Fixed Asset Secured Parties will be deemed to have irrevocably,

absolutely, and unconditionally consented under Section 363 of the Bankruptcy Code (and

otherwise) to any sale of any DIP ABL Priority Collateral supported by the DIP ABL Secured

Parties and to have released their liens on such assets; <u>provided</u> that to the extent the Proceeds of

such DIP ABL Priority Collateral are not applied to reduce DIP ABL Obligations the Fixed

Asset Secured Parties shall retain a lien on such Proceeds in accordance with the terms of the

Interim Order.

28

12.    **Subrogation**

    (a) With respect to the value of any payments or distributions in cash, property or other assets that any of the Fixed Asset Secured Parties actually pays over to the DIP ABL Agent or the DIP ABL Secured Parties under the terms of the Interim Order and Final Order, as applicable, the Fixed Asset Secured Parties shall be subrogated to the rights of the DIP ABL Secured Parties; provided that the Fixed Asset Secured Parties hereby agree not to assert or enforce all such rights of subrogation they may acquire as a result of any payment hereunder until the Discharge of DIP ABL Obligations has occurred.  The Debtors and the DIP Loan Parties acknowledge and agree that, to the extent permitted by applicable law, the value of any payments or distributions in cash, property or other assets received by the Fixed Asset Secured Parties that are paid over to the DIP ABL Secured Parties pursuant to the Interim Order or Final Order, as applicable, shall not reduce any of the Fixed Asset Obligations.  Notwithstanding the foregoing provisions of this Section 12, none of the Fixed Asset Secured Parties shall have any claim against any of the DIP ABL Secured Parties for any impairment of any subrogation rights herein granted to the Fixed Asset Secured Parties.

    (b) With respect to the value of any payments or distributions in cash, property or other assets that any of the DIP ABL Secured Parties actually pays over to the Fixed Asset Secured Parties under the terms of the Interim Order and Final Order, as applicable, the DIP ABL Secured Parties shall be subrogated to the rights of the Fixed Asset Secured Parties; provided that the DIP ABL Agent, on behalf of the DIP ABL Secured Parties, hereby agrees not to assert or enforce all such rights of subrogation it may acquire as a

WEIL:\95256444\10\58399.0011

result of any payment hereunder until the Discharge of Fixed Asset Obligations has

occurred.  The Debtors and the DIP Loan Parties acknowledge and agree that, to the

extent permitted by applicable law, the value of any payments or distributions in cash,

property or other assets received by the DIP ABL Secured Parties that are paid over to the

Fixed Asset Secured Parties pursuant to the Interim Order or Final Order, as applicable,

shall not reduce any of the DIP ABL Obligations.  Notwithstanding the  foregoing

provisions of this Section 12, none of the DIP ABL Secured Parties shall have any claim

against any of the Fixed Asset Secured Parties for any impairment of any subrogation

rights herein granted to the DIP ABL Secured Parties.

**Exhibit 2**

**Budget**

WEIL:\95256444\10\58399.0011

**Exhibit C**

**DIP ABL Credit Agreement**

EXECUTION VERSION

**CHASSIX, INC.,**
**DIVERSIFIED MACHINE, INC,**
**DIVERSIFIED MACHINE BRISTOL, LLC,**
**DIVERSIFIED MACHINE MONTAGUE, LLC,**
**DIVERSIFIED MACHINE, MILWAUKEE LLC,**
**DMI EDON LLC,**
**MEXICO PRODUCTS I, LLC,**
**DMI COLUMBUS, LLC,**
**DMI CHINA HOLDING LLC,**
**CHASSIX GEORGIA MACHINING, LLC,**
**AUTOMOTIVE PROPERTIES OF NEW YORK, LLC,**
**CONCORD INTERNATIONAL, INC.,**
**SMW AUTOMOTIVE, LLC,**
**AUTOMOTIVE, LLC,**
**CHASSIS CO. OF MICHIGAN, LLC,**
and
**ALUTECH, LLC**
as Borrowers and Guarantors,

**UC HOLDINGS, INC.,**
as Parent Guarantor

**AND THE OTHER OBLIGORS PARTY HERETO**

---

**SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION ABL LOAN, SECURITY AND**
**GUARANTY AGREEMENT**

**Dated as of March 12, 2015**

---

**CERTAIN FINANCIAL INSTITUTIONS PARTY HERETO,**
as Lenders,

**PNC BANK, NATIONAL ASSOCIATION,**
as Agent, as Syndication Agent, as LC Issuer and as Swingline Lender,

and

**PNC CAPITAL MARKETS LLC,**
as Sole Lead Arranger and Sole Book Runner

# TABLE OF CONTENTS

**Page**

**SECTION 1.** DEFINITIONS; RULES OF CONSTRUCTION .................................................1
    1.1    Specific Definitions ............................................................................ 1
    1.2    Other Terms ..................................................................................... 33
    1.3    Accounting Terms; GAAP ............................................................... 34
    1.4    Certain Matters of Construction ...................................................... 34

**SECTION 2.** CREDIT FACILITY ................................................................................35
    2.1    Loans ................................................................................................ 35
    2.2    Letters of Credit .............................................................................. 37

**SECTION 3.** INTEREST, FEES AND CHARGES .........................................................43
    3.1    Interest ............................................................................................. 43
    3.2    Computation of Interest and Fees ................................................... 44
    3.3    Fees .................................................................................................. 44
    3.4    Letter of Credit Fees ....................................................................... 44
    3.5    Unused Line Fees ........................................................................... 45
    3.6    Bank Charges .................................................................................. 45
    3.7    Collateral Protection Expenses ...................................................... 45
    3.8    Reimbursement of Costs and Expenses; Inventory Appraisals; Field
            Examinations .................................................................................. 46
    3.9    No Deductions ................................................................................ 46
    3.10   Replacement of Lenders ................................................................. 48
    3.11   Defaulting Lender ........................................................................... 48

**SECTION 4.** LOAN ADMINISTRATION ....................................................................50
    4.1    Manner of Borrowing Revolving Credit Loans .............................. 50
    4.2    Payments ......................................................................................... 53
    4.3    Mandatory and Optional Prepayments ........................................... 54
    4.4    Application of Payments and Collections ...................................... 55
    4.5    All Loans to Constitute One Obligation ........................................ 56
    4.6    Loan Accounts ................................................................................ 56
    4.7    Statements of Account .................................................................... 56
    4.8    Increased Costs ............................................................................... 57
    4.9    Basis for Determining Interest Rate Inadequate or Unfair ........... 57
    4.10   Sharing of Payments, Etc .............................................................. 58
    4.11   Capital Requirements ..................................................................... 58

**SECTION 5.** TERM AND TERMINATION ..................................................................59
    5.1    Term of Revolving Loan Commitments ......................................... 59
    5.2    Termination ..................................................................................... 59

**SECTION 6.** SECURITY INTERESTS ........................................................................60
    6.1    Security Interest in Collateral ......................................................... 60
    6.2    Other Collateral .............................................................................. 61

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

|  | 6.3 | Lien Perfection; Further Assurances | 62 |
|  | 6.4 | Priority and Liens | 62 |
|  | 6.5 | Change of Name or Location | 62 |

**SECTION 7.** COLLATERAL ADMINISTRATION ........................................................................63

|  | 7.1 | General | 63 |
|  | 7.2 | Administration of Accounts | 64 |
|  | 7.3 | Administration of Inventory | 65 |
|  | 7.4 | [Intentionally omitted] | 66 |
|  | 7.5 | Payment of Charges | 66 |

**SECTION 8.** REPRESENTATIONS AND WARRANTIES ...........................................................66

|  | 8.1 | General Representations and Warranties | 66 |

**SECTION 9.** COVENANTS AND CONTINUING AGREEMENTS ..............................................75

|  | 9.1 | Affirmative Covenants | 75 |
|  | 9.2 | Negative Covenants | 83 |
|  | 9.3 | Financial Covenants | 91 |

**SECTION 10.** CONDITIONS PRECEDENT ...............................................................................92

|  | 10.1 | Closing Date Conditions Precedent | 92 |
|  | 10.2 | Conditions Precedent to All Loans and Credit Accommodations | 94 |

**SECTION 11.** EVENTS OF DEFAULT; RIGHTS AND REMEDIES ON DEFAULT ............95

|  | 11.1 | Events of Default | 95 |
|  | 11.2 | Acceleration of the Obligations | 101 |
|  | 11.3 | Other Remedies | 101 |
|  | 11.4 | Grant of License | 102 |
|  | 11.5 | Setoff and Sharing of Payments | 103 |
|  | 11.6 | Remedies Cumulative; No Waiver | 103 |
|  | 11.7 | Limitation on Exercise of Remedies | **Error! Bookmark not defined.** |

**SECTION 12.** AGENT ...............................................................................................................104

|  | 12.1 | Authorization and Action | 104 |
|  | 12.2 | Agent's Reliance, Etc | 104 |
|  | 12.3 | Rights of Agent as a Lender | 105 |
|  | 12.4 | Lender Credit Decision | 105 |
|  | 12.5 | Indemnification | 106 |
|  | 12.6 | Rights and Remedies to Be Exercised by Agent Only | 106 |
|  | 12.7 | Agency Provisions Relating to Collateral; Release of Liens and Guaranties | 106 |
|  | 12.8 | Agent's Right to Purchase Commitments | 107 |
|  | 12.9 | Resignation of Agent; Appointment of Successor | 107 |
|  | 12.10 | Audit, Appraisal and Examination Reports; Disclaimer by Lenders | 108 |
|  | 12.11 | No Reliance on Agent's Customer Identification Program | 108 |
|  | 12.12 | Sole Lead Arranger, Sole Book Runner and Syndication Agent | 109 |
|  | 12.13 | Secured Providers of Bank Products | 109 |

**SECTION 13.** MISCELLANEOUS ...........................................................................................110

ii

| 13.1 | Amendments. | 110 |
|------|-------------|-----|
| 13.2 | Right of Sale; Assignment; Participations | 111 |
| 13.3 | Power of Attorney | 115 |
| 13.4 | Expenses; Indemnity; Damage Waiver | 116 |
| 13.5 | Sale of Interest | 119 |
| 13.6 | Severability | 120 |
| 13.7 | Successors and Assigns | 120 |
| 13.8 | Cumulative Effect; Conflict of Terms | 120 |
| 13.9 | Execution in Counterparts | 120 |
| 13.10 | Notice | 120 |
| 13.11 | Consent | 122 |
| 13.12 | Credit Inquiries | 122 |
| 13.13 | Survival | 122 |
| 13.14 | Time of Essence | 122 |
| 13.15 | Entire Agreement | 122 |
| 13.16 | Interpretation | 122 |
| 13.17 | Confidentiality | 122 |
| 13.18 | GOVERNING LAW; CONSENT TO FORUM | 123 |
| 13.19 | WAIVERS BY OBLIGORS | 124 |
| 13.20 | Advertisement | 125 |
| 13.21 | Joint and Several Liability | 125 |
| 13.22 | Patriot Act Notice | 128 |
| 13.23 | Relationship with Lenders | 128 |
| 13.24 | Appointment for Perfection | 128 |
| 13.25 | Independence of Covenants | 128 |
| 13.26 | No Advisory or Fiduciary Responsibility | 128 |
| 13.27 | Intercreditor Arrangements | 129 |
| 13.28 | Certifications From Banks and Participants; Patriot Act. | 129 |
| 13.29 | | 129 |
| 13.30 | Anti-Terrorism Laws. | 129 |
| 13.31 | | 129 |

**SECTION 14.** GUARANTY | 130

| 14.1 | Guaranty | 130 |
|------|----------|-----|
| 14.2 | Guaranty Absolute | 130 |
| 14.3 | Waiver | 131 |
| 14.4 | Continuing Guaranty; Assignments | 131 |
| 14.5 | Subrogation | 132 |
| 14.6 | [Intentionally omitted]. | 132 |
| 14.7 | Information | 132 |
| 14.8 | Termination | 132 |
| 14.9 | Taxes | 132 |
| 14.10 | Maximum Liability | 133 |
| 14.11 | Contribution | 133 |
| 14.12 | Keepwell | 133 |

**SECTION 15.** THE BORROWER REPRESENTATIVE | 134

| 15.1 | Appointment; Nature of Relationship | 134 |
|------|-------------------------------------|-----|
| 15.2 | Powers | 134 |
| 15.3 | Employment of Agents | 134 |

iii

| | | |
|---|---|---|
| 15.4 | Notices | 134 |
| 15.5 | Successor Borrower Representative | 134 |
| 15.6 | Execution of Loan Documents; Borrowing Base Certificate | 134 |
| 15.7 | Reporting | 135 |
| 15.8 | Excluded Swap Obligations and Security Documents | 135 |

EXHIBITS

| | |
|---|---|
| EXHIBIT A | Form of Note |
| EXHIBIT B | Form of Borrowing Base Certificate |
| EXHIBIT C | Form of Compliance Certificate |
| EXHIBIT D | Form of Assignment and Acceptance |
| EXHIBIT E | Form of Interim Order |
| EXHIBIT F | Form of Financial Covenant Certificate |

SCHEDULES

COMMITMENT SCHEDULE

| | |
|---|---|
| SCHEDULE 1E | Foreign Subsidiaries |
| SCHEDULE 1F | Guarantors |
| SCHEDULE 1G | [Reserved] |
| SCHEDULE 1H | Joint Ventures |
| SCHEDULE 6.1 | Commercial Tort Claims |
| SCHEDULE 7.1.1(a) | Locations of Collateral |
| SCHEDULE 7.1.1(c) | Deposit Accounts and Securities Accounts |
| SCHEDULE 8.1.1 | Foreign Qualifications |
| SCHEDULE 8.1.4 | Names and Capital Structure |
| SCHEDULE 8.1.5 | Title to Properties |
| SCHEDULE 8.1.14 | Intellectual Property |
| SCHEDULE 8.1.18 | Litigation |
| SCHEDULE 8.1.21 | ERISA Exceptions |
| SCHEDULE 8.1.23 | Labor Matters |
| SCHEDULE 8.1.24 | Insurance |
| SCHEDULE 8.1.25(a) | Filing Offices |
| SCHEDULE 9.2.2(g) | Existing Investments |
| SCHEDULE 9.2.3 | Outstanding Indebtedness |
| SCHEDULE 9.2.5 | Permitted Liens |
| SCHEDULE 13.10 | Lender Addresses |

iv

**SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION ABL LOAN,
SECURITY AND GUARANTY AGREEMENT**

**THIS SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION ABL LOAN, SECURITY AND GUARANTY AGREEMENT** made as of the 12th day of March, 2015, by and among **PNC BANK, NATIONAL ASSOCIATION** ("PNC") as Agent (as defined below) for itself and the other Lenders (as defined below), PNC, as LC Issuer and as a Swingline Lender, the **LENDERS, CHASSIX, INC.**, a Delaware corporation ("Chassix"), **DIVERSIFIED MACHINE, INC.**, a Delaware corporation ("DMI"), **DIVERSIFIED MACHINE BRISTOL, LLC**, a Delaware limited liability company ("DM Bristol"), **DIVERSIFIED MACHINE MONTAGUE, LLC**, a Delaware limited liability company ("DM Montague"), **DIVERSIFIED MACHINE, MILWAUKEE LLC**, a Delaware limited liability company ("DM Milwaukee"), **DMI EDON LLC**, a Delaware limited liability company ("DMI Edon"), **MEXICO PRODUCTS I, LLC**, a Delaware limited liability company ("Mexico Products I"), **DMI COLUMBUS, LLC**, a Delaware limited liability company ("DMI Columbus"), **DMI CHINA HOLDING LLC**, a Michigan limited liability company ("DMI China"), **CHASSIX GEORGIA MACHINING, LLC**, a Delaware limited liability company ("CGM"), **AUTOMOTIVE PROPERTIES OF NEW YORK, LLC**, a New York limited liability company ("APNY"), **CONCORD INTERNATIONAL, INC.**, a Delaware corporation ("Concord"), **SMW AUTOMOTIVE, LLC**, a Delaware limited liability company ("SMW Auto"), **AUTOMOTIVE, LLC**, a Delaware limited liability company ("Automotive"), **CHASSIS CO. OF MICHIGAN, LLC**, a Delaware limited liability company ("Chassis MI"), and **ALUTECH, LLC**, a Michigan limited liability company ("Alutech"), as Borrowers, **UC HOLDINGS, INC.**, a Delaware corporation ("Parent"), each a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code as a Guarantor, the other Obligors from time to time party hereto, PNC, as syndication agent (in such capacity, the "Syndication Agent") and PNC Capital Markets LLC, as Sole Lead Arranger and Sole Book Runner (in such capacities, collectively, the "Lead Arranger").

**R E C I T A L S:**

**WHEREAS**, on March 12, 2015 (the "Petition Date"), the Obligors (in such capacity, each a "Debtor") filed voluntary petitions with the Bankruptcy Court initiating cases pending under Chapter 11 of the Bankruptcy Code (collectively, the "Cases" and each a "Case") and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**WHEREAS**, the Borrowers have applied to the Lenders for a revolving credit facility in an aggregate principal amount of $150,000,000 on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS; RULES OF CONSTRUCTION

1.1    Specific Definitions.  When used in this Agreement, the following terms shall have the following meanings (terms defined in the singular to have the same meaning when used in the plural and vice versa):

13-Week Projection – a projected statement of sources and uses of cash for the Debtors on a weekly basis for the following 13 calendar weeks which shall include the anticipated uses of the Loans for each week during such period.  As used herein, "13-Week Projection" shall initially refer to the 13-Week Projection delivered to Agent in connection with the initial borrowings under the DIP ABL Facility

authorized by the Interim Order and, thereafter, the most recent 13-Week Projection delivered by the Borrower in accordance with <u>Section 9.1.3(d)</u>.

<u>21-Week Budget</u>  --the "Budget" as defined in the DIP Term Loan Agreement delivered to the DIP Term Loan Agent from time to time thereunder.

<u>Acceptable Reorganization Plan</u> – a Reorganization Plan that provides for either (i) conversion of this Agreement into an exit asset-based revolving facility on terms acceptable to the Agent and the Lenders upon the earlier of (a) substantial consummation of such Reorganization Plan or (b) the effective date of such Reorganization Plan or (ii) (a) the termination of the Commitments, (b) payment in full in cash of the Obligations under the Loan Documents (other than contingent indemnification obligations not yet due and payable) upon the earlier of (x) substantial consummation of such Reorganization Plan or (y) the effective date of such Reorganization Plan, and (c) the cancellation, cash collateralization, posting of backstop letters of credit or such other provision for outstanding Letters of Credit on the Consummation Date of such Reorganization Plan, and, in each case, is otherwise reasonably acceptable to Agent.

<u>Access Agreement</u> – that certain Access Agreement, dated as of March 11, 2015 (as amended, supplemented or otherwise modified from time to time in accordance with its terms), among Chassix, the Designated OEM Parties, DIP Term Loan Agent, Agent and the other entities from time to time party thereto.

<u>Accommodation Agreement</u> – that certain Accommodation Agreement, dated as of March 11, 2015 (as amended, supplemented or otherwise modified from time to time in accordance with its terms), among Chassix, Parent, Agent, DIP Term Loan Agent, and the Designated OEM Parties and the other entities from time to time party thereto.

<u>Account Debtor</u> – any Person who is or may become obligated under or on account of any Account, Contract Right, Chattel Paper or General Intangible.

<u>Additional Credit</u> – as defined in <u>Section 10.2(d)</u>.

<u>Affiliate</u> – with respect to any Person, another Person that directly or indirectly (through one or more intermediaries), Controls or is Controlled by or is under common Control with the Person specified.

<u>Affiliate Transaction</u> – as defined in <u>Section 9.2.4</u>.

<u>Agent</u> – PNC, in its capacity as agent for the Lenders under this Agreement and any successor in that capacity appointed pursuant to <u>Section 12.9</u>.

<u>Agreement</u> – this Superpriority Secured Debtor-In-Possession ABL Loan, Security and Guaranty Agreement and all Exhibits and Schedules hereto, as each of the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

<u>Alternate Base Rate</u> – for any day, a rate per annum equal to the highest of (a) the Base Rate in effect on such day, (b) the sum of the Federal Funds Open Rate in effect on such day plus one half of one percent (0.5%), and (c) the sum of the Daily LIBOR Rate in effect on such day plus one percent (1.0%), so long as a Daily LIBOR Rate is offered, ascertainable and not unlawful.

<u>Alutech</u> – as defined in the preamble.

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

Anti-Terrorism Laws – any Laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering or bribery, and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws, all as amended, supplemented or replaced from time to time.

APNY – as defined in the preamble.

Applicable Law – all laws, rules and regulations applicable to the Person, conduct, transaction, covenant, Loan Document or contract in question, including all applicable common law and equitable principles, all provisions of all applicable state, federal and foreign constitutions, statutes, rules, regulations, treaties, directives and orders of any Governmental Authority, and all orders, judgments and decrees of all courts and arbitrators.

Applicable Margin – for any day, (i) with respect to any Base Rate Loan, 1.25% and (ii) with respect to any LIBOR Loan, 2.25%.

Applicable Unused Line Fee Rate – a per annum rate equal to 0.375%.

Application Date – as defined in Section 3.2.

Approved Fund – any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in its ordinary course of activities, and is administered or managed by a Lender, an entity that administers or manages a Lender, or an Affiliate of either.

Assignment and Acceptance Agreement – an assignment and acceptance agreement in the form of Exhibit D hereto pursuant to which a Lender assigns to an assignee (with the consent of any party whose consent is required by Section 13.2.1) all or any portion of any of such Lender's rights and obligations hereunder as permitted pursuant to the terms of this Agreement.

Audited Financial Statements – as defined in Section 8.1.8(a).

Automotive – as defined in the preamble.

Availability – at any time of determination, an amount equal to the Maximum Borrowing Amount at such time minus the principal amount of the total Revolving Outstandings for all Lenders at such time.

Availability Reserves – The sum (without duplication) of (a) the Carve-Out Reserve, (b) the Rent and Charges Reserve and (c) other reserves established or maintained by Agent in Agent's Permitted Discretion to the extent such reserves relate to (x) Material Setoffs or Tooling Setoffs (each as defined in the Accommodation Agreement) of which Agent has received notice in accordance with the terms of the Accommodation Agreement or (y) specific events, conditions or contingencies first occurring or first discovered by Agent after the Closing Date and which have a material and adverse effect on the value of the Collateral or the Liens of Agent thereon.

The implementation or increase of any Availability Reserve will be limited to the exercise by Agent of Permitted Discretion, upon at least three business days' prior notice to the Borrower Representative (which notice will include a reasonably detailed description of the reserve being established). During such three business day period, Agent will, if requested, discuss any such reserve or change with the Borrower Representative, and the Borrower Representative may take such action as may be required so that the event, condition or matter that is the basis for such reserve or change no longer exists or exists in a manner that would result in the establishment of a lower reserve or result in a lesser

3

change, in each case, in a manner and to the extent reasonably satisfactory to Agent. Notwithstanding anything to the contrary herein, (a) the amount of any such reserve or change will have a reasonable relationship to the event, condition or other matter that is the basis for such reserve or such change and (b) no reserves or changes will be duplicative of reserves or changes already accounted for through eligibility criteria.

Available Revolving Loan Commitment – at any time, the aggregate Revolving Loan Commitments minus the total Revolving Outstandings for all Lenders (calculated, with respect to any Defaulting Lender, as if such Defaulting Lender had funded its Revolving Loan Percentage of all outstanding Loans).

Avoidance Action – the Debtors' claims and causes of action that constitute avoidance actions under Sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise.

Bank – PNC in its individual capacity, and its successors.

Bank Products – services or facilities extended to any Obligor consisting of the following: (a) credit cards and other purchasing cards, (b) cash management or related services including the automatic clearing house transfer of funds for the account of such Obligor pursuant to agreement or overdraft, and (c) treasury management, including controlled disbursement services.

Bank Product Obligations – every obligation of any Obligor under and in respect of any Bank Products extended to such Obligor by Bank, Agent, any Lender or any Affiliate of Bank or Agent or any Lender.

Bankruptcy Code – Title 11 of the United States Code.

Bankruptcy Court – the United States Bankruptcy Court for the Southern District of New York or any appellate court having jurisdiction over the Cases from time to time.

Base Rate – the base commercial lending rate of PNC as publicly announced to be in effect from time to time, such rate to be adjusted automatically, without notice, on the effective date of any change in such rate.  This rate of interest is determined from time to time by PNC as a means of pricing some loans to its customers and is neither tied to any external rate of interest or index nor does it necessarily reflect the lowest rate of interest actually charged by PNC to any particular class or category of customers of PNC.

Base Rate Loans – any Loan for the periods when the rate of interest applicable to such Loan is calculated by reference to the Alternate Base Rate.

BMO Cash Collateral Account – a Deposit Account at BMO Harris Bank N.A. into which the Obligors will place cash collateral in respect of the Prepetition Letters of Credit.

Borrower Representative – as defined in Section 15.

Borrowers – Chassix, DMI, DM Bristol, DM Montague, DM Milwaukee, DMI Edon,  Mexico Products I, DMI Columbus, DMI China, CGM, APNY, Concord, SMW Auto, Automotive, Chassis MI and Alutech.

Borrowing Base – as at any time of determination thereof, an amount equal to:

      (a)     with respect to Eligible Accounts owing from each Specified Customer, 92.5% of the net amount of such Eligible Accounts outstanding at such time, plus

      (b)     with respect to Eligible Accounts owing from all Account Debtors (other than Specified Customers), 85% of the net amount of such Eligible Accounts outstanding at such time, plus

      (c)     with respect to all Eligible Inventory at such time, (i) all in-transit Inventory and raw materials Inventory at 36.81% of cost and (ii) all work-in-process and finished goods Inventory at 70% of cost; provided, that with respect to Inventory of the SMW Obligors, (1) all raw materials shall be included at 52.87% of cost, (2) all work-in-process Inventory shall be included at 22.7% of cost and (3) all finished goods Inventory shall be included at 70% of cost; provided, further, that to the extent a new inventory appraisal is received after the Closing Date, the advance rates set forth in this clause (c) shall be the lesser of (i) 70% of the cost of Eligible Inventory at such time and (ii) 85% of the NOLV of Eligible Inventory at such time, minus

      (d)     Availability Reserves.

For purposes hereof, (1) the net amount of Eligible Accounts at any time shall be the face amount of such Eligible Accounts less any and all returns, rebates, discounts, credits, allowances or Taxes (including income, excise or other taxes) of any nature issued, owing, claimed by Account Debtors, granted, outstanding or payable in connection with such Accounts at such time and (2) the amount of Eligible Inventory shall be determined on a first-in, first-out, lower of cost or market basis in accordance with GAAP. The Borrowers' Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate delivered to Agent pursuant to Section 9.1.4(a), subject to adjustment as provided in the last sentence of the definition of Borrowing Base Certificate.

Borrowing Base Certificate – a certificate by a Senior Officer of Borrower Representative, on behalf of all Borrowers, substantially in the form of Exhibit B (or another form acceptable to Agent) setting forth the calculation of the Borrowing Base, including a calculation of each component thereof, all in such detail as shall be satisfactory to Agent in its Permitted Discretion.  All calculations of the Borrowing Base in connection with the preparation of any Borrowing Base Certificate shall originally be made by Borrowers and certified to Agent; provided, that Agent may from time to time review and adjust any such calculation to implement or increase Availability Reserves in accordance with the terms of this Agreement or to the extent the calculation is not made in accordance with this Agreement or does not accurately reflect the Availability Reserves.

Bristol Plant – the Obligors' production facility located in Bristol, Indiana.

Business Day – any day excluding Saturday, Sunday and any day which is a legal holiday under the laws the State of New York, the State of Illinois, or is a day on which banking institutions located in such state are closed.

Cases – as defined in the preamble.

Capital Expenditures – expenditures made or liabilities incurred for the acquisition of any fixed assets or improvements, replacements, substitutions or additions thereto which have a useful life of more than one year, including the total principal portion of Capitalized Lease Obligations.

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

Capitalized Lease Obligation – any Indebtedness represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

Carve-Out – as defined in the applicable Order.

Carve-Out Reserve – as defined in the applicable Order.

Cash Collateralize – the delivery of cash to Agent, as security for the payment of Obligations, in an amount equal to (a) with respect to the Maximum Undrawn Amount, 105% of the aggregate Maximum Undrawn Amount, and (b) with respect to any outstanding Swingline Loans or any inchoate, contingent or other Obligations (including Obligations arising under Bank Product Obligations), Agent's good faith estimate of the amount due or to become due, including all accrued and unpaid interest, documented fees and other amounts relating to such Obligations.  "Cash Collateral" and "Cash Collateralization" have correlative meanings.

CGM – as defined in the preamble.

Change in Law – the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking effect of any Applicable Law; (b) any change in any Applicable Law or in the administration, implementation, interpretation or application thereof by any Governmental Body; or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Body; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, regulations, guidelines, interpretations or directives thereunder or issued in connection therewith (whether or not having the force of Applicable Law) and (y) all requests, rules, regulations, guidelines, interpretations or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities (whether or not having the force of law), in each case pursuant to Basel III, shall in each case be deemed to be a Change in Law regardless of the date enacted, adopted, issued, promulgated or implemented.

Chassix – as defined in the preamble.

Chassis MI – as defined in the preamble.

Chrysler Group – collectively, FCA US LLC (f/k/a Chrysler Group LLC) and Chrysler Canada Inc.

Closing Date – March 13, 2015.

Code – the Internal Revenue Code of 1986.

Collateral – all of the Property and interests in Property of the Obligors described in Section 6; provided, that in no event shall the term Collateral include Excluded Assets.

Collateral Access Agreement – any landlord waiver or other agreement, in form and substance reasonably satisfactory to Agent, between Agent and any third party (including any bailee, consignee, warehouseman, customs broker, or other similar Person) in possession of any Collateral or any landlord of any real Property where any Collateral is located, as such landlord waiver or other agreement may be amended, restated, supplemented or otherwise modified from time to time.

Commitment Schedule – the Schedule attached hereto identified as such.

6

Commodity Exchange Act – the Commodity Exchange Act (7 U.S.C. Section 1, et seq.), as amended from time to time, and any successor statute.

Compliance Certificate – as defined in Section 9.1.3.

Computer Hardware and Software – any right of any Obligor (including rights as licensee and lessee) with respect to (a) computer and other electronic data processing hardware, including all integrated computer systems, central processing units, memory units, display terminals, printers, computer elements, card readers, tape drives, hard and soft disk drives, cables, electrical supply hardware, generators, power equalizers, accessories, peripheral devices and other related computer hardware; (b) all software and all software programs designed for use on computers and electronic data processing hardware, including all operating system software, utilities and application programs in any form (source code and object code in magnetic tape, disk or hard copy format or any other listings whatsoever); (c) any firmware associated with any of the foregoing; (d) any documentation for hardware, software and firmware, including flow charts, logic diagrams, manuals, specifications, training materials, charts and pseudo codes and (e) all rights with respect thereto, including any and all licenses, options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications, and any substitutions, replacements, additions or model conversions of any of the foregoing.

Concord – as defined in the preamble.

Consolidated – the consolidation in accordance with GAAP of the accounts or other items as to which such term applies.

Consolidated Total Assets – as of any date of determination, the amount that would, in conformity with GAAP, be set forth opposite the caption "total assets" (or any like caption) on the most recent consolidated balance sheet of Parent and its Subsidiaries at such date.

Contract Right – any right of any Obligor to payment under a contract for the sale or lease of goods or the rendering of services, which right is at the time not yet earned by performance.

Consummation Date – the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of an Acceptable Reorganization Plan that is confirmed pursuant to an order of the Bankruptcy Court.

Control – the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have correlative meanings.

Control Account – each Deposit Account and Securities Account, in each case with respect to which a Deposit Account Control Agreement or Securities Account Control Agreement, as applicable, has been entered into among Bank, as the deposit account bank or one of Bank's Affiliates acceptable to Agent, as the securities intermediary, as the case may be, at which such account is maintained (or, except as required pursuant to Section 9.1.14(b), another domestic bank acceptable to Agent), Agent and the relevant Obligor.

Covered Entity – (a) each Borrower, each of Borrower's Subsidiaries, all Guarantors and all pledgors of Collateral and (b) each Person that, directly or indirectly, is in control of a Person described in clause (a) above.  For purposes of this definition, control of a Person shall mean the direct or indirect (x) ownership of, or power to vote, 25% or more of the issued and outstanding equity interests having

ordinary voting power for the election of directors of such Person or other Persons performing similar functions for such Person, or (y) power to direct or cause the direction of the management and policies of such Person whether by ownership of equity interests, contract or otherwise.

Creditors' Committee – the statutory committee of unsecured creditors appointed in the Cases.

Customer Agreements – those certain Component Supply Agreements by and among the Obligors party thereto and the Designated OEM Parties party thereto entered into pursuant to the Accommodation Agreement.

Daily LIBOR Rate – for any day, the rate per annum determined by the Agent by dividing (x) the Published Rate by (y) a number equal to 1.00 minus the Reserve Percentage.

Debtor – as defined in the preamble.

Default – an event or condition the occurrence of which would, with the lapse of time or the giving of notice, or both, become an Event of Default.

Defaulting Lender – any Lender that (a) has failed to fund any portion of the Loans or participations in Letters of Credit required to be funded by it hereunder within two (2) Business Days of the date required to be funded by it hereunder; unless, such Lender notifies Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including a particular Default or Event of Default, if any) has not been satisfied, (b) has otherwise failed to pay over to Agent or any other Lender any other amount required to be paid by it hereunder within one (1) Business Day of the date when due, unless the subject of a good faith dispute, (c) has been deemed or has a parent company that has been deemed insolvent or becomes the subject of an Insolvency Proceeding, (d) has notified the Borrower Representative, Agent or any Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including a particular Default or Event of Default, if any) to funding a loan under this Agreement cannot be satisfied) or under other agreements in which it commits to extend credit or (e) has failed to confirm within two Business Days of a request by Agent that it will comply with the terms of this Agreement relating to its obligations to fund Loans and participations in Letters of Credit; provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (e) upon Agent's receipt of such certification in form and substance satisfactory to the Agent.

Default Rate – as defined in Section 3.1.2.

Deposit Account Control Agreement – an agreement, in form and substance reasonably satisfactory to Agent, among any Obligor, a banking institution holding such Obligor's funds, and Agent with respect to collection and control of all deposits and balances held in a Deposit Account maintained by such Obligor with such banking institution.

Designated OEM Parties – each of Ford Motor Company, General Motors, LLC, FCA US LLC, and Nissan North America, Inc.

DIP ABL Facility – collectively, the Revolving Loan Commitments and the extensions of credit made hereunder or pursuant to any other Loan Documents.

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

DIP ABL Priority Collateral – the "Collateral" as defined in Section 6.1.

DIP Term Loan Agent – Cantor Fitzgerald Securities, in its capacity as agent under the DIP Term Loan Agreement.

DIP Term Lender(s) –the lenders party to the DIP Term Loan Agreement from time to time.

DIP Term Loan Agreement – that certain Superpriority Secured Debtor-In-Possession Term Loan, Security and Guaranty Agreement, dated as of the date hereof (as amended, supplemented or otherwise modified from time to time), by and among the Obligors, the DIP Term Loan Agent, and the lenders and other parties from time to time party thereto.

DIP Term Loan Documents – the Loan Documents (as defined in the DIP Term Loan Agreement).

DIP Term Loan Facility – the credit facility contemplated by the DIP Term Loan Agreement.

DIP Term Loan Priority Collateral – as defined in the applicable Order.

DIP Term Loan Collateral Account – means any deposit account or securities account required to be established pursuant to the DIP Term Loan Documents for purposes of exclusively holding identifiable Proceeds of DIP Term Loan Priority Collateral pending application as required under the DIP Term Loan Documents (it being understood that DIP ABL Priority Collateral deposited in the DIP Term Loan Collateral Account shall continue to be DIP ABL Priority Collateral).

Distribution – in respect of any Person means and includes any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Parent or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in Parent or any of its Subsidiaries or any option, warrant or other right to acquire any such Equity Interests in Parent or any of its Subsidiaries; *provided* that for purposes of Section 9.2.7, "Distributions" shall include any payment by any Obligor or any of its Subsidiaries to Sponsor.

DM Bristol – as defined in the preamble.

DM Milwaukee – as defined in the preamble.

DM Montague – as defined in the preamble.

DMI – as defined in the preamble.

DMI China – as defined in the preamble.

DMI Columbus – as defined in the preamble.

DMI Edon – as defined in the preamble.

Domestic Subsidiary – any Subsidiary that is not a Foreign Subsidiary.

Drawing Date – as defined in Section 2.2.5(b).

9

Eligible Account – an Account arising in the ordinary course of the business of any Borrower from the sale of goods or rendition of services; provided that no Account shall be an Eligible Account if:

(a)    it arises out of a sale made or services rendered by a Borrower to an Affiliate of any Obligor or any Subsidiary (other than a portfolio company of the Sponsor to the extent such sale or service is made or rendered on an arms-length basis) or an employee or agent of any Obligor or any Subsidiary (other than a portfolio company of the Sponsor to the extent such sale or service is made or rendered on an arms-length basis); or

(b)    it remains unpaid more than the earlier of 60 days after the original due date shown on the invoice or 90 days after the original invoice date shown on the invoice; or

(c)    [Intentionally omitted]; or

(d)    any covenant, representation or warranty contained in this Agreement with respect to such Account has been breached in any material respect; or

(e)    the Account Debtor is also a creditor or supplier of a Borrower or any Subsidiary of a Borrower, or the Account Debtor has disputed liability with respect to such Account, or the Account Debtor has made any claim with respect to any other Account due from such Account Debtor to a Borrower or any Subsidiary of a Borrower, or the Account otherwise is or may become subject to right of setoff by the Account Debtor, provided, that any such Account shall be eligible to the extent such amount thereof exceeds such contract, dispute, claim, setoff or similar right; or

(f)    the Account Debtor has commenced a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or made an assignment for the benefit of creditors, or a decree or order for relief has been entered by a court having jurisdiction in the premises in respect of the Account Debtor in an involuntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other petition or other application for relief under the federal bankruptcy laws, as now constituted or hereafter amended, has been filed against the Account Debtor, or if the Account Debtor has failed, suspended business, ceased to be Solvent, or consented to or suffered a receiver, trustee, liquidator or custodian to be appointed for it or for all or a significant portion of its assets or affairs; or

(g)    it arises from a sale made or services rendered to an Account Debtor outside the United States, unless the sale is (1) either (i) to an Account Debtor located in Canada or (ii) supported by a letter of credit, credit insurance, guaranty or on acceptance terms, in each case acceptable to Agent in its Permitted Discretion or (2) to an Account Debtor that is a Subsidiary of Chrysler Group, Ford Motor Company or General Motors located outside of the United States, in each case, so long as Chrysler Group, Ford Motor Company or General Motors, as applicable, has a rating of BB or better by S&P; or

(h)    (i) it arises from a sale to the Account Debtor on a bill-and-hold, guaranteed sale, sale-or-return, sale-on-approval, consignment, or any other repurchase or return basis; or (ii) it is subject to a reserve established by a Borrower for potential returns or refunds, to the extent of such reserve; or

(i)    the Account Debtor is the United States of America or any department, agency or instrumentality thereof, unless the applicable Borrower assigns its right to payment of such

Account to Agent, in a manner satisfactory to Agent, in its Permitted Discretion, so as to comply with the Assignment of Claims Act of 1940 (31 U.S.C. §203 et seq., as amended); or

(j)    it is not at all times subject to Agent's duly perfected, first priority security interest or is subject to a Lien that is not a Permitted Lien; or

(k)    the goods giving rise to such Account have not been delivered to and accepted by the Account Debtor or the services giving rise to such Account have not been performed by the applicable Borrower and accepted by the Account Debtor or the Account otherwise does not represent a final sale; or

(l)    the Account is evidenced by chattel paper or an instrument of any kind, or has been reduced to judgment; or

(m)    any Borrower or a Subsidiary of any Borrower has made any agreement with the Account Debtor for any extension, compromise, settlement or modification of the Account or deduction therefrom, except for discounts or allowances which are made in the ordinary course of business for prompt payment and which discounts or allowances are reflected in the calculation of the face value of each invoice related to such Account; or

(n)    50% or more of the Accounts owing from the Account Debtor are not Eligible Accounts hereunder; or

(o)    it represents service charges, late fees or similar charges; or

(p)    Accounts with respect to which the respective Account Debtor is on "Cash on Delivery" or other cash in advance terms; or

(q)    the Account relates to any production planning approval equipment, such as tooling and gauging items except to the extent that such Accounts are (i) subject to an Account Debtor approved production part approval process document for production planning approval equipment that has been completed (or a similar document evidencing approval for invoicing for such planning approval equipment by the applicable Account Debtor), (ii) arise under a contract that obligates the Account Debtor to remit payment, and (iii) not unpaid for more than ninety (90) days after the date of the original invoice; or

(r)    it is not otherwise acceptable to Agent in its Permitted Discretion.

Eligible Assignee – a Person that is a Lender, a U.S.-based Affiliate of a Lender or an Approved Fund; provided that neither Sponsor nor any Affiliate of Sponsor may be an Eligible Assignee.

Eligible Inventory – Inventory owned by any Borrower (other than packaging materials and supplies, tooling, samples and literature), including raw materials, finished goods and work in process; provided that no Inventory shall be Eligible Inventory if:

(a)    it is finished goods located in any location containing Eligible Inventory with an aggregate value of less than $50,000; or

(b)    it is not in good, new and saleable condition; or

(c)    it is slow-moving, damaged, aged, obsolete or unmerchantable; or

11

(d)      it does not meet all standards imposed by any governmental agency or authority; or

(e)      it does not conform in any material respect to any covenants, warranties and representations set forth in this Agreement; or

(f)      it is not at all times subject to Agent's duly perfected, first priority security interest or is subject to a Lien that is not a Permitted Lien; or

(g)      it is not situated in the United States or Canada and otherwise at a location in compliance with this Agreement, provided that Inventory situated at a location not owned by such Borrower will be Eligible Inventory only if Agent has received a Collateral Access Agreement with respect to such location or if Agent has established an applicable Rent and Charges Reserve hereunder; provided further that if Agent has been provided a description of such location and the Inventory situated thereon and determines, in its Permitted Discretion, not to establish a Rent and Charges Reserve with respect to such Inventory, then such Inventory shall not be deemed ineligible under this clause (g); or

(h)      it is subject to consignment; or

(i)      it is in transit, unless (i) it is in transit in the continental United States or Canada with a common carrier from vendors or suppliers, so long as the common carrier is not the applicable vendor or supplier or an Affiliate of the applicable vendor or supplier, (ii) it is in transit to either (x) the premises of a Borrower in the United States which are either owned and controlled by a Borrower or leased by a Borrower, or (y) premises of a third-party warehouseman, in each case with respect to which Agent has received a Collateral Access Agreement with respect to such location or if Agent has established an applicable Rent and Charges Reserve (provided that if Agent has been provided a description of such location and the Inventory situated thereon and determines, in its Permitted Discretion, not to establish a Rent and Charges Reserve with respect to such Inventory, then such Inventory shall not be deemed ineligible under this clause (i)), (iii) title to such Inventory in transit has passed to such Borrower and has not been consigned to any other person, (iv) it is not sold by a vendor or supplier that has a right to reclaim, divert shipment of, repossess, stop delivery, claim any reservation of title or otherwise assert Lien rights against the Inventory, or with respect to whom such Borrower is in default of any obligation, (v) such Inventory in transit is insured to the full value thereof, Agent has been named as an additional insured and loss payee in a manner acceptable to Agent, and Agent has received satisfactory evidence of the foregoing, and (vi) such Borrower has provided Agent with such other materials as may be requested by Agent evidencing title of such Borrower to such Inventory; provided that no more than $500,000 in the aggregate at any one time of in-transit Inventory may be Eligible Inventory; or

(j)      it is subject to a recall or similar notice for so long as such particular Inventory is subject to a recall or similar notice; or

(k)      it is subject to a license agreement that (i) would restrict Agent's ability to possess or sell, or assign the right to possess or sell such Inventory, or (ii) require the consent of the licensor or other Person to sell or assign such Inventory unless such consent has been obtained in form and substance satisfactory to Agent in its sole discretion; or

(l)      is damaged, defective, shopworn or otherwise unfit for sale; or

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

(m)    it is not otherwise acceptable to Agent in its Permitted Discretion.

Environmental Laws – the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, et seq.), the Federal Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), as such laws may be amended or otherwise modified from time to time, and any other present or future federal, state, local or foreign statute, ordinance, common law, rule, regulation, order, judgment, decree, permit, license or other binding determination of any Governmental Authority related to the protection of the environment, the handling, storage, generation, transportation, disposal of, Release, deposit or migration of any Hazardous Materials into the environment.

Environmental Liabilities and Costs – all liabilities, monetary obligations, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigations and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any Governmental Authority or any third party, and arising out of or under any Environmental Law or which otherwise relate to any environmental condition or a Release of Hazardous Materials.

Environmental Lien – any Lien in favor of any Governmental Authority arising under or related to any Environmental Law.

Environmental Notice – a notice (whether written or oral) from any Governmental Authority or other Person of any possible noncompliance with, investigation of a possible violation of, litigation relating to, or potential fine or liability under any Environmental Law, or with respect to any Release of Hazardous Materials, environmental pollution or hazardous materials, including any complaint, summons, citation, order, claim, demand or request for correction, remediation, information or otherwise.

Equity Interest – means the interest, whether voting or non-voting, and whether denominated as common stock or preferred stock or ordinary shares or preferred shares, as the case may be, of any (a) shareholder in a corporation; (b) partner in a partnership (whether general, limited, limited liability or Joint Venture); (c) member in a limited liability company; or (d) other Person having any other form of equity security or ownership interest, in each case including all warrants, options beneficial interests, participations or other rights to acquire any of the foregoing.

ERISA – the Employee Retirement Income Security Act of 1974, as amended, and any successor statute, and all rules and regulations from time to time promulgated thereunder.

ERISA Affiliate: any trade or business (whether or not incorporated) under common control with an Obligor within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

ERISA Event – (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Obligor or ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Obligor or ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) the determination that

13

any Pension Plan or Multiemployer Plan is considered an at risk plan or a plan in critical or endangered status within the meaning set forth in the Pension Funding Rules; (f) any Obligor or ERISA Affiliate requests a minimum funding waiver or fails to meet any funding obligations with respect to any Pension Plan or Multiemployer Plan; (g) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Obligor or ERISA Affiliate.

Event of Default – as defined in Section 11.1.

Excess Availability – at any time of determination, an amount equal to Availability at such time plus all cash or cash equivalents of Borrowers at such time deposited in Deposit Accounts or Securities Accounts held at Agent or its Affiliate, as applicable.

Excluded Assets – (a) any lease, license, contract, permit or agreement (or any of its rights or interests thereunder) if and to the extent that the grant of the security interest shall, after giving effect to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) or any other applicable law, constitute or result in (i) the abandonment, invalidation or unenforceability of any right, title or interest of the Obligor therein or (ii) a breach or termination pursuant to the terms of, or a default under, any such lease license, contract, property rights or agreement; (b) any lease, license, contract, permit or agreement (or any of its rights or interests thereunder) if and to the extent that any applicable law or regulation prohibits the creation of a security interest thereon (other than to the extent that any such term would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law or principles of equity); (c) any assets subject to a Purchase Money Lien permitted hereunder to the extent that the agreements governing the Indebtedness secured by such Liens prohibit the granting of a security interest to Agent hereunder (other than to the extent that any such prohibition would be rendered ineffective pursuant to Sections 9-406, 9-407, 9-408 or 9-409 of the UCC (or any successor provision or provisions) of any relevant jurisdiction or any other applicable law or principles of equity); (d) all licenses issued by the Federal Communications Commission to the extent that Agent may not validly possess a security interest therein pursuant to the Communication Act of 1934 (as amended) and the regulations promulgated thereunder or other applicable law (other than the economic value of such licenses, all rights incident or appurtenant to such licenses and the right to receive all monies, consideration and proceeds of any sale, assignment or transfer of such licenses); (e) any of the Voting Stock of a first tier Foreign Subsidiary in excess of 65% of the outstanding Voting Stock of such first tier Foreign Subsidiary, (f) the assets of any Foreign Subsidiary; (g) any other property or asset owned by any Obligor of the type that would constitute DIP Term Loan Priority Collateral.

Excluded Deposit Accounts – (a) Deposit Accounts the balance of which consists exclusively of (i) withheld income taxes and federal, state or local employment taxes required to be paid to the Internal Revenue Service or state or local government agencies with respect to employees of any Obligor and (ii) amounts required to be paid over to an employee benefit plan pursuant to DOL Reg. Sec. 2510.3 102 on behalf of or for the benefit of employees of any Obligor, (b) all segregated deposit accounts constituting (and the balance of which consists solely of funds set aside in connection with) payroll accounts, trust accounts, and accounts dedicated to the payment of accrued employee benefits, medical, dental and employee benefits claims to employees of any Obligor, (c) any zero balance or sweep accounts, the funds in which are swept or transferred on a daily basis (or if due to the policies of the financial institution at which such Deposit Account is maintained such funds are not then available for transfer, on the next Business Day) to a Control Account, (d) the Notes Collateral Account (as defined in the Prepetition Senior Secured Notes Indenture) and the DIP Term Loan Collateral Account and (e) other deposit

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

accounts containing petty cash amounts that do not exceed at any time $100,000 for any such account and $250,000 in the aggregate for all such accounts under this <u>clause (e)</u>.

<u>Excluded Subsidiary</u> – any Foreign Subsidiary.

<u>Excluded Swap Obligation</u> – with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

<u>Excluded Taxes</u> – with respect to Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Obligor hereunder, (a) Taxes imposed on or measured by its net income (however denominated), and franchise Taxes imposed on it (in lieu of net income Taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized, in which its principal office is located, or in which it is otherwise doing business (other than if Agent or such Lender is doing business in such jurisdiction solely as a result of the transactions contemplated by the Loan Documents) or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits Taxes imposed by the United States of America or any similar Tax imposed by any other jurisdiction in which any Obligor is located, (c) any Tax that is imposed under FATCA, (d) in the case of a Lender, any Tax that is attributable to such Lender's failure or inability (other than as a result of a Change in Law) to comply with <u>Section 3.9</u> and (e) in the case of a Non-US Lender, any withholding Tax that is imposed on amounts payable to such Non-US Lender at the time such Non-US Lender becomes a party hereto (or designates a new lending office), except to the extent such Non-US Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from Obligors with respect to such withholding Tax.

<u>FATCA</u> – Sections 1471 through 1474 of the Code, as of the date of this Agreement and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any intergovernmental agreements relating thereto or legislation or administrative guidance implementing the foregoing.

<u>Federal Funds Effective Rate</u> –for any day the rate per annum (based on a year of 360 days and actual days elapsed and rounded upward to the nearest 1/100 of 1%) announced by the Federal Reserve Bank of New York (or any successor) on such day as being the weighted average of the rates on overnight federal funds transactions arranged by federal funds brokers on the previous trading day, as computed and announced by such Federal Reserve Bank (or any successor) in substantially the same manner as such Federal Reserve Bank computes and announces the weighted average it refers to as the "Federal Funds Effective Rate" as of the date of this Agreement; provided, if such Federal Reserve Bank (or its successor) does not announce such rate on any day, the "Federal Funds Effective Rate" for such day shall be the Federal Funds Effective Rate for the last day on which such rate was announced.

<u>Federal Funds Open Rate</u> – for any day the rate per annum (based on a year of 360 days and actual days elapsed) which is the daily federal funds open rate as quoted by ICAP North America, Inc. (or any successor) as set forth on the Bloomberg Screen BTMM for that day opposite the caption "OPEN"

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

(or on such other substitute Bloomberg Screen that displays such rate), or as set forth on such other recognized electronic source used for the purpose of displaying such rate as selected by PNC (an "Alternate Source") (or if such rate for such day does not appear on the Bloomberg Screen BTMM (or any substitute screen) or on any Alternate Source, or if there shall at any time, for any reason, no longer exist a Bloomberg Screen BTMM (or any substitute screen) or any Alternate Source, a comparable replacement rate determined by PNC at such time (which determination shall be conclusive absent manifest error); provided however, that if such day is not a Business Day, the Federal Funds Open Rate for such day shall be the "open" rate on the immediately preceding Business Day.  If and when the Federal Funds Open Rate changes, the rate of interest with respect to any advance to which the Federal Funds Open Rate applies will change automatically without notice to Borrowers, effective on the date of any such change.

Fee Letter – that certain Fee Letter dated as of the Closing Date by and among the Obligors party thereto and Agent.

Final Order – a final order of the Bankruptcy Court in substantially the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications are satisfactory in form and substance to Agent) and authorizing the Additional Credit.

Final Order Entry Date – the date on which the Final Order is entered by the Bankruptcy Court.

Financial Covenant Certificate – a certificate by a Senior Officer of Borrower Representative, on behalf of all Borrowers, substantially in the form of Exhibit F.

First Day Orders – all orders entered by the Bankruptcy Court on, or within five days of, the Petition Date or based on motions filed on or about the Petition Date.

Foreign Plan – any employee benefit plan or arrangement (a) maintained or contributed to by any Obligor or Subsidiary that is not subject to the laws of the United States; or (b) mandated by a government other than the United States for employees of any Obligor or Subsidiary.

Foreign Subsidiary – a Subsidiary that is a "controlled foreign corporation" within the meaning of Section 957 of the Code or is an entity that is disregarded as an entity for U.S. federal income tax purposes substantially all of whose assets are interests in one or more controlled foreign corporations within the meaning of Section 957 of the Code, such that a guaranty by such Subsidiary of the Obligations or a Lien on the assets of such Subsidiary to secure the Obligations could reasonably result in a material tax liability to Borrowers. As of the Closing Date, Schedule 1E sets forth a true and correct list of each Foreign Subsidiary.

Full Term Budget – a projected monthly budget covering the tenor of the DIP ABL Facility delivered to the Agent as a condition precedent to the effectiveness hereof.

GAAP – generally accepted accounting principles in the United States of America in effect from time to time.

Governmental Acts –any act or omission, whether rightful or wrongful or any present or future de jure or de facto Governmental Authority.

Governmental Authority – any nation or government, any Federal, state, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board,

bureau, instrumentality, agency or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank) , and any group charged with setting financial accounting or regulatory capital rules or standards (including without limitation, the Financial Accounting Standards, Board, the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing).

Guarantee – of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

Guaranteed Obligations – as defined in Section 14.1.

Guarantors –Parent, each Borrower, each Subsidiary Guarantor, and each other Person who now or hereafter guarantees payment or performance of the whole or any part of the Obligations pursuant to a Guaranty Agreement or who becomes a party to this Agreement as a Guarantor pursuant to a Joinder Agreement. As of the Closing Date, Schedule 1F sets forth a true and correct list of each Guarantor.

Guaranty Agreement – (a) the guaranty of each Guarantor party hereto contained in Section 14 hereof and (b) each other guaranty executed and delivered by any Guarantor, in form and substance satisfactory to Agent.

Hazardous Material – (a) any element, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substance, extremely hazardous substance or chemical, hazardous waste, special waste, or solid waste under Environmental Laws or that is likely to cause harm to or have an adverse effect on, the environment or risk to human health or safety, including any pollutant, contaminant, waste, hazardous waste, toxic substance or dangerous good which is defined or identified in any Environmental Law and which is present in the environment in such quantity or state that it contravenes any Environmental Law; (b) petroleum and its refined products; (c) polychlorinated biphenyls; (d) any substance exhibiting a hazardous waste characteristic, including corrosivity, ignitability, toxicity or reactivity as well as any radioactive or explosive materials; and (e) any raw materials, building components (including asbestos-containing materials) and manufactured products containing hazardous substances listed or classified as such under Environmental Laws.

Hedge Termination Value – in respect of any one or more Hedging Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Lender or any Affiliate of a Lender).

17

Hedging Agreement – any interest rate, currency or commodity swap agreement, cap agreement, collar agreement, floor, option, forward, cross right or obligation, spot foreign exchange, forward foreign exchange, foreign exchange option (or series of options), or combination thereof or similar transaction, and any other agreement or arrangement designed to protect a Person against fluctuations in interest rates, foreign exchange rates, currency exchange rates, commodity prices or credit or equity risk.

Hedging Obligation – means, with respect to any Person, any liability of such Person under any Hedging Agreement determined (a) for any date on or after the date such Hedging Agreement has been closed out and termination value determined in accordance therewith, using such termination value, and (b) for any date prior to the date referenced in clause (a), using the amount determined as the mark-to-market value for such Hedging Agreement, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreement (which may include a Lender or any Affiliate of a Lender).

Holdings PIK Indenture – that certain Indenture dated as of December 13, 2013 (as amended, supplemented or otherwise modified from time to time) between Chassix Holdings, Inc. and Delaware Trust Company (as successor to U.S. Bank National Association), as trustee.

Holdings PIK Notes – the 10%/10¾% Senior PIK Toggle Notes due 2018 issued by Chassix Holdings, Inc. pursuant to the Holdings PIK Indenture.

Indebtedness – as applied to a Person means, without duplication (a) all indebtedness for borrowed money, (b) all Capitalized Lease Obligations of such Person; (c) all obligations of such person evidenced by bonds, debentures, notes or similar instruments; (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person; (e) all obligations owed for all or any part of the deferred purchase price of property or services, including any earn-out obligations which have become liabilities on the balance sheet of such Person in accordance with GAAP (excluding any such obligations under ERISA and trade debt and receivables arising from the purchase and sale or lease of goods and services between Affiliates); (f) all indebtedness secured by a Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (g) all Guarantees by such Person of Indebtedness of others; (h) all obligations, contingent or otherwise, if such Person in respect of banker's acceptances; (i) all obligations, contingent or otherwise, in connection with letters of credit or letter of credit guaranties issued for the account of such Person; (j) Hedging Obligations; (k) all other Off-Balance Sheet Liabilities.  Notwithstanding the foregoing, Indebtedness shall not include operating leases as defined under GAAP as of the Closing Date to the extent that such leases are deemed to be Indebtedness solely as a result of any change in the requirements under GAAP after the Closing Date s; and (l) all obligations of the types referred to in clauses (a) through (k) of this definition of another Person and all dividends and other distributions of another Person, the payment of which, in either case, (i) such Person has Guaranteed or (ii) is secured by (or the holder of such Indebtedness or the recipient of such dividends or other distributions has an existing right, whether contingent or otherwise, to be secured by) any Lien upon the property or other assets of such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, dividends or other distributions.

Indemnified Person – as defined in Section 13.8.

Initial Unaudited Financial Statements – the unaudited internally prepared interim financial statement of Parent and its Subsidiaries delivered to Agent and Lenders for the fiscal quarters ending March 31, 2014, June 30, 2014, September 30, 2014 and December 31, 2014.

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

Insolvency Proceeding – any case or proceeding commenced by or against a Person under any state, federal or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the Bankruptcy Code, or any other insolvency, debtor relief or debt adjustment law; (b) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for such Person or any part of its Property; or (c) an assignment or trust mortgage for the benefit of creditors.

Intellectual Property – all past, present and future: (i) trade secrets, know-how and other proprietary information, including in Computer Hardware and Software and databases; (ii) trademarks, service marks, internet domain names, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing), indicia and other source and/or business identifiers, and the goodwill of the business connected with the use thereof and symbolized thereby and all registrations or applications for registrations and renewals which have heretofore been or may hereafter be issued thereon throughout the world; (iii) copyrights (including copyrights for Computer Hardware and Software and databases) and copyright registrations or applications for registrations and renewals and extensions which have heretofore been or may hereafter be issued throughout the world; (iv) patent applications and patents, reissues, divisions, continuations, extensions and continuations-in-art thereof and amendments thereto which have heretofore been or may hereafter be issued throughout the world; (v) industrial design applications and registered industrial designs; (vi) mask works, design rights, and any other type of intellectual property right protected anywhere in the world and any applications and registrations therefor; (vii) rights of publicity and the like pertaining to the right to use the names, likeness, biography, voice and signatures of natural persons; (viii) any license agreements related to any of the foregoing; (ix) the right to sue for all past, present and future infringements of any of the foregoing; (x) income, fees, royalties, damages, claim and payments now or hereafter due and/or payable with respect to any of the foregoing and with respect any of the foregoing including damages, claims and payments for past, present or future infringements or other violations thereof; (xi) all other intellectual property; (xii) rights of priority under any international treaty and any common-law rights in any of the foregoing; and (xiii) all common law and other rights throughout the world in and to all of the foregoing.

Intercreditor Arrangements – the relative priorities and intercreditor arrangements as between the DIP ABL Facility on the one hand and the DIP Term Loan Facility and obligations under the Prepetition Senior Secured Notes on the other hand and with respect to the DIP ABL Priority Collateral and the DIP Term Loan Priority Collateral as set forth in the Orders.

Interest Payment Date – (a) as to any Base Rate Loan, the first Business Day of each calendar month and (b) as to any LIBOR Loan, the last day of each Interest Period for such LIBOR Loan, and in addition, where the applicable Interest Period exceeds one month, the date every one month after the beginning of such Interest Period. If an Interest Payment Date falls on a date that is not a Business Day, such Interest Payment Date shall be deemed to be the immediately succeeding Business Day.

Interest Period – relative to any LIBOR Loans:

(a)    initially, the period beginning on (and including) the date on which such LIBOR Loan is made or continued as, or converted into, a LIBOR Loan pursuant to Section 4.1 and ending on (but excluding) the day which numerically corresponds to such date one, two, three or six months thereafter (or, if such month has no numerically corresponding day, on the last Business Day of such month), in each case as Borrower Representative may select in its notice pursuant to Section 4.1; and

(b)    thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such LIBOR Loan and ending one, two, three or six months thereafter, as

selected by Borrower Representative by irrevocable notice to Agent not less than two Business Days prior to the last day of the then current Interest Period with respect thereto;

provided, however, that

(i)    all Interest Periods of the same duration which commence on the same date shall end on the same date;

(ii)    Interest Periods commencing on the same date for LIBOR Loans comprising part of the same advance under this Agreement shall be of the same duration;

(iii)    if such Interest Period would otherwise end on a day which is not a Business Day, such Interest Period shall end on the next following Business Day unless such day falls in the next calendar month, in which case such Interest Period shall end on the first preceding Business Day; and

(iv)    no Interest Period may end later than the termination of this Agreement.

Interim Order – an interim order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms hereof) in the form set forth as Exhibit E, with changes to such form as are reasonably satisfactory to Agent in its reasonable discretion, approving the Loan Documents and the DIP Term Loan Documents.

Interim Order Entry Date – the date on which the Interim Order is entered by the Bankruptcy Court.

Interim Period – the period from and including the Interim Order Entry Date to but not including the Final Order Entry Date.

Investment – by any Person in any other Person means (i) any direct or indirect loan, advance or other extension of credit or capital contribution to or for the account of such other Person (by means of any transfer of cash or other property to any Person or any payment for property or services for the account or use of any Person, or otherwise), (ii) any direct or indirect purchase or other acquisition of any Equity Interests, bond, note, debenture or other debt or equity security or evidence of Indebtedness, or any other ownership interest (including, any option, warrant or any other right to acquire any of the foregoing), issued by such other Person, whether or not such acquisition is from such or any other Person, (iii) any direct or indirect payment by such Person on a Guarantee of any obligation of or for the account of such other Person or any direct or indirect issuance by such Person of such a Guarantee, (iv) any purchase or acquisition (in one transaction or a series of transactions) of any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise) or (v) any other investment of cash or other property by such Person in or for the account of such other Person. The amount of any Investment shall be the original principal or capital amount thereof less all returns of principal or equity thereon (and without adjustment by reason of the financial condition of such other Person) and shall, if made by the transfer or exchange of property other than cash, be deemed to have been made in an original principal or capital amount equal to the fair market value of such property at the time of such transfer or exchange.

IRS – the United States Internal Revenue Service.

Joinder Agreement – has the meaning assigned to such term in Section 9.1.11.

Joint Liability Payment – as defined in Section 13.21.

Joint Venture – any Person other than an individual or a Subsidiary of Parent (i) in which any Obligor (other than Parent) or any of its Subsidiaries holds or acquires an ownership interest (by way of ownership of Equity Interests or other evidence of ownership) and (ii) which is engaged in the same or similar line of business as Borrowers and their Subsidiaries, or a component thereof, or a reasonable extension thereof. As of the Closing Date, Schedule 1H sets forth a true and correct list of each Joint Venture.

Judgment – as defined in Section 11.1.11.

LC Issuer – individually and collectively, as the context may require, Agent and each Lender designated by Borrower Representative and reasonably acceptable to Agent as an LC Issuer, or any replacement LC Issuer appointed pursuant to Section 2.2(g).  Any LC Issuer may, in its discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such LC Issuer, in which case the term "LC Issuer" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

LC Obligations – the aggregate amount of all unpaid Reimbursement Obligations and the Maximum Undrawn Amount.  The LC Obligations of any Lender at any time shall be its Revolving Loan Percentage of the total LC Obligations at such time.

LC Order – as defined in Section 2.2.10(b).

Lead Arranger – as defined in the preamble.

Lenders – the Persons listed on the Commitment Schedule (or an Affiliate or branch of any such Person that is acting on behalf of such Person, in which case the term "Lender" shall include any such Affiliate or branch with respect to the Loans made by such Affiliate or branch) as having a Revolving Loan Commitment or, if the Revolving Loan Commitments have terminated or expired, a Person with Revolving Outstandings, and any other Person that shall have become a party hereto as a "Lender" pursuant to an Assignment and Acceptance Agreement, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Acceptance Agreement.  Unless the context otherwise requires, the term "Lenders" includes the Swingline Lenders.

Letter of Credit – any standby or documentary letter of credit issued by any LC Issuer for the account of any Borrower under Section 2.2 hereof.

Letter of Credit Application –as defined in Section 2.2.3(a).

Letter of Credit Borrowing – as defined in Section 2.2.5(d).

Letter of Credit Sublimit –$15,000,000.

LIBOR – relative to any Interest Period for LIBOR Loans, the rate which appears on the Bloomberg Page BBAM1 (or on such other substitute Bloomberg page that displays rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market), or the rate which is quoted by another source selected by Agent as an authorized information vendor for the purpose of displaying rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market (a "LIBOR Alternate Source"), at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period as the London interbank offered rate

for U.S. Dollars for an amount comparable to such LIBOR Rate Loan and having a borrowing date and a maturity comparable to such Interest Period (or if there shall at any time, for any reason, no longer exist a Bloomberg Page BBAM1 (or any substitute page) or any LIBOR Alternate Source, a comparable replacement rate determined by Agent at such time (which determination shall be conclusive absent manifest error)).

LIBOR Lending Rate – relative to any LIBOR Loan to be made, continued or maintained as, or converted into, a LIBOR Loan for any Interest Period, a rate per annum determined by Agent pursuant to the following formula:

$$\text{LIBOR Lending Rate} = \frac{\text{LIBOR}}{(1.00 - \text{LIBOR Reserve Percentage})}$$

;provided, however, that if the LIBOR Lending Rate determined as provided above would be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.  The LIBOR Lending Rate shall be adjusted with respect to any LIBOR Loan that is outstanding on the effective date of any change in the LIBOR Reserve Percentage as of such effective date.  Agent shall give reasonably prompt notice to the Borrowers of the LIBOR Lending Rate as determined or adjusted in accordance herewith, which determination shall be conclusive absent manifest error.

LIBOR Loans – any Loan for the periods when the rate of interest applicable to such Loan is calculated by reference to the LIBOR Lending Rate.

Lien – with respect to any asset, (a) any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

Liquidity - on any date of determination, the sum of (a) the aggregate amount of cash or cash equivalents held by each Obligor in Control Accounts (but excluding identifiable Proceeds of DIP Term Loan Priority Collateral) plus (b) the Maximum Borrowing Amount on such date minus (c) Revolving Outstandings on such date.

Loan Account – the loan account established on the books of Agent pursuant to Section 4.6.

Loan Documents – this Agreement, the Fee Letter, the Other Agreements and the Security Documents.

Loans – all loans and advances of any kind made by Agent, any Lender, or any Affiliate of Agent or any Lender, pursuant to this Agreement, including any Swingline Loans.

Lockbox Agreement – as defined in Section 9.1.14(b).

Lockboxes – as defined in Section 9.1.14(b).

London Banking Day – any date on which commercial banks are open for business in London, England.

Majority Lenders – at any time, the Lenders holding greater than 50% of the Revolving Loan Commitments at such time determined on a combined basis, and following the termination of the Revolving Loan Commitments, the Lenders holding greater than 50% of the total Revolving Outstandings; provided, that (a) in each case, if there are 2 or more Lenders with Revolving Outstandings or Revolving Loan Commitments at such time, at least 2 Lenders (which are not Affiliates, unless all Lenders are Affiliates) shall be required to constitute Majority Lenders; and (b) the Revolving Outstandings held or deemed held by any Defaulting Lender at such time shall be excluded for purposes of making a determination of Majority Lenders.

Material Adverse Effect – a material adverse effect on (a) the business, assets, financial condition, operation, performance or properties of the Obligors and their respective Subsidiaries, taken as a whole, (b) the rights and remedies of Agent, the LC Issuers or the Lenders under the Loan Documents, (c) the legality, validity or enforceability of this Agreement or any other Loan Document, (d) the ability of the Obligors, taken as a whole, to perform their payment obligations under any Loan Document or (e) the Collateral, or the validity, perfection or priority of a Lien in favor of Agent, for the benefit of the Lenders and the other Secured Parties, on any of the Collateral; provided, that the term "Material Adverse Effect" will not (x) include or apply to any change, circumstance, development, effect or occurrence to the extent caused by or relating to (a) further deterioration of the Obligors' operations at the Bristol Plant but only to the extent such deterioration is offset by surcharge adjustments paid by customers, (b) trade contraction with respect to suppliers (e) matters disclosed in the Business Plan or (f) any other related event previously disclosed to Agent in writing prior to the Closing Date or (y) be deemed to exist as a result of the Cases or the circumstances and events leading up thereto.

Maximum Borrowing Amount – at any time of determination an amount equal to the lesser of (a) the total Revolving Loan Commitments at such time minus the Rent and Charges Reserve and (b) the Borrowing Base based on the most recent Borrowing Base Certificate delivered to Agent pursuant to Section 9.1.4(a).

Maximum Undrawn Amount –with respect to any outstanding Letter of Credit as of any date, the amount of such Letter of Credit that is or may become available to be drawn, including all automatic increases provided for in such Letter of Credit, whether or not any such automatic increase has become effective.

Measurement Date – Friday of each week commencing on March 20, 2015.

Measurement Period –as of any Measurement Date, the period beginning on the Closing Date and ending on the applicable Measurement Date.

Mexico Products I – as defined in the preamble.

Money Borrowed – (a) Indebtedness arising from the lending of money by any Person to Parent or any of its Subsidiaries; (b) Indebtedness, whether or not in any such case arising from the lending by any Person of money to Parent or any of its Subsidiaries, (i) which is represented by notes payable or drafts accepted that evidence extensions of credit, (ii) which constitutes obligations evidenced by bonds, debentures, notes or similar instruments, or (iii) upon which interest charges are customarily paid (other than accounts payable) or that was issued or assumed as full or partial payment for Property; (c) Indebtedness that constitutes a Capitalized Lease Obligation; (d) reimbursement obligations with respect to letters of credit or guaranties of letters of credit and (e) Indebtedness of Parent or any of its Subsidiaries under any guaranty of obligations that would constitute Indebtedness for Money Borrowed under clauses (a) through (c) hereof, if owed directly by Parent or any of its Subsidiaries.  Money Borrowed shall not include trade payables or accrued expenses.

23

Moody's – Moody's Investors Service, Inc.

Multiemployer Plan – any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Obligor or ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

Net Cash Flow – for any Measurement Period, the difference between (i) "Cash Receipts" of the Obligors for such period (taken as a single accounting period) minus (ii) "Total Disbursements" of the Obligors for such period (taken as a single accounting period), in each case calculated in accordance with the 13-Week Projections, plus, without duplication, (iii) the proceeds of any Delayed Draw Term Loans (as defined in the DIP Term Loan Agreement) received by the Obligors in cash during such period.

NOLV – the net orderly liquidation value of Inventory (on a first-in, first-out basis consistent with GAAP), expressed as a percentage of book value, to be realized at an orderly, negotiated sale held within a reasonable period of time, net of all liquidation expenses, as determined from the most recent appraisal of Obligors' Inventory performed by an appraiser and on terms satisfactory to Agent in its Permitted Discretion.

Non-Defaulting Lender – at any time, any Lender holding a Revolving Loan Commitment that is not a Defaulting Lender at such time.

Non-Excluded Taxes – Taxes, other than Excluded Taxes and Other Taxes.

Non-US Lender – as defined in Section 3.9(e).

Obligations – all principal of and premium, if any, on the Loans, all LC Reimbursement Obligations and all reimbursement and other obligations with respect to Letters of Credit, and all other advances, debts, liabilities, obligations, covenants and duties, in each case together with all interest, fees, expenses and other charges thereon, owing, arising, due or payable from any Obligor to Agent, for its own benefit, from any Obligor to Agent for the benefit of any Lender, from any Obligor to any Lender or from any Obligor to any LC Issuer, Swingline Lender, any other Affiliate of Agent or any other Secured Party, of any kind or nature, present or future, whether or not evidenced by any note, guaranty or other instrument or agreement, whether arising under this Agreement or any of the other Loan Documents, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect (including those acquired by assignment), absolute or contingent, primary or secondary, due or to become due, joint or several, now existing or hereafter arising and however acquired, in each case, other than any Bank Product Obligations that are not Secured Bank Product Obligations.

Obligor – each Borrower and each Guarantor.

OFAC – the United States Department of Treasury Office of Foreign Assets Control.

OFAC Sanctions Programs – all laws, regulations, and Executive Orders administered by OFAC, including without limitation, the Bank Secrecy Act, anti-money laundering laws (including, without limitation, the Patriot Act), and all economic and trade sanction programs administered by OFAC, any and all similar United States federal laws, regulations or Executive Orders, and any similar laws, regulators or orders adopted by any State within the United States.

OFAC SDN List – the list of the Specially Designated Nationals and Blocked Persons maintained by OFAC.

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

Off-Balance Sheet Liability – of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person, or (c) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheets of such Person (other than operating leases).

Orders – collectively, the Interim Order and the Final Order, and each an Order.

Organizational I.D. Number – with respect to any Person, the organizational identification number assigned to such Person by the applicable governmental unit or agency of the jurisdiction of organization of such Person.

Other Agreements – any and all agreements, instruments and documents (other than this Agreement and the Security Documents), heretofore, now or hereafter executed by, Parent, any Borrower, or any Guarantor any Subsidiary of Parent or any Borrower or any Guarantor or any other third party and delivered to Agent, any Lender or any Affiliate of Agent or any Lender in respect of the transactions contemplated by this Agreement.

Other Taxes – all present or future stamp, court or documentary taxes or any other excise or property taxes, charges, intangible, recording, filing or similar Taxes arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement.

Parent – as defined in the preamble.

Parent Company – Dharma Holding Corporation and any direct or indirect parent company of Parent that is a direct or indirect wholly-owned Subsidiary of Dharma Holding Corporation.

Participation Advance –as defined in Section 2.2.5(d).

Participation Commitment –the obligation hereunder of each Lender to buy a participation equal to its Revolving Loan Percentage (subject to any reallocation pursuant to Section 3.11(b) hereof) in the Swingline Loans made by Swingline Lender hereunder as provided for in Section 2.1.3 hereof and in the Letters of Credit issued hereunder as provided for in Section 2.2.5(a) hereof.

Patriot Act – the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

Payment in Full – (a) the payment in full in cash of all Loans and other Obligations (including amounts due under Section 4.1.9), other than contingent indemnification and contingent expense reimbursement obligations, in each case, for which no claims have been asserted, (b) the termination of all Revolving Loan Commitments and (c) either (i) the cancellation and return to Agent of all Letters of Credit or (ii) the Cash Collateralization of all Letters of Credit in accordance with this Agreement.

Payment Office – initially Two Tower Center Boulevard, East Brunswick, New Jersey 08816; thereafter, such other office of Agent, if any, which it may designate by notice to Borrowing Agent and to each Lender to be the Payment Office.

PBGC – the Pension Benefit Guaranty Corporation.

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

<u>Pension Act</u> – the Pension Protection Act of 2006.

<u>Pension Funding Rules</u> – the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and Multiemployer Plans and set forth in, with respect to plan years beginning prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act, and, thereafter, Sections 412, 430, 431, 432, and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

<u>Pension Plan</u> – any employee pension benefit plan (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Obligor or ERISA Affiliate or to which the Obligor or ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the preceding five plan years.

<u>Permitted Affiliate Transactions</u> – the following transactions:

(a)    any Affiliate Transaction on terms that are not materially less favorable to Parent or the relevant Subsidiary than those that could reasonably have been obtained in a comparable arms-length transaction by Parent or such Subsidiary with an unaffiliated party and, with respect to any such Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $250,000, the Borrower Representative delivers to Agent a resolution adopted in good faith by the majority of the Board of Directors of Parent or Subsidiary of Parent, as the case may be, approving such Affiliate Transaction and set forth in an officer's certificate of the Borrower Representative certifying that such Affiliate Transaction complies with this <u>clause (a)</u>;

(b)    Investments permitted by <u>Sections 9.2.2(a)</u>, <u>(g)</u> and <u>(s)</u> and dispositions permitted by <u>Section 9.2.9(b)</u>;

(c)    the payment of reasonable and customary fees and indemnities to members of the Board of Directors of Parent or its Subsidiaries;

(d)    any employment agreement, arrangement or plan or similar arrangement entered into by Parent or one of its Subsidiaries in the ordinary course of business, including the payment of reasonable and customary compensation and other benefits (including retirement, health, option, deferred compensation and other benefit plans) and indemnities to officers and employees of Parent or any such Subsidiary as determined by the Board of Directors thereof in good faith;

(e)    transactions between or among Obligors not involving any other Affiliates;

(f)    [intentionally omitted];

(f)    any contribution of capital to Parent or any Obligor, other than contributions made to Parent by any other Obligor;

(g)    transactions permitted by, and complying with, the provisions of <u>Section 9.2.1</u>;

(h)    [intentionally omitted];

(i)    the entering into any tax sharing agreement or arrangement entered into for the purpose of fairly allocating tax expenses and any payments permitted hereunder;

26

(j)        [intentionally omitted];

(k)        [intentionally omitted];

(l)        [intentionally omitted];

(m)        transactions between or among Obligors and Subsidiaries that are not Obligors to the extent permitted under Section 9.2 (other than Section 9.2.4); and

(n)        transactions between or among Subsidiaries that are not Obligors.

Permitted Discretion – a determination made in good faith and in the exercise of reasonable (from the perspective of a secured asset-based lender) business judgment; provided, that as it relates to the establishment of reserves or the adjustment or imposition of exclusionary criteria, Permitted Discretion will require that (a) such establishment, adjustment or imposition after the Closing Date be based on the analysis of facts or events first occurring or first discovered by Agent after the Closing Date that are materially different from facts or events known to Agent on the Closing Date and (b) the contributing factors to the imposition of any Availability Reserve will not duplicate any reserves deducted in computing book value.

Permitted Encumbrances – (a) Liens imposed by law for taxes that are not yet due or payable or are being contested in compliance with Section 8.1.12; (b) carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in good faith and by appropriate proceedings, and each Obligor and each of its Subsidiaries maintains reasonable reserves in conformity with GAAP on its books therefor; (c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation laws, unemployment, general liability and other insurance and other social security laws or retirement benefits or similar laws or regulations; (d) Liens granted and deposits and other investments made to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business and securing obligations that are not overdue by more than 30 days and (e) easements, zoning restrictions, rights-of-way and similar encumbrances on real Property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of Parent or any Subsidiary; provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

Permitted Investments – (a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within 30 days from the date of acquisition thereof; (b) investments in commercial paper maturing within 30 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's; (c) investments in (i) certificates of deposit and time deposits, in each case maturing within 30 days and (ii) banker's acceptances, in each case maturing within 30 days from the date of acquisition thereof, issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000; (d) fully collateralized repurchase agreements with a term of not more than 30 days for securities described in paragraph (a) above and entered into with a financial institution satisfying the criteria described in paragraph (c) above; and (e) money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission

27

Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

> Permitted Liens – any Lien of a kind specified in Section 9.2.5.

> Permitted Mortgage Liens – any Lien of a kind specified in Sections 9.2.5(a), (b), (d) and (i).

> Person – an individual, partnership, corporation, limited liability company, joint stock company, land trust, business trust, or unincorporated organization, or a government or agency or political subdivision thereof.

> Petition Date – as defined in the preamble.

> Plan – any employee benefit plan (as such term is defined in Section 3(3) of ERISA) established by an Obligor or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, an ERISA Affiliate.

> PNC – as defined in the preamble.

> Prepetition ABL Agent – BMO Harris Bank N.A.

> Prepetition ABL Credit Agreement – that certain Amended and Restated Loan, Security and Guaranty Agreement dated as of July 23, 2013 (as amended, supplemented or otherwise modified from time) by and among the Obligors party thereto, the Prepetition ABL Agent and the lenders and other parties from time to time party thereto.

> Prepetition Intercreditor Agreement – that certain Intercreditor Agreement, dated as of July 23, 2013, among the Prepetition ABL Agent, the Prepetition Senior Secured Notes Trustee and the Obligors.

> Prepetition Letters of Credit – collectively, (i) Letter of Credit HACH355551OS issued by BMO Harris Bank N.A., in favor of ISTAR DM I LLC and/or its successors for $1,700,000, (ii) Letter of Credit HACH392905OS issued by BMO Harris Bank N.A., in favor of The Travelers Indemnity Company for $1,250,000 and (iii) Letter of Credit HACH424752OS issued by BMO Harris Bank N.A., in favor of The Travelers Indemnity Company for $2,612,000.

> Prepetition Senior Secured Notes – the 9¼% Prepetition Senior Secured Notes due August 1, 2018 issued by Chassix under the Prepetition Senior Secured Notes Indenture, as the same may be amended, modified, supplemented, refinanced, replaced or extended from time to time.

> Prepetition Senior Secured Notes Documents – the Prepetition Senior Secured Notes, the Prepetition Senior Secured Notes Indenture, the Prepetition Senior Secured Notes Security Documents, and any and all other agreements, instruments and documents, heretofore, now or hereafter executed by Parent, any Borrower, any Subsidiary of Parent or any Borrower or any other third party and delivered in respect of the transactions contemplated by the Prepetition Senior Secured Notes Indenture, in each case, as the same may be amended, modified, supplemented, refinanced, replaced or extended from time to time.

> Prepetition Senior Secured Notes Indenture – the Indenture dated as of July 23, 2013 by and between Chassix and the Prepetition Senior Secured Notes Trustee pursuant to which the Prepetition Senior Secured Notes were issued, as such Indenture may be amended, modified, supplemented, refinanced, replaced or extended from time to time.

Detroit_5279807_16

Prepetition Senior Secured Notes Trustee – U.S. Bank National Association and any successor trustee under the Prepetition Senior Secured Notes Documents.

Prepetition Senior Secured Notes Security Documents – (a) the Security Agreement dated as of July 23, 2013, by the Obligors in favor of U.S. Bank National Association, solely in its capacity as collateral agent, as pledgee, assignee and secured party, for the benefit of the Secured Parties (as defined therein), and acknowledged and agreed to by (i) the Prepetition Senior Secured Notes Trustee and on behalf of the Noteholders (as defined therein) under the Prepetition Senior Secured Notes Indenture and (ii) each other Authorized Representative (as defined therein) from time to time party thereto, and (b) all other instruments and agreements now or at any time hereafter securing the whole or any part of the Indebtedness and other obligations outstanding under the Prepetition Senior Secured Notes and the other Prepetition Senior Secured Notes Documents, in each case, as the same may be amended, modified, supplemented, refinanced, replaced or extended from time to time.

Property – any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible (including, for the avoidance of doubt, any Equity Interests).

PTO – the United States Patent and Trademark Office and any successor thereto.

Published Rate –the rate of interest published each Business Day in the Wall Street Journal "Money Rates" listing under the caption "London Interbank Offered Rates" for a one month period (or, if no such rate is published therein for any reason, then the Published Rate shall be the LIBOR Rate for a one month period as published in another publication selected by the Agent).

Qualified ECP Guarantor – in respect of any Swap Obligation, each Guarantor that has total assets exceeding $10,000,000 at the time the relevant guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other Person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Real Estate – each Obligor's now or hereafter owned or leased estates in real Property, including all fees, leaseholds and future interests, together with all of each Obligor's now or hereafter owned or leased interests in the improvements thereon, the fixtures attached thereto and the easements appurtenant thereto.

Reimbursement Obligations –as defined in Section 2.2.5(b).

Release – any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) into the indoor or outdoor environment, including the movement of Hazardous Materials through or in the ambient air, soil, surface or ground water, or property.

Remedial Action – all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, investigate assess, evaluate or in any other way address Hazardous Materials in the indoor or outdoor environment; (b) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (c) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities; or (d) perform any other actions authorized by 42 U.S.C. § 9601.

WEIL:\95250238\4\99980.0025                                                                 Detroit_5279807_16

<u>Rent and Charges Reserve</u> – an amount equal to $816,000.

<u>Replacement Lender</u> – as defined in <u>Section 3.10</u>.

<u>Reorganization Plan</u> – a liquidation plan or plan of reorganization in any or all of the Cases of the Debtors.

<u>Report</u> – reports prepared by Agent or another Person showing the results of appraisals, field examinations or audits pertaining to the assets of the Obligors from information furnished by or on behalf of Parent or any of its Subsidiaries, after Agent has exercised its rights of inspection pursuant to this Agreement, which Reports may be distributed to the Lenders by Agent.

<u>Reportable Event</u> – any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

<u>Requirement of Law</u> – as to any Person, the Certificate of Incorporation and By Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

<u>Restructuring Support Agreement</u> – that certain Restructuring Support Agreement, dated as of March [____], 2015 (as amended, supplemented or otherwise modified from time to time), by and among the Debtors, certain holders of Prepetition Senior Secured Notes, certain holders of the Holdings PIK Notes and the Sponsor.

<u>Revolving Credit Loan</u> – a Loan made by any Lender pursuant to <u>Section 2.1.1</u>.

<u>Revolving Exposure Limitations</u> – as defined in <u>Section 2.1.1</u>.

<u>Revolving Loan Commitment</u> – with respect to any Lender, the commitment, if any, of such Lender to make Revolving Credit Loans and to acquire participations in Letters of Credit and Swingline Loans hereunder, expressed as an amount representing the maximum possible aggregate amount of such Lender's Revolving Outstandings hereunder, as such commitment may be (a) reduced from time to time pursuant to <u>Section 4.3.5</u> and (b) reduced or increased from time to time by an assignment by or to such lender pursuant to <u>Section 13.2.1</u>.  The initial amount of each Lender's Revolving Loan Commitment is set forth on the Commitment Schedule, or in the Assignment and Acceptance Agreement pursuant to which such Lender shall have assumed its Revolving Loan Commitment, as applicable. "Revolving Loan Commitments" means the aggregate amount of such commitments of all such Lenders.  After giving effect to the Transactions on the Closing Date, the aggregate amount of the Lenders' Revolving Loan Commitments is $150,000,000.

<u>Revolving Loan Percentage</u> – with respect to any Lender, (a) with respect to Loans, LC Obligations and Swingline Loans, a percentage equal to a fraction the numerator of which is such Lender's Revolving Loan Commitment and the denominator of which is the aggregate Revolving Loan Commitment of all Lenders (if the Revolving Loan Commitments have terminated or expired, the Revolving Loan Percentages shall be determined based upon such Lender's share of the aggregate Revolving Outstandings at that time) and (b) with respect to the aggregate Revolving Outstandings, a percentage based upon its share of the aggregate Revolving Outstandings and the unused Revolving Loan Commitments; <u>provided</u> that in the case of <u>Section 3.11</u> when a Defaulting Lender shall exist, any such Defaulting Lender's Revolving Loan Commitment shall be disregarded in the calculations under <u>clauses (a)</u> and <u>(b)</u> above.

30

Revolving Note – a promissory note executed by Borrowers in favor of a Lender to evidence the Revolving Credit Loans made by it, which shall be in the form of Exhibit A-1 to this Agreement, together with any replacement or successor notes therefor.

Revolving Outstandings – with respect to any Lender at any time, the sum of (a) the aggregate principal amount of its outstanding Revolving Credit Loans at such time plus (b) the aggregate amount of its LC Obligations at such time plus (c) an amount equal to its Revolving Loan Percentage of the aggregate principal amount of Swingline Loans at such time.

S&P – Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc.

Scheduled Termination Date – the earlier of (i) December 31, 2015 and (ii) the effective date of a Plan of Reorganization filed in the Cases that is confirmed by any order entered by the Bankruptcy Court.

Secured Bank Product Obligations – all Bank Product Obligations up to the maximum amount (in the case of any provider of the related Bank Products other than Bank and its Affiliates) specified by such provider in writing to Agent pursuant to clause (y) below, which amount may be established or increased (by further written notice to Agent from time to time) as long as (x) no Default or Event of Default exists or would result from establishment of a Secured Bank Product Reserve for such amount and all other Secured Bank Product Obligations, (y) such provider delivers written notice to Agent, in form and substance satisfactory to Agent, by the later of the Closing Date or 10 days following the creation of such Bank Products, (i) describing the Bank Products and setting forth the maximum amount thereunder to be secured by the Collateral and the methodology to be used in calculating such amount and (ii) agreeing to be bound by Section 12.13.

Secured Bank Product Reserve – the aggregate amount of reserves established by Agent from time to time in its Permitted Discretion in respect of Secured Bank Product Obligations.

Secured Indebtedness – means Indebtedness that is secured by Liens on the property or assets of one or more Obligors (other than (i) property or assets held in a defeasance or similar trust or arrangement for the benefit of the Indebtedness secured thereby and (ii) Indebtedness secured only by rights of setoff or banker's liens).

Secured Obligations – the Obligations and any Secured Bank Product Obligations but not including, for the purposes of Section 14.1 of this Agreement, Excluded Swap Obligations.

Secured Parties – Agent, the Lenders, and the other holders of the Secured Obligations.

Secured Provider Indemnified Persons – as defined in Section 12.13.

Secured Providers – each provider of Bank Products that has complied with the requirements set forth in the definition of "Secured Bank Product Obligations".

Securities Account Control Agreement – an agreement, in form and substance reasonably satisfactory to Agent, among any Obligor, a Securities Intermediary holding such Obligor's funds and Agent, with respect to control of all investments and balances held in a Securities Account maintained by such Obligor with such Securities Intermediary.

Securities Act – the Securities Act of 1933, as amended, and as hereafter amended.

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

Securities Exchange Act – the Securities Exchange Act of 1934, as amended, and as hereafter amended.

Security Documents – this Agreement, the Deposit Account Control Agreements, the Securities Account Control Agreements and all other instruments and agreements now or at any time hereafter securing the whole or any part of the Secured Obligations.

Senior Officer – the chairman of the board, president, chief executive officer or chief financial officer of a Borrower or, if the context requires, an Obligor, in each case as certified to Agent in a certificate of incumbency from time to time.

SMW Auto – as defined in the preamble.

SMW Obligors – Concord, APNY and each of their respective Subsidiaries that are Obligors.

Specified Customers – the Designated OEM Parties and any other customers who enter into an accommodation agreement substantially similar to the Accommodation Agreement.

Sponsor – Platinum Equity Advisors, LLC, a Delaware limited liability company, and its Affiliated fund entities and investment vehicles, but excluding all portfolio companies of any of the foregoing.

Subordinated Debt – Indebtedness of any Borrower or any Subsidiary of any Borrower that is subordinated to the Obligations in a manner satisfactory to Agent and contains terms, including payment terms, satisfactory to Agent.

Subsidiary – any Person of which another Person owns, directly or indirectly through one or more intermediaries, more than 50% of the voting securities or other Equity Interests at the time of determination. Unless otherwise expressly noted herein, the term "Subsidiary" means a Subsidiary of Parent, Borrowers or any of their direct or indirect Subsidiaries.

Subsidiary Guarantor – each Subsidiary of Parent other than any Excluded Subsidiary for so long as such Excluded Subsidiary qualifies as an Excluded Subsidiary.

Super-Majority Lenders – as of any date of determination, Lenders holding more than 66⅔% of the Revolving Loan Commitments determined on a combined basis and following the termination of the Revolving Loan Commitments, Lenders holding 66⅔% or more of the total Revolving Outstandings; provided, that the Revolving Outstanding held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Super-Majority Lenders.

Superpriority Claim – a claim against any Debtor in any of the Cases which is an administrative expense claim having priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject only to and effective upon entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code.

Swap Obligation – with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

WEIL:\95250238\4\99980.0025

Swingline Lender – individually and collectively, as the context may require, Agent or any Affiliate of Agent, in each case in its capacity as a lender of Swingline Loans hereunder.

Swingline Loans – as defined in Section 2.1.3.

Syndication Agent – as defined in the preamble.

Tax and Taxes – all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

Term – as defined in Section 5.1.

Transactions – the (i) execution, delivery and performance by the Obligors of this Agreement and the other Loan Documents, the borrowing of Loans and other credit extensions hereunder, the use of the proceeds thereof, the issuance of Letters of Credit hereunder, (ii) execution, delivery and performance by the Obligors of DIP Term Loan Documents, the borrowings and other extensions of credit under the DIP Term Loan Facility, the use of the proceeds thereof, and the payment of fees and expenses related to the foregoing, and (iii) and the payment of fees and expenses related to the foregoing and the entry into the Accommodation Agreement and the Access Agreement.

Triggering Event – the date an Event of Default shall have occurred.

Type of Organization – with respect to any Person, the kind or type of entity by which such Person is organized, such as a corporation or limited liability company.

UCC – the Uniform Commercial Code as in effect in the State of New York on the date of this Agreement, as it may be amended or otherwise modified.

Unaudited Financial Statements – as defined in Section 8.1.8(b).

Unfunded Pension Liability – the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to the Pension Funding Rules for the applicable plan year.

Unused Line Fee – as defined in Section 3.5.

Variance Report – a variance report on a weekly basis setting forth (1) actual cash receipts and disbursements for the prior week, (2) all variances, on an individual line item basis and an aggregate basis, as compared to the Budget and the previously delivered 13-Week Projection on a weekly and cumulative basis, and (3) an explanation, in reasonable detail, for any material variance, certified by a Senior Officer of Parent.

Voting Stock – Equity Interests of any class or classes of a corporation, limited partnership or limited liability company or any other entity the holders of which are ordinarily, in the absence of contingencies, entitled to vote with respect to the election of corporate directors (or Persons performing similar functions).

1.2    Other Terms.  All other terms contained in this Agreement shall have, when the context so indicates, the meanings provided for by the UCC to the extent the same are used or defined therein.  In

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

addition, the terms Account, Certificated Security, Chattel Paper, Commercial Tort Claims, Deposit Account, Document, Electronic Chattel Paper, Equipment, Financial Asset, Fixture, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letter-of-Credit Rights, Money, Payment Intangibles, Proceeds, Securities Account, Securities Intermediary, Security, Security Entitlement, Software, Supporting Obligations, Tangible Chattel Paper and Uncertificated Security have the respective meanings assigned thereto under the UCC.

      1.3   <u>Accounting Terms; GAAP</u>.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; <u>provided</u> that, if Parent notifies Agent that Parent requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if Agent notifies Parent that the Majority Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding anything to the contrary in this Agreement, if Borrowers shall change their method of inventory accounting from the first-in, first-out method to the last-in, first-out method, all calculations necessary to determine compliance with this Agreement, including, without limitation, the calculation of the Borrowing Base or any covenant contained herein shall be made as if such method of inventory accounting had not been so changed.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159) (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of Parent or any Subsidiary at "fair value", as defined therein.

      1.4   <u>Certain Matters of Construction</u>.  The terms "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.  Any pronoun used shall be deemed to cover all genders.  In the computation of periods of time from a specified date to a later specified date, "from" means "from and including," and "to" and "until" each mean "to but excluding."  The terms "including" and "include" shall mean "including, without limitation" and, for purposes of each Loan Document, the parties agree that the rule of *ejusdem generis* shall not be applicable to limit any provision.  Section titles appear as a matter of convenience only and shall not affect the interpretation of any Loan Document.  All references to (a) laws or statutes include all related rules, regulations, interpretations, amendments and successor provisions; (b) any document, instrument or agreement include any amendments, waivers and other modifications, extensions or renewals (to the extent permitted by the Loan Documents); (c) any Section means, unless the context otherwise requires, a Section of this Agreement; (d) any Exhibits or Schedules means, unless the context otherwise requires, Exhibits and Schedules attached hereto, which are hereby incorporated by reference; (e) any Person include successors and assigns; (f) time of day means time of day in New York, New York; or (g) discretion of Agent, LC Issuer or any Lender means the sole and absolute discretion of such Person.  Borrowers shall have the burden of establishing any alleged negligence, misconduct or lack of good faith by Agent, LC Issuer or any Lender under any Loan Documents.  No provision of any Loan Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision.  Whenever the phrase "to the best of Borrowers' knowledge" or words of similar import are used in any Loan Documents, it means actual knowledge of a Senior Officer, or knowledge that a Senior Officer would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including due and appropriate inquiry with respect to the particular matter in question and a good faith attempt to ascertain the matter to which such phrase relates.  Any reference in any of the

Loan Documents to a Permitted Lien is not intended to subordinate or postpone, and shall not be interpreted as subordinating or postponing, or as an agreement to subordinate or postpone, any Lien created by any of the Loan Documents to any Permitted Lien.

## SECTION 2. CREDIT FACILITY

Subject to the terms and conditions of, and in reliance upon the representations and warranties made in, this Agreement and the other Loan Documents, Lenders agree as follows:

2.1    <u>Loans</u>.

2.1.1 <u>Revolving Credit Loans</u>.  Each Lender agrees, severally and not jointly, to make Revolving Credit Loans to Borrowers from time to time during the period from the date hereof to but not including the last day of the Term, as requested by Borrower Representative, on behalf of all Borrowers in the manner set forth in <u>Section 4.1.1</u> hereof up to an aggregate principal amount that will not result in (a) such Lender's Revolving Outstandings exceeding such Lender's Revolving Loan Commitment at any time or (b) the total Revolving Outstandings for all Lenders exceeding the Maximum Borrowing Amount at any time (the foregoing limitations being the "<u>Revolving Exposure Limitations</u>").  Within the foregoing limits and subject to the terms and conditions set forth herein, Borrowers may borrow, prepay and reborrow Revolving Credit Loans; <u>provided</u>, that prior to Final Order Entry Date, the Revolving Loan Commitments shall be available to the Borrowers in the amount authorized by the Bankruptcy Court in the Interim Order but in no event more than $125,000,000.

2.1.2  <u>Use of Proceeds</u>.  The Loans shall be used, in accordance with the 13-Week Projection then in effect and the cash management order entered in connection with the Cases, (a) together with the portion of the DIP Term Loan Facility funded on the Interim Order Entry Date, to refinance in full the Indebtedness outstanding under the Prepetition ABL Credit Agreement on the Interim Order Entry Date (including the cash collateralization of the Prepetition Letters of Credit), (b) to make adequate protection payments with respect to the Prepetition Senior Secured Notes in the form of reasonable fees and expenses of one law firm and one financial advisor to the Prepetition Senior Secured Noteholders that are Lenders, along with any other professionals that may be retained by such Prepetition Senior Secured Noteholders, and make any other adequate protection payments, in each case as expressly permitted under the Loan Documents, Interim Order and the Final Order, (c) for the Borrowers' general operating capital needs in a manner consistent with the provisions of this Agreement and all applicable laws (including working capital, capital expenditures and general corporate purposes), and (d) to pay fees and expenses associated with the closing of the Transactions.

2.1.3  <u>Swingline Loans</u>.

(a)    Subject to the terms and conditions set forth herein, the Swingline Lenders may in their discretion advance, on behalf of the Lenders and in amount requested (subject to the terms herein) same day funds the ("<u>Swingline Loans</u>") to Borrowers from time to time during the period from the Closing Date to but not including the last day of the Term, in an aggregate principal amount at any time outstanding that (i) will not result in the aggregate principal amount of outstanding Swingline Loans exceeding the lesser of 10% of the aggregate Revolving Loan Commitments and $10,000,000 or (ii) when added to the principal amount of all other Revolving Outstandings, will not exceed the Maximum Borrowing Amount; <u>provided</u> that no Swingline Loan shall be made (x) to refinance an outstanding Swingline Loan, (y) during the

period commencing on the first Business Day after such Swingline Lender receives written notice from Agent or any Lender that one or more of the conditions precedent contained in Section 10.2 shall not on such date be satisfied, and ending when such conditions are satisfied or (z) if a Defaulting Lender exists unless Borrowers shall have Cash Collateralized such Defaulting Lender's Revolving Loan Percentage of the Swingline Loans in accordance with Section 3.11. The Swingline Lenders shall not otherwise be required to determine that, or take notice whether, the conditions precedent set forth in Section 10.2 have been satisfied in connection with the making of any Swingline Loan.  Within the foregoing limits and subject to the terms and conditions set forth herein, Borrowers may borrow, prepay and reborrow Swingline Loans.  The Borrower Representative, on behalf of all Borrowers, shall request Swingline Loans in the manner set forth in Section 4.1.1(b).  All Swingline Loans shall bear interest as Base Rate Loans or, if offered by the Swingline Lenders in their sole discretion, at such other rate that is lower than the rate otherwise applicable to Base Rate Loans.

(b)     Any Swingline Lender may, by written notice given to Agent not later than 12:00 noon on any Business Day require the Lenders to acquire participations on such Business Day in all or a portion of such Swingline Lender's outstanding Swingline Loans.  Such notice shall specify the aggregate amount of Swingline Loans in which the Lenders will participate.  Promptly upon receipt of such notice, Agent will give notice thereof to each Lender, specifying in such notice such Lender's Revolving Loan Percentage of each such Swingline Loan.  Each Lender hereby absolutely and unconditionally agrees, upon receipt of notice as provided above, to pay to Agent, for the account of the applicable Swingline Lender, such Lender's Revolving Loan Percentage of each such Swingline Loan.  Each Lender acknowledges and agrees that its obligation to acquire participations in Swingline Loans pursuant to this Section 2.1.3(b) is absolute and unconditional and shall not be affected by any circumstance whatsoever, including the occurrence and continuance of a Default or an Event of Default or reduction or termination of the Revolving Loan Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.  Each Lender shall comply with its obligation under this Section 2.1.3(b) by wire transfer of immediately available funds, in the same manner as provided in Section 4.1.3 with respect to Revolving Credit Loans made by such Lender (and Section 4.1.3 shall apply, mutatis mutandis, to the payment obligations of the Lenders), and Agent shall promptly pay to such Swingline Lender the amounts so received by it from the Lenders.  Agent shall notify the applicable Borrower or Borrowers of any participations in any Swingline Loan acquired pursuant to this Section 2.1.3(b), and thereafter payments in respect of such Swingline Loan shall be made to Agent and not to such Swingline Lender.  Any amounts received by such Swingline Lender from Borrowers (or other party on behalf of Borrowers) in respect of a Swingline Loan after receipt by such Swingline Lender of the proceeds of a sale of participations therein shall be promptly remitted to Agent; any such amounts received by Agent shall be promptly remitted by Agent to the Lenders that shall have made their payments pursuant to this Section 2.1.3(b) and to such Swingline Lender, as their interests may appear; provided that any such payment so remitted shall be repaid to such Swingline Lender or to Agent, as applicable, if and to the extent such payment is required to be refunded to Borrowers for any reason.  The purchase of participations in a Swingline Loan pursuant to this Section 2.1.3(b) shall not relieve Borrowers of any default in the payment thereof.

(c)     Upon the making of a Swingline Loan (whether before or after the occurrence of a Default or Event of Default and regardless of whether a Settlement has been requested with respect to such Swingline Loan), each Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from the applicable Swingline Lender, without recourse or warranty, an undivided interest and participation in such Swingline Loan in proportion to its Revolving Loan Percentage.  The applicable Swingline

36

Lender may, at any time, require the applicable Lenders to fund their participations.  From and after the date, if any, on which any Lender is required to fund its participation in any Swingline Loan purchased hereunder, Agent shall promptly distribute to such Lender, such Lender's Revolving Loan Percentage of all payments of principal and interest and all proceeds of Collateral received by in respect of such Swingline Loan.

(d)      Agent, on behalf of each Swingline Lender shall request settlement (a "Settlement") with the Lenders on at least a weekly basis or on any more frequent date that Agent elects, by notifying the applicable Lenders of such requested Settlement by facsimile, e-mail or telephone no later than 12:00 noon on the date of such requested Settlement (the "Settlement Date").  Each Lender (other than the applicable Swingline Lender, in the case of each Swingline Loan) shall transfer the amount of such Lender's Revolving Loan Percentage of the outstanding principal amount of the applicable Loan with respect to which Settlement is requested to Agent to such account of Agent as it may designate, not later than 3:00 p.m. on such Settlement Date.  Settlements may occur during the existence of a Default or Event of Default and whether or not the applicable conditions precedent set forth in Section 10.2 have then been satisfied.  Such amounts transferred to Agent shall be applied against the amounts of the applicable Swingline Lender's Swingline Loans and, together with such Swingline Lender's Revolving Loan Percentage of such Swingline Loan, shall constitute Revolving Credit Loans of such applicable Lenders (which shall be a Base Rate Loan), and shall no longer constitute Swingline Loans.  If any such amount referred to in this Section 2.1.3(d) is not transferred to Agent by any applicable Lender on such Settlement Date, the applicable Swingline Lender shall be entitled to recover such amount on demand from such Lender together with interest thereon as specified in Section 4.1.3.

2.2      Letters of Credit.

2.2.1  Subject to the terms and conditions hereof, LC Issuer shall issue or cause the issuance of standby letters of credit denominated in Dollars ("Letters of Credit") for the account of any Borrower except to the extent that the issuance thereof would then cause the Revolving Outstandings plus the Maximum Undrawn Amount of the Letter of Credit to be issued to exceed the lesser of (x) the Revolving Loan Commitment or (y) the Borrowing Base.  The Maximum Undrawn Amount of all outstanding Letters of Credit shall not exceed in the aggregate at any time the Letter of Credit Sublimit.  All disbursements or payments related to Letters of Credit shall be deemed to be Base Rate Loans.  Letters of Credit that have not been drawn upon shall not bear interest (but fees shall accrue in respect of outstanding Letters of Credit as provided in Section 3.2 hereof).

2.2.2  Notwithstanding any provision of this Agreement, LC Issuer shall not be under any obligation to issue any Letter of Credit if (i) any order, judgment or decree of any Governmental Authority or arbitrator shall by its terms purport to enjoin or restrain  LC Issuer from issuing any Letter of Credit, or any Law applicable to LC Issuer or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over LC Issuer shall prohibit, or request that LC Issuer refrain from, the issuance of letters of credit generally or the Letter of Credit in particular or shall impose upon LC Issuer with respect to the Letter of Credit any restriction, reserve or capital requirement (for which LC Issuer is not otherwise compensated hereunder) not in effect on the date of this Agreement, or shall impose upon LC Issuer any unreimbursed loss, cost or expense which was not applicable on the date of this Agreement, and which LC Issuer in good faith deems material to it, or (ii) the issuance of the

37

Letter of Credit would violate one or more policies of LC Issuer applicable to letters of credit generally.

### 2.2.3  Issuance of Letters of Credit

(a)    Borrower Representative, on behalf of any Borrower, may request LC Issuer to issue or cause the issuance of a Letter of Credit by delivering to LC Issuer, with a copy to Agent at the Payment Office, prior to 1:00 p.m., at least five (5) Business Days prior to the proposed date of issuance, such LC Issuer's form of Letter of Credit Application (the "Letter of Credit Application") completed to the satisfaction of Agent and LC Issuer; and, such other certificates, documents and other papers and information as Agent or LC Issuer may reasonably request.  LC Issuer shall not issue any requested Letter of Credit if such LC Issuer has received notice from Agent or any Lender that one or more of the applicable conditions set forth in Section 10.2 of this Agreement have not been satisfied or the commitments of Lenders to make Revolving Advances hereunder have been terminated for any reason.

(b)    Each Letter of Credit shall, among other things, (i) provide for the payment of sight drafts, or other written demands for payment, and (ii) have an expiry date not later than twelve (12) months after such Letter of Credit's date of issuance and in no event later than the Scheduled Termination Date.  Each standby Letter of Credit shall be subject either to the Uniform Customs and Practice for Documentary Credits as most recently published by the International Chamber of Commerce at the time a Letter of Credit is issued (the "UCP") or the International Standby Practices (International Chamber of Commerce Publication Number 590) (the "ISP98 Rules"), or any subsequent revision thereof at the time a standby Letter of Credit is issued, as determined by LC Issuer.

(c)    Agent shall use its reasonable efforts to notify Lenders of the request by Borrower Representative for a Letter of Credit hereunder.

### 2.2.4  Requirements for Issuance of Letters of Credit.  Borrower Representative shall authorize and direct any LC Issuer to name the applicable Borrower as the "Applicant" or "Account Party" of each Letter of Credit.  If Agent is not the LC Issuer of any Letter of Credit, Borrower Representative shall authorize and direct LC Issuer to deliver to Agent all instruments, documents, and other writings and property received by LC Issuer pursuant to the Letter of Credit and to accept and rely upon Agent's instructions and agreements with respect to all matters arising in connection with the Letter of Credit, the application therefor.

### 2.2.5  Disbursements, Reimbursement.

(a)    Immediately upon the issuance of each Letter of Credit, each Lender holding a Revolving Loan Commitment shall be deemed to, and hereby irrevocably and unconditionally agrees to, purchase from LC Issuer a participation in each Letter of Credit and each drawing thereunder in an amount equal to such Lender's Revolving Loan Percentage of the Maximum Undrawn Amount of such Letter of Credit (as in effect from time to time) and the amount of such drawing, respectively.

(b)    In the event of any request for a drawing under a Letter of Credit by the beneficiary or transferee thereof, LC Issuer will promptly notify Agent and Borrower Representative. Regardless of whether Borrower Representative shall have received such notice, Borrowers shall reimburse (such obligation to reimburse LC Issuer shall sometimes be referred to as a "Reimbursement Obligation") LC Issuer prior to 12:00 Noon, on each date that an amount is paid by LC Issuer under any Letter of Credit (each such date, a "Drawing Date") in an amount equal to the amount so paid by LC Issuer.  In the event Borrowers fail to reimburse LC Issuer for the full amount of any drawing under any

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

Letter of Credit by 12:00 Noon, on the Drawing Date, LC Issuer will promptly notify Agent and each Lender thereof, and Borrowers shall be automatically deemed to have requested that a Base Rate Loan be made by Lenders to be disbursed on the Drawing Date under such Letter of Credit, and Lenders shall be unconditionally obligated to fund such Loan (all whether or not the conditions specified in Section 10.2 are then satisfied or the commitments of Lenders to make Loans hereunder have been terminated for any reason) as provided for in Section 2.2.5 (c) immediately below.  Any notice given by LC Issuer pursuant to this Section 2.2.5 (b) may be oral if promptly confirmed in writing; provided that the lack of such a confirmation shall not affect the conclusiveness or binding effect of such notice.

(c)      Each Lender holding a Revolving Loan Commitment shall upon any notice pursuant to Section 2.2.5(b) make available to LC Issuer through Agent at the Payment Office an amount in immediately available funds equal to its Revolving Loan Percentage (subject to any contrary provisions of Section 3.11) of the amount of the drawing, whereupon the participating Lenders shall (subject to Section 2.2.5(d)) each be deemed to have made a Base Rate Loan to Borrowers in that amount.  If any Lender holding a Revolving Loan Commitment so notified fails to make available to Agent, for the benefit of LC Issuer, the amount of such Lender's Revolving Loan Percentage of such amount by 2:00 p.m. on the Drawing Date, then interest shall accrue on such Lender's obligation to make such payment, from the Drawing Date to the date on which such Lender makes such payment (i) at a rate per annum equal to the Federal Funds Effective Rate during the first three (3) days following the Drawing Date and (ii) at a rate per annum equal to the rate applicable to Base Rate Loan on and after the fourth day following the Drawing Date.  Agent and LC Issuer will promptly give notice of the occurrence of the Drawing Date, but failure of Agent or LC Issuer to give any such notice on the Drawing Date or in sufficient time to enable any Lender holding a Revolving Loan Commitment to effect such payment on such date shall not relieve such Lender from its obligations under this Section 2.2.5(c), provided that such Lender shall not be obligated to pay interest as provided in Section 2.2.5(c)(i) and (ii) until and commencing from the date of receipt of notice from Agent or LC Issuer of a drawing.

(d)      With respect to any unreimbursed drawing that is not converted into a Base Rate Loan to Borrowers in whole or in part as contemplated by Section 2.2.5(b), because of Borrowers' failure to satisfy the conditions set forth in Section 10.2 hereof (other than any notice requirements) or for any other reason, Borrowers shall be deemed to have incurred from Agent a borrowing (each a "Letter of Credit Borrowing") in the amount of such drawing.  Such Letter of Credit Borrowing shall be due and payable on demand (together with interest) and shall bear interest at the rate per annum applicable to a Base Rate Loan.  Each applicable Lender's payment to Agent pursuant to Section 2.2.5(c) shall be deemed to be a payment in respect of its participation in such Letter of Credit Borrowing and shall constitute a "Participation Advance" from such Lender in satisfaction of its Participation Commitment in respect of the applicable Letter of Credit under this Section 2.2.5.

(e)      Each applicable Lender's Participation Commitment in respect of the Letters of Credit shall continue until the last to occur of any of the following events: (x) LC Issuer ceases to be obligated to issue or cause to be issued Letters of Credit hereunder; (y) no Letter of Credit issued or created hereunder remains outstanding and uncancelled; and (z) all Persons (other than Borrowers) have been fully reimbursed for all payments made under or relating to Letters of Credit.

2.2.6  Repayment of Participation Advances.

(a)      Upon (and only upon) receipt by Agent for the account of LC Issuer of immediately available funds from Borrowers (i) in reimbursement of any payment made by LC Issuer or Agent under the Letter of Credit with respect to which any Lender has made a Participation Advance to Agent, or (ii) in payment of interest on such a payment made by LC Issuer or Agent under such a Letter of Credit, Agent will pay to each Lender holding a Revolving Loan Commitment, in the same funds as

those received by Agent, the amount of such Lender's Revolving Loan Percentage of such funds, except Agent shall retain the amount of the Revolving Loan Percentage of such funds of any Lender holding a Revolving Loan Commitment that did not make a Participation Advance in respect of such payment by Agent (and, to the extent that any of the other Lender(s) holding the Revolving Loan Commitment have funded any portion such Defaulting Lender's Participation Advance in accordance with the provisions of Section 3.11, Agent will pay over to such Non-Defaulting Lenders a pro rata portion of the funds so withheld from such Defaulting Lender).

(b)    If LC Issuer or Agent is required at any time to return to any Borrower, or to a trustee, receiver, liquidator, custodian, or any official in any insolvency proceeding, any portion of the payments made by Borrowers to LC Issuer or Agent pursuant to Section 2.2.6(a) in reimbursement of a payment made under the Letter of Credit or interest or fee thereon, each applicable Lender shall, on demand of Agent, forthwith return to LC Issuer or Agent the amount of its Revolving Loan Percentage of any amounts so returned by LC Issuer or Agent plus interest at the Federal Funds Effective Rate.

2.2.7  <u>Documentation</u>.    Each Borrower agrees to be bound by the terms of the Letter of Credit Application and by LC Issuer's interpretations of any Letter of Credit issued on behalf of such Borrower and by LC Issuer's written regulations and customary practices relating to letters of credit, though LC Issuer's interpretations may be different from such Borrower's own.  In the event of a conflict between the Letter of Credit Application and this Agreement, this Agreement shall govern.  It is understood and agreed that, except in the case of gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment), LC Issuer shall not be liable for any error, negligence and/or mistakes, whether of omission or commission, in following Borrower Representative's or any Borrower's instructions or those contained in the Letters of Credit or any modifications, amendments or supplements thereto.

2.2.8  <u>Determination to Honor Drawing Request</u>.    In determining whether to honor any request for drawing under any Letter of Credit by the beneficiary thereof, LC Issuer shall be responsible only to determine that the documents and certificates required to be delivered under such Letter of Credit have been delivered and that they comply on their face with the requirements of such Letter of Credit and that any other drawing condition appearing on the face of such Letter of Credit has been satisfied in the manner so set forth.

2.2.9  <u>Nature of Participation and Reimbursement Obligations</u>.    The obligation of each Lender holding a Revolving Loan Commitment in accordance with this Agreement to make the Revolving Credit Loans or Participation Advances as a result of a drawing under a Letter of Credit, and the obligations of Borrowers to reimburse LC Issuer upon a draw under a Letter of Credit, shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Section 2.2 under all circumstances, including the following circumstances:

(a)    any set-off, counterclaim, recoupment, defense or other right which such Lender or any Borrower, as the case may be, may have against LC Issuer, Agent, any Borrower or Lender, as the case may be, or any other Person for any reason whatsoever;

(b)    the failure of any Borrower or any other Person to comply, in connection with a Letter of Credit Borrowing, with the conditions set forth in this Agreement for the making of a Revolving

Advance, it being acknowledged that such conditions are not required for the making of a Letter of Credit Borrowing and the obligation of Lenders to make Participation Advances under Section 2.2.5;

(c)    any lack of validity or enforceability of any Letter of Credit;

(d)    any claim of breach of warranty that might be made by any Borrower, Agent, LC Issuer or any Lender against the beneficiary of a Letter of Credit, or the existence of any claim, set-off, recoupment, counterclaim, cross-claim, defense or other right which any Borrower, Agent, LC Issuer or any Lender may have at any time against a beneficiary, any successor beneficiary or any transferee of any Letter of Credit or assignee of the proceeds thereof (or any Persons for whom any such transferee or assignee may be acting), LC Issuer, Agent or any Lender or any other Person, whether in connection with this Agreement, the transactions contemplated herein or any unrelated transaction (including any underlying transaction between any Borrower or any Subsidiaries of such Borrower and the beneficiary for which any Letter of Credit was procured);

(e)    the lack of power or authority of any signer of (or any defect in or forgery of any signature or endorsement on) or the form of or lack of validity, sufficiency, accuracy, enforceability or genuineness of any draft, demand, instrument, certificate or other document presented under or in connection with any Letter of Credit, or any fraud or alleged fraud in connection with any Letter of Credit, or the transport of any property or provision of services relating to a Letter of Credit, in each case even if LC Issuer or any of LC Issuer's Affiliates has been notified thereof;

(f)    payment by LC Issuer under any Letter of Credit against presentation of a demand, draft or certificate or other document which is forged or does not fully comply with the terms of such Letter of Credit (provided that the foregoing shall not excuse LC Issuer from any obligation under the terms of any applicable Letter of Credit to require the presentation of documents that on their face appear to satisfy any applicable requirements for drawing under such Letter of Credit prior to honoring or paying any such draw);

(g)    the solvency of, or any acts or omissions by, any beneficiary of any Letter of Credit, or any other Person having a role in any transaction or obligation relating to a Letter of Credit, or the existence, nature, quality, quantity, condition, value or other characteristic of any property or services relating to a Letter of Credit;

(h)    any failure by LC Issuer or any of LC Issuer's Affiliates to issue any Letter of Credit in the form requested by Borrower Representative, unless Agent and LC Issuer have each received written notice from Borrower Representative of such failure within three (3) Business Days after LC Issuer shall have furnished Agent and Borrower Representative a copy of such Letter of Credit and such error is material and no drawing has been made thereon prior to receipt of such notice;

(i)    the occurrence of any Material Adverse Effect;

(j)    any breach of this Agreement or other Loan Document by any party thereto;

(k)    the occurrence or continuance of an insolvency proceeding with respect to any Borrower or any Guarantor;

(l)    the fact that a Default or an Event of Default shall have occurred and be continuing;

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

(m)     the fact that the Scheduled Termination Date shall have occurred or this Agreement or the obligations of Lenders to make Advances have been terminated; and

(n)     any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

### 2.2.10   Liability for Acts and Omissions.

(a)     As between Borrowers and LC Issuer, Swingline Lender, Agent and Lenders, each Borrower assumes all risks of the acts and omissions of, or misuse of the Letters of Credit by, the respective beneficiaries of such Letters of Credit.  In furtherance and not in limitation of the foregoing, LC Issuer shall not be responsible for: (i) the form, validity, sufficiency, accuracy, genuineness or legal effect of any document submitted by any party in connection with the application for an issuance of any such Letter of Credit, even if it should in fact prove to be in any or all respects invalid, insufficient, inaccurate, fraudulent or forged (even if LC Issuer or any of its Affiliates shall have been notified thereof); (ii) the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign any such Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason; (iii) the failure of the beneficiary of any such Letter of Credit, or any other party to which such Letter of Credit may be transferred, to comply fully with any conditions required in order to draw upon such Letter of Credit or any other claim of any Borrower against any beneficiary of such Letter of Credit, or any such transferee, or any dispute between or among any Borrower and any beneficiary of any Letter of Credit or any such transferee; (iv) errors, omissions, interruptions or delays in transmission or delivery of any messages, by mail, cable, facsimile, telex or otherwise, whether or not they be in cipher; (v) errors in interpretation of technical terms; (vi) any loss or delay in the transmission or otherwise of any document required in order to make a drawing under any such Letter of Credit or of the proceeds thereof; (vii) the misapplication by the beneficiary of any such Letter of Credit of the proceeds of any drawing under such Letter of Credit; or (viii) any consequences arising from causes beyond the control of LC Issuer, including any Governmental Acts, and none of the above shall affect or impair, or prevent the vesting of, any of LC Issuer's rights or powers hereunder.  Nothing in the preceding sentence shall relieve LC Issuer from liability for LC Issuer's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment) in connection with actions or omissions described in such clauses (i) through (viii) of such sentence.  In no event shall LC Issuer or LC Issuer's Affiliates be liable to any Borrower for any indirect, consequential, incidental, punitive, exemplary or special damages or expenses (including without limitation attorneys' fees), or for any damages resulting from any change in the value of any property relating to a Letter of Credit.

(b)     Without limiting the generality of the foregoing, LC Issuer and each of its Affiliates:  (i) may rely on any oral or other communication believed in good faith by LC Issuer or such Affiliate to have been authorized or given by or on behalf of the applicant for a Letter of Credit; (ii) may honor any presentation if the documents presented appear on their face substantially to comply with the terms and conditions of the relevant Letter of Credit; (iii) may honor a previously dishonored presentation under a Letter of Credit, whether such dishonor was pursuant to a court order, to settle or compromise any claim of wrongful dishonor, or otherwise, and shall be entitled to reimbursement to the same extent as if such presentation had initially been honored, together with any interest paid by LC Issuer or its Affiliates; (iv) may honor any drawing that is payable upon presentation of a statement advising negotiation or payment, upon receipt of such statement (even if such statement indicates that a draft or other document is being delivered separately), and shall not be liable for any failure of any such draft or other document to arrive, or to conform in any way with the relevant Letter of Credit; (v) may pay any paying or negotiating bank claiming that it rightfully honored under the laws or practices of the place where such bank is located; and (vi) may settle or adjust any claim or demand made on LC Issuer or its Affiliate in any way

42

related to any order issued at the applicant's request to an air carrier, a letter of guarantee or of indemnity issued to a steamship agent or carrier or any document or instrument of like import (each an "LC Order") and honor any drawing in connection with any Letter of Credit that is the subject of such LC Order, notwithstanding that any drafts or other documents presented in connection with such Letter of Credit fail to conform in any way with such Letter of Credit.

(c)    In furtherance and extension and not in limitation of the specific provisions set forth above, any action taken or omitted by LC Issuer under or in connection with the Letters of Credit issued by it or any documents and certificates delivered thereunder, if taken or omitted in good faith and without gross negligence (as determined by a court of competent jurisdiction in a final non-appealable judgment), shall not put LC Issuer under any resulting liability to any Borrower, Agent or any Lender.

## SECTION 3. INTEREST, FEES AND CHARGES

3.1    <u>Interest</u>.

3.1.1  <u>Rates of Interest</u>.  Except as provided in <u>Section 3.1.2</u> each Loan shall bear interest in accordance with <u>Section 3.2</u> as follows:

(a)    interest shall accrue on the principal amount of the Base Rate Loans outstanding at the end of each day at a fluctuating rate per annum equal to the Applicable Margin then in effect <u>plus</u> the Alternate Base Rate.

(b)    If Borrower Representative, on behalf of all Borrowers, exercises the LIBOR Option as provided in <u>Section 4.1</u>, interest shall accrue on the principal amount of the LIBOR Loans outstanding at the end of each day at a rate per annum equal to the Applicable Margin then in effect <u>plus</u> the LIBOR Lending Rate applicable to each LIBOR Loan for the corresponding Interest Period.

3.1.2  <u>Default Rate of Interest</u>.  Notwithstanding anything to the contrary in this Agreement or the other Loan Documents, immediately upon the occurrence and during the continuance of any Event of Default, all Obligations shall bear interest or earn fees at a rate per annum equal to 2.00% <u>plus</u> the interest rate otherwise applicable thereto (the "<u>Default Rate</u>") unless the Majority Lenders otherwise agree not to impose the Default Rate, and such interest shall be payable on demand.

3.1.3  <u>Maximum Interest</u>.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "<u>Charges</u>"), shall exceed the maximum lawful rate (the "<u>Maximum Rate</u>") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this <u>Section 3.1.3</u> shall be accumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such accumulated amount, together with interest thereon at the rate established pursuant to <u>clause (b)</u> of the definition of Base Rate to the date of repayment, shall have been received by such Lender.  If at any time, the amount of interest paid hereunder is limited by the Maximum Rate, and the amount at which interest accrues hereunder is subsequently below the Maximum Rate, the rate at which interest accrues hereunder shall remain at the Maximum Rate, until such time as the aggregate interest paid hereunder equals the amount of interest that would have been paid had the Maximum Rate not applied.

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

3.2   <u>Computation of Interest and Fees</u>.  Interest, Letter of Credit fees and Unused Line Fees hereunder shall be calculated daily and shall be computed on the actual number of days elapsed (including the first day but excluding the last day) over a year of 360 days, other than interest for Base Rate Loans, which shall be computed on the actual number of days elapsed (including the first day but excluding the last day) over a year of 365 days (or 366 days in a leap year).  For the purpose of computing interest hereunder, (a) payments of Obligations and any other obligations pursuant to the Loan Documents made in immediately available funds shall be applied in accordance with <u>Section 4.4.1</u> and (b) all items of payment received by Agent that are not made in immediately available funds (including, but not limited to, checks, drafts and other similar forms of payment) shall be deemed applied by Agent on account of the Obligations and any other obligations pursuant to the Loan Documents (subject to final payment of such items) on the first Business Day after receipt by Agent of such items  ("Application Date").  Agent is not, however, required to credit Borrowers' Account for the amount of any item of payment which is unsatisfactory to Agent and Agent may charge Borrowers' Account for the amount of any item of payment which is returned, for any reason whatsoever, to Agent unpaid.  Subject to the foregoing, Borrowers agree that for purposes of computing the interest charges under this Agreement, each item of payment received by Agent shall be deemed applied by Agent on account of the Obligations on its respective Application Date.  Borrowers further agree that there is a monthly float charge payable to Agent for Agent's sole benefit, in an amount equal to (x) the face amount of all items of payment received during the prior month (including items of payment received by Agent as a wire transfer or electronic depository check) multiplied by (y) the Base Rate for one (1) Business Day.

3.3   <u>Fees</u>.  Borrowers shall pay to Agent and, to the extent provided therein, its Affiliates, for their respective accounts, certain fees and other amounts in accordance with the terms of the Fee Letter.

3.4   <u>Letter of Credit Fees</u>.  Borrowers shall pay:

(a)   (x) to Agent, for the ratable benefit of Lenders holding Revolving Loan Commitments, fees for each Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, equal to the average daily face amount of each outstanding Letter of Credit multiplied by the Applicable Margin for LIBOR Loans, such fees to be calculated on the basis of a 360-day year for the actual number of days elapsed and to be payable quarterly in arrears on the first day of each calendar quarter and on the last day of the Term, and (y) to Issuer, a fronting fee of 0.125% per annum times the average daily face amount of each outstanding Letter of Credit for the period from and excluding the date of issuance of same to and including the date of expiration or termination, to be payable quarterly in arrears on the first day of each calendar quarter and on the last day of the Term (all of the foregoing fees, the "Letter of Credit Fees").  In addition, Borrowers shall pay to Agent for the benefit of LC Issuer, any and all administrative, issuance, amendment, payment and negotiation charges with respect to Letters of Credit and all fees and expenses as agreed upon by LC Issuer and the Borrower Representative in connection with any Letter of Credit, including in connection with the opening, amendment or renewal of any such Letter of Credit and any acceptances created thereunder, all such charges, fees and expenses, if any, to be payable on demand.  All such charges shall be deemed earned in full on the date when the same are due and payable hereunder and shall not be subject to rebate or pro-ration upon the termination of this Agreement for any reason.  Any such charge in effect at the time of a particular transaction shall be the charge for that transaction, notwithstanding any subsequent change in Issuer's prevailing charges for that type of transaction.  Upon and after the occurrence of an Event of Default, and during the continuation thereof, at the option of Agent or at the direction of Required Lenders (or, in the case of any Event of Default under Section 11.1.13 through 11.1.17 immediately and automatically upon the occurrence of any such Event of Default without the requirement of any affirmative action by any party), the Letter of Credit Fees described in clause (x) of this Section 3.4(a) shall be increased by an additional two percent (2.0%) per annum.

Detroit_5279807_16

(b)    At any time following the occurrence of an Event of Default, at the option of Agent or at the direction of Required Lenders (or, in the case of any Event of Default under Section 11.1.13, immediately and automatically upon the occurrence of such Event of Default, without the requirement of any affirmative action by any party), or upon the expiration of the Term or any other termination of this Agreement (and also, if applicable, in connection with any mandatory prepayment under Section 4.3), Borrowers will Cash Collateralize all outstanding Letters of Credit, and each Borrower hereby irrevocably authorizes Agent, in its discretion, on such Borrower's behalf and in such Borrower's name, to open such an account and to make and maintain deposits therein, or in an account opened by such Borrower, in the amounts required to be made by such Borrower, out of the proceeds of Accounts or other Collateral or out of any other funds of such Borrower coming into any Lender's possession at any time.  Agent may, in its discretion, invest such Cash Collateral (less applicable reserves) in such short-term money-market items as to which Agent and such Borrower mutually agree (or, in the absence of such agreement, as Agent may reasonably select) and the net return on such investments shall be credited to such account and constitute additional Cash Collateral, or Agent may (notwithstanding the foregoing) establish the account provided for under this Section 3.4(b) as a non-interest bearing account and in such case Agent shall have no obligation (and Borrowers hereby waive any claim) under Article 9 of the Uniform Commercial Code or under any other Applicable Law to pay interest on such Cash Collateral being held by Agent.  No Borrower may withdraw amounts credited to any such account except upon the occurrence of all of the following: (x) payment and performance in full of all Obligations; (y) expiration of all Letters of Credit; and (z) termination of this Agreement.  Borrowers hereby assign, pledge and grant to Agent, for its benefit and the ratable benefit of Issuer, Lenders and each other Secured Party, a continuing security interest in and to and Lien on any such Cash Collateral and any right, title and interest of Borrowers in any deposit account, securities account or investment account into which such Cash Collateral may be deposited from time to time to secure the Obligations, specifically including all Obligations with respect to any Letters of Credit.  Borrowers agree that upon the coming due of any Reimbursement Obligations (or any other Obligations, including Obligations for Letter of Credit Fees) with respect to the Letters of Credit, Agent may use such Cash Collateral to pay and satisfy such Obligations.

3.5    <u>Unused Line Fees</u>.  Borrowers shall pay to Agent, for the ratable benefit of Lenders, a fee (the "<u>Unused Line Fee</u>") equal to the Applicable Unused Line Fee Rate per annum multiplied by the average daily amount of the Available Revolving Loan Commitment (excluding any participations in Swingline Loans).  The Unused Line Fee shall be payable monthly in arrears on the first Business Day of each calendar month hereafter and on the date on which the Revolving Loan Commitments terminate, commencing on the first such date to occur after the date hereof.

3.6    <u>Bank Charges</u>.  Borrowers shall pay to Agent, on demand, any and all fees, costs or expenses which Agent or any Lender pays to a bank or other similar institution arising out of or in connection with (i) the forwarding to any Borrower or any other Person on behalf of any Borrower, by Agent or any Lender, of proceeds of Loans made to Borrowers pursuant to this Agreement and (ii) the depositing for collection by Agent or any Lender of any check or item of payment received or delivered to Agent or any Lender on account of the Obligations.

3.7    <u>Collateral Protection Expenses</u>.  All out-of-pocket expenses incurred in protecting, storing, warehousing, insuring, handling, maintaining and shipping the Collateral, and any and all excise, property, sales, and use taxes imposed by any state, federal, or local authority on any of the Collateral or in respect of the sale thereof shall be borne and paid by Borrowers.  If Borrowers fail to promptly pay any portion thereof when due, Agent may, at its option, but shall not be required to, pay the same and charge Borrowers therefor pursuant to <u>Section 13.4</u>.

45

3.8     <u>Reimbursement of Costs and Expenses; Inventory Appraisals; Field Examinations</u>.   In addition to all fees, charges, costs and expenses described in this <u>Section 3</u>, all reasonable and documented out-of-pocket costs and expenses incurred by any Indemnified Person (including in connection with any inventory appraisals and field examinations), shall be paid pursuant to, and subject to the limitations set forth in, <u>Section 13.4</u>.

3.9     <u>No Deductions</u>.

(a)     Except as provided in <u>Section 3.9(b)</u>, any and all payments or reimbursements made hereunder shall be made free and clear of and without deduction for any and all Non-Excluded Taxes or Other Taxes.

(b)     If any Borrower or any other Obligor shall be required by law (as determined in the good faith discretion of the applicable Borrower or other Obligor) to deduct any Non-Excluded Taxes or Other Taxes from or in respect of any sum payable hereunder to Agent or any Lender, then (i) such Borrower or Obligor shall make such deduction and pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law (and provide evidence of such payment to the applicable Lender) and (ii) the sum payable hereunder shall be increased as may be necessary so that, after all required deductions are made (including any deduction required on payments made pursuant to this <u>Section 3.9</u>), Agent or such Lender receives an amount equal to the sum it would have received had no such deductions been made.

(c)     If Agent or any Lender believes, in its sole discretion exercised in good faith, that it is entitled to receive a refund in respect of Non-Excluded Taxes or Other Taxes with respect to which it has been indemnified or any Borrower or Obligor has paid additional amounts, it shall promptly notify such Borrower or Obligor of the availability of such refund and shall, within thirty (30) days after receipt of a request for such by such Borrower or Obligor (whether as a result of notification that it has made of such to such Borrower or Obligor or otherwise), make a claim to such Governmental Authority for such refund and contest such Taxes or liabilities if (i) any Borrower or Obligor has agreed in writing to pay all of Agent's or Lender's reasonable costs and expenses relating to such claim and (ii) Agent or Lender determines, in its sole discretion exercised in good faith, that it would not be materially disadvantaged as a result of such refund claim (it being understood that the mere existence of fees, charges, costs or expenses that any Borrower or Obligor has offered to and agreed to pay on behalf of Agent or Lender shall not be deemed to be materially disadvantageous to such Person).   This <u>paragraph (c)</u> shall not be construed to require Agent or a Lender to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to any Borrower, Obligor or any other Person.   The agreements in this <u>Section 3.9(c)</u> shall survive the termination of this Agreement and the payment of all amounts payable hereunder.

(d)     Agent or any Lender claiming any additional amounts payable pursuant to <u>Section 3.9(b)</u> shall use reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document reasonably requested by Borrower Representative or to change the jurisdiction of its applicable lending office if the making of such filing or change of jurisdiction would avoid the need for or reduce the amount of any such additional amounts that may thereafter accrue or avoid the circumstances giving rise to such exercise and would not, in the sole and absolute determination of Agent or such Lender, as the case may be, result in any unreimbursed additional costs, expenses or risks or be otherwise disadvantageous to it.   Each of Agent and each Lender agrees to use reasonable efforts to notify Borrower Representative as promptly as practicable upon its becoming aware that circumstances exist that would cause Borrowers or Obligors to become obligated to pay additional amounts to Agent or such Lender pursuant to <u>Section 3.9(b)</u>.

(e)    To the extent permitted by applicable law, Agent or each Lender that is not a United States person within the meaning of Code Section 7701(a)(30) (a "Non-US Lender") shall deliver to Borrower Representative and Agent (if delivered by a Lender)  on or prior to the Closing Date (or in the case of a Lender that is an assignee, on the date of such assignment to such Lender) two accurate and complete original signed copies of IRS Form W-8BEN, W-8BEN-E, W-8ECI, or W-8IMY (or any successor or other applicable form prescribed by the IRS) certifying to Agent's or Lender's entitlement to a complete exemption from, or a reduced rate in, United States withholding Tax on (i) interest payments to be made hereunder or with respect to any Loan and (ii) any fees payable to Agent, any Lender or any of their respective Affiliates as provided under Section 3.1.2 or Section 3.3.  If Agent or any Lender that is a Non-US Lender is claiming a complete exemption from withholding on interest pursuant to Sections 871(h) or 881(c) of the Code, Agent or Lender shall deliver (along with two accurate and complete original signed copies of IRS Form W-8BEN or W-8BEN-E, as applicable) a certificate in form and substance reasonably acceptable to Agent and Borrower Representative (any such certificate, a "Withholding Certificate").   Agent or each Lender that is not a Non-US Lender shall, to the extent permitted by law, provide two (2) properly completed and duly executed copies of IRS Form W-9 or W-8 (if applicable) (or any successor or other applicable form) to Borrower Representative and Agent (if delivered by a Lender) certifying that Agent or such Lender is exempt from United States backup withholding Tax.

(f)    Borrowers and Obligors shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(g)    If Agent or any Lender determines, as a result of any change in applicable law, regulation or treaty, or in any official application or interpretation thereof, that it is unable to legally submit to Borrower Representative any form or certificate that Agent or such Lender is legally obligated to submit pursuant to Section 3.9(e) or that Agent or such Lender is legally required to withdraw or cancel any such form or certificate previously submitted, Agent or such Lender shall promptly notify Borrower Representative and Agent (if delivered by a Lender) of such fact and Agent or such Lender shall to that extent not be obligated to provide any such form or certificate and will be entitled to withdraw or cancel any affected form or certificate, as applicable.   Agent or any Lender which delivers a valid form or certificate under Section 3.9(e) further undertakes to deliver to Borrower Representative two additional copies of such form or certificate (or a successor form) on or before the date that such form or certificate expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent form or certificate so delivered by it, and such amendments thereto or extensions or renewals thereof as may be reasonably requested by Borrower Representative.

(h)    If a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender, if it is legally eligible to do so, shall deliver to Borrowers and Agent, at the time or times prescribed by law and at such time or times reasonably requested by Borrowers and Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrowers and Agent as may be necessary for Borrowers and Agent to comply with its obligations under FATCA, to determine that such Lender has or has not complied with such Lender's obligations under FATCA and, as necessary, to determine the amount to deduct and withhold from such payment.  Solely for purposes of this Section 3.9(h), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(i)    Borrowers and any other Obligors shall jointly and severally indemnify Agent and each Lender for any Non-Excluded Taxes or Other Taxes that are paid or payable by Agent or any

47

Lender in connection with any Loan Document (including amounts paid or payable under this <u>Section 3.9(i)</u>) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Non-Excluded Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  The indemnity under this <u>Section 3.9(i)</u> shall be paid within ten (10) days after Agent or any Lender delivers to the Borrower Representative a certificate stating the amount of any Non-Excluded Taxes or Other Taxes so paid or payable by Agent or such Lender and describing the basis for the indemnification claim.  Such certificate shall be conclusive of the amount so paid or payable absent manifest error.  Any such Lender shall deliver a copy of such certificate to Agent.

(j)      Each Lender shall severally indemnify Agent for any Taxes (but, in the case of any Non-Excluded Taxes or Other Taxes, only to the extent that no Borrower or any other Obligor has not already indemnified Agent for such Taxes and without limiting the obligation of Borrowers or any other Obligors to do so) attributable to such Lender that are paid or payable by Agent in connection with any Loan Document and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  The indemnity under this <u>Section 3.9(j)</u> shall be paid within ten (10) days after Agent delivers to the applicable Lender a certificate stating the amount of Taxes so paid or payable by Agent.  Such certificate shall be conclusive of the amount so paid or payable absent manifest error.

3.10    <u>Replacement of Lenders</u>.  If (a) Borrowers or Obligors become obligated to pay additional amounts to any Lender pursuant to <u>Section 3.9</u> or <u>Section 4.8</u>, (b) any Lender is unable to make LIBOR Loans as provided in <u>Section 4.9</u>, or (c) any Lender is a Defaulting Lender, then Borrower Representative may designate another Person in its reasonable discretion (such other Person being called a "<u>Replacement Lender</u>") which Replacement Lender shall be acceptable to Agent, the Swingline Lenders and the LC Issuers in accordance with <u>Section 13.2.1</u> to purchase the Loans of such Lender and such Lender's rights hereunder, without recourse to or warranty by, or expense to, such Lender, for a purchase price equal to the outstanding principal amount of the Loans payable to such Lender plus any accrued but unpaid interest on such Loans and all accrued but unpaid fees owed to such Lender and any other amounts payable to such Lender under this Agreement, and to assume all the obligations of such Lender hereunder, and, upon such purchase and assumption (pursuant to an Assignment and Acceptance Agreement), such Lender shall no longer be a party hereto or have any rights hereunder (other than rights with respect to indemnities and similar rights applicable to such Lender prior to the date of such purchase and assumption) and shall be relieved from all obligations to Borrowers hereunder, and the Replacement Lender shall succeed to the rights and obligations of such Lender hereunder.

3.11    <u>Defaulting Lender</u>.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)      Fees pursuant to <u>Section 3.5</u> shall cease to accrue on the unfunded portion of the Revolving Loan Commitment of such Defaulting Lender.

(b)      If any Swingline Loan, Letters of Credit are outstanding at the time a Lender becomes a Defaulting Lender then:

(i)      all or any part of the Defaulting Lender's obligation to participate in Swingline Loans Letters of Credit shall be reallocated among the Non-Defaulting Lenders with Revolving Loan Commitments in accordance with their respective ratable shares but only to the extent (x) the sum of all Non-Defaulting Lenders' Revolving Outstandings <u>plus</u> such Defaulting Lender's obligation to participate in Swingline Loans, Letters of Credit does not exceed the total

of all Non-Defaulting Lenders' Commitments and (y) the conditions set forth in <u>Section 10.2</u> are satisfied at such time;

(ii)    if the reallocation described in <u>clause (a)</u> above cannot, or can only partially, be effected, Borrowers shall within one Business Day following notice by Agent Cash Collateralize such Defaulting Lender's obligation to participate in Swingline Loans, Letters of Credit (after giving effect to any partial reallocation pursuant to <u>clause (a)</u> above) for so long as such obligation to participate in Swingline Loans, Letters of Credit is outstanding;

(iii)    if Borrowers Cash Collateralize any portion of such Defaulting Lender's obligation to participate in Letters of Credit, Borrowers shall not be required to pay any fees to such Defaulting Lender pursuant to <u>Section 3.4</u> for so long as such Defaulting Lender's obligation to participate in Letters of Credit is Cash Collateralized; and

(iv)    if any Defaulting Lender's Letters of Credit is not Cash Collateralized nor reallocated pursuant to this <u>Section 3.11.2</u>, then, without prejudice to any rights or remedies of any Lender hereunder, all Letter of Credit fees payable under <u>Section 3.4</u> shall be payable to Agent for the applicable LC Issuer until such obligation to participate in Letters of Credit is Cash Collateralized and/or reallocated.

(c)    So long as any Lender is a Defaulting Lender, no LC Issuer shall be required to issue, amend or increase any Letter of Credit, unless it is satisfied that the related exposure will be 100% covered by the Revolving Loan Commitments of the Non-Defaulting Lenders and/or Cash Collateralized, and participating interests in any such newly issued or increased Letter of Credit shall be allocated among Non-Defaulting Lenders in a manner consistent with <u>Section 3.11.2(a)</u> (and Defaulting Lenders shall not participate therein).

(d)    [Intentionally Omitted].

(e)    In the event that Agent and the Borrower Representative each agrees that a Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the obligations to participate in Swingline Loans, Letters of Credit of the Lenders shall be readjusted to reflect the inclusion of such Lender's Revolving Loan Commitment and on such date (a) such Lender shall purchase at par such of the Loans of the other Lenders as Agent shall determine may be necessary in order for such Lender to hold such Loans in accordance with its ratable share and (b) so long as no Default or Event of Default shall have occurred and be continuing and so long as not otherwise required to be provided pursuant to any other provision of this Agreement or any other Loan Document, all Cash Collateral provided by Borrowers in connection with such Lender having been a Defaulting Lender and not otherwise applied in satisfaction of Borrowers' Obligations hereunder shall be returned to Borrowers.

(f)    Any amount payable to a Defaulting Lender hereunder (whether on account of principal, interest, fees or otherwise and including any amount that would otherwise be payable to such Defaulting Lender pursuant to <u>Section 4.10</u> but excluding <u>Section 3.10</u>)) shall, in lieu of being distributed to such Defaulting Lender, be retained by Agent and, subject to any applicable Requirements of Law, be applied at such time or times as may be determined by Agent (i) <u>first</u>, to the payment of any amounts owing by such Defaulting Lender to Agent hereunder, (ii) <u>second</u>, to the funding of any Revolving Credit Loan or the funding or Cash Collateralization of any participating interest in any Swingline Loan, Letter of Credit in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by Agent, (iii) <u>third</u>, if so determined by Agent and Borrowers, held as Cash Collateral for future funding obligations of the Defaulting Lender under this Agreement, (iv) <u>fourth</u>,

*pro rata*, to the payment of any amounts owing to Borrowers or the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Borrower or any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement, and (v) fifth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided, that if such payment is (A) a prepayment of the principal amount of any Loans or Reimbursement Obligations in respect of draws under Letters of Credit with respect to which any Lender has funded its participation obligations and (B) made at a time when the conditions set forth in Section 10.2 are satisfied, such payment shall be applied solely to prepay the Loans of, and Reimbursement Obligations owed to, all Lenders that are not Defaulting Lenders *pro rata* prior to being applied to the prepayment of any Loans, or Reimbursement Obligations owed to, any Defaulting Lender.

(g)    No Defaulting Lender shall have any right to approve or disapprove any amendment, waiver, consent or any other action the Lenders or the Majority Lenders have taken or may take hereunder (including any consent to any amendment or waiver pursuant to Section 13.1); provided that any waiver, amendment or modification requiring the consent of all Lenders which affects such Defaulting Lender differently than other affected Lenders shall require the consent of such Defaulting Lender.

(h)    (i) The fact that a Lender becomes a Defaulting Lender or otherwise fails to perform its obligations hereunder shall not relieve any other Lender of its obligations hereunder and (ii) no Lender shall be responsible for default by another Lender.

## SECTION 4. LOAN ADMINISTRATION

4.1    Manner of Borrowing Revolving Credit Loans.  Borrowings under the credit facility established pursuant to this Agreement shall be as follows:

4.1.1    Loan Requests.

(a)    Revolving Credit Loans.  A request for a Revolving Credit Loan shall be made, or shall be deemed to be made, in the following manner:  (i) Borrower Representative, on behalf of all Borrowers, may give Agent notice of its intention to borrow, in which notice Borrower Representative shall specify (A) the name of each applicable Borrower, (B) the aggregate amount of the proposed borrowing of a Revolving Credit Loan and a breakdown of the separate wires comprising such borrowing, (C) the proposed date of such borrowing, which shall be a Business Day, (D) wire instructions for a deposit account in the name of each such Borrower and located in any city in the United States, (E) whether such borrowing of a Revolving Credit Loan is to be a Base Rate Loan or a LIBOR Loan, and (F) in the case of a borrowing that will be a LIBOR Loan, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period", no later than 1:00 p.m. on the proposed borrowing date (or in accordance with Section 4.1.7 or 4.1.8, as applicable, in the case of a request for a LIBOR Loan), provided, however, that, subject to the last sentence of Section 10.2, no Lender shall be required to make a Revolving Credit Loan if the conditions in Section 10.2 shall not have been satisfied; and (ii) the becoming due of any amount required to be paid under this Agreement or the other Loan Documents, whether as interest or for any other Obligation, shall deemed irrevocably to be a request for a Revolving Credit Loan on the due date in the amount required to pay such interest or other Obligation.  In the case of clause (i) above, if no election as to whether the borrowing is a LIBOR Loan is specified, then (x) a borrowing of any Revolving Credit Loan shall be a Base Rate Loan.  If no Interest Period is specified with respect to any requested LIBOR Loan (or if default interest is accruing under

WEIL:\95250238\4\99980.0025

Section 3.1.2), then the applicable Borrower or Borrowers shall be deemed to have selected an Interest Period of one month's duration.  All Revolving Credit Loans shall be in U.S. Dollars.

(b)    Swingline Loans.  A request for a Swingline Loan shall be made in the following manner:  (a) Borrower Representative, on behalf of all Borrowers, may give Agent an irrevocable notice of its intention to borrow a Swingline Loan, not later than 1:00 p.m. on the day of the proposed Swingline Loan, in which notice Borrower Representative shall specify (i) the name of each applicable Borrower, (ii) the aggregate amount of the proposed borrowing of a Swingline Loan and a breakdown of the separate wires comprising such borrowing, (iii) the proposed date of such Swingline Loan, which shall be a Business Day, and (iv) wire instructions for a deposit account in the name of each such Borrower and located in any city in the United States.  Agent will promptly advise the Swingline Lenders of any such notice received from the Borrower Representative.  Subject to the last sentence of Section 10.2, no Swingline Lender shall be required to make a Swingline Loan if the conditions in Section 10.2 shall not have been satisfied.  Subject to the terms of this Agreement, the applicable Swingline Lender shall make each Swingline Loan available to Borrowers pursuant to Section 4.1.2 on the requested date of such Swingline Loan.  All Swingline Loans shall be in U.S. Dollars.

4.1.2  Disbursement.  Borrowers hereby irrevocably authorize Agent (and, solely with respect to each Swingline Loan provided, each Swingline Lender) to disburse the proceeds of each Loan or Swingline Loan provided, or deemed to be requested, pursuant to Section 4.1.1 as follows:  (a) (i) the proceeds of each Loan provided under Section 4.1.1(a)(i) shall be disbursed by Agent, and (ii) the proceeds of each Swingline Loan provided under Section 4.1.1(b) shall be disbursed by the applicable Swingline Lender, in each case in lawful money of the United States of America in immediately available funds, by wire transfer to such bank account as may be agreed upon in writing by Borrowers and Agent from time to time or elsewhere if pursuant to a written direction from Borrowers (each such account, a "Funding Account"), or in the case of a Loan made to finance the reimbursement of a drawing under a Letter of Credit as provided in Section 2.2(c), by remittance to the applicable LC Issuer, or in the case of repayment of another Loan or fees or expenses as provided by Section 4.1.1(a)(ii) or Section 13.4(a), by remittance to Agent to be distributed to the Lenders; and (b) the proceeds of each Revolving Credit Loan requested under Section 4.1.1(a)(ii) shall be retained by Agent and disbursed in its Permitted Discretion.  If at any time any Loan is funded by Agent or Lenders in excess of the amount requested or deemed requested by Borrowers, Borrowers agree to repay the excess to Agent immediately upon the earlier to occur of (i) any Borrower's discovery of the error and (ii) notice thereof to Borrowers from Agent or any Lender.

4.1.3  Payment by Lenders.  Agent shall give to each Lender prompt written notice by facsimile, telex or cable of the receipt by Agent from Borrower Representative of any request for a Revolving Credit Loan.  Each such notice shall specify the details of such borrowing request and the amount of each Lender's advance thereunder (in accordance with its applicable Revolving Loan Percentage).  Each Lender shall, not later than 2:00 p.m. on such requested date, wire to a bank designated by Agent the amount of that Lender's Revolving Loan Percentage of the requested Revolving Credit Loan.  The failure of any Lender to make the Revolving Credit Loans to be made by it shall not release any other Lender of its obligations hereunder to make its Revolving Credit Loan.  Neither Agent nor any other Lender shall be responsible for the failure of any other Lender to make the Revolving Credit Loan to be made by such other Lender.  The foregoing notwithstanding, Agent, in its sole discretion, may from its own funds make a Revolving Credit Loan on behalf of any Lender.  In such event, each of the Lender on behalf of whom Agent made the Revolving Credit Loan and each Borrower severally agrees that it shall reimburse Agent for the amount of such Revolving Credit Loan made on such Lender's behalf together with interest thereon, for each day from and including the date such amount is made available to the applicable Borrower to but excluding the date of payment to Agent, on a weekly (or more frequent, as

determined by Agent in its sole discretion) basis, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of Borrowers, the interest rate applicable to Base Rate Loans; a certificate setting forth such interest amount submitted to any Lender or Borrower Representative, as applicable, with respect to interest calculated under clauses (i) and (ii) above shall be conclusive absent manifest error. On each such settlement date, Agent will pay to each Lender the net amount owing to such Lender in connection with such settlement, including amounts relating to Revolving Credit Loans, fees, interest and other amounts payable hereunder. The entire amount of interest attributable to such Revolving Credit Loan for the period from the date on which such Revolving Credit Loan was made by Agent on such Lender's behalf until Agent is reimbursed by such Lender, shall be paid to Agent for its own account.

       4.1.4 <u>Authorization</u>. Borrowers hereby irrevocably authorize Agent, in Agent's sole discretion, to advance to Borrowers, and to charge to Borrowers' Loan Account hereunder as a Revolving Credit Loan (which shall be a Base Rate Loan), a sum sufficient to pay all interest accrued on the Obligations when due and to pay all fees, costs and expenses and other Obligations at any time due and owing by any Borrower to Agent or any Lender hereunder.

       4.1.5 <u>Letter of Credit Requests</u>. A request for a Letter of Credit shall be made in accordance with Section 2.2.3.

       4.1.6 <u>Method of Making Requests</u>. As an accommodation to Borrowers, unless a Default or an Event of Default is then in existence, (i) Agent and each Swingline Lender shall permit telephonic or electronic requests for Loans to Agent, (ii) Agent and each LC Issuer may, in their discretion, permit electronic transmittal of requests for Letters of Credit to them, and (iii) Agent may, in Agent's discretion, permit electronic transmittal of instructions, authorizations, agreements or reports to Agent. Unless Borrower Representative, on behalf of all Borrowers specifically directs any or all of Agent, each Swingline Lender and each LC Issuer in writing not to accept or act upon telephonic or electronic communications from any Borrower, neither Agent nor Bank shall have any liability to Borrowers for any loss or damage suffered by any Borrower as a result of Agent's or Bank's honoring of any requests, execution of any instructions, authorizations or agreements or reliance on any reports communicated to it telephonically or electronically and purporting to have been sent to Agent or Bank by any Borrower so long as all Loans are funded into a Funding Account, and neither Agent nor Bank shall have any duty to verify the origin of any such communication or the authority of the Person sending it. Each telephonic request for a Revolving Credit Loan, Swingline Loan, or Letter of Credit accepted by Agent, any Swingline Lender, or any LC Issuer, as applicable, hereunder shall be promptly followed by a written confirmation of such request from Borrower Representative to Agent, such Swingline Lender or such LC Issuer, as applicable.

       4.1.7 <u>LIBOR Loan Request</u>. By delivering a borrowing request to Agent on or before 1:00 p.m. on a Business Day, Borrower Representative, on behalf of all Borrowers, may from time to time irrevocably request, on not less than three (3) nor more than five (5) Business Days' notice, that a LIBOR Loan be made in a minimum amount of $5,000,000 and integral multiples of $100,000, with an Interest Period applicable thereto as contemplated by the definition of the term "<u>Interest Period</u>". On the terms and subject to the conditions of this Agreement, each LIBOR Loan shall be made available to Borrowers no later than 1:00 p.m. on the first day of the applicable Interest Period by deposit to the account of the applicable Borrower as shall have been specified in its borrowing request. In no event shall Borrowers be permitted to have outstanding at any one time LIBOR Loans with more than six (6) different Interest Periods.

4.1.8  <u>Continuation and Conversion Elections</u>.  By delivering a continuation/ conversion notice to Agent on or before 1:00 p.m. on a Business Day, Borrower Representative, on behalf of all Borrowers, may from time to time irrevocably elect, on not less than three (3) nor more than five  (5) Business Days' notice, that all, or any portion in an aggregate minimum amount of $100,000 and integral multiples of $100,000, of (a) any LIBOR Loan be converted on the last day of an Interest Period into a LIBOR Loan with a different Interest Period, or continued on the last day of an Interest Period as a LIBOR Loan with a similar Interest Period or (b) any Revolving Credit Loan that is a Base Rate Loan be converted into a LIBOR Loan, which notice shall specify an Interest Period applicable thereto as contemplated by the definition of the term "<u>Interest Period</u>", <u>provided</u>, <u>however</u>, that upon the election of Agent or Majority Lenders when any Default or Event of Default has occurred and is continuing no portion of the outstanding principal amount of any LIBOR Loans may be converted to, or continued as, LIBOR Loans.  If any Default or Event of Default has occurred and is continuing (if Agent or Majority Lenders so elect), or in the absence of delivery of a continuation/conversion notice with respect to any LIBOR Loan at least three Business Days before the last day of the then current Interest Period with respect thereto, each maturing LIBOR Loan shall automatically be continued as a Base Rate Loan.

4.1.9  <u>Voluntary Prepayment of LIBOR Loans</u>.  LIBOR Loans may be prepaid upon the terms and conditions set forth herein.  Borrower Representative, on behalf of all Borrowers, shall give Agent, no later than 1:00 p.m. at least two (2) Business Days' prior written notice of any proposed prepayment of any LIBOR Loan, specifying the proposed date of payment of such LIBOR Loan, and the principal amount to be paid.  Each partial prepayment of the principal amount of LIBOR Loans shall be in an aggregate minimum amount of $100,000 and integral multiples of $100,000 and accompanied by the payment of all charges outstanding on such LIBOR Loans and of all accrued interest on the principal repaid to the date of payment. Each Borrower shall indemnify Agent and Lenders and hold Agent and Lenders harmless from and against any and all losses or expenses that Agent and Lenders may sustain or incur as a consequence of any prepayment, conversion of or any default by any Borrower in the payment of the principal of or interest on any LIBOR Loan or failure by any Borrower to complete a borrowing of, a prepayment of or conversion of or to a LIBOR Loan after notice thereof has been given, including, but not limited to, any interest payable by Agent or Lenders to lenders of funds obtained by it in order to make or maintain its LIBOR Loans hereunder.  A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Agent or any Lender to Borrower Representative shall be conclusive absent manifest error.

4.2    <u>Payments</u>.  The Obligations shall be payable as follows or as provided in any of the Loan Documents issued or made by Borrowers (<u>provided</u> that in the event of any conflict, the provisions of this Agreement shall control):

4.2.1  <u>Principal</u>.  Borrowers jointly and severally agree to pay to Agent, for the account of each Lender, principal on account of Revolving Credit Loans in accordance with <u>Section 4.4.2(a)</u> immediately upon the earliest of (i)  the receipt by Agent or any Borrower of any proceeds pursuant to <u>Sections 4.3.1</u>, or <u>4.3.2</u>, to the extent of said proceeds, (ii) the occurrence of an Event of Default in consequence of which Agent or Majority Lenders elect to accelerate the payment and maturity of the Obligations, the maturity and payment of the Obligations automatically accelerate, and (iii) termination of this Agreement pursuant to <u>Section 5</u> hereof.  Each payment (including principal prepayment) by Borrowers on account of principal of the Revolving Credit Loans shall be applied first to Base Rate Loans and then to LIBOR Loans.

4.2.2  <u>Interest Provisions</u>.  Borrowers jointly and severally agree to pay interest on the outstanding principal amount of any Loan on each Interest Payment Date, provided further that all accrued and unpaid interest shall be due and payable at the end of the Term.

4.2.3  <u>Costs, Fees and Charges</u>.  Borrowers jointly and severally agree to pay costs, fees and charges payable pursuant to this Agreement, as and when provided in <u>Section 2</u> or <u>Section 3</u> hereof, as applicable to Agent or a Lender, as applicable, or to any other Person designated by Agent or such Lender in writing.

4.2.4  <u>Other Obligations</u>.  Borrowers jointly and severally agree to pay the balance of the Obligations requiring the payment of money, if any, to Agent for distribution to Lenders, as appropriate, as and when provided in this Agreement, the Loan Documents or the Other Agreements, or on demand, whichever is later.

4.3    <u>Mandatory and Optional Prepayments</u>.

4.3.1  <u>Failure to Receive Final Order</u>.  All Loans made available on or after the Interim Order Entry Date shall be repaid in full on the date that is 30 days after the Interim Order Entry Date unless the Final Order shall have been entered by the Bankruptcy Court on or before such date.

4.3.2  [<u>Intentionally omitted</u>].

4.3.3  <u>Excess Revolving Outstandings</u>.  In the event and on such occasion that the Revolving Outstandings exceed the Maximum Borrowing Amount, Borrowers shall prepay the Loans and/or Cash Collateralize LC Obligations in an aggregate amount equal to such excess.

4.3.4  <u>Optional Prepayments of Loans</u>.

(a)    Borrowers may, at their option from time to time prepay any Loan in whole or in part (i) in the case of LIBOR Loans, upon not less than two Business Days' prior written notice to Agent, and (ii) in the case of Base Rate Loans, upon written notice no later than 1:00 p.m. on the date of such prepayment, prepay the Loans, <u>provided</u> that the amount of any such partial prepayment is in integral multiples of $100,000.  Except for charges under <u>Section 4.1.9</u> applicable to prepayments of LIBOR Loans, such prepayments shall be without premium or penalty.  Each such notice of prepayment shall be irrevocable and shall specify the prepayment date and the principal amount of each Loan or portion thereof to be prepaid.  Promptly following receipt of any such notice relating to any Loan, Agent shall advise the Lenders of the contents thereof.

(b)    Prepayments pursuant to this <u>Section 4.3.4</u> shall be accompanied by accrued and unpaid interest as of such payment date.

4.3.5  <u>Optional Reductions of Revolving Loan Commitments</u>.  Borrowers may, at their option from time to time, upon not less than 10 Business Days' prior written notice to Agent (or such shorter period of time as Agent may agree), terminate in whole or permanently reduce ratably in part, the unused portion of the Revolving Loan Commitments, <u>provided</u>, <u>however</u>, that (i) each such partial reduction shall be in an amount of $5,000,000 or integral multiples of $1,000,000 in excess thereof and (ii) after giving effect to such reduction, the Revolving Outstandings do not exceed Maximum Borrowing Amount.  Except for charges under <u>Section 4.1.9</u> applicable to prepayments of LIBOR Loans and except for charges under <u>Section 3.6</u> applicable to termination of the Revolving Loan Commitments, such

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

prepayments shall be without premium or penalty.  Each such notice of reduction shall be irrevocable and shall specify the prepayment date and the principal amount of each Loan or portion thereof to be prepaid. Promptly following receipt of any such notice relating to any Loan, Agent shall advise the Lenders of the contents thereof.

      4.4    <u>Application of Payments and Collections</u>.

      4.4.1  <u>Collections</u>.  All payments of Obligations and any other obligations pursuant to the Loan Documents shall be made to Agent's account at the Payment Office, in U.S. Dollars, without offset, counterclaim or defense of any kind, free of (and without deduction for) any Non-Excluded Taxes or Other Taxes, and in immediately available funds and, if received by Agent by 1:00 p.m. on the date when due (or not later than 1:00 p.m. on the next succeeding Business Day, if the applicable date is not a Business Day), shall be deemed received on that Business Day; <u>provided</u> that any amounts received after 1:00 p.m. on such Business Day may, in Agent's discretion, be deemed received on the next succeeding Business Day.

      4.4.2  <u>Apportionment, Application and Reversal of Payments</u>.

      (a)    (i) Any prepayments made pursuant to <u>Section 4.3.1</u>, <u>4.3.2</u>, or <u>4.3.3</u>, (ii) all proceeds of business interruption insurance applied pursuant to <u>Section 7.1.2(a)</u> and (iii) all funds swept into a collection account in accordance with <u>Section 7.2.5</u> on each Business Day after the occurrence of a Triggering Event shall be applied first to the payment of outstanding principal on the Swingline Loans, second to the payment of outstanding principal on the other Loans and third, to Cash Collateralize outstanding LC Obligations.  Any prepayments made pursuant to <u>Section 4.3.4(a)</u> shall be applied first to the payment of outstanding principal on the Swingline Loans together with any accrued and unpaid interest thereon and second to the payment of outstanding principal on the other Loans, together with any accrued and unpaid interest thereon.

      (b)    Principal and interest payments shall be apportioned ratably among Lenders (according to the unpaid principal balance of the Loans to which such payments relate held by each Lender).  Prior to the occurrence of an Event of Default, all proceeds of Collateral shall be applied by Agent against the outstanding Obligations as otherwise provided in this Agreement.  Anything contained herein or in any other Loan Document to the contrary notwithstanding, all payments and collections received in respect of the Obligations and all proceeds of the Collateral received, in each instance, by Agent or any Lender after the occurrence and during the continuance of an Event of Default and the resultant declaration that all Obligations are immediately due and payable shall be remitted to Agent and distributed as follows:

      (1)    <u>first</u>, to the payment of any outstanding costs and expenses owing to Agent in monitoring, verifying, protecting, preserving or enforcing the Liens on the Collateral, and in protecting, preserving or enforcing rights under this Agreement or any of the other Loan Documents, including under <u>Sections 3.7</u> and <u>13.4</u> hereof and including reimbursement of the fees and expenses of appraisers, field examiners, counsel and financial advisors;

      (2)    <u>second</u>, to the payment of interest on the Swingline Loans;

      (3)    <u>third</u>, to the payment of principal on the Swingline Loans;

(4)     fourth, to the payment of any outstanding interest or fees due in connection with the Loans (other than Swingline Loans) or Letters of Credit under the Loan Documents to be allocated *pro rata* in accordance with the aggregate unpaid amounts owing to each holder thereof;

(5)     fifth, to the payment of principal on the Loans (other than Swingline Loans), unpaid reimbursement obligations in respect of Letters of Credit, together with amounts to be held by Agent as collateral security for any outstanding Letters of Credit pursuant to Section 11.3.4 hereof, the aggregate amount paid to, or held as collateral security for, Lenders to be allocated *pro rata* in accordance with the aggregate unpaid amounts owing to each holder thereof;

(6)     sixth, to the payment of all other unpaid Secured Obligations (including the outstanding costs and expenses owing to the Lenders and Secured Bank Product Obligations), to be allocated pro rata in accordance with the aggregate unpaid amounts owing to each holder thereof; and

(7)     finally, to Borrowers or whoever else may be lawfully entitled to receive such proceeds.

Except as otherwise specifically provided for herein, Borrowers hereby irrevocably waive the right to direct the application of payments and collections at any time received by Agent or any Lender from or on behalf of Borrowers or any Guarantor, and Borrowers hereby irrevocably agree that Agent shall have the continuing exclusive right to apply and reapply any and all such payments and collections received at any time by Agent or any Lender against the Obligations in the manner described above.

(c)     Agent has no responsibility and shall have no liability for the calculation of the exposure owing by Obligors with respect to any Secured Bank Product Obligation or the amount of any Secured Bank Product Reserve applicable thereto, and shall be entitled in all cases to rely on the applicable Lender (or Affiliate thereof) party to such agreement for the calculation thereof.  Such Lender (or Affiliate thereof) agrees to provide Agent with the calculations of all such exposures and reserves, if any, at such times as Agent shall reasonably request and in any event, not less than monthly (unless otherwise agreed to by Agent).

4.5     All Loans to Constitute One Obligation.  The Loans shall constitute one general Obligation of Borrowers and shall be secured by Agent's Lien upon all of the Collateral; provided, however, that Agent and each Lender shall be deemed to be a creditor of, and the holder of a separate claim against, each Borrower to the extent of any Obligations jointly or severally owed by such Borrower.

4.6     Loan Accounts.  Agent shall enter all Loans as debits to a loan account (the "Loan Account") and shall also record in the Loan Account all payments made by Borrowers on any Obligations and all proceeds of Collateral which are finally paid to Agent, and may record therein, in accordance with customary accounting practice, other debits and credits, including interest and all charges and expenses properly chargeable to Borrowers.

4.7     Statements of Account.  Agent will account to Borrower Representative monthly with a statement of Loans, charges and payments made pursuant to this Agreement during the immediately preceding month, and such account rendered by Agent shall be deemed final, binding and conclusive upon Borrowers absent demonstrable error unless Agent is notified by Borrower Representative in writing to the contrary within 30 days of the date each accounting is received by Borrowers.  Such notice shall be deemed an objection only to those items specifically objected to therein.

4.8    Increased Costs.   In the event that any Applicable Law or any Change in Law or compliance by any Lender (for purposes of this Section 4.8, the term "Lender" shall include Agent, Swingline Lender, any LC Issuer or Lender and any corporation or bank controlling Agent, Swingline Lender, any Lender or LC Issuer and the office or branch where Agent, Swingline Lender, any Lender or LC Issuer (as so defined) makes or maintains any LIBOR Loans) with any request or directive (whether or not having the force of law) from any central bank or other financial, monetary or other authority, shall:

(a)    subject Agent, Swingline Lender, any Lender or LC Issuer to any tax of any kind whatsoever with respect to this Agreement, any Letter of Credit, any participation in a Letter of Credit or any LIBOR Loan, or change the basis of taxation of payments to Agent, Swingline Lender, such Lender or LC Issuer in respect thereof (except for Excluded Taxes);

(b)    impose, modify or deem applicable any reserve, special deposit, assessment, special deposit, compulsory loan, insurance charge or similar requirement against assets held by, or deposits in or for the account of, advances or loans by, or other credit extended by, any office of Agent, Swingline Lender, LC Issuer or any Lender, including pursuant to Regulation D of the Board of Governors of the Federal Reserve System; or

(c)    impose on Agent, Swingline Lender, any Lender or LC Issuer or the London interbank LIBOR market any other condition, loss or expense (other than Taxes) affecting this Agreement or any Other Document or any Advance made by any Lender, or any Letter of Credit or participation therein;

and the result of any of the foregoing is to increase the cost to Agent, Swingline Lender, any Lender or LC Issuer of making, converting to, continuing, renewing or maintaining its Loans hereunder by an amount that Agent, Swingline Lender, such Lender or LC Issuer deems to be material or to reduce the amount of any payment (whether of principal, interest or otherwise) in respect of any of the Loans by an amount that Agent, Swingline Lender or such Lender or LC Issuer deems to be material, then, in any case Borrowers shall promptly pay Agent, Swingline Lender, such Lender or LC Issuer, upon its demand, such additional amount as will compensate Agent, Swingline Lender or such Lender or LC Issuer for such additional cost or such reduction, as the case may be, provided that the foregoing shall not apply to increased costs which are reflected in the LIBOR Lending Rate, as the case may be.  Agent, Swingline Lender, such Lender or LC Issuer shall certify the amount of such additional cost or reduced amount to Borrower Representative and such certification shall be conclusive absent manifest error.

4.9    Basis for Determining Interest Rate Inadequate or Unfair.  In the event that Agent or any Lender shall have determined that:

(i)    reasonable means do not exist for ascertaining the LIBOR Lending Rate for any Interest Period; or

(ii)    dollar deposits in the relevant amount and for the relevant maturity are not available in the London interbank market with respect to a proposed LIBOR Loan, or a proposed conversion of a Base Rate Loan into a LIBOR Loan;

(iii)    the making, maintenance or funding of any LIBOR Loan has been made impracticable or unlawful by compliance by Agent or such Lender in good faith with any Applicable Law or any interpretation or application thereof by any Governmental Body or with any request or directive of any such Governmental Body (whether or not having the force of law); or

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

(iv)    the LIBOR Lending Rate will not adequately and fairly reflect the cost to such Lender of the establishment or maintenance of any LIBOR Loan,

Agent or such Lender shall give Borrowers prompt written, telephonic or electronic notice of the determination of such effect.  If such notice is given, (i) any such requested LIBOR Loan shall be made as a Base Rate Loan, unless Borrower Representative, on behalf of all Borrowers, shall notify Agent no later than 1:00 p.m. two (3) Business Days' prior to the date of such proposed borrowing that the request for such borrowing shall be canceled or made as an unaffected type of LIBOR Loan, (ii) any Base Rate Loan which was to have been converted to an affected type of LIBOR Loan shall be continued as or converted into a Base Rate Loan, or, if Borrowers shall notify Agent, no later than 1:00 p.m. two (2) Business Days prior to the proposed conversion, shall be maintained as an unaffected type of LIBOR Loan, and (iii) any outstanding affected LIBOR Loans shall be converted into a Base Rate Loan, or, if Borrowing Representative shall notify Agent, no later than 1:00 p.m. two (2) Business Days prior to the last Business Day of the then current Interest Period applicable to such affected LIBOR Loan, shall be converted into an unaffected type of LIBOR Loan, on the last Business Day of the then current Interest Period for such affected LIBOR Loans (or sooner, if any Lender cannot continue to lawfully maintain such affected LIBOR Loan).  Until such notice has been withdrawn, Lenders shall have no obligation to make an affected type of LIBOR Loan or maintain outstanding affected LIBOR Loans and no Borrower shall have the right to convert a Base Rate Loan or an unaffected type of LIBOR Loan into an affected type of LIBOR Loan.

4.10    Sharing of Payments, Etc.  If any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) on account of any Loan made by, other than pursuant to Section 4.8, Section 4.11 or Section 13.2.1, it in excess of its ratable share of payments on account of Loans made by all Lenders, such Lender shall forthwith (a) notify Agent of such fact and (b) purchase from each other Lender such participation in such Loan as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each other Lender; provided, that, if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and such Lender shall repay to the purchasing Lenders the purchase price to the extent of such recovery, together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered.  Borrowers agree that any Lender so purchasing a participation from another Lender pursuant to this Section 4.10 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of setoff) with respect to such participation as fully as if such Lender were the direct creditor of Borrowers in the amount of such participation.  Notwithstanding anything to the contrary contained herein, all purchases and repayments to be made under this Section 4.10 shall be made through Agent.

4.11    Capital Requirements.

(a)    In the event that Agent, Swingline Lender or any Lender shall have determined that any Applicable Law or guideline regarding capital adequacy, or any Change in Law or any change in the interpretation or administration thereof by any Governmental Body, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Agent, Swingline Lender, Issuer or any Lender (for purposes of this Section 4.11, the term "Lender" shall include Agent, Swingline Lender, Issuer or any Lender and any corporation or bank controlling Agent , Swingline Lender or any Lender and the office or branch where Agent , Swingline Lender or any Lender (as so defined) makes or maintains any LIBOR Loans) with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank or comparable agency, has or would have the effect of reducing the rate of return on Agent, Swingline Lender or any Lender's capital as a consequence

of its obligations hereunder (including the making of any Swinglines) to a level below that which Agent , Swingline Lender or such Lender could have achieved but for such adoption, change or compliance (taking into consideration Agent's, Swingline Lender's and each Lender's policies with respect to capital adequacy) by an amount deemed by Agent, Swingline Lender or any Lender to be material, then, from time to time, Borrowers shall pay upon demand to Agent , Swingline Lender or such Lender such additional amount or amounts as will compensate Agent , Swingline Lender or such Lender for such reduction.  In determining such amount or amounts, Agent, Swingline Lender or such Lender may use any reasonable averaging or attribution methods.  The protection of this Section 4.11 shall be available to Agent, Swingline Lender and each Lender regardless of any possible contention of invalidity or inapplicability with respect to the Applicable Law, rule, regulation, guideline or condition.

(b)    A certificate of Agent, Swingline Lender or such Lender setting forth such amount or amounts as shall be necessary to compensate Agent , Swingline Lender or such Lender with respect to Section 4.11(a) hereof when delivered to Borrowing Agent shall be conclusive absent manifest error.

## SECTION 5. TERM AND TERMINATION

5.1    <u>Term of Revolving Loan Commitments</u>.  Subject to (a) the right of Lenders to cease making Loans to Borrowers during the continuance of any Default or Event of Default, (b) the right of the Lenders to terminate the Revolving Loan Commitments as provided in <u>Section 5.2.1</u> and (c) the right of Borrowers to terminate the Revolving Loan Commitments as provided in <u>Section 5.2.2</u>, the Revolving Loan Commitments shall be in effect until the earlier of (x) the Scheduled Termination Date and (y) any earlier date on which the Revolving Loan Commitments are reduced to zero or otherwise terminated pursuant to the terms hereof (the "<u>Term</u>"), at which time Payment in Full shall be required.

5.2    <u>Termination</u>.

5.2.1    <u>Termination by Lenders</u>.  Agent may, and at the direction of Majority Lenders shall, terminate the Revolving Loan Commitments without notice upon or after the occurrence and during the continuance of an Event of Default.

5.2.2    <u>Termination by Borrowers</u>.  Upon at least 10 Business Days' prior written notice to Agent, Borrowers may, at their option, terminate the Revolving Loan Commitments without premium or penalty; <u>provided</u>, <u>however</u>, that no such termination shall be effective until Payment in Full.  Any notice of termination given by Borrowers shall be irrevocable unless all Lenders otherwise agree in writing and (a) no Lender shall have any obligation to make any Loans and (b) no LC Issuer shall have any obligation to issue or procure any Letters of Credit (and no Lender shall be required to purchase a participation therein), in each case on or after the termination date stated in such notice; <u>provided</u> that a notice of termination of the Revolving Loan Commitments delivered by the Borrower Representative may state that such notice is conditioned upon the effectiveness of other credit facilities or transactions, in which case such notice may be revoked (and the restrictions in <u>clauses (a)</u> and <u>(b)</u> of this <u>Section 5.2.2</u> would no longer apply, solely with respect to such revoked notice) by the Borrower Representative (by notice to Agent prior to the specified effective date of such other credit facilities or transactions) if such condition is not satisfied.  Promptly following receipt of any such notice relating to any Loan, Agent shall advise the Lenders of the contents thereof.   Borrowers may elect to terminate the Revolving Loan Commitments in their entirety only and any termination of the Revolving Loan Commitments shall be permanent.  No section of this Agreement or type of Loan available hereunder may be terminated singly.

5.2.3    <u>Effect of Termination</u>.  All of the Obligations shall be immediately due and payable upon the termination date stated in any notice of termination of this Agreement (subject to the revocation of such notice in accordance with <u>Section 5.2.2</u>).  All undertakings, agreements and covenants

of Borrowers relating to (i) the payment or reimbursement by any Obligor to any Secured Party of any fees or expense (ii) the indemnification of any Obligor of any Indemnified Person, (iii) confidentiality, (iv) governing law, (v) waiver of trial by jury, (vi) consent to forum or (vii) any other term which by its terms expressly survives in each case shall survive Payment in Full.  Notwithstanding the foregoing or the Payment in Full, Agent shall not be required to terminate its Liens in the Collateral unless, with respect to any loss or damage Agent may incur as a result of dishonored checks or other items of payment received by Agent from any Borrower or any Account Debtor and applied to the Obligations, Agent shall, at its option, (a) have received a written agreement reasonably satisfactory to Agent, executed by any Borrowers, indemnifying Agent and each Lender from any such loss or damage or (b) have retained Cash Collateral or a letter of credit in form and substance satisfactory to Agent in its Permitted Discretion for such period of time as Agent, in its Permitted Discretion, may deem necessary to protect Agent and each Lender from any such loss or damage.

## SECTION 6. SECURITY INTERESTS

6.1    <u>Security Interest in Collateral</u>.  To secure the prompt payment and performance to the Secured Parties of the Secured Obligations, each Obligor hereby grants to Agent for the benefit of itself and each other Secured Party a continuing Lien upon and security interest in all of the following assets of such Obligor, whether now owned or existing or hereafter created, acquired or arising and wheresoever located (collectively, "<u>Collateral</u>"):

(a)    all Accounts;

(b)    all (x) Deposit Accounts (other than the DIP Term Loan Collateral Account, and identifiable proceeds of DIP Term Loan Priority Collateral) and money and all cash, checks, other negotiable instruments, funds and other evidences of payments held therein (other than identifiable proceeds of DIP Term Loan Priority Collateral), (y) Securities Accounts and Security Entitlements (as defined in the UCC) and securities credited thereto (other than the DIP Term Loan Collateral Account and identifiable proceeds of DIP Term Loan Priority Collateral) and, in each case, all cash, checks and other property held therein or credited thereto (other than identifiable proceeds of DIP Term Loan Priority Collateral) and (z) refunds of cash collateral received from Prepetition ABL Agent;

(c)    all Inventory and all documents of title for any Inventory;

(d)    all customer accommodation agreements or similar agreements regarding the manufacture or sale of Inventory to which any Obligor is a party from time to time, and all supply agreements or similar agreements regarding the manufacture or supply of Inventory to which any Obligor is a party from time to time;

(e)    all Instruments (including, without limitation, promissory notes), Documents and Chattel Paper at any time evidencing any of the property described in clauses (a) through (d) of this definition, except to the extent constituting identifiable Proceeds of DIP Term Loan Priority Collateral;

(f)    to the extent relating to, evidencing or governing any of the items referred to in the preceding clauses (a) through (e) of this definition, all General Intangibles (other than Capital Stock held by the Company and its Subsidiaries and Intellectual Property) and Commercial Tort Claims;

(g)    to the extent relating to any of the items referred to in the preceding clauses (a) through (d) above, all Supporting Obligations and Letter of Credit Rights;

(h)    all books and records relating to the items referred to in the preceding clauses (a) through (g) above (including all books, databases, customer lists, and records, whether tangible or electronic, which contain any information relating to any of the items referred to in the preceding clauses (a) through (g)); and

(i)    all Proceeds of any of the foregoing, including collateral security and guarantees with respect to any of the foregoing and all cash, Money, insurance proceeds relating to Inventory and business interruption insurance, Instruments, Securities, Financial Assets and Deposit Accounts constituting Proceeds of the foregoing; *provided*, that upon entry of the Final Order to the extent approved by the Bankruptcy Court, "Collateral" shall include and a Lien shall attach to any Proceeds of Avoidance Actions.

Anything herein to the contrary notwithstanding, in no event shall the security interest granted under this Section 6.1 attach to any Excluded Assets.

6.1.1 Notwithstanding anything herein to the contrary, the liens and security interests (and priority of such liens and security interests) granted to the Agent pursuant to this Agreement and the exercise of any right or remedy by the Agent hereunder are subject to the limitations and provisions of the applicable Order. In the event of any conflict between the terms of the applicable Order and the terms of this Agreement, the terms of the applicable Order shall govern and control.

6.2    Other Collateral.

6.2.1 Commercial Tort Claims.  Obligors shall promptly notify Agent in writing upon any Obligor incurring or otherwise obtaining a Commercial Tort Claim with a value in excess of $250,000 after the Closing Date against any third party and, upon request of Agent, promptly enter into an amendment to this Agreement and do such other acts or things necessary and reasonably deemed appropriate by Agent in its Permitted Discretion to give Agent a security interest in any such Commercial Tort Claim. Obligors represent and warrant that as of the Closing Date, to their knowledge, no Obligor possesses any Commercial Tort Claims with a value individually or in the aggregate in excess of $250,000 other than those listed on Schedule 6.1.

6.2.2 Other Collateral.  Obligors shall (a) promptly notify Agent in writing upon acquiring or otherwise obtaining any Collateral after the date hereof consisting of (i) Deposit Accounts not constituting Excluded Deposit Accounts or (ii) Investment Property, Letter of Credit Rights, Chattel Paper or Electronic Chattel Paper, in each case with a value individually or in the aggregate in excess of $250,000 and, in each case, upon the request of Agent, promptly execute such other documents, and do such other acts or things reasonably deemed appropriate by Agent in its Permitted Discretion to deliver to Agent control (within the meaning of the UCC) with respect to such Collateral in accordance with the terms of this Agreement and the Orders; (b) promptly notify Agent in writing upon acquiring or otherwise obtaining any Collateral after the date hereof consisting of Documents or Instruments with a value individually or in the aggregate in excess of $250,000 and, upon the request of Agent, will promptly execute such other documents, and do such other acts or things reasonably deemed appropriate by Agent in its Permitted Discretion to deliver to Agent possession of such Documents (to the extent negotiable) and Instruments, and, with respect to nonnegotiable Documents, to have such nonnegotiable Documents issued in the name of Agent; and (c) with respect to Collateral in the possession of a third party, other than Certificated Securities and Goods covered by a Document, with a value individually or in the aggregate in excess of $250,000 use commercially reasonable efforts to obtain an acknowledgment from the third party that it is holding the Collateral for the benefit of Agent.

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

6.3    <u>Lien Perfection; Further Assurances</u>.  Upon Agent's request, Obligors shall deliver (a) such UCC-1 financing statements as are required by the UCC and (b) such other instruments, assignments or documents as are necessary to perfect Agent's Lien upon any of the Collateral and shall take such other action as may be required to perfect or to continue the perfection of Agent's Lien upon the Collateral. Each Obligor hereby authorizes Agent to file any such financing statement in any filing office in any UCC jurisdiction, including financing statements that (A) indicate the Collateral by any description which reasonably approximates the description contained in <u>Section 6.1</u> and (B) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including whether such Obligor is an organization, the Type of Organization and any organization identification number issued to such Obligor.  At Agent's request, each Obligor shall also promptly execute or cause to be executed and shall deliver to Agent any information, and all documents, instruments and agreements as are necessary or as reasonably requested by Agent, to give effect to or carry out the terms or intent of this <u>Section 6</u>.

6.4    <u>Priority and Liens</u>.

(a)    Subject to the Intercreditor Arrangements, the Borrowers hereby agree that upon the entry of an Interim Order (and when applicable, the Final Order):

(i)    the Obligations, pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed Superpriority Claim in the Cases subject only to the Carve-Out;

(ii)    subject to the terms of the Orders and this Agreement, the Obligations, pursuant to Section 364(d)(1) of the Bankruptcy Code, shall at all times be secured by a valid, binding, continuing, enforceable perfected first priority Lien on all of the DIP ABL Priority Collateral of each Obligor;

(b)    The relative priorities of the Liens described in this <u>Section 6.4</u> with respect to the DIP ABL Facility and the DIP Term Loan Facility shall be as set forth in the Interim Order (and, when entered, the Final Order).  All of the Liens described in this <u>Section 6.4</u> shall be effective and perfected upon entry of the Interim Order without the necessity of the execution, recordation of filings by the Debtors of security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by Agent of, or over, any Collateral, as set forth in the Interim Order.

(c)    For the avoidance of doubt and notwithstanding anything to the contrary herein or in the Loan Documents, the Carve-Out shall be senior to all Liens and claims securing the Loan Documents, any adequate protection liens, if any, granted to any parties entitled thereto and the Superpriority Claims, and any and all other Liens or claims securing this Agreement and the DIP Term Loan Facility (it being understood and agreed that the Carve-Out shall be allocated 100% against the DIP ABL Priority Collateral).

6.5    <u>Change of Name or Location</u>.  No Obligor shall (a) change its name as it appears in official filings in the state of its incorporation or organization, (b) change its chief executive office, principal place of business, mailing address, corporate offices or warehouses or locations at which Collateral is held or stored, or the location of its records concerning the Collateral as set forth in this Agreement, (c) change the type of entity that it is, (d) change its Organizational I.D. Number, if any, issued by its state of incorporation or other organization, or (e) change its state of incorporation or organization.

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

## SECTION 7. COLLATERAL ADMINISTRATION

7.1    <u>General</u>.

7.1.1    Location of Collateral.

(a)    As of the Closing Date, each Obligor's mailing address and the location of its place of business (if it has only one) or its chief executive office (if it has more than one place of business), and the location of its books or records related to any Collateral are disclosed in Schedule 7.1.1(a); such Obligor has no other places of business except those set forth in Schedule 7.1.1(a).

(b)    All tangible Collateral, other than Inventory in transit and motor vehicles, will at all times be kept by Obligors and their Subsidiaries at one or more of the business locations set forth in Schedule 7.1.1(a) hereto (as updated in writing delivered to Agent from time to time and with such new locations located in the United States or another location acceptable to Agent in its Permitted Discretion and in each case otherwise in compliance with the Loan Documents), except that Borrowers may make sales or other dispositions of Collateral in accordance with Section 9.2.9.

(c)    All Deposit Accounts and all Securities Accounts maintained by each Obligor, together with a description thereof (i.e., the bank or broker dealer at which such Deposit Account or Securities Account is maintained, the name in which the account is held, the account number, any lockbox number and address associated with such Deposit Account, the purpose thereof and whether such account is an Excluded Account) are set forth on Schedule 7.1.1(c) hereto (as updated in writing delivered to Agent from time to time and otherwise in compliance with the Loan Documents).

7.1.2    Insurance of Collateral.

(a)    Obligors shall pay all insurance premiums when due and shall maintain insurance upon all Collateral wherever located and with respect to the business of Obligors and each of their Subsidiaries, covering casualty, hazard, flood, public liability, workers' compensation, business interruption and such other risks in such amounts and with such insurance companies as are satisfactory to Agent in its Permitted Discretion.  Obligors shall deliver certified copies of such policies to Agent as promptly as practicable, with satisfactory lender's loss payable endorsements, naming Agent, for its benefit and the benefit of the other Secured Parties, as a loss payee, assignee or additional insured, as appropriate, as its interest may appear.  Subject to the Intercreditor Arrangements, each policy of insurance or endorsement shall provide that (a) all proceeds thereunder with respect to any Collateral shall be payable to Agent, (b) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (c) contain a clause requiring the insurer to give not less than 10 days' prior written notice to Agent in the event of cancellation of the policy for nonpayment of premium and not less than 30 days' prior written notice to Agent in the event of cancellation of the policy for any other reason whatsoever and a clause specifying that the interest of Agent shall not be impaired or invalidated by any act or neglect of any Obligor, any of its Subsidiaries or the owner of the Property or by the occupation of the premises for purposes more hazardous than are permitted by said policy.  Obligors agree to deliver to Agent, promptly as rendered, true copies of all reports made in any reporting forms to insurance companies.  All proceeds of business interruption insurance (if any) of Obligors and their Subsidiaries shall be remitted to Agent for

application to the outstanding balance of the Loans (without reductions in the Revolving Loan Commitments) in accordance with <u>Section 4.4.2</u>. The Borrowers will furnish to Agent and the Lenders, upon Agent's request, information in reasonable detail as to the insurance so maintained.

(b) [Intentionally omitted].

(c) [Intentionally omitted].

(d) Unless Obligors provide Agent with evidence of the insurance coverage required by this Agreement, Agent may (but shall not be obligated to) purchase insurance at Obligors' expense to protect its interests and the interests of the other Secured Parties in the Properties of Obligors and their Subsidiaries. This insurance may, but need not, protect the interests of Obligors and their Subsidiaries. The coverage that Agent purchases may not pay any claim that any Obligor or any Subsidiary makes or any claim that is made against any Obligor or any such Subsidiary in connection with said Property. Obligors may later cancel any insurance purchased by Agent, but only after providing Agent with evidence that Obligors and their Subsidiaries have obtained insurance as required by this Agreement. If Agent purchases insurance, Obligors will be responsible for the costs of that insurance, including interest and any other third party charges Agent may incur in connection with the placement of insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance shall constitute Obligations. The costs of the insurance may be more than the cost of insurance that Obligors and their Subsidiaries may be able to obtain on their own.

7.1.3 <u>Protection of Collateral</u>. Neither Agent nor any Lender shall be liable or responsible in any way for the safekeeping of any of the Collateral or for any loss or damage thereto (except for reasonable care in the custody thereof while any Collateral is in Agent's or any Lender's actual possession) or for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency or other person whomsoever, but the same shall be at Obligors' sole risk.

7.2 <u>Administration of Accounts</u>.

7.2.1 <u>Records, Schedules and Assignments of Accounts</u>. Obligors shall keep records that are accurate and complete, in all material respects, of their Accounts and all payments and collections thereon and shall submit to Agent on such periodic basis during the continuance of an Event of Default or as otherwise required pursuant to the Loan Documents as Agent shall request a sales and collections report for the preceding period, in form acceptable to Agent in its Permitted Discretion. Concurrently with the delivery of each Borrowing Base Certificate described in <u>Section 9.1.4</u>, or more frequently as requested by Agent or during the existence of an Event of Default, from and after the date hereof, Borrowers shall deliver to Agent a detailed aged trial balance of all of their Accounts, specifying the names, addresses, face values, dates of invoices and due dates for each Account Debtor obligated on an Account so listed in a form consistent with reports currently prepared by Borrowers with respect to such information ("<u>Schedule of Accounts</u>"), and upon Agent's written request therefor, copies of proof of delivery and the original copy of all documents, including repayment histories and present status reports relating to the Accounts so scheduled and such other matters and information relating to the status of then existing Accounts as Agent shall request in its reasonable credit judgment. If requested by Agent in writing, upon the occurrence and during the continuation of an Event of Default, Obligors shall execute and deliver to Agent formal written assignments of all of its Accounts weekly or daily, which shall include all Accounts that have been created since the date of the last assignment, together with copies of invoices or invoice registers related thereto.

7.2.2  <u>Discounts; Allowances; Disputes</u>.  If any Obligor grants any discounts, allowances or credits that are not shown on the face of the invoice for the Account involved, Obligors shall report such discounts, allowances or credits, as the case may be, to Agent as part of the next required Schedule of Accounts; provided that no Obligor, will without Agent's consent, compromise, adjust any Account (or extend the time for payment thereof) or accept any returns of merchandise or grant any additional discounts, allowances or credits thereon except for those compromises, adjustments, returns, discounts, credits and allowances as have been heretofore customary in the ordinary course of business of such Obligor.

7.2.3  <u>Account Verification</u>.  Any of Agent's officers, employees or agents shall have the right, at any time or times hereafter, in the name of Agent, any designee of Agent or any Obligor, to verify the validity, amount or any other matter relating to any Accounts by mail, telephone, electronic communication or otherwise.  Obligors shall cooperate fully with Agent in an effort to facilitate and promptly conclude any such verification process.

7.2.4  [Intentionally Omitted]

7.2.5  <u>Collection of Accounts; Proceeds of Collateral</u>.  Each Obligor shall direct all of its Account Debtors to forward payments directly to Lockboxes subject to Lockbox Agreements or Deposit Accounts subject to Deposit Account Control Agreements.  Agent shall have sole access to the Lockboxes at all times and each Obligor shall take all actions necessary to grant Agent such sole access.  At no time shall any Obligor remove any item from a Lockbox or a Control Account without Agent's prior written consent.  If any Obligor should refuse or neglect to notify any Account Debtor to forward payments directly to a Lockbox subject to a Lockbox Agreement after notice from Agent, Agent shall, notwithstanding anything in this Agreement or in any other Loan Document to the contrary, be entitled to make such notification directly to such Account Debtor.  If notwithstanding the foregoing instructions, any Obligor receives any proceeds of any such Accounts, such Obligor shall receive such payments as Agent's trustee, and shall immediately deposit all cash, checks or other similar payments related to or constituting payments made in respect of Accounts received by it to a Deposit Account subject to a Deposit Account Control Agreement.  After the occurrence of a Triggering Event, all funds deposited into any Lockbox subject to a Lockbox Agreement or the appropriate Deposit Account Control Agreement will be swept on a daily basis into a collection account maintained by such Obligor with Agent.  Agent shall hold and apply funds received into such collection account as provided by the terms of <u>Section 4.4.2</u>.

7.2.6  <u>Taxes</u>.  If an Account includes a charge for any tax payable to any Governmental Authority, Agent is authorized, in its sole discretion, to pay the amount thereof to the proper taxing authority for the account of Obligors and to charge Obligors therefor, except for taxes that (i) are being contested in good faith and by appropriate proceedings and with respect to which Obligors maintain adequate reserves in accordance with GAAP on its books therefor and (ii) would not reasonably be expected to result in any Lien other than a Permitted Lien.  In no event shall Agent or any Lender be liable for any such Taxes to any Governmental Authority that may be due by any Obligor.

7.3  <u>Administration of Inventory</u>.  Obligors shall keep records of their Inventory, which records shall be complete and accurate in all material respects.  Borrowers shall furnish to Agent Inventory reports concurrently with the delivery of each monthly Borrowing Base Certificate or more frequently as requested by Agent during the continuation of an Event of Default, which reports will be in such other format and detail as Agent shall reasonably request and shall include a current list of all

65

locations of Borrowers' Inventory. Obligors shall conduct a physical inventory no less frequently than annually and shall provide to Agent a report based on each such physical inventory promptly thereafter, together with such supporting information as Agent shall reasonably request.

7.4     [Intentionally omitted].

7.5     Payment of Charges. All amounts chargeable to Obligors under Section 7 hereof shall be Secured Obligations secured by all of the Collateral, shall be payable on demand and shall bear interest from the date such advance was made until paid in full at the rate applicable to Base Rate Loans from time to time.

## SECTION 8. REPRESENTATIONS AND WARRANTIES

8.1     General Representations and Warranties. To induce Agent and each Lender to enter into this Agreement and to make advances hereunder, Obligors warrant, represent and covenant to Agent and each Lender, on a joint and several basis, that:

8.1.1     Qualification. Each Obligor and each of its Subsidiaries is a corporation, limited partnership or limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization. Subject to the entry of the Orders and subject to the terms thereof, each Obligor and each of its Subsidiaries is duly qualified and is authorized to do business and, to the extent such designation is available in such jurisdiction, is in good standing as a foreign limited liability company, limited partnership or corporation, as applicable, (a) as of the Closing Date in each state or jurisdiction listed on Schedule 8.1.1 hereto and (b) in all states and jurisdictions in which the failure of any Obligor or any of its Subsidiaries to be so qualified, individually and in the aggregate, could reasonably be expected to have a Material Adverse Effect.

8.1.2     Power and Authority. Subject to the entry of the Orders and subject to the terms thereof, each Obligor and each of its Subsidiaries is duly authorized and empowered to enter into, execute, deliver and perform its obligations under this Agreement and each of the other Loan Documents to which it is a party. Subject to the entry of the Orders and subject to the terms thereof, the execution, delivery and performance of this Agreement and the Borrowings of the Loans hereunder and the execution, delivery and performance of each of the other Loan Documents have been duly authorized by all necessary organizational or other relevant action and do not and will not: (a) require any consent or approval of the holders of any Equity Interests of any Obligor or any Subsidiary of any Obligor except, in each case, any consents or approvals as have been obtained or made and are in full force and effect; (b) contravene any Obligor's or any of its Subsidiaries' charter, articles or certificate of incorporation, partnership agreement, articles or certificate of formation, by-laws, limited liability agreement, operating agreement or other organizational documents (as the case may be); (c) violate, or cause any Obligor or any of its Subsidiaries to be in default under, any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award in effect having applicability to such Obligor or any of its Subsidiaries, the violation of which could reasonably be expected to have a Material Adverse Effect; (d) result in a breach of or constitute a default under any indenture (other than the Prepetition Senior Secured Notes Indenture) or loan or credit agreement or any other agreement, lease or instrument to which any Obligor or any of its Subsidiaries is a party or by which it or its Properties are bound or affected, the breach of or default under which (x) would permit the exercise of remedies thereunder on a post-petition basis and (y) could reasonably be expected to have a Material Adverse Effect; (e) require any registration or filing with, or any other action by, any Governmental Authority except (i) such as have been obtained or made and are in full force and effect and (ii) filings necessary to perfect Liens created by the Security Documents; (f) result in, or require, the creation or imposition of any Lien (other than Liens granted to Agent hereunder) upon or with respect to any of the Properties now owned or hereafter

acquired by any Obligor or any of their respective Subsidiaries; or (g) result in a breach of or constitute a default under the DIP Term Loan Agreement.

8.1.3 <u>Legally Enforceable Agreement</u>.  Subject to the entry of the Orders and subject to the terms thereof, each Loan Document, when delivered pursuant to this Agreement, will be a legal, valid and binding obligation of each Obligor and each of its Subsidiaries party thereto, enforceable against such Obligor or such Subsidiary in accordance with its terms.

8.1.4 <u>Capital Structure</u>.  <u>Schedule 8.1.4</u> shows, for each Obligor and each of its Subsidiaries, its exact name as it appears on its organizational documents, its jurisdiction of organization, its Organizational I.D. Number, its authorized and issued Equity Interests, the direct holders of its Equity Interests as of the Closing Date, and all agreements binding on such holders with respect to their Equity Interests as of the Closing Date.  Except as disclosed on <u>Schedule 8.1.4</u>, in the five years preceding the Closing Date, no Obligor or Subsidiary has acquired any substantial assets from any other Person nor been the surviving entity in a merger or combination.  Each Obligor has good title to its Equity Interests in its Subsidiaries, subject (subject to the entry of the Orders and subject to the terms thereof) only to the Liens of the Prepetition Senior Secured Notes Trustee and the DIP Term Loan Agent, and all such Equity Interests are duly issued, fully paid and non-assessable (to the extent that such concepts apply to such Equity Interests).  There are no outstanding purchase options, warrants, subscription rights, agreements to issue or sell, convertible interests, phantom rights or powers of attorney relating to Equity Interests of any Obligor or any of its Subsidiaries.

8.1.5 <u>Title to Properties; Priority of Liens</u>.  As of the Closing Date, <u>Schedule 8.1.5</u> sets forth the address of each parcel of real Property that is owned or leased by each Obligor and each of its Subsidiaries.  Subject to the entry of the Orders and subject to the terms thereof, each Obligor and each of its Subsidiaries has good, indefeasible and marketable title in fee simple to (or the local law equivalent), or valid and enforceable leasehold interests in, license to or right to use, all of its real Property, free and clear of all Liens except Permitted Mortgage Liens, and good title to, or a valid leasehold interest in or right to use, all of the Collateral and all of its other Property, including all Property reflected in any financing statements delivered to or filed by Agent or the Lenders, in each case free and clear of all Liens except Permitted Liens.  Subject to the entry of the Orders and subject to the terms thereof, the Liens granted to Agent under <u>Section 6</u> hereof are duly perfected first priority Liens, subject only to the Intercreditor Arrangements, the Prepetition Intercreditor Agreement and Permitted Liens that are expressly allowed to have priority over Agent's Liens.

8.1.6 <u>Accounts</u>.  Agent may rely, in determining which Accounts are Eligible Accounts, on all statements and representations made by Obligors with respect to any Account or Accounts.  Obligors represent and warrant, with respect to each of Obligors' Accounts, whether or not such Account is an Eligible Account, unless otherwise disclosed to Agent in writing:

> (a)    It is genuine and in all respects what it purports to be;

> (b)    It arises out of a completed, <u>bona fide</u> sale and delivery of goods or rendition of services by an Obligor, in the ordinary course of its business and in accordance with the terms and conditions of all purchase orders, contracts or other documents relating thereto and forming a part of the contract between an Obligor and the Account Debtor;

> (c)    It is for a sum certain, maturing as stated in the invoice covering such sale or rendition of services, a copy of which is available to Agent upon request;

Detroit_5279807_16

(d)    no purchase order, agreement, document or Applicable Law restricts assignment of the Account to Agent (regardless of whether, under the UCC, the restriction is ineffective), and the applicable Obligor, alone or together with any other Obligor, is the sole payee or remittance party shown on the invoice; and

(e)    no extension, compromise, settlement, modification, credit, deduction or return has been authorized with respect to the Account, except discounts or allowances granted in the ordinary course of business for prompt payment that are reflected on the face of the invoice related thereto and in the reports submitted to Agent hereunder.

8.1.7    [Intentionally Omitted].

8.1.8    Financial Statements; No Material Adverse Effect; Fiscal Year.

(a)    The audited consolidated financial statements of Parent and its Subsidiaries as at December 31, 2013 delivered to Agent and Lenders prior to the Closing Date and reported on by and accompanied by an unqualified report from PricewaterhouseCoopers LLP (collectively, the "Audited Financial Statements") present fairly, in all material respects, the financial condition, results of operations and cash flows of Parent and its Subsidiaries as at such date and for such period then ended.

(b)    The Initial Unaudited Financial Statements and the unaudited internally prepared interim financial statements of Parent and its Subsidiaries delivered to Agent and Lenders pursuant to Section 9.1.3(a) (together with the Initial Unaudited Financial Statements, the "Unaudited Financial Statements"), present fairly, in all material respects, the financial condition, results of operations and cash flows of Parent and its Subsidiaries as at such date and for such period then ended.

All such financial statements, including the applicable related schedules and notes thereto, have been prepared in accordance with GAAP, applied consistently throughout the periods involved (except as approved by the aforementioned firm of accountants and disclosed therein), and subject to normal year-end audit adjustments, adjustments for purchase accounting (including adjustments of the type contemplated by Financial Accounting Standards Board Accounting Standards Codification 805, Business Combinations (formerly SFAS 141R)), and the absence of footnotes.

(c)    [Intentionally Omitted].

(d)    Since the Closing Date, no event, change, condition or development has occurred that has had or could reasonably be expected to have a Material Adverse Effect.  As of the date hereof, the fiscal year of Obligors and each of their Subsidiaries ends on December 31 of each year.

8.1.9    13-Week Projections, 21-Week Budget, Full Term Budget.  (a) On and as of the Closing Date, the 13-Week Projections for the period from the week ending March 13, 2015 through and including the week ending June 5, 2015, the 21-Week Budget for the period from the week ending March 13, 2015 and including the week ending July 31, 2015, and the Full Term Budget, copies of which have heretofore been furnished to Agent and the Lenders and (b) following the Closing Date, the 13-Week Projections and the 21-Week Budget delivered pursuant to Section 9.1.3(d) in each case are based on good faith estimates and assumptions made by the management of Parent; provided that such 13-Week Projections, 21-Week Budget, and Full Term Budget are not to be viewed as facts and that actual results

during the period or periods covered by the 13-Week Projections, 21-Week Budget, and Full Term Budget may differ from such 13-Week Projections, 21-Week Budget and Full Term Budget and that the differences may be material; provided, further, the 13-Week Projections, 21-Week Budget, and Full Term Budget were based in good faith on assumptions believed by the management of Parent to be reasonable at the time made and (1) in the case of the 13-Week Projections, 21-Week Budget, and Full Term Budget described in clause (a) above on the Closing Date and (2) in the case of the 13-Week Projections and 21-Week Budget delivered pursuant to clause (b) above, the date of delivery of the same (it being understood that assumptions as to future results are inherently subject to uncertainty and contingencies, many of which are beyond the Obligors' control).

8.1.10  Full Disclosure.  Each Obligor has disclosed to Agent and the Lenders all agreements, instruments and organizational or other restrictions to which it or any of its Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished by or on behalf of any Obligor to Agent or any Lender in connection with the preparation and negotiation of this Agreement or any other Loan Document (as modified or supplemented by other information so furnished), when taken as a whole, contains any misstatement of a material fact or omits to state any material fact necessary to make the statements herein or therein not misleading in light of the circumstances under which such information is furnished (giving effect to all applicable supplements and updates thereto).

8.1.11  [Intentionally Omitted.]

8.1.12  Taxes.  Other than Taxes or claims arising before the Petition Date that have not been authorized to be paid by the Bankruptcy Court, each Obligor and each of its Subsidiaries has filed all federal, state, and, with respect to amounts due in excess of $150,000, local and non-U.S. Tax returns and other reports relating to Taxes that it is required by law to file, and has paid, or made provision for the payment of, all federal, state, and, with respect to amounts due in excess of $150,000, state and local Taxes upon it, its income and Properties as and when such Taxes become due and payable, unless and to the extent any thereof are being contested in good faith and by appropriate proceedings, and each Obligor and each of its Subsidiaries maintains adequate reserves in conformity with GAAP on its books therefor.  The provision for Taxes on the books of each Obligor and each of its Subsidiaries is adequate for all years not closed by applicable statutes of limitation, and for its current fiscal year.  Other than in connection with the Cases, no Tax Lien (other than Liens described in clause (a) of the definition of Permitted Encumbrance) has been filed against any Obligor or any of their respective Subsidiaries and to the knowledge of the Obligors, no claim is being asserted with respect to any Tax, fee or other charge.

8.1.13  Brokers.  As of the Closing Date, there are no brokerage commissions, finder's fees or investment banking fees payable by any Obligor in connection with this Agreement other than fees payable pursuant to the Fee Letter and other than fees payable to Lazard Frères & Co. LLC.

8.1.14  Patents, Trademarks, Copyrights and Licenses.

(a)    Schedule 8.1.14 hereto sets forth a true and accurate list, as of the Closing Date and the date that the most recent update was required to be delivered pursuant to Section 9.1.15 of (i) all United States, state and foreign registrations of any applications for Intellectual Property owned by each Obligor and each of its Subsidiaries and (ii) all licenses granted to each Obligor (or any such Obligor's Subsidiary) to any Intellectual Property that are exclusive or otherwise material to the business of such Obligor (or such Subsidiary) excluding any license for readily available commercial software having a replacement value of less than $150,000 and (iii) all licenses granted by each Obligor (or any such Obligor's Subsidiary) to the

Obligors' or any Subsidiary's Intellectual Property that are exclusive or otherwise material to the business of such Obligor (or such subsidiary).  Each Obligor and each of its Subsidiaries owns or licenses the right to use all Intellectual Property that is material to its business free and clear of licenses other than Permitted Liens without any conflict with the rights of others.

(b)     The Intellectual Property listed on Schedule 8.1.14 and other material Intellectual Property owned by each Obligor and its Subsidiaries is subsisting, in full force and effect, and each Obligor and its Subsidiaries has performed all acts and has paid all renewal, maintenance and other fees and taxes required to maintain each and every registration and application for Intellectual Property included in the Collateral in full force and effect, except as may be permitted to expire in accordance with Section 9.2.9(f).  To the knowledge of Obligors, the Intellectual Property listed on Schedule 8.1.14 and other material Intellectual Property owned by each Obligor and its Subsidiaries is valid and enforceable, except as may be permitted to expire in accordance with Section 9.2.9(f).  No holding, decision or judgment has been rendered in any action or proceeding before any court or administrative authority, including any Intellectual Property registry, challenging the validity of, each Obligor's or its Subsidiaries' right to register, or each Obligor's or its Subsidiaries' rights to own or use, any material Intellectual Property and no such action or proceeding is pending or, to such Obligor's or its Subsidiaries' knowledge, threatened other than routine examiner's comments and office actions in the course of prosecution.  As of the Closing Date, no claim has been asserted or, to Obligor's knowledge, threatened against any Obligor or any Subsidiary of any Obligor which is currently pending including claims asserted in writing in the last (3) years and not resolved that its use of any Intellectual Property or the conduct of its business infringes upon the Intellectual Property rights of any third party and, as of any date after the Closing Date, no such claim has been asserted or threatened that, would be reasonably likely to have a Material Adverse Effect.  To the knowledge of Obligors and except as set forth on Schedule 8.1.14 hereto, as of the date hereof, no Person is infringing upon any Obligor's or any of its Subsidiaries' Intellectual Property that is material or in a manner that could reasonably be expected to have a Material Adverse Effect.

(c)     The consummation and performance of the transactions and actions contemplated by this Agreement and the other Loan Documents, including the exercise by Agent of any of its rights or remedies under Section 11, will not result in the termination or impairment of any of such Obligor's or any of its Subsidiaries' ownership of any Intellectual Property material to the conduct of its business or any material license relating to Intellectual Property to which such Obligor or any of its Subsidiaries' is a party (whether as licensor or licensee).

(d)     Each Obligor and its Subsidiaries is in compliance with all applicable trademark and patent marking laws with respect to marking such Obligor's and its Subsidiaries' products, except to the extent that such non-compliance could not reasonably be expected to have a Material Adverse Effect.

(e)     Each Obligor and its Subsidiaries take reasonable measures to protect the confidentiality of trade secrets and other confidential information necessary for the conduct of its business.  To the knowledge of the Obligors, there has not been any disclosure of any trade secret or other confidential information of such Obligor and its Subsidiaries material to the conduct of its business (including any such information of any other Person disclosed in confidence to such Obligor and its Subsidiaries) to any Person in a manner that has resulted or is likely to result in the loss of any material trade secret or other rights in and to material confidential information.

(f)     During the three (3) years prior to the date hereof, (i) there have been no material security breaches in each Obligor's and its Subsidiaries' information technology

WEIL:\95250238\4\99980.0025

systems, and (ii) there have been no disruptions or defects in any of each Obligor's and its Subsidiaries' information technology systems that materially adversely affected each Obligor's and its Subsidiaries' business or operations.  To the knowledge of each Obligor, neither any Obligor nor any of its Subsidiaries has made available, and has no duty to make available, any source code for any Computer Hardware or Software material to the business of such Obligor or Subsidiary to any escrow agent or any other Person other than an employee or consultant.  Each Obligor and its Subsidiaries have evaluated their disaster recovery and backup needs and have implemented plans and systems that reasonably address their assessment of risk.

8.1.15  <u>Governmental Consents</u>.  Subject to the entry of the Orders and subject to the terms thereof, each Obligor and each of its Subsidiaries has, is in compliance with, and is in good standing with respect to, all consents, approvals, licenses, authorizations, permits, certificates, inspections and franchises from all Governmental Authorities necessary to continue to conduct its business as heretofore or proposed to be conducted by it and to own or lease and operate its Properties as now owned or leased by it, except where the failure to possess, maintain or comply with such rights, licenses and permits could not reasonably be expected to have a Material Adverse Effect.

8.1.16  <u>Compliance with Laws</u>.  Subject to the entry of the Orders and subject to the terms thereof:

(a)    Each Obligor and each of its Subsidiaries has duly complied, and its Properties, business operations and leaseholds are in compliance with, (i) the provisions of all federal (other than the Foreign Corrupt Practices Act of 1977 (15 U.S.C. §§ 78dd-1, et seq.), as amended), state and local laws, rules and regulations applicable to such Obligor or such Subsidiary, as applicable, its Properties or the conduct of its business, including Environmental Laws, in each case, except where non-compliance could not reasonably be expected to have a Material Adverse Effect and (ii) the Foreign Corrupt Practices Act of 1977 (15 U.S.C. §§ 78dd-1, et seq.), as amended.  There have been no citations, notices or orders of non-compliance issued to any Obligor or any of its Subsidiaries under any such law, rule or regulation, except where noncompliance could not reasonably be expected to have a Material Adverse Effect.  Each Obligor and each of its Subsidiaries (with respect to the Foreign Subsidiaries, to the best knowledge of such Obligor) has established and maintains an adequate monitoring system to insure that it remains in compliance in all material respects with all federal, state and local rules, laws and regulations applicable to it.

(b)    (i) Each Obligor is in compliance with the requirements of all OFAC Sanctions Programs applicable to it, (ii) each Subsidiary of each Obligor is in compliance with the requirements of all OFAC Sanctions Programs applicable to such Subsidiary, (iii) each Obligor has provided to Agent and Lenders all information regarding such Obligors and its Affiliates and Subsidiaries requested by Agent and Lenders that are necessary to comply with all applicable OFAC Sanctions Programs, and (iv) neither the Obligors nor its Subsidiaries or, to the best of each Obligor's knowledge, any of their respective Affiliates is, as of the date hereof, named on the current OFAC SDN List.

(c)    No Inventory has been produced in violation of the Fair Labor Standards Act (29 U.S.C. §201 <u>et seq</u>.), as amended.

8.1.17  <u>Restrictive Agreements</u>.  No Obligor nor any of its Subsidiaries is a party to or subject to any contract, agreement or organizational document which restricts its right or ability to incur

the Obligations or which prohibits the execution of or compliance with this Agreement or the other Loan Documents by any Obligor or any of its Subsidiaries, as applicable.

8.1.18   Litigation.   Except as set forth on Schedule 8.1.18 hereto and other than the Cases, there are no unstayed actions, suits, proceedings or investigations pending, or to the knowledge of any Obligor, threatened, against or affecting any Obligor or any of its Subsidiaries, or the business, operations, Properties, prospects, profits or condition of any Obligor or any of its Subsidiaries that (a) involve or relate to any Loan Document or (b) singly or in the aggregate, could reasonably be expected to have a Material Adverse Effect.   Neither any Obligor nor any of its Subsidiaries is in default with respect to any order, writ, injunction, judgment, decree or rule of any court, Governmental Authority or arbitration board or tribunal, which, singly or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

8.1.19   No Defaults.   Subject to the entry of the Orders and subject to the terms thereof, no event, condition or circumstance has occurred or exists which would, upon or after the execution and delivery of this Agreement or any Obligor's performance hereunder or under any other Loan Document, constitute a Default or an Event of Default.

8.1.20   [Intentionally Omitted].

8.1.21   ERISA.   Except as disclosed on Schedule 8.1.21:

(a)   Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code, and other federal and state laws.   Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination or opinion letter from the IRS and, to the knowledge of Parent or Borrowers, nothing has occurred which would prevent, or cause the loss of, such qualification.   Each Obligor and ERISA Affiliate has made when due all contributions required by law or under the terms of any Plan, other than as could not reasonably be expected to have a Material Adverse Effect.   Each Obligor and ERISA Affiliate has met all applicable requirements under the Pension Funding Rules, and no application for a funding waiver of the minimum funding standards or an extension of any amortization period under the Pension Funding Rules has been made with respect to any Plan.

(b)   There are no pending or, to the knowledge of Parent or Borrowers, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.   There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted in or could reasonably be expected to have a Material Adverse Effect.

(c)   (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan (A) has any Unfunded Pension Liability or (B) is or has been in violation of the limitations imposed by Section 436 of the Code; (iii) the conditions for the imposition of a lien under Section 303(k) of ERISA do not exist with respect to any Pension Plan; (iv) no Obligor or ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (v) no Obligor or ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (vi) no Obligor or ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

(d)    With respect to any Foreign Plan, (i) all employer and employee contributions required by law or by the terms of the Foreign Plan have been made, or, if applicable, accrued, in accordance with normal accounting practices; (ii) the fair market value of the assets of each funded Foreign Plan, the liability of each insurer for any Foreign Plan funded through insurance, or the book reserve established for any Foreign Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations with respect to all current and former participants in such Foreign Plan according to the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting principles; and (iii) it has been registered as required and has been maintained in good standing with applicable regulatory authorities.

8.1.22    <u>Trade Relations</u>.  There exists no actual or, to Obligors' knowledge, threatened termination, cancellation or limitation of, or any modification or change in, the business relationship between any Obligor or any of its Subsidiaries and any customer or any group of customers whose purchases individually or in the aggregate are material to the business of Obligors and their Subsidiaries, or with any material supplier, except in each case, where the same could not reasonably be expected to have a Material Adverse Effect, and there exists no present condition or state of facts or circumstances which would prevent any Obligor or any of its Subsidiaries from conducting such business after the consummation of the transactions contemplated by this Agreement in substantially the same manner in which it has heretofore been conducted.

8.1.23    <u>Labor Relations</u>.  Except as described on <u>Schedule 8.1.23</u> hereto, there is (a) no unfair labor practice complaint pending or, to the knowledge of any Obligor, threatened against any Obligor or any of its Subsidiaries before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Obligor which arises out of or under any collective bargaining agreement, (b) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or threatened against any Obligor or (c) to the knowledge of each Obligor, no union representation question existing with respect to the employees of any Obligor and no union organizing activity taking place with respect to any of the employees of any Obligor.  No Obligor or any of its ERISA Affiliates has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("<u>WARN</u>") or similar state law, which remains unpaid or unsatisfied.  The hours worked and payments made to employees of any Obligor have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements, except to the extent such violations could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  All material payments due from any Obligor on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Obligor, except where the failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.1.24    <u>Insurance</u>.  <u>Schedule 8.1.24</u> sets forth a description of all insurance policies maintained by or on behalf of the Obligors and their respective Subsidiaries as of the Closing Date, including but not limited to policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation and employee health and welfare insurance.  All premiums in respect of such insurance policies have been paid as of the Closing Date (or have been financed with Indebtedness permitted under <u>Section 9.2.3(n)</u>, which such Indebtedness has been paid in full to the extent payments thereunder are due and payable on or prior to the Closing Date).  Except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, all insurance policies of the Obligors and their respective Subsidiaries are in full force and effect and are of a nature and provide such coverage as is sufficient and as is customarily carried by businesses of the size and character of such Person.

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

8.1.25  Security Interest in Collateral.  Subject to the entry of the Orders and subject to the terms thereof, except as otherwise contemplated hereby or under any of the Loan Documents, this Agreement and each other Security Document is effective to create in favor of Agent, for its benefit and the benefit of the other Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.  Subject to the entry of the Orders and subject to the terms thereof, Agent shall have a perfected Lien on, and security interest in, all right, title and interest of the Obligors in such Collateral and the proceeds thereof, as security for the Secured Obligations (subject to the limitations set forth in the Security Documents) to the extent perfection is required in accordance with the terms of this Agreement, in each case prior and superior in right to any other Person (except, subject to the Prepetition Intercreditor Agreement and the Intercreditor Arrangements, Liens in favor of the, DIP Term Loan Agent, Prepetition Senior Secured Notes Trustee, and Permitted Encumbrances which have priority over the Liens created by the Security Documents by operation of law).

8.1.26  Margin Regulations.  No Obligor or Subsidiary of any Obligor is engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any "margin stock" (as defined in Regulation U of the Board of Governors of the Federal Reserve System).

8.1.27  Environmental Matters.  (a) The operations of each Obligor are in compliance with all Environmental Laws, except where such noncompliance could not reasonably be expected to have a Material Adverse Effect; (b) there has been no Release at any of the properties currently or formerly owned or operated by any Obligor or a predecessor in interest, or at any disposal or treatment facility which received Hazardous Materials generated by any Obligor or any predecessor in interest which could reasonably be expected to have a Material Adverse Effect; (c) no Obligor or predecessor in interest has received any communication asserting that it is responsible for performing or otherwise financing any Remedial Action nor does any Obligor have knowledge or notice of any threatened or pending Remedial Action being required at any currently or formerly owned or operated properties or at any location where Hazardous Materials generated by any Obligor or predecessor in interest have been sent or Released against any Obligor or any predecessor in interest which could reasonably be expected to have a Material Adverse Effect; (d) no Remedial Actions have been asserted against any facilities that may have received Hazardous Materials generated by any Obligor or any predecessor in interest which could reasonably be expected to have a Material Adverse Effect; (e) no property now or formerly owned or operated by an Obligor has been used as a treatment or disposal site for any Hazardous Material which reasonably could be expected to have a Material Adverse Effect; (f) no Obligor has failed to report to the proper Governmental Authority any Release which is required to be so reported by any Environmental Laws which could reasonably be expected to have a Material Adverse Effect; (g) each Obligor holds all licenses, permits and approvals required under any Environmental Laws in connection with the operation of the business carried on by it, except for such licenses, permits and approvals as to which an Obligor's failure to maintain or comply with could not reasonably be expected to have a Material Adverse Effect; and (h) no Obligor has received any notification pursuant to any Environmental Laws that (i) any work, repairs, construction or Capital Expenditures are required to be made in respect as a condition of continued compliance with any Environmental Laws, or any license, permit or approval issued pursuant thereto, except as could not reasonably be expected to have a Material Adverse Effect or (ii) any license, permit or approval referred to above is about to be reviewed, made, subject to limitations or conditions, revoked, withdrawn or terminated, in each case, except as could not reasonably be expected to have a Material Adverse Effect.

8.1.28  Permits, Etc.  Subject to the entry of the Orders and subject to the terms thereof, each Obligor has, and is in compliance with, all permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business currently owned, leased, managed or operated, or to be acquired, by such Person.  No condition

exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, and to the Obligor's knowledge there is no claim that any thereof is not in full force and effect.

8.1.29    Use of Proceeds.  The proceeds of the Loans shall be used solely in accordance with Section 2.1.2.  The Letters of Credit will be used for general working capital purposes and other general corporate purposes.  No Loan proceeds or Letters of Credit will be used by Obligors or any of their Subsidiaries to purchase or carry, or to reduce or refinance any Indebtedness incurred to purchase or carry, any "margin stock" (as defined in Regulation U of the Board of Governors of the Federal Reserve System) or for any related purpose governed by Regulations T, U or X of the Board of Governors of the Federal Reserve System.

8.1.30    Investment Company Act.  No Obligor is (a) an "investment company" or an "affiliated person" or "promoter" of, or "principal underwriter" of or for, an "investment company", or a "person directly or indirectly controlled by or acting on behalf of an investment company", as such terms are defined in or subject to regulation under the Investment Company Act of 1940, as amended, or (b) subject to regulation under any applicable law that limits in any respect its ability to incur Indebtedness or which may otherwise render all or a portion of the Obligations unenforceable.

8.1.31    [Intentionally omitted].

**SECTION 9. COVENANTS AND CONTINUING AGREEMENTS**

9.1    Affirmative Covenants.  During the Term, and thereafter until Payment in Full, Obligors jointly and severally covenant that they shall and shall cause their Subsidiaries to:

9.1.1    Visits and Inspections; Lender Meeting.  Subject to the provisions of Section 13.4, permit (i) representatives of Agent, and during the continuation of any Default or Event of Default any Lender in accompaniment with Agent (at such Lender's cost), from time to time, during normal business hours, to visit and inspect the Properties of each Obligor and each of its Subsidiaries, inspect, audit and make extracts from its books and records, and discuss with its officers, its employees and its independent accountants, each Obligor's and each of its Subsidiaries' business, assets, liabilities, financial condition, business prospects and results of operations and (ii) appraisers engaged pursuant to Section 13.4 (whether or not personnel of Agent), from time to time, during normal business hours, to visit and inspect the Properties of each Obligor and each of its Subsidiaries, for the purpose of completing appraisals pursuant to Section 13.4. Agent, if no Default or Event of Default then exists, shall give Borrower Representative reasonable prior notice of any such inspection or audit.

9.1.2    Notices.  Notify Agent and Lenders in writing, promptly after an Obligor's obtaining knowledge thereof, of any of the following (excluding, in each case, any event triggered by or relating to the filing of the Cases):

(a)    the threat or commencement of any proceeding or investigation, whether or not covered by insurance, that, (i) could reasonably, individually or in the aggregate, be expected to result in a liability in excess of $1,000,000 (ii) seeks injunctive relief, (iii) is asserted or instituted against any Plan, or any of their fiduciaries or any of their assets, (iv) alleges criminal misconduct by any Obligor, (v) contests any tax, fee, assessment or other governmental charge, individually or in the aggregate, in excess of $1,000,000 or (vi) involves any material product recall;

WEIL:\95250238\4\99980.0025
Detroit_5279807_16

(b)    any pending or threatened labor dispute, strike or walkout, or the expiration of any material labor contract that could reasonably be expected to have a Material Adverse Effect;

(c)    any default under or termination of an agreement or a contract that could reasonably be expected to have a Material Adverse Effect;

(d)    the existence of any Default or Event of Default;

(e)    any post-petition judgment, individually or in the aggregate, in an amount exceeding $1,000,000 or granting injunctive relief;

(f)    any violation or asserted violation of any Requirement of Law that could reasonably be expected to result in a liabilities or costs, individually or in the aggregate, in excess of $1,000,000;

(g)    any Release by an Obligor or on any real Property owned, leased or occupied by an Obligor; or receipt of any Environmental Notice, in each case that could, individually or in the aggregate, reasonably be expected to result in Environmental Liabilities and Costs in excess of $1,000,000;

(h)    the occurrence of any ERISA Event;

(i)    any Lien (other than Permitted Encumbrances, Liens granted by the Obligors in favor of Agent (for the benefit of the Secured Parties, securing the Secured Obligations) or the Prepetition Senior Secured Notes Trustee (securing the obligations under the Prepetition Senior Secured Notes Documents) or the DIP Term Loan Agent (securing the obligations under the DIP Term Loan Documents)), or claim made or asserted in writing against any material portion of the Collateral; any loss, damage or destruction to all or any portion of the Collateral in the amount of $1,000,000 or more, whether or not covered by insurance;

(j)    any and all default notices received under or with respect to the DIP Term Loan Agreement or (ii) any leased location or public warehouse where Collateral with a cost in excess of $1,000,000 is located (which shall be delivered within two Business Days after receipt thereof);

(k)    all amendments, waivers, consents or forbearances to the DIP Term Loan Credit Agreement, Accommodation Agreement, Customer Agreements, or the Access Agreement, together with a copy of each such amendment;

(l)    [intentionally omitted];

(m)    (i) the institution of any proceeding in any court or administrative body of in the PTO or the United States Copyright Office of any foreign counterpart, or any adverse determination in any such proceeding, regarding the validity or enforceability of any Intellectual Property owned by such Obligor or its Subsidiaries material to the conduct of its business or such Obligor's or its Subsidiaries' right to register, own or use such Intellectual Property other than routine examiner's comments and office actions in the course of prosecution; or (ii) any event which may be reasonably expected to materially and adversely affect the value of any Intellectual

Property owned by such Obligor or its Subsidiaries material to the conduct of its business, or the rights and remedies of Agent in relation thereto;

(n)    without limiting Agent's rights and each Obligor's and its Subsidiaries' obligations under Section 9.1.15 below, from time to time upon Agent's request, reasonably detailed statements and amended schedules further identifying and describing the Intellectual Property owned by such Obligor or its Subsidiaries and such other materials evidencing any Intellectual Property owned by such Obligor or its Subsidiaries as Agent may reasonably request;

(o)    any default under, or termination of, the Accommodation Agreement, the Customer Agreements, or the Access Agreement; and

(p)    any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section 9.1.2 shall be accompanied by a statement of a Senior Officer of Parent setting forth in reasonable detail the nature of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

9.1.3    Financial Statements.    Keep adequate records and books of account with respect to its business activities in which proper entries are made in accordance with customary accounting practices reflecting all its financial transactions; and cause to be prepared and furnished to Agent and each Lender, the following, all to be prepared in accordance with GAAP applied on a consistent basis, unless Obligors' certified public accountants concur in any change therein and such change is disclosed to Agent and is consistent with GAAP:

(a)    no later than 120 days after the close of each fiscal year of Parent, audited financial statements of Parent and its Subsidiaries as of the end of such fiscal year, on a Consolidated basis, certified by a firm of independent certified public accountants of recognized standing selected by Parent;

(b)    (i) no later than 45 days after the end of each of the first three fiscal quarters of each fiscal year, commencing with the fiscal quarter ending March 31, 2015, unaudited internally prepared interim financial statements of Parent and its Subsidiaries as of the end of such fiscal quarter and of the portion of the fiscal year then elapsed, on a Consolidated basis and (ii) commencing with the fiscal quarter ending March 31, 2015, no later than 45 days after the end of each of the first three fiscal quarters of each fiscal year, unaudited internally prepared, income statements and balance sheets of Parent and its Subsidiaries, on a consolidating basis, in each case certified by a Senior Officer of Parent as prepared in accordance with GAAP and fairly presenting in all material respects the financial position and results of operations of Parent and its Subsidiaries for such fiscal quarter and period, subject only to changes from audit and year-end adjustments and except that such statements need not contain notes;

(c)    no later than 15 Business Days (or, in the case of a fiscal month that ends on the same day as the end of a fiscal quarter, 20 Business Days) after the end of each fiscal month, commencing with the fiscal month ending March 31, 2015, unaudited internally prepared interim financial statements of Parent and its Subsidiaries as of the end of such fiscal month, on a Consolidated basis. certified by a Senior Officer of Parent as prepared in accordance with GAAP and fairly presenting in all material respects the financial position and results of operations of Parent and its Subsidiaries for such fiscal quarter and period, subject only to changes from audit and year-end adjustments and except that such statements need not contain notes;

(d)    no later than 5:00 p.m. on Friday of each calendar week, commencing with March 20, 2015, an updated 13-Week Projection and a Variance Report;

(e)    the no later than 5:00 p.m. on Friday of each calendar week, commencing with March 20, 2015, a report detailing fees and expenses for professional services incurred by the Obligors during the preceding week;

(f)    together with each delivery of financial statements pursuant to clauses (a) and (b) of this Section 9.1.3, a management discussion and analysis setting forth in comparative form the corresponding figures for the corresponding periods of the previous fiscal year and the corresponding figures from the most recent 13-Week Projections for the current fiscal year delivered pursuant to Section 9.1.3.  The information above shall be presented in reasonable detail and shall be certified by a Senior Officer of Parent to the effect that such information fairly presents in all material respects the results of operation and financial condition of Parent and its Subsidiaries as at the dates and for the periods indicated;

(g)    promptly after the same become publicly available, copies of any regular, periodic and special reports, proxy statements, registration statements and other materials, if any, which Parent or any of its Subsidiaries files with the Securities and Exchange Commission or any Governmental Authority which may be substituted therefor or any national securities exchange;

(h)    upon request of Agent, copies of (i) any annual report (Form 5500 series) filed, if any, in connection with each Plan; (ii) the most recent actuarial valuation report for each Pension Plan, if any; (iii) all notices received by the Obligor from or with respect to any Multiemployer Plan concerning an ERISA Event, if any; and (iv) such other information, documents or governmental reports or filings available relating to any Plan as Agent shall reasonably request;

(i)    such other data and information (financial and otherwise) as Agent or any Lender, from time to time, may reasonably request, bearing upon or related to the Collateral or Obligors' or any of their Subsidiaries' financial condition or results of operations, in each case in form and scope reasonably acceptable to Agent;

(j)    concurrently with delivery of the weekly Borrowing Base Certificate, a Financial Covenant Certificate certified by a Senior Officer of Parent, in reasonable detail, demonstrating compliance with the financial covenant set forth in Section 9.3.1;

(k)    Concurrently with the delivery of the financial statements described in paragraph (a), (b) and (c) of this Section 9.1.3, Borrowers shall cause to be prepared and furnished to Agent a Compliance Certificate in the form of Exhibit C hereto executed by a Senior Officer of Parent (a "Compliance Certificate"); and

(l)    Concurrently with delivery to the DIP Term Loan Agent each updated 21-Week Budget.

9.1.4  Borrowing Base Certificates; Accounts and Inventory.

(a)    As soon as available but in any event (i) on the Wednesday of each calendar week, as of the period then ended, the Borrower Representative shall deliver to Agent a Borrowing Base Certificate as of the last day of the immediately preceding week, with weekly

reporting of rolling forward accounts receivable data by reporting weekly sales, cash collections and credits (and including monthly reporting of gross inventory, inventory ineligibles and accounts receivable ineligibles for each calendar month) and such supporting materials as Agent shall reasonably request; provided, that if a Triggering Event has occurred and is continuing, the Borrowing Base Certificate shall be delivered on a daily basis. On or before the 20th day of each month from and after the Closing Date, the Borrower Representative shall deliver to Agent a Borrowing Base Certificate as of the last day of the immediately preceding month, and the Borrower Representative shall deliver to Agent, in the form reasonably acceptable to Agent, (a) reconciliations of Borrowers' Accounts as shown on such Borrowing Base Certificate to Borrowers' accounts receivable agings, to Borrowers' general ledger and to Borrowers' most recent financial statements, (b) accounts payable agings and updates on ineligible accounts, (c) reconciliations of Borrowers' Inventory, as shown on Borrowers' perpetual inventory, to Borrowers' general ledger and to Borrowers' financial statements and (d) Inventory status reports all with supporting materials as Agent shall reasonably request; and

(b)      As soon as available but in any event within 20 days of the end of each calendar month, as of the period then ended, all delivered electronically in a text formatted file reasonably acceptable to Agent:

(i)      a detailed aging of Borrowers' Accounts (1) including all invoices aged by invoice date and due date (with an explanation of the terms offered) and (2) reconciled to the Borrowing Base Certificate delivered nearest to such date prepared in a manner reasonably acceptable to Agent, together with a summary specifying the name, address, and balance due for each Account Debtor;

(ii)      a schedule detailing Borrowers' Inventory, in form reasonably satisfactory to Agent, (1) by location (showing Inventory in transit, any Inventory located with a third party under any consignment, bailee arrangement, or warehouse agreement), by class (raw material, work-in-process and finished goods), by product type, and by volume on hand, which Inventory shall be valued at the lower of cost (determined on a first-in, first-out basis) or market and adjusted for Availability Reserves, (2) including a report of any variances or other results of Inventory counts performed by Borrowers since the last Inventory schedule (including information regarding sales or other reductions, additions, returns, credits issued by Borrowers and complaints and claims made against Borrowers), and (3) reconciled to the Borrowing Base Certificate delivered nearest to such date; and

(iii)      a schedule and aging of Borrowers' accounts payable.

9.1.5  Existence; Conduct of Business.  (a) Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and, except where the failure to so preserve, renew or keep in full force and effect any of the following could not reasonably be expected to result in a Material Adverse Effect, the rights, qualifications, licenses, permits, franchises, governmental authorizations, governmental licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 9.2 and (b) carry on and conduct its business in substantially the same fields of enterprise it conducts on the Closing Date (or fields reasonably related thereto).

WEIL:\95250238\4\99980.0025

9.1.6  <u>Maintenance of Properties</u>.  Keep and maintain all Property material to the conduct of its business in good working order and condition (condemnation, insured casualty and ordinary wear and tear excepted).

9.1.7  <u>Payment of Obligations</u>.  In accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court, pay or discharge all Taxes, before the same shall become delinquent or in default, except where (a)(i) the validity or amount thereof is being contested in good faith by appropriate proceedings and (ii) such Obligor or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (b) the failure to make payment could not reasonably be expected to result in a Material Adverse Effect; <u>provided</u>, <u>however</u>, that each Obligor will, and will cause each Subsidiary to, remit withholding taxes and other payroll taxes to appropriate Governmental Authorities as and when claimed to be due, notwithstanding the foregoing exceptions.  In accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court, pay or discharge all Indebtedness and all other payment liabilities and obligations (other than Taxes), before the same shall become delinquent or in default, except where the failure to make payment or discharge could not reasonably be expected to result in a Material Adverse Effect; <u>provided</u>, <u>however</u>, that the failure of the Obligors to comply with this <u>Section 9.1.7</u> as it relates to Indebtedness shall not constitute an Event of Default unless <u>Section 11.1.5</u> is also applicable.

9.1.8  <u>Insurance</u>.  Maintain with financially sound and reputable carriers having a financial strength rating of at least A- by A.M. Best Company (a) insurance in such amounts (with no greater risk retention) and against such risks (including loss or damage by fire and loss in transit, theft, burglary, pilferage, larceny, embezzlement and other criminal activities; business interruption; and general liability) and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required pursuant to <u>Section 7.1.2</u> and the other Loan Documents.

9.1.9  <u>Books and Records</u>.  Keep proper books of record and account in entries are made of all dealings and transactions in relation to its business and activities which are true, correct and complete in all material respects.

9.1.10  <u>Collateral Access Agreements</u>.  Provide Agent with copies of all agreements between any Obligor or any of its Subsidiaries and any landlord, warehouseman, processor, distributor or consignee or other Person which owns or is the lessee of any premises at which any Collateral having value in excess of $1,000,000 is kept.  With respect to any such lease (other than leases for sales offices), warehousing agreement or any processing agreement, Obligors shall use commercially reasonable efforts to provide Agent with Collateral Access Agreements with respect to such premises within 60 days after the entry into any new Lease, warehousing agreement or processing agreement. Such Collateral Access Agreements shall be in a form supplied by Agent to Obligors with such reasonable revisions as are customarily accepted by Agent or by similar financial institutions in similar financial transactions.

9.1.11  <u>Subsidiaries; Further Assurances</u>.  Cause each Subsidiary Guarantor, whether now or hereafter in existence, no later than 45 days after becoming a Subsidiary Guarantor (or in the case of an Excluded Subsidiary, no later than 45 days after it no longer qualifies as an Excluded Subsidiary), to execute and deliver to Agent (i) a joinder agreement in form and substance reasonably acceptable to Agent whereby such Subsidiary Guarantor would become an additional Guarantor and Obligor hereunder (a "<u>Joinder Agreement</u>"), or (ii) a Guaranty Agreement and a security agreement pursuant to which such Subsidiary guaranties the payment of all Obligations and grants to Agent a first priority Lien (subject only to Permitted Liens) on its Properties of the types described in <u>Section 6.1</u>.

9.1.12  <u>Compliance with Laws</u>.

(a)    Except as otherwise excused by the Bankruptcy Court, comply with all of its Requirements of Law applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect;

(b)    To, and to cause each ERISA Affiliate to, except as otherwise excused by the Bankruptcy Court (i) comply with all applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder with respect to all Plans, except where the failure to so comply could not reasonably be expected to have a Material Adverse Effect, (ii) not take any action or fail to take action the result of which would result in a liability to the PBGC (or similar Governmental Authority) or to a Multiemployer Plan in an amount that could reasonably be expected to have a Material Adverse Effect, (iii) maintain the qualification of each Plan that is intended to be qualified under Section 401 of the Code, (iv) make to each Plan all contributions required by law or under the terms of any such Plan and (iv) furnish to Agent upon Agent's request such additional information about any Plan concerning compliance with this covenant as may be reasonably requested by Agent.

9.1.13  [Intentionally Omitted].

9.1.14  Deposit Accounts; Lockboxes; Securities Accounts.

(a)    For each Deposit Account (other than an Excluded Deposit Account), Lockbox, and Securities Account that any Obligor owns on the Closing Date, Obligors shall, pursuant to a Deposit Account Control Agreement, Lockbox Agreement or Securities Account Control Agreement, as applicable, cause the depositary bank or securities intermediary, as applicable, to agree to comply upon an Event of Default or Triggering Event, with instructions from Agent to such depositary bank or securities intermediary, as applicable, directing the disposition of funds from time to time credited to such Deposit Account, Lockbox or Securities Account, without further consent of Obligors.

(b)    At any time after the Closing Date, Obligors shall only open new Deposit Accounts (including Deposit Accounts with lockbox service but other than Excluded Deposit Accounts) with Bank and new Securities Accounts with Bank or one of Bank's Affiliates acceptable to Agent, and shall, within 30 days after opening such Deposit Account or Securities Account, or such longer period as is agreed by Agent in its sole discretion, pursuant to a Deposit Account Control Agreement or Securities Account Control Agreement, as applicable, cause Bank (or such Affiliate, as applicable) to agree to comply, upon an Event of Default or Triggering Event, with instructions from Agent to Bank directing the disposition of funds from time to time credited to such Deposit Account (other than an Excluded Deposit Account) or Securities Account, without further consent of Obligors.  In addition, for each Deposit Account with lockbox service (the "Lockboxes") opened after the Closing Date, within 30 days after opening such Deposit Account or Securities Account, or such longer period as is agreed by Agent in its sole discretion, Obligors shall, pursuant to a Deposit Account Control Agreement and an irrevocable lockbox agreement in the form provided by or otherwise reasonably acceptable to Agent, cause the depositary bank to acknowledge the Lien of Agent granted hereunder and irrevocably instruct the depositary bank to wire all amounts collected therein to Deposit Accounts subject to Deposit Account Control Agreements or otherwise pursuant to the instructions of Agent upon an Event of Default or Triggering Event (such agreement, a "Lockbox Agreement").

81

(c)      Obligors may not open any new Deposit Account or Securities Account after the Closing Date without the prior written consent of Agent.

9.1.15    [Intentionally omitted].

9.1.16    Environmental Matters.  Except as otherwise excused by the Bankruptcy Court:

(a)      Comply, and take reasonable efforts to cause all lessees and other persons occupying any real Property owned, operated or leased by any Obligor or its Subsidiaries to comply with all Environmental Laws applicable to its operations and such real Property; and conduct all Remedial Action required by any Governmental Authority or under any applicable Environmental Laws in accordance with, the requirements of any Governmental Authority and applicable Environmental Laws except, in each case, to the extent such non-compliance would not have a Material Adverse Effect.

(b)      Take all reasonable efforts to prevent any Release of Hazardous Materials in, on, under, at, to or from any real Property owned, leased or operated by any of the Obligor, any Subsidiary or their predecessors in interest except in full compliance with applicable Environmental Laws and ensure that there shall be no Hazardous Materials in, on, under or from any real Property owned, leased or operated by any of the Obligors and their Subsidiaries except those that are used, stored, handled and managed in compliance with applicable Environmental Laws except, in each case, to the extent such non-compliance would not have a Material Adverse Effect.

(c)      Undertake all actions, including Remedial Actions necessary to address any Release of Hazardous Materials on, at, under, from or onto any real Property owned, leased or operated by any of the Obligors, Subsidiaries or their predecessors in interest as required pursuant to Environmental Law or the requirements of any Governmental Authority except, in each case, to the extent such non-compliance would not have a Material Adverse Effect.

9.1.17    Post-Closing Covenant.  (a) Within 30 days after the Closing Date (or such later period agreed to by Agent), to the extent not delivered on or prior to the Closing Date, the Borrowers shall deliver insurance endorsements naming Agent as lender loss payee and an additional insured and provides not less than 10 days' prior written notice to Agent in the event of cancellation of the policy for nonpayment of premium and not less than 30 days' prior written notice to Agent in the event of cancellation of the policy for any other reason whatsoever and a clause specifying that the interest of Agent shall not be impaired or  invalidated by any act or neglect of any Obligor, any of its Subsidiaries or the owner of the Property, or by the occupation of the premises for purpose more hazardous than are permitted by said policy, in each case in accordance with Section 7.1.2, (b) within 60 days after the Closing Date (or such later period as agreed to by Agent), the Borrowers shall use commercially reasonable efforts to obtain Collateral Access Agreements for each of the leased locations set forth on Schedule 7.1.1(a), and (c) within 30 days after the Closing Date cause Chassix Holdings, Inc. to deliver to Agent such customer identification information as Agent shall require in order to comply with CIP Regulations, and upon Agent's satisfactory review of the same, at Agent's option, cause Chassix Holdings, Inc. to become a Guarantor by execution of a joinder to this Agreement.

9.1.18    Hedging Obligations and Secured Bank Products.  Obligors will not incur any Hedging Obligations or Secured Bank Product Obligations after the Closing Date.

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

9.2    <u>Negative Covenants</u>.  During the Term, and thereafter until Payment in Full, Obligors jointly and severally covenant that they shall not:

9.2.1    <u>Mergers; Consolidations; Structural Changes</u>.    Merge into or consolidate or amalgamate, or permit any Subsidiary of an Obligor to merge into or consolidate or amalgamate, with any other Person, or permit any other Person to merge into or consolidate or amalgamate with it or any Subsidiary of an Obligor, or liquidate or dissolve, or permit any Subsidiary of an Obligor to liquidate or dissolve, except for, if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing:

(a)    mergers into or consolidations or amalgamations of any Borrower with any other Borrower;

(b)    mergers into or consolidations or amalgamations of any Subsidiary with any Borrower in a transaction in which such Borrower is the surviving corporation;

(c)    mergers, consolidations or amalgamations of any Subsidiary or any Obligor (other than, in each case, a Borrower or Parent) into or with any Obligor in a transaction in which the surviving entity is an Obligor; and

(d)    mergers, consolidations or amalgamations of any Subsidiary (other than an Obligor) into or with any other wholly-owned Subsidiary (other than an Obligor).

9.2.2    <u>Investments; Loans; Acquisitions</u>.  Make, purchase, hold or acquire, or permit any Subsidiary of an Obligor to make, purchase, hold or acquire (including pursuant to any merger or amalgamation with any Person that was not an Obligor and a wholly owned Subsidiary prior to such merger) any Investment, except:

(a)    travel advances, advances against commissions, relocation costs, loans and other similar advances to employees in the ordinary course of business of Obligors and not to exceed $500,000 in the aggregate at any time outstanding;

(b)    extensions of trade credit in the ordinary course of business;

(c)    Investments by (i) Parent in the Equity Interests of Chassix, (ii) any Borrower or any other Obligor (other than Parent) in the Equity Interests of any Obligor and (iii) any Foreign Subsidiary in the Equity Interests of any other wholly-owned Foreign Subsidiary; <u>provided</u> that, in each case in this <u>clause (c)</u>, any such Equity Interests held by an Obligor shall be pledged to the extent required pursuant to <u>Section 6</u> and the other Security Documents;

(d)    Indebtedness of (i) any Obligor to any other Obligor, (ii) any Foreign Subsidiary to any other Foreign Subsidiary and (iii) any Obligor (other than Parent) to any wholly-owned Subsidiary that is not an Obligor;

(e)    acquisitions of assets consisting of fixed assets or real Property that constitute Capital Expenditures in the ordinary course of business of the Obligors;

(f)    Permitted Investments, subject (as provided in <u>Section 6</u>) to a Control Account, or otherwise subject to a perfected security interest of the Obligors in favor of Agent (for the benefit of the Secured Parties, securing the Secured Obligations);

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

(g)    Investments in existence on the Closing Date and described in <u>Schedule 9.2.2(g)</u>;

(h)    (i) Guarantees of obligations of Obligors not constituting Indebtedness, and (ii) Guarantees of Indebtedness of Obligors permitted by <u>Section 9.2.3</u>;

(i)    Investments in Equity Interests, notes payable or other securities issued by Account Debtors to an Obligor or any Subsidiary pursuant to negotiated agreements with respect to settlement of such Account Debtor's Accounts in the ordinary course of business;

(j)    [intentionally omitted];

(k)    [intentionally omitted];

(l)    Investments received in connection with the dispositions of assets permitted by <u>Section 9.2.9</u>;

(m)    Investments in Foreign Subsidiaries set forth in the 13-Week Projections in an aggregate amount not to exceed $10,000,000 at any time outstanding;

(n)    Investments by Foreign Subsidiaries;

(o)    Investments constituting deposits described in <u>paragraphs (d)</u> and <u>(e)</u> of the definition of the term "<u>Permitted Encumbrances</u>";

(p)    any Obligor and its Subsidiaries may acquire and hold accounts receivable owing to any of them, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms of such Obligor or such Subsidiary;

(q)    any Obligor and its Subsidiaries may acquire and hold Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers, and Investments received in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(r)    advances of payroll payments to employees of any Obligor in the ordinary course of business;

(s)    [intentionally omitted];

(t)    [intentionally omitted];

(u)    Investments in deposit accounts or securities accounts opened in the ordinary course of business; <u>provided</u> that the consent of Agent shall be obtained prior to opening any such account after the Closing Date;

(v)    Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit;

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

(w)     [intentionally omitted];

(x)     other Investments not otherwise permitted by this Section 9.2.2 in an aggregate amount not to exceed $1,000,000 at any time outstanding]; and

(y)     to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of intellectual property, in each case, in the ordinary course of business.

Notwithstanding the foregoing, no Investments shall be permitted after the Closing Date except in accordance with the 13-Week Projection then in effect as approved by Agent.

9.2.3  Indebtedness.  Create, incur, assume, or suffer to exist, or permit any Subsidiary of any Obligor to create, incur or suffer to exist, any Indebtedness, except:

(a)     the Obligations;

(b)     Indebtedness existing on the Closing Date and listed on Schedule 9.2.3;

(c)     [intentionally omitted];

(d)     Secured and unsecured Indebtedness of Foreign Subsidiaries in an aggregate amount not to exceed, in addition to Indebtedness of Foreign Subsidiaries listed on Schedule 9.2.3, $1,000,000 at any time outstanding;

(e)     Indebtedness owing to an Obligor;

(f)     Indebtedness under the Prepetition Senior Secured Notes, Holdings PIK Notes, and the DIP Term Loan Agreement;

(g)     [intentionally omitted];

(h)     [intentionally omitted];

(i)     [intentionally omitted];

(j)     other Indebtedness in an aggregate amount not to exceed $1,000,000 at any time outstanding;

(k)     [intentionally omitted];

(l)     Indebtedness which represents an extension, refinancing, replacement or renewal of any of the Indebtedness described in paragraphs (b), and (c), hereof; provided that (i) the principal amount of such Indebtedness is not increased (except to the extent used to finance accrued interest and premiums (including tender or make-whole premiums) thereon and underwriting discounts, defeasance costs, fees, commissions and expenses, including any original issue discount), (ii) any Liens securing such Indebtedness are not extended to any additional property of any Obligor (unless such Lien and the Secured Indebtedness secured thereby is otherwise permitted hereunder), (iii) such extension, refinancing, replacement or renewal does not result in a shortening of the average weighted maturity of the Indebtedness so extended,

refinanced, replaced or renewed and (iv) if the Indebtedness that is refinanced, replaced, renewed or extended was subordinated in right of payment to the Secured Obligations, then the terms and conditions of the refinancing, replacement, renewal, or extension Indebtedness must include subordination terms and conditions that are at least as favorable to Agent and the Lenders as those that were applicable to the refinanced, replaced, renewed, or extended Indebtedness;

(m)    [intentionally omitted]; and

(n)    Indebtedness secured by Liens described in <u>Section 9.2.5(j)</u>.

9.2.4    <u>Affiliate Transactions</u>.  Enter into, or be a party to, or permit any Subsidiary of any Obligor to enter into or be a party to, any transaction with any Affiliate of any Obligor or any holder of any Equity Interests of any Obligor or any Subsidiary of any Obligor (an "<u>Affiliate Transaction</u>"), including the payment of any management, consulting or similar fees, other than Permitted Affiliate Transactions; provided, however, that no management fees shall be permitted to be paid to Sponsor during the term of this Agreement.

9.2.5    <u>Limitation on Liens</u>.  Create or suffer to exist, or permit any Subsidiary of any Obligor to create or suffer to exist, any Lien upon any of its Property, income or profits, whether now owned or hereafter acquired, except:

(a)    Liens at any time granted in favor of Agent to secure the Secured Obligations;

(b)    Permitted Encumbrances;

(c)    [intentionally omitted];

(d)    such other Liens existing on the Closing Date and listed on <u>Schedule 9.2.5</u>;

(e)    sales contracts, leases, statutory obligations, work-in-progress advances and other similar obligations in the ordinary course not incurred in connection with Money Borrowed or the payment of the deferred purchase price of property incurred in the ordinary course of business;

(f)    [intentionally omitted];

(g)    purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(h)    outbound licenses in existence on the Closing Date (including the material licenses in effect as of the date hereof as set forth on <u>Schedule 8.1.14</u>);

(i)    Liens on assets securing Secured Indebtedness permitted pursuant to <u>Section 9.2.3</u>; <u>provided</u> that no such Lien shall attach to DIP ABL Priority Collateral except for any such Lien securing Secured Indebtedness of the types referred to in <u>clause (f)</u> of <u>Section 9.2.3</u>;

(j)      Liens on the amounts of any unpaid insurance premiums payable to any Person under an insurance policy securing Indebtedness of such Person incurred to finance the premium for such insurance policy;

(k)      Liens (i) of a collecting bank arising in the ordinary course of business under Section 4-210 of the UCC in effect in the relevant jurisdiction covering only the items being collected upon or (ii) in favor of a banking institution arising as a matter of law, encumbering amounts credited to deposit or securities accounts (including the right of set-off) and which are within the general parameters customary in the banking industry;

(l)      Liens granted to (i) the Prepetition Senior Secured Notes Trustee to secure the Prepetition Senior Secured Notes and (ii) the DIP Term Loan Agent to secure the DIP Term Loan Facility;

(m)      Liens granted by a Subsidiary that is not an Obligor in favor of any Borrower or another Obligor in respect of Indebtedness owed by such Subsidiary;

(n)      Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of setoff or similar rights and remedies, in each case as to deposit accounts or other funds maintained with a creditor depositary institution;

(o)      other Liens on assets not constituting DIP Term Loan Priority Collateral or the DIP ABL Priority Collateral securing Indebtedness and other obligations permitted hereunder in an aggregate amount not to exceed $1,000,000 at any time outstanding;

(p)      Liens on assets of Foreign Subsidiaries securing Indebtedness permitted under Section 9.2.3(d);

(q)      Liens on specific items of inventory or other goods (and proceeds thereof) of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such Person to facilitate the shipment or importation of such inventory or other goods;

(r)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(s)      Liens granted to BMO Harris Bank on the BMO Cash Collateral Account in respect of cash collateral for the Prepetition Letters of Credit;

(t)      Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by any Obligor or its Subsidiaries in the ordinary course of business;

(u)      Liens resulting from arrangements in existence on the Closing Date among the stockholders of Foreign Subsidiaries which restrict the transfer of Equity Interests of such Foreign Subsidiaries by such stockholders;

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

(v)     receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof; and

Notwithstanding the foregoing, in the event any Obligor grants a Lien on any Real Estate on which any DIP ABL Priority Collateral is maintained, such Lien shall only be permitted to the extent Agent is granted access rights to such DIP ABL Priority Collateral as may be satisfactory to Agent or Agent has established an applicable Rent and Charges Reserve hereunder; provided that if Agent has been provided a description of such Real Estate and the DIP ABL Priority Collateral situated thereon, Agent may determine, in its Permitted Discretion, not to establish a Rent and Charges Reserve with respect to such DIP ABL Priority Collateral.

9.2.6   Prepayments of Certain Debt.

Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness or in any way prepay in any manner (referred to herein as a "Prepayment"), or make any payment in violation of any subordination provision with respect to any Subordinated Debt except:

(a)     prepayments of any Indebtedness in connection with any refinancing, replacement or substitution of such Indebtedness, in whole or in part, permitted hereunder;

(b)     prepayments of intercompany Indebtedness owed by an Obligor to another Obligor or by a non-Obligor to an Obligor or any other non-Obligor;

(c)     subject to approval of the Bankruptcy Court, prepayment in full of the Prepetition ABL Credit Agreement; and

(d)     prepayments approved in the First Day Orders or other orders of the Bankruptcy Court subject to pleadings in form and substance reasonably satisfactory to Agent.

9.2.7   Distributions.   Declare or make, or permit any Subsidiary of any Obligor to declare or make, any Distributions, except for:

(a)     Distributions by any Subsidiary of an Obligor to such Obligor; and

(b)     Distributions paid solely in Equity Interests of a Borrower or any of its Subsidiaries by any Subsidiary that is a wholly-owned Subsidiary of a Borrower.

9.2.8   Certain Motions.   File a motion or plan with the Bankruptcy Court, or otherwise seek or consent to an action  requesting substantive consolidation of any of the Obligors' or Chassix Holdings, Inc.'s Bankruptcy estates without the prior written consent of the Agent.

9.2.9   Disposition of Assets.   Sell, transfer, lease, license or otherwise dispose of any of, or permit any Subsidiary of any Obligor to sell, transfer, lease, license or otherwise dispose of any of, its Properties, including any disposition of Property as part of a sale-and-leaseback transaction, to or in favor of any Person, except for:

(a)     sales of Inventory in the ordinary course of business;

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

(b)　　transfers of Property (i) to a Borrower, (iii) to an Obligor by any other Obligor that is not a Borrower (iv) to an Obligor by any Subsidiary that is not an Obligor, and (v) between Subsidiaries that are not Obligors;

(c)　　dispositions of Equipment or other fixed assets that are substantially worn, obsolete, or surplus or no longer used or useful in the ordinary course of business;

(d)　　the disposition of the Bristol Plant and associated working capital (with Agent's Liens on the working capital transferring to the sale proceeds) pursuant to bidding procedures and an asset purchase agreement approved by the Bankruptcy Court; provided, that any disposition of the Bristol Plant shall not occur prior to the Consummation Date.

(e)　　each Obligor and its Subsidiaries may grant licenses, sublicenses, leases or subleases to other Persons not materially interfering with the conduct of the business of the Obligors or their Subsidiaries, including of Intellectual Property;

(f)　　Intellectual Property abandoned, left to lapse, expire or not renewed if it is not used (by either the Obligor, the Subsidiaries or their respective licensees) in any material respect and the value of maintaining such Intellectual Property does not reasonably justify the cost of doing so;

(g)　　dispositions of investments described in paragraphs (a), (b), (c) and (e) of the definition of the term "Permitted Investment";

(h)　　each Obligor and its Subsidiaries may sell or discount, in each case in the ordinary course of business, accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not as part of any financing transaction and only to the extent that such accounts are not Eligible Accounts;

(i)　　each Obligor and its Subsidiaries may make sales or leases of goods held for sale;

(j)　　the Obligors and their Subsidiaries may consummate the Transactions;

(k)　　[intentionally omitted];

(l)　　each Obligor and its Subsidiaries may make transfers of property subject to casualty or condemnation proceedings upon the occurrence of the related insurance or condemnation event;

(m)　　[intentionally omitted];

(n)　　[intentionally omitted];

(o)　　each Obligor and its Subsidiaries may use cash and cash equivalents to make payments that are otherwise permitted under Sections 9.2.4 and 9.2.7;

(p)　　the Obligors and their Subsidiaries may sell or otherwise dispose of property to the extent that (i) such property is exchanged for credit against the purchase price of

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

similar replacement property or (ii) the proceeds of such sale or disposition are promptly applied to the purchase price of such replacement property;

(q)    dispositions of Investments (including Equity Interests) in Joint Ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the Joint Venture parties set forth in Joint Venture arrangements and similar binding arrangements;

(r)    [intentionally omitted];

(s)    sales and other dispositions of assets of Foreign Subsidiaries;

(t)    [intentionally omitted]; and

(u)    any additional sale and other disposition of assets with a fair market value that, together with the fair market value of all other assets previously sold or disposed pursuant to this clause after the Closing Date, is not in excess at the time of such sale or other disposition of $2,000,000; provided that such sale or other disposition could not reasonably be expected to cause a cessation of production for which inventory has been acquired.

9.2.10    [Intentionally Omitted].

9.2.11    Tax Consolidation.  File or consent to, or permit any Subsidiary of any Obligor to file or consent to, the filing of any consolidated income tax return with any Person other than a Parent Company, Parent, another Borrower and Parent's Subsidiaries.

9.2.12    Organizational Documents.    Agree to, or suffer to occur, any amendment, supplement or addition to its or any of their Subsidiaries' charter, articles or certificate of incorporation, certificate of formation, limited partnership agreement, bylaws, limited liability agreement, operating agreement or other organizational documents (as the case may be) that would be materially adverse to the Lenders in any respect.

9.2.13    Fiscal Year End.  Change, or permit any Subsidiary of any Obligor to change, its fiscal year end.

9.2.14    Negative Pledges.  Enter into any agreement, or permit any Subsidiary of any Obligor to enter into any agreement, (a) limiting the ability of Obligor or any of its Subsidiaries to voluntarily create Liens upon any of its Property, or (b) limiting the ability of any Subsidiary to pay dividends or other distributions with respect to any shares of its Equity Interests or to make or repay loans or advances to any Borrower or any other Subsidiary or to Guarantee Indebtedness of any Borrower or any other Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document or the Indebtedness permitted by Section 9.2.3(f), (ii) clause (a) of the foregoing shall not apply to customary provisions in leases restricting the assignment thereof, (iii) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iv) the foregoing shall not apply to such agreements and restrictions entered into, or binding upon, Foreign Subsidiaries and (v) the foregoing restrictions shall not apply to any such agreement, or restrictions contained therein, if such agreement (or such restrictions) permits the Secured Obligations to be secured by the Collateral.

WEIL:\95250238\4\99980.0025
Detroit_5279807_16

9.2.15  <u>Permitted Activities of Parent</u>.  Parent shall not (a) incur, directly or indirectly, any Indebtedness other than the Indebtedness under the Loan Documents, the DIP Term Loan Agreement and the Prepetition Senior Secured Notes Documents; (b) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than Permitted Encumbrances and the Liens created under the Loan Documents, the Prepetition Senior Secured Notes Documents and the DIP Term Loan Documents; (c) engage in any business or activity or own any assets other than (i) holding 100% of the Equity Interests of Chassix; (ii) performing its obligations and activities incidental thereto under the Loan Documents, the DIP Term Loan Documents and the Prepetition Senior Secured Notes Documents; (iii) making Distributions to the extent permitted by <u>Section 9.2.7</u>; (iv) making Investments in Chassix to the extent permitted by <u>Section 9.2.2(c)</u>; (v) engaging in activities or transactions permitted by <u>Sections 9.2.4</u> and <u>9.2.11</u>; and (vi) issuances of its Equity Interests; (d) consolidate with or merge with or into, or convey, sell, transfer or lease any of its assets to, any Person; (e) sell or otherwise dispose of any Equity Interests of Chassix except to the extent permitted under the Loan Documents; or (f) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

9.2.16  <u>Use of Proceeds</u>.  Use the proceeds of the Loans or Letters of Credit issued pursuant to this Agreement in any way that is not in accordance with <u>Section 8.1.29</u>.

9.2.17  <u>Protection and Maintenance of Intellectual Property</u>.

(a)  abandon, dedicate to the public, or permit to lapse, any Intellectual Property owned by such Obligor or its Subsidiaries, except as permitted by <u>Section 9.2.9(g)</u>;

(b)  except as shall be consistent with its commercially reasonable business judgment: (i) fail to take commercially reasonable action to prosecute infringements, dilutions and other violations of the Intellectual Property owned by such Obligor or its Subsidiaries including commencement of an unstayed suit, and (ii) not settle or compromise any pending or future litigation or administrative proceeding with respect to such Intellectual Property;

(c)  license any Intellectual Property owned by such Obligor or its Subsidiaries, other than licenses which are Permitted Liens, or consent to amend any such Intellectual Property license in a manner that materially and adversely affects the right of such Obligor to receive payments thereunder, or in any manner that would materially impair the Lien on such Intellectual Property owned by such Obligor created pursuant to the Security Documents;

(d)  use proper marking practices in connection with its use of patents and registered trademarks if failure to do so would have an Material Adverse Effect; and

(e)  control the quality of goods and services offered by any licensees of its Trademarks in a manner adequate to preserve the validity of such Trademarks (other than Trademarks which the Obligor or Subsidiary would be permitted to abandon under <u>Section 9.2.9(g)</u>).

9.3  <u>Financial Covenants</u>.

9.3.1  <u>Net Cash Flow</u>.  During the Term, and thereafter until Payment in Full, Obligors jointly and severally covenant that they shall not permit Net Cash Flow as of any Measurement Date and for any applicable Measurement Period to be less than: (x) for each Measurement Period from the Closing Date through May 15, 2015, negative $37,000,000 and (y) for each Measurement Period thereafter, negative $32,000,000.

9.3.2 <u>Minimum Excess Availability</u>. During the Term, and thereafter until Payment in Full, Obligors jointly and severally covenant that they shall not permit (x) the average daily Excess Availability for any five (5) consecutive Business Day period to be less than 10% of the Revolving Loan Commitments during such period or (y) Excess Availability on any day to be less than 5% of the aggregate Revolving Loan Commitment on such day.

## SECTION 10. CONDITIONS PRECEDENT

10.1    <u>Closing Date Conditions Precedent</u>.  This Agreement shall not become effective until the date on which each of the following conditions are satisfied (or waived in accordance with <u>Section 13.1</u>):

(a)    <u>Credit Agreement and Loan Documents</u>.  Agent (or its counsel) shall have received (i) from each party hereto either (A) a counterpart of this Agreement signed on behalf of such party or (B) written evidence reasonably satisfactory to Agent (which may include a facsimile, or other electronic transmission via emailed pdf or other similar format, of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and (ii) (A) such other forms, certificates, documents, instruments and agreements as Agent shall reasonably request in connection with the transactions contemplated by this Agreement and the other Loan Documents, including any Revolving Note requested by a Lender payable to each such requesting Lender and (B) the legal opinion of Weil, Gotshal & Manges LLP, counsel to the Obligors, in form and substance reasonably satisfactory to Agent.

(b)    <u>Financial Statements</u>.  Agent, the Lenders and the Lead Arranger shall have received the Audited Financial Statements and the Unaudited Financial Statements.

(c)    <u>Closing Certificates; Certified Certificate of Incorporation; Good Standing Certificates</u>.  Agent shall have received (i) a certificate of each Obligor, dated the Closing Date and executed by its Secretary or Assistant Secretary, which shall (A) certify the resolutions of its Board of Directors, members or other body authorizing the execution, delivery and performance of the Loan Documents to which it is a party, (B) identify by name and title and bear the signatures of the financial officers and any other officers of each Obligor, as applicable, who are authorized to sign and will sign any Loan Documents to which it is a party and any other documents in connection with the Loan Documents, and (C) contain appropriate attachments, including the certificate or articles of incorporation or organization of the each Obligor, as applicable, certified by the relevant authority of its jurisdiction of organization, and a true and correct copy of its by-laws or operating, management or partnership agreement of such Obligor, as applicable, and (ii) a long form good standing certificate for each Obligor from its jurisdiction of organization.

(d)    <u>Closing Certificate</u>.  Agent shall have received a certificate, signed by a Senior Officer of Parent, on the Closing Date (i) stating that no Default or Event of Default has occurred and is continuing (ii) stating that the representations and warranties set forth herein and in any other Loan Document are true and correct as of the Closing Date; <u>provided</u> that, to the extent such representations and warranties specifically refer to an earlier date, they shall be true and correct as of such earlier date and (iii) certifying true and correct executed copies of the DIP Term Loan Agreement, the Accommodation Agreement, the Customer Agreements and the Access Agreement.

(e)    <u>Fees</u>.  The Lenders, Agent and the Lead Arranger shall have received all fees required to be paid under the Fee Letter, and all expenses (including the reasonable fees and expenses of legal counsel and financial advisors or consultants to Agent, if any) for which invoices have been presented to the Borrower Representative at least 2 Business Days prior to the Closing Date.  All such

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

amounts will be paid with proceeds of Loans made on the Closing Date and will be reflected in the funding instructions given by the Borrower Representative to Agent on or before the Closing Date.

(f)    No Injunction, etc.  There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Borrower) threatened in any court or before any arbitrator or governmental instrumentality (other than the Cases) that could reasonably be expected to have a Material Adverse Effect.

(g)    13-Week Projection; 21-Week Budget; and Full Term Budget.  (i) The initial 13-Week Projection, (ii) the 21-Week Budget, and (ii) the Full Term Budget, in each case, in form and substance reasonably satisfactory to Agent, shall have been received by Agent.

(h)    Bank Regulatory Information.  Agent, the Lenders and the Lead Arranger shall have received all documentation and other information about the Obligors as has been reasonably requested in writing by them at least five (5) Business Days prior to the Closing Date and that Agent, any Lender or any Lead Arranger reasonably determines is required by regulatory authorities for it to comply with applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act.

(i)    No Material Adverse Effect.  Since December 31, 2014, no event, change, condition or development has occurred that has had or could reasonably be expected to have a Material Adverse Effect.

(j)    Prepetition ABL Credit Agreement.  On the Closing Date, after giving effect to the Transactions, the Obligors and their respective Subsidiaries shall have (i) repaid in full the Prepetition ABL Credit Agreement (it being understood and agreed that the Prepetition Letters of Credit shall be cash collateralized on terms reasonably satisfactory to Agent), (ii) terminated any commitments to lend or make other extensions of credit thereunder, (iii) delivered to Agent all documents or instruments necessary to release all Liens securing the Prepetition ABL Credit Agreement and (iv) no Indebtedness other than Indebtedness permitted pursuant to Section 9.2.3.

(k)    DIP Term Loan.  The DIP Term Loan Agreement, in form and substance reasonably satisfactory to Agent, shall, subject to the entry of the Interim Order, become effective substantially concurrently with DIP ABL Facility; provided, that at least $80,000,000 of the DIP Term Facility shall be funded substantially concurrently with the DIP ABL Facility.

(l)    Cash Management; Amendments to Deposit Account Control Agreement.  Agent shall be satisfied, in its reasonable discretion, with the cash management arrangements of the Obligors (it being understood and agreed that the cash management arrangements of the Obligors in effect immediately prior to the Closing Date are reasonably satisfactory to Agent).  Agent shall have received amendments to the existing Deposit Account Control Agreements in form and substance satisfactory to Agent.

(m)    Interim Order Entry Date.  The Interim Order Entry Date shall have occurred prior to the Closing Date and not later than  five (5) Business Days following the Petition Date, and the Interim Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to Agent and shall not be subject to a stay.

(n)    First Day Orders.  The First Day Orders sought by the Borrowers and entered on the Closing Date (including a cash management order) shall be reasonably satisfactory to Agent.

(o)    <u>Liens</u>.  All of the Liens described in <u>Section 6.4</u> shall have been created and perfected upon entry of the Interim Order without the necessity of the execution, recordation of filings by the Debtors of, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by Agent of, or over, any Collateral, as set forth in the Interim Order.  The Interim Order shall have been effective to create the relative priorities of the Liens described in <u>Section 6.4</u> with respect to the Collateral.  The automatic stay under the Bankruptcy Code shall have been automatically vacated, subject to the terms of the Interim Order, to permit enforcement of the Secured Parties' rights and remedies under this Agreement and the other Loan Documents.

(p)    <u>No Trustee</u>.  No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases.

(q)    <u>Borrowing Base Certificate</u>.  Agent shall have received an executed Borrowing Base Certificate reasonably satisfactory to Agent, demonstrating Excess Availability of not less than $55,000,000 after giving effect to any contemplated use of proceeds on the Closing Date.

(r)    <u>Accommodation Agreement, Customer Agreements and Access Agreement</u>.  The parties thereto shall have executed the Accommodation Agreement, Customer Agreements and the Access Agreement, in each case, in form and substance reasonably satisfactory to Agent and each of such agreements shall be in full force and effect and the Bankruptcy Court shall have entered an order approving the same.

(s)    <u>Restructuring Advisors</u>.  The Borrowers shall have continued to retain restructuring advisors acceptable to Agent (it being understood and agreed that Lazard Frères & Co. LLC and FTI Consulting, Inc. are acceptable to Agent).

(t)    <u>Restructuring Support Agreement</u>.  The Borrowers shall have entered into a Restructuring Support Agreement with holders of at least (i) 60% in principal claim amount of the Prepetition Senior Secured Notes and (ii) 66 2/3% in principal claim amount of the Holdings PIK Notes in respect of an Acceptable Reorganization Plan, and such Restructuring Support Agreement shall not have been terminated by any party thereto or amended, supplemented or otherwise modified in a manner that is materially adverse to the Lenders.

(u)    <u>OEM Customer Permitted Resourcings</u>.  The Borrowers shall have provided a list of Permitted Resourcings (as defined in the Accommodation Agreement).

10.2    <u>Conditions Precedent to All Loans and Credit Accommodations</u>.  No Lender shall be required to make any Loan, nor shall any LC Issuer be required to issue, amend, renew or extend, any Letter of Credit unless and until the following conditions are satisfied:

(a)    <u>No Default or Event of Default</u>.  At the time of and immediately after giving effect to such Loan or the issuance, amendment, renewal or extension of such Letter of Credit, as applicable, no Default or Event of Default shall have occurred and be continuing.

(b)    <u>Representations and Warranties</u>.  The representations and warranties of the Obligors set forth in the Loan Documents shall be true and correct in all material respects with the same effect as though made on and as of the date of such Borrowing or the date of issuance, amendment, renewal or extension of such Letter of Credit, as applicable (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true

94

and correct in all material respects only as of such specified date, and that any representation or warranty which is subject to any materiality qualifier shall be required to be true and correct in all respects).

(c)    Availability.    After giving effect to such Loan or the issuance, amendment, renewal or extension of such Letter of Credit, Borrowers shall be in compliance with the Revolving Exposure Limitations.

(d)    Orders.    The Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the written consent of Agent, provided, that at the time of the making of any Loan or the issuance of any Letter of Credit the aggregate amount of either of which, when added to the Revolving Credit Outstandings, would exceed the amount under the DIP ABL Facility authorized by the Interim Order (collectively, the "Additional Credit"), Agent and each of the Lenders shall have received the Final Order and at the time of the extension of any Additional Credit the Final Order shall be in full force and effect, and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the written consent of Agent.

(e)    No Injunction.    The making of such Loan (or the issuance of such Letter of Credit) shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

Each Loan and each issuance, amendment, renewal or extension of a Letter of Credit shall be deemed to constitute a representation and warranty by Borrowers on the date thereof as to the matters specified in paragraphs (a), (b), (c), (d) and (e) of this Section 10.2.

Notwithstanding the failure to satisfy the conditions precedent set forth in paragraphs (a) or (b) of this Section 10.2, unless otherwise directed by the Majority Lenders, Agent may, but shall have no obligation to, continue to make Loans and any LC Issuer may, but shall have no obligation to, issue or cause to be issued any Letter of Credit for the ratable account and risk of the Lenders from time to time if Agent believes that making such Loans or issuing or causing to be issued any such Letter of Credit is in the best interests of the Lenders.

## SECTION 11. EVENTS OF DEFAULT; RIGHTS AND REMEDIES ON DEFAULT

11.1    Events of Default.    The occurrence of one or more of the following events shall constitute an "Event of Default":

11.1.1    Payment of Obligations.    Borrowers shall fail to pay any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise).

11.1.2    Misrepresentations.    Any representation, warranty or other statement made, deemed made, or furnished to Agent or any Lender by or on behalf of any Obligor or any of their respective Subsidiaries in connection with any Loan Document (including any amendment or modification thereof, or any waiver thereunder) or any document, instrument, certificate or financial statement furnished pursuant to or in connection with or in reference thereto or any transaction contemplated hereby or thereby, in each case proves to have been false or misleading in any material respect when made, deemed made, furnished or reaffirmed pursuant to Section 8.1 hereof.

11.1.3    Breach of Specific Covenants.    Any Obligor shall fail or neglect to perform, keep or observe any covenant, condition or agreement contained in Sections 3.11 (Defaulting Lender), 6.2 (Other Collateral), 6.3 (Lien Perfection; Further Assurances), 6.4 (Priority and Liens), 6.5 (Change of

Name or Location), <u>7.1.1</u> (Location of Collateral), <u>7.1.2</u> (Insurance of Collateral), <u>7.2.5</u> (Collection of Accounts; Proceeds of Collateral), <u>9.1.1</u> (Visits and Inspections; Lender Meeting), <u>9.1.2</u> (Notices), <u>9.1.3</u> (Financial Statements), <u>9.1.4</u> (Borrowing Base Certificates), <u>9.1.5</u> (Existence; Conduct of Business), <u>9.1.14</u> (Deposit Accounts; Lockboxes; Securities Accounts) <u>9.2</u> (Negative Covenants), and <u>9.3</u> (Financial Covenants) hereof on the date that such Obligor is required to perform, keep or observe such covenant.

           11.1.4  <u>Breach of Other Covenants</u>.  Any Obligor shall fail or neglect to perform, keep or observe any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than a covenant, condition or agreement which is dealt with specifically elsewhere in <u>Section 11.1</u> hereof) and the breach or failure is not cured within 15 days after the earlier to occur of any Obligor's receipt of notice of such breach or failure from Agent (which notice shall be given at the request of any Lender) or the date on which such failure or neglect first becomes known to any Senior Officer of any Obligor.

           11.1.5  <u>DIP Term Loan Facility</u>.  (a) Any Obligor or any of their respective Subsidiaries shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Indebtedness under the DIP Term Loan Facility, or (b) there shall occur any Event of Default (as defined in the DIP Term Loan Agreement) under the DIP Term Loan Documents.

           11.1.6  <u>Other Defaults</u>.  (a) Any Obligor or any of their respective Subsidiaries shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Indebtedness under any other Indebtedness (other than the Obligations and the Prepetition Senior Secured Notes) with an outstanding principal balance in excess of $5,000,000, when and as the same shall become due and payable and such failure continues beyond all grace periods applicable thereto, or (b) there shall occur any default or event of default on the part of any Obligor or any of their respective Subsidiaries under any agreement, document or instrument to which such Obligor or such Subsidiary is a party or by which such Obligor or such Subsidiary or any of its Property is bound, evidencing or relating to any Indebtedness (other than the Obligations and the DIP Term Loan Facility) with an outstanding principal balance in excess of $5,000,000, which default or event of default continues beyond all grace and notice periods applicable thereto and, as a result thereof, the payment or maturity of such Indebtedness is or is permitted to be accelerated in consequence of such default or event of default or demand for payment of such Indebtedness is made or is permitted to be made in accordance with the terms thereof, or any event or condition shall occur which results in any such Indebtedness becoming due prior to its scheduled maturity or that enables or permits the holders thereof (or a trustee, agent or other representative on their behalf) to require the repayment, repurchase or redemption thereof; <u>provided</u> that this <u>Section 11.1.5</u> shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness, or (c) there occurs under any Hedging Agreement an Early Termination Date (as defined in such Hedging Agreement) resulting from (i) any event of default under such Hedging Agreement as to which an Obligor or any Subsidiary thereof is the Defaulting Party (as defined in such Hedging Agreement) or (ii) any Termination Event (as so defined) under such Hedging Agreement as to which an Obligor or any Subsidiary thereof is an Affected Party (as so defined) and, in either event, (x) the Hedge Termination Value owed by such Obligor or such Subsidiary as a result thereof is in excess of $5,000,000 and (y) the counterparty under the applicable Hedging Agreement could or is permitted to demand payment of such Hedge Termination Value.

           11.1.7  <u>Invalidity of Loan Documents</u>.  Any Loan Document or any provision thereof for any reason ceases to be valid, binding and enforceable against the applicable Obligor in accordance with its terms (or any Obligor shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the

Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms).

11.1.8  Security Documents.  Any lien securing the Obligations shall cease to be (or shall be asserted by the Obligors not to be) valid, perfected (if applicable) and enforceable in all respects or to have the priority granted under the Interim Order and the Final Order or (ii) any Superpriority Claim in respect of the Obligations shall cease to be (or shall be asserted by the Obligors not to be) valid, perfected (if applicable) and enforceable in all respects or to have the priority granted under the Interim Order and the Final Order.

11.1.9  [Intentionally omitted].

11.1.10  [Intentionally omitted].

11.1.11  ERISA.  One or more ERISA Events occurs with respect to any Plan or any event similar to the foregoing occurs or exists with respect to one or more Foreign Plans.

11.1.12  Judgments.  One or more money judgments (including any writ of attachment or similar processes) with respect to any post-petition liability (collectively, "Judgments") are issued or rendered against any Obligor, any of their respective Subsidiaries, or any of their respective Property (i) in the case of money judgments that arose post-petition, in an aggregate amount of $5,000,000 or more for all such Judgments in the aggregate, in each case not paid or covered by insurance from a reputable insurer who has not disclaimed coverage or by an indemnity from an investment-grade (i.e., rated Baa3 or better by Moody's and BBB- or better by S&P) indemnitor which Judgment is not stayed, bonded over, released or discharged within 60 days, and (ii) in the case of non-monetary Judgments, such Judgment or Judgments (in the aggregate) could reasonably be expected to have a Material Adverse Effect, in each case which Judgment is not stayed, bonded over, released or discharged within 60 days.

11.1.13  Accommodation Agreement and Customer Agreements.  (v) Any default under, amendment or modification to, or termination of the Accommodation Agreement that results in an amendment or modification to, or a termination of the set-off waiver provisions (as set forth in the Accommodation Agreement) occurs without the consent of Agent (w) the Term of the Accommodation Agreement expires (x) any  Permitted Resourcing (as defined in the Accommodation Agreement) without the prior written consent of the Agent, or (y) any Designated OEM Party repudiates its obligations under the Access Agreement or Accommodation Agreement with respect to the inventory purchase backstop or the set-off waiver provisions (each as set forth in the Access Agreement and the Accommodation Agreement, respectively) or (z) there shall occur any material default under the Customer Agreements or amendment or modification to the Customer Agreements in any manner that is adverse to the Agent and Lenders.

11.1.14  Access Agreement.  There shall occur any default under the Access Agreement or any amendment or modification to the Access Agreement in any manner that is adverse to the Agent and Lenders.

11.1.15  Restructuring Support Agreement.  There shall occur any breach or default by any Obligor with respect to any terms of the Restructuring Support Agreement.

11.1.16  Dismissal or Conversion of Cases.

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

(a)    Any of the Cases of the Debtors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code,

(b)    A trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases of the Debtors;

(c)    An order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Obligors;

(d)    Any Debtor, or any person on behalf of any Debtor, shall file a motion or other pleading seeking, or otherwise consenting to, any of the matters set forth in clauses (a) through (c) above or the granting of any other relief that if granted would give rise to an Event of Default; or

(e)    Any Obligor or any of its Subsidiaries, or any person claiming by or through any Obligor any of its Subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Agent or any of the Lenders relating to the DIP ABL Facility.

11.1.17    <u>Superpriority Claims</u>.  The existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of the DIP ABL Facility and the Carve-Out or as otherwise permitted hereunder or under the other Loan Documents, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code pari passu with or senior to the claims of Agent and the Lenders, or there shall arise or be granted by the Bankruptcy Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out) or (ii) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except, in each case, as expressly provided in the Loan Documents or in the Order then in effect.

11.1.18    <u>Relief from Stay</u>.  The Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including the automatic stay applicable under Section 362 of the Bankruptcy Code) to the holder or holders of any security interest to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Debtors which have a value in excess of $10,000,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole).

11.1.19    <u>Certain Orders</u>.

(i)    The Final Order Entry Date shall not have occurred by the date that is 30 days (or 45 days, if entry of the Final Order is delayed by any requirements as a result of an evidentiary hearing or similar hearing or process associated with objections being made to entry of the Interim Order or the Final Order) following the Interim Order Entry Date;

(ii)    an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim Order or the Final Order, or Parent or any Subsidiary of Parent shall apply for authority to do so, without the prior written consent of Agent;

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

     (iii) an order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Obligors;

     (iv) the Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Agent and the Majority Lenders;

     (v) any of the Obligors shall fail to comply with the Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date);

     (vi) an order in the Cases shall be entered charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders that becomes a final non-appealable order or the commencement of other actions that is materially adverse to Agent, the Lenders or their respective rights and remedies under the DIP ABL Facility in any of the Cases or inconsistent with any of the Loan Documents; or

     (vii) if the Final Order does not include a waiver, in form and substance satisfactory to Agent, of the right to surcharge the Collateral under Section 506 (c) of the Bankruptcy Code.

  11.1.20 <u>Invalid Plan</u>.  A Reorganization Plan that is not an Acceptable Reorganization Plan shall be confirmed in any of the Cases of the Debtors, or any order shall be entered which dismisses any of the Cases of the Debtors and which order does not provide for termination of the Revolving Loan Commitments and payment in full in cash of the Obligations under the Loan Documents (other than contingent indemnification obligations not yet due and payable), or any of the Obligors or their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order.

  11.1.21 <u>Milestones</u>.  Failure to satisfy any of the following milestones:

     (a) by no later than five days following the Petition Date (or such later date agreed to by Agent), Chassix shall file with the Bankruptcy Court in the Cases a proposed Acceptable Reorganization Plan and a motion seeking approval of a disclosure statement for such Acceptable Reorganization Plan and solicitation procedures contemplating completion of a confirmation hearing which disclosure statement and solicitation procedures must otherwise be in form and substance reasonably acceptable to Agent;

     (b) by no later than 45 days following the Petition Date (or such later date agreed to by Agent), the Bankruptcy Court shall have entered an order approving a disclosure statement for an Acceptable Reorganization Plan and solicitation procedures contemplating completion of a confirmation hearing, which disclosure statement and solicitation procedures must otherwise be in form and substance reasonably acceptable to Agent, and the Bankruptcy Court's approval of such disclosure statement and solicitation procedures shall not have been amended, modified or supplemented (or any portions thereof reversed, stayed or vacated) other than as agreed in writing by Agent;

     (c) by no later than June 30, 2015 (or such later date agreed to by Agent), the Bankruptcy Court shall have entered an order confirming an Acceptable Reorganization Plan, which order

shall be in form and substance reasonably acceptable to Agent and shall not have been amended, modified or supplemented (or any portions thereof reversed, stayed or vacated) other than as agreed in writing by Agent; or

    (d)    by no later than July 17, 2015 (or such later date agreed to by Agent), the effective date of an Acceptable Reorganization Plan shall have occurred, and the order confirming the Acceptable Reorganization Plan shall not have been amended, modified or supplemented (or any portions thereof reversed, stayed or vacated) other than as agreed in writing by Agent.

    11.1.22  <u>Supportive Actions</u>.  Any Obligor or any Subsidiary thereof shall take any action in support of any matter set forth in <u>Section 11.1.13</u> through <u>Section 11.1.20</u> or any other Person shall do so and such application is not contested in good faith by the Obligors and the relief requested is granted in an order that is not stayed pending appeal.

    11.1.23  <u>Other Actions</u>.  Any Obligor or any Subsidiary thereof, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding seeking, or otherwise consenting to (i) the invalidation, subordination or other challenging of the Superpriority Claims and Liens granted to secure the Obligations or any other rights granted to the Agent and the Lenders in the Orders or this Agreement or (ii) any relief under section 506(c) of the Bankruptcy Code with respect to any Collateral.

    11.1.24  <u>Challenges</u>.  Any Obligor shall challenge, support or encourage a challenge of any payments made to the Agent or any Lender with respect to the Obligations, other than to challenge the occurrence of a Default or Event of Default.

    11.1.25  <u>Adequate Protection Motion</u>.  Without the consent of the Majority Lenders, the filing of any motion by the Obligors seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any prepetition agent or lender that is inconsistent with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date).

    11.1.26  <u>Section 364 Financing</u>.  Without the Agent's and the Majority Lenders' consent, the entry of any order by the Bankruptcy Court granting, or the filing by any Obligor or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral in a manner inconsistent with the use of proceeds requirements in this Agreement and without the Agent's consent or to obtain any financing under section 364 of the Bankruptcy Code other than the facility hereunder and the DIP ABL Facility unless such motion or order contemplates Payment in Full in cash of the Obligations immediately upon consummation of the transactions contemplated thereby.

    11.1.27  <u>Asset Sale Motion</u>.  Any Obligor or any person on behalf of any Obligor shall file any motion seeking authority to consummate a sale of assets of the Obligors or the Collateral having a value in excess of $5,000,000 outside the ordinary course of business and not otherwise permitted hereunder;

    11.1.28  <u>Restriction on Business</u>.  If any Obligor or any of its Subsidiaries (other than Excluded Subsidiaries) is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any part of the business affairs of Obligors and their Subsidiaries, taken as a whole, which could reasonably be expected to have a Material Adverse Effect; provided, that the Obligors shall have

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

(5) Business Days after the entry of such order to obtain a court order vacating, staying or otherwise obtaining relief from the Bankruptcy Court or another court to address any such court order.

11.1.29  <u>Prepetition Indebtedness Payment</u>.   Any Obligor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition Indebtedness or payables other than payments (i) in respect of accrued payroll and related expenses as of the commencement of the Cases, (ii) in respect of certain creditors and (iii) permitted under this Agreement, in each case, to the extent authorized by one or more First Day Orders and consistent with the Budget.

11.2    <u>Acceleration of the Obligations</u>.   Upon or at any time after the occurrence and during the continuance of an Event of Default, Agent may, and at the request of the Majority Lenders shall, by notice to the Borrower Representative, take either or both of the following actions, at the same or different times: (i) terminate the Revolving Loan Commitments, and thereupon the Revolving Loan Commitments shall terminate immediately, (ii) declare the Loans then outstanding to be due and payable, and (iii) require Borrowers to Cash Collateralize any Letters of Credit then outstanding consistent with the requirements of <u>Section 3.4 (b)</u> and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of Borrowers accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Borrowers.

11.3    <u>Other Remedies</u>.   Upon the occurrence and during the continuance of an Event of Default, Agent may, and at the request of the Majority Lenders shall, exercise from time to time the following other rights and remedies; provided that with respect to the enforcement of Liens or other remedies with respect to the Collateral, the Agent shall provide Borrowers prior notice to the extent required by and in accordance with the Order:

11.3.1  <u>Generally</u>.   All of the rights and remedies (a) provided to Agent or Lenders under the Loan Documents, (b) of a secured party under the UCC, (c) under other applicable law, and (d) all other legal and equitable rights to which Agent or Lenders may be entitled, all of which rights and remedies shall be cumulative and shall be in addition to any other rights or remedies contained in this Agreement or any of the other Loan Documents, and none of which shall be exclusive.

11.3.2  <u>Possession</u>.   Subject to any Intercreditor Arrangements, the right to take immediate possession of the Collateral, and to (a) require each Obligor to assemble the Collateral, at Borrowers' expense, and make it available to Agent at a place designated by Agent which is reasonably convenient to both parties, and (b) enter any premises where any of the Collateral shall be located and to keep and store the Collateral on said premises until sold (and if said premises be the Property of Parent or any Subsidiary of Parent, Parent agrees not to charge, or permit any of its Subsidiaries to charge, Agent for storage thereof).

11.3.3  <u>Sales; Assignments; Etc</u>.   Subject to any Intercreditor Arrangements, the right to sell, assign, grant a license to use or otherwise dispose of all or any Collateral in its then condition, or after any further manufacturing or processing thereof, at public or private sale or sales, with such notice as may be required by law, in lots or in bulk, for cash or on credit, all as Agent, in its sole discretion, may deem advisable.   Agent may, at Agent's option, disclaim any and all warranties regarding the Collateral in connection with any such sale.   Borrowers agree that 10 days' written notice to Borrower Representative of any public or private sale or other disposition of Collateral shall be reasonable notice thereof, and such sale shall be at such locations as Agent may designate in said notice.   Agent shall have the right to conduct such sales on Parent's or any of its Subsidiaries' premises, without charge therefor, and such sales may be adjourned from time to time in accordance with applicable law.   Subject to any Intercreditor

Arrangements, Agent shall have the right to sell, assign, grant a license to use, lease or otherwise dispose of the Collateral, or any part thereof, for cash, credit or any combination thereof, and Agent, on behalf of Lenders, may purchase all or any part of the Collateral at public or, if permitted by law, private sale and, in lieu of actual payment of such purchase price, may set off the amount of such price against the Secured Obligations.  The proceeds realized from the sale of any Collateral shall be applied, after allowing 2 Business Days for collection, as provided for in <u>Section 4.4.2</u>.  If any deficiency shall arise, each Borrower and each Guarantor shall remain jointly and severally liable to Agent and Lenders therefor.

11.3.4  <u>Commercially Reasonable</u>.  To the extent that Applicable Law imposes duties on Agent to exercise remedies in a commercially reasonable manner, each Borrower acknowledges and agrees that it is not commercially unreasonable for Agent: (i) to fail to incur expenses reasonably deemed significant by Agent to prepare Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition; (ii) to fail to obtain third party consents for access to Collateral to be disposed of, or to obtain or, if not required by other law, to fail to obtain governmental or third party consents for the collection or disposition of Collateral to be collected or disposed of; (iii) to fail to exercise collection remedies against Customers or other Persons obligated on Collateral or to remove Liens on or any adverse claims against Collateral; (iv) to exercise collection remedies against Customers and other Persons obligated on Collateral directly or through the use of collection agencies and other collection specialists; (v) to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature; (vi) to contact other Persons, whether or not in the same business as any Borrower, for expressions of interest in acquiring all or any portion of such Collateral; (vii) to hire one or more professional auctioneers to assist in the disposition of Collateral, whether or not the Collateral is of a specialized nature; (viii) to dispose of Collateral by utilizing internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets; (ix) to dispose of assets in wholesale rather than retail markets; (x) to disclaim disposition warranties, such as title, possession or quiet enjoyment, (xi) to purchase insurance or credit enhancements to insure Agent against risks of loss, collection or disposition of Collateral or to provide to Agent a guaranteed return from the collection or disposition of Collateral; or (xii) to the extent deemed appropriate by the Agent, to obtain the services of other brokers, investment bankers, consultants and other professionals to assist Agent in the collection or disposition of any of the Collateral.  Each Borrower acknowledges that the purpose of this Section 11.3.4 is to provide non-exhaustive indications of what actions or omissions by Agent would not be commercially unreasonable in Agent's exercise of remedies against the Collateral and that other actions or omissions by Agent shall not be deemed commercially unreasonable solely on account of not being indicated in this Section 11.3.4.  Without limitation upon the foregoing, nothing contained in this Section 11.3.4  shall be construed to grant any rights to any Borrower or to impose any duties on Agent that would not have been granted or imposed by this Agreement or by Applicable Law in the absence of this Section 11.3.4.

11.3.5  <u>Cash Collateral</u>.  Agent may, at its option, require Borrowers to Cash Collateralize the Maximum Undrawn Amount and, if Borrowers fail to promptly do so, Agent may advance such amount as a Revolving Credit Loan.  Each such Revolving Credit Loan shall be secured by all of the Collateral and shall constitute a Base Rate Loan.  Any such Cash Collateral or advance shall be held by Agent as a reserve to fund future payments on such and future drawings against such Letters of Credit.  At such time as all have been paid or terminated and all Letters of Credit have been drawn upon or expired, any amounts remaining in such reserve shall be applied against any outstanding Secured Obligations, or, if all Secured Obligations have been paid in full in cash, returned to Borrowers.

11.4    <u>Grant of License</u>.  Each Obligor and its Subsidiaries hereby grants to Agent and its agents, representatives and designees an irrevocable, non-exclusive license or other right to make, have made, affix to goods, use, sell, copy, distribute, perform, make derivative works of, publish, license or

sub-license and otherwise exploit in any manner, without payment of royalty or other compensation to any Obligor or Subsidiary, Obligor's and each of its Subsidiaries' Intellectual Property and Computer Hardware and Software, brochures, customer lists, promotional and advertising materials, labels, packaging materials, rights of use of any name and other Property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral.  Agent agrees to generally maintain the quality of products and services offered under any trademarks and service marks covered by the foregoing license at a level at least substantially consistent with the levels in effect immediately prior to the Event of Default but Agent shall have no liability for failure to maintain such quality in the absence of its gross negligence or willful misconduct, as determined by a final non-appealable order of a court of competent jurisdiction..  Each Obligor's and each of its Subsidiaries' rights and interests under Intellectual Property, including all licenses and franchise agreements, shall inure to Agent's benefit.  Agent covenants and agrees that it shall forebear from exercising the foregoing license unless and until the occurrence and during the continuance of an Event of Default.

11.5    Setoff and Sharing of Payments.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, during the continuance of any Event of Default, each Lender and each of its Affiliates is hereby authorized by Obligors at any time or from time to time, to the fullest extent permitted by law, with prior written consent of Agent and with reasonably prompt subsequent notice to Borrower Representative (any prior or contemporaneous notice to Obligors being hereby expressly waived) to setoff and to appropriate and to apply any and all (i) deposits (general or special, time or demand, provisional or final) at any time held by such Lender or Affiliate at any of its offices for the account of any Obligor or any of its Subsidiaries (regardless of whether such deposits are then due to an Obligor or its Subsidiaries), and (ii) other property at any time held or owing by such Lender or Affiliate to or for the credit or for the account of any Obligor or any of its Subsidiaries, in each case against and on account of any of and all of the Obligations held by such Lender or Affiliate, irrespective of whether or not such Lender or Affiliate shall have made any demand under the Loan Documents and although such obligations may be unmatured.  Any Lender exercising a right to setoff shall, to the extent the amount of any such setoff exceeds its Revolving Loan Percentage of the amount set off, purchase for cash (and the other Lenders shall sell) interests in each such other Lender's *pro rata* share of the Obligations as would be necessary to cause such Lender to share such excess with each other Lender in accordance with their respective Revolving Loan Percentages.  Each Obligor agrees, to the fullest extent permitted by law, that any Lender may exercise its right to set off with respect to amounts in excess of its pro rata share of the Obligations and upon doing so shall deliver such excess to Agent for the benefit of all Lenders in accordance with the Revolving Loan Percentages.

11.6    Remedies Cumulative; No Waiver.  All covenants, conditions, provisions, warranties, guaranties, indemnities, and other undertakings of Obligors contained in this Agreement and the other Loan Documents, or in any document referred to herein or contained in any agreement supplementary hereto or in any Schedule or in any Guaranty Agreement given to Agent or any Lender or contained in any other agreement between any Lender and Obligors or between Agent and Obligors heretofore, concurrently, or hereafter entered into, shall be deemed cumulative to and not in derogation or substitution of any of the terms, covenants, conditions, or agreements of Obligors herein contained.  The failure or delay of Agent or any Lender to require strict performance by Obligors of any provision of this Agreement or to exercise or enforce any rights, Liens, powers, or remedies hereunder or under any of the aforesaid agreements or other documents or security or Collateral shall not operate as a waiver of such performance, Liens, rights, powers and remedies, but all such requirements, Liens, rights, powers, and remedies shall continue in full force and effect until all Loans and other Obligations owing or to become owing from Obligors to Agent and each Lender have been fully satisfied.  None of the undertakings, agreements, warranties, covenants and representations of Obligors contained in this Agreement or any of the other Loan Documents and no Default or Event of Default by Obligors under this Agreement or any

other Loan Documents shall be deemed to have been suspended or waived by Lenders, unless such suspension or waiver is by an instrument in writing specifying such suspension or waiver and is signed by a duly authorized representative of Agent and directed to Obligors.

## SECTION 12. AGENT

12.1    <u>Authorization and Action</u>.  Each Lender, each LC Issuer and each Swingline Lender hereby irrevocably appoints PNC as Agent hereunder and authorizes Agent to take such action on its behalf, including execution of the Loan Documents, as applicable, and to exercise such powers under this Agreement and the other Loan Documents as are delegated to Agent by the terms hereof and thereof, together with such actions and powers as are reasonably incidental thereto.  Each Lender hereby acknowledges that Agent shall not have by reason of this Agreement assumed a fiduciary relationship in respect of any Lender.  Without limiting the generality of the foregoing, Agent shall have the sole and exclusive authority to (a) act as the disbursing and collecting agent for Lenders with respect to all payments and collections arising in connection with the Loan Documents, (b) execute and deliver as Agent each Loan Document, including any intercreditor or subordination agreements, and accept delivery of each Loan Document from any Obligor or other Person and to perform all of its undertakings and obligations thereunder, (c) act as collateral agent for the Secured Parties for purposes of perfecting and administering Liens under the Loan Documents, and for all other purposes stated therein, (d) manage, supervise or otherwise deal with Collateral, and (e) take any action or otherwise exercise any rights or remedies with respect to any Collateral under the Loan Documents, Requirements of Law or otherwise. In performing its functions and duties under this Agreement, Agent shall act solely as agent of Lenders, and shall not assume, or be deemed to have assumed, any obligation toward, or relationship of agency or trust with or for, Obligors.  As to any matters not expressly provided for by this Agreement and the other Loan Documents (including collection of the Revolving Credit Note), Agent may, but shall not be required to, exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Majority Lenders, whenever such instruction shall be requested by Agent or required hereunder, or a greater or lesser number of Lenders if so required hereunder or under any other Loan Document, and such instructions shall be binding upon all Lenders; <u>provided</u>, that Agent shall not be required and shall be fully justified in failing or refusing to take any action which exposes Agent to any liability or which is contrary to this Agreement, the other Loan Documents or applicable law, unless Agent is indemnified to its satisfaction by the other Lenders against any and all liability and expense which it may incur by reason of taking or continuing to take any such action.  If Agent seeks the consent or approval of the Majority Lenders (or a greater or lesser number of Lenders as required in this Agreement or any other Loan Document), with respect to any action hereunder, Agent shall send notice thereof to each Lender and shall notify each Lender at any time that the Majority Lenders (or such greater or lesser number of Lenders) have instructed Agent to act or refrain from acting pursuant hereto.

12.2    <u>Agent's Reliance, Etc</u>.  Neither Agent, any Affiliate of Agent, nor any of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Agreement or the other Loan Documents, except for its or their own gross negligence or willful misconduct as determined by a final non-appealable order of a court of competent jurisdiction.  Without limitation of the generality of the foregoing, Agent:  (i) may treat each Lender party hereto as the holder of Obligations until Agent receives an executed Assignment and Acceptance Agreement from such Lender; (ii) may consult with legal counsel (who may be counsel for the Obligors), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (iii) makes no warranties or representations to any Lender and shall not be responsible to any Lender for any recitals, statements, warranties or representations made in or in connection with this Agreement or any other Loan Documents or in any certificate, report, or other

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

document referred to or provided for in or received by Agent under or in connection with this Agreement or the other Loan Documents or for any failure of the Obligors to perform their obligations hereunder; (iv) shall not have any duty beyond Agent's customary practices in respect of loans in which Agent is the only lender, to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of Obligors, to inspect the property (including the books and records) of Obligors, to monitor the financial condition of Obligors or to ascertain the existence or possible existence or continuation of any Default or Event of Default; (v) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; (vi) shall not be liable to any Lender for any action taken, or inaction, by Agent pursuant to the terms hereof upon the instructions of Majority Lenders (or a greater or lesser number of Lenders if so required hereunder or under any other Loan Document) or refraining to take any action pending such instructions; (vii) shall not be liable for any apportionment or distributions of payments made by it in good faith pursuant to Section 4 hereof; (viii) shall incur no liability under or in respect of this Agreement or the other Loan Documents by acting upon any notice, consent, certificate, message or other instrument or writing (which may be by telephone, facsimile, telegram, cable, e-mail or other electronic transmission) believed in good faith by it to be genuine and signed or sent by the proper party or parties; and (ix) may assume that no Default or Event of Default has occurred and is continuing, unless Agent has actual knowledge of the Default or Event of Default, has received notice from any Obligor or Parent's independent certified public accountants stating the nature of the Default or Event of Default, or has received notice from a Lender or LC Issuer stating the nature of the Default or Event of Default and that such Lender or LC Issuer considers the Default or Event of Default to have occurred and to be continuing.  In the event any apportionment or distribution described in clause (vii) above is determined to have been made in error, the sole recourse of any Person to whom payment was due but not made shall be to recover from the recipients of such payments any payment in excess of the amount to which they are determined to have been entitled.  Agent shall not be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.  In no event shall Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, future changes in applicable law or regulation, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that Agent shall use reasonable efforts consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

12.3    Rights of Agent as a Lender.  The Person serving as Agent hereunder shall have the same rights and powers under this Agreement and the other Loan Documents in its capacity as a Lender as any other Lender and may exercise the same as though it were not Agent; and the terms "Lender," "Lenders," "Majority Lenders," and "Super-Majority Lenders" shall, unless otherwise expressly indicated, include such Person in its individual capacity as a Lender.  The Person serving as Agent hereunder may accept deposits from, lend money to, and generally engage in any kind of business with, Obligors or any Subsidiary of an Obligor or other Affiliate thereof, all as if it were not Agent and without any duty to account therefor to any other Lender.

12.4    Lender Credit Decision.  Each Lender acknowledges that it has, independently and without reliance upon Agent or any other Lender and based on the financial statements referred to herein and such other documents and information as it has deemed appropriate, made its own investigation into the financial condition and affairs of the Obligors, credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon Agent

or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder. Agent shall not have any duty or responsibility, either initially or on an ongoing basis, to provide any Lender with any credit or other similar information regarding Obligors.

12.5    Indemnification.  Lenders agree to indemnify Agent (to the extent not reimbursed by Obligors), in accordance with their respective Revolving Loan Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against Agent in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted by Agent under this Agreement or any other Loan Document; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Agent's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final non-appealable judgment). Without limitation of the foregoing, each Lender agrees to reimburse Agent promptly upon demand for its ratable share, as set forth above, of any out-of-pocket expenses (including attorneys' fees) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiation, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement and each other Loan Document, to the extent that Agent is not reimbursed for such expenses by Obligors.  The obligations of Lenders under this Section 12.5 shall survive the Payment in Full and the termination of this Agreement.  If after payment and distribution of any amount by Agent to Lenders, any Lender or any other Person, including Obligors, any creditor of any Obligor, a liquidator, administrator or trustee in bankruptcy, recovers from Agent any amount found to have been wrongfully paid to Agent or disbursed by Agent to Lenders, then each Lender shall reimburse Agent any amount received by such Lender.

12.6    Rights and Remedies to Be Exercised by Agent Only.  Each Lender agrees that, except as set forth in Section 11.5, no Lender shall have any right individually (i) to realize upon the security created by this Agreement or any other Loan Document, (ii) to enforce any provision of this Agreement or any other Loan Document, or (iii) to make demand under this Agreement or any other Loan Document.

12.7    Agency Provisions Relating to Collateral; Release of Liens and Guaranties.  Each Lender hereby irrevocably authorizes and ratifies Agent's entry into this Agreement and the Security Documents for the benefit of the Secured Parties.  Each Lender hereby irrevocably agrees that any action taken by Agent with respect to the Collateral in accordance with the provisions of this Agreement or the Security Documents, and the exercise by Agent of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized by and binding upon all Lenders.  Agent is hereby irrevocably authorized on behalf of all Lenders, without the necessity of any notice to or further consent from any Lender to take any action with respect to any Collateral or the Loan Documents which may be necessary to perfect and maintain perfected Agent's Liens upon the Collateral, for its benefit and the ratable benefit of Lenders.  Lenders hereby irrevocably agree that the Liens granted to or held by Agent upon any Collateral shall be automatically released (i) upon Payment in Full; or (ii) if such Collateral constitutes property being sold or disposed of and Borrower Representative certifies to Agent that the sale or disposition is made in compliance with the terms of this Agreement (and Agent may rely conclusively on any such certificate, without further inquiry), and to the extent that the property being sold or disposed of constitutes 100% of the Equity Interest of a Subsidiary, Agent is authorized and directed to release any Guaranty Agreement provided by such Subsidiary; or (iii) if such Collateral constitutes leased property in which no Obligor owned any interest at the time the Lien was granted or at any time thereafter and such lease has expired or been terminated in a transaction not prohibited by this Agreement; or (iv) in connection with any foreclosure sale or other disposition of Collateral and the

106

exercise of remedies pursuant to <u>Section 11</u> after the occurrence and during the continuation of an Event of Default.  Except as provided in the preceding sentence and in <u>Section 13.1.1(c)(ii)</u>, Agent will not release any Liens on Collateral without the prior written authorization of the Majority Lenders; <u>provided</u> that, Agent may, in its discretion, release its Liens on Collateral valued in the aggregate not in excess of $5,000,000 during any calendar year without the prior written authorization of the Majority Lenders.  Any such release shall not in any manner discharge, affect or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of the Obligors in respect of) all interests retained by the Obligors, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral.  Upon request by Agent at any time, Lenders will confirm in writing Agent's authority to release particular types or items of Collateral pursuant hereto.  Agent shall have no obligation whatsoever to any Lender or to any other Person to assure that the Collateral exists or is owned by any Obligor or is cared for, protected or insured or has been encumbered or that the Liens granted to Agent herein or pursuant to the Security Documents have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of its rights, authorities and powers granted or available to Agent in this <u>Section 12.7</u> or in any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, Agent may act in any manner it may deem appropriate, in its sole discretion, but consistent with the provisions of this Agreement and the other Security Documents, including given Agent's own interest in the Collateral as a Lender and that Agent shall have no duty or liability whatsoever to any Lender.  The Obligors and Lenders hereby irrevocably authorize Agent, based upon the instruction of the Majority Lenders, to credit bid and purchase (either directly or through one or more acquisition vehicles) or to sell or otherwise dispose of (or to consent to any such sale or other disposition of) all or any portion of the Collateral at any sale thereof conducted by Agent under the provisions of the Code or the PPSA, including pursuant to Sections 9-610 or 9-620 of the Code, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or pursuant to a plan of reorganization, or at any sale or foreclosure conducted by Agent (whether by judicial action or otherwise) in accordance with applicable law.

12.8    <u>Agent's Right to Purchase Commitments</u>.  Agent shall have the right, but shall not be obligated, at any time upon written notice to any Lender and with the consent of such Lender, which may be granted or withheld in such Lender's sole discretion, to purchase for Agent's own account all of such Lender's interests in this Agreement, the other Loan Documents and the Obligations, for the face amount of the outstanding Obligations owed to such Lender, including all accrued and unpaid interest and fees.

12.9    <u>Resignation of Agent; Appointment of Successor</u>.  Agent may resign as Agent at any time by notifying the Lenders, the LC Issuers and the Borrower Representative.  If Agent shall resign under this Agreement, then, (i) the Majority Lenders shall have the right, subject to the consent of the Borrower Representative (not to be unreasonably withheld or delayed, except that the consent of the Borrower Representative shall not be required during the continuation of an Event of Default or where the proposed successor agent is one of the Lenders), to appoint a successor agent or (ii) if a successor agent shall not be so appointed and approved within the thirty (30) day period following the retiring Agent's notice to Lenders, the LC Issuers and Borrower Representative of its resignation, then the retiring Agent may, on behalf of the Lenders and the LC Issuers, appoint a successor agent acceptable to the Borrower Representative, which shall be a commercial bank or an Affiliate of any such commercial bank, who shall serve as Agent until such time as the Majority Lenders appoint a successor agent or ratify the retiring Agent's appointment of a successor agent, in each case subject to the consent of the Borrower Representative (not to be unreasonably withheld or delayed, except that the consent of the Borrower Representative shall not be required during the continuation of an Event of Default or where the proposed successor agent is one of the Lenders).  Upon its appointment, such successor agent shall succeed to the rights, powers and duties of Agent and the term "<u>Agent</u>" shall mean such successor effective upon its

107

appointment, and the retiring Agent's rights, powers and duties as Agent shall be terminated without any other or further act or deed on the part of such retiring Agent or any of the other parties to this Agreement. After the resignation of Agent hereunder, the provisions of this Section 12, Section 13.4 and Section 3.9 shall inure to the benefit of the former Agent and its sub-agents and the former Agent shall not by reason of such resignation be deemed to be released from liability for any actions taken or not taken by it while it was Agent under this Agreement. The fees paid by Borrowers to any successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrowers and such successor Agent. Any resignation by PNC or its successor as Agent pursuant to this Section 12.9 shall also constitute the resignation by PNC and any of its Affiliates, or its successor and any of such successor's Affiliates, as an LC Issuer and as a Swingline Lender. In such event, (a) each applicable Borrower shall prepay any outstanding Swingline Loans made by the retiring Agent and its Affiliates in their capacity as a Swingline Lender and (b) upon such prepayment, the retiring Agent and its Affiliates in their capacity as a Swingline Lender shall surrender any swingline note held by it to the applicable Borrower for cancellation.

12.10   Audit, Appraisal and Examination Reports; Disclaimer by Lenders. By signing this Agreement, each Lender:

(a)   is deemed to have requested that Agent furnish such Lender, promptly after it becomes available, a copy of each Report prepared by or on behalf of Agent;

(b)   expressly agrees and acknowledges that Agent (i) does not make any representation or warranty as to the accuracy of any Report and (ii) shall not be liable for any information contained in any Report;

(c)   expressly agrees and acknowledges that the Reports are not comprehensive audits, appraisals or examinations, that Agent or other party performing any audit or examination will inspect only specific information regarding Borrowers and will rely significantly upon Borrowers' books and records as well as on representations of Borrowers' personnel;

(d)   agrees to keep all Reports confidential and strictly for its internal use, and not to distribute except to its participants, or use any Report in any other manner, in accordance with the provisions of Section 13.16; and

(e)   without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of Borrowers; and (ii) to pay and protect, and indemnify, defend and hold Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses and other amounts (including attorneys' fees and expenses) incurred by Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

12.11   No Reliance on Agent's Customer Identification Program. To the extent the Advances or this Agreement is, or becomes, syndicated in cooperation with other Lenders, each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other obligations required or imposed under or pursuant to the Patriot Act or the regulations thereunder, including the regulations contained in 31 CFR 103.121 (as hereafter amended or replaced, the "CIP

Regulations"), or any other Anti Terrorism Law, including any programs involving any of the following items relating to or in connection with any of Borrowers, their Affiliates or their agents, the Loan Documents or the transactions hereunder or contemplated hereby: (i) any identity verification procedures, (ii) any recordkeeping, (iii) comparisons with government lists, (iv) customer notices or (v) other procedures required under the CIP Regulations or such Anti-Terrorism Laws.

12.12    Sole Lead Arranger, Sole Book Runner and Syndication Agent.  The Sole Lead Arranger, Sole Book Runner and Syndication Agent identified on the cover page and introductory paragraph of this Agreement, each in its capacity as such, shall have no rights, powers, duties or responsibilities and no rights, powers, duties or responsibilities shall be read into this Agreement or any other Loan Document or otherwise exist on behalf of or against such entity, in its capacity as such.  If the Sole Lead Arranger, Sole Book Runner or Syndication Agent resigns in such capacity, no successor shall be appointed.

12.13    Secured Providers of Bank Products.

(a)    Each Secured Provider, by delivery of a notice to Agent of a Bank Product, agrees to be bound by Section 4.4.2 and this Section 12.  Each Secured Provider shall indemnify and hold harmless Agent and its Affiliates, and its and their respective officers, directors, employees, advisors, agents, controlling persons and other representatives and their successors and permitted assigns (collectively, the "Secured Provider Indemnified Persons"), to the extent not reimbursed by Obligors, against, and hold each such Secured Provider Indemnified Person harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the fees, charges and disbursements of counsel, incurred by or asserted against any such Secured Provider Indemnified Person arising out of, in connection with, or as a result of such provider's Secured Bank Product Obligations.

(b)    Notwithstanding any such designation of a Bank Product as a Secured Bank Product Obligation, no provider, holder or counterparty of or to any such Secured Bank Product Obligations shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider of such agreements or the Obligations owing thereunder, nor shall their consent be required (other than in their capacities as a Lender to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or guarantors.  Agent has no responsibility and shall have no liability for the calculation of the exposure owing by Obligors with respect to any Secured Bank Product Obligation or the amount of any Secured Bank Product Reserve applicable thereto, and shall be entitled in all cases to rely on the applicable Lender (or Affiliate thereof) party to such agreement for the calculation thereof. Such Lender (or Affiliate thereof) agrees to provide Agent with the calculations of all such exposures and reserves, if any, at such times as Agent shall reasonably request and in any event, not less than monthly (unless otherwise agreed to by Agent).

12.13.2    Obligors' Undertaking to Agent.  Without prejudice to their respective obligations to Lenders under the other provisions of this Agreement, each Obligor hereby undertakes with Agent to pay to Agent from time to time on demand all amounts from time to time due and payable by it for the account of Agent or Lenders or any of them pursuant to this Agreement to the extent not already paid.  Any payment made pursuant to any such demand shall pro tanto satisfy the relevant Obligors's obligations to make payments for the account of Lenders or the relevant one or more of them pursuant to this Agreement.

12.13.3    Other Agreements.  Each of the Lenders agrees that it shall not, without the express consent of Agent, and that it shall, to the extent it is lawfully entitled to do so, upon the request of Agent, set off against the Obligations, any amounts owing by such Lender to any

Obligor or any deposit accounts of any Obligor now or hereafter maintained with such Lender. Anything in this Agreement to the contrary notwithstanding, each of the Lenders further agrees that it shall not, unless specifically requested to do so by Agent, take any action to protect or enforce its rights arising out of this Agreement or the other Loan Documents, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the other Loan Documents shall be taken in concert and at the direction or with the consent of Agent or Majority Lenders.

## SECTION 13. MISCELLANEOUS

13.1    <u>Amendments</u>.

13.1.1    <u>Amendments and Waivers</u>.  No modification of any Loan Document, including any extension or amendment of a Loan Document or any waiver of a Default or Event of Default, shall be effective without the prior written agreement of Agent (with the consent or at the direction of Majority Lenders) and each Obligor party to such Loan Document; <u>provided</u>, <u>however</u>, that

(a)    no modification shall be effective with respect to any provision in any Loan Document that relates to any rights, duties or discretion of Agent, any LC Issuer or any Swingline Lender without the prior written consent of Agent, such LC Issuer or such Swingline Lender, as the case may be;

(b)    without the prior written consent of each affected Lender, no modification shall be effective that would (w) increase the Revolving Loan Commitment of such Lender; (x) reduce the amount of, or waive or delay payment of, any principal, interest (other than default interest) or fees payable hereunder or under any other Loan Document to such Lender (except as provided in <u>Section 3.11</u> hereof); <u>provided</u> that any provision requiring a mandatory prepayment of the Loans may be amended, modified or waived by the Majority Lenders; (y) extend the Term applicable to Obligations owing to such Lender; or (z) amend this <u>clause (b)</u>;

(c)    without the prior written consent of each Lender (except any Defaulting Lender), no amendment, modification or waiver shall be effective that would (i) alter <u>Sections 4.4.2</u>, <u>Section 4.10</u>, <u>Section 6.1</u> (except to add Collateral), the second sentence of <u>Section 11.4</u>, this <u>Section 13.1.1</u> or <u>Section 13.5</u>; (ii) release all or substantially all of the Collateral or release all or substantially all of the value of the guaranty provided by the Guarantors pursuant to the Guaranty Agreement; (iii) release any Obligor from liability for any Obligations, except as currently contemplated by the Loan Documents; or (iv) modify the definition of "Majority Lenders" or "Super-Majority Lenders";

(d)    without the prior written consent of the Super-Majority Lenders, no modification shall be effective that would (i) modify the definition of Borrowing Base or Borrowing Base Certificate (or any defined term (other than Availability Reserves and defined terms used therein) used in either such definition), Eligible Account or Eligible Inventory in any manner that would have the effect of increasing the amounts available to be borrowed by Borrowers hereunder; (ii) increase any advance rate above the rate specifically set forth in this Agreement on the Closing Date, or as specifically set forth in any written amendment among the applicable Lenders and Borrowers; (iii) amend, or waive any default under, <u>Section 9.3</u>; or (iv) increase the aggregate Revolving Loan Commitments; and

(e)        no modification or amendment to the Intercreditor Arrangements shall be effective without the prior written consent of the Super-Majority Lenders.

13.1.2  <u>Limitations</u>.    The agreement of Borrowers shall not be necessary to the effectiveness of any modification of a Loan Document that deals solely with the rights and duties of Lenders, Agent and/or LC Issuer as among themselves and that does not relate to any rights, duties, obligations or discretion of any Obligor or their respective Subsidiaries.  Only the consent of the parties to the Fee Letter or any agreement relating to a Bank Product shall be required for any modification of such agreement, and any non-Lender that is party to a Bank Product Agreement shall have no right to participate in any manner in modification of any other Loan Document.  Any waiver or consent granted by Agent or Lenders hereunder shall be effective only if in writing and only for the matter specified.

13.1.3  <u>Payment for Consents</u>.    No Borrower will, directly or indirectly, pay any remuneration or other thing of value, whether by way of additional interest, fee or otherwise, to any Lender (in its capacity as a Lender hereunder) as consideration for agreement by such Lender with any modification of any Loan Documents, unless such remuneration or value is concurrently paid, on the same terms, on a ratable basis to all Lenders providing their consent.

13.1.4  <u>Non-Consenting Lenders</u>.    If, in connection with any proposed amendment, waiver or consent requiring the consent of "each Lender", "each affected Lender," or "the Super-Majority Lenders; the consent of the Majority Lenders is obtained, but the consent of the other Lenders is not obtained (any such Lender whose consent is not obtained being referred to herein as a "<u>Non-Consenting Lender</u>"), then the Borrower Representative may elect to replace a Non-Consenting Lender as a Lender party to this Agreement, <u>provided</u> that, concurrently with such replacement, (i) all Non-Consenting Lenders shall be replaced, (ii) one or more other banks or other entities which are satisfactory to the Borrower Representative and Agent shall agree, as of such date, to purchase for cash the Loans and other Obligations due to the Non-Consenting Lenders pursuant to an Assignment and Acceptance Agreement and to become a Lender for all purposes under this Agreement and to assume all obligations of the Non-Consenting Lenders to be terminated as of such date and to comply with the requirements of <u>Section 13.2</u>, and (ii) the Borrower Representative shall pay to each Non-Consenting Lender in same day funds on the day of such replacement (1) all interest, fees and other amounts then accrued but unpaid to such Non-Consenting Lender by Borrowers hereunder to and including the date of termination, including without limitation payments due to such Non-Consenting Lender under <u>Sections 3.9</u> and <u>4.8</u> and (2) an amount, if any, equal to the payment which would have been due to such Lender on the day of such replacement under <u>Section 4.1.9</u> had the Loans of such Non-Consenting Lender been prepaid on such date rather than sold to a replacement Lender.

13.2    <u>Right of Sale; Assignment; Participations</u>.    Obligors hereby consent to any Lender's participation, sale, assignment, transfer or other disposition, at any time or times hereafter, of this Agreement and any of the other Loan Documents, or of any portion hereof or thereof, including all or a portion of its Revolving Loan Commitment (if any) and the Loans at the time owing to it and such Lender's rights, title, interests, remedies, powers and duties hereunder or thereunder without the consent of Borrowers or any other Obligor subject to the terms and conditions set forth below:

13.2.1  <u>Sales; Assignments</u>.    Obligors and each Lender hereby agree that, with respect to any such sale, assignment or transfer:

(a)        no such sale, assignment or transfer shall be for an amount of less than $5,000,000 unless (i) Agent and (unless a Default or Event of Default has occurred and is continuing) the Borrower Representative otherwise agree and consent to such lesser amount, (ii) such sale, assignment or transfer is to an Eligible Assignee or (iii) such sale, assignment or

transfer is for the entire remaining amount of the assigning Lender's Revolving Loan Commitment or Loans,

(b)    each such sale, assignment or transfer shall be made on terms and conditions which are customary in the industry at the time of the transaction,

(c)    Agent and, in the absence of a payment Event of Default, Borrower Representative, must consent (such consents from Agent and Borrower Representative not to be unreasonably withheld or delayed) to each such sale, assignment or transfer to a Person that is not an original signatory to this Agreement; provided that (i) consent of Agent and the Borrower Representative shall not be required for each sale, assignment or transfer to an Eligible Assignee and (ii) the Borrower Representative shall be deemed to have consented to any such sale, assignment or transfer unless it shall object thereto by written notice to Agent within 10 days after having received notice thereof; provided, that, notwithstanding the foregoing, a sale, assignment or transfer to any customer of the Obligors (including each Designated OEM Party) or operating competitor of the Obligors shall be subject to the consent of the Borrower Representative at all times, regardless of whether or not an Event of Default has occurred and is continuing; provided, further that, Agent shall only be required to obtain the consent of the Borrower Representative if such proposed assignee represents and warrants in the Assignment and Acceptance Agreement that such assignee is a customer or operating competitor of the Obligors and no such assignment to a Person shall be voided if such representation is not true and the consent of the Borrower Representative was not obtained prior to such assignment,

(d)    no such sale, assignment or transfer shall be granted in violation of Section 13.2.3, and any attempt to sell, assign or transfer any Revolving Loan Commitment or any Loan to any Person described in the first sentence of Section 13.2.3 at any time shall be null and void,

(e)    except in the case of a sale, assignment or transfer by a Lender to one of its Approved Funds, the assigning Lender shall pay to Agent a processing and recordation fee of $3,500 and any out-of-pocket attorneys' fees and expenses incurred by Agent in connection with any such sale or assignment,

(f)    Agent, the assigning Lender, the assignee and (if Borrower Representative consent is required hereunder) Borrower Representative shall each have executed and delivered an Assignment and Acceptance Agreement, and

(g)    the assignee, if it is not Lender immediately prior to any assignment, shall deliver to Agent a Form W-9, W-8BEN, W-8BEN-E, W-8ECI, W-81MY (as applicable) and an administrative questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about Borrowers, the other Obligors or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

(h)    Consent of any LC Issuer or Swingline Lender hereunder (which consent shall not be unreasonably withheld or delayed) shall be required for any sale or assignment that

increases the obligations of the assignee to participate in exposure under one or more Letters of Credit, or Swingline Loans, as applicable (whether or not outstanding at the time of such sale or assignment).  After such sale or assignment has been consummated (x) the assignee thereupon shall become a "Lender" for all purposes of this Agreement and (y) to the extent of the interest assigned by such Assignment and Acceptance Agreement, the assigning Lender thereupon shall be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance Agreement, covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 3.9, 4.1.9, 4.8 and 13.4) and the assigning Lender shall have no further liability for funding the portion of Revolving Loan Commitments assumed by such other Lender.  Any sale or assignment by a Lender of rights or obligations under this Agreement that does not comply with this Section 13.2.1 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 13.2.2.

(i)    Agent, acting for this purpose as an agent of Borrowers, shall maintain at one of its offices a copy of each Assignment and Acceptance Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Revolving Loan Commitment of, and principal amount and stated interest of the Loans and LC Obligations owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register.  The entries in the Register shall be conclusive absent manifest error, and Borrowers, Agent, the LC Issuers and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by Borrowers, the LC Issuers and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

13.2.2  Participations.  Any Lender may, without the consent of Borrowers (unless such Participant is a customer of the Obligors (including each Designated OEM Party) or operating competitor of the Obligors), in each case as represented to the Agent by such Participant) or Agent, the LC Issuers or the Swingline Lender, grant participations in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Revolving Loan Commitment and the Loans owing to it) to any other Lender or other lending institution (a "Participant"); provided that (a) no such participation shall be for an amount of less than $5,000,000 (unless (i) Agent (and unless a payment Event of Default has occurred and is continuing or such participant is a customer of the Obligors (including each Designated OEM Party) or operating competitor of the Obligors) the Borrower Representative otherwise agrees and consents to such lesser amount or (ii) such participation is granted to an Eligible Assignee), (b) no Participant shall thereby acquire any direct rights under this Agreement, (c) no Participant shall be granted any right to consent to any amendment, except to the extent any of the same pertain to (i) changing the aggregate principal amount of, or interest rate on, or fees applicable to, any Loan or (ii) changing the final stated maturity of any Loan or the stated maturity of any portion of any payment of principal of, or interest or fees applicable to, any of the Loans; provided that the rights described in this subclause (ii) shall not be deemed to include the right to consent to any amendment with respect to, or which has the effect of, requiring any mandatory prepayment of any portion of any Loan or any amendment or waiver of any Default or Event of Default, (d) no such participation shall in any manner relieve the originating Lender of its obligations hereunder, (e) the originating Lender shall remain solely responsible for the performance of such obligations, (f) Borrowers, Agent, the LC Issuers and the other Lenders shall continue to deal solely and directly with the originating Lender in connection

with the originating Lender's rights and obligations under this Agreement and the other Loan Documents, (g) in no event shall any Participant grant a participation in its participation interest in the Loans without the prior written consent of (x) Agent and (y) and, unless a payment Event of Default has occurred and is continuing or such participant is a customer of the Obligors (including each Designated OEM Party) or operating competitor of the Obligors, in each case as represented to the Agent by such Participant, the Borrower Representative (provided, that, the Borrower Representative shall be deemed to have consented to any such sale, assignment or transfer unless it shall object thereto by written notice to Agent within ten (10) days after having received notice thereof), provided, further that Agent shall only be required to obtain the consent of the Borrower Representative if such Participant represents and warrants such Participant is a customer or operating competitor of the Obligors and no such participation grant shall be voided if such representation is not true and the consent of the Borrower Representative was not obtained prior to granting such participation, (h) no participation shall be granted in violation of Section 13.2.3, and any attempt to grant a participation to any Person described in the first two sentences of Section 13.2.3 at any time shall be null and void, and (i) all amounts payable by Borrowers hereunder shall be determined as if the originating Lender had not sold any such participation.

The Borrowers agree that each Participant shall be entitled to the benefits of Sections 3.9, 4.1.9 and 4.8 (subject to the requirements and limitations therein, including the requirements under Section 3.9(e) (it being understood that the documentation required under Section 3.9(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 13.2.1; provided that such Participant (A) agrees to be subject to the provisions of Sections 3.10, 4.4.2, 4.10 and 11.5 as if it were an assignee under Section 13.2.1; and (B) shall not be entitled to receive any greater payment under Section 3.9 or 4.8, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.5 as though it were a Lender, provided such Participant agrees to be subject to Section 4.10 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Revolving Loan Commitments, Loans, Letters of Credit or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Revolving Loan Commitment, Loan, Letter of Credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

13.2.3  Certain Assignees.  Notwithstanding any other provision of this Agreement or any other Loan Document, no assignment or participation may be made to Sponsor, Parent, any Obligor, any of their respective Affiliates or Subsidiaries, any Defaulting Lender or any natural person. Any attempted assignment, participation or transfer to any such Person at any time shall be null and void. In connection with any assignment by a Defaulting Lender, such assignment shall be effective only upon payment by the Eligible Assignee or Defaulting Lender to Agent of an aggregate amount sufficient, upon distribution (through direct payment, purchases of participations or other compensating actions as Agent

114

deems appropriate), (x) to satisfy all funding and payment liabilities then owing by the Defaulting Lender hereunder, and (y) to acquire such Defaulting Lender's *pro rata* share of all Loans and LC Obligations.  If an assignment by a Defaulting Lender shall become effective under applicable law for any reason without compliance with the foregoing sentence, then the assignee shall be deemed a Defaulting Lender for all purposes until such compliance occurs.

13.2.4   <u>Certain Agreements of Borrowers</u>.   Borrowers agree that (a) they will use their commercially reasonable efforts to assist and cooperate with each Lender in any manner reasonably requested by such Lender to effect the sale, assignment, transfer, sale of participation in, or other disposition pursuant to this <u>Section 13.2</u>, including assisting in the preparation of appropriate disclosure documents and making members of management available at reasonable times to meet with and answer questions of potential assignees and Participants; and (b) subject to the provisions of <u>Section 13.16</u> hereof, such Lender may disclose credit information regarding Borrowers to any potential assignee or Participant.

13.2.5   <u>Lender Pledges</u>.   Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this <u>Section 13.2</u> shall not apply to any such pledge or assignment of a security interest; <u>provided</u> that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

13.3    <u>Power of Attorney</u>.   Each Obligor hereby irrevocably designates, makes, constitutes and appoints Agent (and all Persons designated by Agent) as such Obligor's true and lawful attorney (and agent-in-fact), solely with respect to the matters set forth in this <u>Section 13.3</u>, and Agent, or Agent's agent, may, without notice to any Obligor and in any Obligor's or Agent's name, but at the cost and expense of Obligors:

At such time or times as Agent or said agent, in its sole discretion, may determine (and subject to the Intercreditor Arrangements): (a) endorse any Obligor's name on any checks, notes, acceptances, drafts, money orders or any other evidence of payment or proceeds of the Collateral which come into the possession of Agent or under Agent's control; (b) prepare, sign, and file for recordation in any Intellectual Property registry, appropriate evidence of the Lien and security interest granted herein in the Intellectual Property in the name of such Obligor as assignor or pledgor; and (c) take or cause to be taken all actions necessary to perform or comply or cause performance or compliance with the terms of this Agreement, including, without limitation, access to pay or discharge taxes or Liens (other than Permitted Liens) levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by Agent in its sole discretion, any such payments made by Agent to become obligations of such Obligor to Agent, due and payable immediately without demand.

At such time or times upon or after the occurrence and during the continuance of an Event of Default (<u>provided</u> that the occurrence of an Event of Default shall not be required with respect to <u>clauses</u> <u>(d)</u>, <u>(f)</u>, <u>(g)</u>, <u>(h)</u> and <u>(i)</u> below), as Agent or its agent in its sole discretion may determine (subject to the Intercreditor Arrangments): (a) notify any Account Debtors of the assignment of their Accounts, demand payment of the Accounts from the Account Debtors, enforce payment of the Accounts by legal proceedings or otherwise, and generally exercise all of any Obligor's rights and remedies with respect to the Accounts; (b) settle, adjust, modify, compromise, discharge or release any of the Accounts or other Collateral or any legal proceedings brought to collect any of the Accounts or other Collateral; (c) sell or assign any of the Accounts and other Collateral upon such terms, for such amounts and at such time or times as Agent deems advisable, and at Agent's option, with all warranties regarding the Collateral disclaimed; (d) collect, liquidate and receive balances in Deposit Accounts or Securities Accounts, and

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

take control, in any manner, of any item of payment or proceeds relating to any Collateral; (e) prepare, file and sign any Obligor's name to a proof of claim or other document in a bankruptcy of any Account Debtor, or to any notice of Lien, assignment or satisfaction of Lien or similar document in connection with any of the Collateral; (f) receive, open and dispose of all mail addressed to any Obligor and notify postal authorities to change the address for delivery thereof to such address as Agent may designate; (g) endorse the name of any Obligor upon any of the items of payment or proceeds relating to any Collateral and deposit the same to the account of Agent on account of the Obligations; (h) endorse the name of any Obligor upon any chattel paper, document, instrument, invoice, freight bill, bill of lading or similar document or agreement relating to the Accounts, Inventory and any other Collateral; (i) use any Obligor's stationery and sign the name of any Obligor to verifications of the Accounts and notices thereof to Account Debtors; (j) use the information recorded on or contained in any data processing, electronic or other information equipment, systems and Computer Hardware and Software relating to the Accounts, Inventory, Equipment and any other Collateral; (k) make and adjust claims under policies of insurance; (l) take any action as may be necessary or appropriate to obtain payments under any letter of credit, banker's acceptance or other instrument for which an Obligor is a beneficiary; and (m) do all other acts and things necessary, in Agent's determination, to fulfill any Obligor's obligations under the Loan Documents.

The powers conferred on Agent hereunder are solely to protect its interest in the Collateral and the interests of the Secured Parties and shall not impose any duty upon it to exercise any such powers. Except for the exercise of reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral. Agent shall be deemed to have exercised reasonable care in the custody and preservation of Collateral in its possession if such Collateral is accorded treatment substantially equal to that which Agent accords its own property. Neither Agent nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Obligor or otherwise, nor shall any of them have any liability for any error or omission of any kind occurring in the settlement, collection or payment of any of the Accounts or any instrument received in payment thereof or any damages resulting therefrom. If any Obligor fails to perform any agreement contained herein, Agent may itself perform, or cause performance of, such agreement, and the expenses of Agent incurred in connection therewith and the expenses of Agent incurred in connection with actions undertaken as provided in this Section 13.3 shall be payable on demand by each Obligor under Section 13.4.

The power of attorney granted hereby shall constitute a power coupled with an interest and shall be irrevocable until Payment in Full or such longer period as permitted pursuant to Section 14.6.

13.4    Expenses; Indemnity; Damage Waiver. The Borrowers jointly and severally shall pay (i) all reasonable and documented out of pocket costs and expenses incurred by Agent and its Affiliates, including the reasonable and documented fees, charges and disbursements of one primary counsel to Agent and, if necessary, of one local counsel in any relevant jurisdiction, in connection with the syndication and distribution (including, without limitation, via the internet or through a service such as Intralinks) of the credit facilities provided for herein, due diligence expenses (including third party expenses), the preparation, negotiation, administration, replacement, refinancing and enforcement of the Loan Documents or any amendments, supplements, modifications or waivers of the provisions of the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated), and filing and recording fees and expenses in connection therewith, (ii) all reasonable and documented out of pocket costs and expenses incurred by any LC Issuer in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder and (iii) all reasonable and documented out of pocket costs and expenses incurred by Agent, any LC Issuer, any

Lender, and any of their respective Affiliates, and its and their respective officers, directors, employees, advisors, agents, controlling persons and other representatives and their successors and permitted assigns (collectively, the "Indemnified Persons"), including the fees, charges and disbursements of one primary counsel to the Indemnified Persons, taken as a whole and, if necessary, of one local counsel to the Indemnified Persons, taken as a whole, in any relevant jurisdiction and, solely in the case of a conflict of interest, of one additional counsel to the affected Indemnified Persons and reasonable fees, charges and disbursements of financial advisors and consultants, in each case in connection with the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Section 13.4 or in connection with the Loans made or Letters of Credit issued hereunder, including all such reasonable and documented out of pocket costs and expenses (including, so long as an Event of Default shall have occurred and be continuing,  reasonable and documented costs, fees and expenses of other advisors and professionals engaged by Agent) incurred during any workout, restructuring or negotiations in respect of such Loans or Letters of Credit.  Costs and expenses being reimbursed by Borrowers under this Section 13.4 include, without limiting the generality of the foregoing, reasonable costs and expenses incurred in connection with:

(i)    insurance reviews and inventory appraisals; provided, that absent the occurrence and continuation of an Event of Default, only one inventory appraisal during any 12 month period following the Closing Date shall be at the expense of Borrowers; provided, further, that one additional inventory appraisal during such 12 month period shall be at the expense of Borrowers if requested or performed by or at the direction of Agent in its Permitted Discretion to the extent that (i) average Excess Availability is less than 10% of the Revolving Loan Commitments for a period of five consecutive Business Days or (ii) Excess Availability is less than 5% of the aggregate Revolving Loan Commitments on any day;

(ii)    field examinations and the preparation of Reports based on the fees charged by a third party retained by Agent or the internally allocated fees for each Person employed by Agent with respect to each field examination (provided, that absent the occurrence and continuation of an Event of Default, only one field examinations during any 12 month period following the Closing Date shall be at the expense of Borrowers; provided, further, that one additional field examination during such 12 month period shall be at the expense of Borrowers if requested or performed by or at the direction of Agent in its Permitted Discretion to the extent that (i) average Excess Availability is less than 10% of the Revolving Loan Commitments for a period of five consecutive Business Days or (ii) Excess Availability is less than 5% of the aggregate Revolving Loan Commitments on any day) together with the reasonable and documented fees and expenses associated with collateral monitoring services performed by Agent;

(iii)    any attempt to inspect, verify, protect, preserve, restore, collect, sell, liquidate or otherwise dispose of or realize upon the Collateral pursuant to the terms of this Agreement and the other Loan Documents;

(iv)    background checks regarding senior management and/or key investors, as deemed necessary or appropriate in the sole discretion of Agent;

(v)    taxes, fees and other charges for (A) lien and title searches and title insurance and (B) filing financing statements, amendments and continuations, and other actions to perfect, protect, and continue Agent's Liens or that are otherwise payable in connection with the execution and delivery of the Loan Documents;

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

(vi)        sums paid or incurred to take any action required of any Obligor under the Loan Documents that such Obligor fails to pay or take; and

(vii)        forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining the accounts and lockboxes, and costs and expenses of preserving and protecting the Collateral.

All of the foregoing costs and expenses may be charged to Borrowers as Loans or to another deposit account, all as described in Section 4.1.4.  To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 13.4 may be unenforceable because it is violative of any law or public policy, each Obligor shall, jointly and severally, contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all matters described in this Section 13.4 incurred by the Indemnified Persons.

(b)        The Borrowers shall, jointly and severally, indemnify each Indemnified Person against, and hold each Indemnified Person harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the fees, charges and disbursements of one primary counsel to the Indemnified Persons, taken as a whole, and if necessary, of one local counsel to the Indemnified Persons, taken as a whole, in any relevant jurisdiction and, solely in the case of a conflict of interest, of one additional counsel to the affected Indemnified Persons, as applicable, incurred by or asserted against any Indemnified Person arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby (including the Access Agreement or the Accommodation Agreement), (ii) any Loan or Letter of Credit or the use of the proceeds therefrom (including any refusal by an LC Issuer to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnified Person is a party thereto, and the reasonable fees and expenses of legal counsel in connection with any such claim, litigation, investigation or proceeding; provided that such indemnity shall not, as to any Indemnified Person, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are among Indemnified Persons and not involving Agent, the DIP Term Loan Agent, the Prepetition Senior Secured Notes Trustee, the Lead Arranger (or their related respective Indemnified Persons) or are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, or willful misconduct of such Indemnified Person or any of such Indemnified Person's Affiliates or any of its or their respective officers, directors, employees, agents, advisors or other representatives.  This Section 13.4 shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c)        Without limiting any other provision of this Section 13.4, each Borrower agrees to, jointly and severally, defend, indemnify, and hold harmless the Indemnified Persons against any and all Environmental Liabilities and Costs and all other claims, demands, penalties, fines, liability (including strict liability), losses, damages, costs and expenses (including, reasonable legal fees and expenses, consultant fees and laboratory fees), arising out of (a) any Releases or threatened Releases (i) at any property presently or formerly owned or operated by any Obligor or any Subsidiary of any Obligor, or any predecessor in interest, or (ii) any Hazardous Materials generated and disposed of by any Obligor or any Subsidiary of any Obligor, or any predecessor in interest; (b) any violations of Environmental Laws by any Obligor, any of their respective Subsidiaries or any predecessor in interest; (c) any Remedial Action relating to any Obligor or any Subsidiary of any Obligor, or any predecessor in interest; (d) any personal injury (including wrongful death) or property damage (real or personal) arising out of exposure

118

to Hazardous Materials used, handled, generated, transported or disposed by any Obligor or any Subsidiary of any Obligor, or any predecessor in interest; and (e) any breach of any warranty or representation regarding environmental matters made by the Obligors in Section 8.1.27. Notwithstanding the foregoing, the Obligors shall not have any obligation to any Indemnified Person under this Section 13.4(c) regarding any potential environmental matter covered hereunder which is determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence, or willful misconduct of such Indemnified Person or facts or circumstances first arising after repayment of the Obligations or termination of this Agreement.

(d)    To the extent that Borrowers fail to pay any amount required to be paid by it to Agent, under paragraph (a), (b) or (c) of this Section 13.4, each Lender severally agrees to pay to Agent such Lender's Revolving Loan Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, penalty, liability or related expense, as the case may be, was incurred by or asserted against Agent in its capacity as such. To the extent that Borrowers fail to pay any amount required to be paid by it to any LC Issuer or any Swingline Lender under paragraph (a), (b) or (c) of this Section 13.4, each Lender severally agrees to pay to such LC Issuer or such Swingline Lender, as the case may be, such Lender's Revolving Loan Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, penalty, liability or related expense, as the case may be, was incurred by or asserted against such LC Issuer or such Swingline Lender in its capacity as such.

(e)    To the extent permitted by applicable law, no Obligor shall assert, and each Obligor hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the Transactions, any Loan or Letter of Credit or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Obligor hereby waives, releases and agrees not to sue upon any such claim or seek any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(f)    The indemnities, waivers and other obligations of the Borrowers set forth in this Section 13.4 shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

(g)    All amounts due under this Section 13.4 shall be payable on demand (as such expenses are incurred). All amounts chargeable to Borrowers under this Section 13.4 shall be Obligations secured by all of the Collateral, shall be payable on demand (as such expenses are incurred) to such Indemnified Person, as the case may be, and shall bear interest from the date such demand is made until paid in full at the rate applicable to Base Rate Loans from time to time.

13.5    Sale of Interest. No Obligor may sell, assign or transfer any interest in this Agreement, any of the other Loan Documents, or any of the Obligations, or any portion thereof, including such Obligor's rights, title, interests, remedies, powers and duties hereunder or thereunder without the prior written consent of each Lender and each LC Issuer (and any attempted assignment or transfer by such Obligor without such consent shall be null and void).

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

13.6    Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be held to be prohibited, invalid, illegal or unenforceable in any jurisdiction, such provision, as to such jurisdiction, shall be ineffective to the extent of such prohibition, invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof, and the prohibition, invalidity, illegality or unenforceability of a particular provision in a particular jurisdiction shall not prohibit or invalidate, or deem illegal or unenforceable, such provision in any other jurisdiction.

13.7    Successors and Assigns.  This Agreement, the Other Agreements and the Security Documents shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted under Sections 12.9 or 13.2 (including any Affiliate of Agent that provides a Swingline Loan and any LC Issuer that issues any Letter of Credit).   Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of Agent that provides a Swingline Loan and any LC Issuer that issues any Letter of Credit), Participants (to the extent provided in Section 13.2.2)) any legal or equitable right, remedy or claim under or by reason of this Agreement.

13.8    Cumulative Effect; Conflict of Terms.  The provisions of the Other Agreements and the Security Documents are hereby made cumulative with the provisions of this Agreement.  Except as otherwise provided in any of the other Loan Documents by specific reference to the applicable provision of this Agreement, if any provision contained in this Agreement is in direct conflict with, or inconsistent with, any provision in any of the other Loan Documents, the provision contained in this Agreement shall govern and control.

13.9    Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered be deemed to be an original, and all of which counterparts taken together shall constitute but one and the same agreement.  Except as provided in Section 10.1, this Agreement shall become effective when it shall have been executed by Agent and when Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or electronic transmission via e-mailed pdf or other similar format shall be effective as delivery of a manually executed counterpart of this Agreement.

13.10   Notice.  Except as otherwise provided herein, all notices, requests and demands to or upon a party hereto, to be effective, shall be in writing, and shall be sent by certified or registered mail, return receipt requested, by personal delivery against receipt, by reputable overnight courier or by facsimile and, unless otherwise expressly provided herein, shall be deemed to have been validly served, given, delivered or received immediately when delivered against receipt, three (3) Business Days after deposit in the mail, postage prepaid, one (1) Business Day after deposit with an overnight courier or, in the case of facsimile notice, when sent and machine confirmed, provided that if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient, addressed as follows:

| | | |
|---|---|---|
| (A) | If to Agent, including as a Swingline Lender and as a LC Issuer: | PNC Bank, National Association Three PNC Plaza, 6th Floor 225 Fifth Avenue Pittsburg, PA 15222 |

|  |  | Attention: James Steffy, PNC Business Credit |
|--|--|--|

Attention: James Steffy, PNC Business Credit
Telephone: 412-768-6387
James.steffy@pnc.com

With a copy to (which shall
not constitute notice)

Bodman PLC
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, MI 48226
Attention: Robert J. Diehl, Jr.
rdiehl@bodmanlaw.com

(B)    If to Obligors:

Diversified Machine, Inc.
c/o Platinum Equity Advisors, LLC
360 North Crescent Drive, South Bldg.
Beverly Hills, California 90210
Attention General Counsel
Facsimile No.: (310) 712-1863
Telephone No.: (310) 712-1850
E-mail: ekalawski@platinumequity.com

With a copy to (which shall
not constitute notice):

Weil Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention: Ray Schrock
Facsimile No.: (212) 310-8007
Telephone No.: (212) 310-8210
E-mail: ray.schrock@weil.com

(C)    If to any Lender, at its address indicated on Schedule 13.10 or in an Assignment and
Acceptance Agreement.

or to such other address as each party may designate for itself by notice given in accordance with this
Section 13.10; provided, however, that any notice, request or demand to or upon Agent or a Lender
pursuant to Sections 4.1.1 or 5.2.2 hereof shall not be effective until received by Agent or such Lender.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic
communications (including e-mail and internet or intranet websites) pursuant to procedures approved in
advance by Agent; provided that the foregoing shall not apply to notices pursuant to Sections 2, 4 or 5 or
to compliance and no Event of Default certificates delivered pursuant to Section 9.1.2, unless otherwise
agreed by Agent and the applicable Lender.  Agent or the Borrower Representative may, in its discretion,
agree to accept notices and other communications to it hereunder by electronic communications pursuant
to procedures approved in advance by it; provided that approval of such procedures may be limited to
particular notices or communications.  All such notices and other communications (i) sent to an e-mail
address shall be deemed received upon the sender's receipt of an acknowledgement from the intended
recipient (such as by the "return receipt requested" function, as available, return e-mail or other written
acknowledgement), provided that if not given during the normal business hours of the recipient, such
notice or communication shall be deemed to have been given at the opening of business on the next
Business Day for the recipient, and (ii) posted to an Internet or intranet website shall be deemed received
upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

clause (i) of notification that such notice or communication is available and identifying the website address therefor.

13.11   Consent.   Whenever Agent's, LC Issuers', Swingline Lenders', Majority Lenders', Super-Majority Lenders', each Lender's or all Lenders' consent is required to be obtained under this Agreement, any of the Other Agreements or any of the Security Documents as a condition to any action, inaction, condition or event, except as otherwise specifically provided herein, Agent, LC Issuers, Swingline Lenders, Majority Lenders, Super-Majority Lenders, each Lender or all Lenders, as applicable, shall be authorized to give or withhold such consent in its or their sole and absolute discretion.

13.12   Credit Inquiries.   Obligors hereby authorize and permit Agent to respond to usual and customary credit inquiries from third parties concerning any Obligor or any of its Subsidiaries.

13.13   Survival.   All representations and warranties made by the Obligors in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Revolving Loan Commitments have not expired or terminated.

13.14   Time of Essence.   Time is of the essence of this Agreement, the Other Agreements and the Security Documents.

13.15   Entire Agreement.   This Agreement and the other Loan Documents, together with all other instruments, agreements, documents and certificates executed by the parties in connection therewith or with reference thereto, embody the entire understanding and agreement between the parties hereto and thereto with respect to the subject matter hereof and thereof and supersede all prior agreements, understandings and inducements, whether express or implied, oral or written.   Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing, signed by each Borrower's, Agent's and each Lender's respective officers.

13.16   Interpretation.   No provision of this Agreement or any of the other Loan Documents shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have drafted, structured or dictated such provision.

13.17   Confidentiality.   As required by federal law and Agent's policies and practices, Agent may need to obtain, verify, and record certain customer identification information and documentation in connection with opening or maintaining accounts, or establishing or continuing to provide services. Agent, each Lender and each LC Issuer agree to use reasonable efforts (equivalent to the efforts Agent, such Lender or such LC Issuer applies to maintain the confidentiality of its own comparable confidential information) to maintain as confidential all information provided to them by any Obligor and designated as confidential, except that Agent, each Lender and each LC Issuer may disclose such information (a) to its and its Affiliates' directors, officers, employees, members, partners, stockholders and agents, including accountants, auditors, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential); (b) to (i) any assignee or Participant or potential assignee or Participant (

in each case other than to any customer of the Obligors (including each Designated OEM Party) or operating competitor of the Obligors, in each case as represented to the Agent by such Participant or potential assignee, without the prior written consent of the Borrower representative, provided, that, the Borrower Representative shall be deemed to have consented to any such disclosure unless it shall object thereto by written notice to Agent within ten (10) days after having received notice thereof )or (ii) any actual or potential counterparty to any swap or derivative transaction (including any Hedging Agreement) relating to the Obligors and their obligations, in each case that has agreed to comply and be bound by this Section 13.17 (and any such Person may disclose such information to the Persons applicable to it described in clause (a) above); (c) as required or requested by any Governmental Authority or examiner, or any insurance industry association, or as reasonably believed by Agent, such Lender or such LC Issuer to be compelled by any court decree, subpoena or legal or administrative order or process; provided that Agent, such LC Issuer or such Lender, as applicable, agrees that it will notify the Borrower Representative as soon as practicable in the event of any such disclosure by such Person (other than at the request of a Governmental Authority) unless such notification is prohibited by law, rule or regulation, or except in connection with any request as part of a regulatory examination or audit; (d) as it reasonably believes, or on the advice of its counsel, is required by law; (e) in connection with the exercise of any right or remedy under the Loan Documents or in connection with any suit, action, litigation or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (f) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any information relating to the Obligors received by it from such Lender); (g) to any other party to this Agreement; (h) with the consent of the Borrower Representative; or (i) that becomes publicly available other than as the result of a breach of this Section 13.17, or that becomes available to Agent, any Lender or any LC Issuer on a non-confidential basis from a source other than the Obligors.  This Section 13.17 shall supersede all prior confidentiality agreements, non-disclosure agreements or other similar agreements between any Obligor and Agent, any Lender or any LC Issuer with respect to the treatment of confidential information.

EACH LENDER ACKNOWLEDGES THAT INFORMATION FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWERS, AND THEIR AFFILIATES AND THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY ANY BORROWER OR AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWERS AND THEIR AFFILIATES AND THEIR RESPECTIVE SECURITIES.  ACCORDINGLY, EACH LENDER REPRESENTS TO EACH BORROWER AND AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

13.18  GOVERNING LAW; CONSENT TO FORUM.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO CONFLICTS OF LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY COURT; PROVIDED, HOWEVER, THAT IF ANY OF THE COLLATERAL SHALL BE LOCATED IN ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK, THE LAWS OF SUCH JURISDICTION SHALL GOVERN THE METHOD, MANNER AND PROCEDURE FOR FORECLOSURE OF AGENT'S LIEN UPON SUCH COLLATERAL AND THE ENFORCEMENT OF AGENT'S OTHER REMEDIES IN RESPECT OF SUCH COLLATERAL TO THE EXTENT THAT THE LAWS OF SUCH JURISDICTION ARE DIFFERENT FROM OR INCONSISTENT WITH THE LAWS OF THE STATE OF NEW YORK.  AS PART OF THE CONSIDERATION FOR VALUE RECEIVED, AND REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF ANY OBLIGOR, AGENT, ANY LENDER OR ANY LC ISSUER, EACH OBLIGOR HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND FOR ITS PROPERTY, TO THE NON-EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN NEW YORK, NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.  EACH OBLIGOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY CLAIMS, OBJECTIONS AND DEFENSES WHICH IT MAY NOW OR HEREAFTER HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT.  EACH OBLIGOR HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO OBLIGORS AT THE ADDRESS SET FORTH IN THIS AGREEMENT AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF OBLIGORS' ACTUAL RECEIPT THEREOF OR 3 DAYS AFTER DEPOSIT IN THE U.S. MAILS, PROPER POSTAGE PREPAID.  NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE DEEMED OR OPERATE TO AFFECT THE RIGHT OF AGENT OR ANY LENDER TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW, OR TO PRECLUDE THE ENFORCEMENT BY AGENT, ANY LENDER OR ANY LC ISSUER OF ANY JUDGMENT OR ORDER OBTAINED IN SUCH FORUM OR THE TAKING OF ANY ACTION UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT TO ENFORCE SAME IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION.

13.19   WAIVERS BY OBLIGORS.  EACH PARTY HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW (i) THE RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATED TO ANY OF THE LOAN DOCUMENTS, THE OBLIGATIONS, THE TRANSACTIONS CONTEMPLATED HEREBY OR UNDER THE OTHER LOAN DOCUMENTS (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY); (ii) PRESENTMENT, DEMAND AND PROTEST AND NOTICE OF PRESENTMENT, PROTEST, DEFAULT, NON PAYMENT, MATURITY, RELEASE, COMPROMISE, SETTLEMENT,

EXTENSION OR RENEWAL OF ANY OR ALL COMMERCIAL PAPER, ACCOUNTS, CONTRACT RIGHTS, DOCUMENTS, INSTRUMENTS, CHATTEL PAPER AND GUARANTIES AT ANY TIME HELD BY AGENT, ANY LENDER OR ANY LC ISSUER ON WHICH THE OBLIGORS MAY IN ANY WAY BE LIABLE AND HEREBY RATIFIES AND CONFIRMS WHATEVER AGENT, ANY LENDER OR ANY LC ISSUER MAY DO IN REGARD THEREOF; (iii) NOTICE PRIOR TO AGENT'S TAKING POSSESSION OR CONTROL OF THE COLLATERAL OR ANY BOND OR SECURITY WHICH MIGHT BE REQUIRED BY ANY COURT PRIOR TO ALLOWING AGENT TO EXERCISE ANY OF AGENT'S REMEDIES; (iv) THE BENEFIT OF ALL VALUATION, APPRAISEMENT AND EXEMPTION LAWS; AND (v) NOTICE OF ACCEPTANCE HEREOF. EACH OBLIGOR ACKNOWLEDGES THAT THE FOREGOING WAIVERS ARE A MATERIAL INDUCEMENT TO AGENT'S AND EACH LENDER'S ENTERING INTO THIS AGREEMENT AND THAT AGENT AND EACH LENDER IS RELYING UPON THE FOREGOING WAIVERS IN ITS FUTURE DEALINGS WITH OBLIGORS. EACH OBLIGOR WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THE FOREGOING WAIVERS WITH ITS LEGAL COUNSEL AND HAS KNOWINGLY AND VOLUNTARILY WAIVED ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

13.20  <u>Advertisement</u>.  Obligors consent to the publication by Agent or any Lender of announcements commonly known as "tombstones" relating to the financing transactions contemplated by this Agreement (subject in each case to prior review and approval by the Borrower Representative). No Lender may make any such announcement without the prior written consent of Agent (such consent of Agent to be given or withheld in Agent's sole and absolute discretion) and the Borrower Representative. Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

13.21  <u>Joint and Several Liability</u>.

Each Obligor hereby acknowledges and agrees that all of the representations, warranties, covenants, obligations, conditions, agreements and other terms contained in this Agreement and the other Loan Documents to which it is a party shall be applicable to and shall be binding upon each Obligor unless expressly otherwise stated herein.

Each Obligor shall be jointly and severally liable for all of the Obligations of each other Obligor, regardless of which Obligor actually receives the proceeds or other benefits of the Loans or other extensions of credit hereunder or the manner in which Obligors, Agent or any Lender accounts therefor in their respective books and records.

Each Obligor acknowledges that it will enjoy significant benefits from the business conducted by each other Obligor because of, inter alia, their combined ability to bargain with other Persons including their ability to receive the Loans and other credit extensions under this Agreement and the other Loan Documents which would not have been available to any Obligor acting alone. Obligors' business is a mutual and collective enterprise, and the successful operation of each Obligor is dependent upon the successful performance of the integrated group. Each Obligor has determined that it is in its best interest to procure the credit facilities contemplated hereunder, with the credit support of each other Obligor as contemplated by this Agreement and the other Loan Documents. Obligors acknowledge that Agent's and Lenders' willingness to extend credit and to administer the Collateral on a combined basis hereunder is done solely as an accommodation to Obligors and at Obligors' request.

Each of Agent and the Lenders have advised each Obligor that it is unwilling to enter into this Agreement and the other Loan Documents and make available the credit facilities extended hereby or

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

thereby to any Obligor unless each Obligor agrees, among other things, to be jointly and severally liable for the due and proper payment of the Obligations of each other Obligor.  Each Obligor has determined that it is in its best interest and in pursuit of its purposes that it so induce the Lenders to extend credit pursuant to this Agreement, the Loan Documents and the other documents executed in connection herewith (a) because of the desirability to each Obligor of the credit facilities hereunder and the interest rates and the modes of borrowing available hereunder and thereunder, (b) because each Obligor may engage in transactions jointly with other Obligors and (c) because each Obligor may require, from time to time, access to funds under this Agreement for the purposes herein set forth.  Each Obligor, individually, expressly understands, agrees and acknowledges, that the credit facilities contemplated hereunder would not be made available on the terms herein in the absence of the collective credit of all Obligors, and the joint and several liability of all Obligors.  Accordingly, each Obligor acknowledges that the benefit of the accommodations made under this Agreement to Obligors, as a whole, constitutes reasonably equivalent value, regardless of the amount of the indebtedness actually borrowed by, advanced to, or the amount of credit provided to, or the amount of collateral provided by, any one Obligor.

To the extent that applicable law otherwise would render the full amount of the joint and several obligations of any Obligor hereunder and under the other Loan Documents invalid or unenforceable, such Person's obligations hereunder and under the other Loan Documents shall be limited to the maximum amount which does not result in such invalidity or unenforceability; provided, however, that each Obligor's obligations hereunder and under the other Loan Documents shall be presumptively valid and enforceable to their fullest extent in accordance with the terms hereof or thereof, as if this Section 13.21 were not a part of this Agreement.

To the extent that any Obligor shall make a payment under this Section 13.21 of all or any of the Obligations (a "Joint Liability Payment") which, taking into account all other Joint Liability Payments then previously or concurrently made by any other Obligor, exceeds the amount that such Obligor would otherwise have paid if each Obligor had paid the aggregate Obligations satisfied by such Joint Liability Payments in the same proportion that such Person's "Allocable Amount" (as defined below) (as determined immediately prior to such Joint Liability Payments) bore to the aggregate Allocable Amounts of each Obligor as determined immediately prior to the making of such Joint Liability Payments, then, following Payment in Full, such Obligor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Obligor for the amount of such excess, pro rata based upon their respective Allocable Amounts in effect immediately prior to such Joint Liability Payments.  As of any date of determination, the "Allocable Amount" of any Obligor shall be equal to the maximum amount of the claim which could then be recovered from such Obligor under this Section 13.21 without rendering such claim voidable or avoidable under §548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.

Each Obligor assumes responsibility for keeping itself informed of the financial condition of each other Obligor, and any and all endorsers and/or guarantors of any instrument or document evidencing all or any part of such other Obligor's Obligations, and of all other circumstances bearing upon the risk of nonpayment by such other Obligor of their Obligations, and each Obligor agrees that neither Agent nor any Lender shall have any duty to advise such Obligor of information known to Agent or any Lender regarding such condition or any such circumstances or to undertake any investigation not a part of its regular business routine.  If Agent or any Lender, in its sole discretion, undertakes at any time or from time to time to provide any such information to a Obligor, neither Agent nor any Lender shall be under any obligation to update any such information or to provide any such information to such Obligor or any other Person on any subsequent occasion.

126

Each Obligor hereby authorizes Agent to, at any time and from time to time, (a) in accordance with the terms of this Agreement, renew, extend, accelerate or otherwise change the time for payment of, or other terms relating to, Obligations incurred by any Obligor or any other Obligor, otherwise modify, amend or change the terms of any promissory note or other agreement, document or instrument now or hereafter executed by any Obligor or any other Obligor and delivered to Agent or any Lender; (b) accept partial payments on an Obligation incurred by any Obligor; (c) take and hold security or collateral for the payment of an Obligation incurred by any Obligor hereunder or for the payment of any guaranties of an Obligation incurred by any Obligor or other liabilities of any Obligor and exchange, enforce, waive and release any such security or collateral; (d) apply such security or collateral and direct the order or manner of sale thereof as Agent, in its sole discretion, may determine; and (e) settle, release, compromise, collect or otherwise liquidate an Obligation incurred by any Obligor and any security or collateral therefor in any manner, without affecting or impairing the obligations of any other Obligor.  In accordance with the terms of this Agreement, Agent shall have the exclusive right to determine the time and manner of application of any payments or credits, whether received from a Obligor or any other source, and such determination shall be binding on each Obligor.  In accordance with the terms of this Agreement, all such payments and credits may be applied, reversed and reapplied, in whole or in part, to any of an Obligation incurred by any Obligor as Agent shall determine in its sole discretion without affecting the validity or enforceability of the Obligations of any other Obligor.  For the avoidance of doubt, the authority granted to Agent pursuant to this <u>Section 13.21</u> is being granted solely by the Obligors and in no respect is a grant of authority by any Lender.  Nothing in this <u>Section 13.21</u> shall (i) modify any right of any Obligor or any Lender to consent to any amendment or modification of this Agreement or the other Loan Documents in accordance with the terms hereof or thereof, (ii) supplement or modify in any respect any authority granted by the Lenders to Agent pursuant to any other provision of this Agreement or any other Loan Documents or (iii) affect or in any way limit the rights of Agent or any Lender under this Agreement or any of the other Loan Documents.

Each Obligor hereby agrees that, except as hereinafter provided, its obligations hereunder shall be unconditional, irrespective of (a) the absence of any attempt to collect an Obligation incurred by any Obligor from any Obligor or any guarantor or other action to enforce the same; (b) any failure by Agent to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for an Obligation incurred by any Obligor; (c) any borrowing or grant of a security interest by any Obligor as debtor-in-possession under §364 of the Bankruptcy Code; (d) the disallowance, under §502 of the Bankruptcy Code, of all or any portion of Agent's or any Lender's claim(s) for repayment of any portion of an Obligation incurred by any Obligor; or (e) any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor unless such legal or equitable discharge or defense is that of a Obligor in its capacity as a Obligor.

Any notice given by Borrower Representative hereunder shall constitute and be deemed to be notice given by all Obligors, jointly and severally.  Notice given by Agent or any Lender to Obligor Representative hereunder or pursuant to any other Loan Documents in accordance with the terms hereof or thereof shall constitute notice to each Obligor.  The knowledge of any Obligor shall be imputed to all Obligors and any consent by Borrower Representative or any Obligor shall constitute the consent of and shall bind all Obligors.

This <u>Section 13.21</u> is intended only to define the relative rights of Obligors and nothing set forth in this <u>Section 13.21</u> is intended to or shall impair the obligations of Obligors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement or any other Loan Documents.  Nothing contained in this <u>Section 13.21</u> shall limit the liability of any Obligor to pay the credit facilities made directly or indirectly to such Obligor and accrued interest, fees and expenses with respect thereto for which such Obligor shall be primarily liable.

The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of each Obligor to which such contribution and indemnification is owing. The rights of any indemnifying Obligor against the other Obligors under this Section 13.21 shall be exercisable upon Payment in Full.

No payment made by or for the account of a Obligor, including (a) a payment made by such Obligor on behalf of an Obligation of another Obligor or (b) a payment made by any other Person under any guaranty, shall entitle such Obligor, by subrogation or otherwise, to any payment from such other Obligor or from or out of property of such other Obligor and such Obligor shall not exercise any right or remedy against such other Obligor or any property of such other Obligor by reason of any performance of such Obligor of its joint and several obligations hereunder, until, in each case, Payment in Full.

13.22    Patriot Act Notice.    Agent and Lenders hereby notify each Obligor that pursuant to the requirements of the Patriot Act, Agent and Lenders are required to obtain, verify and record information that identifies each Obligor, including its legal name, address, tax ID number and other information that will allow Agent and Lenders to identify it in accordance with the Patriot Act. Agent and Lenders will also require information regarding each personal guarantor, if any, and may require information regarding any Obligor's management and owners, such as legal name, address, social security number and date of birth.

13.23    Relationship with Lenders.    The obligations of each Lender hereunder are several, and no Lender shall be responsible for the obligations or Commitments of any other Lender. Amounts payable hereunder to each Lender shall be a separate and independent debt. It shall not be necessary for Agent or any other Lender to be joined as an additional party in any proceeding for such purposes. Nothing in this Agreement and no action of Agent, Lenders, Bank or any other secured party pursuant to the Loan Documents or otherwise shall be deemed to constitute Agent and any secured party to be a partnership, association, Joint Venture or any other kind of entity, nor to constitute control of any Obligor.

13.24    Appointment for Perfection.    Each Lender hereby appoints each other Lender as its agent for the purpose of perfecting Liens, for the benefit of Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable law can be perfected only by possession. Should any Lender (other than Agent) obtain possession of any such Collateral, such Lender shall notify Agent thereof and, promptly upon Agent's request therefor, shall deliver such Collateral to Agent or otherwise deal with such Collateral in accordance with Agent's instructions.

13.25    Independence of Covenants.    All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permissible by an exception to, or would otherwise be within the limitations of, another covenant shall avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

13.26    No Advisory or Fiduciary Responsibility.    In connection with all aspects of each transaction contemplated by any Loan Document, Obligors acknowledge and agree that (a)(i) this credit facility and any related arranging or other services by Agent, any Lender, any of their Affiliates or any arranger are arms'-length commercial transactions between Obligors and such Person; (ii) Obligors have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate; and (iii) Obligors are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated by the Loan Documents; (b) each of Agent, Lenders, their Affiliates and any arranger is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for Obligors, any of their Affiliates or any other Person, and has no obligation with respect to the transactions contemplated by the Loan Documents except as expressly set forth therein; and (c) Agent,

Lenders, their Affiliates and any arranger may be engaged in a broad range of transactions that involve interests that differ from those of Obligors and their Affiliates, and have no obligation to disclose any of such interests to Obligors or their Affiliates.  To the fullest extent permitted by applicable law, each Obligor hereby waives and releases any claims that it may have against Agent, Lenders, their Affiliates and any arranger with respect to any breach of agency or fiduciary duty in connection with any transaction contemplated by a Loan Document.

13.27    <u>Intercreditor Arrangements</u>.  Notwithstanding anything herein to the contrary, the Liens and security interests granted Agent pursuant to this Agreement and the exercise of any right or remedy by Agent hereunder, are subject to the Intercreditor Arrangements.  In the event of any conflict between the terms of the Intercreditor Arrangements and the terms of this Agreement, the terms of the Intercreditor Arrangements shall govern and control.

13.28    <u>Certifications From Banks and Participants; Patriot Act</u>.

(a)    Each Lender or assignee or participant of a Lender that is not incorporated under the Laws of the United States of America or a state thereof (and is not excepted from the certification requirement contained in Section 313 of the Patriot Act and the applicable regulations because it is both (i) an affiliate of a depository institution or foreign bank that maintains a physical presence in the United States or foreign country, and (ii) subject to supervision by a banking authority regulating such affiliated depository institution or foreign bank) shall deliver to the Agent the certification, or, if applicable, recertification, certifying that such Lender is not a "shell" and certifying to other matters as required by Section 313 of the Patriot Act and the applicable regulations: (1) within ten (10) days after the Closing Date, and (2) as such other times as are required under the Patriot Act.

(b)    The Patriot Act requires all financial institutions to obtain, verify and record certain information that identifies individuals or business entities which open an "account" with such financial institution. Consequently, Lender may from time to time request, and each Borrower shall provide to Lender, such Borrower's name, address, tax identification number and/or such other identifying information as shall be necessary for Lender to comply with the Patriot Act and any other Anti-Terrorism Law.

13.30    <u>Anti-Terrorism Laws</u>.

(a)    Each Borrower represents and warrants that (i) no Covered Entity is a Sanctioned Person and (ii) no Covered Entity, either in its own right or through any third party, (A) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (B) does business in or with, or derives any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; or (C) engages in any dealings or transactions prohibited by any Anti-Terrorism Law.

(b)    Each Borrower covenants and agrees that (i) no Covered Entity will become a Sanctioned Person, (ii) no Covered Entity, either in its own right or through any third party, will (A) have any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (B) do business in or with, or derive any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; (C) engage in any dealings or transactions prohibited by any Anti-Terrorism Law or (D) use the Advances to fund any operations in, finance any investments or activities in, or, make any payments to, a Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law, (iii) the funds used to repay the Obligations will not be derived from any unlawful activity, (iv) each Covered

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

Entity shall comply with all Anti-Terrorism Laws and (v) the Borrowers shall promptly notify the Agent in writing upon the occurrence of a Reportable Compliance Event.

## SECTION 14. GUARANTY

14.1    <u>Guaranty</u>.  Each Obligor hereby jointly and severally, absolutely, unconditionally and irrevocably guarantees to Agent, each LC Issuer and each Lender, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of all Secured Obligations now or hereafter existing under any Loan Document, whether for principal, interest, LC Obligations, fees, commissions, indemnifications, and all costs and expenses including, without limitation, all court costs and reasonable and documented out of pocket attorneys' and paralegals' fees and expenses paid or incurred by Agent, the LC Issuers and the Lenders in endeavoring to collect all or any part of the Secured Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Secured Obligations, in each case except to the extent consisting of obligations or liabilities with respect to Excluded Swap Obligations (collectively with the Secured Obligations, the "<u>Guaranteed Obligations</u>").  Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Guaranty Agreement apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of any Lender that extended any portion of the Guaranteed Obligations.

14.2    <u>Guaranty Absolute</u>.  Each Obligor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of Agent, the Lenders or the LC Issuers with respect thereto.  Each Obligor agrees that this <u>Section 14</u> constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by Agent, any LC Issuer or any Lender to sue any Borrower, any Guarantor, any other guarantor, or any other Person obligated for all or any part of the Guaranteed Obligations (each, an "<u>Obligated Party</u>"), or otherwise enforce its payment against any Collateral securing all or any part of the Guaranteed Obligations.  The obligations of each Obligor under this <u>Section 14</u> are independent of the Guaranteed Obligations and a separate action or actions may be brought and prosecuted against each Obligor to enforce such obligations, irrespective of whether any action is brought against any Obligor or whether any Obligor is joined in any such action or actions.  The liability of each Obligor under this <u>Section 14</u> shall be irrevocable, absolute and unconditional irrespective of, and each Obligor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

(a)    any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Obligor or otherwise;

(c)    any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(d)    the existence of any claim, set-off, defense or other right that any Obligor may have at any time against any Person, including Agent, any Lender or the LC Issuers;

(e)    any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Obligor; or

(f)    any other circumstance (including any statute of limitations) or any existence of or reliance on any representation by Agent, the Lenders or the LC Issuers that might otherwise constitute a defense available to, or a discharge of, any Obligated Party (other than the defense of final payment in full of the Obligations).

14.3    <u>Waiver</u>.  To the maximum extent permitted by applicable law, each Obligor hereby waives (i) promptness and diligence, (ii) acceptance hereof, presentment, demand, protest, notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this <u>Section 14</u> and any requirement that Agent, the Lenders or the LC Issuers exhaust any right or take any action against any Obligor or any other Person or any Collateral, (iii) any right to compel or direct Agent, any Lender or any LC Issuer to seek payment or recovery of any amounts owed under this <u>Section 14</u> from any one particular fund or source or to exhaust any right or take any action against any other Obligor, any other Person or any Collateral, (iv) any requirement that Agent, any Lender or any LC Issuer protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Obligor, any other Person or any Collateral, (v) any defense, right of set-off, claim or counterclaim whatsoever and any and all other rights, benefits, protections and other defenses available to such Obligor now or at any time hereafter, including under California Civil Code Sections 2787 to 2855, inclusive, and California Code of Civil Procedure Sections 580a, 580b, 580d or 726, and all successor sections, whether or not constituting applicable law; (vi) all benefits or defenses arising under Chapter 2 of Title 14 of the California Civil Code, and all successor sections, whether or not constituting applicable law; and (vii) all other principles or provisions of law, if any, that conflict with the terms of this <u>Section 14</u>, including the effect of any circumstances that may or might constitute a legal or equitable discharge of a guarantor.  Each Obligor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder.  Each Obligor waives all rights and defenses arising out of an election of remedies by Agent and the Lenders, even though that election of remedies, such as a judicial or nonjudicial sale or foreclosure, or an assignment of any Collateral in lieu of foreclosure, in each case with respect to security for a guaranteed obligation, has destroyed such Obligor's rights of subrogation and reimbursement against the principal (by the operation of Section 580d of the California Code of Civil Procedure, or otherwise).  Each Obligor agrees that Agent, the Lenders and the LC Issuers shall have no obligation to marshal any assets in favor of any Obligor or against, or in payment of, any or all of the Guaranteed Obligations.  Each Obligor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this <u>Section 14.3</u> is knowingly made in contemplation of such benefits.  Each Obligor hereby waives any right to revoke this <u>Section 14</u>, and acknowledges that this <u>Section 14</u> is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.  Any reference herein to California code sections shall be deemed to include any equivalent code provisions under New York law.  Without limiting the applicability of the equivalent code provisions under New York law, the foregoing references to the California Code of Civil Procedure and the California Civil Code shall apply if, notwithstanding the provisions of this Agreement and the other Loan Documents, the laws of the State of California are applied to the Loan Documents; <u>provided</u>, that the inclusion of such provisions does not affect or limit in any way the parties' choice of New York law.

14.4    <u>Continuing Guaranty; Assignments</u>.  This <u>Section 14</u> is a continuing guaranty and shall (a) remain in full force and effect until the later of (i) the cash payment in full of the Guaranteed Obligations (other than contingent indemnification obligations as to which no claim has been made) and all other amounts payable under this <u>Section 14</u> and (ii) Payment in Full, (b) be binding upon each Obligor, its successors and assigns and (c) inure to the benefit of and be enforceable by Agent, the Lenders and the LC Issuers and their successors, pledgees, transferees and assigns.  Without limiting the

131

generality of the foregoing clause (c), any Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including all or any portion of its Commitments, its Loans, the Reimbursement Obligations and the LC Obligations owing to it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted such Lender herein or otherwise, in each case as provided in Section 13.2.

14.5    Subrogation.  No Obligor will exercise any rights that it may now or hereafter acquire against any Obligated Party that arise from the existence, payment, performance or enforcement of such Obligor's obligations under this Section 14, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim, cause of action or remedy of Agent, the Lenders and the LC Issuers against any Obligor or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from any Obligor or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until Payment in Full.  If any amount shall be paid to any Obligor in violation of the immediately preceding sentence at any time prior to Payment in Full, such amount shall be held in trust for the benefit of Agent for its benefit and the benefit of the other Secured Parties and shall forthwith be paid to Agent for its benefit and the benefit of the other Secured Parties to be credited and applied to the Guaranteed Obligations, and all other amounts payable under this Section 14, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations, or other amounts payable under this Section 14 thereafter arising.  If any Obligor shall make payment to Agent, the Lenders and the LC Issuers of all or any part of the Guaranteed Obligations, upon Payment in Full, Agent, the Lenders and the LC Issuers will, at such Obligor's request and expense, execute and deliver to such Obligor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Obligor of an interest in the Guaranteed Obligations, resulting from such payment by such Obligor.

14.6    [Intentionally omitted].

14.7    Information.  Each Guarantor assumes all responsibility for being and keeping itself informed of Borrowers' financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Guarantor assumes and incurs under this Guaranty Agreement, and agrees that neither Agent, any LC Issuer nor any Lender shall have any duty to advise any Guarantor of information known to it regarding those circumstances or risks.

14.8    Termination.  The Lenders may continue to make loans or extend credit to Borrowers based on this Guaranty Agreement until five days after it receives written notice of termination from any Guarantor.  Notwithstanding receipt of any such notice, each Guarantor will continue to be liable for any Guaranteed Obligations created, assumed or committed to prior to the fifth day after receipt of the notice, and all subsequent renewals, extensions, modifications and amendments with respect to, or substitutions for, all or any part of that Guaranteed Obligations.

14.9    Taxes.  All payments of the Guaranteed Obligations will be made by each Guarantor free and clear of and without deduction for any Non-Excluded Taxes or Other Taxes; provided that if any Guarantor shall be required to deduct any Non-Excluded Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 14.9) Agent, any Lender or any LC Issuer (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Guarantor shall make such deductions and (iii) such Guarantor shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

14.10   Maximum Liability.   The provisions of this Guaranty Agreement are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under this Guaranty Agreement would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Guarantor's liability under this Guaranty Agreement, then, notwithstanding any other provision of this Guaranty Agreement to the contrary, the amount of such liability shall, without any further action by the Guarantors or the Lenders, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "Maximum Liability".  This Section 14.10 with respect to the Maximum Liability of each Guarantor is intended solely to preserve the rights of the Lenders to the maximum extent not subject to avoidance under applicable law, and no Guarantor nor any other person or entity shall have any right or claim under this Section 14.10 with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Guarantor hereunder shall not be rendered voidable under applicable law.  Each Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of each Guarantor without impairing this Guaranty Agreement or affecting the rights and remedies of the Lenders hereunder, provided that, nothing in this sentence shall be construed to increase any Guarantor's obligations hereunder beyond its Maximum Liability.

14.11   Contribution.   In the event any Guarantor (a "Paying Guarantor") shall make any payment or payments under this Guaranty Agreement or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Guaranty Agreement, each other Guarantor (each a "Non-Paying Guarantor") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Applicable Guarantor Percentage" of such payment or payments made, or losses suffered, by such Paying Guarantor.  For purposes of this Section 14, each Non-Paying Guarantor's "Applicable Guarantor Percentage" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (i) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from Borrowers after the date hereof (whether by loan, capital infusion or by other means) to (ii) the aggregate Maximum Liability of all Guarantors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Guarantor, the aggregate amount of all monies received by such Guarantors from Borrowers after the date hereof (whether by loan, capital infusion or by other means).   Nothing in this provision shall affect any Guarantor's several liability for the entire amount of the Guaranteed Obligations (up to such Guarantor's Maximum Liability).   Each of the Guarantors covenants and agrees that its right to receive any contribution under this Guaranty Agreement from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the payment in full in cash of the Guaranteed Obligations.  This provision is for the benefit of each of Agent, each LC Issuer, each Lender, and the Guarantors, and may be enforced by any one, or more, or all of them in accordance with the terms hereof.

14.12   Keepwell.   Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Guarantor to honor all of such Guarantor's obligations under this Guaranty in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this subsection for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this subsection, or otherwise under this Guaranty Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).   The obligations of each Qualified ECP Guarantor under this subsection shall remain in full

133

force and effect until the termination of each Guarantor's obligations under this Agreement. Each Qualified ECP Guarantor intends that this subsection constitute, and this subsection shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

## SECTION 15. THE BORROWER REPRESENTATIVE

15.1    Appointment; Nature of Relationship. Chassix is hereby appointed by each Borrower as its contractual representative (herein referred to as the "Borrower Representative") hereunder and under each other Loan Document, and each Borrower irrevocably authorizes the Borrower Representative to act as the contractual representative of such Borrower with the rights and duties expressly set forth herein and in the other Loan Documents. The Borrower Representative agrees to act as such contractual representative upon the express conditions contained in this Section 15. Additionally, Borrowers hereby appoint the Borrower Representative as their agent to receive all of the proceeds of the Loans in the deposit account or accounts designated for such purpose by the Borrower Representative from time to time, at which time the Borrower Representative shall promptly disburse such Loans to the appropriate Borrower. Agent and the Lenders, and their respective officers, directors, agents or employees, shall not be liable to the Borrower Representative or any Borrower for any action taken or omitted to be taken by the Borrower Representative or Borrowers pursuant to this Section 15.1.

15.2    Powers. The Borrower Representative shall have and may exercise such powers under the Loan Documents as are specifically delegated to the Borrower Representative by the terms of each thereof, together with such powers as are reasonably incidental thereto. The Borrower Representative shall have no implied duties to Borrowers, or any obligation to the Lenders to take any action thereunder except any action specifically provided by the Loan Documents to be taken by the Borrower Representative.

15.3    Employment of Agents. The Borrower Representative may execute any of its duties as the Borrower Representative hereunder and under any other Loan Document by or through authorized officers.

15.4    Notices. Each Borrower shall immediately notify the Borrower Representative of the occurrence of any Default or Event of Default hereunder or under any other Loan Document, referring to this Agreement describing such Default or Event of Default and stating that such notice is a "notice of default." In the event that the Borrower Representative receives such a notice, the Borrower Representative shall give prompt notice thereof to Agent and the Lenders. Any notice provided to the Borrower Representative hereunder shall constitute notice to each Borrower on the date received by the Borrower Representative.

15.5    Successor Borrower Representative. Upon the prior written consent of Agent, the Borrower Representative may resign at any time, such resignation to be effective upon the appointment of a successor Borrower Representative who shall be reasonably acceptable to Agent. Agent shall give prompt written notice of such resignation to the Lenders.

15.6    Execution of Loan Documents; Borrowing Base Certificate. The Borrowers hereby empower and authorize the Borrower Representative, on behalf of all Borrowers, to execute and deliver to Agent and the Lenders the Loan Documents and all related agreements, certificates, documents, or instruments as shall be necessary or appropriate to effect the purposes of the Loan Documents, including without limitation, the Borrowing Base Certificates and the Compliance Certificates. Each Borrower agrees that any action taken by the Borrower Representative or Borrowers in accordance with the terms of this Agreement or the other Loan Documents, and the exercise by the Borrower Representative of its

134

powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of Borrowers.

15.7    <u>Reporting</u>.  Each Borrower hereby agrees that such Borrower shall furnish promptly after each week and each calendar month to the Borrower Representative a copy of its Borrowing Base Certificate and any other certificate or report required hereunder or requested by the Borrower Representative on which the Borrower Representative shall rely to prepare the Borrowing Base Certificates and Compliance Certificates required pursuant to the provisions of this Agreement.

15.8    <u>Excluded Swap Obligations and Security Documents</u>.  Notwithstanding anything to the contrary contained in any Loan Document, no Lien on any asset of any Guarantor created under any Security Document shall secure any Excluded Swap Obligation.

[Signature Pages Follow]

WEIL:\95250238\4\99980.0025

Detroit_5279807_16

**IN WITNESS WHEREOF**, this Agreement has been duly executed on the day and year specified at the beginning of this Agreement.

**CHASSIX, INC.**

By: _____
Name: J. Mark Allan
Title: President and Chief Executive Officer

**DIVERSIFIED MACHINE, INC.**

By: _____
Name: J. Mark Allan
Title: President and Chief Executive Officer

**DIVERSIFIED MACHINE BRISTOL, LLC**

By: _____
Name: J. Mark Allan
Title: President and Chief Executive Officer

**DIVERSIFIED MACHINE MONTAGUE, LLC**

By: _____
Name: J. Mark Allan
Title: President and Chief Executive Officer

**DIVERSIFIED MACHINE, MILWAUKEE LLC**

By: _____
Name: J. Mark Allan
Title: President and Chief Executive Officer

[SIGNATURE PAGE TO DIP ABL CREDIT AGREEMENT]

**DMI EDON LLC**

By: _____
Name: J. Mark Allan
Title: President and Chief Executive Officer

**MEXICO PRODUCTS I, LLC**

By: _____
Name: J. Mark Allan
Title: President and Chief Executive Officer

**DMI COLUMBUS, LLC**

By: _____
Name: J. Mark Allan
Title: President and Chief Executive Officer

**CHASSIX GEORGIA MACHINING, LLC**

By: _____
Name: J. Mark Allan
Title: President and Chief Executive Officer

**DMI CHINA HOLDING LLC**

By: _____
Name: J. Mark Allan
Title: President and Chief Executive Officer

**CONCORD INTERNATIONAL, INC.**

By: _____
Name: J. Mark Allan
Title: President

[SIGNATURE PAGE TO DIP ABL CREDIT AGREEMENT]

**SMW AUTOMOTIVE, LLC**

By: _____
　　Name: J. Mark Allan
　　Title: President

**AUTOMOTIVE, LLC**

By: _____
　　Name: J. Mark Allan
　　Title: President

**CHASSIS CO. OF MICHIGAN, LLC**

By: _____
　　Name: J. Mark Allan
　　Title: President

**AUTOMOTIVE PROPERTIES OF NEW YORK,
LLC**

By: _____
　　Name: J. Mark Allan
　　Title: President

**ALUTECH, LLC**

By: _____
　　Name: J. Mark Allan
　　Title: President

**UC HOLDINGS, INC.**

By: _____
　　Name: J. Mark Allan
　　Title: President and Chief Executive Officer

[SIGNATURE PAGE TO DIP ABL CREDIT AGREEMENT]

**PNC BANK, NATIONAL ASSOCIATION,**
as Agent, as LC Issuer,
and as Swingline Lender

By: _____

Name:  James Steffy
Title:  Vice President

**PNC BANK, NATIONAL ASSOCIATION**,
    as Lender

By: _____
    Name:  James Steffy
    Title:  Vice President

Revolving Loan Commitment:  $150,000,000

**COMMITMENT SCHEDULE**

| Lender | Revolving Loan Commitment |
|---|---|
| PNC BANK, NATIONAL ASSOCIATION | $150,000,000 |
| **Total** | $150,000,000 |

**SCHEDULE 1E**
**Foreign Subsidiaries**

| Foreign Subsidiary | Jurisdiction of Formation |
|---|---|
| Automotive Properties SCI | France |
| DMI Vaux SAS | France |
| DMI Itztapalapa, S.A. de C.V. | Mexico |
| DMI Automotive Spain, S.L | Spain |
| Diversified Machine, Barcelona S.L | Spain |
| DMI (Suzhou) Automotive Components Co., Ltd | China |
| Automotive Design and Engineering Solutions Private Limited | India |
| SMW Automotive Ltd. | Hong Kong |
| SMB Automotive Ltda | Brazil |
| Concord International SAS | France |
| AluTech SAS | France |
| SMW Automotive SAS | France |
| SMW Automotive Parts (Wuhan) Co., Ltd | China |
| Suzhou Alutech Automotive Parts Co., Ltd | China |

**SCHEDULE 1F**
**Guarantors**

1.  CHASSIX, INC.
2.  DIVERSIFIED MACHINE, INC
3.  DIVERSIFIED MACHINE BRISTOL, LLC
4.  DIVERSIFIED MACHINE MONTAGUE, LLC
5.  DIVERSIFIED MACHINE, MILWAUKEE LLC
6.  DMI EDON LLC
7.  MEXICO PRODUCTS I, LLC
8.  DMI COLUMBUS, LLC
9.  DMI CHINA HOLDING LLC
10. CHASSIX GEORGIA MACHINING, LLC
11. AUTOMOTIVE PROPERTIES OF NEW YORK, LLC
12. CONCORD INTERNATIONAL, INC.
13. SMW AUTOMOTIVE, LLC
14. AUTOMOTIVE, LLC
15. CHASSIS CO. OF MICHIGAN, LLC
16. ALUTECH, LLC
17. UC HOLDINGS, INC.

**SCHEDULE 1G**
**[Reserved]**

**SCHEDULE 1H**
**Joint Ventures**

None.

**SCHEDULE 6.1**
**Commercial Tort Claims**

None.

**SCHEDULE 7.1.1(a)**
**Locations of Collateral**

**Mailing Address / Chief Executive Office:**

| Obligor | Address |
|---|---|
| Chassix, Inc. | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |
| AluTech, LLC | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |
| Automotive, LLC | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |
| Automotive Properties of New York, LLC | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |
| Chassis Co. of Michigan, LLC | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |
| Chassix Georgia Machining, LLC | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |
| Concord International, Inc. | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |
| Diversified Machine, Inc. | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |
| Diversified Machine, Milwaukee LLC | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |
| Diversified Machine Bristol, LLC | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |
| Diversified Machine Montague, LLC | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |
| DMI China Holding LLC | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |
| DMI Columbus, LLC | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |
| DMI Edon LLC | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |
| Mexico Products I, LLC | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |
| SMW Automotive, LLC | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |
| UC Holdings, Inc. | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |

**Other Locations of Books, Records and other Collateral:**

| Obligor | Address |
|---|---|
| DMI Columbus LLC | 1600 Northside Industrial Boulevard, Columbus, GA 31904 |
| Chassix Georgia Machining, LLC | 1558 Northside Industrial Blvd., Columbus, GA 31904 |
| AluTech, LLC | 2800 Yasdick, Stevensville, MI 49127 |
| AluTech, LLC | 2660 Lawrence, Stevensville, MI 49127 |
| AluTech, LLC and Concord International, | 1320 Paw Paw Avenue, Benton Harbor, MI 49022 |

| Obligor | Address |
|---|---|
| Inc., as co-tenants | |
| Automotive, LLC | 4320 Federal Drive, Batavia, NY 14020 |
| Diversified Machine, Inc. | 2280 West Grand River Howell, MI 48843 |
| Diversified Machine Bristol, LLC | 51650 County Road #133, Bristol, IN 46507 |
| Diversified Machine Montague, LLC | 5353 Wilcox, Montague, MI 49437 |
| DMI Edon LLC | 507 W. Indiana Street, Edon, OH 43518 |
| SMW Automotive, LLC | 23300 Blackstone, Warren, MI 48089[1] |
| SMW Automotive, LLC | 12700 Stephens Road Warren, MI 48089 |
| SMW Automotive, LLC | 2005 Petit Street, Port Huron, MI 48060 |
| SMW Automotive, LLC | 3150 Dove Street, Port Huron, MI 48060 |
| SMW Automotive, LLC | 2347 Dove Street, Port Huron, MI 48060 |
| SMW Automotive, LLC | 100 Summit Drive Shelbyville, TN 37162 |
| SMW Automotive, LLC, Chassis Co. of Michigan, LLC and Concord International, Inc. | 2223 Dove Street, Port Huron, MI 48060 |
| SMW Automotive, LLC | 3 Allied Drive, Dedham, MA 02026 |
| SMW Automotive, LLC | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |
| Chassix, Inc. | 24155 Wahl Street, Warren, MI 48089 |

---

[1] F/K/A 12755 NINE MILE ROAD, WARREN, MICHIGAN 48089.

WEIL:\95255270\4\35076.0003

## SCHEDULE 7.1.1(c)
## Deposit Accounts and Securities Accounts

| No. | Debtor Name | Bank Name | Type of Account | Account No. (Full) |
|---|---|---|---|---|
| 1. | AluTech, LLC | BMO Harris Bank N.A. | Disbursement / Payroll Account | 160-672-2 |
| 2. | AluTech, LLC | BMO Harris Bank N.A. | Disbursement / Payroll Account | 160-671-4 |
| 3. | AluTech, LLC | PNC Bank, N.A. | Disbursement Account (Idle) | 80-2655-7807 |
| 4. | Automotive, LLC | BMO Harris Bank N.A. | Disbursement / Payroll Account | 160-964-3 |
| 5. | Automotive, LLC | PNC Bank, N.A. | Collection Account | 80-2623-8857 |
| 6. | Automotive, LLC | PNC Bank, N.A. | Disbursement Account (Idle) | 80-2655-7348 |
| 7. | Automotive Properties of New York, LLC | PNC Bank, N.A. | Disbursement Account (Idle) | 80-2655-7479 |
| 8. | Chassix Co. of Michigan, LLC | BMO Harris Bank N.A. | Disbursement / Payroll Account | 203-065-8 |
| 9. | Chassix Co. of Michigan, LLC | PNC Bank, N.A. | Collection Account | 80-2623-8822 |
| 10. | Chassix Co. of Michigan, LLC | PNC Bank, N.A. | Disbursement Account (Idle) | 80-2655-7321 |
| 11. | Chassix, Inc. | BMO Harris Bank N.A. | Check Disbursement Account | 398-919-1 |
| 12. | Chassix, Inc. | BMO Harris Bank N.A. | Disbursement / Payroll Account | 398-918-3 |
| 13. | Chassix Georgia Machining, LLC | BMO Harris Bank N.A. | Disbursement / Payroll Account | 202-287-9 |
| 14. | Chassix Georgia Machining, LLC | BMO Harris Bank N.A. | Collection Account | 202-285-3 |
| 15. | Concord International, Inc. | PNC Bank, N.A. | Collection Account | 80-2623-8873 |
| 16. | Concord International, Inc. | PNC Bank, N.A. | Operating Account | 80-2623-9024 |
| 17. | Concord International, Inc. | PNC Bank, N.A. | Disbursement / Transfer Account | 80-2655-7364 |
| 18. | Concord International, Inc. | Bangkok Bank Public Company Limited | Local Disbursement Account | 203-3-053576 |
| 19. | Concord International, Inc. | Société Générale S.A. | Local Disbursement Account | 30003 02070 00020021949 81 |
| 20. | Diversified Machine, Inc. | BMO Harris Bank N.A. | Collections Concentration Account | 236-679-7 |
| 21. | Diversified Machine, Inc. | BMO Harris Bank N.A. | Disbursements Concentration Account | 236-680-5 |
| 22. | Diversified Machine, Inc. | BMO Harris Bank N.A. | Collection Account | 236-671-4 |
| 23. | Diversified Machine, Inc. | BMO Harris Bank N.A. | Disbursement / Payroll Account | 236-662-3 |

8

| No. | Debtor Name | Bank Name | Type of Account | Account No. (Full) |
|---|---|---|---|---|
| 24. | Diversified Machine, Inc. | BMO Harris Bank N.A. | Capital Expenditures Equity Account (Idle) | 236-757-1 |
| 25. | Diversified Machine, Milwaukee LLC | BMO Harris Bank N.A. | Collection Account | 236-676-3 |
| 26. | Diversified Machine, Milwaukee LLC | BMO Harris Bank N.A. | Disbursement / Payroll Account | 236-666-4 |
| 27. | Diversified Machine Bristol, LLC | BMO Harris Bank N.A. | Collection Account | 236-673-0 |
| 28. | Diversified Machine Bristol, LLC | BMO Harris Bank N.A. | Disbursement / Payroll Account | 236-665-6 |
| 29. | Diversified Machine Montague, LLC | BMO Harris Bank N.A. | Collection Account | 236-672-2 |
| 30. | Diversified Machine Montague, LLC | BMO Harris Bank N.A. | Disbursement / Payroll Account | 236-664-9 |
| 31. | DMI China Holding LLC | BMO Harris Bank N.A. | Disbursement / Payroll Account | 236-635-9 |
| 32. | DMI Columbus, LLC | BMO Harris Bank N.A. | Collection Account | 236-678-9 |
| 33. | DMI Columbus, LLC | BMO Harris Bank N.A. | Disbursement / Payroll Account | 236-670-6 |
| 34. | DMI Edon LLC | BMO Harris Bank N.A. | Collection Account | 236-677-1 |
| 35. | DMI Edon LLC | BMO Harris Bank N.A. | Disbursement / Payroll Account | 236-667-2 |
| 36. | SMW Automotive, LLC | BMO Harris Bank N.A. | Disbursement / Payroll Account | 399-407-6 |
| 37. | SMW Automotive, LLC | BMO Harris Bank N.A. | Disbursement / Payroll Account | 399-375-5 |
| 38. | SMW Automotive, LLC | BMO Harris Bank N.A. | Disbursement / Payroll Account | 399-332-6 |
| 39. | SMW Automotive, LLC | BMO Harris Bank N.A. | Disbursement / Payroll Account | 399-406-8 |
| 40. | SMW Automotive, LLC | BMO Harris Bank N.A. | Disbursement / Payroll Account | 399-376-3 |
| 41. | SMW Automotive, LLC | BMO Harris Bank N.A. | Disbursement / Payroll Account | 399-377-1 |
| 42. | SMW Automotive, LLC | PNC Bank, N.A. | Multicurrency Operating Account (Idle) | 781-0026247 |
| 43. | SMW Automotive, LLC | PNC Bank, N.A. | Collection Account | 80-2623-8865 |
| 44. | SMW Automotive, LLC | PNC Bank, N.A. | Lease Disbursement Account | 80-2655-7356 |

WEIL:\95255270\4\35076.0003

**SCHEDULE 8.1.1**
**Foreign Qualifications**

| Obligor or Subsidiary | Foreign Qualification(s) |
|---|---|
| Automotive, LLC | Michigan |
| Automotive Properties of New York, LLC | Michigan, Tennessee |
| Chassix Georgia Machining, LLC | Georgia |
| Concord International, Inc. | Michigan |
| Diversified Machine, Inc. | Michigan |
| Diversified Machine, Milwaukee LLC | Wisconsin |
| Diversified Machine Bristol, LLC | Indiana, Michigan |
| Diversified Machine Montague, LLC | Indiana, Michigan |
| DMI Columbus, LLC | Georgia |
| DMI Edon LLC | Ohio |
| SMW Automotive, LLC | Tennessee, Michigan |

**SCHEDULE 8.1.4**
**Names and Capital Structure**

**Legal name, jurisdiction of organization and organizational ID number:**

| Legal Name | State of Formation | Org. # |
|---|---|---|
| Chassix, Inc. | Delaware | 5254945 |
| AluTech, LLC | Michigan | B 1308N |
| Automotive, LLC | Delaware | 5295493 |
| Automotive Properties of New York, LLC | New York | 2681002 |
| Chassis Co. of Michigan, LLC | Delaware | 5295496 |
| Chassix Georgia Machining, LLC | Delaware | 4732188 |
| Concord International, Inc. | Delaware | 2128864 |
| Diversified Machine, Inc. | Delaware | 4005929 |
| Diversified Machine, Milwaukee LLC | Delaware | 4463236 |
| Diversified Machine Bristol, LLC | Delaware | 5295495 |
| Diversified Machine Montague, LLC | Delaware | 5295497 |
| DMI China Holding LLC | Michigan | D63276 |
| DMI Columbus, LLC | Delaware | 4732187 |
| DMI Edon LLC | Delaware | 4731799 |
| Mexico Products I, LLC | Delaware | 4699921 |
| SMW Automotive, LLC | Delaware | 5295500 |
| UC Holdings, Inc. | Delaware | 4049057 |
| SMB Automotive LTDA | Brazil | n/a |
| DMI (Suzhou) Automotive Components Co., LTD | China | n/a |
| Automotive Properties SCI | France | n/a |
| Concord International SAS | France | n/a |
| SMW Automotive Ltd. | Hong Kong | n/a |
| Automotive Design and Engineering Solutions Private Limited | India | n/a |
| DMI Iztapalapa, S.A. de C.V. | Mexico | n/a |
| Diversified Machine, Barcelona S.L. | Spain | n/a |
| DMI Automotive Spain, S.L. | Spain | n/a |

**Authorized and Issued Equity Interests and Direct Holders of Equity Interests:**

| Entity | Authorized Equity Interests | Issued Equity Interests | Direct holders of Equity Interests |
|---|---|---|---|
| Concord International, Inc. | 100 Common Shares | 100 Common Shares | Chassix, Inc. |
| Chassix, Inc. | 1,000 Common Shares | 100 Common Shares | UC Holdings, Inc. |
| SMW Automotive, LLC | Uncertificated LLC Interests | N/A | Concord International, Inc. |
| Chassis Co. of Michigan, LLC | Uncertificated LLC Interests | N/A | SMW Automotive, LLC |
| Automotive, LLC | Uncertificated LLC Interests | N/A | SMW Automotive, LLC |
| Diversified Machine, Inc. | 1,000 Common Shares | 1,000 Common Shares | Chassix, Inc. |
| Diversified Machine Bristol, LLC | Uncertificated LLC Interests | N/A | Diversified Machine, Inc. |
| Diversified Machine Montague, LLC | Uncertificated LLC Interests | N/A | Diversified Machine, Inc. |
| DMI Itztapalapa, S.A. de C.V. | 51,000 Class A shares 153,846,600 Class B shares 32,250,000 Class C shares | 51,000 Class A shares 153,846,600 Class B shares 32,250,000 Class C shares | DMI Edon LLC Mexico Products I, LLC |
| SMW Automotive Ltd. | 10,000 Ordinary Shares | 100 Ordinary Shares | Concord International, Inc. |
| Concord International SAS | 900,000 Shares | 900,000 Shares | Concord International, Inc. |
| SMB Automotive LTDA | 8,566,802 quotas | 8,566,802 quotas | Concord International, Inc. |
| Automotive Properties SCI | 1,000 Shares | 1,000 Shares | Automotive Properties of New York, LLC (90%) SMW Automotive SAS (10%) |
| DMI (Suzhou) Automotive Components Co., LTD | Uncertificated Interests | N/A | DMI China Holding LLC |
| Automotive Properties of New York, LLC | Uncertificated LLC Interests | N/A | Chassix, Inc. |
| AluTech, LLC | Uncertificated LLC Interests | N/A | Concord International, Inc. |
| DMI China Holding LLC | Uncertificated LLC Interests | N/A | Diversified Machine, Inc. |
| Diversified Machine, Barcelona S.L. | Uncertificated S.L. Interests | N/A | Diversified Machine, Inc. |
| Chassix Georgia Machining, LLC | Uncertificated LLC Interests | N/A | Diversified Machine, Inc. |

12

| Entity | Authorized Equity Interests | Issued Equity Interests | Direct holders of Equity Interests |
|---|---|---|---|
| DMI Columbus, LLC | Uncertificated LLC Interests | N/A | Diversified Machine, Inc. |
| DMI Edon LLC | Uncertificated LLC Interests | N/A | Diversified Machine, Inc. |
| Diversified Machine, Milwaukee LLC | Uncertificated LLC Interests | N/A | Diversified Machine, Inc. |
| Mexico Products I, LLC | Uncertificated LLC Interests | N/A | Diversified Machine, Inc. |
| UC Holdings, Inc. | 1,000 Common Shares | 100 Common Shares | Chassix Holdings, Inc. |

**Agreements binding on holders of Equity Interests with respect to their Equity Interests:**

- Bylaws and Limited Liability Company Agreements of the Obligor and their Subsidiaries

13

**SCHEDULE 8.1.5**
**Title to Properties**

**Owned Real Property:**

| Owner | Address |
|---|---|
| Automotive Properties of New York, LLC | 4320 Federal Drive, Batavia, NY 14020 |
| Automotive Properties of New York, LLC | 2223 Dove Street, Port Huron, MI 48060 |
| Automotive Properties of New York, LLC | 2347 Dove Street, Port Huron, MI 48060 |
| Automotive Properties of New York, LLC | 3150 Dove Street, Port Huron, MI 48060 |
| Automotive Properties of New York, LLC | 100 Summit Drive, Shelbyville, TN 37162 |
| Automotive Properties of New York, LLC | 1320 Paw Paw Avenue, Benton Harbor, MI 49022 |
| Automotive Properties of New York, LLC | V/L Dove Street, Port Huron, MI 48060 |
| Chassix Georgia Machining, LLC | 1600 Northside Industrial Boulevard, Columbus, GA 31904 |
| Chassix Georgia Machining, LLC | 1442 Belfast Avenue, Columbus, GA 31904 |
| AluTech, LLC | 2800 Yasdick, Stevensville, MI 49127 |
| DMI Itztapalapa, S.A. de C.V. | 1478 Colonia Barrio San Miguel Iztapalapa CP, DF Mexico 09360 |
| DMI Automotive Spain, S.L. | C/L Energia, 18, Progrés 62-68, 08850, Gavá, Barcelona, Spain |

**Leased Real Property:**

| Lessee | Address |
|---|---|
| AluTech, LLC | 2660 Lawrence, Stevensville, MI 49127 |
| AluTech, LLC and Concord International, Inc. | 1320 Paw Paw Avenue, Benton Harbor, MI 49022 |
| Automotive, LLC | 4320 Federal Drive, Batavia, NY 14020 |
| Diversified Machine, Inc. | 2280 West Grand River Howell, MI 48843 |
| Diversified Machine Bristol, LLC | 51650 County Road #133, Bristol, IN 46507 |
| Diversified Machine Montague, LLC | 5353 Wilcox, Montague, MI 49437 |

14

| Lessee | Address |
|---|---|
| DMI Edon LLC | 507 W. Indiana Street, Edon, OH 43518 |
| SMW Automotive, LLC | 23300 Blackstone, Warren, MI 48089 |
| SMW Automotive, LLC | 12700 Stephens Road Warren, MI 48089 |
| SMW Automotive, LLC | 2005 Petit Street, Port Huron, MI 48060 |
| SMW Automotive, LLC | 3150 Dove Street, Port Huron, MI 48060 |
| SMW Automotive, LLC | 2347 Dove Street, Port Huron, MI 48060 |
| SMW Automotive, LLC | 1314 Cedar Street, Port Huron, MI 48060 |
| SMW Automotive, LLC | 100 Summit Drive Shelbyville, TN 37162 |
| SMW Automotive, LLC and Concord International, Inc. | 2223 Dove Street, Port Huron, MI 48060 |
| SMW Automotive, LLC | 3 Allied Drive, Dedham, MA 02026 |
| SMW Automotive, LLC | 300 Galleria Office Center, Suite 501, Southfield, MI 48034 |
| DMI China Holding LLC | 299 Yuyang Road, Building B, Phase I, Kunshan, Jiangsu Province, China |
| Concord International, Inc. | 30-32 rue de Paradis 75010, Paris, France. |
| SMB Automotive LTDA | Rua Pedro de Toledo, 730, CEP 07140-000 Guarulhos, SP-Brasil (includes adjacent parking lot/scrap area) |
| SMB Automotive LTDA | Av três, n° 344 - Parque Industrial Norte - Vespasiano – Minas Gerais - Brazil CEP 33200-00 |
| SMW Automotive Ltd. | 58 Xinghua Road, Wuhan Economic and Technological Development Zone, Wuhan, China |
| Suzhou Alutech Automotive Parts Co., Ltd. | 78-80 Jingu Road, Chefang SIP Suzhou, 215125 China |
| SMW Automotive SAS | ZAC du Bois de Plaisance, Rue du Trou Martinet, 60280 Venette, France |

15

**SCHEDULE 8.1.14**
**Intellectual Property**

## UNITED STATES PATENTS

| Registered Owner | Patent | Registration # | Registration Date |
|---|---|---|---|
| Diversified Machine, Inc. | Wheel Bearing Retainer | 8740467 | 6/3/14 |
| SMW Automotive, LLC | Apparatus For Final Finishing A Wheel Hub Of A Knuckle Assembly And Related Method | 8656568 | 2/25/14 |
| Diversified Machine, Inc. | Knuckle and bushing assembly | 8444158 | 5/21/13 |
| Diversified Machine Montague, LLC | Mold Loading in Low-Pressure Casting | 5601135 | 2/11/97 |
| DMI Edon LLC | Measuring And Testing Device Incorporating An Air Gauge | 7509863 | 3/31/09 |
| DMI Edon LLC | Brake Rotor Assembly and Method for Making Same | 6708589 | 3/23/04 |
| Diversified Machine Montague, LLC | Flexible Manufacturing and Workpiece Transfer System | 6745454 | 6/08/04 |
| Diversified Machine Montague, LLC | Quick-Change Lock Assembly for Casting Machine Fill Tubes | 6755235 | 6/29/04 |
| Diversified Machine Montague, LLC | Mold Temperature Control for Casting System | 6763879 | 7/20/04 |
| Diversified Machine Montague, LLC | Method for Filling a Mold | 6779588 | 8/24/04 |
| Diversified Machine Montague, LLC | Safety Block Device for Use in a Press Device | 6938673 | 9/06/05 |
| Diversified Machine Montague, LLC | Method and Apparatus for Venting a Gas in a Lined Pressure Furnace | 6994148 | 2/7/06 |
| DMI Edon LLC | Knuckle Hub Assembly and Method for Making Same | 6485109 | 11/26/02 |
| DMI Edon LLC | Knuckle Hub Fixture Assembly and Method of Using Same | 6212981 | 4/10/01 |
| DMI Edon LLC | Zero Roll Suspension System | 6550797 | 4/22/03 |
| DMI Edon LLC | Knuckle hub assembly and method for making same | RE42914 | 11/15/11 |
| DMI Edon LLC | Knuckle hub assembly and method for making same | 7716833 | 5/18/10 |
| DMI Edon LLC | Knuckle hub assembly and method for making same | 6450584 | 9/17/02 |

**Applications:**

| Owner/Inventor | Patent | Application # | Application Date | Publication # | Publication Date |
|---|---|---|---|---|---|
| Diversified Machine, Inc. | Wheel Assembly and Method for Making Same | 12/709986 | 2/22/10 | 20100257737 | 10/14/10 |
| Diversified Machine, Inc. | Knuckle and bushing assembly | PCTUS1062568 | 12/30/10 | WO/2012/002991 | 01/05/12 |

16

**INTERNATIONAL/OTHER PATENTS:**

**Registrations:**

U.S. Patent No. 6,173,978:
**Zero Roll Suspension System**

| Owner | Country | Serial No. | Filed | Granted | Published | Status |
|---|---|---|---|---|---|---|
| DMI Edon, LLC | MX | MX222665 | 03/19/01 | 09/13/04 | WO 0016998 (03/30/2000) | Granted |

U.S. Patent No. 6,708,589:
**Brake Rotor Assembly and Method for Making Same**

| Owner | Country | Patent No. | Filed | Granted | Published | Status |
|---|---|---|---|---|---|---|
| DMI Edon, LLC | MX | MX263393 | 09/12/03 | 01/06/09 | WO/2003/018376 (06/03/2003) | Granted |

U.S. Patent No. 8,444,158: **Knuckle and bushing assembly**

| Owner | Country | Serial No. | Filed | Published | Status |
|---|---|---|---|---|---|
| Diversified Machine Inc. | CA | 2,807,725 | 12/30/10 | CA2807725 (01-05-2012) | Published |
| Diversified Machine Inc. | EP | 10/801359.0 | 12/30/12 | EP2588331 (05-08-2013) | Published |
| Diversified Machine Inc. | CN | 201080068777.1 | 12/30/10 | N/A | Pending |
| Diversified Machine Inc. | JP | N/A | 12/30/10 | N/A | Pending |
| Diversified Machine Inc. | KR | 10-2013-7002438 | 12/30/10 | N/A | Pending |
| Diversified Machine Inc. | MX | 2013/000183 | 12/30/10 | N/A | Pending |

**Applications:**

| Owner | Title | Application # | Application Date |
|---|---|---|---|
| SMW Automotive Corporation | Apparatus For Final Finishing A Wheel Hub Of A Knuckle Assembly And Related Method | EP 2011775630 | 10/17/12 |

**UNITED STATES TRADEMARKS**

**Federal Registrations:**

| Owner | Trademark | Registration Date | Registration No. |
|---|---|---|---|
| DMI Edon LLC | DYNATURN | February 21, 2006 | 3,060,849 |

**Federal Applications:**

| Owner | Trademark | Application Date | App. No. |
|---|---|---|---|
| Concord International, Inc. | ALUTECH | September 14, 2011 1(b) status/ITU | 85/422,217 |
| Concord International, | ALUTECH & Design | December 22, 2011 1(b) status/ITU | 85/502,145 |

17

| Owner | Trademark | Application Date | App. No. |
|---|---|---|---|
| Inc. |  | | |
| Concord International, Inc. | SMW AUTOMOTIVE & Design | September 14, 2011 1(b) status/ITU | 85/422,466 |
| Chassix, Inc. | CHASSIX | May 29, 2013 1(b) status/ITU | 85/945,253 |
| Chassix, Inc. | CHASSIX & Design  | May 30, 2013 1(b) status/ITU | 85/946,638 |
| Chassix, Inc. | CHASSIX AUTOMOTIVE & Design  | May 29, 2013 1(b) status/ITU | 85/945,295 |
| Chassix, Inc. | CHASSIX METALCRAFT & Design  | May 29, 2013 1(b) status/ITU | 85/945,314 |

**State Applications**

| Owner | Trademark | State/Status | App. No. |
|---|---|---|---|
| Diversified Machine, Milwaukee, LLC | ACE/CO | WISCONSIN - Renewed March 22, 2005 | WI 5501679 |
| Diversified Machine, Milwaukee, LLC | ACECO | WISCONSIN - Registered January 9, 2008 | WI 5801228 |
| Diversified Machine, Milwaukee, LLC | ALUMINUM CASTING & ENGINEERING CO. | WISCONSIN - Registered January 9, 2008 | WI 5801229 |
| Diversified Machine, Milwaukee, LLC | DMI MILWAUKEE | WISCONSIN - Registered January 9, 2008 | WI 5801230 |

**INTERNATIONAL/OTHER TRADEMARKS**

**Registrations:**

| Owner | Trademark | Registration/ Publication No. | Registration Date | Country |
|---|---|---|---|---|
| Concord International, Inc. | ALUTECH | 1460897 | 20-Apr-2012 | Australia |
| Concord International, Inc. | ALUTECH | 5529549 | 19-Oct-2012 | Japan |
| Concord International, Inc. | ALUTECH | 400979884 | 05-Jul-2013 | Republic of |

18

| | | | | Korea |
|---|---|---|---|---|
| Concord International, Inc. | ALUTECH & Design | 1471794 | 30-Jul-2012 | Australia |
| Concord International, Inc. | ALUTECH & Design | 5532483 | 02-Nov-2012 | Japan |
| Concord International, Inc. | ALUTECH & Design | 2275552 | 07-Nov-2012 | India |
| Concord International, Inc. | ALUTECH & Design | 401011965 | 10-Dec-2013 | Republic of Korea |
| Concord International, Inc. | SMB | 1295889 | 10-Jul-2013 | Mexico |
| Concord International, Inc. | SMW Automotive & Design | 5529548 | 19-Oct-2012 | Japan |
| Concord International, Inc. | SMW Automotive & Design | 400979885 | 05-Jul-2013 | Republic of Korea |
| Concord International, Inc. | ALUTECH | 2554006 | 11-Jan-2013 | Argentina |
| Chassix, Inc. | CHASSIX | 011867801 | 30-Oct-2013 | European Community (CTM) |
| Chassix, Inc. | CHASSIX METALCRAFT (LOGO) | A0039501 | 11-Nov-2013 | European Community (CTM) |
| Chassix, Inc. | CHASSIX AUTOMOTIVE (LOGO) | 1189166 | 25-Nov-2013 | European Community, Australia, Japan, Republic Korea and China |
| Chassix, Inc. | CHASSIX LOGO | 1198325 | 25-Nov-2013 | European Community, Australia, China, India, Japan, Republic of Korea and Hong Kong |
| Chassix, Inc. | CHASSIX LOGO | 302819124 | 28-Nov-2013 | Hong Kong |
| Chassix, Inc. | CHASSIX AUTOMOTIVE (LOGO) | 302819142 | 28-Nov-2013 | Hong Kong |
| Chassix, Inc. | CHASSIX METALCRAFT (LOGO) | 302819151 | 28-Nov-2013 | Hong Kong |
| Chassix, Inc. | CHASSIX METALCRAFT (LOGO) | 1618985 | 25-Nov-2013 | Australia |
| DMI Edon LLC | MSS | 30757726 | 24-Jan-2008 | Germany |

**Applications:**

| Owner | Trademark | Application No. | Filing Date | Country |
|---|---|---|---|---|
| Chassix, Inc. | CHASSIX AUTOMOTIVE (LOGO) | 1189166 | 11-Nov-2013 | Filed with the International Bureau-Designated in China and Mexico |
| Chassix, Inc. | CHASSIX AUTOMOTIVE (STYLIZED AND/OR DESIGN) | 840723814 | 29-Nov-2013 | Brazil |
| Chassix, Inc. | CHASSIX AUTOMOTIVE (LOGO) | 1,653,864 | 28-Nov-2013 | Canada |
| Chassix, Inc. | CHASSIX METALCRAFT (LOGO) | 1,653,865 | 28-Nov-2013 | Canada |
| Chassix, Inc. | CHASSIX METALCRAFT (LOGO) | 1200354 | 11-Nov-2013 | Filed with the International |

19

| | | | | |
|---|---|---|---|---|
| | | | | Bureau-Designated in European Community, China, Mexico, India, Japan and Republic of Korea |
| Chassix, Inc. | CHASSIX METALCRAFT (STYLIZED AND/OR DESIGN) | 840723776 | 29-Nov-2013 | Brazil |
| Chassix, Inc. | CHASSIX LOGO | 1,653,863 | 28-Nov-2013 | Canada |
| Chassix, Inc. | Chassix (Word Mark) | 840723857 | 29-Nov-2013 | Brazil |
| Concord International, Inc. | ALUTECH | 831273151 | 1-Dec-2011 | Brazil |
| Concord International, Inc. | ALUTECH | 1123317 | 22-Nov-2011 | India |
| Concord International, Inc. | ALUTECH | 4020110065732 | 23-Nov-2011 | Republic of Korea |
| Concord International, Inc. | ALUTECH & Design | 2587863 | 14-Aug-2013 | Argentina |
| Concord International, Inc. | ALUTECH & Design | 840028539 | 15-Feb-2012 | Brazil |
| Concord International, Inc. | ALUTECH | 10801758 | 20-Apr-2012 | China |
| Concord International, Inc. | SMB | 3157200 | 12-Apr-2012 | Argentina |
| Concord International, Inc. | SMB | 840028482 | 15-Feb-2012 | Brazil |
| Concord International, Inc. | SMB | 12081692 | 17-May-2012 | Columbia |
| Concord International, Inc. | SMB | 2012010628 | 25-May-2012 | Venezuela |
| Concord International, Inc. | SMW Automotive & Design | 831270454 | 25-Nov-2011 | Brazil |
| Concord International, Inc. | SMW Automotive & Design | 12293638 | 20-Mar-2013 | China |
| Concord International, Inc. | SMW Automotive | 10227892 | 24-Nov-2011 | China |
| Concord International, Inc. | SMW Automotive & Design | 2237992 | 22-Nov-2011 | India |
| Chassix, Inc. | CHASSIX | 1617882 | 25-Nov-2013 | Australia |
| Chassix, Inc. | CHASSIX | 840723903 | 29-Nov-2013 | Brazil |
| Concord International, Inc. | SMW | 831270462 | 29-Nov-2011 | Brazil |
| Chassix, Inc. | CHASSIX | 1653861 | 28-Nov-2013 | Canada |
| Concord International, Inc. | SMW | 10227893 | 24-Nov-2011 | China |
| Concord International, Inc. | ALUTECH | 1022769 | 24-Nov-2011 | China |
| Concord International, Inc. | SMW | 2237991 | 22-Nov-2011 | India |

**UNITED STATES DOMAIN NAMES:**

| Owner | Title | Application Date | Renewal Due |
|---|---|---|---|
| Chassix, Inc. | CHASSIXAUTO.XXX | 30-May-2013 | 30-May-2015 |
| Chassix, Inc. | CHASSIXAUTOMOTIVE.XXX | 30-May-2013 | 30-May-2015 |
| Chassix, Inc. | CHASSIXAUTO.COM | 30-May-2013 | 30-May-2015 |
| Chassix, Inc. | CHASSIXAUTO.NET | 30-May-2013 | 30-May-2015 |
| Chassix, Inc. | CHASSIXAUTO.INFO | 30-May-2013 | 30-May-2015 |
| Chassix, Inc. | CHASSIXAUTO.ORG | 30-May-2013 | 30-May-2015 |
| Chassix, Inc. | CHASSIXAUTOMOTIVE.COM | 30-May-2013 | 30-May-2015 |
| Chassix, Inc. | CHASSIXAUTOMOTIVE.NET | 30-May-2013 | 30-May-2015 |
| Chassix, Inc. | CHASSIXAUTOMOTIVE.INFO | 30-May-2013 | 30-May-2015 |
| Chassix, Inc. | CHASSIXAUTOMOTIVE.ORG | 30-May-2013 | 30-May-2015 |
| Chassix, Inc. | CHASSIXCASTING.XXX | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXCASTING.COM | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXCASTING.NET | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXCASTING.INFO | 12-Dec-2012 | 12-Dec-2014 |

WEIL:\95255270\4\35076.0003

| Chassix, Inc. | CHASSIXCASTING.ORG | 12-Dec-2012 | 12-Dec-2014 |
|---|---|---|---|
| Chassix, Inc. | CHASSIXMETALWORKS.XXX | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXMETALWORKS.COM | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXMETALWORKS.NET | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXMETALWORKS.INFO | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXMETALWORKS.ORG | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXCOMPONENTS.XXX | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXCOMPONENTS.COM | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXCOMPONENTS.NET | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXCOMPONENTS.INFO | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXCOMPONENTS.ORG | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXMETALCRAFT.XXX | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXMETALCRAFT.COM | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXMETALCRAFT.NET | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXMETALCRAFT.INFO | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXMETALCRAFT.ORG | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXINTERNATIONAL.XXX | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXINTERNATIONAL.COM | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXINTERNATIONAL.NET | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXINTERNATIONAL.INFO | 12-Dec-2012 | 12-Dec-2014 |
| Chassix, Inc. | CHASSIXINTERNATIONAL.ORG | 12-Dec-2012 | 12-Dec-2014 |
| Concord International, Inc. | CHASSIX.COM | 06-Dec-2012 | 04-Dec-2014 |
| Concord International, Inc. | ALUTECH.US.COM | 17-May-2011 | 26-Oct-2019 |
| Concord International, Inc. | ALUTECHAUTO.COM | 29-Jan-2015 | 11-Mar-2018 |
| Concord International, Inc. | ALUTECHCORP.COM | 11-Mar-2004 | 11-Mar-2018 |
| Concord International, Inc. | ALUTECHCORPORATION.COM | 11-Mar-2004 | 11-Mar-2018 |
| Concord International, Inc. | AUTOMOTIVE-DESIGN.COM | 09-Apr-2000 | 09-Apr-2018 |
| Concord International, Inc. | AUTOMOTIVECORP.COM | 10-Dec-1999 | 09-Dec-2018 |
| Concord International, Inc. | AUTOMOTIVEDESIGN.ORG | 20-Sep-2002 | 26-Mar-2018 |
| Concord International, Inc. | CHASSISCORP.COM | 08-Nov-2002 | 08-Nov-2018 |
| Concord International, Inc. | CONCORD.EU.COM | 29-May-2008 | 29-May-2018 |
| Concord International, Inc. | CONCORDAUTO.COM | 05-Sep-1998 | 04-Sep-2018 |
| Concord International, Inc. | CONCORDINTL.COM | 25-Sep-1996 | 24-Sep-2018 |
| Concord International, Inc. | CONCORDINTL.NET | 17-Sep-2000 | 16-Sep-2018 |
| Concord International, Inc. | SMBAUTO.COM | 09-Apr-2000 | 09-Apr-2018 |
| Concord International, Inc. | SMWAUTO.COM | 26-Sep-1996 | 25-Sep-2018 |
| Concord International, Inc. | SMWAUTO.NET | 17-Sep-2000 | 16-Sep-2018 |
| Concord International, Inc. | SMWAUTOMOTIVE.COM | 13-Jul-2000 | 13-Jul-2018 |
| Concord International, Inc. | ALUTECH.COM.CN | 06-Jan-2011 | 06-Jan-2021 |
| Concord International, Inc. | ALUTECHAUTO.COM.CN | 05-Aug-2009 | 05-Aug-2019 |
| Concord International, Inc. | ALUTECHCORP.COM.CN | 05-Aug-2009 | 05-Aug-2019 |
| Concord International, Inc. | ALUTECHCORPORATION.COM.CN | 05-Aug-2009 | 05-Aug-2019 |
| Concord International, Inc. | CONCORDINTL.FR | 03-Jun-2008 | N/A |
| SMB Automotive Ltda | SMBAUTO.COM.BR | 28-Apr-1999 | 28-Apr-2015 |
| Tunglim International Pty Limited | CHASSIX.COM.CN | 12-Jul-2013 | 12-Jul-2019 |
| Melanie Frazier Howard & Howard.com | CHASSIX.JPN.COM | 11-Jul-2013 | 11-Jul-2019 |
| Melanie Frazier Howard & Howard.com | CHASSIX.UK.NET | 11-Jul-2013 | 11-Jul-2019 |
| Melanie Frazier Howard & Howard.com | CHASSIX.JP.NET | 11-Jul-2013 | 11-Jul-2019 |
| Tunglim International Pty Limited | CHASSIX.NET.CN | 12-Jul-2013 | 12-Jul-2019 |

WEIL:\95255270\4\35076.0003

| Howard & Howard Attorneys PLLC - Dean Amburn | CHASSIX.COM.MX | 16-Jul-2013 | 16-Jul-2019 |
|---|---|---|---|
| Howard & Howard Attorneys PLLC - Dean Amburn | CHASSIX.BR.COM | 16-Jul-2013 | 16-Jul-2019 |
| Toweb Brasil LTDA EPP | CHASSIX.COM.BR | 19-Jul-2013 | 19-Jul-2019 |
| Toweb Brasil LTDA EPP | CHASSIX.NET.BR | 04-Aug-2013 | 04-Aug-2019 |

**Copyrights:**

None.

WEIL:\95255270\4\35076.0003

**Licenses granted to Obligors/Subsidiaries:**

| Licensors | Licensee | Agreement | Date |
|---|---|---|---|
| Alcoa, Inc. and Alcoa Automotive Castings | Diversified Machine Montague, LLC | Technology License Agreement | 07/31/99 |
| Metaldyne, LLC | Metaldyne (Suzhou) Automotive Components Co., Ltd. | Technology License Agreement | 11/18/05 |

**Licenses granted by Obligors/Subsidiaries:**

| Licensors | Licensee | Agreement | Date |
|---|---|---|---|
| Metaldyne Chassis Products, LLC and Metaldyne Mexico, S.A. de C.V. and DMI Edon LLC (formerly Metaldyne Chassis Products, LLC) | Metaldyne (Suzhou) Automotive Components Co., Ltd. | Technology License Agreement | 12/08/99 |

**Any material infringements on any Obligor's/Subsidiaries' IP:**

None.

WEIL:\95255270\4\35076.0003

**SCHEDULE 8.1.18**
**Litigation**

None.

**SCHEDULE 8.1.21**
**ERISA Exceptions**

None.

### SCHEDULE 8.1.23
### Labor Matters

1.  Grievance filed by the union at DMI Edon facility, together with related NLRB complaint. The parties to the complaint have reached a tentative settlement agreement that has been ratified by the union. The agreement, once finalized, will terminate the NLRB complaint and all requests for arbitration.

2.  EEOC claim filed at the DMI Columbus foundry, including in part a claim of retaliation against an employee due to a prior EEOC claim from January 2013. The prior claim was dropped by the EEOC. The company provided a position statement to EEOC denying the allegations and confirming that the discipline against the employee was due to violations of company policies but has yet to receive a response from the EEOC.

3.  Form I-9 audits at 12700 Stephens Road, Warren, MI 48089 and 2330 Blackstone, Warren, MI 48089 locations.

4.  Labor arbitration between DMI Columbus, LLC, and United Steelworkers of America Local 2948, conducted pursuant to the Grievance Procedure set forth in the parties' Collective Bargaining Agreement. The union claims that the Company violated the Collective Bargaining Agreement by failing to pay overtime to employees for any hours worked on the 6th day of the workweek, even though the employee had not worked the prior 5 work days that week. The Company's position is that the language of the Collective Bargaining Agreement is clear, and requires an employee to have worked the first 5 days of the workweek to receive overtime pay for hours worked on the 6th day of the workweek A hearing was held before the Arbitrator on September 16, 2014, and post hearing briefs were filed by the Company and the Union on November 13, 2014. The parties are waiting to receive the Arbitrator's Opinion and Award.

5.  EEOC claim filed by a temporary worker supplied to the Bristol, Indiana plant through Manpower Staffing. The claimant alleged that her Team Leader sexually harassed her by making inappropriate remarks and physically touching her. The matter was investigated by the company and there was no finding of harassment. The claimant's temporary assignment with the Bristol plant was terminated resulting in the allegation that she was retaliated against for reporting harassment. The Company is currently preparing a response to the EEOC claim.

26

**SCHEDULE 8.1.24**
**Insurance**

| Insurance Provider | Policy Number | Coverage Description | |
|---|---|---|---|
| Natl Union Fire Insurance Co | 025032308 | **Property - "All Risks"** | |
| | | Policy Expiration Date | **7/1/15** |
| | | Total Insured Values | **$1,520,585,874** |
| | | Policy Limit per loss | **$300,000,000** |
| | | Deductible: | **$100,000/$250,000** |
| | | Premium | $997,948 |
| First Specialty Insurance Corp. | IRG200063002 | **General Liability** | **$2,000,000/occurrence** |
| | | | **$4,000,000/aggregate** |
| | | Policy Expiration Date | **12/31/15** |
| | | Retention: | **$25k/$250k** |
| | | Premium | $538,110 |
| Travelers Indemnity Company of America

Travelers Property Casualty Co. of America | TC2H UB 466K5944-14 (AOS)

TRK UB 466K5956-14 (WI/MA) | **Workers Compensation** | **Statutory /$1,000,000** |
| | | Policy Expiration Date | **12/31/15** |
| | | Deductible: | **$350,000** |
| | | Premium - Monopolistic States: | **$93,760** |
| | | Premium - AOS | $1,300,355 |
| Travelers Property Casualty Co. of America | TJ CAP 466K5979A-TIL-14 | **Automobile Liability** | **$1,000,000** |
| | | Policy Expiration Date | **12/31/15** |
| | | Retention: | |
| | | Premium | $25,810 |
| Insurance Company of the State of PA | WR100005064 | **International Liability\*** | **$2/8,000,000** |
| | | Policy Expiration Date | **12/31/15** |
| | | Premium | $49,764 |
| Insurance Company of the State of PA | WR100005064 | **Intl Auto & WC\*** | **$1/2,000,000** |
| | | Policy Expiration Date | **12/31/15** |
| | | Premium | incl in Intl GL |
| Allianz Global Risks US Insurance Company | USA2005371 | **Umbrella Liability** | **$25,000,000** |
| | | Policy Expiration Date | **12/31/15** |
| | | Retention: | $25,000 |
| | | Premium | $480,000 |
| Great American Assurance Company | EXC1910553 | Excess Liability | **$25,000,000** |
| | | Policy Expiration Date | **12/31/15** |
| | | Premium | $117,500 |
| Natl Union Fire Insurance Co | 06-485-02-48 | **Crime Insurance\*** | **$5,000,000** |
| | | Policy Expiration Date | **5/1/15** |
| | | Deductible: | **$50,000** |
| | | Premium | $18,380 |
| Natl Union Fire Insurance Co. | 06-485-02-48 | **Fiduciary Liability\*** | **$5,000,000** |
| | | Policy Expiration Date | **5/1/15** |
| | | Deductible: | **$0** |
| | | Premium | $15,850 |
| Natl Union Fire Insurance Co. | 06-485-02-48 | **Directors & Officers Liability** | **$10,000,000** |
| | | Policy Expiration Date | **5/1/15** |

| Insurance Provider | Policy Number | Coverage Description | |
|---|---|---|---|
| | | Retention: | **$100,000** |
| | | Premium | $44,719 |
| National Union Fire Insurance Co. | 06-485-02-48 | **EPLI\*** | **$10,000,000** |
| | | Policy Expiration Date | **5/1/15** |
| | | Retention: | **$250,000** |
| | | Premium | $93,700 |
| US Specialty | U713-85318 | **Kidnap/Ransom/Extortion\*** | **$500,000** |
| | | Policy Expiration Date | **5/1/16** |
| | | Premium (3 year) | $17,763 |
| Chartis | PLS18174940 | **Environmental\*** | **$10,000,000** |
| | | Policy Expiration Date | **4/16/17** |
| | | Retention: | **$100,000** |
| | | Premium (5 year) | $228,639 |

28

**SCHEDULE 8.1.25(a)**
**Filing Offices**

**Filing Offices for UCC Financing Statements:**

| Obligor | Filing Office |
|---|---|
| Chassix, Inc. | Delaware SOS |
| AluTech, LLC | Michigan SOS |
| Automotive, LLC | Delaware SOS |
| Automotive Properties of New York, LLC | New York SOS |
| Chassis Co. of Michigan, LLC | Delaware SOS |
| Chassix Georgia Machining, LLC | Delaware SOS |
| Concord International, Inc. | Delaware SOS |
| Diversified Machine, Inc. | Delaware SOS |
| Diversified Machine, Milwaukee LLC | Delaware SOS |
| Diversified Machine Bristol, LLC | Delaware SOS |
| Diversified Machine Montague, LLC | Delaware SOS |
| DMI China Holding LLC | Michigan SOS |
| DMI Columbus, LLC | Delaware SOS |
| DMI Edon LLC | Delaware SOS |
| Mexico Products I, LLC | Delaware SOS |
| SMW Automotive, LLC | Delaware SOS |
| UC Holdings, Inc. | Delaware SOS |

**Filing Offices for Fixture Filings:**

| Owned Property Address | Filing Office |
|---|---|
| 1600 Northside Industrial Blvd., Columbus, Georgia | Muscogee County Clerk of the Superior Court |
| 1442 Belfast Avenue, Columbus, Georgia | Muscogee County Clerk of the Superior Court |
| 4320 Federal Drive, Batavia, New York 14020 | Office of County Clerk of Genesee County |
| 2223 Dove Street, Port Huron, Michigan 48060 | St. Clair County Register of Deeds |
| 2347 Dove Street, Port Huron, Michigan 48060 | St. Clair County Register of Deeds |
| 3150 Dove Street, Port Huron, Michigan 48060 | St. Clair County Register of Deeds |
| V/L Dove Street, Port Huron, Michigan 48060 | St. Clair County Register of Deeds |
| 2800 Yasdick Drive, Stevensville, Michigan 49127 | Berrien County Register of Deeds |
| 100 Summit Drive, Shelbyville, Tennessee 37162 | Bedford County Register of Deeds |
| 1320 Paw Paw Ave., Benton Harbor, Michigan 49022 | Berrien County Register of Deeds |

| Leased Property Address | Filing Office |
|---|---|
| 300 Galleria Office Center Ste 501, Southfield, MI | Oakland County Register of Deeds |
| 5353 Wilcox, Montague, Michigan | Muskegon County Register of Deeds |
| 51650 County Road #133, Bristol, Indiana | Elkhart County Recorder |
| 507 W. Indiana Street, Edon, Ohio | Williams County Recorder |
| 2280 West Grand River, Howell, Michigan | Livingston County Register of Deeds |
| 1320 Paw Paw Ave., Benton Harbor, Michigan 49022 | Berrien County Register of Deeds |
| 2600 Lawrence, Stevensville, Michigan 49127 | Berrien County Register of Deeds |
| 2005 Petit Street, Port Huron, MI 48060 | St. Clair County Register of Deeds |
| 12700 Stephens Road, Warren, MI 48089 | Oakland County Register of Deeds |
| 23300 Blackstone, Warren, MI 48089 | Macomb County Register of Deeds |

29

| Leased Property Address | Filing Office |
| --- | --- |
| 1314 Cedar Road, Port Huron, MI 48060 | St. Clair County Register of Deeds |
| 3 Allied Drive, Dedham, MA 02026 | Norfolk County Register of Deeds |

**Filing Offices for Intellectual Property Security Agreements:**

| Document | Filing Office |
| --- | --- |
| Patent Security Agreement | United States Patent and Trademark Office |
| Trademark Security Agreement | United States Patent and Trademark Office |
| Copyright Security Agreement | United States Copyright Office |

WEIL:\95255270\4\35076.0003

**SCHEDULE 9.2.2(g)**
**Existing Investments**

- Investments of any Obligor in one or more of its Subsidiaries on and as of the Amendment Effective Date.

## SCHEDULE 9.2.3
### Outstanding Indebtedness

- Letter of Credit HACH355551OS issued by BMO Harris Bank, N.A., in favor of ISTAR DM I LLC AND/OR ITS SUCCESSORS for $1,700,000

- Letter of Credit HACH392905OS issued by BMO Harris Bank, N.A., in favor of THE TRAVELERS INDEMNITY COMPANY for $1,250,000

- Letter of Credit HACH424752OS issued by BMO Harris Bank, N.A., in favor of THE TRAVELERS INDEMNITY COMPANY for $2,612,000

- Indebtedness pursuant to the factoring agreement between Santander Group and DM I Automotive Spain, S.L., in an aggregate amount of up to €3,000,000

- Indebtedness pursuant to the factoring agreement between BBVA and DMI Automotive Spain, S.L., in an aggregate amount of up to €1,000,000

- Promissory note issued by Diversified Machine, Inc., as payor, in favor of DMI Automotive Spain, S.L.U., as payee, issued on 1/1/11 in the amount of €5,000,000.00, with a maturity date of 1/1/16.

- Promissory note issued by Diversified Machine, Inc., as payor, in favor of DMI Iztapalapa S.A. de C.V., as payee, issued on 9/13/10 in the amount of $20,000,000.00, with a maturity date of 9/1/15.

- The following foreign financing transactions:

| Lender | Borrower | Outstanding Debt as of December 31, 2014 (in thousands) | Maturity Date |
|---|---|---|---|
| Itau Banc | SMB Automotive LTDA | 191.5 | 5/14/2017 |
| Itau Banc | SMB Automotive LTDA | 760.3 | 6/24/2017 |
| Bradesco Banc | SMB Automotive LTDA | 439.4 | 6/20/2017 |
| Bradesco Banc | SMB Automotive LTDA | 459.6 | 9/14/2018 |
| Bradesco Banc | SMB Automotive LTDA | 426.8 | 11/15/2018 |
| Santander | DMI Automotive Spain, S.L. | 635.6 | N/A |
| Bank of China | Suzhou Alutech Automotive Parts Co., Ltd. | 1,634.3 | 4/29/15 |
| Bank of China | Suzhou Alutech Automotive Parts Co., Ltd. | 1,634.3 | 5/15/15 |
| Bank of China | Suzhou Alutech Automotive Parts Co., Ltd. | 1,634.3 | 5/28/15 |
| Bank of China | Suzhou Alutech Automotive Parts Co., Ltd. | 1,634.3 | 6/17/15 |
| Bank of China | Suzhou Alutech Automotive Parts Co., Ltd. | 3,268.5 | 6/29/15 |

| | | | |
|---|---|---|---|
| Bank of China | Suzhou Alutech Automotive Parts Co., Ltd. | 3,268.5 | 7/17/15 |
| Bank of China | Suzhou Alutech Automotive Parts Co., Ltd. | 817.1 | 7/30/15 |
| Bank of China | Suzhou Alutech Automotive Parts Co., Ltd. | 1,797.7 | 11/23/15 |
| Bank of China | Suzhou Alutech Automotive Parts Co., Ltd. | 1,634.3 | 12/1/15 |
| Bank of China | Suzhou Alutech Automotive Parts Co., Ltd. | 1,470.8 | 12/7/15 |
| Vigel S.p.A. | Suzhou Alutech Automotive Parts Co., Ltd. | 171.3 | 6/30/15 |
| Vigel S.p.A. | Suzhou Alutech Automotive Parts Co., Ltd. | 170.3 | 9/30/15 |
| Vigel S.p.A. | Suzhou Alutech Automotive Parts Co., Ltd. | 170.3 | 9/30/15 |
| Vigel S.p.A. | Suzhou Alutech Automotive Parts Co., Ltd. | 170.3 | 11/30/15 |
| Vigel S.p.A. | Suzhou Alutech Automotive Parts Co., Ltd. | 510.5 | 2/25/17 |
| Vigel S.p.A. | Suzhou Alutech Automotive Parts Co., Ltd. | 472.7 | 3/5/17 |
| Vigel S.p.A. | Suzhou Alutech Automotive Parts Co., Ltd. | 504.5 | 3/27/17 |
| Vigel S.p.A. | Suzhou Alutech Automotive Parts Co., Ltd. | 575.2 | 4/15/17 |
| Vigel S.p.A. | Suzhou Alutech Automotive Parts Co., Ltd. | 535.9 | 4/28/17 |

- Indebtedness pursuant to the following capital leases for equipment:

| Lessor | Lessee | Outstanding Debt as of 12/31/14 (in thousands) | Maturity Date |
|---|---|---|---|
| Barcelona Banco Santander | DMI Automotive Spain, S.L. | 954.6 | 4/30/19 |
| Barcelona Banco Santander | DMI Automotive Spain, S.L. | 363.5 | 4/30/19 |
| Barcelona BBVA | DMI Automotive Spain, S.L. | 535.8 | 4/30/19 |
| Barcelona BBVA | DMI Automotive Spain, S.L. | 740.2 | 4/30/19 |
| Bradesco Leasing | SMB Automotive LTDA | 25.0 | 11/1/16 |
| Credit Argicole 1 | SMW Automotive SAS | 275.4 | 12/20/16 |
| Credit Argicole 2 | SMW Automotive SAS | 254.2 | 9/21/16 |
| Deutsche Leasing | DMI Automotive Spain, S.L. | 446.3 | 2/11/18 |
| Deutsche Leasing | DMI Automotive Spain, S.L. | 11.7 | 9/25/15 |
| Deutsche Leasing | DMI Automotive Spain, S.L. | 18.6 | 10/31/15 |
| Deutsche Leasing | DMI Automotive Spain, S.L. | 514.5 | 3/30/17 |
| Natexis | Automotive Properties SCI | 520.0 | 2/7/17 |
| Natiocredimurs | SMW Automotive SAS | 133.9 | 1/3/16 |
| Natiocredimurs 2 | SMW Automotive SAS | 247.6 | 10/21/16 |
| NXT Capital, LLC | Chassix, Inc. | 402.9 | 8/26/17 |

33

| Lessor | Lessee | Outstanding Debt as of 12/31/14 (in thousands) | Maturity Date |
|---|---|---|---|
| NXT Capital, LLC | Diversified Machine, Inc. | 26.1 | 8/26/17 |
| OSEO | SMW Automotive SAS | 288.0 | 6/25/17 |
| Pacific Western Bank | Chassix, Inc., Diversified Machine, Inc., Diversified Machine Bristol, LLC, Diversified Machine Montague, LLC, Diversified Machine Milwaukee, LLC, DMI Edon LLC, DMI Columbus LLC, SMW Automotive, LLC, Automotive, LLC, Chassis Co. of Michigan, LLC, Alutech, LLC, Concord International, Inc., Chassix Georgia Machining, LLC | 11,570.2 | 12/31/17 |
| Star Lease | SMW Automotive SAS | 299.2 | 7/31/17 |

34

**SCHEDULE 9.2.5**
**Permitted Liens**

- Liens on assets securing the Secured Indebtedness set forth on Schedule 9.2.3.

**SCHEDULE 13.10**
**Lender Addresses**

[PNC Bank, NA
James Steffy
Vice President
PNC Business Credit
Three PNC Plaza, 6th Floor
225 Fifth Avenue
Pittsburgh, PA 15222
Tel: 412-768-6387
Fax: 412-768-4369
Email: james.steffy@pnc.com][2]

---

[2] Bodman/PNC to confirm

**EXHIBIT A**

FORM OF
REVOLVING NOTE

$_____                                    _____, 20__

                                                              Chicago, Illinois

      FOR VALUE RECEIVED, the undersigned (hereinafter "Borrowers"), hereby, jointly and severally, PROMISE TO PAY _____, a _____ corporation ("Lender"), or its registered assigns, at the principal office of PNC Bank, National Association, as agent for such Lender (in such capacity, the "Agent"), or at such other place in the United States of America as the holder of this Note may designate from time to time in writing, in lawful money of the United States of America and in immediately available funds, the principal amount of _____ ($_____), or such lesser principal amount as may be outstanding pursuant to the DIP Loan Agreement (as hereinafter defined) with respect to the Revolving Credit Loan, together with interest on the unpaid principal amount of this Note outstanding from time to time.

      This Note is one of the Revolving Notes referred to in, and issued pursuant to, that certain Superpriority Secured Debtor-In-Possession ABL Loan, Security and Guaranty Agreement dated as of March 12, 2015, by and among Borrowers, UC Holdings, Inc., as a guarantor and the other guarantors from time to time party thereto, the lenders from time to time party thereto (including Lender) and the Agent (as may be amended, restated, supplemented or otherwise modified from time to time, the "DIP Loan Agreement"), and is entitled to the benefit and security of the DIP Loan Agreement.  All capitalized terms herein, unless otherwise specifically defined in this Note, shall have the meanings ascribed to them in the DIP Loan Agreement.

      The principal amount of the indebtedness evidenced hereby shall be payable in the amounts and on the dates specified in the DIP Loan Agreement and, if not sooner paid in full, on December 31, 2015, unless the term hereof is extended in accordance with the DIP Loan Agreement.  Interest thereon shall be paid until such principal amount is paid in full at such interest rates and at such times as are specified in the Loan Agreement.

      Upon and after the occurrence, and during the continuation, of an Event of Default, this Note shall or may, as provided in the DIP Loan Agreement, become or be declared immediately due and payable.

      The right to receive principal of, and stated interest on, this Note may only be transferred in accordance with the provisions of the DIP Loan Agreement.

      Demand, presentment, protest and notice of nonpayment and protest are hereby waived by Borrowers.

      This Note shall be interpreted, governed by, and construed in accordance with, the internal laws of the State of New York.

962121.01-CHISR02A - MSW

Detroit_5278876_1

BORROWERS:

**CHASSIX, INC.**

By:_____
   Name:_____
   Title:_____

**DIVERSIFIED MACHINE, INC.**

By:_____
   Name:_____
   Title:_____

**DIVERSIFIED MACHINE BRISTOL, LLC**

By:_____
   Name:_____
   Title:_____

**DIVERSIFIED MACHINE MONTAGUE, LLC**

By:_____
   Name:_____
   Title:_____

**DIVERSIFIED MACHINE, MILWAUKEE LLC**

By:_____
   Name:_____
   Title:_____

**DMI EDON LLC**

By:_____
   Name:_____
   Title:_____

A - 2

**MEXICO PRODUCTS I, LLC**


By:_____
    Name:_____
    Title:_____

**DMI COLUMBUS, LLC**


By:_____
    Name:_____
    Title:_____

**DMI CHINA HOLDING LLC**


By:_____
    Name:_____
    Title:_____

**CHASSIX GEORGIA MACHINING, LLC**


By:_____
    Name:_____
    Title:_____


**AUTOMOTIVE PROPERTIES OF NEW YORK, LLC**


By:_____
    Name:_____
    Title:_____

**CONCORD INTERNATIONAL, INC.**


By:_____
    Name:_____
    Title:_____

**SMW AUTOMOTIVE, LLC**


By:_____
    Name:_____
    Title:_____

**AUTOMOTIVE, LLC**


By:_____
    Name:_____
    Title:_____

**CHASSIS CO. OF MICHIGAN, LLC**


By:_____
    Name:_____
    Title:_____


**ALUTECH, LLC**


By:_____
    Name:_____
    Title:_____

A - 4

**EXHIBIT B**

FORM OF
BORROWING BASE CERTIFICATE

(see attached)

## PNC Bank
### Chassix Inc. (and Domestic Subsidiaries)

**Borrowing Base Certificate**

| Report No. | March 6, 2015 |
|---|---|

| | | | US $ | US $ | US $ |
|---|---|---|---|---|---|
| **COLLATERAL ACTIVITY** | | | | | |
| | | Date | Accounts Receivable Designated OEM's | Accounts Receivable Non-Designated OEM's | Accounts Receivable Total |
| ***ACCOUNTS RECEIVABLE:*** | | | | | |
| 1 | Beginning Accounts Receivable Balance | 27-Feb-15 | 119,944,144.82 | 61,206,350.93 | 181,150,495.75 |
| 2 | GROSS SALES (INVOICES) | | 9,675,507.10 | 8,092,505.18 | 17,768,012.28 |
| 3 | Debit Memos/Others Adjustments | | 286,588.43 | (226,685.59) | 59,902.84 |
| 4 | Credit Memos/Other Adjustments | | 2,206.88 | 323,211.07 | 325,417.95 |
| 5 | TOTAL NET SALES (2+3+4) | | 9,964,302.41 | 8,189,030.66 | 18,153,333.07 |
| 6 | Gross Collections | | 13,887,483.91 | 20,781,426.85 | 34,668,910.76 |
| 7 | Non A/R Collections | | 0.00 | 0.00 | 0.00 |
| 8 | Discounts/Allowances | | 0.00 | 0.00 | 0.00 |
| 9 | TOTAL DEDUCTIONS (6+7+8) | | 13,887,483.91 | 20,781,426.85 | 34,668,910.76 |
| 10 | Net Ending Balance | 6-Mar-15 | **116,020,963.32** | 48,613,954.74 | 164,634,918.06 |
| 11 | Less: Ineligible Accounts | | 9,402,687.04 | 8,850,763.09 | 18,253,450.13 |
| 12 | Total Eligible Accounts Receivable | | 106,618,276.28 | 39,763,191.65 | 146,381,467.93 |
| 13 | Accounts Receivable Advance Rates | | 92.5% | 85.0% | |
| 14 | Accounts Receivable availability | | 98,621,905.56 | 33,798,712.90 | 0.00 |
| 15 | ACCOUNTS RECEIVABLE SUB-LIMIT | | N/A | N/A | N/A |
| 16 | **A/R AVAILABLE** | | *98,621,905.56* | *33,798,712.90* | *0.00* |

| | | Date | Raw Materials | WIP | FG | Total |
|---|---|---|---|---|---|---|
| ***INVENTORY:*** | | | | | | |
| | DESCRIPTION | Date | Raw Materials | WIP | FG | Total |
| 17 | Total Inventory | 31-Jan-15 | 42,374,907.45 | 13,011,907.31 | 14,163,092.32 | 69,549,907.08 |
| 18 | Less: Ineligible Inventory | 31-Jan-15 | 16,244,014.17 | 779,943.06 | 2,785,209.06 | 19,809,166.29 |
| 19 | Total Eligible Inventory | | 26,130,893.28 | 12,231,964.25 | 11,377,883.26 | 49,740,740.79 |
| 20 | Blended Inventory Advance Rates | | 46.90% | 57.27% | 70.00% | |
| 21 | Inventory Availability before sub-limits | | 12,255,963.57 | 7,005,204.74 | 7,964,518.28 | 27,225,686.60 |
| 22 | INVENTORY SUB-LIMIT | | N/A | 10,000,000.00 | N/A | N/A |
| 23 | *INVENTORY AVAILABLE* | | *12,255,963.57* | *7,005,204.74* | *7,964,518.28* | *27,225,686.60* |

| | | |
|---|---|---|
| 24 | **GROSS AVAILABILITY (A/R & INVENTORY)** | **159,646,305.06** |
| 25 | Collateral Above Commitment | (9,646,305.06) |
| 25 | **Gross Availability** | **150,000,000.00** |
| 26 | Carve-Out Reserve (Professional Fees) | (6,865,000.00) |
| 27 | Carve-Out Reserve (Trigger) | (2,350,000.00) |
| 28 | Rent Reserve | (812,000.00) |
| 29 | **NET AVAILABILITY** | **139,973,000.00** |

| | | | |
|---|---|---|---|
| **LOAN ACTIVITY:** | | | |
| 30 | Beginning Loan Balance | 27-Feb-15 | 0 |
| 31 | Total Collections | | 0 |
| 32 | Advance Requirements | | 65,310,962.84 |
| 33 | Ending Loan Balance (+25-26+27) | 6-Mar-15 | 65,310,962.84 |

| | | |
|---|---|---|
| 34 | LETTER OF CREDIT BALANCE (cash collateralized with BMO Harris) | 0.00 |

| | | |
|---|---|---|
| 35 | NET AVAILABILITY | 74,662,037.16 |

*Note: Chassix recognizes additional details will be required for the weekly submissions (e.g. Designated / Non-Designated OEM's)*

Pursuant to, and in accordance with, the terms and provisions of that certain Super-priority Secured Debtor-In-Possession ABL Loan, Security and Guaranty Agreement, dated as of March [9], 2015 (as amended, supplemented or otherwise modified from time to time, the "Agreement"; terms used but not defined herein have the meanings set forthin the Agreement), by and among Chassix, Inc., a Delaware corporation ("Borrower Representative"), the other Obligors party thereto (each a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code) and PNC Bank, National Association ("PNC"), as agent for the Lenders, Borrower Representative, on behalf of the other Borrowers, is executing and delivering to PNC this Borrowing Base Certificate accompanied by supporting data.  Borrower Representative, on behalf of the Borrowers, represents and warrants to PNC that this Borrowing Base Certificate and such supporting data is true and correct, and is based on information contained in the Borrowers' own financial accounting records.  Borrower Representative, by the execution of this Borrowing Base Certificate, hereby ratifies, confirms and affirms all of the terms, conditions and provisions of the Agreement, and further certifies as of this 11th day of March, 2015, that no Default or Event of Default has occurred and is continuing.

**BORROWER REPRESENTATIVE: Chassix, Inc.**
**Authorized Signer:** _____

**EXHIBIT C**

FORM OF
COMPLIANCE CERTIFICATE

UC HOLDINGS, INC.

[PNC Bank, National Association                                   _____, _____
Three PNC Plaza, 6th Floor
225 Fifth Avenue
Pittsburgh, PA 15222]

The undersigned, the chief financial officer of UC Holdings, Inc., a Delaware corporation ("Parent"), hereby makes the certifications set forth below, in his capacity as an officer of Parent and not in his individual capacity, to PNC Bank, National Association, in its capacity as Agent ("Agent") in accordance with the requirements of Section 9.1.3 of that certain Superpriority Secured Debtor-In-Possession ABL Loan, Security and Guaranty Agreement, dated as of March 12, 2015 among Parent, certain subsidiaries of Parent, as borrowers and guarantors, the lenders from time to time party thereto, Agent and the other parties from time to time party thereto (the "DIP Loan Agreement").  Capitalized terms used in this Compliance Certificate, unless otherwise defined herein, shall have the meanings ascribed to them in the DIP Loan Agreement.

[Based upon my review of the financial statements delivered pursuant to Section 9.1.3[(a)][(b)] of Parent and its Subsidiaries for the [_____] period ending _____, _____, copies of which are attached hereto, I hereby certify that:

1.  Such financial statements were prepared in accordance with GAAP and fairly present in all material respects the financial position and results of operations of Parent and its Subsidiaries for such [fiscal year][fiscal quarter], subject only to changes from audit and year-end adjustments and except that such statements need not contain notes.

2.  No Default or Event of Default exists on the date hereof[, other than:
_____]<sup>1</sup>.

---

[1] Specify the details of any Default or Event of Default that is continuing, if any, and any action taken or proposed to be taken with respect thereto.

C - 1

Very truly yours,

_____

Chief Financial Officer

C - 2

**EXHIBIT D**

FORM OF
ASSIGNMENT AND ACCEPTANCE

Reference is made to the Superpriority Secured Debtor-In-Possession ABL Loan, Security and Guaranty Agreement, dated as of March 12, 2015 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "DIP Loan Agreement"), by and among **CHASSIX, INC.**, a Delaware corporation, **DIVERSIFIED MACHINE, INC.**, a Delaware corporation, **DIVERSIFIED MACHINE BRISTOL, LLC**, a Delaware limited liability company, **DIVERSIFIED MACHINE MONTAGUE, LLC**, a Delaware limited liability company, **DIVERSIFIED MACHINE, MILWAUKEE LLC**, a Delaware limited liability company, **DMI EDON, LLC**, a Delaware limited liability company, **MEXICO PRODUCTS I, LLC**, a Delaware limited liability company, **DMI COLUMBUS, LLC**, a Delaware limited liability company, **DMI CHINA HOLDING LLC**, a Michigan limited liability company and **CHASSIX GEORGIA MACHINING, LLC**, a Delaware limited liability company, **AUTOMOTIVE PROPERTIES OF NEW YORK, LLC**, a New York limited liability company, **CONCORD INTERNATIONAL, INC.**, a Delaware corporation, **SMW AUTOMOTIVE, LLC**, a Delaware limited liability company, **AUTOMOTIVE, LLC**, a Delaware limited liability company, **CHASSIS CO. OF MICHIGAN, LLC**, a Delaware limited liability company and **ALUTECH, LLC**, a Michigan limited liability company, as Borrowers, **UC HOLDINGS, INC.**, a Delaware corporation ("Parent"), as a Guarantor, the other Obligors from time to time party hereto, **BMO HARRIS BANK N.A.**, as agent ("Agent") for itself and the lenders from time to time party thereto (the "Lenders"), and the Lenders.  Terms are used but not defined herein shall have the meanings given to them in the DIP Loan Agreement.

_____ ("Assignor") and _____ _____ ("Assignee") agree as follows:

Assignor hereby assigns to Assignee and Assignee hereby purchases and assumes from Assignor, without recourse to the Assignor (a) a principal amount of $_____ of Assignor's outstanding Revolving Credit Loans and $_____ of Assignor's participations in LC Obligations and (b) the amount of $_____ of Assignor's Revolving Loan Commitment (which represents ____% of the total Revolving Loan Commitments) (the foregoing items being, collectively, the "Assigned Interest"), together with (i) an interest in the Loan Documents corresponding to the Assigned Interest and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the DIP Loan Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the Assigned Interest.  This Agreement shall be effective as of the Effective Date set forth below. From and after the Effective Date, Assignee hereby expressly assumes, and undertakes to

D - 1

Detroit_5278883_1

perform, all of Assignor's obligations in respect of the Assigned Interest, and all principal, interest, fees and other amounts which would otherwise be payable to or for Assignor's account in respect of the Assigned Interest shall be payable to or for Assignee's account, to the extent such amounts accrue on or after the Effective Date.

1.    Assignor (a) represents that as of the date hereof, prior to giving effect to this assignment, its Revolving Loan Commitment is $_____, and its Revolving Outstandings is $_____; (b) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the DIP Loan Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the DIP Loan Agreement or any other instrument or document furnished pursuant thereto, other than that (i) Assignor is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim, (ii) Assignor has the full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Acceptance and to consummate the transactions contemplated hereby and (iii) Assignor is not a Defaulting Lender; and (c) makes no representation or warranty and assumes no responsibility with respect to the financial condition of Borrowers or the performance by Borrowers of their obligations under the Loan Documents. *[Assignor is attaching the Note[s] held by it and requests that Agent exchange such Note[s] for new Notes payable to Assignee [and Assignor].]*

2.    Assignee (a) represents and warrants that it has full power and authority, and has taken all action necessary, to enter into this Assignment and Acceptance; (b) confirms that it has received copies of the DIP Loan Agreement and such other Loan Documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Acceptance; (c) agrees that it shall, independently and without reliance upon Assignor and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents; (d) confirms that it is an Eligible Assignee; (e) appoints and authorizes Agent to take such action as agent on Assignee's behalf and to exercise such powers under the DIP Loan Agreement and the other Loan Documents as are delegated to Agent by the terms thereof, together with such powers as are incidental thereto; (e) agrees that it will be bound by and will observe and perform all obligations that are required to be performed by it as a "Lender" under the Loan Documents; and (f) represents and warrants that the assignment evidenced hereby will not result in a non-exempt "prohibited transaction" under Section 406 of ERISA.

3.    This Assignment and Acceptance shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Acceptance shall be governed by the laws of the State of New York without giving effect to conflicts of law principles that would result in the application of the laws of another jurisdiction (but giving effect to federal laws relating to national banks).  If any provision is found to be invalid under applicable law, it shall be ineffective only to the extent of such invalidity and the remaining provisions of this Assignment and Acceptance shall remain in full force and effect. Delivery of an executed counterpart of a signature page of this Assignment and Acceptance by

D - 2

facsimile shall be effective as delivery of a manually executed counterpart of this Assignment and Acceptance.

4.    Each notice or other communication hereunder shall be in writing, shall be sent by messenger, by telecopy or facsimile transmission, or by first-class mail, shall be deemed given when sent and shall be sent as follows:

(a)    (a)    If to Assignee, to the following address (or to such other address as Assignee may designate from time to time):

_____
_____
_____

(b)    If to Assignor, to the following address (or to such other address as Assignor may designate from time to time):

_____
_____
_____
_____

Payments hereunder shall be made by wire transfer of immediately available Dollars as follows:

If to Assignee, to the following account (or to such other account as Assignee may designate from time to time):

_____
_____
ABA No._____
_____
Account No._____
Reference: _____

If to Assignor, to the following account (or to such other account as Assignor may designate from time to time):

_____
_____
ABA No._____
_____
Account No._____
Reference: _____

6.    To the extent not previously provided, the Assignee agrees to deliver to Agent a completed administrative questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrowers, the other Obligors, any of their respective Subsidiaries or their respective securities) will be made available and who may receive such information in

D - 3

accordance with the Assignee's compliance procedures and applicable laws, including Federal and state securities laws.

       7.     Effective Date: _____ ___, 20___ [TO BE INSERTED BY AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

D - 4

**IN WITNESS WHEREOF**, this Assignment and Acceptance is executed as of _____.

_____
("Assignee")

By:_____
   Name:
   Title:


_____
("Assignor")

By:_____
   Name:
   Title:


[Consented to:


PNC BANK, NATIONAL ASSOCIATION, as
Agent[1]

By:_____
   Name:
   Title:

CHASSIX, INC., as Borrower Representative[2]

By:_____
   Name:
   Title:


[_____], as Swingline Lender

By:_____
   Name:
   Title:


[_____], as LC Issuer

---

[1]   Agent consent is not required if the assignment is to an Eligible Assignee.

[2]   Borrower Representative consent is not required if (i) the assignment is to an Eligible Assignee or (ii) an Event of Default has occurred and is continuing. The Borrower Representative shall be deemed to have consented to any assignment unless it objects by written notice to Agent within 10 days after having received notice thereof.

D - 5

By:_____
   Name:
   Title:]

D - 6

**EXHIBIT E**

FORM OF
INTERIM ORDER

(see attached)

**EXHIBIT F**

FORM OF
FINANCIAL COVENANT CERTIFICATE

**UC HOLDINGS, INC.**

PNC Bank, National Association                              _____, ____
Three PNC Plaza, 6th Floor
225 Fifth Avenue
Pittsburgh, PA 15222


     The undersigned, the chief financial officer of UC Holdings, Inc., a Delaware corporation ("Parent"), hereby makes the certifications set forth below, in his capacity as an officer of Parent and not in his individual capacity, to PNC Bank, National Association, in its capacity as Agent ("Agent") in accordance with the requirements of Sections 9.3.1 and 9.3.2 of that certain Superpriority Secured Debtor-In-Possession ABL Loan, Security and Guaranty Agreement, dated as of March 12, 2015 among Parent, certain subsidiaries of Parent, as borrowers and guarantors, the lenders from time to time party thereto, Agent and the other parties from time to time party thereto (the "DIP Loan Agreement").  Capitalized terms used in this Compliance Certificate, unless otherwise defined herein, shall have the meanings ascribed to them in the DIP Loan Agreement.

    1.  On the Friday of the calendar week ending [__], 2015, Net Cash Flow was not less than negative [$37,000,000][1]/[$32,000,000][2].


Very truly yours,


_____
Chief Financial Officer


---

[1] Insert for Measurement Periods ending through May 15, 2015
[2] Insert for Measurement Periods ending after May 15, 2015

F - 1

**Exhibit D**

**DIP Term Loan Agreement**

**CHASSIX, INC.,**
**DIVERSIFIED MACHINE, INC,**
**DIVERSIFIED MACHINE BRISTOL, LLC,**
**DIVERSIFIED MACHINE MONTAGUE, LLC,**
**DIVERSIFIED MACHINE, MILWAUKEE LLC,**
**DMI EDON LLC,**
**MEXICO PRODUCTS I, LLC,**
**DMI COLUMBUS, LLC,**
**DMI CHINA HOLDING LLC,**
**CHASSIX GEORGIA MACHINING, LLC,**
**AUTOMOTIVE PROPERTIES OF NEW YORK, LLC,**
**CONCORD INTERNATIONAL, INC.,**
**SMW AUTOMOTIVE, LLC,**
**AUTOMOTIVE, LLC,**
**CHASSIS CO. OF MICHIGAN, LLC,**
and
**ALUTECH, LLC**
as Borrowers and Guarantors,

**UC HOLDINGS, INC.**
and
**CHASSIX HOLDINGS, INC.**
as Guarantors

**AND THE OTHER OBLIGORS PARTY HERETO**

---

**SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION TERM LOAN, SECURITY AND GUARANTY AGREEMENT**

**Dated as of March 12, 2015**

---

**LENDERS PARTY HERETO,**

**CANTOR FITZGERALD SECURITIES,**
as Agent

# TABLE OF CONTENTS

**Page**

**SECTION 1.** DEFINITIONS; RULES OF CONSTRUCTION ....................................................1
    1.1    Specific Definitions. ................................................................................1
    1.2    Other Terms. ........................................................................................25
    1.3    Accounting Terms; GAAP. ...................................................................25
    1.4    Certain Matters of Construction ..........................................................26

**SECTION 2.** CREDIT FACILITY ...........................................................................................26
    2.1    DIP Term Loan Facility. ......................................................................26
    2.2    Exit Term Facility. ..............................................................................27

**SECTION 3.** INTEREST, FEES AND CHARGES ...................................................................27
    3.1    Interest. ................................................................................................27
    3.2    Computation of Interest and Fees. .......................................................28
    3.3    Fees. ....................................................................................................28
    3.4    [Intentionally omitted]. .......................................................................29
    3.5    Conversion Fee. ...................................................................................29
    3.6    Bank Charges. ......................................................................................29
    3.7    Collateral Protection Expenses. ...........................................................29
    3.8    Reimbursement of Costs and Expenses. ...............................................29
    3.9    No Deductions. .....................................................................................29
    3.10    Replacement of Lenders. ......................................................................31
    3.11    Defaulting Lender. ...............................................................................32

**SECTION 4.** LOAN ADMINISTRATION ...............................................................................32
    4.1    Manner of Borrowing Term Loans. .....................................................32
    4.2    Payments. .............................................................................................34
    4.3    Mandatory and Optional Prepayments..................................................34
    4.4    Application of Payments.......................................................................35
    4.5    All Loans to Constitute One Obligation. ..............................................36
    4.6    [Intentionally omitted.] ........................................................................36
    4.7    [Intentionally omitted.] ........................................................................36
    4.8    Increased Costs. ...................................................................................36
    4.9    Basis for Determining Interest Rate Inadequate or Unfair. ..................38
    4.10    Sharing of Payments, Etc. ....................................................................38
    4.11    Capital Requirements............................................................................38

**SECTION 5.** TERMINATION OF COMMITMENTS..............................................................39
    5.1    Termination of Commitments...............................................................39

**SECTION 6.** SECURITY INTERESTS ...................................................................................39
    6.1    Security Interest in Collateral. .............................................................39

i

6.2    Other Collateral..............................................................................40
6.3    Lien Perfection; Further Assurances......................................................41
6.4    Priority and Liens Applicable to the Obligors. .....................................41
6.5    Change of Name or Location..............................................................42

**SECTION 7.** COLLATERAL ADMINISTRATION..............................................42

7.1    General...........................................................................................42
7.2    [Intentionally omitted]. ....................................................................43
7.3    [Intentionally omitted]. ....................................................................43
7.4    [Intentionally omitted]. ....................................................................44
7.5    Payment of Charges. .......................................................................44

**SECTION 8.** REPRESENTATIONS AND WARRANTIES ...................................44

8.1    General Representations and Warranties................................................44

**SECTION 9.** COVENANTS AND CONTINUING AGREEMENTS........................53

9.1    Affirmative Covenants......................................................................53
9.2    Negative Covenants.........................................................................59
9.3    Financial Covenants.........................................................................67

**SECTION 10.** CONDITIONS PRECEDENT ......................................................67

10.1   Conditions Precedent to the Occurrence of the Closing Date and to the
       Making of the Initial Term Loans......................................................67
10.2   Conditions Precedent to All Term Loans..............................................70
10.3   Conditions Precedent to Delayed Draw Term Loans. ............................71

**SECTION 11.** EVENTS OF DEFAULT; RIGHTS AND REMEDIES ON DEFAULT............71

11.1   Events of Default. ...........................................................................71
11.2   Acceleration of the Obligations. ........................................................77
11.3   Other Remedies...............................................................................77
11.4   Grant of License..............................................................................78
11.5   Setoff and Sharing of Payments.........................................................78
11.6   Remedies Cumulative; No Waiver. ....................................................79

**SECTION 12.** AGENT ...................................................................................79

12.1   Authorization and Action..................................................................79
12.2   Agent's Reliance, Etc.......................................................................80
12.3   Rights of Agent as a Lender...............................................................81
12.4   Lender Credit Decision......................................................................81
12.5   Indemnification................................................................................81
12.6   Rights and Remedies to Be Exercised by Agent Only. ...........................81
12.7   Agency Provisions Relating to Collateral; Release of Liens and
       Guaranties...................................................................................81
12.8   Agent's Right to Purchase Commitments.............................................82
12.9   Resignation of Agent; Appointment of Successor..................................82

**SECTION 13.** MISCELLANEOUS ................................................................................83

    13.1    Amendments. ....................................................................................83
    13.2    Right of Sale; Assignment; Participations. .........................................84
    13.3    Power of Attorney. .............................................................................87
    13.4    Expenses; Indemnity; Damage Waiver. ..............................................88
    13.5    Sale of Interest. ................................................................................91
    13.6    Severability. .....................................................................................91
    13.7    Successors and Assigns. .....................................................................91
    13.8    Cumulative Effect; Conflict of Terms. .................................................92
    13.9    Execution in Counterparts. .................................................................92
    13.10   Notice. ..............................................................................................92
    13.11   Consent. ............................................................................................93
    13.12   Credit Inquiries. ................................................................................93
    13.13   Survival. ...........................................................................................94
    13.14   Time of Essence. ...............................................................................94
    13.15   Entire Agreement. .............................................................................94
    13.16   Interpretation. ...................................................................................94
    13.17   Confidentiality. .................................................................................94
    13.18   GOVERNING LAW; CONSENT TO FORUM ...................................95
    13.19   WAIVERS BY OBLIGORS. .............................................................96
    13.20   Advertisement. ..................................................................................97
    13.21   Joint and Several Liability. .................................................................97
    13.22   Patriot Act Notice. ..........................................................................100
    13.23   Relationship with Lenders. ..............................................................100
    13.24   Appointment for Perfection. .............................................................100
    13.25   Independence of Covenants. .............................................................100
    13.26   No Advisory or Fiduciary Responsibility. ........................................100
    13.27   Intercreditor Arrangements. .............................................................100
    13.28   Anti-Terrorism Laws. ......................................................................101

**SECTION 14.** GUARANTY ..................................................................................101

    14.1    Guaranty. ........................................................................................101
    14.2    Guaranty Absolute. ..........................................................................101
    14.3    Waiver. ...........................................................................................102
    14.4    Continuing Guaranty; Assignments. .................................................103
    14.5    Subrogation. ....................................................................................103
    14.6    [Intentionally omitted]. ...................................................................103
    14.7    Information. .....................................................................................103
    14.8    [Intentionally omitted]. ...................................................................104
    14.9    Taxes. .............................................................................................104
    14.10   Maximum Liability. .........................................................................104
    14.11   Contribution. ...................................................................................104
    14.12   Keepwell. ........................................................................................105

**SECTION 15.** THE BORROWER REPRESENTATIVE .........................................105

Doc#: US1:9899064v18

15.1  Appointment; Nature of Relationship. ...............................................105
15.2  Powers. .......................................................................................105
15.3  Employment of Agents. ...............................................................105
15.4  Notices. .......................................................................................105
15.5  Successor Borrower Representative. ..............................................106
15.6  Execution of Loan Documents. .....................................................106
15.7  [Intentionally omitted]. ................................................................106
15.8  Excluded Swap Obligations and Security Documents......................106

### EXHIBITS

EXHIBIT A        Form of Note
EXHIBIT B        Form of Compliance Certificate
EXHIBIT C        Form of Assignment and Acceptance
EXHIBIT D        Form of Interim Order
EXHIBIT E        Exit Term Facility Term Sheet
EXHIBIT F        Form of Financial Covenant Certificate
EXHIBIT G        Closing Date Budget
EXHIBIT H        Form of Joinder Agreement

### SCHEDULES

COMMITMENT SCHEDULE

SCHEDULE 1E          Foreign Subsidiaries
SCHEDULE 1F          Guarantors
SCHEDULE 1H          Joint Ventures
SCHEDULE 6.1         Commercial Tort Claims
SCHEDULE 7.1.1(a)    Locations of Collateral
SCHEDULE 7.1.1(c)    Deposit Accounts and Securities Accounts
SCHEDULE 8.1.1       Foreign Qualifications
SCHEDULE 8.1.4       Names and Capital Structure
SCHEDULE 8.1.5       Title to Properties
SCHEDULE 8.1.14      Intellectual Property
SCHEDULE 8.1.18      Litigation
SCHEDULE 8.1.21      ERISA Exceptions
SCHEDULE 8.1.23      Labor Matters
SCHEDULE 8.1.24      Insurance
SCHEDULE 8.1.25(a)   Filing Offices
SCHEDULE 9.2.2(g)    Existing Investments
SCHEDULE 9.2.3       Outstanding Indebtedness
SCHEDULE 9.2.5       Permitted Liens
SCHEDULE 13.10       Lender Addresses

## SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION TERM LOAN, SECURITY AND GUARANTY AGREEMENT

**THIS SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION TERM LOAN, SECURITY AND GUARANTY AGREEMENT** made as of the 12th day of March, 2015, by and among **CANTOR FITZGERALD SECURITIES** ("CFS") as Agent or DIP Term Agent (each as defined below) for itself and the other Lenders (as defined below), the **LENDERS, CHASSIX, INC.**, a Delaware corporation ("Chassix"), **DIVERSIFIED MACHINE, INC.**, a Delaware corporation ("DMI"), **DIVERSIFIED MACHINE BRISTOL, LLC**, a Delaware limited liability company ("DM Bristol"), **DIVERSIFIED MACHINE MONTAGUE, LLC**, a Delaware limited liability company ("DM Montague"), **DIVERSIFIED MACHINE, MILWAUKEE LLC**, a Delaware limited liability company ("DM Milwaukee"), **DMI EDON LLC**, a Delaware limited liability company ("DMI Edon"), **MEXICO PRODUCTS I, LLC**, a Delaware limited liability company ("Mexico Products I"), **DMI COLUMBUS, LLC**, a Delaware limited liability company ("DMI Columbus"), **DMI CHINA HOLDING LLC**, a Michigan limited liability company ("DMI China"), **CHASSIX GEORGIA MACHINING, LLC**, a Delaware limited liability company ("CGM"), **AUTOMOTIVE PROPERTIES OF NEW YORK, LLC**, a New York limited liability company ("APNY"), **CONCORD INTERNATIONAL, INC.**, a Delaware corporation ("Concord"), **SMW AUTOMOTIVE, LLC**, a Delaware limited liability company ("SMW Auto"), **AUTOMOTIVE, LLC**, a Delaware limited liability company ("Automotive"), **CHASSIS CO. OF MICHIGAN, LLC**, a Delaware limited liability company ("Chassis MI"), and **ALUTECH, LLC**, a Michigan limited liability company ("Alutech"), as Borrowers, **UC HOLDINGS, INC.**, a Delaware corporation ("Parent"), **CHASSIX HOLDINGS, INC.**, a Delaware corporation ("Holdings"), each a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code as a Guarantor and the other Obligors from time to time party hereto.

### R E C I T A L S:

**WHEREAS**, on March 12, 2015 (the "Petition Date"), the Obligors (in such capacity, each a "Debtor") filed voluntary petitions with the Bankruptcy Court initiating cases pending under Chapter 11 of the Bankruptcy Code (collectively, the "Cases" and each a "Case") and have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**WHEREAS**, the Borrowers have applied to the Lenders for a term loan facility in an aggregate principal amount of $100,000,000 on the terms and subject to the conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained, the parties hereto agree as follows:

## SECTION 1. DEFINITIONS; RULES OF CONSTRUCTION

1.1    Specific Definitions.  When used in this Agreement, the following terms shall have the following meanings (terms defined in the singular to have the same meaning when used in the plural and vice versa):

13-Week Projection – a projected statement of receipts and disbursements of Parent and its consolidated domestic subsidiaries on a weekly basis for the following 13 calendar weeks which shall be in the same form as the Budget and shall be reasonably satisfactory to the Majority Lenders.  As used herein, "13-Week Projection" shall refer to the most recent 13-Week Projection delivered by the Borrower in accordance with Section 9.1.3(d).

Acceptable Reorganization Plan – a Reorganization Plan on terms materially consistent with the plan attached to the Restructuring Support Agreement.

Access Agreement – that certain Access Agreement, dated as of March 12, 2015 (as amended, supplemented or otherwise modified from time to time in accordance with its terms), among Chassix, the Designated OEM Parties, DIP ABL Agent, Agent and the other entities from time to time party thereto.

Accommodation Agreement – that certain Accommodation Agreement, dated as of March 12, 2015 (as amended, supplemented or otherwise modified from time to time in accordance with its terms), among Chassix, Parent, Agent, DIP ABL Agent, the Designated OEM Parties and the other entities from time to time party thereto.

Account Debtor – any Person who is or may become obligated under or on account of any Account, Contract Right, Chattel Paper or General Intangible.

Affiliate – with respect to any Person, another Person that directly or indirectly (through one or more intermediaries), Controls or is Controlled by or is under common Control with the Person specified.

Affiliate Transaction – as defined in Section 9.2.4.

Agent and DIP Term Agent – CFS, in its capacity as agent for the Lenders under this Agreement and any successor in that capacity appointed pursuant to Section 12.9; provided that, when used in the Orders, the term "Agent" and "DIP Term Agent" shall be deemed to include CFS in its capacity as Syndication Agent for purposes of approving the appointment of, releases of, fees, expenses and indemnities of and any rights, privileges and immunities of the Syndication Agent.

Agent Fee Letter – that certain Agency Fee Letter, dated as of the Closing Date, between CFS and the Obligors party thereto.

Agreement – this Superpriority Secured Debtor-In-Possession Term Loan, Security and Guaranty Agreement and all Exhibits and Schedules hereto, as each of the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

Alternate Base Rate – for any day, a rate per annum equal to the highest of (a) the Base Rate in effect on such day, (b) the sum of the Federal Funds Effective Rate in effect on such day plus one half of one percent (0.5%), and (c) the sum of the Daily LIBOR Rate in effect on such day plus one percent (1.0%), so long as a Daily LIBOR Rate is offered, ascertainable and not unlawful.

Alutech – as defined in the preamble.

Anti-Terrorism Laws – any Laws relating to terrorism, trade sanctions programs and embargoes, import/export licensing, money laundering or bribery, and any regulation, order, or directive promulgated, issued or enforced pursuant to such Laws, all as amended, supplemented or replaced from time to time.

APNY – as defined in the preamble.

Applicable Margin – for any day, (i) with respect to any Base Rate Loan, 8.00% and (ii) with respect to any LIBOR Loan, 9.00%.

Approved Fund – any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in loans and similar extensions of credit in its ordinary course of activities,

Doc#: US1:9899064v18

and is administered or managed by a Lender, an entity that administers or manages a Lender, or an Affiliate of either.

Assignment and Acceptance Agreement – an assignment and acceptance agreement in the form of Exhibit C hereto pursuant to which a Lender assigns to an assignee (with the consent of any party whose consent is required by Section 13.2.1) all or any portion of any of such Lender's rights and obligations hereunder as permitted pursuant to the terms of this Agreement.

Audited Financial Statements – as defined in Section 8.1.8(a).

Automotive – as defined in the preamble.

Avoidance Action – the Debtors' claims and causes of action that constitute avoidance actions under Sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code and any other avoidance actions under the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise.

Bankruptcy Code – Title 11 of the United States Code.

Bankruptcy Court – the United States Bankruptcy Court for the Southern District of New York or any appellate court having jurisdiction over the Cases from time to time.

Base Rate – the rate of interest per annum that is equal to the highest rate published on the day of determination (or most recently prior thereto) in the "Money Rates" section of The Wall Street Journal (Eastern edition) as the Prime Rate in the United States for such day (or, if such source is not available, such alternate source as determined by the Agent).  The Base Rate is a reference rate and does not necessarily represent the lowest or best rate actually charged to any customer.  CFS or any other Lender may make commercial loans or other loans at rates of interest at, above or below the Base Rate.

Base Rate Loans – any Term Loan for the periods when the rate of interest applicable to such Term Loan is calculated by reference to the Alternate Base Rate.

BMO Cash Collateral Account – a Deposit Account held at BMO Harris Bank N.A. into which the Obligors will place cash collateral in respect of the Prepetition Letters of Credit.

Borrower Representative – as defined in Section 15.

Borrowers – Chassix, DMI, DM Bristol, DM Montague, DM Milwaukee, DMI Edon,  Mexico Products I, DMI Columbus, DMI China, CGM, APNY, Concord, SMW Auto, Automotive, Chassis MI and Alutech.

Bristol Plant – the Obligors' production facility located in Bristol, Indiana.

Budget - the weekly statement of receipts and disbursements of Parent and its domestic subsidiaries on a consolidated basis for the 21 weeks commencing with the first week following the Petition Date, including (i) individual line items for "Cash Receipts," "Vendor Payments," "Lease, Rent and Utilities," "Payroll and Benefits," "Taxes," "Capital and Tooling," "Funding for Rest of World Entities," "DIP Fees and Interest," "Professional Fees," "UST Fees," "Other," "Total Disbursements" and "Net Cash Inflow/(Outflow)" and (ii) the anticipated uses of the DIP Term Loan Facility and the DIP ABL Facility for such period, in form and substance reasonably satisfactory to the Majority Lenders; *provided* that, to the extent that Payment in Full has not occurred within such 21-week period, the

Borrower Representative shall deliver to the Agent an updated budget covering the period through the Maturity Date, which shall be in the same form as the Budget and shall be reasonably satisfactory to the Majority Lenders, and such updated budget shall become the "Budget" for all purposes under the Loan Documents.  The Budget in effect on the Closing Date is attached hereto as Exhibit G.

Business Day – any day excluding Saturday, Sunday and any day which is a legal holiday under the laws the State of New York, or is a day on which banking institutions located in such state are closed.

Cases – as defined in the preamble.

Capital Expenditures – expenditures made or liabilities incurred for the acquisition of any fixed assets or improvements, replacements, substitutions or additions thereto which have a useful life of more than one year, including the total principal portion of Capitalized Lease Obligations.

Capitalized Lease Obligation – any Indebtedness represented by obligations under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

Carve-Out – as defined in the applicable Order.

CGM – as defined in the preamble.

Chassix – as defined in the preamble.

Chassis MI – as defined in the preamble.

Chrysler Group – collectively, FCA US LLC (f/k/a Chrysler Group LLC) and Chrysler Canada Inc.

Closing Date – March 13, 2015.

Code – the Internal Revenue Code of 1986.

Collateral – all of the Property and interests in Property of the Obligors described in Section 6; provided, that in no event shall the term Collateral include Excluded Assets.

Commitment Schedule – the Schedule attached hereto identified as such.

Commodity Exchange Act – the Commodity Exchange Act (7 U.S.C. Section 1, et seq.), as amended from time to time, and any successor statute.

Compliance Certificate – as defined in Section 9.1.3.

Computer Hardware and Software – any right of any Obligor (including rights as licensee and lessee) with respect to (a) computer and other electronic data processing hardware, including all integrated computer systems, central processing units, memory units, display terminals, printers, computer elements, card readers, tape drives, hard and soft disk drives, cables, electrical supply hardware, generators, power equalizers, accessories, peripheral devices and other related computer hardware; (b) all software and all software programs designed for use on computers and electronic data processing hardware, including all operating system software, utilities and application programs in any form (source code and object code in magnetic tape, disk or hard copy format or any other listings whatsoever); (c) any firmware associated with any of the foregoing; (d) any documentation for hardware, software and firmware, including flow charts, logic diagrams, manuals, specifications, training materials, charts and

4

pseudo codes and (e) all rights with respect thereto, including any and all licenses, options, warranties, service contracts, program services, test rights, maintenance rights, support rights, improvement rights, renewal rights and indemnifications, and any substitutions, replacements, additions or model conversions of any of the foregoing.

Concord – as defined in the preamble.

Consolidated – the consolidation in accordance with GAAP of the accounts or other items as to which such term applies.

Consolidated Total Assets – as of any date of determination, the amount that would, in conformity with GAAP, be set forth opposite the caption "total assets" (or any like caption) on the most recent consolidated balance sheet of Parent and its Subsidiaries at such date.

Contract Right – any right of any Obligor to payment under a contract for the sale or lease of goods or the rendering of services, which right is at the time not yet earned by performance.

Consummation Date – the date of the substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of an Acceptable Reorganization Plan that is confirmed pursuant to an order of the Bankruptcy Court.

Control – the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have correlative meanings.

Control Account – each Deposit Account and Securities Account, in each case with respect to which a Deposit Account Control Agreement or Securities Account Control Agreement, as applicable, has been entered into among a banking institution holding the relevant Obligor's funds or securities, as the deposit account bank or as the securities intermediary, as the case may be, at which such account is maintained, Agent and the relevant Obligor.

Converted Term Loans – as defined in Section 2.2.1.

Covered Entity – (a) each Borrower, each of Borrower's Subsidiaries, all Guarantors and all pledgors of Collateral and (b) each Person that, directly or indirectly, is in control of a Person described in clause (a) above. For purposes of this definition, control of a Person shall mean the direct or indirect (x) ownership of, or power to vote, 25% or more of the issued and outstanding equity interests having ordinary voting power for the election of directors of such Person or other Persons performing similar functions for such Person, or (y) power to direct or cause the direction of the management and policies of such Person whether by ownership of equity interests, contract or otherwise.

Creditors' Committee – the statutory committee of unsecured creditors appointed in the Cases.

Customer Agreements – those certain Component Supply Agreements by and among the Obligors party thereto and the Designated OEM Parties party thereto entered into pursuant to the Accommodation Agreement.

Daily LIBOR Rate –shall mean, for any day, the rate per annum determined by the Agent by dividing (x) the Published Rate by (y) a number equal to 1.00 minus the Reserve Percentage.

Debtor – as defined in the preamble.

Default – an event or condition the occurrence of which would, with the lapse of time or the giving of notice, or both, become an Event of Default.

Defaulting Lender – any Lender that (a) has failed to fund any portion of the Term Loans hereunder within two (2) Business Days of the date required to be funded by it hereunder unless, such Lender notifies Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including a particular Default or Event of Default, if any) has not been satisfied, (b) has otherwise failed to pay over to Agent or any other Lender any other amount required to be paid by it hereunder within one (1) Business Day of the date when due, unless the subject of a good faith dispute, (c) has been deemed or has a parent company that has been deemed insolvent or becomes the subject of an Insolvency Proceeding; provided, however, that a Lender shall not be a Defaulting Lender solely by virtue of a Governmental Authority's ownership of an equity interest in such Lender or parent company so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender, (d) has notified the Borrower Representative, Agent or any Lender in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including a particular Default or Event of Default, if any) to funding a loan under this Agreement cannot be satisfied) or under other agreements in which it commits to extend credit or (e) has failed to confirm within two (2) Business Days of a request by Agent that it will comply with the terms of this Agreement relating to its obligations to fund Term Loans, provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (e) upon Agent's receipt of such confirmation.

Default Rate – as defined in Section 3.1.2.

Delayed Draw Term Loan Commitment –the commitment of a Lender to make or otherwise fund any Delayed Draw Term Loan, and "Delayed Draw Term Loan Commitments" means such commitments of all Lenders in the aggregate. The amount of each Lender's Delayed Draw Term Loan Commitment is set forth on the Commitment Schedule, or, if such Lender's Delayed Draw Term Loan Commitment has been assigned, in the applicable Assignment and Acceptance Agreement, subject to any adjustment pursuant to the terms and conditions hereof. The aggregate amount of the Delayed Draw Term Commitments as of the Closing Date is $20,000,000 (before giving effect to the Delayed Draw Term Loans made on the Final Term Funding Date).

Delayed Draw Term Loan – as defined in Section 2.1.2.

Deposit Account Control Agreement – an agreement, in form and substance reasonably satisfactory to Agent and Majority Lenders (it being understood that any Deposit Account Control Agreement requiring the Agent to indemnify a banking institution in its individual capacity is not reasonably satisfactory to Agent), among any Obligor, a banking institution holding such Obligor's funds, and Agent with respect to collection and control of all deposits and balances held in a Deposit Account maintained by such Obligor with such banking institution.

Designated OEM Parties – each of Ford Motor Company, General Motors, LLC, FCA US LLC and Nissan North America, Inc.

DIP ABL Agent – PNC Bank, National Association, in its capacity as agent under the DIP ABL Loan Agreement.

DIP ABL Facility – the credit facility contemplated by the DIP ABL Loan Agreement.

DIP ABL Loan Agreement – that certain Superpriority Secured Debtor-In-Possession ABL Loan, Security and Guaranty Agreement, dated as of the date hereof (as amended, supplemented or otherwise modified from time to time), by and among the Obligors, the DIP ABL Agent, and the lenders and other parties from time to time party thereto.

DIP ABL Loan Documents – the Loan Documents (as defined in the DIP ABL Loan Agreement).

DIP ABL Priority Collateral – as defined in the applicable Order.

DIP Term Loan Facility – the credit facility contemplated by this Agreement.

DIP Term Loan Priority Collateral – as defined in the applicable Order.

Distribution – in respect of any Person means and includes any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Holdings or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in Holdings or any of its Subsidiaries or any option, warrant or other right to acquire any such Equity Interests in Holdings or any of its Subsidiaries; *provided* that, for purposes of Section 9.2.7, "Distribution" shall include any payment by any Obligor or any of its Subsidiaries to Sponsor.

DM Bristol – as defined in the preamble.

DM Milwaukee – as defined in the preamble.

DM Montague – as defined in the preamble.

DMI – as defined in the preamble.

DMI China – as defined in the preamble.

DMI Columbus – as defined in the preamble.

DMI Edon – as defined in the preamble.

Domestic Subsidiary – any Subsidiary that is not a Foreign Subsidiary.

Eligible Assignee – a Person that is a Lender, a U.S.-based Affiliate of a Lender or an Approved Fund; provided that neither Sponsor nor any Affiliate of Sponsor may be an Eligible Assignee.

Environmental Laws – the Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. § 9601, et seq.), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, et seq.), the Resource Conservation and Recovery Act (42 U.S.C. § 6901, et seq.), the Federal Clean Water Act (33 U.S.C. § 1251 et seq.), the Clean Air Act (42 U.S.C. § 7401 et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601 et seq.) and the Occupational Safety and Health Act (29 U.S.C. § 651 et seq.), as such laws may be amended or otherwise modified from time to time, and any other present or future

Doc#: US1:9899064v18

federal, state, local or foreign statute, ordinance, common law, rule, regulation, order, judgment, decree, permit, license or other binding determination of any Governmental Authority related to the protection of the environment, the handling, storage, generation, transportation, disposal of, Release, deposit or migration of any Hazardous Materials into the environment.

Environmental Liabilities and Costs – all liabilities, monetary obligations, losses, damages, punitive damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants and costs of investigations and feasibility studies), fines, penalties, sanctions and interest incurred as a result of any claim or demand by any Governmental Authority or any third party, and arising out of or under any Environmental Law or which otherwise relate to any environmental condition or a Release of Hazardous Materials.

Environmental Lien – any Lien in favor of any Governmental Authority arising under or related to any Environmental Law.

Environmental Notice – a notice (whether written or oral) from any Governmental Authority or other Person of any possible noncompliance with, investigation of a possible violation of, litigation relating to, or potential fine or liability under any Environmental Law, or with respect to any Release of Hazardous Materials, environmental pollution or hazardous materials, including any complaint, summons, citation, order, claim, demand or request for correction, remediation, information or otherwise.

Equity Interest – means the interest, whether voting or non-voting, and whether denominated as common stock or preferred stock or ordinary shares or preferred shares, as the case may be, of any (a) shareholder in a corporation; (b) partner in a partnership (whether general, limited, limited liability or Joint Venture); (c) member in a limited liability company; or (d) other Person having any other form of equity security or ownership interest, in each case including all warrants, options beneficial interests, participations or other rights to acquire any of the foregoing.

ERISA – the Employee Retirement Income Security Act of 1974, as amended, and any successor statute, and all rules and regulations from time to time promulgated thereunder.

ERISA Affiliate: any trade or business (whether or not incorporated) under common control with an Obligor within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

ERISA Event – (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Obligor or ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Obligor or ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) the determination that any Pension Plan or Multiemployer Plan is considered an at risk plan or a plan in critical or endangered status within the meaning set forth in the Pension Funding Rules; (f) any Obligor or ERISA Affiliate requests a minimum funding waiver or fails to meet any funding obligations with respect to any Pension Plan or Multiemployer Plan; (g) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Obligor or ERISA Affiliate.

Doc#: US1:9899064v18

Event of Default – as defined in <u>Section 11.1</u>.

Excluded Assets – (a) all licenses issued by the Federal Communications Commission to the extent that Agent is prohibited from validly possessing a security interest therein pursuant to the Communication Act of 1934 (as amended) and the regulations promulgated thereunder or other applicable law (other than the economic value of such licenses, all rights incident or appurtenant to such licenses and the right to receive all monies, consideration and proceeds of any sale, assignment or transfer of such licenses) and (b) any of the Voting Stock of a first tier Foreign Subsidiary in excess of 65% of the outstanding Voting Stock of such first tier Foreign Subsidiary.

Excluded Subsidiary – any Foreign Subsidiary.

Excluded Swap Obligation – with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guarantee or security interest is or becomes illegal.

Excluded Taxes – with respect to Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Obligor hereunder, (a) Taxes imposed on or measured by its net income (however denominated), and franchise Taxes imposed on it (in lieu of net income Taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized, in which its principal office is located, or in which it is otherwise doing business (other than if Agent or such Lender is doing business in such jurisdiction solely as a result of the transactions contemplated by the Loan Documents) or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits Taxes imposed by the United States of America or any similar Tax imposed by any other jurisdiction in which any Obligor is located, (c) any Tax that is imposed under FATCA, (d) in the case of a Lender, any Tax that is attributable to such Lender's failure or inability (other than as a result of a Change in Law) to comply with <u>Section 3.9</u> and (e) in the case of a Non-US Lender, any withholding Tax that is imposed on amounts payable to such Non-US Lender at the time such Non-US Lender becomes a party hereto (or designates a new lending office), except to the extent such Non-US Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from Obligors with respect to such withholding Tax.

Exit Term Facility – as defined in <u>Section 2.2.1</u>.

Exit Term Loans – as defined in <u>Section 2.2.2</u>.

Extraordinary Receipts – as defined in <u>Section 4.3.1(d)</u>.

FATCA – Sections 1471 through 1474 of the Code, as of the date of this Agreement and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any intergovernmental agreements relating thereto or legislation or administrative guidance implementing the foregoing.

Doc#: US1:9899064v18

Federal Funds Effective Rate – for any day, the rate per annum (based on a year of 360 days and actual days elapsed and rounded upward to the nearest 1/100 of 1%) announced by the Federal Reserve Bank of New York (or any successor) on such day as being the weighted average of the rates on overnight federal funds transactions arranged by federal funds brokers on the previous trading day, as computed and announced by such Federal Reserve Bank (or any successor) in substantially the same manner as such Federal Reserve Bank computes and announces the weighted average it refers to as the "Federal Funds Effective Rate" as of the date of this Agreement; *provided,* if such Federal Reserve Bank (or its successor) does not announce such rate on any day, the "Federal Funds Effective Rate" for such day shall be the Federal Funds Effective Rate for the last day on which such rate was announced.

Fee Letters – the Agent Fee Letter and the Lender Fee Letter.

Final Order – a final order of the Bankruptcy Court in substantially the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications are satisfactory in form and substance to Agent and the Majority Lenders in their discretion) and authorizing the Delayed Draw Term Loans.

Final Order Entry Date – the date on which the Final Order is entered by the Bankruptcy Court.

Final Term Funding Date - as defined in Section 2.1.2.

First Day Orders – all orders entered by the Bankruptcy Court on, or within five days of, the Petition Date or based on motions filed on or about the Petition Date.

Foreign Plan – any employee benefit plan or arrangement (a) maintained or contributed to by any Obligor or Subsidiary that is not subject to the laws of the United States; or (b) mandated by a government other than the United States for employees of any Obligor or Subsidiary.

Foreign Subsidiary – a Subsidiary that is a "controlled foreign corporation" within the meaning of Section 957 of the Code or is an entity that is disregarded as an entity for U.S. federal income tax purposes substantially all of whose assets are interests in one or more controlled foreign corporations within the meaning of Section 957 of the Code, such that a guaranty by such Subsidiary of the Obligations or a Lien on the assets of such Subsidiary to secure the Obligations could reasonably result in a material tax liability to Borrowers. As of the Closing Date, Schedule 1E sets forth a true and correct list of each Foreign Subsidiary.

GAAP – generally accepted accounting principles in the United States of America in effect from time to time.

Governmental Authority – any nation or government, any Federal, state, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank), and any group charged with setting financial accounting or regulatory capital rules or standards (including without limitation, the Financial Accounting Standards, Board, the Bank for International Settlements or the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing).

Guarantee – of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and

10

including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; <u>provided</u> that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

<u>Guaranteed Obligations</u> – as defined in <u>Section 14.1</u>.

<u>Guarantors</u> – Holdings, Parent, each Borrower, each Subsidiary Guarantor, and each other Person who now or hereafter guarantees payment or performance of the whole or any part of the Obligations pursuant to a Guaranty Agreement or who becomes a party to this Agreement as a Guarantor pursuant to a Joinder Agreement. As of the Closing Date, <u>Schedule 1F</u> sets forth a true and correct list of each Guarantor.

<u>Guaranty Agreement</u> – (a) the guaranty of each Guarantor party hereto contained in <u>Section 14</u> hereof and (b) each other guaranty executed and delivered by any Guarantor, in form and substance satisfactory to Agent.

<u>Hazardous Material</u> – (a) any element, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic pollutant, toxic or hazardous substance, extremely hazardous substance or chemical, hazardous waste, special waste, or solid waste under Environmental Laws or that is likely to cause harm to or have an adverse effect on, the environment or risk to human health or safety, including any pollutant, contaminant, waste, hazardous waste, toxic substance or dangerous good which is defined or identified in any Environmental Law and which is present in the environment in such quantity or state that it contravenes any Environmental Law; (b) petroleum and its refined products; (c) polychlorinated biphenyls; (d) any substance exhibiting a hazardous waste characteristic, including corrosivity, ignitability, toxicity or reactivity as well as any radioactive or explosive materials; and (e) any raw materials, building components (including asbestos-containing materials) and manufactured products containing hazardous substances listed or classified as such under Environmental Laws.

<u>Hedge Termination Value</u> – in respect of any one or more Hedging Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in <u>clause (a)</u>, the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Lender or any Affiliate of a Lender).

<u>Hedging Agreement</u> – any interest rate, currency or commodity swap agreement, cap agreement, collar agreement, floor, option, forward, cross right or obligation, spot foreign exchange, forward foreign exchange, foreign exchange option (or series of options), or combination thereof or similar transaction, and any other agreement or arrangement designed to protect a Person against fluctuations in interest rates, foreign exchange rates, currency exchange rates, commodity prices or credit or equity risk.

<u>Hedging Obligation</u> – means, with respect to any Person, any liability of such Person under any Hedging Agreement determined (a) for any date on or after the date such Hedging Agreement has been

closed out and termination value determined in accordance therewith, using such termination value, and (b) for any date prior to the date referenced in clause (a), using the amount determined as the mark-to-market value for such Hedging Agreement, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreement (which may include a Lender or any Affiliate of a Lender).

Holdings – Chassix Holdings, Inc., a Delaware corporation.

Holdings PIK Indenture – that certain Indenture dated as of December 13, 2013 (as amended, supplemented or otherwise modified from time to time) between Holdings and Delaware Trust Company (as successor to U.S. Bank National Association), as trustee.

Holdings PIK Notes – the 10%/10¾% Senior PIK Toggle Notes due 2018 issued by Holdings pursuant to the Holdings PIK Indenture.

Incremental Exit Commitment – the commitment of a Lender to make or otherwise fund any Incremental Exit Term Loan, and "Incremental Exit Commitments" means such commitments of all Lenders in the aggregate. The amount of each Lender's Incremental Exit Commitment is set forth on the Commitment Schedule, or in the applicable Assignment and Acceptance Agreement, subject to any adjustment pursuant to the terms and conditions hereof.  The aggregate amount of the Incremental Exit Commitments as of the Closing Date is $50,000,000 (in each case, before giving effect to the Incremental Term Loans made on the Incremental Exit Funding Date).

Incremental Exit Funding Date – as defined in Section 2.2.2.

Incremental Exit Term Loans – as defined in Section 2.2.2.

Indebtedness – as applied to a Person means, without duplication (a) all indebtedness for borrowed money, (b) all Capitalized Lease Obligations of such Person; (c) all obligations of such person evidenced by bonds, debentures, notes or similar instruments; (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person; (e) all obligations owed for all or any part of the deferred purchase price of property or services, including any earn-out obligations which have become liabilities on the balance sheet of such Person in accordance with GAAP (excluding any such obligations under ERISA and trade debt and receivables arising from the purchase and sale or lease of goods and services between Affiliates); (f) all indebtedness secured by a Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (g) all Guarantees by such Person of Indebtedness of others; (h) all obligations, contingent or otherwise, if such Person in respect of banker's acceptances; (i) all obligations, contingent or otherwise, in connection with letters of credit or letter of credit guaranties issued for the account of such Person; (j) Hedging Obligations; (k) all other Off-Balance Sheet Liabilities; and (l) all obligations of the types referred to in clauses (a) through (k) of this definition of another Person and all dividends and other distributions of another Person, the payment of which, in either case, (i) such Person has Guaranteed or (ii) is secured by (or the holder of such Indebtedness or the recipient of such dividends or other distributions has an existing right, whether contingent or otherwise, to be secured by) any Lien upon the property or other assets of such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, dividends or other distributions.  Notwithstanding the foregoing, Indebtedness shall not include operating leases as defined under GAAP as of the Closing Date to the extent that such leases are deemed to be Indebtedness solely as a result of any change in the requirements under GAAP after the Closing Date.

Doc#: US1:9899064v18

Indemnified Person – as defined in Section 13.8.

Initial Unaudited Financial Statements – the unaudited internally prepared interim financial statement of Parent and its Subsidiaries delivered to Agent and Lenders for the fiscal quarters ending March 31, 2014, June 30, 2014, September 30, 2014 and December 31, 2014.

Initial Term Loan Commitment – means the commitment of a Lender to make or otherwise fund any Initial Term Loan on the Closing Date, and "Initial Term Loan Commitments" means such commitments of all Lenders in the aggregate on the Closing Date (before giving effect to the Initial Term Loans made on the Closing Date). The amount of each Lender's Initial Term Loan Commitment as of the Closing Date is set forth on the Commitment Schedule and the aggregate amount of the Initial Term Loan Commitments as of the Closing Date is $80,000,000 (in each case, before giving effect to the Initial Term Loans made on the Closing Date).

Initial Term Loans – as defined in Section 2.1.1.

Insolvency Proceeding – any case or proceeding commenced by or against a Person under any state, federal or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the Bankruptcy Code, or any other insolvency, debtor relief or debt adjustment law; (b) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for such Person or any part of its Property; or (c) an assignment or trust mortgage for the benefit of creditors.

Intellectual Property – all past, present and future: (i) trade secrets, know-how and other proprietary information, including in Computer Hardware and Software and databases; (ii) trademarks, service marks, internet domain names, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing), indicia and other source and/or business identifiers, and the goodwill of the business connected with the use thereof and symbolized thereby and all registrations or applications for registrations and renewals which have heretofore been or may hereafter be issued thereon throughout the world; (iii) copyrights (including copyrights for Computer Hardware and Software and databases) and copyright registrations or applications for registrations and renewals and extensions which have heretofore been or may hereafter be issued throughout the world; (iv) patent applications and patents, reissues, divisions, continuations, extensions and continuations-in-art thereof and amendments thereto which have heretofore been or may hereafter be issued throughout the world; (v) industrial design applications and registered industrial designs; (vi) mask works, design rights, and any other type of intellectual property right protected anywhere in the world and any applications and registrations therefor; (vii) rights of publicity and the like pertaining to the right to use the names, likeness, biography, voice and signatures of natural persons; (viii) any license agreements related to any of the foregoing; (ix) the right to sue for all past, present and future infringements of any of the foregoing; (x) income, fees, royalties, damages, claim and payments now or hereafter due and/or payable with respect to any of the foregoing and with respect any of the foregoing including damages, claims and payments for past, present or future infringements or other violations thereof; (xi) all other intellectual property; (xii) rights of priority under any international treaty and any common-law rights in any of the foregoing; and (xiii) all common law and other rights throughout the world in and to all of the foregoing.

Intercreditor Arrangements – the relative priorities and intercreditor arrangements as between the DIP ABL Facility and the DIP Term Loan Facility with respect to the DIP ABL Priority Collateral and the DIP Term Loan Priority Collateral as set forth in the Orders.

Interest Payment Date – (a) as to any Base Rate Loan, the first Business Day of each calendar month and (b) as to any LIBOR Loan, the last day of each Interest Period for such LIBOR Loan.  If an

Interest Payment Date falls on a date that is not a Business Day, such Interest Payment Date shall be deemed to be the immediately succeeding Business Day.

Interest Period – relative to any LIBOR Loans:

(a)        initially, the period beginning on (and including) the date on which such LIBOR Loan is made or continued as, or converted into, a LIBOR Loan pursuant to Section 4.1 and ending on (but excluding) the day which numerically corresponds to such date one month thereafter (or, if such month has no numerically corresponding day, on the last Business Day of such month); and

(b)        thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such LIBOR Loan and ending one month thereafter;

provided, however, that

(i)        if such Interest Period would otherwise end on a day which is not a Business Day, such Interest Period shall end on the next following Business Day unless such day falls in the next calendar month, in which case such Interest Period shall end on the first preceding Business Day; and

(ii)        no Interest Period may end later than the termination of this Agreement.

Interim Order – an interim order of the Bankruptcy Court (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms hereof) in the form set forth as Exhibit D, with changes to such form as are satisfactory to Agent and the Majority Lenders in their discretion, approving the Loan Documents and the DIP ABL Loan Documents.

Interim Order Entry Date – the date on which the Interim Order is entered by the Bankruptcy Court.

Interim Period – the period from and including the Interim Order Entry Date to but not including the Final Order Entry Date.

Investment – by any Person in any other Person means (i) any direct or indirect loan, advance or other extension of credit or capital contribution to or for the account of such other Person (by means of any transfer of cash or other property to any Person or any payment for property or services for the account or use of any Person, or otherwise), (ii) any direct or indirect purchase or other acquisition of any Equity Interests, bond, note, debenture or other debt or equity security or evidence of Indebtedness, or any other ownership interest (including, any option, warrant or any other right to acquire any of the foregoing), issued by such other Person, whether or not such acquisition is from such or any other Person, (iii) any direct or indirect payment by such Person on a Guarantee of any obligation of or for the account of such other Person or any direct or indirect issuance by such Person of such a Guarantee, (iv) any purchase or acquisition (in one transaction or a series of transactions) of any assets of any other Person constituting a business unit (whether through purchase of assets, merger or otherwise) or (v) any other investment of cash or other property by such Person in or for the account of such other Person.  The amount of any Investment shall be the original principal or capital amount thereof less all returns of principal or equity thereon (and without adjustment by reason of the financial condition of such other Person) and shall, if made by the transfer or exchange of property other than cash, be deemed to have been made in an original principal or capital amount equal to the fair market value of such property at the time of such transfer or exchange.

IRS – the United States Internal Revenue Service.

Joinder Agreement – has the meaning assigned to such term in Section 9.1.11.

Joint Liability Payment – as defined in Section 13.20.

Joint Venture – any Person other than an individual or a Subsidiary of Holdings (i) in which any Obligor (other than Holdings or Parent) or any of its Subsidiaries holds or acquires an ownership interest (by way of ownership of Equity Interests or other evidence of ownership) and (ii) which is engaged in the same or similar line of business as Borrowers and their Subsidiaries, or a component thereof, or a reasonable extension thereof. As of the Closing Date, Schedule 1H sets forth a true and correct list of each Joint Venture.

Judgment – as defined in Section 11.1.11.

Lender Fee Letter – that certain Fee Letter dated as of the Closing Date by and among the Obligors party thereto, the Agent and the Lenders party thereto.

Lenders – the Persons listed on the Commitment Schedule (or an Affiliate or branch of any such Person that is acting on behalf of such Person, in which case the term "Lender" shall include any such Affiliate or branch with respect to the Term Loans made by such Affiliate or branch) as having a Term Loan Commitment or, if the Term Loan Commitments have terminated or expired, a Person with outstanding Term Loans, and any other Person that shall have become a party hereto as a "Lender" pursuant to an Assignment and Acceptance Agreement, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Acceptance Agreement.

LIBOR – relative to any Interest Period for LIBOR Loans, the rate which appears on the Bloomberg Page BBAM1 (or on such other substitute Bloomberg page that displays rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market), or the rate which is quoted by another source selected by Agent as an authorized information vendor for the purpose of displaying rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market (a "LIBOR Alternate Source"), at approximately 11:00 a.m., London time, two (2) Business Days prior to the commencement of such Interest Period as the London interbank offered rate for U.S. Dollars for an amount comparable to such LIBOR Rate Loan and having a borrowing date and a maturity comparable to such Interest Period (or if there shall at any time, for any reason, no longer exist a Bloomberg Page BBAM1 (or any substitute page) or any LIBOR Alternate Source, a comparable replacement rate determined by Agent at such time (which determination shall be conclusive absent manifest error)).

LIBOR Lending Rate – relative to any LIBOR Loan to be made, continued or maintained as, or converted into, a LIBOR Loan for any Interest Period, a rate per annum determined by Agent pursuant to the following formula:

$$\text{LIBOR Lending Rate} = \frac{\text{LIBOR}}{(1.00 - \text{LIBOR Reserve Percentage})}$$

;provided, however, that notwithstanding the foregoing, the LIBOR Lending Rate applicable to the Term Loans with respect to any applicable Interest Period will be deemed to be not less than 1.00% per annum. The LIBOR Lending Rate shall be adjusted with respect to any LIBOR Loan that is outstanding on the effective date of any change in the LIBOR Reserve Percentage as of such effective date. Agent shall give

reasonably prompt notice to the Borrowers of the LIBOR Lending Rate as determined or adjusted in accordance herewith, which determination shall be conclusive absent manifest error.

LIBOR Loans – any Term Loan for the periods when the rate of interest applicable to such Term Loan is calculated by reference to the LIBOR Lending Rate.

Lien – with respect to any asset, (a) any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

Loan Account – the loan account established on the books of Agent pursuant to Section 4.6.

Loan Documents – this Agreement, the Fee Letters, the Other Agreements and the Security Documents.

Majority Lenders – at any time, the Lenders holding greater than 50% of the sum of (i) the aggregate outstanding principal amount of the Term Loans and (ii) the unfunded Term Loan Commitments and the Incremental Exit Commitment, at such time; *provided*, that the outstanding Term Loans, the Term Loan Commitments and the Incremental Exit Commitments held or deemed held by any Defaulting Lender at such time shall be excluded for purposes of making a determination of Majority Lenders.

Majority Lenders' Advisors – AlixPartners and Paul, Weiss, Rifkind, Wharton & Garrison LLP (or such other advisors appointed by the Majority Lenders in lieu thereof).

Majority Lenders' Advisors' Expenses – as defined in Section 13.4(a).

Material Adverse Effect – a material adverse effect on (a) the business, assets, financial condition, operation, performance or properties of the Obligors and their respective Subsidiaries, taken as a whole, (b) the rights and remedies of Agent or the Lenders under the Loan Documents, (c) the legality, validity or enforceability of this Agreement or any other Loan Document, (d) the ability of the Obligors, taken as a whole, to perform their payment obligations under any Loan Document or (e) the Collateral, or the validity, perfection or priority of a Lien in favor of Agent, for the benefit of the Lenders and the other Secured Parties, on any of the Collateral; *provided*, that the term "Material Adverse Effect" will not be deemed to exist as a result of the Cases or the circumstances and events leading up thereto.

Maturity Date – the earlier of (i) the first Business Day that occurs nine months following the Interim Order Entry Date, (ii) the acceleration of the Term Loans and the termination of the Term Loan Commitments pursuant to Section 11.2, (iii) 30 days after the entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court prior to the expiration of such 30-day period and (iv) the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code, which for purposes hereof shall be no later than the effective date thereof) of an Acceptable Reorganization Plan that is confirmed pursuant to an order entered by the Bankruptcy Court.

Mexico Products I – as defined in the preamble.

Moody's – Moody's Investors Service, Inc.

Multiemployer Plan – any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Obligor or ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

Non-Excluded Taxes – Taxes, other than Excluded Taxes and Other Taxes.

Non-US Lender – as defined in Section 3.9(e).

Note – a promissory note executed by Borrowers in favor of a Lender to evidence the Term Loans made by it, which shall be in the form of Exhibit A to this Agreement, together with any replacement or successor notes therefor.

Obligations – all principal of and premium, if any, on the Term Loans and all other advances, debts, liabilities, obligations, covenants and duties, in each case together with all interest, fees, expenses and other charges thereon, owing, arising, due or payable from any Obligor to Agent, for its own benefit, from any Obligor to Agent for the benefit of any Lender, from any Obligor to any Lender or from any Obligor to any other Affiliate of Agent or any other Secured Party, of any kind or nature, present or future, whether or not evidenced by any note, guaranty or other instrument or agreement, whether arising under this Agreement, any of the other Loan Documents or by law, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect (including those acquired by assignment), absolute or contingent, primary or secondary, due or to become due, joint or several, now existing or hereafter arising and however acquired, and all Majority Lenders' Advisors' Expenses.  Any reference in this Agreement or in the Loan Documents to the Obligations shall include all or any portion thereof and any extensions, modifications, renewals, or alterations thereof, both prior and subsequent to any insolvency proceeding.

Obligor – each Borrower and each Guarantor.

OFAC – the United States Department of Treasury Office of Foreign Assets Control.

OFAC Sanctions Programs – all laws, regulations, and Executive Orders administered by OFAC, including without limitation, the Bank Secrecy Act, anti-money laundering laws (including, without limitation, the Patriot Act), and all economic and trade sanction programs administered by OFAC, any and all similar United States federal laws, regulations or Executive Orders, and any similar laws, regulators or orders adopted by any State within the United States.

OFAC SDN List – the list of the Specially Designated Nationals and Blocked Persons maintained by OFAC.

Off-Balance Sheet Liability – of a Person means (a) any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person, (b) any indebtedness, liability or obligation under any so-called "synthetic lease" transaction entered into by such Person, or (c) any indebtedness, liability or obligation arising with respect to any other transaction which is the functional equivalent of or takes the place of borrowing but which does not constitute a liability on the balance sheets of such Person (other than operating leases).

Orders – collectively, the Interim Order and the Final Order.

Organizational I.D. Number – with respect to any Person, the organizational identification number assigned to such Person by the applicable governmental unit or agency of the jurisdiction of organization of such Person.

Doc#: US1:9899064v18

Other Agreements – any and all agreements, instruments and documents (other than this Agreement and the Security Documents), heretofore, now or hereafter executed by Parent, any Borrower or any Guarantor, any Subsidiary of Parent or any Borrower or any Guarantor or any other third party and delivered to Agent, any Lender or any Affiliate of Agent or any Lender in respect of the transactions contemplated by this Agreement.

Other Taxes – all present or future stamp, court or documentary taxes or any other excise or property taxes, charges, intangible, recording, filing or similar Taxes arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement.

Parent – as defined in the preamble.

Parent Company – Dharma Holding Corporation and any direct or indirect parent company of Parent that is a direct or indirect wholly-owned Subsidiary of Dharma Holding Corporation.

Patriot Act – the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272 (2001).

Payment in Full – (a) the payment in full in cash of all Term Loans and other Obligations (including amounts due under Section 4.1.5), other than contingent indemnification and contingent expense reimbursement obligations, in each case, for which no claims have been asserted and (b) the termination of all Term Loan Commitments and Incremental Exit Commitments.

PBGC – the Pension Benefit Guaranty Corporation.

Pension Act – the Pension Protection Act of 2006.

Pension Funding Rules – the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and Multiemployer Plans and set forth in, with respect to plan years beginning prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act, and, thereafter, Sections 412, 430, 431, 432, and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

Pension Plan – any employee pension benefit plan (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Obligor or ERISA Affiliate or to which the Obligor or ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the preceding five plan years.

Permitted Affiliate Transactions - – the following transactions:

(a)      any Affiliate Transaction on terms that are not materially less favorable to Holdings, Parent or the relevant Subsidiary than those that could reasonably have been obtained in a comparable arms-length transaction by Holdings, Parent or such Subsidiary with an unaffiliated party and, with respect to any such Affiliate Transaction or series of related Affiliate Transactions involving aggregate consideration in excess of $250,000, the Borrower Representative delivers to Agent a resolution adopted in good faith by the majority of the Board of Directors of Holdings, the Parent or Subsidiary of Holdings, as the case may be, approving such Affiliate Transaction and set forth in an officer's certificate of the Borrower Representative certifying that such Affiliate Transaction complies with this clause (a);

18

(b)      Investments permitted by Sections 9.2.2(a), (g) and (s) and dispositions permitted by Section 9.2.9(b);

(c)      the payment of reasonable and customary fees and indemnities to members of the Board of Directors of Holdings or its Subsidiaries;

(d)      any employment agreement, arrangement or plan or similar arrangement entered into by Holdings, Parent or one of its Subsidiaries in the ordinary course of business, including the payment of reasonable and customary compensation and other benefits (including retirement, health, option, deferred compensation and other benefit plans) and indemnities to officers and employees of Holdings, Parent or any such Subsidiary as determined by the Board of Directors thereof in good faith;

(e)      transactions between or among Obligors not involving any other Affiliates;

(f)      [intentionally omitted];

(f)      any contribution of capital to Parent or any Obligor, other than contributions made to Holdings or Parent by any other Obligor;

(g)      transactions permitted by, and complying with, the provisions of Section 9.2.1;

(h)      [intentionally omitted];

(i)      the entering into any tax sharing agreement or arrangement entered into for the purpose of fairly allocating tax expenses and any payments permitted  hereunder;

(j)      [intentionally omitted];

(k)      [intentionally omitted];

(l)      [intentionally omitted];

(m)      transactions between or among Obligors and Subsidiaries that are not Obligors to the extent permitted under Section 9.2 (other than Section 9.2.4); and

(n)      transactions between or among Subsidiaries that are not Obligors.

Permitted Encumbrances – (a) Liens imposed by law for taxes that are not yet due or payable or are being contested in compliance with Section 8.1.12; (b) carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in good faith and by appropriate proceedings, and each Obligor and each of its Subsidiaries maintains reasonable reserves in conformity with GAAP on its books therefor; (c) pledges and deposits made in the ordinary course of business in compliance with workers' compensation laws, unemployment, general liability and other insurance and other social security laws or retirement benefits or similar laws or regulations; (d) Liens granted and deposits and other investments made to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business and securing obligations that are not overdue by more than 30 days; and (e) easements, zoning restrictions, rights-of-way and similar encumbrances on real Property imposed by law or arising in the ordinary course of business that do not

Doc#: US1:9899064v18

secure any monetary obligations and do not materially detract from the value of the affected property or interfere with the ordinary conduct of business of Holdings, Parent or any Subsidiary; provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness.

Permitted Investments – (a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof; (b) investments in commercial paper maturing within 270 days from the date of acquisition thereof and having, at such date of acquisition, the highest credit rating obtainable from S&P or from Moody's; (c) investments in (i) certificates of deposit and time deposits, in each case maturing within 365 days and (ii) banker's acceptances, in each case maturing within 180 days from the date of acquisition thereof, issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000; (d) fully collateralized repurchase agreements with a term of not more than 30 days for securities described in paragraph (a) above and entered into with a financial institution satisfying the criteria described in paragraph (c) above; and (e) money market funds that (i) comply with the criteria set forth in Securities and Exchange Commission Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated AAA by S&P and Aaa by Moody's and (iii) have portfolio assets of at least $5,000,000,000.

Permitted Liens – any Lien of a kind specified in Section 9.2.5.

Permitted Mortgage Liens – any Lien of a kind specified in Sections 9.2.5(a), (b), and (d).

Person – an individual, partnership, corporation, limited liability company, joint stock company, land trust, business trust, or unincorporated organization, or a government or agency or political subdivision thereof.

Petition Date – as defined in the preamble.

Plan – any employee benefit plan (as such term is defined in Section 3(3) of ERISA) established by an Obligor or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, an ERISA Affiliate.

Prepetition ABL Agent – BMO Harris Bank N.A.

Prepetition ABL Credit Agreement – that certain Amended and Restated Loan, Security and Guaranty Agreement dated as of July 23, 2013 (as amended, supplemented or otherwise modified from time) by and among the Obligors party thereto, the Prepetition ABL Agent and the lenders and other parties from time to time party thereto.

Prepetition Intercreditor Agreement – that certain Intercreditor Agreement, dated as of July 23, 2013, among the Prepetition ABL Agent, the Prepetition Senior Secured Notes Trustee and the Obligors.

Prepetition Letters of Credit – collectively, (i) Letter of Credit HACH355551OS issued by BMO Harris Bank N.A., in favor of ISTAR DM I LLC and/or its successors for $1,700,000, (ii) Letter of Credit HACH392905OS issued by BMO Harris Bank N.A., in favor of The Travelers Indemnity Company for $1,250,000 and (iii) Letter of Credit HACH424752OS issued by BMO Harris Bank N.A., in favor of The Travelers Indemnity Company for $2,612,000.

Doc#: US1:9899064v18

Prepetition Senior Secured Notes – the 9¼% Prepetition Senior Secured Notes due August 1, 2018 issued by Chassix under the Prepetition Senior Secured Notes Indenture, as the same may be amended, modified, supplemented, refinanced, replaced or extended from time to time.

Prepetition Senior Secured Notes Documents – the Prepetition Senior Secured Notes, the Prepetition Senior Secured Notes Indenture, the Prepetition Senior Secured Notes Security Documents, and any and all other agreements, instruments and documents, heretofore, now or hereafter executed by Parent, any Borrower, any Subsidiary of Parent or any Borrower or any other third party and delivered in respect of the transactions contemplated by the Prepetition Senior Secured Notes Indenture, in each case, as the same may be amended, modified, supplemented, refinanced, replaced or extended from time to time.

Prepetition Senior Secured Notes Indenture – the Indenture dated as of July 23, 2013 by and between Chassix and the Prepetition Senior Secured Notes Trustee pursuant to which the Prepetition Senior Secured Notes were issued, as such Indenture may be amended, modified, supplemented, refinanced, replaced or extended from time to time.

Prepetition Senior Secured Notes Trustee – U.S. Bank National Association and any successor trustee under the Prepetition Senior Secured Notes Documents.

Prepetition Senior Secured Notes Security Documents – (a) the Security Agreement dated as of July 23, 2013, by the Obligors in favor of U.S. Bank National Association, solely in its capacity as collateral agent, as pledgee, assignee and secured party, for the benefit of the Secured Parties (as defined therein), and acknowledged and agreed to by (i) the Prepetition Senior Secured Notes Trustee and on behalf of the Noteholders (as defined therein) under the Prepetition Senior Secured Notes Indenture and (ii) each other Authorized Representative (as defined therein) from time to time party thereto, and (b) all other instruments and agreements now or at any time hereafter securing the whole or any part of the Indebtedness and other obligations outstanding under the Prepetition Senior Secured Notes and the other Prepetition Senior Secured Notes Documents, in each case, as the same may be amended, modified, supplemented, refinanced, replaced or extended from time to time.

Property – any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible (including, for the avoidance of doubt, any Equity Interests).

PTO – the United States Patent and Trademark Office and any successor thereto.

Published Rate –shall mean the rate which appears on the Bloomberg Page BBAM1 (or on such other substitute Bloomberg page that displays rates at which U.S. dollar deposits are offered by leading banks in the London interbank deposit market) for a one month period (or, if no such rate is published therein for any reason, then the Published Rate shall be the LIBOR Rate for a one month period as published in another publication selected by the Agent).

Qualified ECP Guarantor – in respect of any Swap Obligation, each Guarantor that has total assets exceeding $10,000,000 at the time the relevant guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other Person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another Person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

Release – any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the

abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) into the indoor or outdoor environment, including the movement of Hazardous Materials through or in the ambient air, soil, surface or ground water, or property.

Remedial Action – all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, investigate assess, evaluate or in any other way address Hazardous Materials in the indoor or outdoor environment; (b) prevent or minimize a Release or threatened Release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (c) perform pre-remedial studies and investigations and post-remedial operation and maintenance activities; or (d) perform any other actions authorized by 42 U.S.C. § 9601.

Replacement Lender – as defined in Section 3.10.

Reorganization Plan – a liquidation plan or plan of reorganization in any or all of the Cases of the Debtors.

Reportable Event – any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

Requirement of Law – as to any Person, the Certificate of Incorporation and By Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

Restructuring Support Agreement – that certain Restructuring Support Agreement, dated as of March 12, 2015 (as amended, supplemented or otherwise modified from time to time), by and among the Debtors, certain holders of Prepetition Senior Secured Notes, certain holders of the Holdings PIK Notes and the Sponsor.

Sanctioned Country – at any time, a country or territory which is, or whose government is, the subject or target of any Sanctions broadly restricting or prohibiting dealings with such country, territory or government.

Sanctioned Person – at any time, any Person with whom dealings are restricted or prohibited under Sanctions, including (i) any Person listed in any Sanctions-related list of designated Persons maintained by the United States (including by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce), the United Nations Security Council, the European Union or any of its member states, Her Majesty's Treasury, Switzerland or any other relevant authority, (ii) any Person located, organized or resident in, or any governmental entity or governmental instrumentality of, a Sanctioned Country or (iii) any Person 25% or more directly or indirectly owned by, controlled by, or acting for the benefit or on behalf of, any Person described in clauses (i) or (ii) hereof.

Sanctions – economic or financial sanctions or trade embargoes or restrictive measures enacted, imposed, administered or enforced from time to time by (i) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or the U.S. Department of Commerce; (ii) the United Nations Security Council; (iii) the European Union or any of its member states; (iv) Her Majesty's Treasury; (v) Switzerland; or (vi) any other relevant authority.

S&P – Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc.

Doc#: US1:9899064v18

Secured Bank Product Obligations – as defined in the DIP ABL Loan Agreement (as in effect on the date hereof).

Secured Indebtedness – means Indebtedness that is secured by Liens on the property or assets of one or more Obligors (other than (i) property or assets held in a defeasance or similar trust or arrangement for the benefit of the Indebtedness secured thereby and (ii) Indebtedness secured only by rights of setoff or banker's liens).

Secured Obligations – the Obligations but not including, for the purposes of Section 14.1 of this Agreement, Excluded Swap Obligations.

Secured Parties – Agent, the Lenders, and the other holders of the Secured Obligations.

Securities Account Control Agreement – an agreement, in form and substance reasonably satisfactory to Agent and Majority Lenders (it being understood that any Securities Account Control Agreement requiring the Agent to indemnify a banking institution in its individual capacity is not reasonably satisfactory to Agent), among any Obligor, a Securities Intermediary holding such Obligor's funds or securities and Agent, with respect to control of all investments and balances held in a Securities Account maintained by such Obligor with such Securities Intermediary.

Securities Act – the Securities Act of 1933, as amended, and as hereafter amended.

Securities Exchange Act – the Securities Exchange Act of 1934, as amended, and as hereafter amended.

Security Documents – this Agreement, the Deposit Account Control Agreements, the Securities Account Control Agreements and all other instruments and agreements now or at any time hereafter securing the whole or any part of the Secured Obligations.

Senior Officer – the chairman of the board, president, chief executive officer or chief financial officer of a Borrower or, if the context requires, an Obligor, in each case as certified to Agent in a certificate of incumbency from time to time.  An initial certificate of incumbency shall be delivered to the Agent on the date hereof.

SMW Auto – as defined in the preamble.

SMW Obligors – Concord, APNY and each of their respective Subsidiaries that are Obligors.

Specified Customers – the Designated OEM Parties and any other customers who enter into an accommodation agreement substantially similar to the Accommodation Agreement.

Sponsor – Platinum Equity Advisors, LLC, a Delaware limited liability company, and its Affiliated fund entities and investment vehicles, but excluding all portfolio companies of any of the foregoing.

Subordinated Debt – Indebtedness of any Borrower or any Subsidiary of any Borrower that is subordinated to the Obligations in a manner satisfactory to Agent and contains terms, including payment terms, satisfactory to Agent.

Subsidiary – any Person of which another Person owns, directly or indirectly through one or more intermediaries, more than 50% of the voting securities or other Equity Interests at the time of

determination. Unless otherwise expressly noted herein, the term "Subsidiary" means a Subsidiary of Holdings, Parent, Borrowers or any of their direct or indirect Subsidiaries.

Subsidiary Guarantor – each Subsidiary of Holdings other than any Excluded Subsidiary for so long as such Excluded Subsidiary qualifies as an Excluded Subsidiary.

Superpriority Claim – a claim against any Debtor in any of the Cases which is an administrative expense claim having priority over any and all administrative expenses, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject only to and effective upon entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code.

Swap Obligation – with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

Syndication Agent – CFS, in its capacity as Syndication Agent under the Agent Fee Letter.

Tax and Taxes – all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

Term Loan – the Initial Term Loans and the Delayed Draw Term Loans.

Term Loan Commitment – the Initial Term Loan Commitments and the Delayed Draw Term Loan Commitments.  The amount of each Lender's Term Loan Commitment as of the Closing Date is set forth on the Commitment Schedule and the aggregate amount of the Term Loan Commitments as of the Closing Date is $100,000,000 (in each case, before giving effect to the Term Loans made on the Closing Date and the Final Term Funding Date).

Term Loan Percentage – with respect to any Lender, a percentage based upon its share of the aggregate outstanding Term Loans and the unused Term Loan Commitments and Incremental Exit Commitments; provided that in the case of Section 3.11 when a Defaulting Lender shall exist, any such Defaulting Lender's outstanding Term Loans, unused Term Loan Commitment and Incremental Exit Commitment shall be disregarded in the calculations.

Test Period – the period commencing the week ending March 20, 2015 and ending on the applicable Friday of each calendar week.

Transactions – the (i) execution, delivery and performance by the Obligors of this Agreement and the other Loan Documents, the borrowing of the Term Loans hereunder, the use of the proceeds thereof, and the payment of fees and expenses related to the foregoing, (ii) execution, delivery and performance by the Obligors of DIP ABL Loan Documents, the borrowings and other extensions of credit under the DIP ABL Facility, the use of the proceeds thereof, and the payment of fees and expenses related to the foregoing, and (iii) the entry into the Accommodation Agreement and the Access Agreement.

Type of Organization – with respect to any Person, the kind or type of entity by which such Person is organized, such as a corporation or limited liability company.

Doc#: US1:9899064v18

UCC – the Uniform Commercial Code as in effect in the State of New York on the date of this Agreement, as it may be amended or otherwise modified.

Unaudited Financial Statements – as defined in Section 8.1.8(b).

Unfunded Pension Liability – the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to the Pension Funding Rules for the applicable plan year.

Variance Report – a variance report on a weekly basis setting forth (1) actual cash receipts and disbursements for the prior week, (2) all variances, on an individual line item basis and an aggregate basis, as compared to the Budget and the previously delivered 13-Week Projection on a weekly and cumulative basis, and (3) an explanation, in reasonable detail, for any material variance, certified by a Senior Officer of Parent.

Voting Stock – Equity Interests of any class or classes of a corporation, limited partnership or limited liability company or any other entity the holders of which are ordinarily, in the absence of contingencies, entitled to vote with respect to the election of corporate directors (or Persons performing similar functions).

1.2    Other Terms.  All other terms contained in this Agreement shall have, when the context so indicates, the meanings provided for by the UCC to the extent the same are used or defined therein.  In addition, the terms Account, Certificated Security, Chattel Paper, Commercial Tort Claims, Deposit Account, Document, Electronic Chattel Paper, Equipment, Financial Asset, Fixture, General Intangibles, Goods, Instruments, Inventory, Investment Property, Letter-of-Credit Rights, Money, Payment Intangibles, Proceeds, Securities Account, Securities Intermediary, Security, Security Entitlement, Software, Supporting Obligations, Tangible Chattel Paper and Uncertificated Security have the respective meanings assigned thereto under the UCC.

1.3    Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if Parent notifies Agent that Parent requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if Agent notifies Parent that the Majority Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding anything to the contrary in this Agreement, if Borrowers shall change their method of inventory accounting from the first-in, first-out method to the last-in, first-out method, all calculations necessary to determine compliance with this Agreement, including, without limitation, the calculation of any covenant contained herein shall be made as if such method of inventory accounting had not been so changed.  Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159) (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of Holdings, Parent or any Subsidiary at "fair value", as defined therein.

1.4    <u>Certain Matters of Construction</u>.    The terms "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.    Any pronoun used shall be deemed to cover all genders.    In the computation of periods of time from a specified date to a later specified date, "from" means "from and including," and "to" and "until" each mean "to but excluding."    The terms "including" and "include" shall mean "including, without limitation" and, for purposes of each Loan Document, the parties agree that the rule of *ejusdem generis* shall not be applicable to limit any provision.    Section titles appear as a matter of convenience only and shall not affect the interpretation of any Loan Document.    All references to (a) laws or statutes include all related rules, regulations, interpretations, amendments and successor provisions; (b) any document, instrument or agreement include any amendments, waivers and other modifications, extensions or renewals (to the extent permitted by the Loan Documents); (c) any Section means, unless the context otherwise requires, a Section of this Agreement; (d) any Exhibits or Schedules means, unless the context otherwise requires, Exhibits and Schedules attached hereto, which are hereby incorporated by reference; (e) any Person include successors and assigns; (f) time of day means time of day in New York, New York; or (g) discretion of Agent or any Lender means the sole and absolute discretion of such Person. Borrowers shall have the burden of establishing any alleged negligence, misconduct or lack of good faith by Agent or any Lender under any Loan Documents.    No provision of any Loan Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision.    Whenever the phrase "to the best of Borrowers' knowledge" or words of similar import are used in any Loan Documents, it means actual knowledge of a Senior Officer, or knowledge that a Senior Officer would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including due and appropriate inquiry with respect to the particular matter in question and a good faith attempt to ascertain the matter to which such phrase relates.    Any reference in any of the Loan Documents to a Permitted Lien is not intended to subordinate or postpone, and shall not be interpreted as subordinating or postponing, or as an agreement to subordinate or postpone, any Lien created by any of the Loan Documents to any Permitted Lien.

## SECTION 2. CREDIT FACILITY

Subject to the terms and conditions of, and in reliance upon the representations and warranties made in, this Agreement and the other Loan Documents, Lenders agree as follows:

2.1    <u>DIP Term Loan Facility</u>.

2.1.1    <u>Initial Term Loans and Delayed Draw Term Loans</u>.

(a)    Initial Term Loans.    Each Lender having an Initial Term Loan Commitment agrees, severally and not jointly, to make, on the Closing Date, subject to satisfaction (or waiver by all such Lenders having Initial Term Loan Commitments identified on the Commitment Schedule) of the conditions precedent set forth in Sections 10.1 and 10.2, Term Loans to Borrowers in a principal amount equal to such Lender's Initial Term Loan Commitment (collectively, the "<u>Initial Term Loans</u>"). Amounts prepaid or repaid in respect of the Initial Term Loans may not be reborrowed.

(b)    Delayed Draw Term Loans.    Each Lender having a Delayed Draw Term Loan Commitment agrees, severally and not jointly, to make, subject to satisfaction (or waiver by all such Lenders having Delayed Draw Term Loan Commitments identified on the Commitment Schedule) of the conditions precedent set forth in Sections 10.2 and 10.3 and in accordance with the procedures set forth in Section 4.1.1, upon written request by the Borrower Representative, on behalf of all Borrowers after the entry of the Final Order, Term Loans to Borrowers in a principal amount equal to such Lender's Delayed Draw Term Loan Commitment (collectively, the "<u>Delayed Draw Term Loans</u>"; the date of the making of the Delayed Draw Term Loans, which may be no later than two (2) Business Days following the Final

Doc#: US1:9899064v18

Order Entry Date, the "Final Term Funding Date").    Amounts prepaid or repaid in respect of Delayed Draw Term Loans may not be reborrowed.

(c)    The Delayed Draw Term Loans and Initial Term Loans shall constitute a single class of Term Loans for all purposes of this Agreement and the other Loan Documents.

(d)    The outstanding principal amount of the Term Loans, together with accrued and unpaid interest thereon, shall be due and payable on the Maturity Date.

2.1.2  Use of Proceeds.  In accordance with the 13-Week Projection then in effect and the cash management order entered in connection with the Cases, Borrowers shall use the proceeds of the Term Loans: (a) together with amounts funded pursuant to the DIP ABL Facility on the Closing Date, to refinance in full the Indebtedness outstanding under the Prepetition ABL Credit Agreement on the Interim Order Entry Date (including the cash collateralization of the Prepetition Letters of Credit), (b) to make adequate protection payments with respect to the Prepetition Senior Secured Notes in the form of reasonable fees and expenses of one law firm and one financial advisor to the Prepetition Senior Secured Noteholders that are Lenders, along with any other professionals that may be retained by such Prepetition Senior Secured Noteholders, and make any other adequate protection payments, in each case as expressly permitted under the Loan Documents, Interim Order and the Final Order, (c) for the Borrowers' general operating capital needs in a manner consistent with the provisions of this Agreement and all applicable laws (including working capital, capital expenditures and general corporate purposes), and (d) to pay fees and expenses associated with the closing of the Transactions.

2.2    Exit Term Facility.

2.2.1  Converted Term Loans.  Subject to approval of the Bankruptcy Court and payment of any fees pursuant to Section 3.5 and in accordance with the Fee Letters, each Lender will agree, upon written request by the Borrower Representative, to the conversion of all of the outstanding Term Loans (the "Converted Term Loans"), on the Consummation Date, on a dollar-for-dollar basis, into term loans under an exit term loan facility on terms set forth on Exhibit E attached hereto and other terms acceptable to the Majority Lenders, and in connection with the Acceptable Reorganization Plan (such facility, the "Exit Term Facility").

2.2.2  Incremental Exit Commitment. Each Lender hereby commits, severally and not jointly, upon written request by the Borrower Representative, on behalf of all Borrowers, to provide, on the Consummation Date immediately after the successful emergence of the Debtors from the Cases (such date, the "Incremental Exit Funding Date"), additional term loans to Borrowers in a principal amount equal to such Lender's Incremental Exit Commitment (collectively, the "Incremental Exit Loans" and together with the Converted Term Loans, the "Exit Term Loans") subject to payment of any fees in accordance with the Fee Letters and other terms and conditions to be agreed in the Exit Term Facility.

## SECTION 3. INTEREST, FEES AND CHARGES

3.1    Interest.

3.1.1  Rate of Interest.  Except as provided in Section 3.1.2, each Term Loan shall bear interest, in accordance with Section 3.2, as follows:

Doc#: US1:9899064v18

(a)      if a LIBOR Loan, at a rate per annum equal to the Applicable Margin plus the LIBOR Lending Rate applicable to each LIBOR Loan for the corresponding Interest Period; and

(b)      if a Base Rate Loan, at a rate per annum equal to the Applicable Margin plus the Alternate Base Rate;

and shall be payable in arrears, in cash, on (i) each Interest Payment Date, (ii) upon any prepayment of the Term Loans, whether voluntary or mandatory, to the extent accrued on the amount being prepaid, and (iii) on the Maturity Date.

3.1.2  Default Rate of Interest.  Notwithstanding anything to the contrary in this Agreement or the other Loan Documents, immediately upon the occurrence and during the continuance of any Event of Default, the outstanding principal amount of the Term Loans and any overdue amounts shall bear interest or earn fees at a rate per annum equal to 2.00% plus the interest rate otherwise applicable thereto (the sum, the "Default Rate") and such interest shall be payable on demand.

3.1.3  Maximum Interest.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Term Loan, together with all fees, charges and other amounts which are treated as interest on such Term Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Term Loan in accordance with applicable law, the rate of interest payable in respect of such Term Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 3.1.3 shall be accumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such accumulated amount, together with interest thereon at the interest rate otherwise applicable thereto, shall have been received by such Lender.  If at any time, the amount of interest paid hereunder is limited by the Maximum Rate, and the amount at which interest accrues hereunder is subsequently below the Maximum Rate, the rate at which interest accrues hereunder shall remain at the Maximum Rate, until such time as the aggregate interest paid hereunder equals the amount of interest that would have been paid had the Maximum Rate not applied.

3.2      Computation of Interest and Fees.  Except as otherwise set forth herein, all interest and fees chargeable under the Loan Documents shall be calculated daily and shall be computed on the actual number of days elapsed (including the first day but excluding the last day) over a year of 360 days, other than interest for Base Rate Loans, which shall be computed on the actual number of days elapsed (including the first day but excluding the last day) over a year of 365 days (or 366 days in a leap year). For the purpose of computing interest hereunder, (a) payments of Obligations and any other obligations pursuant to the Loan Documents made in immediately available funds shall be applied in accordance with Section 4.4.1 and (b) all items of payment received by Agent that are not made in immediately available funds (including, but not limited to, checks, drafts and other similar forms of payment) shall be deemed applied by Agent on account of the Obligations and any other obligations pursuant to the Loan Documents (subject to final payment of such items) on the first Business Day after receipt by Agent of such items in Agent's account located in New York, New York.

3.3      Fees.  Borrowers shall pay to Agent and the Lenders and their Affiliates, as applicable, for their respective accounts, certain fees and other amounts in accordance with the terms of the Fee Letters.

3.4    [Intentionally omitted].

3.5    <u>Conversion Fee</u>.  The Borrowers shall pay to Agent, for the ratable benefit of Lenders, a fee equal to 3% per annum multiplied by the amount of the Converted Term Loans (the "<u>Conversion Fee</u>").  The Conversion Fee shall be payable on the Consummation Date as a condition precedent to the conversion of all of the outstanding Term Loans on the Consummation Date, on a dollar-for-dollar basis, into term loans under the Exit Term Facility.

3.6    <u>Bank Charges</u>.  Borrowers shall pay to Agent, on demand, any and all fees, costs or expenses which Agent or any Lender pays to a bank or other similar institution arising out of or in connection with (i) the forwarding to any Borrower or any other Person on behalf of any Borrower, by Agent or any Lender, of proceeds of Term Loans made to Borrowers pursuant to this Agreement and (ii) the depositing for collection by Agent or any Lender of any check or item of payment received or delivered to Agent or any Lender on account of the Obligations.

3.7    <u>Collateral Protection Expenses</u>.    All out-of-pocket expenses incurred in protecting, storing, warehousing, insuring, handling, maintaining and shipping the Collateral, and any and all excise, property, sales, and use taxes imposed by any state, federal, or local authority on any of the Collateral or in respect of the sale thereof shall be borne and paid by Borrowers.  If Borrowers fail to promptly pay any portion thereof when due, Agent may, at its option, but shall not be required to, pay the same and charge Borrowers therefor pursuant to <u>Section 13.4</u>.

3.8    <u>Reimbursement of Costs and Expenses</u>.  In addition to all fees, charges, costs and expenses described in this <u>Section 3</u>, all reasonable and documented out-of-pocket costs and expenses incurred by any Indemnified Person shall be paid pursuant to, and subject to the limitations set forth in, <u>Section 13.4</u>.

3.9    <u>No Deductions</u>.

(a)    Except as provided in <u>Section 3.9(b)</u>, any and all payments or reimbursements made hereunder shall be made free and clear of and without deduction for any and all Non-Excluded Taxes or Other Taxes.

(b)    If any Borrower or any other Obligor shall be required by law (as determined in the good faith discretion of the applicable Borrower or other Obligor) to deduct any Non-Excluded Taxes or Other Taxes from or in respect of any sum payable hereunder to Agent or any Lender, then (i) such Borrower or Obligor shall make such deduction and pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law (and provide evidence of such payment to the applicable Lender) and (ii) the sum payable hereunder shall be increased as may be necessary so that, after all required deductions are made (including any deduction required on payments made pursuant to this <u>Section 3.9</u>), Agent or such Lender receives an amount equal to the sum it would have received had no such deductions been made.

(c)    If Agent or any Lender believes, in its sole discretion exercised in good faith, that it is entitled to receive a refund in respect of Non-Excluded Taxes or Other Taxes with respect to which it has been indemnified or any Borrower or Obligor has paid additional amounts, it shall promptly notify such Borrower or Obligor of the availability of such refund and shall, within thirty (30) days after receipt of a request for such by such Borrower or Obligor (whether as a result of notification that it has made of such to such Borrower or Obligor or otherwise), make a claim to such Governmental Authority for such refund and contest such Taxes or liabilities if (i) any Borrower or Obligor has agreed in writing to pay all of Agent's or Lender's reasonable costs and expenses relating to such claim and (ii) Agent or Lender

determines, in its sole discretion exercised in good faith, that it would not be materially disadvantaged as a result of such refund claim (it being understood that the mere existence of fees, charges, costs or expenses that any Borrower or Obligor has offered to and agreed to pay on behalf of Agent or Lender shall not be deemed to be materially disadvantageous to such Person).  This paragraph (c) shall not be construed to require Agent or a Lender to make available its tax returns (or any other information relating to its Taxes that it deems confidential) to any Borrower, Obligor or any other Person.  The agreements in this Section 3.9(c) shall survive the termination of this Agreement and the payment of all amounts payable hereunder.

(d)      Agent or any Lender claiming any additional amounts payable pursuant to Section 3.9(b) shall use reasonable efforts (consistent with legal and regulatory restrictions) to file any certificate or document reasonably requested by Borrower Representative or to change the jurisdiction of its applicable lending office if the making of such filing or change of jurisdiction would avoid the need for or reduce the amount of any such additional amounts that may thereafter accrue or avoid the circumstances giving rise to such exercise and would not, in the sole and absolute determination of Agent or such Lender, as the case may be, result in any unreimbursed additional costs, expenses or risks or be otherwise disadvantageous to it.  Each of Agent and each Lender agrees to use reasonable efforts to notify Borrower Representative as promptly as practicable upon its becoming aware that circumstances exist that would cause Borrowers or Obligors to become obligated to pay additional amounts to Agent or such Lender pursuant to Section 3.9(b).

(e)      To the extent permitted by applicable law, Agent or each Lender that is not a United States person within the meaning of Code Section 7701(a)(30) (a "Non-US Lender") shall deliver to Borrower Representative and Agent (if delivered by a Lender) on or prior to the Closing Date (or in the case of a Lender that is an assignee, on the date of such assignment to such Lender) two accurate and complete original signed copies of IRS Form W-8BEN, W-8BEN-E, W-8ECI, or W-8IMY (or any successor or other applicable form prescribed by the IRS) certifying to Agent's or Lender's entitlement to a complete exemption from, or a reduced rate in, United States withholding Tax on (i) interest payments to be made hereunder or with respect to any Loan and (ii) any fees payable to Agent, any Lender or any of their respective Affiliates as provided under Section 3.1.2 or Section 3.3.  If Agent or any Lender that is a Non-US Lender is claiming a complete exemption from withholding on interest pursuant to Sections 871(h) or 881(c) of the Code, Agent or Lender shall deliver (along with two accurate and complete original signed copies of IRS Form W-8BEN or W-8BEN-E, as applicable) a certificate in form and substance reasonably acceptable to Agent and Borrower Representative (any such certificate, a "Withholding Certificate").  Agent or each Lender that is not a Non-US Lender shall, to the extent permitted by law, provide two (2) properly completed and duly executed copies of IRS Form W-9 or W-8 (if applicable) (or any successor or other applicable form) to Borrower Representative and Agent (if delivered by a Lender) certifying that Agent or such Lender is exempt from United States backup withholding Tax.

(f)      Borrowers and Obligors shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(g)      If Agent or any Lender determines, as a result of any change in applicable law, regulation or treaty, or in any official application or interpretation thereof, that it is unable to legally submit to Borrower Representative any form or certificate that Agent or such Lender is legally obligated to submit pursuant to Section 3.9(e) or that Agent or such Lender is legally required to withdraw or cancel any such form or certificate previously submitted, Agent or such Lender shall promptly notify Borrower Representative and Agent (if delivered by a Lender) of such fact and Agent or such Lender shall to that extent not be obligated to provide any such form or certificate and will be entitled to withdraw or cancel any affected form or certificate, as applicable.  Agent or any Lender which delivers a valid form or

certificate under Section 3.9(e) further undertakes to deliver to Borrower Representative two additional copies of such form or certificate (or a successor form) on or before the date that such form or certificate expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent form or certificate so delivered by it, and such amendments thereto or extensions or renewals thereof as may be reasonably requested by Borrower Representative.

(h)    If a payment made to a Lender under any Loan Document would be subject to U.S. Federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender, if it is legally eligible to do so, shall deliver to Borrowers and Agent, at the time or times prescribed by law and at such time or times reasonably requested by Borrowers and Agent, such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrowers and Agent as may be necessary for Borrowers and Agent to comply with its obligations under FATCA, to determine that such Lender has or has not complied with such Lender's obligations under FATCA and, as necessary, to determine the amount to deduct and withhold from such payment.  Solely for purposes of this Section 3.9(h), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(i)    Borrowers and any other Obligors shall jointly and severally indemnify Agent and each Lender for any Non-Excluded Taxes or Other Taxes that are paid or payable by Agent or any Lender in connection with any Loan Document (including amounts paid or payable under this Section 3.9(i)) and any reasonable expenses arising therefrom or with respect thereto, whether or not such Non-Excluded Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  The indemnity under this Section 3.9(i) shall be paid within ten (10) days after Agent or any Lender delivers to the Borrower Representative a certificate stating the amount of any Non-Excluded Taxes or Other Taxes so paid or payable by Agent or such Lender and describing the basis for the indemnification claim.  Such certificate shall be conclusive of the amount so paid or payable absent manifest error.  Any such Lender shall deliver a copy of such certificate to Agent.

(j)    Each Lender shall severally indemnify Agent for any Taxes (but, in the case of any Non-Excluded Taxes or Other Taxes, only to the extent that no Borrower or any other Obligor has not already indemnified Agent for such Taxes and without limiting the obligation of Borrowers or any other Obligors to do so) attributable to such Lender that are paid or payable by Agent in connection with any Loan Document and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  The indemnity under this Section 3.9(j) shall be paid within ten (10) days after Agent delivers to the applicable Lender a certificate stating the amount of Taxes so paid or payable by Agent.  Such certificate shall be conclusive of the amount so paid or payable absent manifest error.

3.10    Replacement of Lenders.    If (a) Borrowers or Obligors become obligated to pay additional amounts to any Lender pursuant to Section 3.9 or Section 4.8, (b) any Lender is unable to make LIBOR Loans as provided in Section 4.9, or (b) any Lender is a Defaulting Lender, then Borrower Representative may designate another Person in its reasonable discretion (such other Person being called a "Replacement Lender") which Replacement Lender shall be acceptable to the Majority Lenders in accordance with Section 13.2.1 to purchase the Term Loans of such Lender and such Lender's rights hereunder, without recourse to or warranty by, or expense to, such Lender, for a purchase price equal to the outstanding principal amount of the Term Loans payable to such Lender plus any accrued but unpaid interest on such Loans and all accrued but unpaid fees owed to such Lender and any other amounts payable to such Lender under this Agreement, and to assume all the obligations of such Lender hereunder, and, upon such purchase and assumption (pursuant to an Assignment and Acceptance Agreement), such

Lender shall no longer be a party hereto or have any rights hereunder (other than rights with respect to indemnities and similar rights applicable to such Lender prior to the date of such purchase and assumption) and shall be relieved from all obligations to Borrowers hereunder, and the Replacement Lender shall succeed to the rights and obligations of such Lender hereunder.

3.11    Defaulting Lender.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)    Fees pursuant to Section 3.5 shall cease to accrue on the unfunded portion of the Term Loan Commitment of such Defaulting Lender.

(b)    Any amount payable to a Defaulting Lender hereunder (whether on account of principal, interest, fees or otherwise and including any amount that would otherwise be payable to such Defaulting Lender pursuant to Section 4.10) shall, in lieu of being distributed to such Defaulting Lender, be retained by Agent and, subject to any applicable Requirements of Law, be applied at such time or times as may be determined by Agent (i) first, to the payment of any amounts owing by such Defaulting Lender to Agent hereunder, (ii) second, to the funding of any Term Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by Agent, (iii) third, pro rata, to the payment of any amounts owing to Borrowers or the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Borrower or any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement, and (iv) fourth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided, that if such payment is (A) a prepayment of the principal amount of any Term Loans and (B) made at a time when the conditions set forth in Section 10.2 are satisfied, such payment shall be applied solely to prepay the Term Loans of all Lenders that are not Defaulting Lenders pro rata prior to being applied to the prepayment of any Term Loans owed to any Defaulting Lender.

(c)    No Defaulting Lender shall have any right to approve or disapprove any amendment, waiver, consent or any other action the Lenders or the Majority Lenders have taken or may take hereunder (including any consent to any amendment or waiver pursuant to Section 13.1); provided that any waiver, amendment or modification requiring the consent of all Lenders which affects such Defaulting Lender differently than other affected Lenders shall require the consent of such Defaulting Lender.

(d)    (i) The fact that a Lender becomes a Defaulting Lender or otherwise fails to perform its obligations hereunder shall not relieve any other Lender of its obligations hereunder and (ii) no Lender shall be responsible for default by another Lender.

## SECTION 4. LOAN ADMINISTRATION

4.1    Manner of Borrowing Term Loans.  Borrowings under the credit facility established pursuant to this Agreement shall be as follows:

4.1.1  Loan Requests.  A request for a Term Loan shall be made, or shall be deemed to be made, in the following manner:  Borrower Representative, on behalf of all Borrowers, shall give Agent irrevocable written notice of its intention to borrow no later than 11:00 a.m. (x) two (2) Business Days in the case of Base Rate Loans or (y) three (3) Business Days in the case of LIBOR Loans, prior to the proposed funding date, in which notice Borrower Representative shall include (A) the name of each applicable Borrower, (B) the aggregate amount of the proposed borrowing of a Term Loan and a breakdown of the separate wires comprising such borrowing, (C)

the proposed date of such borrowing, which shall be a Business Day, (D) wire instructions for a deposit account in the name of each such Borrower and located in any city in the United States, (E) a certification of the satisfaction (or waiver by the Majority Lenders) of the conditions precedent to the incurrence of such Term Loans, (F) whether such borrowing of a Term Loan is to be Base Rate Loan or a LIBOR Loan, and (G) in the case of a borrowing that will be a LIBOR Loan, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; provided, however, no Lender shall be required to make a Term Loan if the conditions applicable to such Term Loans as set forth in Section 10 shall not have been satisfied.    If no election as to whether the borrowing is a LIBOR Loan is specified, then (x) a borrowing of any Term Loan shall be a Base Rate Loan.  If no Interest Period is specified with respect to any requested LIBOR Loan (or if default interest is accruing under Section 3.1.2), then the applicable Borrower or Borrowers shall be deemed to have selected an Interest Period of one month's duration.  All Term Loans shall be in U.S. Dollars.

4.1.2  Disbursement.  Borrowers hereby irrevocably authorize Agent to disburse the proceeds of each Term Loan provided, or deemed to be requested, pursuant to Section 4.1.1 as follows:  the proceeds of each Term Loan provided under Section 4.1.1 shall be disbursed by Agent in lawful money of the United States of America in immediately available funds, by wire transfer to such bank account as may be agreed upon in writing by Borrowers and Agent from time to time or elsewhere if pursuant to a written direction from Borrowers (each such account, a "Funding Account").  If at any time any Loan is funded by Lenders in excess of the amount requested or deemed requested by Borrowers, Borrowers agree to repay the excess to Agent immediately upon the earlier to occur of (i) any Borrower's discovery of the error and (ii) notice thereof to Borrowers from Agent or any Lender.

4.1.3  Payment by Lenders.  Agent shall give to each Lender prompt written notice by facsimile, telex or cable of the receipt by Agent from Borrower Representative of any request for a Term Loan.  Each such notice shall specify the details of such borrowing request and the amount of each Lender's advance thereunder (in accordance with its applicable Term Loan Percentage). Each Lender shall, not later than 12:00 noon on such requested date, wire to a bank designated by Agent the amount of that Lender's Term Loan Percentage of the requested Term Loan.  The failure of any Lender to make the Term Loans to be made by it shall not release any other Lender of its obligations hereunder to make its Term Loan.  Neither Agent nor any other Lender shall be responsible for the failure of any other Lender to make the Term Loan to be made by such other Lender.

4.1.4  Continuation and Conversion Elections.  By delivering a continuation/ conversion notice to Agent on or before 12:00 noon on a Business Day, Borrower Representative, on behalf of all Borrowers, may from time to time irrevocably elect, on not less than three nor more than five (5) Business Days' notice, that all, or any portion in an aggregate minimum amount of $100,000 and integral multiples of $100,000, of (a) any LIBOR Loan be converted on the last day of an Interest Period into a LIBOR Loan with a different Interest Period, or continued on the last day of an Interest Period as a LIBOR Loan with a similar Interest Period or (b) any Base Rate Loan be converted into a LIBOR Loan, which notice shall specify an Interest Period applicable thereto as contemplated by the definition of the term "Interest Period", provided, however, that upon the election of Agent or Majority Lenders when any Default or Event of Default has occurred and is continuing no portion of the outstanding principal amount of any LIBOR Loans may be converted to, or continued as, LIBOR Loans.  If any Default or Event of Default has occurred and is continuing (if Agent or Majority Lenders so elect), or in the absence of delivery of a continuation/conversion notice with respect to any LIBOR Loan at least three (3) Business Days

before the last day of the then current Interest Period with respect thereto, each maturing LIBOR Loan shall automatically be continued as a Base Rate Loan.

        4.1.5  <u>Voluntary Prepayment of LIBOR Loans</u>.  LIBOR Loans may be prepaid upon the terms and conditions set forth herein.  Borrower Representative, on behalf of all Borrowers, shall give Agent, no later than 12:00 noon at least three (3) Business Days' prior written notice of any proposed prepayment of any LIBOR Loan, specifying the proposed date of payment of such LIBOR Loan, and the principal amount to be paid.  Each partial prepayment of the principal amount of LIBOR Loans shall be in an aggregate minimum amount of $100,000 and integral multiples of $100,000 and accompanied by the payment of all charges outstanding on such LIBOR Loans and of all accrued interest on the principal repaid to the date of payment.  Each Borrower shall indemnify Agent and Lenders and hold Agent and Lenders harmless from and against any and all losses or expenses that Agent and Lenders may sustain or incur as a consequence of any prepayment, conversion of or any default by any Borrower in the payment of the principal of or interest on any LIBOR Loan or failure by any Borrower to complete a borrowing of, a prepayment of or conversion of or to a LIBOR Loan after notice thereof has been given, including, but not limited to, any interest payable by Agent or Lenders to lenders of funds obtained by it in order to make or maintain its LIBOR Loans hereunder.  A certificate as to any additional amounts payable pursuant to the foregoing sentence submitted by Agent or any Lender to Borrower Representative shall be conclusive absent manifest error.

      4.2  <u>Payments</u>.  The Obligations shall be payable as follows or as provided in any of the Loan Documents issued or made by Borrowers (<u>provided</u> that in the event of any conflict, the provisions of this Agreement shall control):

        4.2.1  <u>Principal</u>.  Borrowers jointly and severally agree to pay to Agent, for the account of each Lender, principal on account of Term Loans in accordance with <u>Section 4.4.2(a)</u> immediately upon the earliest of (i)  the receipt by Agent or any Borrower of any proceeds pursuant to <u>Sections 4.3.1</u>, or <u>4.3.2</u>, to the extent of said proceeds, (ii) the occurrence of an Event of Default in consequence of which Agent or Majority Lenders elect to accelerate the payment and maturity of the Obligations, the maturity and payment of the Obligations automatically accelerate, and (iii) termination of this Agreement pursuant to <u>Section 5</u> hereof.  Each payment (including principal prepayment) by Borrowers on account of principal shall be applied first to Base Rate Loans and then to LIBOR Loans.

        4.2.2  <u>Interest Provisions</u>.  Borrowers jointly and severally agree to pay interest on the outstanding principal amount of any Term Loan on each Interest Payment Date, provided further that all accrued and unpaid interest shall be due and payable on the Maturity Date.

        4.2.3  <u>Costs, Fees and Charges</u>.  Borrowers jointly and severally agree to pay costs, fees and charges payable pursuant to this Agreement, as and when provided in <u>Section 2</u> or <u>Section 3</u> hereof, as applicable to Agent or a Lender, as applicable, or to any other Person designated by Agent or such Lender in writing.

        4.2.4  <u>Other Obligations</u>.  Borrowers jointly and severally agree to pay the balance of the Obligations requiring the payment of money, if any, to Agent for distribution to Lenders, as appropriate, as and when provided in this Agreement, the Loan Documents or the Other Agreements, or on demand, whichever is later.

      4.3  <u>Mandatory and Optional Prepayments</u>.

Doc#: US1:9899064v18

### 4.3.1 Mandatory Prepayments.

(a)        All Term Loans shall be repaid in full on the Maturity Date.

(b)        Promptly upon, and in any event no later than three (3) Business Days following, the receipt by any Obligor or any of its subsidiaries of the proceeds of any voluntary or involuntary sale or disposition by such Obligor or any of its subsidiaries of any DIP Term Loan Priority Collateral (including casualty losses or condemnations), the Borrowers shall prepay the outstanding amount of the Obligations in accordance with Section 4.4.2 in an amount equal to 100% of such proceeds (including condemnation awards and payments in lieu thereof) received by such Person in connection with such sales or dispositions;

(c)        Promptly upon, and in any event no later than one (1) Business Day following, the receipt by any Obligor or any of its subsidiaries of the proceeds of any issuance of Indebtedness (other than Indebtedness permitted hereunder) by such Obligor or any of its subsidiaries after the Closing Date, the Borrowers shall prepay the outstanding amount of the Obligations in accordance with Section 4.4.2 in an amount equal to 100% of such proceeds;

(d)        Promptly upon, and in any event no later than ten (10) Business Days following, receipt by any Obligor or any of its subsidiaries of any payment of insurance losses or claims, tax refunds, indemnification payments or any other source other than the sale of goods and services in the ordinary course ("Extraordinary Receipts"), the Borrowers shall prepay the outstanding principal amount of the Obligation in accordance with Section 4.4.2 in an amount equal to 100% of such Extraordinary Receipts; *provided* that no such prepayment shall be required to the extent such prepayment would violate the terms of the applicable Order.

### 4.3.2 Optional Prepayments of Loans.

(a)        Borrowers may, at their option from time to time prepay the Term Loans, in whole or in part, upon not less than three (3) Business Days' prior written notice to Agent, provided that the amount of any such partial prepayment is in integral multiples of $100,000 (plus accrued and unpaid interest on the amount of Term Loans prepaid on such date). Except for charges under Section 4.1.5 applicable to prepayments of LIBOR Loans, such prepayments shall be without premium or penalty. Each such notice of prepayment shall be irrevocable and shall specify the prepayment date and the principal amount of the Term Loan or portion thereof to be prepaid.  Promptly following receipt of any such notice, Agent shall advise the Lenders of the contents thereof.

(b)        Prepayments pursuant to this Section 4.3.2 shall be accompanied by accrued and unpaid interest on the amount of the Term Loans prepaid as of such payment date.

## 4.4    Application of Payments.

### 4.4.1 Payments.  All payments of Obligations and any other obligations pursuant to the Loan Documents shall be made to Agent's account located in New York, New York, in U.S. Dollars, without offset, counterclaim or defense of any kind, free of (and without deduction for) any Non-Excluded Taxes or Other Taxes, and in immediately available funds and, if received by Agent by 12:00 noon on the date when due (or not later than 12:00 noon on the next succeeding Business Day, if the applicable date is not a Business Day), shall be deemed received on that Business Day; provided that any amounts received after 12:00 noon on such Business Day may, in Agent's discretion, be deemed received on the next succeeding Business Day.

Doc#: US1:9899064v18

4.4.2 <u>Apportionment, Application and Reversal of Payments</u>.    Principal and interest payments shall be apportioned ratably among Lenders (according to the unpaid principal balance of the Term Loans to which such payments relate held by each Lender).

(a)        Prior to the occurrence of an Event of Default, all proceeds of Collateral shall be applied by Agent against the outstanding Obligations as otherwise provided in this Agreement.

(b)        Anything contained herein or in any other Loan Document to the contrary notwithstanding, all payments and collections received in respect of the Obligations and all proceeds of the Collateral received, in each instance, by Agent or any Lender after the occurrence and during the continuance of an Event of Default and the resultant declaration that all Obligations are immediately due and payable shall be remitted to Agent and distributed as follows:

(1)        <u>First</u>, to the payment of any outstanding fees, costs and expenses owing to Agent in monitoring, verifying, protecting, preserving or enforcing the Liens on the Collateral, and in protecting, preserving or enforcing rights under this Agreement or any of the other Loan Documents, including under <u>Sections 3.7</u> and <u>13.4</u> hereof, or otherwise in performing its duties under this Agreement and the Loan Documents, and including reimbursement of the fees and expenses of counsel and financial advisors, including the Majority Lenders' Advisors' Expenses;

(2)        <u>Second</u>, to the payment of any outstanding interest or fees due in connection with the Term Loans under the Loan Documents to be allocated *pro rata* in accordance with the aggregate unpaid amounts owing to each holder thereof;

(3)        <u>Third</u>, to the payment of principal on the Term Loans;

(4)        <u>Fourth</u>, to the payment of all other unpaid Secured Obligations (including the outstanding costs and expenses owing to the Lenders), to be allocated pro rata in accordance with the aggregate unpaid amounts owing to each holder thereof; and

(5)        <u>Finally</u>, to Borrowers or whoever else may be lawfully entitled to receive such proceeds.

Except as otherwise specifically provided for herein, Borrowers hereby irrevocably waive the right to direct the application of payments at any time received by Agent or any Lender from or on behalf of Borrowers or any Obligor, and Borrowers hereby irrevocably agree that Agent shall have the continuing exclusive right to apply and reapply any and all such payments and collections received at any time by Agent or any Lender against the Obligations in the manner described above.

4.5        <u>All Loans to Constitute One Obligation</u>.    The Term Loans shall constitute one general Obligation of Borrowers and shall be secured by Agent's Lien upon all of the Collateral; <u>provided</u>, <u>however</u>, that Agent and each Lender shall be deemed to be a creditor of, and the holder of a separate claim against, each Borrower to the extent of any Obligations jointly or severally owed by such Borrower.

4.6        [Intentionally omitted.]

4.7        [Intentionally omitted.]

4.8        <u>Increased Costs</u>.    If on or after the Closing Date the adoption of any applicable law, rule, regulation, treaty or guideline (whether or not having the force of law, including any rules or regulations

issued under or implementing any existing law), or any change therein, or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by Agent or any Lender with any request or directive (whether or not having the force of law) of any such authority, central bank or comparable agency (each a "Change in Law"); provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder, issued in connection therewith or in implementation thereof, and (ii) all requests, rules, guidelines and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority) or the United States or foreign regulatory authorities, shall in each case, be deemed to be a "Change in Law," regardless of the date enacted, adopted, issued or implemented:

       (a)      shall subject Agent or any Lender to any tax, duty or other charge with respect to its Term Loans or its obligation to make Term Loans, or its deposits, reserves, other liabilities or capital attributable thereto, or shall change the basis of taxation of payments to Agent or any Lender of the principal of or interest on its Term Loans or any other amounts due under this agreement in respect of its Term Loans or its obligation to make Loans (except for the introduction of, or change in the rate of, Excluded Taxes);

       (b)      shall impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement (including any such requirement imposed by the Board of Governors of the Federal Reserve System of the United) against assets of, deposits with or for the account of, or credit extended by, Agent or any Lender; or

       (c)      shall impose on Agent or any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Term Loans made by such Lender hereunder;

and the result of any of the foregoing is to increase the cost to Agent or any Lender of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender, or to reduce the amount of any sum received or receivable by Agent or any Lender under this Agreement with respect thereto, by an amount deemed by Agent or such Lender to be material, then, within 15 days after demand by Agent or such Lender, Borrowers shall pay to Agent, for its own account or the account of the applicable Lender, such additional amount or amounts as will compensate Agent or such Lender for such increased cost or reduction, as the case may be, provided that the foregoing shall not apply to increased costs which are reflected in the LIBOR Lending Rate, as the case may be; provided further that, Borrowers shall not be required to compensate Agent or a Lender pursuant to this Section 4.8 for any increased costs or reductions incurred more than 180 days prior to the date that Agent or such Lender, as the case may be, notifies the Borrower Representative of the Change in Law giving rise to such increased costs or reductions and Agent's or such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

       4.9    Basis for Determining Interest Rate Inadequate or Unfair.  In the event that Agent or any Lender shall have determined that:

       (a)      reasonable means do not exist for ascertaining the LIBOR Lending Rate for any Interest Period; or

Doc#: US1:9899064v18

(b)    dollar deposits in the relevant amount and for the relevant maturity are not available in the London interbank market with respect to a proposed LIBOR Loan, or a proposed conversion of a Base Rate Loan into a LIBOR Loan;

(c)    the making, maintenance or funding of any LIBOR Loan has been made impracticable or unlawful by compliance by Agent or such Lender in good faith with any Applicable Law or any interpretation or application thereof by any Governmental Body or with any request or directive of any such Governmental Body (whether or not having the force of law); or

(d)    the LIBOR Lending Rate will not adequately and fairly reflect the cost to such Lender of the establishment or maintenance of any LIBOR Loan,

Agent or such Lender shall give Borrowers prompt written, telephonic or electronic notice of the determination of such effect.  If such notice is given, (i) any such requested LIBOR Loan shall be made as a Base Rate Loan, unless Borrower Representative, on behalf of all Borrowers, shall notify Agent no later than 12:00 noon two (2) Business Days' prior to the date of such proposed borrowing that the request for such borrowing shall be canceled or made as an unaffected type of LIBOR Loan, (ii) any Base Rate Loan which was to have been converted to an affected type of LIBOR Loan shall be continued as or converted into a Base Rate Loan, or, if Borrowers shall notify Agent, no later than 12:00 noon two (2) Business Days prior to the proposed conversion, shall be maintained as an unaffected type of LIBOR Loan, and (iii) any outstanding affected LIBOR Loans shall be converted into a Base Rate Loan, or, if Borrowing Representative shall notify Agent, no later than 12:00 noon two (2) Business Days prior to the last Business Day of the then current Interest Period applicable to such affected LIBOR Loan, shall be converted into an unaffected type of LIBOR Loan, on the last Business Day of the then current Interest Period for such affected LIBOR Loans (or sooner, if any Lender cannot continue to lawfully maintain such affected LIBOR Loan).  Until such notice has been withdrawn, Lenders shall have no obligation to make an affected type of LIBOR Loan or maintain outstanding affected LIBOR Loans and no Borrower shall have the right to convert a Base Rate Loan or an unaffected type of LIBOR Loan into an affected type of LIBOR Loan.

4.10    Sharing of Payments, Etc.  If any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) on account of any Term Loan made by it, other than pursuant to Section 4.8, Section 4.11 or Section 13.2.1, in excess of its ratable share of payments on account of Term Loans made by all Lenders, such Lender shall forthwith (a) notify Agent of such fact and (b) purchase from each other Lender such participation in such Term Loan as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each other Lender; provided, that, if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and such Lender shall repay to the purchasing Lenders the purchase price to the extent of such recovery, together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered.  Borrowers agree that any Lender so purchasing a participation from another Lender pursuant to this Section 4.10 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of setoff) with respect to such participation as fully as if such Lender were the direct creditor of Borrowers in the amount of such participation.  Notwithstanding anything to the contrary contained herein, all purchases and repayments to be made under this Section 4.10 shall be made through Agent.

4.11    Capital Requirements.  If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements, has or would have the effect of reducing the rate of return on such Lender's

capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Term Loan Commitments or Incremental Exit Commitments of such Lender or the Term Loans made by such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then Borrowers, within 15 days after demand by such Lender, will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered; provided that Borrowers shall not be required to compensate a Lender pursuant to this Section 4.11 for any reductions suffered more than 180 days prior to the date that such Lender notifies the Borrower Representative of the Change in Law giving rise to such reduction and such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

## SECTION 5. TERMINATION OF COMMITMENTS.

5.1    Termination of Commitments.  The Initial Term Loan Commitments shall terminate on the Closing Date immediately following the funding of the Initial Term Loans to be made on the Closing Date. The Delayed Draw Term Loan Commitments shall terminate on the Final Term Funding Date immediately following the funding of the Delayed Draw Term Loans to be made on the Final Term Funding Date.  The Incremental Exit Commitments shall terminate on the earlier of (a) five (5) Business Days following the Maturity Date and (b) Incremental Exit Funding Date immediately following the funding of the Incremental Term Loans to be made on the Incremental Exit Funding Date.

## SECTION 6. SECURITY INTERESTS

6.1    Security Interest in Collateral.  To secure the prompt payment and performance to the Secured Parties of the Secured Obligations, each Obligor hereby grants to Agent for the benefit of itself and each other Secured Party a continuing Lien upon and security interest in all of the following assets of such Obligor, whether now owned or existing or hereafter created, acquired or arising and wheresoever located (collectively, "Collateral"):

(a)    all Accounts;

(b)    all (x) Deposit Accounts and money and all cash, checks, other negotiable instruments, funds and other evidences of payments held therein, (y) Securities Accounts and Security Entitlements (as defined in the UCC) and securities credited thereto and, in each case, all cash, checks and other property held therein or credited thereto and (z) refunds of cash collateral received from Prepetition ABL Agent;

(c)    all Equipment, Goods, Inventory (including all documents of title for any Inventory) and Fixtures;

(d)    all Documents, Instruments (including, without limitation, promissory notes) and Chattel Paper;

(e)    all customer accommodation agreements or similar agreements regarding the manufacture or sale of Inventory to which any Obligor is a party from time to time, and all supply agreements or similar agreements regarding the manufacture or supply of Inventory to which any Obligor is a party from time to time;

(f)    all Letters of Credit and Letter-of-Credit Rights;

Doc#: US1:9899064v18

(g)      all Securities Collateral, Certificated Securities and Uncertificated Securities;

(h)      all Investment Property, Financial Assets and Security Entitlements;

(i)      all Intellectual Property;

(j)      all Commercial Tort Claims, including those with a value in excess of $100,000 as described on <u>Schedule 6.1</u>;

(k)      all General Intangibles and Contract Rights;

(l)      all Money, Deposit Accounts and Payment Intangibles;

(m)      all Supporting Obligations;

(n)      all books and records relating to the Collateral;

(o)      all Computer Hardware and Software;

(p)      all real property; and

(q)      to the extent not covered by clauses (a) through (p) of this sentence, all other personal property and interest in property of such Obligor whether or not subject to the UCC, whether tangible or intangible, and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to such Obligor from time to time with respect to any of the foregoing; *provided*, that upon entry of the Final Order to the extent approved by the Bankruptcy Court, "Collateral" shall include and a Lien shall attach to any Proceeds of Avoidance Actions.

Anything herein to the contrary notwithstanding, in no event shall the security interest granted under this Section 6.1 attach to any Excluded Assets.

6.1.2 Notwithstanding anything herein to the contrary, the liens and security interests (and priority of such liens and security interests) granted to the Agent pursuant to this Agreement and the exercise of any right or remedy by the Agent hereunder are subject to the limitations and provisions of the applicable Order.   In the event of any conflict between the terms of the applicable Order and the terms of this Agreement, the terms of the applicable Order shall govern and control.

6.2      <u>Other Collateral</u>.  Obligors shall (a) promptly notify Agent in writing upon an Obligor incurring or otherwise obtaining a Commercial Tort Claim with a value in excess of $250,000 after the date hereof and, upon request of Agent, do such acts or things necessary or reasonably deemed appropriate by Agent in its sole discretion to give Agent a security interest in any such Commercial Tort Claim; (b) promptly notify Agent in writing upon acquiring or otherwise obtaining any Collateral after the date hereof consisting of (i) Investment Property, Letter of Credit Rights, Chattel Paper or Electronic Chattel Paper, in each case with a value individually or in the aggregate in excess of $250,000 or (ii) Deposit Accounts, and, in each case, promptly execute such other documents, and do such other acts or things necessary or reasonably deemed appropriate by Agent in its sole discretion to deliver to Agent control (within the meaning of the UCC) with respect to such Collateral in accordance with the terms of this Agreement and the Orders; (c) promptly notify Agent in writing upon acquiring or otherwise

obtaining any Collateral after the date hereof consisting of Documents or Instruments with a value individually or in the aggregate in excess of $250,000 and will promptly execute such other documents, and do such other acts or things necessary or reasonably deemed appropriate by Agent in its sole discretion to deliver to Agent possession of such Documents (to the extent negotiable) and Instruments, and, with respect to nonnegotiable Documents, to have such nonnegotiable Documents issued in the name of Agent; and (d) with respect to Collateral in the possession of a third party, other than Certificated Securities and Goods covered by a Document, with a value individually or in the aggregate in excess of $250,000 use commercially reasonable efforts to obtain an acknowledgment from the third party that it is holding the Collateral for the benefit of Agent.  Obligors represent and warrant that as of the Closing Date, to their knowledge, no Obligor possesses any Commercial Tort Claims with a value individually or in the aggregate in excess of $250,000 other than those listed on Schedule 6.1.

6.3    Lien Perfection; Further Assurances.  Obligors shall deliver (a) such UCC-1 financing statements as are required by the UCC and (b) such other instruments, assignments or documents as are necessary to perfect Agent's Lien upon any of the Collateral and shall take such other action as may be required to perfect or to continue the perfection of Agent's Lien upon the Collateral.  Each Obligor hereby authorizes Agent to file (but Agent shall not be obligated to so file) any such financing statement in any filing office in any UCC jurisdiction, including financing statements that (A) indicate the Collateral by any description which reasonably approximates the description contained in Section 6.1 and (B) contain any other information required by part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement or amendment, including whether such Obligor is an organization, the Type of Organization and any organization identification number issued to such Obligor.  At Agent's request, each Obligor shall also promptly execute or cause to be executed and shall deliver to Agent any information, and all documents, instruments and agreements as are necessary or as reasonably requested by Agent, to give effect to or carry out the terms or intent of this Section 6.

6.4    Priority and Liens Applicable to the Obligors.  Obligors hereby covenant, represent and warrant that, upon the execution of this Agreement and upon entry of the Interim Order (and when applicable, the Final Order), subject in each case to the Carve-Out:

(a)    the Obligations of the Obligors, pursuant to Section 364(c)(1) of the Bankruptcy Code, shall be entitled to Superpriority Claim status in the Cases (but excluding a claim on Avoidance Actions and, prior to entry of the Final Order, the proceeds of Avoidance Actions), subject only to the Carve-Out to the extent provided in the applicable Order, and any payments or proceeds on account of such Superpriority Claim shall be distributed in accordance with Section 4.2.2(b);

(b)    the Obligations of the Obligors, pursuant to Section 364(c)(2) of the Bankruptcy Code, shall be secured by a perfected first priority Lien on all of the assets of the Obligors, whether consisting of real, personal, tangible or intangible property (including all of the outstanding shares of Equity Interests of Subsidiaries and proceeds of the foregoing other than any of the Voting Stock of a first tier Foreign Subsidiary in excess of 65% of the outstanding Voting Stock of such first tier Foreign Subsidiary) that is not subject to valid, perfected and non-avoidable liens as of the Petition Date, excluding avoidance actions and, prior to entry of the Final Order, the proceeds of Avoidance Actions (it being understood that, notwithstanding such exclusion of Avoidance Actions, the proceeds of such actions (including, without limitation, assets as to which liens are avoided) shall, after entry of the Final Order, be subject to such Liens under Section 364(c)(2) of the Bankruptcy Code and available to repay the Term Loans and all other Obligations);

(c)    the Obligations of the Obligors, pursuant to section 364(d)(1) of the Bankruptcy Code and subject to the Intercreditor Arrangements, shall at all times be secured by a valid, binding, continuing, enforceable, fully-perfected senior priming security interest in and Lien upon all pre- and

post-petition property of the Obligors, whether now existing or hereafter acquired, of the same nature, scope and type as the Collateral securing the obligations under the DIP ABL Facility or the Prepetition Senior Secured Notes (including a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and Lien upon the DIP Term Loan Priority Collateral). Such security interests and Liens shall be senior in all respects to the interests in such property of the holders of the Prepetition Senior Secured Notes and the trustees under the Prepetition Senior Secured Notes and, subject to the terms of the Intercreditor Arrangements, the interests in such property of the agent and lenders under the DIP ABL Facility (collectively, the "<u>Primed Liens</u>"), in each case arising from their respective current and future Liens; and

(d)     the Obligations of the Obligors, pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a valid, binding, continuing, enforceable, fully-perfected junior Lien on all of the assets of the Obligors that are subject to (x) valid, perfected and non-avoidable Liens in existence at the time of the commencement of the Cases (other than the Primed Liens) or (y) valid Liens (other than Primed Liens) in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code.

6.5     <u>Change of Name or Location</u>.  No Obligor shall (a) change its name as it appears in official filings in the state of its incorporation or organization, (b) change its chief executive office, principal place of business, mailing address, corporate offices or warehouses or locations at which Collateral is held or stored, or the location of its records concerning the Collateral as set forth in this Agreement, (c) change the type of entity that it is, (d) change its Organizational I.D. Number, if any, issued by its state of incorporation or other organization, or (e) change its state of incorporation or organization.

## SECTION 7. COLLATERAL ADMINISTRATION

7.1     <u>General</u>.

7.1.1     <u>Location of Collateral</u>.

(a)     As of the Closing Date, each Obligor's mailing address and the location of its place of business (if it has only one) or its chief executive office (if it has more than one place of business), and the location of its books or records related to any Collateral are disclosed in <u>Schedule 7.1.1(a)</u>; such Obligor has no other places of business except those set forth in <u>Schedule 7.1.1(a)</u>.

(b)     All tangible Collateral, other than Inventory in transit and motor vehicles, will at all times be kept by Obligors and their Subsidiaries at one or more of the business locations set forth in <u>Schedule 7.1.1(a)</u> hereto (as updated in writing delivered to Agent from time to time and with such new locations located in the United States or another location acceptable to Agent in its reasonable discretion and in each case otherwise in compliance with the Loan Documents), except that Borrowers may make sales or other dispositions of Collateral in accordance with <u>Section 9.2.9</u>.

(c)     All Deposit Accounts and all Securities Accounts maintained by each Obligor, together with a description thereof (i.e., the bank or broker dealer at which such Deposit Account or Securities Account is maintained, the name in which the account is held, the account number, any lockbox number and address associated with such Deposit Account, and the purpose thereof) are set forth on <u>Schedule 7.1.1(c)</u> hereto (as updated in writing delivered to Agent from time to time and otherwise in compliance with the Loan Documents).

7.1.2     <u>Insurance of Collateral</u>.

(a)     Obligors shall pay all insurance premiums when due and shall maintain insurance upon all Collateral wherever located and with respect to the business of Obligors and each of their Subsidiaries, covering casualty, hazard, flood, public liability, workers' compensation, business interruption and such other risks in such amounts and with such insurance companies as are satisfactory to Agent in its reasonable discretion.  Obligors shall deliver certified copies of such policies to Agent as promptly as practicable, with satisfactory lender's loss payable endorsements, naming Agent, for its benefit and the benefit of the other Secured Parties, as a loss payee, assignee or additional insured, as appropriate, as its interest may appear.  Subject to the Intercreditor Arrangements, each policy of insurance or endorsement shall provide that (a) all proceeds thereunder with respect to any Collateral shall be payable to Agent, (b) no such insurance shall be affected by any act or neglect of the insured or owner of the property described in such policy, and (c) contain a clause requiring the insurer to give not less than 10 days' prior written notice to Agent in the event of cancellation of the policy for nonpayment of premium and not less than 30 days' prior written notice to Agent in the event of cancellation of the policy for any other reason whatsoever and a clause specifying that the interest of Agent shall not be impaired or invalidated by any act or neglect of any Obligor, any of its Subsidiaries or the owner of the Property or by the occupation of the premises for purposes more hazardous than are permitted by said policy.  Obligors agree to deliver to Agent, promptly as rendered, true copies of all reports made in any reporting forms to insurance companies.  All proceeds of business interruption insurance (if any) of Obligors and their Subsidiaries shall be remitted to Agent for application to the outstanding balance of the Term Loans in accordance with Section 4.4.2.  The Borrowers will furnish to Agent and the Lenders, upon Agent's request, information in reasonable detail as to the insurance so maintained.

(b)     [Intentionally omitted].

(c)     [Intentionally omitted].

(d)     Unless Obligors provide Agent with evidence of the insurance coverage required by this Agreement, Agent may (but shall not be obligated to) purchase insurance at Obligors' expense to protect its interests and the interests of the other Secured Parties in the Properties of Obligors and their Subsidiaries.  This insurance may, but need not, protect the interests of Obligors and their Subsidiaries. The coverage that Agent purchases may not pay any claim that any Obligor or any Subsidiary makes or any claim that is made against any Obligor or any such Subsidiary in connection with said Property. Obligors may later cancel any insurance purchased by Agent, but only after providing Agent with evidence that Obligors and their Subsidiaries have obtained insurance as required by this Agreement.  If Agent purchases insurance, Obligors will be responsible for the costs of that insurance, including interest and any other third party charges Agent may incur in connection with the placement of insurance, until the effective date of the cancellation or expiration of the insurance.  The costs of the insurance shall constitute Obligations.  The costs of the insurance may be more than the cost of insurance that Obligors and their Subsidiaries may be able to obtain on their own.

7.1.3  Protection of Collateral.  Neither Agent nor any Lender shall be liable or responsible in any way for the safekeeping of any of the Collateral or for any loss or damage thereto (except for reasonable care in the custody thereof while any Collateral is in Agent's or any Lender's actual possession) or for any diminution in the value thereof, or for any act or default of any warehouseman, carrier, forwarding agency or other person whomsoever, but the same shall be at Obligors' sole risk.

7.2     [Intentionally omitted].

7.3     [Intentionally omitted].

Doc#: US1:9899064v18

7.4     [Intentionally omitted].

7.5     Payment of Charges.  All amounts chargeable to Obligors under Section 7 hereof shall be Secured Obligations secured by all of the Collateral, shall be payable on demand and shall bear interest from the date such advance was made until paid in full at the rate applicable to Base Rate Loans from time to time.

## SECTION 8. REPRESENTATIONS AND WARRANTIES

8.1     General Representations and Warranties.  To induce Agent and each Lender to enter into this Agreement and to make advances hereunder, Obligors warrant, represent and covenant to Agent and each Lender, on a joint and several basis, that:

8.1.1  Qualification.  Each Obligor and each of its Subsidiaries is a corporation, limited partnership or limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization.  Subject to the entry of the Orders and subject to the terms thereof, each Obligor and each of its Subsidiaries is duly qualified and is authorized to do business and, to the extent such designation is available in such jurisdiction, is in good standing as a foreign limited liability company, limited partnership or corporation, as applicable, (a) as of the Closing Date in each state or jurisdiction listed on Schedule 8.1.1 hereto and (b) in all states and jurisdictions in which the failure of any Obligor or any of its Subsidiaries to be so qualified, individually and in the aggregate, could reasonably be expected to have a Material Adverse Effect.

8.1.2  Power and Authority.  Subject to the entry of the Orders and subject to the terms thereof, each Obligor and each of its Subsidiaries is duly authorized and empowered to enter into, execute, deliver and perform its obligations under this Agreement and each of the other Loan Documents to which it is a party.  Subject to the entry of the Orders and subject to the terms thereof, the execution, delivery and performance of this Agreement and the Borrowings of the Loans hereunder and the execution, delivery and performance of each of the other Loan Documents have been duly authorized by all necessary organizational or other relevant action and do not and will not: (a) require any consent or approval of the holders of any Equity Interests of any Obligor or any Subsidiary of any Obligor except, in each case, any consents or approvals as have been obtained or made and are in full force and effect; (b) contravene any Obligor's or any of its Subsidiaries' charter, articles or certificate of incorporation, partnership agreement, articles or certificate of formation, by-laws, limited liability agreement, operating agreement or other organizational documents (as the case may be); (c) violate, or cause any Obligor or any of its Subsidiaries to be in default under, any provision of any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award in effect having applicability to such Obligor or any of its Subsidiaries, the violation of which could reasonably be expected to have a Material Adverse Effect; (d) result in a breach of or constitute a default under any indenture (other than the Prepetition Senior Secured Notes Indenture) or loan or credit agreement or any other agreement, lease or instrument to which any Obligor or any of its Subsidiaries is a party or by which it or its Properties are bound or affected, the breach of or default under which (x) would permit the exercise of remedies thereunder on a post-petition basis or (y) could reasonably be expected to have a Material Adverse Effect; (e) require any registration or filing with, or any other action by, any Governmental Authority except (i) such as have been obtained or made and are in full force and effect and (ii) filings necessary to perfect Liens created by the Security Documents; (f) result in, or require, the creation or imposition of any Lien (other than Liens granted to Agent hereunder) upon or with respect to any of the Properties now owned or hereafter acquired by any Obligor or any of

44

their respective Subsidiaries; or (g) result in a breach of or constitute a default under the DIP ABL Loan Agreement.

8.1.3  <u>Legally Enforceable Agreement</u>.  Subject to the entry of the Orders and subject to the terms thereof, each Loan Document, when delivered pursuant to this Agreement, will be a legal, valid and binding obligation of each Obligor and each of its Subsidiaries party thereto, enforceable against such Obligor or such Subsidiary in accordance with its terms.

8.1.4  <u>Capital Structure</u>.  <u>Schedule 8.1.4</u> shows, for each Obligor and each of its Subsidiaries, its exact name as it appears on its organizational documents, its jurisdiction of organization, its Organizational I.D. Number, its authorized and issued Equity Interests, the direct holders of its Equity Interests as of the Closing Date, and all agreements binding on such holders with respect to their Equity Interests as of the Closing Date.  Except as disclosed on <u>Schedule 8.1.4</u>, in the five years preceding the Closing Date, no Obligor or Subsidiary has acquired any substantial assets from any other Person nor been the surviving entity in a merger or combination.  Each Obligor has good title to its Equity Interests in its Subsidiaries, subject (subject to the entry of the Orders and subject to the terms thereof) only to the Liens of the Prepetition Senior Secured Notes Trustee and the DIP ABL Agent, and all such Equity Interests are duly issued, fully paid and non-assessable (to the extent that such concepts apply to such Equity Interests).  There are no outstanding purchase options, warrants, subscription rights, agreements to issue or sell, convertible interests, phantom rights or powers of attorney relating to Equity Interests of any Obligor or any of its Subsidiaries.

8.1.5  <u>Title to Properties; Priority of Liens</u>.  As of the Closing Date, <u>Schedule 8.1.5</u> sets forth the address and a description of each parcel of real Property that is (i) owned or (ii) leased by each Obligor and each of its Subsidiaries.  Subject to the entry of the Orders and subject to the terms thereof, each Obligor and each of its Subsidiaries has good, indefeasible and marketable title in fee simple to (or the local law equivalent), or valid and enforceable leasehold interests in, license to or right to use, all of its real Property, free and clear of all Liens except Permitted Mortgage Liens, and good title to, or a valid leasehold interest in or right to use, all of the Collateral and all of its other Property, including all Property reflected in any financing statements delivered to or filed by Agent or the Lenders, in each case free and clear of all Liens except Permitted Liens.  Subject to the entry of the Orders and subject to the terms thereof, the Liens granted to Agent under <u>Section 6</u> hereof are duly perfected first priority Liens, subject only to the Intercreditor Arrangements, the Prepetition Intercreditor Agreement and Permitted Liens that are expressly allowed to have priority over Agent's Liens.

(a)    The Obligor and each of its Subsidiaries has complied with all material obligations under all leases to which it is a party, except where the failure to comply would not reasonably be expected to have Material Adverse Effect, and all such leases are in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have a Material Adverse Effect. The Obligor and each of its Subsidiaries enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    As of the Closing Date, none of the Obligor or any of its Subsidiaries has received any written notice of any pending or contemplated condemnation proceeding affecting any material portion of real Property owned by the Obligor or any of its Subsidiaries or any sale or disposition thereof in lieu of condemnation that remains unresolved as of the Closing Date.

(c)      As of the Closing Date, none of the Obligor or any of its Subsidiaries is obligated under any right of first refusal, option or other contractual right to sell, assign or otherwise dispose of any real Property owned by the Obligor or any of its Subsidiaries or any interest therein.

8.1.6   [Intentionally Omitted].

8.1.7   [Intentionally Omitted].

8.1.8   Financial Statements; No Material Adverse Effect; Fiscal Year.

(a)      The audited consolidated financial statements of Parent and its Subsidiaries as at December 31, 2013 delivered to Agent and Lenders prior to the Closing Date and reported on by and accompanied by an unqualified report from PricewaterhouseCoopers LLP (collectively, the "Audited Financial Statements") present fairly, in all material respects, the financial condition, results of operations and cash flows of Parent and its Subsidiaries as at such date and for such period then ended.

(b)      The Initial Unaudited Financial Statements and the unaudited internally prepared interim financial statements of Parent and its Subsidiaries delivered to Agent and Lenders pursuant to Section 9.1.3(a) (together with the Initial Unaudited Financial Statements, the "Unaudited Financial Statements"), present fairly, in all material respects, the financial condition, results of operations and cash flows of Parent and its Subsidiaries as at such date and for such period then ended.  All such financial statements, including the applicable related schedules and notes thereto, have been prepared in accordance with GAAP, applied consistently throughout the periods involved (except as approved by the aforementioned firm of accountants and disclosed therein), and subject to normal year-end audit adjustments, adjustments for purchase accounting (including adjustments of the type contemplated by Financial Accounting Standards Board Accounting Standards Codification 805, Business Combinations (formerly SFAS 141R)), and the absence of footnotes.

(c)      [Intentionally Omitted].

(d)      Since the Closing Date, no event, change, condition or development has occurred that has had or could reasonably be expected to have a Material Adverse Effect.  As of the date hereof, the fiscal year of Obligors and each of their Subsidiaries ends on December 31 of each year.

8.1.9   Budget and 13-Week Projections.  (a) On and as of the Closing Date, the Budget of Parent and its Subsidiaries for the 21-week period from the week ending March 13, 2015 through and including the week ending July 31, 2015, copies of which have heretofore been furnished to Agent and the Lenders and (b) following the Closing Date, the 13-Week Projections delivered pursuant to Section 9.1.3(c), in each case are based on good faith estimates and assumptions made by the management of Parent; provided that the Budget and such 13-Week Projections are not to be viewed as facts during the period or periods covered by the Budget and 13-Week Projections may differ from the Budget and such 13-Week Projections, respectively, and that the differences may be material; provided, further, the Budget and 13-Week Projections were based in good faith on assumptions believed by the management of Parent to be reasonable at the time made and (1) in the case of the Budget in clause (a) above, on the Closing Date and (2) in the case of the 13-Week Projections delivered pursuant to clause (b) above, the date of delivery of the same (it being understood that assumptions as to future results are inherently subject to uncertainty and contingencies, many of which are beyond the Obligors' control).

8.1.10  Full Disclosure.  Each Obligor has disclosed to Agent and the Lenders all agreements, instruments and organizational or other restrictions to which it or any of its

Subsidiaries is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports, financial statements, certificates or other information furnished by or on behalf of any Obligor to Agent or any Lender in connection with the preparation and negotiation of this Agreement or any other Loan Document (as modified or supplemented by other information so furnished), when taken as a whole, contains any misstatement of a material fact or omits to state any material fact necessary to make the statements herein or therein not misleading in light of the circumstances under which such information is furnished (giving effect to all applicable supplements and updates thereto).

8.1.11  [Intentionally Omitted.]

8.1.12  Taxes.  Other than Taxes or claims arising before the Petition Date that have not been authorized to be paid by the Bankruptcy Court, each Obligor and each of its Subsidiaries has filed all federal, state, and, with respect to amounts due in excess of $150,000, local and non-U.S. Tax returns and other reports relating to Taxes that it is required by law to file, and has paid, or made provision for the payment of, all federal, and, with respect to amounts due in excess of $150,000, state and local Taxes upon it, its income and Properties as and when such Taxes become due and payable, unless and to the extent any thereof are being contested in good faith and by appropriate proceedings, and each Obligor and each of its Subsidiaries maintains adequate reserves in conformity with GAAP on its books therefor. The provision for Taxes on the books of each Obligor and each of its Subsidiaries is adequate for all years not closed by applicable statutes of limitation, and for its current fiscal year. Other than in connection with the Cases, no Tax Lien (other than Liens described in clause (a) of the definition of Permitted Encumbrance) has been filed against any Obligor or any of their respective Subsidiaries and to the knowledge of the Obligors, no claim is being asserted with respect to any Tax, fee or other charge.

8.1.13  Brokers.  As of the Closing Date, there are no brokerage commissions, finder's fees or investment banking fees payable by any Obligor in connection with this Agreement other than fees payable pursuant to the Fee Letters and other than fees payable to Lazard Frères & Co. LLC.

8.1.14  Patents, Trademarks, Copyrights and Licenses.

(a)    Schedule 8.1.14 hereto sets forth a true and accurate list, as of the Closing Date and the date that the most recent update was required to be delivered pursuant to Section 9.1.15 of (i) all United States, state and foreign registrations of any applications for Intellectual Property owned by each Obligor and each of its Subsidiaries and (ii) all licenses granted to each Obligor (or any such Obligor's Subsidiary) to any Intellectual Property that are exclusive or otherwise material to the business of such Obligor (or such Subsidiary) excluding any license for readily available commercial software having a replacement value of less than $150,000 and (iii) all licenses granted by each Obligor (or any such Obligor's Subsidiary) to the Obligors' or any Subsidiary's Intellectual Property that are exclusive or otherwise material to the business of such Obligor (or such subsidiary). Each Obligor and each of its Subsidiaries owns or licenses the right to use all Intellectual Property that is material to its business free and clear of licenses other than Permitted Liens without any conflict with the rights of others.

(b)    The Intellectual Property listed on Schedule 8.1.14 and other material Intellectual Property owned by each Obligor and its Subsidiaries is subsisting, in full force and effect, and each Obligor and its Subsidiaries has performed all acts and has paid all renewal, maintenance and other fees and taxes required to maintain each and every registration and application for Intellectual Property included in the Collateral in full force and effect, except as may be permitted to expire in accordance with Section 9.2.9(f). To the knowledge of Obligors, the Intellectual Property listed on Schedule 8.1.14 and

47

other material Intellectual Property owned by each Obligor and its Subsidiaries is valid and enforceable, except as may be permitted to expire in accordance with Section 9.2.9(f).  No holding, decision or judgment has been rendered in any action or proceeding before any court or administrative authority, including any Intellectual Property registry, challenging the validity of, each Obligor's or its Subsidiaries' right to register, or each Obligor's or its Subsidiaries' rights to own or use, any material Intellectual Property and no such action or proceeding is pending or, to such Obligor's or its Subsidiaries' knowledge, threatened other than routine examiner's comments and office actions in the course of prosecution.  As of the Closing Date, no claim has been asserted or, to Obligor's knowledge, threatened against any Obligor or any Subsidiary of any Obligor which is currently pending including claims asserted in writing in the last (3) years and not resolved that its use of any Intellectual Property or the conduct of its business infringes upon the Intellectual Property rights of any third party and, as of any date after the Closing Date, no such claim has been asserted or threatened that would be reasonably likely to have a Material Adverse Effect.  To the knowledge of Obligors and except as set forth on Schedule 8.1.14 hereto, as of the date hereof, no Person is infringing upon any Obligor's or any of its Subsidiaries' Intellectual Property that is material or in a manner that could reasonably be expected to have a Material Adverse Effect.

(c)    The consummation and performance of the transactions and actions contemplated by this Agreement and the other Loan Documents, including the exercise by Agent of any of its rights or remedies under Section 11, will not result in the termination or impairment of any of such Obligor's or any of its Subsidiaries' ownership of any Intellectual Property material to the conduct of its business or any material license relating to Intellectual Property to which such Obligor or any of its Subsidiaries' is a party (whether as licensor or licensee).

(d)    Each Obligor and its Subsidiaries is in compliance with all applicable trademark and patent marking laws with respect to marking such Obligor's and its Subsidiaries' products, except to the extent that such non-compliance could not reasonably be expected to have a Material Adverse Effect.

(e)    Each Obligor and its Subsidiaries take reasonable measures to protect the confidentiality of trade secrets and other confidential information necessary for the conduct of its business.  To the knowledge of the Obligors, there has not been any disclosure of any trade secret or other confidential information of such Obligor and its Subsidiaries material to the conduct of its business (including any such information of any other Person disclosed in confidence to such Obligor and its Subsidiaries) to any Person in a manner that has resulted or is likely to result in the loss of any material trade secret or other rights in and to material confidential information.

(f)    During the three (3) years prior to the date hereof, (i) there have been no material security breaches in each Obligor's and its Subsidiaries' information technology systems, and (ii) there have been no disruptions or defects in any of each Obligor's and its Subsidiaries' information technology systems that materially adversely affected each Obligor's and its Subsidiaries' business or operations.  To the knowledge of each Obligor, neither any Obligor nor any of its Subsidiaries has made available, and has no duty to make available, any source code for any Computer Hardware or Software material to the business of such Obligor or Subsidiary to any escrow agent or any other Person other than an employee or consultant.  Each Obligor and its Subsidiaries have evaluated their disaster recovery and backup needs and have implemented plans and systems that reasonably address their assessment of risk.

8.1.15  Governmental Consents.  Subject to the entry of the Orders and subject to the terms thereof, each Obligor and each of its Subsidiaries has, is in compliance with, and is in good standing with respect to, all consents, approvals, licenses, authorizations, permits, certificates, inspections and franchises from all Governmental Authorities necessary to continue to conduct its business as heretofore or proposed to be conducted by it and to own or lease and operate its Properties as now owned or leased by it, except where the failure to possess, maintain or comply

with such rights, licenses and permits could not reasonably be expected to have a Material Adverse Effect.

8.1.16  <u>Compliance with Laws</u>.  Subject to the entry of the Orders and subject to the terms thereof:

(a)     Each Obligor and each of its Subsidiaries has duly complied, and its Properties, business operations and leaseholds are in compliance with, (i) the provisions of all federal (other than the Foreign Corrupt Practices Act of 1977 (15 U.S.C. §§ 78dd-1, et seq.), as amended), state and local laws, rules and regulations applicable to such Obligor or such Subsidiary, as applicable, its Properties or the conduct of its business, including Environmental Laws, in each case, except where non-compliance could not reasonably be expected to have a Material Adverse Effect and (ii) the Foreign Corrupt Practices Act of 1977 (15 U.S.C. §§ 78dd-1, et seq.), as amended.  There have been no citations, notices or orders of non-compliance issued to any Obligor or any of its Subsidiaries under any such law, rule or regulation, except where noncompliance could not reasonably be expected to have a Material Adverse Effect.  Each Obligor and each of its Subsidiaries (with respect to the Foreign Subsidiaries, to the best knowledge of such Obligor) has established and maintains an adequate monitoring system to insure that it remains in compliance in all material respects with all federal, state and local rules, laws and regulations applicable to it.

(b)     (i) Each Obligor is in compliance with the requirements of all OFAC Sanctions Programs applicable to it, (ii) each Subsidiary of each Obligor is in compliance with the requirements of all OFAC Sanctions Programs applicable to such Subsidiary, (iii) each Obligor has provided to Agent and Lenders all information regarding such Obligors and its Affiliates and Subsidiaries requested by Agent and Lenders that are necessary to comply with all applicable OFAC Sanctions Programs, and (iv) neither the Obligors nor its Subsidiaries or, to the best of each Obligor's knowledge, any of their respective Affiliates is, as of the date hereof, named on the current OFAC SDN List.

(c)     No Inventory has been produced in violation of the Fair Labor Standards Act (29 U.S.C. §201 <u>et seq</u>.), as amended.

8.1.17  <u>Restrictive Agreements</u>.  No Obligor nor any of its Subsidiaries is a party to or subject to any contract, agreement or organizational document which restricts its right or ability to incur the Obligations or which prohibits the execution of or compliance with this Agreement or the other Loan Documents by any Obligor or any of its Subsidiaries, as applicable.

8.1.18  <u>Litigation</u>.  Except as set forth on <u>Schedule 8.1.18</u> hereto and other than the Cases, there are no unstayed actions, suits, proceedings or investigations pending, or to the knowledge of any Obligor, threatened, against or affecting any Obligor or any of its Subsidiaries, or the business, operations, Properties, prospects, profits or condition of any Obligor or any of its Subsidiaries that (a) involve or relate to any Loan Document or (b) singly or in the aggregate, could reasonably be expected to have a Material Adverse Effect.  Neither any Obligor nor any of its Subsidiaries is in default with respect to any order, writ, injunction, judgment, decree or rule of any court, Governmental Authority or arbitration board or tribunal, which, singly or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

8.1.19  <u>No Defaults</u>.  Subject to the entry of the Orders and subject to the terms thereof, no event, condition or circumstance has occurred or exists which would, upon or after the execution and delivery of this Agreement or any Obligor's performance hereunder or under any other Loan Document, constitute a Default or an Event of Default.

Doc#: US1:9899064v18

8.1.20   [Intentionally Omitted].

8.1.21   ERISA.  Except as disclosed on Schedule 8.1.21:

(a)      Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code, and other federal and state laws.  Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination or opinion letter from the IRS and, to the knowledge of Holdings, Parent or Borrowers, nothing has occurred which would prevent, or cause the loss of, such qualification.  Each Obligor and ERISA Affiliate has made when due all contributions required by law or under the terms of any Plan, other than as could not reasonably be expected to have a Material Adverse Effect.  Each Obligor and ERISA Affiliate has met all applicable requirements under the Pension Funding Rules, and no application for a funding waiver of the minimum funding standards or an extension of any amortization period under the Pension Funding Rules has been made with respect to any Plan.

(b)      There are no pending or, to the knowledge of Holdings, Parent or Borrowers, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted in or could reasonably be expected to have a Material Adverse Effect.

(c)      (i) No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan (A) has any Unfunded Pension Liability or (B) is or has been in violation of the limitations imposed by Section 436 of the Code; (iii) the conditions for the imposition of a lien under Section 303(k) of ERISA do not exist with respect to any Pension Plan; (iv) no Obligor or ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (v) no Obligor or ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Section 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (vi) no Obligor or ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

(d)      With respect to any Foreign Plan, (i) all employer and employee contributions required by law or by the terms of the Foreign Plan have been made, or, if applicable, accrued, in accordance with normal accounting practices; (ii) the fair market value of the assets of each funded Foreign Plan, the liability of each insurer for any Foreign Plan funded through insurance, or the book reserve established for any Foreign Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations with respect to all current and former participants in such Foreign Plan according to the actuarial assumptions and valuations most recently used to account for such obligations in accordance with applicable generally accepted accounting principles; and (iii) it has been registered as required and has been maintained in good standing with applicable regulatory authorities.

8.1.22   Trade Relations.   There exists no actual or, to Obligors' knowledge, threatened termination, cancellation or limitation of, or any modification or change in, the business relationship between any Obligor or any of its Subsidiaries and any customer or any group of customers whose purchases individually or in the aggregate are material to the business of Obligors and their Subsidiaries, or with any material supplier, except in each case, where the same could not reasonably be expected to have a Material Adverse Effect, and there exists no present condition or state of facts or circumstances which would prevent any Obligor or any of its Subsidiaries from conducting such business after the consummation of the transactions contemplated by this Agreement in substantially the same manner in which it has heretofore been conducted.

Doc#: US1:9899064v18

8.1.23  <u>Labor Relations</u>.  Except as described on <u>Schedule 8.1.23</u> hereto, there is (a) no unfair labor practice complaint pending or, to the knowledge of any Obligor, threatened against any Obligor or any of its Subsidiaries before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Obligor which arises out of or under any collective bargaining agreement, (b) no strike, labor dispute, slowdown, stoppage or similar action or grievance pending or threatened against any Obligor or (c) to the knowledge of each Obligor, no union representation question existing with respect to the employees of any Obligor and no union organizing activity taking place with respect to any of the employees of any Obligor.  No Obligor or any of its ERISA Affiliates has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("<u>WARN</u>") or similar state law, which remains unpaid or unsatisfied.  The hours worked and payments made to employees of any Obligor have not been in violation of the Fair Labor Standards Act or any other applicable legal requirements, except to the extent such violations could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  All material payments due from any Obligor on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Obligor, except where the failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.1.24  <u>Insurance</u>.  Schedule 8.1.24 sets forth a description of all insurance policies maintained by or on behalf of the Obligors and their respective Subsidiaries as of the Closing Date, including but not limited to policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation and employee health and welfare insurance.  All premiums in respect of such insurance policies have been paid as of the Closing Date (or have been financed with Indebtedness permitted under <u>Section 9.2.3(n)</u>, which such Indebtedness has been paid in full to the extent payments thereunder are due and payable on or prior to the Closing Date).  Except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, all insurance policies of the Obligors and their respective Subsidiaries are in full force and effect and are of a nature and provide such coverage as is sufficient and as is customarily carried by businesses of the size and character of such Person.

8.1.25  <u>Security Interest in Collateral</u>.  Subject to the entry of the Orders and subject to the terms thereof, except as otherwise contemplated hereby or under any of the Loan Documents, this Agreement and each other Security Document is effective to create in favor of Agent, for its benefit and the benefit of the other Secured Parties, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof.  Subject to the entry of the Orders and subject to the terms thereof, Agent shall have a perfected Lien on, and security interest in, all right, title and interest of the Obligors in such Collateral and the proceeds thereof, as security for the Secured Obligations (subject to the limitations set forth in the Security Documents) to the extent perfection is required in accordance with the terms of this Agreement, in each case prior and superior in right to any other Person (except, subject to the Prepetition Intercreditor Agreement and the Intercreditor Arrangements, Liens in favor of the, DIP ABL Agent, Prepetition Senior Secured Notes Trustee and Permitted Encumbrances which have priority over the Liens created by the Security Documents by operation of law).

8.1.26  <u>Margin Regulations</u>.  No Obligor or Subsidiary of any Obligor is engaged, principally or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any "margin stock" (as defined in Regulation U of the Board of Governors of the Federal Reserve System).

8.1.27  <u>Environmental Matters</u>.  (a) The operations of each Obligor are in compliance with all Environmental Laws, except where such noncompliance could not reasonably

be expected to have a Material Adverse Effect; (b) there has been no Release at any of the properties currently or formerly owned or operated by any Obligor or a predecessor in interest, or at any disposal or treatment facility which received Hazardous Materials generated by any Obligor or any predecessor in interest which could reasonably be expected to have a Material Adverse Effect; (c) no Obligor or predecessor in interest has received any communication asserting that it is responsible for performing or otherwise financing any Remedial Action nor does any Obligor have knowledge or notice of any threatened or pending Remedial Action being required at any currently or formerly owned or operated properties or at any location where Hazardous Materials generated by any Obligor or predecessor in interest have been sent or Released against any Obligor or any predecessor in interest which could reasonably be expected to have a Material Adverse Effect; (d) no Remedial Actions have been asserted against any facilities that may have received Hazardous Materials generated by any Obligor or any predecessor in interest which could reasonably be expected to have a Material Adverse Effect; (e) no property now or formerly owned or operated by an Obligor has been used as a treatment or disposal site for any Hazardous Material which reasonably could be expected to have a Material Adverse Effect; (f) no Obligor has failed to report to the proper Governmental Authority any Release which is required to be so reported by any Environmental Laws which could reasonably be expected to have a Material Adverse Effect; (g) each Obligor holds all licenses, permits and approvals required under any Environmental Laws in connection with the operation of the business carried on by it, except for such licenses, permits and approvals as to which an Obligor's failure to maintain or comply with could not reasonably be expected to have a Material Adverse Effect; and (h) no Obligor has received any notification pursuant to any Environmental Laws that (i) any work, repairs, construction or Capital Expenditures are required to be made in respect as a condition of continued compliance with any Environmental Laws, or any license, permit or approval issued pursuant thereto, except as could not reasonably be expected to have a Material Adverse Effect or (ii) any license, permit or approval referred to above is about to be reviewed, made, subject to limitations or conditions, revoked, withdrawn or terminated, in each case, except as could not reasonably be expected to have a Material Adverse Effect.

8.1.28 <u>Permits, Etc</u>.  Subject to the entry of the Orders and subject to the terms thereof, each Obligor has, and is in compliance with, all permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business currently owned, leased, managed or operated, or to be acquired, by such Person.  No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, and to the Obligor's knowledge there is no claim that any thereof is not in full force and effect.

8.1.29 <u>Use of Proceeds</u>.  The proceeds of the Term Loans shall be used solely in accordance with <u>Section 2.1.2</u>.  No Term Loan proceeds will be used by Obligors or any of their Subsidiaries to purchase or carry, or to reduce or refinance any Indebtedness incurred to purchase or carry, any "margin stock" (as defined in Regulation U of the Board of Governors of the Federal Reserve System) or for any related purpose governed by Regulations T, U or X of the Board of Governors of the Federal Reserve System.

8.1.30 <u>Investment Company Act</u>.  No Obligor is (a) an "investment company" or an "affiliated person" or "promoter" of, or "principal underwriter" of or for, an "investment company", or a "person directly or indirectly controlled by or acting on behalf of an investment company", as such terms are defined in or subject to regulation under the Investment Company Act of 1940, as amended, or (b) subject to regulation under any applicable law that limits in any respect

its ability to incur Indebtedness or which may otherwise render all or a portion of the Obligations unenforceable.

8.1.31    [Intentionally omitted].

## SECTION 9. COVENANTS AND CONTINUING AGREEMENTS

9.1    Affirmative Covenants.  Until Payment in Full, Obligors jointly and severally covenant that they shall and shall cause their Subsidiaries to:

9.1.1    Visits and Inspections; Lender Meeting.  Subject to the provisions of Section 13.4, permit Agent, any Lender and any of their respective financial advisors or representatives, from time to time, during normal business hours, to visit and inspect the Properties, including any plants, of each Obligor and each of its Subsidiaries, inspect, audit and make extracts from its books and records, and discuss with its officers, its employees, and subject to confidentiality obligations of such Agent, Lender or financial advisor or representative set forth herein, its customers, its financial advisors and its independent accountants, each Obligor's and each of its Subsidiaries' business, assets, liabilities, financial condition, business prospects and results of operations.  Agent or any such Lender, if no Default or Event of Default then exists, shall give Borrower Representative reasonable prior notice of any such inspection or audit.

9.1.2    Notices.  Notify Agent and Lenders in writing, promptly after an Obligor's obtaining knowledge thereof, of any of the following (excluding, in each case, any event triggered by or relating to the filing of the Cases):

(a)    the threat or commencement of any proceeding or investigation, whether or not covered by insurance, that, (i) could reasonably, individually or in the aggregate, be expected to result in a liability in excess of $1,000,000 (ii) seeks injunctive relief, (iii) is asserted or instituted against any Plan, or any of their fiduciaries or any of their assets, (iv) alleges criminal misconduct by any Obligor, (v) contests any tax, fee, assessment or other governmental charge, individually or in the aggregate, in excess of $1,000,000 or (vi) involves any material product recall;

(b)    any pending or threatened labor dispute, strike or walkout, or the expiration of any material labor contract that could reasonably be expected to have a Material Adverse Effect;

(c)    any default under or termination of an agreement or a contract that could reasonably be expected to have a Material Adverse Effect;

(d)    the existence of any Default or Event of Default;

(e)    any post-petition judgment, individually or in the aggregate, in an amount exceeding $1,000,000 or granting injunctive relief;

(f)    any violation or asserted violation of any Requirement of Law that could reasonably be expected to result in a liabilities or costs, individually or in the aggregate, in excess of $1,000,000;

(g)    any Release by an Obligor or on any real Property owned, leased or occupied by an Obligor; or receipt of any Environmental Notice, in each case that could, individually or in the aggregate, reasonably be expected to result in Environmental Liabilities and Costs in excess of $1,000,000;

(h)      the occurrence of any ERISA Event;

(i)      any Lien (other than Permitted Encumbrances, Liens granted by the Obligors in favor of Agent (for the benefit of the Secured Parties, securing the Secured Obligations) or the Prepetition Senior Secured Notes Trustee (securing the obligations under the Prepetition Senior Secured Notes Documents) or the DIP ABL Agent (securing the obligations under the DIP ABL Loan Documents)), or claim made or asserted in writing against any material portion of the Collateral; any loss, damage or destruction to all or any portion of the Collateral in the amount of $1,000,000 or more, whether or not covered by insurance;

(j)      any and all default notices received under or with respect to (i) the DIP ABL Loan Agreement or (ii) any leased location or public warehouse where Collateral with a cost in excess of $1,000,000 is located (which shall be delivered within two (2) Business Days after receipt thereof);

(k)      all amendments, waivers, consents or forbearances to the DIP ABL Loan Agreement, Accommodation Agreement, Customer Agreements or the Access Agreement, together with a copy of each such amendment;

(l)      [intentionally omitted];

(m)      (i) the institution of any proceeding in any court or administrative body of in the PTO or the United States Copyright Office of any foreign counterpart, or any adverse determination in any such proceeding, regarding the validity or enforceability of any Intellectual Property owned by such Obligor or its Subsidiaries material to the conduct of its business or such Obligor's or its Subsidiaries' right to register, own or use such Intellectual Property other than routine examiner's comments and office actions in the course of prosecution; or (ii) any event which may be reasonably expected to materially and adversely affect the value of any Intellectual Property owned by such Obligor or its Subsidiaries material to the conduct of its business, or the rights and remedies of Agent in relation thereto;

(n)      without limiting Agent's rights and each Obligor's and its Subsidiaries' obligations under Section 9.1.15 below, from time to time upon Agent's request, reasonably detailed statements and amended schedules further identifying and describing the Intellectual Property owned by such Obligor or its Subsidiaries and such other materials evidencing any Intellectual Property owned by such Obligor or its Subsidiaries as Agent may reasonably request;

(o)      any default under, or termination of, the Accommodation Agreement, Customer Agreements or the Access Agreement; and

(p)      any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section 9.1.2 shall be accompanied by a statement of a Senior Officer of Parent setting forth in reasonable detail the nature of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

9.1.3  Financial Statements.  Keep adequate records and books of account with respect to its business activities in which proper entries are made in accordance with customary accounting practices reflecting all its financial transactions; and cause to be prepared and furnished to Agent and each Lender, the following, all to be prepared in accordance with GAAP applied on a consistent basis, unless Obligors' certified public accountants concur in any change therein and such change is disclosed to Agent and is consistent with GAAP:

Doc#: US1:9899064v18

(a)      no later than 120 days after the close of each fiscal year of Parent, audited financial statements of Parent and its Subsidiaries as of the end of such fiscal year, on a Consolidated basis, certified by a firm of independent certified public accountants of recognized standing selected by Parent and such other financial statements of Holdings together with such certifications as agreed between Holdings and the Majority Lenders;

(b)      (i) no later than 45 days after the end of each of the first three fiscal quarters of each fiscal year, commencing with the fiscal quarter ending March 31, 2015, unaudited internally prepared interim financial statements of Parent and its Subsidiaries as of the end of such fiscal quarter and of the portion of the fiscal year then elapsed, on a Consolidated basis, (ii) commencing with the fiscal quarter ending March 31, 2015, no later than 45 days after the end of each of the first three fiscal quarters of each fiscal year, unaudited internally prepared, income statements and balance sheets of Parent and its Subsidiaries, on a consolidating basis, in each case certified by a Senior Officer of Parent as prepared in accordance with GAAP and fairly presenting in all material respects the financial position and results of operations of Parent and its Subsidiaries for such fiscal quarter and period, subject only to changes from audit and year-end adjustments and except that such statements need not contain notes and (iii) such other financial statements of Holdings together with such certifications as agreed between Holdings and the Majority Lenders;

(c)      no later than 15 Business Days (or, in the case of a fiscal month that ends on the same day as the end of a fiscal quarter, 20 Business Days) after the end of each fiscal month, commencing with the fiscal month ending March 31, 2015, unaudited internally prepared interim financial statements of Parent and its Subsidiaries as of the end of such fiscal month, on a Consolidated basis, certified by a Senior Officer of Parent as prepared in accordance with GAAP and fairly presenting in all material respects the financial position and results of operations of Parent and its Subsidiaries for such fiscal quarter and period, subject only to changes from audit and year-end adjustments and except that such statements need not contain notes, and such other financial statements of Holdings together with such certifications as agreed between Holdings and the Majority Lenders;

(d)      no later than 5:00 p.m. on Friday of each calendar week, commencing on March 20, 2015, an updated 13-Week Projection and a Variance Report;

(e)      no later than 5:00 p.m. on Friday of each calendar week, commencing with March 20, 2015, a report detailing fees and expenses for professional services incurred by the Obligors during the preceding week;

(f)      together with each delivery of financial statements pursuant to clauses (a) and (b) of this Section 9.1.3, a management discussion and analysis setting forth in comparative form the corresponding figures for the corresponding periods of the previous fiscal year and the corresponding figures from the most recent 13-Week Projections for the current fiscal year delivered pursuant to Section 9.1.3. The information above shall be presented in reasonable detail and (x) with respect to the Parent and its Subsidiaries, shall be certified by a Senior Officer of Parent to the effect that such information fairly presents in all material respects the results of operation and financial condition of Parent and its Subsidiaries and (y) with respect to Holdings, shall be certified by a Senior Officer of Holdings to the effect that such information fairly presents in all material respects the results of operation and financial condition of Holdings, in each case, as at the dates and for the periods indicated;

(g)      promptly after the same become publicly available, copies of any regular, periodic and special reports, proxy statements, registration statements and other materials, if any, which Holdings or any of its Subsidiaries files with the Securities and Exchange Commission or any Governmental Authority which may be substituted therefor or any national securities exchange;

(h)    upon request of Agent, copies of (i) any annual report (Form 5500 series) filed, if any, in connection with each Plan; (ii) the most recent actuarial valuation report for each Pension Plan, if any; (iii) all notices received by the Obligor from or with respect to any Multiemployer Plan concerning an ERISA Event, if any; and (iv) such other information, documents or governmental reports or filings available relating to any Plan as Agent shall reasonably request;

(i)    such other data and information (financial and otherwise) as Agent or any Lender, from time to time, may reasonably request, bearing upon or related to the Collateral or Obligors' or any of their Subsidiaries' financial condition or results of operations, in each case in form and scope reasonably acceptable to Agent or such requesting Lender;

(j)    concurrently with delivery of the Variance Report, a certificate in the form of Exhibit F hereto executed by a Senior Officer of Parent demonstrating compliance with the financial covenants set forth in Section 9.3; and

(k)    concurrently with the delivery of the financial statements described in paragraphs (a), (b) and (c) of this Section 9.1.3, Borrowers shall cause to be prepared and furnished to Agent a Compliance Certificate in the form of Exhibit B hereto executed by a Senior Officer of Parent (a "Compliance Certificate").

9.1.4    [Intentionally omitted].

9.1.5    Existence; Conduct of Business.  (a) Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and, except where the failure to so preserve, renew or keep in full force and effect any of the following could not reasonably be expected to result in a Material Adverse Effect, the rights, qualifications, licenses, permits, franchises, governmental authorizations, governmental licenses and permits material to the conduct of its business, and maintain all requisite authority to conduct its business in each jurisdiction in which its business is conducted; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 9.2 and (b) carry on and conduct its business in substantially the same fields of enterprise as it conducts on the Closing Date (or fields reasonably related thereto).

9.1.6    Maintenance of Properties.  Keep and maintain all Property material to the conduct of its business in good working order and condition (condemnation, insured casualty and ordinary wear and tear excepted).

9.1.7    Payment of Obligations.  In accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court, pay or discharge all Taxes, before the same shall become delinquent or in default, except where (a)(i) the validity or amount thereof is being contested in good faith by appropriate proceedings and (ii) such Obligor or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (b) the failure to make payment could not reasonably be expected to result in a Material Adverse Effect; provided, however, that each Obligor will, and will cause each Subsidiary to, remit withholding taxes and other payroll taxes to appropriate Governmental Authorities as and when claimed to be due, notwithstanding the foregoing exceptions.  In accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court, pay or discharge all Indebtedness and all other payment liabilities and obligations (other than Taxes), before the same shall become delinquent or in default, except where the failure to make payment or discharge could not reasonably be expected to result in a Material Adverse Effect; provided, however, that the failure of

the Obligors to comply with this <u>Section 9.1.7</u> as it relates to Indebtedness shall not constitute an Event of Default unless <u>Section 11.1.5</u> is also applicable.

9.1.8 <u>Insurance</u>.  Maintain with financially sound and reputable carriers having a financial strength rating of at least A- by A.M. Best Company (a) insurance in such amounts (with no greater risk retention) and against such risks (including loss or damage by fire and loss in transit, theft, burglary, pilferage, larceny, embezzlement and other criminal activities; business interruption; and general liability) and such other hazards, as is customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations and (b) all insurance required pursuant to <u>Section 7.1.2</u> and the other Loan Documents.

(a)     Except as the Majority Lenders may agree, the Obligors shall cause all such property and casualty insurance policies with respect to the real Property constituting Collateral located in the United States of America to be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable endorsement, in form and substance reasonably satisfactory to the Majority Lenders, which endorsement shall provide that, from and after the Closing Date, if the insurance carrier shall have received written notice from the Agent of the occurrence of an Event of Default, the insurance carrier shall pay all proceeds otherwise payable to any party hereto under such policies directly to the Agent; cause all such policies covered by this clause (b) to provide that neither the Obligor or any of its Subsidiaries, the Agent nor any other party shall be a coinsurer thereunder and to contain a "replacement cost endorsement," without any deduction for depreciation, and such other provisions as the Agent may reasonably require from time to time to protect their interests; deliver copies of all such policies covered by this clause (b) or a certificate of an insurance broker to the Agent; cause each such policy covered by this clause (b) to provide that it shall not be cancelled or not renewed upon less than 30 days' prior written notice thereof by the insurer to the Agent; deliver to the Agent, prior to or concurrently with the cancellation or nonrenewal of any such policy of insurance covered by this clause (b), a copy of a renewal or replacement policy (or other evidence of renewal of a policy previously delivered to the Agent), or insurance certificate with respect thereto, together with evidence satisfactory to the Agent of payment of the premium therefor, in each case of the foregoing, to the extent customarily maintained, purchased or provided to, or at the request of, lenders by similarly situated companies in connection with credit facilities of this nature.

(b)     If any portion of any real Property constituting Collateral is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a special flood hazard area with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), the Obligor or its applicable Subsidiary shall (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Agent evidence of such compliance in form and substance reasonably acceptable to the Majority Lenders.

9.1.9 <u>Books and Records</u>.  Keep proper books of record and account in entries are made of all dealings and transactions in relation to its business and activities which are true, correct and complete in all material respects.

9.1.10 [<u>Intentionally omitted</u>.]

9.1.11 <u>Subsidiaries; Further Assurances</u>.  Cause each Subsidiary Guarantor, whether now or hereafter in existence, no later than 45 days after becoming a Subsidiary Guarantor (or in the case of an Excluded Subsidiary, no later than 45 days after it no longer qualifies as an

Doc#: US1:9899064v18

Excluded Subsidiary), to execute and deliver to Agent (i) a joinder agreement in substantially the form attached hereto as Exhibit H and reasonably acceptable to Agent whereby such Subsidiary Guarantor would become an additional Guarantor and Obligor hereunder (a "Joinder Agreement"), or (ii) a Guaranty Agreement and a security agreement pursuant to which such Subsidiary guaranties the payment of all Obligations and grants to Agent a first priority Lien (subject only to Permitted Liens) on its Properties of the types described in Section 6.1.

    9.1.12    Compliance with Laws.

    (a)    Except as otherwise excused by the Bankruptcy Court, comply with all of its Requirements of Law applicable to it or its property, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect;

    (b)    To, and to cause each ERISA Affiliate to, except as otherwise excused by the Bankruptcy Court (i) comply with all applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder with respect to all Plans, except where the failure to so comply could not reasonably be expected to have a Material Adverse Effect, (ii) not take any action or fail to take action the result of which would result in a liability to the PBGC (or similar Governmental Authority) or to a Multiemployer Plan in an amount that could reasonably be expected to have a Material Adverse Effect, (iii) maintain the qualification of each Plan that is intended to be qualified under Section 401 of the Code, (iv) make to each Plan all contributions required by law or under the terms of any such Plan and (iv) furnish to Agent upon Agent's request such additional information about any Plan concerning compliance with this covenant as may be reasonably requested by Agent.

    9.1.13    [Intentionally Omitted].

    9.1.14    [Intentionally omitted].

    9.1.15    After-Acquired Intellectual Property. Each Obligor shall provide to Agent written notice of the acquisition of any Intellectual Property after the Closing Date which is the subject of a registration or application (including Intellectual Property Collateral which was theretofore unregistered and becomes the subject of a registration or application) and, upon Agent's request, deliver to Agent a Copyright Security Agreement, a Patent Security Agreement or a Trademark Security Agreement, as applicable, or such other instrument in form and substance reasonably acceptable to Agent and the Majority Lenders, and undertake the filing of any instruments or statements as shall be reasonably necessary to create, record, preserve, protect or perfect Agent's lien and security interest in such material Intellectual Property. Such written notice, delivery and filing shall be made concurrently with the delivery of the next financial statements required to be delivered pursuant to Section 9.1.3(a) or (b) after the end of the calendar quarter in which the Intellectual Property was acquired or registered, as applicable. Further, each Obligor and each of its Subsidiaries authorizes Agent to modify this Agreement by amending Schedule 8.1.14 to include any applications or registrations for Intellectual Property owned by such Obligor or its Subsidiaries (but the failure to so modify such Schedule shall not be deemed to affect Agent's security interest in and lien upon such Intellectual Property).

    9.1.16    Environmental Matters.   Except as otherwise excused by the Bankruptcy Court:

    (a)    Comply, and take reasonable efforts to cause all lessees and other persons occupying any real Property owned, operated or leased by any Obligor or its Subsidiaries to comply with all Environmental Laws applicable to its operations and such real Property; and conduct all Remedial

Action required by any Governmental Authority or under any applicable Environmental Laws in accordance with, the requirements of any Governmental Authority and applicable Environmental Laws except, in each case, to the extent such non-compliance would not have a Material Adverse Effect.

(b)　　Take all reasonable efforts to prevent any Release of Hazardous Materials in, on, under, at, to or from any real Property owned, leased or operated by any of the Obligor, any Subsidiary or their predecessors in interest except in full compliance with applicable Environmental Laws and ensure that there shall be no Hazardous Materials in, on, under or from any real Property owned, leased or operated by any of the Obligors and their Subsidiaries except those that are used, stored, handled and managed in compliance with applicable Environmental Laws except, in each case, to the extent such non-compliance would not have a Material Adverse Effect.

(c)　　Undertake all actions, including Remedial Actions necessary to address any Release of Hazardous Materials on, at, under, from or onto any real Property owned, leased or operated by any of the Obligors, Subsidiaries or their predecessors in interest as required pursuant to Environmental Law or the requirements of any Governmental Authority except, in each case, to the extent such non-compliance would not have a Material Adverse Effect.

9.1.17　Post-Closing Covenant.　Within 30 days after the Closing Date (or such later period agreed to by Agent), to the extent not delivered on or prior to the Closing Date, the Borrowers shall deliver insurance endorsements naming Agent as loss payee and an additional insured and provides not less than 10 days' prior written notice to Agent in the event of cancellation of the policy for nonpayment of premium and not less than 30 days' prior written notice to Agent in the event of cancellation of the policy for any other reason whatsoever and a clause specifying that the interest of Agent shall not be impaired or invalidated by any act or neglect of any Obligor, any of its Subsidiaries or the owner of the Property or by the occupation of the premises for purposes more hazardous than are permitted by said policy, in each case in accordance with Section 7.1.2.

9.1.18　Hedging Obligations and Secured Bank Product Obligations.　Obligors will not incur any Hedging Obligations or Secured Bank Product Obligations after the Closing Date.

9.2　Negative Covenants.　Until Payment in Full, Obligors jointly and severally covenant that they shall not:

9.2.1　Mergers; Consolidations; Structural Changes.　Merge into or consolidate or amalgamate, or permit any Subsidiary of an Obligor to merge into or consolidate or amalgamate, with any other Person, or permit any other Person to merge into or consolidate or amalgamate with it or any Subsidiary of an Obligor, or liquidate or dissolve, or permit any Subsidiary of an Obligor to liquidate or dissolve, except for, if at the time thereof and immediately after giving effect thereto no Event of Default shall have occurred and be continuing:

(a)　　mergers into or consolidations or amalgamations of any Borrower with any other Borrower;

(b)　　mergers into or consolidations or amalgamations of any Subsidiary with any Borrower in a transaction in which such Borrower is the surviving corporation;

(c)　　mergers, consolidations or amalgamations of any Subsidiary or any Obligor (other than, in each case, a Borrower, Parent or Holdings) into or with any Obligor in a transaction in which the surviving entity is an Obligor; and

Doc#: US1:9899064v18

(d)     mergers, consolidations or amalgamations of any Subsidiary (other than an Obligor) into or with any other wholly-owned Subsidiary (other than an Obligor).

9.2.2  <u>Investments; Loans; Acquisitions</u>.  Make, purchase, hold or acquire, or permit any Subsidiary of an Obligor to make, purchase, hold or acquire (including pursuant to any merger or amalgamation with any Person that was not an Obligor and a wholly owned Subsidiary prior to such merger) any Investment, except:

(a)     travel advances, advances against commissions, relocation costs, loans and other similar advances to employees in the ordinary course of business of Obligors and not to exceed $500,000 in the aggregate at any time outstanding;

(b)     extensions of trade credit in the ordinary course of business;

(c)     Investments by (i) Parent in the Equity Interests of Chassix, (ii) Holdings in the Equity Interests of Parent, (iii) any Borrower or any other Obligor (other than Parent or Holdings) in the Equity Interests of any Obligor and (iii) any Foreign Subsidiary in the Equity Interests of any other wholly-owned Foreign Subsidiary; <u>provided</u> that, in each case in this <u>clause (c)</u>, any such Equity Interests held by an Obligor shall be pledged to the extent required pursuant to <u>Section 6</u> and the other Security Documents;

(d)     Indebtedness of (i) any Obligor to any other Obligor, (ii) any Foreign Subsidiary to any other Foreign Subsidiary and (iii) any Obligor (other than Parent or Holdings) to any wholly-owned Subsidiary that is not an Obligor;

(e)     acquisitions of assets consisting of fixed assets or real Property that constitute Capital Expenditures in the ordinary course of business of the Obligors;

(f)     Permitted Investments, subject (as provided in <u>Section 6</u>) to a Control Account, or otherwise subject to a perfected security interest of the Obligors in favor of Agent (for the benefit of the Secured Parties, securing the Secured Obligations);

(g)     Investments in existence on the Closing Date and described in <u>Schedule 9.2.2(g)</u>;

(h)     (i) Guarantees of obligations of Obligors not constituting Indebtedness, and (ii) Guarantees of Indebtedness of Obligors permitted by <u>Section 9.2.3</u>;

(i)     Investments in Equity Interests, notes payable or other securities issued by Account Debtors to an Obligor or any Subsidiary pursuant to negotiated agreements with respect to settlement of such Account Debtor's Accounts in the ordinary course of business;

(j)     [intentionally omitted];

(k)     [intentionally omitted];

(l)     Investments received in connection with the dispositions of assets permitted by <u>Section 9.2.9</u>;

(m)     Investments in Foreign Subsidiaries set forth in the Budget in an aggregate amount not to exceed $10,000,000 at any time outstanding;

60

(n)       Investments by Foreign Subsidiaries;

(o)       Investments constituting deposits described in paragraphs (d) and (e) of the definition of the term "Permitted Encumbrances";

(p)       [intentionally omitted];

(q)       any Obligor and its Subsidiaries may acquire and hold accounts receivable owing to any of them, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms of such Obligor or such Subsidiary;

(r)       any Obligor and its Subsidiaries may acquire and hold Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers, and Investments received in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(s)       advances of payroll payments to employees of any Obligor in the ordinary course of business;

(t)       [intentionally omitted];

(u)       [intentionally omitted];

(v)       Investments in deposit accounts or securities accounts opened in the ordinary course of business; provided that the consent of Agent shall be obtained prior to opening any such account after the Closing Date;

(w)       Investments in the ordinary course of business consisting of UCC Article 3 endorsements for collection or deposit;

(x)       [intentionally omitted];

(y)       other Investments not otherwise permitted by this Section 9.2.2 in an aggregate amount not to exceed $1,000,000 at any time outstanding; and

(z)       to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials and equipment or purchases of contract rights or licenses or leases of intellectual property, in each case, in the ordinary course of business.

Notwithstanding the foregoing, no Investments shall be permitted after the Closing Date except in accordance with the 13-Week Projection then in effect as approved by the Majority Lenders.

9.2.3  Indebtedness.   Create, incur, assume, or suffer to exist, or permit any Subsidiary of any Obligor to create, incur or suffer to exist, any Indebtedness, except:

(a)       the Obligations;

(b)       Indebtedness existing on the Closing Date and listed on Schedule 9.2.3;

(c)       [intentionally omitted];

61

(d)    secured and unsecured Indebtedness of Foreign Subsidiaries in an aggregate amount not to exceed, in addition to Indebtedness of Foreign Subsidiaries listed on <u>Schedule 9.2.3</u>, $1,000,000 at any time outstanding;

(e)    Indebtedness owing to an Obligor;

(f)    Indebtedness under the Prepetition Senior Secured Notes, Holdings PIK Notes and the DIP ABL Loan Agreement;

(g)    [intentionally omitted];

(h)    [intentionally omitted];

(i)    [intentionally omitted];

(j)    other Indebtedness in an aggregate amount not to exceed $1,000,000 at any time outstanding;

(k)    Indebtedness which represents an extension, refinancing, replacement or renewal of any of the Indebtedness described in <u>paragraphs (b)</u> and <u>(c)</u> hereof; <u>provided</u> that (i) the principal amount of such Indebtedness is not increased (except to the extent used to finance accrued interest and premiums (including tender or make-whole premiums) thereon and underwriting discounts, defeasance costs, fees, commissions and expenses, including any original issue discount), (ii) any Liens securing such Indebtedness are not extended to any additional property of any Obligor (unless such Lien and the Indebtedness secured thereby is otherwise permitted hereunder), (iii) such extension, refinancing, replacement or renewal does not result in a shortening of the average weighted maturity of the Indebtedness so extended, refinanced, replaced or renewed and (iv) if the Indebtedness that is refinanced, replaced, renewed or extended was subordinated in right of payment to the Obligations, then the terms and conditions of the refinancing, replacement, renewal, or extension Indebtedness must include subordination terms and conditions that are at least as favorable to Agent and the Lenders as those that were applicable to the refinanced, replaced, renewed, or extended Indebtedness; and

(l)    Indebtedness secured by Liens described in <u>Section 9.2.5(j)</u>.

9.2.4    <u>Affiliate Transactions</u>.  Enter into, or be a party to, or permit any Subsidiary of any Obligor to enter into or be a party to, any transaction with any Affiliate of any Obligor or any holder of any Equity Interests of any Obligor or any Subsidiary of any Obligor (an "<u>Affiliate Transaction</u>"), including the payment of any management, consulting or similar fees, other than Permitted Affiliate Transactions; <u>provided</u>, however, that no management fees shall be permitted to be paid to Sponsor during the term of this Agreement..

9.2.5    <u>Limitation on Liens</u>.  Create or suffer to exist, or permit any Subsidiary of any Obligor to create or suffer to exist, any Lien upon any of its Property, income or profits, whether now owned or hereafter acquired, except:

(a)    Liens at any time granted in favor of Agent to secure the Secured Obligations;

(b)    Permitted Encumbrances;

(c)    [intentionally omitted];

Doc#: US1:9899064v18

(d)        such other Liens existing on the Closing Date and listed on Schedule 9.2.5;

(e)        sales contracts, leases, statutory obligations, work-in-progress advances and other similar obligations in the ordinary course of business not incurred in connection with Indebtedness;

(f)        [intentionally omitted];

(g)        purported Liens evidenced by the filing of precautionary UCC financing statements relating solely to operating leases of personal property entered into in the ordinary course of business;

(h)        outbound licenses in existence on the Closing Date (including the material licenses in effect as of the date hereof as set forth in Schedule 8.1.14);

(i)        [intentionally omitted];

(j)        Liens on the amounts of any unpaid insurance premiums payable to any Person under an insurance policy securing Indebtedness of such Person incurred to finance the premium for such insurance policy;

(k)        Liens (i) of a collecting bank arising in the ordinary course of business under Section 4-210 of the UCC in effect in the relevant jurisdiction covering only the items being collected upon or (ii) in favor of a banking institution arising as a matter of law, encumbering amounts credited to deposit or securities accounts (including the right of set-off) and which are within the general parameters customary in the banking industry;

(l)        Liens granted to (i) the Prepetition Senior Secured Notes Trustee to secure the Prepetition Senior Secured Notes and (ii) the DIP ABL Agent to secure the DIP ABL Facility;

(m)        Liens granted by a Subsidiary that is not an Obligor in favor of any Borrower or another Obligor in respect of Indebtedness owed by such Subsidiary;

(n)        Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of setoff or similar rights and remedies, in each case as to deposit accounts or other funds maintained with a creditor depositary institution;

(o)        other Liens on assets not constituting DIP Term Loan Priority Collateral or the DIP ABL Priority Collateral securing Indebtedness and other obligations permitted hereunder in an aggregate amount not to exceed $1,000,000 at any time outstanding;

(p)        Liens on assets of Foreign Subsidiaries securing Indebtedness permitted under Section 9.2.3(d);

(q)        Liens on specific items of inventory or other goods (and proceeds thereof) of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such Person to facilitate the shipment or importation of such inventory or other goods;

(r)        Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(s)    Liens granted to BMO Harris Bank on the BMO Cash Collateral Account in respect of cash collateral for the Prepetition Letters of Credit;

(t)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into by any Obligor or its Subsidiaries in the ordinary course of business;

(u)    Liens resulting from arrangements in existence on the Closing Date among the stockholders of Foreign Subsidiaries which restrict the transfer of Equity Interests of such Foreign Subsidiaries by such stockholders; and

(v)    receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien on the related inventory and proceeds thereof.

9.2.6    Prepayments of Certain Debt.

Prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Indebtedness or in any way prepay in any manner (referred to herein as a "Prepayment"), or make any payment in violation of any subordination provision with respect to any Subordinated Debt except:

(a)    prepayments of any Indebtedness in connection with any refinancing, replacement or substitution of such Indebtedness, in whole or in part, permitted hereunder;

(b)    prepayments of intercompany Indebtedness owed by an Obligor to another Obligor or by a non-Obligor to an Obligor or any other non-Obligor;

(c)    subject to approval of the Bankruptcy Court, prepayment in full of the Prepetition ABL Credit Agreement; and

(d)    prepayments approved in the First Day Orders or other orders of the Bankruptcy Court subject to pleadings in form and substance reasonably satisfactory to Agent and the Majority Lenders.

9.2.7    Distributions.    Declare or make, or permit any Subsidiary of any Obligor to declare or make, any Distributions, except for:

(a)    Distributions by any Subsidiary of an Obligor to such Obligor; and

(b)    Distributions paid solely in Equity Interests of a Borrower or any of its Subsidiaries by any Subsidiary that is a wholly-owned Subsidiary of a Borrower.

9.2.8    Certain Motions.    File a motion or plan with the Bankruptcy Court, or otherwise seek or consent to an action requesting substantive consolidation of any of the Obligors' Bankruptcy estates without the prior written consent of the Majority Lenders.

9.2.9    Disposition of Assets.    Sell, transfer, lease, license or otherwise dispose of any of, or permit any Subsidiary of any Obligor to sell, transfer, lease, license or otherwise dispose of any of, its Properties, including any disposition of Property as part of a sale-and-leaseback transaction, to or in favor of any Person, except for:

64

(a)    sales of Inventory in the ordinary course of business;

(b)    transfers of Property (i) to a Borrower, (iii) to an Obligor by any other Obligor that is not a Borrower (iv) to an Obligor by any Subsidiary that is not an Obligor, and (v) between Subsidiaries that are not Obligors;

(c)    dispositions of Equipment or other fixed assets that are substantially worn, obsolete, or surplus or no longer used or useful in the ordinary course of business;

(d)    [Intentionally omitted].

(e)    each Obligor and its Subsidiaries may grant licenses, sublicenses, leases or subleases to other Persons in the ordinary course of business not materially interfering with the conduct of the business of the Obligors or their Subsidiaries, including of Intellectual Property;

(f)    Intellectual Property abandoned, left to lapse, expire or not renewed if it is not used (by either the Obligor, the Subsidiaries or their respective licensees) in any material respect and the value of maintaining such Intellectual Property does not reasonably justify the cost of doing so;

(g)    dispositions of investments described in paragraphs (a), (b), (c) and (e) of the definition of the term "Permitted Investment";

(h)    each Obligor and its Subsidiaries may sell or discount, in each case in the ordinary course of business, accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not as part of any financing transaction;

(i)    each Obligor and its Subsidiaries may make sales or leases of goods held for sale;

(j)    the Obligors and their Subsidiaries may consummate the Transactions;

(k)    [intentionally omitted];

(l)    each Obligor and its Subsidiaries may make transfers of property subject to casualty or condemnation proceedings upon the occurrence of the related insurance or condemnation event;

(m)    [intentionally omitted];

(n)    sales and other dispositions of assets of Foreign Subsidiaries with a fair market value that, together with the fair market value of all other assets previously sold or disposed pursuant to this clause (n) after the Closing Date, is not in excess at the time of such sale or other disposition and would not be in excess after giving effect to such sale or other disposition of $1,000,000;

(o)    each Obligor and its Subsidiaries may use cash and cash equivalents to make payments that are otherwise permitted under Sections 9.2.4 and 9.2.7;

(p)    dispositions of Investments (including Equity Interests) in Joint Ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the Joint Venture parties set forth in Joint Venture arrangements and similar binding arrangements; and

(q)    any additional sale or other disposition of assets not otherwise permitted hereunder with a fair market value that, together with the fair market value of all other assets previously

Doc#: US1:9899064v18

sold or disposed pursuant to this clause (q) after the Closing Date, is not in excess at the time of such sale or other disposition and would not be in excess after giving effect to such sale or other disposition of $1,000,000; provided that such sale or other disposition could not reasonably be expected to cause a cessation of production for which inventory has been acquired.

9.2.10   [Intentionally Omitted].

9.2.11   Tax Consolidation.   File or consent to, or permit any Subsidiary of any Obligor to file or consent to, the filing of any consolidated income tax return with any Person other than a Parent Company, Holdings, Parent, another Borrower and Parent's Subsidiaries.

9.2.12   Organizational Documents.   Agree to, or suffer to occur, any amendment, supplement or addition to its or any of their Subsidiaries' charter, articles or certificate of incorporation, certificate of formation, limited partnership agreement, bylaws, limited liability agreement, operating agreement or other organizational documents (as the case may be) that would be materially adverse to the Lenders in any respect.

9.2.13   Fiscal Year End.   Change, or permit any Subsidiary of any Obligor to change, its fiscal year end.

9.2.14   Negative Pledges.   Enter into any agreement, or permit any Subsidiary of any Obligor to enter into any agreement, (a) limiting the ability of Obligor or any of its Subsidiaries to voluntarily create Liens upon any of its Property, or (b) limiting the ability of any Subsidiary to pay dividends or other distributions with respect to any shares of its Equity Interests or to make or repay loans or advances to any Borrower or any other Subsidiary or to Guarantee Indebtedness of any Borrower or any other Subsidiary; provided that (i) the foregoing shall not apply to restrictions and conditions imposed by law or by any Loan Document or the Indebtedness permitted by Section 9.2.3(f), and (ii) clause (a) of the foregoing shall not apply to customary provisions in leases entered into in the ordinary course of business restricting the assignment thereof.

9.2.15   Permitted Activities of Parent and Holdings.   Parent and Holdings shall not (a) incur, directly or indirectly, any Indebtedness other than the Indebtedness under the Loan Documents, the DIP ABL Loan Agreement, the Prepetition Senior Secured Notes Documents and the Holdings PIK Notes; (b) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than Permitted Encumbrances and the Liens created under the Loan Documents, the Prepetition Senior Secured Notes Documents, the DIP ABL  Documents and the Holdings PIK Notes; (c) engage in any business or activity or own any assets other than (i) in the case of Parent, holding 100% of the Equity Interests of Chassix and in the case of Holdings, holding 100% of the Equity Interests of Parent, (ii) performing its obligations and activities incidental thereto under the Loan Documents, the DIP ABL Loan Documents, the Prepetition Senior Secured Notes Documents and the Holdings PIK Notes; (iii) making Distributions to the extent permitted by Section 9.2.7; (iv) making Investments in Parent and Chassix to the extent permitted by Section 9.2.2(c); (v) engaging in activities or transactions permitted by Sections 9.2.4 and 9.2.11; and (vi) issuances of its Equity Interests; (d) consolidate with or merge with or into, or convey, sell, transfer or lease any of its assets to, any Person; (e) sell or otherwise dispose of any Equity Interests of Parent or Chassix except to the extent permitted under the Loan Documents; or (f) fail to hold itself out to the public as a legal entity separate and distinct from all other Persons.

9.2.16   Use of Proceeds.   Use the proceeds of the Term Loans in any way that is not in accordance with Section 8.1.29.

Doc#: US1:9899064v18

9.2.17   Protection and Maintenance of Intellectual Property.

(a)       abandon, dedicate to the public, or permit to lapse, any Intellectual Property owned by such Obligor or its Subsidiaries, except as permitted by Section 9.2.9(g);

(b)       except as shall be consistent with its commercially reasonable business judgment: (i) fail to take commercially reasonable action to prosecute infringements, dilutions and other violations of the Intellectual Property owned by such Obligor or its Subsidiaries including commencement of an unstayed suit, and (ii) not settle or compromise any pending or future litigation or administrative proceeding with respect to such Intellectual Property;

(c)       license any Intellectual Property owned by such Obligor or its Subsidiaries, other than licenses which are Permitted Liens, or consent to amend any such Intellectual Property license in a manner that materially and adversely affects the right of such Obligor to receive payments thereunder, or in any manner that would materially impair the Lien on such Intellectual Property owned by such Obligor created pursuant to the Security Documents;

(d)       use proper marking practices in connection with its use of patents and registered trademarks if failure to do so would have an Material Adverse Effect; and

(e)       control the quality of goods and services offered by any licensees of its Trademarks in a manner adequate to preserve the validity of such Trademarks (other than Trademarks which the Obligor or Subsidiary would be permitted to abandon under Section 9.2.9(g)).

9.3     Financial Covenants.  Commencing with the Test Period ending March 27, 2015 and for each Test Period ending thereafter, the Obligors will not permit the actual results for cumulative net cash flow (calculated as "Cash Receipts" less "Total Disbursements") for such Test Period to have a variance in excess of the greater of (a) $10,000,000 and (b) 25% of such cumulative net cash flow, from the cumulative net cash flow forecasted for such Test Period in the Budget.

## SECTION 10. CONDITIONS PRECEDENT

10.1   Conditions Precedent to the Occurrence of the Closing Date and to the Making of the Initial Term Loans.  The occurrence of the Closing Date, and the obligation of each Lender to make Initial Term Loans on the Closing Date is subject to the fulfillment (or waiver in accordance with Section 13.1), to the satisfaction of the Agent and each Lender, of each of the following conditions precedent:

(a)       Loan Agreement and Loan Documents.  Agent shall have received copies of counterparts of each of the following, together with all exhibits and schedules thereto, as applicable, in each case, duly authorized, executed and delivered by each of the parties thereto, and each shall be in full force and effect: (i) this Agreement executed by each of the parties hereto , (ii) appropriate notes executed by the Borrowers for the account of each Lender which has requested a note at least one (1) Business Day prior to the closing date, and (iii) such other forms, certificates, documents, instruments and agreements as Agent or Lenders shall reasonably request in connection with the transactions contemplated by this Agreement and the other Loan Documents.

(b)       Opinions of Counsel.  Agent shall have received the following in form, scope and substance satisfactory to Agent and Lenders in their sole discretion, a legal opinion of Weil, Gotshal & Manges LLP, counsel to the Obligors, addressed to Agent and each of the Lenders and dated as of the Closing Date.

Doc#: US1:9899064v18

(c)      Financial Statements.  Agent and the Lenders shall have received the Audited Financial Statements and the Unaudited Financial Statements.

(d)      Closing Certificates; Certified Certificate of Incorporation; Good Standing Certificates.  Agent shall have received (i) a certificate of each Obligor, dated the Closing Date and executed by its Secretary or Assistant Secretary, which shall (A) certify the resolutions of its Board of Directors, members or other body authorizing the execution, delivery and performance of the Loan Documents to which it is a party and authorizing the Transactions, (B) identify by name and title and bear the signatures of the financial officers and any other officers of each Obligor, as applicable, who are authorized to sign and will sign any Loan Documents to which it is a party and any other documents in connection with the Loan Documents, and (C) contain appropriate attachments, including the certificate or articles of incorporation or organization of each Obligor, as applicable, certified as of a recent date by the relevant authority of its jurisdiction of organization, and a true, complete and correct copy of its by-laws or operating, management or partnership agreement of such Obligor, as applicable, and (ii) a long form good standing certificate as  of a recent date for each Obligor from its jurisdiction of organization.

(e)      Closing Certificate.  Agent shall have received a certificate, signed by a Senior Officer of Parent, on the Closing Date (i) stating that no Default or Event of Default has occurred and is continuing, (ii) stating that the representations and warranties set forth herein and in any other Loan Document are true and correct as of the Closing Date; provided that, to the extent such representations and warranties specifically refer to an earlier date, they shall be true and correct as of such earlier date, (iii) certifying true and correct executed copies of the DIP ABL Loan Documents, the Accommodation Agreement, the Customer Agreements and the Access Agreement and (iv) stating that all conditions precedent to the making of the Initial Term Loans have been satisfied (or waived in accordance with this Agreement).

(f)      Fees.  The Lenders and Agent shall have received all fees required to be paid under the Fee Letters, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel to Agent and Lenders) to the Borrower Representative at least one (1) Business Day prior to the Closing Date.  All such amounts will be paid with proceeds of the Initial Term Loans made on the Closing Date and will be reflected in the funding instructions given by the Borrower Representative to Agent on or before the Interim Order Entry Date.

(g)      No Injunction, etc.  There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality (other than the Cases) that could reasonably be expected to have a Material Adverse Effect.

(h)      Budget; 13-Week Projection; Operating Budget.  Agent shall have received (i) the Budget, (ii) the initial 13-Week Projection and (ii) a monthly operating budget covering the tenor of the DIP Term Loan Facility, in each case, in form and substance reasonably satisfactory to Agent and the Majority Lenders.

(i)      Bank Regulatory Information.  Agent and the Lenders shall have received, at least two (2) Business Days prior to the Closing Date, all documentation and other information about the Obligors as has been reasonably requested in writing by them at least five (5) Business Days prior to the Closing Date and that Agent or any Lender determines is required by regulatory authorities for it to comply with applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act.

Doc#: US1:9899064v18

(j)      No Material Adverse Effect.  Since December 31, 2014, no event, change, condition or development has occurred that has had or could reasonably be expected to have a Material Adverse Effect.

(k)      Prepetition ABL Credit Agreement.  On the Closing Date, after giving effect to the Transactions, the Obligors and their respective Subsidiaries shall have (i) repaid in full the Prepetition ABL Credit Agreement (it being understood and agreed that the Prepetition Letters of Credit shall be cash collateralized on terms satisfactory to the Lenders), (ii) terminated any commitments to lend or make other extensions of credit thereunder, (iii) delivered to Agent all documents or instruments necessary to release all Liens securing the Prepetition ABL Credit Agreement and (iv) no Indebtedness other than Indebtedness permitted pursuant to Section 9.2.3.

(l)      DIP ABL Facility.  The DIP ABL Loan Agreement, in form and substance satisfactory to the Lenders, shall, subject to the entry of the Interim Order, become effective substantially concurrently with DIP Term Loan Facility; provided, that at least $125,000,000 of the DIP ABL Facility shall be funded substantially concurrently with the DIP Term Loan Facility.

(m)     Interim Order Entry Date.  The Interim Order Entry Date shall have occurred prior to the Closing Date and not later than five (5) Business Days following the Petition Date, and the Interim Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to Agent (with respect to its rights, privileges and immunities thereunder) and Majority Lenders in their sole discretion and shall not be subject to a stay, and the Agent shall have received a signed copy of the Interim Order entered by the Bankruptcy Court.

(n)      Petition Date and First Day Orders.  The Petition Date shall have occurred and each Borrower shall be a debtor and debtor-in-possession in the Cases.  The First Day Orders sought by the Borrowers (including a cash management order) shall be satisfactory in form and substance to the Majority Lenders in their sole discretion.

(o)      Liens.  All of the Liens described in Section 6.4 shall have been created and perfected upon entry of the Interim Order without the necessity of the execution, recordation of filings by the Debtors of, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by Agent of, or over, any Collateral, as set forth in the Interim Order.  The Interim Order shall have been effective to create the relative priorities of the Liens described in Section 6.4 with respect to the Collateral.  The automatic stay under the Bankruptcy Code shall have been automatically vacated, subject to the terms of the Interim Order, to permit enforcement of the Secured Parties' rights and remedies under this Agreement and the other Loan Documents.

(p)      No Trustee.  No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner with enlarged powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed in any of the Cases.

(q)      Accommodation Agreement, Customer Agreements and Access Agreement.  The parties thereto shall have executed the Accommodation Agreement, Customer Agreements and the Access Agreement, in each case, in form and substance satisfactory to the Majority Lenders and each of such agreements shall be in full force and effect.

(r)      Restructuring Advisors.  The Borrowers shall have continued to retain restructuring advisors reasonably acceptable to Agent and Majority Lenders (it being understood and agreed that Lazard Frères & Co. LLC and FTI Consulting, Inc. are reasonably acceptable to Agent and Majority Lenders).

(s)    <u>Restructuring Support Agreement</u>.    The Borrowers shall have entered into the Restructuring Support Agreement with holders of at least (i) 60% in principal claim amount of the Prepetition Senior Secured Notes and (ii) 66 2/3% in principal claim amount of the Holdings PIK Notes in respect of an Acceptable Reorganization Plan in form and substance acceptable to the Majority Lenders in their sole discretion, the Obligors shall not have breached any provision or defaulted under the Restructuring Support Agreement and the Restructuring Support Agreement shall not have been terminated by any party thereto or amended, supplemented or otherwise modified in a manner that is materially adverse to the Lenders.

(t)    <u>Governmental and Third Party Consent</u>.    All necessary governmental and third party consents and approvals necessary in connection with the DIP Term Loan Facility and the transactions contemplated hereby shall have been obtained.

(u)    <u>Compliance with Law</u>.  The making of the Term Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(v)    <u>Security Interest</u>.    The Agent, for the benefit of the Lenders, shall have a valid and perfected security interest in the Collateral.

10.2    <u>Conditions Precedent to All Term Loans</u>.  No Lender shall be required to make any Term Loan unless and until the following conditions are satisfied:

(a)    <u>No Default or Event of Default</u>.    At the time of and immediately after giving effect to such Term Loan, no Default or Event of Default shall have occurred and be continuing.

(b)    <u>Representations and Warranties</u>.    The representations and warranties of the Obligors set forth in the Loan Documents shall be true and correct in all material respects with the same effect as though made on and as of the date of such Borrowing (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date, and that any representation or warranty which is subject to any materiality qualifier shall be required to be true and correct in all respects).

(c)    [Intentionally omitted].

(d)    <u>Orders</u>.

(i)    During the Interim Period, the Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Majority Lenders or

(ii)    On and after the Final Order Entry Date and prior to the Consummation Date, the Final Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Majority Lenders.

(e)    <u>No Injunction</u>.  The making of the Term Loans shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

Each Loan shall be deemed to constitute a representation and warranty by Borrowers on the date thereof as to the matters specified in this <u>Section 10.2</u>.

10.3    <u>Conditions Precedent to Delayed Draw Term Loans</u>.  The occurrence of the Final Term Funding Date and the obligations of each Lender to make its Delayed Draw Term Loans provided for in this Agreement is subject to satisfaction (or waiver in accordance with <u>Section 13.1</u>), to the satisfaction of the Agent and each Lender, of each of the following conditions precedent:

(a)    <u>Loan Request</u>.  Agent shall have received a loan request in form satisfactory to Agent in accordance with Section 4.1.1 executed and delivered by the Borrower Representative to Agent regarding the Delayed Draw Term Loans to be made on the Final Term Funding Date.

(b)    <u>Final Order</u>.  The Final Order Entry Date shall have occurred concurrently with or prior to the Final Term Funding Date, and the Final Order shall be in full force and effect, shall not have been vacated or reversed, shall not have been modified or amended other than as acceptable to Majority Lenders in their sole discretion and shall not be subject to a stay, and the Agent shall have received a signed copy of the Final Order entered by the Bankruptcy Court.

(c)    <u>Fees</u>.  The Lenders and Agent shall have received all fees required to be paid under the Fee Letters, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel to Agent and Lenders) to the Borrower Representative at least one (1) Business Day prior to the Final Term Funding Date.  All such amounts will be paid with proceeds of Delayed Draw Term Loans made on the Final Term Funding Date and will be reflected in the funding instructions given by the Borrower Representative to Agent on or before the Final Order Entry Date.

(d)    <u>No Material Adverse Effect</u>.  Since the Petition Date, no event, change, condition or development has occurred that has had or could reasonably be expected to have a Material Adverse Effect.

## SECTION 11. EVENTS OF DEFAULT; RIGHTS AND REMEDIES ON DEFAULT

11.1    <u>Events of Default</u>.  The occurrence of one or more of the following events shall constitute an "<u>Event of Default</u>":

11.1.1    <u>Payment of Obligations</u>.  Borrowers shall fail to pay any of the Obligations on the due date thereof (whether due at stated maturity, on demand, upon acceleration or otherwise).

11.1.2    <u>Misrepresentations</u>.  Any representation, warranty or other statement made, deemed made, or furnished to Agent or any Lender by or on behalf of any Obligor or any of their respective Subsidiaries in connection with any Loan Document (including any amendment or modification thereof, or any waiver thereunder) or any document, instrument, certificate or financial statement furnished pursuant to or in connection with or in reference thereto or any transaction contemplated hereby or thereby, in each case proves to have been false or misleading in any material respect when made, deemed made, furnished or reaffirmed pursuant to <u>Section 8.1</u> hereof.

11.1.3    <u>Breach of Specific Covenants</u>.  Any Obligor shall fail or neglect to perform, keep or observe any covenant, condition or agreement contained in <u>Sections 3.11</u> (Defaulting Lender), <u>6.2</u> (Other Collateral), <u>6.3</u> (Lien Perfection; Further Assurances), <u>6.4</u> (Priority and Liens), <u>6.5</u> (Change of Name or Location), <u>7.1.1</u> (Location of Collateral), <u>7.1.2</u> (Insurance of Collateral), <u>9.1.1</u> (Visits and Inspections; Lender Meeting), <u>9.1.2</u> (Notices), <u>9.1.3</u> (Financial Statements), <u>9.1.5</u> (Existence; Conduct of Business), <u>9.1.8</u> (Insurance), <u>9.2</u> (Negative Covenants)

and 9.3 (Financial Covenants) hereof on the date that such Obligor is required to perform, keep or observe such covenant.

11.1.4  Breach of Other Covenants.  Any Obligor shall fail or neglect to perform, keep or observe any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than a covenant, condition or agreement which is dealt with specifically elsewhere in Section 11.1 hereof) and the breach or failure is not cured within 15 days after the earlier to occur of any Obligor's receipt of notice of such breach or failure from Agent (which notice shall be given at the request of any Lender) or the date on which such failure or neglect first becomes known to any Senior Officer of any Obligor.

11.1.5  DIP ABL Facility.  (a) Any Obligor or any of their respective Subsidiaries shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Indebtedness under the DIP ABL Facility, (b) there shall occur any breach of Section 9.3 of the DIP ABL Facility as in effect on the date hereof, (c) there shall occur any Event of Default (as defined in the DIP ABL Loan Agreement) under the DIP ABL Loan Documents or (d) notwithstanding the Intercreditor Arrangements, the DIP ABL Facility shall be amended or refinanced in any manner adverse to the Majority Lenders without the prior written consent of the Majority Lenders.

11.1.6  Other Defaults.  (a) Any Obligor or any of their respective Subsidiaries shall fail to make any payment (whether of principal or interest and regardless of amount) in respect of any Indebtedness under any ]Indebtedness (other than the Obligations, the DIP ABL Facility and the Prepetition Senior Secured Notes) with an outstanding principal balance in excess of $5,000,000, when and as the same shall become due and payable and such failure continues beyond all grace periods applicable thereto, or (b) there shall occur any default or event of default on the part of any Obligor or any of their respective Subsidiaries under any agreement, document or instrument to which such Obligor or such Subsidiary is a party or by which such Obligor or such Subsidiary or any of its Property is bound, evidencing or relating to any Indebtedness (other than the Obligations and the DIP ABL Facility) with an outstanding principal balance in excess of $5,000,000, which default or event of default continues beyond all grace and notice periods applicable thereto and, as a result thereof, the payment or maturity of such Indebtedness is or is permitted to be accelerated in consequence of such default or event of default or demand for payment of such Indebtedness is made or is permitted to be made in accordance with the terms thereof, or any event or condition shall occur which results in any such Indebtedness becoming due prior to its scheduled maturity or that enables or permits the holders thereof (or a trustee, agent or other representative on their behalf) to require the repayment, repurchase or redemption thereof; provided that this Section 11.1.5 shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Indebtedness if such sale or transfer is permitted hereunder and under the documents providing for such Indebtedness, or (c) there occurs under any Hedging Agreement an Early Termination Date (as defined in such Hedging Agreement) resulting from (i) any event of default under such Hedging Agreement as to which an Obligor or any Subsidiary thereof is the Defaulting Party (as defined in such Hedging Agreement) or (ii) any Termination Event (as so defined) under such Hedging Agreement as to which an Obligor or any Subsidiary thereof is an Affected Party (as so defined) and, in either event, (x) the Hedge Termination Value owed by such Obligor or such Subsidiary as a result thereof is in excess of $5,000,000 and (y) the counterparty under the applicable Hedging Agreement could or is permitted to demand payment of such Hedge Termination Value.

11.1.7  Invalidity of Loan Documents.  Any Loan Document or any provision thereof for any reason ceases to be valid, binding and enforceable against the applicable Obligor in

Doc#: US1:9899064v18

accordance with its terms (or any Obligor shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any of the Loan Documents has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms).

11.1.8  Security Documents.  (i) Any lien securing the Obligations shall cease to be (or shall be asserted by the Obligors not to be) valid, perfected (if applicable) and enforceable in all respects or to have the priority granted under the Interim Order and the Final Order or (ii) any Superpriority Claim in respect of the Obligations shall cease to be (or shall be asserted by the Obligors not to be) valid, perfected (if applicable) and enforceable in all respects or to have the priority granted under the Interim Order and the Final Order.

11.1.9  [Intentionally omitted].

11.1.10  [Intentionally omitted].

11.1.11  ERISA.  One or more ERISA Events occurs with respect to any Plan or any event similar to the foregoing occurs or exists with respect to one or more Foreign Plans.

11.1.12  Judgments.  One or more money judgments (including any writ of attachment or similar processes) with respect to any post-petition liability (collectively, "Judgments") are issued or rendered against any Obligor, any of their respective Subsidiaries, or any of their respective Property (i) in the case of money judgments that arose post-petition, in an aggregate amount of $5,000,000 or more for all such Judgments in the aggregate, in each case not paid or covered by insurance from a reputable insurer who has not disclaimed coverage or by an indemnity from an investment-grade (i.e., rated Baa3 or better by Moody's and BBB- or better by S&P) indemnitor which Judgment is not stayed, bonded over, released or discharged within 60 days, and (ii) in the case of non-monetary Judgments, such Judgment or Judgments (in the aggregate) could reasonably be expected to have a Material Adverse Effect, in each case which Judgment is not stayed, bonded over, released or discharged within 60 days.

11.1.13  Accommodation Agreement and Customer Agreements.  (v) Any default under, amendment or modification to, or termination of the Accommodation Agreement that results in an amendment or modification to, or a termination of the set-off waiver provisions (as set forth in the Accommodation Agreement) without the consent of the Majority Lenders, (w) the term of the Accommodation Agreement expires (x) any Permitted Resourcing (as defined in the Accommodation Agreement) without the prior written consent of the Majority Lenders, or (y) any Designated OEM Party repudiates its obligations under the Access Agreement or Accommodation Agreement with respect to the inventory purchase backstop or the set-off waiver provisions (each as set forth in the Access Agreement and Accommodation Agreement, respectively) or (z) there shall occur any material default under the Customer Agreements or amendment or modification to the Customer Agreements in any manner that is adverse to the Agent and Lenders.

11.1.14  Access Agreement.  There shall occur any default under the Access Agreement or any amendment or modification to the Access Agreement in any manner that is adverse to the Agent and Lenders.

11.1.15  Restructuring Support Agreement.  There shall occur any breach or default by any Obligor with respect to any terms of the Restructuring Support Agreement.

11.1.16  Dismissal or Conversion of Cases.

73

(a)    Any of the Cases of the Debtors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code;

(b)    A trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases of the Debtors;

(c)    An order of the Bankruptcy Court shall be entered denying or terminating use of cash collateral by the Obligors;

(d)    Any Debtor, or any person on behalf of any Debtor, shall file a motion or other pleading seeking, or otherwise consenting to, any of the matters set forth in clauses (a) through (c) above or the granting of any other relief that if granted would give rise to an Event of Default; or

(e)    Any Obligor or any of its Subsidiaries, or any person claiming by or through any Obligor any of its Subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the Agent or any of the Lenders relating to the DIP Term Loan Facility.

11.1.17  Superpriority Claims.  The existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing any claims or charges, other than in respect of the DIP Term Loan Facility and the Carve-Out or as otherwise permitted under the applicable Loan Documents, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Agent and the Lenders under the DIP Term Loan Facility, or there shall arise or be granted by the Bankruptcy Court (i) any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out) or (ii) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests granted herein, except, in each case, as expressly provided in the Loan Documents or in the Order then in effect (but only in the event specifically consented to by the Agent), whichever is in effect.

11.1.18  Relief from Stay.  The Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Debtors which have a value in excess of $10,000,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole).

11.1.19  Certain Orders.  (i) The Final Order Entry Date shall not have occurred by the date that is 30 days (or such later date as agreed to by the Majority Lenders) following the Interim Order Entry Date;

(ii)    an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim Order or the Final Order, or Holdings or any Subsidiary of Holding shall apply for authority to do so, without the prior written consent of the Majority Lenders;

(iii)    [Intentionally omitted];

74

(iv)    the Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Agent and the Majority Lenders;

(v)    any of the Obligors shall fail to comply with the Interim Order (prior to Final Order Entry Date) or Final Order (on and after the Final Order Entry Date);

(vi)    an order in the Cases shall be entered charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders or the commencement of other actions that is materially adverse to Agent, the Lenders or their respective rights and remedies under the DIP Term Loan Facility in any of the Cases or inconsistent with any of the Loan Documents; or

(vii)    if the Final Order does not include a waiver, in form and substance satisfactory to the Majority Lenders, of the right to surcharge the Collateral under Section 506(c) of the Bankruptcy Code.

11.1.20  Invalid Plan.    A Reorganization Plan that is not an Acceptable Reorganization Plan shall be confirmed in any of the Cases of the Debtors, or any order shall be entered which dismisses any of the Cases of the Debtors and which order does not provide for payment in full in cash of the Obligations under the Loan Documents (other than contingent indemnification obligations not yet due and payable), or any of the Obligors and their Subsidiaries shall seek, support or fail to contest in good faith the filing or confirmation of any such plan or entry of any such order.

11.1.21  Milestones.    Failure to satisfy any of the following milestones (unless waived or extended with the consent of the Majority Lenders):

(a)    by no later than five (5) days following the Petition Date, Chassix shall file with the Bankruptcy Court in the Cases a proposed Acceptable Reorganization Plan and a motion seeking approval of a disclosure statement for such Acceptable Reorganization Plan and solicitation procedures contemplating completion of a confirmation hearing which disclosure statement and solicitation procedures must otherwise be in form and substance reasonably acceptable to Agent and Majority Lenders;

(b)    by no later than 45 days following the Petition Date, the Bankruptcy Court shall have entered an order approving a disclosure statement for an Acceptable Reorganization Plan and solicitation procedures contemplating completion of a confirmation hearing, which disclosure statement and solicitation procedures must otherwise be in form and substance reasonably acceptable to Agent and Majority Lenders, and the Bankruptcy Court's approval of such disclosure statement and solicitation procedures shall not have been amended, modified or supplemented (or any portions thereof reversed, stayed or vacated) other than as agreed in writing by Majority Lenders;

(c)    by no later than June 30, 2015, the Bankruptcy Court shall have entered an order confirming an Acceptable Reorganization Plan, which order shall be in form and substance acceptable to the Majority Lenders in their sole discretion and shall not have been amended, modified or supplemented (or any portions thereof reversed, stayed or vacated) other than as agreed in writing by the Majority Lenders; and

Doc#: US1:9899064v18

(d)      by no later than July 17, 2015, the effective date of an Acceptable Reorganization Plan shall have occurred, and the order confirming the Acceptable Reorganization Plan shall not have been amended, modified or supplemented (or any portions thereof reversed, stayed or vacated) other than as agreed in writing by Majority Lenders.

11.1.22  <u>Supportive Actions</u>.  Any Obligor or any Subsidiary thereof shall take any action in support of any matter set forth in <u>Section 11.1.13</u> through <u>Section 11.1.20</u> or any other Person shall do so and such application is not contested in good faith by the Obligors and the relief requested is granted in an order that is not stayed pending appeal.

11.1.23  <u>Other Actions</u>.  Any Obligor or any Subsidiary thereof shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding seeking, or otherwise consenting to (i) the invalidation, subordination or other challenging of the Superpriority Claims and Liens granted to secure the Obligations or any other rights granted to the Agent and the Lenders in the Orders or this Agreement or (ii) any relief under section 506(c) of the Bankruptcy Code with respect to any Collateral.

11.1.24  <u>Challenges</u>.  Any Obligor shall challenge, support or encourage a challenge of any payments made to the Agent or any Lender with respect to the Obligations, other than to challenge the occurrence of a Default or Event of Default.

11.1.25  <u>Adequate Protection Motion</u>.  Without the consent of the Majority Lenders, the filing of any motion by the Obligors seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any prepetition agent or lender that is inconsistent with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date).

11.1.26  <u>Section 364 Financing</u>.  Without the Agent's and the Majority Lenders' consent, the entry of any order by the Bankruptcy Court granting, or the filing by any Obligor or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without the Agent's consent or to obtain any financing under section 364 of the Bankruptcy Code other than the facility hereunder and the DIP ABL Facility unless such motion or order contemplates Payment in Full in cash of the Obligations immediately upon consummation of the transactions contemplated thereby.

11.1.27  <u>Asset Sale Motion</u>.  Any Obligor or any person on behalf of any Obligor shall file any motion seeking authority to consummate a sale of assets of the Obligors or the Collateral having a value in excess of $5,000,000 outside the ordinary course of business and not otherwise permitted hereunder;

11.1.28  <u>Restriction on Business</u>.  If any Obligor or any of its Subsidiaries (other than Excluded Subsidiaries) is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any part of the business affairs of Obligors and their Subsidiaries, taken as a whole, which could reasonably be expected to have a Material Adverse Effect; <u>provided</u>, that the Obligors shall have five (5) Business Days after the entry of such an order to obtain a court order vacating, staying or otherwise obtaining relief from the Bankruptcy Court or another court to address any such court order.

Doc#: US1:9899064v18

11.1.29  <u>Prepetition Indebtedness Payment</u>.  Any Obligor shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any prepetition Indebtedness or payables other than payments (i) in respect of accrued payroll and related expenses as of the commencement of the Cases, (ii) in respect of certain creditors and (iii) permitted under this Agreement, in each case, to the extent authorized by one or more First Day Orders and consistent with the Budget.

11.1.30  <u>Change of Venue</u>.  If, unless otherwise approved by the Agent and the Majority Lenders, an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to the Cases and such order shall not be reversed or vacated within 10 days.

11.2    <u>Acceleration of the Obligations</u>.  Upon or at any time after the occurrence and during the continuance of an Event of Default, Agent may, and at the request of the Majority Lenders shall, by notice to the Borrower Representative, take either or both of the following actions, at the same or at different times: (i) terminate the Term Loan Commitments and Incremental Exit Commitments, and thereupon the Term Loan Commitments and Incremental Exit Commitments shall terminate immediately, (ii) declare the Term Loans then outstanding to be due and payable, and thereupon the principal of the Term Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of Borrowers accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by Borrowers (provided that with respect to the enforcement of Liens or other remedies with respect to the Collateral, the Agent shall provide Borrowers prior notice to the extent required by and in accordance with the Order).

11.3    <u>Other Remedies</u>.  Subject to the terms of <u>Section 12.1</u> and <u>Section 12.5</u> hereof, upon the occurrence and during the continuance of an Event of Default, Agent may, and at the request of the Majority Lenders shall, exercise from time to time the following other rights and remedies:

11.3.1  <u>Generally</u>.  All of the rights and remedies (a) provided to Agent or Lenders under the Loan Documents, (b) of a secured party under the UCC, (c) under other applicable law, and (d) all other legal and equitable rights to which Agent or Lenders may be entitled, all of which rights and remedies shall be cumulative and shall be in addition to any other rights or remedies contained in this Agreement or any of the other Loan Documents, and none of which shall be exclusive.

11.3.2  <u>Possession</u>.  Subject to any Intercreditor Arrangements, the right to take immediate possession of the Collateral, and to (a) require each Obligor to assemble the Collateral, at Borrowers' expense, and make it available to Agent at a place designated by Agent which is reasonably convenient to both parties, and (b) enter any premises where any of the Collateral shall be located and to keep and store the Collateral on said premises until sold (and if said premises be the Property of Holdings or any Subsidiary of Holdings, Holdings agrees not to charge, or permit any of its Subsidiaries to charge, Agent for storage thereof).

11.3.3  <u>Sales; Assignments; Etc</u>.  Subject to any Intercreditor Arrangements, the right to sell, assign, grant a license to use or otherwise dispose of all or any Collateral in its then condition, or after any further manufacturing or processing thereof, at public or private sale or sales, with such notice as may be required by law, in lots or in bulk, for cash or on credit, all as Agent, in its sole discretion, may deem advisable.  Agent may, at Agent's option, disclaim any and all warranties regarding the Collateral in connection with any such sale.  Borrowers agree that 10 days' written notice to Borrower Representative of any public or private sale or other disposition of Collateral shall be reasonable notice thereof, and such sale shall be at such locations as Agent may

designate in said notice.  Agent shall have the right to conduct such sales on Holdings' or any of its Subsidiaries' premises, without charge therefor, and such sales may be adjourned from time to time in accordance with applicable law.  Subject to any Intercreditor Arrangements, Agent shall have the right (but not the obligation) to sell, assign, grant a license to use, lease or otherwise dispose of the Collateral, or any part thereof, for cash, credit or any combination thereof, and Agent, on behalf of Lenders, may purchase all or any part of the Collateral at public or, if permitted by law, private sale and, in lieu of actual payment of such purchase price, may set off the amount of such price against the Secured Obligations.  The proceeds realized from the sale of any Collateral shall be applied, after allowing 2 Business Days for collection, as provided for in Section 4.4.2.  If any deficiency shall arise, each Borrower and each Guarantor shall remain jointly and severally liable to Agent and Lenders therefor.

11.4    Grant of License.  Each Obligor and its Subsidiaries hereby grants to Agent and its agents, representatives and designees an irrevocable, non-exclusive license or other right to make, have made, affix to goods, use, sell, copy, distribute, perform, make derivative works of, publish, license or sub-license and otherwise exploit in any manner, without payment of royalty or other compensation to any Obligor or Subsidiary, Obligor's and each of its Subsidiaries' Intellectual Property and Computer Hardware and Software, brochures, customer lists, promotional and advertising materials, labels, packaging materials, rights of use of any name and other Property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral.  Agent agrees to generally maintain the quality of products and services offered under any trademarks and service marks covered by the foregoing license at a level at least substantially consistent with the levels in effect immediately prior to the Event of Default, but Agent shall have no liability for failure to maintain such quality in the absence of its gross negligence or willful misconduct, as determined by a final non-appealable order of a court of competent jurisdiction.  Each Obligor's and each of its Subsidiaries' rights and interests under Intellectual Property, including all licenses and franchise agreements, shall inure to Agent's benefit.  Agent covenants and agrees that it shall forebear from exercising the foregoing license unless and until the occurrence and during the continuance of an Event of Default.

11.5    Setoff and Sharing of Payments.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, during the continuance of any Event of Default, each Lender and each of its Affiliates is hereby authorized by Obligors at any time or from time to time, to the fullest extent permitted by law, with prior written consent of Agent and with reasonably prompt subsequent notice to Borrower Representative (any prior or contemporaneous notice to Obligors being hereby expressly waived) to setoff and to appropriate and to apply any and all (i) deposits (general or special, time or demand, provisional or final) at any time held by such Lender or Affiliate at any of its offices for the account of any Obligor or any of its Subsidiaries (regardless of whether such deposits are then due to an Obligor or its Subsidiaries), and (ii) other property at any time held or owing by such Lender or Affiliate to or for the credit or for the account of any Obligor or any of its Subsidiaries, in each case against and on account of any of and all of the Obligations held by such Lender or Affiliate, irrespective of whether or not such Lender or Affiliate shall have made any demand under the Loan Documents and although such obligations may be unmatured.  Any Lender exercising a right to setoff shall, to the extent the amount of any such setoff exceeds its Term Loan Percentage of the amount set off, purchase for cash (and the other Lenders shall sell) interests in each such other Lender's *pro rata* share of the Obligations as would be necessary to cause such Lender to share such excess with each other Lender in accordance with their respective Term Loan Percentages.  Each Obligor agrees, to the fullest extent permitted by law, that any Lender may exercise its right to set off with respect to amounts in excess of its pro rata share of the Obligations and upon doing so shall deliver such excess to Agent for the benefit of all Lenders in accordance with the Term Loan Percentages.

Doc#: US1:9899064v18

11.6    <u>Remedies Cumulative; No Waiver</u>.    All covenants, conditions, provisions, warranties, guaranties, indemnities, and other undertakings of Obligors contained in this Agreement and the other Loan Documents, or in any document referred to herein or contained in any agreement supplementary hereto or in any Schedule or in any Guaranty Agreement given to Agent or any Lender or contained in any other agreement between any Lender and Obligors or between Agent and Obligors heretofore, concurrently, or hereafter entered into, shall be deemed cumulative to and not in derogation or substitution of any of the terms, covenants, conditions, or agreements of Obligors herein contained.    The failure or delay of Agent or any Lender to require strict performance by Obligors of any provision of this Agreement or to exercise or enforce any rights, Liens, powers, or remedies hereunder or under any of the aforesaid agreements or other documents or security or Collateral shall not operate as a waiver of such performance, Liens, rights, powers and remedies, but all such requirements, Liens, rights, powers, and remedies shall continue in full force and effect until all Loans and other Obligations owing or to become owing from Obligors to Agent and each Lender have been fully satisfied.    None of the undertakings, agreements, warranties, covenants and representations of Obligors contained in this Agreement or any of the other Loan Documents and no Default or Event of Default by Obligors under this Agreement or any other Loan Documents shall be deemed to have been suspended or waived by Lenders, unless such suspension or waiver is by an instrument in writing specifying such suspension or waiver and is signed by a duly authorized representative of Agent and directed to Obligors.

## SECTION 12. AGENT

12.1    <u>Authorization and Action</u>.    Each Lender hereby irrevocably appoints CFS as Agent hereunder and authorizes Agent to take such action on its behalf, including execution of the Loan Documents, as applicable, and to exercise such powers under this Agreement and the other Loan Documents as are delegated to Agent by the terms hereof and thereof, together with such actions and powers as are reasonably incidental thereto.    Each Lender hereby acknowledges that Agent shall not have by reason of this Agreement assumed a fiduciary relationship in respect of any Lender, regardless of whether an Event of Default has occurred or is continuing.    Without limiting the generality of the foregoing, Agent shall have the sole and exclusive authority to (a) act as the disbursing and collecting agent for Lenders with respect to all payments and collections arising in connection with the Loan Documents, (b) execute and deliver as Agent each Loan Document, including any intercreditor or subordination agreements, and accept delivery of each Loan Document from any Obligor or other Person and to perform all of its undertakings and obligations thereunder, (c) act as collateral agent for the Secured Parties for purposes of perfecting and administering Liens under the Loan Documents, and for all other purposes stated therein, (d) manage, supervise or otherwise deal with Collateral, and (e) take any action or otherwise exercise any rights or remedies with respect to any Collateral under the Loan Documents, Requirements of Law or otherwise.    In performing its functions and duties under this Agreement, Agent shall act solely as agent of Lenders, and shall not assume, or be deemed to have assumed, any obligation toward, or relationship of agency or trust with or for, Obligors.    As to any matters not expressly provided for by this Agreement and the other Loan Documents, Agent may, but shall not be required to, exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Majority Lenders (accompanied by indemnity satisfactory to the Agent and subject to the indemnification set forth in Section 12.5), whenever such instruction shall be requested by Agent or required hereunder, or a greater or lesser number of Lenders if so required hereunder or under any other Loan Document, and such instructions shall be binding upon all Lenders; <u>provided</u>, that Agent shall be fully justified in failing or refusing to take any action which exposes Agent to any liability or which is contrary to this Agreement, the other Loan Documents or applicable law, unless Agent is indemnified to its satisfaction by the other Lenders against any and all liability and expense which it may incur by reason of taking or continuing to take any such action.    If Agent seeks the consent or approval of the Majority Lenders (or a greater or lesser number of Lenders as required in this Agreement or any other Loan

Document), with respect to any action hereunder, Agent shall send notice thereof to each Lender and shall notify each Lender at any time that the Majority Lenders (or such greater or lesser number of Lenders) have instructed Agent to act or refrain from acting pursuant hereto.  Further, each Lender hereby irrevocably appoints CFS as Syndication Agent hereunder and authorizes Syndication Agent to take such action as are delegated to Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto. In connection with the administration of its duties, the Syndication Agent shall be entitled to all of the rights, privileges and immunities provided to the Agent hereunder.

12.2    Agent's Reliance, Etc.  Neither Agent, any Affiliate of Agent, nor any of their respective directors, officers, agents or employees shall be liable for any action taken or omitted to be taken by it or them under or in connection with this Agreement or the other Loan Documents, except for its or their own gross negligence or willful misconduct, as determined by a final non-appealable order of a court of competent jurisdiction  Without limitation of the generality of the foregoing, Agent:  (i) may treat each Lender party hereto as the holder of Obligations until Agent receives an executed Assignment and Acceptance Agreement from such Lender; (ii) may consult with legal counsel (who may be counsel for the Obligors), independent public accountants and other experts selected by it and shall not be liable for any action taken or omitted to be taken in good faith by it in accordance with the advice of such counsel, accountants or experts; (iii) makes no warranties or representations to any Lender and shall not be responsible to any Lender for any recitals, statements, warranties or representations made in or in connection with this Agreement or any other Loan Documents; (iv) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; (v) shall not be liable to any Lender for any action taken, or inaction, by Agent pursuant to the terms hereof upon the instructions of Majority Lenders (or a greater or lesser number of Lenders if so required hereunder or under any other Loan Document) or refraining to take any action pending such instructions; (vi) shall not be liable for any apportionment or distributions of payments made by it in good faith pursuant to Section 4 hereof; (vii) shall incur no liability under or in respect of this Agreement or the other Loan Documents by acting upon any notice, consent, certificate, message or other instrument or writing (which may be by telephone, facsimile, telegram, cable, e-mail or other electronic transmission) believed in good faith by it to be genuine and signed or sent by the proper party or parties; and (viii) may assume that no Default or Event of Default has occurred and is continuing, unless Agent has actual knowledge of the Default or Event of Default, has received notice from any Obligor or Parent's independent certified public accountants stating the nature of the Default or Event of Default, or has received notice from a Lender stating the nature of the Default or Event of Default and that such Lender considers the Default or Event of Default to have occurred and to be continuing.  In the event any apportionment or distribution described in clause (vi) above is determined to have been made in error, the sole recourse of any Person to whom payment was due but not made shall be to recover from the recipients of such payments any payment in excess of the amount to which they are determined to have been entitled.  Agent shall not be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.  In no event shall Agent be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, future changes in applicable law or regulation, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; *it being understood* that Agent shall use reasonable efforts consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Doc#: US1:9899064v18

12.3    <u>Rights of Agent as a Lender</u>.  The Person serving as Agent hereunder shall have the same rights and powers under this Agreement and the other Loan Documents in its capacity as a Lender, if any, as any other Lender and may exercise the same as though it were not Agent; and the terms "Lender," "Lenders," and "Majority Lenders" shall, unless otherwise expressly indicated, include such Person in its individual capacity as a Lender.  The Person serving as Agent hereunder may accept deposits from, lend money to, and generally engage in any kind of business with, Obligors or any Subsidiary of an Obligor or other Affiliate thereof, all as if it were not Agent and without any duty to account therefor to any other Lender.

12.4    <u>Lender Credit Decision</u>.  Each Lender acknowledges that it has, independently and without reliance upon Agent or any other Lender and based on the financial statements referred to herein and such other documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon Agent or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder.  Agent shall not have any duty or responsibility, either initially or on an ongoing basis, to provide any Lender with any credit or other similar information regarding Obligors.

12.5    <u>Indemnification</u>.  Lenders agree to indemnify Agent (to the extent not reimbursed by Obligors), in accordance with their respective Term Loan Percentages, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against Agent in any way relating to or arising out of this Agreement or any other Loan Document or any action taken or omitted by Agent under this Agreement or any other Loan Document; <u>provided</u> that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Agent's gross negligence or willful misconduct, as determined by a final non-appealable order of a court of competent jurisdiction.  Without limitation of the foregoing, each Lender agrees to reimburse Agent promptly upon demand for its ratable share, as set forth above, of any out-of-pocket expenses (including attorneys' fees) incurred by Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiation, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement and each other Loan Document, to the extent that Agent is not reimbursed for such expenses by Obligors.  The obligations of Lenders under this <u>Section 12.5</u> shall survive the Payment in Full and the termination of this Agreement.  If after payment and distribution of any amount by Agent to Lenders, any Lender or any other Person, including Obligors, any creditor of any Obligor, a liquidator, administrator or trustee in bankruptcy, recovers from Agent any amount found to have been wrongfully paid to Agent or disbursed by Agent to Lenders, then each Lender shall reimburse Agent any amount received by such Lender.

12.6    <u>Rights and Remedies to Be Exercised by Agent Only</u>.  Each Lender agrees that, except as set forth in <u>Section 11.5</u>, no Lender shall have any right individually (i) to realize upon the security created by this Agreement or any other Loan Document, (ii) to enforce any provision of this Agreement or any other Loan Document, or (iii) to make demand under this Agreement or any other Loan Document.

12.7    <u>Agency Provisions Relating to Collateral; Release of Liens and Guaranties</u>.  Each Lender hereby irrevocably authorizes and ratifies Agent's entry into this Agreement and the Security Documents for the benefit of the Secured Parties.  Each Lender hereby irrevocably agrees that any action taken by Agent with respect to the Collateral in accordance with the provisions of this Agreement or the Security Documents, and the exercise by Agent of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized by and binding upon all Lenders.  Agent

Doc#: US1:9899064v18

is hereby irrevocably authorized on behalf of all Lenders, without the necessity of any notice to or further consent from any Lender to take any action with respect to any Collateral or the Loan Documents which may be necessary to perfect and maintain perfected Agent's Liens upon the Collateral, for its benefit and the ratable benefit of Lenders.  Lenders hereby irrevocably agree that the Liens granted to or held by Agent upon any Collateral shall be automatically released (i) upon Payment in Full; or (ii) if such Collateral constitutes property being sold or disposed of and Borrower Representative certifies to Agent that the sale or disposition is made in compliance with the terms of this Agreement (and Agent may rely conclusively on any such certificate, without further inquiry), and to the extent that the property being sold or disposed of constitutes 100% of the Equity Interest of a Subsidiary, Agent is authorized and directed to release any Guaranty Agreement provided by such Subsidiary; or (iii) if such Collateral constitutes leased property in which no Obligor owned any interest at the time the Lien was granted or at any time thereafter and such lease has expired or been terminated in a transaction not prohibited by this Agreement; or (iv) in connection with any foreclosure sale or other disposition of Collateral and the exercise of remedies pursuant to <u>Section 11</u> after the occurrence and during the continuation of an Event of Default.  Except as provided in the preceding sentence and in <u>Section 13.1.1(c)(ii)</u>, Agent will not release any Liens on Collateral without the prior written authorization of the Majority Lenders.  Any such release shall not in any manner discharge, affect or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of the Obligors in respect of) all interests retained by the Obligors, including the proceeds of any sale, all of which shall continue to constitute part of the Collateral.  Upon request by Agent at any time, Lenders will confirm in writing Agent's authority to release particular types or items of Collateral pursuant hereto.  Agent shall have no obligation whatsoever to any Lender or to any other Person to assure that the Collateral exists or is owned by any Obligor or is cared for, protected or insured or has been encumbered or that the Liens granted to Agent herein or pursuant to the Security Documents have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of its rights, authorities and powers granted or available to Agent in this <u>Section 12.7</u> or in any of the Loan Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, Agent may act in any manner it may deem appropriate, in its sole discretion, but consistent with the provisions of this Agreement and the other Security Documents, including given Agent's own interest in the Collateral as a Lender, if any, and that Agent shall have no duty or liability whatsoever to any Lender.    The Obligors and Lenders hereby irrevocably authorize Agent, based upon the instruction of the Majority Lenders, to credit bid and purchase (either directly or through one or more acquisition vehicles) or to sell or otherwise dispose of (or to consent to any such sale or other disposition of) all or any portion of the Collateral at any sale thereof conducted by Agent under the provisions of the Code or the PPSA, including pursuant to Sections 9-610 or 9-620 of the Code, at any sale thereof conducted under the provisions of the Bankruptcy Code, including Section 363 of the Bankruptcy Code or pursuant to a plan of reorganization, or at any sale or foreclosure conducted by Agent (whether by judicial action or otherwise) in accordance with applicable law.

12.8    <u>Agent's Right to Purchase Commitments</u>.  Agent shall have the right, but shall not be obligated, at any time upon written notice to any Lender and with the consent of such Lender, which may be granted or withheld in such Lender's sole discretion, to purchase for Agent's own account all of such Lender's interests in this Agreement, the other Loan Documents and the Obligations, for the face amount of the outstanding Obligations owed to such Lender, including all accrued and unpaid interest and fees.

12.9    <u>Resignation of Agent; Appointment of Successor</u>.  Agent may resign as Agent at any time by notifying the Lenders and the Borrower Representative.  If Agent shall resign under this Agreement, then, (i) the Majority Lenders shall have the right to appoint a successor agent or (ii) if a successor agent shall not be so appointed and approved within the thirty (30) day period following the retiring Agent's notice to Lenders and Borrower Representative of its resignation, then the retiring Agent

may, on behalf of the Lenders appoint a successor agent who shall serve as Agent until such time as the Majority Lenders appoint a successor agent or ratify the retiring Agent's appointment of a successor agent.  Upon its appointment, such successor agent shall succeed to the rights, powers and duties of Agent and the term "Agent" shall mean such successor effective upon its appointment, and the retiring Agent's rights, powers and duties as Agent shall be terminated without any other or further act or deed on the part of such retiring Agent or any of the other parties to this Agreement.    After the resignation of Agent hereunder, the provisions of this Section 12, Section 13.4 and Section 3.9 shall inure to the benefit of the former Agent and its sub-agents and the former Agent shall not by reason of such resignation be deemed to be released from liability for any actions taken or not taken by it while it was Agent under this Agreement.  The fees paid by Borrowers to any successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrowers and such successor Agent.

## SECTION 13. MISCELLANEOUS

13.1    Amendments.

    13.1.1    Amendments and Waivers.   No modification of any Loan Document, including any extension or amendment of a Loan Document or any waiver of a Default or Event of Default, shall be effective without the prior written agreement of Agent (with the consent or at the direction of Majority Lenders) and each Obligor party to such Loan Document; provided, however, that

    (a)    [intentionally omitted]; and

    (b)    without the prior written consent of each affected Lender, no modification shall be effective that would (i) increase the Term Loan Commitment of such Lender; (ii) reduce the amount of, or waive or delay payment of, any principal, interest (other than default interest) or fees payable hereunder or under any other Loan Document to such Lender (except as provided in Section 3.11 hereof); provided that any provision requiring a mandatory prepayment of the Loans may be amended, modified or waived by the Majority Lenders; (iii) extend the term applicable to Obligations owing to such Lender; (iv) amend this clause (b); (v) alter Sections 4.4.2, Section 4.10, Section 6.1 (except to add Collateral), the second sentence of Section 11.4, this Section 13.1.1 or Section 13.5; (vi) release all or substantially all of the Collateral or release all or substantially all of the value of the guaranty provided by the Guarantors pursuant to the Guaranty Agreement (except in connection with any asset sales permitted under any Loan Document); (vii) release any Obligor from liability for any Obligations, except as currently contemplated by the Loan Documents; or (viii) modify the definition of "Majority Lenders".

    13.1.2    Limitations.   The agreement of Borrowers shall not be necessary to the effectiveness of any modification of a Loan Document that deals solely with the rights and duties of Lenders and/or Agent as among themselves and that does not relate to any rights, duties, obligations or discretion of any Obligor or their respective Subsidiaries.  Only the consent of the parties to the Fee Letters shall be required for any modification of such agreement.  Any waiver or consent granted by Agent or Lenders hereunder shall be effective only if in writing and only for the matter specified.   Agent shall not be required to execute any amendment or waiver hereunder if such amendment affects Agent's rights, privileges and immunities hereunder or under the other Loan Documents unless agreed to by Agent.

    13.1.3    Payment for Consents.   No Borrower will, directly or indirectly, pay any remuneration or other thing of value, whether by way of additional interest, fee or otherwise, to any Lender (in its capacity as a Lender hereunder) as consideration for agreement by such Lender with

any modification of any Loan Documents, unless such remuneration or value is concurrently paid, on the same terms, on a ratable basis to all Lenders providing their consent.

13.1.4   <u>Non-Consenting Lenders</u>.  If, in connection with any proposed amendment, waiver or consent requiring the consent of "each Lender" and "each affected Lender,", the consent of the Majority Lenders is obtained, but the consent of the other Lenders is not obtained (any such Lender whose consent is not obtained being referred to herein as a "<u>Non-Consenting Lender</u>"), then the Borrower Representative may elect to replace a Non-Consenting Lender as a Lender party to this Agreement, <u>provided</u> that, concurrently with such replacement, (i) all Non-Consenting Lenders shall be replaced, (ii) one or more other banks or other entities which are satisfactory to the Borrower Representative, Agent and Majority Lenders shall agree, as of such date, to purchase for cash the Term Loans and other Obligations due to such Non-Consenting Lenders pursuant to an Assignment and Acceptance Agreement and to become a Lender for all purposes under this Agreement and to assume all obligations of the Non-Consenting Lenders to be terminated as of such date and to comply with the requirements of <u>Section 13.2</u>, and (ii) the Borrower Representative shall pay to each Non-Consenting Lender in same day funds on the day of such replacement all interest, fees and other amounts then accrued but unpaid to such Non-Consenting Lender by Borrowers hereunder to and including the date of termination, including without limitation payments due to such Non-Consenting Lender under <u>Sections 3.9</u> and <u>4.8</u>.

13.2   <u>Right of Sale; Assignment; Participations</u>.  Obligors hereby consent to any Lender's participation, sale, assignment, transfer or other disposition, at any time or times hereafter, of this Agreement and any of the other Loan Documents, or of any portion hereof or thereof, including all or a portion of its unused Term Loan Commitment (if any), Incremental Exit Commitment (if any) and the Term Loans at the time owing to it and such Lender's rights, title, interests, remedies, powers and duties hereunder or thereunder without the consent of Borrowers or any other Obligor subject to the terms and conditions set forth below:

13.2.1   <u>Sales; Assignments</u>.  Obligors and each Lender hereby agree that, with respect to any such sale, assignment or transfer:

(a)   no such sale, assignment or transfer shall be for an amount of less than $1,000,000 unless (i) Agent agrees and consents to such lesser amount, (ii) such sale, assignment or transfer is to an Eligible Assignee or (iii) such sale, assignment or transfer is for the entire remaining amount of the assigning Lender's Term Loans, Term Loan Commitments or Incremental Exit Commitments, as applicable,

(b)   each such sale, assignment or transfer shall be made on terms and conditions which are customary in the industry at the time of the transaction,

(c)   Agent must consent (such consent not to be unreasonably withheld or delayed) to each such sale, assignment or transfer to a Person that is not an original signatory to this Agreement; <u>provided</u> that consent of Agent shall not be required for each sale, assignment or transfer to an Eligible Assignee; <u>provided</u>, <u>further</u> that, notwithstanding the foregoing, a sale, assignment or transfer to any customer of the Obligors (including each Designated OEM Party) or operating competitor of the Obligors shall be subject to the consent of the Borrower Representative at all times, regardless of whether or not an Event of Default has occurred and is continuing (<u>provided</u> that the Borrower Representative shall be deemed to have consented to any such sale, assignment or transfer unless it shall object thereto by written notice to Agent within ten (10) days after having received notice thereof); <u>provided</u>, <u>further</u> that, Agent shall only be required to obtain the consent of the Borrower Representative if such proposed assignee represents and warrants in the Assignment and Acceptance Agreement that such assignee is a customer or

operating competitor of the Obligors and no such assignment to a Person shall be voided if such representation is not true and the consent of the Borrower Representative was not obtained prior to such assignment,

(d)    no such sale, assignment or transfer shall be granted in violation of <u>Section 13.2.3</u>, and any attempt to sell, assign or transfer any Term Loan Commitment, Incremental Exit Commitment or any Term Loan to any Person described in the first sentence of <u>Section 13.2.3</u> at any time shall be null and void,

(e)    except in the case of a sale, assignment or transfer by a Lender to one of its Approved Funds, the assigning Lender shall pay to Agent a processing and recordation fee of $3,500 and any out-of-pocket attorneys' fees and expenses incurred by Agent in connection with any such sale or assignment,

(f)    Agent, the assigning Lender, the assignee and, to the extent Borrower Representative's consent is required hereunder, Borrower Representative shall each have executed and delivered an Assignment and Acceptance Agreement, and

(g)    the assignee, if it is not Lender immediately prior to any assignment, shall deliver to Agent a Form W-9, W-8BEN, W-8BEN-E, W-8ECI, W-8IMY (as applicable) and an administrative questionnaire acceptable to Agent in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about Borrowers, the other Obligors or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

Agent, acting for this purpose as an agent of Borrowers, shall maintain at one of its offices a copy of each Assignment and Acceptance Agreement delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Term Loan Commitment of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "<u>Register</u>").  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register.  The entries in the Register shall be conclusive absent manifest error, and Borrowers, Agent, and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by any Lender, at any reasonable time and from time to time upon reasonable prior notice.  If the Borrowers issue Notes hereunder, in the event of a conflict between such Notes and the Register, the terms of the Register shall control.

13.2.2    <u>Participations</u>.  Any Lender may, without the consent of Borrowers (unless such Participant is a customer of the Obligors (including each Designated OEM Party) or operating competitor of the Obligors, in each case as represented by such Participant, <u>provided</u>, that, the Borrower Representative shall be deemed to have consented to any such participation unless it shall object thereto by written notice within ten (10) days after having received notice thereof, <u>provided further</u>, that the consent of the Borrower Representative shall only be required if such Participant represents and warrants that such Participant is a customer or operating competitor of the Obligors and no such participation grant shall be voided if such representation is not true and the consent of the Borrower Representative was not obtained prior to granting such participation) or Agent, grant participations in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its unused Term Loan Commitment, Incremental Exit Commitments and the Term Loans owing to it) to any other Lender or other lending institution (a "<u>Participant</u>"); <u>provided</u> that (a) no Participant shall thereby acquire any direct rights under this Agreement, (b) no

Participant shall be granted any right to consent to any amendment, except to the extent any of the same pertain to (i) changing the aggregate principal amount of, or interest rate on, or fees applicable to, any Term Loan or (ii) changing the final stated maturity of any Term Loan or the stated maturity of any portion of any payment of principal of, or interest or fees applicable to, any of the Term Loans; provided that the rights described in this subclause (ii) shall not be deemed to include the right to consent to any amendment with respect to, or which has the effect of, requiring any mandatory prepayment of any portion of any Loan or any amendment or waiver of any Default or Event of Default, (c) no such participation shall in any manner relieve the originating Lender of its obligations hereunder, (d) the originating Lender shall remain solely responsible for the performance of such obligations, (e) Borrowers, Agent and the other Lenders shall continue to deal solely and directly with the originating Lender in connection with the originating Lender's rights and obligations under this Agreement and the other Loan Documents, (f) in no event shall any Participant grant a participation in its participation interest in the Loans without the prior written consent of the Borrower Representative if the prospective participant is a customer of the Obligors (including each Designated OEM Party) or operating competitor of the Obligors, in each case as represented by such prospective participant, provided, that, the Borrower Representative shall be deemed to have consented to any such participation unless it shall object thereto by written notice within ten (10) days after having received notice thereof, provided further, that the consent of the Borrower Representative shall only be required if such prospective participant represents and warrants that it is a customer or operating competitor of the Obligors and no such participation grant shall be voided if such representation is not true and the consent of the Borrower Representative was not obtained prior to granting such participation, (g) no participation shall be granted in violation of Section 13.2.3, and any attempt to grant a participation to any Person described in the first two sentences of Section 13.2.3 at any time shall be null and void, and (h) all amounts payable by Borrowers hereunder shall be determined as if the originating Lender had not sold any such participation.

The Borrowers agree that each Participant shall be entitled to the benefits of Sections 3.9, and 4.8 (subject to the requirements and limitations therein, including the requirements under Section 3.9(e) (it being understood that the documentation required under Section 3.9(e) shall be delivered to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 13.2.1; provided that such Participant (A) agrees to be subject to the provisions of Sections 3.10, 4.4.2, 4.10 and 11.5 as if it were an assignee under Section 13.2.1; and (B) shall not be entitled to receive any greater payment under Section 3.9 or 4.8, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.5 as though it were a Lender, provided such Participant agrees to be subject to Section 4.10 as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any Term Loan Commitments, Incremental Exit Commitments, Term Loans or its other obligations under any Loan Document) except to the extent that such disclosure is necessary to establish that such Term Loan Commitment, Incremental Exit Commitment, Term Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded

in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

13.2.3  <u>Certain Assignees</u>.  Notwithstanding any other provision of this Agreement or any other Loan Document, no assignment or participation may be made to Sponsor, Holdings, Parent, any Obligor, any of their respective Affiliates or Subsidiaries, any Defaulting Lender or any natural person.  Any attempted assignment, participation or transfer to any such Person at any time shall be null and void.  In connection with any assignment by a Defaulting Lender, such assignment shall be effective only upon payment by the Eligible Assignee or Defaulting Lender to Agent of an aggregate amount sufficient, upon distribution (through direct payment, purchases of participations or other compensating actions as Agent deems appropriate), (x) to satisfy all funding and payment liabilities then owing by the Defaulting Lender hereunder, and (y) to acquire such Defaulting Lender's *pro rata* share of all Term Loans.  If an assignment by a Defaulting Lender shall become effective under applicable law for any reason without compliance with the foregoing sentence, then the assignee shall be deemed a Defaulting Lender for all purposes until such compliance occurs.

13.2.4  <u>Certain Agreements of Borrowers</u>.  Borrowers agree that (a) they will use their commercially reasonable efforts to assist and cooperate with each Lender in any manner reasonably requested by such Lender to effect the sale, assignment, transfer, sale of participation in, or other disposition pursuant to this <u>Section 13.2</u>, including assisting in the preparation of appropriate disclosure documents and making members of management available at reasonable times to meet with and answer questions of potential assignees and Participants; and (b) subject to the provisions of <u>Section 13.16</u> hereof, such Lender may disclose credit information regarding Borrowers to any potential assignee or Participant.

13.2.5  <u>Lender Pledges</u>.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to a Federal Reserve Bank, and this <u>Section 13.2</u> shall not apply to any such pledge or assignment of a security interest; <u>provided</u> that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

13.3  <u>Power of Attorney</u>.  Each Obligor hereby irrevocably designates, makes, constitutes and appoints Agent (and all Persons designated by Agent) as such Obligor's true and lawful attorney (and agent-in-fact), solely with respect to the matters set forth in this <u>Section 13.3</u>, and Agent, or Agent's agent, may, without notice to any Obligor and in any Obligor's or Agent's name, but at the cost and expense of Obligors:

At such time or times as Agent or said agent, in its sole discretion, may determine (and subject to any Intercreditor Arrangements): (a) endorse any Obligor's name on any checks, notes, acceptances, drafts, money orders or any other evidence of payment or proceeds of the Collateral which come into the possession of Agent or under Agent's control; (b) prepare, sign, and file for recordation in any Intellectual Property registry, appropriate evidence of the Lien and security interest granted herein in the Intellectual Property in the name of such Obligor as assignor or pledgor; and (c) take or cause to be taken all actions necessary to perform or comply or cause performance or compliance with the terms of this Agreement, including, without limitation, access to pay or discharge taxes or Liens (other than Permitted Liens) levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by Agent in its sole discretion, any such payments made by Agent to become obligations of such Obligor to Agent, due and payable immediately without demand.

At such time or times upon or after the occurrence and during the continuance of an Event of Default (provided that the occurrence of an Event of Default shall not be required with respect to clauses (c), (e), (f), and (g) below), as Agent or its agent in its sole discretion may determine (subject to any Intercreditor Arrangements): (a) settle, adjust, modify, compromise, discharge or release any Collateral or any legal proceedings brought to collect any Collateral; (b) sell or assign any Collateral upon such terms, for such amounts and at such time or times as Agent deems advisable, and at Agent's option, with all warranties regarding the Collateral disclaimed; (c) take control, in any manner, of any proceeds relating to any Collateral; (d) prepare, file and sign any Obligor's name to any notice of Lien, assignment or satisfaction of Lien or similar document in connection with any of the Collateral; (e) receive, open and dispose of all mail addressed to any Obligor and notify postal authorities to change the address for delivery thereof to such address as Agent may designate; (f) endorse the name of any Obligor upon any of the items of payment or proceeds relating to any Collateral and deposit the same to the account of Agent on account of the Obligations; (g) endorse the name of any Obligor upon any chattel paper, document, instrument, invoice, freight bill, bill of lading or similar document or agreement relating to any Collateral; (h) use the information recorded on or contained in any data processing, electronic or other information equipment, systems and Computer Hardware and Software relating to the Collateral; (i) make and adjust claims under policies of insurance; (j) take any action as may be necessary or appropriate to obtain payments under any letter of credit, banker's acceptance or other instrument for which an Obligor is a beneficiary; and (k) do all other acts and things necessary, in Agent's determination, to fulfill any Obligor's obligations under the Loan Documents.

The powers conferred on Agent hereunder are solely to protect its interest in the Collateral and the interests of the Secured Parties and shall not impose any duty upon it to exercise any such powers. Except for the exercise of reasonable care in the custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.    Agent shall be deemed to have exercised reasonable care in the custody and preservation of Collateral in its possession if such Collateral is accorded treatment substantially equal to that which Agent accords its own property.    Neither Agent nor any of its directors, officers, employees or agents shall be liable for failure to demand, collect or realize upon all or any part of the Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Collateral upon the request of any Obligor or otherwise.    If any Obligor fails to perform any agreement contained herein, Agent may itself perform, or cause performance of, such agreement, and the expenses of Agent incurred in connection therewith and the expenses of Agent incurred in connection with actions undertaken as provided in this Section 13.3 shall be payable on demand by each Obligor under Section 13.4.

The power of attorney granted hereby shall constitute a power coupled with an interest and shall be irrevocable until Payment in Full or such longer period as permitted pursuant to Section 14.6.

13.4    Expenses; Indemnity; Damage Waiver.

(a)    The Borrowers jointly and severally shall pay (i) all reasonable and documented out of pocket costs and expenses incurred by Lenders, Agent and their Affiliates, including the reasonable and documented fees, charges and disbursements of the Majority Lenders' Advisors (all reasonable and documented costs, fees and expenses of the Majority Lenders' Advisors, collectively, the "Majority Lenders' Advisors' Expenses"), one primary counsel to Agent and, if necessary, of one local counsel in any relevant jurisdiction, in connection with the syndication and distribution (including, without limitation, via the internet or through a service such as Intralinks) of the credit facilities provided for herein, due diligence expenses (including third party expenses), the preparation, negotiation, administration, replacement, refinancing and enforcement of the Loan Documents or any amendments, supplements, modifications or waivers of the provisions of the Loan Documents (whether or not the

transactions contemplated hereby or thereby shall be consummated), and filing and recording fees and expenses in connection therewith and (ii) all reasonable and documented out of pocket costs and expenses incurred by Agent, Majority Lenders' Advisors, any Lender, and any of their respective Affiliates, and its and their respective officers, directors, employees, advisors, agents, controlling persons and other representatives and their successors and permitted assigns (collectively, the "Indemnified Persons"), including the fees, charges and disbursements of Majority Lenders' Advisors, one primary counsel to Agent, one primary counsel to the Indemnified Persons, taken as a whole, and, if necessary, of one local counsel to the Indemnified Persons in any relevant jurisdiction and, solely in the case of a conflict of interest, of one additional counsel to the affected Indemnified Persons, in each case in connection with the enforcement, collection or protection of its rights in connection with the Loan Documents, including its rights under this Section 13.4 or in connection with the Term Loans made hereunder, including all such reasonable and documented out of pocket costs and expenses (including reasonable and documented costs, fees and expenses of other advisors and professionals engaged by Agent) incurred during any workout, restructuring or negotiations in respect of such Term Loans.  Costs and expenses being reimbursed by Borrowers under this Section 13.4 include, without limiting the generality of the foregoing, reasonable costs and expenses incurred in connection with:

(i)       costs or expenses (including taxes, and insurance premiums) required to be paid by any Obligor or any of its Subsidiaries under any of the Loan Documents that are paid, advanced, or incurred by the Agent or any Lender;

(ii)      taxes, fees and other charges (A) in connection with any Lender's or Agent's transactions with any Obligor or any of its Subsidiaries under any of the Loan Documents, including, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording, publication, appraisal, real estate surveys, real estate title policies and endorsements, title insurance and environmental audits and reviews, and (B) filing financing statements, amendments and continuations, and other actions to perfect, protect, and continue Agent's Liens or that are otherwise payable in connection with the execution and delivery of the Loan Documents;

(iii)     any attempt to inspect, verify, protect, preserve, restore, collect, sell, liquidate or otherwise dispose of or realize upon the Collateral pursuant to the terms of this Agreement and the other Loan Documents;

(iv)      background checks regarding senior management and/or key investors, as deemed necessary or appropriate in the sole discretion of Agent;

(v)       reasonable out-of-pocket audit fees and expenses (including travel, meals, and lodging) of Agent related to any inspections or audits to the extent of the fees and charges (and up to the amount of any limitation) contained in the Agreement or the Fee Letters;

(vi)      sums paid or incurred to take any action required of any Obligor under the Loan Documents that such Obligor fails to pay or take or costs and expenses paid or incurred to correct any default or enforce any provision of the Loan; and

(vii)     forwarding loan proceeds, collecting checks and other items of payment, and establishing and maintaining the accounts and lockboxes, and costs and expenses of preserving and protecting the Collateral.

89

All of the foregoing costs and expenses may be charged to Borrowers as Term Loans or to another deposit account, all as described in Section 4.1.4.  To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 13.4 may be unenforceable because it is violative of any law or public policy, each Obligor shall, jointly and severally, contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all matters described in this Section 13.4 incurred by the Indemnified Persons.

(b)     The Borrowers shall, jointly and severally, indemnify each Indemnified Person against, and hold each Indemnified Person harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the fees, charges and disbursements of Majority Lenders' Advisors, one primary counsel to Agent, one primary counsel to the Indemnified Persons, taken as a whole, and if necessary, of one local counsel to the Indemnified Persons, taken as a whole, in any relevant jurisdiction and, solely in the case of a conflict of interest, of one additional counsel to the affected Indemnified Persons, as applicable, incurred by or asserted against any Indemnified Person arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby (including the Access Agreement or the Accommodation Agreement), (ii) any Loan or the use of the proceeds therefrom, or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnified Person is a party thereto, and the reasonable fees and expenses of legal counsel in connection with any such claim, litigation, investigation or proceeding; provided that such indemnity shall not, as to any Indemnified Person, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are among Indemnified Persons and do not involve Agent, the DIP ABL Agent or the Prepetition Senior Secured Notes Trustee (or their related respective Indemnified Persons) or are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnified Person or any of such Indemnified Person's Affiliates or any of its or their respective officers, directors, employees, agents, advisors or other representatives.  This Section 13.4 shall not apply with respect to Taxes other than any Taxes that represent losses or damages arising from any non-Tax claim.

(c)     Without limiting any other provision of this Section 13.4, each Borrower agrees to, jointly and severally, defend, indemnify, and hold harmless the Indemnified Persons against any and all Environmental Liabilities and Costs and all other claims, demands, penalties, fines, liability (including strict liability), losses, damages, costs and expenses (including, reasonable legal fees and expenses, consultant fees and laboratory fees), arising out of (a) any Releases or threatened Releases (i) at any property presently or formerly owned or operated by any Obligor or any Subsidiary of any Obligor, or any predecessor in interest, or (ii) any Hazardous Materials generated and disposed of by any Obligor or any Subsidiary of any Obligor, or any predecessor in interest; (b) any violations of Environmental Laws by any Obligor, any of their respective Subsidiaries or any predecessor in interest; (c) any Remedial Action relating to any Obligor or any Subsidiary of any Obligor, or any predecessor in interest; (d) any personal injury (including wrongful death) or property damage (real or personal) arising out of exposure to Hazardous Materials used, handled, generated, transported or disposed by any Obligor or any Subsidiary of any Obligor, or any predecessor in interest; and (e) any breach of any warranty or representation regarding environmental matters made by the Obligors in Section 8.1.27.  Notwithstanding the foregoing, the Obligors shall not have any obligation to any Indemnified Person under this Section 13.4(c) regarding any potential environmental matter covered hereunder which is determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnified Person or facts or circumstances first arising after repayment of the Obligations or termination of this Agreement.

Doc#: US1:9899064v18

(d)    To the extent that Borrowers fail to pay any amount required to be paid by it to Agent, under paragraph (a), (b) or (c) of this Section 13.4, each Lender severally agrees to pay to Agent such Lender's Term Loan Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, penalty, liability or related expense, as the case may be, was incurred by or asserted against Agent in its capacity as such.

(e)    To the extent permitted by applicable law, no Obligor shall assert, and each Obligor hereby waives, any claim against any Indemnified Person, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the Transactions, any Term Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Obligor hereby waives, releases and agrees not to sue upon any such claim or seek any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(f)    The indemnities, waivers and other obligations of the Borrowers set forth in this Section 13.4 shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

(g)    All amounts due under this Section 13.4 shall be payable promptly after the date on which demand therefor is made by Agent (as such expenses are incurred).  All amounts chargeable to Borrowers under this Section 13.4 shall be Obligations secured by all of the Collateral, shall be payable on demand (as such expenses are incurred) to such Indemnified Person, as the case may be, and shall bear interest from the date such demand is made until paid in full at the rate applicable to Base Rate Loans from time to time.

13.5    Sale of Interest.  No Obligor may sell, assign or transfer any interest in this Agreement, any of the other Loan Documents, or any of the Obligations, or any portion thereof, including such Obligor's rights, title, interests, remedies, powers and duties hereunder or thereunder without the prior written consent of each Lender (and any attempted assignment or transfer by such Obligor without such consent shall be null and void).

13.6    Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be held to be prohibited, invalid, illegal or unenforceable in any jurisdiction, such provision, as to such jurisdiction, shall be ineffective to the extent of such prohibition, invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof, and the prohibition, invalidity, illegality or unenforceability of a particular provision in a particular jurisdiction shall not prohibit or invalidate, or deem illegal or unenforceable, such provision in any other jurisdiction.

13.7    Successors and Assigns.  This Agreement, the Other Agreements and the Security Documents shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted under Sections 12.9 or 13.2.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in Section 13.2.2)) any legal or equitable right, remedy or claim under or by reason of this Agreement.

13.8    <u>Cumulative Effect; Conflict of Terms</u>.    The provisions of the Other Agreements and the Security Documents are hereby made cumulative with the provisions of this Agreement.    Except as otherwise provided in any of the other Loan Documents by specific reference to the applicable provision of this Agreement, if any provision contained in this Agreement is in direct conflict with, or inconsistent with, any provision in any of the other Loan Documents, the provision contained in this Agreement shall govern and control.

13.9    <u>Execution in Counterparts</u>.    This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered be deemed to be an original, and all of which counterparts taken together shall constitute but one and the same agreement.    Except as provided in <u>Section 10.1</u>, this Agreement shall become effective when it shall have been executed by Agent and when Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or electronic transmission via e-mailed pdf or other similar format shall be effective as delivery of a manually executed counterpart of this Agreement.

13.10    <u>Notice</u>.    Except as otherwise provided herein, all notices, requests and demands to or upon a party hereto, to be effective, shall be in writing, and shall be sent by certified or registered mail, return receipt requested, by personal delivery against receipt, by reputable overnight courier or by facsimile and, unless otherwise expressly provided herein, shall be deemed to have been validly served, given, delivered or received immediately when delivered against receipt, three (3) Business Days after deposit in the mail, postage prepaid, one (1) Business Day after deposit with an overnight courier or, in the case of facsimile notice, when sent and machine confirmed, <u>provided</u> that if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient, addressed as follows:

| | | |
|---|---|---|
| (A) | If to Agent: | Cantor Fitzgerald Securities<br>110 E. 59th Street<br>New York, NY 10022<br>Attention:  Nils Horning<br>Facsimile No.: (646) 219-1180<br>Telephone No.: (212) 829-4889<br>E-mail: nhorning@cantor.com |
| | With copies to: | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br>Attention:  Brian Kim<br>Facsimile No.: (212) 492-0780<br>Telephone No.: (212) 373-3780<br>E-mail: bkim@paulweiss.com |
| | | Shipman & Goodwin LLP<br>One Constitution Plaza<br>Hartford, CT 06103<br>Attention:  Nathan Plotkin<br>Facsimile No.: (860) 251-5212<br>Telephone No.: (860) 251-5320 |

Doc#: US1:9899064v18

(B)    If to Obligors:                        Diversified Machine, Inc.
                                             c/o Platinum Equity Advisors, LLC
                                             360 North Crescent Drive, South Bldg.
                                             Beverly Hills, California 90210
                                             Attention General Counsel
                                             Facsimile No.: (310) 712-1863
                                             Telephone No.: (310) 712-1850
                                             E-mail: ekalawski@platinumequity.com

        With a copy to (which shall          Weil Gotshal & Manges LLP
        not constitute notice):              767 Fifth Avenue
                                             New York, NY 10153
                                             Attention: Ray Schrock
                                             Facsimile No.: (212) 310-8007
                                             Telephone No.: (212) 310-8210
                                             E-mail:  ray.schrock@weil.com

(C)    If to any Lender, at its address indicated on Schedule 13.10 or in an Assignment and
       Acceptance Agreement.

or to such other address as each party may designate for itself by notice given in accordance with this
Section 13.10; provided, however, that any notice, request or demand to or upon Agent or a Lender
pursuant to Sections 4.1.1 or 5.2.2 hereof shall not be effective until received by Agent or such Lender.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic
communications (including e-mail and internet or intranet websites) pursuant to procedures approved in
advance by Agent; provided that the foregoing shall not apply to notices pursuant to Sections 2, 4 or 5 or
to compliance and no Event of Default certificates delivered pursuant to Section 9.1.2, unless otherwise
agreed by Agent and the applicable Lender.  Agent or the Borrower Representative may, in its discretion,
agree to accept notices and other communications to it hereunder by electronic communications pursuant
to procedures approved in advance by it; provided that approval of such procedures may be limited to
particular notices or communications.  All such notices and other communications (i) sent to an e-mail
address shall be deemed received upon the sender's receipt of an acknowledgement from the intended
recipient (such as by the "return receipt requested" function, as available, return e-mail or other written
acknowledgement), provided that if not given during the normal business hours of the recipient, such
notice or communication shall be deemed to have been given at the opening of business on the next
Business Day for the recipient, and (ii) posted to an Internet or intranet website shall be deemed received
upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing
clause (i) of notification that such notice or communication is available and identifying the website
address therefor.

        13.11    Consent.  Whenever Agent's, Majority Lenders', each Lender's or all Lenders' consent is
required to be obtained under this Agreement, any of the Other Agreements or any of the Security
Documents as a condition to any action, inaction, condition or event, except as otherwise specifically
provided herein, Agent, Majority Lenders, each Lender or all Lenders, as applicable, shall be authorized
to give or withhold such consent in its or their sole and absolute discretion.

        13.12    Credit Inquiries.  Obligors hereby authorize and permit Agent to respond to usual and
customary credit inquiries from third parties concerning any Obligor or any of its Subsidiaries.

Doc#: US1:9899064v18

13.13  Survival.  All representations and warranties made by the Obligors in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Term Loan Commitments and Incremental Exit Commitments have not expired or terminated.

13.14  Time of Essence.  Time is of the essence of this Agreement, the Other Agreements and the Security Documents.

13.15  Entire Agreement.  This Agreement and the other Loan Documents, together with all other instruments, agreements, documents and certificates executed by the parties in connection therewith or with reference thereto, embody the entire understanding and agreement between the parties hereto and thereto with respect to the subject matter hereof and thereof and supersede all prior agreements, understandings and inducements, whether express or implied, oral or written.

13.16  Interpretation.  No provision of this Agreement or any of the other Loan Documents shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such party having or being deemed to have drafted, structured or dictated such provision.

13.17  Confidentiality.  As required by federal law and Agent's policies and practices, Agent may need to obtain, verify, and record certain customer identification information and documentation in connection with opening or maintaining accounts, or establishing or continuing to provide services. Agent, each Lender agrees to use reasonable efforts (equivalent to the efforts Agent, such Lender applies to maintain the confidentiality of its own comparable confidential information) to maintain as confidential all information provided to them by any Obligor and designated as confidential, except that Agent, each Lender may disclose such information (a) to its and its Affiliates' directors, officers, employees, members, partners, stockholders and agents, including accountants, auditors, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential); (b) to (i) any assignee or Participant or potential assignee or Participant (in each case other than to any customer of the Obligors (including each Designated OEM Party) or operating competitor of the Obligors, in each case as represented by such Participant or potential assignee, without the prior written consent of the Borrower Representative, provided that it shall not be a violation of this Section 13.17 if such representation is not true and the consent of the Borrower Representative was not obtained prior to such disclosure, provided further, that, the Borrower Representative shall be deemed to have consented to any such disclosure unless it shall object thereto by written notice within ten (10) days after having received notice thereof), or (ii) any actual or potential counterparty to any swap or derivative transaction (including any Hedging Agreement) relating to the Obligors and their obligations, in each case that has agreed to comply and be bound by this Section 13.16 (and any such Person may disclose such information to the Persons applicable to it described in clause (a) above); (c) as required or requested by any Governmental Authority or examiner, or any insurance industry association, or as reasonably believed by Agent, such Lender to be compelled by any court decree, subpoena or legal or administrative order or process; provided that Agent or such Lender, as applicable, agrees that it will notify the Borrower Representative as soon as practicable in the event of any such disclosure by such Person pursuant to this clause (c) (other than at the request of a Governmental Authority) unless such notification is prohibited by law, rule or

regulation, or except in connection with any request as part of a regulatory examination or audit; (d) as it reasonably believes, or on the advice of its counsel, is required by law; (e) in connection with the exercise of any right or remedy under the Loan Documents or in connection with any suit, action, litigation or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (f) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any information relating to the Obligors received by it from such Lender); (g) to any other party to this Agreement; (h) with the consent of the Borrower Representative; or (i) that becomes publicly available other than as the result of a breach of this Section 13.16, or that becomes available to Agent, any Lender on a non-confidential basis from a source other than the Obligors. This Section 13.16 shall supersede all prior confidentiality agreements, non-disclosure agreements or other similar agreements between any Obligor and Agent or any Lender with respect to the treatment of confidential information.

EACH LENDER ACKNOWLEDGES THAT INFORMATION FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING THE BORROWERS, AND THEIR AFFILIATES AND THEIR RESPECTIVE SECURITIES, AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS, FURNISHED BY ANY BORROWER OR AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT THE BORROWERS AND THEIR AFFILIATES AND THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO EACH BORROWER AND AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

13.18  GOVERNING LAW; CONSENT TO FORUM.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO CONFLICTS OF LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION, BUT GIVING EFFECT TO FEDERAL LAWS APPLICABLE TO NATIONAL BANKS AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY COURT; PROVIDED, HOWEVER, THAT IF ANY OF THE COLLATERAL SHALL BE LOCATED IN ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK, THE LAWS OF SUCH JURISDICTION SHALL GOVERN THE METHOD, MANNER AND PROCEDURE FOR FORECLOSURE OF AGENT'S LIEN UPON SUCH COLLATERAL AND THE ENFORCEMENT OF AGENT'S OTHER REMEDIES IN RESPECT OF SUCH COLLATERAL TO THE EXTENT THAT THE LAWS OF SUCH JURISDICTION ARE DIFFERENT FROM OR INCONSISTENT WITH THE LAWS OF THE STATE OF NEW YORK.  AS PART OF THE CONSIDERATION FOR VALUE RECEIVED, AND REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF ANY OBLIGOR, AGENT OR ANY LENDER, EACH OBLIGOR

Doc#: US1:9899064v18

HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND FOR ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN NEW YORK, NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT. EACH OBLIGOR HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY CLAIMS, OBJECTIONS AND DEFENSES WHICH IT MAY NOW OR HEREAFTER HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT. EACH OBLIGOR HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINT AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO OBLIGORS AT THE ADDRESS SET FORTH IN THIS AGREEMENT AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF OBLIGORS' ACTUAL RECEIPT THEREOF OR 3 DAYS AFTER DEPOSIT IN THE U.S. MAILS, PROPER POSTAGE PREPAID. NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT SHALL BE DEEMED OR OPERATE TO AFFECT THE RIGHT OF AGENT OR ANY LENDER TO SERVE LEGAL PROCESS IN ANY OTHER MANNER PERMITTED BY LAW, OR TO PRECLUDE THE ENFORCEMENT BY AGENT OR ANY LENDER OF ANY JUDGMENT OR ORDER OBTAINED IN SUCH FORUM OR THE TAKING OF ANY ACTION UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT TO ENFORCE SAME IN ANY OTHER APPROPRIATE FORUM OR JURISDICTION.

13.19    WAIVERS BY OBLIGORS. EACH PARTY HERETO WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW (i) THE RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT, PROCEEDING OR COUNTERCLAIM OF ANY KIND DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATED TO ANY OF THE LOAN DOCUMENTS, THE OBLIGATIONS, THE TRANSACTIONS CONTEMPLATED HEREBY OR UNDER THE OTHER LOAN DOCUMENTS (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY); (ii) PRESENTMENT, DEMAND AND PROTEST AND NOTICE OF PRESENTMENT, PROTEST, DEFAULT, NON PAYMENT, MATURITY, RELEASE, COMPROMISE, SETTLEMENT, EXTENSION OR RENEWAL OF ANY OR ALL COMMERCIAL PAPER, ACCOUNTS, CONTRACT RIGHTS, DOCUMENTS, INSTRUMENTS, CHATTEL PAPER AND GUARANTIES AT ANY TIME HELD BY AGENT OR ANY LENDER ON WHICH THE OBLIGORS MAY IN ANY WAY BE LIABLE AND HEREBY RATIFIES AND CONFIRMS WHATEVER AGENT OR ANY LENDER MAY DO IN REGARD THEREOF; (iii) NOTICE PRIOR TO AGENT'S TAKING POSSESSION OR CONTROL OF THE COLLATERAL OR ANY BOND OR SECURITY WHICH MIGHT BE REQUIRED BY ANY COURT PRIOR TO ALLOWING AGENT TO EXERCISE ANY OF AGENT'S REMEDIES; (iv) THE BENEFIT OF ALL VALUATION, APPRAISEMENT AND EXEMPTION LAWS; AND (v) NOTICE OF ACCEPTANCE HEREOF. EACH OBLIGOR ACKNOWLEDGES THAT THE FOREGOING WAIVERS ARE A MATERIAL INDUCEMENT TO AGENT'S AND EACH LENDER'S ENTERING INTO THIS AGREEMENT AND THAT AGENT AND EACH LENDER IS RELYING UPON THE FOREGOING WAIVERS IN ITS FUTURE DEALINGS WITH OBLIGORS. EACH OBLIGOR WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THE

Doc#: US1:9899064v18

FOREGOING WAIVERS WITH ITS LEGAL COUNSEL AND HAS KNOWINGLY AND VOLUNTARILY WAIVED ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

13.20    <u>Advertisement</u>.    Obligors consent to the publication by Agent or any Lender of announcements commonly known as "tombstones" relating to the financing transactions contemplated by this Agreement (subject in each case to prior review and approval by the Borrower Representative).  No Lender may make any such announcement without the prior written consent of Agent (such consent of Agent to be given or withheld in Agent's sole and absolute discretion) and the Borrower Representative. Agent reserves the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

13.21    <u>Joint and Several Liability</u>.

Each Obligor hereby acknowledges and agrees that all of the representations, warranties, covenants, obligations, conditions, agreements and other terms contained in this Agreement and the other Loan Documents to which it is a party shall be applicable to and shall be binding upon each Obligor unless expressly otherwise stated herein.

Each Obligor shall be jointly and severally liable for all of the Obligations of each other Obligor, regardless of which Obligor actually receives the proceeds or other benefits of the Loans or other extensions of credit hereunder or the manner in which Obligors, Agent or any Lender accounts therefor in their respective books and records.

Each Obligor acknowledges that it will enjoy significant benefits from the business conducted by each other Obligor because of, inter alia, their combined ability to bargain with other Persons including their ability to receive the Loans and other credit extensions under this Agreement and the other Loan Documents which would not have been available to any Obligor acting alone.  Obligors' business is a mutual and collective enterprise, and the successful operation of each Obligor is dependent upon the successful performance of the integrated group.  Each Obligor has determined that it is in its best interest to procure the credit facilities contemplated hereunder, with the credit support of each other Obligor as contemplated by this Agreement and the other Loan Documents.  Obligors acknowledge that Agent's and Lenders' willingness to extend credit and to administer the Collateral on a combined basis hereunder is done solely as an accommodation to Obligors and at Obligors' request.

Each of Agent and the Lenders have advised each Obligor that it is unwilling to enter into this Agreement and the other Loan Documents and make available the credit facilities extended hereby or thereby to any Obligor unless each Obligor agrees, among other things, to be jointly and severally liable for the due and proper payment of the Obligations of each other Obligor.  Each Obligor has determined that it is in its best interest and in pursuit of its purposes that it so induce the Lenders to extend credit pursuant to this Agreement, the Loan Documents and the other documents executed in connection herewith (a) because of the desirability to each Obligor of the credit facilities hereunder and the interest rates and the modes of borrowing available hereunder and thereunder, (b) because each Obligor may engage in transactions jointly with other Obligors and (c) because each Obligor may require, from time to time, access to funds under this Agreement for the purposes herein set forth.  Each Obligor, individually, expressly understands, agrees and acknowledges, that the credit facilities contemplated hereunder would not be made available on the terms herein in the absence of the collective credit of all Obligors, and the joint and several liability of all Obligors.  Accordingly, each Obligor acknowledges that the benefit of the accommodations made under this Agreement to Obligors, as a whole, constitutes reasonably equivalent

value, regardless of the amount of the indebtedness actually borrowed by, advanced to, or the amount of credit provided to, or the amount of collateral provided by, any one Obligor.

To the extent that applicable law otherwise would render the full amount of the joint and several obligations of any Obligor hereunder and under the other Loan Documents invalid or unenforceable, such Person's obligations hereunder and under the other Loan Documents shall be limited to the maximum amount which does not result in such invalidity or unenforceability; provided, however, that each Obligor's obligations hereunder and under the other Loan Documents shall be presumptively valid and enforceable to their fullest extent in accordance with the terms hereof or thereof, as if this Section 13.21 were not a part of this Agreement.

To the extent that any Obligor shall make a payment under this Section 13.21 of all or any of the Obligations (a "Joint Liability Payment") which, taking into account all other Joint Liability Payments then previously or concurrently made by any other Obligor, exceeds the amount that such Obligor would otherwise have paid if each Obligor had paid the aggregate Obligations satisfied by such Joint Liability Payments in the same proportion that such Person's "Allocable Amount" (as defined below) (as determined immediately prior to such Joint Liability Payments) bore to the aggregate Allocable Amounts of each Obligor as determined immediately prior to the making of such Joint Liability Payments, then, following Payment in Full, such Obligor shall be entitled to receive contribution and indemnification payments from, and be reimbursed by, each other Obligor for the amount of such excess, *pro rata* based upon their respective Allocable Amounts in effect immediately prior to such Joint Liability Payments.  As of any date of determination, the "Allocable Amount" of any Obligor shall be equal to the maximum amount of the claim which could then be recovered from such Obligor under this Section 13.21 without rendering such claim voidable or avoidable under §548 of Chapter 11 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law.

Each Obligor assumes responsibility for keeping itself informed of the financial condition of each other Obligor, and any and all endorsers and/or guarantors of any instrument or document evidencing all or any part of such other Obligor's Obligations, and of all other circumstances bearing upon the risk of nonpayment by such other Obligor of their Obligations, and each Obligor agrees that neither Agent nor any Lender shall have any duty to advise such Obligor of information known to Agent or any Lender regarding such condition or any such circumstances or to undertake any investigation not a part of its regular business routine.  If Agent or any Lender, in its sole discretion, undertakes at any time or from time to time to provide any such information to an Obligor, neither Agent nor any Lender shall be under any obligation to update any such information or to provide any such information to such Obligor or any other Person on any subsequent occasion.

Each Obligor hereby authorizes Agent to, at any time and from time to time, (a) in accordance with the terms of this Agreement, renew, extend, accelerate or otherwise change the time for payment of, or other terms relating to, Obligations incurred by any Obligor, otherwise modify, amend or change the terms of any promissory note or other agreement, document or instrument now or hereafter executed by any Obligor and delivered to Agent or any Lender; (b) accept partial payments on an Obligation incurred by any Obligor; (c) take and hold security or collateral for the payment of an Obligation incurred by any Obligor hereunder or for the payment of any guaranties of an Obligation incurred by any Obligor or other liabilities of any Obligor and exchange, enforce, waive and release any such security or collateral; (d) apply such security or collateral and direct the order or manner of sale thereof as Agent, in its sole discretion, may determine; and (e) settle, release, compromise, collect or otherwise liquidate an Obligation incurred by any Obligor and any security or collateral therefor in any manner, without affecting or impairing the obligations of any other Obligor.  In accordance with the terms of this Agreement, Agent shall have the exclusive right to determine the time and manner of application of any

payments or credits, whether received from an Obligor or any other source, and such determination shall be binding on each Obligor.  In accordance with the terms of this Agreement, all such payments and credits may be applied, reversed and reapplied, in whole or in part, to any of an Obligation incurred by any Obligor as Agent shall determine in its sole discretion without affecting the validity or enforceability of the Obligations of any other Obligor.  For the avoidance of doubt, the authority granted to Agent pursuant to this <u>Section 13.21</u> is being granted solely by the Obligors and in no respect is a grant of authority by any Lender.  Nothing in this <u>Section 13.21</u> shall (i) modify any right of any Obligor or any Lender to consent to any amendment or modification of this Agreement or the other Loan Documents in accordance with the terms hereof or thereof, (ii) supplement or modify in any respect any authority granted by the Lenders to Agent pursuant to any other provision of this Agreement or any other Loan Documents or (iii) affect or in any way limit the rights of Agent or any Lender under this Agreement or any of the other Loan Documents.

Each Obligor hereby agrees that, except as hereinafter provided, its obligations hereunder shall be unconditional, irrespective of (a) the absence of any attempt to collect an Obligation incurred by any Obligor from any Obligor or any guarantor or other action to enforce the same; (b) any failure by Agent to take any steps to perfect and maintain its security interest in, or to preserve its rights to, any security or collateral for an Obligation incurred by any Obligor; (c) any borrowing or grant of a security interest by any Obligor as debtor-in-possession under §364 of the Bankruptcy Code; (d) the disallowance, under §502 of the Bankruptcy Code, of all or any portion of Agent's or any Lender's claim(s) for repayment of any portion of an Obligation incurred by any Obligor; or (e) any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor unless such legal or equitable discharge or defense is that of an Obligor in its capacity as a Borrower.

Any notice given by Borrower Representative hereunder shall constitute and be deemed to be notice given by all Obligors, jointly and severally.  Notice given by Agent or any Lender to Borrower Representative hereunder or pursuant to any other Loan Documents in accordance with the terms hereof or thereof shall constitute notice to each Obligor.  The knowledge of any Obligor shall be imputed to all Obligors and any consent by Borrower Representative or any Obligor shall constitute the consent of and shall bind all Obligors.

This <u>Section 13.21</u> is intended only to define the relative rights of Obligors and nothing set forth in this <u>Section 13.21</u> is intended to or shall impair the obligations of Obligors, jointly and severally, to pay any amounts as and when the same shall become due and payable in accordance with the terms of this Agreement or any other Loan Documents.  Nothing contained in this <u>Section 13.21</u> shall limit the liability of any Obligor to pay the credit facilities made directly or indirectly to such Obligor and accrued interest, fees and expenses with respect thereto for which such Obligor shall be primarily liable.

The parties hereto acknowledge that the rights of contribution and indemnification hereunder shall constitute assets of each Obligor to which such contribution and indemnification is owing.  The rights of any indemnifying an Obligor against the other Obligors under this <u>Section 13.21</u> shall be exercisable upon Payment in Full.

No payment made by or for the account of an Obligor, including (a) a payment made by such Obligor on behalf of an Obligation of another Obligor or (b) a payment made by any other Person under any guaranty, shall entitle such Obligor, by subrogation or otherwise, to any payment from such other Obligor or from or out of property of such other Obligor and such Obligor shall not exercise any right or remedy against such other Obligor or any property of such other Obligor by reason of any performance of such Obligor of its joint and several obligations hereunder, until, in each case, Payment in Full.

Doc#: US1:9899064v18

13.22    <u>Patriot Act Notice</u>.  Agent and Lenders hereby notify each Obligor that pursuant to the requirements of the Patriot Act, Agent and Lenders are required to obtain, verify and record information that identifies each Obligor, including its legal name, address, tax ID number and other information that will allow Agent and Lenders to identify it in accordance with the Patriot Act.  Agent and Lenders will also require information regarding each personal guarantor, if any, and may require information regarding any Obligor's management and owners, such as legal name, address, social security number and date of birth.

13.23    <u>Relationship with Lenders</u>.  The obligations of each Lender hereunder are several, and no Lender shall be responsible for the obligations or Commitments of any other Lender.  Amounts payable hereunder to each Lender shall be a separate and independent debt.  It shall not be necessary for Agent or any other Lender to be joined as an additional party in any proceeding for such purposes.  Nothing in this Agreement and no action of Agent, Lenders, Bank or any other secured party pursuant to the Loan Documents or otherwise shall be deemed to constitute Agent and any secured party to be a partnership, association, Joint Venture or any other kind of entity, nor to constitute control of any Obligor.

13.24    <u>Appointment for Perfection</u>.  Each Lender hereby appoints each other Lender as its agent for the purpose of perfecting Liens, for the benefit of Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable law can be perfected only by possession.  Should any Lender (other than Agent) obtain possession of any such Collateral, such Lender shall notify Agent thereof and, promptly upon Agent's request therefor, shall deliver such Collateral to Agent or otherwise deal with such Collateral in accordance with Agent's instructions.

13.25    <u>Independence of Covenants</u>.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permissible by an exception to, or would otherwise be within the limitations of, another covenant shall avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

13.26    <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated by any Loan Document, Obligors acknowledge and agree that (a)(i) this credit facility and any related arranging or other services by Agent, any Lender, any of their Affiliates or any arranger are arms'-length commercial transactions between Obligors and such Person; (ii) Obligors have consulted their own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate; and (iii) Obligors are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated by the Loan Documents; (b) each of Agent, Lenders, their Affiliates and any arranger is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for Obligors, any of their Affiliates or any other Person, and has no obligation with respect to the transactions contemplated by the Loan Documents except as expressly set forth therein; and (c) Agent, Lenders, their Affiliates and any arranger may be engaged in a broad range of transactions that involve interests that differ from those of Obligors and their Affiliates, and have no obligation to disclose any of such interests to Obligors or their Affiliates.  To the fullest extent permitted by applicable law, each Obligor hereby waives and releases any claims that it may have against Agent, Lenders, their Affiliates and any arranger with respect to any breach of agency or fiduciary duty in connection with any transaction contemplated by a Loan Document.

13.27    <u>Intercreditor Arrangements</u>.  Notwithstanding anything herein to the contrary, the Liens and security interests granted Agent pursuant to this Agreement and the exercise of any right or remedy by Agent hereunder, are subject to the Intercreditor Arrangements.  In the event of any conflict between the terms of the Intercreditor Arrangements and the terms of this Agreement, the terms of the Intercreditor Arrangements shall govern and control.

Doc#: US1:9899064v18

13.28    Anti-Terrorism Laws.

(a)    Each Borrower represents and warrants that (i) no Covered Entity is a Sanctioned Person and (ii) no Covered Entity, either in its own right or through any third party, (A) has any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (B) does business in or with, or derives any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; or (C) engages in any dealings or transactions prohibited by any Anti-Terrorism Law.

(b)    Each Borrower covenants and agrees that (i) no Covered Entity will become a Sanctioned Person, (ii) no Covered Entity, either in its own right or through any third party, will (A) have any of its assets in a Sanctioned Country or in the possession, custody or control of a Sanctioned Person in violation of any Anti-Terrorism Law; (B) do business in or with, or derive any of its income from investments in or transactions with, any Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law; (C) engage in any dealings or transactions prohibited by any Anti-Terrorism Law or (D) use the Term Loans to fund any operations in, finance any investments or activities in, or, make any payments to, a Sanctioned Country or Sanctioned Person in violation of any Anti-Terrorism Law, (iii) the funds used to repay the Obligations will not be derived from any unlawful activity, and (iv) each Covered Entity shall comply with all Anti-Terrorism Laws.

## SECTION 14. GUARANTY

14.1    Guaranty.  Each Obligor hereby jointly and severally, absolutely, unconditionally and irrevocably guarantees to Agent and each Lender, the prompt payment when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter, of all Secured Obligations now or hereafter existing under any Loan Document, whether for principal, interest, fees, commissions, indemnifications, and all costs and expenses including, without limitation, all court costs and reasonable and documented out of pocket attorneys' and paralegals' fees and expenses paid or incurred by Agent and the Lenders in endeavoring to collect all or any part of the Secured Obligations from, or in prosecuting any action against, any Borrower, any Guarantor or any other guarantor of all or any part of the Secured Obligations, in each case except to the extent consisting of obligations or liabilities with respect to Excluded Swap Obligations (collectively with the Secured Obligations, the "Guaranteed Obligations"). Each Guarantor further agrees that the Guaranteed Obligations may be extended or renewed in whole or in part without notice to or further assent from it, and that it remains bound upon its guarantee notwithstanding any such extension or renewal. All terms of this Agreement apply to and may be enforced by or on behalf of any domestic or foreign branch or Affiliate of any Lender that extended any portion of the Guaranteed Obligations.

14.2    Guaranty Absolute.  Each Obligor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of Agent or the Lenders with respect thereto. Each Obligor agrees that this Section 14 constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by Agent or any Lender to sue any Borrower, any Guarantor, any other guarantor, or any other Person obligated for all or any part of the Guaranteed Obligations (each, an "Obligated Party"), or otherwise enforce its payment against any Collateral securing all or any part of the Guaranteed Obligations.  The obligations of each Obligor under this Section 14 are independent of the Guaranteed Obligations and a separate action or actions may be brought and prosecuted against each Obligor to enforce such obligations, irrespective of whether any action is brought against any Obligor or whether any Obligor is joined in any such action or actions.  The liability of each Obligor under this Section 14 shall

Doc#: US1:9899064v18

be irrevocable, absolute and unconditional irrespective of, and each Obligor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

> (a)    any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

> (b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Obligor or otherwise;

> (c)    any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

> (d)    the existence of any claim, set-off, defense or other right that any Obligor may have at any time against any Person, including Agent or any Lender;

> (e)    any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Obligor; or

> (f)    any other circumstance (including any statute of limitations) or any existence of or reliance on any representation by Agent or the Lenders that might otherwise constitute a defense available to, or a discharge of, any Obligated Party (other than the defense of final payment in full of the Obligations).

14.3    <u>Waiver</u>.  To the maximum extent permitted by applicable law, each Obligor hereby waives (i) promptness and diligence, (ii) acceptance hereof, presentment, demand, protest, notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this <u>Section 14</u> and any requirement that Agent or the Lenders exhaust any right or take any action against any Obligor or any other Person or any Collateral, (iii) any right to compel or direct Agent or any Lender to seek payment or recovery of any amounts owed under this <u>Section 14</u> from any one particular fund or source or to exhaust any right or take any action against any other Obligor, any other Person or any Collateral, (iv) any requirement that Agent or any Lender protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Obligor, any other Person or any Collateral, (v) any defense, right of set-off, claim or counterclaim whatsoever and any and all other rights, benefits, protections and other defenses available to such Obligor now or at any time hereafter, whether or not constituting applicable law; (vi) all benefits or defenses arising under Chapter 2 of Title 14 of the California Civil Code, and all successor sections, whether or not constituting applicable law; and (vii) all other principles or provisions of law, if any, that conflict with the terms of this <u>Section 14</u>, including the effect of any circumstances that may or might constitute a legal or equitable discharge of a guarantor.  Each Obligor confirms that it is not a surety under any state law and shall not raise any such law as a defense to its obligations hereunder.  Each Obligor waives all rights and defenses arising out of an election of remedies by Agent and the Lenders, even though that election of remedies, such as a judicial or nonjudicial sale or foreclosure, or an assignment of any Collateral in lieu of foreclosure, in each case with respect to security for a guaranteed obligation, has destroyed such Obligor's rights of subrogation and reimbursement against the principal (by the operation of Section 580d of the California Code of Civil Procedure, or otherwise).  Each Obligor agrees that Agent and the Lenders shall have no obligation to marshal any assets in favor of any Obligor or against, or in payment of, any or all of the Guaranteed Obligations.  Each Obligor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this <u>Section 14.3</u> is

knowingly made in contemplation of such benefits.  Each Obligor hereby waives any right to revoke this Section 14, and acknowledges that this Section 14 is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.  Any reference herein to California code sections shall be deemed to include any equivalent code provisions under New York law.  Without limiting the applicability of the equivalent code provisions under New York law, the foregoing references to the California Code of Civil Procedure and the California Civil Code shall apply if, notwithstanding the provisions of this Agreement and the other Loan Documents, the laws of the State of California are applied to the Loan Documents; provided, that the inclusion of such provisions does not affect or limit in any way the parties' choice of New York law.

14.4    Continuing Guaranty; Assignments.  This Section 14 is a continuing guaranty and shall (a) remain in full force and effect until the later of (i) the cash payment in full of the Guaranteed Obligations (other than contingent indemnification obligations as to which no claim has been made) and all other amounts payable under this Section 14 and (ii) Payment in Full, (b) be binding upon each Obligor, its successors and assigns and (c) inure to the benefit of and be enforceable by Agent and the Lenders and their successors, pledgees, transferees and assigns.  Without limiting the generality of the foregoing clause (c), any Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including all or any portion of its Term Loan Commitments, Incremental Exit Commitments and its Term Loans) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted such Lender herein or otherwise, in each case as provided in Section 13.2.

14.5    Subrogation.  No Obligor will exercise any rights that it may now or hereafter acquire against any Obligated Party that arise from the existence, payment, performance or enforcement of such Obligor's obligations under this Section 14, including any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim, cause of action or remedy of Agent and the Lenders against any Obligor or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including the right to take or receive from any Obligor or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until Payment in Full.  If any amount shall be paid to any Obligor in violation of the immediately preceding sentence at any time prior to Payment in Full, such amount shall be held in trust for the benefit of Agent for its benefit and the benefit of the other Secured Parties and shall forthwith be paid to Agent for its benefit and the benefit of the other Secured Parties to be credited and applied to the Guaranteed Obligations, and all other amounts payable under this Section 14, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations, or other amounts payable under this Section 14 thereafter arising.  If any Obligor shall make payment to Agent and the Lenders of all or any part of the Guaranteed Obligations, upon Payment in Full, Agent and the Lenders will, at such Obligor's request and expense, execute and deliver to such Obligor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Obligor of an interest in the Guaranteed Obligations, resulting from such payment by such Obligor.

14.6    [Intentionally omitted].

14.7    Information.  Each Guarantor assumes all responsibility for being and keeping itself informed of Borrowers' financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that each Guarantor assumes and incurs under this Agreement, and agrees that neither Agent nor any Lender shall have any duty to advise any Guarantor of information known to it regarding those circumstances or risks.

Doc#: US1:9899064v18

14.8    [Intentionally omitted].

14.9    Taxes.  All payments of the Guaranteed Obligations will be made by each Guarantor free and clear of and without deduction for any Non-Excluded Taxes or Other Taxes; provided that if any Guarantor shall be required to deduct any Non-Excluded Taxes or Other Taxes from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 14.9) Agent or any Lender (as the case may be) receives an amount equal to the sum it would have received had no such deductions been made, (ii) such Guarantor shall make such deductions and (iii) such Guarantor shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

14.10    Maximum Liability.  The provisions of this Agreement are severable, and in any action or proceeding involving any state corporate law, or any state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under this Agreement would otherwise be held or determined to be avoidable, invalid or unenforceable on account of the amount of such Guarantor's liability under this Agreement, then, notwithstanding any other provision of this Agreement to the contrary, the amount of such liability shall, without any further action by the Guarantors or the Lenders, be automatically limited and reduced to the highest amount that is valid and enforceable as determined in such action or proceeding (such highest amount determined hereunder being the relevant Guarantor's "Maximum Liability".  This Section 14.10 with respect to the Maximum Liability of each Guarantor is intended solely to preserve the rights of the Lenders to the maximum extent not subject to avoidance under applicable law, and no Guarantor nor any other person or entity shall have any right or claim under this Section 14.10 with respect to such Maximum Liability, except to the extent necessary so that the obligations of any Guarantor hereunder shall not be rendered voidable under applicable law.  Each Guarantor agrees that the Guaranteed Obligations may at any time and from time to time exceed the Maximum Liability of each Guarantor without impairing this Agreement or affecting the rights and remedies of the Lenders hereunder, provided that, nothing in this sentence shall be construed to increase any Guarantor's obligations hereunder beyond its Maximum Liability.

14.11    Contribution.  In the event any Guarantor (a "Paying Guarantor") shall make any payment or payments under this Agreement or shall suffer any loss as a result of any realization upon any collateral granted by it to secure its obligations under this Agreement, each other Guarantor (each a "Non-Paying Guarantor") shall contribute to such Paying Guarantor an amount equal to such Non-Paying Guarantor's "Applicable Guarantor Percentage" of such payment or payments made, or losses suffered, by such Paying Guarantor.  For purposes of this Section 14, each Non-Paying Guarantor's "Applicable Guarantor Percentage" with respect to any such payment or loss by a Paying Guarantor shall be determined as of the date on which such payment or loss was made by reference to the ratio of (i) such Non-Paying Guarantor's Maximum Liability as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder) or, if such Non-Paying Guarantor's Maximum Liability has not been determined, the aggregate amount of all monies received by such Non-Paying Guarantor from Borrowers after the date hereof (whether by loan, capital infusion or by other means) to (ii) the aggregate Maximum Liability of all Guarantors hereunder (including such Paying Guarantor) as of such date (without giving effect to any right to receive, or obligation to make, any contribution hereunder), or to the extent that a Maximum Liability has not been determined for any Guarantor, the aggregate amount of all monies received by such Guarantors from Borrowers after the date hereof (whether by loan, capital infusion or by other means).  Nothing in this provision shall affect any Guarantor's several liability for the entire amount of the Guaranteed Obligations (up to such Guarantor's Maximum Liability).  Each of the Guarantors covenants and agrees that its right to receive any contribution under this Agreement from a Non-Paying Guarantor shall be subordinate and junior in right of payment to the payment in full in cash of the Guaranteed Obligations.  This provision is for the benefit

104

of each of Agent, each Lender, and the Guarantors, and may be enforced by any one, or more, or all of them in accordance with the terms hereof.

14.12   Keepwell.   Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Guarantor to honor all of such Guarantor's obligations under this Agreement in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this subsection for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this subsection, or otherwise under this Agreement, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this subsection shall remain in full force and effect until the termination of each Guarantor's obligations under this Agreement.   Each Qualified ECP Guarantor intends that this subsection constitute, and this subsection shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Guarantor for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

## SECTION 15. THE BORROWER REPRESENTATIVE

15.1   Appointment; Nature of Relationship.   Chassix is hereby appointed by each Borrower as its contractual representative (herein referred to as the "Borrower Representative") hereunder and under each other Loan Document, and each Borrower irrevocably authorizes the Borrower Representative to act as the contractual representative of such Borrower with the rights and duties expressly set forth herein and in the other Loan Documents.   The Borrower Representative agrees to act as such contractual representative upon the express conditions contained in this Section 15.   Additionally, Borrowers hereby appoint the Borrower Representative as their agent to receive all of the proceeds of the Loans in the deposit account or accounts designated for such purpose by the Borrower Representative from time to time, at which time the Borrower Representative shall promptly disburse such Loans to the appropriate Borrower.   Agent and the Lenders, and their respective officers, directors, agents or employees, shall not be liable to the Borrower Representative or any Borrower for any action taken or omitted to be taken by the Borrower Representative or Borrowers pursuant to this Section 15.1.

15.2   Powers.   The Borrower Representative shall have and may exercise such powers under the Loan Documents as are specifically delegated to the Borrower Representative by the terms of each thereof, together with such powers as are reasonably incidental thereto.   The Borrower Representative shall have no implied duties to Borrowers, or any obligation to the Lenders to take any action thereunder except any action specifically provided by the Loan Documents to be taken by the Borrower Representative.

15.3   Employment of Agents.   The Borrower Representative may execute any of its duties as the Borrower Representative hereunder and under any other Loan Document by or through authorized officers.

15.4   Notices.   Each Borrower shall immediately notify the Borrower Representative of the occurrence of any Default or Event of Default hereunder or under any other Loan Document, referring to this Agreement describing such Default or Event of Default and stating that such notice is a "notice of default."   In the event that the Borrower Representative receives such a notice, the Borrower Representative shall give prompt notice thereof to Agent and the Lenders.   Any notice provided to the Borrower Representative hereunder shall constitute notice to each Borrower on the date received by the Borrower Representative.

Doc#: US1:9899064v18

15.5    <u>Successor Borrower Representative</u>.    Upon the prior written consent of Agent, the Borrower Representative may resign at any time, such resignation to be effective upon the appointment of a successor Borrower Representative who shall be reasonably acceptable to Agent.    Agent shall give prompt written notice of such resignation to the Lenders.

15.6    <u>Execution of Loan Documents</u>.    The Borrowers hereby empower and authorize the Borrower Representative, on behalf of all Borrowers, to execute and deliver to Agent and the Lenders the Loan Documents and all related agreements, certificates, documents, or instruments as shall be necessary or appropriate to effect the purposes of the Loan Documents, including without limitation the Compliance Certificates.    Each Borrower agrees that any action taken by the Borrower Representative or Borrowers in accordance with the terms of this Agreement or the other Loan Documents, and the exercise by the Borrower Representative of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of Borrowers.    Agent and Lenders are entitled to conclusively rely on any information provided by Borrower Representative on behalf of the Borrowers.

15.7    <u>[Intentionally omitted]</u>.

15.8    <u>Excluded Swap Obligations and Security Documents</u>.    Notwithstanding anything to the contrary contained in any Loan Document, no Lien on any asset of any Guarantor created under any Security Document shall secure any Excluded Swap Obligation.

[Signature Pages Follow]

Doc#: US1:9899064v18

**IN WITNESS WHEREOF**, this Agreement has been duly executed on the day and year specified at the beginning of this Agreement.

**CHASSIX, INC.**

By: _____

Name: J. Mark Allan
Title: President and Chief Executive Officer

**DIVERSIFIED MACHINE, INC.**

By: _____

Name: J. Mark Allan
Title: President and Chief Executive Officer

**DIVERSIFIED MACHINE BRISTOL, LLC**

By: _____

Name: J. Mark Allan
Title: President and Chief Executive Officer

**DIVERSIFIED MACHINE MONTAGUE, LLC**

By: _____

Name: J. Mark Allan
Title: President and Chief Executive Officer

**DIVERSIFIED MACHINE, MILWAUKEE LLC**

By: _____

Name: J. Mark Allan
Title: President and Chief Executive Officer

**DMI EDON LLC**

By: _____

Name:  J. Mark Allan
Title:  President and Chief Executive Officer

**MEXICO PRODUCTS I, LLC**

By: _____

Name:  J. Mark Allan
Title:  President and Chief Executive Officer

**DMI COLUMBUS, LLC**

By: _____

Name:  J. Mark Allan
Title:  President and Chief Executive Officer

**CHASSIX GEORGIA MACHINING, LLC**

By: _____

Name:  J. Mark Allan
Title:  President and Chief Executive Officer

**DMI CHINA HOLDING LLC**

By: _____

Name:  J. Mark Allan
Title:  President and Chief Executive Officer

**CONCORD INTERNATIONAL, INC.**

By: _____

Name:  J. Mark Allan
Title:  President

[SIGNATURE PAGE TO DIP TERM LOAN AGREEMENT]

**SMW AUTOMOTIVE, LLC**

By: _____
    Name:  J. Mark Allan
    Title:  President

**AUTOMOTIVE, LLC**

By: _____
    Name:  J. Mark Allan
    Title:  President

**CHASSIS CO. OF MICHIGAN, LLC**

By: _____
    Name:  J. Mark Allan
    Title:  President

**AUTOMOTIVE PROPERTIES OF NEW YORK, LLC**

By: _____
    Name:  J. Mark Allan
    Title:  President

**ALUTECH, LLC**

By: _____
    Name:  J. Mark Allan
    Title:  President

**UC HOLDINGS, INC.**

By: _____
    Name:  J. Mark Allan
    Title:  President and Chief Executive Officer

[SIGNATURE PAGE TO DIP TERM LOAN AGREEMENT]

**CHASSIX HOLDINGS, INC.**

By: _____
Name:  J. Mark Allan
Title:  President

[SIGNATURE PAGE TO DIP TERM LOAN AGREEMENT]

**CANTOR FITZGERALD SECURITIES,**
as Agent

By:  _____
Name: James Bond
Title:  Chief Operating Officer

[SIGNATURE PAGE TO DIP TERM CREDIT AGREEMENT]

CANTOR FITZGERALD SECURITIES, as a
Lender

By: _____

Name:

Title:       James Bond
             Chief Operating Officer

GGC Finance Partnership, LP, as a Lender

By: _____
Name: Rob Stobo
Title: Portfolio Manager

AVENUE INCOME CREDIT STRATEGIES
FUND, as a Lender

By: _____
Name: Jeff Gary
Title: PM

AVENUE MUTUAL FUNDS TRUST
on behalf of its series,
Avenue Credit Strategies Fund, as a Lender

By: _____
Name:
Title:

Special Situations Investing Group, Inc., as a
Lender

By: _____

Name: GEOFFREY P. ADAMSON

Title: MANAGING DIRECTOR

Lord, Abbett & Co. LLC for
and on behalf of multiple clients_____,
as a Lender

By: _____
Name: Lawrence H. Kaplan
Title: Member & General Counsel

MIDOCEAN CREDIT FOCUS FUND I L.P., as a Lender

By: MidOcean Credit Opportunity Fund, GP L.P., its General Partner

By: Ultramar Credit Holdings, Ltd., its General Partner

By: _____

Name:

Title:    **Damion Brown**
          Director

MIDOCEAN CREDIT OPPORTUNITY MASTER
FUND, L.P., as a Lender

By: MidOcean Credit Opportunity Fund, GP L.P.,
its General Partner

By: Ultramar Credit Holdings, Ltd., its General
Partner

By:

Name:    Damion Brown
Title:    Director

OCM CHSX Holdings, LLC, as a Lender

By:    OCM FIE, LLC, its Manager

By:    _____
       Name:  Nicholas Basso
       Title:  Authorized Signatory

By:    _____
       Name:  **Emily Stephens**
       Title:  **Authorized Signatory**

**COMMITMENT SCHEDULE**

| Lender | Initial Term Loan Commitment | Delayed Draw Term Loan Commitment | Incremental Exit Commitment |
|---|---|---|---|
| OCM CHSX Holdings, LLC | $ 22,506,639.48 | $ 5,626,659.87 | $ 14,410,282.74 |
| Cantor Fitzgerald Securities | $ 16,359,976.21 | $ 4,089,994.06 | $ 9,253,324.46 |
| Lord, Abbett and Co., LLC | $ 10,637,944.22 | $ 2,659,486.05 | $ 6,811,136.07 |
| Avenue Credit Strategies Fund | $ 8,497,792.61 | $ 2,124,448.15 | $ 5,440,865.32 |
| Avenue Income Credit Strategies Fund | $ 1,756,003.62 | $ 439,000.91 | $ 1,124,313.06 |
| Special Situations Investing Group, Inc. | $ 9,160,451.96 | $ 2,290,112.99 | $ 5,865,144.95 |
| MidOcean Credit Opportunity Master Fund, L.P. | $ 5,611,515.58 | $ 1,402,878.89 | $ 3,592,874.28 |
| MidOcean Credit Focus Fund I L.P. | $ 1,037,199.56 | $ 259,299.89 | $ 664,085.76 |
| GGC Finance Partnership, L.P. | $ 4,432,476.76 | $ 1,108,119.19 | $ 2,837,973.36 |
| **Total** | **$ 80,000,000.00** | **$ 20,000,000.00** | **$ 50,000,000.00** |

**Exhibit E**

**Intercreditor Agreement**

EXECUTION VERSION

INTERCREDITOR AGREEMENT

by and between

BMO HARRIS BANK N.A.,
as ABL Collateral Agent

and

U.S. Bank National Association,
as Notes Collateral Agent

Dated as of July 23, 2013

# TABLE OF CONTENTS

<u>Page No</u>.

ARTICLE 1
DEFINITIONS

Section 1.1    Definitions ..........................................................................................................1
Section 1.2    Rules of Construction ........................................................................................15

ARTICLE 2
LIEN PRIORITY

Section 2.1    Priority of Liens ................................................................................................15
Section 2.2    Waiver of Right to Contest Liens .....................................................................16
Section 2.3    New Liens ..........................................................................................................16
Section 2.4    Similar Liens and Agreements ..........................................................................17
Section 2.5    Exercise of Remedies; Restrictions on Notes Collateral Agent and the
               Notes Secured Parties .......................................................................................17
Section 2.6    Exercise of Remedies; Restrictions on ABL Collateral Agent and the
               ABL Secured Parties ........................................................................................22

ARTICLE 3
ACTIONS OF THE PARTIES

Section 3.1    Collateral Access Rights ...................................................................................26
Section 3.2    Notes Collateral Rights/Access to Information .................................................28
Section 3.3    Exercise of Remedies – Set-Off and Tracing of and Priorities in
               Proceeds ............................................................................................................28

ARTICLE 4
APPLICATION OF PROCEEDS

Section 4.1    Application of Proceeds ....................................................................................29
Section 4.2    Specific Performance ........................................................................................30

ARTICLE 5
OTHER AGREEMENTS

Section 5.1    Releases .............................................................................................................31
Section 5.2    Insurance ...........................................................................................................32
Section 5.3    Amendments to ABL Documents and Notes Documents; Refinancing ...............33
Section 5.4    Bailees for Perfection .......................................................................................35

ARTICLE 6
INSOLVENCY OR LIQUIDATION PROCEEDINGS

Section 6.1    Finance Issues ...................................................................................................36
Section 6.2    Relief from the Automatic Stay ........................................................................38

Page No.

Section 6.3    Adequate Protection.................................................................................39
Section 6.4    Avoidance Issues ...................................................................................41
Section 6.5    Reorganization Securities .......................................................................42
Section 6.6    Post-Petition Interest..............................................................................42
Section 6.7    Separate Grants of Security and Separate Classification.............................43
Section 6.8    Asset Dispositions in an Insolvency or Liquidation Proceeding ...................44
Section 6.9    Certain Waivers .....................................................................................45

ARTICLE 7
MISCELLANEOUS

Section 7.1     Subrogation............................................................................................45
Section 7.2     Further Assurances.................................................................................46
Section 7.3     Representations .....................................................................................46
Section 7.4     Amendments .........................................................................................46
Section 7.5     Addresses for Notices ............................................................................47
Section 7.6     No Waiver, Remedies .............................................................................47
Section 7.7     Continuing Agreement, Transfer of Secured Obligations ............................47
Section 7.8     Governing Law; Entire Agreement...........................................................48
Section 7.9     Counterparts..........................................................................................48
Section 7.10    No Third Party Beneficiaries...................................................................48
Section 7.11    Headings ..............................................................................................48
Section 7.12    Severability ..........................................................................................48
Section 7.13    Attorneys' Fees .....................................................................................48
Section 7.14    VENUE; JURY TRIAL WAIVER.............................................................48
Section 7.15    Intercreditor Agreement.........................................................................49
Section 7.16    Effectiveness.........................................................................................49
Section 7.17    Collateral Agents ..................................................................................49
Section 7.18    No Warranties or Liability ......................................................................49
Section 7.19    Conflicts...............................................................................................50
Section 7.20    Information Concerning Financial Condition of the Grantors.......................50

INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT (as amended, supplemented, restated or otherwise modified from time to time pursuant to the terms hereof, this "**Agreement**") is entered into as of July 23, 2013 between **BMO HARRIS BANK N.A.** ("**BMO**"), in its capacity as collateral agent for the ABL Secured Parties (as defined below), and U.S. Bank National Association , in its capacity as collateral agent (the "**Notes Collateral Agent**") for the Notes Secured Parties (as defined below).

RECITALS

A.       CHASSIX, INC., a Delaware corporation (the "**Company**"), is party to that certain senior secured asset based revolving credit facility, dated as of July 23, 2013 (as amended, restated, supplemented, waived, Refinanced or otherwise modified from time to time (including without limitation to add new loans thereunder or increase the amount of loans thereunder), the "**ABL Credit Agreement**"), among the Company, the several Subsidiary Borrowers party thereto, the guarantors party thereto, the Lenders party thereto from time to time, BMO HARRIS BANK N.A., as Administrative Agent, and the other parties named therein.

B.       The Company is party to an indenture related to the Notes (as defined below), dated as of July 23, 2013 (as amended, restated, supplemented, waived, Refinanced or otherwise modified from time to time, the "**Indenture**"), among the Company, the guarantors identified therein and U.S. Bank National Association, as Trustee.

C. The Company and the other Grantors have consented to this Agreement pursuant to the Consent of Company and Grantors in the form of Exhibit A hereto.

In consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**ARTICLE 1**
**DEFINITIONS**

**Section 1.1**       **Definitions.**  Unless the context otherwise requires, all capitalized terms used but not defined herein shall have the meanings set forth in the ABL Credit Agreement or the Indenture, as applicable, in each case as in effect on the Closing Date.  In addition, as used in this Agreement, the following terms shall have the meanings set forth below:

"**ABL Collateral**" means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted (or purported to be granted) as security for any ABL Obligations.

"**ABL Collateral Agent**" means BMO, in its capacity as agent for the ABL Secured Parties under the ABL Credit Agreement and the other ABL Documents entered into pursuant to the ABL Credit Agreement, together with its successors and permitted assigns under the ABL Credit Agreement and any other agent or representative of the ABL Secured Parties under the ABL Credit Agreement exercising substantially the same rights and powers; and in each case <u>provided</u>

that if such ABL Collateral Agent is not BMO, such ABL Collateral Agent shall have become a party to this Agreement and the other applicable ABL Security Documents.

"**ABL Credit Agreement**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**ABL Default**" means an "Event of Default" (as defined in the ABL Credit Agreement).

"**ABL DIP Financing**" has the meaning assigned to that term in Section 6.1(a).

"**ABL Documents**" means the credit, guaranty and security documents governing the ABL Obligations, including, without limitation, the ABL Credit Agreement, the ABL Security Documents, the other Loan Documents (as defined in the ABL Credit Agreement), Hedging Agreements related to Secured Hedging Obligations  and documentation entered into by any Grantor relating to Secured Bank Product Obligations, as each may be amended, restated, supplemented, modified, renewed, extended or Refinanced from time to time in accordance with the provisions of this Agreement.

"**ABL Lenders**" means the "Lenders" under and as defined in the ABL Credit Agreement.

"**ABL Mortgages**" means a collective reference to each mortgage, deed of trust and other document or instrument under which any Lien on real property owned or leased by any Grantor is granted (or purported to be granted) to secure any ABL Obligations or under which rights or remedies with respect to any such Liens are governed.

"**ABL Obligations**" means all Obligations outstanding under the ABL Credit Agreement and the other ABL Documents, including any Secured Bank Product Obligations and any Secured Hedging Obligations.  "ABL Obligations" shall include all interest, fees and other amounts accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue, regardless of whether a claim therefor is allowed or allowable in any such Insolvency or Liquidation Proceeding) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant ABL Document whether or not the claim for such interest, fees and other amounts is allowed as a claim in such Insolvency or Liquidation Proceeding.

"**ABL Priority Collateral**" means any and all of the following assets and property of any Grantor all now-owned or hereafter acquired ABL Collateral that constitutes:

      (a)     all Accounts;

      (b)     all (x) Deposit Accounts (other than the Notes Collateral Account, Notes Trust Monies and identifiable proceeds of Notes Priority Collateral) and money and all cash, checks, other negotiable instruments, funds and other evidences of payments held therein (other than identifiable proceeds of Notes Priority Collateral), and (y) Securities Accounts and Security Entitlements and securities credited thereto (other than the Notes Collateral Account, Notes Trust Monies and identifiable proceeds of Notes Priority Col-

lateral) and, in each case, all cash, checks and other property held therein or credited thereto (other than identifiable proceeds of Notes Priority Collateral);

    (c)    all Inventory and all documents of title for any Inventory;

    (d)    all customer accommodation agreements or similar agreements regarding the manufacture or sale of Inventory to which any Grantor is a party from time to time, and all supply agreements or similar agreements regarding the manufacture or supply of Inventory to which any Grantor is a party from time to time;

    (e)    all Instruments (including, without limitation, promissory notes), Documents and Chattel Paper at any time evidencing any of the property described in clauses (a) through (d) of this definition, except to the extent constituting identifiable Proceeds of Notes Priority Collateral;

    (f)    to the extent relating to, evidencing or governing any of the items referred to in the preceding clauses (a) through (e) of this definition, all General Intangibles (other than Capital Stock held by the Company and its Subsidiaries and Intellectual Property) and Commercial Tort Claims;

    (g)    to the extent relating to any of the items referred to in the preceding clauses (a) through (d) above, all Supporting Obligations and Letter of Credit Rights;

    (h)    all books and records relating to the items referred to in the preceding clauses (a) through (g) above (including all books, databases, customer lists, and records, whether tangible or electronic, which contain any information relating to any of the items referred to in the preceding clauses (a) through (g)); and

    (i)    all Proceeds of any of the foregoing, including collateral security and guarantees with respect to any of the foregoing and all cash, Money, insurance proceeds relating to Inventory and business interruption insurance, Instruments, Securities, Financial Assets and Deposit Accounts constituting Proceeds of the foregoing.

"**ABL Secured Parties**" means the "Secured Parties" as defined in the ABL Credit Agreement.

"**ABL Security Agreement**" means, initially, the provisions set forth in Sections 6 and 7 of the ABL Credit Agreement and any security agreement that amends, restates, supplements, modifies, renews, extends or Refinances such provisions.

"**ABL Security Documents**" means the ABL Security Agreement and the other Security Documents (as defined in the ABL Credit Agreement) and any other agreement, document or instrument pursuant to which a Lien is granted or purported to be granted securing ABL Obligations or under which rights or remedies with respect to such Liens are governed.

"**ABL Standstill Period**" has the meaning set forth in Section 2.6(a)(i).

"**Access Period**" means for each parcel of Mortgaged Property, the period, after the commencement of an Enforcement Period by the ABL Collateral Agent, which begins on the earlier of (a) the day on which the ABL Collateral Agent provides the Notes Collateral Agent with the written notice of its election to request access pursuant to Section 3.1(b) and (b) the fifth Business Day after the Notes Collateral Agent provides the ABL Collateral Agent with notice that the Notes Collateral Agent (or its agent) has obtained possession or control of such parcel and ends on the earlier of (i) the 180th day after the date (the "**Initial Access Date**") on which the ABL Collateral Agent, or its designee, initially obtains the ability to take physical possession of, remove, or otherwise control physical access to, or actually uses, the ABL Collateral located on such Mortgaged Property plus such number of days, if any, after the Initial Access Date that it is stayed or otherwise prohibited by law or court order from exercising remedies with respect to Collateral located on such Mortgaged Property (provided that if the ABL Collateral Agent is stayed or otherwise prohibited by law or court order from exercising remedies with respect to associated ABL Priority Collateral, if as of the commencement of such stay or other prohibition less than 90 days remain in the 180-day period, the 180-day period shall be extended so that it continues to the date that is 90 days following the date such stay is lifted or prohibition re-moved), and (ii) the termination of such Enforcement Period.

"**Accounts**" means all "accounts" as such term is defined in the UCC.

"**Additional Pari Passu Notes Collateral Agent**" means the Person appointed to act as trustee, agent or representative for the holders of Additional Pari Passu Notes Obligations pursu-ant to any Additional Pari Passu Notes Agreement, it being understood and agreed that no Addi-tional Pari Passu Notes Agent (if other than the Notes Collateral Agent) shall hold any Lien on Collateral.

"**Additional Pari Passu Notes Agreement**" means the indenture, credit agreement or other agreement under which any Additional Pari Passu Notes Obligations are incurred.

"**Additional Pari Passu Notes Obligations**" means Indebtedness of the Grantors issued following the date of this Agreement to the extent (a) such Indebtedness is permitted by the terms of the ABL Credit Agreement and the Indenture to be secured by Liens on the Collateral ranking pari passu with the Liens securing the Notes Obligations, (b) the Grantors have granted Liens on the Collateral to secure the obligations in respect of such Indebtedness, and (c) the Ad-ditional Pari Passu Notes Agent, for the holders of such Indebtedness, has executed a joinder agreement to the Notes Security Documents in the form attached thereto (or other form reasona-bly satisfactory to the Notes Collateral Agent) agreeing on behalf of itself and such holders to (i) be bound by the terms of this Agreement applicable to them, (ii) appoint the Notes Collateral Agent to act as their collateral agent and representative hereunder and (iii) agree to be bound by the pari passu intercreditor provisions contained in the Notes Security Documents entered into in connection with the Indenture (which provisions are binding on the Notes Secured Parties only).

"**Affiliate**" means, with respect to a specified Person, another Person that directly, or in-directly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.  For purposes of this definition, a Person shall be deemed to "control" or be "controlled by" a Person if such Person possesses, directly or indirectly, power to

direct or cause the direction of the management or policies of such Person whether through ownership of equity interests, by contract or otherwise.

"**Agents**" means the ABL Collateral Agent and the Notes Collateral Agent.

"**Agreement**" shall have the meaning assigned to that term in the introduction to this Agreement.

"**Bank Product Obligations**" means all Obligations relating to Bank Products.

"**Bank Product Provider**" means any ABL Lender or Affiliate of an ABL Lender that provides any Bank Products to any Grantor.

"**Bank Products**" means "Bank Products" as such term is defined in the ABL Credit Agreement or any comparable definition (including a definition of "Cash Management Services").

"**Bankruptcy Code**" means Title 11 of the United States Code (11 U.S.C. §101 et seq.), as amended from time to time, and any successor statute.

"**Bankruptcy Law**" means the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect affecting the rights of creditors generally.

"**Business Day**" means a day that is a "Business Day" under both the Indenture and the ABL Credit Agreement.

"**Capital Stock**" means the interest, whether voting or non-voting, and whether denominated as common stock or preferred stock or ordinary shares or preferred shares, as the case may be, of any (a) shareholder in a corporation; (b) partner in a partnership (whether general, limited, limited liability or joint venture); (c) member in a limited liability company; or (d) other Person having any other form of equity security or ownership interest, in each case including all warrants, options beneficial interests, participations or other rights to acquire any of the foregoing.

"**Collateral**" means any and all of the assets and property of any Grantor, whether real, personal or mixed, which constitute ABL Collateral or Notes Collateral.

"**Commercial Tort Claims**" means all present and future "commercial tort claims" (as defined in Article 9 of the UCC).

"**Company**" has the meaning set forth in the recitals to this Agreement.

"**Credit Documents**" means the ABL Documents and the Notes Documents.

"**Deposit Account**" shall have the meaning set forth in the UCC.

-5-

"**<u>Discharge of ABL Obligations</u>**" means, except to the extent otherwise provided in Section 5.3, (A) termination of all commitments of the ABL Secured Parties under the ABL Documents and (B) with respect to (i) any ABL Obligations (other than contingent indemnification and contingent expense reimbursement obligations, in each case, for which no claims have been asserted), payment in full in cash of all ABL Obligations, and, with respect to letters of credit or letter of credit guaranties outstanding under the ABL Documents, either (x) cancellation and return to the ABL Collateral Agent of all letters of credit or letter of credit guaranties outstanding under the ABL Documents or (y) delivery of cash collateral in respect thereof in a manner consistent with the ABL Credit Agreement; and (ii) any ABL Obligations that are contingent in nature (other than ABL Obligations consisting of LC Obligations or Secured Bank Product Obligations of a Borrower or Guarantor), the depositing of cash with the ABL Collateral Agent in an amount equal to 100% of any such ABL Obligations that have been liquidated or, if such ABL Obligations are unliquidated in amount and represent a claim which has been asserted against the ABL Collateral Agent or an ABL Secured Party and for which an indemnity has been provided by the Borrowers in any of the ABL Documents, in an amount that is equal to such claim or the ABL Collateral Agent's good faith estimate of such claim; <u>provided</u> that the Discharge of ABL Obligations shall not be deemed to have occurred if such payments are made with the proceeds of other ABL Obligations that constitute an exchange or replacement for or a Refinancing of such ABL Obligations.

"**<u>Discharge of Notes Obligations</u>**" means payment in full in cash of all Notes Obligations, satisfaction and discharge of the Indenture and any Additional Pari Passu Notes Agreement or legal or covenant defeasance of the Indenture and any Additional Pari Passu Notes Agreement (other than obligations that expressly survive such satisfaction and discharge or legal or covenant defeasance).

"**<u>Disposition</u>**" means any sale, lease, exchange, transfer or other disposition of any Collateral.

"**<u>Enforcement</u>**" means, collectively or individually for one or both of the ABL Collateral Agent and the Notes Collateral Agent, when an ABL Default or Notes Default, as applicable, has occurred and is continuing, to enforce or attempt to enforce any right or power to repossess, replevy, attach, garnish, levy upon, collect the Proceeds of, foreclose or realize in any manner whatsoever its Lien upon, sell, liquidate or otherwise dispose of, or otherwise restrict or interfere with the use of, or exercise any remedies with respect to, or conduct any Going Out of Business Sale with respect to, any material amount of Collateral, whether by judicial enforcement of any of the rights and remedies under the ABL Documents, the Notes Documents and/or under any applicable law, by self-help repossession, by non-judicial foreclosure sale, lease, or other disposition, by set-off, by notification to account obligors of any Grantor, by any sale, lease, or other disposition implemented by any Grantor following an ABL Default or a Notes Default, as applicable, in connection with which the ABL Collateral Agent or the Notes Collateral Agent, as applicable, has agreed to release its Liens on the subject property, or otherwise, but in all cases excluding (i) the establishment of borrowing base reserves (or the increase or release thereof), collateral ineligibles, or other conditions for advances, (ii) the changing of advance rates or advance sublimits, (iii) the imposition of a default rate or late fee, (iv) the collection and application of Accounts or other monies deposited from time to time in Deposit Accounts or Securities Accounts, in each case, to the extent constituting ABL Priority Collateral, against the ABL Obliga-

-6-

tions pursuant to the provisions of the ABL Documents (including, without limitation, the notifi-
cation of account debtors, depositary institutions or any other Person to deliver proceeds of ABL
Priority Collateral to the ABL Collateral Agent, the exercise by the ABL Collateral Agent of its
control of any ABL Priority Collateral that consists of a Deposit Account or Securities Account
that is subject to any "control agreement" to which the ABL Collateral Agent is a party or any
"cash dominion event" or mandatory prepayment event under the ABL Documents), (v) the col-
lection and application of monies deposited from time to time in the Notes Collateral Account, to
the extent constituting Notes Priority Collateral, against the Notes Obligations pursuant to the
provisions of the Notes Documents, (vi) the cessation of lending pursuant to the provisions of the
ABL Documents, including upon the occurrence of a default, the existence of an over-advance or
the failure to satisfy conditions precedent, (vii) the filing of a proof of claim in any Insolvency or
Liquidation Proceeding, (viii) the consent by the ABL Collateral Agent to disposition by any
Grantor of any of the ABL Priority Collateral, (ix) the consent of the Notes Collateral Agent to
disposition by any Grantor of any Notes Priority Collateral, (x) the acceleration of the Notes Ob-
ligations or the ABL Obligations, (xi) the exercise by an ABL Secured Party of the right of offset
with respect to Secured Bank Product Obligations and (xii) the commencement of a Trigger Pe-
riod (as defined in the ABL Credit Agreement).

"**Enforcement Notice**" means a written notice delivered, at a time when an ABL Default
or Notes Default has occurred and is continuing, by either the ABL Collateral Agent or the Notes
Collateral Agent, as applicable, to the other announcing that an Enforcement Period has com-
menced, specifying the relevant event of default.

"**Enforcement Period**" means the period of time following the receipt by either the ABL
Collateral Agent or the Notes Collateral Agent of an Enforcement Notice from the other until the
earliest of (a) in the case of an Enforcement Period commenced by the Notes Collateral Agent,
the Discharge of Notes Obligations, (b) in the case of an Enforcement Period commenced by the
ABL Collateral Agent, the Discharge of ABL Obligations, (c) the ABL Collateral Agent or the
Notes Collateral Agent (as applicable) agreeing in writing to terminate the Enforcement Period,
and (d) the date on which the ABL Default or the Notes Default that was the subject of the En-
forcement Notice relating to such Enforcement Period has been cured to the satisfaction of the
ABL Collateral Agent or the Notes Collateral Agent, as applicable, or waived in writing.

"**Going Out of Business Sale**" means, following the occurrence and during the continu-
ance of any ABL Default, any sale or liquidation of the ABL Priority Collateral consented to by
the ABL Collateral Agent for purposes of permitting the Grantors to obtain funds to permanently
repay the ABL Obligations in whole or in part.

"**Grantors**" means the Company and each Subsidiary that is party to an ABL Security
Document or a Notes Security Document.

"**Hedging Agreement**" means "Hedging Agreement" as such term is defined in the ABL
Credit Agreement or any comparable definition.

"**Hedging Obligations**" means all liabilities owed under any Hedging Agreement.

"**Indebtedness**" shall have the meaning provided in the ABL Credit Agreement and the Indenture as in effect on the date hereof.

"**Indenture**" shall have the meaning assigned to that term in the recitals to this Agreement.

"**Insolvency or Liquidation Proceeding**" means:

(a)    any voluntary or involuntary case or proceeding under the Bankruptcy Code or any other Bankruptcy Law with respect to any Grantor;

(b)    any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of their respective assets, in each case, except as permitted under the ABL Credit Agreement, the Indenture and any Additional Pari Passu Notes Agreement;

(c)    any composition of liabilities or similar arrangement relating to any Grantor, whether or not under a court's jurisdiction or supervision;

(d)    any liquidation, dissolution, reorganization or winding up of any Grantor, whether voluntary or involuntary, whether or not under a court's jurisdiction or supervision, and whether or not involving insolvency or bankruptcy;

(e)    any case or proceeding seeking arrangement, adjustment, protection, relief or composition of any debt or other property of any Grantor;

(f)    any case or proceeding seeking the entry of an order of relief or the appointment of a custodian, receiver, trustee or other similar proceeding with respect to any Grantor or any property or Indebtedness of any Grantor; or

(g)    any general assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Grantor.

"**Instruments**" means all present and future "instruments" (as defined in Article 9 of the UCC).

"**Intellectual Property**" means, all of the following in any jurisdiction throughout the world: (a) patents, patent applications and inventions, including all renewals, extensions, combinations, divisions, or reissues thereof ("**Patents**"); (b) trademarks, service marks, trade names, trade dress, logos, internet domain names and other business identifiers, together with the goodwill symbolized by any of the foregoing, and all applications, registrations, renewals and extensions thereof ("**Trademarks**"); (c) copyrights and all works of authorship including all registrations, applications, renewals, extensions and reversions thereof ("**Copyrights**"); (d) all computer software, source code, executable code, data, databases and documentation thereof; (e) all trade secret rights in information, including trade secret rights in any formula, pattern, compilation, program, device, method, technique, or process, that (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by

-8-

proper means by, other Persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy; (f) all other intellectual property or proprietary rights in any discoveries, concepts, ideas, research and development, know-how, formulae, patterns, inventions, compilations, compositions, manufacturing and production processes and techniques, program, device, method, technique, technical data, procedures, designs, recordings, graphs, drawings, reports, analyses, specifications, databases, and other proprietary or confidential information, including customer lists, supplier lists, pricing and cost information, business and marketing plans and proposals and advertising and promotional materials; and (g) all rights to sue at law or in equity for any infringement or other impairment or violation thereof and all products and proceeds of the foregoing.

"**Inventory**" means as to each Grantor, all of such Grantor's now owned and hereafter existing or acquired inventory, as defined in Article 9 of the UCC.

"**Investment Property**" means all present and future "investment property" (as defined in Article 9 of the UCC), including, without limitation, all Capital Stock held by each of the Company and the Company Subsidiaries.

"**Letter of Credit Rights**" means all present and future "letter of credit rights" (as defined in Article 9 of the UCC).

"**Lien**" means with respect to any asset, (a) any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.  For the purpose of this Agreement, each Grantor shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person for security purposes.

"**Lien Priority**" means with respect to any Lien of the ABL Collateral Agent, the ABL Secured Parties, the Notes Collateral Agent or the Notes Secured Parties on the Collateral, the order of priority of such Lien as specified in Section 2.1.

"**Mortgaged Property**" means any real property which shall now or hereafter be subject to a Notes Mortgage and/or an ABL Mortgage.

"**Non-Conforming Plan of Reorganization**" means any Plan of Reorganization whose provisions are inconsistent with the provisions of this Agreement, including any plan of reorganization that purports to re-order (whether by subordination, invalidation, or otherwise) or otherwise disregard, in whole or part, the provisions of Article II (including the Lien priorities of Section 2.1), the provisions of Article IV, or the provisions of Article VI, unless such Plan of Reorganization has been accepted by the voluntary required vote of each class of ABL Secured Parties and Notes Secured Parties in accordance with Section 1126(c) of the Bankruptcy Code.

"**Noteholders**" means the "Holders" as defined in the Indenture and any holders of Additional Pari Passu Notes Obligations.

"**Notes**" means (a) the initial $350,000,000 in aggregate principal amount of 9 1/4% Senior Secured Notes due 2018 issued by the Company pursuant to the Indenture and (b) any additional notes issued under the Indenture by the Company, to the extent permitted by the Indenture and the ABL Credit Agreement.

"**Notes Collateral**" means any and all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted (or purported to be granted) as security for any Notes Obligations.

"**Notes Collateral Account**" means any deposit account or securities account required to be established pursuant to the Notes Documents for purposes of exclusively holding identifiable Proceeds of Notes Priority Collateral pending application as required under the Notes Documents (it being understood that ABL Priority Collateral deposited in the Notes Collateral Account shall continue to be ABL Priority Collateral).

"**Notes Collateral Agent**" has the meaning assigned to that term in the Preamble of this Agreement.

"**Notes Default**" means an "Event of Default" as defined in the Indenture or in any Additional Pari Passu Notes Agreement.

"**Notes DIP Financing**" has the meaning assigned to that term in Section 6.1(b).

"**Notes Documents**" means the Indenture, the Notes, each Additional Pari Passu Notes Agreement, the Notes Security Documents and each of the other agreements, documents and instruments executed pursuant thereto, and any other document or instrument executed or delivered at any time in connection with any Notes Obligations, including any intercreditor or joinder agreement among holders of Notes Obligations to the extent such are effective at the relevant time, as each may be amended, restated, supplemented, modified, renewed, extended or Refinanced from time to time in accordance with the provisions of this Agreement.

"**Notes Mortgages**" means a collective reference to each mortgage, deed of trust and any other document or instrument under which any Lien on real property owned or leased by any Grantor is granted (or purported to be granted) to secure any Notes Obligations or under which rights or remedies with respect to any such Liens are governed.

"**Notes Obligations**" means all Obligations outstanding under the Notes and the other Notes Documents, and all Additional Pari Passu Notes Obligations.  "Notes Obligations" shall include all interest, fees and other amounts accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue regardless of whether a claim therefor is allowed or allowable in any such Insolvency or Liquidation Proceeding) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant Notes Document or Additional Pari Passu Notes Agreement, whether or not the claim for such interest, fees and other amounts is allowed as a claim in such Insolvency or Liquidation Proceeding.

-10-

"**Notes Priority Collateral**" means all Real Estate Assets, Intellectual Property, Equipment, Capital Stock held by the Company and its Subsidiaries and all other Collateral other than ABL Priority Collateral.

"**Notes Secured Parties**" means (i) so long as the Notes are outstanding, the Trustee and the holders of the Notes (including any additional Notes subsequently issued under and in compliance with the terms of the Indenture), (ii) the Notes Collateral Agent and (iii) the holders from time to time of any other Notes Obligations.

"**Notes Security Agreement**" means the Security Agreement, dated as of July 23, 2013, by and among the Company, the Company Subsidiaries, the Trustee and the Notes Collateral Agent, as the same may be amended, modified, restated, supplemented or replaced from time to time in accordance with its terms.

"**Notes Security Documents**" means any agreement, document or instrument pursuant to which a Lien is granted or purported to be granted securing any Notes Obligations or under which rights or remedies with respect to such Liens are governed.

"**Notes Standstill Period**" has the meaning set forth in Section 2.5(a)(i).

"**Notes Trust Monies**" means Notes Priority Collateral required pursuant to the Notes Documents to be deposited into the Notes Collateral Account.

"**Obligations**" means all present and future loans, advances, liabilities, obligations, covenants, duties, and debts from time to time owing by any Grantor to any agent or trustee (including either Agent), the ABL Secured Parties, the Notes Secured Parties or any of them or their respective Affiliates, arising from or in connection with the ABL Documents or the Notes Documents, whether for principal, interest or payments for early termination, whether or not evidenced by any note, or other instrument or document, whether arising from an extension of credit, opening of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, as principal or guarantor, and including all principal, interest, charges, expenses, fees, attorneys' fees, filing fees and any other sums chargeable to the Grantors, including, without limitation, the "Obligations", as defined in the ABL Credit Agreement, and the "Obligations", as defined in the Indenture, under the Notes and any Additional Pari Passu Notes Agreement.

"**Party**" means the ABL Collateral Agent or the Notes Collateral Agent, and "**Parties**" means collectively the ABL Collateral Agent and the Notes Collateral Agent.

"**Person**" means an individual, partnership, corporation, limited liability company, joint stock company, land trust, business trust, or unincorporated organization, or a government or agency or political subdivision thereof.

"**Plan of Reorganization**" means any plan of reorganization, plan of liquidation, agreement for composition, or other type of dispositive plan of arrangement proposed in or in connection with any Insolvency or Liquidation Proceeding.

"**Pledged Collateral**" has the meaning set forth in Section 5.4(a).

-11-

"**Proceeds**" means (a) all "proceeds," as defined in Article 9 of the UCC, with respect to the Collateral, and (b) whatever is recoverable or recovered when any Collateral is sold, exchanged, collected or disposed of, whether voluntarily or involuntarily.

"**Property**" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"**Real Estate Asset**" means, at any time of determination, any interest (fee, leasehold or otherwise) then owned by the Company or any Grantor in any real property.

"**Recovery**" has the meaning set forth in Section 6.4.

"**Refinance**" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend, increase, modify, supplement, restructure, refund, replace or repay, or to issue other indebtedness or enter alternative financing arrangements, in exchange or replacement for such indebtedness, in whole or in part, including by adding or replacing lenders, creditors, agents, borrowers and/or guarantors, including any increase in the principal amount of the loans and commitments provided thereunder, and including in each case, but not limited to, after the original instrument giving rise to such indebtedness has been terminated.  "**Refinanced**" and "**Refinancing**" have correlative meanings.

"**Secured Bank Product Obligations**" means Bank Product Obligations owed to any Bank Product Provider that is a Secured Provider (as defined in the ABL Credit Agreement or any comparable definition).

"**Secured Hedging Obligations**" means Hedging Obligations owed to any counterparty that is a Secured Provider (as defined in the ABL Credit Agreement or any comparable definition).

"**Secured Party**" means the ABL Secured Parties or the Notes Secured Parties, and "**Secured Parties**" means collectively the ABL Secured Parties and the Notes Secured Parties.

"**Securities Accounts**" means all present and future "securities accounts" (as defined in Article 8 of the UCC), including all monies, "uncertificated securities," and "securities entitlements" (as defined in Article 8 of the UCC) contained therein.

"**Specified ABL Collateral**" has the meaning assigned to that term in Section 2.4.

"**Subsidiary**" shall have the meaning given such term by the ABL Credit Agreement and the Indenture, each as in effect on the date hereof.

"**Supporting Obligations**" means all present and future "supporting obligations" (as defined in Article 9 of the UCC).

"**Trustee**" means U.S. Bank National Association, in its capacity as trustee under the Indenture and as collateral agent on behalf of the Notes Secured Parties, and its permitted successors.

-12-

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of New York; provided that to the extent that the Uniform Commercial Code is used to define any term in any security document and such term is defined differently in differing Articles of the Uniform Commercial Code, the definition of such term contained in Article 9 shall govern; provided, further, that in the event that, by reason of mandatory provisions of law, any or all of the perfection, publication or priority of, or remedies with respect to, Liens of any Party are governed by the Uniform Commercial Code or foreign personal property security laws as enacted and in effect in a jurisdiction other than the State of New York, the term "Uniform Commercial Code" or "UCC" will mean the Uniform Commercial Code or such foreign personal property security laws as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such perfection, publication, priority or remedies and for purposes of definitions related to such provisions.

**Section 1.2    Rules of Construction.**  Unless the context of this Agreement clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the term "including" is not limiting and shall be deemed to be followed by the phrase "without limitation," and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or."  The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement.  Article, section, subsection, clause, schedule and exhibit references herein are to this Agreement unless otherwise specified.  Any reference in this Agreement to any agreement, instrument, or document shall include all alterations, amendments, changes, restatements, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, restatements, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein).  Any reference herein to any Person shall be construed to include such Person's successors and assigns.  Any reference herein to the repayment in full of an obligation shall mean the payment in full in cash of such obligation, or in such other manner as may be approved in writing by the requisite holders or representatives in respect of such obligation, or in such other manner as may be approved by the requisite holders or representatives in respect of such obligation.

## ARTICLE 2
## LIEN PRIORITY

**Section 2.1    Priority of Liens.**

(a)    Notwithstanding (i) the date, time, method, manner, or order of grant, attachment, or perfection of any Liens granted to the ABL Collateral Agent or the ABL Secured Parties in respect of all or any portion of the Collateral or of any Liens granted to the Notes Collateral Agent or any Notes Secured Parties in respect of all or any portion of the Collateral, and regardless of how any such Lien was acquired (whether by grant, statute, operation of law, subrogation or otherwise), (ii) the order or time of filing or recordation of any document or instrument for perfecting the Liens in favor of the ABL Collateral Agent or the Notes Collateral Agent (or the ABL Secured Parties or the Notes Secured Parties) on any Collateral, (iii) any provision of the Uniform Commercial Code, the Bankruptcy Code, any other Bankruptcy Law or any other applicable law, or of any of the ABL Documents or any of the Notes Documents, (iv) whether

-13-

the ABL Collateral Agent or the Notes Collateral Agent, in each case, either directly or through agents, holds possession of, or has control over, all or any part of the Collateral, or (v) any defect or deficiencies in, or failure to perfect, or any avoidance, invalidation or subordination by any third party or court of competent jurisdiction, of the Liens securing the ABL Obligations or Notes Obligations or any other circumstance whatsoever, the ABL Collateral Agent, on behalf of itself and the ABL Secured Parties, and the Notes Collateral Agent, on behalf of itself the Notes Secured Parties, hereby agree that:

      (i)     any Lien in respect of all or any portion of the ABL Priority Collateral, whether now or hereafter held by or on behalf of the ABL Collateral Agent or any ABL Secured Party that secures all or any portion of the ABL Obligations, shall in all respects be senior and prior to all Liens granted to the Notes Collateral Agent or the Notes Secured Parties on the ABL Priority Collateral; and

      (ii)     any Lien in respect of all or any portion of the Notes Priority Collateral, whether now or hereafter held by or on behalf of the Notes Collateral Agent or any Notes Secured Party that secures all or any portion of the Notes Obligations, shall in all respects be senior and prior to all Liens granted to the ABL Collateral Agent or any ABL Secured Party on the Notes Priority Collateral.

      **Section 2.2**    **<u>Waiver of Right to Contest Liens</u>.**  Each of the Notes Collateral Agent, on behalf of itself and the Notes Secured Parties, and the ABL Collateral Agent, on behalf of itself and the ABL Secured Parties, consents to the granting of Liens in favor of the other to secure the ABL Obligations and the Notes Obligations, as applicable, and agrees that no Secured Party will be entitled to, and it will not (and shall be deemed to have irrevocably, absolutely, and unconditionally waived any right to), contest (directly or indirectly) or support (directly or indirectly) any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding): (a) the attachment, perfection, priority, validity or enforceability of any Lien in the Collateral held by or on behalf of any of the ABL Secured Parties to secure the payment of the ABL Obligations or any of the Notes Secured Parties to secure the payment of the Notes Obligations, (b) the priority, validity or enforceability of the ABL Obligations or the Notes Obligations, including the allowability or priority of the Notes Obligations or the ABL Obligations, as applicable, in any Insolvency or Liquidation Proceeding, or (c) the validity or enforceability of the provisions of this Agreement; <u>provided</u> that nothing in this Agreement shall be construed to prevent or impair the rights of the ABL Collateral Agent, on behalf of itself and the ABL Secured Parties, or the Notes Collateral Agent, on behalf of itself and the Notes Secured Parties, to enforce this Agreement, including the provisions of this Agreement relating to the priority of the Liens securing the Obligations as provided in Sections 2.1, 2.5, 2.6 and 6.1.

      **Section 2.3**    **<u>New Liens</u>.**  So long as neither the Discharge of ABL Obligations nor the Discharge of Notes Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Company or any other Grantor, the parties hereto agree, subject to Article VI, that the Company shall not, and shall not permit any other Grantor to:

      (a)      grant or permit any additional Liens on any asset or property to secure any Notes Obligations unless it has granted or concurrently grants a Lien on such asset or property to secure the ABL Obligations; or

      (b)      grant or permit any additional Liens on any asset or property to secure any ABL Obligations unless it has granted or concurrently grants a Lien on such asset or property to secure the Notes Obligations.

To the extent any additional Liens are granted on any asset or property (except as contemplated by Section 2.4) pursuant to this Section 2.3, the priority of such additional Liens shall be determined in accordance with Section 2.1.  In addition, to the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights or remedies available hereunder, the ABL Collateral Agent, on behalf of the ABL Secured Parties, and the Notes Collateral Agent, on behalf of Notes Secured Parties, agree that any amounts received by or distributed to any of them pursuant to or as a result of Liens granted in contravention of this Section 2.3 shall be subject to Section 4.1(c).

      **Section 2.4**      **Similar Liens.**  The parties hereto agree that it is their intention that the ABL Collateral and the Notes Collateral be identical except as provided in Article VI and as otherwise provided herein.  In furtherance of the foregoing and of Section 7.2, the parties hereto agree, subject to the other provisions of this Agreement, upon request by the ABL Collateral Agent or the Notes Collateral Agent, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the ABL Collateral and the Notes Collateral and the steps taken to perfect their respective Liens thereon and the identity of the respective parties obligated under the ABL Documents and the Notes Documents.  Notwithstanding anything herein to the contrary, it is understood and agreed that the provisions of this Section 2.4 shall not apply to any cash collateral that cash collateralizes any letters of credit or letter of credit guaranties outstanding under the ABL Documents (any such cash collateral, the "**Specified ABL Collateral**") to the extent that such Specified ABL Collateral is held by BMO Harris Bank N.A. (or by any other LC Issuer under the ABL Credit Agreement).

      **Section 2.5**      **Exercise of Remedies; Restrictions on Notes Collateral Agent and the Notes Secured Parties**.

      (a)      Until the Discharge of ABL Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, subject to the limited extent provided in Article VI, the Notes Collateral Agent and the other Notes Secured Parties:

      (i)      will not exercise or seek to exercise (but instead shall be deemed to have hereby irrevocably, absolutely and unconditionally waived for the duration of the Notes Standstill Period), any rights, powers, or remedies with respect to any ABL Priority Collateral (including (A) any right of set-off or any right under any lockbox agreement or any control agreement with respect to Deposit Accounts or Securities Accounts), landlord waiver or bailee's letter or similar agreement or arrangement to which the Notes Collateral Agent or any Notes Secured Party is a party, (B) any right to undertake self-help re-

possession or non-judicial disposition of any ABL Priority Collateral (including any partial or complete strict foreclosure), and/or (C) any right to institute, prosecute, or otherwise maintain any action or proceeding with respect to such rights, powers or remedies (including any action of foreclosure)); provided, however, that the Notes Collateral Agent may exercise any or all of such rights, powers, or remedies after a period of at least 180 days has elapsed since the later of:  (i) the date on which the Notes Collateral Agent declared the existence of a Notes Default, accelerated (to the extent such amount was not already due and owing) the payment of the principal amount of all Notes Obligations, and demanded payment thereof and (ii) the date on which the ABL Collateral Agent received the Enforcement Notice from the Notes Collateral Agent relating to such action; provided, further, however, that neither the Notes Collateral Agent nor any other Notes Secured Party shall exercise any rights or remedies with respect to the ABL Priority Collateral if, notwithstanding the expiration of such 180-day period, the ABL Collateral Agent or the other ABL Secured Parties (x) shall have commenced, whether before or after the expiration of such 180-day period, and be diligently pursuing the exercise of their rights, powers, or remedies with respect to all or any material portion of such Collateral (prompt written notice of such exercise to be given to the Notes Collateral Agent, provided that the failure to give such notice shall not affect the ABL Collateral Agent's or any other ABL Secured Party's rights hereunder), or (y) shall have been stayed by operation of law or any court order from pursuing any such exercise of remedies (during which time the 180-day period shall be tolled) (the period during which the Notes Collateral Agent and the other Notes Secured Parties may not pursuant to this Section 2.5(a)(i) exercise any rights, powers, or remedies with respect to the ABL Priority Collateral, the "**Notes Standstill Period**");

(ii)     will not, directly or indirectly, contest, protest or object to or hinder any judicial or non-judicial foreclosure proceeding or action (including any partial or complete strict foreclosure) brought by the ABL Collateral Agent or any other ABL Secured Party relating to the ABL Priority Collateral or any other exercise by the ABL Collateral Agent or any other ABL Secured Party of any other rights, powers and remedies relating to the ABL Priority Collateral, including any sale, lease, exchange, transfer, or other disposition of the ABL Priority Collateral, whether under the ABL Documents, applicable law, or otherwise;

(iii)     subject to their rights under clause (a)(i) above (and under clause (vi) of Section 2.5(c)), will not object to the forbearance by the ABL Collateral Agent or the ABL Secured Parties from bringing or pursuing any Enforcement with respect to the ABL Priority Collateral;

(iv)     except as may be permitted in Section 2.5(c), Section 3.1(a) or Section 3.3,  irrevocably, absolutely, and unconditionally waive any and all rights the Notes Collateral Agent or the Notes Secured Parties may have as a junior lien creditor or otherwise to object (and seek or be awarded any relief of any nature whatsoever based on any such objection) to the manner in which the ABL Collateral Agent or the ABL Secured Parties (A) enforce or collect (or attempt to collect) the ABL Obligations or (B) realize or seek to realize upon or otherwise enforce the Liens in and to the ABL Priority Collateral securing the ABL Obligations, regardless of whether any action or failure to act by or on behalf of

-16-

the ABL Collateral Agent or ABL Secured Parties is adverse to the interest of the Notes Collateral Agent or the Notes Secured Parties.  Without limiting the generality of the foregoing, the Notes Secured Parties shall be deemed to have hereby irrevocably, absolutely, and unconditionally waived any right to object (and seek or be awarded any relief of any nature whatsoever based on any such objection), at any time prior or subsequent to any disposition of any of the ABL Priority Collateral, on the ground(s) that any such disposition of ABL Priority Collateral (x) would not be or was not "commercially reasonable" within the meaning of any applicable UCC and/or (y) would not or did not comply with any other requirement under any applicable UCC or under any other applicable law governing the manner in which a secured creditor (including one with a Lien on real property) is to realize on its collateral; and

(v)     subject to Section 2.5(a) and (c) and Section 3.3, acknowledge and agree that no covenant, agreement or restriction contained in the Notes Security Documents or any other Notes Document (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the ABL Collateral Agent or the ABL Secured Parties with respect to the ABL Priority Collateral as set forth in this Agreement and the ABL Documents;

provided, however, that, in the case of (i), (ii) and (iii) above, the Liens granted to secure the Notes Obligations of the Notes Secured Parties shall attach to any Proceeds resulting from actions taken by the ABL Collateral Agent or any ABL Secured Party with respect to the ABL Priority Collateral in accordance with this Agreement (including the priorities described in Section 2) after application of such Proceeds to the extent necessary to meet the requirements of a Discharge of ABL Obligations.

(b)     Until the Discharge of ABL Obligations, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, the ABL Collateral Agent and the other ABL Secured Parties shall have the right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and, in connection therewith (including voluntary Dispositions of ABL Priority Collateral by the respective Grantors after an ABL Default) make determinations regarding the release, disposition, or restrictions with respect to the ABL Priority Collateral (including, without limitation, exercising remedies under account control agreements and lockbox agreements) without any consultation with, notice to, or the consent of the Notes Collateral Agent or any Notes Secured Party; provided, however, that the Lien securing the Notes Obligations shall remain on the Proceeds (other than those properly applied to the ABL Obligations in accordance with Section 4.1(b)) of such Collateral released or disposed of subject to the relative priorities described in Section 2.1.  In exercising rights, powers, and remedies with respect to the ABL Priority Collateral, the ABL Collateral Agent and the ABL Secured Parties may enforce the provisions of the ABL Documents and exercise rights, powers, and/or remedies thereunder and/or under applicable law or otherwise, all in such order and in such manner as they may determine in the exercise of their sole discretion.  Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of the ABL Priority Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC and of a secured creditor under the Bankruptcy Laws of any applicable jurisdiction.

-17-

(c)    Notwithstanding anything to the contrary contained herein, the Notes Collateral Agent and any Notes Secured Party may:

(i)    file a claim or statement of interest with respect to the Notes Obligations; provided that an Insolvency or Liquidation Proceeding has been commenced by or against any Grantor;

(ii)    take any action (not inconsistent with the terms of this Agreement and not adverse to the priority status of the Liens on the ABL Priority Collateral, or the rights of the ABL Collateral Agent or any of the ABL Secured Parties to exercise rights, powers, and/or remedies in respect thereof, including those under Article VI) in order to create, perfect, preserve or protect (but, subject to Section 3.1(a), not enforce) its Lien on any of the ABL Priority Collateral;

(iii)    file any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims or Liens of the Notes Secured Parties, including any claims secured by the ABL Priority Collateral, if any, in each case in accordance with the terms of this Agreement;

(iv)    file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors arising under either any Insolvency or Liquidation Proceeding or applicable non-bankruptcy law, in each case not inconsistent with the terms of this Agreement or applicable law (including the Bankruptcy Laws of any applicable jurisdiction) and any pleadings, objections, motions or agreements which assert rights or interests available to secured creditors solely with respect to the Notes Priority Collateral;

(v)    vote on any Plan of Reorganization, file any proof of claim, make other filings and make any arguments and motions (including in support of or opposition to, as applicable, the confirmation or approval of any Plan of Reorganization) that are, in each case, in accordance with the terms of this Agreement.  Without limiting the generality of the foregoing or of the other provisions of this Agreement, any vote to accept, and any other act to support the confirmation or approval of, any Non-Conforming Plan of Reorganization shall be inconsistent with and accordingly, a violation of the terms of this Agreement, and the ABL Collateral Agent shall be entitled to have any such vote to accept a Non-Conforming Plan of Reorganization changed and any such support of any Non-Conforming Plan of Reorganization withdrawn;

(vi)    exercise any of the rights, powers and/or remedies with respect to any of the ABL Priority Collateral to the extent permitted by Sections 2.5(a)(i) and 3.1(a); and

(vii)    take any action described in clauses (iii), (v), (vii), (ix) and (x) of the definition of "Enforcement."

The Notes Collateral Agent, on behalf of the Notes Secured Parties, agrees that no Notes Secured Party will take or receive any ABL Priority Collateral (including Proceeds) in connection with the exercise of any right or remedy (including set-off) with respect to ABL Priority Collateral in

-18-

its capacity as a creditor in violation of this Agreement.  Without limiting the generality of the foregoing, unless and until the Discharge of ABL Obligations has occurred, except as expressly provided in Sections 2.5(a)(i), 2.5(c), 3.3 and Article 6 the sole right of the Notes Collateral Agent and the Notes Secured Parties with respect to the ABL Priority Collateral is to hold a Lien on such Collateral pursuant to the Notes Security Documents for the period and to the extent granted therein and to receive a share of the Proceeds thereof, if any, in accordance with Section 4.1(b).

(d)    Except as otherwise specifically set forth in Sections 2.5(a), 3.2 and 3.3 and Article VI, the Notes Collateral Agent and the Notes Secured Parties may exercise rights and remedies as unsecured creditors against any Grantor and may exercise rights and remedies with respect to the Notes Priority Collateral, in each case, in accordance with the terms of the Notes Documents and applicable law; provided, however, that in the event that the Notes Collateral Agent or any Notes Secured Party becomes a judgment creditor in respect of ABL Priority Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the Notes Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the ABL Obligations) as the other Liens securing the Notes Obligations are subject to this Agreement.

(e)    Nothing in this Agreement shall prohibit the receipt by the Notes Collateral Agent or any other Notes Secured Parties of the required payments of interest, principal and other amounts owed in respect of the Notes Obligations so long as such receipt is not the direct or indirect result of the exercise by the Notes Collateral Agent or any Notes Secured Parties of rights or remedies as a secured creditor (including set-off) with respect to ABL Priority Collateral or enforcement in contravention of this Agreement of any Lien held by any of them.  Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the Notes Collateral Agent or the Notes Secured Parties may have against the Grantors under the Notes Documents.

**Section 2.6    Exercise of Remedies; Restrictions on ABL Collateral Agent and the ABL Secured Parties**.

(a)    Until the Discharge of Notes Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, subject to the limited extent provided in Article VI, the ABL Collateral Agent and the other ABL Secured Parties:

(i)    will not exercise or seek to exercise (but instead shall be deemed to have hereby irrevocably, absolutely and unconditionally waived for the duration of the ABL Standstill Period) any rights, powers, or remedies with respect to any Notes Priority Collateral (including (A) any right of set-off or any right under any lockbox agreement or any control agreement with respect to the Notes Collateral Account or Notes Trust Monies), landlord waiver or bailee's letter or similar agreement or arrangement to which the ABL Collateral Agent or any ABL Secured Party is a party, (B) any right to undertake self-help repossession or nonjudicial disposition of any Notes Priority Collateral (including any partial or complete strict foreclosure), or (C) any right to institute, prosecute or otherwise maintain any action or proceeding with respect to such rights, powers, or rem-

edies (including any action of foreclosure)); provided, however, that the ABL Collateral Agent may exercise any or all of such rights, powers, or remedies after a period of at least 180 days has elapsed since the later of: (i) the date on which the ABL Collateral Agent declared the existence of an ABL Default, accelerated (to the extent such amount was not already due and owing) the payment of the principal amount of all ABL Obligations, and demanded payment thereof and (ii) the date on which the Notes Collateral Agent received the Enforcement Notice from the ABL Collateral Agent relating to such action; provided, further, however, that neither the ABL Collateral Agent nor the other ABL Secured Parties shall exercise any remedies with respect to the Notes Priority Collateral if, notwithstanding the expiration of such 180-day period, the Notes Collateral Agent or the Notes Secured Parties (x) shall have commenced, whether before or after the expiration of such 180-day period, and be diligently pursuing the exercise of their rights or remedies with respect to all or any material portion of such Collateral (prompt notice of such exercise to be given to the ABL Collateral Agent, provided, that the failure to give such notice shall not affect the Notes Collateral Agent's or any other Notes Secured Party's rights hereunder) or (y) shall have been stayed by operation of law or by any court order from pursuing any such exercise of remedies (during which time the 180-day period shall be tolled) (the period during which the ABL Collateral Agent and the other ABL Secured Parties may not pursuant to this Section 2.6(a)(i) exercise any rights or remedies with respect to the Notes Priority Collateral, the "**ABL Standstill Period**"); provided, finally, however, that the ABL Collateral Agent, independent in all respects of the preceding provisos, may exercise the rights provided for in Section 3.1 (with respect to any Access Period) and Section 3.2;

(ii)    will not, directly or indirectly, contest, protest or object to or hinder any judicial or non-judicial foreclosure proceeding or action (including any partial or complete strict foreclosure) brought by the Notes Collateral Agent or any other Notes Secured Party relating to the Notes Priority Collateral or any other exercise by the Notes Collateral Agent or any other Notes Secured Party of any rights, powers and remedies relating to the Notes Priority Collateral, including any sale, lease, exchange, transfer, or other disposition of the Notes Priority Collateral, whether under the Notes Documents, applicable law, or otherwise, subject to the Notes Collateral Agent's and the other Notes Secured Parties' obligations under Sections 3.1 and 3.2;

(iii)    subject to their rights under clause (a)(i) above (and under clause (vi) of Section 2.6(c)), will not object to the forbearance by the Notes Collateral Agent or the Notes Secured Parties from bringing or pursuing any Enforcement with respect to the Notes Priority Collateral;

(iv)    except as may be permitted by Section 2.6(c), 3.1, 3.2, or 3.3, irrevocably, absolutely and unconditionally waive any and all rights the ABL Collateral Agent and ABL Secured Parties may have as a junior lien creditor or otherwise to object (and seek to be awarded any relief of any nature whatsoever based on any such objection) to the manner in which the Notes Collateral Agent or the Notes Secured Parties (a) enforce or collect (or attempt to collect) the Notes Obligations or (b) realize or seek to realize upon or otherwise enforce the Liens in and to the Notes Priority Collateral securing the Notes Obligations, regardless of whether any action or failure to act by or on behalf of the

-20-

Notes Collateral Agent or Notes Secured Parties is adverse to the interest of the ABL Secured Parties.  Without limiting the generality of the foregoing, the ABL Secured Parties shall be deemed to have hereby irrevocably, absolutely and unconditionally waived any right to object (and seek or be awarded any relief of any nature whatsoever based on any such objection), at any time prior to or subsequent to any disposition of any Notes Priority Collateral, on the ground(s) that any such disposition of Notes Priority Collateral (a) would not be or was not "commercially reasonable" within the meaning of any applicable UCC and/or (b) would not or did not comply with any other requirement under any applicable UCC or under any other applicable law governing the manner in which a secured creditor (including one with a Lien on real property) is to realize on its collateral; and

      (v)      subject to Sections 2.6(a) and (c) and Sections 3.1, 3.2, and 3.3, acknowledge and agree that no covenant, agreement or restriction contained in the ABL Security Documents or any other ABL Document (other than this Agreement) shall be deemed to restrict in any way the rights and remedies of the Notes Collateral Agent or the Notes Secured Parties with respect to the Notes Priority Collateral as set forth in this Agreement and the Notes Documents;

provided, however, that in the case of (i), (ii) and (iii) above, the Liens granted to secure the ABL Obligations of the ABL Secured Parties shall attach to any Proceeds resulting from actions taken by the Notes Collateral Agent or any Notes Secured Party with respect to the Notes Priority Collateral in accordance with this Agreement (including the priorities described in Section 2) after application of such Proceeds to the extent necessary to meet the requirements of a Discharge of Notes Obligations.

      (b)      Until the Discharge of Notes Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, the Notes Collateral Agent and the Notes Secured Parties shall have the right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and make, in connection therewith (including voluntary Dispositions of Notes Priority Collateral by the respective Grantors after a Notes Default) determinations regarding the release, disposition, or restrictions with respect to the Notes Priority Collateral without any consultation with, notice to, or the consent of the ABL Collateral Agent or any ABL Secured Party subject to the Notes Collateral Agent's and the Notes Secured Parties' obligations under Sections 3.1 and 3.2; provided, however, that the Lien securing the ABL Obligations shall remain on the Proceeds (other than those properly applied to the Notes Obligations in accordance with Section 4.1(b)) of such Collateral released or disposed of subject to the relative priorities described in Section 2.1.  In exercising rights and remedies with respect to the Notes Priority Collateral, the Notes Collateral Agent and the Notes Secured Parties may enforce the provisions of the Notes Documents and exercise remedies thereunder, all in such order and in such manner as they may determine in the exercise of their sole discretion subject to the Notes Collateral Agent's and the Notes Secured Parties' obligations under Sections 3.1 and 3.2.  Such exercise and enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose of the Notes Priority Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC and of a secured creditor under the Bankruptcy Laws of any applicable jurisdiction.

-21-

(c)     Notwithstanding anything to the contrary contained herein, the ABL Collateral Agent and any ABL Secured Party may:

(i)     file a claim or statement of interest with respect to the ABL Obligations; provided that an Insolvency or Liquidation Proceeding has been commenced by or against any Grantor;

(ii)    take any action (not inconsistent with the terms of this Agreement and not adverse to the priority status of the Liens on the Notes Priority Collateral, or the rights of the Notes Collateral Agent or any of the Notes Secured Parties to exercise rights, powers and/or remedies in respect thereof, including those under Article VI) in order to create, perfect, preserve or protect (but, subject to the provisions of Sections 3.1 and 3.2, not enforce) its Lien on any of the Notes Priority Collateral;

(iii)   file any necessary or appropriate responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims or Liens of the ABL Secured Parties, including any claims secured by the Notes Priority Collateral, if any, in each case in accordance with the terms of this Agreement;

(iv)    file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Grantors arising under either any Insolvency or Liquidation Proceeding or applicable non-bankruptcy law, in each case not inconsistent with the terms of this Agreement or applicable law (including the Bankruptcy Laws of any applicable jurisdiction) and any pleadings, objections, motions or agreements which assert rights or interests available to secured creditors solely with respect to the ABL Priority Collateral;

(v)     vote on any Plan of Reorganization, file any proof of claim, make other filings and make any arguments and motions (including in support of or opposition to, as applicable, the confirmation or approval of any Plan of Reorganization) that are, in each case, in accordance with the terms of this Agreement.  Without limiting the generality of the foregoing or of the other provisions of this Agreement, any vote to accept, and any other act to support the confirmation or approval of, any Non-Conforming Plan of Reorganization shall be inconsistent with and, accordingly, a violation of the terms of this Agreement, and the Notes Collateral Agent shall be entitled to have any such vote to accept a Non-Conforming Plan of Reorganization changed and any such support of any Non-Conforming Plan of Reorganization withdrawn;

(vi)    exercise any of its rights, powers, and/or remedies with respect to any of the Notes Priority Collateral to the extent permitted by Sections 2.6(a)(i), 3.1, and 3.2; and

(vii)   take any action described in clauses (i) through (iv), (vi) through (viii) and (x) through (xii) of the definition of "Enforcement."

The ABL Collateral Agent, on behalf of the ABL Secured Parties, agrees that no ABL Secured Party will take or receive any Notes Priority Collateral (including Proceeds) in connection with

the exercise of any right or remedy (including set-off) with respect to any Notes Priority Collateral in its capacity as a creditor in violation of this Agreement. Without limiting the generality of the foregoing, unless and until the Discharge of Notes Obligations has occurred, except as expressly provided in Sections 2.6(a)(i), 2.6(c) 3.1, 3.2, 3.3 and Article 6, the sole right of the ABL Collateral Agent and the ABL Secured Parties with respect to the Notes Priority Collateral is to hold a Lien on such Collateral pursuant to the ABL Security Documents for the period and to the extent granted therein and to receive a share of the Proceeds thereof, if any, in accordance with Section 4.1(b).

(d)    Except as otherwise specifically set forth in Sections 2.6(a) and 3.3 and Article VI, the ABL Collateral Agent and the ABL Secured Parties may exercise rights and remedies as unsecured creditors against any Grantor and may exercise rights and remedies with respect to the ABL Priority Collateral, in each case, in accordance with the terms of the ABL Documents and applicable law; provided, however, that in the event that any the ABL Collateral Agent or ABL Secured Party becomes a judgment Lien creditor in respect of Notes Priority Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the ABL Obligations, such judgment Lien shall be subject to the terms of this Agreement for all purposes (including in relation to the Notes Obligations) as the other Liens securing the ABL Obligations are subject to this Agreement.

(e)    Nothing in this Agreement shall prohibit the receipt by the ABL Collateral Agent or any ABL Secured Parties of the required payments of interest, principal and other amounts owed in respect of the ABL Obligations so long as such receipt is not the direct or indirect result of the exercise by the ABL Collateral Agent or any ABL Secured Parties of rights or remedies as a secured creditor (including set-off) with respect to Notes Priority Collateral or enforcement in contravention of this Agreement of any Lien held by any of them. Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the ABL Collateral Agent or the ABL Secured Parties may have against the Grantors under the ABL Documents.

## ARTICLE 3
## ACTIONS OF THE PARTIES

**Section 3.1    Collateral Access Rights.**

(a)    Subject to the provisions of Sections 2.5 and 2.6, either Agent may join in any judicial proceedings commenced by the other Agent to enforce Liens on the Collateral, provided that neither Agent, nor the other ABL Secured Parties or the other Notes Secured Parties, as applicable, shall interfere with the Enforcement actions of the other with respect to Collateral in which such party has the priority Lien in accordance with Section 2.1 and Section 2.2.

(b)    If the Notes Collateral Agent, or any agent or representative of the Notes Collateral Agent, or any receiver, shall, after any Notes Default, obtain possession or physical control of any of the Mortgaged Premises, the Notes Collateral Agent shall promptly notify the ABL Collateral Agent in writing of that fact, and the ABL Collateral Agent shall, within fifteen (15) Business Days thereafter, notify the Notes Collateral Agent in writing as to whether the ABL Collateral Agent desires to exercise access rights under this Agreement. In addition, if the ABL Collateral Agent, or any agent or representative or the ABL Collateral Agent, or any re-

-23-

ceiver, shall obtain possession or physical control of any of the Mortgaged Premises or any of the tangible Notes Priority Collateral located on any premises other than a Mortgaged Premises or control over any intangible Notes Priority Collateral, following the delivery to the Notes Collateral Agent of an Enforcement Notice, then the ABL Collateral Agent shall promptly notify the Notes Collateral Agent in writing that the ABL Collateral Agent is exercising its access rights under this Agreement and its rights under Section 3.2 under either circumstance. Upon delivery of such notice by the ABL Collateral Agent to the Notes Collateral Agent, the parties shall confer in good faith to coordinate with respect to the ABL Collateral Agent's exercise of such access rights. Consistent with the definition of "Access Period," access rights will apply to differing parcels of Mortgaged Premises at differing times, in which case, a differing Access Period will apply to each such property.

(c)    During any pertinent Access Period, the ABL Collateral Agent and its agents, representatives and designees shall have an irrevocable, non-exclusive right to have access to, and a rent-free right to use, the applicable parcel of Mortgaged Premises that constitutes Notes Priority Collateral and to use any Notes Priority Collateral located thereon for the purpose of (i) arranging for and effecting the sale or disposition of ABL Priority Collateral located on such parcel, including the manufacture, production, completion, packaging and other preparation of such ABL Priority Collateral for sale or disposition, (ii) selling (by public auction, private sale or a "store closing", Going Out of Business Sale or similar sale, whether in bulk, in lots or to customers in the ordinary course of business or otherwise and which sale may include augmented Inventory of the same type sold in any Grantor's business), (iii) storing or otherwise dealing with the ABL Priority Collateral, in each case without notice to, the involvement of or interference by the Notes Collateral Agent or any Notes Secured Party or liability to the Notes Collateral Agent or any Notes Secured Party. During any such Access Period, the ABL Collateral Agent and its representatives (and persons employed on their behalf), may continue to operate, service, maintain, process, manufacture, package and sell the ABL Priority Collateral, as well as to engage in bulk sales of ABL Priority Collateral. The ABL Collateral Agent shall take proper and reasonable care under the circumstances of any Notes Priority Collateral that is used by the ABL Collateral Agent during the Access Period and repair and replace any damage (ordinary wear-and-tear excepted) caused by the ABL Collateral Agent or its agents, representatives or designees and the ABL Collateral Agent shall comply with all applicable laws in all material respects in connection with its use or occupancy of the Notes Priority Collateral. The ABL Collateral Agent and the ABL Secured Parties shall reimburse the Notes Collateral Agent and the Notes Secured Parties for any injury or damage to Persons or property (ordinary wear-and-tear excepted) directly caused by the acts or omissions of Persons under its control; provided, however, that the ABL Collateral Agent and the ABL Secured Parties will not be liable for any diminution in the value of the Mortgaged Premises caused by the absence of the ABL Priority Collateral therefrom. In no event shall the ABL Secured Parties or the ABL Collateral Agent have any liability to the Notes Secured Parties and/or to the Notes Collateral Agent hereunder as a result of any condition (including any environmental condition, claim or liability) on or with respect to the Notes Priority Collateral existing prior to the date of the exercise by the ABL Collateral Agent) of its rights under this Agreement. The ABL Collateral Agent and the Notes Collateral Agent shall cooperate and use reasonable efforts to ensure that their activities during the Access Period as described above do not interfere materially with the activities of the other as described above, including the right of Notes Collateral Agent to show the Notes Priority Collateral to prospective purchasers and to ready the Notes Priority Collateral for sale.

-24-

(d)      Consistent with the definition of the term "Access Period," if any order or injunction is issued or stay is granted or is otherwise effective by operation of law that prohibits the ABL Collateral Agent from exercising any of its rights hereunder, then the Access Period granted to the ABL Collateral Agent under this Section 3.1 shall be stayed during the period of such prohibition and shall continue thereafter for the number of days remaining in the applicable Access Period.  The Notes Collateral Agent shall not foreclose or otherwise sell or dispose of any of the Notes Priority Collateral during the Access Period unless the buyer agrees in writing to acquire the Notes Priority Collateral subject to the terms of this Section 3.1 and Section 3.2 of this Agreement and agrees therein to comply with the terms of this Section 3.1.  The rights of ABL Collateral Agent and the ABL Secured Parties under this Section 3.1 and Section 3.2 during the Access Period shall continue notwithstanding such foreclosure, sale or other disposition by the Notes Collateral Agent and the Notes Collateral Agent agrees that any such foreclosure, sale or other disposition shall be expressly subject to such rights.

(e)      The ABL Collateral Agent and the ABL Secured Parties shall have the right to bring an action to enforce their rights under this Section 3.1 and Section 3.2, including, without limitation, an action seeking possession of the applicable Collateral and/or specific performance of this Section 3.1 and Section 3.2.

Section 3.2      **Notes Collateral Rights/Access to Information**.  For the purposes of enabling the ABL Collateral Agent to exercise rights and remedies under this Agreement during the Enforcement Period, the Notes Collateral Agent and each Grantor hereby grants (to the full extent of their respective rights and interests) the ABL Collateral Agent and its agents, representatives and designees an irrevocable, non-exclusive, royalty-free, rent-free license and lease (which will be binding on any successor or assignee of any Notes Priority Collateral) to use all of the Notes Priority Collateral (including, without limitation, all Intellectual Property) to collect all Accounts included in ABL Priority Collateral, to copy, use, or preserve any and all information relating to any of the ABL Priority Collateral, and to complete the manufacture, packaging, advertising for sale and sale of (i) work-in-process, (ii) raw materials and (iii) complete inventory; provided, however, the royalty-free, rent-free license and lease with respect to the applicable Notes Priority Collateral (other than Intellectual Property), shall immediately expire upon the end of the Access Period applicable to such Notes Priority Collateral located on any Mortgaged Premises; provided, further, that such expiration shall be without prejudice to the sale or other disposition of the ABL Priority Collateral in accordance with applicable law.

Section 3.3      **Exercise of Remedies – Set-Off and Tracing of and Priorities in Proceeds.**  The Notes Collateral Agent, on behalf of the Notes Secured Parties, acknowledges and agrees that, to the extent the Notes Collateral Agent or any Notes Secured Party exercises its rights of set-off against any ABL Priority Collateral, the amount of such set-off shall be held and distributed pursuant to Section 4.1(b).  The ABL Collateral Agent, on behalf of the ABL Secured Parties, acknowledges and agrees that, to the extent the ABL Collateral Agent or any ABL Secured Party exercises its rights of set-off against any Notes Priority Collateral, the amount of such set-off shall be held and distributed pursuant to Section 4.1(b).  The ABL Collateral Agent, for itself and on behalf of the ABL Secured Parties, and the Notes Collateral Agent, for itself and on behalf of the Notes Secured Parties, further agree that prior to an issuance of an Enforcement Notice or the commencement of any Insolvency or Liquidation Proceeding, any Proceeds of Collateral, whether or not deposited in an account subject to an account control agreement, which

-25-

are used by any Grantor to acquire other property which is Collateral shall not (solely as between the Agents, the ABL Secured Parties and the Notes Secured Parties) be treated as Proceeds of Collateral for purposes of determining the relative priorities in the Collateral which was so acquired.  In addition, unless and until the Discharge of ABL Obligations occurs, subject to Section 4.1(c), the Notes Collateral Agent and the Notes Secured Parties each hereby (i) consents to the application, prior to the receipt by the ABL Collateral Agent of an Enforcement Notice issued by the Notes Collateral Agent, of cash or other Proceeds of Collateral, deposited in accounts subject to an account control agreement that constitute ABL Priority Collateral (other than the Notes Collateral Account) to the repayment of ABL Obligations pursuant to the ABL Documents, (ii) agrees that such cash or other Proceeds shall be treated as ABL Priority Collateral and, (iii) unless the ABL Collateral Agent has actual knowledge to the contrary or unless such funds are identifiable Proceeds of Notes Priority Collateral, any claim that payments made to the ABL Collateral Agent through the Deposit Accounts and Securities Accounts that are subject to such account control agreements are Proceeds of or otherwise constitute Notes Priority Collateral is waived by the Notes Collateral Agent and the Notes Secured Parties; provided that after the receipt by the ABL Collateral Agent of an Enforcement Notice issued by the Notes Collateral Agent or the commencement of any Insolvency or Liquidation Proceeding, all identifiable proceeds of Notes Priority Collateral shall be treated as Notes Priority Collateral.

In the event that directly or indirectly some or all of the ABL Priority Collateral and some or all of the Notes Priority Collateral are disposed of in a single transaction or series of related transactions in which the aggregate sales price is not allocated between ABL Priority Collateral and Notes Priority Collateral being sold (including in connection with or as a result of the sale of the Capital Stock of a Company Subsidiary which shall be treated as a sale of assets), then solely for purposes of this Agreement, the portion of the aggregate sales price determined to be proceeds of the ABL Priority Collateral on the one hand, and Notes Priority Collateral on the other hand, shall be allocated based upon, in the case of (i) any ABL Priority Collateral consisting of inventory, no less than the book value as assessed on the date of such disposition, (ii) any ABL Priority Collateral consisting of accounts receivable, no less than the book value as assessed on the date of such disposition, and (iii) all other ABL Priority Collateral and Notes Priority Collateral, fair market value of such ABL Priority Collateral and Notes Priority Collateral sold, as determined in good faith by the Company in its reasonable judgment.

## ARTICLE 4. APPLICATION OF PROCEEDS

Section 4.1        Application of Proceeds.

(a)        Revolving Nature of ABL Obligations.  The Notes Collateral Agent, on behalf of the Notes Secured Parties, acknowledges and agrees that the ABL Credit Agreement includes a revolving commitment and that the amount of the ABL Obligations that may be outstanding at any time or from time to time may be increased or reduced and subsequently reborrowed.

(b)        Application of Proceeds of Collateral.

-26-

(i)      So long as the Discharge of ABL Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, all ABL Priority Collateral or Proceeds thereof received in connection with the sale or other disposition of, or collection on, such ABL Priority Collateral as a result of the exercise of remedies (including for this purpose any voluntary disposition of ABL Priority Collateral by the Grantors, as approved by the ABL Collateral Agent after an ABL Default) or other Enforcement by either Agent or any ABL Secured Parties or Notes Secured Parties, shall be delivered to the ABL Collateral Agent and shall be applied or further distributed by the ABL Collateral Agent to or on account of the ABL Obligations in such order, if any, as specified in the relevant ABL Documents or as a court of competent jurisdiction may otherwise direct.  Upon the Discharge of ABL Obligations, the ABL Collateral Agent shall deliver to the Notes Collateral Agent any ABL Priority Collateral and Proceeds of ABL Priority Collateral received or delivered to it pursuant to the preceding sentence, in the same form as received, with any necessary endorsements, to be applied by the Notes Collateral Agent to the Notes Obligations in such order as specified in the Notes Security Documents or as a court of competent jurisdiction may otherwise direct.

(ii)      So long as the Discharge of Notes Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, all Notes Priority Collateral or Proceeds thereof received in connection with the sale or other disposition of, or collection on, such Notes Priority Collateral as a result of the exercise of remedies (including for this purpose any voluntary disposition of Notes Priority Collateral by the Grantors, as approved by the Notes Collateral Agent after a Notes Default) or other Enforcement by either Agent or any Notes Secured Parties or ABL Secured Parties, shall be delivered to the Notes Collateral Agent and shall be applied by the Notes Collateral Agent to the Notes Obligations in such order as specified in the relevant Notes Documents or as a court of competent jurisdiction may otherwise direct.  Upon the Discharge of Notes Obligations, the Notes Collateral Agent shall deliver to the ABL Collateral Agent any Notes Priority Collateral and Proceeds of Notes Priority Collateral received or delivered to it pursuant to the preceding sentence, in the same form as received, with any necessary endorsements to be applied by the ABL Collateral Agent to the ABL Obligations in such order as specified in the ABL Security Documents or as a court of competent jurisdiction may otherwise direct.

(c)      Payments Over.  So long as neither the Discharge of ABL Obligations nor the Discharge of Notes Obligations has occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against any Grantor, any Collateral (including assets or Proceeds subject to Liens referred to in the final sentence of Section 2.3) received by either Agent or any Notes Secured Parties or ABL Secured Parties in connection with the exercise of any right, power, or remedy (including set-off) relating to the Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith paid over to the appropriate Agent for the benefit of the Notes Secured Parties or the ABL Secured Parties, as applicable, in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct.  Each Agent is hereby authorized by the other Agent to make any such endorsements as agent for the other Agent or any Notes Secured Parties or ABL Secured Parties, as applicable.  This authorization is coupled with an interest and is irrevocable until the Discharge of ABL Obligations and Discharge of Notes Obligations.

(d)   Application of Payments.  Subject to the other terms of this Agreement, all payments received by (a) the ABL Collateral Agent or the ABL Secured Parties may be applied, reversed and reapplied, in whole or in part, to the ABL Obligations to the extent provided for in the ABL Documents and (b) the Notes Collateral Agent or the Notes Secured Parties may be applied, reversed and reapplied, in whole or in part, to the Notes Obligations to the extent provided for in the Notes Documents.

Section 4.2   **Specific Performance.**  Each of the ABL Collateral Agent and the Notes Collateral Agent is hereby authorized to demand specific performance of this Agreement, whether or not the Company or any Grantor shall have complied with any of the provisions of any of the Credit Documents, at any time when the other Party shall have failed to comply with any of the provisions of this Agreement applicable to it.  Each of the ABL Collateral Agent, for and on behalf of itself and the ABL Secured Parties, and the Notes Collateral Agent, for and on behalf of itself and the Notes Secured Parties, hereby irrevocably waives any defense based on the adequacy of a remedy at law that might be asserted as a bar to such remedy of specific performance.

# ARTICLE 5
# OTHER AGREEMENTS

Section 5.1   **Releases**.

(a)   (i)  If, in connection with (A) any exercise of remedies or Enforcement (including as provided for in Section 2.5(b) or Section 6.8(a) and including for this purpose any voluntary disposition of ABL Priority Collateral by the Grantors, as approved by the ABL Collateral Agent after an ABL Default), or (B) any sale, transfer or other disposition of all or any portion of the ABL Priority Collateral, so long as such sale, transfer or other disposition is then not prohibited by the ABL Documents (or is otherwise consented to by the requisite ABL Lenders) or by the Notes Documents (or is otherwise consented to by the requisite Noteholders), irrespective of whether an ABL Default has occurred and is continuing, the ABL Collateral Agent, on behalf of any of the ABL Secured Parties, releases any of its Liens on any part of the ABL Priority Collateral (or if such Liens are automatically released pursuant to the ABL Documents upon such sale, transfer or other disposition), then the Liens, if any, of the Notes Collateral Agent, for the benefit of the Notes Secured Parties, on the ABL Priority Collateral sold or disposed of in connection therewith, shall be automatically, unconditionally and simultaneously released; provided that, to the extent the Proceeds of such ABL Priority Collateral are not applied to reduce ABL Obligations in accordance with Section 4.1, the Notes Collateral Agent shall retain a Lien on such Proceeds in accordance with the terms of this Agreement.  The Notes Collateral Agent, on behalf of the Notes Secured Parties, promptly shall, at the sole cost and expense of the Grantors, execute and deliver to the ABL Collateral Agent or such Grantor such termination statements, releases and other documents as the ABL Collateral Agent or such Grantor may reasonably request in writing to effectively confirm such release.

(ii)   If, in connection with (A) any exercise of remedies or Enforcement (including as provided for in Section 2.6(b) or Section 6.8(b) and including for this purpose any voluntary disposition of Notes Priority Collateral by the Grantors, as approved by the Notes Collateral Agent after a Notes Default), or (B) any sale, transfer or other disposition of all or any

portion of the Notes Priority Collateral, so long as such sale, transfer or other disposition is then not prohibited by the Notes Documents (or is otherwise consented to by the requisite Noteholders) or by the ABL Documents (or is otherwise consented to by the requisite ABL Lenders), irrespective of whether a Notes Default has occurred and is continuing, the Notes Collateral Agent, on behalf of any of the Notes Secured Parties, releases any of its Liens on any part of the Notes Priority Collateral (or if such Liens are automatically released pursuant to the Notes Documents upon such sale, transfer or other disposition), then the Liens, if any, of the ABL Collateral Agent, for the benefit of the ABL Secured Parties, on the Notes Priority Collateral sold or disposed of in connection therewith, shall be automatically, unconditionally and simultaneously released; provided that the provisions of Section 3.1 and 3.2 shall continue, to the extent such Sections are applicable at the time of such sale, transfer or other disposition; provided, further that, to the extent the Proceeds of such Notes Priority Collateral are not applied to reduce Notes Obligations in accordance with Section 4.1, the ABL Collateral Agent shall retain a Lien on such Proceeds in accordance with the terms of this Agreement.  The ABL Collateral Agent, on behalf of the ABL Secured Parties, promptly shall, at the sole cost and expense of the Grantors, execute and deliver to the Notes Collateral Agent or such Grantor such termination statements, releases and other documents as the Notes Collateral Agent or such Grantor may reasonably request in writing to effectively confirm such release.

(b)    Until the Discharge of ABL Obligations and Discharge of Notes Obligations shall occur, the ABL Collateral Agent, on behalf of the ABL Secured Parties, and the Notes Collateral Agent, on behalf of the Notes Secured Parties, as applicable, hereby irrevocably constitutes and appoints the other Agent and any officer or agent of the other Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the other Agent or such holder or in the Agent's own name, from time to time in such Agent's discretion exercised in good faith, for the purpose of carrying out the terms of this Section 5.1, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 5.1, including any endorsements or other instruments of transfer or release.

(c)    Until the Discharge of ABL Obligations and Discharge of Notes Obligations shall occur, to the extent that the Agents or the ABL Secured Parties or the Notes Secured Parties (i) have released any Lien on Collateral and such Lien is later reinstated or (ii) obtain any new Liens from any Grantor, then, in accordance with Section 2.3, the Grantors shall grant a Lien on any such Collateral, subject to the Lien priority provisions of this Agreement, to the other Agent, for the benefit of the ABL Secured Parties or Notes Secured Parties, as applicable.

Section 5.2    **Insurance**.

(a)    Unless and until the Discharge of ABL Obligations has occurred and subject to the terms of, and the rights of the Grantors under, the ABL Documents, the ABL Collateral Agent, on behalf of the ABL Secured Parties, shall have the sole and exclusive right to adjust settlement for any insurance policy covering the ABL Priority Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting such ABL Priority Collateral.  Until the Discharge of ABL Obligations has occurred, (i) all Proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of the ABL Priority Col-

-29-

lateral and to the extent required by the ABL Documents shall be paid to the ABL Collateral Agent for the benefit of the ABL Secured Parties pursuant to the terms of the ABL Documents (including, without limitation, for purposes of cash collateralization of letters of credit) and thereafter, if the Discharge of ABL Obligations has occurred, and subject to the rights of the Grantors under the Notes Security Documents, to the Notes Collateral Agent for the benefit of the Notes Secured Parties to the extent required under the Notes Security Documents and then, to the extent the Discharge of Notes Obligations has occurred, to the owner of the subject property or such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct, and (ii) if the Notes Collateral Agent or any Notes Secured Parties shall, at any time, receive any Proceeds of any such insurance policy or any such award or payment with respect to ABL Priority Collateral in contravention of this Agreement, it shall segregate and hold in trust and forthwith pay such Proceeds over to the ABL Collateral Agent in accordance with the terms of Section 4.1(b).

       (b)    Unless and until the Discharge of Notes Obligations has occurred, subject to the terms of, and the rights of the Grantors under, the Notes Documents, the Notes Collateral Agent, on behalf of the Notes Secured Parties, shall have the sole and exclusive right to adjust settlement for any insurance policy covering the Notes Priority Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting such Notes Priority Collateral. Until the Discharge of Notes Obligations has occurred, (i) all Proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of the Notes Priority Collateral and to the extent required by the Notes Documents shall be paid to the Notes Collateral Agent for the benefit of the Notes Secured Parties pursuant to the terms of the Notes Documents and thereafter, if the Discharge of Notes Obligations has occurred, and subject to the rights of the Grantors under the ABL Documents, to the ABL Collateral Agent for the benefit of the ABL Secured Parties to the extent required under the ABL Security Documents and then, to the extent the Discharge of ABL Obligations has occurred, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct, and (ii) if the ABL Collateral Agent or any ABL Secured Parties shall, at any time, receive any Proceeds of any such insurance policy or any such award or payment with respect to Notes Priority Collateral in contravention of this Agreement, it shall segregate and hold in trust and forthwith pay such Proceeds over to the Notes Collateral Agent in accordance with the terms of Section 4.1(b).

       (c)    To effectuate the foregoing, and to the extent that the pertinent insurance company agrees to issue such endorsements, the Agents shall each receive separate lender's loss payable endorsements naming themselves as loss payee and additional insured, as their interests may appear, with respect to any policies which insure Collateral hereunder. To the extent any Proceeds are received for business interruption or for any liability or indemnification and those Proceeds are not in whole or in part compensation for a casualty loss with respect to the Notes Priority Collateral, such Proceeds shall be applied first, to repay the ABL Obligations (to the extent required pursuant to the ABL Documents), second, to the extent no ABL Obligations are outstanding, to repay the Notes Obligations (to the extent required by the Notes Documents), and third, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct.

### Section 5.3        Amendments to ABL Documents and Notes Documents; Refinancing.

(a)        Subject to Sections 5.3(b) and 5.3(c), the ABL Documents and Notes Documents may be amended, supplemented or otherwise modified in accordance with their terms, all without affecting the Lien subordination or other provisions of this Agreement.  The ABL Obligations may be Refinanced without notice to, or the consent of, the Notes Collateral Agent or the Notes Secured Parties and without affecting the Lien subordination or other provisions of this Agreement, and the Notes Obligations may be Refinanced without notice to, or consent of, the ABL Collateral Agent or the ABL Secured Parties and without affecting the Lien subordination and other provisions of this Agreement so long as such Refinancing is on terms and conditions that would not violate the Notes Documents or the ABL Documents (as applicable), each as in effect on the date hereof (or, if less restrictive to the Company, as in effect on the date of such amendment or Refinancing) or this Agreement; provided, however, that, in each case, (x) the Company shall deliver a notice to the ABL Collateral Agent or the Notes Collateral Agent, as applicable, stating that the Company has entered into new ABL Documents or Notes Documents, as the case may be, and identifying the agent under such Credit Documents (the "**New Agent**") and (iii) the New Agent shall deliver a joinder to this Agreement, substantially in the form of Exhibit B to the remaining Agent; provided further, however, that, if such Refinancing debt is secured by a Lien on any Collateral the holders of such Refinancing debt shall be deemed bound by the terms hereof regardless of whether or not such joinder is provided.  For the avoidance of doubt, the sale or other transfer of Indebtedness is not restricted by this Agreement but the provisions of this Agreement shall be binding on all holders of ABL Obligations and Notes Obligations.

(b)        The ABL Secured Parties will not be entitled to agree (and will not agree) to any amendment to or modification of the ABL Documents, whether in a Refinancing or otherwise, that is inconsistent with the terms of this Agreement.

(c)        The Notes Collateral Agent and the Notes Secured Parties will not be entitled to agree (and will not agree) to any amendment to or modification of the Notes Documents, whether in a Refinancing or otherwise, that is inconsistent with the terms of this Agreement.

(d)        So long as the Discharge of ABL Obligations has not occurred, the Notes Collateral Agent agrees that each applicable Notes Security Document that grants a Lien on any material Collateral shall include the following language (or similar language acceptable to the ABL Collateral Agent):  "Notwithstanding anything herein to the contrary, the liens and security interests granted to U.S. Bank National Association, as Collateral Agent, pursuant to this Agreement and the exercise of any right or remedy by U.S. Bank National Association, as Collateral Agent hereunder, are subject to the provisions of the Intercreditor Agreement dated as of July 23, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among BMO Harris Bank N.A., as the ABL Collateral Agent, U.S. Bank National Association, as Trustee and as Notes Collateral Agent, and acknowledged and consented to by the Grantors (as defined in the Intercreditor Agreement) from time to time party thereto.  In the event of any conflict between the terms of the Intercreditor Agreement and the terms of this Agreement, the terms of the Intercreditor Agreement shall govern and control."

(e)    So long as the Discharge of Notes Obligations has not occurred, the ABL Collateral Agent agrees that each applicable ABL Security Document executed on or after the date hereof that grants a Lien on any material Collateral shall include the following language (or similar language acceptable to the Notes Collateral Agent):  "Notwithstanding anything herein to the contrary, the liens and security interests granted to BMO Harris Bank N.A., as Agent pursuant to this Agreement and the exercise of any right or remedy by the Agent hereunder, are subject to the provisions of the Intercreditor Agreement dated as of July 23, 2013 (as amended, restated, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), among the Agent, as ABL Collateral Agent, U.S. Bank National Association, as Trustee and as Notes Collateral Agent, and acknowledged and consented to by the Grantors (as defined in the Intercreditor Agreement) from time to time party thereto.  In the event of any conflict between the terms of the Intercreditor Agreement and the terms of this Agreement, the terms of the Intercreditor Agreement shall govern and control."

## Section 5.4    Bailees for Perfection.

(a)    Each Agent agrees to hold that part of the Collateral that is in its possession or control (or in the possession or control of its agents or bailees) to the extent that possession or control thereof is taken to perfect a Lien thereon (such Collateral, which shall include, without limitation, Deposit Accounts, Securities Accounts and Capital Stock, being the "**Pledged Collateral**") as (i) in the case of the ABL Collateral Agent, the collateral agent for the ABL Secured Parties under the ABL Documents or, in the case of the Notes Collateral Agent, the collateral agent for the Notes Secured Parties under the Notes Documents and (ii) gratuitous bailee and agent for the benefit and on behalf of the other Agent (such bailment and agency being intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2), 9-104(a) and 9-313(c) of the UCC) and any assignee solely for the purpose of perfecting the security interest granted under the ABL Documents and the Notes Documents, respectively, subject to the terms and conditions of this Section 5.4.  The Notes Collateral Agent and the Notes Secured Parties hereby appoint the ABL Collateral Agent as their agent for the purposes of perfecting their security interest in all Deposit Accounts and Securities Accounts (in each case, other than the Notes Collateral Account) of the Company and the Subsidiaries.  The ABL Collateral Agent hereby accepts such appointment and acknowledges and agrees that it shall act for the benefit of the Notes Collateral Agent and the other Notes Secured Parties under each control agreement and that any Proceeds received by the ABL Collateral Agent under any control agreement shall be applied in accordance with Article IV. In furtherance of the foregoing, each Grantor hereby grants a security interest in the Pledged Collateral to the ABL Collateral Agent for the benefit of the Notes Secured Parties.

(b)    Neither Agent shall have any obligation whatsoever to the other Agent, to any other ABL Secured Parties, or to any other Notes Secured Parties to ensure that the Pledged Collateral is genuine or owned by any of the Grantors or to preserve rights or benefits of any Person except as expressly set forth in this Section 5.4.  The duties or responsibilities of the respective Agents under this Section 5.4 shall be limited solely to holding the Pledged Collateral as bailee in accordance with this Section 5.4 and delivering the Pledged Collateral or Proceeds thereof upon a Discharge of ABL Obligations or Discharge of Notes Obligations, as applicable, as provided in paragraph (d) below.

-32-

(c)     Neither Agent acting pursuant to this Section 5.4 shall have by reason of the ABL Documents, the Notes Documents, this Agreement or any other document a fiduciary relationship in respect of the other Agent, any other ABL Secured Parties or any other Notes Secured Parties.

(d)     Upon the Discharge of ABL Obligations or the Discharge of Notes Obligations, as applicable, the Agent under the ABL Credit Agreement or Notes Documents, as applicable, that have been discharged shall deliver the remaining Pledged Collateral (if any) together with any necessary endorsements, first, to the other Agent to the extent the other Obligations remain outstanding, and second, to the applicable Grantor to the extent the Discharge of ABL Obligations and the Discharge of Notes Obligations have occurred (in each case, so as to allow such Person to obtain possession or control of such Pledged Collateral) or as otherwise required by law.  Each Agent further agrees to take all other action reasonably requested by the other Agent, at the sole cost and expense of the Grantors, in connection with the other Agent obtaining a first-priority interest in the Collateral or as a court of competent jurisdiction may otherwise direct.  Notwithstanding anything to the contrary contained in this Agreement, any obligation of the Agent, which has been discharged, to make any delivery to the other Agent under this Section 5.4(d) is subject to (i) the order of any court of competent jurisdiction, or (ii) any automatic stay imposed in connection with any Insolvency or Liquidation Proceeding.

## ARTICLE 6
## INSOLVENCY OR LIQUIDATION PROCEEDINGS

Section 6.1     **Finance Issues**.  The Notes Collateral Agent, on behalf of the Notes Secured Parties, hereby agrees that, until the Discharge of ABL Obligations has occurred, if any Grantor shall be subject to any Insolvency or Liquidation Proceeding and the ABL Collateral Agent shall desire to permit the use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code) constituting ABL Priority Collateral or to permit any Grantor to obtain financing, whether from the ABL Secured Parties or any other Person under Section 364 of the Bankruptcy Code or any similar Bankruptcy Law ("**ABL DIP Financing**") secured by a Lien on ABL Priority Collateral, then any Notes Secured Parties will not object (and will not raise or support any Person in objecting to), but instead shall be deemed to have hereby irrevocably and absolutely waived, any objection to, and shall not otherwise in any manner be entitled to oppose or support any Person in opposing, and will be deemed to have consented to, such Cash Collateral use or ABL DIP Financing (and agrees, except as expressly provided below, that the Notes Secured Parties are not entitled to and will not request adequate protection of their interest in the Collateral as a condition thereto) so long as such Cash Collateral use or ABL DIP Financing meets the following requirements:  (i) the Notes Collateral Agent and the other Notes Secured Parties retain a Lien on the Collateral and, with respect to the Notes Priority Collateral, with the same priority as existed prior to the commencement of the Insolvency or Liquidation Proceeding, (ii) to the extent that the ABL Collateral Agent is granted adequate protection in the form of a Lien on the ABL Priority Collateral, the Notes Collateral Agent is permitted to seek a Lien (without objection from the ABL Collateral Agent or any ABL Secured Party) on such ABL Priority Collateral arising after the commencement of the Insolvency or Liquidation Proceeding (so long as, with respect to such Collateral, such Lien is junior to the Liens thereon securing such ABL DIP Financing and any other Liens thereon in favor of the ABL Collateral Agent), (iii) the terms of the Cash Collateral use or the ABL DIP Financing (A) do not require

that any Lien of the Notes Collateral Agent on the Notes Priority Collateral be subordinated to and pari passu with the Lien on the Notes Priority Collateral securing such Cash Collateral use or ABL DIP Financing, and (B) do not require any Grantor to seek approval for any Plan of Reorganization that is inconsistent with this Agreement.  The Notes Collateral Agent shall be required to subordinate and will subordinate its Liens in the ABL Priority Collateral to the Liens securing such ABL DIP Financing (and all obligations relating thereto, including any "carve-out" therefrom approved by the ABL Collateral Agent granting administrative priority status or Lien priority to secure repayment of fees and expenses of professionals retained by any debtor or creditors' committee) and, accordingly, such Liens of the Notes Collateral Agent on the ABL Priority Collateral will be automatically subordinated to the Liens thereon securing the ABL DIP Financing and, consistent with the preceding provisions of this Section 6.1(a), the Notes Collateral Agent will not request adequate protection or any other relief in connection therewith (except as expressly provided in clause (ii) above or Section 6.3 hereof); provided, however, if the Liens on the ABL Priority Collateral securing the ABL DIP Financing rank junior to the Liens securing the ABL Obligations, the Notes Collateral Agent shall be required to subordinate its Liens in the ABL Priority Collateral to the Liens thereon securing such ABL DIP Financing.  The Notes Collateral Agent, on behalf of itself and the Notes Secured Parties, agrees that no such Person shall provide to such Grantor any ABL DIP Financing to the extent that the Notes Collateral Agent or any Notes Secured Parties would, in connection with such financing, be granted a Lien on the ABL Priority Collateral in connection with the Notes Obligations senior to or pari passu with the Liens of the ABL Collateral Agent.  The ABL Collateral Agent, on behalf of itself and the ABL Secured Parties, agrees that no such Persons shall provide to such Grantor any ABL DIP Financing to the extent that the ABL Collateral Agent or any ABL Secured Party would, in connection with such financing, be granted a Lien on the Notes Priority Collateral with respect to the ABL Obligations senior to or <u>pari passu</u> with the Liens of the Notes Collateral Agent.  The ABL Collateral Agent, on behalf of the ABL Secured Parties, hereby agrees that, until the Discharge of Notes Obligations has occurred, if any Grantor shall be subject to any Insolvency or Liquidation Proceeding and the Notes Collateral Agent shall desire to permit the use of "Cash Collateral" (as such term is defined in Section 363(a) of the Bankruptcy Code) constituting Notes Priority Collateral or to permit any Grantor to obtain financing, whether from the Notes Secured Parties or any other Person under Section 364 of the Bankruptcy Code or any similar Bankruptcy Law ("**Notes DIP Financing**") secured by a Lien on Notes Priority Collateral, then any ABL Secured Party will not object (and will not raise or support any Person in objecting to), but instead shall be deemed to have hereby irrevocably and absolutely waived, any objection to, and shall not otherwise in any manner be entitled to oppose or support any Person in opposing, and will be deemed to have consented to such Cash Collateral use or Notes DIP Financing (and agrees, except as expressly provided below, that the ABL Secured Parties are not entitled to and will not request adequate protection of their interest in the Collateral as a condition thereto) so long as such Cash Collateral use or Notes DIP Financing meets the following requirements:  (i) the ABL Collateral Agent and the other ABL Secured Parties retain a Lien on the Collateral and, with respect to the ABL Priority Collateral, with the same priority as existed prior to the commencement of the Insolvency or Liquidation Proceeding, (ii) to the extent that the Notes Collateral Agent is granted adequate protection in the form of a Lien on the Notes Priority Collateral, the ABL Collateral Agent is permitted to seek a Lien (without objection from the Notes Collateral Agent or any Notes Secured Party) on such Notes Priority Collateral arising after the commencement of the Insolvency or Liquidation Proceeding (so long as, with respect to such Collat-

eral, such Lien is junior to the Liens thereon securing such Notes DIP Financing and any other Liens thereon in favor of the Notes Collateral Agent), (iii) the terms of the Cash Collateral use or the Notes DIP Financing (A) do not require that any Lien of the ABL Collateral Agent on the ABL Priority Collateral be subordinated to and pari passu with the Lien on the ABL Priority Collateral securing such Cash Collateral use or Notes DIP Financing, and (B) do not require any Grantor to seek approval for any Plan of Reorganization that is inconsistent with this Agreement. The ABL Collateral Agent shall be required to subordinate and will subordinate its Liens in the Notes Priority Collateral to the Liens securing such Notes DIP Financing (and all obligations relating thereto, including any "carve-out" therefrom approved by the Notes Collateral Agent granting administrative priority status or Lien priority to secure repayment of fees and expenses of professionals retained by any debtor or creditors' committee) and, accordingly, such Liens of the ABL Collateral Agent on the Notes Priority Collateral will be automatically subordinated to the Liens thereon securing the Notes DIP Financing and, consistent with the preceding provisions of this Section 6.1(b), the ABL Collateral Agent will not request adequate protection or any other relief in connection therewith (except as expressly provided in clause (ii) above or Section 6.3 hereof); provided, however, if the Liens on the Notes Priority Collateral securing the Notes DIP Financing rank junior to the Liens securing the Notes Obligations, the ABL Collateral Agent shall be required to subordinate its Liens in the Notes Priority Collateral to the Liens thereon securing such Notes DIP Financing. The ABL Collateral Agent, on behalf of itself and the ABL Secured Parties, agrees that no such Person shall provide to such Grantor any Notes DIP Financing to the extent that the ABL Collateral Agent or any ABL Secured Party would, in connection with such financing, be granted a Lien on the Notes Priority Collateral in connection with the ABL Obligations senior to or pari passu with the Liens of the Notes Collateral Agent. The Notes Collateral Agent, on behalf of itself and the Notes Secured Parties, agrees that no such Persons shall provide to such Grantor any Notes DIP Financing to the extent that the Notes Collateral Agent or any Notes Secured Party would, in connection with such financing, be granted a Lien on the ABL Priority Collateral with respect to the Notes Obligations senior to or pari passu with the Liens of the ABL Collateral Agent.

## Section 6.2    Relief from the Automatic Stay.

(a)    Until the Discharge of ABL Obligations, the Notes Collateral Agent, on behalf of the other Notes Secured Parties, agrees that none of them shall (1) seek (or support any other Person seeking) relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the ABL Priority Collateral, without the prior written consent of the ABL Collateral Agent (given or not given in its sole and absolute discretion) or (2) object (or support any other Person objecting) to any motion by the ABL Collateral Agent or the other ABL Secured Parties seeking relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the ABL Priority Collateral.

(b)    Until the Discharge of Notes Obligations has occurred, the ABL Collateral Agent, on behalf of the other ABL Secured Parties, agrees that none of them shall (1) seek (or support any other Person seeking) relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Notes Priority Collateral (other than to the extent such relief is required to exercise its rights under Sections 3.1 and 3.2), without the prior written consent of the Notes Collateral Agent (given or not given in its sole and absolute discretion) or (2) object (or support any other Person objecting) to any motion by the Notes Collateral

Agent or the other Notes Secured Parties seeking relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Notes Priority Collateral.

> **Section 6.3**      **Adequate Protection**.

(a)      The Notes Collateral Agent, on behalf of itself and the Notes Secured Parties, agrees that none of them shall be entitled to contest and none of them shall contest (or support any other Person contesting) (but instead shall be deemed to have hereby irrevocably, absolutely, and unconditionally waived any right):

(i)      any request by the ABL Collateral Agent or the other ABL Secured Parties for adequate protection with respect to the ABL Priority Collateral; provided that if such additional assets or property shall also constitute Notes Priority Collateral, (i) a Lien shall have been created in favor of the Notes Secured Parties in respect of such Collateral and (ii) the Lien in favor of the ABL Collateral Agent or the other ABL Secured Parties shall be subordinated to the extent set forth in this Agreement; or

(ii)      any objection by the ABL Collateral Agent or the other ABL Secured Parties to any motion, relief, action or proceeding based on the ABL Collateral Agent or the other ABL Secured Parties claiming a lack of adequate protection with respect to the ABL Priority Collateral.

(b)      The ABL Collateral Agent, on behalf of itself and the ABL Secured Parties, agrees that none of them shall be entitled to contest and none of them shall contest (or support any other Person contesting) (but instead shall be deemed to have hereby irrevocably, absolutely, and unconditionally waived any right):

(i)      any request by the Notes Collateral Agent or the Notes Secured Parties for adequate protection with respect to the Notes Priority Collateral; provided that if such additional assets or property shall also constitute ABL Priority Collateral, (i) a Lien shall have been created in favor of the ABL Secured Parties in respect of such Collateral and (ii) the Lien in favor of the ABL Collateral Agent or the other ABL Secured Parties shall be subordinated to the extent set forth in this Agreement; or

(ii)      any objection by the Notes Collateral Agent or the Notes Secured Parties to any motion, relief, action or proceeding based on the Notes Collateral Agent or the Notes Secured Parties claiming a lack of adequate protection with respect to the Notes Priority Collateral.

(c)      Consistent with the foregoing provisions in this Section 6.3, and except as expressly set forth in in Section 6.1, in any Insolvency or Liquidation Proceeding:

(i)      except as may be consented to in writing by the ABL Collateral Agent in its sole and absolute discretion, no Notes Secured Party shall (and each Notes Secured Party shall be deemed to have hereby irrevocably, absolutely, and unconditionally waived any right):

(1)      to seek or otherwise be granted any type of adequate protection with respect to its interests in the ABL Priority Collateral; provided, however, subject to Section 6.1, Notes Secured Parties may (A) seek and obtain adequate protection in the form of an additional or replacement Lien on Collateral so long as (i) the ABL Secured Parties have been granted adequate protection in the form of a replacement lien on such Collateral, and (ii) any such Lien of any Notes Secured Party on ABL Priority Collateral (and on any Collateral granted as adequate protection for the ABL Secured Parties in respect of their interest in such ABL Priority Collateral) is subordinated to the Liens of the ABL Collateral Agent in such Collateral on the same basis as the other Liens of the Notes Collateral Agent on ABL Priority Collateral, and (B) seek and obtain adequate protection in the form of a superpriority administrative Claim so long as (i) the ABL Secured Parties have been granted adequate protection in the form of a superpriority administrative claim, and (ii) any such claim with respect to ABL Priority Collateral is subordinated to the claims of the ABL Collateral Agent with respect to such Collateral on the same basis as the other claims of the Notes Collateral Agent on ABL Priority Collateral; or

(2)      to seek or otherwise be granted any adequate protection payments with respect to its interests in the Collateral from Proceeds of ABL Priority Collateral (except as may be consented to in writing by the ABL Collateral Agent in its sole and absolute discretion)

(ii)      except as may be consented to in writing by the Notes Collateral Agent in its sole and absolute discretion, no ABL Secured Party shall (and each ABL Secured Party shall be deemed to have hereby irrevocably, absolutely, and unconditionally waived any right):

(1)      to seek or otherwise be granted any type of adequate protection in respect of Notes Priority Collateral; provided, however, ABL Secured Parties may (A) seek and obtain adequate protection in the form of an additional or replacement Lien on Collateral so long as (i) the Notes Secured Parties have been granted adequate protection in the form of a replacement lien on such Collateral, and (ii) any such Lien of the ABL Secured Parties on Notes Priority Collateral (and on any Collateral granted as adequate protection for the Notes Secured Parties in respect of their interest in such Notes Priority Collateral) is subordinated to the Liens of the Notes Collateral Agent in such Collateral on the same basis as the other Liens of the ABL Collateral Agent on Notes Priority Collateral, and (B) seek and obtain adequate protection in the form of a superpriority administrative Claim so long as (i) the Notes Secured Parties have been granted adequate protection in the form of a superpriority administrative claim, and (ii) any such claim with respect to Notes Priority Collateral is subordinated to the claims of the Notes Collateral Agent with respect to such Collateral on the same basis as the other claims of the ABL Collateral Agent on Notes Priority Collateral; or

-37-

(2)    to seek or otherwise be granted any adequate protection payments with respect to its interests in the Collateral from Proceeds of Notes Priority Collateral

(d)    Except as otherwise expressly set forth in this Section or in Section 6.1 or in connection with the exercise of remedies with respect to the Collateral, nothing herein shall limit the rights of (i) the Notes Collateral Agent or the Notes Secured Parties from seeking adequate protection with respect to their rights in the Notes Priority Collateral in any Insolvency or Liquidation Proceeding (including adequate protection in the form of a cash payment, periodic cash payments or otherwise, other than from Proceeds of ABL Priority Collateral) or (ii) the ABL Collateral Agent or the ABL Secured Parties from seeking adequate protection with respect to their rights in the ABL Priority Collateral in any Insolvency or Liquidation Proceeding (including adequate protection in the form of a cash payment, periodic cash payments or otherwise, other than from Proceeds of Notes Priority Collateral).

Section 6.4    **Avoidance Issues**.  If any ABL Secured Party or Notes Secured Party is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the applicable Grantor any amount paid in respect of ABL Obligations or the Notes Obligations, as applicable (a "**Recovery**"), then such ABL Secured Parties or Notes Secured Parties shall be entitled to a reinstatement of ABL Obligations or the Notes Obligations, as applicable, with respect to all such recovered amounts.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.

Section 6.5    **Reorganization Securities**.  If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed pursuant to a Plan of Reorganization, both on account of ABL Obligations and on account of Notes Obligations, then, to the extent the debt obligations distributed on account of the ABL Obligations and on account of the Notes Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the debt obligations so distributed, to the Liens securing such debt obligations and the distribution of Proceeds thereof.

Section 6.6    **Post-Petition Interest**.

(a)    Neither the Notes Collateral Agent nor any Notes Secured Party shall oppose or seek to challenge:

(i)    any claim by the ABL Collateral Agent or any ABL Secured Party for allowance in any Insolvency or Liquidation Proceeding of ABL Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the Lien on the ABL Priority Collateral securing any ABL Secured Party's claim, without regard to the existence of the Lien of the Notes Collateral Agent on behalf of the Notes Secured Parties on the Collateral;

-38-

     (ii)     the payment of such expenses allowed in accordance with Section 6.6(a)(i); or

     (iii)     the payment of such interest and fees allowed in accordance with Section 6.6(a)(i) solely from Proceeds of ABL Priority Collateral;

provided that nothing contained in this Section 6.6(a) prohibits the Notes Collateral Agent on behalf of the Notes Secured Parties from seeking adequate protection (to the extent it has not already done so under other provisions of this Agreement) with respect to their rights in the Notes Priority Collateral in any Insolvency or Liquidation Proceeding if such Notes Priority Collateral is the source of payment of post-petition expenses payable to the ABL Collateral Agent or any ABL Secured Party.

     (b)     Neither the ABL Collateral Agent nor any other ABL Secured Party shall oppose or seek to challenge:

     (i)     any claim by the Notes Collateral Agent or any Notes Secured Party for allowance in any Insolvency or Liquidation Proceeding of Notes Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the Lien on the Notes Priority Collateral securing any Notes Secured Party's claim, without regard to the existence of the Lien of the ABL Collateral Agent on behalf of the ABL Secured Parties on the Collateral;

     (ii)     the payment of such expenses allowed in accordance with Section 6.6(b)(i); or

     (iii)     the payment of such interest and fees allowed in accordance with Section 6.6(b)(i) solely from Proceeds of Notes Priority Collateral;

provided that nothing contained in this Section 6.6(b) prohibits the ABL Collateral Agent on behalf of the ABL Secured Parties from seeking adequate protection (to the extent it has not already done so under other provisions of this Agreement) with respect to their rights in the ABL Priority Collateral in any Insolvency or Liquidation Proceeding if such ABL Priority Collateral is the source of payment of post-petition expenses payable to the Notes Collateral Agent or any Notes Secured Party.

     **Section 6.7**     <u>**Separate Grants of Security and Separate Classification**</u>.  The Notes Collateral Agent, on behalf of the Notes Secured Parties, and the ABL Collateral Agent on behalf of the ABL Secured Parties, acknowledge and intend that:  the grants of Liens pursuant to the ABL Security Documents and the Notes Security Documents constitute two separate and distinct grants of Liens, and because of, among other things, their differing rights in the Collateral, the Notes Obligations are fundamentally different from the ABL Obligations and must be separately classified in any Plan of Reorganization proposed or confirmed (or approved) in an Insolvency or Liquidation Proceeding.  To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of the ABL Secured Parties and the Notes Secured Parties in respect of the Collateral constitute claims in the same class (rather than separate classes of secured claims), then the ABL Secured Parties and the Notes Secured Parties hereby acknowledge and agree that all distributions in respect or from the Proceeds of

ABL Priority Collateral shall be made as if there were separate classes of ABL Obligations and Notes Obligations against the Grantors (with the effect being that, to the extent that the aggregate value of the ABL Priority Collateral or Notes Priority Collateral, as applicable, is sufficient (for this purpose ignoring all claims held by the other Secured Parties for whom such Collateral is non-priority in accordance with Section 2.1 and Section 2.2), the ABL Secured Parties or the Notes Secured Parties, respectively, shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest and other claims, all amounts owing in respect of post-petition interest, fees or expenses that is available from the applicable priority Collateral of such Secured Party (regardless of whether any such claims may or may not be allowed or allowable in whole or in part as against the Grantor in the respective Insolvency or Liquidation Proceeding pursuant to Section 506(b) of the Bankruptcy Code or otherwise), before any distribution is made from such pool of priority Collateral in respect of the claims held by the other Secured Parties for whom such Collateral is non-priority, with such other Secured Parties hereby acknowledging and agreeing to turn over to the respective other Secured Parties amounts otherwise received or receivable by them from such pool of priority Collateral to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the aggregate recoveries received thereby.

### Section 6.8    <u>Asset Dispositions in an Insolvency or Liquidation Proceeding</u>.

(a)    Without limiting the ABL Collateral Agent's and the ABL Secured Parties' rights under Section 2.5(b), neither the Notes Collateral Agent nor any other Notes Secured Party shall, in any Insolvency or Liquidation Proceeding or otherwise, oppose (or support, directly or indirectly, any other Person seeking to oppose) any motion by a Grantor that is supported by the ABL Secured Parties (i) for any Disposition of any ABL Priority Collateral free and clear of Liens or other claims, under Sections 363 or 1129 of the Bankruptcy Code or otherwise, or (ii) to approve any procedures for the Disposition of any ABL Priority Collateral of any of the Grantors, and the Notes Collateral Agent and each other Notes Secured Party will be deemed to have irrevocably, absolutely, and unconditionally consented under Section 363 of the Bankruptcy Code (and otherwise) to any sale of any ABL Priority Collateral supported by the ABL Secured Parties and to have released their Liens on such assets; <u>provided</u> that to the extent the Proceeds of such Collateral are not applied to reduce ABL Obligations the Notes Collateral Agent shall retain a Lien on such Proceeds in accordance with the terms of this Agreement.

(b)    Without limiting the Notes Collateral Agent's and the Notes Secured Parties' rights under Section 2.6(b), neither the ABL Collateral Agent nor any other ABL Secured Party shall, in any Insolvency or Liquidation Proceeding or otherwise, oppose (or support, directly or indirectly, any other Person seeking to oppose) any motion by a Grantor that is supported by the Notes Secured Parties and made subject to Section 3.1(d) (i) for any Disposition of any Notes Priority Collateral free and clear of Liens or other claims, under Sections 363 or 1129 of the Bankruptcy Code or otherwise, or (ii) to approve any procedures for the Disposition of any Notes Priority Collateral of any of the Grantors, and the ABL Collateral Agent and each other ABL Secured Party will be deemed to have consented under Section 363 of the Bankruptcy Code (and otherwise) to any sale of any Notes Priority Collateral supported by the Notes Secured Parties and to have released their Liens on such assets; <u>provided</u> that to the extent the Proceeds of such Collateral are not applied to reduce Notes Obligations, the ABL Collateral Agent shall retain a Lien on such Proceeds in accordance with the terms of this Agreement; <u>provided further</u>

that the ABL Collateral Agent's and the ABL Secured Parties' rights under Sections 3.1 and 3.2 shall survive any such sale or disposition.

Section 6.9    **Certain Waivers**.

(a)    Each Agent, for itself and on behalf of the Secured Parties, agrees to not to object to (or support any other Person objecting) and hereby waives any claim it may hereafter have against any Secured Parties arising out of the election under Section 1111(b)(2) of the Bankruptcy Code by any ABL Secured Party (to any claims of such ABL Secured Party in respect of the ABL Priority Collateral) or Notes Secured Party (to any claims of such Notes Secured Party in respect of the Notes Priority Collateral) in or from such Insolvency of Liquidation Proceeding.

(b)    Until the Discharge of ABL Obligations has occurred, the Notes Collateral Agent and the Notes Secured Parties will not assert or enforce any claim under Section 506(c) of the Bankruptcy Code senior to or on a parity with the Liens issued to the ABL Collateral Agent on the ABL Priority Collateral for costs or expenses of preserving or disposing of any such Collateral.  Until the Discharge of the Obligations under the Notes has occurred, the ABL Collateral Agent or the ABL Secured Parties will not assert or enforce any claim under Section 506(c) of the Bankruptcy Code senior to or on a parity with the Liens issued to the Notes Collateral Agent on the Notes Priority Collateral for costs or expenses of preserving or disposing of any such Collateral.

## ARTICLE 7
## MISCELLANEOUS

Section 7.1    **Subrogation**.

(a)    With respect to the value of any payments or distributions in cash, property or other assets that any of the Notes Secured Parties actually pays over to the ABL Collateral Agent or the ABL Secured Parties under the terms of this Agreement, the Notes Secured Parties shall be subrogated to the rights of the ABL Secured Parties; provided, however, that the Notes Collateral Agent, on behalf of the Notes Secured Parties, hereby agrees not to assert or enforce all such rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of ABL Obligations has occurred.  The Grantors acknowledge and agree that, to the extent permitted by applicable law, the value of any payments or distributions in cash, property or other assets received by the Notes Secured Parties that are paid over to the ABL Secured Parties pursuant to this Agreement shall not reduce any of the Notes Obligations.  Notwithstanding the foregoing provisions of this Section 7.1(a), none of the Notes Secured Parties shall have any claim against any of the ABL Secured Parties for any impairment of any subrogation rights herein granted to the Notes Secured Parties.

(b)    With respect to the value of any payments or distributions in cash, property or other assets that any of the ABL Secured Parties actually pays over to the Notes Secured Parties under the terms of this Agreement, the ABL Secured Parties shall be subrogated to the rights of the Notes Secured Parties; provided, however, that the ABL Collateral Agent, on behalf of the ABL Secured Parties, hereby agrees not to assert or enforce all such rights of subrogation

it may acquire as a result of any payment hereunder until the Discharge of Notes Obligations has occurred.  The Grantors acknowledge and agree that, to the extent permitted by applicable law, the value of any payments or distributions in cash, property or other assets received by the ABL Secured Parties that are paid over to the Notes Secured Parties pursuant to this Agreement shall not reduce any of the ABL Obligations.  Notwithstanding the foregoing provisions of this Section 7.1(b), none of the ABL Secured Parties shall have any claim against any of the Notes Secured Parties for any impairment of any subrogation rights herein granted to the ABL Secured Parties.

Section 7.2    **Further Assurances.**  The Parties will, at their own expense and at any time and from time to time, promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that any Party may reasonably request, in order to protect any right or interest granted or purported to be granted hereby or to enable the ABL Collateral Agent or the Notes Collateral Agent to exercise and enforce its rights and remedies hereunder; provided, however, that no Party shall be required to pay over any payment or distribution, execute any instruments or documents, or take any other action referred to in this Section 7.2, to the extent that such action would contravene any law, order or other legal requirement or any of the terms or provisions of this Agreement, and in the event of a controversy or dispute, such Party may interplead any payment or distribution in any court of competent jurisdiction, without further responsibility in respect of such payment or distribution under this Section 7.2.

Section 7.3    **Representations.**  The Notes Collateral Agent represents and warrants (for itself and solely in its capacity as Notes Collateral Agent) to the ABL Collateral Agent that it has the requisite power and authority under the Notes Documents to enter into, execute, deliver, and carry out the terms of this Agreement on behalf of itself and the Notes Secured Parties and that this Agreement shall be binding obligations of the Notes Collateral Agent and the Notes Secured Parties, enforceable against the Notes Collateral Agent and Notes Secured Parties in accordance with its terms.  The ABL Collateral Agent represents and warrants to the Notes Collateral Agent that it has the requisite power and authority under the ABL Documents to enter into, execute, deliver, and carry out the terms of this Agreement on behalf of itself and the ABL Secured Parties and that this Agreement shall be binding obligations of the ABL Collateral Agent and the ABL Secured Parties, enforceable against the ABL Collateral Agent and the ABL Secured Parties in accordance with its terms.

Section 7.4    **Amendments.**  No amendment or waiver of any provision of this Agreement nor consent to any departure by any Party hereto shall be effective unless it is in a written agreement executed by the Notes Collateral Agent and the ABL Collateral Agent, and consented to in writing by the Company, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that the Company shall not have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent that such amendment, modification or waiver (i) adversely affects or impairs any Grantor's rights hereunder, under the ABL Documents or under the Notes Documents or (ii) imposes any additional obligation or liability upon any Grantor. Notwithstanding anything in this Section 7.4 to the contrary, this Agreement may be amended from time to time at the written request of the Company delivered to each Agent, at the Company's expense, and without the consent of the ABL Collateral Agent, any ABL Secured Party, the

-42-

Notes Collateral Agent or any Notes Secured Party to (i) provide for a replacement ABL Collateral Agent in accordance with the ABL Documents, provide for a replacement Notes Collateral Agent in accordance with the applicable Notes Documents (including for the avoidance of doubt to provide for a replacement Notes Collateral Agent assuming such role in connection with any Refinancing of the Notes Documents permitted hereunder) and/or secure additional extensions of credit or add other parties holding ABL Obligations or Notes Obligations to the extent such Indebtedness does not expressly violate the ABL Credit Agreement or the Indenture and (ii) in the case of such additional Notes Obligations, (a) establish that the Lien on the Collateral securing such Notes Obligations shall be junior and subordinate in all respects to all Liens on the Collateral securing any ABL Obligations (at least to the same extent as (taken together as a whole) the Liens on Collateral in favor of the Notes Obligations are junior and subordinate to the Liens on Collateral in favor of the ABL Obligations pursuant to this Agreement immediately prior to the incurrence of such additional Notes Obligations) and (b) provide to the holders of such Notes Obligations (or any agent or trustee thereof) the comparable rights and benefits (including any improved rights and benefits that have been consented to by the ABL Collateral Agent) as are provided to the Notes Secured Parties under this Agreement.

**Section 7.5      Addresses for Notices.**  All notices to the ABL Secured Parties and the Notes Secured Parties permitted or required under this Agreement may be sent to the applicable Agent for such Secured Party, respectively, as provided on the signature page hereto or in any joinder hereto or in any written notice of a change of such address delivered by an Agent to the other Agent.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given shall be in writing and may be personally served, telecopied, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of a telecopy or electronic mail or upon receipt via U.S. mail (registered or certified, with postage prepaid and properly addressed).

**Section 7.6      No Waiver, Remedies.**  No failure on the part of any Party to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

**Section 7.7      Continuing Agreement, Transfer of Secured Obligations.**  This Agreement is a continuing agreement and shall (a) subject to Section 5.3, remain in full force and effect until the Discharge of ABL Obligations or Discharge of Notes Obligations shall have occurred, (b) be binding upon the Parties and their successors and assigns, and (c) inure to the benefit of and be enforceable by the Parties and their respective successors, transferees and assigns. Nothing herein is intended, or shall be construed to give, any other Person any right, remedy or claim under, to or in respect of this Agreement or any Collateral.  The parties hereto acknowledge that this Agreement is and shall be enforceable as a "subordination agreement" under Section 510(a) of the Bankruptcy Code.  All references to any Grantor shall include any Grantor as debtor-in-possession and any receiver or trustee for such Grantor in any Insolvency or Liquidation Proceeding.  Without limiting the generality of the foregoing clause (c), the ABL Collateral Agent, any ABL Secured Party, the Notes Collateral Agent and any Notes Secured Party may assign or otherwise transfer all or any portion of the ABL Obligations or the Notes

-43-

Obligations, as applicable, to any other Person (other than the Company, any Grantor or any Affiliate of the Company or any Grantor and any Subsidiary of the Company or any Grantor), and such other Person shall thereupon become vested with all the rights and obligations in respect thereof granted to the ABL Collateral Agent, the Notes Collateral Agent, any ABL Secured Party, or any applicable Notes Secured Party, as the case may be, herein or otherwise. The ABL Secured Parties and the Notes Secured Parties may continue, at any time and without notice to the other parties hereto, to extend credit and other financial accommodations, lend monies and provide Indebtedness to, or for the benefit of, any Grantor on the faith hereof.

Section 7.8    **Governing Law; Entire Agreement.** The validity, performance, and enforcement of this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York. This Agreement constitutes the entire agreement and understanding among the Parties with respect to the subject matter hereof and supersedes any prior agreements, written or oral, with respect thereto.

Section 7.9    **Counterparts.** This Agreement may be executed in any number of counterparts, including by means of facsimile or "pdf" file thereof, and it is not necessary that the signatures of all Parties be contained on any one counterpart hereof, each counterpart will be deemed to be an original, and all together shall constitute one and the same document.

Section 7.10    **No Third Party Beneficiaries.** Except for the Company to the extent provided in Section 7.4, this Agreement is solely for the benefit of the ABL Collateral Agent, the ABL Secured Parties, the Notes Collateral Agent and the Notes Secured Parties. No other Person (including except to the extent provided in Section 7.4, the Company, any Grantor or any Affiliate or Subsidiary of the Company or any Grantor) shall be deemed to be a third party beneficiary of this Agreement.

Section 7.11    **Headings.** The headings of the articles and sections of this Agreement are inserted for purposes of convenience only and shall not be construed to affect the meaning or construction of any of the provisions hereof.

Section 7.12    **Severability.** If any of the provisions in this Agreement shall, for any reason, be held invalid, illegal or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement and shall not invalidate the Lien Priority or the application of Proceeds and other priorities set forth in this Agreement.

Section 7.13    **Attorneys' Fees.** The Parties agree that if any dispute, arbitration, litigation, or other proceeding is brought with respect to the enforcement of this Agreement or any provision hereof, the prevailing party in such dispute, arbitration, litigation, or other proceeding shall be entitled to recover its reasonable attorneys' fees and all other costs and expenses incurred in the enforcement of this Agreement, irrespective of whether suit is brought.

Section 7.14    **VENUE; JURY TRIAL WAIVER.** The parties hereto consent to the jurisdiction of any state or federal court located in New York, New York, and consent that all service of process may be made by registered mail directed to such party as provided in Section 7.5 for such party. Service so made shall be deemed to be completed three days after the same shall be posted as aforesaid. The parties hereto waive any objection to any action instituted

hereunder in any such court based on forum non conveniens, and any objection to the venue of any action instituted hereunder in any such court.  EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO IN CONNECTION WITH THE SUBJECT MATTER HEREOF.

(a)    EACH PARTY TO THIS AGREEMENT IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 7.5.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

**Section 7.15    Intercreditor Agreement.**  This Agreement is the Intercreditor Agreement referred to in the ABL Documents and the Notes Documents. Nothing in this Agreement shall be deemed to subordinate the obligations due to (i) any ABL Secured Party to the obligations due to any Notes Secured Party or (ii) any Notes Secured Party to the obligations due to any ABL Secured Party (in each case, whether before or after the occurrence of an Insolvency or Liquidation Proceeding), it being the intent of the Parties that this Agreement shall effectuate a subordination of Liens but not a subordination of Indebtedness.

**Section 7.16    Effectiveness.**  This Agreement shall become effective when executed and delivered by the parties hereto.  This Agreement shall be effective both before and after the commencement of any Insolvency or Liquidation Proceeding.

**Section 7.17    Collateral Agents.**  It is understood and agreed that (a) BMO is entering into this Agreement in its capacity as collateral agent under the ABL Credit Agreement, and the provisions of Section 12 of the ABL Credit Agreement applicable to the agent thereunder shall also apply to the ABL Collateral Agent hereunder, and (b) U.S. Bank National Association is entering into this Agreement in its capacity as collateral agent under the Indenture, and the provisions of Article VII of the Indenture applicable to the Trustee and collateral agent thereunder shall also apply to the Notes Collateral Agent hereunder.

**Section 7.18    Reliance; No Warranties or Liability.**

(a)    Other than any reliance on the terms of this Agreement, the ABL Collateral Agent, on behalf of itself and the ABL Secured Parties under its ABL Documents, acknowledges that it and such ABL Secured Parties have, independently and without reliance on the Notes Collateral Agent or any Notes Secured Parties, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to enter into such ABL Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the ABL Documents or this Agreement. Other than any reliance on the terms of this Agreement, the Notes Collateral Agent, on behalf of the Notes Secured Parties, acknowledges that the Notes Secured Parties have, independently and without reliance on the ABL Collateral Agent or any ABL Secured Party, and based on documents and information deemed by them appropriate, made their own credit analysis and decision

to enter into each of the Notes Documents and be bound by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the Notes Documents or this Agreement.

(b)        Each of the ABL Collateral Agent and the Notes Collateral Agent acknowledges and agrees that none of the other has made any representation or warranty with respect to the execution, validity, legality, completeness, collectability or enforceability of any other ABL Document or Notes Document, as the case may be.

Section 7.19        **Conflicts.**  In the event of any conflict between the provisions of this Agreement and the provisions of any Credit Document, the provisions of this Agreement shall govern.

Section 7.20        **Information Concerning Financial Condition of the Grantors.** Each of the Notes Collateral Agent and the ABL Collateral Agent hereby assumes responsibility for keeping itself informed of the financial condition of the Grantors and all other circumstances bearing upon the risk of nonpayment of the ABL Obligations or the Notes Obligations.  The ABL Collateral Agent and the Notes Collateral Agent each hereby agree that no party shall have any duty to advise any other party of information known to it regarding such condition or any such circumstances.  In the event either the ABL Collateral Agent or the Notes Collateral Agent, in its sole discretion, undertakes at any time or from time to time to provide any information to any other party to this Agreement, (a) it shall be under no obligation (i) to provide any such information to any other party or any other party on any subsequent occasion, (ii) to undertake any investigation not a part of its regular business routine, or (iii) to disclose any other information, and (b) it makes no representation as to the accuracy or completeness of any such information and shall not be liable for any information contained therein, and (c) the Party receiving such information hereby agrees to hold the other Party harmless from any action the receiving Party may take or conclusion the receiving Party may reach or draw from any such information, as well as from and against any and all losses, claims, damages, liabilities, and expenses to which such receiving Party may become subject arising out of or in connection with the use of such information.

Section 7.21        **Obligations Unconditional**.  All rights, interests, agreements and obligations of the ABL Collateral Agent and the ABL Secured Parties and the Notes Collateral Agent and the Notes Secured Parties, respectively, hereunder shall remain in full force and effect irrespective of:

(a)        any lack of validity or enforceability of any ABL Documents or any Notes Documents;

(b)        except as otherwise expressly set forth in this Agreement, any change in the time, manner or place of payment of, or in any other terms of, all or any of the ABL Obligations or the Notes Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any ABL Document or any Notes Document;

-46-

     (c)     except as otherwise expressly set forth in this Agreement, any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the ABL Obligations or the Notes Obligations or any guaranty thereof;

     (d)     the commencement of any Insolvency or Liquidation Proceeding in respect of any Grantor; or

     (e)     any other circumstances which otherwise might constitute a defense available to, or a discharge of, any Grantor in respect of the ABL Collateral Agent, the ABL Obligations, any ABL Secured Party, the Notes Collateral Agent, the Notes Obligations or any Notes Secured Party in respect of this Agreement.

[Signature pages follow]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

BMO HARRIS BANK N.A.
as ABL Collateral Agent

By: _____
Name: Jason Hoefler
Title: Director

Address for notices:

BMO Harris Bank N.A.
111 West Monroe
20th Floor East
Chicago, Illinois 60603
Attention:   Jason M. Hoefler
Telephone:  (312) 461-7856
Facsimile:  (312) 765-1641
Email:  jason.hoefler@harrisbank.com

[Intercreditor Agreement]

U.S. BANK NATIONAL ASSOCIATION,
as Notes Collateral Agent

By: _____

Name:  Muriel Shaw
Title:   Assistant Vice President

Address for notices:

1349 W. Peachtree Street, NW
Suite 1050
EX-GA-ATPT
Atlanta, Georgia 30309
Attention: Muriel Shaw
Facsimile: (404) 898-8844

[Intercreditor Agreement]

**Exhibit A**

## CONSENT OF COMPANY AND GRANTORS

Dated:  July 23, 2013

Reference is made to the Intercreditor Agreement dated as of the date hereof between BMO Harris Bank N.A., as ABL Collateral Agent, and U.S. Bank National Association, as Notes Collateral Agent, as the same may be amended, restated, supplemented, waived, or otherwise modified from time to time (the "**Intercreditor Agreement**").  Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Intercreditor Agreement.

Each of the undersigned Grantors has read the foregoing Intercreditor Agreement and consents thereto.  Each of the undersigned Grantors agrees not to take any action that would be contrary to the express provisions of the foregoing Intercreditor Agreement applicable to it, agrees to abide by the requirements expressly applicable to it under the foregoing Intercreditor Agreement and agrees that, except as otherwise provided therein, no ABL Secured Party or Notes Secured Party shall have any liability to any Grantor for acting in accordance with the provisions of the foregoing Intercreditor Agreement provided that such party has not acted in violation of the ABL Security Documents, Notes Security Documents or applicable Credit Documents.  Each Grantor understands that the foregoing Intercreditor Agreement is for the sole benefit of the ABL Secured Parties and the Notes Secured Parties and their respective successors and assigns, and that such Grantor is not an intended beneficiary or third party beneficiary thereof except to the extent otherwise expressly provided therein.

Without limitation to the foregoing, each Grantor agrees to take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the ABL Collateral Agent or the Notes Collateral Agent (or any of their respective agents or representatives) may reasonably request to effectuate the terms of and the lien priorities contemplated by the Intercreditor Agreement.

This Consent shall be governed and construed in accordance with the laws of the State of New York.  Notices delivered to any Grantor pursuant to this Consent shall be delivered in accordance with the notice provisions set forth in the ABL Credit Agreement.

IN WITNESS WHEREOF, this Consent is hereby executed by each of the Grantors as of the date first written above.

CHASSIX, INC.

By: _____

Name: Mary Ann Sigler
Title:  Vice President

AUTOMOTIVE, LLC

By: _____

Name: Mary Ann Sigler
Title:  Vice President

CHASSIS CO. OF MICHIGAN, LLC

By: _____

Name: Mary Ann Sigler
Title:  Vice President

CONCORD INTERNATIONAL, INC.

By: _____

Name: Mary Ann Sigler
Title:  Vice President

DIVERSIFIED MACHINE BRISTOL, LLC

By: _____

Name: Mary Ann Sigler
Title:  Vice President

[Intercreditor Agreement]

DIVERSIFIED MACHINE, MILWAUKEE LLC

By: _____
Name: Mary Ann Sigler
Title: Vice President

DIVERSIFIED MACHINE MONTAGUE, LLC

By: _____
Name: Mary Ann Sigler
Title: Vice President

DIVERSIFIED MACHINE, INC.

By: _____
Name: Mary Ann Sigler
Title: Vice President

CHASSIX GEORGIA MACHINING, LLC

By: _____
Name: Mary Ann Sigler
Title: Vice President

DMI COLUMBUS, LLC

By: _____
Name: Mary Ann Sigler
Title: Vice President

[Intercreditor Agreement]

DMI EDON LLC

By: _____
Name: Mary Ann Sigler
Title: Vice President

MEXICO PRODUCTS I, LLC

By: _____
Name: Mary Ann Sigler
Title: Vice President

SMW AUTOMOTIVE, LLC

By: _____
Name: Mary Ann Sigler
Title: Vice President

UC HOLDINGS, INC.

By: _____
Name: Mary Ann Sigler
Title: Vice President

ALUTECH, LLC

By: _____
Name: Mary Ann Sigler
Title: Vice President

[Intercreditor Agreement]

DMI CHINA HOLDING LLC

By: _____
Name: Mary Ann Sigler
Title: Vice President

AUTOMOTIVE PROPERTIES OF NEW YORK, LLC

By: _____
Name: Mary Ann Sigler
Title: Vice President

[Intercreditor Agreement]

**Exhibit B**

## JOINDER AGREEMENT

The undersigned, [                    ], as _____ (in such capacity, together with its successors and assigns in such capacity, the "**[_____] Agent**"), under that certain [credit agreement/indenture/other agreement], dated as of [                    ], 20[  ], among CHASSIX, INC. (the "**Company**"), the subsidiaries of the Company party thereto from time to time and the [                    ] Agent, hereby (a) agrees to become party as [ABL Collateral Agent/Notes Collateral Agent] for the holders of [describe new obligations] under the Intercreditor Agreement dated as of July 23, 2013 (the "**Intercreditor Agreement**") among the Company, the other Grantors from time to time party thereto, BMO HARRIS BANK N.A., as ABL Collateral Agent, and U.S. Bank National Association, as Notes Collateral Agent, as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, for all purposes thereof on the terms set forth therein and (b) agrees to be bound by the terms of the Intercreditor Agreement as fully as if the undersigned had executed and delivered the Intercreditor Agreement as of the date thereof.

The provisions of Sections 7.8 and 7.14 of the Intercreditor Agreement will apply with like effect to this Joinder Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Joinder to be executed by their respective officers or representatives as of the date first written above.

[                    ], as [Agent]


By:    _____
       Name:
       Title:


Address for notices:

Schedule I to the
Joinder Agreement to the
Intercreditor Agreement

Grantors

[            ]

SUPPLEMENTAL INDENTURE

FIRST SUPPLEMENTAL INDENTURE (this "Supplemental Indenture") dated as of June 17, 2014, by and among Chassix, Inc., a Delaware corporation (the "Issuer"), each of the parties identified under the caption "Subsidiary Guarantors" on the signature page hereto (the "Guarantors") and U.S. Bank National Association, a national banking association, as Trustee (the "Trustee").

WITNESSETH:

WHEREAS, the Issuer, the Guarantors, and the Trustee are party to an indenture, dated as of July 23, 2013 (the "Base Indenture" and, together with this Supplemental Indenture, the "Indenture"), providing for the issuance by the Issuer of its 9.25% Senior Notes due 2018;

WHEREAS, pursuant to and on the date of the Base Indenture, the Issuer initially issued $350,000,000 aggregate principal amount of their 9.25% Senior Notes due 2018 (the "Existing Notes");

WHEREAS, Section 2.17 of the Base Indenture provides that the Issuer may, from time to time and in accordance therewith, create and issue Additional Notes (as defined in the Base Indenture) under the Base Indenture;

WHEREAS, the Issuer wishes to issue an additional $25,000,000 aggregate principal amount of its 9.25% Senior Notes due 2018 as Additional Notes (the "New Notes");

WHEREAS, the New Notes shall constitute "Permitted Additional Pari Passu Obligations" under the Indenture;

WHEREAS, Section 9.1 of the Base Indenture provides that, without the consent of the Holders of any Notes, the Issuer, the Guarantors and the Trustee may enter into one or more indentures supplemental to the Base Indenture to make any amendment to the provisions of the Base Indenture relating to the transfer and legending of Notes, including, without limitations, to facilitate the issuance and administration of the Notes; provided, however, that compliance with the Indenture as so amended would not result in Notes being transferred in violation of the Securities Act or any applicable securities law;

WHEREAS, the Issuer wishes to amend the Base Indenture to provide that Notes initially offered and sold in offshore transactions in reliance on Regulation S shall be Temporary Regulation S Notes (as such term is defined herein), with the legends and in the form provided in this Supplemental Indenture and, following the termination of the Restricted Period, shall be Permanent Regulation S Notes (as such term is defined herein), with the legends and in the form provided in this Supplemental Indenture;

WHEREAS, the Issuer and the Guarantors are authorized to execute and deliver this Supplemental Indenture;

WHEREAS, the Issuer has requested that the Trustee execute and deliver this Supplemental Indenture; and

WHEREAS, all conditions and requirements necessary to the execution and delivery of this Supplemental Indenture have been done and performed, and the execution and delivery hereof has been in all respects authorized.

- 1 -

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt of which is hereby acknowledged the Issuer, the Guarantors and the Trustee mutually covenant and agree as follows:

1.    Defined Terms.  Capitalized terms used herein without definition shall have the meanings assigned to them in the Base Indenture.  The words "herein," "hereof" and "hereby" and other words of similar import used in this Supplemental Indenture refer to this Supplemental Indenture as a whole and not to any particular section hereof.

2.    Amount of New Notes.  The aggregate principal amount of New Notes to be authenticated and delivered under this Supplemental Indenture on June 17, 2014 is $25,000,000.

3.    Terms of New Notes.  The New Notes are to be issued as Additional Notes under the Indenture and shall:

   a.  be issued as part of the existing series of Existing Notes under the Indenture, and the New Notes and the Existing Notes shall be a single class for all purposes under the Indenture, including, without limitation, with respect to waivers, amendments, redemptions and offers to purchase;

   b.  be issued on June 17, 2014 at a purchase price of 107.25% of the principal amount, will accrue interest from February 1, 2014 and have a first interest payment date of August 1, 2014;

   c.  be issuable in whole in the form of one or more Global Notes to be held by the Depository and in the form, including appropriate transfer restriction legends, provided in Exhibit A to the Base Indenture;

   d.  initially bear, in the case of New Notes sold under Rule 144A of the Securities Act, the CUSIP number of 16169P AA5 and ISIN of US16169PAA57, and, in the case of New Notes sold under Regulation S of the Securities Act, the CUSIP number of U1617Q AB8 and ISIN of USU1617QAB87;

   e.  the New Notes that are Temporary Regulation S Notes shall be subject to the transfer restrictions applicable to a Transfer Restricted Note and shall have a different CUSIP number than that of the Existing Notes that are Permanent Regulation S Notes; and

   f.  the New Notes shall constitute "Permitted Additional Pari Passu Obligations" under the Indenture.

4.    Amendments to the Indenture

   a.  The following shall be added to the table in Section 1.02 in alphabetical order:
       "Permanent Regulation S Global Note"………………………    2.6
       "Restricted Period"………………………………………………    2.6
       "Temporary Regulation S Global Note"………………………    2.6
       "Permanent Regulation S Notes"…………………………..    2.1
       "Temporary Regulation S Notes" …………………………..    2.1

   b.  The words "Regulation S Note" in the table in Section 1.02 shall be changed to "Regulation S Notes".

c.   Section 2.1(b) shall be amended by replacing the third sentence with:

"Notes that are offered in offshore transactions in reliance on Regulation S shall be issued in the form of one or more Global Notes substantially in the form set forth in Exhibit E-1 (the "Temporary Regulation S Notes") deposited with the Trustee, as Note Custodian, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided.  Following the termination of the Restricted Period, Notes offered and sold in offshore transactions in reliance on Regulation S ("Permanent Regulation S Notes" and, together with the Temporary Regulation S Notes, the "Regulation S Notes") shall bear the legend and include the form assignment set forth in Exhibit E-2."

d.   Section 2.6(a) shall be amended by adding the following immediately after the final period:

"Temporary Regulation S Notes initially shall be represented by one or more notes in registered, global form without interest coupons (collectively, the "Temporary Regulation S Global Notes."  Permanent Regulation S Notes initially shall be represented by one or more notes in registered, global form without interest coupons (collectively, the "Permanent Regulation S Global Notes")."

e.   Section 2.6(c) shall be amended by adding the following immediately before the final period:

"; provided that, in no event shall Certificated Notes be issued upon the transfer or exchange of beneficial interests in the Temporary Regulation S Global Notes prior to (A) the expiration of the Restricted Period and (B) the receipt by the Trustee of any certificates required pursuant to Rule 903 of Regulation S"

f.   Section 2.6 shall be amended by adding the following subclauses immediately after subclause (f):

"(g)     On or prior to the 40th day after the later of the commencement of the offering of any Notes represented by the Regulation S Global Notes and the date on which such Notes are initially issued (such period through and including such 40th day, the "Restricted Period"), a beneficial interest in a Regulation S Global Note may be transferred to a Person who takes delivery in the form of an interest in the corresponding Restricted Global Note only upon receipt by the Trustee of a written certification from the transferor to the effect that such transfer is being made in accordance with Rule 903 or 904 of Regulation S.

(h)     A beneficial interest in the Temporary Regulation S Global Note may not be exchanged for a Certificated Note or transferred to a Person who takes delivery thereof in the form of a Certificated Note prior to (A) the expiration of the Restricted Period and (B) the receipt by the Trustee of any certificates required pursuant to Rule 903(b)(3)(ii)(B) of the Securities Act, except in the case of a transfer pursuant to an exemption from the registration requirements of the Securities Act other than Rule 903 or Rule 904."

g.   Section 2.16(c) shall be replaced in its entirety with the following:

"Following the termination of the Restricted Period, beneficial interests in the Temporary Regulation S Global Notes shall be exchanged for beneficial interests in the Permanent Regulation S Global Notes pursuant to the rules and procedures of the Depository, Euroclear System and/or Clearstream Bank, S.A.  Simultane-

ously with the authentication of the Permanent Regulation S Global Notes, the Trustee shall cancel all of the outstanding Temporary Regulation S Global Notes. The aggregate principal amount of the Temporary Regulation S Global Notes and the Permanent Regulation S Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee and the Depositary or its nominee, as the case may be, in connection with transfers of interest as hereinafter provided."

5.    <u>Ratification of Base Indenture; Supplemental Indenture Part of Indenture</u>.  Except as expressly amended hereby, the Base Indenture is in all respects ratified and confirmed and all the terms, conditions and provisions thereof shall remain in full force and effect.  This Supplemental Indenture shall form a part of the Base Indenture for all purposes, and every Holder of a Note or New Note heretofore or hereafter authenticated and delivered shall be bound hereby.

6.    <u>GOVERNING LAW</u>.  THIS SUPPLEMENTAL INDENTURE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK BUT WITHOUT GIVING EFFECT TO APPLICABLE PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY.

7.    <u>Trustee's Assumption; Trustee Makes No Representation</u>.  The Trustee assumes no duties, responsibilities or liabilities under this Supplemental Indenture other than as set forth in the Base Indenture.  The Trustee makes no representation as to the validity or sufficiency of this Supplemental Indenture.  The Trustee shall not be responsible for any statement or recital herein or any statement or recital contained in any document in connection with the sale of the New Notes.

8.    <u>Counterparts</u>.  The parties may sign any number of copies of this Supplemental Indenture.  Each signed copy shall be an original, but all of them together represent the same agreement.

9.    <u>Effect of Headings</u>.  The Section headings herein are for convenience only and shall not affect the construction thereof.

**CHASSIX, INC.**

By: _____

Name: Mary Ann Sigler
Title:   Vice President

[Supplemental Indenture]

**DIVERSIFIED MACHINE, INC.**

By: _____
   Name: Mary Ann Sigler
   Title:  Vice President

**DIVERSIFIED MACHINE BRISTOL, LLC**

By: _____
   Name: Mary Ann Sigler
   Title:  Vice President

**DIVERSIFIED MACHINE MONTAGUE, LLC**

By: _____
   Name: Mary Ann Sigler
   Title:  Vice President

**DIVERSIFIED MACHINE, MILWAUKEE LLC**

By: _____
   Name: Mary Ann Sigler
   Title:  Vice President

**DMI EDON LLC**

By: _____
   Name: Mary Ann Sigler
   Title:  Vice President

**MEXICO PRODUCTS I, LLC**

By: _____
   Name: Mary Ann Sigler
   Title:  Vice President

**DMI COLUMBUS, LLC**

By: _____
   Name: Mary Ann Sigler
   Title:  Vice President

[Supplemental Indenture]

**CHASSIX GEORGIA MACHINING, LLC**

By: _____
Name: Mary Ann Sigler
Title:  Vice President

**DMI CHINA HOLDING LLC**

By: _____
Name: Mary Ann Sigler
Title:  Vice President

**CONCORD INTERNATIONAL, INC.**

By: _____
Name: Mary Ann Sigler
Title:  Vice President

**SMW AUTOMOTIVE, LLC**

By: _____
Name: Mary Ann Sigler
Title:  Vice President

**AUTOMOTIVE, LLC**

By: _____
Name: Mary Ann Sigler
Title:  Vice President

**CHASSIS CO. OF MICHIGAN, LLC**

By: _____
Name: Mary Ann Sigler
Title:  Vice President

**AUTOMOTIVE PROPERTIES OF NEW YORK, LLC**

By: _____
Name: Mary Ann Sigler
Title:  Vice President

[Supplemental Indenture]

**ALUTECH, LLC**

By: _____

    Name: Mary Ann Sigler

    Title:   Vice President

**UC HOLDINGS, INC.**

By: _____

    Name: Mary Ann Sigler

    Title:   Vice President

[Supplemental Indenture]

U.S. BANK NATIONAL ASSOCIATION,
  as Trustee

By: _____

Name:  Muriel Shaw
Title:  Assistant Vice President

**EXHIBIT E-1**

[FORM OF LEGEND FOR TEMPORARY REGULATION S GLOBAL NOTE]

BY ITS ACQUISITION HEREOF, THE HOLDER HEREOF REPRESENTS THAT IT IS NOT A U.S. PERSON, NOR IS IT PURCHASING FOR THE ACCOUNT OF A U.S. PERSON, AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH REGULATION S UNDER THE SECURITIES ACT.

THE RIGHTS ATTACHING TO THIS TEMPORARY REGULATION S GLOBAL NOTE, AND THE CONDITIONS AND PROCEDURES GOVERNING ITS EXCHANGE FOR CERTIFICATED NOTES, ARE AS SPECIFIED IN THE INDENTURE (AS DEFINED HEREIN).

[FORM OF ASSIGNMENT FOR REGULATION S NOTE]

I or we assign and transfer this Note to:

_____

(Insert assignee's social security or tax I.D. number)

_____

_____

_____

(Print or type name, address and zip code of assignee)

and irrevocably appoint:

_____

_____

Agent to transfer this Note on the books of the Issuer.  The Agent may substitute another to act for him.


[Check One]

[  ] (a)          this Note is being transferred in compliance with the exemption from registration under the Securities Act provided by Rule 144A thereunder.

or

[  ] (b)          this Note is being transferred other than in accordance with (a) above and documents are being furnished which comply with the conditions of transfer set forth in this Note and the Indenture.

If none of the foregoing boxes is checked, the Trustee or Registrar shall not be obligated to register this Note in the name of any person other than the Holder hereof unless and until the conditions to any such transfer of registration set forth herein and in Sections 2.16 and 2.17 of the Indenture shall have been satisfied.

Date: _____     Your Signature: _____

(Sign exactly as your name appears on the face of this Note)

Signature Guarantee: _____

SIGNATURE GUARANTEE

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar, which requirements include membership or participation in the Security Transfer

Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

TO BE COMPLETED BY PURCHASER IF (a) ABOVE IS CHECKED

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Dated: _____    _____

NOTICE:  To be executed by an executive

**EXHIBIT E-2**

[FORM OF LEGEND FOR PERMANENT REGULATION S GLOBAL NOTE]

This Note has not been registered under the U.S. Securities Act of 1933, as amended (the "Act"), and, unless so registered, may not be offered or sold within the United States or to, or for the account or benefit of, U.S. Persons unless registered under the Act or except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Act.

[FORM OF ASSIGNMENT FOR REGULATION S NOTE]

I or we assign and transfer this Note to:

_____

(Insert assignee's social security or tax I.D. number)

_____

_____

_____

(Print or type name, address and zip code of assignee)

and irrevocably appoint:

_____

_____

Agent to transfer this Note on the books of the Issuer.  The Agent may substitute another to act for him.


[Check One]

[  ] (a)            this Note is being transferred in compliance with the exemption from reg-
                    istration under the Securities Act provided by Rule 144A thereunder.

                                    or

[  ] (b)            this Note is being transferred other than in accordance with (a) above and
                    documents are being furnished which comply with the conditions of trans-
                    fer set forth in this Note and the Indenture.

If none of the foregoing boxes is checked, the Trustee or Registrar shall not be obligated to regis-
ter this Note in the name of any person other than the Holder hereof unless and until the condi-
tions to any such transfer of registration set forth herein and in Sections 2.16 and 2.17 of the In-
denture shall have been satisfied.

Date: _____       Your Signature: _____
                                             (Sign exactly as your name appears on the
                                             face of this Note)

Signature Guarantee: _____

SIGNATURE GUARANTEE

Signatures must be guaranteed by an "eligible guarantor institution" meeting the requirements of
the Registrar, which requirements include membership or participation in the Security Transfer
Agent Medallion Program ("STAMP") or such other "signature guarantee program" as may be

determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

## TO BE COMPLETED BY PURCHASER IF (a) ABOVE IS CHECKED

The undersigned represents and warrants that it is purchasing this Note for its own account or an account with respect to which it exercises sole investment discretion and that it and any such account is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act and is aware that the sale to it is being made in reliance on Rule 144A and acknowledges that it has received such information regarding the Issuer as the undersigned has requested pursuant to Rule 144A or has determined not to request such information and that it is aware that the transferor is relying upon the undersigned's foregoing representations in order to claim the exemption from registration provided by Rule 144A.

Dated: _____        _____

NOTICE:  To be executed by an executive officer

## JOINDER AGREEMENT

June 17, 2014


The undersigned, U.S. BANK NATIONAL ASSOCIATION, as trustee (in such capacity, together with its successors and assigns in such capacity, the "**Additional Pari Passu Notes Collateral Agent**"), under that certain Indenture dated as of July 23, 2013, as supplemented by the supplemental indenture, dated as of June 17, 2014, among CHASSIX, INC. (the "**Company**"), the subsidiaries of the Company party thereto from time to time and the Additional Pari Passu Notes Collateral Agent, with respect to the 9 1/4 % Senior Secured Notes due 2018 in the aggregate principal amount of $25,000,000 issued thereunder on the date hereof, hereby (a) agrees to become party as Additional Pari Passu Notes Collateral Agent for the holders of the Additional Pari Passu Notes Obligations under the Intercreditor Agreement dated as of July 23, 2013 (the "**Intercreditor Agreement**") among the Company, the other Grantors from time to time party thereto, BMO HARRIS BANK N.A., as ABL Collateral Agent, and U.S. BANK NATIONAL ASSOCIATION, as Notes Collateral Agent, as amended, supplemented, amended and restated or otherwise modified and in effect from time to time, for all purposes thereof on the terms set forth therein and (b) agrees to be bound by the terms of the Intercreditor Agreement as fully as if the undersigned had executed and delivered the Intercreditor Agreement as of the date thereof.

The provisions of Sections 7.8 and 7.14 of the Intercreditor Agreement will apply with like effect to this Joinder Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Joinder to be executed by their respective officers or representatives as of the date first written above.

U.S. BANK NATIONAL ASSOCIATION,
as Additional Pari Passu Notes Collateral Agent

By: _____
      Name:  Muriel Shaw
      Title:   Assistant Vice President

Address for notices:

U.S. Bank National Association
1349 W. Peachtree Street, N.W.
Suite 1050
EX-GA-ATPT
Atlanta, GA 30309
Facsimile: (404) 898-8844
Attention:  Muriel Shaw

Acknowledged:

Chassix, Inc.

By: _____

Name:    Mary Ann Sigler
Title:    Vice President

Schedule I to the
Joinder Agreement to the
Intercreditor Agreement

Grantors

Chassix, Inc.
Automotive, LLC
Chassis Co. of Michigan, LLC
Concord International, Inc.
Diversified Machine Bristol, LLC
Diversified Machine, Milwaukee LLC
Diversified Machine Montague, LLC
Diversified Machine, Inc.
Chassix Georgia Machining, LLC
DMI Columbus, LLC
DMI Edon LLC
Mexico Products I, LLC
SMW Automotive, LLC
UC Holdings, Inc.
AluTech, LLC
DMI China Holding LLC
Automotive Properties of New York, LLC

**Exhibit F**

**Form of 13-Week Projection**

WEIL:\95271616\1\35076.0003

**Chassix**
**DIP Budget - 13 Week Cash Flow Forecast**
*($000's)*

| | Ch. 11 | | | | Final Order | | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Select Period** | **Week 1** 13-Mar | **Week 2** 20-Mar | **Week 3** 27-Mar | **Week 4** 3-Apr | **Week 5** 10-Apr | **Week 6** 17-Apr | **Week 7** 24-Apr | **Week 8** 1-May | **Week 9** 8-May | **Week 10** 15-May | **Week 11** 22-May | **Week 12** 29-May | **Week 13** 5-Jun | **13 Weeks** |
| **Memo: Sales** | 23,443 | 23,443 | 23,443 | 23,443 | 30,998 | 30,998 | 30,998 | 30,998 | 28,418 | 28,418 | 28,418 | 28,418 | 22,872 | 354,307 |
| **Cash Receipts** | **10,153** | **20,347** | **21,380** | **37,900** | **32,893** | **18,893** | **21,062** | **24,127** | **51,587** | **21,286** | **21,130** | **22,157** | **54,297** | **357,211** |
| **Disbursements** | | | | | | | | | | | | | | |
| Vendors | (8,741) | (22,709) | (17,209) | (16,607) | (22,953) | (22,953) | (22,953) | (22,815) | (15,896) | (15,896) | (15,896) | (14,396) | (16,179) | (235,205) |
| Lease, rent and utilities | - | (821) | (30) | (3,589) | - | (860) | - | (30) | (3,595) | - | (838) | (30) | (3,604) | (13,397) |
| Payroll and benefits | - | (5,441) | (3,498) | (7,926) | (4,928) | (5,774) | (3,134) | (7,948) | (3,185) | (5,117) | (3,185) | (5,117) | (5,345) | (60,599) |
| Taxes | (271) | (11) | (11) | (9) | (269) | (9) | (9) | (9) | (271) | (11) | (395) | (11) | (11) | (1,293) |
| Capital and tooling | (4,140) | (2,070) | (2,070) | (2,070) | (2,571) | (2,571) | (2,571) | (2,571) | (2,421) | (2,421) | (2,421) | (2,421) | (1,956) | (32,272) |
| Funding to rest of world entities | - | - | - | - | - | - | - | - | (5,000) | - | - | - | (5,000) | (10,000) |
| DIP fees and interest | (5,963) | - | - | - | (3,345) | - | - | (894) | - | - | - | (948) | - | (11,149) |
| Professional fees | - | (500) | (500) | (500) | (125) | (125) | (2,045) | (125) | (1,113) | (263) | (3,840) | (238) | (38) | (9,415) |
| U.S. Trustee fees | - | - | - | - | (9) | - | - | - | - | - | - | - | - | (9) |
| Other | 1,574 | (532) | (726) | (453) | (315) | (421) | (315) | (721) | (435) | (494) | (403) | (459) | (739) | (4,440) |
| **Total Disbursements** | **(17,540)** | **(32,084)** | **(24,044)** | **(31,153)** | **(34,515)** | **(32,713)** | **(31,027)** | **(35,113)** | **(31,917)** | **(24,202)** | **(26,979)** | **(23,620)** | **(32,872)** | **(377,779)** |
| **Net Cash Inflow / (Outflow)** | **(7,387)** | **(11,738)** | **(2,665)** | **6,747** | **(1,622)** | **(13,819)** | **(9,965)** | **(10,986)** | **19,670** | **(2,916)** | **(5,849)** | **(1,463)** | **21,425** | **(20,568)** |
| **Revolving DIP facility** | **65,751** | **77,488** | **80,153** | **73,406** | **49,188** | **63,007** | **72,972** | **83,958** | **64,288** | **67,204** | **73,053** | **74,516** | **53,091** | **53,091** |
| **Inflow # 1:  proceeds from DIP Term Loan** | - | - | - | - | **20,000** | - | - | - | - | - | - | - | - | - |
| **Inflow # 2:  funds from successor bank (L/C's)** | - | - | - | - | **5,840** | - | - | - | - | - | - | - | - | - |