Marcia L. Goldstein
Ray C. Schrock, P.C.
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                                        :
**In re**                                               :        **Chapter 11**
                                                        :
**CHASSIX HOLDINGS, INC.,** *et al.*,                   :        **Case No. 15-_____ (___)**
                                                        :
                                                        :        **(Joint Administration Pending)**
                       **Debtors.**[1]                  :
                                                        :
                                                        :
-------------------------------------------------------x

## MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 363(b)(1) AND 105(a) AND FED. R. BANKR. P. 9019 FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO ENTER INTO ACCOMMODATION AGREEMENTS WITH CUSTOMERS

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Chassix Holdings, Inc. ("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**"), and

certain of their affiliates and subsidiaries, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, including Chassix Holdings and Chassix, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012).  The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

"**Debtors**," and together with their non-Debtor subsidiaries, the "**Company**"), respectfully

represent:

## Background

1.      On the date hereof (the "**Commencement Date**"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11 of the United States

Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors

("**Creditors Committee**") has been appointed in these chapter 11 cases.

2.      Contemporaneously herewith, the Debtors have filed a motion requesting

joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**").

3.      The Debtors commenced their chapter 11 cases on a prearranged basis

with the support of their (a) secured and unsecured noteholders, which have committed to make

significant and immediate capital infusions into the Debtors' businesses, and (b) major

automotive manufacturing customers, which have committed to long-term pricing commitments

and other valuable accommodations.  Consistent with their obligations under the restructuring

support agreement, the Debtors have filed a plan of reorganization and proposed disclosure

statement with the Court and are seeking to emerge from chapter 11 on an expedited timeframe.

4.      Information regarding the Debtors' businesses, capital structure, and the

circumstances leading to the commencement of these chapter 11 cases is set forth in the

Declaration of J. Mark Allan Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the

WEIL:\95271100\1\35076.0003

Southern District of New York, sworn to on the date hereof (the "**Allan Declaration**"), which has been filed with the Court contemporaneously herewith.

## Jurisdiction

5.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C.  §§ 1408 and 1409.

## Preliminary Statement

6.    The Debtors appear before the Court with a prenegotiated chapter 11 plan of reorganization (as may be amended, modified or supplemented, the "**Plan**") that will enable them to right-size their capital structure, reduce their operational overhead, and successfully restructure their machining and casting businesses.  As set forth in the Allan Declaration, the Debtors have reached an agreement on the terms of a financial and operational restructuring with their major stakeholders, including an ad hoc committee comprised of holders of approximately 72% of the Debtors' senior secured notes and approximately 80% of the Debtors' unsecured notes (the "**Noteholder Group**"), the Debtors' prepetition private equity sponsor, Platinum Equity Advisors, LLC (collectively, with its related entities, "**Platinum Equity**"), and all of the Debtors' largest customers, including Ford Motor Company ("**Ford**"), General Motors LLC ("**GM**"), FCA US LLC f/k/a Chrysler Group LLC ("**FCA**"), Nissan North America, Inc. ("**Nissan**"), and BMW Manufacturing Co., LLC ("**BMW**" and together with Ford, GM, FCA, and Nissan, collectively, the "**OEM Customers**"), which will result in a significant and substantial infusion of new capital in the Debtors in the form of debtor-in-possession and exit financing.

WEIL:\95271100\1\35076.0003

7.    The long-term accommodations and pricing concessions that the Debtors have secured from the OEM Customers are key components to the Plan as well as the Debtors' ongoing business plan post-emergence.  These accommodations, which are memorialized in the Accommodation Agreements (as defined below), were the product of over a month of good-faith and arms' length negotiations and represent significant value for the Debtors, their estates and all parties in interest.  The Accommodation Agreements are valuable to the Debtors' estates insomuch as they will provide millions of dollars in additional liquidity, a waiver of significant fees and expenses, new business, and foster customer loyalty and confidence.  Specifically, pursuant to the Accommodation Agreements, the Debtors will receive, among other accommodations, the following:

(a)    agreements by the OEM Customers to provide the Debtors with approximately $45 million in annual price increases and new business and programs;

(b)    a continuation of certain interim accommodations implemented prior to the Commencement Date with respect to the Debtors' casting facility in Bristol, Indiana (the "**Bristol Facility**");

(c)    significant liquidity enhancement from the acceleration of payment terms on outstanding purchase orders from the OEM Customers' standard payment terms;

(d)    a guaranty from the OEM Customers of certain future business and programs to be awarded to the Debtors as well as a right of last refusal with respect to other programs;

(e)    restrictions on the OEM Customers' ability to resource parts and programs to the Debtors' competitors during the terms of the Accommodation Agreement;

(f)    certain limitations on the OEM Customers' ability to assert setoffs against the Debtors' accounts receivable; and

(g)    a waiver of certain costs and expenses associated with premium freight and third party advisors.

8.       As set forth below, in exchange for these accommodations, the Debtors

have committed to continue to produce and deliver component parts to the OEM Customers and

to provide other limited accommodations to safeguard the production of the OEM Customers

during the terms of the Accommodation Agreements.  The Debtors have further agreed pursuant

to an access agreement (the "**Access Agreement**") to provide certain of the OEM Customers

with limited rights to access and utilize the Debtors' facilities and equipment in the event there is

a continuing default under the Accommodation Agreements which has resulted in a substantial

likelihood that an OEM Customer's production will be interrupted.

9.       The accommodations embodied in the Accommodation Agreements are

more than mere pieces of the Debtors' Plan—they are central to the Debtors' ability to continue

to operate both in the near-term, during the chapter 11 cases, and on a permanent basis post-

emergence.  First, the Debtors' proposed debtor-in-possession financing lenders have relied on

certain of the terms and conditions set forth in the Accommodation Agreements, including,

without limitation, the accounts receivable set-off waivers and resourcing limitations, in agreeing

to extend financing to the Debtors under the DIP Facilities (as defined below).  Accordingly, the

Debtors' ability to access funding under their proposed DIP Facilities is expressly conditioned

upon receiving Court approval of the Accommodation Agreements and failing to do so may

result in immediate and irreparable harm to the Debtors, as the Debtors do not have sufficient

funds to continue to operate in chapter 11 absent access to the DIP Facilities.

10.      Second, the binding commitments that the Debtors have secured from the

Noteholder Group and Platinum Equity to support the Plan are similarly tied to receiving Court

approval of the Accommodation Agreements.  Under the Restructuring Support Agreement (as

defined in the Plan), failing to secure approval of the Accommodation Agreements will result in

a default under the Restructuring Support Agreement, which would derail the Debtors' chapter

11 cases from the start.

11.     <u>Third</u>, and perhaps most importantly, the long-term pricing concessions

that the Debtors have secured from the OEMs are one of the pillars of the Debtors' go-forward

plan to return to profitability post-emergence.  The significantly improved pricing and new

business awards that the Debtors have negotiated, in combination with the Debtors' de-leveraged

capital structure, will result in a stronger more viable company post-emergence for the benefit of

all stakeholders.  The broad support the Debtors have garnered for the Plan reflects the consensus

among the Debtors' key constituents that the agreements embodied in the Accommodation

Agreements represent real and significant value for the Debtors, for the benefit of the estates, and

all of their creditors and should be approved.

<b><u>Relief Requested</u></b>

12.     By this Motion, pursuant to sections 363(b)(1) and 105(a) of the

Bankruptcy Code and Bankruptcy Rule 9019, the Debtors request authority to enter into (a) that

certain accommodation agreement (together with any exhibits or schedules thereto, the "**Multi-**

**Customer Accommodation Agreement**"), dated March 11, 2015, between and among the

Debtors, Ford, GM, FCA, Nissan, PNC Bank, National Association, as agent for the lenders

under the Debtors' debtor-in-possession asset-based revolving credit facility (the "**DIP ABL**

**Agent**"), and Cantor Fitzgerald Securities, as agent for the lenders under the Debtors' debtor-in-

possession term loan facility (the "**DIP Term Agent**" and, together with the DIP ABL Agent,

the "**DIP Agents**"), and (b) that certain accommodation agreement (together with any exhibits or

schedules thereto, the "**BMW Accommodation Agreement**" and, together with the Multi-

6

Customer Accommodation Agreement, the "**Accommodation Agreements**"), dated March 11, 2015, between and among the Debtors, BMW, the DIP ABL Agent, and the DIP Term Agent.[2]

13.     Annexed to the Accommodation Agreements are the component supply agreements, term sheet and other exhibits (collectively, the "**Component Supply Agreements**") that set forth the specific pricing information, quality metrics, new business awards, and other customer-specific terms that each of the OEM Customers has individually agreed to with the Debtors.  The information set forth therein, as well as certain limited information set forth in the Accommodation Agreements, is highly sensitive and constitutes confidential proprietary information and/or trade secrets.  Accordingly, contemporaneously herewith, the Debtors have filed a motion requesting authority to file the Component Supply Agreements under seal and to additionally permit the Debtors to file the Accommodation Agreements with certain limited redactions.  Unredacted and unsealed copies of the Accommodation Agreements have been submitted to the Court and the Office of the United States Trustee.

14.     An order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit "A"** (the "**Proposed Order**").  Copies of the Multi-Customer Accommodation Agreement and the BMW Accommodation Agreement are annexed hereto as **Exhibit "B"** and **"C,"** respectively.

---

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Accommodation Agreements.

WEIL:\95271100\1\35076.0003

## The Accommodation Agreements[3]

15.     The terms and conditions of the Accommodation Agreements were reached as a result of arms' length negotiations that resulted in agreements regarding the continued relationships between the Debtors and the OEM Customers, which include concessions on both sides.  The salient terms of the Accommodation Agreements are as follows:

### OEM Customer Accommodations

(a)     <u>Limitations of Setoffs</u>.  Subject to the limitations described in the Accommodation Agreements, each of the OEM Customers has agreed to waive its rights to assert setoff, recoupment, or deduction against amounts owed to the Debtors other than those setoffs that are determined to be Allowed Setoffs as set forth in the agreements.  In addition, the OEM Customers have also agreed to limit the amount of any Allowed Setoff to five percent (5%) of the face amount of the respective invoice or group of invoices.

(b)     <u>Resourcing Limitation</u>.  With certain exceptions, the OEM Customers have agreed not to resource the production of any current or future programs or platforms away from the Debtors to any of their competitors other certain agreed upon permitted resources.

(c)     <u>Bristol Surcharge</u>.  The OEM Customers have agreed to continue certain accommodations with respect to the Bristol Facility that include certain funding commitments and other financial accommodations with respect to customer-specific capital expenditures.

(d)     <u>Payment Terms</u>.  The OEM Customers have agreed to make payment on their outstanding accounts payables owed to the Debtors on an expedited basis as set forth in the Component Supply Agreements.

---

[3] The descriptions of the Accommodation Agreements set forth herein are intended for summary purposes only and are not intended to modify any of the terms of the Accommodation Agreements.  As such, the descriptions of the Accommodation Agreements set forth herein are qualified in all respects by the terms of Accommodation Agreements.  In the event of any conflict between the descriptions set forth in this Motion and the terms of the Accommodation Agreements, the terms of the Accommodation Agreements shall govern.

(e)    <u>Price Adjustments</u>.  Commencing on April 1, 2015, each of the OEM Customers has agreed to pay the Debtors a non-refundable Price Adjustment with respect to the Component Parts identified in the Component Supply Agreements.  The OEM Customers have agreed to provide the Price Adjustment without setoff or recoupment, except for Allowed Setoffs, as set forth in the Component Supply Agreements.

(f)    <u>Future Programs and Right of Last Refusal</u>.  The Component Supply Agreements include new business awards for the Debtors on replacement programs as well as new program lines.  In addition, the Component Supply Agreements include rights of last refusal on certain other future programs.

(g)    <u>Premium Freight, Outage Costs and Quality Spill Costs</u>.  The OEM Customers have agreed to waive certain rights for reimbursement from the Debtors on account of costs and expenses relating to premium and expedited freight, outage costs, and quality spill costs.

(h)    <u>Tooling Payments</u>.  The OEM Customers have agreed to make advance progress payments to the Debtors with respect to unpaid and in-process tooling.

## Debtors' Obligations

(a)    <u>Continue to Manufacture</u>.  Under the Accommodation Agreements, the Debtors have agreed to continue to supply Component Parts for each of the OEM Customers according to the terms of the Purchase Orders, as modified by the Accommodation Agreements.  Additionally, the Debtors have agreed that they will promptly move to assume the OEM Customers' Purchase Orders.

(b)    <u>Resourcing Cooperation</u>.  The Debtors have agreed to reasonably cooperate with each OEM Customer in connection with its preparation for any Permitted Resourcing and will cooperate with an OEM Customer's resourcing of production of its Component Parts as set forth in the Accommodation Agreements.

(c)    <u>Access to Information</u>.  The Debtors have agreed to provide the OEM Customers with reasonable access to the Debtors' operations, books, and records during normal business hours, and outside normal business hours when reasonably necessary, for the purposes set forth in the Accommodation Agreements.

WEIL:\95271100\1\35076.0003

(d)    License on Intellectual Property.  The Debtors will grant the OEM Customers a license to Intellectual Property owned by the Debtors, and a sublicense to the Intellectual Property licensed to the Debtors (to the extent that the Debtors have the right to grant sublicenses therein) to the extent necessary to do all things and exercise all rights in the licensed or sublicensed Intellectual Property for production of the Component Parts.  Such a license may only be exercised by an OEM Customer in connection with a Permitted Resourcing or exercise of the Right of Access.

(e)    Access Agreement.  The Debtors, together with the DIP Agents, have also agreed to enter into an Access Agreement that provides certain of the OEM Customers with limited rights to use and access the Debtors' facilities and equipment to continue to manufacture Component Parts in the event of a default under the Accommodation Agreements that results in a material and substantial threat to an OEM Customer's production.

(f)    Treatment of OEM Customer Claims under the Plan.  As a settlement and compromise among the Parties, the OEM Customers shall have allowed prepetition claims in the Chapter 11 Cases (collectively, the "**Customer Claims**") and shall not assert any other such claims in the Chapter 11 Cases.  So long as these Accommodation Agreements remain in effect, the Customer Claims shall be allowed claims in the Chapter 11 Cases; provided that so long as no Event of Default under the Accommodation Agreements occurs and the Debtors otherwise comply with the terms of the Accommodation Agreements and the Access Agreement, the OEM Customers have agreed to waive any and all rights to a recovery or distribution from the Debtors under the Debtors' chapter 11 plan, or otherwise in connection with the Debtors' restructuring, on account of the Customer Claims.

(g)    Inventory Bank.  The Debtors have agreed, upon the request of a Customer, to build up to a two-week inventory bank of Component Parts; provided that the Debtors' obligation to build inventory bank parts will be subject to, among other things, (i) reasonably applied internal capacity limitations, (ii) availability of raw materials and supplies, (iii) available financing, and (iv) that such obligation would not adversely affect Supplier.  The Debtors will not be required to build an Inventory Bank unless the Customer agrees in advance to pay all documented, additional, out-of-pocket costs incurred by Supplier in manufacturing the Inventory Bank including, without limitation, overtime, shipping, packaging, and storage costs.

10

**DIP Agents' Accommodations**.  Under the Accommodation Agreements, each of the DIP Agents consents to the Licenses granted, the Tooling Acknowledgement, and the rights granted to the OEM Customers under the Accommodation Agreements.  The DIP Agents have also agreed to forbear from exercising their rights as secured lenders, or on behalf of the DIP Lenders, against the Debtors if the actions would materially impact the Debtors' ability to perform under the Accommodation Agreements or the Access Agreement.

**Tooling Acknowledgment.**  The Debtors and the DIP Agents acknowledge and agree that Customer Tooling is (i) subject to the terms of the Accommodation Agreements, (ii) owned by the OEM Customers, and (iii) held as bailee-at-will by the Debtors and any third parties to which the Debtors have transferred possession of Customer Tooling.  In addition, the Accommodation Agreements provide for a mechanism to resolve any disputes regarding the ownership of any Tooling.

**The Accommodation Agreements are in the Best Interests of the
Debtors, their Estates and all Parties in Interest and Should be Approved
Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code**

16.    Section 363(b)(1) of the Bankruptcy Code provides in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . ."  Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

17.    Under applicable case law in this and other circuits, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents the exercise of the debtor's reasonable business judgment, such use should be approved.  *See Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring an "articulated business justification"); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that, under normal circumstances, the court defers to the trustee's judgment so long as there is a "legitimate business justification"); *In re Delaware & Hudson R.R. Co.*, 124

11

B.R. 169, 176 (D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)).

18.     In determining whether a "good business reason" exists for a debtor's proposed use of its assets pursuant to section 363(b), courts in the Second Circuit consider "the salient factors pertaining to the proceeding" and are encouraged to "act to further the diverse interests of the debtor, creditors and equity holders." *In re Boston Generating, LLC*, 440 B.R. 302, 322 (Bankr. S.D.N.Y. 2010) (quoting *In re Lionel Corp.*, 722 F.2d at 1071). This includes consideration of, among other things, (i) "the proportionate value of the asset to the estate as a whole," (ii) "the amount of elapsed time since the filing," (iii) "the likelihood that a plan of reorganization will be proposed and confirmed in the near future," (iv) "the effect of the proposed disposition on the future plans of reorganization," (v) "whether the asset is increasing or decreasing in value," (vi) whether the estate has the liquidity to survive until confirmation of a plan, (vii) whether the use or sale opportunity will exist as of the time of plan confirmation," and (viii) if the use or sale opportunity will not exist, whether it is likely that there will be a satisfactory alternative sale or use opportunity, or a stand-alone plan alternative that is equally desirable (or better) for creditors. *In re Boston Generating*, 440 B.R. at 322 (quoting *In re Lionel Corp.*, 722 F.2d at 1071; *In re General Motors Corp.*, 407 B.R. 463, 490 (Bankr. S.D.N.Y. 2009)). If, as here, "there is a material risk that by deferring the [proposed use or] sale, the patient will die on the operating table," a court will approve the debtors' motion. *Id.*

19.     If a valid business justification exists for the use or sale of property of the estate, a debtor's decision enjoys a strong presumption that "in making a business decision the directors . . . acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v.*

*Integrated Res. Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting

*Smith v. Van Gorkom*, 488 A.2d 858,872 (Del. 1985)); *see also In re Bridgeport Holdings, Inc.*,

388 B.R. 548, 567 (Bankr. D. Del. 2008) (stating that directors enjoy a presumption of honesty

and good faith with respect to negotiating and approving a transaction involving a sale of assets).

Indeed, when applying the "business judgment" standard, courts show great deference to a

debtor's business decisions. *In re Troll Commc'ns, LLC*, 385 B.R. 110, 118 (Bankr. D. Del.

2008).

      20.     Finally, the Court has the power to grant the relief requested under section

105, which says that the Court may "issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Similar relief has been

granted in other automotive supplier cases in this and other districts. *See, e.g.*, Order

Authorizing Entry Into an Accommodation Agreement with Chrysler Group LLC Pursuant to

Bankruptcy Rule 9019 and Sections 363(b), 363(f), and 363(m) of the Bankruptcy Code, *In re*

*Visteon Corp.*, No. 09-11786-CSS (Bankr. D. Del. Nov. 12, 2009); Stipulation and Order Among

Debtors, DIP Agent, Prepetition ABL Agent, and Certain Customers Regarding Interim Order

Pursuant to Sections 361, 362, 363, 364 and 510 of the Bankruptcy Code and Rule 4001 of the

Federal Rules of Bankruptcy Procedure (A) Authorizing Debtors to (I) Use Cash Collateral of

Prepetition Secured Lenders, (II) Obtain Postpetition Financing and (III) Provide Adequate

Protection to Prepetition Secured Lenders, (B) Authorizing Debtors to Enter Into, and

Approving, Accommodation Agreement with Certain Customers and (C) Providing Notice and

Scheduling Final Hearing, *In re Metaldyne Corporation,* et al., No. 09-13412 (MG) (Bankr.

S.D.N.Y. June 12, 2009); Order (I) Supplementing January 5, 2007 DIP Refinancing Order

(Docket No. 6461) and Authorizing Debtors to Enter Into and Implement Accommodation

Agreement with Agent and Participating Lenders and (II) Authorizing Debtors to (a) Enter Into Related Documents and (b) Pay Fees in Connection Therewith, *In re Delphi Corporation*, et al., No. 05-44481 (RDD) (Bankr. S.D.N.Y. Dec. 3, 2008).

21.     Entry into the Accommodation Agreements is undoubtedly in the best interest of the Debtors, their estates, and their stakeholders.  As described herein and in the Allan Declaration, the Accommodation Agreements, which are one of the lynchpins of the Debtors' business plan and plan for a successful reorganization, represent significant value to the Debtors in the form of both short and long-term accommodations, including significant pricing adjustments and valuable new program rewards.  As discussed above, the Accommodation Agreements will provide the Debtors with approximately 45 million in annual prices increases and new business and programs.  The Accommodation Agreements permit the Debtors to execute their business plan and obtain substantial additional liquidity without having to incur debt that would need to be repaid in order to emerge from chapter 11.

22.     Moreover, immediate authority to enter into the Accommodation Agreements is necessary and justified by the facts and circumstances of these chapter 11 cases. Absent interim approval by the Court of the Accommodation Agreements, the Debtors' chapter 11 cases may be derailed from the start and all of the support the Debtors have worked diligently over the past five months to garner for the Plan could unravel.  The Accommodation Agreements will provide the Debtors with immediate additional liquidity in the form of immediate lump sum cash payments, price adjustments on existing Purchase Orders, accelerated payment terms, and limitations on the OEM Customers' setoff rights.  Given the Debtors' perilous liquidity position, these accommodations are necessary to avoid any further decline to the Debtors' financial position.  Additionally, the Debtors will be unable to borrow under their proposed DIP Facilities

14

absent Court approval of the Accommodation Agreements.  As the Debtors have insufficient

available liquidity to fund their operations even for a short period of time during these chapter 11

cases, they require immediate access to the borrowings under their proposed DIP Facilities.  In

addition, failing to receive Court approval of the Accommodation Agreements would trigger an

event of default under the Restructuring Support Agreement.  The Accommodation Agreements

constitute the best possible arrangement for the continuation of business between the Debtors

and the OEM Customers and thus should be approved as a reasonable exercise of the Debtors'

business judgment.  Interim approval of the Accommodation Agreements is reasonable and

necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Court

has authority to authorize the Agreements based on sections 105(a) and 363.

### Ample Cause Exists to Approve the Accommodation Agreements Pursuant to Bankruptcy Rule 9019(a)

23.     Bankruptcy Rule 9019(a) allows the Court to approve a compromise or

settlement that is in the Debtors' best interests.  The Debtors request that the Court approve the

Accommodation Agreements pursuant to Bankruptcy Rule 9019(a), which *requires* the Court to

find that the Accommodation Agreements are fair and equitable and are in the best interests of

the Debtors' estates.  *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

Anderson*, 390 U.S. 414, 424 (1968); *Fisher v. Pereira (In re 47-49 Charles St., Inc.)*, 209 B.R.

618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993),

*aff'd*, 17 F.3d 600 (2d Cir. 1994).

24.     The decision to approve a particular settlement agreement lies within the

sound discretion of the Court.  *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).  Unless a

settlement "falls below the lowest point in the range of reasonableness," it will satisfy

WEIL:\95271100\1\35076.0003

Bankruptcy Rule 9019. *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir.

1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997). Courts often exercise their

discretion to approve settlements "in light of the general public policy favoring settlements." *In

re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

25.    While a court must evaluate all factors "relevant to a fair and full

assessment of the wisdom of the proposed compromise," a court need not conduct a "mini-trial"

of the merits of the claims being settled. *Anderson*, 390 U.S. at 424-25; *W.T. Grant Co.*, 699

F.2d at 608; *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y.

1991). "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact.

. . . The court need only canvass [sic] the settlement to determine whether it is within the

accepted range of reasonableness." *Nellis*, 165 B.R. at 123.

26.    When analyzing the reasonableness of a settlement, a court may give

weight to the debtor's informed judgment that the compromise is fair and equitable. *In re

Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993). In fact, the analysis of a

settlement's reasonableness does not require the court to substitute its judgment for the debtor's,

and if the debtor chooses one of two reasonable choices, the court must approve that choice, even

if, all things being equal, the court would have selected the other choice. *In re Ashford Hotels

Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate

that I substitute my judgment for the Trustee's, but only that I test his choice for reasonableness.

. . . If the Trustee chooses one of two reasonable choices, I must approve that choice, even if, all

things being equal, I would have selected the other.").

27.    The Accommodation Agreements satisfy the Bankruptcy Rule 9019(a)

standard. After good faith arms'-length negotiations, the Parties agreed to the terms of the

Accommodation Agreements, which provide the Debtors with immediate liquidity and will enable the Debtors to sustain their operations on a long-term and go-forward basis. The Accommodation Agreements settle a number of claims that could have led to disputes or potential litigation. For example, absent the settlements set forth in the Accommodation Agreements, the parties could become embroiled in lengthy and costly litigation regarding, among other things, any amounts paid by the OEM Customers to the Debtors with respect to the Debtors' Bristol Facility, the Customer Claims, open commercial issues, the ownership of Tooling and other issues. The outcome of these claims is uncertain. Further, the expense incurred in connection with a potential dispute or litigation would be an additional burden to the Debtors' estates and creditors. The Accommodation Agreements avoid both the uncertainty of litigation and the heavy burden litigation would place on the Debtors and their estates. Furthermore, the Accommodation Agreements are more than a settlement of potential claims by and against the Debtors, the Accommodation Agreements are the foundation of the Debtors' plan to successfully restructure their businesses and operations, which will help the Debtors emerge from chapter 11 as a stronger and healthier supplier. The Debtors are getting the support of the OEM Customers and the OEM Customers are settling their claims by agreeing to waive distribution. Accordingly, the Accommodation Agreements should be approved under Bankruptcy Rule 9019(a) as valid exercises of the Debtors' reasonable business judgment and as being in the best interests of the Debtors' estates and all parties in interest.

### The Debtors Have Satisfied Bankruptcy Rule 6003

28.    Bankruptcy Rule 6003 provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a bankruptcy court may approve a motion to "use, sell, lease, or otherwise incur an obligation regarding property of the estate" prior to twenty-one days

WEIL:\95271100\1\35076.0003

after the Commencement Date.  As described herein and in the Allan Declaration, the

Accommodation Agreements provide the Debtors with valuable accommodations, including

pricing adjustments and other payment accommodations, that will infuse much needed liquidity

into the Debtors' estates during the early stages of these chapter 11 cases.  In addition, approval

of the Multi-Customer Accommodation Agreement is a condition precedent to funding under the

Debtors' DIP Facilities, which the Debtors' require access to in order to continue to operate

during the chapter 11 cases.  Furthermore, should the Debtors be unable to receive approval of

the Multi-Customer Accommodation Agreement, it would trigger a default under the

Restructuring Support Agreement, thereby disrupting the Debtors' chapter 11 cases from the

start.  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid

immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

### Waiver of Bankruptcy Rules 6004(a) and (h)

29.     To implement the foregoing immediately, the Debtors seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order

authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Reservation of Rights

30.     Except as otherwise expressly set forth herein or in the Accommodation

Agreements, nothing contained herein is intended to be or shall be construed as (a) an admission

as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any

appropriate party in interest's rights to dispute any claim, or (c) an approval or assumption of any

agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.

Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's

18

order is not intended to be and should not be construed as an admission to the validity of any

claim or a waiver of the Debtors' rights to dispute such claim subsequently.

### Notice

31.     Notice of this Motion has been provided to (i) the Office of the United

States Trustee for the Southern District of New York; (ii) the holders of the five largest secured

claims against the Debtors (on a consolidated basis); (iii) the holders of the forty (40) largest

unsecured claims against the Debtors (on a consolidated basis); (iv) the attorneys for BMO

Harris Bank, N.A., as administrative agent under that certain Amended and Restated Loan,

Security and Guaranty Agreement, dated as of July 23, 2013; (v) the attorneys for U.S. Bank

National Association, as trustee under that certain Indenture for 9 1/4% Senior Secured Notes

due 2018, dated as of July 23, 2013; (vi) the attorneys for Delaware Trust Company, as successor

trustee under that certain Indenture for 10% / 10 3/4% Senior PIK Toggle Notes due 2018, dated

as of December 13, 2013; (vii) the attorneys for the Informal Committee of Noteholders; (viii)

the attorneys for the Revolving DIP Lenders; (ix) the attorneys for the DIP Term Lenders; (x) the

OEM Customers; (xi) the attorneys for Platinum Equity Advisors, LLC; (xii) the Securities and

Exchange Commission; (xiii) the Internal Revenue Service; and (xiv) the United States

Attorney's Office for the Southern District of New York.  The Debtors submit that, in view of

the facts and circumstances, such notice is sufficient and no other or further notice need be

provided.

32.     No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

19

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: March 12, 2015
        New York, New York

                                    /s/ Ray C. Schrock, P.C.
                                    Marcia L. Goldstein
                                    Ray C. Schrock, P.C.

                                    **WEIL, GOTSHAL & MANGES LLP**
                                    767 Fifth Avenue
                                    New York, New York 10153
                                    Telephone:  (212) 310-8000
                                    Facsimile:  (212) 310-8007

                                    *Proposed Attorneys for Debtors
                                    and Debtors in Possession*

**Exhibit A**

**<u>Proposed Interim Order</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
                                            :
In re                                       :      **Chapter 11**
                                            :
**CHASSIX HOLDINGS, INC.,** *et al.,*       :      **Case No. 15-_____ (___)**
                                            :
                                            :      **Jointly Administered**
                    **Debtors.**[1]         :
                                            :
--------------------------------------------------------x

## INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 363(b)(1) AND 105(a) AND FED. R. BANK. P. 9019 AUTHORIZING DEBTORS TO ENTER INTO ACCOMMODATION AGREEMENTS WITH CUSTOMERS

Upon the motion, dated March _, 2015 (the "**Motion**"),[2] of Chassix Holdings, Inc.

("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**"), and certain of their affiliates and subsidiaries,

as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively,

including Chassix Holdings and Chassix, the "**Debtors**"), pursuant to sections 363(b)(1) and

105(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 9019(a) of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of an order

authorizing the Debtors to enter into (a) that certain accommodation agreement (together with

any exhibits or schedules thereto, the "**Multi-Customer Accommodation Agreement**"), dated

March 11, 2015, between and among General Motors LLC ("**GM**"), Ford Motor Company

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012).  The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

("**Ford**"),  FCA US LLC f/k/a Chrysler Group LLC ("**FCA**"), Nissan North America, Inc.

("**Nissan**"), the Debtors, PNC Bank, National Association, as agent for the lenders under the

Debtors' debtor-in-possession asset-based revolving credit facility (the "**DIP ABL Agent**"), and

Cantor Fitzgerald Securities, as agent for the lenders under the Debtors' debtor-in-possession

term loan facility (the "**DIP Term Agent**" and together with the DIP ABL Agent, the "**DIP**

**Agents**"), and (b) that certain accommodation agreement (together with any exhibits or

schedules thereto, the "**BMW Accommodation Agreement**" and together with the Multi-

Customer Accommodation Agreement, the "**Accommodation Agreements**"), between and

among the Debtors, BMW Manufacturing Co., LLC ("**BMW**" and together with Ford, GM,

FCA, and Nissan collectively, the "**OEM Customers**"), the DIP ABL Agent and the DIP Term

Agent, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the

Motion and the relief requested therein in accordance with 28. U.S.C. §§ 157 and 1334 and the

Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided to (i) the Office of the

United States Trustee for the Southern District of New York (the "**U.S. Trustee**"); (ii) the

holders of the five largest secured claims against the Debtors (on a consolidated basis); (iii) the

holders of the forty (40) largest unsecured claims against the Debtors (on a consolidated basis);

(iv) the attorneys for BMO Harris Bank, N.A., as administrative agent under that certain

Amended and Restated Loan, Security and Guaranty Agreement, dated as of July 23, 2013; (v)

the attorneys for U.S. Bank National Association, as trustee under that certain Indenture for 9

1/4% Senior Secured Notes due 2018, dated as of July 23, 2013; (vi) the attorneys for Delaware

2

Trust Company, as successor trustee under that certain Indenture for 10% / 10 3/4% Senior PIK

Toggle Notes due 2018, dated as of December 13, 2013; (vii) the attorneys for the Informal

Committee of Noteholders; (viii) the attorneys for the Revolving DIP Lenders; (ix) the attorneys

for the DIP Term Lenders; (x) the OEM Customers; (xi) the attorneys for Platinum Equity

Advisors, LLC; (xii) the Securities and Exchange Commission; (xiii) the Internal Revenue

Service; and (xiv) the United States Attorney's Office for the Southern District of New York (the

"**Notice Parties**"); and it appearing that no other or further notice need be provided; and a

hearing having been held to consider the relief requested in the Motion (the "**Hearing**"); and

upon the Declaration of J. Mark Allan Pursuant to Rule 1007-2 of the Local Bankruptcy Rules

for the Southern District of New York (the "**Allan Declaration**"), filed contemporaneously with

the Motion, the record of the Hearing and all of the proceedings had before the Court; and the

Court having found and determined that the relief sought in the Motion is necessary to avoid

immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy

Rule 6003, and is in the best interests of the Debtors, their estates, creditors, and all parties in

interest, and that the legal and factual bases set forth in the Motion establish just cause for the

relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted on an interim basis, as provided herein; and

it is further

WEIL:\95271100\1\35076.0003

ORDERED that, pursuant to sections 363(b)(1) and 105(a) of the Bankruptcy

Code and Bankruptcy Rule 9019(a), the Accommodation Agreements annexed to the Motion are

approved and the Debtors are authorized, on an interim basis, to enter into the Accommodation

Agreements and any other transactions or agreements related thereto, including, without

limitation, the Access Agreement; and it is further

ORDERED that the Debtors' claims and noticing agent in the Debtors' chapter 11

cases is authorized and directed to adjust the claims register to reflect the Customer Claims in

accordance with the Accommodation Agreements and the terms of this Interim Order; and it is

further

ORDERED that the Debtors shall serve this Interim Order within three (3)

business days of its entry on the Notice Parties; and it is further

ORDERED that notwithstanding entry of this Interim Order, nothing herein shall

create, nor is intended to create, any rights in favor of or enhance the status of any claim held by,

any party; and it is further

ORDERED that the requirements of Bankruptcy Rule 6003(b) have been

satisfied; and it is further

ORDERED that the requirements of Bankruptcy Rule 6004(a) are hereby waived;

and it is further

ORDERED that, notwithstanding any applicability of Bankruptcy Rule 6004(h),

the terms and conditions of this Interim Order shall be immediately effective and enforceable

upon its entry; and it is further

ORDERED that a hearing to consider entry of an order granting the relief in the

Motion on a final basis shall be held on _____, 2015, at _____ **(Prevailing Eastern**

4

**Time)** and any objections or responses to the Motion shall be in writing, filed with the Court, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C.); and (ii) the Notice Parties, in each case so as to be received no later than **4:00 p.m. (Prevailing Eastern Time) on _____, 2015**; and it is further

ORDERED that this Interim Order is effective only from the date of entry through this Court's disposition of the Motion on a final basis; <u>provided</u> that the Court's ultimate disposition of the Motion on a final basis shall not impair or otherwise affect any action taken pursuant to this Interim Order; and it is further

ORDERED that the Debtors are authorized to take all steps necessary to carry out this Interim Order; and it is further

ORDERED that the relief granted herein shall be binding upon any chapter 11 trustee and/or examiner appointed in these chapter 11 cases or upon any chapter 7 trustee appointed in the event of a subsequent conversion of these chapter 11 cases under chapter 7; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

Dated: _____, 2015
        New York, New York

_____
UNITED STATES BANKRUPTCY JUDGE

WEIL:\95271100\1\35076.0003

**Exhibit B**

**<u>Multi-Customer Accommodation Agreement</u>**

**EXECUTION VERSION**

## ACCOMMODATION AGREEMENT

General Motors LLC ("GM"), Ford Motor Company ("Ford"), FCA US LLC f/k/a Chrysler Group LLC ("FCA"), and Nissan North America, Inc. ("Nissan" and together with GM, Ford, and FCA, collectively, the "Customers" and each, individually, a "Customer"), Chassix, Inc., together with its domestic subsidiaries (collectively, "Supplier" or "Chassix"), UC Holdings, Inc. ("UC Holdings"), PNC Bank, National Association (the "DIP ABL Agent") and Cantor Fitzgerald Securities, solely in its capacity as agent under the DIP Term Facility (the "DIP Term Agent" and together with the DIP ABL Agent, the "DIP Agents") enter into this Accommodation Agreement ("Agreement") on March 11, 2015. Customers, Supplier, UC Holdings and DIP Agents are collectively referred to herein as the "Parties" and each individually as a "Party."

### *RECITALS*

A.      Pursuant to various purchase agreements, release requests and/or purchase orders issued by each of the Customers and accepted by Supplier (as such agreements, release requests or purchase orders may be modified from time to time, "Purchase Orders" or individually, a "Purchase Order"), Customers have ordered from Supplier certain component parts, service parts and assembled goods (collectively, "Component Parts" or individually, a "Component Part").

B.      Supplier faces certain financial difficulties that threaten to interrupt the supply of Component Parts to Customers. In connection therewith, Supplier requested that each of the Customers provide various financial and other interim accommodations to Supplier to facilitate a potential restructuring of Supplier's business operations and capital structure. Effective December 31, 2014, the Customers and Chassix entered into that certain Term Sheet For Proposed Interim Accommodations attached hereto as Exhibit A (as amended, modified or supplemented from time to time, including, without limitation, pursuant to that certain First Amendment dated as of February 6, 2015, the "Interim Accommodation Term Sheet").

C.      Supplier intends to undertake a financial restructuring and recapitalization (the "Restructuring"), which is anticipated to be effected through a solicitation of votes for a plan of reorganization for Supplier, in substantially the form attached hereto as Exhibit B, or such other plan of reorganization so long as such other plan is reasonably acceptable to the Customers (as compared to the terms of the plan attached hereto as Exhibit B) (each such plan, the "Acceptable Plan"), and the commencement by Supplier of voluntary cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

D.      Pursuant to the terms of the proposed DIP order attached hereto as Exhibit C (the "Proposed DIP Order"): (a) the DIP ABL Agent, acting as administrative agent for a syndicate of banks, financial institutions and other institutional lenders (the "ABL DIP Lenders"), has agreed to provide to Supplier an approximate $150 million consensual, priming debtor-in-possession financing facility (collectively, the "DIP ABL Facility") pursuant to that certain Superpriority Secured Debtor-In-Possession ABL Loan, Security and Guaranty Agreement (the "DIP ABL Credit Agreement") in connection with the Chapter 11 Cases; and (b) the DIP Term Agent,

acting as administrative agent for a syndicate of banks, financial institutions and other institutional lenders reasonably acceptable to Chassix and the Customers (the "DIP Term Lenders"), has agreed to provide to Supplier an approximate $100 million consensual, priming debtor in possession financing facility (collectively, the "DIP Term Facility" and together with the DIP ABL Facility, the "DIP Facilities") pursuant to that certain DIP Term Loan Facility (the "DIP Term Credit Agreement" and together with the DIP ABL Credit Agreement, the "DIP Credit Agreements") in connection with the Chapter 11 Cases.

E.    Subject to the terms and conditions of this Agreement, Customers have agreed to provide to Supplier the accommodations set forth in this Agreement, which replaces the Interim Accommodation Term Sheet in its entirety as of the Effective Date (as defined below) except to the extent expressly provided in this Agreement.

**BASED UPON THE FOREGOING RECITALS** and other good and valuable consideration, the receipt and adequacy of which are acknowledged, the Parties agree as follows:

### *TERMS AND CONDITIONS*

1.    **Conditions to Effectiveness.** This Agreement will become effective (the date of such effectiveness, the "Effective Date") only upon the timely satisfaction of each of the following conditions:

(a)    Execution of this Agreement by all of the Parties;

(b)    Supplier's delivery to the Customers of a fully executed copy of an Access Agreement (the "Access Agreement") substantially in the form attached hereto as Exhibit D; and

(c)    Supplier obtaining entry of one or more orders of the Bankruptcy Court (i) approving this Agreement and the Access Agreement as postpetition agreements binding on Supplier, and (ii) authorizing Supplier to use cash collateral and approving the DIP Facilities on terms substantially similar to those set forth in the Proposed DIP Order.

2.    **Term.** For purposes of this Agreement, the "Term" shall mean, unless otherwise extended by written agreement of the Parties, the period from the Effective Date through the earliest to occur of (a) a Section 8 Termination (as defined in Section 8), (b) the effective date of the Acceptable Plan, and (c) July 31, 2015 (the occurrence of any one of these events triggers the ("Termination Date")).

3.    **Customers' Accommodations.**

3.1.





3



3.2.   <u>Sale of the Bristol Facility</u>.  Subject to the terms of the Acceptable Plan, Supplier will give reasonable and due consideration to any offers presented to Supplier by any Customer, or other parties reasonably acceptable to Supplier and the DIP Agents, for the purchase of the Bristol Facility. Supplier agrees to consult in good faith with the Customers in connection with sale process for the Bristol Facility, including with respect to the scope of information to be provided to prospective purchasers in connection with such process. For the avoidance of doubt, except to the extent provided in an Acceptable Plan, Supplier shall not be required to solicit offers for, or otherwise market (in each case, whether formally or informally), the sale of any of its assets or facilities, including, the Bristol Facility.  If, during the Term, a Customer purchases the Bristol Facility, such purchasing Customer hereby agrees (on behalf of itself and its designees(s)) to produce parts for the other customer(s) of the Bristol Facility for a period of time of no more than 195 days subject to (a) the terms of the Access Agreement as if the Customer had exercised its Right of Access and the customers receiving component parts from the Bristol Facility agreeing that their obligations and rights are governed by the terms of the Access Agreement, (b) the necessary tangible personal property being available and (c) the applicable customer agreeing to indemnify and hold the purchasing Customer and its designee(s)

4

harmless from any and all liability arising from or related to the production of the parts for the customer, including any warranty and product liability associated with the parts produced.

### 3.3.    Limitation of Setoffs.

(a)    Each of the Customers waives (and, if and only if, included as Eligible Accounts as defined in the DIP ABL Credit Agreement (or which would have been Eligible Accounts but for the application of any aging or cross-aging eligibility criteria), waives for its respective foreign and domestic subsidiaries and affiliates that are part of the Borrowing Base under the DIP ABL Credit Agreement), subject to Section 10 (i) except for Allowed Setoffs (as defined below), any right of setoff, recoupment or deduction not previously exercised as of December 31, 2014 against any bona fide accounts at the prices agreed between Supplier and Customer owing to Supplier as of the Effective Date, and (ii) except for Allowed Setoffs (as defined below), Material Setoffs (as defined below) and Tooling Setoffs (as defined below), any of its rights of setoff, recoupment or deduction against any bona fide accounts at the prices agreed between Supplier and Customer owing to Supplier that arise during the period commencing on the Effective Date and ending on the date that is ten (10) business days after the end of the Term (any accounts described in this Section 3.3(a) being "Accounts Payable").

(b)    The term "Allowed Setoffs" means valid setoffs, recoupment or deduction for defective or non-conforming parts, quality problems, and fees relating to the non-operational professionals incurred by a Customer; provided, however, that Allowed Setoffs shall not include any setoff for amounts with respect to the Bristol Surcharge, the Premium Freight Costs, the Outage Costs, the Quality Spill Costs, and the Advisor and Independent Contractor Fees (each as defined in the Interim Accommodation Term Sheet).  Allowed Setoffs shall include a Bristol Surcharge Surplus for any Customer if the Company terminates any of its operations or the Bristol Surcharge Termination Date occurs such that there are no future Bristol Surcharge Funds for the immediately succeeding Budget Period as set forth in Section 3.1(d) available for credit.

(c)    The term "Material Setoffs" means setoffs for (i) materials or components delivered to Supplier (but excluding Tooling (as defined below)) or services performed for Supplier, purchased by a Customer from persons other than Supplier or supplied by a Customer to Supplier (either under a materials contract or in order to avoid an interruption in the Customer's production) for use in connection with the production of Component Parts by Supplier for that Customer, or (ii) direct payment(s) to material or service vendors by a Customer for the purchase of materials or components (but excluding Tooling) or services used by Supplier in connection with the production of Component Parts by Supplier for that Customer (either under a materials contract or in order to avoid an interruption in Customer's production) which was supplied under a materials contract or would have been purchased by Supplier but for the vendor's refusal to sell to Supplier and for which Customer has provided Supplier prior written notice of the materials and the amount to be paid to the vendor or purchased by Supplier from Customer, as applicable; provided, that Material Setoffs shall not include any amounts paid by Customer to such vendor with respect to any antecedent obligations of Supplier to such vendor; and provided further, that Customer may only take Material Setoffs against Accounts Payable generated on or after the third business day after Customer gives the DIP Agents notice of such Material Setoff (a "Material Setoff Notice").  Upon receipt of a Material Setoff Notice, the DIP ABL Agent may impose a reserve in the amount of the Material Setoff against the borrowing

WEIL:\95233664\30\35076.0003

base.  Material Setoffs may be taken ten (10) business days after giving Supplier and the DIP Agents notice of the amount paid by Customer.

(d)    The term "Tooling Setoffs" means setoffs for any payment to a tooling vendor or tooling repairman for all or part of the purchase price or repair price of Tooling (defined below) that is necessary for a Customer's production (existing and future) for which the payment is necessary to secure the release of a valid and perfected lien senior to the DIP Agents against Tooling or is required to obtain possession of Tooling from the tooling vendor or tooling repairman.  Tooling Setoffs may be taken three (3) business days after giving Supplier and the DIP Agents prior written notice of the setoff (a "Tooling Setoff Notice").  Tooling Setoffs may be taken only against the amount owed by a Customer on the associated tool order.  Upon receipt of a Tooling Setoff Notice, the DIP ABL Agent may impose a reserve in the amount of the Tooling Setoff if the associated tooling receivable is included in the borrowing base under the DIP ABL Credit Agreement.  The term "Tooling" means, collectively, all tooling, dies, test and assembly fixtures, gauges, jigs, patterns, casting patterns, cavities, molds, spare parts and documentation, including engineering specifications, test reports and manuals, used by Supplier in connection with its manufacture of Component Parts for the Customers.

(e)    Notwithstanding the foregoing provisions in this Section 3.3, Allowed Setoffs shall not include any individual setoff, recoupment or deduction that exceeds five percent (5%) (the "Agreed Cap") of the face amount of any respective invoice or group of invoices to be paid in any monthly invoice cycle.  In the event that a setoff is an Allowed Setoff and such Allowed Setoff is limited by the Agreed Cap, the remainder of such Allowed Setoff may be taken against subsequent payments of Accounts Payable; provided that at no time shall the Allowed Setoffs exceed the Agreed Cap of any invoice or group of invoices to be paid in any calendar month.

(f)    Each of the Customers and Supplier agrees to use best efforts to expedite the resolution of all disputed setoffs, recoupments and deductions.

(g)    Except as set forth in this Agreement, Customers reserve and do not waive any rights and interests they may have, including the right to assert affirmative claims against Supplier, and the right to cancel or terminate purchase orders or other contracts in accordance with their respective terms and conditions.

3.4.    Limitations on Resourcing.

(a) The Customers agree (i) not to resource the production of any Component Parts or programs currently on contract with Supplier or identified as a Future Program in each Customer's respective Component Supply Agreement, except for a Permitted Resourcing (as defined below) and (ii) except as required pursuant to any agreement between the applicable Customer and any Tier 1 supplier in effect on the date hereof, not to instruct, solicit, encourage, propose or coordinate any action that may result in any of Supplier's other customers resourcing their production of any Component Parts or programs currently on contract with Supplier or identified as a Future Program in each Customer's respective Component Supply Agreement.

6

(b) The term "Permitted Resourcing" means the resourcing of Component Parts by any Customer to any party other than Supplier: (i) set forth in each Customer's respective Component Supply Agreement (as amended from time to time during the Term by mutual agreement between the applicable Customer and Supplier) or (ii) resourced after the termination or cancellation of a Purchase Order with respect to such Component Parts either by reason of (A) an uncured material breach of such Purchase Order by Supplier or (B) cancellation of the Purchase Order due to a major refresh or major redesign of the program or the Component Part itself that renders the applicable Component Parts obsolete (unless Supplier has the technical capability to continue the program or the Component Part after taking into account such major refresh or major redesign and subject to any right of last refusal provided under the Component Supply Agreement to which such Customer is a party) (any of the foregoing events, a "Permitted Resourcing Event"); provided, however, Permitted Resourcing shall not include any resourcing due to a material breach arising out of or relating to Purchase Orders fulfilled, directly or through a Tier 1 supplier to a Customer, at the Bristol Facility prior to the Bristol Surcharge Termination Date except for a material breach of a Purchase Order, the consequence of which is a substantial likelihood that a Customer's production will be interrupted.  The Parties reserve all of their respective rights with respect to the allocation of any wind-down costs incurred in connection with any Permitted Resourcing Event.  Nothing in the preceding sentence shall impair the setoff, recoupment, or deduction limitations contained in Section 3.3.

3.5.    Payment Terms. Commencing on the Effective Date and notwithstanding anything to the contrary in any Purchase Order, each Customer will pay its Accounts Payable in accordance with the payment terms set forth in its Component Supply Agreement.

3.6.    Price Adjustments.  Except with respect to the Bristol Facility prior to the Bristol Surcharge Termination Date, commencing on April 1, 2015, Customers will amend existing Component Part Purchase Orders, as set forth in the applicable Customer's form of Component Supply Agreement attached as an exhibit hereto, to pay directly to Supplier a non-refundable price adjustment (the "Price Adjustment") and shall pay all Price Adjustments without setoff or recoupment, except for Allowed Setoffs.  In the event, during the Term, any Chassix directed supplier attempts to increase piece prices, Chassix and each applicable Customer(s) shall use reasonable best efforts to work together to mitigate the impact of any such proposed increase and, in the event a piece price increase occurs from a Customer directed supplier, unless the treatment of a piece price increase is addressed in another agreement between Chassix and the Customer, Chassix will have the ability to pass through any such change in pricing to the applicable Customer(s) for the life of any current Component Parts.

3.7.    Requirements Contracts.  The Customers and Supplier acknowledge and agree that, unless otherwise provided, the Purchase Orders covered by this Agreement constitute requirements contracts within the meaning of Uniform Commercial Code 2-306.  So long as the Supplier has the requisite production capacity, the Customers shall purchase from Supplier 100% of the requirements for the Component Parts in accordance with the terms of Component Supply Agreements; provided, that such purchase obligation shall not apply to any Component Parts that are dual-sourced by the applicable Customer as of the date hereof (but, for the avoidance of doubt, any such purchases shall be made at levels consistent with past practice).

7

3.8.



3.9.

3.10.   Advisors and Independent Contractors

(a) Supplier and Customers shall agree upon any third-party operation advisors ("Advisors") or independent contractors ("Independent Contractors") retained by Supplier and included within the Bristol Surcharge.  Notwithstanding anything herein to the contrary, during the Term, the fees and expenses of any incremental or additional Advisors or Independent Contractors ("Advisor and Independent Contractor Fees") working exclusively on a particular Customer's Component Part production to be staffed or placed on-site at any of Supplier's facilities on or after December 1, 2014, shall be the sole responsibility of the applicable Customer.  Any costs or expenses incurred in connection with any missed or short releases caused, directly or indirectly, by a Customer's Advisors or Independent Contractors shall be the sole responsibility of the applicable Customer.

(b) Customers shall use commercially reasonable efforts to have each of their respective Advisors and Independent Contractors enter into on-site or similar agreements with Supplier, substantially in the form of the agreement attached hereto as Exhibit E.

3.11.   Tooling Payments.   During the Term, upon presentment of an unpaid invoice from a Tooling supplier, subject to the release of liens on terms reasonably acceptable to

8

each applicable Customer, each applicable Customer shall advance to Supplier (and not to the Tooling supplier, unless in compliance with the Tooling Setoff Notice procedures in <u>Section 3.3(d)</u>) payments for completed Unpaid Tooling (as defined below) which is subject to a Purchase Order (or other operative Tooling release or agreement) issued by such Customer, but if such completed Unpaid Tooling has not been given a part submission warrant, Customer will pay that portion of the unpaid balance necessary for the Customer to have paid 90% of the amount of the Customer's Tooling Purchase Order.

3.12.    <u>Support for Acceptable Plan</u>.  Subject to delivery by Supplier to the Customers of a disclosure statement and other solicitation materials for the Acceptable Plan that have been approved by the Bankruptcy Court as having "adequate information" as defined in section 1125 of the Bankruptcy Code and is otherwise in form and substance reasonably acceptable to the Customers (collectively, the "<u>Acceptable Disclosure Statement</u>"), each of the Customers agrees that it shall not, directly or indirectly, (a) object to, delay, impede or take any other action to interfere with acceptance or implementation of the Acceptable Plan, (b) directly or indirectly solicit, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout or plan of reorganization for Supplier other than the Acceptable Plan or (c) otherwise take any action that would in any material respect interfere with, delay or postpone the consummation of the Restructuring except such actions a Customer reasonably believes is necessary to protect the continuity of its production.  Each of the Customers further agrees, subject to delivery of an Acceptable Disclosure Statement, to (i) support and take all necessary steps to effectuate the Restructuring, and (ii) (A) to the extent that each of the Customers is entitled to accept or reject the Acceptable Plan pursuant to its terms (regardless of whether a Customer agrees to waive distribution under the Acceptable Plan), vote to accept the Acceptable Plan by delivering its duly executed and completed ballot accepting the Acceptable Plan on a timely basis following the commencement of the Solicitation, and (B) not change or withdraw (or cause to be changed or withdrawn) such vote provided that the Acceptable Plan is not amended or modified in a manner that adversely affects the Customers.

4.    **Supplier's Obligations.**

4.1.    <u>Continue to Manufacture</u>.    Supplier will continue to supply the Component Parts for each of the Customers in accordance with the terms of the Purchase Orders, as modified by this Agreement.    Supplier agrees to notify each Customer of any threat to continued timely shipment of the applicable Customer's Component Parts promptly upon learning of that threat.  Except as specifically provided for in this Agreement, this Agreement is not intended to modify the terms and conditions of any Customer's Purchase Orders, which terms and conditions otherwise remain in full force and effect. Supplier will not reject Customers' Purchase Orders during the Chapter 11 Cases and, on or before the effective date of an Acceptable Plan, will promptly move to assume the Customers' Purchase Orders in the Chapter 11 Cases.  Except as set forth in <u>Section 8.2</u>, in the event of any inconsistency between the terms of this Agreement and the terms of the Customers' respective Purchase Orders, the terms of this Agreement will control.  Supplier will allocate its capacity and resources equitably among the Customers, with no one Customer receiving priority allocation.

4.2.    <u>Resourcing Cooperation</u>.  Subject to the limitations set forth in <u>Section 3.4</u>, Supplier will reasonably cooperate with each Customer in connection with its preparation

WEIL:\95233664\30\35076.0003

for any Permitted Resourcing.  In connection with a Permitted Resourcing, Supplier will cooperate with a Customer's resourcing of production of its Component Parts permitted under this Agreement including, without limitation, (a) allowing a Customer and potential replacement suppliers access to Supplier's manufacturing facilities (subject to reasonable confidentiality protections) to remove all Customer Tooling (as defined below) used in production of the applicable Customer's Component Parts (provided that no Customer Tooling shall be removed prior to a Permitted Resourcing Event) and (b) using its commercially reasonable efforts and the power of the Bankruptcy Court to assign to the applicable Customers certain contracts (to the extent assignable under the Bankruptcy Code) that are related to the Permitted Resourcing and requested by the Customer.

4.3.    <u>Inventory Bank</u>. During the Term, upon the request of a Customer, Supplier will build for a Customer up to a two-week inventory bank of Component Parts ("<u>Inventory Bank</u>") in accordance with an inventory bank schedule agreeable to that Customer and Supplier; <u>provided</u>, however, that Supplier's obligation to build inventory bank parts will be subject to, among other things, (i) reasonably applied internal capacity limitations (*e.g.*, machine capacity and manpower limitations), (ii) availability of raw materials and supplies, (iii) available financing, and (iv) that such obligation would not adversely affect Supplier.  Supplier will ship Component Parts in each Inventory Bank as they are produced to the location designated by the Customer, and the Customer will pay for those Component Parts in the ordinary course of dealings between the parties.  Supplier will not be required to build an Inventory Bank unless the Customer agrees in advance to pay all documented, additional, out-of-pocket costs incurred by Supplier in manufacturing the Inventory Bank including, without limitation, overtime, shipping, packaging, and storage costs. Supplier will allocate its resources used in building Inventory Banks equitably among Customers and any other customers. Supplier shall give priority to Customers over any other customers not providing accommodations required by <u>Section 3</u>.

4.4.    <u>Access to Information</u>.  Supplier agrees that Customers, upon giving reasonable advance notice, will have access to Supplier's operations, books and records during normal business hours, and outside normal business hours when reasonably necessary, for the purposes of (a) inspecting and removing, when permitted to do so under this Agreement, all Tooling involved with production of its Component Parts, (b) monitoring production of its Component Parts, (c) meeting with members of senior management of Supplier and with Supplier's outside legal and financial advisors, (d) monitoring steps needed to increase production capacity necessary to meet the terms of all Purchase Orders, and (e) monitoring Supplier's compliance with the terms of this Agreement, the Purchase Orders, and any other agreements between Supplier and Customers.

4.5.    <u>Reporting and Notice of Adverse Event</u>.  Supplier will provide to Customers (a) a rolling thirteen (13)-week cash flow forecast updated every other week, monthly budget-to-actual reconciliation, monthly financial statements, a statement of monthly accounts receivable and accounts payable agings and (b) the same financial reporting information, borrowing base certificates and collateral reports that it provides to the DIP Agents at the same time the information is provided to the DIP Agents.  As soon as practicable after becoming aware of any lawsuit against Supplier or any action that could interfere with Supplier's ability to perform its obligations under this Agreement, Supplier will notify Customers of the adverse event.

WEIL:\95233664\30\35076.0003

4.6.    <u>Other Customer Accommodations</u>.    Contemporaneous with this Agreement, Supplier is executing an agreement with BMW of North America, LLC ("<u>BMW</u>") to provide accommodations substantially similar to those in <u>Section 3</u>. To the extent BMW does not provide those accommodations, Supplier will not use any funding supported by Customers' accommodations to manufacture parts or provide services for BMW unless ordered to by a court of competent jurisdiction.

4.7.    <u>License on Intellectual Property</u>.

(a) Notwithstanding anything in this Agreement to the contrary, and in consideration for the accommodations granted by Customers to Supplier under this Agreement, Supplier grants, to Customers and their assignee(s) or designee(s) (i) an irrevocable, fully paid, worldwide non-exclusive license to the Intellectual Property (defined below) owned by Supplier, and (ii) an irrevocable sublicense to the Intellectual Property licensed to Supplier (to the extent that Supplier has the right to grant sublicenses therein) to the extent necessary to make, have made, use, have used, modify, improve, prepare derivative works of, distribute, display, offer to sell, sell, import and do all other things and exercise all other rights in the licensed or sublicensed Intellectual Property for production of the Component Parts ("<u>License</u>"). The License is granted and irrevocable as of the Effective Date but will only be exercisable by a Customer upon (i) resourcing the respective component part in accordance with this Agreement; or (ii) the exercise of the Right of Access (as defined in the Access Agreement). The License granted in (i) and (ii) of the immediately preceding sentence will extend, without limitation, to Customers' production of new vehicles or parts for new vehicles by Customers (or Customers' subsidiaries or affiliates) and service obligations for Customers' previously sold vehicles or parts. Any license granted under this <u>Section 4.7</u> will also apply to any new model year changes, refreshes or follow-on platforms and programs incorporating the Intellectual Property. This <u>Section 4.7</u> is not intended to limit or otherwise restrict any rights granted to Customers in their Purchase Orders or any other agreement that is in effect on the date hereof, but is intended to expand those rights. Moreover, nothing in this Agreement may be construed as an admission by Customers of the validity of Supplier's claimed rights to Intellectual Property, including an admission that a license is required by Customer to make, have made, sell, offer for sale, and/or import its Component Parts. Customers will handle the Intellectual Property in accordance with the same practices employed by Customers to safeguard their own intellectual property against unauthorized use and disclosure. Notwithstanding the foregoing, the License shall expire upon the conclusion of any Occupancy Period exercised under the Access Agreement.

(b) The term "<u>Intellectual Property</u>" means (x) all currently existing registered and applied-for intellectual property owned by Supplier (including, but not limited to, all patents, patent applications, trademark registrations, trademark applications, copyright registrations, and copyright applications), (y) all agreements for intellectual property licensed to Supplier and (z) any other intellectual property used to produce Component Parts (whether or not the intellectual property is identified, including, but not limited to, unregistered copyrights, inventions, discoveries, trade secrets and designs, drawings and data, regardless of whether such items are registerable or patentable in the future, and all related documents and software), that are used in or to produce any Component Parts that Supplier directly or indirectly sells to Customers including, without limitation, everything defined as "intellectual property" (including embodiments of the intellectual property) under 11 U.S.C. §101, as amended from time to time.

11

4.8.    <u>Access Agreement</u>.    Supplier will execute and cause Supplier and its affiliates to execute an Access Agreement in form and substance acceptable to the DIP Agents and Customers substantially in the form of <u>Exhibit D</u> attached hereto.

4.9.    <u>Bankruptcy Court Approval; and Treatment of Claims</u>.

(a) <u>Bankruptcy Court Approval</u>.    Supplier shall seek entry of an order by the Bankruptcy Court approving the terms of this Agreement and the Access Agreement on an expedited basis.

(b) <u>Treatment of Customer Claims under the Acceptable Plan</u>.    As a settlement and compromise among the Parties, the Customers shall have allowed claims in the Chapter 11 Cases (collectively, the "<u>Customer Claims</u>") in total aggregate amounts to be set forth in a schedule to be filed with the Bankruptcy Court in advance of the court's final approval of this Agreement, and shall not assert any other claims in the Chapter 11 Cases. So long as this Agreement remains in effect, the Customer Claims shall be allowed claims in the Chapter 11 Cases; <u>provided</u>, <u>however</u>, that so long as no Event of Default under this Agreement occurs (other than under <u>Section 8.1(g)</u>) and Supplier otherwise complies with the terms of this Agreement and Access Agreement, the Customers agree to waive any and all rights to a recovery or distribution from Supplier under the Acceptable Plan, or otherwise in connection with the Restructuring, on account of the Customer Claims.    The foregoing shall not impair in any way the Customers' rights to defend any challenge or objection to their Customer Claims. The Customers shall retain any claims that may arise or accrue after the commencement of the Chapter 11 Cases (other than claims related to the Bristol Surcharge), including any claims that result from the occurrence of an Event of Default under this Agreement (other than under <u>Section 8.1(g)</u>) or Supplier's failure to comply with the terms of this Agreement or the Access Agreement, and those claims shall not constitute Customer Claims subject to this <u>Section 4.9(b)</u>.

5.    **DIP Agents' Accommodations**.

5.1.    <u>Consent and Acknowledgment</u>.    Each of the DIP Agents consents to the Licenses granted in <u>Section 4.7</u> and the Tooling Acknowledgment in <u>Section 7</u>.  The DIP Agents acknowledge and consent to the rights granted to Customers under this Agreement.

5.2.    <u>DIP Lenders' Exercise of Remedies</u>.    The Parties acknowledge that the DIP Agents and DIP Lenders have the right to exercise all their rights and remedies in accordance with an order entered by the Bankruptcy Court approving the DIP Facilities (the "<u>DIP Order</u>") and the DIP Financing Documents (as defined in the Access Agreement) and nothing in this Agreement shall limit or impair any such rights and remedies granted under the DIP Order or the DIP Financing Documents, subject to each Customer's Right of Access (as defined in the Access Agreement) for the duration of the Occupancy Period (as defined in the Access Agreement).

6.    **UC Holdings' Accommodations**.

12

6.1.    Acknowledgment of Customers' Rights.  UC Holdings acknowledges and consents to the rights granted to Customers in this Agreement and will consent to Supplier granting to Customers the rights under the Access Agreement.

## 7.    **Tooling Acknowledgment.**

7.1.    Definitions.  The term "Unpaid Tooling" means Tooling manufactured for a Customer for which it has not made full payment under the applicable purchase order with Supplier.  The term "Supplier Owned Tooling" means Tooling which Supplier asserts is not owned by Customers and which is not subject to a purchase order issued by Customers.  The term "Customer Tooling" means all other Tooling that is not Unpaid Tooling and/or Supplier Owned Tooling that is used or to be used to manufacture Customers' Component Parts, whether under direct agreements between Supplier and Customers or agreements between Supplier and third parties.

7.2.    Supplier and DIP Agents Tooling Acknowledgment.  Supplier and DIP Agents acknowledge and agree Customer Tooling is (i) subject to the terms of this Agreement, (ii) owned by Customers, and (iii) held as bailee-at-will by Supplier and any third parties to which Supplier has transferred possession of Customer Tooling.

7.3.    Tooling Dispute.  If there is a dispute between Supplier and Customers under this Section 7 regarding whether any Tooling is Customer Tooling, Supplier Owned Tooling or Unpaid Tooling, the disputed Tooling will be presumed to be Customer Tooling, pending resolution of the dispute, provided that the Customer pays into escrow (which will not be subject to DIP Agents' security interests) the lesser of the disputed amount or the unpaid purchase price of such disputed Tooling, and the Customer will have the right to immediate possession of such disputed Tooling (subject to the resourcing limitation, if any, in Section 3.4) and Supplier may not withhold delivery of possession of this Tooling to the Customer pending resolution of the dispute, but the Tooling will remain subject to any claim or right to payment of Supplier for the disputed amount.

7.4.    Unpaid Tooling Obligations Not Modified.  Once the purchase order price of an item of Unpaid Tooling has been paid (whether by payment to Supplier or as a Tooling Setoff), it will be included in the definition of Customer Tooling.  Prior to that time, the Parties reserve their respective rights to determine whether Unpaid Tooling should be treated as Customer Tooling.  Subject to Sections 7.3, nothing in this Agreement modifies Customer's obligations to Supplier on account of Unpaid Tooling.

7.5.    Supplier's Limited Right to Tooling.  Supplier has no right, title or interest in Customer Tooling, other than to possess and use the Customer Tooling solely to manufacture Customers' Component Parts, in Customers' sole discretion.

7.6.    Customers' Right to Repossess Tooling.  Upon an Event of Default (defined in Section 8), or the resourcing of a Component Part as permitted under this Agreement and produced with Customer Tooling:  (i) Customers and their respective affiliates have the right to take immediate possession of their respective Customer Tooling, without payment of any kind to Supplier, (ii) Supplier agrees to cooperate with Customers in their taking possession of

13

Customer Tooling, and (iii) Supplier agrees to provide access to Customers to remove Customer Tooling; provided, however, that Customers will not unreasonably interfere with Supplier's ongoing manufacturing operations or its production of Component Parts for other customers when removing Customer Tooling; and provided, further, that Customers shall be liable for any damages to Supplier's premises or assets resulting from such access or repossession.

7.7.   Additional Rights.   The acknowledgements, rights and obligations contained in this Section 7 are in addition to (and not in lieu of) the rights of Supplier and Customers under the Purchase Orders or any other agreements between Supplier and Customers..

7.8.   Marking Tooling and Notice.   Supplier grants to Customers permission to record, on Supplier's behalf, any notice and/or financing statements concerning Customer Tooling if Customers determine that it is reasonably necessary to do so to reflect its interests in its Customer Tooling.   Supplier will not interfere with, and will provide access so Customers may affix any plate, stamp, or other evidence of a Customer's ownership upon each item of their Customer Tooling.

## 8.   **Events of Default.**

8.1.   The occurrence of any one or more of the following will constitute an "Event of Default" under this Agreement, unless cured in accordance with the following proviso or a waiver or deferral is agreed to in writing by (i) each of the Customers (or, with respect to the repudiation or material breach of a Purchase Order, as agreed to in writing by the applicable Customer), or (ii) with respect to Section 8.1(g) only, the Supplier and the DIP Agents; provided, that notwithstanding anything contained in this Agreement, neither Customers nor Supplier shall be entitled to assert an Event of Default based upon their own actions; provided, further, that upon the occurrence of an Event of Default, other than a default under subpoint (a) below (where no time to cure shall be allowed), the Party alleging such Event of Default shall provide notice (a "Default Notice") to the defaulting Party and to the other Parties and such defaulting Party shall have three (3) business days to cure such default, to the extent such default is capable of cure:

(a) Supplier repudiates, moves to reject, refuses to perform or breaches its obligations, or such breach becomes inevitable, under the provisions of any Purchase Order or this Agreement the consequence of which is a substantial likelihood that a Customer's production will be interrupted; provided, that through the Bristol Surcharge Termination Date any breach arising out of Purchase Orders fulfilled directly or indirectly at the Bristol Facility shall not constitute an Event of Default unless such breach results in a one-time assembly plant shutdown that is not corrected within twenty-four (24) hours;

(b) Subject to the terms of this Agreement, with the exception of piece price increases from a Customer directed supplier as set forth in Section 3.6, Supplier requires a material modification of the terms of any Purchase Order or this Agreement;

(c) Any ABL DIP Lender commences an affirmative enforcement action against any of the collateral supporting production of the Component Parts if that action materially impacts Supplier's operations or ability to perform under this Agreement, the Access Agreement or any Purchase Order;

14

(d)  If the DIP Lenders cease funding for any reason other than from a failure of the Supplier to satisfy any applicable conditions precedent and the failure is not cured and funding resumed within two (2) business days (which two (2) business days is in addition to the three (3) business days provided in the preamble of this <u>Section 8.1</u>);

(e)  Any DIP Lender commences any action seeking the appointment of a Chapter 11 Trustee, conversion of any one of the Supplier's Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, seeking a lifting of the automatic stay or takes action to repudiate any of the terms of this Agreement;

(f)  The aggregate of actual Bristol operating expenses and capital expenses exceed 120% of the Operating Budget and Capital Expenditures Budget in any month during the Term;

(g)  A Customer fails to perform any material obligation under this Agreement;

(h)  Any one of the Chapter 11 Cases has a Chapter 11 Trustee appointed, is converted to a case under chapter 7 of the Bankruptcy Code, or the automatic stay is lifted to allow a party to take any action which will materially threaten Supplier's ability to provide timely production to the Customers; or

(i)  Supplier fails to file an Acceptable Plan and Disclosure Statement and schedule appropriate hearings in time for the Acceptable Plan to be substantially consummated by July 31, 2015.

8.2.    For the avoidance of doubt, the terms and conditions applicable to any Purchase Order as they relate to a delay in performance of Supplier's obligations due to events beyond its reasonable control shall apply to Supplier's obligations hereunder.

8.3.    Following the occurrence and during the continuance of an Event of Default (which, to the extent applicable,  has not been cured, waived or deferred or, with respect to the repudiation or material breach of a Purchase Order, has not been agreed to in writing by the applicable Customer), a Customer may elect to deliver notice, within five (5) days of the delivery of the applicable Default Notice to each other Party (including Supplier) of its election to terminate the Term ("<u>Termination Notice</u>"), which termination shall be effective two (2) business days (which two (2) business days, other than with respect to a Default under <u>Section 8.1(a)</u>, is in addition to the three (3) business days provided in the preamble of <u>Section 8.1</u>) following the delivery of such Termination Notice. Notwithstanding the foregoing, a Termination Notice delivered with or following a Default Notice under <u>Section 8.1(a)</u> shall be effective and termination shall occur immediately upon delivery (unless a longer period is otherwise designated by Customer in the Termination Notice), and in all other cases, a Termination Notice will be effective and termination will occur only after five (5) business days have elapsed following a Default Notice (unless a longer period is otherwise designated by Customer in the Termination Notice) (individually and collectively, a "<u>Section 8 Termination</u>").

9.    **No Further Relief Required.**  Subject to approval of this Agreement by the Bankruptcy Court, no prior relief from the automatic stay in the Chapter 11 Cases shall be

WEIL:\95233664\30\35076.0003

necessary or required for Supplier or a Customer to exercise its rights under this Agreement generally or to deliver the Default Notice or Termination Notice or to pursue its rights and remedies or take any other action afforded the Customer after the giving of the Default Notice or Termination Notice.

10.    **Continuing Obligations**. Unless otherwise provided for in a Component Supply Agreement, Sections 3.1 (which shall continue only until the Bristol Surcharge Termination Date), 3.3, 3.4, 3.6, 3.7 and 3.8, 4.1, 4.2, 4.4, 4.6, 4.7 and 7 of this Agreement shall survive the Term and Termination Date, and such provisions shall continue in full force and effect until the termination of the applicable Purchase Orders; notwithstanding any of the foregoing, Sections 3.3 and 3.6 (as to setoff limitations only) shall continue only for accounts generated through ten (10) business days after the end of the Term.  In the event Supplier and DIP Agents reach an agreement whereby the DIP Facilities (or the DIP ABL Facility alone) are to be converted to exit facilities (the "Exit Facilities") that will continue in full force and effect upon Supplier's exit from chapter 11, then the rights granted to, and the accommodations granted pursuant to Section 3.3 for the benefit of the DIP Agents shall, with respect to any Accounts Payable generated through ten (10) business days after the Termination Date, continue in full force and effect for the benefit of the administrative agents and lenders under such Exit Facilities consistent with the terms of this Agreement.

11.    **Reservation of Rights**.  Unless expressly waived or modified in this Agreement, each Party reserves and does not waive any claims, rights, and remedies that it may have under the Purchase Orders, any other agreements between or among the Parties, or applicable law, and each party expressly reserves all such claims, rights and remedies they have under this Agreement, the Purchase Orders, any other agreements between or among the parties and applicable law.

12.    **Confidentiality**.  The Parties agree that they will not disseminate, disclose or communicate, either directly or indirectly, any of the information contained in or received by virtue of this Agreement to any outside party other than its employees and professional advisors, provided that such outside party is subject to this same confidentiality provision. The Parties will, in good faith, seek to ensure that the contents of this Agreement are kept secret and confidential.  Notwithstanding the foregoing, the Parties acknowledge and agree that Supplier is authorized to file a copy of this Agreement with the Bankruptcy Court in accordance with Section 4.9; provided, however, that Supplier shall take reasonable steps to protect any commercially sensitive information or other confidential trade information, including, without limitation, by filing this Agreement with appropriate redactions or under seal, as determined to be reasonably necessary in consultation with the Customers.

13.    **Notice**.  Any notice or other instrument to be given under this Agreement must be in writing and, except as otherwise provided in this Agreement, will be deemed to be duly given if mailed, delivered by hand or sent by email to the Party to whom the communication is intended to be given and any notice so delivered or sent will be deemed to have been given at the time of service on the day on which it was delivered or sent, and if mailed, will be deemed to be given three (3) days following the date of mailing. Until changed by notice in the manner described above, the addresses of the parties for the purpose of notice will be:

WEIL:\95233664\30\35076.0003

| | |
|---|---|
| If to Customer: | General Motors LLC<br>30001 Van Dyke Road<br>Mail Code: 480-210-880<br>Warren, MI 48090-9020<br>Attention:  Mark W. Fischer<br>Facsimile: (586) 575-3404<br>Email: mark.w.fischer@gm.com |
| With a copy (which shall not constitute notice) to: | Frost Brown Todd LLC<br>150 Third Avenue South, Suite 1900<br>Nashville, TN 37201- 2043<br>Attention:  Robert Sartin, Esq.<br>Facsimile:  (615) 251-5551<br>Email:  rsartin@fbtlaw.com<br><br>And<br><br>General Motors LLC<br>Vehicle Engineering Center<br>MC 480-210-855<br>30001 Van Dyke<br>Warren, MI 48090-9020<br>Attention:  Aaron M. Silver<br>Email:  aaron.silver@gm.com |
| If to Customer: | Sigmund E. Huber<br>Global Director, Supplier Relations & Risk Management<br>FCA US LLC<br>CIMS 484-01-26<br>800 Chrysler Drive<br>Auburn Hills, MI  48326<br>Email:  sig.huber@fcagroup.com |

WEIL:\95233664\30\35076.0003

|  |  |
|---|---|
| With a copy (which shall not constitute notice) to: | Mark Werling<br>Office of the General Counsel Commercial Affairs<br>FCA US LLC<br>CIMS 485-14-07<br>1000 Chrysler Drive<br>Auburn Hills, MI  48326<br>Facsimile:  (248) 512-4053<br>Email:  mark.werling@fcagroup.com |
|  | and |
|  | Dickinson Wright PLLC<br>500 Woodward Avenue<br>Suite 4000<br>Detroit, MI 48226<br>Attention:  James A. Plemmons, Esq.<br>Facsimile:  (313) 223-3598<br>Email: jplemmons@dickinsonwright.com |
| If to Customer: | Ford Motor Company<br>1700 Rotunda Drive<br>Office C135A<br>Mail Drop RC02<br>Dearborn, MI 48120-1100<br>Attention:  Dennis Barrish<br>Facsimile:<br>E-mail:  dbarrish@ford.com |
| With a copy (which shall not constitute notice) to: | Miller Canfield<br>150 West Jefferson<br>Suite 2500<br>Detroit, MI  48226<br>Attention:  Stephen S. LaPlante<br>            Jonathan S. Green<br>Facsimile:  (313) 496-8452<br>E-mail:  laplante@millercanfield.com<br>            green@millercanfield.com |

18

If to Customer:

Nissan North America, Inc.
One Nissan Way
P.O. Box 685001
Franklin TN  37068
Attention:  Alexander ("Skip") Anderson
            Donald R. Parshall, Jr.
Email:     skip.anderson@nissan-usa.com
           Don.parshall@nissan-usa.com

With a copy (which shall not
constitute notice) to:

Waller, Lansden, Dortch & Davis pllc
P.O. Box 198966
511 Union Street, Suite 2700
Nashville, TN 37219
Attention: Michael R. Paslay
Email:     mike.paslay@wallerlawcom

If to Supplier or UC Holdings:

Chassix, Inc.
300 Galleria Officecentre
Suite 501
Southfield, MI 48034
Attention:  J. Mark Allan
            Safi Hamid
            Bibi Di Serio
Facsimile:
Email:    mark.allan@chassix.com
          safi.hamid@chassix.com
          bibi.diserio@chassix.com

With a copy (which shall not
constitute notice) to:

Weil, Gotshal & Manages LLP
767 Fifth Avenue
New York, NY 10153
Attention:  Marcia Goldstein
            Ray C. Schrock
Facsimile: (212) 310-8007
Email:    marcia.goldstein@weil.com
          ray.schrock@weil.com

If to DIP ABL Agent:

PNC Bank, National Association
Three PNC Plaza, 6th Floor
225 Fifth Avenue
Pittsburgh, PA 15222
Attention:  James Steffy, PNC Business Credit
Facsimile: (412) 768-4369
Email:   james.steffy@pnc.com

19

| | |
|---|---|
| With a copy (which shall not constitute notice) to: | Bodman PLC<br>Sixth Floor at Ford Field<br>1901 St. Antoine Street<br>Detroit, MI 48226<br>Attention:  Robert J. Diehl, Jr.<br>               Brian R. Trumbauer<br>Facsimile: (313) 393-7579<br>Email:   rdiehl@bodmanlaw.com<br>               btrumbauer@bodmanlaw.com |
| If to DIP Term Agent: | Cantor Fitzgerald Securities<br>110 East 59th Street – 7th Floor<br>New York, NY 10022<br>Attention:  Nils Horning (Chassix)<br>Facsimile No.: (646) 219-1180<br>E-mail: nhorning@cantor.com |
| With copies (which shall not constitute notice) to: | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br>Attention:  Brian Kim<br>Facsimile No.: (212) 492-0780<br>Telephone No.: (212) 373-3780<br>E-mail: bkim@paulweiss.com<br><br>Shipman & Goodwin LLP<br>One Constitution Plaza<br>Hartford, CT 06103<br>Attention:  Nathan Plotkin<br>Facsimile No.: (860) 251-5212<br>Telephone No.: (860) 251-5320 |

14.    **General Terms**.

14.1.    The Purchase Orders, this Agreement, together with any other documents executed in connection with this Agreement (including, without limitation, the Access Agreement), constitutes the entire understanding of the Parties in connection with the subject matter of this Agreement. There are no written or oral representations or understandings that are not fully expressed in this Agreement. This Agreement may not be modified, altered or amended except by an agreement in writing signed by all Parties.

14.2.    The individuals executing this Agreement as representatives warrant that they have the power and authority to execute this Agreement on behalf of the corporation or entity that they represent and that their signatures bind the corporations or entities to the terms of this Agreement.

WEIL:\95233664\30\35076.0003

14.3.   Supplier must obtain the consent of Customers to assign or transfer, directly or indirectly, any of its rights under this Agreement, which consent shall not be unreasonably withheld in the event the Bristol Facility or any other facility is sold to a third party.   This Agreement is not intended for the benefit of any third parties, including any purchasers of Supplier's assets or other customers of Supplier (other than affiliates of Customers).

14.4.   No delay or failure of any Party to exercise any right, power or privilege hereunder will affect such right, power or privilege, nor will any single or partial exercise thereof preclude any further exercise thereof, nor the exercise of any other right, power or privilege.

14.5.   If any part of this Agreement is for any reason found to be unenforceable, all other parts of this Agreement shall nevertheless remain enforceable.

14.6.   Supplier agrees that it will not enter into any other arrangements or agreements that would in any way materially impair Customers' rights under this Agreement.

14.7.   Supplier is not Customers' agent for any purpose and nothing in this Agreement will be interpreted to designate Supplier as Customers' agent.

14.8.   This Agreement may be executed in any number of counterparts with the same effect as if all signatories had signed the same document. All counterparts must be construed together to constitute one instrument. The Parties agree that their respective signatures may be delivered by facsimile or email, and that facsimile or email signatures will be treated as originals for all purposes.

14.9.   This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan, without giving effect to the conflict of laws principles of Michigan. Notwithstanding the foregoing, the Purchase Orders will continue to be governed by the laws provided for in the applicable Purchase Orders.   During the pendency of the Chapter 11 Cases, any action brought in connection with this Agreement shall be brought in the Bankruptcy Court and the Parties hereby consent to the jurisdiction of the Bankruptcy Court.

15.   **REPRESENTATIONS.  EACH PARTY HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL OF ITS CHOICE BEFORE SIGNING THIS AGREEMENT.  NO PARTY IS RELYING ON ANY REPRESENTATIONS, WARRANTIES OR COMMITMENTS THAT ARE NOT IN THIS AGREEMENT.  ANY AMBIGUOUS LANGUAGE IN THIS AGREEMENT SHOULD NOT BE CONSTRUED AGAINST ANY PARTICULAR PARTY BECAUSE THAT PARTY DRAFTED THE LANGUAGE.**

16.   **JURY TRIAL WAIVER.  THE PARTIES ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED. BY EXECUTING THIS AGREEMENT, EACH PARTY WAIVES ALL RIGHTS TO A TRIAL BY JURY OF ANY DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT OR THE PURCHASE ORDERS.**

*[signatures on next page]*

WEIL:\95233664\30\35076.0003

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**

By: _M.W. Ford_

Print Name: _M. W. Fischer_

Title: _Director, Supply Risk Mgt._

**Ford Motor Company**

By: _____

Print Name: _____

Title: _____

**FCA US LLC f/k/a Chrysler Group LLC**

By: _____

Print Name: _____

Title: _____

**Nissan North America, Inc.**

By: _____

Print Name: _____

Title: _____

**PNC BANK, NATIONAL ASSOCIATION**

By: _____

Print Name: _____

Title: _____

**CANTOR FITZGERALD SECURITIES**

By: _____

Print Name: _____

Title: _____

**UC Holdings, Inc.**

By: _____

Print Name:  J. Mark Allan

Title: President

**Chassix, Inc.**

By: _____

Print Name: J. Mark Allan

Title: President and CEO

[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**

By: _____

Print Name: _____

Title: _____

**Ford Motor Company**

By: _____

Print Name: _MRJones_

Title: _Purchasing Director_

**FCA US LLC f/k/a Chrysler Group LLC**

By: _____

Print Name: _____

Title: _____

**Nissan North America, Inc.**

By: _____

Print Name: _____

Title: _____

**PNC BANK, NATIONAL ASSOCIATION**

By: _____

Print Name: _____

Title: _____

**CANTOR FITZGERALD SECURITIES**

By: _____

Print Name: _____

Title: _____

**UC Holdings, Inc.**

By: _____

Print Name:  J. Mark Allan

Title: President

**Chassix, Inc.**

By: _____

Print Name: J. Mark Allan

Title: President and CEO

[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**

By:_____

Print Name:_____

Title:_____

**Ford Motor Company**

By:_____

Print Name:_____

Title:_____

**FCA US LLC f/k/a Chrysler Group LLC**

By:_____ _dvy_ _7h_____

Print Name:__Sigmund Huber__

Title:__Director_____

**Nissan North America, Inc.**

By:_____

Print Name:_____

Title:_____

**DIP ABL Agent**
**PNC Bank, National Association**

By:_____

Print Name:_____

Title:_____

**DIP Term Agent**
**Cantor Fitzgerald Securities**

By:_____

Print Name:_____

Title:_____

**UC Holdings, Inc.**

By:_____

Print Name:_____

Title:_____

**Chassix, Inc.**

By:_____

Print Name:_____

Title:_____

[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**

By:_____

Print Name:_____

Title:_____


**Ford Motor Company**

By:_____

Print Name:_____

Title:_____


**FCA US LLC f/k/a Chrysler Group LLC**

By:_____

Print Name:_____

Title:_____


**Nissan North America, Inc.**

By: *Chandra Vasser*

Print Name: *Chandra Vasser*

Title: *Director, Purchasing*


**PNC BANK, NATIONAL ASSOCIATION**

By:_____

Print Name:_____

Title:_____


**CANTOR FITZGERALD SECURITIES**

By:_____

Print Name:_____

Title:_____


**UC Holdings, Inc.**

By:_____

Print Name:  J. Mark Allan

Title: President


**Chassix, Inc.**

By:_____

Print Name: J. Mark Allan

Title: President and CEO


[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**

**Ford Motor Company**

By:_____

By:_____

Print Name:_____

Print Name:_____

Title:_____

Title:_____

**FCA US LLC f/k/a Chrysler Group LLC**

**Nissan North America, Inc.**

By:_____

By:_____

Print Name:_____

Print Name:_____

Title:_____

Title:_____

**PNC BANK, NATIONAL ASSOCIATION**

**CANTOR FITZGERALD SECURITIES**

By: _____

By:_____

Print Name: James M. Steff

Print Name:_____

Title: V. ce President

Title:_____

**UC Holdings, Inc.**

**Chassix, Inc.**

By:_____

By:_____

Print Name: J. Mark Allan

Print Name: J. Mark Allan

Title: President

Title: President and CEO

[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**Ford Motor Company**

By: _____

Print Name: _____

Title: _____

Date: _____

**FCA US LLC f/k/a Chrysler Group LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

**Nissan North America, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**PNC Bank, National Association**

By: _____

Print Name: _____

Title: _____

Date: _____

**Cantor Fitzgerald Securities**

By: _____

Print Name: James Bond
Chief Operating Officer

Title: _____

Date: _____

**UC Holdings, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**Chassix, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**                    **Ford Motor Company**

By:_____             By:_____

Print Name:_____             Print Name:_____

Title:_____             Title:_____


**FCA US LLC f/k/a Chrysler Group LLC**   **Nissan North America, Inc.**

By:_____             By:_____

Print Name:_____             Print Name:_____

Title:_____             Title:_____


**PNC BANK, NATIONAL ASSOCIATION**        **CANTOR FITZGERALD SECURITIES**

By:_____             By:_____

Print Name:_____             Print Name:_____

Title:_____             Title:_____


**UC Holdings, Inc.**                     **Chassix, Inc.**

By:_____             By:_____

Print Name: J. Mark Allan               Print Name: J. Mark Allan

Title: President                         Title: President and CEO


[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

# **EXHIBIT A**

## **INTERIM ACCOMMODATION TERM SHEET**

EXECUTION VERSION

## TERM SHEET FOR PROPOSED INTERIM ACCOMMODATIONS

_____

**THIS TERM SHEET IS PROVIDED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. TO THE MAXIMUM EXTENT ALLOWED BY APPLICABLE LAW, THIS TERM SHEET IS INTENDED TO BE ENTITLED TO THE PROTECTIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL INFORMATION AND INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS. FURTHER, NOTHING IN THE TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR DEEMED BINDING ON A CUSTOMER OR THE SUPPLIER (EACH AS HEREIN DEFINED). THIS TERM SHEET IS PROVIDED IN CONFIDENCE AND MAY BE DISTRIBUTED ONLY WITH THE EXPRESS WRITTEN CONSENT OF EACH OF THE PARTIES.**

|  | **Terms and Conditions** |
|---|---|
| **1. Transaction Overview:** | Pursuant to various purchase agreements, release requests and/or purchase orders issued by each of the Customers and accepted by Supplier (as such agreements, release requests or purchase orders may be modified from time to time to reflect any mutually approved engineering or other changes ("Purchase Orders" or individually, a "Purchase Order"), Customers have ordered from Supplier certain component parts, service parts and assembled goods (collectively, "Component Parts" or individually, a "Component Part"). Supplier faces certain financial difficulties that threaten to interrupt the supply of Component Parts to Customers. Supplier has requested that each of the Customers provide various financial and other interim accommodations to Supplier to facilitate a potential restructuring of Supplier's business operations and capital structure (the "Transaction"), which Transaction may include, without limitation, a restructuring, reorganization, refinancing, capital infusion, going concern sale or any combination of the foregoing. Supplier intends that the Transaction must be reasonably acceptable to all Parties, including the Customers. |
| **2. The Parties:** | "Customers" means (a) General Motors LLC ("GM"), (b) Ford Motor Company ("Ford"), and (c) FCA US LLC f/k/a Chrysler Group LLC ("FCA"). <br><br> "Supplier" means Chassix, Inc., together with its subsidiaries. <br><br> Customers and Supplier shall collectively be referred to herein as the "Parties," and each, individually, as a "Party." |
| **3. Term and Effective Date:** | Unless otherwise specifically provided herein with regard to a particular provision, the agreements set forth herein shall be |

| | |
|---|---|
| | effective (the "Effective Date") upon signing of this Term Sheet.<br><br>The "Term" shall mean, unless otherwise extended by written agreement of the Parties, the period from the Effective Date through the earlier to occur of (a) an Event of Default (as defined below), (b) substantial consummation of the Transaction, whether in or out of court, and (c) February 28, 2015 (the occurrence of any one of these events triggers the "Termination Date"). |
| **Customer Accommodations** | Customer agrees to the following: |
| **4.   Resourcing Limitation:** | During the Term, each of the Customers will not resource the Component Parts or programs currently on contract with Supplier except for a Permitted Resourcing (as defined below).<br><br>A "Permitted Resourcing" means any Component Parts: (i) agreed to in writing by Supplier and the applicable Customer, or (ii) resourced after the termination or cancellation of a Purchase Order with respect to such Component Parts either by reason of (A) an uncured material breach of such Purchase Order by Supplier, or (B) cancellation of the Purchase Order due to a major refresh or redesign of the program or the Component Part itself that renders the Component Part obsolete (any of the foregoing events, a "Permitted Resourcing Event"); *provided, however,* Permitted Resourcing shall not include any resourcing due to a material breach arising out of or relating to Purchase Orders fulfilled, directly or through a tier 1 supplier to a Customer, at Supplier's facility in Bristol, IN (the "Bristol Facility") except for a material breach of a Purchase Order, the consequence of which is a substantial likelihood that a Customer's production will be interrupted; *provided further, however,* that a Customer shall not be permitted to alter or change any releases to cause a Permitted Resourcing Event. The Parties reserve all of their respective rights with respect to the allocation of any wind-down costs incurred in connection with any Permitted Resourcing Event. |
| **5.**   ▮▮▮▮ | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |



3



| | |
|---|---|
| **6.** **Outstanding Commercial Issues:** | Each Customer shall pay/settle by no later than January 5, 2015, the following amounts relating to open commercial and tooling issues (the Customers anticipate making partial payments by December 30, 2014):<br><br>    Ford: $10,748,000<br>    GM: $1,538,550[*]<br>    FCA: $2,485,228<br><br>Customers shall provide Supplier with a list of any document or other information requests necessary to resolve any remaining open commercial issues identified on **<u>Exhibit D</u>** hereto by no later than January 2, 2015, and Supplier shall use its reasonable best efforts to promptly respond to such document and information requests.  Except with respect to the amounts set forth above, all remaining amounts identified on **<u>Exhibit D</u>** hereto relating to open commercial and tooling issues shall be resolved and paid/settled by January 15, 2015, provided that Supplier has properly invoiced the Customer.  The Parties acknowledge and agree that resolution and payment/settlement on the commercial issues is not conditioned upon the Effective Date.<br><br>[*] This amount shall resolve all outstanding commercial and tooling issues between GM and Supplier; provided, however, GM and Supplier agree (a) that up to $661,300 shall be reduced from the |

4

| | |
|---|---|
| | $1,538,550 to the extent such payables cannot be documented by Supplier, and (b) that up to $345,904 may be added to the $1,538,550 when the D1XX index surcharge discrepancy is reconciled. |
| **7.** ███████████ | ████████████████████████ |
| **8. Limitation of Setoff against Accounts Payable:** | Pursuant to a Credit Enhancement Agreement (the "Credit Enhancement Agreement"), which shall be entered into by and among Supplier, the Customers, and Lender (as defined below), effective upon the closing of incremental financing in the amount of at least $30,000,000.00 with any lender that is not an affiliate of Supplier (collectively, with the existing ABL Lender Group, the "Lender"), on terms reasonably acceptable to the Customers, and continuing until substantial consummation of a Transaction,  each of the Customers, for the benefit of Lender only, (i) except for Allowed Setoffs (as defined below), limits any right of setoff, recoupment or deduction against any bona fide accounts owing to Supplier for shipments of Component Parts by Supplier at the prices agreed between Supplier and Customer ("Accounts Payable") not previously exercised as of the Effective Date, and (ii) except for Allowed Setoffs (as defined below), Material Setoffs (as defined below), and Tooling Setoffs (as defined below), limits any of its rights of setoff, recoupment or deduction against any of its Accounts Payable whether generated before or during the Term.  The Credit Enhancement Agreement shall provide, among other things, that as between Customers and Lender all obligations and liabilities of Customer and Lenders to the other will remain in full force and effect notwithstanding the fact that Supplier may become subject to an insolvency, bankruptcy, receivership or similar proceeding and/or reject or attempt to reject |

5

its obligations under this Term Sheet, the Credit Enhancement Agreement or any related agreements with Customers; provided, however, that the setoff limitations provided in this Section 8 and the inventory purchase obligations set forth in Section 11 will not apply to any post-petition generated receivables or inventory unless (i) the bankruptcy court has authorized the Supplier to assume performance of this Term Sheet, the Access Agreement and Credit Enhancement Agreement, and (ii) Lender has agreed to provide debtor-in-possession financing to Supplier on terms reasonably acceptable to Customers, unless otherwise agreed to in the Credit Enhancement Agreement.  The Credit Enhancement Agreement will also include access and security provisions.

The term "Allowed Setoffs" means valid setoffs, recoupments or deductions for defective or non-confirming parts, quality problems, and fees relating to the non-operational professionals incurred by a Customer; *provided, however*, that Allowed Setoffs shall not include any setoff for amounts with respect to the Bristol Surcharge, the Premium Freight Costs, the Outage Costs, the Quality Spill Costs that are the Customers' responsibility in Section 7, or the Advisor and Independent Contractor Fees that are the Customers' responsibility in Section 9.  Allowed Setoffs shall include a Bristol Surcharge Surplus for any Customer if Supplier terminates any of its operations such that are no credits for surplus funds against the Bristol Surcharge for the immediately succeeding Budget Period as set forth in Section 5 above.

The term "Material Setoffs" means a setoff for (i) materials or components delivered to Supplier (but excluding Tooling (as defined below)) or services performed for Supplier, purchased by a Customer from persons other than Supplier or supplied by a Customer to Supplier (either under a materials contract or in order to avoid an interruption in the Customer's production) for use in connection with the production of Component Parts by Supplier for that Customer, or (ii) direct payment(s) to material or service vendors by a Customer for the purchase of materials or components (but excluding Tooling) or services used by Supplier in connection with the production of Component Parts by Supplier for that Customer (either under a materials contract or in order to avoid an interruption in Customer's production) which was supplied under a materials contract or would have been purchased by Supplier but for the vendor's refusal to sell to Supplier and for which Customer has provided Supplier prior written notice of the materials and the amount to be paid to the vendor or purchased by Supplier from Customer, as applicable.  Material Setoffs may be taken, subject to the reasonable consent of the Lender, ten (10) business days after giving Supplier and Lender notice of the amount paid by Customer.

The term "Tooling Setoffs" means a setoff for any payment to a

WEIL:\95186297\17\35076.0003

tooling vendor or tooling repairman for all or part of the purchase price or repair price of Tooling (defined below) that is necessary for a Customer's production (existing and future) for which the payment is necessary to secure the release of a valid and perfected lien senior to Lender against Tooling or is required to obtain possession of Tooling from the tooling vendor or tooling repairman. Tooling Setoffs may be taken ten (10) business days after giving Supplier and Lender prior written notice of the setoff. Tooling Setoffs may be taken only against the amount owed by a Customer on the associated tool order.

The term "Tooling" means, collectively, all tooling, dies, test and assembly fixtures, gauges, jigs, patterns, casting patterns, cavities, molds, spare parts and documentation, including engineering specifications, test reports and manuals, used by Supplier in connection with its manufacture of Component Parts for the Customers.

Notwithstanding the above, Allowed Setoffs shall not include:

a) any individual setoff, recoupment or deduction that exceeds an agreed upon percentage of the face amount of any respective invoice or group of invoices to be paid in any monthly invoice cycle (the "Agreed Cap"); or

b) any setoff, recoupment or deduction for the Bristol Surcharge, Premium Freight Costs, Outage Costs, Quality Spill Costs, Capital Expenditure Advances or Advisor and Independent Contractor Fees.

In the event that a setoff is an Allowed Setoff and such Allowed Setoff is limited by the Agreed Cap, the remainder of such Allowed Setoff may be taken against subsequent payments of Accounts Payable; provided that at no time shall the Allowed Setoffs exceed the Agreed Cap of any invoice or group of invoices to be paid in any calendar month.

Each of the Customers and Supplier agrees to use best efforts to expedite the resolution of all disputed setoffs, recoupments and deductions.

To the extent of any inconsistency between this Term Sheet and the Credit Enhancement Agreement, the terms of the Credit Enhancement Agreement shall control.

| **9. Advisor and Independent Contractor Fees:** | The Supplier and Customers shall agree upon any third-party operation advisors ("Advisors") or independent contractors ("Independent Contractors") retained by Supplier and included within the Bristol Surcharge. Notwithstanding anything herein to the contrary, beginning on December 1, 2014, and continuing until |

7

| | |
|---|---|
| | the Termination Date, the fees and expenses ("<u>Advisor and Independent Contractor Fees</u>") of any incremental or additional Advisors or Independent Contractors working exclusively on a particular Customer's Component Part production to be staffed or placed on-site at any of Supplier's facilities after December 1, 2014, shall be the sole responsibility of the applicable Customer. Any costs or expenses incurred in connection with any missed or short releases caused, directly or indirectly, by a Customer's Advisors or Independent Contractors shall be the sole responsibility of the applicable Customer.<br><br>In connection with the execution of this Term Sheet, the Customers shall use commercially reasonable efforts to have each of their respective Advisors and Independent Contractors enter into on-site or similar agreements with Supplier that govern, among other things, liability with respect to acts of negligence and indemnification rights of the parties. |
| **10. Tooling Costs:** | During the Term, upon presentment of an unpaid invoice from a Tooling supplier, subject to the release of liens on terms reasonably acceptable to Customer, each of the Customers shall advance to Supplier payments for completed Unpaid Tooling that is subject to a Purchase Order, or other operative Tooling release or agreement, issued by such Customer, but if the completed Unpaid Tooling has not been given a Part Submission Warrant, Customer will pay that portion of the unpaid balance necessary for the Customer to have paid 90% of the amount of the Customer's Tooling Purchase Order. |
| **11. Inventory Purchase:** | Pursuant to the Credit Enhancement Agreement which shall be entered into by and among Supplier, Customers and Lender, effective upon the closing of incremental financing in the amount of at least $30,000,000.00 with any Lender that is not an affiliate of Supplier, on terms reasonably acceptable to the Customers, and continuing until substantial consummation of a Transaction, on the applicable Inventory Purchase Trigger Date (as defined below), Supplier will become obligated to sell, and each of the Customers (i) will become obligated to purchase and pay for in cash, all "useable" and "merchantable": (a) raw materials and (b) finished goods inventory, and (ii) will have the option to purchase and pay for in cash, any work-in-process, in the case of both (i) and (ii) above, related to the Component Parts for which each of the Customers has Unsatisfied Releases (as defined below); *provided, that,* if on the applicable Inventory Purchase Trigger Date, a Customer does not purchase (and pay for in cash) any work-in-process, then, to the extent that Supplier is able to convert such work-in-process existing as of the Inventory Purchase Trigger Date into finished goods inventory within ten (10) business days, said Customer shall purchase such finished goods inventory as |

8

provided above.

Inventory purchases made pursuant to this section will be for a cash purchase price equal to the following amounts without setoff, recoupment, deduction or reduction of any kind (including, without limitation, Allowed Setoffs): (A) for raw materials, one hundred percent (100%) of Supplier's actual landed cost thereof; (B) for finished goods, one hundred percent (100%) of the purchase price set forth on the applicable Purchase Order; and (C) for work-in-process, a percentage of the finished goods Purchase Order price based on the stage of completion of any such work-in-process.   Supplier will complete a physical inventory at the affected plant or plants within ten (10) business days after the Inventory Purchase Trigger Date.  Each of the Customers will pay the purchase price of such Inventory at the time such Inventory is delivered by Supplier free and clear of all liens, claims and encumbrances. Supplier will deliver such Inventory not later than ten (10) business days after the applicable Inventory Purchase Trigger Date.

For purposes of this Term Sheet, the term "useable" means all Inventory that is not obsolete, as reasonably determined in accordance with applicable industry standards for the specific Inventory, and that is reasonably useable in the production of Component Parts for which a Customer has Unsatisfied Releases to Supplier on the Inventory Purchase Trigger Date.  The term "merchantable" means merchantable as defined in U.C.C. § 2-314 and in conformance with all applicable Purchase Order specifications for the Component Part.  The determination of whether Inventory is "useable" and "merchantable" will be made on the date that the Inventory is made available for delivery to a Customer free and clear of all liens, claims and encumbrances (the "Determination Date").

"Inventory Purchase Trigger Date" means, as applied on a plant-by-plant basis, a Permitted Resourcing Event.

The term "Unsatisfied Releases" means the quantity of Component Parts provided in firm releases, fabrication, raw material or similar authorizations issued directly or indirectly (i.e., whether shipped by Supplier directly to a Customer or to a Customer's supplier) by a Customer and in effect on the Determination Date, less the quantities of Component Parts shipped by Supplier after receipt of those releases or similar authorizations.

To the extent of any inconsistency between this Term Sheet and the Credit Enhancement Agreement, the terms of the Credit Enhancement Agreement shall control.

9

| **Supplier Assurances** | Supplier agrees to do the following: |
|---|---|
| **12. Continue to Manufacture:** | Supplier will continue to supply the Component Parts for each of the Customers in accordance with the terms of the Purchase Orders and related releases, as modified by this Term Sheet.  Supplier agrees to notify a Customer of any threat to continued timely shipment of such Customer's Component Parts promptly upon learning of that threat.  Supplier will allocate its capacity and resources equitably among the Customers, with no one Customer receiving priority allocation.  During the Term, Supplier shall not implement any price increases upon any Component Parts unless such price increases have been previously agreed to in writing by Supplier and a Customer.  Supplier will continue to produce the Theta Rear Knuckles under new Purchase Orders consistent with the terms of this Term Sheet (on terms to be negotiated with Mando Corporation). |
| **13. Resourcing Cooperation:** | Subject to the resourcing limitations set forth above, Supplier will reasonably cooperate with each of the Customer's preparation for any Permitted Resourcing.   In connection with any Permitted Resourcing, Supplier will reasonably cooperate with each Customer's resourcing of production of its Component Parts. Customer and Supplier shall negotiate, in good faith, the specific terms with respect to the reasonable cooperation and assistance to be provided by Supplier in connection with a Permitted Resourcing, including the cost and expense to be borne by each of the Parties in connection therewith. |
| **14. Transaction Proposal** | Supplier agrees to: <br><br> a.   provide each of the Customers with a Transaction proposal by January 15, 2015; <br><br> b.   conduct weekly status calls with Customer and its advisors; and <br><br> c.   use commercially reasonable efforts to reach an agreement with the Customers and other key constituencies on a Transaction by not later than February 15, 2015. |
| **15. Tooling Acknowledgment:** | The term "Unpaid Tooling" means Tooling manufactured for each of the Customers for which a Customer has not made full payment under the applicable tooling purchase orders with Supplier.   The term "Supplier Owned Tooling" means Tooling which is owned by Supplier.  The term "Customer Tooling" means all Tooling, other than Supplier Owned Tooling, currently being used to manufacture each of the Customer's Component Parts, whether under direct agreements between Supplier and a Customer or agreements between Supplier and third parties. <br><br> Supplier acknowledges and agrees that Customer Tooling is (a) |

10

| | |
|---|---|
| | subject to the terms of this Term Sheet, (b) owned by the applicable Customer, and (c) held by Supplier (and, to the extent that Supplier has transferred the Customer Tooling to any third parties, by those third parties), as bailees-at-will. |
| **16. Access Agreement:** | As part of the closing of the incremental financing referenced in Sections 8 and 11 above, Supplier will execute an Access and Security Agreement (the "<u>Access Agreement</u>") in form and substance reasonably acceptable to the Parties. |
| **17. Financial Reporting:** | Supplier agrees to provide each of the Customers with financial and operation reports and updates to Customers on the status of Transaction efforts on a weekly basis and in a form agreed to by Supplier and the Customers, subject to any constraints of Supplier's financial and other information systems. |
| **18. Events of Default:** | The occurrence of any one or more of the following will be an "<u>Event of Default</u>" under this Term Sheet, unless a waiver or deferral is agreed to in writing by each of the affected Customers: |

The occurrence of any one or more of the following will be an "<u>Event of Default</u>" under this Term Sheet, unless a waiver or deferral is agreed to in writing by each of the affected Customers:

a)  Supplier repudiates or breaches its obligations, or such breach becomes inevitable, under the provisions of any Purchase Order or this Term Sheet the consequence of which is a substantial likelihood that a Customer's production will be interrupted (other than a breach arising out of or relating to Purchase Orders fulfilled, directly or indirectly, at the Bristol Facility), *provided that* if a breach under this subsection (a) results in an assembly plant shutdown that is not corrected within 24 hours, then the breach becomes an Event of Default even if the Purchase Orders are filled directly or indirectly at the Bristol Facility;

b)  Any secured credit revolving lender commences an affirmative enforcement action against any of the collateral supporting production of the Component Parts if that action materially impacts Supplier's operations or ability to perform under this Term Sheet, the Access Agreement or any Purchase Order;

c)  If the Lender ceases funding for any reason;

d)  Failure to meet an agreed upon Transaction milestone;

e)  The aggregate of actual Bristol operating expenses and capital expenses exceed 120% of the Operating Budget and Capital Expenditures Budget in any month during the Term;

f)  A Customer fails to perform any material obligation under

11

| | |
|---|---|
| | this Term Sheet and such failure is not otherwise waived by Supplier; or |
| | g) In the event Supplier and/or any of its subsidiaries voluntarily commences a case or cases, or has a case or cases commenced against it, under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), such case is converted to a case under chapter 7 of the Bankruptcy Code. |
| | Notwithstanding anything herein to the contrary, there shall be no Event of Default because of any delay in the performance of Supplier's obligations under this Term Sheet to the extent a Customer's Purchase Orders provide for circumstances beyond the reasonable control of Supplier (such as natural catastrophes). The terms of the Purchase Orders shall control in such circumstances. |
| **19. Cooperation:** | Each Party agrees to cooperate fully with the other Party to take all additional actions that may be reasonably necessary to give full force and effect to this Term Sheet. |
| | Each of the Customers and Supplier agree to use commercially reasonably efforts for Nissan and BMW to be added as parties to this Term Sheet on or prior to January 15, 2015, but in no event later than January 30, 2015. If Nissan or BMW fails to join this Term Sheet or give substantially equivalent accommodations, Supplier may not use the benefits of the Customers' accommodations for the production of parts for Nissan or BMW, or both, as the case may be. |
| **20. Bankruptcy Court Approval:** | In the event Supplier and/or any of its affiliates voluntarily commences a case or cases, or has a case or cases commenced against it, under chapter 11 of the Bankruptcy Code, Supplier agrees to seek entry of an order by the Bankruptcy Court approving the terms of this Term Sheet on an expedited basis. |
| **General Terms** | |
| **21. Assignability:** | Each Party must obtain the prior written consent of the other to assign or transfer, directly or indirectly, any of its rights or obligations under the Term Sheet. |
| **22. Entire Agreement:** | This Term Sheet, together with any documents executed in connection with it (including, without limitation, the Credit Enhancement Agreement and the Access Agreement), constitute the entire understanding of the Parties in connection with the subject matter hereof and thereof. There are no written or oral representations or understandings that are not fully expressed in the Term Sheet. Any such additional representations and understandings shall be set forth in the definitive agreements to be entered into in connection herewith. The Term Sheet may not be |

12

| | modified, altered or amended, except by an agreement in writing signed by the Parties. |
|---|---|
| **23. Severability:** | Should any provision of the Term Sheet be held to be invalid or unenforceable, the remainder of the Term Sheet will not be affected thereby. |
| **24. Governing Law:** | The Term Sheet will be governed by, and must be construed in accordance with, the laws of the state of Michigan, without giving effect to its conflicts of laws principles. |
| **25. Counterparts:** | This Term Sheet may be executed in any number of duplicate originals or counterparts, each of such duplicate originals or counterparts shall be deemed to be an original and taken together shall constitute one and the same instrument. The Parties agree that their respective signatures may be delivered by email (with return receipt acknowledgment) or facsimile with original signatures to follow, and that such email or facsimile signatures shall be treated as originals for all purposes. |

**[signature page to follow]**

13

This Term Sheet is agreed to as of December 31, 2014.

CHASSIX, INC.

By: _____

Title: _____CFO_____

This Term Sheet is agreed to as of December ___, 2014.

JANUARY 7, 2015

By: _____

Title: _____

M.W. FISCHER
DIRECTOR, SUPPLY RISK MGT
GENERAL MOTORS, LLC

[SIGNATURE PAGE FOR TERM SHEET FOR PROPOSED INTERIM ACCOMMODATION AGREEMENT]

13

This Term Sheet is agreed to as of ~~December __, 2014.~~ JANUARY 7, 2015.

FORD Motor Company

By: _____ DAVID FLACK DOA FOR RENEE JONES

Title: _Senior Purchasing Manager_

[SIGNATURE PAGE FOR TERM SHEET FOR PROPOSED INTERIM ACCOMMODATION AGREEMENT]

WEIL:\95186297\17\35076.0003

This Term Sheet is agreed to as of ~~December~~ January 7, __, 2014. _RMB_

FCA GROUP

By: _Matt Bahde_

Title: _Senior Manager_

**<u>Exhibit A</u>**

**<u>Exhibit B</u>**

**<u>Exhibit C</u>**

**<u>Exhibit D</u>**

**EXHIBIT B**

**ACCEPTABLE PLAN**

WEIL:\95233664\30\35076.0003

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| Chassix Holdings, Inc., *et al.*,[1] | ) | Case No. 15-[_____] (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Pending) |
|  | ) |  |

## JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**WEIL, GOTSHAL & MANGES LLP**

Marcia L. Goldstein
Ray C. Schrock, P.C.
Matthew P. Goren
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for Debtors and
Debtors in Possession*

Dated:  March 12, 2015
        New York, New York

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012).  The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

# Table of Contents

**Page**

Section 1.     DEFINITIONS AND INTERPRETATION. ...................................................1

    A.     Definitions. .....................................................................................................1

    B.     Interpretation; Application of Definitions and Rules of Construction.............14

    C.     Reference to Monetary Figures......................................................................14

    D.     Controlling Document ...................................................................................14

Section 2.     ADMINISTRATIVE AND PRIORITY CLAIMS. ......................................14

    2.1.     *Administrative Claims.*...............................................................................14

    2.2.     *Fee Claims.*...............................................................................................15

    2.3.     *Priority Tax Claims.*..................................................................................15

    2.4.     *DIP Claims.*...............................................................................................15

    2.5.     *Prepetition Revolving ABL Facility Claims.* ..............................................15

Section 3.     CLASSIFICATION OF CLAIMS AND INTERESTS. ................................16

    3.1.     *Summary of Classification* .........................................................................16

    3.2.     *Special Provision Governing Unimpaired Claims.*......................................16

    3.3.     *Elimination of Vacant Classes.* .................................................................16

Section 4.     TREATMENT OF CLAIMS AND INTERESTS. .......................................17

    4.1.     *Other Priority Claims (Class 1).*................................................................17

    4.2.     *Other Secured Claims (Class 2).*...............................................................17

    4.3.     *Secured Note Claims (Class 3)* .................................................................17

    4.4.     *Unsecured Note Claims (Class 4).*.............................................................18

    4.5.     *General Unsecured Trade Claims (Class 5).*..............................................18

    4.6.     *Other General Unsecured Claims (Class 6).*..............................................19

    4.7.     *Intercompany Claims (Class 7).* ...............................................................19

    4.8.     *Intercompany Interests (Class 8).*.............................................................20

    4.9.     *Subordinated Securities Claims (Class 9).*................................................20

    4.10.   *Existing Chassix Holdings Equity Interests (Class 10)* ...............................20

Section 5.     MEANS FOR IMPLEMENTATION. .......................................................20

    5.1.     *Compromise and Settlement of Claims, Interests, and Controversies.* ........20

    5.2.     *Global Settlement* ....................................................................................21

    5.3.     *Actions of Dharma Holding Corporation and Triomphe Intermediate Holding Corporation* ................................................................................................22

i

## Table of Contents

**Page**

| | | |
|---|---|---|
| 5.4. | *Cancellation of Existing Securities and Agreements.* | 22 |
| 5.5. | *Corporate Structure.* | 22 |
| 5.6. | *Authorization and Issuance of Plan Securities.* | 22 |
| 5.7. | *Section 1145 Exemption.* | 23 |
| 5.8. | *Exit Financing.* | 23 |
| 5.9. | *Intercreditor Agreement.* | 24 |
| 5.10. | *Reorganized Debtors.* | 24 |
| 5.11. | *Bristol Facility* | 24 |
| 5.12. | *Cancellation of Liens.* | 25 |
| 5.13. | *Management Employment Matters.* | 25 |
| 5.14. | *Withholding and Reporting Requirements.* | 25 |
| 5.15. | *Exemption From Certain Transfer Taxes.* | 26 |
| 5.16. | *Restructuring Transactions; Further Transactions.* | 26 |
| 5.17. | *Dissolution of Chassix Holdings.* | 27 |
| 5.18. | *Effectuating Documents.* | 27 |
| 5.19. | *Closing of the Chapter 11 Cases.* | 27 |
| Section 6. | DISTRIBUTIONS. | 27 |
| 6.1. | *Distribution Record Date.* | 27 |
| 6.2. | *Date of Distributions.* | 28 |
| 6.3. | *Timing of Distributions.* | 28 |
| 6.4. | *Disbursing Agent.* | 28 |
| 6.5. | *Powers of Disbursing Agent.* | 28 |
| 6.6. | *Delivery of Distributions.* | 28 |
| 6.7. | *Manner of Payment Under Plan.* | 29 |
| 6.8. | *Fractional Stock.* | 29 |
| 6.9. | *Minimum Cash Distributions.* | 29 |
| 6.10. | *Setoffs.* | 29 |
| 6.11. | *Distributions After Effective Date.* | 29 |
| 6.12. | *Allocation of Distributions Between Principal and Interest.* | 29 |
| Section 7. | PROCEDURES FOR DISPUTED CLAIMS. | 30 |
| 7.1. | *Allowance of Claims.* | 30 |

**Table of Contents**

**Page**

| | | |
|---|---|---|
| 7.2. | *Objections to Claims.* | 30 |
| 7.3. | *Estimation of Claims.* | 30 |
| 7.4. | *No Distributions Pending Allowance.* | 30 |
| 7.5. | *Distributions After Allowance.* | 31 |
| 7.6. | *Resolution of Claims.* | 31 |
| 7.7. | *Disallowed Claims.* | 31 |
| Section 8. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES. | 31 |
| 8.1. | *General Treatment.* | 31 |
| 8.2. | *Determination of Cure Disputes and Deemed Consent.* | 31 |
| 8.3. | *Payments Related to Assumption of Contracts and Leases.* | 32 |
| 8.4. | *Rejection.* | 32 |
| 8.5. | *Survival of the Debtors' Indemnification Obligations.* | 32 |
| 8.6. | *Compensation and Benefit Plans.* | 33 |
| 8.7. | *Insurance Policies.* | 33 |
| 8.8. | *Intellectual Property Licenses and Agreements.* | 33 |
| 8.9. | *Reservation of Rights.* | 34 |
| Section 9. | CONDITIONS PRECEDENT TO THE EFFECTIVE DATE. | 34 |
| 9.1. | *Conditions Precedent to Confirmation.* | 34 |
| 9.2. | *Conditions Precedent to the Effective Date.* | 34 |
| 9.3. | *Waiver of Conditions Precedent.* | 35 |
| 9.4. | *Effect of Non-Occurrence of Effective Date.* | 36 |
| Section 10. | EFFECT OF CONFIRMATION. | 36 |
| 10.1. | *Subordinated Claims.* | 36 |
| 10.2. | *Vesting of Assets.* | 36 |
| 10.3. | *Discharge of Claims and Termination of Interests.* | 36 |
| 10.4. | *Term of Injunctions or Stays.* | 36 |
| 10.5. | *Injunction Against Interference with Plan.* | 37 |
| 10.6. | *Releases by the Debtors.* | 37 |
| 10.7. | *Releases By Holders of Claims and Interests.* | 38 |
| 10.8. | *Exculpation.* | 38 |
| 10.9. | *Retention of Causes of Action/Reservation of Rights.* | 39 |

WEIL:\95270840\1\35076.0003

**Table of Contents**

**Page**

10.10. *Solicitation of the Plan.* ..............................................................................39

10.11. *Plan Supplement.* ...................................................................................40

10.12. *Corporate and Limited Liability Company Action.* ...................................40

Section 11.    RETENTION OF JURISDICTION. ..................................................40

Section 12.    MISCELLANEOUS PROVISIONS ...................................................42

12.1. *Payment of Statutory Fees.* ......................................................................42

12.2. *Substantial Consummation.* ......................................................................42

12.3. *Dissolution of Creditors Committee.* .........................................................42

12.4. *Request for Expedited Determination of Taxes.* .........................................42

12.5. *Amendments.* ............................................................................................43

12.6. *Revocation or Withdrawal of the Plan.* .....................................................43

12.7. *Severability of Plan Provisions upon Confirmation.* ..................................43

12.8. *Governing Law.* ........................................................................................44

12.9. *Time.* .......................................................................................................44

12.10. *Immediate Binding Effect.* ......................................................................44

12.11. *Successor and Assigns.* ...........................................................................44

12.12. *Entire Agreement.* ..................................................................................44

12.13. *Notices.* ..................................................................................................44

Exhibit A        Accommodation Agreements (without exhibits)

Exhibit B        Restructuring Support Agreement (without exhibits)

WEIL:\95270840\1\35076.0003

Each of Automotive Properties of New York, LLC, Chassix Holdings, Inc., UC Holdings, Inc., Chassix, Inc., Diversified Machine, Inc., Diversified Machine Bristol, LLC, Chassix Georgia Machining, LLC, DMI Columbus, LLC, Diversified Machine Montague, LLC, Diversified Machine, Milwaukee LLC, DMI Edon LLC, Mexico Products I, LLC, DMI China Holding LLC, Concord International, Inc., SMW Automotive, LLC, Automotive, LLC, Chassis Co. of Michigan, LLC, and AluTech, LLC (collectively, the "***Debtors***") propose the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Section 1.A.

## SECTION 1.    DEFINITIONS AND INTERPRETATION.

### A.    Definitions.

1.1    ***Accommodation Agreements*** means (a) that certain accommodation agreement, dated as of March 11, 2015, between and among the Debtors, General Motors LLC, Ford Motor Company, FCA US LLC f/k/a Chrysler Group LLC, Nissan North America, Inc., the DIP ABL Agent, and the DIP Term Agent, and (b) that certain accommodation agreement (together with any exhibits or schedules thereto) between and among the Debtors, BMW Manufacturing Co., LLC, the DIP ABL Agent, and the DIP Term Agent, annexed hereto as **Exhibit** "**A**."

1.2    ***Additional Trade Claim Distribution*** means $4,000,000, in Cash, which shall be distributed on a Pro Rata basis to holders of Allowed General Unsecured Trade Claims that agree to extend Customary Trade Terms to the Debtors (or the Reorganized Debtors, as applicable), pursuant to Section 4.5 below.  For the avoidance of doubt, the foregoing monies shall be reserved by the Debtors, or the Reorganized Debtors, as the case may be, but shall not be held in a segregated account.

1.3    ***Administrative Agent*** means BMO Harris Bank N.A., in its capacity as administrative agent under the Prepetition Revolving ABL Facility.

1.4    ***Administrative Claim*** means any Claim for costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code, including, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for good and other services and leased premises); (b) Fee Claims; (c) DIP Claims; (d) Restructuring Expenses; and (e) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code; <u>provided</u> that, notwithstanding anything herein to the contrary, Fee Claims and DIP Claim shall be treated as provided, respectively, in Sections 2.2 and 2.4 below.

1.5    ***Allowed*** means:

(a)    With respect to any Claim or Interest, proof of which was filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the Bankruptcy Court, (i) as to which no objection to allowance has been interposed in accordance with Section 7.2 hereof, such Claim to the extent asserted in such proof of Claim, (ii) as to which an objection has been interposed, such Claim or Interest to the extent that it has been allowed in whole or in part by a Final Order, or (iii) any Claim or Interest expressly allowed hereunder.

(b)    With respect to any Claim as to which no proof of claim was filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the

Bankruptcy Court, such Claim to the extent that it has been listed in the Schedules as liquidated in amount and not disputed or contingent.

(c)    Notwithstanding the foregoing, the Reorganized Debtors shall retain all claims and defenses to any Allowed Claims that are Reinstated or Unimpaired pursuant to the Plan.

1.6    ***Allowed Amount*** means the lesser of (a) the dollar amount of an Allowed Claim or (b) the estimated amount of such Allowed Claim.  Unless otherwise specified herein or by Final Order, the Allowed Amount of an Allowed Claim shall not include interest accruing on such Allowed Claim from and after the Commencement Date.

1.7    ***Amended Organizational Documents*** means the forms of certificate of incorporation, certificate of formation, limited liability company agreement, or other forms of organizational documents and bylaws for the Reorganized Debtors in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  To the extent such Amended Organizational Documents reflect material changes to the Debtors' existing forms of organization documents and bylaws, substantially final forms of such Amended Organizational Documents will be included in the Plan Supplement.

1.8    ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.9    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York, Manhattan Division, having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

1.10    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

1.11    ***Benefit Plans*** means all benefit plans, policies, and programs sponsored by the Debtors, including all savings plans and health and welfare plans.

1.12    ***Bristol Facility*** means the Debtors' manufacturing facility located at 51650 County Road 133, Bristol, Indiana, 46507.

1.13    ***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.14    ***Cash*** means legal tender of the United States of America.

1.15    ***Causes of Action*** means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen,

2

direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims.

1.16    ***Chapter 11 Cases*** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on March 12, 2015, in the Bankruptcy Court and styled *In re Chassix Holdings, Inc., et. al.*, Case No. 15-[_____] (___).

1.17    ***Chassix*** means Chassix, Inc.

1.18    ***Chassix Holdings*** means Chassix Holdings, Inc.

1.19    ***Claim*** means "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

1.20    ***Class*** means any group of Claims or Interests classified by the Plan pursuant to section 1122(a) of the Bankruptcy Code.

1.21    ***Collateral Agent*** means U.S. Bank, National Association, in its capacity as collateral agent under the Secured Notes Indenture and the related Security Agreement.

1.22    ***Commencement Date*** means the date on which each of the Debtors filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

1.23    ***Commencement Date Plan*** means the joint chapter 11 plan of reorganization, including the exhibits thereto, filed by the Debtors on the Commencement Date.

1.24    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.25    ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.26    ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

1.27    ***Consenting Noteholders*** means the Consenting Secured Noteholders and the Consenting Unsecured Noteholders.

1.28    ***Consenting Secured Noteholders*** means the beneficial holders, or investment advisors or managers for the account of beneficial holders, of Secured Notes party to the Restructuring Support Agreement.

3

1.29    ***Consenting Unsecured Noteholders*** means the beneficial holders, or investment advisors or managers for the account of beneficial holders, of Unsecured Notes party to the Restructuring Support Agreement.

1.30    ***Consummation*** means the occurrence of the Effective Date.

1.31    ***Creditors Committee*** means any official committee of unsecured creditors appointed in the Chapter 11 Cases.

1.32    ***Cure*** means the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

1.33    ***Customary Trade Terms*** means industry trade terms and/or the existing contractual terms between the Debtors and the relevant holder of a General Unsecured Trade Claim including rebates and discounts, which shall in no event be worse than the most favorable terms in effect within two (2) years before the Commencement Date or such other trade terms as agreed to by the Debtors, with the consent of the Required Consenting Noteholders (such consent not to be unreasonably withheld), or the Reorganized Debtors, as applicable.

1.34    ***Debtors*** means Automotive Properties of New York, LLC, Chassix Holdings, UC Holdings, Chassix, Diversified Machine, Inc., Diversified Machine Bristol, LLC, Chassix Georgia Machining, LLC, DMI Columbus, LLC, Diversified Machine Montague, LLC, Diversified Machine, Milwaukee LLC, DMI Edon LLC, Mexico Products I, LLC, DMI China Holding LLC, Concord International, Inc., SMW Automotive, LLC, Automotive, LLC, Chassis Co. of Michigan, LLC, and AluTech, LLC.

1.35    ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

1.36    ***Definitive Documents*** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated herein and that are otherwise necessary or desirable to implement, or otherwise relate to the restructuring contemplated in the Restructuring Support Agreement, the Plan (including the Plan Supplement), any motion seeking the approval thereof, the Confirmation Order, and definitive documentation relating to the DIP Facilities, the use of cash collateral and the Exit Facilities, Amended Organizational Documents, the Accommodation Agreements, advisory or management services agreements, the Management Incentive Plan, the New Warrant Agreement, the Shareholders Agreement and any other shareholder and member related agreements or other related documents, each of which shall contain terms and conditions consistent in all material respects with the Plan and shall otherwise be reasonably acceptable in all respects to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

1.37    ***DIP ABL Agent*** means PNC Bank, National Association, in its capacity as administrative agent and collateral agent for the Revolving DIP Lenders under the Revolving DIP Credit Facility, or its permitted successor and assignee.

1.38    ***DIP Agents*** means the DIP ABL Agent and the DIP Term Agent.

4

1.39    ***DIP Claim*** means a Claim of the DIP Lenders or the DIP Agents arising under the DIP Facilities and the Interim DIP Order and/or Final Order.

1.40    ***DIP Facilities*** means the Revolving DIP Credit Facility and the DIP Term Facility.

1.41    ***DIP Lenders*** means the DIP Term Lenders and the Revolving DIP Lenders.

1.42    ***DIP Term Agent*** means Cantor Fitzgerald Securities, in its capacity as administrative agent and collateral agent for the DIP Term Lenders under the DIP Term Facility, or its permitted successor and assignee.

1.43    ***DIP Term Facility*** means the senior secured non-amortizing term loan credit facility provided by the DIP Term Lenders in an aggregate principal amount of $100 million made pursuant to that certain Superpriority Secured Debtor-in-Possession Term Loan, Security and Guaranty Agreement, by and among Chassix, the other borrowers and guarantors party thereto, the DIP Term Agent, the DIP Term Lenders and other parties thereto.

1.44.    ***DIP Term Lenders*** means those certain Consenting Secured Noteholders who are lenders under the DIP Term Facility.

1.45.    ***Disbursing Agent*** means any entity (including any applicable Debtor if it acts in such capacity) in its capacity as a disbursing agent under Section 6.4 hereof.

1.46.    ***Disclosure Statement*** means the Disclosure Statement for the Plan, in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, which is prepared and distributed in accordance with sections 1125, 1126(b) and/or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018 and/or other applicable law.

1.47.    ***Disclosure Statement Order*** means an order entered by the Bankruptcy Court finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code and otherwise in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

1.48.    ***Disputed Claim*** means (a) any Claim against any Debtor, proof of which was timely and properly filed, which is disputed under the Plan or as to which the Debtors have interposed a timely objection and/or request for estimation, which objection and/or request has not been withdrawn or determined by a Final Order or (b) any Claim against any Debtor proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed.  To the extent only the Allowed Amount of a Claim is in dispute, such Claim shall be deemed Allowed in the amount the Debtors admit to owing, if any, and disputed as to the excess.

1.49.    ***Distribution Date*** means a date or dates, including the Initial Distribution Date, as determined by the Disbursing Agent in accordance with the terms of the Plan, on which the Disbursing Agent makes a distribution to holders of Allowed Claims.

1.50.    ***Distribution Record Date*** means, except with respect to public securities, the Effective Date.

1.51.    ***Effective Date*** means the date on or after the Confirmation Date, but not later than July 17, 2015, on which all conditions to the effectiveness of the Plan set forth in Section 9 hereof have been satisfied or waived in accordance with the terms of the Plan.

1.52.    ***Estate or Estates*** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.53.    ***Exculpated Parties*** means collectively: (a) the Debtors; (b) the Creditors Committee; (c) the Administrative Agent; (d) the Collateral Agent; (e) the other Secured Parties under and as defined in the Security Agreement; (f) the DIP Lenders; (g) the DIP Agents; (h) the Consenting Secured Noteholders; (i) the Consenting Unsecured Noteholders; (j) the arrangers under each of the DIP Facilities and the Exit Facilities; (k) the administrative agents, collateral agents, and lenders under the Exit Facilities; (l)  the OEM Customers; (m) Platinum Equity; (n) the Prepetition Revolving ABL Lenders, and (o) with respect to each of the foregoing entities in clauses (a) through (n), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers and directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, in each case in their capacity as such.

1.54.    ***Existing Chassix Holdings Equity Interests*** means all Interests in Chassix Holdings immediately prior to the Commencement Date, including all equity, warrants, common stock, and preferred stock.

1.55.    ***Existing UC Holdings Equity Interests*** means all Interests in UC Holdings immediately prior to the Commencement Date, including all equity, warrants, common stock, and preferred stock.

1.56.    ***Exit Facilities*** means the Revolving Exit Facility and the Exit Term Loan.

1.57.    ***Exit Term Loan*** means that certain senior secured exit term loan in a principal amount of $150,000,000, on terms acceptable to the Debtors and the Required Consenting Noteholders. Not less than $50,000,000 of the Exit Term Loan will be in the form of a new money investment to be made upon the Effective Date.

1.58.    ***Fee Claim*** means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Confirmation Date by professional persons retained by the Debtors or the Creditors Committee pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

1.59.    ***Final DIP Order*** means the final order of the Bankruptcy Court authorizing, among other things, the Debtors to enter into and make borrowings under the DIP Facilities, and granting certain rights, protections, and liens to and for the benefit of the DIP Lenders.

1.60.    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the Clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been

6

denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; provided that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

1.61.    ***General Unsecured Claim*** means any unsecured Claim, other than an Intercompany Claim and an Unsecured Note Claim, that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, including without limitation, any General Unsecured Trade Claim and any Other General Unsecured Claim.

1.62.    ***General Unsecured Claim Distribution*** means $2,000,000, in Cash, which, in accordance with Section 4.6 below, shall be distributed on a Pro Rata basis to holders of Allowed Other General Unsecured Claims; provided that, in accordance with Section 4.6, the foregoing distribution shall only be made to a holder of an Allowed Other General Unsecured Claim if such holder's sub-class has voted to accept the Plan.  For the avoidance of doubt, the foregoing monies shall be reserved by the Debtors, or the Reorganized Debtors, as the case may be, but shall not be held in a segregated account.

1.63.    ***General Unsecured Trade Claim*** means any General Unsecured Claim against any Debtor held by a trade creditor that the Debtors will have an ongoing business relationship with after the Effective Date.

1.64.    ***Global Settlement*** means that certain settlement incorporated into the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, among the Debtors, the Consenting Noteholders, and Platinum Equity whereby (i) the Unsecured Noteholders shall receive their Pro Rata share of the Unsecured Noteholder Common Stock Distribution and the New Warrants pursuant to Sections 4.4 and 5.2 below and (ii) Platinum Equity and the Released Parties related thereto shall receive releases pursuant to Sections 5.2, 10.6 and 10.7 below.

1.65.    ***Impaired*** means, with respect to a Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.66.    ***Initial Distribution*** means the first distribution that the Disbursing Agent makes to holders of Allowed Claims.

1.67.    ***Initial Distribution Date*** means the date occurring on or as soon as reasonably practicable after the Effective Date on which the Disbursing Agent makes the Initial Distribution to holders of Allowed Claims.

1.68.    ***Intercompany Claim*** means any Claim against a Debtor held by another Debtor.

1.69.    ***Intercompany Interests*** means an Interest in a Debtor (other than Chassix Holdings or UC Holdings) held by another Debtor or an affiliate of a Debtor.

1.70.    ***Intercreditor Agreement*** means that certain intercreditor agreement, between and among the lenders under the Revolving Exit Facility and the Exit Term Loan, to be included in draft form in the Plan Supplement.

1.71.    ***Interests*** means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all common stock, preferred stock or other instruments evidencing an

7

ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interests in a Debtor that existed immediately before the Effective Date.

1.72.    ***Interim DIP Order*** means the interim order of the Bankruptcy Court authorizing, among other things, the Debtors to enter into and make borrowings under the DIP Facilities, and granting certain rights, protections and liens to and for the benefit of the DIP Lenders.

1.73.    ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.74.    ***Management Incentive Plan*** means a post-emergence management incentive plan, to be included in draft form in the Plan Supplement, which shall be in form and substance reasonably satisfactory to the Debtors and the Required Consenting Noteholders, to be implemented by the Reorganized Debtors on the Effective Date, which shall provide for grants of options and/or restricted units/equity reserved for management, directors and employees in an amount of New Common Stock representing 5-10% of the New Common Stock (subject to dilution by the exercise of the New Warrants, to the extent applicable) which shall be sufficient to properly incentivize the senior management team of the Reorganized Debtors.

1.75.    ***New Board*** means the initial board of directors of Reorganized UC Holdings.

1.76.    ***New Common Stock*** means the shares of common stock, par value $.001 per share, in Reorganized UC Holdings that shall be issued on the Effective Date.

1.77.    ***New Warrants*** mean warrants to purchase 5% of the New Common Stock, subject to dilution by the Management Incentive Plan, with a strike price equal to the Reorganized Debtors' total implied equity value being the face amount of the Secured Notes, plus accrued interest and expenses as of the Commencement Date, as more fully set forth in the New Warrant Agreement, which shall be distributed in accordance with Section 4.4 below.

1.78.    ***New Warrant Agreement*** means the warrant agreement that will govern the terms of the New Warrants, the form of which shall be included in the Plan Supplement, and which will be in form and substance reasonably acceptable to the Debtors and the Required Consenting Noteholders.

1.79.    ***OEM Customers*** means, collectively, General Motors LLC, Ford Motor Company, FCA US LLC f/k/a Chrysler Group LLC, Nissan North America, Inc., BMW Manufacturing Co., LLC and any other customer of the Debtors party to the Accommodation Agreements.

1.80.    ***Other General Unsecured Claim*** means any unsecured Claim against any Debtor (other than an Intercompany Claim or a General Unsecured Trade Claim) that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

1.81.    ***Other Priority Claim*** means any Claim against any of the Debtors other than an Administrative Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.82.    ***Other Secured Claim*** means a Secured Claim against any of the Debtors, other than an Administrative Claim, a Priority Tax Claim, a Prepetition Revolving ABL Facility Claim, or a Secured Note Claim.

8

1.83.    ***Person*** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code) or other entity.

1.84.    ***Plan*** means this joint chapter 11 plan of reorganization, including the exhibits hereto, as the same may be amended or modified from time to time in accordance with Section 12.5 herein.

1.85.    ***Plan Supplement*** means a supplemental appendix to the Plan, in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, containing, among other things, substantially final forms of the Amended Organizational Documents (to the extent such Amended Organizational Documents reflect material changes from the Debtors' existing organizational documents and bylaws), the Schedule of Assumed Contracts, the Schedule of Rejected Contracts, the Exit Term Loan, the Revolving Exit Facility, the Management Incentive Plan, the Shareholders Agreement, the New Warrant Agreement, and to the extent known, with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; provided that through the Effective Date, the Debtors shall have the right to amend documents contained in, and exhibits to, the Plan Supplement with the consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  The Plan Supplement shall be filed with the Bankruptcy Court no later than the Plan Supplement Filing Date.

1.86.    ***Plan Supplement Filing Date*** means five business days before the voting deadline established in these cases.

1.87.    ***Platinum Consent Right*** means Platinum Equity's right to consent to or approve any documents, actions, or agreements, as applicable, solely to the extent such documents, actions, or agreements alter in any material way any of the rights or benefits proposed to be granted to or received by Platinum Equity or any Released Parties related thereto, or any obligation Platinum Equity (or any Released Party related thereto) may have, pursuant to the Commencement Date Plan.

1.88.    ***Platinum Equity*** means, collectively, Platinum Equity, LLC, Platinum Equity Advisors, LLC, Platinum Dharma Principals, LLC, Platinum Equity Capital Dharma Partners-PF, L.P., Platinum Equity Capital Dharma Partners, L.P., Platinum Equity Capital Dharma Partners-A, L.P., Platinum Equity Capital Partners III, L.P., Platinum Equity Capital Partners-A III, L.P., Platinum Equity Capital Partners-B III, L.P., Platinum Equity Capital Partners-C III, L.P., Dharma Holding Corporation, Triomphe Intermediate Holding Corporation, and such entities' direct and indirect subsidiaries and affiliates except the Debtors and the Debtors' direct and indirect subsidiaries.

1.89.    ***Prepetition Credit Agreement*** means that certain Amended and Restated Loan, Security and Guaranty Agreement dated as of July 23, 2013, as amended, supplemented or otherwise modified from time to time, by and among Chassix, the other borrowers and guarantors party thereto, the Administrative Agent, the Prepetition Revolving ABL Lenders and other parties thereto.

1.90.    ***Prepetition Intercreditor Agreement*** means that certain Intercreditor Agreement, dated as of July 23, 2013, by and between BMO Harris Bank N.A., as ABL collateral agent, and U.S. Bank National Association, as notes collateral agent.

1.91.    ***Prepetition Revolving ABL Facility*** means that certain $150 million senior secured asset based revolving credit facility pursuant to the Prepetition Credit Agreement.

1.92.    ***Prepetition Revolving ABL Facility Claim*** means any Claim relating to or arising under the Prepetition Revolving ABL Facility which shall be repaid in full in Cash with proceeds from the DIP Facilities in connection with entry of the Interim DIP Order.

1.93.    ***Prepetition Revolving ABL Lenders*** means the lenders from time to time party to the Prepetition Credit Agreement.

1.94.    ***Priority Tax Claim*** means any secured or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.95.    ***Pro Rata*** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Class under the Plan.

1.96.    ***Reinstate, Reinstated or Reinstatement*** means (i) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such Claim so as to leave such Claim Unimpaired or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (a) curing any such default that occurred before or after the Commencement Date, other than a default of the kind specified in section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim as such maturity existed before such default; (c) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) not otherwise altering the legal, equitable or contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement and shall be deemed cured on the Effective Date.

1.97.    ***Released Parties*** means collectively and in each case in their capacity as such: (a) the Debtors; (b) the Creditors Committee; (c) the Administrative Agent; (d) the Collateral Agent; (e) the other Secured Parties under and as defined in the Security Agreement; (f) the DIP Lenders; (g) the DIP Agents; (h) the Consenting Secured Noteholders; (i) the Consenting Unsecured Noteholders; (j) the arrangers under each of the DIP Facilities and the Exit Facilities; (k) the administrative agents, collateral agents, and lenders under the Exit Financing; (l) the OEM Customers; (m) Platinum Equity; (n) the Prepetition Revolving ABL Lenders; and (o) with respect to each of the foregoing entities in clauses (a) through (n), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers and directors, principals, shareholders, members, partners, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

1.98.    ***Reorganized Chassix*** means Chassix, as reorganized on the Effective Date in accordance with the Plan.

1.99.    ***Reorganized Debtors*** means the Debtors, as reorganized on the Effective Date in accordance with the Plan.

1.100.   ***Reorganized UC Holdings*** means UC Holdings, as reorganized on the Effective Date in accordance with the Plan.

1.101.   ***Required Consenting Noteholders*** means the Required Consenting Secured Noteholders and the Required Consenting Unsecured Noteholders.

1.102.   ***Required Consenting Secured Noteholders*** means the Consenting Secured Noteholders holding at least 51% of the Secured Notes that are subject to the terms of the Restructuring Support Agreement.

1.103.   ***Required Consenting Unsecured Noteholders*** means the Consenting Unsecured Noteholders holding at least 51% of the Unsecured Notes that are subject to the terms of the Restructuring Support Agreement.

1.104.   ***Restructuring*** means the proposed financial restructuring the principal terms of which are set forth herein.

1.105.   ***Restructuring Expenses*** means the reasonable and documented fees and expenses incurred by each of the Administrative Agent, the Collateral Agent, the Consenting Noteholders, Platinum Equity, the DIP Agents, and the DIP Lenders  in connection with the Restructuring, including the fees and expenses of their respective legal and financial advisors (limited to one primary counsel for each of the Prepetition ABL Lender, the DIP Agents, the Consenting Noteholders, and Platinum Equity, one financial advisor for each of Platinum Equity and the Consenting Noteholders and any other professionals that may be retained by the Consenting Noteholders and are reasonably acceptable to the Debtors) without the requirement for the filing of retention applications, fee applications or any other applications in the Chapter 11 Cases, which, in each case, shall be Allowed in full and shall not be subject to any offset, defense, counterclaim, reduction or credit of any kind whatsoever.  The reimbursable fees and expenses of Platinum Equity shall not exceed $1,250,000.

1.106.   ***Restructuring Support Agreement*** means that certain Restructuring Support Agreement, dated March 11, 2015, by and among the Debtors, the Consenting Secured Noteholders, the Consenting Unsecured Noteholders and Platinum Equity (as may be amended, supplemented or modified from time to time in accordance with the terms thereof) annexed hereto as **Exhibit** "**B**."

1.107.   ***Restructuring Support Parties*** means, collectively, the Debtors, the Required Consenting Noteholders and Platinum Equity.

1.108.   ***Restructuring Transactions*** means the transactions set forth in Section 5.16 of the Plan, in the order specified therein.

1.109.   ***Revolving DIP Credit Facility*** means that certain senior secured non-amortizing asset-based revolving credit facility in an aggregate principal amount of up to $150,000,000 entered into pursuant to that certain Superpriority Secured Debtor-in-Possession ABL Loan, Security and Guaranty Agreement, by and among Chassix, the other borrowers and guarantors party thereto, the DIP ABL Agent, and the Revolving DIP Lenders.  The Revolving DIP Credit Facility includes sub-facilities for swingline loans in an amount equal to $10,000,000 and letters of credit in an amount equal to $15,000,000.

1.110.   ***Revolving DIP Lenders*** means the lenders under the Revolving DIP Credit Facility.

WEIL:\95270840\1\35076.0003

1.111.    ***Revolving Exit Facility*** means that certain senior secured asset-based revolving exit credit facility with terms and conditions to be negotiated which shall be acceptable to the Debtors and the Required Consenting Noteholders.

1.112.    ***Schedule of Assumed Contracts*** means the schedule of contracts and leases to be assumed by the applicable Debtor(s), with the reasonable consent of the Debtors and the Required Consenting Noteholders, to be filed as part of the Plan Supplement.

1.113.    ***Schedule of Rejected Contracts*** means the schedule of contracts and leases to be rejected by the applicable Debtor(s), with the reasonable consent of the Debtors and the Required Consenting Noteholders, to be filed as part of the Plan Supplement.

1.114.    ***Schedules*** means the schedules of assets and liabilities and the statements of financial affairs filed by each Debtor under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements may be supplemented or amended from time to time.

1.115.    ***Secured Claim*** means a Claim to the extent (i) secured by property of the estate, the amount of which is equal to or less than the value of such property (A) as set forth in the Plan, (B) as agreed to by the holder of such Claim and the Debtors or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

1.116.    ***Secured Note Claim*** means any Claim relating to or arising under the Secured Note Indenture.

1.117.    ***Secured Noteholder Common Stock Distribution*** means shares of New Common Stock representing 97.5% of the New Common Stock (subject to dilution by the Management Incentive Plan and, to the extent applicable, the exercise of the New Warrants) to be distributed in accordance with Section 4.3 below; underlined(provided) that if (i) the Global Settlement is not approved by a Final Order or (ii) either the Class of General Unsecured Trade Claims or the Class of Other General Unsecured Claims does not vote to accept the Plan, the Secured Noteholder Common Stock Distribution shall increase to 100% of the New Common Stock (subject to dilution by the Management Incentive Plan).

1.118.    ***Secured Noteholders*** means the holders of the Secured Notes.

1.119.    ***Secured Note Indenture*** means that certain indenture, dated July 23, 2013, as amended, supplemented or otherwise modified from time to time, among Chassix, as issuer, UC Holdings and certain of its subsidiaries as guarantors thereto, and U.S. Bank National Association, as trustee.

1.120.    ***Secured Note Indenture Trustee*** means U.S. Bank National Association, in its capacity as trustee under the Secured Note Indenture.

1.121.    ***Secured Notes*** means the 9 1/4 % senior secured notes due 2018 of Chassix issued pursuant to the Secured Note Indenture, plus accrued and unpaid interest as of the Commencement Date and any other amounts and obligations payable under the Secured Note Indenture and owed as of the Commencement Date.

1.122.    ***Security*** means any Security, as such term is defined in section 101(49) of the Bankruptcy Code.

1.123.    ***Security Agreement*** means that certain Security Agreement, dated as of July 23, 2013, by Chassix, and the guarantors thereunder, as pledgors, assignors and debtors, and U.S. Bank National Association, in its capacity as collateral agent, pledgee, assignee and secured party for the benefit of the Secured Noteholders under the Secured Note Indenture, and each other Authorized Representative (as defined in the Security Agreement) party thereto.

1.124.    ***Shareholders Agreement*** means that certain Shareholders Agreement to be included in draft form in the Plan Supplement, which shall be consistent with the requirements contained in the Plan and the Restructuring Support Agreement and otherwise be in a form and substance reasonably acceptable to the Debtors and the Required Consenting Noteholders.

1.125.    ***Subordinated Securities Claim*** means a Claim subject to subordination under section 510(b) of the Bankruptcy Code, and any Claim for or that arises from the rescission of a purchase, sale, issuance or offer of a Security of any of the Debtors, or for damages arising from the purchase of sale of such a Security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

1.126.    ***Subsidiary Reorganized Debtors*** means all of the Reorganized Debtors other than Reorganized UC Holdings (and, for the avoidance of doubt, other than Chassix Holdings).

1.127.    ***Tax Code*** means the Internal Revenue Code of 1986, as amended from time to time.

1.128.    ***Trade Claim Distribution*** means $1,000,000, in Cash, which shall be distributed on a Pro Rata basis to holders of Allowed General Unsecured Trade Claims pursuant to Section 4.5 below.  For the avoidance of doubt, the foregoing monies shall be reserved by the Debtors, or the Reorganized Debtors, as the case may be, but shall not be held in a segregated account.

1.129.    ***UC Holdings*** means UC Holdings, Inc.

1.130.    ***Unimpaired*** means, with respect to a Claim, Interest or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.131.    ***Unsecured Note Claim*** means any General Unsecured Claim, derived from, based upon, relating to or arising from the Unsecured Note Indenture.

1.132.    ***Unsecured Noteholder Common Stock Distribution*** means shares of New Common Stock representing 2.5% of the New Common Stock (subject to dilution by the Management Incentive Plan and, to the extent applicable, the exercise of the New Warrants) to be distributed in accordance with, and subject to the conditions set forth in, Section 4.4 below.

1.133.    ***Unsecured Noteholders*** means the holders of the Unsecured Notes.

1.134.    ***Unsecured Note Indenture*** means that certain indenture, dated December 13, 2013, as amended, supplemented or otherwise modified from time to time, between Chassix Holdings, as issuer, and Delaware Trust Company, as successor trustee.

1.135.    ***Unsecured Note Indenture Trustee*** means Delaware Trust Company, in its capacity as trustee under the Unsecured Note Indenture.

WEIL:\95270840\1\35076.0003

1.136.  **Unsecured Notes** means the 10% / 10 3/4% senior unsecured PIK toggle notes due 2018 of Chassix Holdings issued pursuant to the Unsecured Note Indenture.

1.137.  **Voting Record Date** means 5:00 p.m. Eastern Time on the first day of the hearing to approve the Disclosure Statement.

**B.      Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained therein.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

**C.      Reference to Monetary Figures**

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

**D.      Controlling Document**

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document).  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; provided that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

**SECTION 2.      ADMINISTRATIVE AND PRIORITY CLAIMS.**

2.1.  **Administrative Claims**.

Except to the extent that a holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors agree to different treatment, the Debtors (or the Reorganized Debtors, as the case may be) shall pay to each holder of an Allowed Administrative Claim Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Claim becomes an Allowed Claim; provided that Allowed Administrative Claims representing liabilities

14

incurred in the ordinary course of business by the Debtors, as Debtors In Possession, or liabilities arising under loans or advances to or other obligations incurred by the Debtors, as Debtors In Possession, whether or not incurred in the ordinary course of business, shall be paid by the Debtors or the Reorganized Debtors, as the case may be, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

### 2.2. *Fee Claims.*

All entities seeking an award by the Bankruptcy Court of Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred not later than the date that is forty-five (45) days after the Effective Date, (b) shall be paid in full, in Cash, the Allowed Amount of their respective Allowed Fee Claims (i) upon the later of (A) the Effective Date and (B) the date on which the order Allowing such Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or, on and after the Effective Date, the Reorganized Debtors.  The Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval, including those of the Creditors Committee to the extent the Creditors Committee is still in existence.

### 2.3. *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or (b) equal annual Cash payments (commencing on the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course) in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years after the Commencement Date; provided that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option.

### 2.4. *DIP Claims.*

On the Effective Date, the Revolving DIP Facility will either be converted into the Revolving Exit Facility or paid in full, in Cash, using the proceeds of the Revolving Exit Facility.

On the Effective Date, the DIP Term Loan will either be converted into the Exit Term Loan or paid in full, in Cash, using the proceeds of the Exit Term Loan.

### 2.5. *Prepetition Revolving ABL Facility Claims.*

All obligations and claims in respect of or arising under the Prepetition ABL Credit Agreement, including the cash collateralization and letters of credit outstanding thereunder as of the Effective Date, shall be paid in full, in Cash, by the Debtors using the proceeds of the Revolving DIP Credit Facility and the DIP Term Facility on the date the Interim DIP Order is entered by the Bankruptcy Court.

15

## SECTION 3.    CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1.    *Summary of Classification*

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Fee Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Section 3.  The classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes; such Classes shall be treated as set forth in Section 3.3.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 3 | Secured Note Claims | Impaired | Yes |
| 4 | Unsecured Note Claims | Impaired | Yes |
| 5 | General Unsecured Trade Claims | Impaired | Yes |
| 6 | Other General Unsecured Claims | Impaired | Yes |
| 7 | Intercompany Claims | Unimpaired | No (presumed to accept) |
| 8 | Intercompany Interests | Unimpaired | No (presumed to accept) |
| 9 | Subordinated Securities Claims | Impaired | No (deemed to reject) |
| 10 | Existing Chassix Holdings Equity Interests | Impaired | No (deemed to reject) |

### 3.2.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Reorganized Debtors in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.3.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

16

**SECTION 4.    TREATMENT OF CLAIMS AND INTERESTS.**

      4.1.    ***Other Priority Claims (Class 1).***

          (a)    *Classification*: Class 1 consists of Allowed Other Priority Claims.

          (b)    *Treatment*:  Except to the extent that a holder of an Allowed Other Priority Claim has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Claim, in each case, or as soon as reasonably practical thereafter.

          (c)    *Voting*:  Class 1 is Unimpaired, and the holders of Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

      4.2.    ***Other Secured Claims (Class 2).***

          (a)    *Classification*: Class 2 consists of Allowed Other Secured Claims.  To the extent that Allowed Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

          (b)    *Treatment*:  Except to the extent that a holder of an Allowed Other Secured Claim has agreed to less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim shall receive (i) payment in full in Cash on the Effective Date or as soon thereafter as practicable, (ii) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment as is necessary to satisfy section 1129 of the Bankruptcy Code.

          (c)    *Voting*:  Class 2 is Unimpaired, and the holders of Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

      4.3.    ***Secured Note Claims (Class 3)***

          (a)    *Classification*: Class 3 consists of Allowed Secured Note Claims.

          (b)    *Allowance*:  The Allowed Secured Note Claims are Allowed in the amount of $396,192,637.24 (including accrued and unpaid interest as of the Commencement Date), plus any other amounts and obligations payable under the Secured Note Indenture as of the Commencement Date,  and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

          (c)    *Treatment*:  Pursuant to the Global Settlement set forth in Section 5.2, and subject to, and in accordance with, Section 5.16 below, on the Effective Date, each holder of an Allowed Secured Note Claim shall be entitled to receive, in full and final satisfaction of such Allowed Secured Note Claim, its Pro Rata share of the Secured Noteholder Common Stock Distribution; <u>provided</u> that if (i) the Global Settlement is not approved by a Final Order or (ii) either the Class of General Unsecured Trade Claims or the Class of Other General Unsecured Claims does not vote to accept the

17

Plan, the Secured Noteholder Common Stock Distribution shall increase to 100% of the New Common Stock (subject to dilution by the Management Incentive Plan).

(d)    *Voting*:  Class 3 is Impaired, and holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

4.4.    ***Unsecured Note Claims (Class 4).***

(a)    *Classification*:  Class 4 consists of Allowed Unsecured Note Claims.

(b)    *Allowance*:  The Allowed Unsecured Note Claims are Allowed in the amount of $161,097,076.61, plus accrued but unpaid interest through the Commencement Date and any other amounts and obligations payable under the Unsecured Note Indenture as of the Commencement Date,  and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

(c)    *Treatment*:  Pursuant to the Global Settlement set forth in Section 5.2 and subject to, and in accordance with, Section 5.16 below, on the Effective Date, each holder of an Allowed Unsecured Note Claim shall be entitled to receive, in full and final satisfaction of such Allowed Unsecured Note Claim, its Pro Rata share of the Unsecured Noteholder Common Stock Distribution and the New Warrants; <u>provided</u> that holders of Allowed Unsecured Note Claims shall receive the foregoing Pro Rata distributions if the Global Settlement is approved or the following conditions occur:

(i)    the holders of Allowed Class 4 Unsecured Note Claims vote to accept the Plan; and

(ii)    each sub-class of Class 5 General Unsecured Trade Claims and Class 6 Other General Unsecured Claims votes to accept the Plan.

In the event the Bankruptcy Court determines that the Global Settlement cannot be approved and each of the foregoing conditions has not been satisfied, holders of Allowed Unsecured Note Claims shall not receive or retain any property under the Plan.

(d)    *Voting*:  Class 4 is Impaired, and holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

4.5.    ***General Unsecured Trade Claims (Class 5).***

(a)    *Classification*:  Class 5 consists of Allowed General Unsecured Trade Claims.

(b)    *Treatment*:  Except to the extent a holder of an Allowed General Unsecured Trade Claim has agreed to less favorable treatment or has been paid prior to the Effective Date, including pursuant to any Final Order, each holder of an Allowed General Unsecured Trade Claim shall receive its Pro Rata share of the Trade Claim Distribution, in Cash, in full and final satisfaction of such holder's Allowed General Unsecured Trade Claim on the following distribution schedule: (i) ten percent (10%) payable on the Effective Date or as soon as practicable thereafter; (ii) forty-five percent (45%) payable one year after the Effective Date; and (iii) forty-five percent (45%) payable two years after the Effective Date; <u>provided</u> that any holder of an Allowed General Unsecured Trade Claim that enters

18

into an agreement with the Debtors (or the Reorganized Debtors, as applicable) to extend Customary Trade Terms shall receive its Pro Rata share of the Trade Claim Distribution and, in addition, its Pro Rata share of the Additional Trade Claim Distribution on the same schedule set forth above in this Section 4.5(b).

(c)    *Voting*:  Class 5 is Impaired, and holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

4.6.    ***Other General Unsecured Claims (Class 6).***

(a)    *Classification*:  Class 6 consists of Allowed Other General Unsecured Claims.

(b)    *Treatment*:  Except to the extent a holder of an Allowed Other General Unsecured Claim has agreed to less favorable treatment, on the Effective Date or as soon thereafter as is reasonably practicable, each holder of an Allowed Other General Unsecured Claim shall receive the following treatment:

(i)    for any sub-class of Other General Unsecured Claims that votes to accept the Plan of any individual Debtor, each holder of an Allowed Other General Unsecured Claim in such accepting sub-class shall receive its Pro Rata share of the General Unsecured Claim Distribution; and

(ii)    in the event any sub-class of Other General Unsecured Claims votes to reject the Plan with respect to any individual Debtor, the holders of Allowed Other General Unsecured Claims in such a rejecting sub-class shall not receive or retain any property under the Plan on account of such Claims, including, for the avoidance of doubt, any Pro Rata share of the General Unsecured Claim Distribution.  For the avoidance of doubt, to the extent any sub-class of Other General Unsecured Claims votes to reject the Plan and, therefore, is not entitled to receive any portion of the General Unsecured Claim Distribution, such Pro Rata portion attributable to the rejecting sub-class shall be reallocated to the holders of Other General Unsecured Claims in other sub-classes that have voted to accept the Plan.

(c)    *Voting*:  Class 6 is Impaired, and holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

4.7.    ***Intercompany Claims (Class 7).***

(a)    *Classification*:  Class 7 consists of Allowed Intercompany Claims.

(b)    *Treatment*:  On the Effective Date or as soon thereafter as is practicable, the Intercompany Claims may be extinguished or compromised by distribution, contribution or otherwise, or Reinstated, at the discretion of the Debtors or the Reorganized Debtors, as the case may be, on or after the Effective Date; <u>provided</u> that all Intercompany Claims held by Chassix against Diversified Machine, Inc. (whether or not represented by a note) shall be contributed by Chassix to the capital of Diversified Machine, Inc. in accordance with Section 5.16 of the Plan.

19

(c)     *Voting*:  Class 7 is Unimpaired, and the holders of Class 7 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

### 4.8.    *Intercompany Interests (Class 8).*

(a)     *Classification*:  Class 8 consists of Intercompany Interests.

(b)     *Treatment*:  The Intercompany Interests will be Unimpaired under the Plan.

(c)     *Voting*:  Class 8 is Unimpaired, and the holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

### 4.9.    *Subordinated Securities Claims (Class 9).*

(a)     *Classification*:  Class 9 consists of Subordinated Securities Claims.

(b)     *Treatment*:  The holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Claims.

(c)     *Voting*:  Class 9 is Impaired by the Plan, and the holders of the Subordinated Securities Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.   Therefore, the holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Plan.

### 4.10.    *Existing Chassix Holdings Equity Interests (Class 10)*

(a)     *Classification*: Class 10 consists of Existing Chassix Holdings Equity Interests.

(b)     *Treatment*:  On the Effective Date, all Existing Chassix Holdings Equity Interests, including all equity, warrants, common stock, and preferred stock, shall be cancelled.

(c)     Class 10 is Impaired by the Plan, and the holder of Existing Chassix Holdings Equity Interests is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the holder of Existing Chassix Holdings Equity Interests is not entitled to vote to accept or reject the Plan.

## SECTION 5.   MEANS FOR IMPLEMENTATION.

### 5.1.    *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, Causes of Action, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made on account of such Allowed Claim.   The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, Causes of Action, and controversies, including without limitation, approval of the Restructuring Support Agreement, the Global Settlement, and the

WEIL:\95270840\1\35076.0003

Accommodation Agreements, as well as a finding by the Bankruptcy Court that such compromise or settlement is within the range of reasonableness, in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair and equitable.  In accordance with the provisions of the Plan, pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, prior to the Effective Date, the Debtors, subject to the reasonable consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, and after the Effective Date, the Reorganized Debtors, may compromise and settle Claims against the Debtors or the Reorganized Debtors, as applicable.

>       5.2.    ***Global Settlement***

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the substantial contribution and value provided by the Consenting Unsecured Noteholders and Platinum Equity, the Plan incorporates a compromise and settlement of numerous Debtor-creditor and inter-creditor issues, in the form of the Global Settlement, designed to achieve an economic settlement of such issues and potential Claims and Causes of Action against the Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the following compromises or settlements that comprise the Global Settlement, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are within the range of reasonableness, in the best interests of the Debtors, their Estates, their creditors, and other parties-in-interests, and are fair and equitable.  Each provision of the Global Settlement shall be deemed non-severable from each other and from the remaining terms of the Plan.  As set forth in detail herein, the Global Settlement shall be implemented as follows:

(a)     *Platinum Equity.*     On the Effective Date, in full and complete compromise and settlement of any claim that Platinum Equity may assert against the Debtors, the Reorganized Debtors or the Consenting Noteholders, and in consideration of the substantial contribution provided by Platinum Equity to the Debtors' Chapter 11 Cases in the form of, among other things, Platinum Equity's management, consulting and advisory services leading up to and during the Chapter 11 Cases, its agreement to take, or not take, certain actions that could impact the tax attributes of the Reorganized Debtors, its assistance in securing favorable pricing and accommodation terms and conditions for the Debtors in connection with the Chapter 11 Cases, and its participation in prepetition negotiations that facilitated a speedy and consensual Restructuring for the Debtors, Platinum Equity and all Released Parties related thereto shall receive a release pursuant to Sections 10.6 and 10.7 below pursuant to the Global Settlement.

(b)     *Consenting Unsecured Noteholders*.  On the Effective Date, in full and complete compromise and settlement of any claim that the Consenting Unsecured Noteholders may hold against the Debtors, the Reorganized Debtors, Platinum Equity and any Released Parties related thereto, or the Consenting Secured Noteholders, and in consideration of the substantial contribution provided by the Consenting Unsecured Noteholders to the Debtors' Chapter 11 Cases in the form of, among other things, the Consenting Unsecured Noteholders' cooperation in the Debtors' restructuring efforts, the Consenting Unsecured Noteholders' assistance and contribution in prepetition negotiations with the OEM Customers, the contribution by certain of the Consenting Unsecured Noteholders, as DIP Lenders, in the form of the DIP Term Loan, and generally their participation in prepetition negotiations that facilitated a speedy and consensual restructuring for the Debtors, each holder of an Allowed Unsecured Note Claim shall receive its Pro Rata distribution of the Unsecured Noteholder Common Stock Distribution and New Warrants pursuant to the Global Settlement.

5.3.    ***Actions of Dharma Holding Corporation and Triomphe Intermediate Holding Corporation***

On and after the Effective Date, Platinum Equity agrees to (A) waive or cause to be waived any stock loss in respect of the stock of UC Holdings and Chassix Holdings pursuant to Treasury regulation § 1.1502-36, and any comparable provision of state or local income tax law, to the extent directed by the Reorganized Debtors, (B) not take, or cause to be taken, any other action that would reduce, limit or otherwise adversely affect the U.S. federal income tax attributes of the Reorganized Debtors, except as consistent with past practice, general cash management, or short term prudent investment, and (C) cooperate with the Reorganized Debtors in connection with any group tax return filings, audits and proceedings with respect to taxable years ending on or prior to, or including, the Effective Date (including jointly managing such filings and proceedings, and not compromising any audit or proceeding without the Reorganized Debtors' consent, such consent not to be unreasonably withheld), provided that reasonable expenses incurred by Platinum Equity at the request of the Reorganized Debtors in connection with this clause (C) shall be borne by the Reorganized Debtors.

5.4.    ***Cancellation of Existing Securities and Agreements.***

Except as expressly provided herein, on the Effective Date, all notes, instruments, certificates evidencing debt of or interests in, the Debtors, including, without limitation, all obligations related to or arising out of the DIP Facilities, the Secured Notes Indenture, the Prepetition Revolving ABL Facility, and the Unsecured Note Indenture shall be cancelled and obligations of the Debtors and the Reorganized Debtors thereunder shall be discharged.

Notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date, the Secured Note Indenture and the Unsecured Note Indenture shall continue in effect solely for purposes of:  (a) enabling holders of Allowed Class 3 Secured Note Claims and Allowed Class 4 Unsecured Note Claims to receive distributions under the Plan; and (b) allowing the Secured Note Indenture Trustee and Unsecured Note Indenture Trustee to make distributions under the Plan; provided that nothing in this section shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order or the Plan or result in any liability or expense to the Reorganized Debtors.

5.5.    ***Corporate Structure.***

On the Effective Date, except as set forth in Section 5.16 below, all Interests, including all equity, common stock, warrants, and preferred stock, in Chassix Holdings shall be cancelled and extinguished and Chassix Holdings shall be dissolved in accordance with Section 5.17 of the Plan.  The equity in the Subsidiary Reorganized Debtors shall be restored.

5.6.    ***Authorization and Issuance of Plan Securities.***

(a)    *Authorization.*  The Debtors, the Reorganized Debtors, and Reorganized UC Holdings, as applicable, are authorized to issue all plan-related securities and documents, including, without limitation, the New Common Stock and, to the extent applicable, the New Warrants, and any options or entitlements to purchase such plan-related securities, without the need for any further corporate, partnership, or limited liability company action.

(b)    *New Common Stock.*  On the Effective Date, subject to securities, tax and other relevant considerations and Section 5.16, the New Common Stock shall be distributed in accordance with the Plan.

(c)      *New Warrants*.  On the Effective Date, and subject to the satisfaction of the conditions set forth in Section 4.4(c), the New Warrants will be issued pursuant to the terms of the New Warrant Agreement.

(d)      *Shareholders Agreement*.  Any direct or beneficial recipient of the New Common Stock (including New Common Stock issued pursuant to the exercise of New Warrants, if applicable), including all parties to whom such recipients may sell their New Common Stock in the future and all persons who purchase or acquire such equity in future transactions, shall be party to, or shall be deemed to be bound by, the Shareholders Agreement, the terms of which shall govern Reorganized UC Holdings.

### 5.7.    **Section 1145 Exemption.**

The issuance and distribution under the Plan of the New Common Stock and the New Warrants, if applicable, shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code or, to the extent the exemption under section 1145(a) of the Bankruptcy Code is not available to any particular recipient, under Section 4(a)(2) and/or Regulation D of the Securities Act of 1933 and/or any other applicable exemptions without further act or action by any Person.

In addition, under section 1145 of the Bankruptcy Code, any Securities issued under the Plan which are exempt from such registration pursuant to section 1145(a) of the Bankruptcy Code will be freely tradable by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (2) compliance with any rules and regulations of the Securities and Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (3) the restrictions, if any, on the transferability of such Securities and instruments; and (4) applicable regulatory approval.

### 5.8.    **Exit Financing.**

(a)      *Exit Facilities*.  On the Effective Date, the Revolving DIP Facility will be paid in full, in Cash, with the proceeds of, the Revolving Exit Facility with terms and conditions to be negotiated that shall be acceptable to the Debtors and the Required Consenting Noteholders.  On the Effective Date, the DIP Term Loan will be converted into, or paid in full, in Cash, with proceeds of, the Exit Term Loan.

(b)      *Documentation*.  On the Effective Date, documentation evidencing the Revolving Exit Facility and the Exit Term Loan shall be executed and delivered, and the Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Revolving Exit Facility and the Exit Term Loan without the need for any further corporate action or any notice to or order of the Bankruptcy Court and without further action by the holders of Claims or Interests or any other Person.

(c)      *Liens/Security Interests*.    All Liens and security interests granted pursuant to the Exit Facilities are intended to be, and shall be (i) valid, binding, perfected, enforceable, Liens, and security interests in the personal and real property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law and (ii) not subject to avoidance, recharacterization, or subordination under any applicable law.

WEIL:\95270840\1\35076.0003

5.9.    ***Intercreditor Agreement.***

Lien priority and enforcement rights with respect to collateral between and among the lenders under the Revolving Exit Facility and the Exit Term Loan, shall be governed by the Intercreditor Agreement on terms to be negotiated.

5.10.    ***Reorganized Debtors.***

(a)    *Amended Organizational Documents.*  The Amended Organizational Documents shall comply with section 1123(a)(6) of the Bankruptcy Code and shall otherwise be in form and substance satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  The Amended Organizational Documents shall provide, among other things, that Reorganized UC Holdings, and each of the Subsidiary Reorganized Debtors are privately held companies.

(b)    *Board of Directors of Reorganized UC Holdings.*  As of the Effective Date, the term of the current members of the board of UC Holdings shall expire without further action by any person.  The initial directors of the New Board shall consist of five (5) members selected by the Consenting Noteholders and may include at least one member of the Debtors' executive management team.  The members of the New Board will be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.

(c)    *Directors and Officers of the Reorganized Debtors.*  Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date shall serve as the initial officers of each of the respective Reorganized Debtors on or after the Effective Date and in accordance with any employment agreement with the Reorganized Debtors and applicable non-bankruptcy law.  After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.  The members of the board of directors and the board of managing members for each of the Reorganized Debtors (other than Reorganized UC Holdings as provided above) shall be determined as set forth in the Amended Organizational Documents and disclosed as required pursuant to section 1129(a)(5) of the Bankruptcy Code.

(d)    *Capital Structure.*  From and after the Effective Date, subject to the rights of the stockholders to amend the Amended Organizational Documents, including the Certificate of Incorporation of Reorganized UC Holdings, each of the Reorganized Debtors shall have one class of issued and outstanding common stock.

5.11.    ***Bristol Facility***

The Reorganized Debtors shall, on the Effective Date, continue to own and operate the Bristol Facility and shall, without any further notice to or action, order, or approval of the Bankruptcy Court, be authorized to implement any necessary restructuring transactions in connection therewith, <u>provided</u> that the Debtors or the Reorganized Debtors, as the case may be, are authorized, with the consent of the Required Consenting Noteholders, to enter into a transaction pursuant to which the Debtors or the Reorganized Debtors sell the Bristol Facility as long as such a sale transaction does not adversely affect the treatment of any creditor or equity stakeholder under the Plan and is sold for aggregate consideration acceptable to the Debtors and the Required Consenting Noteholders.  Any sale of the Bristol Facility shall be made pursuant to section 1123(a)(5)(D) of the Bankruptcy Code and shall be subject to higher and better offers pursuant to bidding procedures approved by the Bankruptcy Court;

24

<u>provided</u> that the sale of the Bristol Facility shall not be a condition precedent to the Effective Date and such sale may not be consummated any earlier than the Effective Date.

5.12.    ***Cancellation of Liens***.

Except as otherwise specifically provided herein, upon the occurrence of the Effective Date, any Lien securing any Secured Claim shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

5.13.    ***Management Employment Matters.***

On the Effective Date, the applicable Reorganized Debtors shall enter into new employment agreements with certain members of the management team and shall implement the Management Incentive Plan which shall provide for the issuance of New Common Stock, in options or restricted units/equity, to management, directors, and employees of the Reorganized Debtors to incentivize their senior management teams.

5.14.    ***Withholding and Reporting Requirements.***

(a)    *Withholding Rights*.    In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case that a distribution of New Common Stock, New Warrants, or other non-Cash property is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms*.    Any party entitled to receive any property (including Cash) as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Reorganized Debtors (which entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or Form W-8, as applicable, unless such Person is exempt under the Tax Code and so notifies the Disbursing Agent.  If such request is made by the Reorganized Debtors, the Disbursing Agent, or such other Person designated by the Reorganized Debtors and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

WEIL:\95270840\1\35076.0003

5.15.    ***Exemption From Certain Transfer Taxes.***

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with this Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under this Plan or the reinvesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in this Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of collateral under the Exit Facilities and (e) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

5.16.    ***Restructuring Transactions; Further Transactions.***

On or prior to the Effective Date, the following Restructuring Transactions shall be effectuated in the following order:

(a)    All Intercompany Claims held by Chassix against Diversified Machine, Inc. (whether or not represented by a note) shall be contributed by Chassix to the capital of Diversified Machine, Inc.;

(b)    The Amended Organizational Documents of the Reorganized Debtors shall become effective;

(c)    New Common Stock shall be issued and contributed by Reorganized UC Holdings to Reorganized Chassix in an amount of shares sufficient to satisfy the Secured Noteholder Common Stock Distribution under Section 4.3 of the Plan;

(d)    The Existing UC Holdings Equity Interests held by Chassix Holdings shall be recapitalized into an amount of shares of New Common Stock and New Warrants, if applicable, sufficient to satisfy the Unsecured Noteholder Common Stock Distribution under Section 4.4;

(e)    Concurrently, (i) Chassix Holdings shall transfer to the Unsecured Noteholders, in accordance with Sections 4.4 and 5.2 of the Plan, shares of New Common Stock sufficient to satisfy the Unsecured Noteholder Common Stock Distribution and New Warrants, if applicable, and (ii) Reorganized Chassix shall distribute to the Secured Noteholders in satisfaction and discharge of their Allowed Secured Note Claims, such New Common Stock in accordance with Section 4.3 of the Plan; and

(f)    All Interests in Chassix Holdings shall be cancelled and extinguished in accordance with Section 5.4 and Chassix Holdings shall be dissolved in accordance with Section 5.17 below.

WEIL:\95270840\1\35076.0003

On the Effective Date or as soon as practicable thereafter, the Reorganized Debtors may (i) cause any or all of the Subsidiary Reorganized Debtors to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, (iii) use the proceeds of the Exit Term Loan and Revolving Exit Facility, plus Cash on hand, to pay all Restructuring Expenses, (iv) change the name of one or more of the Reorganized Debtors to such name that may be determined in accordance with applicable law, and (v) engage in any other transaction in furtherance of the Plan, including for tax efficiency reasons; <u>provided</u> that such transactions are not inconsistent with the above Restructuring Transactions or the other terms of the Plan.   Subject to the prior written consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, any such transactions may be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders, members, general or limited partners, or directors of any of the Debtors or the Debtors in Possession.

### 5.17.    *Dissolution of Chassix Holdings.*

On the Effective Date, upon the consummation of the Restructuring Transactions and all other Effective Date distributions and transactions in furtherance of the Plan, Chassix Holdings shall file with the Office of the Secretary of State of Delaware a certificate of dissolution which may be executed by an officer of Chassix Holdings without the necessity of the approval of the board of directors of Chassix Holdings or the holders of Interests in Chassix Holdings, and upon such filing shall be deemed dissolved for all purposes and without the necessity of any other action by Chassix Holdings.  From and after the Effective Date, Chassix Holdings shall not be required to file any documents, or take any other action or receive any approval to withdraw business operations in any state in which Chassix Holdings previously conducted its business operations.  To the extent that any of the foregoing is inconsistent or in conflict with any preexisting organizational or related documents of Chassix Holdings, such documents are deemed amended by the Plan to permit and authorize Chassix Holdings to take the contemplated actions.

### 5.18.    *Effectuating Documents.*

On and after the Effective Date, the Reorganized Debtors and the managers, officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### 5.19.    *Closing of the Chapter 11 Cases.*

After an Estate has been fully administered, the Reorganized Debtors shall promptly seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

## SECTION 6.    DISTRIBUTIONS.

### 6.1.    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the Claims register shall be closed and there shall be no further changes in the record holders of any Claims or Interests.  The Debtors

or the Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.  Other than Claims that are expressly permitted by a Final Order or under the Plan to be filed after the Distribution Record Date, the Debtors or the Reorganized Debtors, as applicable, shall have no obligation to recognize any Claims filed from and after the Distribution Record Date.

### 6.2.    *Date of Distributions*.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 6.3.    *Timing of Distributions*.

Except as otherwise provided herein, the Disbursing Agent shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date.  Thereafter, the Disbursing Agent shall from time to time determine the subsequent Distribution Dates, which shall occur no less frequently than semi-annually.

### 6.4.    *Disbursing Agent*.

All distributions hereunder shall be made by Reorganized Chassix (or such other entity designated by Reorganized Chassix), as Disbursing Agent[s], on or after the Effective Date or as otherwise provided herein; provided that the Secured Note Indenture Trustee shall, subject to an acceptable agreements with the Debtors or Reorganized Chassix, serve as Disbursing Agent for Allowed Class 3 Secured Note Claims and the Unsecured Note Indenture Trustee shall serve as Disbursing Agent for Allowed Class 4 Unsecured Note Claims.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable fees and expenses incurred by such Disbursing Agents shall be reimbursed by the Reorganized Debtors.

### 6.5.    *Powers of Disbursing Agent*.

A Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (b) make all distributions contemplated hereby and (c) exercise such other powers as may be vested in a Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by such Disbursing Agent to be necessary and proper to implement the provisions hereof.

### 6.6.    *Delivery of Distributions*.

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders of Allowed Claims.  In the event that any distribution to any holder is returned as undeliverable, no further distributions shall be made to such holder unless and until such Disbursing Agent is notified in writing of such holder's then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter.  Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts back to the Debtors or Reorganized Debtors, as applicable, and shall not be supplemented with any interest, dividends or other accruals of any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy

Code at the expiration of 180 days from the date of distribution.  After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

### 6.7.    *Manner of Payment Under Plan.*

At the option of the Debtors or the Reorganized Debtors, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

### 6.8.    *Fractional Stock.*

If any distributions of New Common Stock or New Warrants pursuant to the Plan would result in the issuance of a fractional share of New Common Stock or New Warrants, then the number of shares of New Common Stock or New Warrants to be issued in respect of such distribution shall be calculated to one decimal place and rounded up or down to the closest whole share (with a half share rounded up).  The total number of shares of New Common Stock or New Warrants to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in this paragraph.

### 6.9.    *Minimum Cash Distributions.*

The Disbursing Agent shall not be required to make any Initial Distribution or semi-annual distribution of Cash less than $50 to any holder of an Allowed General Unsecured Claim; provided that, if any distribution is not made pursuant to this Section 6.9, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.  The Disbursing Agent shall not be required to make any final distributions of Cash less than $25 to any holder of an Allowed Claim.  If either (a) all Allowed General Unsecured Claims (other than those whose distributions are deemed undeliverable hereunder) have been paid in full or (b) the amount of any final distributions to holders of Allowed General Unsecured Claims would be $25 or less and the aggregate amount of cash available for distributions to holders of Allowed General Unsecured Claims is less than $25,000, then no further distribution shall be made by the Disbursing Agent and any surplus Cash shall be donated and distributed to an I.R.C. § 501(c)(3) tax-exempt organization selected by the Disbursing Agent.

### 6.10.    *Setoffs.*

The Debtors and the Reorganized Debtors may, but shall not be required to, set off against any Claim, any claims of any nature whatsoever that the applicable Debtor or Reorganized Debtor may have against the holder of such Claim; *provided, that* neither the failure to do so nor the allowance of any Claim shall constitute a waiver or release by the applicable Debtor or Reorganized Debtor.

### 6.11.    *Distributions After Effective Date.*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.12.    *Allocation of Distributions Between Principal and Interest.*

Except as otherwise provided in this Plan, to the extent that any Allowed Secured Note Claim, Allowed Unsecured Note Claim, Allowed General Unsecured Trade Claim or Allowed Other

29

General Unsecured Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

**SECTION 7.     PROCEDURES FOR DISPUTED CLAIMS.**

> 7.1.     ***Allowance of Claims.***

After the Effective Date, the Reorganized Debtors shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under this Plan.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

> 7.2.     ***Objections to Claims.***

As of the Effective Date, objections to, and requests for estimation of, Claims against the Debtors may be interposed and prosecuted only by the Reorganized Debtors.  Such objections and requests for estimation shall be served and filed (a) on or before the 180th day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended, or (b) such later date as ordered by the Bankruptcy Court.

> 7.3.     ***Estimation of Claims.***

The Debtors or Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtors, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

> 7.4.     ***No Distributions Pending Allowance.***

If an objection to a Claim is filed as set forth in Section 7.2, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.  Cash in the amount of such Disputed Claims shall be reserved by the Debtors but shall not be held in a segregated account.

WEIL:\95270840\1\35076.0003

7.5.    ***Distributions After Allowance.***

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan on the next Distribution Date after the date that such Disputed Claim becomes an Allowed Claim (whether by Final Order of the Bankruptcy Court or otherwise). Holders of Disputed Claims that ultimately become Allowed Claims shall not be entitled to payment of interest unless otherwise provided herein, in a Final Order, or required under applicable bankruptcy law.

7.6.    ***Resolution of Claims.***

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.

7.7.    ***Disallowed Claims.***

All Claims held by persons or entities against whom or which any of the Debtors or Reorganized Debtors has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code shall be deemed "disallowed" claims pursuant to section 502(d) of the Bankruptcy Code and holders of such claims shall not be entitled to vote to accept or reject the Plan. Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtors or the Reorganized Debtors from such party have been paid.

## SECTION 8.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

8.1.    ***General Treatment.***

Effective as of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties are hereby assumed, except for an executory contract or unexpired lease that (a) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (b) is specifically designated as a contract or unexpired lease to be rejected on the Schedule of Rejected Contracts or is otherwise expressly rejected pursuant to the Plan, (c) is the subject of a separate (i) assumption motion filed by the Debtors (with the reasonable consent of the Required Consenting Noteholders) or (ii) rejection motion filed by the Debtors (with the reasonable consent of the Required Consenting Noteholders) under section 365 of the Bankruptcy Code prior to the Confirmation Date, or (e) is the subject of a pending objection regarding assumption, Cure, or "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code or other issues related to assumption of the contract or lease) (each such objection, a "***Cure Dispute***").

8.2.    ***Determination of Cure Disputes and Deemed Consent.***

The Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts and shall serve, within 14 days of the commencement of the Confirmation Hearing, a notice on parties to executory contracts or unexpired leases to be assumed reflecting the Debtors' intention to assume the contract or lease in connection with this Plan and, where applicable, setting forth the proposed cure amount (if any). The proposed cure amount for any executory contract or unexpired lease not listed on the schedule shall be $0. Any such schedule of executory contracts to be assumed and the proposed cure amounts contained therein shall be reasonably acceptable to the Required Consenting Noteholders.

31

To the extent that a Cure Dispute is asserted in an objection filed within fifteen (15) days of service of notice of intent to assume, and properly served on the Debtors, such Cure Dispute shall be scheduled for a hearing by the Bankruptcy Court.  Following resolution of a Cure Dispute by Final Order of the Bankruptcy Court, the applicable contract or lease shall be deemed assumed effective as of the Effective Date, provided that the Debtors reserve the right to reject any contract or lease following entry of a Final Order of the Bankruptcy Court resolving the applicable Cure Dispute by filing a notice indicating such rejection within three (3) Business Days of the entry of such Final Order.

To the extent that an objection is not timely filed and properly served on the Debtors with respect to a Cure Dispute, then the counterparty to the applicable contract or lease shall be deemed to have assented to (a) the Cure amount proposed by the Debtors and (b) the assumption of such contract or lease, notwithstanding any provision thereof that (i) prohibits, restricts or conditions the transfer or assignment of such contract or lease, or (ii) terminates or permits the termination of a contract as a result of any direct or indirect transfer or assignment of the rights of the Debtor under such contract or a change in the ownership or control as contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminated or modifying such contract on account of transactions contemplated by the Plan.

### 8.3.    *Payments Related to Assumption of Contracts and Leases.*

Subject to resolution of any Cure Dispute, any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as the case may be, upon assumption thereof.

Assumption and assignment of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption and/or assignment.  Any proofs of claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other entity.

### 8.4.    *Rejection.*

In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective estates, properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors no later than thirty (30) days after the later of (1) the Confirmation Date or (2) the effective date of the rejection of such executory contract or unexpired lease.  Any such Claims, to the extent Allowed, shall be classified as Class 6 Other General Unsecured Claims.  The Confirmation Order shall constitute the Bankruptcy Court's approval of the rejection of all the leases and contracts identified in the schedule of rejected contracts.

### 8.5.    *Survival of the Debtors' Indemnification Obligations.*

Any obligations of the Debtors pursuant to their corporate charters, bylaws, organizational documents or otherwise (including, without limitation, any applicable indemnification

32

agreements) to indemnify current officers, directors, agents and/or employees with respect to all present and future actions or omissions, suits and proceedings against the Debtors or such directors, officers, agents and/or employees, based upon any act or omission occurring at or prior to the Effective Date for or on behalf of the Debtors shall not be discharged or impaired by confirmation of the Plan or the occurrence of the Effective Date, provided that, for the avoidance of doubt, the Reorganized Debtors shall indemnify officers and directors of the Debtors for any claims or Causes of Action to the fullest extent provided by law pursuant to their respective Amended Organizational Documents and such documents shall not be amended or altered in any way that may diminish or impair the rights of the parties or beneficiaries thereunder that exist or existed as of the Effective Date; provided further that no director shall be indemnified with respect to the issuance of the Unsecured Notes, the use of their proceeds and any events related thereto. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including, without limitation, the "tail policy") in effect as of the Commencement Date, and any directors and officers of the Debtors who served in such capacity at any time before or after the Commencement Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

### 8.6.    *Compensation and Benefit Plans*.

Except as otherwise herein provided, all material employee compensation and Benefit Plans of the Debtors in effect as of the Effective Date shall be deemed to be, and shall be treated as if they were, executory contracts that are to be assumed under the Plan.

### 8.7.    *Insurance Policies.*

All insurance policies pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Reorganized Debtors and shall continue in full force and effect. All other insurance policies shall revest in the Reorganized Debtors. Furthermore, the discharge and release of the Debtors as provided in this Plan, and the re-vesting of property in the Reorganized Debtors, shall not diminish nor impair the enforceability of any insurance policies that may cover Claims against any Debtor or other person or entity.

### 8.8.    *Intellectual Property Licenses and Agreements.*

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the applicable Reorganized Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected hereunder or pursuant to a Final Order, or is the subject of a separate rejection motion filed by the Reorganized Debtors. Unless otherwise provided herein, all other intellectual property contracts, licenses, royalties, or other similar agreements shall revest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such revesting as contemplated herein.

WEIL:\95270840\1\35076.0003

8.9.    *Reservation of Rights*.

Neither the exclusion nor inclusion of any contract or lease on any exhibit, schedule or annex to the Plan or the Plan Supplement, including the Schedule of Assumed Contracts or the Schedule of Rejected Contracts, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that any of the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

Nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## SECTION 9.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.

9.1.    *Conditions Precedent to Confirmation*.

The occurrence of Confirmation is subject to the following conditions precedent:

(a)    the entry of the Disclosure Statement Order;

(b)    the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable;

(c)    the Bankruptcy Court shall have entered the Confirmation Order;

(d)    the Restructuring Support Agreement shall not have been terminated, and shall be in full force and effect;

(e)    the Accommodation Agreements shall not have been terminated, and shall be in full force and effect; and

(f)    the DIP Facilities shall not have been terminated and shall be in full force and effect.

9.2.    *Conditions Precedent to the Effective Date*.

The occurrence of the Effective Date is subject to the following conditions precedent:

(a)    the Definitive Documents shall contain terms and conditions consistent in all material respects with this Plan and the Restructuring Support Agreement and shall otherwise be reasonably satisfactory in all respects to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable;

34

(b)      all actions, documents and agreements necessary to implement and consummate the Plan, including, without limitation, entry into the Definitive Documents, and the Amended Organizational Documents, each in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, and the transactions and other matters contemplated thereby, shall have been effected or executed;

(c)      the Debtors shall enter into the Exit Facilities and the conditions precedent to funding under the Exit Facilities shall have been satisfied or waived;

(d)      subject to Section 12.5 below, any amendments, modifications, or supplements to the Plan (including the Plan Supplement), if any, shall be reasonably acceptable to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable;

(e)      the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred and the Confirmation Order shall not have been stayed, rescinded, vacated or reversed on appeal;

(f)      the Restructuring Support Agreement shall not have been terminated, and shall be in full force and effect;

(g)      the Accommodation Agreements shall not have been terminated, and shall be in full force and effect;

(h)      all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

(i)      all reasonable fees and expenses (including attorney's fees and fees for other retained professionals, advisors and consultants) of the Consenting Noteholders, Platinum Equity, the DIP Agents, and the agents under the Exit Facilities incurred in connection with the Chapter 11 Cases, the negotiation and formulation of the Plan, DIP Facilities and Exit Facilities and related documents, and all transactions set forth herein or necessary to implement and consummate the Plan (whether incurred before or after the Commencement Date) shall have been paid; and

(j)      all conditions precedent listed in (a)-(i) herein occurring prior to July 31, 2015.

9.3.      ***Waiver of Conditions Precedent.***

Each of the conditions precedent in Sections 9.1 and 9.2 may be waived in writing by the Debtors together with the prior written consent of the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

WEIL:\95270840\1\35076.0003

9.4.    ***Effect of Non-Occurrence of Effective Date.***

If the conditions listed in Sections 9.1 and 9.2 are not satisfied or waived in accordance with this Section 9, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person or (c) constitute an admission, acknowledgement, offer or undertaking by the Debtors, any of the other Restructuring Support Parties, or any other Person.

## SECTION 10.  EFFECT OF CONFIRMATION.

10.1.    ***Subordinated Claims.***

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

10.2.    ***Vesting of Assets.***

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates, including without limitation, the intellectual property licenses and other agreements referenced above in Section 8.8, shall vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided pursuant to this Plan, the Confirmation Order, or the Exit Facilities.  The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if no cases were ever filed under any chapter or provision of the Bankruptcy Code, except as provided herein.

10.3.    ***Discharge of Claims and Termination of Interests.***

Except as otherwise provided herein, effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such claims from and after the Commencement Date, against the Debtors or any of their assets, property or estates; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Persons shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns and their assets and properties any other Claims and Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

10.4.    ***Term of Injunctions or Stays.***

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or

WEIL:\95270840\1\35076.0003

otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.5. *Injunction Against Interference with Plan.*

From and after the Effective Date, all Persons are permanently enjoined from commencing or continuing in any manner, whether directly, derivatively or otherwise, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, suit, judgment, damages, Cause of Action, interest, remedy, or liability whatsoever released or to be released pursuant to the Plan or the Confirmation Order.  For the avoidance of doubt, in connection with such injunction, all Persons are permanently enjoined from (i) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order of any kind whatsoever, (ii) creating, perfecting or enforcing any encumbrance of any kind, (iii) asserting any right of setoff, subrogation or recoupment of any kind, or (iv) commencing or continuing in any manner any action or proceeding of any kind on account of or in connection with or with respect to any claim, demand, liability, obligation, debt, right, suit, judgment, damages, Cause of Action, interest, remedy, or liability whatsoever released or to be released pursuant to the Plan or the Confirmation Order.

### 10.6. *Releases by the Debtors.*

**As of the Effective Date, except for the right to enforce the Plan and the Definitive Documents that remain in effect after the Effective Date, for good and valuable consideration, including, without limitation, the Released Parties' contributions to facilitating the Reorganization and implementing the Plan, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by the Debtors, their Estates and the Reorganized Debtors from (and the Debtors, their Estates, and the Reorganized Debtors are deemed to covenant with, and to, the Released Parties not to sue or otherwise seek recovery from the Released Parties on account of) any and all Claims, Interests, obligations, rights, suits, judgments, damages, Causes of Action (including, without limitation, under any state or federal securities laws), remedies and liabilities whatsoever, including, without limitation, any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, their Estates, or the Reorganized Debtors, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Restructuring, the Reorganized Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any other Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Support Agreement or related agreements, instruments or other documents, the solicitation of votes with respect to the Plan, or upon any other act or omission, transaction, agreement, event or other occurrence taking place from the beginning of time through the Effective Date; provided that no Released Party shall be released from any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto.**

10.7.    *Releases By Holders of Claims and Interests.*

**As of the Effective Date, except for the right to enforce the Plan and the Definitive Documents that remain in effect after the Effective Date and the indemnification obligations that survive the Effective Date, (a) each holder of a Claim or an Interest, other than any holder who both voted to reject the Plan and checked the opt out box on the applicable ballot indicating its wish to opt out of the release provisions set forth in this Section 10.7, and (b) each Released Party shall be deemed to have, conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Reorganized Debtors and the Released Parties from (and are deemed to have covenanted with the Reorganized Debtors and the Released Parties not to sue or otherwise seek recovery from the Reorganized Debtors or the Released Parties on account of) any and all Claims, Interests, obligations, rights, suits, judgments, damages, Causes of Action (including, without limitation, under any state or federal securities laws), remedies and liabilities whatsoever, including, without limitation, any derivative Claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any other Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Support Agreement or related agreements, instruments or other documents, the solicitation of votes with respect to the Plan, or upon any other act or omission, transaction, agreement, event or other occurrence taking place from the beginning of time through the Effective Date; <u>provided</u> that no Released Party shall be released from any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto.**

10.8.    *Exculpation.*

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, cause of action or liability for any claim in connection with or arising out of, the administration of the Chapter 11 Cases, the entry into the Restructuring Support Agreement and related documents and the consummation of the transactions contemplated therein, the negotiation and drafting of the Plan, the solicitation of votes for the Plan, or confirmation or the consummation of the Plan, the funding of the Plan, or the administration of the Plan or the property to be distributed under the Plan, the issuance of Securities under or in connection with the Plan, or any transactions, decisions, actions and/or inactions contemplated by or relating to any of the foregoing, except for willful misconduct or gross negligence, but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtors and the Reorganized Debtors (and each of their respective agents, directors, officers, employees, affiliates, advisors and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting the Exculpated Parties from liability.  Without limiting the generality of the foregoing, the Exculpated Parties shall be entitled to and

granted the protections and benefits of section 1125(e) of the Bankruptcy Code.  Pursuant to section 105 of the Bankruptcy Code, no holder or purported holder of an Administrative Claim, claim or Interest shall be permitted to commence or continue any Cause of Action, employment of process, or any act to collect, offset, or recover any claim against an Exculpated Party that accrued on or before the Effective Date and that has been released or waived pursuant to this Plan.

10.9.    *Retention of Causes of Action/Reservation of Rights.*

(a)    Except as otherwise provided herein, including Sections 10.6, 10.7 and 10.8, pursuant to section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their estates may hold against any person or entity without the approval of the Bankruptcy Court, including, without limitation, (i) any and all claims against any Person, to the extent such Person asserts a crossclaim, counterclaim and/or claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, their respective Estates, officers, directors or representatives; and (ii) the turnover of any property of the Estates; provided that the Reorganized Debtors shall not retain any claims or Causes of Action against the Released Parties (other than claims or Causes of Action arising out of or relating to any act or omission of a Released Party that (i) is a criminal act, or (ii) constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto, which claims or Causes of Action are hereby preserved).  The Reorganized Debtors or their successor(s) may pursue such retained claims, rights, or causes of action, suits or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

(b)    Except as otherwise provided herein, including Sections 10.6, 10.7 and 10.8, nothing contained herein or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff or other legal or equitable defense which the Debtors had immediately before the Commencement Date, against or with respect to any Claim left Unimpaired by the Plan; provided that the Reorganized Debtors shall not retain any claims or Causes of Action against the Released Parties (other than claims or Causes of Action arising out of or relating to any act or omission of a Released Party that (i) is a criminal act, or (ii) constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto, which claims or Causes of Action are hereby preserved).  The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses which they had immediately before the Commencement Date with respect to any Claim left Unimpaired by the Plan as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

10.10.    *Solicitation of the Plan.*

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and

WEIL:\95270840\1\35076.0003

therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

10.11.  ***Plan Supplement.***

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court by no later than the Plan Supplement Filing Date.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Documents to be included in the Plan Supplement will be posted at the website of the Debtors' notice, claims, and solicitation agent as they become available.  The Plan Supplement shall contain, among other things, substantially final forms of the Amended Organizational Documents, the Schedule of Assumed Contracts, the Schedule of Rejected Contracts, the Exit Term Loan, the Revolving Exit Facility, the Management Incentive Plan, the Shareholders Agreement, the New Warrant Agreement, and, to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code regarding members of the New Board.

10.12.  ***Corporate and Limited Liability Company Action.***

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) the assumption of the Benefit Plans of the Debtors as provided herein, (b) the selection of the managers, directors, and officers for the Reorganized Debtors, (c) the issuance and distribution of the New Common Stock, (d) the entry into the Revolving Exit Facility and the Exit Term Loan, (e) the approval of the Accommodation Agreements, and (f) the issuance and distribution of the New Warrants, and (g) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date), in each case in accordance with and subject to the terms hereof. All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtors, including (w) the Amended Organizational Documents, (x) the Exit Facilities, and (y) the Accommodation Agreements, and (z) any and all other agreements, documents, securities and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Section 10.12 shall be effective notwithstanding any requirements under non-bankruptcy law.

**SECTION 11.  RETENTION OF JURISDICTION.**

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date;

(b)    to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

WEIL:\95270840\1\35076.0003

(c)       to consider the allowance, classification, priority, compromise, estimation or payment of any Claim;

(d)       to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(e)       to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(f)       to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(g)       to hear and determine all applications under sections 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(h)       to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Plan Supplement, or the Confirmation Order or any agreement, instrument or other document governing or relating to any of the foregoing;

(i)       to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute and consummate the Plan or to maintain the integrity of the Plan following consummation;

(j)       to resolve any matters related to (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor or Reorganized Debtor is party or with respect to which a Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Section 8, any executory contracts or unexpired leases to the Schedule of Rejected Contracts or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(k)       to resolve disputes as to the ownership of any Claim or Interest;

(l)       to hear and determine any matter, case, controversy, suit, dispute, or Cause of Action (i) regarding the existence, nature, and scope of the discharge, releases, injunctions, and exculpation provided under the Plan, and (ii) enter such orders as may be necessary or appropriate to implement such discharge, releases, injunctions, exculpations, and other provisions;

(m)       to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)       to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

WEIL:\95270840\1\35076.0003

(o)    to adjudicate, decide, or resolve any Causes of Actions and Cure Disputes;

(p)    to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(q)    to resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid;

(r)    to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(s)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(t)    to enter a final decree closing the Chapter 11 Cases;

(u)    to recover all assets of the Debtors and property of the Estates, wherever located; and

(v)    to hear and determine any rights, Claims or causes of action held by or accruing to Reorganized Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

## SECTION 12.  MISCELLANEOUS PROVISIONS.

### 12.1.  *Payment of Statutory Fees*.

All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date, and by the Reorganized Debtors after the Effective Date until the Chapter 11 Cases are closed.

### 12.2.  *Substantial Consummation*.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 12.3.  *Dissolution of Creditors Committee.*

On the Effective Date, the Creditors Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; provided that the Creditors Committee shall exist, and its professionals shall be retained, after the Effective Date with respect to (a) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; and (b) pending appeals of the Confirmation Order, if any.

### 12.4.  *Request for Expedited Determination of Taxes*.

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods (or portions thereof) ending after the Commencement Date through the Effective Date.

42

12.5.    *Amendments*.

(a)    *Plan Modifications*.  The Plan may be amended, modified or supplemented by the Debtors or the Reorganized Debtors, as applicable, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code; *provided, that* such amendments, modifications, or supplements shall be satisfactory in all respects to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  In addition, after the Confirmation Date, the Debtors or the Reorganized Debtors, as applicable, may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

(b)    *Other Amendments*.  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; <u>provided</u> that such technical adjustments or modifications shall be satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

12.6.    *Revocation or Withdrawal of the Plan*.

The Debtors may not revoke or withdraw the Plan before the Effective Date without the consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable; <u>provided</u> that the Debtors may revoke or withdraw the Plan if such withdrawal is in the exercise of their fiduciary duty or otherwise permitted under the Restructuring Support Agreement.  If the Debtors take such action, the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed to be a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

12.7.    *Severability of Plan Provisions upon Confirmation*.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors (to be made only with the consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted; <u>provided</u> that any such alteration or interpretation shall be acceptable to the Debtors, the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be); and (3) nonseverable and mutually dependent.

12.8.    *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

12.9.    *Time*.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

12.10.    *Immediate Binding Effect*.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the documents contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, the Exculpated Parties and each of their respective successors and assigns.

12.11.    *Successor and Assigns*.

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

12.12.    *Entire Agreement*.

On the Effective Date, the Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

12.13.    *Notices*.

All notices, requests and demands to or upon the Reorganized Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)    if to the Reorganized Debtors:

Chassix, Inc.
300 Galleria Officecentre
Suite 501
Southfield, Michigan 48034
Facsimile: (248) 352-0241
Attn:  Bibi N. Di Serio, Esq.

- and -

44

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Ray C. Schrock, P.C.
        Marcia L. Goldstein, Esq.
        Matthew P. Goren, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

(b)  if to Platinum Equity:

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty St.
New York, New York 10005
Attn:    Dennis F. Dunne, Esq.
        Samuel A. Khalil, Esq.
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

(c)  if to the DIP ABL Agent:

Bodman PLC
1901 St. Antoine Street, 6th Floor at Ford Field
Detroit, Michigan 48226
Attn:    Robert J. Diehl, Jr., Esq.
Telephone: (313) 393-7597
Facsimile: (313) 393-7579

(d)  if to the DIP Term Agent:

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, Connecticut 06103
Attn:    Nathan Plotkin, Esq.
Telephone:  (860) 251-5320
Facsimile:  (860) 251-5212

(e)  if to the Consenting Noteholders:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attn:    Andrew N. Rosenberg, Esq.
        Alice Belisle Eaton, Esq.
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

WEIL:\95270840\1\35076.0003

(f)   if to the Exit Term Loan Lenders:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attn:    Andrew N. Rosenberg, Esq.
          Alice Belisle Eaton, Esq.
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

After the Effective Date, the Reorganized Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002 and to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to those Persons who have filed such renewed requests.

WEIL:\95270840\1\35076.0003

Dated:  March 12, 2015

New York, New York

                                  Respectfully submitted,

                                  Chassix Holdings and each of the Debtors

                                  By: _____
                                        Name:  J. Mark Allan
                                        Title:    President

**Exhibit A**

**Accommodation Agreements**

**(without exhibits)**

**Exhibit B**

**Restructuring Support Agreement**

**(without exhibits)**

**<u>EXHIBIT C</u>**

**<u>PROPOSED DIP ORDER</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                         :

In re                               :       **Chapter 11**
                                           :

**CHASSIX HOLDINGS, INC.,** *et al.*,    :      **Case No. 15-_____ (____)**
                                         :

                                         :      **(Joint Administration Pending)**
                **Debtors.**[1]       :
                                         :
------------------------------------------------------------x

### INTERIM ORDER AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e), (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (C) GRANT CERTAIN PROTECTIONS TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (D) SCHEDULE A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)

Upon the motion (the "**Motion**"), dated March 12, 2015, of Chassix Holdings, Inc. ("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**") and certain of their direct and indirect subsidiaries, each as debtor and debtor-in-possession (collectively, including Chassix Holdings and Chassix, the "**Debtors**"), in the above captioned chapter 11 cases (the "**Chapter 11 Cases**") pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Bankruptcy

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

Rules (the "**Local Rules**") for the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), seeking:

(1)      authority for the Debtors other than Chassix Holdings and UC Holdings, Inc. (collectively, the "**Borrowers**") to obtain postpetition financing consisting of (i) a senior secured non-amortizing asset based revolving credit facility in the principal amount of $150,000,000, including sub-facilities for swingline loans in an amount equal to $10,000,000 and letters of credit in an amount equal to $15,000,000 (the "**DIP ABL Facility**"), from PNC Bank, National Association, as Agent (in such capacity, the "**DIP ABL Agent**"), for itself or, if it elects to syndicate the loan, for a syndicate of banks, financial institutions and other institutional lenders (collectively, the "**DIP ABL Lenders**") and (ii) a senior secured non-amortizing new money term loan credit facility in the aggregate principal amount of $100,000,000 (the "**DIP Term Loan Facility**," and together with the DIP ABL Facility, the "**DIP Facilities**") from Cantor Fitzgerald Securities, as Agent (in such capacity, the "**DIP Term Loan Agent**" and together with the DIP ABL Agent, the "**DIP Agents**") for a syndicate of Prepetition Secured Noteholders (as defined below and such group, the "**DIP Term Loan Lenders**" and together with the DIP ABL Lenders, the "**DIP Lenders**");

(2)      authority for Debtor Chassix Holdings together with Debtor UC Holdings, Inc. ("**UC Holdings**") and each direct or indirect subsidiary of UC Holdings that is a guarantor (collectively, the "**DIP Loan Parties**") under (i) that certain Secured Notes Indenture (as amended or modified from time to time, the "**Prepetition Secured Indenture**") between Chassix and U.S. Bank National

2

Association ("**U.S. Bank**"), as trustee (in such capacity, the "**Prepetition Indenture Trustee**"), dated July 23, 2013, and (ii) that certain Amended and Restated Loan, Security and Guaranty Agreement (as amended or modified from time to time, the "**Prepetition ABL Credit Agreement**") among UC Holdings, the Borrowers, BMO Harris Bank N.A. ("**BMO**"), as agent (in such capacity, the "**Prepetition ABL Agent**") and the lenders from time to time party thereto (the "**Prepetition ABL Lenders**"), dated July 23, 2013, to guarantee on a secured basis the Borrowers' obligations in respect of the DIP Facilities;[2]

(3)     authority for the Borrowers to execute and enter into the DIP Documents (as defined below) and to perform all such other and further acts as may be necessary or appropriate in connection with the DIP Documents;

(4)     authority for the Borrowers to immediately use proceeds of the DIP ABL Facility and proceeds of the DIP Term Loan Facility upon entry of this interim order (the "**Interim Order**"), in order to refinance in full the indebtedness outstanding under the Prepetition ABL Credit Agreement, including the cash collateralization of all outstanding letters of credit or letters of credit guaranties thereunder and any interest accrued through the date of discharge, and, upon such discharge, receive the simultaneous release and termination of the Prepetition

---

[2] Chassix Holdings is not initially a guarantor of the DIP ABL Facility.  Within 30 days after the closing of the DIP ABL Facility, Debtors shall cause Chassix Holdings to deliver to the DIP ABL Agent such customer identification information as the DIP ABL Agent shall require in order to comply with CIP regulations, and upon the DIP ABL Agent's satisfactory review of the same, at the DIP ABL Agent's option, shall cause Chassix Holdings to become a guarantor by execution of a joinder to the DIP ABL Credit Agreement.  To the extent that Chassix Holdings, at the option of the DIP ABL Agent, does not become a guarantor under the DIP ABL Credit Agreement, the provisions of the DIP Orders adversely impacting Chassix Holdings or requiring or directing Chassix Holdings to take certain actions or incur certain obligations shall be of no force and effect, and Chassix Holdings will not be considered a DIP Loan Party with respect to the DIP ABL Facility.

3

ABL Lenders' liens, claims and encumbrances in accordance with this Interim Order, and provide working capital to the Debtors;

(5)    authority for the Debtors to (i) use the Cash Collateral (as defined below) pursuant to sections 361, 362 and 363 of the Bankruptcy Code, and all other Prepetition Collateral (as defined below), in each case in accordance with the relative priorities set forth more fully below, but subject in all respects to the Carve Out (as defined below), and (ii) provide adequate protection on the terms set forth in this Interim Order to (a) those purchasers and holders of 9 1/4% Senior Secured Notes due 2018 (the "**Prepetition Secured Notes**") issued by Chassix under the Prepetition Secured Indenture, whose liens and security interests are being primed by the DIP Facilities, and (b) the Prepetition ABL Agent and the Prepetition ABL Lenders in respect of contingent obligations that comprise a portion of the unpaid amounts of the Prepetition ABL Debt (as defined below);

(6)    approval of the intercreditor arrangements (the "**Intercreditor Arrangements**") set forth in **Exhibit "1"** annexed to this Interim Order as among the DIP ABL Facility, the DIP Term Loan Facility and the Prepetition Secured Indenture with respect to the DIP ABL Priority Collateral (as defined below) and the DIP Term Loan Priority Collateral (as defined below), and other property of the Debtors, if any, on which a lien is granted pursuant to the DIP Documents and this Interim Order (collectively, the "**DIP Collateral**");

(7)    the granting of *pari passu* superpriority claims under section 364(c)(1) of the Bankruptcy Code to the DIP Lenders payable from, and having recourse to, all

4

prepetition and postpetition property of the Debtors' chapter 11 estates and all proceeds thereof (including, subject only to and effective upon entry of the Final Order (as defined below), any Avoidance Proceeds (as defined below)), subject to the Carve Out (as defined below) and the terms of this Interim Order;

(8)      subject only to and effective upon entry of the Final Order, the limitation of the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(9)      modification of the automatic stay set forth in section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Documents and this Interim Order;

(10)      a waiver of any applicable stay with respect to the effectiveness and enforceability of this Interim Order (including under Bankruptcy Rule 6004); and

(11)      that the Bankruptcy Court schedule a final hearing (the "**Final Hearing**"), pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, to be held within 30 days of entry of this Interim Order to consider entry of an order granting the relief requested in the Motion on a final basis (the "**Final Order**").

The interim hearing on the Motion having been held on March 12, 2015 (the "**Interim Hearing**"); and based upon all of the pleadings filed with the Bankruptcy Court, the evidence presented at the Interim Hearing and the entire record herein; and there being no objections to the relief sought in the Motion that have not previously been withdrawn, waived, settled, or resolved; and the Bankruptcy Court having noted the appearance of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtors and the Debtors' estates and creditors; and the Debtors having provided notice of the

5

Motion as set forth in the Motion and it appearing that no further or other notice of the Motion need be given; and after due deliberation and consideration, and sufficient cause appearing therefor:

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED**, that:

(1)      *Jurisdiction*.  The Bankruptcy Court has core jurisdiction over the Chapter 11 Cases, the parties affected by the Motion, and the Debtors' property pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

(2)      *Notice*.  Notice of the Motion, the relief requested therein and the Interim Hearing was served by the Debtors on (i) the Office of the United States Trustee for Region 2 (the "**U.S. Trustee**"); (ii) the holders of the five largest secured claims against the Debtors (on a consolidated basis); (iii) the holders of the forty (40) largest unsecured claims against the Debtors (on a consolidated basis); (iv) the attorneys for BMO; (v) the attorneys for U.S. Bank National Association, as trustee under the Prepetition Secured Indenture; (vi) the attorneys for Delaware Trust Company, as successor trustee under the Unsecured Notes Indenture (defined below); (vii) the attorneys for the Informal Committee of  Noteholders; (viii) the attorneys for the DIP ABL Lenders; (ix) the attorneys for the DIP Term Loan Lenders; (x) the OEM Customers; (xi) the attorneys for Platinum Equity Advisors, LLC; (xii) the Securities and Exchange Commission; (xiii) the Internal Revenue Service; and (xiv) the United States Attorney's Office for the Southern District of New York (collectively, the "**Notice Parties**"). Under the circumstances, the notice given by the Debtors of the interim relief requested in the Motion and of the Interim Hearing constitutes due and sufficient notice thereof and complies

6

with Bankruptcy Rules 4001(b) and (c) and 9014, and Local Rule 4001-2, and no further notice of the relief sought at the Interim Hearing is necessary or required.

(3)      *Creditors' Committee Formation*.   No statutory committee of unsecured creditors has yet been appointed in any of these Chapter 11 Cases (the "**Creditors Committee**").

(4)      *Debtors' Stipulations*.   Without prejudice to the rights of any other party (but subject to the limitations contained in paragraph 25 below), the Debtors admit, stipulate, and agree that:

(a)      as of the commencement of the Debtors' Chapter 11 Cases on March 12, 2015 (the "**Commencement Date**"), the Debtors were indebted and liable to the Prepetition ABL Lenders  and to the holders of the Prepetition Secured Notes (the "**Prepetition Secured Noteholders**") as follows:

(i)      to the Prepetition ABL Agent and the Prepetition ABL Lenders, without objection, defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $135,000,000, in respect of loans and advances made and the cash collateralization of all outstanding letters of credit or letters of credit guaranties thereunder, plus, unliquidated amounts including interest thereon and fees, expenses, charges and other obligations incurred in connection therewith as provided under the Prepetition ABL Credit Agreement (the "**Prepetition ABL Debt**");

(ii)      the Borrowers' obligations under the Prepetition ABL Credit Agreement are guaranteed by UC Holdings and certain of its direct and indirect subsidiaries (collectively, the "**Prepetition Loan Parties**"), and the Prepetition ABL Credit Agreement is, subject to certain exclusions described in the Prepetition ABL Credit Agreement, secured by a first-priority lien on substantially all existing and future accounts receivable,

7

inventory, cash, deposit accounts, investments in cash and cash equivalents, and other permitted investments, letter of credit rights relating to inventory and the accounts receivable of the Prepetition Loan Parties and all proceeds of the foregoing (collectively, the "**Prepetition ABL Priority Collateral**").  Subject to certain exclusions described in the Prepetition ABL Credit Agreement, the Prepetition ABL Credit Agreement is also secured by a second-priority lien on substantially all real estate assets, intellectual property, equipment, capital stock (limited in the case of  any foreign subsidiaries, to 65% of the voting stock of the Debtors' first tier foreign subsidiaries) and certain other collateral of the Prepetition Loan Parties other than the Prepetition ABL Priority Collateral (collectively, the "**Notes Priority Collateral**" and together with the Prepetition ABL Priority Collateral, the "**Prepetition Collateral**," and such liens and security interests, collectively the "**Prepetition ABL Security Interests**").   The Prepetition ABL Security Interests (i) are valid, binding, perfected, enforceable liens and security interests in the Prepetition Collateral, (ii) are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(iii)    to the Prepetition Secured Noteholders, without objection, defense, counterclaim or offset of any kind, in the aggregate principal amount of $375,000,000, plus accrued and unpaid interest thereon, fees, expenses (including, without limitation, any attorneys', accountants', appraisers', and financial advisors' fees that are chargeable or reimbursable under the Prepetition Secured Indenture and related documents or pursuant to existing engagement letters as of the Commencement Date with certain Prepetition Secured Noteholders in connection with transactions contemplated hereby), charges and other obligations incurred prior to the Commencement Date in respect of the Prepetition Secured Notes (the

8

"**Prepetition Secured Notes Debt**" and together with the Prepetition ABL Debt, the "**Prepetition Indebtedness**");

(iv)    the Prepetition Secured Notes Debt is guaranteed by the Prepetition Loan Parties and the Prepetition Secured Notes are secured by a first-priority lien on all Notes Priority Collateral and a second-priority lien on all Prepetition ABL Priority Collateral (collectively, the "**Notes Security Interests**" and together with the Prepetition ABL Security Interests, the "**Prepetition Security Interests**").  The Notes Security Interests (i) are valid, binding, perfected, enforceable liens and security interests in the Prepetition Collateral, (ii) are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iii) are subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve Out (as defined below) to which the DIP Liens are subject, and (C) valid, perfected and unavoidable liens permitted under the Prepetition Financing Documents (as defined below) to the extent such permitted liens are senior to or pari passu with the liens of the Prepetition Indenture Trustee and the Prepetition Secured Noteholders on the Prepetition Collateral;

(b)    the Prepetition Indebtedness constitutes the legal, valid, binding, non-avoidable and enforceable obligations of the Debtors, other than Chassix Holdings, and the Prepetition Security Interests are valid, binding, properly perfected, non-avoidable, and enforceable liens on and security interests in the Prepetition Collateral, subject to the terms set forth in that certain Intercreditor Agreement (the "**Prepetition Intercreditor Agreement**") between BMO, in its capacity as ABL Collateral Agent, and U.S. Bank, in its capacity as Notes Collateral Agent, dated July 23, 2013;

9

(c)    The Debtors' obligations under the Indenture (as amended or modified from time to time, the "**Unsecured Notes Indenture**") with Delaware Trust Company, as successor trustee, pursuant to which Chassix Holdings issued $150 million in aggregate principal amount of 10%/10.75% of Senior PIK Toggle Notes due 2018 (collectively with all other expenses, charges and other obligations incurred in connection therewith as provided under the Unsecured Notes Indenture, the "**Unsecured Notes Indebtedness**") constitutes the legal, valid, binding, and enforceable obligations of the Debtors and the other DIP Loan Parties.

(d)    the Prepetition Indebtedness and the Prepetition Security Interests are not and shall not be subject to any attachment, contest, attack, rejection, recoupment, reduction, defense, counterclaim, setoff, offset, recharacterization, avoidance or other claim (as "claim" is defined by section 101(5) of the Bankruptcy Code), impairment, disallowance, counterclaim, subordination (whether equitable, contractual, or otherwise, except for any lien subordination contemplated herein), cause of action or any other challenge of any nature under the Bankruptcy Code (including, without limitation, under chapter 5 of the Bankruptcy Code), under applicable nonbankruptcy law or otherwise (including, without limitation, any applicable state Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act);

(e)    in accordance with the terms and conditions set forth in this Interim Order and the DIP Documents, a portion of the Debtors' initial draw under the DIP Facilities will be immediately used to discharge in full the non-contingent indebtedness outstanding under the Prepetition ABL Credit Agreement, including the cash collateralization of all outstanding letters of credit or letter of credit guarantees thereunder and any interest accrued through the date of discharge; and, subject to the terms and conditions herein (including, without limitation, the priming liens granted hereunder, the Carve Out, and expiration of the Challenge

10

Period (as defined below)), adequate protection replacement liens at any time granted to the

Prepetition ABL Agent and the Prepetition ABL Lenders by the Bankruptcy Court shall, unless

otherwise ordered by the Bankruptcy Court), (i) continue to secure the unpaid portion of any

Prepetition ABL Debt (including, without limitation, any Prepetition ABL Debt subsequently

reinstated after the repayment thereof because such payment (or any portion thereof) is required

to be returned or repaid to the Debtors or the DIP Lenders and the liens securing the Prepetition

ABL Debt shall have not been avoided), and (ii) be (A) junior and subordinate in all respects to

the DIP Lenders' liens on and security interests in the DIP Collateral (as defined below and

including, without limitation, the DIP Liens granted under this Interim Order and the DIP

Documents), (B) senior in priority to the Adequate Protection Liens (as defined below) on the

DIP ABL Priority Collateral granted to the Prepetition Indenture Trustee under this Interim

Order and (C) junior in priority to the Adequate Protection Liens (as defined below) on the DIP

Term Loan Priority Collateral  granted under this Interim Order to the Prepetition Indenture

Trustee (collectively, such liens and security interests of the Prepetition Secured Parties are

hereinafter referred to as the "**Contingent Adequate Protection Liens**")), and any such

reinstated Prepetition ABL Debt described in clause (i) of this subparagraph is hereinafter

referred to as the "**Contingent Prepetition ABL Debt**");

(f)    In the event that the Prepetition ABL Agent or any Prepetition

ABL Lenders (each in their capacities as such) are ordered by the Bankruptcy Court to disgorge,

refund or in any manner repay to the Debtors or their estates any amounts (the "**Disgorged**

**Amounts**") leading to Contingent Prepetition ABL Debt, the Disgorged Amounts, unless

otherwise ordered by the Bankruptcy Court, shall be placed in a segregated interest bearing

account in which the Prepetition ABL Agent (on behalf of the Prepetition ABL Lenders) shall

11

have the first lien upon, pending a further final, non-appealable order of a court of competent jurisdiction regarding the distribution of such Disgorged Amounts (either returning the Disgorged Amounts to the Prepetition ABL Agent and the Prepetition ABL Lenders, distributing such amounts to the Debtors or otherwise); provided that, to the extent the Disgorged Amounts are returned to the Prepetition ABL Agent or any Prepetition ABL Lender, they shall receive such amounts plus any interest accrued at the non-default rate set forth in the Prepetition ABL Credit Agreement;

(g)    none of the Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition Indenture Trustee, the Prepetition Secured Noteholders (collectively, the "**Prepetition Secured Parties**"), the DIP Agents or the DIP Lenders are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition ABL Credit Agreement, the Prepetition Secured Indenture, the Prepetition Intercreditor Agreement (collectively with all security, pledge and guaranty agreements and all other documentation executed in connection with any of the foregoing, each as amended, supplemented, or otherwise modified, the "**Prepetition Financing Documents**"), or the DIP Documents;

(h)    the Debtors do not have any claims, challenges, counterclaims, causes of action, defenses, recoupment, disgorgement, or setoff rights related to the Prepetition Indebtedness or the Prepetition Financing Documents, whether arising under the Bankruptcy Code or applicable nonbankruptcy law, on or prior to the date hereof, against the Prepetition Secured Parties, and the Debtors waive, for themselves and their non-Debtor subsidiaries and affiliates, any right to challenge or contest in any way the perfection, validity, and enforceability

12

of the Prepetition Security Interests or the validity or enforceability of the Prepetition

Indebtedness and the Prepetition Financing Documents;

    (i)  the liens granted to the DIP Agents on behalf of the DIP Lenders

shall be valid, enforceable and non-avoidable liens against the Debtors and the DIP Loan Parties;

and

    (j)  subject to the reservation of rights set forth in paragraph 25 below,

including the expiration of the Challenge Period, the Debtors and the DIP Loan Parties hereby

absolutely and unconditionally forever waive, discharge and release each of the Prepetition ABL

Agent, the Prepetition Indenture Trustee and the Prepetition Secured Parties and each of their

respective present and former predecessors, successors, assigns, affiliates, members, partners,

managers, current and former equity holders, agents, attorneys, financial advisors, consultants,

officers, directors, employees and other representatives thereof (all of the foregoing, solely in

their respective capacities as such, collectively, the "**Prepetition Secured Party Releasees**") of

any and all "claims" (as defined in the Bankruptcy Code), counterclaims, actions, causes of

action (including, without limitation, causes of action in the nature of "lender liability"),

defenses, demands, debts, accounts, contracts, liabilities, setoff, recoupment or other offset rights

against any and all of the Prepetition Secured Party Releasees, whether arising at law or in

equity, relating to and/or otherwise in connection with the applicable Prepetition Indebtedness,

the Prepetition Security Interests, Prepetition Collateral or the debtor-creditor relationship among

any of the applicable Prepetition ABL Agent, Prepetition Indenture Trustee or the Prepetition

Secured Parties, on the one hand, and the Debtors, on the other hand, from the beginning of time

until immediately preceding the entry of this Interim Order, including, without limitation, (i) any

recharacterization, subordination, avoidance or other claim arising under or pursuant to section

13

105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law or municipal law and (ii) any right or basis to challenge or object to the amount, validity or enforceability of the applicable Prepetition Indebtedness or any payments made on account of the applicable Prepetition Indebtedness, or the validity, enforceability, priority or non-avoidability of the applicable Prepetition Security Interests securing the applicable Prepetition Indebtedness.

(k)        Effective upon entry of this Interim Order, the Debtors hereby absolutely and unconditionally forever waive, discharge and release each of the DIP Agents and the DIP Lenders and each of their respective present and former predecessors, successors, assigns, affiliates, members, partners, managers, current and former equity holders, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives thereof (all of the foregoing, solely in their respective capacities as such, collectively, the "**DIP Party Releasees**") of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, actions, causes of action (including, without limitation, causes of action in the nature of "lender liability"), defenses, demands, debts, accounts, contracts, liabilities, setoff, recoupment or other offset rights against any and all of the DIP Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the applicable DIP Obligations, DIP Liens, DIP Collateral or the debtor-creditor relationship among any of the applicable DIP ABL Agent, DIP Term Loan Agent, DIP ABL Lenders or the DIP Term Loan Lenders, on the one hand, and any of the Debtors, on the other hand, from the beginning of time until immediately preceding the entry of this Interim Order, including, without limitation, (i) any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law or

14

municipal law and (ii) any right or basis to challenge or object to the amount, validity or enforceability of the applicable DIP Obligations or any payments made on account of the applicable DIP Obligations, or the validity, enforceability, priority or non-avoidability of the applicable DIP Liens securing the applicable DIP Obligations; provided that, nothing herein shall relieve the DIP Party Releasees from fulfilling their obligations or commitments with the DIP Facilities or operate as a release related thereto.

(l)      In no event shall the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable.

(5)      *Cash Collateral*.   For purposes of this Interim Order, the term "**Cash Collateral**," including, without limitation, all cash proceeds of Prepetition Collateral, shall have the meaning ascribed in section 363(a) of the Bankruptcy Code.

(6)      *Use of Cash Collateral*.  The Debtors are hereby authorized, subject to the terms and conditions of the DIP Documents, this Interim Order,  and in accordance with the Budget and the 13-Week Projection (each defined below), to use the Cash Collateral, during the period from the Commencement Date through termination of the DIP Obligations pursuant to the DIP Documents, solely for working capital and general corporate purposes, including, without limitation, in connection with the Debtors' transfer of funds to their non-Debtor foreign subsidiaries if authorized under the Budget and the 13-Week Projection; provided that, and, upon the request of the Debtors, the Prepetition Secured Parties are directed to promptly turn over to the Debtors any and all Cash Collateral they may have received or may hold.  The Debtors' right to use the Cash Collateral shall terminate automatically, provided that, notwithstanding anything to the contrary herein or in the DIP ABL Credit Agreement, the DIP ABL Agent shall be

WEIL:\95256444\10\58399.0011

required to comply with the notice requirement in subsection (c) of this paragraph (6), on the earlier of:

(a)     the Scheduled Termination Date, as defined in the DIP ABL Credit Agreement (as defined below);

(b)     the Maturity Date, as defined in the DIP Term Loan Agreement (as defined below); and

(c)     the occurrence of an Event of Default under any DIP Documents; pursuant to which, either the DIP ABL Agent in respect of an Event of Default under the DIP ABL Credit Agreement or the DIP Term Loan Agent in respect of an Event of Default under the DIP Term Loan Agreement (as defined below), provides the Debtors, with a copy to the Debtors' counsel, five (5) days' prior written notice (which shall run concurrently with any notice provided under the applicable DIP Documents);

(7)     *Findings Regarding the DIP Facilities and Use of Cash Collateral.*

(a)     *Good Cause.*  Good cause has been shown for entry of this Interim Order.

(b)     The Debtors have an immediate need to obtain the financing provided under the DIP Facilities and use the Cash Collateral, in order to, among other things, permit the orderly continuation of their businesses, preserve the going concern value of the Debtors, maintain business relationships with vendors, suppliers and customers, to satisfy payroll obligations, to discharge in full the Prepetition ABL Debt, to make capital expenditures, to pay for certain costs and expenses related to the Debtors' Chapter 11 Cases, and to satisfy other working capital and operational needs of the Debtors.  The access of the Debtors to sufficient working capital and liquidity made available through the use of Cash Collateral, incurrence of

16

new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern value of the Debtors' estates and to a successful reorganization of the Debtors.

(c)    The Debtors are unable to obtain financing, under existing circumstances, on more favorable terms from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.    The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors (i) granting the DIP Lenders, subject to the Carve Out as provided for herein, the DIP Liens (as defined below) and the Superpriority Claims (as defined below), in each case on the terms and conditions set forth in this Interim Order and the DIP Documents, and (ii) discharging the Prepetition ABL Debt in full upon entry of this Interim Order, such discharge being a requirement by the DIP ABL Agent for the DIP ABL Facility (and absent discharging the Prepetition ABL Debt in full upon entry of the Interim Order, would be unable to obtain the consent of the Prepetition ABL Lenders to the provisions of this Interim Order).

(d)    The terms of the DIP Facilities and the use of the Cash Collateral pursuant to this Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are appropriate under the circumstances, and constitute reasonably equivalent value and fair consideration.

(e)    The DIP Facilities have been negotiated in good faith and at arm's length among the Debtors, the DIP ABL Agent, the DIP Term Loan Agent, and the DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection

17

with the DIP Facilities and the DIP Documents, including, without limitation, (i) all loans made

to, and all letters of credit issued for the account of the Debtors pursuant to that certain

Superpriority Secured Debtor-In-Possession ABL Loan, Security and Guaranty Agreement,

dated as of March 12, 2015 (as amended, supplemented, refinanced or otherwise modified from

time to time not in violation of this Interim Order) among the Debtors, the lenders from time to

time party thereto, the DIP ABL Agent and the other parties from time to time party thereto,

substantially in the form attached as **Exhibit "C"** to the Motion (the "**DIP ABL Credit**

**Agreement**"), (ii) all loans made to the Debtors pursuant to the Superpriority Secured Debtor-In-

Possession Term Loan, Security and Guaranty Agreement, dated as of March 12, 2015 (as

amended, supplemented, refinanced or otherwise modified from time to time not in violation of

this Interim Order) among the Debtors, the lenders from time to time party thereto, the DIP Term

Agent and the other parties from time to time party thereto, substantially in the form attached as

**Exhibit "D"** to the Motion (the "**DIP Term Loan Agreement**" and, together with the DIP ABL

Credit Agreement, including, in each case, any exhibits attached thereto and including, without

limitation, all security agreements, all related or ancillary documents and agreements, and any

mortgages contemplated thereby, the "**DIP Documents**"),   and (iii) any obligations and

indebtedness of the Debtors arising under or in connection with the DIP Documents and this

Interim Order now and hereafter owing to the DIP Agents or any DIP Lender (all of the

foregoing in clauses (i), (ii) and (iii) collectively, the "**DIP Obligations**"), shall be deemed to

have been extended by the DIP ABL Agent and the DIP ABL Lender in respect of the DIP ABL

Facility, and the DIP Term Loan Agent and the DIP Term Loan Lenders in respect of the DIP

Term Loan Facility, each in "good faith" as such term is used in section 364(e) of the

Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be

18

entitled to the full protection of section 364(e) of the Bankruptcy Code, in the event that this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.

(f)     Based upon the record before the Bankruptcy Court, the terms of the use of Cash Collateral and the adequate protection granted in this Interim Order have been negotiated at arms' length and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtors, their estates and creditors and are consistent with the Debtors' fiduciary duties.

(g)     *Discharge of the Prepetition ABL Debt.*  Immediately following the entry of this Interim Order and as part of the initial borrowing under the DIP Facilities, the Debtors shall be required to use a portion of the proceeds from the DIP ABL Facility and the DIP Term Loan Facility, in accordance with the DIP Documents and this Interim Order, to discharge in full the Prepetition ABL Debt then outstanding.  The Prepetition ABL Security Interests shall be automatically released and terminated upon such discharge.  The Prepetition ABL Agent shall deliver or cause to be delivered, at the Debtors' cost and expense, any termination statements, releases and/or assignments in favor of the DIP ABL Agent, the DIP ABL Lenders or other documents, in each case as reasonably requested by the Debtors or the DIP ABL Agent in order to effectuate and/or evidence the release and termination of the Prepetition ABL Security Interests.

(h)     The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001-2.  Absent granting the interim relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facilities and the use of the Cash Collateral

19

in accordance with this Interim Order and the DIP Documents are, therefore, in the best interest of the Debtors' estates.

(8)        *Superpriority Claims.*

(a)        Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority senior administrative expense claims against the Debtors (the "**Superpriority Claims**"), which Superpriority Claims in respect of the DIP ABL Facility and the DIP Term Loan Facility shall rank *pari passu* with each other, with priority (except in respect of the Carve Out) over any and all administrative expenses, adequate protection claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which Superpriority Claims shall be payable from and have recourse to all unencumbered property of the Debtors and their estates and all proceeds thereof.    Any payments, distributions or other proceeds received on account of such Superpriority Claims shall be promptly delivered to the applicable DIP Agent (on a *pari passu* basis) to be applied or further distributed by the applicable DIP Agent on account of the applicable DIP Obligations in such order as is specified in this Interim Order and the applicable DIP Documents.    The Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

20

(b)        For purposes hereof, the "**Carve Out**" shall mean an amount equal to the sum of: (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses of up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) allowed and unpaid claims for unpaid fees, costs, and expenses (the "**Professional Fees**") incurred by persons or firms retained by the Debtors or the Creditors' Committee, if any, whose retention is approved by the Bankruptcy Court pursuant to section 327 and 1103 of the Bankruptcy Code (collectively, the "**Professional Persons**"), subject to the terms of this Interim Order, the Final Order and any other interim or other compensation order entered by the Bankruptcy Court that are incurred (A) at any time before or on the first business day following delivery by any DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (the "**Pre-Trigger Date Fees**"), subject to (x) a monthly cap of $50,000 (the "**Committee Monthly Cap**")  with respect to Professional Fees incurred by Professional Persons retained by a Creditors' Committee, if any, and (y) any limits by this Interim Order or the Final Order or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigations of claims and defenses against any Prepetition Secured Parties pursuant to this Interim Order or the Final Order; and (B) after the first business day (the "**Trigger Date**") after the occurrence and during the continuance of an Event of Default (as defined in the DIP ABL Credit Agreement or the DIP Term Loan Agreement) and delivery of notice (the "**Carve Out Trigger Notice**") thereof (which may be by email) to the Debtors, the Debtors' counsel, the United States Trustee, and lead counsel for a Creditors' Committee, if any,

21

in an aggregate amount not to exceed $2,000,000 (the amount set forth in this clause (iii)(B) being the "**Post-Carve Out Trigger Notice Cap**" and together with the Committee Monthly Cap, the "**Carve Out Cap**"); <u>provided</u> that, nothing herein shall be construed to impair the ability of any party to the DIP  Documents to object to the fees, expenses, reimbursement or compensation described in clauses (iii) and (iv) above, on any grounds.

(c)      The DIP ABL Agent may impose a reserve against the Borrowing Base (as defined in the DIP ABL Credit Agreement) in an amount equal to the estimated total amount of all items that comprise the Carve Out for the tenor of the case, including Professional Fees in an amount determined by the DIP ABL Agent in its sole discretion (the "**Carve Out Reserve**").  Initially, and without limiting the DIP ABL Agent's discretion to increase the Carve Out Reserve in its sole discretion, the Carve Out Reserve shall consist of the sum of (i) the Professional Fees and U.S. Trustee fees, each as set forth in the 13-Week Projection for the months of March and April 2015, (ii) $100,000 for fees and expenses of a Chapter 7 trustee; (iii) $250,000 reserve for legal fees and expenses incurred by the Prepetition ABL Agent (on behalf of the Prepetition ABL Lenders) in connection with its defense of any unsuccessful investigation, prosecution or cause of action commenced by the Creditors' Committee or a party-in-interest prior to the expiration of the Challenge Period, solely as it relates to the Prepetition ABL Agent and Prepetition ABL Lenders' Prepetition Security Interests (the "**Prepetition ABL Facility Reserve**"), and (iv) the Post-Carve Out Trigger Notice Cap, and on the 25th day of each month, commencing March 25, 2015, the Carve Out Reserve will be adjusted (x) to relieve any amounts which were previously subject to the Carve Out Reserve but which were subsequently paid, (y) to increase (or decrease) the Carve Out Reserve for the prior month's Professional Fees and U.S. Trustee fees based on actual billings and (z) to increase the Carve Out Reserve by the

22

amount of the Professional Fees and the U.S. Trustee fees set forth in the 13-Week Projection for the subsequent month.

(d)    For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Documents, except as otherwise set forth in paragraph 25 below, all liens and claims securing the DIP Facilities, the Superpriority Claims, and any adequate protection liens granted to any parties entitled thereto shall be subject to the Carve Out, it being understood and agreed that the Carve Out shall be allocated 100% against the DIP ABL Priority Collateral.

(e)    *Budget/13-Week Projection.*  Attached as **Exhibit "2"** hereto and incorporated by reference herein is the weekly statement of receipts and disbursements of the Debtors and their domestic subsidiaries on a consolidated basis for the 21 weeks commencing with the first week following the Commencement Date (the "**Budget**"), including (i) individual line items for "Cash Receipts", "Vendors", "Lease, rent and utilities", "Payroll and benefits", "Taxes", "Capital and tooling", "Funding to rest of world entities", "DIP fees and interest", "Professional fees", "U.S. Trustee fees", "Other", "Net Cash Inflow / (Outflow)" and (ii) the anticipated uses of the DIP Term Loan Facility and the DIP ABL Facility for such period, in form and substance reasonably satisfactory to the DIP ABL Lenders and the Majority Lenders; provided that, to the extent that payment in full in cash of all DIP Term Loan Obligations has not occurred within such 21-week period, the Debtors shall deliver to the DIP Agents an updated budget covering the period through the Maturity Date (as defined in the DIP Term Loan Credit Agreement), which shall be in the same form as the Budget and shall be reasonably satisfactory to the DIP ABL Lenders and the Majority Lenders (as defined in the DIP Term Loan Credit Agreement), and such updated budget shall become the "Budget" for all purposes under the DIP

23

Documents.  The Debtors shall also deliver to the DIP Agents no later than 5:00 p.m. on Friday

of each calendar week, commencing with the first such date following the Commencement Date,

(a) a projected statement of receipts and disbursements of the Debtors and their  consolidated

domestic subsidiaries on a weekly basis for the following 13 calendar weeks which shall be in

the same form as the Budget and shall be reasonably satisfactory to the DIP Agents (the "**13-**

**Week Projection**"); and (b) a variance report on a weekly basis setting forth (1) actual cash

receipts and disbursements for the week ending on the previous Friday, (2) all variances, on an

individual line item basis and an aggregate basis, as compared to the Budget and the previously

delivered 13-Week Projection on a weekly and cumulative basis, and (3) a certified explanation,

in reasonable detail, for any material variance (the "**Variance Report**").

## THE DIP ABL FACILITY

(9)        *Authorization of the DIP ABL Facility Documents and the DIP ABL*

*Facility.*

(a)        The Debtors are hereby authorized and directed to execute, deliver,

enter into, and perform all obligations under the DIP ABL Credit Agreement, and the DIP Loan

Parties are authorized to guarantee all of the Borrowers outstanding obligations under the DIP

ABL Credit Agreement (the "**DIP ABL Obligations**").

(b)        The Borrowers are hereby authorized to make an initial draw under

the DIP ABL Facility pursuant to the DIP ABL Credit Agreement, and the DIP Loan Parties are

hereby authorized to guaranty such borrowings of money and letters of credit, in an initial

aggregate principal amount of up to $125,000,000 of the DIP ABL Facility (subject to any

limitations on borrowings thereunder), in accordance with this Interim Order and the DIP ABL

Facility Documents (as defined below), which amount shall be used for all purposes permitted

24

under the DIP ABL Facility Documents, including, without limitation, a portion of which shall be used together with proceeds from the DIP Term Loan Facility to discharge in full the Prepetition ABL Debt, providing working capital for the Debtors, for other general corporate purposes and to pay interest, fees, and expenses in accordance with this Interim Order and the DIP ABL Facility Documents.

(c)   In furtherance of the foregoing and without further approval of the Bankruptcy Court, each Debtor is authorized and directed to perform, and is authorized and directed to cause the DIP Loan Parties to perform, all acts and to execute, deliver and perform all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages, and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP ABL Facility, including, without limitation:

(i)   the execution, delivery and performance of the DIP ABL Credit Agreement and any exhibits attached thereto, including, without limitation, all security agreements and all related or ancillary documents and agreements and any mortgages contemplated thereby (collectively, the "**DIP ABL Facility Documents**");

(ii)   the execution, delivery and performance of the guarantees by the DIP Loan Parties of the obligations of the Borrowers under the DIP ABL Facility Documents;

(iii)   the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP ABL Facility Documents, in each case in such form as the Debtors and the DIP ABL Agent may agree, and no further approval of the Bankruptcy Court shall be required for amendments, waivers, consents or

25

other modifications to and under the DIP ABL Facility Documents (and any reasonable fees paid in connection therewith) that do not (A) shorten the maturity or the scheduled termination date thereunder, or (B) increase the commitments, the rate of interest (other than invoking the default rate upon an Event of Default), or the letter of credit fees payable thereunder,

(iv)    the non-refundable payment to the DIP ABL Agent and the DIP ABL Lenders, as the case may be, of the reasonable fees and expenses set forth in the DIP ABL Facility Documents, including, without limitation, any upfront or backstop commitment, administrative, syndication or collateral agency fee, and the fees and expenses of the professionals retained as provided for in the DIP ABL Facility Documents, without the need to file retention motions or fee applications, or to provide notice to any party; and

(v)    the performance of all other acts required under or in connection with the DIP ABL Facility Documents.

(d)    Upon execution and delivery of the DIP ABL Facility Documents, the DIP ABL Facility Documents shall constitute valid, binding and unavoidable obligations of the Debtors and the DIP Loan Parties, enforceable against each Debtor and the other DIP Loan Parties in accordance with the terms of this Interim Order and the DIP ABL Facility Documents. No obligation, payment, transfer or grant of security under the DIP ABL Facility Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under chapter 5 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim or counterclaim.

26

(10)    *DIP ABL Facility Liens.*    As security for the DIP ABL Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP ABL Agent of any property, the following security interests and liens are hereby granted to the DIP ABL Agent, for its own benefit and the benefit of the DIP ABL Lenders, subject only to the Carve Out (all such liens and security interests granted to the DIP ABL Agent, for its benefit and for the benefit of the DIP ABL Lenders, pursuant to this Interim Order and the DIP Documents, the "**DIP ABL Facility Liens**"):

(a)    <u>First Lien on DIP ABL Priority Collateral</u>.    Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP ABL Agent, for the benefit of the DIP ABL Lenders, shall have a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in the prepetition and postpetition assets of the Debtors defined as DIP ABL Priority Collateral in the DIP ABL Credit Agreement (the "**DIP ABL Priority Collateral**"), which shall include, without limitation, the Debtors' existing and future accounts receivable, inventory, cash, deposit accounts, investments in cash and cash equivalents and other permitted investments (other than capital stock of subsidiaries), letter of credit rights relating to inventory, accounts receivable and all proceeds of the foregoing, subject only to validly perfected, enforceable and unavoidable liens, arising on or before the Commencement Date, that are expressly allowed to have priority by operation of statute or rule of law ("**Other Priority Liens**") (for clarity, the prepetition liens securing the Prepetition Indebtedness shall not constitute Other Priority Liens), <u>provided</u> that the DIP ABL Priority Collateral shall not include the identifiable cash proceeds of the DIP Term Loan Collateral (as defined below) that are held

27

in a segregated deposit account used only for the purposes of holding such proceeds.  All of the

Debtors' claims, causes of action or other avoidance claims under sections 502(d), 544, 545, 547,

548, 549, 550 or 553 of the Bankruptcy Code, or any other avoidance actions under the

Bankruptcy Code (collectively, "**Avoidance Actions**") or any successful Avoidance Actions,

whether by judgment, settlement or otherwise shall not be considered  DIP ABL Priority

Collateral, but, subject only to and effective upon entry of the Final Order, any proceeds thereof

or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions,

whether by judgment, settlement or otherwise ("**Avoidance Proceeds**") shall constitute DIP

ABL Priority Collateral, <u>provided</u> that, the lien on Avoidance Proceeds securing the DIP ABL

Obligations and the lien on Avoidance Proceeds securing the DIP Term Loan Obligations shall

rank *pari passu* with each other.

(11)    *Adequate Protection of Prepetition ABL Lenders*.  Until the indefeasible

discharge of the Prepetition ABL Debt (which shall be deemed to have occurred upon the

expiration of the Challenge Period (as defined below) if no adversary proceeding or contested

matter is timely and properly asserted, in accordance with paragraph 25 hereof, with respect to

the Prepetition ABL Debt or against the Prepetition ABL Agent or the Prepetition ABL Lenders

(in their capacities as such)), the Prepetition ABL Lenders are entitled, pursuant to sections 361,

363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interest in the

Prepetition Collateral, including the Cash Collateral, for and equal in amount to any aggregate

diminution in the value of the Prepetition ABL Lenders' interests in the Prepetition Collateral,

including, without limitation, any such diminution resulting from the sale, lease or use by the

Debtors (or other decline in value) of Cash Collateral and any other Prepetition Collateral, the

priming of the Prepetition ABL Agent's security interests and liens in the Prepetition Collateral

28

by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Interim Order, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Prepetition ABL Debt and the Contingent Prepetition ABL Debt.  As adequate protection, the Prepetition ABL Agent and the Prepetition ABL Lenders are hereby granted the following (collectively, the "**Prepetition ABL Adequate Protection Obligations**"):

(a)    Prepetition ABL Adequate Protection Liens.  The Prepetition ABL Agent (for itself and for the benefit of the Prepetition ABL Lenders) is hereby granted in the amount of diminution in value of the Prepetition ABL Lenders' interest in its Cash Collateral that results from the Debtors' use thereof and the amount of any Contingent Prepetition ABL Debt, a replacement security interest in and lien upon all of the DIP Collateral, subject and subordinate only to (i) the security interests and liens granted to (x) the DIP Agents for the benefit of the DIP Lenders, and (y) the Prepetition Secured Noteholders in respect of the DIP Term Loan Priority Collateral pursuant to this Interim Order and the DIP Documents and any liens on the DIP Collateral, (ii) the Carve Out, (iii) the Prepetition Secured Noteholders Adequate Protection Liens (as defined below), and (iv) Other Priority Liens (such liens securing the Prepetition ABL Adequate Protection Obligations, the "**Prepetition ABL Adequate Protection Liens**").  The Prepetition ABL Adequate Protection Liens shall secure (i) solely in the event that the Prepetition ABL Debt is not discharged as provided in this Interim Order, an amount equal to any diminution in value of the Prepetition ABL Lenders' interest in its Cash Collateral that results from the Debtor's use thereof, and (ii) the amount of any Contingent Prepetition ABL Debt.

(b)    In the event that the conditions precedent to the granting of the Prepetition ABL Adequate Protection Liens are satisfied, the Prepetition ABL Agent and the

29

Prepetition ABL Lenders are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the Prepetition ABL Adequate Protection Liens.  Whether or not the Prepetition ABL Agent and the Prepetition ABL Lenders shall, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Interim Order.

(c)      Prepetition ABL Sections 503(b) and 507(b) Claim.    The Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, is hereby granted, subject to the Carve Out, a superpriority claim as provided for in sections 503(b) and 507(b) of the Bankruptcy Code for any remaining Prepetition ABL Debt and all Contingent Prepetition ABL Debt, immediately junior to the Superpriority Claims held by the DIP Agents and the DIP Lenders and senior to the superpriority claim held by the Prepetition Indenture Trustee and the Prepetition Secured Noteholders in respect of the DIP ABL Priority Collateral; provided that, unless otherwise expressly agreed to in writing by each DIP Agent, the Prepetition ABL Agent and the Prepetition ABL Lenders shall not receive or retain any payments, property or other amounts in respect of the superpriority claims under section 507(b) of the Bankruptcy Code granted hereunder or under the Prepetition ABL Credit Agreement unless and until the DIP Obligations have indefeasibly been paid in cash in full in accordance with the DIP Documents (the "**ABL Adequate Protection Claim**"); and provided further, that the Prepetition ABL

30

Lenders hereby irrevocably waive the section 503(b) claim granted to them by this Interim Order upon the expiration of the Challenge Period with no challenge having been brought or, if such a challenge is brought, upon the entry of a final judgment resolving such challenge in favor of the Prepetition ABL Lenders; and provided further, that unless the initial draw on the DIP ABL Facility and the DIP Term Loan Facility is used to discharge the outstanding Prepetition ABL Debt, as authorized and directed herein, no further borrowings under the DIP ABL Facility or the DIP Term Loan Facility shall be permitted (other than for other expenditures that the Debtors choose to pay simultaneously therewith or for other expenditures consented to by the Prepetition ABL Agent).

## THE DIP TERM LOAN FACILITY

(12)    *Authorization of the DIP Term Loan Documents and the DIP Term Loan Facility*.

(a)    The Debtors are hereby authorized and directed to execute, deliver, enter into, and perform all obligations under the DIP Term Loan Agreement and related documents, including, without limitation, any exhibits attached thereto, all security agreements, all guarantees, all related or ancillary documents and agreements, and any mortgages contemplated thereby, as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, the "**DIP Term Loan Documents**"), and the DIP Loan Parties are authorized to guarantee all of the Borrowers' outstanding obligations under the DIP Term Loan Documents (the "**DIP Term Loan Obligations**").

(b)    The Borrowers are hereby authorized to borrow a portion of the DIP Term Loan Facility in an amount not to exceed an aggregate principal amount of up to

31

$80,000,000 (subject to any limitations on borrowings thereunder), in accordance with this Interim Order and the DIP Term Loan Documents, which amount shall be used solely for purposes permitted under the DIP Term Loan Documents, including, without limitation, discharging the Prepetition ABL Debt, providing working capital for the Debtors, and paying interest, fees, and expenses in accordance with this Interim Order and the DIP Term Loan Documents.

(c)     In furtherance of the foregoing and without further approval of the Bankruptcy Court, each Debtor is authorized and directed to perform, and is authorized and directed to cause the DIP Loan Parties to perform, all acts and to execute, deliver and perform all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages, and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Term Loan Facility, including, without limitation:

(i)     the execution, delivery and performance of the DIP Term Loan Documents;

(ii)    the execution, delivery and performance of the guarantees by the DIP Loan Parties of the Borrowers' obligations under the DIP Term Loan Documents;

(iii)   the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Term Loan Documents, in each case in such form as the Debtors and the DIP Term Loan Agent may agree, and no further approval of the Bankruptcy Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Term Loan Documents (and any reasonable fees paid in connection therewith) that do not (A) shorten the maturity of the extensions of credit

32

or scheduled termination date thereunder, (B) increase the commitments or the rate of interest payable thereunder;

(iv)    the non-refundable payment to the DIP Term Loan Agent and the DIP Term Loan Lenders, as the case may be, of the fees and any amounts due (or that may become due) in respect of the indemnification obligations in connection with the DIP Term Loan Documents and reasonable fees and expenses as may be due from time to time under the DIP Term Loan Documents, including, without limitation, any upfront or backstop commitment, administrative or collateral agency fee, and the fees and expenses of the professionals retained as provided for in the DIP Term Loan Documents, without the need to file retention motions or fee applications, or to provide notice to any party; and

(v)    the performance of all other acts required under or in connection with the DIP Term Loan Documents.

(d)    Upon execution and delivery of the DIP Term Loan Documents, the DIP Term Loan Documents shall constitute valid, binding and unavoidable obligations of the Debtors and the other DIP Loan Parties, enforceable against each Debtor and each DIP Loan Party in accordance with the terms of this Interim Order and the DIP Term Loan Documents.  No obligation, payment, transfer or grant of security under the DIP Term Loan Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under chapter 5 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim or counterclaim.

33

(13)    *DIP Term Loan Liens.*  As security for the DIP Term Loan Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Term Loan Agent of any property, the following security interests and liens are hereby granted to the DIP Term Loan Agent, for its own benefit and the benefit of the DIP Term Loan Lenders (all property identified in clauses (a), (b), (c) and (d) below being collectively referred to as the "**DIP Term Loan Collateral**"), subject only to the payment of the Carve Out as provided for herein (all such liens and security interests granted to the DIP Term Loan Agent, for its benefit and for the benefit of the DIP Term Loan Lenders, pursuant to this Interim Order and the DIP Documents, the "**DIP Term Loan Liens**" and, together with the DIP ABL Liens, the "**DIP Liens**"):

(a)    First Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Term Loan Agent, for the benefit of the DIP Term Loan Lenders, shall have a valid, binding, continuing, enforceable, fully-perfected first-priority lien on, and security interest in, all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on or as of the Commencement Date or otherwise thereafter acquired, including as a result of the discharge of the Prepetition ABL Debt, that is not subject to valid, perfected, non-avoidable and enforceable liens (collectively, the "**Unencumbered Property**"), including, without limitation, any and all cash and cash collateral of the Debtors (whether maintained with the DIP Term Loan Agent or otherwise) and any investment of such cash and cash collateral, general intangibles, intercompany loans, contracts, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit

34

accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, all issued and outstanding capital stock of each subsidiaries, other rights to payment whether arising before or after the Commencement Date (including, without limitation, postpetition intercompany claims against the Debtors, the DIP Loan Parties and any non-Debtor affiliates), and the proceeds, product, offspring or profits of all of the foregoing, as set forth in the DIP Term Loan Documents, provided that, for the avoidance of doubt, the Unencumbered Property shall not include the DIP ABL Priority Collateral.

(b)    First Lien on DIP Term Loan Priority Collateral.    Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Term Loan Agent, for the benefit of the DIP Term Loan Lenders, shall have a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in all assets of the Debtors and the DIP Loan Parties that do not constitute the DIP ABL Priority Collateral (the "**DIP Term Loan Priority Collateral**"), subject to the Intercreditor Arrangements and any Other Priority Liens.    The DIP Term Loan Priority Collateral is also encumbered by a second-priority lien (junior to the DIP Term Loan Liens) held in favor of the Prepetition Indenture Trustee for the benefit of the Prepetition Secured Noteholders.

(c)    Priming Liens on Prepetition Collateral.    Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Term Loan Agent, for the benefit of the DIP Term Loan Lenders, shall have a valid, binding, continuing, enforceable, fully-perfected first-priority senior priming lien on, and security interest upon all pre- and post-petition property of the Debtors and the DIP Loan Parties that constitutes DIP Term Loan Priority Collateral.    Such security interests and liens shall be senior in all respects to the interests in such property of the Prepetition Secured Parties arising from current and future liens of the Prepetition Secured

35

Parties (including, without limitation, adequate protection liens granted hereunder), but shall not be senior to any valid, perfected and unavoidable interest of other parties arising out of liens, if any on such property existing immediately prior to the Commencement Date.

(d)     Junior Liens on the DIP ABL Priority Collateral.  Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Term Loan Agent, for the benefit of the DIP Term Loan Lenders, shall have a valid, binding, continuing, enforceable, fully-perfected second-priority lien (junior to the DIP ABL Facility Liens) on, and security interest in, the DIP ABL Priority Collateral, subject only to the Intercreditor Arrangements and any Other Priority Liens. The DIP ABL Priority Collateral is also encumbered by a third-priority lien (junior to the DIP ABL Facility Liens and the DIP Term Loan Liens) held in favor of the Prepetition Indenture Trustee for the benefit of the Prepetition Secured Noteholders, subject to the Intercreditor Arrangements and any Other Priority Liens.

(e)     Notwithstanding the foregoing clauses (a), (b), (c) and (d) the DIP Term Loan Collateral under this Interim Order shall exclude Avoidance Actions, but, subject only to and effective upon entry of the Final Order, shall include Avoidance Proceeds, provided, however, that the lien on Avoidance Proceeds securing the DIP Term Loan Obligations and the lien on Avoidance Proceeds securing the DIP ABL Obligations shall rank *pari passu* with each other.

(14)     *Adequate Protection of Prepetition Secured Noteholders*.  The Prepetition Secured Noteholders are entitled, pursuant to sections 361, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interest in the Prepetition Collateral, including any Cash Collateral, for and equal in amount to any aggregate diminution in the value of the Prepetition Secured Noteholders' interests in the Prepetition Collateral, including, without

36

limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral, the Notes Priority Collateral, the ABL Priority Collateral, and any other Prepetition Collateral, the priming of the Prepetition Secured Noteholders' security interests and liens in the Prepetition Collateral by the DIP Agents and the DIP Lenders pursuant to the DIP Documents and this Interim Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.   As adequate protection, the Prepetition Indenture Trustee and the Prepetition Secured Noteholders are hereby granted the following (collectively, the "**Prepetition Secured Noteholders Adequate Protection Obligations**" and, together with the Prepetition ABL Adequate Protection Obligations, the "**Adequate Protection Obligations**"):

(a)      <u>Prepetition Secured Noteholder Adequate Protection Liens</u>. The Prepetition Indenture  Trustee, on behalf of itself and for the benefit of the Prepetition Secured Noteholders, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of such diminution, the following liens: (i) a second-priority lien on the DIP Term Loan Priority Collateral, junior to the lien and security interests granted to the DIP Term Loan Agent for the benefit of the DIP Term Loan Lenders and (ii) a fourth-priority lien on the DIP ABL Priority Collateral, junior to the lien and security interests granted to (x) the DIP ABL Agent for the benefit of the DIP ABL Lenders, (y) the DIP Term Loan Agent for the benefit of the DIP Term Loan Lenders and (z) the Prepetition ABL Adequate Protection Liens (such liens securing the Prepetition Secured Noteholders' Adequate Protection Obligations, collectively, the "**Prepetition Secured Noteholders Adequate Protection Liens**" and, together with the Prepetition Adequate Protection Liens and Contingent Adequate Protection Liens, the "**Adequate Protection Liens**").

37

The Prepetition Secured Noteholders Adequate Protection Liens shall also be junior in all respects to the Carve Out, any Other Priority Liens, and, solely in respect of the DIP ABL Priority Collateral, junior in all respects to the Contingent Adequate Protection Liens.

(b)    The Prepetition Indenture Trustee and the Prepetition Secured Noteholders are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the Prepetition Secured Noteholders Adequate Protection Liens.    Whether or not the Prepetition Indenture Trustee and the Prepetition Secured Noteholders shall, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Interim Order.

(c)    The Debtors are authorized and directed under sections 361, 363 and 364 of the Bankruptcy Code to make adequate protection payments which shall include (a) ongoing payments, when due or as soon as practicable thereafter, of all reasonable and documented costs, fees and expenses incurred either prior to or after the Commencement Date of Paul, Weiss, Rifkind, Wharton & Garrison LLP, AlixPartners and, as reasonably agreed to by the Debtors and in accordance with the Budget,  other legal (foreign and domestic), environmental and industry advisors, each in its capacity as advisor, to the Informal Committee of Noteholders, and in each case, incurred in connection with the Debtors, the Chapter 11 Cases or the transactions contemplated hereby; and (b) continued maintenance and insurance of the

38

Prepetition Collateral and the DIP Collateral as required under the Prepetition Financing Documents and the DIP Documents (collectively, the "**Adequate Protection Payments**").

(15)     *Prepetition Secured Noteholders' Section 507(b) Claim.*  The Prepetition Indenture Trustee, on behalf of itself and the Prepetition Secured Noteholders, is hereby granted, subject to the Carve Out, a superpriority claim as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the Superpriority Claims held by the DIP Agents and the DIP Lenders; provided that, unless otherwise expressly agreed to in writing by the DIP Agents, the Prepetition Indenture Trustee and the Prepetition Secured Noteholders shall not receive or retain any payments, property or other amounts in respect of the superpriority claims granted hereunder or under the Prepetition Financing Documents unless and until the DIP Obligations have indefeasibly been paid in cash in full in accordance with the DIP Documents (the "**Prepetition Secured Noteholders Adequate Protection Claim**" and, together with the Prepetition ABL Adequate Protection Claim, the "**Adequate Protection Claims**").

(16)     *Sufficiency of Adequate Protection.*  Under the circumstances and given that the Adequate Protection Liens, the Adequate Protection Claims and the Adequate Protection Payments (collectively, the "**Adequate Protection Obligations**") are consistent with the Bankruptcy Code; the Bankruptcy Court finds that such adequate protection is reasonable and sufficient to protect the interests of the Prepetition Secured Parties.  Except as expressly provided herein, nothing contained in this Interim Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to any Prepetition Secured Party, the DIP Agents or any DIP Lenders including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract or repurchase agreement with a Debtor to assert rights of setoff or

39

other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion).

(17)    *Limitation on Charging Expenses Against Collateral.*    Subject to and effective only upon entry of the Final Order, except to the extent of the Carve Out, no expenses of administration of these Chapter 11 Cases or any future proceeding that may result therefrom, including a case under Chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the DIP Agents and the DIP Lenders or the Prepetition Indenture Trustee and the Prepetition Secured Noteholders, as the case may be with respect to their respective interests, and no consent shall be implied from any action, inaction or acquiescence by the DIP Agents, the DIP Lenders, the Prepetition Indenture Trustee or the Prepetition Secured Noteholders.  In no event shall the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties be subject to (i) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral.

(18)    *Payment of Fees and Expenses.*    Except as set forth in this paragraph 18, no payments (including professional fees and expenses) with respect to the DIP Obligations or the Adequate Protection Obligations shall be subject to Bankruptcy Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines, and no recipient of any such payments shall be required to file any interim or final fee applications with the Bankruptcy Court or otherwise seek Bankruptcy Court's approval of any such payments.

40

(19)    *Credit Bid.*  The DIP Agents, the DIP Lenders and the Prepetition Secured Parties, respectively, shall have the respective right to credit bid (in the case of the DIP Term Loan Obligations, with the consent of the Majority Lenders (as defined in the DIP Term Loan Agreement)) a portion of or all of their respective claims in connection with a sale of the Debtors' assets under section 363 of the Bankruptcy Code or under a plan of reorganization, unless the Bankruptcy Court, for cause, orders otherwise.  For the avoidance of doubt, no party other than the DIP ABL Agent may credit bid for any DIP ABL Priority Collateral unless the DIP ABL Obligations have been paid in full in cash.

(20)    *Protection of DIP Lenders' Rights.*

(a)    The automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified (and any stay of such vacation or modification under Bankruptcy Rule 4001(a)(3) is waived) without further order of the Bankruptcy Court to the extent necessary to permit the DIP Agents and the DIP Lenders to exercise all rights and remedies provided for in the DIP Documents and Interim Order without further order of or application or motion to the Bankruptcy Court, provided that, such rights and remedies that are exercisable only upon the occurrence of an Event of Default (as defined in the DIP Documents and as set forth in paragraph 23 of this Interim Order), but subject in all respects to the Carve Out Cap, shall require the applicable DIP Agent to give five (5) days' prior written notice (which five days' notice period (the "**Default Notice Period**") shall run concurrently with any notice provided under the DIP Documents) to the U.S. Trustee, the Debtors, the Prepetition Indenture Trustee, the Prepetition ABL Agent, the other DIP Agent, and the Creditors' Committee, if any, of such DIP Agent's intent to exercise such rights and remedies; provided that, the Debtors shall not have the right to contest the enforcement of the remedies set forth in this Interim Order and

41

the DIP Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth herein or in the applicable DIP Documents; and provided further that during the Default Notice Period, the Debtors shall have no authority to borrow under the respective DIP Facility unless the applicable DIP Agent otherwise consents with respect to its DIP Facility, and each DIP Agent may terminate its respective DIP Facility and declare the respective DIP Obligations to be immediately due and payable, and the Debtors' authority to use Cash Collateral shall be as set forth in the 13-Week Projection and limited solely to payment of expenses critical to preservation of the Debtors' estates and the payment of the fees, costs and expenses to administer these Chapter 11 Cases, as agreed by each respective DIP Agent in its sole discretion. The Debtors and the Prepetition Secured Parties shall waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Agents and the DIP Lenders set forth in this Interim Order and in the DIP Documents. For the avoidance of doubt, notwithstanding anything to the contrary in this Interim Order, immediately after the occurrence of a Triggering Event (as defined in the DIP ABL Credit Agreement), the DIP ABL Agent may place the Debtors on dominion of funds as provided in the DIP ABL Credit Agreement without the requirement of five days' prior written notice.

(b)    The DIP Agents' or any DIP Lender's delay or failure to exercise rights and remedies under the applicable DIP Documents or this Interim Order shall not constitute a waiver of such DIP Agent's or such DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents.

WEIL:\95256444\10\58399.0011

(c)        Except as otherwise expressly set forth in this Interim Order, the

Debtors irrevocably waive any right, without the prior written consent of the DIP Agents, (a) to

grant or impose, under section 364 of the Bankruptcy Code or otherwise, liens or security

interests in any DIP Collateral, whether senior, equal or subordinate to the DIP Agents' liens and

security interests; (b) to use, or seek to use, Cash Collateral or; (c) to modify or affect any of the

rights of the DIP Agents or the DIP Lenders under this Interim Order or the DIP Documents by

any plan of reorganization confirmed in these Chapter  11 Cases or subsequent order entered in

these Chapter 11 Cases.

(21)        *Perfection of DIP Liens.*

(a)        The DIP Agents and the DIP Lenders are hereby authorized, but

not required, to file or record (and to execute in the name of the Debtors, as its true and lawful

attorney, with full power of substitution, to the maximum extent permitted by law) financing

statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments

in any jurisdiction, or take possession of or control over deposit accounts and securities accounts

or any other asset, in each case, in order to validate and perfect the liens and security interests

granted to them in the DIP Documents and this Interim Order.  Whether or not the DIP Agents

on behalf of the respective DIP Lenders, each in their discretion, choose to file such financing

statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments,

or take possession of or control over deposit accounts and securities accounts or any other assets,

such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-

avoidable and not subject to challenge dispute or subordination, at the time and on the date of

entry of this Interim Order.  Upon the reasonable request of the DIP Agents, without any further

consent of any party, the DIP Agents, the Debtors, each DIP Lender and the Prepetition Secured

43

Parties are authorized and directed to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agents to further perfect the DIP Liens.

(b)     A certified copy of this Interim Order may, in the discretion of the DIP Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording. For the avoidance of doubt, the automatic stay provisions of section 362(a) of the Bankruptcy Code shall be modified (and any stay of such modification under Bankruptcy Rule 4001(a)(3) is waived) to the extent necessary to permit the DIP Agents to take all actions, as applicable, referenced in this subparagraph (b) and in the immediately preceding subparagraph (a).

(c)     Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other Collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the granting of post-petition liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Lenders in accordance with the terms of the DIP Documents or this Interim Order.

(22)     *Preservation of Rights Granted Under this Interim Order.*

(a)     Except as expressly provided herein or in the DIP Documents, no claim or lien having a priority senior to or *pari passu* with those granted by this Interim Order

44

and the DIP Documents to the DIP Agents, the DIP Lenders and the Prepetition Secured

Noteholders shall be granted or allowed while any portion of the DIP Obligations or the

Adequate Protection Obligations (with respect to the Prepetition ABL Adequate Protection

Obligations, only if the Challenge Period has not expired) remain outstanding, and the DIP Liens

and the Adequate Protection Liens (with respect to the Prepetition ABL Adequate Protection

Liens, only if the Challenge Period has not expired) shall not (i) be subject to or junior to (A) any

lien or security interest that is avoided and preserved for the benefit of the Debtors and their

estates under section 551 of the Bankruptcy Code or (B) any liens arising after the

Commencement Date, including, without limitation, any liens or security interests granted in

favor of any federal, state, municipal or other domestic or foreign governmental unit (including

any regulatory body), commission, board or court for any liability of the Debtors, or

(ii) subordinate to or made *pari passu* with any other lien or security interest, whether under

sections 363 or 364 of the Bankruptcy Code or otherwise.

(b)     In addition to the Events of Default set forth in the DIP

Documents, unless all DIP Obligations and all Adequate Protection Obligations shall have been

indefeasibly paid in full in cash, the Debtors shall not seek, and it shall constitute an Event of

Default under the DIP Documents and terminate the right of the Debtors to use Cash Collateral

hereunder if any of the Debtors seek, or if there is entered, unless the DIP Agents have otherwise

consented:  (i) any modification or extension of this Interim Order without the prior written

consent of the DIP Agents, the Prepetition Indenture Trustee, and the Prepetition Secured

Noteholders, and no such consent shall be implied by any other action, inaction or acquiescence

by the DIP Agents, the Prepetition Indenture Trustee, and the Prepetition Secured Noteholders,

(ii) an order converting or dismissing these Chapter 11 Cases; (iii) an order appointing a Chapter

45

11 trustee in these Chapter 11 Cases or any other representative or other similar appointment, (iv) an order appointing an examiner with enlarged powers in these Chapter 11 Cases, (v) an order providing for a change of venue with respect to these Chapter 11 Cases and such order shall not have been reversed or vacated within ten (10) days; (vi) an order approving a plan of reorganization or the sale of all or substantially all of the DIP Collateral (except to the extent permitted under the DIP Documents) or the Prepetition Collateral (except to the extent permitted under the Prepetition Financing Documents) shall have been entered which does not provide for the repayment in full in cash of all DIP Obligations (other than any contingent obligations not yet due and payable) and all Adequate Protection Obligations (with respect to the Prepetition ABL Adequate Protection Obligations, so long as the Challenge Period has not expired) upon the consummation thereof.  If an order dismissing these Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (x) the Superpriority Claims, priming liens, security interests and replacement security interests granted to the DIP Agents, the DIP Lenders and the Prepetition Secured Parties, including, without limitation, the DIP Liens, the Adequate Protection Liens, the Prepetition Secured Noteholders Adequate Protection Claims and Adequate Protection Payments, the 507(b) claims, and the other administrative expense claims granted pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order (and that such Superpriority Claims, priming liens, security interests and replacement security interests granted to the DIP Agents, the DIP Lenders and the Prepetition Secured Parties, including, without limitation, the DIP Liens, the Adequate Protection Liens, the Prepetition Secured Noteholders Adequate Protection Claims and Adequate Protection Payments, the 507(b) claims, and the other administrative expense claims,

46

liens and security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest, including the priorities set forth herein and in the DIP Documents) until all DIP Obligations and all Adequate Protection Obligations (with respect to the Prepetition ABL Adequate Protection Obligations, so long as the Challenge Period has not expired) shall have been paid and satisfied in full and (y) the Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above; provided that the Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition Obligations or under the Prepetition Financing Documents unless and until the DIP Obligations have indefeasibly been paid in cash in full in accordance with the DIP Documents.

(c)    If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity, priority or enforceability of any DIP Obligations or the Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agents, the Prepetition ABL Agent or the Prepetition Indenture Trustee, as applicable, of the effective date of such reversal, modification, vacation or stay or (ii) the validity, priority or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Documents with respect to any DIP Obligations or the Adequate Protection Obligations.  Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral, the DIP Obligations or the Adequate Protection Obligations incurred by the Debtors to the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agents, the Prepetition ABL Agent or the Prepetition Indenture Trustee of the effective date of such reversal, modification, vacation or stay shall be governed in

47

all respects by the original provisions of this Interim Order, and the DIP Agents, the DIP Lenders, and the Prepetition Secured Parties shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the DIP Documents.

(d)    Except as expressly provided in this Interim Order or in the DIP Documents, the DIP Obligations and the Adequate Protection Obligations, including the DIP Liens, the Superpriority Claims, the 507(b) claims, the Adequate Protection Liens, the Adequate Protection Claims, the Adequate Protection Payments and all other rights and remedies of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of these Chapter 11 Cases to a case under Chapter 7, dismissing these Chapter 11 Cases, approving the sale of any DIP Collateral pursuant to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents, or except to the extent that a release of such liens is authorized under the Intercreditor Arrangements) or by any other act or omission or (ii) the entry of an order confirming a plan of reorganization in these Chapter 11 Cases (except an acceptable plan to the DIP Agents and DIP Lenders under the DIP Documents) and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents shall continue in the Chapter 11 Cases, in any successor cases, or in any superseding Chapter 7 cases under the Bankruptcy Code, and the DIP Obligations and the Adequate Protection Obligations, including the DIP Liens, the Superpriority Claims, the 507(b) claims, the Adequate Protection Liens, the Adequate Protection Claims, the Adequate Protection Payments, the other

48

administrative expense claims granted pursuant to this Interim Order and all other rights and remedies of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties granted under the DIP Documents and this Interim Order shall continue in full force and effect and shall be binding on any Chapter 7 trustee, Chapter 11 trustee, any litigation trust representative, other or similar party hereinafter appointed or elected for the estates of the Debtors until all DIP Obligations and all Adequate Protection Obligations are indefeasibly paid in full in cash as set forth herein and the DIP Documents.

(23)    *Exculpation*.  Nothing in this Interim Order, the DIP Documents, or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Agent or any DIP Lender any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  In addition, (a) the DIP Agents and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors; provided that, (i) the foregoing shall not apply to any act or omission by the DIP Agents or the DIP Lenders that constitutes gross negligence or willful misconduct by the DIP Agents or the DIP Lenders as finally determined by a court of competent jurisdiction.

(24)    *Effect of Stipulations on Third Parties*.

(a)    The stipulations and admissions contained in this Interim Order, including, without limitation, in paragraph 4 of this Interim Order, shall be binding upon each

49

Debtor and their subsidiaries and any of their respective successors and assigns (including, without limitation, any Chapter 7 or Chapter 11 trustee appointed or elected for a Debtor), and each person or entity party to the DIP Documents in accordance with their respective terms and the terms of this Interim Order, in all circumstances.

(b)        The stipulations and admissions contained in this Interim Order, including without limitation, in paragraph 4 of this Interim Order, shall be binding on a permanent basis upon all other parties in interest, including without limitation, the Debtors, as debtors-in-possession, and the Debtors' estates, any Chapter 7 trustee, and any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases (including the Creditors' Committee, if any) and any other person or entity acting on behalf of the Debtors' estates, unless (a) such committee or any other party-in-interest, in each case, with requisite standing granted by the Bankruptcy Court, has timely and properly filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in paragraph 25) by no later than the date that is the later of (i) in the case of any such adversary proceeding or contested matter filed by a party-in-interest with requisite standing other than the Creditors' Committee, 60 days' after the date of entry of the Final Order, (ii) in the case of any such adversary proceeding or contested matter filed by the Creditors' Committee, 60 days after the appointment of the Creditors' Committee, (iii) any such later date agreed to in writing by the Prepetition ABL Agent or the Prepetition Indenture Trustee, as applicable, and (iv) such longer period as the Bankruptcy Court orders for cause shown prior to the expiration of such period (the "**Challenge Period**"), (1) challenging the validity, enforceability, priority, extent, or amount of the obligations under the Prepetition Financing Documents (the "**Prepetition Obligations**") or the liens, subject to valuation under section 506 of the Bankruptcy Code, on the Prepetition Collateral securing the

50

Prepetition Obligations or (2) otherwise asserting or prosecuting any avoidance actions or any

other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the

"**Claims and Defenses**") against the Prepetition Secured Parties or their respective agents,

affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors in connection

with any matter related to the Prepetition Obligations or the Prepetition Collateral, and (b) an

order is entered by a court of competent jurisdiction and becomes final and non-appealable in

favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary

proceeding or contested matter; provided that, (i) as to the Debtors, all such Claims and Defenses

are hereby irrevocably waived and relinquished as of the Commencement Date and (ii) any

challenge or claim shall set forth with specificity the basis for such challenge or claim and any

challenges or claims not so specified prior to the expiration of the Challenge Period shall be

forever deemed waived, released and barred.   If no such adversary proceeding or contested

matter is timely and properly filed in respect of the Prepetition Obligations, (x) the Prepetition

ABL Obligations to the extent not heretofore repaid and the other Prepetition Obligations shall

constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization,

subordination, defense or avoidance, for all purposes in the Chapter 11 Cases and any subsequent

Chapter 7 case, (y) the liens on the Prepetition Collateral securing the Prepetition Obligations, as

the case may be, shall be deemed to have been, as of the Commencement Date, and to be, legal,

valid, binding, perfected and of the priority specified in paragraph 4(b), not subject to defense,

counterclaim, recharacterization, subordination or avoidance and (z) the Prepetition Obligations,

the Prepetition Secured Parties, and the liens on the Prepetition Collateral granted to secure the

Prepetition Obligations, as the case may be, shall not be subject to any other or further challenge

by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any

51

other party-in-interest, and such committee or party-in-interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or a Chapter 7 or 11 trustee appointed or elected for any of the Debtors) with respect thereto.   If any such adversary proceeding or contested matter is timely and properly filed, the stipulations and admissions contained in paragraph 4 of this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this subparagraph) on any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other party-in-interest, except as to any such findings and admissions that were expressly and successfully challenged in such adversary proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction.   In the event that there is a timely successful challenge, pursuant and subject to the limitations contained in this paragraph 24, to the validity, enforceability, extent, perfection or priority of the Prepetition ABL Debt, the Bankruptcy Court shall have the power to unwind or otherwise modify, after notice and hearing, the discharge of the Prepetition ABL Debt or a portion thereof (which might include payment of the Disgorged Amounts or re-allocation of interest, fees, principal or other incremental consideration paid in respect of the Prepetition ABL Debt or the avoidance of liens and/or guarantees with respect to the Debtors), as the Bankruptcy Court shall determine.   Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, Claims and Defenses with respect to the Prepetition Loan Documents or the Prepetition Obligations or any liens granted by any Debtor to secure any of the foregoing.

52

(25)    *Limitation on Use of DIP Facilities and DIP Collateral.*
(a) Notwithstanding anything herein or in any other order by the Bankruptcy Court to the contrary, no borrowings, letters of credit, Cash Collateral, Collateral, Carve Out or the Carve Out Cap may be used to (i) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents or the Prepetition Financing Documents, or the liens or claims granted under this Interim Order, the DIP Documents or the Prepetition Financing Documents, (ii) assert any Claims and Defenses or causes of action against the DIP Agents, the DIP Lenders, the Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition Secured Noteholders, or the Prepetition Indenture Trustee, or their respective agents, affiliates, representatives, attorneys or advisors, (iii) prevent, hinder or otherwise delay the DIP Agents' assertion, enforcement or realization on the Cash Collateral or the Collateral in accordance with the DIP Documents, the Prepetition Financing Documents or this Interim Order, (iv) seek, except in response to the final relief requested in the Motion, to modify any of the rights granted to the DIP Agents, the DIP Lenders, the Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition Indenture Trustee, or the Prepetition Secured Noteholders hereunder or under the DIP Documents, the Prepetition Financing Documents or the Prepetition Secured Indenture, in each of the foregoing cases without such parties' prior written consent or (v) pay any amount on account of any claims arising prior to the Commencement Date unless such payments are (1) approved by an order of this Court (including hereunder) and (2) in accordance with the DIP Documents and the 13-Week Projection; provided that, in accordance with the Carve Out, advisors to the Creditors' Committee may investigate the liens granted pursuant to the Prepetition Financing Documents during the Challenge Period at an

WEIL:\95256444\10\58399.0011

aggregate expense for such investigation, but not litigation, prosecution, objection or challenge thereto, not to exceed $50,000.

(26)    *Intercreditor Arrangements*.    The Bankruptcy Court approves the Intercreditor Arrangements annexed hereto as **Exhibit "1"** and authorizes the Debtors to execute and perform under any related documents and to perform all such other and further acts as may be necessary or appropriate to comply with and fulfill the obligations under the Intercreditor Arrangements.    Notwithstanding anything to the contrary herein or in any other order of the Bankruptcy Court, in determining the relative priorities and rights of any Prepetition Secured Party as against any other Prepetition Secured Party (including, without limitation, the relative priorities and rights of the Prepetition Secured Parties with respect to the Adequate Protection Liens granted hereunder), such priorities and rights shall continue to be governed by the Prepetition Financing Documents.    The Intercreditor Arrangements shall survive the conversion or dismissal of any of the Chapter 11 Cases or any relief from the automatic stay granted in the Chapter 11 Cases.

(27)    *Proofs of Claim*.    None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties will be required to file proofs of claim in any of Chapter 11 Cases or any successor case, and the Debtor's stipulations in this Interim Order shall be deemed to constitute a timely filed proof of claim.    Any order entered by the Bankruptcy Court in connection with the establishment of a bar date for any claim (including without limitation administrative claims) in the Chapter 11 Cases or any successor case shall not apply to the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.

(28)    *Rights of Access and Information*.    Without limiting the rights of access and information afforded the DIP Agents and DIP Lenders under the DIP Documents or the

54

Prepetition Secured Parties under the Prepetition Financing Documents, the Debtors shall be, and hereby are, required to afford representatives, agents and/or employees of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties reasonable access to the Debtors' premises and their books and records in accordance with the DIP Documents and the Prepetition Financing Documents, as the case may be, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.  In addition, the Debtors authorize their independent certified public accountants, financial advisors, restructuring advisers, investment bankers and consultants to cooperate, consult with, and provide to the DIP Agents, and the Prepetition Indenture Trustee (and so long as an Event of Default has occurred and is continuing, each Prepetition Secured Party and DIP Lender) all such information as may be reasonably requested with respect to the business, results of operations and financial condition of the Debtors.

(29)    *Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order or the Final Order, if and when entered, and the DIP Documents, the provisions of this Interim Order or the Final Order, as applicable, shall govern.  Additionally, to the extent that there may be an inconsistency between the terms of this Interim Order or the Final Order, if and when entered, and the Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures, if and when entered, the terms of this Interim Order or Final Order, as applicable, shall govern.

(30)    *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Interim Order, including all findings herein and the Intercreditor Arrangements, shall be binding upon all parties-in-interest in the Chapter 11 Cases on a permanent basis, including without limitation, the DIP Agents, the DIP Lenders, the Prepetition

55

Secured Parties, any statutory or non-statutory committees appointed or formed in the Chapter 11

Cases, and the Debtors and their respective successors and assigns (including any Chapter 7 or

chapter 11 trustee hereinafter appointed or elected for any of the Debtors, an examiner appointed

pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal

representative of any of the Debtors, or similar responsible person or similar designee or

litigation trust hereinafter appointed or elected for the estates of the Debtors) and shall inure to

the benefit of the DIP ABL Agent, the DIP Term Loan Agent, the DIP Lenders, the Prepetition

Secured Parties and the Debtors and their respective successors and assigns, including after

conversion or dismissal of any of the Chapter 11 Cases; provided that, except to the extent

expressly set forth in this Interim Order, the DIP Agents, the DIP Lenders, and the Prepetition

Secured Parties shall have no obligation to permit the use of Cash Collateral or extend any

financing to any Chapter 7 trustee, chapter 11 trustee or similar responsible person or similar

designee or litigation trust hereunder appointed for the estates of the Debtors.

(31)    *Limitation of Liability*.  In determining to make any loan under the DIP

Documents, permitting the use of Cash Collateral or in exercising any rights or remedies as and

when permitted pursuant to this Interim Order or the DIP Documents, the DIP Agents, the DIP

Lenders and the Prepetition Secured Parties shall not be deemed to be in control of the operations

of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to

the operation or management of the Debtors (as such terms, or any similar terms, are used in the

United States Comprehensive Environmental Response, Compensation and Liability Act, 29

U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Furthermore, nothing

in this Interim Order or in the DIP Documents shall in any way be construed or interpreted to

impose or allow the imposition upon the DIP Agents, the DIP Lenders, or the Prepetition

WEIL:\95256444\10\58399.0011

Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their affiliates (as defined in section 101(2) of the Bankruptcy Code).

(32)    *Effectiveness.*    This Interim Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof as of the Commencement Date, and there shall be no stay of execution of effectiveness of this Interim Order.    Any stay of the effectiveness of this Interim Order under Bankruptcy Rule 6004 or otherwise is waived.

(33)    *Final Hearing*.    The Final Hearing on the Motion shall be held on _____, 2015 at __:__ _.m. (Eastern Time), before the Bankruptcy Court.

(34)    *Final Hearing Notice*.    The Debtors shall promptly mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with the Bankruptcy Court and to the Creditors' Committee after the same has been appointed, or Creditors' Committee counsel, if the same shall have been appointed.    Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file written objections with the Bankruptcy Court in accordance with General Order M-399, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue,

New York, New York 10153 (Attn: Marcia L. Goldstein, Esq. and Ray C. Schrock, Esq.); and

(ii) the Notice Parties, in each case so as to be received no later than **4:00 p.m. (Eastern Time)**

**on _____, 2015**.

Dated: _____, 2015
      New York, New York

                    _____
                    United States Bankruptcy Judge

58

## EXHIBIT 1 – INTERCREDITOR ARRANGEMENTS

*Capitalized terms used in this Exhibit I and not defined in this Exhibit shall have the meanings*

*assigned to such terms in this Interim Order.*

### 1.      DEFINITIONS.

"Access Agreement" – means that certain Access Agreement by and among Chassix, Inc., as

Supplier, UC Holdings, Inc., PNC Bank, National Association and Cantor Fitzgerald Securities,

as the DIP Agents, and General Motors LLC, Ford Motor Company, Nissan North America, Inc.,

and FCA US LLC f/k/a Chrysler Group LLC, as Customers.

"DIP ABL Secured Parties" – means the "Secured Parties" (as defined in the DIP ABL Credit

Agreement).

"Discharge of DIP ABL Obligations" - means (A) termination of all commitments of the DIP

ABL Secured Parties under the DIP ABL Facility Documents and (B) with respect to (i) any DIP

ABL Obligations (other than contingent indemnification and contingent expense reimbursement

obligations, in each case, for which no claims have been asserted), payment in full in cash of all

DIP ABL Obligations, and, with respect to letters of credit or letter of credit guaranties

outstanding under the DIP ABL Facility Documents, either (x) cancellation and return to the DIP

ABL Agent of all letters of credit or letter of credit guaranties outstanding under the DIP ABL

Facility Documents or (y) delivery of cash collateral in respect thereof in a manner consistent

with the DIP ABL Credit Agreement; and (ii) any DIP ABL Obligations that are contingent in

nature (other than DIP ABL Obligations consisting of LC Obligations or Secured Bank Product

Obligations (each as defined in the DIP ABL Credit Agreement) of a DIP Loan Party, which are

1

addressed in subparagraph B(i) above), the depositing of cash with the DIP ABL Agent in an amount equal to 100% of any such DIP ABL Obligations that have been liquidated or, if such DIP ABL Obligations are unliquidated in amount and represent a claim which has been asserted against the DIP ABL Agent or a DIP ABL Secured Party and for which an indemnity has been provided by the DIP Loan Parties in any of the DIP ABL Facility Documents, in an amount that is equal to such claim or the DIP ABL Agent's good faith estimate of such claim; provided that the Discharge of DIP ABL Obligations shall not be deemed to have occurred if such payments are made with the proceeds of other DIP ABL Obligations that constitute an exchange or replacement for or a Refinancing of such DIP ABL Obligations.

"Discharge of DIP Term Loan Obligations" - means (A) termination of all commitments under the DIP Term Loan Documents, and (B) payment in full in cash of all DIP Term Loan Obligations and satisfaction and discharge of the DIP Term Loan Credit Agreement (other than obligations that expressly survive such satisfaction and discharge or legal or covenant defeasance).

"Discharge of Prepetition Secured Notes Obligations" - means payment in full in cash of all Prepetition Secured Notes Obligations, satisfaction and discharge of the Prepetition Secured Indenture or legal or covenant defeasance of the Prepetition Secured Indenture (other than obligations that expressly survive such satisfaction and discharge or legal or covenant defeasance).

"Discharge of Fixed Asset Obligations" – means, collectively, the Discharge of DIP Term Loan Obligations and Discharge of Prepetition Secured Notes Obligations.

2

"Enforcement Notice" – means a written notice delivered, at a time when an event of default has occurred and is continuing under the DIP ABL Facility Documents, the DIP Term Loan Documents or the Prepetition Secured Indenture, by the DIP ABL Agent, the DIP Term Loan Agent or the Prepetition Indenture Trustee, as applicable, to the other parties, specifying the relevant event of default.

 "Fixed Asset Obligations" – means, collectively, the DIP Term Loan Obligations and the Prepetition Secured Notes Obligations.

"Fixed Asset Secured Parties" – means, collectively, the Prepetition Indenture Trustee, the Prepetition Secured Noteholders, the DIP Term Loan Agent and the DIP Term Loan Lenders.

"Premises" – means any real property owned or leased by the DIP Loan Parties at which any DIP Collateral is located.

"Prepetition Secured Notes Documents" – means Prepetition Secured Indenture and the other Senior Secured Notes Documents (as defined in the Prepetition Secured Indenture).

"Prepetition Secured Notes Obligations" – means all obligations outstanding under the Prepetition Secured Notes.

"Proceeds" means (a) all "proceeds," as defined in Article 9 of the UCC, with respect to the DIP Collateral, and (b) whatever is recoverable or recovered when any DIP Collateral is sold, exchanged, collected or disposed of, whether voluntarily or involuntarily.

"Refinance" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend,

3

increase, modify, supplement, restructure, refund, replace or repay, or to issue other indebtedness

or enter alternative financing arrangements, in exchange or replacement for such indebtedness, in

whole or in part, including by adding or replacing lenders, creditors, agents, borrowers and/or

guarantors, including any increase in the principal amount of the loans and commitments

provided thereunder, and including in each case, but not limited to, after the original instrument

giving rise to such indebtedness has been terminated.  "Refinanced" and "Refinancing" have

correlative meanings.

"Secured Party Representative" means, collectively, the DIP ABL Agent, the DIP Term Loan

Agent and the Prepetition Indenture Trustee.

"UCC" means the Uniform Commercial Code of any applicable jurisdiction.

4

2.      **Exercise of Remedies on DIP ABL Priority**
        **Collateral by Fixed Asset Secured Parties**

(a) Until the Discharge of  DIP ABL Obligations, the Fixed Asset Secured Parties:

(i)      will not exercise or seek to exercise any rights, powers, or remedies with

respect to any DIP ABL Priority Collateral;

(ii)      will not, directly or indirectly, contest, protest or object to or hinder any

judicial or non-judicial foreclosure proceeding or action (including any partial or

complete strict foreclosure) brought by the DIP ABL Agent or any other DIP

ABL Lender relating to the DIP ABL Priority Collateral or any other exercise by

the DIP ABL Agent or any other DIP ABL Lender of any other rights, powers and

remedies relating to the DIP ABL Priority Collateral, including any sale, lease,

exchange, transfer or other disposition of the DIP ABL Priority Collateral,

whether under the DIP ABL Facility Documents, applicable law, or otherwise;

(iii)      will not object to the forbearance by the DIP ABL Agent or the DIP ABL

Lenders from bringing or pursuing any enforcement action with respect to the DIP

ABL Priority Collateral;

(iv)      except as may be permitted by Section 2(c), irrevocably, absolutely and

unconditionally waive any and all rights the Fixed Asset Secured Parties may

have as a junior lien creditor or otherwise to object (and seek or be awarded any

relief of any nature whatsoever based on any such objection) to the manner in

which the DIP ABL Agent or the DIP ABL Lenders (i) enforce or collect (or

attempt to collect) the DIP ABL Obligations or (ii) realize or seek to realize upon

5

or otherwise enforce the DIP ABL Facility Liens, regardless of whether any action or failure to act by or on behalf of the DIP ABL Agent or the DIP ABL Lenders is adverse to the interest of the Fixed Asset Secured Parties.  Without limiting the generality of the foregoing, the Fixed Asset Secured Parties shall be deemed to have irrevocably, absolutely and unconditionally waived any right to object (and seek to be awarded any relief of any nature whatsoever based on any such objection), at any time prior or subsequent to any disposition of any of the DIP ABL Priority Collateral, on the ground(s) that any such disposition of the DIP ABL Priority Collateral (x) would not be or was not "commercially reasonable" within the meaning of the UCC and/or (y) would not or did not comply with any other requirement under the UCC or under any other applicable law governing the manner in which a secured creditor is to realize on its collateral;

(v)        subjection to Section 2(c), acknowledge and agree that no covenant, agreement or restriction in the documents evidencing the liens and claims of the Fixed Asset Secured Parties shall be deemed to restrict in any way the rights and remedies of the DIP ABL Agent or the DIP ABL Lenders with respect to the DIP ABL Priority Collateral; and

(vi)       subject to Section 2(c), agree that none of them shall object (or support any other Person objecting) to any motion by the DIP ABL Agent or the other DIP ABL Lenders seeking relief from the automatic stay in respect of the DIP ABL Priority Collateral;

provided that, in the case of (i), (ii) and (iii) above, the liens granted to secure the Fixed Asset

WEIL:\95256444\10\58399.0011

Obligations shall attach to any Proceeds resulting from actions taken by the DIP ABL Agent or

any DIP ABL Security Party with respect to the DIP ABL Priority Collateral in accordance with

the Intercreditor Arrangements (including the priorities described in Section 2) after application

of such Proceeds to the extent necessary to meet the requirements of a Discharge of DIP ABL

Obligations.

(b)    Until the Discharge of DIP ABL Obligations, the DIP ABL Agent and the other DIP

ABL Lenders shall have the right to enforce rights, exercise remedies (including set-off

and the right to credit bid their debt) and, in connection therewith (including voluntary

dispositions of DIP ABL Priority Collateral by the Debtors after an Event of Default

under the DIP ABL Facility Documents) make determinations regarding the release,

disposition or restrictions with respect to the DIP ABL Priority Collateral (including,

without limitation, exercising remedies under account control agreements and lockbox

agreements) without any consultation with, notice to or the consent of the Fixed Asset

Secured Parties; provided that the liens securing the obligations owed to the Fixed Asset

Secured Parties shall remain on the Proceeds (other than those properly applied to the

DIP ABL Obligations) of such DIP ABL Priority Collateral released or disposed of (for

clarity, to the extent that the DIP ABL Agent or DIP ABL Lenders acquire DIP ABL

Priority Collateral via credit bid, then there shall be no Proceeds and the liens of the

Fixed Assets Secured Parties on the DIP ABL Priority Collateral that is subject to such

credit bid shall be discharged).  In exercising rights, powers and remedies with respect to

the DIP ABL Priority Collateral, the DIP ABL Agent and the DIP ABL Lenders may

enforce the provisions of the DIP ABL Facility Documents and exercise rights, powers

and/or remedies thereunder and/or under applicable law or otherwise, all in such order

7

and in such manner as they may determine in the exercise of their sole discretion.  Such

exercise and enforcement shall include, without limitation, the rights of an agent

appointed by them to sell or otherwise dispose of the DIP ABL Priority Collateral upon

foreclosure, to incur expenses in connection with such sale or disposition and to exercise

all the rights and remedies of a secured creditor under the UCC.

(c)  Notwithstanding anything to the contrary contained herein, any Fixed Asset Secured

Party may:

(i) take any action (not inconsistent with the terms of the Intercreditor

Arrangements and not adverse to the priority status of the DIP Liens on the DIP

ABL Priority Collateral, or the rights of the DIP ABL Agent or any of the DIP

ABL Secured Parties to exercise rights, powers, and/or remedies in respect

thereof) in order to create, perfect, preserve or protect (but not enforce) its DIP

Liens and Adequate Protection Liens on any of the DIP ABL Priority Collateral;

(ii) file any necessary or appropriate responsive or defensive pleadings in

opposition to any motion, claim, adversary proceeding or other pleading made by

any person objecting to or otherwise seeking the disallowance of the claims or

DIP Liens of the Fixed Asset Secured Parties, including any claims secured by the

DIP ABL Priority Collateral, if any, in each case in accordance with the terms of

the Intercreditor Arrangements;

(iii) unless such Fixed Asset Secured Party would not be permitted under the

Intercreditor Arrangements to take such action in its capacity as a secured

creditor, file (A) any pleadings, objections, motions or agreements which assert

rights or interests available to unsecured creditors of the Debtors, in each case, in

8

accordance with the terms of the Prepetition Financing Documents and the DIP

Documents, as applicable, and applicable law; provided that in the event that any

Fixed Asset Secured Party becomes a judgment Lien creditor in respect of the

DIP ABL Priority Collateral as a result of its enforcement of its rights as an

unsecured creditor with respect to the Fixed Asset Obligations, such judgment

Lien shall be subject to the terms of the Intercreditor Arrangements for all

purposes (including in relation to the DIP ABL Obligations) as the other liens

securing the Fixed Asset Obligations are subject to the Intercreditor Arrangements

and (B) any pleadings, objections, motions or agreements which assert rights or

interests available to secured creditors solely with respect to the Fixed Asset

Collateral; and

(iv) vote on any plan of reorganization, file any proof of claim, impose a default

rate or late fees, collect and apply monies deposited from time to time in their

accounts to the extent constituting Fixed Asset Collateral against the Fixed Asset

Obligations, make other filings and make any arguments and motions (including

in support of or opposition to, as applicable, the confirmation or approval of any

plan of reorganization) that are, in each case, in accordance with the terms of the

Intercreditor Arrangements.

(d) Nothing in the Intercreditor Arrangements shall prohibit the receipt by any Fixed Asset

Secured Parties of the required payments of interest, principal, adequate protection

payments and other amounts owed in respect of the Fixed Asset Obligations, so long as

such receipt is not the direct or indirect result of the exercise by the Fixed Asset Secured

Parties of rights or remedies as a secured creditor (including set-off) with respect to the

9

DIP ABL Priority Collateral or enforcement in contravention of the Intercreditor

Arrangements of any lien held by any of them.  Nothing in the Intercreditor

Arrangements impairs or otherwise adversely affects any rights or remedies any Fixed

Asset Secured Party may have against the Debtors and the DIP Loan Parties under the

DIP Term Loan Documents or the Prepetition Financing Documents.

**3.      Exercise of Remedies on DIP Term Loan Priority
         <u>Collateral by DIP ABL Agent</u>**

(a)  Until the Discharge of Fixed Asset Obligations, the DIP ABL Agent and the DIP ABL

Secured Parties:

(i)      will not exercise or seek to exercise any rights, powers, or remedies with

respect to any DIP Term Loan Priority Collateral;

(ii)      will not, directly or indirectly, contest, protest or object to or hinder any

judicial or non-judicial foreclosure proceeding or action (including any partial or

complete strict foreclosure) brought by any Fixed Asset Secured Party relating to

the DIP Term Loan Priority Collateral or any other exercise by any Fixed Asset

Secured Party of any other rights, powers and remedies relating to the DIP Term

Loan Priority Collateral, including any sale, lease, exchange, transfer or other

disposition of the DIP Term Loan Priority Collateral, whether under the DIP

Term Loan Facility Documents, applicable law, or otherwise;

(iii)      will  not object to the forbearance by the DIP Term Loan Agent or any

Fixed Asset Secured Party from bringing or pursuing any enforcement action with

respect to the DIP Term Loan Priority Collateral;

(iv)      except as may be permitted by Section 3(c), irrevocably, absolutely and

10

unconditionally waive any and all rights the DIP ABL Agent or any DIP ABL

Lender may have as a junior lien creditor or otherwise to object (and seek or be

awarded any relief of any nature whatsoever based on any such objection) to the

manner in which the DIP Term Loan Agent or the Fixed Asset Secured Parties (i)

enforce or collect (or attempt to collect) the Fixed Asset Obligations or (ii) realize

or seek to realize upon or otherwise enforce the liens on the DIP Term Loan

Priority Collateral, regardless of whether any action or failure to act by or on

behalf of the DIP Term Loan Agent or the Fixed Asset Secured Parties is adverse

to the interest of the DIP ABL Agent or the DIP ABL Lenders.  Without limiting

the generality of the foregoing, the DIP ABL Agent and the DIP ABL Lenders

shall be deemed to have irrevocably, absolutely and unconditionally waived any

right to object (and seek to be awarded any relief of any nature whatsoever based

on any such objection), at any time prior or subsequent to any disposition of any

of the DIP Term Loan Priority Collateral, on the ground(s) that any such

disposition of the DIP Term Loan Priority Collateral (x) would not be or was not

"commercially reasonable" within the meaning of the UCC and/or (y) would not

or did not comply with any other requirement under the UCC or under any other

applicable law governing the manner in which a secured creditor is to realize on

its collateral;

(v)        subject to Section 3(c), acknowledge and agree that no covenant,

agreement or restriction in the documents evidencing the liens and claims of the

DIP ABL Lenders shall be deemed to restrict in any way the rights and remedies

of the DIP Term Loan Agent or the Fixed Asset Secured Parties with respect to

11

the DIP Term Loan Priority Collateral; and

(vi)    subject to Section 3(c), agree that none of them shall object (or support any other Person objecting) to any motion by the DIP Term Loan Agent or the other Fixed Asset Secured Parties seeking relief from the automatic stay in respect of the DIP Term Loan Priority Collateral;

provided that, in the case of (i), (ii) and (iii) above, the liens granted to secure the DIP ABL Obligations shall attach to any Proceeds resulting from actions taken by the DIP Term Loan Agent or any Fixed Asset Secured Party with respect to the DIP Term Loan Priority Collateral in accordance with the Intercreditor Arrangements (including the priorities described in Section 3) after application of such Proceeds to the extent necessary to meet the requirements of a Discharge of Fixed Asset Obligations.

(b)    Until the Discharge of Fixed Asset Obligations, the DIP Term Loan Agent and the other Fixed Asset Secured Parties shall have the right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and, in connection therewith (including voluntary dispositions of DIP Term Loan Priority Collateral by the Debtors after an Event of Default under the DIP Term Loan Facility Documents) make determinations regarding the release, disposition or restrictions with respect to the DIP Term Loan Priority Collateral (including, without limitation, exercising remedies under account control agreements and lockbox agreements) without any consultation with, notice to or the consent of the DIP ABL Agent or the DIP ABL Lenders; provided that the liens securing the obligations owed to the DIP ABL Lenders shall remain on the Proceeds (other than those properly applied to the Fixed Asset Obligations) of such DIP Term Loan Priority Collateral released or disposed of. In exercising rights, powers and remedies with respect to the DIP Term Loan Priority

12

Collateral, the DIP Term Loan Agent and the Fixed Asset Secured Parties may enforce the

provisions of the DIP Term Loan Facility Documents and exercise rights, powers and/or

remedies thereunder and/or under applicable law or otherwise, all in such order and in such

manner as they may determine in the exercise of their sole discretion.  Such exercise and

enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose

of the DIP Term Loan Priority Collateral upon foreclosure, to incur expenses in connection

with such sale or disposition and to exercise all the rights and remedies of a secured creditor

under the UCC.

(c)    Notwithstanding anything to the contrary contained herein, the DIP ABL Agent and any

DIP ABL Secured Party may:

(i) take any action (not inconsistent with the terms of the Intercreditor Arrangements and

not adverse to the priority status of the DIP Liens on the DIP Term Loan Priority Collateral, or

the rights of the DIP Term Loan Agent or any of the Fixed Asset Secured Parties to exercise

rights, powers, and/or remedies in respect thereof) in order to create, perfect, preserve or protect

(but not enforce) its DIP Liens and Adequate Protection Liens on any of the DIP Term Loan

Priority Collateral;

(ii) file any necessary or appropriate responsive or defensive pleadings in opposition to

any motion, claim, adversary proceeding or other pleading made by any person objecting to or

otherwise seeking the disallowance of the claims or DIP Liens of the DIP ABL Secured Parties,

including any claims secured by the DIP Term Loan Priority Collateral, if any, in each case in

accordance with the terms of the Intercreditor Arrangements;

(iii)    unless such DIP ABL Agent or DIP ABL Secured Party would not be permitted

under the Intercreditor Arrangements to take such action in its capacity as a secured creditor, file

13

(A) any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Debtors in accordance with the terms of the DIP Documents and applicable law; provided that in the event that any DIP ABL Secured Party becomes a judgment Lien creditor in respect of the DIP Term Loan Priority Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the DIP ABL Obligations, such judgment Lien shall be subject to the terms of the Intercreditor Arrangements for all purposes (including in relation to the Fixed Asset Obligations) as the other liens securing the DIP ABL Obligations are subject to the Intercreditor Arrangements and (B) any pleadings, objections, motions or agreements which assert rights or interests available to secured creditors solely with respect to the DIP ABL Collateral; and

(iv) vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments and motions (including in support of or opposition to, as applicable, the confirmation or approval of any plan of reorganization) that are, in each case, in accordance with the terms of the Intercreditor Arrangements.

(d) Nothing in the Intercreditor Arrangements shall prohibit the receipt by the DIP ABL Agent or any DIP ABL Lender of the required payments of interest, principal, adequate protection payments and other amounts owed in respect of the DIP ABL Obligations, so long as such receipt is not the direct or indirect result of the exercise by the DIP ABL Agent or any DIP ABL Lender of rights or remedies as a secured creditor (including set-off) with respect to the DIP Term Loan Priority Collateral or enforcement in contravention of the Intercreditor Arrangements of any Lien held by any of them.  Nothing in the Intercreditor Arrangements impairs or otherwise adversely affects any rights or remedies the DIP ABL Agent or any DIP ABL Lender may have against the Debtors and the DIP Loan Parties under the DIP ABL

14

Documents.

## 4.   **Bailee for Perfection**

Each Secured Party Representative agrees to hold that part of the DIP Collateral that is in its

possession or control to the extent that possession or control thereof is taken to perfect a lien

thereon as gratuitous bailee and agent for the benefit and on behalf of the other Secured Party

Representatives (to the extent that such Secured Party Representative has been granted a lien on

such DIP Collateral pursuant to DIP ABL Facility Documents, the Prepetition Secured Notes

Documents and DIP Term Loan Documents, respectively) (such bailment and agency being

intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2), 9-

104(a) and 9-313(c) of the UCC) and any assignee solely for the purpose of perfecting the

applicable security interest granted under the DIP ABL Facility Documents, the Prepetition

Secured Notes Documents and DIP Term Loan Documents, respectively.  The Fixed Asset

Secured Parties hereby appoint the DIP ABL Agent as their agent for the purposes of perfecting

their security interest in all Deposit Accounts and Securities Accounts (in each case, other than

the DIP Term Loan Collateral Account and the Prepetition Secured Notes Collateral Account

(each as defined in the DIP ABL Credit Agreement as in effect on the date hereof)) of the DIP

Loan Parties.  The DIP ABL Agent and the DIP ABL Secured Parties hereby appoint the

Prepetition Indenture Trustee and the DIP Term Loan Agent, as applicable, as their agent for the

purposes of perfecting their security interest in all intercompany notes of the DIP Loan Parties.

Upon the Discharge of DIP ABL Obligations or the Discharge of DIP Term Loan Obligations, as

applicable, the applicable Secured Party Representative shall deliver the remaining DIP

Collateral in its possession together with any necessary endorsements, <u>first</u>, (i) in the case of DIP

WEIL:\95256444\10\58399.0011

Term Loan Priority Collateral, to the Prepetition Indenture Trustee and (ii) in the case of DIP

ABL Priority Collateral, to the DIP Term Loan Agent, to the extent the applicable Obligations

remain outstanding, and second, (i) in the case of DIP Term Loan Priority Collateral, to the

applicable DIP Loan Party or as otherwise required by law and (ii) in the case of DIP ABL

Priority Collateral, to the Prepetition Indenture Trustee, to the extent the applicable Obligations

remain outstanding and third, in the case of DIP ABL Priority Collateral, to the applicable DIP

Loan Party or as otherwise required by law, in each case, so as to allow such Person to obtain

possession or control of such DIP Collateral.

## 5.    **IP License**

For the purposes of enabling the DIP ABL Agent to exercise rights and remedies under the

Interim Order, the Fixed Asset Secured Parties and each DIP Loan Party hereby grants (to the

full extent of their respective rights and interests) the DIP ABL Agent and its agents,

representatives and designees an irrevocable, non-exclusive, royalty-free, rent-free license and

lease (which will be binding on any successor or assignee of any DIP Term Loan Priority

Collateral) to use all of the DIP Term Loan Priority Collateral (including, without limitation, all

intellectual property) to collect all accounts included in DIP ABL Priority Collateral, to copy,

use, or preserve any and all information relating to any of the DIP ABL Priority Collateral, and

to complete the manufacture, packaging, advertising for sale and sale of (i) work-in-process, (ii)

raw materials and (iii) complete inventory.

## 6.    **Access Rights**

Upon the occurrence of any Event of Default (as defined in the DIP ABL Credit Agreement), the

DIP ABL Agent and its agents, representatives and designees shall have an irrevocable, non-

16

exclusive right to have access to, and a rent-free right to use, the applicable parcel of Premises

that constitutes DIP Term Loan Priority Collateral and to use any DIP Term Loan Priority

Collateral located thereon (the "**Right of Access**"), for a period of up to 60 days, commencing

upon the date the DIP ABL Agent provides written notice of the intent to exercise the Right of

Access to the DIP Term Loan Agent, for the purpose of (i) arranging for and effecting the sale or

disposition of DIP ABL Priority Collateral located on such parcel, including the manufacture,

production, completion, packaging and other preparation of such DIP ABL Priority Collateral for

sale or disposition, (ii) selling (by public auction, private sale or a "store closing", going out of

business sale or similar sale, whether in bulk, in lots or to customers in the ordinary course of

business or otherwise and which sale may include augmented inventory of the same type sold in

any DIP Loan Party's business), (iii) storing or otherwise dealing with the DIP ABL Priority

Collateral, in each case without notice to, the involvement of or interference by the Fixed Asset

Secured Parties or liability to the Fixed Asset Secured Parties; provided that, (on a plant by plant

basis) in the event that any of the Debtors' customers exercise their respective rights of access

pursuant to the Access Agreement at any plant, then the Right of Access of the DIP ABL Agent

and its agents, representatives and designees with respect to such plant shall terminate 60 days

following the first day on which a customer exercises its access right at such plant.  During any

such Event of Default (as defined in the DIP ABL Credit Agreement), the DIP ABL Agent and

its representatives (and persons employed on their behalf), may continue to operate, service,

maintain, process, manufacture, package and sell the DIP ABL Priority Collateral, as well as to

engage in bulk sales of DIP ABL Priority Collateral.  The DIP ABL Agent shall take proper and

reasonable care under the circumstances of any DIP Term Loan Priority Collateral that is used by

the DIP ABL Agent and repair and replace any damage (ordinary wear-and-tear excepted)

17

caused by the DIP ABL Agent or its agents, representatives or designees and the DIP ABL

Agent shall comply with all applicable laws in all material respects in connection with its use or

occupancy of the DIP Term Loan Priority Collateral.  The DIP ABL Agent and the DIP ABL

Secured Parties shall reimburse the Fixed Asset Secured Parties for any injury or damage to

Persons or property (ordinary wear-and-tear excepted) directly caused by the acts or omissions of

Persons under its control; provided, however, that the DIP ABL Agent and the DIP ABL Secured

Parties will not be liable for any diminution in the value of the Premises caused by the absence of

the DIP ABL Priority Collateral therefrom.  In no event shall the DIP ABL Secured Parties or the

DIP ABL Agent have any liability to the Fixed Asset Secured Parties hereunder as a result of any

condition (including any environmental condition, claim or liability) on or with respect to the

DIP Term Loan Priority Collateral existing prior to the date of the exercise by the DIP ABL

Agent) of its rights under the Interim Order.  The DIP ABL Agent and the Fixed Asset Secured

Parties shall cooperate and use reasonable efforts to ensure that their activities described above

do not interfere materially with the activities of the other as described above, including the right

of Fixed Asset Secured Parties to show the DIP Term Loan Priority Collateral to prospective

purchasers and to ready the DIP Term Loan Priority Collateral for sale.  The Fixed Asset

Secured Parties shall not foreclose or otherwise sell or dispose of any of the DIP Term Loan

Priority Collateral unless the buyer agrees in writing to acquire the DIP Term Loan Priority

Collateral subject to the terms of these Intercreditor Arrangements and agrees to comply with the

terms of this section 5.  The DIP ABL Agent and the DIP ABL Secured Parties shall have the

right to bring an action to enforce their rights under this Section 5 including, without limitation,

an action seeking possession of the applicable DIP Collateral and/or specific performance.

Notwithstanding the foregoing, in no event shall the Fixed Asset Secured Parties have any

18

liability or obligation to the DIP ABL Agent, the DIP ABL Lenders or any of their respective

agents, representatives and designees to pay for any costs and expenses (whether actual or

accrued) incurred in connection with the DIP ABL Agent's, any DIP ABL Lender's or any of

their respective agents', representatives' and designees' exercise of Right of Access.

7.    **Application of Proceeds/Turnover**

(a) <u>Revolving Nature of DIP ABL Obligations</u>.  The Fixed Asset Secured Parties

acknowledge and agree that the DIP ABL Credit Agreement includes a revolving

commitment and that the amount of the DIP ABL Obligations that may be outstanding at

any time or from time to time may be increased or reduced and subsequently reborrowed

in accordance with the terms of the DIP Documents and the Interim Order or Final Order,

as applicable.

(b) <u>Application of Proceeds of Collateral</u>.

i.    So long as the Discharge of DIP ABL Obligations has not occurred, all

DIP ABL Priority Collateral or Proceeds thereof received in connection

with the sale or other disposition of, or collection on, such DIP ABL

Priority Collateral as a result of the exercise of remedies by any Secured

Party Representative or any DIP ABL Secured Parties or Fixed Asset

Secured Parties, shall be delivered to the DIP ABL Agent and shall be

applied or further distributed by the DIP ABL Agent to or on account of

the DIP ABL Obligations in such order, if any, as specified in the relevant

DIP ABL Facility Documents or as a court of competent jurisdiction may

otherwise direct.  Upon the Discharge of DIP ABL Obligations, the DIP

19

ABL Agent shall deliver to the DIP Term Loan Agent any DIP ABL

Priority Collateral and Proceeds of DIP ABL Priority Collateral received

or delivered to it pursuant to the preceding sentence, in the same form as

received, with any necessary endorsements, to be applied by the DIP Term

Loan Agent to the Fixed Asset Obligations in such order as specified in

the DIP Term Loan Agreement or as a court of competent jurisdiction may

otherwise direct.

ii. So long as the Discharge of Fixed Asset Obligations has not occurred, all

DIP Term Loan Priority Collateral or Proceeds thereof received in

connection with the sale or other disposition of, or collection on, such DIP

Term Loan Priority Collateral as a result of the exercise of remedies by

any Secured Party Representative or any Fixed Asset Secured Parties or

DIP ABL Secured Parties, shall be delivered to the DIP Term Loan Agent

and shall be applied by the DIP Term Loan Agent to the DIP Term Loan

Obligations in such order as specified in the relevant DIP Term Loan

Documents or as a court of competent jurisdiction may otherwise direct.

Upon the Discharge of DIP Term Loan Obligations, the DIP Term Loan

Agent shall deliver to the Prepetition Indenture Trustee any DIP Term

Loan Priority Collateral and Proceeds of DIP Term Loan Priority

Collateral received or delivered to it pursuant to the preceding sentence, in

the same form as received, with any necessary endorsements to be applied

by the Prepetition Indenture Trustee to the Prepetition Secured Notes

Obligations in such order as specified in the Prepetition Secured Notes

20

Documents or as a court of competent jurisdiction may otherwise direct.

(c) <u>Payments Over</u>.  So long as neither the Discharge of DIP ABL Obligations nor the

Discharge of Fixed Asset Obligations has occurred, any DIP Collateral received by any

Secured Party Representative or any Fixed Asset Secured Parties or DIP ABL Secured

Parties in connection with the exercise of any right, power, or remedy (including set-off)

relating to the DIP Collateral in contravention of the Interim Order shall be segregated

and held in trust and forthwith paid over to the appropriate Secured Party Representative

for the benefit of the Fixed Asset Secured Parties or the DIP ABL Secured Parties, as

applicable, in the same form as received, with any necessary endorsements or as a court

of competent jurisdiction may otherwise direct.  Each Secured Party Representative is

hereby authorized by the other Secured Party Representative to make any such

endorsements as agent for the other Secured Party Representative or any Fixed Asset

Secured Parties or DIP ABL Secured Parties, as applicable.  This authorization is coupled

with an interest and is irrevocable until the Discharge of DIP ABL Obligations and

Discharge of Fixed Asset Obligations.

(d) <u>Application of Payments</u>.  Subject to the other terms of the Interim Order and Final

Order, as applicable, all payments received by (a) the DIP ABL Agent or the DIP ABL

Secured Parties may be applied, reversed and reapplied, in whole or in part, to the DIP

ABL Obligations to the extent provided for in the DIP ABL Facility Documents and (b)

the Fixed Asset Secured Parties may be applied, reversed and reapplied, in whole or in

part, to the Fixed Asset Obligations to the extent provided for in the DIP Term Loan

Documents.

21

(e)  The DIP ABL Agent, for itself and on behalf of the DIP ABL Lenders, and the Fixed

Asset Secured Parties further agree that, prior to an issuance of any Enforcement Notice,

any Proceeds of DIP Collateral, whether or not deposited in an account subject to an

account control agreement, which are used by any Debtor to acquire other property which

is DIP Collateral shall not (solely as between the DIP ABL Agent, the DIP ABL Lenders

and the Fixed Asset Secured Parties) be treated as Proceeds of DIP Collateral for

purposes of determining the relative priorities in the DIP Collateral which was so

acquired.  In addition, unless and until the Discharge of DIP ABL Obligations occurs, the

Fixed Asset Secured Parties each hereby (i) consents to the application, prior to the

receipt by the DIP ABL Agent of an Enforcement Notice issued by the DIP Term Loan

Agent or the Prepetition Indenture Trustee, of cash or other Proceeds of DIP Collateral,

deposited in accounts subject to an account control agreement that constitute DIP ABL

Priority Collateral to the repayment of DIP ABL Obligations under DIP ABL Facility

Documents, (ii) agrees that such cash or other Proceeds shall be treated as DIP ABL

Priority Collateral and (iii) unless the DIP ABL Agent has actual knowledge to the

contrary or unless such funds are identifiable Proceeds of DIP Term Loan Priority

Collateral, any claim that payments made to the DIP ABL Agent through accounts that

are subject to such account control agreements are Proceeds of or otherwise constitute

DIP Term Loan Priority Collateral is waived by the Fixed Asset Secured Parties;

provided that after the receipt by the DIP ABL Agent of an Enforcement Notice issued by

the DIP Term Loan Agent or the Prepetition Indenture Trustee, all identifiable Proceeds

of DIP Term Loan Priority Collateral shall be treated as DIP Term Loan Priority

Collateral.

22

In the event that directly or indirectly some or all of the DIP ABL Priority Collateral and some or all of the DIP Term Loan Priority Collateral are disposed of in a single transaction or series of related transactions in which the aggregate sales price is no allocated between DIP ABL Priority Collateral and DIP Term Loan Priority Collateral being sold (including in connection with or as a result of the sale of the capital stock of a Debtor which shall be treated as a sale of assets), then the portion of the aggregate sales price determined to be Proceeds of DIP ABL Priority Collateral on the one hand, and DIP Term Loan Priority Collateral on the other hand, shall be allocated based upon, in the case of (i) any DIP ABL Priority Collateral consisting of inventory, no less than the book value as assessed on the date of such disposition, (ii) any DIP ABL Priority Collateral consisting of accounts receivable, no less than the book value as assessed on the date of such disposition, and (iii) all other DIP ABL Priority Collateral and DIP Term Loan Priority Collateral, fair market value of such DIP ABL Priority Collateral and DIP Term Loan Priority Collateral, as determined in good faith by Debtors in their reasonable judgment.

## 8.  Release of DIP ABL Priority Collateral

If, in connection with (A) any exercise of remedies, or (B) any sale, transfer or other disposition of all or any portion of the DIP ABL Priority Collateral, so long as such sale, transfer or other disposition is then not prohibited by the DIP ABL Facility Documents (or is otherwise consented to by the requisite DIP ABL Lenders), or by the DIP Term Loan Documents (or is otherwise consented to by the requisite DIP Term Loan Lenders) irrespective of whether an Event of Default (as defined in the DIP ABL Credit Agreement) has occurred and is continuing, the DIP

23

ABL Agent, on behalf of any of the DIP ABL Secured Parties, releases any of its liens on any part of the DIP ABL Priority Collateral (or if such liens are automatically released pursuant to the DIP ABL Facility Documents upon such sale, transfer or other disposition), then the liens, if any, of the Fixed Asset Secured Parties on the DIP ABL Priority Collateral sold or disposed of in connection therewith, shall be automatically, unconditionally and simultaneously released; provided that the Proceeds of such DIP ABL Priority Collateral are applied to reduce DIP ABL Obligations and the Fixed Asset Secured Parties shall retain a lien on such Proceeds in accordance with the terms of the Interim Order and the DIP Documents (for clarity, to the extent that the DIP ABL Agent or DIP ABL Lenders acquire DIP ABL Priority Collateral via credit bid, then there shall be no Proceeds and the liens of the Fixed Assets Secured Parties on the DIP ABL Priority Collateral that is subject to such credit bid shall be discharged).  The Fixed Asset Secured Parties promptly shall, at the sole cost and expense of the Debtors and the DIP Loan Parties, execute and deliver to the DIP ABL Agent or such DIP Loan Party such termination statements, releases and other documents as the DIP ABL Agent or such Debtor or the DIP Loan Party may reasonably request in writing to effectively confirm such release.

**9.    Insurance**

(a)  Unless and until the Discharge of DIP ABL Obligations has occurred and subject to the terms of, and the rights of the DIP Loan Parties under, the DIP ABL Facility Documents, the DIP ABL Agent, on behalf of the DIP ABL Secured Parties, shall have the sole and exclusive right to adjust settlement for any insurance policy covering the DIP ABL Priority Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation)

24

affecting such DIP ABL Priority Collateral.  Until the Discharge of DIP ABL Obligations has occurred, (i) all Proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of the DIP ABL Priority Collateral and to the extent required by the DIP ABL Facility Documents shall be paid to the DIP ABL Agent for the benefit of the DIP ABL Secured Parties pursuant to the terms of the DIP ABL Facility Documents (including, without limitation, for purposes of cash collateralization of letters of credit) and thereafter, if the Discharge of DIP ABL Obligations has occurred, and subject to the rights of the DIP Loan Parties under the DIP Term Loan Agreement, to the Fixed Asset Secured Parties to the extent required under the DIP Term Loan Agreement and then, to the extent the Discharge of Fixed Asset Obligations has occurred, to the owner of the subject property or such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct, and (ii) if the Fixed Asset Secured Parties shall, at any time, receive any Proceeds of any such insurance policy or any such award or payment with respect to DIP ABL Priority Collateral, it shall segregate and hold in trust and forthwith pay such Proceeds over to the DIP ABL Agent.

(b)  Unless and until the Discharge of Fixed Asset Obligations has occurred, subject to the terms of, and the rights of the DIP Loan Parties under, the DIP Term Loan Documents, the Fixed Asset Secured Parties shall have the sole and exclusive right to adjust settlement for any insurance policy covering the DIP Term Loan Priority Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting such DIP Term Loan Priority Collateral.  Until the Discharge of Fixed Asset Obligations has occurred, (i) all

25

Proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of the DIP Term Loan Priority Collateral and to the extent required by the DIP Term Loan Documents shall be paid to the Fixed Asset Secured Parties pursuant to the terms of the DIP Term Loan Documents and thereafter to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct, and (ii) if the DIP ABL Agent or any DIP ABL Secured Parties shall, at any time, receive any Proceeds of any such insurance policy or any such award or payment with respect to DIP Term Loan Priority Collateral, it shall segregate and hold in trust and forthwith pay such Proceeds over to the Fixed Asset Secured Parties.

(c)    To effectuate the foregoing, and to the extent that the pertinent insurance company agrees to issue such endorsements, the DIP ABL Agent and the DIP Term Loan Agent shall each receive separate lender's loss payable endorsements naming themselves as loss payee and additional insured, as their interests may appear, with respect to any policies which insure the DIP Collateral.  To the extent any Proceeds are received for business interruption or for any liability or indemnification and those Proceeds are not in whole or in part compensation for a casualty loss with respect to the DIP Term Loan Priority Collateral, such Proceeds shall be applied first, to repay the DIP ABL Obligations (to the extent required pursuant to the DIP ABL Facility Documents), second, to the extent no DIP ABL Obligations are outstanding, to repay the Fixed Asset Obligations (to the extent required by the DIP Term Loan Documents), and third, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct.

26

10.    **Amendments**

The DIP ABL Facility Documents and DIP Term Loan Documents may be amended,

supplemented or otherwise modified in accordance with their terms, all without affecting the lien

subordination or other provisions of the Interim Order or the lien and claim priorities set forth in

the Interim Order.  The DIP ABL Obligations may be Refinanced without notice to, or the

consent of, the Fixed Asset Secured Parties and without affecting the lien subordination or other

provisions of the Interim Order, and the Fixed Asset Obligations may be Refinanced without

notice to, or consent of, the DIP ABL Agent or the DIP ABL Secured Parties and without

affecting the lien subordination and other provisions of the Interim Order so long as such

Refinancing is on terms and conditions that would not violate the DIP Term Loan Documents or

the DIP ABL Facility Documents (as applicable), each as in effect on the date hereof (or, if less

restrictive to the DIP Loan Parties, as in effect on the date of such amendment or Refinancing) or

the Interim Order; provided that, in each case, (x) the DIP Loan Parties shall deliver a notice to

the DIP ABL Agent or the DIP Term Loan Agent, as applicable, stating that the DIP Loan

Parties has entered into new DIP ABL Facility Documents or DIP Term Loan Documents, as the

case may be, and identifying the agent under such Credit Documents (the "New Agent") and (iii)

the New Agent shall acknowledge in writing that it is bound by the terms of the Interim Order;

provided further, however, that, if such Refinancing debt is secured by a lien on any DIP

Collateral the holders of such Refinancing debt shall be deemed bound by the terms hereof

regardless of whether or not such joinder is provided.  For the avoidance of doubt, the sale or

other transfer of indebtedness is not restricted by the Interim Order but the provisions of the

Interim Order shall be binding on all holders of DIP ABL Obligations and Fixed Asset

Obligations.  Notwithstanding the foregoing, (i) the DIP ABL Secured Parties will not be entitled

27

to agree (and will not agree) to any amendment to or modification of the DIP ABL Facility

Documents, whether in a Refinancing or otherwise, that is inconsistent with the terms of the

Interim Order and (ii) the Fixed Asset Secured Parties will not be entitled to agree (and will not

agree) to any amendment to or modification of the DIP Term Loan Documents, whether in a

Refinancing or otherwise, that is inconsistent with the terms of the Interim Order.

## 11.    Asset Dispositions of DIP ABL Priority Collateral

The Fixed Asset Secured Parties shall not oppose (or support, directly or indirectly, any other

Person seeking to oppose) any motion by a DIP Loan Party that is supported by the DIP ABL

Secured Parties (i) for any disposition of any DIP ABL Priority Collateral free and clear of liens

or other claims, under Sections 363 or 1129 of the Bankruptcy Code or otherwise, or (ii) to

approve any procedures for the disposition of any DIP ABL Priority Collateral of any of the DIP

Loan Parties, and the Fixed Asset Secured Parties will be deemed to have irrevocably,

absolutely, and unconditionally consented under Section 363 of the Bankruptcy Code (and

otherwise) to any sale of any DIP ABL Priority Collateral supported by the DIP ABL Secured

Parties and to have released their liens on such assets; provided that to the extent the Proceeds of

such DIP ABL Priority Collateral are not applied to reduce DIP ABL Obligations the Fixed

Asset Secured Parties shall retain a lien on such Proceeds in accordance with the terms of the

Interim Order.

28

12.    **Subrogation**

(a)    With respect to the value of any payments or distributions in cash, property or other

assets that any of the Fixed Asset Secured Parties actually pays over to the DIP ABL

Agent or the DIP ABL Secured Parties under the terms of the Interim Order and Final

Order, as applicable, the Fixed Asset Secured Parties shall be subrogated to the rights of

the DIP ABL Secured Parties; provided that the Fixed Asset Secured Parties hereby agree

not to assert or enforce all such rights of subrogation they may acquire as a result of any

payment hereunder until the Discharge of DIP ABL Obligations has occurred.  The

Debtors and the DIP Loan Parties acknowledge and agree that, to the extent permitted by

applicable law, the value of any payments or distributions in cash, property or other

assets received by the Fixed Asset Secured Parties that are paid over to the DIP ABL

Secured Parties pursuant to the Interim Order or Final Order, as applicable, shall not

reduce any of the Fixed Asset Obligations.  Notwithstanding the foregoing provisions of

this Section 12, none of the Fixed Asset Secured Parties shall have any claim against any

of the DIP ABL Secured Parties for any impairment of any subrogation rights herein

granted to the Fixed Asset Secured Parties.

(b)    With respect to the value of any payments or distributions in cash, property or other

assets that any of the DIP ABL Secured Parties actually pays over to the Fixed Asset

Secured Parties under the terms of the Interim Order and Final Order, as applicable, the

DIP ABL Secured Parties shall be subrogated to the rights of the Fixed Asset Secured

Parties; provided that the DIP ABL Agent, on behalf of the DIP ABL Secured Parties,

hereby agrees not to assert or enforce all such rights of subrogation it may acquire as a

29

result of any payment hereunder until the Discharge of Fixed Asset Obligations has

occurred.  The Debtors and the DIP Loan Parties acknowledge and agree that, to the

extent permitted by applicable law, the value of any payments or distributions in cash,

property or other assets received by the DIP ABL Secured Parties that are paid over to the

Fixed Asset Secured Parties pursuant to the Interim Order or Final Order, as applicable,

shall not reduce any of the DIP ABL Obligations.  Notwithstanding the  foregoing

provisions of this Section 12, none of the DIP ABL Secured Parties shall have any claim

against any of the Fixed Asset Secured Parties for any impairment of any subrogation

rights herein granted to the DIP ABL Secured Parties.

WEIL:\95256444\10\58399.0011

**Exhibit 2**

**Budget**

## EXHIBIT D

## ACCESS AGREEMENT

## ACCESS AGREEMENT

Chassix, Inc., a Delaware corporation ("Chassix"), on behalf of itself and its domestic subsidiaries (collectively, "Supplier"), UC Holdings, Inc. ("UC Holdings"), PNC Bank, National Association (the "DIP ABL Agent") and Cantor Fitzgerald Securities, solely in its capacity as agent under the DIP Term Credit Agreement (the "DIP Term Agent" and together with the DIP ABL Agent, the "DIP Agents"), General Motors LLC ("GM"), Ford Motor Company ("Ford"), Nissan North America, Inc. ("Nissan"), and FCA US LLC f/k/a Chrysler Group LLC ("FCA"; and collectively with GM, Ford and Nissan, the "Customers") enter into this Access Agreement ("Agreement") effective as of March 11, 2015 (the "Effective Date").  Customers and Supplier are collectively referred to as the "Parties", or each individually, a "Party".

## RECITALS

A.     Pursuant to various purchase agreements, release requests and/or purchase orders issued by each of the Customers and accepted by Supplier (as such agreements, release requests or orders may be modified or amended from time to time to reflect any mutually approved engineering or other changes, collectively, "Purchase Orders" and each, individually, a "Purchase Order"), Customers have ordered from Supplier certain component parts, service parts and assembled goods (collectively, "Component Parts" and each, individually, a "Component Part").

B.     Supplier intends to undertake a financial restructuring and recapitalization (the "Restructuring"), which is anticipated to be effected through a solicitation of votes for a plan of reorganization for Supplier, in substantially the form attached to the Accommodation Agreement (defined below) as Exhibit B, or such other plan of reorganization so long as such other plan is reasonably acceptable to the Customers (as compared to the terms of the plan attached to the Accommodation Agreement as Exhibit B) (each such plan, the "Acceptable Plan"), and the commencement by Supplier of voluntary cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

C.     Pursuant to the terms of the proposed DIP order attached as Exhibit C to the Accommodation Agreement: (a) the DIP ABL Agent, acting as administrative agent for a syndicate of banks, financial institutions and other institutional lenders (the "ABL DIP Lenders"), has agreed to provide to Supplier an approximate $150 million consensual, priming debtor-in-possession financing facility (collectively, the "DIP ABL Facility") pursuant to that certain Superpriority Secured Debtor-In-Possession ABL Loan, Security and Guaranty Agreement (the "DIP ABL Credit Agreement") in connection with the Chapter 11 Cases; and (b) Cantor Fitzgerald Securities, acting as administrative agent for a syndicate of banks, financial institutions and other institutional lenders (the "DIP Term Lenders"), has agreed to provide to Supplier an approximate $100 million consensual, priming debtor-in-possession financing facility (collectively, the "DIP Term Facility" and together with the DIP ABL Facility, the "DIP Facilities") pursuant to that certain DIP Term Loan Facility (the "DIP Term Credit Agreement" and together with the DIP ABL Credit4 Agreement, the "DIP Financing Documents") in

connection with the Chapter 11 Cases.

D.      Supplier owns or leases the Facilities (as defined below) identified in Schedule A.

E.      Supplier has requested that Customers provide certain financial and other accommodations to Supplier in accordance with the Accommodation Agreement among the Parties dated of even date hereof (the "Accommodation Agreement").  It is a condition of the Accommodation Agreement that Supplier grants Customers access rights as provided herein to Supplier's Facilities.

F.      Supplier is entering into this Agreement to afford Customers the right to use some or all of Supplier's assets located at the Facilities, as provided below if a Default (as defined below) occurs.

**BASED ON THE FOREGOING RECITALS** which are incorporated as representations and warranties of the Parties, and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties agree as follows:

## TERMS AND CONDITIONS

1.      <u>Defined Terms</u>.  In addition to those terms defined elsewhere in this Agreement, the following terms have the indicated meanings, unless the context otherwise requires:

"<u>Access Fee</u>" shall have the meaning ascribed to it in <u>Section 3(c)(viii)</u>.

"<u>Accounts</u>" means any "account" or "chattel paper," as defined in Sections 9-102(a)(2) and 9-102(a)(11), respectively, of the "Code" (defined below), owned now or hereafter by Supplier, and shall also mean and include: (i) all accounts receivable, contract rights, book debts, notes, drafts, instruments, documents, acceptances, payments under leases and other forms of obligations, now owned or hereafter received or acquired by or belonging or owing to Supplier (including under any trade name, styles, or division thereof) whether arising out of goods sold or leased or services rendered by Supplier or from any other transaction, whether or not the same involves the sale of goods or services by Supplier (including, without limitation, any such payment obligation or right to payment which might be characterized as an account, contract right, general intangible, or chattel paper under the Uniform Commercial Code in effect in any jurisdiction); (ii) all monies due to or to become due to Supplier under all contracts for the sale or lease of goods or the performance of services by Supplier (whether or not yet earned by performance on the part of Supplier) now in existence or hereafter arising; and (iii) deposit accounts, insurance refunds, tax refunds, tax refund claims and related cash and cash equivalents, now owned or hereafter received or acquired by or belonging or owing to Supplier.

"<u>Chattel Paper</u>" means all "chattel paper" as defined in Section 9-102(a)(11) of the Code.

"<u>Code</u>" means the Uniform Commercial Code as in effect in the State of Michigan as of the date of this Agreement.

"<u>Contract Rights</u>" means all rights of Supplier (including to payment) under each

2

"Contract" (defined below).

"Contracts" or individually, "Contract", means any licensing agreements and any and all other contracts, supply agreements, or other agreements used in the manufacture, production or assembly of the Customer's Component Parts, and in or under which Supplier may now or hereafter have any right, title, or interest and which pertain to the lease, sale, or other disposition by Supplier of "Equipment" (defined below), "Inventory" (defined below), fixtures, real property, or the right to use or acquire personal property, as any of the same may from time to time be amended, supplemented, or otherwise modified, but excluding the DIP Financing Documents.

"Default" means an Event of Default by Supplier under the Accommodation Agreement (which Event of Default, to the extent applicable, has not been cured) and the result of which is an imminent threat of a material interruption of production at a Customer's assembly line that incorporates the Component Parts is imminent; provided that the foregoing is subject to the force majeure provisions set forth in the general terms and conditions of purchase for such Customer.

"DIP Agents" means, collectively or individually as applicable in the context where used, the DIP ABL Agent and the DIP Term Agent.

"DIP Lenders" means, collectively or individually as applicable in the context where used, the ABL DIP Lenders and the DIP Term Lenders.

"Equipment" means any "equipment," as that term is defined in Section 9-102(a)(33) of the Code, now or hereafter owned by Supplier, which is used in the manufacture, production or assembly of the Component Parts, and shall also mean and include all machinery, equipment, vehicles, furnishings, and fixtures (as such terms are defined in Section 9-102 of the Code) now owned or hereafter acquired by Supplier, including, without limitation, all items of machinery and equipment of any kind, nature and description, whether affixed to real property or not, as well as all additions to, substitutions for, replacements of or accessions to any of the foregoing items and all attachments, components, parts (including spare parts), and accessories whether installed thereon or affixed thereto in each case to the extent used in the manufacture or production of the Customer's Component Parts.

"Facilities" or "Real Estate" means the real property and related manufacturing facilities identified in Schedule A.  "Facility" means any one of them individually.

"General Intangibles" means all "general intangibles," as such term is defined in Section 9-102(a)(42) of the Code, now or hereafter owned by Supplier, which are used in the manufacture, production or assembly of the Customer's Component Parts, including, without limitation, customer lists, rights in intellectual property, goodwill, trade names, service marks, trade secrets, patents, trademarks, copyrights, applications therefor, permits, licenses, now owned or hereafter acquired by Supplier, but excluding items described in the definition of Accounts.

"Instruments" means all "instruments" as defined in Section 9-102(a)(47) of the Code.

3

"Intellectual Property" means all now existing or hereafter acquired patents, trademarks, copyrights, inventions, licenses, discoveries, processes, know-how, techniques, trade secrets, designs, specifications and the like (regardless of whether such items are now patented or registered, or registerable, or patentable in the future), and all technical, engineering, or other information and knowledge, production data and drawings, which are used in the manufacture, production or assembly of the Customer's Component Parts, including without limitation, all items, rights and property defined as "intellectual property" under 11 U.S.C. Section 101, as amended from time to time.

"Inventory" means any "inventory," as that term is defined in Section 9-102(a)(48) of the Code, wherever located, now owned or hereafter acquired by Supplier or in which Supplier now has or hereafter may acquire any right, title or interest including, without limitation, all goods and other personal property now or hereafter owned by Supplier which are leased or held for sale or lease or are furnished or are to be furnished under a contract of service or which constitute raw materials, work in process or materials used or consumed or to be used or consumed in Supplier's manufacture of the Customer's Component Parts, or in the processing, packaging or shipping of the same, and all finished goods.

"Obligations" means solely the obligation to provide each Customer or its designee(s) the "Right of Access" (as defined below).

"Operating Assets" means, as to each Customer separately, assets located at or about the Facilities which are used in the manufacture, production, or assembly of the Customer's Component Parts, together with all other assets of Supplier, wherever located, which are necessary or helpful for production of the Customer's Component Parts, including Equipment, Contract Rights, and General Intangibles (other than deposit accounts, claims against insurance companies, chooses in action, proceeds of any indemnity, any guaranties, insurance refunds, tax refund claims, cash and cash equivalents), but specifically excluding any Accounts, Instruments, Inventory, Chattel Paper, the Proceeds thereof, or the Proceeds of General Intangibles.

"Proceeds" has the meaning provided it under the Code and, in any event, shall include, but not be limited to:  (i) any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to Supplier from time to time with respect to any of the Operating Assets or Real Estate; (ii) any and all payments (in any form whatsoever) made or due and payable to Supplier from time to time in connection with any requisition, confiscation, condemnation, seizure, or forfeiture of all or any part of the Operating Assets or Real Estate by any governmental body, authority, bureau, or agency (or any Person acting under color of governmental authority); and (iii) any and all other amounts from time to time paid or payable under or in connection with any of the Operating Assets or Real Estate.

2.      DIP Lenders' Exercise of Remedies.   The Parties acknowledge that the DIP Agents and DIP Lenders have the right to exercise all rights and remedies against the Operating Assets in accordance with the order entered by the Bankruptcy Court approving the DIP Facilities (the "DIP Order") and the DIP Financing Documents and nothing in this Agreement shall limit or impair any such rights and remedies granted under the DIP Order or the DIP Financing Documents, subject to each Exercising Customer's Right of Access (which may be exercised in accordance with Section 3 at any time prior to expiration of the Right of Access

4

pursuant to Section 12) until termination of the Occupancy Period in connection with such Right of Access. DIP Agents' and DIP Lenders' obligations under this Agreement are limited solely to this Section 2.

3.    <u>Right of Access</u>.

(a)    <u>General</u>.  Supplier hereby grants each Customer (the "<u>Affected Customer</u>"), or such Affected Customer's designee(s), the right, but not the obligation, to occupy one or more of the Facilities at which any Default has occurred ("<u>Right of Access</u>") for a period of up to 195 days commencing upon the date such Affected Customer provides the written notice referenced below after the occurrence of a Default (the "<u>Occupancy Period</u>").  Each Affected Customer may exercise the Right of Access at an affected Facility by delivering written notice at least twenty-four (24) hours in advance to each of Supplier, each of the other Customers, and each of the DIP Agents indicating its intention to exercise the Right of Access and identifying the affected Facility(ies).  Upon delivery of a notice that the Right of Access has been exercised, the Customer exercising such rights must take occupancy of the affected Facility no later than ten (10) business days following delivery of the exercise notice.  In the event that an Affected Customer exercises the Right of Access, each other Customer shall have the right, but not the obligation, to exercise the Right of Access at the Facility at which the Affected Customer exercised its Right of Access, which Right of Access shall continue for the duration of the Affected Customer's Occupancy Period applicable to that specific Affected Customer (including as may be terminated by the Affected Customer pursuant to <u>Section 3(e)</u>) (each Customer that has exercised the Right of Access, including the Affected Customer, an "<u>Exercising Customer</u>"). For the sake of clarity, the Occupancy Period for all Customers will end 195 days after the Affected Customer provides written notice of its intent to exercise its Right of Access. Customers shall have no right to foreclose upon, sell, transfer, or dispose of any of the Operating Assets or the Real Estate as part of the Right of Access.  Before the Bristol Surcharge Termination Date, in connection with the Bristol Facility, an Affected Customer may give the twenty-four (24) hours written notice required by this <u>Section 3(a)</u> of its intention to exercise the Right of Access at any time after an assembly plant shutdown (and before waiting the 24 hour period before it becomes a Default), subject to Supplier's right to cure under Section 8.1(a) of the Accommodation Agreement.

For sake of clarity, an Exercising Customer must elect to exercise its Right of Access with respect to the entire Facility and Operating Assets contained therein.  In such case, the Exercising Customer will become a Producing Customer as defined below, and Supplier shall have no right to produce component parts for any customer during the Occupancy Period at such Facility.

(b)    <u>Cooperation Among Exercising Customers</u>.  Each Exercising Customer shall cooperate with each other Exercising Customer in good faith to coordinate all production after the Right of Access is exercised, subject to Section 3(c)(vi) below.  For purposes of this Section 3(b), no Exercising Customer will be responsible for production related to a vehicle program launch for another Customer unless it affirmatively agrees to do so in writing, in which case all costs associated with any additional launch production will be paid by the Customer requesting the launch production. Resources and costs at a Facility or associated with Operating Assets that are common for Exercising Customers at an affected Facility shall be divided among such

5

Exercising Customers as they shall agree which shall be determined by their respective percentages of sales during the Occupancy Period.

(c)    <u>Customer's Obligations</u>.    If a Customer exercises the Right of Access, such Customer or its designee(s), if any, shall during the Occupancy Period:

(i)    use reasonable care in the custody and preservation of Supplier's assets and indemnify, defend and hold the DIP Agents, DIP Lenders, and Supplier harmless from any costs, expenses (including reasonable attorney fees), losses, damages, and liability relating to damage to property (including the Operating Assets and the Real Estate) or injury suffered by third parties, DIP Agents, DIP Lenders, or Supplier, caused directly or indirectly by the Exercising Customer's or its designee's use of the Operating Assets and the Real Estate or the exercise of the Exercising Customer's rights under this Agreement, which obligation to indemnify the DIP Agents or DIP Lenders, shall not be subject to any setoff or recoupment of any kind that Customer may have against Supplier;

(ii)    insure with comparable insurance, lender loss payees and additional insureds (or continue the Supplier's insurance for the affected Facilit(ies) pursuant to subsection (iii) below), and maintain the Operating Assets and the Real Estate in the same condition as existed on the date the Exercising Customer exercised the Right of Access, ordinary wear and tear excepted;

(iii)    in lieu of the Purchase Order price for Component Parts produced during the Occupancy Period, pay the related costs and expenses incurred (whether actual or accrued) in connection with the manufacturing of the Component Parts (and any Customer's Component Parts manufactured pursuant to <u>Section 3(c)(vi)</u> below) during the Occupancy Period, including, without limitation, inventory, gross wages (including overtime and benefits), insurance, shipping costs, raw materials, utilities and other overhead expenses, prorated property taxes and assessments attributable to the Operating Assets and the Real Estate, and any payments due on account of any of the Operating Assets and Real Estate which are leased from unrelated third parties or related parties, and abide by the terms of any lease agreement applicable to the Real Estate;

(iv)    subject to the Exercising Customer's or its designee's right to use and occupy the Facilities during the Occupancy Period, each Exercising Customer will afford Supplier's and the DIP Agents' respective representatives reasonable access to inspect the Operating Assets and Facilities, to prepare to market and sell the Operating Assets and Facilities at the end of the Occupancy Period, and to sell any assets, other than the Operating Assets or Facilities prior to expiration of the Occupancy Period;

(v)    observe in all material respects all applicable laws, rules, regulations, and ordinances relating to the use and occupancy of the Operating Assets and

6

the Real Estate, and to the manufacturing, processing, and shipping of Component Parts, including, without limitation, all relevant employment laws, collective bargaining agreements pertaining to the Employees and Supplier employment policies during the Occupancy Period;

(vi)     subject to (a) non-exercising Customer or other customer of Supplier (i) agreeing to make payment to the Exercising Customer(s) or its designee(s) on account of their allocable share of overhead and related expenses and all direct expenses related to such non-exercising Customer's or other customer's production and (ii) entering into a separate agreement, acceptable to the Exercising Customer(s) in its sole discretion, under which such non-exercising Customer or other customer agrees to release and indemnify the Exercising Customer(s) from any and all liability in connection with that Customer's or customer's Component Parts, including with respect to any product liability and warranty claims, and (b) Supplier making the necessary tangible personal property available for use during the Occupancy Period, the Exercising Customer agrees, for itself and its designee(s) (each, a "Producing Customer"), to produce parts for such non-exercising Customer or other customer during the Occupancy Period; provided, however, such production shall not include any additional production related to vehicle launch programs except upon the consent of all Exercising Customers, and in such event all extra costs associated with any additional launch production will be paid by the non-exercising Customer or other customer requesting the additional launch production;

(vii)    each Customer exercising the Right of Access shall purchase all of Supplier's raw materials (including purchased components), work in process and finished goods inventory specifically related to that Customer's Component Parts, that are useable (defined below) and merchantable (defined below) (collectively, "Inventory") as of the first day of the Occupancy Period, with such payment being made to the DIP ABL Lenders within seven (7) business days thereafter. "Useable" means Inventory that is (x) not obsolete, and (y) useable by the Exercising Customer in the production of Component Parts in quantities not to exceed those called for by the Exercising Customer's material releases issued prior to exercising the Right of Access. "Merchantable" is as defined in U.C.C. § 2-314 and in conformance with applicable Purchase Order. The Inventory purchases under this Agreement will be for a cash purchase price equal to the following amounts without setoff, recoupment, deduction or reduction of any kind: (A) for raw materials, 100% of Supplier's actual landed cost thereof; (B) for work-in-process, 100% of the Purchase Order price, pro rated based upon percentage of completion; and (C) for finished goods, 100% of the Purchase Order price. Inventory purchased by an Exercising Customer must be sold free and clear of any and all liens, claims and security interests; and

7

(viii) on the first day of the Occupancy Period, pay to the DIP Term Agent, for the benefit of the DIP Term Lender, the prorated portion of the "Access Fee" for the applicable Facility identified on Schedule A, for the month in which the Exercising Customer(s) exercises its Right of Access - the Access Fee shall be paid by the Exercising Customer(s) on the first day of each succeeding month to the DIP Term Agent without setoff or recoupment of any kind.   In the event of multiple Exercising Customers at a Facility, the Access Fee shall be prorated accordingly based on percentages of sales during the Occupancy Period, but in no event will the Access Fee in total exceed the amount set forth on Schedule A hereto.

The Customers' obligations under this Section 3(c) shall not be subject to setoff, recoupment or reduction of any kind.

(d)     Supplier's Obligations.  If any Customers exercise the Right of Access, Supplier shall comply with the following as to each Exercising Customer, as applicable:

(i)     At the Exercising Customer's election, and in its sole discretion, Supplier will use commercially reasonable efforts to continue to employ those of its employees whom Exercising Customer determines are necessary to maintain production of the Component Parts (the "Employees") and, in turn, lease the Employees to Exercising Customer or Exercising Customer's designee(s), and Exercising Customer or its designee(s) shall reimburse Supplier for all costs and expenses relating to Supplier's employment of the Employees incurred during the Occupancy Period. Without limiting the generality of the foregoing, Exercising Customer or its designee(s) shall reimburse Supplier all amounts incurred by Supplier to meet its regular payroll obligations, including salaries, wages (including overtime occasioned by Exercising Customer incurred during the Occupancy Period), payroll taxes, workers' compensation, unemployment insurance, disability insurance, welfare, pension, and other payments and contributions required to be made by Supplier with respect to the Employees, which are incurred during the Occupancy Period, but in no event will Exercising Customer be liable for (A) any costs for unfunded actuarial liability, past service unfunded actuarial liability, or solvency or deficiency liability relating to any pension plan, severance plan or other obligations relating to benefits accrued or service provided prior to the time Exercising Customer exercised its Right of Access or after the termination of the Occupancy Period, (B) any unpaid minimum contribution obligations to the pension plan(s), regardless of when they are due, relating to benefits accrued prior to the time Exercising Customer exercised its Right of Access or after termination of the Occupancy Period, (C) unpaid premium payments to the PBGC with respect to any pension plan which accrued prior to the time Exercising Customer exercised its Right of Access or after the termination of the Occupancy Period, or (D) any excise tax, interest, make whole payments, or agency hearing or litigation costs on account of any prohibited transactions or

8

other fiduciary breaches occurring prior to the time the Exercising Customer exercised the Right of Access or after the termination of the Occupancy Period, alleged or confirmed with respect to Supplier's employee benefit plans.   Notwithstanding the foregoing, under no circumstances will Exercising Customer be responsible for reimbursing Supplier for costs and expenses relating to Supplier's employment of the Employees to the extent the Employees are only performing services unrelated to the production of the Component Parts or performance of Supplier's obligations under the access provisions of this Agreement;

(ii)     During the Occupancy Period, Supplier will have sole responsibility for maintaining and administering all employee benefit plans, and will assume and carry out all fiduciary obligations with respect to such plans. Customer's sole responsibility with respect to Supplier's employee benefit plans during the Occupancy Period will be to pay the Supplier all amounts needed to pay premiums or otherwise fund the plans in accordance with the plan documents and applicable law, and to pay the reasonable costs of administering the plans in the ordinary course during the Occupancy Period (but specifically excluding any items listed in Section 3(d)(i)(A)-(D)).   Other than the obligation to pay Supplier the funds necessary to maintain and administer the employee benefit plans during the Occupancy Period, pursuant to this Section 3(d)(ii) and Section 3(d)(i), Customer has no other responsibilities or obligations with respect to the employee benefit plans, and does not have any role in overseeing, maintaining or administering them during the Occupancy Period;

(iii)    During the Occupancy Period, Supplier shall not increase compensation or benefits of the Employees without the consent of each Exercising Customer except as may be required by applicable law or preexisting contract;

(iv)     During the Occupancy Period, the Supplier will not be responsible for the retention and recruiting of new employees for any reason;

(v)      Supplier shall indemnify, defend and hold each Exercising Customer, its designee(s) and its respective employees and agents harmless from any and all costs, expenses (including reasonable attorneys' fees), losses, damages, liabilities or injury arising from claims or liabilities arising or accruing before the date of the Exercising Customer's exercise of the Right of Access, regardless of when such claims are asserted; and

(vi)     During the Occupancy Period, Supplier agrees that the Exercising Customer and its designee(s) and respective agents and representatives shall have access to Supplier's books and records for the purposes of confirming and calculating the amounts due, if any, from any Customer under this Agreement.

9

(e)    <u>Right to Terminate</u>.  Each Exercising Customer shall have the absolute right to terminate its respective Right of Access upon ten (10) days prior written notice to Supplier, DIP Agents and all other Customers.  If the terminating Exercising Customer is a Producing Customer, each Affected Customer who had not previously exercised its Right of Access may exercise its Right of Access or another Producing Customer may be designated pursuant to the terms of <u>Section 3(c)(vi)</u>, each within ten (10) days after expiration of the notice period, provided, however, in each instance the Occupancy Period shall be deemed to have commenced at such time as the Producing Customer exercised its Right of Access in each Facility.  Upon expiration of the notice period, the Occupancy Period will terminate as to such terminating Affected Customer and each other Exercising Customer that is not an Affected Customer, and each such Exercising Customer (including the terminating Affected Customer) will ensure that its Operating Assets and the Real Estate at such affected Facility are left in a safe and secure state and in substantially the same condition as they were at the beginning of the Occupancy Period, normal wear and tear excepted.  Except for each Exercising Customer's obligation under this Section 3(e) and payment of any amounts payable under Section 3 (c)(i) through (ix) above not paid as of the termination of the Occupancy Period, Customer's right to terminate and its cessation of use and occupancy of the Operating Assets and the Real Estate, shall cause no further obligations or liabilities to Supplier or DIP Lenders on account of the Right of Access.

(f)    **SPECIFIC PERFORMANCE.  IN CONNECTION WITH ANY ACTION OR PROCEEDING TO ENFORCE THE RIGHT OF ACCESS, SUPPLIER ACKNOWLEDGES THAT CUSTOMERS WILL NOT HAVE AN ADEQUATE REMEDY AT LAW, THAT THE OPERATING ASSETS AND THE REAL ESTATE ARE UNIQUE AND THAT CUSTOMER SHALL BE ENTITLED TO SPECIFIC PERFORMANCE OF SUPPLIER'S OBLIGATIONS TO AFFORD EACH CUSTOMER THE RIGHT OF ACCESS UNDER THIS AGREEMENT.  SUPPLIER FURTHER AGREES THAT EACH CUSTOMER MAY SEEK EXPEDITED RELIEF FROM A COURT OF PROPER JURISDICTION AND THAT ONE (1) BUSINESS DAY WRITTEN NOTICE OF SUCH REQUESTED EXPEDITED RELIEF SHALL BE ADEQUATE NOTICE THEREOF.**

(g)    **IRREPARABLE HARM; LIMITATION OF NOTICE.  SUPPLIER ACKNOWLEDGES THAT CUSTOMERS WILL SUFFER IRREPARABLE HARM IF ANY CUSTOMER EXERCISES THE RIGHT OF ACCESS AND SUPPLIER FAILS TO COOPERATE WITH SUCH CUSTOMER IN ALLOWING SUCH CUSTOMER TO EXERCISE THE RIGHT OF ACCESS UNDER THIS AGREEMENT.  ACCORDINGLY, PROVIDED THAT SUPPLIER AND THE DIP AGENTS RECEIVE AT LEAST ONE (1) BUSINESS DAY WRITTEN NOTICE OF ANY REQUEST FOR HEARINGS IN CONNECTION WITH PROCEEDINGS INSTITUTED BY A CUSTOMER(S), SUPPLIER WAIVES, TO THE FULLEST EXTENT POSSIBLE UNDER APPLICABLE LAW, THE RIGHT TO NOTICE IN EXCESS OF ONE (1) BUSINESS DAY IN CONNECTION WITH ANY JUDICIAL PROCEEDINGS INSTITUTED BY A CUSTOMER(S) TO ENFORCE THE RIGHT OF ACCESS.**

(h)    <u>No Prior Automatic Stay Relief Required; Binding Effect</u>.  No prior relief from the automatic stay in the Chapter 11 Cases, or similar proceeding and all converted, succeeding or similar cases in respect thereof, shall be necessary or required for a Customer to exercise any

10

Right of Access, or any other rights under this Agreement, including, by way of example only, the right to deliver any notice required under Section 3(a) or elsewhere in this Agreement, or to pursue its rights and remedies or take any other action afforded the Customers under this Agreement after the occurrence of a Default. Subject to approval by the Bankruptcy Court in the Chapter 11 Cases, this Agreement shall be binding upon the Parties and any subsequently appointed trustee in the Chapter 11 cases or in any and all converted, succeeding or similar cases and any subsequently appointed receiver under applicable state law, and any rights that might be asserted to deny the Right of Access by a trustee pursuant to the Bankruptcy Code (including without limitation §§ 544, 547, 548 or any other applicable section) or a receiver pursuant to applicable state law are deemed waived and released.

4.    License.    Section 4.7 (entitled "License on Intellectual Property") of the Accommodation Agreement is incorporated herein by reference and the license rights granted therein shall apply during the Occupancy Period. Nothing herein is intended to modify any rights granted Customers in the Purchase Orders.

5.    Protection of Production. Upon the occurrence of a Default under this Agreement and the exercise of the Right of Access by the Affected Customer, each Customer shall, with respect to its Component Parts manufactured at the Facility at which the Right of Access was exercised by the Affected Customer, have the right to, without any limitation, enter into discussions, negotiations, and agreements regarding the production of such Component Parts with any current or former sub suppliers, agents, consultants, directors, employees, or officers of Supplier.

6.    Rights of Customers; Limitations on Customers' Obligations.  Unless a Customer exercises its Right of Access, in which case that Customer shall have the obligations outlined in Section 3 above and elsewhere in this Agreement, a Customer shall not have any obligation or liability by reason of or arising out of this Agreement nor shall a Customer be required or obligated in any manner to perform or fulfill any of the obligations of Supplier under this Agreement.

7.    Remedies.    Upon a Default and the expiration of any applicable cure periods, Customers shall have all rights and remedies provided in this Agreement and in any other agreements with Supplier.  All of Customers' rights and remedies under this Agreement are cumulative and not exclusive of any rights and remedies under any other agreement or under applicable law.

8.    Injunctive Relief.    Given that Customers will incur significant damages if Supplier fails to timely satisfy its obligations to Customers and Customers' operations or production will be negatively impacted, and because Customers do not have an adequate remedy at law and would be irreparably harmed by such events, Supplier agrees that Customers shall be entitled to injunctive relief (both prohibitive and mandatory) upon a Default by Supplier under this Agreement.

9.    Representations and Warranties.  Supplier represents and warrants to Customers that:

11

(a)    Title; No Other Security Interests.    Except for the liens and security interests granted to the DIP Agents, the DIP Lenders and the liens and security interests granted any other secured party of record, Supplier owns the Operating Assets and Real Estate free and clear of any and all security interests or claims of others.

(b)    Trade Names.    Any and all trade names under which Supplier transacts any part of its business, and all former names of Supplier, are those which have been previously disclosed to Customers in writing.

(c)    Accuracy of Information.    All information, certificates, or statements given to Customers under this Agreement must be true and complete in all material respects, when given.

(d)    Authority.    It has full power and authority to enter into this Agreement and perform all of its obligations hereunder.

10.    Covenants.    Supplier covenants and agrees with Customers that from and after the date of this Agreement until the Obligations are fully satisfied:

(a)    Further Documentation.    At any time and from time to time, upon the written request of Customers, and at Supplier's sole expense, Supplier will promptly and duly execute and deliver any and all such further instruments and documents and take such further action as Customers may reasonably request for the purpose of obtaining the full benefits of this Agreement and of the rights and powers herein granted.

(b)    Sales or Dispositions of Assets; Certain Uses Prohibited.    Subject to the parties agreements in Section 2 hereof and the prior written consent of each Customer, which consent will not be unreasonably withheld, and the consent of the DIP Agents, Supplier will not: (i) sell or otherwise dispose of any of the Operating Assets or the Real Estate; (ii) encumber the Operating Assets or the Real Estate, except as provided in the DIP Order; or (iii) use, or contract for the use of, any of the Operating Assets or the Real Estate that manufactures Component Parts in any way which would materially adversely affect Customers' Right of Access or Customers' other rights and remedies under this Agreement; provided that, Supplier may sell or otherwise dispose of the Bristol Facility as contemplated under the Accommodation Agreement or an Acceptable Plan.    Supplier acknowledges and agrees that it will be reasonable for Customers to withhold consent if the proposed sale or encumbrance impairs Customers' rights under this Agreement or the Purchase Orders.

(c)    Limitations on Modifications of Agreements, etc.    Supplier will not: (i) amend, modify, terminate, or waive any provision of any Contract which might materially adversely affect Customers' Right of Access without the written consent of all Customers; or (ii) fail to exercise promptly and diligently each and every right which it may have under each Contract in any manner which could materially adversely affect Customers' Right of Access or Customers' other rights or remedies under this Agreement.

(d)    Maintenance of Insurance.    Subject to the provisions of Section 3(c)(ii), Supplier must, at its expense, keep and maintain the Operating Assets and the Real Estate insured against all risk of loss or damage from fire, theft, malicious mischief, explosion, sprinklers, and all other hazards or risks of physical damage included within the meaning of the term "extended

12

coverage" in amounts as are ordinarily insured against by other similar businesses and shall name, in addition to the DIP Agents, Customers as loss payees and additional insured(s) thereon.

(e)     <u>Right of Inspection; Cooperation</u>.  In addition to any rights Customers may have under their respective Purchase Orders and the Accommodation Agreement, Customers and their representatives shall, upon reasonable request and at reasonable times, have the right to enter into and upon any premises where any of the Operating Assets are located for the purpose of inspecting the same, observing their use or otherwise protecting Customers' interests therein.  In addition, upon reasonable request, Customers shall be entitled to review and Supplier shall provide or provide access to, current financial information and forecasts related to Supplier's financial condition.  Customers shall maintain the strict confidentiality of information obtained by Customers, except as required by law.

(f)     <u>Notice of Default</u>.  Supplier will provide prompt written notice to Customers, by way of electronic delivery or overnight express mail service, of their or their attorneys' or agents' receipt of any notice of default under Supplier's agreements with DIP Lenders or any other secured creditors including, but not limited to, taxing authorities.  Supplier hereby grants to Customers the option, but not the obligation, to exercise whatever rights to cure defaults that Supplier has under such agreements or by law.

11.     <u>Third Party Acknowledgments and Limitations on Subsequent Grants</u>.  Supplier will provide to Customers as promptly as practicable acknowledgments of any lessor(s) of the Real Estate and Operating Assets (to the extent leased) to Customers' rights hereunder, in a form substantially similar to <u>Exhibit 11</u> hereto. Supplier will not grant any party other than a Customer a Right of Access similar to that granted in this Agreement, except on terms acceptable to Customers.

12.     <u>Term</u>.  The rights granted to each Customer under this Agreement shall continue until the period that is ten (10) business days after the expiration of the Term (as defined in the Accommodation Agreement), or, in the case of the Bristol Facility, the Bristol Surcharge Termination Date (as defined in the Accommodation Agreement) unless an Affected Customer has, following the occurrence of a Default, exercised the Right of Access in which case this Agreement shall expire upon termination of the Occupancy Period.  Further, the Right of Access shall terminate and be of no further force and effect ten (10) business days after the DIP Agents give written notice, in accordance with <u>Section 21</u>, and referencing this Agreement, that the DIP Agents intend to exercise their rights with respect to the Operating Assets and/or Real Estate, respectively, unless Affected Customer(s) exercises the Right of Access during such ten (10) business day period.  The giving of the written notice by one or both DIP Agents shall give rise to the right of an Affected Customer to exercise the Right of Access during such ten (10) business day period.

13.     <u>Confidential Information and Data</u>.  Without limiting Customers' rights under this Agreement, to the extent the Operating Assets include or Customers or their designee(s) otherwise come into possession of or become aware of, Supplier's trade secrets or proprietary information during Customers' exercise of the Right of Access, subject to Section 4 above, Customers and their designee(s) must:   (a) keep the information, data, and trade secrets confidential; and (b) only use the information, data, and trade secrets during the Occupancy

13

Period in connection with and necessary for producing the Component Parts. The provisions of this Section shall survive termination of this Agreement. Customers acknowledge and agree that Supplier will suffer irreparable harm if Customers or their designee(s) violate or breach their obligations under this Section 13. Customers agree that Supplier shall be entitled to injunctive relief (both prohibitive and mandatory) on an expedited basis in connection with any violations by Customers or their designee(s) of their obligations under this Section 13.

14. <u>UC Holdings' Acknowledgment</u>. UC Holdings acknowledges and consents to the rights granted to Customers in this Agreement.

15. <u>Severability</u>. Should any provision of this Agreement be held invalid, prohibited, or unenforceable in any one jurisdiction it will, as to that jurisdiction only, be ineffective to the extent of such holding without invalidating the remaining provisions of this Agreement, and any such holding does not invalidate or render unenforceable that provision in any other jurisdiction wherein it would be valid and enforceable.

16. <u>Authorization</u>. The individuals executing this Agreement as representatives warrant that they have the power and authority to execute this Agreement on behalf of the legal entity that they represent and that their signatures bind said entities to the terms of this Agreement.

17. <u>Section/Paragraph Headings</u>. The section/paragraph headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation of this Agreement. All references to paragraphs, sections, Schedules, and Exhibits are to paragraphs, sections, Schedules, and Exhibits in or to this Agreement unless otherwise specified.

18. <u>No Waiver; Cumulative Remedies</u>. Customers, Suppliers, and/or DIP Agents (on behalf of the DIP Lenders) shall not by any act, delay, indulgence, omission, or otherwise be deemed to have waived any right or remedy under this Agreement or of any breach of the terms and conditions of this Agreement. A waiver by Customers, Supplier, and/or the DIP Agents of any right or remedy under this Agreement on any one occasion shall not be construed as a bar to any right or remedy which Customers, Supplier, and/or DIP Lenders would otherwise have had on a subsequent occasion. No failure to exercise nor any delay in exercising on the part of Customers any right, power, or privilege under this Agreement, shall operate as a waiver, nor shall any single or partial exercise of any right, power, or privilege under this Agreement preclude any other or future exercise thereof or the exercise of any other right, power, or privilege. The rights and remedies under this Agreement are cumulative, may be exercised singly or concurrently, and are not exclusive of any rights and remedies provided by any other agreements or applicable law.

19. <u>Waivers and Amendments; Successors and Assigns</u>. No term or provision of this Agreement may be waived, altered, modified, or amended except by a written instrument, duly executed by Supplier, Customers and the DIP Agents. This Agreement and all of Supplier's obligations are binding upon the successors and assigns of Supplier, and together with the rights and remedies of Customers under this Agreement, inure to the benefit of each Customer and their respective successors and assigns. Supplier may not assign or transfer any right or obligation

14

under this Agreement without the prior written consent of Customers and the DIP Agents.

20.    <u>Governing Law and Forum</u>.  This Agreement is made in the State of Michigan and shall be governed by, construed, and enforced in accordance with the laws of the State of Michigan.  The parties agree that the federal and state courts sitting in Wayne County, Michigan, have personal jurisdiction over the parties and that proper jurisdiction and venue for any dispute arising from or under this Agreement may be in the federal or state courts sitting in Wayne County, Michigan.   Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this <u>Section 20</u> shall be brought in the Bankruptcy Court and each of the Parties irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court

21.    <u>Notices</u>.  All notices, requests and other communications that are required or may be given under this Agreement must be in writing and shall be deemed to have been given on the date of delivery, if delivered by hand, telecopy or courier, or three (3) days after mailing, if mailed by certified or registered mail, postage prepaid, return receipt requested, addressed as identified in Section 13 of the Accommodation Agreement (which addresses may be changed, from time to time, by notice given in the manner provided in the Accommodation Agreement).  Where notice is required to be given or received by a Supplier Mexican subsidiary, Chassix will be designated to give or receive such notice, as the case may be, and a notice to a Mexican subsidiary will be deemed to have been given or received when the notice is given or received by Chassix on behalf of the Mexican subsidiary.  Chassix will obtain from each Mexican subsidiary a power of attorney designating Chassix to give and receive notice under this Agreement on its behalf.

22.    <u>No Intended Third Party Beneficiary</u>.  The parties hereto acknowledge and agree that the rights and interests of the parties under this Agreement are intended to benefit solely the parties to this Agreement.

23.    <u>Further Assurances</u>.  Upon request of any Party and without further consideration, each Party will execute and deliver to the requesting Party such documents as may be reasonably requested to consummate more effectively the intent and purpose of this Agreement, including without limitation any documents reasonably necessary to effectuate and enforce this Agreement in Mexico.

24.    <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts and by each party hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.  Facsimile signatures shall constitute original signatures for all purposes under this Agreement.

25.    <u>Entire Agreement; Conflicts</u>.  This Agreement, the Accommodation Agreement, the Purchase Orders, and any schedules or exhibits referenced herein or other documents executed in connection with this Agreement, constitute the entire understanding of the parties in connection with the subject matter of this Agreement.  This Agreement constitutes a merger of all proposals, negotiations, representations, understandings, and agreements, whether oral or written, with regard to the subject matter and provisions of this Agreement.   Except as

15

specifically provided herein, this Agreement is not intended to supplant or modify the terms of the Purchase Orders, which will otherwise remain in full force and effect.  In the event and to the extent of a conflict between the terms of the Purchase Orders and this Agreement, the terms of this Agreement will control.

26.  **CONSULTATION WITH COUNSEL.    THE PARTIES HERETO ACKNOWLEDGE THAT THEY HAVE BEEN GIVEN THE OPPORTUNITY TO CONSULT WITH COUNSEL BEFORE EXECUTING THIS AGREEMENT AND ARE EXECUTING SUCH AGREEMENT WITHOUT DURESS OR COERCION AND WITHOUT RELIANCE ON ANY REPRESENTATIONS, WARRANTIES OR COMMITMENTS OTHER THAN THOSE REPRESENTATIONS, WARRANTIES AND COMMITMENTS SET FORTH IN THIS AGREEMENT.**

27.  **WAIVER OF JURY TRIAL.  THE PARTIES HERETO ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED.    THE PARTIES EACH HEREBY KNOWINGLY, VOLUNTARILY AND WITHOUT COERCION, WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ALL DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT OR ANY OTHER AGREEMENTS BETWEEN THE PARTIES EXECUTED IN CONNECTION WITH THIS AGREEMENT.  NO PARTY SHALL BE DEEMED TO HAVE RELINQUISHED THE BENEFIT OF THIS WAIVER OF JURY TRIAL UNLESS SUCH RELINQUISHMENT IS IN A WRITTEN INSTRUMENT SIGNED BY THE PARTY TO WHICH SUCH RELINQUISHMENT WILL BE CHARGED.**

**[REMAINDER OF PAGE INTENTIONALLY BLANK –
SIGNATURES CONTAINED ON NEXT PAGE]**

16

**General Motors LLC**


**By:**_____

**Print Name:** _____

**Title:** _____

**Date:** _____


[Signature page to Access Agreement]

**Ford Motor Company**


By:_____

Print Name: _____

Title: _____

Date: _____

[Signature page to Access Agreement]

**FCA US LLC f/k/a Chrysler Group LLC**

By:_____

Print Name: _____

Title: _____

Date: _____

[Signature page to Access Agreement]

**Nissan North America, Inc.**

By:_____

Print Name: _____

Title: _____

Date:  _____

[Signature page to Access Agreement]

**PNC Bank, National Association**

By:_____

Print Name: _____

Title: _____

Date: _____

[Signature page to Access Agreement]

**CANTOR FITZGERALD SECURITIES, solely in its capacity as DIP Term Agent**

_____

By:_____

Print Name: _____

Title: _____

Date: _____

**Chassix, Inc.**

By:_____

Print Name: _____

Title: _____

Date: _____

[Signature page to Access Agreement]

**UC Holdings, Inc.**


By:_____

Print Name: _____

Title: _____

Date: _____

[Signature page to Access Agreement]

**SCHEDULE A**

**<u>FACILITIES AND ACCESS FEE</u>**

**EXHIBIT 11**

**LESSOR'S**
**ACKNOWLEDGEMENT AND CONSENT**


     While not a party to that certain Access Agreement among General Motors LLC, Ford Motor Company, FCA US LLC, f/k/a Chrysler Group LLC, and Nissan North America, Inc. (collectively, "Customers"), on the one hand, and Chassix, Inc. on behalf of itself and its domestic subsidiaries ("Supplier"), PNC Bank, National Association and Cantor Fitzgerald Securities, solely in its capacity as DIP Term Agent, dated as of March 11, 2015 (the "Access Agreement"), the undersigned leases certain real estate and/or equipment to Supplier, and, in such capacity, the undersigned acknowledges, consents to, and agrees with, and agrees to be bound by, the terms and conditions of the Access Agreement, including Customers' right to use the Operating Assets and the Real Estate during any Occupancy Period.


This Lessor's Acknowledgement and Consent has been executed on _____, 2015.


                                    _____


                                      _____
                                      Name:
                                      Title:


STATE OF _____        )
COUNTY OF _____        )


     I, the undersigned authority, a Notary Public in and for said County in said State, hereby certify that the individual whose name appears above and who is known to me, signed the foregoing instrument on behalf of _____ and acknowledged before me on this day that, being informed of the contents of said instrument, he/she, as such representative of such company and with full authority, executed the same voluntarily for and as the act of said company.


     Given under my hand and official seal, this _____ day of _____ 2015.


                            _____
                            Notary Public

Affix Seal

                            My Commission Expires: _____

**<u>EXHIBIT E</u>**

**<u>ON-SITE AGREEMENT</u>**

## ACCESS AGREEMENT

This Access Agreement (this "Agreement"), is entered into by and among Chassix, Inc., a Delaware corporation, on behalf of itself and its subsidiaries and affiliates (collectively, the "Company"), [•] ("Customer") and [•] ("Advisor"), and is effective as of as of [DATE] (the "Effective Date").

## RECITALS

WHEREAS, the Company operates the casting, machining and/or manufacturing facilities located at the address(es) set forth on Exhibit A hereto (each, a "Facility" and collectively, the "Facilities").

WHEREAS, at the request of the Customer, the Company has provided, or has agreed to provide, Advisor, in its capacity as [•] advisor to Customer, access to the Facilities.

WHEREAS, in accordance with that certain Term Sheet, dated as of [•], the Company and the Advisor have agreed to enter into this Agreement with respect to Advisor's access to the Facilities.

NOW, THEREFORE, in consideration of the above, and the mutual covenants herein, and with the intent to be legally bound, the parties hereto hereby agree as follows:

## AGREEMENT

1.      Access Period.  The term of this Agreement (the "Access Period") shall commence upon the Effective Date and continue until the earlier to occur of (a) 5:00 p.m., New York time on [DATE] and (b) immediately upon delivery of notice by the Company, the Advisor, or Customer to the other parties hereto of such party's election to terminate this Agreement.

2.      Advisor Services; Procedures.  During the Access Period, the Company shall grant Advisor access to enter each Facility solely for the purpose of conducting the analysis detailed in the Approved Scope of Work described on Exhibit B hereto (the "Advisor Services").  The Advisor Services shall adhere to the Approved Scope of Work described in Exhibit B and there shall be no deviations therefrom, in any material respect, without the prior written consent of the Company.  The cost of all work related to the Advisor Services shall be borne solely by Customer.  Customer and Advisor shall conduct the Advisor Services strictly in accordance with the following procedures:

(a)      Unless otherwise agreed to by the Company, Advisor may bring no more than [•] persons to any visit of any Facility.

(b)      Prior to each Advisor personnel's first date of entry into a Facility, the Customer or Advisor shall provide the Company with not less than one day's prior notice, specifying the name of the Advisor's personnel who will be accessing the Facility and acknowledging that such personnel is aware of and agrees to abide by the obligation set forth in this Section 2 and Section 3 below.  Subject to Subsection (m) below, once notice has been received and the applicable personnel has accessed the applicable Facility, no further notice shall be required in order for such personnel to access the Facility, provided that prior to leaving the Facility such personnel informs the Facility plant manager or shift supervisor that he/she will be returning to the Facility the following day (or if not the following day, the date that he/she will be returning to the Facility).

(c)      A representative of the Company shall have the right, but not the obligation, to be present during the Advisor Services.

(d)      Each visit to any Facility shall be conducted during the regular shift hours of such Facility.

(e)      No work shall be undertaken by Advisor or any of its representatives that could result in damage to the Facility, equipment, tooling, vehicles, materials, product, components, supplies, or personal property at any Facility.

(f)      Advisor shall not take any action that could result in a lien or encumbrance against any Facility, the real property at which any Facility is located, or any equipment or other property located at any Facility.

(g)      Advisor shall perform the Advisor Services in compliance with all applicable federal, state and local laws.

(h)      Before, during, and for a minimum of 24 months after the Advisor Services, Advisor shall maintain (1) workers' compensation insurance in accordance with applicable law, (2) commercial general liability insurance with limits of at least Two Million Dollars ($2,000,000) per occurrence, and Ten Million Dollars ($10,000,000) in the aggregate, for bodily or personal injury or death, and (3) property damage insurance with limits of at least Two Million Dollars ($2,000,000) per occurrence, and Ten Million Dollars ($10,000,000) in the aggregate.  Advisor shall deliver to the Company insurance certificates evidencing such insurance coverage before conducting any portion of the Advisor Services.  Such insurance policies shall name the Company as additional insured, and shall be primary and non-contributing policies.  Any exclusion from coverage under such policies shall be disclosed to the Company prior to the commencement of the Advisor Services and any termination of such policies that occurs before the one (1) year anniversary of the expiration of the Access Period must be disclosed to the Company promptly after the Advisor becomes aware of such termination.

(i)      Advisor shall, at its own and sole expense, promptly repair any and all damage to any Facility, including but not limited to real property, personal property, equipment, tooling, vehicles, materials, product, components, supplies or other property of Company or of a third party, arising out of or resulting from Advisor's personnel and/or the Advisor Services.

(j)      Advisor shall be and remain liable for any and all losses (including, without limitation, any costs, penalties, damages or other expenses) arising out of or resulting from any injury to, or death of, any persons, arising out of or resulting from the Advisor's personnel and/or Advisor Services.

(k)      Advisor shall not interfere with the business being conducted at any Facility.

(l)      Advisor shall at all times abide in all material respects by the rules and regulations that apply generally to all employees and visitors at the Company, a copy of which is attached hereto as Exhibit C, as may be updated and amended by the Company at any time, and shall be and remain liable for any and all losses (including, without limitation, any costs, penalties, damages or other expenses) arising out of or resulting from any uncured breach of this Section (l) by any of Advisor's personnel.

(m)      Advisor shall promptly replace any employee of Advisor who the Company requests (in the Company's reasonable judgment) be removed due to such employee's inability or unwillingness to fulfill the obligations and commitments set forth in this Section 2 and Section 3 below.

3.      Confidential Information.  Each of Customer and Advisor agrees that information gathered in connection with the Advisor Services shall be considered confidential information and subject

to the terms of that certain confidentiality agreement, dated as of [•], by and between the [Company Customer and Advisor] [Company and Customer], each of which is incorporated herein by reference. The provisions of this <u>Section 3</u> shall survive the termination of this Agreement.

4.    <u>Notices</u>.  All notices, requests and other communications to any party hereunder shall be in writing and shall be deemed given, made, served or delivered if delivered personally, sent by facsimile (receipt of which is confirmed), sent by e-mail (return receipt requested and followed with one of the other forms of notice set forth in this <u>Section 4</u>) or sent by overnight courier (providing proof of delivery) to the parties hereto at the following addresses:

| | |
|---|---|
| If to the Company: | Chassix, Inc. |
| | 300 Galleria Officentre, Suite 501 |
| | Southfield, MI 48034 |
| | Attention: Mark Allan, Chief Executive Officer |
| | Facsimile: [•] |
| | E-mail: mark.allan@chassix.com |
| | |
| | <u>cc</u>: General Counsel |
| | Email: Bibi.DiSerio@chassix.com |
| | |
| | with a copy to: |
| | |
| | Weil, Gotshal & Manges LLP |
| | 767 Fifth Avenue |
| | New York, NY 10153 |
| | Attention: Ray C. Schrock |
| | Facsimile: 212-310-8007 |
| | E-mail: ray.schrock@weil.com |
| | |
| If to Customer: | [•] |
| | [ADDRESS] |
| | Attention: [•] |
| | Facsimile: [•] |
| | E-mail: [•] |
| | |
| | with a copy to: |
| | |
| | [•] |
| | [ADDRESS] |
| | Attention: [•] |
| | Facsimile: [•] |
| | E-Mail: [•] |
| | |
| If to Advisor: | [•] |
| | [ADDRESS] |
| | Attention: [•] |
| | Facsimile: [•] |
| | E-mail: [•] |
| | |
| | with a copy to: |

[•]
[ADDRESS]
Attention: [•]
Facsimile: [•]
E-mail: [•]

A party may change such party's contact(s) and/or contact information by providing the other two parties with formal notice as set forth in this <u>Section 4</u>.

     5.   <u>Entire Agreement; Assignment</u>.  This Agreement, including the terms, covenants and conditions herein, constitute the entire agreement among the parties hereto with respect to the subject matter hereof, and supersedes all prior or contemporaneous understandings or agreements or course of dealings related to such subject matter.  Notwithstanding the forgoing, nothing contained in this Agreement shall serve to modify, amend or otherwise terminate the confidentiality agreement referenced in <u>Section 3</u> above.  This Agreement may not be modified or amended except in a writing signed by each party hereto.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned, in whole or in part, without the prior written consent of the other parties; provided, however this Agreement may be assigned without consent by sale, merger, reorganization or otherwise by operation of applicable laws, for which the assigning party shall provide the other parties to this Agreement with written notice of such assignment within a reasonable period of time following the assignment.  Subject to the foregoing, this Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective successors and permitted assigns.

     6.   <u>Survival</u>.  Except as specified otherwise in this Agreement, Sections 2 (f), (h), (i), (j), (k), 3, 4, 5, this Section 6, Section 8, and Section 10 shall survive any termination of this Agreement.

     7.   <u>No Relationship</u>: Nothing in this Agreement, the disclosure of confidential information, or any discussions or efforts between any of the parties hereto shall be deemed to create any partnership, joint venture, or other commercial relationship.

     8.   <u>Waiver and Severability</u>.  The waiver of a party of a breach or default under any provision of this Agreement shall not be construed as a waiver of any subsequent breach or default of the same or other provision, nor shall any delay or omission on the part of a party to exercise or avail itself of any right or remedy that it has or may have, operate as a waiver of any right or remedy.  In the event that any provision of this Agreement is found to be invalid or unenforceable by a court of competent jurisdiction, then such provision shall be stricken, and this Agreement shall remain in full force and effect.

     9.   <u>Counterparts</u>.  This Agreement may be executed in counterparts (each of which shall be deemed to be an original but all of which taken together shall constitute one and the same agreement) and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered to the other parties hereto (including by facsimile or e-mail).

     10.   <u>Governing Law; Specific Performance</u>.  Customer and Advisor acknowledge that the Company shall not have an adequate remedy at law  in the event that this Agreement is materially breached, and that Company will suffer irreparable damage and injury in such event, and that, in addition to any other rights and remedies available at law or in equity, the Company shall be entitled to an injunction restricting the breaching party(ies) from committing or continuing any violation of this Agreement, without the requirement of posting a bond.  This Agreement shall be construed and enforced in accordance with, and the rights of the parties hereto shall be governed by, the laws of the State of Michigan, without giving effect to the conflict of laws principles thereof.  The parties agree to submit to

the jurisdiction of the courts of the State of Michigan for the purpose of interpreting and/or enforcing any of the provisions of this Agreement.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the Effective Date.

COMPANY

Chassix, Inc.

By: _____
Name:
Title:

CUSTOMER

[•]

By: _____
Name:
Title:

ADVISOR

[•]

By: _____
Name:
Title:

WEIL:\95201451\8\US.MA

EXHIBIT A

Facilities

EXHIBIT B

Approved Scope of Work

Advisor shall perform the following approved services and analysis in connection with the Agreement
(the "Advisor Services"):

- Assist the Company and Company representatives and employees in the manufacture and
  production of machining and casting component parts, service parts and assembled goods
  (collective, "Component Parts") including, without limitation, assembling, testing, receiving,
  making, observing, reporting, epicking, packaging, quality control, testing, storage,
  documentation, shipment, and/or any other similar services necessary in the manufacture and/or
  production of Component Parts.
- Supervise other Advisor personnel in carrying out the foregoing manufacturing and/or production
  services.
- Provide technical and engineering support necessary in the production and/or manufacture of
  Component Parts, including, without limitation, electrical machinery, optical, power systems,
  electronic device and circuits, and robotic systems.

EXHIBIT C

Chassix Site Rules

**Exhibit C**

**<u>BMW Accommodation Agreement</u>**

Marcia L. Goldstein
Ray C. Schrock, P.C.
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x
|    :
**In re**    :    **Chapter 11**
|    :
**CHASSIX HOLDINGS, INC.,** *et al.*,    :    **Case No. 15-_____ (___)**
|    :
|    :    **(Joint Administration Pending)**
**Debtors.**[1]    :
|    :
------------------------------------------------------x

### MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 363(b)(1) AND 105(a) AND FED. R. BANKR. P. 9019 FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO ENTER INTO ACCOMMODATION AGREEMENTS WITH CUSTOMERS

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Chassix Holdings, Inc. ("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**"), and

certain of their affiliates and subsidiaries, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, including Chassix Holdings and Chassix, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

"**Debtors**," and together with their non-Debtor subsidiaries, the "**Company**"), respectfully represent:

<u>**Background**</u>

1.      On the date hereof (the "**Commencement Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors ("**Creditors Committee**") has been appointed in these chapter 11 cases.

2.      Contemporaneously herewith, the Debtors have filed a motion requesting joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

3.      The Debtors commenced their chapter 11 cases on a prearranged basis with the support of their (a) secured and unsecured noteholders, which have committed to make significant and immediate capital infusions into the Debtors' businesses, and (b) major automotive manufacturing customers, which have committed to long-term pricing commitments and other valuable accommodations.  Consistent with their obligations under the restructuring support agreement, the Debtors have filed a plan of reorganization and proposed disclosure statement with the Court and are seeking to emerge from chapter 11 on an expedited timeframe.

4.      Information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the Declaration of J. Mark Allan Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the

WEIL:\95271100\1\35076.0003

Southern District of New York, sworn to on the date hereof (the "**Allan Declaration**"), which

has been filed with the Court contemporaneously herewith.

## Jurisdiction

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C.  §§ 1408 and 1409.

## Preliminary Statement

6.      The Debtors appear before the Court with a prenegotiated chapter 11 plan

of reorganization (as may be amended, modified or supplemented, the "**Plan**") that will enable

them to right-size their capital structure, reduce their operational overhead, and successfully

restructure their machining and casting businesses.  As set forth in the Allan Declaration, the

Debtors have reached an agreement on the terms of a financial and operational restructuring with

their major stakeholders, including an ad hoc committee comprised of holders of approximately

72% of the Debtors' senior secured notes and approximately 80% of the Debtors' unsecured

notes (the "**Noteholder Group**"), the Debtors' prepetition private equity sponsor, Platinum

Equity Advisors, LLC (collectively, with its related entities, "**Platinum Equity**"), and all of the

Debtors' largest customers, including Ford Motor Company ("**Ford**"), General Motors LLC

("**GM**"), FCA US LLC f/k/a Chrysler Group LLC ("**FCA**"), Nissan North America, Inc.

("**Nissan**"), and BMW Manufacturing Co., LLC ("**BMW**" and together with Ford, GM, FCA,

and Nissan, collectively, the "**OEM Customers**"), which will result in a significant and

substantial infusion of new capital in the Debtors in the form of debtor-in-possession and exit

financing.

3

7.      The long-term accommodations and pricing concessions that the Debtors have secured from the OEM Customers are key components to the Plan as well as the Debtors' ongoing business plan post-emergence.  These accommodations, which are memorialized in the Accommodation Agreements (as defined below), were the product of over a month of good-faith and arms' length negotiations and represent significant value for the Debtors, their estates and all parties in interest.  The Accommodation Agreements are valuable to the Debtors' estates insomuch as they will provide millions of dollars in additional liquidity, a waiver of significant fees and expenses, new business, and foster customer loyalty and confidence.  Specifically, pursuant to the Accommodation Agreements, the Debtors will receive, among other accommodations, the following:

(a)     agreements by the OEM Customers to provide the Debtors with approximately $45 million in annual price increases and new business and programs;

(b)     a continuation of certain interim accommodations implemented prior to the Commencement Date with respect to the Debtors' casting facility in Bristol, Indiana (the "**Bristol Facility**");

(c)     significant liquidity enhancement from the acceleration of payment terms on outstanding purchase orders from the OEM Customers' standard payment terms;

(d)     a guaranty from the OEM Customers of certain future business and programs to be awarded to the Debtors as well as a right of last refusal with respect to other programs;

(e)     restrictions on the OEM Customers' ability to resource parts and programs to the Debtors' competitors during the terms of the Accommodation Agreement;

(f)     certain limitations on the OEM Customers' ability to assert setoffs against the Debtors' accounts receivable; and

(g)     a waiver of certain costs and expenses associated with premium freight and third party advisors.

4

8.      As set forth below, in exchange for these accommodations, the Debtors

have committed to continue to produce and deliver component parts to the OEM Customers and

to provide other limited accommodations to safeguard the production of the OEM Customers

during the terms of the Accommodation Agreements.  The Debtors have further agreed pursuant

to an access agreement (the "**Access Agreement**") to provide certain of the OEM Customers

with limited rights to access and utilize the Debtors' facilities and equipment in the event there is

a continuing default under the Accommodation Agreements which has resulted in a substantial

likelihood that an OEM Customer's production will be interrupted.

9.      The accommodations embodied in the Accommodation Agreements are

more than mere pieces of the Debtors' Plan—they are central to the Debtors' ability to continue

to operate both in the near-term, during the chapter 11 cases, and on a permanent basis post-

emergence.  First, the Debtors' proposed debtor-in-possession financing lenders have relied on

certain of the terms and conditions set forth in the Accommodation Agreements, including,

without limitation, the accounts receivable set-off waivers and resourcing limitations, in agreeing

to extend financing to the Debtors under the DIP Facilities (as defined below).  Accordingly, the

Debtors' ability to access funding under their proposed DIP Facilities is expressly conditioned

upon receiving Court approval of the Accommodation Agreements and failing to do so may

result in immediate and irreparable harm to the Debtors, as the Debtors do not have sufficient

funds to continue to operate in chapter 11 absent access to the DIP Facilities.

10.      Second, the binding commitments that the Debtors have secured from the

Noteholder Group and Platinum Equity to support the Plan are similarly tied to receiving Court

approval of the Accommodation Agreements.  Under the Restructuring Support Agreement (as

defined in the Plan), failing to secure approval of the Accommodation Agreements will result in

a default under the Restructuring Support Agreement, which would derail the Debtors' chapter 11 cases from the start.

11.     <u>Third</u>, and perhaps most importantly, the long-term pricing concessions that the Debtors have secured from the OEMs are one of the pillars of the Debtors' go-forward plan to return to profitability post-emergence.  The significantly improved pricing and new business awards that the Debtors have negotiated, in combination with the Debtors' de-leveraged capital structure, will result in a stronger more viable company post-emergence for the benefit of all stakeholders.  The broad support the Debtors have garnered for the Plan reflects the consensus among the Debtors' key constituents that the agreements embodied in the Accommodation Agreements represent real and significant value for the Debtors, for the benefit of the estates, and all of their creditors and should be approved.

<u>**Relief Requested**</u>

12.     By this Motion, pursuant to sections 363(b)(1) and 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, the Debtors request authority to enter into (a) that certain accommodation agreement (together with any exhibits or schedules thereto, the "**Multi-Customer Accommodation Agreement**"), dated March 11, 2015, between and among the Debtors, Ford, GM, FCA, Nissan, PNC Bank, National Association, as agent for the lenders under the Debtors' debtor-in-possession asset-based revolving credit facility (the "**DIP ABL Agent**"), and Cantor Fitzgerald Securities, as agent for the lenders under the Debtors' debtor-in-possession term loan facility (the "**DIP Term Agent**" and, together with the DIP ABL Agent, the "**DIP Agents**"), and (b) that certain accommodation agreement (together with any exhibits or schedules thereto, the "**BMW Accommodation Agreement**" and, together with the Multi-

6

Customer Accommodation Agreement, the "**Accommodation Agreements**"), dated March 11, 2015, between and among the Debtors, BMW, the DIP ABL Agent, and the DIP Term Agent.[2]

13.    Annexed to the Accommodation Agreements are the component supply agreements, term sheet and other exhibits (collectively, the "**Component Supply Agreements**") that set forth the specific pricing information, quality metrics, new business awards, and other customer-specific terms that each of the OEM Customers has individually agreed to with the Debtors.  The information set forth therein, as well as certain limited information set forth in the Accommodation Agreements, is highly sensitive and constitutes confidential proprietary information and/or trade secrets.  Accordingly, contemporaneously herewith, the Debtors have filed a motion requesting authority to file the Component Supply Agreements under seal and to additionally permit the Debtors to file the Accommodation Agreements with certain limited redactions.  Unredacted and unsealed copies of the Accommodation Agreements have been submitted to the Court and the Office of the United States Trustee.

14.    An order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit "A"** (the "**Proposed Order**").  Copies of the Multi-Customer Accommodation Agreement and the BMW Accommodation Agreement are annexed hereto as **Exhibit "B"** and **"C,"** respectively.

---

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Accommodation Agreements.

WEIL:\95271100\1\35076.0003

## The Accommodation Agreements[3]

15.    The terms and conditions of the Accommodation Agreements were reached as a result of arms' length negotiations that resulted in agreements regarding the continued relationships between the Debtors and the OEM Customers, which include concessions on both sides.  The salient terms of the Accommodation Agreements are as follows:

### OEM Customer Accommodations

(a)    <u>Limitations of Setoffs</u>.  Subject to the limitations described in the Accommodation Agreements, each of the OEM Customers has agreed to waive its rights to assert setoff, recoupment, or deduction against amounts owed to the Debtors other than those setoffs that are determined to be Allowed Setoffs as set forth in the agreements.  In addition, the OEM Customers have also agreed to limit the amount of any Allowed Setoff to five percent (5%) of the face amount of the respective invoice or group of invoices.

(b)    <u>Resourcing Limitation</u>.  With certain exceptions, the OEM Customers have agreed not to resource the production of any current or future programs or platforms away from the Debtors to any of their competitors other certain agreed upon permitted resources.

(c)    <u>Bristol Surcharge</u>.  The OEM Customers have agreed to continue certain accommodations with respect to the Bristol Facility that include certain funding commitments and other financial accommodations with respect to customer-specific capital expenditures.

(d)    <u>Payment Terms</u>.  The OEM Customers have agreed to make payment on their outstanding accounts payables owed to the Debtors on an expedited basis as set forth in the Component Supply Agreements.

---

[3] The descriptions of the Accommodation Agreements set forth herein are intended for summary purposes only and are not intended to modify any of the terms of the Accommodation Agreements.  As such, the descriptions of the Accommodation Agreements set forth herein are qualified in all respects by the terms of Accommodation Agreements.  In the event of any conflict between the descriptions set forth in this Motion and the terms of the Accommodation Agreements, the terms of the Accommodation Agreements shall govern.

(e)     <u>Price Adjustments</u>.  Commencing on April 1, 2015, each of the OEM Customers has agreed to pay the Debtors a non-refundable Price Adjustment with respect to the Component Parts identified in the Component Supply Agreements.  The OEM Customers have agreed to provide the Price Adjustment without setoff or recoupment, except for Allowed Setoffs, as set forth in the Component Supply Agreements.

(f)     <u>Future Programs and Right of Last Refusal</u>.  The Component Supply Agreements include new business awards for the Debtors on replacement programs as well as new program lines.  In addition, the Component Supply Agreements include rights of last refusal on certain other future programs.

(g)     <u>Premium Freight, Outage Costs and Quality Spill Costs</u>.  The OEM Customers have agreed to waive certain rights for reimbursement from the Debtors on account of costs and expenses relating to premium and expedited freight, outage costs, and quality spill costs.

(h)     <u>Tooling Payments</u>.  The OEM Customers have agreed to make advance progress payments to the Debtors with respect to unpaid and in-process tooling.

### Debtors' Obligations

(a)     <u>Continue to Manufacture</u>.  Under the Accommodation Agreements, the Debtors have agreed to continue to supply Component Parts for each of the OEM Customers according to the terms of the Purchase Orders, as modified by the Accommodation Agreements.  Additionally, the Debtors have agreed that they will promptly move to assume the OEM Customers' Purchase Orders.

(b)     <u>Resourcing Cooperation</u>.  The Debtors have agreed to reasonably cooperate with each OEM Customer in connection with its preparation for any Permitted Resourcing and will cooperate with an OEM Customer's resourcing of production of its Component Parts as set forth in the Accommodation Agreements.

(c)     <u>Access to Information</u>.  The Debtors have agreed to provide the OEM Customers with reasonable access to the Debtors' operations, books, and records during normal business hours, and outside normal business hours when reasonably necessary, for the purposes set forth in the Accommodation Agreements.

9

(d)   License on Intellectual Property.  The Debtors will grant the OEM Customers a license to Intellectual Property owned by the Debtors, and a sublicense to the Intellectual Property licensed to the Debtors (to the extent that the Debtors have the right to grant sublicenses therein) to the extent necessary to do all things and exercise all rights in the licensed or sublicensed Intellectual Property for production of the Component Parts.  Such a license may only be exercised by an OEM Customer in connection with a Permitted Resourcing or exercise of the Right of Access.

(e)   Access Agreement.  The Debtors, together with the DIP Agents, have also agreed to enter into an Access Agreement that provides certain of the OEM Customers with limited rights to use and access the Debtors' facilities and equipment to continue to manufacture Component Parts in the event of a default under the Accommodation Agreements that results in a material and substantial threat to an OEM Customer's production.

(f)   Treatment of OEM Customer Claims under the Plan.  As a settlement and compromise among the Parties, the OEM Customers shall have allowed prepetition claims in the Chapter 11 Cases (collectively, the "**Customer Claims**") and shall not assert any other such claims in the Chapter 11 Cases.  So long as these Accommodation Agreements remain in effect, the Customer Claims shall be allowed claims in the Chapter 11 Cases; provided that so long as no Event of Default under the Accommodation Agreements occurs and the Debtors otherwise comply with the terms of the Accommodation Agreements and the Access Agreement, the OEM Customers have agreed to waive any and all rights to a recovery or distribution from the Debtors under the Debtors' chapter 11 plan, or otherwise in connection with the Debtors' restructuring, on account of the Customer Claims.

(g)   Inventory Bank.  The Debtors have agreed, upon the request of a Customer, to build up to a two-week inventory bank of Component Parts; provided that the Debtors' obligation to build inventory bank parts will be subject to, among other things, (i) reasonably applied internal capacity limitations, (ii) availability of raw materials and supplies, (iii) available financing, and (iv) that such obligation would not adversely affect Supplier.  The Debtors will not be required to build an Inventory Bank unless the Customer agrees in advance to pay all documented, additional, out-of-pocket costs incurred by Supplier in manufacturing the Inventory Bank including, without limitation, overtime, shipping, packaging, and storage costs.

10

**DIP Agents' Accommodations**.  Under the Accommodation Agreements, each of the DIP Agents consents to the Licenses granted, the Tooling Acknowledgement, and the rights granted to the OEM Customers under the Accommodation Agreements.  The DIP Agents have also agreed to forbear from exercising their rights as secured lenders, or on behalf of the DIP Lenders, against the Debtors if the actions would materially impact the Debtors' ability to perform under the Accommodation Agreements or the Access Agreement.

**Tooling Acknowledgment**.  The Debtors and the DIP Agents acknowledge and agree that Customer Tooling is (i) subject to the terms of the Accommodation Agreements, (ii) owned by the OEM Customers, and (iii) held as bailee-at-will by the Debtors and any third parties to which the Debtors have transferred possession of Customer Tooling.  In addition, the Accommodation Agreements provide for a mechanism to resolve any disputes regarding the ownership of any Tooling.

### The Accommodation Agreements are in the Best Interests of the Debtors, their Estates and all Parties in Interest and Should be Approved Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code

16.     Section 363(b)(1) of the Bankruptcy Code provides in relevant part that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . ."  Further, pursuant to section 105(a) of the Bankruptcy Code, the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

17.     Under applicable case law in this and other circuits, if a debtor's proposed use of its assets pursuant to section 363(b) of the Bankruptcy Code represents the exercise of the debtor's reasonable business judgment, such use should be approved.  *See Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring an "articulated business justification"); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that, under normal circumstances, the court defers to the trustee's judgment so long as there is a "legitimate business justification"); *In re Delaware & Hudson R.R. Co.*, 124

11

B.R. 169, 176 (D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)).

18.    In determining whether a "good business reason" exists for a debtor's proposed use of its assets pursuant to section 363(b), courts in the Second Circuit consider "the salient factors pertaining to the proceeding" and are encouraged to "act to further the diverse interests of the debtor, creditors and equity holders." *In re Boston Generating, LLC*, 440 B.R. 302, 322 (Bankr. S.D.N.Y. 2010) (quoting *In re Lionel Corp.*, 722 F.2d at 1071). This includes consideration of, among other things, (i) "the proportionate value of the asset to the estate as a whole," (ii) "the amount of elapsed time since the filing," (iii) "the likelihood that a plan of reorganization will be proposed and confirmed in the near future," (iv) "the effect of the proposed disposition on the future plans of reorganization," (v) "whether the asset is increasing or decreasing in value," (vi) whether the estate has the liquidity to survive until confirmation of a plan, (vii) whether the use or sale opportunity will exist as of the time of plan confirmation," and (viii) if the use or sale opportunity will not exist, whether it is likely that there will be a satisfactory alternative sale or use opportunity, or a stand-alone plan alternative that is equally desirable (or better) for creditors. *In re Boston Generating*, 440 B.R. at 322 (quoting *In re Lionel Corp.*, 722 F.2d at 1071; *In re General Motors Corp.*, 407 B.R. 463, 490 (Bankr. S.D.N.Y. 2009)). If, as here, "there is a material risk that by deferring the [proposed use or] sale, the patient will die on the operating table," a court will approve the debtors' motion. *Id.*

19.    If a valid business justification exists for the use or sale of property of the estate, a debtor's decision enjoys a strong presumption that "in making a business decision the directors . . . acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v.*

12

*Integrated Res. Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting

*Smith v. Van Gorkom*, 488 A.2d 858,872 (Del. 1985)); *see also In re Bridgeport Holdings, Inc.*,

388 B.R. 548, 567 (Bankr. D. Del. 2008) (stating that directors enjoy a presumption of honesty

and good faith with respect to negotiating and approving a transaction involving a sale of assets).

Indeed, when applying the "business judgment" standard, courts show great deference to a

debtor's business decisions. *In re Troll Commc'ns, LLC*, 385 B.R. 110, 118 (Bankr. D. Del.

2008).

        20.     Finally, the Court has the power to grant the relief requested under section

105, which says that the Court may "issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Similar relief has been

granted in other automotive supplier cases in this and other districts. *See, e.g.*, Order

Authorizing Entry Into an Accommodation Agreement with Chrysler Group LLC Pursuant to

Bankruptcy Rule 9019 and Sections 363(b), 363(f), and 363(m) of the Bankruptcy Code, *In re

Visteon Corp.*, No. 09-11786-CSS (Bankr. D. Del. Nov. 12, 2009); Stipulation and Order Among

Debtors, DIP Agent, Prepetition ABL Agent, and Certain Customers Regarding Interim Order

Pursuant to Sections 361, 362, 363, 364 and 510 of the Bankruptcy Code and Rule 4001 of the

Federal Rules of Bankruptcy Procedure (A) Authorizing Debtors to (I) Use Cash Collateral of

Prepetition Secured Lenders, (II) Obtain Postpetition Financing and (III) Provide Adequate

Protection to Prepetition Secured Lenders, (B) Authorizing Debtors to Enter Into, and

Approving, Accommodation Agreement with Certain Customers and (C) Providing Notice and

Scheduling Final Hearing, *In re Metaldyne Corporation,* et al., No. 09-13412 (MG) (Bankr.

S.D.N.Y. June 12, 2009); Order (I) Supplementing January 5, 2007 DIP Refinancing Order

(Docket No. 6461) and Authorizing Debtors to Enter Into and Implement Accommodation

Agreement with Agent and Participating Lenders and (II) Authorizing Debtors to (a) Enter Into Related Documents and (b) Pay Fees in Connection Therewith, *In re Delphi Corporation*, et al., No. 05-44481 (RDD) (Bankr. S.D.N.Y. Dec. 3, 2008).

21.     Entry into the Accommodation Agreements is undoubtedly in the best interest of the Debtors, their estates, and their stakeholders.  As described herein and in the Allan Declaration, the Accommodation Agreements, which are one of the lynchpins of the Debtors' business plan and plan for a successful reorganization, represent significant value to the Debtors in the form of both short and long-term accommodations, including significant pricing adjustments and valuable new program rewards.  As discussed above, the Accommodation Agreements will provide the Debtors with approximately 45 million in annual prices increases and new business and programs.  The Accommodation Agreements permit the Debtors to execute their business plan and obtain substantial additional liquidity without having to incur debt that would need to be repaid in order to emerge from chapter 11.

22.     Moreover, immediate authority to enter into the Accommodation Agreements is necessary and justified by the facts and circumstances of these chapter 11 cases.  Absent interim approval by the Court of the Accommodation Agreements, the Debtors' chapter 11 cases may be derailed from the start and all of the support the Debtors have worked diligently over the past five months to garner for the Plan could unravel.  The Accommodation Agreements will provide the Debtors with immediate additional liquidity in the form of immediate lump sum cash payments, price adjustments on existing Purchase Orders, accelerated payment terms, and limitations on the OEM Customers' setoff rights.  Given the Debtors' perilous liquidity position, these accommodations are necessary to avoid any further decline to the Debtors' financial position.  Additionally, the Debtors will be unable to borrow under their proposed DIP Facilities

14

absent Court approval of the Accommodation Agreements.  As the Debtors have insufficient

available liquidity to fund their operations even for a short period of time during these chapter 11

cases, they require immediate access to the borrowings under their proposed DIP Facilities.  In

addition, failing to receive Court approval of the Accommodation Agreements would trigger an

event of default under the Restructuring Support Agreement.  The Accommodation Agreements

constitute the best possible arrangement for the continuation of business between the Debtors

and the OEM Customers and thus should be approved as a reasonable exercise of the Debtors'

business judgment.  Interim approval of the Accommodation Agreements is reasonable and

necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Court

has authority to authorize the Agreements based on sections 105(a) and 363.

### Ample Cause Exists to Approve the Accommodation Agreements Pursuant to Bankruptcy Rule 9019(a)

23.     Bankruptcy Rule 9019(a) allows the Court to approve a compromise or

settlement that is in the Debtors' best interests.  The Debtors request that the Court approve the

Accommodation Agreements pursuant to Bankruptcy Rule 9019(a), which *requires* the Court to

find that the Accommodation Agreements are fair and equitable and are in the best interests of

the Debtors' estates.  *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

Anderson*, 390 U.S. 414, 424 (1968); *Fisher v. Pereira (In re 47-49 Charles St., Inc.)*, 209 B.R.

618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993),

*aff'd*, 17 F.3d 600 (2d Cir. 1994).

24.     The decision to approve a particular settlement agreement lies within the

sound discretion of the Court.  *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).  Unless a

settlement "falls below the lowest point in the range of reasonableness," it will satisfy

15

Bankruptcy Rule 9019. *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir.

1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997). Courts often exercise their

discretion to approve settlements "in light of the general public policy favoring settlements." *In*

*re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

25.    While a court must evaluate all factors "relevant to a fair and full

assessment of the wisdom of the proposed compromise," a court need not conduct a "mini-trial"

of the merits of the claims being settled. *Anderson*, 390 U.S. at 424-25; *W.T. Grant Co.*, 699

F.2d at 608; *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y.

1991). "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact.

. . . The court need only canvass [sic] the settlement to determine whether it is within the

accepted range of reasonableness." *Nellis*, 165 B.R. at 123.

26.    When analyzing the reasonableness of a settlement, a court may give

weight to the debtor's informed judgment that the compromise is fair and equitable. *In re*

*Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993). In fact, the analysis of a

settlement's reasonableness does not require the court to substitute its judgment for the debtor's,

and if the debtor chooses one of two reasonable choices, the court must approve that choice, even

if, all things being equal, the court would have selected the other choice. *In re Ashford Hotels*

*Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate

that I substitute my judgment for the Trustee's, but only that I test his choice for reasonableness.

. . . If the Trustee chooses one of two reasonable choices, I must approve that choice, even if, all

things being equal, I would have selected the other.").

27.    The Accommodation Agreements satisfy the Bankruptcy Rule 9019(a)

standard. After good faith arms'-length negotiations, the Parties agreed to the terms of the

Accommodation Agreements, which provide the Debtors with immediate liquidity and will enable the Debtors to sustain their operations on a long-term and go-forward basis. The Accommodation Agreements settle a number of claims that could have led to disputes or potential litigation. For example, absent the settlements set forth in the Accommodation Agreements, the parties could become embroiled in lengthy and costly litigation regarding, among other things, any amounts paid by the OEM Customers to the Debtors with respect to the Debtors' Bristol Facility, the Customer Claims, open commercial issues, the ownership of Tooling and other issues. The outcome of these claims is uncertain. Further, the expense incurred in connection with a potential dispute or litigation would be an additional burden to the Debtors' estates and creditors. The Accommodation Agreements avoid both the uncertainty of litigation and the heavy burden litigation would place on the Debtors and their estates. Furthermore, the Accommodation Agreements are more than a settlement of potential claims by and against the Debtors, the Accommodation Agreements are the foundation of the Debtors' plan to successfully restructure their businesses and operations, which will help the Debtors emerge from chapter 11 as a stronger and healthier supplier. The Debtors are getting the support of the OEM Customers and the OEM Customers are settling their claims by agreeing to waive distribution. Accordingly, the Accommodation Agreements should be approved under Bankruptcy Rule 9019(a) as valid exercises of the Debtors' reasonable business judgment and as being in the best interests of the Debtors' estates and all parties in interest.

### The Debtors Have Satisfied Bankruptcy Rule 6003

28.    Bankruptcy Rule 6003 provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a bankruptcy court may approve a motion to "use, sell, lease, or otherwise incur an obligation regarding property of the estate" prior to twenty-one days

17

after the Commencement Date.  As described herein and in the Allan Declaration, the

Accommodation Agreements provide the Debtors with valuable accommodations, including

pricing adjustments and other payment accommodations, that will infuse much needed liquidity

into the Debtors' estates during the early stages of these chapter 11 cases.  In addition, approval

of the Multi-Customer Accommodation Agreement is a condition precedent to funding under the

Debtors' DIP Facilities, which the Debtors' require access to in order to continue to operate

during the chapter 11 cases.  Furthermore, should the Debtors be unable to receive approval of

the Multi-Customer Accommodation Agreement, it would trigger a default under the

Restructuring Support Agreement, thereby disrupting the Debtors' chapter 11 cases from the

start.  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid

immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

### Waiver of Bankruptcy Rules 6004(a) and (h)

29.    To implement the foregoing immediately, the Debtors seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order

authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### Reservation of Rights

30.    Except as otherwise expressly set forth herein or in the Accommodation

Agreements, nothing contained herein is intended to be or shall be construed as (a) an admission

as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any

appropriate party in interest's rights to dispute any claim, or (c) an approval or assumption of any

agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.

Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's

18

order is not intended to be and should not be construed as an admission to the validity of any

claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## Notice

31.    Notice of this Motion has been provided to (i) the Office of the United

States Trustee for the Southern District of New York; (ii) the holders of the five largest secured

claims against the Debtors (on a consolidated basis); (iii) the holders of the forty (40) largest

unsecured claims against the Debtors (on a consolidated basis); (iv) the attorneys for BMO

Harris Bank, N.A., as administrative agent under that certain Amended and Restated Loan,

Security and Guaranty Agreement, dated as of July 23, 2013; (v) the attorneys for U.S. Bank

National Association, as trustee under that certain Indenture for 9 1/4% Senior Secured Notes

due 2018, dated as of July 23, 2013; (vi) the attorneys for Delaware Trust Company, as successor

trustee under that certain Indenture for 10% / 10 3/4% Senior PIK Toggle Notes due 2018, dated

as of December 13, 2013; (vii) the attorneys for the Informal Committee of Noteholders; (viii)

the attorneys for the Revolving DIP Lenders; (ix) the attorneys for the DIP Term Lenders; (x) the

OEM Customers; (xi) the attorneys for Platinum Equity Advisors, LLC; (xii) the Securities and

Exchange Commission; (xiii) the Internal Revenue Service; and (xiv) the United States

Attorney's Office for the Southern District of New York.  The Debtors submit that, in view of

the facts and circumstances, such notice is sufficient and no other or further notice need be

provided.

32.    No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

19

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: March 12, 2015
      New York, New York

            /s/ Ray C. Schrock, P.C.
            Marcia L. Goldstein
            Ray C. Schrock, P.C.

            **WEIL, GOTSHAL & MANGES LLP**
            767 Fifth Avenue
            New York, New York 10153
            Telephone:  (212) 310-8000
            Facsimile:  (212) 310-8007

            *Proposed Attorneys for Debtors*
            *and Debtors in Possession*

WEIL:\95271100\1\35076.0003

**Exhibit A**

**<u>Proposed Interim Order</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                            :

In re                          :       Chapter 11
                            :

CHASSIX HOLDINGS, INC., *et al.*,   :       Case No. 15-_____ (___)
                            :

               Debtors.[1]    :       Jointly Administered
                            :
-------------------------------------------------------x

## INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 363(b)(1) AND 105(a) AND FED. R. BANK. P. 9019 AUTHORIZING DEBTORS TO ENTER INTO ACCOMMODATION AGREEMENTS WITH CUSTOMERS

Upon the motion, dated March _, 2015 (the "**Motion**"),[2] of Chassix Holdings, Inc.

("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**"), and certain of their affiliates and subsidiaries,

as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively,

including Chassix Holdings and Chassix, the "**Debtors**"), pursuant to sections 363(b)(1) and

105(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 9019(a) of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of an order

authorizing the Debtors to enter into (a) that certain accommodation agreement (together with

any exhibits or schedules thereto, the "**Multi-Customer Accommodation Agreement**"), dated

March 11, 2015, between and among General Motors LLC ("**GM**"), Ford Motor Company

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

("**Ford**"),  FCA US LLC f/k/a Chrysler Group LLC ("**FCA**"), Nissan North America, Inc.

("**Nissan**"), the Debtors, PNC Bank, National Association, as agent for the lenders under the

Debtors' debtor-in-possession asset-based revolving credit facility (the "**DIP ABL Agent**"), and

Cantor Fitzgerald Securities, as agent for the lenders under the Debtors' debtor-in-possession

term loan facility (the "**DIP Term Agent**" and together with the DIP ABL Agent, the "**DIP**

**Agents**"), and (b) that certain accommodation agreement (together with any exhibits or

schedules thereto, the "**BMW Accommodation Agreement**" and together with the Multi-

Customer Accommodation Agreement, the "**Accommodation Agreements**"), between and

among the Debtors, BMW Manufacturing Co., LLC ("**BMW**" and together with Ford, GM,

FCA, and Nissan collectively, the "**OEM Customers**"), the DIP ABL Agent and the DIP Term

Agent, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the

Motion and the relief requested therein in accordance with 28. U.S.C. §§ 157 and 1334 and the

Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided to (i) the Office of the

United States Trustee for the Southern District of New York (the "**U.S. Trustee**"); (ii) the

holders of the five largest secured claims against the Debtors (on a consolidated basis); (iii) the

holders of the forty (40) largest unsecured claims against the Debtors (on a consolidated basis);

(iv) the attorneys for BMO Harris Bank, N.A., as administrative agent under that certain

Amended and Restated Loan, Security and Guaranty Agreement, dated as of July 23, 2013; (v)

the attorneys for U.S. Bank National Association, as trustee under that certain Indenture for 9

1/4% Senior Secured Notes due 2018, dated as of July 23, 2013; (vi) the attorneys for Delaware

2

Trust Company, as successor trustee under that certain Indenture for 10% / 10 3/4% Senior PIK

Toggle Notes due 2018, dated as of December 13, 2013; (vii) the attorneys for the Informal

Committee of Noteholders; (viii) the attorneys for the Revolving DIP Lenders; (ix) the attorneys

for the DIP Term Lenders; (x) the OEM Customers; (xi) the attorneys for Platinum Equity

Advisors, LLC; (xii) the Securities and Exchange Commission; (xiii) the Internal Revenue

Service; and (xiv) the United States Attorney's Office for the Southern District of New York (the

"**Notice Parties**"); and it appearing that no other or further notice need be provided; and a

hearing having been held to consider the relief requested in the Motion (the "**Hearing**"); and

upon the Declaration of J. Mark Allan Pursuant to Rule 1007-2 of the Local Bankruptcy Rules

for the Southern District of New York (the "**Allan Declaration**"), filed contemporaneously with

the Motion, the record of the Hearing and all of the proceedings had before the Court; and the

Court having found and determined that the relief sought in the Motion is necessary to avoid

immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy

Rule 6003, and is in the best interests of the Debtors, their estates, creditors, and all parties in

interest, and that the legal and factual bases set forth in the Motion establish just cause for the

relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted on an interim basis, as provided herein; and

it is further

ORDERED that, pursuant to sections 363(b)(1) and 105(a) of the Bankruptcy

Code and Bankruptcy Rule 9019(a), the Accommodation Agreements annexed to the Motion are

approved and the Debtors are authorized, on an interim basis, to enter into the Accommodation

Agreements and any other transactions or agreements related thereto, including, without

limitation, the Access Agreement; and it is further

ORDERED that the Debtors' claims and noticing agent in the Debtors' chapter 11

cases is authorized and directed to adjust the claims register to reflect the Customer Claims in

accordance with the Accommodation Agreements and the terms of this Interim Order; and it is

further

ORDERED that the Debtors shall serve this Interim Order within three (3)

business days of its entry on the Notice Parties; and it is further

ORDERED that notwithstanding entry of this Interim Order, nothing herein shall

create, nor is intended to create, any rights in favor of or enhance the status of any claim held by,

any party; and it is further

ORDERED that the requirements of Bankruptcy Rule 6003(b) have been

satisfied; and it is further

ORDERED that the requirements of Bankruptcy Rule 6004(a) are hereby waived;

and it is further

ORDERED that, notwithstanding any applicability of Bankruptcy Rule 6004(h),

the terms and conditions of this Interim Order shall be immediately effective and enforceable

upon its entry; and it is further

ORDERED that a hearing to consider entry of an order granting the relief in the

Motion on a final basis shall be held on _____, 2015, at _____ (**Prevailing Eastern**

4

**Time)** and any objections or responses to the Motion shall be in writing, filed with the Court,

and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767

Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C.); and (ii) the Notice

Parties, in each case so as to be received no later than **4:00 p.m. (Prevailing Eastern Time) on**

**_____, 2015**; and it is further

        ORDERED that this Interim Order is effective only from the date of entry through

this Court's disposition of the Motion on a final basis; <u>provided</u> that the Court's ultimate

disposition of the Motion on a final basis shall not impair or otherwise affect any action taken

pursuant to this Interim Order; and it is further

        ORDERED that the Debtors are authorized to take all steps necessary to carry out

this Interim Order; and it is further

        ORDERED that the relief granted herein shall be binding upon any chapter 11

trustee and/or examiner appointed in these chapter 11 cases or upon any chapter 7 trustee

appointed in the event of a subsequent conversion of these chapter 11 cases under chapter 7; and

it is further

        ORDERED that this Court shall retain jurisdiction to hear and determine all

matters arising from or related to the implementation, interpretation and/or enforcement of this

Interim Order.

Dated: _____, 2015
      New York, New York


                       _____
                       UNITED STATES BANKRUPTCY JUDGE

**Exhibit B**

**<u>Multi-Customer Accommodation Agreement</u>**

**Exhibit C**

**<u>BMW Accommodation Agreement</u>**

Marcia L. Goldstein
Ray C. Schrock, P.C.
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------x
                                         :
In re                                    :        Chapter 11
                                         :
CHASSIX HOLDINGS, INC., et al.,          :        Case No. 15-_____ (___)
                                         :
                                         :        (Joint Administration Pending)
                  Debtors.¹              :
                                         :
                                         :
-------------------------------------------------------x
```

**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 363(b)(1) AND 105(a) AND**
**FED. R. BANKR. P. 9019 FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS**
**TO ENTER INTO ACCOMMODATION AGREEMENTS WITH CUSTOMERS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Chassix Holdings, Inc. ("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**"), and

certain of their affiliates and subsidiaries, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, including Chassix Holdings and Chassix, the

---

¹ The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

"**Debtors**," and together with their non-Debtor subsidiaries, the "**Company**"), respectfully

represent:

**<u>Background</u>**

1.       On the date hereof (the "**Commencement Date**"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11 of the United States

Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors

("**Creditors Committee**") has been appointed in these chapter 11 cases.

2.       Contemporaneously herewith, the Debtors have filed a motion requesting

joint administration of the chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**").

3.       The Debtors commenced their chapter 11 cases on a prearranged basis

with the support of their (a) secured and unsecured noteholders, which have committed to make

significant and immediate capital infusions into the Debtors' businesses, and (b) major

automotive manufacturing customers, which have committed to long-term pricing commitments

and other valuable accommodations.  Consistent with their obligations under the restructuring

support agreement, the Debtors have filed a plan of reorganization and proposed disclosure

statement with the Court and are seeking to emerge from chapter 11 on an expedited timeframe.

4.       Information regarding the Debtors' businesses, capital structure, and the

circumstances leading to the commencement of these chapter 11 cases is set forth in the

Declaration of J. Mark Allan Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the

2

Southern District of New York, sworn to on the date hereof (the "**Allan Declaration**"), which

has been filed with the Court contemporaneously herewith.

## Jurisdiction

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper

before this Court pursuant to 28 U.S.C.  §§ 1408 and 1409.

## Preliminary Statement

6.      The Debtors appear before the Court with a prenegotiated chapter 11 plan

of reorganization (as may be amended, modified or supplemented, the "**Plan**") that will enable

them to right-size their capital structure, reduce their operational overhead, and successfully

restructure their machining and casting businesses.  As set forth in the Allan Declaration, the

Debtors have reached an agreement on the terms of a financial and operational restructuring with

their major stakeholders, including an ad hoc committee comprised of holders of approximately

72% of the Debtors' senior secured notes and approximately 80% of the Debtors' unsecured

notes (the "**Noteholder Group**"), the Debtors' prepetition private equity sponsor, Platinum

Equity Advisors, LLC (collectively, with its related entities, "**Platinum Equity**"), and all of the

Debtors' largest customers, including Ford Motor Company ("**Ford**"), General Motors LLC

("**GM**"), FCA US LLC f/k/a Chrysler Group LLC ("**FCA**"), Nissan North America, Inc.

("**Nissan**"), and BMW Manufacturing Co., LLC ("**BMW**" and together with Ford, GM, FCA,

and Nissan, collectively, the "**OEM Customers**"), which will result in a significant and

substantial infusion of new capital in the Debtors in the form of debtor-in-possession and exit

financing.

3

7.       The long-term accommodations and pricing concessions that the Debtors have secured from the OEM Customers are key components to the Plan as well as the Debtors' ongoing business plan post-emergence.  These accommodations, which are memorialized in the Accommodation Agreements (as defined below), were the product of over a month of good-faith and arms' length negotiations and represent significant value for the Debtors, their estates and all parties in interest.  The Accommodation Agreements are valuable to the Debtors' estates insomuch as they will provide millions of dollars in additional liquidity, a waiver of significant fees and expenses, new business, and foster customer loyalty and confidence.  Specifically, pursuant to the Accommodation Agreements, the Debtors will receive, among other accommodations, the following:

(a)      agreements by the OEM Customers to provide the Debtors with approximately $45 million in annual price increases and new business and programs;

(b)      a continuation of certain interim accommodations implemented prior to the Commencement Date with respect to the Debtors' casting facility in Bristol, Indiana (the "**Bristol Facility**");

(c)      significant liquidity enhancement from the acceleration of payment terms on outstanding purchase orders from the OEM Customers' standard payment terms;

(d)      a guaranty from the OEM Customers of certain future business and programs to be awarded to the Debtors as well as a right of last refusal with respect to other programs;

(e)      restrictions on the OEM Customers' ability to resource parts and programs to the Debtors' competitors during the terms of the Accommodation Agreement;

(f)      certain limitations on the OEM Customers' ability to assert setoffs against the Debtors' accounts receivable; and

(g)      a waiver of certain costs and expenses associated with premium freight and third party advisors.

4

8.      As set forth below, in exchange for these accommodations, the Debtors

have committed to continue to produce and deliver component parts to the OEM Customers and

to provide other limited accommodations to safeguard the production of the OEM Customers

during the terms of the Accommodation Agreements.  The Debtors have further agreed pursuant

to an access agreement (the "**Access Agreement**") to provide certain of the OEM Customers

with limited rights to access and utilize the Debtors' facilities and equipment in the event there is

a continuing default under the Accommodation Agreements which has resulted in a substantial

likelihood that an OEM Customer's production will be interrupted.

9.      The accommodations embodied in the Accommodation Agreements are

more than mere pieces of the Debtors' Plan—they are central to the Debtors' ability to continue

to operate both in the near-term, during the chapter 11 cases, and on a permanent basis post-

emergence.  First, the Debtors' proposed debtor-in-possession financing lenders have relied on

certain of the terms and conditions set forth in the Accommodation Agreements, including,

without limitation, the accounts receivable set-off waivers and resourcing limitations, in agreeing

to extend financing to the Debtors under the DIP Facilities (as defined below).  Accordingly, the

Debtors' ability to access funding under their proposed DIP Facilities is expressly conditioned

upon receiving Court approval of the Accommodation Agreements and failing to do so may

result in immediate and irreparable harm to the Debtors, as the Debtors do not have sufficient

funds to continue to operate in chapter 11 absent access to the DIP Facilities.

10.      Second, the binding commitments that the Debtors have secured from the

Noteholder Group and Platinum Equity to support the Plan are similarly tied to receiving Court

approval of the Accommodation Agreements.  Under the Restructuring Support Agreement (as

defined in the Plan), failing to secure approval of the Accommodation Agreements will result in

WEIL:\95271100\1\35076.0003

a default under the Restructuring Support Agreement, which would derail the Debtors' chapter 11 cases from the start.

11.    <u>Third</u>, and perhaps most importantly, the long-term pricing concessions that the Debtors have secured from the OEMs are one of the pillars of the Debtors' go-forward plan to return to profitability post-emergence.  The significantly improved pricing and new business awards that the Debtors have negotiated, in combination with the Debtors' de-leveraged capital structure, will result in a stronger more viable company post-emergence for the benefit of all stakeholders.  The broad support the Debtors have garnered for the Plan reflects the consensus among the Debtors' key constituents that the agreements embodied in the Accommodation Agreements represent real and significant value for the Debtors, for the benefit of the estates, and all of their creditors and should be approved.

<u>**Relief Requested**</u>

12.    By this Motion, pursuant to sections 363(b)(1) and 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, the Debtors request authority to enter into (a) that certain accommodation agreement (together with any exhibits or schedules thereto, the "**Multi-Customer Accommodation Agreement**"), dated March 11, 2015, between and among the Debtors, Ford, GM, FCA, Nissan, PNC Bank, National Association, as agent for the lenders under the Debtors' debtor-in-possession asset-based revolving credit facility (the "**DIP ABL Agent**"), and Cantor Fitzgerald Securities, as agent for the lenders under the Debtors' debtor-in-possession term loan facility (the "**DIP Term Agent**" and, together with the DIP ABL Agent, the "**DIP Agents**"), and (b) that certain accommodation agreement (together with any exhibits or schedules thereto, the "**BMW Accommodation Agreement**" and, together with the Multi-

Customer Accommodation Agreement, the "**Accommodation Agreements**"), dated March 11,

2015, between and among the Debtors, BMW, the DIP ABL Agent, and the DIP Term Agent.[2]

13.    Annexed to the Accommodation Agreements are the component supply

agreements, term sheet and other exhibits (collectively, the "**Component Supply Agreements**")

that set forth the specific pricing information, quality metrics, new business awards, and other

customer-specific terms that each of the OEM Customers has individually agreed to with the

Debtors.  The information set forth therein, as well as certain limited information set forth in the

Accommodation Agreements, is highly sensitive and constitutes confidential proprietary

information and/or trade secrets.  Accordingly, contemporaneously herewith, the Debtors have

filed a motion requesting authority to file the Component Supply Agreements under seal and to

additionally permit the Debtors to file the Accommodation Agreements with certain limited

redactions.  Unredacted and unsealed copies of the Accommodation Agreements have been

submitted to the Court and the Office of the United States Trustee.

14.    An order granting the relief requested herein on an interim basis is

annexed hereto as **Exhibit "A"** (the "**Proposed Order**").  Copies of the Multi-Customer

Accommodation Agreement and the BMW Accommodation Agreement are annexed hereto as

**Exhibit "B"** and **"C,"** respectively.

---

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the
Accommodation Agreements.

## The Accommodation Agreements[3]

15.    The terms and conditions of the Accommodation Agreements were reached as a result of arms' length negotiations that resulted in agreements regarding the continued relationships between the Debtors and the OEM Customers, which include concessions on both sides.  The salient terms of the Accommodation Agreements are as follows:

### OEM Customer Accommodations

(a)    <u>Limitations of Setoffs</u>.  Subject to the limitations described in the Accommodation Agreements, each of the OEM Customers has agreed to waive its rights to assert setoff, recoupment, or deduction against amounts owed to the Debtors other than those setoffs that are determined to be Allowed Setoffs as set forth in the agreements.  In addition, the OEM Customers have also agreed to limit the amount of any Allowed Setoff to five percent (5%) of the face amount of the respective invoice or group of invoices.

(b)    <u>Resourcing Limitation</u>.  With certain exceptions, the OEM Customers have agreed not to resource the production of any current or future programs or platforms away from the Debtors to any of their competitors other certain agreed upon permitted resources.

(c)    <u>Bristol Surcharge</u>.  The OEM Customers have agreed to continue certain accommodations with respect to the Bristol Facility that include certain funding commitments and other financial accommodations with respect to customer-specific capital expenditures.

(d)    <u>Payment Terms</u>.  The OEM Customers have agreed to make payment on their outstanding accounts payables owed to the Debtors on an expedited basis as set forth in the Component Supply Agreements.

---

[3] The descriptions of the Accommodation Agreements set forth herein are intended for summary purposes only and are not intended to modify any of the terms of the Accommodation Agreements.  As such, the descriptions of the Accommodation Agreements set forth herein are qualified in all respects by the terms of Accommodation Agreements.  In the event of any conflict between the descriptions set forth in this Motion and the terms of the Accommodation Agreements, the terms of the Accommodation Agreements shall govern.

WEIL:\95271100\1\35076.0003

(e)    <u>Price Adjustments</u>.  Commencing on April 1, 2015, each of the OEM Customers has agreed to pay the Debtors a non-refundable Price Adjustment with respect to the Component Parts identified in the Component Supply Agreements.  The OEM Customers have agreed to provide the Price Adjustment without setoff or recoupment, except for Allowed Setoffs, as set forth in the Component Supply Agreements.

(f)    <u>Future Programs and Right of Last Refusal</u>.  The Component Supply Agreements include new business awards for the Debtors on replacement programs as well as new program lines.  In addition, the Component Supply Agreements include rights of last refusal on certain other future programs.

(g)    <u>Premium Freight, Outage Costs and Quality Spill Costs</u>.  The OEM Customers have agreed to waive certain rights for reimbursement from the Debtors on account of costs and expenses relating to premium and expedited freight, outage costs, and quality spill costs.

(h)    <u>Tooling Payments</u>.  The OEM Customers have agreed to make advance progress payments to the Debtors with respect to unpaid and in-process tooling.

**<u>Debtors' Obligations</u>**

(a)    <u>Continue to Manufacture</u>.  Under the Accommodation Agreements, the Debtors have agreed to continue to supply Component Parts for each of the OEM Customers according to the terms of the Purchase Orders, as modified by the Accommodation Agreements.  Additionally, the Debtors have agreed that they will promptly move to assume the OEM Customers' Purchase Orders.

(b)    <u>Resourcing Cooperation</u>.  The Debtors have agreed to reasonably cooperate with each OEM Customer in connection with its preparation for any Permitted Resourcing and will cooperate with an OEM Customer's resourcing of production of its Component Parts as set forth in the Accommodation Agreements.

(c)    <u>Access to Information</u>.  The Debtors have agreed to provide the OEM Customers with reasonable access to the Debtors' operations, books, and records during normal business hours, and outside normal business hours when reasonably necessary, for the purposes set forth in the Accommodation Agreements.

9

(d)     License on Intellectual Property.  The Debtors will grant the OEM Customers a license to Intellectual Property owned by the Debtors, and a sublicense to the Intellectual Property licensed to the Debtors (to the extent that the Debtors have the right to grant sublicenses therein) to the extent necessary to do all things and exercise all rights in the licensed or sublicensed Intellectual Property for production of the Component Parts.  Such a license may only be exercised by an OEM Customer in connection with a Permitted Resourcing or exercise of the Right of Access.

(e)     Access Agreement.  The Debtors, together with the DIP Agents, have also agreed to enter into an Access Agreement that provides certain of the OEM Customers with limited rights to use and access the Debtors' facilities and equipment to continue to manufacture Component Parts in the event of a default under the Accommodation Agreements that results in a material and substantial threat to an OEM Customer's production.

(f)     Treatment of OEM Customer Claims under the Plan.  As a settlement and compromise among the Parties, the OEM Customers shall have allowed prepetition claims in the Chapter 11 Cases (collectively, the "**Customer Claims**") and shall not assert any other such claims in the Chapter 11 Cases.  So long as these Accommodation Agreements remain in effect, the Customer Claims shall be allowed claims in the Chapter 11 Cases; provided that so long as no Event of Default under the Accommodation Agreements occurs and the Debtors otherwise comply with the terms of the Accommodation Agreements and the Access Agreement, the OEM Customers have agreed to waive any and all rights to a recovery or distribution from the Debtors under the Debtors' chapter 11 plan, or otherwise in connection with the Debtors' restructuring, on account of the Customer Claims.

(g)     Inventory Bank.  The Debtors have agreed, upon the request of a Customer, to build up to a two-week inventory bank of Component Parts; provided that the Debtors' obligation to build inventory bank parts will be subject to, among other things, (i) reasonably applied internal capacity limitations, (ii) availability of raw materials and supplies, (iii) available financing, and (iv) that such obligation would not adversely affect Supplier.  The Debtors will not be required to build an Inventory Bank unless the Customer agrees in advance to pay all documented, additional, out-of-pocket costs incurred by Supplier in manufacturing the Inventory Bank including, without limitation, overtime, shipping, packaging, and storage costs.

10

**DIP Agents' Accommodations**.  Under the Accommodation Agreements, each of the DIP Agents consents to the Licenses granted, the Tooling Acknowledgement, and the rights granted to the OEM Customers under the Accommodation Agreements.  The DIP Agents have also agreed to forbear from exercising their rights as secured lenders, or on behalf of the DIP Lenders, against the Debtors if the actions would materially impact the Debtors' ability to perform under the Accommodation Agreements or the Access Agreement.

**Tooling Acknowledgment.**  The Debtors and the DIP Agents acknowledge and agree that Customer Tooling is (i) subject to the terms of the Accommodation Agreements, (ii) owned by the OEM Customers, and (iii) held as bailee-at-will by the Debtors and any third parties to which the Debtors have transferred possession of Customer Tooling.  In addition, the Accommodation Agreements provide for a mechanism to resolve any disputes regarding the ownership of any Tooling.

**The Accommodation Agreements are in the Best Interests of the
Debtors, their Estates and all Parties in Interest and Should be Approved
Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code**

16.     Section 363(b)(1) of the Bankruptcy Code provides in relevant part that

"[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course

of business, property of the estate. . ."  Further, pursuant to section 105(a) of the Bankruptcy

Code, the "court may issue any order, process, or judgment that is necessary or appropriate to

carry out the provisions of this title."

17.     Under applicable case law in this and other circuits, if a debtor's proposed

use of its assets pursuant to section 363(b) of the Bankruptcy Code represents the exercise of the

debtor's reasonable business judgment, such use should be approved.  *See Committee of Equity*

*Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring

an "articulated business justification"); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir.

1996) (noting that, under normal circumstances, the court defers to the trustee's judgment so

long as there is a "legitimate business justification"); *In re Delaware & Hudson R.R. Co.*, 124

11

B.R. 169, 176 (D. Del. 1991) (courts have applied the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)).

18.    In determining whether a "good business reason" exists for a debtor's proposed use of its assets pursuant to section 363(b), courts in the Second Circuit consider "the salient factors pertaining to the proceeding" and are encouraged to "act to further the diverse interests of the debtor, creditors and equity holders." *In re Boston Generating, LLC*, 440 B.R. 302, 322 (Bankr. S.D.N.Y. 2010) (quoting *In re Lionel Corp.*, 722 F.2d at 1071). This includes consideration of, among other things, (i) "the proportionate value of the asset to the estate as a whole," (ii) "the amount of elapsed time since the filing," (iii) "the likelihood that a plan of reorganization will be proposed and confirmed in the near future," (iv) "the effect of the proposed disposition on the future plans of reorganization," (v) "whether the asset is increasing or decreasing in value," (vi) whether the estate has the liquidity to survive until confirmation of a plan, (vii) whether the use or sale opportunity will exist as of the time of plan confirmation," and (viii) if the use or sale opportunity will not exist, whether it is likely that there will be a satisfactory alternative sale or use opportunity, or a stand-alone plan alternative that is equally desirable (or better) for creditors. *In re Boston Generating*, 440 B.R. at 322 (quoting *In re Lionel Corp.*, 722 F.2d at 1071; *In re General Motors Corp.*, 407 B.R. 463, 490 (Bankr. S.D.N.Y. 2009)). If, as here, "there is a material risk that by deferring the [proposed use or] sale, the patient will die on the operating table," a court will approve the debtors' motion. *Id.*

19.    If a valid business justification exists for the use or sale of property of the estate, a debtor's decision enjoys a strong presumption that "in making a business decision the directors . . . acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v.*

12

*Integrated Res. Inc.* (*In re Integrated Res., Inc.*), 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting

*Smith v. Van Gorkom*, 488 A.2d 858,872 (Del. 1985)); *see also In re Bridgeport Holdings, Inc.*,

388 B.R. 548, 567 (Bankr. D. Del. 2008) (stating that directors enjoy a presumption of honesty

and good faith with respect to negotiating and approving a transaction involving a sale of assets).

Indeed, when applying the "business judgment" standard, courts show great deference to a

debtor's business decisions. *In re Troll Commc'ns, LLC*, 385 B.R. 110, 118 (Bankr. D. Del.

2008).

          20.     Finally, the Court has the power to grant the relief requested under section

105, which says that the Court may "issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Similar relief has been

granted in other automotive supplier cases in this and other districts. *See, e.g.*, Order

Authorizing Entry Into an Accommodation Agreement with Chrysler Group LLC Pursuant to

Bankruptcy Rule 9019 and Sections 363(b), 363(f), and 363(m) of the Bankruptcy Code, *In re

Visteon Corp.*, No. 09-11786-CSS (Bankr. D. Del. Nov. 12, 2009); Stipulation and Order Among

Debtors, DIP Agent, Prepetition ABL Agent, and Certain Customers Regarding Interim Order

Pursuant to Sections 361, 362, 363, 364 and 510 of the Bankruptcy Code and Rule 4001 of the

Federal Rules of Bankruptcy Procedure (A) Authorizing Debtors to (I) Use Cash Collateral of

Prepetition Secured Lenders, (II) Obtain Postpetition Financing and (III) Provide Adequate

Protection to Prepetition Secured Lenders, (B) Authorizing Debtors to Enter Into, and

Approving, Accommodation Agreement with Certain Customers and (C) Providing Notice and

Scheduling Final Hearing, *In re Metaldyne Corporation,* et al., No. 09-13412 (MG) (Bankr.

S.D.N.Y. June 12, 2009); Order (I) Supplementing January 5, 2007 DIP Refinancing Order

(Docket No. 6461) and Authorizing Debtors to Enter Into and Implement Accommodation

Agreement with Agent and Participating Lenders and (II) Authorizing Debtors to (a) Enter Into Related Documents and (b) Pay Fees in Connection Therewith, *In re Delphi Corporation*, et al., No. 05-44481 (RDD) (Bankr. S.D.N.Y. Dec. 3, 2008).

21.    Entry into the Accommodation Agreements is undoubtedly in the best interest of the Debtors, their estates, and their stakeholders.  As described herein and in the Allan Declaration, the Accommodation Agreements, which are one of the lynchpins of the Debtors' business plan and plan for a successful reorganization, represent significant value to the Debtors in the form of both short and long-term accommodations, including significant pricing adjustments and valuable new program rewards.  As discussed above, the Accommodation Agreements will provide the Debtors with approximately 45 million in annual prices increases and new business and programs.  The Accommodation Agreements permit the Debtors to execute their business plan and obtain substantial additional liquidity without having to incur debt that would need to be repaid in order to emerge from chapter 11.

22.    Moreover, immediate authority to enter into the Accommodation Agreements is necessary and justified by the facts and circumstances of these chapter 11 cases. Absent interim approval by the Court of the Accommodation Agreements, the Debtors' chapter 11 cases may be derailed from the start and all of the support the Debtors have worked diligently over the past five months to garner for the Plan could unravel.  The Accommodation Agreements will provide the Debtors with immediate additional liquidity in the form of immediate lump sum cash payments, price adjustments on existing Purchase Orders, accelerated payment terms, and limitations on the OEM Customers' setoff rights.  Given the Debtors' perilous liquidity position, these accommodations are necessary to avoid any further decline to the Debtors' financial position.  Additionally, the Debtors will be unable to borrow under their proposed DIP Facilities

14

absent Court approval of the Accommodation Agreements.  As the Debtors have insufficient

available liquidity to fund their operations even for a short period of time during these chapter 11

cases, they require immediate access to the borrowings under their proposed DIP Facilities.  In

addition, failing to receive Court approval of the Accommodation Agreements would trigger an

event of default under the Restructuring Support Agreement.  The Accommodation Agreements

constitute the best possible arrangement for the continuation of business between the Debtors

and the OEM Customers and thus should be approved as a reasonable exercise of the Debtors'

business judgment.  Interim approval of the Accommodation Agreements is reasonable and

necessary to avoid immediate and irreparable harm to the Debtors and their estates and the Court

has authority to authorize the Agreements based on sections 105(a) and 363.

### Ample Cause Exists to Approve the Accommodation Agreements Pursuant to Bankruptcy Rule 9019(a)

23.    Bankruptcy Rule 9019(a) allows the Court to approve a compromise or

settlement that is in the Debtors' best interests.  The Debtors request that the Court approve the

Accommodation Agreements pursuant to Bankruptcy Rule 9019(a), which *requires* the Court to

find that the Accommodation Agreements are fair and equitable and are in the best interests of

the Debtors' estates.  *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.

Anderson*, 390 U.S. 414, 424 (1968); *Fisher v. Pereira (In re 47-49 Charles St., Inc.)*, 209 B.R.

618, 620 (S.D.N.Y. 1997); *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 426 (S.D.N.Y. 1993),

*aff'd*, 17 F.3d 600 (2d Cir. 1994).

24.    The decision to approve a particular settlement agreement lies within the

sound discretion of the Court.  *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994).  Unless a

settlement "falls below the lowest point in the range of reasonableness," it will satisfy

15

Bankruptcy Rule 9019. *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir.

1983); *In re Spielfogel*, 211 B.R. 133, 144 (Bankr. E.D.N.Y. 1997). Courts often exercise their

discretion to approve settlements "in light of the general public policy favoring settlements." *In

re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

25.    While a court must evaluate all factors "relevant to a fair and full

assessment of the wisdom of the proposed compromise," a court need not conduct a "mini-trial"

of the merits of the claims being settled. *Anderson*, 390 U.S. at 424-25; *W.T. Grant Co.*, 699

F.2d at 608; *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y.

1991). "[T]he bankruptcy judge does not have to decide the numerous questions of law and fact.

. . . The court need only canvass [sic] the settlement to determine whether it is within the

accepted range of reasonableness." *Nellis*, 165 B.R. at 123.

26.    When analyzing the reasonableness of a settlement, a court may give

weight to the debtor's informed judgment that the compromise is fair and equitable. *In re

Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993). In fact, the analysis of a

settlement's reasonableness does not require the court to substitute its judgment for the debtor's,

and if the debtor chooses one of two reasonable choices, the court must approve that choice, even

if, all things being equal, the court would have selected the other choice. *In re Ashford Hotels

Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate

that I substitute my judgment for the Trustee's, but only that I test his choice for reasonableness.

. . . If the Trustee chooses one of two reasonable choices, I must approve that choice, even if, all

things being equal, I would have selected the other.").

27.    The Accommodation Agreements satisfy the Bankruptcy Rule 9019(a)

standard. After good faith arms'-length negotiations, the Parties agreed to the terms of the

Accommodation Agreements, which provide the Debtors with immediate liquidity and will enable the Debtors to sustain their operations on a long-term and go-forward basis. The Accommodation Agreements settle a number of claims that could have led to disputes or potential litigation. For example, absent the settlements set forth in the Accommodation Agreements, the parties could become embroiled in lengthy and costly litigation regarding, among other things, any amounts paid by the OEM Customers to the Debtors with respect to the Debtors' Bristol Facility, the Customer Claims, open commercial issues, the ownership of Tooling and other issues. The outcome of these claims is uncertain. Further, the expense incurred in connection with a potential dispute or litigation would be an additional burden to the Debtors' estates and creditors. The Accommodation Agreements avoid both the uncertainty of litigation and the heavy burden litigation would place on the Debtors and their estates. Furthermore, the Accommodation Agreements are more than a settlement of potential claims by and against the Debtors, the Accommodation Agreements are the foundation of the Debtors' plan to successfully restructure their businesses and operations, which will help the Debtors emerge from chapter 11 as a stronger and healthier supplier. The Debtors are getting the support of the OEM Customers and the OEM Customers are settling their claims by agreeing to waive distribution. Accordingly, the Accommodation Agreements should be approved under Bankruptcy Rule 9019(a) as valid exercises of the Debtors' reasonable business judgment and as being in the best interests of the Debtors' estates and all parties in interest.

### The Debtors Have Satisfied Bankruptcy Rule 6003

28.    Bankruptcy Rule 6003 provides that to the extent "relief is necessary to avoid immediate and irreparable harm," a bankruptcy court may approve a motion to "use, sell, lease, or otherwise incur an obligation regarding property of the estate" prior to twenty-one days

17

after the Commencement Date.  As described herein and in the Allan Declaration, the

Accommodation Agreements provide the Debtors with valuable accommodations, including

pricing adjustments and other payment accommodations, that will infuse much needed liquidity

into the Debtors' estates during the early stages of these chapter 11 cases.  In addition, approval

of the Multi-Customer Accommodation Agreement is a condition precedent to funding under the

Debtors' DIP Facilities, which the Debtors' require access to in order to continue to operate

during the chapter 11 cases.  Furthermore, should the Debtors be unable to receive approval of

the Multi-Customer Accommodation Agreement, it would trigger a default under the

Restructuring Support Agreement, thereby disrupting the Debtors' chapter 11 cases from the

start.  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid

immediate and irreparable harm, and, therefore, Bankruptcy Rule 6003 is satisfied.

## Waiver of Bankruptcy Rules 6004(a) and (h)

29.     To implement the foregoing immediately, the Debtors seek a waiver of the

notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order

authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Reservation of Rights

30.     Except as otherwise expressly set forth herein or in the Accommodation

Agreements, nothing contained herein is intended to be or shall be construed as (a) an admission

as to the validity of any claim against the Debtors, (b) a waiver of the Debtors' or any

appropriate party in interest's rights to dispute any claim, or (c) an approval or assumption of any

agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.

Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's

18

order is not intended to be and should not be construed as an admission to the validity of any

claim or a waiver of the Debtors' rights to dispute such claim subsequently.

### Notice

31.     Notice of this Motion has been provided to (i) the Office of the United

States Trustee for the Southern District of New York; (ii) the holders of the five largest secured

claims against the Debtors (on a consolidated basis); (iii) the holders of the forty (40) largest

unsecured claims against the Debtors (on a consolidated basis); (iv) the attorneys for BMO

Harris Bank, N.A., as administrative agent under that certain Amended and Restated Loan,

Security and Guaranty Agreement, dated as of July 23, 2013; (v) the attorneys for U.S. Bank

National Association, as trustee under that certain Indenture for 9 1/4% Senior Secured Notes

due 2018, dated as of July 23, 2013; (vi) the attorneys for Delaware Trust Company, as successor

trustee under that certain Indenture for 10% / 10 3/4% Senior PIK Toggle Notes due 2018, dated

as of December 13, 2013; (vii) the attorneys for the Informal Committee of Noteholders; (viii)

the attorneys for the Revolving DIP Lenders; (ix) the attorneys for the DIP Term Lenders; (x) the

OEM Customers; (xi) the attorneys for Platinum Equity Advisors, LLC; (xii) the Securities and

Exchange Commission; (xiii) the Internal Revenue Service; and (xiv) the United States

Attorney's Office for the Southern District of New York.  The Debtors submit that, in view of

the facts and circumstances, such notice is sufficient and no other or further notice need be

provided.

32.     No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as is just.

Dated: March 12, 2015
New York, New York

/s/ Ray C. Schrock, P.C.
Marcia L. Goldstein
Ray C. Schrock, P.C.

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for Debtors
and Debtors in Possession*

**Exhibit A**

**<u>Proposed Interim Order</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
                                                    :
In re                                               :        **Chapter 11**
                                                    :
CHASSIX HOLDINGS, INC., *et al.*,                   :        **Case No. 15-_____ (___)**
                                                    :
                                                    :        **Jointly Administered**
                   Debtors.[1]                      :
                                                    :
---------------------------------------------------------x

### INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 363(b)(1) AND 105(a) AND FED. R. BANK. P. 9019 AUTHORIZING DEBTORS TO ENTER INTO ACCOMMODATION AGREEMENTS WITH CUSTOMERS

Upon the motion, dated March _, 2015 (the "**Motion**"),[2] of Chassix Holdings, Inc.

("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**"), and certain of their affiliates and subsidiaries,

as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively,

including Chassix Holdings and Chassix, the "**Debtors**"), pursuant to sections 363(b)(1) and

105(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 9019(a) of the

Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of an order

authorizing the Debtors to enter into (a) that certain accommodation agreement (together with

any exhibits or schedules thereto, the "**Multi-Customer Accommodation Agreement**"), dated

March 11, 2015, between and among General Motors LLC ("**GM** "), Ford Motor Company

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012).  The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

("**Ford**"),  FCA US LLC f/k/a Chrysler Group LLC ("**FCA**"), Nissan North America, Inc.

("**Nissan**"), the Debtors, PNC Bank, National Association, as agent for the lenders under the

Debtors' debtor-in-possession asset-based revolving credit facility (the "**DIP ABL Agent**"), and

Cantor Fitzgerald Securities, as agent for the lenders under the Debtors' debtor-in-possession

term loan facility (the "**DIP Term Agent**" and together with the DIP ABL Agent, the "**DIP**

**Agents**"), and (b) that certain accommodation agreement (together with any exhibits or

schedules thereto, the "**BMW Accommodation Agreement**" and together with the Multi-

Customer Accommodation Agreement, the "**Accommodation Agreements**"), between and

among the Debtors, BMW Manufacturing Co., LLC ("**BMW**" and together with Ford, GM,

FCA, and Nissan collectively, the "**OEM Customers**"), the DIP ABL Agent and the DIP Term

Agent, all as more fully set forth in the Motion; and the Court having jurisdiction to consider the

Motion and the relief requested therein in accordance with 28. U.S.C. §§ 157 and 1334 and the

Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and

consideration of the Motion and the relief requested therein being a core proceeding pursuant to

28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and

1409; and due and proper notice of the Motion having been provided to (i) the Office of the

United States Trustee for the Southern District of New York (the "**U.S. Trustee**"); (ii) the

holders of the five largest secured claims against the Debtors (on a consolidated basis); (iii) the

holders of the forty (40) largest unsecured claims against the Debtors (on a consolidated basis);

(iv) the attorneys for BMO Harris Bank, N.A., as administrative agent under that certain

Amended and Restated Loan, Security and Guaranty Agreement, dated as of July 23, 2013; (v)

the attorneys for U.S. Bank National Association, as trustee under that certain Indenture for 9

1/4% Senior Secured Notes due 2018, dated as of July 23, 2013; (vi) the attorneys for Delaware

2

Trust Company, as successor trustee under that certain Indenture for 10% / 10 3/4% Senior PIK

Toggle Notes due 2018, dated as of December 13, 2013; (vii) the attorneys for the Informal

Committee of Noteholders; (viii) the attorneys for the Revolving DIP Lenders; (ix) the attorneys

for the DIP Term Lenders; (x) the OEM Customers; (xi) the attorneys for Platinum Equity

Advisors, LLC; (xii) the Securities and Exchange Commission; (xiii) the Internal Revenue

Service; and (xiv) the United States Attorney's Office for the Southern District of New York (the

"**Notice Parties**"); and it appearing that no other or further notice need be provided; and a

hearing having been held to consider the relief requested in the Motion (the "**Hearing**"); and

upon the Declaration of J. Mark Allan Pursuant to Rule 1007-2 of the Local Bankruptcy Rules

for the Southern District of New York (the "**Allan Declaration**"), filed contemporaneously with

the Motion, the record of the Hearing and all of the proceedings had before the Court; and the

Court having found and determined that the relief sought in the Motion is necessary to avoid

immediate and irreparable harm to the Debtors and their estates as contemplated by Bankruptcy

Rule 6003, and is in the best interests of the Debtors, their estates, creditors, and all parties in

interest, and that the legal and factual bases set forth in the Motion establish just cause for the

relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted on an interim basis, as provided herein; and

it is further

WEIL:\95271100\1\35076.0003

ORDERED that, pursuant to sections 363(b)(1) and 105(a) of the Bankruptcy

Code and Bankruptcy Rule 9019(a), the Accommodation Agreements annexed to the Motion are

approved and the Debtors are authorized, on an interim basis, to enter into the Accommodation

Agreements and any other transactions or agreements related thereto, including, without

limitation, the Access Agreement; and it is further

ORDERED that the Debtors' claims and noticing agent in the Debtors' chapter 11

cases is authorized and directed to adjust the claims register to reflect the Customer Claims in

accordance with the Accommodation Agreements and the terms of this Interim Order; and it is

further

ORDERED that the Debtors shall serve this Interim Order within three (3)

business days of its entry on the Notice Parties; and it is further

ORDERED that notwithstanding entry of this Interim Order, nothing herein shall

create, nor is intended to create, any rights in favor of or enhance the status of any claim held by,

any party; and it is further

ORDERED that the requirements of Bankruptcy Rule 6003(b) have been

satisfied; and it is further

ORDERED that the requirements of Bankruptcy Rule 6004(a) are hereby waived;

and it is further

ORDERED that, notwithstanding any applicability of Bankruptcy Rule 6004(h),

the terms and conditions of this Interim Order shall be immediately effective and enforceable

upon its entry; and it is further

ORDERED that a hearing to consider entry of an order granting the relief in the

Motion on a final basis shall be held on _____, 2015, at _____ **(Prevailing Eastern**

**Time)** and any objections or responses to the Motion shall be in writing, filed with the Court, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Ray C. Schrock, P.C.); and (ii) the Notice Parties, in each case so as to be received no later than **4:00 p.m. (Prevailing Eastern Time) on _____, 2015**; and it is further

        ORDERED that this Interim Order is effective only from the date of entry through this Court's disposition of the Motion on a final basis; <u>provided</u> that the Court's ultimate disposition of the Motion on a final basis shall not impair or otherwise affect any action taken pursuant to this Interim Order; and it is further

        ORDERED that the Debtors are authorized to take all steps necessary to carry out this Interim Order; and it is further

        ORDERED that the relief granted herein shall be binding upon any chapter 11 trustee and/or examiner appointed in these chapter 11 cases or upon any chapter 7 trustee appointed in the event of a subsequent conversion of these chapter 11 cases under chapter 7; and it is further

        ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Interim Order.

Dated: _____, 2015
      New York, New York

                                 _____
                                 UNITED STATES BANKRUPTCY JUDGE

5

**Exhibit B**

## Multi-Customer Accommodation Agreement

**Exhibit C**

**<u>BMW Accommodation Agreement</u>**

EXECUTION VERSION

## ACCOMMODATION AGREEMENT

BMW Manufacturing Co., LLC, on behalf of the BMW Group ("Customer"), Chassix, Inc., together with its domestic subsidiaries, including Diversified Machine, Inc. ("DMI"), Diversified Machine Bristol, LLC ("Bristol"), Diversified Machine Montague, LLC ("Montague") and Automotive Properties of New York, LLC ("Automotive Properties") (collectively, "Supplier" or "Chassix"), UC Holdings, Inc. ("UC Holdings"), PNC Bank, National Association, as agent under the DIP ABL Facility (defined below) (the "DIP ABL Agent"), and Cantor Fitzgerald Securities, solely in its capacity as agent under the DIP Term Facility (defined below) (the "DIP Term Agent" and together with the DIP ABL Agent, the "DIP Agent") enter into this Accommodation Agreement ("Agreement") on March 12, 2015. Customer, Supplier, UC Holdings, DIP ABL Agent and DIP Term Agent are collectively referred to herein as the "Parties" and each individually as a "Party."

### *RECITALS*

A.      Pursuant to various purchase agreements, release requests and/or purchase orders issued by the Customer and accepted by Supplier (as such agreements, release requests or purchase orders may be modified from time to time ("Purchase Orders" or individually, a "Purchase Order")), Customer has, directly or indirectly, ordered from Supplier certain component parts, service parts and assembled goods (collectively, "Component Parts" or individually, a "Component Part").

B.      Supplier faces certain financial difficulties that threaten to interrupt the supply of Component Parts to Customer.  In connection therewith, Supplier requested that Customer provide various financial and other accommodations to Supplier to facilitate a potential restructuring of Supplier's business operations and capital structure.

C.      Supplier intends to undertake a financial restructuring and recapitalization (the "Restructuring"), which is anticipated to be effected through a solicitation of votes for a plan of reorganization for Supplier, in substantially the form attached hereto as Exhibit A, or such other plan of reorganization so long as such other plan is not materially adverse to the interests of the Customer (as compared to the terms of the plan attached hereto as Exhibit A) (each such plan, the "Acceptable Plan"), and the commencement by Supplier of voluntary cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

D.      Pursuant to the terms of the proposed DIP order attached hereto as Exhibit B (the "Proposed DIP Order"): (a) the DIP ABL Agent, acting as administrative agent for a syndicate of banks, financial institutions and other institutional lenders (the "DIP ABL Lenders"), has agreed to provide to Supplier an approximate $150 million consensual, priming debtor in possession financing facility (collectively, the "DIP ABL Facility") pursuant to that certain Superpriority Secured Debtor-In-Possession ABL Loan, Security and Guaranty Agreement (the "DIP ABL Credit Agreement") in connection with the Chapter 11 Cases; and (b) the DIP Term Agent, acting as administrative agent for a syndicate of banks, financial institutions and other institutional lenders reasonably acceptable to Chassix and the Customer (the "DIP Term

Lenders"), has agreed to provide to Supplier an approximate $100 million consensual, priming debtor in possession financing facility (collectively, the "DIP Term Facility" and together with the DIP ABL Facility, the "DIP Facilities") pursuant to that certain DIP Term Loan Facility (the "DIP Term Credit Agreement" and together with the DIP ABL Credit Agreement, the "DIP Credit Agreements") in connection with the Chapter 11 Cases.

E.     Subject to the terms and conditions of this Agreement, Customer has agreed to provide to Supplier the accommodations set forth in this Agreement as of the Effective Date (as defined below).

**BASED UPON THE FOREGOING RECITALS** and other good and valuable consideration, the receipt and adequacy of which are acknowledged, the Parties agree as follows:

### *TERMS AND CONDITIONS*

1.     **Conditions to Effectiveness.**  This Agreement will become effective (the date of such effectiveness, the "Effective Date") only upon the timely satisfaction of each of the following conditions:

(a)     Execution of this Agreement by all of the Parties; and

(b)     Supplier obtaining entry of one or more orders of the Bankruptcy Court (i) approving this Agreement as a postpetition agreement binding on Supplier and (ii) authorizing Supplier to use cash collateral and approving the DIP Facilities on terms substantially similar to those set forth in the Proposed DIP Order.

2.     **Term.**  For purposes of this Agreement, the "Term" shall mean, unless otherwise extended by written agreement of the Parties, the period from the Effective Date through the earliest to occur of (a) a Section 8 Termination (as defined in Section 8), (b) the effective date of the Acceptable Plan, and (c) July 31, 2015 (the occurrence of any one of these events triggers the ("Termination Date")).

3.     **Customer's Accommodations.**

3.1.   Customer Support.

(a)



(b)     Customer shall also allow Supplier's resourcing of production from Supplier's facility in Bristol, IN (the "Bristol Facility") to Supplier's facility in Shelbyville, TN (the "Shelbyville Facility") if Supplier opts to engage in such resourcing.  If Supplier opts to resource to the Shelbyville Facility, such resourcing shall be complete no later than May 31, 2015.

2

3.2.    <u>Support for Plan</u>. Subject to delivery by Supplier to the Customer of a disclosure statement and other solicitation materials for the Acceptable Plan that have been approved by the Bankruptcy Court as having "adequate information" as defined in section 1125 of the Bankruptcy Code and is otherwise in form and substance reasonably acceptable to the Customer (collectively, the "<u>Acceptable Disclosure Statement</u>"), the Customer agrees that it shall not, directly or indirectly, (a) object to, delay, impede or take any other action to interfere with acceptance or implementation of the Acceptable Plan, (b) directly or indirectly solicit, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout or plan of reorganization for Supplier other than the Acceptable Plan or (c) otherwise take any action that would in any material respect interfere with, delay or postpone the consummation of the Restructuring except such actions the Customer reasonably believes are necessary to protect the continuity of its production.  The Customer further agrees, subject to delivery of an Acceptable Disclosure Statement, to (i) support and take all necessary steps to effectuate the Acceptable Plan, and (ii) (A) to the extent that the Customer is entitled to accept or reject the Acceptable Plan pursuant to its terms (regardless of whether the Customer agrees to waive distribution under the Acceptable Plan), vote to accept the Acceptable Plan by delivering its duly executed and completed ballot accepting the Acceptable Plan on a timely basis following the commencement of the Solicitation, and (B) not change or withdraw (or cause to be changed or withdrawn) such vote provided that the Acceptable Plan is not amended or modified in a manner that materially adversely affects the Customer.

3.3.    <u>Limitation of Setoffs</u>.

(a)    Customer waives (and, if and only if, included as Eligible Accounts as defined in the DIP ABL Credit Agreement (or which would have been Eligible Accounts but for the application of any aging or cross-aging eligibility criteria), waives for its respective foreign and domestic subsidiaries and affiliates), subject to <u>Section 10,</u> (i) except for Allowed Setoffs (as defined below), any right of setoff, recoupment or deduction not previously exercised as of December 31, 2014 against any bona fide accounts at the prices agreed between Supplier and Customer owing to Supplier as of the Effective Date, and (ii) except for Allowed Setoffs (as defined below), Material Setoffs (as defined below) and Tooling Setoffs (as defined below), any of its rights of setoff, recoupment or deduction against any bona fide accounts at the prices agreed between Supplier and Customer owing to Supplier that arise during the period commencing on the Effective Date and ending on the date that is ten (10) business days after the end of the Term (any accounts described in this <u>Section 3.3(a)</u> being "<u>Accounts Payable</u>").

(b)    The term "<u>Allowed Setoffs</u>" means valid setoffs, recoupment or deduction for defective or non-conforming parts, quality problems, and fees relating to the non-operational professionals incurred by Customer; <u>provided</u>, <u>however</u>, that Allowed Setoffs shall not include any setoff for any amounts paid pursuant to <u>Section 3.1</u>.

(c)    The term "<u>Material Setoffs</u>" means setoffs for (i) materials or components delivered to Supplier (but excluding Tooling (as defined below)) or services performed for Supplier, purchased by Customer from persons other than Supplier or supplied by Customer to Supplier (either under a materials contract or in order to avoid an interruption in the Customer's production) for use in connection with the production or delivery of Component Parts by Supplier for Customer, or (ii) direct payment(s) to material or service vendors by Customer for

WEIL:\95265857\10\35076.0003

the purchase of materials or components (but excluding Tooling) or services used by Supplier in connection with the production of Component Parts by Supplier for Customer (either under a materials contract or in order to avoid an interruption in Customer's production) which was supplied under a materials contract or would have been purchased by Supplier but for the vendor's refusal to sell to Supplier and for which Customer has provided Supplier prior written notice of the materials and the amount to be paid to the vendor or purchased by Supplier from Customer, as applicable; provided, that Material Setoffs shall not include any amounts paid by Customer to such vendor with respect to any antecedent obligations of Supplier to such vendor; and provided further, that Customer may only take Material Setoffs against Accounts Payable generated on or after the third business day after Customer gives the DIP Agents notice of such Material Setoff (a "Material Setoff Notice"). Upon receipt of a Material Setoff Notice, the DIP ABL Agent may impose a reserve in the amount of the Material Setoff against the borrowing base. Material Setoffs may be taken ten (10) business days after giving Supplier and the DIP Agents notice of the amount paid by Customer.

(d)    The term "Tooling Setoffs" means setoffs for any payment to a tooling vendor or tooling repairman for all or part of the purchase price or repair price of Tooling (defined below) that is necessary for Customer's production (existing and future) for which the payment is necessary to secure the release of an asserted lien senior to the DIP Agents against Tooling or is required to obtain possession of Tooling from the tooling vendor or tooling repairman. Tooling Setoffs may be taken three (3) business days after giving Supplier and the DIP Agents prior written notice of the setoff (a "Tooling Setoff Notice"). Tooling Setoffs may be taken only against the amount owed by Customer on the associated tool order. Upon receipt of a Tooling Setoff Notice, the DIP ABL Agent may impose a reserve in the amount of the Tooling Setoff if the associated tooling receivable is included in the borrowing base under the DIP ABL Credit Agreement. The term "Tooling" means, collectively, all tooling, dies, test and assembly fixtures, gauges, jigs, patterns, casting patterns, cavities, molds, spare parts and documentation, including engineering specifications, test reports and manuals, used by Supplier in connection with its manufacture of Component Parts for the Customer.

(e)    Notwithstanding the foregoing provisions in this Section 3.3, Allowed Setoffs shall not include any individual setoff, recoupment or deduction that exceeds five percent (5%) (the "Agreed Cap") of the face amount of any respective invoice or group of invoices to be paid in any monthly invoice cycle. In the event that a setoff is an Allowed Setoff and such Allowed Setoff is limited by the Agreed Cap, the remainder of such Allowed Setoff may be taken against subsequent payments of Accounts Payable; provided that at no time shall the Allowed Setoffs exceed the Agreed Cap of any invoice or group of invoices to be paid in any calendar month.

(f)    Customer and Supplier agree to use best efforts to expedite the resolution of all disputed setoffs, recoupments and deductions.

3.4.    Inventory Purchase.

(a)    Subject to the terms of this Agreement and provided that the DIP ABL Lenders' commitments to make loans to Supplier under the DIP Facility have not been terminated, upon the applicable Inventory Purchase Trigger Date (as defined below),

Customer (and, if and only if, included as Eligible Inventory as defined in the DIP Credit Agreement, on behalf of itself and its respective foreign and domestic subsidiaries and affiliates): (i) will purchase from the applicable party set forth in <u>Section 3.4(b)</u> all of Supplier's (x) then existing components purchased from third party vendors not consisting of raw aluminum ingot or other raw material metals, including but not limited to, bushings, brackets, ball joints, knuckles, control arms, hubs, spindles, bearings or other casted or machined component parts ("<u>Raw Materials</u>") and (y) finished goods inventory; and (ii) will have the option to purchase from the applicable party set forth in <u>Section 3.4(b)</u>, any work-in-process, in the case of both (i) and (ii) above, related to the Component Parts; <u>provided</u>, that, if on the applicable Inventory Purchase Trigger Date, the Customer does not purchase (and pay for in cash) any work-in-process, then, to the extent that Supplier is able to convert such work-in-process existing as of the Inventory Purchase Trigger Date into finished goods inventory within ten (10) business days, the Customer shall purchase such finished goods inventory as provided above. Notwithstanding the foregoing, if another customer exercises its right to access and produces Component Parts at the request of Customer, then purchase of work-in-process is mandatory, not optional. The Customer shall only be obligated to purchase Inventory (as defined below) which is "useable" and "merchantable" (each as defined below).

(b)    Customer will purchase the Inventory from (i) DIP ABL Lenders (if DIP ABL Lenders obtain possession of and the right to sell the Inventory by way of repossession, voluntary surrender, judicial intervention or otherwise), (ii) a debtor in possession, a trustee, receiver or interim receiver or similar party lawfully acting for the benefit of DIP ABL Lenders, Supplier or Supplier's creditors (collectively, a "<u>Trustee</u>"), for DIP ABL Lenders' benefit, or (iii) Supplier, if DIP ABL Lenders so elect and all applicable provisions of this Agreement are satisfied.

(c)    For purposes of this Agreement, (i) the term "<u>Inventory</u>" means Raw Materials, work-in-process, and finished goods inventory, (ii) the term "<u>useable</u>" means all Inventory that is not obsolete, as reasonably determined in accordance with applicable industry standards for the specific Inventory, and (in the case of Raw Materials and work-in-process) that is reasonably useable in the production of Component Parts and (iii) the term "<u>merchantable</u>" means merchantable as defined in U.C.C. § 2-314 and in conformance with all applicable Purchase Order specifications for the Component Part. The determination of whether Inventory is "useable" and "merchantable" will be made on the date that the Inventory is made available for delivery to the Customer free and clear of all liens, claims and encumbrances.

(d)    "<u>Inventory Purchase Trigger Date</u>" means: (i) an "Event of Default" occurs under the DIP Loan Documents and the DIP ABL Agent gives written notice to Customer of such "Event of Default"; or (ii) Customer resources some or all of its Component Part production from Supplier (provided that a resourcing by Customer of less than all of its Component Parts shall be an Inventory Purchase Trigger Date only as to Customer Inventory related to the resourced Component Parts).

WEIL:\95265857\10\35076.0003

(e)     Inventory purchases made pursuant to this Agreement will be for a cash purchase price equal to the following amounts without setoff, recoupment, deduction or reduction of any kind (the "Purchase Price"):

    i.      for Raw Materials, one hundred (100%) of Supplier's actual, documented, landed cost thereof;

    ii.     for work-in-process, a percentage of the finished goods Purchase Order price based on the stage of completion of any such work-in-process. Supplier will complete a physical inventory at the affected plant or plants within ten (10) business days after the Inventory Purchase Trigger Date; and

    iii.    for finished goods, one hundred (100%) of the purchase price set forth on the applicable Purchase Order.

(f)     All prices are F.O.B. Supplier. Each Customer will pay the purchase price under this Section 3.4 at the time the applicable Inventory is made available to Customer (F.O.B. Supplier) free and clear of all liens, claims and encumbrances. The Inventory will be made available to Customer (F.O.B. Supplier) not later than twenty (20) days after the applicable Inventory Purchase Trigger Date.  Customer agrees to pay directly to DIP ABL Agent (and DIP ABL Agent agrees to apply such payments for Supplier's account) the Purchase Price for its Inventory purchased pursuant to this Agreement without setoff or deduction for any claims or rights Customer may otherwise have against Supplier, DIP ABL Agent, or Trustee, as the case may be, which rights and claims Customer otherwise reserves and does not waive.

(g)     Any sale of the Inventory by DIP ABL Agent will be a private sale pursuant to applicable provisions of the Uniform Commercial Code, or other applicable law, as the case may be, and DIP ABL Agent will represent and warrant in connection with such sale that (i) to its knowledge, DIP ABL Agent has a first priority security interest in the Inventory and (ii) DIP ABL Agent has the right to sell Supplier's interest in the Inventory.

(h)     If a Trustee sells the Inventory and if the Trustee is subject to court supervision, such sale will be pursuant to a final order entered after appropriate notice and a hearing, with all the Inventory sold free and clear of all liens and security interests.  If requested by Customer, Trustee shall seek entry of such final order on an expedited basis. On the other hand, if such a Trustee is not subject to Court supervision, DIP ABL Agent will warrant to the applicable Customer that Inventory is being sold free and clear of all liens and security interests.

(i)     In all cases, subject to the Inventory meeting the definition of usable and merchantable, all of the Inventory (and related supplier warranties) sold to Customer hereunder will be sold **AS IS AND WITH NO WARRANTIES, EXPRESSED OR IMPLIED, WHATSOEVER INCLUDING, WITHOUT LIMITATION, FITNESS FOR A PARTICULAR PURPOSE.** However, to the fullest extent permitted under applicable

WEIL:\95265857\10\35076.0003

law, any warranties related to the Inventory which are received by Supplier from their suppliers will be deemed to pass to Customer upon purchasing the particular Inventory.

        3.5.   <u>Limitations on Resourcing</u>.

        (a) Customer agrees (i) not to resource the production of any Component Parts or any component parts or contracts that have been awarded to Supplier, except for a Permitted Resourcing (as defined below) and (ii) except as required pursuant to any agreement between the Customer and any Tier 1 supplier in effect on the date hereof, not to instruct, solicit, encourage, propose, coordinate, support or otherwise participate in any action that may result in any of Supplier's other customers resourcing their production of any Component Parts or programs currently on contract with Supplier or identified as a Future Program in <u>Schedule 3.7</u>.

        (b) The term "<u>Permitted Resourcing</u>" means the resourcing of Component Parts by Customer to a party other than Supplier: (i) set forth on <u>Schedule 3.5(b)</u> (as amended from time to time during the Term by mutual agreement between the Customer and Supplier) or (ii) resourced after the termination or cancellation of a Purchase Order with respect to such Component Parts either by reason of (A) an uncured material breach of such Purchase Order by Supplier or (B) cancellation of the Purchase Order due to a major refresh or major redesign of the program or the Component Part itself that renders the applicable Component Parts obsolete (unless Supplier has the technical capability to continue the program or the Component Part after taking into account such major refresh or major redesign) (any of the foregoing events, a "<u>Permitted Resourcing Event</u>"); <u>provided</u>, <u>however</u>, Permitted Resourcing shall not include any resourcing due to a material breach arising out of or relating to Purchase Orders fulfilled, directly or through a Tier 1 supplier to a Customer, at the Bristol Facility except for a material breach of a Purchase Order, the consequence of which is a substantial likelihood that a Customer's production will be interrupted; <u>provided further</u>, <u>however</u>, that a Customer shall not be permitted to (and hereby agrees not to) take any action that could result in a Permitted Resourcing Event (including altering or changing any releases to cause a Permitted Resourcing Event). The Parties reserve all of their respective rights with respect to the allocation of any wind-down costs incurred in connection with any Permitted Resourcing Event. Nothing in the preceding sentence shall impair the waiver of setoff, recoupment or deduction against Accounts Payable contained in <u>Section 3.3</u>.

        3.6.   <u>Expedited Payment Terms</u>. Commencing on the Effective Date, and continuing until May 31, 2015, and notwithstanding anything to the contrary in any Purchase Order, Customer will pay its Accounts Payable on net ten (10) day payment terms.

        3.7.   <u>Price Adjustments</u>. Commencing on the Effective Date but retroactive to March 1, 2015, Customer shall cause the payment of the non-refundable price adjustments as set forth on <u>Schedule 3.7</u> to be made to Supplier (the "<u>Price Adjustment</u>") and shall pay all Price Adjustments without setoff or recoupment, except for Allowed Setoffs. In the event, during the Term, any Chassix directed supplier attempts to increase piece prices, Chassix and each applicable Customer(s) shall use commercially reasonable best efforts to work together to mitigate the impact of any such proposed increase and, in the event a piece price increase occurs after attempted joint mitigation from a Customer directed supplier, unless the treatment of a piece price increase is addressed in another agreement between Chassix and the Customer,

WEIL:\95265857\10\35076.0003

Chassix will have the ability to pass through any such change in pricing to the applicable Customer(s) for the life of any current Component Parts. For the avoidance of doubt, the Price Adjustments and the provisions of this Section 3.7 shall survive the Termination Date and shall continue in full force and effect. For the avoidance of doubt, in the event of any inconsistency between the terms of the Purchase Order and this Agreement with respect to pricing and productivity metrics for Component Parts, the terms of this Agreement shall control.

3.8.    Future Programs.    Supplier will be considered in the normal course of business for (i) the award of the next generation of the E7X rear knuckle at the Shelbyville Facility, (ii) the award of the next generation of the E7X control arm at Supplier's facility in Montague (the "Montague Facility") and (iii) other future programs sourced by Customer.

3.9.    Supplier commits to install for the current E7X/F1X program a capacity of 921 vehicle sets per day based on 15 shifts per week for the Bristol Facility, Shelbyville Facility and Montague Facility.

4.    **Supplier's Obligations.**

4.1.    Continue to Manufacture.    Supplier will continue to supply the Component Parts for the Customer in accordance with the terms of the Purchase Orders, as modified by this Agreement. Supplier agrees to notify Customer of any threat to continued timely shipment of the Customer's Component Parts promptly upon learning of that threat. Except as specifically provided for in this Agreement, this Agreement is not intended to modify the terms and conditions of Customer's Purchase Orders, which terms and conditions otherwise remain in full force and effect. Except as set forth in Section 8.2, in the event of any inconsistency between the terms of this Agreement and the terms of the Customer's Purchase Orders, the terms of this Agreement will control. Supplier will allocate its capacity and resources equitably among all of Supplier's customers, with no one customer receiving priority allocation.

4.2.    Resourcing Cooperation.    Subject to the limitations set forth in Section 3.5, Supplier will reasonably cooperate with Customer in connection with its preparation for any Permitted Resourcing. In connection with a Permitted Resourcing, Supplier will cooperate with Customer's resourcing of production of its Component Parts permitted under this Agreement including, without limitation, (a) allowing Customer and potential replacement suppliers access to Supplier's manufacturing facilities (subject to reasonable confidentiality protections) to remove all Customer Tooling (as defined below) used in production of the Customer's Component Parts (provided that no Customer Tooling shall be removed prior to a Permitted Resourcing Event), (b) build up or provide adequate stocks of Component Parts to preclude any interruption of production at Customer during such resourcing and (c) using its commercially reasonable efforts to assign to the Customer, or its designee, certain contracts (to the extent assignable) that are related to the Permitted Resourcing and requested by the Customer.

4.3.    Access to Information.    Supplier agrees that Customer, upon giving reasonable advance notice, will have access to Supplier's operations, books and records during normal business hours, and outside normal business hours when reasonably necessary, for the purposes of (a) inspecting and removing, when permitted to do so under this Agreement, all

8

Tooling involved with production of its Component Parts, (b) monitoring production of its Component Parts, (c) meeting with members of senior management of Supplier and with Supplier's outside legal and financial advisors, (d) monitoring steps needed to increase production capacity necessary to meet the terms of all Purchase Orders and (e) monitoring Supplier's compliance with the terms of this Agreement, the Purchase Orders, and any other agreements between Supplier and Customer.

4.4.    Reporting and Notice of Adverse Event.    Supplier will provide to Customer (a) a rolling thirteen (13)-week cash flow forecast updated every other week, monthly budget-to-actual reconciliation, monthly financial statements, a statement of monthly accounts receivable and accounts payable agings and (b) the same financial reporting information, borrowing base certificates and collateral reports that it provides to the DIP Agents at the same time the information is provided to the DIP Agents.    As soon as practicable after becoming aware of any lawsuit against Supplier or any action that could interfere with Supplier's ability to perform its obligations under this Agreement, Supplier will notify Customer of the adverse event.

4.5.    License on Intellectual Property.

(a) Notwithstanding anything in this Agreement to the contrary, and in consideration for the accommodations granted by Customer to Supplier under this Agreement, upon the occurrence of a License Triggering Event (as defined below), Supplier grants to Customer and its assignee(s) or designee(s) (i) an irrevocable, fully paid, worldwide non-exclusive license to the Intellectual Property (defined below) owned by Supplier, and (ii) an irrevocable sublicense to the Intellectual Property licensed to Supplier (to the extent that Supplier has the right to grant sublicenses therein) to the extent necessary to make, have made, use, have used, modify, improve, prepare derivative works of, distribute, display, offer to sell, sell, import and do all other things and exercise all other rights in the licensed or sublicensed Intellectual Property for production of the Component Parts ("License").    The License Triggering Event means the occurrence of the resourcing of a respective component part in accordance with this Agreement.    For the avoidance of doubt, the License is only granted and exercisable by the Customer upon the occurrence of a License Triggering Event.    The License granted in (i) and (ii) of the immediately preceding sentence will extend, without limitation, to Customer's production of new vehicles or parts for new vehicles by Customer (or Customer's subsidiaries or affiliates) and service obligations for Customer's previously sold vehicles or parts. Any license granted under this Section 4.5 will also apply to any new model year changes, refreshes or follow-on platforms and programs incorporating the Intellectual Property.    This Section 4.5 is not intended to limit or otherwise restrict any rights granted to Customer in its Purchase Orders or any other agreement, but is intended to expand those rights.    Notwithstanding the foregoing, the License shall expire concurrently with the expiration of any similar license of Intellectual Property by Supplier to any other customer(s) of Supplier pursuant to an agreement entered into by Supplier and such customer(s), on or about the date hereof, in connection with the Chapter 11 Cases.

(b) Customer will handle the Intellectual Property in accordance with the same practices employed by Customer to safeguard their own intellectual property against unauthorized use and disclosure.

9

(c) The term "Intellectual Property" means (x) all currently existing registered and applied-for intellectual property owned by Supplier (including, but not limited to, all patents, patent applications, trademark registrations, trademark applications, copyright registrations, and copyright applications), (y) all agreements for intellectual property licensed to Supplier and (z) any other intellectual property used to produce Component Parts (whether or not the intellectual property is identified, including, but not limited to, unregistered copyrights, inventions, discoveries, trade secrets and designs, drawings and data, regardless of whether such items are registrable or patentable in the future, and all related documents and software), that are used in or to produce any Component Parts that Supplier directly or indirectly sells to Customer including, without limitation, everything defined as "intellectual property" (including embodiments of the intellectual property) under 11 U.S.C. §101, as amended from time to time.

4.6. Bankruptcy Court Approval; and Treatment of Claims.

(a) Bankruptcy Court Approval. Supplier agrees to seek entry of an order by the Bankruptcy Court approving the terms of this Agreement on an expedited basis.

(b) Treatment of Customer Claims under the Acceptable Plan. As a settlement and compromise among the Parties, to be approved by the Bankruptcy Court in connection with this Agreement, Customer shall receive an allowed general unsecured claim in the Chapter 11 Cases (the "Customer Claims") in total aggregate amount to be set forth in a schedule to be filed with the Bankruptcy Court in advance of the court's final approval of this Agreement, and shall not assert any other unsecured claims in the Chapter 11 Cases. So long as this Agreement remains in effect, the Customer Claims shall be allowed as general unsecured claims in the Chapter 11 Cases; provided, however, that so long as no Event of Default under this Agreement occurs and Supplier otherwise complies with the terms of this Agreement, the Customer agrees to waive any and all rights to a recovery or distribution from Supplier under the Acceptable Plan, or otherwise in connection with the Restructuring, on account of the Customer Claims. The Customer shall retain any claims that may arise or accrue after the commencement of the Chapter 11 Cases, including any claims that result from the occurrence of an Event of Default under this Agreement or Supplier's failure to comply with the terms of this Agreement, and those claims shall not constitute Customer Claims subject to this Section 4.6(b).

5. **DIP Agents' Accommodations**.

5.1. Consent and Acknowledgment. Each of the DIP Agents consents to the Licenses granted in Section 4.5 and the Tooling Acknowledgment in Section 7. The DIP Agents acknowledge and consent to the rights granted to Customer under this Agreement.

5.2. DIP Lenders' Exercise of Remedies. The parties acknowledge that the DIP Agents and DIP Lenders have the right to exercise all their rights and remedies in accordance with an order entered by the Bankruptcy Court approving the DIP Facilities (the "DIP Order") and the DIP financing documents entered in connection therewith (the "DIP Financing Documents") and nothing in this Agreement shall limit or impair any such rights and remedies granted under the DIP Order or the DIP Financing Documents.

WEIL:\95265857\10\35076.0003

6.  **UC Holdings' Accommodations**.

      6.1.    <u>Acknowledgment of Customer's Rights</u>.  UC Holdings acknowledges and consents to the rights granted to Customer in this Agreement.

7.  **Tooling Acknowledgment.**

      7.1.    <u>Definitions</u>.  The term "<u>Unpaid Tooling</u>" means Tooling manufactured for the Customer for which it has not made full payment under the applicable purchase order with Supplier.  The term "<u>Supplier Owned Tooling</u>" means Tooling which Supplier asserts is not owned by the Customer and which is not subject to a purchase order issued by Customer.  The term "<u>Customer Tooling</u>" means all other Tooling that is not Unpaid Tooling and/or Supplier Owned Tooling that is used or to be used to manufacture Customer's Component Parts, whether under direct agreements between Supplier and Customer or agreements between Supplier and third parties.

      7.2.    <u>Supplier and DIP Agents Tooling Acknowledgment</u>.  Supplier and DIP Agents acknowledge and agree Customer Tooling is (i) subject to the terms of this Agreement, (ii) owned by Customer, and (iii) held as bailee-at-will by Supplier and any third parties to which Supplier has transferred possession of Customer Tooling.

      7.3.    <u>Tooling Dispute</u>.  If there is a dispute between Supplier and Customer under this <u>Section 7</u> regarding whether any Tooling is Customer Tooling, Supplier Owned Tooling or Unpaid Tooling, the disputed Tooling will be presumed to be Customer Tooling, pending resolution of the dispute, provided that the Customer pays into escrow (which will not be subject to DIP Agents' security interest) the lesser of the disputed amount or the unpaid purchase price of such disputed Tooling, and the Customer will have the right to immediate possession of such disputed Tooling (subject to the resourcing limitation, if any, in <u>Section 3.5</u>) and Supplier may not withhold delivery of possession of this Tooling to the Customer pending resolution of the dispute, but the Tooling will remain subject to any claim or right to payment of Supplier for the disputed amount.

      7.4.    <u>Unpaid Tooling Obligations Not Modified</u>.  Once the purchase order price of an item of Unpaid Tooling has been paid (whether by payment to Supplier or as a result of a Tooling setoff), it will be included in the definition of Customer Tooling.  Prior to that time, the Parties reserve their respective rights to determine whether Unpaid Tooling should be treated as Customer Tooling.  Subject to <u>Sections 7.3</u>, nothing in this Agreement modifies Customer's obligations to Supplier on account of Unpaid Tooling.

      7.5.    <u>Supplier's Limited Right to Tooling</u>.  Supplier has no right, title or interest in Customer Tooling, other than to possess and use the Customer Tooling solely to manufacture Customer's Component Parts, in Customer's sole discretion.

      7.6.    <u>Customer's Right to Repossess Tooling</u>.  Upon an Event of Default (defined in <u>Section 8</u>),  or the resourcing of a Component Part as permitted under this Agreement and produced with Customer Tooling:  (i) Customer and its respective affiliates have the right to take immediate possession of their respective Customer Tooling, without payment of any kind to Supplier, (ii) Supplier agrees to cooperate with Customer in their taking possession of Customer

Tooling, and (iii) Supplier agrees to provide access to Customer to remove Customer Tooling; provided, however, that Customer will not unreasonably interfere with Supplier's ongoing manufacturing operations or its production of Component Parts for other customers when removing Customer Tooling; and provided, further, that Customer shall be liable for any damages to Supplier's premises or assets resulting from such access or repossession.

7.7.    Additional Rights.    The acknowledgements, rights and obligations contained in this Section 7 (i) are in addition to (and not in lieu of) the rights of Supplier and Customer under the Purchase Orders or any other agreements between Supplier and Customer and (ii) will continue in effect after the expiration of the Term or termination of this Agreement.

7.8.    Marking Tooling and Notice.    Supplier grants to Customer permission to record, on Supplier's behalf, any notice and/or financing statements concerning Customer Tooling if Customer determines that it is reasonably necessary to do so to reflect its interests in its Customer Tooling. Supplier will not interfere with, and will provide access so Customer may affix any plate, stamp, or other evidence of a Customer's ownership upon each item of their Customer Tooling.

## 8.   **Events of Default.**

8.1.    The occurrence of any one or more of the following will constitute an "Event of Default" under this Agreement, unless cured in accordance with the following proviso or a waiver or deferral is agreed to in writing by (i) the Customer, or (ii) with respect to Section 8.1(d) only, Supplier and the DIP Agents; provided, that notwithstanding anything contained in this Agreement, neither Customer nor Supplier shall be entitled to assert an Event of Default based upon their own actions; provided, further, that upon the occurrence of an Event of Default, other than a default under subpoint (a) below (where no time to cure shall be allowed), the Party alleging such Event of Default shall provide notice (a "Default Notice") to the defaulting Party and to the other Parties and such defaulting Party shall have three (3) business days to cure such default, to the extent such default is capable of cure:

(a) Supplier repudiates or breaches its obligations, or such breach becomes inevitable, under the provisions of any Purchase Order or this Agreement the consequence of which is a substantial likelihood that Customer's production will be interrupted (other than a breach arising out of or relating to Purchase Orders fulfilled, directly or indirectly, at the Bristol Facility); provided that any breach arising out of Purchase Orders fulfilled directly or indirectly at the Bristol Facility shall not constitute an Event of Default unless such breach results in a shutdown of the Bristol Facility that is not corrected within twenty-four (24) hours;

(b) Any DIP Lender commences an affirmative enforcement action against any of the collateral supporting production of the Component Parts if that action materially impacts Supplier's operations or ability to perform under this Agreement or any Purchase Order;

(c) If the DIP Lenders cease funding for any reason other than from a failure of Supplier to satisfy any applicable conditions precedent, or otherwise materially breaches this Agreement;

WEIL:\95265857\10\35076.0003

(d) Customer fails to perform any material obligation under this Agreement and such failure is not otherwise waived by Supplier; or

(e) Any one of the Chapter 11 Cases is dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

8.2.    For the avoidance of doubt, the terms and conditions applicable to any Purchase Order as they relate to a delay in performance of Supplier's obligations due to events beyond its reasonable control shall apply to Supplier's obligations hereunder

8.3.    Following the occurrence and during the continuance of an Event of Default (which, to the extent applicable, has not been cured, waived or deferred or, with respect to the repudiation or material breach of a Purchase Order, has not been agreed to in writing by Customer), Customer may elect to deliver notice, within five (5) days of the delivery of the applicable Default Notice to each other Party (including Supplier) of its election to terminate the Term ("Termination Notice"), which termination shall be effective two (2) business days following the delivery of such Termination Notice. Notwithstanding the foregoing, a Termination Notice delivered with or following a Default Notice under Section 8.1(a) shall be effective and termination shall occur immediately upon delivery (unless a longer period is otherwise designated by Customer in the Termination Notice), and in all other cases, a Termination Notice will be effective and termination will occur only after five (5) business days have elapsed following a Default Notice (unless a longer period is otherwise designated by Customer in the Termination Notice) (individually and collectively, a "Section 8 Termination").

9.    **No Further Relief Required**.  Subject to approval of this Agreement by the Bankruptcy Court, no prior relief from the automatic stay in the Chapter 11 Cases shall be necessary or required for Supplier or the Customer to exercise its rights under this Agreement generally or to deliver the Default Notice or Termination Notice or to pursue its rights and remedies or take any other action afforded the Customer after the giving of the Default Notice or Termination Notice.

10.    **Continuing Obligations**.  Sections 3.3, 3.4, 3.5, 3.7, 3.8, 3.9, 4.1, 4.2, 4.3, 7 and 12 of this Agreement shall survive the Term and Termination Date, and such provisions shall continue in full force and effect until the termination of the Purchase Orders.  Except as specifically set forth herein, the terms of the Purchase Orders will govern after the Term or termination of this Agreement.  In the event Supplier and DIP Agents reach an agreement whereby the DIP Facilities (or the DIP ABL Facility alone) are to be converted to exit facilities (the "Exit Facilities") that will continue in full force and effect upon Supplier's exit from chapter 11, then the rights granted to, and the accommodations granted pursuant to Section 3.3 for the benefit of the DIP Agents shall, with respect to any Accounts Payable generated through ten (10) business days after the Termination Date, continue in full force and effect for the benefit of the administrative agents and lenders under such Exit Facilities consistent with the terms of this Agreement.

11.    **Reservation of Rights**.  Unless expressly waived or modified in this Agreement, each Party reserves and does not waive any claims, rights, and remedies that it may have under the Purchase Orders, any other agreements between or among the Parties, or

13

applicable law, and each party expressly reserves all such claims, rights and remedies they have under this Agreement, the Purchase Orders, any other agreements between or among the parties and applicable law.

12.     **Confidentiality**.  The Parties agree that they will not disseminate, disclose or communicate, either directly or indirectly, any of the information contained in or received by virtue of this Agreement to any outside party other than its employees and professional advisors, provided that such outside party is subject to this same confidentiality provision. The Parties will, in good faith, seek to ensure that the contents of this Agreement are kept secret and confidential.  Notwithstanding the foregoing, the Parties acknowledge and agree that Supplier is authorized to file a copy of this Agreement with the Bankruptcy Court in accordance with Section 4.6; provided, however, that Supplier shall take reasonable steps to protect any commercially sensitive information or other confidential trade information, including, without limitation, by filing this Agreement with appropriate redactions or under seal, as determined to be reasonably necessary in consultation with the Customer.

13.     **Notice**.  Any notice or other instrument to be given under this Agreement must be in writing and, except as otherwise provided in this Agreement, will be deemed to be duly given if mailed, delivered by hand or sent by email to the Party to whom the communication is intended to be given and any notice so delivered or sent will be deemed to have been given at the time of service on the day on which it was delivered or sent, and if mailed, will be deemed to be given three (3) days following the date of mailing. Until changed by notice in the manner described above, the addresses of the parties for the purpose of notice will be:

|  |  |
|---|---|
| If to Customer: | BMW Manufacturing Co., LLC |
|  | Office of Corporate Counsel |
|  | 1400 Highway 101 South |
|  | Greer, SC 29651 |
|  | Attention:  Seann Tzouvelekas |
|  | Email: seann.tzouvelekas@bmwmc.com |
|  |  |
| With a copy (which shall not constitute notice) to: | Jaffe, Raitt, Heuer & Weiss, P.C. |
|  | 27777 Franklin Road, Suite 2500 |
|  | Southfield, MI 48034 |
|  | Attention:  Richard Kruger |
|  | Email:  rkruger@jaffelaw.com |

WEIL:\95265857\10\35076.0003

If to Supplier or UC Holdings:

Chassix, Inc.
300 Galleria Officecentre
Suite 501
Southfield, MI 48034
Attention:  J. Mark Allan
                  Safi Hamid
                  Bibi Di Serio
Facsimile:
Email:   mark.allan@chassix.com
              safi.hamid@chassix.com
              bibi.diserio@chassix.com

With a copy (which shall not
constitute notice) to:

Weil, Gotshal & Manages LLP
767 Fifth Avenue
New York, NY 10153
Attention:  Marcia Goldstein
                  Ray C. Schrock
Facsimile: (212) 310-8007
Email:   marcia.goldstein@weil.com
              ray.schrock@weil.com

If to DIP ABL Agent:

PNC Bank, National Association
Three PNC Plaza, 6th Floor
225 Fifth Avenue
Pittsburgh, PA 15222
Attention:  James Steffy, PNC Business Credit
Facsimile: (412) 768-4369
Email:   james.steffy@pnc.com

With a copy (which shall not
constitute notice) to:

Bodman PLC
Sixth Floor at Ford Field
1901 St. Antoine Street
Detroit, MI 48226
Attention:  Robert J. Diehl, Jr.
                  Brian R. Trumbauer
Facsimile: (313) 393-7579
Email:   rdiehl@bodmanlaw.com
              btrumbauer@bodmanlaw.com

If to DIP Term Agent:

Cantor Fitzgerald Securities
110 East 59th Street – 7th Floor
New York, NY 10022
Attention:  Nils Horning (Chassix)
Facsimile No.: (646) 219-1180
E-mail: nhorning@cantor.com

15

|  |  |
|---|---|
| With a copy (which shall not constitute notice) to: | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br>Attention:  Brian Kim<br>Facsimile No.: (212) 492-0780<br>Telephone No.: (212) 373-3780<br>E-mail: bkim@paulweiss.com<br><br>Shipman & Goodwin LLP<br>One Constitution Plaza<br>Hartford, CT 06103<br>Attention:  Nathan Plotkin<br>Facsimile No.: (860) 251-5212<br>Telephone No.: (860) 251-5320 |

14. **General Terms**.

14.1.   The Purchase Orders, this Agreement, together with any other documents executed in connection with this Agreement constitutes the entire understanding of the Parties in connection with the subject matter of this Agreement. There are no written or oral representations or understandings that are not fully expressed in this Agreement. This Agreement may not be modified, altered or amended except by an agreement in writing signed by all Parties.

14.2.   The individuals executing this Agreement as representatives warrant that they have the power and authority to execute this Agreement on behalf of the corporation or entity that they represent and that their signatures bind the corporations or entities to the terms of this Agreement.

14.3.   Supplier must obtain the consent of Customer to assign or transfer, directly or indirectly, any of its rights under this Agreement.  This Agreement is not intended for the benefit of any third parties, including any purchasers of Supplier's assets or other customers of Supplier (other than affiliates of Customer).

14.4.   No delay or failure of any Party to exercise any right, power or privilege hereunder will affect such right, power or privilege, nor will any single or partial exercise thereof preclude any further exercise thereof, nor the exercise of any other right, power or privilege.

14.5.   If any part of this Agreement is for any reason found to be unenforceable, all other parts of this Agreement shall nevertheless remain enforceable.

14.6.   Supplier agrees that it will not enter into any other arrangements or agreements that would in any way materially impair Customer's rights under this Agreement.

14.7.   Supplier is not Customer's agent for any purpose and nothing in this Agreement will be interpreted to designate Supplier as Customer's agent.

WEIL:\95265857\10\35076.0003

14.8.    This Agreement may be executed in any number of counterparts with the same effect as if all signatories had signed the same document. All counterparts must be construed together to constitute one instrument. The Parties agree that their respective signatures may be delivered by facsimile or email, and that facsimile or email signatures will be treated as originals for all purposes.

14.9.    This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan, without giving effect to the conflict of laws principles of Michigan. Notwithstanding the foregoing, the Purchase Orders will continue to be governed by the laws provided for in the applicable Purchase Orders.  The parties agree that the federal and state courts sitting in Wayne County, Michigan, have personal jurisdiction over the parties and that proper jurisdiction and venue for any dispute arising from or under this Agreement may be in the federal or state courts sitting in Wayne County, Michigan.  Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, any proceedings arising out of or relating to this Agreement shall be brought in the Bankruptcy Court and each of the Parties irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court.

15. **REPRESENTATIONS.  EACH PARTY HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL OF ITS CHOICE BEFORE SIGNING THIS AGREEMENT. NO PARTY IS RELYING ON ANY REPRESENTATIONS, WARRANTIES OR COMMITMENTS THAT ARE NOT IN THIS AGREEMENT.  ANY AMBIGUOUS LANGUAGE IN THIS AGREEMENT SHOULD NOT BE CONSTRUED AGAINST ANY PARTICULAR PARTY BECAUSE THAT PARTY DRAFTED THE LANGUAGE.**

16. **JURY TRIAL WAIVER.  THE PARTIES ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED. BY EXECUTING THIS AGREEMENT, EACH PARTY WAIVES ALL RIGHTS TO A TRIAL BY JURY OF ANY DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT OR THE PURCHASE ORDERS.**

*[signatures on next page]*

WEIL:\95265857\10\35076.0003

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**BMW Manufacturing Co., LLC**

By: *Randall Trigg Franz Linnek.*

Print Name: *RANDALL TRIGG*

Title: *Acting VP/Procurement*

Date: *3/12/2015*

By: *H.*

Print Name: *STEPHANUS SMIDT*

Title: *SECTION MANAGER*

Date: *03/12/2015*

**Chassix, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**UC Holdings, Inc.**

By: _____

Print Name: _____

Title: _____

Date: _____

**PNC Bank, National Association**

By: _____

Print Name: _____

Title: _____

Date: _____

**Cantor Fitzgerald Securities**

By: _____

Print Name: _____

Title: _____

Date: _____

[Signature Page to BMW Accommodation Agreement]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**BMW Manufacturing Co., LLC**

By: _____

Print Name: _____

Title: _____

Date: _____

By: _____

Print Name: _____

Title: _____

Date: _____

**Chassix, Inc.**

By: _____

Print Name: _____ JM ALLAN _____

Title: _____ PRESIDENT + CEO _____

Date: _____

**UC Holdings, Inc.**

By: _____

Print Name: _____ JM ALLAN _____

Title: _____ PRESIDENT. _____

Date: _____

**PNC Bank, National Association**

By: _____

Print Name: _____

Title: _____

Date: _____

**Cantor Fitzgerald Securities**

By: _____

Print Name: _____

Title: _____

Date: _____

[Signature Page to BMW Accommodation Agreement]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**BMW Manufacturing Co., LLC**

**Chassix, Inc.**

By:_____

By:_____

Print Name:_____

Print Name:_____

Title:_____

Title:_____

Date:_____

Date:_____

By:_____

Print Name:_____

Title:_____

Date:_____

**UC Holdings, Inc.**

**PNC Bank, National Association**

By:_____

By:___ ~~James M. Sloffy~~ _____

Print Name:_____

Print Name: ~~James M. Sloffy~~

Title:_____

Title: ~~Vice President~~

Date:_____

Date: ~~March 12, 2015~~

**Cantor Fitzgerald Securities**

By:_____

Print Name:_____

Title:_____

Date:_____

[Signature Page to BMW Accommodation Agreement]

**<u>EXHIBIT A</u>**

**<u>ACCEPTABLE PLAN</u>**

]

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| **In re** | ) | **Chapter 11** |
| | ) | |
| **Chassix Holdings, Inc., *et al.*,**[1] | ) | **Case No. 15-[_____] (___)** |
| | ) | |
| **Debtors.** | ) | **(Joint Administration Pending)** |
| | ) | |

## JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**WEIL, GOTSHAL & MANGES LLP**

Marcia L. Goldstein
Ray C. Schrock, P.C.
Matthew P. Goren
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for Debtors and*
*Debtors in Possession*

Dated:  March 12, 2015
         New York, New York

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012).  The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

# Table of Contents

**Page**

| | | |
|---|---|---|
| Section 1. | DEFINITIONS AND INTERPRETATION. | 1 |
| A. | Definitions. | 1 |
| B. | Interpretation; Application of Definitions and Rules of Construction. | 14 |
| C. | Reference to Monetary Figures | 14 |
| D. | Controlling Document | 14 |
| Section 2. | ADMINISTRATIVE AND PRIORITY CLAIMS. | 14 |
| 2.1. | *Administrative Claims.* | 14 |
| 2.2. | *Fee Claims.* | 15 |
| 2.3. | *Priority Tax Claims.* | 15 |
| 2.4. | *DIP Claims.* | 15 |
| 2.5. | *Prepetition Revolving ABL Facility Claims.* | 15 |
| Section 3. | CLASSIFICATION OF CLAIMS AND INTERESTS. | 16 |
| 3.1. | *Summary of Classification* | 16 |
| 3.2. | *Special Provision Governing Unimpaired Claims.* | 16 |
| 3.3. | *Elimination of Vacant Classes.* | 16 |
| Section 4. | TREATMENT OF CLAIMS AND INTERESTS. | 17 |
| 4.1. | *Other Priority Claims (Class 1).* | 17 |
| 4.2. | *Other Secured Claims (Class 2).* | 17 |
| 4.3. | *Secured Note Claims (Class 3)* | 17 |
| 4.4. | *Unsecured Note Claims (Class 4).* | 18 |
| 4.5. | *General Unsecured Trade Claims (Class 5).* | 18 |
| 4.6. | *Other General Unsecured Claims (Class 6).* | 19 |
| 4.7. | *Intercompany Claims (Class 7).* | 19 |
| 4.8. | *Intercompany Interests (Class 8).* | 20 |
| 4.9. | *Subordinated Securities Claims (Class 9).* | 20 |
| 4.10. | *Existing Chassix Holdings Equity Interests (Class 10)* | 20 |
| Section 5. | MEANS FOR IMPLEMENTATION. | 20 |
| 5.1. | *Compromise and Settlement of Claims, Interests, and Controversies.* | 20 |
| 5.2. | *Global Settlement* | 21 |
| 5.3. | *Actions of Dharma Holding Corporation and Triomphe Intermediate Holding Corporation* | 22 |

## Table of Contents

**Page**

5.4.    *Cancellation of Existing Securities and Agreements.* ....................................................22

5.5.    *Corporate Structure.* ....................................................................................................22

5.6.    *Authorization and Issuance of Plan Securities.* ...........................................................22

5.7.    *Section 1145 Exemption.* ...............................................................................................23

5.8.    *Exit Financing.* .............................................................................................................23

5.9.    *Intercreditor Agreement.* ..............................................................................................24

5.10.   *Reorganized Debtors.* ...................................................................................................24

5.11.   *Bristol Facility* .............................................................................................................24

5.12.   *Cancellation of Liens.* ...................................................................................................25

5.13.   *Management Employment Matters.* ...............................................................................25

5.14.   *Withholding and Reporting Requirements.* ...................................................................25

5.15.   *Exemption From Certain Transfer Taxes.* .....................................................................26

5.16.   *Restructuring Transactions; Further Transactions.* ......................................................26

5.17.   *Dissolution of Chassix Holdings.* ..................................................................................27

5.18.   *Effectuating Documents.* ...............................................................................................27

5.19.   *Closing of the Chapter 11 Cases.* ..................................................................................27

Section 6.    DISTRIBUTIONS. ..........................................................................................................27

6.1.    *Distribution Record Date.* .............................................................................................27

6.2.    *Date of Distributions.* ...................................................................................................28

6.3.    *Timing of Distributions.* ................................................................................................28

6.4.    *Disbursing Agent.* .........................................................................................................28

6.5.    *Powers of Disbursing Agent.* .........................................................................................28

6.6.    *Delivery of Distributions.* ..............................................................................................28

6.7.    *Manner of Payment Under Plan.* ...................................................................................29

6.8.    *Fractional Stock.* ...........................................................................................................29

6.9.    *Minimum Cash Distributions.* .......................................................................................29

6.10.   *Setoffs.* ..........................................................................................................................29

6.11.   *Distributions After Effective Date.* ................................................................................29

6.12.   *Allocation of Distributions Between Principal and Interest.* .........................................29

Section 7.    PROCEDURES FOR DISPUTED CLAIMS. ...................................................................30

7.1.    *Allowance of Claims.* .....................................................................................................30

ii

**Table of Contents**

**Page**

7.2.    *Objections to Claims.* ..............................................................................................30

7.3.    *Estimation of Claims* ...............................................................................................30

7.4.    *No Distributions Pending Allowance.* .....................................................................30

7.5.    *Distributions After Allowance.* ...............................................................................31

7.6.    *Resolution of Claims.* .............................................................................................31

7.7.    *Disallowed Claims.* .................................................................................................31

Section 8.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES..............................31

8.1.    *General Treatment.* ..................................................................................................31

8.2.    *Determination of Cure Disputes and Deemed Consent.* .........................................31

8.3.    *Payments Related to Assumption of Contracts and Leases.* ....................................32

8.4.    *Rejection.* ................................................................................................................32

8.5.    *Survival of the Debtors' Indemnification Obligations.* ...........................................32

8.6.    *Compensation and Benefit Plans* ............................................................................33

8.7.    *Insurance Policies* ...................................................................................................33

8.8.    *Intellectual Property Licenses and Agreements.* .....................................................33

8.9.    *Reservation of Rights.* .............................................................................................34

Section 9.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE. .............................34

9.1.    *Conditions Precedent to Confirmation.* ..................................................................34

9.2.    *Conditions Precedent to the Effective Date.* ...........................................................34

9.3.    *Waiver of Conditions Precedent.* ............................................................................35

9.4.    *Effect of Non-Occurrence of Effective Date.* ..........................................................36

Section 10.    EFFECT OF CONFIRMATION. .......................................................................36

10.1.    *Subordinated Claims* ...............................................................................................36

10.2.    *Vesting of Assets.* .....................................................................................................36

10.3.    *Discharge of Claims and Termination of Interests.* ................................................36

10.4.    *Term of Injunctions or Stays.* ..................................................................................36

10.5.    *Injunction Against Interference with Plan.* .............................................................37

10.6.    *Releases by the Debtors.* ..........................................................................................37

10.7.    *Releases By Holders of Claims and Interests.* .........................................................38

10.8.    *Exculpation.* ............................................................................................................38

10.9.    *Retention of Causes of Action/Reservation of Rights.*.............................................39

iii

**Table of Contents**

**Page**

10.10.   *Solicitation of the Plan.* ........................................................................................39

10.11.   *Plan Supplement.* .................................................................................................40

10.12.   *Corporate and Limited Liability Company Action.* ...............................................40

Section 11.   RETENTION OF JURISDICTION. .......................................................................40

Section 12.   MISCELLANEOUS PROVISIONS. ......................................................................42

12.1.   *Payment of Statutory Fees.* ..................................................................................42

12.2.   *Substantial Consummation.* ..................................................................................42

12.3.   *Dissolution of Creditors Committee.* .....................................................................42

12.4.   *Request for Expedited Determination of Taxes.* ....................................................42

12.5.   *Amendments.* .......................................................................................................43

12.6.   *Revocation or Withdrawal of the Plan.* .................................................................43

12.7.   *Severability of Plan Provisions upon Confirmation.* ..............................................43

12.8.   *Governing Law.* ....................................................................................................44

12.9.   *Time.* ....................................................................................................................44

12.10.   *Immediate Binding Effect.* ....................................................................................44

12.11.   *Successor and Assigns.* .........................................................................................44

12.12.   *Entire Agreement.* ................................................................................................44

12.13.   *Notices.* ................................................................................................................44

Exhibit A      Accommodation Agreements (without exhibits)

Exhibit B      Restructuring Support Agreement (without exhibits)

WEIL:\95270840\1\35076.0003

Each of Automotive Properties of New York, LLC, Chassix Holdings, Inc., UC Holdings, Inc., Chassix, Inc., Diversified Machine, Inc., Diversified Machine Bristol, LLC, Chassix Georgia Machining, LLC, DMI Columbus, LLC, Diversified Machine Montague, LLC, Diversified Machine, Milwaukee LLC, DMI Edon LLC, Mexico Products I, LLC, DMI China Holding LLC, Concord International, Inc., SMW Automotive, LLC, Automotive, LLC, Chassis Co. of Michigan, LLC, and AluTech, LLC (collectively, the "***Debtors***") propose the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Section 1.A.

## SECTION 1.    DEFINITIONS AND INTERPRETATION.

### A.    Definitions.

1.1    ***Accommodation Agreements*** means (a) that certain accommodation agreement, dated as of March 11, 2015, between and among the Debtors, General Motors LLC, Ford Motor Company, FCA US LLC f/k/a Chrysler Group LLC, Nissan North America, Inc., the DIP ABL Agent, and the DIP Term Agent, and (b) that certain accommodation agreement (together with any exhibits or schedules thereto) between and among the Debtors, BMW Manufacturing Co., LLC, the DIP ABL Agent, and the DIP Term Agent, annexed hereto as **Exhibit "A**."

1.2    ***Additional Trade Claim Distribution*** means $4,000,000, in Cash, which shall be distributed on a Pro Rata basis to holders of Allowed General Unsecured Trade Claims that agree to extend Customary Trade Terms to the Debtors (or the Reorganized Debtors, as applicable), pursuant to Section 4.5 below.  For the avoidance of doubt, the foregoing monies shall be reserved by the Debtors, or the Reorganized Debtors, as the case may be, but shall not be held in a segregated account.

1.3    ***Administrative Agent*** means BMO Harris Bank N.A., in its capacity as administrative agent under the Prepetition Revolving ABL Facility.

1.4    ***Administrative Claim*** means any Claim for costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code, including, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for good and other services and leased premises); (b) Fee Claims; (c) DIP Claims; (d) Restructuring Expenses; and (e) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code; provided that, notwithstanding anything herein to the contrary, Fee Claims and DIP Claim shall be treated as provided, respectively, in Sections 2.2 and 2.4 below.

1.5    ***Allowed*** means:

(a)    With respect to any Claim or Interest, proof of which was filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the Bankruptcy Court, (i) as to which no objection to allowance has been interposed in accordance with Section 7.2 hereof, such Claim to the extent asserted in such proof of Claim, (ii) as to which an objection has been interposed, such Claim or Interest to the extent that it has been allowed in whole or in part by a Final Order, or (iii) any Claim or Interest expressly allowed hereunder.

(b)    With respect to any Claim as to which no proof of claim was filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the

Bankruptcy Court, such Claim to the extent that it has been listed in the Schedules as liquidated in amount and not disputed or contingent.

(c)    Notwithstanding the foregoing, the Reorganized Debtors shall retain all claims and defenses to any Allowed Claims that are Reinstated or Unimpaired pursuant to the Plan.

1.6    ***Allowed Amount*** means the lesser of (a) the dollar amount of an Allowed Claim or (b) the estimated amount of such Allowed Claim. Unless otherwise specified herein or by Final Order, the Allowed Amount of an Allowed Claim shall not include interest accruing on such Allowed Claim from and after the Commencement Date.

1.7    ***Amended Organizational Documents*** means the forms of certificate of incorporation, certificate of formation, limited liability company agreement, or other forms of organizational documents and bylaws for the Reorganized Debtors in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable. To the extent such Amended Organizational Documents reflect material changes to the Debtors' existing forms of organization documents and bylaws, substantially final forms of such Amended Organizational Documents will be included in the Plan Supplement.

1.8    ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.9    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York, Manhattan Division, having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

1.10    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

1.11    ***Benefit Plans*** means all benefit plans, policies, and programs sponsored by the Debtors, including all savings plans and health and welfare plans.

1.12    ***Bristol Facility*** means the Debtors' manufacturing facility located at 51650 County Road 133, Bristol, Indiana, 46507.

1.13    ***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.14    ***Cash*** means legal tender of the United States of America.

1.15    ***Causes of Action*** means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen,

2

direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims.

1.16    ***Chapter 11 Cases*** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on March 12, 2015, in the Bankruptcy Court and styled *In re Chassix Holdings, Inc., et. al.*, Case No. 15-[_____] (___).

1.17    ***Chassix*** means Chassix, Inc.

1.18    ***Chassix Holdings*** means Chassix Holdings, Inc.

1.19    ***Claim*** means "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

1.20    ***Class*** means any group of Claims or Interests classified by the Plan pursuant to section 1122(a) of the Bankruptcy Code.

1.21    ***Collateral Agent*** means U.S. Bank, National Association, in its capacity as collateral agent under the Secured Notes Indenture and the related Security Agreement.

1.22    ***Commencement Date*** means the date on which each of the Debtors filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

1.23    ***Commencement Date Plan*** means the joint chapter 11 plan of reorganization, including the exhibits thereto, filed by the Debtors on the Commencement Date.

1.24    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.25    ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.26    ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

1.27    ***Consenting Noteholders*** means the Consenting Secured Noteholders and the Consenting Unsecured Noteholders.

1.28    ***Consenting Secured Noteholders*** means the beneficial holders, or investment advisors or managers for the account of beneficial holders, of Secured Notes party to the Restructuring Support Agreement.

3

1.29    ***Consenting Unsecured Noteholders*** means the beneficial holders, or investment advisors or managers for the account of beneficial holders, of Unsecured Notes party to the Restructuring Support Agreement.

1.30    ***Consummation*** means the occurrence of the Effective Date.

1.31    ***Creditors Committee*** means any official committee of unsecured creditors appointed in the Chapter 11 Cases.

1.32    ***Cure*** means the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

1.33    ***Customary Trade Terms*** means industry trade terms and/or the existing contractual terms between the Debtors and the relevant holder of a General Unsecured Trade Claim including rebates and discounts, which shall in no event be worse than the most favorable terms in effect within two (2) years before the Commencement Date or such other trade terms as agreed to by the Debtors, with the consent of the Required Consenting Noteholders (such consent not to be unreasonably withheld), or the Reorganized Debtors, as applicable.

1.34    ***Debtors*** means Automotive Properties of New York, LLC, Chassix Holdings, UC Holdings, Chassix, Diversified Machine, Inc., Diversified Machine Bristol, LLC, Chassix Georgia Machining, LLC, DMI Columbus, LLC, Diversified Machine Montague, LLC, Diversified Machine, Milwaukee LLC, DMI Edon LLC, Mexico Products I, LLC, DMI China Holding LLC, Concord International, Inc., SMW Automotive, LLC, Automotive, LLC, Chassis Co. of Michigan, LLC, and AluTech, LLC.

1.35    ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

1.36    ***Definitive Documents*** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated herein and that are otherwise necessary or desirable to implement, or otherwise relate to the restructuring contemplated in the Restructuring Support Agreement, the Plan (including the Plan Supplement), any motion seeking the approval thereof, the Confirmation Order, and definitive documentation relating to the DIP Facilities, the use of cash collateral and the Exit Facilities, Amended Organizational Documents, the Accommodation Agreements, advisory or management services agreements, the Management Incentive Plan, the New Warrant Agreement, the Shareholders Agreement and any other shareholder and member related agreements or other related documents, each of which shall contain terms and conditions consistent in all material respects with the Plan and shall otherwise be reasonably acceptable in all respects to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

1.37    ***DIP ABL Agent*** means PNC Bank, National Association, in its capacity as administrative agent and collateral agent for the Revolving DIP Lenders under the Revolving DIP Credit Facility, or its permitted successor and assignee.

1.38    ***DIP Agents*** means the DIP ABL Agent and the DIP Term Agent.

4

1.39   ***DIP Claim*** means a Claim of the DIP Lenders or the DIP Agents arising under the DIP Facilities and the Interim DIP Order and/or Final Order.

1.40   ***DIP Facilities*** means the Revolving DIP Credit Facility and the DIP Term Facility.

1.41   ***DIP Lenders*** means the DIP Term Lenders and the Revolving DIP Lenders.

1.42   ***DIP Term Agent*** means Cantor Fitzgerald Securities, in its capacity as administrative agent and collateral agent for the DIP Term Lenders under the DIP Term Facility, or its permitted successor and assignee.

1.43   ***DIP Term Facility*** means the senior secured non-amortizing term loan credit facility provided by the DIP Term Lenders in an aggregate principal amount of $100 million made pursuant to that certain Superpriority Secured Debtor-in-Possession Term Loan, Security and Guaranty Agreement, by and among Chassix, the other borrowers and guarantors party thereto, the DIP Term Agent, the DIP Term Lenders and other parties thereto.

1.44.   ***DIP Term Lenders*** means those certain Consenting Secured Noteholders who are lenders under the DIP Term Facility.

1.45.   ***Disbursing Agent*** means any entity (including any applicable Debtor if it acts in such capacity) in its capacity as a disbursing agent under Section 6.4 hereof.

1.46.   ***Disclosure Statement*** means the Disclosure Statement for the Plan, in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, which is prepared and distributed in accordance with sections 1125, 1126(b) and/or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018 and/or other applicable law.

1.47.   ***Disclosure Statement Order*** means an order entered by the Bankruptcy Court finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code and otherwise in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

1.48.   ***Disputed Claim*** means (a) any Claim against any Debtor, proof of which was timely and properly filed, which is disputed under the Plan or as to which the Debtors have interposed a timely objection and/or request for estimation, which objection and/or request has not been withdrawn or determined by a Final Order or (b) any Claim against any Debtor proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed. To the extent only the Allowed Amount of a Claim is in dispute, such Claim shall be deemed Allowed in the amount the Debtors admit to owing, if any, and disputed as to the excess.

1.49.   ***Distribution Date*** means a date or dates, including the Initial Distribution Date, as determined by the Disbursing Agent in accordance with the terms of the Plan, on which the Disbursing Agent makes a distribution to holders of Allowed Claims.

1.50.   ***Distribution Record Date*** means, except with respect to public securities, the Effective Date.

WEIL:\95270840\1\35076.0003

1.51.   ***Effective Date*** means the date on or after the Confirmation Date, but not later than July 17, 2015, on which all conditions to the effectiveness of the Plan set forth in Section 9 hereof have been satisfied or waived in accordance with the terms of the Plan.

1.52.   ***Estate or Estates*** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.53.   ***Exculpated Parties*** means collectively: (a) the Debtors; (b) the Creditors Committee; (c) the Administrative Agent; (d) the Collateral Agent; (e) the other Secured Parties under and as defined in the Security Agreement; (f) the DIP Lenders; (g) the DIP Agents; (h) the Consenting Secured Noteholders; (i) the Consenting Unsecured Noteholders; (j) the arrangers under each of the DIP Facilities and the Exit Facilities; (k) the administrative agents, collateral agents, and lenders under the Exit Facilities; (l) the OEM Customers; (m) Platinum Equity; (n) the Prepetition Revolving ABL Lenders, and (o) with respect to each of the foregoing entities in clauses (a) through (n), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers and directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, in each case in their capacity as such.

1.54.   ***Existing Chassix Holdings Equity Interests*** means all Interests in Chassix Holdings immediately prior to the Commencement Date, including all equity, warrants, common stock, and preferred stock.

1.55.   ***Existing UC Holdings Equity Interests*** means all Interests in UC Holdings immediately prior to the Commencement Date, including all equity, warrants, common stock, and preferred stock.

1.56.   ***Exit Facilities*** means the Revolving Exit Facility and the Exit Term Loan.

1.57.   ***Exit Term Loan*** means that certain senior secured exit term loan in a principal amount of $150,000,000, on terms acceptable to the Debtors and the Required Consenting Noteholders. Not less than $50,000,000 of the Exit Term Loan will be in the form of a new money investment to be made upon the Effective Date.

1.58.   ***Fee Claim*** means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Confirmation Date by professional persons retained by the Debtors or the Creditors Committee pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

1.59.   ***Final DIP Order*** means the final order of the Bankruptcy Court authorizing, among other things, the Debtors to enter into and make borrowings under the DIP Facilities, and granting certain rights, protections, and liens to and for the benefit of the DIP Lenders.

1.60.   ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the Clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been

6

denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; provided that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

1.61.    ***General Unsecured Claim*** means any unsecured Claim, other than an Intercompany Claim and an Unsecured Note Claim, that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, including without limitation, any General Unsecured Trade Claim and any Other General Unsecured Claim.

1.62.    ***General Unsecured Claim Distribution*** means $2,000,000, in Cash, which, in accordance with Section 4.6 below, shall be distributed on a Pro Rata basis to holders of Allowed Other General Unsecured Claims; provided that, in accordance with Section 4.6, the foregoing distribution shall only be made to a holder of an Allowed Other General Unsecured Claim if such holder's sub-class has voted to accept the Plan.  For the avoidance of doubt, the foregoing monies shall be reserved by the Debtors, or the Reorganized Debtors, as the case may be, but shall not be held in a segregated account.

1.63.    ***General Unsecured Trade Claim*** means any General Unsecured Claim against any Debtor held by a trade creditor that the Debtors will have an ongoing business relationship with after the Effective Date.

1.64.    ***Global Settlement*** means that certain settlement incorporated into the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, among the Debtors, the Consenting Noteholders, and Platinum Equity whereby (i) the Unsecured Noteholders shall receive their Pro Rata share of the Unsecured Noteholder Common Stock Distribution and the New Warrants pursuant to Sections 4.4 and 5.2 below and (ii) Platinum Equity and the Released Parties related thereto shall receive releases pursuant to Sections 5.2, 10.6 and 10.7 below.

1.65.    ***Impaired*** means, with respect to a Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.66.    ***Initial Distribution*** means the first distribution that the Disbursing Agent makes to holders of Allowed Claims.

1.67.    ***Initial Distribution Date*** means the date occurring on or as soon as reasonably practicable after the Effective Date on which the Disbursing Agent makes the Initial Distribution to holders of Allowed Claims.

1.68.    ***Intercompany Claim*** means any Claim against a Debtor held by another Debtor.

1.69.    ***Intercompany Interests*** means an Interest in a Debtor (other than Chassix Holdings or UC Holdings) held by another Debtor or an affiliate of a Debtor.

1.70.    ***Intercreditor Agreement*** means that certain intercreditor agreement, between and among the lenders under the Revolving Exit Facility and the Exit Term Loan, to be included in draft form in the Plan Supplement.

1.71.    ***Interests*** means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all common stock, preferred stock or other instruments evidencing an

ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interests in a Debtor that existed immediately before the Effective Date.

1.72.    *Interim DIP Order* means the interim order of the Bankruptcy Court authorizing, among other things, the Debtors to enter into and make borrowings under the DIP Facilities, and granting certain rights, protections and liens to and for the benefit of the DIP Lenders.

1.73.    *Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.74.    *Management Incentive Plan* means a post-emergence management incentive plan, to be included in draft form in the Plan Supplement, which shall be in form and substance reasonably satisfactory to the Debtors and the Required Consenting Noteholders, to be implemented by the Reorganized Debtors on the Effective Date, which shall provide for grants of options and/or restricted units/equity reserved for management, directors and employees in an amount of New Common Stock representing 5-10% of the New Common Stock (subject to dilution by the exercise of the New Warrants, to the extent applicable) which shall be sufficient to properly incentivize the senior management team of the Reorganized Debtors.

1.75.    *New Board* means the initial board of directors of Reorganized UC Holdings.

1.76.    *New Common Stock* means the shares of common stock, par value $.001 per share, in Reorganized UC Holdings that shall be issued on the Effective Date.

1.77.    *New Warrants* mean warrants to purchase 5% of the New Common Stock, subject to dilution by the Management Incentive Plan, with a strike price equal to the Reorganized Debtors' total implied equity value being the face amount of the Secured Notes, plus accrued interest and expenses as of the Commencement Date, as more fully set forth in the New Warrant Agreement, which shall be distributed in accordance with Section 4.4 below.

1.78.    *New Warrant Agreement* means the warrant agreement that will govern the terms of the New Warrants, the form of which shall be included in the Plan Supplement, and which will be in form and substance reasonably acceptable to the Debtors and the Required Consenting Noteholders.

1.79.    *OEM Customers* means, collectively, General Motors LLC, Ford Motor Company, FCA US LLC f/k/a Chrysler Group LLC, Nissan North America, Inc., BMW Manufacturing Co., LLC and any other customer of the Debtors party to the Accommodation Agreements.

1.80.    *Other General Unsecured Claim* means any unsecured Claim against any Debtor (other than an Intercompany Claim or a General Unsecured Trade Claim) that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

1.81.    *Other Priority Claim* means any Claim against any of the Debtors other than an Administrative Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.82.    *Other Secured Claim* means a Secured Claim against any of the Debtors, other than an Administrative Claim, a Priority Tax Claim, a Prepetition Revolving ABL Facility Claim, or a Secured Note Claim.

WEIL:\95270840\1\35076.0003

1.83.    **Person** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code) or other entity.

1.84.    **Plan** means this joint chapter 11 plan of reorganization, including the exhibits hereto, as the same may be amended or modified from time to time in accordance with Section 12.5 herein.

1.85.    **Plan Supplement** means a supplemental appendix to the Plan, in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, containing, among other things, substantially final forms of the Amended Organizational Documents (to the extent such Amended Organizational Documents reflect material changes from the Debtors' existing organizational documents and bylaws), the Schedule of Assumed Contracts, the Schedule of Rejected Contracts, the Exit Term Loan, the Revolving Exit Facility, the Management Incentive Plan, the Shareholders Agreement, the New Warrant Agreement, and to the extent known, with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; provided that through the Effective Date, the Debtors shall have the right to amend documents contained in, and exhibits to, the Plan Supplement with the consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  The Plan Supplement shall be filed with the Bankruptcy Court no later than the Plan Supplement Filing Date.

1.86.    **Plan Supplement Filing Date** means five business days before the voting deadline established in these cases.

1.87.    **Platinum Consent Right** means Platinum Equity's right to consent to or approve any documents, actions, or agreements, as applicable, solely to the extent such documents, actions, or agreements alter in any material way any of the rights or benefits proposed to be granted to or received by Platinum Equity or any Released Parties related thereto, or any obligation Platinum Equity (or any Released Party related thereto) may have, pursuant to the Commencement Date Plan.

1.88.    **Platinum Equity** means, collectively, Platinum Equity, LLC, Platinum Equity Advisors, LLC, Platinum Dharma Principals, LLC, Platinum Equity Capital Dharma Partners-PF, L.P., Platinum Equity Capital Dharma Partners, L.P., Platinum Equity Capital Dharma Partners-A, L.P., Platinum Equity Capital Partners III, L.P., Platinum Equity Capital Partners-A III, L.P., Platinum Equity Capital Partners-B III, L.P., Platinum Equity Capital Partners-C III, L.P., Dharma Holding Corporation, Triomphe Intermediate Holding Corporation, and such entities' direct and indirect subsidiaries and affiliates except the Debtors and the Debtors' direct and indirect subsidiaries.

1.89.    **Prepetition Credit Agreement** means that certain Amended and Restated Loan, Security and Guaranty Agreement dated as of July 23, 2013, as amended, supplemented or otherwise modified from time to time, by and among Chassix, the other borrowers and guarantors party thereto, the Administrative Agent, the Prepetition Revolving ABL Lenders and other parties thereto.

1.90.    **Prepetition Intercreditor Agreement** means that certain Intercreditor Agreement, dated as of July 23, 2013, by and between BMO Harris Bank N.A., as ABL collateral agent, and U.S. Bank National Association, as notes collateral agent.

1.91.    **Prepetition Revolving ABL Facility** means that certain $150 million senior secured asset based revolving credit facility pursuant to the Prepetition Credit Agreement.

9

1.92.    ***Prepetition Revolving ABL Facility Claim*** means any Claim relating to or arising under the Prepetition Revolving ABL Facility which shall be repaid in full in Cash with proceeds from the DIP Facilities in connection with entry of the Interim DIP Order.

1.93.    ***Prepetition Revolving ABL Lenders*** means the lenders from time to time party to the Prepetition Credit Agreement.

1.94.    ***Priority Tax Claim*** means any secured or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.95.    ***Pro Rata*** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Class under the Plan.

1.96.    ***Reinstate, Reinstated or Reinstatement*** means (i) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such Claim so as to leave such Claim Unimpaired or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (a) curing any such default that occurred before or after the Commencement Date, other than a default of the kind specified in section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim as such maturity existed before such default; (c) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) not otherwise altering the legal, equitable or contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement and shall be deemed cured on the Effective Date.

1.97.    ***Released Parties*** means collectively and in each case in their capacity as such: (a) the Debtors; (b) the Creditors Committee; (c) the Administrative Agent; (d) the Collateral Agent; (e) the other Secured Parties under and as defined in the Security Agreement; (f) the DIP Lenders; (g) the DIP Agents; (h) the Consenting Secured Noteholders; (i) the Consenting Unsecured Noteholders; (j) the arrangers under each of the DIP Facilities and the Exit Facilities; (k) the administrative agents, collateral agents, and lenders under the Exit Financing; (l) the OEM Customers; (m) Platinum Equity; (n) the Prepetition Revolving ABL Lenders; and (o) with respect to each of the foregoing entities in clauses (a) through (n), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers and directors, principals, shareholders, members, partners, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

1.98.    ***Reorganized Chassix*** means Chassix, as reorganized on the Effective Date in accordance with the Plan.

1.99.    ***Reorganized Debtors*** means the Debtors, as reorganized on the Effective Date in accordance with the Plan.

1.100.   ***Reorganized UC Holdings*** means UC Holdings, as reorganized on the Effective Date in accordance with the Plan.

1.101.   ***Required Consenting Noteholders*** means the Required Consenting Secured Noteholders and the Required Consenting Unsecured Noteholders.

1.102.   ***Required Consenting Secured Noteholders*** means the Consenting Secured Noteholders holding at least 51% of the Secured Notes that are subject to the terms of the Restructuring Support Agreement.

1.103.   ***Required Consenting Unsecured Noteholders*** means the Consenting Unsecured Noteholders holding at least 51% of the Unsecured Notes that are subject to the terms of the Restructuring Support Agreement.

1.104.   ***Restructuring*** means the proposed financial restructuring the principal terms of which are set forth herein.

1.105.   ***Restructuring Expenses*** means the reasonable and documented fees and expenses incurred by each of the Administrative Agent, the Collateral Agent, the Consenting Noteholders, Platinum Equity, the DIP Agents, and the DIP Lenders  in connection with the Restructuring, including the fees and expenses of their respective legal and financial advisors (limited to one primary counsel for each of the Prepetition ABL Lender, the DIP Agents, the Consenting Noteholders, and Platinum Equity, one financial advisor for each of Platinum Equity and the Consenting Noteholders and any other professionals that may be retained by the Consenting Noteholders and are reasonably acceptable to the Debtors) without the requirement for the filing of retention applications, fee applications or any other applications in the Chapter 11 Cases, which, in each case, shall be Allowed in full and shall not be subject to any offset, defense, counterclaim, reduction or credit of any kind whatsoever.  The reimbursable fees and expenses of Platinum Equity shall not exceed $1,250,000.

1.106.   ***Restructuring Support Agreement*** means that certain Restructuring Support Agreement, dated March 11, 2015, by and among the Debtors, the Consenting Secured Noteholders, the Consenting Unsecured Noteholders and Platinum Equity (as may be amended, supplemented or modified from time to time in accordance with the terms thereof) annexed hereto as **Exhibit** "**B**."

1.107.   ***Restructuring Support Parties*** means, collectively, the Debtors, the Required Consenting Noteholders and Platinum Equity.

1.108.   ***Restructuring Transactions*** means the transactions set forth in Section 5.16 of the Plan, in the order specified therein.

1.109.   ***Revolving DIP Credit Facility*** means that certain senior secured non-amortizing asset-based revolving credit facility in an aggregate principal amount of up to $150,000,000 entered into pursuant to that certain Superpriority Secured Debtor-in-Possession ABL Loan, Security and Guaranty Agreement, by and among Chassix, the other borrowers and guarantors party thereto, the DIP ABL Agent, and the Revolving DIP Lenders.  The Revolving DIP Credit Facility includes sub-facilities for swingline loans in an amount equal to $10,000,000 and letters of credit in an amount equal to $15,000,000.

1.110.   ***Revolving DIP Lenders*** means the lenders under the Revolving DIP Credit Facility.

WEIL:\95270840\1\35076.0003

1.111.    ***Revolving Exit Facility*** means that certain senior secured asset-based revolving exit credit facility with terms and conditions to be negotiated which shall be acceptable to the Debtors and the Required Consenting Noteholders.

1.112.    ***Schedule of Assumed Contracts*** means the schedule of contracts and leases to be assumed by the applicable Debtor(s), with the reasonable consent of the Debtors and the Required Consenting Noteholders, to be filed as part of the Plan Supplement.

1.113.    ***Schedule of Rejected Contracts*** means the schedule of contracts and leases to be rejected by the applicable Debtor(s), with the reasonable consent of the Debtors and the Required Consenting Noteholders, to be filed as part of the Plan Supplement.

1.114.    ***Schedules*** means the schedules of assets and liabilities and the statements of financial affairs filed by each Debtor under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements may be supplemented or amended from time to time.

1.115.    ***Secured Claim*** means a Claim to the extent (i) secured by property of the estate, the amount of which is equal to or less than the value of such property (A) as set forth in the Plan, (B) as agreed to by the holder of such Claim and the Debtors or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

1.116.    ***Secured Note Claim*** means any Claim relating to or arising under the Secured Note Indenture.

1.117.    ***Secured Noteholder Common Stock Distribution*** means shares of New Common Stock representing 97.5% of the New Common Stock (subject to dilution by the Management Incentive Plan and, to the extent applicable, the exercise of the New Warrants) to be distributed in accordance with Section 4.3 below; <u>provided</u> that if (i) the Global Settlement is not approved by a Final Order or (ii) either the Class of General Unsecured Trade Claims or the Class of Other General Unsecured Claims does not vote to accept the Plan, the Secured Noteholder Common Stock Distribution shall increase to 100% of the New Common Stock (subject to dilution by the Management Incentive Plan).

1.118.    ***Secured Noteholders*** means the holders of the Secured Notes.

1.119.    ***Secured Note Indenture*** means that certain indenture, dated July 23, 2013, as amended, supplemented or otherwise modified from time to time, among Chassix, as issuer, UC Holdings and certain of its subsidiaries as guarantors thereto, and U.S. Bank National Association, as trustee.

1.120.    ***Secured Note Indenture Trustee*** means U.S. Bank National Association, in its capacity as trustee under the Secured Note Indenture.

1.121.    ***Secured Notes*** means the 9 1/4 % senior secured notes due 2018 of Chassix issued pursuant to the Secured Note Indenture, plus accrued and unpaid interest as of the Commencement Date and any other amounts and obligations payable under the Secured Note Indenture and owed as of the Commencement Date.

1.122.    ***Security*** means any Security, as such term is defined in section 101(49) of the Bankruptcy Code.

12

1.123.    **Security Agreement** means that certain Security Agreement, dated as of July 23, 2013, by Chassix, and the guarantors thereunder, as pledgors, assignors and debtors, and U.S. Bank National Association, in its capacity as collateral agent, pledgee, assignee and secured party for the benefit of the Secured Noteholders under the Secured Note Indenture, and each other Authorized Representative (as defined in the Security Agreement) party thereto.

1.124.    **Shareholders Agreement** means that certain Shareholders Agreement to be included in draft form in the Plan Supplement, which shall be consistent with the requirements contained in the Plan and the Restructuring Support Agreement and otherwise be in a form and substance reasonably acceptable to the Debtors and the Required Consenting Noteholders.

1.125.    **Subordinated Securities Claim** means a Claim subject to subordination under section 510(b) of the Bankruptcy Code, and any Claim for or that arises from the rescission of a purchase, sale, issuance or offer of a Security of any of the Debtors, or for damages arising from the purchase of sale of such a Security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

1.126.    **Subsidiary Reorganized Debtors** means all of the Reorganized Debtors other than Reorganized UC Holdings (and, for the avoidance of doubt, other than Chassix Holdings).

1.127.    **Tax Code** means the Internal Revenue Code of 1986, as amended from time to time.

1.128.    **Trade Claim Distribution** means $1,000,000, in Cash, which shall be distributed on a Pro Rata basis to holders of Allowed General Unsecured Trade Claims pursuant to Section 4.5 below.  For the avoidance of doubt, the foregoing monies shall be reserved by the Debtors, or the Reorganized Debtors, as the case may be, but shall not be held in a segregated account.

1.129.    **UC Holdings** means UC Holdings, Inc.

1.130.    **Unimpaired** means, with respect to a Claim, Interest or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.131.    **Unsecured Note Claim** means any General Unsecured Claim, derived from, based upon, relating to or arising from the Unsecured Note Indenture.

1.132.    **Unsecured Noteholder Common Stock Distribution** means shares of New Common Stock representing 2.5% of the New Common Stock (subject to dilution by the Management Incentive Plan and, to the extent applicable, the exercise of the New Warrants) to be distributed in accordance with, and subject to the conditions set forth in, Section 4.4 below.

1.133.    **Unsecured Noteholders** means the holders of the Unsecured Notes.

1.134.    **Unsecured Note Indenture** means that certain indenture, dated December 13, 2013, as amended, supplemented or otherwise modified from time to time, between Chassix Holdings, as issuer, and Delaware Trust Company, as successor trustee.

1.135.    **Unsecured Note Indenture Trustee** means Delaware Trust Company, in its capacity as trustee under the Unsecured Note Indenture.

WEIL:\95270840\1\35076.0003

1.136.  **Unsecured Notes** means the 10% / 10 3/4% senior unsecured PIK toggle notes due 2018 of Chassix Holdings issued pursuant to the Unsecured Note Indenture.

1.137.  **Voting Record Date** means 5:00 p.m. Eastern Time on the first day of the hearing to approve the Disclosure Statement.

### B.    Interpretation; Application of Definitions and Rules of Construction.

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained therein.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### C.    Reference to Monetary Figures

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

### D.    Controlling Document

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document).  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; _provided_ that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

## SECTION 2.    ADMINISTRATIVE AND PRIORITY CLAIMS.

2.1.  **Administrative Claims**.

Except to the extent that a holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors agree to different treatment, the Debtors (or the Reorganized Debtors, as the case may be) shall pay to each holder of an Allowed Administrative Claim Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Claim becomes an Allowed Claim; _provided_ that Allowed Administrative Claims representing liabilities

14

incurred in the ordinary course of business by the Debtors, as Debtors In Possession, or liabilities arising under loans or advances to or other obligations incurred by the Debtors, as Debtors In Possession, whether or not incurred in the ordinary course of business, shall be paid by the Debtors or the Reorganized Debtors, as the case may be, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

### 2.2.    *Fee Claims.*

All entities seeking an award by the Bankruptcy Court of Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred not later than the date that is forty-five (45) days after the Effective Date, (b) shall be paid in full, in Cash, the Allowed Amount of their respective Allowed Fee Claims (i) upon the later of (A) the Effective Date and (B) the date on which the order Allowing such Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or, on and after the Effective Date, the Reorganized Debtors.  The Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval, including those of the Creditors Committee to the extent the Creditors Committee is still in existence.

### 2.3.    *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or (b) equal annual Cash payments (commencing on the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course) in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years after the Commencement Date; underlined provided that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option.

### 2.4.    *DIP Claims.*

On the Effective Date, the Revolving DIP Facility will either be converted into the Revolving Exit Facility or paid in full, in Cash, using the proceeds of the Revolving Exit Facility.

On the Effective Date, the DIP Term Loan will either be converted into the Exit Term Loan or paid in full, in Cash, using the proceeds of the Exit Term Loan.

### 2.5.    *Prepetition Revolving ABL Facility Claims.*

All obligations and claims in respect of or arising under the Prepetition ABL Credit Agreement, including the cash collateralization and letters of credit outstanding thereunder as of the Effective Date, shall be paid in full, in Cash, by the Debtors using the proceeds of the Revolving DIP Credit Facility and the DIP Term Facility on the date the Interim DIP Order is entered by the Bankruptcy Court.

**SECTION 3.    CLASSIFICATION OF CLAIMS AND INTERESTS.**

3.1.    *Summary of Classification*

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Fee Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Section 3.  The classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes; such Classes shall be treated as set forth in Section 3.3.

| Class | Designation | Treatment | Entitled to Vote |
|:-----:|-------------|:---------:|:----------------:|
| 1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 3 | Secured Note Claims | Impaired | Yes |
| 4 | Unsecured Note Claims | Impaired | Yes |
| 5 | General Unsecured Trade Claims | Impaired | Yes |
| 6 | Other General Unsecured Claims | Impaired | Yes |
| 7 | Intercompany Claims | Unimpaired | No (presumed to accept) |
| 8 | Intercompany Interests | Unimpaired | No (presumed to accept) |
| 9 | Subordinated Securities Claims | Impaired | No (deemed to reject) |
| 10 | Existing Chassix Holdings Equity Interests | Impaired | No (deemed to reject) |

3.2.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Reorganized Debtors in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.3.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

16

**SECTION 4.    TREATMENT OF CLAIMS AND INTERESTS.**

4.1.    ***Other Priority Claims (Class 1).***

(a)    *Classification*:  Class 1 consists of Allowed Other Priority Claims.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Other Priority Claim has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Claim, in each case, or as soon as reasonably practical thereafter.

(c)    *Voting*:  Class 1 is Unimpaired, and the holders of Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

4.2.    ***Other Secured Claims (Class 2).***

(a)    *Classification*:  Class 2 consists of Allowed Other Secured Claims.  To the extent that Allowed Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Other Secured Claim has agreed to less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim shall receive (i) payment in full in Cash on the Effective Date or as soon thereafter as practicable, (ii) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment as is necessary to satisfy section 1129 of the Bankruptcy Code.

(c)    *Voting*:  Class 2 is Unimpaired, and the holders of Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

4.3.    ***Secured Note Claims (Class 3)***

(a)    *Classification*:  Class 3 consists of Allowed Secured Note Claims.

(b)    *Allowance*:  The Allowed Secured Note Claims are Allowed in the amount of $396,192,637.24 (including accrued and unpaid interest as of the Commencement Date), plus any other amounts and obligations payable under the Secured Note Indenture as of the Commencement Date,  and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

(c)    *Treatment*:  Pursuant to the Global Settlement set forth in Section 5.2, and subject to, and in accordance with, Section 5.16 below, on the Effective Date, each holder of an Allowed Secured Note Claim shall be entitled to receive, in full and final satisfaction of such Allowed Secured Note Claim, its Pro Rata share of the Secured Noteholder Common Stock Distribution; provided that if (i) the Global Settlement is not approved by a Final Order or (ii) either the Class of General Unsecured Trade Claims or the Class of Other General Unsecured Claims does not vote to accept the

17

Plan, the Secured Noteholder Common Stock Distribution shall increase to 100% of the New Common Stock (subject to dilution by the Management Incentive Plan).

(d)       *Voting*:  Class 3 is Impaired, and holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

4.4.       ***Unsecured Note Claims (Class 4).***

(a)       *Classification*:  Class 4 consists of Allowed Unsecured Note Claims.

(b)       *Allowance*:  The Allowed Unsecured Note Claims are Allowed in the amount of $161,097,076.61, plus accrued but unpaid interest through the Commencement Date and any other amounts and obligations payable under the Unsecured Note Indenture as of the Commencement Date,  and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

(c)       *Treatment*:  Pursuant to the Global Settlement set forth in Section 5.2 and subject to, and in accordance with, Section 5.16 below, on the Effective Date, each holder of an Allowed Unsecured Note Claim shall be entitled to receive, in full and final satisfaction of such Allowed Unsecured Note Claim, its Pro Rata share of the Unsecured Noteholder Common Stock Distribution and the New Warrants; provided that holders of Allowed Unsecured Note Claims shall receive the foregoing Pro Rata distributions if the Global Settlement is approved or the following conditions occur:

(i)       the holders of Allowed Class 4 Unsecured Note Claims vote to accept the Plan; and

(ii)       each sub-class of Class 5 General Unsecured Trade Claims and Class 6 Other General Unsecured Claims votes to accept the Plan.

In the event the Bankruptcy Court determines that the Global Settlement cannot be approved and each of the foregoing conditions has not been satisfied, holders of Allowed Unsecured Note Claims shall not receive or retain any property under the Plan.

(d)       *Voting*:  Class 4 is Impaired, and holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

4.5.       ***General Unsecured Trade Claims (Class 5).***

(a)       *Classification*:   Class 5 consists of Allowed General Unsecured Trade Claims.

(b)       *Treatment*:   Except to the extent a holder of an Allowed General Unsecured Trade Claim has agreed to less favorable treatment or has been paid prior to the Effective Date, including pursuant to any Final Order, each holder of an Allowed General Unsecured Trade Claim shall receive its Pro Rata share of the Trade Claim Distribution, in Cash, in full and final satisfaction of such holder's Allowed General Unsecured Trade Claim on the following distribution schedule: (i) ten percent (10%) payable on the Effective Date or as soon as practicable thereafter; (ii) forty-five percent (45%) payable one year after the Effective Date; and (iii) forty-five percent (45%) payable two years after the Effective Date; provided that any holder of an Allowed General Unsecured Trade Claim that enters

18

into an agreement with the Debtors (or the Reorganized Debtors, as applicable) to extend Customary Trade Terms shall receive its Pro Rata share of the Trade Claim Distribution and, in addition, its Pro Rata share of the Additional Trade Claim Distribution on the same schedule set forth above in this Section 4.5(b).

(c)    *Voting*:  Class 5 is Impaired, and holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

4.6.    ***Other General Unsecured Claims (Class 6).***

(a)    *Classification*:  Class 6 consists of Allowed Other General Unsecured Claims.

(b)    *Treatment*:  Except to the extent a holder of an Allowed Other General Unsecured Claim has agreed to less favorable treatment, on the Effective Date or as soon thereafter as is reasonably practicable, each holder of an Allowed Other General Unsecured Claim shall receive the following treatment:

(i)    for any sub-class of Other General Unsecured Claims that votes to accept the Plan of any individual Debtor, each holder of an Allowed Other General Unsecured Claim in such accepting sub-class shall receive its Pro Rata share of the General Unsecured Claim Distribution; and

(ii)   in the event any sub-class of Other General Unsecured Claims votes to reject the Plan with respect to any individual Debtor, the holders of Allowed Other General Unsecured Claims in such a rejecting sub-class shall not receive or retain any property under the Plan on account of such Claims, including, for the avoidance of doubt, any Pro Rata share of the General Unsecured Claim Distribution.  For the avoidance of doubt, to the extent any sub-class of Other General Unsecured Claims votes to reject the Plan and, therefore, is not entitled to receive any portion of the General Unsecured Claim Distribution, such Pro Rata portion attributable to the rejecting sub-class shall be reallocated to the holders of Other General Unsecured Claims in other sub-classes that have voted to accept the Plan.

(c)    *Voting*:  Class 6 is Impaired, and holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

4.7.    ***Intercompany Claims (Class 7).***

(a)    *Classification*:  Class 7 consists of Allowed Intercompany Claims.

(b)    *Treatment*:  On the Effective Date or as soon thereafter as is practicable, the Intercompany Claims may be extinguished or compromised by distribution, contribution or otherwise, or Reinstated, at the discretion of the Debtors or the Reorganized Debtors, as the case may be, on or after the Effective Date; <u>provided</u> that all Intercompany Claims held by Chassix against Diversified Machine, Inc. (whether or not represented by a note) shall be contributed by Chassix to the capital of Diversified Machine, Inc. in accordance with Section 5.16 of the Plan.

19

(c)      *Voting*:  Class 7 is Unimpaired, and the holders of Class 7 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

4.8.    ***Intercompany Interests (Class 8).***

(a)      *Classification*: Class 8 consists of Intercompany Interests.

(b)      *Treatment*:  The Intercompany Interests will be Unimpaired under the Plan.

(c)      *Voting*:  Class 8 is Unimpaired, and the holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

4.9.    ***Subordinated Securities Claims (Class 9).***

(a)      *Classification*: Class 9 consists of Subordinated Securities Claims.

(b)      *Treatment*:  The holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Claims.

(c)      *Voting*:  Class 9 is Impaired by the Plan, and the holders of the Subordinated Securities Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Plan.

4.10.    ***Existing Chassix Holdings Equity Interests (Class 10)***

(a)      *Classification*: Class 10 consists of Existing Chassix Holdings Equity Interests.

(b)      *Treatment*:  On the Effective Date, all Existing Chassix Holdings Equity Interests, including all equity, warrants, common stock, and preferred stock, shall be cancelled.

(c)      Class 10 is Impaired by the Plan, and the holder of Existing Chassix Holdings Equity Interests is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the holder of Existing Chassix Holdings Equity Interests is not entitled to vote to accept or reject the Plan.

## SECTION 5.    MEANS FOR IMPLEMENTATION.

5.1.    ***Compromise and Settlement of Claims, Interests, and Controversies.***

Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, Causes of Action, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made on account of such Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, Causes of Action, and controversies, including without limitation, approval of the Restructuring Support Agreement, the Global Settlement, and the

20

Accommodation Agreements, as well as a finding by the Bankruptcy Court that such compromise or settlement is within the range of reasonableness, in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair and equitable.  In accordance with the provisions of the Plan, pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, prior to the Effective Date, the Debtors, subject to the reasonable consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, and after the Effective Date, the Reorganized Debtors, may compromise and settle Claims against the Debtors or the Reorganized Debtors, as applicable.

### 5.2.    *Global Settlement*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the substantial contribution and value provided by the Consenting Unsecured Noteholders and Platinum Equity, the Plan incorporates a compromise and settlement of numerous Debtor-creditor and inter-creditor issues, in the form of the Global Settlement, designed to achieve an economic settlement of such issues and potential Claims and Causes of Action against the Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the following compromises or settlements that comprise the Global Settlement, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are within the range of reasonableness, in the best interests of the Debtors, their Estates, their creditors, and other parties-in-interests, and are fair and equitable.  Each provision of the Global Settlement shall be deemed non-severable from each other and from the remaining terms of the Plan.  As set forth in detail herein, the Global Settlement shall be implemented as follows:

(a)    *Platinum Equity.*    On the Effective Date, in full and complete compromise and settlement of any claim that Platinum Equity may assert against the Debtors, the Reorganized Debtors or the Consenting Noteholders, and in consideration of the substantial contribution provided by Platinum Equity to the Debtors' Chapter 11 Cases in the form of, among other things, Platinum Equity's management, consulting and advisory services leading up to and during the Chapter 11 Cases, its agreement to take, or not take, certain actions that could impact the tax attributes of the Reorganized Debtors, its assistance in securing favorable pricing and accommodation terms and conditions for the Debtors in connection with the Chapter 11 Cases, and its participation in prepetition negotiations that facilitated a speedy and consensual Restructuring for the Debtors, Platinum Equity and all Released Parties related thereto shall receive a release pursuant to Sections 10.6 and 10.7 below pursuant to the Global Settlement.

(b)    *Consenting Unsecured Noteholders*.    On the Effective Date, in full and complete compromise and settlement of any claim that the Consenting Unsecured Noteholders may hold against the Debtors, the Reorganized Debtors, Platinum Equity and any Released Parties related thereto, or the Consenting Secured Noteholders, and in consideration of the substantial contribution provided by the Consenting Unsecured Noteholders to the Debtors' Chapter 11 Cases in the form of, among other things, the Consenting Unsecured Noteholders' cooperation in the Debtors' restructuring efforts, the Consenting Unsecured Noteholders' assistance and contribution in prepetition negotiations with the OEM Customers, the contribution by certain of the Consenting Unsecured Noteholders, as DIP Lenders, in the form of the DIP Term Loan, and generally their participation in prepetition negotiations that facilitated a speedy and consensual restructuring for the Debtors, each holder of an Allowed Unsecured Note Claim shall receive its Pro Rata distribution of the Unsecured Noteholder Common Stock Distribution and New Warrants pursuant to the Global Settlement.

21

5.3.      ***Actions of Dharma Holding Corporation and Triomphe Intermediate Holding Corporation***

On and after the Effective Date, Platinum Equity agrees to (A) waive or cause to be waived any stock loss in respect of the stock of UC Holdings and Chassix Holdings pursuant to Treasury regulation § 1.1502-36, and any comparable provision of state or local income tax law, to the extent directed by the Reorganized Debtors, (B) not take, or cause to be taken, any other action that would reduce, limit or otherwise adversely affect the U.S. federal income tax attributes of the Reorganized Debtors, except as consistent with past practice, general cash management, or short term prudent investment, and (C) cooperate with the Reorganized Debtors in connection with any group tax return filings, audits and proceedings with respect to taxable years ending on or prior to, or including, the Effective Date (including jointly managing such filings and proceedings, and not compromising any audit or proceeding without the Reorganized Debtors' consent, such consent not to be unreasonably withheld), provided that reasonable expenses incurred by Platinum Equity at the request of the Reorganized Debtors in connection with this clause (C) shall be borne by the Reorganized Debtors.

5.4.      ***Cancellation of Existing Securities and Agreements.***

Except as expressly provided herein, on the Effective Date, all notes, instruments, certificates evidencing debt of or interests in, the Debtors, including, without limitation, all obligations related to or arising out of the DIP Facilities, the Secured Notes Indenture, the Prepetition Revolving ABL Facility, and the Unsecured Note Indenture shall be cancelled and obligations of the Debtors and the Reorganized Debtors thereunder shall be discharged.

Notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date, the Secured Note Indenture and the Unsecured Note Indenture shall continue in effect solely for purposes of: (a) enabling holders of Allowed Class 3 Secured Note Claims and Allowed Class 4 Unsecured Note Claims to receive distributions under the Plan; and (b) allowing the Secured Note Indenture Trustee and Unsecured Note Indenture Trustee to make distributions under the Plan; provided that nothing in this section shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order or the Plan or result in any liability or expense to the Reorganized Debtors.

5.5.      ***Corporate Structure.***

On the Effective Date, except as set forth in Section 5.16 below, all Interests, including all equity, common stock, warrants, and preferred stock, in Chassix Holdings shall be cancelled and extinguished and Chassix Holdings shall be dissolved in accordance with Section 5.17 of the Plan. The equity in the Subsidiary Reorganized Debtors shall be restored.

5.6.      ***Authorization and Issuance of Plan Securities.***

(a)      *Authorization.* The Debtors, the Reorganized Debtors, and Reorganized UC Holdings, as applicable, are authorized to issue all plan-related securities and documents, including, without limitation, the New Common Stock and, to the extent applicable, the New Warrants, and any options or entitlements to purchase such plan-related securities, without the need for any further corporate, partnership, or limited liability company action.

(b)      *New Common Stock.* On the Effective Date, subject to securities, tax and other relevant considerations and Section 5.16, the New Common Stock shall be distributed in accordance with the Plan.

WEIL:\95270840\1\35076.0003

(c)    *New Warrants.*  On the Effective Date, and subject to the satisfaction of the conditions set forth in Section 4.4(c), the New Warrants will be issued pursuant to the terms of the New Warrant Agreement.

(d)    *Shareholders Agreement.*  Any direct or beneficial recipient of the New Common Stock (including New Common Stock issued pursuant to the exercise of New Warrants, if applicable), including all parties to whom such recipients may sell their New Common Stock in the future and all persons who purchase or acquire such equity in future transactions, shall be party to, or shall be deemed to be bound by, the Shareholders Agreement, the terms of which shall govern Reorganized UC Holdings.

5.7.    **Section 1145 Exemption.**

The issuance and distribution under the Plan of the New Common Stock and the New Warrants, if applicable, shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code or, to the extent the exemption under section 1145(a) of the Bankruptcy Code is not available to any particular recipient, under Section 4(a)(2) and/or Regulation D of the Securities Act of 1933 and/or any other applicable exemptions without further act or action by any Person.

In addition, under section 1145 of the Bankruptcy Code, any Securities issued under the Plan which are exempt from such registration pursuant to section 1145(a) of the Bankruptcy Code will be freely tradable by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (2) compliance with any rules and regulations of the Securities and Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (3) the restrictions, if any, on the transferability of such Securities and instruments; and (4) applicable regulatory approval.

5.8.    **Exit Financing.**

(a)    *Exit Facilities.*  On the Effective Date, the Revolving DIP Facility will be paid in full, in Cash, with the proceeds of, the Revolving Exit Facility with terms and conditions to be negotiated that shall be acceptable to the Debtors and the Required Consenting Noteholders.  On the Effective Date, the DIP Term Loan will be converted into, or paid in full, in Cash, with proceeds of, the Exit Term Loan.

(b)    *Documentation.*  On the Effective Date, documentation evidencing the Revolving Exit Facility and the Exit Term Loan shall be executed and delivered, and the Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Revolving Exit Facility and the Exit Term Loan without the need for any further corporate action or any notice to or order of the Bankruptcy Court and without further action by the holders of Claims or Interests or any other Person.

(c)    *Liens/Security Interests.*    All Liens and security interests granted pursuant to the Exit Facilities are intended to be, and shall be (i) valid, binding, perfected, enforceable, Liens, and security interests in the personal and real property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law and (ii) not subject to avoidance, recharacterization, or subordination under any applicable law.

WEIL:\95270840\1\35076.0003

5.9.    *Intercreditor Agreement.*

Lien priority and enforcement rights with respect to collateral between and among the lenders under the Revolving Exit Facility and the Exit Term Loan, shall be governed by the Intercreditor Agreement on terms to be negotiated.

5.10.    *Reorganized Debtors.*

(a)    *Amended Organizational Documents.*  The Amended Organizational Documents shall comply with section 1123(a)(6) of the Bankruptcy Code and shall otherwise be in form and substance satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  The Amended Organizational Documents shall provide, among other things, that Reorganized UC Holdings, and each of the Subsidiary Reorganized Debtors are privately held companies.

(b)    *Board of Directors of Reorganized UC Holdings.*  As of the Effective Date, the term of the current members of the board of UC Holdings shall expire without further action by any person.  The initial directors of the New Board shall consist of five (5) members selected by the Consenting Noteholders and may include at least one member of the Debtors' executive management team.  The members of the New Board will be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.

(c)    *Directors and Officers of the Reorganized Debtors.*  Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date shall serve as the initial officers of each of the respective Reorganized Debtors on or after the Effective Date and in accordance with any employment agreement with the Reorganized Debtors and applicable non-bankruptcy law.  After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.  The members of the board of directors and the board of managing members for each of the Reorganized Debtors (other than Reorganized UC Holdings as provided above) shall be determined as set forth in the Amended Organizational Documents and disclosed as required pursuant to section 1129(a)(5) of the Bankruptcy Code.

(d)    *Capital Structure.*  From and after the Effective Date, subject to the rights of the stockholders to amend the Amended Organizational Documents, including the Certificate of Incorporation of Reorganized UC Holdings, each of the Reorganized Debtors shall have one class of issued and outstanding common stock.

5.11.    *Bristol Facility*

The Reorganized Debtors shall, on the Effective Date, continue to own and operate the Bristol Facility and shall, without any further notice to or action, order, or approval of the Bankruptcy Court, be authorized to implement any necessary restructuring transactions in connection therewith, provided that the Debtors or the Reorganized Debtors, as the case may be, are authorized, with the consent of the Required Consenting Noteholders, to enter into a transaction pursuant to which the Debtors or the Reorganized Debtors sell the Bristol Facility as long as such a sale transaction does not adversely affect the treatment of any creditor or equity stakeholder under the Plan and is sold for aggregate consideration acceptable to the Debtors and the Required Consenting Noteholders.  Any sale of the Bristol Facility shall be made pursuant to section 1123(a)(5)(D) of the Bankruptcy Code and shall be subject to higher and better offers pursuant to bidding procedures approved by the Bankruptcy Court;

24

provided that the sale of the Bristol Facility shall not be a condition precedent to the Effective Date and such sale may not be consummated any earlier than the Effective Date.

5.12.    ***Cancellation of Liens.***

Except as otherwise specifically provided herein, upon the occurrence of the Effective Date, any Lien securing any Secured Claim shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

5.13.    ***Management Employment Matters.***

On the Effective Date, the applicable Reorganized Debtors shall enter into new employment agreements with certain members of the management team and shall implement the Management Incentive Plan which shall provide for the issuance of New Common Stock, in options or restricted units/equity, to management, directors, and employees of the Reorganized Debtors to incentivize their senior management teams.

5.14.    ***Withholding and Reporting Requirements.***

(a)    *Withholding Rights*.    In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case that a distribution of New Common Stock, New Warrants, or other non-Cash property is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms*.    Any party entitled to receive any property (including Cash) as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Reorganized Debtors (which entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or Form W-8, as applicable, unless such Person is exempt under the Tax Code and so notifies the Disbursing Agent.  If such request is made by the Reorganized Debtors, the Disbursing Agent, or such other Person designated by the Reorganized Debtors and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

25

5.15.   ***Exemption From Certain Transfer Taxes.***

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with this Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under this Plan or the reinvesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in this Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of collateral under the Exit Facilities and (e) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

5.16.   ***Restructuring Transactions; Further Transactions.***

On or prior to the Effective Date, the following Restructuring Transactions shall be effectuated in the following order:

(a)   All Intercompany Claims held by Chassix against Diversified Machine, Inc. (whether or not represented by a note) shall be contributed by Chassix to the capital of Diversified Machine, Inc.;

(b)   The Amended Organizational Documents of the Reorganized Debtors shall become effective;

(c)   New Common Stock shall be issued and contributed by Reorganized UC Holdings to Reorganized Chassix in an amount of shares sufficient to satisfy the Secured Noteholder Common Stock Distribution under Section 4.3 of the Plan;

(d)   The Existing UC Holdings Equity Interests held by Chassix Holdings shall be recapitalized into an amount of shares of New Common Stock and New Warrants, if applicable, sufficient to satisfy the Unsecured Noteholder Common Stock Distribution under Section 4.4;

(e)   Concurrently, (i) Chassix Holdings shall transfer to the Unsecured Noteholders, in accordance with Sections 4.4 and 5.2 of the Plan, shares of New Common Stock sufficient to satisfy the Unsecured Noteholder Common Stock Distribution and New Warrants, if applicable, and (ii) Reorganized Chassix shall distribute to the Secured Noteholders in satisfaction and discharge of their Allowed Secured Note Claims, such New Common Stock in accordance with Section 4.3 of the Plan; and

(f)   All Interests in Chassix Holdings shall be cancelled and extinguished in accordance with Section 5.4 and Chassix Holdings shall be dissolved in accordance with Section 5.17 below.

26

On the Effective Date or as soon as practicable thereafter, the Reorganized Debtors may (i) cause any or all of the Subsidiary Reorganized Debtors to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, (iii) use the proceeds of the Exit Term Loan and Revolving Exit Facility, plus Cash on hand, to pay all Restructuring Expenses, (iv) change the name of one or more of the Reorganized Debtors to such name that may be determined in accordance with applicable law, and (v) engage in any other transaction in furtherance of the Plan, including for tax efficiency reasons; <u>provided</u> that such transactions are not inconsistent with the above Restructuring Transactions or the other terms of the Plan.  Subject to the prior written consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, any such transactions may be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders, members, general or limited partners, or directors of any of the Debtors or the Debtors in Possession.

### 5.17.    *Dissolution of Chassix Holdings.*

On the Effective Date, upon the consummation of the Restructuring Transactions and all other Effective Date distributions and transactions in furtherance of the Plan, Chassix Holdings shall file with the Office of the Secretary of State of Delaware a certificate of dissolution which may be executed by an officer of Chassix Holdings without the necessity of the approval of the board of directors of Chassix Holdings or the holders of Interests in Chassix Holdings, and upon such filing shall be deemed dissolved for all purposes and without the necessity of any other action by Chassix Holdings.  From and after the Effective Date, Chassix Holdings shall not be required to file any documents, or take any other action or receive any approval to withdraw business operations in any state in which Chassix Holdings previously conducted its business operations.  To the extent that any of the foregoing is inconsistent or in conflict with any preexisting organizational or related documents of Chassix Holdings, such documents are deemed amended by the Plan to permit and authorize Chassix Holdings to take the contemplated actions.

### 5.18.    *Effectuating Documents.*

On and after the Effective Date, the Reorganized Debtors and the managers, officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### 5.19.    *Closing of the Chapter 11 Cases.*

After an Estate has been fully administered, the Reorganized Debtors shall promptly seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

## SECTION 6.    DISTRIBUTIONS.

### 6.1.    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the Claims register shall be closed and there shall be no further changes in the record holders of any Claims or Interests.  The Debtors

or the Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.   Other than Claims that are expressly permitted by a Final Order or under the Plan to be filed after the Distribution Record Date, the Debtors or the Reorganized Debtors, as applicable, shall have no obligation to recognize any Claims filed from and after the Distribution Record Date.

### 6.2.    *Date of Distributions.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 6.3.    *Timing of Distributions.*

Except as otherwise provided herein, the Disbursing Agent shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date.  Thereafter, the Disbursing Agent shall from time to time determine the subsequent Distribution Dates, which shall occur no less frequently than semi-annually.

### 6.4.    *Disbursing Agent.*

All distributions hereunder shall be made by Reorganized Chassix (or such other entity designated by Reorganized Chassix), as Disbursing Agent[s], on or after the Effective Date or as otherwise provided herein; provided that the Secured Note Indenture Trustee shall, subject to an acceptable agreements with the Debtors or Reorganized Chassix, serve as Disbursing Agent for Allowed Class 3 Secured Note Claims and the Unsecured Note Indenture Trustee shall serve as Disbursing Agent for Allowed Class 4 Unsecured Note Claims.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable fees and expenses incurred by such Disbursing Agents shall be reimbursed by the Reorganized Debtors.

### 6.5.    *Powers of Disbursing Agent.*

A Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (b) make all distributions contemplated hereby and (c) exercise such other powers as may be vested in a Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by such Disbursing Agent to be necessary and proper to implement the provisions hereof.

### 6.6.    *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders of Allowed Claims.  In the event that any distribution to any holder is returned as undeliverable, no further distributions shall be made to such holder unless and until such Disbursing Agent is notified in writing of such holder's then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter.   Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts back to the Debtors or Reorganized Debtors, as applicable, and shall not be supplemented with any interest, dividends or other accruals of any kind.   Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy

WEIL:\95270840\1\35076.0003

Code at the expiration of 180 days from the date of distribution.  After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

### 6.7. *Manner of Payment Under Plan.*

At the option of the Debtors or the Reorganized Debtors, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

### 6.8. *Fractional Stock.*

If any distributions of New Common Stock or New Warrants pursuant to the Plan would result in the issuance of a fractional share of New Common Stock or New Warrants, then the number of shares of New Common Stock or New Warrants to be issued in respect of such distribution shall be calculated to one decimal place and rounded up or down to the closest whole share (with a half share rounded up).  The total number of shares of New Common Stock or New Warrants to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in this paragraph.

### 6.9. *Minimum Cash Distributions.*

The Disbursing Agent shall not be required to make any Initial Distribution or semi-annual distribution of Cash less than $50 to any holder of an Allowed General Unsecured Claim; provided that, if any distribution is not made pursuant to this Section 6.9, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.  The Disbursing Agent shall not be required to make any final distributions of Cash less than $25 to any holder of an Allowed Claim.  If either (a) all Allowed General Unsecured Claims (other than those whose distributions are deemed undeliverable hereunder) have been paid in full or (b) the amount of any final distributions to holders of Allowed General Unsecured Claims would be $25 or less and the aggregate amount of cash available for distributions to holders of Allowed General Unsecured Claims is less than $25,000, then no further distribution shall be made by the Disbursing Agent and any surplus Cash shall be donated and distributed to an I.R.C. § 501(c)(3) tax-exempt organization selected by the Disbursing Agent.

### 6.10. *Setoffs.*

The Debtors and the Reorganized Debtors may, but shall not be required to, set off against any Claim, any claims of any nature whatsoever that the applicable Debtor or Reorganized Debtor may have against the holder of such Claim; *provided, that* neither the failure to do so nor the allowance of any Claim shall constitute a waiver or release by the applicable Debtor or Reorganized Debtor.

### 6.11. *Distributions After Effective Date.*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.12. *Allocation of Distributions Between Principal and Interest.*

Except as otherwise provided in this Plan, to the extent that any Allowed Secured Note Claim, Allowed Unsecured Note Claim, Allowed General Unsecured Trade Claim or Allowed Other

General Unsecured Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

**SECTION 7.     PROCEDURES FOR DISPUTED CLAIMS.**

7.1.     ***Allowance of Claims.***

After the Effective Date, the Reorganized Debtors shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under this Plan.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

7.2.     ***Objections to Claims.***

As of the Effective Date, objections to, and requests for estimation of, Claims against the Debtors may be interposed and prosecuted only by the Reorganized Debtors.  Such objections and requests for estimation shall be served and filed (a) on or before the 180th day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended, or (b) such later date as ordered by the Bankruptcy Court.

7.3.     ***Estimation of Claims.***

The Debtors or Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtors, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

7.4.     ***No Distributions Pending Allowance.***

If an objection to a Claim is filed as set forth in Section 7.2, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.  Cash in the amount of such Disputed Claims shall be reserved by the Debtors but shall not be held in a segregated account.

WEIL:\95270840\1\35076.0003

7.5.    ***Distributions After Allowance.***

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan on the next Distribution Date after the date that such Disputed Claim becomes an Allowed Claim (whether by Final Order of the Bankruptcy Court or otherwise).    Holders of Disputed Claims that ultimately become Allowed Claims shall not be entitled to payment of interest unless otherwise provided herein, in a Final Order, or required under applicable bankruptcy law.

7.6.    ***Resolution of Claims.***

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.

7.7.    ***Disallowed Claims.***

All Claims held by persons or entities against whom or which any of the Debtors or Reorganized Debtors has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code shall be deemed "disallowed" claims pursuant to section 502(d) of the Bankruptcy Code and holders of such claims shall not be entitled to vote to accept or reject the Plan.   Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtors or the Reorganized Debtors from such party have been paid.

## SECTION 8.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

8.1.    ***General Treatment.***

Effective as of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties are hereby assumed, except for an executory contract or unexpired lease that (a) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (b) is specifically designated as a contract or unexpired lease to be rejected on the Schedule of Rejected Contracts or is otherwise expressly rejected pursuant to the Plan, (c) is the subject of a separate (i) assumption motion filed by the Debtors (with the reasonable consent of the Required Consenting Noteholders) or (ii) rejection motion filed by the Debtors (with the reasonable consent of the Required Consenting Noteholders) under section 365 of the Bankruptcy Code prior to the Confirmation Date, or (e) is the subject of a pending objection regarding assumption, Cure, or "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code or other issues related to assumption of the contract or lease) (each such objection, a "***Cure Dispute***").

8.2.    ***Determination of Cure Disputes and Deemed Consent.***

The Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts and shall serve, within 14 days of the commencement of the Confirmation Hearing, a notice on parties to executory contracts or unexpired leases to be assumed reflecting the Debtors' intention to assume the contract or lease in connection with this Plan and, where applicable, setting forth the proposed cure amount (if any).   The proposed cure amount for any executory contract or unexpired lease not listed on the schedule shall be $0.   Any such schedule of executory contracts to be assumed and the proposed cure amounts contained therein shall be reasonably acceptable to the Required Consenting Noteholders.

31

To the extent that a Cure Dispute is asserted in an objection filed within fifteen (15) days of service of notice of intent to assume, and properly served on the Debtors, such Cure Dispute shall be scheduled for a hearing by the Bankruptcy Court.  Following resolution of a Cure Dispute by Final Order of the Bankruptcy Court, the applicable contract or lease shall be deemed assumed effective as of the Effective Date, provided that the Debtors reserve the right to reject any contract or lease following entry of a Final Order of the Bankruptcy Court resolving the applicable Cure Dispute by filing a notice indicating such rejection within three (3) Business Days of the entry of such Final Order.

To the extent that an objection is not timely filed and properly served on the Debtors with respect to a Cure Dispute, then the counterparty to the applicable contract or lease shall be deemed to have assented to (a) the Cure amount proposed by the Debtors and (b) the assumption of such contract or lease, notwithstanding any provision thereof that (i) prohibits, restricts or conditions the transfer or assignment of such contract or lease, or (ii) terminates or permits the termination of a contract as a result of any direct or indirect transfer or assignment of the rights of the Debtor under such contract or a change in the ownership or control as contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminated or modifying such contract on account of transactions contemplated by the Plan.

### 8.3.    *Payments Related to Assumption of Contracts and Leases.*

Subject to resolution of any Cure Dispute, any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as the case may be, upon assumption thereof.

Assumption and assignment of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption and/or assignment.   Any proofs of claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other entity.

### 8.4.    *Rejection.*

In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective estates, properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors no later than thirty (30) days after the later of (1) the Confirmation Date or (2) the effective date of the rejection of such executory contract or unexpired lease.  Any such Claims, to the extent Allowed, shall be classified as Class 6 Other General Unsecured Claims.  The Confirmation Order shall constitute the Bankruptcy Court's approval of the rejection of all the leases and contracts identified in the schedule of rejected contracts.

### 8.5.    *Survival of the Debtors' Indemnification Obligations.*

Any obligations of the Debtors pursuant to their corporate charters, bylaws, organizational documents or otherwise (including, without limitation, any applicable indemnification

32

agreements) to indemnify current officers, directors, agents and/or employees with respect to all present and future actions or omissions, suits and proceedings against the Debtors or such directors, officers, agents and/or employees, based upon any act or omission occurring at or prior to the Effective Date for or on behalf of the Debtors shall not be discharged or impaired by confirmation of the Plan or the occurrence of the Effective Date, provided that, for the avoidance of doubt, the Reorganized Debtors shall indemnify officers and directors of the Debtors for any claims or Causes of Action to the fullest extent provided by law pursuant to their respective Amended Organizational Documents and such documents shall not be amended or altered in any way that may diminish or impair the rights of the parties or beneficiaries thereunder that exist or existed as of the Effective Date; provided further that no director shall be indemnified with respect to the issuance of the Unsecured Notes, the use of their proceeds and any events related thereto. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including, without limitation, the "tail policy") in effect as of the Commencement Date, and any directors and officers of the Debtors who served in such capacity at any time before or after the Commencement Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

### 8.6.    *Compensation and Benefit Plans*.

Except as otherwise herein provided, all material employee compensation and Benefit Plans of the Debtors in effect as of the Effective Date shall be deemed to be, and shall be treated as if they were, executory contracts that are to be assumed under the Plan.

### 8.7.    *Insurance Policies*.

All insurance policies pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Reorganized Debtors and shall continue in full force and effect. All other insurance policies shall revest in the Reorganized Debtors. Furthermore, the discharge and release of the Debtors as provided in this Plan, and the re-vesting of property in the Reorganized Debtors, shall not diminish nor impair the enforceability of any insurance policies that may cover Claims against any Debtor or other person or entity.

### 8.8.    *Intellectual Property Licenses and Agreements*.

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the applicable Reorganized Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected hereunder or pursuant to a Final Order, or is the subject of a separate rejection motion filed by the Reorganized Debtors. Unless otherwise provided herein, all other intellectual property contracts, licenses, royalties, or other similar agreements shall revest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such revesting as contemplated herein.

8.9.    ***Reservation of Rights.***

Neither the exclusion nor inclusion of any contract or lease on any exhibit, schedule or annex to the Plan or the Plan Supplement, including the Schedule of Assumed Contracts or the Schedule of Rejected Contracts, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that any of the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

Nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## SECTION 9.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.

9.1.    ***Conditions Precedent to Confirmation.***

The occurrence of Confirmation is subject to the following conditions precedent:

(a)    the entry of the Disclosure Statement Order;

(b)    the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable;

(c)    the Bankruptcy Court shall have entered the Confirmation Order;

(d)    the Restructuring Support Agreement shall not have been terminated, and shall be in full force and effect;

(e)    the Accommodation Agreements shall not have been terminated, and shall be in full force and effect; and

(f)    the DIP Facilities shall not have been terminated and shall be in full force and effect.

9.2.    ***Conditions Precedent to the Effective Date.***

The occurrence of the Effective Date is subject to the following conditions precedent:

(a)    the Definitive Documents shall contain terms and conditions consistent in all material respects with this Plan and the Restructuring Support Agreement and shall otherwise be reasonably satisfactory in all respects to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable;

34

(b)        all actions, documents and agreements necessary to implement and consummate the Plan, including, without limitation, entry into the Definitive Documents, and the Amended Organizational Documents, each in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, and the transactions and other matters contemplated thereby, shall have been effected or executed;

(c)        the Debtors shall enter into the Exit Facilities and the conditions precedent to funding under the Exit Facilities shall have been satisfied or waived;

(d)        subject to Section 12.5 below, any amendments, modifications, or supplements to the Plan (including the Plan Supplement), if any, shall be reasonably acceptable to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable;

(e)        the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred and the Confirmation Order shall not have been stayed, rescinded, vacated or reversed on appeal;

(f)        the Restructuring Support Agreement shall not have been terminated, and shall be in full force and effect;

(g)        the Accommodation Agreements shall not have been terminated, and shall be in full force and effect;

(h)        all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

(i)        all reasonable fees and expenses (including attorney's fees and fees for other retained professionals, advisors and consultants) of the Consenting Noteholders, Platinum Equity, the DIP Agents, and the agents under the Exit Facilities incurred in connection with the Chapter 11 Cases, the negotiation and formulation of the Plan, DIP Facilities and Exit Facilities and related documents, and all transactions set forth herein or necessary to implement and consummate the Plan (whether incurred before or after the Commencement Date) shall have been paid; and

(j)        all conditions precedent listed in (a)-(i) herein occurring prior to July 31, 2015.

9.3.    ***Waiver of Conditions Precedent.***

Each of the conditions precedent in Sections 9.1 and 9.2 may be waived in writing by the Debtors together with the prior written consent of the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

WEIL:\95270840\1\35076.0003

9.4. *Effect of Non-Occurrence of Effective Date.*

If the conditions listed in Sections 9.1 and 9.2 are not satisfied or waived in accordance with this Section 9, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person or (c) constitute an admission, acknowledgement, offer or undertaking by the Debtors, any of the other Restructuring Support Parties, or any other Person.

## SECTION 10.  EFFECT OF CONFIRMATION.

10.1. *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

10.2. *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates, including without limitation, the intellectual property licenses and other agreements referenced above in Section 8.8, shall vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided pursuant to this Plan, the Confirmation Order, or the Exit Facilities.  The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if no cases were ever filed under any chapter or provision of the Bankruptcy Code, except as provided herein.

10.3. *Discharge of Claims and Termination of Interests.*

Except as otherwise provided herein, effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such claims from and after the Commencement Date, against the Debtors or any of their assets, property or estates; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Persons shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns and their assets and properties any other Claims and Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

10.4. *Term of Injunctions or Stays.*

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or

otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.5.    ***Injunction Against Interference with Plan.***

From and after the Effective Date, all Persons are permanently enjoined from commencing or continuing in any manner, whether directly, derivatively or otherwise, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, suit, judgment, damages, Cause of Action, interest, remedy, or liability whatsoever released or to be released pursuant to the Plan or the Confirmation Order.  For the avoidance of doubt, in connection with such injunction, all Persons are permanently enjoined from (i) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order of any kind whatsoever, (ii) creating, perfecting or enforcing any encumbrance of any kind, (iii) asserting any right of setoff, subrogation or recoupment of any kind, or (iv) commencing or continuing in any manner any action or proceeding of any kind on account of or in connection with or with respect to any claim, demand, liability, obligation, debt, right, suit, judgment, damages, Cause of Action, interest, remedy, or liability whatsoever released or to be released pursuant to the Plan or the Confirmation Order.

10.6.    ***Releases by the Debtors.***

**As of the Effective Date, except for the right to enforce the Plan and the Definitive Documents that remain in effect after the Effective Date, for good and valuable consideration, including, without limitation, the Released Parties' contributions to facilitating the Reorganization and implementing the Plan, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by the Debtors, their Estates and the Reorganized Debtors from (and the Debtors, their Estates, and the Reorganized Debtors are deemed to covenant with, and to, the Released Parties not to sue or otherwise seek recovery from the Released Parties on account of) any and all Claims, Interests, obligations, rights, suits, judgments, damages, Causes of Action (including, without limitation, under any state or federal securities laws), remedies and liabilities whatsoever, including, without limitation, any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, their Estates, or the Reorganized Debtors, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Restructuring, the Reorganized Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any other Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Support Agreement or related agreements, instruments or other documents, the solicitation of votes with respect to the Plan, or upon any other act or omission, transaction, agreement, event or other occurrence taking place from the beginning of time through the Effective Date; provided that no Released Party shall be released from any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto.**

37

10.7.    *Releases By Holders of Claims and Interests*.

**As of the Effective Date, except for the right to enforce the Plan and the Definitive Documents that remain in effect after the Effective Date and the indemnification obligations that survive the Effective Date, (a) each holder of a Claim or an Interest, other than any holder who both voted to reject the Plan and checked the opt out box on the applicable ballot indicating its wish to opt out of the release provisions set forth in this Section 10.7, and (b) each Released Party shall be deemed to have, conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Reorganized Debtors and the Released Parties from (and are deemed to have covenanted with the Reorganized Debtors and the Released Parties not to sue or otherwise seek recovery from the Reorganized Debtors or the Released Parties on account of) any and all Claims, Interests, obligations, rights, suits, judgments, damages, Causes of Action (including, without limitation, under any state or federal securities laws), remedies and liabilities whatsoever, including, without limitation, any derivative Claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any other Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Support Agreement or related agreements, instruments or other documents, the solicitation of votes with respect to the Plan, or upon any other act or omission, transaction, agreement, event or other occurrence taking place from the beginning of time through the Effective Date; <u>provided</u> that no Released Party shall be released from any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto.**

10.8.    *Exculpation*.

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, cause of action or liability for any claim in connection with or arising out of, the administration of the Chapter 11 Cases, the entry into the Restructuring Support Agreement and related documents and the consummation of the transactions contemplated therein, the negotiation and drafting of the Plan, the solicitation of votes for the Plan, or confirmation or the consummation of the Plan, the funding of the Plan, or the administration of the Plan or the property to be distributed under the Plan, the issuance of Securities under or in connection with the Plan, or any transactions, decisions, actions and/or inactions contemplated by or relating to any of the foregoing, except for willful misconduct or gross negligence, but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtors and the Reorganized Debtors (and each of their respective agents, directors, officers, employees, affiliates, advisors and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting the Exculpated Parties from liability.  Without limiting the generality of the foregoing, the Exculpated Parties shall be entitled to and

WEIL:\95270840\1\35076.0003

granted the protections and benefits of section 1125(e) of the Bankruptcy Code.  Pursuant to section 105 of the Bankruptcy Code, no holder or purported holder of an Administrative Claim, claim or Interest shall be permitted to commence or continue any Cause of Action, employment of process, or any act to collect, offset, or recover any claim against an Exculpated Party that accrued on or before the Effective Date and that has been released or waived pursuant to this Plan.

10.9.    *Retention of Causes of Action/Reservation of Rights.*

(a)    Except as otherwise provided herein, including Sections 10.6, 10.7 and 10.8, pursuant to section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their estates may hold against any person or entity without the approval of the Bankruptcy Court, including, without limitation, (i) any and all claims against any Person, to the extent such Person asserts a crossclaim, counterclaim and/or claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, their respective Estates, officers, directors or representatives; and (ii) the turnover of any property of the Estates; <u>provided</u> that the Reorganized Debtors shall not retain any claims or Causes of Action against the Released Parties (other than claims or Causes of Action arising out of or relating to any act or omission of a Released Party that (i) is a criminal act, or (ii) constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto, which claims or Causes of Action are hereby preserved).  The Reorganized Debtors or their successor(s) may pursue such retained claims, rights, or causes of action, suits or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

(b)    Except as otherwise provided herein, including Sections 10.6, 10.7 and 10.8, nothing contained herein or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff or other legal or equitable defense which the Debtors had immediately before the Commencement Date, against or with respect to any Claim left Unimpaired by the Plan; <u>provided</u> that the Reorganized Debtors shall not retain any claims or Causes of Action against the Released Parties (other than claims or Causes of Action arising out of or relating to any act or omission of a Released Party that (i) is a criminal act, or (ii) constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto, which claims or Causes of Action are hereby preserved).  The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses which they had immediately before the Commencement Date with respect to any Claim left Unimpaired by the Plan as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

10.10.    *Solicitation of the Plan.*

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and

WEIL:\95270840\1\35076.0003

therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

10.11.   ***Plan Supplement.***

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court by no later than the Plan Supplement Filing Date.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Documents to be included in the Plan Supplement will be posted at the website of the Debtors' notice, claims, and solicitation agent as they become available.  The Plan Supplement shall contain, among other things, substantially final forms of the Amended Organizational Documents, the Schedule of Assumed Contracts, the Schedule of Rejected Contracts, the Exit Term Loan, the Revolving Exit Facility, the Management Incentive Plan, the Shareholders Agreement, the New Warrant Agreement, and, to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code regarding members of the New Board.

10.12.   ***Corporate and Limited Liability Company Action.***

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) the assumption of the Benefit Plans of the Debtors as provided herein, (b) the selection of the managers, directors, and officers for the Reorganized Debtors, (c) the issuance and distribution of the New Common Stock, (d) the entry into the Revolving Exit Facility and the Exit Term Loan, (e) the approval of the Accommodation Agreements, and (f) the issuance and distribution of the New Warrants, and (g) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date), in each case in accordance with and subject to the terms hereof. All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtors, including (w) the Amended Organizational Documents, (x) the Exit Facilities, and (y) the Accommodation Agreements, and (z) any and all other agreements, documents, securities and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Section 10.12 shall be effective notwithstanding any requirements under non-bankruptcy law.

**SECTION 11.  RETENTION OF JURISDICTION.**

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)     to determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date;

(b)     to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(c)      to consider the allowance, classification, priority, compromise, estimation or payment of any Claim;

(d)      to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(e)      to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(f)      to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(g)      to hear and determine all applications under sections 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(h)      to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Plan Supplement, or the Confirmation Order or any agreement, instrument or other document governing or relating to any of the foregoing;

(i)      to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute and consummate the Plan or to maintain the integrity of the Plan following consummation;

(j)      to resolve any matters related to (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor or Reorganized Debtor is party or with respect to which a Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Section 8, any executory contracts or unexpired leases to the Schedule of Rejected Contracts or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(k)      to resolve disputes as to the ownership of any Claim or Interest;

(l)      to hear and determine any matter, case, controversy, suit, dispute, or Cause of Action (i) regarding the existence, nature, and scope of the discharge, releases, injunctions, and exculpation provided under the Plan, and (ii) enter such orders as may be necessary or appropriate to implement such discharge, releases, injunctions, exculpations, and other provisions;

(m)      to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)      to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

WEIL:\95270840\1\35076.0003

(o)    to adjudicate, decide, or resolve any Causes of Actions and Cure Disputes;

(p)    to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(q)    to resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid;

(r)    to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(s)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(t)    to enter a final decree closing the Chapter 11 Cases;

(u)    to recover all assets of the Debtors and property of the Estates, wherever located; and

(v)    to hear and determine any rights, Claims or causes of action held by or accruing to Reorganized Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

## SECTION 12.  MISCELLANEOUS PROVISIONS.

### 12.1.    *Payment of Statutory Fees*.

All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date, and by the Reorganized Debtors after the Effective Date until the Chapter 11 Cases are closed.

### 12.2.    *Substantial Consummation*.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 12.3.    *Dissolution of Creditors Committee*.

On the Effective Date, the Creditors Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; provided that the Creditors Committee shall exist, and its professionals shall be retained, after the Effective Date with respect to (a) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; and (b) pending appeals of the Confirmation Order, if any.

### 12.4.    *Request for Expedited Determination of Taxes*.

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods (or portions thereof) ending after the Commencement Date through the Effective Date.

42

12.5.    *Amendments*.

(a)    *Plan Modifications*.  The Plan may be amended, modified or supplemented by the Debtors or the Reorganized Debtors, as applicable, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code; *provided, that* such amendments, modifications, or supplements shall be satisfactory in all respects to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  In addition, after the Confirmation Date, the Debtors or the Reorganized Debtors, as applicable, may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

(b)    *Other Amendments*.  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; <u>provided</u> that such technical adjustments or modifications shall be satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

12.6.    *Revocation or Withdrawal of the Plan*.

The Debtors may not revoke or withdraw the Plan before the Effective Date without the consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable; <u>provided</u> that the Debtors may revoke or withdraw the Plan if such withdrawal is in the exercise of their fiduciary duty or otherwise permitted under the Restructuring Support Agreement.  If the Debtors take such action, the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed to be a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

12.7.    *Severability of Plan Provisions upon Confirmation*.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors (to be made only with the consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted; <u>provided</u> that any such alteration or interpretation shall be acceptable to the Debtors, the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be); and (3) nonseverable and mutually dependent.

WEIL:\95270840\1\35076.0003

12.8.    *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

12.9.    *Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

12.10.    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the documents contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, the Exculpated Parties and each of their respective successors and assigns.

12.11.    *Successor and Assigns.*

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

12.12.    *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

12.13.    *Notices.*

All notices, requests and demands to or upon the Reorganized Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)  if to the Reorganized Debtors:

Chassix, Inc.
300 Galleria Officecentre
Suite 501
Southfield, Michigan 48034
Facsimile: (248) 352-0241
Attn:  Bibi N. Di Serio, Esq.

- and -

44

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Ray C. Schrock, P.C.
       Marcia L. Goldstein, Esq.
       Matthew P. Goren, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

(b)  if to Platinum Equity:

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty St.
New York, New York 10005
Attn:    Dennis F. Dunne, Esq.
       Samuel A. Khalil, Esq.
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

(c)  if to the DIP ABL Agent:

Bodman PLC
1901 St. Antoine Street, 6th Floor at Ford Field
Detroit, Michigan 48226
Attn:    Robert J. Diehl, Jr., Esq.
Telephone: (313) 393-7597
Facsimile: (313) 393-7579

(d)  if to the DIP Term Agent:

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, Connecticut 06103
Attn:    Nathan Plotkin, Esq.
Telephone:  (860) 251-5320
Facsimile:  (860) 251-5212

(e)  if to the Consenting Noteholders:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attn:    Andrew N. Rosenberg, Esq.
       Alice Belisle Eaton, Esq.
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

WEIL:\95270840\1\35076.0003

(f)   if to the Exit Term Loan Lenders:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attn:    Andrew N. Rosenberg, Esq.
            Alice Belisle Eaton, Esq.
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

After the Effective Date, the Reorganized Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002 and to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to those Persons who have filed such renewed requests.

WEIL:\95270840\1\35076.0003

Dated:  March 12, 2015

New York, New York

Respectfully submitted,

Chassix Holdings and each of the Debtors

By: _____

Name:  J. Mark Allan
Title:    President

**Exhibit A**

**Accommodation Agreements**

**(without exhibits)**

**Exhibit B**

**Restructuring Support Agreement**

**(without exhibits)**

**<u>EXHIBIT B</u>**

**<u>PROPOSED DIP ORDER</u>**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                        :
In re                                   :    Chapter 11
                                        :
CHASSIX HOLDINGS, INC., *et al.*,       :    Case No. 15-_____ (___)
                                        :
                                        :    (Joint Administration Pending)
              Debtors.[1]               :
                                        :
---------------------------------------------------------x

### INTERIM ORDER AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e), (B) USE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (C) GRANT CERTAIN PROTECTIONS TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, AND 364, AND (D) SCHEDULE A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)

Upon the motion (the "**Motion**"), dated March 12, 2015, of Chassix Holdings, Inc. ("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**") and certain of their direct and indirect subsidiaries, each as debtor and debtor-in-possession (collectively, including Chassix Holdings and Chassix, the "**Debtors**"), in the above captioned chapter 11 cases (the "**Chapter 11 Cases**") pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Bankruptcy

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

Rules (the "**Local Rules**") for the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), seeking:

(1)     authority for the Debtors other than Chassix Holdings and UC Holdings, Inc. (collectively, the "**Borrowers**") to obtain postpetition financing consisting of (i) a senior secured non-amortizing asset based revolving credit facility in the principal amount of $150,000,000, including sub-facilities for swingline loans in an amount equal to $10,000,000 and letters of credit in an amount equal to $15,000,000 (the "**DIP ABL Facility**"), from PNC Bank, National Association, as Agent (in such capacity, the "**DIP ABL Agent**"), for itself or, if it elects to syndicate the loan, for a syndicate of banks, financial institutions and other institutional lenders (collectively, the "**DIP ABL Lenders**") and (ii) a senior secured non-amortizing new money term loan credit facility in the aggregate principal amount of $100,000,000 (the "**DIP Term Loan Facility**," and together with the DIP ABL Facility, the "**DIP Facilities**") from Cantor Fitzgerald Securities, as Agent (in such capacity, the "**DIP Term Loan Agent**" and together with the DIP ABL Agent, the "**DIP Agents**") for a syndicate of Prepetition Secured Noteholders (as defined below and such group, the "**DIP Term Loan Lenders**" and together with the DIP ABL Lenders, the "**DIP Lenders**");

(2)     authority for Debtor Chassix Holdings together with Debtor UC Holdings, Inc. ("**UC Holdings**") and each direct or indirect subsidiary of UC Holdings that is a guarantor (collectively, the "**DIP Loan Parties**") under (i) that certain Secured Notes Indenture (as amended or modified from time to time, the "**Prepetition Secured Indenture**") between Chassix and U.S. Bank National

2

Association ("**U.S. Bank**"), as trustee (in such capacity, the "**Prepetition Indenture Trustee**"), dated July 23, 2013, and (ii) that certain Amended and Restated Loan, Security and Guaranty Agreement (as amended or modified from time to time, the "**Prepetition ABL Credit Agreement**") among UC Holdings, the Borrowers, BMO Harris Bank N.A. ("**BMO**"), as agent (in such capacity, the "**Prepetition ABL Agent**") and the lenders from time to time party thereto (the "**Prepetition ABL Lenders**"), dated July 23, 2013, to guarantee on a secured basis the Borrowers' obligations in respect of the DIP Facilities;[2]

(3)      authority for the Borrowers to execute and enter into the DIP Documents (as defined below) and to perform all such other and further acts as may be necessary or appropriate in connection with the DIP Documents;

(4)      authority for the Borrowers to immediately use proceeds of the DIP ABL Facility and proceeds of the DIP Term Loan Facility upon entry of this interim order (the "**Interim Order**"), in order to refinance in full the indebtedness outstanding under the Prepetition ABL Credit Agreement, including the cash collateralization of all outstanding letters of credit or letters of credit guaranties thereunder and any interest accrued through the date of discharge, and, upon such discharge, receive the simultaneous release and termination of the Prepetition

---

[2] Chassix Holdings is not initially a guarantor of the DIP ABL Facility.  Within 30 days after the closing of the DIP ABL Facility, Debtors shall cause Chassix Holdings to deliver to the DIP ABL Agent such customer identification information as the DIP ABL Agent shall require in order to comply with CIP regulations, and upon the DIP ABL Agent's satisfactory review of the same, at the DIP ABL Agent's option, shall cause Chassix Holdings to become a guarantor by execution of a joinder to the DIP ABL Credit Agreement.  To the extent that Chassix Holdings, at the option of the DIP ABL Agent, does not become a guarantor under the DIP ABL Credit Agreement, the provisions of the DIP Orders adversely impacting Chassix Holdings or requiring or directing Chassix Holdings to take certain actions or incur certain obligations shall be of no force and effect, and Chassix Holdings will not be considered a DIP Loan Party with respect to the DIP ABL Facility.

3

ABL Lenders' liens, claims and encumbrances in accordance with this Interim Order, and provide working capital to the Debtors;

(5)     authority for the Debtors to (i) use the Cash Collateral (as defined below) pursuant to sections 361, 362 and 363 of the Bankruptcy Code, and all other Prepetition Collateral (as defined below), in each case in accordance with the relative priorities set forth more fully below, but subject in all respects to the Carve Out (as defined below), and (ii) provide adequate protection on the terms set forth in this Interim Order to (a) those purchasers and holders of 9 1/4% Senior Secured Notes due 2018 (the "**Prepetition Secured Notes**") issued by Chassix under the Prepetition Secured Indenture, whose liens and security interests are being primed by the DIP Facilities, and (b) the Prepetition ABL Agent and the Prepetition ABL Lenders in respect of contingent obligations that comprise a portion of the unpaid amounts of the Prepetition ABL Debt (as defined below);

(6)     approval of the intercreditor arrangements (the "**Intercreditor Arrangements**") set forth in **Exhibit "1"** annexed to this Interim Order as among the DIP ABL Facility, the DIP Term Loan Facility and the Prepetition Secured Indenture with respect to the DIP ABL Priority Collateral (as defined below) and the DIP Term Loan Priority Collateral (as defined below), and other property of the Debtors, if any, on which a lien is granted pursuant to the DIP Documents and this Interim Order (collectively, the "**DIP Collateral**");

(7)     the granting of *pari passu* superpriority claims under section 364(c)(1) of the Bankruptcy Code to the DIP Lenders payable from, and having recourse to, all

4

prepetition and postpetition property of the Debtors' chapter 11 estates and all proceeds thereof (including, subject only to and effective upon entry of the Final Order (as defined below), any Avoidance Proceeds (as defined below)), subject to the Carve Out (as defined below) and the terms of this Interim Order;

(8)      subject only to and effective upon entry of the Final Order, the limitation of the Debtors' right to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(9)      modification of the automatic stay set forth in section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the DIP Documents and this Interim Order;

(10)     a waiver of any applicable stay with respect to the effectiveness and enforceability of this Interim Order (including under Bankruptcy Rule 6004); and

(11)     that the Bankruptcy Court schedule a final hearing (the "**Final Hearing**"), pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, to be held within 30 days of entry of this Interim Order to consider entry of an order granting the relief requested in the Motion on a final basis (the "**Final Order**").

The interim hearing on the Motion having been held on March 12, 2015 (the "**Interim Hearing**"); and based upon all of the pleadings filed with the Bankruptcy Court, the evidence presented at the Interim Hearing and the entire record herein; and there being no objections to the relief sought in the Motion that have not previously been withdrawn, waived, settled, or resolved; and the Bankruptcy Court having noted the appearance of all parties in interest; and it appearing that the relief requested in the Motion is in the best interests of the Debtors and the Debtors' estates and creditors; and the Debtors having provided notice of the

Motion as set forth in the Motion and it appearing that no further or other notice of the Motion need be given; and after due deliberation and consideration, and sufficient cause appearing therefor:

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED**, that:

(1)         *Jurisdiction*.  The Bankruptcy Court has core jurisdiction over the Chapter 11 Cases, the parties affected by the Motion, and the Debtors' property pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

(2)         *Notice*.  Notice of the Motion, the relief requested therein and the Interim Hearing was served by the Debtors on (i) the Office of the United States Trustee for Region 2 (the "**U.S. Trustee**"); (ii) the holders of the five largest secured claims against the Debtors (on a consolidated basis); (iii) the holders of the forty (40) largest unsecured claims against the Debtors (on a consolidated basis); (iv) the attorneys for BMO; (v) the attorneys for U.S. Bank National Association, as trustee under the Prepetition Secured Indenture; (vi) the attorneys for Delaware Trust Company, as successor trustee under the Unsecured Notes Indenture (defined below); (vii) the attorneys for the Informal Committee of  Noteholders; (viii) the attorneys for the DIP ABL Lenders; (ix) the attorneys for the DIP Term Loan Lenders; (x) the OEM Customers; (xi) the attorneys for Platinum Equity Advisors, LLC; (xii) the Securities and Exchange Commission; (xiii) the Internal Revenue Service; and (xiv) the United States Attorney's Office for the Southern District of New York (collectively, the "**Notice Parties**"). Under the circumstances, the notice given by the Debtors of the interim relief requested in the Motion and of the Interim Hearing constitutes due and sufficient notice thereof and complies

6

with Bankruptcy Rules 4001(b) and (c) and 9014, and Local Rule 4001-2, and no further notice of the relief sought at the Interim Hearing is necessary or required.

(3)        *Creditors' Committee Formation*.   No statutory committee of unsecured creditors has yet been appointed in any of these Chapter 11 Cases (the "**Creditors Committee**").

(4)        *Debtors' Stipulations*.   Without prejudice to the rights of any other party (but subject to the limitations contained in paragraph 25 below), the Debtors admit, stipulate, and agree that:

(a)        as of the commencement of the Debtors' Chapter 11 Cases on March 12, 2015 (the "**Commencement Date**"), the Debtors were indebted and liable to the Prepetition ABL Lenders  and to the holders of the Prepetition Secured Notes (the "**Prepetition Secured Noteholders**") as follows:

(i)        to the Prepetition ABL Agent and the Prepetition ABL Lenders, without objection, defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $135,000,000, in respect of loans and advances made and the cash collateralization of all outstanding letters of credit or letters of credit guaranties thereunder, plus, unliquidated amounts including interest thereon and fees, expenses, charges and other obligations incurred in connection therewith as provided under the Prepetition ABL Credit Agreement (the "**Prepetition ABL Debt**");

(ii)        the Borrowers' obligations under the Prepetition ABL Credit Agreement are guaranteed by UC Holdings and certain of its direct and indirect subsidiaries (collectively, the "**Prepetition Loan Parties**"), and the Prepetition ABL Credit Agreement is, subject to certain exclusions described in the Prepetition ABL Credit Agreement, secured by a first-priority lien on substantially all existing and future accounts receivable,

7

inventory, cash, deposit accounts, investments in cash and cash equivalents, and other permitted investments, letter of credit rights relating to inventory and the accounts receivable of the Prepetition Loan Parties and all proceeds of the foregoing (collectively, the "**Prepetition ABL Priority Collateral**").  Subject to certain exclusions described in the Prepetition ABL Credit Agreement, the Prepetition ABL Credit Agreement is also secured by a second-priority lien on substantially all real estate assets, intellectual property, equipment, capital stock (limited in the case of  any foreign subsidiaries, to 65% of the voting stock of the Debtors' first tier foreign subsidiaries) and certain other collateral of the Prepetition Loan Parties other than the Prepetition ABL Priority Collateral (collectively, the "**Notes Priority Collateral**" and together with the Prepetition ABL Priority Collateral, the "**Prepetition Collateral**," and such liens and security interests, collectively the "**Prepetition ABL Security Interests**").   The Prepetition ABL Security Interests (i) are valid, binding, perfected, enforceable liens and security interests in the Prepetition Collateral, (ii) are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(iii)    to the Prepetition Secured Noteholders, without objection, defense, counterclaim or offset of any kind, in the aggregate principal amount of $375,000,000, plus accrued and unpaid interest thereon, fees, expenses (including, without limitation, any attorneys', accountants', appraisers', and financial advisors' fees that are chargeable or reimbursable under the Prepetition Secured Indenture and related documents or pursuant to existing engagement letters as of the Commencement Date with certain Prepetition Secured Noteholders in connection with transactions contemplated hereby), charges and other obligations incurred prior to the Commencement Date in respect of the Prepetition Secured Notes (the

8

"**Prepetition Secured Notes Debt**" and together with the Prepetition ABL Debt, the "**Prepetition Indebtedness**");

(iv)    the Prepetition Secured Notes Debt is guaranteed by the Prepetition Loan Parties and the Prepetition Secured Notes are secured by a first-priority lien on all Notes Priority Collateral and a second-priority lien on all Prepetition ABL Priority Collateral (collectively, the "**Notes Security Interests**" and together with the Prepetition ABL Security Interests, the "**Prepetition Security Interests**").   The Notes Security Interests (i) are valid, binding, perfected, enforceable liens and security interests in the Prepetition Collateral, (ii) are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iii) are subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve Out (as defined below) to which the DIP Liens are subject, and (C) valid, perfected and unavoidable liens permitted under the Prepetition Financing Documents (as defined below) to the extent such permitted liens are senior to or pari passu with the liens of the Prepetition Indenture Trustee and the Prepetition Secured Noteholders on the Prepetition Collateral;

(b)    the Prepetition Indebtedness constitutes the legal, valid, binding, non-avoidable and enforceable obligations of the Debtors, other than Chassix Holdings, and the Prepetition Security Interests are valid, binding, properly perfected, non-avoidable, and enforceable liens on and security interests in the Prepetition Collateral, subject to the terms set forth in that certain Intercreditor Agreement (the "**Prepetition Intercreditor Agreement**") between BMO, in its capacity as ABL Collateral Agent, and U.S. Bank, in its capacity as Notes Collateral Agent, dated July 23, 2013;

9

(c)     The Debtors' obligations under the Indenture (as amended or modified from time to time, the "**Unsecured Notes Indenture**") with Delaware Trust Company, as successor trustee, pursuant to which Chassix Holdings issued $150 million in aggregate principal amount of 10%/10.75% of Senior PIK Toggle Notes due 2018 (collectively with all other expenses, charges and other obligations incurred in connection therewith as provided under the Unsecured Notes Indenture, the "**Unsecured Notes Indebtedness**") constitutes the legal, valid, binding, and enforceable obligations of the Debtors and the other DIP Loan Parties.

(d)     the Prepetition Indebtedness and the Prepetition Security Interests are not and shall not be subject to any attachment, contest, attack, rejection, recoupment, reduction, defense, counterclaim, setoff, offset, recharacterization, avoidance or other claim (as "claim" is defined by section 101(5) of the Bankruptcy Code), impairment, disallowance, counterclaim, subordination (whether equitable, contractual, or otherwise, except for any lien subordination contemplated herein), cause of action or any other challenge of any nature under the Bankruptcy Code (including, without limitation, under chapter 5 of the Bankruptcy Code), under applicable nonbankruptcy law or otherwise (including, without limitation, any applicable state Uniform Fraudulent Transfer Act or Uniform Fraudulent Conveyance Act);

(e)     in accordance with the terms and conditions set forth in this Interim Order and the DIP Documents, a portion of the Debtors' initial draw under the DIP Facilities will be immediately used to discharge in full the non-contingent indebtedness outstanding under the Prepetition ABL Credit Agreement, including the cash collateralization of all outstanding letters of credit or letter of credit guarantees thereunder and any interest accrued through the date of discharge; and, subject to the terms and conditions herein (including, without limitation, the priming liens granted hereunder, the Carve Out, and expiration of the Challenge

10

Period (as defined below)), adequate protection replacement liens at any time granted to the Prepetition ABL Agent and the Prepetition ABL Lenders by the Bankruptcy Court shall, unless otherwise ordered by the Bankruptcy Court), (i) continue to secure the unpaid portion of any Prepetition ABL Debt (including, without limitation, any Prepetition ABL Debt subsequently reinstated after the repayment thereof because such payment (or any portion thereof) is required to be returned or repaid to the Debtors or the DIP Lenders and the liens securing the Prepetition ABL Debt shall have not been avoided), and (ii) be (A) junior and subordinate in all respects to the DIP Lenders' liens on and security interests in the DIP Collateral (as defined below and including, without limitation, the DIP Liens granted under this Interim Order and the DIP Documents), (B) senior in priority to the Adequate Protection Liens (as defined below) on the DIP ABL Priority Collateral granted to the Prepetition Indenture Trustee under this Interim Order and (C) junior in priority to the Adequate Protection Liens (as defined below) on the DIP Term Loan Priority Collateral  granted under this Interim Order to the Prepetition Indenture Trustee (collectively, such liens and security interests of the Prepetition Secured Parties are hereinafter referred to as the "**Contingent Adequate Protection Liens**")), and any such reinstated Prepetition ABL Debt described in clause (i) of this subparagraph is hereinafter referred to as the "**Contingent Prepetition ABL Debt**");

(f)        In the event that the Prepetition ABL Agent or any Prepetition ABL Lenders (each in their capacities as such) are ordered by the Bankruptcy Court to disgorge, refund or in any manner repay to the Debtors or their estates any amounts (the **"Disgorged Amounts"**) leading to Contingent Prepetition ABL Debt, the Disgorged Amounts, unless otherwise ordered by the Bankruptcy Court, shall be placed in a segregated interest bearing account in which the Prepetition ABL Agent (on behalf of the Prepetition ABL Lenders) shall

11

have the first lien upon, pending a further final, non-appealable order of a court of competent

jurisdiction regarding the distribution of such Disgorged Amounts (either returning the

Disgorged Amounts to the Prepetition ABL Agent and the Prepetition ABL Lenders, distributing

such amounts to the Debtors or otherwise); provided that, to the extent the Disgorged Amounts

are returned to the Prepetition ABL Agent or any Prepetition ABL Lender, they shall receive

such amounts plus any interest accrued at the non-default rate set forth in the Prepetition ABL

Credit Agreement;

(g)     none of the Prepetition ABL Agent, the Prepetition ABL Lenders,

the Prepetition Indenture Trustee, the Prepetition Secured Noteholders (collectively, the

"**Prepetition Secured Parties**"), the DIP Agents or the DIP Lenders are control persons or

insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with,

related to or arising from the Prepetition ABL Credit Agreement, the Prepetition Secured

Indenture, the Prepetition Intercreditor Agreement (collectively with all security, pledge and

guaranty agreements and all other documentation executed in connection with any of the

foregoing, each as amended, supplemented, or otherwise modified, the "**Prepetition Financing**

**Documents**"), or the DIP Documents;

(h)     the Debtors do not have any claims, challenges, counterclaims,

causes of action, defenses, recoupment, disgorgement, or setoff rights related to the Prepetition

Indebtedness or the Prepetition Financing Documents, whether arising under the Bankruptcy

Code or applicable nonbankruptcy law, on or prior to the date hereof, against the Prepetition

Secured Parties, and the Debtors waive, for themselves and their non-Debtor subsidiaries and

affiliates, any right to challenge or contest in any way the perfection, validity, and enforceability

12

of the Prepetition Security Interests or the validity or enforceability of the Prepetition Indebtedness and the Prepetition Financing Documents;

(i)      the liens granted to the DIP Agents on behalf of the DIP Lenders shall be valid, enforceable and non-avoidable liens against the Debtors and the DIP Loan Parties; and

(j)      subject to the reservation of rights set forth in paragraph 25 below, including the expiration of the Challenge Period, the Debtors and the DIP Loan Parties hereby absolutely and unconditionally forever waive, discharge and release each of the Prepetition ABL Agent, the Prepetition Indenture Trustee and the Prepetition Secured Parties and each of their respective present and former predecessors, successors, assigns, affiliates, members, partners, managers, current and former equity holders, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives thereof (all of the foregoing, solely in their respective capacities as such, collectively, the "**Prepetition Secured Party Releasees**") of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, actions, causes of action (including, without limitation, causes of action in the nature of "lender liability"), defenses, demands, debts, accounts, contracts, liabilities, setoff, recoupment or other offset rights against any and all of the Prepetition Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the applicable Prepetition Indebtedness, the Prepetition Security Interests, Prepetition Collateral or the debtor-creditor relationship among any of the applicable Prepetition ABL Agent, Prepetition Indenture Trustee or the Prepetition Secured Parties, on the one hand, and the Debtors, on the other hand, from the beginning of time until immediately preceding the entry of this Interim Order, including, without limitation, (i) any recharacterization, subordination, avoidance or other claim arising under or pursuant to section

13

105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law or municipal law and (ii) any right or basis to challenge or object to the amount, validity or enforceability of the applicable Prepetition Indebtedness or any payments made on account of the applicable Prepetition Indebtedness, or the validity, enforceability, priority or non-avoidability of the applicable Prepetition Security Interests securing the applicable Prepetition Indebtedness.

(k)    Effective upon entry of this Interim Order, the Debtors hereby absolutely and unconditionally forever waive, discharge and release each of the DIP Agents and the DIP Lenders and each of their respective present and former predecessors, successors, assigns, affiliates, members, partners, managers, current and former equity holders, agents, attorneys, financial advisors, consultants, officers, directors, employees and other representatives thereof (all of the foregoing, solely in their respective capacities as such, collectively, the "**DIP Party Releasees**") of any and all "claims" (as defined in the Bankruptcy Code), counterclaims, actions, causes of action (including, without limitation, causes of action in the nature of "lender liability"), defenses, demands, debts, accounts, contracts, liabilities, setoff, recoupment or other offset rights against any and all of the DIP Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the applicable DIP Obligations, DIP Liens, DIP Collateral or the debtor-creditor relationship among any of the applicable DIP ABL Agent, DIP Term Loan Agent, DIP ABL Lenders or the DIP Term Loan Lenders, on the one hand, and any of the Debtors, on the other hand, from the beginning of time until immediately preceding the entry of this Interim Order, including, without limitation, (i) any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law or

14

municipal law and (ii) any right or basis to challenge or object to the amount, validity or enforceability of the applicable DIP Obligations or any payments made on account of the applicable DIP Obligations, or the validity, enforceability, priority or non-avoidability of the applicable DIP Liens securing the applicable DIP Obligations; provided that, nothing herein shall relieve the DIP Party Releasees from fulfilling their obligations or commitments with the DIP Facilities or operate as a release related thereto.

(l)        In no event shall the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable.

(5)        *Cash Collateral*.  For purposes of this Interim Order, the term "**Cash Collateral**," including, without limitation, all cash proceeds of Prepetition Collateral, shall have the meaning ascribed in section 363(a) of the Bankruptcy Code.

(6)        *Use of Cash Collateral*.  The Debtors are hereby authorized, subject to the terms and conditions of the DIP Documents, this Interim Order,  and in accordance with the Budget and the 13-Week Projection (each defined below), to use the Cash Collateral, during the period from the Commencement Date through termination of the DIP Obligations pursuant to the DIP Documents, solely for working capital and general corporate purposes, including, without limitation, in connection with the Debtors' transfer of funds to their non-Debtor foreign subsidiaries if authorized under the Budget and the 13-Week Projection; provided that, and, upon the request of the Debtors, the Prepetition Secured Parties are directed to promptly turn over to the Debtors any and all Cash Collateral they may have received or may hold.  The Debtors' right to use the Cash Collateral shall terminate automatically, provided that, notwithstanding anything to the contrary herein or in the DIP ABL Credit Agreement, the DIP ABL Agent shall be

15

required to comply with the notice requirement in subsection (c) of this paragraph (6), on the earlier of:

(a)      the Scheduled Termination Date, as defined in the DIP ABL Credit Agreement (as defined below);

(b)      the Maturity Date, as defined in the DIP Term Loan Agreement (as defined below); and

(c)      the occurrence of an Event of Default under any DIP Documents; pursuant to which, either the DIP ABL Agent in respect of an Event of Default under the DIP ABL Credit Agreement or the DIP Term Loan Agent in respect of an Event of Default under the DIP Term Loan Agreement (as defined below), provides the Debtors, with a copy to the Debtors' counsel, five (5) days' prior written notice (which shall run concurrently with any notice provided under the applicable DIP Documents);

(7)      *Findings Regarding the DIP Facilities and Use of Cash Collateral.*

(a)      *Good Cause.*  Good cause has been shown for entry of this Interim Order.

(b)      The Debtors have an immediate need to obtain the financing provided under the DIP Facilities and use the Cash Collateral, in order to, among other things, permit the orderly continuation of their businesses, preserve the going concern value of the Debtors, maintain business relationships with vendors, suppliers and customers, to satisfy payroll obligations, to discharge in full the Prepetition ABL Debt, to make capital expenditures, to pay for certain costs and expenses related to the Debtors' Chapter 11 Cases, and to satisfy other working capital and operational needs of the Debtors.  The access of the Debtors to sufficient working capital and liquidity made available through the use of Cash Collateral, incurrence of

16

new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern value of the Debtors' estates and to a successful reorganization of the Debtors.

(c)    The Debtors are unable to obtain financing, under existing circumstances, on more favorable terms from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.    The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors (i) granting the DIP Lenders, subject to the Carve Out as provided for herein, the DIP Liens (as defined below) and the Superpriority Claims (as defined below), in each case on the terms and conditions set forth in this Interim Order and the DIP Documents, and (ii) discharging the Prepetition ABL Debt in full upon entry of this Interim Order, such discharge being a requirement by the DIP ABL Agent for the DIP ABL Facility (and absent discharging the Prepetition ABL Debt in full upon entry of the Interim Order, would be unable to obtain the consent of the Prepetition ABL Lenders to the provisions of this Interim Order).

(d)    The terms of the DIP Facilities and the use of the Cash Collateral pursuant to this Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, are appropriate under the circumstances, and constitute reasonably equivalent value and fair consideration.

(e)    The DIP Facilities have been negotiated in good faith and at arm's length among the Debtors, the DIP ABL Agent, the DIP Term Loan Agent, and the DIP Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of or in connection

17

with the DIP Facilities and the DIP Documents, including, without limitation, (i) all loans made

to, and all letters of credit issued for the account of the Debtors pursuant to that certain

Superpriority Secured Debtor-In-Possession ABL Loan, Security and Guaranty Agreement,

dated as of March 12, 2015 (as amended, supplemented, refinanced or otherwise modified from

time to time not in violation of this Interim Order) among the Debtors, the lenders from time to

time party thereto, the DIP ABL Agent and the other parties from time to time party thereto,

substantially in the form attached as **Exhibit "C"** to the Motion (the "**DIP ABL Credit**

**Agreement**"), (ii) all loans made to the Debtors pursuant to the Superpriority Secured Debtor-In-

Possession Term Loan, Security and Guaranty Agreement, dated as of March 12, 2015 (as

amended, supplemented, refinanced or otherwise modified from time to time not in violation of

this Interim Order) among the Debtors, the lenders from time to time party thereto, the DIP Term

Agent and the other parties from time to time party thereto, substantially in the form attached as

**Exhibit "D"** to the Motion (the "**DIP Term Loan Agreement**" and, together with the DIP ABL

Credit Agreement, including, in each case, any exhibits attached thereto and including, without

limitation, all security agreements, all related or ancillary documents and agreements, and any

mortgages contemplated thereby, the "**DIP Documents**"),   and (iii) any obligations and

indebtedness of the Debtors arising under or in connection with the DIP Documents and this

Interim Order now and hereafter owing to the DIP Agents or any DIP Lender (all of the

foregoing in clauses (i), (ii) and (iii) collectively, the "**DIP Obligations**"), shall be deemed to

have been extended by the DIP ABL Agent and the DIP ABL Lender in respect of the DIP ABL

Facility, and the DIP Term Loan Agent and the DIP Term Loan Lenders in respect of the DIP

Term Loan Facility, each in "good faith" as such term is used in section 364(e) of the

Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be

18

entitled to the full protection of section 364(e) of the Bankruptcy Code, in the event that this Interim Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.

(f)        Based upon the record before the Bankruptcy Court, the terms of the use of Cash Collateral and the adequate protection granted in this Interim Order have been negotiated at arms' length and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtors, their estates and creditors and are consistent with the Debtors' fiduciary duties.

(g)        *Discharge of the Prepetition ABL Debt.*   Immediately following the entry of this Interim Order and as part of the initial borrowing under the DIP Facilities, the Debtors shall be required to use a portion of the proceeds from the DIP ABL Facility and the DIP Term Loan Facility, in accordance with the DIP Documents and this Interim Order, to discharge in full the Prepetition ABL Debt then outstanding.  The Prepetition ABL Security Interests shall be automatically released and terminated upon such discharge.  The Prepetition ABL Agent shall deliver or cause to be delivered, at the Debtors' cost and expense, any termination statements, releases and/or assignments in favor of the DIP ABL Agent, the DIP ABL Lenders or other documents, in each case as reasonably requested by the Debtors or the DIP ABL Agent in order to effectuate and/or evidence the release and termination of the Prepetition ABL Security Interests.

(h)        The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001-2.  Absent granting the interim relief set forth in this Interim Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facilities and the use of the Cash Collateral

19

in accordance with this Interim Order and the DIP Documents are, therefore, in the best interest of the Debtors' estates.

(8)     *Superpriority Claims*.

(a)     Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority senior administrative expense claims against the Debtors (the "**Superpriority Claims**"), which Superpriority Claims in respect of the DIP ABL Facility and the DIP Term Loan Facility shall rank *pari passu* with each other, with priority (except in respect of the Carve Out) over any and all administrative expenses, adequate protection claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c) (subject to entry of a Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which Superpriority Claims shall be payable from and have recourse to all unencumbered property of the Debtors and their estates and all proceeds thereof.   Any payments, distributions or other proceeds received on account of such Superpriority Claims shall be promptly delivered to the applicable DIP Agent (on a *pari passu* basis) to be applied or further distributed by the applicable DIP Agent on account of the applicable DIP Obligations in such order as is specified in this Interim Order and the applicable DIP Documents.   The Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

20

(b)        For purposes hereof, the "**Carve Out**" shall mean an amount equal to the sum of: (i) all fees required to be paid to the clerk of the Bankruptcy Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses of up to $100,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) allowed and unpaid claims for unpaid fees, costs, and expenses (the "**Professional Fees**") incurred by persons or firms retained by the Debtors or the Creditors' Committee, if any, whose retention is approved by the Bankruptcy Court pursuant to section 327 and 1103 of the Bankruptcy Code (collectively, the "**Professional Persons**"), subject to the terms of this Interim Order, the Final Order and any other interim or other compensation order entered by the Bankruptcy Court that are incurred (A) at any time before or on the first business day following delivery by any DIP Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice (the "**Pre-Trigger Date Fees**"), subject to (x) a monthly cap of $50,000 (the "**Committee Monthly Cap**")  with respect to Professional Fees incurred by Professional Persons retained by a Creditors' Committee, if any, and (y) any limits by this Interim Order or the Final Order or otherwise on Professional Fees permitted to be incurred in connection with any permitted investigations of claims and defenses against any Prepetition Secured Parties pursuant to this Interim Order or the Final Order; and (B) after the first business day (the "**Trigger Date**") after the occurrence and during the continuance of an Event of Default (as defined in the DIP ABL Credit Agreement or the DIP Term Loan Agreement) and delivery of notice (the "**Carve Out Trigger Notice**") thereof (which may be by email) to the Debtors, the Debtors' counsel, the United States Trustee, and lead counsel for a Creditors' Committee, if any,

21

in an aggregate amount not to exceed $2,000,000 (the amount set forth in this clause (iii)(B) being the "**Post-Carve Out Trigger Notice Cap**" and together with the Committee Monthly Cap, the "**Carve Out Cap**"); <u>provided</u> that, nothing herein shall be construed to impair the ability of any party to the DIP Documents to object to the fees, expenses, reimbursement or compensation described in clauses (iii) and (iv) above, on any grounds.

(c)    The DIP ABL Agent may impose a reserve against the Borrowing Base (as defined in the DIP ABL Credit Agreement) in an amount equal to the estimated total amount of all items that comprise the Carve Out for the tenor of the case, including Professional Fees in an amount determined by the DIP ABL Agent in its sole discretion (the "**Carve Out Reserve**"). Initially, and without limiting the DIP ABL Agent's discretion to increase the Carve Out Reserve in its sole discretion, the Carve Out Reserve shall consist of the sum of (i) the Professional Fees and U.S. Trustee fees, each as set forth in the 13-Week Projection for the months of March and April 2015, (ii) $100,000 for fees and expenses of a Chapter 7 trustee; (iii) $250,000 reserve for legal fees and expenses incurred by the Prepetition ABL Agent (on behalf of the Prepetition ABL Lenders) in connection with its defense of any unsuccessful investigation, prosecution or cause of action commenced by the Creditors' Committee or a party-in-interest prior to the expiration of the Challenge Period, solely as it relates to the Prepetition ABL Agent and Prepetition ABL Lenders' Prepetition Security Interests (the "**Prepetition ABL Facility Reserve**"), and (iv) the Post-Carve Out Trigger Notice Cap, and on the 25th day of each month, commencing March 25, 2015, the Carve Out Reserve will be adjusted (x) to relieve any amounts which were previously subject to the Carve Out Reserve but which were subsequently paid, (y) to increase (or decrease) the Carve Out Reserve for the prior month's Professional Fees and U.S. Trustee fees based on actual billings and (z) to increase the Carve Out Reserve by the

22

amount of the Professional Fees and the U.S. Trustee fees set forth in the 13-Week Projection for the subsequent month.

(d)    For the avoidance of doubt and notwithstanding anything to the contrary herein or in the DIP Documents, except as otherwise set forth in paragraph 25 below, all liens and claims securing the DIP Facilities, the Superpriority Claims, and any adequate protection liens granted to any parties entitled thereto shall be subject to the Carve Out, it being understood and agreed that the Carve Out shall be allocated 100% against the DIP ABL Priority Collateral.

(e)    *Budget/13-Week Projection.*  Attached as **Exhibit "2"** hereto and incorporated by reference herein is the weekly statement of receipts and disbursements of the Debtors and their domestic subsidiaries on a consolidated basis for the 21 weeks commencing with the first week following the Commencement Date (the "**Budget**"), including (i) individual line items for "Cash Receipts", "Vendors", "Lease, rent and utilities", "Payroll and benefits", "Taxes", "Capital and tooling", "Funding to rest of world entities", "DIP fees and interest", "Professional fees", "U.S. Trustee fees", "Other", "Net Cash Inflow / (Outflow)" and (ii) the anticipated uses of the DIP Term Loan Facility and the DIP ABL Facility for such period, in form and substance reasonably satisfactory to the DIP ABL Lenders and the Majority Lenders; provided that, to the extent that payment in full in cash of all DIP Term Loan Obligations has not occurred within such 21-week period, the Debtors shall deliver to the DIP Agents an updated budget covering the period through the Maturity Date (as defined in the DIP Term Loan Credit Agreement), which shall be in the same form as the Budget and shall be reasonably satisfactory to the DIP ABL Lenders and the Majority Lenders (as defined in the DIP Term Loan Credit Agreement), and such updated budget shall become the "Budget" for all purposes under the DIP

23

Documents.  The Debtors shall also deliver to the DIP Agents no later than 5:00 p.m. on Friday

of each calendar week, commencing with the first such date following the Commencement Date,

(a) a projected statement of receipts and disbursements of the Debtors and their  consolidated

domestic subsidiaries on a weekly basis for the following 13 calendar weeks which shall be in

the same form as the Budget and shall be reasonably satisfactory to the DIP Agents (the "**13-

Week Projection**"); and (b) a variance report on a weekly basis setting forth (1) actual cash

receipts and disbursements for the week ending on the previous Friday, (2) all variances, on an

individual line item basis and an aggregate basis, as compared to the Budget and the previously

delivered 13-Week Projection on a weekly and cumulative basis, and (3) a certified explanation,

in reasonable detail, for any material variance (the "**Variance Report**").

## THE DIP ABL FACILITY

(9)        *Authorization of the DIP ABL Facility Documents and the DIP ABL*

*Facility*.

(a)        The Debtors are hereby authorized and directed to execute, deliver,

enter into, and perform all obligations under the DIP ABL Credit Agreement, and the DIP Loan

Parties are authorized to guarantee all of the Borrowers outstanding obligations under the DIP

ABL Credit Agreement (the "**DIP ABL Obligations**").

(b)        The Borrowers are hereby authorized to make an initial draw under

the DIP ABL Facility pursuant to the DIP ABL Credit Agreement, and the DIP Loan Parties are

hereby authorized to guaranty such borrowings of money and letters of credit, in an initial

aggregate principal amount of up to $125,000,000 of the DIP ABL Facility (subject to any

limitations on borrowings thereunder), in accordance with this Interim Order and the DIP ABL

Facility Documents (as defined below), which amount shall be used for all purposes permitted

24

under the DIP ABL Facility Documents, including, without limitation, a portion of which shall be used together with proceeds from the DIP Term Loan Facility to discharge in full the Prepetition ABL Debt, providing working capital for the Debtors, for other general corporate purposes and to pay interest, fees, and expenses in accordance with this Interim Order and the DIP ABL Facility Documents.

(c)      In furtherance of the foregoing and without further approval of the Bankruptcy Court, each Debtor is authorized and directed to perform, and is authorized and directed to cause the DIP Loan Parties to perform, all acts and to execute, deliver and perform all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages, and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP ABL Facility, including, without limitation:

(i)      the execution, delivery and performance of the DIP ABL Credit Agreement and any exhibits attached thereto, including, without limitation, all security agreements and all related or ancillary documents and agreements and any mortgages contemplated thereby (collectively, the "**DIP ABL Facility Documents**");

(ii)      the execution, delivery and performance of the guarantees by the DIP Loan Parties of the obligations of the Borrowers under the DIP ABL Facility Documents;

(iii)      the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP ABL Facility Documents, in each case in such form as the Debtors and the DIP ABL Agent may agree, and no further approval of the Bankruptcy Court shall be required for amendments, waivers, consents or

25

other modifications to and under the DIP ABL Facility Documents (and any reasonable fees paid in connection therewith) that do not (A) shorten the maturity or the scheduled termination date thereunder, or (B) increase the commitments, the rate of interest (other than invoking the default rate upon an Event of Default), or the letter of credit fees payable thereunder,

(iv)    the non-refundable payment to the DIP ABL Agent and the DIP ABL Lenders, as the case may be, of the reasonable fees and expenses set forth in the DIP ABL Facility Documents, including, without limitation, any upfront or backstop commitment, administrative, syndication or collateral agency fee, and the fees and expenses of the professionals retained as provided for in the DIP ABL Facility Documents, without the need to file retention motions or fee applications, or to provide notice to any party; and

(v)    the performance of all other acts required under or in connection with the DIP ABL Facility Documents.

(d)    Upon execution and delivery of the DIP ABL Facility Documents, the DIP ABL Facility Documents shall constitute valid, binding and unavoidable obligations of the Debtors and the DIP Loan Parties, enforceable against each Debtor and the other DIP Loan Parties in accordance with the terms of this Interim Order and the DIP ABL Facility Documents. No obligation, payment, transfer or grant of security under the DIP ABL Facility Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under chapter 5 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim or counterclaim.

26

(10)    *DIP ABL Facility Liens.*    As security for the DIP ABL Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP ABL Agent of any property, the following security interests and liens are hereby granted to the DIP ABL Agent, for its own benefit and the benefit of the DIP ABL Lenders, subject only to the Carve Out (all such liens and security interests granted to the DIP ABL Agent, for its benefit and for the benefit of the DIP ABL Lenders, pursuant to this Interim Order and the DIP Documents, the "**DIP ABL Facility Liens**"):

(a)    First Lien on DIP ABL Priority Collateral.    Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP ABL Agent, for the benefit of the DIP ABL Lenders, shall have a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in the prepetition and postpetition assets of the Debtors defined as DIP ABL Priority Collateral in the DIP ABL Credit Agreement (the "**DIP ABL Priority Collateral**"), which shall include, without limitation, the Debtors' existing and future accounts receivable, inventory, cash, deposit accounts, investments in cash and cash equivalents and other permitted investments (other than capital stock of subsidiaries), letter of credit rights relating to inventory, accounts receivable and all proceeds of the foregoing, subject only to validly perfected, enforceable and unavoidable liens, arising on or before the Commencement Date, that are expressly allowed to have priority by operation of statute or rule of law ("**Other Priority Liens**") (for clarity, the prepetition liens securing the Prepetition Indebtedness shall not constitute Other Priority Liens), provided that the DIP ABL Priority Collateral shall not include the identifiable cash proceeds of the DIP Term Loan Collateral (as defined below) that are held

27

in a segregated deposit account used only for the purposes of holding such proceeds. All of the

Debtors' claims, causes of action or other avoidance claims under sections 502(d), 544, 545, 547,

548, 549, 550 or 553 of the Bankruptcy Code, or any other avoidance actions under the

Bankruptcy Code (collectively, "**Avoidance Actions**") or any successful Avoidance Actions,

whether by judgment, settlement or otherwise shall not be considered  DIP ABL Priority

Collateral, but, subject only to and effective upon entry of the Final Order, any proceeds thereof

or property recovered, unencumbered or otherwise the subject of successful Avoidance Actions,

whether by judgment, settlement or otherwise ("**Avoidance Proceeds**") shall constitute DIP

ABL Priority Collateral, <u>provided</u> that, the lien on Avoidance Proceeds securing the DIP ABL

Obligations and the lien on Avoidance Proceeds securing the DIP Term Loan Obligations shall

rank *pari passu* with each other.

(11)    *Adequate Protection of Prepetition ABL Lenders*.  Until the indefeasible

discharge of the Prepetition ABL Debt (which shall be deemed to have occurred upon the

expiration of the Challenge Period (as defined below) if no adversary proceeding or contested

matter is timely and properly asserted, in accordance with paragraph 25 hereof, with respect to

the Prepetition ABL Debt or against the Prepetition ABL Agent or the Prepetition ABL Lenders

(in their capacities as such)), the Prepetition ABL Lenders are entitled, pursuant to sections 361,

363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interest in the

Prepetition Collateral, including the Cash Collateral, for and equal in amount to any aggregate

diminution in the value of the Prepetition ABL Lenders' interests in the Prepetition Collateral,

including, without limitation, any such diminution resulting from the sale, lease or use by the

Debtors (or other decline in value) of Cash Collateral and any other Prepetition Collateral, the

priming of the Prepetition ABL Agent's security interests and liens in the Prepetition Collateral

28

by the DIP Agent and the DIP Lenders pursuant to the DIP Documents and this Interim Order, the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Prepetition ABL Debt and the Contingent Prepetition ABL Debt.  As adequate protection, the Prepetition ABL Agent and the Prepetition ABL Lenders are hereby granted the following (collectively, the "**Prepetition ABL Adequate Protection Obligations**"):

(a)     Prepetition ABL Adequate Protection Liens.  The Prepetition ABL Agent (for itself and for the benefit of the Prepetition ABL Lenders) is hereby granted in the amount of diminution in value of the Prepetition ABL Lenders' interest in its Cash Collateral that results from the Debtors' use thereof and the amount of any Contingent Prepetition ABL Debt, a replacement security interest in and lien upon all of the DIP Collateral, subject and subordinate only to (i) the security interests and liens granted to (x) the DIP Agents for the benefit of the DIP Lenders, and (y) the Prepetition Secured Noteholders in respect of the DIP Term Loan Priority Collateral pursuant to this Interim Order and the DIP Documents and any liens on the DIP Collateral, (ii) the Carve Out, (iii) the Prepetition Secured Noteholders Adequate Protection Liens (as defined below), and (iv) Other Priority Liens (such liens securing the Prepetition ABL Adequate Protection Obligations, the "**Prepetition ABL Adequate Protection Liens**").  The Prepetition ABL Adequate Protection Liens shall secure (i) solely in the event that the Prepetition ABL Debt is not discharged as provided in this Interim Order, an amount equal to any diminution in value of the Prepetition ABL Lenders' interest in its Cash Collateral that results from the Debtor's use thereof, and (ii) the amount of any Contingent Prepetition ABL Debt.

(b)     In the event that the conditions precedent to the granting of the Prepetition ABL Adequate Protection Liens are satisfied, the Prepetition ABL Agent and the

29

Prepetition ABL Lenders are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the Prepetition ABL Adequate Protection Liens.   Whether or not the Prepetition ABL Agent and the Prepetition ABL Lenders shall, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Interim Order.

(c)     Prepetition ABL Sections 503(b) and 507(b) Claim.    The Prepetition ABL Agent, on behalf of itself and the Prepetition ABL Lenders, is hereby granted, subject to the Carve Out, a superpriority claim as provided for in sections 503(b) and 507(b) of the Bankruptcy Code for any remaining Prepetition ABL Debt and all Contingent Prepetition ABL Debt, immediately junior to the Superpriority Claims held by the DIP Agents and the DIP Lenders and senior to the superpriority claim held by the Prepetition Indenture Trustee and the Prepetition Secured Noteholders in respect of the DIP ABL Priority Collateral; provided that, unless otherwise expressly agreed to in writing by each DIP Agent, the Prepetition ABL Agent and the Prepetition ABL Lenders shall not receive or retain any payments, property or other amounts in respect of the superpriority claims under section 507(b) of the Bankruptcy Code granted hereunder or under the Prepetition ABL Credit Agreement unless and until the DIP Obligations have indefeasibly been paid in cash in full in accordance with the DIP Documents (the "**ABL Adequate Protection Claim**"); and provided further, that the Prepetition ABL

30

Lenders hereby irrevocably waive the section 503(b) claim granted to them by this Interim Order upon the expiration of the Challenge Period with no challenge having been brought or, if such a challenge is brought, upon the entry of a final judgment resolving such challenge in favor of the Prepetition ABL Lenders; and provided further, that unless the initial draw on the DIP ABL Facility and the DIP Term Loan Facility is used to discharge the outstanding Prepetition ABL Debt, as authorized and directed herein, no further borrowings under the DIP ABL Facility or the DIP Term Loan Facility shall be permitted (other than for other expenditures that the Debtors choose to pay simultaneously therewith or for other expenditures consented to by the Prepetition ABL Agent).

## THE DIP TERM LOAN FACILITY

(12)     *Authorization of the DIP Term Loan Documents and the DIP Term Loan Facility*.

(a)     The Debtors are hereby authorized and directed to execute, deliver, enter into, and perform all obligations under the DIP Term Loan Agreement and related documents, including, without limitation, any exhibits attached thereto, all security agreements, all guarantees, all related or ancillary documents and agreements, and any mortgages contemplated thereby, as hereafter amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, the "**DIP Term Loan Documents**"), and the DIP Loan Parties are authorized to guarantee all of the Borrowers' outstanding obligations under the DIP Term Loan Documents (the "**DIP Term Loan Obligations**").

(b)     The Borrowers are hereby authorized to borrow a portion of the DIP Term Loan Facility in an amount not to exceed an aggregate principal amount of up to

31

$80,000,000 (subject to any limitations on borrowings thereunder), in accordance with this Interim Order and the DIP Term Loan Documents, which amount shall be used solely for purposes permitted under the DIP Term Loan Documents, including, without limitation, discharging the Prepetition ABL Debt, providing working capital for the Debtors, and paying interest, fees, and expenses in accordance with this Interim Order and the DIP Term Loan Documents.

(c)    In furtherance of the foregoing and without further approval of the Bankruptcy Court, each Debtor is authorized and directed to perform, and is authorized and directed to cause the DIP Loan Parties to perform, all acts and to execute, deliver and perform all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages, and financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Term Loan Facility, including, without limitation:

(i)    the execution, delivery and performance of the DIP Term Loan Documents;

(ii)    the execution, delivery and performance of the guarantees by the DIP Loan Parties of the Borrowers' obligations under the DIP Term Loan Documents;

(iii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Term Loan Documents, in each case in such form as the Debtors and the DIP Term Loan Agent may agree, and no further approval of the Bankruptcy Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Term Loan Documents (and any reasonable fees paid in connection therewith) that do not (A) shorten the maturity of the extensions of credit

32

or scheduled termination date thereunder, (B) increase the commitments or the rate of interest payable thereunder;

(iv)    the non-refundable payment to the DIP Term Loan Agent and the DIP Term Loan Lenders, as the case may be, of the fees and any amounts due (or that may become due) in respect of the indemnification obligations in connection with the DIP Term Loan Documents and reasonable fees and expenses as may be due from time to time under the DIP Term Loan Documents, including, without limitation, any upfront or backstop commitment, administrative or collateral agency fee, and the fees and expenses of the professionals retained as provided for in the DIP Term Loan Documents, without the need to file retention motions or fee applications, or to provide notice to any party; and

(v)    the performance of all other acts required under or in connection with the DIP Term Loan Documents.

(d)    Upon execution and delivery of the DIP Term Loan Documents, the DIP Term Loan Documents shall constitute valid, binding and unavoidable obligations of the Debtors and the other DIP Loan Parties, enforceable against each Debtor and each DIP Loan Party in accordance with the terms of this Interim Order and the DIP Term Loan Documents.  No obligation, payment, transfer or grant of security under the DIP Term Loan Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under chapter 5 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim or counterclaim.

33

(13)    *DIP Term Loan Liens.*  As security for the DIP Term Loan Obligations, effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Term Loan Agent of any property, the following security interests and liens are hereby granted to the DIP Term Loan Agent, for its own benefit and the benefit of the DIP Term Loan Lenders (all property identified in clauses (a), (b), (c) and (d) below being collectively referred to as the "**DIP Term Loan Collateral**"), subject only to the payment of the Carve Out as provided for herein (all such liens and security interests granted to the DIP Term Loan Agent, for its benefit and for the benefit of the DIP Term Loan Lenders, pursuant to this Interim Order and the DIP Documents, the "**DIP Term Loan Liens**" and, together with the DIP ABL Liens, the "**DIP Liens**"):

(a)    First Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Term Loan Agent, for the benefit of the DIP Term Loan Lenders, shall have a valid, binding, continuing, enforceable, fully-perfected first-priority lien on, and security interest in, all tangible and intangible prepetition and postpetition property of the Debtors, whether existing on or as of the Commencement Date or otherwise thereafter acquired, including as a result of the discharge of the Prepetition ABL Debt, that is not subject to valid, perfected, non-avoidable and enforceable liens (collectively, the "**Unencumbered Property**"), including, without limitation, any and all cash and cash collateral of the Debtors (whether maintained with the DIP Term Loan Agent or otherwise) and any investment of such cash and cash collateral, general intangibles, intercompany loans, contracts, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit

34

accounts, patents, copyrights, trademarks, trade names, rights under license agreements and other intellectual property, all issued and outstanding capital stock of each subsidiaries, other rights to payment whether arising before or after the Commencement Date (including, without limitation, postpetition intercompany claims against the Debtors, the DIP Loan Parties and any non-Debtor affiliates), and the proceeds, product, offspring or profits of all of the foregoing, as set forth in the DIP Term Loan Documents, provided that, for the avoidance of doubt, the Unencumbered Property shall not include the DIP ABL Priority Collateral.

(b)    First Lien on DIP Term Loan Priority Collateral.    Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Term Loan Agent, for the benefit of the DIP Term Loan Lenders, shall have a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in all assets of the Debtors and the DIP Loan Parties that do not constitute the DIP ABL Priority Collateral (the "**DIP Term Loan Priority Collateral**"), subject to the Intercreditor Arrangements and any Other Priority Liens.    The DIP Term Loan Priority Collateral is also encumbered by a second-priority lien (junior to the DIP Term Loan Liens) held in favor of the Prepetition Indenture Trustee for the benefit of the Prepetition Secured Noteholders.

(c)    Priming Liens on Prepetition Collateral.    Pursuant to section 364(d)(1) of the Bankruptcy Code, the DIP Term Loan Agent, for the benefit of the DIP Term Loan Lenders, shall have a valid, binding, continuing, enforceable, fully-perfected first-priority senior priming lien on, and security interest upon all pre- and post-petition property of the Debtors and the DIP Loan Parties that constitutes DIP Term Loan Priority Collateral.    Such security interests and liens shall be senior in all respects to the interests in such property of the Prepetition Secured Parties arising from current and future liens of the Prepetition Secured

35

Parties (including, without limitation, adequate protection liens granted hereunder), but shall not be senior to any valid, perfected and unavoidable interest of other parties arising out of liens, if any on such property existing immediately prior to the Commencement Date.

(d)  Junior Liens on the DIP ABL Priority Collateral.  Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Term Loan Agent, for the benefit of the DIP Term Loan Lenders, shall have a valid, binding, continuing, enforceable, fully-perfected second-priority lien (junior to the DIP ABL Facility Liens) on, and security interest in, the DIP ABL Priority Collateral, subject only to the Intercreditor Arrangements and any Other Priority Liens. The DIP ABL Priority Collateral is also encumbered by a third-priority lien (junior to the DIP ABL Facility Liens and the DIP Term Loan Liens) held in favor of the Prepetition Indenture Trustee for the benefit of the Prepetition Secured Noteholders, subject to the Intercreditor Arrangements and any Other Priority Liens.

(e)  Notwithstanding the foregoing clauses (a), (b), (c) and (d) the DIP Term Loan Collateral under this Interim Order shall exclude Avoidance Actions, but, subject only to and effective upon entry of the Final Order, shall include Avoidance Proceeds, provided, however, that the lien on Avoidance Proceeds securing the DIP Term Loan Obligations and the lien on Avoidance Proceeds securing the DIP ABL Obligations shall rank *pari passu* with each other.

(14)  *Adequate Protection of Prepetition Secured Noteholders.*  The Prepetition Secured Noteholders are entitled, pursuant to sections 361, 363(e), 364(d)(1) and 507 of the Bankruptcy Code, to adequate protection of their interest in the Prepetition Collateral, including any Cash Collateral, for and equal in amount to any aggregate diminution in the value of the Prepetition Secured Noteholders' interests in the Prepetition Collateral, including, without

36

limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral, the Notes Priority Collateral, the ABL Priority Collateral, and any other Prepetition Collateral, the priming of the Prepetition Secured Noteholders' security interests and liens in the Prepetition Collateral by the DIP Agents and the DIP Lenders pursuant to the DIP Documents and this Interim Order and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.   As adequate protection, the Prepetition Indenture Trustee and the Prepetition Secured Noteholders are hereby granted the following (collectively, the "**Prepetition Secured Noteholders Adequate Protection Obligations**" and, together with the Prepetition ABL Adequate Protection Obligations, the "**Adequate Protection Obligations**"):

(a)    <u>Prepetition Secured Noteholder Adequate Protection Liens</u>. The Prepetition Indenture  Trustee, on behalf of itself and for the benefit of the Prepetition Secured Noteholders, is hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements), in the amount of such diminution, the following liens: (i) a second-priority lien on the DIP Term Loan Priority Collateral, junior to the lien and security interests granted to the DIP Term Loan Agent for the benefit of the DIP Term Loan Lenders and (ii) a fourth-priority lien on the DIP ABL Priority Collateral, junior to the lien and security interests granted to (x) the DIP ABL Agent for the benefit of the DIP ABL Lenders, (y) the DIP Term Loan Agent for the benefit of the DIP Term Loan Lenders and (z) the Prepetition ABL Adequate Protection Liens (such liens securing the Prepetition Secured Noteholders' Adequate Protection Obligations, collectively, the "**Prepetition Secured Noteholders Adequate Protection Liens**" and, together with the Prepetition Adequate Protection Liens and Contingent Adequate Protection Liens, the "**Adequate Protection Liens**").

37

The Prepetition Secured Noteholders Adequate Protection Liens shall also be junior in all respects to the Carve Out, any Other Priority Liens, and, solely in respect of the DIP ABL Priority Collateral, junior in all respects to the Contingent Adequate Protection Liens.

(b)    The Prepetition Indenture Trustee and the Prepetition Secured Noteholders are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the Prepetition Secured Noteholders Adequate Protection Liens.  Whether or not the Prepetition Indenture Trustee and the Prepetition Secured Noteholders shall, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the liens and security interests granted to them hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Interim Order.

(c)    The Debtors are authorized and directed under sections 361, 363 and 364 of the Bankruptcy Code to make adequate protection payments which shall include (a) ongoing payments, when due or as soon as practicable thereafter, of all reasonable and documented costs, fees and expenses incurred either prior to or after the Commencement Date of Paul, Weiss, Rifkind, Wharton & Garrison LLP, AlixPartners and, as reasonably agreed to by the Debtors and in accordance with the Budget,  other legal (foreign and domestic), environmental and industry advisors, each in its capacity as advisor, to the Informal Committee of Noteholders, and in each case, incurred in connection with the Debtors, the Chapter 11 Cases or the transactions contemplated hereby; and (b) continued maintenance and insurance of the

38

Prepetition Collateral and the DIP Collateral as required under the Prepetition Financing Documents and the DIP Documents (collectively, the "**Adequate Protection Payments**").

(15)    *Prepetition Secured Noteholders' Section 507(b) Claim.*  The Prepetition Indenture Trustee, on behalf of itself and the Prepetition Secured Noteholders, is hereby granted, subject to the Carve Out, a superpriority claim as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the Superpriority Claims held by the DIP Agents and the DIP Lenders; provided that, unless otherwise expressly agreed to in writing by the DIP Agents, the Prepetition Indenture Trustee and the Prepetition Secured Noteholders shall not receive or retain any payments, property or other amounts in respect of the superpriority claims granted hereunder or under the Prepetition Financing Documents unless and until the DIP Obligations have indefeasibly been paid in cash in full in accordance with the DIP Documents (the "**Prepetition Secured Noteholders Adequate Protection Claim**" and, together with the Prepetition ABL Adequate Protection Claim, the "**Adequate Protection Claims**").

(16)    *Sufficiency of Adequate Protection.*  Under the circumstances and given that the Adequate Protection Liens, the Adequate Protection Claims and the Adequate Protection Payments (collectively, the "**Adequate Protection Obligations**") are consistent with the Bankruptcy Code; the Bankruptcy Court finds that such adequate protection is reasonable and sufficient to protect the interests of the Prepetition Secured Parties.  Except as expressly provided herein, nothing contained in this Interim Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to any Prepetition Secured Party, the DIP Agents or any DIP Lenders including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract or repurchase agreement with a Debtor to assert rights of setoff or

39

other rights with respect thereto as permitted by law (or the right of a Debtor to contest such assertion).

(17)     *Limitation on Charging Expenses Against Collateral.*  Subject to and effective only upon entry of the Final Order, except to the extent of the Carve Out, no expenses of administration of these Chapter 11 Cases or any future proceeding that may result therefrom, including a case under Chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the DIP Agents and the DIP Lenders or the Prepetition Indenture Trustee and the Prepetition Secured Noteholders, as the case may be with respect to their respective interests, and no consent shall be implied from any action, inaction or acquiescence by the DIP Agents, the DIP Lenders, the Prepetition Indenture Trustee or the Prepetition Secured Noteholders.  In no event shall the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties be subject to (i) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral.

(18)     *Payment of Fees and Expenses.*  Except as set forth in this paragraph 18, no payments (including professional fees and expenses) with respect to the DIP Obligations or the Adequate Protection Obligations shall be subject to Bankruptcy Court approval or required to be maintained in accordance with the U.S. Trustee Guidelines, and no recipient of any such payments shall be required to file any interim or final fee applications with the Bankruptcy Court or otherwise seek Bankruptcy Court's approval of any such payments.

40

(19)    *Credit Bid.*  The DIP Agents, the DIP Lenders and the Prepetition Secured Parties, respectively, shall have the respective right to credit bid (in the case of the DIP Term Loan Obligations, with the consent of the Majority Lenders (as defined in the DIP Term Loan Agreement)) a portion of or all of their respective claims in connection with a sale of the Debtors' assets under section 363 of the Bankruptcy Code or under a plan of reorganization, unless the Bankruptcy Court, for cause, orders otherwise.  For the avoidance of doubt, no party other than the DIP ABL Agent may credit bid for any DIP ABL Priority Collateral unless the DIP ABL Obligations have been paid in full in cash.

(20)    *Protection of DIP Lenders' Rights.*

(a)    The automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified (and any stay of such vacation or modification under Bankruptcy Rule 4001(a)(3) is waived) without further order of the Bankruptcy Court to the extent necessary to permit the DIP Agents and the DIP Lenders to exercise all rights and remedies provided for in the DIP Documents and Interim Order without further order of or application or motion to the Bankruptcy Court, provided that, such rights and remedies that are exercisable only upon the occurrence of an Event of Default (as defined in the DIP Documents and as set forth in paragraph 23 of this Interim Order), but subject in all respects to the Carve Out Cap, shall require the applicable DIP Agent to give five (5) days' prior written notice (which five days' notice period (the "**Default Notice Period**") shall run concurrently with any notice provided under the DIP Documents) to the U.S. Trustee, the Debtors, the Prepetition Indenture Trustee, the Prepetition ABL Agent, the other DIP Agent, and the Creditors' Committee, if any, of such DIP Agent's intent to exercise such rights and remedies; provided that, the Debtors shall not have the right to contest the enforcement of the remedies set forth in this Interim Order and

41

the DIP Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth herein or in the applicable DIP Documents; and provided further that during the Default Notice Period, the Debtors shall have no authority to borrow under the respective DIP Facility unless the applicable DIP Agent otherwise consents with respect to its DIP Facility, and each DIP Agent may terminate its respective DIP Facility and declare the respective DIP Obligations to be immediately due and payable, and the Debtors' authority to use Cash Collateral shall be as set forth in the 13-Week Projection and limited solely to payment of expenses critical to preservation of the Debtors' estates and the payment of the fees, costs and expenses to administer these Chapter 11 Cases, as agreed by each respective DIP Agent in its sole discretion. The Debtors and the Prepetition Secured Parties shall waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Agents and the DIP Lenders set forth in this Interim Order and in the DIP Documents. For the avoidance of doubt, notwithstanding anything to the contrary in this Interim Order, immediately after the occurrence of a Triggering Event (as defined in the DIP ABL Credit Agreement), the DIP ABL Agent may place the Debtors on dominion of funds as provided in the DIP ABL Credit Agreement without the requirement of five days' prior written notice.

(b)    The DIP Agents' or any DIP Lender's delay or failure to exercise rights and remedies under the applicable DIP Documents or this Interim Order shall not constitute a waiver of such DIP Agent's or such DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents.

42

(c)        Except as otherwise expressly set forth in this Interim Order, the

Debtors irrevocably waive any right, without the prior written consent of the DIP Agents, (a) to

grant or impose, under section 364 of the Bankruptcy Code or otherwise, liens or security

interests in any DIP Collateral, whether senior, equal or subordinate to the DIP Agents' liens and

security interests; (b) to use, or seek to use, Cash Collateral or; (c) to modify or affect any of the

rights of the DIP Agents or the DIP Lenders under this Interim Order or the DIP Documents by

any plan of reorganization confirmed in these Chapter 11 Cases or subsequent order entered in

these Chapter 11 Cases.

(21)    *Perfection of DIP Liens.*

(a)        The DIP Agents and the DIP Lenders are hereby authorized, but

not required, to file or record (and to execute in the name of the Debtors, as its true and lawful

attorney, with full power of substitution, to the maximum extent permitted by law) financing

statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments

in any jurisdiction, or take possession of or control over deposit accounts and securities accounts

or any other asset, in each case, in order to validate and perfect the liens and security interests

granted to them in the DIP Documents and this Interim Order.  Whether or not the DIP Agents

on behalf of the respective DIP Lenders, each in their discretion, choose to file such financing

statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments,

or take possession of or control over deposit accounts and securities accounts or any other assets,

such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-

avoidable and not subject to challenge dispute or subordination, at the time and on the date of

entry of this Interim Order.  Upon the reasonable request of the DIP Agents, without any further

consent of any party, the DIP Agents, the Debtors, each DIP Lender and the Prepetition Secured

43

Parties are authorized and directed to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Agents to further perfect the DIP Liens.

(b)    A certified copy of this Interim Order may, in the discretion of the DIP Agents, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Interim Order for filing and recording. For the avoidance of doubt, the automatic stay provisions of section 362(a) of the Bankruptcy Code shall be modified (and any stay of such modification under Bankruptcy Rule 4001(a)(3) is waived) to the extent necessary to permit the DIP Agents to take all actions, as applicable, referenced in this subparagraph (b) and in the immediately preceding subparagraph (a).

(c)    Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other Collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the granting of post-petition liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Lenders in accordance with the terms of the DIP Documents or this Interim Order.

(22)    *Preservation of Rights Granted Under this Interim Order.*

(a)    Except as expressly provided herein or in the DIP Documents, no claim or lien having a priority senior to or *pari passu* with those granted by this Interim Order

44

and the DIP Documents to the DIP Agents, the DIP Lenders and the Prepetition Secured

Noteholders shall be granted or allowed while any portion of the DIP Obligations or the

Adequate Protection Obligations (with respect to the Prepetition ABL Adequate Protection

Obligations, only if the Challenge Period has not expired) remain outstanding, and the DIP Liens

and the Adequate Protection Liens (with respect to the Prepetition ABL Adequate Protection

Liens, only if the Challenge Period has not expired) shall not (i) be subject to or junior to (A) any

lien or security interest that is avoided and preserved for the benefit of the Debtors and their

estates under section 551 of the Bankruptcy Code or (B) any liens arising after the

Commencement Date, including, without limitation, any liens or security interests granted in

favor of any federal, state, municipal or other domestic or foreign governmental unit (including

any regulatory body), commission, board or court for any liability of the Debtors, or

(ii) subordinate to or made *pari passu* with any other lien or security interest, whether under

sections 363 or 364 of the Bankruptcy Code or otherwise.

(b)    In addition to the Events of Default set forth in the DIP

Documents, unless all DIP Obligations and all Adequate Protection Obligations shall have been

indefeasibly paid in full in cash, the Debtors shall not seek, and it shall constitute an Event of

Default under the DIP Documents and terminate the right of the Debtors to use Cash Collateral

hereunder if any of the Debtors seek, or if there is entered, unless the DIP Agents have otherwise

consented:  (i) any modification or extension of this Interim Order without the prior written

consent of the DIP Agents, the Prepetition Indenture Trustee, and the Prepetition Secured

Noteholders, and no such consent shall be implied by any other action, inaction or acquiescence

by the DIP Agents, the Prepetition Indenture Trustee, and the Prepetition Secured Noteholders,

(ii) an order converting or dismissing these Chapter 11 Cases; (iii) an order appointing a Chapter

45

11 trustee in these Chapter 11 Cases or any other representative or other similar appointment, (iv) an order appointing an examiner with enlarged powers in these Chapter 11 Cases, (v) an order providing for a change of venue with respect to these Chapter 11 Cases and such order shall not have been reversed or vacated within ten (10) days; (vi) an order approving a plan of reorganization or the sale of all or substantially all of the DIP Collateral (except to the extent permitted under the DIP Documents) or the Prepetition Collateral (except to the extent permitted under the Prepetition Financing Documents) shall have been entered which does not provide for the repayment in full in cash of all DIP Obligations (other than any contingent obligations not yet due and payable) and all Adequate Protection Obligations (with respect to the Prepetition ABL Adequate Protection Obligations, so long as the Challenge Period has not expired) upon the consummation thereof.  If an order dismissing these Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (x) the Superpriority Claims, priming liens, security interests and replacement security interests granted to the DIP Agents, the DIP Lenders and the Prepetition Secured Parties, including, without limitation, the DIP Liens, the Adequate Protection Liens, the Prepetition Secured Noteholders Adequate Protection Claims and Adequate Protection Payments, the 507(b) claims, and the other administrative expense claims granted pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order (and that such Superpriority Claims, priming liens, security interests and replacement security interests granted to the DIP Agents, the DIP Lenders and the Prepetition Secured Parties, including, without limitation, the DIP Liens, the Adequate Protection Liens, the Prepetition Secured Noteholders Adequate Protection Claims and Adequate Protection Payments, the 507(b) claims, and the other administrative expense claims,

46

liens and security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest, including the priorities set forth herein and in the DIP Documents) until all DIP Obligations and all Adequate Protection Obligations (with respect to the Prepetition ABL Adequate Protection Obligations, so long as the Challenge Period has not expired) shall have been paid and satisfied in full and (y) the Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (x) above; provided that the Prepetition Secured Parties shall not receive or retain any payments, property or other amounts in respect of the Prepetition Obligations or under the Prepetition Financing Documents unless and until the DIP Obligations have indefeasibly been paid in cash in full in accordance with the DIP Documents.

(c)      If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect (i) the validity, priority or enforceability of any DIP Obligations or the Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agents, the Prepetition ABL Agent or the Prepetition Indenture Trustee, as applicable, of the effective date of such reversal, modification, vacation or stay or (ii) the validity, priority or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Documents with respect to any DIP Obligations or the Adequate Protection Obligations.  Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral, the DIP Obligations or the Adequate Protection Obligations incurred by the Debtors to the DIP Agents, the DIP Lenders, or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agents, the Prepetition ABL Agent or the Prepetition Indenture Trustee of the effective date of such reversal, modification, vacation or stay shall be governed in

47

all respects by the original provisions of this Interim Order, and the DIP Agents, the DIP

Lenders, and the Prepetition Secured Parties shall be entitled to all the rights, remedies,

privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and

pursuant to the DIP Documents.

(d)　　　　Except as expressly provided in this Interim Order or in the DIP

Documents, the DIP Obligations and the Adequate Protection Obligations, including the DIP

Liens, the Superpriority Claims, the 507(b) claims, the Adequate Protection Liens, the Adequate

Protection Claims, the Adequate Protection Payments and all other rights and remedies of the

DIP Agents, the DIP Lenders and the Prepetition Secured Parties granted by the provisions of

this Interim Order and the DIP Documents shall survive, and shall not be modified, impaired or

discharged by (i) the entry of an order converting any of these Chapter 11 Cases to a case under

Chapter 7, dismissing these Chapter 11 Cases, approving the sale of any DIP Collateral pursuant

to section 363(b) of the Bankruptcy Code (except to the extent permitted by the DIP Documents,

or except to the extent that a release of such liens is authorized under the Intercreditor

Arrangements) or by any other act or omission or (ii) the entry of an order confirming a plan of

reorganization in these Chapter 11 Cases (except an acceptable plan to the DIP Agents and DIP

Lenders under the DIP Documents) and, pursuant to section 1141(d)(4) of the Bankruptcy Code,

the Debtors have waived any discharge as to any remaining DIP Obligations or Adequate

Protection Obligations.  The terms and provisions of this Interim Order and the DIP Documents

shall continue in the Chapter 11 Cases, in any successor cases, or in any superseding Chapter 7

cases under the Bankruptcy Code, and the DIP Obligations and the Adequate Protection

Obligations, including the DIP Liens, the Superpriority Claims, the 507(b) claims, the Adequate

Protection Liens, the Adequate Protection Claims, the Adequate Protection Payments, the other

48

administrative expense claims granted pursuant to this Interim Order and all other rights and remedies of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties granted under the DIP Documents and this Interim Order shall continue in full force and effect and shall be binding on any Chapter 7 trustee, Chapter 11 trustee, any litigation trust representative, other or similar party hereinafter appointed or elected for the estates of the Debtors until all DIP Obligations and all Adequate Protection Obligations are indefeasibly paid in full in cash as set forth herein and the DIP Documents.

(23)    *Exculpation*.    Nothing in this Interim Order, the DIP Documents, or any other documents related to the transactions contemplated hereby shall in any way be construed or interpreted to impose or allow the imposition upon any DIP Agent or any DIP Lender any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  In addition, (a) the DIP Agents and the DIP Lenders shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (b) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the Debtors; provided that, (i) the foregoing shall not apply to any act or omission by the DIP Agents or the DIP Lenders that constitutes gross negligence or willful misconduct by the DIP Agents or the DIP Lenders as finally determined by a court of competent jurisdiction.

(24)    *Effect of Stipulations on Third Parties*.

(a)    The stipulations and admissions contained in this Interim Order, including, without limitation, in paragraph 4 of this Interim Order, shall be binding upon each

49

Debtor and their subsidiaries and any of their respective successors and assigns (including, without limitation, any Chapter 7 or Chapter 11 trustee appointed or elected for a Debtor), and each person or entity party to the DIP Documents in accordance with their respective terms and the terms of this Interim Order, in all circumstances.

(b)     The stipulations and admissions contained in this Interim Order, including without limitation, in paragraph 4 of this Interim Order, shall be binding on a permanent basis upon all other parties in interest, including without limitation, the Debtors, as debtors-in-possession, and the Debtors' estates, any Chapter 7 trustee, and any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases (including the Creditors' Committee, if any) and any other person or entity acting on behalf of the Debtors' estates, unless (a) such committee or any other party-in-interest, in each case, with requisite standing granted by the Bankruptcy Court, has timely and properly filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, *inter alia*, in paragraph 25) by no later than the date that is the later of (i) in the case of any such adversary proceeding or contested matter filed by a party-in-interest with requisite standing other than the Creditors' Committee, 60 days' after the date of entry of the Final Order, (ii) in the case of any such adversary proceeding or contested matter filed by the Creditors' Committee, 60 days after the appointment of the Creditors' Committee, (iii) any such later date agreed to in writing by the Prepetition ABL Agent or the Prepetition Indenture Trustee, as applicable, and (iv) such longer period as the Bankruptcy Court orders for cause shown prior to the expiration of such period (the "**Challenge Period**"), (1) challenging the validity, enforceability, priority, extent, or amount of the obligations under the Prepetition Financing Documents (the "**Prepetition Obligations**") or the liens, subject to valuation under section 506 of the Bankruptcy Code, on the Prepetition Collateral securing the

50

Prepetition Obligations or (2) otherwise asserting or prosecuting any avoidance actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "**Claims and Defenses**") against the Prepetition Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors in connection with any matter related to the Prepetition Obligations or the Prepetition Collateral, and (b) an order is entered by a court of competent jurisdiction and becomes final and non-appealable in favor of the plaintiff sustaining any such challenge or claim in any such duly filed adversary proceeding or contested matter; provided that, (i) as to the Debtors, all such Claims and Defenses are hereby irrevocably waived and relinquished as of the Commencement Date and (ii) any challenge or claim shall set forth with specificity the basis for such challenge or claim and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be forever deemed waived, released and barred.  If no such adversary proceeding or contested matter is timely and properly filed in respect of the Prepetition Obligations, (x) the Prepetition ABL Obligations to the extent not heretofore repaid and the other Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, subordination, defense or avoidance, for all purposes in the Chapter 11 Cases and any subsequent Chapter 7 case, (y) the liens on the Prepetition Collateral securing the Prepetition Obligations, as the case may be, shall be deemed to have been, as of the Commencement Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph 4(b), not subject to defense, counterclaim, recharacterization, subordination or avoidance and (z) the Prepetition Obligations, the Prepetition Secured Parties, and the liens on the Prepetition Collateral granted to secure the Prepetition Obligations, as the case may be, shall not be subject to any other or further challenge by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any

51

other party-in-interest, and such committee or party-in-interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or a Chapter 7 or 11 trustee appointed or elected for any of the Debtors) with respect thereto.   If any such adversary proceeding or contested matter is timely and properly filed, the stipulations and admissions contained in paragraph 4 of this Interim Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this subparagraph) on any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other party-in-interest, except as to any such findings and admissions that were expressly and successfully challenged in such adversary proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction.   In the event that there is a timely successful challenge, pursuant and subject to the limitations contained in this paragraph 24, to the validity, enforceability, extent, perfection or priority of the Prepetition ABL Debt, the Bankruptcy Court shall have the power to unwind or otherwise modify, after notice and hearing, the discharge of the Prepetition ABL Debt or a portion thereof (which might include payment of the Disgorged Amounts or re-allocation of interest, fees, principal or other incremental consideration paid in respect of the Prepetition ABL Debt or the avoidance of liens and/or guarantees with respect to the Debtors), as the Bankruptcy Court shall determine.   Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including, without limitation, Claims and Defenses with respect to the Prepetition Loan Documents or the Prepetition Obligations or any liens granted by any Debtor to secure any of the foregoing.

52

(25)    *Limitation on Use of DIP Facilities and DIP Collateral.*
(a) Notwithstanding anything herein or in any other order by the Bankruptcy Court to the contrary, no borrowings, letters of credit, Cash Collateral, Collateral, Carve Out or the Carve Out Cap may be used to (i) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents or the Prepetition Financing Documents, or the liens or claims granted under this Interim Order, the DIP Documents or the Prepetition Financing Documents, (ii) assert any Claims and Defenses or causes of action against the DIP Agents, the DIP Lenders, the Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition Secured Noteholders, or the Prepetition Indenture Trustee, or their respective agents, affiliates, representatives, attorneys or advisors, (iii) prevent, hinder or otherwise delay the DIP Agents' assertion, enforcement or realization on the Cash Collateral or the Collateral in accordance with the DIP Documents, the Prepetition Financing Documents or this Interim Order, (iv) seek, except in response to the final relief requested in the Motion, to modify any of the rights granted to the DIP Agents, the DIP Lenders, the Prepetition ABL Agent, the Prepetition ABL Lenders, the Prepetition Indenture Trustee, or the Prepetition Secured Noteholders hereunder or under the DIP Documents, the Prepetition Financing Documents or the Prepetition Secured Indenture, in each of the foregoing cases without such parties' prior written consent or (v) pay any amount on account of any claims arising prior to the Commencement Date unless such payments are (1) approved by an order of this Court (including hereunder) and (2) in accordance with the DIP Documents and the 13-Week Projection; provided that, in accordance with the Carve Out, advisors to the Creditors' Committee may investigate the liens granted pursuant to the Prepetition Financing Documents during the Challenge Period at an

53

aggregate expense for such investigation, but not litigation, prosecution, objection or challenge thereto, not to exceed $50,000.

(26)    *Intercreditor Arrangements*.    The Bankruptcy Court approves the Intercreditor Arrangements annexed hereto as **Exhibit "1"** and authorizes the Debtors to execute and perform under any related documents and to perform all such other and further acts as may be necessary or appropriate to comply with and fulfill the obligations under the Intercreditor Arrangements.    Notwithstanding anything to the contrary herein or in any other order of the Bankruptcy Court, in determining the relative priorities and rights of any Prepetition Secured Party as against any other Prepetition Secured Party (including, without limitation, the relative priorities and rights of the Prepetition Secured Parties with respect to the Adequate Protection Liens granted hereunder), such priorities and rights shall continue to be governed by the Prepetition Financing Documents.    The Intercreditor Arrangements shall survive the conversion or dismissal of any of the Chapter 11 Cases or any relief from the automatic stay granted in the Chapter 11 Cases.

(27)    *Proofs of Claim*.    None of the DIP Agent, DIP Lenders, or the Prepetition Secured Parties will be required to file proofs of claim in any of Chapter 11 Cases or any successor case, and the Debtor's stipulations in this Interim Order shall be deemed to constitute a timely filed proof of claim.    Any order entered by the Bankruptcy Court in connection with the establishment of a bar date for any claim (including without limitation administrative claims) in the Chapter 11 Cases or any successor case shall not apply to the DIP Agent, the DIP Lenders, or the Prepetition Secured Parties.

(28)    *Rights of Access and Information*.    Without limiting the rights of access and information afforded the DIP Agents and DIP Lenders under the DIP Documents or the

54

Prepetition Secured Parties under the Prepetition Financing Documents, the Debtors shall be, and hereby are, required to afford representatives, agents and/or employees of the DIP Agent, the DIP Lenders and the Prepetition Secured Parties reasonable access to the Debtors' premises and their books and records in accordance with the DIP Documents and the Prepetition Financing Documents, as the case may be, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested.  In addition, the Debtors authorize their independent certified public accountants, financial advisors, restructuring advisers, investment bankers and consultants to cooperate, consult with, and provide to the DIP Agents, and the Prepetition Indenture Trustee (and so long as an Event of Default has occurred and is continuing, each Prepetition Secured Party and DIP Lender) all such information as may be reasonably requested with respect to the business, results of operations and financial condition of the Debtors.

(29)    *Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order or the Final Order, if and when entered, and the DIP Documents, the provisions of this Interim Order or the Final Order, as applicable, shall govern.  Additionally, to the extent that there may be an inconsistency between the terms of this Interim Order or the Final Order, if and when entered, and the Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures, if and when entered, the terms of this Interim Order or Final Order, as applicable, shall govern.

(30)    *Binding Effect; Successors and Assigns*.  The DIP Documents and the provisions of this Interim Order, including all findings herein and the Intercreditor Arrangements, shall be binding upon all parties-in-interest in the Chapter 11 Cases on a permanent basis, including without limitation, the DIP Agents, the DIP Lenders, the Prepetition

55

Secured Parties, any statutory or non-statutory committees appointed or formed in the Chapter 11

Cases, and the Debtors and their respective successors and assigns (including any Chapter 7 or

chapter 11 trustee hereinafter appointed or elected for any of the Debtors, an examiner appointed

pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal

representative of any of the Debtors, or similar responsible person or similar designee or

litigation trust hereinafter appointed or elected for the estates of the Debtors) and shall inure to

the benefit of the DIP ABL Agent, the DIP Term Loan Agent, the DIP Lenders, the Prepetition

Secured Parties and the Debtors and their respective successors and assigns, including after

conversion or dismissal of any of the Chapter 11 Cases; _provided_ _that_, except to the extent

expressly set forth in this Interim Order, the DIP Agents, the DIP Lenders, and the Prepetition

Secured Parties shall have no obligation to permit the use of Cash Collateral or extend any

financing to any Chapter 7 trustee, chapter 11 trustee or similar responsible person or similar

designee or litigation trust hereunder appointed for the estates of the Debtors.

(31)    _Limitation of Liability_.  In determining to make any loan under the DIP

Documents, permitting the use of Cash Collateral or in exercising any rights or remedies as and

when permitted pursuant to this Interim Order or the DIP Documents, the DIP Agents, the DIP

Lenders and the Prepetition Secured Parties shall not be deemed to be in control of the operations

of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to

the operation or management of the Debtors (as such terms, or any similar terms, are used in the

United States Comprehensive Environmental Response, Compensation and Liability Act, 29

U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).  Furthermore, nothing

in this Interim Order or in the DIP Documents shall in any way be construed or interpreted to

impose or allow the imposition upon the DIP Agents, the DIP Lenders, or the Prepetition

WEIL:\95256444\10\58399.0011

Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their affiliates (as defined in section 101(2) of the Bankruptcy Code).

(32)    *Effectiveness.*    This Interim Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof as of the Commencement Date, and there shall be no stay of execution of effectiveness of this Interim Order.    Any stay of the effectiveness of this Interim Order under Bankruptcy Rule 6004 or otherwise is waived.

(33)    *Final Hearing*.    The Final Hearing on the Motion shall be held on **_____, 2015 at __:__ _.m. (Eastern Time)**, before the Bankruptcy Court.

(34)    *Final Hearing Notice*.    The Debtors shall promptly mail copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with the Bankruptcy Court and to the Creditors' Committee after the same has been appointed, or Creditors' Committee counsel, if the same shall have been appointed.    Any party-in-interest objecting to the relief sought at the Final Hearing shall serve and file written objections with the Bankruptcy Court in accordance with General Order M-399, and served upon (i) the proposed attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue,

WEIL:\95256444\10\58399.0011

New York, New York 10153 (Attn: Marcia L. Goldstein, Esq. and Ray C. Schrock, Esq.); and

(ii) the Notice Parties, in each case so as to be received no later than **4:00 p.m. (Eastern Time)**

**on _____, 2015**.

Dated: _____, 2015
      New York, New York

                              _____
                              United States Bankruptcy Judge

58

## EXHIBIT 1 – INTERCREDITOR ARRANGEMENTS

*Capitalized terms used in this Exhibit I and not defined in this Exhibit shall have the meanings*

*assigned to such terms in this Interim Order.*

## 1.    DEFINITIONS.

"Access Agreement" – means that certain Access Agreement by and among Chassix, Inc., as

Supplier, UC Holdings, Inc., PNC Bank, National Association and Cantor Fitzgerald Securities,

as the DIP Agents, and General Motors LLC, Ford Motor Company, Nissan North America, Inc.,

and FCA US LLC f/k/a Chrysler Group LLC, as Customers.

"DIP ABL Secured Parties" – means the "Secured Parties" (as defined in the DIP ABL Credit

Agreement).

"Discharge of DIP ABL Obligations" - means (A) termination of all commitments of the DIP

ABL Secured Parties under the DIP ABL Facility Documents and (B) with respect to (i) any DIP

ABL Obligations (other than contingent indemnification and contingent expense reimbursement

obligations, in each case, for which no claims have been asserted), payment in full in cash of all

DIP ABL Obligations, and, with respect to letters of credit or letter of credit guaranties

outstanding under the DIP ABL Facility Documents, either (x) cancellation and return to the DIP

ABL Agent of all letters of credit or letter of credit guaranties outstanding under the DIP ABL

Facility Documents or (y) delivery of cash collateral in respect thereof in a manner consistent

with the DIP ABL Credit Agreement; and (ii) any DIP ABL Obligations that are contingent in

nature (other than DIP ABL Obligations consisting of LC Obligations or Secured Bank Product

Obligations (each as defined in the DIP ABL Credit Agreement) of a DIP Loan Party, which are

1

addressed in subparagraph B(i) above), the depositing of cash with the DIP ABL Agent in an amount equal to 100% of any such DIP ABL Obligations that have been liquidated or, if such DIP ABL Obligations are unliquidated in amount and represent a claim which has been asserted against the DIP ABL Agent or a DIP ABL Secured Party and for which an indemnity has been provided by the DIP Loan Parties in any of the DIP ABL Facility Documents, in an amount that is equal to such claim or the DIP ABL Agent's good faith estimate of such claim; provided that the Discharge of DIP ABL Obligations shall not be deemed to have occurred if such payments are made with the proceeds of other DIP ABL Obligations that constitute an exchange or replacement for or a Refinancing of such DIP ABL Obligations.

"Discharge of DIP Term Loan Obligations" - means (A) termination of all commitments under the DIP Term Loan Documents, and (B) payment in full in cash of all DIP Term Loan Obligations and satisfaction and discharge of the DIP Term Loan Credit Agreement (other than obligations that expressly survive such satisfaction and discharge or legal or covenant defeasance).

"Discharge of Prepetition Secured Notes Obligations" - means payment in full in cash of all Prepetition Secured Notes Obligations, satisfaction and discharge of the Prepetition Secured Indenture or legal or covenant defeasance of the Prepetition Secured Indenture (other than obligations that expressly survive such satisfaction and discharge or legal or covenant defeasance).

"Discharge of Fixed Asset Obligations" – means, collectively, the Discharge of DIP Term Loan Obligations and Discharge of Prepetition Secured Notes Obligations.

2

"Enforcement Notice" – means a written notice delivered, at a time when an event of default has occurred and is continuing under the DIP ABL Facility Documents, the DIP Term Loan Documents or the Prepetition Secured Indenture, by the DIP ABL Agent, the DIP Term Loan Agent or the Prepetition Indenture Trustee, as applicable, to the other parties, specifying the relevant event of default.

"Fixed Asset Obligations" – means, collectively, the DIP Term Loan Obligations and the Prepetition Secured Notes Obligations.

"Fixed Asset Secured Parties" – means, collectively, the Prepetition Indenture Trustee, the Prepetition Secured Noteholders, the DIP Term Loan Agent and the DIP Term Loan Lenders.

"Premises" – means any real property owned or leased by the DIP Loan Parties at which any DIP Collateral is located.

"Prepetition Secured Notes Documents" – means Prepetition Secured Indenture and the other Senior Secured Notes Documents (as defined in the Prepetition Secured Indenture).

"Prepetition Secured Notes Obligations" – means all obligations outstanding under the Prepetition Secured Notes.

"Proceeds" means (a) all "proceeds," as defined in Article 9 of the UCC, with respect to the DIP Collateral, and (b) whatever is recoverable or recovered when any DIP Collateral is sold, exchanged, collected or disposed of, whether voluntarily or involuntarily.

"Refinance" means, in respect of any indebtedness, to refinance, extend, renew, defease, amend,

3

increase, modify, supplement, restructure, refund, replace or repay, or to issue other indebtedness

or enter alternative financing arrangements, in exchange or replacement for such indebtedness, in

whole or in part, including by adding or replacing lenders, creditors, agents, borrowers and/or

guarantors, including any increase in the principal amount of the loans and commitments

provided thereunder, and including in each case, but not limited to, after the original instrument

giving rise to such indebtedness has been terminated.  "Refinanced" and "Refinancing" have

correlative meanings.

"Secured Party Representative" means, collectively, the DIP ABL Agent, the DIP Term Loan

Agent and the Prepetition Indenture Trustee.

"UCC" means the Uniform Commercial Code of any applicable jurisdiction.

4

2.     **Exercise of Remedies on DIP ABL Priority
       Collateral by Fixed Asset Secured Parties**

(a) Until the Discharge of DIP ABL Obligations, the Fixed Asset Secured Parties:

(i)     will not exercise or seek to exercise any rights, powers, or remedies with respect to any DIP ABL Priority Collateral;

(ii)    will not, directly or indirectly, contest, protest or object to or hinder any judicial or non-judicial foreclosure proceeding or action (including any partial or complete strict foreclosure) brought by the DIP ABL Agent or any other DIP ABL Lender relating to the DIP ABL Priority Collateral or any other exercise by the DIP ABL Agent or any other DIP ABL Lender of any other rights, powers and remedies relating to the DIP ABL Priority Collateral, including any sale, lease, exchange, transfer or other disposition of the DIP ABL Priority Collateral, whether under the DIP ABL Facility Documents, applicable law, or otherwise;

(iii)   will not object to the forbearance by the DIP ABL Agent or the DIP ABL Lenders from bringing or pursuing any enforcement action with respect to the DIP ABL Priority Collateral;

(iv)    except as may be permitted by Section 2(c), irrevocably, absolutely and unconditionally waive any and all rights the Fixed Asset Secured Parties may have as a junior lien creditor or otherwise to object (and seek or be awarded any relief of any nature whatsoever based on any such objection) to the manner in which the DIP ABL Agent or the DIP ABL Lenders (i) enforce or collect (or attempt to collect) the DIP ABL Obligations or (ii) realize or seek to realize upon

5

or otherwise enforce the DIP ABL Facility Liens, regardless of whether any action or failure to act by or on behalf of the DIP ABL Agent or the DIP ABL Lenders is adverse to the interest of the Fixed Asset Secured Parties.  Without limiting the generality of the foregoing, the Fixed Asset Secured Parties shall be deemed to have irrevocably, absolutely and unconditionally waived any right to object (and seek to be awarded any relief of any nature whatsoever based on any such objection), at any time prior or subsequent to any disposition of any of the DIP ABL Priority Collateral, on the ground(s) that any such disposition of the DIP ABL Priority Collateral (x) would not be or was not "commercially reasonable" within the meaning of the UCC and/or (y) would not or did not comply with any other requirement under the UCC or under any other applicable law governing the manner in which a secured creditor is to realize on its collateral;

(v)      subjection to Section 2(c), acknowledge and agree that no covenant, agreement or restriction in the documents evidencing the liens and claims of the Fixed Asset Secured Parties shall be deemed to restrict in any way the rights and remedies of the DIP ABL Agent or the DIP ABL Lenders with respect to the DIP ABL Priority Collateral; and

(vi)     subject to Section 2(c), agree that none of them shall object (or support any other Person objecting) to any motion by the DIP ABL Agent or the other DIP ABL Lenders seeking relief from the automatic stay in respect of the DIP ABL Priority Collateral;

provided that, in the case of (i), (ii) and (iii) above, the liens granted to secure the Fixed Asset

6

Obligations shall attach to any Proceeds resulting from actions taken by the DIP ABL Agent or

any DIP ABL Security Party with respect to the DIP ABL Priority Collateral in accordance with

the Intercreditor Arrangements (including the priorities described in Section 2) after application

of such Proceeds to the extent necessary to meet the requirements of a Discharge of DIP ABL

Obligations.

(b) Until the Discharge of DIP ABL Obligations, the DIP ABL Agent and the other DIP

ABL Lenders shall have the right to enforce rights, exercise remedies (including set-off

and the right to credit bid their debt) and, in connection therewith (including voluntary

dispositions of DIP ABL Priority Collateral by the Debtors after an Event of Default

under the DIP ABL Facility Documents) make determinations regarding the release,

disposition or restrictions with respect to the DIP ABL Priority Collateral (including,

without limitation, exercising remedies under account control agreements and lockbox

agreements) without any consultation with, notice to or the consent of the Fixed Asset

Secured Parties; provided that the liens securing the obligations owed to the Fixed Asset

Secured Parties shall remain on the Proceeds (other than those properly applied to the

DIP ABL Obligations) of such DIP ABL Priority Collateral released or disposed of (for

clarity, to the extent that the DIP ABL Agent or DIP ABL Lenders acquire DIP ABL

Priority Collateral via credit bid, then there shall be no Proceeds and the liens of the

Fixed Assets Secured Parties on the DIP ABL Priority Collateral that is subject to such

credit bid shall be discharged).  In exercising rights, powers and remedies with respect to

the DIP ABL Priority Collateral, the DIP ABL Agent and the DIP ABL Lenders may

enforce the provisions of the DIP ABL Facility Documents and exercise rights, powers

and/or remedies thereunder and/or under applicable law or otherwise, all in such order

7

and in such manner as they may determine in the exercise of their sole discretion.  Such

exercise and enforcement shall include, without limitation, the rights of an agent

appointed by them to sell or otherwise dispose of the DIP ABL Priority Collateral upon

foreclosure, to incur expenses in connection with such sale or disposition and to exercise

all the rights and remedies of a secured creditor under the UCC.

(c)  Notwithstanding anything to the contrary contained herein, any Fixed Asset Secured

Party may:

(i) take any action (not inconsistent with the terms of the Intercreditor

Arrangements and not adverse to the priority status of the DIP Liens on the DIP

ABL Priority Collateral, or the rights of the DIP ABL Agent or any of the DIP

ABL Secured Parties to exercise rights, powers, and/or remedies in respect

thereof) in order to create, perfect, preserve or protect (but not enforce) its DIP

Liens and Adequate Protection Liens on any of the DIP ABL Priority Collateral;

(ii) file any necessary or appropriate responsive or defensive pleadings in

opposition to any motion, claim, adversary proceeding or other pleading made by

any person objecting to or otherwise seeking the disallowance of the claims or

DIP Liens of the Fixed Asset Secured Parties, including any claims secured by the

DIP ABL Priority Collateral, if any, in each case in accordance with the terms of

the Intercreditor Arrangements;

(iii) unless such Fixed Asset Secured Party would not be permitted under the

Intercreditor Arrangements to take such action in its capacity as a secured

creditor, file (A) any pleadings, objections, motions or agreements which assert

rights or interests available to unsecured creditors of the Debtors, in each case, in

8

accordance with the terms of the Prepetition Financing Documents and the DIP

Documents, as applicable, and applicable law; provided that in the event that any

Fixed Asset Secured Party becomes a judgment Lien creditor in respect of the

DIP ABL Priority Collateral as a result of its enforcement of its rights as an

unsecured creditor with respect to the Fixed Asset Obligations, such judgment

Lien shall be subject to the terms of the Intercreditor Arrangements for all

purposes (including in relation to the DIP ABL Obligations) as the other liens

securing the Fixed Asset Obligations are subject to the Intercreditor Arrangements

and (B) any pleadings, objections, motions or agreements which assert rights or

interests available to secured creditors solely with respect to the Fixed Asset

Collateral; and

(iv) vote on any plan of reorganization, file any proof of claim, impose a default

rate or late fees, collect and apply monies deposited from time to time in their

accounts to the extent constituting Fixed Asset Collateral against the Fixed Asset

Obligations, make other filings and make any arguments and motions (including

in support of or opposition to, as applicable, the confirmation or approval of any

plan of reorganization) that are, in each case, in accordance with the terms of the

Intercreditor Arrangements.

(d) Nothing in the Intercreditor Arrangements shall prohibit the receipt by any Fixed Asset

Secured Parties of the required payments of interest, principal, adequate protection

payments and other amounts owed in respect of the Fixed Asset Obligations, so long as

such receipt is not the direct or indirect result of the exercise by the Fixed Asset Secured

Parties of rights or remedies as a secured creditor (including set-off) with respect to the

9

DIP ABL Priority Collateral or enforcement in contravention of the Intercreditor

Arrangements of any lien held by any of them.  Nothing in the Intercreditor

Arrangements impairs or otherwise adversely affects any rights or remedies any Fixed

Asset Secured Party may have against the Debtors and the DIP Loan Parties under the

DIP Term Loan Documents or the Prepetition Financing Documents.

**3.**    **Exercise of Remedies on DIP Term Loan Priority
Collateral by DIP ABL Agent**

(a) Until the Discharge of Fixed Asset Obligations, the DIP ABL Agent and the DIP ABL

Secured Parties:

(i)    will not exercise or seek to exercise any rights, powers, or remedies with

respect to any DIP Term Loan Priority Collateral;

(ii)    will not, directly or indirectly, contest, protest or object to or hinder any

judicial or non-judicial foreclosure proceeding or action (including any partial or

complete strict foreclosure) brought by any Fixed Asset Secured Party relating to

the DIP Term Loan Priority Collateral or any other exercise by any Fixed Asset

Secured Party of any other rights, powers and remedies relating to the DIP Term

Loan Priority Collateral, including any sale, lease, exchange, transfer or other

disposition of the DIP Term Loan Priority Collateral, whether under the DIP

Term Loan Facility Documents, applicable law, or otherwise;

(iii)    will  not object to the forbearance by the DIP Term Loan Agent or any

Fixed Asset Secured Party from bringing or pursuing any enforcement action with

respect to the DIP Term Loan Priority Collateral;

(iv)    except as may be permitted by Section 3(c), irrevocably, absolutely and

10

unconditionally waive any and all rights the DIP ABL Agent or any DIP ABL

Lender may have as a junior lien creditor or otherwise to object (and seek or be

awarded any relief of any nature whatsoever based on any such objection) to the

manner in which the DIP Term Loan Agent or the Fixed Asset Secured Parties (i)

enforce or collect (or attempt to collect) the Fixed Asset Obligations or (ii) realize

or seek to realize upon or otherwise enforce the liens on the DIP Term Loan

Priority Collateral, regardless of whether any action or failure to act by or on

behalf of the DIP Term Loan Agent or the Fixed Asset Secured Parties is adverse

to the interest of the DIP ABL Agent or the DIP ABL Lenders.  Without limiting

the generality of the foregoing, the DIP ABL Agent and the DIP ABL Lenders

shall be deemed to have irrevocably, absolutely and unconditionally waived any

right to object (and seek to be awarded any relief of any nature whatsoever based

on any such objection), at any time prior or subsequent to any disposition of any

of the DIP Term Loan Priority Collateral, on the ground(s) that any such

disposition of the DIP Term Loan Priority Collateral (x) would not be or was not

"commercially reasonable" within the meaning of the UCC and/or (y) would not

or did not comply with any other requirement under the UCC or under any other

applicable law governing the manner in which a secured creditor is to realize on

its collateral;

(v)        subject to Section 3(c), acknowledge and agree that no covenant,

agreement or restriction in the documents evidencing the liens and claims of the

DIP ABL Lenders shall be deemed to restrict in any way the rights and remedies

of the DIP Term Loan Agent or the Fixed Asset Secured Parties with respect to

11

the DIP Term Loan Priority Collateral; and

(vi)   subject to Section 3(c), agree that none of them shall object (or support any other Person objecting) to any motion by the DIP Term Loan Agent or the other Fixed Asset Secured Parties seeking relief from the automatic stay in respect of the DIP Term Loan Priority Collateral;

provided that, in the case of (i), (ii) and (iii) above, the liens granted to secure the DIP ABL Obligations shall attach to any Proceeds resulting from actions taken by the DIP Term Loan Agent or any Fixed Asset Secured Party with respect to the DIP Term Loan Priority Collateral in accordance with the Intercreditor Arrangements (including the priorities described in Section 3) after application of such Proceeds to the extent necessary to meet the requirements of a Discharge of Fixed Asset Obligations.

(b)   Until the Discharge of Fixed Asset Obligations, the DIP Term Loan Agent and the other Fixed Asset Secured Parties shall have the right to enforce rights, exercise remedies (including set-off and the right to credit bid their debt) and, in connection therewith (including voluntary dispositions of DIP Term Loan Priority Collateral by the Debtors after an Event of Default under the DIP Term Loan Facility Documents) make determinations regarding the release, disposition or restrictions with respect to the DIP Term Loan Priority Collateral (including, without limitation, exercising remedies under account control agreements and lockbox agreements) without any consultation with, notice to or the consent of the DIP ABL Agent or the DIP ABL Lenders; provided that the liens securing the obligations owed to the DIP ABL Lenders shall remain on the Proceeds (other than those properly applied to the Fixed Asset Obligations) of such DIP Term Loan Priority Collateral released or disposed of. In exercising rights, powers and remedies with respect to the DIP Term Loan Priority

12

Collateral, the DIP Term Loan Agent and the Fixed Asset Secured Parties may enforce the

provisions of the DIP Term Loan Facility Documents and exercise rights, powers and/or

remedies thereunder and/or under applicable law or otherwise, all in such order and in such

manner as they may determine in the exercise of their sole discretion.  Such exercise and

enforcement shall include the rights of an agent appointed by them to sell or otherwise dispose

of the DIP Term Loan Priority Collateral upon foreclosure, to incur expenses in connection

with such sale or disposition and to exercise all the rights and remedies of a secured creditor

under the UCC.

(c)    Notwithstanding anything to the contrary contained herein, the DIP ABL Agent and any

DIP ABL Secured Party may:

(i) take any action (not inconsistent with the terms of the Intercreditor Arrangements and

not adverse to the priority status of the DIP Liens on the DIP Term Loan Priority Collateral, or

the rights of the DIP Term Loan Agent or any of the Fixed Asset Secured Parties to exercise

rights, powers, and/or remedies in respect thereof) in order to create, perfect, preserve or protect

(but not enforce) its DIP Liens and Adequate Protection Liens on any of the DIP Term Loan

Priority Collateral;

(ii) file any necessary or appropriate responsive or defensive pleadings in opposition to

any motion, claim, adversary proceeding or other pleading made by any person objecting to or

otherwise seeking the disallowance of the claims or DIP Liens of the DIP ABL Secured Parties,

including any claims secured by the DIP Term Loan Priority Collateral, if any, in each case in

accordance with the terms of the Intercreditor Arrangements;

(iii)    unless such DIP ABL Agent or DIP ABL Secured Party would not be permitted

under the Intercreditor Arrangements to take such action in its capacity as a secured creditor, file

13

(A) any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Debtors in accordance with the terms of the DIP Documents and applicable law; <u>provided</u> that in the event that any DIP ABL Secured Party becomes a judgment Lien creditor in respect of the DIP Term Loan Priority Collateral as a result of its enforcement of its rights as an unsecured creditor with respect to the DIP ABL Obligations, such judgment Lien shall be subject to the terms of the Intercreditor Arrangements for all purposes (including in relation to the Fixed Asset Obligations) as the other liens securing the DIP ABL Obligations are subject to the Intercreditor Arrangements and (B) any pleadings, objections, motions or agreements which assert rights or interests available to secured creditors solely with respect to the DIP ABL Collateral; and

(iv) vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments and motions (including in support of or opposition to, as applicable, the confirmation or approval of any plan of reorganization) that are, in each case, in accordance with the terms of the Intercreditor Arrangements.

(d) Nothing in the Intercreditor Arrangements shall prohibit the receipt by the DIP ABL Agent or any DIP ABL Lender of the required payments of interest, principal, adequate protection payments and other amounts owed in respect of the DIP ABL Obligations, so long as such receipt is not the direct or indirect result of the exercise by the DIP ABL Agent or any DIP ABL Lender of rights or remedies as a secured creditor (including set-off) with respect to the DIP Term Loan Priority Collateral or enforcement in contravention of the Intercreditor Arrangements of any Lien held by any of them. Nothing in the Intercreditor Arrangements impairs or otherwise adversely affects any rights or remedies the DIP ABL Agent or any DIP ABL Lender may have against the Debtors and the DIP Loan Parties under the DIP ABL

14

Documents.

4.    **Bailee for Perfection**

Each Secured Party Representative agrees to hold that part of the DIP Collateral that is in its

possession or control to the extent that possession or control thereof is taken to perfect a lien

thereon as gratuitous bailee and agent for the benefit and on behalf of the other Secured Party

Representatives (to the extent that such Secured Party Representative has been granted a lien on

such DIP Collateral pursuant to DIP ABL Facility Documents, the Prepetition Secured Notes

Documents and DIP Term Loan Documents, respectively) (such bailment and agency being

intended, among other things, to satisfy the requirements of Sections 8-106(d)(3), 8-301(a)(2), 9-

104(a) and 9-313(c) of the UCC) and any assignee solely for the purpose of perfecting the

applicable security interest granted under the DIP ABL Facility Documents, the Prepetition

Secured Notes Documents and DIP Term Loan Documents, respectively.  The Fixed Asset

Secured Parties hereby appoint the DIP ABL Agent as their agent for the purposes of perfecting

their security interest in all Deposit Accounts and Securities Accounts (in each case, other than

the DIP Term Loan Collateral Account and the Prepetition Secured Notes Collateral Account

(each as defined in the DIP ABL Credit Agreement as in effect on the date hereof)) of the DIP

Loan Parties.  The DIP ABL Agent and the DIP ABL Secured Parties hereby appoint the

Prepetition Indenture Trustee and the DIP Term Loan Agent, as applicable, as their agent for the

purposes of perfecting their security interest in all intercompany notes of the DIP Loan Parties.

Upon the Discharge of DIP ABL Obligations or the Discharge of DIP Term Loan Obligations, as

applicable, the applicable Secured Party Representative shall deliver the remaining DIP

Collateral in its possession together with any necessary endorsements, first, (i) in the case of DIP

15

Term Loan Priority Collateral, to the Prepetition Indenture Trustee and (ii) in the case of DIP

ABL Priority Collateral, to the DIP Term Loan Agent, to the extent the applicable Obligations

remain outstanding, and second, (i) in the case of DIP Term Loan Priority Collateral, to the

applicable DIP Loan Party or as otherwise required by law and (ii) in the case of DIP ABL

Priority Collateral, to the Prepetition Indenture Trustee, to the extent the applicable Obligations

remain outstanding and third, in the case of DIP ABL Priority Collateral, to the applicable DIP

Loan Party or as otherwise required by law, in each case, so as to allow such Person to obtain

possession or control of such DIP Collateral.

## 5.      **IP License**

For the purposes of enabling the DIP ABL Agent to exercise rights and remedies under the

Interim Order, the Fixed Asset Secured Parties and each DIP Loan Party hereby grants (to the

full extent of their respective rights and interests) the DIP ABL Agent and its agents,

representatives and designees an irrevocable, non-exclusive, royalty-free, rent-free license and

lease (which will be binding on any successor or assignee of any DIP Term Loan Priority

Collateral) to use all of the DIP Term Loan Priority Collateral (including, without limitation, all

intellectual property) to collect all accounts included in DIP ABL Priority Collateral, to copy,

use, or preserve any and all information relating to any of the DIP ABL Priority Collateral, and

to complete the manufacture, packaging, advertising for sale and sale of (i) work-in-process, (ii)

raw materials and (iii) complete inventory.

## 6.      **Access Rights**

Upon the occurrence of any Event of Default (as defined in the DIP ABL Credit Agreement), the

DIP ABL Agent and its agents, representatives and designees shall have an irrevocable, non-

16

exclusive right to have access to, and a rent-free right to use, the applicable parcel of Premises

that constitutes DIP Term Loan Priority Collateral and to use any DIP Term Loan Priority

Collateral located thereon (the "**Right of Access**"), for a period of up to 60 days, commencing

upon the date the DIP ABL Agent provides written notice of the intent to exercise the Right of

Access to the DIP Term Loan Agent, for the purpose of (i) arranging for and effecting the sale or

disposition of DIP ABL Priority Collateral located on such parcel, including the manufacture,

production, completion, packaging and other preparation of such DIP ABL Priority Collateral for

sale or disposition, (ii) selling (by public auction, private sale or a "store closing", going out of

business sale or similar sale, whether in bulk, in lots or to customers in the ordinary course of

business or otherwise and which sale may include augmented inventory of the same type sold in

any DIP Loan Party's business), (iii) storing or otherwise dealing with the DIP ABL Priority

Collateral, in each case without notice to, the involvement of or interference by the Fixed Asset

Secured Parties or liability to the Fixed Asset Secured Parties; provided that, (on a plant by plant

basis) in the event that any of the Debtors' customers exercise their respective rights of access

pursuant to the Access Agreement at any plant, then the Right of Access of the DIP ABL Agent

and its agents, representatives and designees with respect to such plant shall terminate 60 days

following the first day on which a customer exercises its access right at such plant.  During any

such Event of Default (as defined in the DIP ABL Credit Agreement), the DIP ABL Agent and

its representatives (and persons employed on their behalf), may continue to operate, service,

maintain, process, manufacture, package and sell the DIP ABL Priority Collateral, as well as to

engage in bulk sales of DIP ABL Priority Collateral.  The DIP ABL Agent shall take proper and

reasonable care under the circumstances of any DIP Term Loan Priority Collateral that is used by

the DIP ABL Agent and repair and replace any damage (ordinary wear-and-tear excepted)

17

caused by the DIP ABL Agent or its agents, representatives or designees and the DIP ABL

Agent shall comply with all applicable laws in all material respects in connection with its use or

occupancy of the DIP Term Loan Priority Collateral.  The DIP ABL Agent and the DIP ABL

Secured Parties shall reimburse the Fixed Asset Secured Parties for any injury or damage to

Persons or property (ordinary wear-and-tear excepted) directly caused by the acts or omissions of

Persons under its control; provided, however, that the DIP ABL Agent and the DIP ABL Secured

Parties will not be liable for any diminution in the value of the Premises caused by the absence of

the DIP ABL Priority Collateral therefrom.  In no event shall the DIP ABL Secured Parties or the

DIP ABL Agent have any liability to the Fixed Asset Secured Parties hereunder as a result of any

condition (including any environmental condition, claim or liability) on or with respect to the

DIP Term Loan Priority Collateral existing prior to the date of the exercise by the DIP ABL

Agent) of its rights under the Interim Order.  The DIP ABL Agent and the Fixed Asset Secured

Parties shall cooperate and use reasonable efforts to ensure that their activities described above

do not interfere materially with the activities of the other as described above, including the right

of Fixed Asset Secured Parties to show the DIP Term Loan Priority Collateral to prospective

purchasers and to ready the DIP Term Loan Priority Collateral for sale.  The Fixed Asset

Secured Parties shall not foreclose or otherwise sell or dispose of any of the DIP Term Loan

Priority Collateral unless the buyer agrees in writing to acquire the DIP Term Loan Priority

Collateral subject to the terms of these Intercreditor Arrangements and agrees to comply with the

terms of this section 5.  The DIP ABL Agent and the DIP ABL Secured Parties shall have the

right to bring an action to enforce their rights under this Section 5 including, without limitation,

an action seeking possession of the applicable DIP Collateral and/or specific performance.

Notwithstanding the foregoing, in no event shall the Fixed Asset Secured Parties have any

18

liability or obligation to the DIP ABL Agent, the DIP ABL Lenders or any of their respective

agents, representatives and designees to pay for any costs and expenses (whether actual or

accrued) incurred in connection with the DIP ABL Agent's, any DIP ABL Lender's or any of

their respective agents', representatives' and designees' exercise of Right of Access.

7.    **Application of Proceeds/Turnover**

(a) <u>Revolving Nature of DIP ABL Obligations</u>.  The Fixed Asset Secured Parties

acknowledge and agree that the DIP ABL Credit Agreement includes a revolving

commitment and that the amount of the DIP ABL Obligations that may be outstanding at

any time or from time to time may be increased or reduced and subsequently reborrowed

in accordance with the terms of the DIP Documents and the Interim Order or Final Order,

as applicable.

(b) <u>Application of Proceeds of Collateral</u>.

i.    So long as the Discharge of DIP ABL Obligations has not occurred, all

DIP ABL Priority Collateral or Proceeds thereof received in connection

with the sale or other disposition of, or collection on, such DIP ABL

Priority Collateral as a result of the exercise of remedies by any Secured

Party Representative or any DIP ABL Secured Parties or Fixed Asset

Secured Parties, shall be delivered to the DIP ABL Agent and shall be

applied or further distributed by the DIP ABL Agent to or on account of

the DIP ABL Obligations in such order, if any, as specified in the relevant

DIP ABL Facility Documents or as a court of competent jurisdiction may

otherwise direct.  Upon the Discharge of DIP ABL Obligations, the DIP

19

ABL Agent shall deliver to the DIP Term Loan Agent any DIP ABL

Priority Collateral and Proceeds of DIP ABL Priority Collateral received

or delivered to it pursuant to the preceding sentence, in the same form as

received, with any necessary endorsements, to be applied by the DIP Term

Loan Agent to the Fixed Asset Obligations in such order as specified in

the DIP Term Loan Agreement or as a court of competent jurisdiction may

otherwise direct.

ii.   So long as the Discharge of Fixed Asset Obligations has not occurred, all

DIP Term Loan Priority Collateral or Proceeds thereof received in

connection with the sale or other disposition of, or collection on, such DIP

Term Loan Priority Collateral as a result of the exercise of remedies by

any Secured Party Representative or any Fixed Asset Secured Parties or

DIP ABL Secured Parties, shall be delivered to the DIP Term Loan Agent

and shall be applied by the DIP Term Loan Agent to the DIP Term Loan

Obligations in such order as specified in the relevant DIP Term Loan

Documents or as a court of competent jurisdiction may otherwise direct.

Upon the Discharge of DIP Term Loan Obligations, the DIP Term Loan

Agent shall deliver to the Prepetition Indenture Trustee any DIP Term

Loan Priority Collateral and Proceeds of DIP Term Loan Priority

Collateral received or delivered to it pursuant to the preceding sentence, in

the same form as received, with any necessary endorsements to be applied

by the Prepetition Indenture Trustee to the Prepetition Secured Notes

Obligations in such order as specified in the Prepetition Secured Notes

20

Documents or as a court of competent jurisdiction may otherwise direct.

(c) <u>Payments Over</u>.  So long as neither the Discharge of DIP ABL Obligations nor the

Discharge of Fixed Asset Obligations has occurred, any DIP Collateral received by any

Secured Party Representative or any Fixed Asset Secured Parties or DIP ABL Secured

Parties in connection with the exercise of any right, power, or remedy (including set-off)

relating to the DIP Collateral in contravention of the Interim Order shall be segregated

and held in trust and forthwith paid over to the appropriate Secured Party Representative

for the benefit of the Fixed Asset Secured Parties or the DIP ABL Secured Parties, as

applicable, in the same form as received, with any necessary endorsements or as a court

of competent jurisdiction may otherwise direct.  Each Secured Party Representative is

hereby authorized by the other Secured Party Representative to make any such

endorsements as agent for the other Secured Party Representative or any Fixed Asset

Secured Parties or DIP ABL Secured Parties, as applicable.  This authorization is coupled

with an interest and is irrevocable until the Discharge of DIP ABL Obligations and

Discharge of Fixed Asset Obligations.

(d) <u>Application of Payments</u>.  Subject to the other terms of the Interim Order and Final

Order, as applicable, all payments received by (a) the DIP ABL Agent or the DIP ABL

Secured Parties may be applied, reversed and reapplied, in whole or in part, to the DIP

ABL Obligations to the extent provided for in the DIP ABL Facility Documents and (b)

the Fixed Asset Secured Parties may be applied, reversed and reapplied, in whole or in

part, to the Fixed Asset Obligations to the extent provided for in the DIP Term Loan

Documents.

21

(e) The DIP ABL Agent, for itself and on behalf of the DIP ABL Lenders, and the Fixed

Asset Secured Parties further agree that, prior to an issuance of any Enforcement Notice,

any Proceeds of DIP Collateral, whether or not deposited in an account subject to an

account control agreement, which are used by any Debtor to acquire other property which

is DIP Collateral shall not (solely as between the DIP ABL Agent, the DIP ABL Lenders

and the Fixed Asset Secured Parties) be treated as Proceeds of DIP Collateral for

purposes of determining the relative priorities in the DIP Collateral which was so

acquired.  In addition, unless and until the Discharge of DIP ABL Obligations occurs, the

Fixed Asset Secured Parties each hereby (i) consents to the application, prior to the

receipt by the DIP ABL Agent of an Enforcement Notice issued by the DIP Term Loan

Agent or the Prepetition Indenture Trustee, of cash or other Proceeds of DIP Collateral,

deposited in accounts subject to an account control agreement that constitute DIP ABL

Priority Collateral to the repayment of DIP ABL Obligations under DIP ABL Facility

Documents, (ii) agrees that such cash or other Proceeds shall be treated as DIP ABL

Priority Collateral and (iii) unless the DIP ABL Agent has actual knowledge to the

contrary or unless such funds are identifiable Proceeds of DIP Term Loan Priority

Collateral, any claim that payments made to the DIP ABL Agent through accounts that

are subject to such account control agreements are Proceeds of or otherwise constitute

DIP Term Loan Priority Collateral is waived by the Fixed Asset Secured Parties;

provided that after the receipt by the DIP ABL Agent of an Enforcement Notice issued by

the DIP Term Loan Agent or the Prepetition Indenture Trustee, all identifiable Proceeds

of DIP Term Loan Priority Collateral shall be treated as DIP Term Loan Priority

Collateral.

22

In the event that directly or indirectly some or all of the DIP ABL Priority Collateral and

some or all of the DIP Term Loan Priority Collateral are disposed of in a single

transaction or series of related transactions in which the aggregate sales price is no

allocated between DIP ABL Priority Collateral and DIP Term Loan Priority Collateral

being sold (including in connection with or as a result of the sale of the capital stock of a

Debtor which shall be treated as a sale of assets), then the portion of the aggregate sales

price determined to be Proceeds of DIP ABL Priority Collateral on the one hand, and DIP

Term Loan Priority Collateral on the other hand, shall be allocated based upon, in the

case of (i) any DIP ABL Priority Collateral consisting of inventory, no less than the book

value as assessed on the date of such disposition, (ii) any DIP ABL Priority Collateral

consisting of accounts receivable, no less than the book value as assessed on the date of

such disposition, and (iii) all other DIP ABL Priority Collateral and DIP Term Loan

Priority Collateral, fair market value of such DIP ABL Priority Collateral and DIP Term

Loan Priority Collateral, as determined in good faith by Debtors in their reasonable

judgment.

## 8.    Release of DIP ABL Priority Collateral

If, in connection with (A) any exercise of remedies, or (B) any sale, transfer or other disposition

of all or any portion of the DIP ABL Priority Collateral, so long as such sale, transfer or other

disposition is then not prohibited by the DIP ABL Facility Documents (or is otherwise consented

to by the requisite DIP ABL Lenders), or by the DIP Term Loan Documents (or is otherwise

consented to by the requisite DIP Term Loan Lenders) irrespective of whether an Event of

Default (as defined in the DIP ABL Credit Agreement) has occurred and is continuing, the DIP

23

ABL Agent, on behalf of any of the DIP ABL Secured Parties, releases any of its liens on any

part of the DIP ABL Priority Collateral (or if such liens are automatically released pursuant to

the DIP ABL Facility Documents upon such sale, transfer or other disposition), then the liens, if

any, of the Fixed Asset Secured Parties on the DIP ABL Priority Collateral sold or disposed of in

connection therewith, shall be automatically, unconditionally and simultaneously released;

provided that the Proceeds of such DIP ABL Priority Collateral are applied to reduce DIP ABL

Obligations and the Fixed Asset Secured Parties shall retain a lien on such Proceeds in

accordance with the terms of the Interim Order and the DIP Documents (for clarity, to the extent

that the DIP ABL Agent or DIP ABL Lenders acquire DIP ABL Priority Collateral via credit

bid, then there shall be no Proceeds and the liens of the Fixed Assets Secured Parties on the DIP

ABL Priority Collateral that is subject to such credit bid shall be discharged).  The Fixed Asset

Secured Parties promptly shall, at the sole cost and expense of the Debtors and the DIP Loan

Parties, execute and deliver to the DIP ABL Agent or such DIP Loan Party such termination

statements, releases and other documents as the DIP ABL Agent or such Debtor or the DIP Loan

Party may reasonably request in writing to effectively confirm such release.

**9.**     **Insurance**

(a) Unless and until the Discharge of DIP ABL Obligations has occurred and subject to the

terms of, and the rights of the DIP Loan Parties under, the DIP ABL Facility Documents,

the DIP ABL Agent, on behalf of the DIP ABL Secured Parties, shall have the sole and

exclusive right to adjust settlement for any insurance policy covering the DIP ABL

Priority Collateral in the event of any loss thereunder and to approve any award granted

in any condemnation or similar proceeding (or any deed in lieu of condemnation)

24

affecting such DIP ABL Priority Collateral.  Until the Discharge of DIP ABL Obligations

has occurred, (i) all Proceeds of any such policy and any such award (or any payments

with respect to a deed in lieu of condemnation) if in respect of the DIP ABL Priority

Collateral and to the extent required by the DIP ABL Facility Documents shall be paid to

the DIP ABL Agent for the benefit of the DIP ABL Secured Parties pursuant to the terms

of the DIP ABL Facility Documents (including, without limitation, for purposes of cash

collateralization of letters of credit) and thereafter, if the Discharge of DIP ABL

Obligations has occurred, and subject to the rights of the DIP Loan Parties under the DIP

Term Loan Agreement, to the Fixed Asset Secured Parties to the extent required under

the DIP Term Loan Agreement and then, to the extent the Discharge of Fixed Asset

Obligations has occurred, to the owner of the subject property or such other Person as

may be entitled thereto or as a court of competent jurisdiction may otherwise direct, and

(ii) if the Fixed Asset Secured Parties shall, at any time, receive any Proceeds of any such

insurance policy or any such award or payment with respect to DIP ABL Priority

Collateral, it shall segregate and hold in trust and forthwith pay such Proceeds over to the

DIP ABL Agent.

(b)  Unless and until the Discharge of Fixed Asset Obligations has occurred, subject to the

terms of, and the rights of the DIP Loan Parties under, the DIP Term Loan Documents,

the Fixed Asset Secured Parties shall have the sole and exclusive right to adjust

settlement for any insurance policy covering the DIP Term Loan Priority Collateral in the

event of any loss thereunder and to approve any award granted in any condemnation or

similar proceeding (or any deed in lieu of condemnation) affecting such DIP Term Loan

Priority Collateral.  Until the Discharge of Fixed Asset Obligations has occurred, (i) all

25

Proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect of the DIP Term Loan Priority Collateral and to the extent required by the DIP Term Loan Documents shall be paid to the Fixed Asset Secured Parties pursuant to the terms of the DIP Term Loan Documents and thereafter to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct, and (ii) if the DIP ABL Agent or any DIP ABL Secured Parties shall, at any time, receive any Proceeds of any such insurance policy or any such award or payment with respect to DIP Term Loan Priority Collateral, it shall segregate and hold in trust and forthwith pay such Proceeds over to the Fixed Asset Secured Parties.

(c) To effectuate the foregoing, and to the extent that the pertinent insurance company agrees to issue such endorsements, the DIP ABL Agent and the DIP Term Loan Agent shall each receive separate lender's loss payable endorsements naming themselves as loss payee and additional insured, as their interests may appear, with respect to any policies which insure the DIP Collateral.  To the extent any Proceeds are received for business interruption or for any liability or indemnification and those Proceeds are not in whole or in part compensation for a casualty loss with respect to the DIP Term Loan Priority Collateral, such Proceeds shall be applied first, to repay the DIP ABL Obligations (to the extent required pursuant to the DIP ABL Facility Documents), second, to the extent no DIP ABL Obligations are outstanding, to repay the Fixed Asset Obligations (to the extent required by the DIP Term Loan Documents), and third, to the owner of the subject property, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct.

26

10.    **Amendments**

The DIP ABL Facility Documents and DIP Term Loan Documents may be amended, supplemented or otherwise modified in accordance with their terms, all without affecting the lien subordination or other provisions of the Interim Order or the lien and claim priorities set forth in the Interim Order.  The DIP ABL Obligations may be Refinanced without notice to, or the consent of, the Fixed Asset Secured Parties and without affecting the lien subordination or other provisions of the Interim Order, and the Fixed Asset Obligations may be Refinanced without notice to, or consent of, the DIP ABL Agent or the DIP ABL Secured Parties and without affecting the lien subordination and other provisions of the Interim Order so long as such Refinancing is on terms and conditions that would not violate the DIP Term Loan Documents or the DIP ABL Facility Documents (as applicable), each as in effect on the date hereof (or, if less restrictive to the DIP Loan Parties, as in effect on the date of such amendment or Refinancing) or the Interim Order; provided that, in each case, (x) the DIP Loan Parties shall deliver a notice to the DIP ABL Agent or the DIP Term Loan Agent, as applicable, stating that the DIP Loan Parties has entered into new DIP ABL Facility Documents or DIP Term Loan Documents, as the case may be, and identifying the agent under such Credit Documents (the "New Agent") and (iii) the New Agent shall acknowledge in writing that it is bound by the terms of the Interim Order; provided further, however, that, if such Refinancing debt is secured by a lien on any DIP Collateral the holders of such Refinancing debt shall be deemed bound by the terms hereof regardless of whether or not such joinder is provided.  For the avoidance of doubt, the sale or other transfer of indebtedness is not restricted by the Interim Order but the provisions of the Interim Order shall be binding on all holders of DIP ABL Obligations and Fixed Asset Obligations.  Notwithstanding the foregoing, (i) the DIP ABL Secured Parties will not be entitled

27

to agree (and will not agree) to any amendment to or modification of the DIP ABL Facility

Documents, whether in a Refinancing or otherwise, that is inconsistent with the terms of the

Interim Order and (ii) the Fixed Asset Secured Parties will not be entitled to agree (and will not

agree) to any amendment to or modification of the DIP Term Loan Documents, whether in a

Refinancing or otherwise, that is inconsistent with the terms of the Interim Order.

## 11.    <u>Asset Dispositions of DIP ABL Priority Collateral</u>

The Fixed Asset Secured Parties shall not oppose (or support, directly or indirectly, any other

Person seeking to oppose) any motion by a DIP Loan Party that is supported by the DIP ABL

Secured Parties (i) for any disposition of any DIP ABL Priority Collateral free and clear of liens

or other claims, under Sections 363 or 1129 of the Bankruptcy Code or otherwise, or (ii) to

approve any procedures for the disposition of any DIP ABL Priority Collateral of any of the DIP

Loan Parties, and the Fixed Asset Secured Parties will be deemed to have irrevocably,

absolutely, and unconditionally consented under Section 363 of the Bankruptcy Code (and

otherwise) to any sale of any DIP ABL Priority Collateral supported by the DIP ABL Secured

Parties and to have released their liens on such assets; <u>provided</u> that to the extent the Proceeds of

such DIP ABL Priority Collateral are not applied to reduce DIP ABL Obligations the Fixed

Asset Secured Parties shall retain a lien on such Proceeds in accordance with the terms of the

Interim Order.

28

12.    **Subrogation**

(a)  With respect to the value of any payments or distributions in cash, property or other

assets that any of the Fixed Asset Secured Parties actually pays over to the DIP ABL

Agent or the DIP ABL Secured Parties under the terms of the Interim Order and Final

Order, as applicable, the Fixed Asset Secured Parties shall be subrogated to the rights of

the DIP ABL Secured Parties; provided that the Fixed Asset Secured Parties hereby agree

not to assert or enforce all such rights of subrogation they may acquire as a result of any

payment hereunder until the Discharge of DIP ABL Obligations has occurred.  The

Debtors and the DIP Loan Parties acknowledge and agree that, to the extent permitted by

applicable law, the value of any payments or distributions in cash, property or other

assets received by the Fixed Asset Secured Parties that are paid over to the DIP ABL

Secured Parties pursuant to the Interim Order or Final Order, as applicable, shall not

reduce any of the Fixed Asset Obligations.  Notwithstanding the foregoing provisions of

this Section 12, none of the Fixed Asset Secured Parties shall have any claim against any

of the DIP ABL Secured Parties for any impairment of any subrogation rights herein

granted to the Fixed Asset Secured Parties.

(b)  With respect to the value of any payments or distributions in cash, property or other

assets that any of the DIP ABL Secured Parties actually pays over to the Fixed Asset

Secured Parties under the terms of the Interim Order and Final Order, as applicable, the

DIP ABL Secured Parties shall be subrogated to the rights of the Fixed Asset Secured

Parties; provided that the DIP ABL Agent, on behalf of the DIP ABL Secured Parties,

hereby agrees not to assert or enforce all such rights of subrogation it may acquire as a

29

result of any payment hereunder until the Discharge of Fixed Asset Obligations has

occurred.  The Debtors and the DIP Loan Parties acknowledge and agree that, to the

extent permitted by applicable law, the value of any payments or distributions in cash,

property or other assets received by the DIP ABL Secured Parties that are paid over to the

Fixed Asset Secured Parties pursuant to the Interim Order or Final Order, as applicable,

shall not reduce any of the DIP ABL Obligations.  Notwithstanding the  foregoing

provisions of this Section 12, none of the DIP ABL Secured Parties shall have any claim

against any of the Fixed Asset Secured Parties for any impairment of any subrogation

rights herein granted to the DIP ABL Secured Parties.

WEIL:\95256444\10\58399.0011

**Exhibit 2**

**Budget**

WEIL:\95256444\10\58399.0011

**Schedule 3.5(b)**

**Permitted Resourcing**

None.

**Schedule 3.7**

**Price Adjustments**