**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| Chassix Holdings, Inc., *et al.*,[1] | ) | Case No. 15-[_____] (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Pending) |
| | ) | |

## JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**WEIL, GOTSHAL & MANGES LLP**

Marcia L. Goldstein
Ray C. Schrock, P.C.
Matthew P. Goren
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for Debtors and*
*Debtors in Possession*

Dated:  March 12, 2015
        New York, New York

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012).  The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

# Table of Contents

**Page**

Section 1.        DEFINITIONS AND INTERPRETATION. .................................................1
        A.        Definitions. ..................................................................................................1
        B.        Interpretation; Application of Definitions and Rules of Construction.............14
        C.        Reference to Monetary Figures..........................................................14
        D.        Controlling Document ......................................................................14
Section 2.        ADMINISTRATIVE AND PRIORITY CLAIMS. ...................................14
        2.1.        *Administrative Claims*..................................................................14
        2.2.        *Fee Claims*...................................................................................15
        2.3.        *Priority Tax Claims*......................................................................15
        2.4.        *DIP Claims*...................................................................................15
        2.5.        *Prepetition Revolving ABL Facility Claims.* ...............................15
Section 3.        CLASSIFICATION OF CLAIMS AND INTERESTS. ............................16
        3.1.        *Summary of Classification* ...........................................................16
        3.2.        *Special Provision Governing Unimpaired Claims.*.......................16
        3.3.        *Elimination of Vacant Classes.* ....................................................16
Section 4.        TREATMENT OF CLAIMS AND INTERESTS. ....................................17
        4.1.        *Other Priority Claims (Class 1).* ..................................................17
        4.2.        *Other Secured Claims (Class 2).*...................................................17
        4.3.        *Secured Note Claims (Class 3)* .....................................................17
        4.4.        *Unsecured Note Claims (Class 4).*.................................................18
        4.5.        *General Unsecured Trade Claims (Class 5).*..................................18
        4.6.        *Other General Unsecured Claims (Class 6).*..................................19
        4.7.        *Intercompany Claims (Class 7).* ....................................................19
        4.8.        *Intercompany Interests (Class 8)*...................................................20
        4.9.        *Subordinated Securities Claims (Class 9).*....................................20
        4.10.        *Existing Chassix Holdings Equity Interests (Class 10)* .................20
Section 5.        MEANS FOR IMPLEMENTATION. ......................................................20
        5.1.        *Compromise and Settlement of Claims, Interests, and Controversies.* ........20
        5.2.        *Global Settlement* .........................................................................21
        5.3.        *Actions of Dharma Holding Corporation and Triomphe Intermediate Holding Corporation* ..................................................22

## Table of Contents

**Page**

5.4.    *Cancellation of Existing Securities and Agreements.* .....................................22

5.5.    *Corporate Structure.* ....................................................................................22

5.6.    *Authorization and Issuance of Plan Securities.* ...........................................22

5.7.    *Section 1145 Exemption.* ..............................................................................23

5.8.    *Exit Financing.* ............................................................................................23

5.9.    *Intercreditor Agreement.* ..............................................................................24

5.10.    *Reorganized Debtors.* ...................................................................................24

5.11.    *Bristol Facility* .............................................................................................24

5.12.    *Cancellation of Liens.* ...................................................................................25

5.13.    *Management Employment Matters.* ...............................................................25

5.14.    *Withholding and Reporting Requirements.* ....................................................25

5.15.    *Exemption From Certain Transfer Taxes.* .....................................................26

5.16.    *Restructuring Transactions; Further Transactions.* ......................................26

5.17.    *Dissolution of Chassix Holdings.* ..................................................................27

5.18.    *Effectuating Documents.* ...............................................................................27

5.19.    *Closing of the Chapter 11 Cases.* ..................................................................27

Section 6.    DISTRIBUTIONS. ......................................................................................27

6.1.    *Distribution Record Date.* .............................................................................27

6.2.    *Date of Distributions.* ...................................................................................28

6.3.    *Timing of Distributions.* ................................................................................28

6.4.    *Disbursing Agent.* .........................................................................................28

6.5.    *Powers of Disbursing Agent.* .........................................................................28

6.6.    *Delivery of Distributions.* ..............................................................................28

6.7.    *Manner of Payment Under Plan.* ...................................................................29

6.8.    *Fractional Stock.* ..........................................................................................29

6.9.    *Minimum Cash Distributions.* ........................................................................29

6.10.    *Setoffs.* ........................................................................................................29

6.11.    *Distributions After Effective Date.* ................................................................29

6.12.    *Allocation of Distributions Between Principal and Interest.* ..........................29

Section 7.    PROCEDURES FOR DISPUTED CLAIMS. ................................................30

7.1.    *Allowance of Claims.* .....................................................................................30

**Table of Contents**

**Page**

7.2.    *Objections to Claims.* ............................................................................30

7.3.    *Estimation of Claims* ............................................................................30

7.4.    *No Distributions Pending Allowance.* ..................................................30

7.5.    *Distributions After Allowance.* ............................................................31

7.6.    *Resolution of Claims.* ...........................................................................31

7.7.    *Disallowed Claims.* ..............................................................................31

Section 8.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.................31

8.1.    *General Treatment.* ...............................................................................31

8.2.    *Determination of Cure Disputes and Deemed Consent.* .....................31

8.3.    *Payments Related to Assumption of Contracts and Leases.* ...............32

8.4.    *Rejection.* ..............................................................................................32

8.5.    *Survival of the Debtors' Indemnification Obligations.* .......................32

8.6.    *Compensation and Benefit Plans.* ........................................................33

8.7.    *Insurance Policies.* ...............................................................................33

8.8.    *Intellectual Property Licenses and Agreements.* .................................33

8.9.    *Reservation of Rights.* ..........................................................................34

Section 9.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE. ...................34

9.1.    *Conditions Precedent to Confirmation.* ...............................................34

9.2.    *Conditions Precedent to the Effective Date.* ........................................34

9.3.    *Waiver of Conditions Precedent.* .........................................................35

9.4.    *Effect of Non-Occurrence of Effective Date.* ......................................36

Section 10.    EFFECT OF CONFIRMATION. ............................................................36

10.1.    *Subordinated Claims.* ...........................................................................36

10.2.    *Vesting of Assets.* .................................................................................36

10.3.    *Discharge of Claims and Termination of Interests.* ............................36

10.4.    *Term of Injunctions or Stays.* ..............................................................36

10.5.    *Injunction Against Interference with Plan.* .........................................37

10.6.    *Releases by the Debtors.* ......................................................................37

10.7.    *Releases By Holders of Claims and Interests.* .....................................38

10.8.    *Exculpation.* ..........................................................................................38

10.9.    *Retention of Causes of Action/Reservation of Rights.* .......................39

WEIL:\95270840\1\35076.0003

**Table of Contents**

**Page**

10.10.  *Solicitation of the Plan.* ........................................................................39

10.11.  *Plan Supplement.* ..................................................................................40

10.12.  *Corporate and Limited Liability Company Action.* ..............................40

Section 11.    RETENTION OF JURISDICTION. ............................................40

Section 12.    MISCELLANEOUS PROVISIONS. ...........................................42

12.1.   *Payment of Statutory Fees.* ...................................................................42

12.2.   *Substantial Consummation.* ...................................................................42

12.3.   *Dissolution of Creditors Committee.* .....................................................42

12.4.   *Request for Expedited Determination of Taxes.* .....................................42

12.5.   *Amendments.* ........................................................................................43

12.6.   *Revocation or Withdrawal of the Plan.* ..................................................43

12.7.   *Severability of Plan Provisions upon Confirmation.* ..............................43

12.8.   *Governing Law.* .....................................................................................44

12.9.   *Time.* .....................................................................................................44

12.10.  *Immediate Binding Effect.* ....................................................................44

12.11.  *Successor and Assigns.* ..........................................................................44

12.12.  *Entire Agreement.* .................................................................................44

12.13.  *Notices.* .................................................................................................44

Exhibit A      Accommodation Agreements (without exhibits)

Exhibit B      Restructuring Support Agreement (without exhibits)

WEIL:\95270840\1\35076.0003

Each of Automotive Properties of New York, LLC, Chassix Holdings, Inc., UC Holdings, Inc., Chassix, Inc., Diversified Machine, Inc., Diversified Machine Bristol, LLC, Chassix Georgia Machining, LLC, DMI Columbus, LLC, Diversified Machine Montague, LLC, Diversified Machine, Milwaukee LLC, DMI Edon LLC, Mexico Products I, LLC, DMI China Holding LLC, Concord International, Inc., SMW Automotive, LLC, Automotive, LLC, Chassis Co. of Michigan, LLC, and AluTech, LLC (collectively, the "**Debtors**") propose the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Section 1.A.

## SECTION 1.    DEFINITIONS AND INTERPRETATION.

### A.    Definitions.

1.1    ***Accommodation Agreements*** means (a) that certain accommodation agreement, dated as of March 11, 2015, between and among the Debtors, General Motors LLC, Ford Motor Company, FCA US LLC f/k/a Chrysler Group LLC, Nissan North America, Inc., the DIP ABL Agent, and the DIP Term Agent, and (b) that certain accommodation agreement (together with any exhibits or schedules thereto) between and among the Debtors, BMW Manufacturing Co., LLC, the DIP ABL Agent, and the DIP Term Agent, annexed hereto as **Exhibit** "**A**."

1.2    ***Additional Trade Claim Distribution*** means $4,000,000, in Cash, which shall be distributed on a Pro Rata basis to holders of Allowed General Unsecured Trade Claims that agree to extend Customary Trade Terms to the Debtors (or the Reorganized Debtors, as applicable), pursuant to Section 4.5 below.  For the avoidance of doubt, the foregoing monies shall be reserved by the Debtors, or the Reorganized Debtors, as the case may be, but shall not be held in a segregated account.

1.3    ***Administrative Agent*** means BMO Harris Bank N.A., in its capacity as administrative agent under the Prepetition Revolving ABL Facility.

1.4    ***Administrative Claim*** means any Claim for costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code, including, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for good and other services and leased premises); (b) Fee Claims; (c) DIP Claims; (d) Restructuring Expenses; and (e) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code; provided that, notwithstanding anything herein to the contrary, Fee Claims and DIP Claim shall be treated as provided, respectively, in Sections 2.2 and 2.4 below.

1.5    ***Allowed*** means:

(a)    With respect to any Claim or Interest, proof of which was filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the Bankruptcy Court, (i) as to which no objection to allowance has been interposed in accordance with Section 7.2 hereof, such Claim to the extent asserted in such proof of Claim, (ii) as to which an objection has been interposed, such Claim or Interest to the extent that it has been allowed in whole or in part by a Final Order, or (iii) any Claim or Interest expressly allowed hereunder.

(b)    With respect to any Claim as to which no proof of claim was filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the

Bankruptcy Court, such Claim to the extent that it has been listed in the Schedules as liquidated in amount and not disputed or contingent.

(c)     Notwithstanding the foregoing, the Reorganized Debtors shall retain all claims and defenses to any Allowed Claims that are Reinstated or Unimpaired pursuant to the Plan.

1.6     ***Allowed Amount*** means the lesser of (a) the dollar amount of an Allowed Claim or (b) the estimated amount of such Allowed Claim. Unless otherwise specified herein or by Final Order, the Allowed Amount of an Allowed Claim shall not include interest accruing on such Allowed Claim from and after the Commencement Date.

1.7     ***Amended Organizational Documents*** means the forms of certificate of incorporation, certificate of formation, limited liability company agreement, or other forms of organizational documents and bylaws for the Reorganized Debtors in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable. To the extent such Amended Organizational Documents reflect material changes to the Debtors' existing forms of organization documents and bylaws, substantially final forms of such Amended Organizational Documents will be included in the Plan Supplement.

1.8     ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.9     ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York, Manhattan Division, having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

1.10     ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

1.11     ***Benefit Plans*** means all benefit plans, policies, and programs sponsored by the Debtors, including all savings plans and health and welfare plans.

1.12     ***Bristol Facility*** means the Debtors' manufacturing facility located at 51650 County Road 133, Bristol, Indiana, 46507.

1.13     ***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.14     ***Cash*** means legal tender of the United States of America.

1.15     ***Causes of Action*** means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen,

direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims.

1.16     ***Chapter 11 Cases*** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on March 12, 2015, in the Bankruptcy Court and styled *In re Chassix Holdings, Inc., et. al.*, Case No. 15-[_____] (___).

1.17     ***Chassix*** means Chassix, Inc.

1.18     ***Chassix Holdings*** means Chassix Holdings, Inc.

1.19     ***Claim*** means "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

1.20     ***Class*** means any group of Claims or Interests classified by the Plan pursuant to section 1122(a) of the Bankruptcy Code.

1.21     ***Collateral Agent*** means U.S. Bank, National Association, in its capacity as collateral agent under the Secured Notes Indenture and the related Security Agreement.

1.22     ***Commencement Date*** means the date on which each of the Debtors filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

1.23     ***Commencement Date Plan*** means the joint chapter 11 plan of reorganization, including the exhibits thereto, filed by the Debtors on the Commencement Date.

1.24     ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.25     ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.26     ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

1.27     ***Consenting Noteholders*** means the Consenting Secured Noteholders and the Consenting Unsecured Noteholders.

1.28     ***Consenting Secured Noteholders*** means the beneficial holders, or investment advisors or managers for the account of beneficial holders, of Secured Notes party to the Restructuring Support Agreement.

3

1.29    ***Consenting Unsecured Noteholders*** means the beneficial holders, or investment advisors or managers for the account of beneficial holders, of Unsecured Notes party to the Restructuring Support Agreement.

1.30    ***Consummation*** means the occurrence of the Effective Date.

1.31    ***Creditors Committee*** means any official committee of unsecured creditors appointed in the Chapter 11 Cases.

1.32    ***Cure*** means the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

1.33    ***Customary Trade Terms*** means industry trade terms and/or the existing contractual terms between the Debtors and the relevant holder of a General Unsecured Trade Claim including rebates and discounts, which shall in no event be worse than the most favorable terms in effect within two (2) years before the Commencement Date or such other trade terms as agreed to by the Debtors, with the consent of the Required Consenting Noteholders (such consent not to be unreasonably withheld), or the Reorganized Debtors, as applicable.

1.34    ***Debtors*** means Automotive Properties of New York, LLC, Chassix Holdings, UC Holdings, Chassix, Diversified Machine, Inc., Diversified Machine Bristol, LLC, Chassix Georgia Machining, LLC, DMI Columbus, LLC, Diversified Machine Montague, LLC, Diversified Machine, Milwaukee LLC, DMI Edon LLC, Mexico Products I, LLC, DMI China Holding LLC, Concord International, Inc., SMW Automotive, LLC, Automotive, LLC, Chassis Co. of Michigan, LLC, and AluTech, LLC.

1.35    ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

1.36    ***Definitive Documents*** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated herein and that are otherwise necessary or desirable to implement, or otherwise relate to the restructuring contemplated in the Restructuring Support Agreement, the Plan (including the Plan Supplement), any motion seeking the approval thereof, the Confirmation Order, and definitive documentation relating to the DIP Facilities, the use of cash collateral and the Exit Facilities, Amended Organizational Documents, the Accommodation Agreements, advisory or management services agreements, the Management Incentive Plan, the New Warrant Agreement, the Shareholders Agreement and any other shareholder and member related agreements or other related documents, each of which shall contain terms and conditions consistent in all material respects with the Plan and shall otherwise be reasonably acceptable in all respects to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

1.37    ***DIP ABL Agent*** means PNC Bank, National Association, in its capacity as administrative agent and collateral agent for the Revolving DIP Lenders under the Revolving DIP Credit Facility, or its permitted successor and assignee.

1.38    ***DIP Agents*** means the DIP ABL Agent and the DIP Term Agent.

4

1.39    ***DIP Claim*** means a Claim of the DIP Lenders or the DIP Agents arising under the DIP Facilities and the Interim DIP Order and/or Final Order.

1.40    ***DIP Facilities*** means the Revolving DIP Credit Facility and the DIP Term Facility.

1.41    ***DIP Lenders*** means the DIP Term Lenders and the Revolving DIP Lenders.

1.42    ***DIP Term Agent*** means Cantor Fitzgerald Securities, in its capacity as administrative agent and collateral agent for the DIP Term Lenders under the DIP Term Facility, or its permitted successor and assignee.

1.43    ***DIP Term Facility*** means the senior secured non-amortizing term loan credit facility provided by the DIP Term Lenders in an aggregate principal amount of $100 million made pursuant to that certain Superpriority Secured Debtor-in-Possession Term Loan, Security and Guaranty Agreement, by and among Chassix, the other borrowers and guarantors party thereto, the DIP Term Agent, the DIP Term Lenders and other parties thereto.

1.44.    ***DIP Term Lenders*** means those certain Consenting Secured Noteholders who are lenders under the DIP Term Facility.

1.45.    ***Disbursing Agent*** means any entity (including any applicable Debtor if it acts in such capacity) in its capacity as a disbursing agent under Section 6.4 hereof.

1.46.    ***Disclosure Statement*** means the Disclosure Statement for the Plan, in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, which is prepared and distributed in accordance with sections 1125, 1126(b) and/or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018 and/or other applicable law.

1.47.    ***Disclosure Statement Order*** means an order entered by the Bankruptcy Court finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code and otherwise in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

1.48.    ***Disputed Claim*** means (a) any Claim against any Debtor, proof of which was timely and properly filed, which is disputed under the Plan or as to which the Debtors have interposed a timely objection and/or request for estimation, which objection and/or request has not been withdrawn or determined by a Final Order or (b) any Claim against any Debtor proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed. To the extent only the Allowed Amount of a Claim is in dispute, such Claim shall be deemed Allowed in the amount the Debtors admit to owing, if any, and disputed as to the excess.

1.49.    ***Distribution Date*** means a date or dates, including the Initial Distribution Date, as determined by the Disbursing Agent in accordance with the terms of the Plan, on which the Disbursing Agent makes a distribution to holders of Allowed Claims.

1.50.    ***Distribution Record Date*** means, except with respect to public securities, the Effective Date.

5

1.51.    ***Effective Date*** means the date on or after the Confirmation Date, but not later than July 17, 2015, on which all conditions to the effectiveness of the Plan set forth in Section 9 hereof have been satisfied or waived in accordance with the terms of the Plan.

1.52.    ***Estate or Estates*** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.53.    ***Exculpated Parties*** means collectively: (a) the Debtors; (b) the Creditors Committee; (c) the Administrative Agent; (d) the Collateral Agent; (e) the other Secured Parties under and as defined in the Security Agreement; (f) the DIP Lenders; (g) the DIP Agents; (h) the Consenting Secured Noteholders; (i) the Consenting Unsecured Noteholders; (j) the arrangers under each of the DIP Facilities and the Exit Facilities; (k) the administrative agents, collateral agents, and lenders under the Exit Facilities; (l)  the OEM Customers; (m) Platinum Equity; (n) the Prepetition Revolving ABL Lenders, and (o) with respect to each of the foregoing entities in clauses (a) through (n), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers and directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, in each case in their capacity as such.

1.54.    ***Existing Chassix Holdings Equity Interests*** means all Interests in Chassix Holdings immediately prior to the Commencement Date, including all equity, warrants, common stock, and preferred stock.

1.55.    ***Existing UC Holdings Equity Interests*** means all Interests in UC Holdings immediately prior to the Commencement Date, including all equity, warrants, common stock, and preferred stock.

1.56.    ***Exit Facilities*** means the Revolving Exit Facility and the Exit Term Loan.

1.57.    ***Exit Term Loan*** means that certain senior secured exit term loan in a principal amount of $150,000,000, on terms acceptable to the Debtors and the Required Consenting Noteholders. Not less than $50,000,000 of the Exit Term Loan will be in the form of a new money investment to be made upon the Effective Date.

1.58.    ***Fee Claim*** means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Confirmation Date by professional persons retained by the Debtors or the Creditors Committee pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

1.59.    ***Final DIP Order*** means the final order of the Bankruptcy Court authorizing, among other things, the Debtors to enter into and make borrowings under the DIP Facilities, and granting certain rights, protections, and liens to and for the benefit of the DIP Lenders.

1.60.    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the Clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been

6

denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; provided that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

1.61.    ***General Unsecured Claim*** means any unsecured Claim, other than an Intercompany Claim and an Unsecured Note Claim, that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, including without limitation, any General Unsecured Trade Claim and any Other General Unsecured Claim.

1.62.    ***General Unsecured Claim Distribution*** means $2,000,000, in Cash, which, in accordance with Section 4.6 below, shall be distributed on a Pro Rata basis to holders of Allowed Other General Unsecured Claims; provided that, in accordance with Section 4.6, the foregoing distribution shall only be made to a holder of an Allowed Other General Unsecured Claim if such holder's sub-class has voted to accept the Plan.  For the avoidance of doubt, the foregoing monies shall be reserved by the Debtors, or the Reorganized Debtors, as the case may be, but shall not be held in a segregated account.

1.63.    ***General Unsecured Trade Claim*** means any General Unsecured Claim against any Debtor held by a trade creditor that the Debtors will have an ongoing business relationship with after the Effective Date.

1.64.    ***Global Settlement*** means that certain settlement incorporated into the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, among the Debtors, the Consenting Noteholders, and Platinum Equity whereby (i) the Unsecured Noteholders shall receive their Pro Rata share of the Unsecured Noteholder Common Stock Distribution and the New Warrants pursuant to Sections 4.4 and 5.2 below and (ii) Platinum Equity and the Released Parties related thereto shall receive releases pursuant to Sections 5.2, 10.6 and 10.7 below.

1.65.    ***Impaired*** means, with respect to a Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.66.    ***Initial Distribution*** means the first distribution that the Disbursing Agent makes to holders of Allowed Claims.

1.67.    ***Initial Distribution Date*** means the date occurring on or as soon as reasonably practicable after the Effective Date on which the Disbursing Agent makes the Initial Distribution to holders of Allowed Claims.

1.68.    ***Intercompany Claim*** means any Claim against a Debtor held by another Debtor.

1.69.    ***Intercompany Interests*** means an Interest in a Debtor (other than Chassix Holdings or UC Holdings) held by another Debtor or an affiliate of a Debtor.

1.70.    ***Intercreditor Agreement*** means that certain intercreditor agreement, between and among the lenders under the Revolving Exit Facility and the Exit Term Loan, to be included in draft form in the Plan Supplement.

1.71.    ***Interests*** means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all common stock, preferred stock or other instruments evidencing an

WEIL:\95270840\1\35076.0003

ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interests in a Debtor that existed immediately before the Effective Date.

1.72.    ***Interim DIP Order*** means the interim order of the Bankruptcy Court authorizing, among other things, the Debtors to enter into and make borrowings under the DIP Facilities, and granting certain rights, protections and liens to and for the benefit of the DIP Lenders.

1.73.    ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.74.    ***Management Incentive Plan*** means a post-emergence management incentive plan, to be included in draft form in the Plan Supplement, which shall be in form and substance reasonably satisfactory to the Debtors and the Required Consenting Noteholders, to be implemented by the Reorganized Debtors on the Effective Date, which shall provide for grants of options and/or restricted units/equity reserved for management, directors and employees in an amount of New Common Stock representing 5-10% of the New Common Stock (subject to dilution by the exercise of the New Warrants, to the extent applicable) which shall be sufficient to properly incentivize the senior management team of the Reorganized Debtors.

1.75.    ***New Board*** means the initial board of directors of Reorganized UC Holdings.

1.76.    ***New Common Stock*** means the shares of common stock, par value $.001 per share, in Reorganized UC Holdings that shall be issued on the Effective Date.

1.77.    ***New Warrants*** mean warrants to purchase 5% of the New Common Stock, subject to dilution by the Management Incentive Plan, with a strike price equal to the Reorganized Debtors' total implied equity value being the face amount of the Secured Notes, plus accrued interest and expenses as of the Commencement Date, as more fully set forth in the New Warrant Agreement, which shall be distributed in accordance with Section 4.4 below.

1.78.    ***New Warrant Agreement*** means the warrant agreement that will govern the terms of the New Warrants, the form of which shall be included in the Plan Supplement, and which will be in form and substance reasonably acceptable to the Debtors and the Required Consenting Noteholders.

1.79.    ***OEM Customers*** means, collectively, General Motors LLC, Ford Motor Company, FCA US LLC f/k/a Chrysler Group LLC, Nissan North America, Inc., BMW Manufacturing Co., LLC and any other customer of the Debtors party to the Accommodation Agreements.

1.80.    ***Other General Unsecured Claim*** means any unsecured Claim against any Debtor (other than an Intercompany Claim or a General Unsecured Trade Claim) that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

1.81.    ***Other Priority Claim*** means any Claim against any of the Debtors other than an Administrative Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.82.    ***Other Secured Claim*** means a Secured Claim against any of the Debtors, other than an Administrative Claim, a Priority Tax Claim, a Prepetition Revolving ABL Facility Claim, or a Secured Note Claim.

WEIL:\95270840\1\35076.0003

1.83.    ***Person*** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code) or other entity.

1.84.    ***Plan*** means this joint chapter 11 plan of reorganization, including the exhibits hereto, as the same may be amended or modified from time to time in accordance with Section 12.5 herein.

1.85.    ***Plan Supplement*** means a supplemental appendix to the Plan, in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, containing, among other things, substantially final forms of the Amended Organizational Documents (to the extent such Amended Organizational Documents reflect material changes from the Debtors' existing organizational documents and bylaws), the Schedule of Assumed Contracts, the Schedule of Rejected Contracts, the Exit Term Loan, the Revolving Exit Facility, the Management Incentive Plan, the Shareholders Agreement, the New Warrant Agreement, and to the extent known, with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; provided that through the Effective Date, the Debtors shall have the right to amend documents contained in, and exhibits to, the Plan Supplement with the consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  The Plan Supplement shall be filed with the Bankruptcy Court no later than the Plan Supplement Filing Date.

1.86.    ***Plan Supplement Filing Date*** means five business days before the voting deadline established in these cases.

1.87.    ***Platinum Consent Right*** means Platinum Equity's right to consent to or approve any documents, actions, or agreements, as applicable, solely to the extent such documents, actions, or agreements alter in any material way any of the rights or benefits proposed to be granted to or received by Platinum Equity or any Released Parties related thereto, or any obligation Platinum Equity (or any Released Party related thereto) may have, pursuant to the Commencement Date Plan.

1.88.    ***Platinum Equity*** means, collectively, Platinum Equity, LLC, Platinum Equity Advisors, LLC, Platinum Dharma Principals, LLC, Platinum Equity Capital Dharma Partners-PF, L.P., Platinum Equity Capital Dharma Partners, L.P., Platinum Equity Capital Dharma Partners-A, L.P., Platinum Equity Capital Partners III, L.P., Platinum Equity Capital Partners-A III, L.P., Platinum Equity Capital Partners-B III, L.P., Platinum Equity Capital Partners-C III, L.P., Dharma Holding Corporation, Triomphe Intermediate Holding Corporation, and such entities' direct and indirect subsidiaries and affiliates except the Debtors and the Debtors' direct and indirect subsidiaries.

1.89.    ***Prepetition Credit Agreement*** means that certain Amended and Restated Loan, Security and Guaranty Agreement dated as of July 23, 2013, as amended, supplemented or otherwise modified from time to time, by and among Chassix, the other borrowers and guarantors party thereto, the Administrative Agent, the Prepetition Revolving ABL Lenders and other parties thereto.

1.90.    ***Prepetition Intercreditor Agreement*** means that certain Intercreditor Agreement, dated as of July 23, 2013, by and between BMO Harris Bank N.A., as ABL collateral agent, and U.S. Bank National Association, as notes collateral agent.

1.91.    ***Prepetition Revolving ABL Facility*** means that certain $150 million senior secured asset based revolving credit facility pursuant to the Prepetition Credit Agreement.

WEIL:\95270840\1\35076.0003

1.92.    ***Prepetition Revolving ABL Facility Claim*** means any Claim relating to or arising under the Prepetition Revolving ABL Facility which shall be repaid in full in Cash with proceeds from the DIP Facilities in connection with entry of the Interim DIP Order.

1.93.    ***Prepetition Revolving ABL Lenders*** means the lenders from time to time party to the Prepetition Credit Agreement.

1.94.    ***Priority Tax Claim*** means any secured or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.95.    ***Pro Rata*** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Class under the Plan.

1.96.    ***Reinstate, Reinstated or Reinstatement*** means (i) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such Claim so as to leave such Claim Unimpaired or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (a) curing any such default that occurred before or after the Commencement Date, other than a default of the kind specified in section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim as such maturity existed before such default; (c) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) not otherwise altering the legal, equitable or contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement and shall be deemed cured on the Effective Date.

1.97.    ***Released Parties*** means collectively and in each case in their capacity as such: (a) the Debtors; (b) the Creditors Committee; (c) the Administrative Agent; (d) the Collateral Agent; (e) the other Secured Parties under and as defined in the Security Agreement; (f) the DIP Lenders; (g) the DIP Agents; (h) the Consenting Secured Noteholders; (i) the Consenting Unsecured Noteholders; (j) the arrangers under each of the DIP Facilities and the Exit Facilities; (k) the administrative agents, collateral agents, and lenders under the Exit Financing; (l) the OEM Customers; (m) Platinum Equity; (n) the Prepetition Revolving ABL Lenders; and (o) with respect to each of the foregoing entities in clauses (a) through (n), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers and directors, principals, shareholders, members, partners, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

1.98.    ***Reorganized Chassix*** means Chassix, as reorganized on the Effective Date in accordance with the Plan.

1.99.    ***Reorganized Debtors*** means the Debtors, as reorganized on the Effective Date in accordance with the Plan.

10

1.100.    ***Reorganized UC Holdings*** means UC Holdings, as reorganized on the Effective Date in accordance with the Plan.

1.101.    ***Required Consenting Noteholders*** means the Required Consenting Secured Noteholders and the Required Consenting Unsecured Noteholders.

1.102.    ***Required Consenting Secured Noteholders*** means the Consenting Secured Noteholders holding at least 51% of the Secured Notes that are subject to the terms of the Restructuring Support Agreement.

1.103.    ***Required Consenting Unsecured Noteholders*** means the Consenting Unsecured Noteholders holding at least 51% of the Unsecured Notes that are subject to the terms of the Restructuring Support Agreement.

1.104.    ***Restructuring*** means the proposed financial restructuring the principal terms of which are set forth herein.

1.105.    ***Restructuring Expenses*** means the reasonable and documented fees and expenses incurred by each of the Administrative Agent, the Collateral Agent, the Consenting Noteholders, Platinum Equity, the DIP Agents, and the DIP Lenders  in connection with the Restructuring, including the fees and expenses of their respective legal and financial advisors (limited to one primary counsel for each of the Prepetition ABL Lender, the DIP Agents, the Consenting Noteholders, and Platinum Equity, one financial advisor for each of Platinum Equity and the Consenting Noteholders and any other professionals that may be retained by the Consenting Noteholders and are reasonably acceptable to the Debtors) without the requirement for the filing of retention applications, fee applications or any other applications in the Chapter 11 Cases, which, in each case, shall be Allowed in full and shall not be subject to any offset, defense, counterclaim, reduction or credit of any kind whatsoever.  The reimbursable fees and expenses of Platinum Equity shall not exceed $1,250,000.

1.106.    ***Restructuring Support Agreement*** means that certain Restructuring Support Agreement, dated March 11, 2015, by and among the Debtors, the Consenting Secured Noteholders, the Consenting Unsecured Noteholders and Platinum Equity (as may be amended, supplemented or modified from time to time in accordance with the terms thereof) annexed hereto as **Exhibit** "**B**."

1.107.    ***Restructuring Support Parties*** means, collectively, the Debtors, the Required Consenting Noteholders and Platinum Equity.

1.108.    ***Restructuring Transactions*** means the transactions set forth in Section 5.16 of the Plan, in the order specified therein.

1.109.    ***Revolving DIP Credit Facility*** means that certain senior secured non-amortizing asset-based revolving credit facility in an aggregate principal amount of up to $150,000,000 entered into pursuant to that certain Superpriority Secured Debtor-in-Possession ABL Loan, Security and Guaranty Agreement, by and among Chassix, the other borrowers and guarantors party thereto, the DIP ABL Agent, and the Revolving DIP Lenders.  The Revolving DIP Credit Facility includes sub-facilities for swingline loans in an amount equal to $10,000,000 and letters of credit in an amount equal to $15,000,000.

1.110.    ***Revolving DIP Lenders*** means the lenders under the Revolving DIP Credit Facility.

11

1.111.    **Revolving Exit Facility** means that certain senior secured asset-based revolving exit credit facility with terms and conditions to be negotiated which shall be acceptable to the Debtors and the Required Consenting Noteholders.

1.112.    **Schedule of Assumed Contracts** means the schedule of contracts and leases to be assumed by the applicable Debtor(s), with the reasonable consent of the Debtors and the Required Consenting Noteholders, to be filed as part of the Plan Supplement.

1.113.    **Schedule of Rejected Contracts** means the schedule of contracts and leases to be rejected by the applicable Debtor(s), with the reasonable consent of the Debtors and the Required Consenting Noteholders, to be filed as part of the Plan Supplement.

1.114.    **Schedules** means the schedules of assets and liabilities and the statements of financial affairs filed by each Debtor under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements may be supplemented or amended from time to time.

1.115.    **Secured Claim** means a Claim to the extent (i) secured by property of the estate, the amount of which is equal to or less than the value of such property (A) as set forth in the Plan, (B) as agreed to by the holder of such Claim and the Debtors or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

1.116.    **Secured Note Claim** means any Claim relating to or arising under the Secured Note Indenture.

1.117.    **Secured Noteholder Common Stock Distribution** means shares of New Common Stock representing 97.5% of the New Common Stock (subject to dilution by the Management Incentive Plan and, to the extent applicable, the exercise of the New Warrants) to be distributed in accordance with Section 4.3 below; provided that if (i) the Global Settlement is not approved by a Final Order or (ii) either the Class of General Unsecured Trade Claims or the Class of Other General Unsecured Claims does not vote to accept the Plan, the Secured Noteholder Common Stock Distribution shall increase to 100% of the New Common Stock (subject to dilution by the Management Incentive Plan).

1.118.    **Secured Noteholders** means the holders of the Secured Notes.

1.119.    **Secured Note Indenture** means that certain indenture, dated July 23, 2013, as amended, supplemented or otherwise modified from time to time, among Chassix, as issuer, UC Holdings and certain of its subsidiaries as guarantors thereto, and U.S. Bank National Association, as trustee.

1.120.    **Secured Note Indenture Trustee** means U.S. Bank National Association, in its capacity as trustee under the Secured Note Indenture.

1.121.    **Secured Notes** means the 9 1/4 % senior secured notes due 2018 of Chassix issued pursuant to the Secured Note Indenture, plus accrued and unpaid interest as of the Commencement Date and any other amounts and obligations payable under the Secured Note Indenture and owed as of the Commencement Date.

1.122.    **Security** means any Security, as such term is defined in section 101(49) of the Bankruptcy Code.

WEIL:\95270840\1\35076.0003

1.123.    *Security Agreement* means that certain Security Agreement, dated as of July 23, 2013, by Chassix, and the guarantors thereunder, as pledgors, assignors and debtors, and U.S. Bank National Association, in its capacity as collateral agent, pledgee, assignee and secured party for the benefit of the Secured Noteholders under the Secured Note Indenture, and each other Authorized Representative (as defined in the Security Agreement) party thereto.

1.124.    *Shareholders Agreement* means that certain Shareholders Agreement to be included in draft form in the Plan Supplement, which shall be consistent with the requirements contained in the Plan and the Restructuring Support Agreement and otherwise be in a form and substance reasonably acceptable to the Debtors and the Required Consenting Noteholders.

1.125.    *Subordinated Securities Claim* means a Claim subject to subordination under section 510(b) of the Bankruptcy Code, and any Claim for or that arises from the rescission of a purchase, sale, issuance or offer of a Security of any of the Debtors, or for damages arising from the purchase of sale of such a Security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

1.126.    *Subsidiary Reorganized Debtors* means all of the Reorganized Debtors other than Reorganized UC Holdings (and, for the avoidance of doubt, other than Chassix Holdings).

1.127.    *Tax Code* means the Internal Revenue Code of 1986, as amended from time to time.

1.128.    *Trade Claim Distribution* means $1,000,000, in Cash, which shall be distributed on a Pro Rata basis to holders of Allowed General Unsecured Trade Claims pursuant to Section 4.5 below.  For the avoidance of doubt, the foregoing monies shall be reserved by the Debtors, or the Reorganized Debtors, as the case may be, but shall not be held in a segregated account.

1.129.    *UC Holdings* means UC Holdings, Inc.

1.130.    *Unimpaired* means, with respect to a Claim, Interest or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.131.    *Unsecured Note Claim* means any General Unsecured Claim, derived from, based upon, relating to or arising from the Unsecured Note Indenture.

1.132.    *Unsecured Noteholder Common Stock Distribution* means shares of New Common Stock representing 2.5% of the New Common Stock (subject to dilution by the Management Incentive Plan and, to the extent applicable, the exercise of the New Warrants) to be distributed in accordance with, and subject to the conditions set forth in, Section 4.4 below.

1.133.    *Unsecured Noteholders* means the holders of the Unsecured Notes.

1.134.    *Unsecured Note Indenture* means that certain indenture, dated December 13, 2013, as amended, supplemented or otherwise modified from time to time, between Chassix Holdings, as issuer, and Delaware Trust Company, as successor trustee.

1.135.    *Unsecured Note Indenture Trustee* means Delaware Trust Company, in its capacity as trustee under the Unsecured Note Indenture.

WEIL:\95270840\1\35076.0003

1.136.  ***Unsecured Notes*** means the 10% / 10 3/4% senior unsecured PIK toggle notes due 2018 of Chassix Holdings issued pursuant to the Unsecured Note Indenture.

1.137.  ***Voting Record Date*** means 5:00 p.m. Eastern Time on the first day of the hearing to approve the Disclosure Statement.

**B.      Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived or modified from time to time. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained therein. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

**C.      Reference to Monetary Figures**

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

**D.      Controlling Document**

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document). The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; provided that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

**SECTION 2.      ADMINISTRATIVE AND PRIORITY CLAIMS.**

2.1.    ***Administrative Claims***.

Except to the extent that a holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors agree to different treatment, the Debtors (or the Reorganized Debtors, as the case may be) shall pay to each holder of an Allowed Administrative Claim Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Claim becomes an Allowed Claim; provided that Allowed Administrative Claims representing liabilities

14

incurred in the ordinary course of business by the Debtors, as Debtors In Possession, or liabilities arising under loans or advances to or other obligations incurred by the Debtors, as Debtors In Possession, whether or not incurred in the ordinary course of business, shall be paid by the Debtors or the Reorganized Debtors, as the case may be, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

2.2. ***Fee Claims.***

All entities seeking an award by the Bankruptcy Court of Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred not later than the date that is forty-five (45) days after the Effective Date, (b) shall be paid in full, in Cash, the Allowed Amount of their respective Allowed Fee Claims (i) upon the later of (A) the Effective Date and (B) the date on which the order Allowing such Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or, on and after the Effective Date, the Reorganized Debtors.  The Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval, including those of the Creditors Committee to the extent the Creditors Committee is still in existence.

2.3. ***Priority Tax Claims.***

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or (b) equal annual Cash payments (commencing on the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course) in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years after the Commencement Date; provided that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option.

2.4. ***DIP Claims.***

On the Effective Date, the Revolving DIP Facility will either be converted into the Revolving Exit Facility or paid in full, in Cash, using the proceeds of the Revolving Exit Facility.

On the Effective Date, the DIP Term Loan will either be converted into the Exit Term Loan or paid in full, in Cash, using the proceeds of the Exit Term Loan.

2.5. ***Prepetition Revolving ABL Facility Claims.***

All obligations and claims in respect of or arising under the Prepetition ABL Credit Agreement, including the cash collateralization and letters of credit outstanding thereunder as of the Effective Date, shall be paid in full, in Cash, by the Debtors using the proceeds of the Revolving DIP Credit Facility and the DIP Term Facility on the date the Interim DIP Order is entered by the Bankruptcy Court.

15

**SECTION 3.    CLASSIFICATION OF CLAIMS AND INTERESTS.**

3.1.    *Summary of Classification*

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Fee Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Section 3. The classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes; such Classes shall be treated as set forth in Section 3.3.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 3 | Secured Note Claims | Impaired | Yes |
| 4 | Unsecured Note Claims | Impaired | Yes |
| 5 | General Unsecured Trade Claims | Impaired | Yes |
| 6 | Other General Unsecured Claims | Impaired | Yes |
| 7 | Intercompany Claims | Unimpaired | No (presumed to accept) |
| 8 | Intercompany Interests | Unimpaired | No (presumed to accept) |
| 9 | Subordinated Securities Claims | Impaired | No (deemed to reject) |
| 10 | Existing Chassix Holdings Equity Interests | Impaired | No (deemed to reject) |

3.2.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Reorganized Debtors in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.3.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

WEIL:\95270840\1\35076.0003

**SECTION 4.    TREATMENT OF CLAIMS AND INTERESTS.**

    4.1.    ***Other Priority Claims (Class 1).***

        (a)    *Classification*:  Class 1 consists of Allowed Other Priority Claims.

        (b)    *Treatment*:  Except to the extent that a holder of an Allowed Other Priority Claim has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Claim, in each case, or as soon as reasonably practical thereafter.

        (c)    *Voting*:  Class 1 is Unimpaired, and the holders of Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

    4.2.    ***Other Secured Claims (Class 2).***

        (a)    *Classification*:  Class 2 consists of Allowed Other Secured Claims.  To the extent that Allowed Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

        (b)    *Treatment*:  Except to the extent that a holder of an Allowed Other Secured Claim has agreed to less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim shall receive (i) payment in full in Cash on the Effective Date or as soon thereafter as practicable, (ii) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment as is necessary to satisfy section 1129 of the Bankruptcy Code.

        (c)    *Voting*:  Class 2 is Unimpaired, and the holders of Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

    4.3.    ***Secured Note Claims (Class 3)***

        (a)    *Classification*:  Class 3 consists of Allowed Secured Note Claims.

        (b)    *Allowance*:  The Allowed Secured Note Claims are Allowed in the amount of $396,192,637.24 (including accrued and unpaid interest as of the Commencement Date), plus any other amounts and obligations payable under the Secured Note Indenture as of the Commencement Date,  and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

        (c)    *Treatment*:  Pursuant to the Global Settlement set forth in Section 5.2, and subject to, and in accordance with, Section 5.16 below, on the Effective Date, each holder of an Allowed Secured Note Claim shall be entitled to receive, in full and final satisfaction of such Allowed Secured Note Claim, its Pro Rata share of the Secured Noteholder Common Stock Distribution; <u>provided</u> that if (i) the Global Settlement is not approved by a Final Order or (ii) either the Class of General Unsecured Trade Claims or the Class of Other General Unsecured Claims does not vote to accept the

Plan, the Secured Noteholder Common Stock Distribution shall increase to 100% of the New Common Stock (subject to dilution by the Management Incentive Plan).

(d)      *Voting*:  Class 3 is Impaired, and holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

4.4.      ***Unsecured Note Claims (Class 4).***

(a)      *Classification*:  Class 4 consists of Allowed Unsecured Note Claims.

(b)      *Allowance*:  The Allowed Unsecured Note Claims are Allowed in the amount of $161,097,076.61, plus accrued but unpaid interest through the Commencement Date and any other amounts and obligations payable under the Unsecured Note Indenture as of the Commencement Date,  and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

(c)      *Treatment*:  Pursuant to the Global Settlement set forth in Section 5.2 and subject to, and in accordance with, Section 5.16 below, on the Effective Date, each holder of an Allowed Unsecured Note Claim shall be entitled to receive, in full and final satisfaction of such Allowed Unsecured Note Claim, its Pro Rata share of the Unsecured Noteholder Common Stock Distribution and the New Warrants; underlined provided that holders of Allowed Unsecured Note Claims shall receive the foregoing Pro Rata distributions if the Global Settlement is approved or the following conditions occur:

(i)      the holders of Allowed Class 4 Unsecured Note Claims vote to accept the Plan; and

(ii)      each sub-class of Class 5 General Unsecured Trade Claims and Class 6 Other General Unsecured Claims votes to accept the Plan.

In the event the Bankruptcy Court determines that the Global Settlement cannot be approved and each of the foregoing conditions has not been satisfied, holders of Allowed Unsecured Note Claims shall not receive or retain any property under the Plan.

(d)      *Voting*:  Class 4 is Impaired, and holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

4.5.      ***General Unsecured Trade Claims (Class 5).***

(a)      *Classification*:  Class 5 consists of Allowed General Unsecured Trade Claims.

(b)      *Treatment*:  Except to the extent a holder of an Allowed General Unsecured Trade Claim has agreed to less favorable treatment or has been paid prior to the Effective Date, including pursuant to any Final Order, each holder of an Allowed General Unsecured Trade Claim shall receive its Pro Rata share of the Trade Claim Distribution, in Cash, in full and final satisfaction of such holder's Allowed General Unsecured Trade Claim on the following distribution schedule: (i) ten percent (10%) payable on the Effective Date or as soon as practicable thereafter; (ii) forty-five percent (45%) payable one year after the Effective Date; and (iii) forty-five percent (45%) payable two years after the Effective Date; underlined provided that any holder of an Allowed General Unsecured Trade Claim that enters

into an agreement with the Debtors (or the Reorganized Debtors, as applicable) to extend Customary Trade Terms shall receive its Pro Rata share of the Trade Claim Distribution and, in addition, its Pro Rata share of the Additional Trade Claim Distribution on the same schedule set forth above in this Section 4.5(b).

(c)     *Voting*:  Class 5 is Impaired, and holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

4.6.    ***Other General Unsecured Claims (Class 6).***

(a)     *Classification*:   Class 6 consists of Allowed Other General Unsecured Claims.

(b)     *Treatment*:  Except to the extent a holder of an Allowed Other General Unsecured Claim has agreed to less favorable treatment, on the Effective Date or as soon thereafter as is reasonably practicable, each holder of an Allowed Other General Unsecured Claim shall receive the following treatment:

(i)     for any sub-class of Other General Unsecured Claims that votes to accept the Plan of any individual Debtor, each holder of an Allowed Other General Unsecured Claim in such accepting sub-class shall receive its Pro Rata share of the General Unsecured Claim Distribution; and

(ii)    in the event any sub-class of Other General Unsecured Claims votes to reject the Plan with respect to any individual Debtor, the holders of Allowed Other General Unsecured Claims in such a rejecting sub-class shall not receive or retain any property under the Plan on account of such Claims, including, for the avoidance of doubt, any Pro Rata share of the General Unsecured Claim Distribution.  For the avoidance of doubt, to the extent any sub-class of Other General Unsecured Claims votes to reject the Plan and, therefore, is not entitled to receive any portion of the General Unsecured Claim Distribution, such Pro Rata portion attributable to the rejecting sub-class shall be reallocated to the holders of Other General Unsecured Claims in other sub-classes that have voted to accept the Plan.

(c)     *Voting*:  Class 6 is Impaired, and holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

4.7.    ***Intercompany Claims (Class 7).***

(a)     *Classification*:  Class 7 consists of Allowed Intercompany Claims.

(b)     *Treatment*:  On the Effective Date or as soon thereafter as is practicable, the Intercompany Claims may be extinguished or compromised by distribution, contribution or otherwise, or Reinstated, at the discretion of the Debtors or the Reorganized Debtors, as the case may be, on or after the Effective Date; <u>provided</u> that all Intercompany Claims held by Chassix against Diversified Machine, Inc. (whether or not represented by a note) shall be contributed by Chassix to the capital of Diversified Machine, Inc. in accordance with Section 5.16 of the Plan.

WEIL:\95270840\1\35076.0003

(c)       *Voting*:  Class 7 is Unimpaired, and the holders of Class 7 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

### 4.8.   *Intercompany Interests (Class 8)*.

(a)       *Classification*:  Class 8 consists of Intercompany Interests.

(b)       *Treatment*:  The Intercompany Interests will be Unimpaired under the Plan.

(c)       *Voting*:  Class 8 is Unimpaired, and the holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

### 4.9.   *Subordinated Securities Claims (Class 9)*.

(a)       *Classification*:  Class 9 consists of Subordinated Securities Claims.

(b)       *Treatment*:  The holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Claims.

(c)       *Voting*:  Class 9 is Impaired by the Plan, and the holders of the Subordinated Securities Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Plan.

### 4.10.   *Existing Chassix Holdings Equity Interests (Class 10)*

(a)       *Classification*: Class 10 consists of Existing Chassix Holdings Equity Interests.

(b)       *Treatment*:  On the Effective Date, all Existing Chassix Holdings Equity Interests, including all equity, warrants, common stock, and preferred stock, shall be cancelled.

(c)       Class 10 is Impaired by the Plan, and the holder of Existing Chassix Holdings Equity Interests is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the holder of Existing Chassix Holdings Equity Interests is not entitled to vote to accept or reject the Plan.

## SECTION 5.   MEANS FOR IMPLEMENTATION.

### 5.1.   *Compromise and Settlement of Claims, Interests, and Controversies*.

Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, Causes of Action, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made on account of such Allowed Claim.   The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, Causes of Action, and controversies, including without limitation, approval of the Restructuring Support Agreement, the Global Settlement, and the

20

Accommodation Agreements, as well as a finding by the Bankruptcy Court that such compromise or settlement is within the range of reasonableness, in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair and equitable. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, prior to the Effective Date, the Debtors, subject to the reasonable consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, and after the Effective Date, the Reorganized Debtors, may compromise and settle Claims against the Debtors or the Reorganized Debtors, as applicable.

### 5.2.    *Global Settlement*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the substantial contribution and value provided by the Consenting Unsecured Noteholders and Platinum Equity, the Plan incorporates a compromise and settlement of numerous Debtor-creditor and inter-creditor issues, in the form of the Global Settlement, designed to achieve an economic settlement of such issues and potential Claims and Causes of Action against the Debtors. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the following compromises or settlements that comprise the Global Settlement, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are within the range of reasonableness, in the best interests of the Debtors, their Estates, their creditors, and other parties-in-interests, and are fair and equitable. Each provision of the Global Settlement shall be deemed non-severable from each other and from the remaining terms of the Plan. As set forth in detail herein, the Global Settlement shall be implemented as follows:

(a)    *Platinum Equity.*    On the Effective Date, in full and complete compromise and settlement of any claim that Platinum Equity may assert against the Debtors, the Reorganized Debtors or the Consenting Noteholders, and in consideration of the substantial contribution provided by Platinum Equity to the Debtors' Chapter 11 Cases in the form of, among other things, Platinum Equity's management, consulting and advisory services leading up to and during the Chapter 11 Cases, its agreement to take, or not take, certain actions that could impact the tax attributes of the Reorganized Debtors, its assistance in securing favorable pricing and accommodation terms and conditions for the Debtors in connection with the Chapter 11 Cases, and its participation in prepetition negotiations that facilitated a speedy and consensual Restructuring for the Debtors, Platinum Equity and all Released Parties related thereto shall receive a release pursuant to Sections 10.6 and 10.7 below pursuant to the Global Settlement.

(b)    *Consenting Unsecured Noteholders.*    On the Effective Date, in full and complete compromise and settlement of any claim that the Consenting Unsecured Noteholders may hold against the Debtors, the Reorganized Debtors, Platinum Equity and any Released Parties related thereto, or the Consenting Secured Noteholders, and in consideration of the substantial contribution provided by the Consenting Unsecured Noteholders to the Debtors' Chapter 11 Cases in the form of, among other things, the Consenting Unsecured Noteholders' cooperation in the Debtors' restructuring efforts, the Consenting Unsecured Noteholders' assistance and contribution in prepetition negotiations with the OEM Customers, the contribution by certain of the Consenting Unsecured Noteholders, as DIP Lenders, in the form of the DIP Term Loan, and generally their participation in prepetition negotiations that facilitated a speedy and consensual restructuring for the Debtors, each holder of an Allowed Unsecured Note Claim shall receive its Pro Rata distribution of the Unsecured Noteholder Common Stock Distribution and New Warrants pursuant to the Global Settlement.

WEIL:\95270840\1\35076.0003

5.3.    ***Actions of Dharma Holding Corporation and Triomphe Intermediate Holding Corporation***

On and after the Effective Date, Platinum Equity agrees to (A) waive or cause to be waived any stock loss in respect of the stock of UC Holdings and Chassix Holdings pursuant to Treasury regulation § 1.1502-36, and any comparable provision of state or local income tax law, to the extent directed by the Reorganized Debtors, (B) not take, or cause to be taken, any other action that would reduce, limit or otherwise adversely affect the U.S. federal income tax attributes of the Reorganized Debtors, except as consistent with past practice, general cash management, or short term prudent investment, and (C) cooperate with the Reorganized Debtors in connection with any group tax return filings, audits and proceedings with respect to taxable years ending on or prior to, or including, the Effective Date (including jointly managing such filings and proceedings, and not compromising any audit or proceeding without the Reorganized Debtors' consent, such consent not to be unreasonably withheld), provided that reasonable expenses incurred by Platinum Equity at the request of the Reorganized Debtors in connection with this clause (C) shall be borne by the Reorganized Debtors.

5.4.    ***Cancellation of Existing Securities and Agreements***.

Except as expressly provided herein, on the Effective Date, all notes, instruments, certificates evidencing debt of or interests in, the Debtors, including, without limitation, all obligations related to or arising out of the DIP Facilities, the Secured Notes Indenture, the Prepetition Revolving ABL Facility, and the Unsecured Note Indenture shall be cancelled and obligations of the Debtors and the Reorganized Debtors thereunder shall be discharged.

Notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date, the Secured Note Indenture and the Unsecured Note Indenture shall continue in effect solely for purposes of:  (a) enabling holders of Allowed Class 3 Secured Note Claims and Allowed Class 4 Unsecured Note Claims to receive distributions under the Plan; and (b) allowing the Secured Note Indenture Trustee and Unsecured Note Indenture Trustee to make distributions under the Plan; provided that nothing in this section shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order or the Plan or result in any liability or expense to the Reorganized Debtors.

5.5.    ***Corporate Structure***.

On the Effective Date, except as set forth in Section 5.16 below, all Interests, including all equity, common stock, warrants, and preferred stock, in Chassix Holdings shall be cancelled and extinguished and Chassix Holdings shall be dissolved in accordance with Section 5.17 of the Plan.  The equity in the Subsidiary Reorganized Debtors shall be restored.

5.6.    ***Authorization and Issuance of Plan Securities***.

(a)    *Authorization.*  The Debtors, the Reorganized Debtors, and Reorganized UC Holdings, as applicable, are authorized to issue all plan-related securities and documents, including, without limitation, the New Common Stock and, to the extent applicable, the New Warrants, and any options or entitlements to purchase such plan-related securities, without the need for any further corporate, partnership, or limited liability company action.

(b)    *New Common Stock*.  On the Effective Date, subject to securities, tax and other relevant considerations and Section 5.16, the New Common Stock shall be distributed in accordance with the Plan.

(c)      *New Warrants*.  On the Effective Date, and subject to the satisfaction of the conditions set forth in Section 4.4(c), the New Warrants will be issued pursuant to the terms of the New Warrant Agreement.

(d)      *Shareholders Agreement*.  Any direct or beneficial recipient of the New Common Stock (including New Common Stock issued pursuant to the exercise of New Warrants, if applicable), including all parties to whom such recipients may sell their New Common Stock in the future and all persons who purchase or acquire such equity in future transactions, shall be party to, or shall be deemed to be bound by, the Shareholders Agreement, the terms of which shall govern Reorganized UC Holdings.

5.7.   **Section 1145 Exemption.**

The issuance and distribution under the Plan of the New Common Stock and the New Warrants, if applicable, shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code or, to the extent the exemption under section 1145(a) of the Bankruptcy Code is not available to any particular recipient, under Section 4(a)(2) and/or Regulation D of the Securities Act of 1933 and/or any other applicable exemptions without further act or action by any Person.

In addition, under section 1145 of the Bankruptcy Code, any Securities issued under the Plan which are exempt from such registration pursuant to section 1145(a) of the Bankruptcy Code will be freely tradable by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (2) compliance with any rules and regulations of the Securities and Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (3) the restrictions, if any, on the transferability of such Securities and instruments; and (4) applicable regulatory approval.

5.8.   **Exit Financing.**

(a)      *Exit Facilities*.  On the Effective Date, the Revolving DIP Facility will be paid in full, in Cash, with the proceeds of, the Revolving Exit Facility with terms and conditions to be negotiated that shall be acceptable to the Debtors and the Required Consenting Noteholders.  On the Effective Date, the DIP Term Loan will be converted into, or paid in full, in Cash, with proceeds of, the Exit Term Loan.

(b)      *Documentation*.  On the Effective Date, documentation evidencing the Revolving Exit Facility and the Exit Term Loan shall be executed and delivered, and the Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Revolving Exit Facility and the Exit Term Loan without the need for any further corporate action or any notice to or order of the Bankruptcy Court and without further action by the holders of Claims or Interests or any other Person.

(c)      *Liens/Security Interests*.  All Liens and security interests granted pursuant to the Exit Facilities are intended to be, and shall be (i) valid, binding, perfected, enforceable, Liens, and security interests in the personal and real property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law and (ii) not subject to avoidance, recharacterization, or subordination under any applicable law.

5.9.    *Intercreditor Agreement.*

Lien priority and enforcement rights with respect to collateral between and among the lenders under the Revolving Exit Facility and the Exit Term Loan, shall be governed by the Intercreditor Agreement on terms to be negotiated.

5.10.    *Reorganized Debtors.*

(a)    *Amended Organizational Documents*.  The Amended Organizational Documents shall comply with section 1123(a)(6) of the Bankruptcy Code and shall otherwise be in form and substance satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  The Amended Organizational Documents shall provide, among other things, that Reorganized UC Holdings, and each of the Subsidiary Reorganized Debtors are privately held companies.

(b)    *Board of Directors of Reorganized UC Holdings*.  As of the Effective Date, the term of the current members of the board of UC Holdings shall expire without further action by any person.   The initial directors of the New Board shall consist of five (5) members selected by the Consenting Noteholders and may include at least one member of the Debtors' executive management team.   The members of the New Board will be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.

(c)    *Directors and Officers of the Reorganized Debtors*.  Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date shall serve as the initial officers of each of the respective Reorganized Debtors on or after the Effective Date and in accordance with any employment agreement with the Reorganized Debtors and applicable non-bankruptcy law.  After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.  The members of the board of directors and the board of managing members for each of the Reorganized Debtors (other than Reorganized UC Holdings as provided above) shall be determined as set forth in the Amended Organizational Documents and disclosed as required pursuant to section 1129(a)(5) of the Bankruptcy Code.

(d)    *Capital Structure*.  From and after the Effective Date, subject to the rights of the stockholders to amend the Amended Organizational Documents, including the Certificate of Incorporation of Reorganized UC Holdings, each of the Reorganized Debtors shall have one class of issued and outstanding common stock.

5.11.    *Bristol Facility*

The Reorganized Debtors shall, on the Effective Date, continue to own and operate the Bristol Facility and shall, without any further notice to or action, order, or approval of the Bankruptcy Court, be authorized to implement any necessary restructuring transactions in connection therewith, provided that the Debtors or the Reorganized Debtors, as the case may be, are authorized, with the consent of the Required Consenting Noteholders, to enter into a transaction pursuant to which the Debtors or the Reorganized Debtors sell the Bristol Facility as long as such a sale transaction does not adversely affect the treatment of any creditor or equity stakeholder under the Plan and is sold for aggregate consideration acceptable to the Debtors and the Required Consenting Noteholders.  Any sale of the Bristol Facility shall be made pursuant to section 1123(a)(5)(D) of the Bankruptcy Code and shall be subject to higher and better offers pursuant to bidding procedures approved by the Bankruptcy Court;

24

<u>provided</u> that the sale of the Bristol Facility shall not be a condition precedent to the Effective Date and such sale may not be consummated any earlier than the Effective Date.

5.12.    ***Cancellation of Liens.***

Except as otherwise specifically provided herein, upon the occurrence of the Effective Date, any Lien securing any Secured Claim shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

5.13.    ***Management Employment Matters.***

On the Effective Date, the applicable Reorganized Debtors shall enter into new employment agreements with certain members of the management team and shall implement the Management Incentive Plan which shall provide for the issuance of New Common Stock, in options or restricted units/equity, to management, directors, and employees of the Reorganized Debtors to incentivize their senior management teams.

5.14.    ***Withholding and Reporting Requirements.***

(a)    *Withholding Rights*.    In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.    In the case that a distribution of New Common Stock, New Warrants, or other non-Cash property is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.    Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.    Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.    Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms*.    Any party entitled to receive any property (including Cash) as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Reorganized Debtors (which entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or Form W-8, as applicable, unless such Person is exempt under the Tax Code and so notifies the Disbursing Agent.    If such request is made by the Reorganized Debtors, the Disbursing Agent, or such other Person designated by the Reorganized Debtors and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

WEIL:\95270840\1\35076.0003

5.15.  ***Exemption From Certain Transfer Taxes.***

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with this Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under this Plan or the reinvesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in this Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of collateral under the Exit Facilities and (e) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

5.16.  ***Restructuring Transactions; Further Transactions.***

On or prior to the Effective Date, the following Restructuring Transactions shall be effectuated in the following order:

(a)  All Intercompany Claims held by Chassix against Diversified Machine, Inc. (whether or not represented by a note) shall be contributed by Chassix to the capital of Diversified Machine, Inc.;

(b)  The Amended Organizational Documents of the Reorganized Debtors shall become effective;

(c)  New Common Stock shall be issued and contributed by Reorganized UC Holdings to Reorganized Chassix in an amount of shares sufficient to satisfy the Secured Noteholder Common Stock Distribution under Section 4.3 of the Plan;

(d)  The Existing UC Holdings Equity Interests held by Chassix Holdings shall be recapitalized into an amount of shares of New Common Stock and New Warrants, if applicable, sufficient to satisfy the Unsecured Noteholder Common Stock Distribution under Section 4.4;

(e)  Concurrently, (i) Chassix Holdings shall transfer to the Unsecured Noteholders, in accordance with Sections 4.4 and 5.2 of the Plan, shares of New Common Stock sufficient to satisfy the Unsecured Noteholder Common Stock Distribution and New Warrants, if applicable, and (ii) Reorganized Chassix shall distribute to the Secured Noteholders in satisfaction and discharge of their Allowed Secured Note Claims, such New Common Stock in accordance with Section 4.3 of the Plan; and

(f)  All Interests in Chassix Holdings shall be cancelled and extinguished in accordance with Section 5.4 and Chassix Holdings shall be dissolved in accordance with Section 5.17 below.

On the Effective Date or as soon as practicable thereafter, the Reorganized Debtors may (i) cause any or all of the Subsidiary Reorganized Debtors to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, (iii) use the proceeds of the Exit Term Loan and Revolving Exit Facility, plus Cash on hand, to pay all Restructuring Expenses, (iv) change the name of one or more of the Reorganized Debtors to such name that may be determined in accordance with applicable law, and (v) engage in any other transaction in furtherance of the Plan, including for tax efficiency reasons; provided that such transactions are not inconsistent with the above Restructuring Transactions or the other terms of the Plan.  Subject to the prior written consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, any such transactions may be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders, members, general or limited partners, or directors of any of the Debtors or the Debtors in Possession.

5.17.    ***Dissolution of Chassix Holdings.***

On the Effective Date, upon the consummation of the Restructuring Transactions and all other Effective Date distributions and transactions in furtherance of the Plan, Chassix Holdings shall file with the Office of the Secretary of State of Delaware a certificate of dissolution which may be executed by an officer of Chassix Holdings without the necessity of the approval of the board of directors of Chassix Holdings or the holders of Interests in Chassix Holdings, and upon such filing shall be deemed dissolved for all purposes and without the necessity of any other action by Chassix Holdings.  From and after the Effective Date, Chassix Holdings shall not be required to file any documents, or take any other action or receive any approval to withdraw business operations in any state in which Chassix Holdings previously conducted its business operations.  To the extent that any of the foregoing is inconsistent or in conflict with any preexisting organizational or related documents of Chassix Holdings, such documents are deemed amended by the Plan to permit and authorize Chassix Holdings to take the contemplated actions.

5.18.    ***Effectuating Documents.***

On and after the Effective Date, the Reorganized Debtors and the managers, officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

5.19.    ***Closing of the Chapter 11 Cases.***

After an Estate has been fully administered, the Reorganized Debtors shall promptly seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

**SECTION 6.    DISTRIBUTIONS**.

6.1.    ***Distribution Record Date***.

As of the close of business on the Distribution Record Date, the Claims register shall be closed and there shall be no further changes in the record holders of any Claims or Interests.  The Debtors

or the Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date. Other than Claims that are expressly permitted by a Final Order or under the Plan to be filed after the Distribution Record Date, the Debtors or the Reorganized Debtors, as applicable, shall have no obligation to recognize any Claims filed from and after the Distribution Record Date.

6.2.    *Date of Distributions.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.3.    *Timing of Distributions.*

Except as otherwise provided herein, the Disbursing Agent shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date. Thereafter, the Disbursing Agent shall from time to time determine the subsequent Distribution Dates, which shall occur no less frequently than semi-annually.

6.4.    *Disbursing Agent.*

All distributions hereunder shall be made by Reorganized Chassix (or such other entity designated by Reorganized Chassix), as Disbursing Agent[s], on or after the Effective Date or as otherwise provided herein; provided that the Secured Note Indenture Trustee shall, subject to an acceptable agreements with the Debtors or Reorganized Chassix, serve as Disbursing Agent for Allowed Class 3 Secured Note Claims and the Unsecured Note Indenture Trustee shall serve as Disbursing Agent for Allowed Class 4 Unsecured Note Claims. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable fees and expenses incurred by such Disbursing Agents shall be reimbursed by the Reorganized Debtors.

6.5.    *Powers of Disbursing Agent.*

A Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (b) make all distributions contemplated hereby and (c) exercise such other powers as may be vested in a Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by such Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.6.    *Delivery of Distributions.*

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders of Allowed Claims. In the event that any distribution to any holder is returned as undeliverable, no further distributions shall be made to such holder unless and until such Disbursing Agent is notified in writing of such holder's then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter. Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts back to the Debtors or Reorganized Debtors, as applicable, and shall not be supplemented with any interest, dividends or other accruals of any kind. Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy

Code at the expiration of 180 days from the date of distribution.  After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

### 6.7.    *Manner of Payment Under Plan.*

At the option of the Debtors or the Reorganized Debtors, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

### 6.8.    *Fractional Stock.*

If any distributions of New Common Stock or New Warrants pursuant to the Plan would result in the issuance of a fractional share of New Common Stock or New Warrants, then the number of shares of New Common Stock or New Warrants to be issued in respect of such distribution shall be calculated to one decimal place and rounded up or down to the closest whole share (with a half share rounded up).  The total number of shares of New Common Stock or New Warrants to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in this paragraph.

### 6.9.    *Minimum Cash Distributions.*

The Disbursing Agent shall not be required to make any Initial Distribution or semi-annual distribution of Cash less than $50 to any holder of an Allowed General Unsecured Claim; provided that, if any distribution is not made pursuant to this Section 6.9, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.  The Disbursing Agent shall not be required to make any final distributions of Cash less than $25 to any holder of an Allowed Claim.  If either (a) all Allowed General Unsecured Claims (other than those whose distributions are deemed undeliverable hereunder) have been paid in full or (b) the amount of any final distributions to holders of Allowed General Unsecured Claims would be $25 or less and the aggregate amount of cash available for distributions to holders of Allowed General Unsecured Claims is less than $25,000, then no further distribution shall be made by the Disbursing Agent and any surplus Cash shall be donated and distributed to an I.R.C. § 501(c)(3) tax-exempt organization selected by the Disbursing Agent.

### 6.10.    *Setoffs.*

The Debtors and the Reorganized Debtors may, but shall not be required to, set off against any Claim, any claims of any nature whatsoever that the applicable Debtor or Reorganized Debtor may have against the holder of such Claim; *provided, that* neither the failure to do so nor the allowance of any Claim shall constitute a waiver or release by the applicable Debtor or Reorganized Debtor.

### 6.11.    *Distributions After Effective Date.*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.12.    *Allocation of Distributions Between Principal and Interest.*

Except as otherwise provided in this Plan, to the extent that any Allowed Secured Note Claim, Allowed Unsecured Note Claim, Allowed General Unsecured Trade Claim or Allowed Other

WEIL:\95270840\1\35076.0003

General Unsecured Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

**SECTION 7.    PROCEDURES FOR DISPUTED CLAIMS.**

7.1.    *Allowance of Claims.*

After the Effective Date, the Reorganized Debtors shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under this Plan.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

7.2.    *Objections to Claims.*

As of the Effective Date, objections to, and requests for estimation of, Claims against the Debtors may be interposed and prosecuted only by the Reorganized Debtors.  Such objections and requests for estimation shall be served and filed (a) on or before the 180th day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended, or (b) such later date as ordered by the Bankruptcy Court.

7.3.    *Estimation of Claims.*

The Debtors or Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtors, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

7.4.    *No Distributions Pending Allowance.*

If an objection to a Claim is filed as set forth in Section 7.2, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.  Cash in the amount of such Disputed Claims shall be reserved by the Debtors but shall not be held in a segregated account.

WEIL:\95270840\1\35076.0003

7.5.    ***Distributions After Allowance.***

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan on the next Distribution Date after the date that such Disputed Claim becomes an Allowed Claim (whether by Final Order of the Bankruptcy Court or otherwise).    Holders of Disputed Claims that ultimately become Allowed Claims shall not be entitled to payment of interest unless otherwise provided herein, in a Final Order, or required under applicable bankruptcy law.

7.6.    ***Resolution of Claims.***

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.

7.7.    ***Disallowed Claims.***

All Claims held by persons or entities against whom or which any of the Debtors or Reorganized Debtors has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code shall be deemed "disallowed" claims pursuant to section 502(d) of the Bankruptcy Code and holders of such claims shall not be entitled to vote to accept or reject the Plan.    Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtors or the Reorganized Debtors from such party have been paid.

## SECTION 8.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

8.1.    ***General Treatment.***

Effective as of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties are hereby assumed, except for an executory contract or unexpired lease that (a) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (b) is specifically designated as a contract or unexpired lease to be rejected on the Schedule of Rejected Contracts or is otherwise expressly rejected pursuant to the Plan, (c) is the subject of a separate (i) assumption motion filed by the Debtors (with the reasonable consent of the Required Consenting Noteholders) or (ii) rejection motion filed by the Debtors (with the reasonable consent of the Required Consenting Noteholders) under section 365 of the Bankruptcy Code prior to the Confirmation Date, or (e) is the subject of a pending objection regarding assumption, Cure, or "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code or other issues related to assumption of the contract or lease) (each such objection, a "***Cure Dispute***").

8.2.    ***Determination of Cure Disputes and Deemed Consent.***

The Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts and shall serve, within 14 days of the commencement of the Confirmation Hearing, a notice on parties to executory contracts or unexpired leases to be assumed reflecting the Debtors' intention to assume the contract or lease in connection with this Plan and, where applicable, setting forth the proposed cure amount (if any).    The proposed cure amount for any executory contract or unexpired lease not listed on the schedule shall be $0.    Any such schedule of executory contracts to be assumed and the proposed cure amounts contained therein shall be reasonably acceptable to the Required Consenting Noteholders.

31

To the extent that a Cure Dispute is asserted in an objection filed within fifteen (15) days of service of notice of intent to assume, and properly served on the Debtors, such Cure Dispute shall be scheduled for a hearing by the Bankruptcy Court. Following resolution of a Cure Dispute by Final Order of the Bankruptcy Court, the applicable contract or lease shall be deemed assumed effective as of the Effective Date, provided that the Debtors reserve the right to reject any contract or lease following entry of a Final Order of the Bankruptcy Court resolving the applicable Cure Dispute by filing a notice indicating such rejection within three (3) Business Days of the entry of such Final Order.

To the extent that an objection is not timely filed and properly served on the Debtors with respect to a Cure Dispute, then the counterparty to the applicable contract or lease shall be deemed to have assented to (a) the Cure amount proposed by the Debtors and (b) the assumption of such contract or lease, notwithstanding any provision thereof that (i) prohibits, restricts or conditions the transfer or assignment of such contract or lease, or (ii) terminates or permits the termination of a contract as a result of any direct or indirect transfer or assignment of the rights of the Debtor under such contract or a change in the ownership or control as contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminated or modifying such contract on account of transactions contemplated by the Plan.

### 8.3. *Payments Related to Assumption of Contracts and Leases.*

Subject to resolution of any Cure Dispute, any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as the case may be, upon assumption thereof.

Assumption and assignment of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption and/or assignment. Any proofs of claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other entity.

### 8.4. *Rejection.*

In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective estates, properties or interests in property as agents, assessors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors no later than thirty (30) days after the later of (1) the Confirmation Date or (2) the effective date of the rejection of such executory contract or unexpired lease. Any such Claims, to the extent Allowed, shall be classified as Class 6 Other General Unsecured Claims. The Confirmation Order shall constitute the Bankruptcy Court's approval of the rejection of all the leases and contracts identified in the schedule of rejected contracts.

### 8.5. *Survival of the Debtors' Indemnification Obligations.*

Any obligations of the Debtors pursuant to their corporate charters, bylaws, organizational documents or otherwise (including, without limitation, any applicable indemnification

32

agreements) to indemnify current officers, directors, agents and/or employees with respect to all present and future actions or omissions, suits and proceedings against the Debtors or such directors, officers, agents and/or employees, based upon any act or omission occurring at or prior to the Effective Date for or on behalf of the Debtors shall not be discharged or impaired by confirmation of the Plan or the occurrence of the Effective Date, provided that, for the avoidance of doubt, the Reorganized Debtors shall indemnify officers and directors of the Debtors for any claims or Causes of Action to the fullest extent provided by law pursuant to their respective Amended Organizational Documents and such documents shall not be amended or altered in any way that may diminish or impair the rights of the parties or beneficiaries thereunder that exist or existed as of the Effective Date; provided further that no director shall be indemnified with respect to the issuance of the Unsecured Notes, the use of their proceeds and any events related thereto. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including, without limitation, the "tail policy") in effect as of the Commencement Date, and any directors and officers of the Debtors who served in such capacity at any time before or after the Commencement Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

### 8.6.    *Compensation and Benefit Plans*.

Except as otherwise herein provided, all material employee compensation and Benefit Plans of the Debtors in effect as of the Effective Date shall be deemed to be, and shall be treated as if they were, executory contracts that are to be assumed under the Plan.

### 8.7.    *Insurance Policies*.

All insurance policies pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Reorganized Debtors and shall continue in full force and effect. All other insurance policies shall revest in the Reorganized Debtors. Furthermore, the discharge and release of the Debtors as provided in this Plan, and the re-vesting of property in the Reorganized Debtors, shall not diminish nor impair the enforceability of any insurance policies that may cover Claims against any Debtor or other person or entity.

### 8.8.    *Intellectual Property Licenses and Agreements*.

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the applicable Reorganized Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected hereunder or pursuant to a Final Order, or is the subject of a separate rejection motion filed by the Reorganized Debtors. Unless otherwise provided herein, all other intellectual property contracts, licenses, royalties, or other similar agreements shall revest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such revesting as contemplated herein.

8.9.   ***Reservation of Rights.***

Neither the exclusion nor inclusion of any contract or lease on any exhibit, schedule or annex to the Plan or the Plan Supplement, including the Schedule of Assumed Contracts or the Schedule of Rejected Contracts, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that any of the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

Nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## SECTION 9.   CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.

9.1.   ***Conditions Precedent to Confirmation.***

The occurrence of Confirmation is subject to the following conditions precedent:

(a)      the entry of the Disclosure Statement Order;

(b)      the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable;

(c)      the Bankruptcy Court shall have entered the Confirmation Order;

(d)      the Restructuring Support Agreement shall not have been terminated, and shall be in full force and effect;

(e)      the Accommodation Agreements shall not have been terminated, and shall be in full force and effect; and

(f)      the DIP Facilities shall not have been terminated and shall be in full force and effect.

9.2.   ***Conditions Precedent to the Effective Date.***

The occurrence of the Effective Date is subject to the following conditions precedent:

(a)      the Definitive Documents shall contain terms and conditions consistent in all material respects with this Plan and the Restructuring Support Agreement and shall otherwise be reasonably satisfactory in all respects to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable;

WEIL:\95270840\1\35076.0003

(b)  all actions, documents and agreements necessary to implement and consummate the Plan, including, without limitation, entry into the Definitive Documents, and the Amended Organizational Documents, each in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, and the transactions and other matters contemplated thereby, shall have been effected or executed;

(c)  the Debtors shall enter into the Exit Facilities and the conditions precedent to funding under the Exit Facilities shall have been satisfied or waived;

(d)  subject to Section 12.5 below, any amendments, modifications, or supplements to the Plan (including the Plan Supplement), if any, shall be reasonably acceptable to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable;

(e)  the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred and the Confirmation Order shall not have been stayed, rescinded, vacated or reversed on appeal;

(f)  the Restructuring Support Agreement shall not have been terminated, and shall be in full force and effect;

(g)  the Accommodation Agreements shall not have been terminated, and shall be in full force and effect;

(h)  all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

(i)  all reasonable fees and expenses (including attorney's fees and fees for other retained professionals, advisors and consultants) of the Consenting Noteholders, Platinum Equity, the DIP Agents, and the agents under the Exit Facilities incurred in connection with the Chapter 11 Cases, the negotiation and formulation of the Plan, DIP Facilities and Exit Facilities and related documents, and all transactions set forth herein or necessary to implement and consummate the Plan (whether incurred before or after the Commencement Date) shall have been paid; and

(j)  all conditions precedent listed in (a)-(i) herein occurring prior to July 31, 2015.

9.3.    ***Waiver of Conditions Precedent.***

Each of the conditions precedent in Sections 9.1 and 9.2 may be waived in writing by the Debtors together with the prior written consent of the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

9.4.    ***Effect of Non-Occurrence of Effective Date.***

If the conditions listed in Sections 9.1 and 9.2 are not satisfied or waived in accordance with this Section 9, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person or (c) constitute an admission, acknowledgement, offer or undertaking by the Debtors, any of the other Restructuring Support Parties, or any other Person.

## SECTION 10.  EFFECT OF CONFIRMATION.

10.1.    ***Subordinated Claims.***

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

10.2.    ***Vesting of Assets.***

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates, including without limitation, the intellectual property licenses and other agreements referenced above in Section 8.8, shall vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided pursuant to this Plan, the Confirmation Order, or the Exit Facilities.  The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if no cases were ever filed under any chapter or provision of the Bankruptcy Code, except as provided herein.

10.3.    ***Discharge of Claims and Termination of Interests.***

Except as otherwise provided herein, effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such claims from and after the Commencement Date, against the Debtors or any of their assets, property or estates; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Persons shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns and their assets and properties any other Claims and Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

10.4.    ***Term of Injunctions or Stays.***

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or

WEIL:\95270840\1\35076.0003

otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.5. *Injunction Against Interference with Plan.*

From and after the Effective Date, all Persons are permanently enjoined from commencing or continuing in any manner, whether directly, derivatively or otherwise, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, suit, judgment, damages, Cause of Action, interest, remedy, or liability whatsoever released or to be released pursuant to the Plan or the Confirmation Order.  For the avoidance of doubt, in connection with such injunction, all Persons are permanently enjoined from (i) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order of any kind whatsoever, (ii) creating, perfecting or enforcing any encumbrance of any kind, (iii) asserting any right of setoff, subrogation or recoupment of any kind, or (iv) commencing or continuing in any manner any action or proceeding of any kind on account of or in connection with or with respect to any claim, demand, liability, obligation, debt, right, suit, judgment, damages, Cause of Action, interest, remedy, or liability whatsoever released or to be released pursuant to the Plan or the Confirmation Order.

### 10.6. *Releases by the Debtors.*

**As of the Effective Date, except for the right to enforce the Plan and the Definitive Documents that remain in effect after the Effective Date, for good and valuable consideration, including, without limitation, the Released Parties' contributions to facilitating the Reorganization and implementing the Plan, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by the Debtors, their Estates and the Reorganized Debtors from (and the Debtors, their Estates, and the Reorganized Debtors are deemed to covenant with, and to, the Released Parties not to sue or otherwise seek recovery from the Released Parties on account of) any and all Claims, Interests, obligations, rights, suits, judgments, damages, Causes of Action (including, without limitation, under any state or federal securities laws), remedies and liabilities whatsoever, including, without limitation, any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, their Estates, or the Reorganized Debtors, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Restructuring, the Reorganized Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any other Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Support Agreement or related agreements, instruments or other documents, the solicitation of votes with respect to the Plan, or upon any other act or omission, transaction, agreement, event or other occurrence taking place from the beginning of time through the Effective Date; provided that no Released Party shall be released from any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto.**

10.7.    *Releases By Holders of Claims and Interests.*

**As of the Effective Date, except for the right to enforce the Plan and the Definitive Documents that remain in effect after the Effective Date and the indemnification obligations that survive the Effective Date, (a) each holder of a Claim or an Interest, other than any holder who both voted to reject the Plan and checked the opt out box on the applicable ballot indicating its wish to opt out of the release provisions set forth in this Section 10.7, and (b) each Released Party shall be deemed to have, conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Reorganized Debtors and the Released Parties from (and are deemed to have covenanted with the Reorganized Debtors and the Released Parties not to sue or otherwise seek recovery from the Reorganized Debtors or the Released Parties on account of) any and all Claims, Interests, obligations, rights, suits, judgments, damages, Causes of Action (including, without limitation, under any state or federal securities laws), remedies and liabilities whatsoever, including, without limitation, any derivative Claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any other Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Support Agreement or related agreements, instruments or other documents, the solicitation of votes with respect to the Plan, or upon any other act or omission, transaction, agreement, event or other occurrence taking place from the beginning of time through the Effective Date; _provided_ that no Released Party shall be released from any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto.**

10.8.    *Exculpation.*

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, cause of action or liability for any claim in connection with or arising out of, the administration of the Chapter 11 Cases, the entry into the Restructuring Support Agreement and related documents and the consummation of the transactions contemplated therein, the negotiation and drafting of the Plan, the solicitation of votes for the Plan, or confirmation or the consummation of the Plan, the funding of the Plan, or the administration of the Plan or the property to be distributed under the Plan, the issuance of Securities under or in connection with the Plan, or any transactions, decisions, actions and/or inactions contemplated by or relating to any of the foregoing, except for willful misconduct or gross negligence, but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors and the Reorganized Debtors (and each of their respective agents, directors, officers, employees, affiliates, advisors and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting the Exculpated Parties from liability. Without limiting the generality of the foregoing, the Exculpated Parties shall be entitled to and

WEIL:\95270840\1\35076.0003

granted the protections and benefits of section 1125(e) of the Bankruptcy Code. Pursuant to section 105 of the Bankruptcy Code, no holder or purported holder of an Administrative Claim, claim or Interest shall be permitted to commence or continue any Cause of Action, employment of process, or any act to collect, offset, or recover any claim against an Exculpated Party that accrued on or before the Effective Date and that has been released or waived pursuant to this Plan.

10.9.    *Retention of Causes of Action/Reservation of Rights.*

(a)    Except as otherwise provided herein, including Sections 10.6, 10.7 and 10.8, pursuant to section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their estates may hold against any person or entity without the approval of the Bankruptcy Court, including, without limitation, (i) any and all claims against any Person, to the extent such Person asserts a crossclaim, counterclaim and/or claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, their respective Estates, officers, directors or representatives; and (ii) the turnover of any property of the Estates; provided that the Reorganized Debtors shall not retain any claims or Causes of Action against the Released Parties (other than claims or Causes of Action arising out of or relating to any act or omission of a Released Party that (i) is a criminal act, or (ii) constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto, which claims or Causes of Action are hereby preserved). The Reorganized Debtors or their successor(s) may pursue such retained claims, rights, or causes of action, suits or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

(b)    Except as otherwise provided herein, including Sections 10.6, 10.7 and 10.8, nothing contained herein or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff or other legal or equitable defense which the Debtors had immediately before the Commencement Date, against or with respect to any Claim left Unimpaired by the Plan; provided that the Reorganized Debtors shall not retain any claims or Causes of Action against the Released Parties (other than claims or Causes of Action arising out of or relating to any act or omission of a Released Party that (i) is a criminal act, or (ii) constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto, which claims or Causes of Action are hereby preserved). The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses which they had immediately before the Commencement Date with respect to any Claim left Unimpaired by the Plan as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

10.10.    *Solicitation of the Plan.*

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and

WEIL:\95270840\1\35076.0003

therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

10.11.  *Plan Supplement.*

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court by no later than the Plan Supplement Filing Date.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Documents to be included in the Plan Supplement will be posted at the website of the Debtors' notice, claims, and solicitation agent as they become available.  The Plan Supplement shall contain, among other things, substantially final forms of the Amended Organizational Documents, the Schedule of Assumed Contracts, the Schedule of Rejected Contracts, the Exit Term Loan, the Revolving Exit Facility, the Management Incentive Plan, the Shareholders Agreement, the New Warrant Agreement, and, to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code regarding members of the New Board.

10.12.  *Corporate and Limited Liability Company Action.*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) the assumption of the Benefit Plans of the Debtors as provided herein, (b) the selection of the managers, directors, and officers for the Reorganized Debtors, (c) the issuance and distribution of the New Common Stock, (d) the entry into the Revolving Exit Facility and the Exit Term Loan, (e) the approval of the Accommodation Agreements, and (f) the issuance and distribution of the New Warrants, and (g) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date), in each case in accordance with and subject to the terms hereof. All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtors, including (w) the Amended Organizational Documents, (x) the Exit Facilities, and (y) the Accommodation Agreements, and (z) any and all other agreements, documents, securities and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Section 10.12 shall be effective notwithstanding any requirements under non-bankruptcy law.

**SECTION 11.  RETENTION OF JURISDICTION.**

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date;

(b)    to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

40

(c)    to consider the allowance, classification, priority, compromise, estimation or payment of any Claim;

(d)    to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(e)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(f)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(g)    to hear and determine all applications under sections 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(h)    to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Plan Supplement, or the Confirmation Order or any agreement, instrument or other document governing or relating to any of the foregoing;

(i)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute and consummate the Plan or to maintain the integrity of the Plan following consummation;

(j)    to resolve any matters related to (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor or Reorganized Debtor is party or with respect to which a Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Section 8, any executory contracts or unexpired leases to the Schedule of Rejected Contracts or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(k)    to resolve disputes as to the ownership of any Claim or Interest;

(l)    to hear and determine any matter, case, controversy, suit, dispute, or Cause of Action (i) regarding the existence, nature, and scope of the discharge, releases, injunctions, and exculpation provided under the Plan, and (ii) enter such orders as may be necessary or appropriate to implement such discharge, releases, injunctions, exculpations, and other provisions;

(m)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)    to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

WEIL:\95270840\1\35076.0003

(o)      to adjudicate, decide, or resolve any Causes of Actions and Cure Disputes;

(p)      to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(q)      to resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid;

(r)      to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(s)      to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(t)      to enter a final decree closing the Chapter 11 Cases;

(u)      to recover all assets of the Debtors and property of the Estates, wherever located; and

(v)      to hear and determine any rights, Claims or causes of action held by or accruing to Reorganized Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

## SECTION 12.   MISCELLANEOUS PROVISIONS.

### 12.1.   *Payment of Statutory Fees*.

All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date, and by the Reorganized Debtors after the Effective Date until the Chapter 11 Cases are closed.

### 12.2.   *Substantial Consummation*.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 12.3.   *Dissolution of Creditors Committee*.

On the Effective Date, the Creditors Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; <u>provided</u> that the Creditors Committee shall exist, and its professionals shall be retained, after the Effective Date with respect to (a) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; and (b) pending appeals of the Confirmation Order, if any.

### 12.4.   *Request for Expedited Determination of Taxes*.

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods (or portions thereof) ending after the Commencement Date through the Effective Date.

42

12.5.    *Amendments.*

(a)    *Plan Modifications.*  The Plan may be amended, modified or supplemented by the Debtors or the Reorganized Debtors, as applicable, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code; *provided, that* such amendments, modifications, or supplements shall be satisfactory in all respects to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  In addition, after the Confirmation Date, the Debtors or the Reorganized Debtors, as applicable, may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

(b)    *Other Amendments.*  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; <u>provided</u> that such technical adjustments or modifications shall be satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

12.6.    *Revocation or Withdrawal of the Plan.*

The Debtors may not revoke or withdraw the Plan before the Effective Date without the consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable; <u>provided</u> that the Debtors may revoke or withdraw the Plan if such withdrawal is in the exercise of their fiduciary duty or otherwise permitted under the Restructuring Support Agreement.  If the Debtors take such action, the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed to be a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

12.7.    *Severability of Plan Provisions upon Confirmation.*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors (to be made only with the consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted; <u>provided</u> that any such alteration or interpretation shall be acceptable to the Debtors, the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be); and (3) nonseverable and mutually dependent.

WEIL:\95270840\1\35076.0003

12.8.    *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

12.9.    *Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

12.10.    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the documents contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, the Exculpated Parties and each of their respective successors and assigns.

12.11.    *Successor and Assigns.*

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

12.12.    *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

12.13.    *Notices.*

All notices, requests and demands to or upon the Reorganized Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

    (a)  if to the Reorganized Debtors:

        Chassix, Inc.
        300 Galleria Officecentre
        Suite 501
        Southfield, Michigan 48034
        Facsimile: (248) 352-0241
        Attn:  Bibi N. Di Serio, Esq.

            - and -

44

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Ray C. Schrock, P.C.
          Marcia L. Goldstein, Esq.
          Matthew P. Goren, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

(b)  if to Platinum Equity:

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty St.
New York, New York 10005
Attn:    Dennis F. Dunne, Esq.
            Samuel A. Khalil, Esq.
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

(c)  if to the DIP ABL Agent:

Bodman PLC
1901 St. Antoine Street, 6th Floor at Ford Field
Detroit, Michigan 48226
Attn:    Robert J. Diehl, Jr., Esq.
Telephone: (313) 393-7597
Facsimile: (313) 393-7579

(d)  if to the DIP Term Agent:

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, Connecticut 06103
Attn:    Nathan Plotkin, Esq.
Telephone:  (860) 251-5320
Facsimile:  (860) 251-5212

(e)  if to the Consenting Noteholders:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attn:    Andrew N. Rosenberg, Esq.
            Alice Belisle Eaton, Esq.
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

WEIL:\95270840\1\35076.0003

(f)  if to the Exit Term Loan Lenders:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attn:    Andrew N. Rosenberg, Esq.
            Alice Belisle Eaton, Esq.
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

After the Effective Date, the Reorganized Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002 and to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to those Persons who have filed such renewed requests.

WEIL:\95270840\1\35076.0003

Dated:  March 12, 2015

New York, New York

        Respectfully submitted,

        Chassix Holdings and each of the Debtors

        By:     /s/ J. Mark Allan                  
             Name:  J. Mark Allan
             Title:   President

**Exhibit A**

**Accommodation Agreements**

**(without exhibits)**

WEIL:\95270840\1\35076.0003

**EXECUTION VERSION**

## ACCOMMODATION AGREEMENT

General Motors LLC ("GM" ), Ford Motor Company ("Ford"),  FCA US LLC f/k/a Chrysler Group LLC ("FCA"), and Nissan North America, Inc. ("Nissan" and together with GM, Ford, and FCA, collectively, the "Customers" and each, individually, a "Customer"), Chassix, Inc., together with its domestic subsidiaries  (collectively, "Supplier" or "Chassix"), UC Holdings, Inc. ("UC Holdings"), PNC Bank, National Association (the "DIP ABL Agent") and Cantor Fitzgerald Securities, solely in its capacity as agent under the DIP Term Facility (the "DIP Term Agent" and together with the DIP ABL Agent, the "DIP Agents") enter into this Accommodation Agreement ("Agreement") on March 11, 2015.  Customers, Supplier, UC Holdings and DIP Agents are collectively referred to herein as the "Parties" and each individually as a "Party."

### *RECITALS*

A.    Pursuant to various purchase agreements, release requests and/or purchase orders issued by each of the Customers and accepted by Supplier (as such agreements, release requests or purchase orders may be modified from time to time, "Purchase Orders" or individually, a "Purchase Order"), Customers have ordered from Supplier certain component parts, service parts and assembled goods (collectively, "Component Parts" or individually, a "Component Part").

B.    Supplier faces certain financial difficulties that threaten to interrupt the supply of Component Parts to Customers.  In connection therewith, Supplier requested that each of the Customers provide various financial and other interim accommodations to Supplier to facilitate a potential restructuring of Supplier's business operations and capital structure.   Effective December 31, 2014, the Customers and Chassix entered into that certain Term Sheet For Proposed Interim Accommodations attached hereto as Exhibit A (as amended, modified or supplemented from time to time, including, without limitation, pursuant to that certain First Amendment dated as of February 6, 2015, the "Interim Accommodation Term Sheet").

C.    Supplier intends to undertake a financial restructuring and recapitalization (the "Restructuring"), which is anticipated to be effected through a solicitation of votes for a plan of reorganization for Supplier, in substantially the form attached hereto as Exhibit B, or such other plan of reorganization so long as such other plan is reasonably acceptable to the Customers (as compared to the terms of the plan attached hereto as Exhibit B) (each such plan, the "Acceptable Plan"), and the commencement by Supplier of voluntary cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

D.    Pursuant to the terms of the proposed DIP order attached hereto as Exhibit C (the "Proposed DIP Order"): (a) the DIP ABL Agent, acting as administrative agent for a syndicate of banks, financial institutions and other institutional lenders (the "ABL DIP Lenders"), has agreed to provide to Supplier an approximate $150 million consensual, priming debtor-in-possession financing facility (collectively, the "DIP ABL Facility") pursuant to that certain Superpriority Secured Debtor-In-Possession ABL Loan, Security and Guaranty Agreement (the "DIP ABL Credit Agreement") in connection with the Chapter 11 Cases; and (b) the DIP Term Agent,

acting as administrative agent for a syndicate of banks, financial institutions and other institutional lenders reasonably acceptable to Chassix and the Customers (the "DIP Term Lenders"), has agreed to provide to Supplier an approximate $100 million consensual, priming debtor in possession financing facility (collectively, the "DIP Term Facility" and together with the DIP ABL Facility, the "DIP Facilities") pursuant to that certain DIP Term Loan Facility (the "DIP Term Credit Agreement" and together with the DIP ABL Credit Agreement, the "DIP Credit Agreements") in connection with the Chapter 11 Cases.

E.        Subject to the terms and conditions of this Agreement, Customers have agreed to provide to Supplier the accommodations set forth in this Agreement, which replaces the Interim Accommodation Term Sheet in its entirety as of the Effective Date (as defined below) except to the extent expressly provided in this Agreement.

**BASED UPON THE FOREGOING RECITALS** and other good and valuable consideration, the receipt and adequacy of which are acknowledged, the Parties agree as follows:

### *TERMS AND CONDITIONS*

1.        **Conditions to Effectiveness.**  This Agreement will become effective (the date of such effectiveness, the "Effective Date") only upon the timely satisfaction of each of the following conditions:

(a)        Execution of this Agreement by all of the Parties;

(b)        Supplier's delivery to the Customers of a fully executed copy of an Access Agreement (the "Access Agreement") substantially in the form attached hereto as Exhibit D; and

(c)        Supplier obtaining entry of one or more orders of the Bankruptcy Court (i) approving this Agreement and the Access Agreement as postpetition agreements binding on Supplier, and (ii) authorizing Supplier to use cash collateral and approving the DIP Facilities on terms substantially similar to those set forth in the Proposed DIP Order.

2.        **Term.**  For purposes of this Agreement, the "Term" shall mean, unless otherwise extended by written agreement of the Parties, the period from the Effective Date through the earliest to occur of (a) a Section 8 Termination (as defined in Section 8), (b) the effective date of the Acceptable Plan, and (c) July 31, 2015 (the occurrence of any one of these events triggers the ("Termination Date")).

3.        **Customers' Accommodations.**

3.1.



WEIL:\95233664\30\35076.0003



3



3.2.    <u>Sale of the Bristol Facility</u>.  Subject to the terms of the Acceptable Plan, Supplier will give reasonable and due consideration to any offers presented to Supplier by any Customer, or other parties reasonably acceptable to Supplier and the DIP Agents, for the purchase of the Bristol Facility. Supplier agrees to consult in good faith with the Customers in connection with sale process for the Bristol Facility, including with respect to the scope of information to be provided to prospective purchasers in connection with such process. For the avoidance of doubt, except to the extent provided in an Acceptable Plan, Supplier shall not be required to solicit offers for, or otherwise market (in each case, whether formally or informally), the sale of any of its assets or facilities, including, the Bristol Facility.  If, during the Term, a Customer purchases the Bristol Facility, such purchasing Customer hereby agrees (on behalf of itself and its designees(s)) to produce parts for the other customer(s) of the Bristol Facility for a period of time of no more than 195 days subject to (a) the terms of the Access Agreement as if the Customer had exercised its Right of Access and the customers receiving component parts from the Bristol Facility agreeing that their obligations and rights are governed by the terms of the Access Agreement, (b) the necessary tangible personal property being available and (c) the applicable customer agreeing to indemnify and hold the purchasing Customer and its designee(s)

4

harmless from any and all liability arising from or related to the production of the parts for the customer, including any warranty and product liability associated with the parts produced.

### 3.3.    Limitation of Setoffs.

(a)    Each of the Customers waives (and, if and only if, included as Eligible Accounts as defined in the DIP ABL Credit Agreement (or which would have been Eligible Accounts but for the application of any aging or cross-aging eligibility criteria), waives for its respective foreign and domestic subsidiaries and affiliates that are part of the Borrowing Base under the DIP ABL Credit Agreement), subject to Section 10 (i) except for Allowed Setoffs (as defined below), any right of setoff, recoupment or deduction not previously exercised as of December 31, 2014 against any bona fide accounts at the prices agreed between Supplier and Customer owing to Supplier as of the Effective Date, and (ii) except for Allowed Setoffs (as defined below), Material Setoffs (as defined below) and Tooling Setoffs (as defined below), any of its rights of setoff, recoupment or deduction against any bona fide accounts at the prices agreed between Supplier and Customer owing to Supplier that arise during the period commencing on the Effective Date and ending on the date that is ten (10) business days after the end of the Term (any accounts described in this Section 3.3(a) being "Accounts Payable").

(b)    The term "Allowed Setoffs" means valid setoffs, recoupment or deduction for defective or non-conforming parts, quality problems, and fees relating to the non-operational professionals incurred by a Customer; provided, however, that Allowed Setoffs shall not include any setoff for amounts with respect to the Bristol Surcharge, the Premium Freight Costs, the Outage Costs, the Quality Spill Costs, and the Advisor and Independent Contractor Fees (each as defined in the Interim Accommodation Term Sheet).  Allowed Setoffs shall include a Bristol Surcharge Surplus for any Customer if the Company terminates any of its operations or the Bristol Surcharge Termination Date occurs such that there are no future Bristol Surcharge Funds for the immediately succeeding Budget Period as set forth in Section 3.1(d) available for credit.

(c)    The term "Material Setoffs" means setoffs for (i) materials or components delivered to Supplier (but excluding Tooling (as defined below)) or services performed for Supplier, purchased by a Customer from persons other than Supplier or supplied by a Customer to Supplier (either under a materials contract or in order to avoid an interruption in the Customer's production) for use in connection with the production of Component Parts by Supplier for that Customer, or (ii) direct payment(s) to material or service vendors by a Customer for the purchase of materials or components (but excluding Tooling) or services used by Supplier in connection with the production of Component Parts by Supplier for that Customer (either under a materials contract or in order to avoid an interruption in Customer's production) which was supplied under a materials contract or would have been purchased by Supplier but for the vendor's refusal to sell to Supplier and for which Customer has provided Supplier prior written notice of the materials and the amount to be paid to the vendor or purchased by Supplier from Customer, as applicable; provided, that Material Setoffs shall not include any amounts paid by Customer to such vendor with respect to any antecedent obligations of Supplier to such vendor; and provided further, that Customer may only take Material Setoffs against Accounts Payable generated on or after the third business day after Customer gives the DIP Agents notice of such Material Setoff (a "Material Setoff Notice").  Upon receipt of a Material Setoff Notice, the DIP ABL Agent may impose a reserve in the amount of the Material Setoff against the borrowing

WEIL:\95233664\30\35076.0003

base.  Material Setoffs may be taken ten (10) business days after giving Supplier and the DIP Agents notice of the amount paid by Customer.

(d)    The term "Tooling Setoffs" means setoffs for any payment to a tooling vendor or tooling repairman for all or part of the purchase price or repair price of Tooling (defined below) that is necessary for a Customer's production (existing and future) for which the payment is necessary to secure the release of a valid and perfected lien senior to the DIP Agents against Tooling or is required to obtain possession of Tooling from the tooling vendor or tooling repairman.  Tooling Setoffs may be taken three (3) business days after giving Supplier and the DIP Agents prior written notice of the setoff (a "Tooling Setoff Notice").  Tooling Setoffs may be taken only against the amount owed by a Customer on the associated tool order.  Upon receipt of a Tooling Setoff Notice, the DIP ABL Agent may impose a reserve in the amount of the Tooling Setoff if the associated tooling receivable is included in the borrowing base under the DIP ABL Credit Agreement.  The term "Tooling" means, collectively, all tooling, dies, test and assembly fixtures, gauges, jigs, patterns, casting patterns, cavities, molds, spare parts and documentation, including engineering specifications, test reports and manuals, used by Supplier in connection with its manufacture of Component Parts for the Customers.

(e)    Notwithstanding the foregoing provisions in this Section 3.3, Allowed Setoffs shall not include any individual setoff, recoupment or deduction that exceeds five percent (5%) (the "Agreed Cap") of the face amount of any respective invoice or group of invoices to be paid in any monthly invoice cycle.  In the event that a setoff is an Allowed Setoff and such Allowed Setoff is limited by the Agreed Cap, the remainder of such Allowed Setoff may be taken against subsequent payments of Accounts Payable; provided that at no time shall the Allowed Setoffs exceed the Agreed Cap of any invoice or group of invoices to be paid in any calendar month.

(f)    Each of the Customers and Supplier agrees to use best efforts to expedite the resolution of all disputed setoffs, recoupments and deductions.

(g)    Except as set forth in this Agreement, Customers reserve and do not waive any rights and interests they may have, including the right to assert affirmative claims against Supplier, and the right to cancel or terminate purchase orders or other contracts in accordance with their respective terms and conditions.

3.4.    Limitations on Resourcing.

(a) The Customers agree (i) not to resource the production of any Component Parts or programs currently on contract with Supplier or identified as a Future Program in each Customer's respective Component Supply Agreement, except for a Permitted Resourcing (as defined below) and (ii) except as required pursuant to any agreement between the applicable Customer and any Tier 1 supplier in effect on the date hereof, not to instruct, solicit, encourage, propose or coordinate any action that may result in any of Supplier's other customers resourcing their production of any Component Parts or programs currently on contract with Supplier or identified as a Future Program in each Customer's respective Component Supply Agreement.

6

(b) The term "Permitted Resourcing" means the resourcing of Component Parts by any Customer to any party other than Supplier: (i) set forth in each Customer's respective Component Supply Agreement (as amended from time to time during the Term by mutual agreement between the applicable Customer and Supplier) or (ii) resourced after the termination or cancellation of a Purchase Order with respect to such Component Parts either by reason of (A) an uncured material breach of such Purchase Order by Supplier or (B) cancellation of the Purchase Order due to a major refresh or major redesign of the program or the Component Part itself that renders the applicable Component Parts obsolete (unless Supplier has the technical capability to continue the program or the Component Part after taking into account such major refresh or major redesign and subject to any right of last refusal provided under the Component Supply Agreement to which such Customer is a party) (any of the foregoing events, a "Permitted Resourcing Event"); provided, however, Permitted Resourcing shall not include any resourcing due to a material breach arising out of or relating to Purchase Orders fulfilled, directly or through a Tier 1 supplier to a Customer, at the Bristol Facility prior to the Bristol Surcharge Termination Date except for a material breach of a Purchase Order, the consequence of which is a substantial likelihood that a Customer's production will be interrupted.  The Parties reserve all of their respective rights with respect to the allocation of any wind-down costs incurred in connection with any Permitted Resourcing Event.  Nothing in the preceding sentence shall impair the setoff, recoupment, or deduction limitations contained in Section 3.3.

3.5.    Payment Terms. Commencing on the Effective Date and notwithstanding anything to the contrary in any Purchase Order, each Customer will pay its Accounts Payable in accordance with the payment terms set forth in its Component Supply Agreement.

3.6.    Price Adjustments.  Except with respect to the Bristol Facility prior to the Bristol Surcharge Termination Date, commencing on April 1, 2015, Customers will amend existing Component Part Purchase Orders, as set forth in the applicable Customer's form of Component Supply Agreement attached as an exhibit hereto, to pay directly to Supplier a non-refundable price adjustment (the "Price Adjustment") and shall pay all Price Adjustments without setoff or recoupment, except for Allowed Setoffs.  In the event, during the Term, any Chassix directed supplier attempts to increase piece prices, Chassix and each applicable Customer(s) shall use reasonable best efforts to work together to mitigate the impact of any such proposed increase and, in the event a piece price increase occurs from a Customer directed supplier, unless the treatment of a piece price increase is addressed in another agreement between Chassix and the Customer, Chassix will have the ability to pass through any such change in pricing to the applicable Customer(s) for the life of any current Component Parts.

3.7.    Requirements Contracts.  The Customers and Supplier acknowledge and agree that, unless otherwise provided, the Purchase Orders covered by this Agreement constitute requirements contracts within the meaning of Uniform Commercial Code 2-306.  So long as the Supplier has the requisite production capacity, the Customers shall purchase from Supplier 100% of the requirements for the Component Parts in accordance with the terms of Component Supply Agreements; provided, that such purchase obligation shall not apply to any Component Parts that are dual-sourced by the applicable Customer as of the date hereof (but, for the avoidance of doubt, any such purchases shall be made at levels consistent with past practice).

WEIL:\95233664\30\35076.0003

3.8. 

3.9.

3.10. Advisors and Independent Contractors

(a) Supplier and Customers shall agree upon any third-party operation advisors ("Advisors") or independent contractors ("Independent Contractors") retained by Supplier and included within the Bristol Surcharge. Notwithstanding anything herein to the contrary, during the Term, the fees and expenses of any incremental or additional Advisors or Independent Contractors ("Advisor and Independent Contractor Fees") working exclusively on a particular Customer's Component Part production to be staffed or placed on-site at any of Supplier's facilities on or after December 1, 2014, shall be the sole responsibility of the applicable Customer. Any costs or expenses incurred in connection with any missed or short releases caused, directly or indirectly, by a Customer's Advisors or Independent Contractors shall be the sole responsibility of the applicable Customer.

(b) Customers shall use commercially reasonable efforts to have each of their respective Advisors and Independent Contractors enter into on-site or similar agreements with Supplier, substantially in the form of the agreement attached hereto as Exhibit E.

3.11. Tooling Payments. During the Term, upon presentment of an unpaid invoice from a Tooling supplier, subject to the release of liens on terms reasonably acceptable to

8

each applicable Customer, each applicable Customer shall advance to Supplier (and not to the Tooling supplier, unless in compliance with the Tooling Setoff Notice procedures in Section 3.3(d)) payments for completed Unpaid Tooling (as defined below) which is subject to a Purchase Order (or other operative Tooling release or agreement) issued by such Customer, but if such completed Unpaid Tooling has not been given a part submission warrant, Customer will pay that portion of the unpaid balance necessary for the Customer to have paid 90% of the amount of the Customer's Tooling Purchase Order.

3.12.    Support for Acceptable Plan. Subject to delivery by Supplier to the Customers of a disclosure statement and other solicitation materials for the Acceptable Plan that have been approved by the Bankruptcy Court as having "adequate information" as defined in section 1125 of the Bankruptcy Code and is otherwise in form and substance reasonably acceptable to the Customers (collectively, the "Acceptable Disclosure Statement"), each of the Customers agrees that it shall not, directly or indirectly, (a) object to, delay, impede or take any other action to interfere with acceptance or implementation of the Acceptable Plan, (b) directly or indirectly solicit, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout or plan of reorganization for Supplier other than the Acceptable Plan or (c) otherwise take any action that would in any material respect interfere with, delay or postpone the consummation of the Restructuring except such actions a Customer reasonably believes is necessary to protect the continuity of its production.  Each of the Customers further agrees, subject to delivery of an Acceptable Disclosure Statement, to (i) support and take all necessary steps to effectuate the Restructuring, and (ii) (A) to the extent that each of the Customers is entitled to accept or reject the Acceptable Plan pursuant to its terms (regardless of whether a Customer agrees to waive distribution under the Acceptable Plan), vote to accept the Acceptable Plan by delivering its duly executed and completed ballot accepting the Acceptable Plan on a timely basis following the commencement of the Solicitation, and (B) not change or withdraw (or cause to be changed or withdrawn) such vote provided that the Acceptable Plan is not amended or modified in a manner that adversely affects the Customers.

4.    **Supplier's Obligations.**

4.1.    Continue to Manufacture.    Supplier will continue to supply the Component Parts for each of the Customers in accordance with the terms of the Purchase Orders, as modified by this Agreement.   Supplier agrees to notify each Customer of any threat to continued timely shipment of the applicable Customer's Component Parts promptly upon learning of that threat.  Except as specifically provided for in this Agreement, this Agreement is not intended to modify the terms and conditions of any Customer's Purchase Orders, which terms and conditions otherwise remain in full force and effect. Supplier will not reject Customers' Purchase Orders during the Chapter 11 Cases and, on or before the effective date of an Acceptable Plan, will promptly move to assume the Customers' Purchase Orders in the Chapter 11 Cases.  Except as set forth in Section 8.2, in the event of any inconsistency between the terms of this Agreement and the terms of the Customers' respective Purchase Orders, the terms of this Agreement will control.  Supplier will allocate its capacity and resources equitably among the Customers, with no one Customer receiving priority allocation.

4.2.    Resourcing Cooperation.  Subject to the limitations set forth in Section 3.4, Supplier will reasonably cooperate with each Customer in connection with its preparation

9

for any Permitted Resourcing.  In connection with a Permitted Resourcing, Supplier will cooperate with a Customer's resourcing of production of its Component Parts permitted under this Agreement including, without limitation, (a) allowing a Customer and potential replacement suppliers access to Supplier's manufacturing facilities (subject to reasonable confidentiality protections) to remove all Customer Tooling (as defined below) used in production of the applicable Customer's Component Parts (provided that no Customer Tooling shall be removed prior to a Permitted Resourcing Event) and (b) using its commercially reasonable efforts and the power of the Bankruptcy Court to assign to the applicable Customers certain contracts (to the extent assignable under the Bankruptcy Code) that are related to the Permitted Resourcing and requested by the Customer.

4.3.    Inventory Bank. During the Term, upon the request of a Customer, Supplier will build for a Customer up to a two-week inventory bank of Component Parts ("Inventory Bank") in accordance with an inventory bank schedule agreeable to that Customer and Supplier; provided, however, that Supplier's obligation to build inventory bank parts will be subject to, among other things, (i) reasonably applied internal capacity limitations (e.g., machine capacity and manpower limitations), (ii) availability of raw materials and supplies, (iii) available financing, and (iv) that such obligation would not adversely affect Supplier.  Supplier will ship Component Parts in each Inventory Bank as they are produced to the location designated by the Customer, and the Customer will pay for those Component Parts in the ordinary course of dealings between the parties.  Supplier will not be required to build an Inventory Bank unless the Customer agrees in advance to pay all documented, additional, out-of-pocket costs incurred by Supplier in manufacturing the Inventory Bank including, without limitation, overtime, shipping, packaging, and storage costs. Supplier will allocate its resources used in building Inventory Banks equitably among Customers and any other customers. Supplier shall give priority to Customers over any other customers not providing accommodations required by Section 3.

4.4.    Access to Information.  Supplier agrees that Customers, upon giving reasonable advance notice, will have access to Supplier's operations, books and records during normal business hours, and outside normal business hours when reasonably necessary, for the purposes of (a) inspecting and removing, when permitted to do so under this Agreement, all Tooling involved with production of its Component Parts, (b) monitoring production of its Component Parts, (c) meeting with members of senior management of Supplier and with Supplier's outside legal and financial advisors, (d) monitoring steps needed to increase production capacity necessary to meet the terms of all Purchase Orders, and (e) monitoring Supplier's compliance with the terms of this Agreement, the Purchase Orders, and any other agreements between Supplier and Customers.

4.5.    Reporting and Notice of Adverse Event.  Supplier will provide to Customers (a) a rolling thirteen (13)-week cash flow forecast updated every other week, monthly budget-to-actual reconciliation, monthly financial statements, a statement of monthly accounts receivable and accounts payable agings and (b) the same financial reporting information, borrowing base certificates and collateral reports that it provides to the DIP Agents at the same time the information is provided to the DIP Agents.  As soon as practicable after becoming aware of any lawsuit against Supplier or any action that could interfere with Supplier's ability to perform its obligations under this Agreement, Supplier will notify Customers of the adverse event.

10

4.6.    <u>Other Customer Accommodations</u>.    Contemporaneous with this Agreement, Supplier is executing an agreement with BMW of North America, LLC ("<u>BMW</u>") to provide accommodations substantially similar to those in <u>Section 3</u>.  To the extent BMW does not provide those accommodations, Supplier will not use any funding supported by Customers' accommodations to manufacture parts or provide services for BMW unless ordered to by a court of competent jurisdiction.

4.7.    <u>License on Intellectual Property</u>.

(a) Notwithstanding anything in this Agreement to the contrary, and in consideration for the accommodations granted by Customers to Supplier under this Agreement, Supplier grants, to Customers and their assignee(s) or designee(s) (i) an irrevocable, fully paid, worldwide non-exclusive license to the Intellectual Property (defined below) owned by Supplier, and (ii) an irrevocable sublicense to the Intellectual Property licensed to Supplier (to the extent that Supplier has the right to grant sublicenses therein) to the extent necessary to make, have made, use, have used, modify, improve, prepare derivative works of, distribute, display, offer to sell, sell, import and do all other things and exercise all other rights in the licensed or sublicensed Intellectual Property for production of the Component Parts ("<u>License</u>"). The License is granted and irrevocable as of the Effective Date but will only be exercisable by a Customer upon (i) resourcing the respective component part in accordance with this Agreement; or (ii) the exercise of the Right of Access (as defined in the Access Agreement). The License granted in (i) and (ii) of the immediately preceding sentence will extend, without limitation, to Customers' production of new vehicles or parts for new vehicles by Customers (or Customers' subsidiaries or affiliates) and service obligations for Customers' previously sold vehicles or parts. Any license granted under this <u>Section 4.7</u> will also apply to any new model year changes, refreshes or follow-on platforms and programs incorporating the Intellectual Property.  This <u>Section 4.7</u> is not intended to limit or otherwise restrict any rights granted to Customers in their Purchase Orders or any other agreement that is in effect on the date hereof, but is intended to expand those rights. Moreover, nothing in this Agreement may be construed as an admission by Customers of the validity of Supplier's claimed rights to Intellectual Property, including an admission that a license is required by Customer to make, have made, sell, offer for sale, and/or import its Component Parts.  Customers will handle the Intellectual Property in accordance with the same practices employed by Customers to safeguard their own intellectual property against unauthorized use and disclosure.  Notwithstanding the foregoing, the License shall expire upon the conclusion of any Occupancy Period exercised under the Access Agreement.

(b) The term "<u>Intellectual Property</u>" means (x) all currently existing registered and applied-for intellectual property owned by Supplier (including, but not limited to, all patents, patent applications, trademark registrations, trademark applications, copyright registrations, and copyright applications), (y) all agreements for intellectual property licensed to Supplier and (z) any other intellectual property used to produce Component Parts (whether or not the intellectual property is identified, including, but not limited to, unregistered copyrights, inventions, discoveries, trade secrets and designs, drawings and data, regardless of whether such items are registerable or patentable in the future, and all related documents and software), that are used in or to produce any Component Parts that Supplier directly or indirectly sells to Customers including, without limitation, everything defined as "intellectual property" (including embodiments of the intellectual property) under 11 U.S.C. §101, as amended from time to time.

11

4.8.    <u>Access Agreement</u>.    Supplier will execute and cause Supplier and its affiliates to execute an Access Agreement in form and substance acceptable to the DIP Agents and Customers substantially in the form of <u>Exhibit D</u> attached hereto.

4.9.    <u>Bankruptcy Court Approval; and Treatment of Claims</u>.

(a) <u>Bankruptcy Court Approval</u>.    Supplier shall seek entry of an order by the Bankruptcy Court approving the terms of this Agreement and the Access Agreement on an expedited basis.

(b) <u>Treatment of Customer Claims under the Acceptable Plan</u>.    As a settlement and compromise among the Parties, the Customers shall have allowed claims in the Chapter 11 Cases (collectively, the "<u>Customer Claims</u>") in total aggregate amounts to be set forth in a schedule to be filed with the Bankruptcy Court in advance of the court's final approval of this Agreement, and shall not assert any other claims in the Chapter 11 Cases. So long as this Agreement remains in effect, the Customer Claims shall be allowed claims in the Chapter 11 Cases; <u>provided</u>, <u>however</u>, that so long as no Event of Default under this Agreement occurs (other than under <u>Section 8.1(g)</u>) and Supplier otherwise complies with the terms of this Agreement and Access Agreement, the Customers agree to waive any and all rights to a recovery or distribution from Supplier under the Acceptable Plan, or otherwise in connection with the Restructuring, on account of the Customer Claims.    The foregoing shall not impair in any way the Customers' rights to defend any challenge or objection to their Customer Claims.    The Customers shall retain any claims that may arise or accrue after the commencement of the Chapter 11 Cases (other than claims related to the Bristol Surcharge), including any claims that result from the occurrence of an Event of Default under this Agreement (other than under <u>Section 8.1(g)</u>) or Supplier's failure to comply with the terms of this Agreement or the Access Agreement, and those claims shall not constitute Customer Claims subject to this <u>Section 4.9(b)</u>.

5.    **DIP Agents' Accommodations**.

5.1.    <u>Consent and Acknowledgment</u>.    Each of the DIP Agents consents to the Licenses granted in <u>Section 4.7</u> and the Tooling Acknowledgment in <u>Section 7</u>.    The DIP Agents acknowledge and consent to the rights granted to Customers under this Agreement.

5.2.    <u>DIP Lenders' Exercise of Remedies</u>.    The Parties acknowledge that the DIP Agents and DIP Lenders have the right to exercise all their rights and remedies in accordance with an order entered by the Bankruptcy Court approving the DIP Facilities (the "<u>DIP Order</u>") and the DIP Financing Documents (as defined in the Access Agreement) and nothing in this Agreement shall limit or impair any such rights and remedies granted under the DIP Order or the DIP Financing Documents, subject to each Customer's Right of Access (as defined in the Access Agreement) for the duration of the Occupancy Period (as defined in the Access Agreement).

6.    **UC Holdings' Accommodations**.

12

6.1.    Acknowledgment of Customers' Rights.  UC Holdings acknowledges and consents to the rights granted to Customers in this Agreement and will consent to Supplier granting to Customers the rights under the Access Agreement.

## 7.    **Tooling Acknowledgment.**

7.1.    Definitions.  The term "Unpaid Tooling" means Tooling manufactured for a Customer for which it has not made full payment under the applicable purchase order with Supplier.  The term "Supplier Owned Tooling" means Tooling which Supplier asserts is not owned by Customers and which is not subject to a purchase order issued by Customers.  The term "Customer Tooling" means all other Tooling that is not Unpaid Tooling and/or Supplier Owned Tooling that is used or to be used to manufacture Customers' Component Parts, whether under direct agreements between Supplier and Customers or agreements between Supplier and third parties.

7.2.    Supplier and DIP Agents Tooling Acknowledgment.  Supplier and DIP Agents acknowledge and agree Customer Tooling is (i) subject to the terms of this Agreement, (ii) owned by Customers, and (iii) held as bailee-at-will by Supplier and any third parties to which Supplier has transferred possession of Customer Tooling.

7.3.    Tooling Dispute.  If there is a dispute between Supplier and Customers under this Section 7 regarding whether any Tooling is Customer Tooling, Supplier Owned Tooling or Unpaid Tooling, the disputed Tooling will be presumed to be Customer Tooling, pending resolution of the dispute, provided that the Customer pays into escrow (which will not be subject to DIP Agents' security interests) the lesser of the disputed amount or the unpaid purchase price of such disputed Tooling, and the Customer will have the right to immediate possession of such disputed Tooling (subject to the resourcing limitation, if any, in Section 3.4) and Supplier may not withhold delivery of possession of this Tooling to the Customer pending resolution of the dispute, but the Tooling will remain subject to any claim or right to payment of Supplier for the disputed amount.

7.4.    Unpaid Tooling Obligations Not Modified.  Once the purchase order price of an item of Unpaid Tooling has been paid (whether by payment to Supplier or as a Tooling Setoff), it will be included in the definition of Customer Tooling.  Prior to that time, the Parties reserve their respective rights to determine whether Unpaid Tooling should be treated as Customer Tooling.  Subject to Sections 7.3, nothing in this Agreement modifies Customer's obligations to Supplier on account of Unpaid Tooling.

7.5.    Supplier's Limited Right to Tooling.  Supplier has no right, title or interest in Customer Tooling, other than to possess and use the Customer Tooling solely to manufacture Customers' Component Parts, in Customers' sole discretion.

7.6.    Customers' Right to Repossess Tooling.  Upon an Event of Default (defined in Section 8),  or the resourcing of a Component Part as permitted under this Agreement and produced with Customer Tooling:  (i) Customers and their respective affiliates have the right to take immediate possession of their respective Customer Tooling, without payment of any kind to Supplier, (ii) Supplier agrees to cooperate with Customers in their taking possession of

Customer Tooling, and (iii) Supplier agrees to provide access to Customers to remove Customer Tooling; provided, however, that Customers will not unreasonably interfere with Supplier's ongoing manufacturing operations or its production of Component Parts for other customers when removing Customer Tooling; and provided, further, that Customers shall be liable for any damages to Supplier's premises or assets resulting from such access or repossession.

7.7.    <u>Additional Rights</u>.    The acknowledgements, rights and obligations contained in this <u>Section 7</u> are in addition to (and not in lieu of) the rights of Supplier and Customers under the Purchase Orders or any other agreements between Supplier and Customers..

7.8.    <u>Marking Tooling and Notice</u>.    Supplier grants to Customers permission to record, on Supplier's behalf, any notice and/or financing statements concerning Customer Tooling if Customers determine that it is reasonably necessary to do so to reflect its interests in its Customer Tooling.  Supplier will not interfere with, and will provide access so Customers may affix any plate, stamp, or other evidence of a Customer's ownership upon each item of their Customer Tooling.

## 8.    **Events of Default**.

8.1.    The occurrence of any one or more of the following will constitute an "<u>Event of Default</u>" under this Agreement, unless cured in accordance with the following proviso or a waiver or deferral is agreed to in writing by (i) each of the Customers (or, with respect to the repudiation or material breach of a Purchase Order, as agreed to in writing by the applicable Customer), or (ii) with respect to <u>Section 8.1(g)</u> only, the Supplier and the DIP Agents; provided, that notwithstanding anything contained in this Agreement, neither Customers nor Supplier shall be entitled to assert an Event of Default based upon their own actions; provided, further, that upon the occurrence of an Event of Default, other than a default under subpoint (a) below (where no time to cure shall be allowed), the Party alleging such Event of Default shall provide notice (a "<u>Default Notice</u>") to the defaulting Party and to the other Parties and such defaulting Party shall have three (3) business days to cure such default, to the extent such default is capable of cure:

(a) Supplier repudiates, moves to reject, refuses to perform or breaches its obligations, or such breach becomes inevitable, under the provisions of any Purchase Order or this Agreement the consequence of which is a substantial likelihood that a Customer's production will be interrupted; provided, that through the Bristol Surcharge Termination Date any breach arising out of Purchase Orders fulfilled directly or indirectly at the Bristol Facility shall not constitute an Event of Default unless such breach results in a one-time assembly plant shutdown that is not corrected within twenty-four (24) hours;

(b) Subject to the terms of this Agreement, with the exception of piece price increases from a Customer directed supplier as set forth in <u>Section 3.6</u>, Supplier requires a material modification of the terms of any Purchase Order or this Agreement;

(c) Any ABL DIP Lender commences an affirmative enforcement action against any of the collateral supporting production of the Component Parts if that action materially impacts Supplier's operations or ability to perform under this Agreement, the Access Agreement or any Purchase Order;

14

(d)  If the DIP Lenders cease funding for any reason other than from a failure of the Supplier to satisfy any applicable conditions precedent and the failure is not cured and funding resumed within two (2) business days (which two (2) business days is in addition to the three (3) business days provided in the preamble of this <u>Section 8.1</u>);

(e) Any DIP Lender commences any action seeking the appointment of a Chapter 11 Trustee, conversion of any one of the Supplier's Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, seeking a lifting of the automatic stay or takes action to repudiate any of the terms of this Agreement;

(f) The aggregate of actual Bristol operating expenses and capital expenses exceed 120% of the Operating Budget and Capital Expenditures Budget in any month during the Term;

(g) A Customer fails to perform any material obligation under this Agreement;

(h) Any one of the Chapter 11 Cases has a Chapter 11 Trustee appointed, is converted to a case under chapter 7 of the Bankruptcy Code, or the automatic stay is lifted to allow a party to take any action which will materially threaten Supplier's ability to provide timely production to the Customers; or

(i) Supplier fails to file an Acceptable Plan and Disclosure Statement and schedule appropriate hearings in time for the Acceptable Plan to be substantially consummated by July 31, 2015.

8.2.    For the avoidance of doubt, the terms and conditions applicable to any Purchase Order as they relate to a delay in performance of Supplier's obligations due to events beyond its reasonable control shall apply to Supplier's obligations hereunder.

8.3.    Following the occurrence and during the continuance of an Event of Default (which, to the extent applicable,  has not been cured, waived or deferred or, with respect to the repudiation or material breach of a Purchase Order, has not been agreed to in writing by the applicable Customer), a Customer may elect to deliver notice, within five (5) days of the delivery of the applicable Default Notice to each other Party (including Supplier) of its election to terminate the Term ("<u>Termination Notice</u>"), which termination shall be effective two (2) business days (which two (2) business days, other than with respect to a Default under <u>Section 8.1(a)</u>, is in addition to the three (3) business days provided in the preamble of <u>Section 8.1</u>) following the delivery of such Termination Notice. Notwithstanding the foregoing, a Termination Notice delivered with or following a Default Notice under <u>Section 8.1(a)</u> shall be effective and termination shall occur immediately upon delivery (unless a longer period is otherwise designated by Customer in the Termination Notice), and in all other cases, a Termination Notice will be effective and termination will occur only after five (5) business days have elapsed following a Default Notice (unless a longer period is otherwise designated by Customer in the Termination Notice) (individually and collectively, a "<u>Section 8 Termination</u>").

9.    **No Further Relief Required.**  Subject to approval of this Agreement by the Bankruptcy Court, no prior relief from the automatic stay in the Chapter 11 Cases shall be

WEIL:\95233664\30\35076.0003

necessary or required for Supplier or a Customer to exercise its rights under this Agreement generally or to deliver the Default Notice or Termination Notice or to pursue its rights and remedies or take any other action afforded the Customer after the giving of the Default Notice or Termination Notice.

10.    **Continuing Obligations**. Unless otherwise provided for in a Component Supply Agreement, Sections 3.1 (which shall continue only until the Bristol Surcharge Termination Date), 3.3, 3.4, 3.6, 3.7 and 3.8, 4.1, 4.2, 4.4, 4.6, 4.7 and 7 of this Agreement shall survive the Term and Termination Date, and such provisions shall continue in full force and effect until the termination of the applicable Purchase Orders; notwithstanding any of the foregoing, Sections 3.3 and 3.6 (as to setoff limitations only) shall continue only for accounts generated through ten (10) business days after the end of the Term.  In the event Supplier and DIP Agents reach an agreement whereby the DIP Facilities (or the DIP ABL Facility alone) are to be converted to exit facilities (the "Exit Facilities") that will continue in full force and effect upon Supplier's exit from chapter 11, then the rights granted to, and the accommodations granted pursuant to Section 3.3 for the benefit of the DIP Agents shall, with respect to any Accounts Payable generated through ten (10) business days after the Termination Date, continue in full force and effect for the benefit of the administrative agents and lenders under such Exit Facilities consistent with the terms of this Agreement.

11.    **Reservation of Rights**.  Unless expressly waived or modified in this Agreement, each Party reserves and does not waive any claims, rights, and remedies that it may have under the Purchase Orders, any other agreements between or among the Parties, or applicable law, and each party expressly reserves all such claims, rights and remedies they have under this Agreement, the Purchase Orders, any other agreements between or among the parties and applicable law.

12.    **Confidentiality**.  The Parties agree that they will not disseminate, disclose or communicate, either directly or indirectly, any of the information contained in or received by virtue of this Agreement to any outside party other than its employees and professional advisors, provided that such outside party is subject to this same confidentiality provision. The Parties will, in good faith, seek to ensure that the contents of this Agreement are kept secret and confidential.  Notwithstanding the foregoing, the Parties acknowledge and agree that Supplier is authorized to file a copy of this Agreement with the Bankruptcy Court in accordance with Section 4.9; *provided*, *however*, that Supplier shall take reasonable steps to protect any commercially sensitive information or other confidential trade information, including, without limitation, by filing this Agreement with appropriate redactions or under seal, as determined to be reasonably necessary in consultation with the Customers.

13.    **Notice**.  Any notice or other instrument to be given under this Agreement must be in writing and, except as otherwise provided in this Agreement, will be deemed to be duly given if mailed, delivered by hand or sent by email to the Party to whom the communication is intended to be given and any notice so delivered or sent will be deemed to have been given at the time of service on the day on which it was delivered or sent, and if mailed, will be deemed to be given three (3) days following the date of mailing. Until changed by notice in the manner described above, the addresses of the parties for the purpose of notice will be:

16

| | |
|---|---|
| If to Customer: | General Motors LLC |
| | 30001 Van Dyke Road |
| | Mail Code: 480-210-880 |
| | Warren, MI 48090-9020 |
| | Attention:  Mark W. Fischer |
| | Facsimile: (586) 575-3404 |
| | Email: mark.w.fischer@gm.com |
| | |
| With a copy (which shall not constitute notice) to: | Frost Brown Todd LLC |
| | 150 Third Avenue South, Suite 1900 |
| | Nashville, TN 37201- 2043 |
| | Attention:  Robert Sartin, Esq. |
| | Facsimile:  (615) 251-5551 |
| | Email:  rsartin@fbtlaw.com |
| | |
| | And |
| | |
| | General Motors LLC |
| | Vehicle Engineering Center |
| | MC 480-210-855 |
| | 30001 Van Dyke |
| | Warren, MI 48090-9020 |
| | Attention:  Aaron M. Silver |
| | Email:  aaron.silver@gm.com |
| | |
| If to Customer: | Sigmund E. Huber |
| | Global Director, Supplier Relations & Risk Management |
| | FCA US LLC |
| | CIMS 484-01-26 |
| | 800 Chrysler Drive |
| | Auburn Hills, MI  48326 |
| | Email:  sig.huber@fcagroup.com |

17

| | |
|---|---|
| With a copy (which shall not constitute notice) to: | Mark Werling<br>Office of the General Counsel Commercial Affairs<br>FCA US LLC<br>CIMS 485-14-07<br>1000 Chrysler Drive<br>Auburn Hills, MI  48326<br>Facsimile:  (248) 512-4053<br>Email:  mark.werling@fcagroup.com |
| | and |
| | Dickinson Wright PLLC<br>500 Woodward Avenue<br>Suite 4000<br>Detroit, MI 48226<br>Attention:  James A. Plemmons, Esq.<br>Facsimile:  (313) 223-3598<br>Email: jplemmons@dickinsonwright.com |
| If to Customer: | Ford Motor Company<br>1700 Rotunda Drive<br>Office C135A<br>Mail Drop RC02<br>Dearborn, MI 48120-1100<br>Attention:  Dennis Barrish<br>Facsimile:<br>E-mail:  dbarrish@ford.com |
| With a copy (which shall not constitute notice) to: | Miller Canfield<br>150 West Jefferson<br>Suite 2500<br>Detroit, MI  48226<br>Attention:  Stephen S. LaPlante<br>           Jonathan S. Green<br>Facsimile:  (313) 496-8452<br>E-mail:  laplante@millercanfield.com<br>       green@millercanfield.com |

18

| | |
|---|---|
| If to Customer: | Nissan North America, Inc.<br>One Nissan Way<br>P.O. Box 685001<br>Franklin TN  37068<br>Attention:  Alexander ("Skip") Anderson<br>　　　　　 Donald R. Parshall, Jr.<br>Email:　　 skip.anderson@nissan-usa.com<br>　　　　　 Don.parshall@nissan-usa.com |
| With a copy (which shall not constitute notice) to: | Waller, Lansden, Dortch & Davis pllc<br>P.O. Box 198966<br>511 Union Street, Suite 2700<br>Nashville, TN 37219<br>Attention: Michael R. Paslay<br>Email:　　 mike.paslay@wallerlawcom |
| If to Supplier or UC Holdings: | Chassix, Inc.<br>300 Galleria Officecentre<br>Suite 501<br>Southfield, MI 48034<br>Attention:  J. Mark Allan<br>　　　　　　 Safi Hamid<br>　　　　　　 Bibi Di Serio<br>Facsimile:<br>Email:　　 mark.allan@chassix.com<br>　　　　　 safi.hamid@chassix.com<br>　　　　　 bibi.diserio@chassix.com |
| With a copy (which shall not constitute notice) to: | Weil, Gotshal & Manages LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Attention:  Marcia Goldstein<br>　　　　　　 Ray C. Schrock<br>Facsimile: (212) 310-8007<br>Email:　　 marcia.goldstein@weil.com<br>　　　　　 ray.schrock@weil.com |
| If to DIP ABL Agent: | PNC Bank, National Association<br>Three PNC Plaza, 6th Floor<br>225 Fifth Avenue<br>Pittsburgh, PA 15222<br>Attention:  James Steffy, PNC Business Credit<br>Facsimile: (412) 768-4369<br>Email:  james.steffy@pnc.com |

19

| With a copy (which shall not constitute notice) to: | Bodman PLC<br>Sixth Floor at Ford Field<br>1901 St. Antoine Street<br>Detroit, MI 48226<br>Attention:  Robert J. Diehl, Jr.<br>              Brian R. Trumbauer<br>Facsimile: (313) 393-7579<br>Email:   rdiehl@bodmanlaw.com<br>              btrumbauer@bodmanlaw.com |
|---|---|
| If to DIP Term Agent: | Cantor Fitzgerald Securities<br>110 East 59th Street – 7th Floor<br>New York, NY 10022<br>Attention:  Nils Horning (Chassix)<br>Facsimile No.: (646) 219-1180<br>E-mail: nhorning@cantor.com |
| With copies (which shall not constitute notice) to: | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br>Attention:  Brian Kim<br>Facsimile No.: (212) 492-0780<br>Telephone No.: (212) 373-3780<br>E-mail: bkim@paulweiss.com<br><br>Shipman & Goodwin LLP<br>One Constitution Plaza<br>Hartford, CT 06103<br>Attention:  Nathan Plotkin<br>Facsimile No.: (860) 251-5212<br>Telephone No.: (860) 251-5320 |

14.  **General Terms**.

14.1.  The Purchase Orders, this Agreement, together with any other documents executed in connection with this Agreement (including, without limitation, the Access Agreement), constitutes the entire understanding of the Parties in connection with the subject matter of this Agreement. There are no written or oral representations or understandings that are not fully expressed in this Agreement. This Agreement may not be modified, altered or amended except by an agreement in writing signed by all Parties.

14.2.  The individuals executing this Agreement as representatives warrant that they have the power and authority to execute this Agreement on behalf of the corporation or entity that they represent and that their signatures bind the corporations or entities to the terms of this Agreement.

WEIL:\95233664\30\35076.0003

14.3.    Supplier must obtain the consent of Customers to assign or transfer, directly or indirectly, any of its rights under this Agreement, which consent shall not be unreasonably withheld in the event the Bristol Facility or any other facility is sold to a third party.  This Agreement is not intended for the benefit of any third parties, including any purchasers of Supplier's assets or other customers of Supplier (other than affiliates of Customers).

14.4.    No delay or failure of any Party to exercise any right, power or privilege hereunder will affect such right, power or privilege, nor will any single or partial exercise thereof preclude any further exercise thereof, nor the exercise of any other right, power or privilege.

14.5.    If any part of this Agreement is for any reason found to be unenforceable, all other parts of this Agreement shall nevertheless remain enforceable.

14.6.    Supplier agrees that it will not enter into any other arrangements or agreements that would in any way materially impair Customers' rights under this Agreement.

14.7.    Supplier is not Customers' agent for any purpose and nothing in this Agreement will be interpreted to designate Supplier as Customers' agent.

14.8.    This Agreement may be executed in any number of counterparts with the same effect as if all signatories had signed the same document. All counterparts must be construed together to constitute one instrument. The Parties agree that their respective signatures may be delivered by facsimile or email, and that facsimile or email signatures will be treated as originals for all purposes.

14.9.    This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan, without giving effect to the conflict of laws principles of Michigan. Notwithstanding the foregoing, the Purchase Orders will continue to be governed by the laws provided for in the applicable Purchase Orders.  During the pendency of the Chapter 11 Cases, any action brought in connection with this Agreement shall be brought in the Bankruptcy Court and the Parties hereby consent to the jurisdiction of the Bankruptcy Court.

15.    **REPRESENTATIONS**.  **EACH PARTY HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL OF ITS CHOICE BEFORE SIGNING THIS AGREEMENT. NO PARTY IS RELYING ON ANY REPRESENTATIONS, WARRANTIES OR COMMITMENTS THAT ARE NOT IN THIS AGREEMENT.  ANY AMBIGUOUS LANGUAGE IN THIS AGREEMENT SHOULD NOT BE CONSTRUED AGAINST ANY PARTICULAR PARTY BECAUSE THAT PARTY DRAFTED THE LANGUAGE.**

16.    **JURY TRIAL WAIVER**.  **THE PARTIES ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED. BY EXECUTING THIS AGREEMENT, EACH PARTY WAIVES ALL RIGHTS TO A TRIAL BY JURY OF ANY DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT OR THE PURCHASE ORDERS.**

*[signatures on next page]*

WEIL:\95233664\30\35076.0003

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**

By: _M. Ford_

Print Name: _M. W. Fischer_

Title: _Director, Supply Risk Mgt._

**Ford Motor Company**

By: _____

Print Name: _____

Title: _____

**FCA US LLC f/k/a Chrysler Group LLC**

By: _____

Print Name: _____

Title: _____

**Nissan North America, Inc.**

By: _____

Print Name: _____

Title: _____

**PNC BANK, NATIONAL ASSOCIATION**

By: _____

Print Name: _____

Title: _____

**CANTOR FITZGERALD SECURITIES**

By: _____

Print Name: _____

Title: _____

**UC Holdings, Inc.**

By: _____

Print Name:  J. Mark Allan

Title: President

**Chassix, Inc.**

By: _____

Print Name: J. Mark Allan

Title: President and CEO

[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**

By:_____

Print Name:_____

Title:_____

**Ford Motor Company**

By: _MR Jones_ (signature)

Print Name: _MR Jones_

Title: _Purchasing Director_


**FCA US LLC f/k/a Chrysler Group LLC**

By:_____

Print Name:_____

Title:_____

**Nissan North America, Inc.**

By:_____

Print Name:_____

Title:_____


**PNC BANK, NATIONAL ASSOCIATION**

By:_____

Print Name:_____

Title:_____

**CANTOR FITZGERALD SECURITIES**

By:_____

Print Name:_____

Title:_____


**UC Holdings, Inc.**

By:_____

Print Name:  J. Mark Allan

Title: President

**Chassix, Inc.**

By:_____

Print Name: J. Mark Allan

Title: President and CEO


[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**

By:_____

Print Name:_____

Title:_____

**Ford Motor Company**

By:_____

Print Name:_____

Title:_____

**FCA US LLC f/k/a Chrysler Group LLC**

By:____*[signature]*____

Print Name: _Sigmund Huber_

Title: _Director_

**Nissan North America, Inc.**

By:_____

Print Name:_____

Title:_____

**DIP ABL Agent**
**PNC Bank, National Association**

By:_____

Print Name:_____

Title:_____

**DIP Term Agent**
**Cantor Fitzgerald Securities**

By:_____

Print Name:_____

Title:_____

**UC Holdings, Inc.**

By:_____

Print Name:_____

Title:_____

**Chassix, Inc.**

By:_____

Print Name:_____

Title:_____

[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**                    **Ford Motor Company**

By:_____      By:_____

Print Name:_____      Print Name:_____

Title:_____      Title:_____


**FCA US LLC f/k/a Chrysler Group LLC**   **Nissan North America, Inc.**

By:_____      By: _Chandra Vasser_

Print Name:_____      Print Name: _Chandra Vasser_

Title:_____      Title: _Director, Purchasing_


**PNC BANK, NATIONAL ASSOCIATION**   **CANTOR FITZGERALD SECURITIES**

By:_____      By:_____

Print Name:_____      Print Name:_____

Title:_____      Title:_____


**UC Holdings, Inc.**                    **Chassix, Inc.**

By:_____      By:_____

Print Name:  J. Mark Allan         Print Name: J. Mark Allan

Title: President                   Title: President and CEO


[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**                    **Ford Motor Company**

By:_____             By:_____

Print Name:_____             Print Name:_____

Title:_____              Title:_____


**FCA US LLC f/k/a Chrysler Group LLC**   **Nissan North America, Inc.**

By:_____             By:_____

Print Name:_____             Print Name:_____

Title:_____              Title:_____


**PNC BANK, NATIONAL ASSOCIATION**        **CANTOR FITZGERALD SECURITIES**

By: _____              By:_____

Print Name: James M. Steff               Print Name:_____

Title: V. ce President                   Title:_____


**UC Holdings, Inc.**                     **Chassix, Inc.**

By:_____             By:_____

Print Name: J. Mark Allan                Print Name: J. Mark Allan

Title: President                         Title: President and CEO


[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**                                **Ford Motor Company**


By:_____        By:_____

Print Name: _____        Print Name: _____

Title: _____        Title: _____

Date: _____        Date: _____

**FCA US LLC f/k/a Chrysler Group LLC**        **Nissan North America, Inc.**

By:_____        By:_____

Print Name: _____        Print Name: _____

Title: _____        Title: _____

Date: _____        Date: _____

**PNC Bank, National Association**        **Cantor Fitzgerald Securities**


By:_____        By:_____

Print Name: _____        Print Name: James Bond
                                          Chief Operating Officer

Title: _____        Title: _____

Date: _____        Date: _____

**UC Holdings, Inc.**                        **Chassix, Inc.**


By:_____        By:_____

Print Name: _____        Print Name: _____

Title: _____        Title: _____

Date: _____        Date: _____

[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**

By:_____

Print Name:_____

Title:_____


**Ford Motor Company**

By:_____

Print Name:_____

Title:_____


**FCA US LLC f/k/a Chrysler Group LLC**

By:_____

Print Name:_____

Title:_____


**Nissan North America, Inc.**

By:_____

Print Name:_____

Title:_____


**PNC BANK, NATIONAL ASSOCIATION**

By:_____

Print Name:_____

Title:_____


**CANTOR FITZGERALD SECURITIES**

By:_____

Print Name:_____

Title:_____


**UC Holdings, Inc.**

By:_____

Print Name: J. Mark Allan

Title: President


**Chassix, Inc.**

By:_____

Print Name: J. Mark Allan

Title: President and CEO

**Exhibit B**

**Restructuring Support Agreement**

**(without exhibits)**

EXECUTION COPY

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "Agreement")[1], dated as of March 11, 2015, is entered into by and among (i) Chassix Holdings, Inc. ("Chassix Holdings"), UC Holdings, Inc. ("UC Holdings"), Chassix, Inc. (the "Company") and the direct and indirect subsidiaries of the Company set forth on Schedule 1 annexed hereto (such entities, together with Chassix Holdings, UC Holdings and the Company, the "Chassix Parties") (ii) the undersigned beneficial holders, or investment advisors or managers for the account of beneficial holders (the "Opco Noteholders" and, together with their respective successors and permitted assigns and any subsequent Opco Noteholder that becomes party hereto in accordance with the terms hereof, the "Consenting Opco Noteholders") of the 9 1/4 % Senior Secured Notes due 2018 (the "Opco Notes") issued by the Company, (iii) the undersigned beneficial holders, or investment advisors or managers for the account of beneficial holders (the "Holdco Noteholders" and, together with their respective successors and permitted assigns and any subsequent Holdco Noteholder that becomes party hereto in accordance with the terms hereof, the "Consenting Holdco Noteholders" and together with the Consenting Opco Noteholders, the "Consenting Noteholders") of the 10% / 10 3/4% Senior PIK Toggle Notes due 2018 (the "Holdco Notes") issued by Chassix Holdings, and (iv) Platinum Equity Advisors, LLC, on behalf of certain affiliated entities and investment funds (collectively, the "Consenting Sponsors"). The Chassix Parties, the Consenting Noteholders, and the Consenting Sponsors, collectively, the "Restructuring Support Parties" and together with any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred to herein as the "Parties" and each individually as a "Party."

WHEREAS, the Parties have agreed to undertake a financial restructuring and recapitalization of the Chassix Parties (the "Restructuring"), which is anticipated to be effected through the solicitation of votes for a plan of reorganization for each Chassix Party on terms materially consistent with the Acceptable Plan (as defined below) and reasonably acceptable to the Restructuring Support Parties (the solicitation for such plan, the "Solicitation") and the commencement by each of the Chassix Parties of a voluntary case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

WHEREAS, as of the date hereof, the Consenting Opco Noteholders hold, in the aggregate, approximately 73% of the aggregate outstanding principal amount of the Opco Notes issued by the Company under that certain Indenture, dated July 23, 2013, by and among the Company, as issuer, UC Holdings and certain of its subsidiaries as guarantors thereto, and U.S. Bank National Association, as trustee (as amended, modified or otherwise supplemented from time to time prior to the date hereof, the "Opco Notes Indenture").

WHEREAS, as of the date hereof, the Consenting Holdco Noteholders hold, in the aggregate, approximately 82% of the aggregate outstanding principal amount of the Holdco Notes issued by Chassix Holdings under that certain Indenture, dated December 13, 2013, by and

---

[1] Any capitalized term that is not otherwise defined herein shall have the meaning ascribed to such term in the Acceptable Plan, in the form attached hereto as Exhibit A.

among Chassix Holdings, as issuer, and U.S. Bank National Association, as trustee (as amended, modified or otherwise supplemented from time to time prior to the date hereof, the "<u>Holdco Notes Indenture</u>").

WHEREAS, the Parties desire to express to each other their mutual support and commitment with respect to the Restructuring, the Acceptable Plan and the matters discussed hereunder.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    <u>Certain Definitions</u>.

As used in this Agreement, the following terms have the following meanings:

(a)    "<u>Acceptable Plan</u>" means a plan of reorganization of the Chassix Parties on terms materially consistent with the plan attached hereto as <u>Exhibit A</u>, or otherwise in a form and substance reasonably satisfactory to the Chassix Parties, the Required Consenting Noteholders and, consistent with the Consenting Sponsor Consent Right, the Consenting Sponsors, further, notwithstanding anything to the contrary herein, the Chassix Parties may amend, modify or supplement the Acceptable Plan, from time to time, (x) without the consent of any of the other Restructuring Support Parties, to cure any ambiguity, defect (including any technical defect), inconsistency or amendment with respect to the treatment of creditors, <u>provided</u> that any such amendments, modifications or supplements do not adversely affect the rights, interests, or treatment of any of the other Restructuring Support Parties under the Acceptable Plan or (y) to the extent any such amendments, modifications or supplements are provided to the other Restructuring Support Parties upon at least three (3) business days prior written notice, and if no objection is received from any Restructuring Support Party within two (2) business days following receipt, the other Restructuring Support Parties shall be deemed to have consented to such amendments, modifications or supplements.

(b)    "<u>Acceptable Disclosure Statement</u>" means a disclosure statement of the Chassix Parties for the Acceptable Plan in a form and substance reasonably satisfactory to the Chassix Parties, the Required Consenting Noteholders and, consistent with the Consenting Sponsor Consent Right, the Consenting Sponsors.

(c)    "<u>Claim</u>" means "claim," as defined in section 101(5) of the Bankruptcy Code, against any Chassix Party.

(d)    "<u>Consenting Sponsor Consent Right</u>" means the Consenting Sponsors' right to consent to or approve documents, actions, or agreements, as applicable, solely to the extent such documents, actions, or agreements alter in any material way any of the rights or benefits proposed to be granted to, or received by, the Consenting Sponsors or any Released Party related thereto, or any obligation the Consenting Sponsors (or any Released Party related thereto) may have, pursuant to the Acceptable Plan, in the form attached hereto.

2

(e)    "Definitive Documents" means the documents and agreements (including any related instruments, schedules or exhibits) that are contemplated by the Acceptable Plan that are otherwise necessary or desirable to implement, or otherwise relate to, the Restructuring and the Acceptable Plan, including, but not limited to, (i) this Agreement, (ii) the Acceptable Plan, (iii) the Acceptable Disclosure Statement, (iv) the materials related to the Solicitation, (v) the order entered by the Bankruptcy Court approving the Acceptable Disclosure Statement and materials related to the Solicitation as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "Disclosure Statement Order"), (vi) definitive documentation for the DIP Facilities and Exit Facilities and all agreements and documentation related or ancillary thereto, (vii) the order entered by the Bankruptcy Court confirming the Acceptable Plan, including all exhibits, appendices and related documents (the "Confirmation Order") and pleadings in support of entry of the Confirmation Order, (viii) any documents included in the Plan Supplement, (ix) any motion and proposed interim and final orders (the "DIP Orders") relating to debtor-in-possession financing and/or use of cash collateral, (x) the Accommodation Agreements, Access Agreement (as defined in the Accommodation Agreement) and the attached component supply agreements (each a "Component Supply Agreement" and collectively, the "Component Supply Agreements") among the Debtors and certain of the OEM Customers entered into in connection with the Accommodation Agreements, (xi) organizational and governance documents (including, without limitation, the organizational and governance documents for the reorganized Chassix Parties), shareholder and member related agreements, or other related transactional or corporate documents (including, without limitation, any agreements and documents described in the Acceptable Plan), and (xii) the motions or pleadings seeking approval or confirmation of any of the foregoing transactional or corporate documents, including the motion to approve the Acceptable Disclosure Statement, confirm the Acceptable Plan, ratify the Solicitation, and scheduling a joint hearing, except as otherwise set forth herein, each of the foregoing in form and substance reasonably satisfactory to the Required Consenting Noteholders and, consistent with the Consenting Sponsor Consent Right, the Consenting Sponsors.

(f)    "Indentures" means the Opco Notes Indenture and the Holdco Notes Indenture.

(g)    "Notes" means the Opco Notes and the Holdco Notes.

(h)    "Required Consenting Noteholders" means the Required Opco Noteholders and the Required Holdco Noteholders.

(i)    "Required Opco Noteholders" means, as of the date of determination, Consenting Opco Noteholders holding at least a majority of the outstanding principal amount of the Opco Notes held by such holders, in the aggregate, as of such date.

(j)    "Required Holdco Noteholders" means, as of the date of determination, Consenting Holdco Noteholders holding at least a majority of the outstanding principal amount of the Holdco Notes held by such holders, in the aggregate, as of such date.

(k)    "Support Effective Date" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by: (i) the Chassix Parties; (ii)

3

the Consenting Sponsors, and (iii) the Consenting Noteholders holding at least (A) 66.7% in aggregate outstanding principal amount of the Opco Notes, and (B) 66.7% in aggregate outstanding principal amount of the Holdco Notes.

### 2.    **Bankruptcy Process; Plan of Reorganization.**

(a)    Commencement of the Chapter 11 Cases.    Each Chassix Party hereby agrees that, as soon as reasonably practicable, but in no event later than March 11, 2015 (the date on which such filing occurs, the "Commencement Date"), such Chassix Party shall file with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Case of such Chassix Party.

(b)    Filing of the Acceptable Plan.    On the Commencement Date, the Chassix Parties shall file the Acceptable Plan and the related Acceptable Disclosure Statement with the Bankruptcy Court.

(c)    Confirmation of the Acceptable Plan.    Each of the Chassix Parties shall use its commercially reasonable efforts to obtain confirmation of the Acceptable Plan as soon as reasonably practicable following the Commencement Date in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules of the Bankruptcy Court (the federal and local rules being, the "Bankruptcy Rules") and on terms consistent with this Agreement, and each of the Parties shall use its commercially reasonable efforts to cooperate fully in connection therewith.

(d)    Amendments and Modifications of the Acceptable Plan.    Notwithstanding anything to the contrary herein, the Acceptable Plan may be amended from time to time following the date hereof by written approval of (A) the Required Consenting Noteholders and (B) consistent with the Consenting Sponsor Consent Right, the Consenting Sponsors. Each of the Restructuring Support Parties agrees to negotiate in good faith all amendments and modifications to the Acceptable Plan as reasonably necessary and appropriate to obtain confirmation of the Acceptable Plan pursuant to a final order of the Bankruptcy Court; provided that the Restructuring Support Parties shall have no obligation to agree to any modification that (i) is inconsistent with the Acceptable Plan in the form attached hereto, (ii) creates any material new obligation on any Restructuring Support Party, or (iii) changes or otherwise adversely affects the rights, interests or treatment of such Restructuring Support Party.

### 3.    **Agreements of the Consenting Noteholders.**

(a)    Agreement to Vote.    So long as this Agreement has not been terminated in accordance with the terms hereof, each Consenting Noteholder agrees that it shall:

(i)    subject to the receipt by such Consenting Noteholder of an Acceptable Disclosure Statement and other solicitation materials in respect of the applicable Acceptable Plan, and approval by the Bankruptcy Court of such Acceptable Disclosure Statement and other solicitation materials as consistent with section 1125 of the Bankruptcy Code, (x) vote its Claims to accept the Acceptable Plan, by delivering its duly executed and completed ballots accepting the Acceptable Plan on a timely basis following the commencement of the Solicitation; provided that such vote shall be

4

immediately revoked and deemed void *ab initio* upon termination of this Agreement pursuant to the terms hereof; or (y) not change or withdraw (or cause to be changed or withdrawn) any such vote;

(ii)    not (x) object to, delay, impede or take any other action to interfere with acceptance or implementation of the Acceptable Plan and the Restructuring, (y) solicit, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout or plan of reorganization for the Chassix Parties other than the Acceptable Plan or (z) otherwise take any action that would in any material respect interfere with, delay, impede or postpone the consummation of the Acceptable Plan and the Restructuring; and

(iii)    use commercially reasonable efforts through the informal committee of Opco Noteholders and Holdco Noteholders (the "Informal Committee of Noteholders") or otherwise to support and take all reasonably necessary steps to effectuate the Restructuring and consummation of the Acceptable Plan; provided that nothing in this Agreement, including this <u>Section 3</u>, or the transactions contemplated by this Agreement, shall require, other than as set forth in <u>Section 3(a)(i)</u> and <u>(ii)</u>, any Consenting Noteholder to make, seek or receive any filings, notifications, consents, determinations, authorizations, permits, approvals, licenses or the like with or provide any documentation or information to any regulatory or self-regulatory bodies having jurisdiction over the Company or the Consenting Noteholders.

(b)    <u>Transfers</u>.

(i)    Each Consenting Noteholder agrees that, for the duration of the period commencing on the date hereof and ending on the date on which this Agreement is terminated in accordance with <u>Section 6</u>, such Consenting Noteholder shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of (each, a "<u>Transfer</u>"), directly or indirectly, in whole or in part, any of the Claims (including grant any proxies, deposit any Notes or any other claims against or interests in the Chassix Parties into a voting trust or entry into a voting agreement with respect to any such Notes or such other claims against or interests), unless the transferee thereof either (i) is a Consenting Noteholder or (ii) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Noteholder and to be bound by all of the terms of this Agreement applicable to Consenting Noteholders (including with respect to any and all Claims it already may hold prior to such Transfer) by executing a joinder agreement substantially in the form attached hereto as <u>Exhibit B</u> (each, a "<u>Joinder Agreement</u>"), and delivering an executed copy thereof within two (2) business days following such execution, to (i) Weil, Gotshal & Manges LLP ("<u>Weil</u>"), counsel to the Company, 767 Fifth Avenue, New York, New York 10153 (Attn: Marcia L. Goldstein and Ray C. Schrock) (ii) Milbank, Tweed, Hadley & McCloy LLP ("<u>Milbank</u>"), counsel to the Consenting Sponsors, 28 Liberty Street, New York, New York 10005 (Attn: Dennis F. Dunne and Samuel A. Khalil) and (iii) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("<u>Paul Weiss</u>"), counsel to the Informal Committee of Noteholders, 1285 6th Avenue, New York, New York 10019 (Attn: Andrew N. Rosenberg and Alice B. Eaton) in which event (A) the transferee (including the Consenting Noteholder transferee, if applicable)

shall be deemed to be a Consenting Noteholder hereunder to the extent of such transferred rights and obligations and (B) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations; provided,  that this Section 3(b)(i) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker-dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities.  Each Consenting Noteholder agrees that any Transfer of any Claims that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Noteholder or the Consenting Sponsors shall have the right to enforce the voiding of such Transfer.

(ii)    Notwithstanding Section 3(b)(i): (A) a Consenting Noteholder may Transfer its Notes to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker become a Party; provided that (1) such Qualified Marketmaker must Transfer such right, title or interest within five (5) business days following its receipt thereof, (2) any subsequent Transfer by such Qualified Marketmaker of the right, title or interest in such Notes is to a transferee that is or becomes (by executing a Joinder Agreement and delivering an executed copy thereof to the persons set forth in clause (i) of this Section 3(b)) a Consenting Noteholder at the time of such transfer, (3) such Consenting Noteholder shall be solely responsible for the Qualified Marketmaker's failure to comply with the requirements of this Section 3, and (4) any Transfer that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio* and the Company and each other Consenting Noteholder or the Consenting Sponsors shall have the right to enforce the voiding of such Transfer; and (B) to the extent that a Consenting Noteholder is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interest in the Notes that the Qualified Marketmaker acquires from a holder of the Notes who is not a Consenting Noteholder without the requirement that the transferee be or become a Consenting Noteholder.  For these purposes, a "Qualified Marketmaker" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers Claims (including debt securities or other debt) or enter with customers into long and short positions in Claims (including debt securities or other debt), in its capacity as a dealer or market maker in such Claims, and (y) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

(c)    Additional Claims.  This Agreement shall in no way be construed to preclude any Consenting Noteholder from acquiring additional Claims.  Each Consenting Noteholder agrees such additional Claims shall be subject to this Agreement (including the obligations of the Consenting Noteholders under this Section 3) and such acquiring Consenting Noteholder shall promptly notify Weil of such acquisition of Claims.

(d)    Releases. Each Consenting Noteholder shall, as of the Support Effective Date, fully and finally waive, release, acquit and forever discharge Platinum Equity and its Released Parties (including, without limitation, in all of their respective capacities or positions relating to the Debtors) from any and all claims and Causes of Action of any kind or nature

whatsoever (whether class, derivative or individual in nature) whether known or unknown, fixed or contingent, past, present or future, in law or in equity in any way related to the Debtors or the Restructuring (collectively, the "Release"); provided that no Released Party (including Platinum Equity) shall be released from any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Holdco Notes, the use of their proceeds, and any events related thereto. Such Release shall continue and remain in full force and effect from and after the Support Effective Date, provided that such Release shall terminate and be deemed, for all purposes, to be immediately null and void *ab initio* without any further action if (i) any Consenting Sponsor breaches any of the undertakings, representations, warranties or covenants of this Agreement in any material respect, (ii) any Consenting Sponsor seeks additional consideration except that which is expressly provided for under the Acceptable Plan, (iii) the Chapter 11 Case for the Company or any of the Chassix Parties shall have been converted to a case under chapter 7 of the Bankruptcy Code, or such cases shall have been dismissed by Final Order of the Bankruptcy Court, or (iv) the Bankruptcy Court confirms (by Final Order) a plan of reorganization for the Debtors that (A) provides the Consenting Noteholders with treatment that is materially inconsistent with the Acceptable Plan or that is, in material respects, less favorable to the Consenting Noteholders compared to the treatment provided to the Consenting Noteholders in the Acceptable Plan (a material increase in the proposed principal amount of the DIP Facilities or Exit Facilities being deemed to be "less favorable treatment"), and (B) has not been accepted by Opco Noteholders and Holdco Noteholders, in each case holding at least two-thirds in amount and more than one-half in number of the Opco Notes and Holdco Notes voting on such plan of reorganization. For the avoidance of doubt, for so long as the Release remains in effect, each Consenting Noteholder agrees and confirms that it shall not (i) exercise any "opt out" right related to the releases in the Acceptable Plan or otherwise object to or challenge the releases in the Acceptable Plan in any way, or (ii) seek to receive, or support any party in seeking to receive, any proceeds arising from, or related to, any claims or Causes of Action or any other litigation or similar action (including, without limitation, any settlement or other resolution related thereto) that is the subject of the Release.

(e)     The foregoing clauses (a) – (d) of this Section 3 will not limit any of the Consenting Noteholders' rights to (i) appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement, or (ii) enforce any rights under this Agreement.

(f)     The Consenting Noteholders agree to cooperate with any tax-related requests of the Consenting Sponsors, including in connection with revising the structure of the Plan, if such revisions would not adversely impact the reorganized Chassix Parties, the Consenting Noteholders or their recoveries.

## 4.      **Agreements of the Consenting Sponsors.**

(a)     So long as this Agreement has not been terminated in accordance with the terms hereof, each of the Consenting Sponsors, agrees that it shall not (i) object to, delay, impede or take any other action to interfere with acceptance or implementation of the Acceptable Plan and the Restructuring, (ii) solicit, encourage, propose, file, support, participate in the formulation

WEIL:\95270837\1\35076.0003

of or vote for, any restructuring, sale of assets, merger, workout or plan of reorganization for the Chassix Parties other than the Acceptable Plan or (iii) otherwise take any action that would in any material respect interfere with, delay, impede or postpone the consummation of the Acceptable Plan and the Restructuring.

(b)    Each of the Consenting Sponsors, agrees to use commercially reasonable efforts to support and take all reasonably necessary steps to effectuate the Restructuring and consummation of the Acceptable Plan, and each of the Consenting Sponsors agrees, to the extent applicable, to use commercially reasonable efforts to cause the Chassix Parties to timely provide, all requisite consents and approvals to the extent required for the Chassix Parties to file for relief under chapter 11 of the Bankruptcy Code.

(c)    Each of the Consenting Sponsors, agrees that it shall, subject to the receipt by such Consenting Sponsor of an Acceptable Disclosure Statement and other solicitation materials in respect of the Acceptable Plan, and approval by the Bankruptcy Court of such Acceptable Disclosure Statement and other solicitation materials as consistent with section 1125 of the Bankruptcy Code, (i) vote to accept the Acceptable Plan by delivering its duly executed and completed ballot accepting the Acceptable Plan on a timely basis following the commencement of the Solicitation, and (ii) not change or withdraw (or cause to be changed or withdrawn) any such vote; provided that such vote shall be immediately revoked and deemed void *ab initio* upon termination of this Agreement pursuant to the terms hereof.

(d)    Each of the Consenting Sponsors agree to (A) waive or cause to be waived any stock loss in respect of the stock of UC Holdings and Chassix Holdings pursuant to Treasury regulation § 1.1502-36, and any comparable provision of state or local income tax, to the extent directed by the reorganized Chassix Parties, (B) not take, or cause to be taken, any other action that would reduce, limit or otherwise adversely affect the U.S. federal income tax attributes of the reorganized Chassix Parties, except as consistent with past practice, general cash management, or short term prudent investment, and (C) cooperate with the reorganized Chassix Parties in connection with any group tax return filings, audits and proceedings with respect to taxable years ending on or prior to, or including, the Effective Date (including jointly managing such filings and proceedings, and not compromising any audit or proceeding without the reorganized Chassix Parties' consent, such consent not to be unreasonably withheld); provided that reasonable expenses incurred by the Consenting Sponsors at the request of the reorganized Chassix Parties in connection with this clause (C) shall be borne by the reorganized Chassix Parties.

(e)    Transfers. Each Consenting Sponsor agrees that, as long as this Agreement has not terminated in accordance with its terms, it shall not sell, transfer, assign or otherwise dispose of any of its Claims unless the transferee thereof either (i) is a Consenting Sponsor or (ii) prior to such transfer, agrees in writing for the benefit of the Parties to become a Party to this Agreement. Each Consenting Sponsor further agrees not to transfer, abandon or otherwise dispose of, its interests in Dharma Holding Corporation prior to the effective date of the Acceptable Plan. For the avoidance of doubt, this Agreement shall in no way be construed to preclude any Consenting Sponsor from acquiring additional Claims.

(f)    The foregoing sub-clauses (a) – (e) of this Section 4 will not limit any of the Consenting Sponsors' rights to (i) appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement, or (ii) enforce any rights under this Agreement.

## 5.    Agreements of the Chassix Parties.

(a)    Solicitation and Confirmation.  Each Chassix Party agrees to (i) act in good faith and use reasonable best efforts to support and complete successfully the Solicitation in accordance with the terms of this Agreement, (ii) do all things reasonably necessary and appropriate in furtherance of confirming the Acceptable Plan and consummating the Restructuring in accordance with, and within the time frames contemplated by, this Agreement (including within the deadlines set forth in Section 6), (iii) execute and deliver any required agreements to effectuate and consummate the Restructuring, (iv) obtain any and all required regulatory and/or third-party approvals for the Restructuring, and (v) take no actions materially inconsistent with this Agreement, the Acceptable Plan or the confirmation and consummation of the Acceptable Plan, in each case to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of directors, managers, members or partners, as applicable, of each Chassix Party; provided that no Chassix Party shall be obligated to agree to any modification of any document that is inconsistent with the Acceptable Plan.

(b)    Certain Additional Chapter 11 Related Matters.  Each Chassix Party, as the case may be, shall provide draft copies of all material motions or applications and other documents (including the Acceptable Plan and Acceptable Disclosure Statement, any proposed amended version of such plan or disclosure statement and all "first day" pleadings, or any other plan) any Chassix Party intends to file with the Bankruptcy Court to counsel for the Restructuring Support Parties, if reasonably practicable, at least three (3) days prior to the date when the applicable Chassix Party intends to file any such pleading or other document (and, if not reasonably practicable, as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the form and substance of any such pleading or document.

(c)    Restructuring Expenses. The Chassix Parties shall pay, and shall seek under the DIP Orders the authority to pay, when due and payable, the respective reasonable and documented fees and expenses incurred in connection with the Restructuring, including, the reasonable and documented fees, charges and disbursements of such parties limited to (i) one primary counsel for the Informal Committee of Noteholders (Paul Weiss), (ii) one primary financial advisor to the Informal Committee of Noteholders (AlixPartners LLP), (iii) one primary counsel for the Consenting Sponsors (Milbank, Tweed, Hadley & McCloy LLP), (iv) one primary financial advisor to the Consenting Sponsors (Houlihan Lokey Capital, Inc.), and (v) any other professionals that may be reasonably retained by the Informal Committee of Noteholders that may be required in connection with the Restructuring, provided, that, the expenses of Consenting Sponsors' professionals subject to this provision shall not exceed $1,250,000.  All such reasonable and documented fees, expenses and reimbursements incurred and invoiced up to the Commencement Date shall be paid in full prior to the Commencement Date (without deducting any retainers).  For the avoidance of doubt, such fees, expenses and reimbursements

shall be treated as Restructuring Expenses, and the Parties shall not be required to file retention applications, fee applications or any other applications in the Chapter 11 Cases.

### 6.  Termination of Agreement.

(a)   Consenting Noteholder Termination Events.  Unless cured or a waiver or deferral is agreed to in writing by the Required Consenting Noteholders, this Agreement shall automatically terminate three (3) business days following the delivery of written notice from the Required Consenting Noteholders to the other Restructuring Support Parties any time after and during the continuance of any Consenting Noteholder Termination Event.  A "Consenting Noteholder Termination Event" shall mean any of the following:

(i)   The breach in any material respect by any Chassix Party or the Consenting Sponsors of any of the undertakings, representations, warranties or covenants of the Chassix Parties or the Consenting Sponsors set forth herein which breach remains uncured for a period of five (5) business days after the receipt of written notice of such breach from the Required Consenting Noteholders in accordance with Section 22.

(ii)   On March 11, 2015 at 11:59 p.m. (New York time), unless the Chassix Parties have commenced the Chapter 11 Cases.

(iii)   On the date that is five (5) days after the Commencement Date, if the Chassix Parties have not filed the Acceptable Plan and Acceptable Disclosure Statement with the Bankruptcy Court.

(iv)   On the date that is forty-five (45) days after the Commencement Date, if the Bankruptcy Court shall not have entered an order approving the Acceptable Disclosure Statement for the Acceptable Plan.

(v)   The Chassix Parties (a) withdraw the Acceptable Plan or (b) file any motion or pleading with the Bankruptcy Court that is not consistent with this Agreement or the Acceptable Plan and such motion or pleading has not been withdrawn prior to the earlier of (i) two (2) business days after the Chassix Parties receive written notice from the Required Consenting Noteholders (in accordance with Section 22) that such motion or pleading is inconsistent with this Agreement or the Acceptable Plan and (ii) entry of an order of the Bankruptcy Court approving such motion or pleading.

(vi)   June 30, 2015, if the Bankruptcy Court fails to enter an order confirming the Acceptable Plan in form and substance reasonably satisfactory to the Required Consenting Noteholders.

(vii)   July 17, 2015, if the Effective Date for the Acceptable Plan has not occurred (the "Outside Date").

(viii)   An examiner with expanded powers or a trustee shall have been appointed in the Chapter 11 Cases.

(ix)    The Chassix Parties lose the exclusive right to file and solicit acceptances of a chapter 11 plan.

(x)    The Bankruptcy Court grants relief that is inconsistent with this Agreement or the Acceptable Plan in any materially adverse respect to the Required Consenting Noteholders.

(xi)    The Chassix Parties file, propound or otherwise support any plan of reorganization other than the Acceptable Plan, or publicly announce their intention not to pursue the Restructuring, and such plan of reorganization or public announcement has not been withdrawn or otherwise corrected within two (2) business days after the Chassix Parties receive written notice from the Required Consenting Noteholders (in accordance with Section 22) that such plan of reorganization or public announcement is inconsistent with this Agreement or the Acceptable Plan.

(xii)    The Accommodation Agreements, the Access Agreement or any Component Supply Agreement is terminated, or the Bankruptcy Court does not enter an order or orders approving the terms of the Accommodation Agreements, the Access Agreement or any Component Supply Agreement.

(xiii)    An event of default occurs under the DIP Facilities that results in the acceleration of the Chassix Parties' obligations thereunder.

(xiv)    The Revolving DIP Credit Facility is refinanced, extended, renewed, defeased, amended, increased, modified, supplemented, restructured, refunded, replaced or repaid, in whole or in part, on terms that are not reasonably acceptable to the Required Consenting Noteholders.

(xv)    The commencement by the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Creditors' Committee") of litigation, for which the Creditors' Committee has been granted standing by the Bankruptcy Court to commence, against the Consenting Noteholders or with respect to this Agreement.

(xvi)    The occurrence of an Other Termination Event (as defined in Section 6(d)).

(b)    Consenting Sponsors Termination Events.  Unless cured or a waiver or deferral is agreed to in writing by the Consenting Sponsors, this Agreement shall automatically terminate three (3) business days following the delivery to the other Restructuring Support Parties of a written notice, delivered in accordance with Section 22 of this Agreement, by any of the Consenting Sponsors upon the occurrence and at any time during the continuance of a Consenting Sponsor Termination Event.  A "Consenting Sponsor Termination Event" shall mean any of the following:

(i)    The breach in any material respect by one or more of the Parties of any of the undertakings, representations, warranties or covenants of the Parties set forth herein in any material respect which breach remains uncured for a period of five (5) days after the receipt of written notice of such breach pursuant to Section 22.

WEIL:\95270837\1\35076.0003

(ii)    A Definitive Document modifies, removes or impairs any of the rights or benefits proposed to be granted to, or received by, any Consenting Sponsors as specified under the Acceptable Plan in the form attached hereto or under this Agreement and the Consenting Sponsors have not consented to such modification.

(iii)    The occurrence of an Other Termination Event (as defined in Section 6(d)).

(c)    <u>Company Termination Events</u>.  This Agreement may be terminated by delivery to the other Restructuring Support Parties of a written notice, delivered in accordance with <u>Section 22</u> of this Agreement, by any of the Chassix Parties upon the occurrence and at any time during the continuance of a Company Termination Event.  A "<u>Company Termination Event</u>" shall mean any of the following:

(i)    The breach in any material respect by one or more of the Parties of any of the undertakings, representations, warranties or covenants of the Parties set forth herein in any material respect which breach remains uncured for a period of five (5) days after the receipt of written notice of such breach pursuant to <u>Section 22</u>.

(ii)    The board of directors (or managers) of the Company or another Chassix Party determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law.

(iii)    The occurrence of an Other Termination Event (as defined in Section 6(d)).

(d)    <u>Other Termination Events</u>.  An "<u>Other Termination Event</u>" shall mean the following:

(i)    The issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring or the consummation of the Acceptable Plan, which ruling, judgment or order has not been stayed, reversed or vacated within fourteen (14) days after such issuance.

(ii)    The date that the Chapter 11 Case for the Company or any of the Chassix Parties shall have been converted to a case under chapter 7 of the Bankruptcy Code, or such cases shall have been dismissed by order of the Bankruptcy Court .

(iii)    The date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Acceptable Plan for any of the Chassix Parties or refusing to approve the Acceptable Disclosure Statement, provided, that none of the Parties shall have the right to terminate this Agreement pursuant to this clause (c)(iii) if the Bankruptcy Court declines to approve the Acceptable Disclosure Statement or denies confirmation of the Acceptable Plan subject only to modifications to the Acceptable Plan or Acceptable Disclosure Statement that would not have an adverse effect on the recovery or treatment that a Party would receive as

WEIL:\95270837\1\35076.0003

compared to the recovery they would have otherwise received pursuant to the Acceptable Plan in the form attached hereto.

(iv)    March 11, 2015 at 11:59 p.m. (New York time), if the Support Effective Date shall not have occurred.

Notwithstanding the foregoing, any of the dates or deadlines set forth in Section 6(a) may be extended by agreement among the Chassix Parties and the Required Consenting Noteholders and the dates or deadlines set forth in Section 6(d) may be extended by agreement among the Restructuring Support Parties.

(e)    Mutual Termination.    This Agreement may be terminated by mutual agreement of the Restructuring Support Parties upon the receipt of written notice delivered in accordance with Section 22.

(f)    Automatic Termination.    This Agreement shall terminate automatically without any further required action or notice on the date that the Acceptable Plan becomes effective.

(g)    Effect of Termination.    Subject to the provisions contained in Section 6 and Section 15, upon the termination of this Agreement in accordance with this Section 6, this Agreement shall become void and of no further force or effect in respect to the Party whose rights and obligations have been terminated hereunder and such Party shall, except as otherwise provided in this Agreement, be immediately released from its respective liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement, shall have no further rights, benefits or privileges hereunder, and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring, the Acceptable Plan or otherwise, that it would have been entitled to take had it not entered into this Agreement and no such rights or remedies shall be deemed waived pursuant to a claim of laches or estoppel; provided that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.    Any and all consents and ballots tendered by the Consenting Noteholders and/or Consenting Sponsors (if any) whose obligations to the Chassix Parties have been terminated, as applicable, prior to such termination shall be deemed, for all purposes, automatically to be null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Acceptable Plan and this Agreement or otherwise and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Chassix Parties allowing such change or resubmission).    Further, notwithstanding anything to the contrary herein, a Party shall not have a right to terminate this Agreement if a default or failure (including, without limitation, by action, inaction or misrepresentation) by such Party of its obligations, undertakings, representations, warranties or covenants hereunder is the cause, directly or indirectly, of the event giving rise to the right to terminate.

(h)    Automatic Stay.    The Chassix Parties acknowledge that after the commencement of the Chapter 11 Cases, the giving of notice of default or termination by any other Restructuring Support Party pursuant to this Agreement shall not be a violation of the

WEIL:\95270837\1\35076.0003

automatic stay under section 362 of the Bankruptcy Code; <u>provided</u> that nothing herein shall prejudice any Restructuring Support Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

**7.** **Definitive Documents; Good Faith Cooperation; Further Assurances**. Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise reasonable best efforts with respect to, the pursuit, approval, implementation and consummation of the Restructuring and the Acceptable Plan, as well as the negotiation, drafting, execution and delivery of the Definitive Documents.  Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

**8.** **Representations and Warranties**.

(a) Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Noteholder becomes a party hereto):

(i) Such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder.  The execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part.

(ii) The execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents), or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party.

(iii) The execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary or required by the SEC.

(iv) This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

14

(b)     Each Consenting Noteholder severally (and not jointly) represents and warrants to the Chassix Parties that, as of the date hereof (or as of the date such Consenting Noteholder becomes a party hereto), such Consenting Noteholder (i) is the beneficial owner of the aggregate principal amount of Notes set forth below its name on the signature page hereto (or below its name on the signature page of the applicable Joinder Agreement for any Consenting Noteholder that becomes a party hereto after the date hereof), and/or (ii) has, with respect to the beneficial owners of such Notes, (A) sole investment or voting discretion with respect to such Notes, (B) full power and authority to vote on and consent to matters concerning such Notes or to exchange, assign and Transfer such Notes, and (C) full power and authority to bind or act on the behalf of, the beneficial owners of such Notes.

9.     **Disclosure; Publicity**.  The Company shall submit drafts to counsel for the Restructuring Support Parties of any press releases, public documents and any and all filings that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) business days prior to making any such disclosure. Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Chassix Parties and any Consenting Noteholder, no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Consenting Noteholder), other than advisors to the Restructuring Support Parties, the principal amount or percentage of any Notes held by any Consenting Noteholder or use the name of any Consenting Noteholder or its controlled affiliates, officers, directors, managers, stockholders, members, employees, partners, representatives and agents in any press release, in each case, without such Consenting Noteholder's prior written consent; provided that (a) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Noteholder a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the Company), (b) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Notes (including any series of Notes) held by all the Consenting Noteholders collectively and (c) any Party may disclose information requested by a regulatory authority with jurisdiction over its operations to such authority without limitation or notice to any Party or other person.  Any public filing of this Agreement, with the Bankruptcy Court or otherwise, which includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the holdings of each Consenting Noteholder (provided, that the holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court under seal).

10.     **Creditors' Committee**.  Notwithstanding anything herein to the contrary, if any Consenting Noteholder is appointed to and serves on a Creditors' Committee, the terms of this Agreement shall not be construed so as to limit such Consenting Noteholder's exercise of its fiduciary duties to any person arising from its service on such Creditors' Committee, and any such exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement; provided that nothing in this Agreement shall be construed as requiring any Consenting Noteholder to serve on any Creditors' Committee in any such chapter 11 case. All Parties agree they shall not oppose the participation of any of the Consenting Noteholders or the trustees under the Indentures, on any Creditors' Committee formed in the Chapter 11 Cases.

WEIL:\95270837\1\35076.0003

**11.    <u>Amendments and Waivers</u>**.    Except as otherwise expressly set forth herein, this Agreement may not be waived, modified, amended or supplemented except with the prior written consent of all of the Restructuring Support Parties (which consent may be delivered by electronic mail from counsel to the Restructuring Support Parties).    Notwithstanding the foregoing the Chassix Parties may enter into letter agreements with one or more Consenting Noteholders regarding the binding effect of this Agreement on such Consenting Noteholders' business units or affiliates, without the prior written consent of the Restructuring Support Parties so long as such side letter(s) do not alter the Acceptable Plan.

**12.    <u>Effectiveness</u>**.    This Agreement shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto; <u>provided</u> that signature pages executed by Consenting Noteholders shall be delivered to (a) the other Consenting Noteholders in a redacted form that removes such Consenting Noteholders' holdings of the applicable Notes and (b) the Company, Milbank, Weil, and the Company's other advisors in an unredacted form (to be held by Weil and such other advisors on a professionals' eyes only basis).

**13.    <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>**.

(a)    This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York, without giving effect to the conflict of laws principles thereof.    Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any Party or its successors or assigns shall be brought and determined in any federal or state court in the Borough of Manhattan, the City of New York (the "<u>New York Courts</u>"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement and the Restructuring.    Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the New York Courts, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any New York Court.    Each of the Parties further agrees that notice as provided in <u>Section 22</u> shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient.    Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in the New York Courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (ii) that (A) the proceeding in any New York Court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts.    Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this <u>Section 13(a)</u> shall be brought in the Bankruptcy Court.

(b)    Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated hereby (whether based on

contract, tort or any other theory).  Each Party (i) certifies that no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other Parties have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this section.

14.    **Specific Performance/Remedies**.  It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and the Chassix Parties shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy.  Each Party hereby waives any requirement for the security or posting of any bond in connection with such remedies.

15.    **Survival**.  Notwithstanding the termination of this Agreement pursuant to Sections 6, 6(g), 9, 13 and 14 shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; provided that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

16.    **Headings**.  The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17.    **Successors and Assigns; Severability**.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; provided that nothing contained in this Section 17 shall be deemed to permit Transfers of the Notes or any Claims other than in accordance with the express terms of this Agreement.  If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

18.    **Several, Not Joint, Obligations**.  The agreements, representations and obligations of the Parties under this Agreement are, in all respects, several and not joint.

19.    **Relationship Among Parties**.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.  No Party shall have any responsibility for any trading by any other entity by virtue of this Agreement.  No prior history, pattern or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.  The Parties have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any equity securities

WEIL:\95270837\1\35076.0003

of the Company and do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.

20.    **Prior Negotiations; Entire Agreement**.  This Agreement, including the exhibits and schedules hereto (including the Acceptable Plan), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements executed between the Company and each Consenting Noteholders prior to the execution of this Agreement shall continue in full force and effect.

21.    **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement delivered by facsimile or PDF shall be deemed to be an original for the purposes of this paragraph.

22.    **Notices**.  All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers:

(a)    If to a Chassix Party, to:

Chassix, Inc.
300 Galleria Officentre, Suite 501
Southfield, MI 48034
Attn: Bibi N. Di Serio Vice President and General Counsel
Email: Bibi.DiSerio@chassix.com

With a copy to (that shall not constitute notice):

Weil, Gotshal & Manges LLP (as counsel to the Company)
767 Fifth Avenue
New York, NY 10153
Fax:  (212) 310-8007
Attn: Marcia L. Goldstein and Ray C. Schrock
Email: marcia.goldstein@weil.com and ray.schrock@weil.com

(b)    If to a Consenting Sponsor, the address set forth on its signature page, with a copy (that shall not constitute notice) to:

Milbank Tweed Hadley & McCloy LLP
28 Liberty St.
New York, NY 10005
Fax: (212) 530-5219
Attn:  Dennis F. Dunne and Samuel Khalil
Email:  ddunne@milbank.com and skhalil@milbank.com

(c)    If to a Consenting Noteholder, the address set forth on its signature pages, with a copy (that shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Fax: (212) 492-0158
Attn: Andrew N. Rosenberg and Alice Eaton
Email: arosenberg@paulweiss.com and aeaton@paulweiss.com

Any notice given by delivery, mail or courier shall be effective when received. Any notice given by facsimile or electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

   **23.**   **Settlement Discussions**. This Agreement and the Acceptable Plan are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

   **24.**   **No Solicitation; Adequate Information**. This Agreement is not and shall not be deemed to be a solicitation for consents to the Acceptable Plan. The votes of the holders of Claims will not be solicited until such holders who are entitled to vote on the Acceptable Plan have received the Acceptable Plan, the Acceptable Disclosure Statement and related ballots, and other required solicitation materials, and the Acceptable Disclosure Statement and other solicitation materials have been approved by the Bankruptcy Court as consistent with section 1125 of the Bankruptcy Code. In addition, this Agreement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities.

   **25.**   **Interpretation; Rules of Construction; Representation by Counsel**. When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference shall be to a Section, Exhibit or Schedule, respectively, of or attached to this Agreement unless otherwise indicated. Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or." The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

   **26.**   **Acknowledgements**. THIS AGREEMENT, THE ACCEPTABLE PLAN, AND THE TRANSACTIONS CONTEMPLATED HEREIN AND THEREIN, ARE THE PRODUCT OF NEGOTIATIONS BETWEEN THE PARTIES AND THEIR RESPECTIVE REPRESENTATIVES. EACH PARTY HEREBY ACKNOWLEDGES THAT THIS AGREEMENT IS NOT AND SHALL NOT BE DEEMED TO BE A SOLICITATION OF

VOTES FOR THE ACCEPTANCE OR REJECTION OF ANY CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR OTHERWISE.   THE COMPANY WILL NOT SOLICIT ACCEPTANCES OF THE ACCEPTABLE PLAN FROM ANY PERSON OR ENTITY UNTIL THE PERSON OR ENTITY HAS BEEN PROVIDED WITH A COPY OF THE ACCEPTABLE DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. NOTHING IN THIS AGREEMENT SHALL REQUIRE ANY PARTY TO TAKE ANY ACTION PROHIBITED BY THE BANKRUPTCY CODE, THE SECURITIES ACT OF 1933 (AS AMENDED), THE SECURITIES EXCHANGE ACT OF 1934 (AS AMENDED), ANY RULE OR REGULATIONS PROMULGATED THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY AN ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL GOVERNMENTAL AUTHORITY.

[Signature Page Follows]

20

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

### CHASSIX PARTIES

CHASSIX HOLDINGS, INC.

By:_____

    Name:  J. Mark Allan
    Title:   President

UC HOLDINGS, INC.

By:_____

    Name:  J. Mark Allan
    Title:   President and Chief Executive Officer

CHASSIX, INC.

By:_____

    Name:  J. Mark Allan
    Title:   President and Chief Executive Officer

EACH OF THE SUBSIDIARIES LISTED ON SCHEDULE 1 HERETO

By:_____

    Name:  J. Mark Allan
    Title:   President

**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]



**CONSENTING NOTEHOLDERS**





[SIGNATURE PAGE TO JOINDER AGREEMENT FOR CONSENTING NOTEHOLDERS]

**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



CONSENTING SPONSORS
Platinum Equity Advisors, LLC

By: 

Name:  Eva M. Kalawski

Title:  Executive VP, General Counsel & Secretary

[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**Schedule 1**

**Restructuring Subsidiaries**

| **Subsidiary** | **Tax Identification Number** |
|---|---|
| Automotive Properties of New York, LLC | 30-0024323 |
| Diversified Machine, Inc. | 02-0758762 |
| Diversified Machine Bristol, LLC | 38-2265409 |
| Chassix Georgia Machining, LLC | 27-1111940 |
| DMI Columbus, LLC | 27-1111833 |
| Diversified Machine Montague, LLC | 38-1854771 |
| Diversified Machine, Milwaukee LLC | 26-1500875 |
| DMI Edon LLC | 27-0951847 |
| Mexico Products I, LLC | 27-0393039 |
| DMI China Holding LLC | 45-3214331 |
| Concord International, Inc. | 38-2973536 |
| SMW Automotive, LLC | 38-3269452 |
| Automotive, LLC | 38-3492897 |
| Chassis Co. of Michigan, LLC | 38-3752692 |
| AluTech, LLC | 32-0100012 |