THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF VOTES ON THE PLAN. ACCEPTANCES AND REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS RESERVE THE RIGHT TO AMEND, SUPPLEMENT, OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT PRIOR AND UP TO THE DISCLOSURE STATEMENT HEARING.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| --------------------------------------------------------x | : | |
| In re | : | **Chapter 11** |
| | : | |
| **CHASSIX HOLDINGS, INC.,** *et al.*, | : | **Case No. 15-_____ (____)** |
| | : | |
| | : | **(Joint Administration Pending)** |
| **Debtors.**[1] | : | |
| | : | |
| --------------------------------------------------------x | | |

**PROPOSED DISCLOSURE STATEMENT FOR JOINT PLAN OF**
**REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**WEIL, GOTSHAL & MANGES LLP**
Marcia L. Goldstein
Ray C. Schrock, P.C.
Matthew P. Goren
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

Dated: March 12, 2015
        New York, New York

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012).  The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

## TABLE OF CONTENTS

I. EXECUTIVE SUMMARY ......................................................................................10

II. INTRODUCTION ...............................................................................................15

    A.    DISCLOSURE STATEMENT EXHIBITS ..........................................15

    B.    THE DEBTORS' PROFESSIONALS ...............................................15

    C.    IMPORTANT DATES.......................................................................16

    D.    BRIEF OVERVIEW OF THE PLAN ................................................17

    E.    SUMMARY OF DISTRIBUTIONS AND VOTING ELIGIBILITY ..................19

    F.    VOTING PROCEDURES..................................................................23

    G.    CONFIRMATION UNDER SECTION 1129(B).................................24

    H.    CONFIRMATION HEARING...........................................................24

III. OVERVIEW OF THE DEBTORS' OPERATIONS .........................................25

    A.    THE DEBTORS' BUSINESSES........................................................25

    B.    THE DEBTORS' OPERATIONS ......................................................27

    C.    THE DEBTORS' BUSINESS MODEL .............................................31

    D.    INTERNATIONAL OPERATIONS .................................................31

    E.    PLATINUM EQUITY AND THE DMI/SMW INTEGRATION.......................32

    F.    PREPETITION CAPITAL STRUCTURE .........................................33

        1.    The Prepetition Revolving ABL Facility................................33

        2.    The Secured Notes.................................................................34

        3.    The Intercreditor Agreement.................................................35

        4.    The Unsecured Notes.............................................................35

        5.    Capital Lease Obligations .....................................................36

        6.    Foreign Debt .........................................................................36

IV. KEY EVENTS LEADING TO THE COMMENCEMENT OF THESE CHAPTER 11
    CASES .............................................................................................................37

    A.    INITIAL INTEGRATION AND COST SAVING INITIATIVES ....................37

    B.    INFRASTRACTURE CONSTRAINTS AND LEGACY CONTRACTS ..........37

    C.    INCREASES IN DEMAND FOR AUTOMOBILE  PRODUCTION IN
        NORTH AMERICA LEAD TO A  PERCIPITUOUS DECLINE AT THE
        BRISTOL FACILITY ......................................................................38

    D.    PREPETITION TRADE CONTRACTION.........................................39

    E.    PREPETITION RESTRUCTURING EFFORTS................................39

      1.     Bristol Initiatives and Interim Accommodations ....................................39

      2.     Additional Incremental Financing Actions ..............................................40

      3.     Capital Structure Negotiations, the Restructuring  Support Agreement and the Debtors' Chapter 11 Plan ........................................40

V. THE CHAPTER 11 CASES ............................................................................43

    A.     FIRST DAY PLEADINGS ................................................................43

    B.     DEBTOR-IN-POSSESSION FINANCING.....................................43

    C.     ACCOMMODATION AGREEMENTS.............................................44

    D.     SCHEDULES AND BAR DATES....................................................44

VI. THE PLAN ....................................................................................................45

    A.     INTRODUCTION ...............................................................................45

    B.     CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ...............................................45

    C.     UNCLASSIFIED CLAIMS.................................................................47

      1.     Administrative Claims.................................................................47

      2.     Fee Claims ....................................................................................47

      3.     Priority Tax Claims ......................................................................47

      4.     DIP Claims ...................................................................................48

      5.     Prepetition Revolving ABL Facility Claims.................................48

    D.     CLASSIFICATION OF CLAIMS AND INTERESTS ......................48

      1.     Class 1 – Other Priority Claims ..................................................48

      2.     Class 2 – Other Secured Claims...................................................48

      3.     Class 3 – Secured Note Claims ....................................................49

      4.     Class 4 – Unsecured Note Claims ................................................49

      5.     Class 5 – General Unsecured Trade Claims .............................50

      6.     Class 6 – Other General Unsecured Claims...............................50

      7.     Class 7 – Intercompany Claims...................................................51

      8.     Class 8 – Intercompany Interests ................................................51

      9.     Class 9 – Subordinated Securities Claims ..................................51

      10.    Class 10 - Existing Chassix Holdings Equity Interests .............51

    E.     MEANS FOR IMPLEMENTATION .................................................51

      1.     Compromise and Settlement of Claims, Interests, and Controversies ........................................................................51

WEIL:\95271232\1\35076.0003

2.      Global Settlement ..................................................................52

3.      Actions of Dharma Holding Corporation and Triomphe
        Intermediate Holding Corporation ..........................................53

4.      Cancellation of Existing Securities and Agreements ...............53

5.      Corporate Structure .................................................................54

6.      Authorization and Issuance of Plan Securities.........................54

7.      Section 1145 Exemption...........................................................54

8.      Exit Financing ..........................................................................55

9.      Intercreditor Agreement...........................................................55

10.     Reorganized Debtors ...............................................................55

11.     Bristol Facility..........................................................................56

12.     Cancellation of Liens...............................................................56

13.     Management Employment Matters ..........................................56

14.     Withholding and Reporting Requirements ...............................57

15.     Exemption from Certain Transfer Taxes ..................................57

16.     Restructuring Transactions; Further Transactions ...................58

17.     Dissolution of Chassix Holdings..............................................59

18.     Effectuating Documents ..........................................................59

19.     Closing of the Chapter 11 Cases. ...........................................59

F.      DISTRIBUTIONS ...............................................................................59

1.      Distribution Record Date .........................................................59

2.      Date of Distributions ...............................................................60

3.      Timing of Distributions ............................................................60

4.      Disbursing Agent.....................................................................60

5.      Powers of Disbursing Agent ....................................................60

6.      Delivery of Distributions ..........................................................60

7.      Manner of Payment Under Plan ..............................................61

8.      Fractional Stock.......................................................................61

9.      Minimum Cash Distributions....................................................61

10.     Setoffs .....................................................................................61

11.     Distributions After Effective Date ............................................62

12.     Allocation of Distributions Between Principal and Interest ......62

G.      PROCEDURES FOR DISPUTED CLAIMS ........................................62

WEIL:\95271232\1\35076.0003

|  | 1. | Allowance of Claims ............................................................................62 |
|  | 2. | Objections to Claims .............................................................................62 |
|  | 3. | Estimation of Claims ............................................................................62 |
|  | 4. | No Distributions Pending Allowance ....................................................63 |
|  | 5. | Distributions After Allowance ..............................................................63 |
|  | 6. | Resolution of Claims .............................................................................63 |
|  | 7. | Disallowed Claims ................................................................................63 |
| H. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............................63 |
|  | 1. | General Treatment .................................................................................63 |
|  | 2. | Determination of Cure Disputes and Deemed Consent...........................64 |
|  | 3. | Payments Related to Assumption of Contracts and Leases ....................64 |
|  | 4. | Rejection ...............................................................................................65 |
|  | 5. | Survival of the Debtors' Indemnification Obligations ...........................65 |
|  | 6. | Compensation and Benefit Plans............................................................66 |
|  | 7. | Insurance Policies .................................................................................66 |
|  | 8. | Intellectual Property Licenses and Agreements .....................................66 |
|  | 9. | Reservation of Rights ...........................................................................66 |
| I. | CONDITIONS PRECEDENT TO THE EFFECTIVE DATE............................67 |
|  | 1. | Conditions Precedent to Confirmation ..................................................67 |
|  | 2. | Conditions Precedent to the Effective Date ...........................................67 |
|  | 3. | Waiver of Conditions Precedent ............................................................68 |
|  | 4. | Effect of Non-Occurrence of Effective Date .........................................69 |
| J. | EFFECT OF CONFIRMATION ...................................................................69 |
|  | 1. | Subordinated Claims .............................................................................69 |
|  | 2. | Vesting of Assets...................................................................................69 |
|  | 3. | Discharge of Claims and Termination of Interests.................................69 |
|  | 4. | Term of Injunctions or Stays.................................................................70 |
|  | 5. | Injunction Against Interference with Plan .............................................70 |
|  | 6. | Releases by the Debtors.........................................................................70 |
|  | 7. | Releases By Holders of Claims and Interests ........................................71 |
|  | 8. | Exculpation ...........................................................................................72 |
|  | 9. | Retention of Causes of Action/Reservation of Rights............................72 |
|  | 10. | Solicitation of the Plan .........................................................................73 |

WEIL:\95271232\1\35076.0003

| | | | |
|---|---|---|---|
| | 11. | Plan Supplement | 74 |
| | 12. | Corporate and Limited Liability Company Action | 74 |
| K. | | RETENTION OF JURISDICTION | 74 |
| L. | | MISCELLANEOUS PROVISIONS | 76 |
| | 1. | Payment of Statutory Fees | 76 |
| | 2. | Substantial Consummation | 77 |
| | 3. | Dissolution of Creditors Committee | 77 |
| | 4. | Request for Expedited Determination of Taxes | 77 |
| | 5. | Amendments | 77 |
| | 6. | Revocation or Withdrawal of the Plan | 77 |
| | 7. | Severability of Plan Provisions upon Confirmation | 78 |
| | 8. | Governing Law | 78 |
| | 9. | Time | 78 |
| | 10. | Immediate Binding Effect | 78 |
| | 11. | Successor and Assigns | 79 |
| | 12. | Entire Agreement | 79 |
| | 13. | Notices | 79 |
| VII. | | VALUATION OF THE DEBTORS | 81 |
| A. | | OVERVIEW OF VALUATION | 81 |
| B. | | ADDITIONAL ASSUMPTIONS REGARDING THE REORGANIZED DEBTORS | 83 |
| C. | | VALUATION METHODOLOGY | 84 |
| VIII. | | CERTAIN RISK FACTORS AFFECTING THE DEBTORS | 86 |
| A. | | CERTAIN BANKRUPTCY LAW CONSIDERATIONS | 86 |
| | 1. | Risk of Non-Confirmation of the Plan of Reorganization | 86 |
| | 2. | Non-Consensual Confirmation | 86 |
| | 3. | Risk of Delay in Confirmation of the Plan | 87 |
| | 4. | Risks Related to the Restructuring Support Agreement and DIP Credit Facility | 87 |
| B. | | ADDITIONAL FACTORS TO BE CONSIDERED | 87 |
| | 1. | The Plan Proponents Have No Duty to Update | 87 |
| | 2. | No Representations Outside This Disclosure Statement Are Authorized | 87 |

WEIL:\95271232\1\35076.0003

3.      Financial Projections Are Not Assured, Actual Results  May Vary, and Variances from Financial Projections May Occur..........................87

4.      No Legal or Tax Advice Is Provided to You by This Disclosure Statement ..............................................................................................88

5.      No Admission Made..................................................................................88

6.      A Liquid Trading Market for the New Common Stock is Unlikely to Develop..............................................................................................88

7.      Business Factors and Competitive Conditions.........................................88

IX. CERTAIN U. S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ..............93

A.      CONSEQUENCES TO THE DEBTORS ...........................................................94

1.      Cancellation of Debt................................................................................94

2.      Deconsolidation of the Debtors................................................................95

3.      Potential Limitations on NOL Carryforwards and Other Tax Attributes ................................................................................................95

4.      Alternative Minimum Tax ........................................................................97

B.      CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS ...........................97

1.      Taxable Exchange ....................................................................................98

2.      Character of Gain or Loss........................................................................99

3.      Distributions in Respect of Accrued  But Unpaid Interest or OID .........100

4.      Ownership of Trade Claim Installment Obligation.................................100

5.      Disposition and Ownership of New Common Stock ...............................100

6.      Ownership, Disposition and Exercise of the New Warrants....................101

7.      Information Reporting and Backup Withholding....................................101

X. CONFIRMATION OF THE PLAN ..................................................................................102

A.      CONFIRMATION HEARING.........................................................................102

B.      OBJECTIONS .................................................................................................102

C.      REQUIREMENTS FOR CONFIRMATION OF THE PLAN ..........................104

1.      Requirements of Section 1129(a) of the Bankruptcy Code ....................104

2.      Requirements of Section 1129(b) of the Bankruptcy Code....................107

3.      Alternative to Confirmation and Consummation of the Plan .................109

4.      Nonconsensual Confirmation.................................................................110

XI. CONCLUSION...............................................................................................................111

WEIL:\95271232\1\35076.0003

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THE "**DISCLOSURE STATEMENT**") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE DEBTORS' *JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE*, DATED AS OF MARCH 12, 2015, (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE "**PLAN**") AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.[2]  A COPY OF THE PLAN IS ANNEXED HERETO AS **EXHIBIT A**.  NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN **IN THEIR ENTIRETY** BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VIII (CERTAIN RISK FACTORS AFFECTING THE DEBTORS) OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THE PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. **IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN WILL GOVERN**.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

THE DEBTORS BELIEVE THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THIS DISCLOSURE STATEMENT, AND THE OFFER OF THE NEW COMMON STOCK THAT MAY BE DEEMED TO BE MADE PURSUANT TO THE SOLICITATION, ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE EXEMPTION PROVIDED BY SECTION 1145(a)(1) OF THE BANKRUPTCY CODE, AND EXPECT THAT THE OFFER AND ISSUANCE OF THE NEW COMMON STOCK UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THEAPPLICABILITY OF SECTION 1145(a)(1) OF THE BANKRUPTCY CODE AND SECTION 4(A)(2) OF THE SECURITIES ACT.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING WITH RESPECT TO PROJECTED CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND

---

[2] Unless otherwise expressly set forth herein, capitalized terms used but not otherwise herein defined shall have the same meanings ascribed to such terms in the Plan.

WEIL:\95271232\1\35076.0003

ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS AND DEBTORS IN POSSESSION IN THESE CHAPTER 11 CASES.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

THE DEBTORS, THE OEM CUSTOMERS, THE CONSENTING NOTEHOLDERS AND PLATINUM EQUITY (COLLECTIVELY, THE "**PLAN PROPONENTS**") SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS AND INTERESTS  ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN. THE PLAN PROPONENTS BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERY FOR ALL CREDITORS.

WEIL:\95271232\1\35076.0003

# I.

## EXECUTIVE SUMMARY[3]

On March 12, 2015 (the "**Commencement Date**"), each of Automotive Properties of New York, LLC, Chassix Holdings, Inc. ("**Chassix Holdings**"), UC Holdings, Inc. ("**UC Holdings**"), Chassix, Inc. ("**Chassix**"), Diversified Machine, Inc., Diversified Machine Bristol, LLC, Chassix Georgia Machining, LLC, DMI Columbus, LLC, Diversified Machine Montague, LLC, Diversified Machine, Milwaukee LLC, DMI Edon LLC, Mexico Products I, LLC, DMI China Holding LLC, Concord International, Inc., SMW Automotive, LLC, Automotive, LLC, Chassis Co. of Michigan, LLC, and AluTech, LLC (collectively, the "**Debtors**" and, together with their non-Debtor subsidiaries, the "**Enterprise**"), commenced with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") a voluntary case pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors' chapter 11 cases are being jointly administered, for procedural purposes only, under the case *In re Chassix Holdings, Inc., et. al.*, Case No. 15–[_____] (___) (the "**Chapter 11 Cases**").

The Plan implements a prearranged restructuring negotiated by the Debtors, and the Debtors' major stakeholders, including an ad hoc committee comprised of holders of approximately 72% of the Debtors' Secured Notes and approximately 80% of the Debtors' Unsecured Notes (the "**Informal Committee of Noteholders**"), Platinum Equity Advisors LLC, the Debtors' prepetition private equity sponsor, and certain affiliated entities and investment funds (collectively, "**Platinum Equity**"), and all of the Debtors' largest customers, including General Motors LLC ("**GM**"), Ford Motor Company ("**Ford**"), FCA US LLC f/k/a Chrysler Group LLC ("**FCA**"), Nissan North America, Inc. ("**Nissan**") and BMW Manufacturing Co., LLC ("**BMW**" and, together with GM, Ford, FCA, and Nissan, collectively, the "**OEM Customers**"), which will result in a significant and substantial infusion of new capital in the Debtors in the form of new debtor-in-possession and exit financing. The anticipated benefits of the Plan include, without limitation, the following:

(a)     Approximately $250 million in debtor-in-possession financing comprised of a new $150 million revolving asset based lending facility to be provided by PNC Bank, National Association and a new $100 million term loan (which will convert to an exit term loan at emergence) to be provided by the Debtors' Secured Noteholders, to facilitate operations during the Chapter 11 Cases;

(b)     An infusion of $50 million by certain Secured Noteholders in the form of an additional new exit term loan at emergence, as well as a commitment from the Revolving DIP Lenders to work in good faith on acceptable terms for converting the $150 million Revolving DIP Credit Facility to an

---

[3] The following summary is qualified in its entirety by more detailed information contained in the Plan and elsewhere in this Disclosure Statement.

exit asset based lending facility, that will provide ongoing liquidity for the Debtors upon emerging from the Chapter 11 Cases;

(c)     Conversion of approximately $375 million of the Debtors' Secured Notes and approximately $158 million of the Debtors' Unsecured Notes to equity;

(d)     Agreements with the OEM Customers on long-term accommodations that will provide the Debtors with approximately $45 million in annual price increases and new business and programs, as well as certain other valuable accommodations and protections, including waivers of setoff and plan distributions on account of the OEM Customers' substantial claims against the Debtors;

(e)     Prompt emergence from chapter 11; and

(f)     Pro Rata distributions to holders of allowed General Unsecured Claims subject to certain conditions set forth in the Plan.

The Plan provides for a comprehensive restructuring of the Debtors' prepetition obligations, preserves the going-concern value of the Debtors' businesses, maximizes all creditor recoveries, provides for an equitable distribution to all of the Debtors' stakeholders, and protects the jobs of the Debtors' invaluable employees. To evidence their support of the Debtors' restructuring, the Debtors, the Informal Committee of Noteholders, and Platinum Equity executed the Restructuring Support Agreement (as herein defined), a copy of which is annexed to the Plan.

The agreements that the Debtors have reached with the OEM Customers are also central to the Plan. Pursuant to those certain Accommodation Agreements (defined below), which the Debtors filed on the Commencement Date, the Debtors will receive long-term accommodations and pricing relief from the OEM Customers for the benefit of their estates, creditors and other stakeholders. In addition to the substantial pricing and new business awards mentioned above, these valuable accommodations include the following:

(a)     A right of last refusal on certain future programs;

(b)     A continuation of certain interim accommodation implemented prior to the Commencement Date with respect to the Debtors' facility in Bristol, Indiana (the "**Bristol Facility**") designed to fund the Debtors' operating losses at the Bristol Facility;

(c)     A waiver by the OEM Customers of certain significant fees and expenses including expenses relating to premium and expedited freight, quality spill charges, outage costs, and third-party advisor fees and expenses;

11

(d)    Accelerated payment terms during the term of the Accommodation Agreements;

(e)    Restrictions on the OEM Customers' ability to resource programs to the Debtors' competitors; and

(f)    Agreements by the OEM Customers to waive and/or limit their ability to setoff or recoup charges against amounts owed to the Debtors.

In exchange for these accommodations, the Debtors have committed to continue to produce and deliver component parts to the OEM Customers during the term of the Accommodation Agreements, as well as to provide certain assistance in connection with any resourcing activities that may be permitted under the agreements.  The Debtors have further agreed to provide the OEM Customers with certain limited access rights to utilize the Debtors' facilities and equipment in the event there is a substantial likelihood the OEM Customers' production will be interrupted.  These accommodations provide the Debtors with significant value and are an essential component of the Debtors' Plan as well as for their long-term prospects for successes and sustainability.

The Plan provides for a significant deleveraging of the Debtors' balance sheet, as reflected in the chart below.

| Pre-Petition Capital Structure | | Post-Emergence Capital Structure | |
|---|---|---|---|
| Prepetition Revolving ABL Facility | $135 million[4] | Revolving Exit Facility | $55 million[5] |
| Secured Notes Due 2018 | $375 million | Converted Exit Term Loan | $100 million |
| Unsecured Notes Due 2018 | $158 million | Additional Exit Term Loan | $50 million |
| Capital Lease Obligations | $12 million | Capital Lease Obligations | $12 million |
| Total: | Approx. $680 million | Total: | Approx. $217 million |

In addition, the Plan implements a global release and settlement of numerous Debtor-creditor and inter-creditor issues with the Debtors' existing equity sponsor, Platinum Equity, and the members of the Informal Committee of Noteholders (the "**Global Settlement**").  Under the Plan, and in accordance with the Global Settlement, the holders of Allowed Secured Note Claims will receive their Pro Rata share of approximately 97.5% of the New Common Stock in the Reorganized Debtors (the "**Secured Noteholder Common Stock Distribution**") (subject to dilution as described below).  In addition, as described in further detail below, under

---

[4] Approximate amount drawn on $150 million Prepetition Revolving ABL Facility as of the Commencement Date.

[5] Estimated amount to be drawn on $150 million Revolving Exit Facility on the effective date of the Plan.

WEIL:\95271232\1\35076.0003

the terms of the Global Settlement, and in consideration of each of their substantial contributions to the Debtors' Chapter 11 Cases: (a) the Unsecured Noteholders will receive their Pro Rata share of approximately 2.5% of the New Common Stock (the "**Unsecured Noteholder Common Stock Distribution**") (subject to dilution by the Management Incentive Plan and, to the extent applicable, the exercise of the New Warrants) and warrants to purchase approximately 5% of the New Common Stock, as set forth in the Plan (the "**New Warrants**"); and (b) Platinum Equity will receive a release, as set forth in the Plan. In the event the Bankruptcy Court does not approve the terms of the Global Settlement, the Plan still provides for holders of Allowed Unsecured Noteholder Claims to receive the foregoing distribution if (a) each Class of Allowed Unsecured Note Claims votes to accept the Plan <u>and</u> (b) each Class of Allowed Other General Unsecured Claims and Allowed General Unsecured Trade Claims votes to accept the Plan. In the event either of the foregoing conditions is not met, the holders of Allowed Unsecured Note Claims will not receive or retain any property on account of their Claims under the Plan. If the Global Settlement is not approved or either the Class of General Unsecured Trade Claims or the Class of Other General Unsecured Claims does not vote to accept the Plan, the Secured Noteholder Common Stock Distribution will increase to 100% of the New Common Stock (subject to dilution by the Management Incentive Plan). The terms of the Global Settlement, including the release and indemnification provisions incorporated in the Plan, are integral parts of the Plan and have been agreed to, and are supported by, the Debtors and the other Plan Proponents.

        The Plan also provides for the following distributions to holders of Allowed General Unsecured Claims:

- With respect to holders of Allowed General Unsecured Trade Claims, the Plan provides that each holder of an Allowed General Unsecured Trade Claim will receive its Pro Rata share of $1,000,000 (the "**Trade Claim Distribution**"), in Cash, in full and final satisfaction of such holder's Allowed General Unsecured Trade Claim; <u>provided</u> that any holder of an Allowed General Unsecured Trade Claim that enters into an agreement with the Debtors (or the Reorganized Debtors, as applicable) to extend Customary Trade Terms will receive its Pro Rata Share of the Trade Claim Distribution and, in addition, its Pro Rata share of $4,000,000 (the "**Additional Trade Claim Distribution**").

- With respect to holders of Allowed Other General Unsecured Claims, the Plan provides that, for any Class of Allowed Other General Unsecured Claims that votes to accept the Plan of any Debtor, holders of Allowed Other General Unsecured Claims in such Class will receive their Pro Rata share of $2,000,000 (the "**General Unsecured Claim Distribution**"); <u>provided</u> that in the event that any Class of Other General Unsecured Claims votes to reject the Plan with respect to any Debtor, the holders of Allowed Other General Unsecured Claims in such rejecting Class will not receive or retain any property under the Plan.

WEIL:\95271232\1\35076.0003

Substantially all of the Debtors' assets are subject to valid and perfected liens held by the DIP Lenders, the Prepetition Revolving ABL Lenders and the Secured Noteholders, which require payment in full prior to distributions to holders of unsecured Claims against the Debtors. Thus, on a going-concern basis, because the obligations owed by the Debtors to the DIP Lenders and the Secured Noteholders exceed the value of the Debtors, minimal (if any) distributions would be made to any holders of Claims against the Debtors other than the DIP Lenders and the Secured Noteholders absent consummation of the proposed Plan. Further, as set forth in the attached liquidation analysis (the "**Liquidation Analysis**"), outside of the proposed Plan, holders of non-priority unsecured Claims junior to the Claims of the DIP Lenders and the Secured Noteholders would receive no distribution in a liquidation of the Debtors' Estates. The Debtors have also explored the possibility of receiving additional distributable value from potential avoidance actions and litigation but the Debtors do not believe that any such receivables would be meaningful.

In developing the Plan, the Debtors gave due consideration to various exit alternatives and engaged in significant discussions and negotiations with representatives of and/or professionals for the Informal Committee of Noteholders, Platinum Equity and their other stakeholders. The Debtors also conducted a careful review of their current operations, prospects as an ongoing business and financial projections developed by management and estimated recoveries in a liquidation scenario, and concluded that recoveries to the Debtors' stakeholders will be maximized by the Debtors' continued operation as a going concern. The Debtors believe that their businesses and assets have significant value that would not be realized in a liquidation, either in whole or in substantial part. Consistent with the valuation, liquidation and other analyses prepared by the Debtors with the assistance of their advisors, the value of the Debtors is substantially greater as a going concern than in a liquidation.

The Debtors believe that any alternative to confirmation of the Plan, such as an attempt by another party to file a competing plan of reorganization, would result in significant delays, litigation and additional costs, and could negatively affect value by causing unnecessary uncertainty with the Debtors' key customer and supplier constituencies, including the OEM Customers, which could ultimately lower the recoveries for all holders of Allowed Claims. Additionally, any resulting breach of the milestones set forth in the Restructuring Support Agreement for confirmation of the Plan could jeopardize the willingness of the other Plan Proponents, including the Informal Committee of Noteholders and Platinum Equity, to support the Plan.

The purpose of this Disclosure Statement is to provide holders of Claims entitled to vote to accept or reject the Plan with adequate information about (i) the Debtors' businesses and certain historical events, (ii) the Chapter 11 Cases, (iii) the Plan, (iv) the rights of holders of Claims and Interests under the Plan, and (v) other information necessary to enable each holder of a Claim to make an informed judgment as to whether to vote to accept or reject the Plan.

**THE DEBTORS AND THE OTHER PLAN PROPONENTS URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE IN FAVOR OF THE PLAN.**

WEIL:\95271232\1\35076.0003

## II.

## INTRODUCTION

Pursuant to section 1125 of the Bankruptcy Code, the Debtors submit this Disclosure Statement to all holders of Claims against and Interests in the Estates to provide information in connection with the solicitation of votes to accept or reject the Plan.  The Disclosure Statement is organized as follows:

- Section I contains an executive summary.

- Section II includes certain general information.

- Section III provides an overview of the Debtors' businesses.

- Section IV sets forth key events leading to the Debtors' chapter 11 filings.

- Section V discusses the Chapter 11 Cases.

- Section VI contains a summary of the Plan.

- Section VII discusses the valuation of the Debtors.

- Section VIII describes certain factors affecting the Debtors.

- Section IX discusses certain U.S. federal income tax consequences.

- Section X addresses confirmation of the Plan.

- Section XI concludes this Disclosure Statement and recommends that eligible creditors vote to accept the Plan.

## A.    DISCLOSURE STATEMENT EXHIBITS

The following exhibits are annexed to this Disclosure Statement:

- **EXHIBIT A** – The Plan (with exhibits, including the Accommodation Agreements and Restructuring Support Agreement)
- **EXHIBIT B** – Debtors' Prepetition Organizational Structure
- **EXHIBIT C** – Projected Financial Information
- **EXHIBIT D** – Liquidation Analysis for the Debtors

## B.    THE DEBTORS' PROFESSIONALS

The Debtors have filed, or will soon file, separate applications with the Bankruptcy Court, requesting authority to retain the following professionals:   (i) Weil, Gotshal & Manges LLP ("**Weil**"), as their legal advisors; (ii) Lazard Frères & Co. LLC ("**Lazard**"), as their investment bankers; (iii) FTI Consulting, Inc. ("**FTI**"), to provide the Debtors with an interim chief financial officer (the "**Interim CFO**") and certain other personnel and to provide related restructuring support services; (iv) Ernst & Young LLP ("**E&Y**"), as their independent auditors and tax advisors; and (v) Prime Clerk LLC ("**Prime Clerk**" or the "**Voting Agent**"), as claims

agent and administrative advisor.  The contact information for these professionals is set forth below:

| | |
|---|---|
| **Weil, Gotshal & Manges LLP**<br>767 Fifth Avenue<br>New York, New York 10153<br>Attn:  Ray C. Schrock, P.C.<br>       Marcia L. Goldstein, Esq.<br>       Matthew P. Goren, Esq.<br>Tel:  (212) 310–8000 | **Lazard Frères & Co. LLC**<br>30 Rockefeller Plaza<br>New York, New York 10112<br>Attn:  Andrew Yearley<br>Tel:  (212) 632–1377 |
| **FTI Consulting, Inc.**<br>227 West Monroe Street<br>Suite 900<br>Chicago, Illinois 60606<br>Attn:  David J. Woodward<br>Tel: (312) 252–4058 | **Ernst & Young LLP**<br>One Kennedy Square<br>Suite 1000<br>777 Woodward Avenue<br>Detroit, Michigan 48226<br>Attn:  Michael J. Boehm<br>Tel: (313) 628–8901 |
| **Prime Clerk LLC**<br>830 Third Avenue, 9th Floor<br>New York, New York 10022<br>Attn:  Benjamin Steele<br>Tel:  (212) 257–5490 | |

## C.    IMPORTANT DATES

Please take note of the following important dates and deadlines:

| | |
|---|---|
| Deadline to file and serve any objection or response to the Plan (the "**Plan Objection Deadline**") | **[●], 2015 at [●]:[●][●].m. (Eastern Time)** |
| Deadline for completed ballots to be received by the Voting Agent (the "**Voting Deadline**") | **[●], 2015 at [●]:[●][●].m. (Eastern Time)** |
| Scheduled date and time for the commencement of the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") | **[●], 2015 at [●]:[●][●].m. (Eastern Time)** |

WEIL:\95271232\1\35076.0003

D.    **BRIEF OVERVIEW OF THE PLAN**[6]

    The Plan described in this Disclosure Statement provides for the Debtors' prompt emergence from the Chapter 11 Cases, which the Debtors anticipate will occur on or before July 31, 2015.

    In addition to the Plan, the principal terms of the negotiated settlement are set forth in the following agreements, each of which has been incorporated by reference into the Plan:[7]

   i.  the Restructuring Support Agreement, dated March 12, 2015, by and among the Debtors, the Consenting Noteholders, and Platinum Equity (as may be amended, supplemented or modified from time to time in accordance with the terms thereof, the "**Restructuring Support Agreement**"), by which the parties thereto have affirmed their support for the restructuring embodied in the Plan; and

   ii.  (a) that certain accommodation agreement (together with any exhibits or schedules thereto, the "**Multi-Customer Accommodation Agreement**"), dated March 11, 2015, between and among the Debtors, Ford, GM, FCA, Nissan, the DIP ABL Agent, and the DIP Term Agent, and (b) that certain accommodation agreement (together with any exhibits or schedules thereto, the "**BMW Accommodation Agreement**" and together with the Multi-Customer Accommodation Agreement, the "**Accommodation Agreements**"), between and among the Debtors, BMW, the DIP ABL Agent, and the DIP Term Agent, pursuant to such Accommodation Agreements the OEM Customers have agreed to provide the Debtors with certain valuable, long-term accommodations, including, without limitation, pricing accommodations on a number of go-forward programs and commitments for new business.

    Pursuant to the Plan, and consistent with the terms of the Restructuring Support Agreement, the Debtors will restructure their debt obligations and implement a recapitalization with $100 million of new capital being provided pursuant to the DIP Facilities that will convert to exit financing. The Debtors' Revolving DIP Lenders have also committed to work in good faith on acceptable terms for converting the $150 million Revolving DIP Credit Facility to exit financing at emergence. In addition, certain members of the Informal Committee of Noteholders have committed to provide the Debtors with an additional $50 million in the form of a new exit

---

[6] **This summary is qualified in its entirety by reference to the Plan.** Statements as to the rationale underlying the treatment of Claims and Interests under the Plan are not intended to, and will not, waive, compromise or limit any rights, claims or causes of action in the event that the Plan is not confirmed. You should read the Plan in its entirety before voting to accept or reject the Plan.

[7] Copies of the Accommodation Agreements and the Restructuring Support Agreement are annexed to the Plan as **Exhibit "A"** and **Exhibit "B**,**"** respectively.

WEIL:\95271232\1\35076.0003

term loan to provide the Reorganized Debtors with additional working capital to fund their businesses and operations.

Under the Plan, Secured Noteholders will receive their Pro Rata share of the Secured Noteholder Common Stock Distribution. As a part of the Global Settlement, pursuant to section 1123 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), among the Debtors, the Consenting Noteholders, and Platinum Equity, the Plan provides that, in consideration of the substantial contribution provided by the Consenting Unsecured Noteholders to the Debtors' Chapter 11 Cases in the form of, among other things, the Consenting Unsecured Noteholders' cooperation in the Debtors' restructuring efforts, the Consenting Unsecured Noteholders' assistance and contribution in prepetition negotiations with the OEM Customers, the contribution by certain of the Consenting Unsecured Noteholders, as DIP Lenders, in the form of the DIP Term Loan, and generally their participation in prepetition negotiations that facilitated a speedy and consensual restructuring for the Debtors, Unsecured Noteholders will receive their Pro Rata share of the Unsecured Noteholder Common Stock Distribution and the New Warrants.

In addition, pursuant to the Global Settlement and in consideration of the substantial contribution provided by Platinum Equity to the Chapter 11 Cases in the form of, among other things, Platinum Equity's management, consulting and advisory services leading up to and during the Chapter 11 Cases, its assistance in securing favorable pricing and accommodation terms and conditions for the Debtors in connection with the Chapter 11 Cases, its agreement to take, or not take, certain actions that could impact the tax attributes of the Reorganized Debtors, and its participation in prepetition negotiations that facilitated a speedy and consensual Restructuring for the Debtors, Platinum Equity will receive a release, as set forth in the Plan. Under the Plan, Platinum Equity will also receive reasonable and documented fees and expenses incurred in connection with the Debtors' restructuring (subject to certain limitations).

In the event the Bankruptcy Court does not approve the terms of the Global Settlement pursuant to Bankruptcy Rule 9019, the Plan still provides for holders of Allowed Unsecured Noteholder Claims to receive the foregoing distribution if (a) each Class of Allowed Unsecured Note Claims votes to accept the Plan <u>and</u> (b) each Class of Allowed Other General Unsecured Claims and Allowed General Unsecured Trade Claims votes to accept the Plan. In the event either of the foregoing conditions is not met, the holders of Allowed Unsecured Note Claims will not receive or retain any property on account of their claims under the Plan.

The Plan further provides for the following distributions to holders of Allowed General Unsecured Claims:

- With respect to holders of Allowed General Unsecured Trade Claims, the Plan provides that each holder of an Allowed General Unsecured Trade Claim will receive its Pro Rata share of the Trade Claim Distribution in full and final satisfaction of such holder's Allowed General Unsecured Trade Claim; <u>provided</u> that each holder of an Allowed General Unsecured Trade Claim that enters into an agreement with the Debtors (or the Reorganized Debtors, as applicable) to extend Customary Trade Terms

will receive its Pro Rata share of the Trade Claim Distribution and, in addition, its Pro Rata share of the Additional Trade Claim Distribution.

- With respect to holders of Allowed Other General Unsecured Claims, the Plan provides that, for any Class of Allowed Other General Unsecured Claims that votes to accept the Plan of any Debtor, holders of Allowed Other General Unsecured Claims in such Class will receive their Pro Rata share of the General Unsecured Claim Distribution; provided that in the event that any Class of Other General Unsecured Claims votes to reject the Plan with respect to any Debtor, the holders of Allowed Other General Unsecured Claims in such rejecting Class will not receive or retain any property under the Plan.

If (i) the Global Settlement is not approved by a Final Order or (ii) either the Class of General Unsecured Trade Claims or the Class of Other General Unsecured Claims does not vote to accept the Plan, the Secured Noteholder Common Stock Distribution will increase to 100% of the New Common Stock (subject to dilution by the Management Incentive Plan).

The terms of the Global Settlement, including the release and indemnification provisions incorporated in the Plan, are integral parts of the Plan and have been agreed to, and are supported by, the Debtors and the other Plan Proponents.

Section VI of this Disclosure Statement provides a more detailed description of the Plan.

## E.    SUMMARY OF DISTRIBUTIONS AND VOTING ELIGIBILITY

The following summary table briefly outlines the classification and treatment of Claims against and Interests in the Estates under the Plan, and the voting eligibility of the holders of such Claims and Interests.  **As set forth in the Plan, the classification of Claims and Interests set forth herein will apply separately to each of the Debtors.**  The following summary table is qualified in its entirety by reference to the full text of the Plan.

| CLASS NO. | TYPE OF CLAIM OR INTEREST | IMPAIRMENT | APPROX. ALLOWED AMOUNT[8] | APPROXIMATE PERCENTAGE RECOVERY[9] | ELIGIBLE TO VOTE |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | $4 million | 100%<br><br>Each holder of an Allowed Other Priority Claim will receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practical thereafter. | No (presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | $10 million | 100%<br><br>Each holder of an Allowed Other Secured Claim will receive, at the option of the Debtors or the Reorganized Debtors, (i) payment in full in Cash in full and final satisfaction of such claim, payable on the Effective Date or as soon as reasonably practical thereafter, (ii) delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest required under Section 506(b) of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | No (presumed to accept) |
| 3 | Secured Note Claims | Impaired | $395 million | 79.8%<br><br>Pursuant to the Global Settlement set forth in Section 5.2 of the Plan, and subject to, and in accordance with, Section 5.16 of the Plan, on the Effective Date, each holder of an Allowed Secured Note Claim will be entitled to receive, in full and final satisfaction of such Allowed Secured Note Claim, its Pro Rata share of the Secured Noteholder Common Stock Distribution; provided that if (i) the Global Settlement is not approved by a Final Order or (ii) either the Class of General Unsecured Trade Claims or the Class of Other General Unsecured Claims does not vote to accept the Plan, the Secured Noteholder Common Stock Distribution will increase to 100% of the New Common Stock (subject to dilution by the Management Incentive Plan). | Yes |

---

[8] The amounts set forth herein are estimates based upon the Debtors' books and records as of the Commencement Date. Actual allowed amounts will depend upon, among other things, final reconciliation and resolution of all Claims, and the negotiation of cure amounts. Consequently, the actual allowed amounts may vary from the approximate amounts set forth herein.

[9] The approximate percentage recovery for each Class set forth in this Disclosure Statement is based upon certain assumptions that are subject to change. A detailed discussion of the analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is set forth in the Liquidation Analysis annexed to this Disclosure Statement as **Exhibit D**.

WEIL:\95271232\1\35076.0003

| CLASS NO. | TYPE OF CLAIM OR INTEREST | IMPAIRMENT | APPROX. ALLOWED AMOUNT[8] | APPROXIMATE PERCENTAGE RECOVERY[9] | ELIGIBLE TO VOTE |
|---|---|---|---|---|---|
| 4 | Unsecured Note Claims | Impaired | $158 million | 8.3%<br><br>Pursuant to the Global Settlement, and subject to, and in accordance with, Section 5.16 of the Plan, on the Effective Date, pursuant to the Global Settlement, each holder of an Allowed Unsecured Note Claim will be entitled to receive, in full and final satisfaction of such Allowed Unsecured Note Claim, its Pro Rata share of the Unsecured Noteholder Common Stock Distribution and the New Warrants; provided that holders of Allowed Unsecured Note Claims will receive the foregoing Pro Rata distributions if the Global Settlement is approved or the following conditions occur:<br><br>(i) the holders of Allowed Class 4 Unsecured Note Claims vote to accept the Plan; and<br><br>(ii) each sub-class of Class 5 General Unsecured Trade Claims and Class 6 Other General Unsecured Claims votes to accept the Plan.<br><br>In the event the Bankruptcy Court determines that the Global Settlement cannot be approved and each of the foregoing conditions have not been satisfied, holders of Allowed Unsecured Note Claims will not receive or retain any property under the Plan. | Yes |
| 5 | General Unsecured Trade Claims | Impaired | $31 million | 25%<br><br>Except to the extent a holder of an Allowed General Unsecured Trade Claim has agreed to less favorable treatment or has been paid prior to the Effective Date, including pursuant to any Final Order, each holder of an Allowed General Unsecured Trade Claim will receive its Pro Rata share of the Trade Claim Distribution, in Cash, in full and final satisfaction of such holder's Allowed General Unsecured Trade Claim on the following distribution schedule: (i) ten percent (10%) payable on the Effective Date or as soon as practicable thereafter; (ii) forty-five percent (45%) payable one year after the Effective Date; and (iii) forty-five percent (45%) payable two years after the Effective Date; provided that any holder of a General Unsecured Trade Claim that enters into an agreement with the Debtors (or the Reorganized Debtors, as applicable) to extend Customary Trade Terms will receive its Pro Rata share of the Trade Claim Distribution and, in addition, its Pro Rata share of the Additional Trade Claim Distribution on the same schedule set forth above in Section 4.5(b) of the Plan. | Yes |

WEIL:\95271232\1\35076.0003

| CLASS NO. | TYPE OF CLAIM OR INTEREST | IMPAIRMENT | APPROX. ALLOWED AMOUNT[8] | APPROXIMATE PERCENTAGE RECOVERY[9] | ELIGIBLE TO VOTE |
|---|---|---|---|---|---|
| 6 | Other General Unsecured Claims | Impaired | Undetermined | 5% <br><br> Except to the extent a holder of an Allowed Other General Unsecured Claim has agreed to less favorable treatment, on the Effective Date or as soon thereafter as is reasonably practicable, each holder of an Allowed Other General Unsecured Claim will receive the following treatment: <br><br> (i)      for any sub-class of Other General Unsecured Claims that votes to accept the Plan of any individual Debtor, each holder of an Allowed Other General Unsecured Claim in such accepting sub-class will receive its Pro Rata share of the General Unsecured Claim Distribution; and <br><br> (ii)     in the event any sub-class of Other General Unsecured Claims votes to reject the Plan with respect to any individual Debtor, the holders of Allowed Other General Unsecured Claims in such a rejecting sub-class will not receive or retain any property under the Plan on account of such Claims, including, for the avoidance of doubt, any Pro Rata share of the General Unsecured Claim Distribution.  For the avoidance of doubt, to the extent any sub-class of Other General Unsecured Claims votes to reject the Plan and, therefore, is not entitled to receive any portion of the General Unsecured Claim Distribution, such Pro Rata portion attributable to the rejecting sub-class will be reallocated to the holders of Other General Unsecured Claims in other sub-classes that have voted to accept the Plan. | Yes |
| 7 | Intercompany Claims | Unimpaired | NA | NA <br><br> On the Effective Date or as soon thereafter as is practicable, Intercompany Claims may be extinguished or compromised by distribution, contribution or otherwise, or Reinstated, at the discretion of the Debtors or the Reorganized Debtors, as the case may be, on or after the Effective Date; provided that all Intercompany Claims owing by Diversified Machine, Inc. to Chassix (whether or not represented by a note) will be contributed by Chassix to the capital of Diversified Machine, Inc. under the Plan. | No (presumed to accept) |

WEIL:\95271232\1\35076.0003

| CLASS NO. | TYPE OF CLAIM OR INTEREST | IMPAIRMENT | APPROX. ALLOWED AMOUNT[8] | APPROXIMATE PERCENTAGE RECOVERY[9] | ELIGIBLE TO VOTE |
|---|---|---|---|---|---|
| 8 | Intercompany Interests | Unimpaired | NA | NA<br><br>The Intercompany Interests will be Unimpaired under the Plan. | No (presumed to accept) |
| 9 | Subordinated Securities Claims | Impaired | NA | 0%<br><br>Holders of the Subordinated Securities Claims will not receive or retain any property under the Plan on account of such Claims. | No (deemed to reject) |
| 10 | Existing Chassix Holdings Equity Interests | Impaired | NA | 0%<br><br>The holder of Existing Chassix Holdings Equity Interests will not receive or retain any property under the Plan on account of such Interests. | No (deemed to reject) |

Section VI.B of this Disclosure Statement provides a more detailed description of the treatment of Claims and Interests under the Plan.

Pursuant to the provisions of the Bankruptcy Code, only those holders of claims or interests in classes that are impaired under a plan of reorganization and that are not deemed to have rejected the plan are entitled to vote to accept or reject such proposed plan. Classes of claims or interests in which the holders of claims are unimpaired under a proposed plan are deemed to have accepted such proposed plan and are not entitled to vote to accept or reject the Plan. Classes of claims or interests in which the holders of claims receive no distribution under a proposed plan are deemed to have rejected such proposed plan and are not entitled to vote to accept or reject the Plan.

## F.    VOTING PROCEDURES

As set forth in more detail in Section VI.B of this Disclosure Statement, certain holders of Claims are entitled to vote to accept or reject the Plan. For each holder of a Claim entitled to vote, the Debtors have enclosed with the Disclosure Statement, among other things, a ballot and voting instructions regarding how to properly complete the ballot and submit a vote with respect to the Plan. Holders of more than one Claim will receive an individual ballot for each Claim. The individual ballots must be used to vote each individual Claim. For detailed voting instructions, please refer to the voting instructions and the ballot enclosed with this Disclosure Statement.

All completed ballots must be actually received by the Voting Agent at the following address no later than **5:00 p.m. (Eastern Time) on [●], 2015** (the "**Voting Deadline**").

<u>Via Regular Mail, Overnight Courier, or Hand Delivery</u>:

Chassix Holdings, Inc.
Ballot Processing Center
c/o Prime Clerk LLC
830 3rd Avenue, 9th Floor
New York, New York 10022

If you are a holder of a Claim that is entitled to vote on the Plan and you did not receive a ballot, received a damaged ballot or lost your ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting with respect to the Plan, please contact the Voting Agent at (844) 224–1137 (toll free) or (917) 962–8896 (international toll free).

| |
|---|
| **THE VOTING AGENT WILL NOT COUNT**<br>**ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE.** |

### G.    **CONFIRMATION UNDER SECTION 1129(B)**

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both.  In addition, with respect to the Classes that are deemed to have rejected the Plan, the Debtors intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  Section 1129(b) permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or interests.  Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminately unfairly" and is "fair and reasonable" with respect to each rejecting class.  A more detailed description of the requirements for confirmation of a nonconsensual plan is set forth in Section X of this Disclosure Statement.

### H.    **CONFIRMATION HEARING**

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on **[●], 2015 at [●]:[●][●].m. (Eastern Time)** before the Honorable [_____] at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004–1408.

Objections and responses to confirmation of the Plan, if any, must be served and filed as to be received on or before the Plan Objection Deadline, **[●], 2015 at [●]:[●][●].m. (Eastern Time)**, in the manner described in the order approving this Disclosure Statement (the "**Disclosure Statement Order**") and Section X.B of this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

## III.

## OVERVIEW OF THE DEBTORS' OPERATIONS

### A.    THE DEBTORS' BUSINESSES

Chassix is a leading global manufacturer and supplier of aluminum and iron chassis sub-frame components and powertrain products with both casting and machining capabilities.  The Debtors are based in Southfield, Michigan and serve a diverse customer base that includes both original equipment manufacturers ("**OEMs**") and Tier One suppliers.  For the twelve months ended December 31, 2014, the Debtors generated approximately $1.37 billion in revenue on a consolidated basis.  As of December 31, 2014, the Debtors had approximately $833 million in assets and $784 million in liabilities on a consolidated basis.

The Debtors are currently one of the only suppliers of casted and machined parts such as steering knuckles and control arm components with global manufacturing capabilities in each of North America, South America, Asia and Europe.  As of the Commencement Date, the Debtors employed approximately 3,500 employees, as well as several hundred temporary workers, in fifteen manufacturing facilities located throughout the United States, including facilities in New York, Georgia, Indiana, Massachusetts, Michigan, and Tennessee.

Chassix launched in 2013, and was the result of the integration of two separate businesses.  The Debtors' two business lines—machining and casting—were vertically integrated through the combination of the two businesses in December of 2012.  The following chart summarizes certain relevant aspects of the Debtors' corporate structure as of the Commencement Date.  A more detailed summary of the Debtors' organizational structure as of the Commencement Date is attached hereto as **Exhibit B**.

WEIL:\95271232\1\35076.0003

**Capital Structure as of the Commencement Date**



WEIL:\95271232\1\35076.0003

B.    **THE DEBTORS' OPERATIONS**

Chassix is one of the only suppliers of casted and machined parts with manufacturing capabilities in each of North America, South America, Europe, and China.  The Debtors are the sole source provider on nearly all of the OEM platforms for which they supply component parts.  All of the Debtors' operating facilities have full development, design, engineering, and testing capabilities.

The Debtors and their subsidiaries operate twenty-three manufacturing facilities across six countries, providing safety critical automotive components, having content on approximately 64% of the largest platforms in North America.  Their product mix maintains an even balance among trucks, minivans and SUVs, as well as small and medium size cars and cross-over vehicles.  The Debtors supply component parts to the largest automotive manufacturers in the world, including General Motors, Ford, Fiat/Chrysler, Renault/Nissan, BMW, Volkswagen, and Daimler, as well as other global automotive OEMs and Tier One suppliers.  The Debtors' contracted programs relate to nearly all of the high volume vehicles produced in North America, including, without limitation:

(a)    **Chrysler**:  Jeep Grand Cherokee, Chrysler 300, Dodge Challenger, Dodge Charger, Dodge Durango and Dodge Ram;

(b)    **GM**:  Chevy Cruze, Chevy Malibu, Chevy Impala, Chevy Silverado, GMC Sierra, Chevy Tahoe, GMC Yukon, Cadillac Escalade, GMC Acadia, Buick Enclave, Chevy Corvette, Cadillac SRX, Cadillac XTS and Chevy Traverse;

(c)    **Ford**:  F-150, Fusion, Explorer, Mustang, Taurus, Edge and Transit;

(d)    **Nissan**:  Altima, Maxima, Rogue and Pathfinder; and

(e)    **BMW**:  X5 and X6.

*Chassis Products*

The Debtors have fully integrated design, development, testing, casting, and machining and assembly capabilities across a wide range of aluminum, ductile iron, and steel chassis components.

27

*Representative Chassis Products*



The Debtors' primary chassis products include steering knuckles, sub-frames and control arms. Steering knuckles, which comprise the Debtors' largest product category, are highly engineered components that, together with the steering arm, allow the wheel to pivot. Approximately 50% of the steering knuckles sold by the Debtors are aluminum, with the remainder manufactured from ductile iron. Other chassis components produced by the Debtors include wheel hubs, spindles, brake calipers and brackets. Safety critical chassis components are designed into OEM platforms and homologated, or crash-tested, in accordance with federal safety standards. Chassis products were responsible for approximately 97% of the Debtors revenue for the fiscal year ended December 31, 2014.

WEIL:\95271232\1\35076.0003

The following table describes the Debtors' chassis products:

| Product | | Description |
|---|---|---|
| Front Steering Knuckle |  | Main structural component for a front end vehicle suspension.  Brakes, shocks and the wheel are all mounted to the steering knuckle.  A front steering knuckle also has a steering arm for the control and alignment of the vehicle |
| Rear Steering Knuckle |  | Main structural component for a rear end vehicle suspension.  Brakes, shocks and the wheels are all mounted to the steering knuckle. |
| Sub-Frame and Beams |  | Serviceable section of the frame or unibody of a vehicle chassis that can support suspension components or engine/driveline components.  Typically used in front/rear construction of an independent suspension configuration. |
| Control Arms |  | Linkage between the steering knuckle and main frame component.  Allows for independent vehicle suspension. |
| Brake Calipers and Brackets |  | Calipers are the main section of a hydraulic brake system that contains the pistons and the brake pads. Brackets are a key part of a brake caliper that retain the caliper during the braking cycle.  The brake bracket is bolted to the steering knuckle. |
| Corner Modules |  | A chassis sub-assembly consisting of a steering knuckle, wheel bearing, wheel hub, dust shield and ABS sensor.  In some cases the brake caliper and rotor are part of the sub-assembly.  Corner modules allow for better control of the alignment of the wheel hub and brake caliper/rotor assembly for longer brake life. |
| Front Spindles |  | A spindle is used in a two-wheel drive vehicle configuration and is either a subassembly to the steering knuckle or can be machined as part of the steering knuckle.  The wheel bearing and hub are pressed onto the spindle and the assembly is completed with a locking nut. |
| Wheel Hubs |  | The wheel of a vehicle is mounted to a hub via wheel studs that are installed in the hub with lug nuts.  The hub is attached to a steering knuckle with a wheel bearing. |

The Debtors' chassis products benefit from a number of competitive advantages that the Debtors have relative to their competitors, including: (i) fully integrated capabilities, including, without limitation, design and engineering, testing, and casting and machining capabilities; (ii)  a defensible market position due to complexity of products and full engineering integration with customers; (iii) strong aluminum capabilities to leverage the migration of

WEIL:\95271232\1\35076.0003

products from iron to aluminum for lighter, more fuel efficient vehicles; and (iv) highly engineered and proprietary design and manufacturing processes.

*Powertrain Products*

The Debtors' powertrain products include engine and cylinder blocks, cylinder heads, front covers, intake manifolds, bedplates and brackets.  The Debtors specialize in complex, thin-wall aluminum intakes, fully machined and assembled cylinder heads and engine blocks.  The Debtors benefit from a unique capability to maintain cylindricity and other tight tolerances with engine blocks applications.  The Debtors' powertrain capabilities also include design, testing and casting for both aluminum and iron components. The key powertrain manufacturing processes include broaching, rack rolling, hard and precision turning, micro finishing, grinding and assembly.  Powertrain products were responsible for 3% of the Debtors' revenue for the fiscal year ended December 31, 2014.

The following charts detail the revenue for the Enterprise by product, material, vehicle type and geography for the twelve months ended December 31, 2014.



For the fiscal year ended December 31, 2014, approximately 58% of the Debtors' sales were of aluminum components and approximately 42% were of iron components.  As set forth above, the Debtors' significant capabilities with respect to both aluminum and iron components give them a distinct advantage over their competitors and their strength in aluminum components positions them well as automakers are increasingly utilizing aluminum parts instead of steel to reduce vehicle weight and improve fuel efficiency.  Based on their book of business and the impact of increased fuel-efficiency standards, the Debtors anticipate a significant shift in revenue towards aluminum products over iron products in the coming years.

For the twelve months ended December 31, 2014, the Debtors generated approximately $1.37 billion of net sales and $21.6 million of pro forma adjusted EBITDA.

WEIL:\95271232\1\35076.0003

## C.       THE DEBTORS' BUSINESS MODEL

As is common-place throughout the automotive industry, the Debtors' businesses function under a tiered supply chain structure.  Under this structure, upstream from the car manufacturers (*i.e.*, the OEMs) are Tier One suppliers, like the Debtors, that produce the specialized component parts, service parts and assembled goods ("**Component Parts**") needed for new vehicles.  The Debtors' business relationships with their customers begin when the Debtors are awarded a new program, which generally occurs two or three years prior to the production launch.  This system allows for high revenue visibility and a large program backlog (subject to ultimate production volumes on a particular platform).  The Debtors estimate that, as of December 31, 2014, they had contractually booked revenue of more than $5 billion over the five years ending December 31, 2019.

Generally, each Component Part manufactured by the Debtors is engineered and designed in partnership with the applicable customer.  Key Component Parts must be designed, tested, and validated for quality and safety—a process that can take months or years to complete. In almost all cases, the Debtors are the sole manufacturer of the Component Parts which they supply for their customers.  Accordingly, the chassis and powertrain products that the Debtors manufacture and produce are critical to their customers and cannot be easily replaced or resourced from alternative suppliers even with many months of lead time.

The Debtors deliver Component Parts to the OEMs on a "just-in-time" basis, matching the OEM's exact build schedule for a particular day and shift, thereby reducing inventory levels.  To minimize inventory costs and allow for rapid shifts in manufacturing output based on consumer purchasing trends, the Debtors and their customers maintain a low inventory of finished parts and raw materials and may schedule deliveries of components directly to the assembly line.  This system requires highly choreographed design, purchasing, shipping, inbound logistics and manufacturing operations, working in a highly synchronized manner.  Because of the minimal inventory retained by the Debtors and by their customers and the short lead time on meeting orders, any breakdown in the supply chains could significantly impair—or even completely halt—the Debtors' production process.  Any disruption in the Debtors' production could immediately impact their customers' ability to manufacture automobiles and could result in a significant shutdown in production of many of the largest vehicle platforms in North America.  An OEM's ability to assemble cars, therefore, is directly dependent on the Debtors' ability to deliver Component Parts on schedule.[10]

## D.       INTERNATIONAL OPERATIONS

In addition to their domestic operations, the Debtors maintain manufacturing facilities in five different international geographies and employ over 1,200 employees abroad. Internationally, the Debtors operate machining facilities in South America, Europe, and Asia as well as casting facilities in the People's Republic of China.  The Debtors' international affiliates (all of which are non-Debtors) have historically been self-sustaining and cash generating, with

---

[10] Additional information regarding the critical nature of the Debtors' supply chain is set forth in the *Declaration of David J. Woodward Pursuant to Local Bankruptcy Rule 1007-2 in Support of Vendor Related First Day Motions*.

funds flowing up to the United States parent in the form of management fees.  From time to time, however, funds flow out of the United States cash management system to the foreign subsidiaries in the form of an intercompany loan and/or capital contributions to address either statutory requirements or specified liquidity needs.

## E.    PLATINUM EQUITY AND THE DMI/SMW INTEGRATION

Platinum Equity's ownership of the Debtors began in December 2011, with the purchase of Diversified Machine, Inc. and its subsidiaries (collectively, "**DMI**") from the Carlyle Group.  At that time, DMI had an established history as a global manufacturer of precision chassis and suspension products, including steering knuckles and control arms, as well as engine products, including engine blocks and cylinder heads.  The sale and purchase was accomplished on December 1, 2011, when UC Holdings, then the sole shareholder of DMI, was acquired via merger by Dharma Holding Corporation ("**DHC**"), a wholly-owned subsidiary of certain private equity funds sponsored by Platinum Equity, LLC, through its subsidiary Dharma Intermediate Holding Corporation ("**DIHC**").

Platinum Equity subsequently purchased Concord International, Inc., the parent of SMW Automotive LLC, and Automotive Properties of New York, LLC (together, "**Concord**" or "**SMW**"), in the first quarter of 2012.  Specifically, on January 13, 2012, Triomphe Intermediate Holding Corporation ("**TIHC**"), an indirect wholly-owned subsidiary of certain private equity funds sponsored by Platinum Equity, LLC through DHC and the parent company of UC Holdings, acquired the equity of Concord.  DIHC was subsequently merged into TIHC through DHC and the parent company of UC Holdings.

What is now known as Chassix was later formed in the fourth quarter of 2012, through the combination of the two separate businesses.  Specifically, on December 21, 2012, TIHC contributed its 100% equity interests in DMI and Concord to DMI SMW Holding Corporation.  Beginning in December, 2012, DMI SMW Holding Corporation began to integrate the operations of DMI and SMW.  On May 6, 2013, DMI SMW Holding Corporation changed its name to Chassix.  By combining the machining and casting businesses of DMI and SMW the Debtors positioned themselves as one the few Tier One suppliers able to offer aluminum and iron casting as well as machining and assembly.

Since purchasing DMI in December 2011, Platinum Equity has contributed and invested approximately $450 million in the Debtors' businesses and operations.

*Corporate Advisory Services Agreements*

Since acquiring the Debtors' businesses in 2011 and 2012, Platinum Equity, by and through certain of its direct and indirect affiliates and subsidiaries, has supplied the Debtors, pursuant to certain advisory services agreements (the "**Advisory Agreements**"), with advisory services, including, without limitation, management and financial planning advice; general business advice; assistance and advice regarding negotiating and obtaining financing; accounting advice; and advice and assistance with respect to commercial and marketing activities.  The Advisory Agreements generally provide that DHC or TIHC, on behalf of certain Debtors, pay an annual fee, which is capped at $5 million per year (plus related expenses), to certain Platinum

WEIL:\95271232\1\35076.0003

Equity entities for the management of, and financial advisory services and oversight provided to, the Debtors.

## F.    PREPETITION CAPITAL STRUCTURE

As of the Commencement Date, the Debtors had outstanding funded debt obligations in the aggregate amount of approximately $680 million, which amount consists of (i) approximately $135 million in secured borrowings under the Debtors' Prepetition Revolving ABL Facility, (ii) approximately $375 million in principal amount of Secured Notes, (iii) approximately $158 million in principal amount of Unsecured Notes, and (iv) approximately $12 million in capital lease obligations.

Because the Debtors are privately held, they are not subject to the information disclosure requirements of the Securities Exchange Act of 1934, as amended.  Accordingly, the Debtors do not file annual, quarterly, or current reports or any other financial information with the Securities and Exchange Commission.

### 1.    The Prepetition Revolving ABL Facility

On July 23, 2013, Chassix, together with its domestic subsidiaries, as co-borrowers and guarantors, and UC Holdings, as parent guarantor, entered into that certain amended and restated loan and guaranty agreement (as thereafter amended or modified from time to time, the "**Prepetition Revolving ABL Facility**") with BMO Harris Bank N.A., providing the Debtors with a $125 million asset-based revolving credit facility.  On June 6, 2014, pursuant to that certain Commitment Increase Joinder, the revolving loan commitments under the Prepetition Revolving ABL Facility were increased by $25 million to $150 million.  Funds from the Prepetition Revolving ABL Facility are used for working capital purposes.

Up to $25 million of the Prepetition Revolving ABL Facility was available for issuances of letters of credit and any such issuance of letters of credit reduced the amount available under the Prepetition Revolving ABL Facility on a dollar-for-dollar basis.  Availability under the Prepetition Revolving ABL Facility was capped by a borrowing base, calculated based on certain percentages of the value of the borrowers' inventory and receivables and subject to certain reserves and sub-limits.[11]  Borrowings under the Prepetition Revolving ABL Facility bore interest, at the option of Chassix, at either (i) a base rate or (ii) a LIBOR rate plus, in each case, an applicable margin ranging from 0.75%–1.25% for base rate loans and 1.75%–2.25% for LIBOR rate loans, in each case based on the amount of average excess availability as reported on the most recently delivered borrowing certificate.  A commitment fee was payable quarterly in arrears at rates per annum, depending on average usage under the Prepetition Revolving ABL Facility, of 0.375% or 0.50% of the average daily unused amount of the commitments in respect

---

[11] As described in further detail below, on February 6, 2015, the Debtors entered into an amendment with the lenders under the Prepetition Revolving ABL Facility pursuant to which, among other things, the parties agreed to: (i) shorten the maturity date until March 6, 2015 (which was thereafter extended by amendment to the Commencement Date), (ii) pay interest at the base rate plus 3.75% per annum on a monthly basis, (iii) pay an unused commitment fee of 0.375% per annum paid monthly and (iv) eliminate the fixed charge coverage ratio and  implement daily cash dominion sweeps.

WEIL:\95271232\1\35076.0003

of the Prepetition Revolving ABL Facility. Prior to the amendment described below, the Prepetition Revolving ABL Facility was scheduled to mature on December 21, 2017. The Prepetition Revolving ABL Facility included a financial maintenance covenant whereby UC Holdings and its subsidiaries on a consolidated basis must maintain a minimum fixed charge coverage ratio of 1.0:1.0, tested on the last day of each fiscal quarter only if there exists an Event of Default (as defined in the Prepetition Revolving ABL Facility) or if undrawn availability under the Prepetition Revolving ABL Facility is less than the greater of 10% of the maximum borrowing amount under the Prepetition Revolving ABL Facility and $7.5 million for five consecutive business days.

As set forth above, the Prepetition Revolving ABL Facility is guaranteed by UC Holdings and each of its current and future direct and indirect wholly-owned subsidiaries other than (i) certain immaterial subsidiaries, (ii) certain foreign subsidiaries, and (iii) any subsidiary of any borrower prohibited by requirements of law or an existing contractual restriction from being joined as a guarantor of the Prepetition Revolving ABL Facility. The Prepetition Revolving ABL Facility is secured by a first-priority lien on substantially all accounts, deposit and securities accounts, and inventory (collectively, the "**ABL Priority Collateral**"). Subject to certain exclusions, the Prepetition Revolving ABL Facility is also secured by a second-priority lien on substantially all real estate assets, intellectual property, equipment, capital stock held by the Debtors and all other collateral other than the ABL Priority Collateral (collectively, the "**Notes Priority Collateral**").

On February 6, 2015, as part of their prepetition restructuring efforts, the Debtors negotiated an amendment to the Prepetition Revolving ABL Facility (the "**ABL Amendment**") that provided the Debtors with approximately $23 million in additional liquidity by, among other things, eliminating certain borrowing base reserves and the springing fixed charge coverage ratio covenant. The ABL Amendment also shortened the maturity date on the Prepetition Revolving ABL Facility to March 6, 2015 (which was thereafter extended by amendment to the Commencement Date). Closing on the ABL Amendment allowed the Debtors to extend their cash runway, which provided them with the time necessary to negotiate a prearranged restructuring with their key constituencies. Contemporaneously therewith, the Debtors also moved the monthly deliveries of borrowing base certificates under the Prepetition Revolving ABL Facility to weekly deliveries, which provided the Debtors with an additional $6 to $7 million liquidity benefit by the end of February 2015.

As of the Commencement Date, the Debtors had drawn approximately $135 million under the Prepetition Revolving ABL Facility.

2.    **The Secured Notes**

On July 23, 2013, Chassix, together with the guarantor parties thereto, entered into an indenture (the "**Secured Note Indenture**") with U.S. Bank National Association, as trustee and collateral agent, pursuant to which Chassix issued $350 million in aggregate principal amount of 9 1/4% Secured Notes due 2018 (*i.e.*, the Secured Notes) in a private offering exempt from registration under the Securities Act of 1933, as amended (the "**Securities Act**"). An additional $25 million of Secured Notes were thereafter issued pursuant to a supplemental indenture dated June 17, 2014. The proceeds of the Secured Notes were used to repay

outstanding borrowings under the Debtors' existing indebtedness, to pay related fees and expenses, and for general corporate purposes.   The Secured Notes mature on August 1, 2018.

Chassix pays interest on the Secured Notes semi-annually, in arrears, at the rate of 9 1/4% per year, payable in cash, on February 1 and August 1 of each year.  The Notes are guaranteed on a senior secured basis by UC Holdings and all of Chassix's existing domestic subsidiaries and all future domestic subsidiaries that guarantee its indebtedness or indebtedness of any subsidiary guarantor, including any indebtedness under the Prepetition Revolving ABL Facility.  The Secured Notes are secured by a first-priority lien on all Notes Priority Collateral and a second-priority lien on all ABL Priority Collateral.

As discussed in further detail below, the Debtors' $17.3 million interest payment due on February 2, 2015, was a significant driver in the timing and commencement of the Chapter 11 Cases.

### 3.      The Intercreditor Agreement

The relative priorities of the liens held by the holders of the Secured Notes and the lenders for the Prepetition Revolving ABL Facility and restrictions on the ability to exercise remedies against collateral are subject to that certain Intercreditor Agreement (the "**Intercreditor Agreement**") by and between BMO Harris Bank N.A., as ABL Collateral Agent and U.S. Bank National Association, as Notes Collateral Agent, dated as of July 23, 2013.  In accordance with the Intercreditor Agreement, the holders of the Secured Notes and the lenders for the Prepetition Revolving ABL Facility agree that (i) the Prepetition Revolving ABL Facility liens on the ABL Priority Collateral are senior in all respects and prior to any lien on such collateral by the holders of the Secured Notes; and (ii) the liens that the holders of the Secured Notes have on the Notes Priority Collateral will be senior and prior to any liens the Prepetition Revolving ABL Facility lenders may have on  such collateral.

### 4.      The Unsecured Notes

On December 13, 2013, Chassix Holdings entered into an Indenture (the "**Unsecured Note Indenture**") with U.S. Bank National Association, as trustee (the "**Unsecured Indenture Trustee**"),[12] pursuant to which Chassix Holdings issued $150 million in aggregate principal amount of 10%/10.75% Senior PIK Toggle Notes due 2018 ("**Unsecured Notes**") in a private offering exempt from the registration requirements under the Securities Act.  The Unsecured Notes are unsecured and are not guaranteed.  Most of the purchasers of the Unsecured Notes were the same funds and financial institutions that previously purchased the Debtors' Secured Notes.  The proceeds of the Unsecured Notes were used to pay a special dividend to Platinum Equity and costs and expenses related to the offering.   The Unsecured Notes mature on December 15, 2018.  Chassix Holdings pays interest on the Unsecured Notes semi-annually, in arrears, at the rate of 10% per year with respect to cash interest and 10.75% per year with respect to payment in kind (PIK) interest, payable on June 15 and December 15 of each year.

---

[12] By agreement dated as of March 6, 2015, Delaware Trust Company succeeded U.S. Bank National Association as Unsecured Indenture Trustee.

WEIL:\95271232\1\35076.0003

At the initial stages of the Debtors' restructuring discussions, a cash interest payment for the Senior Unsecured Notes came due on December 15, 2014.  Although the Unsecured Note Indenture permits the Debtors, in certain situations, to pay interest in kind in lieu of payment in cash, they were required under the Unsecured Note Indenture to elect to exercise that option in June 2014 prior to the commencement of the interest period, which the Debtors had not elected to do.   In an effort to conserve cash while they continued restructuring negotiations, and after consulting with their advisors as well as representatives of the Informal Committee of Noteholders, the Board of Directors for Chassix Holdings determined that it was in the Debtors' best interests not to make the cash payment at that time.   Accordingly, on December 30, 2014, Chassix Holdings commenced a solicitation of consents and waivers (the "**Consent Solicitation**") soliciting the holders of Unsecured Notes to agree to waive any default resulting from the failure to make the December 15, 2014 interest payment, permit the payment to be made in the form of additional principal of Unsecured Notes, and approve certain proposed amendments to the Unsecured Notes Indenture to enable the same.  The Consent Solicitation was supported by an overwhelming majority of the holders of the Unsecured Notes, achieving nearly 99% acceptance.

As a result, on January 5, 2015, pursuant to the Unsecured Notes Indenture, Chassix Holdings entered into a first supplemental indenture (the "**Supplemental Indenture**") to the Unsecured Notes Indenture, pursuant to which holders of Unsecured Notes who provided their consent and waiver (the "**Consenting Holders**") in accordance with the Consent Solicitation received amended Unsecured Notes (the "**Consenting Holder Notes**"), which were increased by an aggregate principal amount equal to 10.75% of the Unsecured Notes held by Consenting Holders in lieu of cash interest for the December 15, 2014 interest payment date (the "**PIK Payment**").[13]

As of the Commencement Date, the principal amount of the Unsecured Notes was approximately $158,000,000.

### 5.    Capital Lease Obligations

As of December 31, 2014, the Debtors had capital lease obligations totaling approximately $12 million, which were used to finance various specialized equipment and machinery.  The collateral for the capital lease obligations is the equipment and other property that is being leased and the maturity dates range from 2015 through 2018.

### 6.    Foreign Debt

As of December 31, 2014, the foreign debt of the Enterprise was approximately $31 million, which includes, among other things, $6 million in foreign capital lease obligations,

---

[13] The additional Unsecured Notes issued pursuant to the PIK Payment provided that holders of 50.1% or more of the Consenting Holder Notes would be able to give a notice to Chassix Holdings no earlier than the first business day following January 31, 2015, requiring that Chassix Holdings redeem all Consenting Holder Notes in an amount equal to the aggregate principal amount of additional Unsecured Notes.  The Supplemental Indenture amended the Unsecured Notes Indenture and the Unsecured Notes (including any related default provisions) as necessary to permit the PIK Payment and the redemption feature described herein.

several working capital and equipment loans, and an accounts receivable pledging arrangement. Collateral for the Enterprise's foreign debt includes certain foreign equipment, certain real estate assets, and pledged accounts receivable. Maturity dates for the foreign debt range from 2015 through 2018 at interest rates ranging from 2.5% to 8.7%

IV.

**KEY EVENTS LEADING TO THE
COMMENCEMENT OF THESE CHAPTER 11 CASES**

A combination of operational and financial difficulties in 2014 due to, among other things, underpriced contracts and programs, compounded by a marked spike in the demand for automobile production in North America at a time when there was limited capacity in the machining and casting sectors, began to overwhelm the Debtors' manufacturing facilities—in particular, the Bristol Facility, which experienced an unanticipated and precipitous decline in performance. As set forth in further detail below, by the fourth quarter of fiscal year 2014, the Debtors were failing to meet projections and were facing an imminent liquidity crisis.

A.      **INITIAL INTEGRATION AND COST SAVING INITIATIVES**

As a part of their integration efforts, and after carefully examining the Debtors' financial projections and operations, the Debtors determined that it was necessary to implement certain measures that were designed to (i) optimize the Debtors' manufacturing footprint, (ii) realize purchasing savings by leveraging greater combined purchasing power, and (iii) increase vertical integration, or insourcing, by producing certain castings internally that the Debtors had previously purchased from third parties. Thereafter, the Debtors merged certain of their machining and casting facilities, closed unprofitable plants located in Port Huron, Michigan and Edon, Ohio, and opened a new machining facility in Columbus, Georgia. The Debtors also closed their facility in Milwaukee, Wisconsin, which was determined to be non-core to the Debtors' overall integration strategy.

B.      **INFRASTRACTURE CONSTRAINTS AND LEGACY CONTRACTS**

Although the Debtors were making strides to realize cost savings and synergies through their integration efforts, they faced additional constraints with respect to their equipment and infrastructure. The Debtors' infrastructure required significant upgrade and repair. Generally, the equipment utilized by the Debtors in their manufacturing has a lifetime of ten to fifteen years. Most of DMI and SMW's machinery and equipment was at or near the end of its respective useful lifetime (*e.g.*, 79% of the molding equipment was over ten years old) and required extensive, unexpected maintenance and improvement.

Additionally, some of the manufacturing facilities that had been acquired required considerable technological and structural upgrades. In the three years prior to the Commencement Date, the Debtors invested approximately $300 million to upgrade their infrastructure and purchase new machines in an attempt to meet production demands.

In addition, the Debtors also inherited a number of contracts and programs that were negotiated during a time when DMI and SMW were competitors engaging in bidding wars.

37

As a result, certain of the Debtors' legacy contracts were negotiated in a competitive landscape that created destructive pricing conditions and, in some cases, failed to account for maintenance and other capital expenditure costs or current production costs.

C.    **INCREASES IN DEMAND FOR AUTOMOBILE PRODUCTION IN NORTH AMERICA LEAD TO A PERCIPITUOUS DECLINE AT THE BRISTOL FACILITY**

As the Debtors continued to pursue their integration efforts, the automotive industry as a whole began to experience significant growth.  The industry's growth was followed by a corresponding spike in demand, which quickly brought to light the level to which certain of the Debtors' programs had been underpriced.  As the Debtors struggled to meet the increase in demand, their situation was aggravated by a number of new program launches in 2014 – including the CD4 chassis program – which began to overload the Debtors' equipment and facilities.   These complications were most prevalent at the Debtors' Bristol Facility.

In 2014, the Bristol Facility was responsible for the most new business of all of the Debtors' manufacturing facilities, with twelve new launches—compared to seven new launches in 2013.   To meet production demands, the Debtors relied heavily on existing machinery and equipment at the Bristol Facility while making significant investments in additional equipment.  Notwithstanding this investment, by the fourth quarter of 2014, the Debtors were running almost all of the Bristol Facility's  machinery and equipment at a relentless pace—operating shifts seven days per week rather than the standard five or six days to keep up with demand and production levels.

This non-stop level of activity prevented the Debtors from conducting routine maintenance and service checks on their equipment at the Bristol Facility.  Not surprisingly, as the Debtors were forced to continue to operate their equipment at an unending pace to keep up with customer demand, they began to see a significant increase in the occurrences of machine and equipment breakdown, which reduced the overall equipment effectiveness ("**OEE**") for the Debtors' inventory. These equipment failures and delays forced the Debtors to expend significant capital and resources on premium and expedited truck deliveries and, in some instances, expedited air shipment (including helicopters), in order to meet their scheduled deliveries for their customers.  During the month of September 2014, the Debtors spent over 30% more in premium freight when compared to the same period in 2013.

In response to the decline in OEE and the missed delivery deadlines, certain of the Debtors customers insisted that the Debtors bring in outside advisors and consultants to oversee the production lines at Bristol and other facilities in an effort to mitigate the operational impediments.  By September 2014, the Debtors were expending over $2 million dollars per month in third-party advisor fees and expenses.

Even with the assistance of these outside advisors, however, the Debtors were unable to stave off the precipitous decline at the Bristol Facility.  By the fourth quarter of 2014, the facility was incurring operating losses ranging from $350,000 to $500,000 per day.

WEIL:\95271232\1\35076.0003

D.    **PREPETITION TRADE CONTRACTION**

As news of the Debtors' production and liquidity troubles began to permeate throughout the automotive industry, a number of the Debtors' suppliers and vendors began contacting management and demanding changes in payment and credit terms. Certain of the Debtors' vendors negotiated reductions in trade terms while others demanded that the Debtors pay cash in advance for further delivers or post a letter of credit. Although the Debtors diligently worked with their advisors to resolve open vendor issues and avoid production stoppages, the actions taken by these vendors diminished the Debtors' cash position by approximately $40 million in the months prior to the Commencement Date.

E.    **PREPETITION RESTRUCTURING EFFORTS**

In light of the aforementioned issues, including the unprecedented difficulties facing the Bristol Facility, in the months preceding the Chapter 11 Cases, management, with the assistance of their advisors, took all available actions to preserve and extend the Debtors' liquidity and address their operational and financial concerns. In October 2014, the Debtors retained Oliver Wyman, Inc., a leading global automotive consulting firm, to assist with the operational challenges facing the Bristol Facility. In addition, the Debtors retained (i) FTI to provide an Interim CFO and additional personnel to assist with liquidity and cash forecasting and to provide other restructuring services, and (ii) Lazard to assist the Debtors in addressing their overall financial situation and to take steps to address their immediate interim liquidity needs. At this time, the Debtors also retained Weil to assist them in developing and implementing a comprehensive restructuring plan.

1.    **Bristol Initiatives and Interim Accommodations**

Following an in-depth analysis of their businesses, the Debtors, with the assistance of their professionals, implemented certain operational initiatives specifically designed to address the situation at Bristol. These operational initiatives included (i) reducing spending costs related to production and external contractors, (ii) improving planning and scheduling, (iii) provisionally increasing the use of temporary workforce to meet customer needs, and (iv) transferring production to the Debtors' other facilities to alleviate some of the increased production stress.

Although these operational initiatives showed progress, it would be several months before they would have any meaningful impact on the Debtors' financial position and, absent an immediate infusion of capital, the Debtors were facing an imminent liquidity crisis. To that end, in November 2014, the Debtors commenced negotiations with representatives of the OEM Customers, including Ford, GM, Chrysler, and (later) Nissan regarding interim financial accommodations with respect to the Bristol Facility.

Following nearly a month of good faith and arms' length negotiations, on or about December 31, 2014, the Debtors, together with the OEM Customers, agreed upon certain limited interim accommodations with respect to the Bristol Facility in the form of that certain proposed term sheet for interim accommodations (as thereafter amended from time to time, the "**Interim Accommodations Term Sheet**"), that would help shore up a portion of the Debtors' liquidity

WEIL:\95271232\1\35076.0003

gap and enable them to continue to operate while they negotiated a long-term solution.  In addition to limiting the OEM Customers' ability to resource programs away from the Debtors, restricting the OEM Customers' ability to set-off amounts against the Debtors' accounts receivable, and providing other industry standard accommodations, the Interim Accommodations Term Sheet provided that each of the OEM Customers, and certain other customers that (directly or indirectly) had production at the Bristol Facility, was responsible for (i) funding its allocated amount of projected operating losses at the Bristol Facility in accordance with an agreed upon monthly budget, and (ii) funding capital expenditure advances for such customer's projects at the Bristol Facility again in accordance with an agreed upon budget.  The OEM Customers also waived certain rights for reimbursement from the Debtors for expenses relating to premium freight and shipping, outage costs, quality spill costs, and third-party advisors fees and expenses. Furthermore, the Interim Accommodations Term Sheet facilitated the resolution of certain outstanding commercial issues that resulted in valuable short-term liquidity for the Debtors.

The accommodations provided under the Interim Accommodations Term Sheet resulted in approximately $22.2 million in additional liquidity for the Debtors from the effective date of the agreement through the Commencement Date.

### 2. Additional Incremental Financing Actions

While the interim accommodations contributed by the OEM Customers under the Interim Accommodations Term Sheet provided the Debtors with some much needed liquidity, the Debtors understood that the liquidity provided by the accommodations was insufficient to allow them the time necessary to negotiate a prearranged restructuring of their capital structure with their key creditor constituencies.  To further bridge the Debtors' short-term liquidity gap, in November 2014, the Debtors, together with their professionals at Lazard and Weil, began exploring other potential avenues to augment their liquidity position and provide the Debtors with sufficient runway to negotiate a more permanent restructuring solution.  To that end, Lazard undertook an effort to survey potential sources of incremental financing.  After it became apparent that new or additional third-party incremental financing would not be available to the Debtors prepetition, the Debtors commenced negotiations with the Administrative Agent on an amendment that would provide the Debtors with some limited incremental liquidity under their existing Prepetition Revolving ABL Facility.

As set forth above, the ABL Amendment, which closed on February 6, 2015, increased the Debtors' ability to borrow on the Prepetition Revolving ABL Facility and provided the Debtors with an additional $23 million in liquidity.  At that same time, the Debtors also moved the monthly deliveries of borrowing base certificates under the Prepetition Revolving ABL Facility to weekly deliveries, which provided the Debtors with an additional $6 to $7 million liquidity benefit by the end of February 2015.

### 3. Capital Structure Negotiations, the Restructuring Support Agreement and the Debtors' Chapter 11 Plan

Having secured sufficient interim financial assistance to allow the parties the time necessary to negotiate a long-term solution to the Debtors' financial situation, the Debtors and their advisors commenced negotiations in January 2015 with representatives of Platinum Equity,

the Informal Committee of Noteholders, and the OEM Customers regarding a comprehensive operational and financial restructuring for the Debtors.  Although the Debtors, through their prepetition financing activities, had secured some additional runway for plan negotiations, the Debtors had a $17.3 million interest payment on their Secured Notes coming due on February 2, 2015 (with a 30-day grace period prior to triggering an event of default under the Secured Note Indenture).  With that deadline looming, the parties immediately commenced negotiations on two parallel fronts.

First, the Debtors, together with representatives from FTI, as well as the advisors for the Informal Committee of Noteholders, began negotiating with representatives of the OEM Customers on long-term accommodations that were designed both to replace the accommodations provided under the Interim Accommodations Term Sheet as well as to provide long-term pricing relief on the Debtors' existing contracts and commitments for new business.  Several rounds of in-person meetings and conferences were held between and among the parties over the course of approximately two months.  These hard fought negotiations ultimately resulted in the parties entering into the Accommodation Agreements.  The Accommodation Agreements provide for approximately $45 million in annual prices increases and new business and programs.  On the Commencement Date, the Debtors filed a motion seeking authority to enter into the Accommodation Agreements.

On the second front, representatives of the Debtors, Platinum Equity and the Informal Committee of Noteholders commenced negotiations on the Debtors' go-forward capital structure and balance sheet restructuring.  These negotiations included in-person meetings, conference calls, and multiple term sheet iterations over a period of two months, which ultimately culminated in an agreement on the Plan.

To demonstrate and affirm their support for the Plan, the Debtors, Platinum Equity, and certain members of the Informal Committee of Noteholders executed the Restructuring Support Agreement on March 12, 2015.  Among other things, the Restructuring Support Agreement provides the following:[14]

(a)     *Agreement to Vote*.  So long as the Restructuring Support Agreement has not been terminated in accordance with the terms thereof, and subject to certain limitations set forth therein, the Consenting Noteholders and Platinum Equity each agree (i) subject to the receipt of a disclosure statement and other solicitation materials in respect of the applicable Plan, to vote their claims against the Debtors to accept the  Plan, (ii) not (x) object to, delay, impede or take any other action to interfere with acceptance or implementation of the Plan, (y) solicit, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout or plan of reorganization for

---

[14] The following is a summary of the Restructuring Support Agreement.  The Restructuring Support Agreement is incorporated by reference as if fully set forth herein.  In the event of any inconsistency between this summary and the Restructuring Support Agreement, the Restructuring Support Agreement controls.  Capitalized terms used in this section but not otherwise defined in this section shall have the meanings ascribed to them in the Restructuring Support Agreement or in the Plan.

WEIL:\95271232\1\35076.0003

the Debtors other than the Plan or (z) otherwise take any action that would or would reasonably be expected to, in any material respect interfere with, delay, impede or postpone the consummation of the Plan and the Restructuring or otherwise breach or be inconsistent with the Restructuring Support Agreement, and (iii) use commercially reasonable efforts to support and take all reasonably necessary steps to effectuate the Debtors' restructuring and consummation of the Plan

(b)     *Transfer Restrictions.*  Each Consenting Noteholder and Platinum Equity agree that, for the term of the agreement, such party will not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of, directly or indirectly, in whole or in part, any of its claims against or interests in the Debtors, subject to certain limitations and exceptions set forth therein.

(c)     *Releases.*  Subject to certain conditions and exceptions set forth in the Restructuring Support Agreement, each Consenting Noteholder, as of the Support Effective Date (as defined in the Restructuring Support Agreement) agrees to waive and release any and all Claims and all Causes of Action (as defined in the Plan) against Platinum Equity and its Released Parties from any and all Claims and Causes of Action related to the Debtors or the Restructuring.

(d)     *Debtors' Agreements.*  Each of the Debtors party to the Restructuring Support Agreement agrees to (i) act in good faith and use reasonable best efforts to support and complete successfully the Solicitation in accordance with the terms of the Restructuring Support Agreement and (ii) do all things reasonably necessary and appropriate in furtherance of confirming the Plan and consummating the Restructuring.

(e)     *Events of Default and Plan Milestones.*  In addition to certain other events of default set forth therein (including, among other things, a material breach of the agreement by the Debtors, the appointment of an examiner with expanded powers or a trustee in the Debtors' chapter 11 cases, or the termination of the Debtors' exclusive periods to file and solicit a chapter 11 plan), the Restructuring Support Agreement imposes a number of deadlines and milestones with respect to the Debtors' plan confirmation process which, if not met, will result in the automatic termination of the Restructuring Support Agreement, including the following:

WEIL:\95271232\1\35076.0003

     i.        Five (5) days after the Commencement Date, if the Debtors
have not filed the Plan and its related disclosure statement
with the Bankruptcy Court;

    ii.        Forty-five (45) days after the Commencement Date, if the
Bankruptcy Court has not have entered an order approving
the Debtors' disclosure statement for the Plan;

   iii.        June 30, 2015, if the Bankruptcy Court fails to enter an
order confirming the Plan in form and substance reasonably
satisfactory to the Restructuring Support Parties; and

   iv.        July 17, 2015, if the effective date for the Plan has not
occurred.

The Debtors believe that the restructuring contemplated by the Plan is in the best interests of their estates and their creditors. The Plan not only provides for the Debtors' prompt emergence from the Chapter 11 Cases, but also will facilitate the successful ongoing operations of the Debtors' businesses.

## V.

## THE CHAPTER 11 CASES

### A.    FIRST DAY PLEADINGS

On the Commencement Date, the Debtors filed certain "first-day" motions (collectively, the "**First Day Pleadings**") seeking certain immediate relief from the Bankruptcy Court that would allow the Debtors to continue to operate in chapter 11 and avoid immediate and irreparable harm due to the commencement of the Chapter 11 Cases. A description of the First Day Pleadings is set forth in the *Declaration of J. Mark Allan Pursuant to Local Bankruptcy Rule 1007-2*.

### B.    DEBTOR-IN-POSSESSION FINANCING

On the Commencement Date, the Debtors filed a motion to approve a consensual, priming, debtor-in-possession credit facility in the aggregate principal amount of approximately $250 million (the "**DIP Motion**"), comprised of (i) a term loan in the aggregate principal amount of $100 million (the "**DIP Term Facility**"), and (ii) a senior secured non-amortizing asset-based revolving credit facility in an aggregate principal amount of up to $150 million (the "**Revolving DIP Credit Facility**" and, together with the "**DIP Term Facility**," the "**DIP Credit Facility**").

The proceeds of the DIP Term Loan and the Revolving DIP Credit Facility were used to pay all obligations and claims in respect of or arising under the Prepetition Revolving ABL Facility and provide the Debtors with the working capital necessary to operate their businesses during the Chapter 11 Cases.

WEIL:\95271232\1\35076.0003

C.      **ACCOMMODATION AGREEMENTS**

As set forth above, on the Commencement Date, the Debtors filed a motion with the Bankruptcy Court seeking authority, pursuant to sections 363(b) and 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, to enter into the Accommodation Agreements, which was approved by order of the Bankruptcy Court dated March [●], 2015.

D.      **SCHEDULES AND BAR DATES**

On the Commencement Date, the Debtors filed a motion for entry of an order (i) establishing (a) May 20, 2015 at 5:00 p.m. (Eastern Time) as the deadline for each person or entity (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts, but not including governmental units to file proofs of claim in respect of a prepetition claims against any of the Debtors, and (b) September 8, 2015 at 5:00 p.m. (Eastern Time) as the deadline for governmental units to file proofs of claim in respect of a prepetition claim against any of the Debtors; and (ii) approving certain other related procedures.

Also on the Commencement Date, the Debtors filed a motion to extend the fourteen day period to file their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs by an additional fifteen days, through April 9, 2015.

WEIL:\95271232\1\35076.0003

# VI.

# THE PLAN

## A.    INTRODUCTION

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed as **Exhibit A** hereto.  This summary is qualified in its entirety by reference to the provisions of the Plan.

In general, a chapter 11 plan divides claims and equity interests into separate classes, specifies the property that each class is to receive under the Plan, and contains other provisions necessary to implement the Plan.

Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "equity holders," are classified because creditors and equity holders may hold claims and equity interests in more than one class.

Statements as to the rationale underlying the treatment of claims and equity interests under the Plan are not intended to, and will not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

> **THE DEBTORS URGE YOU TO READ THE PLAN IN ITS ENTIRETY
> BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

## B.    CLASSIFICATION AND TREATMENT OF CLAIMS
##        AND INTERESTS UNDER THE PLAN

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan.  This term is used throughout the Plan and the descriptions below.

In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the debtor.  Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects.  However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed.  These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims, and contingent claims for contribution and reimbursement.  In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires, for purposes of treatment and voting, that a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are not necessarily classified together, nor are equity interests of a substantially similar legal nature necessarily classified together. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the Plan) or "unimpaired" (unaffected by the Plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the Plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the Plan (i) does not alter the legal, equitable and contractual rights of the holders, or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a nonmonetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights.

Pursuant to section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the Plan. Accordingly, their votes are not solicited. Under the Plan, the following classes are unimpaired, and therefore, the holders of such Claims are "conclusively presumed" to have voted to accept the Plan: Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 7 (Intercompany Claims), and Class 8 (Intercompany Interests).

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan. For example, a class is deemed to reject a plan under section 1126(g) of the Bankruptcy Code if the holders of claims or equity interests in such class do not receive or retain property under the Plan on account of their claims or equity interests. Under this provision of the Bankruptcy Code, Class 9 (Subordinated Securities Claims) and Class 10 (Existing Chassix Holdings Equity Interests) are deemed to reject the Plan because, under the Plan, members of Class 9 and Class 10 will receive no distribution and retain no property interest on account of their Claims or Interests. Since Class 9 and Class 10 are deemed to reject the Plan, the Debtors are required to demonstrate that the Plan satisfies the requirements of section 1129(b) of the Bankruptcy Code with respect to such Classes. Among these are the requirements that the Plan be "fair and equitable" with respect to, and not "discriminate unfairly" against, Class 9 and Class 10.

Class 3 (Secured Note Claims), Class 4 (Unsecured Note Claims), Class 5 (General Unsecured Trade Claims), and Class 6 (Other General Unsecured Claims) are impaired under the Plan and, therefore, the holders with respect thereto are entitled to vote to accept or reject the Plan.

C.    **UNCLASSIFIED CLAIMS**

    1.    **Administrative Claims**

        Administrative Claims are the actual and necessary costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code.

        Under the Plan, except to the extent that a holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors agree to different treatment, the Debtors (or the Reorganized Debtors, as the case may be) will pay to each holder of an Allowed Administrative Claim Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Claim becomes an Allowed Claim; provided that Allowed Administrative Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors In Possession, or liabilities arising under loans or advances to or other obligations incurred by the Debtors, as Debtors In Possession, whether or not incurred in the ordinary course of business, will be paid by the Debtors or the Reorganized Debtors, as the case may be, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

    2.    **Fee Claims**

        All entities seeking an award by the Bankruptcy Court of Fee Claims (i) will file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred not later than the date that is forty-five (45) days after the Effective Date, (ii) will be paid in full, in Cash, the Allowed Amount of their respective Allowed Fee Claims (a) upon the later of (X) the Effective Date and (Y) the date on which the order Allowing such Fee Claim is entered or (b) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or, on and after the Effective Date, the Reorganized Debtors.  Under the Plan, the Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval, including those of the Creditors Committee to the extent the Creditors Committee is still in existence.

    3.    **Priority Tax Claims**

        Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim will receive, at the sole option of the Debtors or the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or (b) equal annual Cash payments (commencing on the later of

the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course) in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years after the Commencement Date; <u>provided</u> that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option.

### 4. <u>DIP Claims</u>

On the Effective Date, the Revolving DIP Facility will either be converted into the Revolving Exit Facility or paid in full, in Cash, using the proceeds of the Revolving Exit Facility.

On the Effective Date, the DIP Term Loan will either be converted into the Exit Term Loan or paid in full, in Cash, using the proceeds of the Exit Term Loan.

### 5. <u>Prepetition Revolving ABL Facility Claims</u>

Pursuant to the Plan, all obligations and claims in respect of or arising under the Prepetition ABL Credit Agreement, including the cash collateralization and letters of credit outstanding thereunder as of the Effective Date, will be paid in full, in Cash, by the Debtors using the proceeds of the Revolving DIP Credit Facility and the DIP Term Facility on the date the Interim DIP Order is entered by the Bankruptcy Court.

## D. <u>CLASSIFICATION OF CLAIMS AND INTERESTS</u>

As set forth in Section 3 of the Plan, the classification of Claims and Interests in the Plan will apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth in the Plan. Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes; such Classes will be treated as set forth in Section 3.3 of the Plan.

### 1. <u>Class 1 – Other Priority Claims</u>

Class 1 is Unimpaired by the Plan. Each holder of an Allowed Other Priority Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and is, therefore, not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Priority Claim has agreed to less favorable treatment of its Claim, each such holder will receive, in full and final satisfaction of such Claim, Cash in an amount equal to its Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Claim, in each case, or as soon as reasonably practical thereafter.

### 2. <u>Class 2 – Other Secured Claims</u>

Class 2 is Unimpaired by the Plan. Each holder of an Allowed Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the

WEIL:\95271232\1\35076.0003

Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed Other Secured Claim has agreed to less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim will receive (i) payment in full in Cash on the Effective Date, or as soon thereafter as practicable, (ii) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment as is necessary to satisfy section 1129 of the Bankruptcy Code.

### 3.        Class 3 – Secured Note Claims

Class 3 is Impaired by the Plan. Each holder of an Allowed Secured Note Claim is entitled to vote to accept or reject the Plan.

Pursuant to the Global Settlement set forth in Section 5.2 of the Plan, and subject to, and in accordance with Section 5.16 of the Plan, on the Effective Date, each holder of an Allowed Secured Note Claim will be entitled to receive, in full and final satisfaction of such Allowed Secured Note Claim, its Pro Rata share of the Secured Noteholder Common Stock Distribution; provided that if (a) the Global Settlement is not approved by a Final Order or (b) either the Class of General Unsecured Trade Claims or the Class of Other General Unsecured Claims does not vote to accept the Plan, the Secured Noteholder Common Stock Distribution will increase to 100% of the New Common Stock (subject to dilution by the Management Incentive Plan).

### 4.        Class 4 – Unsecured Note Claims

Class 4 is Impaired by the Plan. Each holder of an Allowed Unsecured Note Claim is entitled to vote to accept or reject the Plan.

Pursuant to the Global Settlement set forth in Section 5.2 of the Plan and subject to, and in accordance with, Section 5.16 of the Plan, on the Effective Date, each holder of an Allowed Unsecured Note Claim will be entitled to receive, in full and final satisfaction of such Allowed Unsecured Note Claim, its Pro Rata share of the Unsecured Noteholder Common Stock Distribution and the New Warrants; provided that holders of Allowed Unsecured Note Claims will receive the foregoing Pro Rata distributions if the Global Settlement is approved or the following conditions occur:

> (i) the holders of Allowed Class 4 Unsecured Note Claims vote to accept the Plan; and
> (ii) each sub-class of Class 5 General Unsecured Trade Claims and Class 6 Other General Unsecured Claims votes to accept the Plan.

In the event the Bankruptcy Court determines that the Global Settlement cannot be approved and each of the foregoing conditions has not been satisfied, holders of Allowed Unsecured Note Claims will not receive or retain any property under the Plan.

5.      **Class 5 – General Unsecured Trade Claims**

Class 5 is Impaired by the Plan.  Each holder of an Allowed General Unsecured Trade Claim is entitled to vote to accept or reject the Plan.

Except to the extent a holder of an Allowed General Unsecured Trade Claim has agreed to less favorable treatment or has been paid prior to the Effective Date, including pursuant to any Final Order, each holder of an Allowed General Unsecured Trade Claim will receive its Pro Rata share of the Trade Claim Distribution, in Cash, in full and final satisfaction of such holder's Allowed General Unsecured Trade Claim on the following distribution schedule:  (i) ten percent (10%) payable on the Effective Date or as soon as practicable thereafter; (ii) forty-five percent (45%) payable one year after the Effective Date; and (iii) forty-five percent (45%) payable after two years after the Effective Date; provided that any holder of an Allowed General Unsecured Trade Claim that enters into an agreement with the Debtors (or the Reorganized Debtors, as applicable) to extend Customary Trade Terms will receive its Pro Rata share of the Trade Claim Distribution and, in addition, its Pro Rata share of the Additional Trade Claim Distribution on the same schedule set forth above in Section 4.5(b) of the Plan.

6.      **Class 6 – Other General Unsecured Claims**

Class 6 is Impaired by the Plan.  Each holder of an Allowed Other General Unsecured Claim is entitled to vote to accept or reject the Plan.

Except to the extent a holder of an Allowed Other General Unsecured Claim has agreed to less favorable treatment, on the Effective Date, or as soon thereafter as is reasonably practicable, each holder of an Allowed Other General Unsecured Claim will receive the following treatment:

(i)      for any sub-class of Other General Unsecured Claims that votes to accept the Plan of any individual Debtor, each holder of an Allowed Other General Unsecured Claim in such accepting sub-class will receive its Pro Rata share of the General Unsecured Claim Distribution; and

(ii)      in the event any sub-class of Other General Unsecured Claims votes to reject the Plan with respect to any individual Debtor, the holders of Allowed Other General Unsecured Claims in such a rejecting sub-class will not receive or retain any property under the Plan on account of such Claims, including, for the avoidance of doubt, any Pro Rata share of the General Unsecured Claim Distribution.  For the avoidance of doubt, to the extent any sub-class of Other General Unsecured Claims votes to reject the Plan and, therefore, is not entitled to receive any portion of the General Unsecured Claim Distribution, such Pro Rata portion attributable to the rejecting sub-class will be reallocated to the holders of Other General Unsecured Claims in other sub-classes that have voted to accept the Plan.

WEIL:\95271232\1\35076.0003

7.     <u>**Class 7 – Intercompany Claims**</u>

Class 7 is Unimpaired by the Plan.  Each holder of an Allowed Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

On the Effective Date or as soon thereafter as is practicable, the Intercompany Claims may be extinguished or compromised by distribution, contribution or otherwise, or Reinstated, at the discretion of the Debtors or the Reorganized Debtors, as the case may be, on or after the Effective Date; <u>provided</u> that all Intercompany Claims held by Chassix against Diversified Machine, Inc. (whether or not represented by a note) will be contributed by Chassix to the capital of Diversified Machine, Inc. in accordance with Section 5.16 of the Plan.

8.     <u>**Class 8 – Intercompany Interests**</u>

Class 8 is Unimpaired by the Plan.  The holders of Intercompany Interest Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are, therefore, not entitled to vote to accept or reject the Plan.

9.     <u>**Class 9 – Subordinated Securities Claims**</u>

Class 9 is Impaired by the Plan.  Each holder of a Subordinated Securities Claim is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

The holders of the Subordinated Securities Claims will not receive or retain any property under the Plan on account of such Claims.

10.     <u>**Class 10 - Existing Chassix Holdings Equity Interests**</u>

Class 10 is Impaired by the Plan.  The holder of the Existing Chassix Holdings Equity Interests is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the holder of Existing Chassix Holdings Equity Interests is not entitled to vote to accept or reject the Plan.

On the Effective Date, all Existing Chassix Holdings Equity Interests, including all equity, warrants, common stock, and preferred stock, will be cancelled.

E.     <u>**MEANS FOR IMPLEMENTATION**</u>

1.     <u>**Compromise and Settlement of Claims, Interests, and Controversies**</u>

Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan will constitute a good faith compromise of all Claims, Interests, Causes of Action, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made on account of such Allowed Claim.  The entry of the Confirmation Order will constitute

WEIL:\95271232\1\35076.0003

the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, Causes of Action, and controversies, including without limitation, approval of the Restructuring Support Agreement, the Global Settlement, and the Accommodation Agreements, as well as a finding by the Bankruptcy Court that such compromise or settlement is within the range of reasonableness, in the best interests of the Debtors, their Estates, and holders of Claims and Interests, and is fair and equitable. In accordance with the provisions of the Plan, pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, prior to the Effective Date, the Debtors, subject to the reasonable consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, and after the Effective Date, the Reorganized Debtors, may compromise and settle Claims against the Debtors or the Reorganized Debtors, as applicable.

## 2.   **Global Settlement**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the substantial contribution and value provided by the Consenting Unsecured Noteholders and Platinum Equity, the Plan incorporates a compromise and settlement of numerous Debtor-creditor and inter-creditor issues, in the form of the Global Settlement, designed to achieve an economic settlement of such issues and potential Claims and Causes of Action against the Debtors. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval of each of the following compromises or settlements that comprise the Global Settlement, and the Bankruptcy Court's findings will constitute its determination that such compromises and settlements are within the range of reasonableness, in the best interests of the Debtors, their Estates, their creditors, and other parties-in-interests, and are fair and equitable. Each provision of the Global Settlement will be deemed non-severable from each other and from the remaining terms of the Plan.

As set forth in the Plan, the Global Settlement will be implemented as follows:

(a)    *Platinum Equity.*   On the Effective Date, in full and complete compromise and settlement of any claim that Platinum Equity may assert against the Debtors, the Reorganized Debtors or the Consenting Noteholders, and in consideration of the substantial contribution provided by Platinum Equity to the Debtors' Chapter 11 Cases in the form of, among other things, Platinum Equity's management, consulting and advisory services leading up to and during the Chapter 11 Cases, its agreement to take, or not take, certain actions that could impact the tax attributes of the Reorganized Debtors, its assistance in securing favorable pricing and accommodation terms and conditions for the Debtors in connection with the Chapter 11 Cases, and its participation in prepetition negotiations that facilitated a speedy and consensual Restructuring for the Debtors, Platinum Equity and all Released Parties related thereto will receive a release pursuant to Sections 10.6 and 10.7 of the Plan pursuant to the Global Settlement.

(b)    *Consenting Unsecured Noteholders.*   On the Effective Date, in full and complete compromise and settlement of any claim that the Consenting Unsecured Noteholders may hold against the Debtors, the Reorganized Debtors, Platinum Equity and any Released Parties related thereto, or the Consenting Secured Noteholders, and in consideration of

WEIL:\95271232\1\35076.0003

the substantial contribution provided by the Consenting Unsecured Noteholders to the Debtors' Chapter 11 Cases in the form of, among other things, the Consenting Unsecured Noteholders' cooperation in the Debtors' restructuring efforts, the Consenting Unsecured Noteholders' assistance and contribution in prepetition negotiations with the OEM Customers, the contribution by certain of the Consenting Unsecured Noteholders, as DIP Lenders, in the form of the DIP Term Loan, and generally their participation in prepetition negotiations that facilitated a speedy and consensual restructuring for the Debtors, each holder of an Allowed Unsecured Note Claim will receive its Pro Rata distribution of the Unsecured Noteholder Common Stock Distribution and New Warrants pursuant to the Global Settlement.

### 3.    Actions of Dharma Holding Corporation and Triomphe Intermediate Holding Corporation

On and after the Effective Date, Platinum Equity agrees to (a) waive or cause to be waived any stock loss in respect of the stock of UC Holdings and Chassix Holdings pursuant to Treasury regulation § 1.1502-36, and any comparable provision of state or local income tax law, to the extent directed by the Reorganized Debtors, (b) not take, or cause to be taken, any other action that would reduce, limit or otherwise adversely affect the U.S. federal income tax attributes of the Reorganized Debtors, except as consistent with past practice, general cash management, or short term prudent investment, and (c) cooperate with the Reorganized Debtors in connection with any group tax return filings, audits and proceedings with respect to taxable years ending on or prior to, or including, the Effective Date (including jointly managing such filings and proceedings, and not compromising any audit or proceeding without the Reorganized Debtors' consent, such consent not to be unreasonably withheld), provided that reasonable expenses incurred by Platinum Equity at the request of the Reorganized Debtors in connection with this section will be borne by the Reorganized Debtors.

### 4.    Cancellation of Existing Securities and Agreements

Except as expressly provided in the Plan, on the Effective Date, all notes, instruments, certificates evidencing debt of or interests in, the Debtors, including, without limitation, all obligations related to or arising out of the DIP Facilities, the Secured Notes Indenture, the Prepetition Revolving ABL Facility, and the Unsecured Note Indenture will be cancelled and obligations of the Debtors and the Reorganized Debtors thereunder will be discharged.

Notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date, the Secured Note Indenture and the Unsecured Note Indenture will continue in effect solely for purposes of the following:  (i) enabling holders of Allowed Class 3 (Secured Note Claims) and Allowed Class 4 (Unsecured Note Claims) to receive distributions under the Plan; and (ii) allowing the Secured Note Indenture Trustee and Unsecured Note Indenture Trustee to make distributions under the Plan; provided that nothing in the Plan will affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order or the Plan or result in any liability or expense to the Reorganized Debtors.

WEIL:\95271232\1\35076.0003

5.    **Corporate Structure**

On the Effective Date, except as set forth in Section 5.15 of the Plan, all Interests, including all equity, common stock, warrants, and preferred stock, in Chassix Holdings will be cancelled and extinguished and Chassix Holdings will be dissolved in accordance with Section 5.16 Plan. The equity in the Subsidiary Reorganized Debtors will be restored.

6.    **Authorization and Issuance of Plan Securities**

(a)    *Authorization*. The Debtors, the Reorganized Debtors, and Reorganized UC Holdings, as applicable, are authorized to issue all plan-related securities and documents, including, without limitation, the New Common Stock and, to the extent applicable, the New Warrants, and any options or entitlements to purchase such plan-related securities, without the need for any further corporate, partnership, or limited liability company action.

(b)    *New Common Stock*. On the Effective Date, subject to securities, tax and other relevant considerations and Section 5.16 of the Plan, the New Common Stock will be distributed in accordance with the Plan.

(c)    *New Warrants*. On the Effective Date, and subject to the satisfaction of the conditions set forth in Section 4.4(c) of the Plan, the New Warrants will be issued pursuant to the terms of the New Warrant Agreement.

(d)    *Shareholders Agreement*. Any direct or beneficial recipient of the New Common Stock (including New Common Stock issued pursuant to the exercise of New Warrants, if applicable), including all parties to whom such recipients may sell their New Common Stock in the future and all persons who purchase or acquire such equity in future transactions, will be party to, or will be deemed to be bound by, the Shareholders Agreement, the terms of which will govern Reorganized UC Holdings.

7.    **Section 1145 Exemption**

The issuance and distribution under the Plan of the New Common Stock and the New Warrants, if applicable, will be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code or, to the extent the exemption under section 1145(a) of the Bankruptcy Code is not available to any particular recipient under Section 4(a)(2) and/or Regulation D of the Securities Act of 1933 and/or any other applicable exemptions without further act or action by any Person.

In addition, under section 1145 of the Bankruptcy Code, any Securities issued under the Plan which are exempt from such registration pursuant to section 1145(a) of the Bankruptcy Code will be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (ii) compliance with any rules and regulations of the Securities and Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (iii) the restrictions, if any, on the transferability of such Securities and instruments; and (iv) applicable regulatory approval.

54

8.      **Exit Financing**

(a)      *Exit Facilities.*  On the Effective Date, the Revolving DIP Facility will be paid in full, in Cash, with the proceeds of, the Revolving Exit Facility with terms and conditions to be negotiated that will be acceptable to the Debtors and the Required Consenting Noteholders. On the Effective Date, the DIP Term Loan will be converted into, or paid in full, in Cash, with proceeds of the Exit Term Loan.

(b)      *Documentation.*  On the Effective Date, documentation evidencing the Revolving Exit Facility and the Exit Term Loan will be executed and delivered, and the Reorganized Debtors will be authorized to execute, deliver, and enter into and perform under the Revolving Exit Facility and the Exit Term Loan without the need for any further corporate action or any notice to or order of the Bankruptcy Court and without further action by the holders of Claims or Interests or any other Person.

(c)      *Liens/Security Interests.*  All Liens and security interests granted pursuant to the Exit Facilities are intended to be, and will be (i) valid, binding, perfected, enforceable, Liens, and security interests in the personal and real property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law and (ii) not subject to avoidance, recharacterization, or subordination under any applicable law.

9.      **Intercreditor Agreement**

Lien priority and enforcement rights with respect to collateral between and among the lenders under the Revolving Exit Facility and the Exit Term Loan will be governed by the Intercreditor Agreement on terms to be negotiated.

10.     **Reorganized Debtors**

(a)      *Amended Organizational Documents.*  The Amended Organizational Documents will comply with section 1123(a)(6) of the Bankruptcy Code and will otherwise be in form and substance satisfactory to the Debtors, the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  The Amended Organizational Documents will provide, among other things, that Reorganized UC Holdings, and each of the Subsidiary Reorganized Debtors are privately held companies.

(b)      *Board of Directors of Reorganized UC Holdings.*  As of the Effective Date, the term of the current members of the board of UC Holdings will expire without further action by any person.  The initial directors of the New Board will consist of five (5) members selected by the Consenting Noteholders and may include at least one member of the Debtors' executive management team.  The members of the New Board will be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.

(c)      *Directors and Officers of the Reorganized Debtors.*  Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date will serve as the initial officers of each of the respective Reorganized Debtors on or after the Effective Date and in accordance with any employment agreement with

WEIL:\95271232\1\35076.0003

the Reorganized Debtors and applicable non-bankruptcy law.  After the Effective Date, the selection of officers of the Reorganized Debtors will be as provided by their respective organizational documents.  The members of the board of directors and the board of managing members for each of the Reorganized Debtors (other than Reorganized UC Holdings as provided above) will be determined as set forth in the Amended Organizational Documents and disclosed as required pursuant to section 1129(a)(5) of the Bankruptcy Code.

(d)    *Capital Structure*.  From and after the Effective Date, subject to the rights of the stockholders to amend the Amended Organizational Documents, including the Certificate of Incorporation of Reorganized UC Holdings, each of the Reorganized Debtors will have one class of issued and outstanding common stock.

## 11.    <u>Bristol Facility</u>

The Reorganized Debtors will, on the Effective Date, continue to own and operate the Bristol Facility and will, without any further notice to or action, order, or approval of the Bankruptcy Court, be authorized to implement any necessary restructuring transactions in connection therewith, <u>provided</u> that the Debtors or the Reorganized Debtors, as the case may be, are authorized, with the consent of the Required Consenting Noteholders, to enter into a transaction pursuant to which the Debtors or the Reorganized Debtors sell the Bristol Facility as long as such a sale transaction does not adversely affect the treatment of any creditor or equity stakeholder under the Plan and is sold for aggregate consideration acceptable to the Debtors and the Required Consenting Noteholders.  Any sale of the Bristol Facility will be made pursuant to section 1123(a)(5)(D) of the Bankruptcy Code and will be subject to higher and better offers pursuant to bidding procedures approved by the Bankruptcy Court; <u>provided</u> that the sale of the Bristol Facility will not be a condition precedent to the Effective Date and such sale may not be consummated any earlier than the Effective Date.

## 12.    <u>Cancellation of Liens</u>

Except as otherwise specifically provided in the Plan, upon the occurrence of the Effective Date, any Lien securing any Secured Claim will be deemed released, and the holder of such Secured Claim will be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

## 13.    <u>Management Employment Matters</u>

On the Effective Date, the applicable Reorganized Debtors will enter into new employment agreements with certain members of the management team and will implement the Management Incentive Plan which will provide for the issuance of New Common Stock, in options or restricted units/equity, to management, directors, and employees of the Reorganized Debtors to incentivize their senior management teams.

WEIL:\95271232\1\35076.0003

## 14.    Withholding and Reporting Requirements

(a)    *Withholding Rights.*  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan will comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements will be subject to any such withholding or reporting requirements.  In the case that a distribution of New Common Stock, New Warrants, or other non-Cash property is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.  Any amounts withheld pursuant to the preceding sentence will be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan will have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms.*  Any party entitled to receive any property (including Cash) as an issuance or distribution under the Plan will, upon request, deliver to the Disbursing Agent or such other Person designated by the Reorganized Debtors (which entity will subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or Form W-8, as applicable, unless such Person is exempt under the Tax Code and so notifies the Disbursing Agent.  If such request is made by the Reorganized Debtors, the Disbursing Agent, or such other Person designated by the Reorganized Debtors and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution will irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution will be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

## 15.    Exemption from Certain Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (iv) the grant of collateral under the Exit Facilities and (v) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, will not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing

WEIL:\95271232\1\35076.0003

or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded will, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 16.    Restructuring Transactions; Further Transactions

On or prior to the Effective Date, the following Restructuring Transactions will be effectuated in the following order:

(a)    All Intercompany Claims held by Chassix against Diversified Machine, Inc. (whether or not represented by a note) will be contributed by Chassix to the capital of Diversified Machine, Inc.;

(b)    The Amended Organizational Documents of the Reorganized Debtors will become effective;

(c)    New Common Stock will be issued and contributed by Reorganized UC Holdings to Reorganized Chassix in an amount of shares sufficient to satisfy the Secured Noteholder Common Stock Distribution under Section 4.3 of the Plan;

(d)    The Existing UC Holdings Equity Interests held by Chassix Holdings will be recapitalized into an amount of shares of New Common Stock and New Warrants, if applicable, sufficient to satisfy the Unsecured Noteholder Common Stock Distribution under Section 4.4 of the Plan;

(e)    Concurrently, (i) Chassix Holdings will transfer to the Unsecured Noteholders, in accordance with Sections 4.4 and 5.2 of the Plan, shares of New Common Stock sufficient to satisfy the Unsecured Noteholder Common Stock Distribution and New Warrants, if applicable, and (ii) Reorganized Chassix will distribute to the Secured Noteholders in satisfaction and discharge of their Allowed Secured Note Claims, such New Common Stock in accordance with Section 4.3 of the Plan; and

(f)    All Interests in Chassix Holdings will be cancelled and extinguished in accordance with Section 5.4 of the Plan and Chassix Holdings will be dissolved in accordance with Section 5.16 of the Plan.

On the Effective Date or as soon as practicable thereafter, the Reorganized Debtors may (i) cause any or all of the Subsidiary Reorganized Debtors to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, (iii) use the proceeds of the Exit Term Loan and Revolving Exit Facility, plus Cash on hand, to pay all Restructuring Expenses, (iv) change the name of one or more of the Reorganized Debtors to such name that may be determined in accordance with applicable law, and (v) engage in any other transaction in furtherance of the Plan, including for tax efficiency reasons; provided that such transactions are not inconsistent with the above Restructuring Transactions or the other terms of the Plan. Subject to the prior

WEIL:\95271232\1\35076.0003

written consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, any such transactions may be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders, members, general or limited partners, or directors of any of the Debtors or the Debtors in Possession.

17.    **Dissolution of Chassix Holdings**

On the Effective Date, upon the consummation of the Restructuring Transactions and all other Effective Date distributions and transactions in furtherance of the Plan, Chassix Holdings will file with the Office of the Secretary of State of Delaware a certificate of dissolution which may be executed by an officer of Chassix Holdings without the necessity of the approval of the board of directors of Chassix Holdings or the holders of Interests in Chassix Holdings, and upon such filing will be deemed dissolved for all purposes and without the necessity of any other action by Chassix Holdings.  From and after the Effective Date, Chassix Holdings will not be required to file any documents, or take any other action or receive any approval to withdraw business operations in any state in which Chassix Holdings previously conducted its business operations.  To the extent that any of the foregoing is inconsistent or in conflict with any preexisting organizational or related documents of Chassix Holdings, such documents are deemed amended by the Plan to permit and authorize Chassix Holdings to take the contemplated actions.

18.    **Effectuating Documents**

On and after the Effective Date, the Reorganized Debtors and the managers, officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

19.    **Closing of the Chapter 11 Cases.**

Pursuant to the Plan, after an Estate has been fully administered, the Reorganized Debtors will promptly seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

F.    **DISTRIBUTIONS**

1.    **Distribution Record Date**

As of the close of business on the Distribution Record Date, the Claims register will be closed and there will be no further changes in the record holders of any Claims or Interests.  The Debtors or the Reorganized Debtors, as applicable, will have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.  Other than Claims that are expressly permitted by a Final Order or under the Plan to be filed after the Distribution Record Date, the Debtors or the Reorganized Debtors, as applicable,

WEIL:\95271232\1\35076.0003

will have no obligation to recognize any Claims filed from and after the Distribution Record
Date.

### 2.    Date of Distributions

In the event that any payment or act under the Plan is required to be made or
performed on a date that is not a Business Day, then the making of such payment or the
performance of such act may be completed on the next succeeding Business Day, but will be
deemed to have been completed as of the required date.

### 3.    Timing of Distributions

Except as otherwise provided in the Plan, the Disbursing Agent will make the
Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date.
Thereafter, the Disbursing Agent will from time to time determine the subsequent Distribution
Dates, which will occur no less frequently than semi-annually.

### 4.    Disbursing Agent

All distributions hereunder will be made by Reorganized Chassix (or such other
entity designated by Reorganized Chassix), as Disbursing Agent(s), on or after the Effective
Date or as otherwise provided in the Plan; provided that the Secured Note Indenture Trustee will,
subject to acceptable agreements with the Debtors or Reorganized Chassix, serve as Disbursing
Agent for Allowed Class 3 Secured Note Claims and the Unsecured Note Indenture Trustee will
serve as Disbursing Agent for Allowed Class 4 Unsecured Note Claims.  A Disbursing Agent
will not be required to give any bond or surety or other security for the performance of its duties,
and all reasonable fees and expenses incurred by such Disbursing Agents will be reimbursed by
the Reorganized Debtors.

### 5.    Powers of Disbursing Agent

Pursuant to the Plan, a Disbursing Agent will be empowered to (a) effect all
actions and execute all agreements, instruments, and other documents necessary to perform its
duties hereunder, (b) make all distributions contemplated hereby and (c) exercise such other
powers as may be vested in a Disbursing Agent by order of the Bankruptcy Court, pursuant to
the Plan, or as deemed by such Disbursing Agent to be necessary and proper to implement the
provisions hereof.

### 6.    Delivery of Distributions

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed
Claim will be made to a Disbursing Agent, who will transmit such distribution to the applicable
holders of Allowed Claims.  In the event that any distribution to any holder is returned as
undeliverable, no further distributions will be made to such holder unless and until such
Disbursing Agent is notified in writing of such holder's then-current address, at which time all
currently-due, missed distributions will be made to such holder as soon as reasonably practicable
thereafter.  Undeliverable distributions or unclaimed distributions will remain in the possession
of the Debtors until such time as a distribution becomes deliverable or holder accepts

WEIL:\95271232\1\35076.0003

distribution, or such distribution reverts back to the Debtors or Reorganized Debtors, as applicable, and will not be supplemented with any interest, dividends or other accruals of any kind.  Such distributions will be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days from the date of distribution.  After such date, all unclaimed property or interest in property will revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property will be discharged and forever barred.

7.      **Manner of Payment Under Plan**

At the option of the Debtors, or the Reorganized Debtors, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

8.      **Fractional Stock**

If any distributions of New Common Stock or New Warrants pursuant to the Plan would result in the issuance of a fractional share of New Common Stock or New Warrants, then the number of shares of New Common Stock or New Warrants to be issued in respect of such distribution will be calculated to one decimal place and rounded up or down to the closest whole share (with a half share rounded up).  The total number of shares of New Common Stock or New Warrants to be distributed in connection with the Plan will be adjusted as necessary to account for the rounding provided for in this paragraph.

9.      **Minimum Cash Distributions**

The Disbursing Agent will not be required to make any Initial Distribution or semi-annual distribution of Cash less than $50 to any holder of an Allowed General Unsecured Claim; provided that if any distribution is not made pursuant to the Plan, such distribution will be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.  The Disbursing Agent will not be required to make any final distributions of Cash less than $25 to any holder of an Allowed Claim.  If either (a) all Allowed General Unsecured Claims (other than those whose distributions are deemed undeliverable hereunder) have been paid in full or (b) the amount of any final distributions to holders of Allowed General Unsecured Claims would be $25 or less and the aggregate amount of cash available for distributions to holders of Allowed General Unsecured Claims is less than $25,000, then no further distribution will be made by the Disbursing Agent and any surplus Cash will be donated and distributed to an I.R.C. § 501(c)(3) tax-exempt organization selected by the Disbursing Agent.

10.     **Setoffs**

The Debtors and the Reorganized Debtors may, but will not be required to, set off against any Claim, any claims of any nature whatsoever that the applicable Debtor or the Reorganized Debtor may have against the holder of such Claim; provided that neither the failure to do so nor the allowance of any Claim will constitute a waiver or release by the applicable Debtor or the Reorganized Debtor.

WEIL:\95271232\1\35076.0003

11.    **Distributions After Effective Date**

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims will be deemed to have been made on the Effective Date.

12.    **Allocation of Distributions Between Principal and Interest**

Except as otherwise provided in the Plan, to the extent that any Allowed Secured Note Claim, Allowed Unsecured Note Claim, Allowed General Unsecured Trade Claim or Allowed Other General Unsecured Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

G.    **PROCEDURES FOR DISPUTED CLAIMS**

1.    **Allowance of Claims**

After the Effective Date, the Reorganized Debtors will have and will retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim will become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

2.    **Objections to Claims**

As of the Effective Date, objections to, and requests for estimation of, Claims against the Debtors may be interposed and prosecuted only by the Reorganized Debtors.  Such objections and requests for estimation will be served and filed (a) on or before the 180th day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended, or (b) such later date as ordered by the Bankruptcy Court.

3.    **Estimation of Claims**

The Debtors or Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtors, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or Reorganized Debtors, as

applicable, may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 4.      No Distributions Pending Allowance

If an objection to a Claim is filed as set forth in Section 7.2 the Plan, no payment or distribution provided under the Plan will be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim. Cash in the amount of such Disputed Claims will be reserved by the Debtors but will not be held in a segregated account.

### 5.      Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) will be made to the holder of such Allowed Claim in accordance with the provisions of the Plan on the next Distribution Date after the date that such Disputed Claim becomes an Allowed Claim (whether by Final Order of the Bankruptcy Court or otherwise). Holders of Disputed Claims that ultimately become Allowed Claims will not be entitled to payment of interest unless otherwise provided in the Plan, in a Final Order, or required under applicable bankruptcy law.

### 6.      Resolution of Claims

On and after the Effective Date, the Reorganized Debtors will have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.

### 7.      Disallowed Claims

All Claims held by persons or entities against whom or which any of the Debtors or Reorganized Debtors has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code will be deemed "disallowed" claims pursuant to section 502(d) of the Bankruptcy Code and holders of such claims will not be entitled to vote to accept or reject the Plan. Claims that are deemed disallowed pursuant to the Plan will continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtors or the Reorganized Debtors from such party have been paid.

## H.      EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.      General Treatment

In accordance with the Plan, effective as of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties will be assumed, except for an executory contract or unexpired lease that (a) has previously been assumed or rejected

WEIL:\95271232\1\35076.0003

pursuant to a Final Order of the Bankruptcy Court, (b) is specifically designated as a contract or unexpired lease to be rejected on the Schedule of Rejected Contracts or is otherwise expressly rejected pursuant to the Plan, (c) is the subject of a separate (i) assumption motion filed by the Debtors (with the reasonable consent of the Required Consenting Noteholders) or (ii) rejection motion filed by the Debtors (with the reasonable consent of the Required Consenting Noteholders) under section 365 of the Bankruptcy Code prior to the Confirmation Date, or (e) is the subject of a pending objection regarding assumption, Cure, or "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code or other issues related to assumption of the contract or lease) (each such objection, a "*Cure Dispute*").

## 2.    Determination of Cure Disputes and Deemed Consent

The Debtors will filed, as part of the Plan Supplement, the Schedule of Assume Contracts and will serve, within 14 days of the commencement of the Confirmation Hearing, a notice on parties to executory contracts or unexpired leases to be assumed reflecting the Debtors' intention to assume the contract or lease in connection with the Plan and, where applicable, setting forth the proposed cure amount (if any).  The proposed cure amount for any executory contract or unexpired lease not listed on the schedule will be $0.  Any such schedule of executory contracts to be assumed and the proposed cure amounts contained therein will be reasonably acceptable to the Required Consenting Noteholders.

To the extent that a Cure Dispute is asserted in an objection filed within fifteen (15) days of service of notice of intent to assume, and properly served on the Debtors, such Cure Dispute will be scheduled for a hearing by the Bankruptcy Court.  Following resolution of a Cure Dispute by Final Order of the Bankruptcy Court, the applicable contract or lease will be deemed assumed effective as of the Effective Date, provided that the Debtors reserve the right to reject any contract or lease following entry of a Final Order of the Bankruptcy Court resolving the applicable Cure Dispute, by filing a notice indicating such rejection within three (3) Business Days of the entry of such Final Order.

To the extent that an objection is not timely filed and properly served on the Debtors with respect to a Cure Dispute, then the counterparty to the applicable contract or lease will be deemed to have assented to (i) the Cure amount proposed by the Debtors and (ii) the assumption of such contract or lease, notwithstanding any provision thereof that (a) prohibits, restricts or conditions the transfer or assignment of such contract or lease or (b) terminates or permits the termination of a contract as a result of any direct or indirect transfer or assignment of the rights of the Debtor under such contract or a change in the ownership or control as contemplated by the Plan, and will forever be barred and enjoined from asserting such objection against the Debtors or terminated or modifying such contract on account of transactions contemplated by the Plan.

## 3.    Payments Related to Assumption of Contracts and Leases

Subject to resolution of any Cure Dispute, any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder is in default will be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or the Reorganized Debtors, as the case may be, upon assumption thereof.

WEIL:\95271232\1\35076.0003

Assumption and assignment of any executory contract or unexpired lease pursuant to the Plan, or otherwise, will result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption and/or assignment. Any proofs of claim filed with respect to an executory contract or unexpired lease that has been assumed will be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other entity.

### 4.    Rejection

In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, will be forever barred and will not be enforceable against the Debtors or the Reorganized Debtors, or their respective estates, properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors no later than thirty (30) days after the later of (i) the Confirmation Date or (ii) the effective date of the rejection of such executory contract or unexpired lease. Any such Claims, to the extent Allowed, will be classified as Class 6 Other General Unsecured Claims. The Confirmation Order will constitute the Bankruptcy Court's approval of the rejection of all the leases and contracts identified in the schedule of rejected contracts.

### 5.    Survival of the Debtors' Indemnification Obligations

Any obligations of the Debtors pursuant to their corporate charters, bylaws, organizational documents or otherwise (including, without limitation, any applicable indemnification agreements) to indemnify current officers, directors, agents and/or employees with respect to all present and future actions or omissions, suits and proceedings against the Debtors or such directors, officers, agents and/or employees, based upon any act or omission occurring at or prior to the Effective Date for or on behalf of the Debtors will not be discharged or impaired by confirmation of the Plan or the occurrence of the Effective Date, provided that for the avoidance of doubt, the Reorganized Debtors will indemnify officers and directors of the Debtors for any claims or Causes of Action to the fullest extent provided by law pursuant to their respective Amended Organizational Documents and such documents will not be amended or altered in any way that may diminish or impair the rights of the parties or beneficiaries thereunder that exist or existed as of the Effective Date; provided further that no director will be indemnified with respect to the issuance of the Unsecured Notes, the use of their proceeds and any events related thereto. All such obligations will be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and will continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations under the Plan will not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

In addition, after the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including,

WEIL:\95271232\1\35076.0003

without limitation, the "**tail policy**")  in effect as of the Commencement Date, and any directors and officers of the Debtors who served in such capacity at any time before or after the Commencement Date will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

6.    **Compensation and Benefit Plans**

Except as otherwise provided in the Plan, all material employee compensation and Benefit Plans of the Debtors in effect as of the Effective Date will be deemed to be, and will be treated as if they were, executory contracts that are to be assumed under the Plan.

7.    **Insurance Policies**

All insurance policies pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Order will be deemed and treated as executory contracts pursuant to the Plan and will be assumed by the respective Reorganized Debtors and will continue in full force and effect.  All other insurance policies will revest in the Reorganized Debtors.  Furthermore, the discharge and release of the Debtors as provided in the Plan, and the revesting of property in the Reorganized Debtors, will not diminish nor impair the enforceability of any insurance policies that may cover Claims against any Debtor or other person or entity.

8.    **Intellectual Property Licenses and Agreements**

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order will be deemed and treated as executory contracts pursuant to the Plan and will be assumed by the applicable Reorganized Debtors and will continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected hereunder or pursuant to a Final Order or is the subject of a separate rejection motion filed by the Reorganized Debtors.  Unless otherwise provided under the Plan, all other intellectual property contracts, licenses, royalties, or other similar agreements will revest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such revesting as contemplated in the Plan.

9.    **Reservation of Rights**

The Plan provides that neither the exclusion nor inclusion of any contract or lease on any exhibit, schedule or annex to the Plan or the Plan Supplement, including the Schedule of Assumed Contracts or the Schedule of Rejected Contracts, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that any of the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

Nothing in the Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

66

Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, will have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## I.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### 1.    Conditions Precedent to Confirmation

The occurrence of Confirmation is subject to the following conditions precedent:

(a)    the entry of the Disclosure Statement Order;

(b)    the Plan Supplement and all of the schedules, documents, and exhibits contained therein will have been filed in form and substance satisfactory to the Debtors, the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable;

(c)    the Bankruptcy Court will have entered the Confirmation Order;

(d)    the Restructuring Support Agreement will not have been terminated, and will be in full force and effect;

(e)    the Accommodation Agreements will not have been terminated, and will be in full force and effect; and

(f)    the DIP Facilities will not have been terminated, and will be in full force and effect.

### 2.    Conditions Precedent to the Effective Date

The occurrence of the Effective Date is subject to the following conditions precedent:

(a)    the Definitive Documents will contain terms and conditions consistent in all material respects with the Plan and the Restructuring Support Agreement and will otherwise be reasonably satisfactory in all respects to the Debtors, the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable;

(b)    all actions, documents and agreements necessary to implement and consummate the Plan, including, without limitation, entry into the Definitive Documents, and the Amended Organizational Documents, each in form and substance reasonably satisfactory to the Debtors, the Required

Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, and the transactions and other matters contemplated thereby, will have been effected or executed;

(c)     the Debtors will enter into the Exit Facilities and the conditions precedent to funding under the Exit Facilities will have been satisfied or waived;

(d)     subject to Section 12.5 of the Plan, any amendments, modifications, or supplements to the Plan (including the Plan Supplement), if any, will be reasonably acceptable to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable;

(e)     the Bankruptcy Court will have entered the Confirmation Order, the Confirmation Date will have occurred and the Confirmation Order will not have been stayed, rescinded, vacated or reversed on appeal;

(f)     the Restructuring Support Agreement will not have been terminated, and will be in full force and effect;

(g)     the Accommodation Agreements will not have been terminated, and will be in full force and effect;

(h)     all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan will have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods will have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

(i)     all reasonable fees and expenses (including attorney's fees and fees for other retained professionals, advisors and consultants) of the Consenting Noteholders, Platinum Equity, the DIP Agents, and the agents under the Exit Facilities incurred in connection with the Chapter 11 Cases, the negotiation and formulation of the Plan, DIP Facilities and Exit Facilities and related documents, and all transactions set forth herein or necessary to implement and consummate the Plan (whether incurred before or after the Commencement Date) will have been paid; and

(j)     all conditions precedent listed in (a)-(i) herein occurring prior to July 17, 2015.

**3.**     **Waiver of Conditions Precedent**

The conditions precedent set forth in Sections 9.1 and 9.2 of the Plan may be waived in writing by the Debtors together with the prior written consent of the Required

WEIL:\95271232\1\35076.0003

Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

### 4.    Effect of Non-Occurrence of Effective Date

If the conditions listed in Sections 9.1 and 9.2 of the Plan are not satisfied or waived in accordance with the Plan, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will (i) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (ii) prejudice in any manner the rights of any Person or (ii) constitute an admission, acknowledgement, offer or undertaking by the Debtors, any of the other Restructuring Support Parties, or any other Person.

## J.    EFFECT OF CONFIRMATION

### 1.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

### 2.    Vesting of Assets

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates, including without limitation, the intellectual property licenses and other agreements referenced in Section 8.8 of the Plan, will vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided pursuant to the Plan, the Confirmation Order, or the Exit Facilities.  The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if no cases were ever filed under any chapter or provision of the Bankruptcy Code, except as provided in the Plan.

### 3.    Discharge of Claims and Termination of Interests

Except as otherwise provided in the Plan, effective as of the Effective Date: (i) the rights afforded in the Plan and the treatment of all Claims and Interests will be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such claims from and after the Commencement Date, against the Debtors or any of their assets, property or estates; (ii) the Plan will bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (iii) all Claims and Interests will be satisfied, discharged, and released in full and the Debtors' liability with respect thereto will be extinguished completely, including any liability of the kind specified under section 502(g) of the

Bankruptcy Code; and (iv) all Persons will be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns and their assets and properties any other Claims and Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

4.       **Term of Injunctions or Stays**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, will remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

5.       **Injunction Against Interference with Plan**

From and after the Effective Date, all Persons are permanently enjoined from commencing or continuing in any manner, whether directly, derivatively or otherwise, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, suit, judgment, damages, Cause of Action, interest, remedy, or liability whatsoever released or to be released pursuant to the Plan or the Confirmation Order. For the avoidance of doubt, in connection with such injunction, all Persons are permanently enjoined from (i) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order of any kind whatsoever, (ii) creating, perfecting or enforcing any encumbrance of any kind, (iii) asserting any right of setoff, subrogation or recoupment of any kind, or (iv) commencing or continuing in any manner any action or proceeding of any kind on account of or in connection with or with respect to any claim, demand, liability, obligation, debt, right, suit, judgment, damages, Cause of Action, interest, remedy, or liability whatsoever released or to be released pursuant to the Plan or the Confirmation Order.

6.       **Releases by the Debtors**

**As of the Effective Date, except for the right to enforce the Plan and the Definitive Documents that remain in effect after the Effective Date, for good and valuable consideration, including, without limitation, the Released Parties' contributions to facilitating the Reorganization and implementing the Plan, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by the Debtors, their Estates and the Reorganized Debtors from (and the Debtors, their Estates, and the Reorganized Debtors are deemed to covenant with, and to, the Released Parties not to sue or otherwise seek recovery from the Released Parties on account of) any and all Claims, Interests, obligations, rights, suits, judgments, damages, Causes of Action (including, without limitation, under any state or federal securities laws), remedies and liabilities whatsoever, including, without limitation, any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, their Estates, or the Reorganized Debtors, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or**

WEIL:\95271232\1\35076.0003

Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Restructuring, the Reorganized Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any other Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Support Agreement or related agreements, instruments or other documents, the solicitation of votes with respect to the Plan, or upon any other act or omission, transaction, agreement, event or other occurrence taking place from the beginning of time through the Effective Date; <u>provided</u> that no Released Party will be released from any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds and any events related thereto.

7.   <u>Releases By Holders of Claims and Interests</u>

As of the Effective Date, except for the right to enforce the Plan and the Definitive Documents that remain in effect after the Effective Date and the indemnification obligations that survive the Effective Date, (a) each holder of a Claim or Interest, other than any holder who both voted to reject the Plan and checked the opt out box on the applicable ballot indicating its wish to opt out of the release provisions set forth in Section 10.7 of the Plan, and (b) each Released Party will be deemed to have, conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Reorganized Debtors and the Released Parties from (and are deemed to have covenanted with the Reorganized Debtors and the Released Parties not to sue or otherwise seek recovery from the Reorganized Debtors and the Released Parties on account of) any and all Claims, Interests, obligations, rights, suits, judgments, damages, Causes of Action (including, without limitation, under any state or federal securities laws), remedies and liabilities whatsoever, including, without limitation, any derivative Claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any other Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Support Agreement or related agreements, instruments or other documents, the solicitation of votes with respect to the Plan, or upon any other act or omission, transaction, agreement, event or other occurrence taking place from the beginning of time through the Effective Date; <u>provided</u> that no Released Party will be released from any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in

WEIL:\95271232\1\35076.0003

connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto.

> **IF YOU VOTE TO ACCEPT THE PLAN, YOU WILL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED THE RELEASED PARTIES FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION TO THE EXTENT PROVIDED IN SECTION 10.8 OF THE PLAN.**

### 8.    Exculpation

No Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, cause of action or liability for any claim in connection with or arising out of, the administration of the Chapter 11 Cases, the entry into the Restructuring Support Agreement and related documents and the consummation of the transactions contemplated therein, the negotiation and drafting of the Plan, the solicitation of votes for the Plan, or confirmation or consummation of the Plan, the funding of the Plan, the administration of the Plan or the property to be distributed under the Plan, the issuance of Securities under or in connection with the Plan, or any transactions, decisions, actions and/or inactions contemplated by or relating to any of the foregoing, except for willful misconduct or gross negligence, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtors and the Reorganized Debtors (and each of their respective agents, directors, officers, employees, affiliates, advisors and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.  This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting the Exculpated Parties from liability.  Without limiting the generality of the foregoing, the Exculpated Parties will be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.  Pursuant to section 105 of the Bankruptcy Code, no holder or purported holder of an Administrative Claim, Claim or Interest will be permitted to commence or continue any Cause of Action, employment of process, or any act to collect, offset, or recover any claim against an Exculpated Party that accrued on or before the Effective Date and that has been released or waived pursuant to the Plan.

### 9.    Retention of Causes of Action/Reservation of Rights

Except as otherwise provided in the Plan, including Sections 10.6, 10.7, and 10.8 of the Plan, pursuant to section 1123(b) of the Bankruptcy Code, the Reorganized Debtors will retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their estates may hold against any person or entity without the approval of the Bankruptcy Court, including, without limitation, (i) any and all claims against any Person, to the extent such Person asserts a crossclaim, counterclaim and/or

WEIL:\95271232\1\35076.0003

claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, their respective Estates, their officers, directors or representatives; and (ii) the turnover of any property of the Estates; *provided, that*, the Reorganized Debtors will not retain any claims or Causes of Action against the Released Parties (other than claims or Causes of Action arising out of or relating to any act or omission of a Released Party that (i) is a criminal act, or (ii) constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto, which claims or Causes of Action are hereby preserved). The Reorganized Debtors or their successor(s) may pursue such retained claims, rights, or causes of action, suits or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

Except as otherwise provided in the Plan, including Sections 10.6, 10.7, and 10.8 of the Plan, nothing contained in the Plan or in the Confirmation Order will be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff or other legal or equitable defense which the Debtors had immediately before the Commencement Date, against or with respect to any Claim left Unimpaired by the Plan; provided that the Reorganized Debtors will not retain any claims or Causes of Action against the Released Parties (other than claims or Causes of Action arising out of or relating to any act or omission of a Released Party that (i) is a criminal act, or (ii) constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto, which claims or Causes of Action are hereby preserved). The Reorganized Debtors will have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses which they had immediately before the Commencement Date with respect to any Claim left Unimpaired by the Plan as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

## 10.    Solicitation of the Plan

The Plan provides that as of and subject to the occurrence of the Confirmation Date: (i) the Debtors will be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and (ii) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys will be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

11.    **Plan Supplement**

Pursuant to the Plan, the Plan Supplement will be filed with the Clerk of the Bankruptcy Court by no later than the Plan Supplement Filing Date.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents to be included in the Plan Supplement will be posted at the website of the Debtors' notice, claims, and solicitation agent as they become available.  The Plan Supplement will contain, among other things, substantially final forms of the Amended Organizational Documents, the Schedule of Assumed Contracts, the Schedule of Rejected Contracts, the Exit Term Loan, the Revolving Exit Facility, the Management Incentive Plan, the Shareholders Agreement, the New Warrant Agreement, and, to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code regarding members of the New Board.

12.    **Corporate and Limited Liability Company Action**

Upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved in all respects, including (a) the assumption of the Benefit Plans of the Debtors as provided in the Plan, (b) the selection of the managers, directors, and officers for the Reorganized Debtors, (c) the issuance and distribution of the New Common Stock, (d) the entry into the Revolving Exit Facility and the Exit Term Loan, (e) the approval of the Accommodation Agreements, and (f) the issuance and distribution of the New Warrants, and (g) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date), in each case in accordance with and subject to the terms hereof.  All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan will be deemed to have occurred and will be in effect, without any requirement of further action by the security holders, directors, managers or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, will be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtors, including (w) the Amended Organizational Documents, (x) the Exit Facilities, and (y) the Accommodation Agreements, and (z) any and all other agreements, documents, securities and instruments relating to the foregoing.  The authorizations and approvals contemplated by Section 10.12 of the Plan will be effective notwithstanding any requirements under non-bankruptcy law.

K.    **RETENTION OF JURISDICTION**

On and after the Effective Date, the Bankruptcy Court will retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date;

WEIL:\95271232\1\35076.0003

(b)  to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan;

(c)  to consider the allowance, classification, priority, compromise, estimation or payment of any Claim;

(d)  to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(e)  to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(f)  to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(g)  to hear and determine all applications under sections 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(h)  to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Plan Supplement, or the Confirmation Order or any agreement, instrument or other document governing or relating to any of the foregoing;

(i)  to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute and consummate the Plan or to maintain the integrity of the Plan following consummation;

(j)  to resolve any matters related to (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor or Reorganized Debtor is party or with respect to which a Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Section 8 of the Plan, any executory contracts or unexpired leases to the Schedule of Rejected Contracts or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(k)  to resolve disputes as to the ownership of any Claim or Interest;

WEIL:\95271232\1\35076.0003

(l)     to hear and determine any matter, case, controversy, suit, dispute, or Cause of Action (i) regarding the existence, nature, and scope of the discharge, releases, injunctions, and exculpation provided under the Plan, and (ii) enter such orders as may be necessary or appropriate to implement such discharge, releases, injunctions, exculpations, and other provisions;

(m)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)     to adjudicate, decide, or resolve any Causes of Actions and Cure Disputes;

(p)     to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(q)     to resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid;

(r)     to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(s)     to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(t)     to enter a final decree closing the Chapter 11 Cases;

(u)     to recover all assets of the Debtors and property of the Estates, wherever located; and

(v)     to hear and determine any rights, Claims or causes of action held by or accruing to Reorganized Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

## L.     **MISCELLANEOUS PROVISIONS**

### 1.     **Payment of Statutory Fees**

All fees payable pursuant to section 1930 of title 28 of the United States Code will be paid by the Debtors on or before the Effective Date, and by the Reorganized Debtors after the Effective Date until the Chapter 11 Cases are closed.

WEIL:\95271232\1\35076.0003

2.      **Substantial Consummation**

On the Effective Date, the Plan will be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

3.      **Dissolution of Creditors Committee**

On the Effective Date, the Creditors Committee will dissolve, and the members thereof will be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; provided that the Creditors Committee will exist, and its professionals will be retained, after the Effective Date with respect to (i) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; and (ii) pending appeals of the Confirmation Order, if any.

4.      **Request for Expedited Determination of Taxes**

The Reorganized Debtors will have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods (or portions thereof) ending after the Commencement Date through the Effective Date.

5.      **Amendments**

(a)      *Plan Modifications*.  The Plan provides that it may be amended, modified or supplemented by the Debtors or the Reorganized Debtors, as applicable, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code; provided that such amendments, modifications, or supplements will be satisfactory in all respects to the Debtors, the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  In addition, after the Confirmation Date, the Debtors or the Reorganized Debtors, as applicable, may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

(b)      *Other Amendments*.  Pursuant to the Plan, before the Effective Date, the Debtors may make appropriate technical adjustments or modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; *provided, however*, that such technical adjustments and modifications will be satisfactory to the Debtors, the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

6.      **Revocation or Withdrawal of the Plan**

The Debtors may not revoke or withdraw the Plan before the Effective Date without the consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable; provided that the Debtors may revoke or withdraw the Plan if such withdrawal is in the exercise of their fiduciary duty or otherwise permitted under the Restructuring Support Agreement.  If the Debtors take such action, the Plan

WEIL:\95271232\1\35076.0003

will be deemed null and void.  In such event, nothing contained in the Plan will constitute or be deemed to be a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

### 7.    Severability of Plan Provisions upon Confirmation

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors (to be made only with the consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable), will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted; provided that any such alteration or interpretation will be acceptable to the Debtors, the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be); and (iii) nonseverable and mutually dependent.

### 8.    Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit to the Plan or a schedule in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### 9.    Time

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 will apply.

### 10.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the documents contained in the Plan Supplement will be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, the Exculpated Parties and each of their respective successors and assigns.

WEIL:\95271232\1\35076.0003

11. **Successor and Assigns**

The rights, benefits and obligations of any Entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

12. **Entire Agreement**

On the Effective Date, the Plan, the Plan Supplement and the Confirmation Order will supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

13. **Notices**

All notices, requests and demands to or upon the Reorganized Debtors to be effective will be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Plan, will be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**(a) if to the Reorganized Debtors:**

Chassix, Inc.
300 Galleria Officecentre
Suite 501
Southfield, Michigan 48034
Facsimile: (248) 532–0241
Attn: Bibi N. Di Serio, Esq.

- and -

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn: Ray C. Schrock, P.C.
       Marcia L. Goldstein, Esq.
       Matthew P. Goren, Esq.
Telephone: (212) 310–8000
Facsimile: (212) 310–8007

WEIL:\95271232\1\35076.0003

**(b) if to Platinum Equity:**

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty Street
New York, New York 10005
Attn:   Dennis F. Dunne, Esq.
        Samuel Khalil, Esq.
Telephone:  (212) 530–5000
Facsimile:  (212) 530–5219

**(c) if to the DIP ABL Agent:**

Bodman PLC
1901 St. Antoine Street, 6th Floor at Ford Field
Detroit, Michigan 48226
Attn:   Robert J. Diehl, Jr., Esq.
Telephone: (313) 393–7597
Facsimile: (313) 393–7579

**(d) if to the DIP Term Agent:**

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103-1919
Facsimile: (860) 251-5099
Attention: Nathan Z. Plotkin, Esq.

**(e) if to the Consenting Noteholders:**

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn: Andrew N. Rosenberg, Esq.
      Alice B. Eaton, Esq.
Telephone: (212) 373–3000
Facsimile: (212) 492–0158

**(f) if to the Exit Term Loan Lenders:**

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn: Andrew N. Rosenberg, Esq.
      Alice B. Eaton, Esq.
Telephone: (212) 373–3000
Facsimile: (212) 492–0158

WEIL:\95271232\1\35076.0003

After the Effective Date, the Reorganized Debtors have authority to send a notice to entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002 and to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to those Persons who have filed such renewed requests.

## VII.

## VALUATION OF THE DEBTORS

> **THE VALUATIONS SET FORTH HEREIN REPRESENT ESTIMATED DISTRIBUTABLE VALUE FOR THE DEBTORS AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN THE PUBLIC OR PRIVATE MARKETS. THE VALUE OF THE NEW COMMON STOCK DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE OF THE DEBTORS.**

## A.    OVERVIEW OF VALUATION

Solely for purposes of the Plan, the Debtors have been advised by Lazard, their investment banker and financial advisors, with respect to the going-concern value (the "**Enterprise Value**") of the Reorganized Debtors (together with their non-Debtor subsidiaries, "**Reorganized Chassix**"). The Enterprise Value is based on projections provided by the Debtors' management for the fiscal years 2015 through 2019 (the "**Projection Period**"), attached to this Disclosure Statement as **Exhibit C** (the "**Financial Projections**"). Lazard has undertaken this Valuation Analysis to estimate the value available for distribution to holders of equity interests in Reorganized Chassix under the Plan and to analyze the relative recoveries of each thereunder. The Valuation Analysis assumes that the Effective Date occurs on July 31, 2015.

The estimated total value available for distribution to holders of equity interests in Reorganized Chassix pursuant to the Plan (the "**Distributable Value**") consists of the Enterprise Value reduced by expected net debt of Reorganized Chassix (inclusive of indebtedness, capital leases and cash at U.S. and foreign operations) and increased by expected net cash. Solely for purposes of the Plan, Lazard estimates that the Enterprise Value of Reorganized Chassix falls within a range of $450 million to $550 million (mid-point of $500 million). The Debtors estimate that Distributable Value will be approximately within a range of $280 to $380 million (mid-point of $330 million). Distributable Value reflects the repayment of the outstanding DIP Facilities as well as net cash after accounting for the expected benefit from the normalization of trade terms less the payment of administrative and priority claims and estimated other exit costs and fees. For the avoidance of doubt, Reorganized Chassix's equity value is subject to dilution by shares issued under the Management Incentive Plan and any potential future exercise of outstanding warrants.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION AVAILABLE TO LAZARD AS OF THE

DATE HEREOF AND IS PREMISED UPON, AMONG OTHER THINGS, AN ASSUMED
EFFECTIVE DATE OF JULY 31, 2015.  ALTHOUGH SUBSEQUENT DEVELOPMENTS
MAY AFFECT LAZARD'S CONCLUSIONS, NEITHER LAZARD NOR THE DEBTORS
HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM THESE ESTIMATES.

Lazard assumed that the Financial Projections prepared by the Debtors'
management were reasonably prepared in good faith and on a basis reflecting the Debtors' most
accurate currently available estimates and judgments as to the future operating and financial
performance of Reorganized Chassix.  Lazard's Valuation Analysis assumes that Reorganized
Chassix will achieve its Financial Projections in all material respects, including revenue and
EBITDA growth and improvements in EBITDA margins, earnings, cash flow, and tax savings,
as projected.  If the business performs at levels below those set forth in the Financial Projections,
such performance may have a materially negative impact on the value of Reorganized Chassix,
the New Common Stock and the New Warrants issued pursuant to the Plan.  Conversely, if the
business performs at levels above those set forth in the Financial Projections, such performance
may have a materially positive impact on the value of the Reorganized Debtors, the New
Common Stock and the New Warrants.

In performing its Valuation Analysis, Lazard did the following: (i) reviewed
certain historical financial information of the Debtors for recent years; (ii) reviewed certain
internal financial and operating data of the Debtors, which data was prepared and provided to
Lazard by the management of the Debtors and which relates to Reorganized Chassix's
businesses and its prospects; (iii) met with the Debtors' senior management team to discuss
Reorganized Chassix's present and future operations and business prospects; (iv) reviewed
certain publicly available financial data for, and considered the market value of, public
companies that Lazard deemed generally relevant in evaluating the operating business of
Reorganized Chassix; (v) considered certain economic and industry information relevant to the
operating business; and (vi) conducted such other studies, analyses, inquiries and investigations
as it deemed appropriate.  Lazard assumed and relied on the accuracy and completeness of all
financial and other information furnished to it by management of the Debtors and the Debtors'
advisors, as well as publicly available information.

Lazard did not independently verify the Financial Projections in connection with
its Valuation Analysis, and no independent valuations or appraisals of Reorganized Chassix were
sought or obtained in connection herewith.  Such forecasts were developed solely for purposes of
the formulation and negotiation of the Plan.  The estimates of the Enterprise Value prepared by
Lazard represent the hypothetical reorganization value of Reorganized Chassix. Such estimates
were developed solely for purposes of the Plan and the analysis of implied relative recoveries to
creditors thereunder.

Lazard's Valuation Analysis of Reorganized Chassix does not constitute a
recommendation to any holder of an Allowed Claim entitled to vote to accept or reject the Plan.
Lazard has not been asked to, and does not express, any view as to what the trading value of
Reorganized Chassix's securities may be when issued on the Effective Date or the prices at
which they may trade in the future.  Lazard's Valuation Analysis of Reorganized Chassix set

forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the distribution to be received by such person under the Plan.

Lazard's Valuation Analysis reflects the application of standard valuation techniques and does not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated valuation of Reorganized Chassix set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Debtors, Reorganized Chassix, Lazard, nor any other person assumes responsibility for any differences between the estimated valuation and such actual outcomes. Actual market prices of securities at issuance will depend upon, among other things, the operating performance of Reorganized Chassix, prevailing interest rates, conditions in the financial markets, the anticipated holding period of securities received by prepetition creditors (some of whom may prefer to liquidate their investment rather than hold it on a long-term basis), developments in Reorganized Chassix's industry and economic conditions generally, and other factors which generally influence the prices of securities.

As noted above, Lazard's estimate of the hypothetical Enterprise Value consists of the aggregate Enterprise Value of Reorganized Chassix on a going-concern basis as of the assumed Effective Date. The Plan does not consolidate the Debtor entities for purposes of measuring claims or distributions. As such, the values of the individual Debtors and the Allowed Claims against such Debtors may affect amounts available for distribution to the creditors of each individual Debtor.

## B.    ADDITIONAL ASSUMPTIONS REGARDING THE REORGANIZED DEBTORS

Solely for purposes of the Plan, with respect to the Enterprise Value of Reorganized Chassix, in addition to the foregoing, Lazard has relied upon the following assumptions:

- The successful reorganization of the Debtors' businesses and finances in a timely manner.

- The implementation of Reorganized Chassix's business plan and the achievement of the financial forecasts reflected therein.

- The present senior management of the Debtors will continue in their current positions following consummation of the Plan.

- The general financial and market conditions as of the assumed Effective Date of the Plan will not differ materially from those conditions prevailing as of the date of this Disclosure Statement or through the Projection Period.

- The Plan becomes effective in accordance with the estimates and other assumptions discussed herein.

WEIL:\95271232\1\35076.0003

- The Accommodation Agreements will be approved by the Bankruptcy Court and will remain in full force and effect.

## C.   VALUATION METHODOLOGY

The following is a brief summary of certain financial analyses performed by Lazard, including a discounted cash flow analysis, publicly traded company analysis and precedent transactions analysis, to arrive at its estimate of the hypothetical Enterprise Value of Reorganized Chassix.  Lazard performed certain procedures, including each of the financial analyses described below, and reviewed the assumptions with the Debtors' management on which such analyses were based and other factors, including the projected financial results of Reorganized Chassix.

Under the valuation methodologies summarized below, Lazard derived a going-concern value estimate assuming Reorganized Chassix is a full federal cash taxpayer.

### 1.   Discounted Cash Flow Analysis

The Discounted Cash Flow ("**DCF**") analysis is a forward-looking enterprise valuation methodology that relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business.  The DCF methodology discounts projected future cash flows by the business's weighted average cost of capital (the "**WACC**").  The WACC reflects the estimated blended rate of return that debt and equity investors would require to invest in the business based on a long-term industry median capital structure.  The DCF analysis calculates Reorganized Chassix's Enterprise Value by measuring the present value of Reorganized Chassix's unlevered after-tax free cash flows based on the Debtors' projections from August 1, 2015 to December 30, 2019 plus an estimate of the value of the firm beyond the Projection Period, known as the terminal value.  The terminal value is derived by applying a perpetuity growth rate for Reorganized Chassix's terminal year unlevered free cash flow.  Lazard also considered calculating the terminal value by applying a multiple to Reorganized Chassix's projected EBITDA in the terminal year, discounted back to the present by the WACC.  The terminal year multiple calculation substantiated the perpetuity growth method for analyzing terminal value.

To estimate the WACC, Lazard used the implied cost of equity and the implied after-tax cost of debt for Reorganized Chassix, assuming a targeted long-term debt-to-total capitalization ratio consistent with Reorganized Chassix's expected capital structure over the forecast period post-emergence.  Lazard calculated the cost of equity based on the "Capital Asset Pricing Model" which assumes that the required equity return is a function of the risk-free cost of capital and the correlation of a publicly traded stock's performance to the return on the broader market.  To estimate the cost of debt, Lazard estimated Reorganized Chassix's blended cost of debt based on Reorganized Chassix's expected capital structure and credit profile over the forecast period post-emergence .  In determining terminal value, Lazard relied upon a range of long-term growth rates, and compared perpetuity growth rates that incorporated various perspectives of growth for companies in the automotive supplier sector.

WEIL:\95271232\1\35076.0003

The estimated cash flows and estimated WACC of Reorganized Chassix are used to derive a potential value. Analyzing the results of such an estimate is not purely mathematical, but instead involves complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of Reorganized Chassix, as well as other factors that could affect the future prospects and cost of capital considerations for the company.

Lazard performed the DCF calculation based on the unlevered after-tax free cash flows for the Projection Period. Lazard utilized management's detailed financial projections as the primary input. Beginning with earnings before interest and taxes, the analysis taxes this figure at an assumed rate of 35% to calculate an unlevered net income figure. The analysis then adds back the non-cash operating expense of depreciation and amortization. In addition, other factors affecting free cash flow are taken into account, such as the change in working capital, as well as capital expenditures, all of which do not affect the income statement and therefore require separate adjustments in the calculation of unlevered after-tax free cash flows.

## 2. Publicly Traded Company Analysis

A publicly traded company analysis estimates value based on a comparison of the target company's financial statistics with the financial statistics of public companies that are similar to the target company. The analysis establishes a benchmark for asset valuation by deriving the value of "comparable" assets, standardized using a common financial metric. The analysis includes a detailed multi-year financial comparison of each company's income statement, balance sheet and cash flow statement. In addition, each company's performance, profitability, margins, leverage and business trends are also examined. Based on these analyses, a number of financial multiples and ratios are calculated to gauge each company's relative performance and valuation.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies for the analysis include, among other relevant characteristics, similar lines of businesses, business risks, growth prospects, maturity of businesses, market presence, size, and scale of operations. The selection of truly comparable companies is often difficult and subject to limitations due to sample size and the availability of meaningful market-based information. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining firm value.

In determining an estimate for the Enterprise Value of Reorganized Chassix using this valuation approach, Lazard principally focused on comparable companies in the automotive supplier industry. While none of these companies are perfectly comparable to Reorganized Chassix, the application of the trading multiples of these companies to various financial metrics of Reorganized Chassix presents a reasonable indication of the Enterprise Value of Reorganized Chassix.

## 3. Precedent Transactions Analysis

The precedent transactions analysis estimates value by examining public merger and acquisition transactions. The valuations paid in such acquisitions or implied in such mergers

WEIL:\95271232\1\35076.0003

are analyzed as ratios of various financial results. These transaction multiples are calculated based on the purchase price (including any debt assumed or retired) paid to acquire companies that are comparable to Reorganized Chassix. Since precedent transactions analysis reflects aspects of value other than the intrinsic value of a company, coupled with the fact that these transactions may have occurred in a different operating and financial environment, there can be potential limitations to the application of precedent transactions analysis to determining the Enterprise Value of Reorganized Chassix. While Lazard considered precedent transactions since 2010, Lazard believes that the precedent transactions identified have less relevance when assessing the Enterprise Value of Reorganized Chassix.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE ANALYSES PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ESTIMATE INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ESTIMATE IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. IN PERFORMING THESE ANALYSES, LAZARD AND THE DEBTORS MADE NUMEROUS ASSUMPTIONS WITH RESPECT TO INDUSTRY PERFORMANCE, BUSINESS AND ECONOMIC CONDITIONS AND OTHER MATTERS. THE ANALYSES PERFORMED BY LAZARD ARE NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN SUGGESTED BY SUCH ANALYSES.

## VIII.

## CERTAIN RISK FACTORS AFFECTING THE DEBTORS

### A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

#### 1.    Risk of Non-Confirmation of the Plan of Reorganization

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

#### 2.    Non-Consensual Confirmation

In the event any impaired class of claims or interests entitled to vote on a plan of reorganization does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. *See* Section X.C.2.

WEIL:\95271232\1\35076.0003

3.        **Risk of Delay in Confirmation of the Plan**

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.  The Restructuring Support Agreement contemplates an outside exit date of July 17, 2015.

4.        **Risks Related to the Restructuring Support
Agreement and DIP Credit Facility**

In the event of a breach or termination of the Restructuring Support Agreement, the Debtors' ability to reorganize will be delayed.  In addition, in the event of a default under the DIP Facilities, the DIP Lenders may seek, among other things, certain remedies with respect to the collateral securing the DIP Facilities, and take certain other actions against the Debtors.

B.      **ADDITIONAL FACTORS TO BE CONSIDERED**

1.        **The Plan Proponents Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the Commencement Date, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

2.        **No Representations Outside This Disclosure Statement Are Authorized**

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

3.        **Financial Projections Are Not Assured, Actual Results
May Vary, and Variances from Financial Projections May Occur**

The fundamental premise of the Plan is the reduction of the Debtors' debt levels and the implementation and realization of the Debtors' business plan and the accommodations received pursuant to the Accommodation Agreements, as reflected in the projections set forth in the Financial Projections, annexed as **Exhibit C** hereto.  The Financial Projections reflect numerous assumptions concerning the anticipated future performance of the Debtors, some of which may not materialize.  Such assumptions include, among other items, assumptions concerning the economy, the ability to effectuate management's business plan, and control future operating expenses.  The Debtors believe that the assumptions underlying the Financial Projections are reasonable.  However, unanticipated events and circumstances occurring subsequent to the preparation of the Financial Projections may affect the actual financial results of the Debtors.  Therefore, the actual results achieved throughout the periods covered by the Financial Projections necessarily will vary from the projected results, and such variations may be material and adverse.

WEIL:\95271232\1\35076.0003

Certain of the information contained in this Disclosure Statement is, by nature, forward looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections including, without limitation, the Financial Projections, which may be materially different from actual future experiences. There are uncertainties associated with any projections and estimates, including, without limitation, the projections and Financial Projections and estimates herein should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

**4.**     **No Legal or Tax Advice Is Provided to You by This Disclosure Statement**

The contents of this Disclosure Statement should **not** be construed as legal, business or tax advice. Each holder of a Claim or Interest should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

**5.**     **No Admission Made**

Nothing contained in the Plan will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

**6.**     **A Liquid Trading Market for the New Common Stock is Unlikely to Develop**

A liquid trading market for the New Common Stock is unlikely to develop. As of the Effective Date, the New Common Stock will not be listed for trading on any stock exchange or trading system and the Reorganized Debtors will not file any reports with the SEC. Consequently, the trading liquidity of the New Common Stock will be limited as of the Effective Date. The future liquidity of the trading markets for New Common Stock will depend, among other things, upon the number of holders of such securities, whether such securities become listed for trading on an exchange or trading system at some future time and whether the Reorganized Debtors begin to file annual and quarterly reports with the SEC.

**7.**     **Business Factors and Competitive Conditions**

(a)     **The Cyclical and Unpredictable Nature of the Automotive Industry**

The Debtors' businesses are directly related to and automotive vehicle production and sales. The automotive industry is highly cyclical and, in addition to general economic conditions, depends on several factors, such as consumer confidence and preference. Automotive sales and production can also easily be affected by labor relations issues, regulatory requirements, trade agreements, the availability of consumer financing, and other similar factors. A significant decrease in the sale of automotive vehicles would likely result in substantially all of the Debtors' customers lowering vehicle production schedules, which would have a direct impact on the Debtors' earnings and cash flows. Any economic decline that results in the reduction of

automotive sales and production may have an adverse effect on the Debtors' businesses, results of operations, and financial condition.

The Debtors' earnings are also affected by inventory levels and customer production levels. Due to the cyclical nature of the automotive industry, the Debtors cannot predict when their customers will decide to increase or decrease inventory levels or whether new inventory levels will approximate historical inventory levels. This uncertainty and other unexpected fluctuations could have a material adverse effect on the Debtors' businesses and their financial condition.

The automotive industry is also seasonal in nature, meaning that some of the Debtors' customers may shut down vehicle production during certain months or weeks of the year. Such seasonality could also adversely affect the Debtors' sales during any given fiscal year.

(b)     **A Change in Product Mix Offered
by Customers Can Impact Revenue**

The Debtors are dependent on the continued growth, viability, and financial stability of their customers, including the OEM Customers. The automotive industry is subject to rapid technological change, vigorous competition, short product life cycles and cyclical and reduced consumer demand patterns. When the Debtors' customers are adversely affected by these factors, the Debtors may be similarly affected to the extent that their customers reduce the volume of orders for the Debtors' products. As a result of changes impacting their customers, sales mix can shift, which may have unfavorable (or favorable) impact on the Debtors. A decrease in consumer demand for specific types of vehicles where the Debtors have traditionally provided significant content could have a detrimental effect on the Debtors' businesses.

(c)     **Dependence on a Small Number of Significant Customers**

The Debtors' three largest end-use customers (Ford, General Motors, and Chrysler) accounted for approximately 83% of global sales for the fiscal year ended December 31, 2014. Although the Debtors expect to maintain their relationships with their customers, the Debtors may not always be able to maintain such relationships or continue to supply their customers at the current levels. While most instances the Debtors' customers agree to purchase their requirements for specific products from the Debtors, they are not required to purchase any minimum amount of product. A significant decrease in demand for certain key models sold by any of the Debtors' major customers or the ability of a manufacturer to resource and discontinue purchasing key models from the Debtors could have a material adverse effect on the Debtors' businesses.

(d)     **Disruptions in the Supply of Goods and/or Services**

In the operation of their businesses, the Debtors and their customers utilize a wide range of materials and supplies, including aluminum, iron, and other metals. A disruption in the supply of these materials could decrease the Debtors' production and shipping levels, which would increase the Debtors' operating costs and materially decrease profit margins.

WEIL:\95271232\1\35076.0003

As described herein, the Debtors ship products to their customers' vehicle assembly plants on a "just-in-time" basis in order to maintain low inventory levels. The Debtors' suppliers also use a similar method. This "just-in-time" method makes the Debtors' supply chain very complex and highly vulnerable to disruptions. Such disruptions could be caused by, among other things, a closure of one of the Debtor's or their suppliers' plants or critical manufacturing lines due to strikes, mechanical breakdowns, electrical outages, fires, explosions or political upheaval, as well as logistical complications due to weather, global climate change, volcanic eruptions, or other natural or nuclear disasters, mechanical failures, delayed customs processing and more. A supply chain disruption could result in delivery delays, production issues, or the delivery of non-conforming products. Thus, any delay or disruption in the Debtors' supply chain can have a catastrophic effect on the Debtors' operations. Even where these risks do not materialize, the Debtors may incur significant costs in making contingency plans for such risks.

Moreover, if the Debtors fail to make timely deliveries in accordance with their contractual obligations, they generally have to absorb the costs for identifying and solving the "root cause" problem, producing replacement components or products and cost associated with overtime and premium freight. If the Debtors cause a customer to halt production, the customer may seek to recoup all of its losses and expenses from the Debtors, which could be significant.

(e)     **Increase in Cost of Materials and Other Supplies**

Significant changes in the markets where the Debtors purchase materials, components, and supplies for the production of their products may adversely affect the Debtors' results of operations—particularly in the event of significant increases in demand where there is not a corresponding increase in supply, inflation, or other pricing increases. In recent years there have been significant fluctuations in the global prices of aluminum and iron and fuel charges, which have in the past had and may in the future have an unfavorable impact on the Debtors' financial condition. While the Debtors are able to pass through almost all increases in underlying aluminum and iron prices to their customers, such price increases may have a detrimental effect on the businesses of the Debtors' customers and result in decreased demand for products.

(f)     **Competitive Automotive Supply Industry**

The automotive industry is highly competitive. Competition is based primarily on price, technology, quality, delivery and overall customer service. While the Debtors expect to emerge from the Chapter 11 Cases as a successful enterprise, there can be no assurance that the Debtors' products will be able to compete with the products of their competitors. Moreover, consolidation in the automotive industry may lead to decreased product purchases from the Debtors. As a result, the Debtors' sales levels and margins could be adversely affected by pricing pressures coming from their customers and pricing actions of competitors. These factors have led to selective resourcing of business to competitors in the past and may also do so in the future.

WEIL:\95271232\1\35076.0003

(g)    **Risks Pertaining to Manufacturing Challenges**

The volume and timing of automotive sales may vary due to, among other things, variation in demand based on consumer preferences or changes in economic conditions, the attempts to manage inventory, design changes, and changes in manufacturing strategy. Accordingly, many of the Debtors' customers do not commit to long-term volume purchases. The inability to forecast the level of customer orders with certainty makes it difficult to schedule production and maximize utilization of manufacturing capacity.

(h)    **Risks Pertaining to Technology**

While the Debtors are currently experiencing a shift towards more aluminum products in the component parts that they produce, changes in regulatory or industry requirements, or in the price of aluminum or other materials may render certain of the Debtors' products less attractive. If aluminum prices were to rise substantially, or if the Debtors' customers are able to achieve superior fuel economy through means other than light weighting of the vehicle with additional aluminum components, it could cause such customers to shift away from aluminum components towards more iron or steel components that could be less expensive. If that were to occur, it would be very expensive for the Debtors to significantly increase their iron capacity (or to add steel capacity). The Debtors cannot provide assurance that certain of their current products will not become less competitive or obsolete in the future.

Moreover, the Debtors' ability to keep their businesses operating effectively depends on the functional and efficient operation of information technology and telecommunications systems. They rely on these systems to make a variety of day-to-day business decisions as well as to track transactions, billings, payments, and inventory. The Debtors' systems, as well as those of their customers, suppliers, partners, and service providers, are susceptible to interruptions (including those caused by systems failures, malicious computer software (malware), and other natural or man-made incidents or disasters), which may be prolonged. The Debtors are also susceptible to security breaches that may go undetected. Although the Debtors have taken precautions to mitigate such events, including geographically diverse data centers and redundant infrastructure, a significant or large-scale interruption of their information technology could adversely affect the Debtors ability to manage and keep their operations running efficiently and effectively. An incident that results in a wider or sustained disruption to the Debtors' businesses could have a material adverse effect on their businesses, financial condition, and results of operations.

(i)    **Product Liability and Related Risks**

The risk of product liability, recall, and warranty claims are inherent in the design, manufacture, and sale of automotive products—the failure of which could result in property damage, personal injury, or death. In addition, the Debtors may be required to participate in a recall involving their products. Furthermore, the Debtors' customers can initiate a recall of the Debtors' products without their agreement and offset costs of the recall against the Debtors' accounts receivable. A successful product liability claim could have a material adverse effect on the Debtors' businesses.

WEIL:\95271232\1\35076.0003

In addition, in the ordinary course of their businesses, the Debtors may be involved in other legal proceedings, which would adversely affect their cash flows, financial condition, or results of operations.

(j)    **Risks Pertaining to Labor**

The Debtors' business is labor-intensive and unions represent approximately 270 employees working at two of the Debtors' facilities.  A strike or other form of significant work disruption by the Debtors' employees would likely have an adverse effect on their ability to operate their businesses. In addition, the Debtors' inability or the inability of any of their customers, their suppliers or their customers' suppliers to negotiate an extension of a collective bargaining agreement upon its expiration could reduce the Debtors' sales and harm profitability.

(k)    **Environmental Risks**

The Debtors are subject to various environmental laws, including those governing discharges into the air and water, the storage, handling and disposal of solid and hazardous wastes, the remediation of contaminated soil and groundwater, and the health and safety of their employees. The Debtors are also required to obtain permits from governmental authorities for certain operations. While the Debtors expect to remain in compliance with all applicable environmental laws and regulations, the Debtors may not be in complete compliance with these laws and permits at all times and any related violations could result in governmental fines or other sanctions, some of which could be material. The Debtors' manufacturing operations and the history of industrial uses at some of their facilities expose the Debtors to the risk of environmental liabilities that could have a material adverse effect on their business. For example, the Debtors may be liable for the costs of clean-up of contamination at current or former facilities, as well as sites at which the Debtors or their predecessors disposed of hazardous waste. The Debtors could be liable even if they did not know about or cause the contamination and even if the practices that resulted in the contamination were legal when they occurred.  Thus, the Debtors cannot assure that costs of complying with current and future environmental and health and safety laws, and their liabilities arising from past or future releases of, or exposure to, hazardous substances will not adversely affect their financial condition.

(l)    **Implementation of Business Plan**

The Debtors believe that they will succeed in implementing and executing their business plan and financial restructuring.  However, there are risks that the goals of the Debtors' going-forward business plan and financial restructuring strategy will not be achieved.  In such event, the Debtors may be forced to sell all or parts of their business, develop and implement further restructuring plans not contemplated herein, or become subject to further insolvency proceedings.

WEIL:\95271232\1\35076.0003

# IX.

## CERTAIN U. S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of certain Claims. This discussion does not address the U.S. federal income tax consequences to holders of Claims who are unimpaired or deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the Tax Code, Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, foreign taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax ("**AMT**") or the "Medicare" tax on unearned income, and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the New Common Stock or the New Warrants in the secondary market.

This discussion assumes that the Claims, the New Common Stock and the New Warrants are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

> **THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON YOUR INDIVIDUAL CIRCUMSTANCES. YOU ARE URGED TO CONSULT YOUR OWN TAX ADVISOR FOR THE U.S. FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

WEIL:\95271232\1\35076.0003

A.    **CONSEQUENCES TO THE DEBTORS**

For U.S. federal income tax purposes, the Debtors are members of an affiliated group of corporations (or disregarded entities wholly owned by members of such group) of which DHC is the common parent, which files a single consolidated U.S. federal income tax return (the "**Dharma Group**").  The Debtors estimate that the Dharma Group has net operating loss ("**NOL**") carryforwards of approximately $264 million for U.S. federal income tax purposes as of December 31, 2014, and certain other tax attributes.  Certain of these tax attributes are subject to existing limitations.  The amount of any such NOL carryforwards and other tax attributes, and the extent to which any limitations apply, remain subject to audit and adjustment by the IRS.

Pursuant to the Plan, new common stock of UC Holdings will be distributed, as a result of which UC Holdings and the other Debtors (other than Chassix Holdings) will be deconsolidated from the Dharma Group.  In addition, Chassix Holdings will be dissolved.  It is contemplated, and the following discussion assumes, that following the Effective Date Reorganized UC Holdings and its domestic subsidiaries (collectively, the "**UC Holdings Group**") will file a single consolidated U.S. federal income tax return.

As discussed below, in connection with the implementation of the Plan and based on the Distributable Value, it is anticipated that the amount of the NOL carryforwards available to the Debtors post-Effective Date will be significantly reduced and possibly eliminated, and that the tax basis of the Debtors' assets may be significantly reduced.  In addition, the subsequent utilization of any loss and other tax attributes remaining following the Effective Date may be severely restricted.

1.    **Cancellation of Debt**

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its tax attributes—such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets—by the amount of any cancellation of debt ("**COD**") incurred pursuant to a confirmed chapter 11 plan.  The amount of COD income incurred is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor.  Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes.  If advantageous, the debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.  Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury regulations require, in certain circumstances, that the tax attributes of the other members of the group must also be reduced.  Any reduction in tax attributes in respect of COD income generally does not occur until after the determination of the debtor's net income or loss for the taxable year in which the COD is incurred.

The Debtors expect to incur significant COD as a result of the implementation of the Plan (based on the Distributable Value), with the result that a significant reduction in the tax attributes of the Debtors is expected.  The amount of COD incurred will depend primarily on the fair market value of the New Common Stock and the New Warrants distributed to holders of Claims.

94

### 2.    Deconsolidation of the Debtors

As previously indicated, the implementation of the Plan will result in the deconsolidation of the Debtors from the Dharma Group (other than Chassix Holdings, which will be dissolved).  As a result, the Debtors comprising the UC Holdings Group will no longer have access to any NOLs or other tax attributes attributable to Chassix Holdings and the two non-Debtor members of the Dharma Group.  In addition, under the consolidated return regulations, a deconsolidating subsidiary's tax attributes generally are reduced to the extent that the shareholding member recognizes a loss on the disposition or extinguishment of the subsidiary's stock and such loss is effectively duplicative of the subsidiary's inside tax attributes.  Accordingly, absent an election by the Dharma Group to forgo its stock loss upon the extinguishment or disposition of its stock interests in UC Holdings and, if applicable, in Chassix Holdings, the Debtors' tax attributes would be reduced by the amount of the "duplicated" loss in their tax attributes (generally after taking into account the attribute reduction that results from the COD arising in connection with the Plan).  However, pursuant to section 5.3 of the Plan, DHC has agreed to forgo any stock loss to the extent directed by the Reorganized Debtors.

### 3.    Potential Limitations on NOL Carryforwards and Other Tax Attributes

Following the Effective Date, any remaining NOL carryforwards and other tax attributes allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") will be subject to limitation under section 382 of the Tax Code.  Any such limitation applies in addition to, and not in lieu of, the use of attributes or the attribute reduction that results from the COD arising in connection with the Plan and the deconsolidation of the Debtors.  The Debtors expect that there will be tax attributes remaining after the Effective Date to which section 382 of the Tax Code will apply.

Under section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code discussed below, the amount of its Pre-Change Losses that may be utilized to offset future taxable income or tax liability is subject to an annual limitation.  The issuance of the New Common Stock pursuant to the Plan will constitute an "ownership change" of the UC Holdings Group for these purposes.

In general, the amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is equal to the product of (1) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments) multiplied by (2) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (*e.g.*, 2.67% for ownership changes occurring in March 2015).  As discussed below, this annual limitation potentially may be increased in the event the corporation (or consolidated group) has an overall "built-in" gain in its assets at the time of the ownership change.  For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation (or the parent of the consolidated group) is generally determined immediately after (rather than before) the ownership change after giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.

WEIL:\95271232\1\35076.0003

Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year. However, if the corporation (or consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two (2) years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses, absent any increases due to recognized built-in gains discussed below.

Accordingly, the impact of an ownership change of the UC Holdings Group pursuant to the Plan depends upon, among other things, the amount of Pre-Change Losses remaining after the reduction of attributes due to the COD and the deconsolidation of the Debtors, the value of Debtors' assets immediately prior to the Effective Date, the value of the reorganized equity of the UC Holdings Group, the continuation of its business, and the amount and timing of future taxable income.

(a)    **Built in Gains and Losses**

Section 382 of the Tax Code can operate to limit the deduction of certain "built-in" losses recognized subsequent to the date of the ownership change.  If a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss and deduction), then any built-in losses recognized during the following five (5) years (up to the amount of the original net unrealized built-in loss) generally will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  Conversely, if the loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized (or, according to an IRS notice, treated as recognized) during the following five (5) years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its Pre-Change Losses against such built-in gain income in addition to its regular annual allowance.  Although the rule applicable to net unrealized built-in losses generally applies to consolidated groups on a consolidated basis, certain corporations that join the consolidated group within the preceding five years may not be able to be taken into account in the group computation of net unrealized built-in loss.  Such corporations would nevertheless still be taken into account in determining whether the consolidated group has a net unrealized built-in gain.  In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless the actual amount of such gain or loss is greater than the lesser of (i) $10,000,000.00 or (ii) fifteen percent (15%) of the fair market value of its assets (with certain adjustments) before the ownership change.  It is expected that the Debtors comprising the UC Holdings Group will be in a net unrealized built-in gain position as of the Effective Date.

(b)    **Section 382(l)(5) Bankruptcy Exception**

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where qualified creditors of a debtor corporation receive, in respect of their claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan.  This exception is potentially applicable in respect of the Debtors.  However, it is not currently

anticipated that the Debtors will apply this exception in the present case; accordingly, the Debtors expect to elect out of the exception, if applicable.

### 4.    Alternative Minimum Tax

In general, a U.S. federal AMT is imposed on a corporation's alternative minimum taxable income at a twenty percent (20%) rate to the extent that such tax exceeds the corporation's regular U.S. federal income tax.  For purposes of computing taxable income for AMT purposes, certain tax deductions and other beneficial allowances are modified or eliminated.  In particular, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, only ninety percent (90%) of a corporation's (or consolidated group's) taxable income for AMT purposes may be offset by available NOL carryforwards (as computed for AMT purposes).  Accordingly, usage of the Debtors' NOLs by the Debtors may be subject to limitations for AMT purposes in addition to any other limitations that may apply.

In addition, if a corporation undergoes an ownership change and is in a net unrealized built-in loss position (as determined for AMT purposes) on the date of the ownership change, the corporation's aggregate tax basis in its assets is reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date.

Any AMT that a corporation pays generally will be allowed as a nonrefundable credit against its regular U.S. federal income tax liability in future taxable years when the corporation is no longer subject to the AMT.

### B.    CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS

As used in this section of the Disclosure Statement, the term "**U.S. Holder**" means a beneficial owner of Secured Note Claims, Unsecured Note Claims, General Unsecured Claims, New Common Stock or New Warrants that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity taxable as a partnership for U.S. federal income tax purposes holds Secured Note Claims, Unsecured Note Claims, General Unsecured Claims, New Common Stock, or New Warrants, the tax treatment of a partner generally will depend upon the

WEIL:\95271232\1\35076.0003

status of the partner and the activities of the partnership.  If you are a partner in a partnership holding any of such instruments, you should consult your own tax advisor.

1.  **Taxable Exchange**

Pursuant to the Plan (and in accordance with the Restructuring Transactions), and in complete and final satisfaction of their respective Claims, (i) holders of Allowed Secured Note Claims will receive New Common Stock, (ii) holders of Allowed Unsecured Note Claims will receive New Common Stock and New Warrants, (iii) holders of Allowed General Unsecured Trade Claims will receive payment partially on the Effective Date and partially in installment payments over two years (such installment obligation is herein referred to as the "**Trade Claim Installment Obligation**"), with potentially additional payments depending on the extent and timing of the resolution of disputed General Unsecured Trade Claims, and (iv) holders of Allowed Other General Unsecured Claims will receive cash in one or more distributions, depending on the extent and timing of the resolution of any disputed Other General Unsecured Claims.  In connection with the foregoing, the Plan provides that the New Common Stock to be distributed to the holders of Allowed Secured Note Claims will be contributed by UC Holdings to Chassix and distributed by Chassix to the holders of Allowed Secured Note Claims and the New Common Stock and New Warrants to be distributed to the holders of Allowed Unsecured Note Claims will be transferred by Chassix Holdings.

In general, a U.S. Holder of an Allowed Secured Note Claim, an Allowed Unsecured Note Claim, or an Allowed General Unsecured Claim should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the aggregate fair market value of any New Common Stock and New Warrants, the issue price of any Trade Claim Installment Obligation and the aggregate amount of any cash received in respect of its Claim (other than any exchange consideration received in respect of a Claim for accrued but unpaid interest and possibly accrued original issue discount ("**OID**")), and (ii) the U.S. Holder's adjusted tax basis in the Claims exchanged (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  (*See* "*Character of Gain or Loss*" *and* "*Ownership of the Trade Claim Installment Obligation,*" below.)  In addition, a U.S. Holder of a Claim will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest not previously included in income.  (See "*Distributions in Respect of Accrued But Unpaid Interest or OID*" below.)

Generally, a U.S. Holder's adjusted tax basis in a Claim will be equal to the cost of the Claim to such U.S. Holder, increased by any OID previously included in income.  If applicable, a U.S. Holder's tax basis in a Claim also will be (i) increased by any market discount previously included in income by such U.S. Holder pursuant to an election to include market discount in gross income currently as it accrues, and (ii) reduced by any cash payments received on the Claim other than payments of qualified stated interest, and by any amortizable bond premium that the U.S. Holder has previously deducted.

A U.S. Holder's tax basis in any New Common Stock or New Warrants received in respect of its Allowed Claim on the Effective Date should equal the fair market value of such stock or warrants on the Effective Date, and its tax basis in any Trade Claim Installment Obligation received should equal the issue price of such obligation.  In addition, the holding

period in such stock or warrants or in such obligation should begin on the day following the Effective Date.

In the event of the subsequent disallowance of any General Unsecured Claims, it is possible that a U.S. Holder of a previously Allowed General Unsecured Claim will have additional gain and/or imputed interest income in respect of additional distributions received due to the disallowance of such Claim. In addition, it is possible that the recognition of any loss realized by a U.S. Holder with respect to an Allowed General Unsecured Claim as to which additional distributions could be received due to the disallowance of other General Unsecured Claims may be deferred until all such other General Unsecured Claims are Allowed or Disallowed. U.S. Holders are urged to consult their tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by such holders in respect of their Claims in a taxable year subsequent to the taxable year in which the Effective Date occurs. The discussion herein assumes that the installment method does not apply.

2.    **Character of Gain or Loss**

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.

A U.S. Holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price, in each case, by at least a *de minimis* amount. The *de minimis* amount is equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity. Generally, qualified stated interest is a stated amount of interest payable in cash at least annually.

Under these rules, any gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the U.S. Holder, on a constant yield basis) during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued. If a U.S. Holder of Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange.

WEIL:\95271232\1\35076.0003

3.        **Distributions in Respect of Accrued
          But Unpaid Interest or OID**

        In general, to the extent that any consideration received pursuant to the Plan by a
U.S. Holder of a Claim is received in satisfaction of accrued interest during its holding period,
such amount will be taxable to the U.S. Holder as interest income (if not previously included in
the U.S. Holder's gross income).  Conversely, a U.S. Holder generally recognizes a deductible
loss to the extent any accrued interest claimed or accrued OID was previously included in its
gross income and is not paid in full, though it is possible that, with respect to accrued OID, such
loss may be a capital loss, rather than an ordinary loss.

        The Plan provides that consideration received in respect of an Allowed Secured
Note Claim, Unsecured Note Claim, General Unsecured Trade Claim or Other General
Unsecured  Claim is allocable first to the principal amount of the Claim (as determined for U.S.
federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim,
including any Claim for accrued but unpaid interest (in contrast, for example, to a pro rata
allocation of a portion of the exchange consideration received between principal and interest, or
an allocation first to accrued but unpaid interest). (See Section 6.12 of the Plan.)  There is no
assurance that the IRS will respect such allocation for U.S. federal income tax purposes.  You are
urged to consult your own tax advisor regarding the allocation of consideration and the inclusion
and deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

4.        **Ownership of Trade Claim Installment Obligation**

        Because U.S. Holders of Allowed General Unsecured Trade Claims will receive a
portion of their consideration in fixed payments over two years (the Trade Claim Installment
Obligation), the OID provisions of the Tax Code generally will apply to such obligation.

        Under applicable Treasury regulations, the Trade Claim Installment Obligation
generally will be treated as having an "issue price" equal to the present value of the two
payments discounted based on the lower of (i) the lowest short-term applicable federal rate in
effect during the three-month period ending with the month that includes the Confirmation Date
and (ii) the lowest short-term applicable federal rate in effect during the three-month period
ending with the month that includes the Effective Date.  The applicable federal rate is set
monthly by the IRS in accordance with section 1274(d) of the Code.  The Trade Claim
Installment Obligation generally will be considered issued with OID in an amount equal to the
excess of the amount of the two payments over the "issue price."  The resulting OID generally
will be required to be accrued and included in the holder's gross income as interest over the two-
year term of the obligation based on the constant yield method, regardless of the holder's regular
method of tax accounting.  Accordingly, each holder generally will be required to include
amounts in gross income in advance of the payment of cash in respect of such income.

5.        **Disposition and Ownership of New Common Stock**

        Unless a nonrecognition provision applies and subject to the discussion above
with respect to market discount (see "*Exchanges of Claims Under the Plan—Character of Gain
or Loss*") and the discussion below, U.S. Holders generally will recognize capital gain or loss

WEIL:\95271232\1\35076.0003

upon the sale or exchange of the New Common Stock in an amount equal to the difference between the U.S. Holder's adjusted tax basis in the New Common Stock and the sum of the cash plus the fair market value of any property received from such disposition. Any such gain or loss generally should be long-term if the U.S. Holder's holding period for its New Common Stock is more than one year at that time. A reduced tax rate on long-term capital gain may apply to noncorporate U.S. Holders. The deductibility of capital loss is subject to significant limitations.

Any gain recognized by a U.S. Holder of a Secured Note Claim upon a subsequent disposition of the New Common Stock (or any stock or property received for it in a later tax-free exchange) received in exchange for such Claim will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any ordinary loss deductions incurred upon exchange or previously as a result of the write-down of the Claim, decreased by any income (other than interest income) recognized by the U.S. Holder upon exchange of the Claim, and (ii) with respect to a cash-basis U.S. Holder and in addition to clause (i) above, any amounts which would have been included in its gross income if the U.S. Holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

In addition, any adjustment to the number of shares of New Common Stock for which the New Warrants may be exercised (or to the exercise price of the New Warrants) may, under certain circumstances, result in constructive distributions that could be taxable to the holders of New Common Stock.

6.        **Ownership, Disposition and Exercise of the New Warrants**

A U.S. Holder generally will not recognize gain or loss when the New Warrants are exercised to acquire the underlying New Common Stock and the U.S. Holder's aggregate tax basis in the New Common Stock acquired generally will equal the U.S. Holder's aggregate tax basis in the exercised warrants increased by the exercise price. A U.S. Holder's holding period in the New Common Stock received upon exercise of a New Warrant will commence on the day following the exercise of such warrant.

Upon the lapse or disposition of a New Warrant, a U.S. Holder generally will recognize gain or loss equal to the difference between the amount realized (zero in the case of a lapse) and its tax basis in the warrant. In general, such gain or loss will be capital gain or loss, long-term or short-term, depending on whether the requisite holding period is satisfied.

In addition, any adjustment to the number of shares of New Common Stock for which the New Warrants may be exercised (or to the exercise price of the New Warrants) may, under certain circumstances, result in constructive distributions that could be taxable to the holders of New Warrants.

7.        **Information Reporting and Backup Withholding**

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of 28%) if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the

WEIL:\95271232\1\35076.0003

recipient is not subject to backup withholding.  Backup withholding is not an additional tax.  Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS.  Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner.  Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions.  Information may also be required to be provided to the IRS concerning payments, unless an exemption applies.  You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds.  You are urged to consult your own tax advisor regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on your tax return.

> **THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  ALL HOLDERS OF CLAIMS OR INTERESTS RECEIVING A DISTRIBUTION UNDER THE PLAN ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

## X.

## CONFIRMATION OF THE PLAN

### A.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan.  The Bankruptcy Court has scheduled the Confirmation Hearing to commence on **[●], 2015 at [●]:[●][●].m. (Eastern Time)**. The Confirmation Hearing may be adjourned from time-to-time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned Confirmation Hearing.

### B.    OBJECTIONS

Section 1128 of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules for the Bankruptcy Court, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' Estates or property, the basis for the objection and the specific

WEIL:\95271232\1\35076.0003

grounds therefor, and must be filed with the Bankruptcy Court, with a copy to the chambers of The Honorable [_____], United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York, together with proof of service thereof, and served upon the parties listed below so as to be received no later than the Plan Objection Deadline of [●], 2015 at [●]:[●][●].m. (**Eastern Time**):

| *Debtors* | *Counsel to the Debtors* |
|---|---|
| Chassix Holdings, Inc.<br>300 Galleria Office Center<br>Suite 501<br>Southfield, MI 48034<br>Attn: Bibi N. Di Serio, Esq. | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Attn: Marcia L. Goldstein, Esq.<br>    Ray C. Schrock, P.C. |
| *Office of the U.S. Trustee* | *Counsel to the Creditors Committee* |
| 201 Varick Street<br>Suite 1006<br>New York, NY 10014<br>Attn:  Susan Golden, Esq.<br>    Andrea B. Schwartz, Esq. | [If Appointed in the Chapter 11 Cases] |
| *Counsel to DIP Term Agent* | *Counsel to DIP ABL Agent* |
| Shipman & Goodwin LLP<br>One Constitution Plaza<br>Hartford, CT 06103-1919<br>Facsimile: (860) 251-5099<br>Attention: Nathan Z. Plotkin, Esq. | **Bodman PLC**<br>1901 St. Antoine Street, 6th Floor at Ford Field<br>Detroit, MI 48226<br>Attn:    Robert J. Diehl, Jr., Esq. |
| *Counsel to the Informal Committee of Noteholders* | *Counsel to Platinum Equity Advisors, LLC* |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019<br>Facsimile: (212) 492-0158<br>Attention: Andrew N. Rosenberg, Esq.<br>    Alice B. Eaton, Esq. | Milbank, Tweed, Hadley & McCloy LLP<br>28 Liberty Street<br>New York, NY 10005<br>Facsimile: (212) 530-5219<br>Attention: Dennis F. Dunne, Esq.<br>    Samuel A. Khalil, Esq. |

WEIL:\95271232\1\35076.0003

| | |
|---|---|
| ***Counsel to FCA US LLC***<br><br>Dickinson Wright PLLC<br>500 Woodward Avenue<br>Suite 4000<br>Detroit, MI 48226<br>Attention: James A. Plemmons, Esq.<br>      Colin T. Ferguson, Esq. | ***Counsel to General Motors LLC***<br><br>Frost Brown Todd LLC<br>150 3rd Avenue South, Suite 1900<br>Nashville, TN 37201<br>Attention: Robert V. Sartin, Esq.<br>      Michelle Drinkard Balfour, Esq. |
| ***Counsel to Ford Motor Company***<br><br>Miller, Canfield, Paddock and Stone, P.L.C.<br>150 West Jefferson<br>Suite 2500<br>Detroit, MI 48226<br>Attention: Jonathan S. Green, Esq.<br>      Stephen S. LaPlante, Esq. | ***Counsel to BMW Manufacturing, LLC***<br><br>Jaffe Raite Heuer & Weiss, P.C.<br>27777 Franklin Road, Suite 2500<br>Detroit, MI 48034<br>Attention: Richard E. Kruger, Esq. |
| ***Counsel to Nissan North America, Inc.***<br><br>Waller Lansden Dortch & Davis, LLP<br>511 Union Street, Suite 2700<br>Nashville, TN 37219<br>Attention:  Mike Paslay, Esq.<br>Tel: (615) 850-8657 | |

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED
AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

**C.**    **REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

      **1.**    **Requirements of Section 1129(a) of the Bankruptcy Code**

          (a)    **General Requirements**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

        (i)    The Plan complies with the applicable provisions of the Bankruptcy Code.

        (ii)    The Debtors have complied with the applicable provisions of the Bankruptcy Code.

        (iii)    The Plan has been proposed in good faith and not by any means proscribed by law.

        (iv)    Any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter

11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

(v)     The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the Debtors participating in a joint plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy.

(vi)    With respect to each Class of Claims or Interests, each holder of an Impaired Claim or Impaired Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code.  *See* discussion of "Best Interests Test" below.

(vii)   Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of Claims or Interests has either accepted the Plan or is not impaired under the Plan.

(viii)  Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that administrative expenses and priority claims will be paid in full on the Effective Date.

(ix)    At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

(x)     Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  *See* discussion of "Feasibility" below.

(xi)    All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the hearing on confirmation of the applicable Plan, have been paid or the applicable Plan provides for

WEIL:\95271232\1\35076.0003

the payment of all such fees on the Effective Date of the applicable Plan.

(b)      **Best Interests Test**

As noted above, the Bankruptcy Code requires that each holder of an impaired Claim or Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. This requirement is referred to as the "best interests test."

This best interests test requires the Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the Liquidation Analysis annexed as **Exhibit D** hereto.

**The Liquidation Analysis is a comparison of (i) the estimated recoveries for creditors and equity holders of the Debtors that may result from the Plan and (ii) an estimate of the recoveries that may result from a hypothetical chapter 7 liquidation. The Liquidation Analysis is based upon a number of significant assumptions which are described therein. The Liquidation Analysis is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a Court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.**

(c)      **Feasibility**

Also as noted above, section 1129(a)(11) of the Bankruptcy Code requires that the Debtors demonstrate that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization.

For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared the Financial Projections set forth on **Exhibit C** hereto. Based upon the Financial Projections, the Debtors believe that they will have sufficient resources to make all

106

payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

Section VIII hereof also sets forth certain risk factors that could impact the feasibility of the Plan.

### 2.    Requirements of Section 1129(b) of the Bankruptcy Code

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of Claims or Interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

### (a)    No Unfair Discrimination

The "no unfair discrimination" test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan.  A chapter 11 plan of reorganization does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or equity interests receives more than it legally is entitled to receive for its claims or equity Interests.  This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors and the other Plan Proponents believe that, under the Plan, all impaired classes of Claims and Interests are treated in a manner that is fair and consistent with the treatment of other classes of Claims and Interests having the same priority.  Accordingly, the Debtors and the other Plan Proponents believe the Plan does not discriminate unfairly as to any impaired class of Claims or Interests.

### (b)    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  The test sets forth different standards for what is fair and equitable, depending on the type of claims or interests in such class.  In order to demonstrate that a plan is "fair and equitable," the plan proponent must demonstrate the following:

**(i) Secured Creditors.**  With respect to a class of impaired secured claims, a proposed plan must provide the following:  (a) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred Cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the Plan, of at least the value of such holder's interest in the estate's interest in such property, or (b) for the sale, subject to section 363 of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such

WEIL:\95271232\1\35076.0003

liens on proceeds under clause (a) or (c) of this paragraph, or (c) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim.

The Plan provides that the holders of Allowed Secured Claims in Class 3 (Secured Note Claims) will receive their Pro Rata share of the Secured Noteholder Common Stock Distribution; provided that if (i) the Global Settlement is not approved by a Final Order or (ii) either the Class of General Unsecured Trade Claims or the Class of Other General Unsecured Claims does not vote to accept the Plan, the Secured Noteholder Common Stock Distribution will increase to 100% of the New Common Stock (subject to dilution by the Management Incentive Plan).

Accordingly, the Plan satisfies the "fair and equitable" test with respect to all Impaired Secured Claims.

**(ii) Unsecured Creditors.**  With respect to a class of impaired unsecured claims, a proposed plan must provide the following: either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class may not receive any property under the plan.

As set forth in the Plan, no holder of Claims or Interests in any Class junior in priority to the holders of Claims in Class 4 (Unsecured Note Claims), Class 5 (General Unsecured Trade Claims) and Class 6 (Other General Unsecured Claims) will receive or retain any property under the Plan on account of such holder's Claims or Interests.  Accordingly, the Plan satisfies the "fair and equitable" test with respect to all Impaired unsecured Claims.

 **(iii) Holders of Equity Interests.**  With respect to a class of equity interests, a proposed plan must provide the following:  (i)  that each holder of an equity interest receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest or (ii) that the holder of any interest that is junior to the interests of the class of equity interests will not receive or retain under the Plan on account of such junior interest any property.

 Pursuant to the Plan, all Existing Chassix Holdings Equity Interests (Class 10), including all equity, warrants, common stock, and preferred stock, will be cancelled and the holder of Existing Chassix Holdings Equity Interests will not receive or retain property on account of its Interests.  Accordingly, the Plan meets the "fair and equitable" test with respect to all Interests.

(c)      **Application to the Plan**

As to any Class that may reject the Plan, the Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirements, because, as to any such dissenting Class, there is no Class of equal priority receiving more favorable treatment, and such Class will either be paid in full, or no Class that is junior to such a

WEIL:\95271232\1\35076.0003

dissenting Class will receive or retain any property on account of the Claims or Interests in such Class.

### 3.    Alternative to Confirmation and Consummation of the Plan

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best option for the Debtors and their estates and will maximize recoveries to parties-in-interest—assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, (ii) a liquidation of the Debtors under chapter 7 of the Bankruptcy Code, or (ii) the preparation and presentation of an alternative plan of reorganization.

### (a)    Sale Under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their assets under section 363 of the Bankruptcy Code.  Holders of Claims in Classes 2 and 3 would be entitled to credit bid on any property to which their security interest is attached, and to offset their Claims against the purchase price of the property.  In addition, the security interests in the Debtors' assets held by holders of Claims in Classes 2 (Other Secured Claims) and 3 (Secured Note Claims) would attach to the proceeds of any sale of the Debtors' assets.  After these Claims are satisfied, the remaining funds could be used to pay holders of Claims in Classes 4 (Unsecured Note Claims), 5 (General Unsecured Trade Claims), and 6 (Other General Unsecured Claims).  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for holders of Claims and Interests than the Plan.

### (b)    Liquidation Under Chapter 7

If no plan can be confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  Section X.C.1(b) (Best Interests Test) of this Disclosure Statement discusses the effects that a chapter 7 liquidation would have on the recovery of holders of claims and equity interests and the Debtors' liquidation analysis.  The Debtors and the other Plan Proponents believe that liquidation under chapter 7 could result in smaller distributions being made to all creditors and equity holders than those provided for in the Plan.

### (c)    Alternative Plan

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan has expired, any other party in interest) could attempt to formulate a different chapter 11 plan.  With respect to an alternative plan, the Debtors have explored various alternatives in connection with the formulation and development of the Plan.  The Debtors and the other Plan Proponents believe that the Plan, as described herein, enables creditors and equity holders to realize the most value under the circumstances.

4.      **Nonconsensual Confirmation**

If any impaired Class of Claims entitled to vote will not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.  With respect to impaired Classes of Claims that are deemed to reject the Plan, the Debtors will request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

WEIL:\95271232\1\35076.0003

# XI.

## CONCLUSION

The Debtors and the other Plan Proponents believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urge holders of impaired Claims in Class 3 (Secured Note Claims), Class 4 (Unsecured Note Claims), Class 5 (General Unsecured Trade Claims), and Class 6 (Other General Unsecured Claims) to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than the Voting Deadline, **[●], 2015 at [●]:[●][●].m. (Eastern Time)**.

Dated:  March [●], 2015
        New York, New York

Respectfully submitted,

Chassix Holdings and each of the Debtors

By:    _____
        Name:  J. Mark Allan
        Title: President

[SIGNATURE PAGE FOR DISCLOSURE STATEMENT FOR JOINT PLAN
OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE]

<u>**EXHIBIT A**</u>

**JOINT PLAN OF REORGANIZATION UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | ) | |
| In re | ) | Chapter 11 |
| | ) | |
| Chassix Holdings, Inc., *et al.*,[1] | ) | Case No. 15-[_____] (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Pending) |
| | ) | |

## JOINT PLAN OF REORGANIZATION
### UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**WEIL, GOTSHAL & MANGES LLP**

Marcia L. Goldstein
Ray C. Schrock, P.C.
Matthew P. Goren
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for Debtors and
Debtors in Possession*

Dated:  March 12, 2015
        New York, New York

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012).  The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

# Table of Contents

**Page**

Section 1.    DEFINITIONS AND INTERPRETATION. ........................................................1

    A.    Definitions. ..........................................................................................................1

    B.    Interpretation; Application of Definitions and Rules of Construction............................14

    C.    Reference to Monetary Figures..............................................................................14

    D.    Controlling Document .........................................................................................14

Section 2.    ADMINISTRATIVE AND PRIORITY CLAIMS. .........................................14

    2.1.    *Administrative Claims.*..........................................................................................14

    2.2.    *Fee Claims.*..........................................................................................................15

    2.3.    *Priority Tax Claims.*.............................................................................................15

    2.4.    *DIP Claims.*.........................................................................................................15

    2.5.    *Prepetition Revolving ABL Facility Claims.* ........................................................15

Section 3.    CLASSIFICATION OF CLAIMS AND INTERESTS. ...................................16

    3.1.    *Summary of Classification* ...................................................................................16

    3.2.    *Special Provision Governing Unimpaired Claims.*...............................................16

    3.3.    *Elimination of Vacant Classes.* ...........................................................................16

Section 4.    TREATMENT OF CLAIMS AND INTERESTS. ..........................................17

    4.1.    *Other Priority Claims (Class 1).*..........................................................................17

    4.2.    *Other Secured Claims (Class 2).*..........................................................................17

    4.3.    *Secured Note Claims (Class 3)* ............................................................................17

    4.4.    *Unsecured Note Claims (Class 4).*........................................................................18

    4.5.    *General Unsecured Trade Claims (Class 5).*.........................................................18

    4.6.    *Other General Unsecured Claims (Class 6).*........................................................19

    4.7.    *Intercompany Claims (Class 7).* ..........................................................................19

    4.8.    *Intercompany Interests (Class 8).*........................................................................20

    4.9.    *Subordinated Securities Claims (Class 9).*...........................................................20

    4.10.    *Existing Chassix Holdings Equity Interests (Class 10)* .......................................20

Section 5.    MEANS FOR IMPLEMENTATION. .........................................................20

    5.1.    *Compromise and Settlement of Claims, Interests, and Controversies.* .......................20

    5.2.    *Global Settlement* ...............................................................................................21

    5.3.    *Actions of Dharma Holding Corporation and Triomphe Intermediate Holding*
          *Corporation* ......................................................................................................22

**Table of Contents**

**Page**

5.4. *Cancellation of Existing Securities and Agreements.* ...................................................22

5.5. *Corporate Structure.* ...................................................22

5.6. *Authorization and Issuance of Plan Securities.* ...........................................22

5.7. *Section 1145 Exemption.* ...................................................23

5.8. *Exit Financing.* ...................................................23

5.9. *Intercreditor Agreement.* ...................................................24

5.10. *Reorganized Debtors.* ...................................................24

5.11. *Bristol Facility* ...................................................24

5.12. *Cancellation of Liens.* ...................................................25

5.13. *Management Employment Matters.* ...................................................25

5.14. *Withholding and Reporting Requirements.* ...................................................25

5.15. *Exemption From Certain Transfer Taxes.* ...................................................26

5.16. *Restructuring Transactions; Further Transactions.* ...................................................26

5.17. *Dissolution of Chassix Holdings.* ...................................................27

5.18. *Effectuating Documents.* ...................................................27

5.19. *Closing of the Chapter 11 Cases.* ...................................................27

Section 6.    DISTRIBUTIONS. ...................................................27

6.1. *Distribution Record Date.* ...................................................27

6.2. *Date of Distributions.* ...................................................28

6.3. *Timing of Distributions.* ...................................................28

6.4. *Disbursing Agent.* ...................................................28

6.5. *Powers of Disbursing Agent.* ...................................................28

6.6. *Delivery of Distributions.* ...................................................28

6.7. *Manner of Payment Under Plan.* ...................................................29

6.8. *Fractional Stock.* ...................................................29

6.9. *Minimum Cash Distributions.* ...................................................29

6.10. *Setoffs.* ...................................................29

6.11. *Distributions After Effective Date.* ...................................................29

6.12. *Allocation of Distributions Between Principal and Interest.* ...................................................29

Section 7.    PROCEDURES FOR DISPUTED CLAIMS. ...................................................30

7.1. *Allowance of Claims.* ...................................................30

ii

## Table of Contents

**Page**

7.2.   *Objections to Claims.*.................................................................30

7.3.   *Estimation of Claims*.................................................................30

7.4.   *No Distributions Pending Allowance.*................................................30

7.5.   *Distributions After Allowance.*.....................................................31

7.6.   *Resolution of Claims.*...............................................................31

7.7.   *Disallowed Claims.*.................................................................31

Section 8.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES....................................31

8.1.   *General Treatment.*.................................................................31

8.2.   *Determination of Cure Disputes and Deemed Consent.*...............................31

8.3.   *Payments Related to Assumption of Contracts and Leases.*...........................32

8.4.   *Rejection.*.........................................................................32

8.5.   *Survival of the Debtors' Indemnification Obligations.*.................................32

8.6.   *Compensation and Benefit Plans.*...................................................33

8.7.   *Insurance Policies.*.................................................................33

8.8.   *Intellectual Property Licenses and Agreements.*....................................33

8.9.   *Reservation of Rights.*.............................................................34

Section 9.   CONDITIONS PRECEDENT TO THE EFFECTIVE DATE. .................................34

9.1.   *Conditions Precedent to Confirmation.*.............................................34

9.2.   *Conditions Precedent to the Effective Date.*........................................34

9.3.   *Waiver of Conditions Precedent.*...................................................35

9.4.   *Effect of Non-Occurrence of Effective Date.*.......................................36

Section 10.   EFFECT OF CONFIRMATION. ......................................................36

10.1.   *Subordinated Claims.*.............................................................36

10.2.   *Vesting of Assets.*.................................................................36

10.3.   *Discharge of Claims and Termination of Interests.*.................................36

10.4.   *Term of Injunctions or Stays.*.....................................................36

10.5.   *Injunction Against Interference with Plan.*.........................................37

10.6.   *Releases by the Debtors.*..........................................................37

10.7.   *Releases By Holders of Claims and Interests.*......................................38

10.8.   *Exculpation.*.......................................................................38

10.9.   *Retention of Causes of Action/Reservation of Rights.*..............................39

WEIL:\95270840\1\35076.0003

**Table of Contents**

**Page**

10.10.    ***Solicitation of the Plan.*** .................................................................39

10.11.    ***Plan Supplement.*** ..................................................................40

10.12.    ***Corporate and Limited Liability Company Action***...................................40

Section 11.    RETENTION OF JURISDICTION. ....................................................40

Section 12.    MISCELLANEOUS PROVISIONS....................................................42

12.1.    ***Payment of Statutory Fees.*** ...................................................42

12.2.    ***Substantial Consummation.*** ..................................................42

12.3.    ***Dissolution of Creditors Committee.*** ...........................................42

12.4.    ***Request for Expedited Determination of Taxes.*** ...................................42

12.5.    ***Amendments.***.............................................................43

12.6.    ***Revocation or Withdrawal of the Plan.*** .........................................43

12.7.    ***Severability of Plan Provisions upon Confirmation.***................................43

12.8.    ***Governing Law.***...........................................................44

12.9.    ***Time.***...................................................................44

12.10.    ***Immediate Binding Effect.***...................................................44

12.11.    ***Successor and Assigns.*** .....................................................44

12.12.    ***Entire Agreement.***.........................................................44

12.13.    ***Notices.*** .................................................................44

Exhibit A    Accommodation Agreements (without exhibits)

Exhibit B    Restructuring Support Agreement (without exhibits)

WEIL:\95270840\1\35076.0003

Each of Automotive Properties of New York, LLC, Chassix Holdings, Inc., UC Holdings, Inc., Chassix, Inc., Diversified Machine, Inc., Diversified Machine Bristol, LLC, Chassix Georgia Machining, LLC, DMI Columbus, LLC, Diversified Machine Montague, LLC, Diversified Machine, Milwaukee LLC, DMI Edon LLC, Mexico Products I, LLC, DMI China Holding LLC, Concord International, Inc., SMW Automotive, LLC, Automotive, LLC, Chassis Co. of Michigan, LLC, and AluTech, LLC (collectively, the "***Debtors***") propose the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Section 1.A.

## SECTION 1.    DEFINITIONS AND INTERPRETATION.

### A.    Definitions.

1.1    ***Accommodation Agreements*** means (a) that certain accommodation agreement, dated as of March 11, 2015, between and among the Debtors, General Motors LLC, Ford Motor Company, FCA US LLC f/k/a Chrysler Group LLC, Nissan North America, Inc., the DIP ABL Agent, and the DIP Term Agent, and (b) that certain accommodation agreement (together with any exhibits or schedules thereto) between and among the Debtors, BMW Manufacturing Co., LLC, the DIP ABL Agent, and the DIP Term Agent, annexed hereto as **Exhibit** "**A**."

1.2    ***Additional Trade Claim Distribution*** means $4,000,000, in Cash, which shall be distributed on a Pro Rata basis to holders of Allowed General Unsecured Trade Claims that agree to extend Customary Trade Terms to the Debtors (or the Reorganized Debtors, as applicable), pursuant to Section 4.5 below.  For the avoidance of doubt, the foregoing monies shall be reserved by the Debtors, or the Reorganized Debtors, as the case may be, but shall not be held in a segregated account.

1.3    ***Administrative Agent*** means BMO Harris Bank N.A., in its capacity as administrative agent under the Prepetition Revolving ABL Facility.

1.4    ***Administrative Claim*** means any Claim for costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code, including, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for good and other services and leased premises); (b) Fee Claims; (c) DIP Claims; (d) Restructuring Expenses; and (e) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code; underlined provided that, notwithstanding anything herein to the contrary, Fee Claims and DIP Claim shall be treated as provided, respectively, in Sections 2.2 and 2.4 below.

1.5    ***Allowed*** means:

(a)    With respect to any Claim or Interest, proof of which was filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the Bankruptcy Court, (i) as to which no objection to allowance has been interposed in accordance with Section 7.2 hereof, such Claim to the extent asserted in such proof of Claim, (ii) as to which an objection has been interposed, such Claim or Interest to the extent that it has been allowed in whole or in part by a Final Order, or (iii) any Claim or Interest expressly allowed hereunder.

(b)    With respect to any Claim as to which no proof of claim was filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the

Bankruptcy Court, such Claim to the extent that it has been listed in the Schedules as liquidated in amount and not disputed or contingent.

(c)    Notwithstanding the foregoing, the Reorganized Debtors shall retain all claims and defenses to any Allowed Claims that are Reinstated or Unimpaired pursuant to the Plan.

1.6    ***Allowed Amount*** means the lesser of (a) the dollar amount of an Allowed Claim or (b) the estimated amount of such Allowed Claim.  Unless otherwise specified herein or by Final Order, the Allowed Amount of an Allowed Claim shall not include interest accruing on such Allowed Claim from and after the Commencement Date.

1.7    ***Amended Organizational Documents*** means the forms of certificate of incorporation, certificate of formation, limited liability company agreement, or other forms of organizational documents and bylaws for the Reorganized Debtors in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  To the extent such Amended Organizational Documents reflect material changes to the Debtors' existing forms of organization documents and bylaws, substantially final forms of such Amended Organizational Documents will be included in the Plan Supplement.

1.8    ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.9    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York, Manhattan Division, having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

1.10    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

1.11    ***Benefit Plans*** means all benefit plans, policies, and programs sponsored by the Debtors, including all savings plans and health and welfare plans.

1.12    ***Bristol Facility*** means the Debtors' manufacturing facility located at 51650 County Road 133, Bristol, Indiana, 46507.

1.13    ***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.14    ***Cash*** means legal tender of the United States of America.

1.15    ***Causes of Action*** means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen,

2

direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims.

1.16    ***Chapter 11 Cases*** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on March 12, 2015, in the Bankruptcy Court and styled *In re Chassix Holdings, Inc., et. al.*, Case No. 15-[_____] (___).

1.17    ***Chassix*** means Chassix, Inc.

1.18    ***Chassix Holdings*** means Chassix Holdings, Inc.

1.19    ***Claim*** means "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

1.20    ***Class*** means any group of Claims or Interests classified by the Plan pursuant to section 1122(a) of the Bankruptcy Code.

1.21    ***Collateral Agent*** means U.S. Bank, National Association, in its capacity as collateral agent under the Secured Notes Indenture and the related Security Agreement.

1.22    ***Commencement Date*** means the date on which each of the Debtors filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

1.23    ***Commencement Date Plan*** means the joint chapter 11 plan of reorganization, including the exhibits thereto, filed by the Debtors on the Commencement Date.

1.24    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.25    ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.26    ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

1.27    ***Consenting Noteholders*** means the Consenting Secured Noteholders and the Consenting Unsecured Noteholders.

1.28    ***Consenting Secured Noteholders*** means the beneficial holders, or investment advisors or managers for the account of beneficial holders, of Secured Notes party to the Restructuring Support Agreement.

3

1.29    ***Consenting Unsecured Noteholders*** means the beneficial holders, or investment advisors or managers for the account of beneficial holders, of Unsecured Notes party to the Restructuring Support Agreement.

1.30    ***Consummation*** means the occurrence of the Effective Date.

1.31    ***Creditors Committee*** means any official committee of unsecured creditors appointed in the Chapter 11 Cases.

1.32    ***Cure*** means the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

1.33    ***Customary Trade Terms*** means industry trade terms and/or the existing contractual terms between the Debtors and the relevant holder of a General Unsecured Trade Claim including rebates and discounts, which shall in no event be worse than the most favorable terms in effect within two (2) years before the Commencement Date or such other trade terms as agreed to by the Debtors, with the consent of the Required Consenting Noteholders (such consent not to be unreasonably withheld), or the Reorganized Debtors, as applicable.

1.34    ***Debtors*** means Automotive Properties of New York, LLC, Chassix Holdings, UC Holdings, Chassix, Diversified Machine, Inc., Diversified Machine Bristol, LLC, Chassix Georgia Machining, LLC, DMI Columbus, LLC, Diversified Machine Montague, LLC, Diversified Machine, Milwaukee LLC, DMI Edon LLC, Mexico Products I, LLC, DMI China Holding LLC, Concord International, Inc., SMW Automotive, LLC, Automotive, LLC, Chassis Co. of Michigan, LLC, and AluTech, LLC.

1.35    ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

1.36    ***Definitive Documents*** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated herein and that are otherwise necessary or desirable to implement, or otherwise relate to the restructuring contemplated in the Restructuring Support Agreement, the Plan (including the Plan Supplement), any motion seeking the approval thereof, the Confirmation Order, and definitive documentation relating to the DIP Facilities, the use of cash collateral and the Exit Facilities, Amended Organizational Documents, the Accommodation Agreements, advisory or management services agreements, the Management Incentive Plan, the New Warrant Agreement, the Shareholders Agreement and any other shareholder and member related agreements or other related documents, each of which shall contain terms and conditions consistent in all material respects with the Plan and shall otherwise be reasonably acceptable in all respects to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

1.37    ***DIP ABL Agent*** means PNC Bank, National Association, in its capacity as administrative agent and collateral agent for the Revolving DIP Lenders under the Revolving DIP Credit Facility, or its permitted successor and assignee.

1.38    ***DIP Agents*** means the DIP ABL Agent and the DIP Term Agent.

4

1.51.    ***Effective Date*** means the date on or after the Confirmation Date, but not later than July 17, 2015, on which all conditions to the effectiveness of the Plan set forth in Section 9 hereof have been satisfied or waived in accordance with the terms of the Plan.

1.52.    ***Estate or Estates*** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.53.    ***Exculpated Parties*** means collectively: (a) the Debtors; (b) the Creditors Committee; (c) the Administrative Agent; (d) the Collateral Agent; (e) the other Secured Parties under and as defined in the Security Agreement; (f) the DIP Lenders; (g) the DIP Agents; (h) the Consenting Secured Noteholders; (i) the Consenting Unsecured Noteholders; (j) the arrangers under each of the DIP Facilities and the Exit Facilities; (k) the administrative agents, collateral agents, and lenders under the Exit Facilities; (l)  the OEM Customers; (m) Platinum Equity; (n) the Prepetition Revolving ABL Lenders, and (o) with respect to each of the foregoing entities in clauses (a) through (n), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers and directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, in each case in their capacity as such.

1.54.    ***Existing Chassix Holdings Equity Interests*** means all Interests in Chassix Holdings immediately prior to the Commencement Date, including all equity, warrants, common stock, and preferred stock.

1.55.    ***Existing UC Holdings Equity Interests*** means all Interests in UC Holdings immediately prior to the Commencement Date, including all equity, warrants, common stock, and preferred stock.

1.56.    ***Exit Facilities*** means the Revolving Exit Facility and the Exit Term Loan.

1.57.    ***Exit Term Loan*** means that certain senior secured exit term loan in a principal amount of $150,000,000, on terms acceptable to the Debtors and the Required Consenting Noteholders**.** Not less than $50,000,000 of the Exit Term Loan will be in the form of a new money investment to be made upon the Effective Date.

1.58.    ***Fee Claim*** means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Confirmation Date by professional persons retained by the Debtors or the Creditors Committee pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

1.59.    ***Final DIP Order*** means the final order of the Bankruptcy Court authorizing, among other things, the Debtors to enter into and make borrowings under the DIP Facilities, and granting certain rights, protections, and liens to and for the benefit of the DIP Lenders.

1.60.    ***Final Order*** means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the Clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been

6

denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; provided that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

1.61.    ***General Unsecured Claim*** means any unsecured Claim, other than an Intercompany Claim and an Unsecured Note Claim, that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, including without limitation, any General Unsecured Trade Claim and any Other General Unsecured Claim.

1.62.    ***General Unsecured Claim Distribution*** means $2,000,000, in Cash, which, in accordance with Section 4.6 below, shall be distributed on a Pro Rata basis to holders of Allowed Other General Unsecured Claims; provided that, in accordance with Section 4.6, the foregoing distribution shall only be made to a holder of an Allowed Other General Unsecured Claim if such holder's sub-class has voted to accept the Plan.  For the avoidance of doubt, the foregoing monies shall be reserved by the Debtors, or the Reorganized Debtors, as the case may be, but shall not be held in a segregated account.

1.63.    ***General Unsecured Trade Claim*** means any General Unsecured Claim against any Debtor held by a trade creditor that the Debtors will have an ongoing business relationship with after the Effective Date.

1.64.    ***Global Settlement*** means that certain settlement incorporated into the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, among the Debtors, the Consenting Noteholders, and Platinum Equity whereby (i) the Unsecured Noteholders shall receive their Pro Rata share of the Unsecured Noteholder Common Stock Distribution and the New Warrants pursuant to Sections 4.4 and 5.2 below and (ii) Platinum Equity and the Released Parties related thereto shall receive releases pursuant to Sections 5.2, 10.6 and 10.7 below.

1.65.    ***Impaired*** means, with respect to a Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.66.    ***Initial Distribution*** means the first distribution that the Disbursing Agent makes to holders of Allowed Claims.

1.67.    ***Initial Distribution Date*** means the date occurring on or as soon as reasonably practicable after the Effective Date on which the Disbursing Agent makes the Initial Distribution to holders of Allowed Claims.

1.68.    ***Intercompany Claim*** means any Claim against a Debtor held by another Debtor.

1.69.    ***Intercompany Interests*** means an Interest in a Debtor (other than Chassix Holdings or UC Holdings) held by another Debtor or an affiliate of a Debtor.

1.70.    ***Intercreditor Agreement*** means that certain intercreditor agreement, between and among the lenders under the Revolving Exit Facility and the Exit Term Loan, to be included in draft form in the Plan Supplement.

1.71.    ***Interests*** means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all common stock, preferred stock or other instruments evidencing an

WEIL:\95270840\1\35076.0003

ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interests in a Debtor that existed immediately before the Effective Date.

1.72.    ***Interim DIP Order*** means the interim order of the Bankruptcy Court authorizing, among other things, the Debtors to enter into and make borrowings under the DIP Facilities, and granting certain rights, protections and liens to and for the benefit of the DIP Lenders.

1.73.    ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.74.    ***Management Incentive Plan*** means a post-emergence management incentive plan, to be included in draft form in the Plan Supplement, which shall be in form and substance reasonably satisfactory to the Debtors and the Required Consenting Noteholders, to be implemented by the Reorganized Debtors on the Effective Date, which shall provide for grants of options and/or restricted units/equity reserved for management, directors and employees in an amount of New Common Stock representing 5-10% of the New Common Stock (subject to dilution by the exercise of the New Warrants, to the extent applicable) which shall be sufficient to properly incentivize the senior management team of the Reorganized Debtors.

1.75.    ***New Board*** means the initial board of directors of Reorganized UC Holdings.

1.76.    ***New Common Stock*** means the shares of common stock, par value $.001 per share, in Reorganized UC Holdings that shall be issued on the Effective Date.

1.77.    ***New Warrants*** mean warrants to purchase 5% of the New Common Stock, subject to dilution by the Management Incentive Plan, with a strike price equal to the Reorganized Debtors' total implied equity value being the face amount of the Secured Notes, plus accrued interest and expenses as of the Commencement Date, as more fully set forth in the New Warrant Agreement, which shall be distributed in accordance with Section 4.4 below.

1.78.    ***New Warrant Agreement*** means the warrant agreement that will govern the terms of the New Warrants, the form of which shall be included in the Plan Supplement, and which will be in form and substance reasonably acceptable to the Debtors and the Required Consenting Noteholders.

1.79.    ***OEM Customers*** means, collectively, General Motors LLC, Ford Motor Company, FCA US LLC f/k/a Chrysler Group LLC, Nissan North America, Inc., BMW Manufacturing Co., LLC and any other customer of the Debtors party to the Accommodation Agreements.

1.80.    ***Other General Unsecured Claim*** means any unsecured Claim against any Debtor (other than an Intercompany Claim or a General Unsecured Trade Claim) that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

1.81.    ***Other Priority Claim*** means any Claim against any of the Debtors other than an Administrative Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.82.    ***Other Secured Claim*** means a Secured Claim against any of the Debtors, other than an Administrative Claim, a Priority Tax Claim, a Prepetition Revolving ABL Facility Claim, or a Secured Note Claim.

1.83.    ***Person*** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code) or other entity.

1.84.    ***Plan*** means this joint chapter 11 plan of reorganization, including the exhibits hereto, as the same may be amended or modified from time to time in accordance with Section 12.5 herein.

1.85.    ***Plan Supplement*** means a supplemental appendix to the Plan, in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, containing, among other things, substantially final forms of the Amended Organizational Documents (to the extent such Amended Organizational Documents reflect material changes from the Debtors' existing organizational documents and bylaws), the Schedule of Assumed Contracts, the Schedule of Rejected Contracts, the Exit Term Loan, the Revolving Exit Facility, the Management Incentive Plan, the Shareholders Agreement, the New Warrant Agreement, and to the extent known, with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; provided that through the Effective Date, the Debtors shall have the right to amend documents contained in, and exhibits to, the Plan Supplement with the consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  The Plan Supplement shall be filed with the Bankruptcy Court no later than the Plan Supplement Filing Date.

1.86.    ***Plan Supplement Filing Date*** means five business days before the voting deadline established in these cases.

1.87.    ***Platinum Consent Right*** means Platinum Equity's right to consent to or approve any documents, actions, or agreements, as applicable, solely to the extent such documents, actions, or agreements alter in any material way any of the rights or benefits proposed to be granted to or received by Platinum Equity or any Released Parties related thereto, or any obligation Platinum Equity (or any Released Party related thereto) may have, pursuant to the Commencement Date Plan.

1.88.    ***Platinum Equity*** means, collectively, Platinum Equity, LLC, Platinum Equity Advisors, LLC, Platinum Dharma Principals, LLC, Platinum Equity Capital Dharma Partners-PF, L.P., Platinum Equity Capital Dharma Partners, L.P., Platinum Equity Capital Dharma Partners-A, L.P., Platinum Equity Capital Partners III, L.P., Platinum Equity Capital Partners-A III, L.P., Platinum Equity Capital Partners-B III, L.P., Platinum Equity Capital Partners-C III, L.P., Dharma Holding Corporation, Triomphe Intermediate Holding Corporation, and such entities' direct and indirect subsidiaries and affiliates except the Debtors and the Debtors' direct and indirect subsidiaries.

1.89.    ***Prepetition Credit Agreement*** means that certain Amended and Restated Loan, Security and Guaranty Agreement dated as of July 23, 2013, as amended, supplemented or otherwise modified from time to time, by and among Chassix, the other borrowers and guarantors party thereto, the Administrative Agent, the Prepetition Revolving ABL Lenders and other parties thereto.

1.90.    ***Prepetition Intercreditor Agreement*** means that certain Intercreditor Agreement, dated as of July 23, 2013, by and between BMO Harris Bank N.A., as ABL collateral agent, and U.S. Bank National Association, as notes collateral agent.

1.91.    ***Prepetition Revolving ABL Facility*** means that certain $150 million senior secured asset based revolving credit facility pursuant to the Prepetition Credit Agreement.

9

1.92.    ***Prepetition Revolving ABL Facility Claim*** means any Claim relating to or arising under the Prepetition Revolving ABL Facility which shall be repaid in full in Cash with proceeds from the DIP Facilities in connection with entry of the Interim DIP Order.

1.93.    ***Prepetition Revolving ABL Lenders*** means the lenders from time to time party to the Prepetition Credit Agreement.

1.94.    ***Priority Tax Claim*** means any secured or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.95.    ***Pro Rata*** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Class under the Plan.

1.96.    ***Reinstate, Reinstated or Reinstatement*** means (i) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such Claim so as to leave such Claim Unimpaired or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (a) curing any such default that occurred before or after the Commencement Date, other than a default of the kind specified in section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim as such maturity existed before such default; (c) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) not otherwise altering the legal, equitable or contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement and shall be deemed cured on the Effective Date.

1.97.    ***Released Parties*** means collectively and in each case in their capacity as such: (a) the Debtors; (b) the Creditors Committee; (c) the Administrative Agent; (d) the Collateral Agent; (e) the other Secured Parties under and as defined in the Security Agreement; (f) the DIP Lenders; (g) the DIP Agents; (h) the Consenting Secured Noteholders; (i) the Consenting Unsecured Noteholders; (j) the arrangers under each of the DIP Facilities and the Exit Facilities; (k) the administrative agents, collateral agents, and lenders under the Exit Financing; (l) the OEM Customers; (m) Platinum Equity; (n) the Prepetition Revolving ABL Lenders; and (o) with respect to each of the foregoing entities in clauses (a) through (n), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers and directors, principals, shareholders, members, partners, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

1.98.    ***Reorganized Chassix*** means Chassix, as reorganized on the Effective Date in accordance with the Plan.

1.99.    ***Reorganized Debtors*** means the Debtors, as reorganized on the Effective Date in accordance with the Plan.

WEIL:\95270840\1\35076.0003

1.100.    ***Reorganized UC Holdings*** means UC Holdings, as reorganized on the Effective Date in accordance with the Plan.

1.101.    ***Required Consenting Noteholders*** means the Required Consenting Secured Noteholders and the Required Consenting Unsecured Noteholders.

1.102.    ***Required Consenting Secured Noteholders*** means the Consenting Secured Noteholders holding at least 51% of the Secured Notes that are subject to the terms of the Restructuring Support Agreement.

1.103.    ***Required Consenting Unsecured Noteholders*** means the Consenting Unsecured Noteholders holding at least 51% of the Unsecured Notes that are subject to the terms of the Restructuring Support Agreement.

1.104.    ***Restructuring*** means the proposed financial restructuring the principal terms of which are set forth herein.

1.105.    ***Restructuring Expenses*** means the reasonable and documented fees and expenses incurred by each of the Administrative Agent, the Collateral Agent, the Consenting Noteholders, Platinum Equity, the DIP Agents, and the DIP Lenders  in connection with the Restructuring, including the fees and expenses of their respective legal and financial advisors (limited to one primary counsel for each of the Prepetition ABL Lender, the DIP Agents, the Consenting Noteholders, and Platinum Equity, one financial advisor for each of Platinum Equity and the Consenting Noteholders and any other professionals that may be retained by the Consenting Noteholders and are reasonably acceptable to the Debtors) without the requirement for the filing of retention applications, fee applications or any other applications in the Chapter 11 Cases, which, in each case, shall be Allowed in full and shall not be subject to any offset, defense, counterclaim, reduction or credit of any kind whatsoever.  The reimbursable fees and expenses of Platinum Equity shall not exceed $1,250,000.

1.106.    ***Restructuring Support Agreement*** means that certain Restructuring Support Agreement, dated March 11, 2015, by and among the Debtors, the Consenting Secured Noteholders, the Consenting Unsecured Noteholders and Platinum Equity (as may be amended, supplemented or modified from time to time in accordance with the terms thereof) annexed hereto as **Exhibit** "**B**."

1.107.    ***Restructuring Support Parties*** means, collectively, the Debtors, the Required Consenting Noteholders and Platinum Equity.

1.108.    ***Restructuring Transactions*** means the transactions set forth in Section 5.16 of the Plan, in the order specified therein.

1.109.    ***Revolving DIP Credit Facility*** means that certain senior secured non-amortizing asset-based revolving credit facility in an aggregate principal amount of up to $150,000,000 entered into pursuant to that certain Superpriority Secured Debtor-in-Possession ABL Loan, Security and Guaranty Agreement, by and among Chassix, the other borrowers and guarantors party thereto, the DIP ABL Agent, and the Revolving DIP Lenders.  The Revolving DIP Credit Facility includes sub-facilities for swingline loans in an amount equal to $10,000,000 and letters of credit in an amount equal to $15,000,000.

1.110.    ***Revolving DIP Lenders*** means the lenders under the Revolving DIP Credit Facility.

WEIL:\95270840\1\35076.0003

1.111.  **Revolving Exit Facility** means that certain senior secured asset-based revolving exit credit facility with terms and conditions to be negotiated which shall be acceptable to the Debtors and the Required Consenting Noteholders.

1.112.  **Schedule of Assumed Contracts** means the schedule of contracts and leases to be assumed by the applicable Debtor(s), with the reasonable consent of the Debtors and the Required Consenting Noteholders, to be filed as part of the Plan Supplement.

1.113.  **Schedule of Rejected Contracts** means the schedule of contracts and leases to be rejected by the applicable Debtor(s), with the reasonable consent of the Debtors and the Required Consenting Noteholders, to be filed as part of the Plan Supplement.

1.114.  **Schedules** means the schedules of assets and liabilities and the statements of financial affairs filed by each Debtor under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements may be supplemented or amended from time to time.

1.115.  **Secured Claim** means a Claim to the extent (i) secured by property of the estate, the amount of which is equal to or less than the value of such property (A) as set forth in the Plan, (B) as agreed to by the holder of such Claim and the Debtors or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

1.116.  **Secured Note Claim** means any Claim relating to or arising under the Secured Note Indenture.

1.117.  **Secured Noteholder Common Stock Distribution** means shares of New Common Stock representing 97.5% of the New Common Stock (subject to dilution by the Management Incentive Plan and, to the extent applicable, the exercise of the New Warrants) to be distributed in accordance with Section 4.3 below; provided that if (i) the Global Settlement is not approved by a Final Order or (ii) either the Class of General Unsecured Trade Claims or the Class of Other General Unsecured Claims does not vote to accept the Plan, the Secured Noteholder Common Stock Distribution shall increase to 100% of the New Common Stock (subject to dilution by the Management Incentive Plan).

1.118.  **Secured Noteholders** means the holders of the Secured Notes.

1.119.  **Secured Note Indenture** means that certain indenture, dated July 23, 2013, as amended, supplemented or otherwise modified from time to time, among Chassix, as issuer, UC Holdings and certain of its subsidiaries as guarantors thereto, and U.S. Bank National Association, as trustee.

1.120.  **Secured Note Indenture Trustee** means U.S. Bank National Association, in its capacity as trustee under the Secured Note Indenture.

1.121.  **Secured Notes** means the 9 1/4 % senior secured notes due 2018 of Chassix issued pursuant to the Secured Note Indenture, plus accrued and unpaid interest as of the Commencement Date and any other amounts and obligations payable under the Secured Note Indenture and owed as of the Commencement Date.

1.122.  **Security** means any Security, as such term is defined in section 101(49) of the Bankruptcy Code.

1.123.    **Security Agreement** means that certain Security Agreement, dated as of July 23, 2013, by Chassix, and the guarantors thereunder, as pledgors, assignors and debtors, and U.S. Bank National Association, in its capacity as collateral agent, pledgee, assignee and secured party for the benefit of the Secured Noteholders under the Secured Note Indenture, and each other Authorized Representative (as defined in the Security Agreement) party thereto.

1.124.    **Shareholders Agreement** means that certain Shareholders Agreement to be included in draft form in the Plan Supplement, which shall be consistent with the requirements contained in the Plan and the Restructuring Support Agreement and otherwise be in a form and substance reasonably acceptable to the Debtors and the Required Consenting Noteholders.

1.125.    **Subordinated Securities Claim** means a Claim subject to subordination under section 510(b) of the Bankruptcy Code, and any Claim for or that arises from the rescission of a purchase, sale, issuance or offer of a Security of any of the Debtors, or for damages arising from the purchase of sale of such a Security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

1.126.    **Subsidiary Reorganized Debtors** means all of the Reorganized Debtors other than Reorganized UC Holdings (and, for the avoidance of doubt, other than Chassix Holdings).

1.127.    **Tax Code** means the Internal Revenue Code of 1986, as amended from time to time.

1.128.    **Trade Claim Distribution** means $1,000,000, in Cash, which shall be distributed on a Pro Rata basis to holders of Allowed General Unsecured Trade Claims pursuant to Section 4.5 below.  For the avoidance of doubt, the foregoing monies shall be reserved by the Debtors, or the Reorganized Debtors, as the case may be, but shall not be held in a segregated account.

1.129.    **UC Holdings** means UC Holdings, Inc.

1.130.    **Unimpaired** means, with respect to a Claim, Interest or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.131.    **Unsecured Note Claim** means any General Unsecured Claim, derived from, based upon, relating to or arising from the Unsecured Note Indenture.

1.132.    **Unsecured Noteholder Common Stock Distribution** means shares of New Common Stock representing 2.5% of the New Common Stock (subject to dilution by the Management Incentive Plan and, to the extent applicable, the exercise of the New Warrants) to be distributed in accordance with, and subject to the conditions set forth in, Section 4.4 below.

1.133.    **Unsecured Noteholders** means the holders of the Unsecured Notes.

1.134.    **Unsecured Note Indenture** means that certain indenture, dated December 13, 2013, as amended, supplemented or otherwise modified from time to time, between Chassix Holdings, as issuer, and Delaware Trust Company, as successor trustee.

1.135.    **Unsecured Note Indenture Trustee** means Delaware Trust Company, in its capacity as trustee under the Unsecured Note Indenture.

13

1.136.  **Unsecured Notes** means the 10% / 10 3/4% senior unsecured PIK toggle notes due 2018 of Chassix Holdings issued pursuant to the Unsecured Note Indenture.

1.137.  **Voting Record Date** means 5:00 p.m. Eastern Time on the first day of the hearing to approve the Disclosure Statement.

### B.      Interpretation; Application of Definitions and Rules of Construction.

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived or modified from time to time.  The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained therein.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### C.      Reference to Monetary Figures

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

### D.      Controlling Document

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document).  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; provided that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

### SECTION 2.      ADMINISTRATIVE AND PRIORITY CLAIMS.

2.1.  **Administrative Claims**.

Except to the extent that a holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors agree to different treatment, the Debtors (or the Reorganized Debtors, as the case may be) shall pay to each holder of an Allowed Administrative Claim Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Claim becomes an Allowed Claim; provided that Allowed Administrative Claims representing liabilities

14

incurred in the ordinary course of business by the Debtors, as Debtors In Possession, or liabilities arising under loans or advances to or other obligations incurred by the Debtors, as Debtors In Possession, whether or not incurred in the ordinary course of business, shall be paid by the Debtors or the Reorganized Debtors, as the case may be, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

2.2.    *Fee Claims.*

All entities seeking an award by the Bankruptcy Court of Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred not later than the date that is forty-five (45) days after the Effective Date, (b) shall be paid in full, in Cash, the Allowed Amount of their respective Allowed Fee Claims (i) upon the later of (A) the Effective Date and (B) the date on which the order Allowing such Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or, on and after the Effective Date, the Reorganized Debtors.  The Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval, including those of the Creditors Committee to the extent the Creditors Committee is still in existence.

2.3.    *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Debtors or the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or (b) equal annual Cash payments (commencing on the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course) in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years after the Commencement Date; provided that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option.

2.4.    *DIP Claims.*

On the Effective Date, the Revolving DIP Facility will either be converted into the Revolving Exit Facility or paid in full, in Cash, using the proceeds of the Revolving Exit Facility.

On the Effective Date, the DIP Term Loan will either be converted into the Exit Term Loan or paid in full, in Cash, using the proceeds of the Exit Term Loan.

2.5.    *Prepetition Revolving ABL Facility Claims.*

All obligations and claims in respect of or arising under the Prepetition ABL Credit Agreement, including the cash collateralization and letters of credit outstanding thereunder as of the Effective Date, shall be paid in full, in Cash, by the Debtors using the proceeds of the Revolving DIP Credit Facility and the DIP Term Facility on the date the Interim DIP Order is entered by the Bankruptcy Court.

WEIL:\95270840\1\35076.0003

## SECTION 3.    CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1.    *Summary of Classification*

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Fee Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Section 3.  The classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes; such Classes shall be treated as set forth in Section 3.3.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 3 | Secured Note Claims | Impaired | Yes |
| 4 | Unsecured Note Claims | Impaired | Yes |
| 5 | General Unsecured Trade Claims | Impaired | Yes |
| 6 | Other General Unsecured Claims | Impaired | Yes |
| 7 | Intercompany Claims | Unimpaired | No (presumed to accept) |
| 8 | Intercompany Interests | Unimpaired | No (presumed to accept) |
| 9 | Subordinated Securities Claims | Impaired | No (deemed to reject) |
| 10 | Existing Chassix Holdings Equity Interests | Impaired | No (deemed to reject) |

### 3.2.    *Special Provision Governing Unimpaired Claims*.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Reorganized Debtors in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.3.    *Elimination of Vacant Classes*.

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

16

SECTION 4.    TREATMENT OF CLAIMS AND INTERESTS.

4.1.    *Other Priority Claims (Class 1).*

(a)    *Classification*:  Class 1 consists of Allowed Other Priority Claims.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Other Priority Claim has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Claim, in each case, or as soon as reasonably practical thereafter.

(c)    *Voting*:  Class 1 is Unimpaired, and the holders of Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

4.2.    *Other Secured Claims (Class 2).*

(a)    *Classification*:  Class 2 consists of Allowed Other Secured Claims.  To the extent that Allowed Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Other Secured Claim has agreed to less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim shall receive (i) payment in full in Cash on the Effective Date or as soon thereafter as practicable, (ii) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment as is necessary to satisfy section 1129 of the Bankruptcy Code.

(c)    *Voting*:  Class 2 is Unimpaired, and the holders of Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

4.3.    *Secured Note Claims (Class 3)*

(a)    *Classification*:  Class 3 consists of Allowed Secured Note Claims.

(b)    *Allowance*:  The Allowed Secured Note Claims are Allowed in the amount of $396,192,637.24 (including accrued and unpaid interest as of the Commencement Date), plus any other amounts and obligations payable under the Secured Note Indenture as of the Commencement Date,  and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

(c)    *Treatment*:  Pursuant to the Global Settlement set forth in Section 5.2, and subject to, and in accordance with, Section 5.16 below, on the Effective Date, each holder of an Allowed Secured Note Claim shall be entitled to receive, in full and final satisfaction of such Allowed Secured Note Claim, its Pro Rata share of the Secured Noteholder Common Stock Distribution; provided that if (i) the Global Settlement is not approved by a Final Order or (ii) either the Class of General Unsecured Trade Claims or the Class of Other General Unsecured Claims does not vote to accept the

17

Plan, the Secured Noteholder Common Stock Distribution shall increase to 100% of the New Common Stock (subject to dilution by the Management Incentive Plan).

(d)    *Voting*:  Class 3 is Impaired, and holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

4.4.    ***Unsecured Note Claims (Class 4).***

(a)    *Classification*:  Class 4 consists of Allowed Unsecured Note Claims.

(b)    *Allowance*:  The Allowed Unsecured Note Claims are Allowed in the amount of $161,097,076.61, plus accrued but unpaid interest through the Commencement Date and any other amounts and obligations payable under the Unsecured Note Indenture as of the Commencement Date,  and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

(c)    *Treatment*:  Pursuant to the Global Settlement set forth in Section 5.2 and subject to, and in accordance with, Section 5.16 below, on the Effective Date, each holder of an Allowed Unsecured Note Claim shall be entitled to receive, in full and final satisfaction of such Allowed Unsecured Note Claim, its Pro Rata share of the Unsecured Noteholder Common Stock Distribution and the New Warrants; provided that holders of Allowed Unsecured Note Claims shall receive the foregoing Pro Rata distributions if the Global Settlement is approved or the following conditions occur:

(i)    the holders of Allowed Class 4 Unsecured Note Claims vote to accept the Plan; and

(ii)    each sub-class of Class 5 General Unsecured Trade Claims and Class 6 Other General Unsecured Claims votes to accept the Plan.

In the event the Bankruptcy Court determines that the Global Settlement cannot be approved and each of the foregoing conditions has not been satisfied, holders of Allowed Unsecured Note Claims shall not receive or retain any property under the Plan.

(d)    *Voting*:  Class 4 is Impaired, and holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

4.5.    ***General Unsecured Trade Claims (Class 5).***

(a)    *Classification*:   Class 5 consists of Allowed General Unsecured Trade Claims.

(b)    *Treatment*:   Except to the extent a holder of an Allowed General Unsecured Trade Claim has agreed to less favorable treatment or has been paid prior to the Effective Date, including pursuant to any Final Order, each holder of an Allowed General Unsecured Trade Claim shall receive its Pro Rata share of the Trade Claim Distribution, in Cash, in full and final satisfaction of such holder's Allowed General Unsecured Trade Claim on the following distribution schedule: (i) ten percent (10%) payable on the Effective Date or as soon as practicable thereafter; (ii) forty-five percent (45%) payable one year after the Effective Date; and (iii) forty-five percent (45%) payable two years after the Effective Date; provided that any holder of an Allowed General Unsecured Trade Claim that enters

18

into an agreement with the Debtors (or the Reorganized Debtors, as applicable) to extend Customary Trade Terms shall receive its Pro Rata share of the Trade Claim Distribution and, in addition, its Pro Rata share of the Additional Trade Claim Distribution on the same schedule set forth above in this Section 4.5(b).

(c)    *Voting*:  Class 5 is Impaired, and holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

4.6.    ***Other General Unsecured Claims (Class 6).***

(a)    *Classification*:  Class 6 consists of Allowed Other General Unsecured Claims.

(b)    *Treatment*:  Except to the extent a holder of an Allowed Other General Unsecured Claim has agreed to less favorable treatment, on the Effective Date or as soon thereafter as is reasonably practicable, each holder of an Allowed Other General Unsecured Claim shall receive the following treatment:

(i)    for any sub-class of Other General Unsecured Claims that votes to accept the Plan of any individual Debtor, each holder of an Allowed Other General Unsecured Claim in such accepting sub-class shall receive its Pro Rata share of the General Unsecured Claim Distribution; and

(ii)    in the event any sub-class of Other General Unsecured Claims votes to reject the Plan with respect to any individual Debtor, the holders of Allowed Other General Unsecured Claims in such a rejecting sub-class shall not receive or retain any property under the Plan on account of such Claims, including, for the avoidance of doubt, any Pro Rata share of the General Unsecured Claim Distribution.  For the avoidance of doubt, to the extent any sub-class of Other General Unsecured Claims votes to reject the Plan and, therefore, is not entitled to receive any portion of the General Unsecured Claim Distribution, such Pro Rata portion attributable to the rejecting sub-class shall be reallocated to the holders of Other General Unsecured Claims in other sub-classes that have voted to accept the Plan.

(c)    *Voting*:  Class 6 is Impaired, and holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

4.7.    ***Intercompany Claims (Class 7).***

(a)    *Classification*:  Class 7 consists of Allowed Intercompany Claims.

(b)    *Treatment*:  On the Effective Date or as soon thereafter as is practicable, the Intercompany Claims may be extinguished or compromised by distribution, contribution or otherwise, or Reinstated, at the discretion of the Debtors or the Reorganized Debtors, as the case may be, on or after the Effective Date; provided that all Intercompany Claims held by Chassix against Diversified Machine, Inc. (whether or not represented by a note) shall be contributed by Chassix to the capital of Diversified Machine, Inc. in accordance with Section 5.16 of the Plan.

19

(c)    *Voting*:  Class 7 is Unimpaired, and the holders of Class 7 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

4.8.    ***Intercompany Interests (Class 8).***

(a)    *Classification*:  Class 8 consists of Intercompany Interests.

(b)    *Treatment*:  The Intercompany Interests will be Unimpaired under the Plan.

(c)    *Voting*:  Class 8 is Unimpaired, and the holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

4.9.    ***Subordinated Securities Claims (Class 9).***

(a)    *Classification*:  Class 9 consists of Subordinated Securities Claims.

(b)    *Treatment*:  The holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Claims.

(c)    *Voting*:  Class 9 is Impaired by the Plan, and the holders of the Subordinated Securities Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Plan.

4.10.    ***Existing Chassix Holdings Equity Interests (Class 10)***

(a)    *Classification*: Class 10 consists of Existing Chassix Holdings Equity Interests.

(b)    *Treatment*:  On the Effective Date, all Existing Chassix Holdings Equity Interests, including all equity, warrants, common stock, and preferred stock, shall be cancelled.

(c)    Class 10 is Impaired by the Plan, and the holder of Existing Chassix Holdings Equity Interests is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the holder of Existing Chassix Holdings Equity Interests is not entitled to vote to accept or reject the Plan.

## SECTION 5.    MEANS FOR IMPLEMENTATION.

5.1.    ***Compromise and Settlement of Claims, Interests, and Controversies.***

Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, Causes of Action, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made on account of such Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, Causes of Action, and controversies, including without limitation, approval of the Restructuring Support Agreement, the Global Settlement, and the

Accommodation Agreements, as well as a finding by the Bankruptcy Court that such compromise or settlement is within the range of reasonableness, in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair and equitable.  In accordance with the provisions of the Plan, pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, prior to the Effective Date, the Debtors, subject to the reasonable consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, and after the Effective Date, the Reorganized Debtors, may compromise and settle Claims against the Debtors or the Reorganized Debtors, as applicable.

5.2.    ***Global Settlement***

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the substantial contribution and value provided by the Consenting Unsecured Noteholders and Platinum Equity, the Plan incorporates a compromise and settlement of numerous Debtor-creditor and inter-creditor issues, in the form of the Global Settlement, designed to achieve an economic settlement of such issues and potential Claims and Causes of Action against the Debtors.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the following compromises or settlements that comprise the Global Settlement, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are within the range of reasonableness, in the best interests of the Debtors, their Estates, their creditors, and other parties-in-interests, and are fair and equitable.  Each provision of the Global Settlement shall be deemed non-severable from each other and from the remaining terms of the Plan.  As set forth in detail herein, the Global Settlement shall be implemented as follows:

(a)    *Platinum Equity.*    On the Effective Date, in full and complete compromise and settlement of any claim that Platinum Equity may assert against the Debtors, the Reorganized Debtors or the Consenting Noteholders, and in consideration of the substantial contribution provided by Platinum Equity to the Debtors' Chapter 11 Cases in the form of, among other things, Platinum Equity's management, consulting and advisory services leading up to and during the Chapter 11 Cases, its agreement to take, or not take, certain actions that could impact the tax attributes of the Reorganized Debtors, its assistance in securing favorable pricing and accommodation terms and conditions for the Debtors in connection with the Chapter 11 Cases, and its participation in prepetition negotiations that facilitated a speedy and consensual Restructuring for the Debtors, Platinum Equity and all Released Parties related thereto shall receive a release pursuant to Sections 10.6 and 10.7 below pursuant to the Global Settlement.

(b)    *Consenting Unsecured Noteholders*.    On the Effective Date, in full and complete compromise and settlement of any claim that the Consenting Unsecured Noteholders may hold against the Debtors, the Reorganized Debtors, Platinum Equity and any Released Parties related thereto, or the Consenting Secured Noteholders, and in consideration of the substantial contribution provided by the Consenting Unsecured Noteholders to the Debtors' Chapter 11 Cases in the form of, among other things, the Consenting Unsecured Noteholders' cooperation in the Debtors' restructuring efforts, the Consenting Unsecured Noteholders' assistance and contribution in prepetition negotiations with the OEM Customers, the contribution by certain of the Consenting Unsecured Noteholders, as DIP Lenders, in the form of the DIP Term Loan, and generally their participation in prepetition negotiations that facilitated a speedy and consensual restructuring for the Debtors, each holder of an Allowed Unsecured Note Claim shall receive its Pro Rata distribution of the Unsecured Noteholder Common Stock Distribution and New Warrants pursuant to the Global Settlement.

21

5.3.    ***Actions of Dharma Holding Corporation and Triomphe Intermediate Holding Corporation***

On and after the Effective Date, Platinum Equity agrees to (A) waive or cause to be waived any stock loss in respect of the stock of UC Holdings and Chassix Holdings pursuant to Treasury regulation § 1.1502-36, and any comparable provision of state or local income tax law, to the extent directed by the Reorganized Debtors, (B) not take, or cause to be taken, any other action that would reduce, limit or otherwise adversely affect the U.S. federal income tax attributes of the Reorganized Debtors, except as consistent with past practice, general cash management, or short term prudent investment, and (C) cooperate with the Reorganized Debtors in connection with any group tax return filings, audits and proceedings with respect to taxable years ending on or prior to, or including, the Effective Date (including jointly managing such filings and proceedings, and not compromising any audit or proceeding without the Reorganized Debtors' consent, such consent not to be unreasonably withheld), provided that reasonable expenses incurred by Platinum Equity at the request of the Reorganized Debtors in connection with this clause (C) shall be borne by the Reorganized Debtors.

5.4.    ***Cancellation of Existing Securities and Agreements.***

Except as expressly provided herein, on the Effective Date, all notes, instruments, certificates evidencing debt of or interests in, the Debtors, including, without limitation, all obligations related to or arising out of the DIP Facilities, the Secured Notes Indenture, the Prepetition Revolving ABL Facility, and the Unsecured Note Indenture shall be cancelled and obligations of the Debtors and the Reorganized Debtors thereunder shall be discharged.

Notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date, the Secured Note Indenture and the Unsecured Note Indenture shall continue in effect solely for purposes of:  (a) enabling holders of Allowed Class 3 Secured Note Claims and Allowed Class 4 Unsecured Note Claims to receive distributions under the Plan; and (b) allowing the Secured Note Indenture Trustee and Unsecured Note Indenture Trustee to make distributions under the Plan; provided that nothing in this section shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order or the Plan or result in any liability or expense to the Reorganized Debtors.

5.5.    ***Corporate Structure.***

On the Effective Date, except as set forth in Section 5.16 below, all Interests, including all equity, common stock, warrants, and preferred stock, in Chassix Holdings shall be cancelled and extinguished and Chassix Holdings shall be dissolved in accordance with Section 5.17 of the Plan.  The equity in the Subsidiary Reorganized Debtors shall be restored.

5.6.    ***Authorization and Issuance of Plan Securities.***

(a)    *Authorization.*  The Debtors, the Reorganized Debtors, and Reorganized UC Holdings, as applicable, are authorized to issue all plan-related securities and documents, including, without limitation, the New Common Stock and, to the extent applicable, the New Warrants, and any options or entitlements to purchase such plan-related securities, without the need for any further corporate, partnership, or limited liability company action.

(b)    *New Common Stock.*  On the Effective Date, subject to securities, tax and other relevant considerations and Section 5.16, the New Common Stock shall be distributed in accordance with the Plan.

22

(c)    *New Warrants*.  On the Effective Date, and subject to the satisfaction of the conditions set forth in Section 4.4(c), the New Warrants will be issued pursuant to the terms of the New Warrant Agreement.

(d)    *Shareholders Agreement*.  Any direct or beneficial recipient of the New Common Stock (including New Common Stock issued pursuant to the exercise of New Warrants, if applicable), including all parties to whom such recipients may sell their New Common Stock in the future and all persons who purchase or acquire such equity in future transactions, shall be party to, or shall be deemed to be bound by, the Shareholders Agreement, the terms of which shall govern Reorganized UC Holdings.

5.7.    **Section 1145 Exemption.**

The issuance and distribution under the Plan of the New Common Stock and the New Warrants, if applicable, shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code or, to the extent the exemption under section 1145(a) of the Bankruptcy Code is not available to any particular recipient, under Section 4(a)(2) and/or Regulation D of the Securities Act of 1933 and/or any other applicable exemptions without further act or action by any Person.

In addition, under section 1145 of the Bankruptcy Code, any Securities issued under the Plan which are exempt from such registration pursuant to section 1145(a) of the Bankruptcy Code will be freely tradable by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (2) compliance with any rules and regulations of the Securities and Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (3) the restrictions, if any, on the transferability of such Securities and instruments; and (4) applicable regulatory approval.

5.8.    **Exit Financing.**

(a)    *Exit Facilities*.  On the Effective Date, the Revolving DIP Facility will be paid in full, in Cash, with the proceeds of, the Revolving Exit Facility with terms and conditions to be negotiated that shall be acceptable to the Debtors and the Required Consenting Noteholders.  On the Effective Date, the DIP Term Loan will be converted into, or paid in full, in Cash, with proceeds of, the Exit Term Loan.

(b)    *Documentation*.  On the Effective Date, documentation evidencing the Revolving Exit Facility and the Exit Term Loan shall be executed and delivered, and the Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Revolving Exit Facility and the Exit Term Loan without the need for any further corporate action or any notice to or order of the Bankruptcy Court and without further action by the holders of Claims or Interests or any other Person.

(c)    *Liens/Security Interests*.    All Liens and security interests granted pursuant to the Exit Facilities are intended to be, and shall be (i) valid, binding, perfected, enforceable, Liens, and security interests in the personal and real property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law and (ii) not subject to avoidance, recharacterization, or subordination under any applicable law.

WEIL:\95270840\1\35076.0003

5.9.    *Intercreditor Agreement.*

Lien priority and enforcement rights with respect to collateral between and among the lenders under the Revolving Exit Facility and the Exit Term Loan, shall be governed by the Intercreditor Agreement on terms to be negotiated.

5.10.    *Reorganized Debtors.*

(a)    *Amended Organizational Documents.* The Amended Organizational Documents shall comply with section 1123(a)(6) of the Bankruptcy Code and shall otherwise be in form and substance satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable. The Amended Organizational Documents shall provide, among other things, that Reorganized UC Holdings, and each of the Subsidiary Reorganized Debtors are privately held companies.

(b)    *Board of Directors of Reorganized UC Holdings.* As of the Effective Date, the term of the current members of the board of UC Holdings shall expire without further action by any person. The initial directors of the New Board shall consist of five (5) members selected by the Consenting Noteholders and may include at least one member of the Debtors' executive management team. The members of the New Board will be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.

(c)    *Directors and Officers of the Reorganized Debtors.* Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date shall serve as the initial officers of each of the respective Reorganized Debtors on or after the Effective Date and in accordance with any employment agreement with the Reorganized Debtors and applicable non-bankruptcy law. After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents. The members of the board of directors and the board of managing members for each of the Reorganized Debtors (other than Reorganized UC Holdings as provided above) shall be determined as set forth in the Amended Organizational Documents and disclosed as required pursuant to section 1129(a)(5) of the Bankruptcy Code.

(d)    *Capital Structure.* From and after the Effective Date, subject to the rights of the stockholders to amend the Amended Organizational Documents, including the Certificate of Incorporation of Reorganized UC Holdings, each of the Reorganized Debtors shall have one class of issued and outstanding common stock.

5.11.    *Bristol Facility*

The Reorganized Debtors shall, on the Effective Date, continue to own and operate the Bristol Facility and shall, without any further notice to or action, order, or approval of the Bankruptcy Court, be authorized to implement any necessary restructuring transactions in connection therewith, <u>provided</u> that the Debtors or the Reorganized Debtors, as the case may be, are authorized, with the consent of the Required Consenting Noteholders, to enter into a transaction pursuant to which the Debtors or the Reorganized Debtors sell the Bristol Facility as long as such a sale transaction does not adversely affect the treatment of any creditor or equity stakeholder under the Plan and is sold for aggregate consideration acceptable to the Debtors and the Required Consenting Noteholders. Any sale of the Bristol Facility shall be made pursuant to section 1123(a)(5)(D) of the Bankruptcy Code and shall be subject to higher and better offers pursuant to bidding procedures approved by the Bankruptcy Court;

24

provided that the sale of the Bristol Facility shall not be a condition precedent to the Effective Date and such sale may not be consummated any earlier than the Effective Date.

5.12.    ***Cancellation of Liens.***

Except as otherwise specifically provided herein, upon the occurrence of the Effective Date, any Lien securing any Secured Claim shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

5.13.    ***Management Employment Matters.***

On the Effective Date, the applicable Reorganized Debtors shall enter into new employment agreements with certain members of the management team and shall implement the Management Incentive Plan which shall provide for the issuance of New Common Stock, in options or restricted units/equity, to management, directors, and employees of the Reorganized Debtors to incentivize their senior management teams.

5.14.    ***Withholding and Reporting Requirements.***

(a)    *Withholding Rights*.    In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case that a distribution of New Common Stock, New Warrants, or other non-Cash property is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    *Forms*.    Any party entitled to receive any property (including Cash) as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Reorganized Debtors (which entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or Form W-8, as applicable, unless such Person is exempt under the Tax Code and so notifies the Disbursing Agent.  If such request is made by the Reorganized Debtors, the Disbursing Agent, or such other Person designated by the Reorganized Debtors and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

WEIL:\95270840\1\35076.0003

5.15.    *Exemption From Certain Transfer Taxes.*

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with this Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under this Plan or the reinvesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in this Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of collateral under the Exit Facilities and (e) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

5.16.    *Restructuring Transactions; Further Transactions.*

On or prior to the Effective Date, the following Restructuring Transactions shall be effectuated in the following order:

(a)    All Intercompany Claims held by Chassix against Diversified Machine, Inc. (whether or not represented by a note) shall be contributed by Chassix to the capital of Diversified Machine, Inc.;

(b)    The Amended Organizational Documents of the Reorganized Debtors shall become effective;

(c)    New Common Stock shall be issued and contributed by Reorganized UC Holdings to Reorganized Chassix in an amount of shares sufficient to satisfy the Secured Noteholder Common Stock Distribution under Section 4.3 of the Plan;

(d)    The Existing UC Holdings Equity Interests held by Chassix Holdings shall be recapitalized into an amount of shares of New Common Stock and New Warrants, if applicable, sufficient to satisfy the Unsecured Noteholder Common Stock Distribution under Section 4.4;

(e)    Concurrently, (i) Chassix Holdings shall transfer to the Unsecured Noteholders, in accordance with Sections 4.4 and 5.2 of the Plan, shares of New Common Stock sufficient to satisfy the Unsecured Noteholder Common Stock Distribution and New Warrants, if applicable, and (ii) Reorganized Chassix shall distribute to the Secured Noteholders in satisfaction and discharge of their Allowed Secured Note Claims, such New Common Stock in accordance with Section 4.3 of the Plan; and

(f)    All Interests in Chassix Holdings shall be cancelled and extinguished in accordance with Section 5.4 and Chassix Holdings shall be dissolved in accordance with Section 5.17 below.

On the Effective Date or as soon as practicable thereafter, the Reorganized Debtors may (i) cause any or all of the Subsidiary Reorganized Debtors to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, (iii) use the proceeds of the Exit Term Loan and Revolving Exit Facility, plus Cash on hand, to pay all Restructuring Expenses, (iv) change the name of one or more of the Reorganized Debtors to such name that may be determined in accordance with applicable law, and (v) engage in any other transaction in furtherance of the Plan, including for tax efficiency reasons; provided that such transactions are not inconsistent with the above Restructuring Transactions or the other terms of the Plan.  Subject to the prior written consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, any such transactions may be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders, members, general or limited partners, or directors of any of the Debtors or the Debtors in Possession.

### 5.17.    *Dissolution of Chassix Holdings.*

On the Effective Date, upon the consummation of the Restructuring Transactions and all other Effective Date distributions and transactions in furtherance of the Plan, Chassix Holdings shall file with the Office of the Secretary of State of Delaware a certificate of dissolution which may be executed by an officer of Chassix Holdings without the necessity of the approval of the board of directors of Chassix Holdings or the holders of Interests in Chassix Holdings, and upon such filing shall be deemed dissolved for all purposes and without the necessity of any other action by Chassix Holdings.  From and after the Effective Date, Chassix Holdings shall not be required to file any documents, or take any other action or receive any approval to withdraw business operations in any state in which Chassix Holdings previously conducted its business operations.  To the extent that any of the foregoing is inconsistent or in conflict with any preexisting organizational or related documents of Chassix Holdings, such documents are deemed amended by the Plan to permit and authorize Chassix Holdings to take the contemplated actions.

### 5.18.    *Effectuating Documents.*

On and after the Effective Date, the Reorganized Debtors and the managers, officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### 5.19.    *Closing of the Chapter 11 Cases.*

After an Estate has been fully administered, the Reorganized Debtors shall promptly seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

## SECTION 6.    DISTRIBUTIONS.

### 6.1.    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the Claims register shall be closed and there shall be no further changes in the record holders of any Claims or Interests.  The Debtors

or the Reorganized Debtors, as applicable, shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date. Other than Claims that are expressly permitted by a Final Order or under the Plan to be filed after the Distribution Record Date, the Debtors or the Reorganized Debtors, as applicable, shall have no obligation to recognize any Claims filed from and after the Distribution Record Date.

6.2.    *Date of Distributions*.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.3.    *Timing of Distributions*.

Except as otherwise provided herein, the Disbursing Agent shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date. Thereafter, the Disbursing Agent shall from time to time determine the subsequent Distribution Dates, which shall occur no less frequently than semi-annually.

6.4.    *Disbursing Agent*.

All distributions hereunder shall be made by Reorganized Chassix (or such other entity designated by Reorganized Chassix), as Disbursing Agent[s], on or after the Effective Date or as otherwise provided herein; provided that the Secured Note Indenture Trustee shall, subject to an acceptable agreements with the Debtors or Reorganized Chassix, serve as Disbursing Agent for Allowed Class 3 Secured Note Claims and the Unsecured Note Indenture Trustee shall serve as Disbursing Agent for Allowed Class 4 Unsecured Note Claims. A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable fees and expenses incurred by such Disbursing Agents shall be reimbursed by the Reorganized Debtors.

6.5.    *Powers of Disbursing Agent*.

A Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (b) make all distributions contemplated hereby and (c) exercise such other powers as may be vested in a Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by such Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.6.    *Delivery of Distributions*.

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders of Allowed Claims. In the event that any distribution to any holder is returned as undeliverable, no further distributions shall be made to such holder unless and until such Disbursing Agent is notified in writing of such holder's then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter. Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts back to the Debtors or Reorganized Debtors, as applicable, and shall not be supplemented with any interest, dividends or other accruals of any kind. Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy

28

Code at the expiration of 180 days from the date of distribution.  After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

### 6.7.    *Manner of Payment Under Plan*.

At the option of the Debtors or the Reorganized Debtors, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

### 6.8.    *Fractional Stock*.

If any distributions of New Common Stock or New Warrants pursuant to the Plan would result in the issuance of a fractional share of New Common Stock or New Warrants, then the number of shares of New Common Stock or New Warrants to be issued in respect of such distribution shall be calculated to one decimal place and rounded up or down to the closest whole share (with a half share rounded up).  The total number of shares of New Common Stock or New Warrants to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in this paragraph.

### 6.9.    *Minimum Cash Distributions*.

The Disbursing Agent shall not be required to make any Initial Distribution or semi-annual distribution of Cash less than $50 to any holder of an Allowed General Unsecured Claim; provided that, if any distribution is not made pursuant to this Section 6.9, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.  The Disbursing Agent shall not be required to make any final distributions of Cash less than $25 to any holder of an Allowed Claim.  If either (a) all Allowed General Unsecured Claims (other than those whose distributions are deemed undeliverable hereunder) have been paid in full or (b) the amount of any final distributions to holders of Allowed General Unsecured Claims would be $25 or less and the aggregate amount of cash available for distributions to holders of Allowed General Unsecured Claims is less than $25,000, then no further distribution shall be made by the Disbursing Agent and any surplus Cash shall be donated and distributed to an I.R.C. § 501(c)(3) tax-exempt organization selected by the Disbursing Agent.

### 6.10.    *Setoffs*.

The Debtors and the Reorganized Debtors may, but shall not be required to, set off against any Claim, any claims of any nature whatsoever that the applicable Debtor or Reorganized Debtor may have against the holder of such Claim; *provided, that* neither the failure to do so nor the allowance of any Claim shall constitute a waiver or release by the applicable Debtor or Reorganized Debtor.

### 6.11.    *Distributions After Effective Date*.

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.12.    *Allocation of Distributions Between Principal and Interest*.

Except as otherwise provided in this Plan, to the extent that any Allowed Secured Note Claim, Allowed Unsecured Note Claim, Allowed General Unsecured Trade Claim or Allowed Other

29

General Unsecured Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

**SECTION 7.    PROCEDURES FOR DISPUTED CLAIMS.**

  7.1. ***Allowance of Claims.***

    After the Effective Date, the Reorganized Debtors shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under this Plan.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

  7.2. ***Objections to Claims.***

    As of the Effective Date, objections to, and requests for estimation of, Claims against the Debtors may be interposed and prosecuted only by the Reorganized Debtors.  Such objections and requests for estimation shall be served and filed (a) on or before the 180th day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended, or (b) such later date as ordered by the Bankruptcy Court.

  7.3. ***Estimation of Claims.***

    The Debtors or Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtors, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

  7.4. ***No Distributions Pending Allowance.***

    If an objection to a Claim is filed as set forth in Section 7.2, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.  Cash in the amount of such Disputed Claims shall be reserved by the Debtors but shall not be held in a segregated account.

WEIL:\95270840\1\35076.0003

7.5.    ***Distributions After Allowance.***

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan on the next Distribution Date after the date that such Disputed Claim becomes an Allowed Claim (whether by Final Order of the Bankruptcy Court or otherwise).   Holders of Disputed Claims that ultimately become Allowed Claims shall not be entitled to payment of interest unless otherwise provided herein, in a Final Order, or required under applicable bankruptcy law.

7.6.    ***Resolution of Claims.***

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.

7.7.    ***Disallowed Claims.***

All Claims held by persons or entities against whom or which any of the Debtors or Reorganized Debtors has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code shall be deemed "disallowed" claims pursuant to section 502(d) of the Bankruptcy Code and holders of such claims shall not be entitled to vote to accept or reject the Plan.   Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtors or the Reorganized Debtors from such party have been paid.

## SECTION 8.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

8.1.    ***General Treatment.***

Effective as of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties are hereby assumed, except for an executory contract or unexpired lease that (a) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (b) is specifically designated as a contract or unexpired lease to be rejected on the Schedule of Rejected Contracts or is otherwise expressly rejected pursuant to the Plan, (c) is the subject of a separate (i) assumption motion filed by the Debtors (with the reasonable consent of the Required Consenting Noteholders) or (ii) rejection motion filed by the Debtors (with the reasonable consent of the Required Consenting Noteholders) under section 365 of the Bankruptcy Code prior to the Confirmation Date, or (e) is the subject of a pending objection regarding assumption, Cure, or "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code or other issues related to assumption of the contract or lease) (each such objection, a "***Cure Dispute***").

8.2.    ***Determination of Cure Disputes and Deemed Consent.***

The Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts and shall serve, within 14 days of the commencement of the Confirmation Hearing, a notice on parties to executory contracts or unexpired leases to be assumed reflecting the Debtors' intention to assume the contract or lease in connection with this Plan and, where applicable, setting forth the proposed cure amount (if any).   The proposed cure amount for any executory contract or unexpired lease not listed on the schedule shall be $0.   Any such schedule of executory contracts to be assumed and the proposed cure amounts contained therein shall be reasonably acceptable to the Required Consenting Noteholders.

WEIL:\95270840\1\35076.0003

To the extent that a Cure Dispute is asserted in an objection filed within fifteen (15) days of service of notice of intent to assume, and properly served on the Debtors, such Cure Dispute shall be scheduled for a hearing by the Bankruptcy Court.  Following resolution of a Cure Dispute by Final Order of the Bankruptcy Court, the applicable contract or lease shall be deemed assumed effective as of the Effective Date, provided that the Debtors reserve the right to reject any contract or lease following entry of a Final Order of the Bankruptcy Court resolving the applicable Cure Dispute by filing a notice indicating such rejection within three (3) Business Days of the entry of such Final Order.

To the extent that an objection is not timely filed and properly served on the Debtors with respect to a Cure Dispute, then the counterparty to the applicable contract or lease shall be deemed to have assented to (a) the Cure amount proposed by the Debtors and (b) the assumption of such contract or lease, notwithstanding any provision thereof that (i) prohibits, restricts or conditions the transfer or assignment of such contract or lease, or (ii) terminates or permits the termination of a contract as a result of any direct or indirect transfer or assignment of the rights of the Debtor under such contract or a change in the ownership or control as contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminated or modifying such contract on account of transactions contemplated by the Plan.

### 8.3.    *Payments Related to Assumption of Contracts and Leases.*

Subject to resolution of any Cure Dispute, any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as the case may be, upon assumption thereof.

Assumption and assignment of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption and/or assignment.  Any proofs of claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other entity.

### 8.4.    *Rejection.*

In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective estates, properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors no later than thirty (30) days after the later of (1) the Confirmation Date or (2) the effective date of the rejection of such executory contract or unexpired lease.  Any such Claims, to the extent Allowed, shall be classified as Class 6 Other General Unsecured Claims.  The Confirmation Order shall constitute the Bankruptcy Court's approval of the rejection of all the leases and contracts identified in the schedule of rejected contracts.

### 8.5.    *Survival of the Debtors' Indemnification Obligations.*

Any obligations of the Debtors pursuant to their corporate charters, bylaws, organizational documents or otherwise (including, without limitation, any applicable indemnification

32

agreements) to indemnify current officers, directors, agents and/or employees with respect to all present and future actions or omissions, suits and proceedings against the Debtors or such directors, officers, agents and/or employees, based upon any act or omission occurring at or prior to the Effective Date for or on behalf of the Debtors shall not be discharged or impaired by confirmation of the Plan or the occurrence of the Effective Date, provided that, for the avoidance of doubt, the Reorganized Debtors shall indemnify officers and directors of the Debtors for any claims or Causes of Action to the fullest extent provided by law pursuant to their respective Amended Organizational Documents and such documents shall not be amended or altered in any way that may diminish or impair the rights of the parties or beneficiaries thereunder that exist or existed as of the Effective Date; provided further that no director shall be indemnified with respect to the issuance of the Unsecured Notes, the use of their proceeds and any events related thereto. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including, without limitation, the "tail policy") in effect as of the Commencement Date, and any directors and officers of the Debtors who served in such capacity at any time before or after the Commencement Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

### 8.6.    *Compensation and Benefit Plans*.

Except as otherwise herein provided, all material employee compensation and Benefit Plans of the Debtors in effect as of the Effective Date shall be deemed to be, and shall be treated as if they were, executory contracts that are to be assumed under the Plan.

### 8.7.    *Insurance Policies*.

All insurance policies pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Reorganized Debtors and shall continue in full force and effect. All other insurance policies shall revest in the Reorganized Debtors. Furthermore, the discharge and release of the Debtors as provided in this Plan, and the re-vesting of property in the Reorganized Debtors, shall not diminish nor impair the enforceability of any insurance policies that may cover Claims against any Debtor or other person or entity.

### 8.8.    *Intellectual Property Licenses and Agreements*.

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the applicable Reorganized Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected hereunder or pursuant to a Final Order, or is the subject of a separate rejection motion filed by the Reorganized Debtors. Unless otherwise provided herein, all other intellectual property contracts, licenses, royalties, or other similar agreements shall revest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such revesting as contemplated herein.

WEIL:\95270840\1\35076.0003

8.9.    *Reservation of Rights.*

Neither the exclusion nor inclusion of any contract or lease on any exhibit, schedule or annex to the Plan or the Plan Supplement, including the Schedule of Assumed Contracts or the Schedule of Rejected Contracts, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that any of the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

Nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## SECTION 9.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.

9.1.    *Conditions Precedent to Confirmation.*

The occurrence of Confirmation is subject to the following conditions precedent:

(a)    the entry of the Disclosure Statement Order;

(b)    the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable;

(c)    the Bankruptcy Court shall have entered the Confirmation Order;

(d)    the Restructuring Support Agreement shall not have been terminated, and shall be in full force and effect;

(e)    the Accommodation Agreements shall not have been terminated, and shall be in full force and effect; and

(f)    the DIP Facilities shall not have been terminated and shall be in full force and effect.

9.2.    *Conditions Precedent to the Effective Date.*

The occurrence of the Effective Date is subject to the following conditions precedent:

(a)    the Definitive Documents shall contain terms and conditions consistent in all material respects with this Plan and the Restructuring Support Agreement and shall otherwise be reasonably satisfactory in all respects to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable;

34

(b)    all actions, documents and agreements necessary to implement and consummate the Plan, including, without limitation, entry into the Definitive Documents, and the Amended Organizational Documents, each in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, and the transactions and other matters contemplated thereby, shall have been effected or executed;

(c)    the Debtors shall enter into the Exit Facilities and the conditions precedent to funding under the Exit Facilities shall have been satisfied or waived;

(d)    subject to Section 12.5 below, any amendments, modifications, or supplements to the Plan (including the Plan Supplement), if any, shall be reasonably acceptable to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable;

(e)    the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred and the Confirmation Order shall not have been stayed, rescinded, vacated or reversed on appeal;

(f)    the Restructuring Support Agreement shall not have been terminated, and shall be in full force and effect;

(g)    the Accommodation Agreements shall not have been terminated, and shall be in full force and effect;

(h)    all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

(i)    all reasonable fees and expenses (including attorney's fees and fees for other retained professionals, advisors and consultants) of the Consenting Noteholders, Platinum Equity, the DIP Agents, and the agents under the Exit Facilities incurred in connection with the Chapter 11 Cases, the negotiation and formulation of the Plan, DIP Facilities and Exit Facilities and related documents, and all transactions set forth herein or necessary to implement and consummate the Plan (whether incurred before or after the Commencement Date) shall have been paid; and

(j)    all conditions precedent listed in (a)-(i) herein occurring prior to July 31, 2015.

9.3.    ***Waiver of Conditions Precedent.***

Each of the conditions precedent in Sections 9.1 and 9.2 may be waived in writing by the Debtors together with the prior written consent of the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

35

9.4.    ***Effect of Non-Occurrence of Effective Date.***

If the conditions listed in Sections 9.1 and 9.2 are not satisfied or waived in accordance with this Section 9, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person or (c) constitute an admission, acknowledgement, offer or undertaking by the Debtors, any of the other Restructuring Support Parties, or any other Person.

## SECTION 10.  EFFECT OF CONFIRMATION.

10.1.    ***Subordinated Claims.***

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

10.2.    ***Vesting of Assets.***

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates, including without limitation, the intellectual property licenses and other agreements referenced above in Section 8.8, shall vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided pursuant to this Plan, the Confirmation Order, or the Exit Facilities.  The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if no cases were ever filed under any chapter or provision of the Bankruptcy Code, except as provided herein.

10.3.    ***Discharge of Claims and Termination of Interests.***

Except as otherwise provided herein, effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such claims from and after the Commencement Date, against the Debtors or any of their assets, property or estates; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Persons shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns and their assets and properties any other Claims and Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

10.4.    ***Term of Injunctions or Stays.***

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or

WEIL:\95270840\1\35076.0003

otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.5.    ***Injunction Against Interference with Plan.***

From and after the Effective Date, all Persons are permanently enjoined from commencing or continuing in any manner, whether directly, derivatively or otherwise, any suit, action or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, suit, judgment, damages, Cause of Action, interest, remedy, or liability whatsoever released or to be released pursuant to the Plan or the Confirmation Order.  For the avoidance of doubt, in connection with such injunction, all Persons are permanently enjoined from (i) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order of any kind whatsoever, (ii) creating, perfecting or enforcing any encumbrance of any kind, (iii) asserting any right of setoff, subrogation or recoupment of any kind, or (iv) commencing or continuing in any manner any action or proceeding of any kind on account of or in connection with or with respect to any claim, demand, liability, obligation, debt, right, suit, judgment, damages, Cause of Action, interest, remedy, or liability whatsoever released or to be released pursuant to the Plan or the Confirmation Order.

10.6.    ***Releases by the Debtors.***

**As of the Effective Date, except for the right to enforce the Plan and the Definitive Documents that remain in effect after the Effective Date, for good and valuable consideration, including, without limitation, the Released Parties' contributions to facilitating the Reorganization and implementing the Plan, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by the Debtors, their Estates and the Reorganized Debtors from (and the Debtors, their Estates, and the Reorganized Debtors are deemed to covenant with, and to, the Released Parties not to sue or otherwise seek recovery from the Released Parties on account of) any and all Claims, Interests, obligations, rights, suits, judgments, damages, Causes of Action (including, without limitation, under any state or federal securities laws), remedies and liabilities whatsoever, including, without limitation, any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, their Estates, or the Reorganized Debtors, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Restructuring, the Reorganized Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any other Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Support Agreement or related agreements, instruments or other documents, the solicitation of votes with respect to the Plan, or upon any other act or omission, transaction, agreement, event or other occurrence taking place from the beginning of time through the Effective Date; <u>provided</u> that no Released Party shall be released from any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto.**

10.7.   *Releases By Holders of Claims and Interests.*

**As of the Effective Date, except for the right to enforce the Plan and the Definitive Documents that remain in effect after the Effective Date and the indemnification obligations that survive the Effective Date, (a) each holder of a Claim or an Interest, other than any holder who both voted to reject the Plan and checked the opt out box on the applicable ballot indicating its wish to opt out of the release provisions set forth in this Section 10.7, and (b) each Released Party shall be deemed to have, conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Reorganized Debtors and the Released Parties from (and are deemed to have covenanted with the Reorganized Debtors and the Released Parties not to sue or otherwise seek recovery from the Reorganized Debtors or the Released Parties on account of) any and all Claims, Interests, obligations, rights, suits, judgments, damages, Causes of Action (including, without limitation, under any state or federal securities laws), remedies and liabilities whatsoever, including, without limitation, any derivative Claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any other Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Support Agreement or related agreements, instruments or other documents, the solicitation of votes with respect to the Plan, or upon any other act or omission, transaction, agreement, event or other occurrence taking place from the beginning of time through the Effective Date; <u>provided</u> that no Released Party shall be released from any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto.**

10.8.   *Exculpation.*

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, cause of action or liability for any claim in connection with or arising out of, the administration of the Chapter 11 Cases, the entry into the Restructuring Support Agreement and related documents and the consummation of the transactions contemplated therein, the negotiation and drafting of the Plan, the solicitation of votes for the Plan, or confirmation or the consummation of the Plan, the funding of the Plan, or the administration of the Plan or the property to be distributed under the Plan, the issuance of Securities under or in connection with the Plan, or any transactions, decisions, actions and/or inactions contemplated by or relating to any of the foregoing, except for willful misconduct or gross negligence, but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtors and the Reorganized Debtors (and each of their respective agents, directors, officers, employees, affiliates, advisors and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting the Exculpated Parties from liability.  Without limiting the generality of the foregoing, the Exculpated Parties shall be entitled to and

38

granted the protections and benefits of section 1125(e) of the Bankruptcy Code. Pursuant to section 105 of the Bankruptcy Code, no holder or purported holder of an Administrative Claim, claim or Interest shall be permitted to commence or continue any Cause of Action, employment of process, or any act to collect, offset, or recover any claim against an Exculpated Party that accrued on or before the Effective Date and that has been released or waived pursuant to this Plan.

10.9.    *Retention of Causes of Action/Reservation of Rights.*

(a)    Except as otherwise provided herein, including Sections 10.6, 10.7 and 10.8, pursuant to section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their estates may hold against any person or entity without the approval of the Bankruptcy Court, including, without limitation, (i) any and all claims against any Person, to the extent such Person asserts a crossclaim, counterclaim and/or claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, their respective Estates, officers, directors or representatives; and (ii) the turnover of any property of the Estates; provided that the Reorganized Debtors shall not retain any claims or Causes of Action against the Released Parties (other than claims or Causes of Action arising out of or relating to any act or omission of a Released Party that (i) is a criminal act, or (ii) constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto, which claims or Causes of Action are hereby preserved). The Reorganized Debtors or their successor(s) may pursue such retained claims, rights, or causes of action, suits or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

(b)    Except as otherwise provided herein, including Sections 10.6, 10.7 and 10.8, nothing contained herein or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff or other legal or equitable defense which the Debtors had immediately before the Commencement Date, against or with respect to any Claim left Unimpaired by the Plan; provided that the Reorganized Debtors shall not retain any claims or Causes of Action against the Released Parties (other than claims or Causes of Action arising out of or relating to any act or omission of a Released Party that (i) is a criminal act, or (ii) constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto, which claims or Causes of Action are hereby preserved). The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses which they had immediately before the Commencement Date with respect to any Claim left Unimpaired by the Plan as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

10.10.    *Solicitation of the Plan.*

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and

39

therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

10.11.  ***Plan Supplement.***

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court by no later than the Plan Supplement Filing Date.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Documents to be included in the Plan Supplement will be posted at the website of the Debtors' notice, claims, and solicitation agent as they become available.  The Plan Supplement shall contain, among other things, substantially final forms of the Amended Organizational Documents, the Schedule of Assumed Contracts, the Schedule of Rejected Contracts, the Exit Term Loan, the Revolving Exit Facility, the Management Incentive Plan, the Shareholders Agreement, the New Warrant Agreement, and, to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code regarding members of the New Board.

10.12.  ***Corporate and Limited Liability Company Action.***

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) the assumption of the Benefit Plans of the Debtors as provided herein, (b) the selection of the managers, directors, and officers for the Reorganized Debtors, (c) the issuance and distribution of the New Common Stock, (d) the entry into the Revolving Exit Facility and the Exit Term Loan, (e) the approval of the Accommodation Agreements, and (f) the issuance and distribution of the New Warrants, and (g) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date), in each case in accordance with and subject to the terms hereof. All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtors, including (w) the Amended Organizational Documents, (x) the Exit Facilities, and (y) the Accommodation Agreements, and (z) any and all other agreements, documents, securities and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Section 10.12 shall be effective notwithstanding any requirements under non-bankruptcy law.

## SECTION 11.  RETENTION OF JURISDICTION.

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date;

(b)    to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(c)    to consider the allowance, classification, priority, compromise, estimation or payment of any Claim;

(d)    to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(e)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(f)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(g)    to hear and determine all applications under sections 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(h)    to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Plan Supplement, or the Confirmation Order or any agreement, instrument or other document governing or relating to any of the foregoing;

(i)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute and consummate the Plan or to maintain the integrity of the Plan following consummation;

(j)    to resolve any matters related to (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor or Reorganized Debtor is party or with respect to which a Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Section 8, any executory contracts or unexpired leases to the Schedule of Rejected Contracts or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(k)    to resolve disputes as to the ownership of any Claim or Interest;

(l)    to hear and determine any matter, case, controversy, suit, dispute, or Cause of Action (i) regarding the existence, nature, and scope of the discharge, releases, injunctions, and exculpation provided under the Plan, and (ii) enter such orders as may be necessary or appropriate to implement such discharge, releases, injunctions, exculpations, and other provisions;

(m)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)    to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

WEIL:\95270840\1\35076.0003

(o)    to adjudicate, decide, or resolve any Causes of Actions and Cure Disputes;

(p)    to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

(q)    to resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid;

(r)    to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(s)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(t)    to enter a final decree closing the Chapter 11 Cases;

(u)    to recover all assets of the Debtors and property of the Estates, wherever located; and

(v)    to hear and determine any rights, Claims or causes of action held by or accruing to Reorganized Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

## SECTION 12.  MISCELLANEOUS PROVISIONS.

### 12.1.    *Payment of Statutory Fees*.

All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date, and by the Reorganized Debtors after the Effective Date until the Chapter 11 Cases are closed.

### 12.2.    *Substantial Consummation*.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 12.3.    *Dissolution of Creditors Committee*.

On the Effective Date, the Creditors Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; provided that the Creditors Committee shall exist, and its professionals shall be retained, after the Effective Date with respect to (a) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; and (b) pending appeals of the Confirmation Order, if any.

### 12.4.    *Request for Expedited Determination of Taxes*.

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods (or portions thereof) ending after the Commencement Date through the Effective Date.

42

12.5.    *Amendments*.

(a)    *Plan Modifications*.  The Plan may be amended, modified or supplemented by the Debtors or the Reorganized Debtors, as applicable, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code; *provided, that* such amendments, modifications, or supplements shall be satisfactory in all respects to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  In addition, after the Confirmation Date, the Debtors or the Reorganized Debtors, as applicable, may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

(b)    *Other Amendments*.  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; provided that such technical adjustments or modifications shall be satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

12.6.    *Revocation or Withdrawal of the Plan*.

The Debtors may not revoke or withdraw the Plan before the Effective Date without the consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable; provided that the Debtors may revoke or withdraw the Plan if such withdrawal is in the exercise of their fiduciary duty or otherwise permitted under the Restructuring Support Agreement.  If the Debtors take such action, the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed to be a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

12.7.    *Severability of Plan Provisions upon Confirmation*.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors (to be made only with the consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted; provided that any such alteration or interpretation shall be acceptable to the Debtors, the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be); and (3) nonseverable and mutually dependent.

43

12.8.    *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

12.9.    *Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

12.10.    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the documents contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, the Exculpated Parties and each of their respective successors and assigns.

12.11.    *Successor and Assigns.*

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

12.12.    *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

12.13.    *Notices.*

All notices, requests and demands to or upon the Reorganized Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)  if to the Reorganized Debtors:

Chassix, Inc.
300 Galleria Officecentre
Suite 501
Southfield, Michigan 48034
Facsimile: (248) 352-0241
Attn:  Bibi N. Di Serio, Esq.

- and -

44

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Ray C. Schrock, P.C.
          Marcia L. Goldstein, Esq.
          Matthew P. Goren, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

(b)  if to Platinum Equity:

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty St.
New York, New York 10005
Attn:    Dennis F. Dunne, Esq.
            Samuel A. Khalil, Esq.
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

(c)  if to the DIP ABL Agent:

Bodman PLC
1901 St. Antoine Street, 6th Floor at Ford Field
Detroit, Michigan 48226
Attn:    Robert J. Diehl, Jr., Esq.
Telephone: (313) 393-7597
Facsimile: (313) 393-7579

(d)  if to the DIP Term Agent:

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, Connecticut 06103
Attn:    Nathan Plotkin, Esq.
Telephone:  (860) 251-5320
Facsimile:  (860) 251-5212

(e)  if to the Consenting Noteholders:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attn:    Andrew N. Rosenberg, Esq.
            Alice Belisle Eaton, Esq.
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

45

(f)  if to the Exit Term Loan Lenders:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attn:    Andrew N. Rosenberg, Esq.
         Alice Belisle Eaton, Esq.
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

After the Effective Date, the Reorganized Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002 and to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to those Persons who have filed such renewed requests.

WEIL:\95270840\1\35076.0003

Dated:  March 12, 2015

New York, New York

Respectfully submitted,

Chassix Holdings and each of the Debtors

By:    /s/ J. Mark Allan
          Name:  J. Mark Allan
          Title:    President

**Exhibit A**

**Accommodation Agreements**

**(without exhibits)**

## ACCOMMODATION AGREEMENT

General Motors LLC ("GM" ), Ford Motor Company ("Ford"),  FCA US LLC f/k/a Chrysler Group LLC ("FCA"), and Nissan North America, Inc. ("Nissan" and together with GM, Ford, and FCA, collectively, the "Customers" and each, individually, a "Customer"), Chassix, Inc., together with its domestic subsidiaries  (collectively, "Supplier" or "Chassix"), UC Holdings, Inc. ("UC Holdings"), PNC Bank, National Association (the "DIP ABL Agent") and Cantor Fitzgerald Securities, solely in its capacity as agent under the DIP Term Facility (the "DIP Term Agent" and together with the DIP ABL Agent, the "DIP Agents") enter into this Accommodation Agreement ("Agreement") on March 11, 2015.  Customers, Supplier, UC Holdings and DIP Agents are collectively referred to herein as the "Parties" and each individually as a "Party."

### RECITALS

A.    Pursuant to various purchase agreements, release requests and/or purchase orders issued by each of the Customers and accepted by Supplier (as such agreements, release requests or purchase orders may be modified from time to time, "Purchase Orders" or individually, a "Purchase Order"), Customers have ordered from Supplier certain component parts, service parts and assembled goods (collectively, "Component Parts" or individually, a "Component Part").

B.    Supplier faces certain financial difficulties that threaten to interrupt the supply of Component Parts to Customers.  In connection therewith, Supplier requested that each of the Customers provide various financial and other interim accommodations to Supplier to facilitate a potential restructuring of Supplier's business operations and capital structure.   Effective December 31, 2014, the Customers and Chassix entered into that certain Term Sheet For Proposed Interim Accommodations attached hereto as Exhibit A (as amended, modified or supplemented from time to time, including, without limitation, pursuant to that certain First Amendment dated as of February 6, 2015, the "Interim Accommodation Term Sheet").

C.    Supplier intends to undertake a financial restructuring and recapitalization (the "Restructuring"), which is anticipated to be effected through a solicitation of votes for a plan of reorganization for Supplier, in substantially the form attached hereto as Exhibit B, or such other plan of reorganization so long as such other plan is reasonably acceptable to the Customers (as compared to the terms of the plan attached hereto as Exhibit B) (each such plan, the "Acceptable Plan"), and the commencement by Supplier of voluntary cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

D.    Pursuant to the terms of the proposed DIP order attached hereto as Exhibit C (the "Proposed DIP Order"): (a) the DIP ABL Agent, acting as administrative agent for a syndicate of banks, financial institutions and other institutional lenders (the "ABL DIP Lenders"), has agreed to provide to Supplier an approximate $150 million consensual, priming debtor-in-possession financing facility (collectively, the "DIP ABL Facility") pursuant to that certain Superpriority Secured Debtor-In-Possession ABL Loan, Security and Guaranty Agreement (the "DIP ABL Credit Agreement") in connection with the Chapter 11 Cases; and (b) the DIP Term Agent,

acting as administrative agent for a syndicate of banks, financial institutions and other institutional lenders reasonably acceptable to Chassix and the Customers (the "DIP Term Lenders"), has agreed to provide to Supplier an approximate $100 million consensual, priming debtor in possession financing facility (collectively, the "DIP Term Facility" and together with the DIP ABL Facility, the "DIP Facilities") pursuant to that certain DIP Term Loan Facility (the "DIP Term Credit Agreement" and together with the DIP ABL Credit Agreement, the "DIP Credit Agreements") in connection with the Chapter 11 Cases.

E.    Subject to the terms and conditions of this Agreement, Customers have agreed to provide to Supplier the accommodations set forth in this Agreement, which replaces the Interim Accommodation Term Sheet in its entirety as of the Effective Date (as defined below) except to the extent expressly provided in this Agreement.

**BASED UPON THE FOREGOING RECITALS** and other good and valuable consideration, the receipt and adequacy of which are acknowledged, the Parties agree as follows:

### *TERMS AND CONDITIONS*

1.    **Conditions to Effectiveness.**  This Agreement will become effective (the date of such effectiveness, the "Effective Date") only upon the timely satisfaction of each of the following conditions:

(a)    Execution of this Agreement by all of the Parties;

(b)    Supplier's delivery to the Customers of a fully executed copy of an Access Agreement (the "Access Agreement") substantially in the form attached hereto as Exhibit D; and

(c)    Supplier obtaining entry of one or more orders of the Bankruptcy Court (i) approving this Agreement and the Access Agreement as postpetition agreements binding on Supplier, and (ii) authorizing Supplier to use cash collateral and approving the DIP Facilities on terms substantially similar to those set forth in the Proposed DIP Order.

2.    **Term.**  For purposes of this Agreement, the "Term" shall mean, unless otherwise extended by written agreement of the Parties, the period from the Effective Date through the earliest to occur of (a) a Section 8 Termination (as defined in Section 8), (b) the effective date of the Acceptable Plan, and (c) July 31, 2015 (the occurrence of any one of these events triggers the ("Termination Date")).

3.    **Customers' Accommodations.**

3.1.





WEIL:\95233664\30\35076.0003



3.2.    <u>Sale of the Bristol Facility</u>.  Subject to the terms of the Acceptable Plan, Supplier will give reasonable and due consideration to any offers presented to Supplier by any Customer, or other parties reasonably acceptable to Supplier and the DIP Agents, for the purchase of the Bristol Facility. Supplier agrees to consult in good faith with the Customers in connection with sale process for the Bristol Facility, including with respect to the scope of information to be provided to prospective purchasers in connection with such process. For the avoidance of doubt, except to the extent provided in an Acceptable Plan, Supplier shall not be required to solicit offers for, or otherwise market (in each case, whether formally or informally), the sale of any of its assets or facilities, including, the Bristol Facility.  If, during the Term, a Customer purchases the Bristol Facility, such purchasing Customer hereby agrees (on behalf of itself and its designees(s)) to produce parts for the other customer(s) of the Bristol Facility for a period of time of no more than 195 days subject to (a) the terms of the Access Agreement as if the Customer had exercised its Right of Access and the customers receiving component parts from the Bristol Facility agreeing that their obligations and rights are governed by the terms of the Access Agreement, (b) the necessary tangible personal property being available and (c) the applicable customer agreeing to indemnify and hold the purchasing Customer and its designee(s)

4

harmless from any and all liability arising from or related to the production of the parts for the customer, including any warranty and product liability associated with the parts produced**.**

3.3.    Limitation of Setoffs.

(a)    Each of the Customers waives (and, if and only if, included as Eligible Accounts as defined in the DIP ABL Credit Agreement (or which would have been Eligible Accounts but for the application of any aging or cross-aging eligibility criteria), waives for its respective foreign and domestic subsidiaries and affiliates that are part of the Borrowing Base under the DIP ABL Credit Agreement), subject to Section 10 (i) except for Allowed Setoffs (as defined below), any right of setoff, recoupment or deduction not previously exercised as of December 31, 2014 against any bona fide accounts at the prices agreed between Supplier and Customer owing to Supplier as of the Effective Date, and (ii) except for Allowed Setoffs (as defined below), Material Setoffs (as defined below) and Tooling Setoffs (as defined below), any of its rights of setoff, recoupment or deduction against any bona fide accounts at the prices agreed between Supplier and Customer owing to Supplier that arise during the period commencing on the Effective Date and ending on the date that is ten (10) business days after the end of the Term (any accounts described in this Section 3.3(a) being "Accounts Payable").

(b)    The term "Allowed Setoffs" means valid setoffs, recoupment or deduction for defective or non-conforming parts, quality problems, and fees relating to the non-operational professionals incurred by a Customer; provided, however, that Allowed Setoffs shall not include any setoff for amounts with respect to the Bristol Surcharge, the Premium Freight Costs, the Outage Costs, the Quality Spill Costs, and the Advisor and Independent Contractor Fees (each as defined in the Interim Accommodation Term Sheet). Allowed Setoffs shall include a Bristol Surcharge Surplus for any Customer if the Company terminates any of its operations or the Bristol Surcharge Termination Date occurs such that there are no future Bristol Surcharge Funds for the immediately succeeding Budget Period as set forth in Section 3.1(d) available for credit.

(c)    The term "Material Setoffs" means setoffs for (i) materials or components delivered to Supplier (but excluding Tooling (as defined below)) or services performed for Supplier, purchased by a Customer from persons other than Supplier or supplied by a Customer to Supplier (either under a materials contract or in order to avoid an interruption in the Customer's production) for use in connection with the production of Component Parts by Supplier for that Customer, or (ii) direct payment(s) to material or service vendors by a Customer for the purchase of materials or components (but excluding Tooling) or services used by Supplier in connection with the production of Component Parts by Supplier for that Customer (either under a materials contract or in order to avoid an interruption in Customer's production) which was supplied under a materials contract or would have been purchased by Supplier but for the vendor's refusal to sell to Supplier and for which Customer has provided Supplier prior written notice of the materials and the amount to be paid to the vendor or purchased by Supplier from Customer, as applicable; provided, that Material Setoffs shall not include any amounts paid by Customer to such vendor with respect to any antecedent obligations of Supplier to such vendor; and provided further, that Customer may only take Material Setoffs against Accounts Payable generated on or after the third business day after Customer gives the DIP Agents notice of such Material Setoff (a "Material Setoff Notice"). Upon receipt of a Material Setoff Notice, the DIP ABL Agent may impose a reserve in the amount of the Material Setoff against the borrowing

WEIL:\95233664\30\35076.0003

base.  Material Setoffs may be taken ten (10) business days after giving Supplier and the DIP Agents notice of the amount paid by Customer.

      (d)    The term "Tooling Setoffs" means setoffs for any payment to a tooling vendor or tooling repairman for all or part of the purchase price or repair price of Tooling (defined below) that is necessary for a Customer's production (existing and future) for which the payment is necessary to secure the release of a valid and perfected lien senior to the DIP Agents against Tooling or is required to obtain possession of Tooling from the tooling vendor or tooling repairman.  Tooling Setoffs may be taken three (3) business days after giving Supplier and the DIP Agents prior written notice of the setoff (a "Tooling Setoff Notice").  Tooling Setoffs may be taken only against the amount owed by a Customer on the associated tool order.  Upon receipt of a Tooling Setoff Notice, the DIP ABL Agent may impose a reserve in the amount of the Tooling Setoff if the associated tooling receivable is included in the borrowing base under the DIP ABL Credit Agreement.  The term "Tooling" means, collectively, all tooling, dies, test and assembly fixtures, gauges, jigs, patterns, casting patterns, cavities, molds, spare parts and documentation, including engineering specifications, test reports and manuals, used by Supplier in connection with its manufacture of Component Parts for the Customers.

      (e)    Notwithstanding the foregoing provisions in this Section 3.3, Allowed Setoffs shall not include any individual setoff, recoupment or deduction that exceeds five percent (5%) (the "Agreed Cap") of the face amount of any respective invoice or group of invoices to be paid in any monthly invoice cycle.  In the event that a setoff is an Allowed Setoff and such Allowed Setoff is limited by the Agreed Cap, the remainder of such Allowed Setoff may be taken against subsequent payments of Accounts Payable; provided that at no time shall the Allowed Setoffs exceed the Agreed Cap of any invoice or group of invoices to be paid in any calendar month.

      (f)    Each of the Customers and Supplier agrees to use best efforts to expedite the resolution of all disputed setoffs, recoupments and deductions.

      (g)    Except as set forth in this Agreement, Customers reserve and do not waive any rights and interests they may have, including the right to assert affirmative claims against Supplier, and the right to cancel or terminate purchase orders or other contracts in accordance with their respective terms and conditions.

      3.4.    Limitations on Resourcing.

      (a) The Customers agree (i) not to resource the production of any Component Parts or programs currently on contract with Supplier or identified as a Future Program in each Customer's respective Component Supply Agreement, except for a Permitted Resourcing (as defined below) and (ii) except as required pursuant to any agreement between the applicable Customer and any Tier 1 supplier in effect on the date hereof, not to instruct, solicit, encourage, propose or coordinate any action that may result in any of Supplier's other customers resourcing their production of any Component Parts or programs currently on contract with Supplier or identified as a Future Program in each Customer's respective Component Supply Agreement.

6

(b) The term "Permitted Resourcing" means the resourcing of Component Parts by any Customer to any party other than Supplier: (i) set forth in each Customer's respective Component Supply Agreement (as amended from time to time during the Term by mutual agreement between the applicable Customer and Supplier) or (ii) resourced after the termination or cancellation of a Purchase Order with respect to such Component Parts either by reason of (A) an uncured material breach of such Purchase Order by Supplier or (B) cancellation of the Purchase Order due to a major refresh or major redesign of the program or the Component Part itself that renders the applicable Component Parts obsolete (unless Supplier has the technical capability to continue the program or the Component Part after taking into account such major refresh or major redesign and subject to any right of last refusal provided under the Component Supply Agreement to which such Customer is a party) (any of the foregoing events, a "Permitted Resourcing Event"); provided, however, Permitted Resourcing shall not include any resourcing due to a material breach arising out of or relating to Purchase Orders fulfilled, directly or through a Tier 1 supplier to a Customer, at the Bristol Facility prior to the Bristol Surcharge Termination Date except for a material breach of a Purchase Order, the consequence of which is a substantial likelihood that a Customer's production will be interrupted.  The Parties reserve all of their respective rights with respect to the allocation of any wind-down costs incurred in connection with any Permitted Resourcing Event.  Nothing in the preceding sentence shall impair the setoff, recoupment, or deduction limitations contained in Section 3.3.

3.5.    Payment Terms.  Commencing on the Effective Date and notwithstanding anything to the contrary in any Purchase Order, each Customer will pay its Accounts Payable in accordance with the payment terms set forth in its Component Supply Agreement.

3.6.    Price Adjustments.  Except with respect to the Bristol Facility prior to the Bristol Surcharge Termination Date, commencing on April 1, 2015, Customers will amend existing Component Part Purchase Orders, as set forth in the applicable Customer's form of Component Supply Agreement attached as an exhibit hereto, to pay directly to Supplier a non-refundable price adjustment (the "Price Adjustment") and shall pay all Price Adjustments without setoff or recoupment, except for Allowed Setoffs.  In the event, during the Term, any Chassix directed supplier attempts to increase piece prices, Chassix and each applicable Customer(s) shall use reasonable best efforts to work together to mitigate the impact of any such proposed increase and, in the event a piece price increase occurs from a Customer directed supplier, unless the treatment of a piece price increase is addressed in another agreement between Chassix and the Customer, Chassix will have the ability to pass through any such change in pricing to the applicable Customer(s) for the life of any current Component Parts.

3.7.    Requirements Contracts.  The Customers and Supplier acknowledge and agree that, unless otherwise provided, the Purchase Orders covered by this Agreement constitute requirements contracts within the meaning of Uniform Commercial Code 2-306.  So long as the Supplier has the requisite production capacity, the Customers shall purchase from Supplier 100% of the requirements for the Component Parts in accordance with the terms of Component Supply Agreements; provided, that such purchase obligation shall not apply to any Component Parts that are dual-sourced by the applicable Customer as of the date hereof (but, for the avoidance of doubt, any such purchases shall be made at levels consistent with past practice).

7

3.8.



3.9.

3.10.  Advisors and Independent Contractors

(a) Supplier and Customers shall agree upon any third-party operation advisors ("Advisors") or independent contractors ("Independent Contractors") retained by Supplier and included within the Bristol Surcharge.  Notwithstanding anything herein to the contrary, during the Term, the fees and expenses of any incremental or additional Advisors or Independent Contractors ("Advisor and Independent Contractor Fees") working exclusively on a particular Customer's Component Part production to be staffed or placed on-site at any of Supplier's facilities on or after December 1, 2014, shall be the sole responsibility of the applicable Customer.  Any costs or expenses incurred in connection with any missed or short releases caused, directly or indirectly, by a Customer's Advisors or Independent Contractors shall be the sole responsibility of the applicable Customer.

(b) Customers shall use commercially reasonable efforts to have each of their respective Advisors and Independent Contractors enter into on-site or similar agreements with Supplier, substantially in the form of the agreement attached hereto as Exhibit E.

3.11.  Tooling Payments.  During the Term, upon presentment of an unpaid invoice from a Tooling supplier, subject to the release of liens on terms reasonably acceptable to

8

each applicable Customer, each applicable Customer shall advance to Supplier (and not to the Tooling supplier, unless in compliance with the Tooling Setoff Notice procedures in Section 3.3(d)) payments for completed Unpaid Tooling (as defined below) which is subject to a Purchase Order (or other operative Tooling release or agreement) issued by such Customer, but if such completed Unpaid Tooling has not been given a part submission warrant, Customer will pay that portion of the unpaid balance necessary for the Customer to have paid 90% of the amount of the Customer's Tooling Purchase Order.

3.12.    Support for Acceptable Plan. Subject to delivery by Supplier to the Customers of a disclosure statement and other solicitation materials for the Acceptable Plan that have been approved by the Bankruptcy Court as having "adequate information" as defined in section 1125 of the Bankruptcy Code and is otherwise in form and substance reasonably acceptable to the Customers (collectively, the "Acceptable Disclosure Statement"), each of the Customers agrees that it shall not, directly or indirectly, (a) object to, delay, impede or take any other action to interfere with acceptance or implementation of the Acceptable Plan, (b) directly or indirectly solicit, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout or plan of reorganization for Supplier other than the Acceptable Plan or (c) otherwise take any action that would in any material respect interfere with, delay or postpone the consummation of the Restructuring except such actions a Customer reasonably believes is necessary to protect the continuity of its production. Each of the Customers further agrees, subject to delivery of an Acceptable Disclosure Statement, to (i) support and take all necessary steps to effectuate the Restructuring, and (ii) (A) to the extent that each of the Customers is entitled to accept or reject the Acceptable Plan pursuant to its terms (regardless of whether a Customer agrees to waive distribution under the Acceptable Plan), vote to accept the Acceptable Plan by delivering its duly executed and completed ballot accepting the Acceptable Plan on a timely basis following the commencement of the Solicitation, and (B) not change or withdraw (or cause to be changed or withdrawn) such vote provided that the Acceptable Plan is not amended or modified in a manner that adversely affects the Customers.

4.    **Supplier's Obligations.**

4.1.    Continue to Manufacture. Supplier will continue to supply the Component Parts for each of the Customers in accordance with the terms of the Purchase Orders, as modified by this Agreement. Supplier agrees to notify each Customer of any threat to continued timely shipment of the applicable Customer's Component Parts promptly upon learning of that threat. Except as specifically provided for in this Agreement, this Agreement is not intended to modify the terms and conditions of any Customer's Purchase Orders, which terms and conditions otherwise remain in full force and effect. Supplier will not reject Customers' Purchase Orders during the Chapter 11 Cases and, on or before the effective date of an Acceptable Plan, will promptly move to assume the Customers' Purchase Orders in the Chapter 11 Cases. Except as set forth in Section 8.2, in the event of any inconsistency between the terms of this Agreement and the terms of the Customers' respective Purchase Orders, the terms of this Agreement will control. Supplier will allocate its capacity and resources equitably among the Customers, with no one Customer receiving priority allocation.

4.2.    Resourcing Cooperation. Subject to the limitations set forth in Section 3.4, Supplier will reasonably cooperate with each Customer in connection with its preparation

for any Permitted Resourcing.   In connection with a Permitted Resourcing, Supplier will cooperate with a Customer's resourcing of production of its Component Parts permitted under this Agreement including, without limitation, (a) allowing a Customer and potential replacement suppliers access to Supplier's manufacturing facilities (subject to reasonable confidentiality protections) to remove all Customer Tooling (as defined below) used in production of the applicable Customer's Component Parts (provided that no Customer Tooling shall be removed prior to a Permitted Resourcing Event) and (b) using its commercially reasonable efforts and the power of the Bankruptcy Court to assign to the applicable Customers certain contracts (to the extent assignable under the Bankruptcy Code) that are related to the Permitted Resourcing and requested by the Customer.

       4.3.    <u>Inventory Bank</u>. During the Term, upon the request of a Customer, Supplier will build for a Customer up to a two-week inventory bank of Component Parts ("<u>Inventory Bank</u>") in accordance with an inventory bank schedule agreeable to that Customer and Supplier; <u>provided</u>, however, that Supplier's obligation to build inventory bank parts will be subject to, among other things, (i) reasonably applied internal capacity limitations (*e.g.*, machine capacity and manpower limitations), (ii) availability of raw materials and supplies, (iii) available financing, and (iv) that such obligation would not adversely affect Supplier.  Supplier will ship Component Parts in each Inventory Bank as they are produced to the location designated by the Customer, and the Customer will pay for those Component Parts in the ordinary course of dealings between the parties.  Supplier will not be required to build an Inventory Bank unless the Customer agrees in advance to pay all documented, additional, out-of-pocket costs incurred by Supplier in manufacturing the Inventory Bank including, without limitation, overtime, shipping, packaging, and storage costs. Supplier will allocate its resources used in building Inventory Banks equitably among Customers and any other customers. Supplier shall give priority to Customers over any other customers not providing accommodations required by <u>Section 3</u>.

       4.4.    <u>Access to Information</u>.   Supplier agrees that Customers, upon giving reasonable advance notice, will have access to Supplier's operations, books and records during normal business hours, and outside normal business hours when reasonably necessary, for the purposes of (a) inspecting and removing, when permitted to do so under this Agreement, all Tooling involved with production of its Component Parts, (b) monitoring production of its Component Parts, (c) meeting with members of senior management of Supplier and with Supplier's outside legal and financial advisors, (d) monitoring steps needed to increase production capacity necessary to meet the terms of all Purchase Orders, and (e) monitoring Supplier's compliance with the terms of this Agreement, the Purchase Orders, and any other agreements between Supplier and Customers.

       4.5.    <u>Reporting and Notice of Adverse Event</u>.   Supplier will provide to Customers (a) a rolling thirteen (13)-week cash flow forecast updated every other week, monthly budget-to-actual reconciliation, monthly financial statements, a statement of monthly accounts receivable and accounts payable agings and (b) the same financial reporting information, borrowing base certificates and collateral reports that it provides to the DIP Agents at the same time the information is provided to the DIP Agents.  As soon as practicable after becoming aware of any lawsuit against Supplier or any action that could interfere with Supplier's ability to perform its obligations under this Agreement, Supplier will notify Customers of the adverse event.

WEIL:\95233664\30\35076.0003

4.6.     <u>Other Customer Accommodations</u>.     Contemporaneous with this Agreement, Supplier is executing an agreement with BMW of North America, LLC ("<u>BMW</u>") to provide accommodations substantially similar to those in <u>Section 3</u>.  To the extent BMW does not provide those accommodations, Supplier will not use any funding supported by Customers' accommodations to manufacture parts or provide services for BMW unless ordered to by a court of competent jurisdiction.

4.7.     <u>License on Intellectual Property</u>.

(a) Notwithstanding anything in this Agreement to the contrary, and in consideration for the accommodations granted by Customers to Supplier under this Agreement, Supplier grants, to Customers and their assignee(s) or designee(s) (i) an irrevocable, fully paid, worldwide non-exclusive license to the Intellectual Property (defined below) owned by Supplier, and (ii) an irrevocable sublicense to the Intellectual Property licensed to Supplier (to the extent that Supplier has the right to grant sublicenses therein) to the extent necessary to make, have made, use, have used, modify, improve, prepare derivative works of, distribute, display, offer to sell, sell, import and do all other things and exercise all other rights in the licensed or sublicensed Intellectual Property for production of the Component Parts ("<u>License</u>"). The License is granted and irrevocable as of the Effective Date but will only be exercisable by a Customer upon (i) resourcing the respective component part in accordance with this Agreement; or (ii) the exercise of the Right of Access (as defined in the Access Agreement). The License granted in (i) and (ii) of the immediately preceding sentence will extend, without limitation, to Customers' production of new vehicles or parts for new vehicles by Customers (or Customers' subsidiaries or affiliates) and service obligations for Customers' previously sold vehicles or parts. Any license granted under this <u>Section 4.7</u> will also apply to any new model year changes, refreshes or follow-on platforms and programs incorporating the Intellectual Property.  This <u>Section 4.7</u> is not intended to limit or otherwise restrict any rights granted to Customers in their Purchase Orders or any other agreement that is in effect on the date hereof, but is intended to expand those rights. Moreover, nothing in this Agreement may be construed as an admission by Customers of the validity of Supplier's claimed rights to Intellectual Property, including an admission that a license is required by Customer to make, have made, sell, offer for sale, and/or import its Component Parts.  Customers will handle the Intellectual Property in accordance with the same practices employed by Customers to safeguard their own intellectual property against unauthorized use and disclosure.  Notwithstanding the foregoing, the License shall expire upon the conclusion of any Occupancy Period exercised under the Access Agreement.

(b) The term "<u>Intellectual Property</u>" means (x) all currently existing registered and applied-for intellectual property owned by Supplier (including, but not limited to, all patents, patent applications, trademark registrations, trademark applications, copyright registrations, and copyright applications), (y) all agreements for intellectual property licensed to Supplier and (z) any other intellectual property used to produce Component Parts (whether or not the intellectual property is identified, including, but not limited to, unregistered copyrights, inventions, discoveries, trade secrets and designs, drawings and data, regardless of whether such items are registerable or patentable in the future, and all related documents and software), that are used in or to produce any Component Parts that Supplier directly or indirectly sells to Customers including, without limitation, everything defined as "intellectual property" (including embodiments of the intellectual property) under 11 U.S.C. §101, as amended from time to time.

11

4.8.    <u>Access Agreement</u>.    Supplier will execute and cause Supplier and its affiliates to execute an Access Agreement in form and substance acceptable to the DIP Agents and Customers substantially in the form of <u>Exhibit D</u> attached hereto.

4.9.    <u>Bankruptcy Court Approval; and Treatment of Claims</u>.

(a) <u>Bankruptcy Court Approval</u>.    Supplier shall seek entry of an order by the Bankruptcy Court approving the terms of this Agreement and the Access Agreement on an expedited basis.

(b) <u>Treatment of Customer Claims under the Acceptable Plan</u>.    As a settlement and compromise among the Parties, the Customers shall have allowed claims in the Chapter 11 Cases (collectively, the "<u>Customer Claims</u>") in total aggregate amounts to be set forth in a schedule to be filed with the Bankruptcy Court in advance of the court's final approval of this Agreement, and shall not assert any other claims in the Chapter 11 Cases. So long as this Agreement remains in effect, the Customer Claims shall be allowed claims in the Chapter 11 Cases; <u>provided</u>, <u>however</u>, that so long as no Event of Default under this Agreement occurs (other than under <u>Section 8.1(g)</u>) and Supplier otherwise complies with the terms of this Agreement and Access Agreement, the Customers agree to waive any and all rights to a recovery or distribution from Supplier under the Acceptable Plan, or otherwise in connection with the Restructuring, on account of the Customer Claims.    The foregoing shall not impair in any way the Customers' rights to defend any challenge or objection to their Customer Claims.    The Customers shall retain any claims that may arise or accrue after the commencement of the Chapter 11 Cases (other than claims related to the Bristol Surcharge), including any claims that result from the occurrence of an Event of Default under this Agreement (other than under <u>Section 8.1(g)</u>) or Supplier's failure to comply with the terms of this Agreement or the Access Agreement, and those claims shall not constitute Customer Claims subject to this <u>Section 4.9(b)</u>.

5.    **DIP Agents' Accommodations**.

5.1.    <u>Consent and Acknowledgment</u>.    Each of the DIP Agents consents to the Licenses granted in <u>Section 4.7</u> and the Tooling Acknowledgment in <u>Section 7</u>.    The DIP Agents acknowledge and consent to the rights granted to Customers under this Agreement.

5.2.    <u>DIP Lenders' Exercise of Remedies</u>.    The Parties acknowledge that the DIP Agents and DIP Lenders have the right to exercise all their rights and remedies in accordance with an order entered by the Bankruptcy Court approving the DIP Facilities (the "<u>DIP Order</u>") and the DIP Financing Documents (as defined in the Access Agreement) and nothing in this Agreement shall limit or impair any such rights and remedies granted under the DIP Order or the DIP Financing Documents, subject to each Customer's Right of Access (as defined in the Access Agreement) for the duration of the Occupancy Period (as defined in the Access Agreement).

6.    **UC Holdings' Accommodations**.

12

6.1.    Acknowledgment of Customers' Rights.  UC Holdings acknowledges and consents to the rights granted to Customers in this Agreement and will consent to Supplier granting to Customers the rights under the Access Agreement.

## 7.    Tooling Acknowledgment.

7.1.    Definitions.  The term "Unpaid Tooling" means Tooling manufactured for a Customer for which it has not made full payment under the applicable purchase order with Supplier.  The term "Supplier Owned Tooling" means Tooling which Supplier asserts is not owned by Customers and which is not subject to a purchase order issued by Customers.  The term "Customer Tooling" means all other Tooling that is not Unpaid Tooling and/or Supplier Owned Tooling that is used or to be used to manufacture Customers' Component Parts, whether under direct agreements between Supplier and Customers or agreements between Supplier and third parties.

7.2.    Supplier and DIP Agents Tooling Acknowledgment.  Supplier and DIP Agents acknowledge and agree Customer Tooling is (i) subject to the terms of this Agreement, (ii) owned by Customers, and (iii) held as bailee-at-will by Supplier and any third parties to which Supplier has transferred possession of Customer Tooling.

7.3.    Tooling Dispute.  If there is a dispute between Supplier and Customers under this Section 7 regarding whether any Tooling is Customer Tooling, Supplier Owned Tooling or Unpaid Tooling, the disputed Tooling will be presumed to be Customer Tooling, pending resolution of the dispute, provided that the Customer pays into escrow (which will not be subject to DIP Agents' security interests) the lesser of the disputed amount or the unpaid purchase price of such disputed Tooling, and the Customer will have the right to immediate possession of such disputed Tooling (subject to the resourcing limitation, if any, in Section 3.4) and Supplier may not withhold delivery of possession of this Tooling to the Customer pending resolution of the dispute, but the Tooling will remain subject to any claim or right to payment of Supplier for the disputed amount.

7.4.    Unpaid Tooling Obligations Not Modified.  Once the purchase order price of an item of Unpaid Tooling has been paid (whether by payment to Supplier or as a Tooling Setoff), it will be included in the definition of Customer Tooling.  Prior to that time, the Parties reserve their respective rights to determine whether Unpaid Tooling should be treated as Customer Tooling.  Subject to Sections 7.3, nothing in this Agreement modifies Customer's obligations to Supplier on account of Unpaid Tooling.

7.5.    Supplier's Limited Right to Tooling.  Supplier has no right, title or interest in Customer Tooling, other than to possess and use the Customer Tooling solely to manufacture Customers' Component Parts, in Customers' sole discretion.

7.6.    Customers' Right to Repossess Tooling.  Upon an Event of Default (defined in Section 8),  or the resourcing of a Component Part as permitted under this Agreement and produced with Customer Tooling:  (i) Customers and their respective affiliates have the right to take immediate possession of their respective Customer Tooling, without payment of any kind to Supplier, (ii) Supplier agrees to cooperate with Customers in their taking possession of

13

Customer Tooling, and (iii) Supplier agrees to provide access to Customers to remove Customer Tooling; provided, however, that Customers will not unreasonably interfere with Supplier's ongoing manufacturing operations or its production of Component Parts for other customers when removing Customer Tooling; and provided, further, that Customers shall be liable for any damages to Supplier's premises or assets resulting from such access or repossession.

7.7.    Additional Rights.    The acknowledgements, rights and obligations contained in this Section 7 are in addition to (and not in lieu of) the rights of Supplier and Customers under the Purchase Orders or any other agreements between Supplier and Customers..

7.8.    Marking Tooling and Notice.    Supplier grants to Customers permission to record, on Supplier's behalf, any notice and/or financing statements concerning Customer Tooling if Customers determine that it is reasonably necessary to do so to reflect its interests in its Customer Tooling.  Supplier will not interfere with, and will provide access so Customers may affix any plate, stamp, or other evidence of a Customer's ownership upon each item of their Customer Tooling.

## 8.    **Events of Default.**

8.1.    The occurrence of any one or more of the following will constitute an "Event of Default" under this Agreement, unless cured in accordance with the following proviso or a waiver or deferral is agreed to in writing by (i) each of the Customers (or, with respect to the repudiation or material breach of a Purchase Order, as agreed to in writing by the applicable Customer), or (ii) with respect to Section 8.1(g) only, the Supplier and the DIP Agents; provided, that notwithstanding anything contained in this Agreement, neither Customers nor Supplier shall be entitled to assert an Event of Default based upon their own actions; provided, further, that upon the occurrence of an Event of Default, other than a default under subpoint (a) below (where no time to cure shall be allowed), the Party alleging such Event of Default shall provide notice (a "Default Notice") to the defaulting Party and to the other Parties and such defaulting Party shall have three (3) business days to cure such default, to the extent such default is capable of cure:

(a) Supplier repudiates, moves to reject, refuses to perform or breaches its obligations, or such breach becomes inevitable, under the provisions of any Purchase Order or this Agreement the consequence of which is a substantial likelihood that a Customer's production will be interrupted; provided, that through the Bristol Surcharge Termination Date any breach arising out of Purchase Orders fulfilled directly or indirectly at the Bristol Facility shall not constitute an Event of Default unless such breach results in a one-time assembly plant shutdown that is not corrected within twenty-four (24) hours;

(b) Subject to the terms of this Agreement, with the exception of piece price increases from a Customer directed supplier as set forth in Section 3.6, Supplier requires a material modification of the terms of any Purchase Order or this Agreement;

(c) Any ABL DIP Lender commences an affirmative enforcement action against any of the collateral supporting production of the Component Parts if that action materially impacts Supplier's operations or ability to perform under this Agreement, the Access Agreement or any Purchase Order;

14

(d)  If the DIP Lenders cease funding for any reason other than from a failure of the Supplier to satisfy any applicable conditions precedent and the failure is not cured and funding resumed within two (2) business days (which two (2) business days is in addition to the three (3) business days provided in the preamble of this Section 8.1);

(e)  Any DIP Lender commences any action seeking the appointment of a Chapter 11 Trustee, conversion of any one of the Supplier's Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, seeking a lifting of the automatic stay or takes action to repudiate any of the terms of this Agreement;

(f)  The aggregate of actual Bristol operating expenses and capital expenses exceed 120% of the Operating Budget and Capital Expenditures Budget in any month during the Term;

(g)  A Customer fails to perform any material obligation under this Agreement;

(h)  Any one of the Chapter 11 Cases has a Chapter 11 Trustee appointed, is converted to a case under chapter 7 of the Bankruptcy Code, or the automatic stay is lifted to allow a party to take any action which will materially threaten Supplier's ability to provide timely production to the Customers; or

(i)  Supplier fails to file an Acceptable Plan and Disclosure Statement and schedule appropriate hearings in time for the Acceptable Plan to be substantially consummated by July 31, 2015.

8.2.   For the avoidance of doubt, the terms and conditions applicable to any Purchase Order as they relate to a delay in performance of Supplier's obligations due to events beyond its reasonable control shall apply to Supplier's obligations hereunder.

8.3.   Following the occurrence and during the continuance of an Event of Default (which, to the extent applicable,  has not been cured, waived or deferred or, with respect to the repudiation or material breach of a Purchase Order, has not been agreed to in writing by the applicable Customer), a Customer may elect to deliver notice, within five (5) days of the delivery of the applicable Default Notice to each other Party (including Supplier) of its election to terminate the Term ("Termination Notice"), which termination shall be effective two (2) business days (which two (2) business days, other than with respect to a Default under Section 8.1(a), is in addition to the three (3) business days provided in the preamble of Section 8.1) following the delivery of such Termination Notice. Notwithstanding the foregoing, a Termination Notice delivered with or following a Default Notice under Section 8.1(a) shall be effective and termination shall occur immediately upon delivery (unless a longer period is otherwise designated by Customer in the Termination Notice), and in all other cases, a Termination Notice will be effective and termination will occur only after five (5) business days have elapsed following a Default Notice (unless a longer period is otherwise designated by Customer in the Termination Notice) (individually and collectively, a "Section 8 Termination").

9.   **No Further Relief Required.**  Subject to approval of this Agreement by the Bankruptcy Court, no prior relief from the automatic stay in the Chapter 11 Cases shall be

WEIL:\95233664\30\35076.0003

necessary or required for Supplier or a Customer to exercise its rights under this Agreement generally or to deliver the Default Notice or Termination Notice or to pursue its rights and remedies or take any other action afforded the Customer after the giving of the Default Notice or Termination Notice.

10.    **Continuing Obligations**. Unless otherwise provided for in a Component Supply Agreement, Sections 3.1 (which shall continue only until the Bristol Surcharge Termination Date), 3.3, 3.4, 3.6, 3.7 and 3.8, 4.1, 4.2, 4.4, 4.6, 4.7 and 7 of this Agreement shall survive the Term and Termination Date, and such provisions shall continue in full force and effect until the termination of the applicable Purchase Orders; notwithstanding any of the foregoing, Sections 3.3 and 3.6 (as to setoff limitations only) shall continue only for accounts generated through ten (10) business days after the end of the Term.  In the event Supplier and DIP Agents reach an agreement whereby the DIP Facilities (or the DIP ABL Facility alone) are to be converted to exit facilities (the "Exit Facilities") that will continue in full force and effect upon Supplier's exit from chapter 11, then the rights granted to, and the accommodations granted pursuant to Section 3.3 for the benefit of the DIP Agents shall, with respect to any Accounts Payable generated through ten (10) business days after the Termination Date, continue in full force and effect for the benefit of the administrative agents and lenders under such Exit Facilities consistent with the terms of this Agreement.

11.    **Reservation of Rights**.  Unless expressly waived or modified in this Agreement, each Party reserves and does not waive any claims, rights, and remedies that it may have under the Purchase Orders, any other agreements between or among the Parties, or applicable law, and each party expressly reserves all such claims, rights and remedies they have under this Agreement, the Purchase Orders, any other agreements between or among the parties and applicable law.

12.    **Confidentiality**.  The Parties agree that they will not disseminate, disclose or communicate, either directly or indirectly, any of the information contained in or received by virtue of this Agreement to any outside party other than its employees and professional advisors, provided that such outside party is subject to this same confidentiality provision. The Parties will, in good faith, seek to ensure that the contents of this Agreement are kept secret and confidential.  Notwithstanding the foregoing, the Parties acknowledge and agree that Supplier is authorized to file a copy of this Agreement with the Bankruptcy Court in accordance with Section 4.9; provided, however, that Supplier shall take reasonable steps to protect any commercially sensitive information or other confidential trade information, including, without limitation, by filing this Agreement with appropriate redactions or under seal, as determined to be reasonably necessary in consultation with the Customers.

13.    **Notice**.  Any notice or other instrument to be given under this Agreement must be in writing and, except as otherwise provided in this Agreement, will be deemed to be duly given if mailed, delivered by hand or sent by email to the Party to whom the communication is intended to be given and any notice so delivered or sent will be deemed to have been given at the time of service on the day on which it was delivered or sent, and if mailed, will be deemed to be given three (3) days following the date of mailing. Until changed by notice in the manner described above, the addresses of the parties for the purpose of notice will be:

If to Customer:

General Motors LLC
30001 Van Dyke Road
Mail Code: 480-210-880
Warren, MI 48090-9020
Attention:  Mark W. Fischer
Facsimile: (586) 575-3404
Email: mark.w.fischer@gm.com

With a copy (which shall not
constitute notice) to:

Frost Brown Todd LLC
150 Third Avenue South, Suite 1900
Nashville, TN 37201- 2043
Attention:  Robert Sartin, Esq.
Facsimile:  (615) 251-5551
Email:  rsartin@fbtlaw.com

And

General Motors LLC
Vehicle Engineering Center
MC 480-210-855
30001 Van Dyke
Warren, MI 48090-9020
Attention:  Aaron M. Silver
Email:  aaron.silver@gm.com

If to Customer:

Sigmund E. Huber
Global Director, Supplier Relations & Risk
Management
FCA US LLC
CIMS 484-01-26
800 Chrysler Drive
Auburn Hills, MI  48326
Email:  sig.huber@fcagroup.com

17

With a copy (which shall not
constitute notice) to:

Mark Werling
Office of the General Counsel Commercial
Affairs
FCA US LLC
CIMS 485-14-07
1000 Chrysler Drive
Auburn Hills, MI  48326
Facsimile:  (248) 512-4053
Email:  mark.werling@fcagroup.com

and

Dickinson Wright PLLC
500 Woodward Avenue
Suite 4000
Detroit, MI 48226
Attention:  James A. Plemmons, Esq.
Facsimile:  (313) 223-3598
Email: jplemmons@dickinsonwright.com

If to Customer:

Ford Motor Company
1700 Rotunda Drive
Office C135A
Mail Drop RC02
Dearborn, MI 48120-1100
Attention:  Dennis Barrish
Facsimile:
E-mail:  dbarrish@ford.com

With a copy (which shall not
constitute notice) to:

Miller Canfield
150 West Jefferson
Suite 2500
Detroit, MI  48226
Attention:  Stephen S. LaPlante
                   Jonathan S. Green
Facsimile:  (313) 496-8452
E-mail:  laplante@millercanfield.com
             green@millercanfield.com

18

If to Customer:                          Nissan North America, Inc.
                                         One Nissan Way
                                         P.O. Box 685001
                                         Franklin TN  37068
                                         Attention:  Alexander ("Skip") Anderson
                                                     Donald R. Parshall, Jr.
                                         Email:      skip.anderson@nissan-usa.com
                                                     Don.parshall@nissan-usa.com

With a copy (which shall not             Waller, Lansden, Dortch & Davis pllc
constitute notice) to:                   P.O. Box 198966
                                         511 Union Street, Suite 2700
                                         Nashville, TN 37219
                                         Attention: Michael R. Paslay
                                         Email:      mike.paslay@wallerlawcom

If to Supplier or UC Holdings:           Chassix, Inc.
                                         300 Galleria Officecentre
                                         Suite 501
                                         Southfield, MI 48034
                                         Attention:  J. Mark Allan
                                                     Safi Hamid
                                                     Bibi Di Serio
                                         Facsimile:
                                         Email:      mark.allan@chassix.com
                                                     safi.hamid@chassix.com
                                                     bibi.diserio@chassix.com

With a copy (which shall not             Weil, Gotshal & Manages LLP
constitute notice) to:                   767 Fifth Avenue
                                         New York, NY 10153
                                         Attention:  Marcia Goldstein
                                                     Ray C. Schrock
                                         Facsimile: (212) 310-8007
                                         Email:      marcia.goldstein@weil.com
                                                     ray.schrock@weil.com

If to DIP ABL Agent:                     PNC Bank, National Association
                                         Three PNC Plaza, 6th Floor
                                         225 Fifth Avenue
                                         Pittsburgh, PA 15222
                                         Attention:  James Steffy, PNC Business Credit
                                         Facsimile: (412) 768-4369
                                         Email:   james.steffy@pnc.com

19

| | |
|---|---|
| With a copy (which shall not constitute notice) to: | Bodman PLC<br>Sixth Floor at Ford Field<br>1901 St. Antoine Street<br>Detroit, MI 48226<br>Attention:  Robert J. Diehl, Jr.<br>　　　　　Brian R. Trumbauer<br>Facsimile: (313) 393-7579<br>Email:   rdiehl@bodmanlaw.com<br>　　　　　btrumbauer@bodmanlaw.com |
| If to DIP Term Agent: | Cantor Fitzgerald Securities<br>110 East 59th Street – 7th Floor<br>New York, NY 10022<br>Attention:  Nils Horning (Chassix)<br>Facsimile No.: (646) 219-1180<br>E-mail: nhorning@cantor.com |
| With copies (which shall not constitute notice) to: | Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br>Attention:  Brian Kim<br>Facsimile No.: (212) 492-0780<br>Telephone No.: (212) 373-3780<br>E-mail: bkim@paulweiss.com<br><br>Shipman & Goodwin LLP<br>One Constitution Plaza<br>Hartford, CT 06103<br>Attention:  Nathan Plotkin<br>Facsimile No.: (860) 251-5212<br>Telephone No.: (860) 251-5320 |

14.    **General Terms**.

14.1.    The Purchase Orders, this Agreement, together with any other documents executed in connection with this Agreement (including, without limitation, the Access Agreement), constitutes the entire understanding of the Parties in connection with the subject matter of this Agreement. There are no written or oral representations or understandings that are not fully expressed in this Agreement. This Agreement may not be modified, altered or amended except by an agreement in writing signed by all Parties.

14.2.    The individuals executing this Agreement as representatives warrant that they have the power and authority to execute this Agreement on behalf of the corporation or entity that they represent and that their signatures bind the corporations or entities to the terms of this Agreement.

20

14.3.    Supplier must obtain the consent of Customers to assign or transfer, directly or indirectly, any of its rights under this Agreement, which consent shall not be unreasonably withheld in the event the Bristol Facility or any other facility is sold to a third party.    This Agreement is not intended for the benefit of any third parties, including any purchasers of Supplier's assets or other customers of Supplier (other than affiliates of Customers).

14.4.    No delay or failure of any Party to exercise any right, power or privilege hereunder will affect such right, power or privilege, nor will any single or partial exercise thereof preclude any further exercise thereof, nor the exercise of any other right, power or privilege.

14.5.    If any part of this Agreement is for any reason found to be unenforceable, all other parts of this Agreement shall nevertheless remain enforceable.

14.6.    Supplier agrees that it will not enter into any other arrangements or agreements that would in any way materially impair Customers' rights under this Agreement.

14.7.    Supplier is not Customers' agent for any purpose and nothing in this Agreement will be interpreted to designate Supplier as Customers' agent.

14.8.    This Agreement may be executed in any number of counterparts with the same effect as if all signatories had signed the same document. All counterparts must be construed together to constitute one instrument. The Parties agree that their respective signatures may be delivered by facsimile or email, and that facsimile or email signatures will be treated as originals for all purposes.

14.9.    This Agreement shall be governed by, and construed in accordance with, the laws of the state of Michigan, without giving effect to the conflict of laws principles of Michigan. Notwithstanding the foregoing, the Purchase Orders will continue to be governed by the laws provided for in the applicable Purchase Orders.  During the pendency of the Chapter 11 Cases, any action brought in connection with this Agreement shall be brought in the Bankruptcy Court and the Parties hereby consent to the jurisdiction of the Bankruptcy Court.

15.    **REPRESENTATIONS.  EACH PARTY HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL OF ITS CHOICE BEFORE SIGNING THIS AGREEMENT. NO PARTY IS RELYING ON ANY REPRESENTATIONS, WARRANTIES OR COMMITMENTS THAT ARE NOT IN THIS AGREEMENT.  ANY AMBIGUOUS LANGUAGE IN THIS AGREEMENT SHOULD NOT BE CONSTRUED AGAINST ANY PARTICULAR PARTY BECAUSE THAT PARTY DRAFTED THE LANGUAGE.**

16.    **JURY TRIAL WAIVER.  THE PARTIES ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL RIGHT, BUT THAT THIS RIGHT MAY BE WAIVED. BY EXECUTING THIS AGREEMENT, EACH PARTY WAIVES ALL RIGHTS TO A TRIAL BY JURY OF ANY DISPUTES ARISING OUT OF OR IN RELATION TO THIS AGREEMENT OR THE PURCHASE ORDERS.**

*[signatures on next page]*

21

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**

By: _M.Wfrd_

Print Name: _M. W. Fischer_

Title: _Director, Supply Risk Mgt._

**Ford Motor Company**

By: _____

Print Name: _____

Title: _____

**FCA US LLC f/k/a Chrysler Group LLC**

By: _____

Print Name: _____

Title: _____

**Nissan North America, Inc.**

By: _____

Print Name: _____

Title: _____

**PNC BANK, NATIONAL ASSOCIATION**

By: _____

Print Name: _____

Title: _____

**CANTOR FITZGERALD SECURITIES**

By: _____

Print Name: _____

Title: _____

**UC Holdings, Inc.**

By: _____

Print Name:  J. Mark Allan

Title: President

**Chassix, Inc.**

By: _____

Print Name: J. Mark Allan

Title: President and CEO

[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**

By:_____

Print Name:_____

Title:_____

**Ford Motor Company**

By: _M R Jones_____

Print Name: _M R Jones_____

Title: _Purchasing Director____

**FCA US LLC f/k/a Chrysler Group LLC**

By:_____

Print Name:_____

Title:_____

**Nissan North America, Inc.**

By:_____

Print Name:_____

Title:_____

**PNC BANK, NATIONAL ASSOCIATION**

By:_____

Print Name:_____

Title:_____

**CANTOR FITZGERALD SECURITIES**

By:_____

Print Name:_____

Title:_____

**UC Holdings, Inc.**

By:_____

Print Name:  J. Mark Allan

Title: President

**Chassix, Inc.**

By:_____

Print Name: J. Mark Allan

Title: President and CEO

[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**

By: _____

Print Name: _____

Title: _____

**Ford Motor Company**

By: _____

Print Name: _____

Title: _____

**FCA US LLC f/k/a Chrysler Group LLC**

By: _____

Print Name: Sigmund Huber

Title: Director

**Nissan North America, Inc.**

By: _____

Print Name: _____

Title: _____

**DIP ABL Agent**
**PNC Bank, National Association**

By: _____

Print Name: _____

Title: _____

**DIP Term Agent**
**Cantor Fitzgerald Securities**

By: _____

Print Name: _____

Title: _____

**UC Holdings, Inc.**

By: _____

Print Name: _____

Title: _____

**Chassix, Inc.**

By: _____

Print Name: _____

Title: _____

[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**

By:_____

Print Name:_____

Title:_____

**Ford Motor Company**

By:_____

Print Name:_____

Title:_____

**FCA US LLC f/k/a Chrysler Group LLC**

By:_____

Print Name:_____

Title:_____

**Nissan North America, Inc.**

By: *Chandra Vasser*

Print Name: *Chandra Vasser*

Title: *Director, Purchasing*

**PNC BANK, NATIONAL ASSOCIATION**

By:_____

Print Name:_____

Title:_____

**CANTOR FITZGERALD SECURITIES**

By:_____

Print Name:_____

Title:_____

**UC Holdings, Inc.**

By:_____

Print Name:  J. Mark Allan

Title: President

**Chassix, Inc.**

By:_____

Print Name: J. Mark Allan

Title: President and CEO

[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**                            **Ford Motor Company**

By:_____                        By:_____

Print Name:_____                         Print Name:_____

Title:_____                      Title:_____


**FCA US LLC f/k/a Chrysler Group LLC**            **Nissan North America, Inc.**

By:_____                         By:_____

Print Name:_____                         Print Name:_____

Title:_____                      Title:_____


**PNC BANK, NATIONAL ASSOCIATION**                 **CANTOR FITZGERALD SECURITIES**

By: _James M. Steff_                               By:_____

Print Name: _James M. Steff_                       Print Name:_____

Title: _V. President_                              Title:_____


**UC Holdings, Inc.**                              **Chassix, Inc.**

By:_____                         By:_____

Print Name: J. Mark Allan                          Print Name: J. Mark Allan

Title: President                                   Title: President and CEO


[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**                    **Ford Motor Company**

By:_____          By:_____

Print Name:_____          Print Name:_____

Title:_____          Title:_____

Date:_____          Date:_____

**FCA US LLC f/k/a Chrysler Group LLC**    **Nissan North America, Inc.**

By:_____          By:_____

Print Name:_____          Print Name:_____

Title:_____          Title:_____

Date:_____          Date:_____

**PNC Bank, National Association**        **Cantor Fitzgerald Securities**

By:_____          By:_____

Print Name:_____          Print Name: James Bond
                                          Chief Operating Officer

Title:_____          Title:_____

Date:_____          Date:_____

**UC Holdings, Inc.**                    **Chassix, Inc.**

By:_____          By:_____

Print Name:_____          Print Name:_____

Title:_____          Title:_____

Date:_____          Date:_____

[SIGNATURE PAGE FOR ACCOMMODATION AGREEMENT]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**General Motors LLC**

By: _____

Print Name: _____

Title: _____

**Ford Motor Company**

By: _____

Print Name: _____

Title: _____

**FCA US LLC f/k/a Chrysler Group LLC**

By: _____

Print Name: _____

Title: _____

**Nissan North America, Inc.**

By: _____

Print Name: _____

Title: _____

**PNC BANK, NATIONAL ASSOCIATION**

By: _____

Print Name: _____

Title: _____

**CANTOR FITZGERALD SECURITIES**

By: _____

Print Name: _____

Title: _____

**UC Holdings, Inc.**

By: _____

Print Name: J. Mark Allan

Title: President

**Chassix, Inc.**

By: _____

Print Name: J. Mark Allan

Title: President and CEO

**Exhibit B**

**Restructuring Support Agreement**

**(without exhibits)**

EXECUTION COPY

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as amended, supplemented or otherwise modified from time to time, this "Agreement")[1], dated as of March 11, 2015, is entered into by and among (i) Chassix Holdings, Inc. ("Chassix Holdings"), UC Holdings, Inc. ("UC Holdings"), Chassix, Inc. (the "Company") and the direct and indirect subsidiaries of the Company set forth on Schedule 1 annexed hereto (such entities, together with Chassix Holdings, UC Holdings and the Company, the "Chassix Parties") (ii) the undersigned beneficial holders, or investment advisors or managers for the account of beneficial holders (the "Opco Noteholders" and, together with their respective successors and permitted assigns and any subsequent Opco Noteholder that becomes party hereto in accordance with the terms hereof, the "Consenting Opco Noteholders") of the 9 1/4 % Senior Secured Notes due 2018 (the "Opco Notes") issued by the Company, (iii) the undersigned beneficial holders, or investment advisors or managers for the account of beneficial holders (the "Holdco Noteholders" and, together with their respective successors and permitted assigns and any subsequent Holdco Noteholder that becomes party hereto in accordance with the terms hereof, the "Consenting Holdco Noteholders" and together with the Consenting Opco Noteholders, the "Consenting Noteholders") of the 10% / 10 3/4% Senior PIK Toggle Notes due 2018 (the "Holdco Notes") issued by Chassix Holdings, and (iv) Platinum Equity Advisors, LLC, on behalf of certain affiliated entities and investment funds (collectively, the "Consenting Sponsors"). The Chassix Parties, the Consenting Noteholders, and the Consenting Sponsors, collectively, the "Restructuring Support Parties" and together with any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred to herein as the "Parties" and each individually as a "Party."

WHEREAS, the Parties have agreed to undertake a financial restructuring and recapitalization of the Chassix Parties (the "Restructuring"), which is anticipated to be effected through the solicitation of votes for a plan of reorganization for each Chassix Party on terms materially consistent with the Acceptable Plan (as defined below) and reasonably acceptable to the Restructuring Support Parties (the solicitation for such plan, the "Solicitation") and the commencement by each of the Chassix Parties of a voluntary case (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

WHEREAS, as of the date hereof, the Consenting Opco Noteholders hold, in the aggregate, approximately 73% of the aggregate outstanding principal amount of the Opco Notes issued by the Company under that certain Indenture, dated July 23, 2013, by and among the Company, as issuer, UC Holdings and certain of its subsidiaries as guarantors thereto, and U.S. Bank National Association, as trustee (as amended, modified or otherwise supplemented from time to time prior to the date hereof, the "Opco Notes Indenture").

WHEREAS, as of the date hereof, the Consenting Holdco Noteholders hold, in the aggregate, approximately 82% of the aggregate outstanding principal amount of the Holdco Notes issued by Chassix Holdings under that certain Indenture, dated December 13, 2013, by and

---

[1] Any capitalized term that is not otherwise defined herein shall have the meaning ascribed to such term in the Acceptable Plan, in the form attached hereto as Exhibit A.

among Chassix Holdings, as issuer, and U.S. Bank National Association, as trustee (as amended, modified or otherwise supplemented from time to time prior to the date hereof, the "Holdco Notes Indenture").

WHEREAS, the Parties desire to express to each other their mutual support and commitment with respect to the Restructuring, the Acceptable Plan and the matters discussed hereunder.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    Certain Definitions.

As used in this Agreement, the following terms have the following meanings:

(a)    "Acceptable Plan" means a plan of reorganization of the Chassix Parties on terms materially consistent with the plan attached hereto as Exhibit A, or otherwise in a form and substance reasonably satisfactory to the Chassix Parties, the Required Consenting Noteholders and, consistent with the Consenting Sponsor Consent Right, the Consenting Sponsors, further, notwithstanding anything to the contrary herein, the Chassix Parties may amend, modify or supplement the Acceptable Plan, from time to time, (x) without the consent of any of the other Restructuring Support Parties, to cure any ambiguity, defect (including any technical defect), inconsistency or amendment with respect to the treatment of creditors, provided that any such amendments, modifications or supplements do not adversely affect the rights, interests, or treatment of any of the other Restructuring Support Parties under the Acceptable Plan or (y) to the extent any such amendments, modifications or supplements are provided to the other Restructuring Support Parties upon at least three (3) business days prior written notice, and if no objection is received from any Restructuring Support Party within two (2) business days following receipt, the other Restructuring Support Parties shall be deemed to have consented to such amendments, modifications or supplements.

(b)    "Acceptable Disclosure Statement" means a disclosure statement of the Chassix Parties for the Acceptable Plan in a form and substance reasonably satisfactory to the Chassix Parties, the Required Consenting Noteholders and, consistent with the Consenting Sponsor Consent Right, the Consenting Sponsors.

(c)    "Claim" means "claim," as defined in section 101(5) of the Bankruptcy Code, against any Chassix Party.

(d)    "Consenting Sponsor Consent Right" means the Consenting Sponsors' right to consent to or approve documents, actions, or agreements, as applicable, solely to the extent such documents, actions, or agreements alter in any material way any of the rights or benefits proposed to be granted to, or received by, the Consenting Sponsors or any Released Party related thereto, or any obligation the Consenting Sponsors (or any Released Party related thereto) may have, pursuant to the Acceptable Plan, in the form attached hereto.

2

(e)    "Definitive Documents" means the documents and agreements (including any related instruments, schedules or exhibits) that are contemplated by the Acceptable Plan that are otherwise necessary or desirable to implement, or otherwise relate to, the Restructuring and the Acceptable Plan, including, but not limited to, (i) this Agreement, (ii) the Acceptable Plan, (iii) the Acceptable Disclosure Statement, (iv) the materials related to the Solicitation, (v) the order entered by the Bankruptcy Court approving the Acceptable Disclosure Statement and materials related to the Solicitation as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "Disclosure Statement Order"), (vi) definitive documentation for the DIP Facilities and Exit Facilities and all agreements and documentation related or ancillary thereto, (vii) the order entered by the Bankruptcy Court confirming the Acceptable Plan, including all exhibits, appendices and related documents (the "Confirmation Order") and pleadings in support of entry of the Confirmation Order, (viii) any documents included in the Plan Supplement, (ix) any motion and proposed interim and final orders (the "DIP Orders") relating to debtor-in-possession financing and/or use of cash collateral, (x) the Accommodation Agreements, Access Agreement (as defined in the Accommodation Agreement) and the attached component supply agreements (each a "Component Supply Agreement" and collectively, the "Component Supply Agreements") among the Debtors and certain of the OEM Customers entered into in connection with the Accommodation Agreements, (xi) organizational and governance documents (including, without limitation, the organizational and governance documents for the reorganized Chassix Parties), shareholder and member related agreements, or other related transactional or corporate documents (including, without limitation, any agreements and documents described in the Acceptable Plan), and (xii) the motions or pleadings seeking approval or confirmation of any of the foregoing transactional or corporate documents, including the motion to approve the Acceptable Disclosure Statement, confirm the Acceptable Plan, ratify the Solicitation, and scheduling a joint hearing, except as otherwise set forth herein, each of the foregoing in form and substance reasonably satisfactory to the Required Consenting Noteholders and, consistent with the Consenting Sponsor Consent Right, the Consenting Sponsors.

(f)    "Indentures" means the Opco Notes Indenture and the Holdco Notes Indenture.

(g)    "Notes" means the Opco Notes and the Holdco Notes.

(h)    "Required Consenting Noteholders" means the Required Opco Noteholders and the Required Holdco Noteholders.

(i)    "Required Opco Noteholders" means, as of the date of determination, Consenting Opco Noteholders holding at least a majority of the outstanding principal amount of the Opco Notes held by such holders, in the aggregate, as of such date.

(j)    "Required Holdco Noteholders" means, as of the date of determination, Consenting Holdco Noteholders holding at least a majority of the outstanding principal amount of the Holdco Notes held by such holders, in the aggregate, as of such date.

(k)    "Support Effective Date" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by: (i) the Chassix Parties; (ii)

the Consenting Sponsors, and (iii) the Consenting Noteholders holding at least (A) 66.7% in aggregate outstanding principal amount of the Opco Notes, and (B) 66.7% in aggregate outstanding principal amount of the Holdco Notes.

## 2.     **Bankruptcy Process; Plan of Reorganization.**

(a)     Commencement of the Chapter 11 Cases.  Each Chassix Party hereby agrees that, as soon as reasonably practicable, but in no event later than March 11, 2015 (the date on which such filing occurs, the "Commencement Date"), such Chassix Party shall file with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Chapter 11 Case of such Chassix Party.

(b)     Filing of the Acceptable Plan.  On the Commencement Date, the Chassix Parties shall file the Acceptable Plan and the related Acceptable Disclosure Statement with the Bankruptcy Court.

(c)     Confirmation of the Acceptable Plan.  Each of the Chassix Parties shall use its commercially reasonable efforts to obtain confirmation of the Acceptable Plan as soon as reasonably practicable following the Commencement Date in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules of the Bankruptcy Court (the federal and local rules being, the "Bankruptcy Rules") and on terms consistent with this Agreement, and each of the Parties shall use its commercially reasonable efforts to cooperate fully in connection therewith.

(d)     Amendments and Modifications of the Acceptable Plan.  Notwithstanding anything to the contrary herein, the Acceptable Plan may be amended from time to time following the date hereof by written approval of (A) the Required Consenting Noteholders and (B) consistent with the Consenting Sponsor Consent Right, the Consenting Sponsors.  Each of the Restructuring Support Parties agrees to negotiate in good faith all amendments and modifications to the Acceptable Plan as reasonably necessary and appropriate to obtain confirmation of the Acceptable Plan pursuant to a final order of the Bankruptcy Court; provided that the Restructuring Support Parties shall have no obligation to agree to any modification that (i) is inconsistent with the Acceptable Plan in the form attached hereto, (ii) creates any material new obligation on any Restructuring Support Party, or (iii) changes or otherwise adversely affects the rights, interests or treatment of such Restructuring Support Party.

## 3.     **Agreements of the Consenting Noteholders.**

(a)     Agreement to Vote.  So long as this Agreement has not been terminated in accordance with the terms hereof, each Consenting Noteholder agrees that it shall:

(i)     subject to the receipt by such Consenting Noteholder of an Acceptable Disclosure Statement and other solicitation materials in respect of the applicable Acceptable Plan, and approval by the Bankruptcy Court of such Acceptable Disclosure Statement and other solicitation materials as consistent with section 1125 of the Bankruptcy Code, (x) vote its Claims to accept the Acceptable Plan, by delivering its duly executed and completed ballots accepting the Acceptable Plan on a timely basis following the commencement of the Solicitation; provided that such vote shall be

immediately revoked and deemed void *ab initio* upon termination of this Agreement pursuant to the terms hereof; or (y) not change or withdraw (or cause to be changed or withdrawn) any such vote;

(ii)    not (x) object to, delay, impede or take any other action to interfere with acceptance or implementation of the Acceptable Plan and the Restructuring, (y) solicit, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout or plan of reorganization for the Chassix Parties other than the Acceptable Plan or (z) otherwise take any action that would in any material respect interfere with, delay, impede or postpone the consummation of the Acceptable Plan and the Restructuring; and

(iii)    use commercially reasonable efforts through the informal committee of Opco Noteholders and Holdco Noteholders (the "Informal Committee of Noteholders") or otherwise to support and take all reasonably necessary steps to effectuate the Restructuring and consummation of the Acceptable Plan; provided that nothing in this Agreement, including this Section 3, or the transactions contemplated by this Agreement, shall require, other than as set forth in Section 3(a)(i) and (ii), any Consenting Noteholder to make, seek or receive any filings, notifications, consents, determinations, authorizations, permits, approvals, licenses or the like with or provide any documentation or information to any regulatory or self-regulatory bodies having jurisdiction over the Company or the Consenting Noteholders.

(b)    Transfers.

(i)    Each Consenting Noteholder agrees that, for the duration of the period commencing on the date hereof and ending on the date on which this Agreement is terminated in accordance with Section 6, such Consenting Noteholder shall not sell, transfer, loan, issue, pledge, hypothecate, assign or otherwise dispose of (each, a "Transfer"), directly or indirectly, in whole or in part, any of the Claims (including grant any proxies, deposit any Notes or any other claims against or interests in the Chassix Parties into a voting trust or entry into a voting agreement with respect to any such Notes or such other claims against or interests), unless the transferee thereof either (i) is a Consenting Noteholder or (ii) prior to such Transfer, agrees in writing for the benefit of the Parties to become a Consenting Noteholder and to be bound by all of the terms of this Agreement applicable to Consenting Noteholders (including with respect to any and all Claims it already may hold prior to such Transfer) by executing a joinder agreement substantially in the form attached hereto as Exhibit B (each, a "Joinder Agreement"), and delivering an executed copy thereof within two (2) business days following such execution, to (i) Weil, Gotshal & Manges LLP ("Weil"), counsel to the Company, 767 Fifth Avenue, New York, New York 10153 (Attn: Marcia L. Goldstein and Ray C. Schrock) (ii) Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), counsel to the Consenting Sponsors, 28 Liberty Street, New York, New York 10005 (Attn: Dennis F. Dunne and Samuel A. Khalil) and (iii) Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), counsel to the Informal Committee of Noteholders, 1285 6th Avenue, New York, New York 10019 (Attn: Andrew N. Rosenberg and Alice B. Eaton) in which event (A) the transferee (including the Consenting Noteholder transferee, if applicable)

shall be deemed to be a Consenting Noteholder hereunder to the extent of such transferred rights and obligations and (B) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of such transferred rights and obligations; provided,  that this Section 3(b)(i) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker-dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities.  Each Consenting Noteholder agrees that any Transfer of any Claims that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Consenting Noteholder or the Consenting Sponsors shall have the right to enforce the voiding of such Transfer.

(ii)     Notwithstanding Section 3(b)(i): (A) a Consenting Noteholder may Transfer its Notes to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker become a Party; provided that (1) such Qualified Marketmaker must Transfer such right, title or interest within five (5) business days following its receipt thereof, (2) any subsequent Transfer by such Qualified Marketmaker of the right, title or interest in such Notes is to a transferee that is or becomes (by executing a Joinder Agreement and delivering an executed copy thereof to the persons set forth in clause (i) of this Section 3(b)) a Consenting Noteholder at the time of such transfer, (3) such Consenting Noteholder shall be solely responsible for the Qualified Marketmaker's failure to comply with the requirements of this Section 3, and (4) any Transfer that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio* and the Company and each other Consenting Noteholder or the Consenting Sponsors shall have the right to enforce the voiding of such Transfer; and (B) to the extent that a Consenting Noteholder is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interest in the Notes that the Qualified Marketmaker acquires from a holder of the Notes who is not a Consenting Noteholder without the requirement that the transferee be or become a Consenting Noteholder.  For these purposes, a "Qualified Marketmaker" means an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers Claims (including debt securities or other debt) or enter with customers into long and short positions in Claims (including debt securities or other debt), in its capacity as a dealer or market maker in such Claims, and (y) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

(c)     Additional Claims.  This Agreement shall in no way be construed to preclude any Consenting Noteholder from acquiring additional Claims.  Each Consenting Noteholder agrees such additional Claims shall be subject to this Agreement (including the obligations of the Consenting Noteholders under this Section 3) and such acquiring Consenting Noteholder shall promptly notify Weil of such acquisition of Claims.

(d)     Releases. Each Consenting Noteholder shall, as of the Support Effective Date, fully and finally waive, release, acquit and forever discharge Platinum Equity and its Released Parties (including, without limitation, in all of their respective capacities or positions relating to the Debtors) from any and all claims and Causes of Action of any kind or nature

WEIL:\95270837\1\35076.0003

whatsoever (whether class, derivative or individual in nature) whether known or unknown, fixed or contingent, past, present or future, in law or in equity in any way related to the Debtors or the Restructuring (collectively, the "Release"); provided that no Released Party (including Platinum Equity) shall be released from any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Holdco Notes, the use of their proceeds, and any events related thereto.  Such Release shall continue and remain in full force and effect from and after the Support Effective Date, provided that such Release shall terminate and be deemed, for all purposes, to be immediately null and void *ab initio* without any further action if (i) any Consenting Sponsor breaches any of the undertakings, representations, warranties or covenants of this Agreement in any material respect, (ii) any Consenting Sponsor seeks additional consideration except that which is expressly provided for under the Acceptable Plan, (iii) the Chapter 11 Case for the Company or any of the Chassix Parties shall have been converted to a case under chapter 7 of the Bankruptcy Code, or such cases shall have been dismissed by Final Order of the Bankruptcy Court, or (iv) the Bankruptcy Court confirms (by Final Order) a plan of reorganization for the Debtors that (A) provides the Consenting Noteholders with treatment that is materially inconsistent with the Acceptable Plan or that is, in material respects, less favorable to the Consenting Noteholders compared to the treatment provided to the Consenting Noteholders in the Acceptable Plan (a material increase in the proposed principal amount of the DIP Facilities or Exit Facilities being deemed to be "less favorable treatment"), and (B) has not been accepted by Opco Noteholders and Holdco Noteholders, in each case holding at least two-thirds in amount and more than one-half in number of the Opco Notes and Holdco Notes voting on such plan of reorganization.  For the avoidance of doubt, for so long as the Release remains in effect, each Consenting Noteholder agrees and confirms that it shall not (i) exercise any "opt out" right related to the releases in the Acceptable Plan or otherwise object to or challenge the releases in the Acceptable Plan in any way, or (ii) seek to receive, or support any party in seeking to receive, any proceeds arising from, or related to, any claims or Causes of Action or any other litigation or similar action (including, without limitation, any settlement or other resolution related thereto) that is the subject of the Release.

(e)    The foregoing clauses (a) – (d) of this Section 3 will not limit any of the Consenting Noteholders' rights to (i) appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement, or (ii) enforce any rights under this Agreement.

(f)    The Consenting Noteholders agree to cooperate with any tax-related requests of the Consenting Sponsors, including in connection with revising the structure of the Plan, if such revisions would not adversely impact the reorganized Chassix Parties, the Consenting Noteholders or their recoveries.

## 4.    Agreements of the Consenting Sponsors.

(a)    So long as this Agreement has not been terminated in accordance with the terms hereof, each of the Consenting Sponsors, agrees that it shall not (i) object to, delay, impede or take any other action to interfere with acceptance or implementation of the Acceptable Plan and the Restructuring, (ii) solicit, encourage, propose, file, support, participate in the formulation

WEIL:\95270837\1\35076.0003

of or vote for, any restructuring, sale of assets, merger, workout or plan of reorganization for the Chassix Parties other than the Acceptable Plan or (iii) otherwise take any action that would in any material respect interfere with, delay, impede or postpone the consummation of the Acceptable Plan and the Restructuring.

(b)    Each of the Consenting Sponsors, agrees to use commercially reasonable efforts to support and take all reasonably necessary steps to effectuate the Restructuring and consummation of the Acceptable Plan, and each of the Consenting Sponsors agrees, to the extent applicable, to use commercially reasonable efforts to cause the Chassix Parties to timely provide, all requisite consents and approvals to the extent required for the Chassix Parties to file for relief under chapter 11 of the Bankruptcy Code.

(c)    Each of the Consenting Sponsors, agrees that it shall, subject to the receipt by such Consenting Sponsor of an Acceptable Disclosure Statement and other solicitation materials in respect of the Acceptable Plan, and approval by the Bankruptcy Court of such Acceptable Disclosure Statement and other solicitation materials as consistent with section 1125 of the Bankruptcy Code, (i) vote to accept the Acceptable Plan by delivering its duly executed and completed ballot accepting the Acceptable Plan on a timely basis following the commencement of the Solicitation, and (ii) not change or withdraw (or cause to be changed or withdrawn) any such vote; provided that such vote shall be immediately revoked and deemed void *ab initio* upon termination of this Agreement pursuant to the terms hereof.

(d)    Each of the Consenting Sponsors agree to (A) waive or cause to be waived any stock loss in respect of the stock of UC Holdings and Chassix Holdings pursuant to Treasury regulation § 1.1502-36, and any comparable provision of state or local income tax, to the extent directed by the reorganized Chassix Parties, (B) not take, or cause to be taken, any other action that would reduce, limit or otherwise adversely affect the U.S. federal income tax attributes of the reorganized Chassix Parties, except as consistent with past practice, general cash management, or short term prudent investment, and (C) cooperate with the reorganized Chassix Parties in connection with any group tax return filings, audits and proceedings with respect to taxable years ending on or prior to, or including, the Effective Date (including jointly managing such filings and proceedings, and not compromising any audit or proceeding without the reorganized Chassix Parties' consent, such consent not to be unreasonably withheld); provided that reasonable expenses incurred by the Consenting Sponsors at the request of the reorganized Chassix Parties in connection with this clause (C) shall be borne by the reorganized Chassix Parties.

(e)    Transfers. Each Consenting Sponsor agrees that, as long as this Agreement has not terminated in accordance with its terms, it shall not sell, transfer, assign or otherwise dispose of any of its Claims unless the transferee thereof either (i) is a Consenting Sponsor or (ii) prior to such transfer, agrees in writing for the benefit of the Parties to become a Party to this Agreement. Each Consenting Sponsor further agrees not to transfer, abandon or otherwise dispose of, its interests in Dharma Holding Corporation prior to the effective date of the Acceptable Plan. For the avoidance of doubt, this Agreement shall in no way be construed to preclude any Consenting Sponsor from acquiring additional Claims.

8

(f)    The foregoing sub-clauses (a) – (e) of this Section 4 will not limit any of the Consenting Sponsors' rights to (i) appear and participate as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement, or (ii) enforce any rights under this Agreement.

## 5.    Agreements of the Chassix Parties.

(a)    Solicitation and Confirmation.  Each Chassix Party agrees to (i) act in good faith and use reasonable best efforts to support and complete successfully the Solicitation in accordance with the terms of this Agreement, (ii) do all things reasonably necessary and appropriate in furtherance of confirming the Acceptable Plan and consummating the Restructuring in accordance with, and within the time frames contemplated by, this Agreement (including within the deadlines set forth in Section 6), (iii) execute and deliver any required agreements to effectuate and consummate the Restructuring, (iv) obtain any and all required regulatory and/or third-party approvals for the Restructuring, and (v) take no actions materially inconsistent with this Agreement, the Acceptable Plan or the confirmation and consummation of the Acceptable Plan, in each case to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of directors, managers, members or partners, as applicable, of each Chassix Party; provided that no Chassix Party shall be obligated to agree to any modification of any document that is inconsistent with the Acceptable Plan.

(b)    Certain Additional Chapter 11 Related Matters.  Each Chassix Party, as the case may be, shall provide draft copies of all material motions or applications and other documents (including the Acceptable Plan and Acceptable Disclosure Statement, any proposed amended version of such plan or disclosure statement and all "first day" pleadings, or any other plan) any Chassix Party intends to file with the Bankruptcy Court to counsel for the Restructuring Support Parties, if reasonably practicable, at least three (3) days prior to the date when the applicable Chassix Party intends to file any such pleading or other document (and, if not reasonably practicable, as soon as reasonably practicable prior to filing) and shall consult in good faith with such counsel regarding the form and substance of any such pleading or document.

(c)    Restructuring Expenses. The Chassix Parties shall pay, and shall seek under the DIP Orders the authority to pay, when due and payable, the respective reasonable and documented fees and expenses incurred in connection with the Restructuring, including, the reasonable and documented fees, charges and disbursements of such parties limited to (i) one primary counsel for the Informal Committee of Noteholders (Paul Weiss), (ii) one primary financial advisor to the Informal Committee of Noteholders (AlixPartners LLP), (iii) one primary counsel for the Consenting Sponsors (Milbank, Tweed, Hadley & McCloy LLP), (iv) one primary financial advisor to the Consenting Sponsors (Houlihan Lokey Capital, Inc.), and (v) any other professionals that may be reasonably retained by the Informal Committee of Noteholders that may be required in connection with the Restructuring, provided, that, the expenses of Consenting Sponsors' professionals subject to this provision shall not exceed $1,250,000.  All such reasonable and documented fees, expenses and reimbursements incurred and invoiced up to the Commencement Date shall be paid in full prior to the Commencement Date (without deducting any retainers).  For the avoidance of doubt, such fees, expenses and reimbursements

WEIL:\95270837\1\35076.0003

shall be treated as Restructuring Expenses, and the Parties shall not be required to file retention applications, fee applications or any other applications in the Chapter 11 Cases.

### 6.    Termination of Agreement.

(a)    Consenting Noteholder Termination Events.  Unless cured or a waiver or deferral is agreed to in writing by the Required Consenting Noteholders, this Agreement shall automatically terminate three (3) business days following the delivery of written notice from the Required Consenting Noteholders to the other Restructuring Support Parties any time after and during the continuance of any Consenting Noteholder Termination Event.  A "Consenting Noteholder Termination Event" shall mean any of the following:

(i)    The breach in any material respect by any Chassix Party or the Consenting Sponsors of any of the undertakings, representations, warranties or covenants of the Chassix Parties or the Consenting Sponsors set forth herein which breach remains uncured for a period of five (5) business days after the receipt of written notice of such breach from the Required Consenting Noteholders in accordance with Section 22.

(ii)    On March 11, 2015 at 11:59 p.m. (New York time), unless the Chassix Parties have commenced the Chapter 11 Cases.

(iii)    On the date that is five (5) days after the Commencement Date, if the Chassix Parties have not filed the Acceptable Plan and Acceptable Disclosure Statement with the Bankruptcy Court.

(iv)    On the date that is forty-five (45) days after the Commencement Date, if the Bankruptcy Court shall not have entered an order approving the Acceptable Disclosure Statement for the Acceptable Plan.

(v)    The Chassix Parties (a) withdraw the Acceptable Plan or (b) file any motion or pleading with the Bankruptcy Court that is not consistent with this Agreement or the Acceptable Plan and such motion or pleading has not been withdrawn prior to the earlier of (i) two (2) business days after the Chassix Parties receive written notice from the Required Consenting Noteholders (in accordance with Section 22) that such motion or pleading is inconsistent with this Agreement or the Acceptable Plan and (ii) entry of an order of the Bankruptcy Court approving such motion or pleading.

(vi)    June 30, 2015, if the Bankruptcy Court fails to enter an order confirming the Acceptable Plan in form and substance reasonably satisfactory to the Required Consenting Noteholders.

(vii)    July 17, 2015, if the Effective Date for the Acceptable Plan has not occurred (the "Outside Date").

(viii)    An examiner with expanded powers or a trustee shall have been appointed in the Chapter 11 Cases.

WEIL:\95270837\1\35076.0003

(ix)     The Chassix Parties lose the exclusive right to file and solicit acceptances of a chapter 11 plan.

(x)     The Bankruptcy Court grants relief that is inconsistent with this Agreement or the Acceptable Plan in any materially adverse respect to the Required Consenting Noteholders.

(xi)     The Chassix Parties file, propound or otherwise support any plan of reorganization other than the Acceptable Plan, or publicly announce their intention not to pursue the Restructuring, and such plan of reorganization or public announcement has not been withdrawn or otherwise corrected within two (2) business days after the Chassix Parties receive written notice from the Required Consenting Noteholders (in accordance with Section 22) that such plan of reorganization or public announcement is inconsistent with this Agreement or the Acceptable Plan.

(xii)     The Accommodation Agreements, the Access Agreement or any Component Supply Agreement is terminated, or the Bankruptcy Court does not enter an order or orders approving the terms of the Accommodation Agreements, the Access Agreement or any Component Supply Agreement.

(xiii)     An event of default occurs under the DIP Facilities that results in the acceleration of the Chassix Parties' obligations thereunder.

(xiv)     The Revolving DIP Credit Facility is refinanced, extended, renewed, defeased, amended, increased, modified, supplemented, restructured, refunded, replaced or repaid, in whole or in part, on terms that are not reasonably acceptable to the Required Consenting Noteholders.

(xv)     The commencement by the official committee of unsecured creditors appointed in the Chapter 11 Cases (the "Creditors' Committee") of litigation, for which the Creditors' Committee has been granted standing by the Bankruptcy Court to commence, against the Consenting Noteholders or with respect to this Agreement.

(xvi)     The occurrence of an Other Termination Event (as defined in Section 6(d)).

(b)     Consenting Sponsors Termination Events.  Unless cured or a waiver or deferral is agreed to in writing by the Consenting Sponsors, this Agreement shall automatically terminate three (3) business days following the delivery to the other Restructuring Support Parties of a written notice, delivered in accordance with Section 22 of this Agreement, by any of the Consenting Sponsors upon the occurrence and at any time during the continuance of a Consenting Sponsor Termination Event.  A "Consenting Sponsor Termination Event" shall mean any of the following:

(i)     The breach in any material respect by one or more of the Parties of any of the undertakings, representations, warranties or covenants of the Parties set forth herein in any material respect which breach remains uncured for a period of five (5) days after the receipt of written notice of such breach pursuant to Section 22.

WEIL:\95270837\1\35076.0003

(ii)    A Definitive Document modifies, removes or impairs any of the rights or benefits proposed to be granted to, or received by, any Consenting Sponsors as specified under the Acceptable Plan in the form attached hereto or under this Agreement and the Consenting Sponsors have not consented to such modification.

(iii)    The occurrence of an Other Termination Event (as defined in Section 6(d)).

(c)    Company Termination Events.  This Agreement may be terminated by delivery to the other Restructuring Support Parties of a written notice, delivered in accordance with Section 22 of this Agreement, by any of the Chassix Parties upon the occurrence and at any time during the continuance of a Company Termination Event.  A "Company Termination Event" shall mean any of the following:

(i)    The breach in any material respect by one or more of the Parties of any of the undertakings, representations, warranties or covenants of the Parties set forth herein in any material respect which breach remains uncured for a period of five (5) days after the receipt of written notice of such breach pursuant to Section 22.

(ii)    The board of directors (or managers) of the Company or another Chassix Party determines in good faith based upon the advice of outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law.

(iii)    The occurrence of an Other Termination Event (as defined in Section 6(d)).

(d)    Other Termination Events.  An "Other Termination Event" shall mean the following:

(i)    The issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring or the consummation of the Acceptable Plan, which ruling, judgment or order has not been stayed, reversed or vacated within fourteen (14) days after such issuance.

(ii)    The date that the Chapter 11 Case for the Company or any of the Chassix Parties shall have been converted to a case under chapter 7 of the Bankruptcy Code, or such cases shall have been dismissed by order of the Bankruptcy Court .

(iii)    The date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Acceptable Plan for any of the Chassix Parties or refusing to approve the Acceptable Disclosure Statement, provided, that none of the Parties shall have the right to terminate this Agreement pursuant to this clause (c)(iii) if the Bankruptcy Court declines to approve the Acceptable Disclosure Statement or denies confirmation of the Acceptable Plan subject only to modifications to the Acceptable Plan or Acceptable Disclosure Statement that would not have an adverse effect on the recovery or treatment that a Party would receive as

12

compared to the recovery they would have otherwise received pursuant to the Acceptable Plan in the form attached hereto.

(iv)    March 11, 2015 at 11:59 p.m. (New York time), if the Support Effective Date shall not have occurred.

Notwithstanding the foregoing, any of the dates or deadlines set forth in Section 6(a) may be extended by agreement among the Chassix Parties and the Required Consenting Noteholders and the dates or deadlines set forth in Section 6(d) may be extended by agreement among the Restructuring Support Parties.

(e)    Mutual Termination.  This Agreement may be terminated by mutual agreement of the Restructuring Support Parties upon the receipt of written notice delivered in accordance with Section 22.

(f)    Automatic Termination.  This Agreement shall terminate automatically without any further required action or notice on the date that the Acceptable Plan becomes effective.

(g)    Effect of Termination.  Subject to the provisions contained in Section 6 and Section 15, upon the termination of this Agreement in accordance with this Section 6, this Agreement shall become void and of no further force or effect in respect to the Party whose rights and obligations have been terminated hereunder and such Party shall, except as otherwise provided in this Agreement, be immediately released from its respective liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement, shall have no further rights, benefits or privileges hereunder, and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring, the Acceptable Plan or otherwise, that it would have been entitled to take had it not entered into this Agreement and no such rights or remedies shall be deemed waived pursuant to a claim of laches or estoppel; provided that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.  Any and all consents and ballots tendered by the Consenting Noteholders and/or Consenting Sponsors (if any) whose obligations to the Chassix Parties have been terminated, as applicable, prior to such termination shall be deemed, for all purposes, automatically to be null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Acceptable Plan and this Agreement or otherwise and such consents or ballots may be changed or resubmitted regardless of whether the applicable voting deadline has passed (without the need to seek a court order or consent from the Chassix Parties allowing such change or resubmission).  Further, notwithstanding anything to the contrary herein, a Party shall not have a right to terminate this Agreement if a default or failure (including, without limitation, by action, inaction or misrepresentation) by such Party of its obligations, undertakings, representations, warranties or covenants hereunder is the cause, directly or indirectly, of the event giving rise to the right to terminate.

(h)    Automatic Stay.  The Chassix Parties acknowledge that after the commencement of the Chapter 11 Cases, the giving of notice of default or termination by any other Restructuring Support Party pursuant to this Agreement shall not be a violation of the

13

automatic stay under section 362 of the Bankruptcy Code; <u>provided</u> that nothing herein shall prejudice any Restructuring Support Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

## 7.    <u>Definitive Documents; Good Faith Cooperation; Further Assurances</u>.

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise reasonable best efforts with respect to, the pursuit, approval, implementation and consummation of the Restructuring and the Acceptable Plan, as well as the negotiation, drafting, execution and delivery of the Definitive Documents.  Furthermore, subject to the terms hereof, each of the Parties shall take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, and shall refrain from taking any action that would frustrate the purposes and intent of this Agreement.

## 8.    <u>Representations and Warranties</u>.

(a)    Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or as of the date a Consenting Noteholder becomes a party hereto):

(i)    Such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder.  The execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part.

(ii)    The execution, delivery and performance by such Party of this Agreement does not and will not (A) violate any material provision of law, rule or regulation applicable to it or any of its subsidiaries or its charter or bylaws (or other similar governing documents), or (B) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party.

(iii)    The execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary or required by the SEC.

(iv)    This Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability.

14

(b)    Each Consenting Noteholder severally (and not jointly) represents and warrants to the Chassix Parties that, as of the date hereof (or as of the date such Consenting Noteholder becomes a party hereto), such Consenting Noteholder (i) is the beneficial owner of the aggregate principal amount of Notes set forth below its name on the signature page hereto (or below its name on the signature page of the applicable Joinder Agreement for any Consenting Noteholder that becomes a party hereto after the date hereof), and/or (ii) has, with respect to the beneficial owners of such Notes, (A) sole investment or voting discretion with respect to such Notes, (B) full power and authority to vote on and consent to matters concerning such Notes or to exchange, assign and Transfer such Notes, and (C) full power and authority to bind or act on the behalf of, the beneficial owners of such Notes.

9.    **Disclosure; Publicity**.    The Company shall submit drafts to counsel for the Restructuring Support Parties of any press releases, public documents and any and all filings that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least two (2) business days prior to making any such disclosure. Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Chassix Parties and any Consenting Noteholder, no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Consenting Noteholder), other than advisors to the Restructuring Support Parties, the principal amount or percentage of any Notes held by any Consenting Noteholder or use the name of any Consenting Noteholder or its controlled affiliates, officers, directors, managers, stockholders, members, employees, partners, representatives and agents in any press release, in each case, without such Consenting Noteholder's prior written consent; provided that (a) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Consenting Noteholder a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the Company), (b) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Notes (including any series of Notes) held by all the Consenting Noteholders collectively and (c) any Party may disclose information requested by a regulatory authority with jurisdiction over its operations to such authority without limitation or notice to any Party or other person. Any public filing of this Agreement, with the Bankruptcy Court or otherwise, which includes executed signature pages to this Agreement shall include such signature pages only in redacted form with respect to the holdings of each Consenting Noteholder (provided, that the holdings disclosed in such signature pages may be filed in unredacted form with the Bankruptcy Court under seal).

10.    **Creditors' Committee**.    Notwithstanding anything herein to the contrary, if any Consenting Noteholder is appointed to and serves on a Creditors' Committee, the terms of this Agreement shall not be construed so as to limit such Consenting Noteholder's exercise of its fiduciary duties to any person arising from its service on such Creditors' Committee, and any such exercise of such fiduciary duties shall not be deemed to constitute a breach of the terms of this Agreement; provided that nothing in this Agreement shall be construed as requiring any Consenting Noteholder to serve on any Creditors' Committee in any such chapter 11 case. All Parties agree they shall not oppose the participation of any of the Consenting Noteholders or the trustees under the Indentures, on any Creditors' Committee formed in the Chapter 11 Cases.

WEIL:\95270837\1\35076.0003

**11.** **Amendments and Waivers**. Except as otherwise expressly set forth herein, this Agreement may not be waived, modified, amended or supplemented except with the prior written consent of all of the Restructuring Support Parties (which consent may be delivered by electronic mail from counsel to the Restructuring Support Parties). Notwithstanding the foregoing the Chassix Parties may enter into letter agreements with one or more Consenting Noteholders regarding the binding effect of this Agreement on such Consenting Noteholders' business units or affiliates, without the prior written consent of the Restructuring Support Parties so long as such side letter(s) do not alter the Acceptable Plan.

**12.** **Effectiveness**. This Agreement shall become effective and binding upon each Party upon the execution and delivery by such Party of an executed signature page hereto; provided that signature pages executed by Consenting Noteholders shall be delivered to (a) the other Consenting Noteholders in a redacted form that removes such Consenting Noteholders' holdings of the applicable Notes and (b) the Company, Milbank, Weil, and the Company's other advisors in an unredacted form (to be held by Weil and such other advisors on a professionals' eyes only basis).

**13.** **Governing Law; Jurisdiction; Waiver of Jury Trial**.

(a) This Agreement shall be construed and enforced in accordance with, and the rights of the Parties shall be governed by, the laws of the State of New York, without giving effect to the conflict of laws principles thereof. Each of the Parties irrevocably agrees that any legal action, suit or proceeding arising out of or relating to this Agreement brought by any Party or its successors or assigns shall be brought and determined in any federal or state court in the Borough of Manhattan, the City of New York (the "New York Courts"), and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the New York Courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement and the Restructuring. Each of the Parties agrees not to commence any proceeding relating hereto or thereto except in the New York Courts, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any New York Court. Each of the Parties further agrees that notice as provided in Section 22 shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in the New York Courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (ii) that (A) the proceeding in any New York Court is brought in an inconvenient forum, (B) the venue of such proceeding is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 13(a) shall be brought in the Bankruptcy Court.

(b) Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated hereby (whether based on

WEIL:\95270837\1\35076.0003

contract, tort or any other theory). Each Party (i) certifies that no representative, agent or attorney of any other Party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other Parties have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this section.

14. **Specific Performance/Remedies**. It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and the Chassix Parties shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy. Each Party hereby waives any requirement for the security or posting of any bond in connection with such remedies.

15. **Survival**. Notwithstanding the termination of this Agreement pursuant to Sections 6, 6(g), 9, 13 and 14 shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; provided that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

16. **Headings**. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17. **Successors and Assigns; Severability**. This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; provided that nothing contained in this Section 17 shall be deemed to permit Transfers of the Notes or any Claims other than in accordance with the express terms of this Agreement. If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

18. **Several, Not Joint, Obligations**. The agreements, representations and obligations of the Parties under this Agreement are, in all respects, several and not joint.

19. **Relationship Among Parties**. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof. No Party shall have any responsibility for any trading by any other entity by virtue of this Agreement. No prior history, pattern or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement. The Parties have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any equity securities

17

of the Company and do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.

      20.    **Prior Negotiations; Entire Agreement**.  This Agreement, including the exhibits and schedules hereto (including the Acceptable Plan), constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements executed between the Company and each Consenting Noteholders prior to the execution of this Agreement shall continue in full force and effect.

      21.    **Counterparts**.  This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement delivered by facsimile or PDF shall be deemed to be an original for the purposes of this paragraph.

      22.    **Notices**.  All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, facsimile, courier or by registered or certified mail (return receipt requested) to the following addresses and facsimile numbers:

      (a)    If to a Chassix Party, to:

Chassix, Inc.
300 Galleria Officentre, Suite 501
Southfield, MI 48034
Attn: Bibi N. Di Serio Vice President and General Counsel
Email: Bibi.DiSerio@chassix.com

With a copy to (that shall not constitute notice):

Weil, Gotshal & Manges LLP (as counsel to the Company)
767 Fifth Avenue
New York, NY 10153
Fax:  (212) 310-8007
Attn: Marcia L. Goldstein and Ray C. Schrock
Email: marcia.goldstein@weil.com and ray.schrock@weil.com

      (b)    If to a Consenting Sponsor, the address set forth on its signature page, with a copy (that shall not constitute notice) to:

Milbank Tweed Hadley & McCloy LLP
28 Liberty St.
New York, NY 10005
Fax: (212) 530-5219
Attn:  Dennis F. Dunne and Samuel Khalil
Email:  ddunne@milbank.com and skhalil@milbank.com

      (c)    If to a Consenting Noteholder, the address set forth on its signature pages, with a copy (that shall not constitute notice) to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Fax: (212) 492-0158
Attn: Andrew N. Rosenberg and Alice Eaton
Email: arosenberg@paulweiss.com and aeaton@paulweiss.com

Any notice given by delivery, mail or courier shall be effective when received.  Any notice given by facsimile or electronic mail shall be effective upon oral, machine or electronic mail (as applicable) confirmation of transmission.

    **23.**  __Settlement Discussions__.  This Agreement and the Acceptable Plan are part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties.  Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

    **24.**  __No Solicitation; Adequate Information__.  This Agreement is not and shall not be deemed to be a solicitation for consents to the Acceptable Plan.  The votes of the holders of Claims will not be solicited until such holders who are entitled to vote on the Acceptable Plan have received the Acceptable Plan, the Acceptable Disclosure Statement and related ballots, and other required solicitation materials, and the Acceptable Disclosure Statement and other solicitation materials have been approved by the Bankruptcy Court as consistent with section 1125 of the Bankruptcy Code.  In addition, this Agreement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities.

    **25.**  __Interpretation; Rules of Construction; Representation by Counsel__. When a reference is made in this Agreement to a Section, Exhibit or Schedule, such reference shall be to a Section, Exhibit or Schedule, respectively, of or attached to this Agreement unless otherwise indicated. Unless the context of this Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or." The Parties agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

    **26.**  **Acknowledgements**.  THIS AGREEMENT, THE ACCEPTABLE PLAN, AND THE TRANSACTIONS CONTEMPLATED HEREIN AND THEREIN, ARE THE PRODUCT OF NEGOTIATIONS BETWEEN THE PARTIES AND THEIR RESPECTIVE REPRESENTATIVES. EACH PARTY HEREBY ACKNOWLEDGES THAT THIS AGREEMENT IS NOT AND SHALL NOT BE DEEMED TO BE A SOLICITATION OF

WEIL:\95270837\1\35076.0003

VOTES FOR THE ACCEPTANCE OR REJECTION OF ANY CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR OTHERWISE.    THE COMPANY WILL NOT SOLICIT ACCEPTANCES OF THE ACCEPTABLE PLAN FROM ANY PERSON OR ENTITY UNTIL THE PERSON OR ENTITY HAS BEEN PROVIDED WITH A COPY OF THE ACCEPTABLE DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. NOTHING IN THIS AGREEMENT SHALL REQUIRE ANY PARTY TO TAKE ANY ACTION PROHIBITED BY THE BANKRUPTCY CODE, THE SECURITIES ACT OF 1933 (AS AMENDED), THE SECURITIES EXCHANGE ACT OF 1934 (AS AMENDED), ANY RULE OR REGULATIONS PROMULGATED THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY AN ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL GOVERNMENTAL AUTHORITY.

[Signature Page Follows]

WEIL:\95270837\1\35076.0003

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

### CHASSIX PARTIES

CHASSIX HOLDINGS, INC.

By:_____

    Name:   J. Mark Allan
    Title:    President

UC HOLDINGS, INC.

By:_____

    Name:   J. Mark Allan
    Title:    President and Chief Executive Officer

CHASSIX, INC.

By:_____

    Name:   J. Mark Allan
    Title:    President and Chief Executive Officer

EACH OF THE SUBSIDIARIES LISTED ON SCHEDULE 1 HERETO

By:_____

    Name:   J. Mark Allan
    Title:    President

**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]



**CONSENTING NOTEHOLDERS**





[SIGNATURE PAGE TO JOINDER AGREEMENT FOR CONSENTING NOTEHOLDERS]

**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



**CONSENTING NOTEHOLDERS**



CONSENTING SPONSORS
Platinum Equity Advisors, LLC

By: 

Name:    Eva M. Kalawski

Title:    Executive VP, General Counsel & Secretary

[SIGNATURE PAGE TO RESTRUCTURING SUPPORT AGREEMENT]

## Schedule 1

### Restructuring Subsidiaries

| Subsidiary | Tax Identification Number |
| --- | --- |
| Automotive Properties of New York, LLC | 30-0024323 |
| Diversified Machine, Inc. | 02-0758762 |
| Diversified Machine Bristol, LLC | 38-2265409 |
| Chassix Georgia Machining, LLC | 27-1111940 |
| DMI Columbus, LLC | 27-1111833 |
| Diversified Machine Montague, LLC | 38-1854771 |
| Diversified Machine, Milwaukee LLC | 26-1500875 |
| DMI Edon LLC | 27-0951847 |
| Mexico Products I, LLC | 27-0393039 |
| DMI China Holding LLC | 45-3214331 |
| Concord International, Inc. | 38-2973536 |
| SMW Automotive, LLC | 38-3269452 |
| Automotive, LLC | 38-3492897 |
| Chassis Co. of Michigan, LLC | 38-3752692 |
| AluTech, LLC | 32-0100012 |

## **EXHIBIT B**

**PREPETITION ORGANIZATIONAL STRUCTURE CHART**



# <u>EXHIBIT C</u>

## FINANCIAL PROJECTIONS

## FINANCIAL PROJECTIONS

On March 12, 2015 (the "**Commencement Date**"), Chassix Holdings, Inc., UC Holdings, Inc., Chassix Inc. ("**Chassix**") and certain of their affiliates and subsidiaries (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the Bankruptcy Court for the Southern District of New York.

The Debtors developed financial projections (the "**Financial Projections**") to support the feasibility of the *Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (as may be amended from time to time, the "**Plan**").[1]

**THE FINANCIAL PROJECTIONS ARE BASED UPON A NUMBER OF SIGNIFICANT ASSUMPTIONS. ACTUAL OPERATING RESULTS AND VALUES MAY VARY SIGNIFICANTLY FROM THESE FINANCIAL PROJECTIONS.**

**THE PROJECTIONS HAVE BEEN PREPARED EXCLUSIVELY BY THE DEBTORS. THESE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT AT THE TIME AND TO THE BEST OF THEIR KNOWLEDGE, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE AS TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.   SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED OR MAY BE UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER.   THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.**

### 1.   Overview of Financial Projections

As a condition to confirmation, the Bankruptcy Code requires, among other things, the Bankruptcy Court to find that entry of the Confirmation Order is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors.  In connection with developing the Plan, and for purposes of determining whether the Plan satisfies feasibility standards, the Debtors' management team has, through the development of the Financial Projections, analyzed the Reorganized Debtors' ability to meet their obligations under the Plan and to maintain sufficient liquidity and capital resources

---

[1] Unless otherwise expressly set forth herein, capitalized terms used but not otherwise herein defined shall have the same meanings ascribed to such terms in the Plan.

to conduct their businesses.  The Financial Projections will also assist each holder of a Claim in determining whether to vote to accept or reject the Plan.  The Debtors prepared the Financial Projections in good faith, based upon estimates and assumptions made by the Debtors' management.  The estimates and assumptions in the Financial Projections, while considered reasonable by management, may not be realized, and are inherently subject to uncertainties and contingencies.  They are also based on factors such as industry performance, general business, economic, competitive, regulatory, market and financial conditions, all of which are difficult to predict and generally beyond the Debtors' control.  Because future events and circumstances may well differ from those assumed and unanticipated events or circumstances may occur, the Debtors expect that the actual and projected results will differ and the actual results may be materially greater or less than those contained in the Financial Projections.  No representations can be made as to the accuracy of the Financial Projections or the Reorganized Debtors' ability to achieve the projected results.  Therefore, the Financial Projections may not be relied upon as a guarantee or as any other form of assurance as to the actual results that will occur.  The inclusion of the Financial Projections herein should not be regarded as an indication that the Debtors considered or consider the Financial Projections to reliably predict future performance.  The Financial Projections are subjective in many respects, and thus are susceptible to multiple interpretations and periodic revisions based on actual experience and future developments.  The Debtors do not intend to update or otherwise revise the Financial Projections to reflect the occurrence of future events, even in the event that assumptions underlying the Financial Projections are not borne out.  The Financial Projections should be read in conjunction with the assumptions and qualifications set forth herein.

In general, as illustrated by the Financial Projections, the Debtors believe that with a significantly deleveraged capital structure and certain accommodations from their largest customers, the Debtors' business will return to viability.  The reduction of debt on the Debtors' balance sheet will substantially reduce interest expense and improve cash flow.  Based on the Financial Projections, the Debtors should have sufficient cash flow to pay and service their debt obligations, including the Revolving Exit Facility and the Exit Term Loan, and to operate their businesses.  The Debtors believe that the Confirmation Date and Effective Date of the Plan are not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors.  Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

**THE DEBTORS DID NOT PREPARE THE FINANCIAL PROJECTIONS WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE DEBTORS' INDEPENDENT AUDITOR HAS NEITHER COMPILED NOR EXAMINED THE ACCOMPANYING PROSPECTIVE FINANCIAL INFORMATION TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO. THE DEBTORS DO NOT, AS A MATTER OF COURSE, PUBLISH FINANCIAL PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION, RESULTS OF OPERATIONS OR CASH FLOWS.**

WEIL:\95271232\1\35076.0003

**ACCORDINGLY, NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS INTEND TO, AND EACH DISCLAIMS ANY OBLIGATION TO (A) FURNISH UPDATED FINANCIAL PROJECTIONS TO HOLDERS OF CLAIMS OR INTERESTS PRIOR TO THE EFFECTIVE DATE OR TO ANY OTHER PARTY AFTER THE EFFECTIVE DATE; (B) INCLUDE ANY SUCH UPDATED INFORMATION IN ANY DOCUMENTS THAT MAY BE REQUIRED TO BE FILED WITH THE SECURITIES AND EXCHANGE COMMISSION; OR (C) OTHERWISE MAKE SUCH UPDATED INFORMATION PUBLICLY AVAILABLE.**

The Debtors prepared the Financial Projections during the fourth quarter 2014 and revised the Financial Projections in February 2015 based on, among other things, the anticipated future financial condition and results of operations of the Reorganized Debtors using the Debtors' business plan. The Debtors' management team developed and refined the business plan and prepared consolidated financial projections of the Debtors for the years ending December 31, 2015 through December 31, 2019 (the "**Projection Period**").

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated by **July 31, 2015** (the "**Assumed Effective Date**").  Any significant delay in the Assumed Effective Date may have a significant negative impact on the operations and financial performance of the Debtors including, but not limited to, an increased risk of inability to meet sales forecasts and the incurrence of higher reorganization expenses.

Although the Financial Projections represent the Debtors' best estimates and good faith judgment (for which the Debtors believe they have a reasonable basis), of the results of future operations, financial position, and cash flows of the Reorganized Debtors, they are only estimates and actual results may vary considerably from such Financial Projections. Consequently, the inclusion of the Financial Projections herein should not be regarded as a representation by the Debtors, the Debtors' advisors or any other person that the projected results of operations, financial position, and cash flows of the Debtors will be achieved.

The Debtors do not intend to update or otherwise revise the Financial Projections to reflect circumstances that may occur after their preparation, or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.

Additional information relating to the principal assumptions used in preparing the Financial Projections is set forth below.

**2.  General Assumptions and Methodology**

The Financial Projections consist of the following unaudited pro forma financial statements: (a) projected consolidated statements of operations for each year in the Projection Period; (b) projected statements of financial position as of December 31 for each year in the Projection Period; and (c) projected statements of cash flows for each year in the Projection Period.  The Financial Projections are based on the Debtors' business plan.  The business

planning process is an annual process undertaken by the Debtors to provide sales and cost projections which assist the Debtors in managing their working capital needs, planning for anticipated capital expenditures and developing their capital structure.  As part of the Debtors' annual business plan process and in preparation for their planned emergence from chapter 11, the Debtors undertook and completed their business planning process during the fourth quarter 2014 and revised the Financial Projections in February 2015.

The Financial Projections (a) are based upon current and projected market conditions in each of the Debtors' respective markets, (b) utilize program detail to create plant financials, (c) assume emergence from chapter 11 on the Assumed Effective Date under terms substantially similar to those set forth in the Plan, (d) reflect anticipated resourcing or loss of certain customer programs, and (e) assume pricing accommodation arrangements entered into during the first quarter 2015 and are effective per the Plan.

### 3.  Income Statement Assumptions

Net Sales:  The Debtors' net sales are revenues generated from products sold to external customers. Net sales also include pass-through adjustments for escalation/de-escalation in raw material costs which is provided for in almost all customer contracts.  The Debtors are engaged in the precision machining, casting and assembly of chassis and powertrain components to automotive and commercial equipment customers located throughout North America, Europe, Asia and South America.

The Debtors' product sales projections utilize IHS vehicle platform production forecast data adjusted to incorporate the Debtors' own expertise gained through information obtained directly from the customer and analysis of past history.  The Debtors combined these vehicle platform production forecasts with information pertaining to the Debtors' existing customer contracts and content for these vehicle platforms and an assessment of future contracts and content for these vehicle platforms to create the Debtors' product sales projections.  Product sales are approximately $1.6 billion in 2015 and $1.3 billion in 2016 and include the impact of the terms of the customer accommodation agreements entered into during the first quarter 2015 and are effective per the Plan.  Projected product sales are $1.2 billion in 2017; $1.1 billion in 2018; and $1.1 billion in 2019.

Cost of Sales ("COS"): COS include direct materials, direct and indirect labor and benefits, engineering, rent, freight, utilities, operating supplies, depreciation, repairs and maintenance and other direct and indirect costs associated with the manufacturing process. Cost of sales is primarily driven by the cost of these items, production volume and the mix of products manufactured.

The Financial Projections assume a stable global currency environment and commodity environment. Cost reduction initiatives are assumed to offset any economic increases throughout the Projection Period. The Reorganized Debtors' gross margin as a percentage of sales is forecasted to be 6.7% in 2015 and then 8.5%, 7.9%, 9.1% and 8.3% during 2016, 2017, 2018 and 2019, respectively. The decrease in COS during the Projection Period is generally due

4

to assumed cost savings associated with ongoing restructuring, cost reduction activities and a result of pricing accommodation agreements entered into during the first quarter 2015.

Selling, General & Administrative Expenses ("SG&A"): SG&A expenses include salaries and benefits for corporate and sales personnel, professional fees, insurance, rent, amortization of intangible assets and other corporate administrative costs not allocated to cost of sales. SG&A expenses are projected to be $44 million of sales in 2015, decreasing to $39 million of sales in 2016 due to assumed savings associated with the Company's continued cost reduction activities and lower amortization expense.

Restructuring Expenses: Restructuring expenses consist of actual and estimated fees for professional advisors, severance, retention, expenses related to discontinued operations, financing fees  and other costs directly attributable to the Chapter 11 Cases. During 2015, prepetition expenses, including professional fees, severance, retention, and other costs associated with the restructuring totaled approximately $10 million.

Interest Expense:  Interest expense for 2015 includes the following: (a) the actual expense incurred prior to the Commencement Date; (b) the projected expense associated with the Revolving DIP Credit Facility and DIP Term Loan through July 31, 2015; and (c) the projected expense related to the Debtor's anticipated debt structure following the Effective Date of the Plan. For 2016 through 2019, interest expense is based upon the Debtors' anticipated debt structure following the Effective Date of the Plan, which for purposes of the Financial Projections is primarily comprised of an Exit Term Loan of $150 million (including the re-financing of the $100 million DIP Term Facility) at an interest rate of 1,200 bps.  Interest expense also includes the non-cash amortization of certain transaction fees associated with emergence, a 38 bps availability fee and interest rate of 275 bps on the Revolving Exit Facility of $150 million (including the re-financing of the $150 million Revolving DIP Credit Facility), and amounts related to other Affiliate debt, primarily capital leases and foreign Affiliate debt.

Income Tax Expense:  Consolidated income tax expense over the Projection Period reflects the tax impact of the profitability as well as a change in anticipated effective tax rates. These tax rates include estimates regarding the Debtors' ability to utilize net operating loss carryforwards to offset a portion of taxable income and the impact of changes in tax laws. Accordingly, the income tax expense takes into account, based on the mid-point Distributable Value, the expected application of annual limitation on the use of pre-Effective Date net operating loss carryforwards under section 382 of the Code and the projected reduction in the Debtors' tax attributes due to the cancelation of debt.  Consistent with Platinum Equity's agreement in section 5.3 of the Plan, the estimated income tax expense does not reflect any additional reduction in the Debtors' tax attributes due to the tax deconsolidation of the Debtors from the Dharma Group pursuant to the Plan.  See discussion at IX.A. of the Disclosure Statement ("*Certain U.S. Federal Income Tax Consequences of the Plan – Consequences to the Debtors*").

WEIL:\95271232\1\35076.0003

### 1. Balance Sheet Assumptions

The Debtors' projected consolidated statements of financial position set forth the projected consolidated financial position after the Effective Date of the Plan. The projected consolidated statements of financial position were developed based upon the Debtors' preliminary and unaudited December 31, 2014 balance sheet, as adjusted for projected results of operations and cash flows over the Projection Period. The projected consolidated statements of financial position do not reflect the impact of "fresh start" accounting, which could result in a material change to the projected values of assets and liabilities.

Cash and Equivalents: Cash and cash equivalents consist of cash and short-term, highly liquid investments with original maturities of three months or less. The Debtors' ability to efficiently access cash balances in foreign jurisdictions is subject to local regulatory and statutory requirements.

Tooling: Tooling costs for which the Debtors' have a contractual guarantee from the customer are accumulated in the tooling account until the completion of the tool and reimbursed from the customer.

Debt: Debt balances as of December 31, 2015, 2016, 2017, 2018 and 2019 assume an anticipated post-reorganization capital structure, consisting of a $150 million Exit Term Loan (including the re-financing of the $100 million DIP Term Facility), a Revolving Exit Facility of $150 million (including the re-financing of the $150 million Revolving DIP Credit Facility), and other debt, primarily capital leases and existing foreign Affiliate debt.

Liabilities Subject to Compromise: Prepetition amounts subject to compromise are assumed to be settled in accordance with the terms of the Plan. For purposes of the Financial Projections, this settlement is reflected in statements of financial position only and is given effect during 2015 as an equity transaction.

### 2. Cash Flow Assumptions

Operating Activities: Cash flows from operating activities are projected to increase from an inflow of $38 million in 2015 to an inflow of $119 million in 2016. This improvement largely reflects net income improvements net of non-cash items during the Projection Period. Other significant sources and uses of cash from operations during the Projection Period include changes in trade working capital cash flows and other assets and liabilities. Changes in trade working capital cash flows in 2015 are affected by the pricing accommodation cash flows associated with the customer agreements.

Investing Activities: Cash flows from investing activities consist of capital expenditures. Capital expenditures are $104 million in 2015, and average $74 million per year for the remainder of the Projection Period.

Financing Activities: Cash flows from financing activities include borrowings from the DIP Term Facility of $100 million in March 2015 and the projected draws/re-payments

6

on the Revolving DIP Credit Facility of $150 million during the March through July 2015 period prior to the Effective Date. The DIP Facilities are assumed to be refinanced on the Effective Date.

On the Effective Date, the DIP Term Facility of $100 million is re-financed by the Exit Term Loan of $150 million and the Revolving DIP Credit Facility of $150 million is re-financed by the Revolving Exit Facility of $150 million.

WEIL:\95271232\1\35076.0003

**Chassix, Inc.**
**Unaudited Projected Consolidated Statements of Operations**
(Dollars in Millions)

|  | For the Year Ended December 31, | | | | |
|  | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Net Sales | $ 1,566 | $ 1,249 | $ 1,172 | $ 1,131 | $ 1,139 |
| Cost of Sales | | | | | |
| Material | 864 | 666 | 623 | 601 | 610 |
| Variable Overhead | 442 | 330 | 313 | 304 | 307 |
| Fixed Overhead | 87 | 86 | 80 | 71 | 72 |
| Depreciation | 68 | 61 | 65 | 52 | 56 |
| Total Cost of Sales | 1,461 | 1,143 | 1,080 | 1,028 | 1,044 |
| **Gross Margin** | **105** | **106** | **92** | **103** | **95** |
| *Memo: Gross Margin as a Percentage of Sales* | *6.7%* | *8.5%* | *7.9%* | *9.1%* | *8.3%* |
| SG&A | 44 | 39 | 39 | 36 | 34 |
| **Operating Income / (Loss)** | **60** | **67** | **54** | **67** | **60** |
| Interest Expense (net of income) | 33 | 20 | 20 | 19 | 19 |
| Restructuring Expense | 54 | 2 | 2 | - | - |
| **Income / (Loss) Before Income Taxes** | **(26)** | **45** | **32** | **48** | **41** |
| Tax Expense | 11 | 17 | 15 | 16 | 15 |
| **Net Income / (Loss)** | **(37)** | **28** | **17** | **32** | **26** |
| Non-Controlling Interest | - | - | - | - | - |
| **Net Income / (Loss) Attributable to Chassix** | **$ (37)** | **$ 28** | **$ 17** | **$ 32** | **$ 26** |

8

**Chassix, Inc.**
**Unaudited Projected Consolidated Statements of Financial Position**
(Dollars in Millions)

| | As of December 31, | | | | |
|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** |
| **Assets** | | | | | |
| Cash & Equivalents | $ 38 | $ 62 | $ 55 | $ 76 | $ 99 |
| Accounts Receivable, Net | 209 | 170 | 165 | 158 | 160 |
| Inventory, Net | 81 | 70 | 66 | 61 | 59 |
| Tooling | 8 | 9 | 8 | 8 | 8 |
| Other Current Assets | 26 | 26 | 26 | 26 | 26 |
| Total Current Assets | 362 | 338 | 321 | 329 | 352 |
| | | | | | |
| PP&E, Net | 395 | 407 | 435 | 452 | 458 |
| Other Long Term Assets | 100 | 96 | 93 | 90 | 90 |
| | | | | | |
| **Total Assets** | $ 857 | $ 841 | $ 848 | $ 871 | $ 901 |
| | | | | | |
| **Liabilities** | | | | | |
| Accounts Payable | $ 158 | $ 135 | $ 131 | $ 124 | $ 128 |
| Current Portion of Long Term Debt | 19 | 20 | 16 | 14 | 14 |
| Payroll and Other Current Liabilities | 42 | 43 | 43 | 43 | 43 |
| Total Current Liabilities | 219 | 198 | 190 | 181 | 184 |
| | | | | | |
| Line of Credit | 15 | - | - | - | - |
| Long Term Debt | 150 | 150 | 150 | 150 | 150 |
| Capital Leases | 11 | 2 | 0 | - | - |
| Other Liabilities | 26 | 26 | 26 | 26 | 26 |
| | | | | | |
| **Total Liabilities** | 421 | 376 | 366 | 358 | 361 |
| | | | | | |
| Shareholder's Equity / (Deficit) | 437 | 465 | 482 | 514 | 540 |
| | | | | | |
| **Total Liabilities and Shareholder's Equity / (Deficit)** | $ 857 | $ 841 | $ 848 | $ 871 | $ 901 |

9

**Chassix, Inc.**
**Unaudited Projected Consolidated Statements of Cash Flow**
(Dollars in Millions)

| | For the Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 |
| **Operating Activities** | | | | | |
| Net Income / (Loss) | $ (37) | $ 28 | $ 17 | $ 32 | $ 26 |
| Depreciation | 68 | 61 | 65 | 52 | 56 |
| Other Expenses (non-cash piece) | 10 | - | - | - | - |
| Amortization (Non-Cash) | 5 | 4 | 4 | 2 | - |
| Changes in Working Capital | | | | | |
| Accounts Receivable, Net | (26) | 38 | 5 | 7 | (2) |
| Inventory, Net | 4 | 11 | 4 | 5 | 2 |
| Tooling | 4 | (1) | 2 | - | - |
| Other Current Assets | - | - | - | - | - |
| Accounts Payable | (11) | (23) | (4) | (6) | 3 |
| Payroll and Other Liabilities | 19 | 1 | (0) | (0) | (0) |
| Net Cash Provided From / (Used By) Operating Activities | 38 | 119 | 92 | 93 | 86 |
| **Investing Activities** | | | | | |
| Capital Expenditures | (104) | (72) | (93) | (69) | (63) |
| Net Cash Provided From / (Used By) Investing Activities | (104) | (72) | (93) | (69) | (63) |
| **Financing Activities** | | | | | |
| Line of Credit / ABL | (113) | (15) | - | - | - |
| Proceeds from / (Payments to) long-term debt | 150 | - | - | - | - |
| Proceeds from / (Payments to) capital leases | (9) | (8) | (6) | (2) | (0) |
| Net Cash Provided From / (Used By) Financing Activities | 28 | (22) | (6) | (2) | (0) |
| Net Increase / (Decrease) in Cash | (37) | 24 | (7) | 21 | 23 |
| **Cash and Equivalents at Beginning of Year** | 75 | 38 | 62 | 55 | 76 |
| **Cash and Equivalents at End of Year** | $ 38 | $ 62 | $ 55 | $ 76 | $ 99 |

10

# **EXHIBIT D**

## **LIQUIDATION ANALYSIS**

## LIQUIDATION ANALYSIS

On March 12, 2015 (the "**Commencement Date**"), Chassix Holdings, Inc., UC Holdings, Inc., Chassix Inc. ("**Chassix**") and certain of their affiliates and subsidiaries (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the Bankruptcy Court for the Southern District of New York.

The Debtors are soliciting votes with respect to the *Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code* (as may be amended from time to time, the "**Plan**") as set forth in the disclosure statement for the Plan (as may be amended from time to time, the "**Disclosure Statement**").[1]

A chapter 11 plan cannot be confirmed unless the bankruptcy court determines that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test requires a bankruptcy court to find either that (a) all members of an impaired class of claims or interests have accepted the plan or (b) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date. Accordingly, with the assistance of FTI Consulting, Inc., the Debtors prepared this hypothetical liquidation analysis in connection with filing their Disclosure Statement and Plan to assist the Court make the findings required under section 1129(a)(7) of the Bankruptcy Code to confirm the Plan.

This liquidation analysis indicates the estimated values that may be obtained from a disposition of the Debtors' assets under chapter 7 of the Bankruptcy Code as an alternative to the continued operation of the Debtors' businesses as contemplated by the Plan. Accordingly, the asset values discussed herein may be different than amounts set forth in the Plan.

> **NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS' ASSETS WOULD OR WOULD NOT APPROXIMATE THE ASSUMPTIONS REPRESENTED HEREIN, AND ACTUAL RESULTS COULD VARY, IN SOME CASES MATERIALLY.**

---

[1] Unless otherwise expressly set forth herein, capitalized terms used but not otherwise herein defined shall have the same meanings ascribed to such terms in the Disclosure Statement or the Plan.

WEIL:\95271232\1\35076.0003

**General Assumptions**

The determination of the costs of, and proceeds generated from, a hypothetical chapter 7 liquidation of the Debtors' assets is an uncertain process involving the extensive use of estimates and the assumptions described herein and in the Disclosure Statement (including exhibits, where applicable) which, although considered reasonable by the Debtors and their advisors, are inherently subject to business, economic and competitive uncertainties and contingencies beyond their control.  Inevitably, certain assumptions set forth herein would not materialize in an actual chapter 7 liquidation scenario, and certain unanticipated events and circumstances could materialize, both of which would affect the ultimate results in an actual chapter 7 liquidation.  **In light of the foregoing, it is important to read and understand these "General Assumptions" and the "Specific Assumptions and Notes" set forth below.**

This analysis is based on management's good faith assumptions believed to be reasonable in light of the circumstances under which they are based.  This analysis has not been examined or reviewed by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants.  The estimates and assumptions, although considered reasonable by the Debtors' management team, are inherently subject to significant uncertainties and contingencies beyond management's control.  Accordingly, there can be no assurance that the results shown would be realized if the Debtors were liquidated, and actual results in such case could vary materially from those presented.

1. **Liquidation Period**.  This liquidation analysis is predicated on the assumption that the Debtors would convert the Chapter 11 Cases and commence a chapter 7 liquidation on July 31, 2015 (the "**Liquidation Date**").  Except as otherwise set forth herein, this analysis assumes that substantially all of the Debtors' U.S. assets will be liquidated over a twelve month period by a chapter 7 trustee (the "**Chapter 7 Trustee**") appointed on the Liquidation Date.  With respect to the U.S. businesses, this analysis contemplates the orderly wind-down of the Debtors' U.S. operations on the Liquidation Date followed by a distressed liquidation sale of remaining tangible and intangible assets at the end of the twelve month period for the following reasons:

   • The automotive industry supply chain operates on a "just-in-time" basis.  If the operations of the Debtors were abruptly interrupted, their customers would face severe consequences including months of production downtime on certain vehicles until alternate suppliers could be qualified to produce the myriad of parts produced by the Debtors.  Meanwhile the consequences to the Debtors could potentially amount to hundreds of millions of dollars of damages which would significantly impair, if not completely mitigate any recoveries available from customer accounts receivable.  For the reasons stated above, it is assumed that the Debtors undertake a twelve month wind-down during which their customers are able to qualify alternate suppliers and move all of their production requirements to such alternate suppliers in an orderly fashion.  It is further assumed that the customers will fund between 50% and 80% of the operating losses incurred during the wind-down period.

WEIL:\95271232\1\35076.0003

- An orderly wind-down is also conducive to value maximization for the foreign affiliates of the Debtors (the "**Foreign Affiliates**"). The Foreign Affiliates rely on the Debtors for the production of certain components used in their own production processes. To the extent that the operations of the Debtors were abruptly interrupted, the ability of the Foreign Affiliates to provide components parts to their own customers would likely be impaired. As a result, it is assumed that the Foreign Affiliates continue to operate and are sold as going-concern operations, prior to the end of the wind-down period.

2. **Asset Value**. Unless otherwise noted, this liquidation analysis is based on the balance sheet of the Debtors as projected at the Liquidation Date.

3. **Claims Estimates**. In preparing this liquidation analysis, the Debtors have preliminarily estimated an amount of allowed claims for each class based upon a review of the Debtors' projected balance sheet as of the Liquidation Date. Additional claims were estimated to include certain chapter 7 administrative obligations incurred after the Liquidation Date. The estimate of all allowed claims in this liquidation analysis is based on the book value of those claims. No order or finding has been entered or made by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of allowed claims set forth in this liquidation analysis. The estimate of the amount of allowed claims set forth in this liquidation analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of allowed claims under the Plan. The actual amount of allowed claims could be materially different from the amount of claims estimated in this liquidation analysis.

4. **Certain Exclusions and Assumptions**. This liquidation analysis does not include detailed estimates for the tax consequences that may be triggered upon the liquidation and sale events included in the analysis. Such tax consequences may be material. In addition, this liquidation analysis does not include recoveries resulting from any potential preference, fraudulent transfer or other litigation or avoidance actions.

4

| | ESTIMATED NET BOOK VALUES AS OF 31-JUL-15 | TOTAL ESTIMATED RECOVERY $'S | | TOTAL ESTIMATED RECOVERY % | | SEE NOTE |
|---|---|---|---|---|---|---|
| | | LOW | HIGH | LOW | HIGH | |
| **A.  SUMMARY OF ASSETS & GROSS RECOVERIES** | | | | | | |
| CASH BALANCE | $          - | $          - | $          - | 0% | 0% | 1 |
| ACCOUNTS RECEIVABLE | 149,435 | 101,616 | 122,985 | 68% | 82% | 2 |
| INVENTORY | 70,127 | 45,583 | 59,608 | 65% | 85% | 3 |
| TOOLING | 3,522 | 2,642 | 2,994 | 75% | 85% | 4 |
| PREPAID EXPENSES / OTHER CURRENT ASSETS | 73,903 | 2,512 | 4,140 | 3% | 6% | 5 |
| FIXED ASSETS / OTHER | 286,113 | 82,729 | 129,769 | 29% | 45% | 6 |
| INTANGIBLE ASSETS | 39,772 | - | - | 0% | 0% | 7 |
| INVESTMENT IN SUBSIDIARIES | 145,273 | 88,615 | 112,747 | 61% | 78% | 8 |
| **TOTAL ASSETS & ESTIMATED GROSS RECOVERIES** | $   768,145 | $   323,696 | $   432,244 | 42% | 56% | |
| **B.  CREDITOR RECOVERY EXPENSES** | | | | | | |
| DIP FUNDING - WIND-DOWN | | $   (35,000) | $   (14,000) | | | 9 |
| FIXED ASSET SALE COSTS | | (3,919) | (6,127) | | | 9 |
| CHAPTER 7 PROFESSIONAL FEES | | (3,000) | (5,000) | | | 9 |
| CHAPTER 7 TRUSTEE FEES | | (9,581) | (12,750) | | | 9 |
| **TOTAL CREDITOR RECOVERY EXPENSES** | | $   (51,500) | $   (37,877) | | | |
| **C.  PROCEEDS AVAILABLE FOR ALLOCATION AFTER CREDITOR RECOVERY EXPENSES** | | $   272,196 | $   394,366 | | | |
| **D.  DISTRIBUTABLE PROCEEDS BY CLAIMANT CLASS** | | | | | | |
| PROCEEDS AVAILABLE FOR DISTRIBUTION TO DIP FACILITY CLAIMS | | $   165,765 | $   165,765 | | | |
| PROCEEDS AVAILABLE FOR DISTRIBUTION TO SECURED NOTE CLAIMS | | 102,092 | 221,369 | | | |
| PROCEEDS AVAILABLE FOR DISTRIBUTION TO SECURED, ADMIN & PRIORITY CLAIMS | | 4,340 | 7,233 | | | |
| PROCEEDS AVAILABLE FOR DISTRIBUTION TO UNSECURED CLAIMS | | - | - | | | |

WEIL:\95271232\1\35076.0003

| | ESTIMATED CLAIMS BY CREDITOR CLASS | | TOTAL ESTIMATED RECOVERY % | | |
| --- | --- | --- | --- | --- | --- |
| | LOW | HIGH | LOW | HIGH | SEE NOTE |
| **TOTAL PROCEEDS AVAILABLE FOR DISTRIBUTION TO CREDITORS** | $ 272,196 | $ 394,366 | | | |
| | | | | | |
| **DIP FACILITY CLAIMS** | | | | | |
| DIP REVOLVER BALANCE | $ (58,230) | $ (58,230) | 100% | 100% | 10 |
| ACCRUED & UNPAID DIP INTEREST | (230) | (230) | 100% | 100% | 10 |
| LETTER OF CREDIT | (5,562) | (5,562) | 100% | 100% | 10 |
| DIP TERM LOAN | (100,000) | (100,000) | 100% | 100% | 10 |
| ACCRUED & UNPAID PROFESSIONAL FEES | (1,743) | (1,743) | 100% | 100% | 10 |
| **TOTAL DIP FACILITY CLAIMS** | $ (165,765) | $ (165,765) | 100% | 100% | |
| | | | | | |
| *PROCEEDS AVAILABLE FOR DISTRIBUTION TO DIP FACILITY CLAIMS* | $ 165,765 | $ 165,765 | | | |
| | | | | | |
| OUTSTANDING BALANCE OF DIP FACILITY CLAIMS | $ - | $ - | 100% | 100% | |
| | | | | | |
| **SECURED NOTE CLAIMS** | | | | | |
| ADEQUATE PROTECTION CLAIM | $ (181,964) | $ (137,817) | 56% | 100% | 11 |
| SECURED NOTE BALANCE, NET OF ADEQUATE PROTECTION CLAIM | (193,036) | (237,183) | 0% | 35% | 11 |
| ACCRUED INTEREST | (34,688) | (34,688) | 0% | 0% | 11 |
| **TOTAL SECURED NOTE CLAIMS** | $ (409,688) | $ (409,688) | 25% | 54% | |
| | | | | | |
| *PROCEEDS AVAILABLE FOR DISTRIBUTION TO SECURED NOTE CLAIMS* | $ 102,092 | $ 221,369 | | | |
| | | | | | |
| OUTSTANDING BALANCE OF SECURED NOTE CLAIMS | $ (307,595) | $ (188,318) | 25% | 54% | |
| | | | | | |
| **OTHER SECURED, PRIORITY & ADMIN CLAIMS** | | | | | |
| CAPITAL LEASE OBLIGATIONS | $ (9,900) | $ (9,900) | 44% | 73% | 12 |
| OTHER WIND-DOWN COSTS | (35,000) | (56,000) | 0% | 0% | 12 |
| CHAPTER 11 ADMINISTRATIVE CLAIMS | (88,328) | (88,328) | 0% | 0% | 12 |
| EMPLOYEE & TAX-RELATED PRIORITY CLAIMS | (3,500) | (4,500) | 0% | 0% | 12 |
| 503(B)(9) CLAIMS (20 DAY SHIPMENTS) | (14,404) | (14,404) | 0% | 0% | 12 |
| **TOTAL OTHER SECURED, PRIORITY & ADMIN CLAIMS** | $ (151,133) | $ (173,133) | 3% | 4% | |
| | | | | | |
| *PROCEEDS AVAILABLE FOR DISTRIBUTION TO OTHER SECURED, PRIORITY & ADMIN CLAIMS* | $ 4,340 | $ 7,233 | | | |
| | | | | | |
| OUTSTANDING BALANCE OF OTHER SECURED, PRIORITY & ADMIN CLAIMS | $ (146,793) | $ (165,900) | 3% | 4% | |
| | | | | | |
| **UNSECURED CLAIMS** | | | | | |
| GENERAL UNSECURED TRADE | $ (46,117) | $ (46,117) | 0% | 0% | 13 |
| GENERAL UNSECURED NON-TRADE | | | | | 13 |
| DEFICIENCY CLAIMS | (313,156) | (190,986) | 0% | 0% | 13 |
| OTHER UNSECURED CLAIMS | (60,000) | (188,000) | 0% | 0% | 13 |
| SENIOR PIK TOGGLE NOTES | (150,000) | (150,000) | 0% | 0% | 13 |
| **TOTAL UNSECURED CLAIMS** | $ (569,273) | $ (575,103) | 0% | 0% | |
| | | | | | |
| *PROCEEDS AVAILABLE FOR DISTRIBUTION TO UNSECURED CLAIMS* | $ - | $ - | | | |
| | | | | | |
| OUTSTANDING BALANCE OF UNSECURED CLAIMS | $ (569,273) | $ (575,103) | 0% | 0% | |
| | | | | | |
| *MEMO: SUMMARY OF ESTIMATED RECOVERIES* | | | | | |
| *DIP FACILITY CLAIMS* | $ 165,765 | $ 165,765 | 100% | 100% | |
| *SECURED NOTE CLAIMS* | 102,092 | 221,369 | 25% | 54% | |
| *OTHER UNSECURED, PRIORITY & ADMIN CLAIMS* | 4,340 | 7,233 | 3% | 4% | |
| *UNSECURED CLAIMS* | | | 0% | 0% | |
| ***TOTAL ESTIMATED RECOVERIES*** | $ 272,196 | $ 394,366 | 21% | 30% | |

6

## Specific Assumptions and Notes

### 1.  Note 1 – Cash

As of the Liquidation Date, the Debtors are expected to have a zero U.S. cash balance.

### 2.  Note 2 – Accounts Receivable

Eligible accounts receivable were assumed to be recoverable between 75% and 90% of book value.  It was assumed that customers would have limited basis to set-off against outstanding receivable since they would have the ability to transition their requirements to alternate suppliers without production disruptions.  Ineligible accounts receivable, primarily comprised of past dues, foreign receivables, and contra payables, were assumed to be recoverable between 25% and 35% of book value.

| (USD 000's) | ESTIMATED BOOK VALUES AS OF 31-JUL-15 | TOTAL ESTIMATED RECOVERY $'S LOW | HIGH | TOTAL ESTIMATED RECOVERY % LOW | HIGH |
|---|---|---|---|---|---|
| ACCOUNTS RECEIVABLE, ELIGIBLE | $      128,514 | $   96,386 | $   115,663 | 75% | 90% |
| ACCOUNTS RECEIVABLE, INELIGIBLE | 20,921 | 5,230 | 7,322 | 25% | 35% |
| **TOTAL ACCOUNTS RECEIVABLE** | $      149,435 | $  101,616 | $  122,985 | 68% | 82% |

### 3.  Note 3 – Inventory

Eligible inventory was assumed to be recoverable between 65% and 85% of book value.  It was assumed that customers would purchase much of the eligible finished goods inventory to support their own production and that alternate suppliers would purchase much of the eligible raw materials and work-in-progress inventory.  Ineligible inventory, primarily comprised of scrap aluminum held by outside processors, was assumed to be recoverable between 65% and 85% of book value.

| (USD 000's) | ESTIMATED BOOK VALUES AS OF 31-JUL-15 | TOTAL ESTIMATED RECOVERY $'S LOW | HIGH | TOTAL ESTIMATED RECOVERY % LOW | HIGH |
|---|---|---|---|---|---|
| INVENTORY - RAW MATERIAL METAL, ELIGIBLE | $        9,595 | $    6,237 | $    8,156 | 65% | 85% |
| INVENTORY - RAW MATERIAL OTHER, ELIGIBLE | 10,905 | 7,088 | 9,269 | 65% | 85% |
| INVENTORY - IN-TRANSIT, ELIGIBLE | 11,306 | 7,349 | 9,610 | 65% | 85% |
| INVENTORY - WORK IN PROCESS, ELIGIBLE | 9,533 | 6,196 | 8,103 | 65% | 85% |
| INVENTORY - FINISHED GOODS, ELIGIBLE | 9,855 | 6,406 | 8,377 | 65% | 85% |
| INVENTORY - INELIGIBLE | 18,934 | 12,307 | 16,094 | 65% | 85% |
| **TOTAL INVENTORY** | $       70,127 | $   45,583 | $   59,608 | 65% | 85% |

7

### 4.  Note 4 – Reimbursable Tooling

Customer reimbursable tooling was assumed to be recoverable between 75% and 85% as this tooling would be needed by customers to facilitate the transition of certain production to alternate suppliers.

| (USD 000's) | ESTIMATED BOOK VALUES AS OF 31-JUL-15 | TOTAL ESTIMATED RECOVERY $'S | | TOTAL ESTIMATED RECOVERY % | |
|---|---|---|---|---|---|
| | | LOW | HIGH | LOW | HIGH |
| ASSETS IN CONSTRUCTION (REIMBURSABLE TOOLING) | $    3,522 | $    2,642 | $    2,994 | 75% | 85% |
| **ASSETS IN CONSTRUCTION (REIMBURSABLE TOOLING)** | **$    3,522** | **$    2,642** | **$    2,994** | **75%** | **85%** |

### 5.  Note 5 – Prepaid and Other Current Assets

Prepaid and Other Current Assets were assumed recoverable between 3% and 6% of book value, with most of the recoveries coming from the refunds of deposits held by third parties.

| (USD 000's) | ESTIMATED BOOK VALUES AS OF 31-JUL-15 | TOTAL ESTIMATED RECOVERY $'S | | TOTAL ESTIMATED RECOVERY % | |
|---|---|---|---|---|---|
| | | LOW | HIGH | LOW | HIGH |
| PREPAID OTHER | $    2,980 | $    745 | $    1,490 | 25% | 50% |
| PREPAID MAINTENANCE AGREEMENTS | 657 | 66 | 99 | 10% | 15% |
| DEPOSITS - SHORT-TERM | 3,402 | 1,701 | 2,552 | 50% | 75% |
| INTERCOMPANY & OTHER PREPAIDS | 66,863 | - | - | 0% | 0% |
| **TOTAL PREPAIDS & OTHER CURRENT ASSETS** | **$    73,903** | **$    2,512** | **$    4,140** | **3%** | **6%** |

### 6.  Note 6 – Fixed Assets and Other

Fixed assets include all land, buildings, machinery and equipment owned by the Debtors. Management believes that most of the facilities and equipment are highly specialized and would have few alternative uses.  Therefore, the market for these facilities would be limited.  However, in some instances, particularly for the OEM business, it is possible that a competitor to whom the business was resourced would purchase the facilities and equipment.  Management has considered all of the above factors in determining the recovery range for fixed assets.

| (USD 000's) | ESTIMATED BOOK VALUES AS OF 31-JUL-15 | TOTAL ESTIMATED RECOVERY $'S | | TOTAL ESTIMATED RECOVERY % | |
|---|---|---|---|---|---|
| | | LOW | HIGH | LOW | HIGH |
| MACHINERY & EQUIPMENT, NET | $    182,421 | $    54,726 | $    91,210 | 30% | 50% |
| CONSTRUCTION IN PROGRESS | 45,330 | 6,800 | 11,333 | 15% | 25% |
| LAND & LAND IMPROVEMENTS, NET | 3,636 | 2,182 | 2,545 | 60% | 70% |
| BUILDING IMPROVEMENTS, NET | 22,873 | 13,724 | 16,011 | 60% | 70% |
| OFFICE FURNITURE, NET | 4,790 | 958 | 1,437 | 20% | 30% |
| CAPITAL LEASES TO BE REPOSITIONED, NET | 14,465 | 4,340 | 7,233 | 30% | 50% |
| OTHER ASSETS | 12,597 | - | - | 0% | 0% |
| **TOTAL FIXED ASSETS & OTHER** | **$    286,113** | **$    82,729** | **$    129,769** | **29%** | **45%** |

WEIL:\95271232\1\35076.0003

7.  **Note 7 – Intangible Assets**

Intellectual property is unpatented, and as such, was not assumed to have recoverable value.

| (USD 000's) | ESTIMATED BOOK VALUES AS OF 31-JUL-15 | TOTAL ESTIMATED RECOVERY $'S LOW | HIGH | TOTAL ESTIMATED RECOVERY % LOW | HIGH |
|---|---|---|---|---|---|
| INTANGIBLE ASSETS | $ 39,772 | $ - $ | - | 0% | 0% |
| **TOTAL INTANGIBLE ASSETS** | $ 39,772 | $ - $ | - | **0%** | **0%** |

8.  **Note 8 – Investment in Subsidiaries**

The recoverable value of the Debtors' investment in its Foreign Affiliates was assumed to range from $88.6 million to $112.7 million. The Foreign Affiliates, with operations located within Mexico, South America, Europe, and Asia were assumed to be sold in a going concern sale. Enterprise value was estimated as a multiple of legal entity EBITDA, net of corporate support services historically provided by the Debtors. It was assumed that the Foreign Affiliates would require these same services at the same rates from either the buyer or a third-party. Sale proceeds were first allocated to intercompany debt and intercompany payables, for which the DIP Lenders were assumed to have a first lien. Remaining sale proceeds (net of assumed 15% foreign withholding taxes) were allocated to Investment in Subsidiaries, with 65% of such proceeds flowing back to the DIP Lenders, and the residual 35% flowing to the Secured Note claimants.

| (USD 000's) PROJECTED EBITDA PERFORMANCE FOR FY'15 | TOTAL ESTIMATED RECOVERY $'S LOW | HIGH |
|---|---|---|
| MEXICO | $ 34,416 | $ 43,020 |
| SOUTH AMERICA | 14,940 | 18,675 |
| EUROPE | 21,808 | 27,260 |
| ASIA | 89,996 | 112,495 |
| CORPORATE EXPENSES | (47,600) | (59,500) |
| **TOTAL ENTERPRISE VALUE** | **$ 113,560** | **$ 141,950** |
| LESS: NET DEBT AND SALE EXPENSES | $ (21,137) | $ (21,137) |
| **GROSS PROCEEDS** | **$ 92,423** | **$ 120,813** |
| ALLOCATION TO INTERCOMPANY DEBT | (19,952) | (19,952) |
| ALLOCATION TO INTERCOMPANY PAYABLES | (47,084) | (47,084) |
| **ALLOCATION TO EQUITY** | **25,388** | **53,778** |
| LESS: FOREIGN TAX WITHHOLDINGS | (3,808) | (8,067) |
| **ALLOCATION TO EQUITY, POST TAX** | **21,580** | **45,711** |
| ALLOCATION TO INTERCOMPANY DEBT | 19,952 | 19,952 |
| ALLOCATION TO INTERCOMPANY PAYABLES | 47,084 | 47,084 |
| **NET DISTRIBUTABLE PROCEEDS** | **$ 88,615** | **$ 112,747** |

9

9. **Note 9 – Creditor Recovery Expenses**

Creditor Recovery Expenses include the following:

- <u>DIP Funding Wind-Down Costs</u>:  The DIP Facilities were assumed to fund 20% to 50% of the operating losses during the wind-down period.  The operating losses are inclusive of all operating costs incurred during the wind-down period, including any employee-related payroll and benefits.

- <u>Fixed Asset Sale Costs</u>:  Fees for the auction of owned machinery, equipment, and real estate were estimated at 5% of gross proceeds.

- <u>Chapter 7 Professional Fees</u>:  Costs for financial and legal advisors to the Chapter 7 Trustee were estimated to range from $3.0 million to $5.0 million.

- <u>Chapter 7 Trustee Fees</u>:  Chapter 7 Trustee fees were estimated at 3% of gross liquidation proceeds, excluding recoveries related to capital lease obligations.

10. **Note 10 – DIP Facility Claims**

DIP Facility Claims outstanding at the end of the five month post-petition period immediately prior to the Liquidation Date included the following:

- <u>Revolving DIP Credit Facility, Accrued and Unpaid Interest for the DIP Facilities and Letters-of-Credit</u> outstanding of $64.0 million;

- <u>DIP Term Facility</u> outstanding of $100.0 million, and;

- <u>Accrued and Unpaid Professional Fees</u> of $1.7 million, net of any related retainers for case professionals.

11. **Note 11 – Secured Note Claims**

Secured Note Claims outstanding at the Liquidation Date included the following:

- <u>Adequate Protection Claim:</u>  A 507(b) Adequate Protection Administrative Claim was estimated to range between $137.8 million and $182.0 million on account of property, plant and equipment that was liquidated at a discount to the related book values.

- <u>9.25% Secured Notes Claims, Net of Adequate Protection Claim</u>:  After $34.7 million of accrued interest through the Liquidation Date, an additional $193.0 million to $237.2 million was outstanding on the Secured Notes, net of the Adequate Protection Claim.

WEIL:\95271232\1\35076.0003

## 12. Note 12 – Other Secured, Priority and Administrative Claims

Other Secured, Priority and Administrative Claims consist of:

- <u>Capital Lease Obligations</u>:  $9.9 million of capital lease obligations were outstanding at the Liquidation Date.

- <u>Other Wind-Down Costs</u>:  $35.0 million to $56.0 million of other wind-down costs result from customer funding of 50% to 80% of the net operating losses incurred during the wind-down period.  These other wind-down costs are stated net of product sale value, and include all operating costs incurred during the wind-down period, including any employee-related payroll and benefits.

- <u>Chapter 11 Postpetition Administrative Claims</u>:  $88.3 million of postpetition trade payables and payroll and related accruals were estimated to remain outstanding at the Liquidation Date.

- <u>Employee & Tax-Related Priority Claims</u>:  $3.5 million to $4.5 million of priority claims related to accrued and unpaid prepetition employee vacation amounts, in addition to outstanding prepetition tax balances, were estimated to remain outstanding at the Liquidation Date.

- <u>503(b)(9) Claims</u>:  $14.4 million of prepetition 503(b)(9) Claims were estimated to remain outstanding at the Liquidation Date.

## 13. Note 13 – General Unsecured Claims

General Unsecured Claims consist of the following:

- <u>General Unsecured Trade Claims</u>: Claims outstanding at the Liquidation Date were estimated to be $46.1 million.

- <u>General Unsecured Non-Trade Claims</u> including the following:

    o <u>Deficiency Claims</u>: These claims range from $191.0 million to $313.2 million and are comprised of the unsecured deficiency claims of the Secured Notes and the Capital Leases.

    o <u>Other Unsecured Claims</u>:  These claims primarily include litigation claims, OEM customer claims and contract rejection claims, and are preliminarily estimated to range from $60.0 million to $188.0 million at the Liquidation Date.

    o <u>Unsecured Notes Claims</u>:  These claims with respect to the Unsecured Notes were $150.0 million at the Liquidation Date.

WEIL:\95271232\1\35076.0003

In the event of liquidation, the aggregate amount of general unsecured claims will likely increase significantly. For example, employees likely will file claims for wages and other benefits, some of which will be entitled to priority. Landlords may file large claims for both unsecured and priority amounts.  The resulting increase in both general unsecured and priority claims could significantly dilute the unsecured claims pool included in this Liquidation Analysis.

WEIL:\95271232\1\35076.0003