**HEARING DATE AND TIME: April 23, 2015 at 11:00 a.m. (Eastern Time)**
**OBJECTION DEADLINE: April 16, 2015 at 4:00 p.m. (Eastern Time)**

Marcia L. Goldstein
Ray C. Schrock, P.C.
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

--------------------------------------------------------x
|  |  |
| :--- | :--- |
| **In re** | Chapter 11 |
| **CHASSIX HOLDINGS, INC.,** *et al.*, | **Case No. 15-10578 (MEW)** |
| | **(Jointly Administered)** |
| **Debtors.**[1] | |

--------------------------------------------------------x

### NOTICE OF HEARING ON MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§503(c) AND 363(b)(1) FOR ENTRY OF AN ORDER APPROVING DEBTORS' KEY EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDER EMPLOYEES

PLEASE TAKE NOTICE that a hearing on the annexed motion, dated  April 1,

2015 (the "**Motion**"), of Chassix Holdings, Inc. ("**Chassix Holdings**"), Chassix, Inc.

("**Chassix**"), and certain of their affiliates and subsidiaries, as debtors and debtors in possession

in the above-captioned chapter 11 cases (collectively, including Chassix Holdings and Chassix,

the "**Debtors**"), seeking entry of an order, pursuant to sections 503(c)(3) and 363(b)(1) of title 11

of the United States Code (the "**Bankruptcy Code**"), approving the Debtors' key employee

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012).  The direct and indirect international subsidiaries of Chassix Holdings are not debtors in these chapter 11 cases.

retention program for a select group of key employees who are not considered "Insiders," as such

term is defined in section 101(31) of the Bankruptcy Code (the "**KERP**"), all as more fully set

forth in the Motion, will be held before the Honorable Michael E. Wiles, United States

Bankruptcy Judge, in Room 617 of the United States Bankruptcy Court for the Southern District

of New York, One Bowling Green, New York, New York 10004 (the "**Bankruptcy Court**"), on

**April 23, 2015 at 11:00 a.m. (Eastern Time)**, or as soon thereafter as counsel may be heard.

PLEASE TAKE FURTHER NOTICE that any responses or objections (the

"**Objections**") to the Motion must be in writing, shall conform to the Federal Rules of

Bankruptcy Procedures  and the Local Bankruptcy Rules for the Southern District of New York,

and shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court,

including attorneys admitted *pro hac vice*, electronically in accordance with General Order M-

399 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest, on a

CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered

directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and

General Order M-399, to the extent applicable, and served in accordance with General Order M-

399 on (i) the attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New

York, New York 10153 (Attn: Ray C. Schrock, P.C.); (ii) the Debtors c/o Chassix, Inc., 300

Galleria Officentre, Suite 501, Southfield, Michigan 48034 (Attn: Bibi N. Di Serio, Esq.);

(iii) the Office of the United States Trustee, 201 Varick Street, Suite 1006, New York, New York

10014 (Attn: Susan Golden, Esq. and Andrea B. Schwartz, Esq.); (iv) the attorneys for the

Official Committee of Unsecured Creditors,  Akin Gump Strauss Hauer & Feld LLP, One Bryant

Park, Bank of America Tower, New York, New York 10036 (Attn: Arik Preis, Esq.); and (v) all

entities that requested notice in these chapter 11 cases under Bankruptcy Rule 2002 so as to be

received no later than **April 16, 2015 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

2

PLEASE TAKE FURTHER NOTICE that if no Objections are timely filed and served with respect to the Motion, the Debtor may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered with no further notice or opportunity to be heard.

Dated: April 1, 2015
      New York, New York

              /s/ Ray C. Schrock, P.C.
              Marcia L. Goldstein
              Ray C. Schrock, P.C.

              **WEIL, GOTSHAL & MANGES LLP**
              767 Fifth Avenue
              New York, New York  10153
              Telephone:  (212) 310-8000
              Facsimile:  (212) 310-8007

              *Proposed Attorneys for Debtors*
              *and Debtors in Possession*

WEIL:\95291581\1\35076.0003

Marcia L. Goldstein
Ray C. Schrock, P.C.
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------x

| | |
|---|---|
| In re | Chapter 11 |
| **CHASSIX HOLDINGS, INC.,** *et al.*, | **Case No. 15-10578 (MEW)** |
| | **(Jointly Administered)** |
| **Debtors.**[1] | |

---------------------------------------------------x

## MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§503(c) AND 363(b)(1) FOR ENTRY OF AN ORDER APPROVING DEBTORS' KEY EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDER EMPLOYEES

TO THE HONORABLE MICHAEL E. WILES,
UNITED STATES BANKRUPTCY JUDGE:

Chassix Holdings, Inc. ("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**"), and

certain of their affiliates and subsidiaries, as debtors and debtors in possession in the above-

captioned chapter 11 cases (collectively, including Chassix Holdings and Chassix, the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

"**Debtors**," and together with their non-Debtor subsidiaries, the "**Company**"), respectfully

represent:

<u>**Background**</u>

1.      On March 12, 2015 (the "**Commencement Date**"), the Debtors each

commenced with this Court a voluntary case under chapter 11 of title 11 of the United States

Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their

businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11

cases.

2.      The Debtors' chapter 11 cases have been jointly administered for

procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**").

3.      On March 19, 2015, the United States Trustee for the Southern District of

New York (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors (the

"**Creditors Committee**").

4.      The Debtors commenced their chapter 11 cases on a prearranged basis

with the support of their (i) secured and unsecured noteholders, which have committed to make

significant and immediate capital infusions into the Debtors' businesses, and (ii) major

automotive manufacturing customers, which have committed to long-term pricing commitments

and other valuable accommodations.   Consistent with their obligations under the restructuring

support agreement, on the Commencement Date, the Debtors filed a plan of reorganization and

proposed disclosure statement with the Court and are seeking to emerge from chapter 11 on an

expedited timeframe.

2

5.      Information regarding the Debtors' businesses, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the Declaration of J. Mark Allan Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York, sworn to and filed on the Commencement Date (the "**Allan Declaration**").

## Jurisdiction

6.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

7.      By this Motion, the Debtors request entry of an order, pursuant to sections 503(c)(3) and 363(b)(1) of the Bankruptcy Code, approving the Debtors' key employee retention program for a select group of key employees who are not considered "Insiders," as such term is defined in section 101(31) of the Bankruptcy Code (the "**KERP**").   The Debtors submit the declaration and expert report of Dewey Imhoff (the "**Dewey Declaration**"), a Senior Managing Director at FTI Consulting, Inc. ("**FTI**"), in support of the Motion, a copy of which is annexed hereto as **Exhibit "A."**[2]  The Debtors also submit the Declaration of David J. Woodward, the Debtors' Interim Chief Financial Officer, in further support of the relief requested herein, a copy of which is annexed hereto as **Exhibit "B."**  A proposed form of order granting the relief requested in the Motion is annexed hereto as **Exhibit "C"** (the "**Proposed Order**").

---

[2] Dewey Imhoff was retained by Weil, Gotshal & Manges LLP to perform an analysis on the KERP.

## The Key Employee Retention Plan

8.      As set forth in the Allan Declaration, the Debtors faced an unprecedented sequence of events and circumstances during 2014 that ultimately led to the commencement of these chapter 11 cases.  A combination of operational and financial difficulties due to, among other things, underpriced contracts and programs, compounded by a marked spike in the demand for automobile production in North America at a time when there was limited capacity in the machining and casting sectors, overwhelmed the Debtors' manufacturing facilities and capabilities.  This perfect storm of events resulted in an unavoidable onslaught of quality issues and missed release dates that significantly increased the Debtors' costs of manufacturing.

9.      Unsurprisingly, the Debtors also experienced a significant increase in employee turnover during this challenging period.  In fiscal year 2014, the Debtors' employee turnover was approximately 1,100, a 46% increase from the prior year.  From June through October 2014, the Debtors lost thirty-seven valued employees as a result of voluntary attrition (four of these employees would have been asked to participate in the KERP).  As a result, the Debtors, in connection with their prepetition restructuring efforts, determined that it was necessary to implement a thoughtful retention plan for key non-insider employees to ensure that their workforce remains in place and motivated.

10.     To that end, prior to the Commencement Date, the Debtors commenced a comprehensive review of their employment packages, including their existing bonus programs, and assessed ways to improve and tailor such programs to prevent further employee exodus during the critical initial stages of the Debtors' restructuring initiatives.  As a part of this review process, the board of directors for Chassix (the "**Board**") sought out the advice of professionals at Weil, Gotshal & Manges LLP ("**Weil**"), as well as significant input from key members of the Debtors' senior management team (who had consulted with professionals at FTI regarding how

4

retention plans are generally structured).  Thereafter, after discussions and deliberations, the

Board approved a narrowly-tailored retention plan for certain essential non-executive Employees

(the "**KERP**").[3]

11.     The Debtors require authorization to continue the KERP postpetition to

ensure that they do not lose valuable talent to the detriment of the Debtors' operations and all

parties in interest, for which replacement personnel of like skills and expertise will not only

unnecessarily jeopardize production, but will also serve as an unwelcome distraction and

ultimate drain on the Debtors' already limited resources.  The costs associated with the KERP

are significantly outweighed by the benefits that have been, and will continue to be, realized by

the estates by ensuring that essential personnel remain with the Debtors and encouraging

participants to stay focused on the Debtors' operations to facilitate a smooth reorganization.

Accordingly, in order to prevent a decline in employee morale and a correlative decline in the

value of their estates, the Debtors respectfully request that the Court approve the terms of the

KERP as hereinafter described.

12.     The lenders under the Debtors' debtor-in-possession lending facilities (the

"**DIP Lenders**"), as well as the informal committee of the Debtors' secured and unsecured

noteholders (the "**Informal Committee of Noteholders**"), have reviewed the terms and

provisions of the retention program and, as part of the Debtors' prearranged restructuring,

support approval and continuation of the KERP during the chapter 11 cases.  In addition, the

---

[3] At the same time, the Board also implemented an employee incentive plan designed to motivate and incentivize certain key members of senior management (the "**Executive Restructuring Bonus Progra**m"). The Debtors are not making payments under the Executive Restructuring Bonus Program during these cases, and thus do not intend to seek the Court's approval of the Executive Restructuring Bonus Program. The Debtors will make disclosures of all executive compensation in connection with confirmation of their plan of reorganization (the "**Plan**") as required by 11 U.S.C. 1129(a)(5) prior to the hearing to consider confirmation of the Plan.

WEIL:\95286222\6\35076.0003

Debtors have also shared information regarding the KERP with the professionals for the
Creditors Committee.

### The Eligible Key Employees

13.    Given the highly technical and sophisticated nature of the Debtors' casting
and machining operations, the Debtors' success is inextricably tied to the breadth and depth of
the industry knowledge, experience, and skillset of the Debtors' workforce.   Between October
2014 and February 2015, the Debtors identified sixty-nine essential employees (the "**Key
Employees**"), each of whom possesses specialized and/or technical expertise in the automotive
industry, institutional know-how, and/or supervisory responsibilities over the Debtors' day-to-
day operations.[4]   As part of identifying the Key Employees, certain members of the Debtors'
management team, including, without limitation, the Vice President of Human Resources and the
Chief Executive Officer, undertook a confidential and comprehensive review of the Debtors'
ongoing staffing requirements.   The eligible employees were evaluated on their level of
familiarity with the automotive industry and the Debtors' businesses, their experience working
with the Debtors' vendor and customer base, and the extent of their role in the Debtors'
operations.   In making these determinations, the Chief Executive Officer and the Vice President
of Human Resources interviewed members of the Debtors' management team and engaged in
various discussions with the Debtors' professionals, including Weil and FTI.

14.    The Key Employees work across a variety of disciplines and are
responsible for facilitating a range of tasks critical to the Debtors' operations, including, without
limitation, matters relating to finance, human resources, information technology, engineering,

---

[4] In October 2014, an initial group of forty-one key non-insider employees was identified to participate in the KERP.
Subsequently, and before February 2015, the Debtors identified an additional twenty-eight key non-insider
employees to participate in the KERP.

WEIL:\95286222\6\35076.0003

purchasing and sales, and general plant management.  Many of the Key Employees have direct

and regular interaction with the Debtors' customers and key vendors and, therefore, play an

important role in maintaining and cultivating those relationships.  In light of the significant

changes in the Debtors' workforce prior to the Commencement Date, including the termination

of approximately 750 employees in fiscal year 2014, the remaining Key Employees have been

required to shoulder an increased workload and significant additional responsibilities in order to

compensate for the loss of other employees.  The Key Employees have also been subject to

increased doubt and stress due to commencement of the chapter 11 cases.

15.    None of the Key Employees are "Insiders" as such term is defined in

section 101(31) of the Bankruptcy Code.  Although certain of the Key Employees hold titles

such as "director" or "manager," each such employee must obtain approval from an appropriate

senior manager before taking any significant action with respect to the Debtors' corporate

policies or the disposition of significant assets. *Woodward Decl. ¶9.*  Although the Key

Employees are important to the Debtors' businesses and are particularly vital during these

chapter 11 cases, their titles are only representative of the Key Employees' importance in their

roles. *Woodward Decl. ¶9.*  Further, none of the Key Employees are executive officers of the

Debtors. *Woodward Decl. ¶9.*  The average annual salary for the Key Employees is

approximately $113,000 per employee.

16.    The Key Employees are critical to the operations of the Debtors and

without their continued support the value of the Debtors' estates will not be maximized.

### The Development and Implementation of the Key Employee Retention Plan

17.    The Debtors designed the KERP in order to incentivize Key Employees to

remain employed with the Debtors while the Debtors pursue their financial and operational

7

restructuring and focus on stabilizing the businesses during the pendency of these chapter 11 cases.

18.      As noted above, members of the Debtors' senior management, including the Chief Executive Officer and Vice President of Human Resources, together with professionals at Weil, reviewed the Debtors' anticipated needs during these chapter 11 cases and discussed with FTI the necessary features of a retention plan.  The Debtors designed the KERP with the goal of ensuring employee retention during the critical early stages of the Debtors' reorganization and throughout the chapter 11 cases.  Based on this review and following robust discussions among the members of the Board, the Board ultimately determined that implementing the KERP was a necessary and appropriate means of ensuring the retention of their Key Employees—all of whom have played, and continue to play, a critical role in the success of the Debtors' businesses.  The final KERP design is a reasonable, cost-effective way to provide the appropriate incentives and to retain personnel essential to these chapter 11 cases.

19.      The KERP was designed to ensure that its terms were competitive within the industry.  As set forth in the Dewey Declaration, FTI evaluated the reasonableness of the proposed KERP by comparing the proposed plan to similar plans approved by bankruptcy courts in recent years.

20.      An overview of the KERP is provided below.

- In exchange for entering into letter agreements (collectively, the "**KERP Agreements**") with the Debtors, each of the Key Employees will receive retention payments (the "**KERP Payments**") in amounts ranging from 17% and 46% of their annual base salary over a seven to ten month retention period (the "**Retention Period**")[5] for as long as they remained employed by the Debtors.  The average payout per employee is approximately 29.8% of base salary.

---

[5] The Retention Period varies depending on when the Key Employees entered into KERP Agreements.

8

- In the aggregate, the approved KERP Payments total approximately $2,324,000, with the average payment per individual totaling approximately $34,000.

- The Retention Payments are scheduled to be made in four equal quarterly installments, with each installment totaling approximately $581,000 in the aggregate.

- The first installment of KERP Payments was made between January and February 2015, in the aggregate amount of approximately $581,000.[6] The second installment is scheduled to be paid on the first pay period following approval of this Motion in the same amount. The remaining installments, including the second installment, total $1.7 million in the aggregate.

- All unpaid KERP Payments are forfeited if a Key Employee resigns without Good Reason (as defined in the KERP Agreements) or is terminated for Cause (as defined in the KERP Agreements). Similarly, all KERP Payments that have already been received must be returned to the Debtors in the event that a Key Employee resigns without Good Reason or is terminated for Cause.[7]

21.    The total cost of the KERP is approximately $2.3 million plus approximately $48,000 of the remaining amount in the Debtors' discretionary restructuring bonus pool.[8] As of the date hereof, the Debtors do not anticipate including any additional employees to the KERP.

22.    Because the final installment of the KERP Payments is not scheduled to be made until after the final vesting date of September 2015, the KERP is expected to incentivize the Key Employees to remain employed with the Debtors even after a successful emergence from chapter 11—a significant factor for continued success post-emergence.

---

[6] This amount does not include payments to non-Debtor employees, which totaled approximately $180,000 in the aggregate.

[7] Forfeited payments are not made available to other employees and, instead, are made available for general operating purposes.

[8] The discretionary bonus pool was approved by the Board in the original amount of $750,000 to give the Debtors (specifically, the Chief Executive Officer) flexibility to make incentive payments to other key non-insider employees who are not covered by the KERP.

9

## The KERP Satisfies the Requirements
## of Section 503(c) of the Bankruptcy Code

23.    The KERP should be approved pursuant to section 503(c)(3) of the

Bankruptcy Code.  The prohibitions and restrictions in section 503(c)(1) do not apply here, as

that provision restricts the ability of "insiders" to receive payments as part of retention plans and,

as set forth below, none of the Key Employees are "insiders" (as such term is defined by section

101(31) of the Bankruptcy Code).[9]

24.    The Bankruptcy Code defines an "insider" to include, among other things,

"an officer of the debtor" and a "person in control of the debtor." 11 U.S.C. § 101(31).  Courts

also have concluded that an employee may be an "insider" if such employee has "at least a

controlling interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to

unqualifiably dictate corporate policy and the disposition of corporate assets." *In re Velo*

*Holdings, Inc.*, 472 B.R. 201, 208 (Bankr. S.D.N.Y. 2012) (citation omitted).  It is well-

established that an employee's job title, alone, does not make such employee an "insider" as

defined by the Bankruptcy Code.  *See In re Borders Grp., Inc.*, 453 B.R. 459, 469 (Bankr.

S.D.N.Y. 2011) (noting that "[c]ompanies often give employees the title 'director' or 'director-

level,' but do not give them decision-making authority akin to an executive" and concluding that

certain "director level" employees in that case were not insiders).

25.    None of the Key Employees are "Insiders," as such term is defined by

section 101(31) of the Bankruptcy Code.  First, none of the Key Employees have discretionary

control over substantial budgetary amounts.  *Woodward Decl. ¶9.*  Second, as noted herein, all

Key Employees must seek authority before taking any significant action relating to strategic

---

[9] Section 503(c)(1) of the Bankruptcy Code generally prohibits retention payments to insiders unless certain
conditions are met. 11 U.S.C. § 503(c)(1).

WEIL:\95286222\6\35076.0003

decision-making or corporate policy and asset disposition. *Woodward Decl. ¶9.* Third, none of

the Key Employees receive equity of the Debtors as part of their compensation structure or are

members of the Debtors' board of directors or participate in the Debtors' corporate governance.

*Woodward Decl. ¶9.* Additionally, none of the Key Employees are executive officers of the

Debtors. *Woodward Decl. ¶9.* Thus, even though certain of the Key Employees have the word

"director" or "manager" in their title, such employees do not exercise sufficient authority to

dictate corporate policy. Therefore, as none of the Key Employees is an "insider" of the

Debtors, the restrictions of section 503(c)(1) of the Bankruptcy Code are inapplicable to the

KERP.

26.    The appropriate standard, therefore, for evaluating the KERP is whether

the KERP is justified by the facts and circumstanced of the case. Specifically, section 503(c)(3)

of the Bankruptcy Code permits payments to a debtor's employees outside the ordinary course of

business if such payments are justified by "the facts and circumstances of the case." 11 U.S.C.

§ 503(c)(3). In this and other districts, courts have concluded that whether payments to

employees are justified by the "facts and circumstances" of a case is to be determined by

application of the business judgment rule. *See In re Velo* 472 B.R. 201, 209 (noting that the

"facts and circumstances language of 503(c)(3) creates a standard "no different than the business

judgment standard under section 363(b)"); *In re Borders Grp., Inc.*, 453 B.R. 459, 473–74

(Bankr. S.D.N.Y. 2011) (evaluating debtors' KERP under business judgment rule); *In re Dana

Corp.*, 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. 2006) (describing six factors that courts may

consider when determining whether the structure of a compensation proposal meets the "sound

business judgment test" in accordance with section 503(c)(3) of the Bankruptcy Code).

Accordingly, whether an incentive plan is justified by the facts and circumstances of the case and

the analysis of whether the approval of such plan is a sound exercise of the debtors' business

judgment remains the same.

27.    Courts within the Second Circuit have generally utilized the factors

identified in *Dana* when determining if the structure of a compensation proposal and the process

for its development meet the business judgment test. *See, e.g., In re Residential Capital, LLC*,

491 B.R. 73, 85–86 (Bankr. S.D.N.Y. 2013) (applying the Dana factors to the debtors' retention

plan for non-insiders, and approving the plan as an exercise of sound business judgment);

*Borders*, 453 B.R. at 473–74 (same). In *Dana*, the bankruptcy court set forth six factors for

evaluating whether a debtor has satisfied the "sound business judgment" test for purposes of the

approval of a compensation plan under section 503(c)(3) of the Bankruptcy Code:

> - Is there a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance? . . .
>
> - Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?
>
> - Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?
>
> - Is the plan or proposal consistent with industry standards?
>
> - What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?
>
> - Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*Dana*, 358 B.R. at 576–77 (emphasis in original). As set forth below, the Debtors' KERP should

be approved under this standard.

28.     First, following an independent review of the KERP conducted, FTI found that the KERP was reasonably designed to retain the Debtors' Key Employees. *Dewey Decl.* *¶ 16, 18.* As noted above, the KERP was implemented to ensure that the Key Employees remain with the Debtors as the Debtors undergo their financial and operational restructuring and beyond. Given the increase in employee turnover in 2014 and the uncertainty caused by the Debtors' chapter 11 cases, the Debtors reasonably believed that failure to implement the KERP may result in a loss of the Key Employees.  The Debtors can ill afford to lose their Key Employees as they not only play a key role in maintaining customer relationships, but have years of industry experience and a wealth of institutional knowledge—all of which are indispensable to the success of the Debtors' machining and casting businesses.  Further, a failure to retain the Key Employees would cause the Debtors to incur significant time and money to obtain and train replacements, which would in turn hinder and delay their restructuring efforts and distract key management from the operation of the Debtors' businesses and the successful administration of these chapter 11 cases, to the detriment of all parties in interest.  For these reasons, the KERP was carefully designed to ensure that the Key Employees remain employed by the Debtors before, during, and after the Debtors' emergence from chapter 11.  Since the time the KERP was implemented, all of the Key Employees have, in fact, remained with the Debtors—demonstrating that the KERP was well-designed to achieve the Debtors' goals.

29.     Second, the KERP is judicious in light of the Debtors' assets, liabilities and earning potential.  The maximum cost of the KERP Payments is approximately $2.3 million, $1.7 of which remains to be paid.  FTI found that the KERP's cost is well within the range of reasonableness, with the average KERP Payment as a percentage of base salary (29.8%) being only slightly above the median (26%) and the average (27.3%) of the comparable plans.  *Dewey*

WEIL:\95286222\6\35076.0003

*Decl. ¶ 17.* Furthermore, the total cost of the KERP as a percentage of the Debtors' assets (0.285%) is within the range (0.001%–0.398%) observed in the comparable plans. *Dewey Decl. ¶ 17.*

30.     Third, the scope of the KERP is fair and reasonable. As noted herein, in identifying participants for the KERP, the Debtors undertook a careful selection process and received input from key members of the Debtors' management team and the Debtors' professionals in determining the specific employees that should be eligible. In doing so, the Debtors were able to ensure that the KERP is available only to those employees who are essential to the Debtors' restructuring efforts and to their continued efficient operation. *Dewey Decl. ¶ 18.* In fact, only sixty-nine Key Employees were selected to participate in the KERP out of the Debtors' total employee base of approximately 3,500. These Key Employees represent less than 2% of the overall workforce, which falls between the median (1.22%) and the average (3.69%) of the comparable plans. *Dewey Decl. ¶ 18.* Thus, FTI determined that the KERP is reasonably designed to ensure that the Key Employees are incentivized to remain with the Debtors, which will ultimately contribute to the Debtors' short- and long-term success. *Dewey Decl. ¶ 16, 18.* Furthermore, as noted above, both the Debtors' DIP Lenders and the Informal Committee of Noteholders support approval of the KERP.

31.     Fourth, as reflected in the Dewey Declaration, the KERP comports with industry standards. Programs similar to the KERP have been implemented to ensure that key non-insider employees remain employed with the company during the critical time of the company's restructuring. *Dewey Decl. ¶ 17.* Moreover, the terms of the KERP are generally in line with the terms of the key employee retention plans approved in other recent chapter 11 cases. These comparable plans utilized by FTI were selected from chapter 11 filings between

14

2009 and 2014 with certain parameters on deal size and case duration in order to maintain

comparability with the Debtors' cases.  Compared to these retention plans, the total cost and

average cost per participant of the KERP are generally within the range of reasonableness.

*Dewey Decl. ¶ 16, 17.*

32.    Accordingly, the KERP satisfies section 503(c)(3) of the Bankruptcy Code

as it is justified by the facts and circumstances of these chapter 11 cases, and should be

approved.

**The Implementation of the KERP Is a Valid
Exercise of the Debtors' Business Judgment**

33.    To the extent applicable, the KERP should also be approved under section

363(b)(1) of the Bankruptcy Code.  Section 363(b)(1) provides that "[t]he [debtor], after notice

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of

the estate." 11 U.S.C. § 363(b)(1).  Use of estate property outside the ordinary course of business

is entrusted to the sound business judgment of a debtor.  *See, e.g., Official Comm. Of Unsecured

Creditors v. LTV Corp. (In re Chateaugay)*, 973 F.2d 141, 143 (2d Cir. 1992) (affirming the

bankruptcy's courts approval of debtors' asset sale pursuant to section 363(b) as a reasonable

exercise of business judgment); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel

Corp.)*, 722 F.2d 1063, 1072 (2d Cir. 1983) (holding that the application of section 363(b)

creditors"); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (emphasizing

the business judgment rule); *Borders*, 453 B.R. at 473 (same).

34.    As noted above, the business judgment rule is the standard courts use to

evaluate whether a retention plan meets the "facts and circumstances" standard set forth in

section 503(c)(3) of the Bankruptcy Code.  Thus, as set forth above, the Debtors' decision to

implement the KERP is a valid exercise of business judgment.  Specifically, the Debtors have

15

determined that implementing the KERP will appropriately incentivize the Key Employees to

remain engaged with the Debtors' during and after these chapter 11 cases.  As noted herein, the

Key Employees possess the special knowledge and expertise necessary to stabilize the Debtors'

operations and allow them to effectuate a successful restructuring.  Additionally, the Debtors'

ability to maximize the going-concern value of their estates is dependent upon the continued

employment, active participation, and ongoing commitment of the Key Employees.  Indeed, the

loss of the Key Employees would adversely impact the Debtors' businesses as, among other

things, it would have a detrimental impact on the moral of the Key Employees' colleagues and

subordinates as well as send a negative message to the Debtors' customers and suppliers with

whom the Key Employees have built a positive and cooperative working relationship, and most

noteworthy, would be difficult to recruit replacement candidates who not only have experience in

the automotive industry, but would possess the requisite expertise regarding the same.

35.    Accordingly, implementing the KERP is a valid exercise of the Debtors'

business judgment and approval of the KERP is in the best interests of the Debtors and their

estates.

### Waiver of Bankruptcy Rules 6004 (h)

36.    To implement the foregoing immediately, the Debtors seek a waiver of the

fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy

Rule 6004(h).

### Notice

37.    Notice of this Motion has been provided all parties in interest in

accordance with the Case Management Order No. 1, dated March 20, 2015 (ECF No. 126).  The

Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other

or further notice need be provided.

16

38.    No previous request for the relief sought herein has been made by the

Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as is just.

Dated: April 1, 2015
       New York, New York

/s/ Ray C. Schrock, P.C.
Marcia L. Goldstein
Ray C. Schrock, P.C.

**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for Debtors
and Debtors in Possession*

17

**Exhibit A**

**Dewey Declaration**

Marcia L. Goldstein
Ray C. Schrock, P.C.
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x

|  |  |
|---|---|
| **In re** | **Chapter 11** |
| **CHASSIX HOLDINGS, INC.**, *et al.*, | **Case No. 15-10578 (MEW)** |
| | **(Jointly Administered)** |
| **Debtors.**[1] | |

-------------------------------------------------------x

**DECLARATION AND EXPERT REPORT OF DEWEY IMHOFF**
**IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY**
**OF AN ORDER APPROVING DEBTORS' KEY EMPLOYEE**
**RETENTION PLAN FOR CERTAIN NON-INSIDER EMPLOYEES**

      I, Dewey Imhoff, declare under penalty of perjury as follows, pursuant to the

provisions of 28 U.S.C. § 1746:

      1.      I submit this Declaration and Expert Report in support of the Debtors'

Motion Pursuant to 11 U.S.C. §§ 503(c)(3) and 363(b) of the Bankruptcy Code for Entry of an

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

Order Approving Debtor' Key Employee Retention Plan for Certain Non-Insider Employees

(the "**Motion**").[2]

2.      Except as otherwise indicated, all statements in this Declaration are based

on my personal experience and knowledge, my opinion, my discussions with the Debtors'

management and professionals and/or my review of relevant documents.[3]  If called to testify, I

could and would testify to each of the facts and opinions set forth herein.

## Qualifications

3.      I am a Senior Managing Director at FTI Consulting, Inc. ("**FTI**").  Prior to

joining FTI, I was a partner at PricewaterhouseCoopers.  Prior to that, I was a senior manager at

a prominent nationally recognized crisis management and turnaround boutique firm and a vice

president of the Special Assets group at Prudential Capital.

4.      I received my MBA in accounting from Rutgers University and a B.A.

from William Paterson University.  I am a certified insolvency and restructuring advisor and a

certified public accountant (retired).  I am a member of the Association of Insolvency &

Restructuring Advisors, the American Bankruptcy Institute, the New Jersey Society of Certified

Public Accountants, the American Institute of Certified Public Accountants, and the Turnaround

Management Association.

5.      I have more than 30 years of advisory and management experience in the

financial services, retail, healthcare, manufacturing, forest products, professional sports and

sporting venues, real estate and energy sectors.  I have worked in positions with responsibility

for financial and statutory reporting, troubled loans, asset sales, fraud auditing, strategic planning

---

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

[3] Certain of the statements made herein relate to matters within the personal knowledge of other professionals at FTI working under my supervision or the Debtors' employees and are based on information provided by them.

WEIL:\95283535\6\35076.0003

and administrative and operational management.  In addition, I have developed or consulted on

more than 30 employee retention plans and employee incentive plans, representing creditors with

respect to certain plans and representing debtors on other plans.  In connection with that work, I

have performed numerous comparative studies of employee retention plans and employee

incentive plans similar to the comparisons described below.  I previously testified as an expert

witness on employee retention plans and employee incentive plans in the following matters:  *In

re Fibermark, Inc.*, Case No. 04-10463 (Bankr. D. Vt. Mar. 30, 2004), *In re Nelson

Nutraceutical, Inc.*, Case No. 06-10072-CSS (Bankr.  D.  Del.  Jan. 28, 2006), and *In re Old HB,

Inc.*, Case No. 12-22052 (Bankr. S.D.N.Y. 2012).  I was also retained to testify as an expert

witness about employee retention plans, although ultimately was not required to provide any

testimony, in *In re Cornerstone Propane, L.P.*, Case No. 04-bk-13856 (Bankr. S.D.N.Y. June 3,

2004), and was retained to testify, but never admitted as an expert witness, in *In re Fleming Co.,

Inc.*, Case No. 03-bk-10945 (Bankr.  D.  Del.  Apr. 1, 2003).  I was the co-editor of *The Credit

Executive's Guide to Business Restructuring* (Dewey Imhoff and Elliot Fuhr eds., FTI

Consulting 2006) and collaborated on *The Practical Guide to Corporate Restructuring* (Cooper

& Lybrand L.L.P. 1997).

   6.   I am not being compensated specifically for this testimony other than

indirectly through the payments received by FTI for my services.

<u>**The Eligible Key Employees**</u>

   7.   Given the nature of the Debtors' casting and machining operations, the

Debtors' success is inextricably tied to the breadth and depth of the industry knowledge,

experience, and skillset of the Debtors' workforce.   Between October 2014 and February 2015,

the Debtors identified sixty-nine essential non-insider employees (the "**Key Employees**") who

have specialized and/or technical expertise in the automotive industry, institutional know-how,

3

and/or supervisory responsibilities over the Debtors' day-to-day operations.[4]  As part of

identifying the Key Employees, certain members of the Debtors' management team, including,

without limitation, the Vice President of Human Resources and the Chief Executive Officer,

undertook a confidential and comprehensive review of the Debtors' ongoing staffing

requirements.  The eligible employees were evaluated on their level of familiarity with the

automotive industry and the Debtors' businesses, their experience working with the Debtors'

vendor and customer base, and the extent of their role in the Debtors' day-to-day operations.  In

making these determinations, the Chief Executive Officer and the Vice President of Human

Resources interviewed members of the Debtors' management team and engaged in various

discussions with the Debtors' advisors, including Weil and FTI.

8.     The Key Employees work across a variety of disciplines and are

responsible for facilitating a range of tasks, including, without limitation, matters relating to

finance, human resources, information technology, engineering, purchasing and sales, and

general plant management.  Many of the Key Employees have direct and regular interaction with

the Debtors' customers and key vendors and, therefore, play a crucial role in maintaining and

cultivating those relationships.  In light of the significant changes in the Debtors' workforce prior

to the Commencement Date, including the termination of approximately 750 employees in fiscal

year 2014, the remaining Key Employees have been required to shoulder an increased workload

and significant additional responsibilities.  The Key Employees have also been subject to

increased doubt and stress due to commencement of the Debtors' chapter 11 cases.

---

[4] In October 2014, an initial group of forty-one key non-insider employees was identified to participate in the KERP. Subsequently and before February 2015, the Debtors identified an additional twenty-eight key non-insider employees to participate in the KERP.

4

## The Key Employee Retention Plan

9.       The Debtors designed the KERP in order to incentivize Key Employees to remain employed with the Debtors while the Debtors pursue their financial and operational restructuring and focus on stabilizing the businesses during the pendency of these chapter 11 cases.

10.      As noted above, members of the Debtors' senior management, including the Chief Executive Officer and Vice President of Human Resources, together with Weil, reviewed the Debtors' anticipated needs during these chapter 11 cases and discussed with FTI the necessary features of a retention plan.  The Debtors designed the KERP with the goal of ensuring employee retention during the critical early stages of the Debtors' reorganization and throughout the chapter 11 cases.  Based on this review and following robust discussions among the members of the Board, the Board ultimately determined that implementing the KERP was a necessary and appropriate means of ensuring the retention of their Key Employees—all of whom have played, and continue to play, a critical role in the success of the Debtors' businesses.  The final KERP design is a reasonable, cost-effective way to promote the appropriate incentives and to retain personnel essential to these chapter 11 cases.

11.      The KERP was designed to ensure that its terms were competitive within the industry.  FTI evaluated the reasonableness of the proposed KERP by comparing the proposed plan to similar plans approved by bankruptcy courts in recent years, as set forth on the expert report entitled *Overview and Analysis of Key Employee Retention Plan* attached as **Exhibit "1"** hereto (the "**Report**").

12.      An overview of the KERP is provided below.

- In exchange for entering into letter agreements (collectively, the "**KERP Agreements**") with the Debtors, each of the Key Employees will receive

retention payments (the "**KERP Payments**") in amounts ranging from 17% and 46% of their annual base salary over a seven to ten month retention period (the "**Retention Period**")[5] for as long as they remained employed by the Debtors. The average payout per employee is approximately 29.8% of base salary.

- In the aggregate, the approved KERP Payments total approximately $2,324,000, with the average payment per individual totaling approximately $34,000.

- The Retention Payments are scheduled to be made in four equal quarterly installments, with each installment totaling approximately $581,000 in the aggregate.

- The first installment of KERP Payments was made between January and February 2015, in the aggregate amount of approximately $581,000.[6] The second installment is scheduled to be paid on the first pay period following approval of this Motion in the same amount. The remaining installments, including the second installment, total $1.7 million in the aggregate.

- All unpaid KERP Payments are forfeited if a Key Employee resigns without Good Reason (as defined in the KERP Agreements) or is terminated for Cause (as defined in the KERP Agreements). Similarly, all KERP Payments that have already been received must be returned to the Debtors in the event that a Key Employee resigns without Good Reason or is terminated for Cause.[7]

13.    The total cost of the KERP is approximately $2.3 million plus approximately $48,000 of the remaining amount in the Debtors' discretionary restructuring bonus pool.[8] As of the date hereof, the Debtors do not anticipate including any additional employees to the KERP.

14.    Because the final installment of the KERP Payments is not scheduled to be made until after the final vesting date of September 2015, the KERP is expected to incentivize

---

[5] The Retention Period varies depending on when the Key Employees entered into KERP Agreements.

[6] This amount does not include payments to non-Debtor employees, which totaled approximately $180,000 in the aggregate.

[7] Forfeited payments are not made available to other employees and, instead, are made available for general operating purposes.

[8] The discretionary bonus pool was approved by the Board in the original amount of $750,000 to give the Debtors (specifically, the Chief Executive Officer) flexibility to make incentive payments to other key non-insider employees who are not covered by the KERP.

the Key Employees to remain employed with the Debtors even after a successful emergence

from chapter 11—a significant factor for continued success post-emergence.

### FTI's Review of the KERP

15.     As noted above, prior to the Commencement Date, the Debtors

experienced a significant increase in employee turnover in 2014.  From June through October of

2014, the Debtors lost approximately thirty-seven valued employees as a result of voluntary

attrition (four of these employees would have been asked to participate in the KERP).  The

Debtors believe that failure to retain the Key Employees would inevitably cause the Debtors to

incur significant costs in attempting to obtain and train replacements.

16.     Thus, the Debtors determined that it was necessary to implement a

retention plan for key non-insider employees in order to motivate these employees to remain

employed with the Debtors during this critical time of restructuring.   Prior to seeking the

approval of the KERP in these chapter 11 cases, the Debtors sought independent review of the

plan from FTI.  The results of FTI's review can be found in the Report.   Based on its review,

FTI found that the KERP is reasonable in terms of the objectives it seeks to achieve, its cost and

scope, and in comparison to similar plans approved by courts in other chapter 11 cases.  Indeed,

since implementing the KERP, all of the Key Employees have remained with the Debtors,

further demonstrating that the KERP is reasonably designed to achieve the Debtors' retention

goals.

17.     First, as noted in the Report, programs similar to the KERP have been

implemented in other chapter 11 cases to ensure that key non-insider employees remain

employed with the company during the critical time of the company's restructuring.  FTI

reviewed the retention programs approved in recent chapter 11 cases in order to evaluate the

7

market-reasonableness of the KERP and found that the terms of the KERP are generally in line

with the terms of the key employee retention plans approved in 14 other recent chapter 11 cases.

These 14 cases reviewed by FTI were selected from chapter 11 filings between 2009 and 2014

(13 of the cases were from chapter 11 filings between 2011 and 2014) with certain parameters on

deal size and case duration in order to maintain comparability with the Debtors' cases.

Compared to these retention plans, the total cost as a percentage of assets and average cost per

participant of the KERP are generally within the range of reasonableness.  For example, the total

cost of  $2.4 million is approximately 0.285% of the Debtors' assets, which, while slightly higher

than the average (0.128%) and median (0.068%), was within the range observed (0.001%-

0.398%). More importantly, the average KERP Payment as a percentage of base salary (29.8%)

is only slightly above the median (26%) and the average (27.3%) of the comparable plans, and

the average cost per person (approximately $34,000) is right on average of the comparable plans

(approximately $34,000).

18.     Moreover, because the KERP is only available to those employees who

are essential to the Debtors' ongoing operations and restructuring efforts, the scope of the KERP

is also fair and reasonable.  The KERP has been narrowly designed to retain Key Employees

who are vital to the successful implementation of the Debtors' restructuring and the

maximization of value for the benefit of all parties in interest.  As noted herein, before

implementing the KERP, the Debtors carefully evaluated the need for a retention plan and ran a

selective process in determining the specific employees that should be eligible.   In fact, only

sixty-nine Key Employees were selected to participate in the KERP out of the Debtors' total

employee base of approximately 3,500.  These Key Employees represent less than 2% of the

overall workforce, which falls between the median (1.22%) and the average (3.69%) of the comparable plans.

19.    Based on the foregoing, and on the findings set forth in the Report, I believe that the KERP will provide necessary inducement to the Key Employees to remain employed with the Debtors while their services are needed, and that the cost and scope are within the range of reasonableness.

I, the undersigned, declare under penalty of perjury that the foregoing is true and correct.

Executed on April 1, 2015                     By:   /s/ Dewey Imhoff
                                                    Dewey Imhoff

WEIL:\95283535\6\35076.0003

**EXHIBIT 1**



# Chassix, Inc.

*Overview and Analysis of Key Employee Retention Plan (KERP)*

*March 30, 2015*

# Key Employee Retention Plan
## Executive Summary

**Below is a summary of the Company's Key Employee Retention Plan (the "KERP").**

- The total cost of the KERP is $2,323,716 plus approximately $48 thousand of the remaining balance of the discretionary pool. The Company has already paid $581 thousand to participants and approximately $1.7 million is remaining to be paid.

- The KERP applies to non-insiders only and as such complies with the Section 503(c) requirements for retention plans applicable to insiders.

- The KERP provides retention payments ranging from 17% to 46% of annual base salary (or 15%-35% of total annual target compensation) over a 10-month retention period (the "Retention Payments").

- The Retention Payments are scheduled to be made in four equal quarterly installments of $580,929, beginning in December 2014.

  - The first installment payable on 12/31/14 was paid by the Company in January and February 2015. The range of payment timing is due to when individual participants were added to the KERP. The remaining 3 installments total $1,742,787.

- The KERP also establishes a discretionary pool for additional potential participants.

  - The initial pool approved by the Board was $750 thousand.

  - In January and February 2015, management added 28 employees whose retention payments of approximately $700 thousand were to be funded by the discretionary pool.

  - The discretionary pool currently has an available balance of approximately $48 thousand.

*($ actual)*

| Number of Participants | Total Plan Cost[1] | Average Cost Per Participant[1] | Remaining Cost[1] | Total Retention Payments Per Quarter | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | 12/31/14[2] | 3/31/15 | 6/30/15 | 9/30/15 |
| 69 | $  2,323,716 | $  33,677 | $  1,742,787 | $  580,929 | $  580,929 | $  580,929 | $  580,929 |

1. Does not include discretionary pool of $48 thousand.
2. The Company made this payment.



Note: Capitalized terms herein are as defined in the KERP Agreement.

2

# Key Employee Retention Plan
## Overview of the Key Terms

**Development of the KERP**

- In response to increased turnover in employee base in 2014 and in order to retain critical employees while the Company pursues its restructuring, management entered into retention agreements with certain employees, none of whom are insiders, in late 2014 and early 2015.
- Between late October of 2014 and February of 2015, management identified 69 non-insider employees critical to the business.
  - The initial group consisted of 41 employees, and 28 employees (i.e., those whose Retention Payments are funded by the discretionary pool) were subsequently added.
  - The Company selected individuals with functional and technical expertise, deep institutional knowledge and management and profit and loss responsibilities over corporate functions and plant operations.
  - The participants cover a wide range of functions, including finance, HR, IT, taxes, engineering and plants/operations.
  - Average base salary of the participants is $112,873 and average total annual target compensation is $133,099.
- The Board of Directors approved the KERP and the discretionary pool in December 2014.

**Payout Calculation**

- The Retention Payment is determined as a percentage of each participant's total annual target compensation.
  - For most of the participants, the payout percentage was at or below 25%.
  - Two participants received higher percentages due to the higher criticality of their roles.
- For the purposes of our analysis, we evaluated the Retention Payments as a percentage of annual base salary in order to be comparable to KERPs in other chapter 11 cases.
  - The Retention Payments are between 17%-46% of annual base salary.
  - The average Retention Payment is approximately $34 thousand per person, representing approximately 30% of annual base salary.
- Employees must remain employed with the Company through September 30, 2015 in order to earn the full Retention Payment.
- The participants in the KERP are still eligible to receive payments under the annual incentive plan.





# Key Employee Retention Plan
## Overview of the Key Terms (cont'd)

**Termination Provisions**

- Resignation for "Good Reason" – Participant can retain all Retention Payments received. All future payments are forfeited.
- Resignation without "Good Reason" – All Retention Payments received must be returned to the Company. All future payments are forfeited.
- Involuntary termination for "Cause" – All Retention Payments received must be returned to the Company. All future payments are forfeited.
- Involuntary termination without "Cause" – Participant can retain all Retention Payments received. All future payments are forfeited.
- In the event of termination upon death or disability, participants will not forfeit their rights to retain any portion of any Retention Payments. All future payments are forfeited.
- Forfeited amounts will not be made available to other employees.

**Discretionary Pool**

- The Company has established a discretionary pool in the event that additional non-insider employees, who are not current KERP participants, require Retention Payments.
  - The amount of the original discretionary pool was $750 thousand.
  - In a period lasting from January 2015 through February 2015, management added an additional 28 KERP participants with retention payments of approximately $700 thousand to be funded by the discretionary pool.
  - The discretionary pool currently has an available balance of approximately $48 thousand.



4

# Key Employee Retention Plan
## Market Study – Overview

- FTI prepared a benchmarking study against other recent chapter 11 cases in order to evaluate the reasonableness of the Company's KERP.
  - FTI selected the sample population based on the following parameters and for which KERP information was available:
    – Chapter 11 filings between 2011-2014
    – Deal sizes between $250 million – $10 billion
    – Eliminated cases lasting longer than 2-years or less than 2 months
  - Furthermore, FTI adjusted the population by adding 1 more case to include a case from the same industry (Visteon), resulting in a comparable set of 14 KERPs.
- We note that the various KERPs approved in other chapter 11 cases catered to unique case issues and needs. For example, we have noted that many have retention periods ranging from 6 months to 24 months, payable upon a specific event or periodically, developed both pre petition and post petition, in liquidations and reorganizations, and with participant number ranging from 3 individuals to 51 individuals. Given this diversity, we believe that the market study should be reviewed with the Company's unique circumstance and issues in mind.

### Key Findings

- Overall, the Company's proposed KERP is within the range of the KERPs offered in other chapter 11 cases that we have reviewed.
  - 12 out of the 14 plans reviewed were new plans that were developed in connection with the debtors' bankruptcy filings. The Company's developed KERP is consistent with this majority practice.
  - 6 out of the 14 plans, just under half of the plans reviewed, provided for payments in multiple installments, similar to the Company's KERP.
  - The average cost per person ($34 thousand) was right on average of the comparable set ($34 thousand) and slightly higher than the median ($32 thousand).
  - The average cost per person as a % of base salary (29.8%) was also within the range, although it was slightly higher than the average (27.3%) and the median (26%).
  - The total cost, inclusive of the discretionary pool, as a % of assets (0.285%) was within the range, although it was higher than the average (0.128%) and the median (0.068%), but lower than the highest benchmarked case (0.398%).
  - The number of participants as a % of total employee base (1.97%) was within the range, although it was lower than the average (3.69%) and higher than the median (1.22%).
  - 5 out of the 14 plans offered discretionary bonus pools ranging from $225 thousand – $375 thousand. The Company's $750 thousand is above the range, although the remaining $48 thousand balance is significantly below the range.

**FTI believes that the cost of the KERP is reasonable in the aggregate and supportable as reasonable compensation during the retention period.**



# Key Employee Retention Plan
## Comparable KERPs Detail

**Comparable KERPs**

| Company | Filing Date | Assets ($ in mms)[1] | Prepetition Employees | Plan Name | Approval Date | Number of Participants | % of Prepetition Employees | Total Cost of Plan [2] | As % of Assets | Avg Cost Per Participant [3] | % of Base Salary [4] | Discretionary Pool | Payout Structure | New or Existing Plan | Payout Timing | Retention Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Borders Group, Inc. | 02/16/11 | $1,275 | 6,100 [5] | Key Employee Retention Plan | 04/22/11 | 25 | 0.41% | $1,233,000 | 0.097% | $37,320 | 30.0% | $300,000 | Lump Sum | New Plan | 30 days after either the effective date of a POR or the closing of a going concern sale | N/D |
| 2 Brookstone Holdings Corp. | 04/03/14 | 388 | 3,200 | Key Employee Retention Plan | 05/12/14 | 33 | 1.03% | 1,282,429 | 0.330% | 38,861 | 33.5% | None | Multiple Installments | New Plan | 50% upon consummation of sale and 50% 60 days after consummation | N/D |
| 3 Coldwater Creek | 04/11/14 | 278 | 5,910 | Key Employee Retention Program | 06/06/14 | 28 | 0.47% | 800,000 | 0.288% | 28,571 | 21.0% | None | Lump Sum | New Plan | Upon satisfaction of specific milestone | N/D |
| 4 Edison Mission Energy | 12/17/12 | 5,126 | 950 | Key Contributor Plan | 03/20/13 | 50 | 5.26% | 2,200,000 | 0.043% | 22,000 [6] | N/D | None | Multiple Installments | New Plan | 2 equal installments over 2 years | 24 mths |
|  |  |  |  | Retention Agreements |  | 3 |  | 70,000 | 0.001% | 23,333 | N/D | None | N/D | Existing Plan |  | ~ 24 mths [7] |
| 5 Exide Technologies | 06/10/13 | 1,895 | 3,600 | Non- Insider Key Employee Retention Plan | 08/15/13 | 51 [8] | 1.42% | 2,005,000 | 0.106% | 31,961 | 25.0% | 375,000 | Lump Sum | New Plan | Earlier of the effective date of the POR, termination of the KERP participant without cause, or in the event of sale, the 90th day following transfer of the Debtor or its assets to the buyer | N/D |
| 6 Furniture Brands, Inc. | 09/09/13 | 547 | 5,400 [9] | Modified Key Employee Retention Plan | 10/11/13 | 48 | 0.89% | 2,174,747 | 0.398% | 40,620 | 26.0% | 225,000 | Lump Sum | New Plan | Lump sum upon closing of a transaction | 6 mths |
| 7 Global Aviation Holdings, Inc. | 02/05/12 | 594 | 1,800 | Key Employee Retention Plan | 07/24/12 | 5 | 0.28% | 137,031 | 0.023% | 27,406 | 26.0% | None | Lump Sum | New Plan | Upon relocating operational control | N/D |
| 8 Global Geophysical Services, Inc. | 03/25/14 | 469 | 824 | Key Employee Retention Plan | 06/05/14 | 43 | 5.22% | 1,419,565 | 0.303% | 33,013 | 26.0% | 250,000 | Multiple Installments | New Plan | 50% paid quarterly and 50% payable at emergence | ~ 9 mths [10] |
| 9 Hawker Beechcraft | 05/04/12 | 2,778 | 5,420 | Key Employee Retention Plan | 07/30/12 | 31 | 0.57% | 1,900,000 | 0.068% | 61,290 | N/D | None | Lump Sum | New Plan | Lump sum upon emergence or consummation of a transaction | Unclear |
| 10 ITR Concession Co, LLC | 09/21/14 | 3,849 [11] | 283 | Valued Employee Program | 01/15/15 | 38 | 13.43% | 748,000 | 0.019% | 19,684 | N/D | None | Multiple Installments | New Plan | 50% paid upon the earlier of the consummation of sale or termination of the sale process, 50% paid 3 mths after the Closing Date | ~ 12 mths [12] |
| 11 Nebraska Book Company, Inc. | 06/27/11 | 657 | 2,500 | Non-Insider Employee Retention Plan | 07/21/11 | 50 | 2.00% | 500,000 | 0.076% | 10,000 | N/D | None | N/D | Existing Plan | N/D | N/D |
| 12 NII | 09/15/14 | 2,243 | 70 | Key Employee Retention Plan | 12/10/14 | 12 | 17.14% | 1,491,366 | 0.066% | 51,724 [6] | 31.0% | 250,000 | Multiple Installments | Existing Plan | 2 installments over a 2-year period | ~ 24 mths |
| 13 Synagro Technologies, Inc. | 04/24/13 | 1,414 [11] | 833 | Key Employee Retention Plan | 05/13/13 | 22 | 2.64% | 540,000 | 0.038% | 24,545 | N/D | None | Lump Sum | New Plan | Lump sum paid within 90 days of a sale/reorganization | N/D |
| 14 Visteon Corporation | 05/28/09 | 4,577 | 5,769 | Non-Insider Retention Program | 07/28/09 | 50 | 0.87% | 3,000,000 | 0.066% | 60,000 | N/D | None | Multiple Installments | New Plan | 50% paid at 12/31/2009, 50% paid by earlier of the effective date or 6 mths later | ~ 12 mths [13] |

Cases: 14, Plans 15

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| High | | $5,126 | 6,100 | | | 51 | 17.14% | $3,000,000 | 0.398% | $61,290 | 33.5% | $375,000 | | | | ~ 24 mths |
| Median | | 1,345 | 2,850 | | | 33 | 1.22% | 1,282,429 | 0.068% | 31,961 | 26.0% | 250,000 | | | | ~ 12 mths |
| Average | | 1,864 | 3,047 | | | 33 | 3.69% | 1,300,076 | 0.128% | 34,022 | 27.3% | 280,000 | | | | ~ 16 mths |
| Low | | 278 | 70 | | | 3 | 0.28% | 70,000 | 0.001% | 10,000 | 21.0% | 225,000 | | | | ~ 6 mths |
| Chassix | 03/12/15 | $833 | 3,500 | Key Employee Retention Plan | TBD | 69 | 1.97% | $2,371,258 | 0.285% | $33,677 | 29.8% | $750,000 | Multiple Installments | New Plan | 4 equal quarterly installments beginning on 12/31/14 and ending on 9/30/15 | ~ 10 mths |



# Key Employee Retention Plan

## Comparable KERPs Detail cont'd

**Footnotes**

[1] Reflects asset values as of Petition Date when information was available.  Otherwise, reflects the most recent information available prior to filing.

[2] Includes the discretionary pool.

[3] Excludes the discretionary pool.

[4] Shown as a median of payout ranges.

[5] Includes only full-time employees.

[6] This is a 2 year KERP.  The amount shown above is for one year.

[7] Agreements entered into in 2010.  Retention period ends between January 2013 and March 2013. Assume 24 months for illustrative purposes.

[8] 15 of the 51 participants are employees of non-debtor affiliates.

[9] Includes US employees only.  The Company also employed 3,500 employees abroad.

[10] Payout varies based on timing of emergence.  For illustrative purposes, the Debtors assumed a 2 quarter retention period with a sensitivity for an additional quarter.  FTI assumed 3 quarters to be conservative.

[11] Source: Disclosure Statement.

[12] In the event of a sale, the Debtors must consummate a sale by 9/1/15 in order for the KERP payment to be made.  For the purpose of this analysis, assume sale consummation on 9/1/15.

[13] Estimated by taking the difference between the motion filing date and the retention period end date.



7



Critical Thinking at the Critical Time ™

**Exhibit B**
**Woodward Declaration**

WEIL:\95286222\6\35076.0003

Marcia L. Goldstein
Ray C. Schrock, P.C.
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------x
:
**In re**                                 :        **Chapter 11**
:
**CHASSIX HOLDINGS, INC.,** *et al.,*      :        **Case No. 15-10578 (MEW)**
:
:        **(Jointly Administered)**
**Debtors.**[1]                            :
:
-------------------------------------------------------x

**DECLARATION OF DAVID J. WOODWARD**
**IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY**
**OF AN ORDER APPROVING DEBTORS' KEY EMPLOYEE**
**RETENTION PLAN FOR CERTAIN NON-INSIDER EMPLOYEES**

I, David J. Woodward, make this declaration under 28 U.S.C. § 1746:

1.      I submit this Declaration in support of the Motion of Debtors Pursuant to

11 U.S.C. §§ 503(c)(3) and 363(b) of the Bankruptcy Code for Entry of an Order Approving the

Debtor' Key Employee Retention Plan For Non-Insider Employees (the "**Motion**" ).[2]

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012).  The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

2.      Except as otherwise indicated, all statements in this Declaration are based on my personal experience and knowledge, my opinion, my discussions with the Debtors' management and professionals and/or my review of relevant documents.[3]  If called to testify, I could and would testify to each of the facts and opinions set forth herein.

### Qualifications

3.      I am the Interim Chief Financial Officer (the "**Interim CFO**") of Chassix Holdings, Inc. ("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**") and each of Chassix's domestic subsidiaries.  I have served in these capacities since January 23, 2015.  I am also a Senior Managing Director at FTI Consulting, Inc. ("**FTI**").  I have over thirty-four years of financial, operating, and mergers and acquisitions experience in a variety of sectors, including more than twenty-five years of experience in the transportation (automotive and heavy trucking) industry.  Prior to my retention as Interim CFO, FTI was retained to serve as financial advisor for Chassix Holdings and its subsidiaries.  In that capacity, I oversaw a team of individuals that assisted management in, among other things, managing and forecasting Chassix's liquidity position, identifying cost reductions, and negotiating with customers and suppliers.

4.      As Interim CFO, and previously as financial advisor to the Debtors, I am knowledgeable and familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records with respect to purchasing and supplier issues.

5.      I have reviewed the Motion or have otherwise had the contents of the Motion explained to me and, to the best of my knowledge, insofar as I have been able to ascertain after reasonable inquiry, I believe that the approval of the relief requested therein is

---

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

[3] Certain of the statements made herein relate to matters within the personal knowledge of other professionals at FTI working under my supervision or the Debtors' employees and are based on information provided by them.

2

necessary to minimize disruption to the Debtors' business operations and maximize the value of the Debtors' estates.

### The Eligible Key Employees

6.      As of the Commencement Date, the Debtors employed approximately 3,500 employees, as well as several hundred temporary workers, in fifteen manufacturing facilities located throughout the United States, including facilities in Georgia, Indiana, Massachusetts, Michigan, New York, and Tennessee.

7.      Given the highly technical and sophisticated nature of the Debtors' casting and machining operations, the Debtors' success is inextricably tied to the industry knowledge, experience, and skillset of the Debtors' workforce.   Accordingly, the Debtors designed the KERP in order to incentivize Key Employees to remain employed with the Debtors while the Debtors pursue their financial and operational restructuring and focus on stabilizing the businesses during the pendency of these chapter 11 cases.

8.      The Key Employees work across a variety of disciplines and are responsible for facilitating a range of tasks, including, without limitation, matters relating to finance, human resources, information technology, engineering, purchasing and sales, and general plant management.  Many of the Key Employees also have direct and regular interaction with the Debtors' largest customers and key vendors and, therefore, play a crucial role in maintaining and cultivating those relationships.

9.      Although certain of the Debtors' Key Employees hold titles such as "director" or "manager," each such employee must obtain approval from an appropriate senior manager before taking any significant action relating to strategic decision-making or corporate policy and asset disposition.  Although the Key Employees are important to the Debtors' businesses and are particularly vital during these chapter 11 cases, their titles are only

3

representative of the Key Employees' importance in their roles.  Further, none of the Key

Employees receive equity of the Debtors as part of their compensation structure or are members

of the Debtors' board of directors or participate in the Debtors' corporate governance.  Based on

my discussions with the Debtors' outside counsel and my review of the plan materials, none of

the Key Employees are executive officers of the Debtors.

          10.     Based on the foregoing, I believe that none of the Key Employees are

"insiders" of the Debtors (as such term is defined in the Bankruptcy Code) who exercise

meaningful control of the Debtors' day-to-day operations.  Further, I believe that the approval of

the KERP is necessary to minimize disruption to the Debtors' business operations and maximize

the value of the Debtors' estates

          I, the undersigned, declare under penalty of perjury that the foregoing is true and

correct.

Dated: April 1, 2015                   /s/ David. J. Woodward_____
      New York, New York            By: David J. Woodward
                                      Title: Interim Chief Financial Office

WEIL:\95288500\4\35076.0003

**Exhibit C**
**Proposed Order**

WEIL:\95286222\6\35076.0003

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
                                            :

In re                                  :       **Chapter 11**
                                            :

**CHASSIX HOLDINGS, INC.,** *et al.,*    :       **Case No. 15-10578 (MEW)**
                                            :

                                            :       **Jointly Administered**
                   **Debtors.**[1]  :

                                            :
--------------------------------------------------------x

## ORDER PURSUANT TO 11 U.S.C. §§503(c) AND 363(b)(1) APPROVING DEBTORS' KEY EMPLOYEE RETENTION PLAN FOR CERTAIN NON-INSIDER EMPLOYEES

Upon the motion, dated April 1, 2015 (the "**Motion**"),[2] of Chassix Holdings, Inc.

("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**"), and certain of their affiliates and subsidiaries,

as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively,

including Chassix Holdings and Chassix, the "**Debtors**"), for entry of an order, pursuant to

sections 503(c)(3) and 363(b)(1) of the Bankruptcy Code approving the Debtors' key employee

retention program for employees who are not considered "Insiders" as such term is defined in

section 101(31) of the Bankruptcy Code (the "**KERP**"), all as more fully described in the

Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein

in accordance with 28 U.S.C. §§ 157 and 1334 and Amended Standing Order of Reference M-

431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the relief

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee, LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

[2] Capitalized terms not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being

proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of

the Motion having been provided to all parties in interest in accordance with the Case

Management Order No. 1, dated March 20, 2015 (ECF No. 126) (the "**Notice Parties**"), and it

appearing that no other or further notice need be provided; and a hearing having been held on

April 23, 2015 at 11:00 a.m. (Eastern Time) to consider the relief requested in the Motion (the

"**Hearing**"); and upon the Declaration of J. Mark Allan Pursuant to Rule 1007-2 of the Local

Bankruptcy Rules of the Southern District of New York, filed on the Commencement Date, and

the declarations of Dewey Imhoff, a Senior Managing Director at FTI, and David J. Woodward,

the Debtors' Interim Chief Financial Officer, each filed contemporaneously with the Motion**;** and

the record of the Hearing and all of the proceedings had before the Court; and the Court having

found and determined that the relief sought in the Motion is in the best interest of the Debtors,

their estates, creditors, and all parties in interest, and that the legal and factual bases set forth in

the Motion establish just cause for the relief granted herein; and after due deliberation and

sufficient cause appearing therefor, it is

      ORDERED that the Motion is granted as set forth herein; and it is further

      ORDERED that, pursuant to sections 503(c) and 363(b)(1) of the Bankruptcy

Code, the KERP is approved;  and it is further

      ORDERED that, the Debtors are authorized, but not directed, to implement the

KERP in the ordinary course; and it is further

      ORDERED that pursuant to Bankruptcy Rule 6004(h), the terms and provisions

of this Order shall be immediately effective and enforceable upon its entry; and it is further

WEIL:\95286222\6\35076.0003

ORDERED that notwithstanding anything to the contrary contained herein, (i) any payment to be made, or authorization contained, hereunder shall be subject to the requirements imposed on the Debtors under the Debtors' postpetition financing agreements (the "**DIP Documents**") and any orders approving the DIP Documents and governing the Debtors' use of cash collateral (including with respect to any budgets governing or relating thereto) and (ii) to the extent there is any inconsistency between the terms of such orders approving the DIP Documents or the Debtors' use of cash collateral and any action taken or proposed to be taken hereunder, the terms of such orders approving the DIP Documents and use of cash collateral shall control; and it is further

ORDERED that the Debtors are authorized to take all steps necessary to carry out this Order; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

Dated: _____, 2015
       New York, New York


_____
United States Bankruptcy Judge

WEIL:\95286222\6\35076.0003