Marcia L. Goldstein
Ray C. Schrock, P.C.
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                                        :
In re                                                   :       **Chapter 11**
                                                        :
**CHASSIX HOLDINGS, INC.,** *et al.*,                   :       **Case No. 15-10578 (MEW)**
                                                        :
                                                        :       **Jointly Administered**
                    **Debtors.**[1]                     :
                                                        :
-------------------------------------------------------x

### NOTICE OF PROPOSED EXPANSION OF SERVICES TO BE PROVIDED BY ERNST & YOUNG LLP TO THE DEBTORS

**PLEASE TAKE NOTICE** that on April 24, 2015, the Court entered the *Order Pursuant to 11 U.S.C. §§ 327(a) and 330, Fed. R. Bankr. P. 2014 and 2016, and Local Rules 2014-1 and 2016-1 Authorizing the Debtors to Retain and Employ Ernst & Young LLP as Independent Auditor and Tax Advisor, Nunc Pro Tunc to the Commencement Date* (ECF No.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee, LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

326) (the "**E&Y Retention Order**"),[2] authorizing Chassix Holdings, Inc. and its above-captioned affiliated debtors and debtors in possession (collectively, the "**Debtors**") to retain and employ Ernst & Young LLP ("**E&Y**") as independent auditor and tax advisors in their Chapter 11 cases.

PLEASE TAKE FURTHER NOTICE that the Debtors have entered into two additional agreements with E&Y: (a) the Statement of Work – 2014 Transfer Pricing Documentation (the "**Transfer Pricing Documentation SOW**"), and (b) the Amendment to Statement of Work (the "**Tax Compliance SOW Amendment**," and together with the Transfer Pricing Documentation SOW, the "**Additional Engagement Letters**").[3]

PLEASE TAKE FURTHER NOTICE that under the Transfer Pricing Documentation SOW, which is attached hereto as <u>Exhibit A-1</u>, E&Y would be engaged to perform the following services, among others:

- preparing the transfer pricing documentation for Chassix, Inc. for the fiscal year ending December 31, 2014 with respect to the following intercompany transactions: (a) headquarters services transactions, and (b) tangible product transactions;

- advising the Debtors with respect to any tax issues arising in the ordinary course of business while the Debtors are in bankruptcy, including assistance with IRS or state and local tax examinations, sales and use taxes, property taxes, state and local income/franchise taxes, and employment taxes; and

- providing routine tax advice and assistance concerning issues as requested by the Debtors, when such projects are not covered by a separate

---

[2]  Capitalized terms used but not otherwise defined herein have the meaning given to them in the E&Y Retention Order.

[3]  The summaries of certain terms of the Additional Engagement Letters herein are qualified in their entirety by reference to the provisions of the Additional Engagement Letters themselves.  To the extent there is any discrepancy between the summaries contained in this Notice and the terms of the Additional Engagement Letters themselves, the terms of the Additional Engagement Letters shall control.

Statement of Work and do not involve any significant tax planning or projects.[4]

**PLEASE TAKE FURTHER NOTICE** that the Tax Compliance SOW Amendment, which is attached hereto as <u>Exhibit A-2</u>, amends that certain Statement of Work, effective as of May 14, 2014 (the "**Original Tax Compliance SOW**")[5] between E&Y and Dharma Holding Corporation on behalf of itself and its affiliates listed in Appendix A thereto. Pursuant to the Tax Compliance SOW Amendment, E&Y has agreed to perform certain additional services, and Chassix, Inc. has agreed to remit payment to E&Y for services performed under the Original Tax Compliance SOW.

**PLEASE TAKE FURTHER NOTICE** that E&Y has informed the Debtors that it intends to subcontract a modest portion of the services covered by the Tax Compliance SOW Amendment and the Original Tax Compliance SOW to a member firm of Ernst & Young Global Limited in Canada ("**E&Y Canada**"). E&Y has informed the Debtors that it expects that the fees and expenses for services to be subcontracted to E&Y Canada will be approximately $10,000, and that E&Y intends to seek compensation and expense reimbursements for such services in its own fee applications.

**PLEASE TAKE FURTHER NOTICE** that under the E&Y Retention Order, any party wishing to oppose the Debtors' entry into the Additional Engagement Letters must file an objection with the United States Bankruptcy Court for the Southern District of New York on or before the objection deadline of **May 22, 2015 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**"). Any such objection must be served on counsel for the Debtors so as to be received

---

[4] The services described in the second and third bullet points above pertain primarily to tax matters arising in the ordinary course of the Debtors' businesses or for which E&Y's fees would be modest. Any tax services relating to the Debtors' restructuring are governed by the Bankruptcy Tax SOW which was approved pursuant to the E&Y Retention Order.

[5] For reference, the Original Tax Compliance SOW is also attached hereto as <u>Exhibit A-2</u>.

by the Objection Deadline.  In the event no objections are timely filed prior to the Objection

Deadline in accordance with this notice, the Additional Engagement Letters may take effect

without any further notice, hearing, or other action, provided that, in accordance with the E&Y

Retention Order, the Debtors will submit to the Court a proposed order substantially in the form

attached hereto as <u>Exhibit B</u>.

     **PLEASE TAKE FURTHER NOTICE** that if an objection is timely filed and

served, the matter will be scheduled for the next omnibus hearing date (or such other hearing

date as set by the Court).

Dated: May 8, 2015
   New York, New York

          /s/ Ray C. Schrock, P.C.
          Marcia L. Goldstein
          Ray C. Schrock, P.C.

          WEIL, GOTSHAL & MANGES LLP
          767 Fifth Avenue
          New York, New York 10153
          Telephone:  (212) 310-8000
          Facsimile:  (212) 310-8007

          *Attorneys for Debtors*
          *and Debtors in Possession*

**<u>EXHIBIT A-1</u>**



**Building a better working world**

## Statement of Work – 2014 Transfer Pricing Documentation

This Statement of Work, which is entered into on March 19, 2015 (this "SOW"), is made by Ernst & Young LLP ("we" or "EY") and Chassix Holdings, Inc., on behalf of itself and its affiliated entities listed in Appendix A (collectively, "you" or "Client"), pursuant to the Agreement, dated March 3, 2015 (the "Agreement"), between EY and Chassix Holdings, Inc., which was executed in connection with the Client filing a petition under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") on or about March 8, 2015 with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), and describes certain tax services that EY will perform for the Client during the Client's Chapter 11 proceedings. This SOW shall be effective as of the date of the Client's filing a Chapter 11 petition with the Bankruptcy Court.

Except as otherwise set forth in this SOW, this SOW incorporates by reference, and is deemed to be a part of, the Agreement. The additional terms and conditions of this SOW shall apply only to the tax advisory Services covered by this SOW and not to Services covered by any other Statement of Work pursuant to the Agreement. Capitalized terms used, but not otherwise defined, in this SOW shall have the meanings in the Agreement, and references in the Agreement to "you" or "Client" shall be deemed references to you.

**Scope of Services**

We will provide the following tax advisory Services to you, contingent upon the Bankruptcy Court's approval of our retention in accordance with the terms and conditions that are set forth in the Agreement (inclusive of this SOW):

<u>TRANSFER PRICING:</u>

EY will prepare transfer pricing documentation for Chassix, Inc. ("Chassix U.S.") for the fiscal year ending December 31, 2014 ("FY 2014") with respect to the following intercompany transactions:

►    Headquarters services transactions; and
►    Tangible product transactions.

Our analysis will include the following steps:

►    **Information Request:** EY will request general information pertaining to Chassix U.S. and to each intercompany transaction under review. These materials may include information regarding the legal and organizational structure of Chassix U.S. and the operations of each relevant related entity. We will also request information regarding the type, volume, and terms of intercompany transactions between each relevant related entity.



Building a better
working world

- **Fact Gathering Interviews:** EY will conduct 2-3 interviews with Chassix U.S. personnel knowledgeable about the general business operations and, specifically, the tangible product transactions under review.

- **Functional Analysis:** Based on discussions with Chassix U.S. and information compiled during the fact gathering interviews, EY will update the functional analysis to reflect Chassix U.S.' functions, risks, and assets with respect to the intercompany transactions as applicable to FY 2014.

- **Company and Industry Analyses:** EY will update the company analysis that will provide a background of Chassix U.S. and its business operations, a description of the product lines, core competencies and capabilities. We will also update the industry analysis to describe the industry structure, market and competitor trends.

- **Benchmarking Analysis:** To benchmark the headquarters services transactions, EY will update the searches for comparables documented in the transfer pricing report for the fiscal year ended December 31, 2013 ("FY 2013 Transfer Pricing Report") using the most recent publicly available financial data. EY will also conduct a search for comparable manufacturers of automotive/industrial products to benchmark Chassix U.S.' tangible product transactions.

- **Headquarters Services Allocation:** EY will incorporate the results of the analysis previously performed to allocate Chassix U.S.' headquarters services costs for FY 2014 to its foreign affiliates in the FY 2014 transfer pricing documentation.

- **Financial Analysis:** Chassix U.S. will prepare any needed Profit and Loss ("P&L") statements and/or segmented P&Ls, which we will use in our analysis. We will review the available financial information to confirm the value of the transactions and identify income statement and balance sheet items that may require adjustment prior to completing our analysis.

  To test the arm's length nature of Chassix U.S.' intercompany transactions, we anticipate comparing the financial result of Chassix U.S. with the interquartile range of financial results established using the comparables identified in the benchmarking analysis.

- **Reports:** At the conclusion of the above steps, EY will prepare transfer pricing documentation for Chassix U.S. for FY 2014 in accordance with the reasonableness requirements of Treas. Reg. § 1.6662-6(d) for purposes of avoiding potential transfer pricing penalties.



**Building a better working world**

<u>TAX ADVISORY/ROUTINE ON-CALL:</u>

▶   Upon written request, advise with respect to any tax issues arising in the ordinary course of business while in bankruptcy, including, but not limited to assistance with IRS and/or state and local tax examinations, sales and use taxes, property taxes, state and local income/franchise taxes, and employment taxes (including assistance responding to notices and assessments);

▶   EY will provide to Client routine tax advice and assistance concerning issues as requested by Client when such projects are not covered by a separate SOW and do not involve any significant tax planning or projects ("on-call tax advisory services"). On-call tax advisory services provided directly to Client the expected fees for each specific project (determined at the beginning of the project) are not to exceed $25,000. The scope of these Services may be agreed to orally or through written communications with Client such as e-mails. The types of Services are described further below:

   ▶   Assistance with tax issues by answering one-off questions, drafting memos describing how specific tax rules work, assisting with general transactional issues, and assisting Client in connection with its dealings with tax authorities (other than serving as a representative).

   ▶   Specific tasks that may be involved in connection with the Services include the following: participating in meetings and telephone calls with Client; participating in meetings and telephone calls with taxing authorities and other third parties where we are not representing Client before the taxing authority; reviewing transaction-related documentation; researching technical issues; and preparing technical memoranda, letters, e-mails, and other written documentation.

   ▶   On-call tax advisory services are not intended to cover Services related to significant tax planning or other projects where a mutual understanding of the scope of the engagement should be formally documented. Routine on-call Services will not include a transaction that is determined to be a reportable transaction, transaction of interest or transaction similarly designated by a tax authority; engagements where we will render formal opinions or opinions that will be relied upon by third parties; engagements where we prepare tax returns, entries on tax returns, or Reports of Foreign Bank and Financial Accounts (FBARs), FinCEN Form 114; studies with respect to Client's tax attributes (e.g., basis studies or repairs and maintenance studies); loaned or assigned staff engagements; and due diligence engagements.



We agree any modification of scope will be confirmed in writing, which may be approved by Client via electronic means (i.e. email). The Services may be modified from time to time by our mutual written agreement and approval of the Bankruptcy Court, if required. Client acknowledges and agrees that, whether or not this SOW has been approved by the Bankruptcy Court at the time any Report is rendered, any such Report rendered by EY prior to the delivery of its final Report is preliminary in nature and cannot be relied upon for any purpose, including penalty protection.

**Out-of-Scope Services**

Any activities not described as Services, as indicated above under Scope of Services, are not covered by the fees stated herein. These services will be considered outside the scope of this SOW and are the responsibility of Client to perform on a timely basis unless otherwise agreed by the parties in writing (in a separate SOW or an amendment to this SOW) and approved by the Bankruptcy Court.

**Your obligations**

We draw your attention to the reservations set out in paragraph 5 of the General Terms and Conditions of the Agreement, as well as your management responsibilities under paragraph 6, and your representation, as of the date hereof, under paragraph 26 thereof. You have obtained the prior approval of your Audit Committee for these Services, as applicable.

You will not, and you will not permit others to, quote or refer to any Reports, any portion, summary or abstract thereof, or to EY or any other EY Firm, in any document filed or distributed in connection with (i) a purchase or sale of securities to which the United States or state securities laws ("Securities Laws") are applicable, or (ii) periodic reporting obligations under Securities Laws. You will not contend that any provisions of Securities Laws could invalidate any provision of this SOW.

**Additional terms and conditions**

The Services are advisory in nature. EY will not render an assurance report or assurance opinion under the Agreement, nor will the Services constitute an audit, review, examination, or other form of attestation as those terms are defined by the American Institute of Certified Public Accountants. We will not conduct a review to detect fraud or illegal acts.

You should be aware that the Internal Revenue Code imposes a penalty on an underpayment of tax attributable to any disallowance of claimed tax benefits because a transaction entered into after March 30, 2010, lacks "economic substance." The penalty rate is 20 percent if the transaction is adequately disclosed to the IRS, with the penalty rate increased to 40 percent if the transaction is not adequately disclosed in the relevant tax return or attachment to that return. As the penalty is one of strict liability, a taxpayer cannot show reasonable cause for the avoidance of the economic substance penalty by establishing reliance on the tax advice of a qualified advisor. Accordingly, our Tax Advice



EY
Building a better
working world

cannot provide any assurance that the claimed tax benefits of a transaction entered into after March 30, 2010, would not be subject to disallowance by reason of a determination by the IRS or the courts that a transaction lacks economic substance or fails to meet the requirements of any similar rule of law, nor can Tax Advice that we provide be relied upon to protect against applicable penalties that may be asserted if it is determined that the transaction lacked economic substance where otherwise required.

If we receive a request from a third party for any information relating to our Tax Advice, we will notify you and will not release any such information unless you have executed an appropriate written consent authorizing such disclosure and the third party has executed a nonreliance and release letter acceptable to us in form and substance.

To facilitate performance of the Services, we may (and may, subject to additional terms and conditions, including license agreements, permit your authorized representatives to) use certain software and tools that allow us to collaborate with you electronically, including Ernst & Young *eRoom* (collectively, "Collaboration Tools"). You shall not, and shall not permit third parties to, copy or modify any Collaboration Tools, or decompile, reverse engineer, or in any way derive any source code from, or create any derivative work of, any Collaboration Tools. COLLABORATION TOOLS ARE PROVIDED "AS IS," AND NONE OF EY OR ANY OTHER PARTY INVOLVED IN THE CREATION, PRODUCTION OR DELIVERY OF ANY COLLABORATION TOOL MAKES ANY WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO ANY COLLABORATION TOOL, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OR USE, NON-INFRINGEMENT, TITLE, OR ANY WARRANTY THAT THE OPERATION OF ANY COLLABORATION TOOL WILL BE UNINTERRUPTED, ERROR FREE OR THAT IT WILL BE COMPATIBLE WITH ANY OF YOUR HARDWARE OR SOFTWARE. EY WILL NOT SUPPORT, MAINTAIN OR UPGRADE ANY COLLABORATION TOOL. YOU ASSUME SOLE RESPONSIBILITY FOR THE USE OF ANY COLLABORATION TOOL AND THE RESULTS THEREOF. Your use of Collaboration Tools (or use on your behalf) is not a substitute for any documentation or system of records you must create or maintain pursuant to law, including, without limitation, Internal Revenue Code Section 6001. You alone are responsible for maintaining separate copies of any documentation you input into any Collaboration Tool.

If the Services are subject to the audit committee pre-approval requirements of the SEC and/or the PCAOB, this SOW will not be effective until the later of (1) the execution of this SOW or (2) the approval of your Audit Committee (or a duly authorized representative of your Audit Committee).



**EY**

Building a better
working world

**Other**

**Contacts**

You have identified Annette Benson as your contact with whom we should communicate about these Services. Your contact at EY for these Services will be Daniel Kelley.

**Engagement Team**

Daniel Kelley (Partner), Karin Schmitz (Senior Manager), and John Ridgeway (Senior Manager) will lead the EY team in providing the Services. If any of these individuals ceases to provide tax Services to the Client pursuant to the Agreement, EY will so advise the Client and, if that person is replaced, provide the Client with the name of the professional's replacement. Other staff, not identified herein, may be utilized as required to conduct our work in an efficient manner.

**Fees**

The General Terms and Conditions of the Agreement address our fees and expenses generally.

For transfer pricing related matters, you shall pay fees of $69,000 for the Services, of which $34,500 will be due on April 30, 2015, $27,600 due upon delivery of the Draft Report and $6,900 due upon delivery of the Final Report.

For tax advisory/ROCA matters, you shall pay fees for the Services, which fees are based on the time that our professionals spend performing them, as adjusted annually on July 1 while the Services under this SOW are being performed. The rates, by level of tax professional, are as follows:

You shall pay fees for the Services based on the time that our professionals spend performing them, billed at the following hourly rates for each such individual.

|  | Local | National Tax Transaction Advisory Services |
|---|---|---|
| Partner | 600 | 895 |
| Executive Director | 500 | 830 |
| Senior Manager | 500 | 755 |
| Manager | 400 | 660 |
| Senior | 275 | 300 |
| Staff | 225 | 250 |



You shall also pay any potential value-added taxes (VAT), sales taxes, and other indirect taxes incurred in connection with the performance of the Services, including any such taxes and related administrative costs that result from billing arrangements specifically requested by you.

We will submit an itemized and detailed billing statement, and we will request payment of our fees and expenses, in accordance with the United States Bankruptcy Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules for the United States Bankruptcy Court for the Southern District of New York ("Local Rules") and any relevant administrative orders. We will submit our invoices as the work progresses and payment of them will be made upon receipt, or as quickly as the Bankruptcy Code, the Bankruptcy Rules, Local Rules and any relevant administrative orders allow.

We acknowledge that payment of our fees and expenses hereunder is subject to (i) the jurisdiction and approval of the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code, any order of the Bankruptcy Court approving the retention of us and the U.S. Trustee Guidelines, (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing interim and final fee applications.

In witness whereof, the parties have executed this SOW as of the date set forth above.

Thanks again for your selection of our firm.

*Ernst & Young LLP*

Chassix Holdings, Inc. on behalf of
itself and its affiliates listed in Appendix A

By: _____
Name: DAVID J. Woodward
Title: Interim CFO

Date: April 21, 2015

EYLLPUSTAX001/ADVISORY/SOW(EA)/080814
Chassix Holdings, Inc.
Page 7 of 8

**Appendix A**

**Affiliate Listing**

UC Holdings, Inc.
Chassix, Inc.
Diversified Machine, Inc.
Diversified Machine Bristol, LLC
Diversified Machine Montague, LLC
Diversified Machine, Milwaukee LLC
Chassix Georgia Machining, LLC
DMI Columbus, LLC
DMI Edon, LLC
Mexico Products I, LLC
DMI Itztapalapa S.A. de C.V. (Mexico)
Diversified Machine, Barcelona S.L. (Spain)
DMI Automotive Spain, S.L. (Spain)
DMI China Holding, LLC
DMI (Suzhou) Automotive Components Co., LTD (China)
Automotive Properties of New York, LLC
Automotive Properties SCI (France)
Concord International, Inc.
SMW Automotive, LLC
AluTech, LLC
Automotive, LLC
Chassis Co. of Michigan, LLC
SMW Automotive Ltd (Hong Kong)
SMW Automotive Parts (Wuhan) Co., Ltd. (China)
Suzhou Alutech Automotive Parts Co., Ltd. (China)
Concord International SAS (France)
AluTech SAS (France)
SMW Automotive SAS (France)
Automotive Design and Engineering Solutions Private Limited (India)
SMB Automotive LTDA (Brazil)

**EXHIBIT A-2**



**EY**

Building a better
working world

## Amendment to Statement of Work

This amendment, dated March 19, 2015 (this "Amendment") amends the Statement of Work, dated May 14, 2014 (the "Original SOW" and as modified by this Amendment, the "SOW"), between Ernst & Young LLP ("we" or "EY") and Dharma Holding Corporation on behalf of itself and its affiliated entities listed in Appendix A ("you" or "Client") related to the tax compliance services. Capitalized terms used, but not otherwise defined, in this Amendment shall have the respective meanings ascribed to them in the Original SOW and identical terms defined in this Amendment and in the Original SOW shall have the respective meanings ascribed to them herein. The Original SOW was executed pursuant to the agreement, dated February 21, 2013 between EY and Dharma Holding Corporation (the "Agreement").

Except as modified by this Amendment, all terms and conditions of the Original SOW shall continue in full force and effect and be unaffected by this Amendment.

This Amendment ratifies the agreement between EY and Client to include the following additional services:

| Entity | Return |
|---|---|
| Dharma Holding Corporation and Subsidiaries | 2014 California Return |
| Chassix, Inc. | 2014 Georgia Return |
| Chassix, Inc. | 2014 Tennessee Return |
| | |
| Dharma Holding Corporation and Subsidiaries | 2015 California Return |
| Chassix, Inc. | 2015 Tennessee Return |
| Chassix, Inc. | 2015 Georgia Return |

**Additional Services:**

Upon written request (which may include authorization through electronic means), EY will assist Client with "Additional Services", which may include other tax compliance services, including the preparation of additional returns and computation of estimated tax payments. Client may authorize a maximum amount of 10 additional returns via this procedure for a maximum fee of $25,000. Additionally, Client may approve services outlined in Attachment A of the Original SOW for fees outlined in Original SOW.



**Building a better working world**

## Fees

The terms and conditions of the Agreement address our fees and expenses generally. In addition to the fees and expenses described in the Original SOW, our fees and expenses for the additional services described for the tax year 2014 and 2015 in this Amendment shall be $7,100 per year.

You shall pay us a fee of $157,600 (original fee of $150,500 and additional fee of $7,100) and $160,600 (including original fee of $153,500 and additional fee of $$7,100) for the tax years ending December 31, 2014 and December 31, 2015 for the Services relating to the tax returns described herein and on Attachment A of the Original SOW.

Invoices for the returns will be sent and payable as follows:

Tax Year ending December 31, 2014

|  | Payable Upon Receipt | Amount |
|---|---|---|
| First Progress bill | May 15, 2015 | $105,600 |
| Second Progress bill | June 15, 2015 | $22,000 |
| Third Progress bill | July 15, 2015 | $15,000 |
| Fourth Progress bill | August 15, 2015 | $10,000 |
| Final bill | Upon delivery of final returns | $5,000 |

Tax Year ending December 31, 2015

|  | Payable Upon Receipt | Amount |
|---|---|---|
| First Progress bill | April 1, 2016 | $83,600 |
| Second Progress bill | May 15, 2016 | $25,000 |
| Third Progress bill | June 15, 2015 | $22,000 |
| Fourth Progress bill | July 15, 2015 | $15,000 |
| Fifth Progress bill | August 15, 2015 | $10,000 |
| Final bill | Upon delivery of final returns | $5,000 |



**EY**

Building a better
working world

If Client approves Additional Services as outlined above, the fees for such services (for additional state returns, computations of estimated payments and/or for services in Attachment A of the Original SOW) are not incorporated in above payment schedules. Payment for the Additional Services will be invoiced as incurred.

Chassix, Inc. hereby agrees to remit payment to EY for services performed under the Original SOW.

We will submit an itemized and detailed billing statement, and we acknowledge that payment of our fees and expenses by Chassix, Inc. will be in accordance with the United States Bankruptcy Code (the "Bankruptcy Code"), the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Local Rules for the United States Bankruptcy Court for the Southern District of New York ("Local Rules") and any relevant administrative orders. We will submit our invoices as the work progresses and payment of them will be made upon receipt, or (in the case of payment by Chassix, Inc.) as quickly as the Bankruptcy Code, the Bankruptcy Rules, Local Rules and any relevant administrative orders allow.

We acknowledge that payment of our fees and expenses by Chassix, Inc. hereunder is subject to (i) the jurisdiction and approval of the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code, any order of the Bankruptcy Court approving the retention of us and the U.S. Trustee Guidelines, (ii) any applicable fee and expense guidelines and/or orders and (iii) any requirements governing interim and final fee applications.

Your obligation to pay our fees and expenses is not contingent upon the results of the Services or the consummation of any transaction.

In witness whereof, the parties have executed this Amendment as of the date set forth above.

*Ernst & Young LLP*

Dharma Holding Corporation, on behalf of
itself and its affiliates listed in Appendix A

By: _____    _____
    Name                              Title

Chassix, Inc.

By: _____    Interim CFO
    Name                              Title

**Attachments**
Dharma Holding Corporation
Page 3 of 4

**Appendix A**

**Affiliate Listing**

Triomphe Intermediate Holding Corporation
Chassix Holdings, Inc.
UC Holdings, Inc.
Chassix, Inc.
Diversified Machine, Inc.
Diversified Machine Bristol, LLC
Diversified Machine Montague, LLC
Diversified Machine, Milwaukee LLC
Chassix Georgia Machining, LLC
DMI Columbus, LLC
DMI Edon, LLC
Mexico Products I, LLC
DMI Itztapalapa S.A. de C.V. (Mexico)
Diversified Machine, Barcelona S.L. (Spain)
DMI Automotive Spain, S.L. (Spain)
DMI China Holding, LLC
DMI (Suzhou) Automotive Components Co., LTD (China)
Automotive Properties of New York, LLC
Automotive Properties SCI (France)
Concord International, Inc.
SMW Automotive, LLC
AluTech, LLC
Automotive, LLC
Chassis Co. of Michigan, LLC
SMW Automotive Ltd (Hong Kong)
SMW Automotive Parts (Wuhan) Co., Ltd. (China)
Suzhou Alutech Automotive Parts Co., Ltd. (China)
Concord International SAS (France)
AluTech SAS (France)
SMW Automotive SAS (France)
Automotive Design and Engineering Solutions Private Limited (India)
SMB Automotive LTDA (Brazil)



**EY**

Building a better
working world

## Statement of Work - Tax Compliance Services

This Statement of Work, which is effective as of May 14, 2014 (this "SOW"), is made by Ernst & Young LLP ("we" or "EY") and Dharma Holding Corporation, on behalf of itself and its affiliated entities listed in Appendix A (collectively, "you" or "Client"), pursuant to the Agreement, dated February 21, 2013 (the "Agreement"), between EY and Dharma Holding Corporation.

Except as otherwise set forth in this SOW, this SOW incorporates by reference, and is deemed to be a part of, the Agreement. The additional terms and conditions of this SOW shall apply only to the tax compliance Services covered by this SOW and not to Services covered by any other Statement of Work pursuant to the Agreement. Capitalized terms used, but not otherwise defined, in this SOW shall have the meanings in the Agreement, and references in the Agreement to "you" or "Client" shall be deemed references to you.

### Scope of Services

EY will provide the following tax compliance Services for Client's tax years ending December 31, 2013, 2014, and 2015:

We will prepare the Federal and State returns and quarterly estimated payments as listed in Attachment A.

Client may be required to file Schedule UTP ("Uncertain Tax Position Statement") with its federal tax return beginning with the 2010 tax year. Among other services, EY can assist you with a review of your financial statement reserve schedules to identify positions that might be subject to disclosure on Schedule UTP, discuss opportunities for remediating such positions, and provide assistance regarding implementation of Schedule UTP processes for current and future years. We will be happy to discuss and provide fee estimates for these services, which would be covered under a separate SOW.

Upon written request, EY will assist Client with other tax compliance services, including preparation of additional returns for the current tax year, and extension requests and computation of estimated tax payments for subsequent tax years. However, these services are not covered under the fee quoted in this letter. We will be happy to discuss and provide fee estimates for such additional services, which would be invoiced separately and subject to all other terms and conditions of this SOW and the above-referenced Agreement.

All Client copies of the tax return(s) will be presented to Client in an electronic format.

This engagement does not include (1) an analysis of any shift in ownership of Client stock, (2) the preparation of statements required by Internal Revenue Code §§382 and 383, or (3) a determination of whether such code sections limit the amount of taxable income or tax that can be offset by net

EYLLPUSTAX002/COMPLIANCE/SOW(EA)/022714
Dharma Holding Corporation
Page 1 of 23



**EY**

**Building a better
working world**

operating loss carryforwards, certain recognized built-in losses, certain excess credits, or net capital loss carryovers. The limitations under these provisions may have a material adverse impact on Client's tax liability. We will not prepare a return on which taxable income (or tax) is offset by such attributes unless an analysis is performed. If you would like EY to perform such an analysis, those services would be covered under a separate engagement letter. Please contact Karin Schmitz if you would like to discuss additional services and fees associated with the analysis and reporting requirements under these rules.

This engagement does not include any advice or determinations regarding what expenses may be qualified research expenses under Internal Revenue Code §41 or comparable state statutes.

Client may be required to file one or more Forms 3115 ("Application for Change in Accounting Method") with its federal tax return beginning with the 2014 tax year (or 2013, or 2012 tax year if adopted early) in order to implement the accounting method changes required by the final set of regulations commonly referred to as the "tangible property regulations." If one or more Forms 3115 are to be filed with Client's [2014] tax return, EY will prepare the Form(s) 3115 based on your instructions and guidance and will file the duplicate form(s) with the IRS according to the instructions provided in the relevant revenue procedure. Any preparation and processing of these forms are in addition to our Services in connection with the preparation of the tax returns for the tax year ended December 31, 2014. Among other services, EY can assist you with evaluating the impact the regulations have on your current tax accounting including identifying what accounting methods can or must be changed, advising you on the various methods that may be available for remediating your current tax methods if necessary, and providing assistance regarding implementation of the regulations for current and future years. We will be happy to discuss and provide fee estimates for these services, which would be covered under a separate SOW.

**Your obligations**

We draw your attention to the reservations set out in paragraph 5 of the General Terms and Conditions of the Agreement, as well as your management responsibilities under paragraph 6, and your representation, as of the date hereof, under paragraph 26 thereof. You have obtained the prior approval of your Audit Committee for these Services, as applicable.

**Additional terms and conditions**

To facilitate performance of the Services, we may (and may, subject to additional terms and conditions, including license agreements, permit your authorized representatives to) use certain software and tools that allow us to collaborate with you electronically, including Ernst & Young *eRoom* (collectively, "Collaboration Tools"). You shall not, and shall not permit third parties to, copy or modify any Collaboration Tools, or decompile, reverse engineer, or in any way derive any source code from, or create any derivative work of, any Collaboration Tools. COLLABORATION TOOLS ARE PROVIDED "AS IS," AND NONE OF EY OR ANY OTHER PARTY INVOLVED IN THE

A member firm of Ernst & Young Global Limited



**EY**

Building a better
working world

CREATION, PRODUCTION OR DELIVERY OF ANY COLLABORATION TOOL MAKES ANY
WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO ANY COLLABORATION TOOL,
INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY
OR FITNESS FOR ANY PARTICULAR PURPOSE OR USE, NON-INFRINGEMENT, TITLE, OR
ANY WARRANTY THAT THE OPERATION OF ANY COLLABORATION TOOL WILL BE
UNINTERRUPTED, ERROR FREE OR THAT IT WILL BE COMPATIBLE WITH ANY OF YOUR
HARDWARE OR SOFTWARE. EY WILL NOT SUPPORT, MAINTAIN OR UPGRADE ANY
COLLABORATION TOOL. YOU ASSUME SOLE RESPONSIBILITY FOR THE USE OF ANY
COLLABORATION TOOL AND THE RESULTS THEREOF. Your use of Collaboration Tools (or
use on your behalf) is not a substitute for any documentation or system of records you must create or
maintain pursuant to law, including, without limitation, Internal Revenue Code Section 6001. You
alone are responsible for maintaining separate copies of any documentation you input into any
Collaboration Tool.

Client authorizes EY, its affiliates, and other members of the global Ernst & Young network,
including those located outside the United States, to disclose Client's tax return information received
or generated in connection with the Services described in this SOW, including prior year tax return
information, to and among each other for the purpose of rendering the Services, discussing and
providing related services to you (including bringing to your attention planning opportunities we may
identify based upon the preparation and/or review of your tax returns), and conducting quality
reviews and reviews of compliance with EY policies and professional standards. You have the ability
to request a more limited disclosure of tax return information than that described above. If, at any
time, you would like us to narrow the scope of the information to be disclosed, please contact us in
writing and we will limit any disclosures that have not yet occurred. You acknowledge that this
consent will be valid for three years from the date this SOW is signed by you below.

**Disclosure of reportable transactions**

Treasury regulations require taxpayers to file disclosure statements relating to certain tax
strategies/transactions that the Internal Revenue Service ("IRS") has identified as Listed Transactions
or Transactions of Interest, any transaction that is substantially similar to a Listed Transaction or
Transaction of Interest, and Other Reportable Transactions. The disclosure statements must be filed
with the proper tax returns and also sent separately to the IRS. In addition, some states have enacted
tax shelter legislation requiring taxpayers to file reportable transaction disclosure statements with the
appropriate state income and franchise tax returns. Failure to disclose properly any of these
transactions/strategies in which Client directly or indirectly participated may result in the imposition
of penalties.



**EY**
Building a better
working world

During the process of gathering data to prepare Client's tax return(s), EY requires Client to complete a questionnaire about Listed Transactions, Transactions of Interest, and Other Reportable Transactions, which is attached to this SOW. If there is a particular person other than you who should respond to such questionnaire on behalf of Client, please immediately provide to EY that person's name, position, and telephone number. EY shall not be liable for any penalties resulting from Client's failure to accurately and timely respond to the questionnaire or to file timely the required disclosure statement.

## Contacts

You have identified Annette Benson as your contact with whom we should communicate about these Services. Your contacts at EY for these Services will be Karin Schmitz and Dan Kelley.

## Fees

The General Terms and Conditions of the Agreement address our fees and expenses generally.

You shall pay us a fee of $132,500, $150,500 and $153,500 for the tax years ending December 31, 2013, December 31, 2014 and December 31, 2015 ($436,500 in total) for the Services relating to the tax returns stated on Attachment A, provided that EY receives all information necessary for the completion of the returns (in electronic forms, where requested) by mutually agreed dates. If the agreed timeline is not met, our fees are subject to change. You shall also pay any potential value-added taxes (VAT), sales taxes, and other indirect taxes incurred in connection with the delivery of the Services, including any such taxes and related administrative costs that result from billing arrangements specifically requested by you.

Invoices for the returns will be sent and payable as follows:

Tax Year ending December 31, 2013

|  | Payable Upon Receipt | Amount |
|---|---|---|
| First Progress bill | May 31, 2014 | $ 66,000 |
| Second Progress bill | June 15, 2014 | $ 20,000 |
| Third Progress bill | July 15, 2014 | $ 15,000 |
| Fourth Progress bill | August 15, 2014 | $ 11,000 |
| Fifth Progress bill | September 15, 2014 | $ 11,000 |
| Final bill | Upon delivery of final returns | $  9,500 |



**EY**
Building a better
working world

Tax Year ending December 31, 2014

|  | Payable Upon Receipt | Amount |
|---|---|---|
| First Progress bill | April 1, 2015 | $75,500 |
| Second Progress bill | May 15, 2015 | $23,000 |
| Third Progress bill | June 15, 2015 | $22,000 |
| Fourth Progress bill | July 15, 2015 | $15,000 |
| Fifth Progress bill | August 15, 2015 | $10,000 |
| Final bill | Upon delivery of final returns | $5,000 |

Tax Year ending December 31, 2015

|  | Payable Upon Receipt | Amount |
|---|---|---|
| First Progress bill | April 1, 2016 | $76,500 |
| Second Progress bill | May 15, 2016 | $25,000 |
| Third Progress bill | June 15, 2015 | $22,000 |
| Fourth Progress bill | July 15, 2015 | $15,000 |
| Fifth Progress bill | August 15, 2015 | $10,000 |
| Final bill | Upon delivery of final returns | $5,000 |

Any expenses, applicable taxes, or other charges, if any, will be billed separately as incurred.

Thank you again for your selection of our firm.

*Ernst & Young LLP*



**EY**

Building a better
working world

Dharma Holding Corporation, on behalf of
itself and its affiliates listed in Appendix A

By: _____
      Signature

      _Brad   Frederick_____
      Name (Please Print)

Title: _____CFO_____

Date: _____5/20/14_____

Attachments

**Appendix A**

**Affiliate Listing**

Dharma Holding Corporation
Triomphe Intermediate Holding Corporation
Chassix Holdings, Inc.
UC Holdings, Inc.
Chassix, Inc.
Diversified Machine, Inc.
Diversified Machine Bristol, LLC
Diversified Machine Montague, LLC
Diversified Machine, Milwaukee, LLC
Chassix Georgia Machining, LLC
DMI Columbus, LLC
DMI Edon, LLC
Mexico Products I, LLC
DMI Itziapalapa S.A. de C.V. (Mexico)
Diversified Machine, Barcelona S.L. (Spain)
DMI Automotive Spain, S.L. (Spain)
DMI China Holding, LLC
DMI (Suzhou) Automotive Components Co., LTD (China)
Automotive Properties of New York, LLC
Automotive Properties SCI (France)
Concord International, Inc.
SMW Automotive, LLC
AluTech, LLC
Automotive, LLC
Chassis Corp of Michigan, LLC.
SMW Automotive Limited (Hong Kong)
SMW Automotive Parts (Wuhan) Co., Ltd. (China)
Suzhou Alutech Automotive Parts Co., Ltd. (China)
Concord International SAS (France)
AluTech SAS (France)
SMW Automotive SAS (France)
Automotive Design and Engineering Solutions Private Limited (India)
SMB Automotive LTDA (Brazil)

# ATTACHMENT A

**Dharma Holding Corporation and Subsidiaries**
**2013 Tax Compliance**

| Entity | Jurisdiction | Return Form | Filing Method | Return Type (Income/Franchise/Etc.) |
|---|---|---|---|---|
| Diversified Machine, Inc. | Canada | Form T2 | Separate | Income |
| Diversified Machine Bristol, Inc. | Canada | Form T2 | Separate | Income |
| Diversified Machine Montague, Inc. | Canada | Form T2 | Separate | Income |
| DMI Columbus, LLC | Canada | Form T3 | Separate | Income |
| | | | | |
| Dharma Holding Corporation & Subsidiaries | Federal | Form 1120 | Consolidated | Income |
| Dharma Holding Corporation & Subsidiaries | Federal | Form 5471 (8) | N/A | Foreign Information |
| Dharma Holding Corporation & Subsidiaries | Federal | Form 8858 (3) | N/A | Foreign Information |
| Dharma Holding Corporation & Subsidiaries | Federal | Form 8865 (1) | N/A | Foreign Information |
| Dharma Holding Corporation & Subsidiaries | Illinois | Form IL-1120 | Unitary | Income/Replacement |
| Dharma Holding Corporation & Subsidiaries | Indiana | Form IT-20 | Consolidated | Income |
| Dharma Holding Corporation & Subsidiaries | Michigan (CIT) | Form 4891 | Unitary | Income |
| Dharma Holding Corporation & Subsidiaries | Wisconsin | Form 4 | Combined | Franchise/Income |
| Dharma Holding Corporation & Subsidiaries | Massachusetts | Form 355U | Combined | Income |
| | | | | |
| Diversified Machine, Inc. | Georgia | Form 600 | Separate | Income |
| Diversified Machine, Inc. | Missouri | From MO-1120 | Separate | Franchise/Income |
| Diversified Machine, Inc. | North Carolina | Form CD-405 | Separate | Franchise/Income |
| Diversified Machine, Inc. | North Carolina | Form CD-479 | Separate | Annual Report |
| Diversified Machine, Inc. | City of Edon | Form R | Separate | Income |
| Diversified Machine, Inc. | Alabama | Form 20C | Separate | Income |
| Diversified Machine Bristol, Inc. | Alabama | Form PPT | Separate | Business Privilege |
| Diversified Machine Montague, Inc. | Alabama | Form PPT | Separate | Business Privilege |
| Diversified Machine, Inc. | Kentucky | Form 720 | Separate | Income/LLET |
| Diversified Machine, Inc. | South Carolina | Form SC-1120 | Separate | Income |
| Diversified Machine, Inc. | Tennessee | Form FAE 170 | Separate | Franchise/Excise |
| Concord International | Tennessee | Form FAE 170 | Separate | Franchise/Excise |
| Concord International | New York | CT-3 | Separate | Franchise |
| Chassix Inc. | New York | CT-3 | Separate | Franchise |
| Concord International | City of Port Huron | PH-1120 | Separate | Income |
| Chassix Inc. | City of Port Huron | PH-1120 | Separate | Income |
| | | | | |
| Estimated payments – Q2, 2014 only | Federal and state | Various | N/A | Income/Franchise |

**Total Full Year Return**

**2013 Short Period Returns (1/1/2013 – 2/28/2013)**

| Entity | Jurisdiction | Return Form | Filing Method | Return Type (Income/Franchise/Etc.) |
|---|---|---|---|---|
| Diversified Machine Bristol, Inc. | AL | AL 20C | Separate | Income/Franchise |
| Diversified Machine Montague, Inc. | AL | AL 20C | Separate | Income/Franchise |
| Diversified Machine Montague, Inc. | KY | KY 720 | Separate | Income |
| Automotive Corporation Inc. | NY | NY CT-3 | Separate | Income |
| SMW Automotive Corporation | Port Huron | MI_City_PH-1120-UC | Separate | Income |
| Diversified Machine Montague, Inc. | SC | SC 1120 | Separate | Income |
| Diversified Machine Montague, Inc. | TN | TN FAE-170 Annual | Separate | Income |
| SMW Automotive Corporation | TN | TN FAE-170 Annual | Separate | Income |
| Chassis Corp. of Michigan | Port Huron | MI_City_PH-1120-UC | Separate | Income |

**Total Short Period Return**

**2012 Returns**

| Entity | Jurisdiction | Return Form | Filing Method | Return Type (Income/Franchise/Etc.) |
|---|---|---|---|---|
| Chassis Corp. of Michigan (1/14/12-8/22/12) | Port Huron | MI_City_PH-1120-UC | Separate | Income |
| Chassis Corp. of Michigan (8/23/12-12/31/12) | Port Huron | MI_City_PH-1120-UC | Separate | Income |

**Total 2012 Return**

ATTACHMENT A (cont.)

**Assumptions in determining hours for fee quote/Additional services EY can Provide at Chassix request**
**(Confirmation of requested services via email will be provided to EY prior to EY commencing services):**

| | | | |
|---|---|---|---|
| Note 1 – Estimated Payments | | $0 - $10k | For additional fee of $10k, EY will prepare Estimated Payments, assuming that the prior year apportionment and prior year book/tax differences are used. |
| Note 2 – SMLLC | | $5k | To increase the EY leverage off provision files, Chassix will add summary tab(s) to the provision file to subtotal the book-to-tax reconciliation columns in tax return filing format. For example, a summary schedule will include a book to tax (B2T) column for each full-year corporation and 2-month corporation. The B2T for the full-year DRE's and the 10-month DRE's are summed up to their parent corporations. The format is similar to the prior year EY prepared consolidated B2T. To clarify, we expect to have ability to view separate provision B2T for each reporting entity that would include all separate SMLLCs, of which the total provision B2T would agree to the reporting entity (i.e. DMI or Concord, etc..) . Additionally, there should be a consolidating tab that would show all reporting entities shown on the return. Fee for EY to prepare is $5k. |
| Note 3 - Trial Balances | | $3 - $5k | For additional $3 – 5k, EY will combine the plant trial balances into legal entity trial balances. EY will break out the trial balances of the 5 entities that were converted to SMLLC's into two-month and 10-month trial balances in order to obtain trial balances that sums to zero. |
| Note 4 – Apportionment | Option 1: | $10k | Fees will be $10k for EY to prepare apportionment if data is provided at plant level activity and eliminations are not incorporated. EY will convert raw data provided for sales, property and payroll (provided at plant level) into EY templates. Eliminations will be provided by Chassix at the appropriate level and EY will incorporate them into the EY template. |
| | Option 2: | $6-8k | Fee will be $6k - $8k for Option 2. To qualify for Option 2, Chassix will summarize the sales by tax reporting entity (we expect that the sales will not be provided by Plant location. Eliminations should be incorporated at the appropriate level). As an example, DMI includes several legal entities converted to SMLLCs. The sales for the 2 month period should be aggregated by reporting entity (not by plant level) and should agree to Form 1120 sales for the reporting entity. Further, the sales apportionment for the SMLLCs 10 month period will be included in the DMI reporting entity. The total sales apportionment for DMI will agree to the sales reported on Form 1120 for DMI reporting entity (and Chassix will have already incorporated eliminations into data provided to EY). In addition, full-year sales apportionment for Montague and Bristol also needs to be provided for AL PPT filing. EY should not need to perform any additional work related to sales to manipulate the data in the EY template. |
| | | | EY will take information provided by reporting level in Chassix format and will convert to the EY format. EY will also obtain property by Plant level from each of the trial balances and incorporate into the apportionment templates. EY will also take payroll data provided by Chassix and incorporate it into templates. |
| | Option 3: | $2-$4k | To qualify for Option 3, Chassix will enter sales data in the EY templates. Sales data must be at the tax reporting level (see Option 2 for example) to qualify for this option. |
| | | | Under Option 3, EY will manipulate the data provided for property and payroll into the EY templates. If property is aggregated by reporting entity and provided to EY, the fee will be $2k. If EY obtains the property based on trial balance details and inputs into EY apportionment templates, the fee will be $4k. |

| | | |
|---|---|---|
| **Option 4:** | $ - | To the extent that Chassix provides all A&A information in the EY template for each reporting entity (including the two short periods for the entities converted to SMLLC's) and EY will only review the A&A information, no additional fee will be charged (as long as all the other parameters that is outlined above is met (i.e. information is provided by reporting entity, with eliminations incorporated, agrees to Form 1120, etc..). |
| **Note 5 – Eliminations** | $3 - $5k | Fee of $3k - $5k will be charged for EY to manipulate G/L accounts to prepare the elimination journal entries for each sub-consolidation group. Chassix can eliminate this charge if the information is provided by sub-consolidated group (e.g. DMI group, Concord group and Chassix group) and also provided for the holding companies in TB format that sums to zero. |
| **Note 6 – book adjusting entries** | $1k - $6k | To the extent that the journal entries are provided after the TBs are imported to the EY system, an additional fee of $1k-6K will be charged. |
| **Note 7 - proforma** | $16.5 - $20k | To the extent that proformas are prepared for the SMLLC's, an additional fee of $16.5K to $20K will be charged. |
| **Note 8 - FTC** | $15k | To the extent that EY computes the Foreign Tax Credit or prepare any related working papers, a fee of $15k will be incurred |
| **Note 9 - depreciation** | $1k | EY will combine Forms 4562 and 4797 for the plants into legal entity format and/or prepare consolidating forms. |
| **Note 10 – Section 263A** | $ - | Base fee assumes Chassix to provide Section 263A calculation for all of the applicable entities. |
| **Note 11 – purchase accounting** | $900-$3.5k | EY will prepare Form 8883 related to the Purchase Accounting Adjustment of $5M to Triomphe Asset Acquisition, including allocation amongst US and Foreign assets and analyze implications related to E&P on Form 5471. To reduce the fee to $900, Chassix will provide completed Form 8594 and related E&P computations for EY review. |
| **Note 12 – Statements & Elections** | $2k | Chassix will prepare the statement and elections for EY Review, including Statements related to the conversion to single member LLCs, dissolution of entities, etc… |

**Reportable Transaction Questionnaire**

<u>Purpose</u>:  This questionnaire and the accompanying appendix are designed to help us properly prepare your tax return(s). Treasury regulations require taxpayers to file disclosure statements relating to certain tax transactions/arrangements. The disclosure statements must be filed with the proper tax return and a copy sent to a separate IRS office, and failure to properly disclose may result in the imposition of penalties. Some states have similar disclosure requirements. **Ernst & Young LLP ("EY") shall not be liable for any penalties resulting from your failure to accurately and timely respond to these questions or to timely file the required disclosure statements.**

<u>Instructions</u>:  Answer the following questions for each individual and entity identified below or on the attached exhibit:

Dharma Holding Corporation & Affiliates (see Appendix A for listing of Affiliates)

If you are an individual filing a joint return, the questions must be answered by both you and your spouse, and your spouse must also sign the questionnaire.

If any identified individual or entity is (i) a U.S. shareholder who owns 10 percent or more of the total combined voting power of all classes of stock entitled to vote in a controlled foreign corporation,[1] or (ii) a 10 percent shareholder (by vote or value) of a qualified electing fund due to an election made under IRC §1295, answer ALL of the following questions with respect to transactions entered into by such controlled foreign corporation(s) and/or qualified electing fund(s).

The terms "you," "your" and "taxpayer" refer collectively to the identified individuals and entities for purposes of this questionnaire. **After answering the questions, return the entire document by May 31, 2014 to Karin Schmitz via fax 866-335-8157 or email at karin.schmitz@ey.com.**

Questions:

1.  Since February 28, 2000, (or for tax years ending after May 17, 2006, for Form 5500 filers) have you participated in any transaction that is a Federal Listed Transaction or might be considered substantially similar to any of the Federal Listed Transactions summarized in the attached Appendix?

    If you file a California, Colorado, New York, or Oregon state tax return, also check "yes" if you participated in any transaction that is an applicable State Listed Transaction or might be considered substantially similar to any of the applicable State Listed Transactions summarized in the attached Appendix.

     No

---

[1]  A controlled foreign corporation is a non-U.S. corporation that has U.S. shareholders (i.e., U.S. persons that directly or indirectly own 10% or more of the total combined voting power of all of the classes of stock of such non-U.S. corporation) that own in the aggregate more than 50% of the total vote or value of such non-U.S. corporation.

_____ Uncertain with respect to the following transaction (you may reference the type and number of the transaction listed in the Appendix, or describe your transaction):

_____

_____

_____ Yes, transaction _____ (reference the type and number of the transaction listed in the Appendix)

2. Since November 2, 2006, have you participated in any transaction that is a Federal Transaction of Interest or might be considered substantially similar to any of the Federal Transactions of Interest summarized in the attached Appendix?

   √ No

   _____ Uncertain with respect to the following transaction (you may reference the type and number of the transaction listed in the Appendix, or describe your transaction):

   _____

   _____

   _____ Yes, transaction _____ (reference the type and number of the transaction listed in the Appendix)

3. If EY prepared your return(s) last year, check this box ☑ and skip to question 4. Otherwise, answer questions (a) and (b), below:

   (a) Have you included a reportable transaction disclosure statement (Form 8886 or other disclosure statement relating to a prohibited tax shelter transaction) in any of your tax returns filed after February 28, 2000 (or for tax years ending after May 17, 2006, for Form 5500 filers)?

   _____ No              _____ Yes; if yes, please provide a copy of such statement.

   (b) After December 31, 2002, and before August 3, 2007, did you enter into any transaction in which you held an asset for 45 days or less and that generated a tax credit exceeding $250,000?

   _____ No              _____ Yes

4. Are you a Regulated Investment Company ("RIC")?

   √ No; continue to question 5

   _____ Yes; skip the remaining questions and complete the signature portion

5. The time period for questions (a), (b), and (c) below depends on whether EY prepared your return(s) last year.

- If EY prepared your return(s) last year, answer the questions below only with respect to transactions entered into during the most recent tax period for which EY is preparing your return(s).

- Otherwise, answer the questions below with respect to transactions entered into after December 31, 2002.

(a) Did you enter into a transaction or receive tax advice regarding a tax position or transaction from *anyone* that made a statement or provided information regarding tax consequences (including statements indicating the transaction was tax-free or had no tax consequences) and who asked you to enter into a confidentiality agreement, or in any other way attempted to limit your ability to disclose information regarding the structure or tax aspects of the transaction or the tax advice?

    ___✓___ No            _____ Yes

(b) Did you enter into a transaction or receive tax advice regarding a tax position or transaction for which you (or a related party) have some form of contractual protection against the possibility that part or all of the intended federal, California, or New York tax consequences will not be sustained (e.g., a fee that is contingent on the tax benefits realized from the transaction or position, or an agreement to get back fees or receive payments if the tax benefits are not sustained)?

    ___✓___ No            _____ Yes

(c) For this question, check the category of taxpayer that applies to you (more than one if applicable), and answer the accompanying question with regard to losses reported or reportable on your federal tax return, or if you file a California state return, answer the question with respect to losses realized for *either* federal or California tax purposes.

    For purposes of the reportable transaction disclosure requirements, a section 165 loss includes an amount deductible pursuant to a provision that treats a transaction as a sale or other disposition, or otherwise results in a deduction under section 165. A section 165 loss includes, for example, a loss resulting from a sale or exchange of a partnership interest under section 741 and a loss resulting from a section 988 transaction. If you are a US shareholder of a controlled foreign corporation or a 10% shareholder of a qualified electing fund (described in greater detail on page 1), include any loss that the foreign corporation would report were it a domestic corporation filing a US return.

    ___✓___ Corporations (other than S corporations) and Partnerships that have only C corporations as partners: Have you directly or indirectly entered into a transaction that results in or is reasonably expected to result in a tax loss under section 165 (other than from casualty or

involuntary conversion) of at least $10 million in any single taxable year or $20 million in any combination of taxable years?

_____✓_____ No                    _____ Yes

_____ S Corporations or all other Partnerships: Have you directly or indirectly entered into a transaction that results in or is reasonably expected to result in a tax loss under section 165 (other than from casualty or involuntary conversion) of at least $2 million in any single taxable year or $4 million in any combination of taxable years?

_____ No                    _____ Yes

_____ Trusts or Individuals: Have you directly or indirectly entered into a transaction that results in or is reasonably expected to result in a tax loss under §165 (other than from casualty or involuntary conversion) of at least $2 million in any single taxable year ($50,000 in any single year if the loss arises with respect to a §988 foreign currency transaction) or $4 million in any combination of taxable years?

_____ No                    _____ Yes

Signature on behalf of the identified individual(s) and/or entity(ies), including any applicable CFC's and/or qualified electing funds:

_____        _____CFC_____        _____5/20/14_____
Your Signature                 Title (if applicable)        Date

# Appendix

Below are short descriptions of the transactions identified as "listed" transactions and "transactions of interest" by the IRS and "listed" transactions by state taxing authorities. Failing to disclose a transaction that is, or is substantially similar to, a federal listed transaction may result in the IRS requesting copies of your tax accrual work papers during an examination of your tax return. References to the published designations are included below. Please direct questions or requests for copies of the published designations to the person identified on page 1 of the questionnaire.

## Federal Listed Transactions

1.  Lease Strips and Other Stripping Transactions: Transactions that allow one participant to realize rental or other income from property or service contracts and another participant or the same participant in a different tax year reports deductions related to that income. Identified in Notice 95-53 and Notice 2003-55.

2.  401K Accelerator: Transactions in which taxpayers claim deductions for contributions to a qualified cash or deferred arrangement or matching contributions to a defined contribution plan where the contributions are attributable to compensation earned by plan participants after the end of the taxable year. Identified in Rev. Rul. 90-105.

3.  Multiple Employer Plans: Trust arrangements purported to qualify as multiple employer welfare benefit funds exempt from the limits of §§419 and 419A of the Internal Revenue Code. Identified in Notice 95-34. (See item #21 below regarding collectively-bargained welfare benefit funds.)

4.  Contingent Installment Sales: Transactions involving contingent installment sales of securities by partnerships in order to accelerate and allocate income to a tax-indifferent partner, such as a tax-exempt entity or foreign person, and to allocate later losses to another partner. Identified as ACM Transactions.

5.  Distributions from Charitable Remainder Trusts: Transactions involving distributions described in Treas. Reg. §1.643(a)-8 from charitable remainder trusts. This transaction uses a §664 charitable remainder trust to convert appreciated assets into cash, while avoiding the gain on the disposition of the assets. Identified in Treas. Reg. §1.643(a)-8.

6.  LILOs: Transactions in which a taxpayer purports to lease property and then purports to immediately sublease it back to the lessor (that is, lease-in/lease-out or LILO transactions). Identified in Rev. Rul. 99-14.

7.  Distribution of Encumbered Property: Transactions involving the distribution of encumbered property in which taxpayers claim tax losses for capital outlays that they have in fact recovered. Identified in Notice 99-59.

8.  Fast-pay Arrangements: Transactions involving fast-pay arrangements as defined in Treas. Reg. §1.7701(l)-3(b) in which a corporation's outstanding stock is structured (in whole or in part) to return the stockholder's investment by distributions treated as dividends. Identified as Fast-pay Arrangements.

9.  Counterbalancing Debt Instruments: Transactions involving the acquisition of two debt instruments the values of which are expected to change significantly at about the same time in opposite directions. Identified in Rev. Rul. 2000-12.

10. Artificially Inflated Tax Basis: Transactions generating losses resulting from artificially inflating the tax basis of partnership interests. Identified in Notice 2000-44.

11. Employee Stock Transfer: Transactions involving the purchase of a parent corporation's stock by a subsidiary, a subsequent transfer of the purchased parent stock from the subsidiary to the parent's employees, and the eventual liquidation or sale of the subsidiary. Identified in Notice 2000-60.

12. Guamanian Trusts: Transactions purporting to apply §935 to Guamanian trusts. Identified in Notice 2000-61.

13. Midco Transactions: A broad range of "routine" transactions that happen to include the acquisition, disposition, or movement of stock and assets. The typical Midco transaction is one in which a taxpayer desires to sell stock of a corporation and a buyer desires to purchase the assets. These parties conduct the transaction through an intermediary, with the taxpayer selling the stock to the intermediary and the buyer then purchasing the assets from it and claiming a fair market value basis. The intermediary, having enabled the target corporation to not pay tax on the built-in gain in its assets, usually receives compensation for participating in the transaction. Notice 2008-111 clarifies Notice 2001-16 and supersedes Notice 2008-20.

14. Contingent Liability Transactions: Transactions involving a loss on the sale of stock acquired in a purported §351 transfer of a high basis asset to a corporation and the corporation's assumption of a liability that the transferor has not yet taken into account for federal income tax purposes. Identified in Notice 2001-17.

15. Basis Shifting on Stock Redemptions: Redemptions of stock in transactions not subject to U.S. tax in which the basis of the redeemed stock is purported to shift to a U.S. taxpayer. Identified in Notice 2001-45.

16. Inflated Tax Basis: Transactions in which the taxpayer as part of an acquisition of assets also assumes debt exceeding their fair market value. The taxpayer claims a higher basis due to the debt assumption. Upon sale of the assets, the taxpayer claims a loss for basis in excess of the fair market value of the assets. Identified in Notice 2002-21.

17. Notional Principal Contract: Transactions using a notional principal contract to claim deductions for periodic payments made by the taxpayer while disregarding the accrual of a right to receive offsetting payments in the future. Identified in Notice 2002-35.

18. Allocation of Straddle Gain or Loss: Transactions involving the creation of straddles in a common trust fund or pass-thru entity (i.e., partnership, S corporation, or grantor trust), with the allocation of gain to one party and loss to another party. Identified in Notice 2002-50, Notice 2002-65, and Notice 2003-54.

19. Prohibited Ownership of S-Corp Securities by ESOP: Transaction in which an S corporation and an associated ESOP, which was formed on or before March 14, 2001, is subsequently transferred and the ESOP claims the benefit of a delayed effective date under IRC §409(p). As a result of the delayed effective date, the earnings of the S corporation are not currently taxed. Identified in Rev. Rul. 2003-6. (See item #26 below regarding S corporation ESOPs involving synthetic equity.)

20. Offshore Deferred Compensation Arrangements: Transactions involving an individual taxpayer who purportedly resigns from his or her current employer or professional corporation and enters an employment contract with an offshore employment leasing company. The offshore leasing company leases the individual's services back to the original employer, typically using one or more intermediaries. The participants claim tax benefits in the form of reduced or avoided individual and corporate income and employment taxes. Identified in Notice 2003-22.

21. Collectively-Bargained Welfare Benefit Funds: Trust arrangements purporting to qualify as collectively-bargained welfare benefit funds exempt from the limits of §§419 and 419A of the Internal Revenue Code. Identified in Notice 2003-24. (See item #3 above regarding multiple employer plans.)

22. Transfers of Compensatory Stock Options to Related Persons: Transactions involving an individual, generally an employee, who has been granted a nonstatutory compensatory stock option, and transfers that option to a related person. The individual does not claim compensation income when the related person exercises the stock option or, in cases where the related person pays for the option with a note or other deferred payment, the individual does not claim compensation income until receiving the deferred payments. Identified in Notice 2003-47.

23. Contested Liability Trusts: Transactions involving transfers to a trust to provide for the satisfaction of contested liabilities in an attempt to accelerate deductions for the contested liabilities under §461(f) of the Internal Revenue Code. Identified in Notice 2003-77.

24. Offsetting Foreign Currency Option Contracts: Transactions in which a taxpayer claims a loss upon the assignment of a §1256 foreign currency option contract to a charity but fails to report the recognition of gain when the taxpayer's obligation under an offsetting non-section 1256 foreign currency option contract terminates. Identified in Notice 2003-81.

25. Roth IRA Contributions: Transactions designed to avoid the statutory limits on contributions to a Roth IRA contained in §408A using a corporation, substantially all the shares of which are owned or acquired by the Roth IRA. Identified in Notice 2004-8.

26. S corporation ESOP Involving Synthetic Equity: Transaction involving an S corporation that is at least 50% owned by an ESOP, designed to avoid current taxation of the S corporation's profits generated by the business activities of a specific individual or individuals. The profits are accumulated and held for the benefit of the individual(s) in a qualified subchapter S subsidiary (QSub) or similar entity (such as a limited liability company), the profits are not paid to the individual(s) as compensation within 2½ months after the end of the year in which earned, and the individual or individuals have rights to acquire stock or similar interests equal to 50% or more of the fair market value of the QSub. Identified in Rev. Rul. 2004-4. (See item #19 above, also involving S corporation ESOPs.)

27. Pension Plans Involving Excessive Life Insurance: Transactions involving a qualified pension plan that includes life insurance contracts on the life of a participant in the plan with a face amount that exceeds the participant's death benefit under the plan by more than $100,000. Upon the death of the covered employee, the life insurance contract proceeds exceeding the death benefit are applied to the premiums under the plan for other participants. Identified in Rev. Rul. 2004-20.

28. Foreign Tax Credit Intermediary Transactions: Transactions in which, pursuant to a prearranged plan, a domestic corporation purports to acquire stock in a foreign target corporation and makes an election under §338 before selling all or substantially all of the target corporation's assets in a transaction that triggers foreign tax on built-in gains that are not subject to U.S. tax. The domestic corporation claims foreign tax credits generated with respect to the foreign income tax imposed on the asset sale. Identified in Notice 2004-20.

29. S Corporation Nonvoting Stock Issued to Tax Exempt Organization: Transactions in which S corporation shareholders attempt to transfer the incidence of taxation on S corporation income by donating S corporation nonvoting stock to an exempt organization, while retaining the economic benefits associated with that stock (through warrants issued to the S corporation shareholders that would dilute the shares of nonvoting stock held by the exempt organization or agreements to repurchase the nonvoting stock from the exempt organization at a value that is substantially reduced by reason of the warrants). Identified in Notice 2004-30.

30. Intercompany Financing Through Partnerships Using Guaranteed Payments: Transactions in which a corporation that is exempt from US federal income tax, such as a foreign corporation, provides financing to a domestic subsidiary by investing in the preferred stock of the subsidiary through a partnership in an attempt to convert interest payments that would not be currently deductible under §163(j) into deductible payments. The foreign corporation's return on investment is structured as a guaranteed payment by the partnership, most of which is allocated to, and deducted by, another domestic subsidiary that is a partner in the partnership. In some cases, the guaranteed payments are made to a partner that is unrelated to the foreign corporation and the partnership's obligations to make the guaranteed payments are assured by the foreign corporation or a related party. Identified in Notice 2004-31.

31. SILOs: Transactions in which a taxpayer/lessor enters into a purported sale-leaseback arrangement with a tax-indifferent person (such as a foreign person, a domestic tax exempt organization or government, or a company in a net operating loss position or other tax neutral situation) as lessee in which substantially all of the tax-indifferent person's future rental payment obligations and purchase option rights are economically defeased/nullified and the taxpayer's risk of loss from a decline, and opportunity for profit from an increase, in the value of the leased property are substantially limited, and there is an obligation on the lessee to provide to the lessor a service contract arrangement or contingent residual value insurance in the event that the lessee purchase option right is not exercised. These leases are frequently referred to as "lease-to-service contracts" or "QTE leases." Identified in Notice 2005-13.

32. Loss Importation Transactions: Transactions in which a taxpayer acquires control of a foreign entity treated as a corporation for U.S. tax purposes, and uses the foreign entity's off-setting positions with respect to foreign currency or other property for the purpose of importing losses, but not corresponding gains. Gain is not imported because the taxpayer causes the foreign entity to close out the gain position while the foreign entity is still treated as a foreign corporation. The taxpayer enters into a new offsetting position to lock in the unrealized loss on the loss position and eliminate further economic risk. The taxpayer then imports the unrealized loss into the U.S., typically by making a check-the-box election with respect to the foreign entity and then closing out the loss position. It may also import the assets of the foreign entity into the U.S. in another type of carryover basis transaction such as a reorganization described in section 368(a). The taxpayer must make the check-the-box election or otherwise dispose of the stock of the foreign

entity within 30 days of acquiring it, so that the foreign entity will not qualify as a CFC and the gain it recognizes will not be taxable under subpart F. Identified in <u>Notice 2007-57.</u>

33. Welfare Benefit Funds Utilizing Cash Value Life Insurance Policies: Trust arrangements purporting to provide employees welfare benefits in the form of cash value life insurance policies. In these arrangements the employer claims deductions for its contributions to the trust per the premium amounts paid, but the employee/policy owners include little if any in corresponding income. These arrangements may involve either a taxable trust or a tax-exempt trust. Identified in <u>Notice 2007-83.</u>

34. Distressed Asset Trust: Transactions in which trusts are used to shift built-in losses in distressed assets that have been transferred into such trusts by a tax-indifferent party to a beneficiary who is a U.S. taxpayer. The distressed assets are then written off by the U.S. taxpayer under §166 or sold with the U.S. taxpayer claiming a deduction under §165, even though the U.S. taxpayer has not incurred an economic loss. Identified in <u>Notice 2008-34.</u>

## California Listed Transactions

1. Real Estate Investment Trust (REIT) Consent Dividends: Transactions occurring after February 28, 2000, in which a REIT takes a deduction for a consent dividend but the REIT's owners do not report the consent dividend as income. Identified in <u>Cal. FTB-Legal Department, Chief Counsel Announcement 2003-1</u>.

2. Wholly Owned or Controlled Regulated Investment Company (RIC): Transactions occurring after February 28, 2000, in which a corporation forms a wholly owned or controlled entity that registers as a RIC and the parent corporation transfers to the RIC some of its income producing assets. The RIC claims the dividends paid deduction under IRC §852 and the parent corporation claims an intercompany dividend received deduction under the California tax code. Thus, no California income or franchise tax is paid on the income earned by the income producing assets contributed to the RIC. Identified in <u>Cal. FTB-Legal Department, Chief Counsel Announcement 2003-1</u>.

3. Sales Factor Denominator Inflation: Intercompany transactions occurring after February 28, 2000, between unitary corporate taxpayers and partnerships to inflate the denominator of the California sales factor and thereby reduce the amount of income apportioned to California. The transactions involve the use of the special sales factor rules in California Regulation 25137-1(f)(3) to include intercompany sales in the denominator of the sales factor. The transactions typically involve a group of corporations filing a California combined report with at least one member (the partner-corporation) of the group owning or acquiring an interest in a partnership and with at least one other corporate member (the nonpartner-corporation) of the combined group not owning an interest in the partnership. The partnership's business is unitary with the combined group and its activities were, or could be, performed by a corporate member of the combined group. The partnership sells goods or services to the nonpartner corporation or the nonpartner corporation makes sales to the partnership. The sales are included in the sales factor denominator, but are generally excluded from the sales factor numerator of the unitary group. Identified in <u>Cal. FTB Notice 2011-01</u>.

4. **Circular Cash Flow with Sale of Subsidiary.** Transaction occurring after February 28, 2000, involving a parent corporation (Parent) that "artificially" increases its basis in the stock of its wholly-owned subsidiary (Subsidiary) through a circular flow of cash from Parent to Subsidiary and back to Parent prior to Parent selling the stock of Subsidiary to a third party. In order to minimize gain on the sale of Subsidiary, Parent contributes a promissory note or other instrument to Subsidiary in a transaction treated as a nontaxable contribution to capital. Parent's contribution to Subsidiary's capital is temporary and is intended to remain with Subsidiary for a short period of time. Subsidiary then generates what it claims are earnings and profits through the sale or transfer of intangible property to a related entity in a manner that avoids the application of California intercompany transaction rules. Parent pays off the promissory note or instrument issued to Subsidiary. Shortly thereafter, Subsidiary distributes cash or other property back to Parent in a distribution claimed to be a nontaxable dividend not requiring Parent to reduce its basis in Subsidiary. As a result, Parent claims an increased basis in Subsidiary for its contribution of the promissory note or other instrument, but the note or instrument does not remain with Subsidiary. Identified in Cal. FTB Notice 2011-04.

## Colorado Listed Transactions

1. **Captive Real Estate Investment Trust (REIT):** Transactions in any open tax year, between a captive REIT and its more than 50% beneficial owner if there is a Colorado tax benefit. A captive REIT is defined as a REIT in which shares or beneficial interests are not regularly traded on an established securities market and of which more than 50% of the voting power or value of the beneficial interest or shares are owned or controlled directly, indirectly, or constructively, by a single entity that is: (1) treated as an association taxable as a corporation under the Internal Revenue Code; and (2) not exempt from federal income tax under IRC §501(a). For these purposes, an "association taxable as a corporation" does not include any REIT other than a captive REIT, any qualified REIT subsidiary other than a qualified REIT subsidiary of a captive REIT, any listed Australian property trust, or a qualified foreign entity. Identified in <u>Colorado Revised Statutes 39-22-652 and 39-22-503(2); Colorado Regulation 39-22-652</u>.

2. **Captive Regulated Investment Company (RIC):** Transactions in any open tax year, between a captive RIC and its more than 50% beneficial owner if there is a Colorado tax benefit. A captive RIC is defined as a RIC in which shares or beneficial interests are not regularly traded on an established securities market and of which more than 50% of the voting power or value of the beneficial interest or shares are owned or controlled directly, indirectly, or constructively, by a single entity that is: (1) treated as an association taxable as a corporation under the IRC; and (2) not exempt from federal income tax under IRC section 501(a). Voting stock in a RIC that is held in a segregated asset account of a life insurance corporation (IRC §817) is not taken into account in determining whether the RIC is captive. Identified in <u>Colorado Revised Statutes 39-22-652 and 39-22-501(2); Colorado Regulation 39-22-652</u>.

### New York Listed Transaction

1. Certain Charitable Contribution Deductions: A transaction occurring on or after January 1, 2006, involving the purchase of a remainder interest in real property by a newly formed pass-through entity, which after holding the remainder interest for one year, contributes it to an exempt organization thereby meeting the federal requirements for computing the charitable contribution deduction based on the fair market value of the remainder interest. The remainder interest is appraised using an income approach that takes into consideration the amount of lease payments remaining on the long term lease resulting in a value of the remainder interest substantially higher then what the pass-through entity paid for it. Following the contribution, the pass-through entity is dissolved, allowing its members/partners to claim a pro-rata share of the charitable contribution deduction. Identified in <u>New York State Department of Taxation and Finance-Office of Tax Policy Analysis Technical Service Division TSB-M-07</u>.

## Oregon Listed Transactions

1. Real Estate Investment Trust (REIT) Transactions:  Transactions occurring on or after January 1, 2007 that lack economic substance in which an Oregon taxable corporation that directly or indirectly owns a REIT: (1) transfers income-producing assets to the REIT; and, (2) claims a dividend-received deduction and the REIT claims a dividend-paid deduction. An "Oregon taxable corporation" is a corporation that does business in Oregon, is organized in Oregon, has income from Oregon sources, or is owned by an Oregon income or corporate excise taxpayer. A "transaction without economic substance" is a transaction for which the taxpayer cannot demonstrate a business purpose other than tax savings.

2. Regulated Investment Company (RIC) Transactions:  Transactions occurring on or after January 1, 2007 that lack economic substance in which an Oregon taxable corporation that directly or indirectly owns a RIC: (1) transfers income-producing assets to the RIC; and, (2) claims a dividend-received deduction and the RIC claims a dividend-paid deduction. An "Oregon taxable corporation" is a corporation that does business in Oregon, is organized in Oregon, has income from Oregon sources, or is owned by an Oregon income or corporate excise taxpayer. A "transaction without economic substance" is a transaction for which the taxpayer cannot demonstrate a business purpose other than tax savings.

## Federal Transactions of Interest

1. Contribution of a Successor Member Interest to a Charity: A transaction in which a taxpayer acquires a successor interest in an LLC or similar entity that directly or indirectly holds real property, transfers the rights more than one year after the acquisition to a charity described in section 170(c) of the Internal Revenue Code, and claims a charitable contribution deduction that is significantly higher than the amount that the taxpayer paid to acquire the rights. Identified in <u>Notice 2007-72</u>.

2. Toggling Grantor Trusts: Transactions in which grantor creates and funds a grantor trust with four options with values that are expected to move inversely in relation to at least one of the other options. The grantor then gives a unitrust interest to a beneficiary while retaining a noncontingent remainder interest and the power to reacquire trust property at a specified future date by substituting other property of equivalent value. Through a series of successive transactions involving the sale of the remainder interest to an unrelated buyer for an amount substantially equal to the fair market value of the options contributed to the trust, the "activation" of the substitution power on its effective date, the close-out of the "loss options," and the sale of the unitrust interest to the unrelated buyer, the grantor trust status of the trust is purportedly "toggled off" and "toggled on." The grantor claims a tax loss attributable to the close-out of the loss options even though the grantor has not suffered an equivalent economic loss. A variation of the transaction described above involves an initial contribution of liquid assets instead of options, and a subsequent substitution of appreciated property for the liquid assets. This variation is designed to enable the grantor to avoid the recognition of gain upon the disposition of the appreciated assets. Identified in <u>Notice 2007-73</u>.

3. Potential for Avoidance of Tax through Sale of Charitable Remainder Trust Interests: Transactions involving the sale or other disposition of all interests in a charitable remainder trust (subsequent to the contribution of appreciated assets to the trust but after their sale by the trust). The grantor or other noncharitable claims an increased basis in the annuity or unitrust interest sold based upon the tax basis of assets within the trust (rather than with reference to the tax basis of assets transferred to the trust) thereby recognizing little, if any, gain from such sale or other disposition of the unitrust or annuity interest. Identified in <u>Notice 2008-99</u>.

4. Use of Domestic Partnership with CFC Partner(s) to Avoid Taxable Subpart F Inclusions: Transactions involving a U.S. taxpayer owning at least one CFC which is a partner in a domestic partnership (the other partner(s) may or may not also be CFCs). The domestic partnership owns a CFC Opco that earns income of a type which is subpart F income. The U.S. taxpayer claims that the subpart F income of the CFC Opco is not subpart F income in the hands of the CFC partner (or the partner's US owner) because of the interposition of the domestic partnership. Identified in <u>Notice 2009-7</u>.

**<u>EXHIBIT B</u>**

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                                          :

In re                              :         Chapter 11
                                            :

CHASSIX HOLDINGS, INC., *et al.*,    :         Case No. 15-10578 (MEW)
                                            :

                                            :         Jointly Administered
                  Debtors.[1]      :
                                              :
-------------------------------------------------------x

## ORDER AUTHORIZING THE DEBTORS TO EXPAND
## THE SCOPE OF THEIR RETENTION OF ERNST & YOUNG LLP

Upon the filing and service of the *Notice of Proposed Expansion of Services to Be Provided by Ernst & Young LLP to the Debtors* (the "**Expansion Notice**") of the proposed expansion of the scope of Ernst & Young LLP's ("**E&Y**") retention by the Debtors in these chapter 11 cases, to include the services set forth in the Statement of Work – 2014 Transfer Pricing Documentation (the "**Transfer Pricing Documentation SOW**") and the Amendment to Statement of Work (the "**Tax Compliance SOW Amendment**," and together with the Transfer Pricing Documentation SOW, the "**Additional Engagement Letters**"), and upon the related certificate of no objection filed by the Debtors; and this Court's *Order Pursuant to 11 U.S.C. §§ 327(a) and 330, Fed. R. Bankr. P. 2014 and 2016, and Local Rules 2014-1 and 2016-1 Authorizing the Debtors to Retain and Employ Ernst & Young LLP as Independent Auditor and Tax Advisor, Nunc Pro Tunc to the Commencement Date* dated April 24, 2015 (the "**E&Y**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee, LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

**Retention Order**")[2] having provided that the Debtors may request authority to expand the scope of E&Y's services in accordance with the procedure set forth in the E&Y Retention Order (without the need to file a supplemental retention application); and due and proper notice of the Expansion Notice having been given; and it appearing that no other or further notice of the Expansion Notice is required; and it appearing that the Court has jurisdiction to enter this Order in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this proceeding is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that the expansion of E&Y's services to include the services set forth in the Additional Engagement Letters is in the best interest of the Debtors, their estates, and creditors; and after due deliberation and sufficient cause appearing therefor, it is hereby:

ORDERED that subject to the terms of the E&Y Retention Order, the Debtors are authorized, pursuant to sections 327(a) and 330 of the Bankruptcy Code, Fed. R. Bankr. P. 2014 and 2016, and Local Rules 2014-1 and 2016-1, to expand the scope of E&Y's services to include the services set forth in the Additional Engagement Letters, in accordance with their terms and conditions (as modified by this Order); and it is further

ORDERED that except as otherwise set forth herein, the provisions of the E&Y Retention Order shall apply to the services E&Y provides under the Additional Engagement Letters. To the extent that the provisions of this Order and the E&Y Retention Order are inconsistent with the provisions of the Additional Engagement Letters, the provisions of this Order and the E&Y Retention Order shall govern; and it is further

---

[2] Capitalized terms used but not defined herein shall the meanings given to them in the E&Y Retention Order.

ORDERED that the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that this Court shall retain jurisdiction over any and all matters arising from or related to the interpretation or implementation of this Order.

Dated: _____, 2015

_____
United States Bankruptcy Judge