Marcia L. Goldstein
Ray C. Schrock, P.C.
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
                           :

**In re**                       :       **Chapter 11**
                           :

**CHASSIX HOLDINGS, INC.,** *et al.*,    :       **Case No. 15-10578 (MEW)**
                           :

                           :       **(Jointly Administered)**

             **Debtors.**[1]   :
                           :

---------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF**
**DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

# Table of Contents

PRELIMINARY STATEMENT ...................................................................................................1

FACTS ..........................................................................................................................................5

ARGUMENT ................................................................................................................................5

I.     SECTION 1129(a)(1): THE PLAN COMPLIES WITH THE APPLICABLE
       PROVISIONS OF THE BANKRUPTCY CODE ..............................................................6

       A.     The Plan Complies with Section 1122 of the Bankruptcy Code ............................6

       B.     The Plan Complies with Section 1123(a) of the Bankruptcy Code ........................8

              1.     Section 1123(a)(1): Designation of Classes of Claims and Interests...........8

              2.     Section 1123(a)(2): Classes that are Not Impaired by the Plan ..................9

              3.     Section 1123(a)(3): Treatment of Classes that are Impaired Under
                     the Plan........................................................................................................9

              4.     Section 1123(a)(4): Equal Treatment Within Each Class............................9

              5.     Section 1123(a)(5): Adequate Means for Implementation ........................10

              6.     Section 1123(a)(6): Prohibition on the Issuance of Non-Voting
                     Securities....................................................................................................11

              7.     Section 1123(a)(7): Provisions Regarding Directors and Officers ............12

       C.     The Plan Complies with Section 1123(b) of the Bankruptcy Code......................12

              1.     Section 1123(b)(1): Impairment of Claims and Interests ..........................12

              2.     Section 1123(b)(2): Executory Contracts and Unexpired Leases..............13

              3.     Section 1123(b)(3): Claims or Interests of the Debtors ............................13

              4.     Section 1123(b)(5): Modifying of Creditor Rights ...................................14

              5.     Section 1123(b)(6): Other Appropriate Provisions...................................14

II.    SECTION 1129(a)(2): THE DEBTORS HAVE COMPLIED WITH THE
       BANKRUPTCY CODE...................................................................................................15

       A.     The Plan Complies with Section 1125 of the Bankruptcy Code:
              Postpetition Disclosure and Solicitation ..............................................................15

       B.     The Plan Complies with Section 1126 of the Bankruptcy Code:
              Acceptance of Plan ..............................................................................................16

III.   SECTION 1129(a)(3): THE PLAN HAS BEEN PROPOSED IN GOOD FAITH
       AND NOT BY ANY MEANS FORBIDDEN BY LAW ..................................................18

IV.    SECTION 1129(a)(4): THE PLAN PROVIDES THAT PROFESSIONAL FEES
       AND EXPENSES ARE SUBJECT TO COURT APPROVAL ........................................20

i

V.      SECTION 1129(a)(5): THE DEBTORS HAVE DISCLOSED ALL
        NECESSARY INFORMATION REGARDING DIRECTORS, OFFICERS, AND
        INSIDERS .......................................................................................................21

VI.     BANKRUPTCY CODE SECTION 1129(a)(6) IS NOT APPLICABLE .........................22

VII.    THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129(a)(7) OF
        THE BANKRUPTCY CODE ..............................................................................22

VIII.   SECTION 1129(a)(8): THE PLAN HAS BEEN ACCEPTED
        BY IMPAIRED CLASSES, AND, AS TO SUCH CLASSES, THE
        REQUIREMENTS OF SECTION 1129(a)(8) HAVE BEEN SATISFIED .....................24

IX.     SECTION 1129(a)(9): THE PLAN PROVIDES FOR
        PAYMENT IN FULL OF ALL ALLOWED PRIORITY CLAIMS ...............................25

X.      SECTION 1129(a)(10): AT LEAST ONE CLASS
        OF IMPAIRED CLAIMS HAS ACCEPTED THE PLAN .............................................26

XI.     SECTION 1129(a)(11): THE PLAN IS NOT LIKELY TO BE FOLLOWED BY
        LIQUIDATION OR THE NEED FOR FURTHER REORGANIZATION .....................27

XII.    SECTION 1129(a)(12): ALL STATUTORY FEES
        HAVE BEEN OR WILL BE PAID .......................................................................29

XIII.   SECTIONS 1129(a)(13), 1129(a)(14), 1129(a)(15), AND 1129(a)(16) DO NOT
        APPLY ..........................................................................................................30

XIV.    SECTION 1129(b): THE PLAN SATISFIES THE "CRAM DOWN"
        REQUIREMENT WITH RESPECT TO CLASSES 9 AND 10 ......................................30

        A.      The Plan Does Not Discriminate Unfairly ............................................31

        B.      The Plan is Fair and Equitable ............................................................33

                1.      The Plan is Fair and Equitable as to Unsecured Claims ...........33

                2.      The Plan is Fair and Equitable as to Equity Interests ...............34

XV.     SECTION 1129(c)-(e) OF THE BANKRUPTCY CODE ...............................................34

XVI.    THE GLOBAL SETTLEMENT IS AN INTEGRAL, UNSEVERABLE
        COMPONENT OF THE PLAN THAT THE COURT SHOULD APPROVE ................35

XVII.   THE PLAN'S RELEASE PROVISIONS SHOULD BE APPROVED ...........................43

        A.      The Debtors' Release Should be Approved ...........................................43

        B.      The Third Party Releases are Appropriate and Should be Approved ...................48

                1.      The Consensual Third Party Releases are Consensual and Should
                        be Approved ...............................................................................49

                2.      The Debtors Received Substantial Consideration that Supports
                        Approval of the Consensual Third Party Releases .....................51

                3.      The Consensual Third Party Releases are an Essential Component
                        of the Plan .................................................................................55

ii

XVIII. THE PLAN'S EXCULPATION PROVISIONS SHOULD BE APPROVED..................57

CONCLUSION.................................................................................................................................59

WEIL:\95365184\1\35076.0003

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 11,111, Inc.*,
117 B.R. 471 (Bankr. D. Minn. 1990) ...................................................................32

*In re Adelphia Commc'ns Corp.*,
359 B.R. 54 (Bankr. S.D.N.Y. 2006) .............................................................25, 27

*In re Adelphia Commc'ns Corp.*,
368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...........................................7, 24, 37, 38, 45

*Aetna Cas. and Sur. Co. v. Clerk, U.S. Bankr. Ct., N.Y., NY (In re Chateaugay Corp.)*,
89 F.3d 942 (2d Cir. 1996) ..............................................................................6, 7

*In re Armstrong World Indus., Inc.*,
348 B.R. 136 (D. Del. 2006) ................................................................................7

*In re Bally Total Fitness of Greater N.Y., Inc.*,
No. 07-12395, 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007)...................45

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999)............................................................................................3

*Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*,
21 F.3d 477 (2d Cir. 1994)...................................................................................6

*Brite v. Sun Country Dev., Inc. (In re Sun Country Dev., Inc.)*,
764 F.2d 406 (5th Cir. 1985) ...............................................................................8

*In re Buttonwood Partners, Ltd.*,
111 B.R. 57 (Bankr. S.D.N.Y. 1990) ...................................................................2

*In re Calpine Corp.*,
No. 05-60200, 2007 WL 4565223 (Bankr. S.D.N.Y. Dec. 19, 2007) .........46, 49, 50

*In re Cano Petroleum, Inc.*,
No. 12-31549, 2012 WL 2931107 (Bankr. N.D. Tex. July 18, 2012)...................46

*Cartalemi v. Karta Corp. (In re Karta Corp.)*,
342 B.R. 45 (Bankr. S.D.N.Y. 2006).....................................................................5

*In re Charter Commc'ns*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009) ........................................................ *passim*

iv

*In re Chemtura Corp.*,
  439 B.R. 561 (Bankr. S.D.N.Y. 2010)........................................................49, 51, 57

*In re DBSD N. Am., Inc.*,
  419 B.R. 179 (Bankr. S.D.N.Y. 2009)..................................................45, 50, 51, 57

*In re Delphi Corp.*,
  No. 05-44481, 2009 WL 973130 (Bankr. S.D.N.Y. Apr. 2, 2009)........................39

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*,
  416 F.3d 136 (2d Cir. 2005)............................................................................49, 51

*In re Drexel Burnham Lambert Grp., Inc.*,
  134 B.R. 493 (Bankr. S.D.N.Y. 1991)..............................................................38, 39

*In re Drexel Burnham Lambert Grp. Inc.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992)..............................................................28, 37

*In re Drexel Burnham Lambert Grp., Inc.*,
  960 F.2d 285 (2d Cir. 1992)............................................................................51, 55

*In re Elsinore Shore Assocs.*,
  91 B.R. 238 (Bankr. D.N.J. 1988) ............................................................................21

*In re Extended Stay Inc.*,
  No. 09-13764, 2010 WL 6561113 (Bankr. S.D.N.Y. July 20, 2010) .....................33

*In re Finlay Enters., Inc.*,
  No. 09-14873, 2010 WL 6580628 (Bankr. S.D.N.Y. June 29, 2010) ...............33, 34

*In re Future Energy Corp.*,
  83 B.R. 470 (Bankr. S.D. Ohio 1988)......................................................................21

*In re Genco Shipping & Trading Ltd.*,
  513 B.R. 233 (Bankr. S.D.N.Y. 2014).......................................................... *passim*

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enter., Ltd. II (In re Briscoe Enter., Ltd. II)*,
  994 F.2d 1160 (5th Cir. 1993) ..................................................................................5

*In re Ionosphere Clubs, Inc.*,
  98 B.R. 174 (Bankr. S.D.N.Y. 1989) ...................................................................6, 19

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986)................................................................15, 32

*In re Johns-Manville (Manville I)*,
  837 F.2d 89 (2d Cir. 1988)......................................................................................45

v

*Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
   843 F.2d 636 (2d Cir. 1988)......................................................................6, 18, 27, 31

*In re Lear Corp.*,
   No. 09-14326, 2009 WL 6677955 (Bankr. S.D.N.Y. Nov. 5, 2009).......................................46

*In re The Leslie Fay Cos.*,
   207 B.R. 764 (Bankr. S.D.N.Y. 1997).........................................................18, 27, 28

*In re LightSquared Inc.*,
   513 B.R. 56 (Bankr. S.D.N.Y. 2014)..............................................................25, 31

*In re Lionel L.L.C.*,
   No. 04-17324, 2008 WL 905928 (Bankr. S.D.N.Y. Mar. 31, 2008).........................................5

*In re Matter of Greate Bay Hotel & Casino, Inc.*,
   251 B.R. 213 (Bankr. D.N.J. 2000) ..............................................................32, 34

*In re Metro. 885 Third Ave Leasehold, LLC*,
   No. 10-16103, 2010 WL 6982778 (Bankr. S.D.N.Y. 2010)....................................................51

*In re MF Global Inc.*,
   No. 11-2790, 2012 WL 3242533 (Bankr. S.D.N.Y. Aug. 10, 2012)................................38, 39

*In re Mirant Corp.*,
   No. 03-46590, 2007 WL 1258932 (Bankr. N.D. Tex. Apr. 27, 2007) ......................................7

*Motorola v. Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*,
   478 F.3d 452 (2d Cir. 2007)........................................................................39

*In re Motors Liquidation Co.*,
   447 B.R. 198 (Bankr. S.D.N.Y. 2011) ....................................................................45

*In re MPM Silicones, LLC*,
   No. 14-22503, 2014 WL 4436335 (Bankr. S.D.N.Y. 2014)..............................................49, 50

*N.L.R.B. v. Bildisco & Bildisco*,
   465 U.S. 513 (1984)..................................................................................20

*In re New York, N.H. & H. R.R. v. Smith*,
   632 F.2d 955 (2d Cir. 1980)............................................................................38

*In re One Times Square Assocs. Ltd. P'ship*,
   159 B.R. 695 (Bankr. S.D.N.Y. 1993)....................................................................27

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
   761 F.2d 1374 (9th Cir. 1985) ..........................................................................28

vi

*In re Purofied Down Prods. Corp.*,
150 B.R. 519 (S.D.N.Y. 1993) ...................................................................................38

*In re Residential Capital*,
497 B.R. 720 (Bankr. S.D.N.Y. 2013) .......................................................................39

*In re Rochem, Ltd.*,
58 B.R. 641 (Bankr. D.N.J. 1985) ...............................................................................8

*Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.)*,
330 B.R. 394 (Bankr. S.D.N.Y. 2005) .......................................................................49

*In re Stone Barn Manhattan, LLC*,
405 B.R. 68 (Bankr. S.D.N.Y. 2009) .........................................................................45

*Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.)*,
800 F.2d 581 (6th Cir. 1986) .......................................................................................7

*In re Texaco Inc.*,
84 B.R. 893 (Bankr. S.D.N.Y. 1988) .........................................................................28

*In re U.S. Truck Co., Inc.*,
47 B.R. 932 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986) ...............................27, 28

*Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*,
326 B.R. 497 (S.D.N.Y. 2005) ...................................................................................58

*In re Washington Mutual, Inc.*,
No. 08-12229 (MFW) (Bankr. D. Del. Feb. 24, 2012), ECF No. 9759 ...................................58

*In re Worldcom, Inc.*,
No. 02-13533, 2003 WL 23861928 (Bankr. S.D.N.Y. 2003) ...................................................58

*In re Zenith Elecs. Corp.*,
241 B.R. 92 (Bankr. Del. 1999) .................................................................................40

**Statutes**

11 U.S.C. § 507(a)(2) .....................................................................................................29

11 U.S.C. § 541(a)(1) .....................................................................................................45

11 U.S.C. § 1122(a) .........................................................................................................6

11 U.S.C. § 1123(a)(1) ...............................................................................................7, 8, 9

11 U.S.C. § 1123(a)(2) .....................................................................................................9

11 U.S.C. § 1123(a)(3)................................................................................................................9

11 U.S.C. § 1123(a)(4)...........................................................................................................9, 10

11 U.S.C. § 1123(a)(5).........................................................................................................10, 11

11 U.S.C. § 1123(a)(6).........................................................................................................11, 14

11 U.S.C. § 1123(a)(7)..............................................................................................................12

11 U.S.C. § 1123(b)(1).........................................................................................................12, 13

11 U.S.C. § 1123(b)(2)..............................................................................................................13

11 U.S.C. § 1123(b)(3)(A)....................................................................................................13, 43

11 U.S.C. § 1123(b)(3)(B)..........................................................................................................13

11 U.S.C. § 1123(b)(5)..............................................................................................................14

11 U.S.C. § 1123(b)(6)..............................................................................................................14

11 U.S.C. § 1125(a)....................................................................................................................15

11 U.S.C. § 1125(b)....................................................................................................................16

11 U.S.C. § 1125(c)....................................................................................................................16

11 U.S.C. § 1126 ................................................................................................................. *passim*

11 U.S.C. § 1129(a)(1)...........................................................................................................6, 14

11 U.S.C. § 1129(a)(2).........................................................................................................15, 18

11 U.S.C. § 1129(a)(3).........................................................................................................18, 20

11 U.S.C. § 1129(a)(4).........................................................................................................20, 21

11 U.S.C. § 1129(a)(5).........................................................................................................12, 21

11 U.S.C. § 1129(a)(6)................................................................................................................22

11 U.S.C. § 1129(a)(7).....................................................................................................12, 22, 23

11 U.S.C. § 1129(a)(8).................................................................................18, 24, 25, 30, 31

11 U.S.C. § 1129(a)(9).....................................................................................................12, 22, 25

11 U.S.C. § 1129(a)(9)(A)...................................................................................................25, 26

WEIL:\95365184\1\35076.0003

11 U.S.C. § 1129(a)(9)(B) ...............................................................................................26

11 U.S.C. § 1129(a)(9)(C) ...............................................................................................26

11 U.S.C. § 1129(a)(10) ..............................................................................................26, 27

11 U.S.C. § 1129(a)(11) ..............................................................................................27, 28

11 U.S.C. § 1129(a)(12) ..............................................................................................29, 30

11 U.S.C. § 1129(a)(13) ...................................................................................................30

11 U.S.C. § 1129(a)(14) ...................................................................................................30

11 U.S.C. § 1129(a)(15) ...................................................................................................30

11 U.S.C. § 1129(a)(16) ...................................................................................................30

11 U.S.C. § 1129(b) ..................................................................................................... *passim*

11 U.S.C. § 1129(b)(2) .....................................................................................................33

11 U.S.C. § 1129(b)(2)(A) ...............................................................................................33

11 U.S.C. § 1129(b)(2)(B) ...............................................................................................35

11 U.S.C. § 1129(b)(2)(C) ...............................................................................................34

11 U.S.C. § 1129(c) ..................................................................................................... *passim*

11 U.S.C. § 1129(d) ..................................................................................................... *passim*

11 U.S.C. § 1129(e) ..................................................................................................... *passim*

26 U.S.C. § 165(f) .............................................................................................................53

26 U.S.C. § 167 .................................................................................................................53

26 U.S.C. § 172 .................................................................................................................53

**Other Authorities**

H.R. Rep. No. 95-595 (1977) ........................................................................................6, 15

S. Rep. No. 95-989 (1978) .............................................................................................6, 15

WEIL:\95365184\1\35076.0003

TO THE HONORABLE MICHAEL E. WILES,
UNITED STATES BANKRUPTCY JUDGE:

Chassix Holdings, Inc. ("**Chassix Holdings**"), Chassix, Inc. ("**Chassix**"), and certain of their affiliates and subsidiaries, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, including Chassix Holdings and Chassix, the "**Debtors**") submit this memorandum of law in support of confirmation, pursuant to section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**"), of the Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (ECF No. 323) (the "**Plan**").[2]  In support of confirmation, the Debtors respectfully represent as follows:

### Preliminary Statement

The Debtors are pleased to be before the Court for confirmation of their Plan. The Plan truly is a remarkable result for the Debtors' Estates and their constituents.  For the reasons set forth herein, and as will be set forth in the Debtors' reply brief in support of confirmation of the Plan (the "**Reply**") and at the Confirmation Hearing, the Court should confirm the Plan.[3]

Merely eight months ago, the Debtors were faced with bleak prospects for any favorable outcome and a business that was hemorrhaging cash as a result of a combination of operational and financial issues, including significant unanticipated complications and losses relating to problematic 2014 program launches at the Debtors' Bristol, Indiana facility.  Indeed, the Debtors had not drawn any funds under their Prepetition Revolving ABL Facility in 2013 and

---

[2] Capitalized terms used but not otherwise herein defined shall have the meaning ascribed to such terms in the Plan or the Disclosure Statement for Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "**Disclosure Statement**"), as may be applicable.

[3] As depositions are still ongoing at the time of filing this brief, and expert reports have not yet been submitted, the Debtors intend to submit evidence in support of confirmation in connection with the filing of the Reply and at the Confirmation Hearing, as is typical in most cases in the Debtors' experience.

were faced with a situation where they were forced to fully draw more than $130 million under that facility by October 2014, when the Debtors hired restructuring professionals.

Early in the Debtors' restructuring process and continuing through January 2015, the Debtors were faced with a seemingly inescapable message from the OEM Customers, advisors, and Plan Support Parties that the likely best outcome for the Debtors and their Estates would be a forced sale and liquidation of the Debtors' businesses. The Debtors knew that this outcome could and likely would be devastating for the Estates, the thousands of employees and families who depend on the Debtors, the approximately 1000 trade vendors that do business with the Debtors, and the holders of hundreds of millions of dollars in claims against the Debtors in the Debtors' existing capital structure. Should that have come to pass, there is little doubt in the Debtors' and their advisors' professional judgment that all of the value the Debtors created in the Plan would have passed to the purchasers of the Debtors' assets, which, would have secured new business awards, as has happened in so many other automotive restructurings.

As the evidence will demonstrate, the Debtors avoided this disastrous outcome by developing and engineering the Plan in carefully constructed and deliberate steps.

- First, the Debtors approached their OEM Customers and notified them that the Debtors would be requesting price increases and other long-term new business commitments. The OEM Customers quickly mobilized and retained advisors in response.

- In mid-November, the Debtors asked their Noteholders to organize. The Noteholders quickly organized into a single, informal group (the "**Informal Committee of Noteholders**") comprised of approximately 80% of the Debtors' Unsecured Notes and more than 73% of the Debtors' Secured Notes. The Debtors executed non-disclosure agreements with the Noteholders' professionals and immediately began providing the advisors with relevant financial and operational information.

- Throughout this process, the Debtors engaged with their existing equity sponsor, Platinum Equity, on alternative restructuring options to preserve the value of the enterprise and maximize the value for all constituents. The Debtors and Platinum Equity explored different options for restructuring the Debtors' business commitments to return to profitability and alternative paths for funding the business.

2

- The Debtors negotiated an agreement with the OEM Customers that provided tens of millions of dollars' worth of incremental value to the Debtors (including significant accommodations with respect to Bristol) while they continued to negotiate with parties. This interim accommodation agreement was a critical piece of the Debtors' strategy and provided significant value to the Debtors' Estates and unsecured creditors and provided the Debtors with a chance to successfully reorganize.

- After careful strategic and tactical analysis taking into account the particular facts and circumstances of the Debtors' situation, the Debtors then assembled a restructuring path that was, in their sound business judgment, the best potential path to maximize value for the Estates.

  - The Debtors' advisors understood that, based on past experience in the automotive sector as well as numerous conversations with parties directly involved in this situation, the OEM Customers would only agree to pricing concessions and new business commitments in the context of a stable, prenegotiated restructuring; notably, one without protracted litigation and where the Debtors could provide strong assurances of a quick exit from chapter 11.

  - Likewise, the Debtors understood that there was going to be a very significant and time-sensitive need for new capital in the immediate term, which would have to be provided on the front-end of any restructuring.

  - The Debtors, thus, worked with their existing Prepetition Revolving ABL Lenders to provide interim funding while negotiations continued and worked to size the capital need for the Debtors' businesses, assuming pricing concessions could be achieved. The Debtors believed that such new capital would have to come from the Informal Committee of Noteholders as, among other things, there was not a sufficient basis to non-consensually prime the Debtors' Secured Noteholders.

  - The OEM Customers would only commit to long-term awards of new business with new capital commitments and the Debtors' Noteholders would only commit new capital in the context of long-term business agreements from the OEM Customers under a prenegotiated restructuring.

  - Moreover, the Debtors could only secure debtor-in-possession (DIP) financing in the context of a prearranged plan. The Debtors either would not have DIP financing, or would only have a bridge to liquidation, without a prearranged plan.

- The Debtors, together with the advisors for the Informal Committee of Noteholders, negotiated with Platinum Equity regarding the terms of any recovery for Platinum Equity. Eventually these negotiations included extensive arms' length negotiations around whether there would be any release involved in such a settlement. The Debtors facilitated those negotiations and the Informal Committee of Noteholders consented to a release of Platinum Equity in exchange for its ongoing substantial cooperation, dedication, and support in the Debtors' restructuring. It is worthy of emphasis that, together with the Debtors, 80% of the Unsecured Noteholders and Platinum Equity

WEIL:\95365184\1\35076.0003

negotiated the release and that portion of the Global Settlement—the very parties allegedly affected by the use of the proceeds.  The Debtors' process was sound and the evidence will demonstrate that the result of more than fair and reasonable, but was also the best way to maximize value for each of the Estates.

- Platinum Equity's support included, among other things, substantial operational support, significant assistance in the negotiation of the Plan, waiver of all claims against the Estates along with an agreement not to pursue claims against the Debtors, and taking steps to ensure the Debtors will obtain substantial net operating losses ("**NOL**") for the benefit of the Reorganized Debtors that will provide the Reorganized Debtors with material cash savings.

The OEM Customers, the DIP Lenders, and the Debtors closely monitored the progress of the negotiations between the Debtors, Platinum Equity and the Informal Committee of Noteholders.  It was evident to the Debtors and other Plan Support Parties that there would be no prenegotiated plan, no DIP Financing, no long-term OEM accommodations, and no substantial capital support without the Global Settlement.  Each component of the Plan necessarily depends on the other components.

As a result of the Debtors' efforts, they filed on the first day of these cases a carefully crafted, prenegotiated Plan that has the support of at least 80% of the Unsecured Noteholders, at least 73% of the Secured Noteholders, all of their significant OEM Customers (including long-term Component Supply Agreements and claim waivers for tens of millions of dollars), and other parties.  The Debtors provided the Informal Committee of Noteholders information necessary for the Noteholders to assess the costs and benefits of entering into the Global Settlement.  The Plan is a global intertwined package, with benefits for all Estates, and is non-severable.  As the evidence will demonstrate, the Debtors respectfully submit that there is no doubt that the Plan satisfies the requirements for confirmation, and, moreover, that failure to confirm the non-severable Plan will result in reopening OEM negotiations, DIP Credit Facility defaults, and, without question, bring about the potential for disastrous value destruction to the Estates, including, among other detrimental results, potential liquidation.  As such, the Debtors

ask this Court to confirm the entire Plan, with all of its carefully defined and negotiated

provisions, in order to allow the Debtors to emerge from chapter 11 as a stronger, more efficient

enterprise.[4]

## Facts

The pertinent facts relating to the Debtors' Chapter 11 Cases and the Plan are set

forth in the Disclosure Statement and the Plan. Such facts are incorporated herein as though set

forth fully and at length. As necessary, salient facts will be referred to in connection with the

discussion of applicable legal principles.

## Argument

To obtain confirmation of the Plan, the Debtors must demonstrate that the Plan

satisfies the applicable provisions of section 1129 of the Bankruptcy Code by a preponderance of

the evidence. *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enter., Ltd. II (In re Briscoe Enter.,*

*Ltd. II)*, 994 F.2d 1160, 1165 (5th Cir. 1993); *see also In re Lionel L.L.C.,* No. 04-17324, 2008

WL 905928, at *4 (Bankr. S.D.N.Y. Mar. 31, 2008) ("The Debtors. . . have the burden of

proving the elements of sections 1129(a) and 1129(b) by a preponderance of the evidence….").

Through filings with the Court and additional testimonial evidence which may be proffered or

adduced at the Confirmation Hearing, the Debtors will demonstrate, by a preponderance of the

evidence, that all applicable subsections of section 1129 of the Bankruptcy Code have been

satisfied with respect to the Plan.

---

[4] As set forth in further detail below, the Voting Deadline is June 19, 2015 and, accordingly, voting on the Plan remains ongoing as of the date of filing this brief. As of the date hereof, however, the Debtors' unofficial results demonstrate overwhelming support for the Plan.

5

I. **SECTION 1129(a)(1): THE PLAN COMPLIES WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE**

Section 1129(a)(1) of the Bankruptcy Code requires that a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1). The legislative history of section 1129(a)(1) indicates that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, governing classification of claims and contents of a plan, respectively. H.R. REP. NO. 95-595, at 412 (1977); S. REP. NO. 95-989, at 126 (1978); *see also Kane v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 843 F.2d 636, 648-49 (2d Cir. 1988). As demonstrated below, the Plan complies with the requirements of sections 1122, 1123, and all other applicable provisions of the Bankruptcy Code.

A. **The Plan Complies with Section 1122 of the Bankruptcy Code**

Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such a claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a). For a classification structure to satisfy section 1122 of the Bankruptcy Code, not all substantially similar claims or interests need to be designated in the same class, but claims or interests designated in a particular class must be substantially similar to each other. *Aetna Cas. and Sur. Co. v. Clerk, U.S. Bankr. Ct., N.Y., NY (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996).

The Second Circuit has recognized that, under section 1122, plan proponents have significant flexibility to place similar claims into different classes, provided there is a rational basis for doing so. *See Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*, 21 F.3d 477, 483 (2d Cir. 1994) (similar claims may be separately classified unless the sole purpose is to engineer assenting impaired class); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 177-78 (Bankr. S.D.N.Y. 1989) ("[A] debtor may place claimants of the same rank in different

6

classes and thereby provide different treatment for each respective class."). Courts have allowed

separate classification where class members possess different legal rights and where there are

good business reasons for separate classification. *See In re Chateaugay Corp.*, 89 F.3d at 949

(debtor had legitimate business reason to justify separate classification of unsecured claims); *In*

*re Mirant Corp.*, No. 03-46590, 2007 WL 1258932, at *7 (Bankr. N.D. Tex. Apr. 27, 2007).

The Plan provides for the separate classification of Claims and Interests in the

Debtors based upon differences in the legal nature and/or priority of such Claims and Interests in

accordance with applicable law. The Plan designates the following ten classes of Claims and

Interests[5]: Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 3 (Secured

Note Claims), Class 4 (Unsecured Note Claims), Class 5 (General Unsecured Trade Claims),

Class 6 (Other General Unsecured Claims), Class 7 (Intercompany Claims), Class 8

(Intercompany Interests), Class 9 (Subordinated Securities Claims), Class 10 (Existing Chassix

Holdings Equity Interests). *See* Plan § 3.1. The Debtors anticipate that certain classes for

particular Debtors will not contain any claims or interest holders and, accordingly, will be

considered vacant and deemed eliminated under the Plan. *See* Plan § 3.3.

Courts have previously held that the separate classification of trade claims from

other general unsecured claims is proper, especially when the two classes of claims have

significantly different legal interests. *See, e.g.*, *Teamsters Nat'l Freight Indus. Negotiating*

*Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.)*, 800 F.2d 581, 587 (6th Cir. 1986)

(separate classification of claims permissible where the claims have "different stake[s] in the

future viability of the reorganized company"); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140,

225 (Bankr. S.D.N.Y. 2007) (separate classification of trade claims warranted where trade claims

---

[5] In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Fee Claims, Priority Tax Claims, and DIP Claims have not been classified.

7

were primarily liquidated and other general unsecured claims were unliquidated litigation or

rejection damages claims); *In re Rochem, Ltd.*, 58 B.R. 641, 643 (Bankr. D.N.J. 1985). The Plan

separately classifies three classes of unsecured third party claims. Class 4 consists of Unsecured

Noteholder Claims, Class 5 consists of the liquidated claims of trade creditors that have ongoing

business relationships with the Debtors, and Class 6 consists of contingent, unliquidated and

disputed litigation claims, customer claims and lease rejection claims. The Claims in each of

these Classes are based on entirely distinct legal interests and bases. Accordingly, the separate

classification under the Plan of Class 4, Class 5 and Class 6 is justified and appropriate.

Each of the Claims or Interests in every Class is substantially similar to the other

Claims and Interests in such Class. Accordingly, the Debtors submit the classification of Claims

and Interests set forth in the Plan does not prejudice the rights of holders of such Claims or

Interests, is consistent with the requirements of the Bankruptcy Code and, thus, is appropriate.[6]

### B.  **The Plan Complies with Section 1123(a) of the Bankruptcy Code**

Section 1123(a) provides seven requirements with which every chapter 11 plan

must comply.[7]  *See* 11 U.S.C. § 1123(a). As demonstrated herein, the Plan complies with each

of these enumerated requirements.

### 1.  **Section 1123(a)(1): Designation of Classes of Claims and Interests**

Section 1123(a)(1) requires that a plan must designate classes of claims and

equity interests subject to section 1122 of the Bankruptcy Code. *See* 11 U.S.C. § 1123(a)(1). As

---

[6] Section 1122(b) of the Bankruptcy Code is an elective, not mandatory, provision allowing the designation of a class of *de minimis* claims for administrative convenience. The Plan does not include a *de minimis* convenience class of claims and, therefore, section 1122(b) of the Bankruptcy Code is inapplicable.

[7] Section 1123(a)(8) provides an eighth requirement for individual debtors, which is not applicable in these Chapter 11 Cases.

discussed above, the Plan designates ten classes of Claims and Interests. *See* Plan § 3.1.

Accordingly, the Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

### 2.    Section 1123(a)(2): Classes that are Not Impaired by the Plan

Section 1123(a)(2) requires a plan to specify which classes of claims or interests

are unimpaired by the plan. *See* 11 U.S.C. § 1123(a)(2).  The Plan specifies that Class 1 (Other

Priority Claims), Class 2 (Other Secured Claims), Class 7 (Intercompany Claims), and Class 8

(Intercompany Interests) are unimpaired. *See* Plan § 4.1.  Accordingly, the Plan satisfies the

requirements of section 1123(a)(2) of the Bankruptcy Code.

### 3.    Section 1123(a)(3): Treatment of Classes that are Impaired Under the Plan

Section 1123(a)(3) requires a plan to specify the treatment of  impaired classes of

claims or interests. *See* 11 U.S.C. § 1123(a)(3).  The Plan sets forth the treatment of Class 3

(Secured Note Claims), Class 4 (Unsecured Note Claims), Class 5 (General Unsecured Trade

Claims), Class 6 (Other General Unsecured Claims), Class 9 (Subordinated Securities Claims),

and Class 10 (Existing Chassix Holdings Equity Interests), each of which constitutes an impaired

class under the Plan. *See* Plan §§ 4.3-4.10.  Accordingly, the Plan satisfies the requirements of

section 1123(a)(3) of the Bankruptcy Code.

### 4.    Section 1123(a)(4): Equal Treatment Within Each Class

Section 1123(a)(4) requires that a plan provide the same treatment for each claim

or interest within a particular class unless any claim or interest holder agrees to receive less

favorable treatment than other class members. *See* 11 U.S.C. § 1123(a)(4).  Pursuant to the Plan,

except to the extent that a holder of an Allowed Claim has agreed to less favorable treatment of

its Claim, the treatment of each Claim against or Interest in the Debtor, in each respective Class,

is the same as the treatment of each other Claim or Interest in such Class. *See* Plan § 4.

Accordingly, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

### 5. Section 1123(a)(5): Adequate Means for Implementation

Section 1123(a)(5) requires that a plan provide "adequate means for the plan's

implementation." 11 U.S.C. § 1123(a)(5). Section 5 of the Plan sets forth a detailed description

of the transactions to be implemented under the Plan and the structure of the Reorganized

Debtors post-Effective Date, providing for (i) the cancellation of all notes, instruments, and

certificates evidencing debt of or interests in, the Debtors, including, without limitation, all

obligations related to or arising out of the DIP Facilities, the Secured Notes Indenture, the

Prepetition Revolving ABL Facility, and the Unsecured Note Indenture, (ii) the issuance of all

plan-related securities and documents, including, without limitation, the New Common Stock

and, to the extent applicable, the New Warrants, (iii) the repayment in full of the Revolving DIP

Facility with proceeds of the Revolving Exit Facility and the conversion, or repayment, of the

DIP Term Loan with proceeds of the Exit Term Loan, (iv) the implementation of the

Restructuring Transactions, as set forth in Section 5.16 of the Plan, and (v) upon the

consummation of the other Restructuring Transactions, the dissolution of Chassix Holdings. *See*

Plan § 5.

Section 5 of the Plan also implements the terms of the Global Settlement, which

incorporates a compromise and settlement of numerous Debtor-creditor and inter-creditor issues,

among the Debtors, the Consenting Noteholders, and Platinum Equity whereby (i) the Unsecured

Noteholders will receive their Pro Rata share of the Unsecured Noteholder Common Stock

Distribution and the New Warrants pursuant to Sections 4.4 and 5.2 of the Plan and (ii) Platinum

Equity and the Released Parties related thereto will receive releases pursuant to Sections 5.2,

10.6 and 10.7 of the Plan. As set forth in detail below, the Unsecured Noteholders and Platinum

10

Equity are receiving the foregoing consideration in exchange for their substantial contributions to the Chapter 11 Cases.  The significant value that has been generated for the benefit of secured and unsecured creditors in these cases would not have been possible absent the hard work that has resulted in the prearranged plan before the Court today.  The Global Settlement is one of the lynch pins of the Plan and has made distributions to unsecured creditors possible in these cases.

In addition, prior to the Voting Deadline, the Debtors will file the Plan Supplement which will include, among other things, substantially final forms of the Reorganized Debtors' Amended Organizational Documents (to the extent such Amended Organizational Documents reflect material changes from the Debtors' existing organizational documents and bylaws), the Schedule of Assumed Contracts, the Schedule of Rejected Contracts, the Exit Term Loan, the Revolving Exit Facility, the Management Incentive Plan, and the New Warrant Agreement.  Accordingly, the Plan, together with the documents and agreements set forth in the Plan Supplement, provide the means for implementation of the Plan as required by section 1123(a)(5).

### 6.  Section 1123(a)(6): Prohibition on the Issuance of Non-Voting Securities

Section 1123(a)(6) prohibits the issuance of nonvoting equity securities, and requires amendment of a debtor's charter to so provide.  This section also requires that a corporate charter provide an appropriate distribution of voting power among the classes of securities possessing voting power.  *See* 11 U.S.C. § 1123(a)(6).  Section 5.10 of the Plan provides that the Reorganized Debtors will adopt the Amended Organizational Documents, which prohibit the issuance of nonvoting equity securities.  *See* Plan § 5.10.  Accordingly, the Plan does not provide for the issuance of nonvoting securities and satisfies section 1123(a)(6).

WEIL:\95365184\1\35076.0003

### 7.  Section 1123(a)(7): Provisions Regarding Directors and Officers

Section 1123(a)(7) requires a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee."  11 U.S.C. § 1123(a)(7).  Sections 5.10(b) and (c) of the Plan contain provisions with respect to the selection of directors and officers of the Reorganized Debtors.  In addition, prior to the Voting Deadline, to the extent known, the Debtors will file with the Plan Supplement information identifying the members of the New Board in accordance with section 1129(a)(5) of the Bankruptcy Code.  Accordingly, the provisions of the Plan are consistent with the interests of creditors, equity security holders, and public policy, thereby satisfying section 1123(a)(7) of the Bankruptcy Code.

### C.  <u>The Plan Complies with Section 1123(b) of the Bankruptcy Code</u>

Section 1123(b) sets forth certain permissive provisions that may be incorporated into a chapter 11 plan.  *See* 11 U.S.C. § 1123(b).  Each provision of the Plan is consistent with section 1123(b) of the Bankruptcy Code.

### 1.  Section 1123(b)(1): Impairment of Claims and Interests

Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests."  11 U.S.C. § 1123(b)(1).  Claims and Interests in Class 3 (Secured Note Claims), Class 4 (Unsecured Note Claims), Class 5 (General Unsecured Trade Claims), Class 6 (Other General Unsecured Claims), Class 9 (Subordinated Securities Claims) and Class 10 (Existing Chassix Holdings Equity Interests) are impaired and are receiving appropriate treatment under the Plan.  Claims in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 7 (Intercompany Claims) and Class 8 (Intercompany

WEIL:\95365184\1\35076.0003

Interests) are not impaired by the Plan. *See* Plan § 4. Accordingly, the Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

### 2. Section 1123(b)(2): Executory Contracts and Unexpired Leases

Section 1123(b)(2) allows a plan to provide for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code. *See* 11 U.S.C. § 1123(b)(2). Section 8.1 of the Plan provides that, as of the Effective Date, the Debtors will be deemed to have assumed each executory contract and unexpired lease to which they are a party unless such contract or lease (a) was previously assumed or rejected, (b) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts, (c) is the subject of a separate assumption or rejection motion prior to the Confirmation Date, or (d) is the subject of a pending objection. *See* Plan § 8.1. Prior to the Voting Deadline the Debtors will file the Schedules of Assumed Contracts and Schedule of Rejected Contracts. Accordingly, the treatment of executory contracts in the Plan is authorized by, and is consistent with, section 1123(b)(2) of the Bankruptcy Code.

### 3. Section 1123(b)(3): Claims or Interests of the Debtors

Section 1123(b)(3)(A) allows a plan to provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). As discussed in detail below, the Global Settlement in Section 5.2 of the Plan and the Debtors' releases in Section 10.6 of the Plan, comply with the requirements of section 1123(b)(3)(A).

In addition, section 1123(b)(3)(B) of the Bankruptcy Code provides that a plan may "provide for the retention and enforcement by the debtor" of certain claims or interests. *See* 11 U.S.C. § 1123(b)(3)(B). Section 10.9 of the Plan preserves for the Reorganized Debtors any rights to enforce, sue on, settle or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or

13

unknown, that the Debtors or their Estates may hold against any person or entity except those

released under sections 10.6, 10.7, and 10.8 of the Plan.  *See* Plan § 10.9.

### 4.    Section 1123(b)(5): Modifying of Creditor Rights

Section 1123(b)(5) of the Bankruptcy Code provides that a plan may "modify the

rights of holders of secured claims, other than a claim secured only by a security interest in real

property that is the debtor's principal residence, or of holders of unsecured claims, or leave

unaffected the rights of holders of any class of claims."  11 U.S.C. § 1123(b)(5).  As set forth in

Section 4 of the Plan, the Plan modifies the rights of holders of Claims and Equity Interests in

Classes 3 through 6 and Classes 9 and 10.  The Plan also leaves unaffected the rights of holders

of Claims and Equity Interests in Classes 1, 2, 7, and 8.  *See* Plan § 4.  Accordingly, the Plan is

consistent with section 1123(b)(5) of the Bankruptcy Code.

### 5.    Section 1123(b)(6): Other Appropriate Provisions

Section 1123(b)(6) of the Bankruptcy Code provides that a plan may "include any

other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy

Code]."  11 U.S.C. § 1123(a)(6).  As discussed in further detail below, the Plan contains certain

release and exculpation provisions that are consistent with applicable provisions of the

Bankruptcy Code and relevant case law.  *See* Plan § 10.  Further, the Plan provides that "the

Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to

the Chapter 11 Cases…."  *See* Plan § 11.  These provisions are consistent with the applicable

provisions of the Bankruptcy Code and should be approved as an integral part of the Plan and the

restructuring facilitated thereunder.  Based upon the foregoing, and as discussed in detail below,

the Plan complies fully with the requirements of sections 1122 and 1123, as well as with all other

provisions of the Bankruptcy Code, and thus satisfies all applicable requirements of section

1129(a)(1).

WEIL:\95365184\1\35076.0003

## II. <u>SECTION 1129(a)(2): THE DEBTORS HAVE COMPLIED WITH THE BANKRUPTCY CODE</u>

Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent "compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(2). The legislative history of section 1129(a)(2) reflects that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code. *See* H.R. REP. NO. 95-595, at 412 (1977); S. REP. NO. 95-989, at 126 (1978); *see also In re Johns-Manville Corp.*, 68 B.R. 618, 630 (Bankr. S.D.N.Y. 1986). As set forth below, the Debtors have complied with the applicable provisions of the Bankruptcy Code, including the provisions of sections 1125 and 1126, as well as the Disclosure Statement Order regarding disclosure and Plan solicitation.

### A. <u>The Plan Complies with Section 1125 of the Bankruptcy Code: Postpetition Disclosure and Solicitation</u>

Under section 1125 of the Bankruptcy Code, prior to the solicitation of votes on a plan of reorganization, debtors must disclose information that is adequate to permit an informed judgment by impaired creditors entitled to vote on the plan. *See* 11 U.S.C. § 1125(a). By entry of the Disclosure Statement Order, after notice and a hearing, the Court approved the Debtors' Disclosure Statement pursuant to section 1125 of the Bankruptcy Code as containing "adequate information" of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors and equity interest holders to make an informed judgment on the Plan.

On May 1, 2015, the Debtors commenced their solicitation of votes to accept the Plan. On May 13, 2015, the Debtors' voting and tabulation agent, Prime Clerk, LLC ("**Prime Clerk**"), filed the *Affidavit of Service of Solicitation Materials* (ECF No. 401) (the "**Prime Clerk Affidavit**"), which states that Prime Clerk solicited votes in accordance with the Disclosure Statement Order. As set forth in the Prime Clerk Affidavit, each holder of a Claim or Interest

15

was sent the solicitation materials required by the Disclosure Statement Order, including, for

holders of Claims and Interests entitled to vote, the Disclosure Statement (with the Plan annexed

thereto), the Disclosure Statement Order (without exhibits), the Confirmation Hearing Notice,

statements from the Debtors and the Creditors Committee setting forth their respective positions

on the Plan, and an appropriate form of ballot and return envelope.  The solicitation package was

transmitted in connection with the solicitation of votes to accept the Plan in compliance with

section 1125 and the Disclosure Statement Order.  11 U.S.C. §§ 1125(b), (c).  The Debtors did

not solicit acceptances of the Plan from any creditor or interest holder prior to the approval of the

Disclosure Statement.  The deadline for voting to accept or reject the Plan is June 19, 2015.

### B. The Plan Complies with Section 1126 of the Bankruptcy Code: Acceptance of Plan

Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of

the Plan.  Pursuant to section 1126, only holders of Allowed Claims and Allowed Interests in

impaired Classes of Claims and Interests that will receive or retain property under the Plan on

account of such Claims or Interests may vote to accept or reject the Plan.  *See* 11 U.S.C. § 1126.

Section 1126 provides, in pertinent part, as follows:

> (a)     The holder of a claim or interest allowed under section 502
> of [the Bankruptcy Code] may accept or reject a plan.
>
> *          *          *
>
> (f)     Notwithstanding any other provision of this section, a class
> that is not impaired under a plan, and each holder of a
> claim or interest of such class, are conclusively presumed
> to have accepted the plan, and solicitation of acceptances
> with respect to such class from the holders of claims or
> interests of such class is not required.
>
> (g)     Notwithstanding any other provision of this section, a class
> is deemed not to have accepted a plan if such plan provides
> that the claims or interests of such class do not entitle the
> holders of such claims or interests to receive or retain any

16

property under the plan on account of such claims or
interests.

As set forth in the Prime Clerk Affidavit, in accordance with section 1126, the

Debtors solicited acceptances of the Plan from the holders of all Allowed Claims and Allowed

Interests in each Class of impaired Claims and Interests entitled to vote to accept or to reject the

Plan.   In accordance with Sections 3 and 4 of the Plan, and the Disclosure Statement Order, the

Debtors did not solicit acceptances from the holders of Claims or Interests, as applicable, in each

Class of Claims and Interests that are not impaired and thus not entitled to vote to accept or reject

the Plan.  Therefore, all applicable requirements of section 1126 have been satisfied.

Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance

of a plan by impaired Classes entitled to vote to accept or reject a plan of reorganization:

A class of claims has accepted a plan if such plan has been accepted
by creditors, other than any entity designated under subsection (e)
of this section, that hold at least two-thirds in amount and more than
one-half in number of the allowed claims of such class held by
creditors, other than any entity designated under subsection (e) of
this section, that have accepted or rejected such plan.

The Debtors anticipate receiving overwhelming support for their Plan.  Holders of

approximately 73% of the Secured Notes in Class 3 and 80% of the Unsecured Notes in Class 4

have committed to vote in favor of the Debtors' Plan pursuant to the Restructuring Support

Agreement.  In addition, the Debtors anticipate that holders of Claims in Classes 5 and 6 will

vote to accept the Plan.  As set forth above, the Debtors did not solicit acceptances from the

Subordinated Securities Claims in Class 9 and Existing Chassix Holdings Equity Interests in

Class 10.  Nevertheless, as set forth below, pursuant to section 1129(b) of the Bankruptcy Code,

the Plan may be confirmed over the "deemed" rejection of Classes 9 and 10 because the Plan

WEIL:\95365184\1\35076.0003

does not discriminate unfairly and is fair and equitable with respect to each such Class.[8]  Based

on the foregoing, the Debtors, have complied with sections 1125 and 1126 of the Bankruptcy

Code, thus complying with the requirements of section 1129(a)(2).

### III.   SECTION 1129(a)(3): THE PLAN HAS BEEN PROPOSED IN GOOD FAITH AND NOT BY ANY MEANS FORBIDDEN BY LAW

Section 1129(a)(3) of the Bankruptcy Code requires a plan be "proposed in good

faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The Second Circuit has

defined good-faith as requiring a showing that "the plan was proposed with 'honesty and good

intentions' and with 'a basis for expecting that a reorganization can be effected.'"  *In re Johns-

Manville Corp.*, 843 F.2d at 649 (quoting *Koelbl v. Glessing* (*In re Koelbl*), 751 F.2d 137, 139

(2d Cir. 1984)).  Courts have held that "a plan is proposed in good faith 'if there is a likelihood

that the plan will achieve a result consistent with the standards prescribed under the Code.'"  *In

re The Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997).  Moreover, "[w]here the plan

is proposed with the legitimate and honest purpose to reorganize and has a reasonable hope of

success, the good faith requirement of section 1129(a)(3) is satisfied."  *Brite v. Sun Country

Dev., Inc. (In re Sun Country Dev., Inc.)*, 764 F.2d 406, 408 (5th Cir. 1985).  The requirement of

good faith must be viewed in light of the totality of the circumstances surrounding the

establishment of a chapter 11 plan.  *Id.*

The Debtors, as the plan proponents, have met their good faith obligation under

the Bankruptcy Code.  The Plan (including all documents necessary to effectuate the Plan) is the

result of extensive arms' length negotiations by and among the Debtors, the Consenting

Noteholders, the OEM Customers and Platinum Equity.  Each of these parties has, without

---

[8] To the extent any other Classes of Claims vote to reject the Plan, the Debtors will demonstrate at, or prior to, the Confirmation Hearing that the Plan satisfies the requirements of section 1129(a)(8) of the Bankruptcy Code with respect to any such rejecting classes.

18

question, acted in good faith.  The Global Settlement, as an integral part of the Plan, represents a

good faith effort to achieve a consensual, speedy restructuring to preserve value for the Debtors'

stakeholders.  As described below, the parties all made concessions and contributions to reach

agreement on the consensual, prearranged Plan.  Among other things, the Plan contemplates

(a) conversion of approximately $375 million of the Debtors' Secured Notes and $158 million of

the Debtors' Unsecured Notes to equity, (b) significant value from the OEM Customers in the

form of price increases and new business commitments, (c) an infusion of $50 million by certain

Secured Noteholders in new exit financing at emergence, (d) a new $150 million exit asset based

lending facility that will provide ongoing liquidity for the Debtors post-emergence, and (e)

preservation of valuable tax attributes, including NOLs, resulting in significant tax savings for

the Debtors.  The Global Settlement resolves many issues and will allow the Debtors to emerge

from Chapter 11 as a stronger, more competitive business. The major stakeholders, including the

OEM Customers, the Noteholders and Platinum Equity, all were integral to reaching the Global

Settlement.

        The Plan also provides for recoveries to General Unsecured Trade Creditors in the

form of the Trade Claim Distribution and the Additional Trade Claim Distribution, as well as a

recovery to Other General Unsecured Claims in the form of the General Unsecured Claim

Distribution.  The Plan, therefore, achieves one of the primary objectives underlying chapter 11:

the equitable distribution of value to creditors for amounts owing.  At the same time, the Plan

provides for the rehabilitation and continuation of the Debtors' businesses, which includes,

among other measures of success, the continued employment of thousands of workers, and

conduct of business with both vendors and customers.  *See In re Ionosphere Clubs, Inc.*, 98 B.R.

at 176 ("[t]he paramount policy and goal of Chapter 11, to which all other bankruptcy policies

are subordinated, is the rehabilitation of the debtor); *see also N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation, with an attendant loss of jobs and possible misuse of economic resources.").

Inasmuch as the Plan promotes the rehabilitative objectives and purposes of the Bankruptcy Code, while also providing for a recovery to creditors, the Plan and the related documents have been filed in good faith in accordance with section 1129(a)(3).

**IV.  SECTION 1129(a)(4): THE PLAN PROVIDES THAT PROFESSIONAL FEES AND EXPENSES ARE SUBJECT TO COURT APPROVAL**

Section 1129(a)(4) of the Bankruptcy Code provides that any payment made or to be made by the plan proponent, the debtor, or a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case or the plan, be subject to approval by the Court as reasonable.  11 U.S.C. § 1129(a)(4).

By order dated April 14, 2015, the Court has authorized and approved the payment of certain fees and expenses of retained professionals, subject to final review by the Bankruptcy Court.  Section 2.2 of the Plan provides that the Allowed Amount of all Fee Claims (Claims arising under section 327, 328, 329, 330, 331, 503(b)(2), 503(b) or 1103) will be paid in full, in cash, (i) upon the later of (A) the Effective Date and (B) the date on which the order Allowing such Fee Claim is entered or (ii) upon other terms as mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors.  The Plan also provides that the Bankruptcy Court will retain jurisdiction "to hear and determine all applications for allowances of compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code . . . ."  *See* Plan § 11(g).  All fees and expenses accrued through the Effective Date thus remain subject to final Bankruptcy Court review.

WEIL:\95365184\1\35076.0003

The foregoing procedures for the Bankruptcy Court's review and ultimate

determination of the fees and expenses to be paid by the Debtor satisfy the objectives of

section 1129(a)(4).  *See In re Elsinore Shore Assocs.*, 91 B.R. 238, 268 (Bankr. D.N.J. 1988)

(requirements of section 1129(a)(4) satisfied where plan provided for payment of only "allowed"

administrative expenses); *In re Future Energy Corp.,* 83 B.R. 470, 488 (Bankr. S.D. Ohio 1988)

("Court approval of payments for services and expenses is governed by various Code provisions

– e.g., §§ 328, 329, 330, 331, and 503(b) – and need not be explicitly provided for in a

Chapter 11 plan.").  Accordingly, the Plan complies with the requirements of section 1129(a)(4).

## V.   **SECTION 1129(a)(5): THE DEBTORS HAVE DISCLOSED ALL NECESSARY INFORMATION REGARDING DIRECTORS, OFFICERS, AND INSIDERS**

Section 1129(a)(5)(A) of the Bankruptcy Code requires that the plan proponent

disclose the identity and affiliations of "any individual proposed to serve, after confirmation of

the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor

participating in a joint plan with the debtor, or a successor to the debtor under the plan."  Further,

section 1129(a)(5) requires that the appointment of such individual be "consistent with the

interests of creditors and equity security holders and with public policy" and that the plan

proponent disclose the identity of any insider that will be employed or retained by the

reorganized debtor and the nature of any compensation for such insider.

The Debtors have satisfied the foregoing requirements.  As of the Effective Date,

the board of directors of Reorganized UC Holdings will consist of five members selected by the

Consenting Noteholders and may include at least one member of the Debtors' executive

management team.  *See* Plan § 5.10(b).  Prior to the Confirmation Hearing, the Debtors will

disclose, in the Plan Supplement, the identity and affiliations of any individuals who will serve

on the New Board of Reorganized UC Holdings.  The Plan also provides that, except as

21

otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors,
other than Reorganized UC Holdings, who served as officers immediately before the Effective
Date will serve as the initial officers of each of the respective Reorganized Debtors on or after
the Effective Date.  *See* Plan § 5.10(c).  The proposed officers' knowledge of the operations,
businesses, accounts, finances, and business relationships of the Debtors are critical to achieving
a successful transition out of chapter 11, and are thus critical to maximizing the value of the
Debtors in these cases.  As such, the appointment of such individuals is consistent with the
interests of the Debtors' creditors, equity holders, and with public policy.

## VI.    BANKRUPTCY CODE SECTION 1129(a)(6) IS NOT APPLICABLE

Bankruptcy Code section 1129(a)(6) provides that "[a]ny governmental regulatory
commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has
approved any rate change provided for in the plan, or such rate change is expressly conditioned
on such approval."  11 U.S.C. § 1129(a)(6).  This provision of the Bankruptcy Code is not
applicable to the Chapter 11 Cases, as the Debtors are not subject to any regulation over the rates
they charge, nor will be they be subject to such regulation after confirmation of the Plan.

## VII.   THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129(a)(7) OF THE BANKRUPTCY CODE

Section 1129(a)(7) of the Bankruptcy Code provides, in relevant part:

With respect to each impaired class of claims or interests –

(A)     each holder of a claim or interest of such class –

(i)     has accepted the plan; or

(ii)    will receive or retain under the plan on account of such claim or interest
        property of a value, as of the effective date of the plan, that is not less than
        the amount that such holder would so receive or retain if the debtor were
        liquidated under chapter 7 of this title on such date . . . ."

22

Section 1129(a)(7) of the Bankruptcy Code is often referred to as the "best interests test" or the "liquidation test." *See* 11 U.S.C. § 1129(a)(7). The best interests test focuses on individual dissenting creditors and equity holders rather than classes of claims or interests. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, n.13 (1999). The test requires that "if the holder of a claim impaired under a plan of reorganization has not accepted the plan, then such holder must 'receive ... on account of such claim ... property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive ... if the debtor were liquidated under chapter 7 ... on such date.'" *Id*. at 440 (quoting 11 U.S.C. § 1129(a)(7)).

The best interests test does not apply to the holders of Claims in Classes 1 (Other Priority Claims), 2 (Other Secured Claims), 7 (Intercompany Claims) and 8 (Intercompany Interests) as they are unimpaired and, therefore, are deemed to have accepted the Plan. The best interests test is satisfied as to each holder of a Claim in Classes 3 (Secured Note Claims), 4 (Unsecured Note Claims), 5 (General Unsecured Trade Claims) and 6 (Other General Unsecured Claims) because each holder in such Class has either voted to accept the Plan, or will receive at least as much as it would receive in a liquidation under chapter 7. The test is satisfied with regard to Classes 9 (Subordinated Securities Claims) and 10 (Existing Chassix Holding Equity Interests) because there is no recovery available to these classes in liquidation.

Exhibit "D" to the Disclosure Statement sets forth the Debtors' Liquidation Analysis, which demonstrates that the creditors in Class 3 (Secured Note Claims), Class 4 (Unsecured Note Claims), Class 5 (General Unsecured Trade Claims) and Class 6 (Other General Unsecured Claims) will receive more value under the Plan than they would receive in a hypothetical chapter 7 liquidation. Specifically, under the Liquidation Analysis, holders of the

23

Claims in Classes 4 (Unsecured Note Claims), 5 (General Unsecured Trade Claims) and 6 (Other

General Unsecured Claims) would likely not receive any value under a hypothetical chapter 7

liquidation.  In contrast, under the Plan, the holders of Allowed Claims in Classes 4, 5 and 6 will

receive substantial value in the form of New Common Stock and New Warrants for Class 4 and

cash distributions in the form of the Trade Claim Distribution, Additional Trade Claims

Distribution and General Unsecured Claim Distribution for Classes 5 and 6.  Based upon the

foregoing, the Debtors submit that the best interests test is satisfied.[9]

## VIII.    SECTION 1129(a)(8): THE PLAN HAS BEEN ACCEPTED BY IMPAIRED CLASSES, AND, AS TO SUCH CLASSES, THE REQUIREMENTS OF SECTION 1129(a)(8) HAVE BEEN SATISFIED

Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or

interests either accept the plan or not be impaired by the plan.  Pursuant to section 1126(c) of the

Bankruptcy Code, a class of claims accepts a plan if holders of at least two thirds in amount and

more than one half in number of the allowed claims in that class vote to accept the plan.

Pursuant to section 1126(d) of the Bankruptcy Code, a class of interests accepts a plan if holders

of at least two thirds in amount of the allowed interests in that class vote to accept the plan.  *See*

11 U.S.C. § 1126.  In addition, for any impaired class of Claims that fails to cast a vote with

respect to the Plan, the Debtors submit that such class should be deemed to have accepted the

Plan.  *See, e.g., In re Adelphia Commc'ns Corp.*, 368 B.R. at 260-63 (citing *Heins v. Ruti-*

*Sweetwater, Inc. (In re Ruti-Sweetwater, Inc.)*, 836 F.2d 1263 (10th Cir. 1988)) (holding that an

impaired class in which no creditors in that class cast a ballot is deemed to accept the plan).

---

[9] To the extent the Creditors Committee argues that any subclass of unsecured creditors would receive more value under a hypothetical chapter 7 liquidation than is contemplated under the Plan, the Debtors will be prepared to argue and present evidence in their Reply and at the Confirmation Hearing that the Plan satisfies the requirements of section 1129(a)(7) with respect any such subclass of any Estate.

24

As set forth above, holders of claims in Classes 1, 2, 7, and 8 are unimpaired under the Plan and are, therefore, conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Additionally, as previously discussed, holders of approximately 73% of the Debtors' Secured Notes in Class 3 and approximately 80% of the Unsecured Notes in Class 4 have committed to support the Plan.[10] Furthermore, the Debtors fully anticipate that Classes 5 and 6 will vote to accept the Plan. As such, section 1129(a)(8) has been, or will be, satisfied with respect to these Classes of Claims.

Holders of Claims in Classes 9 and 10 will not receive or retain any property on account of their Claims or Interests in the Debtors, and, as such, these Classes are deemed to reject the Plan. Further, as the Voting Deadline has not yet passed, it is possible that additional classes will also vote to reject the Plan. Nonetheless, as set forth in Section XIV below, the Plan may be confirmed under the "cram down" provisions of section 1129(b) of the Bankruptcy Code.

## IX. **SECTION 1129(a)(9): THE PLAN PROVIDES FOR PAYMENT IN FULL OF ALL ALLOWED PRIORITY CLAIMS**

Section 1129(a)(9) requires that persons holding claims entitled to priority under section 507(a) of the Bankruptcy Code receive specified cash payments under the Plan. With respect to Allowed Administrative Claims, in accordance with section 1129(a)(9)(A) of the Bankruptcy Code, Section 2.1 of the Plan provides that each holder of an Allowed Administrative Claim will receive payment in full in Cash of the unpaid portion of such Allowed Administrative Claim on, or as soon thereafter as is practicable, the later of the Effective Date or the first Business Day after the date that is thirty (30) calendar days after such Administrative

---

[10] At times, the Creditors Committee has implied that the votes of the 80% of the Unsecured Noteholders that have agreed to support the Plan should not be counted due to the fact that those Noteholders also hold Secured Note Claims. The case law, however, does not support this position and demonstrates that this fact is irrelevant. *See, e.g.,* *In re LightSquared Inc.*, 513 B.R. 56, 91 (Bankr. S.D.N.Y. 2014); *In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 63-64 (Bankr. S.D.N.Y. 2006).

Claim becomes an Allowed Administrative Claim. Thus, the Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code. *See* Plan § 2.1.

With respect to the payment of Allowed Other Priority Claims, in accordance with section 1129(a)(9)(B) of the Bankruptcy Code, Section 4.1 of the Plan provides that holders of Allowed Other Priority Claims shall receive on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Claim, or as soon as reasonably practical thereafter, Cash equal to the allowed amount of such Claim. *See* Plan § 4.1.

With respect to the payment of Allowed Priority Tax Claims, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, Section 2.3 of the Plan provides that holders of Allowed Priority Tax Claims shall receive (a) Cash in an amount equal to such Allowed Priority Tax Claim, or (b) equal annual Cash payments in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years after the Commencement Date. Accordingly, the Plan complies with the requirements of section 1129(a)(9) of the Bankruptcy Code.

## X. SECTION 1129(a)(10): AT LEAST ONE CLASS OF IMPAIRED CLAIMS HAS ACCEPTED THE PLAN

Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of a plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider" if a class of claims is impaired by the plan. 11 U.S.C. § 1129(a)(10). Although the Voting Deadline has not yet passed, pursuant to the Restructuring Support Agreement, approximately 73% of the Holders of Secured Note Claims in Class 3 and approximately 80% of the Holders of Unsecured Note Claims in Class 4 have agreed to accept the Plan, without the inclusion of the acceptance of any insiders. The Secured Noteholders have

claims against each of the Debtors other than Chassix Holdings and the Unsecured Noteholders

Claims are at Chassix Holdings. As discussed above, the Noteholders may cast their vote of

acceptance in each class in which they hold a claim. *See, e.g.*, *In re Adelphia Commc'ns Corp.*,

359 B.R. 54 at 63-64. Additionally, the Debtors anticipate that the holders of claims in Classes 5

and 6 will also vote to support the Plan. Therefore, the Debtors will have at least one impaired

accepting class and have satisfied section 1129(a)(10).

## XI.    SECTION 1129(a)(11): THE PLAN IS NOT LIKELY TO BE FOLLOWED BY LIQUIDATION OR THE NEED FOR FURTHER REORGANIZATION

Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine

that the Plan is feasible as a condition precedent to confirmation. Specifically, the Bankruptcy

Court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The feasibility test set forth in section 1129(a)(11) requires the Bankruptcy Court

to determine whether a plan is workable and has a reasonable likelihood of success. *See In re

Armstrong World Indus., Inc.*, 348 B.R. 136, 167 (D. Del. 2006); *Leslie Fay*, 207 B.R. at 788.

"The feasibility standard is whether the plan offers a reasonable assurance of success. Success

need not be guaranteed." *In re Johns-Manville Corp.*, 843 F.2d at 649; *see also In re U.S. Truck

Co., Inc.*, 47 B.R. 932, 944 (E.D. Mich. 1985) ("Feasibility does not, nor can it, require the

certainty that a reorganized company will succeed."), *aff'd*, 800 F.2d 581 (6th Cir. 1986); *In re

One Times Square Assocs. Ltd. P'ship*, 159 B.R. 695, 709 (Bankr. S.D.N.Y. 1993) ("'It is not

necessary that the success be guaranteed, but only that the plan present a workable scheme of

reorganization and operation from which there may be a reasonable expectation of success.'").

The key element of feasibility is whether there exists a reasonable probability that the provisions

of the plan can be performed. The purpose of the feasibility test is to protect against visionary or speculative plans. *See Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985). However, "[j]ust as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility" and "[t]he mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds . . . ." *Drexel Burnham*, 138 B.R. at 762 (citing *In re U.S. Truck*, 47 B.R. at 944). Applying the foregoing standards of feasibility, courts have identified the following factors as probative:

   (a)    the adequacy of the capital structure;

   (b)    the earning power of the business;

   (c)    economic conditions;

   (d)    the ability of management;

   (e)    the probability of the continuation of the same management;

   (f)    the availability of prospective credit, both capital and trade;

   (g)    the adequacy of funds for equipment replacements;

   (h)    the provisions for adequate working capital; and

   (i)    any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*Leslie Fay*, 207 B.R. at 789 (citing 7 COLLIER ON BANKRUPTCY ¶ 1129 LH[2], at 1129-82 (15th ed. rev. 1996)); *see also In re Texaco Inc.*, 84 B.R. at 910. The foregoing list is neither exhaustive nor exclusive. *Drexel Burnham*, 138 B.R. at 763.

   Applying the factors set forth in *Leslie Fay*, the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code. For purposes of determining whether the Plan satisfies the feasibility standards, the Debtors have analyzed their ability to fulfill their obligations under the Plan. As part of this analysis, the Debtors, with the assistance

28

of their financial advisors, prepared financial projections for the post-Effective Date period of

fiscal year 2015 and each of the fiscal years 2016 through 2019 for the Reorganized Debtors.

These projections, and the assumptions upon which they are based, are included in the Debtors'

Financial Projections, annexed as Exhibit "C" to the Disclosure Statement.  Based upon such

projections, the Debtors submit that all payments required to be made pursuant to the Plan will

be made and, therefore, it is highly unlikely that confirmation of the Plan would be followed by

liquidation or the need for further financial reorganization.  Additionally, as discussed above, the

Debtors and the OEM Customers have entered into long-term agreements, which provide for

price increases and favorable business terms, predicated upon a prenegotiated restructuring and

the Effective Date of the Plan occurring by July 31, 2015.  Should the Effective Date not occur

by that date, the long-term agreements will be in severe jeopardy.  The Consenting Noteholders

have also agreed to convert their debt into equity, thus, deleveraging the Debtors' businesses and

allowing the Debtors to emerge with a substantially superior capital structure.  The Debtors,

therefore, fully believe that pursuant to the Plan, the Debtors' businesses will return to viability.

Accordingly, the Debtors believe that the Plan satisfies the feasibility requirement imposed by

the Bankruptcy Code.

## XII.    SECTION 1129(a)(12): ALL STATUTORY FEES HAVE BEEN OR WILL BE PAID

Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees

payable under section 1930 of title 28 [of the United States Code], as determined by the court at

the hearing on confirmation of the plan."  11 U.S.C. § 1129(a)(12).  Section 507 of the

Bankruptcy Code provides that "any fees and charges assessed against the estate under [section

1930 of] chapter 123 of title 28" are afforded priority as administrative expenses. 11 U.S.C. §

507(a)(2).  In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, the Plan

provides that all such fees shall be paid by the Debtors on or before the Effective Date, and by

the Reorganized Debtors after the Effective Date until the Chapter 11 Cases are closed.  *See* Plan

§ 12.1.  Therefore, the Plan satisfies all applicable requirements of section 1129(a)(12).

## XIII.  SECTIONS 1129(a)(13), 1129(a)(14), 1129(a)(15), AND 1129(a)(16) DO NOT APPLY

Section 1129(a)(13) of the Bankruptcy Code requires a plan to provide for retiree

benefits at levels established pursuant to section 1114 of the Bankruptcy Code.  *See* 11 U.S.C. §

1129(a)(13).  The Debtors do not have any outstanding obligations with respect to retirees.

Accordingly, section 1129(a)(13) of the Bankruptcy Code is inapplicable in these cases.

Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic

support obligations.  *See* 11 U.S.C. § 1129(a)(14).  The Debtors are not subject to any domestic

support obligations, and, as such, this section of the Bankruptcy Code does not apply.

Section 1129(a)(15) applies only in cases in which the debtor is an "individual"

(as that term is defined in the Bankruptcy Code).  None of the Debtors is an "individual," and,

accordingly, section 1129(a)(15) is inapplicable.

Finally, the Debtors are each a moneyed, business, or commercial corporation,

and accordingly, section 1129(a)(16), which provides that property transfers by a corporation or

trust that is not a moneyed, business or commercial corporation or trust be made in accordance

with any applicable provisions of nonbankruptcy law, is inapplicable.

## XIV.  SECTION 1129(b): THE PLAN SATISFIES THE "CRAM DOWN" REQUIREMENT WITH RESPECT TO CLASSES 9 AND 10

Because Classes 9 (Subordinated Securities Claims) and 10 (Existing Chassix

Holdings Equity Interests) are deemed to reject the Plan, the requirements of 1129(a)(8) are not

met with respect to those classes.  However, section 1129(b) of the Bankruptcy Code provides a

30

mechanism for confirmation of a plan in circumstances where not all impaired classes of claims and equity interests accept a plan. This is known colloquially as "cram down."

> Section 1129(b) provides in pertinent part:

> [I]f all of the applicable requirements of [section 1129(a) of the Bankruptcy Code] other than [the requirement contained in section 1129(a)(8) that a plan must be accepted by all impaired classes] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

Thus, under section 1129(b), the Bankruptcy Court may "cram down" a plan over the rejection of a plan by impaired classes of claims or equity interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such classes. *See, e.g., In re Johns-Manville Corp.*, 843 F.2d at 650.

Two impaired Classes – Class 9 (Subordinated Securities Claims) and Class 10 (Existing Chassix Holdings Equity Interests) – are deemed to have rejected the Plan. As set forth above, all of the impaired Classes entitled to vote have either agreed to accept the Plan or the Debtors anticipate will accept the Plan. Accordingly, the Debtors invoke section 1129(b) with respect to Class 9 and Class 10.[11]

## A. __The Plan Does Not Discriminate Unfairly__

The unfair discrimination standard of section 1129(b) ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value it will receive under a plan when compared to the value given to all other similarly situated classes. *See LightSquared Inc.*, 513 B.R. at 99. Section 1129(b)(1) does not include an outright prohibition on discrimination between classes, but rather prohibits discrimination between classes that is unfair.

---

[11] *See supra* note 8 above.

*In re 11,111, Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990). Generally a plan unfairly

discriminates only if similar classes are treated differently without a reasonable basis for the

disparate treatment. *See In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y.

1990); *In re Johns-Manville Corp.*, 68 B.R. at 636. Accordingly, as between two classes of

claims or two classes of equity interests, there is no unfair discrimination if (i) the classes are

comprised of dissimilar claims or interests, *see, e.g., In re Johns-Manville Corp.*, 68 B.R. at 636,

or (ii) taking into account the particular facts and circumstances of the case, there is a reasonable

basis for such disparate treatment, *see, e.g., In re Buttonwood Partners, Ltd.*, 111 B.R. at 63.

To determine whether a plan discriminates unfairly, courts consider "whether (1)

there is a reasonable basis for discriminating, (2) the debtor cannot consummate the plan without

the discrimination, (3) the discrimination is proposed in good faith, and (4) the degree of

discrimination is in direct proportion to its rationale." *In re Genco Shipping & Trading Ltd.*, 513

B.R. 233, 241-42 (Bankr. S.D.N.Y. 2014) (internal citation omitted). Claims and Interests have

been classified under the plan in accordance with section 1129(a) of the Bankruptcy Code, and

the Plan does not "discriminate unfairly" with respect to any of the rejecting classes.

With respect to the Subordinate Security Claims in Class 9, no similar class of

such claims exists. These Claims are not receiving any amounts under the Plan; however, no

other class of such claims is entitled to different treatment. The fact that these claims have been

subordinated changes their level of priority and, therefore, allows them to receive different

treatment than other unsubordinated claims. *See In re Matter of Greate Bay Hotel & Casino,

Inc.*, 251 B.R. 213, 232 (Bankr. D.N.J. 2000). Based upon the fact that this is the only class of

subordinated claims, the Debtors have a rational basis for their separate classification and

treatment. Therefore, the Plan does not discriminate unfairly with respect to these claims.

WEIL:\95365184\1\35076.0003

The Existing Chassix Holdings Equity Interests in Class 10 are legally distinct in nature from all other Classes. Due to the unique priority afforded to these interest holders, the Plan does not discriminate unfairly with respect to such interests. *See In re Extended Stay Inc.*, No. 09-13764, 2010 WL 6561113, at *10 (Bankr. S.D.N.Y. July 20, 2010) (plan did not unfairly discriminate with respect to rejecting class of equity interests where no holders of equity interests were treated differently); *In re Finlay Enters., Inc.*, No. 09-14873, 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29, 2010) (holding that plan did not unfairly discriminate against rejecting class of equity interests because no other class of interests existed and, therefore, rejecting class was of a different legal nature and priority than the other classes).

### B. **The Plan is Fair and Equitable**

Pursuant to section 1129(b)(2), a plan must be fair and equitable with respect to each class that rejects the Plan. *See* 11 U.S.C. § 1129(b)(2). The definition of "fair and equitable" varies based on the priority of the claim or interest of the class. The Plan is fair and equitable with respect to each rejecting Class of claims or interests.

### 1. **The Plan is Fair and Equitable as to Unsecured Claims**

To be "fair and equitable" as to holders of unsecured claims, section 1129(b)(2)(B) of the Bankruptcy Code requires a Plan to provide either (i) that each holder of an unsecured claim will receive or retain under the plan property of a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (ii) that a holder of any claim or interest that is junior to the nonaccepting class will not receive or retain any property under the plan. 11 U.S.C. § 1129(b)(2)(B).[12] This rule is satisfied as to the holders of Subordinated

---

[12] No Class of Holders of Secured Claims has voted to reject the Debtors' Plan and, accordingly, there is no discussion herein of the "fair and equitable" requirements with respect to secured claims under section 1129(b)(2)(A) of the Bankruptcy Code.

33

Securities Claims in Class 9, as no claims or interests junior to such Class will receive or retain any property under the Plan.  *See Greate Bay Hotel & Casino, Inc.*, 251 B.R. at 233.

### 2.    The Plan is Fair and Equitable as to Equity Interests

To be "fair and equitable" as to holders of equity interests, section 1129(b)(2)(C) requires a Plan to provide either (i) that each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) that a holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.  11 U.S.C. § 1129(b)(2)(C).  The "fair and equitable" rule is satisfied as to the holders of Existing Chassix Holdings Equity Interests in Class 10, as no interests junior to such class will receive or retain any property under the Plan on account of such junior interests.  *See In re Finlay Enters. Inc.*, 2010 WL 6580628, at *7 (holding that the fair and equitable test was satisfied where no interest junior to the interests of the rejecting class received any property under the plan).  Based on the foregoing, the Plan satisfies all requirements under section 1129(b) of the Bankruptcy Code.

### XV.    <u>SECTION 1129(c)-(e) OF THE BANKRUPTCY CODE</u>

The Plan is the only plan filed in these cases, and accordingly, section 1129(c) of the Bankruptcy Code is satisfied in these Chapter 11 Cases.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, therefore, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.  Finally, none of the Chapter 11 Cases are "small business case[s]," as that term is defined in section 101(51C), and, accordingly, section 1129(e) of the Bankruptcy Code is inapplicable.

WEIL:\95365184\1\35076.0003

## XVI.  **THE GLOBAL SETTLEMENT IS AN INTEGRAL, UNSEVERABLE COMPONENT OF THE PLAN THAT THE COURT SHOULD APPROVE**

As discussed above, the Plan implements the terms of the Global Settlement, which forms the basis of the prearranged Plan before the Court and has created significant value for the Debtors and their Estates.  Pursuant to the Global Settlement embodied in Section 5.2(a) of the Plan, on the Effective Date, in full and complete compromise and settlement of any claim that Platinum Equity may assert against the Debtors, the Reorganized Debtors, or the Consenting Noteholders, Platinum Equity and the Released Parties related thereto will receive a release of potential claims held by the Debtors or third parties.  The Debtors and the other Released Parties, including the Consenting Unsecured Noteholders, have agreed to provide Platinum Equity and its related Released Parties the foregoing release in consideration of the substantial contributions provided by Platinum Equity to the Chapter 11 Cases, including:

- Platinum Equity's waiver of any stock loss in respect of the stock of UC Holdings and Chassix Holdings, and preservation of certain tax attributes including valuable NOLs, allowing a tax savings for the Debtors of approximately $8 million on a present value basis over five years and upwards of $146 million of NOLs after such time;

- Platinum Equity's management, consulting and advisory services leading up to and during the Chapter 11 Cases;

- Platinum Equity's waiver of significant unsecured claims (totaling approximately $10 million) it has against various Debtors, its agreement not to pursue other claims against the Debtors and its agreement to forego attempts to recover any of the significant equity contributed to the Debtors over the last five years;

- Platinum Equity's assistance in securing favorable pricing and accommodation terms and conditions for the Debtors from DIP Financing sources in connection with the Chapter 11 Cases;

- Platinum Equity's significant allocation of operational resources to the Debtors; and

WEIL:\95365184\1\35076.0003

- Platinum Equity's participation in prepetition negotiations that facilitated a speedy and consensual Restructuring for the Debtors, avoiding the likely alternative of a liquidation.

*See* Plan §§ 5.2(a), 10.6, 10.7.  Without Platinum Equity's contributions, the Debtors' Plan would not have been able to provide a consensual resolution to *all* major stakeholders.  Such cooperation by Platinum Equity led to the negotiation of the Global Settlement, without which it is unlikely that the OEM Customers would have provided the Debtors with such favorable accommodations, resulting in a highly likely liquidation of the Company.  As a result of the Global Settlement and Plan, however, the Debtors will emerge from chapter 11 as a stronger, more efficient enterprise and provide a recovery to their unsecured creditors, including the Unsecured Noteholders, who would likely receive no recovery under a liquidation.

Similarly, pursuant to Section 5.2(b) of the Plan, in consideration of the substantial contribution provided by the Consenting Unsecured Noteholders to the Chapter 11 Cases in the form of, among other things, the Consenting Unsecured Noteholders' cooperation in the Debtors' restructuring efforts, the Consenting Unsecured Noteholders' assistance and contribution in prepetition negotiations with the OEM Customers, the contribution by certain of the Consenting Unsecured Noteholders, as DIP Lenders, in the form of the DIP Term Loan, and generally their participation in prepetition negotiations that facilitated a speedy and consensual restructuring for the Debtors, each holder of an Allowed Unsecured Note Claim will receive its Pro Rata distribution of the Unsecured Noteholder Common Stock Distribution and New Warrants in full settlement of any claim that the Consenting Unsecured Noteholders may hold against the Debtors, the Reorganized Debtors, Platinum Equity and any Released Parties related thereto, or the Consenting Secured Noteholders.  *See* Plan § 5.2(b), 10.6, 10.7.

As previously discussed, the Global Settlement came together through a series of carefully executed steps, all of which rely on each other in order to provide recovery to creditors

36

and maintain the Debtors' businesses.  The OEM Customers would only agree to provide their

ongoing support and accommodations as part of a structured, prearranged plan, without the threat

of protracted, expensive, and time-consuming litigation.  To facilitate this result, the Informal

Committee of Noteholders negotiated directly with Platinum Equity on a number of issues,

including, without limitation, the capital structure of the Reorganized Debtors, potential claims,

and Platinum Equity's ongoing support and cooperation during the Chapter 11 Cases.  As a result

of those negotiations, the Debtors and the Informal Committee of Noteholders ultimately agreed

to provide Platinum Equity a release in exchange for its ongoing cooperation and its

contributions to the Debtors' Restructuring.  Without such an agreement, the Debtors would not

have been able to achieve any of the benefits of its prenegotiated Plan: the DIP Financing, the

OEM accommodations, or the substantial capital support.  These benefits are the crux of the

Debtors' Plan, which will be used to maintain the businesses going forward, saving thousands of

jobs for the Debtors' employees, and providing recovery to the Debtors numerous trade

creditors.  As the Debtors will demonstrate at the Confirmation Hearing to the extent necessary,

the only likely alternative to the Global Settlement and Plan is a value-destructive liquidation of

the Company, which will severely diminish creditor recoveries.

              A chapter 11 plan may include provisions for the settlement of claims against the

estate under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.  *See Drexel*

*Burnham*, 138 B.R. at 758.  Courts have broad authority to approve compromises and

settlements, which are favored by the courts, as they allow the estate to avoid the expenses and

burdens associated with litigating claims.  *Id.*  Under Bankruptcy Rule 9019, a court may

approve a settlement that is in the "best interests of the estate," meaning that the settlement is

"fair and equitable."  *In re Adelphia Commc'ns Corp.*, 368 B.R. at 225; *see also In re MF Global*

*Inc.*, No. 11-2790, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y. Aug. 10, 2012).  The Court must

also determine that the settlement is reasonable.  However, "[a] bankruptcy court need not

conduct an independent investigation into the reasonableness of the settlement but must only

'canvass the issues and see whether the settlement falls below the lowest point in the range of

reasonableness.'"  *In re Adelphia Commc'ns Corp.*, 368 B.R. at 225.  Further, Bankruptcy Rule

9019 does not require or contemplate a 'mini-trial' on the merits of the underlying claims.  *See In*

*re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 493, 496-97 (Bankr. S.D.N.Y. 1991); *see also*

*In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522-23 (S.D.N.Y. 1993) ("[t]he lenient

standards concerning approval of settlements and a limited scope of review reflect the considered

judgment that little would be saved by the settlement process if bankruptcy courts could approve

settlements only after an exhaustive investigation and determination of the underlying claims.").

 Generally, settlements are encouraged and favored during the bankruptcy process.

*See In re New York, N.H. & H. R.R. v. Smith*, 632 F.2d 955, 959 (2d Cir. 1980) (citing *Protective*

*Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424

(1968)) (recognizing that courts favor settlements in bankruptcy as an economical and practical

solution to claims); *see also In re MF Global Inc.*, 2012 WL 3242533, at *5 ("Settlements and

compromises are favored in bankruptcy as they minimize costly litigation and further parties'

interests in expediting the administration of the bankruptcy estate.").  Courts in the Second

Circuit have set forth factors to evaluate if a settlement is fair and equitable, including: (1) the

balance between the litigation's possibility of success and the settlement's future benefits; (2) the

likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and

delay," including the difficulty in collecting on the judgment; (3) the paramount interests of

creditors, including each affected class's relative benefits "and the degree to which creditors

either do not object to or affirmatively support the proposed settlement;" (4) whether other

parties in interest support the settlement; (5) the "competency and experience of counsel"

supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the

settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7)

"the extent to which the settlement is the product of arm's-length bargaining." *Motorola v.*

*Official Comm. Of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d

Cir. 2007) (internal citations omitted). Applying these factors, Bankruptcy Rule 9019 does not

require that the settlement be the best the debtor could have obtained, nor does it require the

court to conduct a mini-trial, and is consistent with the notion that the court must only "canvass

the issues raised by the parties" in determining whether the settlement is reasonable. *In re*

*Charter Commc'ns*, 419 B.R. 221, 252-53 (Bankr. S.D.N.Y. 2009) (internal citations omitted).

 While a court must independently evaluate the reasonableness of a settlement, the

business judgment of the debtor in recommending the settlement should factor into the court's

analysis. *In re Residential Capital, LLC*, 497 B.R. 720, 749-50 (Bankr. S.D.N.Y. 2013); *In re*

*MF Global Inc.*, 2012 WL 3242533, at *5 (citing *In re Charter Commc'ns*, 419 B.R. at 252); *see*

*also In re Delphi Corp.*, No. 05-44481, 2009 WL 973130, at *2 (Bankr. S.D.N.Y. Apr. 2, 2009).

 In certain instances, however, courts have determined that a higher level of

scrutiny may be appropriate. When a proposed settlement is negotiated between a debtor and an

insider, courts will evaluate the proposed agreement under the *Iridium* factors, in view of the

parties' insider relationship. *See Drexel Burnham*, 134 B.R. at 498 ("We subjected the

agreement to closer scrutiny because it was negotiated with an insider, and hold that *closer*

*scrutiny of insider agreements should be added to the cook book list of factors that Courts use to*

*determine whether a settlement is fair and reasonable*.") (emphasis added); *In re Charter*

39

*Commc'ns*, 419 B.R. 221, 241–42, 252–57 (Bankr. S.D.N.Y. 2009) (proposed settlement

between a debtor and chairman of its board of directors and controlling shareholder was fair and

reasonable after careful scrutiny under *Iridium*).

Courts have found, however, that where a major bondholder group with its own

set of professionals is involved in the plan negotiations, a heightened standard does not apply. *In

re Zenith Elecs. Corp.*, 241 B.R. 92, 109 (D. Del. 1999) (finding that bondholder participation in

plan negotiations, through separate professionals, countered any undue influence the shareholder

may have had over the debtor); *In re Charter Commc'ns*, 419 B.R. at 261. Since the very first

meeting between the Noteholders and Platinum Equity, the Noteholders, through their separate

counsel and financial advisors, were heavily involved in the Plan negotiations, and, as a result,

agreed to give Platinum Equity their release. The Noteholders, as an independent third party,

have therefore approved the release provisions contained in the Global Settlement.

Should the Court, however, determine that a heightened standard is applicable, the

Global Settlement is fair and equitable and should be approved by this Court under the *Iridium*

standards. The possibility of the litigation's success is at best speculative, while the Global

Settlement as a whole and Platinum Equity's contributions thereto provide definite and

substantial recoveries to the Debtors' creditors. Additionally, as discussed below, the litigation

would likely be extremely expensive and cause excess delay to the payment of claims. The

Debtors' major stakeholders all support the Global Settlement with the support of their

competent and experienced counsel. Finally, the Global Settlement is the product of months of

arms' length negotiations, including between the Informal Committee of Noteholders and

Platinum Equity, which resulted in a consensual Plan providing for the resolution of millions of

dollars of claims against the Debtors.

40

Through their experienced counsel and financial consultants, both the Debtors and the Consenting Noteholders conducted an extensive investigation into potential avoidance actions and litigation, including with respect to Platinum Equity and the issuance of the Unsecured Notes and use of certain proceeds thereof.  The analysis of claims was performed by the Debtors attorneys, Weil, Gotshal & Manges LLP ("**Weil**") with the aid of a team of consultants at Alvarez and Marsal Valuation Services, LLC ("**A&M**").  The analysis began in mid-October 2014 and the work was concluded in February 2015.  As part of that analysis, Weil reviewed a large number of the Debtors' documents, including among other things communications between Chassix individuals and Platinum Equity, financial projections and Board consents, and spoke with a half dozen people with relevant information to Weil's analysis. Additionally, the A&M consultants performed a significant amount of work at the direction of Weil to aid in the analysis of the potential claims and Weil also performed an extensive legal analysis of potential claims.

After receipt of the relevant information in connection with such investigation, and in consideration of the substantial contributions made by Platinum Equity to the Plan (including its waiver of significant claims, preservation of millions of dollars' worth of NOLs, and management and advisory services) and other relevant factors, the Debtors concluded that while one could argue there may be colorable claims against Platinum Equity in connection with the issuance of the Unsecured Notes, any potential recoveries were purely speculative and prosecution of such claims was not in the best interest of any Estate.  Additionally, any potential recovery from such litigation would likely cost the Estates a great deal of time, effort, and resources to pursue, as such claims would almost certainly be vigorously opposed.   The Debtors further concluded that the decision to pursue any claim as well as any delay to the confirmation

41

of the Plan that may result from pursuing such causes of action would in all likelihood seriously

jeopardize the pricing and other commitments negotiated under the Accommodation Agreements

as well as result in significant additional administrative expenses, all to the detriment of

unsecured creditors.  Furthermore, the Global Settlement has widespread support including the

OEM Customers, approximately 73% of the Secured Noteholders, and, most importantly,

approximately 80% of the Unsecured Noteholders – the only parties that would benefit from

pursuing potential claims against Platinum Equity.

         The support of these parties is embodied in the various agreements entered into in

support of the Plan and the Global Settlement, including the Restructuring Support Agreement

and the Accommodation Agreements.  The Plan, including the Global Settlement, is the result of

over eight months of  arms' length and good faith negotiations by and among the Plan Support

Parties, who will, in fact, rehabilitate and reorganize the Debtors' businesses and operations in a

collective effort to ensure that Chassix will continue to operate as a going-concern and avoid a

highly likely and value destructive liquidation, preserve thousands of jobs, maximize value for

all stakeholders, and provide for predictability and finality as to the settled claims.  Additionally,

and of importance, all of the Plan Support Parties are sophisticated institutions and were

represented by sophisticated and experienced counsel and financial advisors, who concluded that

the Global Settlement would be the most efficient and beneficial outcome to the Debtors'

restructuring.  *See, e.g.*, *In re Charter Commn'cs*, 419 B.R. at 256 (that settling parties were

represented by highly regarded law firms and financial advisors with ample relevant experience

in the restructuring field weighs in favor of approving the settlement).  Finally, as discussed

below, the releases obtained by officers and directors are reasonable and satisfy the Second

Circuit's requirements.

WEIL:\95365184\1\35076.0003

The professionals for the Creditors Committee appear to be treading new ground by objecting to the Plan that the Debtors will demonstrate is supported by over 80% of the Unsecured Noteholders as well as the trade and other general unsecured creditors the Committee purports to represent. This appears, by all accounts, to be a situation where the Creditors Committee's professionals have run amok – running up millions of dollars in fees and expenses against the Estates – with little or no supervision from the principals. The Global Settlement resolves all claims among the Debtors, Platinum Equity and the Consenting Noteholders, provides for predictability and certainty with respect to such claims for all creditors, and has the overwhelming support of the Debtors' major constituencies. Accordingly, the Global Settlement is reasonable and in the best interests of the Debtors' Estates.[13]

## XVII.   THE PLAN'S RELEASE PROVISIONS SHOULD BE APPROVED

The Plan provides for both releases of claims by the Debtors and releases by holders of claims and interests. Both release provisions are consistent with the Bankruptcy Code and applicable case law and, as such, should be approved as integral components of the Plan.

### A.   The Debtors' Release Should be Approved

In accordance with section 1123(b)(3)(A) of the Bankruptcy Code, Section 10.6 of the Plan contains a release of claims of the Debtors and the Reorganized Debtors against certain parties (*i.e.*, the Released Parties) relating to the Debtors or their Affiliates, existing as of the Effective Date or thereafter arising from occurrences prior to the Effective Date (the

---

[13] It is also worth noting that the Debtors may choose to abandon any avoidance action to a state law trust to effectuate the Global Settlement as a method of implementation, as has happened in other chapter 11 cases. It is noteworthy that if the Debtors were to pursue that course, given that 80% of the Unsecured Notes have already granted a release to Platinum Equity and support the Plan, and it takes 25% of the Unsecured Noteholders under the Unsecured Note Indenture to pursue any collective action (*See* Unsec. Note Inden. § 6.6), the result would be the same as the Debtors' current method of implementation in the Plan. To the extent relevant or necessary, the Debtors will expound upon these points in their Reply.

WEIL:\95365184\1\35076.0003

"**Debtors' Release**").[14]  The Released Parties under the Plan are (a) the Debtors; (b) the

Creditors Committee; (c) the Administrative Agent; (d) the Collateral Agent; (e) the other

Secured Parties under and as defined in the Security Agreement; (f) the DIP Lenders; (g) the DIP

Agents; (h) the Consenting Secured Noteholders; (i) the Consenting Unsecured Noteholders; (j)

the arrangers under each of the DIP Facilities and the Exit Facilities; (k) the administrative

agents, collateral agents, and lenders under the Exit Facilities; (l) the OEM Customers; (m)

Platinum Equity; (n) the Prepetition Revolving ABL Lenders; (o) the Unsecured Note Indenture

Trustee; (p) the Secured Note Indenture Trustee; and (q) with respect to each of the foregoing

entities in clauses (a) through (p), such entities' predecessors, successors and assigns,

subsidiaries, affiliates, managed accounts or funds, current and former officers and directors,

principals, shareholders, members, partners, employees, subcontractors, agents, advisory board

members, financial advisors, attorneys, accountants, investment bankers, consultants,

representatives, management companies, fund advisors and other professionals, and such

persons' respective heirs, executors, estates, servants and nominees.

The Debtors' Release constitutes a release of claims including: (1) any right to

setoff, counterclaim, or recoupment and any claim for breach of contract or breach of duties,

---

[14] Specifically, Section 10.6 of the Plan provides that:

> …to the fullest extent permitted by applicable law, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by the Debtors, their Estates and the Reorganized Debtors from…any and all Claims, Interests, obligations, rights, suits, judgments, damages, Causes of Action (including, without limitation, under any state or federal securities laws), remedies and liabilities whatsoever…based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Restructuring, the Reorganized Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any other Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Support Agreement or related agreements, instruments or other documents, or the solicitation of votes with respect to the Plan taking place from the beginning of time through the Effective Date.

WEIL:\95365184\1\35076.0003

(2) the right to object to Claims or Interests, (3) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code, (4) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (5) any claims under state or foreign law, including any fraudulent transfer or similar claims.

Claims held by a debtor against third parties are property of the estate and may be released in exchange for settlement. *In re Johns-Manville (Manville I)*, 837 F.2d 89, 91-92 (2d Cir. 1988); s*ee also* 11 U.S.C. 541(a)(1). When reviewing releases in a debtor's plan, courts consider whether such releases are in the best interest of the estate. *In re Charter Commc'ns*, 419 B.R. at 257-61 (analyzing a plan and embodied settlement under a best interests standard); *In re DBSD N. Am., Inc.,* 419 B.R. 179, 217 (Bankr. S.D.N.Y. 2009) (finding debtor releases appropriate where they represented a valid exercise of the debtors' business judgment and were in the best interests of the estate); *In re Bally Total Fitness,* No. 07-12395, 2007 WL 2779438, at *12 (Bankr. S.D.N.Y. Sept. 17, 2007) (same). Debtors have considerable leeway in issuing releases of their own claims, and such releases are considered "uncontroversial." *See In re Adelphia Commc'ns Corp.*, 368 B.R. at 263 n. 289.

As set forth above, when evaluating whether a settlement or release is in the best interests of the estate, a court must decide whether a proposed settlement or release falls "below the lowest point in the range of reasonableness." *In re Stone Barn Manhattan, LLC*, 405 B.R. 68, 75 (Bankr. S.D.N.Y. 2009) (citing *In re Teltronics Servs., Inc.*, 762 F.2d 185, 189 (2d Cir. 1985)). Where this standard is satisfied, releases by estates are permissible in a plan, either as part of a settlement or otherwise. *See In re Motors Liquidation Co.*, 447 B.R. 198, 220 (Bankr. S.D.N.Y. 2011). Courts in this District and others recognize that releases by debtors are often in the best interests of the estate where "the costs involved [in pursuing the released claims] likely

45

would outweigh any potential benefit from pursuing such claims." *In re Lear Corp.*, No. 09-14326, 2009 WL 6677955, at *7 (Bankr. S.D.N.Y. Nov. 5, 2009); *see also In re Cano Petroleum, Inc.*, No. 12-31549, 2012 WL 2931107, at *15 (Bankr. N.D. Tex. July 18, 2012); *In re Calpine Corp.*, No. 05-60200, 2007 WL 4565223, at *9-*10 (Bankr. S.D.N.Y. Dec. 19, 2007).

As set forth above, prior to the Commencement Date, the Debtors, through their counsel and financial advisors, explored the possibility of receiving additional distributable value from the potential avoidance actions and litigation claims discussed above. After receipt of the results of the investigation conducted by counsel and its financial consultants at A&M, as well as the significant value to the Plan being provided to the Debtors, the Debtors concluded that the benefits to the Estates realized from the Global Settlement would greatly outweigh pursuing any such potential claim. Even more importantly, a supermajority of the holders of the Debtors' Secured Notes and the Debtors' Unsecured Notes, through their experienced counsel and financial advisors, independently concluded, based upon the facts and circumstances here, that the compromises reflected in the Restructuring Support Agreement, including the releases granted to Platinum Equity, were fair and reasonable and made economic sense. Furthermore, as discussed below, Platinum Equity made substantial contributions to the Debtors' Chapter 11 Cases and these substantial contributions alone, setting aside any other considerations, warrant the releases under the Plan.

Any delay to the confirmation of the Plan that may result from pursuing such causes of action would, among other things, also seriously jeopardize the accommodations negotiated with the OEM Customers under the Accommodation Agreements. The OEM Customers agreed to such accommodations due to the expedited nature of these chapter 11 cases and the resulting decreased likelihood of costly litigation. Again, any delay in confirming the

46

Plan beyond the deadlines imposed under the Accommodation Agreements and the Component

Supply Agreements will jeopardize the significant pricing accommodations and new business

commitments the Debtors have negotiated for the benefit of the Estates and their creditors.  In

addition, any delay that results in a default under the Accommodation Agreements may also

undo the valuable claim waivers the Debtors have negotiated, resulting in significant additional

administrative expenses and further diminishing recoveries to unsecured creditors.

   Pursuant to section 1123(b)(3), the Debtors may include a settlement of any

claims they own as a discretionary provision in their Plan.  Here, the Debtors' Release is "an

integral part of a comprehensive Plan that provides substantial value to the estates."  *In re*

*Charter Commc'ns*, 419 B.R. at 257.  The inclusion of the Debtors' Release under the Plan was a

key provision and a significant inducement that was necessary to garner widespread support for

the Plan from the Debtors' key constituencies, in particular, the Consenting Secured

Noteholders, the Consenting Unsecured Noteholders, the OEM Customers and Platinum Equity.

Furthermore, in light of the extensive investigation conducted by the Debtors and the Consenting

Noteholders prior to the Commencement Date, the Debtors do not believe that they are foregoing

any valuable claims or causes of action against the Released Parties.  Finally, courts in this

District and others have approved releases similar to the Debtors' Release.  *See e.g., In re*

*Residential Capital, LLC*, No. 12-12020 (MG), at 51-53 (Bankr. S.D.N.Y. Dec. 11, 2013), ECF

No. 6065 (approving a debtor release where released parties were absolved from liability for a

broad range of claims, including fraud); *In re Washington Mutual, Inc.*, No. 08-12229 (MFW), at

88-90 (Bankr. D. Del. Feb. 24, 2012), ECF No. 9759 (confirming plan containing a debtor

release releasing claims of gross negligence and willful misconduct with respect to certain

47

entities).[15]  The Debtors' Release is in the best interests of the Estates, as it is reasonable and

satisfies the factors under Bankruptcy Rule 9019, and should be approved.

**B.  <u>The Third Party Releases are Appropriate and Should be Approved</u>**

Section 10.7 of the Plan contains Releases by Holders of Claims and Interests (the

"**Consensual Third Party Releases**"), which provides that such Holders of Claims and Interests

shall release the Released Parties—the same parties released pursuant to the Debtors' Release

described above—from liability based on or relating to the Debtors' Restructuring or the Chapter

11 Cases.  While the Consensual Third Party Releases are broad, they are tailored to apply only

in connection to the Debtors, the Restructuring, or the Chapter 11 Cases.  The Consensual Third

Party Releases also do not apply to any act or omission that constitutes fraud, gross negligence,

or willful misconduct, except in connection with the issues of the Unsecured Notes, the use of

their proceeds, and any events related thereto.  As noted, this exception was proposed by the

relevant constituency: the overwhelming majority of the Unsecured Noteholders.

The Consensual Third Party Releases only apply to those creditors who consent to

the releases by (i) voting in favor of the Plan, (ii) indicating their consent to the releases as set

forth on the Ballots, or (iii) electing not to vote or submitting an invalid ballot.  Pursuant to this

mandatory opt-in scheme, if a creditor votes to reject the Plan, and does not check the box

granting the Consensual Third Party Releases, that creditor will not be bound to such releases.

Courts in this Circuit have analyzed several factors in reviewing third party releases, including:

> (1) whether the estate received substantial consideration;
> (2) whether the enjoined claims were "channeled" to a
> settlement fund rather than extinguished; (3) whether the
> enjoined claims would indirectly impact the debtor's
> reorganization by way of indemnity or contribution; (4)
> whether the plan otherwise provided for the full payment of

---

[15] Copies of the orders cited herein are attached hereto as **Exhibit** "**A**."

the enjoined claims; or (5) whether the releases are consensual.

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005).  However, analyzing non-debtor releases is not a "matter of factors and prongs."  *Id.*  Rather, the Court must look to the full set of circumstances when making its determination.  Courts have approved third party releases where (1) the releases were essential to the plan and (2) the released parties substantially contributed to the debtors' reorganization.  *See Rosenberg v. XO Commc'ns, Inc. (In re XO Commc'ns, Inc.)*, 330 B.R. 394, 437-38 (Bankr. S.D.N.Y. 2005).  Third party releases are also regularly approved in this Circuit based on a purely consensual basis, unless the releases are truly offensive.  *See In re MPM Silicones, LLC*, No. 14-22503, 2014 WL 4436335, at *32 (Bankr. S.D.N.Y. 2014).  As set forth below, the Consensual Third Party Releases satisfy the *Metromedia* requirements and should be approved.

### 1.  The Consensual Third Party Releases are Consensual and Should be Approved

First, and most importantly, the Consensual Third Party Releases are precisely that – consensual.  As discussed in connection with the approval of the Debtors' Disclosure Statement, courts in this District regularly approve third party releases such as those contained in the Plan on the grounds that such releases are consensual.  *See MPM Silicones*, 2014 WL 4436335, at *32 (citing *Metromedia*, 416 F.3d at 141); *see also In re Genco Shipping & Trading Ltd.*, 513 B.R. at 271 (granting releases with respect to any party that consented or was deemed to consent through its ability to "check the box" on the plan ballots to opt out of the release); *In re Chemtura Corp.*, 439 B.R. 561, 611 (Bankr. S.D.N.Y. 2010) (finding releases permissible based on creditor consent); *In re Calpine Corp.*, 2007 WL 4565223, at *10 (same).

49

When a plan provides for a release by those who vote in favor of the plan,

abstain from voting, choose not to opt out of the releases, or have otherwise consented to the

release, courts within this District have regularly found such releases to be consensual and, thus,

permissible under the Bankruptcy Code. *See, e.g.*, *In re Calpine Corp.,* 2007 WL 4565223, at

\*10; *see also MPM Silicones*, 2014 WL 4436335, at \*32 (finding releases consensual if parties

voted in favor of the plan, did not opt out of the third party releases, or failed to object to the

third party releases); *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233 at 271 (same).  Courts

in this District have also approved third party releases as consensual when, as here, adequate

notice of the release has been provided to creditors.  *MPM Silicones*, 2014 WL 4436335, at \*32.

Notice is "adequate" when, for example, the third party release is bolded in the plan and

disclosure statement or language on the ballot explains that by voting to accept the plan or

abstaining without opting out of the release the creditor consents to the release.  *In re DBSD*, 419

B.R. at 218-19; *MPM Silicones*, 2014 WL 4436335, at \*32 (citing *In re Genco Shipping &

Trading Ltd.*, 513 B.R. 233).  The Consensual Third Party Releases are adequately disclosed to

creditors, as the ballots contain bold, capitalized explanatory text with respect to the releases.[16]

Similar language was also set forth for the benefit of creditors in the Disclosure Statement.  Such

language and disclosure has been held to provide "clear notice" to creditors of a third party

release.  *See, e.g.*, *MPM Silicones*, 2014 WL 4436335, at \*32.  Creditors have thus been provided

---

[16] Specifically, the Ballots contained the following bold, capitalized language stating:

**IF YOU VOTE TO ACCEPT THE PLAN, ELECT NOT TO VOTE OR SUBMIT AN INVALID BALLOT, THE DEBTORS WILL ARGUE THAT YOU SHOULD BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER CONSENTED TO THE RELEASE AND DISCHARGE OF THE RELEASED PARTIES FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION TO THE EXTENT PROVIDED IN SECTION 10.7 OF THE PLAN IF THE EFFECTIVE DATE OF THE PLAN OCCURS.**

WEIL:\95365184\1\35076.0003

with more than adequate notice of the effect of either voting in favor of the Plan or opting into

the Consensual Third Party Release.

　　　　　　While most courts merely require rejecting creditors to indicate their preference to

opt out of a release, *see, e.g. In re Genco Shipping & Trading Ltd.*, 513 B.R. 233 at 271 (finding

release consensual where a rejecting party was able to opt out of the release); *In re Chemtura

Corp.*, 439 B.R. at 611 ("where creditors' ballots [give] them the opportunity to opt out of the

releases," the releases are consensual); *In re DBSD*, 419 B.R. at 218, here, creditors voting to

reject the Plan were provided the option to opt in to the Consensual Third Party Releases.

Therefore, any creditor who will be bound by the Consensual Third Party Releases will have

affirmatively consented to such treatment, going above and beyond the requirements imposed in

other cases within this District for consensual releases.  Accordingly, the Consensual Third Party

Releases are consensual and warrant the Court's approval.

### 2.    The Debtors Received Substantial Consideration that Supports Approval of the Consensual Third Party Releases

　　　　　　In addition to being consensual, the Debtors received substantial consideration

from the Released Parties justifying approval of the Consensual Third Party Release.  While

substantial consideration by the released party is a factor in the *Metromedia* analysis,

consideration can come in many forms, including, but not limited to, consideration in the form of

payment.  *See Metromedia*, 416 F.3d at 143 (citing *In re Drexel Burnham Lambert Grp., Inc.*,

960 F.2d 285, 289 (2d Cir. 1992)).  Courts have also approved third party releases based upon

non-financial consideration.  *See In re Charter Commc'ns*, 419 B.R. at 258-59.  Where a released

party provides "money's worth" to accommodate the debtor's business objectives and permits

successful reorganization of the estate, such a release is consistent with applicable law.  *In re

Metro. 885 Third Ave Leasehold, LLC*, No. 10-16103, 2010 WL 6982778 (Bankr. S.D.N.Y. Dec.

51

22, 2010). Foregoing or giving up certain rights has also been found by this Court to constitute

substantial consideration. *See, e.g.*, *In re Residential Capital, LLC*, No. 12-12020 (MG), at 28

(Bankr. S.D.N.Y. Dec. 11, 2013), ECF No. 6065 (finding that the giving up of shared rights by

the released parties constituted a substantial contribution).

          All of the Released Parties have provided substantial contributions to the Debtors'

Estates. Certain of the Released Parties have contributed to the Debtors' Chapter 11 Cases in the

form of cash investments or loans. The Secured Noteholders have provided the Debtors with

substantial liquidity during the Chapter 11 Cases in the form of the $100 million DIP Term Loan,

which has been found by this Court to satisfy the substantial contribution factor. *See In re

Residential Capital, LLC*, No. 12-12020 (MG), at 28 (Bankr. S.D.N.Y. Dec. 11, 2013), ECF No.

6065 (finding that the released parties' DIP loan was an important contribution to the debtors'

estates). In addition, the Secured Noteholders have agreed to convert the $100 million DIP Term

Loan to an exit facility and to provide an additional $50 million in post-effective date financing.

Both the Secured and Unsecured Noteholders have also agreed to convert their outstanding debt

into equity and cancel their existing note obligations, thereby providing the Debtors with a

much-needed deleveraging of their balance sheets. The DIP Lenders, DIP Agents, Exit Lenders,

and Exit Agents have similarly provided the Debtors with the necessary liquidity to sustain their

businesses and operations both during and after the Chapter 11 Cases.

          Pursuant to section 5.2 of the Plan, and as described in further detail below,

Platinum Equity has fully cooperated with the Debtors and, in addition to its management,

consulting, and advisory services leading up to and during the Chapter 11 Cases, Platinum

Equity has agreed to (a) waive or cause to be waived any stock loss in respect of the stock of UC

Holdings and Chassix Holdings pursuant to Treasury Regulation § 1.1502-36, and any

WEIL:\95365184\1\35076.0003

comparable provision of state or local income tax law, to the extent directed by the Reorganized

Debtors, (b) not take, or cause to be taken, any other action that would reduce, limit or otherwise

adversely affect the U.S. federal income tax attributes of the Reorganized Debtors, except as

consistent with past practice, general cash management, or short term prudent investment, and

(c) cooperate with the Reorganized Debtors in connection with any group tax return filings,

audits and proceedings with respect to taxable years ending on or prior to, or including, the

Effective Date (including jointly managing such filings and proceedings, and not compromising

any audit or proceeding without the Reorganized Debtors' consent, such consent not to be

unreasonably withheld). Compared to the case of no waiver, the waiver of such stock loss is

expected to increase the available amount of the Debtors' NOL carryforwards and the amount of

the Debtors' tax basis in certain of its assets (taking into account expected reductions for the

cancellation of debt and expected limitations resulting from the change-in-ownership of Chassix

Holdings pursuant to the Plan). The Debtors' NOL carryforwards are valuable assets of the

Debtors' Estates in that the Internal Revenue Code of 1986, as amended, generally permits

corporations to carry forward NOLs to offset future income, thereby reducing their tax liability

in future periods. *See* 26 U.S.C. § 172. Similarly, more tax basis means increased operating

deductions (such as amortization and depreciation deductions) and/or reduced gain or increased

loss upon a subsequent sale of assets. *See* 26 U.S.C. §§ 165(f) and 167. Based upon projections

described in the Disclosure Statement, and reasonable assumptions, the increased NOLs and tax

basis will allow the Debtors to significantly reduce future U.S. federal income tax liability.

This Court has previously held that the agreement to refrain from taking action

that would degrade the value of the Debtors' potentially valuable NOLs has been found to satisfy

the substantial contribution requirement in this Court. *See In re Charter Commc'ns*, 419 B.R. at

258-59 (holding that the substantial consideration factor is satisfied where a released party agrees not to take action that would deteriorate the value of the Debtors' NOLs).  With the waiver of such stock loss and the resulting greater amount of NOLs and tax basis, the Debtors are projected to save approximately $8 million in tax liability on a present value basis over the next five years, as well as preserve upwards of $146 million of NOLs (with the prospect of significant future tax savings) after such time.  Additionally, Platinum Equity has agreed to waive its right to any distribution under the Plan on account of approximately $10 million in prepetition claims and has agreed not to pursue other claims against the Debtors.  These savings will substantially enhance the Debtors' cash position for the benefit of all parties in interest and contribute to the Debtors' efforts toward a successful restructuring and future success as a going concern.

The OEM Customers have also provided the Debtors with significant consideration.  In addition to the long-term price increases and significant new business commitments which will allow the Debtors to sustain their businesses, the OEM Customers have also provided the Debtors with (1) waivers and accommodations with respect to certain significant fees and expenses, (2) accelerated payment terms, (3) restrictions on the OEM Customers' ability to resource programs to the Debtors' competitors, and (4) agreements to waive or limit their ability to setoff or recoup charges against amounts owed to the Debtors. These crucial accommodations have given the Debtors greater liquidity and flexibility during these Chapter 11 Cases and will also assist the Debtors operationally upon emergence.  Finally, the remaining Released Parties participated in the prepetition negotiations that facilitated the speedy and consensual restructuring of the Debtors and have, and continue to, fully cooperate with the Debtors in good faith in connection with these Chapter 11 Cases.

WEIL:\95365184\1\35076.0003

### 3.  The Consensual Third Party Releases are an Essential Component of the Plan

As set forth above, courts have approved third party releases where they are essential to the debtor's plan.  *See In re Genco Shipping & Trading Ltd.*, 513 B.R. at 268 (non-debtor releases are permissible when the provisions are important to a debtor's plan); *see also Drexel Burnham,* 960 F.2d at 293 ("In bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan.").  While it is unclear exactly when such non-debtor releases are "important" to a plan, courts have approved such releases when the debtors could not confirm a plan absent such releases.  *See Cartalemi v. Karta Corp. (In re Karta Corp.)*, 342 B.R. 45, 54-55 (Bankr. S.D.N.Y. 2006) (finding that the third party releases were essential to confirmation of the plan and that without such releases, the plan would unravel).  Additionally, third party releases have been approved when the releases were key components of plan settlement agreements.  In *Drexel Burnham*, the court approved such a release because it was "unquestionably an essential element of [the Debtor's] ultimate reorganization."  *Drexel Burnham*, 960 F.2d at 293; *see also In re Residential Capital, LLC*, No. 12-12020 (MG), at 28-29 (Bankr. S.D.N.Y. Dec. 11, 2013), ECF No. 6065 (approving third party releases as a "lynchpin" of debtors' global settlement, without which, "the Plan would not be confirmable or feasible, and the recoveries currently contemplated by the Plan would not exist").

Without the releases contained in the Plan, the Debtors would not have obtained the high level of support that has enabled them to negotiate the financial restructuring represented by the Plan, which will, among other things, (i) provide for a distribution of value to holders of Unsecured Note Claims and General Unsecured Claims, (ii) present a clear and viable plan for the future of the Debtors' businesses, and (iii) allow the Debtors to emerge as a

WEIL:\95365184\1\35076.0003

significantly de-leveraged reorganized company.  Specifically, neither the Secured Noteholders

nor the OEM Customers would agree to contribute additional funds or make long-term

commitments to the Debtors unless all issues, including any potential litigation, were settled in

connection with a pre-arranged Plan.  Without such assurances, the Secured Noteholders would

not have agreed to provide the Debtors with DIP or exit financing.  Similarly, the OEM

Customers would likely have immediately begun resourcing programs to other suppliers and

would not have agreed to the price accommodations and new business commitments granted

under the Accommodation Agreements, which are crucial to the Debtors' long-term success.

   The Consensual Third Party Releases are tailored to comply with the scope and

breadth of previously approved third-party releases.  The Consensual Third Party Releases are

narrowly tailored to apply only in connection with the Debtors, the Restructuring, and the

Chapter 11 Cases.  Additionally, with the limited exception of acts performed in connection with

the issuance of the Unsecured Notes, the Consensual Third Party Releases do not absolve the

Released Parties from any act or omission that constitutes fraud, gross negligence, or willful

misconduct as determined by a Final Order.  Plans containing releases of similar scope have been

confirmed in this District and others.  *See*, *e.g.*, *In re Residential Capital, LLC*, No. 12-12020

(MG), at 51-53 (Bankr. S.D.N.Y. Dec. 11, 2013), ECF No. 6065 (approving a third-party release

where released parties were absolved from liability for a broad range of claims, including fraud);

*In re Washington Mutual, Inc.*, No. 08-12229 (MFW), at 88-90 (Bankr. D. Del. Feb. 24, 2012),

ECF No. 9759 (confirming plan containing a third-party release releasing claims of gross

negligence and willful misconduct with respect to certain entities).

   The significance attached to the releases by the parties whose cooperation was

necessary to the Restructuring, the significant consideration given by the Released Parties to

56

obtain the releases, the increase in value available to creditors as a result of successfully

consummating the proposed restructuring transactions, and the resulting distributions under the

Plan, all demonstrate that the releases are fair to the parties granting them.  Without the

consensus facilitated by the Consensual Third Party Releases, the Debtors would not have the

support of their largest creditor constituencies, and would have suffered significant loss in value,

to the detriment of all parties.  In addition, the releases being granted are entirely consensual.

Accordingly, the Consensual Third Party Releases should be approved.

## XVIII.   THE PLAN'S EXCULPATION PROVISIONS SHOULD BE APPROVED

In addition to the releases discussed above, section 10.8 of the Plan also contains

a release and exculpation for certain Exculpated Parties for claims arising out or relating to,

among other things, the Restructuring, the administration of the Chapter 11 Cases, and the

solicitation, confirmation and consummation of the Plan (the "**Exculpation Provision**").

Exculpation provisions are frequently included in chapter 11 plans because "stake

holders all too often blame others for failures to get the recoveries they desire; seek vengeance

against other parties; or simply wish to second guess the decision makers in the chapter 11 case."

*In re Chemtura Corp.*, 439 B.R. at 610 (citing *In re DBSD*, 419 B.R. at 217).  Such provisions

are permissible where they are important to a debtor's plan.  *See id.* at 610-11; *see also In re*

*Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Dec. 11, 2013), ECF No. 6065

(confirming plan that contained exculpations for Released Parties that were "instrumental to the

successful prosecution of the Chapter 11 Cases or their resolution pursuant to the Plan, and/or

provided a substantial contribution to the Debtors, which value provided a significant benefit to

the Debtors' Estates and general unsecured creditors, and which will allow for distributions that

would not otherwise be available but for the contributions made by such non-Debtor parties").

57

Courts in this Circuit have found that where an exculpation provision has been negotiated by the parties and was necessary to the negotiation of the Plan, for the Court to "pull away this string would thus tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition." *Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*, 326 B.R. 497, 503 (S.D.N.Y. 2005) (holding that exculpation provisions in the Plan would be approved because the parties who participated in the creation and negotiation of the Plan acted under the guarantee that they would receive some protection); *see also In re Worldcom, Inc.,* No. 02-13533, 2003 WL 23861928, at*28 (Bankr. S.D.N.Y. Oct. 31, 2003) ("The inclusion of the Exculpation Provision…in the Plan [was] vital to the successful negotiation of the terms of the Plan in that without such provisions, the [Exculpated] Parties would have been less likely to negotiate the terms of the settlements and the Plan.").

The Exculpated Parties greatly contributed to the Debtors' reorganization efforts and enabled the successful execution of the Restructuring Support Agreement and nearly entirely consensual Plan.  The Exculpation Provision was essential to receiving the full cooperation of the Exculpated Parties, each of which were instrumental in the Debtors' reorganization efforts and, should the Court fail to approve this provision, it will expose the Exculpated Parties to litigation after months of good faith negotiations.  Further, the Debtors tailored the Exculpation Provision to comply with similar provisions that have been previously approved in this Circuit. Therefore, the Court should approve the Exculpation Provision as an integral and important part of the Debtors' Plan.

WEIL:\95365184\1\35076.0003

## <u>CONCLUSION</u>

The Plan complies with and satisfies all of the requirements of section 1129 of the

Bankruptcy Code.  The Debtors, therefore, request that the Court confirm the Plan.


Dated:  June 10, 2015
        New York, New York

<div style="margin-left:40%">

/s/ Ray C. Schrock, P.C.
Marcia L. Goldstein
Ray C. Schrock, P.C.
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors and*
*Debtors in Possession*

</div>

59

**Exhibit A**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) |
| | )   Case No. 12-12020 (MG) |
| RESIDENTIAL CAPITAL, LLC, <u>et al.</u>, | ) |
| | )   Chapter 11 |
| Debtors. | ) |
| | )   Jointly Administered |
| | ) |

## ORDER CONFIRMING SECOND AMENDED JOINT CHAPTER 11 PLAN PROPOSED BY RESIDENTIAL CAPITAL, LLC, et al. AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

Residential Capital, LLC ("<u>ResCap</u>")[1] and its direct and indirect subsidiaries, each as a chapter 11 debtor and debtor-in-possession (collectively, the "<u>Debtors</u>") in the above-referenced chapter 11 cases (the "<u>Chapter 11 Cases</u>"), and the Official Committee of Unsecured Creditors (the "<u>Creditors Committee</u>" and, together with the Debtors, the "<u>Plan Proponents</u>") having proposed the Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors (ECF Doc. # 6030), dated December 6, 2013 (the "<u>Plan</u>," a copy of which is attached hereto as <u>Appendix 1</u>); the Court having conducted a hearing to consider confirmation of the Plan on November 19, 2013 through November 25, 2013 (the "<u>Confirmation Hearing</u>"); the Court having considered: (1) each of the Confirmation Declarations,[2] all of which were admitted into evidence at the Confirmation Hearing, (2) the

---

[1]     All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[2]     The "<u>Direct Testimony</u>" consists of the: (a) Affidavit of P. Joseph Morrow IV Certifying the Tabulation of Votes on the Joint Chapter 11 Plan Proposed by Residential Capital, LLC, et al. and the Official Committee of Unsecured Creditors (the "<u>Voting Declaration</u>") (ECF Doc. # 5699), (b) Declaration of Fernando Acebedo (ECF Doc. # 5674), (c) Direct Testimony of Lucy Allen (ECF Doc. # 5706); (d) Direct Testimony of Martin Blumentritt (ECF Doc. # 5698); (e) Direct Testimony of Michael Carpenter (ECF Doc. # 5695); (f) Direct Testimony of John Dubel (ECF Doc. # 5697), (g) Affidavit Regarding Dissemination of Notices and Information to RMBS Trust Certificateholders (ECF Doc. # 5687); (h) Direct Testimony of Ronald Friedman (ECF Doc. # 5710); (i) Direct Testimony of Gina Gutzeit (ECF Doc. # 5707); (j) Direct Testimony of Tammy Hamzehpour (ECF Doc. # 5708); (k) Declaration of Susheel Kirpalani (ECF Doc. # 5681); (l) Direct Testimony of Lewis Kruger (ECF Doc. # 5709); (m) Direct Testimony of Jeffrey A. Lipps (ECF Doc. # 5701); (n) Declaration of Ralph R. Mabey (ECF Doc. #

arguments of counsel presented at the Confirmation Hearing, (iii) the objections filed with

respect to confirmation of the Plan, (iv) the Plan Proponents Memorandum of Law in Support of

Confirmation of the Plan (the "Confirmation Memorandum") (ECF Doc. # 5720), (v) the Plan

Proponents' Omnibus Response to Certain Objections to Confirmation (the "Reply") (ECF Doc.

# 5718), (vi) the various responses and statements in support of confirmation filed by parties in

interest (ECF Doc. ## 5669, 5679, 5684, 5685, 5694, 5721); including the Objection of the Notes

Trustee and the Ad Hoc Committee of Junior Secured Noteholders to Confirmation of Plan

Proponents' Chapter 11 Plan (ECF Doc. # 5443), and (vii) the pleadings filed in the JSN

Adversary Proceeding, including, without limitation, the Joint Pretrial Order (ECF Doc. # 5716);

and the Court being familiar with the Plan and other relevant factors affecting these Chapter 11

Cases pending under the Bankruptcy Code; and the Court having taken judicial notice of the

entire docket of the Debtors' Chapter 11 Cases maintained by the Clerk of the Court and/or its

duly appointed agent, and evidence and arguments made, proffered, or adduced at the hearings

held before the Court during the pendency of the Chapter 11 Cases; and the Court having found

that due and proper notice has been given with respect to the Confirmation Hearing and the

deadlines and procedures for filing objections to the Plan; and the Court having heard the

---

5686); (o) Declaration of Robert Major (ECF Doc. # 5677); (p) Direct Testimony of Thomas Marano (ECF Doc. # 5705); (q) Declaration of Brendan Meyer (ECF Doc. # 5690); (r) Direct Testimony of Nancy Mueller-Handal in Support of Plan Confirmation (ECF Doc. # 5688); (s) Declaration of Thomas Musarra (ECF Doc. # 5675); (t) Declaration of Alan M. Pfeiffer (ECF Doc. # 5682); (u) Direct Testimony of Mark Renzi (ECF Doc. # 5702); (v) Direct Testimony of Mamta K. Scott, as Officer of U.S. Bank, as RMBS Trustee (ECF Doc. # 5683); (w) Direct Examination of Frank Sillman (ECF Doc. # 5703); (x) Declaration of Mary Sohlberg (ECF Doc. # 5680); (y) Direct Testimony of William R. Thompson (ECF Doc. # 5713); (z) Direct Testimony of Barbara Westman (ECF Doc. # 5704); (aa) Declaration of Jim Young (ECF Doc. # 5696); (bb) Direct Testimony of John S. Dubel on behalf of FGIC (ECF Doc. # 5692); (cc) Supplemental Declaration of Lorenzo Marinuzzi Regarding the Tabulation of Votes on the Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors (ECF Doc. # 6061) (the "Marinuzzi Declaration") (dd) Declaration of Gerard Uzzi in Connection with Changed Votes of Members of Ad Hoc Group of Junior Secured Noteholders on Plan Proponents' Second Amended Chapter 11 Plan (ECF Doc. # 6058) (together with the Marinuzzi Declaration, the "Supplemental Voting Declarations"); and (ee) Supplemental Declaration of Lewis Kruger in Support of Plan Confirmation (ECF Doc. # 6018).

statements, arguments and objections made in respect of Confirmation of the Plan, the Court having considered any and all objections to the Plan and to Confirmation and all such objections being consensually resolved, withdrawn, or overruled on the merits; and the appearance of all interested parties having been duly noted in the record of the Confirmation Hearing; and upon the record of the Confirmation Hearing, and after due deliberation thereon, and sufficient cause appearing therefor;

## I.     FINDINGS OF FACT AND CONCLUSIONS OF LAW

IT IS HEREBY FOUND AND CONCLUDED, that:

### JURISDICTION AND VENUE

A.     **Jurisdiction and Venue**.  The Court has jurisdiction over this matter and these Chapter 11 Cases pursuant to 28 U.S.C. § 1334. Confirmation of the Plan is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), this Court has jurisdiction to enter a final order with respect thereto, and this Court's exercise of such jurisdiction is constitutional in all respects.  The Court has exclusive jurisdiction to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code and should be confirmed. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtors are proper debtors under section 109 of the Bankruptcy Code, and the Debtors and the Creditors' Committee are proper proponents of the Plan under section 1121(a) of the Bankruptcy Code.

B.     **Proper Notice**.  As described below and as evidenced by the Affidavit of Service of P. Joseph Morrow IV re: Order (I) Approving Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan Proponents' Joint Chapter 11 Plan, (III) Approving the Form of Ballots, (IV) Scheduling a Hearing on Confirmation of the Plan, (V) Approving Procedures for Notice of the Confirmation Hearing and

for Filing Objections to Confirmation of Plan, and (VI) Granting Related Relief (ECF Doc. #

5196), dated September 25, 2013 (the "KCC Service Affidavit"), due, adequate and sufficient

notice of the Disclosure Statement, the Plan, including the Debtor Release and the Third Party

Release, the Plan Supplement, and the Confirmation Hearing, together with all deadlines for

voting on or objecting to the Plan and with respect to confirmation was given in compliance with

the Bankruptcy Rules, and no other or further notice is or shall be required.

      C.    **Transmission of Ballots**. Ballots were transmitted to holders of Claims and

Equity Interests in the Classes under the Plan that are treated as impaired ("Impaired") within the

meaning of section 1124 of the Bankruptcy Code (the "Voting Impaired Classes") and entitled to

vote on the Plan in accordance with the Plan and the Disclosure Statement Orders.  Subsequent

to the filing of the Second Amended Plan (as defined below), a Notice of Proposed Resolution of

Litigation Regarding Junior Secured Notes Claims and Opportunity to Change Voted with

Respect to Second Amended Plan (ECF Doc. # 5998) (the "JSN Change Vote Notice"), which

provided holders of Junior Secured Notes Claims that had previously rejected the Plan the

opportunity to change their vote to accept the Second Amended Plan, was filed and transmitted

to affected holders of Claims.

      D.    **Good Faith Solicitation (11 U.S.C. § 1125(e))**. The Plan Proponents solicited

votes for the Plan from the holders of Claims in the Voting Impaired Classes in good faith and in

a manner consistent with the Bankruptcy Code, including, but not limited to, section 1125(e) of

the Bankruptcy Code.

      E.    **Modification of the Plan (11 U.S.C. § 1127(a))**.  Pursuant to and in compliance

with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3018, the Plan Proponents

proposed certain modifications to the Plan as reflected in the modified or amended versions of

the Plan filed on November 12, 2013, November 18, 2013, December 3, 2013, and December 6,

2013 (collectively, the "Plan Modifications").  In accordance with Bankruptcy Rule 3019, the

Plan Modifications do not (1) affect the classification of Claims or Equity Interests, (2) constitute

material modifications of the Plan under section 1127 of the Bankruptcy Code, (3) cause the Plan

to fail to meet the requirements of sections 1122 or 1123 of the Bankruptcy Code, (4) materially

and adversely change the treatment of Claims or Equity Interests (other than any Claims and

Equity Interests held by those who have accepted such Plan Modifications in writing or in open

court), (5) require resolicitation of acceptances or rejections from any holders of Claims or

Equity Interests, or (6) require that any such holders be afforded an opportunity to change

previously cast acceptances or rejections of the Plan. Under the circumstances, the form and

manner of notice of the proposed Modifications are adequate, and no other or further notice of

the proposed Modifications is necessary or required.

<div align="center">

**STANDARDS FOR CONFIRMATION
UNDER SECTION 1129 OF THE BANKRUPTCY CODE**

</div>

F.      The Plan Proponents, as proponents of the Plan, have met their burden of proving

the elements of sections 1129(a) and 1129(b) of the Bankruptcy Code by a preponderance of the

evidence, which is the applicable evidentiary standard for confirmation of the Plan.  Further, the

Plan Proponents have proven the elements of sections 1129(a) and 1129(b) of the Bankruptcy

Code by clear and convincing evidence.  The evidentiary record of the Confirmation Hearing

supports the findings of fact and conclusions of law set forth in the following paragraphs.

G.      **Section 1129(a)(1).**  The Plan complies with each applicable provision of the

Bankruptcy Code.  Pursuant to sections 1122(a) and 1123(a)(1) of the Bankruptcy Code,

Article III of the Plan provides for the classification of Claims and Interests into separate

Classes, based on differences in the legal nature or priority of such Claims and Interests (other

<div align="center">- 5 -</div>

than Administrative Claims, Fee Claims, Priority Tax Claims, and Statutory Fees, which are addressed in Article II of the Plan and which are not required to be designated as separate Classes pursuant to section 1123(a)(1) of the Bankruptcy Code). In particular, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code as follows:

1. In accordance with section 1122(a) of the Bankruptcy Code, Article III of the Plan classifies each Claim against and Equity Interest in the Debtors into a Class containing only substantially similar Claims or Equity Interests;

2. In accordance with section 1123(a)(1) of the Bankruptcy Code, Article III of the Plan properly classifies all Claims and Equity Interests that require classification. With respect to Claims and Equity Interests in all Classes, the Plan Proponents have provided proof of a legitimate reason for the separate classification of such Claims and Equity Interests, and such classification is justified. Separate classification was not done for any improper purpose and does not unfairly discriminate between or among holders of Claims or Equity Interests;

3. In accordance with section 1123(a)(2) of the Bankruptcy Code, Article III of the Plan properly identifies and describes each Class of Claims and Equity Interests that is Unimpaired under the Plan;

4. In accordance with section 1123(a)(3) of the Bankruptcy Code, Article III of the Plan properly identifies and describes the treatment of each Class of Claims or Equity Interests that is Impaired under the Plan;

5. In accordance with section 1123(a)(4) of the Bankruptcy Code, the Plan provides the same treatment for each Claim or Equity Interest within a particular Class unless the holder of such a Claim or Equity Interest has agreed to less favorable treatment;

6. In accordance with section 1123(a)(5) of the Bankruptcy Code, the Plan, including the Plan Supplement, provides in detail adequate and proper means for its implementation, including, pursuant to Section 1123(a)(5)(B), transfer and assignment of certain GM Insurance Rights to the Kessler Settlement Class, the Liquidating Trust, and others;

7. Pursuant to Article IV.P of the Plan, the Debtors will be dissolved on or after the Effective Date. Accordingly, section 1123(a)(6) of the Bankruptcy Code is not applicable in these cases;

8. Pursuant to Article IV.P of the Plan, the Debtors will be dissolved on or after the Effective Date and no individuals will serve as officers, directors or voting trustees of the Debtors after the Effective Date. Accordingly, section 1123(a)(7) of the Bankruptcy Code is inapplicable in these cases. Nevertheless, the initial

members of the Liquidating Trust Board and Liquidating Trust Management were set forth in Exhibits 6 and 7 to the Plan Supplement and, thus, were disclosed prior to the Hearing. The Liquidating Trust Board and Liquidating Trust Management were selected by members of the Consenting Claimants in accordance with the terms of the Plan Support Agreement. No party has objected to the identity of the members of the Liquidating Trust Board or Liquidating Trust Management. In light of the foregoing, the manner of selection of the Liquidating Trust Board and Liquidating Trust Management is consistent with the interests of holders of Claims and Equity Interests and public policy;

H.     **Section 1129(a)(2).** The Plan Proponents have complied with all applicable provisions of the Bankruptcy Code as required by section 1129(a)(2) of the Bankruptcy Code, including sections 1122, 1123, 1124, 1125, 1126, 1127 and 1128 of the Bankruptcy Code and Bankruptcy Rules 3017, 3018 and 3019, and all other applicable rules, laws and regulations with respect to the Plan and the solicitation of acceptances or rejections thereof. In particular, acceptances or rejections of the Plan were solicited in good faith and in compliance with the requirements of sections 1125 and 1126 of the Bankruptcy Code as follows:

1.     In compliance with the *Order (I) Approving Disclosure Statement, (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan Proponents Joint Chapter 11 Plan, (III) Approving the Form of Ballots, (IV) Scheduling a Hearing on Confirmation of the Plan, (V) Approving Procedures for Notice of the Confirmation Hearing and for Filing Objections to Confirmation of the Plan, and (VI) Granting Related Relief* entered on August 23, 2013 (ECF Doc. # 4809) (the "Disclosure Statement Order"), on August 29, 2013, the Plan Proponents, through the Debtors' claims and noticing agent, Kurtzman Carson Consultants ("KCC"), caused copies of the following materials to be served on all holders of Claims in Classes that were entitled to vote to accept or reject the Plan (i.e., Claims in Classes R-3, RS-3, GS-3, R-4, GS-4A, GS-4B, RS-4, R-5, GS-5, RS-5, R-6, GS-6, RS-6, R-7, RS-7, R-8, GS-7, RS-8, R-11, RS-11, R-12, GS-10, and RS-12); *see* KCC Service Affidavit:

- a written notice (the "Confirmation Hearing Notice") of (a) the Court's approval of the Disclosure Statement, (b) the deadline for voting on the Plan, (c) the date of the Confirmation Hearing, (d) the deadline for objections to the confirmation of the Plan, and (e) the Plan Releases (as defined herein);

- the Disclosure Statement (together with the exhibits thereto, including the Plan and the Disclosure Statement Order) in a CD-ROM;

- the letter from the Creditors' Committee to holders of General Unsecured Claims (the "Committee Letter to GUCs") in Classes R-4, GS-4A, GS-4B, RS-4, R-6, GS-6, RS-6, R-7, RS-7, R-8, GS-7, RS-8, R-11, and RS-11 and the letter from the Creditors' Committee to holders of Borrower Claims (the "Committee Letter to Borrowers") in Classes R-5, GS-5, and RS-5;

- the appropriate form of Ballot with a postage prepaid return envelope.

2. In compliance with the Disclosure Statement Order, on August 29, 2013, the Plan Proponents, through KCC, caused copies of the Disclosure Statement and the Confirmation Hearing Notice to be served on (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) the parties comprising the Monthly Service List (as defined in the *Order Under Bankruptcy Code Sections 102(1), 105(a) and 105(d), Bankruptcy Rules 1015(c), 2002(m) and 9007 And Local Bankruptcy Rule 2002-2 Establishing Certain Notice, Case Management And Administrative Procedures* (ECF Doc. # 141)). *See* KCC Service Affidavit (ECF Doc. # 5196).

3. In compliance with the Disclosure Statement Order, on August 29, 2013, the Plan Proponents, through KCC, caused a copy of the notice of non-voting status to be served on all holders of Claims and Equity Interests in the non-voting classes (i.e., Classes R-1, GS-1, RS-1, R-2, GS-2, RS-2, R-9, R-10, GS-8, GS-9, RS-9, and RS-10). *See* KCC Service Affidavit (ECF Doc. # 5196).

4. In compliance with the Disclosure Statement Order, on August 29, 2013, the Plan Proponents, through KCC, caused a copy of the Confirmation Hearing Notice to be served on all parties in the creditor database maintained by KCC not otherwise served pursuant to paragraphs 1 and 3 above, including, but not limited to, (a) all non-Debtor parties to Executory Contracts or Unexpired Leases, (b) all holders of Administrative Claims and Priority Tax Claims, (c), all parties to litigation with the Debtors, (d) all parties to litigation with Ally relating to the Debtors' businesses, regardless of whether such parties were entitled to vote on the Plan, (e) all known members of potential class action lawsuits, and (f) individual borrowers whose loans were serviced by the Debtors as of September 20, 2012. *See* KCC Service Affidavit (ECF Doc. # 5196).

5. In compliance with the Disclosure Statement Order, on September 3, 2013, the Plan Proponents, through KCC, caused a copy of the Confirmation Hearing Notice to be published in the *Wall Street Journal* and *USA Today*. *See* KCC Affidavit of Publication (ECF Doc. # 5025), dated September 11, 2012.

6. On October 11, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) the following exhibits to the Plan Supplement (together with the Plan and any and all documents executed in connection therewith including the FGIC Settlement, the "Plan Documents"), in substantially final forms (ECF Doc. # 5342):

- the Liquidating Trust Agreement (Exhibit 2 to the Plan Supplement)

- the RMBS Claims Trust Agreement (Exhibit 3 to the Plan Supplement);

- the Borrower Claims Trust Agreement (Exhibit 4 to the Plan Supplement);

- the Private Securities Claims Trust Agreement (Exhibit 5 to the Plan Supplement);

- the Initial Members of the Liquidating Trust Board (Exhibit 6 to the Plan Supplement);

- the Initial Members of Liquidating Trust Management (Exhibit 7 to the Plan Supplement);

- the Initial Members of the Borrower Claims Trust Committee and Identity of the Borrower Claims Trustee (Exhibit 8 to the Plan Supplement);

- the Identity of the Private Securities Claims Trustee (Exhibit 9 to the Plan Supplement);

- the Borrower Trust True-Up (Exhibit 10 to the Plan Supplement)

- the Cooperation Agreement between the Liquidating Trust and the Kessler Settlement Class (Exhibit 11 to the Plan Supplement);

- the Policy Numbers for the GM Policies (Exhibit 12 to the Plan Supplement);

- the Liquidating Trust Causes of Action (Exhibit 13 to the Plan Supplement);

- the Stipulated Allocation of the Allowed Fee Claim (Exhibit 14 to the Plan Supplement);

- the Borrower-Related Causes of Action (Exhibit 15 to the Plan Supplement);

- the Updated RMBS Trust Claims Schedules (Exhibit 16 to the Plan Supplement);

- the Ally Contract Claims Estimate (Exhibit 17 to the Plan Supplement);

- the identity of the RMBS Claims Trust Trustee (Exhibit 18 to the Plan Supplement);

- the Material Terms on which the Plan Proponents may Pay Post-Petition Interest Over Time (Exhibit 19 to the Plan Supplement);

- the Initial List of Claims to be Subordinated under the Plan  (Exhibit 20 to the Plan Supplement); and

- the Updated Disclosure Statement Exhibits 12 and 13 (Exhibit 21 to the Plan Supplement).

7. On October 29, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) and served the Assumption Schedule setting forth Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan (ECF Doc. # 5547) as Exhibit 1 to the Plan Supplement. *See* Affidavit of Service (ECF Doc. # 5561), dated October 30, 2013.

8. On November 12, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap), the *First Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* (the "First Amended Plan") (ECF Doc. # 5722) and the Confirmation Memorandum (ECF Doc. # 5720).

9. On November 12, 2013, the Plan Proponents, through KCC, caused copies of the First Amended Plan and the Confirmation Memorandum to be served on the parties comprising the Monthly Service List.  *See* Affidavit of Service by KCC (ECF Doc. # 5770), dated November 14, 2013.

10. On November 12, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) the following amended Plan Supplement documents, in substantially final form (ECF Doc. # 5719):

- the Liquidating Trust Agreement (Amended Exhibit 2 to the Plan Supplement);

- the Borrower Claims Trust Agreement (Amended Exhibit 4 to the Plan Supplement);

- the Liquidating Trust Causes of Action (Amended Exhibit 13 to the Plan Supplement); and

- the Borrower-Related Causes of Action (Amended Exhibit 15 to the Plan Supplement).

11. On November 18, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap), certain modifications to the *First Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* (the "Revised First Amended Plan") (ECF Doc. # 5854).

- 10 -

12. On November 18, 2013, the Plan Proponents, through KCC, caused copies of the Revised First Amended Plan to be served on the parties comprising the Monthly Service List. *See* Affidavit of Service by KCC (ECF Doc. # 5922) dated November 21, 2013.

13. On December 3, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap), the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* (the "Second Amended Plan") (ECF Doc. # 5993).

14. On December 3, 2013, the Plan Proponents, through KCC, caused copies of (a) the Second Amended Plan and (b) the JSN Change Vote Notice to be served on the parties comprising the Monthly Service List. *See* Affidavit of Service by KCC (ECF Doc. # 6008), dated December 4, 2013.

15. On December 6, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap), certain modifications to the *Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors* (the "Revised Second Amended Plan") (ECF Doc. # 6030).

16. On December 6, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) a revised Assumption Schedule (Amended Exhibit 1 to the Plan Supplement) (ECF Doc. # 6035):

17. On December 6, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) the following amended Plan Supplement documents, in substantially final form (ECF Doc. # 6036):

- the Liquidating Trust Causes of Action (Second Amended Exhibit 13 to the Plan Supplement); and

- the Borrower-Related Causes of Action (Second Amended Exhibit 15 to the Plan Supplement).

18. On December 6, 2013, the Plan Proponents, through KCC, caused copies of the Revised Second Amended Plan, Amended Exhibit 1, Second Amended Exhibit 13, and Second Amended Exhibit 15 to be served on the parties comprising the Monthly Service List. *See* Affidavit of Service by KCC (ECF Doc. # 6048) dated December 9, 2013.

19. On December 10, 2013, the Plan Proponents filed (and made available on the Debtors' restructuring website at www.kccllc.net/rescap) a revised Liquidating Trust Agreement (Second Amended Exhibit 2 to the Plan Supplement) (ECF Doc. # 6064):

20. The Confirmation Hearing Notice provided due and proper notice of the Confirmation Hearing and all relevant dates, deadlines, procedures and other information relating to the Plan and/or the solicitation of votes thereon, including, without limitation, the voting deadline, the objection deadline, the time, date and place of the Confirmation Hearing and the release provisions in the Plan, including the Debtor Release and the Third Party Release.

21. All persons entitled to receive notice of the Disclosure Statement, the Plan and the Confirmation Hearing have received proper, timely and adequate notice in accordance with the Disclosure Statement Order and the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, and have had an opportunity to appear and be heard with respect thereto.

22. The Plan Proponents solicited votes with respect to the Plan in good faith and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order. Accordingly, the Plan Proponents are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the exculpation provisions set forth in Article IX.H of the Plan.

23. Claims in Classes R-1, R-2, GS-1, GS-2, RS-1 and R-2 are Unimpaired, and such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

24. The Plan was voted on by 183 sub-Classes of Impaired Claims that were entitled to vote pursuant to the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order (i.e., each sub-Class entitled to vote within Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11, R-12, GS-3, GS-4A, GS-4B, GS-5, GS-6, GS-7, GS-10, RS-3, RS-4, RS-5, RS-6, RS-7, RS-8, RS-11, and RS-12).

25. Prior to the filing of the Voting Declaration, KCC made a final determination of the validity of, and tabulation with respect to, all acceptances and rejections of the Plan by holders of Claims entitled to vote on the Plan, including the amount and number of accepting and rejecting Claims in each sub-Class entitled to vote within Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11, R-12, GS-3, GS-4A, GS-4B, GS-5, GS-6, GS-7, GS-10, RS-3, RS-4, RS-5, RS-6, RS-7, RS-8, RS-11, and RS-12 under the Plan. *See* Voting Declaration at Exhibit B.

26. As reflected in the Voting Declaration, each of the sub-Classes within Classes R-4, R-5, R-6, R-7, R-8, R-12, GS-4A, GS-4B, GS-5, GS-6, GS-7, GS-10, RS-4, RS-5 (at all sub-Classes other than Residential Funding Real Estate Holdings, LLC), RS-6, RS-7, RS-8, and RS-12 voted to accept the Plan by at least two-thirds in amount and a majority in number of the Claims in such Classes actually voting. *See* Voting Declaration, at Exhibit B.

27. Subsequent to the filing of the Voting Declaration, and pursuant to the settlement with the FHFA, the FHFA changed their previous votes rejecting the Plan to votes to accept the Plan in Classes R-11 and RS-11.

28. Subsequent to the filing of the Voting Declaration, and pursuant to the JSN Settlement (as defined herein), certain holders of Claims in Classes R-3, GS-3, and RS-3 changed their previous votes rejecting the Plan to votes to accept the Plan such that, together with holders of Claims in Classes R-3, GS-3, and RS-3 that previously voted to accept the Plan, holders of at least two-thirds in amount and a majority in number of the Claims actually voting in Classes R-3, GS-3, and RS-3 have accepted the Plan. *See* Supplemental Voting Declarations.

I.    **Section 1129(a)(3).**  The Plan has been proposed in good faith and not by any means forbidden by law.  The Plan Proponents' good faith is evident from the facts and record of these Chapter 11 Cases, the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in these Chapter 11 Cases.  The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' estates and effectuating an orderly liquidation of the Debtors.  The Plan is the result of extensive good faith, arm's-length negotiations between the Debtors, the Creditors' Committee, Ally, and certain of the Debtors' principal creditor constituencies, including each of the Consenting Claimants and their respective representatives, and reflects substantial input from the principal constituencies having an interest in the Chapter 11 Cases.  The Plan Proponents and each of their respective officers, directors, employees, advisors and professionals, as applicable: (i) acted in good faith in negotiating, formulating, and proposing, where applicable, the Plan and agreements, compromises, settlements, transactions, and transfers contemplated thereby, and (ii) will be acting in good faith in proceeding to (a) consummate the Plan and the agreements, compromises, settlements, transactions, transfers, and documentation contemplated by the Plan, including, but not limited to, the Plan Supplement documents, and (b) take any actions authorized and directed or contemplated by this Order.  Thus, the Plan satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

J.    **Section 1129(a)(4).**  The Plan provides that Professional Fee Claims submitted by Professionals for services incurred prior to the Effective Date will receive payment only if and

to the extent they are approved by the Court. The Plan also provides for the payment of the reasonable pre- and postpetition fees and expenses of the RMBS Trustees pursuant to the provisions of, and subject to, the procedures set forth in the *Final Supplemental Order (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs; (II) Approving Procedures for Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses* (ECF Doc. # 774), and the *Order under 11 U.S.C. §§ 105, 363, and 365, and Fed Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement with Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief* (ECF Doc. # 2246), which provisions and procedures will also apply to HSBC. The Plan further provides for the allowance of the Allowed Fee Claim, with Units and distributions on account of such claim made to counsel for the Institutional Investors. In accordance with the Plan, all other Administrative Claims will receive payment only to the extent they are Allowed Claims. Thus, the Plan satisfies the requirements of section 1129(a)(4) of the Bankruptcy Code.

K.    **Section 1129(a)(5).**  Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Plan discloses the identities and compensation structure for the members of the Liquidating Trust Board, Liquidating Trust Management, the Private Securities Claims Trustee, the RMBS Claims Trust Trustee, the Borrower Claims Trustee and the Borrower Claims Trust Committee.

In addition, members of the Liquidating Trust Board and Liquidating Trust Management set forth on <u>Exhibits 6 and 7</u> to the Plan Supplement are qualified, and their selection is consistent with the interests of holders of Claims and Equity Interests and with public policy.

L.   **<u>Section 1129(a)(6).</u>** The Plan does not provide for any changes in rates that require regulatory approval of any governmental agency.  Accordingly section 1129(a)(6) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

M.   **<u>Section 1129(a)(7).</u>** The liquidation analysis set forth in <u>Exhibit 8</u> to the Disclosure Statement, as well as other evidence proffered or adduced at or prior to, or in declarations in connection with, the Confirmation Hearing (a) are reasonable, persuasive, accurate and credible, (b) utilize reasonable and appropriate methodologies and assumptions; (c) have not been controverted by other evidence, and (d) establish that each holder of a Claim or Equity Interest in an Impaired Class either (i) has accepted the Plan or (ii) will receive or retain under the Plan, on account of such Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that it would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on such date.  Thus, the Plan Proponents have demonstrated that the Plan is in the best interests of creditors.

N.   **<u>Section 1129(a)(8).</u>** Claims in Classes R-1, R-2, GS-1, GS-2, RS-1, and RS-2, are Unimpaired and are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  As set forth in the Voting Declaration and the Supplemental Voting Declarations, each sub-Class entitled to vote within Classes R-3, R-4, R-5, R-6, R-7, R-8, R-11, R-12, GS-3, GS-4A, GS-4B, GS-5, GS-6, GS-7, GS-10, RS-3, RS-4, RS-5 (at all sub-Classes other than Residential Funding Real Estate Holdings, LLC), RS-6, RS-7, RS-8, RS-11, and RS-12 has voted to accept the Plan, and the Class RS-5 at the Residential Funding Real

- 15 -

Estate Holdings, LLC sub-Class voted to reject the Plan.  In addition, holders of Intercompany

Claims in Classes R-9, GS-8, and RS-9, and holders of Equity Interests in R-10, GS-9 and RS-

10 are deemed to have rejected the Plan (collectively with Class RS-5 (at the Residential

Funding Real Estate Holdings, LLC sub-Class), the "Rejecting Classes").  Nevertheless, the

Plan is confirmable because it does not discriminate unfairly and is fair and equitable with

respect to the Rejecting Classes and thus satisfies section 1129(b)(1) of the Bankruptcy Code

(as set forth in paragraph U below).

O.    **Section 1129(a)(9).** The Plan provides treatment for Administrative Claims,

Priority Tax Claims and Other Priority Claims that is consistent with the requirements of

section 1129(a)(9) of the Bankruptcy Code.

P.    **Section 1129(a)(10).** The Plan has been accepted by at least one class of Impaired

Claims at each Debtor that is entitled to vote on the Plan, determined without including any

acceptance of the Plan by any "insider."  *See* Voting Declaration, Exhibit B.

Q.    **Section 1129(a)(11).**  The Plan is feasible, within the meaning of section

1129(a)(11) of the Bankruptcy Code.  The Debtors' projections show that the Debtors expect to

have sufficient funds to make the payments required under the Plan.

R.    **Section 1129(a)(12).** The Plan provides that fees payable pursuant to 28 U.S.C.

§ 1930 will be paid by the Debtors on or before the Effective Date.  On and after the Effective

Date, notwithstanding the grouping of the Debtors into the Debtor Groups under the Plan, each

of the Debtors shall (i) pay the applicable U.S. Trustee fees when due in the ordinary course

until such time as the Bankruptcy Court enters a final decree in such Debtors' Chapter 11 Case

or until each Chapter 11 Case is converted or dismissed, and (ii) file consolidated post-

confirmation quarterly status reports.

S.     **Section 1129(a)(13).**  The retirement plan covering the Debtors' employees is sponsored by AFI, the indirect parent of ResCap and a non-Debtor.  Article IX.E of the Plan provides that nothing in the Plan releases AFI or any other party from the obligations under the Employees Retirement Plan for GMAC Mortgage Group, LLC and ERISA.  The Debtors have no other retiree benefit obligations.  Therefore, to the extent applicable, section 1129(a)(13) of the Bankruptcy Code is satisfied.

T.     **Sections 1129(a)(14), (15) and (16).** The Debtors do not owe any domestic support obligations and are not individuals.  Therefore, sections 1129(a)(14) and (15) of the Bankruptcy Code do not apply to the Debtors.  Further, the Debtors are moneyed, business, or commercial corporations or trusts, not nonprofit entities, and, therefore, section 1129(a)(16) of the Bankruptcy Code does not apply to the Debtors.  To the extent that any transfer of property under the Plan will be made by a nonprofit corporation or trust and section 1129(a)(16) of the Bankruptcy Code is thus applicable to the Debtors, such transfers shall be made in accordance with applicable non-bankruptcy law, thereby satisfying section 1129(a)(16) of the Bankruptcy Code.

U.     **Section 1129(b).** The Plan satisfies section 1129(b) of the Bankruptcy Code with respect to the Rejecting Classes.  The evidence proffered or adduced at the Confirmation Hearing is persuasive and credible, has not been controverted by other evidence, and establishes that the Plan does not discriminate unfairly and is fair and equitable with respect to the Rejecting Classes.  As required by section 1129(b)(2)(B) and 1129(b)(2)(C) of the Bankruptcy Code, the Plan is fair and equitable with respect to the Intercompany Balances and Equity Interests because (a) no holder of a Claim or Equity Interest will receive more than it is legally entitled to receive on account of its Claim or Equity Interest, and (b) the Plan does not

- 17 -

provide a recovery on account of any Claim or Equity Interest that is junior to the Rejecting

Classes.  As a result, the Plan satisfies the requirements of section 1129(b) of the Bankruptcy

Code. Thus, the Plan may be confirmed even though section 1129(a)(8) of the Bankruptcy

Code is not satisfied. After entry of the Confirmation Order and upon the occurrence of the

Effective Date, the Plan shall be binding upon the members of the Rejecting Classes.

       V.    **Section 1129(c).** The Plan (including previous versions thereof) is the only plan

that has been filed in these Chapter 11 Cases that has been found to satisfy the requirements of

subsections (a) and (b) of section 1129 of the Bankruptcy Code.  Accordingly, confirmation of

the Plan complies with the requirements of section 1129(c) of the Bankruptcy Code.

       W.    **Section 1129(d).** No party in interest has requested that the Court deny

Confirmation of the Plan on grounds that the principal purpose of the Plan is the avoidance of

taxes or the avoidance of the application of section 5 of the Securities Act, and the principal

purpose of the Plan is not such avoidance.  Accordingly, the Plan satisfies the requirements of

section 1129(d) of the Bankruptcy Code.

       X.    **Section 1129(e).** None of these Chapter 11 Cases is a small business case within

the meaning of the Bankruptcy Code.

       Y.    Based upon the foregoing and all other pleadings and evidence proffered or

adduced at or prior to the Confirmation Hearing, the Plan and the Debtors as proponents of the

Plan satisfy the requirements for confirmation set forth in section 1129 of the Bankruptcy

Code.

<div align="center">

**IMPLEMENTATION OF THE PLAN**

</div>

       Z.    All documents and agreements necessary to implement the Plan, including, but

not limited to, the Plan Documents, are essential elements of the Plan and consummation of each

<div align="center">- 18 -</div>

agreement is in the best interests of the Debtors, the Estates and holders of Claims.  The Debtors

have exercised reasonable business judgment in determining to enter into the Plan Documents,

and each of the Plan Documents have been negotiated in good faith, at arm's length, are fair and

reasonable, and shall, upon execution and upon the occurrence of the Effective Date, constitute

legal, valid, binding, enforceable, and authorized obligations of the respective parties thereto and

will be enforceable in accordance with their terms.  Pursuant to section 1142(a) of the

Bankruptcy Code, the Plan Supplement documents, and any other documents or agreements

necessary to implement the Plan will apply and be enforceable notwithstanding any otherwise

applicable non-bankruptcy law.

### CONDITIONS TO THE CONFIRMATION OF THE PLAN

AA.    Each of the conditions precedent to entry of this Order has been satisfied in

accordance with Article X.A of the Plan or properly waived in accordance with Article X.C of

the Plan.

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

BB.    Pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code, upon the

occurrence of the Effective Date, Article V of the Plan provides for the assumption, assumption

and assignment, or rejection of certain Executory Contracts and Unexpired Leases. The Debtors'

determinations regarding the assumption, assumption and assignment, or rejection of Executory

Contracts and Unexpired Leases are based on and within the sound business judgment of the

Debtors, are necessary to the implementation of the Plan and are in the best interests of the

Debtors, their Estates, holders of Claims and other parties in interest in the Chapter 11 Cases.

The Plan Proponents have filed the Assumption Schedule (as it may have been amended or

supplemented) and have provided notice to counterparties of the Debtors' determinations

regarding the assumption, assumption and assignment, or rejection of Executory Contracts or Unexpired Leases and any related Cure Claims.  *See* KCC Affidavit of Service (ECF Doc. # 5581).

### GLOBAL SETTLEMENT UNDER THE PLAN

CC.     The Plan settles numerous litigable issues in the Chapter 11 Cases pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code.   These settlements are in consideration for the compromises, distributions and other benefits provided under the Plan.   The Plan constitutes a compromise of all Claims, Equity Interests or Causes of Action relating to the contractual, legal and subordination rights that a holder of a Claim or Equity Interest may have with respect to any Allowed Claim or Equity Interest or any distribution to be made on account of such an Allowed Claim or Equity Interest.

DD.     **The Global Settlement.**   The Plan includes an integrated and comprehensive settlement that resolves various inter-Debtor, Debtor-Creditor and inter-Creditor issues through (i) the Ally Settlement, including the funding of the Ally Contribution, (ii) the RMBS Settlement, (iii) the settlement of the allowed amount and priority of Claims held by certain monoline insurers, including the FGIC Settlement Agreement, (iv) the settlement of the Private Securities Claims, (v) the settlement of the allowed amount and priority of the Claims of the Kessler Class Claimants, (vi) the NJ Carpenters Claims Settlement, (vii) the settlement of the claims held by the Senior Unsecured Notes Indenture Trustee, on behalf of the Senior Unsecured Noteholders, (viii) the settlement with FHFA, (ix) the division of the Ally Contribution and Administrative Expenses among Debtor Groups, (x) a settlement of issues regarding substantive consolidation, (xi) a settlement of the treatment of the Intercompany Balances, and (xii) a settlement with the Consenting JSNs, the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Collateral Agent, and the Ad Hoc Group.   Each component of the Global

- 20 -

Settlement is an integral and inextricable part thereof that cannot be severed from the whole without unraveling the entire Plan. The creditors supporting the Global Settlement include each of the Consenting Claimants, the NJ Carpenters Class, Ambac, Assured, Syncora, the Consenting JSNs, the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Collateral Agent, and the Ad Hoc Group, each of which is a sophisticated party and represented by counsel that is recognized as being knowledgeable and experienced in the field of complex chapter 11 cases. The Global Settlement, and each of the settlements embodied within the Global Settlement, is a result of good faith arm's-length negotiations, is in the best interests of the Debtors, the Estates, the RMBS Trusts, Investors, and other parties-in-interest, and is fair, equitable, and within the range of reasonableness.

EE.    In reaching its decision on the substantive fairness of the Global Settlement and the various settlement incorporated therein, the Court considered the following factors:  (i) the balance between the litigation's possibility of success and the settlement's future benefits; (ii) the likelihood of complex and protracted litigation with attendant expense, inconvenience and delay; (iii) the paramount interests of creditors, including the relative benefits to each affected class and the degree to which creditors either do not object to or affirmatively support the proposed settlement; (iv) whether other parties in interest support the settlement; (v) the competency and experience of counsel and the experience and knowledge of the bankruptcy judge; (vi) the nature and breadth of releases to be obtained by officers and directors; and (vii) the extent to which the settlement is the product of arm's length bargaining.

FF.    As set forth in Article IV.B. of the Plan, pursuant to the Global Settlement, Ally shall pay the Estates the Ally Contribution in accordance with the Plan.  In addition, Ally has made numerous substantial contributions to the Estates during the chapter 11 cases that were

essential to the success of the Debtors' bankruptcy, e.g., serving as the stalking horse bidder for the Debtors' portfolio of HFS loans; enabling the Debtors to continue originating loans during the chapter 11 cases by funding the loans on market terms, which sustained and enhanced the value of the Debtors' servicing platform sold to Ocwen Loan Servicing, LLC for $3 billion; providing the Debtors with DIP financing of up to $220 million; permitting the Debtors to use Ally Bank's portfolio of loans to satisfy their obligations to various regulators so that the Debtors could continue operations and reduce liabilities; providing certain shared services to the Debtors; and supporting certain pension obligations of the Debtors.  In exchange for the Ally Contribution and the Ally Released Parties' other substantial contributions during the Chapter 11 Cases, Ally shall receive the following consideration:  (i) the Debtor Releases, (ii) the Third Party Releases, (iii) a settlement of the Debtors' rights to and under the Settlement Insurance Policies, (iv) the transfer by the Debtors of the funds held in the Ally Indemnity Escrow Account and the remission of the Misdirected Funds to Ally, and Ally's release of the approximately $1.787 million in Cash overfunded by the Debtors prior to the Petition Date and which is currently held by Ally, (v) the Debtors' performance of the obligations under the DOJ/AG Settlement, the Consent Order and the Order of Assessment on the terms set forth in Article IV.B(e) of the Plan, and (vi) the allowance and payment in full of the Ally Contract Claims as provided in the Plan.

GG.    The consideration provided to the Ally Released Parties as part of the Global Settlement, including the rights and obligations accorded elsewhere in the Plan to Ally is: (1) in exchange for the good, valuable and substantial consideration from the Ally Released Parties; (2) in the best interests of the Debtors, the Estates, the Plan Trusts and all holders of Claims and Equity Interests; (3) a good faith settlement and compromise of the claims released under the Plan; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for a

hearing; (6) justified by truly unusual circumstances; (7) an essential component and critical to the success of the Plan; (8) resulting in distributions to the creditors that would otherwise have been unavailable; (9) the result of an identity of interest between the Debtors and the Ally Released Parties regarding the Plan; and (10) a bar to the Debtors, the Plan Trusts, in the case of the Debtor Releases, and any party asserting a claim or cause of action released against any of the Ally Released Parties in connection with the Third Party Release.

HH.    As one component of the Global Settlement, the Plan implements the FGIC Settlement Agreement.  The Court approved the FGIC Settlement Agreement by order dated September 16, 2013.  The findings of fact and conclusions of law in support of the Court's approval of the FGIC Settlement are set forth in the Court's *Memorandum Decision and Order, and Findings of Fact and Conclusions of Law, Approving the FGIC Settlement Motion* (ECF Doc. # 5042) (the "FGIC Settlement Approval Decision"), dated September 13, 2013, and included, among other things, that the FGIC Settlement is an "essential, inextricable, and critical cornerstone of the Global Settlement" underlying the Plan. (FGIC Settlement Approval Decision, at *35; *see also id.* at *20 ("The Settlement Agreement that is the subject of this Motion, while a stand-alone agreement, represents a critical component of the Global Settlement.").  Among other things, the FGIC Settlement Approval Decision overruled an objection by the Ad Hoc Group of Junior Secured Noteholders (the "JSNs") that the FGIC Settlement Agreement did not subordinate the Monoline Claims pursuant to section 510(b) of the Bankruptcy Code.  The JSNs objected to confirmation on this same basis.  That objection has been resolved by the JSN Settlement.

II.    As one component of the Global Settlement, the Plan also implements the RMBS Settlement, and the Global Settlement reflects a good faith compromise and settlement of all

objections to the Original RMBS Settlement Agreements by the Creditors' Committee, certain of the Consenting Claimants, and certain other parties.

JJ.     As one component of the Plan and Global Settlement, the Plan also implements a settlement with the Consenting JSNs, the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Collateral Agent, and the Ad Hoc Group (the "JSN Settlement"), and the JSN Settlement reflects a good faith compromise and settlement between the Plan Proponents and the Ad Hoc Group that resolves all issues raised in the JSN Adversary Proceeding, and the confirmation objections filed by the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Collateral Agent, and the Ad Hoc Group. Each of the "Managed Funds" and the "Direct Holders" listed on Exhibit A to the Declaration Of Gerard Uzzi In Connection With Changed Votes Of Certain Members Of Ad Hoc Group Of Junior Secured Noteholders On Plan Proponents' Second Amended Chapter 11 Plan, dated December 10, 2013 (ECF Doc. # 6058) has voted to accept the Second Amended Plan and, along with each Managed Fund's "Investment Manager" also listed on Exhibit A, is a Consenting JSN under the Plan and this Confirmation Order.  Each of the entities listed on Schedule 1 to the Supplemental Declaration of Lorenzo Marinuzzi Regarding the Tabulation of Votes on the Second Amended Joint Chapter 11 Plan Proposed by Residential Capital, LLC et al. and the Official Committee of Unsecured Creditors, dated December 10, 2013 (ECF Doc. # 6061) has voted to accept the Second Amended Plan and is a Consenting JSN under the Plan and this Confirmation Order.

KK.     The Plan Support Agreement, the Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement Agreement, the JSN Settlement, and all transactions contemplated by each of the foregoing, including the releases given therein, are in the best interests of the Debtors, their Estates, their creditors, the Investors in each RMBS Trust, each

- 24 -

such RMBS Trust, the RMBS Trustees and all other parties in interest.  The RMBS Trustees

acted reasonably, in good faith and in the best interests of the Investors in each RMBS Trust and

each such RMBS Trust in (i) entering into the Plan Support Agreement, (ii) performing their

obligations under the Plan Support Agreement, including voting in favor of the Plan, where

applicable, and (iii) agreeing to, and performing under, the Global Settlement and each of the

settlements embodied therein, including the RMBS Settlement and the FGIC Settlement

Agreement.  The RMBS Trustees' Notice of the Plan Support Agreement, the Plan, the Global

Settlement, the RMBS Settlement, the FGIC Settlement Agreement, and all the transactions

contemplated by each of the foregoing, including the releases given therein, was sufficient and

effective in satisfaction of federal and state due process requirements and other applicable law to

put the parties in interest in these Chapter 11 Cases and others, including the Institutional

Investors and the Investors in each RMBS Trust, on notice of the Plan Support Agreement, the

Plan, the Global Settlement, the RMBS Settlement, the FGIC Settlement Agreement, and all the

transactions contemplated by each of the foregoing, including the releases given therein.  The

findings of fact and conclusions of law set forth in this paragraph shall be binding solely in

connection with the RMBS Trustees, the RMBS Trusts (including the Investors in the RMBS of

such RMBS Trusts) and the actions of the RMBS Trusts and the RMBS Trustees with respect to

the Plan Support Agreement and Plan, including the RMBS Settlement and the FGIC Settlement

Agreement.  In addition, the Allowed Fee Claim is reasonable and appropriate under the

circumstances.

LL.    The Global Settlement, and each of the settlements embodied therein, gives due

consideration to the strengths and weaknesses of potential arguments that have been made for

and against substantive consolidation of the Debtors' estates.  As set forth in the Confirmation

Brief and the Direct Testimony, litigation regarding substantive consolidation of the Debtors would require vast amounts of discovery and investigation into the Debtors' operations prior to the Petition Date, would be extraordinarily complex and costly for all parties involved and would significantly delay distributions to creditors.  The proposed partial consolidation under the Plan, as a key element of the Global Settlement, is reasonable and appropriate under the circumstances, and does not adversely affect any holders of Claims or Equity Interests.

MM.    Prior to the Petition Date, the Debtors entered into tens of thousands of transactions over a period of years which led to intercompany balances on the Debtors' books and records as of the Petition Date.  The Debtors conducted an analysis of the Intercompany Balances and, based on the facts and analyses set forth in the Disclosure Statement, Confirmation Brief, and the Direct Testimony, believe, with the support of the Creditors' Committee, that such Intercompany Balances lack many of the indicia of true debt and enforceable claims.  Litigation regarding the enforceability of the Intercompany Balances would be extremely time consuming and expensive, would delay distributions to all creditors, and would have a substantial detrimental impact on creditor recoveries.   In light of the JSN Settlement, the waiver of Intercompany Balances as one part of the Global Settlement embodied in the Plan is therefore in the best interest of the Debtors' estates and all creditors.

NN.    **Releases, Exculpations, and Injunctions of Released Parties.**   Each Debtor Released Party that is not a Debtor will benefit from the releases, exculpations and related injunctions set forth in the Plan (collectively, the "Plan Releases"), and either shares an identity of interest with the Debtors (either by way of right to indemnity, contribution, or otherwise), was instrumental to the successful prosecution of the Chapter 11 Cases or their resolution pursuant to the Plan, and/or provided a substantial contribution to the Debtors, which value provided a

- 26 -

significant benefit to the Debtors' estates and general unsecured creditors, and which will allow

for distributions that would not otherwise be available but for the contributions made by such

non-Debtor parties.  The Plan, including the Plan Releases, garnered overwhelming support from

the Debtors' creditor constituencies.   The Plan Releases are, individually and collectively,

integral to, and necessary for the successful implementation of, the Plan, essential to the Debtors'

orderly liquidation and supported by reasonable consideration.

OO.   Debtor Releases. The releases and discharges of Claims and Causes of Action by

the Debtors described in Article IX.C of the Plan (the "Debtor Releases") pursuant to section

1123(b)(3)(A) of the Bankruptcy Code represent a valid exercise of the Debtors' business

judgment. Settling such claims against the Debtor Released Parties is in the best interest of the

Debtors' estates as the benefits of settling such claims outweigh any potential benefit from

pursuing such claims in light of, among other things, the cost and risk involved in litigation.

Thus, the Debtor Release is: (1) in exchange for the good and valuable consideration provided by

the Debtor Released Parties; (2) a good faith settlement and compromise of the claims released

by the Debtors' release; (3) in the best interests of the Debtors, the Estates, the Plan Trusts and

all holders of Claims and Equity Interests; (4) fair, equitable and reasonable; (5) given and made

after due notice and opportunity for a hearing; and (6) a bar to the Debtors, the Plan Trusts and

any holder of a Claim or Equity Interest or other Entity who would have been legally entitled to

assert such Claim or Equity Interest on behalf of any of the Debtors or any of their Estates from

asserting any Claim or Cause of Action released pursuant to the Debtors' release.

PP.   Third Party Releases.  The circumstances of these Chapter 11 Cases are unique

and truly unusual and they render the releases of Claims and Causes of Action by Holders of

Claims and Interests described in Article IX.D of the Plan (the "Third Party Release") critical to

the success of the Plan.  The Ally Contribution constitutes a substantial contribution to the estates by the Ally Released Parties and constitutes the vast majority of the $2.6 billion that is estimated to be available for distribution to unsecured creditors.  In addition, the Ally Released Parties made several non-economic contributions to the Estates during the Chapter 11 Cases, including cooperation with the Debtors to enable their operations to continue unabated following the Petition Date and to achieve the sale of their key assets as a going concern.  Ally also permitted the Debtors to continue to originate and subservice loans that were sold to Ally Bank, which helped maintain the value of the Debtors' origination and servicing platform.  Ally also provided a DIP loan to the Debtors and was willing to serve as the stalking horse bidder for the Debtors' legacy loan portfolio, each of which contributed significant incremental value to the Debtors' estates.

QQ.    The individual officers and directors of Ally and its subsidiaries (including the Debtors' directors, officers, and employees) covered by the Third Party Release have also made a substantial contribution to the Plan by giving up their rights to shared insurance that they would otherwise have access to defend themselves against such potential claims.  The amount of the coverage that Ally's individual officers and directors have sacrificed is directly related to $150 million of the Ally Contribution.  These parties will also forego their own claims for indemnity and contribution from the estates.  By giving up their insurance and contractual indemnity claims, the Debtors' officers and directors have provided substantial consideration to the Debtors' Estates.

RR.    In consideration for the Ally Contribution and as part of the Global Settlement, the Ally Released Parties required that the Third Party Release be included in the Plan.  The Ally Contribution is the lynchpin of the Plan, without which the cases would devolve into endless

- 28 -

litigation, the Plan would not be confirmable or feasible, and the recoveries currently contemplated by the Plan would not exist.   These facts are unprecedented and justify the approval of the Third Party Releases.

SS.      There is an identity of interest between the Debtors and the beneficiaries of the Third Party Releases. The Ally Released Parties have the right to seek indemnity, contribution or other reimbursement from the Debtors with respect to the Debtors' activities.   The Third Party Releases appropriately relieve the Debtors from these potential expenses.   Finally, Ally and the Debtors' officers, directors, and employees are co-insured parties on "wasting asset" errors and omissions and directors and officers insurance.   Any claim against Ally, or its subsidiaries or affiliates, or against any of its directors, officers, or employees, that is covered by any of these policies could reduce the amount of insurance available to the Debtors.

TT.      The Third Party Releases are overwhelmingly consensual as they are supported by all parties to the Global Settlement, are not opposed by any clearly affected creditors, and numerous additional creditors have expressed their consent as part of individual or group settlements entered into subsequent to Plan solicitation. The Third Party Release is also consensual as to those parties that affirmatively voted to approve the Plan.   The Third Party Release was extensively disclosed in the Disclosure Statement and the Ballots and consented to by all parties who either voted in favor of the Plan and/or failed to properly submit a ballot voting on the Plan.

UU.      The Third Party Releases satisfy the applicable standards contained in *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005), are otherwise appropriate under *In re Johns-Manville Corp.*, 600 F.3d 135 (2d Cir. 2010), and are: (1) in exchange for the good, valuable and substantial consideration provided by the Ally Released Parties; (2) in the best

interests of the Debtors, the Estates, the Plan Trusts and all holders of Claims and Equity

Interests; (3) fair, equitable and reasonable; (4) given and made after due notice and opportunity

for a hearing; (5) justified by truly unusual circumstances; (6) an essential component and critical

to the success of the Plan; (7) the primary source of distributions to the Creditors that would

otherwise have been unavailable; (8) the result of an identity of interest between the Debtors and

the Ally Released Parties regarding the Plan; and (9) a bar to any party asserting a claim or cause

of action released pursuant to this Third Party Release against any of the Ally Released Parties.

VV.    <u>Exculpation</u>.  The exculpation provisions set forth in Article IX.H of the Plan are

essential to the Plan. The record in the Chapter 11 Cases fully supports the Exculpation, and the

Exculpation provisions set forth in Article IX.H of the Plan are appropriately tailored to protect

the Exculpated Parties from inappropriate litigation. The Exculpation shall have no effect on the

liability of any Entity that results from any act or omission that is determined in a final, non-

appealable, order to have constituted gross negligence or willful misconduct; <u>provided, however,</u>

that each Exculpated Party shall be entitled to rely upon the advice of counsel and financial

advisors concerning his, her, or its duties pursuant to, or in connection with, any prepetition plan

support agreement, the Plan Support Agreement, the Plan, the Disclosure Statement, the FGIC

Settlement Agreement, and the RMBS Settlement.  There are no remaining objections to the

Exculpation set forth in Article IX.H of the Plan.

WW.    <u>Injunction</u>.  The injunction provisions set forth in Article IX.I of the Plan are

essential to the Plan and are necessary to preserve and enforce the Debtor Releases, the Third

Party Releases, and the exculpation provisions in Article IX of the Plan, and are narrowly

tailored to achieve that purpose.

XX.      Each of the Debtor Releases, the Third Party Releases, and the injunction and exculpation provisions set forth in the Plan: (a) is within the jurisdiction of the Bankruptcy Court under 28 U.S.C. §§ 1334(a), 1334(b), and 1334(d); (b) is an essential means of implementing the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code; (c) is an integral element of the transactions incorporated into the Plan; (d) confers material benefits on, and is in the best interests of, the Debtors, the Estates, and their Creditors; (e) is important to the overall objectives of the Plan to finally resolve all Claims among or against the parties-in-interest in the Chapter 11 Cases with respect to the Debtors; and (f) is consistent with sections 105, 1123, 1129 of the Bankruptcy Code, other provisions of the Bankruptcy Code, and other applicable law. The record of the Confirmation Hearing and the Chapter 11 Cases is sufficient to support the Debtor Releases, the Third Party Releases, and the injunction and exculpation provisions contained in Article IX of the Plan.

## **MISCELLANEOUS**

YY.      **Objections**.  All parties have had a full and fair opportunity to litigate all issues raised in the objections (excluding any timely filed objections that relate solely to the assumption of any executory contract), or which might have been raised, and the objections (excluding any timely filed objections that relate solely to the assumption of any executory contract) have been fully and fairly litigated.

ZZ.      **Waiver of Stay**.  Given the facts and circumstances of these cases and the absence of any material objections to confirmation of the Plan, it is appropriate that the 14-day stay imposed by Bankruptcy Rules 3020(e) and 7062(a) be waived.

AAA.   **Retention of Jurisdiction**.  This Court is authorized to retain jurisdiction over the matters set forth in Article XII of the Plan and sections 105(a) and 1142 of the Bankruptcy Code.

## II.   ORDER

BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1.   **Confirmation of the Plan.**   The Plan (including the Plan Supplement), is CONFIRMED in each and every respect, pursuant to section 1129 of the Bankruptcy Code, and the terms of the Plan (including the Plan Supplement) are incorporated by reference into, and are an integral part of, this Order.  The Effective Date of the Plan shall occur on the date determined by the Plan Proponents in accordance with Articles X.D and XI.A of the Plan, when the conditions set forth in Article X.B of the Plan have been satisfied or, if applicable, have been waived in accordance with Article X.C of the Plan.  The failure to specifically include or to refer to any particular article of the Plan, section or provision of the Plan, Plan Supplement or any related document in this Order shall not diminish or impair the effectiveness of such article, section or provision, it being the intent of the Court that this Order confirm the Plan and any related documents in their entirety.

2.   **Objections to the Plan are Overruled**.   All parties have had a full and fair opportunity to litigate all issues raised by objections to confirmation of the Plan.  Any objections or responses to confirmation of the Plan and the reservation of rights contained therein that (a) have not been withdrawn, waived or settled prior to the entry of this Order or (b) are not cured by the relief granted herein are hereby OVERRULED in their entirety and on their merits, and all withdrawn objections or responses are hereby deemed withdrawn with prejudice.

3.   **Notice**.   Notice of the Confirmation Hearing complied with the terms of the Disclosure Statement Order, was appropriate and satisfactory based on the circumstances of the Chapter 11 Cases, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.  In addition, due, adequate and sufficient notice of the

Assumption Schedule was provided to all counterparties to Executory Contracts and Unexpired

Leases with the Debtors, in substantial compliance with the Disclosure Statement Order and

Bankruptcy Rules 2002(b), 3017 and 3020(b), and no other or further notice is or shall be

required.

        4.      **Plan Classification Controlling.**  The terms of the Plan shall solely govern the

classification of Claims and Equity Interests for purposes of the distributions to be made

thereunder.  The classifications set forth on the Ballots tendered to or returned by the holders of

Claims or Equity Interests in connection with voting on the Plan pursuant to the Disclosure

Statement Approval Order:  (a) were set forth on the Ballots solely for purposes of voting on the

Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise

affect, the actual classification of such Claims and Equity Interests under the Plan for distribution

purposes; (c) may not be relied upon by any holder of a Claim or Equity Interest as representing

the actual classification of such Claim or Equity Interest under the Plan for distribution purposes;

and (d) shall not be binding on the Debtors or the Plan Trusts except for voting purposes.

        5.      **Order Binding on All Parties.**  Subject to Article X.A of the Plan, and

notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062 or otherwise, upon the occurrence of

the Effective Date, the terms of the Plan and this Order shall be immediately effective and

enforceable and deemed binding upon, and inure to the benefit of: (a) the Debtors; (b) the Plan

Trusts; (c) any and all holders of Claims or Equity Interests (irrespective of whether such Claims

or Equity Interests are deemed to have accepted the Plan); (d) all Entities that are parties to or

subject to the settlements, compromises, releases, discharges, and injunctions described in the

Plan; (e) each Entity acquiring property under the Plan; (f) any and all non-Debtor parties to

Executory Contracts or Unexpired Leases with any of the Debtors; and (g) the respective heirs,

executors, administrators, trustees, affiliates, officers, directors, agents, representatives, attorneys, beneficiaries (including the Investors), guardians, successors or assigns, if any, of any of the foregoing. On the Effective Date, all settlements, compromises, releases (including, without limitation, the Plan Releases), waivers, discharges, exculpations, and injunctions set forth in the Plan shall be effective and binding on all Persons.

6. **Other Essential Documents and Agreements.** The form of documents comprising the Plan Supplement, any other agreements, instruments, certificates or documents related thereto, including any amendments permitted or contemplated by paragraph 60 of this Order, and the transactions and other matters contemplated by each of the foregoing are approved and, upon execution and delivery of the agreements and documents relating thereto by the applicable parties, shall be in full force and effect and valid, binding and enforceable in accordance with their terms without the need for any further notice to or action, order or approval of this Court, or other act or action under applicable law, regulation, order or rule. The Debtors, and after the Effective Date, the Plan Trusts, are authorized, without further approval of this Court or any other party, to execute and deliver all agreements, documents, instruments, securities and certificates relating to such agreements and perform their obligations thereunder, including, without limitation, payment of all fees due thereunder or in connection therewith.

7. **Global Settlement**. The Global Settlement set forth in Article IV of the Plan, and each component of the Global Settlement, including the JSN Settlement, are hereby approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 as fair and reasonable and in the best interests of each of the Debtors, their estates and Creditors. Each provision of the Global Settlement is non-severable from each other and the remaining terms of the Plan. The compromises and settlements embodied in the Global Settlement are in the best

interests of the Debtors, their Estates, Creditors, the RMBS Trusts, Investors, and other parties-in-interest, and are fair, equitable, and within the range of reasonable results if the issues were litigated and therefore falls above the lowest point in the range of reasonableness.  The Debtors or the Plan Trusts, as applicable, are duly authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents, and papers, including each of the Plan Documents, and to take any and all actions reasonably necessary or appropriate to consummate the Global Settlement and each of the settlements embodied therein, including waiving any conditions precedent to their effectiveness, and performing any and all obligations contemplated therein.

8.    <u>Ally Settlement</u>. The Ally Settlement set forth in Article IV.B of the Plan is hereby approved as part of the Global Settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.

9.    <u>RMBS Settlement</u>. The RMBS Settlement, including the Allowed Fee Claim, set forth in Article IV.C of the Plan is hereby approved as part of the Global Settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.  To the extent applicable, the Allowed Fee Claim is hereby approved as reasonable pursuant to section 1129(a)(4) of the Bankruptcy Code.  Pursuant to section 502 of the Bankruptcy Code, the RMBS Trusts shall have Allowed Claims against the Debtor Groups in the amounts and allocations set forth in Article IV.C.2 of the Plan, with distributions on account of such Claims subject to the RMBS Trust Allocation Protocol, and the Allowed Fee Claim shall be payable to counsel to the Institutional Investors in the amount set forth in Article IV.C.6 of the Plan and the Plan Supplement.  Upon entry of this Order, all objections to the Original RMBS Settlement Agreement by the Creditors' Committee and the Consenting Claimants, as applicable, shall be deemed settled.

10.     <u>Settlement of Monoline Claims</u>. The settlements of the Allowed amount and priority of the Claims held by certain monoline insurers set forth in Article IV.D of the Plan are hereby approved as part of the Global Settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.  Pursuant to section 502 of the Bankruptcy Code, MBIA, FGIC, Assured, and Ambac shall have Allowed General Unsecured Claims against the Debtor Groups in the amounts and allocations set forth in Article IV.D.1, IV.D.2, IV.D.3, and IV.D.4 of the Plan, respectively.

11.     <u>Settlement of Settling Private Securities Claimants' Claims</u>. The settlements of the Allowed amount and priority of the Claims held by the Settling Private Securities Claimants set forth in Article IV.E of the Plan are hereby approved as part of the Global Settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.  Pursuant to section 502 of the Bankruptcy Code, the Settling Private Securities Claimants shall have Allowed Claims for voting purposes in the amounts set forth in Article IV.E.6 of the Plan.

12.     <u>Settlement of Senior Unsecured Notes Claims</u>. The settlement of the Senior Unsecured Notes Claims set forth in Article IV.I of the Plan is hereby approved as part of the Global Settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.  Pursuant to section 502 of the Bankruptcy Code, the Senior Unsecured Noteholders shall have Allowed Claims in the amounts set forth in Article IV.I of the Plan.

13.     <u>NJ Carpenters Settlement</u>. The NJ Carpenters Settlement, including but not limited to the payment of the NJ Carpenters Claims Distribution in settlement of the NJ Carpenters Claims, is hereby approved as part of the Global Settlement pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019.  The NJ Carpenters Class Members shall receive the NJ Carpenters Claims Distribution less the amounts advanced by the Debtors for

class notice and administration as provided for and in accordance with the Plan and New Jersey Carpenters Settlement.

14.    <u>Partial Consolidation of the Debtors</u>.  The partial consolidation of the Debtors into Debtor Groups solely for purposes of describing treatment under the Plan and making distributions under the Plan is fair and appropriate and approved as one component of the Global Settlement.  The partial consolidation of the Debtors, however, shall not (other than for purposes relating to making distributions under the Plan) affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, nor cause the transfer of any assets except as contemplated by the Plan; and, except as otherwise provided by or permitted in the Plan, all Debtors shall continue to exist as separate legal entities until dissolved in accordance with the Plan.

15.    <u>FHFA Settlement</u>. The FHFA assigned to Ally any and all distributions due to the FHFA and/or Freddie Mac under the Plan effective as of the Effective Date on account of the proofs of claim filed by the FHFA in the Chapter 11 Cases [Claim Nos. 6296, 6297, 6298, 6299, 6300, and 6301) (the "<u>FHFA Claim Proceeds</u>").[3] The FHFA has in writing directed the Debtors and the Liquidating Trustees to pay to Ally on the Effective Date the FHFA Claims Proceeds.

---

[3]    For the avoidance of doubt, the FHFA Claim Proceeds do not include any distributions to the Federal Home Loan Mortgage Corporation ("<u>Freddie Mac</u>") or to securitization trustees on account of claims set forth in proofs of claims other than claim numbers 6296, 6297, 6298, 6299, 6300, and 6301. Nothing herein or in the Plan prohibits, restricts, or limits FHFA or Freddie Mac from receiving any benefits deriving from, or exercising any rights appurtenant to, Freddie Mac's ownership of interests in RMBS at issue in the lawsuit entitled Federal Housing Finance Agency v. Ally Financial Inc., et al., No. 11 Civ. 7010 or these Chapter 11 Cases, including without limitation, the right to receive or assign payments from its investments in the RMBS or to sell or otherwise dispose of its interests in the RMBS. Other than the FHFA Claims Proceeds, Ally is not entitled to any other amounts relating to RMBS owned by Freddie Mac, including any amounts relating to claims set forth in Article IX.E.ii of the Plan.

The Debtors and the Liquidating Trust shall pay to Ally on the Effective Date the FHFA Claim Proceeds.

16. Strictly for purposes of voting on the Plan and distributions thereunder, (i) the FHFA Claims against RFC shall be allowed in the amount of $1.2 billion in full and final satisfaction of the FHFA Claims; (ii) such allowed claim shall be an "Allowed FHFA Claim" in class RS-11 as provided in Art. III.D.3(k) of the Plan; (iii) the Allowed FHFA Claim shall not be subject to subordination and shall receive a cash distribution of $24 million on the Effective Date (equal to 2% of the Allowed amount of the FHFA Claim), as provided in Art. III.D.3(k) of the Plan; and (iv) the FHFA Claims against any Debtors other than RFC shall be deemed satisfied in full, without any further order or action.

17. The Plan does not contain any determination regarding the validity or invalidity of the application of Section 4617(b)(15) of the Housing and Economic Recovery Act of 2008 ("HERA") in the Chapter 11 Cases. Nothing herein or in the Plan is, or shall be construed as, a concession to the validity of any disputes or defenses interposed to claims asserted by FHFA and Ally, including, without limitation, with respect to FHFA's assertions of rights, powers, and priorities under 12 U.S.C. § 4617(b)(15) as such disputes have been compromised and settled pursuant to FHFA and Ally's October 25, 2013 agreement, and any subsequently entered into agreement between them. Nothing in the Plan or this Order shall affect, limit or otherwise prejudice the FHFA's rights, titles, powers, and privileges under HERA; provided that nothing in this paragraph 17 shall limit the releases as set forth in the Plan and any such agreement between FHFA and Ally.

18. JSN Settlement. The JSN Settlement, including but not limited to the payment of the Junior Secured Notes Distribution in full and final settlement, satisfaction and release of any

and all Claims of (and obligations and duties between and among) the Junior Secured Noteholders, the Ad Hoc Group, the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Predecessor Indenture Trustee, and the Junior Secured Notes Collateral Agent (including Claims by the Junior Secured Noteholders against the Junior Secured Notes Collateral Agent, the Junior Secured Notes Indenture Trustee, and the Junior Secured Notes Predecessor Indenture Trustee), under, evidenced by, or related to any of the JSN Documents, including, but not limited to, any claims for principal, interest, fees and expenses (including the Junior Secured Notes Collateral Agent Fees and Expenses and the Junior Secured Notes Indenture Trustee Fees, which, to the extent unpaid, shall be charged against and paid from the Junior Secured Notes Distribution promptly following the distribution of the Junior Secured Notes Distribution), indemnification claims, and other charges, is hereby approved pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019. No person shall be entitled to seek to disgorge or recharacterize any amounts previously paid or reimbursed under the Paydown Orders or the AFI/JSN Cash Collateral Order, which amounts shall be deemed indefeasibly paid and finally allowed. On the Effective Date, all claims, counterclaims, and/or issues raised in the JSN Adversary Proceeding and the FGIC Settlement Appeal shall be automatically deemed finally and irrevocably settled by the Plan. Within five (5) days of entry of this Confirmation Order, (i) the parties to the JSN Adversary Proceeding shall execute, and within one (1) Business Day after the funding of the Junior Secured Notes Distribution the plaintiffs in the JSN Adversary Proceeding shall file, a stipulation of dismissal in the JSN Adversary Proceeding; and (ii) the parties to the FGIC Settlement Appeal shall execute, and within one (1) Business Day after the funding of the Junior Secured Notes Distribution the Ad Hoc Group shall file, a stipulation voluntarily dismissing the FGIC Settlement Appeal in accordance with Bankruptcy Rule

8001(c), in each of (i) and (ii) above, with prejudice and without costs awarded to any party.  For the avoidance of doubt, the Bankruptcy Court shall retain jurisdiction to enforce the terms of this paragraph 18.

19.     **WFBNA Objections**.  The *Limited Objection of WFBNA to Confirmation of Joint Chapter 11 Plan Proposed by Residential Capital, LLC and the Official Committee of Unsecured Creditors* (ECF Doc. # 5411) and the *Post Confirmation Hearing Brief in Further Support of Limited Objection to WFBNA to Confirmation of Joint Chapter 11 Plan Proposed by Residential Capital, LLC and the Official Committee of Unsecured Creditors* (ECF Doc. # 6017) have been withdrawn with prejudice. (ECF Doc. ## 6052, 6053). Wachovia Bank and Wachovia Bank of Delaware, now succeeded by Wells Fargo Bank, N.A. ("WFBNA") shall be deemed to have consented to confirmation of the Plan.   The Plan Proponents, Liquidating Trust and the Liquidating Trustee, on the one hand, and WFBNA, on the other hand, reserve all of their respective rights with respect to the claims filed by WFBNA in these Chapter 11 Cases.

20.     **Compromise and Settlement of Claims, Equity Interests, and Controversies.** In accordance with section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall, upon consummation, constitute a good faith compromise of all Claims, Equity Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or Equity Interest, or any distribution to be made on account of such Allowed Claim or Equity Interest.  All such compromises or settlements of Claims, Equity Interests and controversies, are approved, in the best interests of the Debtors, their Estates and holders of Claims and Equity Interests are entirely fair and are fair, equitable and reasonable.  In accordance with the provisions of the Plan,

pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Liquidating Trust may compromise and settle Claims against the Debtors and Causes of Action against other Entities.

21. **Implementation of the Plan**.  This Confirmation Order authorizes (a) the creation and implementation of the Liquidating Trust, the RMBS Claims Trust, the Private Securities Claims Trust and the Borrower Claims Trust in accordance with the terms of the Confirmation Order, the Plan, the Liquidating Trust Agreement, the RMBS Claims Trust Agreement, the Private Securities Claims Trust Agreement and the Borrower Claims Trust Agreement, and (b) the Liquidating Trust Board and Liquidating Trust Management, the RMBS Claims Trust Trustee, the Private Securities Claims Trustee, and the Borrower Claims Trustee to accomplish the purposes of the Liquidating Trust, the RMBS Claims Trust, the Private Securities Claims Trust and the Borrower Claims Trust, respectively, as set forth in the Liquidating Trust Agreement, the RMBS Claims Trust Agreement, the Private Securities Claims Trust Agreement and the Borrower Claims Trust Agreement, respectively, notwithstanding any otherwise applicable nonbankruptcy law.  The Liquidating Trust, the RMBS Claims Trust, the Private Securities Claims Trust and the Borrower Claims Trust may be established prior to the Effective Date to the extent necessary, desirable, or appropriate to effectuate the Plan.  The Liquidating Trust, the RMBS Claims Trust, the Private Securities Claims Trust and the Borrower Claims Trust, and each of their respective boards, trustees, and management, as applicable, shall have no liability other than as set forth in the applicable trust agreement, and shall have no other obligations other than to carry out the purpose and obligations of the respective Plan Trust in accordance with their terms.

22. The Debtors, the Liquidating Trust, the Liquidating Trust Manager, their respective members, directors, officers, representatives and agents are hereby authorized to enter into, execute, deliver, file and/or implement any documents and instruments substantially consistent with or incidental to the Plan, and any amendments, supplements or modifications thereto as may be appropriate, and to take such other steps and perform such other acts as may be necessary, useful or appropriate to implement and effectuate the Plan and all other related instruments and documents and this Confirmation Order, and to satisfy all other conditions precedent to the implementation and effectiveness of the Plan. The Liquidating Trust is hereby authorized to make distributions and other payments in accordance with the Plan and the Liquidating Trust Agreement, regardless of whether any appeal of this Confirmation Order has been filed, except where a stay pending appeal has been granted. The signature of the Liquidating Trust Manager, or any other member of the Liquidating Trust Management duly authorized by the Liquidating Trust Board, on any check issued by the Debtors or the Liquidating Trust in payment of Distributions or other amounts contemplated by the Plan shall be sufficient authorization for the drawee bank to honor such check, and no other signature shall be required.

23. On or prior to the Effective Date the Liquidating Trust shall be converted from a Delaware common law trust to a Delaware statutory trust, and if such conversion occurs prior to the Effective Date, John S. Dubel shall be appointed to serve as the sole member of the Liquidating Trust Board until the Effective Date. Quest Turnaround Advisors, LLC shall be appointed as the Liquidating Trust Manager at such time as the Liquidating Trust is converted to a Delaware statutory trust as aforesaid. The members of the Liquidating Trust Board from and after the Effective Date shall initially consist of John S. Dubel, Mitchell Sonkin, Matthew

Doheny, Paul J. Weber, Samuel L. Molinaro, Jr.   John S. Dubel, in his capacity as trustee of the

common law trust, and the sole member of Liquidating Trust Board, the Liquidating Trust

Manager and any other officers of the Liquidating Trust, insofar as they shall serve in such

capacities prior to the Effective Date, shall be exculpated and indemnified to the same extent as

the exculpation and indemnification of the Liquidating Trust Board, the Liquidating Trust

Manager and the other officers of the Liquidating Trust from and after the Effective Date.  The

appointment of the Liquidating Trust Manager and the Liquidating Trust Board is consistent with

the interests of holders of Claims against and Equity Interests in the Debtors and with public

policy.

24.     As provided in the Plan, on the Effective Date, or as soon as reasonably

practicable thereafter, the Debtors will transfer and assign to the Liquidating Trust the Available

Assets in accordance with Article VI.C of the Plan, which shall be deemed vested in the

Liquidating Trust.  On and after the Effective Date, the Liquidating Trust Board shall have

discretion with respect to the timing of the transfers of Liquidating Trust Assets.  The

Liquidating Trust will hold and administer Liquidating Trust Assets, including the Available

Assets, including among other things, (i) Cash in bank account(s), (ii) the Liquidating Trust

Expenses Set Aside, (iii) the Administrative, Priority, Secured and Convenience Distribution

Reserve, (iv) the DOJ/AG Settlement Reserve, and (v) the Disputed Claims Reserve.

25.     All transfers of property by the Debtors to the Liquidating Trust (i) are or shall be

legal, valid and effective transfers of property, (ii) vest or shall vest the Liquidating Trust with

good title to such property free and clear of all liens, charges, claims, encumbrances or interests,

except as expressly provided in the Plan or in this Confirmation Order, (iii) do not and shall not

constitute voidable transfers under the Bankruptcy Code or under applicable non-bankruptcy

law, (iv) shall be exempt from any transfer, sales, stamp or other similar tax (which exemption shall also apply to the transfers by the Liquidating Trust) and (v) do not and shall not subject the Liquidating Trust Board, Liquidating Trust Management, or holders of Claims to any liability by reason of such transfer under the Bankruptcy Code or under applicable non-bankruptcy law, including, without limitation, any laws affecting successor or transferee liability.

26.     On and after the Effective Date, the Liquidating Trust Board shall be authorized, in its sole and absolute discretion, to take all actions reasonably necessary to manage or dissolve the Debtors and their subsidiaries, including the Non-Debtor Subsidiaries, under applicable laws, including the laws of the jurisdictions in which they may be organized or registered, notwithstanding any applicable consent requirements or other restrictions contained in any financing agreements or other debt or other documents to which any Debtor is a party, and to pay all reasonable costs and expenses in connection with such dissolutions, including the costs of preparing or filing any necessary paperwork or documentation.  The Liquidating Trust Board shall have no liability for using its discretion to dissolve or not dissolve any of the Debtors or their subsidiaries.  Whether or not dissolved, the Debtors shall have no authorization to implement the provisions of the Plan from and after the Effective Date except as specifically provided otherwise in the Plan or as directed by the Liquidating Trust.  Notwithstanding the foregoing, the Liquidating Trust Board shall not dissolve any Debtor to the extent such Debtor is required to hold Available Assets after the Effective Date pursuant to Article VI.C of the Plan, and any such Debtors shall be authorized to take such actions at the direction of the Liquidating Trust Board as may be necessary to implement the provisions of the Plan with respect to such Available Assets or otherwise.  Notwithstanding anything in this Order, the Equity Interests in the Debtors are cancelled on the Effective Date as set forth in Article III.D of the Plan.

27.    **Waiver of Rights to and Under Settlement Insurance Policies**.  Article IV.B.c of the Plan provides that the Debtors shall: (a) permit Ally to recover under the Settlement Insurance Policies, and (b) relinquish in favor of Ally and its Representatives all coverage that might otherwise belong to, or inure to the benefit of, the Debtors under such Settlement Insurance Policies.  Subject to Article IV.B.c of the Plan, in exchange for the Third Party Releases under the Plan, the Debtors' former and current officers and former and current directors that would otherwise have indemnity rights against the Debtors or rights as an "insured" under applicable insurance policies, shall be deemed to have waived such rights against the Debtors.

28.    **Exemption from Certain Taxes and Fees**.  Pursuant to Bankruptcy Code section 1146(a), any transfers of property pursuant to the Plan shall not be subject to any stamp, real estate transfer, mortgage reporting, or other similar tax or governmental assessment in the United States, and this Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

29.    **Governmental Approvals Not Required**.  Except as otherwise expressly provided in this Confirmation Order, this Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan, the Disclosure Statement, and any documents, instruments, or agreements, and any amendments or modifications thereto. Each

federal, state, commonwealth, local, foreign, or other governmental agency is directed and authorized to accept the validity of (a) any and all documents, trust agreements, mortgages, and instruments and (b) all actions of the Liquidating Trust and those acting on its behalf, that are necessary or appropriate to effectuate, implement, or consummate the transactions contemplated by the Plan, this Confirmation Order, and the agreements created or contemplated by the Plan.

30.     **Vesting of Assets**. From and after the Effective Date, the Liquidating Trust may take any action, including, without limitation, the use, acquisition, sale, lease and disposition of property, and the entry into transactions, agreements, understandings or arrangements, subject to the Liquidating Trust Agreement, whether or not in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, free of any restrictions in the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as explicitly provided in the Plan.

31.     **Obligations Under Ocwen APA and Ocwen Sale Order**.  Notwithstanding anything to the contrary in the Plan, on the Effective Date, the Ocwen APA (as defined in the *Order Under 11 U.S.C. §§ 105, 363, and 365 and Fed. R. Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement with Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief* (ECF Doc. # 2246) (the "Ocwen Sale Order")) and that certain AFI/ResCap/Ocwen/Walter Cooperation Agreement, dated as of January 31, 2013 (which for the purposes hereof shall be included in the definition of Ocwen APA) shall vest in the Liquidating

- 46 -

Trust in accordance with the Plan and the Ocwen Sale Order. The Liquidating Trust shall assume and perform any and all rights, benefits, duties and obligations of the Debtors under the Ocwen APA and the Ocwen Sale Order in accordance with their terms, and such rights, benefits, duties and obligations shall not be deemed to have been released or discharged by the occurrence of the Effective Date, by any provisions of the Plan (including, but not limited to, the provisions of Article IX of the Plan), or otherwise. Nothing in the Plan Documents or this Confirmation Order shall, or shall be deemed or construed to, alter, change, modify or amend the terms and provisions of the Ocwen APA and Ocwen's, the Debtors', and the Liquidating Trust's rights, as applicable, thereunder, which rights shall continue in full force and effect and be enforceable following the Effective Date in accordance with the terms thereof. For the avoidance of doubt, Ocwen shall not be required to file an Administrative Claim to preserve its rights or Claims arising after the Effective Date from or related to the Ocwen APA.

32. **Obligations Under Berkshire APA and Berkshire Sale Order**. Notwithstanding anything in this Article IX or in the Plan to the contrary, on the Effective Date, the Berkshire APA shall vest in the Liquidating Trust in accordance with the Plan and the Berkshire Sale Order. The Liquidating Trust shall assume and perform any and all rights, benefits, duties and obligations of the Debtors under the Berkshire APA and the Berkshire Sale Order in accordance with their terms, and such rights, benefits, duties and obligations shall not be deemed to have been released or discharged by the occurrence of the Effective Date, by any provisions of the Plan (including, but not limited to, the provisions of Article IX of the Plan), or otherwise. Nothing in the Plan Documents shall, or shall be deemed or construed to, alter, change, modify or amend the terms and provisions of the Berkshire APA or the rights of the Debtors, the Liquidating Trust, and Berkshire Hathaway Inc. and its Affiliates, subsidiaries, and

- 47 -

related entities, as applicable, thereunder, which rights shall continue in full force and effect and

be enforceable following the Effective Date in accordance with the terms thereof. For the

avoidance of doubt, Berkshire Hathaway Inc., its Affiliates, subsidiaries, and related entities

shall not be required to file an Administrative Claim to preserve their rights or Claims arising

after the Effective Date from or related to the Berkshire APA.

33. **NJ Carpenters Settlement and District Court Approval**. Notwithstanding

anything to the contrary in the Plan, on the Effective Date, the Order and Final Judgment entered

on October 7, 2013 in the NJ Carpenters Class Action (the "NJ Carpenters District Court Order")

and the NJ Carpenters Settlement shall vest in the Liquidating Trust in accordance with the Plan.

The Liquidating Trust shall assume and perform any and all rights, benefits, duties and

obligations of the Debtors under the NJ Carpenters District Court Order and the NJ Carpenters

Settlement in accordance with their terms, and such rights, benefits, duties and obligations shall

not be deemed to have been released or discharged by the occurrence of the Effective Date, by

any provisions of the Plan, or otherwise. Nothing in the Plan Documents or this Confirmation

Order shall, or shall be deemed or construed to, alter, change, modify or amend the terms and

provisions of the NJ Carpenters Settlement and the applicable parties' rights thereunder, which

rights shall continue in full force and effect and be enforceable following the Effective Date in

accordance with the terms thereof.

34. **Substitution in Pending Legal Actions**. Except as otherwise provided in this

Confirmation Order or in the Plan, on the Effective Date, the Liquidating Trust shall be deemed

to be substituted as the party to any litigation in which the Debtors are a party, including, but not

limited to: (i) pending and contested matters or adversary proceedings in the Court, (ii) any

appeals of orders of the Court, and (iii) any state court or federal or state administrative

proceeding pending as of the Petition Date. The Liquidating Trust, and professionals for the Liquidating Trust are not required to, but may, take such steps as are appropriate to provide notice of such substitution.

35.     **Plan Distributions.**   On or as soon as practicable after the Effective Date, (i) Cash distributions to holders of Allowed Administrative, Priority, Secured, ETS Unsecured and General Unsecured Convenience Claims, the Borrower Claims Trust, the NJ Carpenters Settlement, (ii) the issuance of Units to the RMBS Claims Trust, the Private Securities Claims Trust, the Disputed Claims Reserve, and the holders of Allowed Unsecured Claims (other than the Allowed Unsecured Claims otherwise provided for under the Plan), and (iii) distributions of Distributable Cash paid by the Liquidating Trust, shall each be effectuated in accordance with Article VII of the Plan and the Liquidating Trust Agreement.   On or within one (1) Business Day of the Effective Date, the Junior Secured Notes Indenture Trustee shall receive the Junior Secured Notes Distribution, which shall thereafter be distributed in accordance with Article VII.G of the Plan.   The issuance of Units to the RMBS Claims Trust shall be subject to the rights of the RMBS Trustees under Article XI.A of the Plan.

36.     **No Reserve for Disallowed or Expunged Claims**.   None of the Debtors, the Liquidating Trust, the RMBS Claims Trust, the Private Securities Claims Trust or the Borrower Claims Trust shall be required to establish reserves for Claims that have been disallowed or expunged by order of the Bankruptcy Court in the absence of an order of the Bankruptcy Court expressly directing the Debtors to establish such a reserve.

37.     **Setoffs and Recoupment**.   Except as prohibited by the Plan, the Liquidating Trust may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that it may have against the claimant, including any Causes of Action transferred to

the Liquidating Trust by the Debtors, but neither the failure to do so nor the Allowance of any Claim shall constitute a waiver or release by the Debtors or the Liquidating Trust of any such Claim it may have against the holder of such Claim.

38.    Before the Liquidating Trust or the Borrower Claims Trust can set-off or recoup against the distribution to be made on account of an Allowed Claim, the holder of the Claim shall be served with written notice of the proposed setoff or recoupment at least thirty (30) days prior to exercising any asserted setoff or recoupment right, and, if such claimant serves a written objection to such asserted setoff or recoupment on or before thirty (30) days of receipt of such written notice, (i) the objection shall be deemed to initiate a contested matter governed by, inter alia, Bankruptcy Rule 9014 and Local Bankruptcy Rules 9014-1 and 9014-2, (ii) nothing in the Plan shall affect the respective burden of each party in connection with such contested matter, and (iii) the Liquidating Trust and the Borrower Claims Trust shall not proceed with the asserted setoff or recoupment absent the withdrawal of such objection or by order of the Bankruptcy Court overruling such objection.

39.    **Securities Laws Exemption**. The offering, issuance, or distribution of the Units by the Liquidating Trust in accordance with the Plan and the Liquidating Trust Agreement is exempt from the provisions of Section 5 of the Securities Act of 1933, as amended, and any state or local law requiring registration for the offer, issuance, or distribution of a security by reason of section 1145(a) of the Bankruptcy Code. The Units shall be transferrable to the extent permitted by applicable securities laws.

40.    **Releases, Exculpations and Injunctions of Released Parties.**

(a)    The Plan Releases set forth in Article IX of the Plan are approved and authorized in their entirety, are so ordered and shall be immediately effective on the Effective

Date of the Plan without further order or action on the part of the Court, any of the parties to such releases or any other party:

**A. Releases by the Debtors**

> **Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, including with respect to the Ally Released Parties, the Ally Contribution provided to the Estates under the Plan and otherwise, on and as of the Effective Date of the Plan, the Debtor Released Parties are deemed released and discharged by the Debtors, the Estates and the Liquidating Trust from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, including those Causes of Action based on avoidance liability under federal or state laws, veil piercing or alter-ego theories of liability, a theory of debt recharacterization, or equitable subordination liability, arising from or related in any way to the Debtors, including those that any of the Debtors would have been legally entitled to assert against a Debtor Released Party in its own right (whether individually or collectively) or that any holder of a Claim or Equity Interest, the Liquidating Trust, or other Entity would have been legally entitled to assert on behalf of any of those Debtors or any of their Estates, including those in any way related to the Chapter 11 Cases or the Plan to the fullest extent of the law.**

**B. Third Party Release**

> **On and as of the Effective Date of the Plan, except as provided by Article IX.E of the Plan, the holders of Claims and Equity Interests shall be deemed to provide a full and complete discharge and release to the Ally Released Parties and their respective property from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, derivative or direct, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, contribution, indemnification, joint liability, or otherwise, arising from or related in any way to the Debtors, including those in any way related to RMBS issued and/or sold by the Debtors or their affiliates and/or the Chapter 11 Cases or the Plan, the Consent Order, and the Order of Assessment.**

**C. Third Party Release Carve-Out**

> **Notwithstanding anything to the contrary in the Plan, the Third Party Release shall not apply to any claims held by: (i) the FHFA, as conservator for Fannie Mae, and/or Fannie Mae against Ally Bank, including, without limitation, any claims of FHFA and/or Fannie Mae against Ally Bank for**

continuing liabilities, obligations, and duties owed by Ally Bank to FHFA and/or Fannie Mae under the Fannie Mae Contract, including the obligations and duties to honor all selling and servicing representations and warranties related to the portfolio of loans sold and/or serviced, or that were previously serviced, by Ally Bank; (ii) the FHFA and/or Freddie Mac (a) against Ally Bank for any selling and servicing representation and warranty claims for loans sold to Freddie Mac directly by Ally Bank subsequent and pursuant to the May 1, 2012 and August 1, 2012 master selling and servicing agreements among Ally Bank and Freddie Mac, and (b) against Ally Financial Inc. as guarantor for the limited time that the Debtors subserviced the Ally Bank loans sold pursuant to the agreements set forth in clause (ii)(a) above, (iii) the United States and the DOJ/AG Settling States with regard to any monetary obligation the Ally Released Parties may have arising under the DOJ/AG Settlement or causes of action preserved under Article V and Exhibits F and G of the DOJ/AG Settlement; and shall not apply to (iv) any liability or obligation of AFI to the United States or the States arising under the Internal Revenue Code, environmental laws, civil fraud laws, or criminal laws, including, but not limited to, any such liability or obligation preserved under Article V and Exhibits F and G of the DOJ/AG Settlement.

Nothing herein is intended to expand any liabilities under any agreement set forth above or applicable law; the carve outs set forth above in clauses (ii) and (iii) are limited to liabilities under agreements referenced therein and Ally expressly reserves all rights, claims, and defenses against persons and entities carved out under Article IX.E of the Plan regarding any liability that is the subject of Article IX.E of the Plan.

Notwithstanding anything to the contrary in the Plan or this Confirmation Order, in the event of a "Cap Re Settlement Denial" • (as defined below), the claims pled by plaintiffs Donna Moore, Frenchola Holden, and Keith McMillon (the "Cap Re Plaintiffs") and the right to assert and prosecute those claims against Cap Re in the action commenced by the Cap Re Plaintiffs pending in the United States District Court for the Eastern District of Pennsylvania (the "Cap Re District Court"), captioned *Moore v. GMAC Mortgage, LLC*, No. 2:07-cv-04926-PD (the "Cap Re Action") are preserved as against Cap Re. In the event of a Cap Re Settlement Denial, if there is a subsequent adjudication in the Cap Re Action against Cap Re or a settlement with Cap Re, the Cap Re Plaintiffs' rights to any recovery against Cap Re arising from that adjudication or settlement are preserved. The preservation of rights in this paragraph is intended solely for the Cap Re Plaintiffs and the putative class they represent in the Cap Re Action and no other Person or Entity in any capacity. For the avoidance of doubt, no Ally Released Party, other than Cap Re, shall have any liability or obligation under or in connection with this paragraph or, as of the Effective Date, the Cap Re Action, including that no Ally Released Party or Debtor shall have any liability or obligation to Cap Re. As used herein, the term "Cap Re Settlement Denial" means the failure of the Cap Re District Court to grant final approval of the settlement of the Cap Re Action among the Cap Re

Plaintiffs, GMACM, and Cap Re of the Cap Re Action, or the subsequent reversal or set aside of the Cap Re District Court's final approval of such settlement.

For the avoidance of doubt, no party can assert claims, causes of actions or liabilities against the Debtors or Liquidating Trust arising from claims that are carved out under Article IX.E(i) of the Plan.

Nothing in the Plan or this Confirmation Order releases AFI or any other party from the obligations under the Employees Retirement Plan for GMAC Mortgage Group, LLC (the "Pension Plan") and ERISA. Notwithstanding the foregoing, upon the Effective Date, the Debtors and the Plan Trusts shall be released from all obligations under the Pension Plan and ERISA related thereto, except for any Claims for fiduciary breaches or prohibited transactions (as defined in ERISA) relating to the Pension Plan under applicable law.

### D. Ally Release

Except with respect to the Ally Contract Claims, on and as of the Effective Date of the Plan, the Ally Released Parties shall release the Creditors' Committee, the Debtors, and the Consenting Claimants and their respective successors and assigns, members, partners, advisors, and Representatives, in their capacities as such, from any and all Causes of Action whatsoever, whether known or unknown, asserted or unasserted, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise arising from or related to the Debtors' liquidation, including the negotiation, formulation, or preparation of the Plan Support Agreement, the Plan, the Disclosure Statement, and any other Plan Documents and related disclosures, as well as any counterclaims in commenced or tolled litigation with the Debtors or the Consenting Claimants.

### E. Junior Secured Notes Releases

As set forth in Article IX.G of the Plan, on and as of the Effective Date, (i) each of the Consenting JSNs, the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Predecessor Indenture Trustee, the Ad Hoc Group, and the Junior Secured Notes Collateral Agent, and each of their predecessors, successors, and assigns, group members (except any such member of the Ad Hoc Group that voted to reject the Plan and has not changed its vote to accept the Plan by the Confirmation Date), general partners, advisors, and Representatives, each solely in their capacities as such, shall be deemed to release (a) each other, and (b) the Debtors, the Creditors' Committee, each of the Consenting Claimants, and the Ally Released Parties, and each of their predecessors, successors and assigns, group members, general partners, advisors, and Representatives, each solely in their capacities as such; and (ii) the Debtors, the Creditors' Committee, each of the Consenting Claimants, and the Ally Released Parties and each of their successors and assigns, members, partners, advisors, and

- 53 -

Representatives, each solely in their capacities as such, shall be deemed to release the Consenting JSNs, the Junior Secured Notes Indenture Trustee, the Junior Secured Notes Predecessor Indenture Trustee, the Ad Hoc Group, and the Junior Secured Notes Collateral Agent and each of their predecessors, successors, and assigns, members (except any such member of the Ad Hoc Group that voted to reject the Plan and has not changed its vote to accept the Plan by the Confirmation Date), partners, advisors, and Representatives, each solely in their capacities as such, in the case of (i) and (ii) above from any and all Claims and Causes of Action whatsoever, whether known or unknown, asserted or unasserted, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise arising from or related to the Debtors, including, without limitation, any right to seek sanctions, take discovery, or initiate any investigation or examination pursuant to Bankruptcy Rule 2004 or any other similar action, all of which shall be considered Released Claims under the Plan; it being understood and agreed that the Claims and Causes of Action being released pursuant to Article IX.G of the Plan are limited to those Claims and Causes of Action arising from or related to the JSN Documents and each Person's conduct and participation in the Chapter 11 Cases and shall not include any Claims or Causes of Action that a Person holds in any other capacity or arising under any other documents or facts and circumstances; provided, however, that nothing in this release shall limit the rights of the Junior Secured Notes Indenture Trustee to receive and make distributions as provided in the Junior Secured Notes Indenture and as provided and preserved in the Plan. Notwithstanding anything to the contrary contained in Article IX.G of the Plan, any Person (other than a Person that is itself a member of the Ad Hoc Group or a Junior Secured Noteholder, in each case that is also a Consenting JSN) that is a former, present or future parent, affiliate, member, member firm, associated entity, shareholder, principal, limited partner, equity investor, or managed entity (along with the respective attorneys, financial advisors, investment advisors, employees, officers, directors, managers, agents and other authorized representatives of each of the foregoing) of a Consenting Claimant or a Junior Secured Noteholder that is a Consenting JSN, in each case solely in their capacities as such, shall be the recipient of, but shall not itself grant to any other Person, the release provided for by Article IX.G of the Plan. Notwithstanding the above, nothing contained in Article IX.G of the Plan in any way limits Article IX.D of the Plan.

F.    Exculpation

The Exculpated Parties shall neither have, nor incur, any liability to any entity for any pre-petition or post-petition act or omission taken in connection with, or related to, formulating, negotiating, preparing, disseminating, soliciting, implementing, administering, confirming, or effecting the consummation of any prepetition plan support agreements, the Plan Support Agreement, the Plan, the Disclosure Statement, the FGIC Settlement Agreement, the Kessler Settlement Agreement, the RMBS

Settlement, the settlement of the Junior Secured Notes Claims as provided in the Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, <u>provided, however</u>, that the foregoing provisions of this Exculpation shall have no effect on the liability of any entity that results from any such act that is determined in a final, non-appealable order to have constituted gross negligence or willful misconduct; <u>provided, however</u>, that the Exculpated Parties shall be entitled to rely upon the advice of counsel and financial advisors concerning his, her, or its duties pursuant to, or in connection with, any prepetition plan support agreement, the Plan Support Agreement, the Plan, the Disclosure Statement, the FGIC Settlement Agreement, the Kessler Settlement Agreement, the RMBS Settlement, and the settlement of the Junior Secured Notes Claims as provided in the Plan. Notwithstanding the foregoing or any other provision in the Plan to the contrary, as to the DOJ-Represented Agencies, nothing in this paragraph shall release or exculpate any of the Exculpated Parties from any liability or obligation to the DOJ-Represented Agencies for any pre-petition act or omission, or from any liability or obligations arising under the tax laws, the environmental laws, civil fraud laws, criminal laws, or the police or regulatory powers of the United States, except (i) to the extent the applicable Bar Date or the discharge, release or injunction provisions of the Plan bar the United States from pursuing Claims against the Debtors or the Liquidating Trust and (ii) to the extent the United States released or settled any causes of action against any of the Exculpated Parties, including but not limited to under the DOJ/AG Settlement (including exhibits). For the avoidance of doubt, nothing in the foregoing provisions shall release or exculpate the Ally Released Parties from any claims or obligations to the United States and the DOJ/AG Settling States arising under the DOJ/AG Settlement or causes of action preserved under Article V and Exhibits F and G of the DOJ/AG Settlement.

### G. Injunction

Except as otherwise provided in the Plan or this Order and in accordance with Article IX.E of the Plan, all Entities, including Investors, who have held, hold or may hold Claims, Equity Interests, Causes of Action or liabilities that constitute Released Claims, are permanently enjoined and precluded, from and after the Effective Date of the Plan, from: (a) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party whether directly, derivatively or otherwise, on account of or in connection with or with respect to any Released Claims; (b) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Released Party on account of or in connection with or with respect to any Released Claims; (c) creating, perfecting or enforcing any lien (other than any charging lien of a trustee under its respective indenture), claim or encumbrance of any kind against any Released Party on account of or in connection with or with respect to any Released Claims; (d) asserting any right to setoff, subrogation or recoupment

of any kind against any obligation due from any Released Party on account of or in connection with or with respect to any Released Claims unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in a Proof of Claim or Equity Interest or otherwise that such holder asserts, has or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; (e) commencing or continuing in any manner or action or other proceeding of any kind against any Released Party on account of or in connection with or with respect to any Released Claims; and (f) seeking relief or collecting judgments on an Investor-related securities claim in a manner that fails to conform with the terms of the judgment reduction provision set forth in the Plan and the Confirmation Order; **provided**, that nothing contained in the Plan shall be construed to prevent any entity from objecting to claims or defending against claims objections or collection actions whether by asserting a right of setoff or otherwise to the extent permitted by law.  Such injunction shall extend to the successors of the Liquidating Trust, if any, and to their respective properties and interests in property.  Any person injured by any willful violation of this injunction shall be entitled to recover actual damages, including costs and attorneys' fees and, in appropriate circumstances, may recover punitive damages from the willful violator.

For the avoidance of doubt, nothing in Article IX.E of the Plan shall expand or limit the application of Article IX.I of the Plan to Claims, Equity Interests, Causes of Action or liabilities against the Debtors or the Liquidating Trust.

41.    **Release of Liens**. Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of any Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall vest in the Liquidating Trust.

42.    **Discharge**. Except as expressly provided in the Plan or the Confirmation Order, (a) each holder (as well as any trustees and agents on behalf of each holder) of a Claim against or Equity Interest in a Debtor shall be deemed to have forever waived, released and discharged the

Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any
and all Claims, Equity Interests, rights and liabilities that arose prior to the Effective Date and (b)
all such holders shall be forever precluded and enjoined, pursuant to section 524 of the
Bankruptcy Code, from prosecuting or asserting any discharged Claim against or terminated
Equity Interest in the Debtors.

43.     **Satisfaction and Release of Claims and Equity Interests**. The rights afforded in
the Plan and the treatment of all Claims and Equity Interests under the Plan shall be in exchange
for and in complete satisfaction and release of all Claims of any nature whatsoever, including
any interest accrued on such Claims from and after the Petition Date, against the Debtors, the
Plan Trusts, or any of their respective assets or properties arising prior to the Effective Date.
Except as otherwise expressly specified in the Plan, after the Effective Date, any holder of such
Claim or Equity Interest shall be precluded from asserting against the Debtors, the Plan Trusts,
or any of their respective assets or properties, any other or further Claim based on any document,
instrument, act, omission, transaction, or other activity of any kind or nature that occurred before
the entry of this Order.

44.     **Judgment Reduction**. A defendant against whom a judgment of a court of
competent jurisdiction is obtained (whether in a proceeding now pending or hereafter
commenced) on an Investor-related securities claim where such defendant has a claim for
indemnity or contribution that is subject to the Third Party Releases shall be entitled to a
judgment credit in the underlying litigation in the amount and on the terms that would be
available if the Third Party Releases were treated as a bar order in the underlying litigation, in
accordance with, and to the extent permitted under, applicable statutory or common law, as
determined by a court of competent jurisdiction.  (For the avoidance of doubt, a defendant

- 57 -

against whom a judgment of a court of competent jurisdiction is obtained (whether in a proceeding now pending or hereafter commenced) on an Investor-related securities claim where such defendant has or had a claim for indemnity or contribution against any Debtor is not precluded from asserting that it is entitled to a judgment credit in the underlying litigation in connection with such claim against the Debtors, and the plaintiff(s) in such action shall have the right to oppose any such request for a judgment credit on any basis, including but not limited to that no such right exists and with reference to Bankruptcy Code section 502(e).)   For the avoidance of doubt, judgment reduction in the NJ Carpenters Class Action shall be governed by the terms of the Order and Final Judgment entered by the District Court granting final approval to the NJ Carpenters Settlement.  *See* (ECF Doc. # 5354).  Notwithstanding the foregoing and without limitation (i) no Ally Released Party shall be deemed to have admitted to such fault by virtue of this provision; (ii) nothing in the Plan or Confirmation Order shall create any right for a defendant that it does not have under applicable statutory or common law, if any, to obtain discovery from any Ally Released Party, or create an obligation for any Ally Released Party to participate in any proceeding to determine fault that does not exist under applicable statutory or common law, if any, in connection with such claim; and (iii) no finding in any proceeding to determine fault shall create any claim against any Ally Released Party or obligation of any Ally Released Party to satisfy any claim.  For the avoidance of doubt, nothing in Article IX.L of the Plan affects the Third Party Releases, and all parties' rights under applicable law with respect to discovery and any Ally Released Party's participation in any proceeding to determine fault are preserved.

45.    **Special Provisions for the United States and the States.**

(a)    As to the United States, except where the Plan or Confirmation Order explicitly states otherwise as to the United States, nothing in the Plan or Confirmation Order shall limit or expand the scope of discharge, release or injunction to which the Debtors or Liquidating Trust are entitled to under the Bankruptcy Code, if any.  The discharge, release, exculpation and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar the United States and the States from, subsequent to the Bankruptcy Court's entry of the Confirmation Order, pursuing any police or regulatory action against the Debtors or the Liquidating Trust, except (i) to the extent the applicable Bar Date or the discharge, release, exculpation or injunction provisions of the Plan bar a Governmental Unit from pursuing pre-petition Claims against the Debtors or the Liquidating Trust and (ii) to the extent a Governmental Unit released or settled any causes of action against the Debtors or the Liquidating Trust, including but not limited to under the DOJ/AG Settlement (including exhibits).  For the avoidance of doubt, Governmental Units are subject to the Administrative Claim Bar Date.

(b)    Notwithstanding anything contained in the Plan or Confirmation Order to the contrary, nothing in the Plan or Confirmation Order shall discharge, release, impair or otherwise preclude: (1) any liability of the Debtors or the Liquidating Trust to the United States and the States that is not a Claim; (2) any Claim of the United States and the States against the Debtors or the Liquidating Trust arising on or after the Confirmation Date; (3) any valid right of setoff or recoupment of any Governmental Unit against any of the Debtors, regardless of whether (a) a right of setoff was reserved in a proof of claim filed with respect to the debt subject to setoff or (b) the setoff has been authorized or approved by the Bankruptcy Court; or (4) any liability of

the Debtors or the Liquidating Trust to any Governmental Unit under environmental law as the owner or operator of property that such entity owns or operates after the Confirmation Date. Nor shall anything in this Confirmation Order or the Plan: (i) enjoin or otherwise bar the United States or the States from seeking to assert or enforce outside the Bankruptcy Court, any liability described in the preceding sentence; or (ii) divest any court, commission, or tribunal of jurisdiction to determine whether any liabilities asserted by the United States or the States are discharged or otherwise barred by this Confirmation Order, the Plan, or the Bankruptcy Code. Notwithstanding the foregoing, (1) to the extent any Governmental Unit has (i) in connection with these Chapter 11 Cases, entered into any stipulation or settlement of claims, or been subject to a Bankruptcy Court order and (ii) there is any conflict between the terms of such stipulation or settlement of claims or Bankruptcy Court order and this paragraph, the terms of such stipulation, settlement or Bankruptcy Court order shall control; and (2) this paragraph shall not expand or limit the scope of any releases or settlement of causes of action granted to or for the benefit of the Debtors or the Liquidating Trust by any Governmental Unit, including but not limited to under the DOJ/AG Settlement (including exhibits).

(c) Nothing in the Confirmation Order or the Plan shall bar the United States and the States from pursuing any police and regulatory action against any non-Debtor (including AFI). Further, nothing in the Confirmation Order or Plan shall release or exculpate any non-Debtor (other than AFI, which for purposes of this paragraph shall be governed by Article IX.D, IX.E and IX.I of the Plan) from any liability to any DOJ-Represented Agency including, but not limited to, any liabilities arising under the Internal Revenue Code, the environmental laws, the civil fraud laws, or the criminal laws, nor shall anything in this Confirmation Order or Plan enjoin any DOJ-Represented Agency from bringing any claim, suit, action, or other proceeding

- 60 -

against any non-Debtor in connection therewith, except as provided by sections 1125(e) and 1145 of the Bankruptcy Code; provided, however, that the foregoing sentence shall not expand or limit the scope of discharge granted to the Debtors and the Liquidating Trust under sections 524 and 1141 of the Bankruptcy Code; and provided further, however, that this paragraph shall not expand or limit the scope of any exculpations granted to the Exculpated Parties, which shall be governed by Article IX.H of the Plan; and provided further, however, that this paragraph shall not expand or limit the scope of any releases or settlement of causes of action granted to or for the benefit of any non-Debtor by the United States or the States, including but not limited to under the DOJ/AG Settlement (including exhibits).

(d)       Nothing contained in the Plan or Confirmation Order shall constitute a determination of the United States or the Bankruptcy Court regarding the federal tax liability of any person or entity, including but not limited to the Debtors or the Liquidating Trust, nor shall the Plan or Confirmation Order be deemed to have determined the federal tax treatment by the United States or the Bankruptcy Court of any item, distribution, or entity, including the federal tax consequences of the Plan, nor shall anything in the Plan or Confirmation Order be deemed to have conferred jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liability and federal tax treatment except as provided under 11 U.S.C. § 505.  For the avoidance of doubt, the foregoing paragraph does not modify the terms of any settlement under the Plan or Confirmation Order.

(e)       Nothing in the Plan or the Confirmation Order shall limit or expand the scope of the Debtors' or the Liquidating Trust's ability to estimate a Disputed Claim of the United States or the States pursuant to 11 U.S.C. § 502(c) of the Bankruptcy Code.

(f)     Notwithstanding any other provision in the Plan, the Liquidating Trust shall not retain and may not enforce any cause of action, whether based upon 11 U.S.C. §§ 547 and 548 or otherwise, against either the United States or any DOJ/AG Settling States under the DOJ/AG Settlement, for any transaction required by the DOJ/AG Settlement, whether arising before or after the Petition Date.

(g)     To the extent the Debtors or the Liquidating Trust are found liable for any obligations arising out of a Final Order or settlement in Commonwealth of Massachusetts v. Bank of America, N.A., et al. (Civ. A. No. 11-4363) currently pending in the Superior Court of Massachusetts, Suffolk County, all parties reserve their rights with regard to enforcement of such obligations against the Debtors or the Liquidating Trust.  The aforementioned civil action is referenced in proofs of claim numbers 6025, 6028 and 6033.

46.     **Limitation on Obligations to the Ally Released Parties.**  Except with respect to the Debtors' and the Liquidating Trust's obligations to Ally as specifically set forth in the Plan (including their obligations to perform under the Ally Contracts in accordance with their terms), on and after the Effective Date the Debtors and the Plan Trusts shall have no other obligations to the Ally Released Parties.

47.     **Executory Contracts and Unexpired Leases.**

(a)     The Executory Contract and Unexpired Lease provisions of Article V of the Plan are specifically approved in all respects, are incorporated herein in their entirety and are so ordered.  The Debtors are authorized to assume, assign and/or reject Executory Contracts or Unexpired Leases in accordance with Article V of the Plan.

(b)     Pursuant to Article V of the Plan, on the Effective Date each Executory Contract and Unexpired Lease not previously assumed shall be deemed automatically rejected

pursuant to sections 365 and 1123 of the Bankruptcy Code unless any such Executory Contract

or Unexpired Lease:  (i) is expressly identified on the Assumption Schedule; (ii) has been

previously assumed by the Debtors by Final Order or has been assumed by the Debtors by order

of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the

Effective Date; (iii) is the subject of a motion to assume pending as of the Effective Date; or (iv)

is otherwise assumed pursuant to the terms of the Plan.  This Order will constitute an order of the

Court approving such rejections pursuant to sections 365 and 1123 of the Bankruptcy Code as of

the Effective Date or as otherwise set forth in the Plan Supplement.

(c)      Unless withdrawn from the Assumption Schedule by the Plan Proponents

prior to the Effective Date, each Executory Contract and Unexpired Lease identified on the

Assumption Schedule shall be deemed assumed pursuant to sections 365 and 1123 of the

Bankruptcy Code as of the Effective Date or as otherwise set forth in the Plan Supplement.

(d)      Any request for payment of a Cure Claim that is not timely filed and

served shall be disallowed automatically, forever barred and not be enforceable against any

Debtor or the Liquidating Trust, without the need for an objection by the Debtors or the

Liquidating Trust or order of the Court.  The Plan Proponents, prior to the Effective Date, or the

Liquidating Trust, following the Effective Date, may settle any dispute on the amount of a Cure

Claim without further notice to any party or action, approval, or order of the Bankruptcy Court.

If the Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the

Effective Date, object to any request for payment of a Cure Claim, the Bankruptcy Court shall

determine the Allowed amount of such Cure Claim and any related issues.  Unless the parties to

the Executory Contract or Unexpired Lease agree otherwise, all disputed defaults that are

required to be cured shall be cured by the later of (i) ten (10) days after entry of a Final Order

determining the amount, if any, of the Debtors' liability with respect thereto and (ii) the Effective Date. The Plan Proponents, prior to the Effective Date, or the Liquidating Trust, following the Effective Date, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease no later than thirty (30) days after a Final Order determining a Cure Claim greater than that proposed by the Debtors.

(e)       Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date the Debtors or the Liquidating Trust assume such Executory Contract or Unexpired Lease. Any proofs of claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court.

(f)       Notwithstanding anything herein or in the Plan to the contrary, and subject to approval by the Bankruptcy Court, the parties to the *Stipulation (I) Resolving the Objection to Confirmation of Impac Funding Corporation, and Impac Mortgage Holdings, Inc., and (II) Resolving Impac's Objection to and Providing for the Sale, Assumption and Assignment of Certain Servicing Agreements to Ocwen Loan Servicing, LLC* (ECF Doc. # 6059) shall perform their obligations thereunder in accordance with the terms thereof.

(g)       Notwithstanding anything to the contrary herein or in the Plan and based upon the information available to the Debtors as of the date hereof, in order to resolve *Oracle's Limited Objection and Reservation of Rights Regarding Joint Chapter 11 Plan Proposed by*

*Residential Capital, LLC, et al., and the Official Committee of Unsecured Creditors* (ECF Doc. #

5404), the Debtors have agreed as follows:  The Debtors have endeavored to list all agreements

between one or more of the Debtors and Oracle America, Inc. (including any of its predecessors-

in-interest) ("Oracle") that they seek to have transferred to the Liquidating Trust on the

Assumption Schedule, as amended, filed in connection with the Plan.  Any agreements presently

existing between any of the Debtors and Oracle that are not listed on the Assumption Schedule or

that are subsequently removed from the Assumption Schedule shall be deemed rejected (the

"Oracle Rejected Agreements") as of the Effective Date of the Plan ("Rejection Date").  For any

and all of the Oracle Rejected Agreements: (a) on the Rejection Date, the Debtors shall

immediately cease use of all Oracle software and services subject to the Oracle Rejected

Agreements; (b) as soon as practicable after the Rejection Date, to the extent required by the

Oracle Rejected Agreements, the Debtors shall use commercially reasonable efforts to cause

their agents to scrub, remove and expunge all Oracle software that is subject to the Oracle

Rejected Agreements and any portions thereof from all computers, hardware, servers,

mainframes and storage media and devices on which it is located (with no copies retained by the

Debtors); and (c) if requested by Oracle, the Debtors shall certify in writing that the Debtors or

their agents have complied with the obligations in (a) and (b) herein within sixty (60) days of the

Rejection Date.  The Debtors agree to execute customary assignments in connection with any

Oracle agreements assigned to the Liquidating Trust.

       48.    **Preservation of Causes of Action.** Unless any Causes of Action against an Entity

are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan

(including pursuant to the Plan Support Agreement), or by a Final Order, in accordance with

section 1123(b) of the Bankruptcy Code, the Borrower Claims Trust with respect to Borrower-

- 65 -

Related Causes of Action, and the Liquidating Trust with respect to all other Causes of Action, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action of the Debtors or the Debtors' Estates, whether arising before or after the Petition Date, including, without limitation, any Causes of Action specifically enumerated in the Plan Supplement, and the Liquidating Trust's and Borrower Claims Trust's respective rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Liquidating Trust and the Borrower Claims Trust may pursue their respective Causes of Action, as appropriate, in accordance with the best interests of the respective Trust.  **No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against such Entity as any indication that the Liquidating Trust or Borrower Claims Trust, as the case may be, will not pursue any and all available Causes of Action against such Entity. The Liquidating Trust and the Borrower Claims Trust, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Liquidating Trust expressly reserves all Causes of Action other than Borrower-Related Causes of Action, and the Borrower Claims Trust expressly reserves all Borrower-Related Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation, the Global Settlement, the Plan Settlements, or Consummation. For the avoidance of doubt, the Plan does not release any Causes of Action that the Plan Proponents or the Liquidating Trust or

Borrower Claims Trust have or may have now or in the future against any Entity other than the Released Parties (and only in their capacity as Released Parties).  The Liquidating Trustees and the Borrower Claims Trustee, as applicable, are deemed representatives of the Estates for the purpose of prosecuting, as applicable, the Liquidating Trust Causes of Action, Borrower-Related Causes of Action and any objections to Claims pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

49.     Except as otherwise provided in the Plan or in a Final Order, the Liquidating Trust reserves and shall retain Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors may hold against any Entity that is not released under the Plan or a separate settlement approved by Final Order shall vest in the Borrower Claims Trust with respect to Borrower-Related Causes of Action and in the Liquidating Trust with respect to all other Causes of Action. The Liquidating Trust and Borrower Claims Trust, as the case may be, through their respective authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Liquidating Trust has the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Causes of Action other than Borrower-Related Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.  The Borrower Claims Trust has the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Borrower-Related Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any

third party or any further notice to or action, order, or approval of the Bankruptcy Court. In pursuing any claim, right, Cause of Action or objection, the Liquidating Trust or the Borrower Claims Trust shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the time periods in which a Cause of Action may be brought under section 546 of the Bankruptcy Code.

50.   **Claims Bar Dates and Other Claims Matters.**

(a)   **Bar Date.** Except as otherwise agreed by the Debtors, the Liquidating Trust, or the Borrower Claims Trust, as applicable, or ordered by the Bankruptcy Court, any and all Proofs of Claim filed after the applicable Bar Date shall be deemed disallowed, discharged, released, and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such claims may not receive any distributions on account of such claims, unless such late Proof of Claim is deemed timely filed by a Final Order of the Bankruptcy Court.

(b)   **Professional Claims.** All requests for compensation or reimbursement of Professional Claims (other than Professional Claims for the Examiner and the Professionals retained by the Examiner) accrued through the Effective Date shall be Filed no later than seventy-five (75) days after the Effective Date, and any final hearing on any request for compensation or reimbursement of Professional Claims accrued through the Effective Date, unless authorized by final order prior to the Effective Date, shall occur no sooner than sixty (60) days after the filing of such final requests for compensation or reimbursement, and the deadline to object to such requests shall be no sooner than ten (10) days before any hearing on such request.

- 68 -

(c)     Other than as set forth herein or in the Plan, the procedures set forth in the Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (the "Interim Compensation Order") (ECF Doc. # 797) shall remain in effect through the Effective Date.

(d)     **Bar Date for Rejection Claims.** Claims arising from the rejection of Executory Contracts or Unexpired Leases must be Filed with the Court no later than the Rejection Damages Claims Bar Date, which is: (a) with respect to an Executory Contract or Unexpired Lease that is rejected pursuant to the Plan, forty-five (45) days after the Effective Date, or (b) with respect to an Executory Contract or Unexpired Lease that is otherwise rejected, the applicable bar date established by the Bar Date Order or other order of the Bankruptcy Court. For the avoidance of doubt, all Allowed Claims arising from the rejection of Executory Contracts or Unexpired Leases shall be treated as General Unsecured Claims against the applicable Debtor Groups.

(e)     Any Claims arising from the rejection of Executory Contracts or Unexpired Leases that are not timely filed shall be disallowed automatically, forever barred from assertion, and shall not be enforceable against the Debtors, the Liquidating Trust, or their assets or properties without the need for any objection by the Liquidating Trust or further notice to, or action, order, or approval of the Bankruptcy Court.

(f)     **Administrative Claim Bar Date.**  Except as provided for in the Plan, this Confirmation Order, or in any order of the Bankruptcy Court, and subject to section 503(b)(1)(D) of the Bankruptcy Code, holders of Administrative Claims that arose prior to the Effective Date (other than holders of Administrative Claims paid in the ordinary course of business, holders of Professional Claims, holders of Claims for fees and expenses pursuant to section 1930 of chapter

123 of title 28 of the United States Code, and holders of Postpetition Intercompany Balances)
must File and serve on the Plan Proponents or the Liquidating Trust, as applicable, requests for
the payment of such Administrative Claims not already Allowed by Final Order in accordance
with the procedures specified in the Confirmation Order, on or before the first Business Day that
is thirty (30) days following the Effective Date, or be forever barred, estopped, and enjoined
from asserting such Claims against the Debtors, the Plan Trusts, or their assets or properties, and
such Claims shall be deemed discharged as of the Effective Date.

(g)     **Statutory Fees.**   Notwithstanding anything to the contrary contained in
the Plan, on the Effective Date or as soon as practicable thereafter, the Liquidating Trust shall
pay all U.S. Trustee Fees that are due and owing on the Effective Date.  For the avoidance of
doubt, nothing in the Plan shall release the Liquidating Trust from its obligation to pay all U.S.
Trustee Fees due and owing after the Effective Date before a Final Order is entered by the
Bankruptcy Court concluding or closing the Chapter 11 Cases.

51.     **No Change in Control.**  Pursuant to Article V.F. of the Plan, the consummation
of the Plan or the assumption of any Executory Contract or Unexpired Lease is not intended to,
and shall not, constitute a change in ownership or change in control under any employee benefit
plan or program, financial instrument, loan or financing agreement, Executory Contract or
Unexpired Lease or contract, lease or agreement in existence on the Effective Date to which a
Debtor is a party.

52.     **Cancellation of Existing Securities.**  Subject to Article IV.C.8 of the Plan and
the assumption of Executory Contracts and Unexpired Leases as set forth in the Plan, and except
for purposes of evidencing a right to distributions under the Plan or in order to prosecute
preserved Causes of Action, on the Effective Date, all notes, stock, instruments, certificates,

indentures, guarantees, and other documents or agreements evidencing a Claim against or Equity Interest in the Debtors will be deemed automatically cancelled with respect to the Debtors and shall be of no further force or effect as against the Debtors, whether such document is surrendered for cancellation or not, and the obligations of Ally, the Debtors, or the Liquidating Trust, thereunder or in any way related thereto will be discharged.

53.     Notwithstanding anything to the contrary in the Plan, (i) the Senior Unsecured Notes Indenture will continue in effect for the limited purposes of: (a) allowing the Senior Unsecured Noteholders to receive distributions on account of their Senior Unsecured Notes Claims, and (b) allowing the Senior Unsecured Notes Indenture Trustee to make distributions in accordance with the terms of the Plan, to fund the Senior Unsecured Notes Indenture Trustee Reserve, and to exercise its Senior Unsecured Notes Indenture Trustee Charging Lien against distributions under the Plan and against the Senior Unsecured Notes Indenture Trustee Reserve for payment of Senior Unsecured Notes Indenture Trustee Fees and Expenses; (ii) the First Priority Security Agreement will continue in effect for the limited purposes of allowing the First Priority Collateral Agent to exercise its First Priority Collateral Agent Lien for the payment of First Priority Collateral Agent Fees and Expenses; and (iii) all JSN Documents shall be deemed automatically canceled and discharged on the Effective Date, provided, however, that the JSN Documents shall continue in effect solely for the purposes of (x) allowing the holders of the Junior Secured Notes Claims to receive distributions on account of their Junior Secured Notes Claims as provided in the Plan, (y) allowing the Junior Secured Notes Indenture Trustee to make the distributions to be made on account of the Junior Secured Notes Claims in accordance with Article VII.G of the Plan; and (z) permitting the Junior Secured Notes Indenture Trustee to assert its Junior Secured Notes Indenture Trustee Charging Lien against such distributions for payment

of the Junior Secured Notes Indenture Trustee Fees and the Junior Secured Notes Collateral Agent Fees and Expenses.

54.    **Treatment of Intercreditor Agreement**.  The Intercreditor Agreement shall be deemed automatically cancelled and discharged upon the Effective Date.  Upon the occurrence of the Effective Date, no Ally Party shall be entitled to receive any portion of the Junior Secured Notes Distribution and no Person may directly or indirectly interfere in any manner with the distribution of the Junior Secured Notes Distribution to the Junior Secured Noteholders in accordance with Article VII.G of the Plan.

55.    **Escrow Agreement**. Subject to paragraph 16 of that certain Escrow Agreement made and entered into as of January 3, 2013 by and among GMACM, AFI, and U.S. Bank National Association, a national banking association (the "Escrow Agreement") and the Compensation Order, GMACM, and its successors and assigns, shall comply with all applicable regulatory and statutory requirements, including any requirements under the Troubled Asset Relief Program, when distributing funds pursuant to the Compensation Order.

56.    **Binding Effect of Prior Orders.**  Pursuant to section 1141 of the Bankruptcy Code, effective as of the Confirmation Date, but subject to the occurrence of the Effective Date and subject to the terms of the Plan and this Order, all prior orders entered in the Chapter 11 Cases, all documents and agreements executed by the Debtors as authorized and directed thereunder and all motions or requests for relief by the Debtors pending before the Court as of the Effective Date shall be binding upon and shall inure to the benefit of any parties thereto, including the Debtors, the Plan Trusts, and any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

57.    **Reversal.**  If any or all of the provisions of this Order are hereafter reversed, modified or vacated by subsequent order of this Court or any other court, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Debtors' receipt of written notice of such order.  Notwithstanding any such reversal, modification or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Order and the Plan and all related documents or any amendments or modifications thereto.

58.    **Notice of Confirmation of the Plan and Occurrence of the Effective Date.** Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c)(2), the Plan Proponents or the Liquidating Trust are directed to serve a notice of the entry of this Order and notice of the occurrence of the Effective Date, substantially in the form of Appendix 2 attached hereto and incorporated herein by reference (the "Confirmation Notice and Notice of Effective Date"), upon (a) all parties listed in the creditor matrix maintained by KCC and (b) such additional persons and entities as deemed appropriate by the Plan Proponents, no later than five (5) Business Days after the Effective Date. The Plan Proponents shall publish the Confirmation Notice and Notice of Effective Date in each of the national editions of the *Wall Street Journal* and *USA Today* within seven (7) Business Days after the Effective Date.  As soon as practicable after the entry of this  Order, the Plan Proponents shall make copies of this Order available on the Debtors' restructuring website at www.kccllc.net/rescap.  As soon as practicable after the Effective Date, the Plan Proponents shall make copies of the Confirmation Notice and Notice of Effective Date available on the Debtors' restructuring website at www.kccllc.net/rescap.

59.    **Notice of Administrative Claim Bar Date.**    The Plan Proponents or the
Liquidating Trust are directed to serve a notice of Administrative Claim Bar Date, substantially
in the form of Appendix 3 attached hereto an incorporated by reference (the "Administrative
Claim Bar Date Notice") upon (a) all parties listed in the creditor matrix maintained by KCC and
(b) such additional persons and entities as deemed appropriate by the Plan Proponents, no later
than five (5) Business Days after the Effective Date; provided, however, that with respect to (a)
above, those Entities whose Claims have been expunged from the Debtors' official claims
register as of the Confirmation Date, shall not be entitled to service of the Administrative Claim
Bar Date Notice and neither the Plan Proponents nor the Liquidating Trust shall be under any
obligation to serve such Entities with the Administrative Claim Bar Date Notice.  As soon as
practicable after the Effective Date, the Plan Proponents shall make copies of the Administrative
Claim Bar Date Notice available on the Debtors' restructuring website at www.kccllc.net/rescap.

60.    **Modification of the Plan.**    The Plan Proponents or the Liquidating Trust, as
applicable, are authorized to amend or modify the Plan in accordance with and subject to Article
XI of the Plan at any time prior to the substantial consummation of the Plan without further order
of the Court, or if requested by the Plan Proponents or the Liquidating Trust, pursuant to a
subsequent order of the Court.  In addition, without the need for a further order or authorization
of this Court, but subject to the express provisions of this Order and the Plan, the Plan
Proponents and the Liquidating Trust shall be authorized and empowered to make non-material
modifications to the documents filed with the Court, including the Plan Supplement, in their
reasonable business judgment as may be necessary.  At any time, at the request of the RMBS
Trustees, Art. IV.C.3 of the Plan may be amended as will be required to preserve the REMIC tax
status of the RMBS Trusts notwithstanding the distribution of Units to the RMBS Claims Trust

under the Plan to the RMBS Claims Trust on behalf of the RMBS Trusts, and such amendment

will be deemed non-material.

61.     **Dissolution of Creditors' Committee.**   On the Effective Date, the Creditors'

Committee shall dissolve; provided, however, that, following the Effective Date, the Creditors'

Committee shall continue in existence and have standing and a right to be heard for the following

limited purposes: (i) Claims and/or applications, and any relief related thereto, for compensation

by Professionals and requests for allowance of Administrative Claims for substantial

contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; (ii) any appeals to which

the Creditors' Committee is a party; (iii) any adversary proceedings or contested matters as of

the Effective Date to which the Creditors' Committee is a party; and (iv) responding to creditor

inquiries for one-hundred-twenty (120) days following the Effective Date.  Upon the dissolution

of the Creditors' Committee, the current and former members of the Creditors' Committee and

their respective officers, employees, counsel, advisors and agents, shall be released and

discharged of and from all further authority, duties, responsibilities and obligations related to and

arising from and in connection with the Chapter 11 Cases, and the retention or employment of

the Creditors' Committee's respective attorneys, accountants and other agents shall terminate,

except with respect to matters (i) through (iv) above.

62.     **Governing Law.**   Unless a rule of law or procedure is supplied by federal law

(including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated,

the laws of the State of New York, without giving effect to the principles of conflict of laws that

would require application of the law of another jurisdiction, shall govern the rights, obligations,

construction, and implementation of the Plan, and any agreements, securities, instruments, or

other documents executed or delivered in connection with the Plan (except as otherwise set forth

in those documents, in which case the governing law of such documents shall control); <u>provided,</u> <u>however,</u> that governance matters relating to the Debtors, the Liquidating Trust, the Borrower Claims Trust, the RMBS Claims Trust, or the Private Securities Claims Trust, as applicable, shall be governed by the laws of the State of organization or formation thereof.

      63.   **Miscellaneous Provisions.**

      (a)   Notwithstanding any other provision in the Plan or this Confirmation Order, to the extent Ally processes any employment tax refunds on behalf of the Debtors, Ally will remit such refunds that it receives that are attributable to the Debtors to the Debtors or the Liquidating Trust, as applicable.

      (b)   Except as otherwise provided in the Plan and this Order, following the Effective Date, notice of all subsequent pleadings in the Chapter 11 Cases shall be limited to counsel to the Debtors, counsel to the Liquidating Trust, the U.S. Trustee and any party known to be directly affected by the relief sought.

      (c)   On or before the Effective Date, the Plan Proponents may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Liquidating Trust, as applicable, and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

      (d)   Any document related to the Plan that refers to a plan of liquidation or chapter 11 plan of the Debtors other than the Plan confirmed by this Order shall be, and it hereby

is, deemed to be modified such that the reference to a plan of liquidation or chapter 11 plan of the Debtors in such document shall mean the Plan confirmed by this Order, as appropriate.

(e)    Without intending to modify any prior Order of this Court (or any agreement, instrument or document addressed by any prior Order), in the event of an inconsistency between the Plan, on the one hand, and any other agreement, instrument, or document intended to implement the provisions of the Plan, on the other, the provisions of the Plan shall govern (unless otherwise expressly provided for in the Plan or such agreement, instrument, or document).  In the event of any inconsistency between the Plan or any agreement, instrument, or document intended to implement the Plan, on the one hand, and this Order, on the other, the provisions of this Order shall govern.

(f)    In accordance with Article X.D. of the Plan, if the Effective Date does not occur on or before December 24, 2013, then upon motion by the Plan Proponents or Ally made before the Effective Date, this Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the Filing of such motion to vacate, this Order may not be vacated if the Effective Date occurs before the Bankruptcy Court enters an order granting such motion. If this Order is vacated, then, except as provided in any order of the Bankruptcy Court vacating this Order, the Plan, including the assumptions, assignments or rejections of Executory Contracts, will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall: (1) constitute a waiver or release of any Claims, Equity Interests or Causes of Action; (2) prejudice in any manner the rights of any Debtor or any other Entity; or (3) constitute an admission, acknowledgment, offer or undertaking of any sort by such Debtor or any other Entity.

(g)    Unless otherwise provided in the Plan or in this Order, all injunctions or

stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan and this Order shall remain in full force and effect in accordance with their terms, provided, however, that any and all relief from the automatic stay granted by the Court during these Chapter 11 Cases on an individual or omnibus basis by order, including, without limitation, pursuant to the *Final Supplemental Order Under Bankruptcy Code Sections 105(a), 362, 363, 502, 1107(a), and 1108 and Bankruptcy Rule 9019 (I) Authorizing the Debtors to Continue Implementing Loss Mitigation Programs; (II) Approving Procedures For Compromise and Settlement of Certain Claims, Litigations and Causes of Action; (III) Granting Limited Stay Relief to Permit Foreclosure and Eviction Proceedings, Borrower Bankruptcy Cases, and Title Disputes to Proceed; and (IV) Authorizing and Directing the Debtors to Pay Securitization Trustee Fees and Expenses* (ECF Doc. # 774), to the extent such relief remains applicable, shall not be subject to the injunction provisions of this Order or the Plan, and such orders shall remain in full force and effect in accordance with their terms.

(h)    Each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms and (b) integral to the Plan and may not be deleted or modified without the consent of the Plan Proponents.

64.    **Findings and Conclusions**. The determinations, findings, judgments, decrees, and orders set forth and incorporated into this Order constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding by

Bankruptcy Rule 9014.  Each finding of fact set forth or incorporated herein, to the extent it is or may be deemed a conclusion of law, shall also constitute a conclusion of law.  Each conclusion of law set forth or incorporated herein, to the extent it is or may be deemed a finding of fact, shall also constitute a finding of fact.  The terms of the Plan, the Plan Supplement, and the exhibits thereto are incorporated herein by reference to, and are an integral part of, this Order.  The terms of the Plan, the Plan Documents, all exhibits thereto, and all other relevant and necessary documents shall be effective and binding as of the Effective Date.

65.    **Headings**.  The headings contained within this Confirmation Order are used for the convenience of the parties and shall not alter or affect the meaning of the text of this Confirmation Order.

66.    **Retention of Jurisdiction**.  The business and assets of the Debtors shall remain subject to the jurisdiction of this Court until the Effective Date.  Notwithstanding the entry of this Order, from and after the Effective Date, the Court shall retain such jurisdiction over the Chapter 11 Cases as is legally permissible, including jurisdiction over those matters and issues described in Article XII of the Plan, including with respect to (i) insurance settlements and disputes involving insurance policies settled or otherwise addressed under or in connection with the Plan, and (ii) the Claims filed by WFBNA in these Chapter 11 Cases and any Claims or Causes of Action that may be asserted by WFBNA against any of the Ally Released Parties.

67.    **Order Effective Immediately**. Notwithstanding Bankruptcy Rules 3020(e) or 7062 or otherwise, the stay provided for under Bankruptcy Rule 3020(e) or any other applicable rule (e.g., Rules 6004(h) or 6006(d)) shall be waived and this Order shall be effective and enforceable immediately upon entry.  The Debtors are authorized to consummate the Plan and

the transactions contemplated thereby immediately after entry of this Order and upon, or

concurrently with, satisfaction of the conditions set forth in the Plan.


Dated: December 11, 2013
      New York, New York



*Martin Glenn*
_____

MARTIN GLENN
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

```
-----------------------------------------------------------x
                                          :
In re                                     :        Chapter 11
                                          :
WASHINGTON MUTUAL, INC., et al.,¹         :        Case No. 08-12229 (MFW)
                                          :
        Debtors.                          :        (Jointly Administered)
                                          :
                                          :
-----------------------------------------------------------x
```

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE SEVENTH AMENDED JOINT PLAN OF AFFILIATED DEBTORS PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

Washington Mutual, Inc. and WMI Investment Corp., as debtors and debtors in possession (collectively, the "Debtors"), having proposed and filed with the United States Bankruptcy Court for the District of Delaware (the "Court") the *Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code*, dated December 12, 2011 [D.I. 9178] (the "Filed Plan"), as has been and may be further modified, including, without limitation, pursuant to that certain (1) Modification of Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated January 9, 2012 [D.I. 9365] (the "First Plan Modification"), (2) Second Modification of Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated January 12, 2012 [D.I. 9400] (the "Second Plan Modification"), and (3) Third Modification of Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated February 16, 2012 [D.I. 9697] (the "Third Plan

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395). The Debtors' principal offices are located at 1201 Third Avenue, Suite 3000, Seattle, Washington 98101.

Modification" and, together with the First Plan Modification and the Second Plan Modification, the "Plan Modifications" and, collectively with the Filed Plan, the "Plan")[2]; and the Court having entered, pursuant to, *inter alia*, section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an order, dated January 13, 2012 [D.I. 9414] (the "Disclosure Statement Order"), approving the Disclosure Statement, establishing procedures for the solicitation, voting, and tabulation of votes on and elections with respect to the Plan, approving the forms of ballots, master ballots, and election forms used in connection therewith, and scheduling the Confirmation Hearing; and the Court having entered (i) an Opinion with respect to the Sixth Amended Plan [D.I. 6528] (the "January Opinion") and a related Order [D.I. 6529] (the "January Order"); and the Court having entered an Opinion with respect to the Modified Sixth Amended Plan [D.I. 8612] (the "September Opinion") and a related order [D.I. 8613] (the "September Order"); and the following documents having been filed by the Debtors in support of or in connection with confirmation of the Plan:

(a)    the *Notice of Election of Treatment of Priority Tax Claims*, dated February 13, 2012 [D.I. 9656];

(b)    the Plan Supplement;

(c)    the Cure Notice;

(d)    the Service Affidavits;

(e)    the Voting Certifications;

(f)    the Goulding Declaration;

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, the Disclosure Statement Order, or the Confirmation Brief (each as defined herein), as applicable. A composite copy of the Filed Plan and Plan Modifications is annexed hereto as Exhibit A.

(g) *Memorandum of Law in Support of Confirmation of the Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code*, dated February 13, 2012 [D.I. 9665] (the "Confirmation Brief"); and

(h) *Stipulation and Agreement Among the Debtors, the TPS Group, the TPS Consortium, the Equity Committee, and JP Morgan Chase Bank, N.A. With Respect to the Debtors' Seventh Amended Plan* [D.I. 9705] (the "TPS Stipulation");

and responses or statements in support of the Plan having been filed by the Creditors' Committee [D.I. 9666], the Equity Committee [D.I. 9657], JPMC [D.I. 9660], and Law Debenture Trust Company of New York [D.I. 9654]; and objections to confirmation having been interposed by certain parties, as reflected on the docket of the Chapter 11 Cases and/or on the record of the Confirmation Hearing; and each of the objections having been resolved, overruled, or withdrawn at, prior to, or subsequent to the Confirmation Hearing; and the Court having held the Confirmation Hearing commencing on February 16, 2012; and the appearances of all interested parties having been noted in the record of the Confirmation Hearing; and after full consideration of the record of the Chapter 11 Cases, including, without limitation, motions, applications and orders in the Chapter 11 Cases, the foregoing documents, and the evidence admitted and arguments of counsel made at the Confirmation Hearing; and after due deliberation and good and sufficient cause appearing therefor; the Court hereby FINDS, DETERMINES, AND CONCLUDES as follows:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A. Findings and Conclusions. The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the

following conclusions of law constitute findings of fact, they are adopted as such. Any headings or sub-headings used herein are for reference purposes only and shall not affect in any way the meaning or interpretation of this Order and the Plan.

        B.     <u>Jurisdiction</u>. This Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. § 1334. Confirmation of the Plan and approval of the Global Settlement Agreement are core proceedings pursuant to 28 U.S.C. § 157(b) and this Court has jurisdiction to enter a final order with respect thereto. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

        C.     <u>Judicial Notice</u>. The Court takes judicial notice of the dockets of the Chapter 11 Cases, the appellate court dockets of any and all appeals filed from any orders entered or opinions issued by the Court in the Chapter 11 Cases, and the following litigations and adversary proceedings: <u>JPMorgan Chase Bank, N.A. v. Washington Mutual, Inc., et al.,</u> Adversary Pro. No. 09-50551 (MFW) (the "<u>JPMC Action</u>"); <u>Washington Mutual, Inc., et al. v. JPMorgan Chase Bank, N.A.,</u> Adversary Pro. No. 09-50934 (MFW) (the "<u>Turnover Action</u>"); <u>Official Committee of Equity Security Holders v. Washington Mutual, Inc.,</u> Adversary Pro. No. 10-50731 (MFW) (the "<u>Equity Committee Adversary Proceeding</u>"); <u>Willingham, et al v. Washington Mutual, Inc., et al.,</u> Adv. Pro. No. 10-51297 (MFW) (the "<u>Equity Committee Action to Compel</u>"); <u>Broadbill Investment Corp., et al. v. Washington Mutual, Inc.,</u> Adversary Pro. No. 10-50911 (MFW) (the "<u>Dime Warrant Litigation</u>") and <u>Black Horse Capital Master Fund Ltd., et al. v. Washington Mutual, Inc., et al.,</u> Adv. Pro. No. 10-51387 (MFW) (the "<u>TPS Action</u>"), each of which is maintained by the Clerk of the Court, including all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at the

hearings held before the Court during the pendency of the Chapter 11 Cases and such adversary proceedings.

      D.    <u>Burden of Proof</u>. The Debtors have the burden of proving the elements of section 1129 of the Bankruptcy Code and Rule 9019 of the Bankruptcy Rules by a preponderance of the evidence. With respect to each Debtor and each element of section 1129 of the Bankruptcy Code and Bankruptcy Rule 9019, the Debtors have met their burden.

**The Chapter 11 Cases**

      E.    <u>Chapter 11 Petitions</u>. On September 26, 2008, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with this Court. [D.I. 1, 6] The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. In accordance with this Court's Order, dated October 3, 2008 [D.I. 25], the Debtors' cases are being jointly administered pursuant to Bankruptcy Rule 1015(b). Conf DX 569 – Goulding Decl. ¶ 7.

      F.    <u>Statutory Committees</u>. On October 15, 2008, the United States Trustee for the District of Delaware (the "<u>U.S. Trustee</u>") appointed the Creditors' Committee [D.I. 78]. On January 11, 2010, the U.S. Trustee appointed the Equity Committee [D.I. 2130]. Membership on each of the Creditors' Committee and the Equity Committee have been modified or reconstituted from time to time. No trustee has been appointed in the Chapter 11 Cases.

      G.    By order, dated September 13, 2010 [D.I. 5416], the Bankruptcy Court approved that certain *Stipulation Authorizing the Official Committee of Unsecured Creditors to Bring Certain Causes of Action on Behalf of Debtors' Estate* [D.I. 5410] (the "<u>UCC Stipulation</u>"). Pursuant to the UCC Stipulation, during the Debtors' Chapter 11 Cases, the Creditors' Committee was vested with the right to make demands in connection with, commence, litigate, settle or otherwise abandon certain "Assigned Avoidance Actions" (as

defined in the UCC Stipulation), including "causes of action related by a factual or transaction nexus to" the Transfers (as defined in the UCC Stipulation). The "Assigned Avoidance Actions" include, without limitation, (i) avoidance actions under chapter 5 of the Bankruptcy Code and other applicable law, and (ii) causes of action (whether for breach of fiduciary duty, corporate waste or otherwise) against current and former officers and directors of WMI and its subsidiaries relating to transfers from WMI to affiliates (including WMB) before the Petition Date. During the pendency of the Chapter 11 Cases, pursuant to the UCC Stipulation, the Creditors' Committee asserted claims and made demands with respect to the Assigned Avoidance Actions. Pursuant to the Plan, any and all Assigned Avoidance Actions not settled or resolved under the Plan are vested in the Liquidating Trust for prosecution by the Liquidating Trustee.

H. Sixth Amended Plan. On October 6, 2010, the Debtors filed the Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated October 6, 2010 [D.I. 5548] (as subsequently modified, the "Sixth Amended Plan"). Conf DX 2 – Sixth Amended Plan; Conf DX 569 – Goulding Decl. ¶ 12. The Sixth Amended Plan was premised on the implementation of that certain Amended and Restated Settlement Agreement, dated as of October 6, 2010, by and among the Debtors, JPMC, the FDIC, the Creditors' Committee, and certain creditor constituencies resolving certain claims and causes of action among such parties (the "Initial Global Settlement Agreement"). Conf DX 2H – Initial Global Settlement Agreement; Conf DX 569 – Goulding Decl. ¶ 12.

I. December Confirmation Hearing. This Court held a hearing to consider confirmation of the Sixth Amended Plan on December 2, 3, 6 and 7, 2010 (the "December Confirmation Hearing"). Upon the conclusion of the December Confirmation Hearing, on January 7, 2011, this Court issued the January Opinion and January Order, which, among other

things, found that (i) the Initial Global Settlement Agreement, the integral foundation of the

Sixth Amended Plan, and the transactions completed therein, are fair, reasonable, and in the best

interests of the Debtors' creditors and the Debtors' chapter 11 estates, Conf DX 265 – January

Opinion at 2, 60, and (ii) certain modifications to the Sixth Amended Plan, if made, would

enable the Sixth Amended Plan to be confirmed. Id. at 2. In conjunction with its determination

that the Initial Global Settlement should be approved, this Court concluded that (i) the Debtors

are not likely to achieve a significantly better result if they were to continue to litigate the claims

resolved pursuant to the Initial Global Settlement Agreement, (ii) there are difficulties inherent in

collecting on account of the Debtors' potential claims against JPMC and the FDIC Receiver,

(iii) the claims resolved pursuant to the Initial Global Settlement Agreement are complex and

would be expensive and would cause delay to litigate, and (iv) the Initial Global Settlement

Agreement provides a reasonable return in light of the possible results of the litigation resolved

by such agreement. Id. at 56-60. This Court specifically noted that, "[a]lthough equity interest

holders are not likely to get a recovery, the Court is not convinced that continued litigation,

against JPMC and/or the FDIC would change that result." Id. at 66-67.

      J.     On January 7, 2011, this Court entered an opinion concerning the TPS

Action wherein this Court granted the defendants' motions for summary judgment and found,

among other things, that the Conditional Exchange was automatic and occurred on

September 26, 2008 [Adv. Proc. 10-51387, D.I. 179] (the "TPS Summary Judgment Opinion").

Conf DX 267 – TPS Summary Judgment Opinion. Thus, this Court determined that the prior

holders of the Trust Preferred Securities now hold Depositary Shares (as defined in the TPS

Summary Judgment Opinion) representing REIT Series, which comprise certain related series of

WMI Preferred Shares (as defined in the TPS Summary Judgment Opinion). Id. at 13.

K.  Appeals from the January Opinion and TPS Summary Judgment Opinion.

On January 19, 2011, the Equity Committee filed a notice of appeal of that portion of the January

Opinion finding that the Initial Global Settlement Agreement satisfies the requisite standards for

approval [D.I. 6575]. This action, styled as Official Committee of Equity Security Holders v.

Washington Mutual, Inc., et al., Civil Action No. 11-158 (the "January Equity Committee

Appeal"), is pending in the United States District Court for the District of Delaware (the

"Delaware District Court") as of the date hereof, as, by order, dated February 8, 2011 [D.I.

6703], the Court denied the Equity Committee's motion for a direct appeal to the United States

Court of Appeals for the Third Circuit.

L.  On January 14, 2011, certain of the plaintiffs in the TPS Action filed a

notice of appeal of the TPS Summary Judgment Opinion to the Delaware District Court [Adv.

Proc. 10-51387, D.I. 182] (the "TPS Appeal"). As of the date hereof, the TPS Appeal is pending

in the Delaware District Court as Case No. 1:11-cv-00124-GMS. The parties have completed

briefing, and the plaintiffs in the TPS Action have requested oral argument [TPS Appeal, D.I.

42]. The Delaware District Court has not yet ruled on this request. On January 15, 2012, the

plaintiffs in the TPS Action filed with the Delaware District Court an emergency motion for a

stay of the hearing on confirmation of the Plan [TPS Appeal, D.I. 44] and a motion for writ of

mandamus [TPS Appeal, D.I. 46], as well as an emergency motion to expedite the hearings on

such motions. The Delaware District Court denied all three motions by order, dated January 19,

2012 [TPS Appeal, D.I. 52]. On January 30, 2012, the plaintiffs in the TPS Action filed a notice

of appeal from such order [TPS Appeal, D.I. 55], as well as a request for certification of a direct

appeal to the United States Circuit Court for the Third Circuit (the "Third Circuit") [TPS Appeal,

D.I. 55]. Notwithstanding the fact that the Delaware District Court did not grant the motion for

direct certification, the plaintiffs in the TPS Action then filed motions in the Third Circuit seeking to stay the Confirmation Hearing, for a writ of mandamus, and for expedited review of such requests. By order, dated February 10, 2012, the Third Circuit denied such requests.

M.    Global Settlement Agreement. On February 7, 2011, WMI, WMI Investment Corp., JPMC, the FDIC Receiver, FDIC Corporate, and the Creditors' Committee, all of whom were parties to the Initial Global Settlement Agreement, entered into the Second Amended and Restated Settlement Agreement (as amended, the "Global Settlement Agreement"). Conf DX 255H, 402, 422 – Global Settlement Agreement (as amended). The Global Settlement Agreement incorporates the terms of and mirrors the Initial Global Settlement Agreement, except that it excludes certain creditors who previously were parties to the Initial Global Settlement Agreement and certain non-economic provisions were amended to conform to certain plan-related modifications and in accordance with the January Opinion. See id.

N.    Modified Sixth Amended Plan. On February 8, 2011, the Debtors filed the Modified Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated February 7, 2011 [D.I. 6696] (as subsequently modified, the "Modified Sixth Amended Plan"), as well as a corresponding disclosure statement [D.I. 7081] (the "Supplemental Disclosure Statement"). Conf DX 255 – Modified Sixth Amended Plan; Conf DX 253 – Supplemental Disclosure Statement. Similar to the Sixth Amended Plan, the Modified Sixth Amended Plan was premised on the Global Settlement Agreement. Conf DX 374 – Goulding Decl. Supporting Modified Sixth Plan ¶ 19. In addition, the Modified Sixth Amended Plan incorporated modifications consistent with the January Opinion. Id. Like the Sixth Amended Plan, the Modified Sixth Amended Plan provided for the Debtors' reorganization, with WMMRC remaining as Reorganized WMI's sole operating entity. Id. ¶ 27.

WMMRC is a captive reinsurance company that entered into mortgage reinsurance agreements
based on mortgage insurance policies on mortgage loans issued by WMB and other affiliates of
the Debtors. Id.; Conf DX 442 – September Opinion at 43. Since the seizure of WMB,
WMMRC has operated on a runoff basis in that it has not issued any new policies and is simply
collecting premiums and paying claims on the existing policies. Id.

      O.    The July Confirmation Hearing and the Equity Committee's Standing
Motion. Commencing on July 13, 2011 and concluding on July 21, 2011, this Court held a
hearing to consider, among other things, confirmation of the Modified Sixth Amended Plan (the
"July Confirmation Hearing"). On July 12, 2011, on the eve of the July Confirmation Hearing,
the Equity Committee filed, under seal, a motion seeking authority to prosecute, on the Debtors'
behalf, an action to equitably disallow or, in the alternative, to equitably subordinate certain
Claims [D.I. 8179] (the "Standing Motion"). At the July Confirmation Hearing, counsel for the
Equity Committee requested that the Court take into account the evidence adduced at the July
Confirmation Hearing in connection with deciding the Standing Motion. During closing
arguments at the July Confirmation Hearing, several parties presented argument on the Standing
Motion. In addition, on August 10, 2011, the Debtors, the Creditors' Committee, and certain
other parties filed objections to the Standing Motion.

      P.    September Opinion and Order. On September 13, 2011, this Court issued
the September Opinion and entered the September Order that, among other things (i) found that
this Court has jurisdiction to approve the Global Settlement Agreement [September Opinion at
16, 22-23]; (ii) reaffirmed its conclusion that the settlements underlying the Initial Global
Settlement Agreement, which were at that time embodied in the Global Settlement Agreement,
and all the transactions contemplated therein are fair and reasonable [id. at 26, 35, 101];

(iii) ordered that this Court's ruling with respect to the Global Settlement Agreement constitutes the "law of the case" [id. at 27]; (iv) overruled objections that the Modified Sixth Amended Plan was not proposed in good faith [id. at 73]; and (v) denied confirmation of the Modified Sixth Amended Plan, but identified certain modifications that, if incorporated, would permit confirmation thereof. The September Opinion also granted the Standing Motion with respect to certain equitable disallowance claims, but stayed all proceedings related to the Standing Motion and directed certain parties to participate in mediation (the "Mediation") to explore a possible settlement of the Standing Motion and any issues that remained an impediment to confirmation of a plan of reorganization. Id. at 138.

   Q. Valuation. Pursuant to the September Opinion, and on the basis of the evidence presented at the July Confirmation Hearing, this Court determined that "the value of the existing business of WMMRC (assuming no new business is generated or acquisitions are made) is . . . $140 million." Conf DX 442 – September Opinion at 45. In addition, this Court determined that Reorganized WMI's total enterprise value is $210 million, taking into account the value of net operating losses ("NOLs") potentially available to Reorganized WMI, including both "the value of the NOLs to the existing WMMRC business" (which the Court determined had a value of $20 million) and the value of "the NOLs that might be able to be used in the event of a future acquisition of a profitable business" (which this Court determined had a value of $50 million). Conf DX 442 – September Opinion at 47, 62. This Court's finding as to the value of the NOLs that might be able to be used in the event of a future acquisition of a profitable business was "based on the Court's conclusion that the Reorganized Debtor should be able to raise additional capital and debt over the next twenty years equal to twice the value of its current

assets which will be invested in restarting the reinsurance business of WMMRC or acquiring other related businesses." Conf DX 442 – September Opinion at 62.

R.      Appeals from the September Opinion and September Order. Several parties filed notices of appeal (the "September Appeals") from the September Opinion and September Order: (i) AAOC,[3] with (a) Aurelius [D.I. 8670] filing individually and (b) Appaloosa, Owl Creek and Centerbridge filing jointly [D.I. 8673]; (ii) the Creditors' Committee [D.I. 8726]; (iii) the Debtors [D.I. 8785]; (iv) the Equity Committee, which filed a conditional notice of cross-appeal [D.I. 8791]; (v) the WMB Noteholders [D.I. 8679]; (vi) Normandy Hill Capital L.P. ("Normandy Hill") [D.I. 8671]; and (vii) Wells Fargo [D.I. 8771] (collectively, the "September Appellants").

S.      Mediation. By order, dated October 10, 2011 [D.I. 8780], this Court appointed the Honorable Raymond Lyons, United States Bankruptcy Judge, as mediator (the "Mediator"), and directed the following parties to participate in the Mediation: (i) the Debtors, (ii) the Creditors' Committee, (iii) the Equity Committee, (iv) Aurelius, (v) Appaloosa, (vi) Centerbridge, (vii) Owl Creek, (viii) the TPS Consortium and the TPS Group, (ix) the WMB Noteholders, (x) Normandy Hill, (xi) The Bank of New York Mellon Trust Company, N.A., ("BNY Mellon"), in its capacity as Indenture Trustee for the Senior Notes, and (xii) the WMI Noteholders Group (as such term is used in the September Opinion) (collectively, the "Mediation

---

[3] "AAOC" means each of (a) Appaloosa Management L.P., Appaloosa Investment L.P.I, Palomino Fund Ltd., Thoroughbred Fund, L.P., and Thoroughbred Master Ltd. (collectively, "Appaloosa"), (b) Aurelius Capital Management, LP, Aurelius Capital Partners, LP and Aurelius Investment, LLC (collectively, "Aurelius"), (c) Owl Creek Asset Management, L.P., Owl Creek I, L.P., Owl Creek II, L.P., Owl Creek Overseas Fund, Ltd., Owl Creek Socially Responsible Investment Fund, Ltd., Owl Creek Asia I, L.P., Owl Creek Asia II, L.P., and Owl Creek Asia Master Fund, Ltd. (collectively, "Owl Creek"), and (d) Centerbridge Partners, L.P., Centerbridge Special Credit Partners, L.P., Centerbridge Credit Partners, L.P., and Centerbridge Credit Partners Master, L.P. (collectively, "Centerbridge") and any other Affiliates of the funds listed in (a) through (d) above that own or, during the Chapter 11 Cases, owned securities issued by and/or have direct or indirect Claims against WMI.

Parties"); provided, however, that Normandy Hill and BNY Mellon were not required to attend the Mediation.

       T.     The Mediation commenced on October 19, 2011. At status conferences held on November 7, 2011, and on December 8, 2011, this Court granted the Mediator's request for additional time to continue the Mediation. As a result of the Mediation, discussions among the Debtors, the Creditors' Committee, the Equity Committee, Aurelius, Appaloosa, Owl Creek, Centerbridge, and other Creditor constituencies culminated in certain modifications to the Modified Sixth Amended Plan, which are embodied in the Plan and which resolve, among other things, certain plan-related issues and objections, as well as the Standing Motion.

       U.     The Plan. The Debtors filed the Plan and Disclosure Statement on December 12, 2011. Like the Modified Sixth Amended Plan, the Plan is premised upon and incorporates the terms of the Global Settlement Agreement, which, as discussed above, this Court has already determined, pursuant to both the January Opinion and the September Opinion, to be fair, reasonable and in the best interests of the Debtors' estates. Conf DX 265 – January Opinion at 60; Conf DX 442 – September Opinion at 26, 35, 101. In addition, as was the case pursuant to the Modified Sixth Amended Plan, pursuant to the Plan, WMI will reorganize around its sole remaining active subsidiary, WMMRC, a mortgage reinsurance company currently operating on a runoff basis. Conf DX 569 - Goulding Decl. ¶ 54. However, the Plan incorporates modifications thereto made after the Mediation to resolve the Standing Motion and certain plan-related issues and objections, as well as additional modifications that the Court determined, pursuant to the September Opinion, were required for the Modified Sixth Amended Plan to satisfy the confirmation requirements set forth in the Bankruptcy Code. Conf DX 569 - Goulding Decl. ¶¶ 15, 19.

V.    The Plan and Related Documents Are Consistent With the September Opinion. Consistent with the September Opinion, (i) the Plan provides that Postpetition Interest Claims are (a) calculated using the federal judgment rate determined as of the Petition Date (1.95%), and (b) compounded annually; (ii) the form of Liquidating Trust Agreement filed with the Plan Supplement provides that the Liquidating Trustee may be removed by a majority vote of the members of the Trust Advisory Board; (iii) the provisions of the Plan and Liquidating Trust Agreement ensure that the Trust Advisory Board will adequately represent the constituencies of the Liquidating Trust at any given time[4]; (iv) the Plan provides that "[t]he individual(s) serving as or comprising the Liquidating Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, the payment of which shall be subject to the approval of the court" (emphasis added); and (v) the Plan provides that fees paid pursuant to Section 41.18 of the Plan must be approved by the Court. See Conf DX 442 - September Opinion at 24-25, 77-78, 89-90; Conf DX 432A - Plan §§ 1.231; 1.169; 27.12; 41.18; Conf DX 434 – Liquidating Trust Agreement §§ 4.1, 6.4, 7.7, 8.2. Accordingly the Plan incorporates modifications resolving each of the areas of concern raised by the Court in the September Opinion.

W.    The Compromise and Settlement Embodied in the Plan is Fair, Reasonable and in the Best Interests of the Debtors' Estates. The Plan is the result of extensive arms' length negotiations among the Debtors, the Creditors' Committee, the Equity Committee, and

---

[4] Specifically, the Trust Advisory Board will have an oversight function with respect to the Liquidating Trust and, initially, shall be comprised of ten (10) members, four (4) members solely selected by the Creditors' Committee, four (4) members selected solely by the Equity Committee, one (1) member selected by the Creditors' Committee and approved by the Equity Committee, which approval shall not be unreasonably withheld, and one (1) member selected by HoldCo Advisors, LLC serving in a non-voting ex officio capacity,. Conf DX 432A – Plan § 1.231. The composition of the Trust Advisory Board may change only in accordance with the provisions of the Liquidating Trust Agreement. Id.

significant Creditor constituencies, Conf DX 569 - Goulding Decl. ¶ 33, and, among other things, resolves the Standing Motion and has the full support of the Equity Committee. Conf DX 432 - Disclosure Statement at 10. Pursuant to the Plan, all of the September Appeals will be deemed withdrawn, with prejudice, and the Equity Committee will cause the withdrawal and dismissal, with prejudice, of the January Equity Committee Appeal, the Equity Committee Adversary Proceeding, and Equity Committee Action to Compel. Id.; Conf DX 432A - Plan §§ 33.1; 41.17.

      X.    Any attempt to confirm a chapter 11 plan without the compromises and settlements embodied in the Plan would have invited significant confirmation objections by the Equity Committee, among others, including with respect to issues related to the Standing Motion and the effect that such disputes would have with respect to distributions pursuant to any such plan. Conf DX 432 - Disclosure Statement at 10. Without addressing the merits, it is beyond doubt that such issues were likely to lead to further contested confirmation hearings, significant delays in confirmation of a plan, and erosion of Creditor distributions. Id.; see also Hr'g Tr. 10/6/11 83:19–23.

      Y.    The detrimental effects of further delay in confirmation and consummation of a plan in the Chapter 11 Cases cannot be underestimated. Conf DX 432 - Disclosure Statement at 10. As delay in consummation of a plan would have been accompanied by a continued accrual of interest and fees in significant amounts and the attendant depletion of estate assets and increase in total Claims, further delay would have significantly eroded recoveries for the Debtors' junior-most Creditors and stakeholders. Id. Unlike the Modified Sixth Amended Plan, the Plan resolves many of the objections and issues that have been or could be raised, regardless of the merits. Id. Furthermore, as a result of the compromises and

settlements, Reorganized WMI will receive the Senior Notes Release Consideration and the

Senior Subordinated Notes Release Consideration in the aggregate amount of $75 million, access

to the Credit Facility to be provided by certain members of AAOC, and, to the extent available,

Runoff Proceeds having a face value of $10 million, subject to the priority scheme set forth in

the documents governing the Runoff Notes, as well as certain potential Litigation Proceeds. Id.;

see also Notice of Lenders Under the Credit Facility [D.I. 9671]. Thus, it was a reasonable

exercise of business judgment for the Debtors to conclude that the Plan was more likely to result

in an expeditious exit from bankruptcy and prevent further deterioration of Creditors' recoveries

than any alternative plan. Conf DX 432 - Disclosure Statement at 10. The Court finds that the

compromises and settlements embodied in the Plan are fair, reasonable, in the best interests of

the Debtors' estates and above the lowest level of the range of reasonableness.

**The Solicitation Process**

      Z.    Adequacy of Disclosure Statement. Pursuant to the Disclosure Statement

Order, entered on January 13, 2012, this Court approved the Disclosure Statement and found,

among other things, that the Disclosure Statement contained "adequate information" within the

meaning of section 1125 of the Bankruptcy Code and authorized the Debtors to solicit

acceptances and rejections of the Plan, as well as certain elections with respect thereto. Conf DX

432B – Disclosure Statement Order. Prior to the transmission of the Disclosure Statement, the

Debtors did not solicit acceptances of the Plan by any holder of Claims or Equity Interests. See

Conf DX 569 – Goulding Decl. ¶ 30.

      AA.    Solicitation and Notice. As described in the Voting Certifications, the

(i) Disclosure Statement Order, (ii) Confirmation Hearing Notice, (iii) Disclosure Statement

(which includes as an exhibit a copy of the Plan), (iv) Ballots, (v) Election Forms, and

(vi) Notices of Non-Voting Status (collectively, the "Solicitation Packages") were served in

compliance with the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules, and the

Disclosure Statement Order. <u>See</u> Conf DX 570 – Klamser Decl. ¶ 11-22; Conf DX 571 – Sharp

Decl. ¶¶ 11-21; Conf DX 18 – Klamser Decl. for the Sixth Amended Plan ¶ 3; Conf DX 19 –

Sharp Decl. for the Sixth Amended Plan ¶ 3.

       BB.    On January 25, 2012, the Debtors caused the posting with the Depository

Trust Company of a communication to holders of PIERS Claims in Class 16 from Whitebox

Advisors, LLC, who had issued an earlier communication to holders of PIERS Claims in Class

16, which earlier communication was included in the Solicitation Packages pursuant to the

Procedures Order. Conf DX 571 – Sharp Decl. ¶ 19. The second communication of Whitebox

Advisors, LLC was served on Class 16 and posted at www.kccllc.net/wamu. <u>Id.</u>; Class 16 Letter

Service Affidavit.

       CC.    The (a) service of the Solicitation Packages, (b) publication of the

Confirmation Hearing Notice, and (c) notice of the Ballot Date: (i) were adequate and sufficient

under the circumstances of these Chapter 11 Cases; (ii) provided adequate and sufficient notice

of the Ballot Date, the deadline for objecting to confirmation of the Plan, the method of voting,

and the date, time, and location of the Confirmation Hearing; (iii) provided holders of Claims

and Equity Interests with a reasonable period of time to make an informed decision to accept or

reject the Plan and to make certain elections provided thereunder; (iv) were in compliance with

the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the Disclosure

Statement Order, and any other applicable orders and rulings of the Court; and (v) provided due

process to all parties in interest in these Chapter 11 Cases. <u>See</u> Service Affidavits; Conf DX 570

– Klamser Decl. ¶¶ 11-22; Conf DX 571 – Sharp Decl ¶¶ 11-21; Conf DX 18 – Klamser Decl.

for the Sixth Amended Plan ¶ 3; Conf DX 19 – Sharp Decl. for the Sixth Amended Plan ¶ 3.

DD.    With respect to holders of Equity Interests, efforts to ensure that

(a) service of the Solicitation Packages, (b) publication of the Confirmation Hearing Notice, and

(c) notice of the Ballot Date to such holders gave such holders a reasonable period of time to

make an informed decision to accept or reject the Plan and to make certain elections provided

thereunder went above and beyond what was required.  For example, the Disclosure Statement

Order, as modified on the record of the Confirmation Hearing, provides that holders of Preferred

Equity Interests and Common Equity Interests have until March 7, 2012 to submit elections with

respect to the releases set forth in Section 41.6 of the Plan, notwithstanding that the Ballot Date

was February 9, 2012 for all holders of Claims and Equity Interests other than holders of Dime

Warrants, for whom the Ballot Date is February 29, 2012.  Conf DX 431 – Disclosure Statement

Order ¶¶ 46-47.  In addition, on January 13, 2012, the Equity Committee issued a press release

recommending that all foreign Equity Interest holders immediately contact their Voting

Nominees to request that the Voting Nominee immediately contact KCC to request electronic

receipt of the Solicitation Packages and instructions on how to properly process responses.  See

Conf DX 540 - Equity Committee Press Release to Foreign Shareholders, dated January 13, 2012

(the "Foreign Shareholders Press Release").  The Foreign Shareholders Press Release further

(1) provided that all ballots must be returned to the applicable Voting Nominee, not KCC, (2)

provided notice of the Ballot Date, (3) provided notice of the February 28, 2012 deadline for

submission of elections with respect to the releases set forth in Section 41.6 of the Plan for

holders of Preferred Equity Interests and Common Equity Interests (which deadline was

subsequently extended, by the Debtors on the record of the Confirmation Hearing, to March 7,

2012), and (4) encouraged holders to avoid delay in returning Ballots.  Id.  The Debtors' efforts

in this regard were largely successful, as 96.46% (by dollar amount) of holders of Senior Note

Claims, 99.71% (by dollar amount) of holders of Senior Subordinated Notes Claims, 97.22% (by dollar amount) of holders of PIERS, 87.26% (by dollar amount of liquidation preference) of holders of Preferred Equity Interests, and 63.70% (by number of shares) of holders of Common Equity Interests voted on the Plan.

       EE.    No other or further notice with respect to the Plan or the Confirmation Hearing is required. Based upon the foregoing, the Debtors, the Creditors' Committee, the Equity Committee, and each of their respective successors, predecessors, control persons, members, officers, directors, employees, agents, attorneys, financial advisors, investment bankers, accountants, and other retained professionals, and any and all affiliates, members, managers, shareholders, partners, employees, attorneys, and advisors of the foregoing (i) have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code in compliance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, the Local Bankruptcy Rules, and any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with all their respective activities relating to the solicitation of acceptances to the Plan or elections thereunder and their participation in the activities described in section 1125 of the Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of securities under the Plan and, therefore, are not, and on account of such offer, issuance and solicitation will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or elections thereunder or the offer and issuance of the securities under the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such

parties are listed therein, the exculpation provisions set forth in Section 41.8 of the Plan. Conf.

DX 432A - Plan § 41.8.

        FF.      <u>Voting</u>. As evidenced by the Voting Certifications, votes to accept or

reject the Plan were solicited and tabulated fairly, in good faith, and in a manner consistent with

the order approving the disclosure statement for the Sixth Amended Plan (the "<u>Prior Disclosure</u>

<u>Statement Order</u>"), the Disclosure Statement Order, the Bankruptcy Code, the Bankruptcy Rules,

and the Local Bankruptcy Rules. <u>See</u> Conf DX 570 – Klamser Decl. ¶¶ 3, 11-24; Conf DX 571

– Sharp Decl. ¶¶ 3, 9, 11-24; Conf DX 18 – Klamser Decl. for the Sixth Amended Plan ¶ 3; Conf

DX 19 – Sharp Decl. for the Sixth Amended Plan ¶ 3.

        GG.     <u>Plan Elections</u>. As set forth in the Voting Certifications, elections made

by holders of Claims and Equity Interests pursuant to the Plan were and continue to be solicited,

tabulated, and implemented fairly, in good faith, and in a manner consistent with the Plan, the

Prior Disclosure Statement Order, the Disclosure Statement Order, the Bankruptcy Code, the

Bankruptcy Rules, and the Local Rules. <u>See</u> Conf DX 570 – Klamser Decl. ¶ 11-24, 31-33; Conf

DX 571 – Sharp Decl ¶ 11-24, 31-35; Conf DX 18 – Klamser Decl. for the Sixth Amended Plan

¶ 36; Conf DX 19 – Sharp Decl. for the Sixth Amended Plan ¶ 36.

        HH.     <u>Plan Supplement</u>. All materials contained in the Plan Supplement comply

with the terms of the Plan, and the filing, notice, and service of such documents were done in

accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other

or further notice is or shall be required. <u>See</u> Service Affidavits; Conf DX 434 – Plan

Supplement.

**Compliance with the Requirements of Section 1129 of the Bankruptcy Code**

        II.     <u>Plan Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(1))</u>. As

required by Bankruptcy Rule 3016, the Plan is dated and identifies the Debtors as proponents.

Conf DX 432A – Plan at 1, 108. In addition, the Plan contains provisions consistent with the

requirements of sections 1122 and 1123 of the Bankruptcy Code:

(1)     Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).  With the

exception of Administrative Expense Claims and Priority Tax Claims, which need not be

classified, Article IV of the Plan classifies twenty-three (23) Classes of Claims and Equity

Interests.  Conf DX 432A – Plan Art. IV.  The Claims or Equity Interests in each Class are

substantially similar to the other Claims or Equity Interests, as the case may be, in each such

Class.  Conf DX 569 – Goulding Decl. ¶ 29.  All the Preferred Equity Interests in Class 19 are

substantially similar notwithstanding differences in the liquidation preferences on a per share

basis between various of the series of Preferred Equity Interests because, among other things, (i)

each series of the Preferred Equity Interests is a separately designated series of a single class of

WMI preferred stock, and (ii) each of the series of Preferred Equity Interests ranks on parity with

each of the others in terms of those aspects of such interests affecting their legal status in relation

to the Debtors' assets, namely, their equal standing with respect to priority of payment in the

event of a liquidation.  See *Order Denying Motion of the Consortium of Trust Preferred Security*

*Holders to Determine Propriety of Proposed Classification of Interests Subject to Treatment*

*Under Class of the Plan of Liquidation*, dated January 11, 2012 [D.I. 9398]; Hr'g Tr. 1/11/2012

at 94:3-11 (denying motion for reclassification filed by certain Trust Preferred Securities holders

on the basis that such holders have "the exact same [rights] as the other[] [holders of Preferred

Equity Interests," but stating that "the liquidation preference has to be accounted for, used as the

calculation for determining the votes in that class").

(2)     To the extent that Unsecured Claims or Equity Interests of equal

priority are placed in different Classes pursuant to the Plan, valid business, factual, and/or legal

reasons exist for such separate classification, and such classification does not unfairly

discriminate between holders of Claims and Equity Interests. Conf DX 569 – Goulding Decl.

¶ 29. Specifically, with respect to the separate classification of Unsecured Claims of equal

priority:

(i)     The Claims in each of Classes 2, 3 and 16 relate to notes issued by WMI, but such notes arose from different debentures, each with slightly different legal rights, including, among other things, inter-creditor contractual subordination provisions.

(ii)    The Claims in Classes 4 through 11 are for liabilities related to certain assets transferred to JPMC pursuant to the P&A Agreement, or to be transferred to JPMC pursuant to the Global Settlement Agreement and, accordingly, JPMC has agreed to satisfy such Claims.

(iii)   The Claims in Classes 14 and 15 relate to guarantees issued by WMI of funded indebtedness of WMB and are governed by slightly different underlying documentation (both as compared to other Unsecured Claims as well as compared to one another).

(iv)    The Claims in Classes 17A and 17B relate to funded indebtedness of WMB, with respect to which such holders asserted related Claims against WMI. The Claims in Class 17A are contractually senior to the Claims in Class 17B, and the Claims in Class 17B represent only derivative, and not direct, Claims against the Debtors.

See Conf DX 569 – Goulding Decl. ¶ 29. With respect to the separate classification of Equity

Interests of equal priority:

(i) Although the Dime Warrants and Common Equity Interests in Classes 21 and 22, respectively, represent common stock interests, the Dime Warrants arise from a different, unrelated issuance of securities. Moreover, unlike holders of Common Equity Interests, voting by and distributions to Dime Warrants holders are governed by the LTW Stipulation. Pursuant to the LTW Stipulation, unlike holders of Common Equity Interests, holders of Dime Warrants will receive certain distributions as holders of Allowed General Unsecured Claims and Allowed Subordinated Claims in addition to certain distributions as holders of Allowed Equity Interests.

See id.; Conf DX 567 - LTW Settlement Approval Order. In addition to the above justifications, such separate classification does not unfairly discriminate between holders of similar Claims and Equity Interests. See Conf DX 569 – Goulding Decl. ¶ 29. Moreover, the definition and classification of Convenience Claims in Class 13 is reasonable and necessary for administrative convenience. Id.

(3) Unimpaired Classes Specified (11 U.S.C. § 1123(a)(2)). Class 1 (Priority Non-Tax Claims), Class 4 (WMI Medical Plan Claims), and Class 7 (Qualified Plan Claims) (collectively, the "Unimpaired Classes") are unimpaired under the Plan within the meaning of section 1124 of the Bankruptcy Code, thereby satisfying section 1123(a)(2) of the Bankruptcy Code. Conf DX 432A – Plan § 31.1; Conf DX 569 – Goulding Decl. ¶ 29.

(4) Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)). Articles VI, VII, IX, X, and XII through XXVI and Section 30.1 of the Plan designate Class 2 (Senior Notes Claims), Class 3 (Senior Subordinated Notes Claims), Class 5 (JPMC Rabbi Trust/Policy Claims), Class 6 (Other Benefit Plan Claims), Class 8 (WMB Vendor Claims), Class 9 (Visa Claims), Class 10 (Bond Claims), Class 11 (WMI Vendor Claims), Class 12 (General Unsecured Claims), Class 12A (Late-Filed Claims), Class 13 (Convenience Claims), Class 14 (CCB-1 Guarantees Claims), Class 15 (CCB-2 Guarantees Claims), Class 16 (PIERS

Claims), Class 17A (WMB Senior Notes Claims), Class 17B (WMB Subordinated Notes Claims), Class 18 (Subordinated Claims), Class 19 (Preferred Equity Interests), Class 21 (Dime Warrants), and Class 22 (Common Equity Interests) (collectively, the "Impaired Classes") as impaired within the meaning of section 1124 of the Bankruptcy Code and clearly specify the treatment of the Claims and Equity Interests in those Classes, thereby satisfying section 1123(a)(3) of the Bankruptcy Code. Conf DX 432A – Plan Arts. VI, VII, IX, X, XII through XXVI, § 31.1; Conf DX 569 – Goulding Decl. ¶ 23.

(5)     No Discrimination (11 U.S.C. § 1123(a)(4)). Pursuant to the Plan, the treatment of each Claim against or Equity Interest in the Debtors, in each respective Class, is the same as the treatment of every other Claim or Equity Interest in such Class, except to the extent that a particular holder has elected different treatment (and, even in such circumstances, each holder was offered the very same election), thereby satisfying section 1123(a)(4) of the Bankruptcy Code. See Conf DX 569 – Goulding Decl. ¶ 29. This does not violate section 1123(a)(4), as any applicable elections (i.e., Runoff Notes Election and Reorganized Common Stock Election), consistent with the January Opinion, have been made available, as applicable, to all holders within a Class, including holders of Disputed Claims and Dime Warrants. See Conf DX 265 – January Opinion at 101. All members of each Class, including holders of Disputed Claims as of the Effective Date that subsequently become Allowed Claims and holders of Dime Warrants will receive the same ultimate percentage recovery on account of their Claims, irrespective of whether they elected (if applicable) to receive Runoff Notes or Reorganized Common Stock. See Conf DX 432A – Plan §§ 6.2, 7.2, 16.1, 18.2, 19.2, 20.2; Conf DX 569 – Goulding Decl. ¶ 29.

(6)     In addition, holders of Claims and Equity Interests were provided with the opportunity to elect not to grant the releases set forth in Section 41.6 of the Plan (in which case, such non-releasing holders are not entitled to receive a distribution). See Conf DX 432A – Plan § 41.6; Conf DX 569 – Goulding Decl. ¶ 29. To the extent that holders of REIT Series elected to grant the releases in connection with the Sixth Amended Plan, such holders also are entitled to receive a distribution from JPMC. See Conf DX 432A – Plan § 2.1(h); Conf DX 255H, 402, 422 – Global Settlement Agreement (as amended) § 2.24; Conf DX 431 – Disclosure Statement Order at 12; see also Conf DX 265 – January Opinion at 102-103 (approving the treatment of the REIT Series over objection that such treatment was discriminatory as to other holders of Preferred Equity Interests and finding that "[t]o the extent that the REIT Holders are receiving anything more than other preferred shareholders, they are receiving it directly from JPMC in exchange for the releases").

(7)     Implementation of the Plan (11 U.S.C. § 1123(a)(5)). The Plan and the various documents and agreements set forth in the Plan Supplement and other related documents provide adequate and proper means for implementation of the Plan, including (a) the creation of a Liquidating Trust pursuant to Article XXVII of the Plan, (b) the transfer of certain property of the Debtors' estates to JPMC, the FDIC Receiver, and the Liquidating Trust, as set forth more fully in the Plan and Global Settlement Agreement, (c) the distribution and/or issuance, as the case may be, of Cash, Reorganized Common Stock, Runoff Notes and Liquidating Trust Interests, as set forth in Articles XXXI and XXXII of the Plan, (d) the prompt release of the tax refunds from the JPMC Escrow Account, the Washington Mutual Escrow Account, and the FDIC Escrow Account in accordance with and as defined in Section 2.4 of the Global Settlement Agreement, (e) the retention by the Reorganized Debtors of all remaining

property of the Debtors' estates, (f) the cancellation of all documents, agreements, and

instruments evidencing Claims against or Equity Interests in the Debtors, except as provided in

the Plan, (g) the surrender of all instruments or notes, pursuant to Section 32.6 of the Plan, (h)

the curing of defaults with respect to assumed executory contracts and leases, pursuant to Article

XXXIV of the Plan, (i) the entry by the Reorganized Debtors and the lenders thereto into the

Credit Facility and all Financing Documents (as defined below), and (j) to the extent applicable,

the adoption and filing of the Reorganized Debtors Certificates of Incorporation and the

Reorganized Debtors By-Laws, as set forth in Article XL of the Plan and the Plan Supplement.

See Conf DX 432A – Plan Arts. XXVII, XXXI, XXXII, XXXIV, XL; Plan §§ 32.4, 32.6; Conf

DX 434 – Liquidating Trust Agreement §§ 1.1, 1.3; Conf DX 569 – Goulding Decl. ¶ 29; Conf

DX 434 – Plan Supplement; Conf DX 492 – Cure Notice. Accordingly, the Plan satisfies the

requirements of section 1123(a)(5) of the Bankruptcy Code.

(8)    Prohibition of Issuance of Non-Voting Securities (11 U.S.C.

§ 1123(a)(6)). Article XL of the Plan provides that, as of the Effective Date of the Plan, the

articles of incorporation and by-laws of the Debtors shall be amended and restated to provide

substantially as set forth in the Reorganized Debtors Certificates of Incorporation and the

Reorganized Debtors By-Laws, which, as set forth in the forms of such documents included with

the Plan Supplement, prohibit the issuance of nonvoting equity securities, thereby satisfying

section 1123(a)(6) of the Bankruptcy Code. Conf DX 432A – Plan Art. XL; Conf DX 569 –

Goulding Decl. ¶ 29. Accordingly, the Plan satisfies the requirements of section 1123(a)(6) of

the Bankruptcy Code.

(9)    Designation of Directors and Officers (11 U.S.C. § 1123(a)(7)).

Section 40.4 of the Plan provides that, on the Effective Date, the board of directors of each of the

Reorganized Debtors shall consist of seven (7) persons: six (6) members selected by the Equity

Committee (subject to the provisions of the TPS Stipulation) and one (1) member selected by the

lenders party to the Credit Facility. See Conf DX 432A – Plan § 40.4; Conf DX 569 – Goulding

Decl. ¶ 29; Conf DX 434 – Plan Supplement, Ex. E (naming the proposed directors). Pursuant to

Section 40.5 of the Plan, the boards of directors of the Reorganized Debtors shall elect officers of

the Reorganized Debtors as of or after the Effective Date. See Conf DX 432A – Plan § 40.5;

Conf DX 569 – Goulding Decl. ¶ 29. Such provisions are consistent with the interests of

creditors, equity security holders, and public policy, thereby satisfying section 1123(a)(7) of the

Bankruptcy Code.

       (10)   Impairment/Unimpairment of Classes of Claims and Equity

Interests (11 U.S.C. § 1123(b)(1)). Claims in Classes 2, 3, 5, 6, 8, 9, 10, 11, 12, 12A, 13, 14, 15,

16, 17A, 17B and 18, and Equity Interests in Classes 19, 21 and 22 are impaired by the Plan.

Claims in Classes 1, 4 and 7 are not impaired by the Plan. See Conf DX 432A – Plan Arts. V-

XXV, § 30.1; Conf DX 569 – Goulding Decl. ¶ 29. Accordingly, the Plan is consistent with

section 1123(b)(1) of the Bankruptcy Code.

       (11)   Assumption and Rejection (11 U.S.C. § 1123(b)(2)). Section 34.1

of the Plan provides that, on the Effective Date, all prepetition executory contracts and unexpired

leases that exist between one or both of the Debtors and any Entity, and which have not expired

by their own terms on or prior to the Confirmation Date, shall be deemed rejected by the

Debtors, except for any executory contract or unexpired lease that (i) has been assumed, assumed

and assigned, or rejected pursuant to an order of the Court entered prior to the Effective Date or

(ii) that is specifically designated as a contract or lease to be assumed or assumed and assigned

on the schedules to the Plan Supplement, including, without limitation, any executory contract or

unexpired lease sold, accepted or transferred to one of the JPMC Entities pursuant to the terms of the Global Settlement Agreement. See Conf DX 432A – Plan § 34.1; Conf DX 434D – Plan Supplement at Ex. D [D.I. 9488]. Pursuant to the Cure Notice, the Debtors provided notice of any defaults to be cured with respect to each agreement to be assumed or assumed and assigned by the Debtors. Conf DX 492 – Cure Notice. Specifically, there are no defaults to be cured with respect to the contracts to be assigned to JPMC. Conf DX 492 – Cure Notice. As a significant national bank with over $2 trillion in assets, JPMC, as assignee of certain of the contracts to be transferred, is financially sound and able to provide adequate assurances of future performance under such contracts. Moreover, based upon the relative value to the Debtors post-Effective Date of the agreements that JPMC will obtain pursuant to the Plan, transfer of such contracts is within the Debtors' reasonable business judgment, is warranted and is in the best interests of their chapter 11 estates. Accordingly, the Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

(12)     Settlement/Retention of Claims or Interests (11 U.S.C. § 1123(b)(3)). The Plan is premised upon the Global Settlement Agreement, which is integral to the Plan and settles and compromises certain Claims and Causes of Action among the Debtors, the JPMC Entities, and the FDIC, and which settlement this Court has determined is fair and reasonable and is in the best interests of all creditors and above the lowest range of reasonableness. See Conf DX 265 – January Opinion at 2; Conf DX 441 – September Opinion at 31-32; Conf DX 255H, 402, 422 – Global Settlement Agreement (as amended); Conf DX 569 – Goulding Decl. ¶ 29. Section 41.11 of the Plan provides that, except as provided in the Plan, nothing contained in the Plan or this Order shall be deemed to limit, abridge or otherwise affect the rights of the Reorganized Debtors, the Creditors' Committee, the Liquidating Trustee, the

JPMC Entities, the FDIC Receiver, or FDIC Corporate to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by any of them. Conf DX 432A – Plan § 41.11; Conf DX 569 – Goulding Decl. ¶ 29. The Debtors' estates are retaining certain claims and causes of action against Persons other than the JPMC Entities pursuant to Section 28.1 of the Plan and the UCC Stipulation, and the Liquidating Trustee or the Creditors' Committee, as applicable, shall have the right and power to litigate any Claim or Cause of Action that constitutes an Asset of the Debtors and their estates that is not otherwise settled or released pursuant to the Plan or the Global Settlement Agreement, including, without limitation, any avoidance or recovery action under section 541, 542, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code and any other cause of action, right to payment, or claim that may be pending on the Effective Date or instituted by the Debtors thereafter. See Conf DX 432A – Plan § 28.1; Conf DX 434 – Liquidating Trust Agreement §§ 1.5, 9.6; Conf DX 569 – Goulding Decl. ¶ 29. These provisions are consistent with section 1123(b)(3) of the Bankruptcy Code and are in the best interests of the Debtors' estates and within the range of reasonableness.

(13)   Sale of Assets (11 U.S.C. § 1123(b)(4)). Although, pursuant to the Plan and Global Settlement Agreement, the Debtors are selling, transferring and assigning certain assets to the JPMC Entities pursuant to sections 363 and 365 of the Bankruptcy Code, such sale, transfer, and assignment does not constitute a sale of all or substantially all of the Debtors' property. Conf DX 569 – Goulding Decl. ¶ 29; Opinion, dated Jan. 3, 2012 [Adv. No. 10-50911, D.I. 312] at 26 (stating that the Global Settlement Agreement "is not a sale of substantially all the assets of WMI.")

(14)   Modification of Rights (11 U.S.C. § 1123(b)(5)). The Plan modifies the rights of holders of Claims in Classes 2, 3, 5, 6, 8, 9, 10, 11, 12, 12A, 13, 14, 15, 16,

17A, 17B, and 18, and Equity Interests in Classes 19, 21, and 22. The Plan also leaves

unaffected the rights of holders of Claims in Classes 1, 4 and 7. Conf DX 432A – Plan Arts. V-

XXV; Conf DX 569 – Goulding Decl. ¶ 29.

       (15)   Additional Plan Provisions (11 U.S.C. § 1123(b)(6)). The Plan

contains release, injunction and exculpation provisions in Article XLI of the Plan—including

releases by the Debtors, the third party releases set forth in Section 41.6 of the Plan, consensual

releases by holders of Claims and Equity Interests (to the extent they affirmatively elect to grant

such releases and are entitled to receive a distribution pursuant to the Plan), and a customary

exculpation provision (which provision is consistent with the January Opinion). Conf DX 432A

– Plan Art. XLI. Such provisions are consistent with the January Opinion, are an integral

component of the complex compromises underlying the Plan, the Global Settlement Agreement,

and the compromise and settlement related to the Mediation that is incorporated in the Plan, are

necessary for the Debtors' reorganization and the realization of value for stakeholders, are the

product of extensive arm's-length negotiations, were necessary to the formation of consensus to

support the Global Settlement Agreement and the Plan, and are, in light of the foregoing,

appropriate. See, e.g., Conf DX 265 – January Opinion at 58-60. In addition, the third party

releases set forth in Section 41.6 of the Plan are consensual and only are binding against

consenting Entities who receive a distribution from the Debtors' estates. Conf DX 432A -- Plan

§ 41.6. Furthermore, the exculpation provision in Section 41.8 of the Plan is limited to a

qualified immunity for acts of negligence, does not relieve any party of liability for gross

negligence or willful misconduct, and provides exculpation only to the Debtors, the estates'

professionals, the Creditors' Committee and the Equity Committee and their respective members

and professionals, and the Debtors' directors and officers. Id. § 41.8. Accordingly, the Plan is

consistent with section 1123(b)(6) of the Bankruptcy Code.

    (16)   Vacatur. Article XXXVI of the Plan notes several conditions

precedent to the confirmation of the plan, including, among other things, the condition that this

Court vacate, for all purposes, (a) the September Order to the extent it relates to the Standing

Motion, and (b) those portions of the September Opinion that relate to the Standing Motion,

namely, (i) Section III (H) of the September Opinion, pages 108 through 139, and (ii) the first

sentence on page 68, footnote 31 on page 70 and the last paragraph of Section III(D) of the

September Opinion, page 73. See Conf DX 432A - Plan § 36.1(a)(11).

    (a)   Pursuant to Federal Rule of Civil Procedure 60(b), "on motion and

just terms, the court may relieve a party or its legal representative from a final judgment, order,

or proceeding" for, among other things, "any . . . reason that justifies relief," FED. R. CIV. PRO.

60(b), including, for example, when "exceptional circumstances" warrant vacatur because "the

negative effects of vacating [the] case are relatively minor and the positive effects substantial."

See, e.g., McKinney v. Philadelphia Hous. Auth., 2010 WL 2510382, at *1 (E.D. Pa. June 16,

2010). The Third Circuit has advised that, when a party seeks vacatur of an order on appeal,

several steps should be followed. First, the requesting party should seek relief from the trial

court pursuant to Rule 60(b). Second, if the trial court "is inclined to grant the motion or intends

to grant the motion . . . it should certify its inclination or its intention to the appellate court which

can then entertain a motion to remand the case. Once remanded, the . . . [trial] court will have

the power to grant the motion, but not before." Venen v. Sweet, 758 F.2d 117, 123 (3d Cir.

1985); see also FED. R. CIV. P. 62.1 (providing procedures for remand to resolve a motion that a

court states it would grant or states raised a substantial issue); FED. R. APP. P. 12.1 (same).[5]

       (b)     On January 9, 2012, the Debtors filed the *Motion of Washington*

*Mutual, Inc., and WMI Investment Corp. for an Order Pursuant to Bankruptcy Rule 9024,*

*Federal Rule of Civil Procedure 60(b) and Section 105(a) of the Bankruptcy Code, to Vacate, in*

*Part, the September Opinion and the September Order, as a Condition of Mediated Settlement*

*Embodied in the Plan* [D.I. 9358] (the "Vacatur Motion"), and, by order, dated January 25, 2012,

the Court granted the Vacatur Motion and the relief requested therein [D.I. 9481]. Thereafter,

pursuant to that certain *Order Granting Appellants' Joint Emergency Motion for Immediate,*

*Limited Remand of Their Respective Pending Appeals to Enable the court to Vacate, In Part, Its*

*September 13, 2011 Order and Opinion in Conjunction with Confirmation Proceedings on the*

*Debtors' Plan*, dated February 9, 2012, the Delaware District Court remanded the September

Appeals to this Court to enable the Court to vacate (a) the September Order to the extent it

relates to the Standing Motion, and (b) those portions of the September Opinion relating to the

Standing Motion, namely, (i) Section III(H) of the September Opinion, pages 108 through 139,

and (ii) the first sentence on page 68, footnote 31 on page 70 and the last paragraph of Section

III(D) of the September Opinion, page 73.

---

[5] See also Freedom Wireless, Inc., v. Boston Commc'ns Group, Inc., 2006 WL 4451477 (D. Mass. Oct. 11, 2006) (granting motion to vacate after (i) movant filed Rule 60(b) motion with the district court; (ii) the district court stated its inclination to grant the motion if jurisdiction was reestablished; and (iii) the court of appeals granted a motion to remand); Tommy Hilfiger Licensing, Inc. v. Costco Cos., 2002 WL 31654958, at *3 (S.D.N.Y. Nov. 25, 2002) ("[T]he Court finds that the requested 60(b) relief is merited . . . [but] this Court does not actually grant vacatur at this time, but instead hereby advises the Second Circuit of its intention to grant such relief if the case is remanded for that purpose."); In re Fairchild Aircraft Corp., 220 B.R. 909, 910 (Bankr. W.D. Tex. 1998) (bankruptcy court vacated its prior appealed decision, following remand from the district court).

(c)     Under the circumstances, the Court finds that exceptional circumstances exist, such that partial vacatur of the September Opinion and September Order, as a condition of the compromise and settlement embodied in the Plan, is warranted.  Specifically, as discussed in detail elsewhere herein, the Court has determined that the compromise and settlement incorporated in the Plan after the Mediation is fair, reasonable and in the best interests of the Debtors' estates.  See supra ¶¶ W - Y.  Furthermore, pursuant to this Order, the Court has confirmed the Plan.  See infra ¶ 1.

(d)     Pursuant to the settlements and compromises by and among the Debtors, the Creditors' Committee, the Equity Committee, and certain significant Creditor constituencies, which settlements and compromises are embodied in the Plan, (i) the shareholders of WMI will receive substantially all of the equity of Reorganized WMI, see Conf DX 432A - Plan, §§ 23.1, 24.1, 25.1, (ii) Reorganized WMI will receive the Senior Notes Release Consideration and the Senior Subordinated Notes Release Consideration in the aggregate amount of $75 million, access to the $125 million Credit Facility to be provided by certain members of AAOC and, to the extent available, Runoff Proceeds having a face value of $10 million, subject to the priority scheme set forth in the documents governing the Runoff Notes, as well as certain potential Litigation Proceeds, (iii) granting partial vacatur of the September Order and September Opinion in furtherance of the settlement embodied in the Plan, and in conjunction with consideration of confirmation of the Plan, will enable the distribution of more than $7 billion in value to the Debtors' stakeholders, see Conf DX 569 – Goulding Decl. ¶¶ 22, 25, (iv) absent the requested vacatur, the collapse of the Plan could result in the termination of the Global Settlement Agreement, see Conf DX 569 - Goulding Decl. ¶¶ 22, 25, which would mean the loss of billions of dollars in recoveries and the recommencement of

litigation that the Court has already determined to be "the precise type of multi-faceted litigation that cries out for settlement" due to the multiplicity of issues, the complexity of the various arguments, and the significant risks associated with litigation of the multitude of claims asserted therein, see Conf DX 265 – January Opinion at 59, (v) if the Settlement is not consummated, recoveries for holders of Allowed PIERS Claims and, thereafter, for holders of Allowed CCB-1 Guarantees Claims and Allowed CCB-2 Guarantees Claims will evaporate, due to the additional incurrence of expenses and the ongoing accrual of postpetition interest, Conf DX 569 – Goulding Decl. ¶ 23, (vi) absent vacatur, the eight separate appeals of the September Opinion will proceed in at least one appellate court, if not more, which appellate process could last for years, imposing significant costs on the parties and the judicial system, Conf DX 569 – Goulding Decl. ¶ 23, (vii) if the requested relief is denied, the Settlement will be void and litigation over the Standing Motion, which could last for years, will continue, Conf DX 569 – Goulding Decl. ¶ 23; Conf DX 441 - September Opinion at 138, (viii) the portions of the September Order and September Opinion that the Motion seeks to vacate are fact-specific, unique to this bankruptcy, and are non-binding on other courts, Hr'g Tr. 1/25/11 48:13-49:22, (ix) vacating in part the September Order and September Opinion in furtherance of the Settlement will avoid further protracted litigation in this Court, in the Delaware District Court, and in the Third Circuit, Conf DX 569 – Goulding Decl. ¶ 24, and (x) the Settlement resolves a complex, multi-party action and will conserve the resources of this Court and potentially other courts, and similarly conserve the time, money, and resources of the Debtors, the Creditors' Committee, the Equity Committee, and AAOC—all in furtherance of the public interest, Conf DX 569 – Goulding Decl. ¶ 24.

(e)     This Court finds that there is "a strong public policy in bankruptcy cases to encourage settlement." See 1/25/2012 Tr. at 49:23-24. Here, this policy counsels in

favor of granting the request for partial vacatur, especially in the context of the complex and contentious procedural history of this bankruptcy, the historic context in which it arose, and in light of the multitude of disputes that have arisen over the three year history of the Chapter 11 Cases, the vast majority of which are consensually resolved pursuant to the Plan. Moreover, the Court's determination, pursuant to the September Opinion and September Order, that the Equity Committee has standing to pursue certain equitable disallowance claims was merely a preliminary ruling. In contrast to a ruling on the merits based upon a fully developed factual record after a full trial and discovery, the precedential value of the portions of the September Opinion and September Order that are related to the Standing Motion therefore is not high. On the other hand, the resolution of the Chapter 11 Cases pursuant to the Plan and the compromises and settlements embodied therein preserves estate resources, conserves judicial resources, and ensures that billions of dollars in distributions can be made to creditors and holders of equity interests who have waited over three years for any recovery. This Court thus concludes that the Debtors have demonstrated the presence of "exceptional circumstances" warranting the requested vacatur and that the requested vacatur will serve the public interest.

JJ. Sale of Exempt Property (11 U.S.C. § 1123(c)). The Debtors are not "individuals" (as that term is defined in the Bankruptcy Code) and, accordingly, section 1123(c) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases. Conf DX 569 – Goulding Decl. ¶ 29.

KK. Cure of Defaults (11 U.S.C. § 1123(d)). Section 34.4 of the Plan provides for the satisfaction of default claims associated with each executory contract and unexpired lease to be assumed pursuant to the Plan in accordance with section 365(b)(1) of the Bankruptcy Code. Conf DX 432A – Plan § 34.4. All cure amounts are set forth in the Cure Notice, and were

determined in accordance with the underlying agreements and applicable bankruptcy and nonbankruptcy law. Conf DX 569 – Goulding Decl. ¶ 29; Conf DX 492 – Cure Notice. No party has objected to the Cure Notice. Accordingly, the Plan complies with section 1123(d) of the Bankruptcy Code.

      LL.   <u>Plan Proponents' Compliance with the Bankruptcy Code (11 U.S.C. § 1129(a)(2))</u>. Except as otherwise provided for or permitted by orders of the Court, the Debtors have complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the Prior Disclosure Statement Order (with respect to Class 17A and, with respect to certain elections, holders of REIT Series), and the Disclosure Statement Order (with respect to all other Classes) in transmitting the Solicitation Packages and in tabulating the votes and elections with respect to the Plan. Conf DX 5B - Prior Disclosure Statement Order; Conf DX 570 – Klamser Decl. ¶ 11-22; Conf DX 571 – Sharp Decl. ¶ 11-21; Conf DX 18 – Klamser Decl. for the Sixth Amended Plan ¶ 3; Conf DX 19 – Sharp Decl. for the Sixth Amended Plan ¶ 3. Accordingly, the Plan complies with section 1129(a)(2) of the Bankruptcy Code.

      MM.   <u>Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3))</u>. Pursuant to the January Opinion and the September Opinion, the Court determined that both the Sixth Amended Plan and Modified Sixth Amended Plan were proposed in good faith. Conf DX 265 – January Opinion at 106; Conf DX 441 – September Opinion at 73. The Plan (including the Global Settlement Agreement and all other agreements, documents and instruments necessary to effectuate the Plan) is the result of extensive arm's-length negotiations among, and with substantial input from, a large number of independent parties and their respective professionals, including during and as a result of the Mediation. Conf DX 569 – Goulding Decl. ¶ 19.

Moreover, because the major provisions of the Modified Sixth Amended Plan are incorporated into the Plan, this Court's good faith determinations in the January Opinion and September Opinion apply equally to the Plan. See Conf DX 569 – Goulding Decl. ¶ 32. The Plan achieves a reorganization of the Debtors, provides for a distribution to holders of Equity Interests, and properly distributes value to Creditors based upon their respective priorities, including through the enforcement of certain parties' contractual subordination rights and implementation of parties' elections with respect to distributions. Conf DX 569 – Goulding Decl. ¶ 34. The Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' estates, and to maximize distributions to all creditors. Conf DX 569 – Goulding Decl. ¶ 31.

NN.    The Court further finds that the financial accommodations to be extended pursuant to the Financing Documents are being extended by the lenders thereunder in good faith, for legitimate business purposes, and are reasonable. In addition, despite efforts by the Debtors in accordance with Section 32.11 of the Plan, (i) the Debtors did not receive any other bona fide financing proposals with respect to the Reorganized Debtors, and (ii) two (2) parties contacted the Debtors regarding the Credit Facility, which parties were referred to the Equity Committee, and the Equity Committee declined to move forward with such parties. Moreover, the Credit Facility has been negotiated in good faith and among independent parties.

OO.    Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)). Pursuant to the interim compensation procedures previously approved by this Court and established in these Chapter 11 Cases pursuant to section 331 of the Bankruptcy Code,[6] all payments made or to be made by the Debtors to their retained professionals for services rendered

---

[6] *Amended Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals*, dated November 17, 2008 [D.I. 302].

and expenses incurred in or in connection with these Chapter 11 Cases, or in connection with the Plan and incidental to these Chapter 11 Cases, have been or will be authorized and approved by this Court, subject to final review for reasonableness by this Court pursuant to section 330 of the Bankruptcy Code. As set forth in Section 3.2 of the Plan, all Entities awarded compensation or reimbursement of expenses by the court in accordance with section 328, 330, or 331 of the Bankruptcy Code, or entitled to priorities established pursuant to section 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code, will have ninety (90) days following the Effective Date to submit final fee applications. Conf DX 432A - Plan § 3.2. In addition, consistent with the determination set forth in the September Opinion, the Plan provides that fees and expenses of the Liquidating Trustee, other Trustees and certain creditors' professionals listed in Section 41.18 of the Plan must be approved by the court as reasonable before being paid by the Debtors. See Conf DX 441 - September Opinion at 23-24; Conf DX 432A – Plan §§ 27.12, 41.18; Conf DX 434A – Liquidating Trust Agreement §§ 4.1, 6.2(d), 6.4(l), 6.5(k), 6.6(b) and (c), 6.8(b), 7.7; Conf DX 569 – Goulding Decl. ¶ 35.

PP. _Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5))._ The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code. Section 40.4 of the Plan provides that the boards of directors of each of the Reorganized Debtors shall consist of seven (7) persons: six (6) members selected by the Equity Committee (subject to the terms of the TPS Stipulation) and one (1) member selected by the lenders party to the Credit Facility. Conf DX 432A – Plan § 40.4. The Equity Committee has currently selected, as members of the Reorganized Debtors' boards of directors, (i) Michael Willingham, (ii) Mark Holiday, (iii) Diane Glossman and (iv) Timothy Graham. The member selected by the lenders party to the Credit Facility is Gene Davis. Pursuant to Section 40.5 of the Plan, the boards of directors of the

Reorganized Debtors shall elect officers of the Reorganized Debtors as of or after the Effective Date. Conf DX 432A - Plan § 40.5. Each director and officer will serve in accordance with the terms and subject to the conditions of the Reorganized Debtors' Certificates of Incorporation, the Reorganized Debtors' By-Laws, and other relevant organizational documents, each as applicable.

QQ. The ten (10) initial members of the Trust Advisory Board shall (a) consist of (i) four (4) members selected solely by the Creditors' Committee (subject to the terms of the *Stipulation and Agreement Between the Debtors and Tricadia Capital Management, LLC With Respect to the Debtors' Seventh Amended Plan*, dated February 12, 2012), (ii) four (4) members selected solely by the Equity Committee (subject to the terms of the TPS Stipulation), (iii) one (1) member selected by the Creditors' Committee and approved by the Equity Committee, which approval shall not be unreasonably withheld, and (iv) one (1) member selected by HoldCo Advisors, L.P. serving in a non-voting *ex officio* capacity, and (b) have an oversight function with respect to the Liquidating Trust, the composition of which may change only in accordance with the provisions of the Liquidating Trust Agreement. Currently, (i) Wells Fargo Bank, N.A., Arnold Kastenbaum, Mayur Lakhani, and Marc Kirschner have been selected as the Creditors' Committee's designees to the Trust Advisory Board; (ii) Joel Klein, Michael Willingham, and the Honorable Douglas Southard have been selected as the Equity Committee's designees to the Trust Advisory Board; (iii) Matthew Cantor has been selected as the joint designee to the Trust Advisory Board; and (iv) William Kosturos has been named the Liquidating Trustee. Conf DX 434 – Liquidating Trust Agreement §§ 1.4, 6.1. Further, Misha Zaitzeff, a principal of HoldCo Advisors, L.P. shall be appointed as an *ex officio* member to the Trust Advisory Board (with limited rights). *See Stipulation and Agreement Resolving Objection of HoldCo Advisors, L.P. to*

*the Debtors' Plan*, dated February 12, 2012 [D.I. 9683, Ex. 1]. If, prior to the Effective Date, the

Equity Committee and Creditors' Committee designate additional or substitute persons than

those listed above to serve as one or more of such parties' nominees, such committee shall file a

notice thereof with this Court. In addition, pursuant to Section 8.2 of the Form of Liquidating

Trust Agreement that was filed as part of the Plan Supplement, the Liquidating Trustee may be

removed by a majority vote of the members of the Trust Advisory Board.

      RR.    To address the concern of the Court that the composition of the Trust

Advisory Board should change once creditors have been paid in full, the Trust Advisory Board

members solely appointed by the Creditors' Committee are subject to replacement on a staggered

basis as and when all Allowed Claims approach satisfaction in full.

      SS.    <u>No Rate Changes (11 U.S.C. § 1129(a)(6))</u>. The Plan does not provide for

rate changes by any of the Reorganized Debtors. Thus, section 1129(a)(6) of the Bankruptcy

Code is not applicable in these Chapter 11 Cases. <u>See</u> Conf DX 569 – Goulding Decl. ¶ 39.

**Converting to Chapter 7 Would Result in Delay, Added Costs, and Loss of Value**

      TT.    <u>Best Interest of Creditors (11 U.S.C. § 1129(a)(7))</u>. Recoveries pursuant

to the Plan are equal to or in excess of those that would be available if the Debtors were

liquidated pursuant to chapter 7 and, therefore, the Plan satisfies the "best interests" test set forth

in section 1129(a)(7) of the Bankruptcy Code.

      UU.    Section 1129(a)(7) is satisfied as to each holder of a Claim in an

unimpaired class of Claims, as they are deemed to have accepted the Plan. As to the remaining

Creditors, the Debtors' Liquidation Analysis demonstrates that each of the Debtors' creditors

will receive at least as much, if not more, value under the Plan than it would receive in a

hypothetical chapter 7 liquidation. Conf DX 569 – Goulding Decl. ¶¶ 40-46. Under either

scenario, holders of claims in Class 17B receive nothing. <u>Id.</u> ¶¶ 30, 45.

VV.    In a chapter 7 liquidation, assuming a chapter 7 trustee is able to consummate a settlement of the issues resolved by the Global Settlement Agreement on the same terms and conditions as the Debtors, the cash available for distribution to creditors would consist mainly of the proceeds from the Global Settlement Agreement. Conf DX 569 – Goulding Decl. ¶ 42. The Debtors' Liquidation Analysis assumes that the Global Settlement Agreement would still exist in a chapter 7 liquidation because, without consummation of a similar global settlement on similar terms as the Global Settlement Agreement or, in the alternative, litigating to finality each issue related to distribution of assets (which would take a substantial amount of time), a chapter 7 trustee would be unable to resolve all claims in these estates or make significant distributions. Id. As this Court has noted, however, the Debtors can provide no assurance that a global settlement agreement will be reached in the Chapter 7 Cases. See Conf DX 265 – January Opinion at 95-96. Without the Global Settlement Agreement, an additional $54 billion in claims would have to be considered. See id. This Court has concluded that, under a scenario where no similar global settlement agreement is consummated, the recovery under the Chapter 7 Cases would be less than the recovery under the Chapter 11 Cases. See id.

WW.    Cash distributions in a chapter 7 liquidation, however, would be delayed and significantly reduced by the costs and expenses of a chapter 7 liquidation, including fees payable to the chapter 7 trustee and its professional advisors, who would need to engage in a substantial amount of work to become familiar with the many complex legal and factual issues in the Debtors' bankruptcy cases. Conf DX 265 – Goulding Decl. ¶ 43. This could "stall" the cases for a prolonged period of time while these new parties familiarize themselves with the background and status of the cases. Id. Given the complexities of these chapter 11 cases and the underlying assets and Claims, and after considering the time it took the Equity Committee upon

US_ACTIVE:\43911945\15\79831.0003
RLF1 5853319v. 1                                    41

formation to bring itself "up-to-speed" regarding the complex issues involved in the Chapter 11

Cases, a chapter 7 trustee and its professionals likely would require at least 2 to 4 months to

familiarize themselves with the Debtors' estates and their assets (the "Start-up Time"). Id. After

the Start-up Time, the actual liquidation of the Debtors would continue for an additional

estimated 2 to 4 months. Id. A conversion of these cases would result in an increase of $3

million in operational expenses and $37 million in professional fees, in addition to an estimated

$37 million chapter 7 trustee transaction fee. Id.; Conf DX 432C - Disclosure Statement, Ex. C

at vi-vii.

XX. In addition to the foregoing, in a chapter 7 liquidation, a chapter 7 trustee

would be forced to sell WMMRC quickly. Conf DX 569 - Goulding Decl. ¶ 44. Thus, creditors

would suffer diminished recoveries because a "fire-sale" liquidation of WMMRC would

substantially reduce the potential value of this asset, as compared to the value to be generated by

reorganizing around this entity. Id. Moreover, third parties may be inclined to submit lower bids

to a chapter 7 trustee knowing that the asset must be sold at any price. Id. In any event, a

chapter 7 liquidation would not permit WMMRC or any other entity to utilize the WMI tax

group's large NOLs on a go forward basis to any significant extent. Id.

YY. Aside from the additional fees and expenses, and the reduction in available

proceeds from a sale of WMMRC, any such delay would impact the recoveries of junior

creditors subject to contractual subordination provisions who are obligated to "pay-up" to senior

creditors until such senior creditors' claims are paid in full, including postpetition interest at the

contract rate that would continue to accrue. Id. ¶ 45. Accordingly, after contractual

subordination, holders of PIERS Claims, CCB-1 Guarantee Claims, CCB-2 Guarantee Claims,

Subordinated Claims, Preferred Equity Interests, and Common Equity Interests would recover

<u>nothing</u> in a chapter 7 liquidation. <u>Id.</u> Such creditors and equity holders will thus recover substantially more value under the proposed Plan than they would through a chapter 7 liquidation. <u>Id.</u>

ZZ.     Based upon the foregoing, if these chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code, there likely would be a several month delay in returns to creditors to conduct a liquidation that would result in the reduced estimated liquidation proceeds set forth in the Liquidation Analysis, as compared with the certainty and timing of distributions under the Plan. <u>Id.</u> ¶ 46. For some Creditors, such as holders of Allowed Senior Notes Claims, this would result in the same value recovered with respect to such holders' Allowed Claims, but only after a significant delay. <u>Id.</u> For holders of Allowed Senior Subordinated Notes Claims and Allowed General Unsecured Claims (as well as holders of Allowed Senior Notes Claims with respect to such holders' Claims for postpetition interest), however, this would mean a smaller recovery than that which is projected pursuant to the Plan. <u>Id.</u>; <u>see also</u> Conf DX 432C - Disclosure Statement, Ex. C at v. For holders of PIERS Claims, CCB-1 Guarantee Claims, CCB-2 Guarantee Claims, Subordinated Claims, Preferred Equity Interests, and Common Equity Interests, however, chapter 7 liquidation would mean that such holders' recoveries would evaporate completely. Conf DX 569 - Goulding Decl. ¶ 46. Moreover, and as discussed above, there is no guarantee that a chapter 7 trustee would be able to consummate a global settlement on the same terms and conditions as the Debtors.[7] <u>Id.</u>; Conf DX 265 – January Opinion at 95-96. If this did not occur, the recoveries for creditors in all Classes could drop precipitously. Conf DX 569 - Goulding Decl. ¶ 46. The Court further notes that,

---

[7] Additionally, Class 17A may see their recoveries disappear if a chapter 7 trustee withdraws its support for the settlement with the holders of WMB Senior Notes, and the WMB Senior Notes Claims are disallowed.

even after the Senior Notes Release Consideration and Senior Subordinated Notes Release Consideration are taken into account, holders of Allowed Senior Notes Claims and Allowed Senior Subordinated Notes Claims still fare the same or better pursuant to the Plan than they would in a chapter 7 liquidation. Id. at n.20. Accordingly, this Court finds the Plan satisfies section 1129(a)(7) of the Bankruptcy Code notwithstanding the payment pursuant to the Plan to Reorganized WMI of a small percentage of their recoveries by holders of Allowed Senior Notes Claims and Allowed Senior Subordinated Notes Claims.

AAA. Based upon the foregoing, recoveries pursuant to the Plan are greater than what estimated recoveries would be pursuant to a chapter 7 liquidation (except with respect to Classes receiving no distribution pursuant to the Plan, which would receive no distribution in either scenario).

BBB. <u>Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8))</u>. As set forth in the Voting Certifications, holders of Claims in Classes 2, 3, 5, 6, 10, 11, 12, 12A, 13, 14, 15, 16 17A, 18, 19, and 22 voted to accept the Plan. <u>See</u> Conf DX 570 – Klamser Decl. ¶ 25. Conf DX 571 – Sharp Decl. ¶ 24; Conf DX 18 – Klamser Decl. for the Sixth Amended Plan ¶ 29. Pursuant to the LTW Settlement Approval Order, votes on behalf of holders of interests in Class 21 were deemed cast in support of acceptance of the Plan. Conf DX – Goulding Decl. ¶ 28 n.9. However, because the distribution to the class of holders is through Classes 12, 18, and 22, such votes were cast in Classes 12, 18, and 22. <u>Id.</u> Pursuant to the TPS Stipulation, votes on behalf of holders of Equity Interests held by the TPS Funds (as defined in the TPS Stipulation) were deemed cast in support of acceptance of the Plan. <u>See</u> *Stipulation and Agreement Among the Debtors, the TPS Group, the TPS Consortium, the Equity Committee, and JP Morgan Chase Bank, N.A. With Respect to the Debtors' Seventh Amended Plan* [D.I.9705]. The Plan therefore

satisfies section 1129(a)(8) of the Bankruptcy Code with respect to Classes 2, 3, 5, 6, 10, 11, 12, 12A, 13, 14, 15, 16, 17A, 18, 19 and 22.[8]  With respect to the other Classes, the Plan is confirmable because the Plan satisfies section 1129(b)(2) of the Bankruptcy Code.  As such, section 1129(a)(8) is satisfied.

CCC.    Treatment of Administrative Expense Claims, Priority Non-Tax Claims, and Priority Tax Claims (11 U.S.C. § 1129(a)(9)).  The Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.  Section 3.1 of the Plan provides that, on the later to occur of (i) the Effective Date and (ii) the date on which an Administrative Expense Claim becomes an Allowed Claim, the Disbursing Agent shall pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Allowed Administrative Expense Claim.  Conf DX 432A – Plan § 3.1.  Section 5.1 of the Plan provides that, unless otherwise mutually agreed upon by the holder of an Allowed Priority Non-Tax Claim and the Debtors, on the later of (i) the Effective Date and (ii) the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable, the Disbursing Agent shall pay to each holder of an Allowed Priority Non-Tax Claim, in Cash, the full amount of such Allowed Priority Non-Tax Claim.  Conf DX 255 – Plan § 5.1.  Pursuant to Section 3.3 of the Plan, and as set forth in the Priority Tax Claim Election Notice, each holder of an Allowed Priority Tax Claim shall receive, in satisfaction, release, and exchange of such holder's Allowed Priority Tax Claim, payment in full, in Cash, on or as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date on which such claim becomes an Allowed Claim, and to the extent that payment is made after the Effective Date, together with interest accrued thereon at the applicable non-bankruptcy rate as of the calendar month in which this Order is

---

[8] Class 8 contains no claims, and thus, no votes were cast on behalf of this class.

entered. Conf DX 432A – Plan § 3.3; Conf DX 574 – Priority Tax Claim Election Notice; Conf

DX 569 – Goulding Decl. ¶¶ 48-51.

DDD.   Acceptance by Impaired Class (11 U.S.C. § 1129(a)(10)). Fifteen (15)

impaired Classes entitled to vote affirmatively accepted the Plan, thereby satisfying the

requirements of section 1129(a)(10) of the Bankruptcy Code. See Conf DX 570 – Klamser Decl.

¶ 25; Conf DX 571 – Sharp Decl. ¶ 24; Conf DX 18 – Klamser Decl. for the Sixth Amended

Plan ¶ 29.

EEE.   Feasibility (11 U.S.C. § 1129(a)(11)). Pursuant to the September Opinion,

and based on the evidence presented at the hearing on confirmation of the Modified Sixth

Amended Plan, the Court determined that the value of WMMRC's existing portfolio is $140

million and that, if it is assumed that Reorganized WMI raises new capital and acquires new

businesses, the value of the NOLs that are potentially available to Reorganized WMI is $70

million. Conf DX 441 – September Opinion at 43-45, 62. Pursuant to the Plan, in addition to

owning WMMRC and having the potential ability to apply the NOLs against its future taxable

income, (see Conf DX 432A – Plan § 1.192; Conf DX 432 – Disclosure Statement at 221),

Reorganized WMI will have unrestricted access to cash, as of the Effective Date, in the form of

the $75 million Senior Notes Release Consideration and Senior Subordinated Notes Release

Consideration that will be paid to Reorganized WMI by holders of Allowed Senior Notes Claims

and Allowed Senior Subordinated Notes Claims. Conf DX 432A – Plan §§ 6.1, 7.1; Conf DX

569 – Goulding Decl. ¶ 56. Further, certain members of AAOC will provide Reorganized WMI

a senior secured multi-draw term Credit Facility, in the aggregate original principal amount of

$125 million, to be used by Reorganized WMI to finance working capital and general corporate

purposes, as well as certain permitted acquisitions and originations, all subject to the terms and

conditions of the Credit Agreement and the Financing Documents (as defined below). <u>See</u> Conf DX 569 – Goulding Decl. ¶ 22.

FFF.    As of the Effective Date, the Reorganized Debtors' assets will exceed its liabilities. <u>See</u> Conf DX 569 - Goulding Decl. ¶ 57. Upon such date, Reorganized WMI will have only two sources of significant liability—loan loss reserves associated with the WMMRC Trusts and the Runoff Notes. <u>Id.</u> ¶ 55. The loan loss reserves are limited to the assets available within each of the WMMRC Trusts. <u>Id.</u>; Conf DX 432 - Disclosure Statement § IV.A.6. Pursuant to the Plan, Reorganized WMI will issue Runoff Notes in the aggregate original principal amount of One Hundred Forty Million Dollars ($140,000,000.00) (subject to reduction as a result of the Reorganized Common Stock Elections, as discussed in Disclosure Statement). Conf DX 569 - Goulding Decl. ¶ 55. Such Runoff Notes are, except for the limited circumstances set forth in the governing indentures, non-recourse to the Reorganized Debtors and may only be satisfied by the Runoff Proceeds. <u>Id.</u> Except for the limited circumstances set forth in the governing indentures, Reorganized WMI has no obligation to satisfy any deficiency if the Runoff Proceeds prove to be insufficient to fully repay the Runoff Notes. <u>Id.</u> The only other source of liability for Reorganized WMI relates to Reorganized WMI's obligation to be a public reporting company. <u>Id.</u>

GGG.    Additional sources of income for Reorganized WMI will potentially become available as well, including (i) an additional $10 million, as well as interest accrued thereon at a rate of thirteen percent (13%) per annum, in the form of a portion of the Runoff Proceeds, to the extent available and in accordance with the relative priorities thereto as set forth

in the documents governing the Runoff Notes,[9] (ii) certain potential Litigation Proceeds, and (iii)

all distributions of Runoff Proceeds after all amounts due on the Runoff Notes have been paid in

full, solely to the extent any such additional distributions are available. Conf DX 569 –

Goulding Decl. ¶ 56.

HHH. In light of the excess of their Effective Date assets over their liabilities,

their potential additional sources of funding, and the general non-recourse nature of the Runoff

Notes described above, the Court concludes that the Reorganized Debtors will be able to pay

their liabilities as they become due. For example, the Reorganized Debtors' assets are more than

adequate to cover the anticipated public reporting costs, as is demonstrated by the Debtors' post-

Effective Date financial projections, which show that Reorganized WMI will have a cash balance

of Seventy-Four Million Eleven Thousand Dollars ($74,011,000.00) in the final year of such

projections. Conf DX 432 – Disclosure Statement at 210; Conf DX 569 - Goulding Decl. ¶ 57.

Accordingly, this Court concludes that confirmation of the Plan is not likely to be followed by

the eventual liquidation of either of the Reorganized Debtors. Rather, the Reorganized Debtors

will have sufficient funds to continue to manage their assets and satisfy their liabilities.

---

[9] Pursuant to the Plan, any eligible Creditor that elected to or that is otherwise entitled to receive Runoff Notes in lieu of Creditor Cash has the right to make a further election (a "Reorganized Common Stock Election") to receive Reorganized Common Stock in lieu of (among other things) some or all of such Runoff Notes. To the extent any such holder makes such a Reorganized Common Stock Election, such holder's share of the Runoff Notes to which the Reorganized Common Stock Election was effective will not be issued, thereby reducing the aggregate amount of Runoff Notes outstanding and, subject to the relative priorities set forth in the documents governing the Runoff Notes, Reorganized WMI will retain (and will not transfer to the Liquidating Trust) Runoff Proceeds in an amount equal to the payments of principal and interest that would have been due on the Runoff Notes to which the Reorganized Common Stock Election was effective. In the event that holders of Claims with rights to make Reorganized Common Stock Elections decline to tender Runoff Notes in the original principal amount necessary to reach the Runoff Threshold, Section 31.14(d) of the Plan deems AAOC to have made certain elections as set forth more fully therein to ensure that the Runoff Threshold is reached.

III.     In addition, this Court concludes that the Debtors have sufficient funds to meet their post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Cases.  In particular, pursuant to the provisions of the Plan and the Liquidating Trust Agreement, it is clear that the Liquidating Trust will have sufficient funds to manage the Liquidating Trust, maintain the Liquidating Trust assets, and make payments to the Liquidating Trust Beneficiaries.  Conf DX 432A - Plan § 27.10; Conf DX 434A - Liquidating Trust Agreement § 1.3.  The Liquidating Trust will consist of the Liquidating Trust Assets (as defined in the Plan), which include, among other things, the cash necessary to fund the Liquidating Trust.  See id. § 1.4;  Conf DX 432A - Plan §§ 1.140, 27.3.

JJJ.     Payment of Statutory Fees (11 U.S.C. § 1129(a)(12)).  Pursuant to Section 41.14 of the Plan, all fees currently payable pursuant to section 1930 of title 28, United States Code, as determined by the Bankruptcy Code, have been or will be paid on or before the Effective Date, thereafter as and when they become due, or otherwise pursuant to an agreement between the Reorganized Debtors and the United States Department Justice, Office of the United States Trustee, thereby satisfying the requirements of section 1129(a)(12) of the Bankruptcy Code.  See Conf DX 432A – Plan § 41.14; Conf DX 569 – Goulding Decl. ¶ 59.

KKK.     Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)).  Pursuant to Section 34.7 of the Plan, from and after the Effective Date, the Debtors, the Reorganized Debtors, and the Liquidating Trustee, as the case may be, shall (a) continue to perform any and all of their administrative obligations under the Benefit Plans and (b) continue to make any required minimum funding and insurance premium payments, until such time as the Debtors or the Liquidating Trustee, as the case may be, decides to transfer or terminate any such Benefit Plan in accordance with the terms and provisions of the documents and instruments relating

thereto and applicable law. Conf DX 432A – Plan § 34.7; Conf DX 569 – Goulding Decl. ¶ 60. Thus, the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code.

LLL. <u>No Domestic Support Obligations (11 U.S.C. § 1129(a)(14))</u>. The Debtors are not subject to any domestic support obligations. Accordingly, section 1129(a)(14) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases. <u>See</u> Conf DX 569 – Goulding Decl. ¶ 61.

MMM. <u>Debtors Are Not Individuals (11 U.S.C. § 1129(a)(15))</u>. The Debtors are not "individuals" (as that term is defined in the Bankruptcy Code) and, accordingly, section 1129(a)(15) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases. <u>See</u> Conf DX 569 – Goulding Decl. ¶ 62.

NNN. <u>No Applicable Nonbankruptcy Law Regarding Transfers (11 U.S.C. § 1129(a)(16))</u>. The Debtors are each a moneyed, business, or commercial corporation and, accordingly, section 1129(a)(16) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases. <u>See</u> Conf DX 569 – Goulding Decl. ¶ 63.

OOO. <u>No Unfair Discrimination; Fair and Equitable (11 U.S.C. § 1129(b))</u>. Class 9 (Visa Claims) voted to reject the Plan.[10] Conf DX 569 – Goulding Decl. ¶ 64; Conf DX 570 – Klamser Decl. ¶ 25; Conf DX 571 – Sharp Decl. ¶ 24; Conf DX 19 – Sharp Decl. for Sixth Amended Plan ¶ 30. Accordingly, the "cram down" requirements of section 1129(b) of the Bankruptcy Code must be satisfied with respect to Class 9.

---

[10] Class 17B is not receiving any distribution pursuant to the Plan. Conf DX 569 – Goulding Decl. ¶ 64. In light of that fact, the Disclosure Statement Order provided that Class 17B was deemed to reject the Plan. Conf DX 432B – Disclosure Statement Order ¶ M. However, it must be noted that there are no Claims in Class 17B because any such Claims are derivative in nature and belong to the FDIC, and the Debtors are providing a distribution on account thereof to the FDIC Receiver pursuant to the Global Settlement Agreement. Conf DX 569 - Goulding Decl. ¶ 65. Because there are no Allowed Claims in Class 17B—indeed no Claims at all—it does not matter that Classes junior to such Class may receive or retain property on account of the Claims or Equity Interests classified therein. <u>Id.</u> ¶ 66 n. 27.

PPP.   Based upon the evidence proffered, adduced, and presented by the Debtors and supporters of the Plan at the Confirmation Hearing, the Plan does not discriminate unfairly and is fair and equitable with respect to Class 9, as required by sections 1129(b)(1) and (b)(2) of the Bankruptcy Code.  With respect to Class 9, except to the extent waived, no holder of a Claim or Equity Interest junior to each of the Claims classified in Class 9 will receive or retain any property pursuant to the Plan, unless and until such Classes are paid in full.  See Conf DX 569 – Goulding Decl. ¶ 66.  Specifically, Class 9 is being paid in full so holders of Claims junior to Class 9 may receive distributions pursuant to the Plan.  Id.

QQQ.   The Plan provides for payment of Allowed Claims and, if appropriate, Postpetition Interest Claims on account of Allowed Claims.  Id. ¶ 67.  Distributions to claimants will be made in Cash, Liquidating Trust Interests that represent the right to receive future Cash distributions from the Liquidating Trust and, in certain circumstances, Runoff Notes and/or Reorganized Common Stock.  Id.  No Class is projected to recover more than one hundred percent (100%) on account of the Claims or Equity Interests, as the case may be, classified in each Class.  See Conf DX 432C - Disclosure Statement, Ex. C at 4-5.

RRR.   No holder of a Claim or Equity Interest will receive more value than such respective Claim or Equity Interest (based on liquidation preference amount).  Conf DX 569 - Goulding Decl. ¶ 68.

SSS.   Only One Plan (11 U.S.C. § 1129(c)).  Other than with respect to prior plans of reorganization filed in these cases, namely, the Sixth Amended Plan and Modified Sixth Amended Plan, the Plan is the only plan filed in each of these cases.  Conf DX 569 – Goulding Decl. ¶ 69.  Accordingly, section 1129(c) is inapplicable in these Chapter 11 Cases.

TTT. <u>Principal Purpose of the Plan (11 U.S.C. § 1129(d))</u>. The principal purpose of the Plan is not the avoidance of taxes or the application of section 5 of the Securities Act of 1933, and no governmental unit has objected to confirmation of the Plan on any such grounds. <u>Id.</u> ¶ 70. The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

UUU. <u>Not a Small Business Case (11 U.S.C. § 1129(e))</u>. The Chapter 11 Cases are not "small business cases" as defined in the Bankruptcy Code. <u>Id.</u> ¶ 71. Accordingly, section 1129(e) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

VVV. <u>Satisfaction of Confirmation Requirements</u>. Based upon the foregoing, the Plan satisfies the requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

WWW. <u>Implementation</u>. All documents necessary to implement the Plan, including those contained in the Plan Supplement and the Global Settlement Agreement, and all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law. Without limiting the generality of the foregoing, the Debtors, prior to the Effective Date, and Reorganized WMI, from and after the Effective Date, are authorized to enter into the Credit Facility substantially on the terms set forth in the Plan and Plan Supplement. The execution, delivery, or performance by the Debtors or Reorganized Debtors, as the case may be, of the Credit Facility and any documents in connection with the Credit Facility, including any guarantees and security documents (together, the "<u>Financing Documents</u>"), and the granting of all Liens and security interests thereunder, and

compliance by the Debtors or Reorganized Debtors, as the case may be, with the terms thereof, is

hereby authorized by, and will not conflict with, the terms of the Plan or the Confirmation Order.

XXX. Good Faith. The Debtors will be acting in good faith if they proceed to (i)

consummate the Plan and the agreements, settlements, transactions, and transfers contemplated

thereby, including, without limitation, the Global Settlement Agreement, and (ii) take the actions

authorized and directed by this Order.

YYY. Liquidating Trust. Entry into the Liquidating Trust Agreement is in the

best interests of the Debtors, the Debtors' estates, and creditors and holders of Equity Interests.

The establishment of the Liquidating Trust, the selection of William C. Kosturos to serve as the

Liquidating Trustee, and the form of the proposed Liquidating Trust Agreement (as it may be

modified or amended) is appropriate and in the best interests of creditors and holders of Equity

Interests. The Liquidating Trust Agreement shall, upon execution, be valid, binding, and

enforceable in accordance with its terms.

ZZZ. Preservation of Causes of Action. It is in the best interests of the Debtors,

their Creditors, and Equity Interest holders, that all Causes of Action, other than those expressly

released pursuant to the Plan and the Global Settlement Agreement, be retained by the

Liquidating Trust, as set forth in the Plan.

AAAA. Retention of Jurisdiction. This Court may properly and, upon the

Effective Date shall, consistent with Article XXXVIII of the Plan, retain exclusive jurisdiction

over all matters arising out of, and related to, the Chapter 11 Cases, including, without limitation,

all Causes of Action not otherwise released pursuant to the Plan and the matters set forth in

Article XXXVIII of the Plan and section 1142 of the Bankruptcy Code. Conf DX 432A - Plan,

Art. XXXVIII.

**Modifications of the Plan**

BBBB. Plan Modifications. The Plan, as modified by the Plan Modifications, is consistent with and meets the requirements of section 1127 of the Bankruptcy Code because such modifications were filed prior to the solicitation of votes and elections on the Plan.

ACCORDINGLY, IT IS HEREBY ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT:

## ORDER

1.    Confirmation of the Plan. The Plan and each of its provisions, as modified pursuant to the Plan Modifications and any revisions made at or subsequent to the Confirmation Hearing as set forth in this Order, including the Plan Supplement, and as may be modified pursuant to section 1127 of the Bankruptcy Code, shall be, and hereby are, CONFIRMED pursuant to section 1129 of the Bankruptcy Code. The documents contained in the Plan Supplement are authorized and approved. The terms of the Plan, as modified by the Plan Modifications and revisions made at or subsequent to the Confirmation Hearing, as set forth in this Order as well as in the revised composite copy attached hereto as Exhibit A, and including the Global Settlement Agreement and the Plan Supplement, as has and may be amended, are incorporated by reference into and are an integral part of this Order.

2.    Compromise of Controversies. For the reasons stated herein and in the January Opinion and September Opinion, the provisions of the Plan and the Global Settlement Agreement constitute a good faith, reasonable, fair, and equitable compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, the Global Settlement Agreement and the compromise and settlement incorporated into the Plan after the Mediation, and the entry of this Order constitutes approval of all such compromises and settlements pursuant to Bankruptcy Rule 9019 and sections 105(a), 363, and 365 of the

Bankruptcy Code. To the extent provided in the Plan and the Global Settlement Agreement, on the Effective Date, such compromises and settlements shall be binding upon the Debtors, the other parties to the Global Settlement Agreement, all Creditors, all holders of Equity Interests, and other Entities.

3.     <u>Global Settlement Agreement Approved</u>. The Court (a) approves the Global Settlement Agreement as a good faith compromise that is fair and reasonable and in the estates' best interests and integral to the Plan, (b) hereby reaffirms its prior approval of the Global Settlement Agreement as set forth in the January Opinion and September Opinion and, (c) subject to the provisions of decretal paragraph 11 hereof, upon the Effective Date, authorizes and directs the consummation of the Global Settlement Agreement by all parties thereto.

4.     <u>Plan Settlement Approved</u>. The Court hereby approves the compromises and settlements embodied in the Plan after and as a result of the Mediation as fair, reasonable, and in the estates' best interests and, upon the effectiveness of the Plan, authorizes and directs the consummation thereof.

5.     <u>Objections</u>. All Objections, responses to, and statements and comments, if any, in opposition to or inconsistent with the Plan and the Global Settlement Agreement shall be and hereby are, OVERRULED and DENIED in their entirety. All withdrawn objections are deemed withdrawn with prejudice.

6.     <u>Equity Committee Actions and Appeals Deemed Withdrawn, With Prejudice</u>. As soon as practicable after the Effective Date, the Equity Committee shall take any and all actions necessary to cause the withdrawal, with prejudice, of each of the Equity Committee Adversary Proceeding, the Equity Committee Action to Compel, the January Equity Committee Appeal, and the Equity Committee's cross-appeal from the September Opinion and

55

September Order, as well as any other proceeding or action instituted by the Equity Committee with respect to the Debtors or the Global Settlement Agreement, including any appeals.

7.    September Appeals. As soon as practicable after the Effective Date, each of (i) AAOC, with (a) Aurelius filing individually and (b) Appaloosa, Owl Creek and Centerbridge filing jointly, (ii) the Creditors' Committee, (iii) the Debtors, (iv) the WMB Noteholders, (v) Normandy Hill, and (vi) Wells Fargo Bank, National Association, solely in its capacity as the PIERS Trustee shall take any and all actions necessary to cause the withdrawal, with prejudice, of such Entities' appeals from the September Opinion and September Order.

8.    Treatment of Preferred Equity Interests. Commencing on the Effective Date, and subject to the execution and delivery of a release in accordance with the provisions of Section 41.6 of the Plan, each holder of a Preferred Equity Interest, including, without limitation, each holder of a REIT Series, shall be entitled to receive such holder's Pro Rata Share of seventy-five percent (75%) of (a) subject to the right of election provided in Sections 6.2(b), 7.2(b), 16.1(b)(ii), 18.2(b), 19.2(b) and 20.2(b) of the Plan, the Reorganized Common Stock, and (b) in the event that all Allowed Claims and Postpetition Interest Claims in respect of Allowed Claims are paid in full (including with respect to Allowed Subordinated Claims), any Liquidating Trust Interests to be redistributed.

9.    Treatment of Common Equity Interests. Commencing on the Effective Date, and subject to the execution and delivery of a release in accordance with the provisions of Section 41.6 of the Plan, each holder of Common Equity Interests shall be entitled to receive such holder's Pro Rata Share of twenty-five percent (25%) of (a) subject to (i) the right of election provided in Sections 6.2(b), 7.2(b), 16.1(b)(ii), 18.2(b), 19.2(b), and 20.2(b) of the Plan and (ii) the rights of holders of Dime Warrants pursuant to the LTW Stipulation, the Reorganized

Common Stock, and (b) in the event that all Allowed Claims and Postpetition Interest Claims in respect of Allowed Claims are paid in full (including with respect to Allowed Subordinated Claims), any Liquidating Trust Interests to be redistributed.

10. <u>Partial Vacatur of September Opinion and September Order</u>. The Court hereby vacates, for all purposes, (a) the September Order to the extent it relates to the Standing Motion, and (b) those portions of the September Opinion that relate to the Standing Motion, namely, (i) Section III (H) of the September Opinion, pages 108 through 139, and (ii) the first sentence on page 68, footnote 31 on page 70 and the last paragraph of Section III(D) of the September Opinion, page 73. All official and unofficial publishers of the September Opinion and/or September Order are hereby advised that such portions of the September Opinion and the September Order have been vacated and should be removed from any publication and/or computer database.

11. <u>Execution of Certain Documents</u>. Prior to the Effective Date, the Debtors and any and all other parties to such documents shall execute and take all other actions necessary to effect and execute the documents necessary to implement the Plan and the Global Settlement Agreement, including, without limitation, the Credit Facility and all related documents, and shall take any and all steps necessary, if any, to reflect or effectuate, as the case may be, the transfer of the Trust Preferred Securities to WMI and then to WMB, and to reflect JPMC as the sole legal, equitable and beneficial owner of the Trust Preferred Securities in accordance with Section 2.3 of the Global Settlement Agreement and in conformity with applicable law. In accordance with Section 2.3 of the Global Settlement Agreement, with respect to matters related to the Trust Preferred Securities, all persons and entities shall be authorized and directed to take instructions solely from JPMC or its designee with respect to those items as to which the owner is entitled to

give instructions, any and all persons and entities shall be authorized and directed to take

necessary, proper or advisable actions and all other actions reasonably requested or instructed by

JPMC to record, reflect, transfer, vest, assign, convey, and maintain, as necessary, that a transfer

of the Trust Preferred Securities was made to WMI (and subsequently by WMI to JPMC) and

that JPMC is the sole legal, equitable, and beneficial owner of the Trust Preferred Securities as

transferee of WMI, including, without limitation, by:  (i) causing the applicable trustees,

registrars, paying agents, depositary, and transfer agents to amend their records (including the

securities registers of each Issuing Trust) to reflect a transfer of the Trust Preferred Securities to

WMI and then to WMB, and to reflect JPMC as the sole legal, equitable, and beneficial owner of

the Trust Preferred Securities; (ii) causing the trustees and boards of directors of the Issuing

Trusts to take all necessary, proper and advisable action to reflect JPMC as the sole legal,

equitable, and beneficial owner of the Trust Preferred Securities; and (iii) amending any

agreements, articles, or declarations to reflect JPMC as the sole legal, equitable, and beneficial

owner of the Trust Preferred Securities.

     12.    <u>Implementation of the Plan</u>.  subject to the provisions of decretal

paragraph 11 hereof, on and after the Effective Date, the Debtors, the Reorganized Debtors, and

the Liquidating Trust are authorized to (i) execute, deliver, file, or record such documents,

contracts, instruments, releases, and other agreements, including, without limitation, those

contained in the Plan Supplement and the Global Settlement Agreement, and including, without

limitation, Section 2.3 of the Global Settlement Agreement, (ii) make any and all distributions

and transfers contemplated pursuant to, and as provided for in, the Plan and the Global

Settlement Agreement, and (iii) take such other actions as may be necessary to effectuate,

implement, and further evidence the terms and conditions of the Plan and the Global Settlement

Agreement, including, among other things, all such actions delineated in Article XXXII of the Plan. On the Effective Date, the appropriate officers or representatives of the Debtors, the Reorganized Debtors and the Liquidating Trust, as the case may be, and members of the boards of directors of the same (including, without limitation, the Trust Advisory Board), are authorized and empowered to issue, execute, file, and deliver or record such documents, contracts, instruments, releases, and other agreements, including those contained in the Plan Supplement, contemplated by the Plan and the Global Settlement Agreement, and make any and all distributions and transfers contemplated pursuant to, and as provided for in, the Plan and the Global Settlement Agreement, in the name of and on behalf of the Debtors and their estates, the Reorganized Debtors and the Liquidating Trust, as applicable. Except as otherwise provided in the Plan, the Prior Disclosure Statement Order, or the Disclosure Statement Order (including, without limitation, with respect to holders of WMB Senior Notes), the record date for determining the holders of Allowed Claims and Equity Interests entitled to receive distributions pursuant to the Plan shall be the Effective Date. Without limiting the generality of the foregoing, and without further action by the Bankruptcy Court or any other party, the Debtors and the Reorganized Debtors are authorized and empowered pursuant to Section 1142 of the Bankruptcy Code to (a) execute, deliver and consummate the Credit Facility and the Financing Documents, (b) perform and comply with all of the terms, conditions, and obligations of and under the Credit Facility and the Financing Documents, (c) take all other actions and execute, deliver, record, and file all other such agreements, documents, instruments, mortgages, deeds of trust, financing statements, releases, applications, registration statements, reports and changes, additions, or modifications thereto in connection with the consummation of the transactions contemplated by the Credit Facility and the Financing Documents and the performance thereof, including, without

limitation, the making of such filings or the recording of any security interests, as may be required under such documents, (d) grant valid, binding, enforceable, and perfected security interests and Liens upon all of the collateral specified in the Credit Facility and the Financing Documents in accordance with the terms thereof, and (e) pay all fees, costs, and expenses under the Credit Facility and Financing Documents.  The financial accommodations to be extended pursuant to the Credit Facility and the other Financing Documents are being extended, and shall be deemed to have been extended by the lenders thereunder, in good faith, for legitimate business purposes, are reasonable, shall not be subject to recharacterization for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any other applicable nonbankruptcy law.  Any person or entity that has asserted mortgages, deeds of trust, Liens, security interests, financing statements, lis pendens or other documents or agreements evidencing claims on or interests in property of the Debtors, as may have been recorded or may otherwise exist, is authorized and directed to execute termination statements, instruments of satisfaction or discharge, or releases of all such claims or interests which such person or entity has with respect to property of the Debtors; if any such person or entity shall not have delivered to the Debtors or the Reorganized Debtors, in proper form for filing or recording and executed by the appropriate party(ies), such termination statements, instruments of satisfaction or discharge, or releases of all such claims or interests which such person or entity has with respect to the property of the Debtors, then the Reorganized Debtors are hereby authorized and directed to execute and file or record any and all such statements, instruments, discharges, releases and other documents, and take any and all other actions as may be necessary on behalf of such person or entity asserting a claim or interests in the Debtors' property.

13.     No Action. Pursuant to section 1142(b) of the Bankruptcy Code, no action of the respective directors or stockholders of the Debtors shall be required to authorize the Debtors to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan and the Global Settlement Agreement, and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan and the Global Settlement Agreement, including, without limitation, the Plan Supplement.

14.     Credit Facility. The financial accommodations to be extended pursuant to the Financing Documents shall not be subject to recharacterization for any purposes whatsoever. Each party to the Credit Facility may rely on the provisions of this Order in closing the Credit Facility.

15.     Binding Effect. On or after entry of this Order, and subject to the occurrence of the Effective Date, except to the extent otherwise provided in the Plan or this Order, the provisions of the Plan shall bind the Debtors, the Reorganized Debtors, the Liquidating Trust, the Liquidating Trustee, all holders of Claims and Equity Interests of the Debtors (irrespective of whether such Claims or Equity Interests are impaired pursuant to the Plan or whether the holders of such Claims or Equity Interests accepted, rejected, or are deemed to have accepted or rejected the Plan), any and all non-Debtor parties to executory contracts and unexpired leases with any of the Debtors, any other party in interest in these Chapter 11 Cases, and the respective heirs, executors, administrators, successors, or assigns, if any, of any of the foregoing.

16.     Free and Clear. Except as otherwise provided in the Plan, in this Order, in the Credit Facility or in the Financing Documents, from and after the Effective Date, (i) pursuant

to sections 363, 1123, and 1141(c) of the Bankruptcy Code, the Plan Contribution Assets to be

transferred to the JPMC Entities and the FDIC Receiver, respectively, pursuant to the Global

Settlement Agreement shall be transferred to such Entities, free and clear of all Claims, liens,

encumbrances, charges, and other interests of any Entity, including, but not limited to, creditors

and equity security holders of the Debtors, except for any claim that is an Allowed JPMC

Assumed Liability Claim, (ii) the Liquidating Trust Assets shall be transferred to the Liquidating

Trust, free and clear of all Claims, liens, encumbrances, charges, and other interests of creditors

and equity security holders of the Debtors, and (iii) the Reorganized Debtors shall be vested with

all property of the estates not otherwise transferred pursuant to the terms of the Plan and the

Global Settlement Agreement, free and clear of all Claims, liens, encumbrances, charges and

other interests of creditors and equity security holders of the Debtors. Each of the transfers of

property of the Debtors, their estates, the Reorganized Debtors, or the Liquidating Trust, as the

case may be, pursuant to the Plan (a) are or shall be deemed to be legal, valid and effective

transfers of property, (b) shall not constitute, or be construed to be, avoidable transfers pursuant

to the Bankruptcy Code or applicable nonbankruptcy law, and (c) shall not subject the Debtors,

the Reorganized Debtors, the Liquidating Trustee, or the Liquidating Trust, as the case may be,

to any liability by reason of such transfer pursuant to the Bankruptcy Code or applicable

nonbankruptcy law, including, without limitation, any law affecting successor or transferee

liability. From and after the Effective Date, the Reorganized Debtors may operate each of their

businesses and use, acquire, or dispose of assets free of any restriction imposed by the

Bankruptcy Code, the Court, or the United States Trustee.

      17.    Exhibit "U" Contracts. All right, title and interest in the contracts listed

on Exhibit "U" to the Global Settlement Agreement and all of the assets acquired thereunder are

deemed to have been the assets of WMB and sold to the Acquisition JPMC Entities pursuant to the Purchase and Assumption Agreement and, effective as of the Effective Date, the WMI Entities shall be deemed to have waived any and all claims and rights to such contracts and all of the assets acquired thereunder.

18. <u>Intellectual Property</u>. All of the WMI Entities' right, title and interest in and to the intellectual property listed on Exhibit "W" to the Global Settlement Agreement shall be deemed to have been sold, transferred and assigned by the WMI Entities to JPMC or its designee on the Effective Date, free and clear of any liens, Claims, interests and encumbrances of any Person, other than the liens, Claims, interests and encumbrances, if any, of JPMC. All right, title and interest in and to the intellectual property listed on Exhibit "X" to the Global Settlement Agreement was sold to the Acquisition JPMC Entities pursuant to the Purchase and Assumption Agreement. All right, title and interest in and to the intellectual property listed on Exhibit "Y" to the Global Settlement Agreement was and remains assets of the WMI Entities. All of the WMI Entities' right, title and interest, if any, in and to trademarks, patents, domain names and copyrighted materials (whether or not the subject of registration) that were used by WMB by license or otherwise, or were available for WMB's use, prior to the Petition Date, but are not listed on Exhibit "W" or "Y" to the Global Settlement Agreement shall be deemed to have been sold, transferred, and assigned by the WMI Entities to JPMC or its designee on the Effective Date.

19. <u>Issuance of Liquidating Trust Interests, Runoff Notes, and Reorganized Common Stock</u>. The Debtors, the Reorganized Debtors and the Liquidating Trustee, as applicable, are authorized, without the need for any further corporate action and without any further action by holders of Claims or Equity Interests, to execute the Liquidating Trust

Agreement and to take all other necessary steps to establish the Liquidating Trust and the
Liquidating Trust Interests therein for the benefit of the Liquidating Trust Beneficiaries. In
addition, Reorganized WMI is authorized, without the need for any further corporate action and
without any further action by holders of Claims or Equity Interests, to issue the Runoff Notes
and Reorganized Common Stock and such notes and stock shall be, upon execution and delivery,
legal, valid, and binding obligations, enforceable against Reorganized WMI in accordance with
their terms.

20.    Compliance with Section 1123(a)(6) of the Bankruptcy Code. The
Reorganized Debtors Certificates of Incorporation and the Reorganized Debtors By-laws
(together, the "Organizational Documents"), and the terms governing the issuance of the stock of
Reorganized WMI, comply in all respects with section 1123(a)(6) of the Bankruptcy Code, and
are hereby approved. The adoption and filing of the Organizational Documents are hereby
authorized, ratified, and approved. The Debtors have complied in all respects, to the extent
necessary, with section 1123(a)(6) of the Bankruptcy Code.

21.    Boards of Directors of Reorganized Debtors. As of the Effective Date, the
board of directors of each of the Debtors, as constituted immediately prior to the Effective Date,
are hereby removed and Michael Willingham, Mark Holliday, Diane Glossman, Timothy
Graham, and Gene Davis are hereby appointed as directors of the Reorganized Debtors, to serve
until their resignation or removal pursuant to the terms and provisions of the Organizational
Documents; provided, however, that the first annual election of the boards of directors shall take
place no later than fifteen (15) months after the Effective Date. At such time as the Equity
Committee has designated its two (2) remaining selections for the boards of directors of the
Reorganized Debtors, a notice thereof shall be filed with this Court. In the event that, during the

period from the Confirmation Hearing up to and including the Effective Date, circumstances require the substitution of one (1) or more persons selected to serve on the boards of directors of the Reorganized Debtors, the Equity Committee and the lenders party to the Credit Facility, as the case may be, shall choose a respective substitute and the Debtors shall file a notice thereof with the Bankruptcy Court, and, for purposes of section 1129 of the Bankruptcy Code, any such replacement person, designated in accordance with Section 40.4 of the Plan, shall be deemed to have been selected and disclosed prior to the Confirmation Hearing.

22. **Exemption from Securities Law.** The issuance of Runoff Notes, Reorganized Common Stock, and the Liquidating Trust Interests, and any subsequent sale, resale, transfer, or other distribution of any such securities shall be exempt from any federal or state securities laws registration requirements, including section 5 of the Securities Act, to the fullest extent permitted by section 1145 of the Bankruptcy Code.

23. **Cancellation of Existing Securities and Agreements.** Pursuant to Section 32.4 of the Plan, and except as otherwise provided in the Plan, any document, agreement, or instrument evidencing any Claim or Equity Interest shall be deemed automatically cancelled and terminated on the Effective Date without further act or action under any applicable agreement, law, regulation, order, or rule and any and all obligations or liabilities of the Debtors under such documents, agreements, or instruments evidencing such Claims and Equity Interests shall be discharged; provided, however, that the foregoing cancellation of securities, documents, agreements or instruments shall not apply to (a) the securities related to the WMB Senior Notes or the WMB Subordinated Notes and (b) any security, document, agreement or instrument related to a Disputed Claim or Disputed Equity Interest until a Final Order resolving any such Disputed Claim or Disputed Equity Interest, as applicable, is entered; and, provided, further, that,

during the pendency of any such dispute, and except as provided in the Plan with respect to

Postpetition Interest Claims, the Debtors shall not accrue or incur any additional liability or

obligation with respect thereto; and, <u>provided, further</u>, that the Indentures and Guarantee

Agreements shall continue in effect for the limited purposes of (i) allowing the Trustees to make

distributions pursuant to the Plan and to perform such other necessary functions with respect

thereto, (ii) permitting the Trustees to maintain and assert any right or Lien for reasonable fees,

costs, expenses and indemnities under the Indentures and Guarantee Agreements, (iii)

effectuating the applicable subordination provisions of such documents, (iv) enabling the

beneficial holders of the securities to receive distributions and (v) enabling the Trustees to make

applications in accordance with Section 31.12 of the Plan; and, <u>provided, further</u>, that, except as

otherwise provided in the Plan, nothing in the Plan shall impair, affect, or adversely affect the

related transactions and the rights of the parties thereto.  Notwithstanding any of the foregoing,

nothing contained in the Plan shall be deemed to impair, waive or extinguish any rights of the

Trustees with respect to any rights contained in the respective Indentures or Guarantee

Agreements; <u>provided, however</u>, that, upon payment in full of the respective Trustee Claims and

Trustee Distribution Expenses in accordance with the Plan, the rights of the Trustees to seek

payment from or assert claims against the Debtors for amounts owed under the respective

Indentures or Guarantee Agreements shall be discharged as provided in the Plan.

     24.    <u>Surrender of Instruments</u>.  Except to the extent evidenced by electronic

entry, as a condition of receiving any distribution pursuant to the Plan, each holder of a

certificated instrument (other than with respect to WMI Preferred Equity Interests or WMI

Common Equity Interests) or note must surrender such instrument or note to the appropriate

Trustee, agent, or the Disbursing Agent or its designee.  Any holder of such instrument or note

that fails to (i) surrender such instrument or note or (ii) execute and deliver an affidavit of loss and/or indemnity or similar affidavit reasonably satisfactory to the appropriate Trustee, agent, or the Disbursing Agent before the first (1st) anniversary of the Effective Date shall be deemed to have forfeited all rights, interests and Claims and may not participate in any distribution pursuant to the Plan. Any distribution so forfeited shall become the property of the Disbursing Agent for distribution to holders of Allowed Claims and Equity Interests in accordance with the terms and provisions of the Plan.

25.     Liquidating Trust.  On or before the Effective Date, the Liquidating Trust Agreement shall be executed by the Debtors or the Reorganized Debtors, as applicable, and the Liquidating Trustee.  In addition, the parties shall, without any additional or further Court authority, take all other steps necessary to establish the Liquidating Trust and the Liquidating Trust Interests therein.  In the event of any conflict between the terms of the Plan and the terms of the Liquidating Trust Agreement, the terms of the Liquidating Trust Agreement shall govern. The Liquidating Trust Agreement may provide powers, duties and authorities in addition to those explicitly stated in the Plan, but only to the extent that such powers, duties and authorities do not affect the status of the Liquidating Trust as a liquidating trust for United States federal income tax purposes. The Liquidating Trust Assets shall be transferred to the Liquidating Trust in accordance with the provisions of the Plan, the Liquidating Trust Agreement, and this Order. Pursuant to the Liquidating Trust Agreement, William C. Kosturos is hereby appointed as "Managing Trustee" and CSC Trust Company of Delaware is hereby appointed as "Resident Trustee" of the Liquidating Trust.

26.     Assumption or Rejection of Contracts and Leases.  Pursuant to Section 34.1 of the Plan, except as otherwise provided herein, or in any contract, instrument, release, or

other agreement or document entered into in connection with the Plan, as of the Effective Date,

the Debtors shall be deemed to have rejected each prepetition executory contract and unexpired

lease to which they are a party, pursuant to section 365 of the Bankruptcy Code, unless such

contract or lease (i) was assumed, assumed and assigned, or rejected pursuant to an order of the

Court entered prior to the Effective Date, (ii) previously expired or terminated pursuant to its

own terms or by agreement of the parties, (iii) is the subject of a motion to assume or assume and

assign filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated

as a contract or lease to be assumed or assumed and assigned on the Schedule to the Plan

Supplement, including, without limitation, any executory contract or unexpired lease sold,

accepted, or transferred to one of the JPMC Entities pursuant to the terms of the Global

Settlement Agreement. This Order shall constitute an order of the Court pursuant to sections 365

and 1123(b) of the Bankruptcy Code approving the contract and lease assumptions or rejections

described above, as of the Effective Date.

      27.   <u>Objection to Cure Amounts; Rejection Damage Claims</u>. Any dispute

regarding (i) the amount of any cure payment, (ii) the ability to provide "adequate assurance of

future performance" (within the meaning of section 365 of the Bankruptcy Code), or (iii) any

other matter pertaining to assumption had to have been filed and served within twenty (20) days

of the date of service of the Cure Notice. No party filed any such objection. If the rejection of

an executory contract or unexpired lease by the Debtors pursuant to the Plan results in damages

to the other party or parties to such contract or lease, any claim for such damages, if not

heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be

enforceable against the Debtors, or their properties or agents, successors, or assigns, including,

without limitation, the Reorganized Debtors and the Liquidating Trust, unless a proof of Claim is

filed with the Court and served upon attorneys for the Debtors or the Liquidating Trustee, as the

case may be, on or before thirty (30) days after the latest to occur of (i) the Confirmation Date,

and (ii) the date of entry of an order by the Court authorizing rejection of such executory contract

or unexpired lease.

28.     <u>Payment of Cure Amounts</u>.  Any monetary amount required as a cure

payment with respect to each prepetition executory contract and unexpired lease to be assumed

pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by

payment of the cure amount in Cash on the Effective Date or upon such other terms and dates as

the parties to such executory contracts or unexpired leases and the Debtors, otherwise may agree.

29.     <u>Non-Release of Certain Obligations</u>.  Notwithstanding anything contained

in the Global Settlement Agreement or the Plan to the contrary, nothing is intended to release,

nor shall it have the effect of releasing, (a) the WMI Releasees (as defined in the Global

Settlement Agreement), the JPMC Releasees (as defined in the Global Settlement Agreement), or

the FDIC Parties from the performance of their obligations in accordance with the Global

Settlement Agreement and the agreements set forth on Schedules 3.1(b) and 3.2 to the Global

Settlement Agreement and (b) any Releasee (as defined in the Global Settlement Agreement) or

any Person, including, without limitation, the United States of America, from any claims and

causes of action asserted or that could be asserted in either the American Savings Litigation or

the Anchor Litigation, nor is it intended to assign, nor shall it have the effect of assigning, any

claims or causes of action asserted or that could be asserted in either the American Savings

Litigation or the Anchor Litigation, but only to provide for the disposition of the proceeds, if

any, arising from such litigation.  In addition, as set forth in and consistent with Section 3.8 of

the Global Settlement Agreement, nothing in the Global Settlement Agreement, the Plan, or this

Order shall waive, release, acquit or discharge, nor shall anything in the Global Settlement Agreement, the Plan, or this Order be construed to waive, release, acquit or discharge the rights and obligations of JPMC and the FDIC Parties pursuant to the Purchase and Assumption Agreement, including, without limitation, any right to assert that liabilities remain with the FDIC Parties or seek indemnification in accordance with the provisions of Section 12.1 of the Purchase and Assumption Agreement or dispute the assertion of liabilities or the entitlement to indemnification; provided, however, that the Global Settlement Agreement shall affect and be binding upon JPMC and the FDIC Parties to the extent it resolves any and all claims among JPMC and the FDIC Parties to the assets and consideration paid, sold, assigned and transferred to the JPMC Entities and the FDIC Parties pursuant to the Global Settlement Agreement and the Purchase and Assumption Agreement.

30.    Setoff. Except as otherwise provided in the Plan, the Disbursing Agent may, pursuant to applicable bankruptcy and nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Allowed Claim), the Claims, rights, and Causes of Action of any nature the Debtors, the Reorganized Debtors, or the Liquidating Trust may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, Reorganized Debtors, or Liquidating Trust of any such Claims, rights, and Causes of Action.

31.    Delivery of Distributions. Subject to the provisions of Rule 9010 of the Bankruptcy Rules, and except as provided in Section 31.5 of the Plan and herein, distributions and deliveries to holders of Allowed Claims or Equity Interests shall be made at the address of

each such holder as set forth on the Schedules filed with the Court, unless superseded by the address set forth on proofs of Claim or Equity Interests filed by such holders, or at the last known address of such holder if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address; provided, however, that initial distributions of Creditor Cash by the Disbursing Agent for the benefit of holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, and Allowed PIERS Claims as applicable, shall be made to the appropriate Trustee (or such Trustee's designee) under the respective governing documents for such obligations. Each such Trustee (or such Trustee's designee) shall, in turn, in accordance with the Plan, distribute and deliver Creditor Cash, as applicable, to those holders in whose name Senior Notes, Senior Subordinated Notes, CCB-1 Common Securities, CCB-1 Preferred Securities, CCB-2 Common Securities, CCB-2 Preferred Securities, PIERS Common Securities (subject to Section 37 below), and PIERS Preferred Securities representing Allowed Claims are registered, in the applicable Trustees' books and records, on the Distribution Record Date, in the manner provided for in the applicable Indenture and other governing documents. The Trustees may conclusively rely upon the distribution instructions received from the Debtors or their agents with respect to contra-CUSIP positions and escrow positions set up by the Debtors or their agents with the DTC, and the Trustees shall close and terminate the original CUSIPS after making initial distributions of Creditor Cash and shall have no further distribution obligations thereafter. The Trustees shall not be required to give any bond or surety or other security for the performance of their duties, unless otherwise ordered by the Court. The Trustees shall only be required to make the distributions and deliveries described in this decretal paragraph and shall be only required to make such distributions and deliveries in accordance with the terms of this Order and the Plan,

and shall have no liability for actions taken in accordance with this Order, the Plan or in reliance upon information provided to the Trustees in accordance with this Order, the Plan or in connection with distributions to be made hereunder and thereunder, except for liabilities resulting from their own gross negligence or willful misconduct. Initial distributions of Runoff Notes, Reorganized Common Stock and Liquidating Trust Interests by the Disbursing Agent for the benefit of holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, Allowed General Unsecured Claims, Allowed Late-Filed Claims, Allowed PIERS Claims, Allowed WMB Senior Notes Claims, Accepting Non-Filing WMB Senior Note Holders, Allowed Subordinated Claims, Allowed Preferred Equity Interests, Allowed Dime Warrants and Allowed Common Equity Interests, as and to the extent applicable, will be made by the Disbursing Agent directly to such holders, upon consent of the applicable Trustee, which consent shall not be unreasonably withheld. Subsequent distributions to such holders, as and to the extent applicable, that have identified themselves to the Liquidating Trustee, to the extent the Liquidating Trustee deems appropriate, will be the responsibility of the Liquidating Trustee as Disbursing Agent. Notwithstanding the foregoing, all distributions are subject to the Lien and priority rights of the Trustees. The Debtors, their agents and servicers, the Disbursing Agent and the Trustees shall have no obligation to recognize any transfer of Senior Notes Claims, Senior Notes, Senior Subordinated Notes Claims, Senior Subordinated Notes, CCB-1 Guarantees Claims, CCB-1 Guarantees, CCB-1 Common Securities, CCB-1 Preferred Securities, CCB-2 Guarantees Claims, CCB-2 Guarantees, CCB-2 Common Securities, CCB-2 Preferred Securities, General Unsecured Claims, Late-Filed Claims PIERS Claims, PIERS Common Securities, PIERS Preferred Securities, Preferred Equity Interests, Dime Warrants and Common Equity Interests occurring

after the Distribution Record Date, or any transfer of WMB Senior Notes or WMB Senior Notes Claims occurring after October 25, 2010; provided, however, that the Liquidating Trustee shall recognize transfers of Liquidating Trust Interests in accordance with the Plan and the Liquidating Trust Agreement, which provide that a Liquidating Trust Interest is not transferable or assignable by a Liquidating Trust Beneficiary except by will, intestate succession or operation of law.

32. <u>Distributions to Holders of Dime Warrants</u>. The Distributions on account of the Allowed LTW Claims (as defined in that certain *Stipulation and Agreement Between the Debtors and Class Representatives of the LTW Holders Resolving Adversary Proceeding and the LTW Proofs of Claim*, dated January 10, 2012 (the "<u>LTW Stipulation</u>")) shall be made in accordance with the LTW Stipulation. After reimbursement of fees and expenses allowed by the Court, the balance of the distribution on account of the Allowed LTW Claims (as defined in the LTW Stipulation) shall be made on a pro rata basis to those holders of Dime Warrants who execute and deliver the release required pursuant to in Section 41.6 of the Plan on or prior to February 29, 2012.

33. <u>Disbursing Agent</u>. Pursuant to Section 1.89 of the Plan, the Disbursing Agent shall be (a) the Reorganized Debtors or the Reorganized Debtors' designee, with respect to the initial distribution of (i) Cash pursuant to Article III of the Plan to holders of Allowed Administrative Expense Claims and, to the extent applicable, Allowed Priority Tax Claims as of the Effective Date; (ii) Cash to holders of Allowed Priority Non-Tax Claims as of the Effective Date; (iii) Cash to holders of Allowed Convenience Claims, Allowed WMI Claims, Allowed Trustee Claims and the fees and expenses owed to certain Creditors' professionals pursuant to Section 41.18 of the Plan (to the extent approved by the Court as reasonable), in each case as of the Effective Date; (iv) Creditor Cash pursuant to Section 31.1 of the Plan; and (v) Runoff Notes,

Liquidating Trust Interests and Reorganized Common Stock to or for the benefit of holders of Allowed Claims and Equity Interests, as applicable, the Reorganized Debtors or the Reorganized Debtors' designee, and (b) the Liquidating Trustee or any Entity in its capacity as a disbursing agent, with respect to all other distributions. The Disbursing Agent also shall, at the election of JPMC, make the distribution to each Releasing REIT Trust Holder set forth in Article XXIII of the Plan Cash or stock transferred by JPMC to the Disbursing Agent for that purpose. In its role as Disbursing Agent, the Reorganized Debtors shall hold Cash, Creditor Cash, Runoff Notes, Reorganized Common Stock, and Liquidating Trust Interests as agent only, and shall not have any ownership interest in such cash, stock or interests.

34. <u>"Pro Rata Share" for Holders of Claims Subordinated to the Level of Equity Interests</u>. For purposes of calculating Pro Rata Share of distributions for holders of Claims, the share count for such holders shall be determined by dividing the amount of an Allowed Claim by the per share price of WMI common stock as of the close of business on the day immediately preceding the Petition Date.

35. <u>Tax Withholdings by Liquidating Trustee</u>. The Liquidating Trustee may withhold and pay to the appropriate Tax Authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution to the holders of Liquidating Trust Interests. All such amounts withheld and paid to the appropriate Tax Authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of Liquidating Trust Interests for all purposes of the Liquidating Trust Agreement. The Liquidating Trustee shall be authorized to collect such tax information from the holders of Liquidating Trust Interests (including, without limitation, social security numbers or other tax identification numbers) as in its sole discretion

the Liquidating Trustee deems necessary to effectuate the Plan, this Order, and the Liquidating

Trust Agreement.  In order to receive distributions under the Plan, all holders of Liquidating

Trust Interests (including, without limitation, (i) holders of Allowed Senior Notes Claims,

Allowed Senior Subordinated Notes Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-

2 Guarantees Claims, Allowed General Unsecured Claims, Allowed Late-Filed Claims, Allowed

PIERS Claims, Allowed WMB Senior Notes Claims, Allowed Preferred Equity Interests,

Allowed Common Equity Interests and holders of Dime Warrants and (ii) Accepting Non-Filing

WMB Senior Note Holders, who, in each case, deliver a release in accordance with the

provisions of Section 41.6 of the Plan shall be required to identify themselves to the Liquidating

Trustee and provide tax information and the specifics of their holdings, to the extent the

Liquidating Trustee deems appropriate in the manner and in accordance with the procedures

from time to time established by the Liquidating Trustee for these purposes.  This identification

requirement generally applies to all holders, including those who hold their securities in street

name.  The Liquidating Trustee may refuse to make a distribution to any holder of a Liquidating

Trust Interest that fails to furnish such information in a timely fashion, and until such

information is delivered, and may treat such holder's Liquidating Trust Interests as disputed;

provided, however, that, upon the delivery of such information by a holder of a Liquidating Trust

Interest, the Liquidating Trustee shall make such distribution to which the holder of the

Liquidating Trust Interest is entitled, without additional interest occasioned by such holder's

delay in providing tax information; and, provided, further, that, if such information is not

furnished to the Liquidating Trustee within six (6) months of the original request to furnish such

information, no further distributions shall be made to the holder of such Liquidating Trust

Interest; and, provided, further that, if the Liquidating Trustee fails to withhold in respect of

amounts received or distributable with respect to any such holder and the Liquidating Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Liquidating Trustee for such liability (to the extent such amounts were actually distributed to such holder).

36.     Distributions to Holders of Allowed WMB Senior Notes Claims and Accepting Non-Filing WMB Senior Note Holders.  Pursuant to Sections 21.1(a) and (b) of the Plan, amounts distributed to holders of Allowed WMB Senior Notes Claims and Accepting Non-Filing WMB Senior Note Holders shall not be credited against or otherwise reduce such holders' claims against the Receivership solely for purposes of determining the holder's relative participation in distributions (unless and until the holder has recovered, in the aggregate, through distributions pursuant to the Plan and from the Receivership, the full amount of its claim); provided, however, that no holder of a WMB Senior Note shall be entitled to receive, in the aggregate from distributions from the Debtors and the Receivership, more than the amount owed with respect to such WMB Senior Note.  Pursuant to the Plan and the Plan Support Agreement, payments made by the Debtors pursuant to Sections 21.1(a) and (b) of the Plan shall be treated as payments made on account of the WMB Senior Notes held by holders of Allowed WMB Senior Notes Claims and Accepting Non-Filing WMB Senior Note Holders, and shall reduce the principal amount of such notes (and thus the maximum recovery permitted against the Receivership).

37.     Distributions on Account of PIERS Common Securities.  Pursuant to Section 20.1 of the Plan, the beneficial holder of the PIERS Common Securities shall receive its Pro Rata Share of Creditor Cash and Liquidating Trust Interests; provided, however, that any distribution on account of the PIERS Common Securities of Creditor Cash and Cash on account of Liquidating Trust Interests shall be redistributed to Entities who hold PIERS Preferred

Securities, or Liquidating Trust Interests on account thereof, until such time as such Entities'

Allowed PIERS Claims and Postpetition Interest Claims have been satisfied in accordance with

the terms and provisions of the PIERS Trust Agreement, and the beneficial holder of the PIERS

Common Securities shall be deemed to have waived its right to receive any distribution in excess

of such amount.

    38.    <u>Distributions on Account of CCB-1 Common Securities</u>.  Pursuant to

Section 18.1 of the Plan, the beneficial holder of the CCB-1 Common Securities shall receive its

Pro Rata Share of Creditor Cash and Liquidating Trust Interests; <u>provided</u>, <u>however</u>, that any

distribution on account of the CCB-1 Common Securities of Creditor Cash and Cash on account

of Liquidating Trust Interests shall be redistributed to Entities who hold CCB-1 Preferred

Securities, or Liquidating Trust Interests on account thereof, until such time as such Entities'

Allowed CCB-1 Guarantees Claims and Postpetition Interest Claims have been satisfied in

accordance with the terms and provisions of the CCB Trust Agreements.

    39.    <u>Distributions on Account of CCB-2 Common Securities</u>.  Pursuant to

Section 19.1 of the Plan, the beneficial holder of the CCB-2 Common Securities shall receive its

Pro Rata Share of Creditor Cash and Liquidating Trust Interests; <u>provided</u>, <u>however</u>, that any

distribution on account of the CCB-2 Common Securities of Creditor Cash and Cash on account

of Liquidating Trust Interests shall be redistributed to Entities who hold CCB-2 Preferred

Securities, or Liquidating Trust Interests on account thereof, until such time as such Entities'

Allowed CCB-2 Guarantees Claims and Postpetition Interest Claims have been satisfied in

accordance with the terms and provisions of the CCB Trust Agreements.

    40.    <u>Disputed Claims Holdback</u>.  The holdback for Disputed Claims provided

for in Section 26.3 of the Plan and the terms thereof are hereby approved in their entirety;

provided, however, that the Debtors and the Liquidating Trustee are not obligated to hold back or reserve any Creditor Cash, Cash, Liquidating Trust Interests, Runoff Notes, Reorganized Common Stock, or other currency on account of Claims that JPMC is obligated to pay pursuant to the Global Settlement Agreement, including, without limitation, (a) Claims in Classes 4 through 10, which will be paid or funded by JPMC (to the extent provided in the Plan), or (b) Claims in Class 11, which will be paid from the Vendor Escrow; and, provided, further, that the Debtors and the Liquidating Trustee are not obligated to hold back or reserve any Creditor Cash, Cash, Liquidating Trust Interests, Runoff Notes, Reorganized Common Stock or other currency on account of any tax claim for which monies have been set aside in the Refund Escrow Account (as defined in the Global Settlement Agreement) for potential payment.

41. <u>Disputed Equity Escrow</u>. From and after the Effective Date, until such time, or from time to time, as each Disputed Equity Interest has been compromised and settled or allowed or disallowed by Final Order of the Bankruptcy Court, there shall be held in the Disputed Equity Escrow by the Liquidating Trustee, as escrow agent, for the benefit of each holder of a Disputed Equity Interest, Reorganized Common Stock and any dividends, gains or income attributable in respect of such Reorganized Common Stock, in an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Equity Interest if it were an Allowed Equity Interest. To the extent that the Liquidating Trustee retains any such Reorganized Common Stock, until such time as such stock is distributed, the Liquidating Trustee shall exercise voting or consent rights with respect to such stock; provided, however, that the Liquidating Trustee shall be obligated to vote or consent, as the case may be, as to such stock in the same proportion as all other holders of issued and distributed Reorganized Common Stock have voted or consented, in each case on an issue-by-issue basis. Apart from the

Liquidating Trustee serving as escrow agent, the Disputed Equity Escrow shall be separate and distinct from the Liquidating Trust (and the Liquidating Trust Claims Reserve), and the assets therein shall not comprise part of the Liquidating Trust Assets. At such time as any other Disputed Equity Interest becomes, in whole or in part, an Allowed Equity Interest, the Liquidating Trustee shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan, together with any dividends, gains or income attributable thereto. To the extent a Disputed Equity Interest is disallowed, in whole or in part, the Liquidating Trustee, as escrow agent, shall distribute to the holders of Common Equity Interests entitled to receive a distribution in accordance with the provisions of Sections 24.1 and 25.1 of the Plan, on a pro rata basis, the shares of Reorganized Common Stock, together with any dividends, gains or income attributable thereto, allocable to such Disputed Equity Interest. to the extent of such disallowance.

42. <u>Reserve Pending Delivery of Third Party Release by Holders of Claims</u>. Notwithstanding anything contained in the Plan to the contrary, in the event that a holder of a Claim entitled to a distribution thereunder failed to execute and deliver prior to the Ballot Date the third party release required in accordance with the provisions of Section 41.6 of the Plan (other than (a) holders that affirmatively elect to opt out of granting the releases provided in Section 41.6 and (b) of Claims in Class 17A and Non-Filing WMB Senior Note Holders), (i) from and after the Effective Date, the Disbursing Agent or the Liquidating Trustee, as the case may be, shall reserve amounts of Creditor Cash and Liquidating Trust Interests (but not Runoff Notes), as the case may be, otherwise to be distributed to such holder,[11] (ii) provided that a third

---

[11] With respect to Claims in Classes 2, 3, and 16 relating to debt securities, holders of such securities as of the cancellation date of such securities (*i.e.*: the Effective Date).

party release is not executed and delivered by such holder to the Liquidating Trustee prior to the three (3), six (6) and nine (9) month anniversary of the Effective Date, on or prior to the fifth (5th) Business Day following any such date, the Liquidating Trustee shall serve a notice (together with a form of release) upon such holder, either directly or indirectly through such holder's nominee, informing such holder of such reserved distribution and the requirement of such holder to execute and deliver such third party release to the Liquidating Trustee prior to delivery of such reserved distribution, and (iii) in the event that, on or prior to the one (1) year anniversary of the Effective Date, such holder fails to execute and deliver such third party release to the Liquidating Trustee, then, the Liquidating Trustee shall be deemed authorized to permanently remove such holder and its corresponding Claim from the Liquidating Trustee's books and records and any consideration held for distribution on account of such Allowed Claim shall revert to the Liquidating Trustee for redistribution to holders of Liquidating Trust Interests in accordance with the terms and provisions of the Plan and hereof. Without in any way limiting the foregoing, any release election, whether submitted in accordance with this Section 31.6(c) of the Plan or otherwise, submitted during the period between the Ballot Date and the Effective Date shall not be recognized and shall be deemed null and void. In the event that a holder of a Claim seeks to receive and execute a release form in accordance with this provision at any time from and after the Effective Date, but other than pursuant to the periodic notices to be distributed as set forth above, then such holder may, following the Effective Date, submit a request, in writing, to the Liquidating Trustee to receive a release form, and the appropriate trustee will send such form to such requesting holder on or prior to the fifth (5th) Business Day following the date such trustee receives such request; provided, however, that under no circumstances shall requests

for such release form from holders of Claims in Class 17A and Non-Filing WMB Senior Note Holders be honored by the Liquidating Trustee.

43.     Deadline for Submission of Third Party Releases by Holders of Equity Interests and Dime Warrants.  Holders of Preferred Equity Interests and Common Equity Interests that do not submit elections with respect to the releases set forth in Section 41.6 of the Plan on or prior to March 7, 2012 will not receive a distribution pursuant to the Plan.  Holders of Dime Warrants that do not submit elections with respect to the releases set forth in Section 41.6 of the Plan on or prior to February 29, 2012 will not receive a distribution pursuant to the Plan.

44.     Claims of Subordination.  Except as specifically provided in the Plan, to the fullest extent permitted by applicable law, on the latest to occur of (i) the Effective Date, (ii) the entry of a Final Order resolving all Claims in the Chapter 11 Cases, and (iii) the final distribution made to holders of Allowed Claims in accordance with Article XXXI of the Plan, all Claims and Equity Interests, and all rights and claims between or among holders of Claims and Equity Interests relating in any manner whatsoever to Claims or Equity Interests, based upon any contractual, equitable or legal subordination and/or subrogation rights, will be terminated and discharged in the manner provided in the Plan, and all such Claims, Equity Interests and rights so based, and all such contractual, equitable and legal subordination and/or subrogation rights to which any Entity may be entitled will be irrevocably waived.  To the fullest extent permitted by applicable law, the rights afforded and the distributions that are made in respect of any Claims or Equity Interests under this Plan will not be subject to levy, garnishment, attachment or like legal process by any holder of a Claim or Equity Interest by reason of any contractual, equitable or legal subordination and/or subrogation rights, so that, notwithstanding any such contractual,

equitable or legal subordination and/or subrogation rights, each holder of a Claim or Equity

Interest shall have and receive the benefit of the rights and distributions set forth in this Plan.

45.    <u>No Amendments to Proofs of Claim</u>.  As of the commencement of the

Confirmation Hearing, a proof of Claim may not be filed or amended without the authority of the

Court.  Notwithstanding that the Court may permit the filing or amendment of such a proof of

Claim, the Debtors are not required to reserve Liquidating Trust Assets to pay or otherwise

satisfy any such Claims.

46.    <u>Conditions to Effective Date</u>.  The Plan shall not become effective unless

and until the conditions set forth in Section 37.1 of the Plan have been satisfied or waived

pursuant to Section 37.2 of the Plan.  For the avoidance of doubt, no waiver of the conditions

precedent to the Effective Date shall have occurred without the consent of the Creditors'

Committee, the Equity Committee, the JPMC Entities, the FDIC Receiver, FDIC Corporate, and

AAOC.

47.    <u>Administrative Claim Bar Date</u>.  The last day to file proof of

Administrative Expense Claims shall be ninety (90) days after the Effective Date, after which

date, any proof of Administrative Expense Claim not filed with this Court shall be deemed

forever barred and the Debtors, the Reorganized Debtors, and the Liquidating Trust shall have no

obligation with respect thereto; <u>provided</u>, however, that no proof of Administrative Expense

Claim shall be required to be filed if such Administrative Expense Claim shall have been

incurred (i) in accordance with an order of this Court or (ii) with the consent of the Debtors and

in the ordinary course of the Debtors' operations.

48.    <u>Professional Compensation and Reimbursement Claims</u>.  Except as

provided in Section 41.18 of the Plan, all Entities awarded compensation or reimbursement of

expenses by the Bankruptcy Court in accordance with sections 328, 330, or 331 of the Bankruptcy Code or entitled to priorities established pursuant to sections 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code shall be paid in full, in Cash, in the amounts allowed by the Bankruptcy Court (i) on or as soon as reasonably practicable following the later to occur of (a) the Effective Date and (b) the date upon which the Bankruptcy Court order allowing such Claim becomes a Final Order or (ii) upon such other terms no more favorable to the claimant than as may be mutually agreed upon between such claimant and the Disbursing Agent; provided, however, that, except as provided herein, each professional must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the Administrative Claim Bar Date. Except as otherwise ordered by the Court, the Disbursing Agent is authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Court approval.

49.    Objections to Final Fee Applications. All objections to any Final Fee Application shall be filed with the Court, together with proof of service thereof, and served upon the applicant, the Debtors, the U.S. Trustee, the Creditors' Committee, the Equity Committee, and parties entitled to receive notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002, so as to be received not later than 4:00 p.m., prevailing Eastern Time, on the date that is fifteen (15) days prior to the Final Fee Hearing.

50.    Assumption of Blackstone Engagement Letter by Liquidating Trustee in Certain Circumstances. From and after the Effective Date, the Reorganized Debtors shall remain bound by that certain engagement letter, dated April 20, 2010, by and among Blackstone Advisory Partners L.P. ("Blackstone") and the Debtors (including that certain indemnification

agreement, dated April 9, 2010), as amended by that certain supplemental engagement letter,

dated November 3, 2010 (collectively, the "Engagement Letter").

      51.    Administrative Expenses. Administrative expenses incurred by the

Debtors or the Reorganized Debtors after the Effective Date, including Claims for professionals'

fees and expenses, shall not be subject to an application and may be paid by the Debtors or the

Reorganized Debtors, as the case may be, in the ordinary course of business and without further

Court approval.

      52.    Discharge. As of the Effective Date, the confirmation of the Plan shall

effectuate the following:

      a.    Except as expressly provided in Section 41.6 of the Plan or this

Order, all distributions and rights afforded under the Plan and the treatment of Claims and

Equity Interests under the Plan shall be, and shall be deemed to be, in exchange for, and in

complete satisfaction, settlement, discharge and release of, all Claims and any other

obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities

of any nature whatsoever, and of all Equity Interests, or other rights of a holder of an Equity

Interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective

assets, property and estates, or interests of any nature whatsoever, including any interest

accrued on such Claims from and after the Petition Date, and regardless of whether any

property will have been distributed or retained pursuant to the Plan on account of such

Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of

action or liabilities, or Equity Interests or other rights of a holder of an equity security or

other ownership interest. Upon the Effective Date, the Debtors and the Reorganized Debtors

shall (i) be deemed discharged under section 1141(d)(1)(A) of the Bankruptcy Code and

released from any and all Claims and any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, and any Equity Interests or other rights of a holder of an equity security or other ownership interest, of any nature whatsoever, including, without limitation, liabilities that arose before the Effective Date (including prior to the Petition Date), and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan, and (ii) terminate and cancel all rights of any equity security holder in any of the Debtors and all Equity Interests.

   b.  Except as provided in Sections 41.6 and 41.12 of the Plan or in this Order, all Entities shall be precluded from asserting against any and each of the Debtors and the Reorganized Debtors, and any and each of their respective assets, property and estates, any other or further Claims, or any other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities of any nature whatsoever, and of all Equity Interests, or other rights of a holder of an Equity Interest, relating to any of the Debtors or the Reorganized Debtors or any of their respective assets, property and estates, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities, or Equity Interests or other rights of a holder of an equity security or other ownership interest. In accordance with the foregoing, except as expressly provided in the Plan or this Order, this Order shall constitute a judicial determination, as of the Effective

Date, of the discharge and release of all such Claims or other obligations, suits, judgments,

damages, debts, rights, remedies, causes of action or liabilities, and any Equity Interests, or

other rights of a holder of an equity interest and termination of all rights of any such holder in

any of the Debtors, pursuant to sections 524 and 1141 of the Bankruptcy Code, and such

discharge shall void and extinguish any judgment obtained against any of the Debtors or the

Reorganized Debtors, and their respective assets, property and estates at any time, to the

extent such judgment is related to a discharged Claim, debt or liability or terminated right of

any holder of any Equity Interest in any of the Debtors. As of the Effective Date, and in

consideration for the value provided under the Global Settlement Agreement to effectuate the

Plan, each holder of a Claim or Equity Interest in any Class under the Plan shall be and

hereby is deemed to release and forever waive and discharge as against each and any of the

Debtors and the Reorganized Debtors, and their respective assets, property and estates, all

such Claims and Equity Interests.

     c.     Except as expressly provided in Sections 41.6 and 41.12 of the

Plan or this Order, in furtherance of the foregoing and for good and valuable consideration,

and except for the JPMC Assumed Liabilities, Allowed WMB Vendor Claims, and Allowed

WMI Vendor Claims, to the extent provided in the Global Settlement Agreement, none of the

JPMC Entities or any of their Related Persons shall have any liability for, and the Debtors, on

behalf of themselves, their respective estates and their present Affiliates (other than WMB

and its subsidiaries), hereby release the JPMC Entities and each of their Related Persons

from liability for, any and all Claims that (i) are or were property of the Debtors, their

respective estates, or their present Affiliates (other than WMB and its subsidiaries), and (ii)

were or could have been brought in any of the Related Actions.

53.     Releases by the Debtors, the Creditors' Committee and the Equity

Committee.

a.     Released Parties.  Except as otherwise expressly provided in the

Plan, this Order, or the Global Settlement Agreement, on the Effective Date, for good and

valuable consideration, each of the Debtors and the Reorganized Debtors on its own

behalf and as representative of its respective estate, the Disbursing Agent and each of the

Debtors' Related Persons shall be deemed to have and hereby does irrevocably and

unconditionally, fully, finally and forever waive, release, acquit, and discharge the

Released Parties from any and all Claims or Causes of Action that the Debtors, the

Reorganized Debtors, and the Disbursing Agent, or any of them, or anyone claiming

through them, on their behalf or for their benefit, have or may have or claim to have, now

or in the future, against any Released Party that are Released Claims or otherwise are

based upon, relate to, or arise out of or in connection with, in whole or in part, any act,

omission, transaction, event or other circumstance relating to the Debtors taking place or

existing on or prior to the Effective Date, and/or any Claim, act, fact, transaction,

occurrence, statement, or omission in connection with or alleged or that could have been

alleged in the Related Actions, including, without limitation, any such claim, demand,

right, liability, or cause of action for indemnification, contribution, or any other basis in

law or equity for damages, costs or fees; provided, however, that the foregoing release

shall not extend to acts of gross negligence or willful misconduct (other than with respect

to the JPMC Entities and their respective Related Persons).

b.     Release of AAOC, Holders of Allowed Senior Notes Claims,

Holders of Allowed Senior Subordinated Notes Claims, Holders of CCB-1 Guarantees

<u>Claims, Holders of CCB-2 Guarantees Claims and Holders of Allowed PIERS Claims</u>. On the Effective Date, for good and valuable consideration, each of the Debtors and the Reorganized Debtors, on its own behalf and as representative of its respective estate, the Disbursing Agent and each of the Debtors' Related Persons, the Creditors' Committee and the Equity Committee, without giving any legitimacy or merit to any of the allegations raised or asserted with respect to AAOC, holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims and holders of Allowed PIERS Claims during the Chapter 11 Cases, shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and discharge (1) the AAOC Releasees, (2) the Senior Notes Claims Releasees, (3) the Senior Subordinated Notes Claims Releasees, (4) the PIERS Claims Releasees and (5) the CCB Releasees, and each of their respective officers, directors, agents, employees and, solely in their capacity as counsel with respect to the Debtors' Chapter 11 Cases, attorneys from any and all Estate Claims that the Debtors, the Creditors' Committee and the Equity Committee, have or may have or claim to have, now or in the future, against (1) the AAOC Releasees, (2) the Senior Notes Claims Releasees, (3) the Senior Subordinated Notes Claims Releasees, (4) the PIERS Claims Releasees and (5) the CCB Releasees, and each of their respective officers, directors, agents, employees and, solely in their capacity as counsel with respect to the Debtors' Chapter 11 Cases, attorneys.

54.     <u>Releases by Holders of Claims</u>.

a.     <u>Global Third Party Releases</u>.  On the Effective Date, for good and valuable consideration, and to the fullest extent permissible under applicable law, each Entity (Creditor or holder of an Equity Interest) that (i) has held, currently holds or may

hold a Released Claim or any Released Third Party Causes of Action, (ii) is entitled to receive, directly or indirectly, a distribution or satisfaction of its Claim or Equity Interest pursuant to the Plan, and (iii) elects, by not checking or checking the appropriate box on its Ballot or election form, as the case may be, to grant the releases set forth in Section 41.6 of the Plan, on their own behalf and on behalf of anyone claiming through them, shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit and discharge (1) each and all of the Released Parties from any and all Released Claims and/or any claim, act, fact, transaction, occurrence, statement, or omission in connection with or alleged in the Actions or in the Texas Litigation, or that could have been alleged in respect of the foregoing or other similar proceeding, including, without limitation, any such claim demand, right, liability, or cause of action for indemnification, contribution or any other basis in law or equity for damages, costs or fees incurred by the releasors therein arising directly or indirectly from or otherwise relating thereto and (2) each of (a) the AAOC Releasees, (b) the Senior Notes Claims Releasees, (c) the Senior Subordinated Notes Claims Releasees, (d) the PIERS Claims Releasees and (e) the CCB Releasees from any and all Released Third Party Causes of Action; **provided, however, that each Entity that has elected not to grant the releases set forth in Section 41.6 of the Plan, including, without limitation, any Entity that fails to execute and deliver a release following notice in accordance with the provisions of Section 31.6(c) of the Plan, shall not be entitled to, and shall not receive, any payment, distribution or other satisfaction of its claim pursuant to the Plan;** and, provided, further, that, notwithstanding anything contained in Section 41.6(a) of the Plan to the contrary, the release set forth in Section 41.6(a)(1) of the Plan

shall not extend to acts of gross negligence or willful misconduct of any Released Parties

(other than with respect to the JPMC Entities and their respective Related Persons); and,

provided, further, that, notwithstanding the foregoing, solely for purposes of Section

41.6(a) of the Plan, "Released Parties" shall not include Related Persons other than

(i) Related Persons of the JPMC Entities and (ii) Related Persons of the FDIC Receiver

and FDIC Corporate.

         b.    Limited Governmental Exceptions. Nothing contained in the Plan

or this Order shall (1) (i) release, or is intended to release, any non-Debtor, including any

non-Debtor Entity that may be a Released Party or a Related Person, in connection with

any legal action or claim brought by the United States Securities and Exchange

Commission or (ii) prejudice the rights of any such non-Debtor Entity to defend or

otherwise contest any such legal action or claim, (2) (i) to the extent that (A) the Pension

Plans are terminated from and after the Effective Date and (B) the Pension Plans are

underfunded as of the Effective Date, release, or is intended to release, any non-Debtor,

including any non-Debtor Entity that may be a Released Party or a Related Person, from

any liability as a fiduciary of the Pension Plans, under any law, government policy or

regulatory provision, (ii) enjoin or preclude the Pension Benefit Guaranty Corporation

from enforcing such liability against such non-Debtor Entity during the applicable statute

of limitations period set forth in 29 U.S.C. § 1303 following any such termination, or

(iii) prejudice the rights of any such non-Debtor Entity to defend or otherwise contest any

such legal action or claim, and (3) (i) release the claims held by the California Franchise

Tax Board or the Oregon Department of Revenue (together, the "State Taxing

Agencies"), including rights of setoff and recoupment with respect to claims against or

among two or more non-Debtor Entities, against any non-Debtor and, notwithstanding

any other provision of the Plan or this Order, the State Taxing Agencies shall not be

enjoined from pursuing any such claims and (ii) prejudice the rights of any such non-

Debtor to defend or otherwise contest any such legal action or claim, or the rights and

obligations as between JPMC and the FDIC pursuant to the P&A Agreement with respect

to any such legal action or claim.

    c.    <u>BKK Liabilities</u>.  Nothing in the Plan or this Order is intended to,

nor shall it, release any non-Debtor or non-Debtor Entity that may be a Released Party or

a Related Person, in connection with any legal action or claim brought by CDTSC or the

BKK Group relating to the BKK Site that is the subject of the BKK Litigation; <u>provided,
</u>
<u>however,</u> that nothing contained in Section 41.6(c) of the Plan is intended, nor shall it be

construed, to (1) constitute evidence of or any support for an argument that any such non-

Debtors have any such liabilities, or (2) create any liability on behalf of the Liquidating

Trust.  For the avoidance of doubt, nothing herein shall affect the releases or other terms

of the BKK Settlement Agreement, which provisions shall control over any contrary

provision in this Order, the Plan or the Global Settlement Agreement.

    d.    <u>Securities Litigations</u>.  Nothing in the Plan, this Order or the

Global Settlement Agreement with respect to the releases, exculpations, injunctions or

similar provisions is intended to, nor shall it, release, enjoin or impact in any way the

prosecution of the claims asserted, or to be asserted, against any non-Debtor or non-

Debtor Entity in the Securities Litigations, including, but not limited to, the defendants

named in the Securities Litigations (the "<u>Securities Litigations Carve-Out</u>"), nor will any

potential distribution on account of the relevant proofs of claim filed by lead plaintiffs in

the Securities Litigations and/or which have been withdrawn without prejudice (subject to all parties' rights with respect to the relevant proofs of claim in accordance with and subject to the terms of the Bankruptcy Court-approved stipulations) be forfeited by virtue of the Securities Litigations Carve-Out. Subject to further order of the Court, in accordance with the terms and provisions of Section 26.3 of the Plan, the Debtors shall treat that certain Proof of Claim filed by the Class Representatives, Policemen's Annuity and Benefit Fund of the City of Chicago, Boilermaker National Annuity Trust and Doral Bank Puerto Rico, on behalf of the class in *Boilermaker National Annuity Trust Fund, on Behalf of Itself and All Others Similarly Situated v. WAMU Mortgage Pass-Through Certificates, Series ARI, et al.*, Case No. C09-0037 (MJP) (W.D. Wash.), dated January 26, 2012 and assigned Proof of Claim number 4069 (the "MBS Plaintiffs' Claim"), as a Disputed Claim in Class 12 of the Plan and reserve distributions in connection therewith as if an Allowed Claim in the amount of Four Hundred Thirty-Five Million Dollars ($435,000,000.00); provided, however, that this reserve is without prejudice to any party's right to argue that the MBS Plaintiffs' Claim is invalid on any ground or shall be treated in a different class for distribution purposes.

e. Tranquility. Pending the effective date of that certain Stipulation and Agreement Between the Debtors and Tranquility Master Fund, Ltd. (A) Resolving Amended Proof of Claim Number 3925 and (B) Allowing Claims for Voting Purposes, dated February 16, 2012 [D.I. 9698], the following language, which was deleted pursuant to the Third Plan Modification, shall be deemed reinserted in Section 41.6(e) of the Plan, and is hereby approved and deemed effective:

Nothing contained herein or in the Confirmation Order with respect to releases, exculpations, injunctions or similar provisions is intended to, nor

shall it, affect, impact, impair, modify, or limit or otherwise be used to contest the Tranquility Claim, or Tranquility's ability to receive distributions on account of the Tranquility Claim; provided, however, that the Debtors' ability to contest whether any subsequent amendments or modifications to the Tranquility Claim were properly filed and relate to the Tranquility Claim are expressly reserved.

      f.     <u>Truck and Fire</u>. Notwithstanding anything contained herein or in the Plan or in the Verification Form (as defined in the order approving the Supplemental Disclosure Statement [D.I. 7081]), with respect to the Claims of Truck Insurance Exchange ("<u>Truck</u>") and Fire Insurance Exchange ("<u>Fire</u>") asserted against the Debtors and the Debtors' chapter 11 estates (collectively, the "<u>Truck/Fire Claims</u>"), including, without limitation, those Claims included in Classes 17A and 17B of the Plan, (a) the release and injunction provisions of the Plan and this Order are intended to, and shall release only, all Claims of Truck and Fire against any Released Parties arising from or relating to the Truck/Fire Claims, other than any claims, counterclaims or defenses under or relating to any policies of insurance, and (b) the release and injunction provisions of the Plan and this Order are not intended to, and shall not release, any claims of Truck, Fire or any Affiliate of Truck or Fire against (i) a non-Debtor as an investor in securities issued by any such non-Debtor Entity, (ii) WMB, (iii) the Receivership or (iv) the FDIC Receiver solely with respect to the Receivership.

      g.     <u>Texas Litigation</u>. Nothing in the Plan or this Order with respect to the releases, exculpations, injunctions or similar provisions is intended to, nor shall it, release, enjoin or restrain the prosecution of direct claims, if any, asserted, or that could have been asserted, in the Texas Litigation against any non-Debtor Entity; provided, however, that the foregoing is without prejudice to the rights of any such non-Debtor Entity to contest, upon notice and a hearing, the validity, merits and ownership of or

standing to assert any such direct claims; and, <u>provided</u>, <u>further</u>, that this Court is not making, either pursuant to the Plan or this Order, a determination as to which Entity, including, without limitation, the Debtors, owns the claims asserted, or that could have been asserted, in the Texas Litigation; and, <u>provided</u>, <u>further</u>, that any and all direct claims against the Debtors and derivative claims of the Debtors, if any, that have been or could have been asserted against any Released Party in the Texas Litigation shall, upon the Effective Date, be released, discharged and enjoined.

h.    In addition to, and not in any way limiting the foregoing, each holder of an Allowed WMB Senior Notes Claim and each Accepting Non-Filing WMB Senior Notes Holder shall be deemed to have released the Debtors, the Reorganized Debtors, and each of their respective Related Persons from any and all direct and derivative claims arising from or related to such holder's WMB Senior Notes, as well as any misrepresentation or other similar claim for damages arising from the purchase or sale of such holder's WMB Senior Notes (including, without limitation, any Section 510(b) Subordinated WMB Notes Claims that such holder may have).

i.    <u>**Waiver of Section 1542**</u>:  **All persons providing releases pursuant to the provisions of Section 41.6 of the Plan are hereby deemed to have expressly and voluntarily waived Section 1542 of the California Civil Code, or any similar, comparable or equivalent provision of the statutory or non-statutory law of California or any other jurisdiction.  Section 1542 provides:**

> **A general release does not extend to claims under which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

55.   Release and Exculpation Provisions.  All release and exculpation provisions, including, but not limited to, those contained in Article XLIII of the Plan, are approved and shall be effective and binding on all Entities, to the extent provided herein.

56.   **Injunctions and Stays.**

a.   **Injunctions on Claims.  Except as otherwise expressly provided in Sections 41.6 and 41.12 of the Plan, this Order or such other order of this Court that may be applicable, all Entities who have held, hold or may hold Claims or any other debt or liability that is discharged or Equity Interests or other right of equity interest that is terminated or cancelled pursuant to the Plan or the Global Settlement Agreement, or who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to Section 41.2 of the Plan, are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability that is discharged or Equity Interest that is terminated, cancelled, assumed or transferred pursuant to the Plan against any of the Released Parties or any of their respective assets, property or estates, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any of the Released Parties or any of their respective assets, property or estates on account of any Claim or other debt or liability that is discharged or Equity Interest that is terminated, cancelled, assumed or transferred pursuant to the Plan, (c) creating, perfecting, or enforcing any encumbrance of any kind against any of the Released**

Parties or any of their respective assets, property or estates on account of any Claim or other debt or liability that is discharged or Equity Interest that is terminated, cancelled, assumed or transferred pursuant to the Plan, and (d) except to the extent provided, permitted or preserved by sections 553, 555, 556, 559 or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets, property or estates, with respect to any such Claim or other debt or liability that is discharged or Equity Interest that is terminated, cancelled, assumed or transferred pursuant to the Plan; provided, however, that such injunction shall not preclude the United States of America, any state or any of their respective police or regulatory agencies from enforcing their police or regulatory powers; and, provided, further, that, except in connection with a properly filed proof of Claim, the foregoing proviso does not permit the United States of America, any State or any of their respective police or regulatory agencies from obtaining any monetary recovery, including fines, restitution or forfeiture, from any of the Released Parties, including, without limitation, the Debtors, the Debtors in Possession or the Reorganized Debtors, or any of their respective assets, property or estates, with respect to any such Claim or other debt or liability that is discharged or Equity Interest or other right of equity interest that is terminated or cancelled pursuant to the Plan, including, without limitation, any monetary claim or penalty in furtherance of a police or regulatory power; and, provided, further that, subject to Section 3.8 of the Global Settlement Agreement, such injunction shall not preclude the JPMC Entities, the Receivership,

the FDIC Receiver and the FDIC Corporate from pursuing any and all claims against each other or any other defenses thereto pursuant to the Purchase and Assumption Agreement. Such injunction shall extend to all successors and assigns of the Released Parties and their respective assets, property and estates.

b. **Injunction Related to Releases.** As of the Effective Date, all Entities that hold, have held, or may hold a Released Claim, an Estate Claim, any Released Third Party Cause of Action or an Equity Interest that is released pursuant to Sections 41.5 and 41.6 of the Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Released Claims, Estate Claims, Released Third Party Causes of Action or such Equity Interests: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under Sections 41.5 and 41.6 of the Plan; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in

**any forum, that does not comply with or is inconsistent with the provisions of the the Plan or this Order.**

57.    <u>Exculpation</u>.  The Debtors, the Debtors' officers and directors serving during the period from the Petition Date up to and including the Effective Date, the Creditors' Committee and each of its members in their capacity as members of the Creditors' Committee, the Equity Committee and each of its members in their capacity as members of the Equity Committee, and each of their respective professionals shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Chapter 11 Cases (including any actions taken by the Creditors' Committee or the Equity Committee after the Effective Date), the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement and the Supplemental Disclosure Statement related thereto, the Global Settlement Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan and the Global Settlement Agreement; <u>provided</u>, <u>however</u>, that the foregoing provisions, set forth in Section 41.8 of the Plan, shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted gross negligence or willful misconduct.  Nothing in Section 41.8 of the Plan shall prejudice the right of any of the Debtors, the Debtors' officers and directors serving during the period from the Petition Date up to and including the Effective Date, the Creditors' Committee and each of its members in their capacity as members of the Creditors' Committee, the Equity Committee and each of its members in their capacity as members of the Equity

Committee, and each of their respective professionals to assert reliance upon advice of counsel as a defense with respect to their duties and responsibilities under the Plan.

58. **Bar Order.** To the limited extent provided in Section 41.6 of the Plan and decretal paragraph 54 of this Order, each and every Entity is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing or litigating in any manner any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, direct or derivative, whether asserted or unasserted, against any of the Released Parties, based upon, related to, or arising out of or in connection with any of the Released Claims, the Debtors' Claims, the JPMC Claims, the FDIC Claim, the Purchase and Assumption Agreement (other than any rights or claims the JPMC Entities, the Receivership, the FDIC Receiver or the FDIC Corporate may have under the Purchase and Assumption Agreement), confirmation and consummation of the Plan, the negotiation and consummation of the Global Settlement Agreement, or any claim, act, fact, transaction, occurrence, statement or omission in connection with or alleged or that could have been alleged in the Related Actions, including, without limitation, any such claim, demand, right, liability, or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred arising directly or indirectly from or otherwise relating to the Related Actions, either directly or indirectly by any Person for the direct or indirect benefit of any Released Party arising from or related to the claims, acts, facts, transactions, occurrences, statements or omissions that are, could have been or may be alleged in the Related Actions or any other action brought or that might be brought by, through, on

behalf of, or for the benefit of any of the Released Parties (whether arising under federal, state or foreign law, and regardless of where asserted).

59.    Deemed Consent. By submitting a Ballot or election form and receiving a distribution under or any benefit pursuant to this Plan and not electing to withhold consent to the releases of the applicable Released Parties and the Entities set forth in Section 41.6 of the Plan, or by order of this Court, each holder of a Claim or Equity Interest shall be deemed, to the fullest extent permitted by applicable law, to have specifically consented to the releases set forth in Section 41.6 of the Plan.

60.    **Supplemental Injunction.** Notwithstanding anything contained herein or in the Plan to the contrary, except to the limited extent provided in Section 41.6 of the Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims or Equity Interests against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against or Equity Interest in any of the Debtors, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims or Equity Interests arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

(a)    Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim or Equity Interest against any of the Released Parties or the assets or property of any Released Party;

(b)      Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim or Equity Interest;

(c)      Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim or Equity Interest;

(d)      Except as otherwise expressly provided in the Plan, this Order, or the Global Settlement Agreement, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim or Equity Interest; and

(e)      Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan, this, or the Global Settlement Agreement relating to such Released Claim or Equity Interest;

provided, however, that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code and, provided, further, that the supplemental injunction provided pursuant to the terms of this Section 41.12 shall not preclude any current or former officers or directors of WMI from asserting any setoff or recoupment rights against any judgment or other obligation due to the Debtors, the Debtors' estates, or the Liquidating Trust or against the property of the Debtors or the Debtors' estates, to the extent such individuals have such rights pursuant to applicable non-bankruptcy law.

61.      Term of Existing Injunctions or Stays.  Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105, 362, or 525 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until entry of an order in accordance with Section 41.23 of the Plan or such other Final Order of the Court; provided, however, that the terms of the Stock Trading Order

shall remain in full force and effect forever, including, without limitation, with respect to any violation thereof on or before the Effective Date.

62.     Prosecution of Claims.  Except as settled and released herein, from and after the Effective Date, the Liquidating Trustee, subject to the oversight and consent rights of the Trust Advisory Board, the Litigation Subcommittee, and the Bankruptcy Court, and subject to the terms of this Order, the Plan, and the Liquidating Trust Agreement, shall have the right and power to litigate, and the Liquidating Trust shall be vested with, any Claim or Cause of Action that constituted an Asset of the Debtors and their estates, including, without limitation, any avoidance or recovery action under section 541, 542, 544, 545, 547, 548, 549, 550, 551, or 553 of the Bankruptcy Code and any other cause of action, right to payment, or claim that may be pending on the Effective Date or instituted by the Debtors or the Liquidating Trust thereafter, to a Final Order, and the Liquidating Trustee may compromise and settle such claims, upon approval of the Court.

63.     Nothing in this Order, the Plan or the Global Settlement Agreement shall be deemed or construed to release, waive or abandon any demands, claims or causes of action of the Debtors and their estates against present and former officers and directors of the Debtors for actions occurring prior to the Petition Date (collectively, "D&O Claims").  By virtue of the UCC Stipulation and the *Order* thereon [Docket No. 5416], the Creditors' Committee was authorized to prosecute claims or causes of action related by a factual or transaction nexus to the Transfers (as defined in the UCC Stipulation) and, in accordance therewith, the Creditors' Committee asserted D&O Claims pursuant to the authority granted it by the referenced *Stipulation* and *Order*.  Any D&O Claims that the Creditors' Committee previously was authorized to prosecute shall be vested in the Liquidating Trust for prosecution by the Liquidating Trustee as if any such

D&O Claims had continued to have been asserted by the Creditors' Committee, and nothing in such transfer or vesting shall waive or diminish the rights to pursue any such D&O Claims. With respect to the D&O Claims and any other any demands, claims or causes of action of the Debtors and their estates vested in the Liquidating Trust and over which the Liquidating Trustee shall have the right and power to litigate, the Liquidating Trust shall succeed to and constitute the assignee of all rights, powers and privileges that, before the Effective Date of the Plan, could be exercised by the Creditors' Committee, any representative of the estates, and any comparable authority, including a trustee or examiner with expanded powers. Any D&O Claims and any other demands, claims or causes of action of the Debtors and their estates, which are hereby vested in the Liquidating Trust shall be brought by the Liquidating Trustee on behalf of the Liquidating Trust.

64. The Liquidating Trustee is appointed as trustee pursuant to Bankruptcy Code § 1123(a)(7) and, with respect to the D&O Claims and any other any demands, claims or causes of action of the Debtors and their estates vested in the Liquidating Trust, shall have all rights, powers and privileges as if such Liquidating Trustee had been appointed trustee in the Chapter 11 Cases.

65. <u>Indemnification and Reimbursement Obligations</u>. For purposes of the Plan, (i) to the extent executory in nature, the obligations of the Debtors to indemnify and reimburse their directors or officers that were directors or officers, respectively, on or prior to the Petition Date shall be deemed rejected as of the Effective Date and such parties' rights to assert rejection damage claims, if any, shall be governed by Section 34.5 of the Plan and (ii) indemnification obligations of the Debtors arising from conduct of officers and directors during the period from and after the Petition Date shall be Administrative Expense Claims.

66.    <u>Intercompany Claims</u>.  Intercompany Claims shall be extinguished, unless otherwise agreed or resolved between the parties to a given Intercompany Claim, resolved by the Global Settlement Agreement or released by operation of the Plan.  Any such transaction may be effected without any further action by the stockholders of any of the Debtors or the Debtors in Possession.  To the extent that any Intercompany Claim is extinguished in accordance with this provision, Kurtzman Carson Consultants LLC, the Debtors' Court-retained claims agent, may take such action as is necessary to reflect such extinguishment on the Debtors' claims registry.

67.    <u>Benefit Plans</u>.  Notwithstanding anything contained in the Plan to the contrary, the Debtors and the Liquidating Trustee, as the case may be, are authorized, but not required, to terminate all Benefit Plans, in accordance with the terms and provisions of the documents and instruments relating thereto and applicable law, at such time as determined by the Debtors or the Liquidating Trustee, as the case may be, in their sole discretion; <u>provided, however</u>, that, until the transfer or termination of any Benefit Plan, the Debtors, the Liquidating Trustee, and the Reorganized Debtors, as the case may be, shall (a) continue to perform any and all of their administrative obligations thereunder and (b) with respect to Benefit Plans subject to Title IV of ERISA, continue to make any required minimum funding contributions and pay applicable Pension Benefit Guaranty Corporation insurance premiums; and, <u>provided, further</u>, that, upon termination thereof, the Debtors, the Liquidating Trustee, or the Reorganized Debtors, as the case may be, shall provide administrative services in connection with the operation and wind down of the Benefit Plans; and, <u>provided, further</u>, that the continuation of any Benefit Plan by the Debtors, the Liquidating Trustee, or the Reorganized Debtors, as the case may be, from and after the Confirmation Date, including, without limitation, the provision of administrative services in connection with the operation and wind down of such Benefit Plan, shall not

constitute an assumption of such Benefit Plans in accordance with section 365 of the Bankruptcy Code; and, provided, further, that the failure to perform any obligation under the Benefit Plans or to provide administrative services in connection with the wind down of the Benefit Plans shall be without prejudice to (i) any Entity to assert such failure gives rise to an Administrative Expense Claim and (ii) the Debtors or the Liquidating Trustee to contest the assertion thereof. For the avoidance of doubt, the foregoing shall not apply to any employee benefit or welfare plan to be maintained by the Reorganized Debtors or the Liquidating Trustee, as the case may be, in the ordinary course of business after the Effective Date for the benefit of employees actively employed by the Reorganized Debtors or the Liquidating Trustee.

68. <u>Termination of Vendor Stipulation</u>. On the Effective Date, that certain Stipulation By and Between Debtors and JPMorgan Chase Bank, N.A. Concerning Certain Contracts, dated October 16, 2008, approved by the Court pursuant to the Order Approving Stipulation By and Between the Debtors and JPMorgan Chase Bank. N.A. Concerning Certain Vendor Contracts, dated December 30, 2008 (the "<u>Confidentiality Order</u>"), shall be terminated and deemed of no further force and effect, except as specifically provided in Section 2.14 of the Global Settlement Agreement; provided, however, that notwithstanding anything to the contrary in this Order or the Plan or the Confidentiality Order, the Debtors, the Creditors' Committee, and their respective Representatives (as such term is used in the Confidentiality Order) shall continue, in accordance with the obligations described in the Confidentiality Order and the Debtors' undertakings on the record of the hearing to consider approval of the stipulation, to protect "Confidential Information" provided in connection with a "Vendor Claim" or "Vendor Contracts," as those terms are defined in the Confidentiality Order, until final resolution of any objection to a Vendor Claim, including any appeal thereof. Upon such a final resolution, and as

set forth in the Confidentiality Order, the Debtors, the Creditors' Committee, and their respective Representatives shall return to JPMC or destroy, and certify such destruction, the Vendor Contract and any other Confidential Information pertaining to such Vendor Claim.

69.   <u>D&O Policies</u>. Notwithstanding anything contained in the Plan or this Order to the contrary, neither the Plan nor this Order shall be deemed to invalidate or otherwise affect coverage under the Debtors' director and officer liability insurance policies which were acquired in connection with WMI's indemnification obligations to its officers and directors (the "<u>D&O Policies</u>"), the obligations of the insurers pursuant to the D&O Policies, or the rights of the insureds thereunder.

70.   <u>IAA/JPMC</u>. Pursuant to Section 2.20(a) of the Global Settlement Agreement, that certain Information Access Agreement, dated November 21, 2008, between the Debtors and JPMC, as amended (the "<u>IAA/JPMC</u>"), shall be deemed amended under its current terms to provide for the extension of the term set forth therein to the entry of an order of the Court closing the Chapter 11 Cases; <u>provided</u>, <u>however</u>, that such extension shall be solely for the limited purposes of providing the Debtors, or their successors in interest, as the case may be, with access to documents reasonably necessary (1) to comply with pending or future requests in any litigation or governmental investigation, (2) in connection with any objection by the Debtors, or their successors in interest, as the case may be, to any claim in the Chapter 11 Cases, so long as such objection is interposed on or prior to December 31, 2012, and (3) with respect to the Debtors' administration and resolution of all Pre-2009 Group Tax (as defined in the Global Settlement Agreement) matters in accordance with the terms and provisions of the Global Settlement Agreement. Notwithstanding the foregoing, rather than extending the expiration of the IAA/JPMC in accordance with Section 2.20(a) of the Global Settlement Agreement (as set

forth above), JPMC, at its sole option, discretion and expense, may elect to make available for inspection and copying by WMI any or all of the books and records to which WMI has access under the IAA/JPMC, including all electronic records, through and up to twelve (12) months following the Effective Date of the Global Settlement Agreement. If so elected, WMI and JPMC shall agree on a third party provider which, subject to confidentiality limitations, shall have such access as may reasonably be required to copy the records (including electronic records and backup tapes) designated by WMI, and JPMC shall be relieved of any further obligations or undertaking to the WMI Entities with respect thereto.

71. <u>IAA/FDIC</u>. Pursuant to Section 2.20(b) of the Global Settlement Agreement, that certain letter agreement, dated November 19, 2008, between the Debtors, the Creditors' Committee and the FDIC Receiver, as may be amended, shall be deemed amended under its current terms to provide for an expiration upon the earlier to occur of (a) entry of an order of this Court closing the Chapter 11 Cases and (b) the closing of the Receivership.

72. <u>Compliance with Tax Requirements</u>. Any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or Tax Authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim or Equity Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any Taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made

arrangements satisfactory to such issuing or disbursing party for payment of any such Tax

obligations and, if any party issuing any instrument or making any distribution pursuant to the

Plan fails to withhold with respect to any such holder's distribution, and is later held liable for

the amount of such withholding, the holder shall reimburse such party. The Disbursing Agent

may require, as a condition to the receipt of a distribution, that the holder complete the

appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply

with such a request within one year, such distribution shall be deemed an unclaimed distribution.

     73.    <u>Exemption from Transfer Taxes</u>. Pursuant to sections 106, 1141 and

1146(a) of the Bankruptcy Code, the issuance, transfer and exchange of assets, notes or equity

securities pursuant to or in connection with the Plan or the Global Settlement Agreement, the

creation of any mortgage, deed of trust or other security interest, the making or assignment of

any lease or sublease, or the making or delivery of any deed or other instrument of transfer

pursuant to, in furtherance of, or in connection with the Plan or the Global Settlement

Agreement, including, without limitation, the Runoff Notes, the Credit Facility, the Reorganized

Common Stock, the Trust Preferred Securities, and any merger agreements or agreements of

consolidation, deeds, bills of sale, or assignments executed in connection with any of the

transactions contemplated pursuant to the Plan or the Global Settlement Agreement shall not be

subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar Tax. All

state and local government officials and agents shall forego the collection of any such Tax or

governmental assessment and shall accept for filing and recordation any instrument or other

document issued or transferred pursuant to the Plan, without the payment of any such Tax or

government assessment.

74.  <u>Dissolution of the Creditors' Committee</u>.  On the first (1st) Business Day thirty (30) days following the Effective Date, and provided that payments to holders of Unsecured Claims have been made in accordance with Article XXXI of the Plan, the Creditors' Committee shall be dissolved, and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, and other agents, if any, shall terminate other than for purposes of filing and prosecuting applications for final allowances of compensation for professional services rendered and reimbursement of expenses incurred in connection therewith; provided, however, that the Creditors' Committee may, at its own discretion, continue or resume its duties arising from or relating to (i) any pending litigation or contested matter to which the Creditors' Committee is a party, (ii) the MBS Plaintiffs' Claim (iii) any appeal filed regarding confirmation of the Plan, (iv) obligations arising under confidentiality agreements, joint interest agreements, and protective orders, if any, entered during the Chapter 11 Cases that remain in full force and effect according to their terms, (v) applications for fees and expenses of members of the Creditors' Committee and requests for compensation and reimbursement of expenses pursuant to section 503(b) of the Bankruptcy Code for making a substantial contribution in any of the Chapter 11 Cases, and (vi) motions, appeals or other litigation seeking the enforcement of the provisions of the Plan and the transactions contemplated hereunder or in the Confirmation Order; and, provided, further, that the Liquidating Trust shall continue to compensate the Creditors' Committee's attorneys, financial advisors, and other agents, if any, for any such post-Effective Date activities or those identified Section 33.1 of the Plan; and, provided, further, that, in the event that (a) the Creditors' Committee elects to continue or resume any or all of the

enumerated duties set forth in Section 33.1 of the Plan or this Confirmation Order and (b) all then-appointed members of the Creditors' Committee subsequently resign, (i) the United States Trustee may appoint such Persons as the United States Trustee deems appropriate to represent the interests of the Creditors' Committee and (ii) if no such Persons are appointed, then, only with respect to this second proviso to this paragraph 74, (y) all right, title and interest of the Creditors' Committee in any and all tolling agreements entered into by the Creditors' Committee, for itself or on behalf of the Debtors and their estates, on the one hand, and a potential defendant, on the other hand, shall be deemed assigned to the Liquidating Trust and the Liquidating Trustee and the Liquidating Trust and the Liquidating Trustee shall be entitled to the benefits therein, including, without limitation, timing with respect to the commencement of any litigation, as if the Liquidating Trust and the Liquidating Trustee were a party to any such tolling agreement, and (z) in its sole and absolute discretion, the Liquidating Trustee may, and, if it chooses to, shall, accede to the position of the Creditors' Committee in prospective or then-pending litigations or contested matters, as the case may be.  Without limiting the foregoing, on the Effective Date, the Creditors' Committee shall take any and all action as is necessary to cause the withdrawal and dismissal, with prejudice, of the appeal taken by the Creditors' Committee from the September Opinion.

75.    [Intentionally omitted.]

76.    <u>Dissolution of Equity Committee</u>.  On the Effective Date, other than with respect to its duties and obligations set forth herein or in the Plan, the Equity Committee shall be dissolved and the members thereof shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Equity Committee's

attorneys, financial advisors, and other agents, if any, shall terminate other than for purposes of

filing and prosecuting applications for final allowances of compensation for professional services

rendered and reimbursement of expenses incurred in connection therewith; <u>provided, however,</u>

that, in the event that (a) a timely appeal is taken from the Confirmation Order and (b) such

appeal remains pending, the Equity Committee shall be dissolved on the earlier to occur of (1)

dismissal or withdrawal of such appeal and (2) a determination, by Final Order, as to the merits

of such appeal and; <u>provided, further</u> that, in the event of any such appeal from the Confirmation

Order, the Liquidating Trust shall pay the reasonable fees and expenses of the Equity Committee

in connection with any such appeal, subject to approval by the Bankruptcy Court. Without

limiting the foregoing, on the Effective Date, the Equity Committee shall take any and all action

as is necessary to cause the withdrawal and dismissal, with prejudice, of (x) the Equity

Committee Adversary Proceeding, (y) the Equity Committee Action to Compel and (z) the

appeals taken by the Equity Committee from (i) the January Opinion and (ii) the September

Opinion.

77. <u>Payment of Statutory Fees</u>. All fees payable pursuant to section 1930 of

title 28 of the United States Code and, if applicable, any interest payable pursuant to section

3717 of title 31 of the United States Code, as determined by the Bankruptcy Court, shall be

obligations and liabilities of the Liquidating Trust and shall be paid on the Effective Date or

thereafter as and when they become due or otherwise pursuant to an agreement between the

Debtors and the United States Department of Justice, Office of the United States Trustee, until

such time as the Chapter 11 Cases shall be closed in accordance with the provisions of Section

41.23 of the Plan.

78.      Payment of Fees and Expenses of Certain Creditors.  Within ninety (90)

days of the Effective Date, (i) Fried, Frank, Harris, Shriver & Jacobson LLP, (ii) Blank Rome

LLP, (iii) White & Case LLP, (iv) Kasowitz, Benson, Torres & Friedman LLP, (v) Zolfo Cooper

LLC, (vi) Kramer, Levin, Naftalis & Frankel LLP, (vii) Halperin Battaglia Raicht LLP, (viii)

Kilpatrick Townsend & Stockton LLP, (ix) Brown Rudnick LLP, (x) Arkin Kaplan Rice LLP,

(xi) Campbell & Levine, LLC, (xii) Mesirow Financial Consulting, LLC, (xiii) Schnader

Harrison Segal & Lewis LLP, and (xiv) in accordance with Section 21.1(a) of the Plan, Wilmer

Cutler Pickering Hale & Dorr LLP, Pachulski Stang Ziehl & Jones LLP, and Boies, Schiller &

Flexner LLP, to the extent any clients with respect to the foregoing professionals seek

reimbursement for the payment of fees and expenses incurred, shall file with this Court an

application (for purposes of reviewing the reasonableness of the amounts requested therein),

together with detailed invoices annexed thereto, requesting payment for reasonable fees and

expenses incurred during the period from the Petition Date through and including the Effective

Date, in connection with the Chapter 11 Cases, the Global Settlement Agreement, the Plan or the

transactions contemplated herein or therein (including, without limitation, investigating,

negotiating, documenting, and completing such transactions and enforcing, attempting to

enforce, and preserving any right or remedy contemplated under the Global Settlement

Agreement and in the Chapter 11 Cases).  All objections to any such fee applications shall be

filed with the Court, together with proof of service thereof, and served upon the applicant, the

Debtors, the U.S. Trustee, the Creditors' Committee, and parties entitled to receive notice in

these Chapter 11 Cases pursuant to Bankruptcy Rule 2002, so as to be received not later than

4:00 p.m., prevailing Eastern Time, on the date that is fifteen (15) days prior to the final hearing

with respect to such fees.  Within ten (10) Business Days of the entry of a Final Order by this

Court approving the payment thereof, in whole or in part, the Disbursing Agent shall pay such fees and expenses so approved.

79.     <u>Securities Litigations Documents</u>.  On the Effective Date, the Debtors shall not transfer any documents, in electronic form or otherwise, to the Reorganized Debtors that relate to the claims, defenses and allegations in the Securities Litigations.  All such documents will be transferred to the Liquidating Trust on the Effective Date and shall be thereafter maintained and preserved in accordance with the terms of the Liquidating Trust Agreement; <u>provided</u>, <u>however</u>, that, in the event that any documents are required for the operations of the Reorganized Debtors and are transferred to the Reorganized Debtors, copies of any such documents shall be transferred to the Liquidating Trust on the Effective Date and thereafter maintained and preserved in accordance with the terms of the Liquidating Trust Agreement.

80.     <u>Documents Requested by the Reorganized Debtors</u>.  Upon receipt of a written request from the Reorganized Debtors, at any time within the two years following the Effective Date, the Liquidating Trust, JPMC or the FDIC Receiver, as applicable, shall make available for inspection and copying (at the expense of the Reorganized Debtors) such documents or information, in either written or electronic form, as is reasonably requested by the Reorganized Debtors, that the Reorganized Debtors may require in order to comply with U.S. federal and state governmental regulations, including, but not limited to, Federal and state tax, insurance or securities laws, rules, or regulations, and that is not protected by the attorney-client privilege or any other legal protection for confidential dealings and communications; <u>provided</u>, <u>however</u>, nothing herein shall constitute an obligation of, or undertaking by, the Liquidating Trust, JPMC or the FDIC Receiver, as the case may be, to create documents or information, or to retain documents or information other than in the ordinary course of business in order to make

such documents or information available to the Reorganized Debtors or the Liquidating Trust as contemplated hereby.

81.    Documents and Instruments.  Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan, the Global Settlement Agreement, and this Order.

82.    Reversal/Stay/Modification/Vacatur of Order.  Except as otherwise provided in this Order, if any or all of the provisions of this Order are hereafter reversed, modified, vacated, or stayed by subsequent order of this Court, or any other court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or lien incurred or undertaken by the Debtors, the Reorganized Debtors, the Liquidating Trust, or the JPMC Entities, as applicable, prior to the effective date of such reversal, stay, modification, or vacatur.  Notwithstanding any such reversal, stay, modification, or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Order prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respects by the provisions of this Order, the Global Settlement Agreement and the Plan.  To the extent not specifically reversed, modified, vacated, or stayed by an order of this Court, all existing orders entered in these Chapter 11 Cases remain in full force and effect.

83.    Retention of Jurisdiction.  Notwithstanding the entry of this Order or the occurrence of the Effective Date, subject to Article XXXVIII of the Plan and except as otherwise provided in the Plan or herein, pursuant to sections 105 and 1142 of the Bankruptcy Code, this Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter

11 Cases to the fullest extent as is legally permissible, including, but not limited to, jurisdiction over the matters set forth in Article XXXVIII of the Plan.

84.      <u>Conflicts Among Order, Plan and Global Settlement Agreement</u>.  The provisions of the Plan, this Order, and the Global Settlement Agreement shall be construed in a manner consistent with each other so as to effect the purpose of each; <u>provided</u>, <u>however</u> that, in the event of any inconsistency between the Global Settlement Agreement, the Plan or this Order, the documents shall control in the following order of priority:  (i) this Order, (ii) the Global Settlement Agreement, and (iii) the Plan; <u>provided</u>, <u>however</u>, that, in the event of any inconsistency between these documents with respect to the releases provided in Section 41.6 of the Plan, the documents shall control in the following order of priority:  (i) this Order, (ii) the Plan, and (iii) the Global Settlement Agreement; and <u>provided</u>, <u>further</u>, however, that nothing herein is intended to nor shall be construed to modify the economic terms of the Plan.

85.      <u>Modifications</u>.  Without need for further order or authorization of the Court and subject to any limitations set forth in the Plan (including consent rights) and any stipulation approved by this Court in connection with the Plan, the Debtors, the Reorganized Debtors, or the Liquidating Trust are authorized and empowered to make any and all modifications to the Plan, any and all documents included as part of the Plan Supplement, and any other document that is necessary to effectuate the Plan that does not materially modify the terms of such documents and are consistent with the Plan.

86.      <u>Provisions of Plan and Order Nonseverable and Mutually Dependent</u>.  The provisions of the Plan and this Order, including the findings of fact and conclusions of law set forth herein, are nonseverable and mutually dependent.

87.   Governing Law.  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an Exhibit to the Plan or Plan Supplement provides otherwise (in which case the governing law therein shall be applicable to such Exhibit), the rights, duties and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws.

88.   Applicable Nonbankruptcy Law.  Pursuant to sections 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of this Order, the Plan and related documents or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

89.   Waiver of Filings.  Any requirement pursuant to section 521 of the Bankruptcy Code or Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Court of the Office of the U.S. Trustee (except for monthly operating reports or any other post-confirmation reporting obligation to the U.S. Trustee) is hereby waived as to any such list, schedule, or statement not filed as of the Effective Date.

90.   Police Powers.  Nothing contained in the Plan or this Order shall preclude the United States of America, any state or any of their respective police or regulatory agencies from enforcing their statutory, police or regulatory powers.

91.   Notice of Order.  In accordance with Bankruptcy Rules 2002 and 3020(c), as soon as reasonably practicable after the Effective Date, the Debtors shall serve notice of the entry of this Order and the occurrence of the Effective Date, substantially in the form attached as Exhibit B hereto, to all parties who hold a Claim or Equity Interest in these Chapter 11 Cases, as well as the Creditors' Committee, Equity Committee, the U.S. Trustee, any party filing a notice

pursuant to Bankruptcy Rule 2002, the Securities and Exchange Commission, the Internal

Revenue Service, and the United States attorney for the District of Delaware. Such notice is

hereby approved in all respects and shall be deemed good and sufficient notice of entry of this

Order.

92.    <u>Substantial Consummation</u>.  On the Effective Date, the Plan shall be

deemed to be substantially consummated pursuant to sections 1101 and 1127 of the Bankruptcy

Code.

93.    <u>No Waiver</u>.  The failure to specifically include any particular provision of

the Plan in this Order will not diminish the effectiveness of such provision nor constitute a

waiver thereof, it being the intent of this Court that the Plan is confirmed in its entirety and

incorporated herein by this reference.

Dated: _____ __, 2012
       Wilmington, Delaware

_____
THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE