Marcia L. Goldstein
Ray C. Schrock, P.C.
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

|  |  |  |
|---|---|---|
|  | : |  |
| **In re** | : | **Chapter 11 Case No.** |
|  | : |  |
| **CHASSIX HOLDINGS, INC.,** *et al.*, | : | **15-10578 (MEW)** |
|  | : |  |
| Debtors.[1] | : | **(Jointly Administered)** |
|  | : |  |

----------------------------------------------------------------x

### NOTICE OF FILING OF SUPPLEMENT TO DISCLOSURE STATEMENT SETTING FORTH MODIFICATIONS TO DEBTORS' SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND EXTENSION OF RELATED DEADLINES

PLEASE TAKE NOTICE that, by order dated April 24, 2015 (ECF No. 327) (the

"**Solicitation Procedures Order**"), the Court approved the disclosure statement (ECF No. 324)

(the "**Disclosure Statement**") for the Debtors' *Second Amended Joint Plan of Reorganization*

*Under Chapter 11 of the Bankruptcy Code* (ECF No. 323) (the "**Plan**") and related solicitation

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings are not debtors in these chapter 11 cases.

procedures.[2]  The hearing on confirmation of the Plan was scheduled for June 30, 2015 at 10:00 a.m. (Eastern Time) (the "**Confirmation Hearing**").

PLEASE TAKE FURTHER NOTICE that the Solicitation Procedures Order established June 19, 2015 at 5:00 p.m. (Eastern Time) (the "**Original Voting Deadline**") as the deadline by which votes to accept or reject the Plan must actually be received by the solicitation and voting agent, Prime Clerk, LLC (the "**Voting Agent**").  The Solicitation Procedures Order further provided that responses or objections to the Plan were required to be filed and served so as to be received by the Notice Parties (as defined in the Solicitation Procedures Order) no later than June 19, 2015 at 5:00 p.m. (Eastern Time) (the "**Original Plan Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that, pursuant to a consent order dated June 19, 2015 (ECF No. 515) (the "**First Consent Order**"), the Court amended the Solicitation Procedures Order to extend the Original Voting Deadline to June 22, 2015, at 5:00 p.m. (Eastern Time) (the "**Current Voting Deadline**") and the Original Plan Objection Deadline to June 22, 2015, at 5:00 p.m. (Eastern Time) (the "**Current Plan Objection Deadline**").

PLEASE TAKE FURTHER NOTICE that on June 23, 2015, the Debtors filed certain modifications to the Plan (ECF No. 526) to incorporate and reflect a settlement reached between and among the Debtors, the Informal Committee of Noteholders, Platinum Equity and the Creditors Committee to resolve the Creditors Committee's objections with respect to the Plan that will result in enhanced recoveries to the holders of Allowed Claims in Class 4 (Unsecured Note Claims) and consenting Sub-classes in Class 5 (General Unsecured Trade Claims) and Class 6 (Other General Unsecured Claims).  The modifications to the Plan are described in that

---

[2] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement, as applicable.

certain *Supplement to Disclosure Statement Setting Forth Modifications to Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* filed by the Debtors on June 23, 2015 (ECF No. 527) (the "**Disclosure Statement Supplement**"), a copy of which is annexed hereto as **Exhibit A** (a redline copy showing changes to the Plan, as modified, is annexed as an exhibit to the Disclosure Statement Supplement).

PLEASE TAKE FURTHER NOTICE that, pursuant to a second consent order entered by the Court on June 22, 2015 (ECF No. 521) (the "**Second Consent Order**"), **the Current Voting Deadline on the Plan has been extended to June 29, 2015 at 5:00 p.m. (Eastern Time) (the "Revised Voting Deadline")**.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Second Consent Order, **the Current Plan Objection Deadline has been extended to June 26, 2015 at 5:00 p.m. (Eastern Time) (the "Revised Plan Objection Deadline")**.

PLEASE TAKE FURTHER NOTICE that for the avoidance of doubt, any creditor that has submitted a Ballot voting its claim(s) to accept or reject the Plan prior to the entry of the Consent Order is permitted to file a revised Ballot with respect to its claim(s) prior to the Revised Voting Deadline.

> **IF YOU HOLD A CLAIM IN A CLASS UNDER THE PLAN IN WHICH HOLDERS ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN, YOU ARE <u>NOT</u> REQUIRED TO SUBMIT YOUR BALLOT BY THE CURRENT VOTING DEADLINE. RATHER, ALL BALLOTS MUST BE PROPERLY EXECUTED, COMPLETED, AND DELIVERED TO THE VOTING AGENT BY FIRST-CLASS MAIL, OVERNIGHT COURIER, OR PERSONAL DELIVERY, SO THAT THEY ARE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN THE REVISED VOTING DEADLINE.**

PLEASE TAKE FURTHER NOTICE that if a creditor that has previously submitted a timely, validly executed Ballot does not submit a revised Ballot before the Revised

3

Voting Deadline, such creditor's vote cast by the first Ballot shall be considered to be a vote on the Plan, as modified.

PLEASE TAKE FURTHER NOTICE that **the hearing on confirmation of the Plan, as modified, has been adjourned from June 30, 2015 at 10:00 a.m. (Eastern Time) to July 2, 2015 at 10:00 a.m. (Eastern Time) (the "Confirmation Hearing")** or as soon thereafter as counsel may be heard. The Confirmation Hearing will be held before the Honorable Michael E. Wiles, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004. The Confirmation Hearing may be further adjourned from time to time without further notice other than the announcement by the Debtors in open court of the adjourned date(s) at the Confirmation Hearing or any continued hearing.

PLEASE TAKE FURTHER NOTICE that the Disclosure Statement Supplement and the Plan, as modified, can be viewed for free at the website maintained by Prime Clerk: https://cases.primeclerk.com/chassix/. Additionally, copies of the Disclosure Statement Supplement and the Plan, as modified, are available upon request by contacting Prime Clerk at 844 224-1137 (917-962-8896 for international), by regular mail, hand or overnight delivery to Chassix Holdings, Inc. Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 9th Floor, New York, NY 10022 or via e-mail at chassixballots@primeclerk.com or by accessing the Bankruptcy Court's website: www.nysb.uscourts.gov. A PACER password and login are needed to access documents on the Bankruptcy Court's website. A PACER password can be obtained at http://www.pacer.psc.uscourts.gov.

4

Dated: June 23, 2015
     New York, New York

     /s/ Ray C. Schrock, P.C.
     Marcia L. Goldstein
     Ray C. Schrock, P.C.

     **WEIL, GOTSHAL & MANGES LLP**
     767 Fifth Avenue
     New York, New York 10153
     Telephone: (212) 310-8000
     Facsimile: (212) 310-8007

     *Attorneys for Debtors*
     *and Debtors in Possession*

**EXHIBIT A**

**SUPPLEMENT TO DISCLOSURE STATEMENT SETTING FORTH
MODIFICATIONS TO SECOND AMENDED JOINT PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
                                            :
In re                                       :        Chapter 11
                                            :
CHASSIX HOLDINGS, INC., *et al.*,           :        Case No. 15-10578 (MEW)
                                            :
                                            :        (Jointly Administered)
                    Debtors.[1]             :
                                            :
---------------------------------------------------------x

<u>**SUPPLEMENT**</u> **TO DISCLOSURE STATEMENT SETTING FORTH**
**MODIFICATIONS TO SECOND AMENDED JOINT PLAN OF REORGANIZATION**
<u>**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**</u>

**WEIL, GOTSHAL & MANGES LLP**
Marcia L. Goldstein
Ray C. Schrock, P.C.
Matthew P. Goren
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

Dated: June 23, 2015
        New York, New York

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012). The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS SUPPLEMENT (THE "**SUPPLEMENT**") TO THE DEBTORS' DISCLOSURE STATEMENT (THE "**DISCLOSURE STATEMENT**") IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE DEBTORS' *MODIFIED SECOND AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE*, DATED AS OF JUNE 23, 2015, (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE "**PLAN**") AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.[2]  A REDLINE COPY OF THE PLAN SHOWING CHANGES TO THE PLAN, AS MODIFIED, FROM THE VERSION MAILED TO CREDITORS WITH THE DISCLOSURE STATEMENT IS ANNEXED HERETO AS **EXHIBIT A**.  NO SOLICITATION OF VOTES TO ACCEPT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT, THIS SUPPLEMENT AND THE PLAN **IN THEIR ENTIRETY** BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION VIII (CERTAIN RISK FACTORS AFFECTING THE DEBTORS) OF THE DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  THE PLAN SUMMARIES AND STATEMENTS MADE IN THE DISCLOSURE STATEMENT AND THIS SUPPLEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN, THE DISCLOSURE STATEMENT AND THIS SUPPLEMENT.  **IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THE DISCLOSURE STATEMENT OR THIS SUPPLEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN, AS MODIFIED, WILL GOVERN**.

THIS SUPPLEMENT AND THE DISCLOSURE STATEMENT HAVE BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH OTHER NON-BANKRUPTCY LAW.

THE DEBTORS BELIEVE THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THE DISCLOSURE STATEMENT AND THIS SUPPLEMENT, AND THE OFFER OF THE NEW COMMON STOCK THAT MAY BE DEEMED TO BE MADE PURSUANT TO THE SOLICITATION, ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE EXEMPTION PROVIDED BY SECTION 1145(a)(1) OF THE BANKRUPTCY CODE, AND EXPECT THAT THE OFFER AND ISSUANCE OF THE NEW COMMON STOCK UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT

---

[2] Unless otherwise expressly set forth herein, capitalized terms used but not otherwise herein defined shall have the same meanings ascribed to such terms in the Plan.

AND RELATED STATE STATUTES BY REASON OF THEAPPLICABILITY OF SECTION 1145(a)(1) OF THE BANKRUPTCY CODE AND SECTION 4(A)(2) OF THE SECURITIES ACT.

CERTAIN STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT AND THIS SUPPLEMENT, INCLUDING WITH RESPECT TO PROJECTED CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THE DISCLOSURE STATEMENT AND THIS SUPPLEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THE DISCLOSURE STATEMENT AND THIS SUPPLEMENT WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THE DISCLOSURE STATEMENT AND THIS SUPPLEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS AND DEBTORS IN POSSESSION IN THESE CHAPTER 11 CASES.

THE STATEMENTS CONTAINED IN THIS SUPPLEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS SUPPLEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

.

THE DEBTORS, THE OEM CUSTOMERS, THE CONSENTING NOTEHOLDERS AND PLATINUM EQUITY (COLLECTIVELY, THE "**PLAN SUPPORT PARTIES**") SUPPORT CONFIRMATION OF THE PLAN, AS MODIFIED.  BASED ON THE FACTS AND CIRCUMSTANCES OF THESE CHAPTER 11 CASES, THE CREDITORS COMMITTEE ALSO SUPPORTS CONFIRMATION OF THE PLAN, AS MODIFIED. THE PLAN SUPPORT PARTIES AND THE CREDITORS COMMITTEE URGE ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN.  THE PLAN SUPPORT PARTIES AND, UNDER THE FACTS AND CIRCUMSTANCES OF THESE CHAPTER 11 CASES, THE CREDITORS COMMITTEE BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERY FOR ALL CREDITORS.

WEIL:\95370449\4\35076.0004

# I.

# EXECUTIVE SUMMARY[3]

On March 12, 2015 (the "**Commencement Date**"), each of Automotive Properties of New York, LLC, Chassix Holdings, Inc. ("**Chassix Holdings**"), UC Holdings, Inc. ("**UC Holdings**"), Chassix, Inc. ("**Chassix**"), Diversified Machine, Inc., Diversified Machine Bristol, LLC, Chassix Georgia Machining, LLC, DMI Columbus, LLC, Diversified Machine Montague, LLC, Diversified Machine, Milwaukee LLC, DMI Edon LLC, Mexico Products I, LLC, DMI China Holding LLC, Concord International, Inc., SMW Automotive, LLC, Automotive, LLC, Chassis Co. of Michigan, LLC, and AluTech, LLC (collectively, the "**Debtors**"), commenced with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") a voluntary case pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors' chapter 11 cases are being jointly administered, for procedural purposes only, under the case *In re Chassix Holdings, Inc., et. al.*, Case No. 15–10578 (MEW) (the "**Chapter 11 Cases**").

On April 24, 2015, the Bankruptcy Court entered an order approving the Debtors' Disclosure Statement for the Plan (ECF No. 327) (the "**Disclosure Statement Order**"). Upon entry of the Disclosure Statement Order, the Debtors commenced solicitation of the Plan by mailing copies of the Disclosure Statement, Ballots and other approved solicitation materials to parties entitled to vote to accept or reject the Plan , in accordance with the Disclosure Statement Order.

Since that time, representatives of the Debtors, the Informal Committee of Noteholders, Platinum Equity and the Creditors Committee have engaged in discussions to resolve the issues and objections the Creditors Committee had with respect to the Plan, as previously proposed which issues and objections were set forth in the *Preliminary Objection to Confirmation of the Plan from the Official Committee of Unsecured Creditors of Chassix Holdings, Inc., et al* (ECF No. 484). The Debtors are pleased to report that they have reached an agreement with the Creditors Committee on certain modifications to the Plan which resolve the Creditors Committee's issues with respect to the Plan and will result in, among other things, the Creditors Committee's support of the Plan, as modified, enhanced recoveries under the Plan to the holders of Allowed Claims in Class 4 (Unsecured Note Claims) and consenting Sub-classes in Class 5 (General Unsecured Trade Claims) and Class 6 (Other General Unsecured Claims), resolution of the Creditors Committee's objections to the Debtors' Plan, a cessation of all Plan-related discovery by the Creditors Committee, and a more consensual Confirmation Hearing. The Plan, as modified – which already had wide spread support, including approximately 73% of the Debtors' Secured Noteholders, approximately 80% of the Debtors' Unsecured Noteholders, Platinum Equity, and all of the Debtors' largest customers, including GM, Ford, FCA, Nissan and BMW – is also now supported by the Creditors Committee, based on the facts and circumstances of these Chapter 11 Cases. The principal benefits of the modifications and improvements to the Plan can be summarized as follows:

---

[3] The following summary is qualified in its entirety by more detailed information contained in the Plan and elsewhere in this Disclosure Statement.

WEIL:\95370449\4\35076.0004

- An additional $9 million in incremental Cash to be distributed Pro Rata to the Holders of Allowed General Unsecured Claims in consenting Sub-classes under the Plan as follows:

  o An additional $7 million, for a total of up to $12 million in the aggregate, to be distributed Pro Rata to the Holders of Allowed Class 5 General Unsecured Trade Claims in consenting Sub-classes under the Plan payable in accordance with the schedule and on the terms and conditions set forth below and in the Plan.

  o An additional $2 million, for a total of $4 million in the aggregate, to be distributed Pro Rata to the Holders of Allowed Class 6 Other General Unsecured Claims in consenting Sub-classes under the Plan subject to the terms and conditions set forth below and in the Plan.

- An increase in New Warrants to be distributed Pro Rata to Holders of Allowed Class 4 Unsecured Note Claims from 5% of the New Common Stock to 8% of the New Common Stock, with a five-year expiration period, subject to the terms and conditions set forth below and in the Plan.

- A Cash distribution of $4 million to be distributed Pro Rata to the Holders of Allowed Class 4 Unsecured Note Claims payable on the Effective Date subject to the terms and conditions set forth below and in the Plan.

- Immediate cessation of all Plan-related discovery and litigation by the Creditors Committee.

- Platinum Equity's additional contribution of $2,250,000 in value by (i) waiving its right to reimbursement of $1,250,000 in Restructuring Expenses, and (ii) contributing $1,000,000 in Cash to fund certain of the enhanced recoveries as set forth above.

These increased and enhanced recoveries are in addition to the other principal benefits of the Plan which include, without limitation, the following:

(a)    Approximately $250 million in debtor-in-possession financing comprised of a $150 million revolving asset based lending facility to be provided by PNC Bank, National Association and a $100 million term loan (which will convert to an exit term loan at emergence) to be provided by the Debtors' Secured Noteholders, to facilitate operations during the Chapter 11 Cases;

(b)    An infusion of $50 million by certain Secured Noteholders in the form of an additional new exit term loan at emergence, as well as a commitment from the Revolving DIP Lenders to work in good faith on acceptable terms for converting the $150 million Revolving DIP Credit Facility to an

4

exit asset based lending facility, that will provide ongoing liquidity for the Debtors upon emerging from the Chapter 11 Cases;

(c)     Conversion of approximately $375 million of the Debtors' Secured Notes and approximately $158 million of the Debtors' Unsecured Notes to equity;

(d)     Agreements with the OEM Customers on long-term accommodations that will provide significant annual price increases and new business commitments, as well as certain other valuable accommodations and protections, including waivers of setoff and plan distributions on account of the OEM Customers' substantial claims against the Debtors;

(e)     Platinum Equity's support including, among other things, substantial operational support, significant assistance in the negotiation of the Plan, waiver of all claims against the Estates (including, among other claims, claims totaling approximately $10 million in principal amount), and taking steps to ensure the Debtors will obtain substantial net operating losses for the benefit of the Reorganized Debtors that will provide the Reorganized Debtors with material cash savings; and

(f)     Prompt emergence from chapter 11.

The Debtors, the Creditors Committee and the other Plan Support Parties engaged in intense negotiations over the modified terms of the Plan and believe that, under the circumstances, the enhanced recoveries provided for under the Plan, as modified, are the highest and best recoveries for all creditors and urge you to vote in favor of the Plan. A letter from the Creditors Committee in support of the Plan, as modified, is attached hereto as **Exhibit B.**

As previously set forth in the Disclosure Statement, the Plan provides for a significant deleveraging of the Debtors' balance sheet, as reflected in the chart below.

| Pre-Petition Capital Structure | | Post-Emergence Capital Structure | |
|---|---|---|---|
| **Prepetition Revolving ABL Facility** | $135 million[4] | **Revolving Exit Facility** | $57 million[5] |
| **Secured Notes Due 2018** | $375 million | **Converted Exit Term Loan** | $100 million |
| **Unsecured Notes Due 2018** | $158 million | **Additional Exit Term Loan** | $50 million |
| **Capital Lease Obligations** | $12 million | **Capital Lease Obligations** | $10 million |
| **Total:** | **Approx. $680 million** | **Total:** | **Approx. $217 million** |

In addition, the Plan implements a global release and settlement of numerous Debtor-creditor and inter-creditor issues with the Debtors' existing equity sponsor, Platinum Equity, and the members of the Informal Committee of Noteholders (the "**Global Settlement**"). Under the Plan, and in accordance with the Global Settlement, the holders of Allowed Secured Note Claims will receive their Pro Rata share of approximately 97.5% of the New Common Stock in the Reorganized Debtors (the "**Secured Noteholder Common Stock Distribution**") (subject to dilution as described below). In addition, as described in further detail in the Disclosure Statement, under the terms of the Global Settlement, and in consideration of each of their substantial contributions to the Debtors' Chapter 11 Cases: (a) the Unsecured Noteholders will receive their Pro Rata share of (i) approximately 2.5% of the New Common Stock (the "**Unsecured Noteholder Common Stock Distribution**") (subject to dilution by the Management Incentive Plan and, to the extent applicable, the exercise of the New Warrants), and (ii) warrants to purchase approximately 5% of the New Common Stock, as set forth in the Plan; and (b) Platinum Equity will receive a release, as set forth in the Plan. In the event the Bankruptcy Court does not approve the terms of the Global Settlement, the Plan still provides for holders of Allowed Unsecured Noteholder Claims to receive the foregoing distribution if (a) the Class of Allowed Unsecured Note Claims votes to accept the Plan and (b) each Class of Allowed Other General Unsecured Claims and Allowed General Unsecured Trade Claims votes to accept the Plan. In the event either of the foregoing conditions is not met, the holders of Allowed Unsecured Note Claims will not receive or retain any property on account of their Claims under the Plan. If the Global Settlement is not approved or either the Class of General Unsecured Trade Claims or the Class of Other General Unsecured Claims does not vote to accept the Plan, the Secured Noteholder Common Stock Distribution will increase to 100% of the New Common Stock (subject to dilution by the Management Incentive Plan). The terms of the Global Settlement, including the release and indemnification provisions incorporated in the Plan, are integral parts of the Plan and have been agreed to, and are supported by, the Debtors and the other Plan Support Parties.

---

[4] Approximate amount drawn on $150 million Prepetition Revolving ABL Facility as of the Commencement Date.

[5] Estimated amount to be drawn on $150 million Revolving Exit Facility on the effective date of the Plan, subject to certain availability reserves.

WEIL:\95370449\4\35076.0004

The Plan, as modified, based on the settlement with the Creditors Committee, also provides for the following enhanced distributions to holders of Allowed unsecured claims:

- With respect to holders of Allowed Unsecured Note Claims, in addition to the above-discussed distributions, each holder will receive (i) its Pro Rata share of warrants to purchase an additional 3% of the New Common Stock and (ii) its Pro Rata share of $4,000,000 (the "**Unsecured Noteholder Cash Distribution**").

- With respect to holders of Allowed General Unsecured Trade Claims, the Plan provides that (i) each holder of an Allowed General Unsecured Trade Claim will receive its Pro Rata share of $1,000,000 (the "**Trade Claim Distribution**"), in Cash, in full and final satisfaction of such holder's Allowed General Unsecured Trade Claim on the following distribution schedule: (a) ten percent (10%) payable on the Effective Date or as soon as practicable thereafter; (b) forty-five percent (45%) payable one year after the Effective Date; and (c) forty-five percent (45%) payable two years after the Effective Date; <u>provided</u> that any holder of an Allowed General Unsecured Trade Claim that enters into an agreement with the Debtors (or the Reorganized Debtors, as applicable) to extend Customary Trade Terms will receive its Pro Rata Share of the Trade Claim Distribution and, in addition, its Pro Rata share of $4,000,000 on the same schedule as set forth above (the "**Additional Trade Claim Distribution**"); and (ii) for any Sub-class of General Unsecured Trade Claims that votes to accept the Plan, each holder of an Allowed General Unsecured Trade Claim in such accepting Sub-class will also receive, in addition to the foregoing distribution, its Pro Rata share of $7,000,000 (the "**Enhanced General Unsecured Trade Distribution**") on the following distribution schedule: (a) such holder's Pro Rata share of $3,000,000 payable on the Effective Date, or as soon as practicable thereafter; (b) such holder's Pro Rata share of $2,000,000 payable one year after the Effective Date; and (c) such holder's Pro Rata share of $2,000,000 payable two years after the Effective Date. In the event any Sub-class of General Unsecured Trade Claims votes to reject the Plan, the holders of Allowed General Unsecured Trade Claims in such a rejecting Sub-class will not receive or retain any Pro Rata share of the Enhanced General Unsecured Trade Distribution. For the avoidance of doubt, to the extent any Sub-class of General Unsecured Trade Claims votes to reject the Plan and, therefore, is not entitled to receive any portion of the Enhanced General Unsecured Trade Distribution, such Pro Rata portion attributable to the rejecting Subclass will be reallocated to the holders of Allowed General Unsecured Trade Claims in other Sub-classes that have voted to accept the Plan.

- With respect to holders of Allowed Other General Unsecured Claims, the Plan provides that, for any Sub-class of Allowed Other General Unsecured

Claims that votes to accept the Plan, each holder of an Allowed Other General Unsecured Claims in such accepting Sub-class will receive its Pro Rata share of $4,000,000 (the "**General Unsecured Claim Distribution**") on the following distribution schedule: (i) such holder's Pro Rata share of $3,000,000 on the Effective Date, or as soon as practicable thereafter, and (ii) such holder's Pro Rata share of $1,000,000 one year after the Effective Date.  In the event any Sub-class of Other General Unsecured Claims votes to reject the Plan, the holders of Allowed Other General Unsecured Claims in such a rejecting Sub-class will not receive or retain any property under the Plan on account of such Claims, including, for the avoidance of doubt, any Pro Rata share of the General Unsecured Claim Distribution. For the avoidance of doubt, to the extent any Sub-class of Other General Unsecured Claims votes to reject the Plan and, therefore, is not entitled to receive any portion of the General Unsecured Claim Distribution, such Pro Rata portion attributable to the rejecting Sub-class will be reallocated to the holders of Other General Unsecured Claims in other Sub-classes that have voted to accept the Plan.

**THE DEBTORS, THE CREDITORS COMMITTEE AND THE OTHER PLAN SUPPORT PARTIES URGE ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN TO VOTE IN FAVOR OF THE PLAN.**

A redline copy showing the changes to the Plan, as modified, is annexed hereto as **Exhibit A** and can be viewed for free at the website maintained by the Debtors' solicitation and voting Agent, Prime Clerk, LLC (the "**Voting Agent**"): https://cases.primeclerk.com/chassix/. Additionally, copies of the Plan are available upon request by contacting the Voting Agent at 844 224-1137 (917-962-8896 for international), by regular mail, hand or overnight delivery to Chassix Holdings, Inc. Ballot Processing, c/o Prime Clerk LLC, 830 Third Avenue, 9th Floor, New York, NY 10022 or via e-mail at chassixballots@primeclerk.com or by accessing the Bankruptcy Court's website: www.nysb.uscourts.gov.  A PACER password and login are needed to access documents on the Bankruptcy Court's website.  A PACER password can be obtained at http://www.pacer.psc.uscourts.gov.

WEIL:\95370449\4\35076.0004

## II.

### IMPORTANT DATES

Please take note of the following important dates and deadlines <u>certain of which have recently been extended pursuant to certain Consent Orders[6] entered by the Court</u>:

| | |
|---|---|
| Deadline to file and serve any objection or response to the Plan (the "**Revised Plan Objection Deadline**") | **June 26, 2015 at 5:00 p.m. (Eastern Time)** |
| Deadline for completed ballots to be received by the Voting Agent (the "**Revised Voting Deadline**") | **June 29, 2015 at 5:00 p.m. (Eastern Time)** |
| Scheduled date and time for the commencement of the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**") | **July 2, 2015 at 10:00 a.m. (Eastern Time)** |

**IF YOU HOLD A CLAIM AGAINST ONE OF THE DEBTORS AND ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE DEBTORS' PLAN, YOU ARE <u>NOT</u> REQUIRED TO SUBMIT YOUR VOTE(S) TO ACCEPT OR REJECT THE DEBTORS' PLAN BY JUNE 19, 2015 AT 5:00 P.M. (EASTERN TIME) AS PREVIOUSLY SET FORTH IN THE DISCLOSURE STATEMENT. THE REVISED VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN HAS BEEN MOVED TO JUNE 29, 2015 AT 5:00 P.M. (EASTERN TIME).**

**IF YOU PREVIOUSLY SUBMITTED A TIMELY, VALIDLY EXECUTED BALLOT AND DO NOT SUBMIT A REVISED BALLOT BEFORE THE REVISED VOTING DEADLINE, YOUR VOTE CAST BY THE FIRST BALLOT WILL BE CONSIDERED TO BE A VOTE ON THE PLAN, AS MODIFIED.**

---

[6] "**Consent Orders**" means (i) Consent Order Amending Solicitation Procedures Order and Extending Related Deadlines for Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated June 19, 2015 (ECF No. 515]) and (ii) Second Consent Order Amending Solicitation Procedures Order and Extending Related Deadlines for Debtors' Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated June 22, 2015 (ECF No. 521).

WEIL:\95370449\4\35076.0004

## III.

## SUMMARY OF <u>ENHANCED</u> DISTRIBUTIONS AND VOTING ELIGIBILITY

The following summary table briefly outlines the classification and treatment of Claims against and Interests in the Estates under the Plan, as modified, and the voting eligibility of the holders of such Claims and Interests.  **As set forth in the Plan, the classification of Claims and Interests set forth herein will apply separately to each of the Debtors.**  The following summary table is qualified in its entirety by reference to the full text of the Plan.

| CLASS NO. | TYPE OF CLAIM OR INTEREST | IMPAIRMENT | APPROX. ALLOWED AMOUNT[7] | APPROXIMATE PERCENTAGE RECOVERY[8] (RECOVERIES PRIOR TO MODIFICATION) | ELIGIBLE TO VOTE |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | $0 - $1 million | 100% (100%)<br><br>Each holder of an Allowed Other Priority Claim will receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practical thereafter. | No (presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | $10 million - $11 million | 100% (100%)<br><br>Each holder of an Allowed Other Secured Claim will receive, at the option of the Debtors or the Reorganized Debtors, (i) payment in full in Cash in full and final satisfaction of such claim, payable on the Effective Date or as soon as reasonably practical thereafter, (ii) delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest required under Section 506(b) of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | No (presumed to accept) |
| 3 | Secured Note Claims | Impaired | $396 million | 72.8% (79.8%)<br><br>Pursuant to the Global Settlement set forth in Section 5.2 of the Plan, and subject to, and in accordance with, Section 5.16 of the Plan, on the Effective Date, each holder of an Allowed Secured Note Claim will be entitled to receive, in full and final satisfaction of such Allowed | Yes |

---

[7] The amounts set forth herein are estimates based upon the Debtors' books and records as of the Commencement Date.  Actual allowed amounts will depend upon, among other things, final reconciliation and resolution of all Claims, and the negotiation of cure amounts.  Consequently, the actual allowed amounts may vary from the approximate amounts set forth herein.

[8] The approximate percentage recovery for each Class set forth in this Disclosure Statement is based upon certain assumptions that are subject to change.  A detailed discussion of the analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is set forth in the Disclosure Statement.

| CLASS NO. | TYPE OF CLAIM OR INTEREST | IMPAIRMENT | APPROX. ALLOWED AMOUNT[7] | APPROXIMATE PERCENTAGE RECOVERY[8] (RECOVERIES PRIOR TO MODIFICATION) | ELIGIBLE TO VOTE |
|---|---|---|---|---|---|
| | | | | Secured Note Claim, its Pro Rata share of the Secured Noteholder Common Stock Distribution; provided that if (i) the Global Settlement is not approved by a Final Order or (ii) either the Class of General Unsecured Trade Claims or the Class of Other General Unsecured Claims does not vote to accept the Plan, the Secured Noteholder Common Stock Distribution will increase to 100% of the New Common Stock (subject to dilution by the Management Incentive Plan). | |
| 4 | Unsecured Note Claims | Impaired | $161 million | 11.9% (8.3%)<br><br>Pursuant to the Global Settlement, and subject to, and in accordance with, Section 5.16 of the Plan, on the Effective Date, pursuant to the Global Settlement, each holder of an Allowed Unsecured Note Claim will be entitled to receive, in full and final satisfaction of such Allowed Unsecured Note Claim, its Pro Rata share of (i) the Unsecured Noteholder Common Stock Distribution, (ii) the New Warrants, and (iii) the Unsecured Noteholder Cash Distribution; provided that holders of Allowed Unsecured Note Claims will receive the foregoing Pro Rata distributions if the Global Settlement is approved or the following conditions occur:<br><br>(i) the Class of holders of Allowed Class 4 Unsecured Note Claims votes to accept the Plan; and<br><br>(ii) each Sub-class of Class 5 General Unsecured Trade Claims and Class 6 Other General Unsecured Claims votes to accept the Plan.<br><br>In the event the Bankruptcy Court determines that the Global Settlement cannot be approved and each of the foregoing conditions have not been satisfied, holders of Allowed Unsecured Note Claims will not receive or retain any property under the Plan. | Yes |
| 5 | General Unsecured Trade Claims | Impaired | $30 million - $34 million | 35% - 40%[9] (16.1%)<br><br>Except to the extent a holder of an Allowed General Unsecured Trade Claim has agreed to less favorable treatment or has been paid prior to the Effective Date, including pursuant to | Yes |

---

[9] The estimated recoveries for Class 5 (General Unsecured Trade Claims) assume that all eligible Class 5 creditors participate in the Additional Trade Claim Distribution.

11

| CLASS NO. | TYPE OF CLAIM OR INTEREST | IMPAIRMENT | APPROX. ALLOWED AMOUNT[7] | APPROXIMATE PERCENTAGE RECOVERY[8] (RECOVERIES PRIOR TO MODIFICATION) | ELIGIBLE TO VOTE |
|---|---|---|---|---|---|
| | | | | any Final Order, each holder of an Allowed General Unsecured Trade Claim will receive the following treatment: | |

(i)     each holder of an Allowed General Unsecured Trade Claim will receive its Pro Rata share of the Trade Claim Distribution, in Cash, in full and final satisfaction of such holder's Allowed General Unsecured Trade Claim on the following distribution schedule: (a) ten percent (10%) payable on the Effective Date or as soon as practicable thereafter; (b) forty-five percent (45%) payable one year after the Effective Date; and (c) forty-five percent (45%) payable two years after the Effective Date; provided that any holder of an Allowed General Unsecured Trade Claim that enters into an agreement with the Debtors (or the Reorganized Debtors, as applicable) to extend Customary Trade Terms will receive its Pro Rata share of the Trade Claim Distribution and, in addition, its Pro Rata share of the Additional Trade Claim Distribution on the same schedule set forth above in Section 4.5(b) of the Plan; and

(ii)     for any Sub-class of General Unsecured Trade Claims that votes to accept the Plan, each holder of an Allowed General Unsecured Trade Claim in such accepting Sub-class will receive, in addition to the foregoing distribution, its Pro Rata share of the Enhanced General Unsecured Trade Distribution on the following distribution schedule: (a) such holder's Pro Rata share of $3 million payable on the Effective Date, or as soon as practicable thereafter; (b) such holder's Pro Rata share of $2 million payable one year after the Effective Date; and (c) such holder's Pro Rata share of $2 million payable two years after the Effective Date; and

(iii)     in the event any Sub-class of General Unsecured Trade Claims votes to reject the Plan, the holders of Allowed General Unsecured Trade Claims in such a rejecting Sub-class will not receive or retain any Pro Rata share of the Enhanced

WEIL:\95370449\4\35076.0004

| CLASS NO. | TYPE OF CLAIM OR INTEREST | IMPAIRMENT | APPROX. ALLOWED AMOUNT[7] | APPROXIMATE PERCENTAGE RECOVERY[8] (RECOVERIES PRIOR TO MODIFICATION) | ELIGIBLE TO VOTE |
|---|---|---|---|---|---|
| | | | | *General Unsecured Trade Distribution. For the avoidance of doubt, to the extent any Sub-class of General Unsecured Trade Claims votes to reject the Plan and, therefore, is not entitled to receive any portion of the Enhanced General Unsecured Trade Distribution, such Pro Rata portion attributable to the rejecting Subclass will be reallocated to the holders of Allowed General Unsecured Trade Claims in other Sub-classes that have voted to accept the Plan.* | |
| 6 | Other General Unsecured Claims | Impaired | Undetermined | 10% (5%)<br><br>Except to the extent a holder of an Allowed Other General Unsecured Claim has agreed to less favorable treatment, on the Effective Date or as soon thereafter as is reasonably practicable, each holder of an Allowed Other General Unsecured Claim will receive the following treatment:<br><br>(i) for any Sub-class of Other General Unsecured Claims that votes to accept the Plan, each holder of an Allowed Other General Unsecured Claim in such accepting Sub-class will receive its Pro Rata share of the General Unsecured Claim Distribution on the following distribution schedule: (a) such holder's Pro Rata share of $3 million on the Effective Date, or as soon as practicable thereafter, and (b) such holder's Pro Rata share of $1 million one year after the Effective Date; and<br><br>(ii) in the event any Sub-class of Other General Unsecured Claims votes to reject the Plan, the holders of Allowed Other General Unsecured Claims in such a rejecting Sub-class will not receive or retain any property under the Plan on account of such Claims, including, for the avoidance of doubt, any Pro Rata share of the General Unsecured Claim Distribution. For the avoidance of doubt, to the extent any Sub-class of Other General Unsecured Claims votes to reject the Plan and, therefore, is not entitled to receive any portion of the General Unsecured Claim Distribution, such Pro Rata portion attributable to the rejecting Sub-class will be reallocated to the holders of Other General Unsecured Claims in | Yes |

WEIL:\95370449\4\35076.0004

| CLASS NO. | TYPE OF CLAIM OR INTEREST | IMPAIRMENT | APPROX. ALLOWED AMOUNT[7] | APPROXIMATE PERCENTAGE RECOVERY[8] (RECOVERIES PRIOR TO MODIFICATION) | ELIGIBLE TO VOTE |
|---|---|---|---|---|---|
| | | | | other Sub-classes that have voted to accept the Plan. | |
| 7 | Intercompany Claims | Unimpaired | NA | NA (NA)<br><br>On the Effective Date or as soon thereafter as is practicable, Intercompany Claims may be extinguished or compromised by distribution, contribution or otherwise, or Reinstated, at the discretion of the Debtors or the Reorganized Debtors, as the case may be, on or after the Effective Date; provided that all Intercompany Claims owing by Diversified Machine, Inc. to Chassix (whether or not represented by a note) will be contributed by Chassix to the capital of Diversified Machine, Inc. under the Plan. | No (presumed to accept) |
| 8 | Intercompany Interests | Unimpaired | NA | NA (NA)<br><br>The Intercompany Interests will be Unimpaired under the Plan. | No (presumed to accept) |
| 9 | Subordinated Securities Claims | Impaired | NA | 0% (0%)<br><br>Holders of the Subordinated Securities Claims will not receive or retain any property under the Plan on account of such Claims. | No (deemed to reject) |
| 10 | Existing Chassix Holdings Equity Interests | Impaired | NA | 0% (0%)<br><br>The holder of Existing Chassix Holdings Equity Interests will not receive or retain any property under the Plan on account of such Interests. | No (deemed to reject) |

Pursuant to the provisions of the Bankruptcy Code, only those holders of claims or interests in classes that are impaired under a plan of reorganization and that are not deemed to have rejected the plan are entitled to vote to accept or reject such proposed plan. Classes of claims or interests in which the holders of claims are unimpaired under a proposed plan are deemed to have accepted such proposed plan and are not entitled to vote to accept or reject the Plan. Classes of claims or interests in which the holders of claims receive no distribution under a proposed plan are deemed to have rejected such proposed plan and are not entitled to vote to accept or reject the Plan.

## A.      VOTING PROCEDURES

As set forth in the Disclosure Statement, certain holders of Claims are entitled to vote to accept or reject the Plan. For each holder of a Claim entitled to vote, the Debtors have enclosed with the Disclosure Statement, among other things, a ballot and voting instructions regarding how to properly complete the ballot and submit a vote with respect to the Plan. Holders of more than one Claim will receive an individual ballot for each Claim. The individual ballots must be used to vote each individual Claim. For detailed voting instructions, please refer to the voting instructions and the ballot enclosed with this Disclosure Statement.

All completed ballots must be actually received by the Voting Agent at the following address no later than **5:00 p.m. (Eastern Time) on June 29, 2015** (*i.e.*, the Revised Voting Deadline).

Via Regular Mail, Overnight Courier, or Hand Delivery:

Chassix Holdings, Inc.
Ballot Processing Center
c/o Prime Clerk LLC
830 3rd Avenue, 9th Floor
New York, New York 10022

For the avoidance of doubt, any creditor that previously submitted a Ballot voting its claim(s) prior to the entry of the Consent Order is permitted to file a revised Ballot with respect to its claim(s) prior to the Revised Voting Deadline.  If a creditor that has previously submitted a timely, validly executed Ballot does not submit a revised Ballot before the Revised Voting Deadline, such creditor's vote cast by the first Ballot shall be considered to be a vote on the Plan.

If you are a holder of a Claim that is entitled to vote on the Plan and you did not receive a ballot, received a damaged ballot or lost your ballot, you require a new Ballot in order to change your previous vote case by a prior Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, or the procedures for voting with respect to the Plan, please contact the Voting Agent at (844) 224–1137 (toll free) or (917) 962–8896 (international toll free).

If you are the holder of a Class 5 General Unsecured Trade Claim and you did not elect to provide Customary Trade Terms on your Ballot, you can still participate in the Additional Trade Claim Distribution by submitting your proposed payment terms to ChassixTradeTermsExternal@weil.com no later than July 15, 2015.  The Debtors (or Reorganized Debtors) will then confirm whether such terms conform with Customary Trade Terms and will respond back to each submission accordingly.  For the avoidance of doubt, the agreed upon Customary Trade Terms shall take effect at the Effective Date.  If you do not notify the Debtors of your intention (either on your Ballot or as set forth above) or otherwise enter into an agreement committing to extend Customary Trade Terms to the Debtors or Reorganized Debtors, as applicable, you will not be eligible to participate in the Additional Trade Claim Distribution.

| **THE VOTING AGENT WILL NOT COUNT ANY BALLOTS RECEIVED AFTER THE REVISED VOTING DEADLINE.** |
| --- |

## B.    CONFIRMATION UNDER SECTION 1129(B)

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both.  In addition, with respect to the Classes that are deemed to have rejected the Plan, the Debtors intend to request confirmation of the Plan pursuant

WEIL:\95370449\4\35076.0004

to section 1129(b) of the Bankruptcy Code.  Section 1129(b) permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or interests.  Under section 1129(b), a plan may be confirmed by a bankruptcy court if it does not "discriminately unfairly" and is "fair and reasonable" with respect to each rejecting class.  A more detailed description of the requirements for confirmation of a nonconsensual plan is set forth in Section X of the Disclosure Statement.

## C.    CONFIRMATION HEARING

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on **July 2, 2015 at 10:00 a.m. (Eastern Time)** before the Honorable Michael E. Wiles at the United States Bankruptcy Court for the Southern District of New York, Room 617, One Bowling Green, New York, NY 10004–1408.

## D.    OBJECTIONS

Section 1128 of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

Any objection to confirmation of the Plan, as modified, must be in writing, must conform to the Bankruptcy Rules and the Local Bankruptcy Rules for the Bankruptcy Court, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' Estates or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to the chambers of The Honorable Michael E. Wiles, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York, together with proof of service thereof, and served upon the parties listed below so as to be received no later than the Revised Plan Objection Deadline of **June 26, 2015 at 5:00 p.m. (Eastern Time)**:

| *Debtors* | *Counsel to the Debtors* |
|---|---|
| Chassix Holdings, Inc.<br>300 Galleria Office Center<br>Suite 501<br>Southfield, MI 48034<br>Attn: Bibi N. Di Serio, Esq. | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>Attn: Marcia L. Goldstein, Esq.<br>    Ray C. Schrock, P.C. |
| *Office of the U.S. Trustee* | *Counsel to the Creditors Committee* |
| 201 Varick Street<br>Suite 1006<br>New York, NY 10014<br>Attn:  Susan Golden, Esq.<br>    Andrea B. Schwartz, Esq. | Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, NY 10014<br>Attn: Arik Preis, Esq.<br>    Jason P. Rubin, Esq. |

WEIL:\95370449\4\35076.0004

| | |
|---|---|
| ***Counsel to DIP Term Agent***<br><br>Shipman & Goodwin LLP<br>One Constitution Plaza<br>Hartford, CT 06103-1919<br>Facsimile: (860) 251-5099<br>Attn: Nathan Z. Plotkin, Esq. | ***Counsel to DIP ABL Agent***<br><br>Bodman PLC<br>1901 St. Antoine Street, 6th Floor at Ford Field<br>Detroit, MI 48226<br>Attn: Robert J. Diehl, Jr., Esq. |
| ***Counsel to the Informal Committee of Noteholders***<br><br>Paul, Weiss, Rifkind, Wharton & Garrison LLP<br>1285 Avenue of the Americas<br>New York, NY 10019<br>Facsimile: (212) 492-0158<br>Attn: Andrew N. Rosenberg, Esq.<br>     Alice B. Eaton, Esq. | ***Counsel to Platinum Equity***<br><br>Milbank, Tweed, Hadley & McCloy LLP<br>28 Liberty Street<br>New York, NY 10005<br>Facsimile: (212) 530-5219<br>Attn: Dennis F. Dunne, Esq.<br>     Samuel A. Khalil, Esq. |
| ***Counsel to FCA US LLC***<br><br>Dickinson Wright PLLC<br>500 Woodward Avenue<br>Suite 4000<br>Detroit, MI 48226<br>Attention: James A. Plemmons, Esq.<br>     Colin T. Ferguson, Esq. | ***Counsel to General Motors LLC***<br><br>Frost Brown Todd LLC<br>150 3rd Avenue South, Suite 1900<br>Nashville, TN 37201<br>Attention: Robert V. Sartin, Esq.<br>     Michelle Drinkard Balfour, Esq. |
| ***Counsel to Ford Motor Company***<br><br>Miller, Canfield, Paddock and Stone, P.L.C.<br>150 West Jefferson<br>Suite 2500<br>Detroit, MI 48226<br>Attention: Jonathan S. Green, Esq.<br>     Stephen S. LaPlante, Esq. | ***Counsel to BMW Manufacturing, LLC***<br><br>Jaffe Raitt Heuer & Weiss, P.C.<br>27777 Franklin Road, Suite 2500<br>Southfield, MI 48034<br>Attention: Richard E. Kruger, Esq. |
| ***Counsel to Nissan North America, Inc.***<br><br>Waller Lansden Dortch & Davis, LLP<br>511 Union Street, Suite 2700<br>Nashville, TN 37219<br>Attention:  Mike Paslay, Esq.<br>Tel: (615) 850-8657 | |

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

WEIL:\95370449\4\35076.0004

# IV.

## CONCLUSION

The Debtors, the Creditors Committee and the other Plan Support Parties believe that, under the circumstances, confirmation and implementation of the Plan, as modified, is in the best interests of all creditors, and urge holders of impaired Claims in Class 3 (Secured Note Claims), Class 4 (Unsecured Note Claims), Class 5 (General Unsecured Trade Claims), and Class 6 (Other General Unsecured Claims) to vote to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than the Revised Voting Deadline, **June 29, 2015 at 5:00 p.m. (Eastern Time)**.

Dated:  June 23, 2015
        New York, New York

Respectfully submitted,

Chassix Holdings and each of the Debtors

By:    /s/ J. Mark Allan
       Name:  J. Mark Allan
       Title: President

## <u>EXHIBIT A</u>

**REDLINE OF MODIFIED SECOND AMENDED JOINT PLAN OF
REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| Chassix Holdings, Inc., *et al.*,[1] | ) | Case No. 15-10578 (MEW) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**MODIFIED SECOND AMENDED JOINT PLAN OF REORGANIZATION**
**UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**WEIL, GOTSHAL & MANGES LLP**

Marcia L. Goldstein
Ray C. Schrock, P.C.
Matthew P. Goren
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Attorneys for Debtors and*
*Debtors in Possession*

Dated:  ~~April 24~~June 23, 2015
        New York, New York

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Automotive Properties of New York, LLC (4323); Chassix Holdings, Inc. (9249); UC Holdings, Inc. (5026); Chassix, Inc. (5728); Diversified Machine, Inc. (8762); Diversified Machine Bristol, LLC (5409); Chassix Georgia Machining, LLC (1940); DMI Columbus, LLC (1833); Diversified Machine Montague, LLC (4771); Diversified Machine, Milwaukee LLC (0875); DMI Edon LLC (1847); Mexico Products I, LLC (3039); DMI China Holding LLC (4331); Concord International, Inc. (3536); SMW Automotive, LLC (9452); Automotive, LLC (2897); Chassis Co. of Michigan, LLC (2692); AluTech, LLC (0012).  The direct and indirect international subsidiaries of Chassix Holdings, Inc. are not debtors in these chapter 11 cases.

**Table of Contents**

**Page**

Section 1.    DEFINITIONS AND INTERPRETATION. ......................................... 1
        A.    Definitions. ............................................................................. 1
    1.6.    *Allowed Amount.* ........................................................................ 2
    1.7.    *Amended Organizational Documents.* ............................................ 2
    1.8.    *Bankruptcy Code.* ...................................................................... 2
    1.9.    *Bankruptcy Court.* ..................................................................... 2
    1.10.   *Bankruptcy Rules.* ..................................................................... 2
    1.11.   *Benefit Plans.* ........................................................................... 2
    1.12.   *Bristol Facility.* ........................................................................ 2
    1.13.   *Business Day* ........................................................................... 2
    1.14.   *Cash.* ...................................................................................... 2
    1.15.   *Causes of Action.* ...................................................................... 2
    1.16.   *Chapter 11 Cases* ..................................................................... 3
    1.17.   *Chassix* ................................................................................... 3
    1.18.   *Chassix Holdings.* ..................................................................... 3
    1.19.   *Claim* ...................................................................................... 3
    1.20.   *Class* ...................................................................................... 3
    1.21.   *Collateral Agent* ...................................................................... 3
    1.22.   *Commencement Date.* ................................................................ 3
    1.23.   *Commencement Date Plan* .......................................................... 3
    1.24.   *Confirmation Date.* .................................................................... 3
    1.25.   *Confirmation Hearing* ............................................................... 3
    1.26.   *Confirmation Order.* .................................................................. 3
    1.27.   *Consenting Noteholders.* ............................................................ 3
    1.28.   *Consenting Secured Noteholders* ................................................. 4
    1.29.   *Consenting Unsecured Noteholders* .............................................. 4
    1.30.   *Consummation* ......................................................................... 4
    1.31.   *Creditors Committee* ................................................................. 4
    1.32.   *Cure* ....................................................................................... 4
    1.33.   *Customary Trade Terms* ............................................................. 4

WEIL:\95312210\3\35076.0004 WEIL:\95377628\4\35076.0004

**Table of Contents**

**Page**

| | | |
|---|---|---|
| 1.34. | *Debtors* | 4 |
| 1.35. | *Debtors in Possession* | 4 |
| 1.36. | *Definitive Documents* | 4 |
| 1.37. | *DIP ABL Agent* | 5 |
| 1.38. | *DIP Agents* | 5 |
| 1.39. | *DIP Claim* | 5 |
| 1.40. | *DIP Facilities* | 5 |
| 1.41. | *DIP Lenders* | 5 |
| 1.42. | *DIP Term Agent* | 5 |
| 1.43. | *DIP Term Facility* | 5 |
| 1.44. | *DIP Term Lenders* | 5 |
| 1.45. | *Disbursing Agent* | 5 |
| 1.46. | *Disclosure Statement* | 5 |
| 1.47. | *Disclosure Statement Order* | 5 |
| 1.48. | *Disputed Claim* | 5 |
| 1.49. | *Distribution Date* | 5 |
| 1.50. | *Distribution Record Date* | 6 |
| 1.51. | *Effective Date* | 6 |
| 1.52. | *Enhanced General Unsecured Trade Distribution* | 6 |
| 1.53. | *Estate or Estates* | 6 |
| 1.54. | *Exculpated Parties* | 6 |
| 1.55. | *Existing Chassix Holdings Equity Interests* | 6 |
| 1.56. | *Existing UC Holdings Equity Interests* | 6 |
| 1.57. | *Exit Facilities* | 6 |
| 1.58. | *Exit Term Loan* | 6 |
| 1.59. | *Fee Claim* | 6 |
| 1.60. | *Final DIP Order* | 7 |
| 1.61. | *Final Order* | 7 |
| 1.62. | *General Unsecured Claim* | 7 |
| 1.63. | *General Unsecured Claim Distribution* | 7 |
| 1.64. | *General Unsecured Trade Claim* | 7 |

WEIL:\95312210\3\35076.0004 WEIL:\95377628\4\35076.0004

**Table of Contents**

| | | **Page** |
|---|---|---|
| 1.65. | *Global Settlement* | 7 |
| 1.66. | *Impaired* | 7 |
| 1.67. | *Initial Distribution* | 7 |
| 1.68. | *Initial Distribution Date* | 7 |
| 1.69. | *Intercompany Claim* | 8 |
| 1.70. | *Intercompany Interests* | 8 |
| 1.71. | *Intercreditor Agreement.* | 8 |
| 1.72. | *Interests* | 8 |
| 1.73. | *Interim DIP Order* | 8 |
| 1.74. | *Lien* | 8 |
| 1.75. | *Management Incentive Plan* | 8 |
| 1.76. | *New Board* | 8 |
| 1.77. | *New Common Stock* | 8 |
| 1.78. | *New Warrants* | 8 |
| 1.79. | *New Warrant Agreement* | 8 |
| 1.80. | *OEM Customers* | 8 |
| 1.81. | *Other General Unsecured Claim* | 9 |
| 1.82. | *Other Priority Claim.* | 9 |
| 1.83. | *Other Secured Claim* | 9 |
| 1.84. | *Person* | 9 |
| 1.85. | *Plan* | 9 |
| 1.86. | *Plan Supplement* | 9 |
| 1.87. | *Plan Supplement Filing Date* | 9 |
| 1.88. | *Platinum Consent Right.* | 9 |
| 1.89. | *Platinum Equity* | 9 |
| 1.90. | *Prepetition Credit Agreement.* | 10 |
| 1.91. | *Prepetition Intercreditor Agreement.* | 10 |
| 1.92. | *Prepetition Revolving ABL Facility* | 10 |
| 1.93. | *Prepetition Revolving ABL Facility Claim* | 10 |
| 1.94. | *Prepetition Revolving ABL Lenders* | 10 |
| 1.95. | *Priority Tax Claim* | 10 |

WEIL:\95312210\3\35076.0004 WEIL:\95377628\4\35076.0004

**Table of Contents**

|  |  | **Page** |
|---|---|---|
| 1.96. | *Pro Rata*. | 10 |
| 1.97. | *Reinstate, Reinstated or Reinstatement* | 10 |
| 1.98. | *Released Parties* | 10 |
| 1.99. | *Reorganized Chassix*. | 11 |
| 1.100. | *Reorganized Debtors* | 11 |
| 1.101. | *Reorganized UC Holdings* | 11 |
| 1.102. | *Required Consenting Noteholders* | 11 |
| 1.103. | *Required Consenting Secured Noteholders*. | 11 |
| 1.104. | *Required Consenting Unsecured Noteholders*. | 11 |
| 1.105. | *Restructuring*. | 11 |
| 1.106. | *Restructuring Expenses* | 11 |
| 1.107. | *Restructuring Support Agreement* | 11 |
| 1.108. | *Restructuring Support Parties* | 11 |
| 1.109. | *Restructuring Transactions* | 12 |
| 1.110. | *Revolving DIP Credit Facility* | 12 |
| 1.111. | *Revolving DIP Lenders* | 12 |
| 1.112. | *Revolving Exit Facility*. | 12 |
| 1.113. | *Schedule of Assumed Contracts* | 12 |
| 1.114. | *Schedule of Rejected Contracts* | 12 |
| 1.115. | *Schedules* | 12 |
| 1.116. | *Secured Claim* | 12 |
| 1.117. | *Secured Note Claim* | 12 |
| 1.118. | *Secured Noteholder Common Stock Distribution* | 12 |
| 1.119. | *Secured Noteholders*. | 12 |
| 1.120. | *Secured Note Indenture* | 13 |
| 1.121. | *Secured Note Indenture Trustee* | 13 |
| 1.122. | *Secured Note Indenture Trustee Charging Lien*. | 13 |
| 1.123. | *Secured Note Indenture Trustee Fees* | 13 |
| 1.124. | *Secured Notes*. | 13 |
| 1.125. | *Security*. | 13 |
| 1.126. | *Security Agreement* | 13 |

iv

**Table of Contents**

|  |  |  | **Page** |
|---|---|---|---|
| 1.127. | *Shareholders Agreement* | | 13 |
| 1.128. | *Sub-class* | | 13 |
| 1.129. | *Subordinated Securities Claim* | | 13 |
| 1.130. | *Subsidiary Reorganized Debtors* | | 13 |
| 1.131. | *Tax Code* | | 13 |
| 1.132. | *Trade Claim Distribution* | | 14 |
| 1.133. | *UC Holdings* | | 14 |
| 1.134. | *Unimpaired.* | | 14 |
| 1.135. | *Unsecured Note Claim* | | 14 |
| 1.136. | *Unsecured Noteholder Cash Distribution* | | 14 |
| 1.137. | *Unsecured Note Indenture Trustee Charging Lien* | | 14 |
| 1.138. | *Unsecured Note Indenture Trustee Fees* | | 14 |
| 1.139. | *Unsecured Noteholder Common Stock Distribution* | | 14 |
| 1.140. | *Unsecured Noteholders* | | 14 |
| 1.141. | *Unsecured Note Indenture* | | 14 |
| 1.142. | *Unsecured Note Indenture Trustee* | | 14 |
| 1.143. | *Unsecured Notes.* | | 14 |
| 1.144. | *Voting Record Date* | | 14 |
| B. | Interpretation; Application of Definitions and Rules of Construction. | | ~~14~~15 |
| C. | Reference to Monetary Figures | | 15 |
| D. | Controlling Document | | 15 |
| Section 2. | ADMINISTRATIVE AND PRIORITY CLAIMS. | | 15 |
| 2.1. | *Administrative Claims.* | | 15 |
| 2.2. | *Fee Claims.* | | ~~15~~16 |
| 2.3. | *Priority Tax Claims.* | | 16 |
| 2.4. | *DIP Claims.* | | 16 |
| 2.5. | *Prepetition Revolving ABL Facility Claims.* | | 16 |
| Section 3. | CLASSIFICATION OF CLAIMS AND INTERESTS. | | ~~16~~17 |
| 3.1. | *Summary of Classification* | | ~~16~~17 |
| 3.2. | *Special Provision Governing Unimpaired Claims.* | | 17 |
| 3.3. | *Elimination of Vacant Classes.* | | 17 |

WEIL:\95312210\3\35076.0004 WEIL:\95377628\4\35076.0004

**Table of Contents**

**Page**

Section 4.        TREATMENT OF CLAIMS AND INTERESTS. .............................................. ~~17~~18

    4.1.        *Other Priority Claims (Class 1).* ..................................................... ~~17~~18

    4.2.        *Other Secured Claims (Class 2).* .................................................... 18

    4.3.        *Secured Note Claims (Class 3)* ....................................................... 18

    4.4.        *Unsecured Note Claims (Class 4).* ................................................. ~~18~~19

    4.5.        *General Unsecured Trade Claims (Class 5).* ................................. 19

    4.6.        *Other General Unsecured Claims (Class 6).* ................................ ~~19~~20

    4.7.        *Intercompany Claims (Class 7).* .................................................... ~~20~~21

    4.8.        *Intercompany Interests (Class 8).* ................................................. ~~20~~21

    4.9.        *Subordinated Securities Claims (Class 9).* ................................... 21

    4.10.      *Existing Chassix Holdings Equity Interests (Class 10)* ............... ~~21~~22

Section 5.        MEANS FOR IMPLEMENTATION. ..................................................... ~~21~~22

    5.1.        *Compromise and Settlement of Claims, Interests, and Controversies.* ........ ~~21~~22

    5.2.        *Global Settlement* ........................................................................... ~~22~~23

    *5.3.*        *Committee Settlement* ................................................................... 23

    5.~~3~~4.      *Actions of Dharma Holding Corporation and Triomphe Intermediate Holding Corporation* ................................................................. ~~22~~24

    5.~~4~~5.      *Cancellation of Existing Securities and Agreements.* ................. ~~23~~24

    5.~~5~~6.      *Corporate Structure.* ....................................................................... ~~23~~25

    5.~~6~~7.      *Authorization and Issuance of Plan Securities.* ........................... ~~24~~25

    5.~~7~~8.      *Section 1145 Exemption.* ................................................................ ~~24~~25

    5.~~8~~9.      *Exit Financing.* ................................................................................ ~~24~~26

    ~~5.9~~5.10.   *Intercreditor Agreement.* ................................... ~~25~~26

    5.1~~0~~1.    *Reorganized Debtors.* ..................................................................... ~~25~~26

    5.1~~1~~2.    *Bristol Facility* ................................................................................. ~~26~~27

    5.1~~2~~3.    *Cancellation of Liens.* ..................................................................... ~~26~~27

    5.1~~3~~4.    *Management Employment Matters.* ................................................ ~~26~~27

    5.1~~4~~5.    *Withholding and Reporting Requirements.* ..................................... ~~26~~27

    5.1~~5~~6.    *Exemption From Certain Transfer Taxes.* ..................................... ~~27~~28

    5.1~~6~~7.    *Restructuring Transactions; Further Transactions.* ..................... ~~27~~29

    5.1~~7~~8.    *Dissolution of Chassix Holdings.* .................................................. ~~28~~29

# Table of Contents

|  |  |  | Page |
|---|---|---|---|
| | 5.1~~8~~9. | *Effectuating Documents.* | ~~28~~30 |
| | ~~5.19~~5.20. | | *Closing of the Chapter 11 Case* |
| Section 6. | | DISTRIBUTIONS. | ~~29~~30 |
| | 6.1. | *Distribution Record Date.* | ~~29~~30 |
| | 6.2. | *Date of Distributions.* | ~~29~~30 |
| | 6.3. | *Timing of Distributions.* | ~~29~~31 |
| | 6.4. | *Disbursing Agent.* | ~~29~~31 |
| | 6.5. | *Powers of Disbursing Agent.* | ~~30~~31 |
| | 6.6. | *Delivery of Distributions.* | ~~30~~31 |
| | 6.7. | *Manner of Payment Under Plan.* | ~~30~~31 |
| | 6.8. | *Fractional Stock.* | ~~30~~32 |
| | 6.9. | *Minimum Cash Distributions.* | ~~30~~32 |
| | 6.10. | *Setoffs.* | ~~31~~32 |
| | 6.11. | *Distributions After Effective Date.* | ~~31~~32 |
| | 6.12. | *Allocation of Distributions Between Principal and Interest.* | ~~31~~32 |
| Section 7. | | PROCEDURES FOR DISPUTED CLAIMS. | ~~31~~33 |
| | 7.1. | *Allowance of Claims.* | ~~31~~33 |
| | 7.2. | *Objections to Claims.* | ~~31~~33 |
| | 7.3. | *Estimation of Claims.* | ~~31~~33 |
| | 7.4. | *No Distributions Pending Allowance.* | ~~32~~33 |
| | 7.5. | *Distributions After Allowance.* | ~~32~~33 |
| | 7.6. | *Resolution of Claims.* | ~~32~~34 |
| | 7.7. | *Disallowed Claims.* | ~~32~~34 |
| Section 8. | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES. | ~~32~~34 |
| | 8.1. | *General Treatment.* | ~~32~~34 |
| | 8.2. | *Determination of Cure Disputes and Deemed Consent.* | ~~33~~34 |
| | 8.3. | *Payments Related to Assumption of Contracts and Leases.* | ~~33~~35 |
| | 8.4. | *Rejection.* | ~~34~~35 |
| | 8.5. | *Survival of the Debtors' Indemnification Obligations.* | ~~34~~35 |
| | 8.6. | *Compensation and Benefit Plans.* | ~~34~~36 |
| | 8.7. | *Insurance Policies.* | ~~35~~36 |

WEIL:\95312210\3\35076.0004  WEIL:\95377628\4\35076.0004

# Table of Contents

**Page**

| | | | |
|---|---|---|---|
| 8.8. | *Intellectual Property Licenses and Agreements.* | | 3536 |
| 8.9. | *Reservation of Rights.* | | 3536 |
| Section 9. | CONDITIONS PRECEDENT TO THE EFFECTIVE DATE. | | 3537 |
| 9.1. | *Conditions Precedent to Confirmation.* | | 3537 |
| 9.2. | *Conditions Precedent to the Effective Date.* | | 3637 |
| 9.3. | *Waiver of Conditions Precedent.* | | 3738 |
| 9.4. | *Effect of Non-Occurrence of Effective Date.* | | 3739 |
| Section 10. | EFFECT OF CONFIRMATION. | | 3739 |
| 10.1. | *Subordinated Claims.* | | 3739 |
| 10.2. | *Vesting of Assets.* | | 3739 |
| 10.3. | *Discharge of Claims and Termination of Interests.* | | 3839 |
| 10.4. | *Term of Injunctions or Stays.* | | 3840 |
| 10.5. | *Injunction Against Interference with Plan.* | | 3840 |
| 10.6. | *Releases by the Debtors.* | | 3840 |
| 10.7. | *Releases By Holders of Claims and Interests.* | | 3941 |
| 10.8. | *Exculpation.* | | 4041 |
| 10.9. | *Retention of Causes of Action/Reservation of Rights.* | | 4042 |
| 10.10. | *Solicitation of the Plan.* | | 4143 |
| 10.11. | *Plan Supplement.* | | 4143 |
| 10.12. | *Corporate and Limited Liability Company Action.* | | 4243 |
| Section 11. | RETENTION OF JURISDICTION. | | 4244 |
| Section 12. | MISCELLANEOUS PROVISIONS. | | 4446 |
| 12.1. | *Payment of Statutory Fees.* | | 4446 |
| 12.2. | *Substantial Consummation.* | | 4446 |
| 12.3. | *Dissolution of Creditors Committee.* | | 4446 |
| 12.4. | *Request for Expedited Determination of Taxes.* | | 4446 |
| 12.5. | *Amendments.* | | 4446 |
| 12.6. | *Revocation or Withdrawal of the Plan.* | | 4547 |
| 12.7. | *Severability of Plan Provisions upon Confirmation.* | | 4547 |
| 12.8. | *Governing Law.* | | 4547 |
| 12.9. | *Time.* | | 4547 |

WEIL:\95312210\3\35076.0004 WEIL:\95377628\4\35076.0004

## Table of Contents

**Page**

12.10. *Immediate Binding Effect*. ...................................................... 46 47

12.11. *Successor and Assigns*. ...................................................... 46 48

12.12. *Entire Agreement*. ...................................................... 46 48

12.13. *Notices*. ...................................................... 46 48

Exhibit A        Accommodation Agreements (without exhibits)

Exhibit B        Restructuring Support Agreement (without exhibits)

WEIL:\95312210\3\35076.0004 WEIL:\95377628\4\35076.0004

Each of Automotive Properties of New York, LLC, Chassix Holdings, Inc., UC Holdings, Inc., Chassix, Inc., Diversified Machine, Inc., Diversified Machine Bristol, LLC, Chassix Georgia Machining, LLC, DMI Columbus, LLC, Diversified Machine Montague, LLC, Diversified Machine, Milwaukee LLC, DMI Edon LLC, Mexico Products I, LLC, DMI China Holding LLC, Concord International, Inc., SMW Automotive, LLC, Automotive, LLC, Chassis Co. of Michigan, LLC, and AluTech, LLC (collectively, the "***Debtors***") propose the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Section 1.A.

## SECTION 1.    DEFINITIONS AND INTERPRETATION.

### A.    Definitions.

1.1.    ***Accommodation Agreements*** means (a) that certain accommodation agreement, dated as of March 11, 2015, between and among the Debtors, General Motors LLC, Ford Motor Company, FCA US LLC f/k/a Chrysler Group LLC, Nissan North America, Inc., the DIP ABL Agent, and the DIP Term Agent, and (b) that certain accommodation agreement (together with any exhibits or schedules thereto) between and among the Debtors, BMW Manufacturing Co., LLC, the DIP ABL Agent, and the DIP Term Agent, annexed hereto as **Exhibit "A"** and approved on a final basis by order of the Bankruptcy Court dated April 10, 2015 (ECF No. 255).

1.2.    ***Additional Trade Claim Distribution*** means $4,000,000, in Cash, which shall be distributed on a Pro Rata basis to holders of Allowed General Unsecured Trade Claims that agree to extend Customary Trade Terms to the Debtors (or the Reorganized Debtors, as applicable), pursuant to Section 4.5 below.  For the avoidance of doubt, the foregoing monies shall be reserved by the Debtors, or the Reorganized Debtors, as the case may be, but shall not be held in a segregated account.

1.3.    ***Administrative Agent*** means BMO Harris Bank N.A., in its capacity as administrative agent under the Prepetition Revolving ABL Facility.

1.4.    ***Administrative Claim*** means any Claim for costs and expenses of administration during the Chapter 11 Cases pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b) or 507(a)(2) of the Bankruptcy Code, including, (a) the actual and necessary costs and expenses incurred after the Commencement Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for good and other services and leased premises); (b) Fee Claims; (c) DIP Claims; (d) Restructuring Expenses; and (e) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code; <u>provided</u> that, notwithstanding anything herein to the contrary, Fee Claims and DIP Claim shall be treated as provided, respectively, in Sections 2.2 and 2.4 below.

1.5.    ***Allowed*** means:

(a)    With respect to any Claim or Interest, proof of which was filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the Bankruptcy Court, (i) as to which no objection to allowance has been interposed in accordance with Section 7.2 hereof, such Claim to the extent asserted in such proof of Claim, (ii) as to which an

objection has been interposed, such Claim or Interest to the extent that it has been allowed in whole or in part by a Final Order, or (iii) any Claim or Interest expressly allowed hereunder.

(b)    With respect to any Claim as to which no proof of claim was filed within the applicable period of limitation fixed in accordance with Bankruptcy Rule 3003(c)(3) by the Bankruptcy Court, such Claim to the extent that it has been listed in the Schedules as liquidated in amount and not disputed or contingent.

(c)    Notwithstanding the foregoing, the Reorganized Debtors shall retain all claims and defenses to any Allowed Claims that are Reinstated or Unimpaired pursuant to the Plan.

1.6.    ***Allowed Amount*** means the lesser of (a) the dollar amount of an Allowed Claim or (b) the estimated amount of such Allowed Claim.  Unless otherwise specified herein or by Final Order, the Allowed Amount of an Allowed Claim shall not include interest accruing on such Allowed Claim from and after the Commencement Date.

1.7.    ***Amended Organizational Documents*** means the forms of certificate of incorporation, certificate of formation, limited liability company agreement, or other forms of organizational documents and bylaws for the Reorganized Debtors in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, the Creditors Committee, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  To the extent such Amended Organizational Documents reflect material changes to the Debtors' existing forms of organization documents and bylaws, substantially final forms of such Amended Organizational Documents will be included in the Plan Supplement.

1.8.    ***Bankruptcy Code*** means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.9.    ***Bankruptcy Court*** means the United States Bankruptcy Court for the Southern District of New York, Manhattan Division, having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

1.10.    ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

1.11.    ***Benefit Plans*** means all benefit plans, policies, and programs sponsored by the Debtors, including all savings plans and health and welfare plans.

1.12.    ***Bristol Facility*** means the Debtors' manufacturing facility located at 51650 County Road 133, Bristol, Indiana, 46507.

1.13.    ***Business Day*** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.14.    ***Cash*** means legal tender of the United States of America.

WEIL:\95312210\3\35076.0004 WEIL:\95377628\4\35076.0004

1.15.    ***Causes of Action*** means any action, claim, cross-claim, third-party claim, cause of action, controversy, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, debt, damage, judgment, account, defense, remedies, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, foreseen or unforeseen, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively (including, without limitation, under alter ego theories), whether arising before, on, or after the Commencement Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, Cause of Action includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to sections 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any claims under any state or foreign law, including, without limitation, any fraudulent transfer or similar claims.

1.16.    ***Chapter 11 Cases*** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on March 12, 2015, in the Bankruptcy Court and styled *In re Chassix Holdings, Inc., et. al.*, Case No. 15-10578 (MEW).

1.17.    ***Chassix*** means Chassix, Inc.

1.18.    ***Chassix Holdings*** means Chassix Holdings, Inc.

1.19.    ***Claim*** means "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

1.20.    ***Class*** means any group of Claims or Interests classified by the Plan pursuant to section 1122(a) of the Bankruptcy Code.

1.21.    ***Collateral Agent*** means U.S. Bank, National Association, in its capacity as collateral agent under the Secured Notes Indenture and the related Security Agreement.

1.22.    ***Commencement Date*** means the date on which each of the Debtors filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code.

1.23.    ***Commencement Date Plan*** means the joint chapter 11 plan of reorganization, including the exhibits thereto, filed by the Debtors on the Commencement Date.

1.24.    ***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.25.    ***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.26.    ***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, the Creditors Committee, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

1.27.    ***Consenting Noteholders*** means the Consenting Secured Noteholders and the Consenting Unsecured Noteholders.

1.28.    ***Consenting Secured Noteholders*** means the beneficial holders, or investment advisors or managers for the account of beneficial holders, of Secured Notes party to the Restructuring Support Agreement.

1.29.    ***Consenting Unsecured Noteholders*** means the beneficial holders, or investment advisors or managers for the account of beneficial holders, of Unsecured Notes party to the Restructuring Support Agreement.

1.30.    ***Consummation*** means the occurrence of the Effective Date.

1.31.    ***Creditors Committee*** means the official committee of unsecured creditors appointed in the Chapter 11 Cases.

1.32.    ***Cure*** means the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

1.33.    ***Customary Trade Terms*** means industry trade terms and/or the existing contractual terms between the Debtors and the relevant holder of a General Unsecured Trade Claim including rebates and discounts, which shall in no event be worse than the most favorable terms in effect within two (2) years before the Commencement Date or such other trade terms as agreed to by the Debtors, with the consent of the Required Consenting Noteholders (such consent not to be unreasonably withheld), or the Reorganized Debtors, as applicable.

1.34.    ***Debtors*** means Automotive Properties of New York, LLC, Chassix Holdings, UC Holdings, Chassix, Diversified Machine, Inc., Diversified Machine Bristol, LLC, Chassix Georgia Machining, LLC, DMI Columbus, LLC, Diversified Machine Montague, LLC, Diversified Machine, Milwaukee LLC, DMI Edon LLC, Mexico Products I, LLC, DMI China Holding LLC, Concord International, Inc., SMW Automotive, LLC, Automotive, LLC, Chassis Co. of Michigan, LLC, and AluTech, LLC.

1.35.    ***Debtors in Possession*** means the Debtors in their capacity as debtors in possession pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

1.36.    ***Definitive Documents*** means the documents (including any related orders, agreements, instruments, schedules or exhibits) that are contemplated herein and that are otherwise necessary or desirable to implement, or otherwise relate to the restructuring contemplated in the Restructuring Support Agreement, the Plan (including the Plan Supplement), any motion seeking the approval thereof, the Confirmation Order, and definitive documentation relating to the DIP Facilities, the use of cash collateral and the Exit Facilities, Amended Organizational Documents, the Accommodation Agreements, advisory or management services agreements, the Management Incentive Plan, the New Warrant Agreement, the Shareholders Agreement and any other shareholder and member related agreements or other related documents, each of which shall contain terms and conditions consistent in all material respects with the Plan and shall otherwise be reasonably acceptable in all respects to the Debtors, the Required Consenting Noteholders, the Creditors Committee (solely to

WEIL:\95312210\3\35076.0004WEIL:\95377628\4\35076.0004

the extent the Plan provides the Creditors Committee a consent right with respect to the applicable document), and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

1.37. ***DIP ABL Agent*** means PNC Bank, National Association, in its capacity as administrative agent and collateral agent for the Revolving DIP Lenders under the Revolving DIP Credit Facility, or its permitted successor and assignee.

1.38. ***DIP Agents*** means the DIP ABL Agent and the DIP Term Agent.

1.39. ***DIP Claim*** means a Claim of the DIP Lenders or the DIP Agents arising under the DIP Facilities and the Interim DIP Order and/or Final Order.

1.40. ***DIP Facilities*** means the Revolving DIP Credit Facility and the DIP Term Facility.

1.41. ***DIP Lenders*** means the DIP Term Lenders and the Revolving DIP Lenders.

1.42. ***DIP Term Agent*** means Cantor Fitzgerald Securities, in its capacity as administrative agent and collateral agent for the DIP Term Lenders under the DIP Term Facility, or its permitted successor and assignee.

1.43. ***DIP Term Facility*** means the senior secured non-amortizing term loan credit facility provided by the DIP Term Lenders in an aggregate principal amount of $100 million made pursuant to that certain Superpriority Secured Debtor-in-Possession Term Loan, Security and Guaranty Agreement, by and among Chassix, the other borrowers and guarantors party thereto, the DIP Term Agent, the DIP Term Lenders and other parties thereto.

1.44. ***DIP Term Lenders*** means those certain Consenting Secured Noteholders who are lenders under the DIP Term Facility.

1.45. ***Disbursing Agent*** means any entity (including any applicable Debtor if it acts in such capacity) in its capacity as a disbursing agent under Section 6.4 hereof.

1.46. ***Disclosure Statement*** means the Disclosure Statement for the Plan, as supplemented from time to time, in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, which is prepared and distributed in accordance with sections 1125, 1126(b) and/or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018 and/or other applicable law.

1.47. ***Disclosure Statement Order*** means an̶the order entered by the Bankruptcy Court on April 24, 2015 finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code a̶n̶d̶ ̶o̶t̶h̶e̶r̶w̶i̶s̶e̶ ̶i̶n̶ ̶f̶o̶r̶m̶ ̶a̶n̶d̶ ̶s̶u̶b̶s̶t̶a̶n̶c̶e̶ ̶r̶e̶a̶s̶o̶n̶a̶b̶l̶y̶ ̶s̶a̶t̶i̶s̶f̶a̶c̶t̶o̶r̶y̶ ̶t̶o̶ ̶t̶h̶e̶ ̶D̶e̶b̶t̶o̶r̶s̶,̶ ̶t̶h̶e̶ ̶R̶e̶q̶u̶i̶r̶e̶d̶ ̶C̶o̶n̶s̶e̶n̶t̶i̶n̶g̶ ̶N̶o̶t̶e̶h̶o̶l̶d̶e̶r̶s̶,̶ ̶a̶n̶d̶,̶ ̶c̶o̶n̶s̶i̶s̶t̶e̶n̶t̶ ̶w̶i̶t̶h̶ ̶t̶h̶e̶ ̶P̶l̶a̶t̶i̶n̶u̶m̶ ̶C̶o̶n̶s̶e̶n̶t̶ ̶R̶i̶g̶h̶t̶,̶ ̶P̶l̶a̶t̶i̶n̶u̶m̶ ̶E̶q̶u̶i̶t̶y̶,̶ ̶a̶s̶ ̶a̶p̶p̶l̶i̶c̶a̶b̶l̶e̶(ECF No. 327).

1.48. ***Disputed Claim*** means (a) any Claim against any Debtor, proof of which was timely and properly filed, which is disputed under the Plan or as to which the Debtors have interposed a timely objection and/or request for estimation, which objection and/or request has not been withdrawn or determined by a Final Order or (b) any Claim against any Debtor proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely

or properly filed.  To the extent only the Allowed Amount of a Claim is in dispute, such Claim shall be deemed Allowed in the amount the Debtors admit to owing, if any, and disputed as to the excess.

1.49.    ***Distribution Date*** means a date or dates, including the Initial Distribution Date, as determined by the Disbursing Agent in accordance with the terms of the Plan, on which the Disbursing Agent makes a distribution to holders of Allowed Claims.

1.50.    ***Distribution Record Date*** means, except with respect to public securities, the Effective Date.

1.51.    ***Effective Date*** means the date on or after the Confirmation Date, but not later than July 31, 2015, on which all conditions to the effectiveness of the Plan set forth in Section 9 hereof have been satisfied or waived in accordance with the terms of the Plan.

1.52.    ***Enhanced General Unsecured Trade Distribution*** means $7,000,000, in Cash, which, in accordance with Section 4.5 below, shall be distributed on a Pro Rata basis to holders of Allowed General Unsecured Trade Claims; provided that, in accordance with Section 4.5, the foregoing distribution shall only be made to a holder of an Allowed General Unsecured Trade Claim if such holder's Sub-class has voted to accept the Plan.  For the avoidance of doubt, the foregoing monies shall be reserved by the Debtors, or the Reorganized Debtors, as the case may be, but shall not be held in a segregated account.

1.53.    ~~1.52.~~ ***Estate or Estates*** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.54.    ~~1.53.~~ ***Exculpated Parties*** means collectively: (a) the Debtors; (b) the Creditors Committee; (c) the Administrative Agent; (d) the Collateral Agent; (e) the other Secured Parties under and as defined in the Security Agreement; (f) the DIP Lenders; (g) the DIP Agents; (h) the Consenting Secured Noteholders; (i) the Consenting Unsecured Noteholders; (j) the arrangers under each of the DIP Facilities and the Exit Facilities; (k) the administrative agents, collateral agents, and lenders under the Exit Facilities; (l)  the OEM Customers; (m) Platinum Equity; (n) the Prepetition Revolving ABL Lenders, (o) the Unsecured Note Indenture Trustee, (p) the Secured Note Indenture Trustee and (q) with respect to each of the foregoing entities in clauses (a) through (p), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers and directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, in each case in their capacity as such.

1.55.    ~~1.54.~~ ***Existing Chassix Holdings Equity Interests*** means all Interests in Chassix Holdings immediately prior to the Commencement Date, including all equity, warrants, common stock**,** and preferred stock.

1.56.    ~~1.55.~~ ***Existing UC Holdings Equity Interests*** means all Interests in UC Holdings immediately prior to the Commencement Date, including all equity, warrants, common stock, and preferred stock.

1.57.    ~~1.56.~~ ***Exit Facilities*** means the Revolving Exit Facility and the Exit Term Loan.

1.58.   1.57. *Exit Term Loan* means that certain senior secured exit term loan in a principal amount of $150,000,000, on terms acceptable to the Debtors and the Required Consenting Noteholders.  Not less than $50,000,000 of the Exit Term Loan will be in the form of a new money investment to be made upon the Effective Date.

1.59.   1.58. *Fee Claim* means a Claim for professional services rendered or costs incurred on or after the Commencement Date through the Confirmation Date by professional persons retained by the Debtors or the Creditors Committee pursuant to sections 327, 328, 329, 330, 331, 503(b) or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

1.60.   1.59. *Final DIP Order* means the final order of the Bankruptcy Court authorizing, among other things, the Debtors to enter into and make borrowings under the DIP Facilities, and granting certain rights, protections, and liens to and for the benefit of the DIP Lenders dated April 10, 2015 (ECF No. 252).

1.61.   1.60. *Final Order* means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the Clerk of such court, which has not been reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari*, or other proceedings for a new trial, reargument or rehearing shall then be pending, or (b) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired; provided that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion pursuant to section 502(j) or 1144 of the Bankruptcy Code or under Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 has been or may be filed with respect to such order or judgment.

1.62.   1.61. *General Unsecured Claim* means any unsecured Claim, other than an Intercompany Claim and an Unsecured Note Claim, that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, including without limitation, any General Unsecured Trade Claim and any Other General Unsecured Claim.

1.63.   1.62. *General Unsecured Claim Distribution* means $24,000,000, in Cash, which, in accordance with Section 4.6 below, shall be distributed on a Pro Rata basis to holders of Allowed Other General Unsecured Claims; provided that, in accordance with Section 4.6, the foregoing distribution shall only be made to a holder of an Allowed Other General Unsecured Claim if such holder's Sub-class has voted to accept the Plan.  For the avoidance of doubt, the foregoing monies shall be reserved by the Debtors, or the Reorganized Debtors, as the case may be, but shall not be held in a segregated account.

1.64.   1.63. *General Unsecured Trade Claim* means any General Unsecured Claim against any Debtor held by a trade creditor that the Debtors will have an ongoing business relationship with after the Effective Date.

1.65.   1.64. *Global Settlement* means that certain settlement incorporated into the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, among the Debtors, the Consenting Noteholders, and Platinum Equity whereby (i) the Unsecured Noteholders shall receive their Pro Rata share of the Unsecured Noteholder Common Stock Distribution and the New Warrants

pursuant to Sections 4.4 and 5.2 below and (ii) Platinum Equity and the Released Parties related thereto shall receive releases pursuant to Sections 5.2, 10.6 and 10.7 below.

1.66.    ~~1.65.~~ ***Impaired*** means, with respect to a Claim, Interest or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.67.    ~~1.66.~~ ***Initial Distribution*** means the first distribution that the Disbursing Agent makes to holders of Allowed Claims.

1.68.    ~~1.67.~~ ***Initial Distribution Date*** means the date occurring on or as soon as reasonably practicable after the Effective Date on which the Disbursing Agent makes the Initial Distribution to holders of Allowed Claims.

1.69.    ~~1.68.~~ ***Intercompany Claim*** means any Claim against a Debtor held by another Debtor.

1.70.    ~~1.69.~~ ***Intercompany Interests*** means an Interest in a Debtor (other than Chassix Holdings or UC Holdings) held by another Debtor or an affiliate of a Debtor.

1.71.    ~~1.70.~~ ***Intercreditor Agreement*** means that certain intercreditor agreement, between and among the lenders under the Revolving Exit Facility and the Exit Term Loan, to be included in draft form in the Plan Supplement.

1.72.    ~~1.71.~~ ***Interests*** means any equity security in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all common stock, preferred stock or other instruments evidencing an ownership interest in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, to acquire any such interests in a Debtor that existed immediately before the Effective Date.

1.73.    ~~1.72.~~ ***Interim DIP Order*** means the interim order of the Bankruptcy Court authorizing, among other things, the Debtors to enter into and make borrowings under the DIP Facilities, and granting certain rights, protections and liens to and for the benefit of the DIP Lenders dated March 13, 2015 (ECF No. 67).

1.74.    ~~1.73.~~ ***Lien*** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.75.    ~~1.74.~~ ***Management Incentive Plan*** means a post-emergence management incentive plan, to be included in draft form in the Plan Supplement, which shall be in form and substance reasonably satisfactory to the Debtors and the Required Consenting Noteholders, to be implemented by the Reorganized Debtors on the Effective Date, which shall provide for grants of options and/or restricted units/equity reserved for management, directors and employees in an amount of New Common Stock representing 5-10% of the New Common Stock (subject to dilution by the exercise of the New Warrants, to the extent applicable) which shall be sufficient to properly incentivize the senior management team of the Reorganized Debtors.

1.76.    ~~1.75.~~ ***New Board*** means the initial board of directors of Reorganized UC Holdings.

1.77. ~~1.76.~~ **New Common Stock** means the shares of common stock, par value $.001 per share, in Reorganized UC Holdings that shall be issued on the Effective Date.

1.78. ~~1.77.~~ **New Warrants** mean warrants to purchase ~~5~~8% of the New Common Stock, subject to dilution by the Management Incentive Plan, with a strike price equal to the Reorganized Debtors' total implied equity value being the face amount of the Secured Notes, plus accrued interest and expenses as of the Commencement Date and an exercise period of five years, as more fully set forth in the New Warrant Agreement, which shall be distributed in accordance with Section 4.4 below.

1.79. ~~1.78.~~ **New Warrant Agreement** means the warrant agreement that will govern the terms of the New Warrants, the form of which shall be included in the Plan Supplement, and which will be in form and substance reasonably acceptable to the Debtors ~~and~~, the Required Consenting Noteholders, and the Creditors Committee.

1.80. ~~1.79.~~ **OEM Customers** means, collectively, General Motors LLC, Ford Motor Company, FCA US LLC f/k/a Chrysler Group LLC, Nissan North America, Inc., BMW Manufacturing Co., LLC and any other customer of the Debtors party to the Accommodation Agreements.

1.81. ~~1.80.~~ **Other General Unsecured Claim** means any unsecured Claim against any Debtor (other than an Intercompany Claim or a General Unsecured Trade Claim) that is not entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court.

1.82. ~~1.81.~~ **Other Priority Claim** means any Claim against any of the Debtors other than an Administrative Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.83. ~~1.82.~~ **Other Secured Claim** means a Secured Claim against any of the Debtors, other than an Administrative Claim, a Priority Tax Claim, a Prepetition Revolving ABL Facility Claim, or a Secured Note Claim.

1.84. ~~1.83.~~ **Person** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code) or other entity.

1.85. ~~1.84.~~ **Plan** means this joint chapter 11 plan of reorganization, including the exhibits hereto, as the same may be amended or modified from time to time in accordance with Section 12.5 herein.

1.86. ~~1.85.~~ **Plan Supplement** means a supplemental appendix to the Plan, in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, the Creditors Committee (solely to the extent the Plan provides the Creditors Committee a consent right with respect to the applicable document), and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, containing, among other things, substantially final forms of the Amended Organizational Documents (to the extent such Amended Organizational Documents reflect material changes from the Debtors' existing organizational documents and bylaws), the Schedule of Assumed Contracts, the Schedule of Rejected Contracts, the Exit Term Loan, the Revolving Exit Facility, the Management Incentive Plan, the Shareholders Agreement, the New Warrant Agreement, and to the extent known, with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; provided that through the Effective Date,

9

the Debtors shall have the right to amend documents contained in, and exhibits to, the Plan Supplement with the consent of the Required Consenting Noteholders, the Creditors Committee (solely to the extent the Plan provides the Creditors Committee a consent right with respect to the applicable document or exhibit) and, consistent with the Platinum Consent Right, Platinum Equity, as applicable. The Plan Supplement shall be filed with the Bankruptcy Court no later than the Plan Supplement Filing Date.

1.87.    1.86. ***Plan Supplement Filing Date*** means five business days before the voting deadline established in these cases.

1.88.    1.87. ***Platinum Consent Right*** means Platinum Equity's right to consent to or approve any documents, actions, or agreements, as applicable, solely to the extent such documents, actions, or agreements alter in any material way any of the rights or benefits proposed to be granted to or received by Platinum Equity or any Released Parties related thereto, or any obligation Platinum Equity (or any Released Party related thereto) may have, pursuant to the Commencement Date Plan.

1.89.    1.88. ***Platinum Equity*** means, collectively, Platinum Equity, LLC, Platinum Equity Advisors, LLC, Platinum Dharma Principals, LLC, Platinum Equity Capital Dharma Partners-PF, L.P., Platinum Equity Capital Dharma Partners, L.P., Platinum Equity Capital Dharma Partners-A, L.P., Platinum Equity Capital Partners III, L.P., Platinum Equity Capital Partners-A III, L.P., Platinum Equity Capital Partners-B III, L.P., Platinum Equity Capital Partners-C III, L.P., Dharma Holding Corporation, Triomphe Intermediate Holding Corporation, and such entities' direct and indirect subsidiaries and affiliates except the Debtors and the Debtors' direct and indirect subsidiaries.

1.90.    1.89. ***Prepetition Credit Agreement*** means that certain Amended and Restated Loan, Security and Guaranty Agreement dated as of July 23, 2013, as amended, supplemented or otherwise modified from time to time, by and among Chassix, the other borrowers and guarantors party thereto, the Administrative Agent, the Prepetition Revolving ABL Lenders and other parties thereto.

1.91.    1.90. ***Prepetition Intercreditor Agreement*** means that certain Intercreditor Agreement, dated as of July 23, 2013, by and between BMO Harris Bank N.A., as ABL collateral agent, and U.S. Bank National Association, as notes collateral agent.

1.92.    1.91. ***Prepetition Revolving ABL Facility*** means that certain $150 million senior secured asset based revolving credit facility pursuant to the Prepetition Credit Agreement.

1.93.    1.92. ***Prepetition Revolving ABL Facility Claim*** means any Claim relating to or arising under the Prepetition Revolving ABL Facility which shall be repaid in full in Cash with proceeds from the DIP Facilities in connection with entry of the Interim DIP Order.

1.94.    1.93. ***Prepetition Revolving ABL Lenders*** means the lenders from time to time party to the Prepetition Credit Agreement.

1.95.    1.94. ***Priority Tax Claim*** means any secured or unsecured Claim of a governmental unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.96.    1.95. ***Pro Rata*** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims in a

particular Class and other Classes entitled to share in the same recovery as such Allowed Class under the Plan.

1.97.    1.96. *Reinstate, Reinstated or Reinstatement* means (i) leaving unaltered the legal, equitable and contractual rights to which a Claim entitles the holder of such Claim so as to leave such Claim Unimpaired or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (a) curing any such default that occurred before or after the Commencement Date, other than a default of the kind specified in section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim as such maturity existed before such default; (c) compensating the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) not otherwise altering the legal, equitable or contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by the Plan or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement and shall be deemed cured on the Effective Date.

1.98.    1.97. *Released Parties* means collectively and in each case in their capacity as such: (a) the Debtors; (b) the Creditors Committee; (c) the Administrative Agent; (d) the Collateral Agent; (e) the other Secured Parties under and as defined in the Security Agreement; (f) the DIP Lenders; (g) the DIP Agents; (h) the Consenting Secured Noteholders; (i) the Consenting Unsecured Noteholders; (j) the arrangers under each of the DIP Facilities and the Exit Facilities; (k) the administrative agents, collateral agents, and lenders under the Exit Facilities; (l) the OEM Customers; (m) Platinum Equity; (n) the Prepetition Revolving ABL Lenders; (o) the Unsecured Note Indenture Trustee; (p) the Secured Note Indenture Trustee; and (q) with respect to each of the foregoing entities in clauses (a) through (p), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers and directors, principals, shareholders, members, partners, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

1.99.    1.98. *Reorganized Chassix* means Chassix, as reorganized on the Effective Date in accordance with the Plan.

1.100.    1.99. *Reorganized Debtors* means the Debtors, as reorganized on the Effective Date in accordance with the Plan.

1.101.    1.100. *Reorganized UC Holdings* means UC Holdings, as reorganized on the Effective Date in accordance with the Plan.

1.102.    1.101. *Required Consenting Noteholders* means the Required Consenting Secured Noteholders and the Required Consenting Unsecured Noteholders.

1.103.    1.102. *Required Consenting Secured Noteholders* means the Consenting Secured Noteholders holding at least 51% of the Secured Notes that are subject to the terms of the Restructuring Support Agreement.

WEIL:\95312210\3\35076.0004 WEIL:\95377628\4\35076.0004

1.104.   ~~1.103.~~ *Required Consenting Unsecured Noteholders* means the Consenting Unsecured Noteholders holding at least 51% of the Unsecured Notes that are subject to the terms of the Restructuring Support Agreement.

1.105.   ~~1.104.~~ *Restructuring* means the proposed financial restructuring the principal terms of which are set forth herein.

1.106.   ~~1.105.~~ *Restructuring Expenses* means the reasonable and documented fees and expenses incurred by each of the Administrative Agent, the Collateral Agent, the Consenting Noteholders, ~~Platinum Equity,~~ the DIP Agents, and the DIP Lenders  in connection with the Restructuring, including the fees and expenses of their respective legal and financial advisors (limited to one primary counsel for each of the Prepetition ABL Lender, the DIP Agents, <u>and</u> the Consenting Noteholders, ~~and Platinum Equity,~~ one financial advisor for ~~each of Platinum Equity and~~ the Consenting Noteholders and any other professionals that may be retained by the Consenting Noteholders and are reasonably acceptable to the Debtors) without the requirement for the filing of retention applications, fee applications or any other applications in the Chapter 11 Cases, which, in each case, shall be Allowed in full and shall not be subject to any offset, defense, counterclaim, reduction or credit of any kind whatsoever. ~~The reimbursable fees and expenses of Platinum Equity shall not exceed $1,250,000.~~

1.107.   ~~1.106.~~ *Restructuring Support Agreement* means that certain Restructuring Support Agreement, dated March 11, 2015, by and among the Debtors, the Consenting Secured Noteholders, the Consenting Unsecured Noteholders and Platinum Equity (as may be amended, supplemented or modified from time to time in accordance with the terms thereof) annexed hereto as **Exhibit** "**B**."

1.108.   ~~1.107.~~ *Restructuring Support Parties* means, collectively, the Debtors, the Required Consenting Noteholders and Platinum Equity.

1.109.   ~~1.108.~~ *Restructuring Transactions* means the transactions set forth in Section 5.1~~6~~<u>7</u> of the Plan, in the order specified therein.

1.110.   ~~1.109.~~ *Revolving DIP Credit Facility* means that certain senior secured non-amortizing asset-based revolving credit facility in an aggregate principal amount of up to $150,000,000 entered into pursuant to that certain Superpriority Secured Debtor-in-Possession ABL Loan, Security and Guaranty Agreement, by and among Chassix, the other borrowers and guarantors party thereto, the DIP ABL Agent, and the Revolving DIP Lenders.  The Revolving DIP Credit Facility includes sub-facilities for swingline loans in an amount equal to $10,000,000 and letters of credit in an amount equal to $15,000,000.

1.111.   ~~1.110.~~ *Revolving DIP Lenders* means the lenders under the Revolving DIP Credit Facility.

1.112.   ~~1.111.~~ *Revolving Exit Facility* means that certain senior secured asset-based revolving exit credit facility with terms and conditions to be negotiated which shall be acceptable to the Debtors and the Required Consenting Noteholders.

1.113.   ~~1.112.~~ *Schedule of Assumed Contracts* means the schedule of contracts and leases to be assumed by the applicable Debtor(s), with the reasonable consent of the Debtors and the Required Consenting Noteholders, to be filed as part of the Plan Supplement.

~~WEIL:\95312210\3\35076.0004~~<u>WEIL:\95377628\4\35076.0004</u>

1.114. ~~1.113.~~ *Schedule of Rejected Contracts* means the schedule of contracts and leases to be rejected by the applicable Debtor(s), with the reasonable consent of the Debtors and the Required Consenting Noteholders, to be filed as part of the Plan Supplement.

1.115. ~~1.114.~~ *Schedules* means the schedules of assets and liabilities and the statements of financial affairs filed by each Debtor under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements may be supplemented or amended from time to time.

1.116. ~~1.115.~~ *Secured Claim* means a Claim to the extent (i) secured by property of the estate, the amount of which is equal to or less than the value of such property (A) as set forth in the Plan, (B) as agreed to by the holder of such Claim and the Debtors or (C) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

1.117. ~~1.116.~~ *Secured Note Claim* means any Claim relating to or arising under the Secured Note Indenture.

1.118. ~~1.117.~~ *Secured Noteholder Common Stock Distribution* means shares of New Common Stock representing 97.5% of the New Common Stock (subject to dilution by the Management Incentive Plan and, to the extent applicable, the exercise of the New Warrants) to be distributed in accordance with Section 4.3 below; provided that if (i) the Global Settlement is not approved by a Final Order or (ii) either the Class of General Unsecured Trade Claims or the Class of Other General Unsecured Claims does not vote to accept the Plan, the Secured Noteholder Common Stock Distribution shall increase to 100% of the New Common Stock (subject to dilution by the Management Incentive Plan).

1.119. ~~1.118.~~ *Secured Noteholders* means the holders of the Secured Notes.

1.120. ~~1.119.~~ *Secured Note Indenture* means that certain indenture, dated July 23, 2013, as amended, supplemented or otherwise modified from time to time, among Chassix, as issuer, UC Holdings and certain of its subsidiaries as guarantors thereto, and U.S. Bank National Association, as trustee.

1.121. ~~1.120.~~ *Secured Note Indenture Trustee* means U.S. Bank National Association, in its capacity as trustee under the Secured Note Indenture.

1.122. ~~1.121.~~ *Secured Note Indenture Trustee Charging Lien* means any Lien or other priority in payment arising prior to the Effective Date to which the Secured Note Indenture Trustee is entitled, pursuant to the Secured Note Indenture.

1.123. ~~1.122.~~ *Secured Note Indenture Trustee Fees* means the reasonable, invoiced and documented compensation, fees, expenses, disbursements, and indemnity claims, incurred by the Secured Note Indenture Trustee, whether prior to or after the Commencement Date and whether prior to or after the Effective Date, including, without limitation, attorneys' and agents' fees, expenses, and disbursements, without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, which, in each case, shall be Allowed in full and shall not be subject to any offset, defense, counterclaim, reduction, or credit of any kind whatsoever.

1.124. ~~1.123.~~ *Secured Notes* means the 9 1/4 % senior secured notes due 2018 of Chassix issued pursuant to the Secured Note Indenture, plus accrued and unpaid interest as of the

13

Commencement Date and any other amounts and obligations payable under the Secured Note Indenture and owed as of the Commencement Date.

1.125. ~~1.124.~~ *Security* means any Security, as such term is defined in section 101(49) of the Bankruptcy Code.

1.126. ~~1.125.~~ *Security Agreement* means that certain Security Agreement, dated as of July 23, 2013, by Chassix, and the guarantors thereunder, as pledgors, assignors and debtors, and U.S. Bank National Association, in its capacity as collateral agent, pledgee, assignee and secured party for the benefit of the Secured Noteholders under the Secured Note Indenture, and each other Authorized Representative (as defined in the Security Agreement) party thereto.

1.127. ~~1.126.~~ *Shareholders Agreement* means that certain Shareholders Agreement to be included in draft form in the Plan Supplement, which shall be consistent with the requirements contained in the Plan and the Restructuring Support Agreement and otherwise be in a form and substance reasonably acceptable to the Debtors, and the Required Consenting Noteholders.

1.128. ***Sub-class*** means a Class of Claims against any one Debtor.

1.129. ~~1.127.~~ *Subordinated Securities Claim* means a Claim subject to subordination under section 510(b) of the Bankruptcy Code, and any Claim for or that arises from the rescission of a purchase, sale, issuance or offer of a Security of any of the Debtors, or for damages arising from the purchase of sale of such a Security, or for reimbursement, indemnification, or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

1.130. ~~1.128.~~ *Subsidiary Reorganized Debtors* means all of the Reorganized Debtors other than Reorganized UC Holdings (and, for the avoidance of doubt, other than Chassix Holdings).

1.131. ~~1.129.~~ *Tax Code* means the Internal Revenue Code of 1986, as amended from time to time.

1.132. ~~1.130.~~ *Trade Claim Distribution* means $1,000,000, in Cash, which shall be distributed on a Pro Rata basis to holders of Allowed General Unsecured Trade Claims pursuant to Section 4.5 below. For the avoidance of doubt, the foregoing monies shall be reserved by the Debtors, or the Reorganized Debtors, as the case may be, but shall not be held in a segregated account.

1.133. ~~1.131.~~ *UC Holdings* means UC Holdings, Inc.

1.134. ~~1.132.~~ *Unimpaired* means, with respect to a Claim, Interest or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.135. ~~1.133.~~ *Unsecured Note Claim* means any General Unsecured Claim, derived from, based upon, relating to or arising from the Unsecured Note Indenture.

1.136. ***Unsecured Noteholder Cash Distribution*** means $4,000,000, in Cash, which shall be distributed on a Pro Rata basis to holders of Allowed Unsecured Note Claims pursuant to Section 4.4 below. For the avoidance of doubt, the foregoing monies shall be reserved by the Debtors, or the Reorganized Debtors, as the case may be, but shall not be held in a segregated account.

WEIL:\95312210\3\35076.0004WEIL:\95377628\4\35076.0004

1.137. 1.134. *Unsecured Note Indenture Trustee Charging Lien* means any Lien or other priority in payment arising prior to the Effective Date to which the Unsecured Note Indenture Trustee is entitled, pursuant to the Unsecured Note Indenture.

1.138. 1.135. *Unsecured Note Indenture Trustee Fees* means the reasonable, invoiced and documented compensation, fees, expenses, disbursements, and indemnity claims, incurred by the Unsecured Note Indenture Trustee, whether prior to or after the Commencement Date and whether prior to or after the Effective Date, including, without limitation, attorneys' and agents' fees, expenses, and disbursements, without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, which, in each case, shall be Allowed in full and shall not be subject to any offset, defense, counterclaim, reduction, or credit of any kind whatsoever.

1.139. 1.136. *Unsecured Noteholder Common Stock Distribution* means shares of New Common Stock representing 2.5% of the New Common Stock (subject to dilution by the Management Incentive Plan and, to the extent applicable, the exercise of the New Warrants) to be distributed in accordance with, and subject to the conditions set forth in, Section 4.4 below.

1.140. 1.137. *Unsecured Noteholders* means the holders of the Unsecured Notes.

1.141. 1.138. *Unsecured Note Indenture* means that certain indenture, dated December 13, 2013, as amended, supplemented or otherwise modified from time to time, between Chassix Holdings, as issuer, and Delaware Trust Company, as successor trustee.

1.142. 1.139. *Unsecured Note Indenture Trustee* means Delaware Trust Company, in its capacity as trustee under the Unsecured Note Indenture.

1.143. 1.140. *Unsecured Notes* means the 10% / 10 3/4% senior unsecured PIK toggle notes due 2018 of Chassix Holdings issued pursuant to the Unsecured Note Indenture.

1.144. 1.141. *Voting Record Date* means 5:00 p.m. Eastern Time on the first day of the hearing to approve the Disclosure Statement.

**B.    Interpretation; Application of Definitions and Rules of Construction.**

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived or modified from time to time. The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to the Plan as a whole and not to any particular section, subsection or clause contained therein. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

WEIL:\95312210\3\35076.0004 WEIL:\95377628\4\35076.0004

C.    **Reference to Monetary Figures**

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

D.    **Controlling Document**

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document).  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; provided that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.

**SECTION 2.    ADMINISTRATIVE AND PRIORITY CLAIMS.**

2.1.    *Administrative Claims.*

Except to the extent that a holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors agree to different treatment, the Debtors (or the Reorganized Debtors, as the case may be) shall pay to each holder of an Allowed Administrative Claim Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Claim becomes an Allowed Claim; provided that Allowed Administrative Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors In Possession, or liabilities arising under loans or advances to or other obligations incurred by the Debtors, as Debtors In Possession, whether or not incurred in the ordinary course of business, shall be paid by the Debtors or the Reorganized Debtors, as the case may be, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing or other documents relating to such transactions.

2.2.    *Fee Claims.*

All entities seeking an award by the Bankruptcy Court of Fee Claims (a) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred not later than the date that is forty-five (45) days after the Effective Date, (b) shall be paid in full, in Cash, the Allowed Amount of their respective Allowed Fee Claims (i) upon the later of (A) the Effective Date and (B) the date on which the order Allowing such Fee Claim is entered or (ii) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Debtors or, on and after the Effective Date, the Reorganized Debtors.  The Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval, including those of the Creditors Committee to the extent the Creditors Committee is still in existence.

2.3.    *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of

16

the Debtors or the Reorganized Debtors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or (b) equal annual Cash payments (commencing on the later of the Effective Date, the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and the date such Allowed Priority Tax Claim is due and payable in the ordinary course) in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years after the Commencement Date; provided that the Debtors reserve the right to prepay all or a portion of any such amounts at any time under this option.

2.4.    ***DIP Claims.***

On the Effective Date, the Revolving DIP Facility will either be converted into the Revolving Exit Facility (if consented to by the DIP ABL Agent and the Revolving DIP Lenders) or paid in full, in Cash, using the proceeds of the Revolving Exit Facility, together with cancellation, cash collateralization, posting of backstop letters of credit or such other provision for outstanding letters of credit under the Revolving DIP Facility as is otherwise reasonably acceptable to the DIP ABL Agent.

On the Effective Date, the DIP Term Loan will either be converted into the Exit Term Loan or paid in full, in Cash, using the proceeds of the Exit Term Loan.

2.5.    ***Prepetition Revolving ABL Facility Claims.***

All obligations and claims in respect of or arising under the Prepetition ABL Credit Agreement, including the cash collateralization and letters of credit outstanding thereunder as of the Effective Date, shall be paid in full, in Cash, by the Debtors using the proceeds of the Revolving DIP Credit Facility and the DIP Term Facility on the date the Interim DIP Order is entered by the Bankruptcy Court.

**SECTION 3.    CLASSIFICATION OF CLAIMS AND INTERESTS.**

3.1.    ***Summary of Classification***

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code and (c) deemed to reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Fee Claims, Priority Tax Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in this Section 3. The classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein. Certain of the Debtors may not have holders of Claims or Interests in a particular Class or Classes; such Classes shall be treated as set forth in Section 3.3.

WEIL:\95312210\3\35076.0004WEIL:\95377628\4\35076.0004

| Class | Designation | Treatment | Entitled to Vote |
|:---:|---|:---:|:---:|
| 1 | Other Priority Claims | Unimpaired | No (presumed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (presumed to accept) |
| 3 | Secured Note Claims | Impaired | Yes |
| 4 | Unsecured Note Claims | Impaired | Yes |
| 5 | General Unsecured Trade Claims | Impaired | Yes |
| 6 | Other General Unsecured Claims | Impaired | Yes |
| 7 | Intercompany Claims | Unimpaired | No (presumed to accept) |
| 8 | Intercompany Interests | Unimpaired | No (presumed to accept) |
| 9 | Subordinated Securities Claims | Impaired | No (deemed to reject) |
| 10 | Existing Chassix Holdings Equity Interests | Impaired | No (deemed to reject) |

3.2.    ***Special Provision Governing Unimpaired Claims*.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Reorganized Debtors in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.3.    ***Elimination of Vacant Classes*.**

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

**SECTION 4.    TREATMENT OF CLAIMS AND INTERESTS.**

4.1.    ***Other Priority Claims (Class 1)*.**

(a)    *Classification*:  Class 1 consists of Allowed Other Priority Claims.

(b)    *Treatment*:  Except to the extent that a holder of an Allowed Other Priority Claim has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on the later of the Effective Date and the date on which such Other Priority Claim becomes an Allowed Claim, in each case, or as soon as reasonably practical thereafter.

(c)    *Voting*:  Class 1 is Unimpaired, and the holders of Class 1 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan.

WEIL:\95312210\3\35076.0004WEIL:\95377628\4\35076.0004

4.2. *Other Secured Claims (Class 2)*.

(a) *Classification*: Class 2 consists of Allowed Other Secured Claims.  To the extent that Allowed Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 2.

(b) *Treatment*:  Except to the extent that a holder of an Allowed Other Secured Claim has agreed to less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim shall receive (i) payment in full in Cash on the Effective Date or as soon thereafter as practicable, (ii) delivery of collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code, or (iii) such other treatment as is necessary to satisfy section 1129 of the Bankruptcy Code.

(c) *Voting*:  Class 2 is Unimpaired, and the holders of Class 2 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan.

4.3. *Secured Note Claims (Class 3)*

(a) *Classification*: Class 3 consists of Allowed Secured Note Claims.

(b) *Allowance*:  The Allowed Secured Note Claims are Allowed in the amount of $396,192,637.24 (including accrued and unpaid interest as of the Commencement Date), plus any other amounts and obligations payable under the Secured Note Indenture as of the Commencement Date,  and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

(c) *Treatment*:  Pursuant to the Global Settlement set forth in Section 5.2, and subject to, and in accordance with, Section 5.167 below, on the Effective Date, each holder of an Allowed Secured Note Claim shall be entitled to receive, in full and final satisfaction of such Allowed Secured Note Claim, its Pro Rata share of the Secured Noteholder Common Stock Distribution; <u>provided</u> that if (i) the Global Settlement is not approved by a Final Order or (ii) either the Class of General Unsecured Trade Claims or the Class of Other General Unsecured Claims does not vote to accept the Plan, the Secured Noteholder Common Stock Distribution shall increase to 100% of the New Common Stock (subject to dilution by the Management Incentive Plan).

(d) *Voting*:  Class 3 is Impaired, and holders of Class 3 Claims are entitled to vote to accept or reject the Plan.

4.4. *Unsecured Note Claims (Class 4)*.

(a) *Classification*:  Class 4 consists of Allowed Unsecured Note Claims.

(b) *Allowance*:  The Allowed Unsecured Note Claims are Allowed in the amount of $161,097,076.61, plus accrued but unpaid interest through the Commencement Date and any other amounts and obligations payable under the Unsecured Note Indenture as of the Commencement Date,  and shall not be subject to any avoidance, reductions, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-

19

claims, defenses, disallowance, impairment, objection, or any other challenges under any applicable law or regulation by any person or entity.

(c)      *Treatment*:  Pursuant to the Global Settlement set forth in Section 5.2 and subject to, and in accordance with, Section 5.1~~6~~7 below, on the Effective Date, each holder of an Allowed Unsecured Note Claim shall be entitled to receive, in full and final satisfaction of such Allowed Unsecured Note Claim, its Pro Rata share of (i) the Unsecured Noteholder Common Stock Distribution~~and~~; (ii) the New Warrants; and (iii) the Unsecured Noteholder Cash Distribution; provided that holders of Allowed Unsecured Note Claims shall receive the foregoing Pro Rata distributions if the Global Settlement is approved or the following conditions occur:

(i)      the Class of holders of Allowed Class 4 Unsecured Note Claims votes to accept the Plan; and

(ii)      each ~~s~~Sub-class of Class 5 General Unsecured Trade Claims and Class 6 Other General Unsecured Claims votes to accept the Plan.

In the event the Bankruptcy Court determines that the Global Settlement cannot be approved and each of the foregoing conditions has not been satisfied, holders of Allowed Unsecured Note Claims shall not receive or retain any property under the Plan.

(d)      *Voting*:  Class 4 is Impaired, and holders of Class 4 Claims are entitled to vote to accept or reject the Plan.

4.5.      ***General Unsecured Trade Claims (Class 5).***

(a)      *Classification*:  Class 5 consists of Allowed General Unsecured Trade Claims.

(b)      *Treatment*:  Except to the extent a holder of an Allowed General Unsecured Trade Claim has agreed to less favorable treatment or has been paid prior to the Effective Date, including pursuant to any Final Order, each holder of an Allowed General Unsecured Trade Claim shall receive the following treatment:

(i)      each holder of an Allowed General Unsecured Trade Claim shall receive its Pro Rata share of the Trade Claim Distribution, in Cash, in full and final satisfaction of such holder's Allowed General Unsecured Trade Claim on the following distribution schedule: (i) ten percent (10%) payable on the Effective Date or as soon as practicable thereafter; (ii) forty-five percent (45%) payable one year after the Effective Date; and (iii) forty-five percent (45%) payable two years after the Effective Date; provided that any holder of an Allowed General Unsecured Trade Claim that enters into an agreement with the Debtors (or the Reorganized Debtors, as applicable) to extend Customary Trade Terms shall receive its Pro Rata share of the Trade Claim Distribution and, in addition, its Pro Rata share of the Additional Trade Claim Distribution on the same schedule set forth above in this Section 4.5(b)~~.~~(i); and

(ii)      for any Sub-class of General Unsecured Trade Claims that votes to accept the Plan, each holder of an Allowed General Unsecured Trade

20

Claim in such accepting Sub-class shall receive, in addition to the foregoing distribution, its Pro Rata share of the Enhanced General Unsecured Trade Distribution on the following distribution schedule: (i) such holder's Pro Rata share of $3 million payable on the Effective Date, or as soon as practicable thereafter; (ii) such holder's Pro Rata share of $2 million payable one year after the Effective Date; and (iii) such holder's Pro Rata share of $2 million payable two years after the Effective Date; and

(iii)    in the event any Sub-class of General Unsecured Trade Claims votes to reject the Plan, the holders of Allowed General Unsecured Claims in such a rejecting Sub-class shall not receive or retain any Pro Rata share of the Enhanced General Unsecured Trade Distribution. For the avoidance of doubt, to the extent any Sub-class of General Unsecured Trade Claims votes to reject the Plan and, therefore, is not entitled to receive any portion of the Enhanced General Unsecured Trade Distribution, such Pro Rata portion attributable to the rejecting Sub-class shall be reallocated to the holders of Allowed General Unsecured Trade Claims in other Sub-classes that have voted to accept the Plan.

(c)    *Voting*:  Class 5 is Impaired, and holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

4.6.    ***Other General Unsecured Claims (Class 6).***

(a)    *Classification*:  Class 6 consists of Allowed Other General Unsecured Claims.

(b)    *Treatment*:  Except to the extent a holder of an Allowed Other General Unsecured Claim has agreed to less favorable treatment, on the Effective Date or as soon thereafter as is reasonably practicable, each holder of an Allowed Other General Unsecured Claim shall receive the following treatment:

(i)    for any Sub-class of Other General Unsecured Claims that votes to accept the Plan, each holder of an Allowed Other General Unsecured Claim in such accepting Sub-class shall receive its Pro Rata share of the General Unsecured Claim Distribution on the following distribution schedule: (i) such holder's Pro Rata share of $3 million on the Effective Date, or as soon as practicable thereafter, and (ii) such holder's Pro Rata share of $1 million one year after the Effective Date; and

(ii)    in the event any Sub-class of Other General Unsecured Claims votes to reject the Plan, the holders of Allowed Other General Unsecured Claims in such a rejecting Sub-class shall not receive or retain any property under the Plan on account of such Claims, including, for the avoidance of doubt, any Pro Rata share of the General Unsecured Claim Distribution.  For the avoidance of doubt, to the extent any Sub-class of Other General Unsecured Claims votes to reject the Plan and, therefore, is not entitled to receive

21

any portion of the General Unsecured Claim Distribution, such Pro Rata portion attributable to the rejecting sSub-class shall be reallocated to the holders of Other General Unsecured Claims in other sSub-classes that have voted to accept the Plan.

(c)    *Voting*:  Class 6 is Impaired, and holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

4.7.    ***Intercompany Claims (Class 7).***

(a)    *Classification*:  Class 7 consists of Allowed Intercompany Claims.

(b)    *Treatment*:  On the Effective Date or as soon thereafter as is practicable, the Intercompany Claims may be extinguished or compromised by distribution, contribution or otherwise, or Reinstated, at the discretion of the Debtors or the Reorganized Debtors, as the case may be, on or after the Effective Date; provided that all Intercompany Claims held by Chassix against Diversified Machine, Inc. (whether or not represented by a note) shall be contributed by Chassix to the capital of Diversified Machine, Inc. in accordance with Section 5.167 of the Plan.

(c)    *Voting*:  Class 7 is Unimpaired, and the holders of Class 7 Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

4.8.    ***Intercompany Interests (Class 8).***

(a)    *Classification*:  Class 8 consists of Intercompany Interests.

(b)    *Treatment*:  The Intercompany Interests will be Unimpaired under the Plan.

(c)    *Voting*:  Class 8 is Unimpaired, and the holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

4.9.    ***Subordinated Securities Claims (Class 9).***

(a)    *Classification*:  Class 9 consists of Subordinated Securities Claims.

(b)    *Treatment*:  The holders of Subordinated Securities Claims shall not receive or retain any property under the Plan on account of such Claims.

(c)    *Voting*:  Class 9 is Impaired by the Plan, and the holders of the Subordinated Securities Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the holders of Subordinated Securities Claims are not entitled to vote to accept or reject the Plan.

4.10.    ***Existing Chassix Holdings Equity Interests (Class 10)***

(a)    *Classification*:  Class 10 consists of Existing Chassix Holdings Equity Interests.

(b)    *Treatment*:  On the Effective Date, all Existing Chassix Holdings Equity Interests, including all equity, warrants, common stock, and preferred stock, shall be cancelled.

(c)    Class 10 is Impaired by the Plan, and the holder of Existing Chassix Holdings Equity Interests is conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, the holder of Existing Chassix Holdings Equity Interests is not entitled to vote to accept or reject the Plan.

## SECTION 5.    MEANS FOR IMPLEMENTATION.

5.1.    ***Compromise and Settlement of Claims, Interests, and Controversies.***

Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, Causes of Action, and controversies relating to the contractual, legal, and subordination rights that a holder of a Claim may have with respect to any Allowed Claim or any distribution to be made on account of such Allowed Claim.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, Causes of Action, and controversies, including without limitation, approval of the Restructuring Support Agreement, the Global Settlement, and the Accommodation Agreements, as well as a finding by the Bankruptcy Court that such compromise or settlement is within the range of reasonableness, in the best interests of the Debtors, their Estates, and holders of Claims and Interests and is fair and equitable.  In accordance with the provisions of the Plan, pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, prior to the Effective Date, the Debtors, subject to the reasonable consent of the Required Consenting Noteholders, the Creditors Committee, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, and after the Effective Date, the Reorganized Debtors, may compromise and settle Claims against the Debtors or the Reorganized Debtors, as applicable.

5.2.    ***Global Settlement***

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration of the substantial contribution and value provided by the Consenting Unsecured Noteholders and Platinum Equity, the Plan incorporates a compromise and settlement of numerous Debtor-creditor and inter-creditor issues, in the form of the Global Settlement, designed to achieve an economic settlement of such issues and potential Claims and Causes of Action against the Debtors. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of each of the following compromises or settlements that comprise the Global Settlement, and the Bankruptcy Court's findings shall constitute its determination that such compromises and settlements are within the range of reasonableness, in the best interests of the Debtors, their Estates, their creditors, and other parties-in-interests, and are fair and equitable.  Each provision of the Global Settlement shall be deemed non-severable from each other and from the remaining terms of the Plan.  As set forth in detail herein, the Global Settlement shall be implemented as follows:

(a)    *Platinum Equity.*  On the Effective Date, in full and complete compromise and settlement of any claim that Platinum Equity may assert against the Debtors, the Reorganized Debtors or the Consenting Noteholders, and in consideration of the substantial contribution provided by Platinum Equity to the Debtors' Chapter 11 Cases in the form of, among other things,  Platinum Equity's management, consulting and advisory services leading up to and during the Chapter 11 Cases, its agreement to take, or not take, certain actions that could impact the

tax attributes of the Reorganized Debtors, its assistance in securing favorable pricing and accommodation terms and conditions for the Debtors in connection with the Chapter 11 Cases, and its participation in prepetition negotiations that facilitated a speedy and consensual Restructuring for the Debtors, Platinum Equity and all Released Parties related thereto shall receive a release pursuant to Sections 10.6 and 10.7 below pursuant to the Global Settlement.

(b)     *Consenting Unsecured Noteholders*.  On the Effective Date, in full and complete compromise and settlement of any claim that the Consenting Unsecured Noteholders may hold against the Debtors, the Reorganized Debtors, Platinum Equity and any Released Parties related thereto, or the Consenting Secured Noteholders, and in consideration of the substantial contribution provided by the Consenting Unsecured Noteholders to the Debtors' Chapter 11 Cases in the form of, among other things, the Consenting Unsecured Noteholders' cooperation in the Debtors' restructuring efforts, the Consenting Unsecured Noteholders' assistance and contribution in prepetition negotiations with the OEM Customers, the contribution by certain of the Consenting Unsecured Noteholders, as DIP Lenders, in the form of the DIP Term Loan, and generally their participation in prepetition negotiations that facilitated a speedy and consensual restructuring for the Debtors, each holder of an Allowed Unsecured Note Claim shall receive its Pro Rata distribution of the Unsecured Noteholder Common Stock Distribution and ~~New Warrants~~ warrants to purchase 5% of the New Common Stock (subject to dilution by the Management Incentive Plan) pursuant to the Global Settlement.

### 5.3.     *Committee Settlement*

As a resolution of the Creditors Committee's objections to the Plan, the Debtors, with the consent of the Consenting Noteholders and Platinum Equity, and upon Platinum Equity's agreement to waive its right to receive reimbursement of $1,250,000 in Restructuring Expenses and to contribute $1,000,000 to fund certain of the enhanced distributions under the Plan, have agreed to substantially increase the distributions to the holders of Allowed Unsecured Note Claims, Allowed General Unsecured Trade Claims and Allowed Other General Unsecured Trade Claims (the "*Committee Settlement*").  Specifically, under this modified Plan, (a) all holders of Allowed Unsecured Note Claims will receive warrants to purchase an additional 3% of the New Common Stock, plus their Pro Rata share of $4 million in Cash (the Plan previously provided for no Cash distribution to Class 4), (b) all holders of Allowed General Unsecured Trade Claims will receive their Pro Rata share of an additional $7 million in Cash, to be paid on the payment schedule as set forth in Section 4.5(b) of the Plan, and (c) all holders of Allowed Other General Unsecured Trade Claims will receive their Pro Rata share of an additional $2 million in Cash, to be paid on the payment schedule as set forth in Section 4.6(b) of the Plan.

### 5.4.     ~~5.3.~~ *Actions of Dharma Holding Corporation and Triomphe Intermediate Holding Corporation*

On and after the Effective Date, Platinum Equity agrees to (A) waive or cause to be waived any stock loss in respect of the stock of UC Holdings and Chassix Holdings pursuant to Treasury regulation § 1.1502-36, and any comparable provision of state or local income tax law, to the extent directed by the Reorganized Debtors, (B) not take, or cause to be taken, any other action that would reduce, limit or otherwise adversely affect the U.S. federal income tax attributes of the Reorganized Debtors, except as consistent with past practice, general cash management, or short term prudent investment, and (C) cooperate with the Reorganized Debtors in connection with any group tax return filings, audits and proceedings with respect to taxable years ending on or prior to, or including, the Effective Date (including jointly managing such filings and proceedings, and not compromising any audit or proceeding without the Reorganized Debtors' consent, such consent not to be unreasonably withheld), <u>provided</u> that reasonable expenses incurred by Platinum Equity at the request

of the Reorganized Debtors in connection with this clause (C) shall be borne by the Reorganized Debtors.

### 5.5.    5.4. *Cancellation of Existing Securities and Agreements.*

Except as expressly provided herein, on the Effective Date, all notes, instruments, certificates evidencing debt of or interests in, the Debtors, including, without limitation, all obligations related to or arising out of the DIP Facilities, the Secured Notes Indenture, the Prepetition Revolving ABL Facility, and the Unsecured Note Indenture shall be cancelled and obligations of the Debtors and the Reorganized Debtors thereunder shall be discharged.  As a condition precedent to receiving any distribution on account of its Unsecured Note Claim, each record Unsecured Noteholder shall be deemed to have surrendered its Unsecured Notes or other documentation underlying each Unsecured Note Claim, and all such surrendered Unsecured Notes and other documentation shall be deemed to be cancelled pursuant to this Section, except to the extent otherwise provided herein.

Notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date, the Secured Note Indenture and the Unsecured Note Indenture shall continue in effect solely for purposes of: (a) enabling holders of Allowed Class 3 Secured Note Claims and Allowed Class 4 Unsecured Note Claims to receive distributions under the Plan; (b) allowing the Secured Note Indenture Trustee and Unsecured Note Indenture Trustee to make distributions under the Plan; and (c) preserving the (i) rights of the Secured Note Indenture Trustee and the Unsecured Note Indenture Trustee with respect to the Secured Note Indenture Trustee Fees and Unsecured Note Indenture Trustee Fees, respectively, and (ii) the Secured Note Indenture Trustee Charging Lien and Unsecured Note Indenture Trustee Charging Lien, respectively; <u>provided</u> that nothing in this section shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order or the Plan or result in any liability or expense to the Reorganized Debtors.  In the event that the Secured Note Indenture Trustee or the Unsecured Note Indenture Trustee asserts amounts are owing that are subject to the Secured Note Indenture Trustee Charging Lien or Unsecured Note Indenture Trustee Charging Lien, as applicable, the Debtors, in consultation with the Informal Committee of Noteholders regarding payment of such amounts, shall pay the Secured Note Indenture Trustee Fees or Unsecured Note Indenture Trustee Fees, as applicable, in cash.

Subsequent to the performance by the Secured Note Indenture Trustee and the Unsecured Note Indenture Trustee or its agents of any duties that are required under the Plan and the Confirmation Order, the Secured Note Indenture Trustee and the Unsecured Note Indenture Trustee and its agents (i) shall be fully relieved of, and released from, all obligations associated with the Secured Notes and Unsecured Notes, as applicable, arising under the Secured Note Indenture and Unsecured Note Indenture, respectively, or under any other applicable agreements or law and (ii) shall be deemed to be fully discharged.

### 5.6.    5.5. *Corporate Structure.*

On the Effective Date, except as set forth in Section 5.1~~6~~7 below, all Interests, including all equity, common stock, warrants, and preferred stock, in Chassix Holdings shall be cancelled and extinguished and Chassix Holdings shall be dissolved in accordance with Section 5.1~~7~~8 of the Plan.  The equity in the Subsidiary Reorganized Debtors shall be restored.

### 5.7.    5.6. *Authorization and Issuance of Plan Securities.*

(a)    *Authorization.*  The Debtors, the Reorganized Debtors, and Reorganized UC Holdings, as applicable, are authorized to issue all plan-related securities and

WEIL:\95312210\3\35076.0004 WEIL:\95377628\4\35076.0004

documents, including, without limitation, the New Common Stock and, to the extent applicable, the New Warrants, and any options or entitlements to purchase such plan-related securities, without the need for any further corporate, partnership, or limited liability company action.

(b)    *New Common Stock*.  On the Effective Date, subject to securities, tax and other relevant considerations and Section 5.16̶7, the New Common Stock shall be distributed in accordance with the Plan.

(c)    *New Warrants*.  On the Effective Date, and subject to the satisfaction of the conditions set forth in Section 4.4(c), the New Warrants will be issued pursuant to the terms of the New Warrant Agreement.

(d)    *Shareholders Agreement*.  Any direct or beneficial recipient of the New Common Stock (including New Common Stock issued pursuant to the exercise of New Warrants, if applicable), including all parties to whom such recipients may sell their New Common Stock in the future and all persons who purchase or acquire such equity in future transactions, shall be party to, or shall be deemed to be bound by, the Shareholders Agreement, the terms of which shall govern Reorganized UC Holdings.

5.8.    ~~5.7.~~ *Section 1145 Exemption.*

The issuance and distribution under the Plan of the New Common Stock and the New Warrants, if applicable, shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code or, to the extent the exemption under section 1145(a) of the Bankruptcy Code is not available to any particular recipient, under Section 4(a)(2) and/or Regulation D of  the Securities Act of 1933 and/or any other applicable exemptions without further act or action by any Person.

In addition, under section 1145 of the Bankruptcy Code, any Securities issued under the Plan which are exempt from such registration pursuant to section 1145(a) of the Bankruptcy Code will be freely tradable by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (2) compliance with any rules and regulations of the Securities and Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (3) the restrictions, if any, on the transferability of such Securities and instruments; and (4) applicable regulatory approval.

5.9.    ~~5.8.~~ *Exit Financing.*

(a)    *Exit Facilities*.  On the Effective Date, the Revolving DIP Facility will be paid in full, in Cash, with the proceeds of, the Revolving Exit Facility with terms and conditions to be negotiated that shall be acceptable to the Debtors and the Required Consenting Noteholders.  On the Effective Date, the DIP Term Loan will be converted into, or paid in full, in Cash, with proceeds of, the Exit Term Loan.

(b)    *Documentation*.  On the Effective Date, documentation evidencing the Revolving Exit Facility and the Exit Term Loan shall be executed and delivered, and the Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Revolving Exit Facility and the Exit Term Loan without the need for any further corporate action or any notice to or order of the Bankruptcy Court and without further action by the holders of Claims or Interests or any other Person.

(c)    *Liens/Security Interests.*  All Liens and security interests granted pursuant to the Exit Facilities are intended to be, and shall be (i) valid, binding, perfected, enforceable, Liens, and security interests in the personal and real property described in and subject to such documents, with the priorities established in respect thereof under applicable non-bankruptcy law and (ii) not subject to avoidance, recharacterization, or subordination under any applicable law.

### 5.10.    ~~5.9.~~ *Intercreditor Agreement.*

Lien priority and enforcement rights with respect to collateral between and among the lenders under the Revolving Exit Facility and the Exit Term Loan, shall be governed by the Intercreditor Agreement on terms to be negotiated.

### 5.11.    ~~5.10.~~ *Reorganized Debtors.*

(a)    *Amended Organizational Documents.*  The Amended Organizational Documents shall comply with section 1123(a)(6) of the Bankruptcy Code and shall otherwise be in form and substance satisfactory to the Debtors, the Required Consenting Noteholders, the Creditors Committee, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.  The Amended Organizational Documents shall provide, among other things, that Reorganized UC Holdings, and each of the Subsidiary Reorganized Debtors are privately held companies.

(b)    *Board of Directors of Reorganized UC Holdings.*  As of the Effective Date, the term of the current members of the board of UC Holdings shall expire without further action by any person.  The initial directors of the New Board shall consist of five (5) members selected by the Consenting Noteholders and may include at least one member of the Debtors' executive management team.  The members of the New Board will be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.

(c)    *Directors and Officers of the Reorganized Debtors.*  Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date shall serve as the initial officers of each of the respective Reorganized Debtors on or after the Effective Date and in accordance with any employment agreement with the Reorganized Debtors and applicable non-bankruptcy law.  After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.  The members of the board of directors and the board of managing members for each of the Reorganized Debtors (other than Reorganized UC Holdings as provided above) shall be determined as set forth in the Amended Organizational Documents and disclosed as required pursuant to section 1129(a)(5) of the Bankruptcy Code.

(d)    *Capital Structure.*  From and after the Effective Date, subject to the rights of the stockholders to amend the Amended Organizational Documents, including the Certificate of Incorporation of Reorganized UC Holdings, each of the Reorganized Debtors shall have one class of issued and outstanding common stock.

### 5.12.    ~~5.11.~~ *Bristol Facility*

The Reorganized Debtors shall, on the Effective Date, continue to own and operate the Bristol Facility and shall, without any further notice to or action, order, or approval of the Bankruptcy Court, be authorized to implement any necessary restructuring transactions in connection therewith, provided that the Debtors or the Reorganized Debtors, as the case may be, are authorized, with the

27

consent of the Required Consenting Noteholders, to enter into a transaction pursuant to which the Debtors or the Reorganized Debtors sell the Bristol Facility as long as such a sale transaction does not adversely affect the treatment of any creditor or equity stakeholder under the Plan and is sold for aggregate consideration acceptable to the Debtors and the Required Consenting Noteholders. Any sale of the Bristol Facility shall be made pursuant to section 1123(a)(5)(D) of the Bankruptcy Code and shall be subject to higher and better offers pursuant to bidding procedures approved by the Bankruptcy Court; provided that the sale of the Bristol Facility shall not be a condition precedent to the Effective Date and such sale may not be consummated any earlier than the Effective Date.

### 5.13. 5.12. *Cancellation of Liens*.

Except as otherwise specifically provided herein, upon the occurrence of the Effective Date, any Lien securing any Secured Claim shall be deemed released, and the holder of such Secured Claim shall be authorized and directed to release any collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors, to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

### 5.14. 5.13. *Management Employment Matters*.

On the Effective Date, the applicable Reorganized Debtors shall enter into new employment agreements with certain members of the management team and shall implement the Management Incentive Plan, which shall provide for the issuance of New Common Stock, in options or restricted units/equity, to management, directors, and employees of the Reorganized Debtors to incentivize their senior management teams.

### 5.15. 5.14. *Withholding and Reporting Requirements*.

(a)     *Withholding Rights*.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case that a distribution of New Common Stock, New Warrants, or other non-Cash property is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution.  Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)     *Forms*.  Any party entitled to receive any property (including Cash) as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Reorganized Debtors (which entity shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or Form W-8, as applicable, unless such Person is exempt under the Tax Code and so notifies the Disbursing Agent.  If such request is made by the Reorganized Debtors, the Disbursing Agent, or such other Person designated by the Reorganized Debtors and the holder fails to comply before the date that

is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

5.16.    5.15. *Exemption From Certain Transfer Taxes.*

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with this Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under this Plan or the reinvesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in this Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of collateral under the Exit Facilities and (e) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

5.17.    5.16. *Restructuring Transactions; Further Transactions.*

On or prior to the Effective Date, the following Restructuring Transactions shall be effectuated in the following order:

(a)    All Intercompany Claims held by Chassix against Diversified Machine, Inc. (whether or not represented by a note) shall be contributed by Chassix to the capital of Diversified Machine, Inc.;

(b)    The Amended Organizational Documents of the Reorganized Debtors shall become effective;

(c)    New Common Stock shall be issued and contributed by Reorganized UC Holdings to Reorganized Chassix in an amount of shares sufficient to satisfy the Secured Noteholder Common Stock Distribution under Section 4.3 of the Plan;

(d)    The Existing UC Holdings Equity Interests held by Chassix Holdings shall be recapitalized into an amount of shares of New Common Stock and New Warrants, if applicable, sufficient to satisfy the Unsecured Noteholder Common Stock Distribution under Section 4.4;

(e)    Concurrently, (i) Chassix Holdings shall transfer to the Unsecured Noteholders, in accordance with Sections 4.4 and 5.2 of the Plan, shares of New Common Stock sufficient to satisfy the Unsecured Noteholder Common Stock Distribution and New Warrants, if applicable, and (ii) Reorganized Chassix shall distribute to the Secured Noteholders in satisfaction and

discharge of their Allowed Secured Note Claims, such New Common Stock in accordance with Section 4.3 of the Plan; and

(f)    All Interests in Chassix Holdings shall be cancelled and extinguished in accordance with Section 5.45 and Chassix Holdings shall be dissolved in accordance with Section 5.178 below.

On the Effective Date or as soon as practicable thereafter, the Reorganized Debtors may (i) cause any or all of the Subsidiary Reorganized Debtors to be merged into one or more of the Reorganized Debtors, dissolved or otherwise consolidated, (ii) cause the transfer of assets between or among the Reorganized Debtors, (iii) use the proceeds of the Exit Term Loan and Revolving Exit Facility, plus Cash on hand, to pay all Restructuring Expenses, (iv) change the name of one or more of the Reorganized Debtors to such name that may be determined in accordance with applicable law, and (v) engage in any other transaction in furtherance of the Plan, including for tax efficiency reasons; provided that such transactions are not inconsistent with the above Restructuring Transactions or the other terms of the Plan.  Subject to the prior written consent of the Required Consenting Noteholders and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, any such transactions may be effective as of the Effective Date pursuant to the Confirmation Order without any further action by the stockholders, members, general or limited partners, or directors of any of the Debtors or the Debtors in Possession.

### 5.18.    5.17.  *Dissolution of Chassix Holdings.*

On the Effective Date, upon the consummation of the Restructuring Transactions and all other Effective Date distributions and transactions in furtherance of the Plan, Chassix Holdings shall file with the Office of the Secretary of State of Delaware a certificate of dissolution which may be executed by an officer of Chassix Holdings without the necessity of the approval of the board of directors of Chassix Holdings or the holders of Interests in Chassix Holdings, and upon such filing shall be deemed dissolved for all purposes and without the necessity of any other action by Chassix Holdings.  From and after the Effective Date, Chassix Holdings shall not be required to file any documents, or take any other action or receive any approval to withdraw business operations in any state in which Chassix Holdings previously conducted its business operations.  To the extent that any of the foregoing is inconsistent or in conflict with any preexisting organizational or related documents of Chassix Holdings, such documents are deemed amended by the Plan to permit and authorize Chassix Holdings to take the contemplated actions.

### 5.19.    5.18.  *Effectuating Documents.*

On and after the Effective Date, the Reorganized Debtors and the managers, officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

WEIL:\95312210\3\35076.0004WEIL:\95377628\4\35076.0004

5.20.    ~~5.19.~~ *Closing of the Chapter 11 Cases.*

After an Estate has been fully administered, the Reorganized Debtors shall promptly seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

**SECTION 6.    DISTRIBUTIONS.**

6.1.    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, (i) the Claims register and (ii) the transfer books and records of the Unsecured Notes as maintained by the Unsecured Note Indenture Trustee or its agent shall be closed and there shall be no further changes in the record holders of any Claims or Interests; provided that the Distribution Record Date shall not apply to any distributions made through Cede & Co.  The Debtors or the Reorganized Debtors, as applicable, the Disbursing Agents, and the Unsecured Note Indenture Trustee shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date, and shall instead be entitled to recognize and deal for all purposes under this Plan with only those holders of record as of the close of business on the Distribution Record Date.  Other than Claims that are expressly permitted by a Final Order or under the Plan to be filed after the Distribution Record Date, the Debtors or the Reorganized Debtors, as applicable, shall have no obligation to recognize any Claims filed from and after the Distribution Record Date.

6.2.    *Date of Distributions.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.3.    *Timing of Distributions.*

Except as otherwise provided herein, the Disbursing Agent shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date.  Thereafter, the Disbursing Agent shall from time to time determine the subsequent Distribution Dates, which shall occur no less frequently than semi-annually.

6.4.    *Disbursing Agent.*

All distributions hereunder shall be made by Reorganized Chassix (or such other entity designated by Reorganized Chassix), as Disbursing Agent[s], on or after the Effective Date or as otherwise provided herein; provided that the Secured Note Indenture Trustee shall, subject to an acceptable agreements with the Debtors or Reorganized Chassix, serve as Disbursing Agent for Allowed Class 3 Secured Note Claims or shall otherwise direct the distributions to be made on account of Allowed Class 3 Secured Note Claims, and the Unsecured Note Indenture Trustee shall, subject to an acceptable agreement with the Debtors or Reorganized Chassix, serve as Disbursing Agent for Allowed Class 4 Unsecured Note Claims or shall otherwise direct the distributions to be made on account of Allowed Class 4 Secured Note Claims.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable fees and expenses incurred by such Disbursing Agents shall be reimbursed by the Reorganized Debtors.

WEIL:\95312210\3\35076.0004WEIL:\95377628\4\35076.0004

6.5.    ***Powers of Disbursing Agent.***

A Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (b) make all distributions contemplated hereby and (c) exercise such other powers as may be vested in a Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by such Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.6.    ***Delivery of Distributions.***

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders of Allowed Claims.  In the event that any distribution to any holder is returned as undeliverable, no further distributions shall be made to such holder unless and until such Disbursing Agent is notified in writing of such holder's then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter.  Undeliverable distributions or unclaimed distributions shall remain in the possession of the Debtors until such time as a distribution becomes deliverable or holder accepts distribution, or such distribution reverts back to the Debtors or Reorganized Debtors, as applicable, and shall not be supplemented with any interest, dividends or other accruals of any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of 180 days from the date of distribution.  After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.

6.7.    ***Manner of Payment Under Plan.***

At the option of the Debtors or the Reorganized Debtors, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements.

6.8.    ***Fractional Stock.***

If any distributions of New Common Stock or New Warrants pursuant to the Plan would result in the issuance of a fractional share of New Common Stock or New Warrants, then the number of shares of New Common Stock or New Warrants to be issued in respect of such distribution shall be calculated to one decimal place and rounded up or down to the closest whole share (with a half share rounded up).  The total number of shares of New Common Stock or New Warrants to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in this paragraph.

6.9.    ***Minimum Cash Distributions***.

The Disbursing Agent shall not be required to make any Initial Distribution or semi-annual distribution of Cash less than $50 to any holder of an Allowed General Unsecured Claim; provided that, if any distribution is not made pursuant to this Section 6.9, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.  The Disbursing Agent shall not be required to make any final distributions of Cash less than $25 to any holder of an Allowed Claim.  If either (a) all Allowed General Unsecured Claims (other than those whose distributions are deemed undeliverable hereunder) have been paid in full or (b) the amount of

WEIL:\95312210\3\35076.0004WEIL:\95377628\4\35076.0004

any final distributions to holders of Allowed General Unsecured Claims would be $25 or less and the aggregate amount of cash available for distributions to holders of Allowed General Unsecured Claims is less than $25,000, then no further distribution shall be made by the Disbursing Agent and any surplus Cash shall be donated and distributed to an I.R.C. § 501(c)(3) tax-exempt organization selected by the Disbursing Agent.

### 6.10.    *Setoffs.*

The Debtors and the Reorganized Debtors may, but shall not be required to, set off against any Claim, any claims of any nature whatsoever that the applicable Debtor or Reorganized Debtor may have against the holder of such Claim; *provided, that* neither the failure to do so nor the allowance of any Claim shall constitute a waiver or release by the applicable Debtor or Reorganized Debtor.

### 6.11.    *Distributions After Effective Date.*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.12.    *Allocation of Distributions Between Principal and Interest.*

Except as otherwise provided in this Plan, to the extent that any Allowed Secured Note Claim, Allowed Unsecured Note Claim, Allowed General Unsecured Trade Claim or Allowed Other General Unsecured Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

## SECTION 7.    PROCEDURES FOR DISPUTED CLAIMS.

### 7.1.    *Allowance of Claims.*

After the Effective Date, the Reorganized Debtors shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under this Plan.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

### 7.2.    *Objections to Claims.*

As of the Effective Date, objections to, and requests for estimation of, Claims against the Debtors may be interposed and prosecuted only by the Reorganized Debtors.  Such objections and requests for estimation shall be served and filed (a) on or before the 180th day following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended, or (b) such later date as ordered by the Bankruptcy Court.

### 7.3.    *Estimation of Claims.*

WEIL:\95312210\3\35076.0004WEIL:\95377628\4\35076.0004

The Debtors or Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Debtors, as applicable, previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### 7.4.    *No Distributions Pending Allowance.*

If an objection to a Claim is filed as set forth in Section 7.2, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim. Cash in the amount of such Disputed Claims shall be reserved by the Debtors but shall not be held in a segregated account.

### 7.5.    *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan on the next Distribution Date after the date that such Disputed Claim becomes an Allowed Claim (whether by Final Order of the Bankruptcy Court or otherwise). Holders of Disputed Claims that ultimately become Allowed Claims shall not be entitled to payment of interest unless otherwise provided herein, in a Final Order, or required under applicable bankruptcy law.

### 7.6.    *Resolution of Claims.*

On and after the Effective Date, the Reorganized Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.

### 7.7.    *Disallowed Claims.*

All Claims held by persons or entities against whom or which any of the Debtors or Reorganized Debtors has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549 and/or 550 of the Bankruptcy Code shall be deemed "disallowed" claims pursuant to section 502(d) of the Bankruptcy Code and holders of such claims shall not be entitled to vote to accept or reject the Plan. Claims that are deemed disallowed pursuant to this section shall continue to be disallowed for all purposes until the avoidance action against such party has been settled or resolved by Final Order and any sums due to the Debtors or the Reorganized Debtors from such party have been paid.

WEIL:\95312210\3\35076.0004WEIL:\95377628\4\35076.0004

**SECTION 8.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.**

### 8.1.    *General Treatment.*

Effective as of the Effective Date, all executory contracts and unexpired leases to which any of the Debtors are parties are hereby assumed, except for an executory contract or unexpired lease that (a) has previously been assumed or rejected pursuant to a Final Order of the Bankruptcy Court, (b) is specifically designated as a contract or unexpired lease to be rejected on the Schedule of Rejected Contracts or is otherwise expressly rejected pursuant to the Plan, (c) is the subject of a separate (i) assumption motion filed by the Debtors (with the reasonable consent of the Required Consenting Noteholders) or (ii) rejection motion filed by the Debtors (with the reasonable consent of the Required Consenting Noteholders) under section 365 of the Bankruptcy Code prior to the Confirmation Date, or (e) is the subject of a pending objection regarding assumption, Cure, or "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code or other issues related to assumption of the contract or lease) (each such objection, a "***Cure Dispute***").

### 8.2.    *Determination of Cure Disputes and Deemed Consent.*

The Debtors shall file, as part of the Plan Supplement, the Schedule of Assumed Contracts and shall serve, within 14 days of the commencement of the Confirmation Hearing, a notice on parties to executory contracts or unexpired leases to be assumed reflecting the Debtors' intention to assume the contract or lease in connection with this Plan and, where applicable, setting forth the proposed cure amount (if any).  The proposed cure amount for any executory contract or unexpired lease not listed on the schedule shall be $0.  Any such schedule of executory contracts to be assumed and the proposed cure amounts contained therein shall be reasonably acceptable to the Required Consenting Noteholders.

To the extent that a Cure Dispute is asserted in an objection filed within fifteen (15) days of service of notice of intent to assume, and properly served on the Debtors, such Cure Dispute shall be scheduled for a hearing by the Bankruptcy Court.  Following resolution of a Cure Dispute by Final Order of the Bankruptcy Court, the applicable contract or lease shall be deemed assumed effective as of the Effective Date, provided that the Debtors reserve the right to reject any contract or lease following entry of a Final Order of the Bankruptcy Court resolving the applicable Cure Dispute by filing a notice indicating such rejection within three (3) Business Days of the entry of such Final Order.

To the extent that an objection is not timely filed and properly served on the Debtors with respect to a Cure Dispute, then the counterparty to the applicable contract or lease shall be deemed to have assented to (a) the Cure amount proposed by the Debtors and (b) the assumption of such contract or lease, notwithstanding any provision thereof that (i) prohibits, restricts or conditions the transfer or assignment of such contract or lease, or (ii) terminates or permits the termination of a contract as a result of any direct or indirect transfer or assignment of the rights of the Debtor under such contract or a change in the ownership or control as contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminated or modifying such contract on account of transactions contemplated by the Plan.

### 8.3.    *Payments Related to Assumption of Contracts and Leases.*

Subject to resolution of any Cure Dispute, any monetary amounts by which any executory contract and unexpired lease to be assumed hereunder is in default shall be satisfied, under

WEIL:\95312210\3\35076.0004WEIL:\95377628\4\35076.0004

section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as the case may be, upon assumption thereof.

Assumption and assignment of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of assumption and/or assignment. Any proofs of claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other entity.

8.4.    *Rejection*.

In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a timely filed proof of claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective estates, properties or interests in property as agents, successors or assigns, unless a proof of claim is filed with the Bankruptcy Court and served upon counsel for the Debtors no later than thirty (30) days after the later of (1) the Confirmation Date or (2) the effective date of the rejection of such executory contract or unexpired lease. Any such Claims, to the extent Allowed, shall be classified as Class 6 Other General Unsecured Claims. The Confirmation Order shall constitute the Bankruptcy Court's approval of the rejection of all the leases and contracts identified in the schedule of rejected contracts.

8.5.    *Survival of the Debtors' Indemnification Obligations*.

Any obligations of the Debtors pursuant to their corporate charters, bylaws, organizational documents or otherwise (including, without limitation, any applicable indemnification agreements) to indemnify current officers, directors, agents and/or employees with respect to all present and future actions or omissions, suits and proceedings against the Debtors or such directors, officers, agents and/or employees, based upon any act or omission occurring at or prior to the Effective Date for or on behalf of the Debtors shall not be discharged or impaired by confirmation of the Plan or the occurrence of the Effective Date, provided that, for the avoidance of doubt, the Reorganized Debtors shall indemnify officers and directors of the Debtors for any claims or Causes of Action to the fullest extent provided by law pursuant to their respective Amended Organizational Documents and such documents shall not be amended or altered in any way that may diminish or impair the rights of the parties or beneficiaries thereunder that exist or existed as of the Effective Date; provided further that no director shall be indemnified with respect to the issuance of the Unsecured Notes, the use of their proceeds and any events related thereto. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection in either case by reason of section 502(e)(1)(B) of the Bankruptcy Code.

In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including, without limitation, the "tail policy") in effect as of the Commencement Date, and any directors and officers of the Debtors who served in such capacity at any time before or after the Commencement Date shall

36

be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

8.6. *Compensation and Benefit Plans*.

Except as otherwise herein provided, all material employee compensation and Benefit Plans of the Debtors in effect as of the Effective Date shall be deemed to be, and shall be treated as if they were, executory contracts that are to be assumed under the Plan.

8.7. *Insurance Policies*.

All insurance policies pursuant to which the Debtors have any obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Reorganized Debtors and shall continue in full force and effect. All other insurance policies shall revest in the Reorganized Debtors. Furthermore, the discharge and release of the Debtors as provided in this Plan, and the re-vesting of property in the Reorganized Debtors, shall not diminish nor impair the enforceability of any insurance policies that may cover Claims against any Debtor or other person or entity.

8.8. *Intellectual Property Licenses and Agreements*.

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the applicable Reorganized Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected hereunder or pursuant to a Final Order, or is the subject of a separate rejection motion filed by the Reorganized Debtors. Unless otherwise provided herein, all other intellectual property contracts, licenses, royalties, or other similar agreements shall revest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such revesting as contemplated herein.

8.9. *Reservation of Rights*.

Neither the exclusion nor inclusion of any contract or lease on any exhibit, schedule or annex to the Plan or the Plan Supplement, including the Schedule of Assumed Contracts or the Schedule of Rejected Contracts, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that any of the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

Nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable,

WEIL:\95312210\3\35076.0004WEIL:\95377628\4\35076.0004

shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**SECTION 9.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.**

     9.1.    ***Conditions Precedent to Confirmation***.

The occurrence of Confirmation is subject to the following conditions precedent:

     (a)    the entry of the Disclosure Statement Order;

     (b)    the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance satisfactory to the Debtors, the Required Consenting Noteholders, the Creditors Committee (solely to the extent the Plan provides the Creditors Committee a consent right with respect to the applicable schedule, document, or exhibit), and, consistent with the Platinum Consent Right, Platinum Equity, as applicable;

     (c)    the Bankruptcy Court shall have entered the Confirmation Order;

     (d)    the Restructuring Support Agreement shall not have been terminated, and shall be in full force and effect;

     (e)    the Accommodation Agreements shall not have been terminated, and shall be in full force and effect; and

     (f)    the DIP Facilities shall not have been terminated and shall be in full force and effect.

     9.2.    ***Conditions Precedent to the Effective Date***.

The occurrence of the Effective Date is subject to the following conditions precedent:

     (a)    the Definitive Documents shall contain terms and conditions consistent in all material respects with this Plan and the Restructuring Support Agreement and shall otherwise be reasonably satisfactory in all respects to the Debtors, the Required Consenting Noteholders, the Creditors Committee (solely to the extent the Plan provides the Creditors Committee a consent right with respect to the applicable document), and, consistent with the Platinum Consent Right, Platinum Equity, as applicable;

     (b)    all actions, documents and agreements necessary to implement and consummate the Plan, including, without limitation, entry into the Definitive Documents, and the Amended Organizational Documents, each in form and substance reasonably satisfactory to the Debtors, the Required Consenting Noteholders, the Creditors Committee (solely to the extent the Plan provides the Creditors Committee a consent right with respect to the applicable action, document, or agreement), and, consistent with the Platinum Consent Right, Platinum Equity, as applicable, and the transactions and other matters contemplated thereby, shall have been effected or executed;

     (c)    the Debtors shall enter into the Exit Facilities and the conditions precedent to funding under the Exit Facilities shall have been satisfied or waived;

(d)    subject to Section 12.5 below, any amendments, modifications, or supplements to the Plan (including the Plan Supplement), if any, shall be reasonably acceptable to the Debtors, the Required Consenting Noteholders, the Creditors Committee (solely to the extent provided herein) and, consistent with the Platinum Consent Right, Platinum Equity, as applicable;

(e)    the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred and the Confirmation Order shall not have been stayed, rescinded, vacated or reversed on appeal;

(f)    the Restructuring Support Agreement shall not have been terminated, and shall be in full force and effect;

(g)    the Accommodation Agreements shall not have been terminated, and shall be in full force and effect;

(h)    all governmental and third party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

(i)    all reasonable fees and expenses (including attorney's fees and fees for other retained professionals, advisors and consultants) of the Consenting Noteholders, ~~Platinum Equity,~~ the DIP Agents, and the agents under the Exit Facilities incurred in connection with the Chapter 11 Cases, the negotiation and formulation of the Plan, DIP Facilities and Exit Facilities and related documents, and all transactions set forth herein or necessary to implement and consummate the Plan (whether incurred before or after the Commencement Date) shall have been paid; and

(j)    Platinum Equity shall have paid $1,000,000 to the Debtors as part of the Committee Settlement;

(k)    ~~(j)~~ all conditions precedent listed in (a)-(~~i~~j) herein occurring prior to July 31, 2015.

### 9.3.    *Waiver of Conditions Precedent.*

Each of the conditions precedent in Sections 9.1 and 9.2 may be waived in writing by the Debtors together with the prior written consent of the Required Consenting Noteholders, the Creditors Committee (solely with respect to Sections 9.1(b) and 9.2(a), (b), and (d)), and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

### 9.4.    *Effect of Non-Occurrence of Effective Date.*

If the conditions listed in Sections 9.1 and 9.2 are not satisfied or waived in accordance with this Section 9, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person or (c) constitute an admission, acknowledgement, offer or undertaking by the Debtors, any of the other Restructuring Support Parties, or any other Person.

**SECTION 10.  EFFECT OF CONFIRMATION.**

    10.1.  *Subordinated Claims.*

        The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal or equitable subordination relating thereto.

    10.2.  *Vesting of Assets.*

        On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates, including without limitation, the intellectual property licenses and other agreements referenced above in Section 8.8, shall vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided pursuant to this Plan, the Confirmation Order, or the Exit Facilities.  The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if no cases were ever filed under any chapter or provision of the Bankruptcy Code, except as provided herein.

    10.3.  *Discharge of Claims and Termination of Interests.*

        Except as otherwise provided herein, effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such claims from and after the Commencement Date, against the Debtors or any of their assets, property or estates; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Persons shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns and their assets and properties any other Claims and Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

    10.4.  *Term of Injunctions or Stays.*

        Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

    10.5.  *Injunction Against Interference with Plan.*

        From and after the Effective Date, all Persons are permanently enjoined from commencing or continuing in any manner, whether directly, derivatively or otherwise, any suit, action

WEIL:\95312210\3\35076.0004 WEIL:\95377628\4\35076.0004

or other proceeding, on account of or respecting any claim, demand, liability, obligation, debt, right, suit, judgment, damages, Cause of Action, interest, remedy, or liability whatsoever released or to be released pursuant to the Plan or the Confirmation Order.  For the avoidance of doubt, in connection with such injunction, all Persons are permanently enjoined from (i) enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order of any kind whatsoever, (ii) creating, perfecting or enforcing any encumbrance of any kind, (iii) asserting any right of setoff, subrogation or recoupment of any kind, or (iv) commencing or continuing in any manner any action or proceeding of any kind on account of or in connection with or with respect to any claim, demand, liability, obligation, debt, right, suit, judgment, damages, Cause of Action, interest, remedy, or liability whatsoever released or to be released pursuant to the Plan or the Confirmation Order.

> 10.6.    ***Releases by the Debtors.***

> **As of the Effective Date, except for the right to enforce the Plan and the Definitive Documents that remain in effect after the Effective Date, for good and valuable consideration, including, without limitation, the Released Parties' contributions to facilitating the Reorganization and implementing the Plan, to the fullest extent permitted by applicable law, the Released Parties are deemed conclusively, absolutely, unconditionally, irrevocably and forever released and discharged by the Debtors, their Estates and the Reorganized Debtors from (and the Debtors, their Estates, and the Reorganized Debtors are deemed to covenant with, and to, the Released Parties not to sue or otherwise seek recovery from the Released Parties on account of) any and all Claims, Interests, obligations, rights, suits, judgments, damages, Causes of Action (including, without limitation, under any state or federal securities laws), remedies and liabilities whatsoever, including, without limitation, any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, their Estates, or the Reorganized Debtors, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Restructuring, the Reorganized Debtors, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any other Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Support Agreement or related agreements, instruments or other documents, or the solicitation of votes with respect to the Plan taking place from the beginning of time through the Effective Date; <u>provided</u> that no Released Party shall be released from any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto; <u>provided</u> <u>further</u> that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).**

> 10.7.    ***Releases By Holders of Claims and Interests.***

> **As of the Effective Date, except for the right to enforce the Plan and the Definitive Documents that remain in effect after the Effective Date and the indemnification obligations that survive the Effective Date, (a) each holder of a Claim or an Interest, other than any holder who voted to reject the Plan and elected not to check the opt in box on the applicable ballot indicating its consent to the release provisions set forth in this Section 10.7, and (b) each Released Party shall be deemed, to the fullest extent permitted by applicable law, to have,**

WEIL:\95312210\3\35076.0004 WEIL:\95377628\4\35076.0004

conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Reorganized Debtors and the Released Parties from (and are deemed to have covenanted with the Reorganized Debtors and the Released Parties not to sue or otherwise seek recovery from the Reorganized Debtors or the Released Parties on account of) any and all Claims, Interests, obligations, rights, suits, judgments, damages, Causes of Action (including, without limitation, under any state or federal securities laws), remedies and liabilities whatsoever, including, without limitation, any derivative Claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any other Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Support Agreement or related agreements, instruments or other documents, or the solicitation of votes with respect to the Plan taking place from the beginning of time through the Effective Date; <u>provided</u> that no Released Party shall be released from any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto; <u>provided</u> <u>further</u> that nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

10.8.    *Exculpation*.

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated, to the fullest extent permitted by applicable law, from, any claim, obligation, cause of action or liability for any claim in connection with or arising out of, the administration of the Chapter 11 Cases, the entry into the Restructuring Support Agreement and related documents and the consummation of the transactions contemplated therein, the negotiation and drafting of the Plan, the solicitation of votes for the Plan, or confirmation or the consummation of the Plan, the funding of the Plan, or the administration of the Plan or the property to be distributed under the Plan, the issuance of Securities under or in connection with the Plan, or any transactions, decisions, actions and/or inactions contemplated by or relating to any of the foregoing, except for willful misconduct or gross negligence, but in all respects such Persons shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtors and the Reorganized Debtors (and each of their respective agents, directors, officers, employees, affiliates, advisors and attorneys) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the securities pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting the Exculpated Parties from liability. Without limiting the generality of the foregoing, the Exculpated Parties shall be entitled to and granted the protections and benefits of section 1125(e) of the Bankruptcy Code.  Pursuant to section 105 of the Bankruptcy Code, no holder or purported holder of an Administrative Claim, claim or Interest shall be permitted to commence or continue any Cause of Action, employment of process, or any act to collect, offset, or recover any claim against an Exculpated Party that accrued on or before the Effective Date and that has been released or waived pursuant to this Plan.  For the avoidance of doubt,

notwithstanding anything to the contrary in this Plan: (a) any release or exculpation given by PNC Bank, National Association in its capacity as DIP ABL Agent, Revolving DIP Lender or, to the extent that it provides any Exit Facilities, then also in its capacity as agent or lender under the Exit Facilities, shall be effective only upon the payment in full or conversion of the Revolving DIP Facility in accordance with Section 2.4 of the Plan; (b) nothing in this Plan exculpates, discharges or releases the Debtors from any obligations owed to the DIP ABL Agent or the Revolving DIP Lenders under the Revolving DIP Credit Facility (including any contingent indemnity obligations under the loan documents evidencing the Revolving DIP Credit Facility); (c) nothing in this Plan discharges any liens securing the Revolving DIP Credit Facility until the Debtors' obligations under the Revolving DIP Credit Facility are paid in full in accordance with Section 2.4 of this Plan; (d) the DIP ABL Agent will retain (i) its contingent reimbursement claims and (ii) its lien on any cash collateral that is pledged to secure contingent reimbursement obligations, in both cases with respect to outstanding letters of credit under the Revolving DIP Facility; and (e) if the Revolving DIP Facility is converted into the Revolving Exit Facility (with consent of the DIP ABL Agent and the Revolving DIP Lenders) or if the DIP ABL Agent and the Revolving DIP Lenders provide any Exit Facilities, then the DIP ABL Agent will retain a lien on assets of the Debtors to secure the applicable Exit Facilities as set forth in the definitive documentation for the applicable Exit Facilities.

10.9.    ***Retention of Causes of Action/Reservation of Rights.***

(a)    Except as otherwise provided herein, including Sections 10.6, 10.7 and 10.8, pursuant to section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) all claims, rights, causes of action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their estates may hold against any person or entity without the approval of the Bankruptcy Court, including, without limitation, (i) any and all claims against any Person, to the extent such Person asserts a crossclaim, counterclaim and/or claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, their respective Estates, officers, directors or representatives; and (ii) the turnover of any property of the Estates; provided that the Reorganized Debtors shall not retain any claims or Causes of Action against the Released Parties (other than claims or Causes of Action arising out of or relating to any act or omission of a Released Party that (i) is a criminal act, or (ii) constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto, which claims or Causes of Action are hereby preserved). The Reorganized Debtors or their successor(s) may pursue such retained claims, rights, or causes of action, suits or proceedings, as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

(b)    Except as otherwise provided herein, including Sections 10.6, 10.7 and 10.8, nothing contained herein or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff or other legal or equitable defense which the Debtors had immediately before the Commencement Date, against or with respect to any Claim left Unimpaired by the Plan; provided that the Reorganized Debtors shall not retain any claims or Causes of Action against the Released Parties (other than claims or Causes of Action arising out of or relating to any act or omission of a Released Party that (i) is a criminal act, or (ii) constitutes fraud, gross negligence or willful misconduct as determined by a Final Order, except in connection with the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto, which claims or Causes of Action are hereby preserved). The Reorganized Debtors shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff and other legal or equitable defenses which they had immediately before the Commencement Date with respect to any Claim left Unimpaired by the Plan as if the Chapter 11 Cases had not been commenced, and all of the

Reorganized Debtors' legal and equitable rights respecting any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 10.10.    *Solicitation of the Plan.*

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance and solicitation will not be, liable at any time for any violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### 10.11.    *Plan Supplement.*

The Plan Supplement shall be filed with the Clerk of the Bankruptcy Court by no later than the Plan Supplement Filing Date.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Documents to be included in the Plan Supplement will be posted at the website of the Debtors' notice, claims, and solicitation agent as they become available.  The Plan Supplement shall contain, among other things, substantially final forms of the Amended Organizational Documents, the Schedule of Assumed Contracts, the Schedule of Rejected Contracts, the Exit Term Loan, the Revolving Exit Facility, the Management Incentive Plan, the Shareholders Agreement, the New Warrant Agreement, and, to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code regarding members of the New Board.

### 10.12.    *Corporate and Limited Liability Company Action.*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) the assumption of the Benefit Plans of the Debtors as provided herein, (b) the selection of the managers, directors, and officers for the Reorganized Debtors, (c) the issuance and distribution of the New Common Stock, (d) the entry into the Revolving Exit Facility and the Exit Term Loan, (e) the approval of the Accommodation Agreements, and (f) the issuance and distribution of the New Warrants, and (g) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date), in each case in accordance with and subject to the terms hereof.  All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Debtors, including (w) the Amended Organizational Documents, (x) the Exit Facilities, and (y) the Accommodation Agreements, and (z) any and all other agreements, documents, securities

WEIL:\95312210\3\35076.0004 WEIL:\95377628\4\35076.0004

and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Section 10.12 shall be effective notwithstanding any requirements under non-bankruptcy law.

## SECTION 11.  RETENTION OF JURISDICTION.

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)     to determine any motion, adversary proceeding, application, contested matter and other litigated matter pending on or commenced after the Confirmation Date;

(b)     to ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(c)     to consider the allowance, classification, priority, compromise, estimation or payment of any Claim;

(d)     to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

(e)     to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(f)     to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(g)     to hear and determine all applications under sections 330, 331 and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Confirmation Date;

(h)     to hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, the Plan Supplement, or the Confirmation Order or any agreement, instrument or other document governing or relating to any of the foregoing;

(i)     to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute and consummate the Plan or to maintain the integrity of the Plan following consummation;

(j)     to resolve any matters related to (a) the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which a Debtor or Reorganized Debtor is party or with respect to which a Debtor or Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Section 8, any executory contracts

WEIL:\95312210\3\35076.0004WEIL:\95377628\4\35076.0004

or unexpired leases to the Schedule of Rejected Contracts or otherwise; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

        (k)      to resolve disputes as to the ownership of any Claim or Interest;

        (l)      to hear and determine any matter, case, controversy, suit, dispute, or Cause of Action (i) regarding the existence, nature, and scope of the discharge, releases, injunctions, and exculpation provided under the Plan, and (ii) enter such orders as may be necessary or appropriate to implement such discharge, releases, injunctions, exculpations, and other provisions;

        (m)      to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

        (n)      to hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

        (o)      to adjudicate, decide, or resolve any Causes of Actions and Cure Disputes;

        (p)      to adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

        (q)      to resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim for amounts not timely repaid;

        (r)      to adjudicate any and all disputes arising from or relating to distributions under the Plan;

        (s)      to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

        (t)      to enter a final decree closing the Chapter 11 Cases;

        (u)      to recover all assets of the Debtors and property of the Estates, wherever located; and

        (v)      to hear and determine any rights, Claims or causes of action held by or accruing to Reorganized Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

## SECTION 12.  MISCELLANEOUS PROVISIONS.

### 12.1.  *Payment of Statutory Fees*.

        All fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date, and by the Reorganized Debtors after the Effective Date until the Chapter 11 Cases are closed.

WEIL:\95312210\3\35076.0004WEIL:\95377628\4\35076.0004

12.2.    ***Substantial Consummation.***

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

12.3.    ***Dissolution of Creditors Committee.***

On the Effective Date, the Creditors Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; provided that the Creditors Committee shall exist, and its professionals shall be retained, after the Effective Date with respect to (a) all applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and any related hearings; and (b) pending appeals of the Confirmation Order, if any.

12.4.    ***Request for Expedited Determination of Taxes.***

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods (or portions thereof) ending after the Commencement Date through the Effective Date.

12.5.    ***Amendments.***

(a)    *Plan Modifications.*  The Plan may be amended, modified or supplemented by the Debtors or the Reorganized Debtors, as applicable, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code; provided, that such amendments, modifications, or supplements shall be satisfactory in all respects to the Debtors, the Required Consenting Noteholders, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable; provided further, that such amendments, modifications, or supplements shall be satisfactory in all respects to the Creditors Committee, but only with respect to any such amendment, modification, or supplement (i) that impacts any distribution to holders of Allowed General Unsecured Claims or Allowed Unsecured Note Claims, (ii) to Sections 5.3 and 12.3 of the Plan, or (iii) to any Section of the Plan which provides the Creditors Committee with consent rights, including but not limited to this Section 12.5.  In addition, after the Confirmation Date, the Debtors or the Reorganized Debtors, as applicable, may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

(b)    *Other Amendments.*  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; provided that such technical adjustments or modifications shall be satisfactory to the Debtors, the Required Consenting Noteholders, the Creditors Committee, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable.

12.6.    ***Revocation or Withdrawal of the Plan.***

The Debtors may not revoke or withdraw the Plan before the Effective Date without the consent of the Required Consenting Noteholders, the Creditors Committee, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable; provided that the Debtors may revoke or

47

withdraw the Plan if such withdrawal is in the exercise of their fiduciary duty or otherwise permitted under the Restructuring Support Agreement.  If the Debtors take such action, the Plan shall be deemed null and void.  In such event, nothing contained herein shall constitute or be deemed to be a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

### 12.7.    *Severability of Plan Provisions upon Confirmation.*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors (to be made only with the consent of the Required Consenting Noteholders, the Creditors Committee, and, consistent with the Platinum Consent Right, Platinum Equity, as applicable), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted; provided that any such alteration or interpretation shall be acceptable to the Debtors, the Required Consenting Noteholders, the Creditors Committee (solely to the extent such alteration or interpretation impacts (a) any distribution to holders of Allowed General Unsecured Claims or Allowed Unsecured Note Claims or (b) any term or provision of the Plan which provides the Creditors Committee with a consent right or (c) any term or provision with respect to which the Committee has a consent right), and, consistent with the Platinum Consent Right, Platinum Equity, as applicable. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be); and (3) nonseverable and mutually dependent.

### 12.8.    *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### 12.9.    *Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.10.    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the documents contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, the Exculpated Parties and each of their respective successors and assigns.

12.11.   *Successor and Assigns.*

The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

12.12.   *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

12.13.   *Notices.*

All notices, requests and demands to or upon the Reorganized Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)   if to the Reorganized Debtors:

Chassix, Inc.
300 Galleria Officecentre
Suite 501
Southfield, Michigan 48034
Facsimile: (248) 352-0241
Attn:  Bibi N. Di Serio, Esq.

- and -

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:  Ray C. Schrock, P.C.
        Marcia L. Goldstein, Esq.
        Matthew P. Goren, Esq.
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

(b)   if to Platinum Equity:

Milbank, Tweed, Hadley & McCloy LLP
28 Liberty St.
New York, New York 10005
Attn:    Dennis F. Dunne, Esq.
         Samuel A. Khalil, Esq.
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

WEIL:\95312210\3\35076.0004WEIL:\95377628\4\35076.0004

(c)  if to the DIP ABL Agent:

Bodman PLC
1901 St. Antoine Street, 6th Floor at Ford Field
Detroit, Michigan 48226
Attn:    Robert J. Diehl, Jr., Esq.
Telephone: (313) 393-7597
Facsimile: (313) 393-7579

(d)  if to the DIP Term Agent:

Shipman & Goodwin LLP
One Constitution Plaza
Hartford, Connecticut 06103
Attn:    Nathan Plotkin, Esq.
Telephone:  (860) 251-5320
Facsimile:  (860) 251-5212

(e)  if to the Consenting Noteholders or the Exit Term Loan Lenders:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019-6064
Attn:    Andrew N. Rosenberg, Esq.
            Alice Belisle Eaton, Esq.
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990

(f)  if to the Exit Term Loan LendersCreditors Committee:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 1001910036-60646745
Attn:    Andrew N. RosenbergArik Preis, Esq.
            Alice Belisle EatonJason P. Rubin, Esq.
Telephone:  (212) 373872-30007418
Facsimile:  (212) 757872-39901002

After the Effective Date, the Reorganized Debtors have authority to send a notice to
Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a
renewed request to receive documents pursuant to Bankruptcy Rule 2002 and to limit the list of
Persons receiving documents pursuant to Bankruptcy Rule 2002 to those Persons who have filed such
renewed requests.

WEIL:\95312210\3\35076.0004WEIL:\95377628\4\35076.0004

Dated: ~~April~~ ~~24~~June 23,                                    2015
New York, New York

Respectfully submitted,

Chassix Holdings and each of the Debtors


By:    /s/ J. Mark Allan
Name:  J. Mark Allan
Title:   President

~~WEIL:\95312210\3\35076.0004~~WEIL:\95377628\4\35076.0004

**Exhibit A**

**Accommodation Agreements**

**(without exhibits)**

**Exhibit B**

**Restructuring Support Agreement**

**(without exhibits)**

| | |
|---|---|
| **Summary report:** **Litéra® Change-Pro TDC 7.5.0.112 Document comparison done on 6/23/2015 3:50:47 PM** | |
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:**iw://WEILDMS/WEIL/95312210/3 | |
| **Modified DMS:** iw://WEILDMS/WEIL/95377628/4 | |
| **Changes:** | |
| Add | 461 |
| Delete | 277 |
| Move From | 1 |
| Move To | 1 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 740 |

## **EXHIBIT B**

**CREDITORS COMMITTEE LETTER IN SUPPORT OF THE PLAN**

THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
OF CHASSIX HOLDINGS, INC., et al.
c/o Akin Gump Strauss Hauer & Feld LLP and Teneo Securities LLC


June 23, 2015


To All Unsecured Creditors of Chassix Holdings, Inc., et al.:

The Official Committee of Unsecured Creditors (the "Committee") of Chassix Holdings, Inc., Chassix Inc. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") was appointed on March 19, 2015, to act as the fiduciary body representing the interests of all unsecured creditors in the Debtors' chapter 11 cases (the "Chapter 11 Cases"). The Committee submits this letter regarding the Debtors' *Modified Second Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "Amended Plan").  For the reasons set forth below, the Committee recommends that unsecured creditors of the reorganizing Debtor entities vote to accept the Amended Plan.

As the unsecured creditors are aware, the Committee had certain objections to the Plan as previously proposed, as set forth in the *Preliminary Objection to Confirmation of the Plan from the Official Committee of Unsecured Creditors of Chassix Holdings, Inc.,* et al. [ECF No. 484]. Following negotiations with the Debtors, the Informal Committee of Noteholders and Platinum Equity, and in resolution of the Committee's objections to the Plan, the Debtors have agreed to modify the Plan to provide enhanced distributions to unsecured creditors.  Specifically, under the Amended Plan, (a) all holders of Unsecured Note Claims will receive warrants to purchase an additional 3% of the New Common Stock (the additional warrants are valued at approximately $3.5 million based on the valuation of the Debtors' financial advisor, Lazard), plus their Pro Rata share of $4 million in Cash (the Plan filed on April 24, 2015 previously provided for no Cash distribution to Class 4), subject to the terms and conditions as set forth in Section 4.4(c) of the Amended Plan, (b) all holders of General Unsecured Trade Claims will receive their Pro Rata share of an **additional** $7 million in Cash (*i.e.* in addition to what is currently contemplated by the Plan filed on April 24, 2015), to be paid on the payment schedule as set forth in Section 4.5(b) of the Amended Plan, and (c) all holders of Other General Unsecured Claims will receive their Pro Rata share of an **additional** $2 million in Cash (*i.e.* in addition to what is currently contemplated by the Plan filed on April 24, 2015), to be paid on the payment schedule as set forth in Section 4.6(b) of the Amended Plan.  The chart below sets forth the recoveries to unsecured creditors under the Debtors' previous Plan and the Amended Plan.

| Creditor Class | Value of (and estimated percent)[1] Recovery Under Previous Plan (April 24, 2015) | Value of (and estimated percent)[2] Recovery Under Amended Plan |
|---|---|---|
| Class 4 – Unsecured Note Claims | $12.7 million in New Common Stock and Warrants (8.3% recovery) | $20.1 million in New Common Stock, Warrants, and Cash (11.9% recovery) |
| Class 5 – General Unsecured Trade Claims | $5.0 million (16.1% recovery) | $12.0 million (35-40% recovery)[3] |
| Class 6 – Other General Unsecured Claims | $2.0 million (5% recovery) | $4.0 million (10% recovery) |

**The Committee believes that, under the circumstances, the enhanced recoveries provided for under the Amended Plan are the highest and best recoveries for the unsecured creditor body as a whole and, therefore, the Committee recommends that unsecured creditors of the reorganizing Debtor entities vote to accept the Amended Plan.**

If you have any questions with respect to the Amended Plan, the proposed treatment of your claims or the information contained in this letter, please contact counsel to the Committee, Akin Gump Strauss Hauer & Feld LLP, by emailing apreis@akingump.com or calling (212) 872-7418 or financial advisor to the Committee, Teneo Securities LLC, by emailing brendan.j.murphy@teneocap.com or calling (646) 561-3542.

*This letter is not intended as a substitute for the Amended Plan and Disclosure Statement. All unsecured creditors should read the Amended Plan and Disclosure Statement and make their own respective independent decision as to whether the Amended Plan is acceptable.*

Very truly yours,

The Official Committee of Unsecured Creditors of Chassix Holdings, Inc., et al.

---

[1] The estimated percent recovery is based on information provided to the Committee by the Debtors. The percentages listed herein may be higher or lower based on (a) the final allowance of claims and (b) the valuation of the Reorganized Debtors used to calculate these percentages.

[2] The estimated percent recovery is based on information provided to the Committee by the Debtors. The percentages listed herein may be higher or lower based on (a) the final allowance of claims and (b) the valuation of the Reorganized Debtors used to calculate these percentages.

[3] The recovery percentage for Class 5 assumes that all Class 5 creditors opt to provide Customary Trade Terms and thus are subject to the Additional Trade Claim Distribution of $4,000,000.