**UNITED STATES BANKRUPTCY COURT**              For Publication
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
In re                                    :        **Chapter 11 Case No.**
                                         :
**CHASSIX HOLDINGS, INC.,** *et al.,*    :        **15-10578 (MEW)**
                                         :
                        **Debtors.**     :        **(Jointly Administered)**
----------------------------------------------------------------x

<u>**Opinion Regarding Benefit Street Objections to Plan Confirmation**</u>

A P P E A R A N C E S :

WEIL, GOTSHAL & MANGES LLP
New York, New York
*Counsel for the Debtors*
        By:  Ray C. Schrock, Esq.
             Richard W. Slack, Esq.
             Richard L. Levine, Esq.
             Matthew P. Goren, Esq.


MILBANK, TWEED, HADLEY & McCLOY LLP
New York, New York
*Counsel for Platinum Equity Advisors, LLC*
        By:  Andrew M. LeBlanc, Esq.
             Sam Khalil, Esq.


AKIN GUMP STRAUSS HAUER & FELD LLP
New York, New York
*Counsel for the Official Committee of Unsecured Creditors*
        By:  Arik Preis, Esq.
             Jason P. Rubin, Esq.
             Deborah Newman, Esq.


BAKER BOTTS LLP
New York, New York
*Counsel for Benefit Street Credit Alpha Master Fund Ltd.*
*and PECM Strategic Funding LP*
        By:  Emanuel C. Grillo, Esq.
             Christopher Newcomb, Esq.

1

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
New York, New York
*Counsel for the Informal Committee of Noteholders*
        By:  Alice Belisle Eaton, Esq.
             Andrew Rosenberg, Esq.
             Kyle Kimpur, Esq.

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE
New York, New York
        By:  Andrea B. Schwartz, Esq.
             Susan Golden, Esq.

**MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the motion by the Debtors[1] for confirmation of their Modified Second

Amended Joint Plan of Reorganization (ECF Nos. 526, 583) (the "**Plan**").  Objections were filed

by Benefit Street Credit Alpha Master Fund Ltd. and PECM Strategic Funding LP (collectively,

"**Benefit Street**") [ECF 518, 560].  The Court heard evidence and arguments of counsel at a

hearing on July 2, 2015.  For the reasons explained on the record at the hearing and in this

Opinion, and based on the "Findings of Fact, Conclusions of Law and Order Confirming

Modified Second Amended Joint Plan of Reorganization" entered this same day (the

"**Confirmation Order**"), the Court will confirm the Plan (subject to modification and

clarification of certain release provisions) and overrule the objections.

## Background

Chassix Holdings, Inc. ("Holdings") is a holding company organized under Delaware

law.  Holdings has a number of direct and indirect subsidiaries that engage in the manufacture of

---

[1]    The Debtors are: Automotive Properties of New York, LLC; Chassix Holdings, Inc.; UC
       Holdings, Inc.; Chassix, Inc.; Diversified Machine, Inc.; Diversified Machine Bristol, LLC;
       Chassix Georgia Machining, LLC; DMI Columbus, LLC; Diversified Machine Montague,
       LLC; Diversified Machine, Milwaukee LLC; DMI Edon LLC; Mexico Products I, LLC;
       DMI China Holding LLC; Concord International, Inc.; SMW Automotive, LLC; Automotive,
       LLC; Chassis Co. of Michigan, LLC; and AluTech, LLC.

chassis sub-frame components and power train products for sale to automobile manufacturers and other suppliers.  The current corporate structure is the outgrowth of a combination, in 2012, of Diversified Machine, Inc., Concord International, Inc., and their respective subsidiaries.  The US subsidiaries of Holdings are debtors in these cases, but the foreign subsidiaries are not.

Holdings ultimately is owned by accounts and entities managed by Platinum Equity Advisors LLC; the equity owners are referred to collectively herein as "**Platinum**."  Holdings conducts no operations of its own.  The assets of Holdings (with the exception of possible litigation claims that are discussed below) consist of the equity in Holdings' subsidiaries.

On December 10, 2013, Holdings issued $150 million of 10%/10.75% Senior PIK Toggle Notes Due 2018 (the "**Unsecured Notes**").  Holdings is the only obligor with respect to the Unsecured Notes.  Approximately $140 million of the proceeds from the issuance of the Unsecured Notes were used to pay a dividend to Platinum.

The Debtors filed voluntary Chapter 11 petitions on March 12, 2015.  Prior to that date, the Debtors and their advisors negotiated the terms of a proposed plan of reorganization with major creditors, customers and other parties in interest.  The parties to those negotiations included (i) certain holders of the 9-1/4% Senior Secured Notes due 2018 issued by Chassix Inc. and guaranteed by certain subsidiaries of Chassix Inc. (the "**Secured Notes**"); (ii) certain holders of the Unsecured Notes (most of whom also held Secured Notes); (iii) the Debtors' largest customers, including General Motors, LLC, Ford Motor Company, FCA US LLC f/k/a Chrysler Group LLC, Nissan North America, Inc. and BMW Manufacturing Co. (the "**OEM Customers**"); and (iv) Platinum.  More recently the Debtors and other parties agreed with the Official Committee of Unsecured Creditors (the "**Creditors Committee**") to make additional modifications to the Plan to increase the proposed distributions to unsecured creditors.

3

The key terms of the modified proposed Plan include:

(a)    The elimination of approximately $396 million of Secured Notes and $161 million of Unsecured Notes, and the conversion of those debts to equity;

(b)    Agreements with the OEM Customers to pricing and other accommodations, including approximately $45 million in price increases and new business and programs, plus waivers of certain setoffs and other claims;

(c)    New financing for the Debtors' operations after emergence from bankruptcy;

(d)    Cash distributions to trade creditors with an estimated value equal to approximately 35%-40% of the amounts of their allowed claims;

(e)    Cash distributions to other unsecured creditors of the Debtors' operating companies with an estimated value equal to approximately 10% of the amounts of their allowed claims;

(f)    Distributions of stock, warrants and cash to the holders of the Unsecured Notes, having an estimated value equal to 11.9% of their claims; and

(g)    Releases of claims against Platinum and other parties, including not only releases of claims belonging to the Debtors but also of "third party" claims that might be asserted by creditors of the Debtors.

All classes of creditors that were entitled to vote have voted to approve the Plan.  Benefit Street filed the only remaining objections.  Benefit Street argues that Holdings owns valuable litigation claims against Platinum with respect to the 2013 dividend; that the proposed settlement of those claims is not on reasonable terms; that the litigation claims (if pursued) would provide holders of the Unsecured Notes with recoveries that are greater than the recoveries they will

4

receive under the Plan, and that the Plan therefore fails to satisfy the requirements of Section

1129(a)(7) of the Bankruptcy Code; that the proposed third party releases in favor of Platinum

and other parties are unwarranted; and that the Plan allegedly was not filed in good faith.  Benefit

Street asks the Court to deny confirmation of the Plan, to sever Holdings' case from the other

Debtors' cases and to appoint a trustee for Holdings.

### Testimony at the July 2, 2015 Hearing

At the hearing on July 2, 2015, Benefit Street and all other parties present agreed that the

Declarations of David J. Woodward [ECF 590], Howard Tucker [ECF 590], Bryan P. Collins

[ECF 592], David A. Hall [ECF 587] and Christine Pullo [ECF 598], and the exhibits to those

declarations, would be received into evidence, and those witnesses were cross-examined by

Benefit Street's counsel (with the exception of Mr. Collins and Ms. Pullo, as to whom cross-

examination was waived).  The Court also heard the testimony of Brendan T. Joyce on direct

examination and on cross-examination and received additional exhibits during his testimony.

**Woodward Testimony**.  Mr. Woodward is the interim Chief Financial Officer of

Holdings and of its domestic subsidiaries and also is a Senior Managing Director at FTI

Consulting, Inc. ("**FTI**").  His declaration described the terms of the Plan and the negotiations

that led to the Plan.  He stated that the proposed release of Platinum was negotiated "directly

between the Informal Committee of Noteholders and Platinum Equity" and that "[a]lthough the

Debtors facilitated those negotiations, it was the Informal Committee of Noteholders that

consented to a release of Platinum Equity in exchange for, among other things, a waiver by

Platinum Equity of certain potential tax deductions" and Platinum's cooperation in the

restructuring generally.  *See* Declaration [ECF 590] ¶ 7.  Mr. Woodward also stated that the

members of the Informal Committee of Noteholders held 73% of the Secured Notes and 80% of

the Unsecured Notes.  *Id.*  Mr. Woodward noted that in addition to the tax waivers, Platinum had

agreed to contribute $1 million to the amounts to be distributed under the Plan, to waive

approximately $10 million of intercompany claims that it owned, and to waive its potential right

to reimbursement of $1.25 million of restructuring-related expenses.  *Id.* at ¶¶ 71-75.

Mr. Woodward stated that the potential claims against Platinum regarding the December

2013 dividend had been reviewed by the Debtors' counsel, Weil Gotshal & Manges LLP.  *Id.*

¶¶ 28, 76.  However, the Debtors elected not to waive the attorney-client privilege and did not

produce counsel's report or analysis of the claims at the hearing.  Mr. Woodward stated that after

considering the matter thoroughly, the Debtors and the Informal Committee of Noteholders had

each determined that the settlement with Platinum was appropriate.  *Id.* ¶ 76.  On cross-

examination, Mr. Woodward admitted that he himself did not participate in the negotiation of the

settlement or in the review of the potential claims against Platinum, except that Mr. Woodward

was present during a presentation by the Debtors' counsel to the board of directors.

**Joyce Testimony**.  Mr. Joyce is a Managing Director of FTI and a temporary employee

in the Finance Department of Chassix, Inc.  Mr. Joyce testified that the holders of Unsecured

Notes have total claims of approximately $160 million against Holdings and that other creditors

had filed claims against Holdings totaling approximately $140 million, including (a) a litigation

claim by Allison Transmission, Inc.; (b) intercompany claims asserted by Platinum; (c) various

claims asserted by the OEM Customers; and (d) other small claims.  Mr. Joyce also testified that

the Debtors estimated that Holdings would likely incur additional administrative expenses

(including trustee fees and litigation costs) if it were to pursue litigation against Platinum, and

that Holdings would likely need to employ counsel on a contingency fee basis for that purpose.

Based on these assumptions, Mr. Joyce testified that Holdings would need to recover at least $19

million from litigation against Platinum before it would have any funds left (after payment of a one-third contingency fee and payment of administrative expenses) for distribution to the unsecured creditors of Holdings, and that Holdings would need to recover at least $80 million before the distributions to the holders of Unsecured Notes would equal the distributions to be made under the Plan. (Mathematically these calculations presume that expenses, apart from contingency fees, would be approximately $12.66 million.) Mr. Joyce testified that he had been instructed by counsel to presume that litigation claims against Platinum would have no value for purposes of his liquidation analyses, but that he himself had not analyzed or valued those claims.

On cross-examination Mr. Joyce acknowledged that the Disclosure Statement did not include a "stand-alone" liquidation analysis for Holdings and that his analysis as to Holdings had been prepared more recently. In response to questions by the Court, Mr. Joyce testified that his calculations presumed that all of the filed claims against Holdings would be allowed and therefore that potential recoveries by Holdings would have to be distributed among creditors holding $300 million of claims (and not just to holders of the Unsecured Notes), but that he had not reviewed the other filed claims to determine if that assumption was reasonable.

**Hall Testimony**. Mr. Hall is a Managing Director of Alvarez & Marsal Global Forensic Dispute Services. Mr. Hall's declaration stated that he had analyzed the financial condition of Holdings at the time the 2013 dividend was paid. Mr. Hall calculated the enterprise value of Holdings and its subsidiaries on a "discounted cash flow" and "market multiple" basis. The discounted cash flow calculations were based on December 2013 cash flow forecasts that the Debtors had prepared. Mr. Hall testified at the hearing (in response to questions by the Court) that he had reviewed those forecasts and determined that they were reasonable, and noted that they were less optimistic than the forecasts that had been prepared earlier in 2013.

Mr. Hall's declaration concluded that Holdings had a value of $549.9 million on a

discounted cash flow basis (excluding cash on hand) and a value of $619.2 million on a "market

multiple" basis (again excluding cash on hand), from which Mr. Hall concluded that Holdings

likely had an enterprise value (excluding cash on hand) of $584.5 million as of December 2013.

Mr. Hall also concluded that the total value (including cash on hand) was $615.4 million, which

resulted in a "surplus of between $96.1 and $124.5 million over the $519.4 million in debt that

was outstanding (taking into account the dividend transaction)."  *See* Hall Declaration [ECF 587]

at ¶ 5.  As a result, Mr. Hall concluded that Holdings had "sufficient equity value even taking

into account the debt issued in connection with the dividend recapitalization transaction," *id*., and

that "it is more likely than not that Chassix was solvent as of the December Dividend Dates."  *Id.*

at ¶ 4.  Mr. Hall also reviewed cash flow forecasts and other financial information and concluded

that Holdings and its subsidiaries had sufficient capital to conduct their businesses and sufficient

resources to make debt payments as they came due.

On cross-examination, Mr. Hall acknowledged that in his Declaration he had concluded

that it was "more likely than not" that Chassix was solvent as of the December Dividend Dates.

He also stated that he had not been provided with a copy of any solvency analysis that had been

done at the time the dividend was paid.[2]

**Tucker and Collins Testimony**.  Mr. Tucker is a Tax Partner in the New York area

Transaction Tax Group of Ernst & Young LLP, and Mr. Collins is a senior partner with Deloitte

Tax LLP.  They submitted evidence, in their declarations, as to the values of certain tax benefits

that were being made available to Holdings and its subsidiaries as a result of the settlements with

---

[2]    Platinum filed papers asserting that a legal analysis of the dividend that "included a solvency
analysis" was presented to the Holdings directors before the dividend was paid.  *See*
Platinum Memorandum [ECF No. 584] at 6, n. 10.  However, there materials (if they exist)
were not provided to the Court.  As noted above, the Debtors elected not to waive privileges.

Platinum.  One feature of the settlement is an agreement by Platinum to waive the ability to take

certain stock losses with respect to the investments in the Debtors.  Mr. Tucker and Mr. Collins

testified that the waiver would produce positive tax benefits for the reorganized Debtors having a

total present value of approximately $19.8 million.

**Pullo Testimony**.  Ms. Pullo is the Senior Director of Solicitation at Prime Clerk LLC,

the firm which tabulated ballots in connection with the Plan.  Her declaration showed that all

classes of creditors that were entitled to vote had accepted the Plan.

## Discussion

I.    **The Objection to the Settlement of the Dividend Claim, and the "Best Interest" Objection, are Unfounded**

Rule 9019 of the Federal Rules of Bankruptcy Procedure permits a debtor to settle a

potential claim with the approval of the Court.  *See* Fed. R. Bankr. P. 9019.  Section 1123(b)(3)

of the Bankruptcy Code also permits the settlement of a claim belonging to the debtor as part of a

plan of reorganization.  *See* 11 U.S.C. § 1123(b)(3)(A).  Ordinarily a settlement is reviewed

under a "business judgment" standard, and is approved so long as it does not fall below the

lowest point in the range of reasonableness.  *See Cosoff v. Rodman (In re W.T. Grant Co.)*, 699

F.2d 599, 608 (2d Cir. 1983); *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006).

However, since the settlement here is with the Debtors' parent (Platinum), the Court agrees that

it is proper to apply "heightened scrutiny and some skepticism" in considering the settlement

terms.  *See In re Charter Communications,* 419 B.R. 221, 240 (Bankr. S.D.N.Y. 2009).

Regardless of the level of scrutiny (or deference) to be applied, the factors to be

considered by the Court in connection with the proposed settlement are essentially the same.

The Second Circuit Court of Appeals has identified them as including: (1) a comparison between

the possibility of success and the benefits offered by the settlement; (2) the likelihood of

complex and protracted litigation in the absence of a settlement; (3) the interests of creditors,

including "the degree to which creditors either do not object to or affirmatively support the

proposed settlement;" (4) whether other parties in interest support the settlement; (5) the

competency and experience of counsel supporting the settlement and the experience of the

bankruptcy judge in reviewing the settlement; (6) the nature and breadth of the releases to be

obtained by officers and directors; and (7) the extent to which the settlement is the result of

arm's-length bargaining. *See Motorola, Inc. v. Official Comm. Of Unsecured Creditors (In re*

*Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007). The Court should apply these factors

to determine whether the settlement is fair and equitable. However, in making that determination

the Court need not "hold a mini-trial" on the merits of the potential claim. *See In re Enron*, 40

Bankr. Ct. Dec. 228, 2003 WL 230838, at *2 (S.D. N.Y. 2003).

Section 1129(a)(7) of the Bankruptcy Code also provides that a plan may not be

confirmed unless every holder of a claim or interest has either accepted the plan or will receive

or retain, under the plan, property with a value "that is not less than the amount that such holder

would so receive or retain if the debtor were liquidated under chapter 7" of the Bankruptcy Code.

*See* 11 U.S.C. § 1129(a)(7). This is commonly referred to as the "best interest of creditors" test.

Benefit Street argues that the potential litigation recoveries (if litigation were pursued in a

Chapter 7 case) would provide better returns to Benefit Street than it would receive under the

Plan. The best interest objection attacks the merits of the settlement with Platinum, so it is

appropriate to consider it together with the objection to the settlement.

The testimony offered by the Debtors' witnesses is summarized above. At the hearing,

Benefit Street criticized the completeness of the analyses offered by the Debtors' witnesses.

However, Benefit Street offered no contrary evidence. Although the Court finds that some

10

aspects of the Debtors' analyses are deficient, on the whole the evidence at the hearing compels the conclusion that the settlement should be approved and that the Plan should be confirmed.

Benefit Street contends that the Debtors were controlled by Platinum and that Platinum therefore allegedly dictated the terms of the settlement. However, the Court has no reason to question the testimony by Mr. Woodward that the release of Platinum was negotiated at arm's-length by the Informal Committee of Noteholders, and not by the Debtors.

In addition, the members of the Informal Committee of Noteholders (who hold 73% of the Secured Notes and 80% of the Unsecured Notes) continue to support the settlement. Their support is a strong indication of the reasonableness of the negotiated terms. Benefit Street argued that the support of the Informal Committee should be discounted because its members own Secured Notes as well as Unsecured Notes, but that argument makes no economic sense. The value of the settlement with Platinum consisted of the tax benefits and other financial concessions made by Platinum.[3] If the other holders of Unsecured Notes believed that the claims against Platinum were worth more than was being provided through the settlement, then as the holders of 80% of the Unsecured Notes they would have had every economic incentive to insist that Holdings pursue the claims against Platinum, and that is true regardless of whether they also owned some of the Secured Notes. Benefit Street offered no reason to think otherwise.

Benefit Street also did not dispute the value of the tax benefits being provided to the Debtors as a result of the settlement with Platinum. Instead, Benefit Street argued that Platinum

---

[3]    The Debtors have also argued that Platinum supported the Plan negotiations and the discussions with the OEM Customers, that Platinum provided valuable management services and that Platinum acted as a good citizen during the restructuring process. It may well be the case that such good behavior was helpful to the restructuring process; customers might have been less willing to make deals if fights were brewing, for example. However, the evidence on these points was general and conclusory, and did not permit the Court to assign any particular value to these items of consideration.

15

might not have been able to use the "stock loss" that was being waived and, therefore, that the cost of the waiver (to Platinum) was not necessarily equal to the benefit that the Debtors would receive. However, Mr. Tucker testified that he believed that it was more likely than not that Platinum would be able to make use of the stock loss if it were not waived. Furthermore, the wisdom of the proposed settlement (from the perspective of Holdings) ultimately should focus on the benefits to Holdings and its creditors, not the "cost" of the tax waivers to Platinum.

Most importantly, the evidence at the hearing gives the Court no reason to believe that the potential claims against Platinum would have any value at all if they were pursued. The primary potential claim would be a claim that the dividend transaction was either an intentional or constructive fraudulent transfer. A transfer is intentionally fraudulent if it is made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted." *See* 11 U.S.C. § 548(a)(1)(A). In these cases, the Official Committee of Unsecured Creditors conducted extensive discovery of the Debtors and of Platinum, including the collection and review of many thousands of pages of documents and electronic communications and the depositions of key fact witnesses. Benefit Street (as an *ex officio* member of the Committee) had access to at least some of that information, and could have had access to all of it if it had elected to be an active participant in the discovery process, or if it had sought such access after the Committee reached its own settlement with the Debtors. However, Benefit Street offered no evidence at all on the issue and gave the Court no reason to think that an "intentional fraudulent transfer" claim could be effectively pursued.

A transfer is a "constructive" fraudulent transfer if it occurred when the debtor was insolvent, had unreasonably small capital, or believed that it could not pay debts as they matured,

or if the transfer itself resulted in any of these conditions.  *See* 11 U.S.C. § 548(a)(1)(B).  Mr. Hall's uncontroverted testimony, however, shows that Holdings was solvent after taking the dividend transactions into account, that it had sufficient capital to conduct its business and that it had sufficient cash flow to meet its obligations as they came due.  At the hearing, Benefit Street focused almost entirely on the fact that Mr. Hall stated his conclusions in a professionally guarded way (*i.e.*, that it was "more likely than not" that Holdings was solvent).  However, Benefit Street did not challenge or criticize in any way the forecasts upon which Mr. Hall's analyses were based, or his selection of a discount rate, or his calculations of terminal values, or his selection of a market multiple, or any other aspect of his work.  Nor did Benefit Street offer any other evidence that might suggest that Holdings' financial condition was impaired when the dividend was paid or as a result of that payment.  Based on the record of the hearing, the notion that a fraudulent transfer claim against Platinum could be pursued is pure speculation.

Benefit Street also suggested (during closing argument) that the dividend transaction might support claims that Platinum had breached fiduciary duties.  However, Delaware law makes clear that a parent does not violate any fiduciary duty by taking a dividend from a solvent and adequately capitalized subsidiary.  Wholly-owned subsidiaries are supposed to be run (and financed) for the benefits of their owners, provided that the required financial condition is maintained.  *Trenwick Am. Litig. Trust v. Ernst & Young*, 906 A.2d 168, 200 (Del. Ch. 2006). Benefit Street also argued during closing arguments that the dividend might have been wrongful as a matter of Delaware corporate law, but it offered no evidence and no analysis that would suggest that any claim could have been asserted on that ground.

Based on the evidence before the Court: (1) the benefits offered by the settlement exceed the likely benefits of pursuing a claim; (2) there would be complex, protracted, and expensive

13

litigation in the absence of a settlement; (3) all of the major creditor groups, including those with the greatest potential interest in the pursuit of the claims, support the settlement terms; (4) other parties in interest (with the exception of Benefit Street) either affirmatively support the settlement or have not objected to it; (5) the settlement was negotiated by parties who were represented by sophisticated and competent counsel; (6) the releases to be granted (as modified below) are reasonable in scope in light of the issues being settled; and (7) the settlement with Platinum is the result of arm's-length bargaining, having principally been negotiated by the Informal Committee of Noteholders.  The settlement therefore merits approval under the *Motorola* standards.

As to the "best interest" analysis (and what would happen if there were no settlement and if Holdings were to proceed on its own): Mr. Joyce's estimates of the total creditor claims against Holdings are highly suspect.  More particularly, Mr. Joyce simply presumed (for purposes of his analysis) that all of the $300 million of asserted claims would be allowed as claims against Holdings in a separate Chapter 7 case.  However, the Debtors themselves have previously argued that the $65 million litigation claim asserted by Allison Transmission, Inc. should be treated as having nominal value and (more importantly for this purpose) that such claim cannot properly be asserted against Holdings, as Holdings is not even named as a defendant in the pre-bankruptcy litigation upon which the claim is based.  *See* Debtors' Objection to Motion of Allison Transmission, Inc. for Temporary Allowance of Claims for Voting Purposes Pursuant to Bankruptcy Rule 3018 [ECF 492].  It simply is not reasonable to presume (as Mr. Joyce did) that all of the filed claims against Holdings would be "allowed" claims without making some review and assessment of the claims themselves.

14

On the other hand, Benefit Street offered no evidence of its own as to the likely costs of

pursuing a claim against Platinum, the expenses that Holdings would have to incur, the

contingency fees that Holdings likely would have to pay, and the minimum recovery that

Holdings would need to obtain before it would have any amounts at all to distribute to unsecured

creditors.  Instead, the gist of Benefit Street's criticisms was that the analysis had only recently

been prepared.  However, that itself is not a reason to believe that Mr. Joyce's analysis of

potential administrative expenses, and potential contingency fees, is wrong.[4]

More importantly, there is only speculation (and no evidence) to suggest that the

Unsecured Notes would receive any recoveries at all if Holdings were to be separated from the

other Debtors and liquidated under Chapter 7 of the Bankruptcy Code.  Even if one were to

assume that Holdings had no creditors other than the holders of the Unsecured Notes, the Court

calculated (based on extrapolations from Mr. Joyce's figures) that Holdings would need to

recover more than $45 million before distributions to its creditors (after deducting a one-third

contingency fee and administrative expenses) would provide greater recoveries to Benefit Street

than the 11.9% recoveries projected under the Plan.  The record provides no support for the

suggestion that the claims against Platinum have such value.

The gist of Benefit Street's objection is that the Court should disregard the testimony by

the Debtors' witnesses and the support of other parties in interest and should conclude that the

evidence offered by the Debtors somehow was not enough to carry their burden of proof as to the

wisdom of the settlement and the compliance with the "best interest" test.  However, "heightened

scrutiny" of a settlement does not mean the Court should subscribe to conspiracy theories or that

---

[4]    Benefit Street also complained that the Disclosure Statement did not include a separate stand-alone liquidation analysis for Holdings.  However, the proposed Disclosure Statement was circulated to creditors (including Benefit Street) before it was approved by the Court.  If Benefit Street thought a stand-alone liquidation analysis was needed, it should have said so.

15

the Court should substitute blind guesswork in place of the evidence that was submitted. It is true that the Debtors did not provide the Court with analyses that may have been performed at the time the dividend was paid or of the analyses of the potential claims that the Debtors' counsel performed. Those analyses might have been helpful, but parties are not required to waive privileges in order to obtain the approval of settlements.

The settlement with Platinum has the overwhelming approval of the Debtors' creditors, including (as noted above) the other holders of Unsecured Notes. The evidence before the Court suggests no reason to believe that the claims against Platinum have any value, and the Court concludes (exercising its own independent judgment) that the settlement of the dividend claims is reasonable and that the Plan provides the holders of Unsecured Notes with recoveries that exceed the amounts they would receive in a Chapter 7 liquidation of Holdings. The objections on these points are therefore overruled.

## II.    The Plan Has Been Proposed in Good Faith

"[T]he term 'good faith,' as used in Section 1129(a)(3) [of the Bankruptcy Code], . . . is generally interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *See In re Madison Hotel Assocs.*, 749 F.2d 410, 424 (7th Cir. 1984) (other internal quotations omitted; citations omitted); *see also In re Coastal Cable T.V., Inc.,* 709 F.2d 762, 764 (1st Cir. 1983)). In passing, Benefit Street suggests that the sole purpose of including Holdings in the proposed Plan was to support releases in favor of Platinum and that the Plan therefore has not been proposed in good faith. However, Holdings itself is currently insolvent; the evidence as to that point was uncontroverted. The inclusion of Holdings in the proposed joint Plan, and Platinum's agreement to waive stock losses, provides tax benefits to the Reorganized Debtors and is the basis on which

16

other constituents have been willing to make available the distributions that the Plan provides to

the holders of the Unsecured Notes that Holdings issued.  Benefit Street may have preferred a

different course, but it was not "bad faith" for other holders of Unsecured Notes, the Debtors and

other parties in interest to conclude that the Plan was the best way to reorganize the Debtors'

affairs.  In fact, for the reasons stated above the Plan provides better recoveries for Holdings'

creditors than they would otherwise be likely to receive.  It is true (as Benefit Street argued) that

the Plan contemplates the ultimate dissolution of Holdings, but that is a result that the

Bankruptcy Code permits.  *See* 11 U.S.C. § 1129(a)(11).  The filing of Holdings' Chapter 11

petition, and the inclusion of Holdings in the joint Chapter 11 Plan, serves the purposes and

objectives of the Bankruptcy Code and the interests of Holdings and its creditors, and the "good

faith" objections asserted by Benefit Street are without merit.

**III.     The Proposed Third Party Releases Must Be Modified and Clarified**

The proposed Plan contains a number of release and exculpation provisions.  The only

objections filed with respect to releases by the Debtors are the objections filed by Benefit Street

with respect to the Debtors' release of claims against Platinum.  The Court finds that the releases

of the Debtors' claims against Platinum are justified for the reasons stated in Part I of this

Opinion, and should be approved.

The proposed Plan also contains a number of provisions that purport to release certain

claims held by creditors of the Debtors.  First, Section 5.2(a) of the Plan (as modified on June 30,

2015) includes the following proposed releases and covenants not to sue:

> On the Effective Date . . . the Platinum Equity Released Parties shall be
> conclusively, absolutely, unconditionally, irrevocably and forever released
> and discharged by the Debtors, their Estates, the Reorganized Debtors, ***and
> the Consenting Creditors*** from (and the Debtors, their Estates, the
> Reorganized Debtors and the Consenting Creditors are deemed to covenant
> with, and to, the Platinum Equity Released Parties not to sue or otherwise

17

seek recovery from the Platinum Equity Released Parties on account of) any and all claims, interests, obligations, rights, suits, judgments, damages, Causes of Action (including, without limitation, under any state or federal securities laws), remedies and liabilities whatsoever, including, without limitation, any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, their Estates, the Reorganized Debtors *or the Consenting Creditors* would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any claim or interest or other entity, based on or relating to, or in any manner arising from, in whole or in part the issuance of the Unsecured Notes, the use of their proceeds, and any events related thereto.

(Emphasis added). The Plan (again as modified on June 30, 2015) includes the following

proposed definition of "Consenting Creditors:"

*Consenting Creditors* means (a) any holder of a Claim other than any holder who voted to reject the Plan and elected not to provide the release (as set forth on the applicable ballot), and (b) any Released Party.

The term "Platinum Equity Released Parties" is defined as follows:

1.91 *Platinum Equity Released Parties* shall mean Platinum Equity, its managed accounts or funds, current and former officers and directors, principals, shareholders, members, partners, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such persons' respective heirs, executors, estates, servants and nominees, as well as the Debtors' current and former officers and directors.

Section 10.7 of the Plan includes additional releases to which the Platinum Released

Parties and other parties are beneficiaries and that purport to bind certain holders of claims and

interests in the Debtors. Section 10.7 provides as follows:

10.7 *Releases By Holders of Claims and Interests*.

As of the Effective Date . . . (a) each holder of a Claim or an Interest, other than any holder who voted to reject the Plan and elected not to check the opt in box on the applicable ballot indicating its consent to the release provisions set forth in this Section 10.7, and (b) each Released Party shall be deemed, to the fullest extent permitted by applicable law, to have,

18

conclusively, absolutely, unconditionally, irrevocably and forever, released and discharged the Reorganized Debtors **and the Released Parties** from (and are deemed to have covenanted with the Reorganized Debtors and the Released Parties not to sue or otherwise seek recovery from the Reorganized Debtors or the Released Parties on account of) any and all claims, interests, obligations, rights, suits, judgments, damages, Causes of Action (including, without limitation, under any state or federal securities laws), remedies and liabilities whatsoever, including, without limitation, any derivative claims asserted or assertable on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any other Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Restructuring Support Agreement or related agreements, instruments or other documents, or the solicitation of votes with respect to the Plan taking place from the beginning of time through the Effective Date; <u>provided</u> that no Released Party shall be released under this Section 10.7 any act or omission that constitutes fraud, gross negligence or willful misconduct as determined by a Final Order and nothing in the Plan shall limit the liability of professionals to their clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8 Rule 1.8(h)(1) (2009).

The term "Released Parties" is defined as follows:

1.100. **Released Parties** means collectively and in each case in their capacity as such:  (a) the Debtors; (b) the Creditors Committee; (c) the Administrative Agent; (d) the Collateral Agent; (e) the other Secured Parties under and as defined in the Security Agreement; (f) the DIP Lenders; (g) the DIP Agents; (h) the Consenting Secured Noteholders; (i) the Consenting Unsecured Noteholders; (j) the arrangers under each of the DIP Facilities and the Exit Facilities; (k) the administrative agents, collateral agents, and lenders under the Exit Facilities; (l) the OEM Customers; (m) Platinum Equity; (n) the Prepetition Revolving ABL Lenders; (o) the Unsecured Note Indenture Trustee; (p) the Secured Note Indenture Trustee; and (q) with respect to each of the foregoing entities in clauses (a) through (p), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current and former officers and directors, principals, shareholders, members, partners, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors

and other professionals, and such persons' respective heirs, executors, estates, servants and nominees.

Although Benefit Street complains about some aspects of the proposed releases, the releases do not apply to Benefit Street, as Benefit Street voted to reject the Plan and did not "opt into" the releases pursuant to procedures that are described below.  However, the Court believes on its own initiative that the proposed release provisions must be modified to limit their application to those creditors who have actually consented to them, and to clarify the scope of the releases that are granted.

### A.    Prior Consideration at the Disclosure Statement Hearing

In April 2015, the Debtors sought the Court's approval of Ballots and accompanying disclosures.  One portion of the proposed Ballot forms would have advise such creditors that "[i]f you have voted to accept the Plan . . . you will be deemed to consent to the releases contained in section 10.7 of the Plan to the fullest extent permitted by law."  (At that time the separate release that now appears in Section 5.2 of the Plan was incorporated in the releases granted pursuant to Section 10.7.)  The Debtors also proposed to advise creditors who rejected the Plan that they, too, would still be bound by the proposed third party releases unless they took the additional step of affirmatively "opting out" of the releases by checking a box on the ballot form.  The Debtors' proposed ballot form would have stated:

> If you voted to reject the Plan in Item 2 above, check this box if you elect not to grant the releases contained in Section 10.7 of the Plan.  Election to withhold consent is at your option.  If you submit your Ballot without this box checked, you will be deemed to consent to the releases contained in Section 10.7 of the Plan to the fullest extent permitted by applicable law.

The Debtors also proposed that creditors who were not entitled to vote on the Plan (those who were unimpaired and those who were deemed to have rejected the Plan) would be deemed to have consented to the proposed releases.

The Creditors Committee, and the U.S. Trustee, objected to the proposed ways in which

the Debtors proposed to solicit creditors' "consents" to third party releases and the circumstances

under which consents would be "deemed" to have been given.  The Creditors Committee asked

the Court to direct the Debtors to use an affirmative "opt-in" form of Ballot, under which no

party (even a party voting in favor of the proposed plan) would be deemed to have granted a

third party release unless that party affirmatively opted to do so in a way that was separate from

that party's vote with respect to the Plan.

At the hearing to consider these objections, the Court noted that there are many cases in

this District and elsewhere in which "deemed consent" and "opt out" arrangements have been

approved that are nearly identical to the arrangements that the Debtors proposed in this case.

There are also reported decisions in which Courts in this District and elsewhere have held that

where such procedures have been approved in advance, and where their effects have been fully

disclosed in a manner approved by the Court, it is then fair to bind creditors to the terms of the

approved procedures.  *See, e.g., In re DBSD N. Am., Inc.*, 419 B.R. 179, 217-29 (Bankr.

S.D.N.Y. 2009), *aff'd*, No. 09 CIV. 10156 (LAK), 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010);

*aff'd in part, rev'd in part*, 627 F.3d 496 (2d Cir. 2010); *In re Calpine Corp.*, Case No. 05-

60200, 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. December 19, 2007).  However, there is

little to no guidance in the reported cases as to the factors that a Court properly should consider

in deciding *whether* to approve such procedures in the first place.

The purpose of the "opt-out" and "deemed consent" voting rules that the Debtors

proposed was to aid the parties in compiling a broader set of third party releases than might be

obtained if a different, "affirmative consent" approach were adopted.  The proposed procedures

would have done so by deeming "consent" to exist in situations where no affirmative consent

21

had actually been manifested.  Finding "consent" in these circumstances is to some extent a legal

fiction.  We know from experience that many creditors and interest holders who receive

disclosure statements and solicitation materials simply will not respond to them, either because

they elect not to read them at all or for other reasons.  We also know from experience that a

certain number of people will make mistakes in interpreting the procedures that are outlined in

the Ballots.  The Debtors' proposed Order seeking approval of the Disclosure Statement

anticipated such errors: it included multiple provisions regarding creditors who failed to sign

Ballots, or creditors who checked both the "accept" and "reject" boxes on Ballots, or who made

other errors that commonly are made.  The point is that inattentiveness, inaction and mistake are

a known and expected part of the voting process.

There are circumstances in which public policy justifies a rule under which people are

bound by a proposed action unless they take affirmative steps to note their disagreement.  Class

actions pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure are a well-known

example of a situation in which parties may be bound by their own inaction and in which parties

will be deemed to be part of a class in the absence of an affirmative "opt out" vote.  However, in

the class action context there is a public policy that favors the consolidation of similar cases and

that justifies the imposition of a rule that binds class members who have not affirmatively opted

out.  Furthermore, people who fail to respond to class action notices are bound because that is the

legal consequence that the Rule specifies, and not on the theory that their inaction is the

equivalent of an affirmative joinder in an action.

The situation is different with respect to third party releases that are proposed as part of a

plan of reorganization.  There is no rule that specifies an "opt out" mechanism or a "deemed

consent" mechanism with respect to third party releases.  Nor is there a general "public policy"

in favor of making third party releases applicable to as many creditors as possible.  To the contrary: the plain admonition of the Second Circuit Court of Appeals is that third party releases are frequently a subject of abuse and that they are appropriate only in narrow and unusual circumstances.  *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 143 (2d Cir.2005).  Care is particularly warranted where (as was true in this case) the Debtors and other Released Parties made clear that they intended to argue, under *Metromedia*, that the third party releases should be effective as to creditors who had "consented" to them (or who had been "deemed" to consent to them) without the need to satisfy the other "unusual circumstances" standards that are set forth in the *Metromedia* decision.  If (as the Court of Appeals held in *Metromedia*) a Bankruptcy Court should be wary of imposing third party releases on creditors, then a Bankruptcy Court should be equally wary of approving voting procedures that effectively would impose those same releases on creditors who have not affirmatively manifested their consent to them.

Circumstances may justify a different approach in different cases.  Just as the *Metromedia* decision recognized that different cases might support different outcomes with respect to the imposition of involuntary third party releases, so too those same considerations could support different outcomes as to the voting procedures in individual cases.  The Court does not know what considerations were debated in those cases that approved voting procedures like the ones the Debtors proposed in this case (or, indeed, if any objections were made in those cases).  In these cases, however, the Court was not persuaded that the proposed procedures were appropriate.

As to creditors who might vote in favor of the proposed Plan: the Court noted that many courts have treated a vote in favor of a Plan as a "consent" to third party releases.  *Metromedia*,

416 F.3d at 142; *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993); *In re MPM Silicones, LLC*, No. 14-22503, 2014 WL 4436335, at *32 (Bankr. S.D.N.Y. Sep. 9, 2014).  Here, however, the Plan contemplated the possibility that a class of unsecured creditors might not approve the Plan, in which case all recoveries to unsecured creditors were to be cancelled.  In that event, the Plan contemplated that a creditor who voted in favor of the Plan would still be deemed to have consented to the release of that creditor's third party claims, even though the creditor would have received no consideration at all (through the Plan) in exchange for the creditor's affirmative vote.  The Court noted at the April hearing that if such a circumstance arose, the Court would need to reserve judgment on the issue of whether a creditor had truly "consented" to third party releases.  The disclosure materials were therefore modified to state that the Debtors intended to argue that a vote in favor of the Plan would constitute a "consent" to third party releases, but that the Court had not ruled on that issue and would not do so until the Confirmation Hearing.

As to creditors who might vote to reject the Plan: the Court noted that it was difficult to understand why any other action should be required to show that the creditor also objected to the proposed third party releases.  If (as prior cases have held) a creditor who votes in favor of a plan have implicitly endorsed and "consented" to third party releases that are contained in that plan, then by that same logic a creditor who votes to reject a plan should also be presumed to have rejected the proposed third party releases that are set forth in the plan.  The additional "opt out" requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.  In response, the Debtors agreed to modify the proposed Ballots so that creditors who rejected the Plan would be given the ability to "opt in" to the proposed releases by checking a box indicating their desire to do so.  The revised disclosure

24

materials stated clearly that if a creditor rejected the Plan, and did not affirmatively "opt into" the proposed releases, the creditor would not have consented to the releases.

As to other creditors (those who failed to return ballots or were not entitled to vote): the Court noted that final decisions as to whether or not they could be said to have "consented" to releases did not need to be determined in connection with the motion for approval of the Ballots and disclosure materials. However, the Court directed that the Ballots and disclosure materials be modified to make clear that although the Debtors intended to argue that such creditors had consented to the proposed releases, the Court had not ruled on that issue and would not do so until the Confirmation Hearing.

### B.    The Definition of Consenting Creditors

As noted above, the proposed Plan (as modified on June 30, 2015) included the following proposed definition of "Consenting Creditors:"

> ***Consenting Creditors*** means (a) any holder of a Claim other than any holder who voted to reject the Plan and elected not to provide the release (as set forth on the applicable ballot), and (b) any Released Party.

A similar approach was reflected in the terms of Section 10.7 of the Plan, though the term "Consenting Creditors" is not used in that provision.

At the Confirmation Hearing the Court expressed concern as to whether the proposed terms were consistent with the disclosure materials that had been sent to creditors, which (as noted above) had informed creditors that the Court would determine, at the Confirmation Hearing, the extent to which particular creditors had or had not "consented" to the proposed releases. The Debtors agreed at the Confirmation Hearing that they only sought to impose releases on creditors who had actually consented to those releases, and that the Court retained the power to determine whether creditors had or had not provided such consent. The Debtors also

agreed that the Plan would be deemed to be modified to confirm with a ruling by the Court on the "consent" issues.

The Court agrees that "Consenting Creditors" should include creditors who voted in favor of the Plan. The ballots and disclosure materials clearly set forth the terms of the proposed releases and the parties who would benefit from them. As noted above, case law in this District and elsewhere supports the conclusion that the creditors' vote for the Plan constitutes a consent to the releases. The issue that gave the Court concern at the Disclosure Statement hearing (the possibility that a creditor might vote for the Plan but then receive nothing) did not materialize, as the Plan was approved by all voting classes.

Similarly, creditors who rejected the Plan, but who nevertheless "opted in" to the releases, have consented to those releases. A clearer form of "consent" can hardly be imagined.

However, as to creditors who were entitled to vote, but who chose to take no action at all: under the circumstances of this case it would be inappropriate to treat such inaction as a "consent" to third party releases. Prior to a settlement with the Committee, which occurred shortly before the voting deadline, the affected voting creditors in these cases were scheduled to receive only their *pro rata* shares of $2 million in distributions. (Trade Creditors who agreed to provide trade credit were to share *pro rata* in an additional $4 million pool.) The relatively small recoveries that were initially proposed, and the widely-publicized fact that other creditor groups had endorsed the proposed Plan, could easily have prompted an even higher-than-usual degree of inattentiveness or inaction among affected creditors in these cases. Furthermore, many creditors may simply have assumed that a package that related to the Debtors' bankruptcy case must have related only to their dealings with the Debtors and would not affect their claims against other parties. Charging all inactive creditors with full knowledge of the scope and implications of the

26

proposed third party releases, and implying a "consent" to the third party releases based on the creditors' inaction, is simply not realistic or fair, and would stretch the meaning of "consent" beyond the breaking point. *See In re Washington Mut. Inc.*, 442 B.R. 314, 355 (Bankr. D. Del. 2011) (holding that "inaction" was not a sufficient manifestation of consent to support a release).

As to creditors and interest holders who were deemed to reject the Plan (and therefore were given no opportunity to vote or to "opt in" to the releases): it would defy common sense to conclude that those parties had "consented" to releases. Voting creditors who chose to reject the Plan are not bound by the releases unless they "opted in" to them. Creditors and interest holders who were deemed to reject the Plan should similarly be deemed to have rejected the third party releases in the absence of an affirmative act manifesting a contrary consent. Since no "opt in" mechanism was provided for creditors and interest holders who were deemed to have rejected the Plan, those parties have not "consented" to the proposed third party releases. *See, e.g., In re Chemtura Corp.*, 439 B.R. 561, 609-613 (Bankr. S.D.N.Y. 2010) (refusing to enforce third party releases against creditors who were provided with no mechanism by which they could express their desires to grant or to withhold such releases).

As to "unimpaired" creditors: the Bankruptcy Code provides that a class of creditors that is not impaired under a plan is "conclusively presumed" to have accepted the plan. *See* 11 U.S.C. § 1127(f). Many courts have held that as a result an impaired class of creditors also is presumed to have consented to any third party releases that are set forth in a plan. *See, e.g., In re Indianapolis Downs, LLC*, 486 B.R. 286, 304-06 (Bankr. D. Del. 2006). However, this proposition requires further analysis. Normally a creditor is "unimpaired" if a plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." *See* 11 U.S.C. § 1124. If a creditor must release a claim

27

against a third party under a plan (as a condition to whatever payment or other treatment the plan provides for the creditor's claim against the debtor), it is difficult to understand how such a creditor could properly be considered to be "unimpaired" by the Plan in the first place.

At the Confirmation Hearing, counsel to Platinum argued that the released claims all relate to the Debtors and that the full payment of "unimpaired" creditors' claims would fully satisfy such claims. However, if that were true then the releases would be unnecessary. There are only two possibilities as to creditors whose claims are paid in full: either the releases only relate to the claims that the Debtors themselves are satisfying (in which case the releases serve no purpose), or the releases cover claims that the creditors might be able to pursue notwithstanding the satisfaction of their claims against the Debtors – in which case there is no good basis on which to say that the Debtors' satisfaction of the Debtors' own liabilities should constitute a deemed "consent" by the creditors to the release of their claims against other parties.

For these reasons, the Court concludes that unimpaired creditors should not be deemed to have consented to the third party releases set forth in the Plan. *See, e.g., In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 270 (Bankr. S.D.N.Y. 2014) ("The Court agrees that simply classifying a party as unimpaired does not mean that they should be somehow automatically deemed to grant a release where the requirements of *Metromedia* have not been met.").

Based on the foregoing, the definition of "Consenting Creditors" in the Plan must be replaced by the following definition:

> 1.27    ***Consenting Creditors*** means (a) any Released Party, (b) any holder of a Claim who voted to accept the Plan, and (c) any holder of a Claim who voted to reject the Plan but who affirmatively elected to provide releases by checking the appropriate box on the ballot form.

In addition, the releases set forth in Section 10.7 must be modified to make clear that the only creditors and holders of interests who are granting such releases are Consenting Creditors, as that

28

term is defined above.  These changes will be incorporated into the Confirmation Order and will

be deemed to be modifications to the proposed Plan.

### C.    Scope of the Releases

As originally proposed the releases would have applied not only to matters relating to the

Debtors' operations, but also to other matters.  Those portions of the releases were removed from

the Plan when the Court raised the issue at the Disclosure Statement Hearing.  As modified, the

releases relate only to matters that directly involve the Debtors and the parties' dealings with the

Debtors.  In light of the limitation of the releases to parties who have affirmatively consented to

grant them, and the limitation of the scope of the releases to matters involving the Debtors, the

releases are proper under *Metromedia*.  However, the scope of the releases should be clarified to

ensure that the limiting terms set forth in the releases apply to all of the releases that are granted.

The Platinum release, for example, applies to:

> . . . any and all claims, interests, obligations, rights, suits, judgments,
> damages, Causes of Action (including, without limitation, under any state or
> federal securities laws), remedies and liabilities ***whatsoever, including,
> without limitation***, any derivative claims, asserted or assertable on behalf of
> the Debtors, whether known or unknown, foreseen or unforeseen, existing or
> hereinafter arising, in law, equity or otherwise, that the Debtors, their Estates,
> the Reorganized Debtors or the Consenting Creditors would have been
> legally entitled to  assert in their own right (whether individually or
> collectively) or on behalf of the holder of any claim or interest or other entity,
> based on or relating to, or in any manner arising from, in whole or in part the
> issuance of the Unsecured Notes, the use of their proceeds, and any events
> related thereto.

(Emphasis added).  In context, it is not sufficiently clear that the limiting words at the end of the

paragraph apply to all of the releases, or whether they apply only to the specific claims that

follow the word "whatsoever."  The Court will include terms in the Confirmation Order that

make clear that the limiting terms in the release set forth in Section 5.2 of the Plan apply to the

entire paragraph and to all of the releases set forth therein.  The Court will also include terms in

29

the Confirmation Order that make clear that the limiting terms in the release set forth in Section

10.7 of the Plan apply to the entire paragraph and to all of the releases set forth therein.

### Conclusion

For the foregoing reasons, the objections filed by Benefit Street are overruled.  The

definition of "Consenting Creditors" will be modified and Sections 5.2 and 10.7 of the Plan will

be deemed to be modified and clarified in the way set forth above.

Dated: New York, New York
       July 9, 2015

s/Michael E. Wiles
UNITED STATES BANKRUPTCY JUDGE